# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Objection Deadline: At the Hearing** |
| | ) **Hearing Date: April 6, 2020 at 1:00 p.m. (ET)** |
| | ) |

## DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this motion (this "Motion"), pursuant to section 1112(a) of title 11 of the United

States Code (the "Bankruptcy Code"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed

Order"), (i) converting each of the Debtors' chapter 11 cases to cases under chapter 7 of the

Bankruptcy Code, effective as of 12:00 a.m. (prevailing Delaware time on April 7, 2020 (the

"Conversion Date"), (ii) establishing a deadline for filing final chapter 11 fee applications and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A000304

setting a hearing thereon, and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

<b>PRELIMINARY STATEMENT[2]</b>

1.    These Chapter 11 Cases were pending for just three days when on March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) outbreak to be a pandemic.[3]  These Chapter 11 Cases were pending for just five days when on March 13, 2020, the Trump administration declared a national emergency in response to the COVID-19 outbreak.[4] These Chapter 11 Cases were pending for just six days when on March 14, 2020, government regulators in Pennsylvania, one of four states in which the Debtors' core retail operations are concentrated, issued guidance urging all non-essential retail businesses to close, with other states and localities soon to follow.[5]  And, these Chapter 11 Cases were pending for just eleven to fourteen days when the four states in which the Debtors' principal operations are located — Michigan, Pennsylvania, Ohio and Illinois — issued "stay at home" or "shelter in place" orders requiring, among other things, all non-essential businesses (including the Debtors' retail stores) to shut their doors and mandating that individuals not leave their homes except in limited circumstances.[6]

---

[2]    Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion.

[3]    World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).

[4]    Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).

[5]    Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/).

[6]    **Michigan:** Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020 (https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html); **Pennsylvania:** Gov.

13308537 v1                                                                                                        A000305

2.     Even before government action in response to the COVID-19 pandemic made it impossible for the Debtors' retail operations to continue, the consumer public's understandable fear of the spread of the COVID-19 disease already had a devastating impact on the Debtors' ability to implement their original restructuring plan.  These key components included (a) the continuation of Store Closing Sales at substantially all of the Debtors' 125 Art Van Furniture, Art Van Pure Sleep and Scott Shuptrine Interiors branded locations and eight of the Debtors' Wolf Furniture branded locations, and (b) the operation of 44 Levin Furniture, Levin Mattress and Wolf Furniture locations pending consummation of a going concern sale of those business lines and related assets that was contemplated at the outset of these proceedings.  Unfortunately, by the conclusion of the week ending March 14, 2020, customer traffic in the Debtors' stores — both those participating in the Store Closing Sales program and the Levin and Wolf going concern locations — precipitously dropped below what any of the Debtors' pre-bankruptcy and pre-COVID-19 pandemic financial could have predicted.  As a consequence, it was quickly evident that continued retail operations of any sort would cause the Debtors to incur expenses for the foreseeable future that far outstripped the revenues generated.  Ultimately, of course, the aforementioned restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease effectively removed any choice the Debtors had in the matter by mandating that the Debtors discontinue all retail operations and other non-essential business operations.

---

Tom Wolf, Executive Order, dated March 19, 2020 (https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf); **Ohio:** Dir. Of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020 (https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf); and **Illinois:** Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020 (https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf).

3.      By late March, the exponential spread of the COVID-19 disease throughout the United States, along with the resulting state and locally imposed limitations and prohibitions on non-essential retail operations, had left the Debtors with few potentially viable options.  Further, these extraordinary and unprecedented events have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the best path forward in these proceedings for the Debtors and their estates.  At present, no one can predict with any reliability how long the shelter-in-place orders issued in many states where the Debtors operate will remain in effect.  In fact, the Trump administration just recently extended social distancing guidelines from April 15, 2020 through April 30, 2020.[7]  And, even assuming regulatory barriers to resuming retail operations are lifted in the near future, no one can predict with any reliability what consumer appetite will exist for furniture, given the economic and other trauma that the nation is undergoing presently.[8]

4.      In order to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that may eventually be distributable to their creditors, the Debtors had initially hoped — consistent with what has been recently approved in certain other retail chapter 11 bankruptcy proceedings[9] — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these chapter 11 cases until such time as the broader economic and public safety

---

[7]      See, e.g., Michael D. Shear, "Trump Extends Social Distancing Guidelilnes Through End of April," *The New York Times* (Pub. March 29, 2020, updated April 1, 2020) (https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html).

[8]      See, e.g., Ed Yong, "How the Pandemic Will End," *The Atlantic* (March 25, 2020) (exploring different plausible scenarios for resolution of the COVID-19 epidemic with some taking 12-18 months for society to return to a level of normalcy).

[9]      See Order Establishing Temporary Procedures and Granting Related Relief, entered March 30, 2020 [D.I. 217], *In re CraftWorks Parent, LLC, et al.,* Case No. 20-10475 (BLS) (Bankr. D. Del.); Order Temporarily Suspending the Debtors' Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, entered March 27, 2020 [D.I. 166], *In re Modell's Sporting Goods, Inc., et al.,* Case No. 20-14179 (VFP) (Bankr. D.N.J.).

4

 A000307

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to this Court and parties in interest at the status conference held that day.

5.    Unfortunately, despite the Debtors and their advisors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, no viable path forward in chapter 11 emerged that would garner the support of the Debtors' senior secured lenders and certain other stakeholders.  With the COVID-19 pandemic still raging and by all reputable accounts likely to get worse in the next several weeks before it improves, the execution risk associated with any of these strategies appears to be unacceptably high for the Debtors to garner the support their senior secured lenders and other stakeholders necessary for the Debtors to be able to move forward.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is likely inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consummated by the time the Debtors and their senior secured lenders conceivably might have some visibility into if or when any of these restructuring alternatives could be successfully implemented.

6.    Furthermore, the Debtors have no ability, without the consent of the Prepetition ABL Agent, to implement any case suspension-based restructuring strategy.  Of necessity, on or about March 19, 2020, after communicating with representatives of the Prepetition ABL Agent on several occasions about the Debtors' increasing operating losses and need to take appropriate

13308537 v1

A000308

action to prevent further dissipation of the Debtors' assets, the Debtors ceased operating their retail stores as going concerns and thereafter dismissed the vast majority of their employees. As a result, the Debtors have no top line revenue, such that each dollar expended by the Debtors at this point is not being replaced. For this and other reasons, the Debtors have no ability to demonstrate that their secured lenders are adequately protected to the degree required for the Debtors continue using cash collateral and other collateral without their consent. And, under the terms of the Interim CC Order, absent extraordinary relief from the Court, the consent of the Senior Secured Parties to use cash collateral and other collateral will expire no later than the end of the day Monday, April 6, 2020.

7.    The Debtors, thus, find themselves with no choice other than to move for the prompt conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Though this path is a difficult one that the Debtors are following only after exhausting all other alternatives, under these dire circumstances, the Debtors believe that converting these cases is in the best interests of the Debtors' estates. The Debtors understand that the conversion of Chapter 11 Cases is supported by the Debtors' senior lenders and not opposed by the Committee.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13308537 v1

A000309

10. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The statutory bases for the relief requested herein are section 1112(a) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

### A. General Background.

12. On March 8, 2020 (the "Petition Date"), each of the Debtors commenced with this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13. The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS) pursuant to Bankruptcy Rule 1015.

14. Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 12], incorporated by reference herein.

15. At the commencement of these cases, the Debtors operated 169 stores in eight states, specifically Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, West Virginia, and Virginia.[10] The Debtors also have four regional distribution centers, three of which are leased and one of which is owned. The Debtors are headquartered in Warren, Michigan and had approximately 4,500 employees as of the Petition Date.

---

[10] The vast majority of the Debtors' stores were located in four states: Michigan; Ohio; Pennsylvania; and Illinois. The remaining five states listed above accounted for only 16 of the Debtors' 169 retail locations as of the Petition Date.

13308537 v1

A000310

16. As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases with the intention of liquidating their inventory through store closing sales (the "Store Closing Sales") conducted with the assistance of the Consultant and other proposed professionals, paying down their secured debt, and using any remaining proceeds of their Store Closing Sales to windup their operations. Also as set forth in the First Day Declaration and Exhibit B thereto, as of the Petition Date, the Debtors were party to a binding letter of intent for a going concern sale of 44 Levin and Wolf stores and related assets and operations (the "Levin-Wolf Sale"). The Debtors intended to effectuate this restructuring through the consensual use of cash collateral.

17. In furtherance thereof, on or around the Petition Date, the Debtors filed, among other things:

    a. *Debtors' Application for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 3];

    b. *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 5]; and

    c. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to § 327(a) of the Bankruptcy Code and (V) Granting Related Relief* [D.I. 52] (the "Store Closing Motion").

18. On March 10, 2020 (as continued, in part, to March 12, 2020), the Court held a hearing (the "First Day Hearing") following which it entered certain orders, including: (a) an order [D.I. 77], pursuant to 28 U.S.C. § 156(c), appointing Kurtzman Carson Consultants LLC ("KCC") as the Claims and Noticing Agent for these Chapter 11 Cases (the "Claims Agent"); (b) the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,

A000311

and (V) Granting Related Relief [D.I. 93] (the "Interim CC Order"); and (c) an order [D.I. 143] granting limited relief in connection with the Store Closing Motion on an interim basis.

19.     Shortly after the Petition Date, the Debtors filed applications to employ and retain: (a) Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"), as their proposed general bankruptcy counsel [D.I. 142]; (b) Montgomery McCracken Walker & Rhoads ("MMWR"), as their proposed special counsel [D.I. 193]; (c) Alvarez & Marsal North America LLC ("A&M"), as their proposed financial advisors [D.I. 145]; and (d) Jones Lang Lasalle Americas, Inc. ("JLL," and together with Benesch, MMWR and A&M, the "Debtors' Professionals"), as their proposed real estate consultants and advisors [D.I. 141].  The applications to employ and retain Benesch, A&M and JLL, each are scheduled to be heard on April 6, 2020, at 1:00 p.m. (ET).  The application to employ and retain MMWR is scheduled to be heard on April 27, 2020, at 2:00 p.m. (ET).

20.     On March 18, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a seven member Official Committee of Unsecured Creditors in these Chapter 11 Cases (as reconstituted from time to time, the "Committee").  The Committee has engaged and filed applications to employ and retain Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as its proposed counsel [D.I. 244] and Alix Partners ("Alix Partners," and together with Pachulski Stang, the "Committee's Professionals"), as its proposed financial advisor [D.I. 241].

**B.  Events in the Chapter 11 Cases.**

21.     Since the First Day Hearing, the exponential spread of COVID-19 has wrought economic and social havoc across the country and the globe.  As discussed in the Preliminary Statement, on the afternoon of March 13, 2020, President Trump declared COVID-19 a national

A000312

emergency and most of the states in which the Debtors operate have also declared states of emergency and issued "stay at home" or "shelter-in-place" type orders.

22.     Notwithstanding the careful planning and modeling of the Debtors and their advisors, since shortly after the Petition Date, the Debtors' situation has changed drastically as a result of COVID-19. Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the Store Closing Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23.0 million;[11] however, for the full week ending March 15th, deposits from sales were just $8.0 million. It quickly became apparent to the Debtors' management and advisory teams that continued retail operations of any sort were causing the Debtors to incur expenses (and would do so for the foreseeable future) that far outstripped any revenues being generated through the Debtors' continued retail operations.

23.     By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[12] Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …."[13] Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan — where

---

[11]    The Debtors, however, did not realize the cash proceeds from most of these sales because just prior to the Petition Date and immediately thereafter, certain of the Debtors' credit card processor banks purported to exercise rights to intercept the proceeds from such transactions and redirect them into chargeback reserve accounts.

[12]    Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/)

[13]    Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts, March 16, 2020 (https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/).

A000313

the Debtors' headquarters, a distribution center and 82 of their stores are located — entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[14] While Michigan's initial order did not explicitly mandate closing of all non-essential retail establishments, it was accompanied by appropriately alarming statement from Governor Whitmer urging Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[15] Government authorities in Ohio and Illinois also issued similar guidance and direction.

24.     As detailed in the Preliminary Statement, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations are located to issue a "stay at home" or "shelter in place" type order. Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.

25.     Although the situation was evolving rapidly, the Debtors' board, management team and advisors were paying close attention to the threat COVID-19 posed to the health and welfare of the Debtors' employees and customers and to the financial impact on the Debtors' businesses. The Debtors' board, management team and advisors were in near constant communication about these events as they unfolded in mid-March. Moreover, the Debtors and their advisors worked to the best of their ability under these circumstances to keep their secured lenders and other stakeholders informed about these challenges and exhausted all efforts to work with them to develop viable responses to the rapidly deteriorating situation. When no other viable alternative emerged, on March 19, 2020, the Debtors made the painful decision to suspend all retail operations

---

[14]     Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders, March 16, 2020 (https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521763--,00.html).

[15]     *Id.*

A000314

and terminate the majority of their employees — moves the Debtors hoped at the time would be only temporary measures.

26.     Further compounding the Debtors' problems, on March 19, 2020 the proposed purchaser for the Levin-Wolf Sale notified the Debtors that they would not proceed with the transaction at that time, effectively ending any hope the Debtors had to consummate a going concern transaction for the Levin and Wolf furniture operations and dashing hopes to save upwards of a 1,000 jobs.

27.     Late in the day on March 19, 2020, however, the Prepetition ABL Agent issued a purported Termination Declaration under the Interim CC Order.  Pursuant to Paragraph 21 of the Interim CC Order, a valid Termination Declaration issued on March 19th would have triggered a Remedies Notice Period five business days' in length.  Thereafter, the Prepetition ABL Agent agreed to extend any Remedies Notice Period relating to the alleged Termination Declaration through the end of the day on Tuesday, March 31, 2020, and then again through and including the end of the day on Monday, April 6, 2020.

28.     Following these events, the Debtors and their advisors continued to work with the Prepetition ABL Agent, the Committee, and their respective advisors to identify solutions for the Debtors' deteriorating situation that would allow them to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that might eventually be distributable to their creditors.  The Debtors had hoped — consistent with what has been recently approved this Court in the *CraftWorks* chapter 11 cases and by the District of New Jersey bankruptcy court in the *Modell's* chapter 11 cases — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these Chapter 11 Cases until such time as the broader economic and public safety

A000315

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to the Court that day.

29.    Both before and after the March 26th status conference, the Debtors, with the assistance of their advisors and in consultation with the Prepetition ABL Agent, the Committee and their respective advisors, were working to develop and evaluate several potentially value maximizing alternatives for the Debtors to pursue after the contemplated suspension of operations and downscaling of activities in these Chapter 11 Cases came to an end.  One such path was to resume Store Closing Sales at all of the Debtors' locations where it would be financially and operationally viable to do so.  A second path considered was to focus on one or more bulk sales most or all of the Debtors' inventory, equipment, and other readily monetizable assets. Additionally, the Debtors and their advisors examined several "middle" paths for the Debtors and their estates, which would involve various combinations of resuming Store Closing Sales at certain locations and bulk-selling inventory, equipment, and certain other assets associated with other locations.

30.    To be clear, each of the post-suspension restructuring alternatives explored by the Debtors had the prospect of producing some return to the Debtors' senior secured lenders and potentially to other stakeholders.  But none of the potential scenarios showed a reasonable chance of generating a recovery for the Debtors' senior secured lenders coming anywhere near what the pre-COVID 19 pandemic modeling had suggested.  Indeed, under most scenarios, the Prepetition ABL Secured Parties, which at the outset of these proceedings were projected to receive a full

A000316

recovery on their approximately $34 million of Prepetion ABL Obligations by the mid-point of the Store Closing Sales Process, would not get out whole before their ABL Priority Collateral was fully monetized.

31.     Despite the Debtors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, these concerted efforts were unable to produce a path forward in chapter 11 that would garner the support of their senior secured lenders and potentially other stakeholders.  Unfortunately, with the COVID-19 pandemic still raging and by all reputable accounts likely to get worse before it improves, the perceived execution risk of any of these restructuring strategies has proven to be an insurmountable  barrier to the Debtors ability to obtain the necessary support of their secured lenders and others.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the reasonable best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consumed by operating expenses before the Debtors and their senior secured lenders would have meaningful visibility into whether these restructuring alternatives could be successfully implemented.

32.     By Monday, March 30, 2020, the Debtors were effectively out of time, with their access to Cash Collateral under the Interim CC Order then due to terminate at the end of the following day.  Although it was clear by this point in the proceedings that the Debtors would be unable to continue these Chapter 11 Cases without the support and consent of their senior secured lenders, unresolved issues existed as to what obligations would and would not be funded under the terms of the Interim CC Order prior to any conversion of the Chapter 11 Cases.  Recognizing the contributions that their employees had made to the Debtors' businesses postpetition and the

13308537 v1

A000317

extreme hardship that many of the employees and their families were apt to experience as a result of losing their jobs in the midst of an ongoing pandemic and associated economic crisis, the Debtors attempted everything in their power to ensure that employee payroll and related employee obligations would be fully funded under the Interim CC Order.

33.     These efforts were to a degree successful.  At a hearing held on March 31, 2020, the Court confirmed that the Debtors would have access to Cash Collateral to fund and pay current payroll obligations, including wages, salaries and commissions.  The cash available, however, was insufficient for it to be possible for the Debtors to provide at this time for payment in full of other employee related obligations, such as coverage obligations for employee healthcare expenses and certain other benefits plans that were, in whole or part, self-funded by the company.[16]  Even though this situation is primarily the result of the COVID-19 pandemic and other circumstances entirely beyond the Debtors' control, the Debtors deeply regret that they are not in a position to be able to do more for their employees, customers, vendors, landlords and other stakeholders.

34.     Based upon the foregoing, the Debtors have considered the circumstances in which they find themselves, and have concluded that converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates.

---

[16]     The Debtors estimate the total unfunded trailing liabilities under their partially self-funded employee health plan to be approximately $8.5 million. Under self-funded plans, like the ones the Debtors had established for their employees in the ordinary course of business prior to the Petition Date, when employees and their covered dependents receive covered services the resulting charges are remitted to the plan's claims administrator for processing.  Thereafter, the approved claims are batched and remitted to the Debtors for payment.  The remittance of the batched claims to the Debtors for payment can trail the rendering of services to employees by up to several months. In general, the Debtors terminated health care covered for their employees effective as of the dates such employees separated from the company.  Thus, the estimated $8.5 million of trailing obligations is on account of covered healthcare services to covered persons provided prior to each such employee's termination date.  Although the Debtors' original budget for these Chapter 11 Cases contemplated the funding of such trailing employee healthcare plan obligations, the COVID-19 pandemic's disruption of the Debtors' ability to operate postpetition  combined with the issuance of a Termination Declaration under the Interim CC Order that followed, left the Debtors with inadequate cash on hand and inadequate access to additional cash with which to fund such obligations.

## RELIEF REQUESTED

35.     By this Motion, the Debtors request entry of the Proposed Order, pursuant to section 1112(a) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date, (ii) establishing a deadline for filing final chapter 11 professional fee applications and setting a date for a hearing thereon, and (iii) granting related relief.

36.     The Debtors also request that the Court approve the following procedures in connection with the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code (the "Conversion Procedures"):

a.  **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

b.  **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain

A000319

copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

## **BASIS FOR RELIEF**

### A. **The Conversion Relief Should be Granted**

37. Section 1112(a) of the Bankruptcy Code provides that a debtor may convert a case to chapter 7 as a matter of right. *See* H.R. Rep. No. 95-595, 1st Sess. 405 (1977) ("Subdivision (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case"); *see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) ("[A] debtor has the absolute right to convert [its] Chapter 11 case to a Chapter 7 case"). There are only three circumstances where a debtor is precluded from exercising that right: (i) the debtor is not a debtor in possession; (ii) the case was originally commenced as an involuntary case under chapter 11; or (iii) the case was converted to a case under chapter 11 other than at the debtor's request. 11 U.S.C. § 1112(a).

A000320

None of those exceptions is applicable in these Chapter 11 Cases. Therefore, the Debtors are entitled, as an absolute right, to convert the Chapter 11 Cases to cases under chapter 7.

38.     In addition, conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates and creditors. The Debtors no longer have funding to administer these Chapter 11 Cases. Thus, although there is substantial inventory and equipment remaining in the Debtors' stores and distribution centers and other estate assets that may be available to satisfy certain creditor claims, without an ability to fund ongoing administrative expenses, the Debtors have no ability to pursue the recovery of those assets or prosecute a chapter 11 plan. Accordingly, the Debtors believe there is no reasonable likelihood that the Debtors could confirm and consummate a chapter 11 plan, and respectfully submit that a chapter 7 trustee will be able to more efficiently and effectively bring these cases to their conclusion.

39.     Accordingly, the Debtors respectfully request that the Court enter an order converting the Debtors' cases from chapter 11 to chapter 7, effective as of the Conversion Date.

**B.     The Conversion Procedures and Other Related Relief Should Be Approved**

40.     Pursuant to Local Rule 2002-1(f)(xi), "[u]pon conversion of a chapter 11 case to a chapter 7 case, if there are more than 200 creditors, the claims agent appointed in the chapter 11 case shall . . . submit a termination order." Del. Bankr. L.R. 2002-1(f)(xi).

41.     Accordingly, the Debtor requests that the conversion order sought hereby also provides for the termination of KCC services as claims and noticing agent in these Chapter 11 Cases.

42.     The Debtor also believes that the Conversion Procedures are appropriate under the facts of this case and should be approved. The Conversion Procedures include, among other things, a request to extend the deadline under Bankruptcy Rule 1019(1)(A) for the filing of any statements

and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) from fourteen (14) days after the Conversion Date to forty-two days (42) after the Conversion Date.

43.     The Court has authority to grant the requested extension under Bankruptcy Rules 1007(c) and 9006(b) and Bankruptcy Local Rule 1007-1(b). Bankruptcy Rule 1007(c), together with Bankruptcy Rule 9006(b), allows the Court to extend the filing deadline for the Schedules and Statements "for cause shown." Similarly, Bankruptcy Local Rule 1007-1(b) provides that such an extension may be granted for cause. Showing "cause" merely requires that a debtor "demonstrate some justification for the issuance of the order," and bankruptcy courts will normally grant such extensions "in the absence of bad faith or prejudice to the adverse party." *See, e.g., Bryant v. Smith,* 165 B.R. 176, 182 (W.D. Va. 1994) (discussing the standard for granting extensions under Bankruptcy Rule 1007) (internal citations and quotation marks omitted).

44.     Because of the COVID-19 pandemic and other extremely difficult circumstances that have defined these Chapter 11 Cases, the Debtors and their advisors have had virtually no free time or resources available since he Petition Date to devote to the preparation of schedules and statements required by Bankruptcy Rules 1019(1)(A) and 1007(b).  Given the extent of work that remains to be done and the extremely limited resources remaining with which to undertake such work, which conditions both exist through no fault of the Debtors and their advisors, the Debtors' respectfully submit that "cause" exists to extend this deadline. Moreover, since these proceedings are still in their very early stages, the granting of such an extension is unlikely to prejudice the trustee, any creditor or any other party in interest.

## NOTICE

45.     Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of Delaware; (ii) proposed counsel for the Committee; (iii) the agents under the Debtors' prepetition

13308537 v1

A000322

secured facilities and counsel thereto; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. A copy of this Motion is also available on the website of the Debtors' notice and claims agent at https://www.kccllc.net/artvan. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

### RESERVATION OF RIGHTS

46.     The Debtors understand that employee payroll, the Carve Out and all other obligations that are required to be funded and paid under the Interim CC Order, including without limitation Paragraph 2 thereof, have been or will be funded and paid prior to the Conversion Date. Nevertheless, in the event that such obligations are not funded and paid as required under the Interim CC Order, the Debtors reserve all rights for themselves and their estates, including but not limited to any chapter 7 trustee that may hereafter be appointed.

13308537 v1

A000323

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other relief as is appropriate under the circumstances.

Dated:  April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        kharmon@beneschlaw.com
        jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

13308537 v1

A000324

# Exhibit A

A000325

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: D.I. _____** |
|  | ) |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED, as set forth herein.

2.      Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.      The following Conversion Procedures are hereby approved:

   a. **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

13308536 v1

A000327

b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4. Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5. Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting*

3

A000328

*Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.  Except as expressly provided in Paragraph 5 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order).

7.  For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or

4

A000329

(ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

8.    Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

9.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Objection Deadline: At the Hearing** |
| | ) **Hearing Date: April 6, 2020 at 1:00 p.m. (ET) (requested)** |
| | ) |

## NOTICE OF VIDEO AND TELEPHONIC HEARING REGARDING DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING <u>A HEARING THEREON, AND (III) GRANTING RELATED RELIEF</u>

**PLEASE TAKE NOTICE** that on April 3, 2020, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed the *Debtors <u>Corrected</u> Motion for Entry of an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the "<u>Motion</u>") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "<u>Bankruptcy Court</u>"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on **April 6, 2020 at 1:00 p.m. (ET)**, before the Honorable Chief Judge Christopher S. Sontchi via video and telephonic conference.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A000331

**PLEASE TAKE FURTHER NOTICE THAT THE HEARING IS PROCEEDING VIA ZOOM USING THE FOLLOWING INSTRUCTIONS:**

> **Topic: Art Van Furniture 20-10553 - Hearing**
> **Time: Apr 6, 2020 1:00 PM Eastern Time (US and Canada)**
> **Join Zoom Meeting**
> **https://uchicago.zoom.us/j/911880719**
> **Meeting ID: 911 880 719**

**DO NOT COME TO THE COURTHOUSE. ANY PARTY WHO WISHES TO PRESENT EVIDENCE OR EXAMINE WITNESSES IS REQUIRED TO ACCESS VIA ZOOM. ANY PARTY WHO WISHES TO ACCESS VIA ZOOM MUST ALSO MAKE AUDIO ARRANGEMENTS THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**OTHER PARTIES IN INTEREST MAY MAKE ARRANGEMENTS TO PARTICIPATE BY TELEPHONE AT THE HEARING THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**PLEASE TAKE FURTHER NOTICE THAT, IF NO RESPONSES OR OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

A000332

Dated:  April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**

  */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
       mbarrie@beneschlaw.com
       jhoover@beneschlaw.com
       kcapuzzi@beneschlaw.com
       kharmon@beneschlaw.com
       jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

A000333