## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, *et al.*,[1]<br><br>        Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>(Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>ART VAN FURNITURE, LLC, *et al.*,<br><br>        Defendants. | Adv. Proc. No. 20-50548 (CSS) |

## MEMORANDUM IN SUPPORT OF
## CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (DE Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: bsandler@pszjlaw.com
    blevine@pszjlaw.com
    crobinson@pszjlaw.com
    pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

A000390

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF NATURE AND STATUS OF PROCEEDING ....................................1

II.   SUMMARY OF ARGUMENT ...................................................................1

III.  STATEMENT OF MATERIAL FACTS TO
      WHICH THERE IS NO GENUINE DISPUTE...................................................4

      A.   General Background ......................................................................4

      B.   The Planned Liquidation Process........................................................5

      C.   The Chapter 11 Cases ....................................................................8

      D.   The Rapid Escalation of the COVID-19 Pandemic ..................................9

      E.   The Plaintiffs' Termination and the Conversion to Chapter 7.............................11

      F.   The Adversary Proceeding..............................................................15

IV.   ARGUMENT ......................................................................................15

      A.   Summary Judgment Standard ..........................................................16

      B.   The WARN Act ..........................................................................17

      C.   There is No Genuine Dispute That AVF Was a Liquidating Fiduciary At
           the Time of the Layoff and Not Subject to the WARN Act ..................................17

      D.   The Governmental Mandated "Shelter in Place" and "Stay at Home"
           Orders Were "Not Reasonably Foreseeable" and Thus, the Debtors Were
           Not Subject to the Notice Provisions of the WARN Act....................................20

      E.   If the WARN Act Is Applicable, Which It is Not, the Debtors Were Not
           Required to Provide Any Notice Because the Layoff Was Due to the
           COVID-19 Pandemic -- a "Natural Disaster" For Purposes of the WARN
           Act.......................................................................................23

V.    CONCLUSION....................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re AE Liquidation, Inc.*
522 B.R. 62 (Bankr. D. Del. 2014) ........................................................................... 21

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 248 (1986) ......................................................................................... 16

*Bailey v. Jamesway*
1997 Bankr. LEXIS 825 (Bankr. S.D.N.Y. 1997) .................................................... 19

*Benson v. Enter. Leasing Co. of Orlando*, LLC
2021 U.S. Dist. LEXIS 55137 (D. M.D. Fla. Feb. 4, 2021) ..................................... 26

*Bostock v. Clayton Cty., Ga.*
140 S. Ct. 1731 (2020) .............................................................................................. 26

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) .................................................................................................. 16

*Czyzewksi v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*
496 B.R. 151 (Bankr. D. Del. 2013) (Hon. B. Shannon) ......................................... 21

*Easom v. US Well Servs*
2021 U.S. Dist. LEXIS 52941 (S.D. Tex. March 22, 2021) .......................... 22, 23, 26

*In Friends of Danny DeVito v. Wolf*
227 A.3d 872 (Pa. 2020), *cert. denied*, 141 S. Ct. 239 (2020) ................................ 25

*Hotel Employees & Restaurant Employees International Union Local 54 v. Elsinore Shore*
*Associates* 173 F.3d 175 (3d Cir. 1999) .................................................................... 21

*Ieradi v. Mylan Labs., Inc.*
230 F.3d 594 (3d Cir. 2000) ...................................................................................... 10

*JN Contemporary Art, LLC v. Phillips Auctioneers LLC*
2020 U.S. Dist. LEXIS 237085 (S.D.N.Y. Dec. 16, 2020) ...................................... 25

*Kasten v. Saint-Gobain Performance Plastics Corp.*
563 U.S. 1 (2011) ...................................................................................................... 23

*Matias v. Terrapin House, Inc.*
2021 U.S. Dist. LEXIS 176094 (E.D. Pa. Sept. 16, 2021) ....................................... 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
475 U.S. 574 (1986) .................................................................................................. 16

*Montemayor v. City of San Antonio*
276 F.3d 687 (5th Cir. 2001) .................................................................................... 17

*Pennsylvania Democratic Party v. Boockvar*
238 A.3d 345 (Pa. 2020) ........................................................................................... 25

*Reeves v. Sanderson Plumbing Prods., Inc.*
530 U.S. 133, 120 S. Ct. 2097 (2000) ...................................................................... 16

*Scully v. Allegheny Ludlum Corp.*
2006 U.S. Dist. LEXIS 105589 (W.D. Pa. Feb. 10, 2006) ....................................... 10

*In re United Healthcare System, Inc.*
200 F.3d 170 (3d Cir. 1999), *cert denied*, 530 U.S. 1204 (2000) ................... 17, 18, 19

A000392

**Page(s)**

**CASES** (continued)

*Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*
    481 B.R. 268 (Bankr. S.D. N.Y. 2012) ........................................................................ 18
*U.S. ex rel. Anderson v. N. Telecom, Inc.*
    52 F.3d 810 (9th Cir. 1995) (quoting *Celotex*, 477 U.S. at 327) ............................. 16
*United States v. Kindred Healthcare, Inc.*
    469 F.Supp.3d 431 (E.D. Pa. 2020) ........................................................................... 10
*United States v. Petway*
    2020 U.S. Dist. LEXIS 82954 (D.N.J. May 11, 2020) ............................................. 10
*Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*
    866 F.3d 515 (3d Cir. 2017).......................................................................................... 21
*Walsh v. Century City Doctors Hosp., LLC*
    *(In re Century City Doctors Hosp., LLC)*
    417 B.R. 801 (Bankr. C.D. Cal. 2009) ........................................................................ 18


**OTHER AUTHORITIES**

20 C.F.R. § 639.9 .............................................................................................................. 17
20 C.F.R. § 639.9(c).......................................................................................................... 23
29 U.S.C. § 2101 ................................................................................................. 3, 7, 13, 15
29 U.S.C. § 2101(a)(1)...................................................................................................... 17
29 U.S.C. § 2102 ............................................................................................................... 17
29 U.S.C. § 2102(a) .......................................................................................................... 17
29 U.S.C. § 2102(b)(2)(A)......................................................................................... 15, 20
29 U.S.C. § 2102(b)(2)(B) ..................................................................................... 3, 15, 23
29 U.S.C. § 2102 ............................................................................................................... 17
29 U.S.C.§ 2102(b)(2)(A).................................................................................................. 3
29 U.S.C. § 2104 ............................................................................................................... 17
Fed. R. Civ. P. 56(a) ......................................................................................................... 16
Fed.R.Evid. 201 ................................................................................................................ 10
Fed.R.Evid. 201(b)............................................................................................................ 10

A000393

Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee") to Art Van Furniture, LLC ("AVF"), Sam Levin, Inc. ("SLI") and related debtors (collectively, the "Debtors" or "Art Van") submits this memorandum of law, together with the declaration of Bradford Sandler (the "Sandler Declaration"), in support of his motion for summary judgment (the "Motion").

## I. STATEMENT OF NATURE AND STATUS OF PROCEEDING

1.      The Debtors commenced their chapter 11 bankruptcy cases on March 8, 2020. Upon the Debtors' motion, the chapter 11 cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020.

2.      On March 23, 2020, Plaintiffs initiated this adversary proceeding by filing their *Class Action Adversary Proceeding Complaint For Violation of WARN Act 29 U.S.C. § 2101, et seq.* in which they assert that the Debtors violated the WARN Act and seek, *inter alia*, judgment in favor of Plaintiffs and other similarly situated former employees for unpaid wages and other benefits and damages for up to 60 days that would have been otherwise paid.

3.      The Trustee filed an Answer on December 10, 2020, and in accordance with the Pretrial Scheduling Order, on October 29, 2021, the Trustee filed his First Amended Answer.

## II. SUMMARY OF ARGUMENT[1]

4.      This case arises out of AVF's termination of Todd Stewart and Jennifer Sawle ("Plaintiffs") on March 20, 2020, as part of the cessation of the Debtors' business caused by the COVID-19 global pandemic.

5.      Notwithstanding that the Debtors were liquidating their business prior to filing for bankruptcy on March 8, 2020 (the "Petition Date"), the Plaintiffs are seeking WARN Act damages

---

[1] Capitalized terms used but not defined in this Summary of Argument have the meanings ascribed to them in the balance of this brief, and all facts adverted to herein are supported by record citations in the balance of this brief.

A000394

because they were terminated as a result of the global COVID-19 pandemic. There are no genuine issues of material fact, and the Plaintiffs ignore a critical piece of information in their complaint that has enormous legal implications for their allegations: prior to the Petition Date (and prior to March 20, 2020), the Debtors had already started an orderly wind-down plan, comprised of going-out-of-business ("GOB") sales (commenced pre-petition) and an anticipated sale of the SLI stores to a third party buyer, Robert Levin, who previously owned those SLI stores. *See* Complaint, attached as **Exhibit Y** to Sandler Declaration, at ¶ 25 (pre-petition, "Debtors began to execute on its planned liquidation."). Indeed, on March 5, 2020, Art Van had publicly announced that it was liquidating and going out of business, and in an abundance of caution, had provided a WARN Act notification to its employees that their employment would terminate on May 5, 2020. That, of course, was before the global economy shut down as a result of the COVID-19 pandemic.

6.      The Debtors then filed their Chapter 11 Cases on March 8, 2020, to further implement and facilitate their Planned Liquidation Process which was designed to liquidate their assets and pay down their secured creditors, which were owed in excess of $200 million.

7.      However, by mid-March 2020, the world economy had changed drastically, as the COVID-19 pandemic surged and governmental authorities started to issue extensive business restrictions by imposing business shutdowns and "stay at home" orders. In this unprecedented, unforeseeable situation, on March 19, 2020 (the day that the Governor of Pennsylvania ordered the closure of all non-essential businesses), the Debtors were forced to shut down their retail operations. With no revenue being generated, the Debtors abandoned their orderly liquidation plan and terminated all retail employees, including the Plaintiffs.

8.      Within a few days of their termination, on March 23, 2020, Plaintiffs brought this action alleging violations of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §

2101 *et seq.* (the "WARN Act") on behalf of themselves and a purported class of former employees.

9.      As set forth below, Plaintiffs are not entitled to WARN Act damages[2] because:

(i)      AVF was not an "employer" under the WARN Act on March 20, 2020.  It was a "liquidating fiduciary" which is not subject to the WARN Act's notice requirements.

(ii)      Assuming *arguendo* AVF was subject to the WARN Act, which it was not for reasons discussed below, pursuant to 29 U.S.C. § 2102(b)(2)(A) (the "unforeseeable business circumstances exception"), AVF is not liable to Plaintiffs because the Debtors' inability to conduct the GOB Sales and other parts of the Planned Liquidation Process due to the unprecedented government-ordered business closures (or threatened closures) and the government-ordered requirement of citizens to shelter in place or stay at home, together, constituted a business circumstance that was not reasonably foreseeable on January 18, 2020, when AVF would have had to give notice of the March 20, 2020 terminations.[3]

(iii)      Assuming *arguendo* AVF was subject to the WARN Act, which it is not, pursuant to 29 U.S.C. § 2102(b)(2)(B) (the "natural disaster exception"), it is not liable to Plaintiffs because the Plaintiffs' termination was caused by COVID-19, and COVID-19 is a "natural disaster."

---

[2] The Trustee reserves his rights to assert any and all additional defenses to liability including, but not limited to, opposing priority or administrative treatment of any claim under the WARN Act.

[3] All of the Debtors' employees worked for either AVF or SLI.  Plaintiffs both worked for AVF, but all of the arguments set forth herein would apply equally to claims brought by former employees of SLI.  While AVF and SLI are not subject to WARN Act liability for the reasons discussed herein, Defendants AVF Holding Company, Inc., AVCE, LLC,  AVF Holdings I, LLC, AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC,  AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., and Comfort Mattress LLC are also not subject to WARN Act liability because they did not have any employees, and were not, therefore, "employers" under the WARN Act.

10. As set forth below, the foregoing legal conclusions that mandate summary judgment are based on facts as to which there is no genuine dispute.

### III. STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE DISPUTE

**A.    General Background**

11. On March 8, 2020 (the "Petition Date"), the Debtors commenced their respective voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS).

12. Upon the Debtors' motion (the "Conversion Motion"), based on the facts and circumstances described further below, less than a month after the Petition Date, on April 6, 2020, the Chapter 11 Cases were converted to chapter 7 proceedings (the "Cases").

13. Prior to the Petition Date, the Debtors had sold furniture for over 60 years, with 169 stores in Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, and approximately 4,500 employees.[4]

14. The Debtors filed the Chapter 11 Cases with the intention of winding down their affairs by liquidating their inventory through store closing sales (the "GOB Sales"), paying down their secured debt, and using any remaining proceeds of their GOB Sales to wind-down their operations.[5] As of the Petition Date, the Debtors were party to a binding letter of intent for a sale of 44 Levin and Wolf stores and related assets and operations (the "Levin Sale") to a third party buyer. The GOB Sales, the Levin Sale, and other actions taken by the Debtors in the Chapter 11

---

[4] *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Bankr. Doc. 12] ("Ladd Declaration") at 2. A copy of the Ladd Declaration is **Exhibit A** to the Sandler Declaration.

[5] Ladd Declaration at ¶¶ 6 & 18.

A000397

Cases were all part of the orderly liquidation and wind-down planned by the Debtors prior to and as of the Petition Date (the "Planned Liquidation Process") in order to maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors. [6]

**B.    The Planned Liquidation Process**

15.    In the months leading up to the Petition Date, Art Van was struggling under the weight of poor sales and $208.5 million in secured debt encumbering substantially all of its assets: (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan (the "Term Loan") from FS KKR Capital Corp. (the "Term Lenders" and together with Wells Fargo, the "Secured Lenders").[7] Art Van had defaulted on the ABL Loan on February 5, 2020 and had only been able to obtain a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the business.  As a condition to the forbearance, Wells Fargo insisted that the Debtors begin to prepare for going-out-of-business (GOB) sales. [8]

16.    In spite of the Debtors' efforts over the next 23 days in February 2020, by February 28, 2020, the Debtors were unable to secure financing or attract a going concern buyer.[9] The forbearance period ended on that date, and the Debtors had no alternative but to pursue an orderly wind-down of their operations and liquidation of their assets.[10] To that end, prior to the Petition Date, the Debtors negotiated a wind-down budget with Wells Fargo ("Wind-Down Budget"), hired

---

[6] Ladd Declaration at ¶¶ 6, 16, 17, 18, 19, 20, 40, 41, 42 & 43.

[7] *See* Ladd Declaration at ¶¶ 7, 8, 13, 14, 16, 17, 18, 31-36.

[8] *See* Ladd Declaration at ¶¶ 14 & 36.

[9] *See* Transcript of March 10, 2020 hearing at p. 55, line 25 to 57, line 20; Ladd Declaration at ¶¶ 14-15.  A copy of the March 10, 2020 Transcript is **Exhibit B** to the Sandler Declaration.

[10] *See* Ladd Declaration at ¶¶ 16-18.

A000398

a liquidator, and announced publicly that after decades in business they were going out of business.[11]

17.     As part of the Planned Liquidation Process, on March 4, 2020, SLI entered into a letter agreement (the "Levin LOI") pursuant to which it agreed to sell 44 stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") to Robert Levin (the "Levin Sale").[12]  The Levin Sale was expected to be approved in bankruptcy and consummated in or about early April 2020.  The Debtors believed that the buyer would keep the 44 stores operating and thereby preserve approximately 1,000 jobs.[13]

18.     The Levin LOI contemplated that the Levin Sale stores would briefly continue operating pending the closing of the Levin Sale.[14]  Because the Debtors had no money to operate these stores (they only had the money that Wells Fargo had agreed to let them use to conduct the GOB Sales), Robert Levin agreed to extend $10 million of debtor-in-possession (DIP) financing to SLI (the "Levin DIP Loan") to the Debtors to facilitate the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale.[15]

---

[11] *See* Ladd Declaration at ¶¶ 16-18; *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 93] (the "Interim CC Order") at 13.  A copy of the Interim CC Order is **Exhibit C** to the Sandler Declaration.  On March 5, 2020, the Debtors entered into an agreement (the "Consulting Agreement") with HilcoMerchant Resources, LLC (the "Liquidator").  *See* Interim CC Order at 12.  *See also* "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html ("Art Van GOB Press Release") (attached as **Exhibit D** to Sandler Declaration).

[12] Robert Levin had owned the stores that were the subject of the Levin LOI prior to them being sold to the Debtors.

[13] *See* Ladd Declaration at ¶¶ 19-20 & 40-42.

[14] *See* Ladd Declaration at ¶¶ 40-41.  *See also Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Bankr. Doc. 49] ("Levin DIP Motion") (attached as **Exhibit E** to Sandler Declaration).

[15] *See* Levin DIP Motion; *Interim Order* on Levin DIP Motion [Bankr. Doc. 137] ("Interim Levin DIP Order") (attached as **Exhibit F** to Sandler Declaration).

A000399

19.     In sum, as of March 5, 2020, the Debtors had an orderly wind-down plan, comprised of the GOB Sales to liquidate AVF's assets including 125 stores and the Levin Sale to liquidate the SLI Assets.

20.     On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business.[16]  Indeed, plaintiffs have acknowledged and admitted that the Debtors began their liquidation plan at this time.  *See* Complaint (attached as **Exhibit Y** to Sandler Declaration) at ¶ 25 ("… Debtors began to execute on its planned liquidation.").

21.     On March 5, 2020, as part of its Planned Liquidation Process, although not required, AVF issued a WARN Act notice to approximately 1,400 potentially "affected employees" who worked in or reported to seven facilities in Michigan, two facilities in Illinois and one in Pennsylvania.  Each of the Plaintiffs worked at an affected location in Michigan and were notified as follows:

> Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

> The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

---

[16] *See* Art Van GOB Press Release (attached as **Exhibit D** to Sandler Declaration).

> You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "GOB Sale WARN Notice").[17]

22. The Debtors' target date to end the GOB Sales was the end of April 2020.[18] The GOB Sales commenced as expected, and went well at first. From March 5, 2020 through March 8, 2020, deposits from inventory sales were in excess of $23 million.[19]

## C. The Chapter 11 Cases

23. On March 8, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases and filed "first day motions" to obtain approval of, *inter alia*, the Wind-Down Budget,[20] the Levin DIP,[21] and GOB Sales and the Consulting Agreement with the Liquidator.[22] First day hearings were held on March 10, 2020. While there was an extensive discussion of the GOB Sales at the first day hearing, there was no discussion by the Court and other parties of COVID-19 and the effects thereof, including any potential government-mandated shut downs and extensive business restrictions.[23]

---

[17] A copy of the GOB Sale WARN Notice is **Exhibit G** to the Sandler Declaration.

[18] *See* Ladd Declaration at ¶ 18 (Debtors seeking to complete store closure sales in six to eight weeks from March 5, 2020).

[19] *Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* [Bankr. Doc. 252] (the "Conversion Motion") at ¶ 22. A copy of the Conversion Motion is **Exhibit H** to the Sandler Declaration.

[20] *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 5] (attached as **Exhibit I** to Sandler Declaration).

[21] *See* Levin DIP Motion (**Exhibit E** to Sandler Declaration); Interim Levin DIP Order (**Exhibit F** to Sandler Declaration).

[22] *See Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* [Bankr. Doc. 52] (attached as **Exhibit J** to Sandler Declaration).

[23] *See* Transcript from March 10, 2020 Hearing (attached as **Exhibit B** to Sandler Declaration).

24.     On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order, authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales.  The Wind-Down Budget assumed that the GOB Sales would continue unabated through April 30, 2020, and provided that the "the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis" is a default, and thus, the Debtors continued their ongoing GOB sales.[24]

25.     Art Van continued the hearing on its first day motions to March 12, 2020.  The Bankruptcy Court apologized for taking the bench 40 minutes late, saying, "I very much apologize. As I'm sure you all are aware, things are developing very quickly.  It is taking a lot of my time."[25] The Bankruptcy Court and the U.S. Trustee expressed concerns about the fee in the Liquidator's Consulting Agreement and continued that portion of the Debtors' GOB sale motion to March 20, 2020.  Other than the Bankruptcy Court's comments at the beginning of the hearing, however, there was no mention by the parties at the March 12, 2020 hearing of COVID-19 or the possibility that the GOB Sales might not be able to continue.

**D.      The Rapid Escalation of the COVID-19 Pandemic**

26.     The unprecedented, extraordinary circumstances caused by the COVID-19 pandemic confronting the Debtors during the period March 8, 2020 (the Petition Date) and March 19, 2020 (the day of the COVID WARN Notice, as discussed below) are a matter of public

---

[24] Interim CC Order at pp. 34-35.

[25] Transcript of March 12, 2020 Hearings at p. 5, lines 5-7. A copy of the transcript from the March 12, 2020 Hearing is at **Exhibit K** of the Sandler Declaration.

A000402

record.[26]  On March 13, 2020, then-President Donald Trump declared a national emergency.[27]  By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[28]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …."[29]

27.    Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan -- where the Debtors' headquarters, their main distribution center the size of 14 football fields, and 82 of their stores are located -- entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[30]  Governor Whitmer urged Michigan residents to "mak[e] smart choices"

---

[26] This Court can take judicial notice of online publications of federal and state governmental authorities and online newspaper articles and other publications pursuant to Fed.R.Evid. 201(b) and to evaluate what information is in the "public realm."  *See, e.g., Ieradi v. Mylan Labs., Inc*., 230 F.3d 594, n.2 (3d Cir. 2000) (court taking judicial notice of *New York Times* article; citations omitted); *Scully v. Allegheny Ludlum Corp*., 2006 U.S. Dist. LEXIS 105589, at n.3 (W.D. Pa. Feb. 10, 2006) (court taking judicial notice of a newspaper article for company related statistics pursuant to Fed.R.Evid. 201(b); citation omitted); *United States v. Petway*, 2020 U.S. Dist. LEXIS 82954, at *6 (D.N.J. May 11, 2020) ("the Court takes judicial notice of the world-wide pandemic that is continuing to unfold and impact all of us" under Fed.R.Evid. 201; "The federal government and State of New Jersey have declared emergencies. Public health officials have attributed the pandemic to a novel corona virus spreading from person to person.  COVID-19 'poses a serious public health risk.' (footnotes and citations including citations to CDC publications omitted)); *United States v. Kindred Healthcare, Inc.*, 469 F.Supp.3d 431, n.3 (E.D. Pa. 2020) (taking judicial notice of court filings and news reports to evaluate "what was in the public realm" at a given time; citations omitted); *Matias v. Terrapin House, Inc.*, 2021 U.S. Dist. LEXIS 176094, at n.4 (E.D. Pa. Sept. 16, 2021) (taking judicial notice of COVID-19 related facts in CDC publications available on its website).

[27] *Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, dated March 13, 2020 (85 F.R 15337 (March 13, 2020)), available at https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf (attached as **Exhibit L** to Sandler Declaration).

[28] *Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/ (attached as **Exhibit M** to Sandler Declaration).

[29] *All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19*, March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/ (attached as **Exhibit N** to Sandler Declaration).

[30] *Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at

by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary." [31]

28.     On March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations were located to issue a "stay at home" or "shelter in place" type order.  Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.[32]

29.     Further, on March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction, and thus, the stores covered by the Levin Sale would also have to be immediately closed by the Debtors.[33]

## E.     The Plaintiffs' Termination and the Conversion to Chapter 7

30.     Notwithstanding the careful planning of the Debtors and their advisors, as a result of the COVID-19 pandemic and resultant shutdowns, shortly after the Petition Date, the Debtors' situation changed drastically upending the Debtors' plans for an orderly liquidation.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date.  Specifically, during the initial days of the GOB Sales

---

https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html (attached as **Exhibit O** to Sandler Declaration).

[31] *Id.*

[32] Pennsylvania: Gov. Tom Wolf, Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (attached as **Exhibit P** to Sandler Declaration); Michigan: Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html (attached as **Exhibit Q** to Sandler Declaration); Ohio: Dir. of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (attached as **Exhibit R** to Sandler Declaration); and Illinois: Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf (attached as **Exhibit S** to Sandler Declaration).

[33] Conversion Motion at ¶ 26.

A000404

from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million,[34] suggesting, among other things, a precipitous drop in customer traffic in the Debtors' stores.

31.     Ultimately, the restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease (discussed in greater detail below) mandated that the Debtors discontinue all retail operations and other non-essential business operations – a scenario they had not and could not have planned for when they developed their Planned Liquidation Process.[35]

32.     Soon thereafter, the Debtors' management, with their professionals' counsel and assistance, determined that the Planned Liquidation Process, in its then-form, was no longer viable and that a more immediate shutdown of the Debtors' stores and remaining support operations was in the estates' and creditors' best interest.[36]  Thus, on March 19, 2020, the Debtors made the painful decision to suspend all sales operations in all stores and terminate the majority of their employees, excluding workers who would be needed for the rest of the liquidation and wind-down process.[37]

33.     Accordingly, on March 19, 2020, AVF issued a WARN Act notice to employees which stated:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste

---

[34] Conversion Motion at ¶ 22.

[35] Conversion Motion at ¶¶ 1-2.

[36] Conversion Motion at ¶¶ 1-2.

[37] Conversion Motion at ¶ 25.

A000405

B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

***Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").***

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "COVID WARN Notice") (emphasis added).[38]

34.     Plaintiffs Todd Stewart and Jennifer Sawle were two of AVF's employees, and each worked at one of AVF's 82 stores in the State of Michigan (where AVF also had it main trucking terminal, its corporate headquarters and a distribution center). Mr. Stewart was a store manager at an AVF Store in Shelby Township, Michigan; and Ms. Sawle was a salesperson at an AVF Store in Lansing, Michigan. In accordance with the COVID WARN Notice, the Trustee believes that Mr. Stewart and Ms. Sawle were both terminated by AVF, as were most of AVF's and SLI's employees, on March 20, 2022 (the "Layoff").[39]

---

[38] A copy of the COVID WARN Notice is at **Exhibit T** to the Sandler Declaration.

[39] Complaint (attached as **Exhibit Y** to Sandler Declaration) at ¶¶ 6, 7, 10.

A000406

35. During a March 19, 2020 status conference, Debtors' counsel advised the Bankruptcy Court of the store closures.[40] Judge Sontchi stated on the record at a later related hearing:

> This is an unfortunate situation. It is nobody's fault. It is nobody's fault. I know many people in my local business community who are good business people who have great businesses who are staring down the barrel of a gun based on what's happened. It's just—it's extraordinary. And I'm not casting aspersions on anyone, but obviously this case changed dramatically, as did the whole world—well not the whole world but as to the United States in the last three weeks, three or four weeks.[41]

36. Wells Fargo declared a default under the Interim CC Order, and terminated use of cash collateral as of March 24, 2020; later extended through March 31 and finally April 6.[42] Unable to continue the Chapter 11 Cases without the continued consent of the Debtors' secured lenders to use their cash collateral, the Debtors filed the Conversion Motion and the Chapter 11 Cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020.[43] In ruling on the Conversion Motion, Judge Sontchi stated:

> This case is very unfortunate. It's really been a parade of unfortunate events that has kind of conspired to put a long-standing, solid business into liquidation. And, as I sit here today, I certainly don't have enough information to blame anyone or anything other than the coronavirus and the disaster it has left in its wake.[44]

---

[40] *See* Transcript of March 19, 2020 Hearing at 10, line 8 to 11, line 1. A copy of the Transcript of the March 19, 2020 Hearing is at **Exhibit U** to the Sandler Declaration.

[41] Transcript of March 31, 2020 Hearing at 47, line 24 to 48, line 7. A copy of the Transcript of the March 31, 2020 Hearing is at **Exhibit V** of the Sandler Declaration.

[42] Conversion Motion at ¶ 27.

[43] *See* Order Granting Debtor's Amended Motion to Convert [Bankr. Doc. 263] ("Conversion Order') (attached as **Exhibit W** to Sandler Declaration).

[44] *See* Transcript of April 6, 2020 Hearing at 28, line 24 to p. 29, line 5. A copy of the Transcript from the April 6, 2020 Hearing is **Exhibit X** to the Sandler Declaration.

A000407

37.     Upon the conversion, Alfred Giuliano was appointed as the chapter 7 trustee [Bankr. Doc. 264].

**F.     The Adversary Proceeding**

38.     On March 23, 2020, Plaintiffs initiated the adversary proceeding (the "Adversary Proceeding") by filing their *Class Action Adversary Proceeding Complaint For Violation of Warn Act 29 U.S.C. § 2101, et seq.* [Adv. Docket No. 1] (the "Complaint") in which they assert that the Debtors violated the WARN Act and seek, *inter alia*, judgment in favor of Plaintiffs and other similarly situated former employees for unpaid wages and other benefits and damages for up to 60 days that would have been otherwise paid, all determined in accordance with the WARN Act.

39.     The Trustee filed an Answer on December 10, 2020 [Adv. Docket No. 25], and in accordance with the Pretrial Scheduling Order [Adv. Docket No. 31], on October 29, 2021, the Trustee filed his First Amended Answer [Adv. Docket No. 40].

## IV. ARGUMENT

40.     This Court should grant summary judgment to the Trustee because, as discussed below the Debtors are not subject to WARN Act liability because: (1) on the date of the Layoff, AVF and SLI were not "employers," but rather "liquidating fiduciaries" to whom the WARN Act's notice requirements do not apply under controlling Third Circuit precedent (as discussed below); (2) even if the Debtors were subject to the WARN Act as of the date of the Layoff, which they were not, they are subject to the unforeseeable business circumstances exception set forth in in 29 U.S.C. § 2102(b)(2)(A) because of their inability to conduct their Court-approved post-petition GOB Sales as a result of COVID-19 and the unprecedented governmental issuance of orders requiring businesses to shut down and people to shelter in place; and (3) assuming *arguendo* the Debtors were subject to the WARN Act as of the date of the Layoff, which they were not, they are subject to the natural disaster exception set forth in 29 U.S.C. § 2102(b)(2)(B) because the Layoff

A000408

was clearly and unequivocally caused by COVID-19, a natural disaster.

## A.    Summary Judgment Standard

41.     Summary judgment should be granted "if the movant shows that there is no ***genuine*** dispute as to any ***material*** fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  A fact is "material" if, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party.  *Id*.

42.     The movant "bears the initial responsibility of informing the … court of the basis for its motion" and identifying what "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party carries this burden, the "party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 256.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is properly granted.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

43.     Summary judgment is "'not a disfavored procedural shortcut,' but [rather is] the 'principal tool by which factually insufficient claims or defenses can be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources.'" *U.S. ex rel. Anderson v. N. Telecom, Inc*., 52 F.3d 810, 815 (9th Cir. 1995) (quoting *Celotex*, 477 U.S. at 327).    While the Court may not make credibility determinations or weigh the evidence, pursuant to *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097 (2000), "*Reeves*

A000409

does not require [the Court] to reject the plainly obvious." *Montemayor v. City of San Antonio*, 276 F.3d 687, 693 (5th Cir. 2001).

**B.     The WARN Act**

44.     The WARN Act requires "employers" that are subject to its terms to give sixty (60) days' notice to all "affected employees" or their representatives prior to a mass layoff or a plant closing.  29 U.S.C. § 2102(a).  To prove a WARN Act violation, a plaintiff must show that: (i) the defendant was an employer; (ii) the defendant ordered a mass layoff; (iii) the defendant failed to give employees 60-days' notice before the mass layoff; and (iv) the plaintiff is an aggrieved or affected employee. 29 U.S.C. §§ 2102, 2104.  An employer who violates the notice provision "shall be liable to each aggrieved employee who suffers an employment loss for back pay for each day of violation."  If the plaintiff establishes its *prima facia* case, the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the WARN Act's three exceptions: (1) faltering company; (2) unforeseen business circumstances; or (3) natural disaster.  29 U.S.C. § 2102; 20 C.F.R. § 639.9.

**C.     There is No Genuine Dispute That AVF Was a Liquidating Fiduciary At the Time of the Layoff and Not Subject to the WARN Act**

45.     The Third Circuit Court of Appeals has specifically held that where, as here, a chapter 11 debtor-in-possession has ceased operating as a going concern and is merely conducting a liquidation, it is not operating a "business enterprise" and is therefore not, an "employer"[45] subject to the WARN Act.   *In re United Healthcare System, Inc.,* 200 F.3d 170, 178 (3d Cir. 1999), cert denied, 530 U.S. 1204 (2000).

---

[45] The WARN Act defines an "employer" is "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."  29 U.S.C. § 2101(a)(1).

46.    In *United Healthcare*, the creditors' committee argued that the debtor-in-possession -- a hospital that ceased operating and terminated its 1,300 employees 16 days after the petition was filed -- was not an "employer" under the WARN Act.  The Third Circuit Court of Appeals agreed, reasoning:

> [W]e find that United Healthcare, as the fiduciary in bankruptcy proceedings, was operating not as a "business operating as a going concern," but rather as a business liquidating its affairs. On February 18, 1997, United Healthcare surrendered its certificates of need; on February 19, it filed a voluntary bankruptcy plan under which it would liquidate its assets and cease to exist; and, no later than February 21, United Healthcare had discharged or transferred all of its patients and was no longer admitting new patients. Significantly, after February 19, but in any event no later than February 21, its employees were no longer engaged in their regular duties but instead were performing tasks solely designed to prepare United Healthcare for liquidation.
>
> We recognize that United Healthcare filed for Chapter 11 bankruptcy, ordinarily used to reorganize, rather than Chapter 7 bankruptcy, generally used to liquidate. **But as discussed, United Healthcare's actions from the time it filed its Chapter 11 petition throughout the proceedings clearly demonstrate its intent to liquidate.**  Simultaneously, United Healthcare filed for bankruptcy, agreed to sell its assets and goodwill to St. Barnabas, and surrendered its certificates of need.  Had United Healthcare's conduct and activities demonstrated a *bona fide* effort toward reorganization, the evidence may have shown that United Healthcare was an "employer" subject to the WARN Act.
>
> We believe this analysis is consistent with the legislative purpose behind WARN. . . .

200 F.3d at 178 (emphasis in bold added).

47.    Other courts have similarly recognized this "liquidating fiduciary" principle.  *See, e.g., Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*, 481 B.R. 268, 272 (Bankr. S.D. N.Y. 2012) ("The U.S. Department of Labor ('DOL') and federal courts addressing WARN Act claims have recognized a 'liquidating fiduciary' principle, excepting from the protection of the WARN Act employee layoffs by liquidating fiduciaries."); *Walsh v. Century City Doctors Hosp., LLC (In re Century City Doctors Hosp., LLC)*, 417 B.R. 801, 804-05 (Bankr. C.D. Cal. 2009), *aff'd* 2010 Bankr. LEXIS 5048 (B.A.P. 9th Cir. Oct. 29, 2010) (holding a chapter 7

A000411

trustee who operated a hospital for a few days post-petition (pursuant to an order authorizing him to do so) before terminating its employees was not an "employer" under the WARN Act based on *United Healthcare* where it was clear from the record that the "trustee's intentions have consistently been to close the hospital business at the earliest reasonable time and to liquidate its assets for the benefit of its creditors.  The trustee only operated [the debtor] for approximately a week from the date of filing, and the trustee's brief operation of [the debtor] was not for any commercial purpose."); *Bailey v. Jamesway*, 1997 Bankr. LEXIS 825, at *40 (Bankr. S.D.N.Y. 1997) ("liquidating fiduciaries need not provide notice to terminated employees under the WARN Act").  Consistent with the foregoing judicial conclusions, the Department of Labor, the agency responsible for interpreting and implementing WARN Act requirements, has explained in connection with its regulations that "DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a 'business enterprise' in the normal commercial sense."  54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989).

48.    Here, as in *United Healthcare*, the Debtors' actions from the beginning of the Chapter 11 Cases (and before) evidence a clear intent to liquidate the Debtors' stores and other assets, and <u>not</u> to operate their business "in the normal commercial sense." *See* 54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989).  As detailed in Section III.B above, all of the Debtors' efforts at reorganizing as a going concern occurred prepetition, when they hired advisors to reach out to potential buyers and investors.  Those efforts failed prior to the bankruptcy filing.  As a result of this failure, and prior to the Petition Date, the Debtors, at Wells Fargo's insistence, hired the Liquidator, gave the GOB Sale WARN Notice and commenced GOB Sales.  Further, when the Debtors filed their Chapter 11 Cases on March 8, 2020, they intended to, and did, continue to

liquidate their assets through the GOB Sales and the Levin Sale. As of the Petition Date, and prior to the Layoff, the only business activities to be conducted by the Debtors were those necessary to liquidate their assets to pay off their creditors.

49. There can be no dispute that the Debtors were at all relevant times liquidating, as opposed to reorganizing, in the Chapter 11 Cases. As described in detail above, the Debtors intended to be and were acting as liquidating fiduciaries prior to the Petition Date and at the time of the March 20, 2020 Layoff. Therefore, as a matter of law, the Debtors were not "employers" under the WARN Act, and, accordingly, by its terms cannot be held liable for failure to give sixty days' notice of the Layoff, and as such, summary judgment is mandated in favor of the Trustee.

**D.** **The Governmental Mandated "Shelter in Place" and "Stay at Home" Orders Were "Not Reasonably Foreseeable" and Thus, the Debtors Were Not Subject to the Notice Provisions of the WARN Act.**

50. The COVID-19 pandemic was a business circumstance that was not reasonably foreseeable during the 60-day period prior to Layoff. As a matter of law, the Debtors therefore cannot be held liable for failure to provide 60 days' notice of the Layoff, and summary judgment should be granted in favor of the Trustee.

51. Specifically, 29 U.S.C. § 2102(b)(2)(A) provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances **that were not reasonably foreseeable as of the time that notice would have been required.**" 29 U.S.C. § 2102(b)(2)(A) (emphasis added)**.**

52. Here, the Debtors' inability to conduct the GOB Sales and orderly liquidation they had planned to execute in March and April of 2020 were caused by (1) COVID-19, (2) the government-ordered business closures (or threatened closures), and (3) the restriction of residents

A000413

to their homes, which, together constitute a business circumstance that was not reasonably foreseeable during the 60-day period prior to the Layoff.

53.     The Third Circuit Court of Appeals has established that, under the WARN Act, a layoff becomes reasonably foreseeable when it becomes "probable" (more likely than not) that it would occur; a clear probability of layoffs is necessary to trigger the WARN Act notice requirement. *Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*, 866 F.3d 515, 528 (3d Cir. 2017) (company had received numerous assurances that funding for a transaction that would have allowed it to continue its operations was imminent, and thus, the company was entitled to invoke the WARN Act's unforeseeable business circumstances exception).[46]  *See also Hotel Employees & Restaurant Employees International Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175 (3d Cir. 1999) (casino's closure was not reasonably foreseeable and thus the unforeseeable business circumstances defense applied to excuse the casino's failure to notify its employees prior to its being shut down by the New Jersey Casino Control Commission).

54.     As explained by Bankruptcy Judge Shannon:

> The Department of Labor's ("DOL") regulations state that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some *sudden, dramatic, and unexpected action or condition outside the employer's control*." 20 C.F.R. § 639.9(b)(1). The DOL's test for determining when business circumstances are not reasonably foreseeable
>
>> focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of a particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.
>
> *Id*. § 639.9(b)(2).

---

[46] Notably, the bankruptcy court in the proceedings below in *AE Liquidation* had granted the trustee's motion for summary judgment on the basis that the applicable circumstance there was unforeseeable for purposes of WARN Act liability.  *In re AE Liquidation, Inc*., 522 B.R. 62 (Bankr. D. Del. 2014) (Judge Walrath).  The bankruptcy court's decision was affirmed by the district court, and both decisions were affirmed by the Third Circuit Court of Appeals in the afore-cited *AE Liquidation* case.

*Czyzewksi v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*, 496 B.R. 151, 161 (Bankr. D. Del. 2013) (Hon. B. Shannon) (emphasis added).

55.     In addition, in order to establish the applicability of the exception, courts require that employers show that an unforeseen business circumstance was the immediate cause of a mass layoff.  *Easom v. US Well Servs.*, 2021 U.S. Dist. LEXIS 52941, at *32.

56.     The unforeseeable business circumstances exception is plainly applicable here. First, as discussed in Sections III.D and E above, the COVID-19 pandemic was clearly the immediate cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and immediately shut down their business.  The pandemic made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required citizens to stay at home or shelter in place to limit the spread of COVID-19. The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would follow shortly thereafter.

57.     Moreover, on January 18, 2020 and thereafter (the 60-day period prior to the Layoff), the Debtors could not reasonably have foreseen that the threat of infection and death from COVID-19 would be so profound that millions of people in the United States would be afraid to leave their homes and governments would be ordering their citizens to stay at home and closing non-essential businesses across the nation.

58.     Finally, given that the Governor of Pennsylvania ordered store closures on March 19, 2020 (the day of the Debtors' COVID WARN Notice), the one day's notice that the Debtors gave to the Plaintiffs was patently reasonable under the circumstances.

59.     Based on the foregoing circumstances, it cannot be credibly debated that the

A000415

COVID-19 pandemic and its unprecedented adverse business and societal effects could have been reasonably foreseeable by the Debtors as of January 18, 2020 or that the Debtors' actions were not commercially reasonable under the circumstances. Accordingly, the Trustee is also entitled to summary judgment in his favor on the basis of the unforeseen business exception.

**E.** **If the WARN Act Is Applicable, Which It is Not, the Debtors Were Not Required to Provide Any Notice Because the Layoff Was Due to the COVID-19 Pandemic -- a "Natural Disaster" For Purposes of the WARN Act.**

### (i) The COVID-19 Pandemic Is a Natural Disaster

60.     If the WARN Act were held to be applicable (which it is not because of the liquidating fiduciary exception), the Debtors were not required to give any notice because the March 20, 2020 Layoff was due to the COVID-19 pandemic, which falls within the natural disaster exception to the WARN Act.

61.     The WARN Act provides: "No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States." 29 U.S.C. § 2102(b)(2)(B); 20 C.F.R. § 639.9(c). As the statue makes clear, if the employer establishes that the mass layoff was "due to any form of natural disaster," there is no duty to provide any notice under the WARN Act.

62.     The COVID-19 pandemic is a "natural disaster" and therefore falls under the exception to the WARN Act's notice requirement. *Easom v. US Well Servs*, 2021 U.S. Dist. LEXIS 52941, *17 (S.D. Tex. March 22, 2021) ("The dictionary definition of natural disaster, other court decisions, and the statutory language support the conclusion that the COVID-19 pandemic is a natural disaster under the WARN Act.").[47] *See also* Hiltzik, M., "A declassified

---

[47] The statute in fact refers more broadly to "any form of natural disaster" – a phrase which plainly supports a broad interpretation of "natural disaster." *See, e.g., Kasten v. Saint-Gobain Performance Plastics Corp*., 563 U.S. 1, 9–10 (2011) (the statutory phrase "any complaint" suggests a broad interpretation).

A000416

government report offers no support for the lab-leak theory of COVID's origin," *Los Angeles Times*, Nov. 1, 2021, available at https://www.latimes.com/business/story/2021-11-01/declassified-government-report-lab-leak-theory (attached as **Exhibit Z** to Sandler Declaration) ("LA Times Article") (recently declassified report by federal governmental agency, Office of the Director of National Intelligence ("ODNI Report"), "provides details of the agencies' findings that make clear they looked into the specific assertions that have been proposed in support of the lab-leak theory and found them wanting"); Office of the Director of National Intelligence, "Updated Assessment on COVID-19 Origins" Report, available at https://www.dni.gov/files/ODNI/documents/assessments/Declassified-Assessment-on-COVID-19-Origins.pdf (ODNI Report referenced in the LA Times Article) (attached as **Exhibit AA** to Sandler Declaration).

63.     As the District Court for the Southern District of Texas reasoned in *Easom*:

> COVID-19 qualifies as a disaster under the WARN Act.  COVID-19 is clearly a "disaster."  *See* Disaster, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] calamity; a catastrophic emergency"); Natural Disaster, OXFORD ENGLISH DICTIONARY ("[a] natural event that causes great damage or loss of life").  In a year, two million people lost their lives, and over one hundred million people were diagnosed with infections.  *See AB Stable VIII LLC*, 2020 Del. Ch. LEXIS 353, 2020 WL 7024929, at *58 ("[The COVID-19 pandemic] is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths.") . . . .

> COVID-19 also qualifies as a "natural" disaster because human beings were not responsible for starting or consciously spreading the virus. . . .  COVID-19, like other viruses, did not require conscious human effort to appear or spread, as individuals without symptoms infected others.  *See* Angela L. Rasmussen, *On the Origins of SARS-CoV-2*, 27 Nature Medicine 9, 9 (2021) ("[A]ll indications suggest that, like SARS-CoV and MERS-CoV, this virus probably evolved in a bat host until an unknown spillover event into humans occurred."); Murat Seyran, *et al.*, *Questions Concerning the Proximal Origin of SARS CoV-2*, Journal of Medical Virology 1, 1 (2020) ("There is a consensus that severe acute respiratory syndrome coronavirus (SARS-CoV-2) originated naturally from bat coronaviruses (CoVs), in particular RaTG13."); *see also AB Stable VIII LLC*, 2020 Del. Ch. LEXIS 353, 2020 WL 7024929, at *58 n.214 ("The record in this case does not support a finding that the virus was anything other than a natural

A000417

product of germ evolution."). While humans can take precautions to slow the spread of COVID-19 or engage in behavior that fosters contagion, the possibility of slowing the virus spread does not suggest that humans caused the pandemic.

*Id.* at *20-*21.

64. Outside the WARN Act context, courts have also consistently found that COVID-19 is a natural disaster for reasons that are equally applicable here. The U.S. District Court for the Southern District of New York held that COVID-19 qualified as a "natural disaster" for the purpose of applying a force majeure clause in a contract dispute. *See JN Contemporary Art, LLC v. Phillips Auctioneers LLC*, 2020 U.S. Dist. LEXIS 237085 (S.D.N.Y. Dec. 16. 2020). The Pennsylvania Supreme Court has held twice that the Covid-19 pandemic is a "natural disaster." In *In Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 876 (Pa. 2020), *cert. denied*, 141 S. Ct. 239 (2020), the petitioners challenged the Pennsylvania governor's executive order closing all non-life-sustaining businesses to control the virus' spread. Among other arguments, they contended that the pandemic was not a "natural disaster" under the state's Emergency Code because it was not specifically listed as such and was different in "type or kind" from those disasters found in the statute. The Pennsylvania Supreme Court disagreed, holding, "The COVID-19 pandemic is, by all definitions, a natural disaster, and a catastrophe of massive proportions." *Id.* at 889. The Pennsylvania Supreme Court re-affirmed this conclusion seven months later in the context of election-related litigation. *See Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster.").

65. Accordingly, even if the WARN Act applies, which it does not because the Debtors were liquidating fiduciaries, the Debtors were not required to give notice of the Layoff because Covid-19 is a "natural disaster," and summary judgment should be granted in favor of the Trustee.

### (ii)     The Layoff Was "Due To" the COVID-19 Pandemic

66.     The Debtors' Layoff was clearly "due to" the COVID-19 pandemic.  The "but for" standard of causation applies to the natural disaster exception.  *Easom v. US Well Servs*, 2021 U.S. Dist. LEXIS 52941, at \*33-\*34 ("[T]he WARN Act's language, structure, and legislative history, as well as case law interpreting similar statutory language, support finding that the natural-disaster exception uses but-for causation standards. The COVID-19 pandemic need not be the direct or sole cause of the layoffs for the natural-disaster exception to apply.").[48]  But-for causation is established whenever a particular outcome would not have happened "but for" the purported cause. The "but-for" test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a "but-for" cause.  *Bostock v. Clayton Cty., Ga*., 140 S. Ct. 1731, 1739 (2020).

67.     But for COVID-19, Debtors would have completed the Planned Liquidation Process as originally planned, including the provision of adequate notice of the Layoff.   As discussed in greater detail in Sections III.B and C above, the Debtors expressly intended to liquidate their assets under chapter 11 through a combination of the GOB Sales and the Levin Sale. The Debtors had hired a Liquidator, negotiated a Wind-Down Budget with Wells Fargo, announced store closures, commenced the GOB Sales and filed the Chapter 11 Cases.  The Planned Liquidation Process was proceeding as expected, even as late as the second week in March.

68.     But for the threat of infection and death from COVID-19, the foot traffic in the Debtors' stores would have continued apace, and Plaintiffs would have worked throughout their 60-days' notice period under the GOB Sale WARN Notice.  But for the threat of infection and

---

[48] Whether the WARN Act's natural disaster exception uses the "but for" standard was certified for appeal and accepted by the Court of Appeals for the Fifth Circuit in *Easom* (pending as Case No. 21-90010), as well as by the Court of Appeals for the Eleventh Circuit in *Bensen* (pending as Case No. 21-11911) (*Benson v. Enter. Leasing Co. of Orlando*, LLC, 2021 U.S. Dist. LEXIS 55137 (D. M.D. Fla. Feb. 4, 2021) (court assumed *arguendo* that COVID -19 was a "natural disaster" under the WARN Act but denied employer's motion to dismiss because complaint did not allege that COVID-19 was the "direct cause" (*i.e*., the "proximate cause") of the layoff)).

A000419

death from COVID-19, the Debtors' employees would not have been afraid or hesitant to come to work. But for the threat of infection and death from Covid-19, the Debtors would not have been under threat of compulsory closures in every state in which it did business. But for the threat of infection and death from COVID-19, the Governor of Pennsylvania would not have ordered the Debtors to close all of their stores in Pennsylvania by 8 pm on March 19, 2020. But for the threat of infection and death from COVID-19, the Debtors would not have issued the COVID WARN Notice and would not have terminated the Plaintiffs on March 20, 2020.

69.     The natural disaster exception applies, and, accordingly, the Debtors are not liable under the WARN Act. Summary judgment should therefore be granted in favor of the Trustee.

## V.  CONCLUSION

For the reasons set forth herein, the Trustee respectfully requests that the Court grant the Motion, enter judgment in his favor, and grant such other and further relief as the Court deems appropriate.

Respectfully Submitted,

Dated:   November 12, 2021            PACHULSKI STANG ZIEHL & JONES LLP
         Wilmington, Delaware

                                      */s/ Bradford Sandler*
                                      Bradford J. Sandler (DE Bar No. 4142)
                                      Beth Levine (New York Bar No. 2572246)
                                      (admitted *pro hac vice*)
                                      Colin R. Robinson (DE Bar No. 5524)
                                      Peter J. Keane (DE Bar No. 5503)
                                      **PACHULSKI STANG ZIEHL & JONES LLP**
                                      919 North Market Street, 17th Floor
                                      P.O. Box 8705
                                      Wilmington, Delaware 19899
                                      Telephone: (302) 652-4100
                                      Facsimile: (302) 652-4400
                                      Email:    bsandler@pszjlaw.com
                                                blevine@pszjlaw.com
                                                crobinson@pszjlaw.com
                                                pkeane@pszjlaw.com

A000420

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

A000421