## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, *et al.*,[1]<br><br><div align="right">Debtors.</div> | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>(Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br><div align="center">Plaintiffs,</div><br>vs.<br><br>ART VAN FURNITURE, LLC, *et al.*,<br><br><div align="center">Defendants.</div> | Adv. Proc. No. 20-50548 (CSS) |

## DECLARATION OF BRADFORD SANDLER IN SUPPORT OF
## CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (DE Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  bsandler@pszjlaw.com
          blevine@pszjlaw.com
          crobinson@pszjlaw.com
          pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

---

[1]  The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

A000435

I, BRADFORD SANDLER, hereby declares:

1.      I am an attorney at law duly licensed to practice before this Court.  I am a partner of the law firm of Pachulski Stang Ziehl & Jones LLP, attorneys of record for Alfred T. Giuliano, Chapter 7 Trustee to Defendants Art Van Furniture, LLC, *et al*. in the above-captioned chapter 7 case (the "Case").  The facts stated herein are of my own personal knowledge, or made known to me from a review of the files and pleadings in the Case which are maintained in the ordinary course of business.  If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.  All capitalized terms not defined below shall have the meaning ascribed to said terms in the Chapter 7 Trustee's Motion for Summary Judgment (the "Motion").

2.      Attached hereto as **Exhibit A** is a true and correct copy of the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed in the Chapter 11 Cases [Bankr. Doc. 12].

3.      Attached hereto as **Exhibit B** is a true and correct copy of the transcript of the March 10, 2020 hearing held before the Bankruptcy Court in the Chapter 11 Cases.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered in the Chapter 11 Cases [Bankr. Doc. 93].

5.      Attached hereto as **Exhibit D** is a true and correct copy of the article "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html.

A000436

6.      Attached hereto as **Exhibit E** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 49] ("Levin DIP Motion").

7.      Attached hereto as **Exhibit F** is a true and correct copy of the *Interim Order* on Levin DIP Motion entered in the Chapter 11 Cases [Bankr. Doc. 137].

8.      Attached hereto as **Exhibit G** is a true and correct copy of the WARN Act notice issued by AVF on March 5, 2020, to potentially "affected employees" who worked in or reported to seven of the Debtors' facilities in Michigan, two facilities in Illinois and one in Pennsylvania.

9.      Attached hereto as **Exhibit H** is a true and correct copy of the *Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* filed in the Chapter 11 Cases [Bankr. Doc. 252].

10.      Attached hereto as **Exhibit I** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 5].

11.      Attached hereto as **Exhibit J** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 52].

12.     Attached hereto as **Exhibit K** is a true and correct copy of the transcript of the March 12, 2020 hearing held before the Bankruptcy Court in the Chapter 11 Cases.

13.     Attached hereto as **Exhibit L** is a true and correct copy of the *Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* dated March 13, 2020 (85 F.R. 15337 (March 13, 2020)), available at https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf.

14.     Attached hereto as **Exhibit M** is a true and correct copy of *Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/.

15.     Attached hereto as **Exhibit N** is a true and correct copy of *All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19,* March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/.

16.     Attached hereto as **Exhibit O** is a true and correct copy of *Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html.

17.     Attached hereto as **Exhibit P** is a true and correct copy of Gov. Tom Wolf's Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf.

A000438

18.     Attached hereto as **Exhibit Q** is a true and correct copy of Gov. Gretchen Whitmer's Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html.

19.     Attached hereto as **Exhibit R** is a true and correct copy of Dir. of Public Health Amy Acton's Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf.

20.     Attached hereto as **Exhibit S** is a true and correct copy of Gov. JB Pritzker's Executive Order in Response to COVID-19 (COVID-19Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf.

21.     Attached hereto as **Exhibit T** is a true and correct copy of the WARN Act notice issued by AVF on March 19, 2020, to AVF employees.

22.     Attached hereto as **Exhibit U** is a true and correct copy of the transcript of the March 19, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

23.     Attached hereto as **Exhibit V** is a true and correct copy of the transcript of the March 31, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

24.     Attached hereto as **Exhibit W** is a true and correct copy of the *Order Granting Debtor's Amended Motion to Convert* entered in the Chapter 11 Cases [Bankr. Doc. 263].

25.     Attached hereto as **Exhibit X** is a true and correct copy of the transcript of the April 6, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

26.     Attached hereto as **Exhibit Y** is a true and correct copy of the *Class Action Adversary Proceeding Complaint For Violation of Warn Act 29 U.S.C. § 2101, et seq.* filed in the

A000439

above-captioned adversary proceeding [Adv. Docket No. 1].

27.     Attached hereto as **Exhibit Z** is a true and correct copy of the article by Hiltzik, M., "A declassified government report offers no support for the lab-leak theory of COVID's origin," *Los Angeles Times*, Nov. 1, 2021, available at https://www.latimes.com/business/story/2021-11-01/declassified-government-report-lab-leak-theory.

28.     Attached hereto as **Exhibit AA** is a true and correct copy of the Office of the Director of National Intelligence, "Updated Assessment on COVID-19 Origins" Report, available at https://www.dni.gov/files/ODNI/documents/assessments/Declassified-Assessment-on-COVID-19-Origins.pdf.

A000440

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed this 12th day of November, 2021 at Wilmington, Delaware.

_____
Bradford Sandler

# EXHIBIT A

A000442

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF
## DAVID LADD, EXECUTIVE VICE PRESIDENT AND
## CHIEF FINANCIAL OFFICER OF ART VAN FURNITURE, LLC,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, David Ladd, hereby declare under penalty of perjury:

1.       I am the Executive Vice President and Chief Financial Officer of Art Van Furniture,

LLC ("Art Van"), one of the above-captioned debtors and debtors in possession (collectively, the

"Debtors" or the "Company").

2.       I have served in this role since October 10, 2016.  In my current position, I oversee

financial planning, accounting and the management of financial risk for the Company and its

brands.  Prior to serving in this capacity, I had over twenty years of financial experience in the

retail sector, during which time I served in various roles, including as an auditor for Kmart and as

Vice President of Finance for various divisions of Sears.  Most recently, I served as the Vice

President of Finance for 1,500 Sears and Kmart stores.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A000443

3.    I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (this "<u>Declaration</u>") to assist the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested pursuant to the motions and applications filed on the first day of these cases (collectively, the "<u>First Day Motions</u>").

4.    Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions with the other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

**<u>Preliminary Statement</u>**

5.    Art Van is a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan.  The Company operates 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Company does business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Company was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("<u>THL</u>") in March 2017.  As part of this transaction, THL acquired the operating assets of the Company and certain real estate investment trusts, who closed the transaction alongside THL, acquired the owned real estate portfolio of the Company, and entered into long-term leases with Art Van.  The proceeds from the sale-leaseback transaction were used to fund the purchase price

2

paid to the selling shareholders.  Pennsylvania-based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017 through similar transaction structures.  As of the Petition Date, the Company operates stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

6.      In the wake of extreme market conditions and faced with limited liquidity, the Company has commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down its remaining store locations and other operations through a going-out-of-business sales process.  Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going concern, the Company is simply unable to meet its financial obligations.  The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind down process that will maximize value and recoveries for stakeholders in these cases.

7.      Art Van's declines in sales, profits, and cash flow were driven by a combination of several factors.  *First*, the Company has faced significant macro-related revenue headwinds, as well as local microeconomic headwinds, that have led to sustained negative "same-store sales," a key measure of retail health, during every quarter since June 2016.  These macro-related headwinds include broad-based declining retail foot traffic, market share losses of brick and mortar furniture outlets to online sellers such as Wayfair and Amazon.com, and increased fragmentation and intense competition in mattresses leading to decreased profitability.  On a local level, Art Van has faced increased retail competition, as key competitors such as Ashley HomeStore, Bob's Discount

3

Furniture, and Mattress Firm opened at least 30 stores in Michigan and Illinois over the last three years

8.    **Second**, while Art Van revenues have declined approximately 27% cumulatively on a same-store basis since fiscal year 2016 through January 2020, expenses have increased significantly due to, among other things, over $8 million in tariff costs in fiscal year 2019 (which continued and escalated in fiscal year 2020) and an increase in marketing expenses intended to stem same-store sales declines.

9.    **Third**, the business suffered numerous operational challenges in the course of the Company's effort to grow and navigate a challenging retail environment.  In continuing to support the existing management team and growth initiatives that had driven the Company's success over the prior decade, the Company invested significant capital, but many of the initiatives failed to meet expectations and were insufficient in offsetting countervailing headwinds.  These operational challenges included, among other things:

- **Expansion**.  The Company began an expansion into Chicago in fiscal year 2013 that continued through fiscal year 2018, which ultimately led to market oversaturation as new stores cannibalized revenues from preexisting locations.  Despite spending significant capital and gaining material revenue share in this market, the Company was not able to achieve sustained profitability in Chicago.

- **Leadership Turnover**.  The Company lost eight of its top nine executive leaders in fiscal years 2017 and 2018 through unplanned and, in many cases, voluntary departures.

- **Required Changes to Marketing Strategies**.  In June 2017, the Company ceased certain of its historically successful marketing practices after becoming aware they violated the Telephone Consumer Protection Act ("TCPA"), and in early 2018, the Company settled a class-action lawsuit on account of an alleged violation of the TCPA.

- **St. Louis Franchise Acquisition**.  In fiscal year 2018, the Company entered into an operating agreement with its largest franchisee, based in St. Louis, Missouri, due to financial distress being experienced by the franchisee.  The Company acquired the operations of the franchisee in fiscal year 2019 to help stabilize performance and avoid further deterioration, but Art Van was unable to stabilize the revenues of the St. Louis stores or generate a profit in the market after such acquisition.

4

- **Levin/Wolf Integration**.  In fiscal year 2019, the Company's management attempted to integrate the operations of Wolf Furniture into Levin Furniture.  The integration involved a significant overhaul of many fundamental aspects of the Wolf business, including human capital management, furniture assortments, distribution/delivery, and technology systems.  These actions were taken in an effort to improve the business and align its operations with those of Levin, but they created significant strain on the Wolf business, which led to same-store sales declines of approximately 22% in Wolf in the second half of fiscal year 2019, as well as meaningful turnover of tenured sales staff.

- **Changes to Inventory Mix and Showroom Layout**.  In the same year, the Company turned over approximately 60% of its furniture assortment and reorganized many of its flagship showroom floors by "lifestyle" instead of by category of product, which negatively impacted sales and led to increased markdowns from product that was not easily saleable.

As a result of these challenges, the Company's Adjusted EBITDA decreased significantly in each fiscal year since 2016 and dropped to negative for the twelve months ended December 31, 2019.

10.     Faced with rapidly declining profitability, the Company made key leadership changes in summer 2019 that it deemed necessary to stem the downward trajectory and recover sales and profits.  In August 2019, the Company's board of directors (the "Board") terminated the Company's then-current Chief Executive Officer, its Chief Merchant, its Head of Stores, and several other executives.  It promoted a Company veteran to the role of Chief Merchant in August 2019, and, in September 2019, the Board hired a mattress industry turnaround executive as Chief Executive Officer.  The Board also named Gary Van Elslander, the former President of Art Van, as Chairman of the Board, in an effort to improve morale and re-establish a connection between the Company's employees and customers with the namesake of the business.  During this period, the Company also launched a new marketing campaign intended to differentiate the business against a competitive landscape, and it improved its e-commerce operating systems, including its website.

11.     In the summer and fall of 2019, the Company took further actions to create additional liquidity and extend the runway for management to execute on a sales-led operational turnaround:

5

- In November, 2019, the Company amended its asset-backed loan ("ABL") facility with Wells Fargo Bank, National Association ("Wells Fargo") to increase the size of the facility from $60 million to $82.5 million.

- In summer 2019, the Company engaged Evercore Group L.L.C. ("Evercore") as investment banker and undertook a review of strategic alternatives, including efforts to identify potential buyers for all or portions of the business.

- In December 2019, the Company secured an amendment to its term loan credit facility, which allowed the Company to suspend cash interest payments and mandatory amortization under the term loan.[2]

- In the fall and winter of 2019, the Company also was implementing a cost reduction and profit improvement plan, which was predicated on (a) reducing marketing expenses as a percentage of sales; (b) increasing gross margin through improved coordination of the merchandising, marketing, and in-store sales teams; and
  (c) decreasing occupancy costs.

12.    Throughout this time, the Company also was focused on optimizing its lease portfolio and reducing rent expense:

- With the assistance of its financial advisor, Alvarez & Marsal North America, LLC ("A&M") the Company created a store footprint optimization analysis that supported store closure plan.

- The Company hired real estate restructuring advisers Jones Lang LaSalle ("JLL") and Newmark Knight Frank to lead discussions with key landlords to reduce rent expense given the Company's decline in sales and to close 49 underperforming locations (including 31 mattress locations), consistent with and supported by the above-referenced store closure plan.

- The Company hired an accounting advisory firm in November, 2019, to create standardized and reliable schedules of store-level financials needed for JLL and Newmark Knight Frank to be able to engage in productive negotiations with the Company's lessors. This effort was completed in January, 2020, and the real estate brokers began discussions with key lessors shortly thereafter.

---

[2]    Despite these liquidity enhancements, the Company also faced offsetting liquidity challenges. Certain companies, including The CIT Group ("CIT"), which provided accounts receivable factoring services to the Company's suppliers, refused to factor receivables owed by the Company unless the Company issued CIT and other factoring companies letters of credit under its ABL facility. These letters of credit reduced availability under the Company's ABL facility by $10 million, further exacerbating the Company's liquidity constraints.

A000448

13.    In late January, 2020, the Company unexpectedly faced further liquidity constraints due to a reduction in the Company's "borrowing base," which is required collateral support for borrowing under the ABL facility.  At the same time, certain financial partners of the Company began to demand additional collateral and tightened access to credit as a result of the Company's weak financial results.  These financial partners included credit card processing companies, including Bank of America Merchant Services and PNC Merchant Services—who are critical to the Company's ability to accept credit cards in stores and on-line for customer purchases—as well as providers of consumer credit.  In total, this group demanded approximately $33 million in collateral through holdbacks to fund reserves and letters of credit.

14.    As a result of the impending liquidity crisis created by the shrinking borrowing base, poor operating cash flow, and the collateral demands, the Company was unable to issue "clean" audited financial statements (*i.e.*, without a potential "going concern" qualification), which led to a default under the Company's ABL facility, as well as various other contractual arrangements, including certain leases.  Wells Fargo agreed to forbear from exercising remedies on account of such default until February 28, 2020, to give the Company time to explore opportunities to raise additional capital and restructure its debt obligations.  As part of this short forbearance, Wells Fargo required the Company to comply with cash dominion, and also required the Company to begin immediate preparations for a "going-out-of-business" liquidation in the event ongoing efforts to raise capital did not materialize before the forbearance period expired.

15.    Against this backdrop, with the assistance of Evercore and A&M, the Company held discussions with at least 31 potential buyers and investors, including its term loan lender, FS KKR Capital Corp. and affiliates ("KKR"), about potential transactions to recapitalize or sell all

A000449

or parts of the business.[3]  Following a short evaluation period, KKR declined to make a new money investment in Art Van pursuant to any recapitalization transaction.  The most likely and promising alternative that emerged was an out-of-court recapitalization transaction involving a consortium of investors that included a new-money investment from THL, the Van Elslander family, and three important suppliers to the Art Van business (the "Consortium").  The transaction contemplated the Consortium investing significant new capital into the Company and refinancing the existing ABL facility.[4]  The Consortium also sought and received support for the transaction from the Company's five largest lessors (the "Master Lessors"), in which the Master Lessors agreed to reduce rent obligations on the company and allow Art Van to close certain underperforming locations.  The Consortium submitted a letter of intent to the Company outlining the details of its proposal on February 20, 2020, followed by a further letter of intent on February 26, 2020, discussing the Consortium's progress in arranging the transaction.  Unfortunately, the Consortium ultimately failed to secure the necessary capital commitments due to a variety of circumstances, including, but not limited to, the significant equity market impact of the coronavirus during the week of February 24, 2020, and the resulting deleterious effect on Consortium investors' willingness to contribute capital.  Over the weekend of March 1, 2020, the Company, its Board, and the Company's advisors worked with JLL and the Master Lessors to attempt to replace the deficit in the Consortium investment with a new money investment from the Master Lessors in the form of a lease incentive investment, but on Monday, March 2, 2020, certain Master Lessors declined to participate in the proposed transaction as revised.

---

[3]  Immediately prior to the Petition Date, KKR assigned the claims and obligations under the term loan to HGB AVF Lending, LLC, which is an affiliate of Hilco Merchant Resources, LLC.

[4]  KKR also agreed to participate in the Consortium Bid by exchanging its term loan into a percentage of the pro forma equity and new debt *pari passu* with the Consortium investment.

A000450

16.     After the Company's forbearance with Wells Fargo expired on February 28, 2020, the Company went into default under its credit facilities and focused its attention on launching a going-out-of-business process to preserve value.  Based on the expected timing for commencing the liquidation process, any delay in a launch of the going-out-of-business sales could have caused the process to continue into May and, therefore, necessitate the payment of May rent at locations still active in the liquidation at that time.  The Company also had not received substantial shipments of new product since early February given it was no longer making payments to vendors, and, as such, sales were decreasing and weekly cash burn was increasing.

17.     With no actionable alternatives, and given the urgency with which Wells Fargo was pressing the Company and its advisors to proceed, the Company began executing on plans for an orderly wind-down of the Company's operations and a liquidation of its inventory (the "<u>Wind Down</u>").  The Company and its advisors negotiated extensively with the Company's secured lenders to ensure that customer deposits, credits, and/or refunds, as well as payment of certain administrative costs, were contemplated by the agreed budget for the Wind Down process.  In particular, as a result of these negotiations, the Company has implemented a process for addressing customer deposits whereby customers can elect to: (a) receive the merchandise they purchased if such merchandise is present in the Art Van warehouses; (b) receive a credit in an amount equal to their deposits that can be used to purchase alternative merchandise at discounted prices during the Wind-Down, if the originally purchased merchandise is not available; or (c) cancel their order and submit a request to refund their deposit, which request would be processed as soon as practicable depending on the volume of refund requests, required processing times, and the timing and availability of cash proceeds generated by the Wind Down.[5]

---

[5]     The relief requested with respect to the customer deposits, credits and/or refunds is set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain*

A000451

18. To facilitate the Wind Down, the Company and its advisors solicited bids from potential liquidators to conduct store closing sales, and received bids from various parties, including a proposal from certain parties to acquire certain of the Company's intellectual property and other assets. After discussions with several firms that specialize in store closings and inventory dispositions, and with input from its secured lenders, the Company entered into a consulting agreement with a contractual joint venture (as amended and restated, the "Consultant Agreement") of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Consultant") to conduct the store closing sales. The Consultant Agreement is an expense-based arrangement in which the Consultant will provide reimbursement of all supervisor costs, reasonable and documented travel expenses, and general legal fees subject to the caps set forth in the Consultant Agreement. The Debtors expect to move swiftly through these chapter 11 cases to minimize costs, with an expected timeline for completing the store closing sales of approximately six to eight weeks. To maximize recoveries and minimize administrative expenses, the Company announced and initiated a soft launch of the store closing sales on March 5, 2020,[6] and seeks to expedite the remaining store closure sales in order to complete them within six to eight weeks.

19. In parallel with preparations for the Wind-Down, the Company continued to engage with interested parties regarding alternative transactions, which ultimately resulted in a proposal to preserve the Levin business segment and a portion of the Wolf business segment as a going-

---

*Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief*, filed contemporaneously herewith, and remains subject to approval by the Bankruptcy Court.

[6] Upon commencement of the store closing sales, Bank of America, N.A., Banc of America Merchant Services, LLC ("BAMS"), one of the company's credit card processors, immediately issued notice of its intent to hold 100 percent of all sale proceeds as a reserve. The filing of petitions on March 8, 2020, initiated an automatic stay against any action to control property of these estates and the Debtors reserve all rights and causes of action against BAMS, including with respect to potential preference claims. In addition, on March 6, 2020, Broadstone AVF Illinois, LLC, and Broadstone AVF Michigan, LLC (collectively, "Broadstone"), two of the Company's Master Lessors, initiated a lawsuit against the Company in Illinois federal court, alleging, among other things, various defaults under their respective leases related to the commencement the store closing sales.

A000452

concern.  In the days leading up to the Petition Date, the Company, with the assistance of its advisors, extensively negotiated and reached an agreement-in-principle with Robert Levin, the former owner of Levin Furniture, regarding a going-concern sale of certain of the assets of Sam Levin, Inc. and LF Trucking, Inc. (the "Levin-Wolf Sale").  The key terms of the Levin-Wolf Sale are set forth in a letter of intent, dated as of March 4, 2020, a copy of which is attached hereto as **Exhibit B** (the "Levin-Wolf LOI").  As set forth in the Levin-Wolf LOI, the Levin-Wolf Sale will:

- provide for cash and non-cash consideration, including the assumption of liabilities related to customer deposits, employee obligations, specified cure costs, and potential claims under section 503(b)(9) of the Bankruptcy Code;

- preserve nearly 1,000 jobs; and

- provide for the continued operation of approximately 44 retail store locations under the Wolf and Levin store banners and two related distribution centers.

20.     The Company expects to move forward with definitive documentation for, and approval of, the Levin-Wolf Sale on an expedited basis.  The Company believes effectuating the Levin-Wolf Sale on an expedited basis is critical to avoiding employee attrition and other potential value leakage related to the simultaneous Wind Down of the Company's other operations.  The Levin-Wolf Sale is supported by the Company's secured lenders.

21.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions (defined below and filed contemporaneously herewith) this Declaration is organized as follows:

- **Part I** provides a general overview of the Debtors' corporate history and business operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

A000453

- **Part III** provides a discussion of the circumstances leading to these chapter 11 cases and the Debtors efforts to pursue alternate restructuring options; and

- **Part IV** sets forth the evidentiary basis in support of the relief requested in each of the First Day Motions.

## I.  The Company's Corporate History and Business Operations.

### A.  Corporate History

22.  Mr. Art Van Elslander founded Art Van Furniture in 1959 with the first location on Gratiot Avenue and 10 Mile Road in East Detroit, Michigan.  From 1959 through the 1970s, Mr. Van Elslander focused on building the foundation for his furniture store footprint.  During this time he opened additional stores and acquired the current corporate headquarters and distribution center in Warren, Michigan.  From 1980 to 2000, Art Van Furniture focused on its expansion in the state of Michigan and introduced the first Art Van credit card, the clearance center concept, and ArtVan.com.  By 1997, following growth in the early to mid-1990s, the Company had increased in size to a total of twenty-six stores with over 2,600 employees.  Further, in the following decade the Company would open seven more stores for a total of 33 stores in 2009.  In this most recent decade, the Company experienced its most intense growth phase under former CEO Kim Yost, who led the business from 2009 until his departure in 2018.  In 2010, the Company began to execute on its freestanding PureSleep mattress store thesis.  From 2011–2015, the Company acquired 27 Mattress World stores, began franchising, and entered the Chicago market.  Upon Art Van Elslander's sale of the Company in 2017, the enterprise had 113 stores, more than triple the amount of stores than it did in 2009.  Around this time, the Company was ranked as number nineteen on Furniture Today's "Top 100 list."

23.  In 2016, founder and sole owner Art Van Elslander decided to explore exit opportunities and engaged in a transaction to sell the Company and its owned real estate to THL

A000454

for $612.5 million, which transaction closed in March 2017 (the "2017 Transaction"). At the closing of the 2017 Transaction, THL acquired the operating assets of the business and certain real estate investment trusts acquired the owned real estate portfolio. The proceeds from the sale-leaseback transaction were used to fund the purchase price paid to the selling shareholders. Later in 2017, the Company acquired two Pennsylvania-based furniture companies: Levin, with operations in greater Pittsburgh and Cleveland, and Wolf, with operations in eastern Pennsylvania, Maryland, and Virginia. The Company continued its growth strategy through further geographic expansion and new store openings, and it also invested in e-commerce capabilities to bolster the brand and improve consumer experiences. As of the Petition Date, the Company has 92 total furniture showrooms and 77 freestanding mattress and specialty locations.

**B.** **The Company's Products.**

24. Since its founding, Art Van Furniture has focused on retailing high-quality, made-to-last furniture that is available to customers across all price points. Art Van Furniture delivers an array of merchandise and uses a "Good-Better-Best" approach to pricing, which allows the Company to play up and down the value spectrum. The Debtors' store locations feature a seasonally refreshed assortment that has both exclusive and national brands, traditional and fashion-forward merchandise, and an optimal mix to maximize sales per square foot performance. To support the customer experience, Art Van Furniture has a financing program to offer customers flexibility in purchasing larger and more expensive items. Key comparable companies in the industry include Ashley Furniture, Raymour & Flanigan, Haverty's, Mattress Firm, and Rooms To Go. Other relevant companies in the industry include Bob's Discount Furniture, IKEA, Ethan Allen, Restoration Hardware, and Gardner White.

A000455

**C.     The Company's Brands.**

25.     The Company operates stores under five primary retail nameplates: Art Van®, Art Van PureSleep®, Scott Shuptrine Interiors, Levin, and Wolf.  The respective stores operate as follows:



*Art Van* features high-quality, made-to-last furniture featuring deals on furniture for every room in your home.



*Pure Sleep* features top brand mattress and other sleep and bedding related goods and products at accessible prices.



*Scott Shuptrine* is primarily a store-within-a-store format offering exclusive and custom designed home furniture and furnishings



*Levin Furniture*, including the *Levin Mattress* nameplate, features a wide selection of modern and stylish living room, dining room, and bedroom furniture, including mattresses, with operations in the greater Pittsburgh and Cleveland area.



*Wolf Furniture* features a wide selection of eclectic furniture from around the country, including Amish made furniture, with operations in Pennsylvania, Maryland and Virginia.

The Art Van and Art Van PureSleep nameplates have their own standalone stores and operate under the website artvan.com.  Both Levin Furniture (including Levin Mattress) and Wolf Furniture nameplates operate their own standalone stores and operate under the websites levinfurniture.com and wolffurniture.com, respectively.

**D.     The Company's Business Operations.**

26.     The Company markets and sells its merchandise through a variety of different channels, including stand-alone stores, franchised locations, and their e-commerce platforms.

14

A000456

### 1. Brick-and-Mortar Presence.

27.  ***Stand-Alone Stores.***   The Company maintains a substantial domestic presence.   Currently, the Company operates 169 stores across 9 states.  Of these, 92 are showroom and 77 are freestanding sleep and specialty stores.  Certain furniture showroom locations have attached Clearance Center & Outlet stores to sell discounted products and merchandise.



28.  ***Franchise Stores.***  The Company also has arrangements with franchisees (each, a "Franchise Store").   There currently are 20 Franchise Stores across the United States.   The Franchise Stores are subject to franchise agreements with the Company, pursuant to which the Company supplies franchisees with product and receives a royalty on sales.

### 2. E-Commerce Platform.

29.  In addition to its physical footprint, the Company maintains a user-friendly and well-curated e-commerce platform with the goal of facilitating a complete, omnichannel customer experience to help educate them before they arrive at a showroom.  Customers can seek out the latest home furnishing trends, explore different options for an array of different furniture styles, and purchase furniture online.  In 2019, e-commerce accounted for approximately 2% of sales.



A000457

### 3. Distribution Centers

30. The Company primarily operates from two principal distribution centers, one of which is co-located with Art Van's headquarters in Warren, MI. The second distribution center is located in Smithon, PA.

## II. The Company's Prepetition Corporate and Capital Structure.

31. A summary chart depicting the Debtors' corporate structure is attached to this Declaration as **Exhibit A**. As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations under the Prepetition ABL Credit Facility and the Prepetition Term Loan (each as defined herein) in the aggregate principal amount of approximately $208.5 million. The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Principal Outstanding as of the Petition Date |
|---|---|---|
| Prepetition ABL Credit Facility | March 1, 2022 | $33.5 million |
| Prepetition Term Loan | March 1, 2024 | $175 million |
| Total Funded Debt | | $208.5 million |

## A. The Prepetition ABL Credit Facility.

32. The Debtors are party to that certain amended and restated senior secured revolving credit facility, dated as of March 1, 2017 (as amended from time to time the "Prepetition ABL Credit Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower agent, certain of its subsidiaries, as subsidiary borrowers, certain of its subsidiaries, as guarantors, and Wells Fargo, as administrative agent collateral agent, and issuing bank, and the Lenders party thereto. The Prepetition ABL Credit Agreement provides for total revolving credit commitments of $82.5 million with a maturity date of March 1, 2022 (the "Prepetition ABL Credit Facility").

A000458

Approximately $33.5 million is currently outstanding in principal under the Prepetition ABL Credit Facility.

33.     The obligations under the Prepetition ABL Credit Facility are secured by a security interest in substantially all of the Debtors' assets.  However, solely with respect to liens on certain of the Debtor's fixed assets, the liens securing the Prepetition ABL Credit Facility on such assets are subordinated, to the extent set forth in that certain intercreditor agreement, dated March 1, 2017 (as amended from time to time, the "Intercreditor Agreement"), to the payment in full of the obligations in respect of the Prepetition Term Loan.  The Prepetition ABL Credit Agreement contains various affirmative and negative covenants, representations, and warranties, including a covenant that the Debtors maintain a certain amount of excess availability.  Due to the Debtors' deteriorating financial performance, Wells Fargo increased certain reserves in the months leading up to the Petition Date.

**B.     The Prepetition Term Loan.**

34.     The Debtors are party to that certain term loan credit agreement (the "Prepetition Term Loan Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower, certain of its subsidiaries, as guarantors, Virtus Group, LP ("Virtus"), as administrative agent and collateral agent, and the lenders party thereto.  The Prepetition Term Loan matures on March 1, 2024 (the "Prepetition Term Loan").  Approximately $175 million is currently outstanding in principal on the Prepetition Term Loan.

35.     Obligations under the Prepetition Term Loan are secured by a security interest in substantially all of each Debtor's assets.  However, solely with respect to liens on the Debtor's trade receivables, inventory, cash intangibles and other assets collectively referred to as ABL Priority Collateral in the Intercreditor Agreement, the liens securing the Prepetition Term Loan on

A000459

such assets are subordinated, to the extent set forth in the Intercreditor Agreement, to the payment in full of the obligations in respect of the Prepetition ABL Credit Facility.

36.     The Prepetition Term Loan Agreement was subsequently amended, including on February 5, 2020 (the "Term Loan Amendment").  Among other things, pursuant to the Term Loan Amendment, Virtus and certain of the Prepetition Term Loan lenders agreed to extend the deadline to deliver the 2019 annual financial statements to February 28, 2020.

## III.    Additional Information Regarding the Debtors' Efforts to Pursue Alternate Restructuring Options.

37.     Recognizing the need to explore strategic alternatives, the Debtors worked closely with THL and their advisors to evaluate available solutions to the Debtors' deteriorating circumstances, including efforts to continue the business as a going concern by means of one or more out of court transactions.

### 1.    Prepetition Marketing Process.

38.     The Debtors, with the assistance of their advisors, Evercore and A&M, engaged in discussions with various parties considered to be potential investors in the business.  Evercore and A&M compiled diligence information and responded to a high volume of diligence requests from multiple interested parties.

39.     Prior to the Petition Date, Evercore and members of the Board contacted at least 31 potentially interested strategic, financial, corporate and individual parties, including at least 19 parties interested in the whole company and at least 12 parties interested in Levin and/or Wolf. Many of these parties entered into confidentiality agreements with the Debtors and received various confidential information documents, and thus began the diligence process.  As discussed above, the Debtors made substantial progress towards consummation of the Consortium Proposal, but due to market conditions and the uncertain financial viability of the business, the Debtors were

A000460

unable to secure investments needed for an actionable going-concern reorganization of the entire business.

### 2.   The Expedited Levin-Wolf Sale.

40.    Prior to the Petition Date, Robert Levin, the former owner of the Levin entities, submitted a written proposal, and the Debtors worked to finalize the Wolf-Levin LOI, pursuant to which Robert Levin will purchase substantially all of the assets of Debtors Sam Levin, Inc. and LF Trucking, Inc., excluding inventory located at the eight Maryland and Virginia Wolf locations (the "Assets"), as part of an expedited sale process under section 363 of the Bankruptcy Code.  The purchase price consists of a combination of cash consideration and assumed liabilities, including: a cash payment equal to 82.25% of the agreed value of Wolf and Levin's actual cost of goods and freight, the amount of allowed section 503(b)(9) claims related to the Assets, the amount of any cure costs for executory contracts or unexpired leases assumed as part of the Levin-Wolf Sale, and an incremental payment of $3,650,000.  The Levin-Wolf Sale also contemplates the assumption of customer deposits and employee obligations related to the Wolf and Levin business.

41.    After hard-fought negotiations, the Debtors and Robert Levin reached an agreement on material terms and are currently moving toward definitive documentation.  The Debtors are commencing an expedited sale process to close the Levin-Wolf Sale to prevent continued diminution of value and mitigate the risk of employee and customer attrition as the Debtors contemporaneously pursue the Wind-Down with respect to the Art Van store portfolio.  The Levin-Wolf Sale contemplates the following timeline:

- the Debtors shall file a motion to approve a private sale of the Assets to Robert Levin no later than five (5) days following the Petition Date;

- the buyer and Debtors shall enter into an asset purchase agreement for the sale of the Assets no later than ten (10) days following the Petition Date; and

A000461

- the Court shall enter an order approving the asset purchase agreement no later than twenty-one (21) days following the Petition Date.

42. The Debtors expect the Levin-Wolf Sale to maximize recoveries for the Debtors' creditors as well as to preserve jobs and the Levin and Wolf brands.

### 3. Store Closings.

43. Due to the challenges discussed above, and at the direction of Wells Fargo, the assets not included in the Levin-Wolf Sale will be subject to going-out-of-business sales conducted in accordance with the Consultant Agreement. To avoid incurring any unnecessary administrative expenses with respect to certain facilities where the Debtors are no longer operating and retain no assets of value, the Debtors expect to take a number of steps to reduce their expenses moving forward, including filing contract and lease rejection motions, pursuant to which the Debtors will seek to reject store leases and contracts that the Debtors and their advisors have determined are no longer be necessary to the Debtors' business operations.

## IV. Relief Sought in First Day Motions.

44. Contemporaneously herewith, the Debtors filed the First Day Motions seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases. The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates. A list of the First Day Motions is attached hereto as **Exhibit C**.

45. These First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, honor employee-related wages and benefit obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to

A000462

give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

46.     Several of these motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

47.     I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; and (b) best serves the interests of the Debtors' stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

*[Remainder of Page Intentionally Blank]*

A000463

Dated:  March 8, 2020
Wilmington, Delaware

/s/ David Ladd
Name: David Ladd
Title:   Executive Vice President and Chief Financial
          Officer

A000464

**Exhibit A**

**Corporate and Capital Structure**

A000465



A000466

**Exhibit B**

**Levin-Wolf LOI**

A000467

March 4, 2020

David Ladd, Chief Financial Officer
Michael Zambricki, Vice President and General Counsel
Sam Levin, Inc.
LF Trucking, Inc.
6500 E 14 Mile Rd
Warren, MI 48092

    **Re:**    **Purchase of Substantially All of the Assets of Sam Levin, Inc. and LF Trucking, Inc.**
                    **Assets by a Newly-Formed Entity Owned and Controlled by Robert Levin**

This non-binding letter of intent (this "Letter Agreement" is intended to confirm certain understandings between Company representatives, Sam Levin, Inc., LF Trucking, Inc. and Buyer (defined below) with respect to the potential purchase by Buyer of substantially all of the assets free and clear of all liens, claims and encumbrances except for such liabilities explicitly assumed by Buyer pursuant to an order of the Bankruptcy Court (defined below). If this letter of intent accurately summarizes the understanding of Company representatives, Sam Levin, Inc. and LF Trucking, Inc. with respect to the potential transaction, please date and execute this letter of intent and return the same to me.

| | |
|---|---|
| **Buyer:** | Levin Furniture, LLC and Levin Trucking, LLC, newly formed entities controlled by Robert Levin, ("Buyer") (Buyer, Sam Levin and LF Trucking, Inc. are each a "Party", herein collectively referred to as the "Parties"). |
| **Seller:** | Sam Levin and LF Trucking, Inc. |
| **Purchased Assets:** | Substantially all of the assets of Sam Levin, Inc. and LF Trucking, Inc. (the "Assets"), excluding the inventory located at the eight Maryland and Virginia Wolfe locations. |
| **Purchase Price:** | The Inventory Valuation (defined below), _less_ any amounts of customer deposits and employee obligations existing as of the date of closing _plus_ the amount of section 503(b)(9) claims allowed pursuant to an order of the Bankruptcy Court (defined below) and any cure costs associated with any leases and/or executory contract designated for assumption by the Buyer and approved for such assumption and assignment by an order of the Bankruptcy Court (defined below) (the customer deposits, employee obligations, section 503(b)(9) claims and cure costs will be referred to herein as "Additional Consideration") _plus_ $3,650,000 related to FF&E and other related assets. |
| | The term "Inventory Valuation" means 82.25% of the estimated value of the Seller's actual cost of goods plus freight based upon actual record receipts provided by Seller (which valuation excludes the value of the inventory located at the eight Maryland and Virginia Wolfe locations we estimate to be over $4,500,000). |

**Security Deposit:**   Buyer will deposit $2,000,000 in cash (the "<u>Deposit</u>") promptly following execution of this Letter Agreement in an interest bearing escrow account held by a mutually agreeable escrow agent pursuant to a commercially reasonable escrow agreement.  The Deposit is refundable in the following instances: 1) the Seller terminates the transaction or otherwise materially breaches any of its obligations under the definitive documentation required to implement the transactions contemplated hereby; 2) the Bankruptcy Court does not approve the transaction; 3) the Bankruptcy Court approves an alternative transaction for the sale of the Assets; or 4) the transaction does not close on or before 30 days from the Petition Date (defined below).  The Deposit is non-refundable in the event the Buyer terminates the transaction unilaterally or otherwise materially breaches any of its obligations under the definitive documentation required to implement the transactions contemplated hereby..

**Fiduciary Duty:**   Notwithstanding anything to the contrary in this Letter Agreement or the Definitive Agreements (defines below), nothing in such agreements shall require a Debtor party or the board of directors, board of managers, or similar governing body of a Debtor party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the restructuring transactions contemplated by this letter of intent to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction shall not be deemed to constitute a breach of those agreements.

**Bankruptcy Filing:**   No later than March 8, 2020,or such other date as may be agreed to by the Parties (the "<u>Petition Date</u>") Sam Levin, Inc. and LF Trucking, Inc. (the "<u>Debtors</u>") shall file voluntary petitions for protection under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware ("<u>Bankruptcy Court</u>").

**Sale Process:**   No later than 5 days following the Petition Date, or such other date as may be agreed to by the Parties, the Debtors shall file a motion to approve private sale of the Assets to Buyer ("<u>Sale Motion</u>").  The Sale Motion must explicitly request approval of the sale of the Assets to Buyer without futher marketing, competitive bidding or an alterntive transaction.

No later than 10 days following the Petition Date, or such other date as may be agreed to by the Parties, Buyer and Seller shall enter into an asset purchase agreement for the sale of the Assets in a form reasonably acceptable to Buyer, subject only to Bankuptcy Court approval ("<u>Asset Purchase Agreement</u>").

No later than 21 days following the Petition Date, or such other date as may be agreed to by the Parties, the Bankruptcy Court shall enter an order approving the Asset Purchase Agreement and the closing of the sale of the Assets to Buyer free and clear of all liens, claims and excumbrances, other than such claims explicitly assumed by Buyer in the Asset Purchase Agreement with a finding that the Buyer is a "good faith purchaser" for sufficient value for the Assets and approval of the assumption and assignment of unexpired leases and executory contracts designated by the Buyer for such assumption and assignment ("<u>Sale Order</u>").

Until the entry of the Sale Order, the Buyer has the right to designate which unexpired leases and executory contracts shall by assumed and assigned pursuant to the Sale Order. Seller shall cooperate with Buyer to permit Buyer access to the Seller's landlords for the purpose of negotiating amendments to such leases.

The Sale Order shall include an explicit provision waiving any stay of the Sale Order (i.e. Federal Rule of Bankruptcy Procedure 6004(f)) to permit the Buyer and Seller to close promptly upon entry of the Sale Order.

**Expenses:** Each of the Parties would pay their own legal fees and other incidental expenses incurred in connection with the transactions contemplated hereby.

**Due Diligence:** Buyer waives any due diligence, other than verification of the Inventory Valuation and any items that comprise the Additional Consideration.

**Closing Date:** The Buyer and Seller shall close on the transaction within two (2) business days from the entry of the Sale Order.

**Closing Conditions:** Closing shall occur, and the Definitve Agreements (defined below) shall become effective, only upon timely entry of the Sale Order in a form and manner acceptable to Buyer in accordance with the timeframes set forth herein.

**Documentation:** The Parties intend to prepare and negotiate (i) the Asset Purchase Agreement, and (ii) any other agreements reasonably necessary to consummate the transactions contemplated hereby.

**Miscellaneous:** This letter of intent sets forth the intent of the Parties with respect to the transactions contemplated hereby but does not create any legal or binding obligation, except for the provisions set forth under the title "Miscellaneous" of this letter of intent (the "<u>Binding Provisions</u>"), which provisions shall be binding on each Party. Except for the Binding Provisions, no other obligation will arise unless and until mutually satisfactory definitive documentation, including the Asset Purchase Agreement (the "<u>Definitive Agreements</u>"), has or have been executed and delivered by the Parties hereto. This letter of intent will be governed by the laws of the Commonwealth of Pennsylvania and may not be amended, and no provision hereof may be waived or modified, except by an instrument in writing signed by the party to be bound. This letter of intent may be executed in any number of counterparts, each of which shall be deemed to be an original. This letter of intent shall not become effective until executed by all Parties.

Sincerely,

Levin Furniture, LLC

By: _Robert Levin_

Print Name: _Robert Levin_

Title: _President_

Date: _3/4/20_

Levin Trucking, LLC

By: _Robert Levin_

Print Name: _ROBERT LEVIN_

Title: _President_

Date: _3/4/20_

*Duly Executed and Agreed to by Seller:*

Sam Levin, Inc. / LF Trucking, Inc.

By:
Print Name: Michael Zambricki
Title: Secretary
Date: Sam Levin, Inc.
March 4, 2020

By:
Print Name: Michael Zambricki
Title: Secretary, LF Trucking, Inc.
Date: March 4, 2020

A000472

## Exhibit C

## First Day Motions

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief;*

- *Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of an Order (A) Authorizing the Debtors to File a (I) Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (III) Redact Certain Personally Identifiable Information for Individual Creditors and Interest Holders and (B) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (V) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement, and (IV) Granting Related Relief;* and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Specified Lienholder Claims and (II) Granting Related Relief.*

A000474

# EXHIBIT B

A000475

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3                                      .    Chapter 11
      IN RE:                           .
4                                      .    Case No. 20-10553 (CSS)
      ART VAN FURNITURE, LLC, et al., .
5                                      .    Courtroom No. 6
                                       .    824 North Market Street
6                                      .    Wilmington, Delaware 19801
                                       .
7                    Debtors.          .    March 10, 2020
      . . . . . . . . . . . . . . . .  .    10:00 A.M.
8
                   TRANSCRIPT OF FIRST DAY HEARING
9           BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                   UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For the Debtors:          Gregory G. Werkheiser, Esquire
                                Michael J. Barrie, Esquire
13                              Jennifer Hoover, Esquire
                                Kevin Capuzzi, Esquire
14                              John C. Gentile, Esquire
                                BENESCH, FRIEDLANDER, COPLAN
15                                 & ARONOFF LLP
                                222 Delaware Avenue, Suite 801
16                              Wilmington, Delaware 19801

17

18    Audio Operator:          Leslie Murin

19    Transcription Company:   Reliable
                                1007 N. Orange Street
20                              Wilmington, Delaware 19801
                                (302)654-8080
21                              Email:  gmatthews@reliable-co.com

22    Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
23

24

25
```

A000476

```
 1    APPEARANCES (Continued):

 2    For the Debtors:          Marua I. Russell, Esquire
                                MONTGOMERY MCCRACKEN WALKER
 3                                 & RHOADS LLP
                                437 Madison Avenue, 24th Floor
 4                              New York, New York 10022

 5
      For U.S. Trustee:         Linda Richenderfer, Esquire
 6                              David Buchbinder, Esquire
                                UNITED STATES DEPARTMENT OF JUSTICE
 7                              OFFICE OF UNITED STATES TRUSTEE
                                844 King Street, Suite 2207
 8                              Lockbox 35
                                Wilmington, Delaware 19801
 9
      For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                              MORGAN LEWIS & BOCKIUS LLP
                                101 Park Avenue
11                              New York, New York 10178

12                             - and -

13
                                Cory Falgowski, Esquire
14                              BURR & FORMAN LLP
                                1201 N. Market Street, Suite 1407
15                              Wilmington, Delaware 19801

16    For Kingsdown, Inc.:      Gregory Taylor, Esquire
                                ASHBY & GEDDES LLP
17                              500 Delaware Avenue, 8th Floor
                                P.O. Box 1150
18                              Wilmington, Delaware 19899

19
      For Landlords:            Leslie C. Heilman, Esquire
20                              BALLARD SPAHR LLP
                                919 North Market Street, 11th Floor
21                              Wilmington, Delaware 19801

22    For Hilco & Gordon        Steven E. Fox, Esquire
      Brothers:                 RIEMER & BRAUNSTEIN LLP
23                              Times Square Tower, Suite 2506
                                Seven Times Square
24                              New York, New York 10036

25
```

A000477

APPEARANCES (Continued):

For Levin Furniture:      William C. Price, Esquire
                          CLARK HILL PLC
                          One Oxford Centre
                          301 Grant Street, 14th Floor
                          Pittsburgh, Pennsylvania 15219

For US Assets, Inc.:      Zachary I. Shapiro, Esquire
                          RICHARDS, LAYTON & FINGER LLP
                          920 North King Street
                          Wilmington, Delaware 19801

A000478

FIRST DAY MOTIONS:

**Joint Administration Motion.** Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief [Docket No. 2]

**Ruling:  Order Entered**

**Creditor Matrix Motion.** Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to File a (A) Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (B) Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, (III) Authorizing the Debtors to Redact Certain Personal Identification Information, and (IV) Granting Related Relief [Docket No. 6]

**Ruling:  Order Entered**

**Kurtzman Carson Consultants LLC 156(c) Retention Application.** Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date [Docket No. 3]

**Ruling:  Order Entered**

**Cash Management Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief [Docket No. 4]

**Ruling:  Order Entered**

**Customer Programs Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief [Docket No. 27]

**Ruling:  Order Entered**

**Cash Collateral Motion.** Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief [Docket No. 5]

**Ruling:  Order Entered**

A000479

1  **Taxes Motion.** Debtors' Motion for Entry of Interim and Final Orders
   (I) Authorizing the Payment of Certain Prepetition Taxes and Fees
2  and (II) Granting Related Relief [Docket No. 7]

3  **Ruling:  Order Entered**

4  **Utilities Motion.** Debtors' Motion for Entry of Interim and Final
   Orders (I) Determining Adequate Assurance of Payment for Future
5  Utility Services, (II) Prohibiting Utility Providers from Altering,
   Refusing, or Discontinuing Utility Services, (III) Establishing
6  Procedures for Determining Adequate Assurance of Payment, (IV)
   Requiring Utility Providers to Return Deposits for Utility Services
7  No Longer in Use, and (V) Granting Related Relief [Docket No. 8]

8  **Ruling:  Order Entered**

9  **Wages Motion.** Debtors' Motion for Entry of Interim and Final Orders
   (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages,
10 Salaries, Other Compensation, and Reimbursable Employee Expenses and
   (B) Continue Employee Benefits Programs and (II) Granting Related
11 Relief [Docket No. 9]

12 **Ruling:  Order Entered**

13 **NOL Motion.** Debtors' Motion for Entry of Interim and Final Orders
   (I) Approving Notification and Hearing Procedures for Certain
14 Transfers of and Declarations of Worthlessness With Respect to
   Common Stock and (II) Granting Related Relief [Docket No. 10]

15 **Ruling:  Order Entered**

16 **Lienholder Claims Motion.** Debtors' Motion for Entry of Interim and
   Final Orders (I) Authorizing Debtors to Pay Certain Prepetition
17 Specified Lienholder Claims and (II) Granting Related Relief [Docket
   No. 11]
18
19 **Ruling:  Order Entered**

20

21 EXHIBITS:                                    ID      Rec'd

22 Declaration of David Ladd                             52

23

24

25

A000480

1          (Proceedings commence at 10:27 a.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Please be seated.

4          Good morning, Mr. Werkheiser.

5               MR. WERKHEISER:  Good morning, Your Honor.  For

6     the record Gregory Werkheiser, Benesch Friedlander Coplan &

7     Aronoff LLP, proposed counsel for the debtors.

8               Thank you, Your Honor, for accommodating us so we

9     could have this expedited first day hearing in these cases.

10               If I may, Your Honor, just before we get underway,

11     I'd like to make some quick introductions to the court.

12               THE COURT:  Of course.

13               MR. WERKHEISER:  So, seated behind me, Your Honor,

14     is the debtors' chief financial officer and executive vice

15     president, Mr. David Ladd.

16               THE COURT:  Sir.

17               MR. WERKHEISER:  He's joined us from Detroit,

18     Illinois.  Also with us today, Your Honor, is Mr. Dennis

19     Stogsdill from Alvarez & Marsal North America.

20               THE COURT:  Welcome.

21               MR. WERKHEISER:  He leads the engagement with

22     Alvarez for this case.

23               THE COURT:  Very good.

24               MR. WERKHEISER:  Joining me, Your Honor, at

25     counsel's table, I think, are some familiar faces.  You know

A000481

1    Mr. Capuzzi, Mr. John Gentile, Kate Harmon, Jennifer Hoover;

2    all from the Benesch Firm.  Then our special counsel, Marua

3    Russell, who I know is familiar to this court as well.

4              THE COURT:  Welcome.

5              MR. WERKHEISER:  Just before we proceed, in the

6    press of getting everything done, we did not have an

7    opportunity to file a *pro hac* motion for Ms. Russell.  If the

8    court wanted to entertain an oral motion we will file for

9    something in writing.

10             THE COURT:  All right.  I assume she's admitted

11   somewhere.

12             MR. WERKHEISER:  I will represent that Ms.

13   Russell, to my understanding, is admitted and in good

14   standing in New York and other jurisdictions.  And we would

15   have no reservations at all in signing her *pro hac* motion.

16             THE COURT:  Very good.  Happy to admit you *pro hac*

17   *vice* pending entry of an order.

18             MR. WERKHEISER:  Thank you, Your Honor.

19             Your Honor, if its acceptable to the court what we

20   would propose to do is give Your Honor a brief overview, and

21   I'm going to emphasize because I know Your Honor is pressed

22   for time this morning and we've already taken some to try to

23   work out issues.  A brief overview of the case and the

24   company, and then what we would like to do is try to work

25   through what I think are the least controversial of the first

1    days; joint administration, the creditor matrix motion, KCC,

2    cash management, customer programs, taxes, utilities, wages

3    and lienholders.  I think then we would like to take up the

4    cash collateral, and I think the only open issues we're aware

5    of there at this point involves some comments from our U.S.

6    Trustees Office that in the time we had available we resolved

7    a lot of them, but we do have a couple outstanding still.

8           Then there are, of course, a couple of matters

9    that we did not have an opportunity to get on the docket

10   until last evening.  One is a supplement small DIP facility

11   that relates to just one of the debtors.  The second one is

12   the GOB sale motion.  We understand what the court said in

13   terms of scheduling of those matters.  We would like to just

14   discuss them with the court before the end of today's hearing

15   and see if we can't accomplish a little bit with those

16   motions and agree with people on a path forward.

17          THE COURT:  Okay.

18          MR. WERKHEISER:  So, Your Honor, again, to

19   expedite things I'm going to assume Your Honor has had a

20   chance to read our first day declaration.

21          THE COURT:  I did, yes.

22          MR. WERKHEISER:  So, this is on the spectrum of

23   Chapter 11 cases a more difficult case.  This is a company

24   that, you know, finds itself in significant distress and for

25   which the circumstances have dictated for the majority of the

A000483

1 business there is no other option but liquidation.  And so in

2 that sense it is regrettable that we have to be here today

3 because it means some jobs will be lost, and creditors, you

4 know, may not achieve recoveries that they were hoping for,

5 but I can assure you that the company and its advisors are

6 here today to do the best that they can to not only maximize

7 value, but to do this in a way that is most respectful of all

8 the stakeholders who are affected by this process and that,

9 you know, minimizes any harm to anyone as part of this

10 process.

11      The good news, Your Honor, is that despite all of

12 the head winds that this company faced leading to getting

13 here today, and being in the bankruptcy court, and the

14 inability to save the core, Art Van Furniture, business from

15 liquidation.  We are in the happy position of having a buyer

16 for the Wolf and Levin furniture lines.  These are two

17 Pennsylvania based furniture retailers that were acquired in

18 2017 from the Levin Family.  And they had performed somewhat

19 better than other parts of the business; although, they have

20 had their own challenges.

21      Fortunately, as part of the process that got us

22 here today, the company and its advisors were able to engage

23 successfully with them and ultimately to come to an

24 understanding on a proposed assert purchase acquisition of

25 the assets of the Sam Levin, Inc. entity, which is one of our

1   debtors, and LF Trucking, Inc., which is a second of our

2   debtors.  Those are the debtors that hold the assets related

3   to those two retail furniture lines.  We are going to be

4   seeking, although not shortening notice, but to proceed with

5   a very expedited sale process for that by, if at all

6   possible, a private sale process because of the, otherwise,

7   dire liquidity situation of the overall company.

8           Part of the relief that we had sought through the

9   filings yesterday was to get, when Your Honor can entertain

10  it, what would be a small inventory DIP for that piece of the

11  business which would encumber only those assets and none

12  others, then would ultimately be credited against the

13  purchase price to be paid for those assets when that sale

14  closes.  The concept there is to simply give the company

15  liquidity for a runway to purchase inventory and preserve

16  going concern value over the expedited sales process as

17  contemplated; just for context, Your Honor.

18          So, stepping back for a moment, Your Honor, I --

19  we are relatively recently involved as a firm in the case,

20  but in the short time that we have been on the case I've come

21  to understand that this company is, in a way, sort of an

22  iconic institution for a lot of people in the mid-west.  A

23  lot of people in Michigan especially, you know, have some

24  piece of Art Van Furniture in their house.  So, I think, you

25  know, even lawyers, and lawyers, obviously, are not the most

1    sentimental bunch in the world, lawyers who have called or

2    emailed me about this case since it filed have expressed, you

3    know, some bit of sadness that the company is going away, but

4    a fondness for the company over the years.  So, you know, we

5    are, sort of, mindful of that and will proceed accordingly.

6         The goal for this case, you know, given the

7    difficult circumstances, given the lack of access to capital

8    in the markets that was available to the company, and just eh

9    operational and financial challenges that it faced is, you

10    know, unfortunately to maximize value through a liquidation

11    of most of the locations, preserve the going concern on the

12    balance and hopefully save those thousand jobs, and provide a

13    benefit to those creditors.  To do that as expeditiously as

14    possible maximizing value and doing as little harm to our

15    creditors and other stakeholders as possible along the way.

16         Again, I think I will cut-off opening comments

17    there, Your Honor, and jump right into the first day agenda

18    unless Your Honor has questions or comments before we proceed

19    with that.

20         THE COURT:  I do not.  Thank you very much.

21         MR. WERKHEISER:  Thank you.

22         Your Honor, I'm going to turn the podium over to

23    Mr. Gentile who's going to present our joint administration

24    motion, then I or Mr. Capuzzi will be back up at the podium

25    in just a moment.

A000486

 1                 THE COURT:  Okay.

 2                 MR. GENTILE:  Good morning, Your Honor.

 3                 THE COURT:  Good morning.

 4                 MR. GENTILE:  John Gentile from Benesch

 5     Friedlander Coplan & Aronoff LLP, proposed counsel for the

 6     debtors.

 7                 Before we get started, Your Honor, I have a stack

 8     of orders here.  May I approach?

 9                 THE COURT:  Yes, you may.  Thank you.

10                 MR. GENTILE:  Your Honor, before I begin just one

11     slight change in scheduling.  I'm going to be handling the

12     joint admin and the KCC retention app.  I think the creditor

13     matrix is sandwiched in between, and Kevin Capuzzi is going

14     to handle that one.

15                 THE COURT:  Okay.

16                 MR. GENTILE:  So, for our first motion the debtors

17     request that they be allowed to administer these cases

18     jointly.  There are no objections to the joint admin.  So, we

19     ask that the court enter the order.

20                 THE COURT:  Any changes?

21                 MR. GENTILE:  No changes.

22                 THE COURT:  Do you have a copy that doesn't have

23     this legend at the top because if I file this, if I e-file

24     with this legend on the top and then anyone else prints it

25     with their legend on the top its going to be unreadable.  So,

A000487

1    all clean orders can't have that.

2              MR. GENTILE:  I do understand, Your Honor.

3              THE COURT:  Yeah.  It just looks like the only

4    ones are the -- the consolidated list of creditors has the

5    same problem. All the others look fine -- well, no, I lied,

6    the others have the same problem.

7              MR. GENTILE:  Your Honor, may we submit the orders

8    immediately after the hearing?

9              THE COURT:  Yes.

10             MR. GENTILE:  Okay.  Thank you.

11             THE COURT:  I will orally grant joint

12   administration.

13             MR. GENTILE:  Thank you, Your Honor.

14             THE COURT:  Can you just upload them for Ms.

15   Szymanski --

16             MR. GENTILE:  Yes.  We will upload them.

17             THE COURT:  -- and she will take care of them.

18             MR. GENTILE:  Moving onto the KCC retention

19   application your folder only contains a redline.  We needed

20   to resolve one minor comment from the U.S. Trustee that is

21   reflected in the redline.  There were no other objections or

22   comments.  So, as a result we ask that we be allowed to

23   upload a clean order by the court.

24             THE COURT:  Does anybody wish to be heard?

25             MS. RICHENDERFER:  Your Honor, Linda Richenderfer

1    for the U.S. Trustees Office.

2          I have just asked counsel if I could have a copy

3    of what Your Honor is looking at so I can just make certain

4    that the remaining comment I had was addressed.

5          THE COURT:  Its looks like it's at the top of Page

6    4.

7          MS. RICHENDERFER:  Thank you, Your Honor.  No

8    objection.

9          THE COURT:  Okay.  The court will grant the

10   motion.  Just upload a clean version and it will be entered.

11         MR. GENTILE:  Thank you, Your Honor.

12         At this time I would like to introduce my

13   colleague, Kevin Capuzzi.

14         THE COURT:  Thank you very much, sir.

15         MR. CAPUZZI:  Good morning, Your Honor.  For the

16   record Kevin Capuzzi of Benesch Friedlander Coplan & Aronoff,

17   proposed counsel for the debtors.

18         THE COURT:  That law firm is a real mouthful.

19      (Laughter)

20         MR. CAPUZZI:  I know, right.  We need to shorten

21   that; the Werkheiser Firm.

22      (Laughter)

23         MR. CAPUZZI:  Your Honor, I'm going to be running

24   through some operational motions.  I also have the cash

25   management or the creditor matrix motion which I know there

A000489

1  is an objection by the U.S. Trustee.  So, what I propose is

2  to go through some of the more routine ones and then handle

3  creditor matrix at the end.

4          THE COURT:  Okay.

5          MR. CAPUZZI:  All right. So, the first one I'm

6  going to handle is Number 6 on the agenda, it's the cash

7  management motion.  The debtors seek authority to continue

8  their prepetition cash management system and honor

9  obligations in connection therewith.

10          The debtors have about 45 bank accounts that are

11  spread across six banks.  They are all in the United States.

12  All but two of those 45 accounts are on the U.S. Trustees

13  approved list.  And the two that are not on the approved list

14  do not exceed the FDIC insured maximum levels.  Continuation

15  of these systems will facilitate the smooth transition into

16  Chapter 11.

17          I do have, Your Honor, a redline of that order.

18  If you can't easily find it in your packet I can hand it up.

19          THE COURT:  I think I have it right -- I think

20  what you gave me was the redline.

21          MR. CAPUZZI:  Okay.  These are all agreed changes

22  with the Office of the United States Trustee. We do not have

23  any outstanding issues.  So, we will, unless the court has

24  any questions, upload a copy of that order.

25          THE COURT:  It looks like I have a clean here.

A000490

 1        MR. CAPUZZI:  I don't think you do.  I think it

 2   looks like there is, but I paged through in the rush of this

 3   morning and I think that is a stapled copy of a redline that

 4   looks clean.

 5        So, I think just to make things easier we will

 6   upload; however, Your Honor --

 7        THE COURT:  You can upload.  That's fine.

 8        MR. CAPUZZI:  -- if you could orally grant that

 9   one just because we need to process payroll today.  That

10   would be very helpful.

11        THE COURT:  By the way, backing up to the Kurtzman

12   motion, I had the same comment.  So, thank you, Ms.

13   Richenderfer, for doing my job for me.

14        All right.  So, it's an interim order.

15        MR. CAPUZZI:  Correct.

16        THE COURT:  I'm sorry, does anyone -- I'm off my

17   game this morning.  I apologize.  I've only had six cups of

18   coffee today.

19        (Laughter)

20        THE COURT:  Does anyone wish to be heard in

21   connection with cash management?

22        (No verbal response)

23        THE COURT:  All right.  I hear none.  It's an

24   interim order so we need a date to fill in the blanks there

25   for a second day hearing.  So, now is a good a time as any to

A000491

1  talk about that.  Let's see, did you file yesterday?  You

2  filed Monday or you filed Sunday?

3            MR. CAPUZZI:  We filed Sunday night in the wee

4  hours.

5            THE COURT:  Okay.  Was it the wee hours of Monday

6  morning or was it Sunday night?

7            MR. CAPUZZI:  No.  It was the late hours of Sunday

8  night.

9            THE COURT:  Okay.  All right.  So, sometime the

10 week of March 30th for a second day hearing, Mr. Werkheiser,

11 is that all right?

12           MR. WERKHEISER:  I'm sorry, Your Honor, you said

13 the week of March 30th?

14           THE COURT:  Yeah, sometime that week.  That will

15 be 21 plus days from the -- the 31st is 21 days from today.

16 We can go into the next week.  We might need to actually

17 because I'm unavailable Thursday and Friday.  So, I guess we

18 could do April fool's day or we could do the week of April

19 6th which I have more availability the week of April 6th.

20           MR. WERKHEISER:  Your Honor, can we just consult?

21           THE COURT:  Yes, of course.

22           MS. RICHENDERFER:  Your Honor, Linda Richenderfer

23 again from the Office of the United States Trustees Office.

24           Just for the record, in case it effects anyone's

25 scheduling, we are currently -- the proposed date for the

A000492

1   committee formation meeting is Wednesday the 11th.

2          THE COURT:  Tomorrow.

3          MS. RICHENDERFER:  I'm sorry, Wednesday the 18th.

4   I'm mixing up my calendar here.

5          THE COURT:  That's okay.

6          MS. RICHENDERFER:  Just so that Your Honor has

7   that in mind.  So, April 1st would be good.  It would give

8   the committee, if formed, two weeks.

9          THE COURT:  Yeah.  I think April 1st is really the

10  earliest because if you file any new motions today that you

11  want to schedule for that hearing date that will be 21 days'

12  notice, but if you go -- actually, that will be 21 days'

13  notice, but if you go -- actually, that would be 22 days'

14  notice.  I'm think the week of March 6th makes the most sense

15  -- April 6th, I apologize.

16         MR. WERKHEISER:  Your Honor, I think that seems to

17  be the leading candidate.  I was just trying to give folks a

18  moment to confirm.  Ideally, if you could hear us that

19  Monday, April 6th that --

20         THE COURT:  Yeah.  I can fit you in.  One o'clock?

21         MR. WERKHEISER:  Fine for me, Your Honor.

22         THE COURT:  That way people coming from --

23         MR. WERKHEISER:  I don't see anybody --

24         THE COURT:  -- out of town can fly in that morning

25  hopefully and not have to spend Sunday night in exciting

A000493

 1  Wilmington, Delaware.  So, April 6th at one p.m., and then

 2  the objection deadline will be March 30th at four.  You don't

 3  have to put a time anymore, but if you want to put a time you

 4  can put four o'clock.  We will use that for the second day

 5  hearing for everything and that will include final cash

 6  collateral and final DIP after we have the interim DIP

 7  probably Thursday this week, but we will talk about that when

 8  we get to it.

 9          MR. WERKHEISER:  Thank you, Your Honor.

10          THE COURT:  All right.  So, fill those blanks in

11  and I will be happy to approve cash managment.  I orally

12  approve cash management along the lines set forth in the

13  motion for purposes of being able to process payroll.

14          MR. CAPUZZI:  Thank you, Your Honor.

15          The next motion will be the taxes motion which is

16  Number 9 in the amended agenda.  The debtors seek authority

17  to pay prepetition taxes and fees in an interim amount of

18  $854,000 dollars and a final amount of $1,031,000 dollars.

19  There's a table in Paragraph 10 of the motion that reflects

20  how that is broken down.

21          The order, as filed with the motion, reflects the

22  agreed changes with the U.S. Trustee.  There has been no

23  changes since then.  So, we would ask the court to enter that

24  order on an interim basis.

25          THE COURT:  Does anyone wish to be heard?

A000494

1      (No verbal response)

2           THE COURT:  All right.  We will use the same date

3  for the final hearing.  We have the same problem with the

4  form of orders so please upload it with the correct date and

5  the court will approve the motion.

6           MR. CAPUZZI:  Thank you, Your Honor.

7           The next motion is the wages motion which is

8  Number 11 in your binder.  The debtors seek authority to pay

9  prepetition wages, benefits and non-insider commissions in an

10  interim amount of approximately $12 and a half million

11  dollars, and a final amount of approximately $20.4 million

12  dollars.

13           There is a table in Paragraph 12 of the motion

14  which breaks that down in further detail.  These are wages

15  that are, otherwise, entitled to priority.  The debtors are

16  not seeking to exceed the cap imposed by Section 507(a)(4) of

17  the Bankruptcy Code.  The relief is necessary to maintain the

18  goodwill of the employees and the smooth transition into

19  Chapter 11.

20           The order, as filed, which we will have to re-

21  upload, reflects the agreed changes with the United States

22  Trustee.  So, unless there are any issues with that I'd ask

23  that it be entered and orally granted today so that we can

24  process payroll.

25           THE COURT:  Does anyone wish to be heard?

1        (No verbal response)

2            THE COURT:  All right.  The court will grant the

3    motion and it's granted subject to entry of an order, but

4    orally granted for purposes of process payroll.

5            MR. CAPUZZI:  Thank you, Your Honor.

6            And that's an interim order.  We will fill-in the

7    same dates.

8            THE COURT:  Yes.

9            MR. CAPUZZI:  The next motion is Number 12 in the

10   court's packet or the court's binder, I'm sorry.  This is the

11   NOL motion.  The debtors seek to establish procedures related

12   to the transfers or declarations of worthlessness as to

13   debtor Art Van Furniture stock.  They estimate roughly 90

14   million in federal NOL's and tax attributes which are

15   property of the estate.  These are requested notification

16   procedures that we would seek to approve on an interim basis.

17           There is a redline order in the court's packet.

18   There is just one very minor change at the request of the

19   Office of the United States Trustee and that is in the

20   procedures which are Exhibit 1 to the order and it is the

21   very last provision of the procedures. There was a procedure

22   that stated that the forms could be filed in a redacted

23   version.  I added, with the agreement of Ms. Richenderfer,

24   that it would be subject to the requirements of the new

25   robust Local Rule 9018.1(d).

1          Other than that, Your Honor, there were no further

2    comments from the Office of the United States Trustee. We'd

3    ask that this be entered on an interim basis subject to the

4    same dates and deadlines which we would upload following the

5    hearing.

6          THE COURT:  Does anyone wish to be heard?

7      (No verbal response)

8          THE COURT:  Court will grant the motion.

9          MR. CAPUZZI:  The next motion, Your Honor, is the

10   lienholder's motion which is Number 14 in the court's agenda.

11   The debtors seek authority to pay prepetition lienholder

12   claims in an interim amount of $1,154,000 dollars and a final

13   amount of $3,462,000 dollars.  These claims generally relate

14   to shippers, importers and others who are integral to the

15   debtors' logistical network and may, otherwise, possess

16   common law or statutory lien rights over the debtors'

17   property.  The relief is necessary to ensure the

18   uninterrupted flow of inventory and shipment of merchandise.

19          Your Honor, the order, as submitted, which we will

20   upload, reflects the agreed changes with the Office of the

21   United States Trustee.  And there has been no further

22   changes.  With that we would ask that it be approved on an

23   interim basis subject to the same dates and deadlines that we

24   have discussed.

25          THE COURT:  Does anyone wish to be heard?

A000497

1          (No verbal response)

2               THE COURT:  Court will grant the motion.

3               MR. CAPUZZI:  The other operational motion is the

4    utilities motion which my colleague, Kate Harmon, will

5    handle, but so that we don't wear out the carpet should we do

6    creditor matrix now?

7               THE COURT:  Sure.

8               MR. CAPUZZI:  The creditor matrix motion, I

9    believe, is Number 4 in the court's binder.  Some of the

10   relief sought in here is pretty generic and I don't believe

11   there is an objection to it by the Office of the United

12   States Trustee.  That generally relates to filing a

13   consolidated creditor's list and consolidated top 30 list.  I

14   believe that is not at issue here.

15              The aspect of the motion that's garnered some

16   attention, as you can imagine, is the request to redact the

17   home addresses of the employees and customer creditors of the

18   debtors.  There is about 4,000 employees and about 7,000

19   customer creditors; people who have deposits, or potential

20   returns, or gift cards, things of that nature.

21              While I recognize that the relief sought is not

22   routine it is becoming increasingly important and more

23   commonly granted as issues of identity theft and safety of

24   non-debtor individual's rise.  The debtors respectfully

25   assert that those issues that concern those individuals who

A000498

1  are not part of this bankruptcy by choice, but because they

2  merely work for the debtor or have dealings with the debtor

3  outweigh any transparency or public policy concerns that the

4  Office of the United States Trustee may raise.

5         We recognize that those concerns are important,

6  but redacting the home addresses, not the names of those

7  creditors, will not impinge on the bankruptcy process.  Those

8  addresses will be made available to the court, to the Office

9  of the United States Trustee, to any creditors committee.

10  So, I see not prejudice in redacting them from the publicly

11  filed versions of the creditor matrix.

12         Similar relief has been granted recently, as

13  recent as last year in Loot Crate, THG Holdings, and the

14  Achaogen cases, as well as older cases such a Model Reorg and

15  Dex Media which are set forth in our motion.  The debtors,

16  therefore, assert that cause exists under 107(c)(1) to grant

17  the relief requested.

18         THE COURT:  All right.

19         MR. CAPUZZI:  Thank you.

20         THE COURT:  Any objection?

21         MS. RICHENDERFER:  Your Honor, Linda Richenderfer

22  for the Office of the United States Trustee.

23         Your Honor, I rise to object because I note for

24  the record that there has been no attempt to make an

25  evidentiary showing to meet the burden.  We just have generic

A000499

 1  comments regarding identity theft.  There is nothing in the

 2  first day affidavit regarding this.  So, I would just submit

 3  to Your Honor that the debtors have not met their burden of

 4  proof.

 5          THE COURT:  Okay.  Well I disagree on that in that

 6  I really don't view it as a burden of proof as much as a

 7  common sense issue.  I'm not sure what proof you would say

 8  other than to get a witness up and say just want counsel

 9  said.

10          In my experience this has become a serious issue

11  and I have changed my thinking on this as I'm sure people who

12  track these things know, based on experience in a previous

13  case.  In my mind, at this point and given the risks

14  associated with having any kind of private information out on

15  the internet, this has really become routine.  I think

16  obvious relief.

17          I don't ignore the plain meaning of the code or

18  the rules lightly, but sometimes the code and the rules lag

19  behind reality, and don't take into account the issues that

20  face real life people every day.  I can, from personal

21  experience, tell you that identity theft happens, it happens

22  all the time. It happened to my wife and I a few years ago.

23  And I have had experience in other cases with people who have

24  been subject to danger by estranged people in their lives who

25  have been able to find out where they are.  I take that

A000500

 1  extremely seriously.

 2          So, I will overrule the objection and grant the

 3  motion.

 4          MR. CAPUZZI:  Thank you, Your Honor.  We will

 5  upload that order.

 6          To round up the operation motions my colleague,

 7  Kate Harmon, will handle the utilities motion, then Mr.

 8  Werkheiser will be back for customer programs and cash

 9  collateral.

10          Thank you.

11          THE COURT:  Now I know it's cold in here, but is

12  that a scarf?

13          MS. HARMON:  It is.

14          THE COURT:  Okay.

15      (Laughter)

16          THE COURT:  It's lovely, it's just its not that

17  cold.

18          MS. HARMON:  Always cold.  Good morning, Your

19  Honor.  Kate Harmon, Benesch Friedlander Coplan & Aronoff,

20  proposed counsel to the debtors.

21          As Mr. Capuzzi mentioned, I will be presenting the

22  utilities motion which is Number 10 on the agenda and should

23  be Number 10 in your binder.

24          As set forth more fully in our motion we are

25  seeking interim relief today with respect to the utility

A000501

1  services that the debtors rely on and the utility providers

2  that provide those services, and submit that the relief is

3  necessary both to maintain good customer relationships,

4  employee goodwill and also to aid in the transition into the

5  Chapter 11 cases.

6         As set forth in our motion we propose to provide

7  an adequate assurance deposit in a segregated account in the

8  amount that is half of the estimated average monthly payments

9  for the utilities that the debtors pay on a direct basis.

10 Additionally, we propose to continue paying our utilities on

11 a monthly basis going forward in the ordinary course of

12 business from cash on hand, cash received in the ordinary

13 course of business and cash collateral.

14        Additionally, we have proposed additional

15 assurance procedures should utility providers request that.

16 Those are set forth fully in the motion and in our interim

17 order.  We submitted our motion and interim, proposed interim

18 order to the U.S. Trustee in the last couple of days.  The

19 U.S. Trustee provided one proposed change.  It's Paragraph

20 8(b) of the proposed interim order which just changed the

21 language regarding the timing in which the debtors need to

22 make that adequate assurance deposit to a date certain which

23 is five days from the entry of the interim order.

24        Unless the court has any questions we'd request

25 that the court enter that order today.

A000502

1          THE COURT:  Does anyone wish to be heard?

2      (No verbal response)

3          THE COURT:  Okay.  Happy to grant the order as

4  modified.  If you could upload that that would be great.

5          MS. HARMON:  With the same dates as discussed?

6          THE COURT:  Yup.

7          MS. HARMON:  Thank you.

8          THE COURT:  You're on a roll, Mr. Werkheiser.

9  Don't mess it up.

10          MR. WERKHEISER:  I was going to say I seem to

11  always get up and create the difficult issues.

12          Your Honor, again, for the record Gregory

13  Werkheiser returning to the podium to present the customer

14  practices motion.  Your Honor, this appears at Docket Item

15  27.  The customer practices motion seeks authority for the

16  debtors to maintain a subset of customer practices as

17  modified which it identifies as the essential customer

18  practices.

19          Prior to the petition date and the commencement of

20  store closing sales the debtors maintained a number of

21  customer practice programs in the ordinary course of business

22  at their various retail locations, as detailed in our motion,

23  including taking customer practices for furniture products

24  which are often large dollar value items and have to be

25  special ordered.  And in connection with the Art Van

A000503

1  Furniture stores the debtors had loyalty programs referenced

2  in the motion as the Art Van signature card which had various

3  different participation levels and benefits to customers.

4         Third, the debtors maintained a refund and

5  exchange policy prepetition in the ordinary course under

6  which customers were generally permitted only seven days to

7  return anything purchased to the store or to exchange it

8  after delivery.  Fourth, the debtors had traditional

9  warranties and extended warranties that they offered their

10 customers.  Fifth, the debtors had the ability for customers

11 either online or in store to purchase gift cards.  I believe

12 that all of their stores other than Wolf Furniture stores

13 that existed.

14        So, in light of the debtors current difficult

15 financial and operation circumstances and the need to

16 discontinue the larger portion of the business we are seeking

17 to continue customer programs in a modified form as described

18 in the motion, but I would summarize as follows:

19        For customer deposits at the stores that are the

20 subject of what is defined as the wind-down in the motion,

21 but essentially these are the store closing locations,

22 customers have the option to, who have deposits previously

23 provided to the debtors, receive store merchandise that they

24 purchased if its present in an Art Van store or warehouse.

25 If the originally purchased merchandise is not available to

A000504

1    receive a store credit in an amount equal to their deposit

2    that can be used towards the purchase of alternative

3    merchandise during the wind-down.  For those customers for

4    whom neither of those options would work we are seeking the

5    authority for the debtors, but the debtor is not to be

6    required because as set forth in the first day declaration

7    and elsewhere, their financial circumstances do not permit

8    them unlimited liquidity to do this.

9            THE COURT:  What are we talking about quantity of

10   deposits on hand?

11           MR. WERKHEISER:  So, the quantity -- let me just -

12   - so across all of the stores, Your Honor, there are

13   approximately 7,000 people that have submitted deposits in an

14   aggregate amount give or take 35 million.  And so, you know,

15   it's quite widespread in some magnitude in the overall scope

16   of the business.

17           What I was saying, Your Honor, is that we are

18   seeking authority, in certain circumstances, to be able to

19   provide refunds, but, you know, I want to be clear for the

20   record that financial circumstances and the cash limitations

21   that the debtors have are such that those --

22           THE COURT:  Is there an argument?  Is there an

23   argument that it's not your money, that you're holding it in

24   trust?

25           MR. WERKHEISER:  Not that I'm aware of based on

A000505

1   anything that we've seen to date since our involvement in the

2   case.  I mean, obviously, these -- we're not necessarily

3   disputing that these wouldn't be entitled to priority under

4   507 of the Code.  I'm not trying to prejudice anybody's claim

5   in that regard, but, no, I think especially for items that

6   are special order items, you know, the nature of the

7   transaction is such that if somebody makes a down payment and

8   then the debtor makes, you know, a financial commitment to

9   its suppliers to special order something.  So, I think there

10  is consideration given by the company from the outset even

11  when it's only received a deposit.

12          THE COURT:  Okay.  I'm listening.

13          MR. WERKHEISER:  I do, you know, also want to be

14  clear that the debtors, again taking into account the

15  financial limitations of their liquidity and their other

16  circumstances are trying to make the resources they can make

17  available to make refunds in those cases where there is no

18  other viable alternative for the customer.  So, we are

19  seeking that relief.  And, you know, again, we will need to

20  use is sparingly because of the circumstances of the company

21  in its financial situation, but that is part of the relief

22  requested.

23          I also want to draw distinction for Your Honor

24  between the ultimate treatment of customer deposits in the

25  sides of the business that are subject to liquidation and the

A000506

1  11 Wolf Furniture stores.  Those are the subject of a

2  proposed going concern sale.  And while the debtors are not

3  necessarily in a position to honor those outside of the

4  bankruptcy process the buyer may very well be assuming those

5  upon closing of that sale.  And there may be the opportunity

6  for those customers to be made whole if that transaction

7  closes.  It's certainly contemplated that those may be among

8  the obligations that will be assumed by the buyer.

9          With respect to the Art Van signature card

10  program, Your Honor, that has been discontinued.  It was

11  discontinued in connection with the wind-down.  We are not

12  seeking any relief to continue that.

13          With respect to refund and exchange policies, Your

14  Honor, although the motion may give the impression that the

15  policy has changed, in reality, as it relates to any person

16  who purchased merchandise or furniture prior to the

17  commencement of the store closing sales.  The policy remains

18  the same.  They have the same seven days to return or

19  exchange that they had under the stores existing policy.

20          What has changed is that, and all customers that

21  enter the store are made aware of this fact through signage,

22  anything they buy as part of the store closing sales is a

23  final sale.  There are no returns or exchanges for those

24  items.  Again, that is not a change in the policy for the

25  stores operating in the ordinary course.

1    Then finally with respect to warranties, as we
2    explained in the motion, their financial circumstances and
3    because of the bankruptcy the company is not in a position to
4    honor warranty obligations.  Again, setting aside the Wolf
5    and Levin Furniture stores and such warranty obligations as
6    the buyer may pick-up as part of that transaction.

7    And with respect to the gift cards, Your Honor,
8    the debtor had approximately 1.2 million in the aggregate in
9    gift cards outstanding as of the petition date; 500,000 of
10   which are Art Van cards and 700,000 of which were Levin
11   Furniture cards.  I believe none were Wolf because to my
12   understanding they don't have gift cards.

13   The gift cards will be honored and customers are
14   being notified of this fact through information being made
15   available on the company's website and in store that they
16   have until April 15th to remit those gift cards.  And they
17   will be honored through April 15th.  Again, the gift cards as
18   they relate to the stores in the Levin/Wolf sale transactions
19   upon closing, I believe it was contemplated that the buyer
20   would be assuming those obligations as to those particular
21   gift cards, but not Art Van gift cards generally.

22   The last portion of the relief, Your Honor, that
23   we're seeking here relates to credit card processing and
24   other payment processors.  This is simply designed to provide
25   comfort to the parties involved in those transactions that

A000508

1  the debtors will continue in the ordinary course of accepting

2  the non-cash payment which I think accounts for something

3  like 80 or 90 percent or more of the transaction volume in

4  the stores.  So, we want to maintain that in the ordinary

5  course.

6        THE COURT:  So, if people have ordered a specific

7  piece of furniture in a liquidating store, and it hasn't been

8  delivered yet are they going to get that or should they

9  immediately be looking at whatever is on the floor while

10 there still is stuff on the floor to get credit for their

11 deposit?

12       MR. WERKHEISER:  So, if the furniture exists in an

13 Art Van warehouse, even if it's not on the floor, the company

14 will be trying to fill that order and is committing to try to

15 fill that order even under these customer practices.

16       THE COURT:  But if it hasn't been delivered it's

17 not coming?

18       MR. WERKHEISER:  If it's not currently in the

19 possession of the company in some fashion we're not in a

20 position to --

21       THE COURT:  How are the customers going to know

22 what to do?  Someone who is given a deposit to your client

23 how are they going to know what to do?  What notice are they

24 going to be given of the fact that they're not getting their

25 deposit back in all likelihood and they might not be getting

A000509

1   their furniture back, but if they want to not lose that value

2   they need to get busy and come to the store and buy something

3   else?  How are they going to find that out?

4        MR. WERKHEISER:  Your Honor, can I just take a

5   moment to consult with Mr. Stogsdill?

6        (Participants conferring)

7        MR. WERKHEISER:  Your Honor, I'm sorry.  I just

8   wanted to confirm that my understanding of these things is

9   correct.

10       So, the company -- well, one, there has been

11  widespread publicity about this.  This is the worst kept

12  secret, one of the worst kept secrets in a long time.  So,

13  you know, I think from experience people are well aware of

14  the GOB process and the consequences of that.  But beyond

15  that, as I mentioned, the company has replaced its original

16  website landing page with one that contains a summary of its

17  policies in this regard and to contact a call center for

18  people to get more information.

19       In addition, anyone who is in store can have this

20  information.  And then the company has been, over the last

21  few days, trying to determine whether they have sufficient

22  information to make an email distribution to all of the

23  customers who submitted deposits to notify them of their

24  rights under the new policy with respect to the deposits.

25       I can't, standing at the podium right now,

A000510

1    represent to Your Honor in a conclusive fashion that we have

2    the data we need to do that across the board, but that is

3    something that the company is committing to executing upon if

4    they can.

5              THE COURT:  All right.

6              MR. WERKHEISER:  Then, Your Honor, I may have been

7    not entirely clear in my comments previously about the gift

8    card cut-off and merchandise cut-off, but I just want to re-

9    emphasize that April 15th is the hard cut-off date for all of

10   those if I wasn't clear about that before.

11             Your Honor, for purposes of the interim relief

12   we're seeking today I am not aware of any objections that are

13   unresolved.  Apparently Ms. Richenderfer has objections that

14   remain unresolved that I wasn't clear about.  I believe one

15   issue that we have addressed to the satisfaction of the U.S.

16   Trustees Office is in Paragraph 2 of the proposed order.

17             There is language that confirms and cross-

18   references to any orders using cash collateral and makes

19   clear that payments are subject to that which, obviously, is

20   a given.  We have agreed to remove that, obviously, without

21   prejudice to any rights that the lenders have as secured

22   lenders pursuant to the cash collateral order so that this

23   order is clear in that regard.

24             I will cede the podium to Ms. Richenderfer from

25   the U.S. Trustees Office and reserve the opportunity to

A000511

1    respond to any concerns she expresses.  Thank you.

2              MS. RICHENDERFER:  Good morning, Your Honor.

3    Linda Richenderfer from the Office of the United States

4    Trustee.

5              With respect to that last comment by Mr.

6    Werkheiser it's actually the last sentence of Paragraph 3

7    that I ask be removed.  I believe debtors have agreed to

8    remove.

9              Your Honor, the issue that I had raised while

10   reviewing these particular motions was the issue of notice,

11   the same issue that Your Honor has brought up.  I'm used to

12   seeing in these types of orders detailed procedures regarding

13   where the announcements were going to be made.  For instance,

14   requirements that every store would have a big sign in them

15   that would give everyone notice as to when the gift cards

16   would no longer be accepted.

17             Your Honor raised questions regarding notice to

18   the people with deposits.  I would think that the debtors

19   would have contact information cause, otherwise, you wouldn't

20   be able to tell the individual when their goods had been

21   received.  There has to be some sort of contact information.

22             Your Honor, with respect to the website, this is

23   what Mr. Werkheiser had sent to me and if I may approach I'd

24   like Your Honor to take a look at what the website currently

25   says as of yesterday and I'll ask Mr. Werkheiser to confirm

A000512

1 | this for me.

2 |     THE COURT:  What is the website address?

3 |     MS. RICHENDERFER:  They took the paper from me,

4 | Your Honor.

5 |     THE COURT:  What's the --

6 |     UNIDENTIFIED SPEAKER:  Artvan.com.

7 |     THE COURT:  Thank you.  I'm looking at it right

8 | now.

9 |     MS. RICHENDERFER:  Okay.  Your Honor, I'm told

10 | that there has been information that's been added regarding

11 | the gift cards, but the information that I'm looking at with

12 | respect to the deposits I don't think clearly defines what

13 | was just described to us.

14 |     THE COURT:  It's different.  It says store credit.

15 | It does not say what was represented to the court.

16 |     MS. RICHENDERFER:  That's right.

17 |     THE COURT:  And I don't see the gift cards.

18 |     MR. BUCHBINDER:  Your Honor, Dave Buchbinder for

19 | the record.

20 |     THE COURT:  Oh, I see it.

21 |     MR. BUCHBINDER:  Its here in the liquidation

22 | paragraph.

23 |     THE COURT:  Yeah.  Boy, that couldn't be buried

24 | any further.  Yeah.  We're going to have to talk about this.

25 | This is inadequate.

1          MS. RICHENDERFER:  It has to be more --

2          THE COURT:  Absolutely.

3          MS. RICHENDERFER:  The other thing, Your Honor, I

4  was just doing -- well, actually Mr. Buchbinder did some

5  quick math for me here.  With a total of 7,000 deposits on

6  hand that total 35 million, if we just presume, for the sake

7  of argument, that everyone put down the same amount that's

8  5,000 per person.  And the -- 7,000, I'm sorry.

9          MR. BUCHBINDER:  70,000.

10         MS. RICHENDERFER:  Oh, 70,000.  Okay.  I guess,

11  Your Honor, the point is this; what portion of the 35 million

12  would apply for -- should be given, I should say,

13  administrative priority under the code because debtors are

14  not going to be able to confirm a plan later on if that is

15  where they're going with this unless the administrative

16  claims are paid.  And at this point I don't know what portion

17  of the 35 million qualifies.

18         THE COURT:  Not to be argumentative, but why is a

19  deposit an administrative claim?

20         MS. RICHENDERFER:  Priority claim.  I'm sorry, I'm

21  using the wrong terminology under 507(a)(2).

22         THE COURT:  Why is it a priority claim?  I was

23  looking at the -- huh, which ones?

24         MS. RICHENDERFER:  507(a)(7), I'm sorry.  Section

25  507(a)(7).

A000514

 1          THE COURT:  I was looking earlier when Mr.

 2   Werkheiser was talking and I decided that I should actually

 3   be paying attention to him.  So, I stopped looking.  Oh, I

 4   see it.

 5          MS. RICHENDERFER:  Yeah.  So, the deposit would be

 6   up to $3,025 dollars.

 7          THE COURT:  Every time I open the code I find

 8   something I didn't know was in there before.  I shouldn't

 9   admit that, should I.

10      (Laughter)

11          THE COURT:  All right.  Let me say something.

12   First of all, I got a couple comments.  One, the order itself

13   needs to spell all this out.  Right now it just references a

14   defined term that's defined in the motion and I think in this

15   particular instance the order really needs to spell out

16   exactly what the procedures are and what the elements are of

17   the customer program that the court is approving.

18          Second, I think you have to -- I'm particularly

19   concerned about two people.  Now gift card holders who knows

20   where are, right.  You know, I bought the gift card, but I

21   gave it to my uncle and it's been in his sock drawer for two

22   years.  I mean, you know, who knows where these gift cards

23   are.  But I think there has to be some notice both on the

24   website and on the store that's more obvious as to exactly

25   how gift cards are going to be dealt with especially since

A000515

1   there's a deadline of just five weeks.  Not even five weeks

2   in order to cash them in.

3           Did you give notice of the filing to State

4   Attorney's General?

5           MR. WERKHEISER:  I believe we did, Your Honor.

6   I'm not sure if anyone from the SAG is on the telephone

7   today, but that was certainly part of the notice.

8           THE COURT:  Well, you might get some trouble from

9   them.  That was a big piece of the RadioShack case as you

10  might remember.

11          The other thing is, the other people I'm really

12  worried about are the deposit fore's.  I think you, first of

13  all, need to have, again, obvious notice on the website and

14  at the store exactly what you are going to do.  And it needs

15  to be consistent with whatever is in the order I'm signing.

16  This is not -- what's on the website now is not consistent

17  with what you told the court.  It just says simply store

18  credit.

19          MR. WERKHEISER:  Your Honor, I want to just

20  clarify I would not knowingly misrepresent that to the court.

21          THE COURT:  Of course you wouldn't, Mr.

22  Werkheiser.  We've known each other 20 years.  No, no.  It's

23  not a problem.

24          MR. WERKHEISER:  I worked off the version Ms.

25  Richenderfer had that existed yesterday.

A000516

1          THE COURT:  These things -- to describe these

2    situations as fluid is an understatement.  We all know, we've

3    all done this for a long time.  I am not in any way implying

4    anybody has done anything other than in good faith.  So, I'm

5    just saying there's an inconsistency.  I want it to be

6    consistent and I want it to be, obviously, advertised.

7          I don't know, I'm a little worried -- I'm

8    remembering, I don't know if anyone else remembers <u>Breuners</u>

9    <u>Home Furnishings</u> from 2004 or 2005 where the debtor used

10   deposits to pay rent to get the landlords off their back.

11   And I'm worried that these deposits are going to be used for

12   liquidity to run the company as opposed to provide services

13   to the people who put their money up and haven't received

14   anything in return yet.  I'm particularly worried about the

15   priority cap being preserved.

16          So, I'm not going to do anything with that right

17   now other than to say that I have concerns about the use of

18   the deposits.  We might need to deal with that in connection

19   with the cash collateral budget.  I haven't -- I just got the

20   budget this morning and I haven't, frankly, had an

21   opportunity to look at it because I've been involved with a

22   lot of things going on.  But I'm worried we're going to spend

23   the deposits.  And if that's the case that's a problem at

24   least particularly at the priority level because you can say

25   you get store credit and that's it, but the law says

1  otherwise, assuming you do a plan.  You may liquidate, I

2  don't know, in which case you don't have to pay your priority

3  claims.

4          MR. WERKHEISER:  Your Honor, obviously, the end of

5  this case is uncertain at this stage.

6          THE COURT:  Of course it is.

7          MR. WERKHEISER:  And as to whatever comments I

8  made about priority I think -- you know, what I was trying to

9  convey and may have in-artfully done was that we're not

10  trying to prejudice anybody's arguments as to what is

11  priority and what's not.  I think that the language that was

12  chose in that provision is in-artful, to be charitable, and

13  so for today's purposes that's, obviously, not something that

14  is before the court.

15          THE COURT:  Well, yes and no.  So, yes, this isn't

16  confirmation of a plan where we have to talk about the

17  details of the priority scheme, but, yes, it's before the

18  court because you're seeking to use this money to operate

19  your business whereas if I were to cut you off today, I'm not

20  going to do it, don't get excited, convert your case, hand

21  over everything to a trustee he would be sitting on that

22  cash.  Meanwhile, you're going to use that cash or what's

23  left of it to operate the business.  The banks are shaking

24  their heads.

25          MR. WERKHEISER:  Maybe I was going to say I don't

 1  know the --

 2          THE COURT:  I haven't gone through the cash

 3  collateral budget with any detail.

 4          MR. WERKHEISER:  Well, I don't know the

 5  particulars also, Your Honor, of what actions the banks have

 6  taken in the past in terms of sweeping cash from the company,

 7  but certainly they are of the view that this is their cash

 8  collateral. So, to the extent that deposits had been accepted

 9  it is certainly conceivable that that money has already made

10  its way into the hands of the lenders and is no longer in the

11  possession of the debtors.

12          So, I think respectfully the situation you posit

13  where we're using it to pay landlords and operate the

14  business is probably less likely than a scenario where the

15  money is no longer with the debtors at this stage.

16          THE COURT:  So, you don't have it in your hands

17  anymore?

18          MR. WERKHEISER:  I don't know.

19          THE COURT:  What you have about 11 million cash on

20  hand?  I can't remember.  I thought I saw in the papers you

21  have $11 million dollars in cash, is that right?  No?

22          MS. RICHENDERFER:  Your Honor, the budget shows

23  11.6 million as of Monday this week.

24          MR. WERKHEISER:  Yeah.  I mean one of the

25  challenges of this case, Your Honor, is that the debtors have

1  been in cash dominion for some time.

2          THE COURT:  Have been what?

3          MR. WERKHEISER:  In cash dominion.  So, the

4  lenders have, effectively, control of all of the cash are

5  just essentially revolving it back to us for cash collateral

6  purposes.

7          THE COURT:  So, its not been swept?

8          MR. WERKHEISER:  I'm going to -- I think I should

9  probably let the finance lawyers delve into this a little bit

10  more.

11          THE COURT:  Yeah.  They never want to say anything

12  though.  They like it when you do the talking.

13          MR. WERKHEISER:  You know, the upshot is that this

14  is, obviously, not the place the debtors wanted to be I think

15  as we detailed in our papers.  We did everything possible to

16  preserve the status quo with cash deposits, but reality is

17  reality and this is where we are.  We're trying to do the

18  best we can.

19          THE COURT:  Yeah.  But that doesn't mean you can

20  do whatever you want.

21          MR. WERKHEISER:  Understood, Your Honor.

22          THE COURT:  Okay.

23          MR. FALGOWSKI:  Good morning, Your Honor; Cory

24  Falgowski from Burr & Forman on behalf of Wells Fargo Bank.

25  I'm here with my co-counsel from Morgan Lewis, Jennifer

1  Feldsher, Margorie Crider and Chris Carter.  I believe Ms.

2  Feldsher is going to take the lead in addressing the court.

3           THE COURT:  All right.  Ms. Feldsher?

4           MS. FELDSHER:  Good morning, Your Honor.

5           THE COURT:  Good morning.

6           MS. FELDSHER:  I guess I can't hid from the

7  gallery anymore.

8           THE COURT:  Well, if you keep nodding and shaking

9  your head, you know, I'm going to notice you.

10          MS. FELDSHER:  I just didn't want to compound any

11 representations to the court that weren't 100 percent

12 accurate.

13          THE COURT:  Of course not.

14          MS. FELDSHER:  So, that is why I was shaking my

15 head.

16          Your Honor, as the debtors have reported to you

17 the company has been in cash dominion for some time.  What

18 that means is we have a -- the ABL lenders have a revolver.

19 In the ordinary course money comes in, it goes to pay down

20 the revolver and then the debtors borrow back on the line

21 that they have.  So, that is normal course and that would be

22 the same if deposits came in.  The debtors use that, they pay

23 down, they get more availability on the line.

24          Prior to the filing, because the debtors were in

25 default of their obligations under the ABL facility they went

A000521

1   into cash dominion which means that they have -- you know,

2   the lenders fund based on what the debtors need.  They give

3   us a schedule, they say we need the following things funded

4   and the banks fund based on the things that they approve to

5   be funded.  So, the deposits are not in the debtors' bank

6   accounts today.  What the debtors have is sufficient cash to

7   pay their payroll.

8           The debtors are selling collateral and that

9   collateral, we believe, should exceed the amount that the

10  debtors need to fund their Chapter 11 cases and to repay

11  those deposits that don't get used by people in the ordinary

12  course towards buying something else at the stores.

13  Obviously, that is the preference for the company so that it

14  can realize value from both the deposits and the furniture

15  that they have in stock.  But we have discussed with the

16  debtors and they insisted upon being able to return deposits

17  as they need to.  There is going to be some process because

18  they need people to tell them that they don't want to use the

19  deposit towards something else in the store.

20          And from the ABL lender's perspective and also

21  from the term loan perspective we have allowed -- we have

22  agreed that the debtors can do that through the budget and we

23  believe there are sufficient funds in the budget that they

24  will be realizing as they sell assets to be able to return

25  deposits that aren't, otherwise, used by customers towards

A000522

1    other purchases.

2              THE COURT:  Okay.  I got you.

3              MS. FELDSHER:  Hopefully that's helpful.

4              THE COURT:  It was very helpful.

5              MS. FELDSHER:  Thank you.

6              THE COURT:  I'm not going to resolve this today.

7    All I want is notice.  I want clear notice to go to the

8    deposit holders exactly what is happening to them and the

9    deadlines that they're facing.  So, that they are able to

10   maximize their ability to get some value for the deposit.

11             MR. WERKHEISER:  Understood, Your Honor.

12             THE COURT:  In my experience if you wait, based on

13   cases I've had, thankfully have not been in this position,

14   but if your depositors wait too long by the time they go to

15   the store, unless its one of the going concern stores, unless

16   they go to one of the liquidating stores if they don't go in

17   time there's not going to be anything that they want that

18   they could use the store credit for.

19             MR. WERKHEISER:  Yes, Your Honor.

20             THE COURT:  So, that has happened in cases I have

21   been involved with.  So, the important thing is people --

22   they are where they are from their legal right's perspective.

23   I'm not going to change that.  I'm not trying to change that.

24   I'm not saying you have to do X, Y or Z, or I'm going to

25   convert your case or any nonsense like that.  All I'm saying

A000523

1    is you got to give people notice.  And part of that is I want

2    the order to really specify what's happening and I want clear

3    and conspicuous notice to go on the website and in the

4    stores.  I would prefer something going to them in the mail

5    or email, but you're telling me you don't know if you have

6    that ability.

7              So, we will put something in there that if you can

8    do it you're required to do it and if you can't you can make

9    some sort of representation to the court that you can't.

10             MR. WERKHEISER:  Thank you, Your Honor.

11             THE COURT:  Okay.

12             MR. WERKHEISER:  I just would like to reiterate so

13   you hear it from the debtors is that, yes, we do believe that

14   the budget does provide for adequate access to cash going

15   forward if we meet our projections to honor refunds and

16   exchanges.

17             THE COURT:  Let me ask you another question.

18             MR. WERKHEISER:  Excuse me, honor deposits rather

19   as described by our lender's counsel.

20             THE COURT:  How old are your projections?

21             MR. WERKHEISER:   I think they have been updated

22   as recently as yesterday.  Within a couple days, Your Honor.

23             THE COURT:  Okay.

24             MR. WERKHEISER:  And --

25             THE COURT:  The only reason I -- I know we all

A000524

1  watched the news yesterday, the economy may not be doing so

2  well right now.  So, I was just wondering if we were dealing

3  with February 12th projections or we were dealing with March

4  10th projections.

5          MR. WERKHEISER:  No.  I think we're dealing with

6  March 8th and 9th projections in that range, Your Honor.

7          THE COURT:  Okay.

8          MR. WERKHEISER:  What I also wanted to just

9  clarify for the record to is one of the things that the

10  debtors negotiated vigorously for was that the term loan

11  lenders have agreed to subordinate their recoveries to the

12  extent necessary consistent with our budget for us to honor

13  the deposit obligations.  So, once Wells gets out as the ABL

14  lender, you know, we are maintaining availability within the

15  cash collateral structure to honor deposit obligations

16  consistent with the budget by agreement with the term loan

17  lenders.

18          THE COURT:  So, make those changes to the order.

19          MR. WERKHEISER:  We will

20          THE COURT:  Submit it under certification of

21  counsel.  Run it by the U.S. Trustee before you submit it and

22  let me know in the COC whether or not they're okay with it.

23          MR. WERKHEISER:  Very well, Your Honor.  Thank

24  you.

25          THE COURT:  Okay.

```
1              MR. WERKHEISER:  Yes.

2              THE COURT:  Can we take just a few minute break

3   just five minutes.  All we have left is cash collateral,

4   right?

5              MR. WERKHEISER:  And then we'd like to have some

6   preliminary discussions.

7              THE COURT:  Okay.  We're running out of time, but

8   we'll get it done.  I just need a short recess.

9              MR. WERKHEISER:  Thank you.

10         (Recess taken at 11:33 a.m.)

11         (Proceedings resumed at 11:37 a.m.)

12              THE CLERK:  All rise.

13              THE COURT:  Please be seated.

14         All right.  Let me get your website off my

15   computer here.

16              MR. WERKHEISER:  All right.  Your Honor, for the

17   record, Gregory Werkheiser.

18              I think that brings us to cash collateral, Your

19   Honor.  And before we proceed, I just would like to take care

20   of the housekeeping matter of moving in the first day

21   declaration of David Ladd, which is the factual basis for our

22   first day relief --

23              THE COURT:  Any objection?

24         (No verbal response)

25              MR. WERKHEISER:  -- which was filed with the
```

1    petition.

2              THE COURT:  It's admitted.

3         (Ladd Declaration received in evidence)

4              MR. WERKHEISER:  Thank you, Your Honor.

5              Your Honor, as we get into cash collateral here, I

6    would like to offer a proffer of Mr. Dennis Stogsdill who, as

7    Your Honor knows from my prior introductions, is present in

8    the courtroom and available for cross-examination if that

9    becomes necessary.

10             And before we get underway with the overview of

11   the cash collateral order and some issues that we resolved,

12   and a handful that remain outstanding, I'd like to offer that

13   proffer and just a brief introduction to the process that

14   resulted in this order, if I could?

15             THE COURT:  Any objection to the use of a proffer?

16        (No verbal response)

17             THE COURT:  You may proceed.

18             MR. WERKHEISER:  Okay.  Mr. Stogsdill of Alvarez &

19   Marsal North America, LLC is present in the courtroom and

20   available for cross-examination.

21             If called to testify, Mr. Dennis Stogsdill could

22   and would testify truthfully, as follows:  one, that he is a

23   managing director of Alvarez & Marsal North America, LLC,

24   which has been advising Art Van Furniture, LLC and its

25   affiliated debtors on their restructuring and deleveraging

1   efforts at certain times, since August of 2019.

2         He has more than 20 years of management consulting

3   and restructuring experience, serving as a financial advisor,

4   and providing performance improvements services to

5   corporations, various creditor groups, equity owners, and

6   other constituencies.

7         THE COURT:  Slow down a little bit.

8         MR. WERKHEISER:  Sure.  Sorry.  I was just trying

9   to speed through the background, Your Honor.

10         THE COURT:  Yeah, but I still have understand you.

11     (Laughter)

12         MR. WERKHEISER:  Mr. Stogsdill has -- would

13   testify that he has significant experience assisting

14   distressed retail companies with day-to-day management

15   activities, including development of business plans, cash

16   flow management, and implementation of liquidity and cost-

17   saving strategies, including store-closing strategies.

18         His prior retail restructuring experience includes

19   advisory roles in Chapter 11 cases such as Sears Holdings,

20   Fairway Market, and Fresh & Easy Markets.

21         A&M, itself, is a global business-advisory firm

22   with multidisciplinary solutions, complex and challenges and

23   opportunities, and he would testify that it is well-equipped

24   and deeply resourced for engagements of this nature.

25         He Mr. Stogsdill would testify that since A&M's

A000528

1  retention, he has overseen a team of individuals assisting

2  the debtors' management with, among other things, managing

3  and forecasting the debtors' liquidity position, evaluating

4  profitability on a four-wall basis, providing alternative

5  sale and financing options, and other financial analyses and

6  planning.

7          Accordingly, he is knowledgeable and familiar with

8  the debtors' day-to-day operations, business, and financial

9  affairs, cash flow needs, and projections, and personnel.

10          He is also familiar with the debtors' supply chain

11  and the status of the debtors' relationship with various

12  vendors, suppliers, service providers.

13          With respect to the debtors' restructuring

14  efforts, Mr. Stogsdill would testify that he is familiar with

15  the testimony of Art Van's executive vice president and chief

16  financial officer David Ladd, as set forth in his first day

17  declaration, filed on March 9th at Docket Item 12 and based

18  on his and his team's extensive work with the debtors since

19  August of 2019, could and would testify, consistent with

20  Mr. Ladd's testimony regarding, among other things, the

21  debtors' restructuring efforts and the events that led the

22  debtors to commence these Chapter 11 proceedings,

23  particularly, as it appears in Paragraphs 6 through 20 and 37

24  through 43 of Mr. Ladd's declaration.

25          Further, through A&M's engagement with the debtors

A000529

1   he would testify that he has become deeply familiar with the

2   debtors' prepetition corporate and capital structure and,

3   therefore, could and would testify, consistently with

4   Mr. Ladd's testimony appearing at Paragraphs 31 through 36 of

5   his first day declaration.

6          With respect to the circumstances that brought the

7   debtors to this Court today, Mr. Stogsdill would testify and

8   emphasize that, as detailed in the live first day

9   declaration, the debtors were making headway in late 2019 and

10  addressing their operational and financial challenges but

11  lacked the runway necessary to fully implement these remedial

12  steps.

13         He would further testify that the company's

14  situation became critical when, in January 2020, the

15  company's borrowing base under its prepetition ABL facility

16  was further restricted and certain other financial partners

17  of the company tightened its access to credit.  When it

18  became clear in early January that the company's lenders and

19  certain other financial partners could not or would not

20  support an extended schedule for the company to explore

21  strategic alternatives, Alvarez & Marsal and Evercore, the

22  company's financial -- excuse me -- the investment banker

23  assisted the company pursue an expedited process to

24  recapitalize or sell all or part of its business or assets.

25         Mr. Stogsdill and A&M personnel under his

1  supervision worked closely with Evercore's team on this

2  project.  As a result of these efforts, the company and its

3  advisors held discussions with at least 31 potential buyers

4  and investors, including its prepetition term loan lender,

5  KKR Capital Corp. and affiliates about such potential

6  transactions.  In parallel with these efforts and as a

7  condition to its ABL lender's forbearance, the company, with

8  A&M's assistance, began preparations for potential store-

9  closing sales.

10          The most viable option to emerge from this process

11  was the so-called consortium recapitalization transaction

12  discussed in Paragraph 15 of the Ladd first day declaration.

13  This transaction was developed in concert with the parties'

14  most financially motivated to support the business as a

15  going-concern.  It depended upon, among other things, an

16  additional capital infusion from Thomas H. Lee, the debtors'

17  equity sponsor, and the Van Elslander family, which was the

18  family of the founder and the original owners of the company;

19  second, it contemplated refinancing of the company's existing

20  ABL facility; third; it contemplated and the support from the

21  company's trade vendors; and fourth, rent relief from the

22  company's five largest lessors under master leases with those

23  parties.  Indeed, the debtors negotiated extensively with

24  those master lessors, in connection with the consortium

25  including several of the parties that filed a response to the

1   first day declaration late last evening.

2            Another key constituency of this consortium effort

3   was the Levin family, the former owners of the Levin-Wolf

4   Furniture business.

5            As detailed, Mr. Stogsdill would testify as

6   detailed in the Ladd first day declaration the consortium

7   transaction ultimately failed to come to fruition, given the

8   significant amount of capital needed and unforeseen setbacks

9   in the capital matters that resulted in the withdrawal of

10   certain investors' willingness to infuse new capital.

11            Although efforts were then made to resuscitate the

12   transaction, they were unsuccessful for several reasons,

13   including the unwillingness of the master leaseholders to

14   enter into further lease concessions.

15            It was not until the end of February that it

16   became clear that the consortium transaction was beyond

17   saving; however, as mentioned previously, at the insistence

18   of the ABL lenders, efforts were already underway to prepare

19   the company for the contingency of an orderly liquidation

20   process.

21            Even as the consortium deal was falling apart, the

22   debtors were able to salvage a going-concern sale transaction

23   with the Levin family for the sale of assets of the Levin-

24   Wolf Furniture lines.  Although the cash value of that

25   transaction is only slightly above liquidation value, it has

1  important additional benefits that cannot be realized in a

2  liquidation, including nearly 1,000 jobs will be preserved,

3  customer deposits and warranty obligations are expected to be

4  honored by the buyer upon closing, and Section 503(b)(9)

5  vendor obligations will be assumed.

6          However, for the Levin to proceed on a going-

7  concern basis, the inventory stocks of those stores needs to

8  be replenished, which has led to the debtors' decision to

9  agree to that separate DIP facility.

10          With respect to the debtors' need to -- for access

11  to cash collateral, he would testify that the debtors'

12  immediate access to cash collateral, ability to use the cash

13  collateral, consistent with the agreed-upon budget is

14  critical to providing sufficient liquidity to market and

15  conduct the -- not only the going-concern sale transaction,

16  but the orderly wind-down and liquidation of the debtors'

17  assets.

18          He would further emphasize that the process of

19  getting to an agreement on cash collateral was extensively

20  negotiated over a process -- a period of weeks, and in large

21  part, was a challenging negotiation because the debtors we're

22  so dedicated to trying to ensure that they had sufficient

23  liquidity to meet employee obligations and customer

24  obligations, including allowing customers the opportunity to

25  either receive store credit or in certain cases, a return of

1   customer deposits.  This, the debtors believe, was achieved
2   in large part through the extensive efforts of the debtors
3   and their advisors and their equity sponsors who have pushed
4   for this to be part of the overall deal for cash collateral.
5           With respect to milestones, Your Honor,
6   Mr. Stogsdill would testify that these had to be agreed to as
7   part of the attaining the lender's agreement to use cash
8   collateral.  That he believes most of the milestones that are
9   contained in the interim order are traditional bankruptcy-
10  related milestones.  Others that are relating to the approval
11  and conduct of store-closing sales and related documentation
12  and approval in closing of the Levin-Wolf sale.
13          He would further testify that at his direction,
14  counsel has been in contact with the Levin buyer group and
15  with the other lenders and has secured agreements to modify,
16  outward, some of those milestones to ensure that the Levin
17  sale, when it goes forward, can go forward under normal
18  Bankruptcy Rule-required notice.
19          With respect to the milestones in general, he
20  would testify that based on his experience, having been
21  involved in many such orders in the past and many such retail
22  restructurings, that they are achievable under the
23  circumstances that we have available here.
24          As the order relates to fees, Mr. Stogsdill would
25  testify that he is aware that the order provides for the

A000534

1    lender to recover a weekly consent fee of $150,000.  While

2    this was certainly something that the debtor would, in its

3    preference, would not have had to pay as consent to obtain

4    access to cash collateral, this was part of the overall

5    package of bargained-for cash collateral access that the

6    lenders required is something that they insist on having has

7    part of their overall adequate protection package to make

8    cash available to the debtor in connection with this case.

9              Let me just confirm if I've left anything out.

10        (Pause)

11             MR. WERKHEISER:  Your Honor, that concludes

12   Mr. Stogsdill's proffer in support of our cash collateral.

13             THE COURT:  Does anyone wish to cross-examine the

14   witness?

15        (No verbal response)

16             THE COURT:  Okay.  I hear none.

17             I have no questions.

18             MR. WERKHEISER:  Thank you, Your Honor.

19             So, Your Honor, again, I know time is short, so

20   I'm going to try to expedite this presentation as much as

21   possible --

22             THE COURT:  Yep.

23             MR. WERKHEISER:  -- this is a fairly, I think, on

24   the whole, traditional cash collateral order for a retail

25   liquidation of this nature.  We have an ABL facility with

A000535

1 approximately $34 million owing and then behind that, a much

2 larger term loan facility, as originally held and agented by

3 affiliates of KKR. It has since been acquired by certain

4 affiliates of Hilco and Gordon Brothers in an assignment and

5 the debtors negotiated with all of those parties at various

6 times to ensure that they had adequate liquidity in their

7 judgment to conduct this orderly liquidation and wind-down of

8 the stores, other than the Wolf and Levin stores and to try

9 to sell those stores as a going-concern in furtherance of

10 fulfilling their fiduciary duties and maximizing value.

11          Cash collateral, as you would expect, is tied to a

12 13-week cash flow budget that is subject to approval by the

13 lender group and, as detailed in the Mr. Stogsdill's proffer,

14 is subject to various milestones related to the conduct of

15 the case.

16          It has, Your Honor, the traditional stipulations

17 by debtors in this situation as to validity of liens and

18 claims and the lack of defenses to them and it also has the

19 traditional reservations for a committee to challenges within

20 75 days after commencement of the case or 60 days of

21 committee formation.

22          Adequate protection packages for the lenders

23 consist of, of course, the replacement liens, the ability to

24 receive a payment of their respective counsel's attorney's

25 fees, subject to a review process, that this Court has seen

1  before, and such matters as carve-out liens on proceeds of

2  avoidance actions, waiver of 552 waiver, 506(c) waiver, and

3  so on, are all reserved for the final hearing, subject to the

4  rights of the committee or parties in interest to dispute

5  whether the final order should contain those.

6          I can represent that to our knowledge there is no

7  non-consensual priming contemplated by this order and it has

8  appropriate language that carves out preexisting liens that

9  are valid and by their terms, would be senior, and broadly

10 speaking, that is the order.

11         I think most of the issues that we have with this

12 order, yet, Your Honor, are (indiscernible) in the nature of

13 drafting issues and certain protections that there's a

14 difference of opinion on as to whether they're appropriate,

15 with the exception of the consent fee.

16         So, briefly, we did try to engage with the U.S.

17 Trustee's Office prior to the hearing and I think we resolved

18 a number of these issues.  To my understanding, we received

19 comments from Ms. Richenderfer from -- in reference to the

20 findings that appear in Paragraphs E and N of the order and I

21 believe we have agreement to modify language there in a way

22 that is acceptable to the U.S. Trustee's Office on what

23 notice was provided and how we express the adequacy of that

24 notice in context of this interim order.

25         With respect to the payment of professional fees

A000537

1  and expenses to the term loan and ABL lenders, I believe

2  we've satisfied the U.S. Trustee as to the existence of

3  appropriate language that allows for an opportunity for a

4  review and objection of those fees, as is consistent with

5  practice in the district.  With respect to -- and that

6  language, Your Honor, is already present in the order; it did

7  not require changes.

8           With respect to Paragraph 12(e)(ii) of the order,

9  that contemplates certain milestones related to, among other

10 things, the Levin asset sale -- the Levin-Wolf asset sale

11 and, by agreement, with the buyer there and our lenders.  We

12 have agreed to adjust those milestones slightly so that

13 instead of what is currently read into the order, we will be

14 filing a sale motion and executed APA within seven days of

15 the petition date.  We will be seeking a sale order proving

16 that within what is approximately 22 days thereafter, which I

17 believe is April 7th, if my math is correct, and we will be,

18 then, closing within two business days after that.

19           So, those milestones are not necessarily

20 milestones that our ABL and term loan lenders have demanded,

21 but since they tie to that transaction, that transaction is a

22 source of value to the estate, so they appear to the

23 milestones that are required by the purchaser and the

24 proposed DIP lender.

25           THE COURT:  I'm not crazy about a milestone that

1  blows the cash collateral order in 21 days, but -- unless a

2  committee shows up and want some more time.

3       MR. WERKHEISER:  We're certainly committed to

4  engaging with them in good faith and I think, you know,

5  committees being committees and late on the scene, certainly

6  have the ability to accomplish things that debtors do not.

7  So, you know, we understand Your Honor's concern and

8  obviously the committee will have its opportunity to be heard

9  if and when that happens.

10      In Paragraph 20(n), Your Honor, we've agreed to

11 modify language at the request of the U.S. Trustee's Office

12 to make clear that the filing of a motion of the type

13 described in that paragraph by a party other than the debtors

14 is not a default event unless the debtors fail to contest

15 that in good faith, which is more in keeping with the

16 practice in this district and elsewhere.  And I think that's

17 it, in terms of I believe the issues that we've been able to

18 resolve.

19      I believe there are three issues on cash

20 collateral that are open to my knowledge.  One is the U.S.

21 Trustee's Office disagrees that as to the propriety of paying

22 a consent fee to the ABL lenders for access to cash

23 collateral and the second issue relates to the language that

24 appears in subparagraph -- in Clause A of Paragraph 25, this,

25 which recognizes the ability of a committee to -- or any

A000539

 1  party in interest -- to contest the existence of the default,

 2  but (indiscernible) with certain other actions that might

 3  interfere with the lender's exercise of remedies.

 4          Finally, there's a dispute that remains in

 5  Paragraph 27(b) as it relates to the lender's entitlement to

 6  recover fees in the event of a challenge to the lender's

 7  liens and the claims by someone with standing to do so.  And

 8  the position of the U.S. Trustee's Office, as I understand

 9  it, there, is that the lenders should have to prevail on that

10  challenge, then under some definition of prevail that I think

11  is not currently present in the documents.

12          THE COURT:  Explain that to me.  I don't have a

13  blackline.  Explain that to me.

14          What -- under the order as it exists, if the

15  committee brings a challenge, they have to disgorge all their

16  fees?

17          MR. WERKHEISER:  Under the order, as it's

18  currently written, Your Honor, the lenders are entitled to

19  their fees --

20          THE COURT:  Oh, the lenders?

21          MR. WERKHEISER:  -- on a real time -- essentially,

22  you know, as they're being incurred, when they're defending

23  against a committee challenge.

24          THE COURT:  Oh, so, the U.S. Trustee wants to stop

25  that, pending the challenge for however long it takes?

```
 1                MR. WERKHEISER:  And --

 2                THE COURT:  All right.  I understand.

 3                MR. WERKHEISER:  -- is of the view that the lender

 4   must actually prevail on the challenge before they can get

 5   their fees.

 6                THE COURT:  I understand.

 7                MR. WERKHEISER:  So, I those are our three issues.

 8   I will cede the podium to the U.S. Trustee's Office --

 9                THE COURT:  Okay.

10                MR. WERKHEISER:  -- and reserve an opportunity for

11   the lenders and the debtors' response.

12                THE COURT:  All right.

13                MS. RICHENDERFER:  Your Honor, Linda Richenderfer

14   from the Office of the United States Trustee.

15                In considering the time --

16                THE COURT:  Yeah, don't rush, because we're not

17   going to finish --

18                MS. RICHENDERFER:  Okay.

19                THE COURT:  -- before I have to get off the bench.

20   I thought I made it pretty clear --

21                MS. RICHENDERFER:  Okay.

22                THE COURT:  -- that I have a meeting that I cannot

23   miss.  So, we're going to be reconvening, so take your time.

24                MS. RICHENDERFER:  Okay.  Your Honor, the first --

25   there's four issues.  Let me back up a minute.
```

1    We had discussions prior to the hearing today in

2 response to the comments that Mr. Buchbinder and I supplied

3 yesterday and believe we've reached some agreements with the

4 debtors and with the ABL lenders regarding changes in

5 language and Mr. Werkheiser did touch upon several of those

6 instances.

7    We will need to see the revised form of order to

8 know whether or not we have totally been able to resolve

9 those because we don't have a blackline and didn't receive

10 any responses.  So, we just want to make sure that Your Honor

11 is aware of that until we see it in black and white, there

12 may be some issues that remain.

13         THE COURT:  Okay.

14         MS. RICHENDERFER:  The consent fee, which is on

15 Page 27 -- it's Paragraph 20 -- I'm sorry, it's

16 Paragraph 12(d) of the order -- requires that the debtors pay

17 $150,000 per week until the prepetition ABL obligations have

18 been repaid in full.  It is part of the covenant -- I'm

19 confused by the limits, Your Honor, because I don't believe

20 it's part of the prepetition documentation for the ABL loan,

21 but there was something that Mr. Werkheiser said that led me

22 to believe maybe it was.  I'm not -- with respect to the

23 proffer that he was giving us, don't understand the basis for

24 that because it's apart from any adequate assurance.

25         THE COURT:  Okay.  Have you ever seen this?

1          MS. RICHENDERFER:  No.  Mr. Buchbinder nor I have

2    ever seen this.

3          THE COURT:  All right.  I haven't seen this,

4    either.

5          MS. RICHENDERFER:  So, that was another reason why

6    it caught our eye.

7          Your Honor, on Page 47 -- and this is part of

8    Paragraph 25(a) at the very beginning, it starts off, "Except

9    to contest the occurrence of an event of default ..."

10          The idea of adding in there "preventing hindering

11    or delaying" are very, I think, undefined terms of art that

12    could be used in many instances where it would not be

13    appropriate in order to use this particular provision against

14    the debtors.

15          Page 50 is the one that Mr. Werkheiser spelled out

16    for Your Honor that's part of Paragraph 27(b) that would

17    allow a during the challenge period, the prepetition secured

18    parties are going to be entitled to receiving their costs and

19    expenses, while the challenge is ongoing.  And that's costs

20    and expenses, with respect to the challenge, not the

21    challenges ongoing.

22          The other concern, Your Honor, is that on Page 53,

23    Paragraph 36, all concerns the Levin DIP facility, which I

24    know Your Honor has already stated will not be heard today.

25    Quite frankly, Your Honor, I haven't even had time to print

1   it out to if you look at it yet and I'm concerned that

2   anything and all that's in here not be considered to be any

3   approval by Your Honor of the Levin DIP facility until such

4   time as the Court has scheduled a hearing on that and we have

5   time to review the documentation in connection with it.

6          THE COURT:  All right.  We're in recess until 1:30

7   and we'll reconvene at that time to talk about cash

8   collateral.  It would be nice to have a redline by then, if

9   possible.  What I have here is just a clean copy, so -- which

10  I think is the original copy.

11         MR. WERKHEISER:  I think what you have is what was

12  filed --

13         THE COURT:  Huh?

14         MR. WERKHEISER:  Yeah, that's what was filed

15  (indiscernible) --

16         THE COURT:  Right.  So, if there's been changes,

17  it would be nice to see them in a redline if you have time;

18  otherwise, it will be what it will be.

19         So, 1:30 or as promptly thereafter, as possible.

20  I have a series of important internal bankruptcy court

21  meetings today, so I apologize, but it is what it is and you

22  can blame Wuhan, China, for what we're talking about.

23         So, we're in recess until 1:30.

24         COUNSEL:  Thank you, Your Honor.

25       (Recess taken at 12:06 p.m.)

1              (Proceedings resumed at 1:45 p.m.)

2                    THE COURT OFFICER:  All rise.

3                    THE COURT:  Please be seated.

4              So, before we proceed, Ms. Richenderfer, if you

5    could -- I want to make sure I have your three points.  So,

6    if you could bullet point your three objections, again, for

7    me, because I was distracted, frankly, because I knew I had

8    to be in this meeting.

9                    MS. RICHENDERFER:  Your Honor, there's actually

10   four.

11                   THE COURT:  Four bullet points, there you go.

12                   MS. RICHENDERFER:  There's three of greater

13   importance, maybe.  The consent fee -- it's on Page 27,

14   Paragraph 12(d) -- there's language at the beginning of

15   Paragraph 25(a) on Page 47 that we think will have a chilling

16   effect on actions taken by the committee or may be taken by

17   the committee.

18                   THE COURT:  And what's that -- oh, that's the sort

19   of --

20                   MS. RICHENDERFER:  Like hindering and --

21                   THE COURT:  Yeah, hindering, right.

22                   MS. RICHENDERFER:  -- these undefined terms.

23              The next issue was the payment of legal fees --

24                   THE COURT:  Right.

25                   MS. RICHENDERFER:  -- to the lender during the --

1 | any challenge period. That's prevailing party 27 -- we think

2 | it should be prevailing party, Paragraph 27(b), as in boy, on

3 | Page 50.

4 | THE COURT: Uh-huh.

5 | MS. RICHENDERFER: And then I just wanted to

6 | underscore and make sure that the Court approving the

7 | language that's in Paragraph 36 on Page 53 regarding the

8 | Levin DIP, is in no way meant to or construed to be an

9 | approval of the DIP, which the Court still needs to consider

10 | at a later date.

11 | THE COURT: Thank you very much.

12 | Does anyone wish to be heard?

13 | MR. WERKHEISER: Good afternoon, Your Honor. For

14 | the record, again, Gregory Werkheiser, from Benesch, on

15 | behalf of the debtors -- proposed counsel on behalf of the

16 | debtors.

17 | Your Honor, I'll make some comments on these

18 | points and to the extent our ABL or term loan lenders want to

19 | be heard, I'd ask them to have an opportunity to speak, as

20 | well. So, I think let's take the easiest one first. I think

21 | that was 53, Linda?

22 | MS. RICHENDERFER: Paragraph 36 on Page 53.

23 | MR. WERKHEISER: Page 53. So, yeah, I think we

24 | can make a representation to the Court today that no one's

25 | rights relative to consideration of the Levin DIP are being

1 prejudiced by anything contained in today's order.  This

2 language exists in the order solely to anticipate that that

3 small DIP financing facility will be presented to the Court

4 and to make sure that the order is capable of being read

5 consistently with what we understand the terms of that DIP

6 facility and their proposed interim DIP order to be when it's

7 adjudicated by the Court.

8           THE COURT:  Well, I can actually make it even

9 easier.  I don't think it's appropriate, so strike it.

10          This order stands on its own.  The DIP order will

11 stand on its own.

12          MR. WERKHEISER:  Let me cede the podium for a

13 moment, Your Honor.

14          THE COURT:  Uh-huh.

15          MS. RICHENDERFER:  Your Honor, I just rise to say

16 that that change is fine, Your Honor.

17          THE COURT:  Okay.  Thank you.

18          The Paragraph 27(b) legal fees of the lender if

19 there's a challenge ongoing, I think it's appropriate that

20 that language stay in.  I don't think there should be some

21 presumption that the lender doesn't -- isn't entitled to its

22 fees just because somebody brings and action.  And it can be

23 prejudicial to the lender to have to front its own legal fees

24 on a challenge that could last years, so I think it's

25 appropriate to have that language.  So, I'll overrule that

1   objection.

2           MR. WERKHEISER:  All right.  Thank you, Your

3   Honor.

4           And then let's just leave the consent fee to the

5   last, if we may, Your Honor.

6           And then with respect to the language on -- I'm

7   sorry -- Paragraph 25(a), so, it's my understanding this is

8   relatively typical language in this court and in others;

9   essentially, the committee has their investigation budget.

10  This does not invade any traditional investigatory activities

11  by an official committee that Your Honor would appoint.  But,

12  you know, it is, I think, a well-accepted principle of

13  drafting these orders that, as they've developed over the

14  years, that, you know, a secured lender should not be forced

15  to allow its own cash collateral to be used in actually

16  litigating and I think that's what these terms are primarily

17  contemplating.

18          I'm speaking from 21-plus years of experience at

19  this.  I've never seen a committee that was really deterred

20  by this language.

21          THE COURT:  So, if you have a plan, which would be

22  helpful, and it's got the support of the secured creditors

23  and the committee objects to the plan can they use cash

24  collateral to pay their fees to object to the plan?

25          MR. WERKHEISER:  Well, again, I think as this

A000548

 1   language, as in my experience has been interpreted over the

 2   years -- and I cannot speak for our specific lenders -- but,

 3   you know, I've never seen a lender successfully object just

 4   based on that cause to a committee objecting to a plan that

 5   they think violated the Bankruptcy Code in some way or was

 6   not in the best interests of the estate.

 7          If the committee's objection was based on the

 8   assertion that the lenders (indiscernible) to the liens or

 9   claims, I think, then, they might be well within their rights

10   to rely on this language in that scenario if that's what the

11   committee was trying to litigate in the context of that

12   objection.

13          But, again, I, you know, my understanding and

14   certainly the contextualized understanding that has developed

15   over time and I believe in this court, is that a generic

16   confirmation objection would not be limited on the part of

17   the committee.

18          THE COURT:  Counsel?

19          MS. FELDSHER:  Good afternoon, Your Honor.

20   Jennifer Feldsher, Morgan, Lewis & Bockius, on behalf of

21   Wells Fargo --

22          THE COURT:  Can you move the microphone towards

23   you.  Thank you.

24          MS. FELDSHER:  That's usually never my problem,

25   Your Honor.

1    THE COURT:  Well, this is a noisy air-conditioner,

2 unfortunately.

3    MS. FELDSHER:  -- Counsel for the agent for the

4 ABL lenders.

5    Your Honor, I actually don't read language, (A),

6 to cover the Court's concern about a Chapter 11 plan, because

7 what it says is, you know, this goes to permitted

8 enforcement -- and that's what it says in (A) -- permitted

9 enforcement or realization upon the collateral.  So, it's

10 what's permitted under the order and I view that to be an

11 exercise of remedy.

12    So, in other words, if there's a default, there's

13 language, as is typical in similar orders, that says, you

14 know, if the default -- unless the Court orders otherwise,

15 with an x amount of days, the lenders can foreclose, the

16 lenders can take other actions, they can seize cash, they can

17 do things.

18    And so, I think this gets to that point --

19    THE COURT:  Yeah.

20    MS. FELDSHER:  -- that the creditors' committee

21 can't use cash collateral of the lenders, frankly, to

22 challenge anything but the event of default and whether that

23 occurs.  And we do think that this language is fairly typical

24 and while I absolutely hate standing up and citing other

25 cases that the Court's been involved in, that I'm not

1   involved in, so I don't know the ramifications of that, I do

2   know this is similar language to what was in True Religion,

3   which I believe the Court approved, as well.

4           THE COURT:  You could write a list a thousand

5   pages long of things that are in orders that I've signed that

6   I don't like --

7           MS. FELDSHER:  I did preface --

8           THE COURT:  -- but this is not one of them.

9           MS. FELDSHER:  I did preface that by saying I hate

10  citing it, but I would do it anyway.

11      (Laughter)

12          THE COURT:  You're going to do it anyway; you're

13  contractually obligated.

14          MS. FELDSHER:  That, I am.

15          THE COURT:  No, I'm okay with this language.  I

16  don't think this is -- I understand the concern, you know,

17  what does hindering meaning, what does preventing mean, but I

18  think it's -- the way the sentence reads, it's really focused

19  on the permitted enforcement or realization on the collateral

20  and I think that's pretty narrow, so I'm okay with that.

21          MS. FELDSHER:  Correct.  Thank you, Your Honor.

22          THE COURT:  So, we're left with the consent fee.

23          MR. WERKHEISER:  Yes, Your Honor.

24          Gregory Werkheiser for the record, again.  So, the

25  consent fee, I think as we got into this previously,

1    obviously, the debtors would prefer not to pay a consent fee.

2    We would like to conserve as much cash as possible and keep

3    the lenders' claims as minimized as possible to ensure the

4    greatest recoveries for everyone in the case.

5              That being said, we did not have the ability to

6    demonstrate adequate protection for both, the ABL and the

7    term loan, in the context of this order and this order

8    represents a negotiated package of terms under which they

9    were prepared to give the debtors access to cash collateral.

10             We got some things that we wanted, such as

11   budgeting, in order to honor customer deposits, budgeting to

12   cover, you know, ordinary course operating expenses for the

13   contemplated projected duration of the liquidation.

14             We didn't get some things that we didn't want such

15   as taking out obligations like this.

16             So, it's hard to -- I don't think it's appropriate

17   in the context of this order to segregate this and say, Well,

18   there's not necessarily a basis explicitly in the prepetition

19   documents for this, therefore, they should not get it.

20             It is part of the overall deal.  It is part of

21   what was required under our agreements to provide adequate

22   protection and it was the bargain that the debtor struck.

23   So, we are prepared to live by it, even if it's not ideal.

24             THE COURT:  Yeah.  Well, I'm okay with it.  I

25   mean, I don't like it either, but it's not my money.

A000552

1          And this cases is tremendously risky for the

2     lenders.  The prudent lender might simply force a

3     liquidation, so it's a bit of a wing and a prayer here and I

4     certainly -- and I think, importantly, there's just no

5     adequate protection available.  And cash payments, although

6     they generally are to principal as opposed to a fee, but cash

7     payments are specifically contemplated as something that can

8     be used as adequate protection, so I'll allow it.

9          MR. WERKHEISER:  Thank you, Your Honor.

10         THE COURT:  You're welcome.

11         MR. WERKHEISER:  I think that is the remaining

12     open issues we have on the interim order.

13         THE COURT:  I don't -- do you have a blackline

14     yet?

15         MR. WERKHEISER:  I do have a blackline for Your

16     Honor, if I may approach?

17         THE COURT:  Yes.  I just need to go through my

18     notes and see if there's any open issues left.

19         Thank you.

20         Here come the landlords.

21       (Laughter)

22         THE COURT:  Look out.

23         Ms. Heilman, how are you?

24         MS. HEILMAN:  Good afternoon, Your Honor.  Leslie

25     Heilman, Ballard Spahr, on behalf of a number of landlords of

1  the debtors that represent approximately 42 locations of the

2  debtors, so a significant majority of the landlords, Your

3  Honor.

4          I rise, number one, since we are dealing with the

5  DIP, we did raise certain concerns with respect to the DIP.

6  I have seen a blackline that has addressed those concerns,

7  namely, with respect to access in Paragraph 32 and

8  Paragraph 21, just subjecting any default to the access

9  language in Paragraph 32.  I have seen that language.  I

10  believe the order that's been handed up to you will reflect

11  those changes.

12          So, with respect to the DIP, I think we are -- or

13  the cash collateral, we are resolved, with the exception

14  of -- and this is more of like a preview for things to

15  come -- I think, Your Honor, we have been told that stub rent

16  is in the budget for approximately the third week of March,

17  or at least near the tail end of March to be paid.  This is a

18  liquidation case, as they've teed it up to Your Honor and

19  they have commenced GOB sales prior to the petition date and

20  have asked Your Honor authority to continue those sales post-

21  petition, outside the ordinary course of business.  So, it

22  is -- and with the liquidity concerns before Your Honor, we

23  had serious concerns that the rent to be paid during their

24  time of use and occupancy of the premises.  So, that will

25  come to fruition probably before the final and we'll raise

1  any concerns with respect to rent at that time.

2         I do want to say, Your Honor, we are not

3  advocating for our rent to be paid out of the priority claims

4  as was indicated earlier this year.  We would not advocate

5  for that, administrative creditors should share equally in

6  that regard.

7         Your Honor, in addition -- and I'm not sure -- I

8  think where we're going is the scheduling piece going

9  forward, and we did file a response to the first day

10 declaration.  I'm not sure if Your Honor had an opportunity

11 to see that.

12         THE COURT:  I saw that.

13         MS. HEILMAN:  Your Honor --

14         THE COURT:  I wouldn't know if I would call it a

15 response; it had a little edge to it.

16     (Laughter)

17         MS. HEILMAN:  It had a little edge to it.  And,

18 Your Honor, it was not raised by all of my representative

19 clients, but there are certain majority interests of

20 landlords here that are very, very concerned going forward,

21 with respect to the expediency of this case and the process

22 to date and the fact that this is on a fast-track for

23 liquidation before any committee is in the door, as well as

24 we are mindful of the liquidity constraints, but as people

25 have indicated, this is an iconic institution.  It is very --

A000555

1  you know, the places that -- the geography of where it sits

2  is very important to the people.  It's very important to the

3  landlord community.  It's very important to the vendor

4  community.

5          And we filed the declaration because we think that

6  even though there are liquidity constraints, we are aware

7  that there are buyers out there and that there should be at

8  least be some slowdown, however slight to, allow for that to

9  play out to see if there is possibly a going-concern

10  enterprise here.  And the committee should have a seat at the

11  able on that.

12          I know that the U.S. Trustee's Office has set a

13  formation meeting for next Wednesday and we have continued

14  the liquidation motion to Thursday, so there is some time

15  here to continue to explore that with those purchasers, but

16  there are prospective purchasers out there for a go-forward

17  enterprise and before the train leaves the station, I think

18  that everyone should be mindful of that and see if we can

19  stop fast-tracking to just a closer of the doors for the

20  employees, for the landlords, and for everyone that's

21  involved to maximize value.

22          So, Your Honor, I rise to say that because we just

23  didn't want -- we wanted to comments to be heard and we're

24  hopeful and that will really set the stage for the motion

25  that will be heard on Thursday, as well as when the committee

 1   is formed.

 2           THE COURT:  Just so -- by liquidation motion, you

 3   mean the motion on the GOB sales?

 4           MS. HEILMAN:  Yes, Your Honor.

 5           THE COURT:  Okay.

 6           MS. HEILMAN:  And we will have our usual -- we

 7   have our usual concerns with that motion which we are working

 8   with the liquidators on, with respect to the conduct of the

 9   sale, the signage, and the like, as well as the proposed form

10   of order, but there is this overall concern, too --

11           THE COURT:  Whether that's the --

12           MS. HEILMAN:  -- that we're speeding towards a

13   liquidation where there is a prospect for a going-concern.

14           THE COURT:  Okay.  Thank you.

15           MS. HEILMAN:  Thank you, Your Honor.

16           MS. RUSSELL:  Your Honor, Maura Russell,

17   Montgomery McCracken Walker & Rhoads, proposed special

18   counsel for the debtor.

19           I don't want to get -- jump ahead of the Court

20   with respect to the motion to approve the store-closing

21   sales, but if Your Honor was entertaining comments, our

22   responses to counsel's comments, I wanted to rise and to

23   address those.

24           THE COURT:  Oh, that's not necessary.

25           MS. RUSSELL:  Okay.

1          THE COURT:  Thank you.  Mr. Taylor?

2          You get more distinguished every time I see you,

3    which means you're getting grayer.

4       (Laughter)

5          MR. TAYLOR:  I'm sure it has nothing to do with

6    what's going on up here.

7       (Laughter)

8          MR. TAYLOR:  Good afternoon, Your Honor.  Greg

9    Taylor --

10          THE COURT:  Good afternoon.

11          MR. TAYLOR:  -- of Ashby & Geddes.

12          On the phone with me, Your Honor, is Mr. Michael

13   Small of the Foley & Lardner firm.  Together, we represent

14   Kingsdown, Inc. and our primary issue, Your Honor, is that

15   Kingsdown provides certain diagnostic units and kiosks that

16   are located in the debtors' stores and these diagnostic units

17   contain proprietary technology.

18          We want to make sure that no liens attach or

19   purport to attach to those items that are owned by Kingsdown

20   and we also want to make sure that those items find their way

21   back to Kingsdown at the close of the debtors' stores.

22          We have begun to engage in the dialogue with

23   debtors' counsel on this and we look forward to continuing to

24   work with them on that.  But we did want to at least mention

25   it today, highlight the issue for Your Honor in the event

A000558

1   that we were not able to reach an agreement and we're back

2   before you at the final hearing on a disputed matter.

3           THE COURT:  All right.

4           MR. TAYLOR:  Thank you, Your Honor.

5           THE COURT:  Thank you, Mr. Taylor.

6           Of course, if it's not the debtors' property, they

7   can't give somebody a lien on it.  If it is, they can.  And I

8   will decide that at a future date, if necessary.

9           Let me just run through the --

10          MR. WERKHEISER:  And, Your Honor, with respect to

11  the Kingsdown property, there is likely no dispute there.  We

12  just were advised of this position yesterday.  We've had some

13  preliminary discussions with our client and I think, likely,

14  at the end of the day, we'll come to an understanding to

15  return that to them, but we just haven't had a chance to

16  diligence their statement that they owned that property and

17  that it ought to be returned from the locations where it

18  exists with the debtors right now.

19          So, everybody's rights are fully reserved.

20          I don't want to get into the weeds on landlords'

21  counsel's comments before but I do want to just make clear,

22  and I want our record to be clear, that although

23  circumstances have us in a position where we have to pursue a

24  liquidation currently for the majority of the stores, to be

25  clear, the phones are open, the doors are open.  We will

1  entertain legitimate offers that produce more value for our

2  stakeholders than the option that we've currently got before

3  us.  If that option exists, you know, we're prepared to

4  consider it.

5          You know, the difficult part of the situation is

6  that we've tried very hard to find a better option and have

7  not been able to succeed at that to date and so -- but, you

8  know, stranger things have happened and if somebody could

9  come forward with not just, you know, an offer as an going-

10  concern offer, but one that can deliver more value, which is

11  the guiding principle for this Court at the end of the day,

12  everyone, I think, behind me is prepared to consider that.

13          THE COURT:  Okay.  I have some comments to the

14  order.

15          MR. WERKHEISER:  Yes, sir?

16          THE COURT:  Page 14, Paragraph K, which is a

17  finding that there's an entitlement to the equities of the

18  case exception waiver and 506(c), since that's preserved for

19  the final order, I would like to take out that finding.  I'm

20  making no such finding.

21          And then --

22          MR. WERKHEISER:  Your Honor, just to be clear, by

23  removing that now, we are just preserving the *status quo*,

24  pending a final hearing; is that fair?

25          THE COURT:  What does "preserving the *status quo*"

1  mean?

2          MR. WERKHEISER:  It means that the issue can still

3  be addressed when we get before Your Honor at a final

4  hearing.

5          THE COURT:  I'm just not making a finding today.

6          MR. WERKHEISER:  Yeah.

7          THE COURT:  I mean, I don't even know why we do

8  this, but it says -- you put a paragraph -- this is why the

9  orders are so long -- you put a paragraph in that says,

10  "subject to the final order" and here's a one-page-long

11  paragraph.  This interim order doesn't even do what this

12  paragraph is designed to do, other than put a pin in it so

13  that the committee has something to aim at or they know what

14  your position is.

15          I'm certainly not going to make a finding for a

16  paragraph that doesn't make any sense to begin with, but I'll

17  live with that.  I'm used to seeing that, but I'm not making

18  any finding.

19          MR. WERKHEISER:  Understood, Your Honor.

20          THE COURT:  There's a blank in Paragraph 11,

21  Page 25, for the exhibit number for the budget.  I don't know

22  what the number is supposed to be, but you want me to fill

23  that in?

24          MR. WERKHEISER:  Yeah, one, please.

25          THE COURT:  There are, one, two, three, four -- at

    1   least five instances where you've said that people are

    2   authorized and directed to do something.

    3           I'd like you to make a global search and replace

    4   and get rid of "and directed" and just authorize.  So, for

    5   example, I mean, I could list them all for you.  In

    6   Paragraphs 7, 8, 9, 17, and 22 is where the language is.

    7           So, 12(b) on Page 27, there's a blank for the

    8   exhibit number for the borrowing base certificate and 12(c),

    9   right below it, there's a blank for the exhibit number for

   10   the budget-variance certificate.

   11           MR. WERKHEISER:  Yes, I believe those will be two,

   12   and three, and so forth.

   13           THE COURT:  Well, they are what they are.

   14           We've already talked about Paragraph 36 and then

   15   for the final hearing let's just use the date, if that's all

   16   right, the date that we've already sat of April 6th, I think;

   17   is that right?

   18           MR. WERKHEISER:  That was April 6th, Your Honor,

   19   with a 10:00 a.m.

   20           UNIDENTIFIED:  I have 1:00.

   21           MR. WERKHEISER:  Oh, 1:00, now?

   22           THE COURT:  The 6th at one o'clock, yeah, and

   23   objections are due the 30th of March.

   24           MR. WERKHEISER:  Okay.

   25           THE COURT:  Subject to making those changes and

1    submitting it under certification of counsel, I'm happy to

2    approve your cash collateral order.

3              MR. WERKHEISER:  All right.  Thank you, Your

4    Honor.

5              We will get that over before the end of the day.

6              THE COURT:  Okay.

7              MR. WERKHEISER:  Your Honor, one of the things we

8    left at the hearing prior was our customer practices [sic]

9    motion, and just to bring Your Honor up to speed on that, as

10   I arrived here, we distributed some redline for people to

11   review to try to make some changes responsive to Your Honor's

12   comments about that.  I think rather than put anyone in a

13   position, especially given that we're coming back here within

14   the next day or so, in a position where they don't have an

15   opportunity to review, if I could just summarize those for

16   Your Honor and then give people an opportunity to review the

17   document.

18             But we did agree to reproduce the detailed wind-

19   down customer practices in the text of the order and have

20   revised that to do so.  And then in addition to have attached

21   an exhibit that it provides a fair bit more detail on how

22   customer deposits are processed --

23             THE COURT:  Okay.

24             MR. WERKHEISER:  -- going forward.

25             And then I was able to consult with the company

A000563

1    and our financial advisor during the break and I understand

2    that the intention is, within the next several days to make a

3    distribution to all customers that tendered deposits for

4    which we have an email address, by email, that will notify

5    them of the company's current policy on customer deposits, so

6    they are alerted to that in time to act upon, you know,

7    whatever they intend to do with their customer deposit.

8              And for those that we do not have email addresses,

9    we have, by and large, physical addresses and will be sending

10   out notices to them by mail.

11             THE COURT:  Good.  Thank you.

12             MR. WERKHEISER:  So --

13             THE COURT:  I expect that this -- word of this has

14   hit these communities where these stores are located -- and I

15   didn't look myself -- but I'm told there are some news

16   stories about the world clearly knows that this is going on,

17   but I think that it does make a lot of sense and it's

18   appropriate and consistent with due process to give these

19   people an opportunity to receive formal notice or informal

20   notice of what is going to be done in connection with their

21   deposits.  Because this is real money for real people and it

22   makes a real difference.

23             MR. WERKHEISER:  Thank you, Your Honor.

24             And I would just ask that if they're present in

25   the courtroom today, if they had further comments on the

1   order, to get them to me before the end of the day and we'll

2   try to sort of things out.  And if everybody is onboard,

3   submit it under certification if that's acceptable to Your

4   Honor?

5              THE COURT:  That's fine.

6              MR. WERKHEISER:  Thank you, Your Honor.

7              THE COURT:  You're welcome.

8              MR. WERKHEISER:  I think that brings us to the

9   remaining items that were filed last evening, for which we

10  want to discuss scheduling.  Why don't we take up store-

11  closing sales first and I'll cede the podium to Ms. Russell

12  and we can try to talk about getting a game plan for that.

13             THE COURT:  Okay.

14             MS. RUSSELL:  Good afternoon, Your Honor.  I'm

15  certainly mindful of the clock, so I will be brief.

16             While we regret the timing of the filing of the

17  motion, that was the quickest we could get it, so we do

18  apologize.  We had hoped that we would be able to at least

19  have preliminary hearings, with respect to the motion and

20  that Your Honor would keep the record open and, perhaps, a

21  telephonic conference tomorrow later in the day to resolve

22  any remaining issues or outstanding objections.

23             We've discussed that with a few of the counsel to

24  the landlords that are in the courtroom.  They've expressed a

25  willingness, so long as there is a, you know, maintaining of

A000565

 1   the *status quo* until Your Honor has that hearing.

 2          The U.S. Trustee's Office is not inclined to --

 3   that scheduling did not work for them.

 4          THE COURT:  I am not going to conduct a hearing at

 5   all.  I'm not going to start a hearing.  I'm not going to

 6   conduct a hearing on a motion that was filed at midnight last

 7   night for a 10:00 a.m. hearing this morning.  I'm not mad at

 8   anybody for filing it.  I understand these things take time.

 9   It's just inappropriate and not consistent with the due

10   process to even start the hearing.

11          I'll give you Thursday.

12          MS. RUSSELL:  Okay.

13          THE COURT:  I'm in an all-day mediation

14   tomorrow -- I cannot do it tomorrow -- I can hear you

15   Thursday afternoon on this motion.

16          MS. RUSSELL:  Okay.  Understood, Your Honor.

17          With respect to comments that any parties have to

18   the order that was filed, if they could -- are inclined to

19   communicate those to me at some point tomorrow with the hopes

20   of us being able to incorporate those comments into a revise

21   proposed order for Your Honor to review prior to the hearing,

22   that would be helpful.

23          We would also request that Your Honor -- we have

24   sales going forward and we understand that the debtors are

25   continuing in the mode that they had been in prepetition and

A000566

1  it is currently their intention to continue in that capacity

2  until that hearing on Thursday.

3          Obviously, signage, Your Honor, would not --

4  banners would not be going up, but there are in-store

5  promotions that are currently ongoing since the petition

6  date, as well as the debtors' intention to comply with the

7  revised customer practices, as set forth in the motion that

8  was discussed earlier.

9          THE COURT:  Well, if it's inside the ordinary

10  course of business you have every right to do it.  If it's

11  outside the ordinary course of business, you are violating

12  the Bankruptcy Code and those are unauthorized post-petition

13  transactions that are avoidable.  It's up to you.

14          MS. RUSSELL:  Well, Your Honor, I guess the

15  question for your is whether or not we can continue until --

16          THE COURT:  I'm not going to tell you.  It's up to

17  you.  I don't know.  I don't know.

18          How am I going to know?  I mean, the Code is what

19  it is.  If it's inside the ordinary course of business,

20  you're free to do it.

21          MS. RUSSELL:  It was in the ordinary course of

22  business upon the filing; however, Your Honor, we do have a

23  motion pending before the Court with regard to other

24  provisions of the motion, but the debtor had been in the

25  process of conducting store-closing sales prior to the

A000567

1  filing.

2          As I indicated, the banners are not going up, so

3  it would be a much more soft-sale type structure, but we

4  didn't want to create any inconsistency if anyone was in our

5  stores and saw that there was discounting and promotions that

6  we were somehow not complying with what was going on before

7  the Court.

8          THE COURT:  Look, the problem is, okay, that

9  actions have consequences.  The filing of a petition has

10  consequences.  If you weren't ready, you shouldn't have

11  filed, okay.

12          I'm not the one who filed and then six hours or

13  eight hours before the hearing filed a motion, okay.  I'm not

14  mad at anybody -- it is what it is -- but that was a calculus

15  you made and you did what you had to do, but I'm not going to

16  give you an advisory opinion about whether you're acting

17  consistent with the Code.  I don't know the facts and I don't

18  have time or the inclination, frankly, to get educated about

19  them.

20          MS. RUSSELL:  Understood.  It was the balancing of

21  a whole host of --

22          THE COURT:  I'm sure it was.  I'm sure it was.

23          MS. RUSSELL:  -- challenges in terms of the timing

24  of the filing versus the timing of the motion.

25          THE COURT:  I'm sure it was.

1              Look, I did these cases before, too.  I understand

2    how hard they are, but I have an obligation to preserve due

3    process and I've got the U.S. Trustee objecting and I

4    completely back the U.S. Trustee.

5              Did you give them a draft of this motion like

6    you're supposed to?

7              No.

8              MS. RUSSELL:  And, Your Honor --

9              THE COURT:  I can't believe it existed at whole-

10   cloth at 11:45 last night; obviously, you had a draft at some

11   point.  You had an obligation to share it with the

12   U.S.  Trustee.  Read the Local Rules.

13             MS. RUSSELL:  Understood, Your Honor.  That was --

14   it was not intended to put the U.S. Trustee's Office or the

15   Court in a difficult spot or with respect to the timing of

16   the filing of the motion or this morning's hearing.

17             We certainly want to give people the opportunity

18   to review the motion and the order and the relief being

19   requested; unfortunately, we had a timing -- timing didn't

20   sync with respect to all of the objectives we were filing.

21             THE COURT:  All right.  Let me ask the U.S.

22   Trustee, are you okay with the hearing tomorrow if I can fit

23   it in and if so, when?

24             MS. RICHENDERFER:  I'm sorry, Your Honor.  I

25   didn't catch that last part.

1           THE COURT:  Sorry.  Are you okay with a hearing

2   tomorrow, and if so, when, on this issue, the store closing?

3           MS. RICHENDERFER:  I've got two 341s I'm

4   conducting tomorrow, so I'm trying to figure out -- I mean if

5   the Court wants to hear it tomorrow, I don't know what is the

6   best time, I guess, because I know it's going to be a long

7   hearing.

8           I haven't read it yet either, Your Honor.  I tried

9   to print it out fast this morning and it jammed our printer.

10  I had requested so many times for a draft copy and just never

11  got anything at all, so I suspect that based on the

12  particular type of transaction here that's been structured,

13  I'm going to have a lot of questions and probably cross-

14  examination of witnesses and I do need time to prepare.

15          Thursday is wide open.  If it has to be tomorrow,

16  I'll live with it somehow and try to make arrangements, but

17  like I said, I've got two 341s.

18          THE COURT:  No.  If it's going to be contested, I

19  can't squeeze it in tomorrow.

20          MR. FOX:  Your Honor, if I may?  I apologize for

21  interrupting.

22          Steven Fox from Riemer & Braunstein, on behalf of

23  the Hilco and Gordon Brothers consulting entities.  I can

24  short circuit the scheduling issues for Your Honor for

25  tomorrow.

1    In light of the U.S. Trustee's suggestion that it
2    may be necessary to inquire of witnesses, we won't be able to
3    have people here for that purpose tomorrow.  When we learned
4    this morning that the hearing was not going to go forward
5    today, we put a Hilco representative who landed in
6    Philadelphia back on a plane and sent them back to Chicago.

7    Ms. Shea (ph) is here today for the hearing and
8    unfortunately will not be available to be here Thursday, but
9    we will have Hilco representatives here on Thursday to
10   respond to any questions that the Court or the U.S. Trustee
11   may have.

12   So, from our perspective, we think at this point
13   it's going to need to be Thursday just for availability
14   purposes.

15   With respect to the continued conduct of the sale
16   comments from Ms. Russell, we are prepared under the terms of
17   our agreement to continue to operate in the normal course
18   under that agreement.  We understand the Court's concerns and
19   with respect to advisory opinions and we're also big boys and
20   we've been down this path before, so a two-day delay is not
21   going to affect us in terms of how we react with the debtor.

22   THE COURT:  Okay.

23   MR. FOX:  Just one last comment, with respect to
24   the customer programs, Your Honor.  We have been working with
25   the company in terms of communications to customers.  As you

 1    probably understand, it's our practice to make sure stores

 2    are properly signed for treatment of gift cards and gift

 3    certificates, merchandise, credits, and the like and we will

 4    continue to work with the company on communications, in-

 5    store, with the customers about how to treat their deposits

 6    and merchandise deliveries --

 7                THE COURT:  Thank you.

 8                MR. FOX:  -- and those are all covered by our

 9    consulting agreement.

10                THE COURT:  All right.  Thank you.

11                MR. FOX:  Thank you, Your Honor.

12                THE COURT:  That's very helpful.

13                Thursday.

14                MS. RUSSELL:  Yes, Your Honor.  I didn't get a

15    time from you.

16                THE COURT:  Yeah, I'm just looking.  I'll move

17    something -- what time is that -- let's do two o'clock.  I

18    might be a few minutes late, but let's shoot for two o'clock.

19    I have a meeting outside the office.

20                And we'll do both, the DIP and the going out of

21    business, although it sounds like the GOB is probably needs

22    to be the focus of our attention, but, of course, we'll deal

23    with the DIP, too.  And that's normal -- that's more than

24    normal notice for a DIP financing.

25                MS. RICHENDERFER:  Your Honor, I would hope that

1 upon review of the DIP, that I may be able to work things

2 out.

3          THE COURT:  Have you seen that before, either?

4          MS. RICHENDERFER:  It was -- a draft was emailed

5 to me at eight o'clock last evening and I could not pull it

6 up on my cell phone --

7          THE COURT:  Okay.

8          MS. RICHENDERFER:  -- so I haven't had a chance to

9 review that yet.

10          But under the circumstances of the particular --

11 of the sale and of the DIP, I'm hopeful that we can work

12 things through and be able to present --

13          THE COURT:  Yeah, I think my clerk said it was

14 about a 20-page order, so it hardly even counts as a DIP.  I

15 think he said it was a short order.

16     (Laughter)

17          MS. RICHENDERFER:  Yeah, these days -- so, Your

18 Honor, we may be left only with the GOB motion.

19          THE COURT:  Well, I may have comments to the

20 DIP -- I don't know -- I, obviously, will have to reserve

21 rights on that.

22          What the heck -- hang on, I just messed something

23 up.

24     (Pause)

25          THE COURT:  What did I say?  Two o'clock?

 1                    MR. WERKHEISER:  Yes, Your Honor.

 2                    MS. RUSSELL:  Yes.

 3                    THE COURT:  I cannot operate a computer.

 4                    All right.  All set.  No problem.

 5                    MR. WERKHEISER:  And one small point, Your Honor.

 6                    THE COURT:  And I think a lot of your orders were

 7     uploaded, so we're working on getting those signed as quickly

 8     as possible.

 9                    MR. WERKHEISER:  Thank you, Your Honor.

10                    As I was going to say, just one small point on the

11     Levin DIP.  So, it did contemplate having a hearing a little

12     bit earlier than Thursday, so we were contemplating interim

13     relief, I think for 3.5 million would have been the

14     (indiscernible) purchases under the DIP.  They've raised the

15     possibility that we may need to increase that slightly to get

16     those stores sort of back up to, you know, normal operating

17     levels of inventory.  And so, they're going to look at that,

18     but there might be a slight change in the relief requested

19     between now and Thursday.

20                    THE COURT:  Okay.

21                    MR. WERKHEISER:  I just wanted to preview that for

22     the Court and the parties.

23                    THE COURT:  Just keep everybody in the loop on

24     that, including the budget.

25                    MR. WERKHEISER:  I believe Mr. Price is here on

1  behalf of the Levin parties and would like to address the

2  Court.

3          MR. PRICE:  Good afternoon, Your Honor.  William

4  Price, Clark Hill, on behalf of Levin Furniture.

5          We look forward to working with the U.S. Trustee,

6  the other lenders, and the debtor to hammer out the finer

7  points on the DIP order.  We appreciate your time and look

8  forward to being before you Thursday.

9          THE COURT:  Okay.  Great.

10          MR. PRICE:  Thank you.

11          MR. WERKHEISER:  I think, Your Honor, looking

12  around -- no, we've got one more coming.

13          THE COURT:  You've got to hurry, because I

14  literally have three minutes.

15          MR. SHAPIRO:  I'll be very brief, Your Honor.

16          For the record, Zach Shapiro of Richards, Layton &

17  Finger.  I am appearing on behalf of U.S. Assets, Inc.

18          I think you heard from Ms. Heilman that at least

19  certain of the landlords have concerns about how the sale

20  process was run leading up to the filing.  We represent a

21  potential purchaser of the debtors' assets and we expressed

22  an interest in purchasing them as a going concern and we

23  continue to be interested.

24          We're trying to pursue a transaction that would

25  preserve value for a portion of the debtors' stores as a

A000575

1  going concern and going forward, we would really very much

2  appreciate being able to participate in a process that makes

3  sense and is fair to all parties.  Thank you, Your Honor.

4  　　　　THE COURT:  You're welcome.  Thank you very much.

5  　　　　Is there anything pressing, Mr. Werkheiser;

6  otherwise, we're going to adjourn.

7  　　　　MR. WERKHEISER:  No.  Again, I just want to be

8  clear that the value is there and the closing risk is

9  acceptable, so we are prepared to engage and we invite them

10  to come talk to us.  So, I think that concludes our business

11  today and we thank Your Honor for your patience and attention

12  and are looking forward to things going a little more

13  smoothly after today.

14  　　　　THE COURT:  All right.  Thank you.

15  　　　　We're adjourned.

16  　　　(Proceedings concluded at 2:26 p.m.)

17

18

19  　　　　　　　　　　CERTIFICATE

20

21  I certify that the foregoing is a correct transcript from the

22  electronic sound recording of the proceedings in the above-

23  entitled matter.

24
   /s/Mary Zajaczkowski_____　　　　March 10, 2020
25  Mary Zajaczkowski, CET**D-531

# EXHIBIT C

A000577

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of (a) AVF Parent, LLC (the "Borrower"), and (b) AVF Holdings II, LLC, Art Van Furniture, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVCE, LLC, AVF Franchising, LLC, AVF Holding Company, Inc., AVF Holdings I, LLC, Levin Parent, LLC, LF Trucking, Inc., Comfort Mattress, LLC and Sam Levin, Inc., each as a debtor and debtor in possession (collectively, with the Borrower, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this "Interim Order") pursuant to sections 105, 361, 362, 363 and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

13178186 v1

A000578

(i)        authorizing the Debtors to use the Prepetition Collateral (as defined herein), including all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value, including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and, in the case of the Prepetition Secured Parties, the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("Diminution in Value");

(ii)        vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(iii)        scheduling a final hearing (the "Final Hearing") within 30 days of the Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* and the evidence submitted and argument made at the interim hearing held on March 10, 2020 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Interim Hearing having

A000579

been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

      A.    **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

      B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A000580

U.S.C. §§ 1408 and 1409.

D. **Committee Formation**. As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E. **Notice**. Notice of the Motion and the Interim Hearing have been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

F. **Debtors' Stipulations**. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 27 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i) *Prepetition ABL Facility*. Pursuant to that certain *ABL Credit Agreement* dated as of March 1, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) the Borrower (the "Prepetition ABL Borrower"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors"), (c) Wells Fargo Bank, National Association, as administrative agent, issuing bank and collateral agent (in such capacity, the "Prepetition ABL Agent"), and (d) the lenders party thereto (collectively, including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and the Prepetition ABL Lenders and the Prepetition ABL Agent, together, the "Prepetition ABL

4

Parties"), the Prepetition ABL Lenders provided revolving credit, term loans and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility") in an aggregate principal amount of up to $82,500,000.

(ii)    *Prepetition ABL Obligations*. As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than approximately $33,573,784.18, inclusive of not less than $14,900,000 of issued and outstanding letters of credit and the Early Termination Premium as defined in the Prepetition ABL Documents (collectively, together with accrued and unpaid interest, bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors' obligations pursuant to, or secured by, the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations").

(iii)    *Prepetition ABL Liens and Prepetition ABL Priority Collateral*. As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, security interests in and continuing liens on

5

(the "Prepetition ABL Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain Intercreditor Agreement referred to in paragraph F(vii) below) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) and proceeds, products, and rents of any of the foregoing (collectively, the "Prepetition Term Priority Collateral," and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral"), subject only to the liens of the Prepetition Term Loan Agent on the Prepetition Term Priority Collateral and Prepetition ABL Permitted Prior Liens (as defined herein).

(iv)     *Prepetition Term Loan Facility*.  Pursuant to that certain Credit Agreement dated as of March 1, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Agreement," and collectively with the Loan Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Documents," and together with the Prepetition ABL Documents, the "Prepetition Documents"), among (a) the Borrower (the "Prepetition Term Loan Borrower" and together with the Prepetition ABL Borrower, the "Prepetition Borrowers"), (b) Virtus Group, LP, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent," and together with the Prepetition ABL Agent, the "Prepetition Agents"), (c) the guarantors thereunder (the "Prepetition Term Loan Guarantors" and, together with the Prepetition ABL Guarantors, the "Prepetition

6

Guarantors"), and (d) the lenders party thereto (the "Prepetition Term Loan Lenders," and collectively, including the Prepetition Term Loan Agent, the "Prepetition Term Loan Parties," and together with the Prepetition ABL Parties, the "Prepetition Secured Parties"), the Prepetition Term Loan Lenders provided term loans to the Prepetition Term Loan Borrower (the "Prepetition Term Loan Facility," and together with the Prepetition ABL Facility, the "Prepetition Secured Facilities") in an aggregate principal amount of $100,000,000.

(v)  *Prepetition Term Loan Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was not less than approximately $175,000,000 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements reimbursable thereunder), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrower's and the Prepetition Term Loan Guarantors' obligations pursuant to, or secured by, the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Term Loan Obligations," and together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations").

(vi)  *Prepetition Term Loan Liens and Prepetition Term Priority Collateral*.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders,

A000584

security interests in and continuing liens on (the "Prepetition Term Loan Liens," and together with the Prepetition ABL Liens, the "Prepetition Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to the liens of the Prepetition ABL Agent on the Prepetition ABL Priority Collateral and Prepetition Term Loan Permitted Prior Liens (as defined herein).

(vii) *Priority of Prepetition Liens; Intercreditor Agreement.* The Prepetition Agents entered into that certain Intercreditor Agreement dated as of March 1, 2017 (as may be further amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other obligors. Each of the Prepetition Borrowers and Prepetition Guarantors under the Prepetition Documents acknowledged and agreed to the Intercreditor Agreement.

(viii) *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of

8

the Bankruptcy Code) or otherwise permitted by the Prepetition ABL Documents (the "<u>Prepetition ABL Permitted Prior Liens</u>"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition ABL Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix)      *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.*  The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Loan Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Parties for fair consideration and reasonably equivalent value;

9

(b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Term Loan Documents (the "Prepetition Term Loan Permitted Prior Liens" and, together with the Prepetition ABL Permitted Prior Liens, the "Permitted Prior Liens");[4] (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Facility; (f) the Debtors have

---

[4] For the avoidance of doubt, as used in this Interim Order, no reference to the Prepetition ABL Permitted Prior Liens, the Prepetition Term Loan Permitted Prior Liens, or the Permitted Prior Liens shall refer to or include the Prepetition ABL Liens or the Prepetition Term Loan Liens.

A000587

waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

        (x)     *Release.*  The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Interim Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order.

A000588

(xi)    *Default by the Debtors.*  The Debtors acknowledge and stipulate that (i) they have been, since February 5, 2020, and are in default of their obligations under the Prepetition ABL Documents, and that an Event of Default has occurred under the Prepetition ABL Documents, and that since February 5, 2020, interest has accrued, and will continue to accrue, on the Prepetition ABL Obligations at the default rate set forth in the Prepetition ABL Agreement, and (ii) they have been, since February 29, 2020, and are in default of the obligations under the Prepetition Term Loan Documents, and that a Default has occurred under the Prepetition Term Loan Documents, and that as of the Petition Date, interest will accrue, on the Prepetition Term Loan Obligations at the default rate set forth in the Prepetition Term Loan Documents.

(xii)    *Consulting Agreement with the Liquidators*.  Pursuant to that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020, by and among Hilco Merchant Resources, LLC, Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC, Gordon Brothers Retail Partners, LLC, DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC and Gordon Brothers Brands, LLC and certain of the Debtors, acknowledged by the Prepetition Agents (as amended, restated or otherwise modified from time to time, the "Consulting Agreement"), the Debtors have retained the Consultant to conduct "Going Out of Business" sales of the Assets (each as defined in the Consulting Agreement).  The continued existence and validity of the Consulting Agreement and the uninterrupted continuation of the sales contemplated thereby is a condition to the consent of the Prepetition Agents to this Interim Order and the Debtors' use of Cash Collateral hereunder.

G.    DIP Facility. On March 9, 2020, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to*

12

*11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Dkt. No. 49] (the "Levin DIP Motion"). To the extent the Court enters the Orders approving the DIP Facility in accordance with the terms and provisions of the DIP Credit Agreement (each term as defined in the Levin DIP Motion), the Prepetition Agents have consented to the DIP Facility (in accordance with the Orders and the DIP Credit Agreement, in form and substance reasonably acceptable to the Prepetition Agents), and the Debtors' compliance with, and the obligations incurred under, the DIP Facility (in accordance with the Orders and the DIP Credit Agreement, in form and substance reasonably acceptable to the Prepetition Agents) shall not give rise to an Event of Default under this Interim Order.

H. **Permitted Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien, rather, any such alleged claim arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claims had on the Petition Date.

I. **Cash Collateral**. All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

A000590

J.  **Adequate Protection**.  The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, are each entitled to receive adequate protection as set forth herein to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral.

K.  **Good Faith**.  The Prepetition Secured Parties and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (defined below).  The Prepetition Secured Parties have agreed to permit the Debtors to use their Cash Collateral for the Specified Period, subject to the terms and conditions set forth herein, which terms and conditions are fair and reasonable and have been stipulated to by the Debtors in the exercise of their sound business judgment.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

L.  **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

M.  **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); (vi) counsel to Levin Furniture, LLC and Levin Trucking, LLC, and (vii) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtors have made reasonable efforts to

14

afford the best notice possible under the circumstances.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1. Motion Granted. The Motion is granted, subject to the terms and conditions set forth in this Interim Order. The Debtors shall not use Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2. Authorization to Use Cash Collateral. Subject to the terms and conditions of this Interim Order, and in accordance with the Budget, subject to such variances as are permitted by this Interim Order, the Debtors are authorized to use Cash Collateral for the period (the "Specified Period") from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date, (b) thirty (30) days after the Petition Date and (c) entry of the Final Order; *provided, however*, that, during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget and as otherwise agreed to by the Prepetition ABL Agent in its sole discretion. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any use of Cash Collateral or proceeds resulting therefrom, except (x) as permitted in the Consulting Agreement or the Levin APA (as defined below), (y) as otherwise consented to by the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term

15

Priority Collateral) in writing, or (z) as otherwise disposed of, or used, in accordance with the Budget, subject to such variances as are permitted by this Interim Order.

        3.    <u>Adequate Protection Liens</u>.

        (a)    *Prepetition ABL Adequate Protection Liens*. Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition ABL Adequate Protection Liens</u>") on any Postpetition Collateral.[5]

---

[5] "Postpetition Collateral" means: all personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) subject to entry of a Final Order, proceeds of the Debtors' rights under section 506(c) (solely to the extent such rights result from the use of Postpetition Collateral, and are, therefore, enforceable against parties other than the Prepetition Agents or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (e) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date. Notwithstanding the foregoing, Postpetition Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases). Postpetition Collateral that is (i) Prepetition ABL Priority Collateral, (ii) of a type that would be Prepetition ABL Priority Collateral; (iii) of a type that would be Prepetition ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (iv) the "Deposit", as defined in that certain letter agreement dated as of March 4, 2020 by and among Levin Furniture, LLC, Levin Trucking, LLC, as Buyer, and Sam Levin, Inc. and LF Trucking, Inc., as Seller (the "<u>Levin LOI</u>") shall, in each case, constitute "<u>Postpetition ABL Priority Collateral</u>." Postpetition Collateral that is (i) Prepetition Term Priority Collateral, (ii) of a type that would be Prepetition Term Priority Collateral; and (iii) of a type that would be Prepetition Term Priority Collateral, but that was not otherwise subject to valid, perfected,

A000593

(b)    *Prepetition Term Loan Adequate Protection Liens.*  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens") on the Postpetition Collateral.

4.    Priority of Adequate Protection Liens.

(a)    The Prepetition ABL Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to:  (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens and (B) the Prepetition ABL Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, (B) the Prepetition Term Loan Liens, (C) the Prepetition Term Loan Adequate Protection Liens, and (D) the Prepetition ABL Liens.

(b)    The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral;

---

enforceable, and unavoidable liens on the Petition Date shall constitute "Postpetition Term Priority Collateral."  Postpetition Collateral that is (i) the proceeds of the Debtors' real property leases; and (ii) the proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents shall be shared Postpetition Collateral, and the Prepetition ABL Liens and Prepetition Term Loan Liens (and corresponding adequate protection liens and claims) on such proceeds shall rank equally in priority and share such proceeds equally (with 50% of such proceeds applied to the Prepetitition ABL Obligations and 50% applied to the Prepetition Term Loan Obligations).  Nothing herein shall be construed to impair any Permitted Prior Liens.

17

*provided that*, the Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens, (B) the Prepetition ABL Liens, (C) the Prepetition ABL Adequate Protection Liens, and (D) the Prepetition Term Loan Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, and (B) the Prepetition Term Loan Liens.

(c)     Except as provided herein (including with respect to the Carve Out), the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"), and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

5.     <u>Adequate Protection Superpriority Claims</u>.

(a)     *Prepetition ABL Superpriority Claim*. As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative

A000595

expense claim in each of the Cases and any Successor Cases (the "Prepetition ABL Superpriority Claim").

(b) *Prepetition Term Loan Superpriority Claim*. As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition Term Loan Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").

6. Priority of the Adequate Protection Superpriority Claims. Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code. The Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall be subject to the following priorities: (a) with respect to Postpetition ABL Priority Collateral, (1) the Prepetition ABL Superpriority Claim and (2) the Prepetition Term Loan Superpriority Claim; and (b) with respect to Postpetition Term Priority Collateral, (1) the Prepetition Term Loan Superpriority Claim and (2) the Prepetition ABL Superpriority Claim.

7. Adequate Protection Payments and Protections for Prepetition ABL Parties. As further adequate protection, the Debtors are authorized to pay in cash the following: (a) all

A000596

principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 below, (b) immediately upon entry of this Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) in accordance with paragraph 22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e) the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI. In addition, immediately upon the payment in full in cash of the Prepetition ABL Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement, or similar continuing

20

obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 below, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 hereof. The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of funds on deposit in the Prepetition ABL Indemnity Reserve. The Prepetition ABL Indemnity Reserve shall be released at such time

A000598

as the Prepetition ABL Indemnity Obligations are Paid in Full.[6]

       8.    <u>Adequate Protection Payments and Protections for Prepetition Term Loan Agent</u>.  As further adequate protection, the Debtors are authorized to pay in cash the following: (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph 22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided*, *however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral.

       9.    <u>Perfection of Adequate Protection Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility.  No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Prepetition ABL Obligations (i) the Challenge Deadline (as defined in paragraph 34 of this Interim Order) shall have occurred without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge; and (c) the Prepetition ABL Agent has received (i) a countersigned payoff letter in form and substance satisfactory to the Prepetition ABL Agent and (ii) releases in form and substance satisfactory to the Prepetition ABL Agent in its sole discretion.

A000599

granted herein, including the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each Prepetition Agent is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Adequate Protection Liens. The Debtors are authorized to execute and deliver promptly upon demand to the Prepetition Agents, as applicable, all such financing statements, mortgages, notices, and other documents as the Prepetition Agents may reasonably request. Each Prepetition Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

10. <u>Adequate Protection Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases. The receipt by the Prepetition Secured Parties of the adequate protection

A000600

provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

11.     <u>Budget</u>. The use of Cash Collateral during the Specified Period is permitted solely in accordance with a cash collateral budget (the "<u>Budget</u>") approved by the Prepetition Agents,[7] each in their sole discretion, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents. A copy of the initial approved Budget is attached hereto as <u>Exhibit 1</u>. The Budget shall depict, on a weekly basis and line item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals and advisors), asset sales and any other fees and expenses), and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date, and such initial Budget shall be approved by, and in form and substance satisfactory to the Prepetition Agents, each in their sole discretion (it being acknowledged and agreed that the initial Budget attached hereto is approved by and satisfactory to the Prepetition Agents). The Budget shall be updated, modified, or supplemented by the Debtors with the written consent of the Prepetition Agents, but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Prepetition Agents, each in their sole discretion), and no such updated, modified, or supplemented budget shall be effective until so

---

[7] For the avoidance of doubt, any reference to the consent rights of the Prepetition Term Loan Agent shall mean the Prepetition Term Loan Agent acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Agreement).

A000601

approved, and once so approved shall be deemed the Budget; *provided, however*, that in the event the Prepetition Agents, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the Debtors shall continue to operate under the most recent prior-approved Budget and such disagreement shall give rise to an Event of Default once the period covered by such prior Budget has terminated. Each Budget delivered to the Prepetition Agents shall be accompanied by such customary supporting documentation as reasonably requested by the Prepetition Agents and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable at the time of delivery. A copy of any Budget (or updated Budget once approved by the Prepetition Agents) shall simultaneously be delivered to the counsel for a Committee (if appointed), and the U.S. Trustee. All Cash Collateral use must be strictly in accordance with the terms of the Budget, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.

12.    <u>Covenants</u>.

(a)    *Budget Compliance*.  The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts for any rolling two week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements for any rolling two week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Operating Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the

25

Budget for such period (with any unspent amounts in this subparagraph (iv) being carried forward for subsequent periods).

(b) *Borrowing Base*. Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall at all times maintain actual Total Excess ABL Availability After Covenant (calculated in the manner set forth in the Borrowing Base Certificate attached to the Budget) in an amount not less than $0, it being understood and agreed that the Availability Block set forth in the Borrowing Base Certificate attached to the Budget shall be deemed to be $5,000,000 for each of the weeks beginning March 8, 2020 and March 15, 2020. Until the Prepetition ABL Obligations are Paid in Full, the Borrowing Base Certificate shall be updated and delivered weekly in accordance with the requirements of an "Increased Reporting Event" as defined in the Prepetition ABL Agreement. For the avoidance of doubt, the calculation of the Borrowing Base shall at all times deduct the amount of the Carve Out Reserves. Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall deliver to the Prepetition Agents, by not later than Thursday of each week, an updated Borrowing Base Certificate, substantially in the form attached hereto as Exhibit 2 (the "Borrowing Base Certificate"), and such Borrowing Base Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents (it being agreed the detail required by the Prepetition ABL Agreement shall be deemed so satisfactory).

(c) *Variance Testing*. The Debtors shall, commencing with the week beginning March 15, 2020, deliver to the Prepetition Agents, by not later than Thursday of each week, a certificate, substantially in the form attached hereto as Exhibit 3 (the "Budget Variance Certificate") and such Budget Variance Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents, showing a reconciliation for the prior two week cumulative period, and certifying that (i) the Debtors are in compliance with the covenants contained in this

A000603

Section 12 and (ii) to the knowledge of the Debtors, no Event of Default hereunder has occurred or, if such an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto.

(d)     *Consent Fee for Prepetition ABL Parties*.  The Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, a consent fee ("Consent Fee") in the amount of $150,000 per week until such time as the Prepetition ABL Obligations have been repaid in full in cash (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents.  The Consent Fee shall be fully earned on Saturday of each week and shall be paid to the Prepetition ABL Agent on the immediately following Tuesday and shall not be subject to refund, offset or rebate under any circumstances.

(e)     *Levin Sale Milestones*.   The Debtors shall achieve each of the following milestones, if and when applicable (as the same may be extended from time to time with the consent of the Prepetition ABL Agent (in its sole discretion), the "Levin Sale Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the Prepetition ABL Agent in all respects:

(i)     On or before the date that is seven (7) days following the Petition Date, the Debtors shall file a motion to approve the sale of the "Assets", as such term is defined in the Levin LOI (the "Levin Sale"), to the Buyer under the Levin LOI.

27

(ii)     On or before the date that is seven (7) days following the Petition Date, the Debtors shall enter into an asset purchase agreement with the Buyer under the Levin LOI for the Levin Sale (the "Levin APA").

(iii)     On or before the date that is twenty-nine (29) days following the Petition Date, the Debtors shall receive an order from the Court approving the Levin Sale.

(iv)     On or before the date that is two (2) business days after the order approving the Levin Sale, the Debtor shall have consummated the Levin Sale and the proceeds thereof shall have been applied to the Prepetition ABL Obligations.

13.     Modification of Automatic Stay.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to:  (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the Prepetition ABL Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the Prepetition ABL Parties under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

14.     Protections of Rights of Prepetition Secured Parties.

(a)     Subject to the Intercreditor Agreement, unless the Prepetition ABL Agent and Prepetition Term Loan Agent have each provided their respective prior written consent, or all Prepetition ABL Obligations and Prepetition Term Loan Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been Paid in Full, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and

28

otherwise shall object to any motion or application seeking entry of, any order (other than this Interim Order or the Final Order, but including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Postpetition Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim Order; (ii) the use of Cash Collateral for any purpose other than as permitted in this Interim Order (including any use in accordance with the Budget, subject to variances permitted by this Interim Order); (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the Prepetition Secured Parties' rights under this Interim Order, the Prepetition ABL Documents, or the Prepetition Term Loan Documents with respect any Prepetition ABL Obligations or Prepetition Term Loan Obligations. It shall be an Event of Default under this Interim Order if, in any of these Cases or any Successor Cases, the Debtors take or take to take any of the actions contemplated with respect to provisions (i) through (iv) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

(b)     The Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the Prepetition

A000606

Agents, as applicable, all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the Prepetition Agents, as applicable) to provide under the Prepetition Documents, or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the Prepetition Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Prepetition Documents; (iv) permit the Prepetition Agents to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; and (v) upon reasonable advance notice, permit the Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Postpetition Collateral and Prepetition Collateral, in each case, in accordance with the Prepetition Documents.

15. <u>Credit Bidding</u>. No Debtor shall object to any Prepetition ABL Parties credit bidding up to the full amount of the applicable outstanding Prepetition ABL Obligations, or with respect to the Prepetition Term Loan Parties, credit bidding up to the full amount of the applicable outstanding Prepetition Term Loan Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, to the extent permitted by section 363(k) of the Bankruptcy Code, and subject in each case to the rights, duties, and limitations, as

A000607

applicable, of the parties under the Intercreditor Agreement, Prepetition Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid.

        16.   <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the Prepetition Obligations being Paid in Full, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any Prepetition Collateral or Postpetition Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the Prepetition ABL Agent (or, following the Prepetition ABL Obligations being Paid in Full, to the Prepetition Term Loan Agent) to be applied in accordance with this Interim Order and the Intercreditor Agreement.

        17.   <u>Cash Collection</u>.  From and after the date of the entry of this Interim Order, all collections and proceeds of any Postpetition Collateral and Prepetition Collateral and all Cash Collateral (that does not constitute Prepetition or Postpetition Term Priority Collateral) that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition ABL Priority Collateral were deposited under the Prepetition Documents (or in such other accounts as are designated by the Prepetition ABL Agent from time to time) (collectively, the "<u>Cash Collection Accounts</u>"), which accounts shall, until the Prepetition ABL Obligations are Paid in Full, be subject to the sole dominion and control of the Prepetition ABL Agent and any amounts deposited into the Cash

A000608

Collection Accounts shall be deemed to be Postpetition ABL Priority Collateral. Proceeds and other amounts in the Cash Collection Accounts shall be used, subject to the conditions set forth herein, to fund the Budget during the Specified Period, and the Debtors are authorized to pay to the Prepetition ABL Agent, and the Prepetition ABL Agent is authorized to apply, amounts in excess thereof in accordance with the Budget until the Prepetition ABL Obligations are Paid in Full. In furtherance of the foregoing, each Thursday during the Specified Period the Debtors shall deliver to the Prepetition Agents a schedule of all proposed disbursements for the following seven (7) day period (each a "<u>Disbursement Schedule</u>"), including identification of which line item(s) in the Budget such proposed disbursements relate to. Upon the Prepetition ABL Agent's receipt of a written cash collateral draw request (each a "<u>CC Draw Request,</u>" which shall be delivered to the Prepetition Term Loan Agent at the same time such CC Draw Request is delivered to the Prepetition ABL Agent) (which may be made on a daily basis), and following verification of conformity with the associated Disbursement Schedule and Budget, the Prepetition ABL Agent shall disburse funds from the Cash Collection Account as appropriate to fund the amounts specified in the CC Draw Request; *provided* that, during the period prior to the Prepetition ABL Obligations being Paid in Full, the Prepetition ABL Agent shall only be required to disburse funds if the Debtors are in compliance with the provisions of this Interim Order (including, without limitation, that after giving effect to such disbursement, actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0). For the avoidance of doubt, it shall be a condition to the Debtors' ability to access and use the Prepetition Secured Parties' Cash Collateral that they submit to the Prepetition ABL Agent the CC Draw Request and associated Disbursement Schedule in the manner and time provided herein. In addition to the foregoing, the

32

Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid In Full) is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount sufficient to maintain the "Ending Balance" set forth in the Budget for any applicable weekly period (at the end of the relevant week) and, until the Prepetition ABL Obligations are Paid in Full, the Prepetition ABL Agent is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount such that actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0. Until the Prepetition ABL Obligations are Paid in Full, unless otherwise agreed to in writing by the Prepetition ABL Agent or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "Cash Management Order"). The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid in Full), in each case, to the extent such direction is made in accordance with this Interim Order. The Debtors shall cause the proceeds of Prepetition and Postpetition Term Priority Collateral as identified by the Consultant to be deposited into a segregated, non-commingled account which is required to be subject to the control of the Prepetition Term Loan Agent, and the Debtors' use of such proceeds shall be subject to (and limited to the extent set forth in) this Interim Order but, for the avoidance of doubt, may be used in accordance with the Budget, subject to variances permitted by this Interim Order.

33

18.     Maintenance of Collateral.  Until all Prepetition ABL Obligations are Paid in Full, the Debtors shall:  (a) insure the Postpetition Collateral and Prepetition Collateral as required under the Prepetition Documents; and (b) maintain the cash management system in effect as of the Petition Date, as may be modified with the consent of the Prepetition Agents (such consent not to be unreasonably withheld) or as a result of entry of any order by the Court.

19.     Disposition of Collateral.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Postpetition Collateral or Prepetition Collateral other than in the ordinary course of business and in accordance with the Consulting Agreement and the Levin APA, without (subject to the Intercreditor Agreement) the prior written consent of the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral), and no such consent shall be implied, from any other action, inaction or acquiescence by the Prepetition Secured Parties or from any order of this Court.

20.     Events of Default.  The occurrence of any of the following events, unless consented to or waived by the Prepetition Agents in advance, in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "Events of Default"):

(a)     the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including, without limitation, the Covenants in paragraph 12 herein and the payment of all amounts to the Prepetition Secured Parties authorized hereunder);

(b)     the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c)     the failure by the Debtors to continue sales of the Assets in

34

accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

(d) the filing of a motion or any plan of reorganization or disclosure statement attendant thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Interim Order; (ii) to grant any lien other than Permitted Prior Liens upon or affecting any Postpetition Collateral; or (iii) except as provided in this Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code;

(e) (i) the filing of any Prohibited Plan (as defined herein) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors) or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan;

(f) the entry of an order in any of the Cases confirming a Prohibited Plan;

(g) the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to this Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect;

(h) the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by this Interim Order;

(i) the appointment of an interim or permanent trustee in the Cases, the

A000612

appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a trustee receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(j)     the filing of a motion to approve a Prohibited Sale or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI;

(k)     the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Cases to Chapter 7 of the Bankruptcy Code;

(l)     the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor Agreement, the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (C) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $250,000 or more;

(m)     the existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior

A000613

to the claims of the Prepetition Secured Parties under this Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except, in each case, as expressly provided in this Interim Order;

(n)     the Debtors shall file, or any Debtor shall fail to contest in good faith the filing of, a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction;

(o)     any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations;

(p)     any Debtors shall challenge, support or encourage a challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations;

(q)     the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in this Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code;

(r)     any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA, with respect to Postpetition Collateral or Prepetition

A000614

Collateral having a value in excess of $250,000 outside the ordinary course of business and not otherwise permitted hereunder;

(s)     any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders" as approved by the Prepetition Agents in writing (provided that this Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by this Interim Order;

(t)     any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under this paragraph 20;

(u)     the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.

21.     <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default under this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall be referred to herein as a "<u>Termination Declaration</u>") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out has occurred through the delivery of the Carve Out

38

Trigger Notice (as defined herein); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to herein as the "Termination Date"). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and this Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable). During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the Prepetition ABL Parties shall be permitted to exercise all remedies set forth herein, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and this Interim Order. Upon the occurrence

A000616

and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement and paragraph 32, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process.

22. <u>Prepetition Secured Parties' Expenses</u>. The Debtors are authorized to pay, in accordance with this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (a) the Prepetition ABL Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Morgan, Lewis & Bockius LLP and Burr & Forman LLP, and any successor counsel) and, (b) solely from the proceeds of Postpetition Term Priority Collateral, the Prepetition Term Loan Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Riemer & Braunstein LLP and Greenberg Traurig, LLP, and any successor counsel). Payment of all such fees and expenses shall not be subject to allowance by the Court. Professionals for the Prepetition Agents shall not be required to comply with the U.S. Trustee fee guidelines, *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors that were incurred after the Petition Date, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S.

40

Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such

summary fee and expense statements to the Debtors. Any objections raised by the Debtors, the

U.S. Trustee, or a Committee (if appointed) with respect to such invoices within ten (10) days of

the receipt thereof will be subject to resolution by the Court to the extent they cannot be resolved

by the applicable parties. Pending such resolution, the undisputed portion of any such invoice will

be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized to

pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket

expenses of the Prepetition ABL Parties as provided in the Prepetition ABL Documents, incurred

on or prior to such date without the need for any professional engaged by the Prepetition ABL

Parties to first deliver a copy of its invoice as provided for herein. No attorney or advisor to any

Prepetition ABL Party shall be required to file an application seeking compensation for services

or reimbursement of expenses with the Court.

23. <u>Proofs of Claim</u>. Notwithstanding any order entered by this Court in

relation to the establishment of a bar date in any of the Cases or any Successor Cases to the

contrary, the Prepetition ABL Parties and the Prepetition Term Loan Parties will not be required

to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the

Prepetition ABL Documents or the Prepetition Term Loan Documents. The Debtors' stipulations,

admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to

constitute a timely filed proof of claim for the Prepetition ABL Parties and the Prepetition Term

Loan Parties with regard to all claims arising under the Prepetition ABL Documents or the

Prepetition Term Loan Documents, as the case may be. Notwithstanding the foregoing, the

Prepetition ABL Agent on behalf of itself and the Prepetition ABL Parties, and the Prepetition

Term Loan Agent on behalf of itself and the Prepetition Term Loan Parties, are hereby authorized

A000618

and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in any of the Cases deemed to be filed in all Cases of each of the Debtors and asserted against all of the applicable Debtors). Any proof of claim filed by the Prepetition ABL Agent or the Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Parties or Prepetition Term Loan Parties. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the Prepetition ABL Parties or the Prepetition Term Loan Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

24. <u>Carve Out</u>.

(a) *Carve Out*. As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve Out</u>"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee</u>

A000619

Professionals" and, together with the Debtor Professionals, the "Professional Persons") (such fees and expenses, the "Allowed Professional Fees") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined herein), *provided* that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "ABL Professional Fee Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week).

(b) *Carve Out Reserves*. On the day on which a Carve Out Trigger Notice is given by the Prepetition ABL Agent (the "Termination Declaration Date"), the Carve

A000620

Out Trigger Notice shall be deemed a demand to the Debtors, and authorization for the Debtors, to utilize cash on hand and proceeds of the Postpetition Collateral to fund a reserve in an amount equal to the Carve Out. The Debtors shall deposit and hold such amounts in a segregated account at the Prepetition ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees (each, a "Carve Out Reserves"). For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order or the Final Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

(i)        Following payment of all Allowed Professional Fees entitled to benefit from the Carve Out, any remaining funds in the Carve-Out Reserves funded by (x) the proceeds of Postpetition ABL Priority Collateral shall be distributed (A) first, to the Prepetition ABL Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full, and (B) second, to the Prepetition Term Loan Agent on account of the Obligations (as defined in the Prepetition Term Loan Agreement) until such obligations have been Paid in Full; and (y) the proceeds of Postpetition Term Priority Collateral shall be distributed (A) first, to the Prepetition Term Loan Agent which shall apply such funds to the Obligations (as defined in the Prepetition Term Loan Agreement) in accordance with the Prepetition Term Loan Agreement until such obligations have been Paid in Full, and (B) second, to the Prepetition ABL Administrative Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full.

(ii)        Notwithstanding anything to the contrary in this Interim Order, following the end of the third business day after delivery of a Carve Out Trigger Notice, (x) the

A000621

Prepetition ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the Prepetition ABL Agent, on the one hand, and the Prepetition Term Loan Agent, on the other hand, shall have a security interest in any residual interests in the Carve Out Reserves, with any excess paid as provided above; and (y) the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves required to be funded by the proceeds of Postpetition Collateral have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves held in accounts by the Prepetition Term Loan Agent, with any excess paid as provided above.

(iii)     For the avoidance of doubt and notwithstanding anything to the contrary herein or in any Prepetition Secured Facilities, to the extent of any shortfall in the Carve Out Reserves, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and any and all other forms of adequate protection, liens, or claims securing the obligations under the Prepetition Documents; provided that in all cases, the Carve Out priority with regard to the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral will always be subject to the limitations applicable thereto set forth in the definition of Carve Out.

(c)     *No Direct Obligation To Pay Allowed Professional Fees*.  The Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the

A000622

Debtors have sufficient funds to pay such compensation or reimbursement.

(d) *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.* Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e) *Payment of Carve Out On or After the Termination Declaration Date.* Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(f) *Release of Prepetition ABL Parties.* Notwithstanding anything to the contrary contained herein, (i) prior to the delivery of the Carve Out Trigger Notice, the Debtors shall fund the Carve Out Reserves at the reasonable request of the Prepetition ABL Agent in consultation with the Prepetition Term Loan Agent, the Debtors and their advisors, and (ii) upon the repayment in full of the principal amount of all Loans under the Prepetition ABL Agreement, the cash-collateralization of all Letters of Credit under the Prepetition ABL Agreement and the funding of the Prepetition ABL Indemnity Reserve (the date that such events occur, the "ABL Repayment Date"), and after the funding of the Carve Out Reserves in an amount equal to, as of the ABL Repayment Date, the lesser of (x) the amount set forth in the Budget for Professional Persons (plus the amounts set forth in 24(a)(i) and (ii)) and (y) the then accrued Carve Out, the Prepetition ABL Parties and the Prepetition ABL Liens shall be released from all further liability from the Carve Out (such release shall be a condition to the Prepetition ABL Obligations being deemed Paid in Full).

A000623

25. <u>Limitations on Use of Cash Collateral, and Carve Out</u>. The Postpetition Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with: (a) except to contest the occurrence of an Event of Default, preventing, hindering, or delaying any of the Prepetition Secured Parties' permitted enforcement or realization upon any of the Postpetition Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order; (c) selling or otherwise disposing of Postpetition Collateral without the consent of the Prepetition Agents; (d) using or seeking to use any insurance proceeds constituting Prepetition Collateral or Postpetition Collateral except as provided for in this Interim Order without the consent of the Prepetition ABL Agent or the Prepetition Term Loan Agent (in the case of Postpetition Term Priority Collateral); (e) incurring Indebtedness (as defined in the Prepetition Documents) without the prior consent of the Prepetition Agents; (f) seeking to amend or modify any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis; (g) objecting to or challenging in any way the Prepetition Liens, Prepetition Secured Obligations, Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the Prepetition Secured Parties, respectively; (h) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations, or any other rights or interests of any of

A000624

the Prepetition Secured Parties; or (j) seeking to subordinate, recharacterize, disallow, or avoid the Prepetition Secured Obligations; *provided, however*, without prejudice to the ability of a Committee (if appointed) to contest the Investigation Budget Amount (as defined herein) in connection with the Final Hearing, that the Carve Out and such collateral proceeds may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final Order, $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging), the Prepetition Lien and Claim Matters (as defined herein).

26.     Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Budget provided by the Debtors to the Prepetition Agents.

27.     Effect of Stipulations on Third Parties.

(a)     *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless and to the extent that a party in interest with proper standing granted by order of the

A000625

Bankruptcy Court (or other court of competent jurisdiction) has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) and (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 27) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

(b)     *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition

49

Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof. To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties, in accordance with paragraph 22, shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection. Upon a successful Challenge brought pursuant to this paragraph 27, the Court may fashion any appropriate remedy.

28. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

29. <u>Section 506(c) Claims</u>. Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code,

50

A000627

or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

        30.    <u>No Marshaling/Applications of Proceeds</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order, notwithstanding any other agreement or provision to the contrary.

        31.    <u>Section 552(b)</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

        32.    <u>Access to Collateral</u>.  Subject to and effective upon entry of a Final Order, upon expiration of the Remedies Notice Period, the Prepetition Secured Parties, subject to the Intercreditor Agreement, shall be permitted to (a) access and recover any and all Prepetition and Postpetition Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Postpetition Collateral, *provided*, *however*, in the case of clause (b), notwithstanding anything to the contrary herein, and subject to the Intercreditor Agreement, the Prepetition Secured Parties can only enter upon a leased premises during the continuation of an Event of Default in accordance with (i) a separate written agreement by and between the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of

A000628

the Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable Prepetition Secured Party on such notice to the landlord as shall be required by this Court; *provided*, *however*, that solely with respect to rent due to a landlord of any such leased premises, the Prepetition Secured Parties, as applicable, shall be obligated only to reimburse the Debtors for the payment of rent of the Debtors that first accrues after delivery of the Termination Declaration in accordance with paragraph 21 herein that is payable during the period of such occupancy by the Prepetition Secured Parties, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to delivery of the Termination Declaration through and including any assumption and/or rejection of any lease. Nothing herein shall require the Prepetition Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

33. <u>Limits on Lender Liability</u>. Subject to entry of a Final Order, nothing in this Interim Order, the Prepetition Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Cases. The Prepetition Secured Parties shall not, solely by reason of having made loans under the Prepetition Documents, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or

A000629

state statute). Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

34.     <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the Prepetition ABL Agent (on behalf of the Prepetition ABL Parties) and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Parties), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the Postpetition Collateral.

35.     <u>Additional Rights of the Prepetition Term Loan Agent</u>.  Subject to the Prepetition ABL Obligations being Paid in Full and the rights preserved in paragraph 27 herein, any reference in this Interim Order to the Prepetition ABL Agent agreeing to or having the right to do, or refraining from or having the right to refrain from doing, an act, or providing any consent or waiver hereunder, shall automatically, without further order of the Court, be construed as referring to the Prepetition Term Loan Agent.

36.     <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder.

37.     <u>No Superior Rights of Reclamation</u>.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claim had on the Petition Date.

53

38.    Rights Preserved.    Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, subject to the Prepetition Documents and the Intercreditor Agreement: (a) the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the Prepetition Secured Parties.    Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.    Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and, unless otherwise set forth in this Interim Order or the Final Order, any other position which any party in interest deems appropriate to raise in the Debtors' Chapter 11 cases.

39.    No Waiver by Failure to Seek Relief.    The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Secured Parties.

A000631

40.     <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition Secured Parties, all other creditors of any of the Debtors, a Committee (if appointed), or any other court appointed committee, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

41.     <u>No Modification of Interim Order</u>.  Until and unless the Prepetition Secured Obligations have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the Prepetition ABL Documents which survive such discharge by their terms) the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the Prepetition Agents, (i) any modification, stay, vacatur, or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the Prepetition ABL Agent for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from Collateral or Prepetition Collateral; or (c) without the prior written consent of the Prepetition Agents, any lien on any of the Postpetition Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens, other than the Carve Out.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written

A000632

consent, as provided in the foregoing, of the Prepetition Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the Prepetition ABL Agent or the Prepetition Term Loan Agent.

        42.    <u>Continuing Effect of Intercreditor Agreement</u>.  The Debtors and Prepetition Secured Parties each shall be bound by, and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.

        43.    <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Intercreditor Agreement and this Interim Order (solely as between the Prepetition Secured Parties), the provisions of the Intercreditor Agreement shall govern and control.

        44.    <u>Discharge</u>.  The obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable, has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that does not require that all Prepetition ABL Obligations be Paid in Full (in the case of the sale of Postpetition ABL Priority Collateral) or that all Prepetition Term Loan Obligations be Paid in Full (in the case of the sale of Postpetition Term Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a

A000633

"Prohibited Plan or Sale") without the written consent of each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable. For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder.

45. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition Secured Parties granted pursuant to this Interim Order, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (x) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to the Prepetition ABL Documents and this Interim Order, have been Paid in Full; and (y) in respect of the Prepetition Term Loan Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been Paid in Full. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Parties notwithstanding the repayment in full of the Prepetition ABL Obligations.

46. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (EST)** before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge at the United States Bankruptcy Court for the District of

A000634

Delaware. On or before March 12, 2020, the Debtors, or an agent appointed for such purpose, shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) counsel for the Consultant; and (g) counsel for Levin Furniture, LLC, and Levin Towing, LLC. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **March 30, 2020, at 4:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (iv) counsel to the Committee (if appointed).

47. *Nunc Pro Tunc Effect of this Interim Order*. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

A000635

48.  <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the this Interim Order.

CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

**Dated: 3/11/2020**
**Wilmington, Delaware**

59

A000636

Exhibit 1

DRAFT - SUBJECT TO CHANGE

**AVF Holding, LLC**
**Cash Collateral Budget (Summary)**

| $ in thousands | Week 1 Fcst 8-Mar | Week 2 Fcst 15-Mar | Week 3 Fcst 22-Mar | Week 4 Fcst 29-Mar | Week 5 Fcst 5-Apr | Week 6 Fcst 12-Apr | Week 7 Fcst 19-Apr | Week 8 Fcst 26-Apr | Week 9 Fcst 3-May | Week 10 Fcst 10-May | Week 11 Fcst 17-May | Week 12 Fcst 24-May | Week 13 Fcst 31-May | 13-Week Total | Remaining Cash Flow | Total Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Receipts | $ 11,585 | $ 6,186 | $ 17,831 | $ 38,607 | $ 13,858 | $ 14,135 | $ 10,190 | $ 9,353 | $ 2,329 | $ 3,566 | $ 1,769 | $ 1,769 | $ 26 | $ 131,204 | $ 2,499 | $ 133,703 |
| GOB Disbursements | - | (2,603) | (13,666) | (4,564) | (4,112) | (7,380) | (5,544) | (5,771) | (2,923) | (524) | (289) | - | - | (45,377) | (100) | (45,477) |
| Operating Disbursements | (12,063) | (2,712) | (2,844) | (721) | (1,963) | (402) | (2,423) | (664) | (1,414) | (2,555) | (767) | (1,143) | (145) | (29,817) | (3,996) | (33,813) |
| Non-Operating Disbursements | (7,539) | (650) | (1,150) | (4,080) | (4,578) | (650) | - | - | - | - | - | - | 2,100 | (16,547) | 1,101 | (15,446) |
| Net Cash Flow | $ (8,017) | $ 221 | $ 170 | $ 29,241 | $ 3,205 | $ 5,703 | $ 3,223 | $ 2,918 | $ (2,008) | $ 486 | $ 714 | $ 1,626 | $ 1,981 | $ 39,464 | $ (496) | $ 38,968 |
| FF&E Sales & Other | - | - | - | (3,650) | (70) | (70) | (70) | (70) | (278) | (1,669) | (1,669) | (1,669) | - | (9,212) | (500) | (9,712) |
| Net Cash Flow to ABL | $ (8,017) | $ 221 | $ 170 | $ 25,591 | $ 3,135 | $ 5,633 | $ 3,154 | $ 2,848 | $ (2,287) | $ (1,182) | $ (955) | $ (42) | $ 1,981 | $ 30,252 | $ (996) | $ 29,256 |
| Memo: ABL Balance | | | | | | | | | | | | | | | | |
| Beg. ABL Bal. / (Cash on Hand) | 25,918 | 33,934 | 33,713 | 33,543 | 7,952 | 4,816 | (817) | (3,971) | (6,819) | (4,533) | (3,350) | (2,395) | (2,353) | 25,918 | (4,334) | 25,918 |
| End. ABL Bal. / (Cash on Hand) | $ 33,934 | $ 33,713 | $ 33,543 | $ 7,952 | $ 4,816 | $ (817) | $ (3,971) | $ (6,819) | $ (4,533) | $ (3,350) | $ (2,395) | $ (2,353) | $ (4,334) | $ (4,334) | | $ (4,334) |
| Net Borrowing Base | $ 34,277 | $ 37,140 | $ 34,413 | $ 10,656 | $ 8,223 | $ 2,545 | - | - | - | - | - | - | - | | | |
| Ending ABL Balance | 33,934 | 33,713 | 33,543 | 7,952 | 4,816 | - | - | - | - | - | - | - | - | | | |
| Borrowing Base Availability | $ 343 | $ 3,427 | $ 870 | $ 2,705 | $ 3,407 | $ 2,545 | - | - | - | - | - | - | - | | | |
| Availability Excess / (Deficiency) | $ 343 | $ 3,427 | $ 870 | $ 2,705 | $ 3,407 | $ 3,362 | $ 3,971 | $ 6,819 | $ 4,533 | $ 3,350 | $ 2,395 | $ 2,353 | $ 4,334 | $ 4,334 | $ 3,338 | $ 3,338 |

*The cash collateral budget contemplates the loss of credit card receipts that occurred on March 6th and March 7th and impact of store closure on March 8th. This resulted in deferral of certain disbursements that are essential to the Company's business operations, including, but not limited to, rent, freight, fuel, liquidator fees and other critical operating expenses. The loss of the credit card receipts that were reserved and the deferment of the critical disbursements will likely result in business disruption and ultimately reduce recovery to the estate.*

For Discussion Purposes Only

A000637

Exhibit 2

## FORM OF BUDGET VARIANCE CERTIFICATE

BUDGET VARIANCE CERTIFICATE

Date of Certificate: _____

To:  Wells Fargo Bank, N.A.
125 High Street
Boston, Massachusetts 02110
Attention: Danielle Baldinelli & Lauren Murphy
Danielle.m.baldinelli@wellsfargo.com
Lauren.murphy@wellsfargo.com

Reference is made to the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Order"). This certificate is being delivered pursuant to Paragraph 12(c) of the Cash Collateral Order. Capitalized terms used but not defined herein shall have the meanings set forth in the Cash Collateral Order.

The undersigned, a duly authorized and acting responsible officer of the Debtors, in such capacity and not individually, hereby certifies to the Prepetition Agents and the Prepetition Secured Parties on behalf of the Debtors, to the best of his/her knowledge and understanding, as follows:

1. The Debtors are in compliance with the covenants contained in Paragraph 12 of the Cash Collateral Order.

2. To the knowledge of the Debtors, no Event of Default has occurred.

3. [If an Event of Default has occurred, more details can be found in Appendix I.]

4. Attached as Appendix II is the Budget Variance Report for the two week period ending [_____].

DB1/ 112918635.1

A000638

IN WITNESS WHEREOF, the undersigned responsible officer, in his or her capacity and not individually has duly executed this Budget Variance Certificate as of the first date written above.

**ART VAN FURNITURE, LLC**

By: _____

Name: _____

Title: _____

DB1/ 112918635.1

A000639

### Appendix I to Budget Variance Certificate

[An Event of Default has occurred and is continuing, and the following describes the nature and extent of the Event of Default in reasonable detail and the corrective, if any, being taken or contemplated by the Debtors to be taken on account thereof.]

A000640

## FORM OF BUDGET VARIANCE REPORT

| | Week of _____ | | Variance over Rolling Two Week Period | |
|---|---|---|---|---|
| | Budget | Actual | Difference | Percent Variance |
| Total Cash Receipts | | | | |
| GOB Disbursements | | | | |
| Operating Disbursements | | | | |
| Non-Operating Disbursements | | | | |

DB1/ 112918635.1

A000641

**Exhibit 3**

DRAFT
SUBJECT TO MATERIAL CHANGE

**AVF Holding, LLC**
Borrowing Base Certificate

*$ in thousands, unless otherwise noted*

| | Week 1 Fcst. 8-Mar | Week 2 Fcst. 15-Mar | Week 3 Fcst. 22-Mar | Week 4 Fcst. 29-Mar | Week 5 Fcst. 5-Apr | Week 6 Fcst. 12-Apr |
|---|---|---|---|---|---|---|
| **Credit Card Receivables** | | | | | | |
| Total Credit Card Receivables | $ - | $ - | $ - | $ - | $ - | $ - |
| Less: Outstandings > 5 Business Days | - | - | - | - | - | - |
| Less: Credit Card Fees | - | - | - | - | - | - |
| Eligible Credit Card Receivables | - | - | - | - | - | - |
| Credit Card Advance Rate | | | | | | |
| **Total Credit Card Receivables Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| **Ending Inventory as of:** | | | | | | |
| Stock Ledger Ending Inventory at Cost | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Ineligible Inventory | - | - | - | - | - | - |
| Eligible Inventory | - | - | - | - | - | - |
| **Total Eligible Inventory Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| **Gross Borrowing Base Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| **Less: Availability Reserves** | | | | | | |
| Gift Certificates and Gift Cards (50% of GL Balance, net) | | | | | | |
| Customer Deposits (100%) | | | | | | |
| Professional Fee Reserve | | | | | | |
| Professional fee Payments (cumulative) | | | | | | |
| P-Card | | | | | | |
| Landed Cost Reserves | | | | | | |
| Landlord Lien (PA, VA, WA) | | | | | | |
| Other | | | | | | |
| Carveout | | | | | | |
| **Total Availability Reserves** | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Uncapped Borrowing Base** | $ - | $ - | $ - | $ - | $ - | $ - |
| ABL Balance | - | - | - | - | - | - |
| L/C Balance | - | - | - | - | - | - |
| Sub-total - ABL Balance | - | - | - | - | - | - |
| **Total Excess ABL Balance** | $ - | $ - | $ - | $ - | $ - | $ - |
| Availability Block | - | - | - | - | - | - |
| **Total Excess ABL Availability After Covenant** | $ - | $ - | $ - | $ - | $ - | $ - |
| **Beginning Accrued Professional Fees** | $ - | $ - | $ - | $ - | $ - | $ - |
| Professional Fees Accrued in Period | - | - | - | - | - | - |
| Professional Fees Paid in Period | - | - | - | - | - | - |
| **Ending Accrued Professional Fees Balance** | $ - | $ - | $ - | $ - | $ - | $ - |

For Discussion Purposes Only

A000642

# EXHIBIT D

A000643

ADVERTISEMENT

BUSINESS

# Art Van Furniture to close all stores, including 24 in Illinois

By CHICAGO TRIBUNE STAFF
CHICAGO TRIBUNE  |  MAR 05, 2020

  



SECTIONS

**ONLY $1 FOR 6 MONTHS**
Our best offer ends soon

LOG IN



The ArtVan store at 2606 N. Elston on November 2, 2015. (Phil Velasquez / Chicago Tribune)

Art Van Furniture, one of the Midwest's largest furniture retailers with almost 180 stores, including two dozen in Illinois, announced Thursday it will shut down.

Liquidation sales are scheduled to begin Friday.

ADVERTISEMENT

**American Greetings** - Sponsored

**Make Every Moment Merrier**

Shop Now

**American Greetings** - Sponsored

**Make Every Moment Merrier**

Shop Now

ADVERTISEMENT

The company, started in the Detroit area in 1959 and now based in Warren, Michigan, operates stores in the Chicago name under the names Art Van

A000645

Furniture, Art Van PureSleep and Scott Shuptrine Interiors. In addition to stores in Michigan and Illinois, it has locations in Indiana, Missouri and Ohio.



Shoppers inside the Art Van Furniture store in Chicago on Nov. 2, 2015. (Phil Velasquez / Chicago Tribune)

It entered the Chicago market in mid-2013, with plans to invest more than $40 million in land, store build-out, inventory and labor. The state's Department of Commerce and Economic Opportunity provided a $404,000 tax credit spread over 10 years and based on the company creating 35 jobs and making a $4.9 million investment at its Bolingbrook distribution facility. The distribution center will close when final sales are completed, said spokeswoman Diane Charles.

A000646

The company's website lists 24 stores in Illinois. Altogether, the shutdown will mean the loss of 520 jobs in Illinois, she said.

[Nordstrom closing Trunk Club stores »](#)

Art Van drew attention for its creative marketing promotions. Those included free furniture if the temperature at O'Hare International Airport topped 100 degrees during part of the summer of 2016 and bets on heavy snowfall during Super Bowl games. In 2015, Art Van refunded a total of $2.5 million to about 1,200 furniture buyers when it snowed more than 3 inches during that year's Super Bowl.

ADVERTISEMENT



In 2017, Boston-based private equity firm Thomas H. Lee Partners acquired a majority stake in Art Van and the retailer began an aggressive expansion, including buying other chains and opening in spaces left empty by other retailers.

[The Standard Club, long the social nexus for Chicago's Jewish leaders, is closing May 1 amid financial struggles »](#)

A000647

# EXHIBIT E

A000648

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10533 (CSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364 (d); AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order" and, collectively with the Interim Order, the "Orders") authorizing the Debtors' use of secured post-petition financing (the "DIP Facility") on an interim and final basis pursuant to the terms of the Debtor-in-Possession Credit and Security Agreement (the "DIP Credit Agreement") by and among Debtor Sam Levin, Inc. (the "Borrower" or "Debtor Levin") and Levin Furniture LLC (the "DIP Lender") attached here to as Exhibit B.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A000649

2.     In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

3.     In further support of the Motion, the Debtors respectfully represent as follows:

## Overview

4.     By this Motion, the Debtors seek entry of the Interim Order:

a.     authorizing, under sections 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors to obtain secured, superpriority, post-petition loans, advances and other financial accommodations (the "DIP Facility"), on an interim basis;

b.     authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related documents and agreements as contemplated by the DIP Credit Agreement and requested by the DIP Lender (collectively, the "DIP Loan Documents");

c.     authorizing the Debtors, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $7,000,000.00 at any one time outstanding;

d.     granting allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents, subject to carve-outs;

e.     granting to the DIP Lender automatically perfected security interests and liens on all of the DIP Collateral;

f.     authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents;

g.     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

h.     granted related relief; and

i.     scheduling the final hearing on this Motion (the "Final Hearing").

13169264 v1

A000650

## Jurisdiction and Venue

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are 105, 361, 363(c) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6004 and 9014, and Bankruptcy Local Rule 4001-2.

## Background

8.      The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.  Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.  As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

3

A000651

The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

9.     On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### Need to the DIP Facility

10.     The Debtors have an urgent and immediate need to obtain postpetition financing. Here, the DIP Facility sends a fundamentally positive signal to the Debtors' vendors, employees, customers, and other parties critical to maintaining the Debtors' viability that the operations at the stores subject to the Wolf-Levin LOI (attached to the First Day Declaration) will continue as a going concern.

11.     The DIP Facility is narrow and limited to purchasing inventory for sale in those stores.  Without the availability provided under the DIP Facility, the Debtors may be unable to preserve such stores as a going concern.

A000652

12.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Credit Agreement and hereby request authority to obtain such financing through the proposed Orders.

**Statement of the Material Terms of the Interim Order**

13.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Bankruptcy Local Rule 4001-2(a)(i) and (ii), the following is a concise statement and summary of the material terms of the Interim Order and/or the DIP Credit Agreement (collectively, the "Highlighted Provisions"):

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Borrowers** | Sam Levin, Inc. | DIP Credit Agreement at p. 1 |
| **Guarantors** | None | N/A |
| **DIP Lender** | Levin Furniture, LLC | DIP Credit Agreement at p.1 |
| **Purpose** | To fund operations of Borrower, specifically, to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case | Interim Order at ¶ G |
| **Interim Debt Limit** | Not to exceed $3,500,000.00 during the Interim Period. | Interim Order at ¶ K and DIP Credit Agreement at § 3(d) |
| **Type and Amount of DIP Facility** | $7 million secured superpriority facility | DIP Agreement introduction and defined terms |

5

A000653

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Maturity Date** | April 7, 2020 | DIP Credit Agreement at § 14(a) |
| **Interest Rate** | Non-default rate: 9% per annum based upon 360 day year<br><br>Default rate: Non-default rate plus 2% per annum | DIP Credit Agreement at §§ 1 and 3(e)(ii) |
| **Other Fees** | N/A | N/A |
| **Conditions Precedent to Lending** | (a) Each of the representations and warranties made by Borrower in or pursuant to DIP Credit Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.<br><br>(b) <u>Financing Orders</u>. Subject to Section 9(c) of the DIP Credit Agreement, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the DIP Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "<u>Additional Credit</u>"), the DIP Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the DIP Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor | DIP Credit Agreement at § 10 |

A000654

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | the performance by the Borrower of any of its obligations under the DIP Credit Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.<br><br>(c)    <u>Sale Motion</u>.  For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the DIP Lender, which shall be reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Motion</u>").<br><br>(d)    <u>Asset Purchase Agreement</u>.  For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "<u>Sellers</u>"), and the DIP Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "<u>Purchasers</u>"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "<u>Sale Agreement</u>"), which shall be reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Motion</u>").<br><br>(e)    For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Order</u>") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal.  Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.<br><br>(f)    <u>No Default</u>.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that, the DIP Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default. | |
| **Interim Borrowing Limit** | Not to exceed $3,500,000.00 during the Interim Period. | Interim Order at ¶ K |

A000655

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | | |
| **Limitations on Use of Proceeds:** | The funds available under the DIP Facility may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders. | DIP Credit Agreement at § 4 |
| **Budget and Financial Covenants** | N/A | N/A |
| **Cash Dominion** | N/A | N/A |
| **DIP Lien / Superpriority Claim** | Borrower agrees to grant DIP Lender an allowed Superpriority Claim which shall survive any conversion of the these matters to a case under chapter 7 of the Bankruptcy Code. "Superpriority Claim" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code. | DIP Credit Agreement at §§ 1 and 5(i) |
| **DIP Collateral** | To secure prompt payment and performance of all obligations, the Borrower grants to the DIP Lender a continuing security interest in and Lien upon: (a) all inventory of the Borrower purchased solely with the proceeds of any Advances under the DIP Loan Documents; (b) all receivables; (c) all right, title and interest in and to (i) all inventory returned or rejected by | DIP Credit Agreement at §1 |

8

A000656

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
| --- | --- | --- |
| | customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, dentinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer related to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien of security interest as security for the payment or enforcement of receivables referred to in clause (b)<br><br>(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and<br><br>(e) proceedings and products of (a), (b), (c) or (d) of this definition, in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claims proceeds. | |

9

A000657

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | The term Collateral shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code, or any other applicable law, constitute or result in (i) the abandonment, invalidation or uneforceability of any right, title or interest of Borrower therein or (ii) a breach of termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest or Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied. | |
| **Lien on Avoidance Claims** | N/A | N/A |
| **Administrative Carve-Out** | Subject to the Financing Orders and the DIP Loan Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall:  (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected | DIP Credit Agreement at § 15(k) |

10

A000658

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral. | |
| **Waivers** | N/A | N/A |
| **Perfection Other Than Under State Law** | The Interim DIP Lien shall be automatically perfected upon entry of the Interim Order. | Interim Order at ¶10 and DIP Credit Agreement at § 5(b) |
| **Events of Default** | The occurrence of one or more of the following events shall constitute an "Event of Default": | DIP Credit Agreement at § 12 |
| | (a) Payment of Obligations. Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document. | |
| | (b) Misrepresentations. Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made. | |
| | (c) Failure to Furnish Information. Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten | |

11

A000659

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | (10) days after such information is requested, or (iii) permit the inspection of its books or records.<br><br>       (d)    <u>Liens Against Assets</u>.  Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days.<br><br>       (e)    <u>Breach of Covenants</u>.  Except as otherwise provided for in this Section, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations.<br><br>       (f)    <u>Judgment</u>.  Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage).<br><br>       (g)    <u>Loss of Priority Lien</u>.  Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders.<br><br>       (h)    <u>Invalidity of Credit Agreement</u>. Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender.<br><br>       (i)    <u>Destruction of Collateral</u>.  Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material | |

<div align="center">12</div>

A000660

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | impairment or loss of the security provided by this Agreement or the Other Documents. | |
| | (j) Pre-Petition Payments. Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date. | |
| | (k) Dismissal or Conversion of Bankruptcy Case. The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is pari passu with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim. | |
| | (l) Relief from Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower. | |

13

A000661

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | (m)    <u>The Financing Orders</u>.  Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower.  Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.<br><br>(n)    <u>Lien Challenge</u>.  Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender. Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor or the Lender.<br><br>(o)    <u>Filing of Reorganization Plan or Sale Motion</u>.  A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers. | |

13169264 v1

A000662

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Remedies / Relief from Automatic Stay** | Upon the occurrence and during the continuance of any Event of Default, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and/or modified to the extent necessary to permit the DIP Lender to (i) perfect the security interests and Liens granted under the DIP Loan Documents and (ii) exercise its rights under section 13 of the DIP Loan Documents. | DIP Credit Agreement at § 7(d) |
| **Indemnification and Exculpation** | Borrower shall indemnify the DIP Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person (as defined in the DIP Loan Agreement) with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related thereto, the DIP Loan Agreement or Other Documents (as defined in the DIP Loan Agreement), whether or not the DIP Lender is party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified. | DIP Credit Agreement at § 15(a) |

## **Bankruptcy Local Rule 4001-2 Disclosures**

13.　　The Debtors do not believe that this Motion or the Interim Order contain any provisions requiring special disclosure under Bankruptcy Local Rule 4001-2(a).

A000663

## Basis for Relief

**I.      The Debtors Should Be Permitted to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

14.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense…" 11 U.S.C. § 364(c).

15.     In evaluating proposed post-petition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether: (i) unencumbered credit or alternative financing without superpriority status is available to the debtor; (ii) the credit transactions are necessary to preserve assets of the estate; (iii) the terms of the credit agreement are fair, reasonable, and adequate; (iv) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and (v) the proposed financing agreement adequately protects prepetition secured creditors.

16.     *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*,

16

A000664

308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

17.    For the reasons discussed below, the Debtors satisfy the standards required to obtain post-petition financing under section 364(c) of the Bankruptcy Code. For the avoidance of doubt, the Debtors are not seeking any relief pursuant to section 364(d) of the Bankruptcy Code

## II.    The Debtors Were Unable to Obtain Financing on an Unsecured Basis.

18.    Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

19.    Here, as detailed in the First-Day Declaration, as supplemented by the record, the Debtors filed these cases to avert a liquidity crisis and prevent further deterioration of their business. The Debtors are unable, in the present circumstances, to purchase inventory at the Wolf-Levin go-forward stores by obtaining financing on an unsecured, administrative expense basis.

20.    The Debtors respectfully submit that their efforts to obtain post-petition financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code. *See, e.g., In*

17

A000665

*re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

### III. The Proposed Financing is Necessary to Preserve the Assets of the Debtors' Estates.

21.     Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including purchasing inventory for the Wolf-Levin go-forward stores so that they can continue as going concerns. The DIP Facility thus is essential to Debtor Levin's continued operational viability and will provide Debtor Levin with the opportunity to preserve its businesses while the Debtors prepare to enter the sale process.

22.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require post-petition financing under the terms of the DIP Loan Documents to continue their operations during these Chapter 11 Cases.

### IV. The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.

23.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank &*

18

A000666

*Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

24.     The terms of the DIP Credit Agreement and the proposed DIP Orders were negotiated between the Debtors and the DIP Lender. The Debtors negotiated with the DIP Lender in good faith to ensure that the terms of the DIP Facility are consistent with "market" terms, and are fair and reasonable to the Debtors. To that end, the Debtors, on the one hand, and the DIP Lender on the other hand, each had separate business teams and used separate counsel in negotiating the DIP Facility.

## V.     Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.

25.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

26.     Here, the Debtors' sound business judgment clearly supports entry into the DIP

A000667

Credit Agreement to gain access to needed funding and maximize value for all constituents.

## VI.     The DIP Lender is Extending Credit in Good Faith.

27.     Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

28.     The Debtors and the DIP Lender negotiated the DIP Credit Agreement in good faith. Accordingly, the DIP Orders should provide that the DIP Lender, as a good faith lender, is entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

### Request for Final Hearing

29.     Pursuant to Bankruptcy Rule 400l(b)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days of the Petition Date and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

30.     The urgent need to preserve the Debtors' businesses, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain post-petition financing as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Cases. Without the ability to obtain access to such funding, the Debtors would be unable to meet their post-petition obligations, including maintaining and maximizing the value of the Debtors' businesses, thus causing irreparable harm to the value of the Debtors' estates.

A000668

31. Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects, and that the terms and provisions of the Interim Order be implemented and be deemed binding, and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

32. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, authorizing the Debtors to use the DIP Facility and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

33. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

34. Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. Without limiting the

21

A000669

foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

35.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, and based on the record of the Chapter 11 Case, the Debtors respectfully request that this Court (a) enter the Orders (i) authorizing the Debtors to use the DIP Facility on an interim and final basis subject to the terms and conditions set forth therein; (ii) scheduling the Final Hearing, pursuant to the Interim Order, within approximately thirty-five (35) days of the commencement of the chapter 11 cases, to consider approval of this Motion on a final basis; and (iii) granting related relief; and (b) grant the Debtors such other and further relief as may be just and proper.

Dated:  March 9, 2020  
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_/s/ Gregory W. Werkheiser_  
Gregory W. Werkheiser (DE No. 3553)  
Michael J. Barrie (DE No. 4684)  
Jennifer Hoover (DE No. 5111)  
Kevin Capuzzi (DE No. 5462)  
Kate Harmon (DE No. 5343)  
222 Delaware Avenue, Suite 801  
Wilmington, DE 19801  
Telephone: (302) 442-7010  
Facsimile: (302) 442-7012  
E-mail: gwerkheiser@beneschlaw.com  
        mbarrie@beneschlaw.com  
        jhoover@beneschlaw.com  
        kcapuzzi@beneschlaw.com  
        kharmon@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

# EXHIBIT A

A000672

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) Case No. 20-10533 (CSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) **Re: Docket No. _____** |

## INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i) authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the Collateral (as defined in the DIP Loan Documents, and referred to herein as the "DIP Collateral")  to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

A000673

adequate protection to the DIP Lender in accordance with this order; and

(ii)        scheduling a final hearing (the "Final Hearing") within twenty days of the

Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and

approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of*

*David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in*

*Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and

argument made at the interim hearing held on March 10, 2020 (the "Interim Hearing"); and notice

of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and

(d), and all applicable local rules of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"); and the Interim Hearing having been held and concluded; and all

objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved

or overruled by the Court; and it appearing that approval of the interim relief requested in the

Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates

pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the

Debtors, their estates, and all parties in interest, and is essential for the continued operation of the

Debtors' businesses and the preservation of the value of the Debtors' assets; and after due

deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE**

**COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF**

**LAW:**[3]

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.
To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

2

A000674

A. **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B. **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C. **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E. **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F. **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing (the "DIP Facility") from the DIP Lender pursuant to the terms set forth in that certain Debtor-In-Possession Credit and Security Agreement and that certain Revolving Credit Note (collectively,

---

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

3

A000675

the "DIP Loan Documents") attached to the Motion and as **Exhibit B** thereto.

        G.    **Debtor Operations**.  DIP Borrower is unable to operate without the Liquidity provided by the DIP Facility.

        H.    **Inability to Obtain Alternative Credit**.  DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

        I.    **Good Faith**.  The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

        J.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

        K.    **Interim Debt Limit**.  The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $3,500,000.00 during this Interim Period in accordance with the DIP Loan Documents.

        L.    **Avoid Immediate and Irreparable Harm**.  The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other

4

A000676

things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

M. **Interim Hearing**. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules. The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1. **Motion Granted**. The Motion is granted.

2. **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3. **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower attached to the Motion and incorporated herein, as modified by this Interim Order.

A000677

4.     **DIP Loan Documents**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder.  The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

5.     **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

6.     **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7.     **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately

6

A000678

due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8. **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[4] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

---

[4] Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. ____).

7

A000679

9.    **Security for DIP Loan**.   As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "DIP Lien") against the DIP Collateral, as that term is defined in the DIP Loan Documents.   Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

10.    **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be

8

A000680

obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

11.    **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12.    **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted,

9

A000681

superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13. **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14. **No Liability to Third Parties**. DIP Lender shall not (i) have liability to any third party nor shall it be deemed to be in control of the operations of the DIP Borrower or to be acting as a "controlling person", "responsible person" or "owner or operator" with respect to the operation or management of the DIP Borrower (as such terms, or any similar terms, are used in the Internal Revenue Code, the Unites States Comprehensive, Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), or owe any fiduciary duty to the DIP Borrower, its creditors or its estates, and (ii) DIP Lender's relationship with the DIP Borrower shall not constitute nor be deemed to constitute a joint venture or partnership with the DIP Borrower. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

15. **Order Binding Upon Parties in Interest**. All of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its

A000682

successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16.     **Effect of Modification of Interim Order**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

17.     **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18.     **Insurance Proceeds and Policies**.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be,

11

A000683

without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

20. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

21. **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

22. **Final Hearing**. The Final Hearing to consider entry of the Final Order is scheduled for **[_____], 2020 at [__]:00 [_].m. (EST)** before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before March 12, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **[_____], 2020, at [__]:00 p.m. (EST)**,

12

A000684

which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

23.      ***Nunc Pro Tunc* Effect of this Interim Order**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

24.      **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

Dated: _____
Wilmington, Delaware

_____
CHIEF JUDGE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

A000685

# EXHIBIT B

A000686

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT** (this "Agreement"), dated the 10th day of March, 2020, is entered into by and between Sam Levin, Inc., a Pennsylvania corporation ("Borrower"), and Levin Furniture LLC, a Pennsylvania limited liability company ("Lender").

### Recitals

**WHEREAS,** Borrower has encountered financial difficulties and, together with certain of is affiliates, has filed for bankruptcy protection under chapter 11 of 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are the subject of a request for joint administration under Case No. 20-10553 (CSS) (collectively, the "Bankruptcy Cases");

**WHEREAS,** Lender has agreed to provide post-petition debtor-in-possession financing (the "DIP Financing") to Borrower as more fully set forth herein and as set forth in the Financing Orders (as defined in Section 1 hereof), which Financing Orders shall be in form and substance acceptable to Lender in Lender's sole discretion, such DIP Financing to be used to pay certain expenses of Borrower during the Bankruptcy Case on the terms set forth below;

**WHEREAS,** in return for the DIP Financing, Lender requires that Borrower obtain entry by the Bankruptcy Court of the Financing Orders, specifically granting Lender, among other things, a secured superpriority administrative expense claim against Borrower and its assets only pursuant to Section 364(c) of the Bankruptcy Code with respect to the DIP Financing; and

**WHEREAS,** Borrower and Lender each acknowledge and agree that the terms of this Agreement must be approved by the Bankruptcy Court and that the Interim Financing Order (as defined in Section 1 hereof) be entered by the Bankruptcy Court before this Agreement is enforceable.

**NOW THEREFORE,** in consideration of the mutual covenants and undertakings herein contained, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

### Agreement

Borrower and Lender each agree that the foregoing Recitals are true and correct.

1. **Definitions**. For purposes of this Agreement the following terms shall have the following meanings:

"Additional Credit" shall have the meaning set forth in Section 10(b) hereof.

"Advances" shall mean loans made pursuant to the terms of this Agreement under the Revolving Credit Note.

"Agreement" shall have the meaning set forth in the Preamble hereof.

"Approved Amount" shall mean, as of any date, the maximum amount of Advances that are authorized pursuant to the terms of the Interim Financing Order or the Final Financing Order, as the case may be.

A000687

"Bankruptcy Case" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Code" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Court" shall have the meaning set forth in the Recitals hereof.

"Borrower" shall have the meaning set forth in the Preamble hereof.

"Borrower Group" shall have the meaning set forth in Section 15(l) hereof.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Pittsburgh, Pennsylvania.

"Cash Collateral Order" shall mean that certain *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered by the Bankruptcy Court in connection with the Bankruptcy Case.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar governmental authority, domestic or foreign, upon the Collateral, the Borrower or any affiliates of the Borrower.

"Claims" shall have the meaning set forth in Section 15(l) hereof.

"Closing" shall mean the closing of the DIP Financing and the other transactions to be consummated on the Closing Date, as contemplated by this Agreement.

"Closing Date" shall mean the date on which all conditions to the effectiveness of this Agreement are satisfied, but in no event shall such date be later than seven (7) days after the Petition Date.

"Collateral" shall mean and include all of the following personal property assets of the Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

(a)     all inventory of the Borrower purchased solely with the proceeds of any Advances made hereunder;

(b)     all receivables of the Borrower arising out of the sale of inventory referred to in clause (a) above;

(c)     all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer relating to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any

-2-

A000688

of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

        (d)      ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

        (e)      proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Agreement, the term "Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

        "<u>Contract Rate</u>" shall mean a fixed interest rate equal to **[9 percent (9.00%)]** per annum based on a three hundred sixty (360) day year.

        "<u>Default</u>" shall mean an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

        "<u>Default Rate</u>" shall have the meaning set forth in Section 3(e)(ii) hereof.

        "<u>DIP Financing</u>" shall have the meaning set forth in the Recitals hereof.

        "<u>Event of Default</u>" shall mean the occurrence of any of the events set forth in Section 12 hereof.

        "<u>Final Financing Order</u>" shall mean a Financing Order that is a Final Order entered in the Bankruptcy Case after notice and final hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure and applicable local rules.

        "<u>Final Order</u>" shall mean an order or judgment of the Bankruptcy Court duly entered in the docket of the Bankruptcy Case that (a) has not been modified or amended without the consent of the

A000689

Lender, or vacated, reversed, revoked, rescinded, stayed or appealed from, except as the Lender may otherwise specifically agree, (b) with respect to which the time to appeal, petition for certiorari, application or motion for reversal, rehearing, reargument, stay, or modification has expired, (c) no petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for a writ of certiorari with respect thereto has been filed or granted or the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order or judgment was appealed and (d) is no longer subject to any or further appeal or petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for any writ of certiorari with respect thereto or further judicial review in any form.

"Financing Orders" shall mean the Interim Financing Order and such other interim, final, permanent and/or supplemental orders, including the Final Financing Order, satisfactory to the Lender entered by the Bankruptcy Court in the Bankruptcy Case after notice pursuant to Section 364 of the Bankruptcy Code relating thereto or authorizing the granting of credit by the Lender to the Borrower pursuant to the terms of this Agreement.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Interim Financing Order" shall mean the order entered by the Bankruptcy Court on or about the date hereof in the form of Exhibit A attached hereto, with such changes thereto as may be approved by the Lender.

"Lender" shall have the meaning set forth in the Preamble hereof.

"Lender Group" shall have the meaning set forth in Section 15(l) hereof.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

A000690

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, results of operations, business or prospects of Borrower or (b) the Lender's Liens on the Collateral taken as a whole or, subject to Permitted Encumbrances, the priority of any such Lien; it being understood that the commencement of the Bankruptcy Case and events and conditions which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code (including, without limitation, reduction in payment terms by suppliers and reclamation claims) shall not be deemed a material adverse effect.

"Maximum Advance Amount" shall mean **Seven Million and 00/100 Dollars ($7,000,000.00)**.

"Notice" shall have the meaning set forth in Section 15(b) hereof.

"Obligations" shall mean and include advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) owing by the Borrower to the Lender or to any other direct or indirect subsidiary or affiliate of the Lender of any kind or nature, present or future (including, without limitation, any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, arising under this Agreement or the Other Documents, whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan or guarantee, or arising under any hedging contract or in connection with any cash management or treasury administration services or agreements, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise, whether evidenced by any other agreement or instrument, including, but not limited to, any and all of Borrower's Indebtedness and/or liabilities under this Agreement or the Other Documents and any amendments, extensions, renewals or increases and all costs and expenses of the Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to, reasonable attorneys' fees and expenses and all obligations of Borrower to the Lender to perform acts or refrain from taking any action, in each such case solely with respect to and/or arising in connection with the Collateral.

"Other Documents" shall mean the Revolving Credit Note, each agreement pursuant to which the Lender is granted a Lien to secure the Obligations and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents and all other writings heretofore, now or hereafter executed by Borrower and/or delivered to the Lender in respect of the transactions contemplated by this Agreement whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Permitted Encumbrances" shall mean (a) Liens in favor of the Lender; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrower in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of the Lender or the value of the assets in which the Lender has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or

13172237 v2

A000691

similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of Borrower's business; (e) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting real property, none of which materially impairs the use of such real property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (f) Liens of the Prepetition Secured Parties as set forth in the Cash Collateral Order; (g) other Liens permitted by the Cash Collateral Order; and (h) Liens disclosed on Schedule 1(f) attached hereto provided that the principal amount secured thereby is not hereafter increased to an amount greater than the amount outstanding on the Closing Date, and no additional assets become subject to such Liens except as otherwise specifically identified on Schedule 1(f).

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall mean March 8, 2020.

"Preamble" shall mean the introductory paragraph of this Agreement.

"Prior Event" shall have the meaning set forth in Section 15(l) hereof.

"Purchasers" shall have the meaning set forth in Section 10(d) hereof.

"Revolving Credit Note" shall mean the promissory note referred to in Section 3(a) hereof, together with all amendments, restatements, extensions, renewals, replacements, refinancings or refundings thereof in whole or in part.

"Sale Agreement" shall have the meaning set forth in Section 10(d) hereof.

"Sale Motion" shall have the meaning set forth in Section 10(d) hereof.

"Sale Order" shall have the meaning given set forth Section 10(f) hereof.

"Sellers" shall have the meaning set forth in Section 10(d) hereof.

"Superpriority Claim" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Term" shall have the meaning set forth in Section 14(a) hereof.

"Uniform Commercial Code" shall mean the Uniform Commercial Code or other similar law of the Commonwealth of Pennsylvania as in effect on the date of this Agreement and as amended from time to time.

A000692

2.     **Accounting Terms.** As used in this Agreement, the Revolving Credit Note or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined herein shall have the respective meanings given to them under GAAP.

3.     **The DIP Financing**.

(a)     Advances.  Subject to the terms and conditions set forth in this Agreement, Lender will make Advances to the Borrower in aggregate amounts outstanding at any time equal to the lesser of (x) the Maximum Advance Amount and (y) the Approved Amount.  The Advances shall be evidenced by a secured promissory note substantially in the form attached hereto as Exhibit B (the "Revolving Credit Note").

(b)     Procedure for Borrowing Advances.  Borrower may notify Lender prior to 12:00 p.m. (eastern time) on a Business Day of Borrower's request to incur, on that day, an Advance hereunder. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any Other Document, or with respect to any other Obligation, become due, same shall be deemed a request for an Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any Other Document, and such request shall be irrevocable.

(c)     Disbursement of Advance Proceeds.  During the Term, Borrower may use the Advances by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof.  The proceeds of (i) each Advance requested by Borrower to the extent Lender makes such Advance, shall be made available to Borrower on the day so requested by way of credit to Borrower's operating account at Bank of America in immediately available funds and (ii) each Advance deemed to have been requested by Borrower under Section 3(b) hereof shall be disbursed to Lender to be applied to the outstanding Obligations giving rise to such deemed request.

(d)     Maximum Advances.  The aggregate balance of outstanding Advances outstanding at any time (i) pursuant to the Interim Financing Order shall not exceed the lesser of (a) **Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00)** and (b) the Approved Amount and (ii) pursuant to the Final Financing Order shall not exceed the lesser of (a) the Maximum Advance Amount and (b) the Approved Amount.

(e)     Interest on Advances.

(i)     Interest charges shall be computed on the actual principal amount of Advances outstanding during the calendar month and shall bear interest for each day at a rate per annum equal to the Contract Rate.

(ii)     Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Obligations shall bear interest at the Contract Rate plus two percent (2.00%) per annum (the "Default Rate").

(iii)     If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the Contract Rate during such extension.

(iv)     In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law.  In the event interest and other

A000693

charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by the Borrower, and if then remaining excess amount is greater than the previously unpaid principal balance, the Lender shall promptly refund such excess amount to the Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate.

(f)     Repayment of Advances.

(i)     The Advances shall be due and payable in full on the last day of the Term.  Borrower shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

(ii)     All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Lender not later than 11:00 A.M. (eastern time) on the due date therefor in lawful money of the United States of America in immediately available funds.  Lender shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging the Borrower or by making Advances as provided in Section 3(b) hereof.

(iii)     The aggregate balance of outstanding Advances at any time in excess of the maximum amount of such Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, whether or not a Default or Event of Default has occurred.

4.     **Use of Funds**.  The funds available under the DIP Financing may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders.

5.     **Collateral; General Terms**.

(a)     Security Interest in the Collateral.  Pursuant to the Interim Financing Order and the Final Financing Order and in accordance with the terms thereof, to secure the prompt payment and performance to the Lender of the Obligations, Borrower hereby assigns, pledges and grants to the Lender a continuing security interest in and to all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  Borrower shall promptly provide the Lender with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s).  Upon delivery of each such notice, Borrower shall be deemed to hereby grant to the Lender a security interest and lien in and to such commercial tort claims and all proceeds thereof.

(b)     Perfection of Security Interest.  Borrower shall take all action that may be necessary or desirable, or that the Lender may request, so as at all times to maintain the validity, perfection, enforceability and priority of the Lender's security interest in the Collateral or to enable the Lender to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens on the Collateral other than Permitted Encumbrances, (ii) delivering to the Lender, endorsed or accompanied by such instruments of assignment as the Lender may specify, and stamping or marking, in such manner as the Lender may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iii) entering into warehousing, lockbox and other custodial arrangements satisfactory to

A000694

the Lender as and to the extent required hereunder, and (iv) executing and delivering control agreements, instruments of pledge, notices and assignments, in each case in form and substance satisfactory to the Lender, relating to the creation, validity, perfection, maintenance or continuation of the Lender's security interest in Collateral under the Uniform Commercial Code or other applicable law. The Lender is hereby authorized to file financing statements in accordance with the Uniform Commercial Code from time to time. By its signature hereto, Borrower hereby authorizes the Lender to file against Borrower, one or more financing, continuation, or amendment statements pursuant to the Uniform Commercial Code to perfect Liens in the Collateral arising hereunder in form and substance satisfactory to the Lender. All charges, expenses and fees the Lender may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Borrower as an Advance and added to the Obligations (notice thereof shall be provided to the Borrower thereafter), or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(c)     Disposition of Collateral. Borrower will safeguard and protect all Collateral for the Lender's general account and make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement.

(d)     Preservation of Collateral. Following the occurrence and during the continuation of an Event of Default in addition to the rights and remedies set forth in Section 13(a) hereof, the Lender: (i) may at any time take such steps as the Lender deems necessary to protect the Lender's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as the Lender may deem appropriate; (ii) may employ and maintain at any of Borrower's premises a custodian who shall have full authority to do all acts necessary to protect the Lender's interests in the Collateral; (iii) may lease warehouse facilities to which the Lender may move all or part of the Collateral; (iv) may use Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (v) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrower's owned or leased property. Borrower shall cooperate fully with all of the Lender's efforts to preserve the Collateral as permitted in the foregoing sentence and will take such actions to preserve the Collateral as the Lender may direct. All of the Lender's expenses of preserving the Collateral in accordance with the foregoing, including any expenses relating to the bonding of a custodian, shall be charged to the Borrower as an Advance and added to the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(e)     Ownership of Collateral. With respect to the Collateral, at the time the Collateral becomes subject to the Lender's security interest: (i) Borrower shall be the owner of and fully authorized and able to sell, transfer, pledge and/or grant a security interest having the priority set forth in the Financing Orders in each and every item of its Collateral to the Lender; and, except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by Borrower or delivered to the Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of Borrower that appear on such documents and agreements shall be genuine and Borrower shall have full capacity to execute same; and (iv) Borrower's inventory shall be located as set forth on Schedule 5(e) attached hereto (as such Schedule may be updated from time to time) and shall not be removed from such location(s) without the prior written consent of the Lender except with respect to the sale of inventory in the ordinary course of business and with respect to inventory in transit from (a) a supplier to one location identified on Schedule 5(e) (as such Schedule may be updated from time to time) or (b) one location identified on Schedule 5(e) to another location identified on Schedule 5(e).

(f)     Defense of Lender's Interests. Until (i) indefeasible payment and performance in full of all of the Obligations and (ii) termination of this Agreement, the Lender's interests in the Collateral

13172237 v2

A000695

shall continue in full force and effect. During such period Borrower shall not, without the Lender's prior written consent, pledge, sell (except inventory in the ordinary course of business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, and except for dispositions expressly permitted elsewhere herein, any part of the Collateral. Borrower shall defend the Lender's interests in the Collateral against any and all Persons whatsoever. At any time after an Event of Default has occurred and is continuing and after demand by the Lender for payment of all Obligations, the Lender shall have the right, after the giving of any required notices under Section 13 hereof and upon the effectiveness of the granting of relief from the stay of Section 362(a) of the Bankruptcy Code, to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including, without limitation, labels, stationery, documents, instruments and advertising materials. If the Lender exercises such right to take possession of the Collateral, Borrower shall, upon demand, assemble it in the best manner possible and make it available to the Lender at a place reasonably convenient to the Lender. In addition, with respect to all Collateral, the Lender shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other applicable law. After the occurrence and during the continuance of an Event of Default and after the giving of any required notices under Section 13 hereof, Borrower shall, and the Lender may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, inventory, documents or instruments in which the Lender holds a security interest to deliver same to the Lender and/or subject to the Lender's order and if they shall come into Borrower's possession, they shall be held by Borrower in trust as the Lender's trustee, and Borrower will immediately deliver them to the Lender in their original form together with any necessary endorsement.

   (g) <u>Books and Records</u>. Borrower shall (i) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (ii) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (iii) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful receivables, advances and investments and all other proper accruals (including without limitation by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in all material respects in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrower.

   (h) <u>Financial Disclosure</u>. Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by Borrower at any time during the Term and promptly after the written request of the Lender (with prior written notice to the Borrower so long as no Event of Default has occurred and is continuing) to deliver to the Lender copies of Borrower's financial statements (if any exist at or prior to the date of such request), trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to the Lender any information such accountants may have concerning Borrower's financial status and business operations. Borrower hereby authorizes all federal, state and municipal authorities to furnish to the Lender copies of reports or examinations relating to Borrower, whether made by Borrower or otherwise; however, the Lender will attempt to obtain such information or materials directly from Borrower prior to obtaining such information or materials from such accountants or such authorities.

   (i) <u>Priority</u>. Subject to entry of the Financing Orders by the Bankruptcy Court, Borrower agrees to grant Lender an allowed Superpriority Claim, and said Superpriority Claim shall survive any conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

13172237 v2

A000696

(j)    Compliance with Laws.  Borrower shall comply with all laws, acts, rules, regulations and orders of any Governmental Body with jurisdiction over it or the Collateral or any part thereof or to the operation of Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of those Governmental Bodies or officials in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's Lien on or security interest in the Collateral. The Collateral at all times shall be maintained in accordance with the material requirements of all insurance carriers which provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect.

(k)    Inspection of Premises.  Borrower shall (i) permit the Lender or any of its agents, attorneys, field examiners, auditors, financial consultants, appraisers and/or any other consultants or advisors access to Borrower's assets, properties, and premises at times to be mutually agreed, during normal business hours to, among other things, conduct appraisals and evaluations of the Collateral and any other assets or properties of Borrower, and (ii) fully cooperate and completely and promptly comply with any and all requests of the Lender and/or any of its agents for information or copies of documents. All fees, costs, and expenses of such agents, now or hereafter incurred by the Lender shall be reimbursed by Borrower in accordance with Section 15(e) hereof.

(l)    Insurance.  Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral.  Subject to the orders of the Bankruptcy Court, at Borrower's own cost and expense in amounts and with carriers acceptable to the Lender, Borrower shall (i) keep all its insurable properties and properties in which Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrower's including, without limitation, business interruption insurance; (ii) maintain insurance in such amounts as is customary in the case of companies engaged in businesses similar to Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business; and (v) furnish the Lender with (1) evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (2) appropriate lender loss payable endorsements in form and substance satisfactory to the Lender, naming the Lender as an additional insured and lender loss payee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to the Lender, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to the Lender.  Borrower shall provide copies of all such insurance policies (including the appropriate lender loss payee and additional insured endorsements) within thirty (30) days after the Lender's request, however, only certificates of such insurance shall be required at Closing.  In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by the Lender and the Borrower to make payment for such loss to the Lender and not Borrower and the Lender jointly.  If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to Borrower and the Lender jointly, the Lender may endorse Borrower's name thereon and do such other things as the Lender may deem advisable to reduce the same to cash.  The Lender is hereby authorized to negotiate and compromise claims under insurance

-11-

A000697

coverage with respect to Collateral. All loss recoveries with respect to Collateral received by the Lender upon any such insurance may be applied to the Obligations, in such order as the Lender in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by the Lender to Borrower or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Borrower to the Lender, on demand. Any loss recoveries not relating to items of Collateral shall be payable directly to Borrower and, if received by the Lender, the Lender shall promptly deliver same to Borrower. Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below, the Lender shall remit to the Borrower all proceeds of business interruption insurance, and all proceeds of insurance with respect to larceny, embezzlement or other criminal misappropriation, regardless of amount, shall be payable directly and promptly to the Borrower. The agreement of the Lender to remit insurance proceeds in the manner above provided shall be subject to satisfaction that no Event of Default or Default shall then have occurred and be continuing.

(m)     Failure to Pay Insurance. If Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, the Lender, if the Lender so elects, may obtain such insurance and pay the premium therefor on behalf of Borrower, and charge the Borrower therefor as an Advance and such expenses so paid shall be part of the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(n)     Payment of Taxes. Subject to the orders of the Bankruptcy Court, Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon Borrower or any of the Collateral including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except (i) those taxes, assessments or charges that are not material; (ii) those taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding; and (iii) those taxes which Borrower is prohibited from paying (or are not required to pay) by operation of the Bankruptcy Code, provided that, with respect to items (i) and (ii) referenced above in this Section 5(n), that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. If any tax by any governmental authority is or may be imposed on or as a result of any transaction between Borrower and the Lender which the Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in the Lender's opinion, may possibly create a valid Lien on the Collateral, the Lender may without notice to Borrower pay the taxes, assessments or other Charges and Borrower hereby indemnifies and holds the Lender harmless in respect thereof. The Lender will not pay any taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. The amount of any payment by the Lender under this Section 5(n) shall be charged to the Borrower as an Advance and added to the Obligations and, until Borrower shall furnish the Lender with an indemnity therefor (or supply the Lender with evidence satisfactory to the Lender that due provision for the payment thereof has been made), the Lender may hold without interest any balance standing to the Borrower's credit and the Lender shall retain its security interest in any and all Collateral held by the Lender.

(o)     Payment of Leasehold Obligations. Borrower shall at all times pay, when and as due, its rental obligations arising after the Petition Date under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases (other than to the extent that the enforcement of such terms by the applicable landlord is stayed by virtue of the Bankruptcy Case) and, at the Lender's reasonable request will provide evidence of having done so.

-12-

A000698

(p)  <u>Power of Lender to Act on Borrower's Behalf</u>.  The Lender shall have the right, at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to receive, endorse, assign and/or deliver in the name of the Lender or Borrower any and all checks, drafts and other instruments for the payment of money relating to receivables, and Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Borrower hereby constitutes the Lender or the Lender's designee as Borrower's attorney with power at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code (i) to endorse Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign Borrower's name on any invoice or bill of lading relating to any of the receivables, drafts against customers, assignments and verifications of receivables; (iii) to send verifications of receivables to any customer; (iv) to demand payment of the receivables; (v) to enforce payment of the receivables by legal proceedings or otherwise; (vi) to exercise all of the Borrower's rights and remedies with respect to the collection of the receivables and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the receivables; (viii) to settle, adjust or compromise any legal proceedings brought to collect receivables; (ix) to prepare, file and sign Borrower's name on a proof of claim in bankruptcy or similar document against any customer; (x) to prepare, file and sign Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the receivables; and (xi) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done with gross (not mere) negligence or willful misconduct; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  The Lender shall have the right at any time following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to change the address for delivery of mail addressed to Borrower to such address as the Lender may designate and to receive, open and dispose of all mail addressed to Borrower.

(q)  <u>No Liability</u>.  The Lender shall not, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the receivables or any instrument received in payment thereof, or for any damage resulting therefrom unless such liability arises from the Lender's willful misconduct or gross negligence as finally determined by a court of competent jurisdiction.  Following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, the Lender may, without any other notice or consent from Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  The Lender is authorized and empowered to accept following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code the return of the goods represented by any of the receivables, without notice to or consent by Borrower, all without discharging or in any way affecting Borrower's liability hereunder.

(r)  <u>Exculpation of Liability</u>.  Nothing herein contained shall be construed to constitute the Lender as Borrower's agent for any purpose whatsoever, nor shall the Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof except to the extent such shortage, discrepancy, damage, loss or destruction resulted directly from the gross (not mere) negligence or willful

-13-

A000699

misconduct of the Lender. The Lender will not, whether by anything herein or in any assignment or otherwise, assume any of Borrower's obligations under any contract or agreement assigned to the Lender, and the Lender shall not be responsible in any way for the performance by Borrower of any of the terms and conditions thereof.

6. <u>**Representations and Warranties**</u>.

(a) <u>Authority</u>. Subject to entry of the Financing Orders, Borrower has the full power, authority and legal right to enter into this Agreement and the Other Documents to which it is a party and to perform all of its Obligations hereunder and thereunder, as the case may be. Subject to entry of the Financing Orders, this Agreement and the Other Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms. The execution, delivery and performance of this Agreement and of the Other Documents by Borrower (i) subject to entry of the Financing Orders, are within Borrower's limited liability company powers, have been duly authorized, are not in contravention of law or the terms of Borrower's operating agreement, articles of organization or other applicable documents relating to Borrower's formation or organization, as the case may be, or to the conduct of Borrower's business or of any material agreement or undertaking arising after the Petition Date to which Borrower is a party or by which Borrower is bound, and (ii) will not conflict with nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of Borrower under the provisions of any agreement, charter document or other instrument arising after the Petition Date to which Borrower is a party or by which it or its property may be bound.

(b) <u>Formation and Qualification</u>. Borrower is duly organized and in good standing under the laws of the Commonwealth of Pennsylvania, which constitutes all jurisdictions in which qualification and good standing are necessary for Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Borrower has delivered to the Lender true and complete copies of its articles of organization, operating agreement or other organizational documents and will promptly notify the Lender of any amendment or changes thereto.

(c) <u>Survival of Representations and Warranties</u>. All representations and warranties of Borrower contained in this Agreement and the Other Documents, as the case may be, shall be true at the time of Borrower's execution of this Agreement and the Other Documents, as the case may be, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the Closing.

(d) <u>No Litigation, Violation or Default</u>. Except as disclosed in <u>Schedule 6(e)</u>, Borrower does not have any pending or threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect. Borrower is not in violation of any applicable statute, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is Borrower in violation of any order of any court, governmental authority or arbitration board or tribunal which would reasonably be expected to have a Material Adverse Effect.

(e) <u>The Financing Orders</u>. On the date of the making of the initial Advances hereunder, the Interim Financing Order will have been entered and be in full force and effect and will not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in its sole discretion, amended, supplemented or modified. On the date of the making of any Advance, the Interim Financing Order or the Final Financing Order, as the case may be, shall have been entered and be in full force and effect and shall not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in Lender's sole discretion, amended, supplemented or modified. Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lender shall, subject solely to

-14-

A000700

the provisions of Sections 3(f)(iv), 12 and 13 hereof and to such reservations of rights as may be expressly set forth in the Financing Orders, be entitled to immediate payment in full of such Obligations in cash, and the Lender shall be entitled to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

(f) <u>Good Faith</u>. This Agreement has been negotiated in good faith and at arm's length between the Borrower and the Lender.

7. **Affirmative Covenants.** Following the Closing Date, Borrower shall until payment or satisfaction in full of the Obligations and termination of this Agreement:

(a) <u>Conduct of Business and Maintenance of Existence and Assets</u>. (i) Conduct its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including, without limitation, all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral; (ii) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (iii) make all such reports and pay all such franchise and other taxes and license fees arising after the Petition Date and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so would reasonably be expected to have a Material Adverse Effect.

(b) <u>Violations</u>. Promptly notify the Lender in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to Borrower or the Collateral which could reasonably be expected to have a Material Adverse Effect.

(c) <u>Execution of Supplemental Instruments</u>. Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as the Lender may reasonably request, in order for the full intent of this Agreement to be carried into effect.

(d) <u>Modification of the Automatic Stay</u>. The Interim Financing Order (and Final Financing Order, as applicable) shall contain language, which shall be satisfactory to the Lender in its sole discretion, vacating and modifying the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary to permit the Lender to (i) perfect the security interests and Liens granted hereunder and (ii) exercise its rights under Section 13 hereof of this Agreement.

8. **Negative Covenants.** Borrower shall not until satisfaction in full of the Obligations and termination of this Agreement:

(a) <u>Merger, Consolidation, Acquisition and Sale of Assets</u>.

(i) Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person or permit any other Person to consolidate with or merge with it; or

13172237 v2

A000701

(ii)     Except transactions involving the sale, lease, transfer or other disposition of inventory in the ordinary course of business, sell, lease, transfer or otherwise dispose of any of its properties or assets unless such sale is in accordance with the Sale Agreement, the Sale Motion and the Sale Order.

(b)     <u>Creation of Liens</u>.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

(c)     <u>Guarantees</u>.  Become liable upon the obligations of any Person by assumption, endorsement or guaranty thereof or otherwise.

(d)     <u>Loans</u>.  Make advances, loans or extensions of credit to any Person, including, without limitation, any affiliate, except with respect to the extension of commercial trade credit in connection with the sale of inventory in the ordinary course of its business.

(e)     <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness except in respect of (i) trade debt, deposits placed with the Borrower by customers of the Borrower for boat orders, and as disclosed by the Borrower in its schedules filed in the Bankruptcy Case, (ii) Indebtedness existing on the Closing Date and set forth on <u>Schedule 8(e)</u> attached hereto (including any extensions, renewals or refinancings thereof), provided that there is no material change in the material terms thereof and the principal amount of such Indebtedness shall not be increased to an amount greater than the amount outstanding on the Closing Date without the prior written consent of the Lender, (iii) Indebtedness of the Prepetition Secured Parties under the Prepetition Documents as set forth in the Cash Collateral Order, (iv) other Indebtedness permitted pursuant to the Cash Collateral Order, and (v) Indebtedness to the Lender under or pursuant to this Agreement or the Other Documents.

(f)     <u>Nature of Business</u>.  Substantially change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business or other than those which are useful in, necessary for and are to be used in its business, as presently conducted.

(g)     <u>Amendment of Articles of Organization or Operating Agreement</u>.  Amend, modify or waive any material term or material provision of its articles of organization or operating agreement or other organizational documents which amendment, modification or waiver would reasonably be considered material and adverse to the Lender, unless required by law.

(h)     <u>Prepayment of Indebtedness</u>.  At any time, directly or indirectly, prepay or repurchase, redeem or retire any Indebtedness, except for the prepayment, repurchase, redemption, retirement or acquisition of any Indebtedness of Borrower owed to the Lender pursuant to this Agreement or the Other Documents.

9.     **Conditions to Initial Advances**.  The agreement of the Lender to make the initial Advance requested to be made on the Closing Date is subject to the satisfaction, or waiver by the Lender, immediately prior to or concurrently with the making of such Advance, of the following conditions precedent:

(a)     <u>Note</u>.  The Lender shall have received the Revolving Credit Note duly executed and delivered by an authorized officer of Borrower.

(b)     <u>Bankruptcy Matters</u>.  No trustee or examiner with expanded powers relating to the operation of the business of the Borrower shall have been appointed with respect to Borrower or its

business, properties or assets, including without limitation, the Collateral and any other property that is security for the Obligations and Borrower shall have complied in full with all other requirements as provided for under the Interim Financing Order.

(c) <u>Interim Financing Order</u>. At the time of the making of the initial Advance, the Lender shall have received satisfactory evidence of the entry of the Interim Financing Order which Interim Financing Order (i) shall be in form and substance satisfactory to the Lender in Lender's sole discretion, (ii) shall have been entered not later than seven (7) days following the Petition Date and (iii) shall not have been vacated, stayed, reversed, modified or amended in any respect without the express written consent of the Lender, and, if the Interim Financing Order is the subject of a pending appeal in any respect, neither the making of such Advance, nor the performance by the Borrower of any of its obligations hereunder or under the Other Documents or under any other instrument or agreement referred to herein, shall be the subject of a presently effective stay pending appeal.

(d) <u>First Day Orders</u>. All of the "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Bankruptcy Case shall be reasonably satisfactory in form and substance to the Lender.

(e) <u>Corporate Proceedings of Borrower</u>. The Lender shall have received a copy of the resolutions in form and substance reasonably satisfactory to the Lender, of the board of directors, partners, managers or members, as the case may be, of Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Revolving Credit Note and any Other Document to which Borrower is a party, and (ii) the granting by Borrower of the security interests in and Liens upon the Collateral. Such resolutions shall be certified by an authorized individual of Borrower as of the Closing Date and such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate.

(f) <u>Incumbency Certificate of Borrower</u>. The Lender shall have received a certificate of an authorized individual of Borrower, dated the Closing Date, as to the incumbency and signature of the officers or manager of Borrower executing any certificate or other documents to be delivered by Borrower pursuant hereto, together with evidence of the incumbency of such authorized individual.

(g) <u>Good Standing Certificates</u>. The Lender shall have received copies of good standing certificates, or similar certifications, for Borrower, issued by the Department of State of the Commonwealth of Pennsylvania and each jurisdiction where the conduct of its business activities or the ownership of its properties necessitates qualification.

(h) <u>Insurance</u>. The Lender shall have received in form and substance satisfactory to the Lender, certificates of insurance for the Borrower's casualty insurance policies, together with loss payable endorsements on the Borrower's standard form of loss payee endorsement naming the Lender as lender loss payee with respect to the Collateral, and certificates of insurance for the Borrower's liability insurance policies, together with endorsements naming the Lender as an additional insured.

(i) <u>Consents</u>. The Lender shall have received any and all consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, such consents of such third parties as might assert claims with respect to the Collateral, as the Lender and its counsel shall deem necessary.

(j)    <u>Other</u>.  All limited liability company and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Lender and its counsel.

10.    **Conditions to Each Advance**.  The agreement of the Lender to make any Advance requested to be made on any date (including, without limitation, the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made.

(a)    <u>Representations and Warranties</u>.  Each of the representations and warranties made by Borrower in or pursuant to this Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b)    <u>Financing Orders</u>.  Subject to Section 9(c) hereof, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "<u>Additional Credit</u>"), the Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor the performance by the Borrower of any of its obligations under this Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.

(c)    <u>Sale Motion</u>.  For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the Lender, which shall be reasonably satisfactory in form and substance to the Lender (the "<u>Sale Motion</u>").

(d)    <u>Asset Purchase Agreement</u>.  For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "<u>Sellers</u>"), and the Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "<u>Purchasers</u>"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "<u>Sale Agreement</u>"), which shall be reasonably satisfactory in form and substance to the Lender (the "<u>Sale Motion</u>").

(e)    For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the Lender (the "<u>Sale Order</u>") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal.   Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.

(f)    <u>No Default</u>.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such

date; provided, however that, the Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default.

        (g)    <u>Maximum Advances</u>.  In the case of any Advances requested to be made, after giving effect thereto, the aggregate Advances shall not exceed the Maximum Advance Amount.

Each request for an Advance by the Borrower hereunder shall constitute a representation and warranty by Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied (to the extent that such conditions are required to be satisfied by such date).

    11.    **Information as to Borrower.**  Borrower shall, until payment or satisfaction in full of the Obligations and the termination of this Agreement deliver the following information:

        (a)    <u>Disclosure of Material Matters</u>.  Immediately upon learning thereof, report to the Lender all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including, without limitation, Borrower's reclamation or repossession of, or the return to Borrower of, a material amount of goods or material claims or material disputes asserted by any customer or other obligor.

        (b)    <u>Litigation</u>.  Promptly notify the Lender in writing of any adversary proceeding, contested matter or administrative proceeding affecting Borrower, whether or not the claim is covered by insurance, and of any adversary proceeding, contested matter or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

        (c)    <u>Material Occurrences</u>.  Promptly, but in any event no later than five (5) days after such occurrence, notify the Lender in writing upon the occurrence of (i) any Event of Default or Default; (ii) any event, development or circumstance whereby any financial statements or other reports furnished to the Lender fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Borrower as of the date of such statements; (iii) each and every default by Borrower which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness arising after the Petition Date, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated; and (iv) any other development in the business or affairs of Borrower which could reasonably be expected to have a Material Adverse Effect; in each case, to the extent permitted by applicable law, describing the nature thereof and the action Borrower proposes to take with respect thereto.

        (d)    <u>Additional Information</u>.  Furnish the Lender with such additional information as the Lender shall reasonably request in order to enable the Lender to determine whether the terms, covenants, provisions and conditions of this Agreement and the Revolving Credit Note have been complied with by Borrower and execute and deliver to the Lender, upon request, such documents and agreements as the Lender may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

        (e)    <u>Weekly Reporting</u>.  Furnish the Lender with weekly reporting of inventory tracking, accounts payable aging and accounts receivable aging of the Borrower by 5:00 p.m. on Thursday of each week for the preceding week.

    12.    **Events of Default.**  The occurrence of any one or more of the following events shall constitute an "Event of Default":

A000705

(a)     Payment of Obligations.  Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document.

(b)     Misrepresentations.  Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made.

(c)     Failure to Furnish Information.  Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten (10) days after such information is requested, or (iii) permit the inspection of its books or records.

(d)     Liens Against Assets.  Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days.

(e)     Breach of Covenants.  Except as otherwise provided for in this Section 12, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations.

(f)     Judgment.  Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage).

(g)     Loss of Priority Lien.  Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders.

(h)     Invalidity of Credit Agreement.  Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender.

(i)     Destruction of Collateral.  Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material impairment or loss of the security provided by this Agreement or the Other Documents.

(j)     Pre-Petition Payments.  Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date.

(k)     Dismissal or Conversion of Bankruptcy Case.  The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy

-20-

A000706

Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is <u>pari</u> <u>passu</u> with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such <u>pari</u> <u>passu</u> or senior Superpriority Claim.

(l)    <u>Relief from Stay</u>. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower.

(m)    <u>The Financing Orders</u>. Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower. Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.

(n)    <u>Lien Challenge</u>. Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender. Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor or the Lender.

(o)    <u>Filing of Reorganization Plan or Sale Motion</u>. A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers.

13.    **Lenders' Rights and Remedies After Default.**

(a)    <u>Rights and Remedies</u>. Upon the occurrence of an Event of Default and at any time thereafter (such default not having previously been cured), at the option of Lender during the continuance of such event, and without further order of or application to the Bankruptcy Court except as otherwise provided in the Financing Orders, the Lender may, by notice to the Borrower and its counsel (with a copy to (x) counsel for any statutory creditors' committee appointed in the Bankruptcy Case, (y) the United States Trustee for the Bankruptcy Court and (z) counsel to each of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties pursuant to the Cash Collateral Order), take one or more of the following actions, at the same or different times: (i) terminate or suspend forthwith the commitment to make Advances hereunder; (ii) declare the Advances or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Advances together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any Other Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any Other Document to the contrary notwithstanding; and (iii)

A000707

exercise any and all remedies under this Agreement and the Other Documents and under applicable law available to the Lender.

(b)     Lender's Discretion.  The Lender shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies the Lender may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of the Lender's rights hereunder.

(c)     Setoff.  In addition to any other rights which the Lender may have under applicable law, upon the occurrence and during the continuance of an Event of Default hereunder, the Lender shall have a right to apply Borrower's property held by the Lender to reduce the Obligations; *provided that* in no event shall the Postpetition Collateral (as defined in the Cash Collateral Order) be available for such right of setoff.

(d)     Rights and Remedies Not Exclusive.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

(e)     Allocation of Payments After Event of Default.  Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received from Borrower (including the monetary proceeds of collections or of realization upon any Collateral) shall be applied in such order as the Lender shall determine in its sole discretion.

14.     **Effective Date and Termination.**

(a)     Term.  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of Borrower and the Lender, shall become effective on the date hereof and shall continue in full force and effect, and Advances borrowed under this Agreement will be paid in full in cash and the DIP Financing will terminate upon the earliest to occur of the following (the "Term"):  (i) **[April 7, 2020],** or such later date as may be agreed pursuant to this Agreement, (ii) unless extended with the consent of the Lender, the failure to meet any of the dates set forth in the Sale Motion or the entry of the Sale Order to occur, (iii) the closing of a sale pursuant to the Sale Agreement, the Sale Motion and the Sale Order, (iv) at the option of the Lender, at any time on or after an Event of Default, or (v) acceleration of the Obligations in accordance with this Agreement.

(b)     Termination.  The termination of this Agreement shall not affect Borrower's or the Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated.  The security interests, Liens and rights granted to the Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement, until all of the Obligations of Borrower have been paid or performed in full after the termination of this Agreement or Borrower has furnished the Lender with an indemnification satisfactory to the Lender with respect thereto.  Accordingly, Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and the Lender shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds.  All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or

A000708

performed in full.  Without limitation, all indemnification obligations contained herein shall survive the termination hereof and payment in full of the Obligations.

15.  **Miscellaneous.**

(a)  <u>Indemnity</u>.  Borrower shall indemnify the Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not the Lender is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified.

(b)  <u>Notice</u>.  Any notice or request hereunder may be given to the Borrower or to the Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15(b).  Any notice, request, demand, direction or other communication (for purposes of this Section 15(b) only, a "<u>Notice</u>") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission in accordance with this Section 15(b).  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 15(b) hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 15(b).  Any Notice shall be effective:

(i)  In the case of hand-delivery, when delivered;

(ii)  If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(iii)  In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(iv)  In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(v)  In the case of electronic transmission, when actually received;

(vi)  If given by any other means (including by overnight courier), when actually received.

-23-

A000709

| (A) | If to Lender: | Levin Furniture, LLC |
|---|---|---|
| | | c/o Goldberg, Kamin & Garvin |
| | | 1806 Frick Building |
| | | 437 Grant St. |
| | | Pittsburgh, Pennsylvania 15219 |
| | | Attention: Jonathan M. Kamin |
| | | Telephone: |
| | | Email: |

| | With a copy to: | Clark Hill PLC |
|---|---|---|
| | | One Oxford Centre |
| | | 301 Grant Street, 14th Floor |
| | | Pittsburgh, Pennsylvania 15219-1425 |
| | | Attention: Jarrod J. Duffy / William C. Price |
| | | Telephone: (412) 394-2324 / (412) 394-7776 |
| | | Telecopier: (412) 394-2555 |
| | | Email: jduffy@clarkhill.com / wprice@clarkhill.com |

| (B) | If to Borrower: | Sam Levin, Inc. |
|---|---|---|
| | | c/o Art Van Furniture, LLC |
| | | 6500 14 Mile Road |
| | | Warren, MI 48092 |
| | | Attention: Michael Zambricki |
| | | Email: mzambricki@artvan.com |

with copies (which shall not constitute notice) to:

Benesch, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Attn: Gregory Werkheiser & Michael J. Barrie
Email: gwerkheiser@beneschlaw.com /
mbarrie@beneschlaw.com

     (c)    <u>Representation by Counsel.</u>  Each party hereto acknowledges that it has been represented by counsel in connection with this Agreement. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the parties hereto.

     (d)    <u>Governing Law.</u>  This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without reference to the conflicts of law provisions thereof and, to the extent applicable, the Bankruptcy Code.

     (e)    <u>Expenses.</u>  All costs and expenses including, without limitation, reasonable attorneys' fees and disbursements incurred by the Lender (i) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (ii) in connection with the modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, or (iii) in instituting, maintaining, preserving, enforcing and

13172237 v2

A000710

foreclosing on the Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (iv) in defending or prosecuting any actions or proceedings arising out of or relating to the Lender's transactions with Borrower, or (v) in connection with any advice given to the Lender with respect to its rights and obligations under this Agreement and any Other Document, may be charged to the Borrower and shall be part of the Obligations (the Lender shall promptly thereafter provide notice thereof to the Borrower).

(f)     Injunctive Relief.  Borrower recognizes that, in the event it fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to the Lender; therefore, the Lender, if the Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

(g)     Consequential Damages.  Neither the Lender nor any of its agents or attorneys shall be liable to Borrower for any special, incidental, consequential or punitive damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

(h)     Counterparts.  This Agreement may be executed in counterpart, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

(i)     Modifications in Writing.  No modification or amendment of the terms of this Agreement shall be valid unless such amendment is in writing and signed by Borrower and Lender.

(j)     Headings.  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

(k)     Effect of Financing Orders.  The Liens and security interest referred to in this Agreement and any Other Document with respect to the Borrower shall be deemed valid and perfected by entry of the Interim Financing Order.

Subject to the Financing Orders and this Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall: (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral.

(l)     Release.  Borrower, on behalf of itself and any Person claiming by, through, or under Borrower (collectively, the "Borrower Group") acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature (including, for the avoidance of doubt, any claim under Chapter 5 of the Bankruptcy Code) whatsoever (collectively, "Claims") against the Lender and/or any of its former, present or future directors, officers, members, employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns (the Lender and its former, present or future directors, officers, members,

13172237 v2

A000711

employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns are jointly and severally referred to as the "Lender Group"), that directly or indirectly arise out of, are based upon, or are in any manner connected with any Prior Event; and, should any Claims nonetheless exist, Borrower, on behalf of itself and all the other members of the Borrower Group, hereby (i) releases and discharges each member of the Lender Group from any liability whatsoever on such Claims that directly or indirectly arise out of, are based upon, or are in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Claims against any member of the Lender Group.  As used herein the term "Prior Event" means any transaction, event, circumstance, action, failure to act or occurrence of any sort or type, including without limitation any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the execution of this Agreement.

[INTENTIONALLY LEFT BLANK]

13172237 v2

A000712

**IN WITNESS WHEREOF,** Borrower and Lender have caused this Agreement to be executed as of the date first set forth above.

<div style="margin-left: 50%;">

**BORROWER:**

Sam Levin, Inc.,
a Pennsylvania corporation

_____

By:
Name:
Title:


**LENDER:**

Levin Furniture, LLC,
a Pennsylvania limited liability company

_____

By:  Robert Levin, President

</div>

### INDEX TO EXHIBITS

Exhibit A      -      Interim Financing Order
Exhibit B      -      Revolving Credit Note

**EXHIBIT A**

**Interim Financing Order**

(see attached)

A000715

**EXHIBIT B**

**Revolving Credit Note**


(see attached)

**INDEX TO SCHEDULES**

Schedule 1(f)    -    Permitted Encumbrances
Schedule 5(e)    -    Inventory Locations
Schedule 6(e)    -    Litigation
Schedule 8(e)    -    Indebtedness

A000717

**SCHEDULE 1(f)**

**Permitted Encumbrances**

A000718

**SCHEDULE 5(e)**

**Inventory Locations**

223525600
13172237 v2

A000719

**SCHEDULE 6(e)**

**Litigation**

**SCHEDULE 8(e)**

**Indebtedness**

A000721

# REVOLVING CREDIT NOTE

$7,000,000.00

Date: March __, 2020
Pittsburgh, Pennsylvania

This Revolving Credit Note (this "Note") is executed and delivered under and pursuant to the terms of that certain Debtor-in-Possession Credit and Security Agreement, dated of even date herewith (as may be amended, modified, supplemented or restated, from time to time, the "DIP Credit Agreement"), by and between Sam Levin, Inc., a Pennsylvania corporation (the "Borrower"), and Levin Furniture, LLC, a Pennsylvania limited liability company (the "Lender"). Capitalized terms not otherwise defined herein shall have the meanings provided in the DIP Credit Agreement.

FOR VALUE RECEIVED, the Borrower hereby promises to pay to the order of the Lender at such place as Lender may from time to time designate to the Borrower in writing:

(i)      the principal sum of Seven Million Five Hundred Thousand and 00/100 Dollars ($7,000,000.00) or, if different from such amount, the unpaid principal balance of the Advances as may be due and owing under the DIP Credit Agreement, payable in accordance with the provisions of the DIP Credit Agreement and subject to acceleration upon the occurrence of an Event of Default under the DIP Credit Agreement or earlier termination of the DIP Credit Agreement pursuant to the terms thereof; and

(ii)     interest on the principal amount of this Note from time to time outstanding until such principal amount is paid in full at the Contract Rate in accordance with the provisions of the DIP Credit Agreement. In no event, however, shall interest exceed the maximum interest rate permitted by law. Upon and after the occurrence of an Event of Default, and during the continuation thereof, interest shall be payable at the Default Rate.

This Note is the Revolving Credit Note referred to in the DIP Credit Agreement and is secured by the Liens granted pursuant to the DIP Credit Agreement and the Other Documents, is entitled to the benefits of the DIP Credit Agreement and the Other Documents and is subject to all of the agreements, terms and conditions therein contained.

This Note may be voluntarily prepaid, in whole or in part, on the terms and conditions set forth in the DIP Credit Agreement.

If an Event of Default shall have occurred under the DIP Credit Agreement, then this Note may, as provided in the DIP Credit Agreement, be declared immediately due and payable, without notice, together with reasonable attorneys' fees if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof.

This Note shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania. The Borrower hereby consents to the jurisdiction and venue of the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") with respect to any suit arising out of or mentioning this Note provided, however, that in the event that the Bankruptcy Court does not have jurisdiction over any matter or if it has jurisdiction but does not exercise such jurisdiction for any reason, the Borrower hereby consents to the jurisdiction and venue of the courts of the Commonwealth of Pennsylvania or the United States District Court for the Western District of Pennsylvania, in each case located in Allegheny County, Pennsylvania.

The Borrower expressly waives any presentment, demand, protest, notice of protest, or notice of any kind except as expressly provided in the DIP Credit Agreement.

13172258 v2

A000722

**WAIVER OF TRIAL BY JURY.** THE UNDERSIGNED HEREBY EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVE ALL BENEFIT AND ADVANTAGE OF ANY RIGHT TO A TRIAL BY JURY, AND THEY WILL NOT AT ANY TIME INSIST UPON, OR PLEAD OR IN ANY MANNER WHATSOEVER CLAIM OR TAKE THE BENEFIT OR ADVANTAGE OF A TRIAL BY JURY IN ANY ACTION ARISING IN CONNECTION WITH THIS NOTE, THE DIP CREDIT AGREEMENT OR ANY OF THE OTHER DOCUMENTS.

[INTENTIONALLY LEFT BLANK]

13172258 v2

A000723

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned has hereby executed this Revolving Credit Note on the date first set forth above.

**BORROWER:**

Sam Levin, Inc.,
a Pennsylvania corporation

By:_____
Name:_____
Title:_____

A000724

ACKNOWLEDGMENT

_____ OF _____ )
 ) SS:
COUNTY OF _____ )


     On this, the _____ day of March, 2020, before me, a Notary Public, the undersigned officer, personally appeared _____ who acknowledged himself/herself to be the _____ of Sam Levin, Inc., a Pennsylvania corporation (the "Company"), and that he/she as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by himself/herself as such officer on behalf the Company.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                           _____
                                Notary Public


My Commission Expires:

13172258 v2

A000725

# EXHIBIT F

A000726

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No.  49** |

**INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i)        authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the DIP Collateral (as defined below)[3] to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

[3]    As used in this Interim Order, "DIP Collateral" shall mean and include all of the following personal property assets of the DIP Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

A000727

with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and adequate protection to the DIP Lender in accordance with this order; and

    (ii)        scheduling a final hearing (the "<u>Final Hearing</u>") within twenty days of the

---

(a) all inventory of the DIP Borrower purchased solely with the proceeds of any Advances made under the DIP Credit Agreement;

(b) all receivables of the DIP Borrower arising out of the sale of inventory referred to in clause (a) above;

(c) all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the DIP Borrower giving rise to receivables referred to in clause (b) above, (ii) all of DIP Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b), (iii) all additional amounts due to DIP Borrower from any customer relating to the receivables set forth in clause (b) above, (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b), (v) all of DIP Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b), (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b), and (vii) if and when obtained by DIP Borrower, all real and personal property of third parties in which DIP Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

(e) proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Interim Order or the DIP Credit Agreement, the term "DIP Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

2

A000728

Petition Date to consider the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and argument made at the first day hearing held on March 10, 2020 and the interim hearing held on March 12, 2020 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable local rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

3

A000729

A. **Petition Date**. On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B. **Debtors in Possession**. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C. **Jurisdiction and Venue**. This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Committee Formation**. As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E. **DIP Loan**. DIP Borrower proposes that it obtain post-petition financing (the "DIP Facility") from the DIP Lender pursuant to the terms set forth in this Interim Order and in that certain form of Debtor-In-Possession Credit and Security Agreement (the "DIP Credit Agreement") and that certain Revolving Credit Note (collectively with the DIP Credit Agreement, the "DIP Loan Documents"), each in substantially the form as filed on the docket in these chapter 11 proceedings on March 13, 2020.

F. **Debtor Operations**. DIP Borrower is unable to operate without the

---

such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Liquidity provided by the DIP Facility.

G.    **Inability to Obtain Alternative Credit**.  DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

H.    **Good Faith**.  The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

I.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

J.    **Interim Debt Limit**.  The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $10,000,000.00 during this Interim Period in accordance with the DIP Loan Documents.

K.    **Avoid Immediate and Irreparable Harm**.  The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

<center>5</center>

L.        **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.        **Motion Granted**. The Motion is granted.

2.        **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3.        **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower, as modified by this Interim Order; *provided, however,* notwithstanding anything to the contrary in the Motion or the forms of the DIP Loan Documents annexed to the Motion: (a) the "Maximum advance Amount" (as defined in the DIP Credit Agreement) shall be **Twenty Million and 00/100 U.S. dollars ($20,000,000.00);** (b) the aggregate balance of outstanding advances outstanding at any time pursuant to this Interim Order shall not exceed **Ten Million and 00/100 U.S. dollars**

6

A000732

**($10,000,000.00)**; and Section 14(a)(i) of the DIP Credit Agreement is deemed amended to strike the text "[April 7, 2020]" and replace it with "April 9, 2020". The Debtors are authorized to revise, execute and deliver the DIP Loan Documents to conform with this Paragraph 3.

    4.  **Additional DIP Loan Documents; Non-Material Amendments**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder. The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

    5.  **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

    6.  **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to

A000733

limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7.    **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8.    **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[5] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the

---

[5]   Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 93) (the "Interim CC Order").

A000734

DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

        9.    **Security for DIP Loan**.  As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "<u>DIP Lien</u>") against the DIP Collateral, as that term is defined in the DIP Loan Documents; *provided, however,* that the DIP Lien shall be junior only to the pre-existing liens on and security interests in such DIP Collateral granted in favor of third parties (other than any Prepetition ABL Secured Party or any Prepetition Term Loan Secured Party (each as defined in the Interim CC Order)) that, as of the Petition Date, (a) were senior in priority under applicable law to the DIP Lien, (b) were not subordinated by agreement or applicable law, and (c) were in existence, valid, enforceable, properly perfected and non-avoidable as of the Petition Date, including any such liens and security interests that were perfected after the Petition Date but relate back to the Petition Date pursuant to section 546(b) of the Bankruptcy Code.  Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

<div align="center">9</div>

A000735

10. **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

10

A000736

11. **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12. **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13. **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any

11

A000737

successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14.    RESERVED

15.    **Order Binding Upon Parties in Interest**. To the fullest extent that relief is available at a hearing held pending a final hearing as contemplated by Bankruptcy Rule 4001(2), all of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16.    **Effect of Modification of Interim Order**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

12

A000738

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Relationship to Contemplated Sale Transaction.** As contemplated by the Levin-Wolf LOI (attached as Exhibit B to the First Day Declaration), the Sale Agreement (as defined in the DIP Credit Agreement) shall provide for the DIP Lender and Levin Trucking, LLC, the purchasers thereunder, to assume, pay or otherwise satisfy all allowed section 503(b)(9) claims against the DIP Borrower, effective upon and subject to the occurrence of the closing under such Sale Agreement.

20. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

21. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

13

22.     **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

23.     **Final Hearing**.  The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (Prevailing Delaware Time)** before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware.  On or before March 13, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than **March 30, 2020**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal

14

Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

       24.    ***Nunc Pro Tunc* Effect of this Interim Order**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

       25.    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

**Dated: March 16th, 2020**
**Wilmington, Delaware**

15

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT G

A000742


FURNITURE
MATTRESS

# MEMORANDUM

---

**TO:** Employees Affected By Closing of 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321

**FROM:** Cathrine Wenger, Senior Counsel

**SUBJECT:** WARN Act Notice

**DATE:** March 5, 2020

---

Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

\*   \*   \*

On a personal note, we are extremely grateful for the service you have given to the Company, and greatly appreciate your continued professionalism through this process.

A000743

# EXHIBIT H

A000744

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline: At the Hearing** |
| | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET)** |
| | ) | |

## DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") hereby submit this motion (this "<u>Motion</u>"), pursuant to section 1112(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed Order</u>"), (i) converting each of the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, effective as of 12:00 a.m. (prevailing Delaware time on April 7, 2020 (the "<u>Conversion Date</u>"), (ii) establishing a deadline for filing final chapter 11 fee applications and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

setting a hearing thereon, and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      These Chapter 11 Cases were pending for just three days when on March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) outbreak to be a pandemic.[3]  These Chapter 11 Cases were pending for just five days when on March 13, 2020, the Trump administration declared a national emergency in response to the COVID-19 outbreak.[4]  These Chapter 11 Cases were pending for just six days when on March 14, 2020, government regulators in Pennsylvania, one of four states in which the Debtors' core retail operations are concentrated, issued guidance urging all non-essential retail businesses to close, with other states and localities soon to follow.[5]   And, these Chapter 11 Cases were pending for just eleven to fourteen days when the four states in which the Debtors' principal operations are located — Michigan, Pennsylvania, Ohio and Illinois — issued "stay at home"  or "shelter in place" orders requiring, among other things, all non-essential businesses (including the Debtors' retail stores) to shut their doors and mandating that individuals not leave their homes except in limited circumstances.[6]

---

[2]     Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion.

[3]     World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).

[4]     Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).

[5]     Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/).

[6]     **Michigan:** Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020 (https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html); **Pennsylvania:** Gov.

2.      Even before government action in response to the COVID-19 pandemic made it impossible for the Debtors' retail operations to continue, the consumer public's understandable fear of the spread of the COVID-19 disease already had a devastating impact on the Debtors' ability to implement their original restructuring plan.  These key components included (a) the continuation of Store Closing Sales at substantially all of the Debtors' 125 Art Van Furniture, Art Van Pure Sleep and Scott Shuptrine Interiors branded locations and eight of the Debtors' Wolf Furniture branded locations, and (b) the operation of 44 Levin Furniture, Levin Mattress and Wolf Furniture locations pending consummation of a going concern sale of those business lines and related assets that was contemplated at the outset of these proceedings.  Unfortunately, by the conclusion of the week ending March 14, 2020, customer traffic in the Debtors' stores — both those participating in the Store Closing Sales program and the Levin and Wolf going concern locations — precipitously dropped below what any of the Debtors' pre-bankruptcy and pre-COVID-19 pandemic financial could have predicted.  As a consequence, it was quickly evident that continued retail operations of any sort would cause the Debtors to incur expenses for the foreseeable future that far outstripped the revenues generated.  Ultimately, of course, the aforementioned restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease effectively removed any choice the Debtors had in the matter by mandating that the Debtors discontinue all retail operations and other non-essential business operations.

---

Tom Wolf, Executive Order, dated March 19, 2020 (https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf); **Ohio:** Dir. Of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020 (https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf); and **Illinois:** Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020 (https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf).

A000747

3.    By late March, the exponential spread of the COVID-19 disease throughout the United States, along with the resulting state and locally imposed limitations and prohibitions on non-essential retail operations, had left the Debtors with few potentially viable options.  Further, these extraordinary and unprecedented events have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the best path forward in these proceedings for the Debtors and their estates.  At present, no one can predict with any reliability how long the shelter-in-place orders issued in many states where the Debtors operate will remain in effect.  In fact, the Trump administration just recently extended social distancing guidelines from April 15, 2020 through April 30, 2020.[7]  And, even assuming regulatory barriers to resuming retail operations are lifted in the near future, no one can predict with any reliability what consumer appetite will exist for furniture, given the economic and other trauma that the nation is undergoing presently.[8]

4.    In order to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that may eventually be distributable to their creditors, the Debtors had initially hoped — consistent with what has been recently approved in certain other retail chapter 11 bankruptcy proceedings[9] — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these chapter 11 cases until such time as the broader economic and public safety

---

[7]    *See, e.g.,* Michael D. Shear, "Trump Extends Social Distancing Guidelilnes Through End of April," *The New York Times* (Pub. March 29, 2020, updated April 1, 2020) (https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html).

[8]    *See, e.g.,* Ed Yong, "How the Pandemic Will End," *The Atlantic* (March 25, 2020) (exploring different plausible scenarios for resolution of the COVID-19 epidemic with some taking 12-18 months for society to return to a level of normalcy).

[9]    *See* Order Establishing Temporary Procedures and Granting Related Relief, entered March 30, 2020 [D.I. 217], *In re CraftWorks Parent, LLC, et al.,* Case No. 20-10475 (BLS) (Bankr. D. Del.); Order Temporarily Suspending the Debtors' Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, entered March 27, 2020 [D.I. 166], *In re Modell's Sporting Goods, Inc., et al.,* Case No. 20-14179 (VFP) (Bankr. D.N.J.).

13308537 v1                                                                                                          A000748

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to this Court and parties in interest at the status conference held that day.

5.      Unfortunately, despite the Debtors and their advisors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, no viable path forward in chapter 11 emerged that would garner the support of the Debtors' senior secured lenders and certain other stakeholders.  With the COVID-19 pandemic still raging and by all reputable accounts likely to get worse in the next several weeks before it improves, the execution risk associated with any of these strategies appears to be unacceptably high for the Debtors to garner the support their senior secured lenders and other stakeholders necessary for the Debtors to be able to move forward.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is likely inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consummated by the time the Debtors and their senior secured lenders conceivably might have some visibility into if or when any of these restructuring alternatives could be successfully implemented.

6.      Furthermore, the Debtors have no ability, without the consent of the Prepetition ABL Agent, to implement any case suspension-based restructuring strategy.  Of necessity, on or about March 19, 2020, after communicating with representatives of the Prepetition ABL Agent on several occasions about the Debtors' increasing operating losses and need to take appropriate

action to prevent further dissipation of the Debtors' assets, the Debtors ceased operating their retail stores as going concerns and thereafter dismissed the vast majority of their employees. As a result, the Debtors have no top line revenue, such that each dollar expended by the Debtors at this point is not being replaced. For this and other reasons, the Debtors have no ability to demonstrate that their secured lenders are adequately protected to the degree required for the Debtors continue using cash collateral and other collateral without their consent. And, under the terms of the Interim CC Order, absent extraordinary relief from the Court, the consent of the Senior Secured Parties to use cash collateral and other collateral will expire no later than the end of the day Monday, April 6, 2020.

7.      The Debtors, thus, find themselves with no choice other than to move for the prompt conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Though this path is a difficult one that the Debtors are following only after exhausting all other alternatives, under these dire circumstances, the Debtors believe that converting these cases is in the best interests of the Debtors' estates. The Debtors understand that the conversion of Chapter 11 Cases is supported by the Debtors' senior lenders and not opposed by the Committee.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13308537 v1

A000750

10.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested herein are section 1112(a) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

### A.  General Background.

12.     On March 8, 2020 (the "Petition Date"), each of the Debtors commenced with this Court voluntary cases  (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS) pursuant to Bankruptcy Rule 1015.

14.     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 12], incorporated by reference herein.

15.     At the commencement of these cases, the Debtors operated 169 stores in eight states, specifically Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, West Virginia, and Virginia.[10]  The Debtors also have four regional distribution centers, three of which are leased and one of which is owned. The Debtors are headquartered in Warren, Michigan and had approximately 4,500 employees as of the Petition Date.

---

[10]     The vast majority of the Debtors' stores were located in four states: Michigan; Ohio; Pennsylvania; and Illinois.  The remaining five states listed above accounted for only 16 of the Debtors' 169 retail locations as of the Petition Date.

13308537 v1

A000751

16.     As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases with the intention of liquidating their inventory through store closing sales (the "Store Closing Sales") conducted with the assistance of the Consultant and other proposed professionals, paying down their secured debt, and using any remaining proceeds of their Store Closing Sales to windup their operations.   Also as set forth in the First Day Declaration and Exhibit B thereto, as of the Petition Date, the Debtors were party to a binding letter of intent for a going concern sale of 44 Levin and Wolf stores and related assets and operations (the "Levin-Wolf Sale"). The Debtors intended to effectuate this restructuring through the consensual use of cash collateral.

17.     In furtherance thereof, on or around the Petition Date, the Debtors filed, among other things:

   a. *Debtors' Application for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 3];

   b. *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 5]; and

   c. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to § 327(a) of the Bankruptcy Code and (V) Granting Related Relief* [D.I. 52] (the "Store Closing Motion").

18.     On March 10, 2020 (as continued, in part, to March 12, 2020), the Court held a hearing (the "First Day Hearing") following which it entered certain orders, including: (a) an order [D.I. 77], pursuant to 28 U.S.C. § 156(c), appointing Kurtzman Carson Consultants LLC ("KCC") as the Claims and Noticing Agent for these Chapter 11 Cases (the "Claims Agent");  (b) the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,

13308537 v1

A000752

and (V) Granting Related Relief [D.I. 93] (the "Interim CC Order"); and (c) an order [D.I. 143] granting limited relief in connection with the Store Closing Motion on an interim basis.

19. Shortly after the Petition Date, the Debtors filed applications to employ and retain: (a) Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"), as their proposed general bankruptcy counsel [D.I. 142]; (b) Montgomery McCracken Walker & Rhoads ("MMWR"), as their proposed special counsel [D.I. 193]; (c) Alvarez & Marsal North America LLC ("A&M"), as their proposed financial advisors [D.I. 145]; and (d) Jones Lang Lasalle Americas, Inc. ("JLL," and together with Benesch, MMWR and A&M, the "Debtors' Professionals"), as their proposed real estate consultants and advisors [D.I. 141]. The applications to employ and retain Benesch, A&M and JLL, each are scheduled to be heard on April 6, 2020, at 1:00 p.m. (ET). The application to employ and retain MMWR is scheduled to be heard on April 27, 2020, at 2:00 p.m. (ET).

20. On March 18, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a seven member Official Committee of Unsecured Creditors in these Chapter 11 Cases (as reconstituted from time to time, the "Committee"). The Committee has engaged and filed applications to employ and retain Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as its proposed counsel [D.I. 244] and Alix Partners ("Alix Partners," and together with Pachulski Stang, the "Committee's Professionals"), as its proposed financial advisor [D.I. 241].

## B. Events in the Chapter 11 Cases.

21. Since the First Day Hearing, the exponential spread of COVID-19 has wrought economic and social havoc across the country and the globe. As discussed in the Preliminary Statement, on the afternoon of March 13, 2020, President Trump declared COVID-19 a national

A000753

emergency and most of the states in which the Debtors operate have also declared states of emergency and issued "stay at home" or "shelter-in-place" type orders.

22.     Notwithstanding the careful planning and modeling of the Debtors and their advisors, since shortly after the Petition Date, the Debtors' situation has changed drastically as a result of COVID-19.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the Store Closing Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23.0 million;[11] however, for the <u>full</u> week ending March 15th, deposits from sales were just $8.0 million.  It quickly became apparent to the Debtors' management and advisory teams that continued retail operations of any sort were causing the Debtors to incur expenses (and would do so for the foreseeable future) that far outstripped any revenues being generated through the Debtors' continued retail operations.

23.     By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[12]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …."[13] Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan — where

---

[11]     The Debtors, however, did not realize the cash proceeds from most of these sales because just prior to the Petition Date and immediately thereafter, certain of the Debtors' credit card processor banks purported to exercise rights to intercept the proceeds from such transactions and redirect them into chargeback reserve accounts.

[12]     Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/)

[13]     Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts, March 16, 2020 (https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/).

the Debtors' headquarters, a distribution center and 82 of their stores are located — entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[14]  While Michigan's initial order did not explicitly mandate closing of all non-essential retail establishments, it was accompanied by appropriately alarming statement from Governor Whitmer urging Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[15]  Government authorities in Ohio and Illinois also issued similar guidance and direction.

24.     As detailed in the Preliminary Statement, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations are located to issue a "stay at home" or "shelter in place" type order.  Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.

25.     Although the situation was evolving rapidly, the Debtors' board, management team and advisors were paying close attention to the threat COVID-19 posed to the health and welfare of the Debtors' employees and customers and to the financial impact on the Debtors' businesses. The Debtors' board, management team and advisors were in near constant communication about these events as they unfolded in mid-March.  Moreover, the Debtors and their advisors worked to the best of their ability under these circumstances to keep their secured lenders and other stakeholders informed about these challenges and exhausted all efforts to work with them to develop viable responses to the rapidly deteriorating situation.  When no other viable alternative emerged, on March 19, 2020, the Debtors made the painful decision to suspend all retail operations

---

[14]     Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders, March 16, 2020 (https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521763--,00.html).

[15]     *Id.*

and terminate the majority of their employees — moves the Debtors hoped at the time would be only temporary measures.

26.     Further compounding the Debtors' problems, on March 19, 2020 the proposed purchaser for the Levin-Wolf Sale notified the Debtors that they would not proceed with the transaction at that time, effectively ending any hope the Debtors had to consummate a going concern transaction for the Levin and Wolf furniture operations and dashing hopes to save upwards of a 1,000 jobs.

27.     Late in the day on March 19, 2020, however, the Prepetition ABL Agent issued a purported Termination Declaration under the Interim CC Order.  Pursuant to Paragraph 21 of the Interim CC Order, a valid Termination Declaration issued on March 19th would have triggered a Remedies Notice Period five business days' in length.  Thereafter, the Prepetition ABL Agent agreed to extend any Remedies Notice Period relating to the alleged Termination Declaration through the end of the day on Tuesday, March 31, 2020, and then again through and including the end of the day on Monday, April 6, 2020.

28.     Following these events, the Debtors and their advisors continued to work with the Prepetition ABL Agent, the Committee, and their respective advisors to identify solutions for the Debtors' deteriorating situation that would allow them to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that might eventually be distributable to their creditors.  The Debtors had hoped — consistent with what has been recently approved this Court in the *CraftWorks* chapter 11 cases and by the District of New Jersey bankruptcy court in the *Modell's* chapter 11 cases — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these Chapter 11 Cases until such time as the broader economic and public safety

A000756

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to the Court that day.

29.     Both before and after the March 26th status conference, the Debtors, with the assistance of their advisors and in consultation with the Prepetition ABL Agent, the Committee and their respective advisors, were working to develop and evaluate several potentially value maximizing alternatives for the Debtors to pursue after the contemplated suspension of operations and downscaling of activities in these Chapter 11 Cases came to an end.  One such path was to resume Store Closing Sales at all of the Debtors' locations where it would be financially and operationally viable to do so.  A second path considered was to focus on one or more bulk sales most or all of the Debtors' inventory, equipment, and other readily monetizable assets. Additionally, the Debtors and their advisors examined several "middle" paths for the Debtors and their estates, which would involve various combinations of resuming Store Closing Sales at certain locations and bulk-selling inventory, equipment, and certain other assets associated with other locations.

30.     To be clear, each of the post-suspension restructuring alternatives explored by the Debtors had the prospect of producing some return to the Debtors' senior secured lenders and potentially to other stakeholders.  But none of the potential scenarios showed a reasonable chance of generating a recovery for the Debtors' senior secured lenders coming anywhere near what the pre-COVID 19 pandemic modeling had suggested.  Indeed, under most scenarios, the Prepetition ABL Secured Parties, which at the outset of these proceedings were projected to receive a full

recovery on their approximately $34 million of Prepetion ABL Obligations by the mid-point of the Store Closing Sales Process, would not get out whole before their ABL Priority Collateral was fully monetized.

31.     Despite the Debtors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, these concerted efforts were unable to produce a path forward in chapter 11 that would garner the support of their senior secured lenders and potentially other stakeholders.  Unfortunately, with the COVID-19 pandemic still raging and by all reputable accounts likely to get worse before it improves, the perceived execution risk of any of these restructuring strategies has proven to be an insurmountable  barrier to the Debtors ability to obtain the necessary support of their secured lenders and others.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the reasonable best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consumed by operating expenses before the Debtors and their senior secured lenders would have meaningful visibility into whether these restructuring alternatives could be successfully implemented.

32.     By Monday, March 30, 2020, the Debtors were effectively out of time, with their access to Cash Collateral under the Interim CC Order then due to terminate at the end of the following day.  Although it was clear by this point in the proceedings that the Debtors would be unable to continue these Chapter 11 Cases without the support and consent of their senior secured lenders, unresolved issues existed as to what obligations would and would not be funded under the terms of the Interim CC Order prior to any conversion of the Chapter 11 Cases.  Recognizing the contributions that their employees had made to the Debtors' businesses postpetition and the

14

A000758

extreme hardship that many of the employees and their families were apt to experience as a result of losing their jobs in the midst of an ongoing pandemic and associated economic crisis, the Debtors attempted everything in their power to ensure that employee payroll and related employee obligations would be fully funded under the Interim CC Order.

33.     These efforts were to a degree successful.  At a hearing held on March 31, 2020, the Court confirmed that the Debtors would have access to Cash Collateral to fund and pay current payroll obligations, including wages, salaries and commissions.  The cash available, however, was insufficient for it to be possible for the Debtors to provide at this time for payment in full of other employee related obligations, such as coverage obligations for employee healthcare expenses and certain other benefits plans that were, in whole or part, self-funded by the company.[16]  Even though this situation is primarily the result of the COVID-19 pandemic and other circumstances entirely beyond the Debtors' control, the Debtors deeply regret that they are not in a position to be able to do more for their employees, customers, vendors, landlords and other stakeholders.

34.     Based upon the foregoing, the Debtors have considered the circumstances in which they find themselves, and have concluded that converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates.

---

[16]     The Debtors estimate the total unfunded trailing liabilities under their partially self-funded employee health plan to be approximately $8.5 million. Under self-funded plans, like the ones the Debtors had established for their employees in the ordinary course of business prior to the Petition Date, when employees and their covered dependents receive covered services the resulting charges are remitted to the plan's claims administrator for processing.  Thereafter, the approved claims are batched and remitted to the Debtors for payment.  The remittance of the batched claims to the Debtors for payment can trail the rendering of services to employees by up to several months. In general, the Debtors terminated health care covered for their employees effective as of the dates such employees separated from the company.  Thus, the estimated $8.5 million of trailing obligations is on account of covered healthcare services to covered persons provided prior to each such employee's termination date.  Although the Debtors' original budget for these Chapter 11 Cases contemplated the funding of such trailing employee healthcare plan obligations, the COVID-19 pandemic's disruption of the Debtors' ability to operate postpetition  combined with the issuance of a Termination Declaration under the Interim CC Order that followed, left the Debtors with inadequate cash on hand and inadequate access to additional cash with which to fund such obligations.

**RELIEF REQUESTED**

35.     By this Motion, the Debtors request entry of the Proposed Order, pursuant to section 1112(a) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date, (ii) establishing a deadline for filing final chapter 11 professional fee applications and setting a date for a hearing thereon, and (iii) granting related relief.

36.     The Debtors also request that the Court approve the following procedures in connection with the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code (the "Conversion Procedures"):

> a.  **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.
>
> b.  **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain

16

A000760

copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

## BASIS FOR RELIEF

**A.     The Conversion Relief Should be Granted**

37.     Section 1112(a) of the Bankruptcy Code provides that a debtor may convert a case to chapter 7 as a matter of right. *See* H.R. Rep. No. 95-595, 1st Sess. 405 (1977) ("Subdivision (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case"); *see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) ("[A] debtor has the absolute right to convert [its] Chapter 11 case to a Chapter 7 case"). There are only three circumstances where a debtor is precluded from exercising that right: (i) the debtor is not a debtor in possession; (ii) the case was originally commenced as an involuntary case under chapter 11; or (iii) the case was converted to a case under chapter 11 other than at the debtor's request. 11 U.S.C. § 1112(a).

A000761

None of those exceptions is applicable in these Chapter 11 Cases. Therefore, the Debtors are entitled, as an absolute right, to convert the Chapter 11 Cases to cases under chapter 7.

38.    In addition, conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates and creditors. The Debtors no longer have funding to administer these Chapter 11 Cases. Thus, although there is substantial inventory and equipment remaining in the Debtors' stores and distribution centers and other estate assets that may be available to satisfy certain creditor claims, without an ability to fund ongoing administrative expenses, the Debtors have no ability to pursue the recovery of those assets or prosecute a chapter 11 plan. Accordingly, the Debtors believe there is no reasonable likelihood that the Debtors could confirm and consummate a chapter 11 plan, and respectfully submit that a chapter 7 trustee will be able to more efficiently and effectively bring these cases to their conclusion.

39.    Accordingly, the Debtors respectfully request that the Court enter an order converting the Debtors' cases from chapter 11 to chapter 7, effective as of the Conversion Date.

**B.    The Conversion Procedures and Other Related Relief Should Be Approved**

40.    Pursuant to Local Rule 2002-1(f)(xi), "[u]pon conversion of a chapter 11 case to a chapter 7 case, if there are more than 200 creditors, the claims agent appointed in the chapter 11 case shall . . . submit a termination order." Del. Bankr. L.R. 2002-1(f)(xi).

41.    Accordingly, the Debtor requests that the conversion order sought hereby also provides for the termination of KCC services as claims and noticing agent in these Chapter 11 Cases.

42.    The Debtor also believes that the Conversion Procedures are appropriate under the facts of this case and should be approved. The Conversion Procedures include, among other things, a request to extend the deadline under Bankruptcy Rule 1019(1)(A) for the filing of any statements

A000762

and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) from fourteen (14) days after the Conversion Date to forty-two days (42) after the Conversion Date.

43. The Court has authority to grant the requested extension under Bankruptcy Rules 1007(c) and 9006(b) and Bankruptcy Local Rule 1007-1(b). Bankruptcy Rule 1007(c), together with Bankruptcy Rule 9006(b), allows the Court to extend the filing deadline for the Schedules and Statements "for cause shown." Similarly, Bankruptcy Local Rule 1007-1(b) provides that such an extension may be granted for cause. Showing "cause" merely requires that a debtor "demonstrate some justification for the issuance of the order," and bankruptcy courts will normally grant such extensions "in the absence of bad faith or prejudice to the adverse party." *See, e.g., Bryant v. Smith,* 165 B.R. 176, 182 (W.D. Va. 1994) (discussing the standard for granting extensions under Bankruptcy Rule 1007) (internal citations and quotation marks omitted).

44. Because of the COVID-19 pandemic and other extremely difficult circumstances that have defined these Chapter 11 Cases, the Debtors and their advisors have had virtually no free time or resources available since he Petition Date to devote to the preparation of schedules and statements required by Bankruptcy Rules 1019(1)(A) and 1007(b). Given the extent of work that remains to be done and the extremely limited resources remaining with which to undertake such work, which conditions both exist through no fault of the Debtors and their advisors, the Debtors' respectfully submit that "cause" exists to extend this deadline. Moreover, since these proceedings are still in their very early stages, the granting of such an extension is unlikely to prejudice the trustee, any creditor or any other party in interest.

## NOTICE

45. Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of Delaware; (ii) proposed counsel for the Committee; (iii) the agents under the Debtors' prepetition

secured facilities and counsel thereto; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. A copy of this Motion is also available on the website of the Debtors' notice and claims agent at https://www.kccllc.net/artvan. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## RESERVATION OF RIGHTS

46. The Debtors understand that employee payroll, the Carve Out and all other obligations that are required to be funded and paid under the Interim CC Order, including without limitation Paragraph 2 thereof, have been or will be funded and paid prior to the Conversion Date. Nevertheless, in the event that such obligations are not funded and paid as required under the Interim CC Order, the Debtors reserve all rights for themselves and their estates, including but not limited to any chapter 7 trustee that may hereafter be appointed.

13308537 v1

A000764

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other relief as is appropriate under the circumstances.

| | |
|---|---|
| Dated: April 3, 2020 | **BENESCH, FRIEDLANDER, COPLAN** |
| Wilmington, Delaware | **& ARONOFF LLP** |

  */s/ Gregory W. Werkheiser*

Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
      mbarrie@beneschlaw.com
      jhoover@beneschlaw.com
      kcapuzzi@beneschlaw.com
      kharmon@beneschlaw.com
      jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

13308537 v1

A000765

# Exhibit A

A000766

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. _____** |
| | ) |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.     The Motion is GRANTED, as set forth herein.

2.     Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.     The following Conversion Procedures are hereby approved:

    a.   **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

    b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

    c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

    d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

    e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

    f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4.    Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5.    Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting*

*Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.     Except as expressly provided in Paragraph 5 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order).

7.     For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or

13308536 v1

A000770

(ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

8.     Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

9.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

A000771

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Objection Deadline: At the Hearing** |
| | ) **Hearing Date: April 6, 2020 at 1:00 p.m. (ET) (requested)** |
| | ) |

### NOTICE OF VIDEO AND TELEPHONIC HEARING REGARDING DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING <u>A HEARING THEREON, AND (III) GRANTING RELATED RELIEF</u>

**PLEASE TAKE NOTICE** that on April 3, 2020, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed the *Debtors <u>Corrected</u> Motion for Entry of an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the "<u>Motion</u>") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "<u>Bankruptcy Court</u>"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on **April 6, 2020 at 1:00 p.m. (ET)**, before the Honorable Chief Judge Christopher S. Sontchi via video and telephonic conference.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A000772

**PLEASE TAKE FURTHER NOTICE THAT THE HEARING IS PROCEEDING VIA ZOOM USING THE FOLLOWING INSTRUCTIONS:**

> **Topic: Art Van Furniture 20-10553 - Hearing**
> **Time: Apr 6, 2020 1:00 PM Eastern Time (US and Canada)**
> **Join Zoom Meeting**
> **https://uchicago.zoom.us/j/911880719**
> **Meeting ID: 911 880 719**

**DO NOT COME TO THE COURTHOUSE. ANY PARTY WHO WISHES TO PRESENT EVIDENCE OR EXAMINE WITNESSES IS REQUIRED TO ACCESS VIA ZOOM. ANY PARTY WHO WISHES TO ACCESS VIA ZOOM MUST ALSO MAKE AUDIO ARRANGEMENTS THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**OTHER PARTIES IN INTEREST MAY MAKE ARRANGEMENTS TO PARTICIPATE BY TELEPHONE AT THE HEARING THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**PLEASE TAKE FURTHER NOTICE THAT, IF NO RESPONSES OR OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

A000773

Dated:  April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**

  */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
           mbarrie@beneschlaw.com
           jhoover@beneschlaw.com
           kcapuzzi@beneschlaw.com
           kharmon@beneschlaw.com
           jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

A000774

# EXHIBIT D

A000775

ADVERTISEMENT

BUSINESS

# Art Van Furniture to close all stores, including 24 in Illinois

By CHICAGO TRIBUNE STAFF
CHICAGO TRIBUNE   |   MAR 05, 2020

  



SECTIONS

ONLY $1 FOR 6 MONTHS
Our best offer ends soon

LOG IN



The ArtVan store at 2606 N. Elston on November 2, 2015. (Phil Velasquez / Chicago Tribune)

Art Van Furniture, one of the Midwest's largest furniture retailers with almost 180 stores, including two dozen in Illinois, announced Thursday it will shut down.

Liquidation sales are scheduled to begin Friday.

ADVERTISEMENT

**American Greetings** - Sponsored

**Make Every Moment Merrier**

Shop Now

**American Greetings** - Sponsored

**Make Every Moment Merrier**

Shop Now

ADVERTISEMENT

The company, started in the Detroit area in 1959 and now based in Warren, Michigan, operates stores in the Chicago name under the names Art Van

A000777

Furniture, Art Van PureSleep and Scott Shuptrine Interiors. In addition to stores in Michigan and Illinois, it has locations in Indiana, Missouri and Ohio.



Shoppers inside the Art Van Furniture store in Chicago on Nov. 2, 2015. (Phil Velasquez / Chicago Tribune)

It entered the Chicago market in mid-2013, with plans to invest more than $40 million in land, store build-out, inventory and labor. The state's Department of Commerce and Economic Opportunity provided a $404,000 tax credit spread over 10 years and based on the company creating 35 jobs and making a $4.9 million investment at its Bolingbrook distribution facility. The distribution center will close when final sales are completed, said spokeswoman Diane Charles.

A000778

The company's website lists 24 stores in Illinois. Altogether, the shutdown will mean the loss of 520 jobs in Illinois, she said.

[Nordstrom closing Trunk Club stores »](#)

Art Van drew attention for its creative marketing promotions. Those included free furniture if the temperature at O'Hare International Airport topped 100 degrees during part of the summer of 2016 and bets on heavy snowfall during Super Bowl games. In 2015, Art Van refunded a total of $2.5 million to about 1,200 furniture buyers when it snowed more than 3 inches during that year's Super Bowl.

ADVERTISEMENT



In 2017, Boston-based private equity firm Thomas H. Lee Partners acquired a majority stake in Art Van and the retailer began an aggressive expansion, including buying other chains and opening in spaces left empty by other retailers.

[The Standard Club, long the social nexus for Chicago's Jewish leaders, is closing May 1 amid financial struggles »](#)

A000779

# **EXHIBIT E**

A000780

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) |
|  | ) Case No. 20-10533 (CSS) |
| Debtors. | ) |
|  | ) (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364 (d); AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.     The Debtors seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order" and, collectively with the Interim Order, the "Orders") authorizing the Debtors' use of secured post-petition financing (the "DIP Facility") on an interim and final basis pursuant to the terms of the Debtor-in-Possession Credit and Security Agreement (the "DIP Credit Agreement") by and among Debtor Sam Levin, Inc. (the "Borrower" or "Debtor Levin") and Levin Furniture LLC (the "DIP Lender") attached here to as Exhibit B.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

2.      In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

3.      In further support of the Motion, the Debtors respectfully represent as follows:

**Overview**

4.      By this Motion, the Debtors seek entry of the Interim Order:

a.      authorizing, under sections 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors to obtain secured, superpriority, post-petition loans, advances and other financial accommodations (the "DIP Facility"), on an interim basis;

b.      authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related documents and agreements as contemplated by the DIP Credit Agreement and requested by the DIP Lender (collectively, the "DIP Loan Documents");

c.      authorizing the Debtors, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $7,000,000.00 at any one time outstanding;

d.      granting allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents, subject to carve-outs;

e.      granting to the DIP Lender automatically perfected security interests and liens on all of the DIP Collateral;

f.      authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents;

g.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

h.      granted related relief; and

i.      scheduling the final hearing on this Motion (the "Final Hearing").

## Jurisdiction and Venue

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are 105, 361, 363(c) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6004 and 9014, and Bankruptcy Local Rule 4001-2.

## Background

8.      The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.  Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.  As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

3

A000783

The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

9.      On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### Need to the DIP Facility

10.     The Debtors have an urgent and immediate need to obtain postpetition financing. Here, the DIP Facility sends a fundamentally positive signal to the Debtors' vendors, employees, customers, and other parties critical to maintaining the Debtors' viability that the operations at the stores subject to the Wolf-Levin LOI (attached to the First Day Declaration) will continue as a going concern.

11.     The DIP Facility is narrow and limited to purchasing inventory for sale in those stores.  Without the availability provided under the DIP Facility, the Debtors may be unable to preserve such stores as a going concern.

A000784

12.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Credit Agreement and hereby request authority to obtain such financing through the proposed Orders.

## Statement of the Material Terms of the Interim Order

13.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Bankruptcy Local Rule 4001-2(a)(i) and (ii), the following is a concise statement and summary of the material terms of the Interim Order and/or the DIP Credit Agreement (collectively, the "Highlighted Provisions"):

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Borrowers** | Sam Levin, Inc. | DIP Credit Agreement at p. 1 |
| **Guarantors** | None | N/A |
| **DIP Lender** | Levin Furniture, LLC | DIP Credit Agreement at p.1 |
| **Purpose** | To fund operations of Borrower, specifically, to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case | Interim Order at ¶ G |
| **Interim Debt Limit** | Not to exceed $3,500,000.00 during the Interim Period. | Interim Order at ¶ K and DIP Credit Agreement at § 3(d) |
| **Type and Amount of DIP Facility** | $7 million secured superpriority facility | DIP Agreement introduction and defined terms |

5

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Maturity Date** | April 7, 2020 | DIP Credit Agreement at § 14(a) |
| **Interest Rate** | Non-default rate: 9% per annum based upon 360 day year<br><br>Default rate: Non-default rate plus 2% per annum | DIP Credit Agreement at §§ 1 and 3(e)(ii) |
| **Other Fees** | N/A | N/A |
| **Conditions Precedent to Lending** | (a) Each of the representations and warranties made by Borrower in or pursuant to DIP Credit Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.<br><br>(b) <u>Financing Orders</u>. Subject to Section 9(c) of the DIP Credit Agreement, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the DIP Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "<u>Additional Credit</u>"), the DIP Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the DIP Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor | DIP Credit Agreement at § 10 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | the performance by the Borrower of any of its obligations under the DIP Credit Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.<br><br>       (c)    <u>Sale Motion</u>.  For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the DIP Lender, which shall be reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Motion</u>").<br><br>       (d)    <u>Asset Purchase Agreement</u>.  For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "<u>Sellers</u>"), and the DIP Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "<u>Purchasers</u>"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "<u>Sale Agreement</u>"), which shall be reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Motion</u>").<br><br>       (e)    For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Order</u>") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal.  Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.<br><br>       (f)    <u>No Default</u>.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that, the DIP Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default. | |
| **Interim Borrowing Limit** | Not to exceed $3,500,000.00 during the Interim Period. | Interim Order at ¶ K |

7

A000787

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | | |
| Limitations on Use of Proceeds: | The funds available under the DIP Facility may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders. | DIP Credit Agreement at § 4 |
| Budget and Financial Covenants | N/A | N/A |
| Cash Dominion | N/A | N/A |
| DIP Lien / Superpriority Claim | Borrower agrees to grant DIP Lender an allowed Superpriority Claim which shall survive any conversion of the these matters to a case under chapter 7 of the Bankruptcy Code. "Superpriority Claim" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code. | DIP Credit Agreement at §§ 1 and 5(i) |
| DIP Collateral | To secure prompt payment and performance of all obligations, the Borrower grants to the DIP Lender a continuing security interest in and Lien upon: (a) all inventory of the Borrower purchased solely with the proceeds of any Advances under the DIP Loan Documents; (b) all receivables; (c) all right, title and interest in and to (i) all inventory returned or rejected by | DIP Credit Agreement at §1 |

8

A000788

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, dentinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer related to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien of security interest as security for the payment or enforcement of receivables referred to in clause (b)<br><br>(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and<br><br>(e) proceedings and products of (a), (b), (c) or (d) of this definition, in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claims proceeds. | |

9

A000789

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | The term Collateral shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code, or any other applicable law, constitute or result in (i) the abandonment, invalidation or uneforceability of any right, title or interest of Borrower therein or (ii) a breach of termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest or Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied. | |
| Lien on Avoidance Claims | N/A | N/A |
| Administrative Carve-Out | Subject to the Financing Orders and the DIP Loan Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall:  (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected | DIP Credit Agreement at § 15(k) |

A000790

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral. | |
| **Waivers** | N/A | N/A |
| **Perfection Other Than Under State Law** | The Interim DIP Lien shall be automatically perfected upon entry of the Interim Order. | Interim Order at ¶10 and DIP Credit Agreement at § 5(b) |
| **Events of Default** | The occurrence of one or more of the following events shall constitute an "Event of Default": (a)    Payment of Obligations. Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document. (b)    Misrepresentations. Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made. (c)    Failure to Furnish Information. Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten | DIP Credit Agreement at § 12 |

A000791

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | (10) days after such information is requested, or (iii) permit the inspection of its books or records. | |
| |      (d)    Liens Against Assets. Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days. | |
| |      (e)    Breach of Covenants. Except as otherwise provided for in this Section, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations. | |
| |      (f)    Judgment. Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage). | |
| |      (g)    Loss of Priority Lien. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders. | |
| |      (h)    Invalidity of Credit Agreement. Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender. | |
| |      (i)    Destruction of Collateral. Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material | |

12

A000792

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | impairment or loss of the security provided by this Agreement or the Other Documents.<br><br>(j)    Pre-Petition Payments. Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date.<br><br>(k)    Dismissal or Conversion of Bankruptcy Case. The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is pari passu with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim.<br><br>(l)    Relief from Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower. | |

13169264 v1

A000793

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | (m)  The Financing Orders.  Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower.  Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.<br><br>(n)  Lien Challenge.  Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender.  Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor of the Lender.<br><br>(o)  Filing of Reorganization Plan or Sale Motion.  A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers. | |

14

A000794

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Remedies / Relief from Automatic Stay** | Upon the occurrence and during the continuance of any Event of Default, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and/or modified to the extent necessary to permit the DIP Lender to (i) perfect the security interests and Liens granted under the DIP Loan Documents and (ii) exercise its rights under section 13 of the DIP Loan Documents. | DIP Credit Agreement at § 7(d) |
| **Indemnification and Exculpation** | Borrower shall indemnify the DIP Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person (as defined in the DIP Loan Agreement) with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related thereto, the DIP Loan Agreement or Other Documents (as defined in the DIP Loan Agreement), whether or not the DIP Lender is party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified. | DIP Credit Agreement at § 15(a) |

### Bankruptcy Local Rule 4001-2 Disclosures

13.     The Debtors do not believe that this Motion or the Interim Order contain any provisions requiring special disclosure under Bankruptcy Local Rule 4001-2(a).

15

<u>**Basis for Relief**</u>

**I.      The Debtors Should Be Permitted to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

14.      Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense…" 11 U.S.C. § 364(c).

15.      In evaluating proposed post-petition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether: (i) unencumbered credit or alternative financing without superpriority status is available to the debtor; (ii) the credit transactions are necessary to preserve assets of the estate; (iii) the terms of the credit agreement are fair, reasonable, and adequate; (iv) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and (v) the proposed financing agreement adequately protects prepetition secured creditors.

16.      *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*,

16

A000796

308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

17.     For the reasons discussed below, the Debtors satisfy the standards required to obtain post-petition financing under section 364(c) of the Bankruptcy Code. For the avoidance of doubt, the Debtors are not seeking any relief pursuant to section 364(d) of the Bankruptcy Code

## II.     The Debtors Were Unable to Obtain Financing on an Unsecured Basis.

18.     Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

19.     Here, as detailed in the First-Day Declaration, as supplemented by the record, the Debtors filed these cases to avert a liquidity crisis and prevent further deterioration of their business. The Debtors are unable, in the present circumstances, to purchase inventory at the Wolf-Levin go-forward stores by obtaining financing on an unsecured, administrative expense basis.

20.     The Debtors respectfully submit that their efforts to obtain post-petition financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code. *See, e.g., In*

17

A000797

*re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

## III. The Proposed Financing is Necessary to Preserve the Assets of the Debtors' Estates.

21.     Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including purchasing inventory for the Wolf-Levin go-forward stores so that they can continue as going concerns. The DIP Facility thus is essential to Debtor Levin's continued operational viability and will provide Debtor Levin with the opportunity to preserve its businesses while the Debtors prepare to enter the sale process.

22.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require post-petition financing under the terms of the DIP Loan Documents to continue their operations during these Chapter 11 Cases.

## IV. The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.

23.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank &*

A000798

*Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

24.     The terms of the DIP Credit Agreement and the proposed DIP Orders were negotiated between the Debtors and the DIP Lender. The Debtors negotiated with the DIP Lender in good faith to ensure that the terms of the DIP Facility are consistent with "market" terms, and are fair and reasonable to the Debtors. To that end, the Debtors, on the one hand, and the DIP Lender on the other hand, each had separate business teams and used separate counsel in negotiating the DIP Facility.

## V.     Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.

25.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

26.     Here, the Debtors' sound business judgment clearly supports entry into the DIP

A000799

Credit Agreement to gain access to needed funding and maximize value for all constituents.

## VI. The DIP Lender is Extending Credit in Good Faith.

27. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

28. The Debtors and the DIP Lender negotiated the DIP Credit Agreement in good faith. Accordingly, the DIP Orders should provide that the DIP Lender, as a good faith lender, is entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

### Request for Final Hearing

29. Pursuant to Bankruptcy Rule 400l(b)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days of the Petition Date and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

30. The urgent need to preserve the Debtors' businesses, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain post-petition financing as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Cases. Without the ability to obtain access to such funding, the Debtors would be unable to meet their post-petition obligations, including maintaining and maximizing the value of the Debtors' businesses, thus causing irreparable harm to the value of the Debtors' estates.

A000800

31. Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects, and that the terms and provisions of the Interim Order be implemented and be deemed binding, and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

32. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, authorizing the Debtors to use the DIP Facility and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

33. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

34. Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. Without limiting the

A000801

foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

35.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

A000802

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, and based on the record of the Chapter 11 Case, the Debtors respectfully request that this Court (a) enter the Orders (i) authorizing the Debtors to use the DIP Facility on an interim and final basis subject to the terms and conditions set forth therein; (ii) scheduling the Final Hearing, pursuant to the Interim Order, within approximately thirty-five (35) days of the commencement of the chapter 11 cases, to consider approval of this Motion on a final basis; and (iii) granting related relief; and (b) grant the Debtors such other and further relief as may be just and proper.

Dated:  March 9, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

___*/s/ Gregory W. Werkheiser*___
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        kharmon@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

A000803

# EXHIBIT A

A000804

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC ., *et al.,*[1] | ) | Case No. 20-10533 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re: Docket No. _____** |

## INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i)        authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the Collateral (as defined in the DIP Loan Documents, and referred to herein as the "DIP Collateral")  to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

A000805

adequate protection to the DIP Lender in accordance with this order; and

(ii)        scheduling a final hearing (the "Final Hearing") within twenty days of the

Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and

approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of*

*David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in*

*Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and

argument made at the interim hearing held on March 10, 2020 (the "Interim Hearing"); and notice

of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and

(d), and all applicable local rules of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"); and the Interim Hearing having been held and concluded; and all

objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved

or overruled by the Court; and it appearing that approval of the interim relief requested in the

Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates

pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the

Debtors, their estates, and all parties in interest, and is essential for the continued operation of the

Debtors' businesses and the preservation of the value of the Debtors' assets; and after due

deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE**

**COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF**

**LAW:**[3]

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.
To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

A000806

A.     **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B.     **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.     **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.     **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing (the "DIP Facility") from the DIP Lender pursuant to the terms set forth in that certain Debtor-In-Possession Credit and Security Agreement and that certain Revolving Credit Note (collectively,

---

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

3

A000807

the "DIP Loan Documents") attached to the Motion and as **Exhibit B** thereto.

G.     **Debtor Operations**.   DIP Borrower is unable to operate without the Liquidity provided by the DIP Facility.

H.     **Inability to Obtain Alternative Credit**.   DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

I.     **Good Faith**.   The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility.   Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

J.     **Immediate Entry**.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

K.     **Interim Debt Limit**.   The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $3,500,000.00 during this Interim Period in accordance with the DIP Loan Documents.

L.     **Avoid Immediate and Irreparable Harm**.   The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate.   This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other

4

A000808

things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

M. **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1. **Motion Granted**. The Motion is granted.

2. **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3. **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower attached to the Motion and incorporated herein, as modified by this Interim Order.

5

A000809

4. **DIP Loan Documents**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder. The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

5. **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

6. **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7. **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately

6

A000810

due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8. **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[4] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

---

[4] Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. ___).

13172137 v2

A000811

9.    **Security for DIP Loan**.  As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "DIP Lien") against the DIP Collateral, as that term is defined in the DIP Loan Documents.  Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

10.    **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be

8

A000812

obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

11.     **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12.     **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted,

9

A000813

superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13. **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14. **No Liability to Third Parties**. DIP Lender shall not (i) have liability to any third party nor shall it be deemed to be in control of the operations of the DIP Borrower or to be acting as a "controlling person", "responsible person" or "owner or operator" with respect to the operation or management of the DIP Borrower (as such terms, or any similar terms, are used in the Internal Revenue Code, the Unites States Comprehensive, Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), or owe any fiduciary duty to the DIP Borrower, its creditors or its estates, and (ii) DIP Lender's relationship with the DIP Borrower shall not constitute nor be deemed to constitute a joint venture or partnership with the DIP Borrower. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

15. **Order Binding Upon Parties in Interest**. All of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its

A000814

successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16. **Effect of Modification of Interim Order**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be,

11

A000815

without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

        19.    **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

        20.    **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

        21.    **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

        22.    **Final Hearing**.  The Final Hearing to consider entry of the Final Order is scheduled for **[_____], 2020 at [__]:00 [_].m. (EST)** before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware.  On or before March 12, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **[_____], 2020, at [__]:00 p.m. (EST)**,

<div align="center">12</div>

which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

23. ***Nunc Pro Tunc* Effect of this Interim Order**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

24. **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

Dated: _____
Wilmington, Delaware

_____
CHIEF JUDGE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

13

A000817

# EXHIBIT B

A000818

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT** (this "Agreement"), dated the 10th day of March, 2020, is entered into by and between Sam Levin, Inc., a Pennsylvania corporation ("Borrower"), and Levin Furniture LLC, a Pennsylvania limited liability company ("Lender").

## Recitals

**WHEREAS,** Borrower has encountered financial difficulties and, together with certain of is affiliates, has filed for bankruptcy protection under chapter 11 of 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are the subject of a request for joint administration under Case No. 20-10553 (CSS) (collectively, the "Bankruptcy Cases");

**WHEREAS,** Lender has agreed to provide post-petition debtor-in-possession financing (the "DIP Financing") to Borrower as more fully set forth herein and as set forth in the Financing Orders (as defined in Section 1 hereof), which Financing Orders shall be in form and substance acceptable to Lender in Lender's sole discretion, such DIP Financing to be used to pay certain expenses of Borrower during the Bankruptcy Case on the terms set forth below;

**WHEREAS,** in return for the DIP Financing, Lender requires that Borrower obtain entry by the Bankruptcy Court of the Financing Orders, specifically granting Lender, among other things, a secured superpriority administrative expense claim against Borrower and its assets only pursuant to Section 364(c) of the Bankruptcy Code with respect to the DIP Financing; and

**WHEREAS,** Borrower and Lender each acknowledge and agree that the terms of this Agreement must be approved by the Bankruptcy Court and that the Interim Financing Order (as defined in Section 1 hereof) be entered by the Bankruptcy Court before this Agreement is enforceable.

**NOW THEREFORE,** in consideration of the mutual covenants and undertakings herein contained, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

## Agreement

Borrower and Lender each agree that the foregoing Recitals are true and correct.

1. **Definitions**.  For purposes of this Agreement the following terms shall have the following meanings:

"Additional Credit" shall have the meaning set forth in Section 10(b) hereof.

"Advances" shall mean loans made pursuant to the terms of this Agreement under the Revolving Credit Note.

"Agreement" shall have the meaning set forth in the Preamble hereof.

"Approved Amount" shall mean, as of any date, the maximum amount of Advances that are authorized pursuant to the terms of the Interim Financing Order or the Final Financing Order, as the case may be.

A000819

"Bankruptcy Case" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Code" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Court" shall have the meaning set forth in the Recitals hereof.

"Borrower" shall have the meaning set forth in the Preamble hereof.

"Borrower Group" shall have the meaning set forth in Section 15(l) hereof.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Pittsburgh, Pennsylvania.

"Cash Collateral Order" shall mean that certain *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered by the Bankruptcy Court in connection with the Bankruptcy Case.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar governmental authority, domestic or foreign, upon the Collateral, the Borrower or any affiliates of the Borrower.

"Claims" shall have the meaning set forth in Section 15(l) hereof.

"Closing" shall mean the closing of the DIP Financing and the other transactions to be consummated on the Closing Date, as contemplated by this Agreement.

"Closing Date" shall mean the date on which all conditions to the effectiveness of this Agreement are satisfied, but in no event shall such date be later than seven (7) days after the Petition Date.

"Collateral" shall mean and include all of the following personal property assets of the Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

(a)     all inventory of the Borrower purchased solely with the proceeds of any Advances made hereunder;

(b)     all receivables of the Borrower arising out of the sale of inventory referred to in clause (a) above;

(c)     all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer relating to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any

13172237 v2

A000820

of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

(e) proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Agreement, the term "Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

"Contract Rate" shall mean a fixed interest rate equal to **[9 percent (9.00%)]** per annum based on a three hundred sixty (360) day year.

"Default" shall mean an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3(e)(ii) hereof.

"DIP Financing" shall have the meaning set forth in the Recitals hereof.

"Event of Default" shall mean the occurrence of any of the events set forth in Section 12 hereof.

"Final Financing Order" shall mean a Financing Order that is a Final Order entered in the Bankruptcy Case after notice and final hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure and applicable local rules.

"Final Order" shall mean an order or judgment of the Bankruptcy Court duly entered in the docket of the Bankruptcy Case that (a) has not been modified or amended without the consent of the

A000821

Lender, or vacated, reversed, revoked, rescinded, stayed or appealed from, except as the Lender may otherwise specifically agree, (b) with respect to which the time to appeal, petition for certiorari, application or motion for reversal, rehearing, reargument, stay, or modification has expired, (c) no petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for a writ of certiorari with respect thereto has been filed or granted or the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order or judgment was appealed and (d) is no longer subject to any or further appeal or petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for any writ of certiorari with respect thereto or further judicial review in any form.

"Financing Orders" shall mean the Interim Financing Order and such other interim, final, permanent and/or supplemental orders, including the Final Financing Order, satisfactory to the Lender entered by the Bankruptcy Court in the Bankruptcy Case after notice pursuant to Section 364 of the Bankruptcy Code relating thereto or authorizing the granting of credit by the Lender to the Borrower pursuant to the terms of this Agreement.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Interim Financing Order" shall mean the order entered by the Bankruptcy Court on or about the date hereof in the form of Exhibit A attached hereto, with such changes thereto as may be approved by the Lender.

"Lender" shall have the meaning set forth in the Preamble hereof.

"Lender Group" shall have the meaning set forth in Section 15(l) hereof.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

A000822

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, results of operations, business or prospects of Borrower or (b) the Lender's Liens on the Collateral taken as a whole or, subject to Permitted Encumbrances, the priority of any such Lien; it being understood that the commencement of the Bankruptcy Case and events and conditions which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code (including, without limitation, reduction in payment terms by suppliers and reclamation claims) shall not be deemed a material adverse effect.

"Maximum Advance Amount" shall mean **Seven Million and 00/100 Dollars ($7,000,000.00)**.

"Notice" shall have the meaning set forth in Section 15(b) hereof.

"Obligations" shall mean and include advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) owing by the Borrower to the Lender or to any other direct or indirect subsidiary or affiliate of the Lender of any kind or nature, present or future (including, without limitation, any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, arising under this Agreement or the Other Documents, whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan or guarantee, or arising under any hedging contract or in connection with any cash management or treasury administration services or agreements, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise, whether evidenced by any other agreement or instrument, including, but not limited to, any and all of Borrower's Indebtedness and/or liabilities under this Agreement or the Other Documents and any amendments, extensions, renewals or increases and all costs and expenses of the Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to, reasonable attorneys' fees and expenses and all obligations of Borrower to the Lender to perform acts or refrain from taking any action, in each such case solely with respect to and/or arising in connection with the Collateral.

"Other Documents" shall mean the Revolving Credit Note, each agreement pursuant to which the Lender is granted a Lien to secure the Obligations and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents and all other writings heretofore, now or hereafter executed by Borrower and/or delivered to the Lender in respect of the transactions contemplated by this Agreement whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Permitted Encumbrances" shall mean (a) Liens in favor of the Lender; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrower in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of the Lender or the value of the assets in which the Lender has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or

-5-

A000823

similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of Borrower's business; (e) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting real property, none of which materially impairs the use of such real property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (f) Liens of the Prepetition Secured Parties as set forth in the Cash Collateral Order; (g) other Liens permitted by the Cash Collateral Order; and (h) Liens disclosed on Schedule 1(f) attached hereto provided that the principal amount secured thereby is not hereafter increased to an amount greater than the amount outstanding on the Closing Date, and no additional assets become subject to such Liens except as otherwise specifically identified on Schedule 1(f).

"Person" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall mean March 8, 2020.

"Preamble" shall mean the introductory paragraph of this Agreement.

"Prior Event" shall have the meaning set forth in Section 15(l) hereof.

"Purchasers" shall have the meaning set forth in Section 10(d) hereof.

"Revolving Credit Note" shall mean the promissory note referred to in Section 3(a) hereof, together with all amendments, restatements, extensions, renewals, replacements, refinancings or refundings thereof in whole or in part.

"Sale Agreement" shall have the meaning set forth in Section 10(d) hereof.

"Sale Motion" shall have the meaning set forth in Section 10(d) hereof.

"Sale Order" shall have the meaning given set forth Section 10(f) hereof.

"Sellers" shall have the meaning set forth in Section 10(d) hereof.

"Superpriority Claim" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Term" shall have the meaning set forth in Section 14(a) hereof.

"Uniform Commercial Code" shall mean the Uniform Commercial Code or other similar law of the Commonwealth of Pennsylvania as in effect on the date of this Agreement and as amended from time to time.

A000824

2.     **Accounting Terms.** As used in this Agreement, the Revolving Credit Note or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined herein shall have the respective meanings given to them under GAAP.

3.     **The DIP Financing**.

(a)     Advances.  Subject to the terms and conditions set forth in this Agreement, Lender will make Advances to the Borrower in aggregate amounts outstanding at any time equal to the lesser of (x) the Maximum Advance Amount and (y) the Approved Amount.  The Advances shall be evidenced by a secured promissory note substantially in the form attached hereto as Exhibit B (the "Revolving Credit Note").

(b)     Procedure for Borrowing Advances.  Borrower may notify Lender prior to 12:00 p.m. (eastern time) on a Business Day of Borrower's request to incur, on that day, an Advance hereunder. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any Other Document, or with respect to any other Obligation, become due, same shall be deemed a request for an Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any Other Document, and such request shall be irrevocable.

(c)     Disbursement of Advance Proceeds.  During the Term, Borrower may use the Advances by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof.  The proceeds of (i) each Advance requested by Borrower to the extent Lender makes such Advance, shall be made available to Borrower on the day so requested by way of credit to Borrower's operating account at Bank of America in immediately available funds and (ii) each Advance deemed to have been requested by Borrower under Section 3(b) hereof shall be disbursed to Lender to be applied to the outstanding Obligations giving rise to such deemed request.

(d)     Maximum Advances.  The aggregate balance of outstanding Advances outstanding at any time (i) pursuant to the Interim Financing Order shall not exceed the lesser of (a) **Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00)** and (b) the Approved Amount and (ii) pursuant to the Final Financing Order shall not exceed the lesser of (a) the Maximum Advance Amount and (b) the Approved Amount.

(e)     Interest on Advances.

(i)     Interest charges shall be computed on the actual principal amount of Advances outstanding during the calendar month and shall bear interest for each day at a rate per annum equal to the Contract Rate.

(ii)     Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Obligations shall bear interest at the Contract Rate plus two percent (2.00%) per annum (the "Default Rate").

(iii)     If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the Contract Rate during such extension.

(iv)     In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law.  In the event interest and other

A000825

charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by the Borrower, and if then remaining excess amount is greater than the previously unpaid principal balance, the Lender shall promptly refund such excess amount to the Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate.

(f)　　　Repayment of Advances.

(i)　　　The Advances shall be due and payable in full on the last day of the Term.  Borrower shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

(ii)　　　All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Lender not later than 11:00 A.M. (eastern time) on the due date therefor in lawful money of the United States of America in immediately available funds.  Lender shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging the Borrower or by making Advances as provided in Section 3(b) hereof.

(iii)　　　The aggregate balance of outstanding Advances at any time in excess of the maximum amount of such Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, whether or not a Default or Event of Default has occurred.

4.　　　**Use of Funds**.  The funds available under the DIP Financing may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders.

5.　　　**Collateral; General Terms**.

(a)　　　Security Interest in the Collateral.  Pursuant to the Interim Financing Order and the Final Financing Order and in accordance with the terms thereof, to secure the prompt payment and performance to the Lender of the Obligations, Borrower hereby assigns, pledges and grants to the Lender a continuing security interest in and to all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  Borrower shall promptly provide the Lender with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s).  Upon delivery of each such notice, Borrower shall be deemed to hereby grant to the Lender a security interest and lien in and to such commercial tort claims and all proceeds thereof.

(b)　　　Perfection of Security Interest.  Borrower shall take all action that may be necessary or desirable, or that the Lender may request, so as at all times to maintain the validity, perfection, enforceability and priority of the Lender's security interest in the Collateral or to enable the Lender to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens on the Collateral other than Permitted Encumbrances, (ii) delivering to the Lender, endorsed or accompanied by such instruments of assignment as the Lender may specify, and stamping or marking, in such manner as the Lender may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iii) entering into warehousing, lockbox and other custodial arrangements satisfactory to

A000826

the Lender as and to the extent required hereunder, and (iv) executing and delivering control agreements, instruments of pledge, notices and assignments, in each case in form and substance satisfactory to the Lender, relating to the creation, validity, perfection, maintenance or continuation of the Lender's security interest in Collateral under the Uniform Commercial Code or other applicable law. The Lender is hereby authorized to file financing statements in accordance with the Uniform Commercial Code from time to time. By its signature hereto, Borrower hereby authorizes the Lender to file against Borrower, one or more financing, continuation, or amendment statements pursuant to the Uniform Commercial Code to perfect Liens in the Collateral securing Obligations arising hereunder in form and substance satisfactory to the Lender. All charges, expenses and fees the Lender may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Borrower as an Advance and added to the Obligations (notice thereof shall be provided to the Borrower thereafter), or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(c)  Disposition of Collateral. Borrower will safeguard and protect all Collateral for the Lender's general account and make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement.

(d)  Preservation of Collateral. Following the occurrence and during the continuation of an Event of Default in addition to the rights and remedies set forth in Section 13(a) hereof, the Lender: (i) may at any time take such steps as the Lender deems necessary to protect the Lender's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as the Lender may deem appropriate; (ii) may employ and maintain at any of Borrower's premises a custodian who shall have full authority to do all acts necessary to protect the Lender's interests in the Collateral; (iii) may lease warehouse facilities to which the Lender may move all or part of the Collateral; (iv) may use Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (v) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrower's owned or leased property. Borrower shall cooperate fully with all of the Lender's efforts to preserve the Collateral as permitted in the foregoing sentence and will take such actions to preserve the Collateral as the Lender may direct. All of the Lender's expenses of preserving the Collateral in accordance with the foregoing, including any expenses relating to the bonding of a custodian, shall be charged to the Borrower as an Advance and added to the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(e)  Ownership of Collateral. With respect to the Collateral, at the time the Collateral becomes subject to the Lender's security interest: (i) Borrower shall be the owner of and fully authorized and able to sell, transfer, pledge and/or grant a security interest having the priority set forth in the Financing Orders in each and every item of its Collateral to the Lender; and, except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by Borrower or delivered to the Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of Borrower that appear on such documents and agreements shall be genuine and Borrower shall have full capacity to execute same; and (iv) Borrower's inventory shall be located as set forth on Schedule 5(e) attached hereto (as such Schedule may be updated from time to time) and shall not be removed from such location(s) without the prior written consent of the Lender except with respect to the sale of inventory in the ordinary course of business and with respect to inventory in transit from (a) a supplier to one location identified on Schedule 5(e) (as such Schedule may be updated from time to time) or (b) one location identified on Schedule 5(e) to another location identified on Schedule 5(e).

(f)  Defense of Lender's Interests. Until (i) indefeasible payment and performance in full of all of the Obligations and (ii) termination of this Agreement, the Lender's interests in the Collateral

13172237 v2

A000827

shall continue in full force and effect. During such period Borrower shall not, without the Lender's prior written consent, pledge, sell (except inventory in the ordinary course of business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, and except for dispositions expressly permitted elsewhere herein, any part of the Collateral. Borrower shall defend the Lender's interests in the Collateral against any and all Persons whatsoever. At any time after an Event of Default has occurred and is continuing and after demand by the Lender for payment of all Obligations, the Lender shall have the right, after the giving of any required notices under Section 13 hereof and upon the effectiveness of the granting of relief from the stay of Section 362(a) of the Bankruptcy Code, to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including, without limitation, labels, stationery, documents, instruments and advertising materials. If the Lender exercises such right to take possession of the Collateral, Borrower shall, upon demand, assemble it in the best manner possible and make it available to the Lender at a place reasonably convenient to the Lender. In addition, with respect to all Collateral, the Lender shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other applicable law. After the occurrence and during the continuance of an Event of Default and after the giving of any required notices under Section 13 hereof, Borrower shall, and the Lender may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, inventory, documents or instruments in which the Lender holds a security interest to deliver same to the Lender and/or subject to the Lender's order and if they shall come into Borrower's possession, they shall be held by Borrower in trust as the Lender's trustee, and Borrower will immediately deliver them to the Lender in their original form together with any necessary endorsement.

(g) <u>Books and Records</u>. Borrower shall (i) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (ii) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (iii) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful receivables, advances and investments and all other proper accruals (including without limitation by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in all material respects in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrower.

(h) <u>Financial Disclosure</u>. Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by Borrower at any time during the Term and promptly after the written request of the Lender (with prior written notice to the Borrower so long as no Event of Default has occurred and is continuing) to deliver to the Lender copies of Borrower's financial statements (if any exist at or prior to the date of such request), trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to the Lender any information such accountants may have concerning Borrower's financial status and business operations. Borrower hereby authorizes all federal, state and municipal authorities to furnish to the Lender copies of reports or examinations relating to Borrower, whether made by Borrower or otherwise; however, the Lender will attempt to obtain such information or materials directly from Borrower prior to obtaining such information or materials from such accountants or such authorities.

(i) <u>Priority</u>. Subject to entry of the Financing Orders by the Bankruptcy Court, Borrower agrees to grant Lender an allowed Superpriority Claim, and said Superpriority Claim shall survive any conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

A000828

(j) <u>Compliance with Laws</u>. Borrower shall comply with all laws, acts, rules, regulations and orders of any Governmental Body with jurisdiction over it or the Collateral or any part thereof or to the operation of Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect. Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of those Governmental Bodies or officials in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's Lien on or security interest in the Collateral. The Collateral at all times shall be maintained in accordance with the material requirements of all insurance carriers which provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect.

(k) <u>Inspection of Premises</u>. Borrower shall (i) permit the Lender or any of its agents, attorneys, field examiners, auditors, financial consultants, appraisers and/or any other consultants or advisors access to Borrower's assets, properties, and premises at times to be mutually agreed, during normal business hours to, among other things, conduct appraisals and evaluations of the Collateral and any other assets or properties of Borrower, and (ii) fully cooperate and completely and promptly comply with any and all requests of the Lender and/or any of its agents for information or copies of documents. All fees, costs, and expenses of such agents, now or hereafter incurred by the Lender shall be reimbursed by Borrower in accordance with Section 15(e) hereof.

(l) <u>Insurance</u>. Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. Subject to the orders of the Bankruptcy Court, at Borrower's own cost and expense in amounts and with carriers acceptable to the Lender, Borrower shall (i) keep all its insurable properties and properties in which Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrower's including, without limitation, business interruption insurance; (ii) maintain insurance in such amounts as is customary in the case of companies engaged in businesses similar to Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business; and (v) furnish the Lender with (1) evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (2) appropriate lender loss payable endorsements in form and substance satisfactory to the Lender, naming the Lender as an additional insured and lender loss payee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to the Lender, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to the Lender. Borrower shall provide copies of all such insurance policies (including the appropriate lender loss payee and additional insured endorsements) within thirty (30) days after the Lender's request, however, only certificates of such insurance shall be required at Closing. In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by the Lender and the Borrower to make payment for such loss to the Lender and not Borrower and the Lender jointly. If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to Borrower and the Lender jointly, the Lender may endorse Borrower's name thereon and do such other things as the Lender may deem advisable to reduce the same to cash. The Lender is hereby authorized to negotiate and compromise claims under insurance

A000829

coverage with respect to Collateral. All loss recoveries with respect to Collateral received by the Lender upon any such insurance may be applied to the Obligations, in such order as the Lender in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by the Lender to Borrower or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Borrower to the Lender, on demand. Any loss recoveries not relating to items of Collateral shall be payable directly to Borrower and, if received by the Lender, the Lender shall promptly deliver same to Borrower. Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below, the Lender shall remit to the Borrower all proceeds of business interruption insurance, and all proceeds of insurance with respect to larceny, embezzlement or other criminal misappropriation, regardless of amount, shall be payable directly and promptly to the Borrower. The agreement of the Lender to remit insurance proceeds in the manner above provided shall be subject to satisfaction that no Event of Default or Default shall then have occurred and be continuing.

(m)     Failure to Pay Insurance.  If Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, the Lender, if the Lender so elects, may obtain such insurance and pay the premium therefor on behalf of Borrower, and charge the Borrower therefor as an Advance and such expenses so paid shall be part of the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(n)     Payment of Taxes.  Subject to the orders of the Bankruptcy Court, Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon Borrower or any of the Collateral including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except (i) those taxes, assessments or charges that are not material; (ii) those taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding; and (iii) those taxes which Borrower is prohibited from paying (or are not required to pay) by operation of the Bankruptcy Code, provided that, with respect to items (i) and (ii) referenced above in this Section 5(n), that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. If any tax by any governmental authority is or may be imposed on or as a result of any transaction between Borrower and the Lender which the Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in the Lender's opinion, may possibly create a valid Lien on the Collateral, the Lender may without notice to Borrower pay the taxes, assessments or other Charges and Borrower hereby indemnifies and holds the Lender harmless in respect thereof. The Lender will not pay any taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. The amount of any payment by the Lender under this Section 5(n) shall be charged to the Borrower as an Advance and added to the Obligations and, until Borrower shall furnish the Lender with an indemnity therefor (or supply the Lender with evidence satisfactory to the Lender that due provision for the payment thereof has been made), the Lender may hold without interest any balance standing to the Borrower's credit and the Lender shall retain its security interest in any and all Collateral held by the Lender.

(o)     Payment of Leasehold Obligations.  Borrower shall at all times pay, when and as due, its rental obligations arising after the Petition Date under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases (other than to the extent that the enforcement of such terms by the applicable landlord is stayed by virtue of the Bankruptcy Case) and, at the Lender's reasonable request will provide evidence of having done so.

(p)    Power of Lender to Act on Borrower's Behalf.  The Lender shall have the right, at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to receive, endorse, assign and/or deliver in the name of the Lender or Borrower any and all checks, drafts and other instruments for the payment of money relating to receivables, and Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Borrower hereby constitutes the Lender or the Lender's designee as Borrower's attorney with power at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code (i) to endorse Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign Borrower's name on any invoice or bill of lading relating to any of the receivables, drafts against customers, assignments and verifications of receivables; (iii) to send verifications of receivables to any customer; (iv) to demand payment of the receivables; (v) to enforce payment of the receivables by legal proceedings or otherwise; (vi) to exercise all of the Borrower's rights and remedies with respect to the collection of the receivables and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the receivables; (viii) to settle, adjust or compromise any legal proceedings brought to collect receivables; (ix) to prepare, file and sign Borrower's name on a proof of claim in bankruptcy or similar document against any customer; (x) to prepare, file and sign Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the receivables; and (xi) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done with gross (not mere) negligence or willful misconduct; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  The Lender shall have the right at any time following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to change the address for delivery of mail addressed to Borrower to such address as the Lender may designate and to receive, open and dispose of all mail addressed to Borrower.

(q)    No Liability.  The Lender shall not, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the receivables or any instrument received in payment thereof, or for any damage resulting therefrom unless such liability arises from the Lender's willful misconduct or gross negligence as finally determined by a court of competent jurisdiction.  Following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, the Lender may, without any other notice or consent from Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  The Lender is authorized and empowered to accept following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code the return of the goods represented by any of the receivables, without notice to or consent by Borrower, all without discharging or in any way affecting Borrower's liability hereunder.

(r)    Exculpation of Liability.  Nothing herein contained shall be construed to constitute the Lender as Borrower's agent for any purpose whatsoever, nor shall the Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof except to the extent such shortage, discrepancy, damage, loss or destruction resulted directly from the gross (not mere) negligence or willful

A000831

misconduct of the Lender. The Lender will not, whether by anything herein or in any assignment or otherwise, assume any of Borrower's obligations under any contract or agreement assigned to the Lender, and the Lender shall not be responsible in any way for the performance by Borrower of any of the terms and conditions thereof.

6.    **Representations and Warranties**.

(a)    <u>Authority</u>. Subject to entry of the Financing Orders, Borrower has the full power, authority and legal right to enter into this Agreement and the Other Documents to which it is a party and to perform all of its Obligations hereunder and thereunder, as the case may be. Subject to entry of the Financing Orders, this Agreement and the Other Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms. The execution, delivery and performance of this Agreement and of the Other Documents by Borrower (i) subject to entry of the Financing Orders, are within Borrower's limited liability company powers, have been duly authorized, are not in contravention of law or the terms of Borrower's operating agreement, articles of organization or other applicable documents relating to Borrower's formation or organization, as the case may be, or to the conduct of Borrower's business or of any material agreement or undertaking arising after the Petition Date to which Borrower is a party or by which Borrower is bound, and (ii) will not conflict with nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of Borrower under the provisions of any agreement, charter document or other instrument arising after the Petition Date to which Borrower is a party or by which it or its property may be bound.

(b)    <u>Formation and Qualification</u>. Borrower is duly organized and in good standing under the laws of the Commonwealth of Pennsylvania, which constitutes all jurisdictions in which qualification and good standing are necessary for Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Borrower has delivered to the Lender true and complete copies of its articles of organization, operating agreement or other organizational documents and will promptly notify the Lender of any amendment or changes thereto.

(c)    <u>Survival of Representations and Warranties</u>. All representations and warranties of Borrower contained in this Agreement and the Other Documents, as the case may be, shall be true at the time of Borrower's execution of this Agreement and the Other Documents, as the case may be, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the Closing.

(d)    <u>No Litigation, Violation or Default</u>. Except as disclosed in <u>Schedule 6(e)</u>, Borrower does not have any pending or threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect. Borrower is not in violation of any applicable statute, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is Borrower in violation of any order of any court, governmental authority or arbitration board or tribunal which would reasonably be expected to have a Material Adverse Effect.

(e)    <u>The Financing Orders</u>. On the date of the making of the initial Advances hereunder, the Interim Financing Order will have been entered and be in full force and effect and will not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in its sole discretion, amended, supplemented or modified. On the date of the making of any Advance, the Interim Financing Order or the Final Financing Order, as the case may be, shall have been entered and be in full force and effect and shall not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in Lender's sole discretion, amended, supplemented or modified. Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lender shall, subject solely to

-14-

A000832

the provisions of Sections 3(f)(iv), 12 and 13 hereof and to such reservations of rights as may be expressly set forth in the Financing Orders, be entitled to immediate payment in full of such Obligations in cash, and the Lender shall be entitled to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

       (f)    <u>Good Faith</u>.  This Agreement has been negotiated in good faith and at arm's length between the Borrower and the Lender.

    7.    **Affirmative Covenants.**  Following the Closing Date, Borrower shall until payment or satisfaction in full of the Obligations and termination of this Agreement:

       (a)    <u>Conduct of Business and Maintenance of Existence and Assets</u>.  (i) Conduct its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including, without limitation, all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral; (ii) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (iii) make all such reports and pay all such franchise and other taxes and license fees  arising after the Petition Date and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so would reasonably be expected to have a Material Adverse Effect.

       (b)    <u>Violations</u>.  Promptly notify the Lender in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to Borrower or the Collateral which could reasonably be expected to have a Material Adverse Effect.

       (c)    <u>Execution of Supplemental Instruments</u>.  Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as the Lender may reasonably request, in order for the full intent of this Agreement to be carried into effect.

       (d)    <u>Modification of the Automatic Stay</u>.  The Interim Financing Order (and Final Financing Order, as applicable) shall contain language, which shall be satisfactory to the Lender in its sole discretion, vacating and modifying the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary to permit the Lender to (i) perfect the security interests and Liens granted hereunder and (ii) exercise its rights under Section 13 hereof of this Agreement.

    8.    **Negative Covenants.**  Borrower shall not until satisfaction in full of the Obligations and termination of this Agreement:

       (a)    <u>Merger, Consolidation, Acquisition and Sale of Assets</u>.

         (i)    Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person or permit any other Person to consolidate with or merge with it; or

-15-

A000833

(ii)     Except transactions involving the sale, lease, transfer or other disposition of inventory in the ordinary course of business, sell, lease, transfer or otherwise dispose of any of its properties or assets unless such sale is in accordance with the Sale Agreement, the Sale Motion and the Sale Order.

(b)     <u>Creation of Liens</u>.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

(c)     <u>Guarantees</u>.  Become liable upon the obligations of any Person by assumption, endorsement or guaranty thereof or otherwise.

(d)     <u>Loans</u>.  Make advances, loans or extensions of credit to any Person, including, without limitation, any affiliate, except with respect to the extension of commercial trade credit in connection with the sale of inventory in the ordinary course of its business.

(e)     <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness except in respect of (i) trade debt, deposits placed with the Borrower by customers of the Borrower for boat orders, and as disclosed by the Borrower in its schedules filed in the Bankruptcy Case, (ii) Indebtedness existing on the Closing Date and set forth on <u>Schedule 8(e)</u> attached hereto (including any extensions, renewals or refinancings thereof), provided that there is no material change in the material terms thereof and the principal amount of such Indebtedness shall not be increased to an amount greater than the amount outstanding on the Closing Date without the prior written consent of the Lender, (iii) Indebtedness of the Prepetition Secured Parties under the Prepetition Documents as set forth in the Cash Collateral Order, (iv) other Indebtedness permitted pursuant to the Cash Collateral Order, and (v) Indebtedness to the Lender under or pursuant to this Agreement or the Other Documents.

(f)     <u>Nature of Business</u>.  Substantially change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business or other than those which are useful in, necessary for and are to be used in its business, as presently conducted.

(g)     <u>Amendment of Articles of Organization or Operating Agreement</u>.  Amend, modify or waive any material term or material provision of its articles of organization or operating agreement or other organizational documents which amendment, modification or waiver would reasonably be considered material and adverse to the Lender, unless required by law.

(h)     <u>Prepayment of Indebtedness</u>.  At any time, directly or indirectly, prepay or repurchase, redeem or retire any Indebtedness, except for the prepayment, repurchase, redemption, retirement or acquisition of any Indebtedness of Borrower owed to the Lender pursuant to this Agreement or the Other Documents.

9.     **Conditions to Initial Advances**.  The agreement of the Lender to make the initial Advance requested to be made on the Closing Date is subject to the satisfaction, or waiver by the Lender, immediately prior to or concurrently with the making of such Advance, of the following conditions precedent:

(a)     <u>Note</u>.  The Lender shall have received the Revolving Credit Note duly executed and delivered by an authorized officer of Borrower.

(b)     <u>Bankruptcy Matters</u>.  No trustee or examiner with expanded powers relating to the operation of the business of the Borrower shall have been appointed with respect to Borrower or its

13172237 v2

A000834

business, properties or assets, including without limitation, the Collateral and any other property that is security for the Obligations and Borrower shall have complied in full with all other requirements as provided for under the Interim Financing Order.

(c)     Interim Financing Order.  At the time of the making of the initial Advance, the Lender shall have received satisfactory evidence of the entry of the Interim Financing Order which Interim Financing Order (i) shall be in form and substance satisfactory to the Lender in Lender's sole discretion, (ii) shall have been entered not later than seven (7) days following the Petition Date and (iii) shall not have been vacated, stayed, reversed, modified or amended in any respect without the express written consent of the Lender, and, if the Interim Financing Order is the subject of a pending appeal in any respect, neither the making of such Advance, nor the performance by the Borrower of any of its obligations hereunder or under the Other Documents or under any other instrument or agreement referred to herein, shall be the subject of a presently effective stay pending appeal.

(d)     First Day Orders.  All of the "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Bankruptcy Case shall be reasonably satisfactory in form and substance to the Lender.

(e)     Corporate Proceedings of Borrower.  The Lender shall have received a copy of the resolutions in form and substance reasonably satisfactory to the Lender, of the board of directors, partners, managers or members, as the case may be, of Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Revolving Credit Note and any Other Document to which Borrower is a party, and (ii) the granting by Borrower of the security interests in and Liens upon the Collateral.  Such resolutions shall be certified by an authorized individual of Borrower as of the Closing Date and such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate.

(f)     Incumbency Certificate of Borrower.  The Lender shall have received a certificate of an authorized individual of Borrower, dated the Closing Date, as to the incumbency and signature of the officers or manager of Borrower executing any certificate or other documents to be delivered by Borrower pursuant hereto, together with evidence of the incumbency of such authorized individual.

(g)     Good Standing Certificates.  The Lender shall have received copies of good standing certificates, or similar certifications, for Borrower, issued by the Department of State of the Commonwealth of Pennsylvania and each jurisdiction where the conduct of its business activities or the ownership of its properties necessitates qualification.

(h)     Insurance.  The Lender shall have received in form and substance satisfactory to the Lender, certificates of insurance for the Borrower's casualty insurance policies, together with loss payable endorsements on the Borrower's standard form of loss payee endorsement naming the Lender as lender loss payee with respect to the Collateral, and certificates of insurance for the Borrower's liability insurance policies, together with endorsements naming the Lender as an additional insured.

(i)     Consents.  The Lender shall have received any and all consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, such consents of such third parties as might assert claims with respect to the Collateral, as the Lender and its counsel shall deem necessary.

(j)    Other.  All limited liability company and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Lender and its counsel.

10.    **Conditions to Each Advance**.  The agreement of the Lender to make any Advance requested to be made on any date (including, without limitation, the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made.

(a)    Representations and Warranties.  Each of the representations and warranties made by Borrower in or pursuant to this Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b)    Financing Orders.  Subject to Section 9(c) hereof, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "Additional Credit"), the Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor the performance by the Borrower of any of its obligations under this Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.

(c)    Sale Motion.  For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the Lender, which shall be reasonably satisfactory in form and substance to the Lender (the "Sale Motion").

(d)    Asset Purchase Agreement.  For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "Sellers"), and the Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "Purchasers"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "Sale Agreement"), which shall be reasonably satisfactory in form and substance to the Lender (the "Sale Motion").

(e)    For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the Lender (the "Sale Order") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal.   Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.

(f)    No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such

13172237 v2

A000836

date; provided, however that, the Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default.

(g)     Maximum Advances.  In the case of any Advances requested to be made, after giving effect thereto, the aggregate Advances shall not exceed the Maximum Advance Amount.

Each request for an Advance by the Borrower hereunder shall constitute a representation and warranty by Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied (to the extent that such conditions are required to be satisfied by such date).

11.     **Information as to Borrower.**  Borrower shall, until payment or satisfaction in full of the Obligations and the termination of this Agreement deliver the following information:

(a)     Disclosure of Material Matters.  Immediately upon learning thereof, report to the Lender all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including, without limitation, Borrower's reclamation or repossession of, or the return to Borrower of, a material amount of goods or material claims or material disputes asserted by any customer or other obligor.

(b)     Litigation.  Promptly notify the Lender in writing of any adversary proceeding, contested matter or administrative proceeding affecting Borrower, whether or not the claim is covered by insurance, and of any adversary proceeding, contested matter or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

(c)     Material Occurrences.  Promptly, but in any event no later than five (5) days after such occurrence, notify the Lender in writing upon the occurrence of (i) any Event of Default or Default; (ii) any event, development or circumstance whereby any financial statements or other reports furnished to the Lender fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Borrower as of the date of such statements; (iii) each and every default by Borrower which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness arising after the Petition Date, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated; and the amount of such Indebtedness; and (iv) any other development in the business or affairs of Borrower which could reasonably be expected to have a Material Adverse Effect; in each case, to the extent permitted by applicable law, describing the nature thereof and the action Borrower proposes to take with respect thereto.

(d)     Additional Information.  Furnish the Lender with such additional information as the Lender shall reasonably request in order to enable the Lender to determine whether the terms, covenants, provisions and conditions of this Agreement and the Revolving Credit Note have been complied with by Borrower and execute and deliver to the Lender, upon request, such documents and agreements as the Lender may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

(e)     Weekly Reporting.  Furnish the Lender with weekly reporting of inventory tracking, accounts payable aging and accounts receivable aging of the Borrower by 5:00 p.m. on Thursday of each week for the preceding week.

12.     **Events of Default.**  The occurrence of any one or more of the following events shall constitute an "Event of Default":

A000837

(a)  Payment of Obligations.  Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document.

(b)  Misrepresentations.  Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made.

(c)  Failure to Furnish Information.  Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten (10) days after such information is requested, or (iii) permit the inspection of its books or records.

(d)  Liens Against Assets.  Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days.

(e)  Breach of Covenants.  Except as otherwise provided for in this Section 12, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations.

(f)  Judgment.  Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage).

(g)  Loss of Priority Lien.  Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders.

(h)  Invalidity of Credit Agreement.  Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender.

(i)  Destruction of Collateral.  Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material impairment or loss of the security provided by this Agreement or the Other Documents.

(j)  Pre-Petition Payments.  Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date.

(k)  Dismissal or Conversion of Bankruptcy Case.  The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy

-20-

A000838

Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is pari passu with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim.

(l)    Relief from Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower.

(m)    The Financing Orders. Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower. Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.

(n)    Lien Challenge. Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender. Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor or the Lender.

(o)    Filing of Reorganization Plan or Sale Motion. A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers.

13.    **Lenders' Rights and Remedies After Default.**

(a)    Rights and Remedies. Upon the occurrence of an Event of Default and at any time thereafter (such default not having previously been cured), at the option of Lender during the continuance of such event, and without further order of or application to the Bankruptcy Court except as otherwise provided in the Financing Orders, the Lender may, by notice to the Borrower and its counsel (with a copy to (x) counsel for any statutory creditors' committee appointed in the Bankruptcy Case, (y) the United States Trustee for the Bankruptcy Court and (z) counsel to each of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties pursuant to the Cash Collateral Order), take one or more of the following actions, at the same or different times: (i) terminate or suspend forthwith the commitment to make Advances hereunder; (ii) declare the Advances or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Advances together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any Other Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any Other Document to the contrary notwithstanding; and (iii)

13172237 v2

A000839

exercise any and all remedies under this Agreement and the Other Documents and under applicable law available to the Lender.

(b)     Lender's Discretion.  The Lender shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies the Lender may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of the Lender's rights hereunder.

(c)     Setoff.  In addition to any other rights which the Lender may have under applicable law, upon the occurrence and during the continuance of an Event of Default hereunder, the Lender shall have a right to apply Borrower's property held by the Lender to reduce the Obligations; *provided that* in no event shall the Postpetition Collateral (as defined in the Cash Collateral Order) be available for such right of setoff.

(d)     Rights and Remedies Not Exclusive.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

(e)     Allocation of Payments After Event of Default.  Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received from Borrower (including the monetary proceeds of collections or of realization upon any Collateral) shall be applied in such order as the Lender shall determine in its sole discretion.

14.     **Effective Date and Termination.**

(a)     Term.  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of Borrower and the Lender, shall become effective on the date hereof and shall continue in full force and effect, and Advances borrowed under this Agreement will be paid in full in cash and the DIP Financing will terminate upon the earliest to occur of the following (the "Term"):  (i) **[April 7, 2020]**, or such later date as may be agreed pursuant to this Agreement, (ii) unless extended with the consent of the Lender, the failure to meet any of the dates set forth in the Sale Motion or the entry of the Sale Order to occur, (iii) the closing of a sale pursuant to the Sale Agreement, the Sale Motion and the Sale Order, (iv) at the option of the Lender, at any time on or after an Event of Default, or (v) acceleration of the Obligations in accordance with this Agreement.

(b)     Termination.  The termination of this Agreement shall not affect Borrower's or the Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated.  The security interests, Liens and rights granted to the Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement, until all of the Obligations of Borrower have been paid or performed in full after the termination of this Agreement or Borrower has furnished the Lender with an indemnification satisfactory to the Lender with respect thereto.  Accordingly, Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and the Lender shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds.  All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or

13172237 v2

A000840

performed in full. Without limitation, all indemnification obligations contained herein shall survive the termination hereof and payment in full of the Obligations.

15. **Miscellaneous.**

(a) <u>Indemnity.</u> Borrower shall indemnify the Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not the Lender is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified.

(b) <u>Notice.</u> Any notice or request hereunder may be given to the Borrower or to the Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15(b). Any notice, request, demand, direction or other communication (for purposes of this Section 15(b) only, a "<u>Notice</u>") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission in accordance with this Section 15(b). Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 15(b) hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 15(b). Any Notice shall be effective:

(i) In the case of hand-delivery, when delivered;

(ii) If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(iii) In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(iv) In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(v) In the case of electronic transmission, when actually received;

(vi) If given by any other means (including by overnight courier), when actually received.

A000841

(A)    If to Lender:        Levin Furniture, LLC
                           c/o Goldberg, Kamin & Garvin
                           1806 Frick Building
                           437 Grant St.
                           Pittsburgh, Pennsylvania 15219
                           Attention:  Jonathan M. Kamin
                           Telephone:
                           Email:

       With a copy to:      Clark Hill PLC
                           One Oxford Centre
                           301 Grant Street, 14th Floor
                           Pittsburgh, Pennsylvania 15219-1425
                           Attention:  Jarrod J. Duffy / William C. Price
                           Telephone:  (412) 394-2324 / (412) 394-7776
                           Telecopier:  (412) 394-2555
                           Email:  jduffy@clarkhill.com / wprice@clarkhill.com

(B)    If to Borrower:      Sam Levin, Inc.

                           c/o Art Van Furniture, LLC
                           6500 14 Mile Road
                           Warren, MI 48092
                           Attention: Michael Zambricki
                           Email: mzambricki@artvan.com

                           with copies (which shall not constitute notice) to:

                           Benesch, Friedlander, Coplan & Aronoff LLP
                           222 Delaware Avenue, Suite 801
                           Wilmington, Delaware 19801
                           Attn: Gregory Werkheiser & Michael J. Barrie
                           Email: gwerkheiser@beneschlaw.com /
                           mbarrie@beneschlaw.com

        (c)    <u>Representation by Counsel.</u>  Each party hereto acknowledges that it has been represented by counsel in connection with this Agreement.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the parties hereto.

        (d)    <u>Governing Law.</u>  This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without reference to the conflicts of law provisions thereof and, to the extent applicable, the Bankruptcy Code.

        (e)    <u>Expenses.</u>  All costs and expenses including, without limitation, reasonable attorneys' fees and disbursements incurred by the Lender (i) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (ii) in connection with the modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, or (iii) in instituting, maintaining, preserving, enforcing and

-24-

A000842

foreclosing on the Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (iv) in defending or prosecuting any actions or proceedings arising out of or relating to the Lender's transactions with Borrower, or (v) in connection with any advice given to the Lender with respect to its rights and obligations under this Agreement and any Other Document, may be charged to the Borrower and shall be part of the Obligations (the Lender shall promptly thereafter provide notice thereof to the Borrower).

(f)     Injunctive Relief.  Borrower recognizes that, in the event it fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to the Lender; therefore, the Lender, if the Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

(g)     Consequential Damages.  Neither the Lender nor any of its agents or attorneys shall be liable to Borrower for any special, incidental, consequential or punitive damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

(h)     Counterparts.  This Agreement may be executed in counterpart, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

(i)     Modifications in Writing.  No modification or amendment of the terms of this Agreement shall be valid unless such amendment is in writing and signed by Borrower and Lender.

(j)     Headings.  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

(k)     Effect of Financing Orders.  The Liens and security interest referred to in this Agreement and any Other Document with respect to the Borrower shall be deemed valid and perfected by entry of the Interim Financing Order.

Subject to the Financing Orders and this Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall:  (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral.

(l)     Release.  Borrower, on behalf of itself and any Person claiming by, through, or under Borrower (collectively, the "Borrower Group") acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature (including, for the avoidance of doubt, any claim under Chapter 5 of the Bankruptcy Code) whatsoever (collectively, "Claims") against the Lender and/or any of its former, present or future directors, officers, members, employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns (the Lender and its former, present or future directors, officers, members,

-25-

A000843

employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns are jointly and severally referred to as the "Lender Group"), that directly or indirectly arise out of, are based upon, or are in any manner connected with any Prior Event; and, should any Claims nonetheless exist, Borrower, on behalf of itself and all the other members of the Borrower Group, hereby (i) releases and discharges each member of the Lender Group from any liability whatsoever on such Claims that directly or indirectly arise out of, are based upon, or are in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Claims against any member of the Lender Group. As used herein the term "Prior Event" means any transaction, event, circumstance, action, failure to act or occurrence of any sort or type, including without limitation any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the execution of this Agreement.

<div align="center">[INTENTIONALLY LEFT BLANK]</div>

13172237 v2

A000844

**IN WITNESS WHEREOF,** Borrower and Lender have caused this Agreement to be executed as of the date first set forth above.

<div style="margin-left:50%">

**BORROWER:**

Sam Levin, Inc.,
a Pennsylvania corporation

_____

By:
Name:
Title:

**LENDER:**

Levin Furniture, LLC,
a Pennsylvania limited liability company

_____

By:  Robert Levin, President

</div>

## **INDEX TO EXHIBITS**

| Exhibit A | - | Interim Financing Order |
|-----------|---|-------------------------|
| Exhibit B | - | Revolving Credit Note |

**EXHIBIT A**

**Interim Financing Order**

(see attached)

**EXHIBIT B**

**Revolving Credit Note**

(see attached)

## INDEX TO SCHEDULES

Schedule 1(f)          -          Permitted Encumbrances
Schedule 5(e)          -          Inventory Locations
Schedule 6(e)          -          Litigation
Schedule 8(e)          -          Indebtedness

223525600
13172237 v2

A000849

**SCHEDULE 1(f)**

**Permitted Encumbrances**

A000850

**SCHEDULE 5(e)**

**Inventory Locations**

A000851

**SCHEDULE 6(e)**

**Litigation**

223525600
13172237 v2

A000852

**SCHEDULE 8(e)**

**Indebtedness**

A000853

**REVOLVING CREDIT NOTE**

$7,000,000.00

Date: March __, 2020
Pittsburgh, Pennsylvania

This Revolving Credit Note (this "Note") is executed and delivered under and pursuant to the terms of that certain Debtor-in-Possession Credit and Security Agreement, dated of even date herewith (as may be amended, modified, supplemented or restated, from time to time, the "DIP Credit Agreement"), by and between Sam Levin, Inc., a Pennsylvania corporation (the "Borrower"), and Levin Furniture, LLC, a Pennsylvania limited liability company (the "Lender"). Capitalized terms not otherwise defined herein shall have the meanings provided in the DIP Credit Agreement.

FOR VALUE RECEIVED, the Borrower hereby promises to pay to the order of the Lender at such place as Lender may from time to time designate to the Borrower in writing:

(i) the principal sum of Seven Million Five Hundred Thousand and 00/100 Dollars ($7,000,000.00) or, if different from such amount, the unpaid principal balance of the Advances as may be due and owing under the DIP Credit Agreement, payable in accordance with the provisions of the DIP Credit Agreement and subject to acceleration upon the occurrence of an Event of Default under the DIP Credit Agreement or earlier termination of the DIP Credit Agreement pursuant to the terms thereof; and

(ii) interest on the principal amount of this Note from time to time outstanding until such principal amount is paid in full at the Contract Rate in accordance with the provisions of the DIP Credit Agreement. In no event, however, shall interest exceed the maximum interest rate permitted by law. Upon and after the occurrence of an Event of Default, and during the continuation thereof, interest shall be payable at the Default Rate.

This Note is the Revolving Credit Note referred to in the DIP Credit Agreement and is secured by the Liens granted pursuant to the DIP Credit Agreement and the Other Documents, is entitled to the benefits of the DIP Credit Agreement and the Other Documents and is subject to all of the agreements, terms and conditions therein contained.

This Note may be voluntarily prepaid, in whole or in part, on the terms and conditions set forth in the DIP Credit Agreement.

If an Event of Default shall have occurred under the DIP Credit Agreement, then this Note may, as provided in the DIP Credit Agreement, be declared immediately due and payable, without notice, together with reasonable attorneys' fees if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof.

This Note shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania. The Borrower hereby consents to the jurisdiction and venue of the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") with respect to any suit arising out of or mentioning this Note provided, however, that in the event that the Bankruptcy Court does not have jurisdiction over any matter or if it has jurisdiction but does not exercise such jurisdiction for any reason, the Borrower hereby consents to the jurisdiction and venue of the courts of the Commonwealth of Pennsylvania or the United States District Court for the Western District of Pennsylvania, in each case located in Allegheny County, Pennsylvania.

The Borrower expressly waives any presentment, demand, protest, notice of protest, or notice of any kind except as expressly provided in the DIP Credit Agreement.

A000854

**WAIVER OF TRIAL BY JURY.** THE UNDERSIGNED HEREBY EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVE ALL BENEFIT AND ADVANTAGE OF ANY RIGHT TO A TRIAL BY JURY, AND THEY WILL NOT AT ANY TIME INSIST UPON, OR PLEAD OR IN ANY MANNER WHATSOEVER CLAIM OR TAKE THE BENEFIT OR ADVANTAGE OF A TRIAL BY JURY IN ANY ACTION ARISING IN CONNECTION WITH THIS NOTE, THE DIP CREDIT AGREEMENT OR ANY OF THE OTHER DOCUMENTS.

[INTENTIONALLY LEFT BLANK]

13172258 v2

A000855

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned has hereby executed this Revolving Credit Note on the date first set forth above.

**BORROWER:**

Sam Levin, Inc.,
a Pennsylvania corporation


By:_____
Name:_____
Title:_____

A000856

ACKNOWLEDGMENT

_____ OF _____                    )
                                                       )        SS:
COUNTY OF _____                         )


        On this, the _____ day of March, 2020, before me, a Notary Public, the undersigned officer, personally appeared _____ who acknowledged himself/herself to be the _____ of Sam Levin, Inc., a Pennsylvania corporation (the "Company"), and that he/she as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by himself/herself as such officer on behalf the Company.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                        _____
                                                Notary Public


My Commission Expires:

A000857

# **EXHIBIT F**

A000858

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 49** |

## INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i)        authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the DIP Collateral (as defined below)[3] to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

[3]   As used in this Interim Order, "DIP Collateral" shall mean and include all of the following personal property assets of the DIP Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

13193241 v4

A000859

with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and adequate protection to the DIP Lender in accordance with this order; and

(ii)      scheduling a final hearing (the "<u>Final Hearing</u>") within twenty days of the

---

(a) all inventory of the DIP Borrower purchased solely with the proceeds of any Advances made under the DIP Credit Agreement;

(b) all receivables of the DIP Borrower arising out of the sale of inventory referred to in clause (a) above;

(c) all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the DIP Borrower giving rise to receivables referred to in clause (b) above,  (ii) all of DIP Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b), (iii) all additional amounts due to DIP Borrower from any customer relating to the receivables set forth in clause (b) above, (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b), (v) all of DIP Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b), (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b), and (vii) if and when obtained by DIP Borrower, all real and personal property of third parties in which DIP Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

(e) proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Interim Order or the DIP Credit Agreement, the term "DIP Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

2

A000860

Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and argument made at the first day hearing held on March 10, 2020 and the interim hearing held on March 12, 2020 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable local rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

3

A.     **Petition Date**.  On March 8, 2020 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

B.     **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "<u>Committee</u>").

E.     **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing (the "<u>DIP Facility</u>") from the DIP Lender pursuant to the terms set forth in this Interim Order and in that certain form of Debtor-In-Possession Credit and Security Agreement (the "<u>DIP Credit Agreement</u>") and that certain Revolving Credit Note (collectively with the DIP Credit Agreement, the "<u>DIP Loan Documents</u>"), each in substantially the form as filed on the docket in these chapter 11 proceedings on March 13, 2020.

F.     **Debtor Operations**.  DIP Borrower is unable to operate without the

---

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4

Liquidity provided by the DIP Facility.

G.    **Inability to Obtain Alternative Credit**.  DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

H.    **Good Faith**.  The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

I.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

J.    **Interim Debt Limit**.  The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $10,000,000.00 during this Interim Period in accordance with the DIP Loan Documents.

K.    **Avoid Immediate and Irreparable Harm**.  The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

A000863

L.       **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.       **Motion Granted**. The Motion is granted.

2.       **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3.       **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower, as modified by this Interim Order; *provided, however,* notwithstanding anything to the contrary in the Motion or the forms of the DIP Loan Documents annexed to the Motion: (a) the "Maximum advance Amount" (as defined in the DIP Credit Agreement) shall be **Twenty Million and 00/100 U.S. dollars ($20,000,000.00);** (b) the aggregate balance of outstanding advances outstanding at any time pursuant to this Interim Order shall not exceed **Ten Million and 00/100 U.S. dollars**

6

A000864

**($10,000,000.00)**; and Section 14(a)(i) of the DIP Credit Agreement is deemed amended to strike the text "[April 7, 2020]" and replace it with "April 9, 2020". The Debtors are authorized to revise, execute and deliver the DIP Loan Documents to conform with this Paragraph 3.

    4.  **Additional DIP Loan Documents; Non-Material Amendments**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder. The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

    5.  **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

    6.  **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to

A000865

limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7.    **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8.    **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[5] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the

---

[5]    Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 93) (the "Interim CC Order").

DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

9. **Security for DIP Loan**. As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "DIP Lien") against the DIP Collateral, as that term is defined in the DIP Loan Documents; *provided, however,* that the DIP Lien shall be junior only to the pre-existing liens on and security interests in such DIP Collateral granted in favor of third parties (other than any Prepetition ABL Secured Party or any Prepetition Term Loan Secured Party (each as defined in the Interim CC Order)) that, as of the Petition Date, (a) were senior in priority under applicable law to the DIP Lien, (b) were not subordinated by agreement or applicable law, and (c) were in existence, valid, enforceable, properly perfected and non-avoidable as of the Petition Date, including any such liens and security interests that were perfected after the Petition Date but relate back to the Petition Date pursuant to section 546(b) of the Bankruptcy Code. Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

9

A000867

10.     **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

10

A000868

11. **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12. **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13. **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any

11

A000869

successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14.     <u>RESERVED</u>

15.     **<u>Order Binding Upon Parties in Interest</u>**. To the fullest extent that relief is available at a hearing held pending a final hearing as contemplated by Bankruptcy Rule 4001(2), all of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16.     **<u>Effect of Modification of Interim Order</u>**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

A000870

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Relationship to Contemplated Sale Transaction.** As contemplated by the Levin-Wolf LOI (attached as Exhibit B to the First Day Declaration), the Sale Agreement (as defined in the DIP Credit Agreement) shall provide for the DIP Lender and Levin Trucking, LLC, the purchasers thereunder, to assume, pay or otherwise satisfy all allowed section 503(b)(9) claims against the DIP Borrower, effective upon and subject to the occurrence of the closing under such Sale Agreement.

20. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

21. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

13

A000871

22.     **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

23.     **Final Hearing**.  The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (Prevailing Delaware Time)** before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware.  On or before March 13, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than **March 30, 2020**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal

14

Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

24.     ***Nunc Pro Tunc* Effect of this Interim Order**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

25.     **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

**Dated: March 16th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
15  **UNITED STATES BANKRUPTCY JUDGE**

13193241 v4

A000873

# EXHIBIT G

A000874



**FURNITURE**
**MATTRESS**

# MEMORANDUM

---

**TO:** Employees Affected By Closing of 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321

**FROM:** Cathrine Wenger, Senior Counsel

**SUBJECT:** WARN Act Notice

**DATE:** March 5, 2020

---

Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

\*             \*             \*

On a personal note, we are extremely grateful for the service you have given to the Company, and greatly appreciate your continued professionalism through this process.

A000875

# EXHIBIT H

A000876

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Objection Deadline: At the Hearing** |
|  | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET)** |
|  | ) |  |

## DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER
## (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER
## CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL
## CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON,
## AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
hereby submit this motion (this "Motion"), pursuant to section 1112(a) of title 11 of the United
States Code (the "Bankruptcy Code"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure
(the "Bankruptcy Rules"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and
Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),
for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed
Order"), (i) converting each of the Debtors' chapter 11 cases to cases under chapter 7 of the
Bankruptcy Code, effective as of 12:00 a.m. (prevailing Delaware time on April 7, 2020 (the
"Conversion Date"), (ii) establishing a deadline for filing final chapter 11 fee applications and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A000877

setting a hearing thereon, and (iii) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      These Chapter 11 Cases were pending for just three days when on March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) outbreak to be a pandemic.[3] These Chapter 11 Cases were pending for just five days when on March 13, 2020, the Trump administration declared a national emergency in response to the COVID-19 outbreak.[4] These Chapter 11 Cases were pending for just six days when on March 14, 2020, government regulators in Pennsylvania, one of four states in which the Debtors' core retail operations are concentrated, issued guidance urging all non-essential retail businesses to close, with other states and localities soon to follow.[5] And, these Chapter 11 Cases were pending for just eleven to fourteen days when the four states in which the Debtors' principal operations are located — Michigan, Pennsylvania, Ohio and Illinois — issued "stay at home" or "shelter in place" orders requiring, among other things, all non-essential businesses (including the Debtors' retail stores) to shut their doors and mandating that individuals not leave their homes except in limited circumstances.[6]

---

[2]      Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion.

[3]      World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).

[4]      Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).

[5]      Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/).

[6]      **Michigan:** Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020 (https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html); **Pennsylvania:** Gov.

2.      Even before government action in response to the COVID-19 pandemic made it impossible for the Debtors' retail operations to continue, the consumer public's understandable fear of the spread of the COVID-19 disease already had a devastating impact on the Debtors' ability to implement their original restructuring plan.  These key components included (a) the continuation of Store Closing Sales at substantially all of the Debtors' 125 Art Van Furniture, Art Van Pure Sleep and Scott Shuptrine Interiors branded locations and eight of the Debtors' Wolf Furniture branded locations, and (b) the operation of 44 Levin Furniture, Levin Mattress and Wolf Furniture locations pending consummation of a going concern sale of those business lines and related assets that was contemplated at the outset of these proceedings.  Unfortunately, by the conclusion of the week ending March 14, 2020, customer traffic in the Debtors' stores — both those participating in the Store Closing Sales program and the Levin and Wolf going concern locations — precipitously dropped below what any of the Debtors' pre-bankruptcy and pre-COVID-19 pandemic financial could have predicted.  As a consequence, it was quickly evident that continued retail operations of any sort would cause the Debtors to incur expenses for the foreseeable future that far outstripped the revenues generated.  Ultimately, of course, the aforementioned restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease effectively removed any choice the Debtors had in the matter by mandating that the Debtors discontinue all retail operations and other non-essential business operations.

---

Tom Wolf, Executive Order, dated March 19, 2020 (https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf); **Ohio:** Dir. Of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020 (https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf); and **Illinois:** Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020 (https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf).

13308537 v1

A000879

3.　　By late March, the exponential spread of the COVID-19 disease throughout the United States, along with the resulting state and locally imposed limitations and prohibitions on non-essential retail operations, had left the Debtors with few potentially viable options. Further, these extraordinary and unprecedented events have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the best path forward in these proceedings for the Debtors and their estates. At present, no one can predict with any reliability how long the shelter-in-place orders issued in many states where the Debtors operate will remain in effect. In fact, the Trump administration just recently extended social distancing guidelines from April 15, 2020 through April 30, 2020.[7] And, even assuming regulatory barriers to resuming retail operations are lifted in the near future, no one can predict with any reliability what consumer appetite will exist for furniture, given the economic and other trauma that the nation is undergoing presently.[8]

4.　　In order to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that may eventually be distributable to their creditors, the Debtors had initially hoped — consistent with what has been recently approved in certain other retail chapter 11 bankruptcy proceedings[9] — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these chapter 11 cases until such time as the broader economic and public safety

---

[7]　　*See, e.g.,* Michael D. Shear, "Trump Extends Social Distancing Guidelilnes Through End of April," *The New York Times* (Pub. March 29, 2020, updated April 1, 2020) (https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html).

[8]　　*See, e.g.,* Ed Yong, "How the Pandemic Will End," *The Atlantic* (March 25, 2020) (exploring different plausible scenarios for resolution of the COVID-19 epidemic with some taking 12-18 months for society to return to a level of normalcy).

[9]　　*See* Order Establishing Temporary Procedures and Granting Related Relief, entered March 30, 2020 [D.I. 217], *In re CraftWorks Parent, LLC, et al.,* Case No. 20-10475 (BLS) (Bankr. D. Del.); Order Temporarily Suspending the Debtors' Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, entered March 27, 2020 [D.I. 166], *In re Modell's Sporting Goods, Inc., et al.,* Case No. 20-14179 (VFP) (Bankr. D.N.J.).

13308537 v1

A000880

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to this Court and parties in interest at the status conference held that day.

5.     Unfortunately, despite the Debtors and their advisors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, no viable path forward in chapter 11 emerged that would garner the support of the Debtors' senior secured lenders and certain other stakeholders.  With the COVID-19 pandemic still raging and by all reputable accounts likely to get worse in the next several weeks before it improves, the execution risk associated with any of these strategies appears to be unacceptably high for the Debtors to garner the support their senior secured lenders and other stakeholders necessary for the Debtors to be able to move forward.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is likely inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consummated by the time the Debtors and their senior secured lenders conceivably might have some visibility into if or when any of these restructuring alternatives could be successfully implemented.

6.     Furthermore, the Debtors have no ability, without the consent of the Prepetition ABL Agent, to implement any case suspension-based restructuring strategy.  Of necessity, on or about March 19, 2020, after communicating with representatives of the Prepetition ABL Agent on several occasions about the Debtors' increasing operating losses and need to take appropriate

action to prevent further dissipation of the Debtors' assets, the Debtors ceased operating their retail stores as going concerns and thereafter dismissed the vast majority of their employees. As a result, the Debtors have no top line revenue, such that each dollar expended by the Debtors at this point is not being replaced. For this and other reasons, the Debtors have no ability to demonstrate that their secured lenders are adequately protected to the degree required for the Debtors continue using cash collateral and other collateral without their consent. And, under the terms of the Interim CC Order, absent extraordinary relief from the Court, the consent of the Senior Secured Parties to use cash collateral and other collateral will expire no later than the end of the day Monday, April 6, 2020.

7.     The Debtors, thus, find themselves with no choice other than to move for the prompt conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Though this path is a difficult one that the Debtors are following only after exhausting all other alternatives, under these dire circumstances, the Debtors believe that converting these cases is in the best interests of the Debtors' estates. The Debtors understand that the conversion of Chapter 11 Cases is supported by the Debtors' senior lenders and not opposed by the Committee.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6

A000882

10.    Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.    The statutory bases for the relief requested herein are section 1112(a) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

### A.  General Background.

12.    On March 8, 2020 (the "Petition Date"), each of the Debtors commenced with this Court voluntary cases  (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.    The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS) pursuant to Bankruptcy Rule 1015.

14.    Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 12], incorporated by reference herein.

15.    At the commencement of these cases, the Debtors operated 169 stores in eight states, specifically Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, West Virginia, and Virginia.[10]  The Debtors also have four regional distribution centers, three of which are leased and one of which is owned. The Debtors are headquartered in Warren, Michigan and had approximately 4,500 employees as of the Petition Date.

---

[10]    The vast majority of the Debtors' stores were located in four states: Michigan; Ohio; Pennsylvania; and Illinois.  The remaining five states listed above accounted for only 16 of the Debtors' 169 retail locations as of the Petition Date.

A000883

16. As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases with the intention of liquidating their inventory through store closing sales (the "Store Closing Sales") conducted with the assistance of the Consultant and other proposed professionals, paying down their secured debt, and using any remaining proceeds of their Store Closing Sales to windup their operations. Also as set forth in the First Day Declaration and Exhibit B thereto, as of the Petition Date, the Debtors were party to a binding letter of intent for a going concern sale of 44 Levin and Wolf stores and related assets and operations (the "Levin-Wolf Sale"). The Debtors intended to effectuate this restructuring through the consensual use of cash collateral.

17. In furtherance thereof, on or around the Petition Date, the Debtors filed, among other things:

   a. *Debtors' Application for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 3];

   b. *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 5]; and

   c. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to § 327(a) of the Bankruptcy Code and (V) Granting Related Relief* [D.I. 52] (the "Store Closing Motion").

18. On March 10, 2020 (as continued, in part, to March 12, 2020), the Court held a hearing (the "First Day Hearing") following which it entered certain orders, including: (a) an order [D.I. 77], pursuant to 28 U.S.C. § 156(c), appointing Kurtzman Carson Consultants LLC ("KCC") as the Claims and Noticing Agent for these Chapter 11 Cases (the "Claims Agent"); (b) the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,

and (V) Granting Related Relief [D.I. 93] (the "Interim CC Order"); and (c) an order [D.I. 143] granting limited relief in connection with the Store Closing Motion on an interim basis.

19.     Shortly after the Petition Date, the Debtors filed applications to employ and retain: (a) Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"), as their proposed general bankruptcy counsel [D.I. 142]; (b) Montgomery McCracken Walker & Rhoads ("MMWR"), as their proposed special counsel [D.I. 193]; (c) Alvarez & Marsal North America LLC ("A&M"), as their proposed financial advisors [D.I. 145]; and (d) Jones Lang Lasalle Americas, Inc. ("JLL," and together with Benesch, MMWR and A&M, the "Debtors' Professionals"), as their proposed real estate consultants and advisors [D.I. 141].  The applications to employ and retain Benesch, A&M and JLL, each are scheduled to be heard on April 6, 2020, at 1:00 p.m. (ET).  The application to employ and retain MMWR is scheduled to be heard on April 27, 2020, at 2:00 p.m. (ET).

20.     On March 18, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a seven member Official Committee of Unsecured Creditors in these Chapter 11 Cases (as reconstituted from time to time, the "Committee").  The Committee has engaged and filed applications to employ and retain Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as its proposed counsel [D.I. 244] and Alix Partners ("Alix Partners," and together with Pachulski Stang, the "Committee's Professionals"), as its proposed financial advisor [D.I. 241].

**B. Events in the Chapter 11 Cases.**

21.     Since the First Day Hearing, the exponential spread of COVID-19 has wrought economic and social havoc across the country and the globe.  As discussed in the Preliminary Statement, on the afternoon of March 13, 2020, President Trump declared COVID-19 a national

A000885

emergency and most of the states in which the Debtors operate have also declared states of emergency and issued "stay at home" or "shelter-in-place" type orders.

22.     Notwithstanding the careful planning and modeling of the Debtors and their advisors, since shortly after the Petition Date, the Debtors' situation has changed drastically as a result of COVID-19.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the Store Closing Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23.0 million;[11] however, for the full week ending March 15th, deposits from sales were just $8.0 million.  It quickly became apparent to the Debtors' management and advisory teams that continued retail operations of any sort were causing the Debtors to incur expenses (and would do so for the foreseeable future) that far outstripped any revenues being generated through the Debtors' continued retail operations.

23.     By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[12]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …."[13] Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan — where

---

[11]     The Debtors, however, did not realize the cash proceeds from most of these sales because just prior to the Petition Date and immediately thereafter, certain of the Debtors' credit card processor banks purported to exercise rights to intercept the proceeds from such transactions and redirect them into chargeback reserve accounts.

[12]     Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/)

[13]     Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts, March 16, 2020 (https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/).

the Debtors' headquarters, a distribution center and 82 of their stores are located — entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[14] While Michigan's initial order did not explicitly mandate closing of all non-essential retail establishments, it was accompanied by appropriately alarming statement from Governor Whitmer urging Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[15] Government authorities in Ohio and Illinois also issued similar guidance and direction.

24.     As detailed in the Preliminary Statement, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations are located to issue a "stay at home" or "shelter in place" type order. Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.

25.     Although the situation was evolving rapidly, the Debtors' board, management team and advisors were paying close attention to the threat COVID-19 posed to the health and welfare of the Debtors' employees and customers and to the financial impact on the Debtors' businesses. The Debtors' board, management team and advisors were in near constant communication about these events as they unfolded in mid-March. Moreover, the Debtors and their advisors worked to the best of their ability under these circumstances to keep their secured lenders and other stakeholders informed about these challenges and exhausted all efforts to work with them to develop viable responses to the rapidly deteriorating situation. When no other viable alternative emerged, on March 19, 2020, the Debtors made the painful decision to suspend all retail operations

---

[14]     Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders, March 16, 2020 (https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521763--,00.html).

[15]     *Id.*

A000887

and terminate the majority of their employees — moves the Debtors hoped at the time would be only temporary measures.

26.     Further compounding the Debtors' problems, on March 19, 2020 the proposed purchaser for the Levin-Wolf Sale notified the Debtors that they would not proceed with the transaction at that time, effectively ending any hope the Debtors had to consummate a going concern transaction for the Levin and Wolf furniture operations and dashing hopes to save upwards of a 1,000 jobs.

27.     Late in the day on March 19, 2020, however, the Prepetition ABL Agent issued a purported Termination Declaration under the Interim CC Order.  Pursuant to Paragraph 21 of the Interim CC Order, a valid Termination Declaration issued on March 19th would have triggered a Remedies Notice Period five business days' in length.  Thereafter, the Prepetition ABL Agent agreed to extend any Remedies Notice Period relating to the alleged Termination Declaration through the end of the day on Tuesday, March 31, 2020, and then again through and including the end of the day on Monday, April 6, 2020.

28.     Following these events, the Debtors and their advisors continued to work with the Prepetition ABL Agent, the Committee, and their respective advisors to identify solutions for the Debtors' deteriorating situation that would allow them to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that might eventually be distributable to their creditors.  The Debtors had hoped — consistent with what has been recently approved this Court in the *CraftWorks* chapter 11 cases and by the District of New Jersey bankruptcy court in the *Modell's* chapter 11 cases — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these Chapter 11 Cases until such time as the broader economic and public safety

A000888

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to the Court that day.

29. Both before and after the March 26th status conference, the Debtors, with the assistance of their advisors and in consultation with the Prepetition ABL Agent, the Committee and their respective advisors, were working to develop and evaluate several potentially value maximizing alternatives for the Debtors to pursue after the contemplated suspension of operations and downscaling of activities in these Chapter 11 Cases came to an end. One such path was to resume Store Closing Sales at all of the Debtors' locations where it would be financially and operationally viable to do so. A second path considered was to focus on one or more bulk sales most or all of the Debtors' inventory, equipment, and other readily monetizable assets. Additionally, the Debtors and their advisors examined several "middle" paths for the Debtors and their estates, which would involve various combinations of resuming Store Closing Sales at certain locations and bulk-selling inventory, equipment, and certain other assets associated with other locations.

30. To be clear, each of the post-suspension restructuring alternatives explored by the Debtors had the prospect of producing some return to the Debtors' senior secured lenders and potentially to other stakeholders. But none of the potential scenarios showed a reasonable chance of generating a recovery for the Debtors' senior secured lenders coming anywhere near what the pre-COVID 19 pandemic modeling had suggested. Indeed, under most scenarios, the Prepetition ABL Secured Parties, which at the outset of these proceedings were projected to receive a full

A000889

recovery on their approximately $34 million of Prepetion ABL Obligations by the mid-point of the Store Closing Sales Process, would not get out whole before their ABL Priority Collateral was fully monetized.

31.     Despite the Debtors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, these concerted efforts were unable to produce a path forward in chapter 11 that would garner the support of their senior secured lenders and potentially other stakeholders.  Unfortunately, with the COVID-19 pandemic still raging and by all reputable accounts likely to get worse before it improves, the perceived execution risk of any of these restructuring strategies has proven to be an insurmountable  barrier to the Debtors ability to obtain the necessary support of their secured lenders and others.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the reasonable best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consumed by operating expenses before the Debtors and their senior secured lenders would have meaningful visibility into whether these restructuring alternatives could be successfully implemented.

32.     By Monday, March 30, 2020, the Debtors were effectively out of time, with their access to Cash Collateral under the Interim CC Order then due to terminate at the end of the following day.  Although it was clear by this point in the proceedings that the Debtors would be unable to continue these Chapter 11 Cases without the support and consent of their senior secured lenders, unresolved issues existed as to what obligations would and would not be funded under the terms of the Interim CC Order prior to any conversion of the Chapter 11 Cases.  Recognizing the contributions that their employees had made to the Debtors' businesses postpetition and the

extreme hardship that many of the employees and their families were apt to experience as a result of losing their jobs in the midst of an ongoing pandemic and associated economic crisis, the Debtors attempted everything in their power to ensure that employee payroll and related employee obligations would be fully funded under the Interim CC Order.

33.     These efforts were to a degree successful.  At a hearing held on March 31, 2020, the Court confirmed that the Debtors would have access to Cash Collateral to fund and pay current payroll obligations, including wages, salaries and commissions.  The cash available, however, was insufficient for it to be possible for the Debtors to provide at this time for payment in full of other employee related obligations, such as coverage obligations for employee healthcare expenses and certain other benefits plans that were, in whole or part, self-funded by the company.[16]  Even though this situation is primarily the result of the COVID-19 pandemic and other circumstances entirely beyond the Debtors' control, the Debtors deeply regret that they are not in a position to be able to do more for their employees, customers, vendors, landlords and other stakeholders.

34.     Based upon the foregoing, the Debtors have considered the circumstances in which they find themselves, and have concluded that converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates.

---

[16]     The Debtors estimate the total unfunded trailing liabilities under their partially self-funded employee health plan to be approximately $8.5 million. Under self-funded plans, like the ones the Debtors had established for their employees in the ordinary course of business prior to the Petition Date, when employees and their covered dependents receive covered services the resulting charges are remitted to the plan's claims administrator for processing.  Thereafter, the approved claims are batched and remitted to the Debtors for payment.  The remittance of the batched claims to the Debtors for payment can trail the rendering of services to employees by up to several months. In general, the Debtors terminated health care covered for their employees effective as of the dates such employees separated from the company.  Thus, the estimated $8.5 million of trailing obligations is on account of covered healthcare services to covered persons provided prior to each such employee's termination date.  Although the Debtors' original budget for these Chapter 11 Cases contemplated the funding of such trailing employee healthcare plan obligations, the COVID-19 pandemic's disruption of the Debtors' ability to operate postpetition  combined with the issuance of a Termination Declaration under the Interim CC Order that followed, left the Debtors with inadequate cash on hand and inadequate access to additional cash with which to fund such obligations.

A000891

## RELIEF REQUESTED

35.     By this Motion, the Debtors request entry of the Proposed Order, pursuant to section 1112(a) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date, (ii) establishing a deadline for filing final chapter 11 professional fee applications and setting a date for a hearing thereon, and (iii) granting related relief.

36.     The Debtors also request that the Court approve the following procedures in connection with the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code (the "Conversion Procedures"):

a. **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain

16

A000892

copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

## BASIS FOR RELIEF

### A. The Conversion Relief Should be Granted

37. Section 1112(a) of the Bankruptcy Code provides that a debtor may convert a case to chapter 7 as a matter of right. *See* H.R. Rep. No. 95-595, 1st Sess. 405 (1977) ("Subdivision (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case"); *see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) ("[A] debtor has the absolute right to convert [its] Chapter 11 case to a Chapter 7 case"). There are only three circumstances where a debtor is precluded from exercising that right: (i) the debtor is not a debtor in possession; (ii) the case was originally commenced as an involuntary case under chapter 11; or (iii) the case was converted to a case under chapter 11 other than at the debtor's request. 11 U.S.C. § 1112(a).

A000893

None of those exceptions is applicable in these Chapter 11 Cases. Therefore, the Debtors are entitled, as an absolute right, to convert the Chapter 11 Cases to cases under chapter 7.

38. In addition, conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates and creditors. The Debtors no longer have funding to administer these Chapter 11 Cases. Thus, although there is substantial inventory and equipment remaining in the Debtors' stores and distribution centers and other estate assets that may be available to satisfy certain creditor claims, without an ability to fund ongoing administrative expenses, the Debtors have no ability to pursue the recovery of those assets or prosecute a chapter 11 plan. Accordingly, the Debtors believe there is no reasonable likelihood that the Debtors could confirm and consummate a chapter 11 plan, and respectfully submit that a chapter 7 trustee will be able to more efficiently and effectively bring these cases to their conclusion.

39. Accordingly, the Debtors respectfully request that the Court enter an order converting the Debtors' cases from chapter 11 to chapter 7, effective as of the Conversion Date.

**B.      The Conversion Procedures and Other Related Relief Should Be Approved**

40. Pursuant to Local Rule 2002-1(f)(xi), "[u]pon conversion of a chapter 11 case to a chapter 7 case, if there are more than 200 creditors, the claims agent appointed in the chapter 11 case shall . . . submit a termination order." Del. Bankr. L.R. 2002-1(f)(xi).

41. Accordingly, the Debtor requests that the conversion order sought hereby also provides for the termination of KCC services as claims and noticing agent in these Chapter 11 Cases.

42. The Debtor also believes that the Conversion Procedures are appropriate under the facts of this case and should be approved. The Conversion Procedures include, among other things, a request to extend the deadline under Bankruptcy Rule 1019(1)(A) for the filing of any statements

A000894

and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) from fourteen (14) days after the Conversion Date to forty-two days (42) after the Conversion Date.

43. The Court has authority to grant the requested extension under Bankruptcy Rules 1007(c) and 9006(b) and Bankruptcy Local Rule 1007-1(b). Bankruptcy Rule 1007(c), together with Bankruptcy Rule 9006(b), allows the Court to extend the filing deadline for the Schedules and Statements "for cause shown." Similarly, Bankruptcy Local Rule 1007-1(b) provides that such an extension may be granted for cause. Showing "cause" merely requires that a debtor "demonstrate some justification for the issuance of the order," and bankruptcy courts will normally grant such extensions "in the absence of bad faith or prejudice to the adverse party." *See, e.g., Bryant v. Smith,* 165 B.R. 176, 182 (W.D. Va. 1994) (discussing the standard for granting extensions under Bankruptcy Rule 1007) (internal citations and quotation marks omitted).

44. Because of the COVID-19 pandemic and other extremely difficult circumstances that have defined these Chapter 11 Cases, the Debtors and their advisors have had virtually no free time or resources available since he Petition Date to devote to the preparation of schedules and statements required by Bankruptcy Rules 1019(1)(A) and 1007(b). Given the extent of work that remains to be done and the extremely limited resources remaining with which to undertake such work, which conditions both exist through no fault of the Debtors and their advisors, the Debtors' respectfully submit that "cause" exists to extend this deadline. Moreover, since these proceedings are still in their very early stages, the granting of such an extension is unlikely to prejudice the trustee, any creditor or any other party in interest.

## <u>NOTICE</u>

45. Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of Delaware; (ii) proposed counsel for the Committee; (iii) the agents under the Debtors' prepetition

secured facilities and counsel thereto; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. A copy of this Motion is also available on the website of the Debtors' notice and claims agent at https://www.kccllc.net/artvan. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## RESERVATION OF RIGHTS

46.     The Debtors understand that employee payroll, the Carve Out and all other obligations that are required to be funded and paid under the Interim CC Order, including without limitation Paragraph 2 thereof, have been or will be funded and paid prior to the Conversion Date. Nevertheless, in the event that such obligations are not funded and paid as required under the Interim CC Order, the Debtors reserve all rights for themselves and their estates, including but not limited to any chapter 7 trustee that may hereafter be appointed.

13308537 v1

A000896

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other relief as is appropriate under the circumstances.

Dated: April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
mbarrie@beneschlaw.com
jhoover@beneschlaw.com
kcapuzzi@beneschlaw.com
kharmon@beneschlaw.com
jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

13308537 v1

A000897

# Exhibit A

A000898

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. _____** |
| | ) | |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

A000899

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED, as set forth herein.

2.      Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.      The following Conversion Procedures are hereby approved:

    a.    **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

    b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

    c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

    d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

    e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

    f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4.    Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5.    Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting*

A000901

*Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.     Except as expressly provided in Paragraph 5 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order).

7.     For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or

A000902

(ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

8.     Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

9.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

A000903

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline: At the Hearing** |
| | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET) (requested)** |
| | ) | |

## NOTICE OF VIDEO AND TELEPHONIC HEARING REGARDING DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING <u>A HEARING THEREON, AND (III) GRANTING RELATED RELIEF</u>

**PLEASE TAKE NOTICE** that on April 3, 2020, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed the *Debtors <u>Corrected</u> Motion for Entry of an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the "<u>Motion</u>") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "<u>Bankruptcy Court</u>"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on **April 6, 2020 at 1:00 p.m. (ET)**, before the Honorable Chief Judge Christopher S. Sontchi via video and telephonic conference.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

PLEASE TAKE FURTHER NOTICE THAT THE HEARING IS PROCEEDING VIA ZOOM USING THE FOLLOWING INSTRUCTIONS:

> **Topic: Art Van Furniture 20-10553 - Hearing**
> **Time: Apr 6, 2020 1:00 PM Eastern Time (US and Canada)**
> **Join Zoom Meeting**
> **https://uchicago.zoom.us/j/911880719**
> **Meeting ID: 911 880 719**

DO NOT COME TO THE COURTHOUSE. ANY PARTY WHO WISHES TO PRESENT EVIDENCE OR EXAMINE WITNESSES IS REQUIRED TO ACCESS VIA ZOOM. ANY PARTY WHO WISHES TO ACCESS VIA ZOOM MUST ALSO MAKE AUDIO ARRANGEMENTS THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).

OTHER PARTIES IN INTEREST MAY MAKE ARRANGEMENTS TO PARTICIPATE BY TELEPHONE AT THE HEARING THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).

PLEASE TAKE FURTHER NOTICE THAT, IF NO RESPONSES OR OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

A000905

Dated: April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**

_/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        kharmon@beneschlaw.com
        jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in
Possession_

3

A000906

# EXHIBIT I

A000907

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING
A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an interim order (the "Interim Order"), substantially in

the form attached hereto, and a final order (the "Final Order"), *inter alia*:  (a) authorizing the

Debtors' use of Cash Collateral (as defined below); (b) granting adequate protection to the

Prepetition Secured Parties (as defined below) for any diminution in value of their interests in the

Prepetition Collateral (as defined below), including Cash Collateral; and (c) vacating and

modifying the automatic stay solely to the extent necessary to implement and effectuate the terms

and provisions of the Interim Order.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A000908

2. In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

3. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105, 361, 362, 363, 503, 506, 507 and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 4001 and 9014, and Bankruptcy Local Rules 4401-2 and 9013.1(m).

## Background

6. The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture. The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL")

2

A000909

in March 2017.  Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.  As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia. The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

7.      On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**Statement of the Material Terms of the Interim Order**

8.      Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Bankruptcy Local Rule 4001-2(a)(i) and (ii), the following is a concise statement and summary of the material terms of the Interim Order (collectively, the "Highlighted Provisions"):

3

A000910

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Entities with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(i)* | The Prepetition ABL Parties[2] and the Prepetition Term Loan Parties[3] (collectively, the "<u>Prepetition Secured Parties</u>") | ¶¶ F & H |
| **Purposed Use of Cash Collateral**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors seek authority to use Cash Collateral to:<br><br>(i) finance their working capital needs and for any other general corporate purposes; and (ii) pay related transaction costs, fees, liabilities and expenses (including all professional fees and expenses) and other administration costs incurred in connection with and for the benefit of these chapter 11 cases, in each case solely to the extent consistent with the Budget (as defined below) and the Interim Order. | ¶ 2 |
| **Budget and Variance Reporting**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | <u>Budget</u>: The use of Cash Collateral for the first thirteen-week period from the Petition Date shall be in accordance with the budget (the "<u>Budget</u>"), which Budget shall be updated, modified, or supplemented by the Debtors not less than one time in each four-week period. | ¶ 11 |
|  | <u>Budget Compliance</u>: The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts (as defined in the Interim Order) for any rolling four-week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements (as defined in the Interim Order) for any rolling four-week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements (as defined in the Interim Order) for any rolling four-week period to exceed 110% of the aggregate Operating | ¶ 12(a) |

---

[2] The "Prepetition ABL Parties" are Wells Fargo Bank, National Association, as administrative agent, issue bank, and collateral agent (in such capacity, the "<u>Prepetition ABL Agent</u>") and the lenders party to the Prepetition ABL Agreement (as defined in the Interim Order).

[3] The "Prepetition Term Loan Parties" are Virtus Group, LP, as administrative agent and collateral agent and the lenders party to the Prepetition Term Loan Agreement (as defined in the Interim Order).

A000911

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements (as defined in the Interim Order) for any rolling four week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the Budget for such period (with any unspent amounts in the subparagraph (iv) being carried forward for subsequent periods). | |
| **Duration of Use of Cash Collateral/ Events of Default/ Rights and Remedies Upon Event of Default** | Specified Period:  The Debtors are authorized to use Cash Collateral for the period from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date (as defined in the Interim Order), (b) thirty (30) days after the Petition Date, and (c) entry of the Final Order; provided, however, that, during the Remedies Notice Period (as defined in the Interim Order) the Debtors may use Cash Collateral for certain specified purposes. | ¶ 2 |
| | Events of Default:  The occurrence of any of the following events, unless consented to or waived by the Prepetition Agents in advance in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "Events of Default"):

(a)      the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order (including, without limitation, the Covenants in paragraph 12 of the Interim Order);

(b)      the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c)      (i) the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

(d)      the filing of a motion or any plan of reorganization or disclosure statement attendant | ¶ 20 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to the Interim Order; (ii) to grant any lien other than Permitted Prior Liens (as defined in the Interim Order) upon or affecting any Postpetition Collateral(as defined in the Interim Order); or (iii) except as provided in the Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code; | |
| | (e)  (i) the filing of any Prohibited Plan (as defined in the Interim Order) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors), or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan; | |
| | (f)  the entry of an order in any of the cases confirming a Prohibited Plan; | |
| | (g)  the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to the Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect; | |
| | (h)  the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by the Interim Order; | |
| | (i)  the appointment of an interim or permanent trustee in the cases, the appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a | |

6

A000913

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | trustee receiver or an examiner in the cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;<br><br>(j)  the filing of a motion to approve a Prohibited Sale (as defined in the Interim Order) or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI (as those terms are defined in the Interim Order);<br><br>(k)  the dismissal of any case, or the conversion of any case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the cases to Chapter 7 of the Bankruptcy Code;<br><br>(l)  the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor Agreement (as defined in the Interim Order), the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (iii) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of [$250,000] or more;<br><br>(m)  the existence of any claim or charges, or the entry of any order of the Court authorizing any | |

7

A000914

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | claims or charges entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under the Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted in the Interim Order, except, in each case, as expressly provided in the Interim Order; | |
| | (n) the filing of a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction; | |
| | (o) any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations; | |
| | (p) any Debtor shall challenge, support or encourage the challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations; | |
| | (q) the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in the Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code; | |
| | (r) any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to | |

8

A000915

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA (as defined in the Interim Order), with respect to Postpetition Collateral or Prepetition Collateral having a value in excess of [$250,000] outside the ordinary course of business and not otherwise permitted under the Interim Order;<br><br>(s)    any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders as approved by the Prepetition Agents in writing (provided that the Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by the Interim Order;<br><br>(t)    any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under paragraph 20 of the Interim Order;<br><br>(u)    the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.<br><br>Rights and Remedies Upon Entry of Default: Immediately upon the occurrence and during the continuation of an Event of Default, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or | ¶ 21 |

9

A000916

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | the Prepetition Term Loan Agent, as applicable, shall be referred to as a "<u>Termination Declaration</u>") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out (as defined in the Interim Order) has occurred through the delivery of the Carve Out Trigger Notice (as defined in the Interim Order); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restrict on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to as the "<u>Termination Date</u>").  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee.  The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "<u>Remedies Notice Period</u>"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and the Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable).  During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court.  Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the | |

13144876 v3

A000917

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Prepetition ABL Parties shall be permitted to exercise all remedies set forth in the Interim Order, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and the Interim Order.  Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process. | |
| **Proposed Adequate Protection**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(iv)*<br><br>*Local Rule 4001-2(a)(ii)* | The Prepetition Secured Parties shall be granted, to the extent of any diminution in value of its interests in the Prepetition Collateral from and after the Petition Date, the following:<br><br>Adequate Protection Liens.<br>(a)   Prepetition ABL Adequate Protection Liens. Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition ABL Adequate Protection Liens") on any Postpetition Collateral.<br><br>(b)   Prepetition Term Loan Adequate Protection Liens.  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the | ¶¶ 3, 5, 7-8<br><br><br><br><br>¶ 3(a)-(b) |

11

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Prepetition Term Loan Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens") on the Postpetition Collateral. | |
| | Adequate Protection Superpriority Claims. | ¶ 5(a)-(b) |
| | (a)    Prepetition ABL Superpriority Claim.  As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition ABL Superpriority Claim"). | |
| | (b)    Prepetition Term Loan Superpriority Claim.  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition Term Loan Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims"). | |

12

A000919

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
|  | Adequate Protection Payments and Protections for Prepetition ABL Parties.  As further adequate protection, the Debtors are authorized and directed to pay in cash the following:  (a) all principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 of the Interim Order), (b) immediately upon entry of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) om accordance with paragraph 22 of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e)the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI.  In addition, immediately upon the payment in full in cash of the Prepetition ABL Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted),  the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure | ¶ 7 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 of the Interim Order, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 of the Interim Order. The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of the funds on deposit in the Prepetition ABL Indemnity Reserve. The Prepetition ABL Indemnity Reserve shall be released at such time as the Prepetition ABL Indemnity | |

14

A000921

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Obligations are Paid in Full.<br><br>Adequate Protection Payments and Protections for Prepetition Term Loan Agent. As further adequate protection, the Debtors are authorized and directed to pay in cash the following: (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph 22 of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided, however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral. | ¶ 8 |
| **Liens on Chapter 5 Actions**<br><br>*Local Rule 4001-2(a)(i)(D)* | Subject to the entry of the Final Order, the Adequate Protection Liens include the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents. | ¶ 3(a)-(b) |

A000922

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Carve Out**<br><br>*Local Rule 4001-2(a)(i)(F)* | The "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve Out</u>"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") (such fees and expenses, the "<u>Allowed Professional Fees</u>") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined in the Interim Order), provided that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "<u>ABL Professional Fee Cap</u>"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[500,000] incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "<u>Post Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the | ¶ 24 |

13144876 v3

A000923

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | continuation of an Event of Default (as defined above), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week). | |
| **Cross Collateralization** *Local Rule 4001-2(a)(i)(A)* | None, other than replacement liens as adequate protection. | N/A |
| **Findings Regarding Validity/ Perfection/ Amount** *Local Rule 4001-2(a)(i)(B)* | As set forth in the Interim Order, the Debtors have acknowledged and agreed as set forth therein, to the validity, perfection, priority, amount and enforceability of the Prepetition Secured Obligations, without prejudice to any other party's rights to assert claims, counterclaims or causes of actions, objections, contests or defenses prior to the expiration of the Challenge Period (as defined below). | ¶¶ F, 27 |
| **Challenge Period** *Local Rule 4001-2(a)(i)(B)* | The "Challenge Period" is (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline. | ¶ 27 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **506(c) Waiver**<br><br>*Local Rule 4001-2(a)(i)(C)* | Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties. | ¶ 29 |
| **552(b) Wavier**<br><br>*Local Rule 4001-2(a)(i)(H)* | Subject to entry of the Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral. | ¶ 31 |
| **Releases**<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated under the Interim Order or thereunder occurring prior to the entry of the Interim Order including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, | ¶ F(x) |

18

A000925

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering the Interim Order. | |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt**<br><br>*Local Rule 4001-2(a)(i)(E)* | None. | N/A |
| **Non-Consensual Priming**<br><br>*Local Rule 4001-2(a)(i)(G)* | None. | N/A |

## **Basis for Relief**

**I.     The Debtors' Request to Use Cash Collateral and Proposed Adequate Protection are Appropriate**

10.     The Debtors' use of property of their estates, including Cash Collateral, is governed by section 363 of the Bankruptcy Code.[4]  Pursuant to section 363(c)(2) of the Bankruptcy Code, a

---

[4] The Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as

13144876 v3

A000926

debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

11.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. 11 U.S.C. § 363(e). Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Satcon Tech. Corp.*, No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 COLLIER ON BANKRUPTCY ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry left to the vagaries of each case . . . ") (citation and quotation omitted).

12.     The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re*

---

provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

A000927

*Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

### A. The Proposed Adequate Protection for the Prepetition Secured Parties is Sufficient

13. As set forth in the Interim Order and described above in the Highlighted Provisions, the Debtors propose to provide the Prepetition Secured Parties with various forms of Adequate Protection. The Debtors respectfully submit that, in light of the circumstances of these chapter 11 cases, the proposed Adequate Protection is appropriate and sufficient to protect the Prepetition Secured Parties from any diminution in value to the Collateral during the Specified Period. In particular, the Cash Collateral will be used to sustain the Debtors' business operations, allowing for the maximization of the value of the Debtors' estates, specifically the arms' length negotiated terms to protect the Debtors' customer programs. If Cash Collateral is not available for this purpose, the Debtors will be unable to fund payroll obligations, procure goods and services from vendors or otherwise maintain their operations and service their customers, thereby dissipating value to the detriment of the Prepetition Secured Parties and other stakeholders. The use of the Cash Collateral will therefore protect the Prepetition Secured Parties' security interests by preserving the value of their collateral. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (evaluating "whether the value of the debtor's property will increase as a result of the" use of collateral in determining sufficiency of adequate protection); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream,"

21

A000928

provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (observing that debtor's use of rents to maintain and operate property "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the secured lender's] mortgage").

14.     In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate. Thus, the Debtors' proposed Adequate Protection not only is necessary to protect the Prepetition Secured Parties against any diminution in value, but also is fair and appropriate on an interim basis under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using Cash Collateral in the near term, for the benefit of their estates and all parties in interest.

## II.     Failure to Obtain Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm

15.     Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Fed. R. Bankr. P. 4001(b)(2). However, the Court is authorized to conduct a preliminary expedited hearing on the Motion and authorize the Debtors' proposed use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  *Id.*

16.     The Debtors has an immediate postpetition need to use Cash Collateral.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash. The Debtors will use cash to, among other things, continue operating their business and satisfy other working capital needs during the chapter 11 cases, including, among other things, to fund their customer programs. The Debtors believe that all or substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral, as that term is

used by section 363(c) of the Bankruptcy Code. The Debtors therefore will be unable to proceed with operating their business without the ability to use Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral is vital to the preservation and maintenance of the value of the Debtors' estates.

17.    The Debtors, therefore, seek immediate authority to use the Cash Collateral on an interim basis and as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b)(2). Accordingly, to the extent that the Debtors require the use of Cash Collateral, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001(b)(2) to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

### III.    <u>Modification of the Automatic Stay is Appropriate</u>

18.    The Interim Order and Final Order (together, the "<u>Cash Collateral Orders</u>") contemplate a modification of the automatic stay (to the extent applicable) as necessary to, *inter alia*, permit the Debtors to: (a) grant the security interests, liens and superpriority claims described above, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; and (b) authorize the Debtors to make certain payments in accordance with the terms of the Cash Collateral Orders.  In addition, the Cash Collateral Orders provide for modification of the automatic stay to allow the Prepetition Secured Partiers to exercise remedies upon the occurrence and during the continuance of an Event of Default, and after the giving of five (5) business days' prior written notice to the Debtors.

A000930

19.     Stay modification provisions of this kind are ordinary and standard terms of postpetition use by debtors-in-possession of prepetition collateral, and, in the Debtors' business judgment, are reasonable under the present circumstances. *See, e.g., In re Open Road Films, LLC*, Case No. 18-12012 (LSS) [Docket No. 51] (Bankr. D. Del. September 7, 2018) (terminating automatic stay after occurrence of termination event and applicable notice*); In re RM Holdco LLC*, Case No. 18-11795 (MFW) [Docket No. 53] (Bankr. D. Del. August 7, 2018) (same); *In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG) [Docket No. 46] (Bankr. D. Del. July 31, 2018) (same); *In re EBH Topco, LLC*, Case No. 18-11212 (BLS) [Docket No. 55] (Bankr. D. Del. May 24, 2018) (same); *In re Gibson Brands, Inc.*, Case No. 18-11025 (CSS) [Docket No. 71] (Bankr. D. Del. May 2, 2018) (same); *In re Appvion, Inc.*, Case No. 17-12082 (KJC) [Docket No. 75] (Bankr. D. Del. October 5, 2017).  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Cash Collateral Orders.

### Request for Final Hearing

20.     Pursuant to Bankruptcy Rule 400l(b)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days of the Petition Date and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

24.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to use Cash Collateral and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would

24

A000931

severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

25. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

26. Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's Interim Order and Final Order is not intended and should not be construed as an admission as to the validity,

A000932

priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### Notice

27.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

28.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

A000933

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, and based on the record of the Chapter 11 Case, the Debtors respectfully request that this Court (a) enter the Cash Collateral Orders (i) authorizing the Debtors to use Cash Collateral on an interim and final basis subject to the terms and conditions set forth therein; (ii) granting adequate protection to the Prepetition Secured Parties to the extent set forth in the Cash Collateral Orders; (iii) scheduling the Final Hearing, pursuant to the Interim Order, within approximately thirty-five (35) days of the commencement of the chapter 11 cases, to consider approval of this Motion on a final basis; and (iv) granting related relief; and (b) grant the Debtors such other and further relief as may be just and proper.

Dated:  March 8, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
          mbarrie@beneschlaw.com
          jhoover@beneschlaw.com
          kcapuzzi@beneschlaw.com
          jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

A000934

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of (a) AVF Parent, LLC (the "Borrower"), and

(b) AVF Holdings II, LLC, Art Van Furniture, LLC, Art Van Furniture of Canada, LLC, AV Pure

Sleep Franchising, LLC, AVCE, LLC, AVF Franchising, LLC, AVF Holding Company, Inc., AVF

Holdings I, LLC, Levin Parent, LLC, LF Trucking, Inc., Comfort Mattress, LLC and Sam Levin,

Inc., each as a debtor and debtor in possession (collectively, with the Borrower, the "Debtors") in

the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this

"Interim Order") pursuant to sections 105, 361, 362, 363 and 507 of chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

A000935

(i)      authorizing the Debtors to use the Prepetition Collateral (as defined herein), including all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value, including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and, in the case of the Prepetition Secured Parties, the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("Diminution in Value");

(ii)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(iii)    scheduling a final hearing (the "Final Hearing") within 30 days of the Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* and the evidence submitted and argument made at the interim hearing held on March [__], 2020 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Interim Hearing having

2

A000936

been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

      A.    **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

      B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A000937

U.S.C. §§ 1408 and 1409.

D.    **Committee Formation**. As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.    **Notice**. Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.    **Debtors' Stipulations**. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 27 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i)    *Prepetition ABL Facility*. Pursuant to that certain *ABL Credit Agreement* dated as of March 1, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) the Borrower (the "Prepetition ABL Borrower"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors"), (c) Wells Fargo Bank, National Association, as administrative agent, issuing bank and collateral agent (in such capacity, the "Prepetition ABL Agent"), and (d) the lenders party

4

A000938

thereto (collectively, including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and the Prepetition ABL Lenders and the Prepetition ABL Agent, together, the "Prepetition ABL Parties"), the Prepetition ABL Lenders provided revolving credit, term loans and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility") in an aggregate principal amount of up to $82,500,000.

> (ii)     *Prepetition ABL Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than approximately $33,573,784.18, inclusive of not less than $14,900,000 of issued and outstanding letters of credit and the Early Termination Premium as defined in the Prepetition ABL Documents (collectively, together with accrued and unpaid interest, bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors' obligations pursuant to, or secured by, the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations").

> (iii)     *Prepetition ABL Liens and Prepetition ABL Priority Collateral*.  As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition

5

A000939

ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, security interests in and continuing liens on (the "Prepetition ABL Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain Intercreditor Agreement referred to in paragraph F(vii) below) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) and proceeds, products, and rents of any of the foregoing (collectively, the "Prepetition Term Priority Collateral," and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral"), subject only to the liens of the Prepetition Term Loan Agent on the Prepetition Term Priority Collateral and Prepetition ABL Permitted Prior Liens (as defined herein).

(iv)    *Prepetition Term Loan Facility*.  Pursuant to that certain Credit Agreement dated as of March 1, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Agreement," and collectively with the Loan Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Documents," and together with the Prepetition ABL Documents, the "Prepetition Documents"), among (a) the Borrower (the "Prepetition Term Loan Borrower" and together with the Prepetition ABL Borrower, the "Prepetition Borrowers"), (b) Virtus Group, LP, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent," and together with the

A000940

Prepetition ABL Agent, the "Prepetition Agents"), (c) the guarantors thereunder (the "Prepetition Term Loan Guarantors" and, together with the Prepetition ABL Guarantors, the "Prepetition Guarantors"), and (d) the lenders party thereto (the "Prepetition Term Loan Lenders," and collectively, including the Prepetition Term Loan Agent, the "Prepetition Term Loan Parties," and together with the Prepetition ABL Parties, the "Prepetition Secured Parties"), the Prepetition Term Loan Lenders provided term loans to the Prepetition Term Loan Borrower (the "Prepetition Term Loan Facility," and together with the Prepetition ABL Facility, the "Prepetition Secured Facilities") in an aggregate principal amount of $100,000,000.

(v)     *Prepetition Term Loan Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was not less than approximately $175,000,000 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements reimbursable thereunder), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrower's and the Prepetition Term Loan Guarantors' obligations pursuant to, or secured by, the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Term Loan Obligations," and together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations").

(vi)     *Prepetition Term Loan Liens and Prepetition Term Priority Collateral*.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition

7

Date, the Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, security interests in and continuing liens on (the "Prepetition Term Loan Liens," and together with the Prepetition ABL Liens, the "Prepetition Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to the liens of the Prepetition ABL Agent on the Prepetition ABL Priority Collateral and Prepetition Term Loan Permitted Prior Liens (as defined herein).

(vii) *Priority of Prepetition Liens; Intercreditor Agreement.* The Prepetition Agents entered into that certain Intercreditor Agreement dated as of March 1, 2017 (as may be further amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other obligors. Each of the Prepetition Borrowers and Prepetition Guarantors under the Prepetition Documents acknowledged and agreed to the Intercreditor Agreement.

(viii) *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and

A000942

senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition ABL Documents (the "Prepetition ABL Permitted Prior Liens"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition ABL Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix) *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.* The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Loan Liens on the Prepetition Collateral were valid,

9

A000943

binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Term Loan Documents (the "Prepetition Term Loan Permitted Prior Liens" and, together with the Prepetition ABL Permitted Prior Liens, the "Permitted Prior Liens");[4] (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Parties, or any of their

---

[4] For the avoidance of doubt, as used in this Interim Order, no reference to the Prepetition ABL Permitted Prior Liens, the Prepetition Term Loan Permitted Prior Liens, or the Permitted Prior Liens shall refer to or include the Prepetition ABL Liens or the Prepetition Term Loan Liens.

13167798 v1

A000944

respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x) *Release*. The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Interim Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against

11

the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order.

(xi) *Default by the Debtors.* The Debtors acknowledge and stipulate that (i) they have been, since February 5, 2020, and are in default of their obligations under the Prepetition ABL Documents, and that an Event of Default has occurred under the Prepetition ABL Documents, and that since February 5, 2020, interest has accrued, and will continue to accrue, on the Prepetition ABL Obligations at the default rate set forth in the Prepetition ABL Agreement, and (ii) they have been, since February 29, 2020, and are in default of the obligations under the Prepetition Term Loan Documents, and that a Default has occurred under the Prepetition Term Loan Documents, and that as of the Petition Date, interest will accrue, on the Prepetition Term Loan Obligations at the default rate set forth in the Prepetition Term Loan Documents.

(xii) *Consulting Agreement with the Liquidators.* Pursuant to that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020, by and among Hilco Merchant Resources, LLC, Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC, Gordon Brothers Retail Partners, LLC, DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC and Gordon Brothers Brands, LLC and certain of the Debtors, acknowledged by the Prepetition Agents (as amended, restated or otherwise modified from time to time, the "Consulting Agreement"), the Debtors have retained the Consultant to conduct "Going Out of Business" sales of the Assets (each as defined in the Consulting Agreement). The continued existence and validity of the Consulting Agreement and the uninterrupted continuation of the sales contemplated thereby is a condition to the consent of the Prepetition Agents to this Interim Order and the Debtors' use of Cash Collateral hereunder.

G.  Levin DIP Facility. [Insert description of Levin DIP motion/relief, to be referenced as the "<u>Levin DIP Facility</u>."].  The Prepetition Agents have consented to the Levin DIP Facility (in accordance with the Levin DIP Order and Levin DIP Documents, in form and substance reasonably acceptable to the Prepetition Agents), and the Debtors' compliance with, and the obligations incurred under, the Levin DIP Facility (in accordance with the Levin DIP Order and Levin DIP Documents, in form and substance reasonably acceptable to the Prepetition Agents) shall not give rise to an Event of Default under this Interim Order.

H.  **Permitted Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien, rather, any such alleged claim arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claims had on the Petition Date.

I.  **Cash Collateral**.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

J.  **Adequate Protection**.  The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, are each entitled to receive adequate protection as set

13167798 v1

A000947

forth herein to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral.

K.  **Sections 506(c) and 552(b).**  In light of: (i) the Prepetition ABL Parties' agreement that their liens shall be subject to the Carve Out and, in the case of the Prepetition Term Priority Collateral, subordinate to the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens; (ii) the Prepetition Term Loan Parties' agreement that their liens shall be subject to the Carve Out and, in the case of the Prepetition ABL Priority Collateral, subordinate to the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens; and (iii) the payment of claims and/or expenses as set forth in the Budget (as defined herein) to the extent approved by the Court in connection with the Debtors' "first day motions," subject to entry of a Final Order, the Prepetition Secured Parties are each entitled to (a) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

L.  **Good Faith**.  The Prepetition Secured Parties and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (defined below). The Prepetition Secured Parties have agreed to permit the Debtors to use their Cash Collateral for the Specified Period, subject to the terms and conditions set forth herein, which terms and conditions are fair and reasonable and have been stipulated to by the Debtors in the exercise of their sound business judgment.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

M.  **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

A000948

N. **Interim Hearing**. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); (vi) counsel to Levin Furniture, LLC and Levin Trucking, LLC, and (vii) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules. The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1. <u>Motion Granted</u>. The Motion is granted, subject to the terms and conditions set forth in this Interim Order. The Debtors shall not use Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2. <u>Authorization to Use Cash Collateral</u>. Subject to the terms and conditions of this Interim Order, and in accordance with the Budget, subject to such variances as are permitted by this Interim Order, the Debtors are authorized to use Cash Collateral for the period (the "<u>Specified Period</u>") from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date, (b) thirty (30) days after the Petition Date and (c) entry of the Final Order;

15

A000949

*provided, however*, that, during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget and as otherwise agreed to by the Prepetition ABL Agent in its sole discretion. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any use of Cash Collateral or proceeds resulting therefrom, except (x) as permitted in the Consulting Agreement or the Levin APA (as defined below), (y) as otherwise consented to by the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral) in writing, or (z) as otherwise disposed of, or used, in accordance with the Budget, subject to such variances as are permitted by this Interim Order.

      3.    <u>Adequate Protection Liens</u>.

      (a)    *Prepetition ABL Adequate Protection Liens*. Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition ABL Adequate Protection Liens</u>") on any Postpetition Collateral.[5]

---

[5] "Postpetition Collateral" means: all personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the

A000950

(b)   *Prepetition Term Loan Adequate Protection Liens*.  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens") on the Postpetition Collateral.

4.      Priority of Adequate Protection Liens.

(a)     The Prepetition ABL Adequate Protection Liens shall be senior to

---

payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) subject to entry of a Final Order, proceeds of the Debtors' rights under section 506(c) (solely to the extent such rights result from the use of Postpetition Collateral, and are, therefore, enforceable against parties other than the Prepetition Agents or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (e) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date.  Notwithstanding the foregoing, Postpetition Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases).  Postpetition Collateral that is (i) Prepetition ABL Priority Collateral, (ii) of a type that would be Prepetition ABL Priority Collateral; (iii) of a type that would be Prepetition ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (iv) the "Deposit", as defined in that certain letter agreement dated as of March 4, 2020 by and among Levin Furniture, LLC, Levin Trucking, LLC, as Buyer, and Sam Levin, Inc. and LF Trucking, Inc., as Seller (the "Levin LOI") shall, in each case, constitute "Postpetition ABL Priority Collateral."  Postpetition Collateral that is (i) Prepetition Term Priority Collateral, (ii) of a type that would be Prepetition Term Priority Collateral; and (iii) of a type that would be Prepetition Term Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date shall constitute "Postpetition Term Priority Collateral."  Postpetition Collateral that is (i) the proceeds of the Debtors' real property leases; and (ii) the proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents shall be shared Postpetition Collateral, and the Prepetition ABL Liens and Prepetition Term Loan Liens (and corresponding adequate protection liens and claims) on such proceeds shall rank equally in priority and share such proceeds equally (with 50% of such proceeds applied to the Prepetitition ABL Obligations and 50% applied to the Prepetition Term Loan Obligations).

A000951

all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens and (B) the Prepetition ABL Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, (B) the Prepetition Term Loan Liens, (C) the Prepetition Term Loan Adequate Protection Liens, and (D) the Prepetition ABL Liens.

(b) The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens, (B) the Prepetition ABL Liens, (C) the Prepetition ABL Adequate Protection Liens, and (D) the Prepetition Term Loan Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, and (B) the Prepetition Term Loan Liens.

(c) Except as provided herein (including with respect to the Carve Out), the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"), and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of

18

A000952

the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

        5.    <u>Adequate Protection Superpriority Claims</u>.

        (a)    *Prepetition ABL Superpriority Claim*.  As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition ABL Superpriority Claim</u>").

        (b)    *Prepetition Term Loan Superpriority Claim*.  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition Term Loan Superpriority Claim</u>," and together with the Prepetition ABL Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>").

        6.    <u>Priority of the Adequate Protection Superpriority Claims</u>.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b),

507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114

of the Bankruptcy Code.  The Adequate Protection Superpriority Claims shall be subject to the

Carve Out and shall be subject to the following priorities:  (a) with respect to Postpetition ABL

Priority Collateral, (1) the Prepetition ABL Superpriority Claim and (2) the Prepetition Term Loan

Superpriority Claim; and (b) with respect to Postpetition Term Priority Collateral, (1) the

Prepetition Term Loan Superpriority Claim and (2) the Prepetition ABL Superpriority Claim.

       7.    <u>Adequate Protection Payments and Protections for Prepetition ABL Parties</u>.

As further adequate protection, the Debtors are authorized and directed to pay in cash the

following: (a) all principal and interest at the default rate due under the Prepetition ABL

Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 below, (b)

immediately upon entry of this Interim Order, the reasonable and documented fees, out-of-pocket

fees and expenses, and disbursements (including the reasonable and documented fees, out-of-

pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party

consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition

Date and reimbursable under the Prepetition ABL Documents, (c) in accordance with paragraph

22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and

disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses,

and disbursements of counsel, financial advisors, auditors, third-party consultants, and other

vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date

reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in

accordance with the Budget, and (e) the Prepetition ABL Obligations with the Deposit (as defined

in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of

the Levin LOI.  In addition, immediately upon the payment in full in cash of the Prepetition ABL

A000954

Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 below, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such

A000955

indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 hereof. The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of funds on deposit in the Prepetition ABL Indemnity Reserve. The Prepetition ABL Indemnity Reserve shall be released at such time as the Prepetition ABL Indemnity Obligations are Paid in Full.[6]

> 8. <u>Adequate Protection Payments and Protections for Prepetition Term Loan Agent</u>. As further adequate protection, the Debtors are authorized and directed to pay in cash the following: (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility. No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Prepetition ABL Obligations (i) the Challenge Deadline (as defined in paragraph 27 of this Interim Order) shall have occurred without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge; and (c) the Prepetition ABL Agent has received (i) a countersigned payoff letter in form and substance satisfactory to the Prepetition ABL Agent and (ii) releases in form and substance satisfactory to the Prepetition ABL Agent in its sole discretion.

A000956

22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided*, *however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral.

9.　　Perfection of Adequate Protection Liens.　This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Parties to the priorities granted herein.　Notwithstanding the foregoing, each Prepetition Agent is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Adequate Protection Liens.　The Debtors are authorized and directed to execute and deliver promptly upon demand to the Prepetition　Agents, as applicable,

A000957

all such financing statements, mortgages, notices, and other documents as the Prepetition Agents may reasonably request. Each Prepetition Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

10.  **Adequate Protection Reservation**.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

11.  **Budget**.  The use of Cash Collateral during the Specified Period is permitted solely in accordance with a cash collateral budget (the "Budget") approved by the Prepetition Agents,[7] each in their sole discretion, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.  A copy of the initial approved Budget is attached hereto as Exhibit [_].  The Budget shall depict, on a weekly basis and line item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals

---

[7] For the avoidance of doubt, any reference to the consent rights of the Prepetition Term Loan Agent shall mean the Prepetition Term Loan Agent acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Agreement).

24

A000958

and advisors), asset sales and any other fees and expenses), and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date, and such initial Budget shall be approved by, and in form and substance satisfactory to the Prepetition Agents, each in their sole discretion (it being acknowledged and agreed that the initial Budget attached hereto is approved by and satisfactory to the Prepetition Agents). The Budget shall be updated, modified, or supplemented by the Debtors with the written consent of the Prepetition Agents, but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Prepetition Agents, each in their sole discretion), and no such updated, modified, or supplemented budget shall be effective until so approved, and once so approved shall be deemed the Budget; *provided, however*, that in the event the Prepetition Agents, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the Debtors shall continue to operate under the most recent prior-approved Budget and such disagreement shall give rise to an Event of Default once the period covered by such prior Budget has terminated. Each Budget delivered to the Prepetition Agents shall be accompanied by such customary supporting documentation as reasonably requested by the Prepetition Agents and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable at the time of delivery. A copy of any Budget (or updated Budget once approved by the Prepetition Agents) shall simultaneously be delivered to the counsel for a Committee (if appointed), and the U.S. Trustee. All Cash Collateral use must be strictly in accordance with the terms of the Budget, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.

12. <u>Covenants</u>.

(a) *Budget Compliance*. The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts for any rolling two week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements for any rolling two week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Operating Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the Budget for such period (with any unspent amounts in this subparagraph (iv) being carried forward for subsequent periods).

(b) *Borrowing Base*. Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall at all times maintain actual Total Excess ABL Availability After Covenant (calculated in the manner set forth in the Borrowing Base Certificate attached to the Budget) in an amount not less than $0, it being understood and agreed that the Availability Block set forth in the Borrowing Base Certificate attached to the Budget shall be deemed to be $5,000,000 for each of the weeks beginning March 8, 2020 and March 15, 2020. Until the Prepetition ABL Obligations are Paid in Full, the Borrowing Base Certificate shall be updated and delivered weekly in accordance with the requirements of an "Increased Reporting Event" as defined in the Prepetition ABL Agreement. For the avoidance of doubt, the calculation of the Borrowing Base shall at all times deduct the amount of the Carve Out Reserves. Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall deliver to the Prepetition Agents, by not later than Thursday of each week, an updated Borrowing Base Certificate, substantially in the form attached hereto as Exhibit

A000960

[_] (the "<u>Borrowing Base Certificate</u>"), and such Borrowing Base Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents (it being agreed the detail required by the Prepetition ABL Agreement shall be deemed so satisfactory).

(c)　　*Variance Testing*.　The Debtors shall, commencing with the week beginning March 15, 2020, deliver to the Prepetition Agents, by not later than Thursday of each week, a certificate, substantially in the form attached hereto as Exhibit [_] (the "<u>Budget Variance Certificate</u>") and such Budget Variance Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents, showing a reconciliation for the prior two week cumulative period, and certifying that (i) the Debtors are in compliance with the covenants contained in this Section 12 and (ii) to the knowledge of the Debtors, no Event of Default hereunder has occurred or, if such an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto.

(d)　　*Consent Fee for Prepetition ABL Parties*.　The Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, a consent fee ("<u>Consent Fee</u>") in the amount of $150,000 per week until such time as the Prepetition ABL Obligations have been repaid in full in cash (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents.　The Consent Fee shall be fully earned on Saturday of each week and shall be paid to the Prepetition ABL Agent on the immediately following Tuesday and shall not be subject

27

to refund, offset or rebate under any circumstances.

(e)    *Levin Sale Milestones*.  The Debtors shall achieve each of the following milestones, if and when applicable (as the same may be extended from time to time with the consent of the Prepetition ABL Agent (in its sole discretion), the "Levin Sale Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the Prepetition ABL Agent in all respects:

(i)    On or before the date that is five (5) days following the Petition Date, the Debtors shall file a motion to approve the sale of the "Assets", as such term is defined in the Levin LOI (the "Levin Sale"), to the Buyer under the Levin LOI.

(ii)    On or before the date that is ten (10) days following the Petition Date, the Debtors shall enter into an asset purchase agreement with the Buyer under the Levin LOI for the Levin Sale (the "Levin APA").

(iii)    On or before the date that is twenty-one (21) days following the Petition Date, the Debtors shall receive an order from the Court approving the Levin Sale.

(iv)    On or before the date that is two (2) business days after the order approving the Levin Sale, the Debtor shall have consummated the Levin Sale and the proceeds thereof shall have been applied to the Prepetition ABL Obligations.

13.    Modification of Automatic Stay.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to:  (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the Prepetition ABL Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to

A000962

the Prepetition ABL Parties under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

14. Protections of Rights of Prepetition Secured Parties.

(a) Subject to the Intercreditor Agreement, unless the Prepetition ABL Agent and Prepetition Term Loan Agent have each provided their respective prior written consent, or all Prepetition ABL Obligations and Prepetition Term Loan Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been Paid in Full, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and otherwise shall object to any motion or application seeking entry of, any order (other than this Interim Order or the Final Order, but including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Postpetition Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim Order; (ii) the use of Cash Collateral for any purpose other than as permitted in this Interim Order (including any use in accordance with the Budget, subject to variances permitted by this Interim Order); (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the Prepetition

A000963

Secured Parties' rights under this Interim Order, the Prepetition ABL Documents, or the Prepetition Term Loan Documents with respect any Prepetition ABL Obligations or Prepetition Term Loan Obligations. It shall be an Event of Default under this Interim Order if, in any of these Cases or any Successor Cases, the Debtors take or take to take any of the actions contemplated with respect to provisions (i) through (iv) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

(b)     The Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the Prepetition Agents, as applicable, all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the Prepetition Agents, as applicable) to provide under the Prepetition Documents, or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the Prepetition Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Prepetition Documents; (iv) permit the Prepetition Agents to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; and (v) upon reasonable advance notice, permit the Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Postpetition

30

A000964

Collateral and Prepetition Collateral, in each case, in accordance with the Prepetition Documents.

15.     Credit Bidding.  No Debtor shall object to any Prepetition ABL Parties credit bidding up to the full amount of the applicable outstanding Prepetition ABL Obligations, or with respect to the Prepetition Term Loan Parties, credit bidding up to the full amount of the applicable outstanding Prepetition Term Loan Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, to the extent permitted by section 363(k) of the Bankruptcy Code, and subject in each case to the rights, duties, and limitations, as applicable, of the parties under the Intercreditor Agreement, Prepetition Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid.

16.     Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the Prepetition Obligations being Paid in Full, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any Prepetition Collateral or Postpetition Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the Prepetition ABL Agent (or, following the Prepetition ABL Obligations being Paid in Full, to the Prepetition Term Loan Agent) to be applied in accordance with this Interim Order and the Intercreditor Agreement.

17.     Cash Collection.  From and after the date of the entry of this Interim Order,

A000965

all collections and proceeds of any Postpetition Collateral and Prepetition Collateral or services provided by any Debtor and all Cash Collateral (that does not constitute Prepetition or Postpetition Term Priority Collateral) that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition ABL Priority Collateral were deposited under the Prepetition Documents (or in such other accounts as are designated by the Prepetition ABL Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall, until the Prepetition ABL Obligations are Paid in Full, be subject to the sole dominion and control of the Prepetition ABL Agent and any amounts deposited into the Cash Collection Accounts shall be deemed to be Postpetition ABL Priority Collateral. Proceeds and other amounts in the Cash Collection Accounts shall be used, subject to the conditions set forth herein, to fund the Budget during the Specified Period, and the Debtors are authorized and directed to pay to the Prepetition ABL Agent, and the Prepetition ABL Agent is authorized to apply, amounts in excess thereof in accordance with the Budget until the Prepetition ABL Obligations are Paid in Full. In furtherance of the foregoing, each Thursday during the Specified Period the Debtors shall deliver to the Prepetition Agents a schedule of all proposed disbursements for the following seven (7) day period (each a "Disbursement Schedule"), including identification of which line item(s) in the Budget such proposed disbursements relate to. Upon the Prepetition ABL Agent's receipt of a written cash collateral draw request (each a "CC Draw Request," which shall be delivered to the Prepetition Term Loan Agent at the same time such CC Draw Request is delivered to the Prepetition ABL Agent) (which may be made on a daily basis), and following verification of conformity with the associated Disbursement Schedule and Budget, the Prepetition ABL Agent shall disburse funds

A000966

from the Cash Collection Account as appropriate to fund the amounts specified in the CC Draw Request; *provided* that, during the period prior to the Prepetition ABL Obligations being Paid in Full, the Prepetition ABL Agent shall only be required to disburse funds if the Debtors are in compliance with the provisions of this Interim Order (including, without limitation, that after giving effect to such disbursement, actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than \$0). For the avoidance of doubt, it shall be a condition to the Debtors' ability to access and use the Prepetition Secured Parties' Cash Collateral that they submit to the Prepetition ABL Agent the CC Draw Request and associated Disbursement Schedule in the manner and time provided herein. In addition to the foregoing, the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid In Full) is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount sufficient to maintain the "Ending Balance" set forth in the Budget for any applicable weekly period (at the end of the relevant week) and, until the Prepetition ABL Obligations are Paid in Full, the Prepetition ABL Agent is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount such that actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than \$0. Until the Prepetition ABL Obligations are Paid in Full, unless otherwise agreed to in writing by the Prepetition ABL Agent or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "Cash Management Order"). The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit, without offset or deduction, funds

33

A000967

in such Cash Collection Accounts upon receipt of any direction to that effect from the Prepetition

ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid

in Full), in each case, to the extent such direction is made in accordance with this Interim Order.

The Debtors shall cause the proceeds of Prepetition and Postpetition Term Priority Collateral as

identified by the Consultant to be deposited into a segregated, non-commingled account which is

required to be subject to the control of the Prepetition Term Loan Agent, and the Debtors' use of

such proceeds shall be subject to (and limited to the extent set forth in) this Interim Order but, for

the avoidance of doubt, may be used in accordance with the Budget, subject to variances permitted

by this Interim Order.

      18.    <u>Maintenance of Collateral</u>.  Until all Prepetition ABL Obligations are Paid

in Full, the Debtors shall:  (a) insure the Postpetition Collateral and Prepetition Collateral as

required under the Prepetition Documents; and (b) maintain the cash management system in effect

as of the Petition Date, as may be modified with the consent of the Prepetition Agents (such consent

not to be unreasonably withheld) or as a result of entry of any order by the Court.

      19.    <u>Disposition of Collateral</u>.  The Debtors shall not sell, transfer, lease,

encumber, or otherwise dispose of any portion of the Postpetition Collateral or Prepetition

Collateral other than in the ordinary course of business and in accordance with the Consulting

Agreement and the Levin APA, without (subject to the Intercreditor Agreement) the prior written

consent of the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the

Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral), and no such

consent shall be implied, from any other action, inaction or acquiescence by the Prepetition

Secured Parties or from any order of this Court.

      20.    <u>Events of Default</u>.  The occurrence of any of the following events, unless

A000968

consented to or waived by the Prepetition Agents in advance, in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "Events of Default"):

(a)     the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including, without limitation, the Covenants in paragraph 12 herein);

(b)     the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c)     (i) the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

(d)     the filing of a motion or any plan of reorganization or disclosure statement attendant thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Interim Order; (ii) to grant any lien other than Permitted Prior Liens upon or affecting any Postpetition Collateral; or (iii) except as provided in this Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code;

(e)     (i) the filing of any Prohibited Plan (as defined herein) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors) or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan;

(f)     the entry of an order in any of the Cases confirming a Prohibited

A000969

Plan;

(g) the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to this Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect;

(h) the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by this Interim Order;

(i) the appointment of an interim or permanent trustee in the Cases, the appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a trustee receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(j) the filing of a motion to approve a Prohibited Sale or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI;

(k) the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Cases to Chapter 7 of the Bankruptcy Code;

(l) the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor

A000970

Agreement, the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (C) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of [$250,000] or more;

(m)     the existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under this Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except, in each case, as expressly provided in this Interim Order;

(n)     the filing of a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction;

(o)     any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations;

(p)     any Debtors shall challenge, support or encourage a challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations;

37

A000971

(q)  the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in this Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code;

(r)  any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA, with respect to Postpetition Collateral or Prepetition Collateral having a value in excess of [$250,000] outside the ordinary course of business and not otherwise permitted hereunder;

(s)  any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders" as approved by the Prepetition Agents in writing (provided that this Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by this Interim Order;

(t)  any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under this paragraph 20;

(u)  the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.

21.  <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default under this Interim Order,

A000972

notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall be referred to herein as a "Termination Declaration") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice (as defined herein); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to herein as the "Termination Date"). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and this Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable). During the

A000973

Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the Prepetition ABL Parties shall be permitted to exercise all remedies set forth herein, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and this Interim Order. Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process.

22. <u>Prepetition Secured Parties' Expenses</u>. The Debtors are authorized and directed to pay, in accordance with this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (a) the Prepetition ABL Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Morgan, Lewis & Bockius LLP and Burr & Forman LLP, and any successor counsel) and, (b) solely from the proceeds of Postpetition Term Priority Collateral, the Prepetition Term Loan Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Riemer & Braunstein LLP and Greenberg Traurig, LLP, and any successor counsel). Payment of all such fees and expenses shall not be subject to allowance by the Court. Professionals for the Prepetition Agents shall not be required to comply with the

A000974

U.S. Trustee fee guidelines, *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors that were incurred after the Petition Date, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such summary fee and expense statements to the Debtors. Any objections raised by the Debtors, the U.S. Trustee, or a Committee (if appointed) with respect to such invoices within ten (10) days of the receipt thereof will be subject to resolution by the Court to the extent they cannot be resolved by the applicable parties. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized and directed to pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition ABL Parties as provided in the Prepetition ABL Documents, incurred on or prior to such date without the need for any professional engaged by the Prepetition ABL Parties to first deliver a copy of its invoice as provided for herein. No attorney or advisor to any Prepetition ABL Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

23.     <u>Proofs of Claim</u>.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the Prepetition ABL Parties and the Prepetition Term Loan Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the

41

A000975

Prepetition ABL Documents or the Prepetition Term Loan Documents. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition ABL Parties and the Prepetition Term Loan Parties with regard to all claims arising under the Prepetition ABL Documents or the Prepetition Term Loan Documents, as the case may be. Notwithstanding the foregoing, the Prepetition ABL Agent on behalf of itself and the Prepetition ABL Parties, and the Prepetition Term Loan Agent on behalf of itself and the Prepetition Term Loan Parties, are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in any of the Cases deemed to be filed in all Cases of each of the Debtors and asserted against all of the applicable Debtors). Any proof of claim filed by the Prepetition ABL Agent or the Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Parties or Prepetition Term Loan Parties. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the Prepetition ABL Parties or the Prepetition Term Loan Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

24.     <u>Carve Out</u>.

(a)     *Carve Out*. As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and

A000976

expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (such fees and expenses, the "Allowed Professional Fees") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined herein), *provided* that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "ABL Professional Fee Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[500,000] incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional

A000977

Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week).

(b)     *Carve Out Reserves*.   On the day on which a Carve Out Trigger Notice is given by the Prepetition ABL Agent (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed a demand to the Debtors, and authorization for the Debtors, to utilize cash on hand and proceeds of the Postpetition Collateral to fund a reserve in an amount equal to the Carve Out.  The Debtors shall deposit and hold such amounts in a segregated account at the Prepetition ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees (each, a "Carve Out Reserves").   For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order or the Final Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

(i)     Following payment of all Allowed Professional Fees entitled to benefit from the Carve Out, any remaining funds in the Carve-Out Reserves funded by (x) the proceeds of Postpetition ABL Priority Collateral shall be distributed (A) first, to the Prepetition ABL Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full, and (B) second, to the Prepetition Term Loan Agent on account of the Obligations (as defined in the Prepetition Term Loan Agreement) until such obligations have been Paid in Full; and (y) the proceeds of Postpetition Term Priority Collateral

44

A000978

shall be distributed (A) first, to the Prepetition Term Loan Agent which shall apply such funds to the Obligations (as defined in the Prepetition Term Loan Agreement) in accordance with the Prepetition Term Loan Agreement until such obligations have been Paid in Full, and (B) second, to the Prepetition ABL Administrative Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full.

(ii)     Notwithstanding anything to the contrary in this Interim Order, following the end of the third business day after delivery of a Carve Out Trigger Notice, (x) the Prepetition ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the Prepetition ABL Agent, on the one hand, and the Prepetition Term Loan Agent, on the other hand, shall have a security interest in any residual interests in the Carve Out Reserves, with any excess paid as provided above; and (y) the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves required to be funded by the proceeds of Postpetition Collateral have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves held in accounts by the Prepetition Term Loan Agent, with any excess paid as provided above.

(iii)     For the avoidance of doubt and notwithstanding anything to the contrary herein or in any Prepetition Secured Facilities, to the extent of any shortfall in the Carve Out Reserves, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and any and all other forms of adequate protection, liens, or claims securing the obligations under the Prepetition Documents; provided that in all cases, the Carve Out priority with regard to the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral

A000979

will always be subject to the limitations applicable thereto set forth in the definition of Carve Out.

(c)     *No Direct Obligation To Pay Allowed Professional Fees*.  The Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     *Payment of Carve Out On or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(f)     *Release of Prepetition ABL Parties*.  Notwithstanding anything to the contrary contained herein, (i) prior to the delivery of the Carve Out Trigger Notice, the Debtors shall fund the Carve Out Reserves at the reasonable request of the Prepetition ABL Agent in consultation with the Prepetition Term Loan Agent, the Debtors and their advisors, and (ii) upon the repayment in full of the principal amount of all Loans under the Prepetition ABL Agreement, the cash-collateralization of all Letters of Credit under the Prepetition ABL Agreement and the funding of the Prepetition ABL Indemnity Reserve (the date that such events occur, the "ABL

A000980

Repayment Date"), and after the funding of the Carve Out Reserves in an amount equal to, as of the ABL Repayment Date, the lesser of (x) the amount set forth in the Budget for Professional Persons (plus the amounts set forth in 24(a)(i) and (ii)) and (y) the then accrued Carve Out, the Prepetition ABL Parties and the Prepetition ABL Liens shall be released from all further liability from the Carve Out (such release shall be a condition to the Prepetition ABL Obligations being deemed Paid in Full).

25.     <u>Limitations on Use of Cash Collateral, and Carve Out</u>.  The Postpetition Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with:  (a) except to contest the occurrence of an Event of Default, preventing, hindering, or delaying any of the Prepetition Secured Parties' permitted enforcement or realization upon any of the Postpetition Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order; (c) selling or otherwise disposing of Postpetition Collateral without the consent of the Prepetition Agents; (d) using or seeking to use any insurance proceeds constituting Prepetition Collateral or Postpetition Collateral except as provided for in this Interim Order without the consent of the Prepetition ABL Agent or the Prepetition Term Loan Agent (in the case of Postpetition Term Priority Collateral); (e) incurring Indebtedness (as defined in the Prepetition Documents) without the prior consent of the Prepetition Agents; (f) seeking to amend or modify any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis; (g) objecting to or challenging in any way the Prepetition Liens, Prepetition Secured Obligations, Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the Prepetition Secured Parties, respectively; (h) asserting, commencing, or prosecuting any claims or causes of action

A000981

whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations, or any other rights or interests of any of the Prepetition Secured Parties; or (j) seeking to subordinate, recharacterize, disallow, or avoid the Prepetition Secured Obligations; *provided, however*, without prejudice to the ability of a Committee (if appointed) to contest the Investigation Budget Amount (as defined herein) in connection with the Final Hearing, that the Carve Out and such collateral proceeds may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final Order, $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging), the Prepetition Lien and Claim Matters (as defined herein).

26.     Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Budget provided by the Debtors to the Prepetition Agents.

27.     Effect of Stipulations on Third Parties.

A000982

(a)     *Generally.*  The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim Order (collectively, the "<u>Prepetition Lien and Claim Matters</u>") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless and to the extent that a party in interest with proper standing granted by order of the Bankruptcy Court (or other court of competent jurisdiction) has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) and (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 27) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "<u>Challenge</u>") by no later than the earlier of (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "<u>Challenge Deadline</u>"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any

A000983

such judgment has become a final judgment that is not subject to any further review or appeal.

(b)     *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof.  To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection.  Upon a successful Challenge brought pursuant to this paragraph 27, the Court may fashion any appropriate remedy.

28.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this

50

A000984

Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

29.     Section 506(c) Claims.   Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

30.     No Marshaling/Applications of Proceeds.   Subject to entry of a Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order, notwithstanding any other agreement or provision to the contrary.

31.     Section 552(b).   Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

32.     Access to Collateral.   Subject to and effective upon entry of a Final Order, upon expiration of the Remedies Notice Period, the Prepetition Secured Parties, subject to the Intercreditor Agreement, shall be permitted to (a) access and recover any and all Prepetition and Postpetition Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of

51

A000985

the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Postpetition Collateral, *provided*, *however*, in the case of clause (b), notwithstanding anything to the contrary herein, and subject to the Intercreditor Agreement, the Prepetition Secured Parties can only enter upon a leased premises during the continuation of an Event of Default in accordance with (i) a separate written agreement by and between the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of the Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable Prepetition Secured Party on such notice to the landlord as shall be required by this Court; *provided*, *however*, that solely with respect to rent due to a landlord of any such leased premises, the Prepetition Secured Parties, as applicable, shall be obligated only for the payment of rent of the Debtors that first accrues after delivery of the Termination Declaration in accordance with paragraph 20 herein that is payable during the period of such occupancy by the Prepetition Secured Parties, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to delivery of the Termination Declaration through and including any assumption and/or rejection of any lease. Nothing herein shall require the Prepetition Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

33. <u>Limits on Lender Liability</u>. Subject to entry of a Final Order, nothing in this Interim Order, the Prepetition Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of

A000986

their businesses or in connection with the administration of these Cases. The Prepetition Secured Parties shall not, solely by reason of having made loans under the Prepetition Documents, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

34.     <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the Prepetition ABL Agent (on behalf of the Prepetition ABL Parties) and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Parties), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the Postpetition Collateral.

35.     <u>Additional Rights of the Prepetition Term Loan Agent</u>.  Subject to the Prepetition ABL Obligations being Paid in Full and the rights preserved in paragraph 27 herein, any reference in this Interim Order to the Prepetition ABL Agent agreeing to or having the right to do, or refraining from or having the right to refrain from doing, an act, or providing any consent or waiver hereunder, shall automatically, without further order of the Court, be construed as referring to the Prepetition Term Loan Agent.

36.     <u>Levin DIP Facility</u>.  Notwithstanding anything to the contrary contained herein or in any order approving the Levin DIP Facility, (a) the DIP Lenders (as defined in the

A000987

Levin DIP) shall not have a lien on any Prepetition or Postpetition Collateral (other than Prepetition or Postpetition Collateral that is DIP Collateral (as defined in the DIP Order), (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the Levin DIP shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Agent and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the Levin DIP Order.

37. <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder.

38. <u>No Superior Rights of Reclamation</u>. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claim had on the Petition Date.

39. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly

A000988

or implicitly, subject to the Prepetition Documents and the Intercreditor Agreement: (a) the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order. Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and, unless otherwise set forth in this Interim Order or the Final Order, any other position which any party in interest deems appropriate to raise in the Debtors' Chapter 11 cases.

40. <u>No Waiver by Failure to Seek Relief</u>. The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Secured Parties.

41. <u>Binding Effect of Interim Order</u>. Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to

A000989

the benefit of the Debtors, the Prepetition Secured Parties, all other creditors of any of the Debtors, a Committee (if appointed), or any other court appointed committee, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

42.      No Modification of Interim Order.  Until and unless the Prepetition Secured Obligations have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the Prepetition ABL Documents which survive such discharge by their terms) the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the Prepetition Agents, (i) any modification, stay, vacatur, or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the Prepetition ABL Agent for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from Collateral or Prepetition Collateral; or (c) without the prior written consent of the Prepetition Agents, any lien on any of the Postpetition Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens, other than the Carve Out.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the Prepetition Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the Prepetition ABL Agent or the

Prepetition Term Loan Agent.

43. <u>Continuing Effect of Intercreditor Agreement</u>. The Debtors and Prepetition Secured Parties each shall be bound by, and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.

44. <u>Interim Order Controls</u>. In the event of any inconsistency between the terms and conditions of the Intercreditor Agreement and this Interim Order (solely as between the Prepetition Secured Parties), the provisions of the Intercreditor Agreement shall govern and control.

45. <u>Discharge</u>. The obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable, has otherwise agreed in writing. None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that does not require that all Prepetition ABL Obligations be Paid in Full (in the case of the sale of Postpetition ABL Priority Collateral) or that all Prepetition Term Loan Obligations be Paid in Full (in the case of the sale of Postpetition Term Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "<u>Prohibited Plan or Sale</u>") without the written consent of each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable. For the avoidance of doubt, the Debtors' proposal or

A000991

support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder.

46. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition Secured Parties granted pursuant to this Interim Order, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (x) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to the Prepetition ABL Documents and this Interim Order, have been Paid in Full; and (y) in respect of the Prepetition Term Loan Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been Paid in Full. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Parties notwithstanding the repayment in full of the Prepetition ABL Obligations.

47. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order is scheduled for **[_____], 2020 at [__]:00 [_].m. (EST)** before the Honorable [_____], United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before [_____], 2020, the Debtors, or an agent appointed for such purpose, shall serve, by United States mail, first-class postage prepaid, notice of the entry of this

Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) counsel for the Consultant; and (g) counsel for Levin Furniture, LLC, and Levin Towing, LLC. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **[_____], 2020, at [__]:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (iv) counsel to the Committee (if appointed).

48. *Nunc Pro Tunc Effect of this Interim Order*. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

49. <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the this Interim Order.

13167798 v1

A000993

Dated: _____                    _____
Wilmington, Delaware                  UNITED STATES BANKRUPTCY JUDGE

13167798 v1

A000994

# EXHIBIT J

A000995

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE
CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO
EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION
OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE
BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN
CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION
ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE
BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state as follows in support of this motion (this "<u>Motion</u>"):[2]

## <u>Relief Requested</u>

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "<u>Interim Order</u>" and the "<u>Final

Order</u>"):  (a) authorizing and approving, on an interim and final basis, store closing or similar

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 12) (the "<u>First Day Declaration</u>") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on March 8, 2020 (the "<u>Petition Date</u>").  Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

A000996

themed sales ("Store Closings") in accordance with the terms of the store closing sale procedures (the "Store Closing Procedures," attached as **Exhibit 1** to **Exhibit A** hereto), with such sales to be free and clear of all liens, claims, and encumbrances; (b) authorizing the Debtors to pay customary bonuses to employees of the stores listed on **Exhibit 2** to **Exhibit B** attached hereto (collectively, the "Closing Stores"); (c) in accordance with sections 363 and 365 of the Bankruptcy Code, authorizing the Debtors to assume that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020 (the "Consulting Agreement"), by and between Debtor AVF Holding Company, Inc. and the following entities: Hilco Merchant Resources, LLC ("HMR"), Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC (such entities collectively, the "Hilco Consulting Entities"), Gordon Brothers Retail Partners, LLC ("GBRP"), DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC (such entities collectively the "GB Consulting Entities", and together with the Hilco Consulting Entities the "Consultant"), a copy of which is attached as **Exhibit 3** to **Exhibit A** hereto; (d) authorizing the Debtors to retain certain of the entities comprising the Consultant that will be providing receivables collection (at the Debtors' option) and intellectual property disposition services as special asset disposition advisors and consultants to the Debtors, pursuant to Section 327(a) of the Bankruptcy Code[3]; and (e) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider entry of the Final Order with respect to the relief sought in the Motion.

---

[3]   The Consultant affiliated entities that will provide these specific asset disposition services are: Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Receivables, LLC, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC

13172884 v1

A000997

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 554(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6003, and 6004, and Bankruptcy Local Rule 9013-1(m).

## The Store Closings

### I.      The Store Closing Decisions and the Consulting Agreement

5.      As described more fully in the First Day Declaration, in the wake of extreme market conditions and faced with limited liquidity, the Debtors have commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down their remaining store locations and other operations through a going-out-of-business sales process. Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going

3

A000998

concern, the Company is simply unable to meet its financial obligations. The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind-down process that will maximize value and recoveries for stakeholders in these cases.

6.       In connection with the aforementioned wind-down process, prior to the Petition Date the Debtors conducted a competitive process to engage an exclusive consultant(s) to provide a wide range of asset disposition consulting and related services to assist in and facilitate the Debtors' planned wind-down efforts.  During the course of that same proposal solicitation process, Hilco and Gordon Brothers were engaged in parallel discussions with the Debtors' prepetition term loan lenders, FS KKR Capital Corp. and FS KKR Capital Corp. II (collectively, "KKR") concerning the status of the prepetition term loan debt (the "Term Loans"), and the prospects for development of a creative consulting structure such that the Debtors' estates and their various stakeholders could be spared the burden of having to pay the types of consulting fees that are customary for the types of asset disposition services required by the Debtors.

7.       After arm's-length and extensive negotiations, these discussions ultimately yielded a series of agreements under which (a) the Debtors determined to engage the Consultant to provide the full range of asset disposition consulting services required by the Debtors in respect of merchandise inventories, fixed assets, receivables (subject to a Debtors' option), and intellectual property[4], (b) HGB AVF Lending, LLC ("HGB"), an entity controlled by affiliates of Hilco and Gordon Brothers, entered into an agreement with KKR under which HGB acquired KKR's

---

[4]    The Consulting Agreement presently provides that in addition to the consulting services described herein, the Debtors were to engage the Consultant to market and sell Debtors' real estate holdings.  Subsequent to execution of the Consulting Agreement, the Debtors and the Consultant agreed to exclude the real estate services from the scope of Consultant's engagement.

interests in the Term Loans (and as part of such transaction GBH agreed to share a portion of any recovery, if any, it may later receive on account of the Term Loans), and (c) the Consultant simultaneously agreed with the Debtors that the Consultant would **NOT** earn or be paid any consulting or other fee or compensation from the Debtors or their estates, other than reimbursement of certain out-of-pocket expenses incurred in connection with the conduct of the Store Closing Sales, any such reimbursement being strictly in accordance with a budget agreed to by the Debtors and the Debtors' secured lenders.

8. Through this approach - whereby the Consultant's only opportunity to realize any compensation on account of the consulting services being provided under the Consulting Agreement is through a recovery realized by its affiliates on account of the Term Loans (a portion of which recovery, if any, will be shared with KKR) - the Debtors, in consultation with their professionals and key stakeholders, determined that the above-described arrangement provided the best framework for accomplishing the Debtors' paramount goal of an orderly and efficient liquidation of all assets. At the same time, this arrangement fully aligned the estates' interests with those of the Term Lender in achieving maximum realizable value for Debtors' assets during the wind-down process.

9. Based on an evaluation of the circumstances, the economic structure of the Consulting Agreement, and the Consultant's experience in conducting Store Closings on similar timelines, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.

10. Accordingly, by this Motion, the Debtors seek relief in two essential parts; <u>first</u>, consistent with well-established precedent in this District, the Debtors seek – on an interim basis –to assume the Consulting Agreement under sections 363 and 365 of the Bankruptcy Code, so that

A001000

the HMR and GBRP, the Consultant-constituent entities that are providing the inventory and fixed asset disposition consulting services under the Consulting Agreement, may continue their role as the Debtors' consultant in connection with the conduct of the Store Closings on a post-petition basis without interruption; second, the Debtors seek to retain the remaining Consultant-constituent entities that are providing the receivables, and intellectual property-related disposition consulting services, pursuant to section 327 of the Bankruptcy Code. In connection with the foregoing, the Debtors have determined, in the exercise of their business judgment, that (a) the continuation of services by the Consultant is necessary for efficient large-scale execution of the Store Closings, and the marketing and sale of the other Assets to maximize the value of the Assets being sold and (b) any change or elimination of the engagement with the Consultant would significantly disrupt the Debtors' reorganization efforts and impair the value of the Assets.[5] Further, the Store Closings and the marketing and sale of the Assets are a critical component of the Debtors' ability to maximize value for all stakeholders, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

11.     For the convenience of the Court and interested parties, a summary of the salient terms of the Consulting Agreement is set forth below:[6]

---

[5]     By this Motion, the Debtors' seek approval of the conduct of the Sales at the Stores and the associated disposition of the Merchandise and the owned M&E in a manner consistent with customary practices in this jurisdiction and in jurisdictions throughout the country in connection with Store Closings. However, nothing in this Motion seeks approval of the Debtors' assumption and assignment of any of their non-residential real property leases or executory contracts. To the extent that the Debtors', through the services of the Consultant, find one or more buyers of the Real Estate Assets and/or the IP Assets, the Debtors' would file one or more separate motions seeking approval of such asset sales on as expedited a basis as the circumstances and/or economics of such sale dictate.

[6]     The following summary chart is for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects. Any capitalized terms used in the summary chart but not defined therein are used as defined in the Consulting Agreement.

13172884 v1

A001001

| Term | Consultant Agreement |
|---|---|
| **Services Provided by Consultant** | Services to be provided by Consultant include, among other things:<br><br>• Provision of qualified Supervisors to supervise and assist the Debtors in its conduct of the Sale;<br><br>• Provision of oversight, supervision, and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and the M&E;<br><br>• Recommendation and implementation of appropriate point of purchase, point of sale, and external advertising to effectively sell the Merchandise during the Sale Term;<br><br>• Advice regarding appropriate discounting of Merchandise, staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;<br><br>• Other advice regarding and during the Sale;<br><br>• Development of an advertising and marketing plan for the sale, auction, or other disposition of the M&E;<br><br>• Implementation of advertising and marketing as deemed necessary to maximize the net recovery on the M&E;<br><br>• Preparation for the sale of the M&E;<br><br>• Developing a Strategic Plan with the Debtors for disposition of the Properties;<br><br>• Subject to the Debtors' exercise of the election under the Consulting Agreement, collecting, settling, and otherwise resolving the Receivables on the Debtors' behalf;<br><br>• Collecting and securing available information regarding the Intellectual Property;<br><br>• Preparing marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition; and<br><br>• Assisting the Debtors in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property.<br><br>• To the extent that the Consultant locates a purchaser of the Assets, other that the Merchandise and the M&E, the Debtors (in consultation with the Secured Lenders) shall file one or motion seeking approval of such underlying transaction(s) on such notice (or Court approved shortened notice) as the terms and the economics of such transactions dictate. |
| **Sale Term** | The Store Closing began on March 6, 2020, and are to continue to no later than May 31, 2020; provided, however, absent the prior consent of the Debtors, the Sale shall conclude in the Stores no later than April 30, 2020. |

| Asset Marketing Period | The period commencing on the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Debtors and the Consultant (in consultation with the Secured Lenders); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Debtors (in consultation with the Secured Lenders) and the Consultant |
|---|---|
| Sale Expenses | The Debtors shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses). The Debtors, Consultant and Secured Lenders have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses (the "<u>Budget</u>") in the form and content annexed hereto and made a part hereof as <u>Exhibit B</u>. The Budget may only be modified by mutual agreement of the Debtors, the Consultant and the Secured Lenders. In connection with the Sale and subject to the limitations set forth in the Budget as to the Consultant Incurred Expenses, the Debtors shall be responsible for the payment of all expenses incurred in connection with the Sale, including, without limitation, all Sale Expenses (and Consultant shall not be responsible for any such expenses or Sale Expenses except as expressly provided for in <u>Section 11</u> below). Consultant Incurred Expenses shall not exceed the aggregate line item amount of Consultant Incurred Expenses set forth in the Budget without the prior written consent of the Debtors and Secured Lenders, which consent shall not be unreasonably withheld, delayed or conditioned. Subject to the limitations of the Sale Budget, the Debtors shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in <u>Section 4</u> hereof upon presentation of invoices and statements for such expenses. In addition, to the extent that the Consultant anticipates that it, or the Debtors will incur any additional out of pocket expenses in connection with the Services being provided by the Consultant in relating to its provision of Services in connection with the marketing and disposition of the other Assets, such expenses shall be subject to Supplemental Expense Budget to be agreed to between the Debtors (in consultation with the Secured Lenders) and the Consultant prior to such expenses being incurred. |
| Consultant's Compensation | In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall <u>not</u> earn any fee or other compensation from the Debtors, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time in the course of performing Services hereunder, in each case limited to the amounts set forth in the Budget and at the times provided herein. Any fees payable to Consultant shall be paid to Consultant by the Term Loan Lenders from their recovery on account of their secured claim. |
| Tracking of Proceeds of the Sales | The Debtors shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item sold the retail price (as reflected on Debtors' books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale. The Debtors shall make all such records and reports available to Consultant and the Secured Lenders during regular business hours upon reasonable notice. |
| Expenses Deposit | The Interim Approval Order and the Final Approval Order shall include approval on the part of the Debtors to fund, and the Debtors shall thereafter promptly fund, to Consultant $3,353,912 (the "<u>Expense Deposit</u>"). The Debtors shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this |

8

A001003

| | |
|---|---|
| | Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by the Debtors to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Debtors (or their designee) within three (3) business days following the Final Settlement. |
| **Debtors' Employees** | The Debtors and the Consultant shall cooperate to retain the employees of the Debtors (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion.  Such employees shall remain employees of the Debtors, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Debtors' other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("WARN Act") payments, or any other costs, expenses, obligations, or liabilities arising from the Debtors' employment  or termination of such employees prior to, during, and subsequent to the Sale Term.  Other than advising Debtors that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s). |
| **Fulfillment of Pre-Sale Customer Orders** | Consistent with the relief sought in the Debtors' companion Customer Programs Motion, in addition to providing the forgoing Services in connection with the Sale, the Consultant shall use commercially reasonable efforts to assist the Debtors in fulfilling certain pre-Sale Commencement Date orders for which the Debtors has received customer deposits (collectively, the "Pre-SCD Orders").<br><br>• On-Hand Fulfillment Orders. Consultant shall assist the Debtors in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "On-Hand Fulfillment Orders"), on account of which orders (i) the Debtors has received customer deposits in the aggregate amount of $18 Million (collectively, the "On-Hand Customer Deposits") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "On-Hand Fulfillment Merchandise").  As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Debtors in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Debtors) in order to fulfill and complete the On-Hand Fulfillment Orders. Consultant shall advise the Debtors in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Debtors and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Debtors' existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales commissions and delivery (collectively, the "On-Hand Fulfillment Processing Expenses"), shall be borne exclusively by the Debtors, and the Consultant shall not be responsible for any such costs or expenses.  Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without |

9

<table>
<tr>
<td></td>
<td>limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Debtors. To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Debtors on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder. Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <i>provided</i>, that any proceeds realized by the Debtors upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder.

&bull; <u>Back-Order Fulfillment Orders</u>. Following the Sale Commencement Date, Consultant shall also assist the Debtors in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Debtors has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>"). To the extent that a Back-Order Fulfillment Order(s) can be filled by the Debtors within a reasonable time after the Sale Commencement Date, the Debtors and the Consultant shall work together to implement a protocol for fulfillment of such order(s). To the extent that the Debtors is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Debtors, and the Debtors and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Debtors' bankruptcy case for the full amount of such customer's Back-Order Customer Deposit.

&bull; If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit.

&bull; During the Sale Term, the Debtors shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders.</td>
</tr>
<tr>
<td><b>Additional Consultant Goods</b></td>
<td>&bull; In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("<u>Additional Consultant Goods</u>"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing</td>
</tr>
</table>

10

A001005

fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods). Sales of Additional Consultant Goods shall be run through Debtors' point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and Debtors shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Debtors goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Debtors' written consent and subject to Consultant's agreement to reimburse Debtors for any associated expenses, Consultant shall not use Debtors' distribution centers for any Additional Consultant Goods.

- Consultant shall pay to the Debtors an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Debtors any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation. Except for sales taxes associated with the sale of Additional Consultant Goods and Debtors' Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation. Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

- The Consultant, the Debtors, and the Secured Lenders intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Debtors in all respects and not a consignment for security purposes. Subject solely to Consultant's obligations to pay to Debtors the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Secured Lenders, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant. In furtherance of the foregoing, the Debtors acknowledge that the Additional Consultant Goods shall be consigned to Debtors as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC"). The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Secured Lenders.

- The Debtors shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with the Debtors' insurers. Consultant shall be responsible for payment of any deductible (but only in relation to the

| | Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods. |
|---|---|
| **Debtors' Indemnification Obligations** | The Debtors shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: <br><br> (a) Debtors' material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; <br><br> (b) any failure of Debtors to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; <br><br> (c) any consumer warranty or products liability claims relating to any Merchandise; <br><br> (d) any liability or other claims asserted by customers, any of Debtors' employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant; <br><br> (e) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Debtors or any of Debtors' employees, agents, or representatives (including, without limitation, any Debtors employees); and <br><br> (f) the negligence or willful misconduct of Debtors or any of its officers, directors, employees, agents or representatives. |
| **Consultant Indemnification Obligations** | The Consultant shall indemnify and hold Debtors and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Debtors Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: <br><br> (a) Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; <br><br> (b) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Debtors (including, without limitation, any Store Employees) by Consultant or any |

A001007

|  | of Consultant's representatives (including, without limitation, any Supervisor); |
|  | (c) any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Debtors or Debtors Indemnified Parties or from a breach of the terms hereof by Debtors; and |
|  | (d) the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor. |

## II. Store Closing Procedures.

12. In connection with and in facilitation of the ongoing conduct of the store closing sales, the Debtors further seek approval of the Store Closing Procedures, the form and substance of which are consistent with the procedures utilized by debtors in this and many other jurisdictions in connection with the similar such store closing processes.

13. As is customary, the Store Closing Procedures provide, among other things, that: (a) all sales of Store Assets will be deemed free and clear of all liens, claims, interests, and other encumbrances; (b) the Merchandise and the M&E (as each term is defined in the Consulting Agreement) will be sold with the benefit of various marketing techniques and price markdowns to promote efficient liquidation; and (c) certain unsold M&E and other Store assets that cannot be promptly liquidated may be abandoned if and when the Debtors determine, in their business judgment, that retaining, storing, or removing such assets would result in unnecessary expense with little or no benefit to the estates. The Debtors seek approval of the Store Closing Procedures to, among other things, provide local regulatory authorities and media in which the Store Closings may be advertised with knowledge that the Debtors are conducting the Store Closings in compliance with the Court's order.

14. The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings. In certain cases, the contemplated Store Closings may be inconsistent with various provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions. Such restrictions, unless waived, would hamper the Debtors' ability to maximize value in selling their inventory.

15. As set forth in the Store Closing Procedures, the Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on the behalf of the foregoing parties shall interfere with or otherwise impede the conduct of the Store Closings, nor institute any action against the Debtors in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings or the advertising and promotion (including through the posting of signs) of the Store Closings.

16. The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Merchandise and the M&E to maximize the value of the Debtors' estates. The Debtors intend to facilitate the Store Closings using current personnel at no increased cost (except as set forth herein), and estimate that, with perhaps a few exceptions, the Stores Closings will be completed by no later than April 30, 2020, with May 31, 2020 being the outside Sale Termination Date at locations that the Debtors (in consultation with

13172884 v1

A001009

their secured lenders) and the Consultant agree generate a net positive return by continuing in the month of May 2020.

### III.    Liquidation Sale Laws and Dispute Resolution Procedures.

17.    Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").  Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings.  Such requirements hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Store Closing Procedures, and to the extent such procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures should control.

18.    To facilitate the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), on an interim and final basis:

> a.    Provided that the Store Closings are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct Store Closings in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b. Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Store Closings are being held; (iii) the county consumer protection agency or similar agency for each county in which the Store Closings are being held; (iv) the division of consumer protection for each state in which the Store Closings are being held; (v) the chief legal counsel for each local jurisdiction in which the Store Closings are being held (collectively, the "Dispute Notice Parties").

c. With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (b) proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (c) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (d) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (e) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (f) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (g) counsel to any statutory committee appointed in these chapter 11 cases. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d. In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Store Closings pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Store Closings pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e. If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

## IV. Fast Pay Laws.

19. Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Applicable State Laws"). These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

20. The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated at or near the end of the Store Closings. To be

clear, the Debtors intend to pay their terminated employees as expeditiously as possible, under normal payment procedures, and pursuant to applicable Court order.[7]  Moreover, the Debtors' approved Cash Collateral Budget expressly contemplates the payment of employee wages in the ordinary course during the Store Closings.  The Debtors therefore believe that their current systems will allow their employees to be paid expeditiously and in accordance with any Applicable State Laws.  However, given the number of employees who will likely be terminated during the Store Closings, the Debtors request a waiver of compliance with the Applicable State Laws to the extent that the Debtors' payroll systems limit their ability to so comply.

**V.      Store Closing Bonus Plan.**

21.      Through this Motion, the Debtors are requesting the authority, but not the obligation, to pay bonuses (the "Store Closing Bonuses") to store-level non-insider employees at the Closing Stores who remain in the employ of the Debtors during the Store Closings (the "Store Closing Bonus Plan").  The Debtors believe that the Store Closing Bonus Plan will motivate employees during the Store Closings and will enable the Debtors to retain those employees necessary to successfully complete the Store Closings.

22.      The amount of the bonuses offered under the Store Closing Bonus Plan will vary depending upon a number of factors, including the employee's position with the Debtors and the performance of the Closing Stores in which the relevant employees work.

23.      The Debtors will set the amounts of the Store Closing Bonuses and eligible employees in consultation with the Consultant, who typically utilizes such bonuses to retain

---

[7]      The Debtors are seeking such relief pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, (the "Wages Motion") filed contemporaneously herewith.

13172884 v1

employees and incentivize higher recoveries during store closing sales and are well-acquainted with optimal methods for designing such bonus plans.[8]

24.     The total aggregate cost of the Store Closing Bonus Plan will also vary depending on how many Closing Stores are ultimately closed.  If the Debtors were to close every Closing Store, the aggregate amount of Store Closing Bonuses paid will be not more than approximately $600,000, assuming one hundred percent of the performance targets were met during the Store Closings at every Closing Store.

25.     Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' work force due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing process.  For the avoidance of doubt, the Debtors do not propose to make any payment on account of Store Closing Bonuses to any insiders.

26.     Accordingly, the Debtors respectfully submit that the Store Closing Bonus Plan is in the best interests of their estates and request that the Court authorize the payments under the Store Closing Bonus Plan as a sound exercise of their business judgment.

## **Basis for Relief**

## I.     **The Debtors Have a Valid Business Justification for the Store Closings.**

27.     Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  When selling assets outside of the ordinary course of business, a debtor

---

[8]     The final terms of the Store Closing Bonus Plan are still being formulated in consultation with the Consultant.

must articulate a valid business justification to obtain court approval. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)); *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision). When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11 cases, especially where the debtor is a Delaware corporation).

28. Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See, e.g.*, *Ames Dept. Stores*, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"). As such, bankruptcy courts in this jurisdiction have approved similar store closing sales. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019); *In re Fred's Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 27, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re Things Remembered, Inc.*, No. 19-10234

(KG) (Bankr. D. Del. Feb. 28, 2019); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 13, 2017).[9]

29.     Sufficient business justification exists to approve the proposed Store Closings under section 363(b)(1) of the Bankruptcy Code.  The Debtors, with the assistance of their advisors, have determined that the Store Closings represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Merchandise and the M&E  and provide the Debtors with much-needed liquidity.  There are meaningful amounts of Merchandise, in the aggregate, that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm.  Further, delay in commencing the Store Closings would diminish the recovery tied to monetization of the Merchandise and the M&E for several important reasons.  Many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity.  As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Merchandise and the M&E  and the termination of operations at the Closing Stores.  Further, uninterrupted and orderly Store Closings will allow the Debtors to timely reject leases associated with the Closing Stores and, therefore, avoid the accrual of unnecessary administrative expenses for rent and related costs.  Suspension of the Store Closings until entry of the Final Order may cause the Debtors to incur claims for rent at many of these stores, creating a further drain on the Debtors' liquidity.

30.     Courts in this district and courts in other jurisdictions have approved sale guidelines in chapter 11 cases on an interim basis.  Importantly, a number of courts have granted retail debtors first day authority to implement such procedures.  *See, e.g.*, *In re Destination Maternity*

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

A001016

*Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (approving procedures on an interim basis); *In re Fred's, Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 11, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Mar. 15, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 7, 2019) (same) (*In re Payless Holdings LLC*, No. 17-42267 (E.D. Mo. April 7, 2017) (same).

**II.      The Court Should Approve the Sale of the Merchandise
          and the M&E  Free and Clear of all Liens, Encumbrances,
          and Other Interests Under Bankruptcy Code Section 363(f).**

31.      The Debtors request approval to sell the Merchandise and the M&E on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.   A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).  Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

32.      Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes

other obligations that may flow from ownership of the property." *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000).  As the Fourth Circuit held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam*), the scope of section 363(f) is not limited to *in rem* interests in a debtor's assets.  Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute."  *Folger Adam*, 209 F.3d at 258.

33.     With respect to any other party asserting a lien, claim, or encumbrance against the Merchandise and the M&E, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  In connection with the sale of the Merchandise and the M&E , the Debtors propose that any liens, claims, and encumbrances asserted against the Merchandise and the M&E  be transferred to and attach to the amounts earned by the Debtors under the Store Closings with the same force, effect, and priority as such liens currently have on the Merchandise and the M&E .

**III.    The Court Should Waive Compliance with Applicable
State Laws and Approve the Dispute Resolution Procedures**

34.     The Debtors' ability to conduct the Store Closings in accordance with the Store Closing Procedures and without strict compliance with all Applicable State Laws is critical to the Store Closings' success.  Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Store Closings, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.

35.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still

adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings. As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

36. The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws. *First*, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding contrary Applicable State Laws as it is essential to maximize the value of the Debtors' business. *Third*, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Court because the Debtors are only seeking interim relief at the outset of these cases, and parties in interest will be able to raise any further issues at the final hearing.

13172884 v1

A001019

37.     Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See Belculfine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

38.     Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety.  *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

39.     Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Store Closings without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The Debtors do not seek a general waiver of all state and local

13172884 v1

A001020

law requirements, but only those that apply specifically to retail liquidation sales.  Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closings.  Moreover, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising.  Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

40.     Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein.  *See, e.g.*, *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales under the terms of the order "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Sales are conducted and advertised in compliance with this Order"); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

13172884 v1

A001021

IV.    **The Court Should Waive Compliance with any Restriction**
       **in the Leases and Approve the Store Closing Procedures**

41.    Certain of the Debtors' leases governing the premises of the stores subject to any Store Closings may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H., Macy and Co. Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

42.    This Court has long held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (ordering "the sale of the Store Closure Assets shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease, license, reciprocal easement agreement, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store

A001022

Closings or the Sales"); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7,

2014) (ordering that store closing sales be conducted without the further need for compliance with,

among other things, lease provisions); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del.

Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D.

Del. June 13, 2008) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del.

May 30, 2008) (same).

43.　　　Thus, to the extent that such provisions or restrictions exist in any of the leases of

the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors

conduct the Store Closings without reference to any such restrictive provisions or interference by

any landlords or other persons affected, directly or indirectly, by the Store Closings.

## V.　The Court Should Approve the Abandonment of Certain Property in Connection with Any Liquidation Sales and Lease Rejections

44.　　　After notice and a hearing, a debtor "may abandon any property of the estate that

is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C.

§ 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating

that a trustee "may abandon his claim to any asset, including a cause of action, he deems less

valuable than the cost of asserting that claim").

45.　　　The Debtors are seeking to sell all M&E remaining in the Closing Stores.  However,

the Debtors may determine that the costs associated with holding or selling certain property or

M&E exceeds the proceeds that will be realized upon its sale or that such property is not sellable

at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may

be burdensome to retain.

46.　　　To maximize the value of the Debtors' assets and to minimize the costs to the

estates, the Debtors respectfully request authority to abandon any of their remaining M&E or other

13172884 v1

A001023

property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned M&E or other property be authorized to dispose of such property without liability to any third parties.

47.     Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that, alone or in conjunction with other information, identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

## VI.     The Store Closing Bonus Plan Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved

48.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a debtor to use property of the estate when such use has a "sound business purpose" and when the use of the property is proposed in good faith.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

49.     Courts generally require a debtor to demonstrate that a valid business purpose exists for the use of estate property in a manner that is outside the ordinary course of business.  *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).  The debtor's articulation of a valid business justification raises a presumption that the debtor's decision was made on an informed basis, in good faith, and with the honest belief that the action is in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Furthermore, once "the

A001024

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule shields a debtor's management from judicial second-guessing. *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615–16 (noting that "the Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the actions in question should be approved under section 363(b)(1) of the Bankruptcy Code.

50. In this case, the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors and their estates. The store employees—along with their skills, knowledge, and hard work—are more critical now than ever. Through their commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and at a time when those employees' positions will soon be terminated.

51. Additionally, the total cost of the Store Closing Bonus Plan is reasonable in light of competitive market practice and involves compensation structures often used in other restructuring situations to incentivize employees to continue optimal performances despite the added stress inherent in the chapter 11 process.

52. The Store Closing Bonus Plan is comparable to employee incentive plans regularly paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed sales. As in those other instances, the specific Store Closing Bonus Plan here was devised with the input of the Consultant based on its views of maximizing the sale process and recoveries for creditors.

As such, courts have approved incentive payments similar to those contemplated by the Store Closing Bonus Plan. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing store closing retention bonus program on a final basis); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Toys "R" Us, Inc.*, No. 17- (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re rue21, Inc.*, No. 17-22045 (GLT) (Bankr. W.D. Pa. June 12, 2017) (same); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 9, 2017) (same).

53.    The Debtors respectfully submit that the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and should be approved pursuant to section 363 of the Bankruptcy Code as in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

## VII.    The Court Should Authorize the Assumption of the Consulting Agreement.

54.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract . . . of the debtor." The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract is whether the debtor's reasonable business judgment supports such assumption or rejection. *See, e.g.*, *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard, and that such decision may only be overturned if found to be a product of bad faith, whim, or caprice); *see also In re Market Square Inn Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

55.    The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.3d 1301, 1311 (5th Cir. 1985).

56. Assumption of the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment. In consultation with their advisors, the Debtors have determined that the stores to be closed are unduly burdensome, and the Merchandise and the M&E should be liquidated for the benefit of the Debtors' estates and their creditors. The Store Closings are already in progress. The Debtors determined that entering into the Consulting Agreement, after engaging in extensive negotiations with the Consultant and their prepetition lenders, will provide the greatest return to the Debtors' estates for the Merchandise and the M&E. The Debtors believe, in their business judgment, that the terms set forth in the Consulting Agreement constitute the best available alternative for the conduct of the Store Closings and Sales.

57. The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closings in an efficient and cost-effective manner. Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closings for the benefit of all stakeholders. Given the number of stores and the particular issues in administering the Store Closings, the Debtors may not be able to retain a liquidator able to conduct the process as efficiently and effectively as the Consultant, who already has significant experience

A001027

with the Debtors' business operations and outlay of stores. If the Consulting Agreement is not approved, operative, and effective on an interim basis, the Store Closings would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to a loss of additional liquidity and increased administrative expenses. Moreover, it is imperative that the Consulting Agreement be approved on an interim basis so that the Debtors and the Consultant can immediately begin conducting the Store Closings and closing stores in accordance with the Store Closing Procedures, which will generate more proceeds for the Debtors and their estates.

**VIII.  The Court Should Authorize the Retention of the Consultant Pursuant to Section 327(a) in Connection with Assumption of the Consulting Agreement.**

58.     The Debtors have selected the Consultant because they believe that the Consultant has developed an expertise in such matters that will significantly enhance the value recovered for the Assets, whether through the disposition of such through the conduct of strategic store closings for the Merchandise and the M&E, or through targeting marketing of the other Assets through their various divisions having an expertise in each such asset categories. Each entity comprising the Consultant is familiar with retail businesses generally, and the Debtors' business operations specifically, and are well regarded and a leader in the distressed asset acquisition and disposition field.

59.     The Debtors believe the employment of the Consultant as asset disposition consultants and advisors is in the best interest of the Debtors and their creditors since the Consultant will provide invaluable services as the Debtors attempt to maximize the realizable value recovered for its business and assets. The matters for which the Consultant is to be engaged are matters in which no other professional employed in this case will render services duplicative of the services rendered by the Consultant.

A001028

60.     Based on the information the Consultant has to date provided to the Debtors, the Debtors believe that the Consultant does not hold an interest adverse to either the Debtors or their estates, and with respect to the subject matter on which the Consultant has been engaged is a "disinterested person" pursuant to sections 327(a) and 101(14) of the Bankruptcy Code.

61.     As is customary in this district, each entity comprising the Consultant will file declarations of their connections prior to the final hearing on this Motion (the "Consultant's Declarations").

62.     To the best of the Debtors' knowledge, and except as may be disclosed in the respective Consultant Declarations when filed, the Consultant has not provided services to the Debtors' creditors, equity security holders, or any other parties-in-interest, or its respective attorneys, in any matter relating to the Debtors or their estates.

63.     The Debtors respectfully requests that the Consultant be retained in conjunction with the Court's approval of the assumption of the Consulting Agreement, *nunc pro tunc* to the Petition Date.  Since the Petition Date, the Consultant has provided valuable services that were time sensitive and critical to protection of the interests of the Debtors' stakeholders.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

64.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors reject certain unexpired leases, approving store closing or similar themed sales in accordance with the Store Closing Procedures, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief

34

A001029

requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations, and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## **Reservation of Rights**

65. Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

13172884 v1

A001030

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

66.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

67.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) the Dispute Notice Parties; (g) all of the Debtors' landlords at the locations of the Closing Stores, and counsel thereto, if known; and (h) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

68.     No prior request for the relief sought in this Motion has been made to this or any other court.


[*Remainder of page intentionally left blank*]

13172884 v1

A001031

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the form**s** attached hereto as **Exhibit A** and **Exhibit B,** respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated: March 9, 2020          **BENESCH, FRIEDLANDER, COPLAN &**
Wilmington, Delaware          **ARONOFF LLP**

              */s/ Gregory W. Werkheiser*
          Gregory W. Werkheiser (DE No. 3553)
          Michael J. Barrie (DE No. 4684)
          Jennifer Hoover (DE No. 5111)
          Kevin Capuzzi (DE No. 5462)
          John C. Gentile (DE No. 6159)
          222 Delaware Avenue, Suite 801
          Wilmington, DE 19801
          Telephone: (302) 442-7010
          Facsimile: (302) 442-7012
          E-mail: gwerkheiser@beneschlaw.com
                  mbarrie@beneschlaw.com
                  jhoover@beneschlaw.com
                  kcapuzzi@beneschlaw.com
                  jgentile@beneschlaw.com

          *Proposed Counsel to the Debtors and Debtors in*
          *Possession*

A001032

# EXHIBIT A

A001033

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **Re: Docket No. _____** |

## INTERIM ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (a) authorizing and approving the conduct of store closing or similar themed sales in accordance with the terms of the store closing procedures (the "Store Closing Procedures") attached hereto as **Exhibit 1**, with such sales to be free and clear of all liens, claims and encumbrances; (b) authorizing the Debtors to conduct the Store Closings; (c) authorizing the Debtors to pay customary bonuses to employees of Closing Stores; (d) authorizing the Debtors to assume the Consulting Agreement; (e)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVCE, LLC (2509); AVF Franchising, LLC (6325); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); LF Trucking, Inc. (1484); and Sam Levin, Inc. (5198). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

authorizing the Debtors to retain the Consultant as special asset disposition advisor pursuant ot Section 327(a) fo the bankruptcy Code; (f) scheduling a final hearing to consider approval of the Motion on a final basis; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

    A.    The Debtors have advanced sound business reasons for seeking to implement the Store Closing Procedures and assume the Consulting Agreement, as set forth in the Motion and at the Hearing, and such relief is in the best interests of the Debtors and their estates.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

2

A001035

B.     The Store Closing Procedures are reasonable, and the conduct of the Closing Sales in accordance with the Store Closing Procedures will provide an efficient means for the Debtors to dispose of the Merchandise and the M&E and will maximize the returns on the Merchandise and the M&E.

C.     The Consulting Agreement was negotiated, proposed, and entered into by the Debtors and the Consultant without collusion, in good faith, and from arm's-length bargaining positions, and the operation and effectiveness of the Consulting Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

D.     The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.     The Store Closings and Closing Sales are in the best interest of the Debtors' estates.

F.     The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is HEREBY ORDERED THAT:

1.     The Motion is granted on an interim basis as provided herein.

2.     The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2020, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2020, and shall be served on:  (a) the Debtors, 6500 14 Mile Road, Warren, Michigan 48092, Attn:  Michael Zambricki; (b) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (c)

A001036

proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (d) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (e) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (f) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (g) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (h) counsel to any statutory committee appointed in these chapter 11 cases.. In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

3.      The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan.

4.      The Debtors and the Consultant are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion. The failure to specifically include any provision of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments, and transactions be, and hereby are, authorized and approved as and to the extent provided in this Interim Order.

5. To the extent of any conflict between this Interim Order, the Consulting Agreement, and the Store Closing Procedures, the terms of this Interim Order shall control.

6. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

**I. Authority to Engage in Closing Sales and Conduct Store Closings.**

7. The Debtors and the Consultant are authorized, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct Closing Sales at the Closing Stores in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

8. The Store Closing Procedures are approved in their entirety on an interim basis.

9. The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

10. All entities that are presently in possession of some or all of the Merchandise or M&E in which the Debtors hold an interest that are hereby are directed to surrender possession of such Merchandise or M&E to the Debtors.

11. Neither the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Closing Sales and to take the related actions authorized herein.

**II. Conduct of the Sales.**

12. All media in which the Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Closing Sales and the sale of Merchandise, M&E, and Additional Consultant Goods, including, without limitation, to conduct and advertise the sale of the

5

Merchandise, M&E, and Additional Consultant Goods in the manner contemplated by and in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

13.     The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Store Closings without necessity of further order of this Court as provided in this Interim Order, the Store Closing Procedures, and the Consulting Agreement, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, and street signage; *provided*, *however*, that only Debtor-approved terminology will be used at each Closing Store in connection with the Sales.

14.     The Consultant is authorized to supplement the Merchandise in the Closing Stores with Additional Consultant Goods, provided that any such supplementing with Additional Consultant Goods must be of like kind and no lesser quality than goods sold in the Closing Stores prior to the Petition Date.  Sales of Additional Consultant Goods shall be run through the Debtors' cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  The Consultant and Merchant shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods from the Merchandise.

15.     All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Consultant to the Debtors

6

A001039

under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. At all times and for all purposes, the Additional Consultant Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Consultant Goods or the proceeds thereof. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultant. The Debtors shall, at Consultant's sole cost and expense, insure Additional Consultant Goods and, if required, promptly file any proofs of loss with regard thereto.

16. Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected on a interim basis pursuant to this Interim Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional Consultant Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds). As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Consultant Goods to the Consultant, net of any fee payable to the Debtors pursuant to the Consulting Agreement.

17. Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, M&E, and

Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during

the course of such sale regarding laws regulating the use of sign-walkers, banners, or other

advertising and the Debtors are unable to resolve the matter consensually, any party may request

an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will,

to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing, or

(b) within two (2) business days of such request. This scheduling shall not be deemed to preclude

additional hearings for the presentation of evidence or arguments as necessary.

18.     The sale of the Merchandise, M&E, and Additional Consultant Goods shall be

conducted by the Debtors notwithstanding any restrictive provision of any lease, sublease,

restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict

the conduct of the Store Closings or the Closing Sales (including the sale of the Merchandise,

M&E, and Additional Consultant Goods) and the rejection of leases, abandonment of assets, or

"going dark" provisions, and such provisions shall not be enforceable in conjunction with the Sales

or the Store Closings. Breach of any such provisions in these chapter 11 cases in conjunction with

the Store Closings or the Closing Sales shall not constitute a default under a lease or provide a

basis to terminate the lease; *provided* that the Store Closings and Closing Sales are conducted in

accordance with the terms of this Interim Order and the Store Closing Procedures.

19.     Except as expressly provided for herein or in the Store Closing Procedures, and

except with respect to any Governmental Unit (as to which paragraphs 22 and 23 shall apply) no

person or entity, including, but not limited to, any landlord, licensor, service provider, utility, or

creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder

consummation of the Closing Sales or the sale of merchandise, M&E, or Additional Consultant

Goods, or the advertising and promotion (including the posting of signs and exterior banners or

A001041

the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding the conduct of the Closing Sales and/or Store Closings, and/or (b) instituting any action or proceeding in any court (other than this Court) or administrative body seeking an order or judgment against, among others, the Debtors, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Closing Sales or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.     In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Interim Order.

21.     All sales of Merchandise, M&E and Additional Consultant Goods shall be "as is" and final.  Returns related to the purchase of Store Assets shall not be accepted at stores that are not participating in the Store Closings.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.     The Consultant shall not be liable for sales taxes except wither respect to the Additional Consultant Goods, and  as expressly provided in the Consulting Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors, subject to Consultant's

obligation to collect and remit the sales taxes attributable to the sale of Additional Consultant Goods. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit. For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. This Interim Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell Store Assets—and all sales of Store Assets whether by the Consultant or the Debtors, shall be—free and clear of any and all of any liens, claims, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-

13172880 v2

A001043

contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances")s; as provided for herein because in each case, one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied; *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of the Merchandise and the M&E with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Merchandise and the M&E, subject to any claims and defenses that any party may possess with respect thereto and subject to the Consultant's fees and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon M&E that may contain personal and/or confidential information about the Debtors' employees and/or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of M&E before such sale or abandonment.

25.     The Debtors are authorized and empowered to transfer merchandise, M&E and Additional Consultant Goods among, and into, the Stores.

## III.     Dispute Resolution Procedures with Governmental Units.

26.     Nothing in this Interim Order, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including,

13172880 v2

A001044

without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Nothing in this Interim Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations. Nothing in this Interim Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the bankruptcy Code or this Interim Order. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

27. To the extent that the sale of Merchandise, M&E, and Additional Consultant Goods is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the merchandise, M&E, and Additional Consultant Goods, the Dispute Resolution Procedures in this section shall apply:

    a.     Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing

Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.      Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; (iv) the division of consumer protection for each state in which the Closing Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Closing Sales are being held (collectively, the "Dispute Notice Parties").

c.      With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036; (iii) the United States Trustee's Office for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) counsel to the Prepetition Term Loan Lenders, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf. If the Debtors and the Governmental Unit are unable to resolve the Reserved

A001046

Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.    In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.    If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

28.    Subject to paragraphs 22 and 23 above, each and every federal, state, or local agency, departmental unit, or Governmental Unit with regulatory authority over the Closing Sales, and all newspapers and other advertising media in which the Closing Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors be required, to post any bond, to conduct the Sales.

13172880 v2

A001047

29.     Within three business days of this Interim Order, the Debtors shall serve copies of this Interim Order, and the Store Closing Procedures via e-mail, facsimile, or regular mail, on: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) all parties who are known by the Debtors to assert liens against the Merchandise and the M&E ; (g) all state attorneys general in which the Merchandise and the M&E are located; (h) municipalities in which the Merchandise and the M&E are located; (i) all of the Debtors' landlords at the locations of the Stores; (j) all applicable state and consumer protection agencies; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## IV.   Effectiveness of the Consulting Agreement.

30.     The Consulting Agreement is operative and effective on an interim basis.  The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including, without limitation, reimbursing all expenses to the Consultant as required by the Consulting Agreement without the need for any application of the Consultant or a further order of the Court.  For avoidance of doubt, the Debtors are also authorized to fund the Expense Deposit in accordance with the terms of the Consulting Agreement.

31.     The treatment of Pre-SCD Orders, including the Cancelled Back-Order Merchandise Credit, described in the Consulting Agreement is a sound exercise of the Debtors' business judgment, complies with applicable law, and is hereby approved, subject to entry of the Final Order.

A001048

32.     Subject to the restrictions set forth in this Interim Order and the Store Closing Procedures, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement, the Store Closings, and the Closing Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and the Closing Sales prior to the date hereof, are hereby approved and ratified.   The failure to specifically include any particular provision of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Consulting Agreement and all of its provisions, payments, and transactions, be and hereby are authorized and approved as and to the extent provided for in this Interim Order.

33.     Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of any act or omission by the Consultant constituting fraud, gross negligence, or willful misconduct.

## V.     Debtors are Authorized to Retain Consultant as Special Asset Disposition Consultant Pursuant to the Consulting Agreement.

34.     The This Court is satisfied that the Consultant represents and holds no interest adverse to the Debtors or their estates, and that the Consultant will not represent any other entity in connection with these cases and that its employment is necessary and would be in the best interests of the Debtors and the estates.  Accordingly, pursuant to sections 327(a), 330 and 331 of Bankruptcy Code, the Debtors be, and hereby are, authorized to retain the Consultant as their special asset disposition advisors and consultants, to assist the Debtors in the marketing and sale process for the Assets in accordance with the Consulting Agreement; provided however, it is agreed and understood that no fees shall be payable to the Consultant in connection with Services

13172880 v2

A001049

rendered by it to the Debtors pursuant to the Consulting Agreement, and other than the right to reimbursement of Consultant Incurred Expenses, Consultant shall have to claim or right to payment from the Company; provided further however, Consultant shall not be required to file a fee application for reimbursement of the Consultant Incurred Expenses. Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, however, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible

## VI. Other Provisions.

35. The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

36. The Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, *however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible.

37. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or

17

A001050

(g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Interim Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens. Any payment made pursuant to this Interim Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

38. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

39. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

40. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

41. Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

42. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

43. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords for protection from interference with the Store

A001051

Closings or Closing Sales, (c) any other disputes related to the Store Closings or Closing Sales, and (d) protect the Debtors against any assertions of any liens, claims, encumbrances, and other interests. No such parties or person shall take any action against the Debtors, the landlords, the Store Closings, or the Closing Sales until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

13172880 v2

A001052

# **EXHIBIT 1**

A001053

## Store Closing Procedures[1]

1.      The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.      The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.      The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]      Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures. In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores. In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.     The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.     Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.     Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease. No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales. The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E. The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines. The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag. For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

A001055

15. If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

A001056

**EXHIBIT B**

**Proposed Final Order**

A001057

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re: Docket No. _____** |

**FINAL ORDER GRANTING DEBTORS'
EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE
CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO
EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION
OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE
BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO
RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET
DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A)
OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Final Order"): (a) authorizing and

approving the conduct of store closing or similar themed sales in accordance with the terms of the

store closing procedures (the "Store Closing Procedures") attached hereto as **Exhibit 1**, with such

sales to be free and clear of all liens, claims and encumbrances; (b) authorizing the Debtors to

conduct the Store Closings; (c) authorizing the Debtors to pay customary bonuses to employees of

---

[1]　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVCE, LLC (2509); AVF Franchising, LLC (6325); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); LF Trucking, Inc. (1484); and Sam Levin, Inc. (5198). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]　Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

13172872 v1

A001058

Closing Stores; (d) authorizing the Debtors to assume the Consulting Agreement; (e) authorizing the Debtors to retain the Consultant as special asset disposition advisor pursuant to Section 327(a) of the Bankruptcy Code; (f) scheduling a final hearing to consider approval of the Motion on a final basis; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

A001059

A. The Debtors have advanced sound business reasons for seeking to implement the Store Closing Procedures and assume the Consulting Agreement, as set forth in the Motion and at the Hearing, and such relief is in the best interests of the Debtors and their estates.

B. The Store Closing Procedures are reasonable, and the conduct of the Closing Sales in accordance with the Store Closing Procedures will provide an efficient means for the Debtors to dispose of the Merchandise and the M&E and will maximize the returns on the Merchandise and the M&E.

C. The Consulting Agreement was negotiated, proposed, and entered into by the Debtors and the Consultant without collusion, in good faith, and from arm's-length bargaining positions, and the operation and effectiveness of the Consulting Agreement on a final basis is a sound exercise of the Debtors' business judgment.

D. The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E. The Store Closings and Closing Sales are in the best interest of the Debtors' estates.

F. The entry of this Final Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as provided herein.

2. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

3. The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan.

A001060

4.      The Debtors and the Consultant are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.  The failure to specifically include any provision of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments, and transactions be, and hereby are, authorized and approved as and to the extent provided in this Final Order.

5.      To the extent of any conflict between this Final Order, the Consulting Agreement, and the Store Closing Procedures, the terms of this Final Order shall control.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of the Final Order are immediately effective and enforceable upon its entry.

## I.      Authority to Engage in Closing Sales and Conduct Store Closings.

7.      The Debtors and the Consultant are authorized, on a final pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to continue and conduct Closing Sales at the Closing Stores in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement as may be modified by a Side Letter (as defined below) between the Debtors and the landlords at the closing locations.

8.      The Store Closing Procedures are approved in their entirety on a final basis. The Store Closing Procedures shall be used for all permitted store closings in these chapter 11 cases, unless otherwise ordered.

9.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement.

10.      All entities that are presently in possession of some or all of the Merchandise or M&E in which the Debtors hold an interest that are or may be subject to this Final Order hereby are directed to surrender possession of such Merchandise or M&E to the Debtors.

11.     Neither the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Closing Sales and to take the related actions authorized herein.

**II.     Conduct of the Sales.**

12.     All media in which the Closing Sales may be advertised and all landlords are directed to accept this Final Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Closing Sales and the sale of Merchandise, M&E, and Additional Consultant Goods, including, without limitation, to conduct and advertise the sale of the Merchandise, M&E, and Additional Consultant Goods in the manner contemplated by and in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement.

13.     The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Store Closings without necessity of further order of this Court as provided in this Final Order,  the Store Closing Procedures, and the Consulting Agreement, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, and street signage; *provided*, *however*, that only Debtor-approved terminology will be used at each Closing Store in connection with the Sales.

14.     The Consultant is authorized to supplement the Merchandise in the Closing Stores with Additional Consultant Goods, provided that any such supplementing with Additional Consultant Goods must be of like kind and no lesser quality than goods sold in the Closing Stores prior to the Petition Date.  Sales of Additional Consultant Goods shall be run through the Debtors'

cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. The Consultant and Merchant shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods from the Merchandise.

15.    All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Consultant to the Debtors under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. At all times and for all purposes, the Additional Consultant Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Consultant Goods or the proceeds thereof. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultant. The Debtors shall, at Consultant's sole cost and expense, insure Additional Consultant Goods and, if required, promptly file any proofs of loss with regard thereto.

16.    Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected on an final pursuant to this Final Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional

A001063

Consultant Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds). As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Consultant Goods to the Consultant, net of any fee payable to the Debtors pursuant to the Consulting Agreement.

17.    Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, M&E, and Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing, or (b) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18.    The sale of the Merchandise, M&E, and Additional Consultant Goods shall be conducted by the Debtors notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Closing Sales (including the sale of the Merchandise, M&E, and Additional Consultant Goods) and the rejection of leases, abandonment of assets, or "going dark" provisions, and such provisions shall not be enforceable in conjunction with the Sales or the Store Closings. Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Closing Sales are conducted in

A001064

accordance with the terms of this Final Order and the Store Closing Procedures. Subject to the approval of the Secured Lenders, the Debtors and landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Store Closing Procedures without further order of the Court and such Side Letters shall be binding as among the Debtors and any such landlords. In the event of any conflict between the Store Closing Procedures and any Side Letter, the terms of such Side Letter shall control.

19. Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs  and  shall apply) no person or entity, including, but not limited to, any landlord, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Closing Sales or the sale of Merchandise, M&E, or Additional Consultant Goods, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding the conduct of the Closing Sales and/or Store Closings, and/or (b) instituting any action or proceeding in any court (other than this Court) or administrative body seeking an order or judgment against, among others, the Debtors, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Closing Sales or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.     In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Order.

21.     All sales of Merchandise, M&E and Additional Consultant Goods shall be "as is" and final.  Returns related to the purchase of Store Assets shall not be accepted at stores that are not participating in the Store Closings.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.     The Consultant shall not be liable for sales taxes except with respect to the Additional Consultant Goods, and  as expressly provided in the Consulting Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors, subject to Consultant's obligation to collect and remit the sales taxes attributable to the sale of Additional Consultant Goods.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  This Final Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

13172872 v1

A001066

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell Store Assets—and all sales of Store Assets whether by the Consultant or the Debtors, shall be—free and clear of any and all of any liens, claims, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances")s; as provided for herein because in each case, one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied; *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of the Merchandise and the M&E with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Merchandise and the M&E, subject to any claims and defenses that any party may possess with respect thereto and subject to the Consultant's and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon M&E that may contain personal and/or confidential information about the Debtors' employees and/or customers

A001067

(the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of M&E before such sale or abandonment.

25.     The Debtors are authorized and empowered to transfer merchandise, M&E and Additional Consultant Goods among, and into, the Stores.

## III.     Dispute Resolution Procedures with Governmental Units.

26.     Nothing in this Final Order, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Final Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Final Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Final Order.  Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with

A001068

respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

27.     To the extent that the sale of Merchandise, M&E, and Additional Consultant Goods is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the merchandise, M&E, and Additional Consultant Goods, the Dispute Resolution Procedures in this section shall apply:

  a. Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

  b. Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following:  (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; (iv) the division of consumer protection for each state in which the Closing Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Closing Sales are being held (collectively, the "<u>Dispute Notice Parties</u>").

  c. With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "<u>Additional Closing Store</u>

List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036; (iii) the United States Trustee's Office for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) counsel to the Prepetition Term Loan Lenders, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.   In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any

A001070

jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e. If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

28. Subject to paragraphs and __ above, each and every federal, state, or local agency, departmental unit, or Governmental Unit with regulatory authority over the Closing Sales, and all newspapers and other advertising media in which the Closing Sales are advertised shall consider the Final Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors be required, to post any bond, to conduct the Sales.

29. Within three business days of the Final Order, the Debtors shall serve copies of the Final Order, and the Store Closing Procedures via e-mail, facsimile, or regular mail, on: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) all parties who are known by the Debtors to assert liens against the Merchandise and the M&E ; (g) all state attorneys general in which the Merchandise and the M&E are located; (h) municipalities in which the Merchandise and the M&E are located; (i) all of the Debtors' landlords at the locations of the Stores; (j) all applicable state and consumer protection agencies; and (k) any party that has requested notice pursuant to

A001071

Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## IV. Effectiveness of the Consulting Agreement.

30. The Consulting Agreement is operative and effective on a final basis. The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including, without limitation, reimbursing all expenses to the Consultant as required by the Consulting Agreement without the need for any application of the Consultant or a further order of the Court. For avoidance of doubt, the Debtors are also authorized to fund the Expense Deposit in accordance with the terms of the Consulting Agreement.

31. The treatment of Pre-SCD Orders, including the Cancelled Back-Order Merchandise Credit, described in the Consulting Agreement is a sound exercise of the Debtors' business judgment, complies with applicable law, and is hereby approved, subject to entry of the Final Order.

32. Subject to the restrictions set forth in this Final Order Order and the Store Closing Procedures, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement, the Store Closings, and the Closing Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and the Closing Sales prior to the date hereof, are hereby approved and ratified. The failure to specifically include any particular provision of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Consulting Agreement and all of its provisions, payments, and transactions, be and hereby are authorized and approved as and to the extent provided for in this Final Order.

16

A001072

33.     Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of any act or omission by the Consultant constituting fraud, gross negligence, or willful misconduct.

**V.      Debtors are Authorized to Retain Consultant as Special Asset Disposition Consultant Pursuant to the Consulting Agreement.**

34.     The This Court is satisfied that the Consultant represents and holds no interest adverse to the Debtors or their estates, and that the Consultant will not represent any other entity in connection with these cases and that its employment is necessary and would be in the best interests of the Debtors and the estates.  Accordingly, pursuant to sections 327(a), 330 and 331 of Bankruptcy Code, the Debtors be, and hereby are, authorized to retain the Consultant as their special asset disposition advisors and consultants, to assist the Debtors in the marketing and sale process for the Assets in accordance with the Consulting Agreement; provided however, it is agreed and understood that no fees shall be payable to the Consultant in connection with Services rendered by it to the Debtors pursuant to the Consulting Agreement, and other than the right to reimbursement of Consultant Incurred Expenses, Consultant shall have to claim or right to payment from the Company; provided further however, Consultant shall not be required to file a fee application for reimbursement of the Consultant Incurred Expenses. Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, however, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible

**VI.     Other Provisions.**

35.     The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

13172872 v1

A001073

36.     The Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, *however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible.

37.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Final Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens. Any payment made pursuant to this Final Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

38.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

39.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

A001074

40. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

41. Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

42. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

43. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords for protection from interference with the Store Closings or Closing Sales, (c) any other disputes related to the Store Closings or Closing Sales, and (d) protect the Debtors against any assertions of any liens, claims, encumbrances, and other interests. No such parties or person shall take any action against the Debtors, the landlords, the Store Closings, or the Closing Sales until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

A001075

# EXHIBIT 1

A001076

**Store Closing Procedures**[1]

1.　　The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.　　The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.　　On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.　　At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.　　The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.　　The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]　　Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures. In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores. In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease. No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales. The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E. The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines. The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag. For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

A001078

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

A001079

# **EXHIBIT 2**

A001080

Art Van Furniture
Results - Store Count Strategy by Location

| | | |
|---|---|---|
| 169 | # Stores included in liquidation | Yes |
| 2 | # stores closed prior to sale commencement | No |

Financial Information in ($000's)

| Location Information | | | | | | | | | | | | Location Space Details | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store # | Store Name | Original Store Name | Include in Liquidation | Direct Marketing Area | Store Type | Company Affiliation | Gross Sq. Ft. | Selling Sq. Ft. | Lease Beginning Date | Lease Expire. | Months Remaining | SLB Property | Landlord | Master Lease | Address |
| 1 | Bel Air, MD (1) | BEL AIR (#65) | Yes | Baltimore | Standard | WLF | 74,400 | 62,000 | 5/15/2015 | 12/31/2025 | 70 | No | CAMPUS HILLS MARYLAND ASSOCIATES, L.P. | None | 2400 E Churchville Rd, Bel Air, MD, 21015, USA |
| 2 | Pasadena, MD (2) | PASADENA (#61) | Yes | Baltimore | Standard | WLF | 61,646 | 54,000 | 5/15/2015 | 8/31/2025 | 66 | No | ARUNDEL PROPERTY INVESTORS LP | None | 8038 Ritchie Hwy, Pasadena, MD, 21122, USA |
| 3 | Westminster, MD (3) | WESTMINSTER (#64) | Yes | Baltimore | Standard | WLF | 40,550 | 38,000 | 5/15/2015 | 8/31/2021 | 18 | No | WESTMINSTER GATEWAY, LLC | None | 1030 Baltimore Blvd Suite 110, Westminster, MD, 21157, USA |
| 4 | Towson, MD (4) | TOWSON (#63) | Yes | Baltimore | Standard | WLF | 54,000 | 46,000 | 5/15/2015 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1530 E Joppa Rd, Towson, MD, 21286, USA |
| 5 | Catonsville, MD (5) | CATONSVILLE (#62) | Yes | Baltimore | Standard | WLF | 115,300 | 40,000 | 5/15/2015 | 8/31/2025 | 66 | No | JMB JOINT VENTURE | None | 6415 Baltimore National Pike, Catonsville, MD, 21228, USA |
| 6 | Downers Grove, IL (6) | DOWNERS GROVE AVF & SSI (#199) | Yes | Chicago | Flagship | AVF | 100,000 | 92,428 | 8/1/2015 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1021 BUTTERFIELD RD, DOWNERS GROVE, IL, 60515, USA |
| 7 | Merrillville, IN (7) | MERRILLVILLE AVF | Yes | Chicago | Standard | AVF | 50,000 | 43,130 | 8/24/2013 | 2/28/2023 | 36 | No | ACADIA MERRILLVILLE REALTY, L.P. | None | 1600 E 80TH AVE, MERRILLVILLE, IN, 46410, USA |
| 8 | Naperville, IL (8) | NAPERVILLE AVF | Yes | Chicago | Standard | AVF | 62,000 | 52,753 | 6/18/2015 | 8/31/2025 | 66 | No | BRIXMOR HERITAGE SQUARE, LLC | None | 404 SOUTH ROUTE 59, NAPERVILLE, IL, 60540, USA |
| 9 | Bedford Park, IL (9) | BEDFORD PK AVF | Yes | Chicago | Standard | AVF | 84,505 | 71,590 | 10/26/2013 | 4/30/2024 | 50 | No | SPIRIT SPE LOAN PORTFOLIO 2013-3, LLC | None | 7200 S CICERO AVE, BEDFORD PARK, IL, 60638, USA |
| 10 | Elston, IL (10) | ELSTON AVE AVF | Yes | Chicago | Standard | AVF | 48,000 | 40,660 | 10/26/2013 | 4/30/2024 | 50 | No | Farbman Group | None | 2606 ELSTON AVE, CHICAGO, IL, 60647, USA |
| 11 | Batavia, IL (11) | BATAVIA AVF | Yes | Chicago | Standard | AVF | 42,500 | 37,055 | 9/14/2013 | 1/31/2024 | 47 | No | PARAGON BATAVIA, LLC | None | 165 N RANDALL RD, BATAVIA, IL, 60510, USA |
| 12 | Orland Park, IL (12) | ORLAND PARK AVF | Yes | Chicago | Standard | AVF | 65,523 | 53,329 | 7/13/2013 | 5/31/2024 | 51 | No | 55th & S. Kedzie, LLC | None | 15080 S LA GRANGE RD, ORLAND PARK, IL, 60462, USA |
| 13 | Algonquin, IL (13) | ALGONQUIN AVF | Yes | Chicago | Standard | AVF | 48,397 | 41,272 | 3/31/2016 | 7/31/2025 | 65 | No | c/o Mid America Asset Management, Inc. | None | 1500 S RANDALL ROAD, ALGONQUIN, IL, 60102, USA |
| 14 | Kildeer, IL (14) | KILDEER AVF | Yes | Chicago | Standard | AVF | 40,628 | 34,534 | 10/4/2017 | 9/30/2027 | 91 | No | Kildeer Village Square, LLC. | None | 20393 N RAND RD, KILDEER, IL, 60074, USA |
| 15 | Glendale Heights, IL (15) | GLENDALE HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,820 | 37,044 | 2/26/2016 | 3/31/2026 | 73 | No | 125 W. Army Trail Road LLC | None | 125 ARMY TRAIL ROAD, GLENDALE HGTS, IL, 60139, USA |
| 16 | Deerfield, IL (16) | DEERFIELD AVF | Yes | Chicago | Standard | AVF | 41,966 | 35,671 | 12/13/2017 | 2/29/2028 | 96 | No | Gateway Fairview, Inc. | None | 120 S. WAUKEGAN, DEERFIELD, IL, 60015, USA |
| 17 | Schaumburg, IL (17) | SCHAUMBURG AVF& SSI (#303) | Yes | Chicago | Flagship | AVF | 71,400 | 61,990 | 10/29/2016 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1293 E HIGGINS RD, SCHAUMBURG, IL, 60173, USA |
| 18 | Joliet, IL (18) | JOLIET PS | Yes | Chicago | Sleep | APS | 3,116 | 2,884 | 12/26/2017 | 12/31/2027 | 94 | No | GW Fidelity PH, LLC | None | 2901 PLAINFIELD, JOLIET, IL, 60435, USA |
| 19 | Burbank, IL (19) | BURBANK PS | Yes | Chicago | Sleep | APS | 3,994 | 3,476 | 3/21/2015 | 3/31/2025 | 61 | No | WM 73 RE, LLC | None | 7712 CICERO AVENUE, BURBANK, IL, 60459, USA |
| 20 | Woodridge, IL (20) | WOODRIDGE AVF | Yes | Chicago | Standard | AVF | 68,400 | 59,687 | 3/27/2014 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 900 E BOUGHTON RD, WOODRIDGE, IL, 60517, USA |
| 21 | Gurnee, IL (21) | GURNEE AVF | Yes | Chicago | Standard | AVF | 34,000 | 28,900 | 6/26/2018 | 12/31/2032 | 154 | No | 3503 RP Gurnee, L.L.C. | None | 6911 W. GRAND AVE, GURNEE, IL, 60031, USA |
| 22 | Plainfield, IL (22) | PLAINFIELD PS | Yes | Chicago | Sleep | APS | 3,600 | 3,290 | 2/11/2017 | 2/28/2027 | 84 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 13511 S ROUTE 59, PLAINFIELD, IL, 60544, USA |
| 23 | Willowbrook, IL (23) | WILLOWBROOK PS | Yes | Chicago | Sleep | APS | 3,834 | 3,400 | 12/3/2016 | 1/31/2027 | 83 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6938 KINGERY HIGHWAY, WILLOWBROOK, IL, 60527, USA |
| 24 | Chicago, IL (24) | ASHLAND PS | Yes | Chicago | Sleep | APS | 3,000 | 2,600 | 9/10/2016 | 9/30/2026 | 79 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 2911 N. ASHLAND AVENUE, CHICAGO, IL, 60657, USA |
| 25 | Bloomingdale, IL (25) | BLOOMINGDALE PS | Yes | Chicago | Sleep | APS | 4,798 | 4,370 | 5/26/2017 | 4/30/2027 | 86 | No | Bloomingdale Square, LP | None | 398 W ARMY TRAIL RD #102, BLOOMINGDALE, IL, 60108, USA |
| 26 | Harwood Heights, IL (26) | HARWOOD HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,000 | 51,000 | 11/15/2017 | 12/31/2038 | 226 | No | DBD AVF | None | 7304 WEST LAWRENCE AVE, HARWOOD HEIGHTS, IL, 60706, U |
| 27 | Avon, OH (27) | AVON (#45, 46 CC) | Yes | Cleveland | Standard | LVF | 77,000 | 72,380 | 7/1/2011 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1801 NAGEL ROAD, AVON, OH, 44011, USA |
| 28 | North Canton, OH (28) | CANTON (#14, 25, 26 CC) | Yes | Cleveland | Standard | LVF | 65,765 | 60,199 | 3/1/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 6229 PROMLER AVENUE NW, NORTH CANTON, OH, 44720, USA |
| 29 | Akron, OH (29) | AKRON (#23, 24 CC) | Yes | Cleveland | Standard | LVF | 69,422 | 65,257 | 10/1/2005 | 9/30/2020 | 7 | No | TABANI AKRON, LP | None | 3742 BROOKWALL DRIVE, AKRON, OH, 44333, USA |
| 30 | Middleburg Heights, OH (30) | MIDDLEBURG (#11, 31 CC) | Yes | Cleveland | Standard | LVF | 50,000 | 45,172 | 7/1/1993 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 16960 SPRAGUE ROAD, MIDDLEBURG HEIGHTS, OH, 44130, US |
| 31 | Mentor, OH (31) | MENTOR (#9, 27, 28 CC) | Yes | Cleveland | Standard | LVF | 75,600 | 70,712 | 7/1/2009 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 7799 MENTOR AVE, MENTOR, OH, 44060, USA |
| 32 | Oakwood Village, OH (32) | OAKWOOD VILLAGE (#18, 19 CC) | Yes | Cleveland | Standard | LVF | 89,723 | 67,723 | 8/1/2002 | 11/30/2027 | 93 | No | FIRST INERNATIONAL HAWTHORNE LP | None | 23100 BROADWAY AVE, OAKWOOD VILLAGE, OH, 44146, USA |
| 33 | North Olmsted, OH (33) | NORTH OLMSTED (#12, 34 CC) | Yes | Cleveland | Standard | LVF | 46,000 | 41,270 | 8/1/1996 | 1/31/2027 | 83 | No | GLITZ AND ASSOCIATES INC | None | 23250 LORAIN ROAD, NORTH OLMSTED, OH, 44070, USA |
| 34 | Strongsville, OH (34) | STRONGSVILLE (#74) | Yes | Cleveland | Sleep | LM | 5,000 | 4,400 | 11/5/2015 | 10/31/2025 | 68 | No | ECHO STRONGSVILLE LLC | None | 16105 PEARL ROAD, STRONGSVILLE, OH, 44136, USA |
| 35 | Mayfield Heights, OH (35) | MAYFIELD (#65) | Yes | Cleveland | Sleep | LM | 4,620 | 4,120 | 5/1/2012 | n/a | n/a | No | JACK H SCHWARTS, TRUSTEE OF THE JACK H | None | 6061 Mayfield Rd, Mayfield Heights, OH, 44124, USA |
| 36 | Stow, OH (36) | STOW (#68) | Yes | Cleveland | Sleep | LM | 4,160 | 3,660 | 10/25/2013 | 1/31/2024 | 47 | No | DEVILLE DEVELOPMENTS LLC | None | 1061 GRAHAM RD, STOW, OH, 44224, USA |
| 37 | Medina, OH (37) | MEDINA (#76) | Yes | Cleveland | Sleep | LM | 4,500 | 4,000 | 8/25/2016 | 9/30/2021 | 19 | No | GOWE LEASING LIMITED | None | 3823 PEARL RD, MEDINA, OH, 44256, USA |
| 38 | Sandusky, OH (38) | SANDUSKY (#73) | Yes | Cleveland | Sleep | LM | 5,400 | 4,900 | 11/14/2014 | 2/28/2025 | 60 | No | PLI II LTD | None | 4917 MILAN RD PLAZA, SANDUSKY, OH, 44870, USA |
| 39 | Elyria, OH (39) | ELYRIA (#72) | Yes | Cleveland | Sleep | LM | 6,400 | 5,800 | 6/19/2015 | 6/30/2026 | 76 | No | ELYRIA-CHESTNUT, LLC / NICKLEPLATE REALT | None | 510 CHESTNUT COMMONS DR, ELYRIA, OH, 44035, USA |
| 40 | Solon, OH (40) | SOLON (#67) | Yes | Cleveland | Sleep | LM | 3,788 | 3,288 | 2/22/2013 | 5/31/2023 | 39 | No | L & y PROPERTIES - SOLON, LLC | None | 6130 KRUSE DRIVE, SOLON, OH, 44139, USA |
| 41 | Canton, OH (41) | MASSILLON (#71) | Yes | Cleveland | Sleep | LM | 5,650 | 5,150 | 6/27/2014 | 11/30/2024 | 57 | No | PERRY TOWN CENTER LLC | None | 5119 WEST TUSCARAWAS ST, CANTON, OH, 44708, USA |
| 42 | Polaris, OH (42) | POLARIS AVF | Yes | Columbus | Flagship | AVF | 70,000 | 59,500 | 3/16/2019 | 10/31/2037 | 212 | Yes | STORE CAPITAL | Other | 1551 GEMINI PLACE, COLUMBUS, OH, 43240, USA |
| 43 | Novi, MI (43) | NOVI AVF | Yes | Detroit | Flagship | AVF | 102,520 | 88,958 | 1/1/1985 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 27775 NOVI RD, NOVI, MI, 48377, USA |
| 44 | Warren, MI (44) | TECH PLAZA AVF | Yes | Detroit | Flagship | AVF | 109,980 | 87,859 | 11/26/1982 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 6500 E 14 MILE RD, WARREN, MI, 48092, USA |
| 45 | Shelby Township, MI (45) | LAKESIDE AVF | Yes | Detroit | Flagship | AVF | 68,104 | 72,336 | 8/14/1992 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 14055 HALL RD, SHELBY TOWNSHIP, MI, 48315, USA |
| 46 | Canton, MI (46) | CANTON AVF | Yes | Detroit | Flagship | AVF | 69,929 | 58,740 | 1/3/2018 | 12/31/2038 | 226 | Yes | Agree Limited Partnership | None | 41661 FORD ROAD, CANTON, MI, 48187, USA |
| 47 | Taylor, MI (47) | TAYLOR AVF | Yes | Detroit | Flagship | AVF | 91,720 | 79,294 | 3/6/1978 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 22035 EUREKA RD, TAYLOR, MI, 48180, USA |
| 48 | Ann Arbor, MI (48) | ANN ARBOR AVF | Yes | Detroit | Flagship | AVF | 70,000 | 60,912 | 7/2/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 425 E EISENHOWER PKWY, ANN ARBOR, MI, 48108, USA |
| 49 | Southfield, MI (49) | SOUTHFIELD AVF | Yes | Detroit | Standard | AVF | 64,584 | 52,094 | 11/1/2000 | 7/31/2023 | 41 | No | GREENFIELD PLAZA, INC. | None | 22555 GREENFIELD RD, SOUTHFIELD, MI, 48075, USA |
| 50 | Royal Oak, MI (50) | WOODWARD AVF & SSI (#174) | Yes | Detroit | Standard | AVF | 56,520 | 54,943 | 11/14/1997 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 32301 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 51 | Clinton Twp, MI (51) | CLINTON AVF | Yes | Detroit | Flagship | AVF | 69,720 | 60,128 | 1/1/1988 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 33801 S GRATIOT AVE, CLINTON TWP, MI, 48035, USA |
| 52 | Chesterfield, MI (52) | CHESTERFIELD AVF | Yes | Detroit | Standard | AVF | 73,152 | 58,029 | 12/26/2003 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 50400 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 53 | Howell, MI (53) | HOWELL AVF | Yes | Detroit | Standard | AVF | 51,075 | 45,721 | 11/1/1997 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4101 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 54 | Waterford, MI (54) | DRAYTON PLAINS AVF | Yes | Detroit | Standard | AVF | 53,188 | 57,435 | 6/30/1971 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 5053 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 55 | Dearborn, MI (55) | DEARBORN AVF | Yes | Detroit | Standard | AVF | 57,633 | 58,164 | 7/11/1997 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN CAPITAL PARTNERS, LLC | 15701 MARKET DR, DEARBORN, MI, 48126, USA |
| 56 | Auburn Hills, MI (56) | GREAT LAKES AVF | Yes | Detroit | Standard | AVF | 43,319 | 37,296 | 1/1/2011 | 1/31/2021 | 11 | No | Taubman Auburn Hills Associates Limited Partnersh | None | 4612 BALDWIN RD, AUBURN HILLS, MI, 48326, USA |
| 57 | Port Huron, MI (57) | PORT HURON AVF | Yes | Detroit | Standard | AVF | 74,800 | 59,123 | 9/20/2002 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1234 32ND ST, PORT HURON, MI, 48060, USA |
| 58 | Rochester Hills, MI (58) | ROCHESTER AVF | Yes | Detroit | Standard | AVF | 48,621 | 41,328 | 5/16/2019 | 11/30/2033 | 165 | No | Rochester KM Partners, LLC | None | 1032 SOUTH ROCHESTER ROAD, ROCHESTER, MI, 48307, USA |
| 59 | Livonia, MI (59) | 7 MILE AVF | Yes | Detroit | Standard | AVF | 61,752 | 53,795 | 1/1/1985 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 29905 7 MILE RD, LIVONIA, MI, 48152, USA |
| 60 | Warren, MI (60) | SCHOENHERR AVF | Yes | Detroit | Standard | AVF | 38,795 | 41,890 | 1/19/1972 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 13855 E 8 MILE RD, WARREN, MI, 48089, USA |
| 61 | Westland, MI (61) | WESTLAND AVF | Yes | Detroit | Standard | AVF | 79,773 | 70,723 | 4/14/1987 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 8300 N WAYNE RD, WESTLAND, MI, 48185, USA |
| 62 | Ann Arbor, MI (62) | ANN ARBOR W PS | Yes | Detroit | Sleep | APS | 4,600 | 4,079 | 9/1/2011 | 8/31/2021 | 18 | No | BRIXMOR Holdings 1 SPE, LLC | None | 2570 JACKSON AVE, ANN ARBOR, MI, 48103, USA |
| 63 | Rochester, MI (63) | ROCHESTER PS | Yes | Detroit | Sleep | APS | 5,000 | 4,474 | 6/1/2010 | 7/31/2020 | 5 | No | McKnight South East, LP c/o McKnight Property Mar | None | 1856 S ROCHESTER RD, ROCHESTER, MI, 48307, USA |
| 64 | Grosse Pointe Woods, MI (64) | GROSSE POINTE SOUTH PS | Yes | Detroit | Sleep | APS | 3,500 | 2,688 | 3/1/2018 | 2/29/2028 | 96 | No | Ryder Investments | None | 19387 MACK AVE, GROSSE POINTE, MI, 48236, USA |
| 65 | Warren, MI (65) | WARREN E PS | Yes | Detroit | Sleep | APS | 5,072 | 4,507 | 5/16/2011 | 6/30/2022 | 28 | No | WARREN VILLAGE, LLC | None | 6400 14 MILE RD, WARREN, MI, 48092, USA |
| 66 | Sterling Hgts, MI (66) | STERLING HTS PS | Yes | Detroit | Sleep | APS | 4,014 | 3,672 | 2/9/2013 | 2/28/2023 | 36 | No | EASTLAKE COMMONS ASSOCIATES, LLC | None | 44975 HAYES RD, STERLING HGTS, MI, 48313, USA |
| 67 | Washington, MI (67) | WASHINGTON PS | Yes | Detroit | Sleep | APS | 4,000 | 3,425 | 5/16/2011 | 10/31/2021 | 20 | No | AF Jonna Development & Management Company, L | None | 7887 26 MILE ROAD, WASHINGTON, MI, 48094, USA |
| 68 | Southgate, MI (68) | SOUTHGATE PS | Yes | Detroit | Sleep | APS | 5,117 | 4,768 | 1/16/2016 | 3/31/2021 | 13 | No | BRANDON ASSOCIATES SOUTHGATE L.L.C. | None | 15060 DIX TOLEDO RD, SOUTHGATE, MI, 48195, USA |
| 69 | Canton, MI (69) | CANTON PS | Yes | Detroit | Sleep | APS | 4,600 | 4,280 | 7/1/2009 | 6/30/2024 | 52 | No | Ford Road Investments, LLC | None | 41913 FORD RD, CANTON, MI, 48187, USA |
| 70 | Monroe, MI (70) | MONROE PS | Yes | Detroit | Sleep | APS | 4,000 | 3,593 | 7/30/2016 | 7/31/2026 | 77 | No | Keystone Commercial | None | 1570 NORTH TELEGRAPH ROAD, MONROE, MI, 48162, USA |
| 71 | Troy, MI (71) | TROY N PS | Yes | Detroit | Sleep | APS | 4,500 | 4,059 | 5/16/2011 | 7/31/2021 | 17 | No | Universal Mall Properties LLC | None | 1735 BIG BEAVER RD, TROY, MI, 48083, USA |
| 72 | West Bloomfield, MI (72) | W BLOOMFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,655 | 10/1/2013 | 2/29/2024 | 48 | No | MAPLE ORCHARD ASSOCIATES, LLC | None | 6470 ORCHARD LAKE ROAD, WEST BLOOMFIELD, MI, 48322, U |
| 73 | Chesterfield, MI (73) | CHESTERFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,572 | 11/18/2017 | 11/30/2027 | 93 | No | CHESTERFIELD COMMONS ASOCIATES, LLC | None | 50938 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 74 | Woodhaven, MI (74) | WOODHAVEN PS | Yes | Detroit | Sleep | APS | 3,966 | 3,565 | 10/17/2015 | 10/31/2025 | 68 | No | THE ALLENWEST GROUP, LLC | None | 19410 WEST ROAD, WOODHAVEN, MI, 48183, USA |
| 75 | Brighton, MI (75) | BRIGHTON E PS | Yes | Detroit | Sleep | APS | 4,248 | 3,218 | 5/16/2011 | 9/30/2022 | 31 | No | BRIGHTON GATE COMMONS, LLC | None | 9990 E GRAND RIVER AVE, BRIGHTON, MI, 48116, USA |
| 76 | Bloomfield Twp, MI (76) | BLOOMFIELD TWP PS | Yes | Detroit | Sleep | APS | 3,602 | 3,139 | 5/20/2017 | 7/31/2027 | 89 | No | BP OF WHITE LAKE, INC. | None | 6450 TELEGRAPH ROAD, BLOOMFIELD TWP, MI, 48301, USA |
| 77 | New Hudson, MI (77) | NEW HUDSON PS | Yes | Detroit | Sleep | APS | 4,106 | 3,758 | 4/10/2012 | 10/31/2022 | 32 | No | Milford Road Plaza, LLC | None | 30821 MILFORD RD, NEW HUDSON, MI, 48165, USA |
| 78 | Lapeer, MI (78) | LAPEER PS | Yes | Detroit | Sleep | APS | 4,500 | 3,864 | 10/1/2016 | 1/31/2027 | 83 | No | JKL REAL ESTATE CO. | None | 806 S MAIN STREET, LAPEER, MI, 48446, USA |
| 79 | Royal Oak, MI (79) | ROYAL OAK PS | Yes | Detroit | Sleep | APS | 5,950 | 4,956 | 5/16/2011 | 6/30/2024 | 52 | No | 4400 North Woodward, LLC | None | 32500 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 80 | White Lake, MI (80) | WHITE LAKE PS | Yes | Detroit | Sleep | APS | 3,680 | 2,995 | 5/16/2011 | 3/31/2021 | 13 | No | CLOSED | 0 | 5951 HIGHLAND RD, WHITE LAKE, MI, 48383, USA |
| 81 | Troy, MI (81) | TROY S PS | Yes | Detroit | Sleep | APS | 4,675 | 3,464 | 5/16/2011 | 1/31/2022 | 23 | No | URBAN CAL OAKLAND PLAZA, LLC | None | 272 JOHN R, TROY, MI, 48083, USA |
| 82 | Waterford, MI (82) | WATERFORD PS | Yes | Detroit | Sleep | APS | 6,008 | 5,060 | 5/16/2011 | 3/31/2022 | 25 | No | INVESTCO OF MICHIGAN LLC | None | 4977 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 83 | Novi, MI (83) | NOVI PS | No | Detroit | Sleep | APS | 2,600 | 2,073 | 5/16/2011 | 1/31/2020 | n/a | No | RAMCO WEST OAKS II LLC | None | 43420 W OAKS DR, NOVI, MI, 48377, USA |
| 84 | Brighton, MI (84) | BRIGHTON W PS | Yes | Detroit | Sleep | APS | 4,200 | 3,784 | 5/16/2011 | 10/31/2021 | 20 | No | CROSS GRAND PLAZA, LLC | None | 8709 WEST GRAND RIVER, BRIGHTON, MI, 48116, USA |
| 85 | Ann Arbor, MI (85) | ANN ARBOR E PS | Yes | Detroit | Sleep | APS | 4,274 | 3,062 | 5/16/2011 | 5/31/2021 | 15 | No | AF Jonna Development & Management Company, L | None | 3550 WASHTENAW, ANN ARBOR, MI, 48104, USA |
| 86 | Lake Orion, MI (86) | LAKE ORION PS | Yes | Detroit | Sleep | APS | 4,160 | 3,775 | 4/1/2014 | 1/31/2022 | 23 | No | SHOPS AT THE SHORES OF LONG LAKE L.L.C. | None | 610 N. LAPEER RD, LAKE ORION, MI, 48362, USA |
| 87 | Ferndale, MI (87) | FERNDALE PS | Yes | Detroit | Sleep | APS | 6,553 | 5,587 | 4/1/2016 | 6/30/2026 | 76 | No | B.P. of White Lake Inc. | None | 23100 WOODWARD AVE, FERNDALE, MI, 48220, USA |
| 88 | Utica, MI (88) | UTICA E PS | Yes | Detroit | Sleep | APS | 5,900 | 2,858 | 9/1/2011 | 1/31/2023 | 35 | No | SHELBY CORNERS, LLC | None | 45040 NORTHPOINTE BLVD, UTICA, MI, 48315, USA |
| 89 | Howell, MI (89) | HOWELL PS | Yes | Detroit | Sleep | APS | 9,400 | 8,794 | 5/16/2011 | 10/31/2024 | 56 | No | COUNTRY CORNERS SHOPPING CENTER, L.L.C | None | 4050 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 90 | Westland, MI (90) | WESTLAND PS | Yes | Detroit | Sleep | APS | 4,400 | 3,976 | 10/1/2016 | 10/31/2026 | 80 | No | CENTRAL-WAYNE PROPERITES, LLC | None | 7671 NORTH WAYNE RD, WESTLAND, MI, 48185, USA |
| 91 | Grosse Pointe, MI (91) | GROSSE POINTE SSI | Yes | Detroit | Design | SSI | 7,600 | 5,933 | 6/26/2015 | 10/31/2020 | 8 | No | ST. John Health | None | 17145 KERCHEVAL, GROSSE POINTE, MI, 48230, USA |
| 92 | Plymouth, MI (92) | PLYMOUTH PS | Yes | Detroit | Sleep | APS | 4,000 | 3,580 | 9/24/2016 | 11/30/2026 | 81 | No | PLYMOUTH HAGGERTY UNIT 6 | None | 41512 ANN ARBOR RD, PLYMOUTH, MI, 48170, USA |
| 93 | Shelby Twp, MI (93) | SHELBY TWP PS | Yes | Detroit | Sleep | APS | 4,000 | 3,714 | 1/13/2018 | 1/31/2028 | 95 | No | JERUSALEM PROPERTIES, LLC | None | 46975 VAN DYKE AVE, SHELBY TWP, MI, 48317, USA |
| 94 | Roseville, MI (94) | ROSEVILLE PS | Yes | Detroit | Sleep | APS | 4,800 | 4,512 | 11/21/2013 | 5/31/2024 | 51 | No | ROSEVILLE VILLAGE, L.L.C. | None | 31851 GRATIOT AVE, ROSEVILLE, MI, 48066, USA |
| 95 | Taylor, MI (95) | TAYLOR PS | Yes | Detroit | Sleep | APS | 4,000 | 3,433 | 10/3/2015 | 10/31/2025 | 68 | No | VAN ELSLANDER VENTURES, LLC | None | 23471 EUREKA RD, TAYLOR, MI, 48180, USA |
| 96 | Dearborn, MI (96) | DEARBORN PS | Yes | Detroit | Sleep | APS | 5,828 | 4,141 | 4/8/2017 | 5/31/2027 | 87 | No | AMD, LLC. | None | 22731 MICHIGAN AVE, DEARBORN, MI, 48124, USA |
| 97 | Livonia, MI (97) | LIVONIA PS | Yes | Detroit | Sleep | APS | 3,612 | 3,120 | 5/17/2014 | 5/31/2024 | 51 | No | Middlebelt Plymouth Venture LLC | None | 29611 PLYMOUTH, LIVONIA, MI, 48150, USA |
| 98 | Southfield, MI (98) | SOUTHFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,606 | 1/13/2018 | 1/31/2028 | 95 | No | AF Jonna Development & Management Company, L | None | 29119 TELEGRAPH RD, SOUTHFIELD, MI, 48034, USA |
| 99 | Bloomfield Hills, MI (99) | BLOOMFIELD AVF | Yes | Detroit | Standard | AVF | 46,388 | 26,440 | 3/15/2016 | 2/28/2037 | 204 | No | LCN PARTNERS | None | 2300 TELEGRAPH RD, BLOOMFIELD HILL, MI, 48302, USA |
| 100 | Saginaw, MI (100) | SAGINAW AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 77,827 | 56,540 | 6/30/1984 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 2660 TITTABAWASSEE RD, SAGINAW, MI, 48604, USA |
| 101 | Flint, MI (101) | FLINT AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,177 | 48,827 | 6/30/1977 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 4577 MILLER RD, FLINT, MI, 48507, USA |
| 102 | Burton, MI (102) | BURTON AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,196 | 48,841 | 7/31/1987 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4095 E COURT ST, BURTON, MI, 48509, USA |
| 103 | Bay City, MI (103) | BAY CITY AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 34,578 | 36,957 | 2/2/1996 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 4150 WILDER RD, BAY CITY, MI, 48706, USA |
| 104 | Grand Blanc, MI (104) | GRAND BLANC PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,477 | 8/2/2014 | 8/31/2024 | 54 | No | GRAND SAGINAW PLAZA, L.L.C. | None | 11501 SOUTH SAGINAW, GRAND BLANC, MI, 48439, USA |
| 105 | Flint Township, MI (105) | FLINT PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,600 | 4/27/2018 | 1/31/2028 | 95 | No | Jonna Management Group, LLC | None | 4002 MILLER ROAD, FLINT, MI, 48507, USA |
| 106 | Saginaw, MI (106) | SAGINAW PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,847 | 4,368 | 1/30/2016 | 1/31/2021 | 11 | No | KMS Investments, LLC | None | 4605 BAY RD #200, SAGINAW, MI, 48604, USA |
| 107 | Fort Wayne, IN (107) | FORT WAYNE AVF | Yes | Fort Wayne | Standard | AVF | 45,982 | 39,667 | 1/25/2014 | 9/30/2023 | 43 | No | Sandor Development Company | None | 311 E COLISEUM BLVD, FORT WAYNE, IN, 46805, USA |
| 108 | Grand Rapids, MI (108) | GRAND RAPIDS AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 79,400 | 69,174 | 7/30/1987 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4375 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 109 | Portage, MI (109) | KALAMAZOO AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 73,990 | 60,986 | 5/1/1989 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 550 RING RD, PORTAGE, MI, 49024, USA |
| 110 | Muskegon, MI (110) | MUSKEGON AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,590 | 34,069 | 1/23/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 630 SEMINOLE RD, MUSKEGON, MI, 49441, USA |
| 111 | Grandville, MI (111) | GRANDVILLE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 28,530 | 24,910 | 1/1/2010 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 4625 WILSON AVE SW, GRANDVILLE, MI, 49418, USA |
| 112 | Battle Creek, MI (112) | BATTLE CREEK AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 50,220 | 43,411 | | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 6100 B DR N, BATTLE CREEK, MI, 49014, USA |

A001081

2/20/2020

| Store # | Store Name | Original Store Name | Include in Liquidation | Marketing Area | Type | Affiliation | Gross Sq. Ft. | Sq. Ft. | Lease Beginning Date | Expire. | Remaining | SLB Property | Landlord | Master Lease | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113 | Comstock Park, MI (113) | ALPINE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 111,077 | 63,525 | 11/26/1999 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4273 ALPINE AVE NW STE B, COMSTOCK PARK, MI, 49321, USA |
| 114 | Holland, MI (114) | HOLLAND AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,950 | 38,443 | 8/18/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 12610 FELCH ST STE 100, HOLLAND, MI, 49424, USA |
| 115 | Muskegon, MI (115) | MUSKEGON PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,519 | 5/28/2016 | 10/31/2021 | 20 | No | SVH PROPERTIES, LLC | None | 1664 E STERNBERG RD, MUSKEGON, MI, 49444, USA |
| 116 | Portage, MI (116) | PORTAGE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,018 | 3,632 | 5/24/2014 | 5/31/2024 | 51 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6947 SOUTH WESTNEDGE AVE, PORTAGE, MI, 49002, USA |
| 117 | Grandville, MI (117) | GRANDVILLE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,229 | 3,773 | 3/1/2015 | 5/31/2024 | 51 | No | CWD Grandville 1, LLC | None | 4540 IVANREST AVE SW, GRANDVILLE, MI, 49418, USA |
| 118 | Kalamazoo, MI (118) | KALAMAZOO PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 3,481 | 3,186 | 3/8/2013 | 3/31/2023 | 37 | No | Kalamazoo Mall LLC | None | 338 N DRAKE RD, KALAMAZOO, MI, 49009, USA |
| 119 | Grand Rapids, MI (119) | GRAND RAPIDS PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 5,562 | 4,903 | 10/15/2014 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 3500 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 120 | Grand Rapids, MI (120) | GRAND RAPIDS N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,687 | 9/1/2016 | 8/31/2026 | 78 | No | EAST BELTLINE DEVELOPMENT, LLC | None | 2036 EAST BELTLINE AVE, GRAND RAPIDS, MI, 49525, USA |
| 121 | Comstock Park, MI (121) | ALPINE N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,300 | 3,797 | 5/16/2011 | 10/31/2022 | 32 | No | ALPINE VALLEY, L.L.C. | None | 4174 ALPINE AVE NW STE A, COMSTOCK PARK, MI, 49321, USA |
| 122 | Lancaster, PA (122) | LANCASTER (#46) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 9/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 2040 Bennett Avenue, Lancaster, PA, 17601, USA |
| 123 | York, PA (123) | YORK (#44) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 1/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO | 380 North Northern Way, York, PA, 17402, USA |
| 124 | Harrisburg, PA (124) | HARRISBURG (#42) | Yes | Harrisburg | Standard | WLF | 61,900 | 51,900 | 1/1/1999 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4661 Lindle Road, Harrisburg, PA, 17111, USA |
| 125 | Hanover, PA (125) | HANOVER (#50) | Yes | Harrisburg | Standard | WLF | 34,600 | 30,600 | 5/19/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 371 Eisenhower Drive, Hanover, PA, 17331, USA |
| 126 | Mechanicsburg, PA (126) | MECHANICSBURG (#43) | Yes | Harrisburg | Standard | WLF | 45,567 | 42,567 | 8/22/2010 | 7/31/2020 | 5 | No | LESTER ASSOCIATES | None | 75 Gateway Drive, Mechanicsburg, PA, 17055, USA |
| 127 | Chambersburg, PA (127) | CHAMBERSBURG (#51) | Yes | Harrisburg | Standard | WLF | 27,262 | 25,762 | 1/1/2009 | 12/27/2038 | 226 | No | BRTM, LLC | None | 480 Gateway Avenue, Chambersburg, PA, 17201, USA |
| 128 | Altoona, PA (128) | ALTOONA (#28) | Yes | Johnstown | Standard | WLF | 53,136 | 43,176 | 1/1/1978 | 4/30/2038 | 218 | Yes | VEREIT REAL ESTATE LP | Store Master Funding XII, LLC | 4 Sellers DriveAltoona, Altoona, PA, 16601, USA |
| 129 | Johnstown, PA (129) | JOHNSTOWN (#32) | Yes | Johnstown | Standard | WLF | 40,258 | 37,258 | 9/1/1995 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1130 Scalp Avenue, Johnstown, PA, 15904, USA |
| 130 | State College, PA (130) | STATE COLLEGE (#40) | Yes | Johnstown | Standard | WLF | 50,000 | 51,402 | 5/1/2007 | 11/21/2037 | 213 | No | PATTON CENTER ASSOCIATES LP | None | 138 Valley Vista Drive, State College, PA, 16803, USA |
| 131 | Lansing, MI (131) | LANSING AVF | Yes | Lansing | Flagship | AVF | 71,581 | 77,379 | 10/25/2000 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 8748 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 132 | Jackson, MI (132) | JACKSON AVF | Yes | Lansing | Standard | AVF | 33,214 | 30,012 | 6/5/1992 | 7/31/2024 | 53 | No | ARGYLE ACRES MALL, LLC | None | 950 N WEST AVE, JACKSON, MI, 49202, USA |
| 133 | E Lansing, MI (133) | OKEMOS PS | Yes | Lansing | Sleep | APS | 5,855 | 4,457 | 5/16/2011 | 8/31/2023 | 42 | No | RICHARD AND MICHELLE BROWN | None | 2660 E. GRAND RIVER, EAST LANSING, MI, 48823, USA |
| 134 | East Lansing, MI (134) | EAST LANSING PS | Yes | Lansing | Sleep | APS | 3,974 | 3,495 | 7/16/2016 | 7/31/2021 | 17 | No | River Caddis Development, LLC | None | 1595 LAKE LANSING ROAD, EAST LANSING, MI, 48823, USA |
| 135 | Lansing, MI (135) | LANSING PS | Yes | Lansing | Sleep | APS | 4,590 | 3,689 | 5/16/2011 | 12/31/2021 | 22 | No | John Doezema Real Estate | None | 6007 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 136 | Wexford, PA (136) | WEXFORD (#4, 29, 30 CC) | Yes | Pittsburgh | Standard | LVF | 53,000 | 48,823 | 10/1/2009 | 2/28/2038 | 216 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 10688 PERRY HIGHWAY, WEXFORD, PA, 15090, USA |
| 137 | Monroeville, PA (137) | MONROEVILLE (#3 CC, 20, 21 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,545 | 7/1/2004 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO / LEVIN FAMILY PA | 124 LEVIN WAY, MONROEVILLE, PA, 15146, USA |
| 138 | Mcmurray, PA (138) | SOUTH HILLS (#2, 32 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,964 | 7/1/2001 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 3664 WASHINGTON ROAD, MCMURRAY, PA, 15317, USA |
| 139 | Greensburg, PA (139) | GREENSBURG (#40, 41 CC) | Yes | Pittsburgh | Standard | LVF | 55,314 | 50,637 | 8/1/2011 | 10/31/2021 | 20 | No | CBL/WESTMORELAND, LP | None | 5280 ROUTE 30, GREENSBURG, PA, 15601, USA |
| 140 | Pittsburgh, PA (140) | THE POINTE (#15, 35 CC) | Yes | Pittsburgh | Standard | LVF | 68,730 | 61,886 | 7/1/1999 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 400 CHAUVET DRIVE, PITTSBURGH, PA, 15275, USA |
| 141 | Pleasant Hills, PA (141) | CURRY HOLLOW (#47, 48 CC) | Yes | Pittsburgh | Standard | LVF | 96,500 | 87,500 | 7/1/1991 | 9/30/2026 | 79 | No | PAUL PROPERTY MANAGEMENT, LP | None | 292 CURRY HOLLOW RD, PLEASANT HILLS, PA, 15236, USA |
| 142 | Mount Pleasant, PA (142) | MOUNT PLEASANT (#1, 22 CC) | Yes | Pittsburgh | Standard | LVF | 34,500 | 30,766 | 1/1/1924 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 600 MAIN STREET, MT. PLEASANT, PA, 15666, USA |
| 143 | Cranberry Township, PA (143) | CRANBERRY (#60) | Yes | Pittsburgh | Sleep | LM | 5,000 | 4,500 | 5/1/2012 | 4/30/2022 | 26 | No | WALNUT CAPITAL PARTNERS - CRANBERRY SC | None | 20012 ROUTE 19, CRANBERRY, PA, 16066, USA |
| 144 | Mount Lebanon, PA (144) | MOUNT LEBANON (#36) | Yes | Pittsburgh | Sleep | LM | 3,990 | 3,490 | 6/28/2013 | 7/31/2023 | 41 | No | RELIANCE PITTSBURGH LLC | None | 1600 WASHINGTON RD, MT LEBANON, PA, 15228, USA |
| 145 | Butler, PA (145) | BUTLER (#75) | Yes | Pittsburgh | Sleep | LM | 5,010 | 5,010 | 11/18/2016 | 2/28/2027 | 84 | No | BUTLER SITEWORK ASSOICATES LLC | None | 620 Butler Crossing Suite 5, BUTLER, PA, 16001, USA |
| 146 | Pittsburgh, PA (146) | SHADYSIDE (#70) | Yes | Pittsburgh | Sleep | LM | 7,145 | 6,645 | 10/10/2014 | 4/30/2024 | 50 | No | MCKNIGHT SOUTH EAST LP | None | 5438 BAUM BLVD, PITTSBURGH, PA, 15232, USA |
| 147 | Washington, PA (147) | WASHINGTON (#63) | Yes | Pittsburgh | Sleep | LM | 7,800 | 7,300 | 3/29/2013 | 4/30/2023 | 38 | No | WASHINGTON MALL - JCP ASSOCIATES, LTD | None | 56 TRINITY POINT DR, WASHINGTON, PA, 15301, USA |
| 148 | Pittsburgh, PA (148) | FOX CHAPEL (#61) | Yes | Pittsburgh | Sleep | LM | 4,000 | 3,500 | 5/1/2012 | 4/30/2022 | 26 | No | WATERWORKS PHASE II | None | 956 FREEPORT ROAD, PITTSBURGH, PA, 15238, USA |
| 149 | Pittsburgh, PA (149) | ROBINSON (#64) | Yes | Pittsburgh | Sleep | LM | 5,593 | 5,093 | 8/30/2013 | 12/31/2023 | 46 | No | MCROBIN LTC AND MOSITES FAMILY GST TRUS | None | 6528 STEUBENVILLE PIKE, PITTSBURGH, PA, 15205, USA |
| 150 | Indiana, PA (150) | INDIANA (#33) | Yes | Pittsburgh | Sleep | LM | 4,800 | 4,300 | 6/7/2013 | 9/30/2023 | 43 | No | LIBBY REGENCY ASSOCIATES LP | None | 1570 OAKLAND AVE, INDIANA, PA, 15701, USA |
| 151 | Monroeville, PA (151) | MONROEVILLE (#62) | Yes | Pittsburgh | Sleep | LM | 4,319 | 4,000 | 6/1/2012 | 6/30/2022 | 28 | No | CE-MONROEVILLE 3820 WM PENN LP | None | 3820 WILLIAM PENN HIGHWAY, MONROEVILLE, PA, 15146, USA |
| 152 | St. Louis, MO (152) | AFFTON | Yes | St. Louis | Standard | AVF | 41,352 | 32,759 | 1/17/2018 | 12/31/2023 | 46 | No | South Lindbergh Property LLC | None | 5711 S LINDBERGH BLVD, SAINT LOUIS, MO, 63123, USA |
| 153 | O'fallon, IL (153) | FAIRVIEW | Yes | St. Louis | Standard | AVF | 39,676 | 32,627 | 1/17/2018 | 12/31/2023 | 46 | No | Rothman-O'Fallon LLC | None | 1776 WEST US 50, O FALLON, IL, 62269, USA |
| 154 | O'fallon, MO (154) | O FALLON | Yes | St. Louis | Standard | AVF | 40,884 | 31,674 | 1/16/2018 | 12/31/2023 | 46 | No | O'Fallon Missouri Properties, LLC | None | 2101 E TERRA LN, O FALLON, MO, 63366, USA |
| 155 | Bridgeton, MO (155) | BRIDGETON | Yes | St. Louis | Standard | AVF | 45,314 | 35,975 | 1/17/2018 | 12/31/2023 | 46 | No | JS Westflo, LLC | None | 925 NORTHWEST PLAZA, SAINT ANN, MO, 63074, USA |
| 156 | Richmond Heights, MO (156) | RICHMOND (DESIGN STUIDO) | Yes | St. Louis | Design | AVF | 3,670 | 3,343 | 11/15/2017 | 7/31/2024 | 53 | No | Hanley LM Properties, LLC | None | 1516 S HANLEY RD, SAINT LOUIS, MO, 63144, USA |
| 157 | Holland, OH (157) | TOLEDO AVF | Yes | Toledo | Flagship | AVF | 91,000 | 80,731 | 8/27/2013 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1301 E MALL DR, HOLLAND, OH, 43528, USA |
| 158 | Toledo, OH (158) | TOLEDO PS | Yes | Toledo | Sleep | APS | 4,500 | 4,045 | 5/24/2013 | 11/30/2023 | 45 | No | REED HOLDING-TALMADGE, LLC | None | 4600 TALMADGE RD, TOLEDO, OH, 43623, USA |
| 159 | Holland, OH (159) | HOLLAND PS (TOLEDO) | Yes | Toledo | Sleep | APS | 3,485 | 3,135 | 7/13/2018 | 8/31/2028 | 102 | No | Kiezi Properties BG, LLC | None | 6760 AIRPORT HWY SUITE B, HOLLAND, OH, 43528, USA |
| 160 | Perrysburg Township, OH (160) | PERRYSBURGH (FREEMONT) | Yes | Toledo | Sleep | APS | 3,500 | n/a | 2/8/2019 | 4/30/2029 | 110 | No | 10411 Fremont Pike, LLC | None | 10411 FREMONT PIKE, PERRYSBURG, OH, 43551, USA |
| 161 | Traverse City, MI (161) | TRAVERSE CITY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 63,120 | 49,903 | 11/21/1998 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 1775 OAK HOLLOW DR, TRAVERSE CITY, MI, 49686, USA |
| 162 | Petoskey, MI (162) | PETOSKEY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 48,115 | 49,765 | 10/5/2002 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 1619 ANDERSON ROAD, PETOSKEY, MI, 49770, USA |
| 163 | Traverse City, MI (163) | TRAVERSE CITY PS | Yes | Traverse City-Cadillac | Sleep | APS | 4,509 | 4,104 | 6/30/2016 | 6/30/2026 | 76 | No | ANCHOR MANISTEE | None | 3675 N US 31 S SUITE B, TRAVERSE CITY, MI, 49684, USA |
| 164 | Frederick, MD (164) | FREDERICK (#7) | Yes | Washington DC | Standard | WLF | 60,000 | 52,500 | 7/1/2003 | 1/31/2024 | 47 | No | Frederick-BILCO, LLP | None | 1215 West Patrick Street, Frederick, MD, 21702, USA |
| 165 | Hagerstown, MD (165) | HAGERSTOWN (#9) | Yes | Washington DC | Standard | WLF | 66,829 | 60,000 | 2/1/2004 | 5/31/2029 | 111 | No | OUTLET VILLAGE OF HAGERSTOWN LP | None | 900 Premium Outlets Boulevard, Hagerstown, MD, 21740, USA |
| 166 | Leesburg, VA (166) | LEESBURG (#48) | Yes | Washington DC | Standard | WLF | 46,030 | 41,430 | 8/24/2012 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 131 Fort Evans Road NE, Leesburg, VA, 20176, USA |
| 167 | Frederick, MD (167) | FREDERICK OUTLET (#52) | No | Washington DC | Standard | WLF | 40,484 | 30,484 | 9/17/2014 | 1/31/2020 | n/a | No | RAVID FREDERICK, LLC | None | 5830 Ballenger Creek Pike, Frederick, MD, 21703, USA |
| 168 | Saint Clairsville, OH (168) | SAINT CLAIRSVILLE (#50) | Yes | Wheeling | Standard | LVF | 24,908 | 21,000 | 9/29/2017 | 10/31/2022 | 32 | No | OHIO VALLEY MALL CO | None | 67661 MALL RING RD, SAINT CLAIRSVILLE, OH, 43950, USA |
| 169 | Boardman, OH (169) | BOARDMAN (#52) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 8/31/2018 | 8/31/2028 | 102 | No | A&R Properties | None | 300 BOARDMAN POLAND ROAD, BOARDMAN, OH, 44512, USA |
| 170 | Hermitage, PA (170) | HERMITAGE (#54) | Yes | Youngstown | Standard | LVF | 42,000 | n/a | 9/21/2018 | 9/30/2023 | 43 | No | A&R Properties | None | 1340 N. Hermitage Road Suite 1 Route 18, Hermitage, PA, 16148, U |
| 171 | Niles, OH (171) | NILES (#56) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 10/31/2018 | 10/31/2028 | 104 | No | A&R Properties | None | 836 YOUNGSTOWN-WARREN RD, NILES, OH, 44446, USA |
| Totals | | | | | | | 5,879,611 | 4,932,964 | | | | | | | |

A001082

# EXHIBIT 3

A001083

## CONSULTING AND MARKETING SERVICES AGREEMENT

This Consulting and Marketing Services Agreement, dated as of March 4, 2020 (this "Agreement"), is made by and between **AVF HOLDING COMPANY, INC.**, and **AVF HOLDING COMPANY, INC.** d/b/a Art Van Furniture, Art Van Pure Sleep, Levin Furniture, Levin Mattress and Wolf Furniture (collectively, the "Company"), and a contractual joint venture comprised of **HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC**, each a Delaware limited liability company (collectively, "Hilco"), and **GORDON BROTHERS RETAIL PARTNERS, LLC, DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE, GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC AND GORDON BROTHERS BRANDS, LLC**, each, a Delaware limited liability company (collectively, "GBG", and together with Hilco, the "Consultant").

## R E C I T A L S:

WHEREAS, the Company is (i) the owner or lessee of certain real property identified on Exhibit A attached hereto (each a "Property", and collectively, the "Properties"), (ii) machinery, equipment, furniture, fixtures and other personal property located at, in, or in the vicinity of the Properties (the "M&E"), (iii) Merchandise (defined below) inventory located at, in, or the vicinity of the Properties, (iv) to the extent the Company exercise the Receivables Option (defined below), outstanding trade accounts receivable for which the Company has the exclusive right to collect, except for those accounts receivable that are currently the subject of litigation (the "Receivables") and (v) intangible assets, including, without limitation, trademarks, trade names, copyrights, domain names, software and source code, URLs, telephone numbers, customer data including customer names, addresses, email addresses, transaction history and other demographic data captured and maintained by the Company, vendor data, franchise agreements, "IP" addresses, and license agreements, logos and assorted artwork used in marketing materials and other contractual rights relating to the foregoing (collectively, the "Intellectual Property"; and collectively with the M&E, Inventory, Receivables (to the extent the Company exercises the Receivables Option), and Properties, the "Assets");

WHEREAS, the Company desires to retain Consultant to provide certain consulting, marketing and related asset disposition services to the Company with respect to the Assets, including where the context makes appropriate assisting the Company in the conduct of certain "Store Closing Sale", "Total Inventory Blowout", "Everything Must Go", "Everything On Sale" or similar themed liquidation sales (the "Sale") at the Company's retail store locations identified on Exhibit A-1 attached hereto (each individually, a "Store", and collectively, the "Stores"); and (ii) provide assistance to the Company in fulfilling and delivering On-Hand Fulfillment Merchandise and Back-Order Fulfillment Merchandise on account of goods sold by the Company prior to the Sale Commencement Date (defined below), in each case as more fully described herein; and

WHEREAS, Consultant is in the business of marketing, selling and otherwise realizing maximum value for assets similar to those comprising the Assets on behalf of its clients, and subject to the terms and conditions set forth herein, including, without limitation, authorization and approval of the Bankruptcy Court (defined below), is willing to serve as the Company's

exclusive agent and consultant to perform the services described herein upon the terms and conditions, and in the manner set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1. **Definitions**

For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

"ABL Agent" means shall mean Wells Fargo Bank, National Association, as administrative agent and collateral agent for itself and the other ABL Lenders.

"ABL Lenders" means those lenders under that certain ABL Credit Agreement, dated as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof), by and among, among others, the Company, such lenders and the ABL Agent.

"Advertising Expenses" means the costs and expenses incurred in connection with advertising the Sale, including, without limitation, direct media costs, agency fees and production costs) and Signage Costs.

"Approval Orders" shall mean collectively the Interim Order and Final Order.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Cash Collateral Budget" means that certain debtor-in-possession and/or cash collateral Cash Collateral Budget to be approved under the Interim Cash Collateral Order.

"Central Services" shall mean those central administrative services provided by Company that are necessary or appropriate for the conduct and support of the Sale, including, but not limited to, use and/or access to Company's: (i) inventory control system, (ii) payroll system, (iii) accounting system, (iv) office facilities (including use of reasonably sized offices located at Company's central office facility to effect the Sale), (v) central administrative services and personnel to process and perform sales audit, banking, accounting, sale and expense reconciliation, and other normal course administrative services customarily provided to or for the benefit of operating the Stores, (vi) no fewer than one weekly email messages targeted to the customers of the Stores and Company's e-commerce site, which email messages will be designed by Consultant (and approved by Company) and sent by Company or Company's existing service provider and (vii) such other central office services reasonably necessary or appropriate for the Sale.

"Consultant Incurred Expenses" shall mean the aggregate amount of (i) Supervisor Costs; (ii) reasonable and documented travel expenses for members of Consultant's executive team in an

2

aggregate amount not to exceed $20,000; (iii) Consultant's reasonable and documented general legal fees incurred in connection with the negotiation of this Agreement in an aggregate amount not to exceed $35,000; <u>provided</u>, <u>however</u>, in addition to, and not as part of, such capped amount, Company shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with negotiating any "side letters" with landlords of the Stores; and (iv) Advertising Expenses, in each case in as defined herein and in accordance with the Sale Budget (as defined below).

"Final Order" shall mean a final order of the Bankruptcy Court granting final approval, inter alia, for the Company's (a) assumption of this Agreement, (b) retention of the Consultant to perform the consulting, marketing and sale-related services described herein, (c) conduct of the Sale, and (d) granting such other and further relief as is appropriate in order to effectuate the terms and provisions of this Agreement.

"Gross Sales" shall mean the sum of all proceeds derived from the sale of Merchandise during the Sale Term (excluding amounts paid for sales, excise, or gross receipts taxes); plus (i) all proceeds of fire, flood or other insurance covering the Merchandise, and (ii) the amount of any gift cards or merchandise credits redeemed at the Stores during the Sale Term; provided, however, that it is expressly understood and agreed, that Gross Sales shall not include sales made by or on behalf of Company prior to the Sale Commencement Date or after the Sale Termination Date, regardless of when the applicable Merchandise is delivered to or picked up by the customer(s).

"Interim Order" shall mean an order of the Bankruptcy Court granting interim approval, inter alia, for the Company's (a) assumption of this Agreement, (b) retention of the Consultant to perform the consulting, marketing and sale-related services described herein, (c) conduct of the Sale, and (d) granting such other and further relief as is appropriate in order to effectuate the terms and provisions of this Agreement.

"Leases" shall mean all leases, occupancy agreements, reciprocal easement, license, or similar agreements pursuant to which Company has the right to occupy or utilize the Stores.

"Lender Agents" mean collectively, the ABL Agent and the Term Loan Agent.

"Merchandise" shall mean all inventory that is owned by Company and actually sold in the Stores during the Sale Term, the aggregate amount of which shall be determined using the gross rings inventory taking method, which may include inventory that (i) is located at, or in transit to, the Store as of the Sale Commencement Date with respect to each such Store; and/or (ii) is located at the Company's distribution center in the United States during the Sale Term; provided, however, the Company and the Consultant agree that "Merchandise" shall expressly exclude: (1) goods which belong to sublessees, licensees or concessionaires of Company; (2) goods held by the Company on memo or consignment, unless otherwise agreed to by Company (in consultation with the Lender Agents) and Consultant;  (3) M&E; and (4) Additional Agent Goods.

"Merchandise File" shall mean the "Store and DC Master Inventory Report Final 020320.xlsx" and "Levin Store & DC Master Inventory as of 2.3.20.xlslx" files together with all subsequent files specifically delivered by Merchant to Agent on or prior to the Sale Commencement Date to be used in connection with this Agreement.

A001086

"Sale Commencement Date" shall mean a date determined by the Company in consultation with the Consultant, but in no event later than March 6, 2020.

"Sale Expenses" shall mean all expenses incurred in connection with and attributable to the Sale.

"Sale Guidelines" shall mean the Sale Guidelines annexed hereto as Exhibit C which shall serve as the guidelines under which the Sale shall be conducted.

"Sale Term" shall mean the period of time beginning with the Sale Commencement Date and ending on the Sale Termination Date.

"Sale Termination Date" shall mean a date determined by the Consultant in consultation with the Company, but in no event later than May 31, 2020; provided, however, absent the prior consent of the Company, the Sale shall conclude in the Stores no later than April 30, 2020.

"Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

"Signage Costs" shall mean all the interior and exterior signage used in connection with the Sale, including, without limitation, banners, A-frames, feather flags, and sign walkers, in each case to the extent approved by Consultant.

"Store Employees" shall mean those employees of the Company retained by Company to conduct the Sale following consultation with Consultant.

"Supervisor(s)" shall mean the individual(s) whom Consultant shall engage to provide Services in the Stores to Company in connection with the Sale in accordance with Section 2.3 below.

"Supervisor Costs" shall mean the following customary costs and expenses incurred by Consultant with respect to Supervisors in accordance with the Sale Budget,: (i) the weekly compensation paid during the Sale Term per Supervisor (which in each case represents Consultant's actual costs); (ii) reasonable and documented travel expenses of the Supervisors between Stores during the term of the Sale, and to and from the Sale locations at the commencement and conclusion of the Sale (and reasonable travel to and from the Supervisors' homes during the Sale Term as is typical and customary in the liquidation industry given the nature of the Merchandise, the length of the Sale, and the actual results of the Sale); and (iii) reasonable Supervisor deferred compensation.

"Term Loan Agent" shall mean Virtus Group, LP, as administrative agent and collateral agent for itself and the other Term Loan Lenders.

"Term Loan Lenders" means those lenders under that certain Credit Agreement, dated as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof), by and among, among others, the Company, such lenders and the Term Loan Agent.

A001087

**2.** **Consulting Services**

    2.1    Company hereby retains Consultant, and Consultant hereby agrees to serve as the exclusive independent consultant to the Company in connection with the conduct of the Sale as set forth herein. With respect to the Sale, Consultant shall serve as the sole and exclusive consultant to the Company relative to the conduct of the Sale at the Stores, and the sale or other disposition of the other Assets, in each case throughout the Sale Term.

    2.2    Conduct of the Sale; Merchandise Services. On the terms and conditions set forth herein, commencing as of the Sale Commencement Date, the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the Merchandise as part of the Sale:

    (a)    provision of approximately forty six (46) qualified Supervisors to supervise and assist Company in its conduct of the Sale as further described in Section 2.3 below, including such lead, regional, financial, and field Supervisors as needed (after consultation with Company and Lender Agents). All Supervisors shall have industry-specific experience conducting "Store Closing", "Total Inventory Blowout", "Everything on Sale", "Everything Must Go" or similar themed liquidation sales, and shall act in a professional manner; provided, that from time to time during the Sale Term the Company and the Consultant shall meet and confer to evaluate the level and number of Supervisors being utilized in connection with the conduct of the Sale, and the Company and the Consultant (in consultation with the Lender Agents) shall jointly determine any reasonable adjustments thereto; provided, further, that, once identified, Supervisors cannot be removed from the project absent Company consent;

    (b)    provide the Company with such oversight, supervision and guidance as may be appropriate or requested by the Company with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and M&E as may be required from time to time to maximize the recovery for such Assets;

    (c)    recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with the theme of the Sale and the Sale Guidelines, it being understood that the Sale will be advertised as a "Total Inventory Blowout", "Store Closing", "Everything Must Go", "Everything on Sale" or similar sale themes throughout the term of the Sale; provided, that Consultant shall not utilize "Going Out of Business" sale theme absent (i) prior consultation with and approval by the Company and (ii) as may be set forth in the Approval Orders;

    (d)    advise the Company as to appropriate discounting of Merchandise, appropriate staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;

    (e)    advise the Company in creating the optimal display of Merchandise in the Stores in an effort to maximize the recovery for such Assets;

A001088

(f)     assist Company in the formulation and implementation of a loss prevention security program designed to protect the Merchandise from theft or other shortages;

(g)     assist Company with accounting functions for the Stores, including evaluation of sales of Merchandise by category, sales reporting and monitoring of expenses, in each case using the Company's infrastructure;

(h)     recommend and implement the transfer and balancing of Merchandise between and among the Stores to maximize results during the Sale;

(i)     participate in weekly calls with representatives of the Company and Lender Agents; and

(j)     provide such other related services deemed necessary or prudent by the Company (in consultation with the Lender Agents), and as may be mutually agreed by the Consultant and the Company under the circumstances giving rise to the Sale.

2.3     <u>M&E Services</u>.

(a)     On the terms and conditions set forth herein, commencing as of the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Company and the Consultant (in consultation with the Lender Agents)); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Company (in consultation with the Lender Agents) and the Consultant (as applicable the "<u>Asset Marketing Period</u>"), the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the M&E (the "<u>M&E Services</u>"):

(i)     Develop an advertising and marketing plan ("<u>M&E Marketing Plan</u>") for the sale or auction of, or other disposition strategy for, the M&E and in connection therewith; <u>provided</u>, that no later than March 13, 2020, the Company (in consultation with the Lender Agents) and the Consultant shall mutually agree upon a supplemental expense budget for the sale or other disposition of the M&E (the "<u>M&E Expense Budget</u>");

(ii)     Implement the M&E Marketing Plan as deemed necessary by Consultant to maximize the net recovery on the M&E;

(iii)     Prepare for the sale of the M&E, including gathering specifications and photographs for brochures;

(iv)     Make the M&E available for viewing by potential buyers on an appointment-only basis;

(v)     Sell or auction the M&E for cash to the highest bidder "as is," "where is," and in accordance with the terms of this Agreement; and

6

A001089

(vi) Charge and collect on behalf of the Company from all purchasers any purchase price (inclusive of any Buyer's premium paid by the respective buyer(s)) together with all applicable taxes in connection therewith.

(b) All proceeds collected by Consultant in connection with the M&E Services shall be either remitted directly to the Company to such account as designated by the Company (the "Company's Designated Deposit Account") by the buyer of the M&E, or, to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation provided for in Section 4.2 hereof, with such amounts to be deposited into the Company's Designated Deposit Account.

2.4     Real Estate Services.

(a) On the terms and conditions set forth herein, during the applicable Asset Marketing Period, the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the Properties (the "Real Estate Services"):

(i) Meet with the Company to ascertain the Company's goals, objectives and financial parameters with respect to the sale or other disposition of the Properties;

(ii) Mutually agree with the Company with respect to a strategic plan for the disposition of each Property (the "Real Estate Strategic Plan");

(iii) In accordance with the Real Estate Strategic Plan, and in lieu of assigning a Property lease to a third party, work with the Company to secure favorable termination agreements whereby a landlord pays the Company to terminate the lease associated with each such Property; and

(iv) Solicit interested parties for the assumption/assignment of leases associated with each Property or, where applicable, the sale of each Property, and marketing each Property for assignment/sale in accordance with the Real Estate Strategic Plan.

(b) In connection with the performance of Real Estate Services, the Consultant agrees that the Company shall not be responsible for the payment of any expenses incurred in connection with the execution of the Real Estate Strategic Plan, except to the extent pursuant to a budget ("Real Estate Services Budget"), which Real Estate Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(c) All proceeds collected by Consultant in connection with the Real Estate Strategic Plan shall be either remitted directly to Company's Designated Deposit Account by the buyer/assignee of the Company's interests in the Properties, or to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such amounts, with such amounts to be deposited into the Company's Designated Deposit Account.

A001090

2.5     Receivables Services.  (a)  From the date of execution of this Agreement to and including March 31, 2020, the Company shall retain the exclusive option, in its sole discretion (following consultation with the Lender Agents)(the "Receivables Election") to direct the Consultant to perform Receivables Services (defined below).  The Company shall exercise the Receivables Election, if at all, by delivery of a written notice to the Consultant on or before the above date indicating its direction to the Consultant to commence performance of Receivables Services.  Upon the Company's exercise of the Receivables Election, the Consultant shall thereafter perform Receivables Services on the terms and conditions set forth herein, through the later of (i) expiration of the Asset Marketing Period or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant agree (the "Receivables Marketing Period")

(b)     the Services with respect to the collection or other disposition of the Receivables shall include the following (collectively, the "Receivables Services"):

(i)     In consultation with the Company, collect, service, settle, and otherwise resolve the Receivables on the Company's behalf and in otherwise compliance with applicable law;

(ii)    Direct the obligors on the Receivables to make payment to Consultant, as the agent for the Company and the Lender Agents;

(iii)   (a) Receive cash, drafts, checks, wire transfers, credit cards, and money orders on account or in satisfaction of the Receivables; and (b) endorse and negotiate any of the foregoing received by Consultant, as the agent for the Company; and

(iv)    If the Company requests, identify and oversee third party collection attorneys to collect those Receivables Consultant is otherwise unable to collect.

(c)     In connection with the performance of Receivables Services, the Consultant agrees that the Company shall not be responsible for payment of any expenses incurred in connection with the Consultant's performance of the Receivables Services, except to the extent pursuant to a budget ("Receivables Services Budget"), which Receivables Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(d)     Any amounts collected by Consultant in connection with the collection of the Receivables, shall be remitted by the Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such Proceeds, with such amounts to be deposited into the Company's Designated Deposit Account.

2.6     IP Services.

(a)     Through the later of (i) the expiration of the Asset Marketing Period; or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant may

A001091

agree (the "<u>IP Marketing Period</u>"), the Consultant shall provide the Company with the following Services with respect to the collection or other disposition of the Company's Intellectual Property (the "<u>IP Services</u>"):

      (i)      Work with the Company's management and advisors to collect and secure all of the available information and data concerning the Intellectual Property;

      (ii)      In consultation with the Company, prepare marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition;

      (iii)      In consultation with the Company, develop and execute a sales and marketing program designed to elicit proposals to acquire the Intellectual Property from qualified acquirers, with a view toward completing one or more sales, assignments, licenses, or other dispositions of the Intellectual Property; and

      (iv)      Assist the Company in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property.

(b)      In connection with the performance of IP Services, the Consultant agrees that the Company shall not be responsible for payment of any expenses incurred in connection with the Consultant's performance of the IP Services, except to the extent pursuant to a budget ("<u>IP Services Budget</u>"), which IP Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(c)      All proceeds collected by Consultant in connection with the IP Services shall be either remitted directly to Company's Designated Deposit Account by the buyer(s) of the IP Assets, or to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in <u>Section 4.2</u> hereof, following Consultant's receipt of such amounts, with such amounts to be deposited into the Company's Designated Deposit Account

2.7    <u>License</u>.  (a)  Solely in connection with the performance of the Services as provided herein, the Company hereby grants Consultant a non-exclusive royalty free license ("<u>Services License</u>") to use, including, but not limited to, in all of its advertising and promotional activities related to this Agreement, all Intellectual Property, including, without limitation, the following Company tradenames: "Art Van Furniture", "Wolf Furniture", "Levin Furniture", and/or similar derivations thereof. The Services License shall extend through the later of (i) the expiration of the Asset Marketing Period, or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant may agree (the "<u>License Period</u>").

(b)      The Company hereby grants Consultant a license to allow Consultant to enter and occupy the Properties.  Specifically, Consultant shall have the right to enter and  the Properties during the applicable Asset Marketing Period solely for the purposes of performing its obligations under this Agreement, including, without limitation, taking photographs and preparing the marketing material for the Assets, and selling and overseeing the removal of the removable

A001092

Assets, without interference from any labor unions or any other third parties. The Company shall use reasonable efforts to ensure that the Consultant shall have access to and quiet enjoyment of the Properties for the applicable Asset Marketing Period. Consultant shall not be obligated to pay any rent, taxes, utilities, or other occupancy-related charges arising from or related to its access to and occupancy of the Properties during the applicable Asset Marketing Period. Subject to and limited by the Cash Collateral Budget, the Company agrees to continue to provide and pay for all utilities and other usual and customary occupancy-related costs and expenses during the course of Consultant's occupancy of the Properties. The Company agrees to maintain and bear the cost of any existing security personnel and trash removal for the Properties during the term of this Agreement. The Company acknowledges that Consultant is not an insurer of the Assets. Consultant shall have the right to abandon at the Properties any movable Assets not sold.

2.8    Supervisory Personnel.  (a)  In connection with the Sale, Consultant shall directly or indirectly retain and engage the Supervisors. The Supervisors are engaged by Consultant as independent contractors and are not and shall not be deemed to be employees or agents of Company in any manner whatsoever; nor do the Supervisors have any relationship with Company by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of Company for the Supervisors, except with respect to indemnification pursuant to Section 7.7 hereof.  During the Sale Term, the Supervisors shall perform Services during normal Store operating hours and for the period of time prior to the Stores' opening and subsequent to the Stores' closing, as required in connection with the Sale, in Consultant's discretion.

(b)    In consideration of Consultant's engagement of the Supervisors, Company agrees to reimburse Consultant, as a Sale Expense, for the actual Supervisor Costs paid by Consultant for services rendered by the Supervisors during the Sale Term. Company shall reimburse Consultant for all Supervisor Costs weekly, based upon invoices or other documentation reasonably satisfactory to Company (in consultation with the Lender Agents).  Company shall not be obligated to pay Supervisor Costs and/or Supervisor deferred compensation that have not been included in, or provided for, in the Sale Budget.

2.4    Title.  (a)  Title to all Assets shall remain with Company at all times during the Sale Term until such Asset(s) is sold.  Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the benefits to Company from the sale or other disposition of the other Assets, the Company expressly acknowledges that Consultant is not guaranteeing the results of the Sale or ensuring the recoveries to be realized by the Company from the sale or other disposition of the Assets. All sales of Assets shall be made on behalf of Company.  Consultant shall have no liability to the Company or any third party for its failure to sell any Asset(s), and shall have the right to abandon such unsold Asset(s) at the conclusion of the applicable Asset Marketing Period; provided, that any abandonment of any M&E in any Store(s) shall be done in a neat and orderly fashion.

(b)    the Company further agrees that responsibility for the handling of any Merchandise or other goods held by Company and located in the Properties under any consignment, sale or return, or other similar agreement shall lie exclusively with Company, and Consultant shall have no responsibility with respect thereto.

(c)    The Company and Consultant agree, and the Company hereby expressly

A001093

acknowledges, that Consultant shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found at or in the Assets, or obtaining or maintaining any Environmental Permits or other permits with respect thereto. The Company shall be responsible for ensuring that the Company possesses and is in compliance with all Environmental Permits that are required for the operation of the Company's businesses. As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws. In addition to any other indemnities provided herein, the Company hereby agrees to defend, indemnify and hold Consultant harmless from any and all claims, losses, damages and liabilities (including reasonable attorney's fees and costs) of any kind whatsoever which arise from or are in connection with any hazardous chemicals, solvents or substances found at or in the Assets or any violation of any such Environmental Laws or Environmental Permits.

## 3. Sale Expenses; Consultant's Compensation

3.1 <u>Sale Expenses</u>. (a) The Company shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses), and Consultant shall not be responsible for any such expenses, including Consultant Incurred Expenses, except as expressly provided for in <u>Section 11</u> below. The Company, Consultant and Lender Agents have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses to be incurred in connection with the sale of Merchandise through the Stores (the "<u>Sale Budget</u>"), the form and content of which Sale Budget is annexed hereto and made a part hereof as <u>Exhibit B</u>. The Sale Budget may only be modified by mutual agreement of the Company, the Consultant, and the Lender Agents. Consultant Incurred Expenses shall not exceed the aggregate amount, per expense category, of Consultant Incurred Expenses set forth in the Sale Budget without the prior written consent of the Company and Lender Agents. Subject to the limitations of the Sale Budget, the Company shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in <u>Section 4</u> hereof upon presentation of invoices and statements for such expenses.

(b) To the extent the Company, Consultant and Lender Agents agree on any separate M&E Budget, Real Estate Budget, Receivables Services Budget, and/or IP Services Budget, as the case may be, such supplemental budgets (each a "<u>Supplemental Budget</u>", and collectively the "<u>Supplemental Budgets</u>") shall be in addition to, and not in substitution of, the Sale Budget.

3.2 <u>Consultant's Compensation</u>. In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall NOT earn any fee or other compensation from the Company, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time at the request of the Company, in the course of performing Services hereunder, in each case limited to the amounts set forth in the Sale Budget and at the times provided herein. The Company shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item sold the

A001094

retail price (as reflected on Company's books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale. The Company shall make all such records and reports available to Consultant and the Lender Agents during regular business hours upon reasonable notice.

3.3     Expenses Deposit. The Interim Order and/or the Interim Cash Collateral Order (defined below) shall include approval on the part of the Company to fund, and the Company shall thereafter promptly fund, to Consultant $3,353,912 (the "Expense Deposit"). The Company shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by Company to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Company (or its designee) within three (3) business days following the Final Settlement.

## 4.     **Sale Proceeds; Weekly/Final Settlement**

4.1     During the Sale, the Company shall collect all proceeds realized from the sale of Merchandise and deposit the same in deposit accounts established by Company for the deposit thereof consistent with Company's existing cash management system (which may be Company's existing Store-level deposit accounts) (the "Sale Accounts"). In addition, if in connection with the sale of any M&E hereunder the Consultant assesses or receives any "buyer's premium" or similar sale price enhancement, the Company shall be entitled to receive any such amount, and the Consultant shall remit such amount to the Company in connection with the weekly reconciliation provided for hereunder and/or any Final Settlement (defined herein). The Company shall, upon request, deliver to Consultant and Lender Agents account statements and such other information relating sale of the Assets (including the Gross Sales and the Sale Accounts) reasonably requested by Consultant or Lender Agents.

4.2     On Wednesday of each week, commencing on the first Wednesday following the Sale Commencement Date, the Company (in consultation with the Lender Agents) and the Consultant shall reconcile the results of the sales of Asset for the prior week, including, without limitation, Gross Sales, sales of Assets, Sale Expenses (including Consultant Incurred Expenses), and any other expenses that may be incurred in connection with the performance of Services that may be in conformity with any Supplemental Budget(s). The Company shall promptly pay or reimburse all amounts due to Consultant on account of Sale Expenses, including Consultant Incurred Expenses and other expenses incurred by Consultant for the previous week on account of which it is entitled to be reimbursed pursuant to the Sale Budget and/or any Supplemental Budget(s).

4.3     No later than fourteen (14) business days following the end of the Sale Term, the Company (in consultation with the Lender Agents) and the Consultant shall complete a final accounting and reconciliation of all amounts contemplated by this Agreement ("Final Settlement"), including, without limitation, the determination and payment/reimbursement of any Sale Expenses, including Consultant Incurred Expenses, and such other expenses reimbursable to

A001095

Consultant in connection with the performance of Services that may be in conformity with any Supplemental Budget(s), if any.

4.4    To the extent the Company fails to pay or reimburse the Consultant for any amount for which it is entitled to be reimbursed as and when due, the Consultant shall be entitled to set off Asset sale proceeds in its possession and/or the Expense Deposit as reimbursement for any such unreimbursed amounts as part of the weekly reconciliations under Section 4.2 hereof and/or the Final Settlement under Section 4.3 hereof.

## 5.    Company Employees

5.1    The Company and the Consultant shall cooperate to retain the employees of the Company (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion.  Such employees shall remain employees of the Company, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Company's other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("WARN Act") payments, or any other costs, expenses, obligations, or liabilities arising from the Company's employment  or termination of such employees prior to, during, and subsequent to the Sale Term. Other than advising Company that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s).

## 6.    Fulfillment of Pre-Sale Customer Orders

6.1    In addition to providing the forgoing Services, the Consultant shall use commercially reasonable efforts to assist the Company in fulfilling certain pre-Sale Commencement Date orders for which the Company has received customer deposits (collectively, the "Pre-SCD Orders").

(a)    On-Hand Fulfillment Orders. Consultant shall assist the Company in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "On-Hand Fulfillment Orders"), on account of which orders (i) the Company has received customer deposits in the aggregate amount of $18 Million (collectively, the "On-Hand Customer Deposits") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Company's Distribution Centers or the Stores (collectively, the "On-Hand Fulfillment Merchandise").  As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Company in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Company) in order to fulfill and complete the On-Hand Fulfillment Orders.  Consultant shall advise the Company in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Company and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Company's existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales

13

A001096

commissions and delivery (collectively, the "<u>On-Hand Fulfillment Processing Expenses</u>"), shall be borne exclusively by the Company, and the Consultant shall not be responsible for any such costs or expenses. Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Company. To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Company on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder. Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <u>provided</u>, that any proceeds realized by the Company upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder.

(b)    <u>Back-Order Fulfillment Orders</u>. Following the Sale Commencement Date, Consultant shall also assist the Company in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Company has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Company's Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>"). To the extent that a Back-Order Fulfillment Order(s) can be filled by the Company within a reasonable time after the Sale Commencement Date, the Company and the Consultant shall work together to implement a protocol for fulfillment of such order(s). To the extent that the Company is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Company, and the Company and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Company's bankruptcy case for the full amount of such customer's Back-Order Customer Deposit.

(c)    If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit.

(d)    During the Sale Term, the Company shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders.

**7.**    <u>**Affirmative Duties Of Company**</u>

7.1    The Company shall be solely liable for, and shall pay when due (except as provided in this <u>Section 7.1</u>) the following: (i) all Store-level operating expenses, all Sale Expenses (including, but not limited to, Consultant Incurred Expenses), Central Service expenses, any expenses provided for in any Supplemental Budget(s), and all other Sale-related expenses that are

14

necessary to conduct, or are incurred in the conduct of, the Sale or Company's businesses, including, without limitation, all taxes, costs, expenses, accounts payable and other liabilities relating to the Sale, the Properties, Store Employees, any other agents and representatives of Company, and/or Company's businesses. For the avoidance of doubt, unless otherwise agreed to by Company and Lender Agents in writing, the Company shall not be responsible for, and shall have no obligation to pay or reimburse, any Consultant Incurred Expenses or other expenses in excess of the amounts set forth in the Sale Budget or any Supplemental Budget(s).

7.2     The Company shall collect all sales, excise, or gross receipts taxes. The Company shall be solely responsible for preparing and processing of all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes (including, but not limited to, sales taxes collected as part of the Sale) to the appropriate taxing authorities; and Company shall pay all collected sales taxes when due in accordance with applicable law. The Consultant shall provide all assistance reasonably required or requested by the Company in connection with the preparation and processing of any such reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes (including, but not limited to, sales taxes collected as part of the Sale) to the appropriate taxing authorities.

7.3     Without limiting any other term or provision of this Agreement, during the Sale Term, Company shall provide Consultant, with (i) Central Services; (ii) employees at the Stores necessary or appropriate to implement and conduct the Sale, and (iii) subject to lease expirations, peaceful use and occupancy of, and reasonable access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores and Company's corporate offices and Distribution Centers for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby; provided, however, any incremental cost or expense to the Company in connection with the foregoing that is solely attributable to the Additional Consultant Goods shall reimbursed to the Company by the Consultant. In furtherance of the foregoing, the Company shall use reasonable efforts to (i) cause the Company's employees, including Store Employees, to cooperate with Consultant and the Supervisors; (ii) execute all agreements determined by the Company and Consultant to be necessary or desirable for the operation of the Stores during the Sale; and (iii) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores.

7.4     During the period between the Sale Commencement Date and April 15, 2020, the Company and the Consultant agree that gift cards and merchandise credits, including any Cancelled Back-Order Merchandise Credit shall be honored at the Stores in accordance with store-level operation procedures to be mutually agreed upon between the Company, the Consultant, and the Lender Agents. The Company and Consultant further agree that no gift cards shall be sold from the Stores during the Sale Term.

7.5     During the first seven (7) days following the Sale Commencement Date, the Company agrees that returns of inventory sold prior to the Sale Commencement Date and either delivered to customers prior to or after the Sale Commencement Date ("Returned Merchandise") shall be accepted in a manner consistent with Company's customary practices and policies in effect on the Sale Commencement Date; provided however, no pricing adjustments, or returns of inventory sold prior to the Sale Commencement Date followed by the Customer's attempt to

A001098

repurchase the item (or item of the same sku) at the discounted price shall be accepted or honored during the Sale Term. All customer requests for cash refunds or merchandise credits in respect of any Returned Merchandise shall be processed exclusively through Company's point-of-sale system. All Returned Merchandise, to the extent it is not defective, shall be included as Merchandise. No returns of inventory sold prior to the Sale Commencement Date shall be accepted or allowed following the seventh (7th) day following the Sale Commencement Date.

7.6     The Company agrees to procure and maintain, during the Sale Term, all insurance (including, without limitation, commercial general liability, property damage, fire and other perils insurance) currently in effect and in the same amounts, levels, deductibles, and coverages in respect of all Assets until sold.

7.7     The Company shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

       (a)     Company's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

       (b)     any failure of Company to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

       (c)     any consumer warranty or products liability claims relating to any Merchandise;

       (d)     any liability or other claims asserted by customers, any of Company's employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant;

       (e)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Company or any of Company's employees, agents, or representatives (including, without limitation, any Company employees); and

       (f)     the negligence or willful misconduct of Company or any of its officers, directors, employees, agents or representatives.

## 8.     Affirmative Duties Of Consultant

8.1     To the extent necessary, and except as provided in the Approval Orders, Consultant shall assist the Company in obtaining all required permits and governmental consents required in

A001099

order to conduct the Sale, and shall ensure that the Sale is conducted in accordance with all applicable laws, regulations and ordinances.

8.2    The Consultant shall indemnify and hold Company and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Company Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)    Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(b)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Company (including, without limitation, any Store Employees) by Consultant or any of Consultant's representatives (including, without limitation, any Supervisor);

(c)    any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Company or Company Indemnified Parties or from a breach of the terms hereof by Company; and

(d)    the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor.

## 9.    Additional Consultant Goods

9.1    In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("Additional Consultant Goods"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods).  Sales of Additional Consultant Goods shall be run through Company's point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  Consultant and Company shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Company goods.  Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Company's written

A001100

consent and subject to Consultant's agreement to reimburse Company for any associated expenses, Consultant shall not use Company's distribution centers for any Additional Consultant Goods.

9.2     Consultant shall pay to the Company an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Company any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation.  Except for sales taxes associated with the sale of Additional Consultant Goods and Company's Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation.  Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

9.3     The Consultant, the Company, and the Lender Agents intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Company in all respects and not a consignment for security purposes.  Subject solely to Consultant's obligations to pay to Company the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Lender Agents, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.  In furtherance of the foregoing, the Company acknowledges that the Additional Consultant Goods shall be consigned to Company as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC").  The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Lender Agents.

9.4     The Company shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with Company's insurers.  Consultant shall be responsible for payment of any deductible (but only in relation to the Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

A001101

## 10. Representation and Warranties

10.1 <u>Representations and Warranties of the Consultant</u>. Each entity comprising Consultant hereby represents, warrants and covenants in favor of Company as follows:

(a) Consultant has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b) Upon execution by the parties hereto, this Agreement is a valid and binding obligation of Consultant enforceable in accordance with its terms, subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof.

(c) No action or proceeding has been instituted or, to Consultant's knowledge, threatened, affecting the Consultant's ability to consummate this Agreement or the transactions contemplated herein.

(d) Except as provided in the Approval Orders and the Sale Guidelines, Consultant will comply with and act in accordance with any and all applicable state and local laws, rules and regulations and other legal obligations of all governmental authorities and the terms/restrictions of the underlying Stores' leases.

10.2 <u>Representations and Warranties of the Company</u>: the Company hereby represents, warrants and covenants in favor of Consultant as follows:

(a) Subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof, the Company has taken all necessary action required to authorize its execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b) Subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof, upon execution by the Company, this Agreement is a valid and binding obligation of the Company enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally and the availability of equitable remedies.

(c) Except as may be affected by the Company's commencement of the Bankruptcy Case, no court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for the Company's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.

(d) The Company has all requisite authority to grant the License to Consultant to utilize the Properties and the Intellectual Property, including, without limitation, the tradenames "Art Van Furniture", "Wolf Furniture", "Levin Furniture", and similar derivations thereof as provided for under this Agreement.

A001102

(e) The Company has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files, records, and information received by Consultant are true and accurate in all material respects.

(f) Except for the liens of the ABL Lenders and Term Loan Lenders, all Assets are, or will be as of the Sale Commencement Date free and clear of all liens, claims and encumbrances of any kind whatsoever.

**11.** **Bankruptcy Matters**. If the Company commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the Bankruptcy Court, the Company shall promptly file an expedited motion (a) seeking authorization to conduct the Sale and sell or otherwise dispose of the Assets, and (b) to assume this Agreement under section 365 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved by the Interim Order, and thereafter the Final Order (together with the Interim Order, the "Approval Orders"). The Approval Orders shall be reasonably acceptable in form and substance to the Consultant, the Company and the Lender Agents, and provide for, among other things, the following:

(a) approval of the transactions contemplated by this Agreement, including, without limitation, the company's conduct of the Sale and the sale of the other Assets;

(b) approving the Company's retention and employment of Consultant to perform the Services contemplated by this Agreement;

(c) approving the Sale Guidelines;

(d) authorizing the Company's reimbursement to Consultant of all Sale Expenses advanced by the Consultant, including Consultant Incurred Expenses, together with any additional expenses incurred pursuant to any Supplemental Budget(s), such reimbursements to be made on a weekly basis and otherwise in accordance with this Agreement, from the Expense Deposit, and thereafter from gross receipts from the sale or other disposition of the Assets (or retained by the Consultant from such receipts) without further order of the Bankruptcy Court and otherwise in accordance with this Agreement, in each case without further order of the Bankruptcy Court, and any such payment(s)/reimbursement(s) shall be free and clear of all liens, claims and encumbrances;

(e) providing that the authority granted herein for the reimbursement of Sale Expenses, including Consultant Incurred Expenses, and any other expenses incurred or advanced by Consultant pursuant to any Supplemental Budget(s), shall be subject to the provisions of (i) that certain proposed Interim Order authorizing the Company Use of Cash Collateral" (the "Interim Cash Collateral Order") to be filed and entered in the Bankruptcy Case, and shall be made strictly in accordance with the Cash Collateral Budget (as defined in the Interim Cash Collateral Order), subject to such variances as permitted by the Cash Collateral Order; provided, however, that neither the Interim Cash Collateral Order shall not require or impose a cap or reduction on amounts due to the Consultant under this

A001103

Agreement, other than any such cap or reduction resulting from the Company's required compliance with the Cash Collateral Budget;

(f) not later than two (2) business days after entry of the Interim Order the Company shall deliver to the Consultant the Expense Deposit as set forth in the Sale Budget as security for payment or reimbursement to Consultant of Sale Expenses incurred by Consultant on account of which it is entitled to be reimbursed;

(e) any remaining balance of Expense Deposit being held by Consultant upon completion of the Final Settlement shall (i) be applied by Consultant as shall be set forth in the Final Settlement, and (ii) be subject to all provisions relating to Cash Collateral set forth in the Interim Cash Collateral Order;

(f) authorizing the Company's conduct of the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale;

(g) authorizing the Company's conduct of the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents;

(h) approving the sale of Additional Consultant Goods in accordance with the terms and conditions hereof; and

(i) authorizing the Consultant and the Company to take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.

Upon the commencement of the Bankruptcy Case, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over the Company's Bankruptcy Case, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum *non conveniens*. From and after entry of the Approval Orders, Consultant shall conduct the Sale in accordance with the terms of the Approval Orders in all material respects.

## 12. <u>Insurance; Risk of Loss</u>

12.1 Company shall maintain throughout the Sale Term, (i) insurance with respect to the Assets in amounts and on such terms and conditions as are consistent with the Company's ordinary course operations and (ii) casualty and liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the operation of the Stores, and shall cause Consultant to be listed as an additional insured with respect to all such policies, and as loss payee for the property insurance. Company shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence or willful misconduct of Consultant, or its employees, representatives, agents or Supervisors.

A001104

12.2 Consultant shall maintain, throughout the Sale Term, liability insurance policies (including, but not limited to, comprehensive general liability and auto liability insurance) covering injuries to persons and property in or in connection with Consultant's provision of Services at the Stores, and shall cause Company to be named an additional insured with respect to such policies.

12.3 Notwithstanding any other provision of this Agreement, the Company and the Consultant agree that Company shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores before, during and after the Sale Term, except to the extent any such claim arises from the negligence, willful misconduct, or unlawful acts of the Consultant or any Supervisor engaged by Consultant under the terms of this Agreement.

## 13. <u>Miscellaneous</u>

13.1 Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

If to the Company:     c/o AVF HOLDING COMPANY, INC.
6500 East Fourteen Mile Road
Warren, MI  48092
Attn: David Ladd
Email: dladd@artvan.com

With copies to:

MONTGOMERY MCCRACKEN WALKER &
RHOADS, LLP
437 Madison Avenue
New York, NY 10022
Attn:  Maura I. Russell
Email:  mrussell@mmwr.com

ALVAREZ & MARSAL, LLP
600 Madison Avenue – 7th Floor
New York, NY 10022
Attn:   Dennis Stogsdill
        Matthew Davidson
Email: DStogsdill@alvarezandmarsal.com
        matthew.davidson@alvarezandmarsal.com

A001105

If to the Consultant: HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention: Ian S. Fredericks
Tel: (847) 418-2075
Email: ifredericks@hilcotrading.com

-and-

GORDON BROTHERS RETAIL PARTNERS, LLC, DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE, GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC AND GORDON BROTHERS BRANDS, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn: Mackenzie L. Shea
Tel: (617) 210-7116
Email: mshea@gordonbrothers.com

With a copy to (which shall not constitute notice):

RIEMER & BRAUNSTEIN LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn: Steven E. Fox
Email: sfox@riemerlaw.com

If to the ABL Lenders: WELLS FARGO BANK, NATIONAL ASSOCIATION
125 High Street, 11th Floor
Boston, MA 02110
Attn: Danielle Baldinelli
Email: Danielle.M.Baldinelli@wellsfargo.com

MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110-1726
Attn: Marjorie B. Crider
Email: marjorie.crider@morganlewis.com

23

A001106

If to the Term Lenders:        King & Spalding LLP
                               1185 Avenue of the Americas
                               New York, NY 10036
                               Attn: W. Todd Holleman
                               Email: tholleman@kslaw.com

13.2    <u>Governing Law</u>.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions.

13.3    <u>Severability</u>.  In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

13.4    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with respect of the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by the Company (with the consent of the Lender Agents, which consent shall not be unreasonably withheld, delayed or conditioned) and the Consultant.

13.5    <u>Assignment</u>.  Neither Company nor Consultant shall assign this Agreement without the express written consent of the other; <u>provided</u>, <u>however</u>, notwithstanding the foregoing, the Consultant may delegate and assign its rights and obligations under this Agreement to one or more affiliates with subject matter experience with applicable Assets without the consent of the Company.  This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

13.6    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument.  Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

13.7    <u>Independent Contractor</u>.  Nothing contained herein shall be deemed to create any relationship between the Company and the Consultant other than that of an independent contractor. It is stipulated that the parties are not partners or joint venturers.

13.8    <u>Termination</u>.  This Agreement shall terminate upon the earlier to occur (a) in the event the Bankruptcy Court does not enter the Interim Order on or before March 10, 2020, (b) in the event the Sale Commencement Date does not occur on or prior to March 7, 2020, (c) in the event the Bankruptcy Court does not enter the Final Order on or before March 31, 2020, (d) the mutual agreement of the Parties, or (e) upon the completion and approval of the Final Settlement; <u>provided</u>, <u>however</u>, that either party may terminate this Agreement in the event that the other commits a material breach or material failure of its obligations hereunder.  If either party seeks to terminate this Agreement by reason of a claim of a material breach or material failure, such party shall provide the other party with not less than five (5) days' prior written notice stating with specificity the nature of the claimed material breach or material failure, and the party receiving

A001107

such notice shall have five (5) business days in which to cure such material breach or material failure, failing which this Agreement shall be deemed terminated. In the event this Agreement is terminated by Consultant on account of a material breach or material failure by the Company, Consultant shall be entitled to be reimbursed any Sale Expenses, including Consultant Incurred Expenses and any other expenses incurred in conformity with the Sale Budget or any Supplemental Budget(s) through the date of such termination.

13.8 <u>Confidentiality</u>. Except for such disclosure as may be required and/or incident to Asset sale-related activities and Services provided for herein, all information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Company, its customers, parent, subsidiary or other affiliated entities (for purposes of this provision, all such entities are included within each reference to "Company") is Company's confidential, trade secret information ("<u>Company Confidential Information</u>"), which is and shall remain the exclusive intellectual property of Company. Consultant shall not divulge, furnish, make available or in any other manner disclose such information to any third party other than Consultant's officers, employees, representatives and agents. Consultant shall take and shall cause its officers, employees, representatives and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Company Confidential Information. Consultant agrees to maintain strict confidentiality and agrees that it may use Company Confidential Information only as reasonably necessary to the performance of its obligations related to the sale of the Assets as contemplated hereby. Notwithstanding the foregoing, Company hereby agrees that Consultant may identify Company as a Consultant customer for which Consultant has provided services for purposes of promoting its business.

13.9 <u>Force Majeure</u>. If any casualty or act of God, war, or terrorism prevents or substantially inhibits the conduct of business in the ordinary course at any Store(s), or results in a material loss or impairment of the Assets, then the subject location(s) and the remaining Merchandise located thereat shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Consultant and shall have no further rights or obligations hereunder with respect thereto; <u>provided</u>, <u>however</u>, that the proceeds of any insurance attributable to impacted Assets or proceeds from business interruption insurance shall constitute Gross Proceeds hereunder.

13.10 By executing or otherwise accepting this Agreement, the Company and Consultant acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

A001108

13.11   This Agreement shall be deemed drafted by both parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

[Remainder of Page Intentionally Left Blank]
[Signatures Appear On Next Page]

A001109

IN WITNESS WHEREOF, the Company and the Consultant have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

AVF HOLDING COMPANY, INC.
AVF HOLDING COMPANY, INC.

By: _David Ladd_

Name: DAVID LADD

Its: 3/4/2020

[Signatures Continue Next Page]

A001110

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By:_____

    Name:    Sarah Baker
    Title:    Assistant General Counsel

    - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By:_____

    Name:    _____
    Its:    _____

**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By:_____

    Name:    _____
    Its:    _____

**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By:_____

    Name:    _____
    Its:    _____

A001111

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By:_____
    Name:    Sarah Baker
    Title:     Assistant General Counsel

        **-** and **–**

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By:_____
    Name:    _____
    Its:     _____

**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By:_____
    Name:    _____
    Its:     _____

**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By:_____
    Name:    _____
    Its:     _____

28

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**


By:_____
    Name:    Sarah Baker
    Title:    Assistant General Counsel

       - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**


By:_____
    Name:    _____
    Its:    _____


**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**


By:_____
    Name:    Mark T. Dufton
    Its:    Chief Executive Officer , Real Estate


**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**


By:_____
    Name:    _____
    Its:    _____

A001113

**HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC**

By: _____

    Name:    Sarah Baker

    Title:    Assistant General Counsel

            - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By: _____

    Name:    _____

    Its:    _____

**DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE**

By: _____

    Name:    _____

    Its:    _____

**GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC**

By: *Robert J Maroney*

    Name:    Robert J. Maroney

    Its:    President

28

A001114

**GORDON BROTHERS BRANDS, LLC**

By: _____

Name:     RAMEZ TOUBASSY

Its:         PRESIDENT

[Signatures Continue Next Page]

A001115

ACKNOWLEDGED AND AGREED
TO THIS ___ DAY OF MARCH, 2020:

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
As Administrative Agent and Collateral Agent

By: _____
    Name: Lauren Murphy
    Its: Director

[Signatures Continue Next Page]

A001116

**VIRTUS GROUP, LP,**
As Administrative Agent and Collateral Agent
For Itself and the Other Term Loan Lenders

VIRTUS GROUP, LP,
as Administrative Agent

By: _____

Name:

Title: SNR DIR

Art Van Furniture
Results - Store Count Strategy by Location

| | | |
|---|---|---|
| 169 | # Stores included in liquidation | Yes |
| 2 | # stores closed prior to sale commencement | No |

*Financial Information in ($000's)*

| Store # | Store Name | Original Store Name | Include in Liquidation | Direct Marketing Area | Store Type | Company Affiliation | Gross Sq. Ft. | Selling Sq. Ft. | Lease Beginning Date | Lease Expire. | Months Remaining | SLB Property | Landlord | Master Lease | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Bel Air, MD (1) | BEL AIR (#65) | Yes | Baltimore | Standard | WLF | 74,400 | 62,000 | 5/15/2015 | 12/31/2025 | 70 | No | CAMPUS HILLS MARYLAND ASSOCIATES, L.P. | None | 2400 E Churchville Rd, Bel Air, MD, 21015, USA |
| 2 | Pasadena, MD (2) | PASADENA (#61) | Yes | Baltimore | Standard | WLF | 61,646 | 54,000 | 5/15/2015 | 8/31/2025 | 66 | No | ARUNDEL PROPERTY INVESTORS LP | None | 8038 Ritchie Hwy, Pasadena, MD, 21122, USA |
| 3 | Westminster, MD (3) | WESTMINSTER (#64) | Yes | Baltimore | Standard | WLF | 40,550 | 38,000 | 5/15/2015 | 8/31/2021 | 18 | No | WESTMINSTER GATEWAY, LLC | None | 1030 Baltimore Blvd Suite 110, Westminster, MD, 21157, USA |
| 4 | Towson, MD (4) | TOWSON (#63) | Yes | Baltimore | Standard | WLF | 54,000 | 46,000 | 5/15/2015 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1530 E Joppa Rd, Towson, MD, 21286, USA |
| 5 | Catonsville, MD (5) | CATONSVILLE (#62) | Yes | Baltimore | Standard | WLF | 115,300 | 40,000 | 5/15/2015 | 8/31/2025 | 66 | No | JMB JOINT VENTURE | None | 6415 Baltimore National Pike, Catonsville, MD, 21228, USA |
| 6 | Downers Grove, IL (6) | DOWNERS GROVE AVF & SSI (#199) | Yes | Chicago | Flagship | AVF | 100,000 | 92,428 | 8/1/2015 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1021 BUTTERFIELD RD, DOWNERS GROVE, IL, 60515, USA |
| 7 | Merrillville, IN (7) | MERRILLVILLE AVF | Yes | Chicago | Standard | AVF | 50,000 | 43,130 | 8/24/2013 | 2/28/2023 | 36 | No | ACADIA MERRILLVILLE REALTY, L.P. | None | 1600 E 80TH AVE, MERRILLVILLE, IN, 46410, USA |
| 8 | Naperville, IL (8) | NAPERVILLE AVF | Yes | Chicago | Standard | AVF | 62,000 | 52,753 | 6/18/2015 | 8/31/2025 | 66 | No | BRIXMOR HERITAGE SQUARE, LLC | None | 404 SOUTH ROUTE 59, NAPERVILLE, IL, 60540, USA |
| 9 | Bedford Park, IL (9) | BEDFORD PK AVF | Yes | Chicago | Standard | AVF | 84,505 | 71,590 | 10/26/2013 | 4/30/2024 | 50 | No | SPIRIT SPE LOAN PORTFOLIO 2013-3, LLC | None | 7200 S CICERO AVE, BEDFORD PARK, IL, 60638, USA |
| 10 | Elston, IL (10) | ELSTON AVE AVF | Yes | Chicago | Standard | AVF | 48,000 | 40,660 | 10/26/2013 | 4/30/2024 | 50 | No | Farbman Group | None | 2606 ELSTON AVE, CHICAGO, IL, 60647, USA |
| 11 | Batavia, IL (11) | BATAVIA AVF | Yes | Chicago | Standard | AVF | 42,500 | 37,055 | 9/14/2013 | 1/31/2024 | 47 | No | PARAGON BATAVIA, LLC | None | 165 N RANDALL RD, BATAVIA, IL, 60510, USA |
| 12 | Orland Park, IL (12) | ORLAND PARK AVF | Yes | Chicago | Standard | AVF | 65,523 | 53,329 | 7/13/2013 | 5/31/2024 | 51 | No | 55th & S. Kedzie, LLC | None | 15080 S LA GRANGE RD, ORLAND PARK, IL, 60462, USA |
| 13 | Algonquin, IL (13) | ALGONQUIN AVF | Yes | Chicago | Standard | AVF | 48,397 | 41,272 | 3/31/2016 | 7/31/2025 | 65 | No | c/o Mid America Asset Management, Inc. | None | 1500 S RANDALL ROAD, ALGONQUIN, IL, 60102, USA |
| 14 | Kildeer, IL (14) | KILDEER AVF | Yes | Chicago | Standard | AVF | 40,628 | 34,534 | 10/4/2017 | 9/30/2027 | 91 | No | Kildeer Village Square, LLC. | None | 20393 N RAND RD, KILDEER, IL, 60074, USA |
| 15 | Glendale Heights, IL (15) | GLENDALE HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,820 | 37,044 | 2/26/2016 | 3/31/2026 | 73 | No | 125 W. Army Trail Road LLC | None | 125 ARMY TRAIL ROAD, GLENDALE HGTS, IL, 60139, USA |
| 16 | Deerfield, IL (16) | DEERFIELD AVF | Yes | Chicago | Standard | AVF | 41,966 | 35,671 | 12/13/2017 | 2/29/2028 | 96 | No | Gateway Fairview, Inc. | None | 120 S. WAUKEGAN, DEERFIELD, IL, 60015, USA |
| 17 | Schaumburg, IL (17) | SCHAUMBURG AVF& SSI (#303) | Yes | Chicago | Flagship | AVF | 71,400 | 61,990 | 10/29/2016 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1293 E HIGGINS RD, SCHAUMBURG, IL, 60173, USA |
| 18 | Joliet, IL (18) | JOLIET PS | Yes | Chicago | Sleep | APS | 3,116 | 2,884 | 12/26/2017 | 12/31/2027 | 94 | No | GW Fidelity PH, LLC | None | 2901 PLAINFIELD, JOLIET, IL, 60435, USA |
| 19 | Burbank, IL (19) | BURBANK PS | Yes | Chicago | Sleep | APS | 3,994 | 3,476 | 3/21/2015 | 3/31/2025 | 61 | No | WM 73 RE, LLC | None | 7712 CICERO AVENUE, BURBANK, IL, 60459, USA |
| 20 | Woodridge, IL (20) | WOODRIDGE AVF | Yes | Chicago | Standard | AVF | 68,400 | 59,687 | 3/27/2014 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 900 E BOUGHTON RD, WOODRIDGE, IL, 60517, USA |
| 21 | Gurnee, IL (21) | GURNEE AVF | Yes | Chicago | Standard | AVF | 34,000 | 28,900 | 6/26/2018 | 12/31/2032 | 154 | No | 3503 RP Gurnee, L.L.C. | None | 6911 W. GRAND AVE, GURNEE, IL, 60031, USA |
| 22 | Plainfield, IL (22) | PLAINFIELD PS | Yes | Chicago | Sleep | APS | 3,600 | 3,290 | 2/11/2017 | 2/28/2027 | 84 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 13511 S ROUTE 59, PLAINFIELD, IL, 60544, USA |
| 23 | Willowbrook, IL (23) | WILLOWBROOK PS | Yes | Chicago | Sleep | APS | 3,834 | 3,400 | 12/3/2016 | 1/31/2027 | 83 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6938 KINGERY HIGHWAY, WILLOWBROOK, IL, 60527, USA |
| 24 | Chicago, IL (24) | ASHLAND PS | Yes | Chicago | Sleep | APS | 3,000 | 2,600 | 9/10/2016 | 9/30/2026 | 79 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 2911 N. ASHLAND AVENUE, CHICAGO, IL, 60657, USA |
| 25 | Bloomingdale, IL (25) | BLOOMINGDALE PS | Yes | Chicago | Sleep | APS | 4,798 | 4,370 | 5/26/2017 | 4/30/2027 | 86 | No | Bloomingdale Square, LP | None | 398 W ARMY TRAIL RD #102, BLOOMINGDALE, IL, 60108, USA |
| 26 | Harwood Heights, IL (26) | HARWOOD HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,000 | 51,000 | 11/15/2017 | 12/31/2038 | 226 | No | DBD AVF | None | 7304 WEST LAWRENCE AVE, HARWOOD HEIGHTS, IL, 60706, U |
| 27 | Avon, OH (27) | AVON (#45, 46 CC) | Yes | Cleveland | Standard | LVF | 77,000 | 72,380 | 7/1/2011 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1801 NAGEL ROAD, AVON, OH, 44011, USA |
| 28 | North Canton, OH (28) | CANTON (#14, 25, 26 CC) | Yes | Cleveland | Standard | LVF | 65,765 | 60,199 | 3/1/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 6229 PROMLER AVENUE NW, NORTH CANTON, OH, 44720, USA |
| 29 | Akron, OH (29) | AKRON (#23, 24 CC) | Yes | Cleveland | Standard | LVF | 69,422 | 65,257 | 10/1/2005 | 9/30/2020 | 7 | No | TABANI AKRON, LP | None | 3742 BROOKWALL DRIVE, AKRON, OH, 44333, USA |
| 30 | Middleburg Heights, OH (30) | MIDDLEBURG (#11, 31 CC) | Yes | Cleveland | Standard | LVF | 50,000 | 45,172 | 7/1/1993 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 16960 SPRAGUE ROAD, MIDDLEBURG HEIGHTS, OH, 44130, US |
| 31 | Mentor, OH (31) | MENTOR (#9, 27, 28 CC) | Yes | Cleveland | Standard | LVF | 75,600 | 70,712 | 7/1/2009 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 7799 MENTOR AVE, MENTOR, OH, 44060, USA |
| 32 | Oakwood Village, OH (32) | OAKWOOD VILLAGE (#18, 19 CC) | Yes | Cleveland | Standard | LVF | 89,723 | 67,723 | 8/1/2002 | 11/30/2027 | 93 | No | FIRST INERNATIONAL HAWTHORNE LP | None | 23100 BROADWAY AVE, OAKWOOD VILLAGE, OH, 44146, USA |
| 33 | North Olmsted, OH (33) | NORTH OLMSTED (#12, 34 CC) | Yes | Cleveland | Standard | LVF | 46,000 | 41,270 | 8/1/1996 | 1/31/2027 | 83 | No | GLITZ AND ASSOCIATES INC | None | 23250 LORAIN ROAD, NORTH OLMSTED, OH, 44070, USA |
| 34 | Strongsville, OH (34) | STRONGSVILLE (#74) | Yes | Cleveland | Sleep | LM | 5,000 | 4,400 | 11/5/2015 | 10/31/2025 | 68 | No | ECHO STRONGSVILLE LLC | None | 16105 PEARL ROAD, STRONGSVILLE, OH, 44136, USA |
| 35 | Mayfield Heights, OH (35) | MAYFIELD (#65) | Yes | Cleveland | Sleep | LM | 4,620 | 4,120 | 5/1/2012 | n/a | n/a | No | JACK H SCHWARTS, TRUSTEE OF THE JACK H | None | 6061 Mayfield Rd, Mayfield Heights, OH, 44124, USA |
| 36 | Stow, OH (36) | STOW (#68) | Yes | Cleveland | Sleep | LM | 4,160 | 3,660 | 10/25/2013 | 1/31/2024 | 47 | No | DEVILLE DEVELOPMENTS LLC | None | 1061 GRAHAM RD, STOW, OH, 44224, USA |
| 37 | Medina, OH (37) | MEDINA (#76) | Yes | Cleveland | Sleep | LM | 4,500 | 4,000 | 8/25/2016 | 9/30/2021 | 19 | No | GOWE LEASING LIMITED | None | 3823 PEARL RD, MEDINA, OH, 44256, USA |
| 38 | Sandusky, OH (38) | SANDUSKY (#73) | Yes | Cleveland | Sleep | LM | 5,400 | 4,900 | 11/14/2014 | 2/28/2025 | 60 | No | PLI II LTD | None | 4917 MILAN RD PLAZA, SANDUSKY, OH, 44870, USA |
| 39 | Elyria, OH (39) | ELYRIA (#72) | Yes | Cleveland | Sleep | LM | 6,400 | 5,800 | 6/19/2015 | 6/30/2026 | 76 | No | ELYRIA-CHESTNUT, LLC / NICKLEPLATE REALT | None | 510 CHESTNUT COMMONS DR, ELYRIA, OH, 44035, USA |
| 40 | Solon, OH (40) | SOLON (#67) | Yes | Cleveland | Sleep | LM | 3,788 | 3,288 | 2/22/2013 | 5/31/2023 | 39 | No | L & y PROPERTIES - SOLON, LLC | None | 6130 KRUSE DRIVE, SOLON, OH, 44139, USA |
| 41 | Canton, OH (41) | MASSILLON (#71) | Yes | Cleveland | Sleep | LM | 5,650 | 5,150 | 6/27/2014 | 11/30/2024 | 57 | No | PERRY TOWN CENTER LLC | None | 5119 WEST TUSCARAWAS ST, CANTON, OH, 44708, USA |
| 42 | Polaris, OH (42) | POLARIS AVF | Yes | Columbus | Flagship | AVF | 70,000 | 59,500 | 3/16/2019 | 10/31/2037 | 212 | Yes | STORE CAPITAL | Other | 1551 GEMINI PLACE, COLUMBUS, OH, 43240, USA |
| 43 | Novi, MI (43) | NOVI AVF | Yes | Detroit | Flagship | AVF | 102,520 | 88,958 | 1/1/1985 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 27775 NOVI RD, NOVI, MI, 48377, USA |
| 44 | Warren, MI (44) | TECH PLAZA AVF | Yes | Detroit | Flagship | AVF | 109,980 | 87,859 | 11/26/1982 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 6500 E 14 MILE RD, WARREN, MI, 48092, USA |
| 45 | Shelby Township, MI (45) | LAKESIDE AVF | Yes | Detroit | Flagship | AVF | 68,104 | 72,336 | 8/14/1992 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 14055 HALL RD, SHELBY TOWNSHIP, MI, 48315, USA |
| 46 | Canton, MI (46) | CANTON AVF | Yes | Detroit | Flagship | AVF | 69,929 | 58,740 | 1/3/2018 | 12/31/2038 | 226 | Yes | Agree Limited Partnership | None | 41661 FORD ROAD, CANTON, MI, 48187, USA |
| 47 | Taylor, MI (47) | TAYLOR AVF | Yes | Detroit | Flagship | AVF | 91,720 | 79,294 | 3/6/1978 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 22035 EUREKA RD, TAYLOR, MI, 48180, USA |
| 48 | Ann Arbor, MI (48) | ANN ARBOR AVF | Yes | Detroit | Flagship | AVF | 70,000 | 60,912 | 7/2/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 425 E EISENHOWER PKWY, ANN ARBOR, MI, 48108, USA |
| 49 | Southfield, MI (49) | SOUTHFIELD AVF | Yes | Detroit | Standard | AVF | 64,584 | 52,094 | 11/1/2000 | 7/31/2023 | 41 | No | GREENFIELD PLAZA, INC. | None | 22555 GREENFIELD RD, SOUTHFIELD, MI, 48075, USA |
| 50 | Royal Oak, MI (50) | WOODWARD AVF & SSI (#174) | Yes | Detroit | Standard | AVF | 56,520 | 54,943 | 11/14/1997 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 32301 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 51 | Clinton Twp, MI (51) | CLINTON AVF | Yes | Detroit | Flagship | AVF | 69,720 | 60,128 | 1/1/1988 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 33801 S GRATIOT AVE, CLINTON TWP, MI, 48035, USA |
| 52 | Chesterfield, MI (52) | CHESTERFIELD AVF | Yes | Detroit | Standard | AVF | 73,152 | 58,029 | 12/26/2003 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 50400 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 53 | Howell, MI (53) | HOWELL AVF | Yes | Detroit | Standard | AVF | 51,075 | 45,721 | 11/1/1997 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4101 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 54 | Waterford, MI (54) | DRAYTON PLAINS AVF | Yes | Detroit | Standard | AVF | 53,188 | 57,435 | 6/30/1971 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 5053 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 55 | Dearborn, MI (55) | DEARBORN AVF | Yes | Detroit | Standard | AVF | 57,633 | 58,164 | 7/11/1997 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN CAPITAL PARTNERS, LLC | 15701 MARKET DR, DEARBORN, MI, 48126, USA |
| 56 | Auburn Hills, MI (56) | GREAT LAKES AVF | Yes | Detroit | Standard | AVF | 43,319 | 37,296 | 1/1/2011 | 1/31/2021 | 11 | No | Taubman Auburn Hills Associates Limited Partnersh | None | 4612 BALDWIN RD, AUBURN HILLS, MI, 48326, USA |
| 57 | Port Huron, MI (57) | PORT HURON AVF | Yes | Detroit | Standard | AVF | 74,800 | 59,123 | 9/20/2002 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1234 32ND ST, PORT HURON, MI, 48060, USA |
| 58 | Rochester Hills, MI (58) | ROCHESTER AVF | Yes | Detroit | Standard | AVF | 48,621 | 41,328 | 5/16/2019 | 11/30/2033 | 165 | No | Rochester KM Partners, LLC | None | 1032 SOUTH ROCHESTER ROAD, ROCHESTER, MI, 48307, USA |
| 59 | Livonia, MI (59) | 7 MILE AVF | Yes | Detroit | Standard | AVF | 61,752 | 53,795 | 1/1/1985 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 29905 7 MILE RD, LIVONIA, MI, 48152, USA |
| 60 | Warren, MI (60) | SCHOENHERR AVF | Yes | Detroit | Standard | AVF | 38,795 | 41,890 | 1/19/1972 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 13855 E 8 MILE RD, WARREN, MI, 48089, USA |
| 61 | Westland, MI (61) | WESTLAND AVF | Yes | Detroit | Standard | AVF | 79,773 | 70,723 | 4/14/1987 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 8300 N WAYNE RD, WESTLAND, MI, 48185, USA |
| 62 | Ann Arbor, MI (62) | ANN ARBOR W PS | Yes | Detroit | Sleep | APS | 4,600 | 4,079 | 9/1/2011 | 8/31/2021 | 18 | No | BRIXMOR Holdings 1 SPE, LLC | None | 2570 JACKSON AVE, ANN ARBOR, MI, 48103, USA |
| 63 | Rochester, MI (63) | ROCHESTER PS | Yes | Detroit | Sleep | APS | 5,000 | 4,474 | 6/1/2010 | 7/31/2020 | 5 | No | McKnight South East, LP c/o McKnight Property Mar | None | 1856 S ROCHESTER RD, ROCHESTER, MI, 48307, USA |
| 64 | Grosse Pointe Woods, MI (64) | GROSSE POINTE SOUTH PS | Yes | Detroit | Sleep | APS | 3,500 | 2,688 | 3/1/2018 | 2/29/2028 | 96 | No | Ryder Investments | None | 19387 MACK AVE, GROSSE POINTE, MI, 48236, USA |
| 65 | Warren, MI (65) | WARREN E PS | Yes | Detroit | Sleep | APS | 5,072 | 4,507 | 5/16/2011 | 6/30/2022 | 28 | No | WARREN VILLAGE, LLC | None | 6400 14 MILE RD, WARREN, MI, 48092, USA |
| 66 | Sterling Hgts, MI (66) | STERLING HTS PS | Yes | Detroit | Sleep | APS | 4,014 | 3,672 | 2/9/2013 | 2/28/2023 | 36 | No | EASTLAKE COMMONS ASSOCIATES, LLC | None | 44975 HAYES RD, STERLING HGTS, MI, 48313, USA |
| 67 | Washington, MI (67) | WASHINGTON PS | Yes | Detroit | Sleep | APS | 4,000 | 3,425 | 5/16/2011 | 10/31/2021 | 20 | No | AF Jonna Development & Management Company, L | None | 7887 26 MILE ROAD, WASHINGTON, MI, 48094, USA |
| 68 | Southgate, MI (68) | SOUTHGATE PS | Yes | Detroit | Sleep | APS | 5,117 | 4,768 | 1/16/2016 | 3/31/2021 | 13 | No | BRANDON ASSOCIATES SOUTHGATE L.L.C. | None | 15060 DIX TOLEDO RD, SOUTHGATE, MI, 48195, USA |
| 69 | Canton, MI (69) | CANTON PS | Yes | Detroit | Sleep | APS | 4,600 | 4,280 | 7/1/2009 | 6/30/2024 | 52 | No | Ford Road Investments, LLC | None | 41913 FORD RD, CANTON, MI, 48187, USA |
| 70 | Monroe, MI (70) | MONROE PS | Yes | Detroit | Sleep | APS | 4,000 | 3,593 | 7/30/2016 | 7/31/2026 | 77 | No | Keystone Commercial | None | 1570 NORTH TELEGRAPH ROAD, MONROE, MI, 48162, USA |
| 71 | Troy, MI (71) | TROY N PS | Yes | Detroit | Sleep | APS | 4,500 | 4,059 | 5/16/2011 | 7/31/2021 | 17 | No | Universal Mall Properties LLC | None | 1735 BIG BEAVER RD, TROY, MI, 48083, USA |
| 72 | West Bloomfield, MI (72) | W BLOOMFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,655 | 10/1/2013 | 2/29/2024 | 48 | No | MAPLE ORCHARD ASSOCIATES, LLC | None | 6470 ORCHARD LAKE ROAD, WEST BLOOMFIELD, MI, 48322, U |
| 73 | Chesterfield, MI (73) | CHESTERFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,572 | 11/18/2017 | 11/30/2027 | 93 | No | CHESTERFIELD COMMONS ASOCIATES, LLC | None | 50938 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 74 | Woodhaven, MI (74) | WOODHAVEN PS | Yes | Detroit | Sleep | APS | 3,966 | 3,565 | 10/17/2015 | 10/31/2025 | 68 | No | THE ALLENWEST GROUP, LLC | None | 19410 WEST ROAD, WOODHAVEN, MI, 48183, USA |
| 75 | Brighton, MI (75) | BRIGHTON E PS | Yes | Detroit | Sleep | APS | 4,248 | 3,218 | 5/16/2011 | 9/30/2022 | 31 | No | BRIGHTON GATE COMMONS, LLC | None | 9990 E GRAND RIVER AVE, BRIGHTON, MI, 48116, USA |
| 76 | Bloomfield Twp, MI (76) | BLOOMFIELD TWP PS | Yes | Detroit | Sleep | APS | 3,602 | 3,139 | 5/20/2017 | 7/31/2027 | 89 | No | BP OF WHITE LAKE, INC. | None | 6450 TELEGRAPH ROAD, BLOOMFIELD TWP, MI, 48301, USA |
| 77 | New Hudson, MI (77) | NEW HUDSON PS | Yes | Detroit | Sleep | APS | 4,106 | 3,758 | 4/10/2012 | 10/31/2022 | 32 | No | Milford Road Plaza, LLC | None | 30821 MILFORD RD, NEW HUDSON, MI, 48165, USA |
| 78 | Lapeer, MI (78) | LAPEER PS | Yes | Detroit | Sleep | APS | 4,500 | 3,864 | 10/1/2016 | 1/31/2027 | 83 | No | JKL REAL ESTATE CO. | None | 806 S MAIN STREET, LAPEER, MI, 48446, USA |
| 79 | Royal Oak, MI (79) | ROYAL OAK PS | Yes | Detroit | Sleep | APS | 5,950 | 4,956 | 5/16/2011 | 6/30/2024 | 52 | No | 4400 North Woodward, LLC | None | 32500 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 80 | White Lake, MI (80) | WHITE LAKE PS | Yes | Detroit | Sleep | APS | 3,680 | 2,995 | 5/16/2011 | 3/31/2021 | 13 | No | CLOSED | 0 | 5951 HIGHLAND RD, WHITE LAKE, MI, 48383, USA |
| 81 | Troy, MI (81) | TROY S PS | Yes | Detroit | Sleep | APS | 4,675 | 3,464 | 5/16/2011 | 1/31/2022 | 23 | No | URBAN CAL OAKLAND PLAZA, LLC | None | 272 JOHN R, TROY, MI, 48083, USA |
| 82 | Waterford, MI (82) | WATERFORD PS | Yes | Detroit | Sleep | APS | 6,008 | 5,060 | 5/16/2011 | 3/31/2022 | 25 | No | INVESTCO OF MICHIGAN LLC | None | 4977 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 83 | Novi, MI (83) | NOVI PS | No | Detroit | Sleep | APS | 2,600 | 2,073 | 5/16/2011 | 1/31/2020 | n/a | No | RAMCO WEST OAKS II LLC | None | 43420 W OAKS DR, NOVI, MI, 48377, USA |
| 84 | Brighton, MI (84) | BRIGHTON W PS | Yes | Detroit | Sleep | APS | 4,200 | 3,784 | 5/16/2011 | 10/31/2021 | 20 | No | CROSS GRAND PLAZA, LLC | None | 8709 WEST GRAND RIVER, BRIGHTON, MI, 48116, USA |
| 85 | Ann Arbor, MI (85) | ANN ARBOR E PS | Yes | Detroit | Sleep | APS | 4,274 | 3,062 | 5/16/2011 | 5/31/2021 | 15 | No | AF Jonna Development & Management Company, L | None | 3550 WASHTENAW, ANN ARBOR, MI, 48104, USA |
| 86 | Lake Orion, MI (86) | LAKE ORION PS | Yes | Detroit | Sleep | APS | 4,160 | 3,775 | 4/1/2014 | 1/31/2022 | 23 | No | SHOPS AT THE SHORES OF LONG LAKE L.L.C. | None | 610 N. LAPEER RD, LAKE ORION, MI, 48362, USA |
| 87 | Ferndale, MI (87) | FERNDALE PS | Yes | Detroit | Sleep | APS | 6,553 | 5,587 | 4/1/2016 | 6/30/2026 | 76 | No | B.P. of White Lake Inc. | None | 23100 WOODWARD AVE, FERNDALE, MI, 48220, USA |
| 88 | Utica, MI (88) | UTICA E PS | Yes | Detroit | Sleep | APS | 5,900 | 2,858 | 9/1/2011 | 1/31/2023 | 35 | No | SHELBY CORNERS, LLC | None | 45040 NORTHPOINTE BLVD, UTICA, MI, 48315, USA |
| 89 | Howell, MI (89) | HOWELL PS | Yes | Detroit | Sleep | APS | 9,400 | 8,794 | 5/16/2011 | 10/31/2024 | 56 | No | COUNTRY CORNERS SHOPPING CENTER, L.L.C | None | 4050 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 90 | Westland, MI (90) | WESTLAND PS | Yes | Detroit | Sleep | APS | 4,400 | 3,976 | 10/1/2016 | 10/31/2026 | 80 | No | CENTRAL-WAYNE PROPERITES, LLC | None | 7671 NORTH WAYNE RD, WESTLAND, MI, 48185, USA |
| 91 | Grosse Pointe, MI (91) | GROSSE POINTE SSI | Yes | Detroit | Design | SSI | 7,600 | 5,933 | 6/26/2015 | 10/31/2020 | 8 | No | ST. John Health | None | 17145 KERCHEVAL, GROSSE POINTE, MI, 48230, USA |
| 92 | Plymouth, MI (92) | PLYMOUTH PS | Yes | Detroit | Sleep | APS | 4,000 | 3,580 | 9/24/2016 | 11/30/2026 | 81 | No | PLYMOUTH HAGGERTY UNIT 6 | None | 41512 ANN ARBOR RD, PLYMOUTH, MI, 48170, USA |
| 93 | Shelby Twp, MI (93) | SHELBY TWP PS | Yes | Detroit | Sleep | APS | 4,000 | 3,714 | 1/13/2018 | 1/31/2028 | 95 | No | JERUSALEM PROPERTIES, LLC | None | 46975 VAN DYKE AVE, SHELBY TWP, MI, 48317, USA |
| 94 | Roseville, MI (94) | ROSEVILLE PS | Yes | Detroit | Sleep | APS | 4,800 | 4,512 | 11/21/2013 | 5/31/2024 | 51 | No | ROSEVILLE VILLAGE, L.L.C. | None | 31851 GRATIOT AVE, ROSEVILLE, MI, 48066, USA |
| 95 | Taylor, MI (95) | TAYLOR PS | Yes | Detroit | Sleep | APS | 4,000 | 3,433 | 10/3/2015 | 10/31/2025 | 68 | No | VAN ELSLANDER VENTURES, LLC | None | 23471 EUREKA RD, TAYLOR, MI, 48180, USA |
| 96 | Dearborn, MI (96) | DEARBORN PS | Yes | Detroit | Sleep | APS | 5,828 | 4,141 | 4/8/2017 | 5/31/2027 | 87 | No | AMD, LLC. | None | 22731 MICHIGAN AVE, DEARBORN, MI, 48124, USA |
| 97 | Livonia, MI (97) | LIVONIA PS | Yes | Detroit | Sleep | APS | 3,612 | 3,120 | 5/17/2014 | 5/31/2024 | 51 | No | Middlebelt Plymouth Venture LLC | None | 29611 PLYMOUTH, LIVONIA, MI, 48150, USA |
| 98 | Southfield, MI (98) | SOUTHFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,606 | 1/13/2018 | 1/31/2028 | 95 | No | AF Jonna Development & Management Company, L | None | 29119 TELEGRAPH RD, SOUTHFIELD, MI, 48034, USA |
| 99 | Bloomfield Hills, MI (99) | BLOOMFIELD AVF | Yes | Detroit | Standard | AVF | 46,388 | 26,440 | 3/15/2016 | 2/28/2037 | 204 | No | LCN PARTNERS | None | 2300 TELEGRAPH RD, BLOOMFIELD HILL, MI, 48302, USA |
| 100 | Saginaw, MI (100) | SAGINAW AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 77,827 | 56,540 | 6/30/1984 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 2660 TITTABAWASSEE RD, SAGINAW, MI, 48604, USA |
| 101 | Flint, MI (101) | FLINT AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,177 | 48,827 | 6/30/1977 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 4577 MILLER RD, FLINT, MI, 48507, USA |
| 102 | Burton, MI (102) | BURTON AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,196 | 48,841 | 7/31/1987 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4095 E COURT ST, BURTON, MI, 48509, USA |
| 103 | Bay City, MI (103) | BAY CITY AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 34,578 | 36,957 | 2/2/1996 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 4150 WILDER RD, BAY CITY, MI, 48706, USA |
| 104 | Grand Blanc, MI (104) | GRAND BLANC PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,477 | 8/2/2014 | 8/31/2024 | 54 | No | GRAND SAGINAW PLAZA, L.L.C. | None | 11501 SOUTH SAGINAW, GRAND BLANC, MI, 48439, USA |
| 105 | Flint Township, MI (105) | FLINT PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,600 | 4/27/2018 | 1/31/2028 | 95 | No | Jonna Management Group, LLC | None | 4002 MILLER ROAD, FLINT, MI, 48507, USA |
| 106 | Saginaw, MI (106) | SAGINAW PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,847 | 4,368 | 1/30/2016 | 1/31/2021 | 11 | No | KMS Investments, LLC | None | 4605 BAY RD #200, SAGINAW, MI, 48604, USA |
| 107 | Fort Wayne, IN (107) | FORT WAYNE AVF | Yes | Fort Wayne | Standard | AVF | 45,982 | 39,667 | 1/25/2014 | 9/30/2023 | 43 | No | Sandor Development Company | None | 311 E COLISEUM BLVD, FORT WAYNE, IN, 46805, USA |
| 108 | Grand Rapids, MI (108) | GRAND RAPIDS AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 79,400 | 69,174 | 7/30/1987 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4375 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 109 | Portage, MI (109) | KALAMAZOO AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 73,990 | 60,986 | 5/1/1989 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 550 RING RD, PORTAGE, MI, 49024, USA |
| 110 | Muskegon, MI (110) | MUSKEGON AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,590 | 34,069 | 1/23/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 630 SEMINOLE RD, MUSKEGON, MI, 49441, USA |
| 111 | Grandville, MI (111) | GRANDVILLE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 28,530 | 24,910 | 1/1/2010 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 4625 WILSON AVE SW, GRANDVILLE, MI, 49418, USA |
| 112 | Battle Creek, MI (112) | BATTLE CREEK AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 50,220 | 43,411 | [illegible] | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 6100 B DR N, BATTLE CREEK, MI, 49014, USA |

A001118

2/20/2020

A001119

| Class # / Store Name | Original Store Name | Include in Database | | City | | Date | | Lessor | Address |
|---|---|---|---|---|---|---|---|---|---|
| 113 Comstock Park, MI (113) | ALPINE AVF | Yes | Flagship | Grand Rapids-Kalamazoo Battle Creek | | | | LON AVF WARREN LLC | |
| 114 Midland, MI (114) | MIDLAND AVF | Yes | Standard | Grand Rapids-Kalamazoo Battle Creek | | | | SCF RC Funding III LLC | |
| 115 Muskegon, MI (115) | MUSKEGON PS | Yes | Sleep | Grand Rapids-Kalamazoo Battle Creek | | | | None | |
| 116 Portage, MI (116) | PORTAGE PS | Yes | Sleep | Grand Rapids-Kalamazoo Battle Creek | | | | None | |
| 117 Grandville, MI (117) | GRANDVILLE PS | Yes | Sleep | Grand Rapids-Kalamazoo Battle Creek | | | | None | |
| 118 Kalamazoo, MI (118) | KALAMAZOO PS | Yes | Sleep | Grand Rapids-Kalamazoo Battle Creek | | | | None | |
| 119 Grand Rapids, MI (119) | GRAND RAPIDS PS | Yes | Standard | Grand Rapids-Kalamazoo Battle Creek | | | | Broadstone | |
| 120 Grand Rapids N PS | GRAND RAPIDS N PS | Yes | Standard | Grand Rapids-Kalamazoo Battle Creek | | | | EAST ALPINE DEVELOPMENT, LLC | |
| 121 Comstock Park, MI (121) | ALPINE N PS | Yes | Sleep | Grand Rapids-Kalamazoo Battle Creek | | | | ALPINE VALLEY 1, LLC | |
| 122 Cascade (PA 122) | LANCASTER (#042) | Yes | Sleep | Harrisburg | | | | VEREIT REAL ESTATE LP | |
| 123 York, PA (123) | YORK (#44) | Yes | Standard | Harrisburg | | | | VEREIT REAL ESTATE LP | |
| 124 Harrisburg PA (124) | HARRISBURG (#42) | Yes | Standard | Harrisburg | | | | COLE AV PORTFOLIO | |
| 125 HANOVER (#50) | HANOVER (#50) | Yes | Standard | Harrisburg | | | | Store Master Funding XX LLC | |
| 126 Mechanicsburg PA (#63) | MECHANICSBURG (463) | Yes | Standard | Harrisburg | | | | Vereit | |
| 127 Chambersburg PA (127) | CHAMBERSBURG (#61) | Yes | Standard | Harrisburg | | | | Vereit | |
| 128 Altoona PA (128) | ALTOONA (#49) | Yes | Standard | Johnstown | | | | BRITHI, LLC | |
| 129 Johnson, PA (129) | JOHNSTOWN (#62) | Yes | Standard | Johnstown | | | | VEREIT REAL ESTATE LP | |
| 130 Johnstown, PA (130) | STATE COLLEGE (#45) | Yes | Standard | Johnstown | | | | VEREIT REAL ESTATE LP | |
| 131 Lansing, MI (131) | LANSING AVF | Yes | Standard | Lansing | | | | PATTON CENTER ASSOCIATES LP | |
| 132 Jackson, MI (132) | JACKSON AVF | Yes | Standard | Lansing | | | | BROADSTONE | |
| 133 Lansing, MI (133) | OKEMOS PS | Yes | Sleep | Lansing | | | | BROADSTONE AVF MICHIGAN, LLC | |
| 134 East Lansing, MI (134) | EAST LANSING PS | Yes | Sleep | Lansing | | | | None | |
| 135 Lansing, MI (135) | LANSING PS | Yes | Sleep | Lansing | | | | None | |
| 136 Holt PA (136) | HOLT PS | Yes | Sleep | Lansing | | | | River Run Development, LLC | |
| 137 Meridian Twp (137) | MERIDIAN PS | Yes | Sleep | Lansing | | | | None | |
| 138 Wexford PA (28, 35 DC2) | WEXFORD (#28, 35 DC2) | Yes | Standard | Pittsburgh | | | | Store Master Funding XX LLC | |
| 139 Monroeville PA (21 DC2) | MONROEVILLE (21 DC2, 25 21 DC) | Yes | Standard | Pittsburgh | | | | COLE AV PORTFOLIO / STEVEN FAMILY PA | |
| 140 South Hills PA (32 DC) | SOUTH HILLS PUB. (32 DC) | Yes | Standard | Pittsburgh | | | | STORE CAPITAL | |
| 141 Greensburg PA (#43, 33 DC) | GREENSBURG (#43, 33 DC) | Yes | Standard | Pittsburgh | | | | STORE CAPITAL | |
| 142 The Pointe (#15, 20 DC) | THE POINTE (#15, 20 DC) | Yes | Standard | Pittsburgh | | | | STORE CAPITAL | |
| 143 Curry Hollow (#40, 46 DC) | CURRY HOLLOW (#40, 46 DC2) | Yes | Standard | Pittsburgh | | | | FMTL PROPERTY MANAGEMENT LP | |
| 144 Mount Pleasant PA (142) | MOUNT PLEASANT (#1, 22 CC) | Yes | Standard | Pittsburgh | | | | STORE CAPITAL | |
| 145 Cranberry Township PA (143) | CRANBERRY (#29) | Yes | Standard | Pittsburgh | | | | STORE CAPITAL PARTNERS - CRANBERRY PA | |
| 146 Mount Lebanon PA (144) | MOUNT LEBANON (#36) | Yes | Standard | Pittsburgh | | | | RELIANCE INTER 2 LLC | |
| 147 Butler, PA (145) | BUTLER (#27) | Yes | Standard | Pittsburgh | | | | BUTLER STREVANN ASSOCIATE II LLC | |
| 148 Pittsburgh PA (146) | SHADYSIDE (#30) | Yes | Standard | Pittsburgh | | | | MONSIGHT SOUTH EAST LP | |
| 149 Washington, PA (147) | WASHINGTON (#26) | Yes | Standard | Pittsburgh | | | | WASHINGTON PLAZA LLC / JCP ASSOCIATES LTD | |
| 150 Pittsburgh PA (148) | WATERWORKS PHASE II | Yes | Standard | Pittsburgh | | | | WATERWORKS PHASE II | |
| 151 Robinson PA (149) | ROBINSON (#84) | Yes | Sleep | Pittsburgh | | | | ROBINSON TOWN CENTRE ASSOCIATES LP | |
| 152 Indiana PA (150) | INDIANA (453) | Yes | Standard | Pittsburgh | | | | 1070 OAKLAND AVE, INDIANA, PA 15701, USA | |
| 153 Pittsburgh PA (151) | WATERFRONT (#62) | Yes | Sleep | Pittsburgh | | | | LIBBY REGENCY ASSOCIATES LP | |
| 154 St. Louis, MO (152) | AFFTON | Yes | Standard | St. Louis | | | | South Lindbergh Property LLC | |
| 155 Fenton PA (#1) | FENTON (#1) | Yes | Standard | St. Louis | | | | Robinson V. Brands S LLC | |
| 156 O'Fallon, MO (154) | O FALLON | Yes | Standard | St. Louis | | | | O'Fallon Missouri Properties, LLC | |
| 157 St. Louis, MO (155) | BRIDGETON | Yes | Standard | St. Louis | | | | 25 year holding | |
| 158 Richmond Heights, MO (156) | RICHMOND (DESIGN STUDIO) | Yes | Design | St. Louis | | | | Hanley Lab Properties, LLC | |
| 159 Wheeling, WV (157) | WHEELING | Yes | Standard | Wheeling | | | | STORE CAPITAL | |
| 160 Toledo, OH (158) | TOLEDO PS | Yes | Sleep | Toledo | | | | 4600 TALMADGE RD, TOLEDO, OH, 43623, USA | |
| 161 Maumee OH (159) | MAUMEE (TOLEDO) | Yes | Standard | Toledo | | | | REED HOLDING / TALMADGE LLC | |
| 162 Perrysburg Township, OH (160) | PERRYSBURG (FREEMONT) | Yes | Standard | Toledo | | | | STORE CAPITAL | |
| 163 Traverse City,Cadillac | PETOSKEY AVF | Yes | Standard | Traverse City-Cadillac | | | | BROADSTONE AVF MICHIGAN, LLC | |
| 164 Petoskey, MI (162) | PETOSKEY AVF | Yes | Standard | Traverse City-Cadillac | | | | STORE CAPITAL | |
| 165 Traverse City, MI (163) | TRAVERSE CITY AVF | Yes | Standard | Traverse City-Cadillac | | | | STORE SPE AVF 2017-2, LLC | |
| 166 Frederick, MD (164) | FREDERICK (AF) | Yes | Standard | Washington DC | | | | Frederick BLCO, LLP | |
| 167 Gaithersburg, MD (165) | GAITHERSBURG AVF OF HAGERSTOWN LP | Yes | Standard | Washington DC | | | | GT ESTATE HOLDINGS | |
| 168 Leesburg VA (166) | LEESBURG (#46) | Yes | Standard | Washington DC | | | | 511 Fort Evans Road NE, Leesburg, Va, 20176, USA | |
| 169 Saint Clairsville, OH (168) | SAINT CLAIRSVILLE (#52) | Yes | Standard | Youngstown | | | | OHIO VALLEY MALL CO | |
| 170 Boardman, OH (169) | BOARDMAN (#64) | Yes | Standard | Youngstown | | | | None | |
| 171 Hermitage (#62) | HERMITAGE (#62) | Yes | Standard | Youngstown | | | | None | |
| 172 Niles, OH (171) | NILES (#65) | Yes | Standard | Youngstown | | | | AMR Properties | |

# AVF Holding Company, Inc.
## Exhibit B

| Expense Budget (1) |
|---|

**Advertising**

| | |
|---|---:|
| Media (2) | 2,097,000 |
| Signs (3) | 1,236,760 |
| Sign Walkers | 566,588 |
| Subtotal Advertising | 3,900,348 |

**Supervision**

| | |
|---|---:|
| Fees / Wages / Expenses (4) | 2,160,913 |
| Subtotal Supervision | 2,160,913 |

| | |
|---|---:|
| Miscellaneous /Legal (5) | 35,000 |

| | |
|---|---:|
| Total Expenses | 6,096,261 |

*Note(s):*

*1. This Expense Budget contemplates a sale term of March, 5, 2020 through April 26, 2020. The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.*

*2. Amounts attributable to media shall only be spent in consultation with the Company.*

*3. Includes Sales Tax.*

*4. Includes Deferred Compensation and Insurance.*

*5. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.*

## <u>Store Closing Procedures</u>[1]

1.      The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves.  On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant.  The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.      The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business".  The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures.  All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.      The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]      Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores.  In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease.  No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E.  The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines.  The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

A001122

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

A001123

# **EXHIBIT K**

A001124

```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2
                                       .   Chapter 11
 3   IN RE:                            .
                                       .   Case No. 20-10553 (CSS)
 4   ART VAN FURNITURE, LLC, et al., .
                                       .   Courtroom No. 6
 5                                     .   824 North Market Street
                                       .   Wilmington, Delaware 19801
 6                                     .
                                       .
 7                         Debtors.    .   March 12, 2020
     . . . . . . . . . . . . . . . . .     2:00 P.M.
 8
              TRANSCRIPT OF CONTINUED FIRST DAY HEARING
 9         BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                   UNITED STATES BANKRUPTCY JUDGE
10
11   APPEARANCES:
12   For the Debtors:          Gregory G. Werkheiser, Esquire
                               Michael J. Barrie, Esquire
13                             Jennifer Hoover, Esquire
                               Kevin Capuzzi, Esquire
14                             John C. Gentile, Esquire
                               BENESCH, FRIEDLANDER, COPLAN
15                                & ARONOFF LLP
                               222 Delaware Avenue, Suite 801
16                             Wilmington, Delaware 19801
17
18   Audio Operator:          Leslie Murin
19   Transcription Company:   Reliable
                               1007 N. Orange Street
20                             Wilmington, Delaware 19801
                               (302)654-8080
21                             Email: gmatthews@reliable-co.com
22   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
23
24
25
```

A001125

```
 1   APPEARANCES (Continued):

 2   For the Debtors:          Marua I. Russell, Esquire
                               MONTGOMERY MCCRACKEN WALKER
 3                                & RHOADS LLP
                               437 Madison Avenue, 24th Floor
 4                             New York, New York 10022

 5
     For U.S. Trustee:         Linda Richenderfer, Esquire
 6                             David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
 7                             OFFICE OF UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
 8                             Lockbox 35
                               Wilmington, Delaware 19801
 9
     For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                             MORGAN LEWIS & BOCKIUS LLP
                               101 Park Avenue
11                             New York, New York 10178

12                                - and -

13
                               Cory Falgowski, Esquire
14                             BURR & FORMAN LLP
                               1201 N. Market Street, Suite 1407
15                             Wilmington, Delaware 19801

16   For Jofran Sales, Inc.:   Jeffrey R. Waxman, Esquire
                               MORRIS JAMES LLP
17                             500 Delaware Avenue, Suite 1500
                               Wilmington, Delaware 19801
18
     For Landlords:            Leslie C. Heilman, Esquire
19                             BALLARD SPAHR LLP
                               919 North Market Street, 11th Floor
20                             Wilmington, Delaware 19801

21
     For Hilco & Gordon        Steven E. Fox, Esquire
22   Brothers:                 RIEMER & BRAUNSTEIN LLP
                               Times Square Tower, Suite 2506
23                             Seven Times Square
                               New York, New York 10036
24

25
```

A001126

```
 1   APPEARANCES (Continued):

 2   For Levin Furniture:        William C. Price, Esquire
                                 CLARK HILL PLC
 3                               One Oxford Centre
                                 301 Grant Street, 14th Floor
 4                               Pittsburgh, Pennsylvania 15219

 5   TELEPHONIC APPEARANCE:

 6
     For the Debtors:            Beth E. Rogers, Esquire
 7                               ROGERS LAW OFFICES
                                 The Equitable Building
 8                               100 Peachtree Street, Suite 1950
                                 Atlanta, Georgia 30303
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A001127

1 | FIRST DAY MOTIONS:

2 | **Customer Programs Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Implement and Administer

3 | Essential Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief [Docket

4 | No. 27; Filed March 9, 2020]

5 | **Ruling:  Order Entered**

6 | **Store Closing Sales Motion.** Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing

7 | Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement

8 | Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset

9 | Disposition Advisors to the Debtors Pursuant to §327(a) of the Bankruptcy Code and (V) Granting Related Relief [Docket No.

10 | 52; Filed March 9, 2020]

11 | **Ruling:  Order Entered**

12 | **Levin DIP Financing Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing

13 | Pursuant to 11 U.S.C. §§ 105, 361, 364(c), and 364(d), and (II) Granting Related Relief [Docket No. 49; Filed March 9, 2020].

14 | **Ruling:  Order Entered**

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commence at 2:40 p.m.)

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.  Good afternoon

4  everybody.

5            It's been a long time since I started a hearing

6  forty minutes late.  I very much apologize.  As I'm sure

7  you're all aware, things have been developing quickly.  So,

8  it's taking a lot of my time.  I apologize.

9            MR. WERKHEISER:  Your Honor, for the record

10  Gregory Werkheiser of Benesch Friedlander Coplan & Aronoff

11  LLP.

12            Certainly no apology necessary.  We're all working

13  under less than ideal circumstances these days and doing the

14  best we can.

15            If Your Honor is ready I can provide, sort of, a

16  brief overview of where we stand generally and also wanted to

17  take the opportunity to preview some issues surrounding the

18  company's financial situation that are developing and coming

19  to light presently, as if we needed more problems to contend

20  with in this case, Your Honor.

21            So, just to refresh Your Honor's recollection, one

22  of the motions that was on for that hearing, but got carried

23  over to this hearing was the debtor's customer practices

24  motion.  We have worked closely with Ms. Richenderfer and her

25  colleagues at the U.S. Trustees Office and our other

A001129

1  stakeholders over the last couple of days.  I think we have

2  gotten to a place where we're going to be able to proceed

3  consensually to submit an interim order with revisions

4  responsive to both the feedback from the U.S. Trustees Office

5  and Your Honor's comments at our first day hearing.  So, I am

6  hopeful that will be fully consensual in a few minutes and

7  just a function of walking through an order.

8          With respect to the Levin DIP financing facility,

9  again, my expectation is that that is going to proceed on a

10  consensual basis. There have been some changes that we will

11  need to highlight for Your Honor, but in terms of impacting

12  anybody who is not fully consenting to that arrangement they

13  should not have any material adverse effect.

14          We, as I understand, remain contested as it

15  relates to the GOB consultant motion on a number of issues

16  with the U.S. Trustee.  And Ms. Russell will be able to

17  provide Your Honor an overview of where things stand in a

18  moment.  I think most of the other responses, formal and

19  informal that we knew about at the conclusion of the hearing

20  and even several that have been made aware to us since then,

21  we have been able to successfully address and resolve to

22  everyone's satisfaction.

23          To my knowledge, with the exception of, I think,

24  some objections that hit the docket this morning or an

25  objection that hit the docket this morning the only other

1  objection that remains is that of the U.S. Trustees Office.

2  Your Honor, what we propose to do, in terms of the

3  agenda, would be to take customer practices first, the Levin-

4  Wolf DIP financing facility second and then do the GOB

5  matters last.  I think the first two items we can take care

6  of relatively quickly.

7  THE COURT:  Okay.

8  MR. WERKHEISER:  Your Honor, in the interest of

9  full disclosure to the court, before we jump in I do want to

10  highlight what is a developing situation in a case that is

11  already fairly strapped for cash, and just because we don't

12  want to surprise either anyone in the courtroom or Your

13  Honor.

14  Shortly before the company filed, as is not

15  uncommon in these situations, several of the credit card

16  processors began escalating their reserves including Bank of

17  America Merchant Services which imposed a 100 percent reserve

18  on any transactions at that point.  This coincided with the

19  commencement of the prepetition commencement of the store

20  closing sales.  So, volume was much higher than would

21  normally be the case.

22  By the company's calculation at this point Bank of

23  America is holding something on the order of $24 million

24  dollars of transaction related value.  And at least our

25  information suggests that this has no reasonable relation to

A001131

8

1  any, sort of, adequate protection they would require based on

2  threatened chargebacks or any other need for it.

3          The other component of this is that the

4  information is just now rolling in from the first sales that

5  have occurred since the petitions were filed and at least the

6  preliminary information we have suggests that they are not

7  remitting more than a small fraction of funds related to

8  those transactions as well.  And certainly whatever debate

9  one could have about their activities up until the petition

10 date there's probably no debate that they're violating the

11 stay now in our view.

12          So, Your Honor, just to preview, and I'm sorry

13 that we may end up imposing on the court again, but we may be

14 in here quickly seeking some sort of relief to address this

15 because this is, sort of, an existential threat to the case

16 as things currently stand.  It threatens our compliance with

17 covenants and cash collateral order, and puts an already cash

18 starved case on, you know, basically life support at best.

19          So, I will just leave it at that.  Obviously,

20 everybody's rights are fully preserved if we do have to come

21 before the court, but it may be a necessity.

22          Your Honor, turning to the agenda, on customer

23 programs, as I said, we were able to work closely with the

24 U.S. Trustees Office, I think, on that to address the open

25 issues and we were able to try to address Your Honor's

A001132

1  comments.

2          If I may approach the bench I have a redline of

3  the order marked against the version that we had in court and

4  filed with the motion at the first day hearing.

5          So, what we've tried to do here, Your Honor, is to

6  reproduce, per Your Honor's instruction, the details of the

7  wind down customer programs beginning at Page 3 of the order.

8  Both a detailed statement of how the company is treating

9  customer deposits going forward with a new Exhibit 1.  That

10  is, essentially, a matrix that shows the treatment in various

11  scenarios where customers have previously provided deposits.

12  It makes it clear what expectations should be.

13          With respect to refunds and exchanges we've fully

14  reproduced a statement of what that policy is as part of the

15  wind down, virtually verbatim for what was in the motion,

16  Your Honor.  We have a clear statement of gift cards being

17  required to be redeemed by April 15th.

18          Finally, and, again, this is consistent with Your

19  Honor's feedback and the feedback we got from the Office of

20  the United States Trustee, Subpart (d) on Page 4 of your

21  redline outlines our customer communications plan here.  So,

22  we are, as I indicated at the afternoon session on Tuesday's

23  hearing, that we are going to do an email blast to all of the

24  customers who have provided customer deposits advising them

25  of the current policies and the need to act quickly to obtain

1  the benefit of those customer deposits.  For those customers

2  that did not provide email addresses the company believes

3  that it has mailing addresses and would simultaneously send

4  out a notice by mail to all of those parties.

5            In addition, the statement of the liquidation

6  terms policy will be prominently displayed on the company's

7  website and changes are going to be made by Monday to make

8  sure that that is more prominent then it is now; enlarging

9  the text, making it bold face.

10           THE COURT:  Monday?

11           MR. WERKHEISER:  I mean we gave ourselves till

12 Monday to implement all of this, but it may be happing as we

13 speak.

14           THE COURT:  Its Thursday.  You're open Friday,

15 you're open Saturday, you're open Sunday; so, sooner.

16           MR. WERKHEISER:  Understood, Your Honor.

17           THE COURT:  IT people are like associates.

18 They're used to working all the time.

19           MR. WERKHEISER:  Then similar information will be

20 put on the claims agent website as well.

21           In addition, I consulted with Ms. Richenderfer

22 before the hearing and she just asked me to confirm for the

23 record, and I can confirm for the record, that to the extent

24 that anybody had submitted a customer deposit for furniture

25 that is in the company's possession, but for which the party

A001134

 1  had not yet taken delivery as of the petition date the

 2  company is continuing to notify those people in the ordinary

 3  course that, basically, they can get their stuff delivered or

 4  that they can come pick it up as appropriate.  That has not

 5  changed; notwithstanding the fact that we're now involved in

 6  this store closing process.

 7          Your Honor, the only other changes were to just,

 8  again, add a decretal Paragraph 4, which is consistent with

 9  the relief in the motion, about continuing to accept non-cash

10  payments and abiding by the terms of the processing

11  agreements with respect to those.

12          Finally, just backing up to Paragraph 2 we plugged

13  in the dates consistent with scheduling of the second day

14  hearing and seven day before that objection deadline.

15          THE COURT:  Does anyone wish to be heard in

16  connection with the customer programs motion?

17          MS. RICHENDERFER:  Your Honor, Linda Richenderfer

18  from the Office of the United States Trustee.

19          Just a comment that I think should be put on the

20  record with respect to this motion.  In reading materials

21  associated with the sale motion there's representations in

22  there that of the $35 million dollars being held in deposits

23  that product exists that is associated with 18 million of the

24  35 million.  That is a discussion I had with Mr. Werkheiser

25  prior to beginning this conference today.  I would hope and I

1   would think that debtors are working very hard to reach out

2   to the holders of those $18 million dollars in deposits to

3   let them know that the product is there so it can be

4   delivered to the extent that they want to move forward with

5   the transaction.

6            I know we had questions at the first day hearing

7   on Tuesday regarding how much of this product is available or

8   not available, but somebody has been able to identify $18

9   million dollars' worth of product and associated with

10  deposits.  So, I hope the debtors continue every effort

11  because, otherwise, product may go out the door that really

12  belongs to a creditor who has a deposit with the debtors.

13           THE COURT:  Okay.  Thank you.

14           The only date -- the only place I see a date here

15  is March 16th for the customer communication.

16           MR. WERKHEISER:  Yes, Your Honor.

17           THE COURT:  But you had mentioned something else?

18           MR. WERKHEISER:  No, Your Honor.  We had given

19  ourselves until the 16th to fully implement the customer

20  communication plan.

21           THE COURT:  Okay.  That's all right.  I mean

22  sooner is better than later, but I understand.  Monday is

23  fine.

24           MR. WERKHEISER:  All right.  Thank you, Your

25  Honor.

1            THE COURT:  All right.  I will sign this order

2    whenever you give it to me.

3            MR. WERKHEISER:  Okay.  Would you prefer us to

4    upload it or do you want a copy?

5            THE COURT:  I'm sorry.

6            MR. WERKHEISER:  Do you need us to upload it or

7    hand up a clean copy?

8            THE COURT:  If you have a clean that's presentable

9    I'll sign that.

10           MR. WERKHEISER:  Your Honor, why don't we upload

11   it because I think we set it up --

12           THE COURT:  All right.  That's fine.

13           MR. WERKHEISER:  (Inaudible).

14           THE COURT:  Yes, you may.

15           MR. WERKHEISER:  All right.  Thank you, Your

16   Honor.

17           Your Honor, that brings us to the Levin/Wolf DIP

18   financing facility, Item 2 on today's -- excuse me, Item 3 on

19   today's agenda.  Your Honor, this was one of the items that

20   we got on file a little bit too late to be entertained at

21   Tuesday's hearing.

22           To refresh Your Honor's recollection there is a

23   subset of the debtors' overall enterprise that consists of

24   Levin and Wolf furniture branded stores that operate

25   primarily in Pennsylvania.  Those were acquired in 2017 and -

 1   - well, certainly certain back office functions have been

 2   integrated with the debtors' broader business of the outward

 3   facing parts of that business and many of the store level

 4   operations have remained distinct from the balance of the

 5   debtors' business.

 6          As things had developed leading up to the

 7   bankruptcy, as was discussed at our last hearing and through

 8   the evidence we put in through Mr. Ladd's first day

 9   declaration and Mr. Stogsdill's proffer as well, as we

10   explained there as a consortium deal that parties were

11   putting together.  And unfortunately that fell apart at the

12   eleventh hour near the end of February.

13          In the wake of that falling apart the debtors,

14   with the assistance of the Levin group, were able to

15   resuscitate a transaction for the sale of the, I believe its,

16   40 stores that are the Pennsylvania based Levin and Wolfe

17   Furniture stores which is the subject of an APA and motion

18   that we hope to get on file as early as tomorrow, but most

19   likely Monday.

20          Those stores are to be sold as a going concern.

21   That is a sale that once consummated would stand to, among

22   other things, preserve a thousand jobs nearly.  It then also

23   produces benefits to various creditors who could expect to

24   have claims assumed as part of that process and to customers

25   who might fare better in that process with respect to gift

1  card obligations, warranties and customer deposits then they

2  would in the general liquidation process.

3         This DIP facility, Your Honor, exists solely to

4  support that transaction.  The only borrower is the Sam Levin

5  Inc., entity which is the entity that holds those assets.

6  The collateral for the DIP facility, Your Honor, is inventory

7  and primarily the inventory that would be purchased using the

8  proceeds of the DIP facility.  And the DIP facility when that

9  sale, hopefully, ultimately closes, will be credited against

10  the purchase price as part of that DIP facility.

11  Essentially, it is of limited recourse, in most other

12  respects, because of the limited collateral pool.

13         The DIP facility, Your Honor, when we came before

14  the court on Tuesday, and this is a function of how fast

15  things have been moving, Your Honor, and trying to get real

16  time information to back up the documents, but as originally

17  constructed the DIP facility contemplated an interim

18  borrowing of 3.5 million and final 7.  It's been

19  significantly upsized now.  The proposed order that we filed

20  shortly before today's hearing contemplates interim borrowing

21  of up to 10 million and all in number subject to final

22  approval of 20 million.

23         Again, the other essential characteristics of the

24  facility are the same.  And, essentially, I think the

25  defining principal behind the DIP facility is --

```
1              THE COURT:  So, you've gone from seven to 20.
2              MR. WERKHEISER:  Seven to 20, Your Honor.
3              THE COURT:  And three and a half to ten.
4              MR. WERKHEISER:  Yes.  And at the risk of
5    testifying from the podium the underlying factors that have
6    produced that result, you know, some of it is information
7    flow because things have been moving very quickly, but its
8    largely a function of the fact that because the debtors have
9    been in distress for some time that the inventory on the
10   floor in most of these stores is, you know, primarily the
11   floor samples and there's a little warehouse of inventory
12   that was available on orders.
13              As I understand it, the company has historically
14   done 121 to 14 million cost of sales every 30 day period of
15   prime inventory. The level right now is down well under 8
16   million.  And as I understand it that based on the, you know,
17   review of orders of outstanding there is a significant number
18   of special orders for customers that remain to be filled.
19   That debtor and the buyer are hopeful to be able to use
20   proceeds to fill those special orders, maintain that customer
21   relationship and honor those customer deposits consistent
22   with everybody's expectations.
23              The last factor, I think, that people began to
24   appreciate as they got deeper into this that may not have
25   been fully appreciated from the outset is that sales
```

1   personnel at these stores only get paid once.  The customer

2   actually takes delivery of the furniture or other merchandise

3   that they order.

4            So, the buyer who is very keen both to maintaining

5   going concern value and to make sure that this is done in

6   such a way that does the least, you know, violence possible

7   to the customer and employee communities has indicated to us

8   or has made us aware that they would prefer to have

9   sufficient availability under this to make sure that those

10  commission obligations can get honored in the ordinary

11  course.

12           Those are the underlying, sort of, factors that

13  have resulted in the decision to upside the DIP.  To my

14  understanding we have socialized this change with our term

15  loan and ABL lenders, with the U.S. Trustees Office, and

16  given the uniquely compact nature of this DIP where the only

17  collateral is this inventory and proceeds thereof, and the

18  fact that the existing lienholders are the ABL's and the term

19  loan lenders and they're consenting to this arrangement no

20  one's ox, at the end of the day, really gets gored other than

21  theirs, and our purchaser/DIP lender, in the event that the

22  transaction does not close.

23           So, it's against that backdrop that we're before

24  Your Honor today asking for interim approval of the DIP.  We

25  would, for purposes of that, incorporate our record from a

1   first day hearing including Mr. Stogsdill's proffer, much of

2   which overlaps with the record we would want in support of

3   approval of this DIP facility on an interim basis.

4           THE COURT:  All right.  Does anyone wish to be

5   heard?

6           Mr. Waxman, good afternoon.

7           MR. WAXMAN:  Good afternoon, Your Honor.  May I

8   please the court, Jeff Waxman of Morris James on behalf of --

9           THE COURT:  Could you do me a favor.  Could you

10  actually point those towards you?  Thank you.

11          MR. WAXMAN:  Is this better, Your Honor?

12          THE COURT:  Yeah.

13          MR. WAXMAN:  Thank you, Your Honor.

14          Your Honor, first I'm kind of pulling double duty

15  here.  I am here on behalf of Serta Simmons Bedding Company.

16  Serta Simmons, just by way of background, as Your Honor is

17  likely aware, it provides mattresses and bedding.  They sold

18  -- prior to the petition date they were owed approximately

19  $2.7 million dollars.  And Serta Simmons believes that close

20  to a $1 million dollars of that claim is entitled to an

21  administrative priority pursuant to Section 503(b)(9).  So,

22  this is not an insignificant claim.

23          Your Honor, I do realize that we are only here on

24  an interim basis, but Serta Simmons has some issues with the

25  proposed financing specifically now that the amount has gone

1   up so much.  First, it seeks the -- the motion seeks to

2   provide the DIP lender superpriority administrative expense

3   thereby subordinating administrative claims.  And Serta

4   Simmons has an administrative expense in the right to reclaim

5   its goods which shouldn't be subordinated and funds should be

6   carved out to pay the administrative expenses whether or not

7   the sale goes through.

8         Second, Your Honor, the buyer and the lender here

9   are, essentially, the same entity and should not get a

10   superpriority lien subordinating the administrative expenses

11   and reclamation rights of suppliers without the buyer having

12   to pay those claims as part of the purchase price.

13         Certainly, this case should not result in

14   administrative claimants receiving worse treatment than they

15   did on the petition date and particularly now that the amount

16   of the DIP loan has done up so significantly in only the last

17   couple of days there is certainly that threat.

18         Finally, the DIP collateral should not include all

19   receivables.  It should just be limited to the receivables

20   from inventory bought with the DIP funds.  Generally, the

21   whole description of collateral needs to be rewritten to

22   restricted to only a security interest in the that inventory

23   purchase with the DIP funds.

24         If Your Honor has any questions I am happy to

25   address them.

A001143

```
1              THE COURT:  I do not.

2              MR. WAXMAN:  Thank you, Your Honor.

3              THE COURT:  Anyone else?

4         (No verbal response)

5              THE COURT:  You want to respond, Mr. Werkheiser?

6              MR. WERKHEISER:  I will and I believe Mr. Price is

7  here on behalf of the Levin Group which is serving as the DIP

8  lender here.  I believe if Your Honor will indulge him he'd

9  like to be heard as well.

10             So, with respect to this I understood a couple

11 points here.  So, first, this is all news to us, Your Honor.

12 So, Mr. Waxman filed --

13             THE COURT:  First day hearing.

14             MR. WERKHEISER:  Well, not precisely, but Mr.

15 Waxman, obviously, was very busy this morning and filed a

16 lengthy complaint with, I think, like thirty something

17 exhibits, a TRO motion, an objection on behalf of another

18 client.

19             THE COURT:  Just don't beat this horse.  Move on.

20             MR. WERKHEISER:  And so he's here telling me

21 verbally that he has a client that has a potential

22 administrative claim and we've had no ability to test any of

23 those contentions.  I mean he may or he may not, but I think

24 if he wants to show up an contest what is appropriate relief

25 in the context of DIP financing, you know, the onus was on
```

1   him to at least come in and come in with some evidence and

2   some concrete information to support his clients asserted

3   theoretical administrative claim.

4          But be that as it may --

5          THE COURT:  I have to say I take issue with that.

6   This is an emergent hearing on, at this point, 36 hours'

7   notice.  Its, in effect, a first day hearing and he's a

8   creditor.  The onus isn't on him.  It's your burden of proof.

9   If you don't think we can go forward we'll continue this to

10  next week and we'll have an evidentiary hearing.  But you

11  can't jump on a creditor who didn't have advance notice of

12  this DIP motion until eight p.m. the day before the first day

13  hearing and fault them for not being ready for a contested

14  evidentiary hearing.  If that's your position fine, this

15  hearing is over.  We will do it next week.

16         MR. WERKHEISER:  Respectfully, Your Honor, these

17  issues were out there in connection with cash collateral as

18  well.  And so, you know, I'm not impugning anybody's motives

19  or --

20         THE COURT:  Cash collateral is completely

21  different than putting new debt on the company.  It's

22  completely different.  You're putting a $20 million dollar

23  superpriority admin claim in front of his company.  The only

24  thing you would do with cash collateral is a diminution

25  claim, okay, that will possibly be a superpriority claim.

A001145

1  It's completely different than putting $20 million dollars of

2  new debt in front of him.

3           MR. WERKHEISER:  Understood, Your Honor.

4           THE COURT:  So, we're going forward, but this is a

5  loser argument.  So, I hope you have a better one.

6           MR. WERKHEISER:  Your Honor, what I would like to

7  just also highlight for Your Honor, again, is that I think as

8  is clear in the letter of intent that was part of the first

9  day declaration that we filed previously it is the intent to

10  use the proceeds of the DIP to pay for the inventories being

11  acquired.  As is set forth in that letter of intent the buyer

12  is committing to assume certain 503(b)(9) obligations as well

13  and the post-petition ordinary course obligations for those

14  businesses.

15           So, those items are the subject of commitments by

16  the buyer.  We are in the process of documenting that in a

17  binding APA that as I indicated would be expected to be filed

18  no later than Monday.  We are trying to seek expedited, as

19  much as Your Honor can accommodate us, approval of that sale

20  process precisely because there really is no other path to

21  save this business as a going concern and save those jobs.

22           I don't think -- certainly this is not designed to

23  prejudice anyone else.  I think the lender has asked for

24  those traditional protections that a DIP lender would want

25  and actually has asked for a lot less than your typical DIP

1    lender would demand in this situation where there really was

2    not a substantial existing collateral base to support the

3    loan.

4           So, let me limit my comments there.  And since I

5    cannot speak specifically for what our DIP lender can and

6    cannot do in terms of perhaps getting Mr. Waxman's client

7    comfortable and Your Honor comfortable, but I would just

8    submit that what we put before the court is not prejudicial

9    to anyone as is currently crafted.

10          Thank you.

11          THE COURT:  Thank you.

12          Mr. Price?

13          MR. PRICE:  Good afternoon, Your Honor; William

14   Price, Clark Hill, on behalf of Levin Furniture LLC.

15          Your Honor, will try to isolate my comments to

16   just simply responding to the one pending objection, but I'm

17   happy to answer any questions you have about the DIP.  The

18   intention is, as Mr. Werkheiser presented it, which is

19   provide new inventory to replenish as best we can to

20   reinvigorate a going concern for a contemplated sale.

21          The DIP is a commitment by Mr. Levin, frankly, to

22   just make sure that his employees do have the ability when he

23   takes them over as his employees again to be able to work,

24   and function, and have compensation.  He committed quickly to

25   increase the DIP amount because there was further discussions

1  when we got continued that we would need a couple more weeks

2  and he committed to ensure that there would be enough space

3  and availability to do what the company needed to do.  So,

4  that is our view of the expansion of the DIP.

5          With respect to treatment I think I can make it

6  easier because this isn't the intention.  If the drafting

7  wasn't done properly we will tailor it and make everybody

8  comfortable.  But the purpose of the super-priority claim was

9  to the extent inventory is purchased, and to the extent that

10  things don't close, and we don't get our credit, and there's

11  a liquidation, and there's an accounting tracking on the

12  skews that relate to the DIP liquidated inventory, and

13  there's a deficiency that was our request that we have some

14  protection for fronting the money.  His client would have

15  been paid for post-petition deliveries with the money used

16  from the DIP that we be provided some superpriority

17  protection for the efforts and the fronting of money when no

18  other financial party will put any money into this estate.

19          So, that was our request.  It's not for purposes

20  of just saddling the estate with a massive superpriority

21  claim.  It's in the event that the thing craters and it

22  liquidates, and the inventory that was purchased within the

23  last few weeks precipitously drops in value and there is a

24  deficiency there.  So, that is the intention and if there is

25  a modification necessary to the order or the credit agreement

1    we will do it.  If it's just a non-starter for the court I
2    will talk to my client quickly and we'll talk about which
3    tranche they get in the form of a deficiency claim.  We
4    really just want to get the DIP in place and get the thing
5    functioning and flowing.
6            On the other issue on 503(b)(9)'s the LOI is of
7    record, I believe, and there is an assumption of 503(b)(9)'s
8    to the extent they relate to the Sam Levin entity.  So, if
9    it's a party that shipped to the stores that we're taking
10   over we would assume those 503(b)(9)'s to the extent that
11   they're authenticated and we would pay them as part of our
12   purchase.  So, I don't believe that to be an issue to the
13   extent that we're talking about the Levin/Wolf stores that
14   are part of the transaction.
15           The last piece of the puzzle is there's no
16   guarantees in life.  We have no idea if we're going to own
17   this company in a couple of weeks.  So, we want some base
18   protections and we greatly appreciate everything the court
19   has done.  The U.S. Trustee was very user friendly in
20   negotiating out the comments they had.  So, I think that we
21   do have a DIP that's properly designed to have the minimally
22   invasive technique to try to keep this thing afloat, but if
23   there is still an issue I'm happy to talk in the hall, hammer
24   it out, get my client on the phone and try to get something
25   that works for everybody whether he has a claim or not.

1          THE COURT:  Thank you.

2          MR. PRICE:  Thank you.

3          THE COURT:  Mr. Waxman, reply -- oh, Mr.

4   Werkheiser.  Sorry, Mr. Waxman.  Hang on.

5          MR. WERKHEISER:  If I could just take a minute

6   with Mr. Price.

7          MR. WAXMAN:  Actually, while --

8          THE COURT:  Well, no, he needs to be able to

9   listen to what you're saying.  He's your opponent.

10         MR. WAXMAN:  I just wanted to say I thought it

11  might be helpful if we're able to speak.  My co-counsel is on

12  the phone.  So, it might make sense for us to speak about

13  some issues.

14         THE COURT:  You want a break?

15         MR. WAXMAN:  I think that might be helpful, Your

16  Honor.

17         THE COURT:  Mr. Werkheiser, is that acceptable?

18         MR. WERKHEISER:  Your Honor --

19         THE COURT:  You got me all day.  I'm staying till

20  we're done today.  So, if we're late we're late.  So be it.

21  Who knows if we'll ever be allowed to be in the same room

22  ever again after today.

23      (Laughter)

24         MR. WAXMAN:  Not in basketball.

25         MR. WERKHEISER:  Your Honor, I think a break

1   wouldn't hurt.

2              THE COURT:  Sure.

3              MR. WERKHEISER:  I think this is something we can

4   resolve.

5              THE COURT:  If you get headquarters back at home

6   base to upload that we'll get that order because I would like

7   to get that on since you are actually doing all the things

8   that the order says you are allowed to do.  So, the sooner we

9   actually get it authorized the better.  So, we will check it

10  out when we get back.

11             MR. WERKHEISER:  Thank you, Your Honor.

12             THE COURT:  We'll take a short recess.  Just let

13  us know when you're ready to go.

14        (Recess taken at 3:13 p.m.)

15        (Proceedings resumed at 3:56 p.m.)

16             THE CLERK:  All rise.

17             THE COURT:  Please be seated.

18             MR. WERKHEISER:  All right.  Thank you, Your

19  Honor.

20             THE COURT:  No problem.

21             MR. WERKHEISER:  For the record Gregory

22  Werkheiser.

23             I think we are able to use the time constructively

24  as it relates to the Levin DIP financing motion.  And I

25  believe that we have come to an understanding with Mr.

1   Waxman's client, and co-counsel, and Mr. Waxman about

2   allowing us to proceed on that in a fully consensual manner.

3          So, the concern Your Honor, as was articulated,

4   was that --

5          THE COURT:  I'm sorry.

6          MR. WERKHEISER:  What's the name of your client?

7          MR. WAXMAN:  Serta Simmons.

8          MR. WERKHEISER:  Serta Simmons might, under some

9   theory, have an administrative claim by virtue of certain

10  sales guidelines that they believe were part of a prepetition

11  contract.

12         Leaving that issue aside, not asking the court to

13  address that one way or the other today, what we have agreed

14  to do in the context of the DIP order, I believe, to give

15  everybody comfort on that point is, one, I'm going to just

16  confirm everyone's understanding for the record that the

17  definition of DIP collateral that appears in the order as

18  revised -- and if I may approach, Your Honor, I have a

19  redline copy of the revised interim order that has that

20  definition now built into it.

21         THE COURT:  Thank you.

22         MR. WERKHEISER:  Your Honor, this definition of

23  DIP collateral appears on the first page in Footnote 3 and

24  that is adapted without substantive change from the DIP

25  credit agreement that was attached to the motion.

1          Broadly speaking what it says is that the new

2  inventory that Sam Levin Inc. purchases using the proceeds of

3  the DIP is the collateral.  And the proceeds of that

4  inventory are the collateral.  It's not reaching back in time

5  to grab other inventory or other assets unrelated.  So, I

6  think we have come to an understanding that resolves their

7  concerns there.

8          The second concern was the granting of the

9  superpriority administrative claim.  I think as I understand

10 it the way we've been able to successful address that point

11 is that we are going to incorporate language into the DIP

12 order that acknowledges the terms of the LOI that contemplate

13 that 503(b)(9) obligations related to the Sam Levin Inc.,

14 entity are going to be assumed upon closing of the sale

15 transaction and make clear that the final asset purchase

16 agreement will honor those terms.

17         I just ask Mr. Waxman or his co-counsel to confirm

18 that I accurately recited our understandings in that regard.

19         THE COURT:  Thank you, Mr. Werkheiser.

20         Mr. Waxman?

21         MR. WAXMAN:  Your Honor, that is correct.  I

22 understand we will see a revised form of order that we will

23 get a chance to make sure that everything is correct and it

24 will be submitted under certification of counsel.

25         MR. WERKHEISER:  That's correct, Your Honor.  We

1   will get that done hopefully after we get done today.

2           THE COURT:  Okay.  Thank you.

3           MR. WERKHEISER:  Thank you.

4           THE COURT:  Is there anything else in connection

5   with the DIP?

6       (No verbal response)

7           THE COURT:  All right.  Subject to the -- I

8   actually look at the redline before I do that.

9           MR. WERKHEISER:  Your Honor, I can just walk you

10  through it quickly if that's helpful.

11          THE COURT:  I'll just page through it.  It doesn't

12  look like there's a lot of changes.

13          If you're on the phone I'd appreciate it if you

14  would please mute your line; otherwise, we get static and a

15  sound from your line. So, if you could please mute your line

16  unless you're speaking.  Thank you.

17          Okay.  This is fine.

18          MR. WERKHEISER:  Thank you, Your Honor.

19          THE COURT:  Everyone is standing though.  I was

20  about to rule.

21          Subject, obviously, to the changes that were just

22  discussed in court with Mr. Waxman's client I'm prepared to

23  approve the DIP and sign the order along the lines of the one

24  you just showed me with only those changes that are still in

25  flux.  And as soon as you get it to me under certification of

31

1  counsel I will get it filed, and signed, and docketed.   Then

2  you will be good to go.

3          MR. PRICE:  Thank you so much, Your Honor.

4  William Price.

5          I have to leave and my colleague, Ms. Grivner, is

6  going to stay for the remainder of the proceedings.  I really

7  appreciate all your time.

8          THE COURT:  You're welcome.  Thank you.

9          MR. WAXMAN:  Your Honor, can I ask the indulgence

10  of the court, and everybody, I have to step out for two

11  minutes.  I just got an emergency call from my mother's

12  caretaker.

13          THE COURT:  Oh, of course.  Should we take a

14  break?

15          MR. WAXMAN:  If we could.  I promise it won't be

16  more than three minutes.

17          THE COURT:  Of course.  Happy to give you that

18  accommodation.

19          MR. WAXMAN:  I apologize to everybody in the

20  court.

21          THE COURT:  We will take a very short recess for

22  in deference to Mr. Waxman's personal life.

23          MR. WERKHEISER:  Thank you, Your Honor.

24          THE COURT:  And the customer motion has been

25  docketed.  The order has been docketed.

1          MR. WERKHEISER:  Thank you, Your Honor.

2      (Recess taken at 4:01 p.m.)

3      (Proceedings resumed at 4:09 p.m.)

4          THE CLERK:  All rise.

5          THE COURT:  Okay.  So, the DIP order is taken care

6  of, the customer procedures motion that order has been

7  entered.

8          MR. WERKHEISER:  Yes, Your Honor.

9          THE COURT:  So, that leaves us with store closing.

10         MR. WERKHEISER:  Store closing. Main even.

11 Fortunately for this I get to sit down and I'm going to hand

12 the podium to Ms. Russell.

13         THE COURT:  Okay.

14         MR. WERKHEISER:  Thank you.

15         MS. RUSSELL:  Good afternoon, Your Honor.

16         THE COURT:  Good afternoon.

17         MS. RUSSELL:  Marua Russell, Montgomery McCracken

18 Walker & Rhoads, proposed special counsel for the debtors.

19         We are here in connection with the debtors'

20 emergency motion for entry of an interim order today

21 approving the bid procedures for a store closing sale and

22 authorizing customary bonuses to store employees, and

23 authorizing the assumption of a consulting agreement between

24 the debtors and various entities affiliated with Gordon

25 Brothers Retail Partners and Hilco Merchant Resources LLC.

1        Your Honor, just so that we have a listing in

2    connection with the motion, which the motion was filed at

3    Docket Number 52, Your Honor, we have the declaration of Mr.

4    David Ladd, which was actually filed at Docket Number 12,

5    which was filed in connection with and in support of all of

6    the first day motions.

7        Your Honor, we also have the declaration of Mr.

8    Dennis Stogsdill which was filed in conjunction with the

9    first day motion.  Mr. Stogsdill is a director of Alvarez &

10   Marsal who is the financial advisor to the debtors.

11       In addition, Your Honor, yesterday afternoon there

12   was a declaration filed at Docket Number 96, the declaration

13   of Mackenzie Shea of Gordon Brothers in support of the

14   debtors' motion.

15       In addition, at Docket Number 97 there was a

16   declaration of Sarah Baker in support of Hilco, also in

17   support of the debtors'' motion.

18       Since we were before Your Honor, although not on

19   this motion, that we were before Your Honor on Tuesday, we

20   have had several discussions with counsel for the landlords

21   who were here in the court.  We revised and circulated a

22   revised draft of the proposed order, interim order,

23   addressing issues that had been raised at that hearing.  And

24   we circulated that last evening to everyone who had filed a

25   notice of appearance in the case.  We subsequently received

1  additional comments from various parties and incorporated

2  those comments.  And we filed or uploaded a redline draft of

3  the consolidated revised blackline of the order showing all

4  agreed upon changes between the proposed interim order that

5  was filed with the motion and what we had agreed with the

6  various parties.

7       Your Honor has not yet seen that order.  While we

8  do have some clean-up changes to make based upon comments we

9  received in the courtroom, but we do have copies.  We're

10 happy to show it to the court when Your Honor is ready to

11 review that.

12       THE COURT:  Okay.

13       MS. RUSSELL:  With respect to the outstanding

14 issues in connection with the motion there are the Office of

15 the United States Trustee raised some concerns regarding the

16 consulting agreement, the motion and the proposed order.  We

17 believe we have resolved the majority of those issues subject

18 to the one issue, and I will allow the Office of the United

19 States Trustee to speak as to the substance of that

20 objection, but my understanding is the concern with regard to

21 the relationship between the proposed consultant here in

22 connection with the debtors' assets and the relationship with

23 those entities and the entity that now currently holds the

24 term debt of the debtors.

25       Other than that we have spoken.  There was the

A001158

1   motion also contemplated that the consultant, in addition to

2   providing services to the debtor in connection with the

3   merchandise, machinery and equipment, that the consultant

4   would also provide consulting services to the extent the

5   debtor has elected with respect to the collection of

6   receivables, and also that the debtor would retain the

7   services of affiliates of the consultant Hilco Stream Bank

8   and Gordon Brothers Brands in connection with assisting the

9   debtor with the marketing and sale of the debtors'

10  intellectual property.

11          While those transactions would not be to the

12  ultimate purchaser were not subject to that motion and the

13  debtors would be required to come back to the court the U.S.

14  Trustee has raised concerns about a Section 327 retention

15  within the context of the debtors' 363 motion currently

16  before the court.  So, we have agreed that with respect to

17  the intellectual property, which would be the subject of the

18  Section 327 retention, that that would not go forward today

19  and it would be subject to Your Honor's availability heard on

20  April 6th.  And to the extent that the Office of the United

21  States Trustee and/or Your Honor required or would like us to

22  file a separate application seeking to retain those advisors

23  under Section 327 that teh debtors would do so just to

24  separate the issue and any concern about it all being wrapped

25  up into the one motion.

1          Your Honor, one of the unusual facts and economic

2   terms of this consulting agreement that I have never seen

3   before and I don't think anyone in the courtroom has seen

4   before is the concept that the fee to the consultant in

5   consideration for the services that the consultant has

6   provided is not being paid by the debtor.  Instead, the

7   debtors would reimburse the consultant for the out of pocket

8   consultant incurred expenses that are incurred in connection

9   with a budget that is part of the consulting agreement.

10          Other than that, any other fees that we would

11  customarily see, 1 percent of sales, 2 percent of sales that

12  we would see on merchandise and 15 percent of sales on

13  machinery and equipment, Your Honor, that's not here.  Those

14  are not fees that the estate is going to incur directly to

15  the consultant.  Instead, the consultant has an economic

16  relationship in the agreement with the holder of the term

17  debt and that any amounts paid would be paid from the

18  recovery under the term debt.

19          So, from the perspective of the estate it was a

20  win-win.  It enabled the estate to not directly incur those

21  fees on an ongoing basis, but instead those fees were

22  deferred to a later date and to be paid out of a recovery if

23  any that is obtained on account of the term loan debt.  Your

24  Honor, that was a beneficial result for the estate because it

25  did preserve cash-flow.

1    In addition, Your Honor, an extensive amount of

2    time has been spent on the debtors' new customer policies

3    that addresses this $35 million dollars of customer deposits.

4    The debtor has heavily negotiated with all parties, Wells

5    Fargo as well as the term lenders, to allow the debtors and

6    to not have issues with respect to the priorities and who

7    gets paid what when, but to come up with these customer

8    policies that enables the debtor to either provide by

9    merchandise credit or refund later on down the road to the

10   consumers.

11   So, in connection with the overall transaction

12   that was a significant benefit to the estate.  Those customer

13   deposits and refunds the term lenders have agreed that they

14   would be satisfied prior to any amounts being paid to them.

15   So, the consultant here has agreed to provide the services,

16   but in essence their fee is really on the back end and is

17   really contingent upon them doing an excellent job to get

18   past and through the Wells Fargo amounts that are owed to it

19   as well as whatever amounts that are due and owing are being

20   paid through the debtors' cash collateral motion and budget.

21   With that, Your Honor, I'm happy to answer any

22   questions that you may have with respect to how we have gone

23   so far, but, otherwise, I would cede the podium to the Office

24   of the United States Trustee to tee-up whatever issues still

25   remain outstanding with respect to the concerns that she has

 1   raised.  I do want to note that we did receive a list of

 2   questions from the Office of the United States Trustee late

 3   yesterday and the debtors, in consultation with the

 4   consultant, provided a detailed response to all of those

 5   questions.

 6               THE COURT:  I have no questions.  Thank you.

 7               MS. RICHENDERFER:  Good afternoon, Your Honor;

 8   Linda Richenderfer from the Office of the United States

 9   Trustee.

10               I guess I respectfully would not agree with the

11   characterization that we've been able to resolve issues.  I

12   think that there is a major gating issue here and I would

13   respectfully submit that at this point in time that the

14   hearing on this particular motion should be adjourned until a

15   time when due process can be served, and the major

16   stakeholders who are directly impacted by this particular

17   order, the unsecured creditors, have an opportunity to form a

18   committee so that they can fashion a constructive concerted

19   response to the particular transaction that is in front of

20   Your Honor.

21               This is totally out of the norm, as Ms. Russell

22   said.  This is not your usual situation where it is a fee for

23   service.  We have gotten used to those over the past five

24   years.  And under that scenario we have also gotten used to

25   the court providing interim approval, and, again, fee for

A001162

1   service.  And we have the liquidator, Hilco/Gordon, in a

2   position for running the GOB sales.  At the backend they may

3   come in with other things, they may want to buy-out the

4   inventory that's left, but going into the deal for the most

5   part they're serving as the consultant who is leading the GOB

6   sales.

7         Here we have an entity that is wearing four

8   different hats in this case.  They are secured lender with a

9   claim for $175 million dollars.  They are controlling the

10  purse strings along with Wells Fargo for this case because

11  the cash collateral order is the means by which the debtor

12  continues to operate and run this Chapter 11 case.

13        So, the expenses that they're going to get paid

14  that have to be approved through budgets done by the debtor

15  in consultation with the lenders they're one of the lenders.

16  They're approving the budget that tells then what they can

17  pay for themselves.  And they're also wearing the hat as

18  being a non-327 professional consultant, whatever we want to

19  call them in the normal course, being in charge of the GOB

20  sales.  And then in addition they want to serve as a 327

21  professional.

22        All of this was nicely put together for us in one

23  entire agreement.  We've always heard how separate entities,

24  this and that.  They brought it together as one complete

25  package here.  And we know that Hilco, the consultant I'll

1   call them, isn't doing this for free.  But what we don't know

2   are the economics of the deal.  We have no idea of the

3   economics of this deal here.  I think it's also disingenuous

4   to say that their interests are aligned with those of the

5   estate.  Their interest are aligned with the secured

6   creditor.  Their interest is to get Wells Fargo paid and to

7   get the secured debt paid.

8          Now at the end Ms. Russell said something that I

9   don't know if this is something that I missed or if this is

10  something that is new, but that the term lender agreed that

11  they would satisfy the deposits before they take any of the

12  money owed to them. I don't see that anywhere in the

13  documentation.  I don't believe that that is a consideration

14  for the court today when looking at the particular

15  transaction the court is being asked to give interim approval

16  to.

17         We all know once interim approval is given the

18  horse is out of the barn.  And we're doing that when we are

19  not going to have committee formation until next Wednesday.

20  There are repercussions here.  We need time to analyze this.

21  Yes, I asked preliminary questions and they were answered.  I

22  don't believe the debtor represented it, I don't believe Mr.

23  Ladd is here today for me to cross-examine.  And I don't

24  believe that there are individuals here could answer the

25  questions that need to be answered.  We need time.  We need

A001164

 1   discovery and, again, need the committee to be able to step-

 2   in and protect the interests of the unsecured creditors.

 3          THE COURT:  Okay.  Thank you.

 4          Ms. Russell?

 5          MS. RUSSELL:  Your Honor, with respect to the U.S.

 6   Trustees Office not being aware of the financial arrangements

 7   between the term lender and the consultant I did share with

 8   her a letter that we had requested and received from the

 9   consultant setting forth the economic terms of that financial

10   relationship.  They did request, for confidentiality reasons,

11   that we not file that, but they have consented that that

12   letter be shared with the U.S. Trustees Office, with the

13   creditors committee once appointed, and that to the extent,

14   you know, Your Honor has any questions with regard to that

15   financial arrangement Mr. Steven Fox is here representing the

16   consultant.

17          With respect to the intellectual property, Your

18   Honor, because we will stipulate to remove that and move that

19   to a separate hearing, the court, the U.S. Trustees Office

20   and any other party in interest can review and object to the

21   retention with respect to the intellectual property on

22   whatever basis that they deem is appropriate.  So, we are

23   talking right now that it's the inventory, machinery and

24   equipment that are pretty customary to the consulting

25   agreement.

A001165

1          This consulting agreement, the budget that is part

2     of this consulting agreement was a budget that had been

3     agreed upon and discussed during prior discussions when

4     competing liquidation groups were submitting bids and

5     proposals before ultimately we landed on the consulting

6     agreement with the current consultant.  So, the expenses are

7     identified in the budget that was submitted as part of a

8     liquidation proposal.  There is no mystery to them.

9          The debtors certain have the ability to, in

10    certain circumstances where we have identified we want to

11    weigh-in and perhaps adjust downward some of the line item

12    expenses to the extent that we determine that we don't think,

13    for example, marketing media purchases that the debtors don't

14    think that those purchases are necessary we reserve the right

15    in the agreement and in the exhibit in the budget to object

16    to those.

17         So, the one key difference is who's paying the fee

18    to the consultant.  And that fee is being paid out of the

19    backend recovery to the term loan lenders.  So, that is the

20    difference and that difference has created a tremendous

21    benefit to the estate.  Unfortunately, Your Honor, we don't

22    have the time or the financial wherewithal to stop everything

23    now.  We're happy to sit down with the Office of the United

24    States Trustee to discuss any questions, or comments or

25    concerns they have between now and the proposed final hearing

1   on April 6th.  But we would like to be in a position to get

2   our signage up, to get into really fully launch into the

3   store closing program as we need to.

4          Time is not on our side.  With respect to the

5   backend there is so much inventory that needs to be

6   liquidated through these stores.  To the extent we are

7   further delayed in a launch of that liquidation the more

8   likelihood is that we could potentially have too much

9   inventory and have to carry over into the month of May in

10  operating these stores or some of these stores which is an

11  additional expense that the company just does not have the

12  ability to absorb.

13         So, we would request -- we're happy to sit down

14  and I'm sure Mr. Fox would likewise say sit down with the

15  Office of the United States Trustee.  Get them comfortable

16  that while, yes, unusual this particular structure is a

17  benefit to the debtors' estate and that we would hope to be

18  able to resolve those concerns prior to the April 6th

19  hearing.  And if not we will discuss and present as

20  appropriate to Your Honor.

21         MS. RICHENDERFER:  Your Honor, if I may respond

22  briefly.

23         Your Honor, one of the problems here is that

24  because they are controlling so many aspects of the case

25  we're in a situation where you have the lender basically

1   standing in the way of a market test which normally this
2   court would not allow.  The lender here is also the person
3   that only benefits to the extent that they're part of the
4   liquidation of the assets on a store by store basis
5   continuing with the sales, the going out of business sales at
6   the locations.  So, while I understand and appreciate the
7   debtors need to continue forward on a path they had chosen we
8   do have the right to look at that path.  And unfortunately a
9   lot of parts of that are not within our purview.

10          Yes, I was given a letter that outlined how things
11  were going to be divvied up, so to speak, between KKR and the
12  HGB.  That doesn't tell me the economics of the deal.  I
13  don't know what HGB paid for the position it has.  So, I
14  don't know what they're making off of this deal.

15          I will harken back, Your Honor may recall that
16  there was a period of time when my office was looking into
17  the issue of whether or not liquidators in the going out of
18  business sales should be considered to be 327(a)
19  professionals.  And Judge Shannon, when issuing his opinion,
20  stated,

21          "The established practice requires fulsome
22  disclosure of the services to be provided and the
23  compensation to be paid followed by a hearing on the merits
24  where the debtor must carry the burden under Bankruptcy Code
25  Sections 365 and 363 that demonstrates that proceeding in

A001168

1    good faith and its proposed course of action reflects the

2    exercise of reasonable business judgment.  This structure is

3    compliant with the bankruptcy code and is sufficient to

4    address the U.S.T's legitimate desire for transparency and

5    due process without imposing the additional requirements and

6    restrictions by 327(a)."

7              Here we are in a situation where the structure is

8    not giving us the transparency and the due process that Judge

9    Shannon wrote about and was the basis of his opinion when he

10   determined that at least with respect to the going out of

11   business sales they did not need to qualify as a 327(a)

12   professional.

13             So, Your Honor, I don't know how we proceed

14   forward at this point in time again without allowing for

15   there to be more disclosure which is required and allow the

16   real interest holders here, the unsecured creditors, to get

17   up to speed and to analyze this scenario.

18             THE COURT:  Thank you.

19             MR. FOX:  Good afternoon, Your Honor.  For the

20   record, Steven Fox, Riemer & Braunstein, on behalf of the

21   consultant group of affiliates of Hilco Merchant Resources

22   and Gordon Brothers Retail Partners.

23             I rise, Your Honor, ahead of Mr. Waxman, not

24   intending to be disrespectful, but rather, since the

25   U.S. Trustee has identified what they consider to be gating

A001169

1    issues, before we deal with Mr. Waxman's inventory-related

2    questions, I thought it might be appropriate to sort of deal

3    with the elephant in the room, so to speak.

4              Your Honor, at the outset, let me be the first to

5    acknowledge and concede that the transaction structure before

6    the Court is a little bit different than what the Court and

7    some interested party may be accustomed to seeing, but I also

8    want to be clear that it is not in any way, shape or form

9    unique or novel in any respect.  It is a structure that has

10   been tried and tested before in other cases; most recently, a

11   similar structure was adopted and approved by the Bankruptcy

12   Court of the Southern District of New York in the Barneys

13   cases where there was a clear connection between, in that

14   case, the DIP lender and the consultant that was being

15   engaged by the estate for purposes of liquidating inventory

16   in certain stores, as well as marketing for sale, certain

17   intellectual property.

18             But putting aside that nonbinding precedent, Your

19   Honor, I think part of the failure here is one of

20   understanding as opposed to one of substance.  The reality

21   here is we've heard some terms thrown around such

22   transparency and due process, referring to Judge Shannon's

23   decision, which I'm intimately familiar with because, of

24   course, the parties, similar to my client, were involved in

25   that case and issues not necessarily substantively similar,

1  but certainly relating to the 327(a) retention issues were

2  relevant there.

3           First, let's deal with the 327(a) issues.  As

4  you've heard from Ms. Russell, we understand the debtor is

5  fully prepared to separate that issue and deal with it at the

6  second day hearing on April 6th as it relates to the

7  intellectual property of the consulting agreement and I can

8  confirm on behalf of consultant that it has no objection to

9  proceeding in that manner and should the debtor decide, in

10 consultation with the U.S. Trustee or with a committee, once

11 formed, that a separate motion on that issue is appropriate,

12 then we will certainly cooperate and work in conjunction with

13 the debtor and others to ensure that motion is timely filed

14 in that connection, Your Honor.

15          As far as due process and transparency is

16 concerned, we should be clear when we're talking about those

17 types of issues.  In our opinion there has been full

18 foreclosure.  One need not read further than the second

19 substantive paragraph of the debtors' motion to find

20 disclosure of the fact that there was this unusual

21 relationship; again, not unique and not without precedent,

22 but certainly different than the traditional fee for

23 services.

24          And the reason for that is because the debtor has

25 a definable, realizable, demonstrable benefit from this

 1  relationship in that it pays us nothing.  I am representing a

 2  party here, who I dare say, is the only party in this room

 3  who is working for free.  I'm not, but my client is.  My

 4  client, by virtue of the terms of the consulting agreement

 5  earns no compensation whatsoever from the debtors' estate for

 6  the full range of services that it will provide if this

 7  motion is approved today.

 8          And I should point out we're only asking for

 9  interim approval today, so if for some reason a party in

10  interest has an issue or raises and objection in connection

11  with the final hearing that we cannot resolve or we cannot

12  overcome, we may permanently work for nothing.  But as it

13  stands now, our consulting agreement provides that the estate

14  pays no fee or other compensation to the consultant on

15  account of the consulting services.

16          Our recovery, if any, derives solely and

17  exclusively from a recovery that our affiliate receive and I

18  stress "may," if at the end of the day, this estate generates

19  a return to the term debt, which is junior there the ABL debt

20  and all of the other things that the ABL lenders and the term

21  lenders have agreed be funded through the cash collateral

22  budget.

23          Among other things Your Honor heard through Mr.

24  Werkheiser's introductory remarks today, that right now

25  somebody else is grabbing all the cash.  So, who knows, given

1   uncertainties as to what the ultimate recoveries for the

2   secured creditors in this estate will be, but we understood

3   that risk in negotiating in an arm's-length fashion between

4   our affiliate and the prior holders of the term debt that at

5   the end of the day, we may realize nothing.

6          That is our risk and is not a risk to be borne by

7   the estate, because they do not pay us, again, anything,

8   other than as Ms. Russell indicated, reimbursement for

9   certain definable out-of-pocket expenses, which have been

10  reduced to a highly negotiated budget that would be expenses

11  incurred by the estate, no matter who the liquidators were

12  here.  They include expenses such as signs, supervisors,

13  certain limited travel -- and believe me today, it's going to

14  be limited -- certain other related expenses, but nothing in

15  the nature of a fee or other compensation.

16         With regard further to transparency, Your Honor,

17  as Ms. Russell indicated, it was the debtors' insistence that

18  they understand the economic parameters of the agreement that

19  was being negotiated between the affiliates of the consultant

20  and the prior debt holder KKR.  In response to the debtors'

21  insistence, we made full disclosure to the debtors of the

22  economic relationship and went so far as to reduce it to a

23  writing and then deliver that writing to the debtors'

24  professionals and the debtors have been fully apprised from

25  the very start of what that economic relationship is.

1          And to put it simply, Your Honor, without going

2    into the actual numbers, there is a sharing arrangement

3    solely related to a recovery on account of the term debt.

4    So, again, no fee or any compensation from the estate, other

5    than a sharing between our affiliate, HDB, the current term

6    debt holder, and the prior term debt holder.  They have no

7    involvement in the estate.  They are entitled to no

8    compensation from the estate.  They only get a piece of our

9    recovery, the economics of which have been fully disclosed to

10   the debtors.  So, totally transparent here, no hidden agendas

11   or otherwise.

12          Ms. Richenderfer said that we lack transparency

13   because she claims she knows nothing about it.  She has that

14   letter.  That letter was clearly intended to be delivered to

15   the U.S. Trustee's Office and it specifically said so.  It

16   was prepared in anticipation that the U.S. Trustee's Office

17   was going to want to know and was going to have these

18   questions because of the unusual nature of their

19   relationships here.

20          I'll only ask, as Ms. Russell indicated, that it

21   not be -- it contains certain confidential information about

22   trade information and negotiations relating to third parties

23   not here and we ask merely if it ever needed to become part

24   of the public record, that it not be filed of record, it only

25   be filed under seal, and then if the U.S. Trustee needed to

1  use it in connection with any litigation or objections, we'd

2  be happy to do that, just so long as it be done under seal;

3  again, not intending to hide anything.

4        That same letter also says that the debtors are

5  free to share with the creditors' committee, once appointed;

6  again, not looking to hide anything.  The economics are open

7  and transparent to anybody who wants to see it who are the

8  key constituents in the estate, including the ABL lenders on

9  their own.

10        So, from that perspective, Your Honor, I think we

11  have satisfied the transparency concerns that Judge Shannon

12  might have expressed in a different context, as well as the

13  due process concerns.  We are seeking merely interim relief

14  here and if the U.S. Trustee or the creditors' committee

15  subsequently has any additional questions, after having an

16  opportunity to review the substance of that transaction,

17  we're happy to do that.

18        I would also add that to the extent that they

19  think there's anything nefarious that happened here, the term

20  claims are what they are and the committee, once appointed,

21  and any other third party that may wish to challenge that,

22  has all the challenge rights provided for in interim cash

23  collateral order and that is not affected in any way by

24  approval of the consulting agreement or the conduct of the

25  GOB sales.

1          Next, Your Honor, Ms. Richenderfer indicated a

2     concern about the relationship depriving the estate of a

3     market test.  I can only assume from that remark that she

4     somehow believes that the debtor did not exercise its

5     business judgment by testing the market for the most

6     beneficial transaction to the estate.  I beg do differ.

7          As the U.S. Trustee has been apprised in response

8     to the written questions that they posed to us last night by

9     the debtors, that the debtors solicited five separate

10    liquidation firms; especially, the they national liquidation

11    firms that can do a transaction of this size and nature.  It

12    was at the conclusion of that solicitation process that the

13    debtors selected the Hilco and Gordon Brothers venture to

14    conduct store-closing sales on the terms set forth in the

15    consulting agreement.

16         It is equally important to note, however, Your

17    Honor, that there is no linkage between the debt transaction

18    and the consulting agreement.  So, the debtors were be

19    obligated to select us as the consultant just because we were

20    conducting parallel discussions with KKR over the acquisition

21    of the debt.  They made that decision based upon their

22    assessment, I assume, of the economic benefits to the estate

23    of our transaction, which is free services, as opposed to the

24    other proposals, which I've never seen, but I can only

25    assume, based upon my experience in the area, actually cost

A001176

1  the estate some money.

2      And were Your Honor to somehow elect to not

3  approve the conduct of sales in the consulting agreement, our

4  affiliate still owns the debt.  The deal still stays the

5  same, but it's not, in our opinion, in the best interests of

6  any of the stakeholders in the estate to disrupt a process

7  that is currently orderly and ongoing.

8      Ms. Richenderfer also indicated an objection

9  because she's of the opinion that somehow because we hold,

10  through the affiliate, the term debt, that we are controlling

11  the purse strings by approval of the budget.  What I can

12  represent to Your Honor is -- and I am confident that the

13  debtors can confirm this -- that the term lenders played very

14  little, if any, role in the construction of the budget that

15  is part of the cash collateral order.  That was driven almost

16  exclusively, and if not exclusively, then certainly primarily

17  by the ABL lenders.

18      The reasons for that are quite obvious; it's their

19  ox that gets gored first and equally importantly, based upon

20  the intercreditor relationship between the two parties, we

21  have an interest in certain party collateral and they have an

22  interest in everything else.  So, their interests are far

23  broader than us on a first lien basis and as Your Honor can

24  certainly recall from your own experience in such matters,

25  the ABL lender didn't really care much -- not disrespecting

A001177

1  us -- but really didn't care much for our opinions, to the

2  extent we had any, on the budget as they were liquidating

3  their priority collateral first; namely, the inventory and

4  other receivables.  So, we played little to no role in the

5  construction of the budget.

6          We did participate at some extensive level in

7  terms of how the customer deposit issues were going to be

8  handled for two very simple reasons.  The first is, Your

9  Honor can read in the consulting agreement, there are

10  actually mechanics that we agreed to as the consultant to

11  facilitate the debtors' completion of as many customer orders

12  that were represented by corresponding deposits as possible,

13  both in terms of facilitating the approximately $18 million,

14  if that's the correct number, of deposits where there's

15  actually merchandise on hand today, as well as helping the

16  debtors try and source and facilitate completion of orders

17  which there's no inventory represented in the company's

18  coffers today.  So, we spent a lot of time talking about that

19  and memorialized all that, those requirements and the

20  services in the consulting agreement.

21          But separate and apart from that on a near daily

22  basis we also, on the debt side of the transaction, were

23  participants in discussions, along with the ABL lenders and

24  the debtors' professionals and business principals, on how

25  best to deal with the customer deposits on a daily basis

 1  both, in terms of the messaging -- we spent a lot of time
 2  talking -- over two days before Your Honor about that -- in
 3  making sure the communications to the customers are clear and
 4  concise, but as well, how we're going to deal with the
 5  financial impact of that.

 6          And, Your Honor, I'm certain will recall, that
 7  when we were talking about cash collateral on Tuesday
 8  afternoon, it was -- I recall it being pretty clear -- my
 9  notes reflect this -- that the statement was made that as
10  part of the budgetary process, the term lenders were fully
11  supportive of the budgetary components that had the company
12  honoring the refund of customer deposits and the use of store
13  credits and the like, notwithstanding that, at least on a
14  legal basis, the term lenders might have been in a position
15  to assert a senior, prior right to proceeds and not honor
16  those deposits as refund requests were being made.

17          That is not the posture the term lenders took then
18  and it's certainly not the posture that we're taking today.
19  We are fully supportive and understand that there's a
20  subordination component that applies to us in that regard and
21  we're not going to back off of that.

22          So, the U.S. Trustee also mentions that one of
23  their concerns is that they don't know what we're making on
24  the deal; respectfully, Your Honor, neither do we.  What we
25  know we're not doing is charging the estate the fee.  We are,

1    as I said at the outset, working for free, hoping that our

2    efforts will generate a maximal recovery for the estate and

3    that at some future point in time, whether it's through a

4    wind-down, a plan, a Chapter 7 conversion, whatever the

5    ultimate outcome of this liquidating estate will be, that

6    proceeds will trickle-down through contractual or statutory

7    priorities, to the term debt.  And if that happens, then we

8    will earn a recovery maybe, subject to the sharing

9    arrangement that we have described in writing to the U.S.

10    Trustee.

11          In those circumstances and given those parameters

12    and given the disclosures, including the declarations that

13    were filed yesterday anticipating what the U.S. Trustee's

14    lack of disclosure objection might be, we believe that there

15    is nothing nefarious or inappropriate concerning the

16    relationship that exists between the consultant and its

17    affiliate that is holding the term debt.  We believe,

18    contrary to the U.S. Trustee's posture, that the estate's

19    interests are fully aligned with both, the consultant and the

20    holders of the term debt.  All of those parties are geared

21    towards and their interests are driven towards maximizing the

22    recoverable value for the estate's available assets.

23          Where those proceeds ultimately wind up and who

24    has the first right to them and the like is not being decided

25    today.  Nobody is asking this Court to offer an opinion on

 1 that or make any ruling on that; that will happen in a

 2 subsequent process, that we believe -- expect that the senior

 3 ABL lenders, the term lenders, and the committee, once

 4 appointed, will be fully engaged in.

 5           Your Honor, with that, I'm happy to respond to any

 6 questions that the Court may have and I would just reserve

 7 the opportunity to respond to any other comments that other

 8 parties may make that relate to this relationship.

 9           THE COURT:  Thank you.

10           MR. FOX:  Thank you, Your Honor.

11           MR. WAXMAN:  Good afternoon, Your Honor -- and it

12 still is afternoon -- Jeff Waxman of Morris James, on behalf

13 of two clients.  I'm going to start out of, again, with Serta

14 Simmons Bedding Company but after that, there is a limited

15 objection which was filed this morning by JoFran Sales, Inc.

16 and that is at Docket 101; that is a limited objection.

17           Your Honor, before going into the two remaining

18 issues, my understanding is that the debtors do not intend to

19 proceed with respect to the sale of the intellectual property

20 on an interim basis, so that issue that Serta Simmons was

21 concerned with is no longer a live issue, as we understand

22 it; certainly, if the debtors disagree, they are welcome to

23 say so.

24           Your Honor, this dovetails -- the first issue that

25 remains dovetails with the U.S. Trustee's, although, theirs

1  is certainly more process-oriented, with respect to 327.

2  Serta Simmons is concerned by the fact that the consultant is

3  a prepetition lender, has a significant interest, and is

4  getting $3.3 million for expenses, and in order to liquidate

5  what is, in essence, their own collateral, but there is no

6  money that is apparently being provided from the sales to pay

7  administrative expenses.  So, this case is being run for the

8  benefit of the lenders and the lenders are actually getting

9  the expense from the estate in order to do so.

10       I know that this is only an interim motion, but

11  the Court should be concerned, as I know this Court has been

12  in other cases, about where the entirety of the case is being

13  done for the benefit of the lenders.

14       On a more-narrow issue, Your Honor, the parties,

15  Serta Simmons, did business with the debtors prior to the

16  petition date and they are subject to certain terms which

17  include minimum advertised price policies or other policies

18  or guidelines, which, among other things, restrict the price

19  at which the debtors may sell Serta Simmons products and how

20  those products are displayed and marketed.

21       Serta Simmons has a concern, Your Honor, that in

22  the GOB sale, the debtors are going to mark down the price,

23  thereby, flooding the market and diluting the value of Serta

24  Simmons' policy, contrary to the terms of the policies to

25  which the debtors are a party.  Those claims, were they to do

 1   that, would be post-petition claims. They could potentially

 2   be claims against the consultants, since they are the ones

 3   who are marketing down the prices.

 4          At least on an interim basis, the debtors should

 5   be -- the debtors and consultants in all GOB sales -- should

 6   be required to adhere to those policies and that's all that I

 7   have for Serta Simmons, Your Honor, unless Your Honor has

 8   questions with respect to those.

 9          THE COURT: I do not.

10          MR. WAXMAN: The next issues, Your Honor, are

11   JoFran Sales and as I'm sure Your Honor is aware, we filed a

12   complaint and a request for a temporary restraining order.

13   This dovetails with that.

14          Before going into the limited objection, Your

15   Honor, I would just take a pause to ask if Your Honor intends

16   to hear the motion to enjoin the debtors in connection with

17   that motion today?

18          THE COURT: I'm not prepared to hear the TRO

19   today. I'll hear it as soon as I have an opportunity,

20   frankly, to spend the time and effort to be properly

21   educated -- maybe tomorrow, maybe Monday -- I don't know --

22   but it won't be today.

23          MR. WAXMAN: Okay. Your Honor, that actually

24   brings us into greater relief, then --

25          THE COURT: Okay.

1            MR. WAXMAN:  -- because in terms of the relief

2    sought by the GOB motion today.

3            And perhaps I should take a moment or two and

4    explain what -- and this is certainly -- everything is in a

5    verified complaint that was filed this morning.  There's an

6    adversary proceeding.  There's a motion for a restraining

7    order.  There's a lengthy memorandum that sets out everything

8    with the citations for the basis of the relief requested.

9            JoFran Sales designs furniture and the debtors

10   purchased certain furniture from JoFran Sales -- excuse me --

11   well, yes, they did -- and then it was in their stores.

12   Basically, the debtors were using those goods as an

13   opportunity to test drive those particular models to see what

14   sold best.

15           It is alleged in the verified complaint that the

16   debtors then contracted with somebody to manufacture, in

17   essence, duplicate, the same goods that are manufactured in,

18   I believe, Vietnam.  The debtors were aware of -- that we

19   knew.  There are emails that are attached as exhibits to the

20   complaint and the preliminary injunction, the TRO requests

21   that the debtors, the consultants, all of the defendants stop

22   manufacturing, selling, advertising, transporting, taking

23   anything that is going to dilute the rights, the trade dress

24   of JoFran.

25           I understand that there are relatively modest --

A001184

 1  and I say "I understand" because those are the

 2  representations that we've received today -- that there are a

 3  relatively modest amount of the offending, the infringing

 4  furniture remaining in the debtors' stores.  We understand

 5  it's thirty or $40,000 worth of this furniture.

 6          We also understand that there is a significant

 7  amount of that furniture that is on the water someplace and

 8  the debtors apparently have no intention of picking that up.

 9  I don't know if that's true or not.  I don't know anything

10  other than what was represented today and, frankly, there

11  were a couple of statements made that seem contradictory.

12          All we're looking for today, with respect to the

13  limited objection to the GOB sale procedures is that the

14  debtors remove the offensive pictures advertising the

15  infringing furniture and that they do not sell that

16  infringing furniture on an interim basis and certainly while

17  this Court hasn't had an opportunity to consider the TRO, it

18  is important that that not happen.  It is dilution and causes

19  actual damage to JoFran to have the pictures of the

20  infringing furniture remaining on the debtors' websites.

21          THE COURT:  Okay.  Thank you, Mr. Waxman.

22          MR. WAXMAN:  Does Your Honor have any questions?

23          THE COURT:  I do not.  I do not.

24          All right.  Let me -- I'm ready to make some

25  comments.  I've heard my colleague Judge Shannon to comment

1  on more than one occasion that when it comes to first day

2  motions, creativity is not encouraged.  This is very creative

3  and I think it raises some very serious issues.

4         At the end of the day, this is a principal agency

5  problem.  The principal here, of course, is the debtors'

6  estate.  The principal is the trustee, the debtor in

7  possession, who owes fiduciary duties to the creditors and

8  who has obligations under the Bankruptcy Code and limitations

9  under the Bankruptcy Code in order to ensure that that

10  principal acts appropriately.

11         But a principal can only act through agents and

12  the agents include the lawyers and they get retained in the

13  327 or 328 and they get paid under 330.

14         There are a lot of regulations in place both, in

15  the Code and in practice, to ensure that the incentives to

16  the agent align to the benefit of the principal who is acting

17  on behalf of its beneficiaries.

18         Here, we have a situation where we have a proposal

19  where the principal here is going to hire an agent to conduct

20  store-closing sales and one of the things that we do when we

21  hire agents in bankruptcy is we control how much they make.

22  We have the ability to know what compensation is being paid

23  and it's not just to make sure that the administrative

24  estate -- administrative expenses stay low; it's also to

25  ensure that the incentives of that agent are aligned with the

A001186

1  benefit of the principal.

2          This is not the case here.  Here we have a

3  situation where -- and I've never seen it before and

4  obviously I wasn't involved in the <u>Barneys</u> case -- I've

5  certainly never seen it in Delaware before where the services

6  are for free.

7          I've been around long enough to know that if

8  somebody else you that they're going to do something for you

9  for free, you grab your wallet to make sure it's still there

10  because it ain't for free.  Nobody's in this business and

11  nobody is making the kind of money to pay Mr. Fox to

12  represent them by doing stuff for free.  It's a business

13  transaction and that's fine.  That's fine.

14          But it's a business transaction where the payout

15  is out of the recovery to a creditor.  It's not an

16  administrative expense that's monitored by the estate,

17  monitored by the Courts, subject to a fee application, or

18  even some sort of review at all.  It's a black box.

19          And Ms. Richenderfer makes a really important

20  point.  We really don't get into this in bankruptcy very

21  often because the debt is the debt and it changes hands and

22  people buy it at discount.  It doesn't matter.  You buy the

23  discount.  The debt is the debt.  That is what you get paid.

24          It's always in the back of my head when I have a

25  kind of entity in front of me that I know buys at a discount

 1 and they claim they're getting a terrible recovery at 80

 2 cents on the dollar.  Well, did they pay 30 and they're doing

 3 great or did they pay 85 and they're not doing great?

 4          I don't want to think about that.  I leave that

 5 alone.  It is what it is.

 6          But here, I think it's important because we don't

 7 know what the recovery is.  We don't know the economic

 8 incentives that are in play in connection with an agent.  And

 9 a principal which -- and I understand why -- who is getting

10 something, to a certain extent, for nothing; i.e., services

11 they don't have to pay out of administrative expense claims,

12 at least not for the most part in a cash-strapped estate, I

13 certainly understand why you want to do that.

14          But I think the bigger picture here is that I'm

15 very worried that there is a fundamental disconnect based on

16 this economic structure; whereas, we have no idea who the

17 consultant is working for.  We have no ability to control the

18 consultant because we don't understand or have any real

19 insight into the economics that are running the deal.  So, I

20 agree with the U.S. Trustee that this is too creative and too

21 important to be heard on this time frame.

22          Now, I don't want to wait until April 6th, but I

23 do want to wait until after a committee is formed, which will

24 be the 18th?

25          MS. RICHENDERFER:  Yes, Your Honor.

1      THE COURT:  So, what I'll do is continue this

2  hearing to the 20th, and I know going to put whoever pitches

3  this committee and gets the job, behind a tough schedule and

4  I can put it on the record now, a motion for a continuance

5  will not be looked upon favorably.  We can't wait forever to

6  put this company into GOB mode.

7      I am taking a risk -- again, it's not my money --

8  but I mean, I am taking a bit of a risk in gambling that the

9  company won't be hurt by this delay, but I think that risk is

10  appropriate, given the uncertainty around this economic

11  relationship.  So, we'll do this Friday, the 20th, at 10:00

12  a.m., and we'll have a committee who will be fresh off the

13  bricks and they can appear.  And in the meantime, the GOBs

14  can't go forward.

15      That moots Mr. Waxman's objection, with regard at

16  least to the GOBs, although I know you still have the TRO --

17  we're going to talk about that in a minute -- and I think it

18  moots, in connection with the mattresses, as well.

19      Yes?

20      MS. RUSSELL:  Your Honor, if I may request -- with

21  respect to the actual conduct of the GOB sale, other than

22  Mr. Waxman's client, I'm not sure that the underlying issues

23  are with respect to actually conducting the going-out-of-

24  business sales.  We would like to request that the debtors be

25  authorized to not engage the consultant -- I understand Your

1    Honor's ruling in adjourning that issue until March 20th --

2    but that we be allowed to otherwise proceed with the going-

3    out-of-business sales in accordance with the store-closing

4    procedures and that the debtor, in the interim, will run

5    those store-closing sales themselves.

6           The damage to the estate and the cost to the

7    estate by not moving through into going-out-of-business

8    status could have a detrimental effect or will have a

9    detrimental effect on the overall recovery on this collateral

10   for all creditors, not alone, the term lenders, but Wells

11   Fargo and the other creditors.  I'm not sure if the U.S.

12   Trustee's Office has raised any concerns with respect to that

13   portion of the motion.

14          THE COURT:  Comment?

15          MS. RICHENDERFER:  Your Honor, Linda Richenderfer

16   from the U.S. Trustee's Office, just briefly.

17          I guess I'm not quite sure how the debtor is going

18   to implement the going-out-of-business procedures, not that I

19   have an issue, and counsel is correct that we've raised no

20   issue with the procedures; we raised the issue with respect

21   to who's implementing the procedures and I don't know how the

22   debtors will implement them.  I leave that up to Your Honor,

23   though, as to whether or not to allow them.

24          There was a portion of the procedures, though,

25   that was the bonuses and as a principle, I don't have an

A001190

1  issue with it, it was just that there wasn't a lot of detail

2  regarding the bonuses and, perhaps, that's something that can

3  also be delayed until next week just to get more details

4  regarding the bonuses.

5         THE COURT:  Well, I'm open to allowing the debtors

6  to run GOB sales themselves under procedures everyone can

7  agree on as long as it's consistent with general practice

8  that we impose and that the landlords' rights are respected.

9         What I would request, specifically, is that you

10  not GOB Mr. Waxman's furniture, so that needs to be cut out.

11         What's the position on the response to the issue

12  with the mattresses?

13         MS. RUSSELL:  Your Honor, what we've been

14  provided -- and, again, another thing that I've been asked

15  not to make public -- which we were provided today are not --

16  they're pricing policies, pricing suggestions.  There's no

17  contract that I've been provided to show on the pricing of

18  the inventory.

19         At best, to the extent there's a contract, it's an

20  executory contract; again, I don't know.  Even -- I've asked

21  to understand what the discounting restrictions are and I've

22  not been provided with that information.  One of the concerns

23  that they have is they've asked us to not sell those goods

24  until now the March 20th, hearing, but it was previously the

25  April 6th hearing.

A001191

1        And the situation the estate would find itself in

2   is that today, while they could discount and sell these

3   mattresses for perhaps 10, 15 percent off, when we get into

4   April, we're going to have to be in potentially significantly

5   higher discounts in order to complete the liquidation.

6        THE COURT:  I'm sorry, in my experience, I mean,

7   these aren't unusual commercial relationships where you put a

8   collar on what somebody can sell somebody's product for.  A

9   retailer can't -- you know, if you sell fine china, you don't

10  want it to end up at Marshalls being sold at a deep discount.

11       So, if you -- I don't know -- a mattress is a

12  mattress, as far as I know, but I'm not a connoisseur of

13  mattresses -- but, you know, if they sell a very high-end

14  mattress, they don't want you to sell it for a low-end

15  mattress price.  And I wouldn't be surprised if there's

16  policies or contracts in place to enforce that, but there may

17  not be -- I don't know.

18       MS. RUSSELL:  What I have been provided are

19  suggested retail pricings and I believe counsel acknowledged

20  that they have not provided copies of any contracts that

21  would impose such a restriction on the debtors' sale of those

22  goods.

23       I'm happy to have a conversation with them and I

24  need to understand as to the people at the company

25  understand, you know, now, with, in terms of now the plan --

A001192

1   the discounted program that the company is now running and

2   how that cadence interplays with the discounting or purported

3   discounting restrictions that Mr. Waxman's client is

4   asserting.

5           MS. ROGERS:  (Via telephone)  Your Honor?

6           THE COURT:  Yes.

7           MS. ROGERS:  -- this is Beth Rogers for Serta

8   Simmons Bedding Company.

9           May I be heard?

10          THE COURT:  Yes.

11          MS. ROGERS:  Your Honor, there is a contract in

12  place between the debtors and Serta Simmons which provides

13  that the debtor will comply with the pricing guidelines.  And

14  so, I mean, I apologize I didn't have an opportunity to get

15  that to the debtors' counsel.  Everything is, you know,

16  obviously on an emergency basis.

17          So, we would just ask -- I mean, we're talking,

18  you know, another week that the *status quo* be maintained as

19  far as the debtor complying with the pricing guidelines

20  (indiscernible) as far as how a product is displayed, how

21  it's advertised, how it's marketed.  So, I wouldn't think

22  that maintaining the *status quo* for a week is going to be

23  detrimental to the debtor.

24          THE COURT:  Well, you know, look, if you're going

25  to sell a discount bed suite, you probably want to include a

1   discount mattress, along with the bed suite in order to do

2   the sale, otherwise somebody is going to go down the street

3   to Mattress Firm, one of my debtors -- please go often --

4           (Laughter)

5           THE COURT:  -- and buy their discounted mattress

6   there.  So, I mean I can see why they would want some --

7   well, I'm not going to -- I mean, we're going to talk this

8   through, but what is going to happen is you're going to go

9   off and negotiate an order and send it to me tomorrow under

10   certification of counsel.

11           So, I think this is something that you should

12   discuss and if there is a -- again, this would not surprise

13   me -- if there is a contract that says you cannot sell my

14   price for less than 80 percent off suggested retail, I don't

15   think it's appropriate in a store-closing sale, even, to

16   violate that contract.  That's a post-petition breach.  I

17   think it's perhaps an executory contract that might give rise

18   to administrative expense claims.

19           And those contracts are generally -- I can't

20   remember the name of the case -- but it was affirmed by the

21   Supreme Court several years ago.  Those contracts are not

22   uncommon.

23           So, let's do this.  So, let's -- I will consider a

24   motion -- excuse me -- consider an order that allows the

25   debtors to conduct the GOB sales according to the procedures

A001194

1  that have been put in place, no bonuses, no -- none of

2  that -- just do the GOB sales.  I'd like you to either settle

3  with or carve out Mr. Waxman's furniture client from that.

4  I'd like you to discuss some sort of an arrangement with the

5  mattress client and if you can't resolve that, you can submit

6  some competing language with the certifications.  So, I will

7  choose a winner or a loser.

8           Now, I just said no to the bonuses.  I want to

9  rethink that for a second.  Who are the bonuses going to?

10          MS. RUSSELL:  Your Honor, those -- I was going ask

11  Your Honor to reconsider -- those bonuses are contemplated

12  for store-level employees.

13          THE COURT:  They're the store employees; they're

14  not the consultant?

15          MS. RUSSELL:  They're not the consultant,

16  absolutely not.

17          THE COURT:  All right.  They're fine.  They're

18  fine.

19          Okay.  And then Ms. Heilman is being very patient

20  back there.  She keeps standing up and sitting down.  Just a

21  second.

22          But we'll kick the consultant agreement to the

23  20th.

24          Ms. Richenderfer?

25          The 20th, right?

A001195

1          MS. RICHENDERFER:  Your Honor, my issue with the

2    bonuses was -- and maybe counsel can make this

3    representation -- it wasn't clear to me that we were talking

4    about rank-and-file employees in the stores.

5          MS. RUSSELL:  It would be a combination, rank-and-

6    file and possibly store manager, incentivizing everybody to

7    work, and the aggregate amount was proposed that it would not

8    exceed 10 percent of payroll.  So, that's fairly --

9          THE COURT:  Any officers?

10          MS. RUSSELL:  No officers or directors.

11          THE COURT:  Nobody that's vice president of fun

12    and games or anything like that?

13          MS. RUSSELL:  No, Your Honor.

14          THE COURT:  District managers?

15          MS. RUSSELL:  No, Your Honor.

16          THE COURT:  Store managers only?

17          MS. RUSSELL:  Store managers and rank-and-file.

18          MS. RICHENDERFER:  Your Honor, if it only goes up

19    through the store level --

20          THE COURT:  Nobody's getting rich.

21          MS. RICHENDERFER:  -- that's fine.  And that was

22    our concern, was that the specifics like that were not there.

23    So, if we have those representations, we're fine.

24          THE COURT:  All right.  Give me two seconds,

25    Ms. Heilman, and I'm going to give you all my attention.

1          (Pause)

2          MS. HEILMAN:  Good afternoon, Your Honor.  Leslie

3     Heilman, Ballard Spahr, on behalf of a number of the debtors'

4     landlords.

5          Your Honor, I do appreciate Your Honor's comment

6     about respecting the interests of the landlords in

7     authorizing the debtors to proceed and conduct going-out-of-

8     business sales as not through the consultant, but through the

9     company; however, Your Honor, I do rise because we would have

10    objected to the conduct of the going-out-of-business sales

11    generally, as proposed under the motion, but for our ability

12    to structure and have some balancing of the interests through

13    our side agreement with the consultant that negotiated, and

14    now we will -- I'm sure Ms. Russell will work with us with

15    respect to a similar side agreement -- I'm sure she's very

16    familiar with them with respect to that -- but, Your Honor,

17    the going-out-of-business sales, themselves, are in violation

18    of the leases.

19         And bankruptcy courts generally do authorize once

20    a debtor has filed for bankruptcy, to allow them to proceed

21    with such sales, but they are subject to limitations --

22         THE COURT:  Of course.

23         MS. HEILMAN:  -- and they're subject to the

24    limitations so that the parties can balance the interests to

25    maximize value for the debtors' estate, but also not run

1    havoc across the lease terms.

2           And, Your Honor, some of those balancing go to

3    signage restrictions and limits on the signage and limits on

4    augmentation, store-closing hours, and the store-closing

5    procedures that are proposed, while customary and we see

6    attached to them, many of those store-closing procedures do

7    not adhere to the provisions of the leases in terms of how

8    they need to -- the hours they need to operate and, Your

9    Honor, whether or not they can use the exterior of the

10   building and so forth.

11          So, Your Honor, while we are not opposed to the

12   debtor commencing and continuing their GOB sales, we do

13   request that they be subject to some limitations and that we

14   can negotiate through a side agreement, but until that side

15   agreement is in place, Your Honor, we do request that, at a

16   minimum, no banners be hung, with respect to those sales --

17          THE COURT:  Okay.

18          MS. HEILMAN:  -- and where there is signage

19   limitations.

20          THE COURT:  Yeah.  So, this is easy stuff, right,

21   this is A, B, C stuff.  So, believe it or not we used to

22   litigate this stuff 20 years ago, but we don't anymore, so --

23          MS. RUSSELL:  Your Honor, we would not envision

24   running a sale in any fashion that is inconsistent with the

25   proposed store-closing procedures that the consultant

A001198

1    obligated to comply with.

2              And the side letter, other than the signature

3    block being from the debtor, I would envision that the side

4    letter, assuming that it's consistent with customary

5    practices, will be the same letter as they would have

6    negotiated with the liquidator.

7              THE COURT:  All right.  So, if you submit the

8    order, you need to certify that you've signed the side letter

9    or that if you haven't, that Ms. Heilman and the other

10   landlords agree to the procedures that you've put in place.

11             MS. RUSSELL:  Well, Your Honor, I guess I haven't

12   heard any objections from any other landlords or any issues

13   that were raised.  We did circulate the store-closing

14   procedures with the motion.  I don't believe there were

15   substantive revisions to those store-closing procedures since

16   we circulated the order, but I guess if there are issues,

17   people should contact me and we can deal with it.

18             I'm not sure prior to tomorrow I will have signed

19   side letters with all the landlord groups.

20             THE COURT:  All right.  I haven't seen the side

21   letter.  What side letter?

22             MS. RUSSELL:  How many signs you can hang within

23   so many thousand feet.

24             THE COURT:  I'm just remembering a couple of years

25   ago there was a furniture-store chain that went under

A001199

1    bankruptcy -- not in Delaware -- by they had a store in

2    Delaware -- so unusual -- and I was driving down Concord Pike

3    and they had a banner that was the entire side of the

4    building and all I could say was that they definitely did not

5    file in Delaware because none of our judges would have signed

6    that order.

7              So, I --

8              MS. RUSSELL:  The signage banner -- the banner

9    language that tends that be in certain side letters -- not

10   all -- that would be something that would be negotiated and

11   we would resolve that in the side letter.

12             THE COURT:  Well, let's see.  Who's here?  That's

13   what really matters, right?

14             And Mr. Riley is here.

15             MR. RILEY:  Your Honor, Richard Riley from

16   Whiteford Taylor.

17             I represent a receiver for a shopping center, so

18   he is the landlord.

19             THE COURT:  Right.

20             MR. RILEY:  So, I don't know if he has reached out

21   to do a side letter, but we would, of course, want to make

22   sure that the GOB sale is done, according to a side letter

23   and is not -- doesn't have banners on the side of our

24   building.

25             THE COURT:  Yeah.  So, when you submit the COC,

1    you're going to need to certify that you've talked to

2    Mr. Riley, Ms. Heilman, and any other landlord that calls you

3    between now and when you do the certification and that

4    they're agreeable, and if they're not -- say that -- and then

5    that person will have an opportunity to say something to me.

6              You can just call up and let Ms. Gadson know that

7    you have our own language and we'll take care of it.  Okay?

8              MS. RUSSELL:  Thank you, Your Honor.

9              THE COURT:  Mr. Waxman?

10             MR. WAXMAN:  First of all, Your Honor, I was

11   remiss earlier -- and excuse me -- I would like to introduce

12   Maureen Mulligan, my co-counsel on -- in relation to JoFran.

13             THE COURT:  Yep.  Welcome.

14             MR. WAXMAN:  Her admission has been moved *pro hac*

15   *vice*.  I haven't seen a copy of the order yet, but that

16   doesn't mean it hasn't been entered.

17             And one of the reasons that I rise to introduce

18   her is because of the issue of the TRO, just in terms of

19   scheduling.  That going forward, I don't know her

20   availability or the client's availability to come down.

21             THE COURT:  Listen, I have it, but I can tell you

22   I haven't read your complaint.  Okay?  I've been extremely

23   busy all day.

24             MR. WAXMAN:  I understand.

25             THE COURT:  I'm running in place in connection

1 with all the things associated with recent developments

2 outside of this courtroom.

3        So, I'm going to do it this evening and I will

4 reach out tomorrow.  Chambers will reach out tomorrow and let

5 you know, (A), if we're going to schedule it, and, (B), when

6 it'll be, and we'll obviously consult you on that.

7        MR. WAXMAN:  Okay.  And the second --

8        THE COURT:  And we can do that by phone.

9        MR. WAXMAN:  What's that?

10        THE COURT:  We can do that by phone, the TRO.

11        MR. WAXMAN:  Okay.  That would be great, Your

12 Honor.  Thank you.

13        Actually, before I get to my final point, I think

14 it was Levitz, Your Honor, on Naamans Road that had the

15 enormous sign that was on the --

16        THE COURT:  The whole building.

17        MR. WAXMAN:  -- the whole side of the building.

18        THE COURT:  It was crazy.

19        MR. WAXMAN:  Yes.  It was the single largest GOB

20 sign I've ever seen.

21        THE COURT:  That's why you should file in

22 Delaware.

23     (Laughter)

24        MR. WAXMAN:  Just for clarification -- I know that

25 you had said, and I appreciate that Mr. Waxman's client is

1    going to be carved out -- that was with respect to JoFran?

2              THE COURT:  Yes.

3              MR. WAXMAN:  And we would also mention the

4    mattress separately.

5              THE COURT:  So, I was going to talk to you about

6    Serta and see if you can work something out and if you can't,

7    you can just do dueling language.

8              MR. WAXMAN:  Thank you, Your Honor.

9              THE COURT:  Okay.

10             MR. WAXMAN:  I appreciate it.

11             THE COURT:  You're welcome.

12             Mr. Werkheiser?

13             MR. WERKHEISER:  Your Honor, I just wanted to rise

14   and see if we could just take care of a couple of process

15   points here of what's kicking the hearing to the 20th.

16             Did Your Honor have a timeline for us to start on

17   the 20th?

18             THE COURT:  10:00.

19             MR. WERKHEISER:  Could we -- I mean, the committee

20   is in a different position because they won't be formed until

21   the 18th, but for other parties that are going to raise

22   issues that we have to address for the hearing on the 20th,

23   can we have an objection deadline set so that we know what

24   we're confronted with?

25             THE COURT:  Yeah, I think that's fair -- the 18th

1   at noon.

2          MR. WERKHEISER:  Thank you.

3          THE COURT:  And, you know, in my mind, the issue

4   isn't going to be the nuts and bolts of the sale anymore --

5   we're dealing with that tomorrow when I sign an order

6   allowing the debtors to do it -- it's the nuts and bolts of

7   the consulting arrangement, so it's narrowed to that point.

8          MR. WERKHEISER:  Uh-huh.

9          THE COURT:  I mean the committee may come in and

10  say, Don't do GOB sales, but I think the genie is out of that

11  bottle, but I'll deal with that if that's what they say.

12         But what I really want to focus on the 20th is the

13  issue of the consulting agreement.

14         MR. WERKHEISER:  Understood, Your Honor.

15         Let me just sweep through and make sure there's no

16  other business we need to take care of today.  But I think

17  that covers our agenda and of course we --

18         THE COURT:  So, I'm waiting tomorrow, I'm waiting

19  for the DIP order under COC and I'm waiting for the store-

20  closing order under COC.

21         MR. WERKHEISER:  Correct.

22         THE COURT:  And I'm in all day tomorrow, so not to

23  give you permission to take until 8:00 p.m. but take the time

24  you need and be in touch with chambers if there are any

25  issues.

```
 1              MR. WERKHEISER:  Thank you, Your Honor.
 2              THE COURT:  If there's a dust-up or something, you
 3   know, we always have the ability to get everybody on the
 4   phone and try to figure that out.
 5              MR. WERKHEISER:  Thank you, Your Honor.
 6              THE COURT:  All right.  Let me just double-check
 7   what my availability is tomorrow.
 8         (Pause)
 9              THE COURT:  Yeah, I have lots of time to fit you
10   in here and there, so that won't be a problem.  All right.
11              MR. WERKHEISER:  We'll do everything possible to
12   avoid having to disturb you, too.  Hopefully we'll just be
13   sending things over and alerting you to their availability.
14              THE COURT:  Well, that would be great.
15              All right.  Thank you very much.  We're adjourned.
16              (Proceedings concluded at 5:28 p.m.)
17
18
19                          CERTIFICATE
20
21   I certify that the foregoing is a correct transcript from the
22   electronic sound recording of the proceedings in the above-
23   entitled matter.
24
     /s/Mary Zajaczkowski_____          March 13, 2020
25   Mary Zajaczkowski, CET**D-531
```

# EXHIBIT L

A001206

# Presidential Documents

Proclamation 9994 of March 13, 2020

## Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak

### By the President of the United States of America

### A Proclamation

In December 2019, a novel (new) coronavirus known as SARS–CoV–2 ("the virus") was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID–19 that has now spread globally. The Secretary of Health and Human Services (HHS) declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID–19. I have taken sweeping action to control the spread of the virus in the United States, including by suspending entry of foreign nationals seeking entry who had been physically present within the prior 14 days in certain jurisdictions where COVID–19 outbreaks have occurred, including the People's Republic of China, the Islamic Republic of Iran, and the Schengen Area of Europe. The Federal Government, along with State and local governments, has taken preventive and proactive measures to slow the spread of the virus and treat those affected, including by instituting Federal quarantines for individuals evacuated from foreign nations, issuing a declaration pursuant to section 319F–3 of the Public Health Service Act (42 U.S.C. 247d–6d), and releasing policies to accelerate the acquisition of personal protective equipment and streamline bringing new diagnostic capabilities to laboratories. On March 11, 2020, the World Health Organization announced that the COVID–19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States.

The spread of COVID–19 within our Nation's communities threatens to strain our Nation's healthcare systems. As of March 12, 2020, 1,645 people from 47 States have been infected with the virus that causes COVID–19. It is incumbent on hospitals and medical facilities throughout the country to assess their preparedness posture and be prepared to surge capacity and capability. Additional measures, however, are needed to successfully contain and combat the virus in the United States.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b–5), do hereby find and proclaim that the COVID–19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020. Pursuant to this declaration, I direct as follows:

**Section 1**. *Emergency Authority*. The Secretary of HHS may exercise the authority under section 1135 of the SSA to temporarily waive or modify certain requirements of the Medicare, Medicaid, and State Children's Health Insurance programs and of the Health Insurance Portability and Accountability Act Privacy Rule throughout the duration of the public health emergency declared in response to the COVID–19 outbreak.

**Sec. 2**. *Certification and Notice*. In exercising this authority, the Secretary of HHS shall provide certification and advance written notice to the Congress as required by section 1135(d) of the SSA (42 U.S.C. 1320b–5(d)).

**Sec. 3**. *General Provisions*. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirteenth day of March, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

[FR Doc. 2020–05794
Filed 3–17–20; 8:45 am]
Billing code 3295–F0–P

# EXHIBIT M

A001209

# Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts

March 14, 2020

*Businesses in Bucks, Chester, Delaware, Montgomery counties urged to close for 14 days*

**Harrisburg, PA** – Today, the Department of Community and Economic Development (DCED), in consultation with the Department of Health (DOH), issued guidance for non-essential businesses in Bucks, Chester, Delaware, and Montgomery counties to mitigate the spread of COVID-19.

Governor Tom Wolf has strongly urged non-essential businesses in the four counties to close during their county-specific mitigation periods to protect employees, customers, and suppliers and limit the spread of the virus through personal contact and surfaces. DCED and DOH are reaching out to businesses through a **letter (https://dced.pa.gov/letter-from-secretary-levine)** to provide guidance on the types of businesses that are urged to close. The letter also indicates to businesses that financial assistance opportunities are available to mitigate the financial impact of closures.

"We are committed to keeping all Pennsylvanians safe and healthy, and we are taking every measure to prevent the spread of COVID-19," said DCED Secretary Dennis Davin. "We continue to report new cases of coronavirus every day, and additional steps must be taken to stop the spread. Therefore, we strongly urge non-essential businesses across Pennsylvania to do their part by temporarily closing to help mitigate the spread of this contagious virus."

Non-essential businesses include community and recreation centers; gyms, including yoga, barre and spin facilities; hair salons, nail salons and spas; casinos; concert venues; theaters; bars; sporting event venues and golf courses; retail

A001210

facilities, including shopping malls and except for pharmacy or other health care facilities within retail operations. Restaurants are urged only to remain open for carry-out and delivery orders.

"We understand that small businesses are an economic driver in Pennsylvania, and a temporary closure will be a financial and community disruptor," Davin said. "However, our top priority is maintaining public health and safety of all Pennsylvanians and taking these proactive steps now can help mitigate a potential community spread. DCED is committed to working with the business community to provide helpful resources for financial assistance."

DCED offers working capital loans that could be of assistance to businesses impacted by COVID-19. Resources and information will be posted to **https://dced.pa.gov/resources (https://dced.pa.gov/resources)** as they become available. The U.S. Small Business Administration, in addition to local funding partners, may also be a source of assistance for affected businesses.

The Wolf Administration strongly encourages businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health, including section 7301 of the Emergency Management Services Code.

**MEDIA CONTACTS:**

Casey Smith, DCED, 717.783.1132

Lyndsay Kensinger, Gov. Wolf, 717-783-1116

<p align="center"># # #</p>

 covid-19 (https://dced.pa.gov/tag/covid-19/)

Facebook        Twitter        LinkedIn        More

A001211

# EXHIBIT N

A001212

# ALL NON-LIFE-SUSTAINING BUSINESSES IN PENNSYLVANIA TO CLOSE PHYSICAL LOCATIONS AS OF 8 PM TODAY TO SLOW SPREAD OF COVID-19

March 19, 2020

**Press Release,  Public Health**

Wolf Administration Orders Closure of Non-Life-Sustaining Businesses at 8 p.m. Today, March 19
Enforcement Actions for Restaurant, Bar Dine-In Closure Began at 8 p.m., March 18
Enforcement Actions for Non-Compliance will Begin at 12:01 a.m. Saturday, March 21

Governor Tom Wolf today ordered all non-life-sustaining businesses in Pennsylvania to close their physical locations as of 8 p.m. today, March 19, to slow the spread of COVID-19. Enforcement actions against businesses that do not close physical locations will begin at 12:01 a.m. Saturday, March 21.

Gov. Wolf's order is here.
A video statement from Gov. Wolf is here.
Sec. of Health's order is here.
A list of life-sustaining businesses is here.

In extenuating circumstances, special exemptions will be granted to businesses that are supplying or servicing health care providers.

"To protect the health and safety of all Pennsylvanians, we need to take more aggressive mitigation actions," said Gov. Wolf. "This virus is an invisible danger that could be present everywhere. We need to act with the strength we use against any other severe threat. And, we need to act now before the illness spreads more widely."

The governor had previously encouraged non-life-sustaining businesses to close to mitigate the spread of COVID-19. Restaurants and bars were already required to stop all dine-in services. Enforcement for establishments with a liquor license began at 8 p.m. March 18, and enforcement for all other food establishments will begin at 8 p.m. tonight. Food establishments can offer carry-out, delivery, and drive-through food and beverage service, including alcohol.

Pursuant to the Emergency Management Services Code, the governor is granted extraordinary powers upon his declaration of a disaster emergency, such as COVID-19. Among these powers, the governor may control the ingress and egress into the disaster area, the movement of persons, and the occupancy of premises within the disaster area, which has been established to be the entire commonwealth for the COVID-19 disaster emergency. The secretary of health separately is authorized under the law to employ measures necessary for the prevention and suppression of disease.

Separately, and taken together, the administration is exercising these powers to temporarily close all non-life-sustaining businesses and dine-in facilities at all restaurants and bars across the commonwealth. Persons must be removed from these premises to cope with the COVID-19 disaster emergency.

**Failure to Comply and Enforcement**
Failure to comply with these requirements will result in enforcement action that could include citations, fines, or license suspensions.

The governor has directed the following state agencies and local officials to enforce the closure orders to the full extent of the law:

- Pennsylvania Liquor Control Board
- Department of Health
- Department of Agriculture
- Pennsylvania State Police
- Local officials, using their resources to enforce closure orders within their jurisdictions

A001213

Private businesses, local organizations and other noncompliant entities that fail or refuse to comply with the governor's orders that protect the lives and health of Pennsylvanians will forfeit their ability to receive any applicable disaster relief and/or may be subject to other appropriate administrative action. Such action may include termination of state loan or grant funding, including Redevelopment Assistance Capital Project (RACP) grant funding and/or suspension or revocation of licensure for violation of the law.

Finally, in addition to any other criminal charges that might be applicable, the Department of Health is authorized to prosecute noncompliant entities for the failure to comply with health laws, including quarantine, isolation or other disease control measures. Violators are subject to fines or imprisonment.

**Business Loans and Support**

The Department of Community and Economic Development (DCED) offers working capital loans that could be of assistance to businesses impacted by COVID-19. Resources and information will be posted to http://dced.pa.gov/resources as they become available. The U.S. Small Business Administration, in addition to local funding partners, may also be a source of assistance for affected businesses.

The Wolf Administration today announced the availability of low-interest loans for small businesses and eligible non-profits in all 67 counties in Pennsylvania through the U.S. Small Business Administration (SBA).

Businesses seeking guidance from DCED can also contact its customer service resource account at ra-dcedcs@pa.gov or by calling 1-877-PA-HEALTH and selecting option 1.

For the most up-to-date information on COVID-19, Pennsylvanians should visit: https://www.pa.gov/guides/responding-to-covid-19/.

# EXHIBIT O

A001215



# THE OFFICE OF GOVERNOR GRETCHEN WHITMER

WHITMER / NEWS / PRESS RELEASES

# Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders

FOR IMMEDIATE RELEASE
March 16, 2020

Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders

LANSING, Mich. -- Today, Governor Gretchen Whitmer signed Executive Order 2020-9, which temporarily closes theaters, bars, and casinos, and limits restaurants to carry-out and delivery orders.

Under Executive Order 2020-9, effective Monday, March 16 at 3:00pm, the following places of public accommodation will be closed; restaurants, cafes, coffee houses, bars, taverns, brewpubs, distilleries, clubs, movie theaters, indoor and outdoor performance venues, gymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor exercise facilities, exercise studios, spas, and casinos.

This order does not restrict a place of business from offering food and beverage using delivery service, window service, walk-up service, drive-through service, or drive-up service. Places of public accommodation are encouraged to do so and use precautions to mitigate potential transmission of COVID-19, including social distancing. Restaurants may allow five people inside at a time to pick up orders, so long as they stay six feet apart from each other.

These restrictions do not apply to the following locations: office buildings, grocery stores, markets, food pantries, pharmacies, drug stores, and providers of medical equipment and supplies, health care facilities, residential care facilities, congregate care facilities, and juvenile justice facilities, warehouse and distribution centers, and industrial and manufacturing facilities.

Order restrictions will remain in place until Monday, March 30 at 11:59 pm.



"This disease is a challenge unlike any we've experienced in our lifetimes," said Governor Whitmer. "Fighting it will cause significant but temporary changes to our daily lives. By practicing social distancing and taking aggressive action now, the state is working to mitigate the spread of coronavirus so we reduce the risk that our health care system becomes overwhelmed. This is about saving lives. Michiganders are tough and we are going to get through this, but it will require everyone doing their part. That means making smart choices and not putting yourself or others at risk by going out in public unless it is absolutely necessary."

"We need to move quickly to slow the spread of the virus and protect public health," said Dr. Joneigh Khaldun. "I realize these actions will present temporary changes to the way we live, but they are critical to help ensure our health care system is prepared to treat those who need the most urgent medical care."

"This crisis will require business and labor working together to ensure that we are putting the best interests of Michiganders first in order to protect public health," said Jeff Donofrio, Director of the Department of Labor and Economic Opportunity. "We understand that these decisions will impact the way we do business, but the decisions we make now will allow us to get our economy back on track sooner rather than later. We are putting measures in place to help protect the employers, employees, and individuals that will be impacted."

To mitigate the spread of COVID-19, Governors across the United States have begun implementing similar measures in their states, including Jay Inslee (D-WA), Charlie Baker (R-MA), and Tom Wolf (D-PA).

Patients with confirmed infection have reportedly had mild to severe respiratory illness with symptoms of:
- Fever
- Cough
- Shortness of breath

The best prevention for viruses, such as influenza, the common cold or COVID-19 is to:
- If you think you have been exposed to COVID-19, call your health care provider. If you do not have a health care provider, call the nearest hospital.
- Wash your hands often with soap and warm water for 20 seconds. If not available, use hand sanitizer.
- Avoid touching your eyes, nose, or mouth with unwashed hands.
- Cover your mouth and nose with a tissue or upper sleeve when coughing or sneezing.
- Avoid contact with people who are sick.
- If you are sick, stay home, and avoid contact with others.
- Replace handshakes with elbow bumps.
- Stay at least 6 feet away from others when in a public setting.



A001217

Information around this outbreak is changing rapidly. The latest information is available at Michigan.gov/Coronavirus and CDC.gov/Coronavirus.



- MICHIGAN.GOV HOME
  ADA
  MICHIGAN NEWS
  POLICIES

COPYRIGHT 2021 STATE OF MICHIGAN

A001218

# EXHIBIT P

A001219



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

### ORDER OF

### THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA REGARDING THE CLOSURE OF ALL BUSINESSES THAT ARE NOT LIFE SUSTAINING

*WHEREAS, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

*WHEREAS, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and*

*WHEREAS, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and*

*WHEREAS, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein; and suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, and combustibles. 35 Pa. C.S. § 7301(f); and*

*WHEREAS, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and*

*WHEREAS, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and*

*WHEREAS, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.*

*NOW THEREFORE, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:*

*Section 1:      Prohibition on Operation of Businesses that are not Life Sustaining*

*All prior orders and guidance regarding business closures are hereby superseded.*

*No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations.*

*Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons. A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.*

*Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.*

Section 2:    *Prohibition on Dine-In Facilities including Restaurants and Bars*

*All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19.*

*Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons. Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.*

Section 3:    *Effective Date and Duration*

*This order is effective immediately and will remain in effect until further notice.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this nineteenth day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

**TOM WOLF**
*Governor*

# Exhibit Q

A001222

OFFICIAL WEBSITE OF MICHIGAN.GOV

THE OFFICE OF
# GOVERNOR GRETCHEN WHITMER



WHITMER

# Governor Whitmer Signs "Stay Home, Stay Safe" Executive Order

**FOR IMMEDIATE RELEASE**

March 23, 2020

### Governor Whitmer Signs "Stay Home, Stay Safe" Executive Order

Governor directs all non-critical businesses to temporarily close, all Michiganders to stay home or six feet away from others during COVID-19 crisis

**LANSING, Mich. --** Today, Governor Gretchen Whitmer signed the "Stay Home, Stay Safe" Executive Order (EO 2020-21), directing all Michigan businesses and operations to temporarily suspend in-person operations that are not necessary to sustain or protect life. The order also directs Michiganders to stay in their homes unless they're a part of that critical infrastructure workforce, engaged in an outdoor activity, or performing tasks necessary to the health and safety of themselves or their family, like going to the hospital or grocery store.

Effective at 12:01 am on March 24, 2020, for at least the next three weeks, individuals may only leave their home or place of residence under very limited circumstances, and they must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention when they do so, including remaining at least six feet from people from outside the individual's household to the extent feasible under the circumstances.

"In just 13 days, we've gone from 0 to over 1,000 COVID-19 cases," said **Governor Whitmer.** "This is an unprecedented crisis that requires all of us working together to protect our families and our communities. The most effective way we can slow down the virus is to stay home. I know this will be hard, but it will be temporary. If we all come together, get serious, and do our part by staying home, we can stay safe and save lives."

"Taking aggressive action to protect our communities is the most important thing we can do to mitigate further spread of COVID-19," said Michigan Department of Health and Human Services Chief Deputy for Health and Chief Medical Executive **Dr. Joneigh Khaldun.** "If we do this now, we can make sure our hospitals and healthcare workers are prepared to take care of the sickest people. It is crucial that people do the right thing by staying home and staying safe."

Executive Order 2020-21 prohibits all businesses and operations from requiring workers to leave their homes, unless those workers are necessary to sustain or protect life or to conduct minimum basic operations. Businesses and operations are to designate the workers that meet those criteria, and must adopt social distancing practices and other mitigation measures to protect workers and patrons in the performance of that necessary in-person work.

A001223

Workers that are necessary to sustain or protect life include those in health care and public health, law enforcement and public safety, grocery store workers, and more. For a full list of these critical infrastructure workers, click the link to Executive Order 2020-21 at the bottom of this page.

Additionally, under Executive Order 2020-21, all public and private gatherings of any number of people occurring among persons outside a single household are temporarily prohibited. People may leave the house to perform for limited, necessary purposes, and may engage in outdoor activities like walking, hiking, running, cycling, or any other recreational activity, consistent with remaining at least six feet from people from outside a person's household and with other restrictions imposed by prior executive orders.

Michigan is currently in the top five states in the nation in number of confirmed COVID-19 cases. Several governors across the country have taken similar steps to protect their communities from the spread of COVID-19, including governors Mike DeWine (R-OH), Andrew Cuomo (D-NY), J.B. Pritzker (D-IL), Tom Wolf (D-PA), Gavin Newsom (D-CA), John Bel Edwards (D-LA), Phil Murphy (D-NJ), and Ned Lamont (D-CT).

Patients with confirmed infection have reportedly had mild to severe respiratory illness with symptoms of:

- Fever
- Cough
- Shortness of breath

The best prevention for viruses, such as influenza, the common cold or COVID-19 is:

- If you think you have symptoms of COVID-19, call your health care provider. If you do not have a health care provider, call the nearest hospital.
- Wash your hands often with soap and warm water for 20 seconds. If not available, use hand sanitizer.
- Avoid touching your eyes, nose, or mouth with unwashed hands.
- Cover your mouth and nose with a tissue or upper sleeve when coughing or sneezing.
- Avoid contact with people who are sick.
- If you are sick, stay home, and avoid contact with others.
- Stay at least 6 feet away from others when in a public setting.

Information around this outbreak is changing rapidly. The latest information is available at **Michigan.gov/Coronavirus and CDC.gov/Coronavirus.**

For those who have questions about the state's actions to mitigate the spread of coronavirus, please call the COVID-19 Hotline at 1-888-535-6136 between 8AM - 5PM daily.

Michiganders can apply for unemployment benefits if they have left work or taken a leave of absence because of self-isolation or self-quarantine in response to elevated risk from COVID-19 due to being immunocompromised, displaying the symptoms of COVID-19, having contact in the last 14 days with someone with a confirmed diagnosis of COVID-19, the need to care for someone with a confirmed diagnosis of COVID-19, or a family care responsibility as a result of a government directive. Those temporarily laid off from work should apply for unemployment benefits online at www.michigan.gov/UIA or 1-866-500-0017.

A001224

Governor Whitmer is working to ensure that children who rely on the food provided by schools will have the resources they need. The Michigan Department of Education (MDE) has developed an online map for families to find meals. Families can access the map at: **https://www.mcgi.state.mi.us/schoolnutrition/**.

On March 19, the U.S. Small Business Administration (SBA) approved the governor's request for a statewide Economic Injury Disaster Loan (EIDL) declaration, opening the opportunity to small businesses to access low-interest loans from the SBA. The application for disaster loan assistance is available at **https://disasterloan.sba.gov/ela/**. For businesses looking for more information on how to apply for an SBA EIDL loan or whether it is something they should consider, visit michiganbusiness.org/covid19.

To view executive order 2020-21, click the link below:

## Executive Order 2020-21

This press release will be translated and made available in Arabic and Spanish at **www.michigan.gov/whitmer.**

<div align="center">###</div>



•

MICHIGAN.GOV HOME
ADA
MICHIGAN NEWS
POLICIES

COPYRIGHT 2021 STATE OF MICHIGAN

A001225

# EXHIBIT R

A001226



**Mike DeWine**, Governor
**Jon Husted**, Lt. Governor          **Amy Acton, M.D., MPH**, Director

<u>**DIRECTOR'S STAY AT HOME ORDER**</u>

Re:   **Director's Order that All Persons Stay at Home Unless Engaged in Essential Work or Activity**

I, Amy Acton, MD, MPH, Director of the Ohio Department of Health (ODH), pursuant to the authority granted to me in R.C. 3701.13 to "make special orders…for preventing the spread of contagious or infectious diseases" **Order** the following to prevent the spread of COVID-19 into the State of Ohio:

1. **Stay at home or place of residence**. With exceptions as outlined below, all individuals currently living within the State of Ohio are ordered to stay at home or at their place of residence except as allowed in this Order. To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible, maintain social distancing of at least six feet from any other person, with the exception of family or household members, consistent with the Social Distancing Requirements set forth in this Order. All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to participate in Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this Order, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Ohio Department of Health (ODH)). This order does not apply to incarcerated individuals, they are to follow the guidance of the facility in which they are confined. Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location. For purposes of this Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease**.  All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses, including home-based businesses, may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

   All Essential Businesses and Operations are encouraged to remain open. Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.** All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Order. Any gathering of more than ten people is prohibited unless exempted by this Order. This is

A001227

in accordance with President Trump's coronavirus guidelines issued March 16, 2020. Nothing in this Order prohibits the gathering of members of a household or residence.

All places of public amusement, whether indoors or outdoors, including, but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed.

4. **Prohibited and permitted travel.** Only Essential Travel and Essential Activities as defined herein, are permitted. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for Essential Activities is permitted.** For purposes of this Order, individuals may leave their residence only to perform any of the following Essential Activities:

    a. **For health and safety**. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members or persons who are unable or should not leave their home (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

    b. **For necessary supplies and services.** To obtain necessary services or supplies for themselves and their family or household members or persons who are unable or should not leave their home, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, automobile supplies (including dealers, parts, supplies, repair and maintenance), and products necessary to maintain the safety, sanitation, and essential operation of residences.

    c. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, public access playgrounds may increase spread of COVID-19, and therefore shall be closed.

    d. **For certain types of work** To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

    e. **To take care of others.** To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Order. This includes attending weddings and funerals.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary

A001228

to seek medical care. Nothing in this Order prevents the Department Health or local health departments from issuing and enforcing isolation and quarantine orders.

7. **Healthcare and Public Health Operations.** For purposes of this Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical marijuana dispensaries and licensed medical marijuana cultivation centers; obstetricians and gynecologists; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. **Human Services Operations.** For purposes of this Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Ohio Department of Aging, Department of Developmental Disabilities, Department of Health, Department of Job and Family Services, Department of Medicaid, Department of Mental Health and Addiction Services, Opportunities for Ohioans with Disabilities, Department of Veterans Services, and Department of Youth Services that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; day care centers, day care homes, group day care homes; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, and social

A001229

services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure.** For purposes of this, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, fulfillment centers, storage facilities, marinas, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, school construction, essential business construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.** For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, legislators, judges, court personnel, jurors and grand jurors, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Order.

Essential Government Functions means all services provided by the State or any municipality, township, county, political subdivision, board, commission or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions. Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

This Order does not apply to the United States government. Nothing in this Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Order.** For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

A001230

12. **Essential Businesses and Operations.** For the purposes of this Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:

   a. **CISA List.** On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency (CISA), issued a *Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response.* The definition of Essential Businesses and Operations in this Order includes all the workers identified in that Memorandum.

   b. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, prepared food, alcoholic and non-alcoholic beverages, any other household consumer products (such as cleaning and personal care products), and specifically includes their supply chain and administrative support operations. This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

   c. **Food, beverage, and licensed marijuana production and agriculture.** Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical marijuana use, medical marijuana dispensaries and licensed medical marijuana cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

   d. **Organizations that provide charitable and social services.** Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

   e. **Religious entities.** Religious facilities, entities and groups and religious gatherings, including weddings and funerals.

   f. **Media.** Newspapers, television, radio, and other media services;

   g. **First amendment protected speech.**

   h. **Gas stations and businesses needed for transportation.** Gas stations and auto supply, auto-repair, farm equipment, construction equipment, boat repair, and related facilities and bicycle shops and related facilities;

   i. **Financial and insurance institutions.** Bank, currency exchanges, consumer lenders, including but not limited, to pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures

A001231

exchanges, payday lenders, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products. Also insurance companies, underwriters, agents, brokers, and related insurance claims and agency services;

**j.** **Hardware and supply stores.** Hardware stores and businesses that sell electrical, plumbing, and heating material;

**k.** **Critical trades.** Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

**l.** **Mail, post, shipping, logistics, delivery, and pick-up services.** Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods, vehicles or services to end users or through commercial channels;

**m.** **Educational institutions.** Educational institutions-including public and private pre-K-12 schools, colleges, and universities-for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible. This Order is consistent with and does not amend or supersede prior Orders regarding the closure of schools;

**n.** **Laundry services.** Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

**o.** **Restaurants for consumption off-premises.** Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Order is consistent with and does not amend or supersede prior Orders regarding the closure of restaurants;

**p.** **Supplies to work from home.** Businesses that sell, manufacture, or supply products needed for people to work from home;

**q.** **Supplies for Essential Businesses and Operations.** Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

Page **6** of **12**

A001232

r. **Transportation.** Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, marinas, docks, boat storage, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Order;

s. **Home-based care and services.** Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

t. **Residential facilities and shelters.** Residential facilities and shelters for adults, seniors, children, pets, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

u. **Professional services.** Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

v. **Manufacture, distribution, and supply chain for critical products and industries.** Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

w. **Critical labor union functions.** Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations - provided that these checks should be done by telephone or remotely where possible.

x. **Hotels and motels.** Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

y. **Funeral services.** Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations.** For the purposes of this Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

14. **Essential Travel.** For the purposes of this Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

a. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

A001233

   b.   Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

   c.   Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

   d.   Travel to return to a place of residence from outside the jurisdiction.

   e.   Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

   f.   Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements.** For purposes of this Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

   a.  **Required measures.** Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

      i.   **Designate six-foot distances.** Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

      ii.   **Hand sanitizer and sanitizing products.** Having hand sanitizer and sanitizing products readily available for employees and customers;

      iii.   **Separate operating hours for vulnerable populations.** Implementing separate operating hours for elderly and vulnerable customers; and

      iv.   **Online and remote access.** Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Order.** The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements. All provisions of this Order should be interpreted to effectuate this intent.

17. **Enforcement.** This Order may be enforced by State and local law enforcement to the extent set forth in Ohio law. To the extent any public official enforcing this Order has questions regarding what services are prohibited under this Order, the Director of Health hereby delegates to local health departments the authority to answer questions in writing and consistent with this Order.

18. **COVID-19 Information and Checklist for Businesses/Employers.** Business and employers are to take the following actions:

A001234

a. Allow as many employees as possible to work from home by implementing policies in areas such as teleworking and video conferencing.

b. Actively encourage sick employees to stay home until they are free of fever (without the use of medication) for at least 72 hours (three full days) AND symptoms have improved for at least 72 hours AND at least seven days have passed since symptoms first began. Do not require a healthcare provider's note to validate the illness or return to work of employees sick with acute respiratory illness; healthcare provider offices and medical facilities may be extremely busy and not able to provide such documentation in a timely way.

c. Ensure that your sick leave policies are up to date, flexible, and non-punitive to allow sick employees to stay home to care for themselves, children, or other family members. Consider encouraging employees to do a self-assessment each day to check if they have any COVID-19 symptoms (fever, cough, or shortness of breath).

d. Separate employees who appear to have acute respiratory illness symptoms from other employees and send them home immediately. Restrict their access to the business until they have recovered.

e. Reinforce key messages — stay home when sick, use cough and sneeze etiquette, and practice hand hygiene — to all employees, and place posters in areas where they are most likely to be seen. Provide protection supplies such as soap and water, hand sanitizer, tissues, and no-touch disposal receptacles for use by employees.

f. Frequently perform enhanced environmental cleaning of commonly touched surfaces, such as workstations, countertops, railings, door handles, and doorknobs. Use the cleaning agents that are usually used in these areas and follow the directions on the label. Provide disposable wipes so that commonly used surfaces can be wiped down by employees before each use.

g. Be prepared to change business practices if needed to maintain critical operations (e.g., identify alternative suppliers, prioritize customers, or temporarily suspend some of your operations).

19. **No limitation on authority.** Nothing in this Order shall, in any way, alter or modify any existing legal authority allowing the State or any local health department from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closure of a specific location for a limited period of time, including the duration of this public health emergency.

20. **Savings clause.** If any provision of this Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Order are declared to be severable.

21. **Previous Orders superseded.** This Order supersedes, only to the extent that it conflicts, and amends any previous Order which conflicts with the provisions of this Order.

22. **Duration.** This Order shall be effective at 11:59 p.m. on March 23, 2020 and remain in full force and effect until 11:59 p.m. on April 6, 2020, unless the Director of the Ohio Department of Health rescinds or modifies this Order at a sooner time and date.

A001235

COVID-19 is a respiratory disease that can result in serious illness or death, is caused by the SARS-CoV-2 virus, which is a new strain of coronavirus that had not been previously identified in humans and can easily spread from person to person. The virus is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person coughs or sneezes. It may be possible that individuals can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose or eyes.

On January 23, 2020, the Ohio Department of Health issued a Director's Journal Entry making COVID-19 a Class A reportable disease in Ohio.

On January 28, 2020, the Ohio Department of Health hosted the first statewide call with local health departments and healthcare providers regarding COVID-19.

On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the outbreak of COVID-19 a public health emergency of international concern.

On January 31, 2020, Health and Human Services Secretary, Alex M. Azar II, declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19.

On February 1, 2020, the Ohio Department of Health issued a statewide Health Alert Network to provide local health departments and healthcare providers with updated guidance for COVID-19 and revised Person Under Investigation (PUI) criteria.

On February 3, 2020, the Ohio Department of Health trained over 140 personnel to staff a call center for COVID-19, in the event it was needed.

On February 5, 2020, the Ohio Department of Health began updating and notifying the media of the number of PUIs in Ohio every Tuesday and Thursday.

On February 6, 2020, the Ohio Department of Health updated all agency assistant directors and chiefs of staff on COVID-19 preparedness and status during the Governor's cabinet meeting.

On February 7, 2020, the Ohio Department of Health and the Ohio Emergency Management Agency met to conduct advance planning for COVID-19.

On February 13, 2020, the Ohio Department of Health conducted a Pandemic Tabletop Exercise with State agencies to review responsive actions should there be a pandemic in Ohio.

On February 14, 2020, the Ohio Department of Health held a conference call with health professionals across the state. The purpose of the call was to inform and engage the healthcare community in Ohio. Presentations were provided by the Department of Health, Hamilton County Public Health, and the Ohio State University.

On February 27, 2020, the Ohio Department of Health and the Ohio Emergency Management Agency briefed the directors of State agencies during the Governor's cabinet meeting regarding preparedness and the potential activation of the Emergency Operations Center.

A001236

On February 28, 2020, the "Governor DeWine, Health Director Update COVID-19 Prevention and Preparedness Plan" was sent to a broad range of associations representing healthcare, dental, long-term care, K-12 schools, colleges and universities, business, public transit, faith-based organizations, non-profit organizations, and local governments.

On March 2, 2020, the Ohio Department of Health activated a Joint Information Center to coordinate COVID-19 communications.

On March 5, 2020, the Ohio Department of Health hosted the Governor's Summit on COVID-19 Preparedness, a meeting with the Governor, cabinet agency directors, local health department commissioners, and their staff.

On March 6, 2020, the Ohio Department of Health opened a call center to answer questions from the public regarding COVID-19.

On March 9, 2020, testing by the Department of Health confirmed that three (3) patients were positive for COVID-19 in the State of Ohio. This confirms the presence of a potentially dangerous condition which may affect the health, safety and welfare of citizens of Ohio.

On March 9, 2020, the Ohio Emergency Management Agency activated the Emergency Operations Center.

On March 9, 2020, the Governor Declared a State of Emergency in Executive Order 2020-01D.

On March 11, 2020, the head of the World Health Organization declared COVID-19 a pandemic.

On March 11, 2020, testing by the Ohio Department of Health confirmed that one (1) more patient was positive for COVID-19 in the State of Ohio.

On March 11, 2020, the Ohio Departments of Health and Veterans Services issued a Joint Directors' Order to limit access to Ohio nursing homes and similar facilities.

On March 15, 2020, the Ohio Department of Health issued a Director's Order to limit access to Ohio's jails and detention facilities.

On March 15, 2020, the Ohio Department of Health issued a Director's Order to limit the sale of food and beverages, liquor, beer and wine to carry-out and delivery only.

On March 15, 2020, the CDC issued Interim Guidance for mass gatherings or large community events, stating that such events that consist of 50 or more people should be cancelled or postponed.

On March 16, 2020 the Ohio Department of Health issued a Director's Order closing polling locations for the March 17, 2020 primary election.

A001237

On March 17, 2020 the Ohio Department of Health issued a Director's Order for the management of non-essential surgeries and procedures throughout Ohio.

On March 17, 2020 the Ohio Department of Health issued an Amended Director's Order to limit and/or prohibit mass gatherings and the closure of venues in the State of Ohio.

On March 19, 2020, the Ohio Department of Health issued a Director's Order closing hair salons, nail salons, barber shops, tattoo parlors, body piercing locations, and massage therapy locations.

Multiple areas of the United States are experiencing "community spread" of the virus that causes COVID-19. Community spread, defined as the transmission of an illness for which the source is unknown, means that isolation of known areas of infection is no longer enough to control spread.

The CDC reports that people are most contagious when they are most symptomatic (the sickest) however some spread might be possible before people show symptoms although that is not the main way the virus spreads.

Mass gatherings (10 or more persons) increase the risk of community transmission of the virus COVID-19.

Accordingly, to avoid an imminent threat with a high probability of widespread exposure to COVID-19 with a significant risk of substantial harm to a large number of people in the general population, including the elderly and people with weakened immune systems and chronic medical conditions, I hereby **ORDER** effective at 11:59 p.m. on March 23, 2020, all persons are to stay at home or their place of residence unless they are engaged in Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations as set forth in this Order. This Order shall remain in full force and effect until 11:59 p.m. on April 6, 2020, unless the Director of the Ohio Department of Health rescinds or modifies this Order at a sooner time and date. To the extent any public official enforcing this Order has questions regarding what services are prohibited under this Order, the Director of Health hereby delegates to local health departments the authority to answer questions in writing and consistent with this Order.

_____          _March 22, 2020_____
Amy Acton, MD, MPH
Director of Health

A001238

# EXHIBIT S

A001239

## EXECUTIVE ORDER IN RESPONSE TO COVID-19
## (COVID-19 EXECUTIVE ORDER NO. 8)

**WHEREAS**, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (Gubernatorial Disaster Proclamation) in response to the outbreak of Coronavirus Disease 2019 (COVID-19); and,

**WHEREAS**, in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS**, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19;

**WHEREAS**, COVID-19 has resulted in significant economic impact, including loss of income and wages, that threaten to undermine housing security and stability;

**WHEREAS**, the enforcement of eviction orders for residential premises is contrary to the interest of preserving public health and ensuring that individuals remain in their homes during this public health emergency;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(2), 7(8), 7(10), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective March 21, 2020 at 5:00 pm and for the remainder of the duration of the Gubernatorial Disaster Proclamation, which currently extends through April 7, 2020:

**Section 1. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations**

1. **Stay at home or place of residence.**  With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order.  To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible maintain social distancing of at least six feet from any other person, consistent with the Social Distancing Requirements set forth in this Executive Order.  All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public

Health (IDPH)).  Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location.  For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease.**  All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

   All Essential Businesses and Operations are encouraged to remain open.  To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.**  All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order.  Pursuant to current guidance from the CDC, any gathering of more than **ten** people is prohibited unless exempted by this Executive Order.  Nothing in this Executive Order prohibits the gathering of members of a household or residence.

   All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

   This Executive Order supersedes Section 2 of Executive Order 2020-07 (COVID-19 Executive Order No. 5), which prohibited gatherings of 50 people or more.

4. **Prohibited and permitted travel.**  All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited.  People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for essential activities is permitted.**  For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities:

    a. **For health and safety.** To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

    b. **For necessary supplies and services**. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences.

    c. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, playgrounds may increase spread of COVID-19, and therefore shall be closed.

    d. **For certain types of work**. To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

    e. **To take care of others**. To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care. Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

7. **Healthcare and Public Health Operations.** For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined.  Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. **Human Services Operations.**  For purposes of this Executive Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Illinois Department of Human Services, Illinois Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, group day care homes, and day care centers licensed as specified in Section 12(s) of this Executive Order; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;  transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies;

businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure.** For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.** For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Executive Order.

Essential Government Functions means all services provided by the State or any municipal, township, county, subdivision or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions. Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

This Executive Order does not apply to the United States government. Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Executive Order**. For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. **Essential Businesses and Operations**. For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:[1]

    a. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

    b. **Food, beverage, and cannabis production and agriculture**. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

    c. **Organizations that provide charitable and social services**. Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

---

[1] On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency, issued a *Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response*. The definition of Essential Businesses and Operations in this Order is meant to encompass the workers identified in that Memorandum.

d.   **Media**.  Newspapers, television, radio, and other media services;

e.   **Gas stations and businesses needed for transportation.** Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;

f.   **Financial institutions**.  Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products;

g.   **Hardware and supply stores**.  Hardware stores and businesses that sell electrical, plumbing, and heating material;

h.   **Critical trades.**  Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

i.   **Mail, post, shipping, logistics, delivery, and pick-up services**.  Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j.   **Educational institutions**.  Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible.  This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools are ordered closed through April 7, 2020;

k.   **Laundry services**.  Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l.   **Restaurants for consumption off-premises.**  Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up,

and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) except that Section 1 is ordered to be extended through April 7, 2020;

m. **Supplies to work from home**. Businesses that sell, manufacture, or supply products needed for people to work from home;

n. **Supplies for Essential Businesses and Operations**. Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

o. **Transportation.** Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Executive Order;

p. **Home-based care and services**. Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

q. **Residential facilities and shelters**. Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

r. **Professional services**. Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

A001247

s. **Day care centers for employees exempted by this Executive Order**. Day care centers granted an emergency license pursuant to Title 89, Section 407.400 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation.

t. **Manufacture, distribution, and supply chain for critical products and industries**. Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

u. **Critical labor union functions**. Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations – provided that these checks should be done by telephone or remotely where possible.

v. **Hotels and motels**. Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

w. **Funeral services**. Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations**. For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

14. **Essential Travel.**  For the purposes of this Executive Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

    a.  Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

    b.  Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

    c.  Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

    d.  Travel to return to a place of residence from outside the jurisdiction.

    e.  Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

    f.  Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements**.  For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

    a.  **Required measures.**  Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

        i.  **Designate six-foot distances.**  Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

        ii.  **Hand sanitizer and sanitizing products.**  Having hand sanitizer and sanitizing products readily available for employees and customers;

        iii.  **Separate operating hours for vulnerable populations**.  Implementing separate operating hours for elderly and vulnerable customers; and

A001249

    iv. **Online and remote access**.  Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Executive Order**.  The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements.  All provisions of this Executive Order should be interpreted to effectuate this intent.

17. **Enforcement**.  This Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305.

18. **No limitation on authority**.  Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing the State or any county, or local government body from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closer of a specific location for a limited period of time, including the duration of this public health emergency.  Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

## Section 2. Order ceasing evictions.

Pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(2), (8), and (10), all state, county, and local law enforcement officers in the State of Illinois are instructed to cease enforcement of orders of eviction for residential premises for the duration of the Gubernatorial Disaster Proclamation.  No provision contained in this Executive Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage.

## Section 3. Savings clause.

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

A001250

# EXHIBIT T

A001251



FURNITURE
MATTRESS

# MEMORANDUM

---

**TO:**      Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321; and 1021 Butterfield Rd. Downers Grove, Ilinois, 60515.

**FROM:**    Cathrine Wenger, Senior Counsel

**SUBJECT:** WARN Act Notice (revised)

**DATE:**    March 19, 2020

---

On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

---

# EXHIBIT U

A001253

```
                      UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE


                                    .  Chapter 11
         IN RE:                     .
                                    .  Case No. 20-10553(CSS)
         ART VAN FURNITURE, et al,  .
                                    .
                                    .  824 Market Street
                                    .  Wilmington, Delaware 19801
                      Debtors.  .
         . . . . . . . . . . . . . . .  Thursday, March 19, 2020


                 TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
               BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                   CHIEF UNITED STATES BANKRUPTCY JUDGE


         APPEARANCES VIA TELEPHONE:

         For the Debtors:           Gregory Werkheiser, Esq.
                                    Michael J. Barrie, Esq.
                                    Kevin M. Capuzzi, Esq.
                                    John Gentile, Esq.
                                    Kate Harmon, Esq.
                                    Jennifer Hoover, Esq.
                                    BENESCH, FRIEDLANDER, COPLAN
                                     & ARONOFF, LLP

                                    Maura Russell, Esq.
                                    MONTGOMERY, MCCRACKEN, WALKER
                                     & RHOADS, LLP

         For the U.S. Trustee:      Linda Richenderfer, Esq.
                                    OFFICE OF THE U.S. TRUSTEE




         (Appearances Continued)

         Audio Operator:            Electronically Recorded
                                    by CourtCall/Court Personnel

         Transcription Company:     Reliable
                                    1007 N. Orange Street
                                    Wilmington, Delaware 19801
                                    (302)654-8080
                                    Email:  gmatthews@reliable-co.com


         Proceedings recorded by electronic sound recording,
         transcript produced by transcription service.
```

A001254

APPEARANCES VIA TELEPHONE:   (Continued)

For the Official Committee
of Unsecured Creditors:      Robert J. Feinstein, Esq.
                             Bradford J. Sandler, Esq.
                             PACHULSKI, STANG, ZIEHL
                              & JONES, LLP

For Wells Fargo Bank:        J. Cory Falgowski, Esq.
                             BURR & FORMAN, LLP

For Wells Fargo
Capital Finance:             Jennifer Feldsher, Esq.
                             MORGAN, LEWIS & BOCKIUS, LLP

For Hilco Merchant
Resources, LLC, et al:       Douglas Hermann, Esq.
                             PEPPER HAMILTON, LLP

                             Steven Fox, Esq.
                             RIEMER & BRAUNSTEIN, LLP

For HGB AVF Lending:         Dennis A. Meloro, Esq.
                             Jeffrey Wolf, Esq.
                             GREENBERG TRAURIG, LLP


ALSO APPEARING VIA TELEPHONE:

                             Dennis Stogsdill
                             ALVAREZ & MARSAL

3

INDEX

|  | Page |
|---|---|
| STATUS BY MR. WERKHEISER | 7 |
| COMMENTS BY MS. FELDSHER | 14 |
| COMMENTS BY MR. WERKHEISER | 16 |
| COMMENTS BY MR. FOX | 18 |
| COMMENTS BY MR. SANDLER | 20 |
| COMMENTS BY MR. BARRIE | 22 |
| SCHEDULING | 25 |

A001256

1    (Proceedings commence at 2:01 p.m.)

2         THE COURT:  Good afternoon, everyone.  This is

3    Judge Sontchi.  I hope all can hear me.  You can't see me,

4    however.  You might -- for many of you, that's an advantage

5    that you are soon going to lose.

6         UNIDENTIFIED:  Your Honor, I think we have to shut

7    down either the audio in the Skype because we're hearing some

8    feedback.

9         THE COURT:  Well, everybody that I have that is on

10   Skype is on mute, except for Mr. Sandler.  There we go.

11        UNIDENTIFIED:  That's better, Your Honor.

12        THE COURT:  And --

13        MR. SANDLER:  (Not identified) My apologies, Your

14   Honor.  I've never used Skype before.

15        THE COURT:  Me neither.  Somehow -- wait a minute.

16   We're doing our best here, some new technology.

17        Let me ask because, apparently, I've disappeared.

18   Can you see me on your displays?

19        UNIDENTIFIED:  No.

20        UNIDENTIFIED:  No.

21        UNIDENTIFIED:  We can see your name, but there's no

22   picture.

23     (Participants confer)

24        UNIDENTIFIED:  There you are.  That works.

25        THE COURT:  Oh, I can tell by the happy faces that

5

1     I have arrived.

2             UNIDENTIFIED:  You can look at everybody's houses

3     now.

4             THE COURT:  All right.  Well, thank you very much.

5     The Bankruptcy Court remains open for business, but it is not

6     business as normal, as you can tell.  We are dealing with

7     everything you are dealing -- I'm seeing many of you who are

8     clearly at home.  I'm in the office, but I'm about the only

9     person here, and we are operating remotely at the Bankruptcy

10    Court now.

11            So we're going to be, as you know from my previous

12    order -- maybe you've seen it -- we are going to be operating

13    at -- with regard to only time-sensitive matters only.  All

14    other matters are being cleared until, at this point, April

15    15th.  That, of course, is subject to further extension, if

16    necessary.  Our primary concern is the health and safety of

17    our employees and the public, doing our civic duty to help

18    stop the spread of this virus, and to promote and fulfill our

19    mission of running the bankruptcy system.  And those are hard

20    -- four hard things to try to get to work at the same time,

21    but we're doing the very best we can.

22            As you know, we're doing telephonic appearances for

23    most everything.  We are using -- we have this ability to use

24    video to a limited extent, when we have to deal with

25    witnesses.  Our interpretation of the law -- which could be

A001258

1     wrong, but it's our interpretation -- is that, if you have a

2     contested evidentiary matter, it is not sufficient to have

3     the witness available by telephone, but that there has to be

4     a video connection, so that the Court can discern the

5     demeanor of the witness, so that parties cross-examining that

6     witness can see the witness, and so the witness can see the

7     people cross-examining him or her.  And of course, there has

8     to be the ability to look at documents.  So this is a

9     complication.

10          And the reason I have this hearing today -- this

11    conference today, is to prepare for tomorrow's hearing, which

12    may be -- well, I think is going to be contested, and it may

13    involve contested evidence.  I'm not sure about that, and

14    that's one of the reasons I asked you all to be on the phone

15    today, so we could flesh that out.

16          So what I'd like to do, first of all, is welcome

17    Mr. Sandler to the case, who I understand represents the

18    Official Committee of Unsecured Creditors that was appointed

19    yesterday.

20          Mr. Barrie, if I could turn to your first, as

21    counsel for the debtors, to give me a general report on

22    what's going on with the debtor and what you -- how you

23    foresee tomorrow going forward.

24          MR. BARRIE:  Thank you, Your Honor.  I'm actually

25    going to defer to Mr. Werkheiser, who is on CourtCall.  As

1    you can imagine, this global pandemic has kind of thrown a

2    wrench into everybody's business everywhere, and the debtors

3    having retail going-out-of-business sales in the Midwest and

4    the Northeast is certainly not excused from that.  So I want

5    to kind of pitch it over to Greg, who can give the Court a

6    general status update as to all the matters that are

7    happening and the status of what the debtors are doing.

8                MR. WERKHEISER:  Yes.  Thank you, Mr. Barrie.

9                Your Honor, Greg Werkheiser of Benesch for the

10   record, for the debtors.  And it seems like a lifetime ago,

11   but I think, with the exception of the hearing we had on

12   Monday on the TRO on the (indiscernible) matter, we were last

13   before Your Honor on March 12th.

14               And this situation has evolved with a rapidity and

15   severity over the last week that I don't think anybody could

16   have predicted, and in a way that sort of uniquely makes life

17   challenging for a furniture retailer especially.  And you

18   know, so, obviously, as Your Honor is aware, this coronavirus

19   epidemic has been sweeping through the country since early --

20   I think it was late February or early March.  But really, you

21   know, we started getting, you know, significant feedback

22   about this shortly after the case was filed.  You know, as I

23   look through the time lines of everything that has gone on

24   relative to the coronavirus epidemic, you know, it's really

25   just been in the last week that things have really ramped up.

1    And you know, from the debtors' experience and

2    their operations, you know, what we've seen transpiring in

3    the states and localities where the debtors operate is -- you

4    know, obviously, we have now federal state of emergency

5    declared on account of this, and you know, all of the sort of

6    reliable sources and information is urging everyone to stay

7    home to the greatest extent to possible and to -- you know,

8    no nonessential activities out of their homes.

9    And then a number of places where the company has

10   operated in its core markets, such as Ohio and Pennsylvania

11   and Michigan, the, you know, state and local governments have

12   either issued strong guidance or outright directives for

13   nonessential retail to not be operating over the last several

14   days.  And this has had, you know, a devastating effect on

15   the debtors' ability to operate, you know, both the store

16   closing sales that had gotten underway just before the filing

17   and for the quotations that were contemplated to be part of

18   the Levin-Wolf going concern sale, which are 44 stores,

19   primarily located in Pennsylvania and Ohio, those locations,

20   as well.

21   Not to put too fine of a point on it, but you know,

22   I think, for at least the last several days, you know, the

23   company has been unable to meet, even at the store closing

24   locations, you know, the operating expenses that are incurred

25   just by keeping the doors open and the lights on and staff in

1    place to run those sales.  It's just not getting -- it wasn't

2    getting volume into the stores, in terms of customer traffic.

3    And obviously, people, out of health concerns and economic

4    concerns, are reluctant to make these types of bigger ticket

5    expenditures that are involved in committing to purchase a

6    piece of furniture.

7         So we are in a place now that I think we never

8    hoped or expected to be when, you know, planning for this

9    Chapter 11 was underway, certainly not any -- what anybody

10   expected in negotiating a cash collateral budget or orders.

11   And you know, everybody is doing the best they can under

12   these extraordinary -- extraordinarily different

13   circumstances to -- you know, obviously, paramount is the

14   health and safety of everyone involved, but -- and then, you

15   know, to treat all of our constituents, especially, you know,

16   our employees and customers, as fairly as possible under the

17   circumstances, but also to preserve and maximize value to the

18   greatest extent possible.

19        And so this -- where this has left us is in a

20   position where we've had to make some very, very hard

21   decisions over the last several days.  And just so the -- to

22   preview it for Your Honor, we've got a few different buckets

23   of stores that the company has operated.  There were, you

24   know, Art Van (indiscernible) branded mattress stores that

25   were the subject of going concern sales that were largely

1   completed as of mid March.  There's another bucket of stores

2   that are the, you know, Art Van stores, and the eight

3   Maryland and Virginia-based Wolf stores that had been the

4   subject of the closing -- the store closing sales that had

5   begun just before the filing.  And then thirdly, we have the

6   -- you know, what were going to be the Levin-Wolf going

7   concern stores.

8        And you know, as to the ones where we still had

9   ongoing GOBs and -- or were attempting to operate as much as

10  possible in the ordinary course, the company has made the --

11  you know, the difficult decision, effective as of today, to

12  tell employees not to report to work at those locations.  We

13  hope that -- and has, at least temporarily, shuttered these

14  locations.  You know, we hope this is not forever, but the

15  situation is extraordinarily difficult and very fluid.  And

16  so, you know, we have to adapt consistent with our

17  obligations and fiduciary duties to the facts as they

18  (indiscernible)

19       THE COURT:  So I'm confused.  I apologize, Mr.

20  Werkheiser.  So what stores are you not going -- or what

21  stores is it that you're telling employees not to show up to,

22  the store closing sale stores or all stores?

23       MR. WERKHEISER:  Effectively, all of the ones that

24  we still have ongoing store closing sales or that we're

25  operating in the ordinary course, which is basically the

1    Levin-Wolf sale, so (indiscernible)

2              THE COURT:  So the Wolf and -- so the Wolf and

3    Levin stores are closed, as well?

4              MR. WERKHEISER:  At least temporarily, Your Honor,

5    yes.  And --

6              THE COURT:  What about the mattress stores?

7              MR. WERKHEISER:  Your Honor, the mattress stores,

8    with the exception, I believe, of the Levin Mattress stores -

9    - so all of the Art Van or -- I think the brand was Pure

10   Sleep branded mattress stores were already, to my knowledge,

11   involved in store closing sales.  And as I understand it, the

12   nature of that inventory is such that they tend to sell down

13   quite quickly in a store closing sale context.  And so most

14   of those, if not all of them, were already through their

15   process as of last week.

16             THE COURT:  All right.

17             MR. WERKHEISER:  (Indiscernible)

18             THE COURT:  So, as of tomorrow, you will be not

19   operating business.

20             MR. WERKHEISER:  With the exception of --

21             THE COURT:  Online?

22             MR. WERKHEISER:  -- some back office functions and

23   distribution center functions and the headquarters.  And then

24   the sort of fulfillment side of the retail stores, I believe,

25   for a few days is contemplated to continue open -- operating

1    to try to, you know, allow customers to pick up have

2    delivered product that they've recently ordered.

3              THE COURT:  Okay.  So I guess the -- well, to cut

4    to the chase, that means we're not having a hearing tomorrow.

5              MR. WERKHEISER:  I don't want to speak for

6    everybody, Your Honor, on the phone.  But I think that is the

7    debtor's view, and Mr. Barrie can speak more to that.

8              I guess, before we sort of segue into talking about

9    tomorrow's hearing, Your Honor, I just -- I do want to make

10   clear that, you know, we are trying to explore with our

11   lenders and our other stakeholders, you know, other options,

12   short of outright (indiscernible) liquidation.  And you know,

13   we're aware, for example, that in a -- in the Craftworks

14   case, currently pending before Judge Shannon, they've --

15             THE COURT:  I think that's --

16             MR. WERKHEISER:  -- (indiscernible)

17             THE COURT:  Actually, I think that's confidential

18   information, Mr. Werkheiser.

19             MR. WERKHEISER:  Oh --

20             THE COURT:  That call was not on the record today.

21             MR. WERKHEISER:  I was not aware of that, I'm

22   sorry, Your Honor.

23             So let me just say then, conceptually, we are

24   looking at the possibility of a -- you know, going idle or

25   going into a state of dormancy for a period of time, and the

A001265

1    possibility then of either, you know, reopening stores, some

2    subset of stores as -- either in furtherance of the going

3    concern transaction, if there's still one to be had at that

4    point, or -- you know, or closing sales and an orderly

5    liquidation, you know, essentially, once the economic and the

6    retail environment and the safety environment have improved

7    to a degree that we can do that.

8           It is, you know, a number -- there are a number of

9    scenarios under consideration.  I think, of every available

10    scenario, that is probably the, you know, most attractive one

11    that we have.  And we are, right now, engaging in a dialogue

12    with Wells Fargo and our term loan lenders to see if there's

13    a way to pursue that alternative.  The -- you know, but the

14    reality of the situation is that we cannot continue to burn

15    cash at the rate that we've been, given that there's

16    virtually no revenue coming into the company right now.

17           And you know, we -- of course -- and of course, for

18    us to be able to do that, we need cooperation from the ABL

19    agent and the term loan lenders and, you know, need

20    everyone's assurances that, while we are having these

21    dialogues, that, you know, they'll take no precipitous action

22    to make that -- an already difficult situation worse by, you

23    know, sweeping all of the cash, for example, that are in the

24    debtors' cash collection accounts and leaving us without even

25    the cash necessary to fund those operating and restructuring

1    expenses already incurred or that might be incurred

2    imminently, as we're, you know, trying to navigate this

3    situation.

4            THE COURT:  All right.  Thank you, Mr. Werkheiser.

5            MR. WERKHEISER:  Thank you, Your Honor.

6            THE COURT:  Obviously distressing news, but I

7    appreciate the update.

8            Would anyone like to be heard in connection with

9    Mr. Werkheiser's report?  The lenders, the committee, the

10   liquidator, anybody?

11           MS. FELDSHER:  Your Honor --

12           MR. FOX:  Your Honor --

13           MS. FELDSHER:  -- this is Jennifer --

14           MR. FOX:  -- Steve Fox -- go ahead, Jennifer.

15           THE COURT:  Ms. Feldsher?

16           MS. FELDSHER:  Your Honor, this is Jennifer

17   Feldsher from Morgan Lewis on behalf of Wells Fargo, the ABL

18   lender.

19           Your Honor, these are unprecedented times, and

20   we're -- I personally was on, you know, calls that aren't of

21   public record earlier today.  This has hit retail, it has hit

22   restaurants and other industries very hard.  And it has hit,

23   you know, a lot of cases and a lot of people, and we are

24   mindful of that.

25           Your Honor, a lot of this information and the

1  debtors' decisions, unfortunately, are coming at us minutes

2  before the -- before these hearings.  These are not

3  discussions that -- you know, I would say that where the

4  debtors are, as opposed to other cases, is they haven't fully

5  come to their creditors, other than to say this is somebody

6  else's problem and, you know, put -- you know, fix it for us

7  or don't sweep or do these things.

8          I think that we are certainly discussing with the

9  debtors -- we want to try to find a path forward.  We would

10  like to find a path that makes sense for all stakeholders

11  here, but it's going to require extraordinary measures

12  because we are living through extraordinary times, to try to

13  figure out what is the path forward, what's the path that

14  preserves, you know, value, that provides as much value as

15  possible to those that are impacted by these decisions.

16          And unfortunately, we haven't gotten the

17  information that we need from the company to be able to even

18  consider a full wind-down plan.  So, you know, you heard Mr.

19  Werkheiser, I think asking for an advisory opinion on

20  remedies that the lenders can take.  We're not -- you know,

21  we're in fact-finding mode and, you know, they're asking for

22  advisory opinions.  I mean, I -- they're in default today

23  under their cash collateral budget, they understand that.  We

24  are trying to work with them productively.  There are a

25  number of outstanding items.

A001268

1          That's all I can say to you at this time because

2   that is truthful in where we are with the parties.  And you

3   know, we're trying to cope and we're trying to absorb all of

4   this in the best way that we can.  So I'm happy to take any

5   questions that Your Honor has, but a lot what was said on the

6   call has -- is complete news and -- just to the ABL lenders.

7          THE COURT:  Okay.  Yeah, it's news to me, too, of

8   course.  Have you actually issued a notice of default,

9   though?

10          MS. FELDSHER:  We have not yet, Your Honor.

11          THE COURT:  Okay.  Thank you.

12          Anyone else?

13          MR. WERKHEISER:  Your Honor, it's Mr. Werkheiser.

14   If I could respond briefly?

15          THE COURT:  Yes, Mr. Werkheiser.

16          MR. WERKHEISER:  So, Your Honor, I think we have a

17   -- obviously, somewhat of a difference of opinion about

18   information flow, but -- and I don't think we need to belabor

19   that point.  We are committed to -- and I think we have been

20   giving as much information as possible to the lenders.  It's

21   just, you know, the rapidity and severity of the

22   circumstances, you know, have limited how much useful

23   information we have, and therefore we can share at any given

24   moment in time.  But we're committed to making that

25   information available.

1          But -- and I also want to be clear.  I was not

2     asking Your Honor to limit their remedies or prevent the

3     lenders from having whatever rights are available to them

4     under the Code and the interim cash collateral order today.

5     But we are concerned that we are in a situation that nobody

6     could have anticipated.  And because there has been a lack of

7     communication, we want to make sure that the debtors are not

8     left in a position where they're not able to meet those

9     committed expenses that have been incurred or cannot be

10    avoided to be incurred in the near term.

11         And my point was simply that we need to have that

12    communication going forward.  But then we absolutely reserve

13    our rights to come before the Court if we need to, to address

14    those sorts of issues.  And you know, we wanted to preview

15    that we had concerns, but not asking for Your Honor to do

16    anything or to grant any relief today.

17         THE COURT:  Well, you're not going to get anything,

18    so that's good.  Obviously --

19         MR. FOX:  Your Honor --

20         THE COURT:  -- the cash collateral --

21         MR. FOX:  -- if I --

22         THE COURT:  -- order --

23         MR. FOX:  If I may?

24         THE COURT:  Just a second.

25         Actually, you know, the cash collateral says what

18

it says, and if there's a default that's called, there are

certain things that occur.  I think that all the lenders and

creditors probably understand that this is a difficult

situation, but I'm sure they're all still focused on

maximizing their recoveries, even though what "maximizing"

means today may not be what "maximizing" meant on Monday, and

it is what it is.

But I -- what's important, I'm -- I -- like Ms.

Feldsher, I'm in information-gathering mode at this point,

and this is just a status conference; it's not a hearing.

But all of this is very important and I appreciate the

information.

And I interrupted someone, and I don't know who it

was.

MR. FOX:  Your Honor, thank you.  This is Steven

Fox from Riemer & Braunstein.  As Your Honor will recall, we

represent the proposed consultant Hilco and Gordon Brothers.

We, too, share everybody's disappointment in the necessity,

from the debtors' standpoint, of making this difficult

decision.

We, too, were a bit in the dark up until minutes

before this hearing, when Mr. Barrie sent me an email that

the debtors had made this decision and were not planning on

going forward tomorrow.  Your Honor probably is aware we did

file a declaration in support of the motion earlier today,

1    with the expectation that we were going forward tomorrow.  So

2    this came quite as a shock to us, shortly before the hearing

3    this afternoon.

4            We do have more than 40 people out in the field,

5    who have been continuing to perform services in anticipation

6    of going forward tomorrow.  We've been incurring expenses to

7    support the debtors' efforts in keeping the store closing

8    sales going for the benefit of the estate and the creditors,

9    with the expectation that the debtors were going to conduct

10   themselves in good faith and move forward in connection with

11   the motion.

12           We continue to provide these services at the

13   request of the debtors, as well as the ABL lenders.  And we

14   will continue to stand by to support the estates' efforts,

15   whatever decisions are ultimately made, in terms of what the

16   path forward will be.

17           And we, too, will commit to work with the ABL

18   lenders, the term lenders, and the debtors, and now the

19   committee, having recently been appointed, to find the

20   optimal path forward to maximize value because, as Your Honor

21   will recall, we also, through an affiliate, hold pre-petition

22   term debt, so our interests are aligned with the rest of the

23   constituents within the estate to maximize recovery here for,

24   not only the benefit of ourselves, but for the benefit of

25   others involved.  And we look forward to having an

1    opportunity to come back and resolve these issues when a path

2    forward is ultimately resolved.  Thank you, Your Honor.

3              THE COURT:  Thank you, Mr. Fox.

4              Mr. Wolf?

5              UNIDENTIFIED:  Your Honor, this --

6              MR. SANDLER:  Your Honor, it's Brad Sandler.  If I

7    may be heard.

8              THE COURT:  Yes, you may, Mr. Sandler.

9              MR. SANDLER:  Thank you, Your Honor.  And as you

10   noted, just for the record, Brad Sandler, Pachulski Stang,

11   for the committee.

12             Your Honor, you know, the committee, having only

13   selected us as counsel yesterday, having been informed

14   yesterday, this is all new to us, but none of it really

15   surprising.  The committee's overarching goal was to, I'll

16   just say maximize value, like everybody else.  But there are

17   other things besides, you know, dollar recoveries.

18             For example, with the Wolf Levin going concern

19   sale, we were hoping that 44 stores would be saved, thousands

20   of jobs would be saved.  Maybe that will happen down the

21   road.  But as -- you know, certainly, with the coronavirus,

22   this unprecedented shutdown throughout the country that

23   certainly we have never seen, and hopefully never will see

24   again, Simon Properties closing their malls, L Brands,

25   JCPenney, you know, the Gap, you know, many, many retailers

1    around the country are starting to shut down.  And to have

2    the debtor do that at this time, frankly, from our

3    perspective, makes a lot of sense, to put everything on ice.

4         First of all, it's important for the employees, to

5    make sure that they're not exposed potentially to the virus.

6    It's also something that -- right?  We're talking about

7    something that is not perishable.  You know, furniture,

8    whether, you know, it's in the store today or in the store,

9    you know, a month from now or two months from now, it's still

10   the same furniture.  So it should be relatively easy to shut

11   the debtor down without any value that would dissipate

12   because of the furniture somehow, you know, getting destroyed

13   or damaged.

14        You know, it seems to me, Your Honor, that, in

15   these times -- right?  Restructuring professionals are, in

16   part, supposed to come up with creative solutions to very,

17   very tough problems.  And it may be easy to look at this

18   situation and pull the plug and say let's convert the case to

19   a Chapter 7.  I'm not really sure what that gets you.  If

20   people aren't shopping right now because everybody is shut in

21   their, you know, respective abodes, Chapter 7 isn't going to

22   generate any more value.

23        And it seems to me that this is a creative approach

24   to put everything on ice.  And hopefully, you know, at some

25   time period, whether it's 30 days, 60 days, 90 days, whatever

1    that time period may be, to, you know, turn the lights back

2    on and resume the liquidation of the stores and hopefully

3    find a going concern for the Wolf Levin properties.

4           And whether, you know, Robert Levin is the

5    purchaser at that time, whether he's still interested, we

6    don't know.  But the best chance in certainly the committee's

7    mind right now, to preserve value, is to put everything on

8    ice and let's come back to in, you know, a month or two and

9    see where we are.

10          MR. BARRIE:  Your Honor (indiscernible)

11          THE COURT:  Thank you, Mr. Sandler.

12          MR. BARRIE:  This is Michael Barrie.  If I could

13   just add a lit bit more color to what Mr. Sandler has just

14   spoken about.

15          THE COURT:  Yes.

16          MR. BARRIE:  So mister (indiscernible) did a

17   (indiscernible) explain (indiscernible) where we are and how

18   we got there, and I appreciate all of the constituents', you

19   know, requests and, to some extent, a little bit of

20   frustration about getting information.  But again, this is a

21   fluid -- this is a fluid time where no one had any

22   expectation that the entire world would come to a screeching

23   halt.

24          We are working with Wells, we have given them

25   information about 48 hours ago.  We're starting to get some

1    comments and feedback on that information now.  But as Mr.

2    Sandler said, the thought process would be kind of -- and

3    we've set this forth in a more fulsome motion that the Court

4    can hear.  But main -- find a way to maintain a -- almost a

5    status quo going forward, ensure that the employees who have

6    worked to realize a return for the inventory for the benefit

7    of Wells, make sure they're compensated.

8         Make sure our consumers know that -- who have gift

9    cards or who have creditors, you know, make sure that they're

10   aware of how -- you know, through communications on the

11   website, emails, whatever, how they -- you know, they will be

12   treated.  But the idea is let's not make this a

13   (indiscernible) thing.  But the reality of the situation is,

14   is that we can't have a going out of business sale if there's

15   no one to come and buy the merchandise.

16        On the Levin side -- on the Levin side, one of the

17   bigger issues that we're faced with are half of those stores

18   are in Pennsylvania, I think 27 of them.  The Commonwealth of

19   Pennsylvania closed all those stores by order of the

20   Governor.  So they -- being open is not even an option for

21   any of them.

22        So the thought is let's put this thing in a coma

23   for a little bit, let's skinny down this budget.  Let's work

24   with Wells to make sure that the people who are working hard

25   to maximize recovery so far are being taken care of, and then

1   make sure that consumers know how they can be taken care of.

2   And then let's -- let us work with Wells to figure out how

3   this works in the near term.  Let us -- knowing full well

4   that we can use this time to work out if there are bulk

5   inventory sale opportunities; use this time to further

6   discuss the Levin sale, keep that going because that's mostly

7   an attorney-driven piece; discuss potential lease disposition

8   options under 365(d) and discuss with our credit card

9   processors returning monies for the increased reserves they

10  had taken during the preference period, which all can be done

11  in the context of during this temporary -- during this

12  temporary -- for lack of a better word -- coma, and then have

13  some sort of procedure going forward -- again, we'll do this

14  by motion -- that truly puts those emergent needs that have

15  to be decided because of destruction of proper threats or

16  threats to life and safety, putting those needs on an

17  emergent basis that have to be heard, but holding all other

18  non-emergent, monetary-type relief until such point that the

19  parties can really deal with it as it comes down.

20          And we just felt that this is a better framework

21  for preserving the value of what's there, as opposed to

22  simply just pulling the plug and walking way from everything.

23  So --

24          THE COURT:  All right.

25          MR. BARRIE:  -- you know, in that context, with

1  respect to the Hilco retention, Your Honor, in that context,

2  we just don't feel it's appropriate to go forward on a

3  retention hearing for something that hopefully will happen

4  eventually, but is not going to be happening in the next

5  couple of days.

6          THE COURT:  All right.  Now I'm confused.  So you

7  do want to go forward tomorrow?

8          MR. BARRIE:  No, no, no.  We don't want to go

9  forward.  We don't think it's necessary to go forward on that

10 because there's not going to be a going out of business sale

11 right now, so we don't think that it's necessary to go

12 forward on that until that issue materializes.  We just think

13 it's a -- we do think Hilco's partnership is very important

14 and we do intend to go forward with it at some point, just

15 tomorrow is not the day to do it.

16         THE COURT:  All right.  And you don't want to set a

17 date for that at this time?

18         MR. BARRIE:  We can set a date.  I don't have a

19 problem setting a date just to keep it on the calendar.  But

20 I would suspect that that date would be probably mid to later

21 April.

22         THE COURT:  All right.  Well, we have a hearing on

23 April 6th, so we can continue it to then, at least for now.

24         Any objection to continuing that until April 6th?

25     (No verbal response)

 1        THE COURT:  Okay.  I don't hear any.

 2        We'll obviously not go forward tomorrow, and that's

 3   a shame, mainly because it's a shame for the business; and,

 4   second, it's a shame because we were hoping to see if we

 5   could figure out how to do this, and this was going to be one

 6   of the first opportunities.  But that's nothing compared to

 7   the loss of productivity and recovery to the employees and

 8   the creditors as a result of these developments, which are

 9   clearly outside the control of anybody on this call, that's

10   for sure.

11        So this has been very helpful.  We'll cancel

12   tomorrow's hearing.  Is there anything anybody else would

13   like to offer to the Court?

14        MR. WERKHEISER:  Your Honor, this is Greg

15   Werkheiser.

16        UNIDENTIFIED:  Your Honor --

17        MR. WERKHEISER:  I just wanted to mention that we

18   do have a -- I think a March 31st hearing scheduled with the

19   Court that we are trying to keep on the calendar, if at all

20   possible.  I mentioned that there were some 60 odd locations

21   that the debtors are --

22        THE COURT:  Yeah, I have that --

23        MR. WERKHEISER:  -- (indiscernible)

24        THE COURT:  I have that on my -- yes, I have that

25   on my calendar.  But that's a special hearing, that's not an

1    omnibus, so that's why I didn't mention it.  The April 6th

2    hearing is the second day hearing for the case, so that's why

3    I mentioned that hearing.  But now, you still have the March

4    --

5                MR. WERKHEISER:  Okay (indiscernible)

6                THE COURT:  -- you still have the March 31st

7    hearing.

8                MR. WERKHEISER:  All right.  Thank you, Your Honor.

9                THE COURT:  Anyone else?

10               MR. BARRIE:  The only other -- the only other

11   request, given that things are so fluid, Your Honor, and

12   things are ever development, I don't think it's needed for

13   tomorrow.  But maybe perhaps early next week we could just

14   have one further status conference, so, if there are any

15   issues that the Court can help the parties resolve on a

16   little more of an informal basis, and also to update the

17   parties and the Court as to what's going on with the matters,

18   maybe earlier next week might be a good time to have a status

19   conference?

20               THE COURT:  Sure.  I'm available.  It's a very

21   empty calendar, and this is clearly an important and time-

22   sensitive matter.  So I'm available pretty much every -- I

23   have a hearing Wednesday at 2, and I have -- I'm not free

24   Thursday morning, and I have a lunch conference on Friday.

25   Other than that, I'm wide open.  Monday seems early.  How

A001280

1   about Tuesday?

2           MR. BARRIE:  Yeah.  Yeah.  Tuesday would be fine

3   with us, Your Honor.

4           THE COURT:  Do we have -- can we do 10 a.m., or

5   does that inconvenience people?  I don't know if we have

6   people on the west coast or not.

7           MR. BARRIE:  I don't believe we do.

8           THE COURT:  All right.

9           MR. BARRIE:  10 a.m. works for the debtors.

10          THE COURT:  All right.  That will be a --

11          MR. SANDLER:  Works for the committee.

12          THE COURT:  Okay.  That will just be a telephonic,

13  no fancy Skype for Business, that will just be a telephonic

14  status conference.

15          MR. WERKHEISER:  Thank you, Your Honor.  We'll get

16  that notice out.

17          UNIDENTIFIED:  (Indiscernible)

18          THE COURT:  Great.  All right.  And Mr. Barrie or

19  Mr. Werkheiser, if you could just issue a notice of

20  continuation of the hearing for tomorrow until April 6th on

21  the docket, that would be great.

22          MR. BARRIE:  Will do.

23          MR. WERKHEISER:  Yes, Your Honor.

24          THE COURT:  All right.  Anything further?

25      (No verbal response)

1          THE COURT:  All right.  Well, thank you everyone.

2          UNIDENTIFIED:  That's it, Your Honor.

3          THE COURT:  Bad news, but good to --

4     (Proceedings concluded at 2:37 p.m.)

5                         *****

A001282

30

1        <u>CERTIFICATION</u>

2             I certify that the foregoing is a correct

3        transcript from the electronic sound recording of the

4        proceedings in the above-entitled matter to the best of my

5        knowledge and ability.

6

7

8

9

10       _____        March 26, 2020

11       Coleen Rand, AAERT Cert. No. 341

12       Certified Court Transcriptionist

13       For Reliable

A001283

# EXHIBIT V

A001284

```
 1                  UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE
 2

 3                                      .    Chapter 11
     IN RE:                             .
 4                                      .    Case No. 20-10553 (CSS)
     ART VAN FURNITURE, LLC, et al., .
 5                                      .    Courtroom No. 6
                                        .    824 North Market Street
 6                                      .    Wilmington, Delaware 19801
                                        .
 7                  Debtors.            .    March 31, 2020
     . . . . . . . . . . . . . . . . .       1:00 P.M.
 8

 9                TRANSCRIPT OF STATUS HEARING
           BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
10                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:         Gregory G. Werkheiser, Esquire
                              Michael J. Barrie, Esquire
13                            Jennifer Hoover, Esquire
                              Kevin Capuzzi, Esquire
14                            John C. Gentile, Esquire
                              BENESCH, FRIEDLANDER, COPLAN
15                               & ARONOFF LLP
                              222 Delaware Avenue, Suite 801
16                            Wilmington, Delaware 19801

17

18   Audio Operator:          Leslie Murin

19   Transcription Company:   Reliable
                              1007 N. Orange Street
20                            Wilmington, Delaware 19801
                              (302)654-8080
21                            Email:  gmatthews@reliable-co.com

22   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
23

24

25
```

A001285

```
 1   APPEARANCES (Continued):

 2   For the Debtors:          Marua I. Russell, Esquire
                               MONTGOMERY MCCRACKEN WALKER
 3                                & RHOADS LLP
                               437 Madison Avenue, 24th Floor
 4                             New York, New York 10022

 5
     For U.S. Trustee:         Linda Richenderfer, Esquire
 6                             David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
 7                             OFFICE OF UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
 8                             Lockbox 35
                               Wilmington, Delaware 19801
 9
     For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                             MORGAN LEWIS & BOCKIUS LLP
                               101 Park Avenue
11                             New York, New York 10178

12
     For Brixmor and Various   Craig Ganz, Esquire
13   Landlords:               BALLARD SPAHR LLP
                               1 East Washington Street, Suite 2300
14                             Phoenix, Arizona

15   For the Committee:        Bradford Sandler, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
16                             780 Third Avenue
                               New York, New York 10017
17
     For HGB AVF Lending:      Jeffrey Wolf, Esquire
18                             GREENBERG TRAURIG LLP
                               One International Place, Suite 2000
19                             Boston, Massachusetts 02110

20
     For Jennifer Sawle:       Rene Roupinian, Esquire
21                             RAISNER ROUPINIAN LLP
                               500 5th Avenue, Suite 1600
22                             New York, New York 10110

23
     For State of              Saverio Mirarchi, Esquire
24   Pennsylvania, Office      STATE OF PENNSYLVANIA
     Of the Attorney General:  OFFICE OF THE ATTORNEY GENERAL
25                             Strawberry Square
                               Harrisburg, Pennsylvania 17120
```

A001286

1    (Proceedings commence at 1:01 p.m.)

2         THE COURT:  Good afternoon everybody.  This is

3    Judge Sontchi.  This is the Art Van hearing.  I know we're

4    all appearing remotely.  Obviously, if you could please make

5    sure you mute your phones unless you're speaking.  It's

6    particularly important if you're working from home with

7    background noise or if you're using a cell phone.  So, thank

8    you very much for your courtesy.

9         I did sign the only matter that was listed on the

10   agenda as going forward.  I signed that order just a little

11   while ago under certification of counsel, but I'd like to

12   turn it over to the debtors, if I may, for a update on the

13   current situation with the case and any scheduling matters

14   that might be related to that and then, of course, once the

15   debtors have made their report I would welcome any

16   contributions from any other parties in interest who wish to

17   be heard.

18        MR. WERKHEISER:  Good afternoon, Your Honor.  It's

19   Gregory Werkheiser of Benesch, proposed counsel for the

20   debtors.  Thank you for making this time available to us.

21        Before we get into this contemplated status

22   conference, Your Honor, I do have to go back to the rejection

23   motion because we were apprised by Ms. Heilman a short time

24   ago that one of her clients has an unresolved issue with the

25   form of issue that we were not aware until after the

4

1   certification had been submitted this morning.  And so we

2   have been communicating with her to try to resolve that.  I

3   don't know whether that issue is or is not resolved at this

4   point.  And I apologize, we did not have the opportunity in

5   the short amount of time available after hearing from Ms.

6   Heilman before the hearing to communicate with Chambers, to

7   notify Chambers that that response from Ms. Heilman had been

8   received.

9           The issue, as I understand it -- well, if I could

10  just generally, for the benefit of the parties on the phone

11  and the court, a number of parties had sought, and I think we

12  had provided, confirmation that as to all of the rejected

13  locations that are incorporated in the proposed order that

14  was submitted to the court this morning the debtors believe

15  that all of the salable inventory in those locations, which

16  was primarily mattresses, these were Art Van Pure Sleep

17  stores, has been removed from those locations or would be

18  removed by the end of the day today, March 31st.  All of the

19  surrendering notices that were contemplated by the motion did

20  go out to the counterparties to the leases last Friday and

21  should have been received by those parties yesterday or at

22  the very latest today by overnight courier.

23          So, putting that issue aside I just don't know,

24  there might be a language issue that Ms. Heilman has still on

25  the order and so if I could pause momentarily and let her

1 have an opportunity or her co-counsel have an opportunity to

2 respond we can try to see if this is something that is easily

3 resolvable or where we stand.

4       THE COURT:  Okay.

5       MR. GANZ:  Good afternoon, Your Honor.  Craig

6 Ganz, Ballard Spahr on behalf of Brixmor and various other

7 landlords.

8       This kind of informal objection that we were

9 working through specifically related to Brixmor.  And as I

10 understand, and I have been cc'd on the emails that have gone

11 back and forth between Mr. Werkheiser and Ms. Heilman, that I

12 think we largely have worked out everything as far as the

13 language.  Just making sure that there's a representation on

14 the record here that the debtors are, in fact, out of the

15 locations notwithstanding anything in the order and if they

16 are out just preserving all rights to any asserted claims

17 that we may have to the extent that there are other issues

18 relating to that abandonment of property and whether that was

19 accomplished or not.

20       The short answer is I think we're resolved on

21 those issues.

22       THE COURT:  Okay.  So it sounds like your resolved

23 and simply based on the representations of Mr. Werkheiser and

24 his client with regard to the fact that they've exited the

25 location and you're reserving all your rights with regard to

1  whether they have executed it correctly or completely.  We

2  will deal with that going forward if we have to.

3          MR. GANZ:  Exactly, Your Honor.  Thank you.

4          THE COURT:  All right.

5          MR. WERKHEISER:  Thank you, Your Honor.

6          I think we should move forward to the status

7  update.  So, Your Honor, when we were last before the court,

8  I believe it was last Thursday, March 26th, at that time the

9  debtors reported that they believed they had, at least, an

10 agreement in principal with Wells Fargo, the prepetition ABL

11 agent and on a path forward for a mothball motion or a

12 suspension motion, you know, very short hands for these

13 things.  The concept was that we would reduce the company's

14 remaining operations to the bare minimum and to suspend, to

15 the greatest extent possible, activity in the bankruptcy case

16 over the next short period of time to better assess the

17 outcome of the Coronavirus situation and most viable

18 alternatives to the company going forward to maximize value.

19         So, despite that conceptual agreement there are,

20 obviously, important details that still needed to be worked

21 out related to the budget and other details of that

22 arrangement.  I think what we found, as the parties were

23 working round the clock on these issues since before we were

24 in court last Thursday and throughout the weekend, was that

25 due to a number of facts that are somewhat unique to these

1  debtors and this case we were not able to get to a point

2  where we had the agent support and consent for the mothball

3  arrangement primarily because of the company's liquidity

4  issues and cash needs, both as they exist today based on

5  obligations that have accrued thus far since the filing and

6  the expected obligations that would be incurred going forward

7  even with reducing and deferring obligations for, you know,

8  rent and reducing other activities to the bare minimum.

9          THE COURT:  Mr. Werkheiser, could you keep your

10  voice up, please, I can't hear you.

11          MR. WERKHEISER:  Yes.  I'm sorry.

12          Just by way of example, Your Honor, as is somewhat

13  unique to this debtor as opposed to some others the debtor

14  had a large number of employees, I think in excess of 4,000,

15  as of the petition date.  A lot of those employees are sales

16  personnel who earn commissions on furniture only when it

17  actually delivers, which means there is a long tail on

18  employee compensation.  And so, there was a large portion of

19  employee compensation that still remains outstanding right

20  now from the couple of weeks that the debtors were operating

21  during teh bankruptcy.

22          In addition, this company as a partially self-

23  funded health insurance plan which, again, means that for

24  those employee benefits there are fairly substantial -- there

25  is a fairly substantial tail.  And so the all-in number for

8

1   those types of obligations is something approaching $10

2   million dollars based on our best estimates of what is owed

3   right now and the company has, you know, cash in the

4   neighborhood of, I believe, $12 to $13 million dollars now

5   just to put, you know, a high level -- just to paint a high

6   level picture of where things stand financially for the

7   company.

8            And so I can't -- you know, we cannot speak for

9   Wells Fargo's decision making process, but, you know, we do

10  understand that as we attempt to model the various scenarios

11  for mothballing the company over the next six, seven, eight

12  weeks as appropriate the challenge always became how to

13  achieve a liquidity event on the backend of that period.

14  That was generating sufficient value both to satisfy any

15  deferred obligations and to provide a recovery to the senior

16  secured lenders at a level that was acceptable to them.

17  Also, how to manage liquidity during that period under

18  certain of the scenarios that we considered.

19           Those scenarios have included, you know, among

20  other things the resumption of GOB sales, various bulk sale

21  scenarios for inventory, consignment arrangements and other

22  potential transactions with parties that have been under

23  discussion for, you know, the last ten days or more

24  including, as we heard at the last status conference, the

25  possibility of resuming a transaction with the Levin Partners

9

for, at least, a subset of those assets.

And, you know, all those various alternatives, given the circumstances, the uncertainty surrounding the Coronavirus impact on the business and on the world in general, you know, creates a lot of uncertainty both as to timing and eventual recoveries. And then some of those alternatives such as GOB sales require the company to ramp-up in advance and incur, you know, fairly substantial expenses in advance to bring employees back on, to incur advertising expense, to spruce up the stores as necessary to resume, you know, store closing sales at those locations. The numbers are just not rosy from the debtor's perspective and we gather from our lenders' perspective given their unwillingness to go forward on that basis.

Your Honor, I think where that leaves us at this time is with few options none of which are particularly attractive for anyone here. We are operating subject to an alleged termination declaration that was issued by Wells Fargo as the agent on March 19th. The so-called notice -- remedies notice period under the cash collateral order was extended, but only through the end of the day today. We do not know at this time whether Wells Fargo is prepared to further extend that beyond today and absent that or absent some extraordinary relief from the court the debtors would no longer have access to cash collateral at the close of

1    business -- excuse me, at the end of the day today.

2            The other issues, I think, Your Honor, that are

3    still being worked through at this time relate to funding

4    obligations that may exist under the cash collateral order

5    during this remedies notice period.  Paragraph 2 of the cash

6    collateral order does require funding for employee payroll,

7    certain other emergency expenses and other obligations that

8    would be approved by the agent.

9            The company does have outstanding funding requests

10   to the agent related to those obligations that have not yet

11   been acted upon.  Finally, the order does contemplate the

12   establishment of carve-out reserves and a carve-out trigger

13   notice has been issued.  We have to confirm that those

14   arrangements are in place.

15           So, given all of that, Your Honor, I think while

16   no final decision has been made by the debtors, you know,

17   absent a significant change in the trajectory of these cases

18   over the next, you know, twelve hours or several days, if we

19   can get beyond the next twelve hours, we are looking at a

20   scenario where the debtors will likely have no choice but to

21   move forward with seeking conversion of these cases to a

22   Chapter 7 liquidation.

23           It is our hope and our intention to accomplish

24   that in coordination with our lenders, the committee and our

25   other stakeholders, and to do as orderly and as soft as

A001294

1   possible a conversion if, in fact, there is no other choice

2   at this point.  That provides to the fullest extent possible

3   to satisfy the employee obligations and the other accrued

4   obligations that are required to be summoned under the cash

5   collateral order, but we are not there yet.  You know, we do

6   not have a clear indication from the agent where we will end

7   up on those issues.

8          I think, Your Honor, I've been talking quite a

9   while and I will pause here and I'm happy to answer Your

10  Honor's questions or respond to questions or comments from

11  any of the other parties on the phone.

12         THE COURT:  No.  I don't have any questions.

13         Does anyone else wish to be heard?

14         MS. FELDSHER:  Your Honor, this is Jennifer

15  Feldsher from Morgan Lewis on behalf of Wells Fargo.  If it

16  would be helpful for Your Honor I can, kind of, weigh in a

17  little bit where Mr. Werkheiser left pauses, I think, in his

18  presentation on where the ABL lenders thinking is at and to

19  correct a couple of, you know, what I think are, at least,

20  misunderstandings in our view with respect to what is or

21  isn't' required of the ABL lender in this case.

22         Your Honor, I want to start by saying that Wells

23  Fargo, as Your Honor has heard from status conference after

24  status conference in this case, you know, we, like everybody

25  else has had to adopt to the new normal or, you know, current

1   circumstances which were completely unforeseen.  And one of

2   the things that we're seeing across these industries that

3   have been so terribly hit by the pandemic and the, you know,

4   shut down orders and things like that is in order for these

5   Chapter 11 cases to continue or to have any chance of

6   success, and we've told this to Your Honor previously so I

7   won't dwell on it or take up a lot of time, but they require

8   creative solutions,

9        Most importantly, a willing partnership between

10  the debtors and their stakeholders, and a fair amount of

11  cooperation from everybody because we're all dealing with

12  this together and in these unforeseen circumstances they are

13  cataclysmic from a top-line number.  The debtor has

14  absolutely no revenue coming in and so we are left to deal

15  with how to get from point a to point b, and all of the

16  costs, and all of the stakeholders that are implicated

17  including employees, including landlords, including lenders

18  with a finite amount of cash and a totally uncertain path

19  forward, at least, in the near term.

20       Within that Wells Fargo has funded every single

21  payroll request that the debtors have made for current pay,

22  for employees that have worked and for payroll requests that

23  has come in.  What has occurred, and Your Honor might recall

24  from a prior status conference where I was notified right

25  before coming into court, I believe, on the 20th, on a status

1　conference that the debtors had determined to suspend all of

2　their operations even though they were still operating in

3　some locations and there were not necessarily shutdown orders

4　in place at that time.

5　　　　　They had determined to suspend all operations

6　immediately, to terminate all employees; not all, but

7　significantly all of their employees, certainly all of the

8　store levels.  That was not something that was done in

9　coordination with the lenders, either the ABL lender or the

10　term lender, or even the consultant as far as we know who, as

11　Your Honor remembers, had remained even though their

12　retention was still up in the air had remained to support the

13　debtor's efforts to try to continue a GOB sale.

14　　　　　So, as a result of terminating their employees, as

15　Mr. Werkheiser described, the debtors now have significant

16　accrued PTO commissions, other benefits related to the

17　terminated employees as well as healthcare obligations.  Most

18　of these were not included in any budget and certainly in the

19　cash collateral budget because there was no contemplation of

20　a wholesale mass termination of employees.  Could these have

21　been mitigated if employees had been furloughed, could these

22　have been mitigated by a, you know, less drastic more spaced

23　out termination we will never know.  We weren't part of the

24　terminations to begin with.  We will never know, but now

25　these expenses, as Mr. Werkheiser explained, exist.

1    Just the employee obligations alone, Your Honor,

2    just because I think it's really important given what Mr.

3    Werkheiser disclosed as the cash position, total over $14

4    million dollars.  So, if the debtors have cash, as Mr.

5    Werkheiser said --

6         THE COURT:  I'm sorry, 14?

7         MS. FELDSHER:  14, Your Honor, correct.  That is

8    an estimate on the healthcare costs and that's using an

9    estimate, Your Honor, that's a little bit lower than what Mr.

10   Werkheiser just told you.  In materials that they have

11   provided to the ABL lender we're looking at a number for

12   anticipated healthcare obligations of $8.5 and change million

13   dollars and Mr. Werkheiser, I believe, just told the court

14   that he's now using a $10 million dollar number.

15        Your Honor, that's part of the problem here to is

16   there are lots of demands, including one last night, that all

17   of these amounts need to be paid despite the fact that there

18   just isn't enough cash to pay them, but the numbers detailed

19   on the numbers, we asked for this detail, we don't have the

20   information on it, but we can tell you in the aggregate these

21   numbers are far in excess of what the debtors have in cash

22   today.  And then if you take into account, as Mr. Werkheiser

23   said, the fee carve-out that is required to be funded, and

24   they had demanded as well, that is in excess of, I believe,

25   another $2 and a half million dollars.

A001298

1    So, again, 14, two and a half, and that's not even

2  taking into account any other expenses that might result.

3  So, our concern is that, yes, the parties are moving forward.

4  There hasn't been a proposal that's been presented to the

5  lenders that shows a market improvement in outcomes in a

6  Chapter 11 then in a Chapter 7, and the expenses associated

7  with the Chapter 11 are typically illustratively much higher.

8  There is also no scenario that the debtors have put forth

9  that they believe provides the ABL lenders with payment in

10  full.

11    At the end of the day whether that's a resumption

12  of the GOB process or a bulk sale, as the debtors have

13  suggested, they might be forced into because they won't have

14  enough cash by their own budget to get through to a GOB

15  process.  There is no scenario under which the debtors

16  believe that Wells Fargo will be paid in full let alone other

17  creditors.  And yet what we have are demands to today to take

18  all of the remaining cash that exists in the debtors account,

19  use that cash, this is the debtor's request, to pay employee

20  obligations that have accrued.  Again, not current employee

21  obligations going forward.  We have no issue paying for

22  employee wages that are coming due, but to pay the employee

23  obligations as much as they can to fund the professional fee

24  carve-out and then they have asked for Wells Fargo to provide

25  some type of an assurance that out of any proceeds that Wells

1    Fargo is to receive they will fund the remaining employee

2    obligations no matter what that recovery is going to be to

3    Wells Fargo, but they will fund the remaining obligations to

4    employees.

5         Now, Your Honor, we're talking about employees and

6    I'm mindful of that, obviously.  Nobody in entering this case

7    and even as we sit here today had any intention of incurring

8    obligations to employees that were not going to be met.  The

9    budgets originally for, you know, the Chapter 11 case took

10   into account the anticipated employee obligations and, you

11   know, everybody had always hoped and expected that employee

12   obligations could be paid in full through the process and

13   certainly through the GOB sales.

14        The debtors currently don't anticipate being able

15   to make it to a GOB sale and I don't think they believe that

16   even a Chapter 7 Trustee may make it through a GOB sale

17   without further financing.  Yet when it comes to obligations

18   for which they perceive that there might be D&O liability we

19   are getting demands for those.  On anything else they're

20   willing to talk to us, but as to our recoveries, as to other

21   stakeholder recoveries, as to what's in the best interest of

22   all other stakeholders unfortunately, Your Honor, we haven't

23   been as cooperative.

24        So, on the one hand we very much like to say to

25   the debtors let's do this cooperatively.  That is our

A001300

1   preference that is what we asked the debtors to do.  We'd

2   like to have a smooth transition to a Chapter 7 process in

3   which we can account for, you know, make sure the inventory

4   is safeguarded, make sure the information is available for

5   the Chapter 7 Trustee so that the Chapter 7 Trustee can get

6   up to speed as quickly as possible, make sure key employees

7   are available and their information is available so that the

8   Chapter 7 Trustee can reach out to them.  Hopefully, if he or

9   she determines that this is the way that we would go so that

10  all of the inventory and the assets can be safeguarded, can

11  be put together.

12          Unfortunately, that is not what is happening and

13  as I started the presentation what I said was that in these

14  times, especially when we're dealing with such unprecedented

15  disruption, the key is to have a willing partner.  And so,

16  Your Honor, we need those assurances from the debtors that

17  they will get their creditors the information they need and

18  the information that will be critical to have a soft landing,

19  but as a condition to that is that we have to gaurantee that

20  all potential liabilities for the directors and officers are

21  taken care of full stop we are not in a position to do that

22  today.  We simply can't.  The debtors do not have sufficient

23  cash today to pay for those things.  This is not a DIP, they

24  don't have availability or no additional cash other then what

25  they have on hand.

A001301

1     So, we're a little bit in a -- and I don't really

2 know because I'd prefer option A, Your Honor.  I'd prefer

3 that we did this consensually and that we were before the

4 court late in the week with respect to a voluntary

5 conversion, but I don't know because of demands that we

6 received very, very late last night.  As Mr. Werkheiser said,

7 everybody has been working round the clock to try to make

8 this work and to try to come up with a scenario that works.

9 Then, you know, late in the evening we're getting demands

10 that say you must pay what we believe are $16 and a half

11 million dollars of obligations and we'd like to take that

12 money today.

13     If the debtors were permitted to do what they're

14 asking to do, of course, there's no options for any creditors

15 in a Chapter 7 because you will turn over the case to a

16 Chapter 7 Trustee with no money and no funding.  So, where we

17 sit today our view is if this is likely to convert to a

18 Chapter 7 Trustee then we should turn over the funds that

19 remain in the estate to the Chapter 7 Trustee as well.  I

20 just would be remiss if I didn't mention that the debtors

21 are, as Your Honor can imagine, out of borrowing base

22 compliance.  So, the lenders have the right, under the

23 interim cash collateral order, to sweep cash, to put them

24 into compliance which would be in excess of $5 million

25 dollars.  We have not taken that action for exactly this

A001302

1    reason because our view and the view that we have shared with

2    the debtors is we appreciate that the estate today has more

3    obligations that they didn't have cash to pay.  They're going

4    to be tough decisions that need to be made going forward

5    undoubtedly.

6              There might be a scenario in which we have to fund

7    to an exit.  We just don't know, but if its likely to convert

8    to a Chapter 7 anyway then it makes sense for the Chapter 7

9    Trustee to have all of the available options and the cash to

10   make those tough decisions rather than a situation which is,

11   I believe, what the debtors are suggesting or requesting

12   today which is that they would take all of the cash, leave

13   the estate with zero money and soft convert it.  I don't know

14   what's soft about that, but convert it into a Chapter 7 case

15   and leave all of the creditors and the Chapter 7 Trustee with

16   absolutely no options but, you know, a zero for everybody.

17             We can't imagine that that's maximizing value.

18   Certainly not by our view and so, therefore, Your Honor, we

19   are where we are and, as I said, if the debtors want to work

20   cooperatively, we are here.  We want to do that, but we've

21   got to be working towards that conversion and, you know, we

22   will fund payroll expenses for employees that remain at the

23   company today and certain those that we need going forward.

24   But we cannot give the debtors assurances that we are going

25   to fund something to deal with D&O liabilities today.  It's

A001303

1    just not appropriate and we're not in a position to do so.

2            THE COURT:  Thank you.

3            MS. FELDSHER:  Your Honor, unless you have any

4    questions thank you.

5            THE COURT:  Anyone else before I turn it back over

6    to Mr. Werkheiser?

7            MR. SANDLER:  Your Honor, very briefly.  Brad

8    Sandler, Pachulski Stang, for the committee.  May I be heard?

9            THE COURT:  Yes.

10           MR. SANDLER:  Your Honor, as I think I said when

11   we had our first hearing that the committee was involved in

12   the overarching goal of this committee was to see one or more

13   going concerns because, obviously, that would be good for the

14   employees, for the landlords and the vendors.

15           You know, you've heard two very different

16   presentations over the last, I guess, about 30 minutes or so

17   that I think you can sense what is going on within the case.

18   The committee is, kind of, caught in the middle.  The one

19   thing from the committee's perspective I don't think there is

20   really much of an operational difference right now with this

21   Chapter 11 in particular and what will likely occur in a

22   Chapter 7 given the state of the emergency.

23           And considering that the trustees in Delaware are,

24   for the most part, comfortable operating a business one of

25   the things that I do want Your Honor to know is that we have

A001304

1  been talking to our committee members, some of our committee
2  members, which consist of major vendors as well as major
3  landlords of the debtor.  And we have also had conversations
4  with Robert Levin's counsel and separately with Gary Van
5  Elslander's counsel.  And the committees goal still remains
6  to try to find a going concern transaction, one or more going
7  concern transactions that will hopefully save some portion of
8  the Wolf/Levin stores and the Art Van stores.

9          This, you know, ultimately may be done in a
10  Chapter 7 and it may be that some of us are not around in the
11  Chapter 7, although some of us may be around, and we intend
12  to continue to find a way to develop a value maximizing
13  transaction, one or more of them here because it really will
14  be critical to try to get a going concern to the extent
15  possible.

16          You know, in terms of where the case ultimately
17  goes its unfortunate.  A conversion is never a great thing
18  for a case.  We understand the disagreements between Wells
19  and the company.  We will, obviously, take a look at whatever
20  conversion motion is filed and we will weigh-in on that.  At
21  this time, though, we certainly understand the substantial
22  challenges confronting this debtor right now.

23          So, with that, Your Honor, I think I will just see
24  if you have any questions from the committee's perspective.

25          THE COURT:  No.  Thank you.

 1          MS. RICHENDERFER:  Your Honor, if I may.  This I

 2   Linda Richenderfer from the U.S. Trustees Office.

 3          The one thing that strikes me is that we have a

 4   cash collateral -- use of cash collateral that expires at

 5   some point this evening.  And it doesn't sound like a motion

 6   to convert would be filed sooner than a day or two and then

 7   that still needs time for Your Honor to hear it.

 8          I have a great concern about who is going to be

 9   protecting the collateral in the meantime because it

10   certainly will not be under the control of the Chapter 7

11   Trustee.  And I don't know if the debtor has spoken to the

12   lender yet about any arrangements being made, but until that

13   order is signed and until the trustee is appointed a Chapter

14   7 Trustee is not responsible for what happens with the

15   collateral.  That is just a point I wanted to emphasize at

16   this point.

17          THE COURT:  Thank you.

18          MR. GANZ:  Your Honor, Craig Ganz.  May I be

19   heard?

20          THE COURT:  Yes.

21          MR. GANZ:  Craig Ganz, Ballard Spahr.  Again, Your

22   Honor, as you know, we represent a group of landlords

23   including Brixmor Store, Essential and Broadstone.

24          One of the issues that the Trustee brought up, its

25   one of the issues that we have as well, you know, once we

A001306

1   turn the page in April here we're not onto April rents and

2   essentially being a rent free storage facility for the

3   collateral.  It brings a lot of concerns.  We have had

4   multiple discussions with potential purchasers both on that

5   collateral that's inside our stores and also purchasers on

6   the leases as well.  We have tried to direct them many times

7   over to debtor's counsel.  We have not seen any of those

8   conversations bear any fruit.

9            The position that we are taking right now is we

10  just want to find a way here where we can remove ourselves

11  from this process and if it has to be go direct with these

12  potential purchasers of the leases or acquirers a we do have

13  potential new tenants lined up to take over here, but there

14  is no mechanism here to extract us.  And, you know, there

15  could be a situation where we're hopeful when we get into a

16  Chapter 7 that we'll have a trustee that is responsive to

17  removing the collateral from these locations or liquidating

18  the collateral to a potential acquirer of these leases so we

19  can have a new tenant, but as these days start to drag on

20  there's some significant implications here especially, like I

21  said, we're viewed somehow as a rent free storage facility

22  where, you know, those amounts are going to need to be paid

23  at some point and what the mechanism to do it is and whether

24  that is through the Chapter 11 process or through the Chapter

25  7 process.  We would like to see, you know, a mechanism to

A001307

```
 1  move this along while at the same time, obviously, being
 2  sympathetic to the situation that we're all facing.
 3           Thank you.
 4           MR. WOLF:  Your Honor, Jeff Wolf from Greenberg
 5  Traurig on behalf of HGB AVF.  If I could be heard.
 6           THE COURT:  Yes.
 7           MR. WOLF:  Thank you.
 8           We are the term lender and at this point now the
 9  successor agent under the term loan facility.  I just wanted
10  to make sure that you and the other parties understood that,
11  first, we have not been involved in the back and forth on the
12  day to day of the discussions between the debtor and Wells
13  Fargo.  We have not been consulted on the continued use of
14  cash collateral.  We have not been a party to the development
15  of the mothball budgets.
16           That having been said I just wanted to let you and
17  the other parties understand that it would have been our
18  hope, like Wells Fargo, that the ABL agent and the debtors
19  would have worked out a mothball budget and continued with
20  consensual use of cash collateral and continued in Chapter
21  11.  And hopefully to find a way to get the stores back open
22  when the time is allowed and dispose of the collateral in an
23  orderly basis in the hope of getting recoveries for the term
24  loan term lenders.
25           Given what we understand to be the current
```

 1  circumstances and demands of the debtor in terms of what

 2  needs to get paid, and lack of cash and other resources we're

 3  supportive of the ABL agent's position at this point to

 4  terminate cash collateral.  We would echo their sentiment as

 5  well as the U.S. Trustees and landlord's counsel about trying

 6  to give this thing a soft landing in Chapter 7 with

 7  safeguarding the collateral and paying attention to all the

 8  niceties of trying to put the Chapter 7 Trustee in as good a

 9  position as possible to maximize value for the benefit of all

10  stakeholders.

11          Thank you.

12          MS. ROUPINIAN:  Your Honor, this is Rene Roupinian

13  of Raisner Roupinian.  May I be heard?

14          THE COURT:  Yes.

15          MS. ROUPINIAN:  Thank you, Your Honor.

16          As everyone knows, this healthcare crisis

17  continues and we wanted to highlight to the court and to the

18  parties that irreparable harm to these employees continues

19  due to the lack of their health insurance.  And while the

20  estate exists, we implore the parties to make every effort to

21  relieve as much of this healthcare crisis as possible by

22  whatever means is available.  Even if it causes some

23  discomfort in the financial analysis here.

24          We're talking about human lives that are at stake.

25  And there would be goodwill towards the parties if some

1   accommodation could be made with respect to these employee

2   obligations.  And we think that goodwill is worth quite a

3   bit.  And unlike money, can't be regained.  So, we felt it

4   important to make a plea here for the employees who, you

5   know, have been terminated and have lost their health

6   insurance, and have serious medical issues as my colleague,

7   Jeff Raisner, pointed out at the last call.  Those issues

8   continue.

9         Our concern is that these medical bills aren't

10  going to be paid.  There is not going to be money there for

11  them and, obviously, the concern is that they have no

12  healthcare going forward and it sounds like that maybe their

13  payroll is not going to be paid as well.  So, that puts them

14  in an even worse position in terms of trying to pay any kind

15  of medical coverage.

16        Thank you, Your Honor.

17        THE COURT:  Anyone else before I turn it over to

18  Mr. Werkheiser for a brief rebuttal?

19        MR. MIRARCHI:  Your Honor?

20        THE COURT:  I'm sorry.  Yes, sir.

21        MR. MIRARCHI:  Your Honor, this is Sam Mirarchi

22  from the Commonwealth Pennsylvania Office of the Attorney

23  General.

24        We remain interested in this case.  We believe the

25  consumers -- there are many consumers who have been harmed by

1    making deposits who didn't get their furniture.  We're going

2    to stay committed to having any discussions that we believe

3    would be helpful to anybody or any of the parties.  Those

4    discussions we would like to be a part of that, but we will

5    be watching and monitoring the proceedings so that consumers

6    are treated fairly in this case.

7              Thank you.

8              THE COURT:  You're welcome.

9              All right, Mr. Werkheiser?

10             MR. WERKHEISER:  Your Honor, thank you for the

11   opportunity to address some of these statements.

12             Your Honor, first, I just want to direct the court

13   and everyone else to Paragraph 2 of the interim cash

14   collateral order which I think is the operative language

15   given where the case is at right now.  And that language

16   states:

17             "During the remedies notice period the debtors may

18   use cash collateral solely to meet payroll obligations and

19   pay expenses necessary or reasonably advisable to avoid

20   immediate and irreparable harm to the debtors' estates in

21   accordance with the budget, and as otherwise agreed to by the

22   prepetition ABL agent in its sole discretion."

23             So, Your Honor, the fairest reading of that is

24   that --

25             THE COURT:  Wait, wait, where is that?  I don't

1    see that?  That's not Paragraph 2.

2            MR. WERKHEISER:  Of the interim cash collateral

3    order, Your Honor?

4            THE COURT:  Yeah, I'm looking at it.

5            MR. WERKHEISER:  Where --

6            THE COURT:  Oh, I see it.  All right.  Hang on,

7    let me read it.

8            MR. WERKHEISER:  Okay.

9            THE COURT:  Not that I don't like being read to,

10   but I don't.  So, what are you -- nothing -- I didn't hear

11   anything other than the payroll obligations that were

12   necessary to avoid irreparable harm.

13           MR. WERKHEISER:  I think we are -- that is

14   primarily our focus at this point, Your Honor.  There are

15   approximately 4.8 million of payroll obligations, wages,

16   salary, and commissions for sales personnel who worked on a

17   post-petition basis to monetize Wells Fargo's collateral on

18   the collateral of the other secured lenders in these cases

19   that remain unpaid at this time.

20           The sales commissions, in particular, have a long

21   tail, Your Honor, because they do not become earned until the

22   furniture is actually delivered to the customer.  And so that

23   accounts for a large portion of those employee obligations

24   that at this point remain unfunded.

25           The second component of employee obligations that

1 was identified were the healthcare obligations, Your Honor,

2 that are part of the employee benefits and would normally be

3 part of payroll.

4       THE COURT: Its not payroll. Do they have a right

5 to -- if you cancel the healthcare, do they have a right to a

6 money payment from you?

7       MR. WERKHEISER: The healthcare benefits?

8       THE COURT: Are you required under state law to

9 continue to give them healthcare if you decide to voluntarily

10 get rid of it?

11       MR. WERKHEISER: Your Honor, just to clarify what

12 we're talking about here are claims that were submitted by

13 employees under the debtors' healthcare plan prior to the

14 termination of their employment. So, these are services

15 where an employee went to a physician or received medical

16 care prior to, in most cases, March 19th and had billed and

17 had been proceed through the insurance claims process or

18 system since then and its now going to get sent back to the

19 debtors to pay several weeks later.

20       So, the numbers that are believed to be the

21 obligations are those that are going to hit the debtors over

22 the next several weeks based on those claims that were made

23 by employees, we think, predominately during the post-

24 petition period and were part of their, you know, employee

25 compensation and benefits package with their wages.

1          THE COURT:  Let me back up a minute.  What

2    furniture have you delivered since you shut down?  None,

3    right?

4          MR. WERKHEISER:  I can't speak without, you know,

5    having the ability to talk to the client and get detail about

6    what that was, but I believe there's been some furniture

7    delivered since the petition date since March 8th through the

8    19th or so. I can't tell definitely whether there's anything

9    that's been delivered after the 19th.

10          THE COURT:  So, how often do you pay payroll?

11    When was the last payroll?

12          MR. WERKHEISER:  I think, Your Honor -- I know

13    this is a little unorthodox, but I believe Mr. Stogsdill is

14    on the line and I don't know if he has that information handy

15    for us.

16          MR. STOGSDILL:  I am Greg.  Payroll is made every

17    Friday at Art Van and those commissions cover the period of

18    March 1st through deliveries that were made up to late as

19    March 21st, I believe.

20          THE COURT:  So, you haven't paid for any March

21    deliveries?

22          MR. STOGSDILL:  Not for commissions.  Commissions

23    are made on a monthly basis.

24          THE COURT:  So when are they due generally?

25          MR. STOGSDILL:  This week.

1           THE COURT:  They're due this week, so the 3rd?

2           MR. STOGSDILL:  Well technically, Your Honor, they

3  would be paid if we were going concern, they would be paid in

4  April after the month concluded.  Because we terminated

5  everybody and shut down the operations, we moved them up to

6  be paid one to two weeks after the closing.

7           THE COURT:  Well the closing was the 19th, okay.

8  So, you have March commission earned due to March deliveries

9  that have not been paid.  How much is it?

10          MR. STOGSDILL:  It's a little over $2.2 million

11 dollars, I believe.

12          THE COURT:  And I'm hearing from Mr. Werkheiser

13 that there's payroll that would normally be due, I guess,

14 this Friday for people who are currently working that haven't

15 been paid, is that correct?

16          MR. STOGSDILL:  There's two components of the

17 amounts being paid this week.  It's for employees who were

18 laid off as part of the shutdown on the 19th and there's also

19 a small group of employees that have continued to support the

20 estates, and they're in there as well.  But the bigger piece

21 of it is for the preclosing payroll, just by virtue of

22 having, you know, several thousand people on that.

23          THE COURT:  Okay. So, it's people who are being

24 paid for work they did before you closed that haven't been

25 paid yet.  How much is that?

 1          MR. STOGSDILL:  I don't have that number directly

 2    in front of me but it's around $4 million dollars, high

 3    three's probably.

 4          THE COURT:  So, they normally would have been paid

 5    on like the 20th or the 27th, but they weren't?

 6          MR. STOGSDILL:  That's right.

 7          THE COURT:  Okay.  And for people who have been

 8    supporting the company post-closing which was the 19th, how

 9    much is that payroll?

10          MR. STOGSDILL:  It's roughly about $250,000

11    dollars every two weeks.

12          THE COURT:  Okay.  And Mr. Werkheiser was giving

13    me some numbers about healthcare reimbursements. And it

14    sounded like there was a distinction between what you had

15    already received request for payment for and what you

16    expected in the future, is that right?

17          MR. STOGSDILL:  Yes, what's in the forecast which

18    has been in every forecast we've ever put out is a tail; I

19    think of it as like an actuarial tail for claims made

20    incurred in the prior period that because of paperwork and

21    bureaucracy take several months to be processed and presented

22    to the company for payment.  So, the $8 million dollars or so

23    that's in the forecast, that's always been in the forecast is

24    for claims that have been made over the last -- as far back

25    as six months ago.

```
 1              THE COURT:  And you have a wage order, Mr.
 2   Werkheiser, that allows you to pay those even though they're
 3   prepetition claims?
 4              MR. WERKHEISER:  We did. We did get authorization
 5   from the court that are continued processing and honoring
 6   healthcare reimbursement claims for the employees.
 7              THE COURT:
 8              MS. FELDSHER:  Your Honor, this is Ms. Feldsher.
 9              THE COURT:  Yep.
10              MS. FELDSHER:  Can I be heard here?
11              THE COURT:  Of course.  I'm just trying to
12   understand --
13              MS. FELDSHER:  Yeah.
14              MR. WERKHEISER:  Your Honor, I'm sorry.  I'm happy
15   to have Ms. Feldsher be heard.  There were a number of
16   mischaracterizations of the record --
17              THE COURT:  Mr. Werkheiser, you'll --
18              MR. WERKHEISER:  -- in the presentation she made
19   to the court.
20              THE COURT:  Mr. Werkheiser --
21              MR. WERKHEISER:  Okay.  I just didn't want to not
22   address those points.
23              THE COURT:  You will get your opportunity -- stop
24   talking over me.  You will get your opportunity to speak.
25   I'm trying to figure out the facts and, frankly, I'm not
```

A001317

1  getting them very well from you where I have to ask your

2  client and others to tell me what's actually going on.

3          So, Ms. Feldsher.

4          MS. FELDSHER:  Thank you, Your Honor.

5          Your Honor, with respect to these healthcare

6  obligations my understanding and, again, at the risk of the

7  lawyer talking numbers, is that what was included in the

8  budget that was filed -- actually, Your Honor, if I may just

9  take a brief step back.

10          So, we view the language in two, to be as Your

11  Honor I think, you know, understands and has seen this

12  provision in virtually all DIP and cash collateral orders,

13  this is the debtors can keep the lights on, you know, the

14  stuff that's absolutely necessary they can pay it until they

15  can get back to court and seek some relief from the court.

16          And, you know, as you've heard these obligations

17  were obligations that the debtors incurred by virtue of

18  terminating of all of the employees.  Again, Your Honor, I

19  just want to be very clear --

20          MR. WERKHEISER:  Debtors do --

21          MS. FELDSHER:  -- all current payroll, all current

22  payroll that we are aware of that's been submitted to Wells

23  Fargo has been funded.  But on the issue of these healthcare

24  obligations my understanding is that, one, this is not -- if

25  you look at the budget it's not, there's no line item for

 1  these obligations in the budget.

 2          But from Clear Thinking Group, which is Wells

 3  Fargo's financial advisor in this case, I am told that what

 4  was included in the backup to the budget that went in with

 5  the cash collateral order was accrued worker's comp and

 6  medical of $6.2 million dollars.  There were no provisions

 7  for unpaid PTO or vacation because the debtors understandably

 8  did not anticipate terminating all of their workforce.

 9          Again, we have asked all of these questions as

10  well, Your Honor, many many times.  We tried to get to exact

11  numbers.  Mr. (indiscernible) gives one number, the debtors

12  today submitted a funding request for these obligations that

13  were not the same as the numbers we received in a demand

14  email from the debtors' advisors yesterday evening.

15          So, there's always these discrepancies and, you

16  know, that's part, I think, of the issue here.  But any

17  payroll, actual, you know, payroll, right, people working

18  their salaries my understanding is that those have always

19  been honored and have all been paid.

20          THE COURT:  What about the commissions?

21          MS. FELDSHER:  So, the commissions, Your Honor,

22  have not been paid yet and they have not been paid because as

23  you heard from Mr. Werkheiser, these were delayed and they

24  were accelerated, as Mr. Stogsdill said.  They have been

25  accelerated unilaterally by the company to be payable now.

A001319

1  They wouldn't ordinarily be payable.

2       Your Honor, we have asked for and continue to ask

3  for details on the exact number of these obligations.  And in

4  and of themselves, again, Your Honor, we can work on one

5  issue and say, okay we absolutely agree that these should be

6  paid, and we can get them paid.  There's sufficient cash to

7  pay them.  The problem is there isn't sufficient cash to pay

8  all of the employee obligations, so how do you draw the line?

9  How do you draw the line on commission payments, but not PTO,

10 but not healthcare costs, but not this, but not that?

11      There has to be -- there's a fiduciary that's

12 supposed to be in place to make those decisions.  And if this

13 is going to convert to a Chapter 7, we think the right place

14 is for the Chapter 7 trustee to look at all of these, get to

15 the right, you know, final number and make, you know, and

16 look at those and decide if these obligations can be paid.

17      But as we currently sit here today, were the

18 debtors to pay everything that they want to pay, it would

19 exceed the amount of cash they have and that's even before

20 any sweep for cash that are permitted in the cash collateral

21 order for Wells Fargo which I'm not suggesting we would take.

22 I'm just saying even before you do any of that, you're in

23 excess of the amount that they have.

24      So where do you draw the line?  Why do employees

25 that submitted claims previously get their healthcare claims

A001320

1  paid?  The ones that submit them tomorrow aren't going to get

2  them paid because the debtors aren't going to have sufficient

3  month.  There's no way to easily peel this onion as far as we

4  can tell.  We've tried very very hard with the debtors. We're

5  happy to try some more, but we need definitive numbers, not

6  estimates.  We need actual numbers.  We need to know exactly

7  what is being requested.  And what we're doing in funding

8  that in terms of what will be possible in the Chapter 7 for

9  all other stakeholders.

10         THE COURT:  All right, thank you.

11         Mr. Werkheiser.

12         MR. WERKHEISER:  Yes, Your Honor.  Thank you.

13         Your Honor, and I'm sorry if my presentation has

14  not been as clear as would be idea.  We're, obviously, you

15  know, this is a developing situation.  We are doing this by

16  telephone.

17         If we were all in the same room, I would be able

18  to hand you cash forecasts going back to the beginning of the

19  case that have shown that these obligations were in the

20  forecast, in the budget they contemplated.  The numbers may

21  have changed somewhat over the course of the case, but they

22  were always known and always part of what needed to be paid

23  to pay the freight to be in Chapter 11 bankruptcy, this

24  lender and the other secured lenders.

25         And, Your Honor, I would just, again, we don't --

1    the version of the budget that is attached to the cash

2    collateral has minimal detail, you know, has become common,

3    unfortunately, in these cases.  But the backups to that

4    really shows, even at the very beginning of the case, for

5    example, that these healthcare obligations were contemplated

6    and prefunded and reflected as prefunded employee obligations

7    in excess of $6 million dollars, at that point in time.

8           Your Honor, I need to correct the factual record

9    too on a number of things that Mr. Feldsher said.  I will,

10   giving her the benefit of the doubt assume unintentional.

11          These lenders received daily reports of the

12   operations of the debtors during the bankruptcy case.  They

13   knew exactly what was going on with both the GOP stores and

14   the operating stores on a real-time basis.  There was

15   complete information flow all throughout these cases.

16          So, it is really disingenuous for her to say that

17   we somehow surprised them with the board having made a

18   responsible decision on March 19th to discontinue operations

19   when the coronavirus was already rousing throughout the

20   country at that point.  Pennsylvania, at that point, had

21   issued an order to stay in place where a large portion of the

22   debtors' stores are located.

23          And, Your Honor, I think we can take judicial

24   notice of the fact that Michigan, Ohio and Illinois, where

25   the bulk of the other operations of the debtors and the

1  debtors' headquarters are located in the case of Michigan,

2  have all since issued stay-in-place orders no later than

3  March 23rd.

4      So, maybe the board anticipated the formal

5  government action, at that point, but it was clear, the

6  writing was on the wall, and it was known to Wells Fargo and

7  to everyone else in this case that the operations at those

8  stores, at that point, were losing money on a daily basis

9  because the traffic in the stores, and this makes sense.  The

10 company that sells furniture, and this is a virus that are

11 reports indicating live on hard surfaces for a period of time

12 after somebody touches them who's infected.

13     The customer traffic in the stores was at very low

14 levels once it became known what this country was dealing

15 with in this virus.  So, the board did what it had to do both

16 for economic reasons and for the health and safety and

17 welfare of employees and customers in making the difficult

18 decision to discontinue operations on March 13th.

19     What did that do, Your Honor, at that point?  It

20 didn't change anything other than potential retriggering

21 obligations with respect to unused vacation time.  Unused

22 vacation time, Your Honor, is not part of any of the funding

23 request that we're talking about today.

24     The obligations we're talking about today are

25 salaries, wages, commissions, and healthcare obligations.

1   Does not include vacation pay.  It does not include PTO of

2   any other sort.  That's a red herring and that's

3   misdirection.

4          I also do want to, again, address the point of

5   whether these debtors have tried to cooperate with their

6   lenders. We have been trying throughout this case and before

7   to do that and especially since it became clear the original

8   contemplated going concern transaction and the GOP sales were

9   not going to be able to be implemented as parties that

10  originally intended.

11         Again, if we were all in the same room, I could

12  show you model after model after model of that.  Alvarez &

13  Marsal has shared with the lenders financial advisor and I

14  could show you email after email after email in which we

15  previewed that these issues existed.  We're trying to explain

16  to the lenders why, what challenges the company faced in this

17  situation and what obligations needed to be funded in

18  connection with these cases to pay the freight.

19         So there has been fulsome communication.  There

20  has been accurate communication.  Numbers changed because new

21  data comes in from time to time and new claims come in from

22  time to time.  But the information has always been provided

23  as soon as it was available.

24         Your Honor, what this comes down to, Your Honor,

25  is everybody -- it's a miserable situation.  The employees

1    have been hurt.  The customers have been hurt.  Everyone else

2    has been hurt in some fashion by the way this has developed.

3    Much of it is beyond anyone's control.  Some of it, in

4    particular, within the control of our secured lenders and

5    that is, you know, how do we do the least harm to the most

6    people, primarily the employees?

7            And that's why we are pressing for these

8    obligations that are baked into this cash collateral order --

9            THE COURT:  Well, listen, Mr. Werkheiser, you just

10   raised the point that's the problem.  You got a fixed amount

11   of money, insufficient to meet all this company's

12   obligations.  You want to do the least harm possible

13   particularly to the employees.  Particularly to the employees

14   is a choice.  You are choosing one creditor over another.

15   Those creditors will get paid, other creditors of equal

16   priority will not.

17           Now, generally speaking, a debtor-in-possession

18   has the ability to run his business or its business.  When

19   you start to make those kind of value judgments when you're

20   picking one administrative creditor over another that's

21   really the purview of the court.  And they're very very

22   difficult questions that have to be answered, consistent with

23   due process, an opportunity to be heard, and based on facts

24   and law, not just the debtors' board prefers to pay his

25   employees rather than his bank, rather than his landlords,

 1  rather than his taxes, rather than any other administrative

 2  obligations that are going to go unpaid.

 3          And while I certainly understand and sympathize

 4  with that desire of a company to want to take care of its

 5  employees -- oh by the way, and the other then also includes

 6  customers who are never, at this point, going to get their

 7  deposits back.  That's a choice.  And, you know, frankly, I

 8  don't think your client is in a position to make that choice

 9  because reality has outstretched a previous life.

10          MR. WERKHEISER:  Your Honor, may I respond

11  briefly, just on that --

12          THE COURT:  Of course.

13          MR. WERKHEISER:  I do appreciate the difficult

14  situation and perhaps the impossible situation that the court

15  is in and everybody else is in.  But what I'm talking about

16  is enforcing a choice that not just the debtor but the

17  lenders made in the order that they agreed to and had Your

18  Honor enter.  That order explicitly says that the debtors had

19  the ability to use the cash collateral to meet the payroll

20  obligations.

21          They committed -- and I'm not standing -- asking

22  Your Honor today to order them to make additional funds

23  available.  If they committed to make the money available for

24  that purpose and those are obligations that are due now for

25  the most part.

1              THE COURT:  It says payroll obligations and

2     irreparable harm expenses.

3              MR. WERKHEISER:  Yes, Your Honor.

4              THE COURT:  And the only payroll obligations that

5     I've heard are salary, wages, and commissions that have been

6     (indiscernible) but unpaid through today.  That's all I've

7     heard.

8              The healthcare reimbursements are not payroll

9     obligations.  They're just not.  Under no reasonable

10    definition of what payroll obligations are would they include

11    healthcare reimbursements under a terminated healthcare

12    policy, many of which are prepetition.  And it's terrible and

13    it's ridiculous that in this country you have to have a job

14    to have health insurance, but that is the law.

15             MR. WERKHEISER:  Understood, Your Honor.  I

16    understand where the court is coming from.

17             Your Honor, again, despite us airing our

18    respective dirty laundry in front of the court today which is

19    not what we had set out to do this afternoon, you know, I

20    think the one thing that from the debtors' perspective, you

21    know, we would agree with our lenders on is that everyone is

22    better off if we can somehow come to an understanding as to

23    dealing with these obligations that is fair and honors the

24    bargain reflected in the cash collateral order, and you know,

25    the basis principles under which I think this court has

A001327

1  operated for some time which is, you know.

2       I know Judge Walsh always used to say I can't --

3  if a secure lender wants to be dumb and take, you know, make

4  a rational decision that's collateral at the end of the day,

5  I can't stop them, but so they're going to have to pay the

6  freight.

7       THE COURT:  Well, I think we can all agree a force

8  majeure has occurred between the decision making at the

9  beginning of this case and where we are today, for everyone.

10      MR. WERKHEISER:  Well, of course.  All I'm saying

11 is I think, you know, we are acknowledging as Judge Walsh did

12 that, you know, the secured lender has rights and has a

13 significant amount of control over its collateral.  And that

14 was my only point in raising that, Your Honor.

15      But, at the same time, there's a duty to pay the

16 freight.  And in this case, you know, the freight is -- the

17 largest chunk of that freight that needs to be addressed, you

18 know, sooner rather than later is the employee obligations.

19 And customer obligations which, you know, again, that the

20 (indiscernible) there's not a real opportunity to pay, at

21 least as to the prepetition.

22      You know, I cannot speak to and I do not know, at

23 this time, what ability there is for customers who bought

24 goods and paid in full for them on a post-petition basis

25 where the company was only selling inventory that was

1   actually in its possession at that time, not taking special

2   orders, that may actually sit someplace in a warehouse, at

3   this point, and could be delivered if the resources were

4   there to do it, and there was not government action

5   preventing that from happening.  But, again, you know, it's

6   paying the freight, doing what's right and fair and, you

7   know, not to the extent possible hurting individuals who have

8   no control over what transpired here.

9           Thank you, Your Honor.

10         THE COURT:  You're welcome.

11         All right --

12         MS. FELDSHER:  Your Honor, this is Jennifer

13   Feldsher.  I won't take up the time other than I didn't want

14   my silence to be perceived as acquiescence to Mr.

15   Werkheiser's statement that I somehow misrepresented to the

16   court.

17         What I said to the court is to the best of my

18   knowledge and I hope that Your Honor knows that we tried to

19   be very careful about the things we say to the court and that

20   we're not misrepresenting it.

21         THE COURT:  All right.  It's a very difficult

22   situation for everybody, to say the very least and,

23   hopefully, one that will never be put into again but I think

24   it's our reality probably for the next several months.

25         All right, so here's where we are.  What I would

1  like to do is have a hearing Friday at one o'clock. I'd like

2  that by video in case we need testimony. And Ms. Gatsun will

3  work with you on that.

4  In the interim, the debtor may not spend any

5  money; however, I believe that under the cash collateral

6  order, they have authority to pay salaries, wages, and

7  commissions that were earned but were unpaid through today,

8  the 31st. But before I authorize that pay, I'm going to need

9  details of exact numbers and backup that can be shared both

10  with me and with Wells Fargo, and any other creditor.

11  Obviously, I don't need names of employees. I

12  don't want any personal identifiable information. Maybe

13  names are okay, but obviously but no social security numbers,

14  no addresses, no phone numbers, just pure names is fine, if

15  we have to get to that level of detail. But I really want

16  detail. I want to know what these numbers are.

17  Not healthcare, not severance, not PPO, not

18  expense reimbursement, no other fringe benefits. Just good

19  old fashion wages, commissions and salary. I think that's

20  fair under the cash collateral order that the debtors would

21  have normally the ability to simply pay that, even without

22  the agreement of the agent. But in current circumstances

23  and, in particular, some disagreement as to what truly is

24  owed or not, I'm going to insert myself into that process and

25  make a decision on Friday of exactly what's going to get

1    paid.

2            I'd like to make a request of the debtors that

3    they make a decision very quickly as to whether to convert

4    the case or not.  I'm not going to allow anything other than

5    what I just discussed to be paid before conversion, allowing

6    the bank accounts to be emptied to zero and then converting

7    the case is a recipe for disaster and unfair to the

8    creditors, none of whom are going to get paid in full.  And

9    the Chapter 7 trustee has to have something to deal with,

10   some way to operate the estate.

11           So, I'm requesting that the debtors quickly decide

12   whether they're going to convert and do so -- if they decide

13   to do so, to do so quickly and to file a motion to shorten

14   and the court will hear it on shortened notice.

15           I'd also like to request Wells Fargo to indulge me

16   by agreeing to continue the stay relief date that ends today

17   through Monday, April 6th to give us an opportunity to figure

18   out what to do, hopefully, with some comfort that no money is

19   going out the door unless otherwise ordered by the court.

20   And the only money the court is considering are the wages,

21   salaries and commissions, and only after hearing detailed

22   evidence of same on Friday with an opportunity for the agent

23   to be heard.

24           This is an unfortunate situation.  It is nobody's

25   fault.  It is nobody's fault.  I know many people in my local

1  business community who are good business people who have

2  great businesses who are staring down the barrel of a gun

3  based on what's happened.  It's just -- it's extraordinary.

4  And I'm not casting aspersions on anyone, but obviously this

5  case changed dramatically as did the whole world -- well not

6  the whole world but as to the United States in the last three

7  weeks, three or four weeks.

8           So, Mr. Werkheiser, is that okay?  Well it may not

9  be okay, but do you understand?

10          MR. WERKHEISER:  Of course, Your Honor, we do

11 understand and let me be clear.  The reason, in part, we're

12 having this debate today is the debtors, of course, never

13 entertained the idea of trying to pay these things without,

14 you know, some court authorization -- some specific vetting

15 of these issues in front of the court given, you know, the

16 lack of consent of Wells Fargo to agreeing to pay these, even

17 if we thought they were required by the order.

18          So we, of course, will abide by Your Honor's

19 direction on these points.

20          THE COURT:  Thank you.

21          MS. FELDSHER:  Your Honor, Jennifer Feldsher.  I

22 apologize for interrupting, just for one clarification.

23          THE COURT:  Yes, ma'am.

24          MS. FELDSHER:  We have been advised -- I

25 apologize, Your Honor.  We understand Your Honor's ruling and

1   will abide by it as well.

2         Your Honor, we were advised late last night, you

3   know, as usual it's always an emergency.  But the debtors

4   have their property insurance is coming due and they need to

5   enter into a renewal on -- Mr. Werkheiser may have more

6   information but we have been told that they need to enter

7   into a renewal by tomorrow or they will have no insurance

8   related to their properties.  And, obviously, there's a

9   significant amount of inventory here.

10        So we have no objections to the debtors entering

11   into the renewal policy and we would be okay with the use of

12   cash collateral for that because we think that in any

13   instance, whether this is a Chapter 11 or a Chapter 7, we

14   will need to have, you know, a proper insurance covering the

15   inventory here.

16        While the debtors haven't been able to secure the

17   same insurance that was required under the prepetition credit

18   agreements, they have told us what's the best insurances they

19   can get and we think that's better than not having any

20   insurance.

21        THE COURT:  Well if you consent, it's okay with

22   me.  And I can guarantee you the first question the Chapter

23   7, if there is one, will ask is whether there's insurance.

24   So, obviously, that's a good idea.

25        MS. FELDSHER:  We agree, Your Honor, we just

A001333

1  didn't want to be, you know, violating a court order so we

2  wanted to make sure you were mindful of that and we will

3  consent to that being paid.

4          MR. WERKHEISER:  Thank you, Ms. Feldsher, and

5  thank you, Your Honor.

6          Yes, I think we had communicated with Wells Fargo

7  just to let them know the terms of the policy, for example,

8  is available for renewal which was less attractive than the

9  one that was in effect through today.  And we're trying to

10 ensure that that would be acceptable to them under the

11 circumstances.

12         As I understand it, we have to sign the paperwork

13 by tomorrow, but nobody need go out the door immediately that

14 there is probably for two weeks of a grace period to make

15 those payments.  So, I think between now and Friday this

16 won't change the amount of cash on hand.

17         THE COURT:  Okay.  Thank you.  Makes a lot of

18 sense.  So, Ms. Feldsher, putting you on -- can you give me

19 that waiver until Monday or do you need to talk to your

20 client?

21         MS. FELDSHER:  Your Honor, I think that I'm

22 authorized -- my client is on, but might be on a mute line,

23 but we will, of course, give Your Honor, the time necessary,

24 particularly if, you know, as we know that the cash position

25 is going to remain the same.  So, Your Honor, at the risk of

 1  getting ahead of my client and somebody else being on the

 2  phone on Friday, I'm going to go ahead and agree to Your

 3  Honor's request.

 4        THE COURT:  Okay.  Thank you.

 5        I am very cognizant for the landlords on the

 6  phone.  I am very cognizant of the fact that you are now as

 7  of tomorrow involuntary storage facilities for many of you

 8  for the debtors' inventory and property.  And I take that

 9  very seriously and I know that you will not get paid your

10  rent tomorrow and I know it's not the only commercial lessee

11  who is not going to pay rent tomorrow in the United States of

12  America, and that puts you all in a very difficult situation.

13  You all have your own lenders and you all have your own

14  stockholders, your own vendors.

15        So, I take that very seriously.  I will take that

16  very seriously and we will address that as quickly as

17  possible; however, until we have some decision about a path

18  forward, which -- I mean my preference is a Chapter 7, but

19  I'm not the fiduciary, thank goodness.  And that will be up

20  to either the debtor-in-possession to make that election or a

21  creditor to move to convert.  I cannot and nor would I

22  convert sua sponte.

23        I kind of lost my cool a little bit but, you know,

24  the healthcare situation is horrible.  Among the most

25  difficult decisions I've had to make since I took the bench

1   involved terminating people's healthcare insurance.  I had to

2   do that in <u>Fistion</u> (phonetic) for 50,000 retirees.  It was as

3   very difficult decision for me to make, and I don't take that

4   lightly either.

5          However, at least, at this point, I think, the law

6   compels me and good sense compels me, first of all, I can't

7   create money out of thin air or force Wells Fargo to fund

8   money that they aren't legally required to fund.  There isn't

9   enough money to pay everybody including healthcare in full.

10  Paying some now and others nothing is making a choice that

11  may not be fair.

12         And there is hope, I hope, a chance that some of

13  that money might get paid through the results of a

14  liquidation of the inventory in a Chapter 7 that would be, I

15  think, probably fairly, some of it at least, administrative

16  expenses, but that's going to have to await time.  That is a

17  hardship for real people that I take very seriously, but it

18  is unfortunately, in my mind, unavoidable under the facts and

19  law in this situation.

20         I'm worried too about the deposits.  As many of

21  you will remember from early in this case, at our first day

22  hearing, I was very concerned about the deposits.  That

23  situation has gotten not better.  It's gotten much much

24  worse.  That's money people, at least, partially have a

25  priority for and, again, hopefully, Chapter 11 priority wage

1  and claims and Chapter 11 priority deposit claims, at least,

2  will get some recovery.  We'll have to wait and see how that

3  plays out but that's a very difficult situation.

4          And I am cognizant of the Commonwealth of

5  Pennsylvania and other Attorney's General being concerned

6  about consumers.  The reality is nobody is getting out of

7  this happy and we're just going to have to do the best we can

8  to weigh the different interests, preserve due process, and

9  make measured decisions that do the least harm possible, and

10 that's hopefully what we're going to accomplish.

11         So, I'll see you all, unless there's anything

12 else.  Mr. Werkheiser, I'll see you all on Friday the 3rd at

13 one.  I would like that by video just in case we have to put

14 somebody on the stand or answer questions.  We really

15 shouldn't do it over the phone like I did today without

16 swearing the witness.

17         It's probably unclear now whether I'm going to use

18 Skype for Business or Zoom, but I'll get you that

19 information, Mr. Werkheiser, and you can include it in

20 whatever notice that goes out at an appropriate time for that

21 hearing.

22         All the audio is by CourtCall, as always, when we

23 go by video.  Only the video is for the pictures and the

24 audio is CourtCall so we can make sure we have a full

25 transcript available as required by law.

1       And if you have detail you can provide me prior to

2   the hearing, as long as you copy the other side with it or

3   the other parties with it, I'd be happy for you to submit

4   this to me by email.  You can work through Ms. Werkheiser or

5   Ms. Samanski; otherwise, I can certainly -- I will need it no

6   later than the hearing.  I will need something in my hand

7   that gives me the detail and you can provide that by email.

8           Any questions?

9           MR. WERKHEISER:  Your Honor, Mr. Werkheiser.  Just

10  a couple requests for clarification here.

11          So, I understood Wells Fargo to indicate that the

12  stay is not being lifted.  I just want to confirm for the

13  record that means that the remedy notice period continues

14  through Monday.  And that's only -- well material, not only

15  material but material from the perspective of while we are

16  not authorized to make any expenditures right now -- if the

17  debtors have no access to cash collateral, we would have no

18  choice but to dismiss the remaining employees effective the

19  end of the day today.  We cannot incur the types of

20  obligations without the ability to pay them, among others.

21          So if we could just clarify for the record that

22  the remedies notice period is continuing through Monday, I

23  think that will assist in (indiscernible) assets until then.

24          THE COURT:  The remedies notice period through

25  Monday but that is not result in the fact that you can or

1  you're going to be able to pay wages from April 1 through

2  April 6th without further order of the court.  The answer to

3  that is no.  I'm not going to let you do that.  What we're

4  going to talk about Friday is through March 31st.

5        MR. WERKHEISER:  I guess, Your Honor, what we're

6  struggling with then is we would then have to effectively

7  dismiss the remaining employees today.

8        THE COURT:  No, you don't.  No, you don't.  They

9  have a --

10        MR. WERKHEISER:  Can't have people to work when I

11  can't pay them.

12        THE COURT:  They have an admin claim.  You're

13  working, you're not getting paid.  They have an admin claim.

14  I may allow it.  I may not.  I don't know.  You don't have

15  the numbers for me.

16        MR. WERKHEISER:  Okay.  Okay.

17        THE COURT:  You can't not give me the information

18  to make a decision and then complain that I can't make a

19  decision, Mr. Werkheiser.

20        MR. WERKHEISER:  Your Honor, that's not what I'm

21  doing, please, please.  What I am trying to make sure is that

22  the legal status of the debtor is not, as of today, that cash

23  collateral is fully cut off, as opposed to making

24  expenditures.  Because if the legal status as of the end of

25  the day today is that there is no more access to cash

1  collateral at all, then the debtors do have zero ability to

2  pay the delegations that might be incurred through the end of

3  the week.

4          THE COURT:  I am struggling to understand in what

5  world you think that occurred.  I didn't terminate the cash

6  collateral order.  I terminated your ability -- I froze your

7  ability to make payments under that cash collateral order

8  until further order of the court.  And I asked and got an

9  accommodation from your lender to extend the remedies notice

10 period for Monday.  That's all that happened.

11         MR. WERKHEISER:  Right.  And nobody actually used

12 the word remedies notice period, Your Honor.  And so, I just

13 wanted to make sure there was no ambiguity about that being

14 extended through Monday.  That's all I was trying to do.  I'm

15 sorry if I did it in an inarticulate way.

16         THE COURT:  All right, whatever.

17         MR. WERKHEISER:  And, Your Honor, just on the

18 issue of conversion as a whole.  I mean I just want to be

19 clear the debtors are not resisting that.  I mean

20 realistically we understand this cannot continue in Chapter

21 11 without the consent of the secured lenders because we do

22 not have the ability to provide adequate protection, given

23 the circumstances of this case.  It's really how to

24 accomplish that, that we struggle with and continue to

25 struggle with.

1        We will do everything we can between now and

2  Friday to try to move past those issues with our lenders and

3  resolve or, at least, narrow the issues that we have on

4  Friday.  Thank you.

5        THE COURT:  Thank you.  Does anyone else wish to

6  be heard?

7        MR. MIRACHI:  Your Honor, this is Commonwealth.

8        THE COURT:  Yes.

9        MR. MIRACHI:  Commonwealth of Pennsylvania; just

10  real quickly.

11        The amount of the commissions may be indicative of

12  the number of deposits or the amount of deposits that were

13  made.  Is there any way we can get a copy of whatever

14  information is going to be provided as well?

15        THE COURT:  Yes.  You'll have to get your

16  information to Mr. Werkheiser.

17        MR. MIRACHI:  We've been in touch with Mr.

18  Werkheiser.  We can do that.  Thank you, Your Honor.

19        MR. WERKHEISER:  Yes, yes.  Your Honor, this

20  hadn't been requested previously, but I'm certain we can

21  accommodate the Commonwealth and provide information about

22  the amount of customer deposits received post-petition and

23  prepetition to the Pennsylvania customers.

24        THE COURT:  Okay.

25        MR. MIRACHI:  Great.  Thanks.

A001341

1    THE COURT:  Anyone else?  Yeah, you're welcome.

2    Anybody else?

3  (No verbal response)

4    THE COURT:  All right, thank you. We're adjourned.

5  (A Chorus of "Thank you, Your Honor")

6    (Teleconference ended at 12:51 p.m.)

7

8

9         CERTIFICATE

10

11  I certify that the foregoing is a correct transcript

12 from the electronic sound recording of the proceedings in the

13 above-entitled matter.

14

15 /s/Mary Zajaczkowski    April 1, 2020
Mary Zajaczkowski, CET**D-531

16

17

18

19

20

21

22

23

24

25

# EXHIBIT W

A001343

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 252** |
| | ) | |

ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER
CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11
FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III)
GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors

and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section

1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under

chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee

applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to

consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of*

*Reference* from the United States District Court for the District of Delaware dated February 29,

2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291);
AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451);
Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC
(8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort
Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East
14 Mile Road, Warren Michigan 48092.

[2]     Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in
the Motion.

13308536 v4

A001344

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. The Motion is GRANTED, as set forth herein.

2. Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3. The following Conversion Procedures are hereby approved:

   a. **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with the terms of the Interim CC Order; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the Interim CC Order and the priorities set forth in section 726(b) the Bankruptcy Code.

b. **Books and Records.** As soon as reasonably practicable, but in no event later than April 10, 2020, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. Without prejudice to the chapter 7 trustee's ability to request further extensions and any party in interest's ability to oppose such requests, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4. Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5. Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured*

A001346

*Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.      Notwithstanding anything to the contrary in the Interim CC Order, the Carve Out Reserves shall be established and funded as follows: (a) $2,593,000 (the "Carve Out Escrow Funds") of the Debtors' funds shall be wired into an IOLTA account at proposed general bankruptcy counsel for the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch"), pursuant to wire instructions Benesch has provided to the Prepetition ABL Agent, where such funds shall be held in trust for the applicable beneficiaries of the Carve Out and disbursed strictly in accordance with the terms of this Order and the Interim CC Order (as modified hereby); and (b) the Carve Out Reserve for the Chapter 7 Trustee Carve Out shall be deemed funded by allowing $50,000 of the Debtors' funds to remain in a bank account of the Debtors where such funds shall remain available to satisfy the reasonable fees and expenses of any interim or permanent chapter 7 trustee, as applicable, for the Debtors' bankruptcy cases. The Carve Out Escrow Funds shall be disbursed by Benesch only as follows: (i) with respect to the portion of the Carve Out Escrow Funds allocable to KCC for fees and expenses incurred as the Claims Agent, in accordance with the procedures set forth in the Claims Agent Order and KCC's Agreement; (ii) with respect to the

4

A001347

portions of the Carve Out Escrow Funds allocable to the Debtor Professionals (other than, for the avoidance of doubt, KCC) and the Committee Professionals, upon entry of, and in accordance with the terms of, such further order or orders of the Court as may be entered following the filing of Final Fee Applications and notice and opportunity to object thereto in accordance with the procedures set forth in Paragraph 3(a) above; and (iii) with respect to the portion allocable to fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, as may hereafter be directed by the interim or final chapter 7 trustee, as applicable.

7. Except as expressly provided in Paragraphs 5 and 6 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, (a) all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order), and (b) any lien priorities or superpriority claims granted pursuant to the Interim CC Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

8. For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or

A001348

are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or (ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

9.      The Debtors have a need for the services of certain independent contractors, including individuals who are former employees of the Debtors (collectively, "Independent Contractors") following the Conversion Date in order to, among other things, (a) provide on-site security at the Debtors' distribution centers, and (b) continue the collection and the Debtors' books and records for transmission to the chapter 7 trustee, prepare the Schedule of Unpaid Debts and prepare the Final Report.  The Debtors are authorized to pay the Independent Contractors from cash on hand in advance for their work and related expenses in an aggregate amount not to exceed $73,243 and as further set forth in the Estimated Disbursements Forecast April 6th - April 10th provided to the Prepetition ABL Agent on April 5, 2020.  After April 10, 2020, the chapter 7 trustee will determine whether, and to what extent, to continue to use the services of the Independent Contractors.

10.     Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

11.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

**Dated: April 6th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

6

A001349

# EXHIBIT X

A001350

```
 1                    UNITED STATES BANKRUPTCY COURT
                            DISTRICT OF DELAWARE
 2

 3                                       .   Chapter 11
      IN RE:                             .
 4                                       .   Case No. 20-10553 (CSS)
      ART VAN FURNITURE, LLC, et al., .
 5                                       .   Courtroom No. 6
                                         .   824 North Market Street
 6                                       .   Wilmington, Delaware 19801
                                         .
 7                   Debtors.            .   April 6, 2020
      . . . . . . . . . . . . . . . . .      1:00 P.M.
 8

 9               TRANSCRIPT OF TELEPHONIC HEARING
             BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
10                 UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtors:          Gregory G. Werkheiser, Esquire
                                Michael J. Barrie, Esquire
13                              Jennifer Hoover, Esquire
                                Kevin Capuzzi, Esquire
14                              John C. Gentile, Esquire
                                BENESCH, FRIEDLANDER, COPLAN
15                                & ARONOFF LLP
                                222 Delaware Avenue, Suite 801
16                              Wilmington, Delaware 19801

17

18    Audio Operator:          Leslie Murin

19    Transcription Company:    Reliable
                                1007 N. Orange Street
20                              Wilmington, Delaware 19801
                                (302)654-8080
21                              Email:  gmatthews@reliable-co.com

22    Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
23

24

25
```

A001351

```
1   TELEPHONIC APPEARANCES (Cont'd):

2   For the Debtors:          Marua I. Russell, Esquire
                              MONTGOMERY MCCRACKEN WALKER
3                               & RHOADS LLP
                              437 Madison Avenue, 24th Floor
4                             New York, New York 10022

5
    For U.S. Trustee:         Linda Richenderfer, Esquire
6                             David Buchbinder, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
7                             OFFICE OF UNITED STATES TRUSTEE
                              844 King Street, Suite 2207
8                             Lockbox 35
                              Wilmington, Delaware 19801
9
    For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                            MORGAN LEWIS & BOCKIUS LLP
                              101 Park Avenue
11                            New York, New York 10178

12                            - and -

13
                              Cory Falgowski, Esquire
14                            BURR & FORMAN LLP
                              1201 N. Market Street, Suite 1407
15                            Wilmington, Delaware 19801

16  For the Committee:        Bradford Sandler, Esquire
                              PACHULSKI STANG ZIEHL & JONES LLP
17                            919 North Market Street
                              Wilmington, Delaware 19801
18
    For Jofran Sales:         Jeffrey Waxman, Esquire
19                            MORRIS JAMES LLP
                              500 Delaware Avenue, Suite 1500
20                            Wilmington, Delaware 19801

21

22

23

24

25
```

A001352

1   <u>MATTERS GOING FORWARD</u>:

2   Debtors' Application for Entry of an Order Authorizing the
    Retention and Employment of Jones Lang Lasalle Americas, Inc.
3   as Special Real Estate Consultant to the Debtors Nunc Pro Tunc
    to the Petition Date [Filed 03/16/2020; Docket No. 141]

4
    Debtors' Application for Entry of an Order Authorizing and
5   Approving the Retention of Benesch, Friedlander, Coplan &
    Aronoff LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc
6   to the Petition Date [Filed 03/16/2020; Docket No. 142]

7   **Ruling:  Matters Continued to April 27th, 2020**

8
    Debtors' Motion to Convert the case to Chapter 7
9
    **Ruling:  28**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Proceedings commence at 1:01 p.m.)

2          THE COURT:  Good afternoon, everybody.  This is

3   Judge Sontchi.  This is the Art Van Furniture hearing; 20-

4   10553, scheduled for one p.m. on Monday afternoon.

5          Just to say what you already know which is all the

6   audio is being done through CourtCall, so if you don't have

7   CourtCall on or are not connected when you want to speak it

8   won't be registered; you have to do that to preserve a valid

9   transcript.  The audio is optional and is on. You have --

10  excuse me, the video is optional and on.  You have the

11  ability to blackout your screen.  That is not a problem, if

12  you're uncomfortable or just don't wish for us to see you

13  that's not a problem whatsoever.

14          I will turn it over to counsel for the debtors.

15          MR. WERKHEISER:  Good afternoon, Your Honor.  This

16  is Gregory Werkheiser of Benesch Friedlander.  Thank you,

17  again, for making this time available to us.

18          Your Honor, this was originally our second day

19  hearing in the case.  So it is a rather lengthy agenda in

20  terms of pages.  Obviously, only one matter of substance

21  going forward today.

22          I just want to make sure Your Honor has the most

23  current version of the agenda which is the second amended

24  agenda that the debtors filed this morning.

25          THE COURT:  I do.

1          MR. WERKHEISER:  Alright, thank you.

2          So, Your Honor, just briefly, items one through

3   eight are all adjourned.

4          Item number nine was the debtors' motion to reject

5   certain executory contracts and Your Honor was kind enough to

6   enter the order for us on that in the last couple of days.

7          Item number ten was the debtors' application to

8   retain Jones Lang Lasalle to provide certain real estate

9   related services, and with the court's permission we are

10  carrying that application to the April 27th which is an

11  omnibus date in this case.  (Indiscernible) remain on the

12  calendar as a hearing date notwithstanding the impending

13  conversion of the cases.

14         There were some comments to that from the United

15  States Trustees Office and (indiscernible) still being

16  evaluated.  Candidly, it is unclear whether Jones Lang

17  Lasalle will decide to go forward with a retention

18  application or not under the circumstances.  We contemplated

19  compensation that was largely a success fee or

20  (indiscernible).  So there may not be a need for that

21  application to be pursued, but that is being evaluated

22  currently.

23         Your Honor, item number eleven is our firm's

24  retention application.  Your Honor, we have a bit of

25  (indiscernible) activity on this, this morning.  Largely it

1  seems to be a miscommunication that occurred Friday evening

2  with Ms. Richenderfer of the U.S. Trustees Office.  We had

3  been learning with her over the last several days some

4  informal comments we received from her.  There was,

5  apparently, a miscommunication Friday night as to whether

6  this was going to go forward or not go forward.  We tried to,

7  you know, clear that up this morning to indicate that we were

8  prepared to adjourn the application if she still had

9  concerns, but I see that the U.S. Trustees Office has since

10  filed an objection to the retention application and now

11  appears at the docket at Item 260.

12         Notwithstanding that I think, you know, from our

13  firm's perspective and from the debtors' perspective, you

14  know, we think the issues that have been raised are ones that

15  we need some more time to work with the U.S. Trustees Office.

16  It should be entirely resolvable and we just need time to go

17  through the issues (indiscernible).

18         Let me pause there, Your Honor, in case you have

19  any questions or the U.S. Trustee would like to be heard on

20  this issue.

21         MS. RICHENDERFER:  Your Honor, this is Linda

22  Richenderfer from the Office of the United States Trustee.

23         I had no issue with this hearing being continued.

24  That was my understanding on Friday.  I was quite surprised

25  when the agenda did not reflect that.  And based on

A001356

1  communications it was not my understanding that the issue was

2  going to be pushed.  Believe me, I have enough to do without

3  having to file objections to retention applications at this

4  point.  Regardless, the objection has been filed.  We will

5  continue to work with the Benesch Law Firm and have no issue

6  with this being pushed to the 27th hearing date.

7         THE COURT:  Okay.  Thank you.  We will continue it

8  to April 27th.

9         In connection with the April 27th date what will

10  happen with that will depend on interactions with whoever the

11  interim trustee is, but we will certainly use that as a

12  holding date.

13         MR. WERKHEISER:  Understood, Your Honor.  Thank

14  you.

15         Your Honor, that then brings us to the Alvarez &

16  Marsal application.  The court did enter an order on that on

17  Friday.  So thank you for that.

18         Item number thirteen was a matter that really

19  should have been continued from the very beginning, it's the

20  interim compensation procedures motion.  On the first amended

21  agenda we did reflect that that was going to be adjourned at

22  that date given where we are.

23         Item fourteen is the schedule extension motion and

24  the court did enter an order for us on that particular

25  motion.  So nothing further to do on that today.

A001357

1          Your Honor, I think that brings us to the main

2     event today which is the much talked about debtors' motion to

3     convert these cases to Chapter 7 liquidation cases.  It was

4     filed Friday evening and this would make a record that after

5     filing an original version we did discover a mistake

6     (indiscernible) for the effective date and filed a corrected

7     version thereafter.  That was a version that got served out

8     on all of the parties.  That appears as Docket Item 252.

9     That would be the version that we are pursuing, Your Honor,

10    for purposes of today's hearing.

11          THE COURT:  Okay.

12          MR. WERKHEISER:  Your Honor, the relief -- the

13    basic relief that we sought is, of course, converting to

14    Chapter 7 and, you know, (indiscernible) right to do, you

15    know, for the reasons that we have set forth in the motion,

16    you know, while, obviously, I think on this call which

17    (indiscernible) the circumstances in the Chapter 11 cases are

18    such that the debtors aren't able to continue in Chapter 11

19    because of the broader circumstances with the coronavirus

20    (indiscernible) because, you know, lack of access to cash

21    collateral going forward beyond today.

22          So the debtors did feel it was important to lay

23    out, sort of, the history of these cases and the efforts that

24    have been made over the course of these cases and before they

25    were filed to, you know, (indiscernible) to salvage this

A001358

1  company and to, you know, protect the interests of the

2  various stakeholders including employees and customers.  I

3  think, you know, all of that is, really, the nature and

4  background for the relief that is being requested which is

5  to, you know, convert these cases effective 12 a.m. tomorrow,

6  Tuesday morning, April 7th to Chapter 7 liquidation cases.

7        Your Honor, the proposed order attached to the

8  motion does have some features that are a little bit unusual

9  for a motion of this nature.  And we did circulate a further

10  revised proposed order to the court just before the hearing

11  which has also been circulated to, among others, counsel for

12  the committee, counsel for the ABL term loan agent, counsel

13  for -- excuse me, counsel for the prepetition ABL agent,

14  counsel for the prepetition term loan agent, and the U.S.

15  Trustee.

16        That further revised order, which I think the

17  court has as well, reflects some changes that were made in

18  the response to comments received and ongoing review of the

19  order as filed with the motion.  We can pursue that however

20  Your Honor would like.  You know, I can walk you through

21  changes at this point or if you'd like me to pause to answer

22  any questions the court has or let other people to make

23  whatever comments they feel they need to make for the record;

24  however Your Honor wants to proceed.

25        THE COURT:  Alright, thank you.

1          Given the motion to shorten we have the objection

2    deadline is actually the hearing, let's just open this up.

3    First I'd like to hear from the committee and Wells Fargo,

4    and then anyone else who wishes to be heard in connection

5    with the motion.

6          I will start with the committee.  Mr. Sandler?

7          MR. SANDLER:  Good morning, Your Honor.

8          It's very unfortunate that this case is

9    converting.  It's something that, you know, we were hoping to

10   see a going concern sale. I think I mentioned that one of the

11   status conferences I was talking to both professionals for

12   Mr. Van Elslander who expressed an interest in the Michigan

13   stores and also with Mr. Levin's counsel who is interested in

14   some of the Pennsylvania stores.

15         So this is unfortunate, but, you know, we all know

16   the history of these cases.  We are where we are and at this

17   point the committee has no objection to the conversion.

18         THE COURT:  Thank you.

19         Ms. Feldsher?

20         MS. FELDSHER:  Good afternoon, Your Honor.  Thank

21   you.

22         I would echo Mr. Sandler's statements and why two

23   decades of practicing it's my first case to convert from an

24   11 to a 7.  On a personal level, you know, its deeply

25   troubling that we couldn't do more to salvage it, but it's

1  just a circumstance of a case caught in the cross-hairs of

2  what is, you know, certainly in my lifetime and hopefully in

3  the lifetime of all those around us who would be a once in a

4  lifetime pandemic and disaster in the country.  So we have no

5  objection to the conversion.

6         We did have some issues with the revised order.

7  There were several versions of the order that had gone

8  around, the latest of which came just before the hearing

9  began.  There is a couple of things, I wouldn't call them

10 objections, per say, but things that we could have cleared up

11 with a little bit more time, but since we're doing it in real

12 time unfortunately we need to, you know, bring them up with

13 the court.

14        The first is, this is Paragraph -- apologies, Your

15 Honor, Paragraph 9.  The debtors have requested a funding of

16 $88,243 to pay for employees that the debtors have identified

17 as being critical to this next week.  Those, I think, as they

18 have been explained to us, fall into two buckets.  The first

19 is security, the second is employees that are necessary to

20 put together information for the Chapter 7 Trustee and also

21 some information that's been requested by the ABL lenders

22 which we think will be integral to the Chapter 7 Trustee as

23 well.

24        The $15,000 of security costs, Your Honor, have

25 already been funded per our last status conference which I

A001361

1  believe was on Friday at which time the court had approved up
2  to $40,000 of security costs.  They actually were $15,000 at
3  the time.  I think Your Honor just gave everybody a little
4  bit of leeway so we didn't have to have an emergency which we
5  appreciated, but those costs have already been paid.  So if
6  you net those out the actual amount, which I believe ties to
7  what the company has already requested, but the ABL lender
8  fund is $73,243 and not the $88,243.

9        I just -- you know, I didn't want -- I appreciate
10 that the language has not to exceed which protects us, but
11 the $40,000 number created some confusion with some vendors
12 after the last hearing and we got calls from the debtors
13 about that.  So I just wanted to be more precise on this one
14 so that there wasn't any ambiguity on what could and couldn't
15 be funded.

16       The ABL lender has no objection to the funding of
17 the amounts for these employees who have committed to working
18 throughout this week to assist the debtors in getting the
19 information over to the Chapter 7 Trustee.

20       Your Honor, with that the ABL lender has
21 requested, which are the three critical pieces of information
22 as we see it that we're hopeful the debtors will be putting
23 together during this week.

24       The first is information about the debtors'
25 inventory.  A lot of inventory, Your Honor, has been moved

1  recently as a result of the debtors rejecting a variety of

2  leases that this court has approved, but as a result there's

3  a lot of uncertainty as to where inventory resides.  That,

4  obviously, goes to the issue of whether or not there is

5  appropriate security at the locations as well.  We want to

6  make sure we know where the inventory is.

7         So we have asked the debtors to put together

8  inventory by location and also, if possible, by skew number.

9  We have been told that that would be provided to us by end of

10  the day tomorrow, but the debtors were not willing to put

11  something into the order requiring them to do so.  I just

12  would like the court to know that we view that as being

13  absolutely critical to the Chapter 7 Trustee being able to

14  get involved quickly, understand where the inventory is and

15  make sure that the trustee can secure it.

16         Secondly, as has been brought up to the court

17  previously, the debtors' insurance policies, its property

18  insurance lapsed and the debtors did get approval to go ahead

19  and pay for replacement insurance  My understanding that that

20  is in progress, but, obviously, we would like to make sure

21  that that gets bound and finalized before, you know,

22  hopefully as part of the (indiscernible), but the Chapter 7

23  Trustee has very current information on what, if anything,

24  remains to be done to have that insurance bounded and

25  completed.

A001363

1        And the third, which I believe was resolved as we

2   were on the phone, is we would ask about the Levin sites who

3   was going to be providing security at those sites which I

4   believe has just been -- the information was just provided to

5   us.  So, Your Honor, we had agreed to fund the $73,243 but it

6   was under the agreement of the parties that the people would

7   continue to work notwithstanding the conversion.  They would

8   work throughout this week for which they are being funded and

9   that they would put this information together.

10  Unfortunately, we're not able to get there with the debtors

11  to include some language that would assure that that was

12  going to occur.

13        Obviously, we're not looking to hold anybody in

14  contempt of court.  If the debtors need some extra time we

15  are, obviously, going to work with them, but we do view this

16  information as being critical to the conversion itself.

17        THE COURT:  Alright, thank you.

18        Mr. Werkheiser, would you like to respond to that?

19        MR. WERKHEISER:  Sure, Your Honor.

20        I think we're largely on the same page in terms of

21  what we are trying to accomplish both with the Chapter 7

22  Trustee and for Wells Fargo who is our other secured lender,

23  whose collateral is implicated in these cases.  So Ms.

24  Feldsher is correct, the amount that remains to be funded

25  under the proposed budget for the week that the debtors would

A001364

1   seek to pre-fund today, Your Honor, and this is why we didn't
2   reflect it in Paragraph 9 of the further revised order that
3   w3as circulated just before the hearing.  It would be
4   $73,243.
5           That covers some -- it covers, essentially, the
6   debtors' personnel who will be providing some functions
7   ancillary to the security functions that the court recently
8   approved and working on collecting books and record, and
9   collecting the categories and information that Ms. Felder
10  referred to.
11          So, you know, that is something that we would hope
12  the court would consider authorizing the debtor to
13  (indiscernible) cash collateral with the consent of our
14  secured lenders (indiscernible).
15          In terms of the inclusion of language or non-
16  inclusion of language in the order to that effect I think,
17  you know, we had some concerns about because as everyone has
18  acknowledged we are doing this real time and because the
19  debtors did have to make decisions on Friday to relieve the
20  remaining employees that they have, the 40 or 50 employees
21  that was left after prior elections enforced they had to
22  terminate everyone effective the end of the day Friday.
23          We then were in discussions throughout the weekend
24  about these issues and I think reached agreement on what
25  would be (indiscernible) staffing for the security issues and

1  for these information issues to be addressed over the next

2  several days, and an appropriate budget for that which is

3  reflected in Paragraph 9.  But given the circumstances and

4  the lack of resources available to the debtors and the fact

5  that some of the employees, you know, we couldn't be certain

6  that the employees would be available to the debtors to

7  (indiscernible).

8          We did have concerns about eliminating every

9  single item of information that the Chapter 7 Trustee or

10  Wells might like in the text of the order and then even

11  create a situation where intentionally or unintentionally

12  parties were put in the position of having violated the

13  order.

14          I can confirm, however, for the record, that the

15  debtors are working on assembling all the information that

16  Wells Fargo and the Chapter 7 Trustee would want relative to

17  the inventory.  So this would be inventory detailed by

18  location and skewed.  I think we had indicated, through

19  correspondence over the weekend, that that is a somewhat more

20  regular intensive process especially given how much an

21  employee has been moved over the last few weeks; objections

22  to various incidents and so on in the case.  That is

23  something that we understand from personnel of the debtors to

24  be completed by (indiscernible) tomorrow.

25          I can also, I think, provide information, and I

A001366

 1  didn't realize this was still an open item as far as Wells

 2  Fargo was concerned, as to the status of property insurance.

 3  In one of our recent prior hearings we did, I believe,

 4  discuss this on the record and the debtors have executed a

 5  binder for new property insurance to request a policy that

 6  expired on March 31st at various locations.

 7       It is our understanding that the debtors have a

 8  thirty day grace period to pay the premiums on that.  So I

 9  don't know right here today whether those premiums have been

10  funded, but, you know, there is no, to our understanding, any

11  gap in the insurance at this time and wouldn't be so long as

12  the premiums are funded within thirty days of the binder

13  having been signed.

14       And then one last point, Your Honor, again, to

15  correct -- just to make sure the record is clear on this

16  point.  The debtors did have to terminate the remaining

17  employees at the end of the day Friday.  So any former

18  employees that are among the personnel that are being asked

19  to provide these services this week are being brought in,

20  effectively, as any contractors at this point and not any

21  employees of the debtors.  I just want to make sure the

22  record is clear on that point because among other things that

23  have expired these debtors they no longer have Worker's

24  Compensation insurance at this point in time.

25       THE COURT:  Thank you, Mr. Werkheiser.  Question:

1  I thought in the context of authorizing the debtors to renew

2  property insurance that there was a sum of money that was

3  involved with that, which I assumed was an initial premium or

4  something along those lines, and now you're saying you don't

5  know if the premiums have been paid.  So what's the status?

6         MR. WERKHEISER:  Yes, Your Honor.  Sorry if I

7  wasn't clear.  So I think we had a discussion about the

8  premium, which was, you know, quite expensive to renew under

9  the circumstances, in excess of, I think, $2 million in

10  total, and then had a discussion on the record at one of the

11  recent prior hearings about the timing of funding of that

12  premium.  And I think what we said at that time is, to my

13  knowledge, still true that there was not a need to fund the

14  premium immediately, that there was a 30-day grace period,

15  and we're still well within that grace period right now.

16         So, given the broader situation with our, you

17  know, limited access to cash collateral and the other things

18  going on in the case, the debtors haven't felt it appropriate

19  to fund that premium prior to the appointment of the trustee.

20  But, you know, certainly, you know, we'd fully cooperate and

21  support the decision to fund that premium once the trustee is

22  in place.

23         THE COURT:  Okay.  All right.  Ms. Feldsher, any

24  response?

25         MS. FELDSHER:  I'm sorry, Your Honor, I could not

A001368

1  get off mute early enough.

2       Your Honor, my only concern with that is, one,

3  these amounts have already been authorized by the Court, so

4  I'm not sure what benefit is gained from the grace period or

5  being with the grace period.  My only concern is, you know,

6  for the Chapter 7 trustee to have sufficient time to get

7  involved, and I don't know what orders of the Court the

8  Chapter 7 trustee will feel they will need, you know, to go

9  ahead and authorize the payment of this premium, if they will

10  need an order to operate the debtors' businesses, and I just

11  didn't want the timing of that to become an issue in the

12  case.  We just want to make sure that the company has

13  appropriate insurance; it's not as fulsome as what we had

14  prepetition, but it is, we understand from the debtors, the

15  best that they could get and it's certainly better than

16  nothing.

17       So, you know, our view would be the debtors are

18  authorized to go ahead and pay it and we don't see the

19  benefit of not paying it.  But if Your Honor thinks the

20  Chapter 7 trustee will have sufficient time to address it as

21  well, that's fine, as long as the debtors make the Chapter 7

22  trustee aware of the timing, so that it isn't something that

23  slips, you know, as the Chapter 7 trustee is trying to get

24  his arms around all that is coming over with respect to this

25  case.

A001369

1          THE COURT:  Ms. Richenderfer, do you have any

2   thoughts on this?

3          MS. RICHENDERFER:  Your Honor, I have a couple of

4   thoughts that I think are interrelated to this question.  One

5   has to do with the form of order itself.  On paragraph 3(b)

6   as (indiscernible) it talks about turning over the books and

7   records to the trustee as soon as reasonably practicable.

8   Your Honor, I have asked that the language be changed to make

9   it clear that the trustee has immediate access to all of the

10  debtors' books and records.  The trustee will make

11  arrangements as need be to obtain physical possession, but

12  the reading of this would have you believe that the trustee

13  does not have immediate access.  I mean, the trustee

14  immediately becomes responsible for the debtor, has the

15  fiduciary duty and is running the business, so to speak, is

16  that they are the debtor, they are the debtors.

17          So I think paragraph (b) needs to be changed to

18  state that the Chapter 7 trustee will have immediate access

19  and can work with the appropriate individuals with respect to

20  the turnover of the information.

21          I do have a general concern, Your Honor, in that

22  we're talking about certain requests for information that are

23  going to go past the date when the Chapter 7 trustee is going

24  to take over the role.  At 12:01 tomorrow morning, it will be

25  the Chapter 7 trustee, and it will be their responsibility

1   and they work with the lender and whomever as they need to

2   with respect to requests for information, with respect to the

3   direction of anyone working on behalf of the debtors.

4           And I guess I'm confused also, Your Honor, because

5   I thought that there was supposed to be a payment that was

6   being made, that was authorized, so that the property

7   insurance would be in place, because it would take the

8   Chapter 7 trustee some time to get their arms around this and

9   to get the property insurance and have it be in place.  So

10  I'm not clear why there wasn't a payment that was made, as

11  Ms. Feldsher has suggested was supposed to have been.

12          MR. WERKHEISER:  Your Honor, this is Mr.

13  Werkheiser, may I speak to Ms. Richenderfer's comments?

14          THE COURT:  Yes.

15          MR. WERKHEISER:  Okay.  Your Honor, so -- you

16  know, subject to -- I believe Mr. Stogsdill is on the line

17  today for the hearing, who is a (indiscernible) at Alvarez

18  and Marsal -- so subject to him piping up and telling us that

19  there's not the present ability to make the premium payment

20  for the property insurance today before the conversion orders

21  become effective, we're not objecting to doing that.  This is

22  really the first we've been told that there was an

23  expectation that would be done pre-conversion versus post

24  conversion.  So I think we can deal with that issue and, if

25  the wires do go out today, you know, we would try to make

1  that happen, if that's the consensus that that should be

2  happening today.

3          THE COURT:  All right, let's pay the insurance.

4  Let's get it done today.

5          MR. WERKHEISER:  Okay.

6          THE COURT:  Please, yes, because the Court so

7  authorizes.

8          MR. WERKHEISER:  Thank you, Your Honor.  And I'd

9  be happy to speak to Ms. Richenderfer's comments about the

10 access information issue --

11         THE COURT:  Yes, please, go ahead.

12         MR. WERKHEISER:  -- if Your Honor wants to hear --

13 sure.

14         THE COURT:  Yeah, please.

15         MR. WERKHEISER:  So I think, again, this is just

16 situation where we're struggling with some of the realities

17 of the situation of having a debtor that until very recently

18 was still an operating debtor with, you know, a hundred to

19 200 locations throughout different areas of the country and,

20 not only that, Your Honor, had really two distinct business

21 lines, the Art Van Furniture line and the Levin and Wolf

22 furniture lines, and the systems for those hadn't been fully

23 integrated.  So what we've been trying to work through with

24 the U.S. Trustee's Office on this issue is just the fact

25 that, as a practical matter, it's not like flipping a switch

1    and we can deliver access, you know, immediately as of the

2    effective date of conversion to trustee to all of the

3    documents and information that the debtors have.

4            Technically, is the trustee at that point in

5    charge of all that information and does the trustee have a

6    right to it?  Absolutely, nobody is contending otherwise.

7    But practically can, you know, we connect the trustee into

8    all of the computer systems of the debtors or, you know,

9    provide access to all the books of the debtor in hard copy

10   or, you know, located remotely someplace as of midnight, you

11   know, this evening?  No.

12           And so really I think the -- this is more of a

13   semantic issue than a difference of view on when things

14   should happen.  We are committed to getting all of this

15   information to the trustee as soon as possible, I just didn't

16   want to again set up the client for somebody to say later

17   that they did not do what they were supposed to do by saying

18   access was going to be delivered immediately to everything as

19   of the effective date of conversion when there isn't a

20   practical ability to do that.

21           THE COURT:  All right.  Okay, thank you.  I hear

22   you on that and I think that's reasonable.  I was playing

23   around with drafting some language on the draft and there's

24   really no way to realistically say something needs to be made

25   immediately available at 12 midnight tonight, but I think 14

1 days is way too long.  First of all, you're not going to have

2 anyone around past Friday, so unless the trustee decides to

3 pay them.  So I'm going to say four days, no later than four

4 days.

5          MR. WERKHEISER:  Understood, Your Honor.

6          THE COURT:  That means Friday, so -- unless I did

7 the math wrong, I think that's Friday.  Do you want to put --

8          MR. WERKHEISER:  Thank you.

9          THE COURT:  -- Friday instead of four days, just

10 to be clear -- whatever, either four days or Friday, either

11 is fine.

12          MR. WERKHEISER:  All right, Your Honor, we'll make

13 that change.

14          THE COURT:  We have to fix paragraph 9 to make the

15 number 73,243.  Let me just ask Wells and the U.S. Trustee,

16 did you have any other comments on the order that we haven't

17 already heard?

18          MS. RICHENDERFER:  Your Honor, this is Linda

19 Richenderfer.  No, I do not.

20          THE COURT:  Thank you.

21          MS. FELDSHER:  And, Your Honor, this is Jennifer

22 Feldsher, I didn't as well.

23          THE COURT:  Okay, very good.  Thank you very much.

24          Is there anyone else on the phone who would like

25 to be heard in connection with the debtors' conversion motion

25

1  and/or the form of order?

2       MR. WAXMAN:  Your Honor, this is Jeff Waxman, if I

3  may be heard?

4       THE COURT:  Yes, Mr. Waxman.  Good afternoon.

5       MR. WAXMAN:  Good afternoon.  First, Your Honor, I

6  did get a version of the order on Friday that includes the

7  language that we had requested from the debtors, and I want

8  to thank the debtors for its inclusion.  I just haven't seen

9  a revised order, and so I would just ask that Mr. Werkheiser

10 confirm on the record that the language that's in what was

11 paragraph 8 is still in the order in whatever paragraph it's

12 now in.

13      THE COURT:  I'll do that --

14      MR. WERKHEISER:  Yes --

15      THE COURT:  -- it's paragraph 10 now, but it's the

16 same language, there's been no change.

17      MR. WAXMAN:  Okay.  Thank you very much, Your

18 Honor.  I have nothing further.

19      THE COURT:  Okay.  Thank you, Mr. Waxman.

20      Sorry to cut you off, Mr. Werkheiser.

21      MR. WERKHEISER:  No problem, Your Honor.

22      THE COURT:  Anyone else have anything they'd like

23 to say?

24    (No vocal response)

25      THE COURT:  All right, I hear none.  I had no

A001375

1   comments to the order myself.  Let me look at it again.  I

2   assume we didn't have any problem with what I had seen on

3   Friday.

4           MS. FELDSHER:  Your Honor, this is Jennifer

5   Feldsher again.  If I might just highlight for the Court,

6   this isn't something that we would have an issue with, but I

7   didn't think Mr. Werkheiser brought it up, but there is a

8   change in this order from what was in the cash -- the interim

9   cash collateral order in that Wells is going to be funding

10  the carveout reserve for the professionals to an account at

11  the Benesch law firm.  The initial -- the interim cash

12  collateral order had required a segregated account be set up

13  at Wells Fargo, but administratively that takes some time and

14  in excess of the time that we would have had on the schedule

15  that the debtors laid out for conversion.  So in order to

16  effectuate the spirit, if not the letter, of what was in the

17  interim cash collateral order, we've arranged for the Benesch

18  firm to hold the funds for the professionals, and then of

19  course any distributions to professionals would be subject to

20  the Court's interim compensation provisions, as well as some

21  of the additional provisions that the debtors have put into

22  this order with respect to professional fees.

23          THE COURT:  Okay.  I did see that.  And I never

24  let Mr. Werkheiser walk through the order, so that's not his

25  fault that we didn't get to that, but I did see that.  Thank

1   you very much.  And I did walk through the order, which I got

2   before the hearing, which was extremely helpful.  Thank you

3   very much for sending that to Ms. Gadson.

4           MR. WERKHEISER:  Of course, Your Honor.

5           THE COURT:  I do have --

6           MR. WERKHEISER:  Your Honor, I --

7           THE COURT:  -- a question about -- I'm sorry -- I

8   do have a question about 7, paragraph 7, at the end, there's

9   a new (b) about lien priorities, what's that about?

10          MR. WERKHEISER:  Your Honor, that is language that

11  the debtors agreed to add at the request of our secured

12  lenders and it simply means that, once the carveout is fully

13  funded, that we don't have any special super-priority status

14  or lien status outside of the carveout reserves that are

15  being funded for, you know, professional fees and the like.

16          THE COURT:  Yep, I got it.  Okay.  All right, well

17  -- yes?  I'm sorry, Mr. Werkheiser.

18          MR. WERKHEISER:  Oh, yes, Your Honor, one other

19  thing I just had wanted to highlight for the Court is that

20  we've had to do just a little bit of gymnastics here with

21  KCC, just because their status as the claims agent is not

22  technically that of a professional.  So some of the language

23  that appears in paragraph of the motion -- or the order as

24  originally filed, and then as carried over through paragraph

25  6 as well, just deals with that issue.

28

1    So, in addition to the professional fees and the

2  fees that they've -- the U.S. Trustee quarterly fees, the

3  fees for KCC's services as the claims agent are included in

4  the carveout reserves escrow that Benesch would hold and then

5  would disburse in accordance with the language that is set

6  forth in paragraph 6.

7    THE COURT:  Thank you.  I saw that, yes.

8    Ms. Richenderfer, when will the panel -- when will

9  the interim trustee be appointed, tomorrow morning?

10   MS. RICHENDERFER:  Your Honor, I have to admit,

11  I'm not clear whether or not we can file something prior to

12  12:01 this morning -- tomorrow morning, I mean, in

13  anticipation --

14   THE COURT:  My --

15   MS. RICHENDERFER:  -- of that --

16   THE COURT:  -- my experience is that your office

17  has not done that in the past, that it requires the actual

18  conversion before they'll do that, is my experience.

19   MS. RICHENDERFER:  And I think that's the same

20  case here, Your Honor, and so that would mean that it would

21  be filed first thing tomorrow morning.

22   THE COURT:  Okay.  Like Ms. Feldsher, this is not

23  my first experiencing converting a Chapter 11 to a Chapter 7

24  and it's never a good experience.  This case is very

25  unfortunate.  It's really been a parade of unfortunate events

A001378

1   that has kind of conspired to put a long-standing, solid

2   business into liquidation.  And, as I sit here today, I

3   certainly don't have enough information to blame anyone or

4   anything other than the coronavirus and the disaster it has

5   left in its wake.

6            Obviously, this was always a partial liquidation,

7   although through a GOB sale process and a partial going-

8   concern sale, which as retail cases in 2020 go is pretty

9   doggone good, but events have led us elsewhere.  And I feel

10  very strongly that it is -- I feel very strong sympathy for

11  the creditors who are not going to get paid their

12  administrative expense claims, at least right away.  The

13  employees who have health care reimbursements, some of them

14  never got -- according to the letters I've received, some of

15  them never got their retention, promised retention payments.

16  I don't think we had a retention program in this case, if I

17  remember correctly, but at least some of the letters had

18  mentioned that that was the case.  And a variety of other

19  claimants.  Obviously, of great concern to me from the very

20  beginning was the deposits, which I think at one point I was

21  told were 35 million.

22           In any event, it is what it is, we are where we

23  are, and we can only do the best we can under the

24  circumstances.  The debtors have presented a perfectly

25  reasonable and acceptable conversion order.  The debtors

 1  have, in my mind, the absolute right to convert, and I'm

 2  really constrained to, but I would not -- in any way not

 3  approve this motion at this time.  We just need to make

 4  changes to paragraph 3(b) and 9 that are consistent with what

 5  we discussed on the record, but with those changes I will

 6  grant the motion and enter the order.

 7          If you file -- if you upload a clean with those

 8  changes, Mr. Werkheiser, and simply email Ms. Gadson or Ms.

 9  Szymanski a redline to show those two changes, that will be

10  sufficient.  I'm not going to make you go through the hula-

11  hoops of filing another COC with just two changes on it.

12  Anyone who cares about what's going on is on the phone or on

13  the video today.

14          So as soon as that gets -- as soon as I get that

15  redline and as soon as the new clean is uploaded, the order

16  will be executed and on the docket, and the conversion will

17  happen at midnight.

18          MR. WERKHEISER:  Thank you, Your Honor.  And,

19  yeah, we can get that over immediately after the hearing.

20          Your Honor, I just wanted to take this opportunity

21  to -- again, I think we tried to communicate our message and

22  wanted to be clear to all of our stakeholders in the motion

23  to convert, you know, how deeply the debtors regret this

24  situation and wish that, you know, circumstances had not

25  conspired to result in this outcome, but, you know,

1 understand that this is adversely affecting a large number of

2 people for reasons beyond, you know, most everybody's

3 control.

4          And, Your Honor, we also wanted to take this

5 opportunity to thank Your Honor for your availability, for

6 your close attention to this case.  And as bad as this is, it

7 certainly could have been a lot worse without everyone

8 working, you know, very diligently, and without the Court's

9 supervision to help us at least deal with the situation in

10 the most orderly way possible.

11          Your Honor, I also wanted to take the opportunity

12 just to clarify one thing about the record, just because the

13 customer deposits, as you might imagine, is an issue that is

14 being paid close attention to by various state's attorney

15 generals.  And I'm not sure that we ever used the number 35

16 million for purposes of the record and I think the number as

17 it stands now might be quite, quite a bit less than even the

18 debtors thought it was earlier in the case for a number of

19 reasons, something south of ten.  But be that as it may, you

20 know, a lot of individuals and small businesses probably have

21 suffered to some degree because the debtors have been unable

22 at this stage of the proceedings to honor those customer

23 deposit obligations and, whatever the number is, we

24 understand that people do -- you know, forced at minimum to

25 wait, then may not get a recovery at the end of the day,

1    depending how things play out from here.

2         But, again, thank you, Your Honor.  I have nothing

3    further to say, unless the Court has anything else for us,

4    and that concludes our business today.

5         THE COURT:  No, I have nothing further.  Anyone

6    else?  Last chance.

7         All right, thank you all.  We are adjourned.  I'll

8    await the order.  Have a good day.

9         COUNSEL:  Thank you, Your Honor.

10        (Proceedings concluded at 1:45 p.m.)

11

12

13

14                      CERTIFICATE

15

16       We certify that the foregoing is a correct transcript

17   from the electronic sound recording of the proceedings in the

18   above-entitled matter.

19
     /s/Mary Zajaczkowski_____          May 16, 2021
20   Mary Zajaczkowski, CET**D-531

21
     /s/ Tracey J. Williams_____         May 16, 2021
22
23   Tracey J. Williams, CET-914

24

25

A001382

# EXHIBIT Y

A001383

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, et al.,[1]<br><br>                Debtors. | Chapter 11<br>Bankr. Case No.  20-10553<br>**Joint Administration Pending** |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>                Plaintiff,<br><br>     v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>                Defendants. | **Adv. Pro. No. _____ - \_\_\_\_\_** |

## CLASS ACTION
## ADVERSARY PROCEEDING COMPLAINT FOR
## <u>VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ.</u>

Plaintiffs Todd Stewart and Jennifer Sawle ("Plaintiffs") alleges on behalf of themselves

and a putative class of similarly situated former employees of Debtor Art Van Furniture, LLC

and its affiliates (together "Debtors" or "Defendants") by way of this Class Action Adversary

Proceeding Complaint against Defendants as follows:

### <u>NATURE OF THE ACTION</u>

1.      The Plaintiffs brings this action on behalf of themselves, and other similarly

---

[1]

  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A001384

situated former employees who worked for Defendants and who were terminated without cause as part of, or as the result of, mass layoffs or plant closings ordered by Defendants beginning on March 4, 2020, who were not provided 60 days advance written notice of their terminations by Defendants, as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq, (the "WARN Act").

2.      Plaintiffs were terminated along with approximately 700 other similarly situated employees as part of, or as the foreseeable result of a mass layoffs or plant shutdowns ordered by Defendants.  These terminations failed to give Plaintiffs and other similarly situated employees of Defendants at least 60 days' advance notice of termination, as required by the WARN Act.  As a consequence of the violation, Plaintiffs and other similarly situated employees of Defendants seek their statutory remedies, pursuant to 29 U.S.C. § 2104.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1334, and 29 U.S.C. § 2104(a)(5).

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1409 and 29 U.S.C. § 2104(a)(5).

## THE PARTIES

### *Plaintiffs*

6.      Plaintiff Stewart was employed by Defendants as the Store Manager at Defendants' facility at 14055 Hall Rd. Shelby Township Michigan 48315 one of seven WARN-covered facilities (the "WARN Facilities") until his termination.

7.      Plaintiff Sawle was employed by Defendants as a salesperson at one of Defendants' WARN Facilities located at 8748 West Saginaw Highway, Lansing, Michigan until her

A001385

termination.

8.     On March 4, 2020, Plaintiffs received a letter notifying them that terminations at the Facilities where they worked would commence on May 5, 2020 or within 14 days thereafter.

9.     Plaintiffs were not terminated on May 5, 2020. Instead, on evening of March 19, 2020, Defendants abruptly notified its employees, including Plaintiffs that terminations would occur immediately for non-leader personnel and March 22, for lead personnel.

10.     Plaintiff Sawle's last day of employment was March 20, 2020.

11.     Plaintiff Stewart was, and other store leaders were, specifically told they would not get paid unless they continued to work through the Saturday and Sunday, March 21 and 22.

12.     With the power off at the facility, Plaintiff Stewart and colleagues worked in the dark through the week carrying purchased furniture out to the cars of waiting customers.

13.     Along with Plaintiffs, hundreds of other employees of Defendants who worked at, reported to, or received assignments from Defendants' Facilities were terminated on or about March 19, 2020 without advanced written notice.

### *Defendants*

14.     Upon information and belief and at all relevant times, Defendant Art Van Furniture LLC is a Delaware corporation with its principal place of business located at 6500 E. 14 Mile Road, Warren, Michigan (the "Headquarters Facility") and it conducted business in this district.

15.     Upon information and belief at all relevant times, Defendants owned, maintained and operated its corporate headquarters at the Headquarters Facility, and operated additional facilities as that term is defined by the WARN Act in the United States.

16.     Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. Debtors do business under several brand names,

A001386

including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.

17. The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.

18. As of the Petition Date of March 9, 2020, Debtors operated stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19. Upon information and belief, on March 19, 2020, Defendants terminated approximately 700 employees who worked at or reported to their WARN Facilities, and the rest of the employees who worked at non-WARN-covered stores (because they did not employee 50 full-time employees as required by the WARN Act definition of a mass layoff or plant shutdown).

20. By late-January, 2020, Debtors had sunk into a liquidity crisis leading to a default of the Defendant's revolver facility with its lender, Wells Fargo, and some leases. Wells Fargo agreed to forebear until February 28, 2020 conditioned on taking control of Defendant's cash and on Defendant immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by then.

21. By January 31, 2020, the United States reported its first confirmed case of person-to-person transmission of the Wuhan coronavirus and the WHO determined that the outbreak constitutes a Public Health Emergency of International Concern.

22. In February, 2020, KKR investigated then quickly dropped consideration of make a new money investment in Art Van. Debtor's private equity parent THL, along with Van Eslander family, and some important suppliers formed a "Consortium."

A001387

23.     The Consortium proposed to infuse new capital into Art Van, but by month's end failed to secure the capital purportedly due in part to the impact of coronavirus on the equity markets during the week of February 24, 2020.

24.     According Debtors, the market drop had a "deleterious effect" on the Consortium investors' "willingness to contribute capital." (Doc. 12, Mar. 9, 2020, First Day Declaration of David Ladd.)

25.     As a result of the Consortium investors' unwillingness, Debtors began to execute on its planned liquidation.

26.     On March 5, 2020, Art Van announced its store closing sales and that it would complete the closures with six to eight weeks.

27.     That day, it informed it WARN Facility employees in a WARN notice that they would be retained and paid through May 5th and terminated then or within 14 days thereafter, whether there was work for them or not.  Their benefits including health coverage would be maintained until their termination.

28.     The Debtors' March 5, 2020 WARN notice did not condition the 60 days' of pay and benefits on any contingency.  It did not mention coronavirus or any factor that could reduce the 60-day period of anticipated employment.

29.     By March 8, 2020, at least eight states had declared a State of Emergency due to coronavirus.

30.     On March 9, 2020, Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. Joint administration of those cases is pending.

## FEDERAL WARN ACT CLASS ALLEGATIONS

31.     Plaintiffs bring this Claim for Relief for violation of 29 U.S.C. § 2101 et seq., on

A001388

behalf of himself and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from Defendants' Facilities and were terminated without cause beginning on or about March 19, 2020, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020 and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

32.     The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

33.     Upon information and belief, Defendants employed more than 100 full-time employees who worked at or reported to the Facilities.

34.     On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants.

35.     On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of Defendants.

36.     Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)     whether the members of the WARN Class were employees of the Defendants who worked at or reported to Defendants' Facilities;

6

   (b)  whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

   (c)  whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

  37. Plaintiffs' claims are typical of those of the WARN Class. Plaintiffs, like other WARN Class members, worked at or reported to Defendants' Facilities and was terminated beginning on or about March 19, 2020, due to the mass layoff and/or plant closing ordered by Defendants.

  38. Plaintiffs will fairly and adequately protect the interests of the WARN Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

  39. On or about March 19, 2020, Plaintiffs were terminated by Defendants. These terminations were part of mass layoffs or plant closings as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to receive 60 days advance written notice under the WARN Act.

  40. Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate Defendants, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

A001390

41.     Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

42.     Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

## CLAIM FOR RELIEF

### Violation of the Federal WARN Act

43.     Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

44.     At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

45.     At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a) and continued to operate as a business until it decided to order mass layoffs or plant closings at the Facilities.

46.     At all relevant times, Plaintiffs and the other similarly situated former employees were employees of Defendants as that term is used in 29 U.S.C. §2101.

47.     On or about March 19, 2020, the Defendants ordered mass layoffs or plant closings at the Facilities, as that term is defined by 29 U.S.C. § 210l(a)(2).

48.     The mass layoffs or plant closings at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well

8

A001391

as thirty–three percent of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2l01(a)(8).

49.     Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants at the Facilities.

50.     Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

51.     Defendants were required by the WARN Act to give Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

52.     Defendants failed to give Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

53.     Plaintiffs and each of the Class Members are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

54.     Defendants failed to pay Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, health and life insurance premiums, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to provide employee benefits including health insurance, for 60 days from and after the dates of their respective terminations.

55.     The relief sought in this proceeding is predominately equitable in nature.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated persons, prays for the following relief as against Defendants:

A.     Certification of this action as a class action;

9

B.      Designation of Plaintiffs as Class Representatives;

C.      Appointment of the undersigned attorneys as Class Counsel;

D.      A judgment in favor of the Plaintiffs and each of the affected employees equal to the sum of:  their unpaid wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits, for up to 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period all determined in accordance with the federal WARN Act, 29 U.S.C. §2104(a)(1)(A);

E.      Allowance of all damages as first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) or, alternatively wage priority status pursuant to 11 U.S.C. § 507(a)(4) and (5) up to $13,650, and the remainder as a general unsecured claim;

F.      Reasonable attorneys' fees and the costs and disbursements that Plaintiffs will incur in prosecuting this action, as authorized by the federal WARN Act, 29 U.S.C. § 2104(a)(6);

G.      Interest as allowed by law on the amounts owed under the preceding paragraphs; and

H.      Such other and further relief as this Court may deem just and proper.


*[Signature Page to Follow]*

A001393

Dated: March 23, 2020

Respectfully submitted,

*/s/ Michael Joyce*
Michael J. Joyce (No. 4563)
THE LAW OFFICES OF JOYCE, LLC
1225 King Street
Suite 800
Wilmington, DE 19801
(302)-388-1944
Email: mjoyce@mjlawoffices.com

-and-

OF COUNSEL:

Jack A. Raisner
René S. Roupinian
RAISNER ROUPINIAN LLP
500 Fifth Avenue, Suite 1600
New York, New York 10110
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for the and the putative class*
*Plaintiffs*

A001394

# EXHIBIT Z

A001395



**Moving Forward Post Pandemic**

SPONSORED BY **MERRILL**

SEE MORE

BUSINESS

# Column: A declassified government report offers no support for the lab-leak theory of COVID's origin

A001396



A thoroughfare in Wuhan, China, shows the effect of a government lockdown in January 2020 after the first reports of a COVID-19 outbreak in the teeming city. (Hector Retamal / AFP/Getty Images)

BY MICHAEL HILTZIK | BUSINESS COLUMNIST

NOV. 1, 2021 12:19 PM PT



For months, adherents of the theory that COVID-19 originated in a Chinese government laboratory have hoped that an assessment President Biden ordered from the nation's intelligence agencies would validate their suspicions.

Their hopes are now dashed. The intelligence report was declassified and released on Oct. 29. It effectively demolishes the lab-leak theory.

The release of the full report follows the publication of a brief declassified summary in August, stressing the intelligence community's inability to reach a firm conclusion about

whether SARS-CoV-2, the virus responsible for the COVID pandemic, originated from natural sources or a Chinese laboratory.

*Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China...increase the probability that initial transmission occurred along these lines.*

U.S. INTELLIGENCE SERVICES REPORT ON COVID ORIGINS

ADVERTISEMENT

The latest version, which is likely to be the most complete assessment to be released publicly, is couched in the same conditional and qualified language.

The report avoids offering a firm conclusion about the two prevailing theories. But it provides details of the agencies' findings that make clear they looked into the specific assertions that have been proposed in support of the lab-leak theory and found them wanting.

---

✉

### Get the latest from Michael Hiltzik

Commentary on economics and more from a Pulitzer Prize winner.

Enter email address

A001398

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.

The intelligence agencies also noted that although no animal source for the virus has yet been identified, that doesn't necessarily undermine the theory of a natural source.

In many previous outbreaks, the report says, "the identification of animal sources has taken years, and in some cases, animal sources have not been identified."

The report was published by the Office of the Director of National Intelligence, an umbrella agency for 17 government intelligence services, including the CIA, FBI, four Cabinet agencies and the intelligence arms of the military services.

Experts who were contacted by the intelligence services preparing the report have said they were impressed by the agents' commitment to a scientific analysis. "These folks were really knowledgeable, had PhDs in molecular biology, they had read all of the papers in detail," Tulane virologist Robert Garry told science writer Amy Maxmen of Nature in August.

BUSINESS

**Column: New evidence undermines the COVID lab-leak theory — but the press keeps pushing it**

Sept. 28, 2021

The lab-leak theory has been kept on life support for more than a year by partisan propagandists, abetted by amateurs posting on social media and credulous journalists reluctant to relinquish a story that would be, as the saying goes, "interesting, if true."

As we've reported before, the hypothesis that the SARS-CoV-2 virus escaped from a Chinese laboratory to wreak havoc on the world originated with a clutch of anti-China

A001399

ideologues in the State Department under Trump.

In its initial incarnation, the hypothesis held that the virus was developed by the Beijing government as a biological weapon. Its proponents soon abandoned that claim as too fantastical to win over many believers, so they retreated to the claim that it was merely genetically engineered in standard virological research and reached the outside world through inattention or accident.

In its most recent form, the theory is that a precursor virus was brought from the wild to a Chinese lab in Wuhan and evolved there, and *that* was what sneaked out into the open.

The intelligence assessment dismisses the first two versions outright. It suggests that while it's "plausible" that a lab worker unwittingly became the carrier, that's "less likely than an infection occurring through numerous hunters, farmers, merchants, and others who have frequent, natural contact with animals."

---

BUSINESS

**Column: When will the Wall Street Journal stop publishing lab-leak propaganda?**

Oct. 8, 2021

---

The report states that the agencies judged the bioweapon allegation to be "supported by scientifically invalid claims," adding that its "proponents are suspected of spreading disinformation."

It says that the intelligence agencies found no "genetic signatures in SARS-CoV-2" that would indicate genetic engineering, such as deliberate manipulation of a virus in the lab to make it more dangerous to humans.

Nor did they find evidence of any virus strains that "could have plausibly served as a backbone" — that is, a biological foundation — for a genetically engineered version.

A001400

The agencies examined one of the more popular claims by lab-leak proponents, involving the so-called furin cleavage site on SARS-CoV-2. This is a feature of the virus' spike, the structure that allows it to penetrate healthy cells and pass along infectious material. To be effective, the spike has to be cut in two, a process achieved by the enzyme furin.

Lab-leak proponents have asserted that the furin site is so rare and so well-adapted to human infection that it's certain to have been added to the virus in a lab. Just as many academic virologists have noted, the report observes that furin sites have been found in naturally occurring viruses and can be the product of natural evolution.

The intelligence services found support for the so-called zoonotic theory that the pandemic resulted from a natural spillover of the virus from animals to humans in virological history. Many virological outbreaks have happened this way, the report observes.

---

BUSINESS

**Column: The lab-leak origin claim for COVID-19 is in the news, but it's still fact-free**

June 3, 2021

---

"Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China," along with historically lax government oversight, "increase the probability that initial transmission occurred along these lines."

Support for the lab-leak hypothesis, the services say, comes chiefly from reports questioning whether the Wuhan institute conducted its research under adequate biological safeguards. But the services found "no indications that the institute's research involved SARS-CoV-2 or a close progenitor virus."

A001401

The report does state that, among its contributing agencies, four "assess with low confidence" that the virus probably sprung from natural sources; one finds with "moderate confidence" that the pandemic "most likely" resulted from a laboratory incident, and three couldn't decide between the two theories. The report doesn't link specific agencies to those findings, however.

The intelligence services also reproach the Chinese government for hindering international investigations of COVID-19's origins, in part by refusing to share information about WIV research or its own findings about the early course of the disease in Wuhan.

"These actions reflect, in part, China's government's own uncertainty about where an investigation could lead," the U.S. report says, "as well as its frustration the international community is using the issue to exert political pressure on China."

The services are generally dismissive of what it calls "open-source" theories of the pandemic's origin, typically passed around on social media. "These theories generally do not provide diagnostic information on COVID-19 origins, and in some cases are not supported by the information available to us."

Whether the government report will stifle the propaganda about a Chinese lab-leak is uncertain, but that may not be the way to bet. Too many people are ideologically committed to the claim, and a scientific debunking of a theory that has had little science to support it from the start probably won't matter.

---

LATEST FROM MICHAEL HILTZIK ›

Column: Inflation has spiked. Don't freak out

Column: Billionaire anti-deficit hawks are already attacking Biden's spending plan. Ignore them

Column: The infrastructure bill offers lots for California, and social spending you wouldn't expect

BUSINESS



## Get the latest from Michael Hiltzik

Commentary on economics and more from a Pulitzer Prize winner.

Enter email address

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.



Michael Hiltzik

Twitter    Instagram    Email    Facebook

Los Angeles Times columnist Michael Hiltzik writes a daily blog appearing on latimes.com. His seventh book, "Iron Empires: Robber Barons, Railroads, and the Making of Modern America," has just been published by Houghton Mifflin Harcourt. Follow him on Twitter at twitter.com/hiltzikm and on Facebook at facebook.com/hiltzik.

A001403

MORE FROM THE LOS ANGELES TIMES

BUSINESS

**After Twitter poll, Elon Musk sells off more than $5 billion in Tesla shares**

Nov. 11, 2021

BUSINESS

**SpaceX crew launch marks 600 space travelers in 60 years**

Nov. 10, 2021

BUSINESS

**Hot inflation report slams bond market, sends stocks lower**

Nov. 10, 2021

TECHNOLOGY

**Justice Department sues Uber over wait-time fees charged to disabled passengers**

Nov. 10, 2021

A001404

SUBSCRIBERS ARE READING

CALIFORNIA

Gov. Newsom returns to public eye after sudden absence sparked social media speculation

LIFESTYLE

The L.A. Times 2021 holiday gift guide

CALIFORNIA

FOR SUBSCRIBERS

A001405

Colonialism, power and race. Inside California ethnic studies classes

LIFESTYLE

The 27 coolest made-in-L.A. gifts to give this year

BUSINESS

Cargo jam at L.A. and Long Beach ports begins to ease as hefty fines loom

LATEST BUSINESS ›

TECHNOLOGY

Rivian skyrockets in 2021's biggest IPO

Nov. 10, 2021

LIFESTYLE

Black Girl Magic meets Jazz Age speakeasy at this new L.A. pot shop

Nov. 10, 2021

REAL ESTATE

Liberace's former townhouse above the Sunset Strip is listed for $3.4 million

Nov. 10, 2021

BUSINESS

U.S. consumer prices soared 6.2% in past year, most since 1990

Nov. 10, 2021

A001406

BUSINESS

Which retirement option is better: Lump sum or monthly payout?

Nov. 10, 2021

A001407

Subscribe for unlimited access

Follow Us

eNewspaper

Coupons

Find/Post Jobs

Place an Ad

Media Kit: Why the
L. A. Times?

Bestcovery

Copyright © 2021, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell My Personal Information

A001408

# **EXHIBIT AA**

A001409





OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

NATIONAL INTELLIGENCE COUNCIL

Updated Assessment on

# COVID-19 ORIGINS

A001410

# Updated Assessment on COVID-19 Origins

## Key Takeaways

*Scope Note: This assessment responds to the President's request that the Intelligence Community (IC) update its previous judgments on the origins of COVID-19. It also identifies areas for possible additional research. Annexes include a lexicon, additional details on methodology, and comments from outside experts. This assessment is based on information through August 2021.*

The IC assesses that SARS-CoV-2, the virus that causes COVID-19, probably emerged and infected humans through an initial small-scale exposure that occurred no later than November 2019 with the first known cluster of COVID-19 cases arising in Wuhan, China in December 2019. In addition, the IC was able to reach broad agreement on several other key issues. We judge the virus was not developed as a biological weapon. Most agencies also assess with low confidence that SARS-CoV-2 probably was not genetically engineered; however, two agencies believe there was not sufficient evidence to make an assessment either way. Finally, the IC assesses China's officials did not have foreknowledge of the virus before the initial outbreak of COVID-19 emerged.

After examining all available intelligence reporting and other information, though, the IC remains divided on the most likely origin of COVID-19. All agencies assess that two hypotheses are plausible: natural exposure to an infected animal and a laboratory-associated incident.

- Four IC elements and the National Intelligence Council assess with low confidence that the initial SARS-CoV-2 infection was most likely caused by natural exposure to an animal infected with it or a close progenitor virus—a virus that probably would be more than 99 percent similar to SARS-CoV-2. These analysts give weight to China's officials' lack of foreknowledge, the numerous vectors for natural exposure, and other factors.

- One IC element assesses with moderate confidence that the first human infection with SARS-CoV-2 most likely was the result of a laboratory-associated incident, probably involving experimentation, animal handling, or sampling by the Wuhan Institute of Virology. These analysts give weight to the inherently risky nature of work on coronaviruses.

- Analysts at three IC elements remain unable to coalesce around either explanation without additional information, with some analysts favoring natural origin, others a laboratory origin, and some seeing the hypotheses as equally likely.

- Variations in analytic views largely stem from differences in how agencies weigh intelligence reporting and scientific publications and intelligence and scientific gaps.

The IC judges they will be unable to provide a more definitive explanation for the origin of COVID-19 unless new information allows them to determine the specific pathway for initial natural contact with an animal or to determine that a laboratory in Wuhan was handling SARS-CoV-2 or a close progenitor virus before COVID-19 emerged.

- The IC—and the global scientific community—lacks clinical samples or a complete understanding of epidemiological data from the earliest COVID-19 cases. If we obtain information on the earliest cases that identified a location of interest or occupational exposure, it may alter our evaluation of hypotheses.

A001411



NATIONAL INTELLIGENCE COUNCIL

China's cooperation most likely would be needed to reach a conclusive assessment of the origins of COVID-19. Beijing, however, continues to hinder the global investigation, resist sharing information, and blame other countries, including the United States. These actions reflect, in part, China's government's own uncertainty about where an investigation could lead as well as its frustration the international community is using the issue to exert political pressure on China.

A001412

 **NATIONAL INTELLIGENCE COUNCIL**

## IC Assessments of COVID-19 Origins



**AREAS OF BROAD AGREEMENT**

- First known cluster of COVID-19 cases emerged in Wuhan, China in December 2019
- Virus not developed as a biological weapon
- Virus not genetically engineered
- China's officials unaware of virus before pandemic emerged



**TWO PLAUSIBLE HYPOTHESES ON INITIAL HUMAN EXPOSURE**

- Natural transmission from animal to human
- Laboratory-associated incident
- Evidence not strongly diagnostic of either hypothesis



**CHINA'S COOPERATION KEY TO UNDERSTANDING ORIGINS**

- Beijing's lack of cooperation on origins not diagnostic of either hypothesis
- Numerous information gaps, particularly related to technical data

A001413

## Introduction

The IC has prepared several assessments examining the origins of COVID-19. Analysts have focused on whether SARS-CoV-2, the causative virus of COVID-19, was genetically engineered—particularly as a biological weapon—was transmitted to humans naturally or transmitted due to a laboratory-associated incident, perhaps during sampling or experimentation. China's reaction to and handling of the pandemic have given analysts insights into these issues, but Beijing's actions have also impeded the global scientific community and our ability to confidently determine how the virus first infected humans.

## SARS-CoV-2 Probably Not a Biological Weapon

The IC assesses China did not develop SARS-CoV-2 as a biological weapon.

- We remain skeptical of allegations that SARS-CoV-2 was a biological weapon because they are supported by scientifically invalid claims, their proponents do not have direct access to the Wuhan Institute of Virology (WIV), or their proponents are suspected of spreading disinformation. [*See appendix B.*]

## Most Analysts Assess SARS-CoV-2 Not Genetically Engineered

Most IC analysts assess with low confidence that SARS-CoV-2 was not genetically engineered. Their assessment is based on technical analysis of SARS-CoV-2 and the IC's growing understanding of traits and the potential for recombination in other coronaviruses. Two agencies believe there is not sufficient evidence to make an assessment either way.

- As of August 2021, we still have not observed genetic signatures in SARS-CoV-2 that would be diagnostic of genetic engineering, according to the IC's understanding of the virus. Similarly, we have not identified any existing coronavirus strains that could have plausibly served as a backbone if SARS-CoV-2 had been genetically engineered.

- Our growing understanding of the similarities of SARS-CoV-2 to other coronaviruses in nature and the ability of betacoronaviruses—the genus to which SARS-CoV-2 belongs—to naturally recombine suggests SARS-CoV-2 was not genetically engineered. For instance, academic literature has noted that in some instances betacoronaviruses have recombined with other viruses in nature and that furin cleavage sites (FCS)—a region in the spike protein that enhances infection—have been identified in naturally occurring coronaviruses in the same genetic location as the FCS in SARS-CoV-2. This suggests that SARS-CoV-2 or a progenitor virus could have acquired its FCS through natural recombination with another virus.

IC analysts do not have higher confidence that SARS-CoV-2 was not genetically engineered because some genetic engineering techniques can make modifications difficult to identify and we have gaps in our knowledge of naturally occurring coronaviruses.

- Some genetic engineering techniques may make genetically modified viruses indistinguishable from natural viruses, according to academic journal articles. For instance, a 2017 dissertation by a WIV student showed that reverse genetic cloning techniques—which are standard techniques used in advanced molecular laboratories—left no trace of genetic modification of SARS-like coronaviruses.

- It will be difficult to increase our confidence that the distinguishing features in SARS-CoV-2 emerged naturally without a better understanding of the diversity of coronaviruses in nature and how often recombination occurs during co-infection of multiple coronaviruses within a particular host. For example, academic literature has indicated that a FCS had previously been inserted into SARS-CoV-1, the causative agent of SARS, complicating differentiation of how such a feature may have appeared.

A001414

## NIC | NATIONAL INTELLIGENCE COUNCIL

## Closest Known Relatives of SARS-CoV-2, as of August

As of August, the closest known whole genome match to SARS-CoV-2—around **96 percent** identical—is **RaTG13**, a coronavirus collected from a bat in 2013 by the Wuhan Institute of Virology (WIV), according to academic literature. Scientific literature examining the genome of SARS-CoV-2 has identified at least some similarities to those of other naturally occurring coronaviruses in bats and pangolins, but an immediate precursor virus strain and animal reservoir have not been identified.

| VIRUS NAME | PERCENT IDENTITY TO COVID-19 VIRUS | YEAR COLLECTED | LOCATION COLLECTED | ANIMAL COLLECTED |
|---|---|---|---|---|
| RaTG13 | 96.2 | 2013 | Yunnan Province, China | Bat |
| RpYN06 | 94.5 | 2020 | Yunnan Province, China | Bat |
| RmYN02 | 93.3 | 2019 | Yunnan Province, China | Bat |
| RShSTT200 | 92.7 | 2010 | Cambodia | Bat |
| RacCS203 | 91.5 | 2020 | Thailand | Bat |
| PrC31 | 90.7 | 2018 | Yunnan Province, China | Bat |
| Pangolin-CoV Guangdong | 90.1 | 2019 | Guangdong Province, China | Pangolin |
| ZC45 | 88.1 | 2015 | Zhejiang Province, China | Bat |
| ZXC21 | 88.0 | 2015 | Zhejiang Province, China | Bat |
| Guangxi pangolin-CoV | 85.5 | 2017, 2018 | Guangxi Zhuang Autonomous Region, China | Pangolin |
| Rc-o319 | 79.2 | 2013 | Japan | Bat |
| RaTG15 | 77.6 | 2015 | Yunnan Province, China | Bat |

- The WIV previously created chimeras, or combinations, of SARS-like coronaviruses, but this information does not provide insight into whether SARS-CoV-2 was genetically engineered by the WIV.

No IC analysts assess that SARS-CoV-2 was the result of laboratory adaptation, although some analysts do not have enough information to make this determination. Repeated passage of a closely related virus through animals or cell culture—which we consider laboratory adaptation and not genetic engineering—could result in some features of SARS-CoV-2, according to publicly available information. However, it probably would take years of laboratory adaptation using the appropriate cell types and a virus that is more closely related to SARS-CoV-2 than ones currently known to generate the number of mutations separating SARS-CoV-2 from any known coronavirus strains, judging from scientific journal articles. Such processes would require differentiation and maintenance of primary cells and the development of appropriate animal models.

A001415

NIC ▌▌▌▌▌▌▌    NATIONAL INTELLIGENCE COUNCIL

## China's Lack of Foreknowledge of SARS-CoV-2

The IC assesses China's officials probably did not have foreknowledge that SARS-CoV-2 existed before WIV researchers isolated it after public recognition of the virus in the general population. Accordingly, if the pandemic originated from a laboratory-associated incident, they probably were unaware in the initial months that such an incident had occurred.

- Early in the pandemic, the WIV identified that a new virus was responsible for the outbreak in Wuhan. It is therefore assessed that WIV researchers pivoted to COVID-19-related work to address the outbreak and characterize the virus. These activities suggest that WIV personnel were unaware of the existence of SARS-CoV-2 until the outbreak was underway.

## Two Plausible Hypotheses of Pandemic Origin

IC analysts assess that a natural origin and a laboratory-associated incident are both plausible hypotheses for how SARS-CoV-2 first infected humans. Analysts, however, disagree on which is more likely, or whether an assessment can be made at all, given the lack of diagnosticity of the available information. Most agencies are unable to make higher than low confidence assessments for these reasons, and confidence levels are tempered by plausible arguments for the opposing hypothesis. For these hypotheses, IC analysts consider an exposure that occurs during animal sampling activity that supports biological research to be a laboratory-associated incident and not natural contact. What follows is a look at the cases that can be made for these competing hypotheses.

## The Case for the Natural Origin Hypothesis

Some IC analysts assess with low confidence that the first human COVID-19 infection most likely was caused by natural exposure to an animal that carried SARS-CoV-2 or a close progenitor virus—a virus that would likely be more than 99 percent similar to SARS-CoV-2.

Four IC elements, the National Intelligence Council, and some analysts at elements that are unable to coalesce around either explanation are among this group. Analysts at these agencies give weight to China's officials' lack of foreknowledge and highlight the precedent of past novel infectious disease outbreaks having zoonotic origins, the wide diversity of animals that are susceptible to SARS-CoV-2 infection, and the range of scenarios—to include animal trafficking, farming, sale, and rescue—in China that enable zoonotic transmission. Although no confirmed animal source of SARS-CoV-2 has been identified, to include a reservoir or intermediate species, analysts that assess the pandemic was due to natural causes note that in many previous zoonotic outbreaks, the identification of animal sources has taken years, and in some cases, animal sources have not been identified.

- These analysts assess that WIV's activities in early 2020 related to SARS-CoV-2 are a strong indicator that the WIV lacked foreknowledge of the virus.

- They also see the potential that a laboratory worker inadvertently was infected while collecting unknown animal specimens to be less likely than an infection occurring through numerous hunters, farmers, merchants, and others who have frequent, natural contact with animals.

- Given China's poor public health infrastructure and the potential for asymptomatic infection, some analysts that lean towards a natural origin argue that China's infectious disease surveillance system would not have been able to detect the SARS-CoV-2 exposure as quickly as a suspected exposure in a laboratory setting.

### History of Zoonotic Pathogen Emergence, Conditions in China Ripe for Zoonotic Spillover

Analysts that find the natural zoonotic spillover hypothesis the most likely explanation for the pandemic also note the wide diversity of animals that are susceptible to SARS-CoV-2 infection, range of scenarios—to include animal trafficking, farming, sale, and rescue—in China that would enable zoonotic

A001416

# NIC ‖‖‖‖‖‖‖‖  NATIONAL INTELLIGENCE COUNCIL

## Comparing COVID-19 Pandemic to Past Select Viral Zoonotic Outbreaks

| | Location of Emergence | Asymptomatic Infection Common | Reservoir Species and Year Identified | Probable Intermediate Species and Year Identified |
|---|---|---|---|---|
| **COVID-19** *(2019–Present)* | China | Yes | Unknown | Unknown |
| **Ebola** *(2014–16)* | Guinea | No *(Probably)* | Bats *(Probably)*; N/A | Nonhuman primate *(Probably)*; N/A |
| **MERS** *(2012)* | Saudi Arabia, Jordan | Yes | Bats *(Probably)*; N/A | Dromedary camels; 2013 |
| **SARS** *(2002–04)* | China | No *(Probably)* | Horseshoe bats; 2016 | Masked palm civets and Raccoon dogs *(Possibly)*; 2003 |
| **Nipah** *(1998–99)* | Malaysia | Yes | Fruit bats; 1999 | Pigs; 1998 |
| **HIV-1**[a] *(1970s–Present)* | Democratic Republic of Congo *(Probably)* | No *(Probably)* | Chimpanzees *(Probably)*; 1999 | N/A |

*a. HIV is believed to have crossed from chimpanzees to humans in the 1920s; the first documented death occurred in the late 1960s.*

transmission, and precedent of novel human infectious disease outbreaks originating from zoonotic transmission. Previous human coronavirus outbreaks, to include SARS-CoV-1 and Middle East Respiratory Syndrome coronavirus (MERS-CoV), occurred naturally and were linked to animal reservoirs with zoonotic transmission to humans, according to scientific literature.

- Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China and historically lax government regulation—and even promotion—of these activities increase the probability that initial transmission occurred along one of these routes.

- Academic literature has revealed Wuhan markets sold live mammals and dozens of species—including raccoon dogs, masked palm civets, and a variety of other mammals, birds, and reptiles—often in poor conditions where viruses can jump among species, facilitating recombination events and the acquisition of novel mutations. SARS-CoV-2 can infect a range of mammals, including cats, dogs, pangolins, minks, raccoon dogs, and a variety of wild and domestic animals, according to academic literature.

- Wider Hubei Province has extensive farming and breeding of animals that are susceptible to SARS-CoV-2, including minks and raccoon dogs.

A001417

**NIC** ▌▌▌▌▌▌▌ NATIONAL INTELLIGENCE COUNCIL

These analysts note that there is a precedent for viral vectors to travel long distances in China and cause infection elsewhere because of transportation and trade nodes, thereby widening and complicating the search for the specific zoonotic spillover incident. For instance, the bat coronavirus that is currently the closest known relative to the original SARS-CoV-1 was identified in Yunnan Province, even though the first SARS outbreak detected in humans occurred in Guangdong Province, hundreds of kilometers away.

## The Case for the Laboratory-Associated Incident Hypothesis

One IC element assesses with moderate confidence that COVID-19 most likely resulted from a laboratory-associated incident involving WIV or other researchers—either through exposure to the virus during experiments or through sampling. Some analysts at elements that are unable to coalesce around either explanation also assess a laboratory origin with low confidence. These analysts place emphasis on academic articles authored by WIV employees indicating that WIV scientists conducted research on other coronaviruses under what these analysts consider to be inadequate biosafety conditions that could have led to opportunities for a laboratory-associated incident. These analysts also take into account SARS-CoV-2's genetic epidemiology and that the initial recorded COVID-19 clusters occurred only in Wuhan—and that WIV researchers who conducted sampling activity throughout China provided a node for the virus to enter the city.

### WIV Research Includes Work With Animals That Carry Relatives of SARS-CoV-2

The analysts that find the laboratory-associated origin theory most likely assess that WIV researchers' inherently risky work with coronaviruses provided numerous opportunities for them to unwittingly become infected with SARS-CoV-2. Although the IC has no indications

> **WIV Illnesses in Fall 2019 Not Diagnostic**
>
> The IC assesses that information indicating that several WIV researchers reported symptoms consistent with COVID-19 in autumn 2019 is not diagnostic of the pandemic's origins. Even if confirmed, hospital admission alone would not be diagnostic of COVID-19 infection.

that WIV research involved SARS-CoV-2 or a close progenitor virus, these analysts note that it is plausible that researchers may have unwittingly exposed themselves to the virus without sequencing it during experiments or sampling activities, possibly resulting in asymptomatic or mild infection. Academic literature indicates that WIV researchers conducted research with bat coronaviruses or collected samples from species that are known to carry close relatives of SARS-CoV-2.

- Based on currently available information, the closest known relatives to SARS-CoV-2 in bats have been identified in Yunnan Province, and researchers bringing samples to laboratories provide a plausible link between these habitats and the city.

- These analysts also note that China's investigations into the pandemic's origin might not uncover evidence of a laboratory-associated incident if it involved only a small number of researchers who did not acknowledge or have knowledge of a potential infection.

### Biosafety Conditions for Specific Work Could Have Led to an Incident

The analysts that assess COVID-19 most likely originated from a laboratory-associated incident also place emphasis on information suggesting researchers in China used biosafety practices that increased the risk of exposure to viruses. Academic publications suggest that WIV researchers did not use adequate biosafety precautions at least some of the time, increasing the risk of a laboratory-associated incident.

A001418

### The Role of the Huanan Seafood Wholesale Market

Some scientists and China's public health officials have shifted their view on the role of the Huanan Seafood Wholesale Market in the pandemic since early 2020. Some now view the market as a potential site of community spread rather than where the initial human infection may have occurred.

- On January 1, 2020, China's security authorities shut down the market after several workers fell ill in late December 2019. China focused early source tracing on the market and Hubei Province; association with the market was included as part of the early case definition.

- In January 2020, a scientific article that described clinical features of initial COVID-19 infections in China found that some COVID-19 patients did not have any known association with the market. Furthermore, there continues to be conflicting data with some academic articles and preprints noting that phylogenetic analysis of the available data on the earliest cases suggests that the progenitor virus may not have originated from the market.

## China's Transparency Key to Determining COVID-19 Origin

The IC judges that closing persistent information gaps on the origins of COVID-19 is very likely to require greater transparency and collaboration from Beijing. The scientific community lacks technical data on a reservoir species, possible intermediate species, and closer relatives to SARS-CoV-2.

**Data and Samples From Initial Cases:** The global scientific community does not know exactly where, when, or how the first human infection with SARS-CoV-2 occurred. It lacks a complete picture of

the initial cases in Wuhan—or potentially elsewhere in China—that would allow it to better understand potential sources of infection or conduct phylogenetic analysis that would help validate both hypotheses.

**Information That Would Confirm Natural Outbreak:** Searching for a natural reservoir or potential intermediate host requires collecting, isolating, and sequencing viruses from samples taken from potential host species and environments to search for viruses related to SARS-CoV-2, endeavors that require international collaboration, resources, and time.

- Information that the earliest confirmed COVID-19 cases were in individuals or families who spent time in rural regions or who were involved in animal trade or environments that facilitate close human-to-animal interactions could indicate that the virus was circulating within an animal reservoir and a zoonotic spillover event caused the first COVID-19 case in humans.

- However, some transmission pathways are fleeting, meaning an animal acquires a virus and evidence of infection vanishes, particularly if the animals are reared and harvested for agricultural or commercial purposes.

**Information That Would Confirm Laboratory-Associated Incident:** China's coronavirus research or related information from origins investigations by Beijing or international organizations could provide clear indications of a laboratory-associated incident or at least yield some new insights.

A001419

**WIV's Publicly Available Coronavirus Research**

IC analysts are examining published research from China for any indicators that would inform our understanding of COVID-19's origins. The WIV and other research groups in China published coronavirus articles in 2020 and 2021, including the discovery of the closest known relative of SARS-CoV-2, but at least some relevant data on coronaviruses of interest has either been unavailable or has not been published.

Although the WIV described the sampling trip to the mineshaft in Mojiang in Yunnan Province where it collected RaTG13 in 2016, it did not explicitly state that RaTG13 was collected from that mine until 2020. Similarly, the WIV collected eight other coronaviruses from the same mine in 2015 that it did not fully disclose until 2021. In some of these instances, however, the WIV has described unpublished work in webinars and interviews prior to publishing.

## China Likely To Impede Investigation

The IC judges they will be unable to provide a more definitive explanation for the origin of COVID-19 unless new information allows them to determine the specific pathway for initial natural contact with an animal or to determine that a laboratory in Wuhan was handling SARS-CoV-2 or a close progenitor virus before COVID-19 emerged.

- For instance, Beijing limited the World Health Organization (WHO) investigation team's access to sites.

- In late July, China denounced a WHO plan for future investigations into COVID-19 origins, claiming that the proposal for future investigations was politicized. China's officials publicly rebuked the WHO's plans for a future study of labs in China,

saying Beijing would not allow the WHO to engage in the "conspiracy theory."

China is also pushing its narrative that the virus originated outside China.

- Public statements from China's Government have continued to claim the virus originated from imported frozen food, an extremely unlikely theory.

- China's Government continues to spread allegations that the United States created or intentionally spread SARS-CoV-2 to divert attention away from Beijing.

A001420

**NIC** ‖‖‖‖‖‖     NATIONAL INTELLIGENCE COUNCIL

## Annex A: Definitions

**Antibody:** A protein produced during an immune response to a part of an infectious agent called an antigen.

**Backbone:** A genetic sequence used as a chassis upon which to build synthetic constructs, such as those used for cloning, protein expression, and production.

**Biological weapon:** A weapon that uses bacteria, viruses, toxins, fungi, and biochemical/biomolecule agents that can cause death or injury to humans, plants, or animals or destroy materials.

**Biosafety:** The application of knowledge, techniques, and equipment to prevent personal, laboratory, and environmental exposure to potentially infectious agents or biohazards. Four **Biosafety levels (BSL)** define the containment conditions under which biological agents can be safely manipulated. These standards range from moderate safety requirements for low-risk agents (BSL-1), to the most stringent controls for high-risk agents (BSL-4). China's standards range from P1–4.

**Biosecurity:** The protection, control of, and accountability for biological agents, toxins, and biological materials and information to prevent unauthorized possession, loss, theft, misuse, diversion, and accidental or intentional release.

**Coronavirus:** A common type of virus that can infect humans and/or animals. The human illness caused by most coronaviruses usually last a short time and presents symptoms consistent with the "common cold," such as a runny nose, sore throat, cough, and a fever.

**COVID-19:** An infectious disease caused by the **SARS-CoV-2** virus, which is a betacoronavirus.

**Diagnostic information:** Information that allows IC analysts to distinguish between hypotheses—in this case, the laboratory origin and natural origin theories.

**DNA (deoxyribonucleic acid):** A molecule that carries an organism's genetic blueprint for growth, development, function, and reproduction.

**Epidemiology:** The study of the distribution and determinants of health-related events in specified populations, and the application of this study to prevent and control health problems.

**Furin cleavage site (FCS):** A region in the spike protein of SARS-CoV-2 that enhances infection.

**Gain-of-function:** The IC considers this as a research method that involves manipulating an organism's genetic material to impart new biological functions that could enhance virulence or transmissibility (e.g., genetically modifying a virus to expand its host range, transmissibility, or severity of illness). The IC assesses that genetic engineering, genetic modification, and laboratory-adaptation can all be used for gain-of-function experiments, but are not inherently so. We address both genetic engineering and laboratory-adaptation in the body of this assessment; the IC is unaware of an agreed, international definition.

**Genetically engineered or genetically modified viruses** are intentionally altered, created, or edited using biotechnologies, such as Clustered Regularly Interspaced Short Palindromic Repeat (CRISPR), DNA recombination, or reverse genetics. These viruses have intentional, targeted edits to the genome designed to achieve specific results, but unintentional genomic changes may also occur.

**Genome:** The genetic material of an organism. It consists of DNA (and sometimes RNA for viruses).

**Genome sequencing:** The process of determining the DNA or RNA sequence of an organism's genome, or its "genetic code." An organism's genetic code is the order in which the four nucleotide bases—adenine, cytosine, guanine, and thymine—are arranged to direct the sequence of the 20 different amino acids in the proteins that determine inherited traits.

**Intermediate species/host:** An organism that can be infected with a pathogen from a reservoir species and

A001421

passes the pathogen to another host species; infection is not sustained in this population.

**Laboratory-adapted viruses** have undergone natural, random mutations through human-enabled processes in a laboratory—such as repeated passage through animals or cells—that put pressure on the virus to more rapidly evolve. Specific changes to the viral genome are not necessarily anticipated in these processes, though the virus can be expected to gain certain characteristics, like the ability to infect a new species. This is a common technique used in public health research of viruses. We consider directed evolution to be under laboratory adaptation.

**Laboratory-associated incidents** include incidents that happen in biological research facilities or during research-related sampling activities.

**Molecular biology:** Study of the molecular basis of activities in and between cells. This includes techniques to amplify or join genetic sequences.

**Naturally occurring viruses** have not been altered in a laboratory. Viruses commonly undergo random mutations as part of the evolutionary process and can continue to change over time; mutations may enable a virus to adapt to its environment, such as evading host immune responses and promoting viral replication.

**Outbreak:** A sudden increase in occurrences of a disease in a particular time and place. Outbreaks include **epidemics**, which is a term that is reserved for infectious diseases that occur in a confined geographical area. **Pandemics** are near-global disease outbreaks.

**Pangolin:** An African and Asian mammal that has a body covered in overlapping scales. Pangolins are a natural reservoir of coronaviruses and researchers are investigating their potential role as an intermediate host for SARS-CoV-2.

**Pathogen:** A bacterium, virus, or other microorganism that can cause disease.

**Phylogenetics:** The study of the evolutionary relationships among groups of organisms.

**Progenitor virus:** A virus that is closely related enough—probably more than 99 percent—to SARS-CoV-2 to have been its direct ancestor or plausible immediate origin of the outbreak. The closest known relative to SARS-CoV-2 is only around 96 percent similar; to put this into context, humans and chimps are around 99 percent similar, demonstrating the signficant differences even at this similarity.

**RaTG13:** A coronavirus with the closest known whole genome to SARS-CoV-2, although it is widely believed to not be a direct ancestor of SARS-CoV-2.

**Resevoir species/host:** An organism that harbors a pathogen, which is endemic within the population.

**RNA (ribonucleic acid):** A molecule essential for gene coding, decoding, regulation, and expression. Certain viruses use RNA as a genetic blueprint.

**Transmissibility:** The measure of new infections initiated by an existing infection.

**Virus:** A replicating piece of genetic material—DNA or RNA—and associated proteins that use the cellular machinery of a living cell to reproduce.

**Wet market:** A market where fresh food and live and dead animals, including wildlife, are sold.

**Zoonosis:** An infection or a disease that is transmissible from animals to humans under natural conditions. A **zoonotic pathogen** may be viral, bacterial, or parasitic, and can sometimes be transmitted through insects, such as mosquitoes.

**Zoonotic spillover:** An initial infection or disease that is caused by contact between an animal and human under natural conditions.

NIC

## NATIONAL INTELLIGENCE COUNCIL

## Annex B: IC Examination of Open-Source Theories

IC analysts have examined a number of open-source articles from a variety of sources that have raised theories about SARS-CoV-2 and COVID-19's origin. The IC assesses that these theories generally do not provide diagnostic information on COVID-19 origins, and in some cases, are not supported by the information available to us. However, several have drawn on insightful methods or identified potential leads.

### Theory of Abnormal Activity at the WIV in Fall 2019

The IC assesses that an assessment about abnormal activity at the WIV in fall 2019 lacks support and does not offer diagnostic insight. The Multi-Agency Collaboration Environment (MACE) published a report assessing that the pandemic began in October 2019 because of a release at the WIV.

- Although the methodology is insightful, the IC has concerns with the small data set and analytic rigor used to derive the group's findings, and our review of information directly contradicts some of its findings.

### Theory That SARS-CoV-2 Was a Biological Weapon

The IC assesses that public claims from a Hong Kong virologist that Beijing created SARS-CoV-2 as a biological weapon are inconsistent with available technical information on coronaviruses. We assess that the articles contain several technical inaccuracies and omit key data points.

- Since September 2020, a virologist who worked in a WHO-affiliated laboratory in Hong Kong has publicly stated that Beijing created SARS-CoV-2 from bat coronaviruses and that China's researchers intentionally released it. The scientific community did not peer review these articles and some publicly rejected the articles' claims as scientifically unsound.

### Theory That SARS-CoV-2 Was Genetically Engineered

The IC assesses that public claims that some distinguishing features in SARS-CoV-2 are the result of genetic engineering are not diagnostic of genetic engineering. The IC has been evaluating how SARS-CoV-2 could have developed these features and notes that the furin cleavage site (FCS)—a region in the spike protein that enables infection and has been the topic of open-source debate—can also be consistent with a natural origin of the virus.

We do not fully understand the diversity of natural coronaviruses or how often they recombine, suggesting that there are plausible natural means by which these features in SARS-CoV-2 could have emerged beyond what we currently understand.

- For example, the author of an article in April notes the SARS-CoV-2's FCS is unique among known betacoronaviruses. The author argues that such features are rare and so well-adapted for human infection that they are more likely emerged from laboratory work than from natural selection.

- Although an IC review of scientific literature has indicated that no known betacoronaviruses in the same subgenus have this FCS in the same region of the spike protein as SARS-CoV-2, similar FCSs are present in the same region of the spike protein as other naturally occurring coronaviruses, according to scientific articles.

We also do not find credible a now-withdrawn preprint article from two Indian educational institutes posted in January 2020 that asserted SARS-CoV-2 was genetically engineered using sequences from the human immunodeficiency virus. We assess it is unlikely that scientists would have chosen to intentionally engineer the specific sequences that were the focus of the scientific article.

A001423



NATIONAL INTELLIGENCE COUNCIL

## Theory That SARS-CoV-2 Originated Outside China

We are aware of scientific studies claiming to have found SARS-CoV-2 viral fragments or antibodies in samples taken before November 2019 outside China. However, technical flaws in some of these studies, uncertainties in the methodologies, and in some cases, the lack of a credible review process make us skeptical of their utility in determining the pandemic's origin.

- We assess that the first cluster of confirmed COVID-19 cases arose in Wuhan, China, in late 2019, but we lack insight—and may never have it—on where the first SARS-CoV-2 infection occurred. Although all of the earliest confirmed cases of COVID-19 were documented in China's Hubei Province, where Wuhan is located, according to Western and China's press reports, it is plausible that a traveler came in contact with the virus elsewhere and then went to Wuhan.

- We continue to monitor scientific publications and discuss these issues with experts. Even if the virus is found to have existed outside China before the Wuhan outbreak, credible evidence of human infection would also be necessary to determine if the first COVID-19 outbreak began there.

A001424

## Annex C: IC Approach to 90-Day Study

The NIC collaborated closely with the National Counterproliferation Center (NCPC), the National Intelligence Management Council (NIMC), IC agencies, and other USG entities and departments on this assessment.  The IC kicked off the 90-day study by outlining the core intelligence questions that would be addressed over lines of effort—collection and analysis. These questions included:

- Did the outbreak begin through contact with infected domestic or wild animals or was it the result of a laboratory-associated incident?

- Was the virus genetically engineered?

- Is SARS-CoV-2 a biological weapon?

**Collection:** At the kick-off meeting for the 90-day study, the IC discussed core intelligence gaps to drive collection moving forward.

**Analysis:** The NIC had two separate structured analytic exercises to discuss both the underlying reporting and to strengthen argumentation moving into the drafting phase.  Analysts at individual agencies also pursued various structured analytic techniques to build their own assessments.

- During a two-day-long in-person IC-wide **Analysis of Competing Hypothesis (ACH)** analytic exercise in June, analysts determined whether existing reporting was consistent or inconsistent with information in individual reports.  This exercise allowed analysts to determine that most reporting was consistent with both hypotheses and the reporting that was inconsistent was deemed to be not credible.

- Before the start of drafting, the NIC hosted an IC-wide **Team A/Team B** analytic exercise to explore how the IC could strengthen either hypothesis through a debate style format.  Agencies pulled from these conversations—along with the work conducted during and before the study—to solidify their consensus positions.

A001425



# NATIONAL INTELLIGENCE COUNCIL

## Annex D: Outside Review

The NIC conducted four rounds of outside review of the draft assessment.  These sessions provided valuable feedback that we incorporated into the assessment.  The NIC made some organizational changes in response to comments; comments included:

- Emphasize points of agreement.

- Provide additional definitions in the lexicon and ensure technical or intelligence jargon is explicitly explained.

A001426

**NIC** ▮▮▮▮▮▮▮  NATIONAL INTELLIGENCE COUNCIL

## Annex E: Questions

Answers to the following questions would help us better evaluate hypotheses related to the origins of COVID-19:

What additional information—to include timing, location, relevant animal exposures, occupational information, and clinical samples—is there on the earliest cases of COVID-19?

How were early cases investigated? What questions or tools were utilized for tracing contacts and contacts of those contacts?

What direct or indirect indicators of COVID-19 clusters is China aware of from early in the outbreak? This may include things like hospital occupancy rates or efforts to triage medical care outside of hospital facilities.

What insight can China provide on the search for the reservoir and potential intermediate species of the COVID-19 virus?

What insight can China provide on the search for the identification of a progenitor virus? Have any leading candidates or regions for spillover been identified?

What information, data, and/or samples does China have on wildlife or other animals present in the following markets in Wuhan:

- Huanan Seafood Wholesale Market

- Qiyimen Live Animal Market

- Baishazhou Market

- Dijiao Outdoor Pet Market

What information, data, and/or samples does China have on wildlife present in the other markets, wildlife rescue centers, and/or farms in Wuhan, across Hubei, in neighboring provinces, or in locations where live animals in Hubei Province are sourced from?

[ 17 ]

A001427