**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

IN RE:

START MAN FURNITURE, LLC, et al.[1]

Chapter 7
Case No. 20-10553 (CTG)
Jointly Administered

| | |
|---|---|
| TODD STEWART and JENNIFER SAWLE, on behalf of themselves and all others similarly situated,<br><br>       Appellants,<br><br> v.<br><br><br>ALFRED T. GIULIANO, chapter 7 trustee for Debtors Start Man Furniture, LLC, et al.,<br><br>      Appellee. | Civil Action No. 22-cv-00450 (CFC)<br><br>Bankruptcy Case No. 20-10553 (CTG)<br>Bankruptcy Adv. Pro. No. 20-50548 (CTG)<br>Bankruptcy BAP No. 22-00030 |
| ALFRED T. GIULIANO, chapter 7 trustee for Debtors Start Man Furniture, LLC, et al.,<br><br>       Appellant,<br><br> v.<br><br>TODD STEWART and JENNIFER SAWLE, on behalf of themselves and all others similarly situated,<br><br>       Appellees. | Civil Action No. 22-cv-489 (CFC)<br><br>Bankruptcy Case No. 20-10553 (CTG)<br>Bankruptcy Adv. Pro. No. 20-50548 (CTG)<br>Bankruptcy BAP No. 22-00032 |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, including Start Man Furniture, LLC (f/k/a Art Van Furniture, LLC) (9205); SVF Holding Company, Inc. (f/k/a AVF Holding Company, Inc.) (0291); SVCE, LLC (f/k/a AVCE, LLC) (2509); StartVF Holdings I, LLC (f/k/a AVF Holdings I, LLC) (2537); StartVF Holdings II, LLC (f/k/a AVF Holdings II, LLC) (7472); SVF Parent, LLC (f/k/a AVF Parent, LLC) (3451); Levin Parent, LLC (8052); Start Man Furniture of Canada, LLC (f/k/a Art Van Furniture of Canada, LLC) (9491); SV Sleep Franchising, LLC (f/k/a AV Pure Sleep Franchising, LLC) (8968); SVF Franchising, LLC (f/k/a AVF Franchising, LLC) (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

## <u>APPELLANTS' OPENING BRIEF</u>

Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302)-388-1944
Email:  mjoyce@mjlawoffices.com

René S. Roupinian
Jack A. Raisner
Gail C. Lin
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile:  (212) 221-1747
Email:  rsr@raisnerroupinian.com
Email:  jar@raisnerroupinian.com
Email: gcl@raisnerroupinian.com

*Attorneys for Appellants and Cross Appellees*
*Todd Stewart and Jennifer Sawle, on behalf of themselves and all others*

Dated: June 21, 2022

## <u>TABLE OF CONTENTS</u>

STATEMENT OF JURISDICTION............................................................. 1

STATEMENT OF THE ISSUES................................................................. 1

STANDARD OF APPELLATE REVIEW...................................................... 1

HISTORY OF THE CASE ....................................................................... 2

STATEMENT OF RELEVANT FACTS ........................................................ 6

SUMMARY OF THE ARGUMENT ........................................................... 13

ARGUMENT…………………………………………………………………………15

   I.   THE BANKRUPTCY COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE UNFORESEEABLE BUSINESS CIRCUMSTANCES DEFENSE IN THE ABSENCE OF A SUFFICIENT EVIDENTIARY RECORD . . . . . . . . . . . . . . . . . 15

   A.  The UBC Defense Demands Scrutiny of an Employer's Claimed Reason for Laying Off Large Numbers of Employees ....................................................................... 16

   B.  Art Van's Litigation Convenient Explanation is Riddled with Gaps and Inconsistencies that Precluded Summary Judgment ................................................................ 20

     1.  Debtors Never Have Explained What Caused an Interruption of Art Van's Liquidation Plan to Result in Abrupt, Permanent Terminations................................. 21

     2.  The Notice Had to State Precisely What Caused the Abrupt, Permanent Terminations, but Debtors' Notice Did Not......................................................................... 22

     3.  At the Time of the Terminations, Art Van Painted Drastically Different Pictures of Business Conditions to the Employees and to the Bankruptcy Court and Stakeholders. .......................................................................................... 24

        *a.* *March 19 hearing – Debtors did not disclose the permanent terminations and suspension of operations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        *b.* *March 31 hearing – Debtors identified its own actions as causing the shutdown.* 28

   II.  THE BANKRUPTCY COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE NATURAL DISASTER EXCEPTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   A.  COVID is Not a Natural Disaster under the WARN Act ................................... 31

     1.  Congress intended to exclude human disease from the external "disasters" that trigger the WARN exception. ................................................................................ 31

     2.  Debtors have not and cannot prove that the COVID pandemic was natural .............. 33

   B.  Every Theory of "Natural Disaster" Causation is Fact Intensive and Requires an Evidentiary Record ........................................................................................ 34

   III.  THE BANKRTUPCY COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFFS-APPELANTS' CROSS-MOTION TO DEFER RULING  . . . . . . . . . 36

CONCLUSION................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alarcon v. Keller Indus., Inc.*,
   27 F.3d 386 (9th Cir. 1994) ................................................................ 24

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,
   197 F.3d 76 (3d Cir. 1999)................................................................... 2

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)........................... 36

*Benson v. Enter. Leasing Co. of Orlando*,
   No. 6:20-CV-891-RBD-LRH, 2021 WL 1078410 (M.D. Fla. Feb. 4, 2021) .............. 21, 34, 35

*Benson v. Enterprise Leasing Co. of Fla., LLC*,
   620CV891ORL37LRH, 2021 WL 1078185 (M.D. Fla. Jan. 4, 2021) ..................... 34

*Benson v. Enterprise Leasing Co. of Orlando, LLC*,
   6:20-CV-891-RBD-LRH, 2021 WL 1080914 (M.D. Fla. Feb. 4, 2021).......................... 34, 35

*Biase v. Congress Fin. Corp. (In re Tops Appliance City, Inc.)*,
   372 F.3d 510 (3d Cir. 2004)................................................................... 1

*Bradley v. Sequoyah Fuels Corp.*,
   847 F.Supp. 863 (E.D.Okla.1994) .......................................................... 18

*Calloway v. Caraco Pharm. Labs., Ltd.*,
   800 F.3d 244 (6th Cir. 2015) ................................................................ 16

*Carpenters Dist. Council v. Dillard Dept. Stores*,
   778 F.Supp. 297 (E.D.La.1991) ....................................................... 17, 18

*Carver v. Foresight Energy LP*
   3:16-CV-3013, 2016 WL 3812376 (C.D. Ill. July 12, 2016) ................................. 33

*Childress v. Darby Lumber Inc.*,
   126 F. Supp. 2d 1310 (D. Mont. 2001)..................................................... 23

*Costlow v. United States*,
   552 F.2d 560 (3d Cir.1977).................................................................. 36

*Doe v. Abington Friends School*,
   480 F.3d 252 (3d Cir. 2007)............................................................... 1, 36

*Dowling v. City of Philadelphia*,
  855 F.2d 136 (3d Cir. 1988) ........................................................................ 36

*Easom v. US Well Services, Inc.*,
  21-20202, 2022 WL 2136084 (5th Cir. June 15, 2022) ......................... 31, 32, 33, 35

*Easom v. US Well Servs.*, Inc.,
  527 F. Supp. 3d 898 (S.D. Tex. 2021) .......................................... 21, 21, 33, 35

*Gray v. York Newspapers, Inc.*,
  957 F.2d 1070 (3d Cir. 1992) ...................................................................... 2

*Grimmer v. Lord Day & Lord*,
  937 F.Supp. 255 (S.D.N.Y.1996) .............................................................. 23

*Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*,
  173 F.3d 175 (3d Cir. 1999) ...................................................................... 32

*In re AE Liquidation, Inc.*,
  866 F.3d 515 (3d Cir. 2017) ...................................................................... 23

*In re Dewey & Leboeuf, LLP*,
  507 B.R. 522 (Bankr. S.D.N.Y. 2014) ...................................................... 23

*In re Hechinger*,
  298 F.3d 219 (3d Cir. 2002) ........................................................................ 1

*In re Tweeter OPCO*,
  453 B.R. 534 (Bankr. D. Del. 2011) .......................................................... 23

*Jones v. Kayser–Roth Hosiery*,
  748 F.Supp. 1276 (E.D.Tenn.1990) ................................................ 16, 18, 19

*Jones v. Scribe Opco, Inc.*,
  8:20-CV-2945-VMC-SPF,2022 WL 813824 (M.D. Fla. Mar. 17, 2022) ............... 35

*Lorenzo v. Griffith*,
  12 F.3d 23 (3d Cir.2003) ............................................................................. 1

*Miller v. Beneficial Mgmt. Corp.*,
  977 F.2d 834 (3d Cir.1992) ........................................................................ 37

*Newman as Tr. of World Mktg. Tr. v. Crane, Heyman, Simon, Welch, & Clar*,
  435 F. Supp. 3d 834 (N.D. Ill. 2020) ........................................................ 23

*Saldana v. Kmart Corp.*,
  260 F.3d 228 (3d Cir. 2001)..............................................................................2

*Sides v. Macon Cty. Greyhound Park, Inc.*,
  725 F.3d 1276 (11th Cir. 2013) ........................................................................23

*Snider v. Com. Fin. Services*
  288 B.R. 890 (N.D. Okla. 2002) .......................................................................17

*St. Surin v. V.I. Daily News, Inc.*,
  21 F.3d 1309 (3d Cir.1994)...............................................................................36

*Wallace v. Detroit Coke Corp.*,
  818 F. Supp. 192 (E.D. Mich. 1993)..................................................................19

*Ward v. United States*,
  471 F.2d 667 (3d Cir.1973)...............................................................................36

*Yates v. United States*,
  574 U.S. 528, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015)....................................31

Statutes

28 U.S.C. § 158(a)(1)............................................................................................1
29 U.S.C. § 2101(a)(2)...............................................................................2, 10, 15
29 U.S.C. § 2102 (b)(2)(B) ..................................................................................31
29 U.S.C. § 2102(a) and (b).........................................................................passim
29 U.S.C. § 2102(b)(3) .........................................................................................23
29 U.S.C. § 2101 ....................................................................................................4

Rules

FED. R. CIV. P. 56(c) .............................................................................................36
Fed. R. Civ. P. 56(d) .........................................................................................6, 36
Rule 56 ...................................................................................................................6
Rule 56(f) .............................................................................................................36

Regulations

20 C.F.R. § 639.9(b)(1).........................................................................................16
20 C.F.R. § 639.9(c).......................................................................................34, 35
20 C.F.R. § 639.9(a)...............................................................................................4

## STATEMENT OF JURISDICTION

The United States District Court for the District of Delaware has appellate subject matter jurisdiction over this bankruptcy appeal pursuant to 28 U.S.C. § 158(a)(1).

On March 21, 2022, the Bankruptcy Court issued its Opinion (PA01272) and Order (PA01301) granting the Trustee's Motion for Summary Judgment ("Trustee's SJ Motion").  On April 4, 2022, Plaintiffs-Appellants Todd Stewart and Jennifer Sawle ("Plaintiffs-Appellants") filed a timely notice of appeal. (PA01302).

## STATEMENT OF THE ISSUES

**ISSUE 1:**      Did the Bankruptcy Court abuse its discretion in entering summary judgment for the Trustee on the WARN Act's unforeseeable business circumstances and natural disaster exceptions before Plaintiffs-Appellants had the opportunity to complete discovery on those issues?

**ISSUE 2:**      Did the Bankruptcy Court err in finding that the WARN Act's unforeseeable business circumstances and natural disaster exceptions excused Art Van from complying with the 60-day notice requirements of the WARN Act?

## STANDARD OF APPELLATE REVIEW

The district court uses an abuse of discretion standard when reviewing the trial court's decision as to whether a summary judgment motion was ripe for resolution.  *Doe v. Abington Friends School*, 480 F.3d 252, 256 (3d Cir. 2007), *Lorenzo v. Griffith,* 12 F.3d 23, 27 n. 5 (3d Cir.2003).

In reviewing a bankruptcy court's grant of summary judgment, the district court applies a plenary, or de novo standard of review to legal determinations.  *Biase v. Congress Fin. Corp. (In re Tops Appliance City, Inc.*), 372 F.3d 510, 513 (3d Cir. 2004); *In re Hechinger*, 298 F.3d 219,

224 (3d Cir. 2002); *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).  The reviewing court looks at whether the record demonstrates "a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).  Courts must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).

## <u>HISTORY OF THE CASE</u>

Until petitions for Chapter 11 bankruptcy were filed on March 9, 2020, Art Van Furniture, LLC and its affiliates (the "Debtors" or "Art Van") operated a retail business with 169 locations under brand names such as Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture. Plaintiffs-Appellants and the other similarly situated former employees were terminated as part of, or as a result of mass layoffs and/or plant closings, as defined by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2101 *et seq.* (the "WARN Act") at stores in Illinois, Michigan, and Pennsylvania, with approximately 2,000 employees working at those locations. Plaintiffs-Appellants had worked at two of Art Van's stores in Michigan before their terminations.  None of the employees received 60 days' written notice of their terminations.

On March 8, 2020, the Art Van entities filed voluntary petitions in the U.S. Bankruptcy Court for the District of Delaware under Chapter 11 of Title 11 of the Bankruptcy Code.  (Bankr. No. 20-10553, D.I. 2).  On March 10, 2020, the cases were consolidated for joint administration. (Bankr. No. 20-10553, D.I. 71).  On April 7, 2020, the Chapter 11 bankruptcy cases were converted to Chapter 7 and Alfred T. Giuliano was appointed the Chapter 7 Trustee (the "Trustee") to the Debtors.  (Bankr. No. 20-10553, D.I. 263, 264).

On March 23, 2020, Plaintiffs-Appellants filed a Class Action Adversary Proceeding Complaint in which they assert that the Debtors violated the WARN Act and seek, *inter alia*, up to sixty (60) days' unpaid wages and other benefits and damages for Plaintiffs and other similarly situated former employees for.  (PA00001).

On December 10, 2020, the Trustee filed an Answer to the Complaint generally denying the allegations and asserting several affirmative defenses, including that the terminations were caused by unforeseeable business circumstances ("UBC") and that notice was not required because the terminations were caused by a natural disaster. (PA00024-25).

On April 28, 2021, Plaintiffs-Appellants served their first set of interrogatories and request for production of documents on the Trustee's counsel.  (Decl. of René S. Roupinian ("Roupinian Decl."), PA01012, PA01018).  The parties informally exchanged information regarding the composition of the putative class, covered sites and damages, discussed the substantive issues of the case and agreed to stay formal discovery pending mediation. (PA1012, ¶4).  The parties negotiated a Stipulated Scheduling Order, entered by the Court on June 10, 2021, reflecting their intention to conduct informal discovery. (PA01012-13; PA01055, ¶11). The Stipulated Scheduling Order specified that "fact discovery[] shall be completed and closed within [180] days from the filing of the Mediator's report." (PA001056, ¶ 22).

On June 21, 2021, pursuant to the parties' agreement to informally exchange documents, Plaintiffs-Appellants' counsel emailed an informal request to Trustee's counsel seeking information regarding, *inter alia*, Art Van's efforts to raise capital, the circumstances leading to the terminations, the effects of the COVID-19 pandemic on Art Van's going out of business plans, efforts to avoid mass layoffs, and minutes of Board of Directors' meetings.  (PA01013, ¶ 6; PA01060).  Specifically, the documents sought were:

1. Documents which shows that on or about Jan 5, 2020, Debtor was engaged in discussions for an amount of capital that if received would have avoided the GOB sale.
2. Documents which show any unforeseeable business circumstance that occurred between Jan 5 and Mar 5 that made the GOB sale and sending of WARN notice on March 5 unforeseeable.
3. Documents which show any COVID related event that took place prior to March 19 that affected Debtor's ability to remain viable.
4. Documents which show decision(s) that precipitated Debtor's pursuit of GOB sales.
5. Documents which show the Debtor's options up to March 19 to avoid conducting permanent terminations on or around that date.
6. Documents which show the infeasibility of Debtor's options that would have avoided permanent terminations on or around March 19.
7. Documents which show the number of employees Debtor engaged after March to carry out GOB sales or other business, at the eight WARN locations.
8. Board minutes from January 1, 2020 and thereafter.

On July 12, 2021, the Trustee's counsel responded to Ms. Roupinian, identifying certain public documents and court filings, and producing a total of three documents: (1) Art Van Holding Co., Inc. Q1 Board Member Meeting dated February 4, 2020 (heavily redacted), (2) Board Member Minutes dated April 2, 2020 (almost entirely redacted), and (3) Wind Down Plans dated March 23, 2020. (PA01014, ¶7; PA01063-65).  The Trustee produced two documents regarding the time period of January through March 2020.

On July 27, 2021, the parties participated in a mediation with the Hon. Kevin Gross but did not settle the Adversary Proceeding, as set forth in the Mediator's Final Report filed on October 15, 2021. (PA01014, ¶8; PA00035).  Thereafter, the parties were to resume written discovery pursuant to the pretrial scheduling order entered on June 10, 2021.  (PA01056).  The parties exchanged Rule 26(a) disclosures on October 29, 2021.  (PA00057; PA00061).

On October 29, 2021, the Trustee filed a First Amended Answer to the Complaint (PA00036).  In its First Amended Answer, the Trustee denies that Defendants were an "employer" under 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639(a), and asserted for the first time

4

the defense of liquidating fiduciary. (PA00049, ¶58).   While the Trustee had invoked the "natural disaster exception in the original Answer (PA00024-25), the First Amended Answer specified for the first time that the Trustee was relying on the "natural disaster" defense due to the effects of the COVID-19 pandemic. (PA00050, ¶ 64).

On November 12, 2021, the Trustee filed a motion for summary judgment (PA00063; PA00065; PA00097) on three factual issues: (1) that Art Van was a "liquidating fiduciary" exempt from providing WARN notice; (2) that Art Van's decision to conduct mass layoffs was caused by an unforeseeable business circumstance ("UBC"); and (3) that the layoffs were caused by a natural disaster.

On November 16, 2021, Plaintiffs-Appellants' counsel contacted the Trustee's counsel to request again that the Trustee serve overdue responses to the discovery requests that they served on April 28, 2021.  (PA01014, ¶11; PA00087).

On November 17, 2021, Plaintiffs served Plaintiffs' Second Request for Production of Documents on the Trustee. (PA01015, ¶12; PA01092).  The Second Request for Production of Documents seeks documents relevant to the newly raised affirmative defenses in the Trustee's First Amended Answer, including communications with Art Van's owners and Wells Fargo relating to financing for the company and efforts to liquidate the company.  (PA01106, Req. Nos. 11-17).  On December 1, 2021, two days before Plaintiffs' response to the Trustee's Motion for Summary Judgment was due, Trustee's counsel served written responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents, which Plaintiffs had served more than 6 months prior.  The Trustee produced no documents in conjunction with those responses.  (PA01015, ¶13; PA01112).

On December 3, 2021, Plaintiffs filed an Opposition to the Trustee's Motion for

Summary Judgment and Cross-Motion to Defer Ruling, requesting, *inter alia*, that the Bankruptcy Court defer ruling on the Trustee's Motion and allow Plaintiffs to take discovery pursuant to Fed. R. Civ. P. 56(d).  (PA00985-86).

On March 21, 2022, Judge Christopher Sontchi of the Bankruptcy Court issued a Memorandum Opinion and Order holding that the liquidating fiduciary exception did not apply and, as such, Debtors were employers subject to the WARN Act's requirements, but that the UBC and natural disaster exceptions did apply, thereby excusing Debtors' non-compliance with the WARN Act.  (PA01272; PA01301).  The Bankruptcy Court denied Plaintiffs-Appellants' cross motion to defer ruling pending discovery.  (PA01300).  This appeal addresses the UBC and natural disaster exceptions to the WARN Act, as well as the denial of Plaintiffs-Appellants' Rule 56 request to defer ruling.

## STATEMENT OF RELEVANT FACTS

The following is a statement of available record facts relevant to the issues for review on appeal.  A complete record regarding what led to the terminations of the Art Van employees does not exist because Plaintiffs-Appellants have not had the opportunity to complete discovery.  Plaintiffs-Appellants have served both informal requests and two sets of written discovery requests seeking this information, to which the Trustee has not responded and has only produced three documents.

On January 31, 2020, the World Health Organization issued a Global Health Emergency regarding COVID-19[2] and the U.S. declared a Public Health Emergency.[3]  At that same time, Art Van was in a parallel crisis of financial distress.  The company was in the control of its secured

---

[2] *Coronavirus Declared Global Health Emergency by WHO*, BBC News, Jan. 31, 2020, available at httpsline//www.bbc.com/news/world-51318246.  (PA00992, n.4).

[3] *US Declares Public Health Emergency Over Coronavirus,* ABC News, Feb. 1, 2020, available at httpsline//abcnews.go.com/Health/delta-suspends-us-flights-china-amid-coronavirus/story?id=68666037. (PA00992, n.5).

lenders, to which it owed approximately $208.5 million.  (PA00133, ¶31).  Its ABL facility borrowing base was being further restricted and its access to credit tightened.  (PA00124, ¶13).  On February 5, 2020, the company defaulted on its ABL facility and Wells Fargo agreed to forbear until February 28 to allow Art Van to explore a capital raise.  But Wells Fargo took "cash dominion" and required the company to begin immediate going out of business ("GOB") liquidation before February 28th if the effort was unsuccessful.  (PA00124, ¶14.)

In February 2020, T.H. Lee Partners formed a Consortium with Art Van's founders to attempt the capital raise.  On February 27, COVID-19 fears set off the sharpest fall of the stock markets since 2008, with the Dow Jones Industrial Average falling 1,191 points, its largest one-day drop in history.[4] The Consortium purportedly failed to secure the necessary capital commitments because the coronavirus made the Consortium's investors unwilling to contribute the capital that Art Van needed. (PA00124-5, ¶15).

On March 4, 2020, Art Van sent letters to employees notifying them that terminations at the Facilities where they worked would begin more than two months later, on May 5, 2020. (PA00003, ¶8).  The terminations would affect approximately 1,400 employees.  (PA00418). However, Plaintiffs-Appellants were actually terminated just over two weeks after the letters were sent, beginning on March 19th.  (PA00003, ¶9).

On March 8, 2020, Art Van and its affiliates filed Chapter 11 bankruptcy with plans to shut down all but 44 of its 169 stores. (PA01206, ¶11). Around March 13th, temporary stay-at-home orders were issued in Pennsylvania (where Art Van operated 25 stores) and other states. (PA01208-9, ¶¶ 15-18).

As of March 10, 2020, Art Van's $11.6 million in cash had been in its lenders'' dominion

---

[4] *Dow Falls 1,191 Points – The Most in History*, CNN, Feb. 27, 2020, available at httpsline//www.cnn.com/2020/02/27/investing/dow-stock-market-selloff/index.html. (PA00992, n.6).

for "some time." (PA00194 line 22 to PA00195 line 5). Wells Fargo was supporting the wind

down plan: Art Van itemized its expenses and Wells Fargo approved the payments. (PA00196

line 16 to PA00197 line 19). Wells Fargo "funded every single payroll request that the

debtors…made for current pay." (Transcript of Hearing on Mar. 31, 2020, PA0839 lines 20-23).

*See also* Cash Collateral Order, PA00267, ¶2).

At a March 19, 2020 status conference, Art Van's counsel told the Bankruptcy Court that

despite "attempting to operate as much as possible in the ordinary course," it had "t[old its]

employees not to report to work" effective that day. (Transcript of Hearing on Mar. 19, 2020,

PA00806, lines 9-12). Counsel downplayed the impact of the government guidance and

directives, stating that it was the company's "hope" that the locations it had "at least temporarily,

shuttered" that day would not be closed "forever," but asserted the need to "adapt consistent with

our obligations and fiduciary duties." (*Id.*, PA00806, lines 12-18). Art Van's counsel sought to

immediately make "clear" that "we are trying to explore with our lenders and our other

stakeholders … other options short of outright liquidation." (*Id.*, PA00808, lines 9 to 14). Art

Van's counsel specifically mentioned the ongoing "Craftworks" case that was pending before

Bankruptcy Judge Shannon, in which a pause in the Chapter 11 closing sale plan process was

being considered to adapt to the COVID-19 directives. Counsel intoned a spirit of problem-

solving and dialogue:

> So let me just say then, conceptually, we are looking at the possibility of…going
> idle or going into a state of dormancy for a period of time, and then the possibility
> then of either…reopening stores, some subset of stores as, either in furtherance of
> the going concern transaction…or…closing sales and an orderly liquidation, you
> know, essentially, once the economic and retail environment and the safety
> environment have improved to a degree that we can do that. … [T]here are a
> number of scenarios under consideration… we are right now, engaging in a
> dialogue with Wells Fargo and our term loan lenders to see if there's a way to
> pursue that alternative.

(*Id.*, PA00808 line 23 to PA00809 line 13).  Art Van's counsel stated that for alternatives to be

possible, Wells Fargo needed to cooperate, as there was a need for

> cooperation from the ABL agent and the term loan lenders and… assurances that,
> while we are having these dialogues…they'll ***take no precipitous action*** to make
> that -- an already difficult situation worse by [] sweeping all of the cash, for
> example, that are in the debtors' cash collection accounts and leaving us without
> even the cash necessary to fund those operating and restructuring expenses already
> incurred or that might be incurred imminently, as we're [] trying to navigate this
> situation.

(*Id.*, PA00809 line 17 to PA00810 line 3) (emphasis added).

Next at the podium, Wells Fargo's counsel Jennifer Feldsher described the unexpected

nature of Art Van's shut-down decision: "Debtors' decisions, unfortunately, are coming at us

minutes before these hearings."  (PA00811 lines 1-2).  She explained while Wells Fargo sought

"to try to find a path forward…for all stakeholders," Art Van, "as opposed to other cases," had

not "fully come to their creditors, other than to say this is somebody else's problem and, put --

you know, fix it for us or don't sweep or do these things."  (PA00811 lines 2-9).  She continued:

"unfortunately, we haven't gotten the information that we need from the company to be able to

even consider a full wind-down plan.  (PA00811 lines 16-18).

Creditors' committee counsel, Mr. Bradford Sandler, echoed Art Van's hopefulness.  He

stated the hope that "44 stores would be saved, thousands of jobs would be saved.  Maybe that

will happen down the road."   (PA00816 lines 18-21).  He emphasized that putting the winddown

"on ice" would be advantageous:

> We're talking about something that is not perishable. [F]urniture, whether[] it's in
> the store today or…a month…or two months from now, it's still the same
> furniture. So it should be relatively easy to shut the debtor down without any
> value that would dissipate because of the furniture somehow [] getting destroyed
> or damaged.

(PA00817 lines 6-13).  Mr. Sandler cautioned that "pulling the plug" would be detrimental:

> Restructuring professionals are…supposed to come up with creative solutions to very very tough problems. And it may be easy to … pull the plug and say let's convert the case to a Chapter 7. I'm not really sure what that gets you. … And it seems to me that this is a creative approach to put everything on ice. And hopefully [] at some time period, whether it's 30 days, 60 days, 90 days…to [] turn the lights back on and resume the liquidation of the stores and hopefully find a going concern for the Wolf Levin propertie'.

(PA00817 line 14 to PA00818 line 3).  He said the committee favored "put[ting] everything on ice and let's come back to it in[]a month or two and see."  (PA00818 lines 4-9).[5]

Yet, later that same day, Art Van notified its employees that it was *permanently* terminating its non-leader personnel the next day and its lead personnel three days later. Along with Plaintiffs-Appellants, the other similarly situated employees were terminated on or about March 19, 2020 without 60 days written notice as required by the WARN Act. The March 19 Letter states in part:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at [seven Michigan sites], which would in the permanent termination the employment [sic] of all employees at these locations.
>
> Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact.  Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date.  The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").
>
> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/ or Sales Manager scheduled to work on

---

[5] In its April 3 Motion to Convert to Chapter 7, Art Van described the March 19 layoffs as a decision to "suspend all retail operations and terminate the majority of their employees – moves the Debtors hoped at the time would be only temporary measures." (PA01355-6, ¶25).

> March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(PA01211-2, ¶23; PA00795).

At a subsequent hearing on March 31, Art Van's counsel, Gregory Werkheiser, reported to the Bankruptcy Court what had happened regarding the termination of employees, stating "we were not able to get to a point where we had the agent support and consent for the mothball arrangement primarily because of the company's liquidity issues and cash needs, both as they exist today based on obligations that have accrued thus far since the filing and the expected obligations[.]" (PA00834 lines 1-6).

Ms. Feldsher painted a different picture.  She explained that Art Van's decision to immediately suspend operations, including places where there were no shutdown orders in place, and "to terminate all" or "significantly all of their employees" "was not something that was done in coordination with the lenders, either the ABL lender or the term lender, or even the [Gordon Brothers store-closing] consultant …who…had remained to support the debtor's efforts to try to continue a GOB sale." (PA00840 lines 1-13).  Ms. Feldsher stated: "[s]o, as a result of terminating their employees, … the debtors now have significant accrued PTO commissions, other benefits related to the terminated employees as well as healthcare obligations.  Most of these were not included in any budget and certainly in the cash collateral budget because there was **no contemplation of a wholesale mass termination of employees**." (PA00840 lines 14-20) (emphasis added).

Ms. Feldsher indicated these obligations could have been avoided had employees been laid off temporarily: "Could these have been mitigated if employees had been furloughed [or by]

less drastic more spaced out termination we will never know… but now these expenses exist."
(PA00840 lines 20-25).   "[J]ust the employee obligation alone" were over $14 million.
(PA00841 lines 1-4).

Art Van's counsel argued that Wells Fargo shared the blame for the "impossible situation," because, as the ABL lender, it had committed to the payroll expenses and it needed to "pay the freight," including the healthcare plan benefits.  (PA00869 line 14; PA00864 21-23).
He stated:

> I do appreciate the difficult situation and perhaps the impossible situation that the court is in and everybody else is in. But what I'm talking about is enforcing a choice that not just the debtor but the lenders made in the order that they agreed to and had Your Honor enter. That order explicitly says that the debtors had the ability to use the cash collateral to meet the payroll obligations.

(PA00869 lines 13-20).

Wells Fargo declared a default under the Interim CC Order and terminated use of cash collateral as of March 24, 2020; later extended through March 31, 2020, and finally through April 6, 2020. (PA01213, ¶ 27).  Art Van filed a motion to convert the bankruptcy from Chapter 11 to Chapter 7, which was granted on April 6, 2020 (PA01213, ¶28).

In 2021 President Biden ordered a study and report on COVID's origins.  (*See* Report, PA00954).  The report of the National Intelligence Council elevated the creditability of the "laboratory leak" theory above the [infected animals in the] "market" hypothesis.  After examining all available intelligence, the Council and "four [Intelligence Community] elements" assessed with *low confidence* that the initial SARS-CoV-2 infection was most likely caused by natural exposure to an animal infected with it. (PA00954 (emphasis added)).  But "one Intelligence Community element assesse[d] with *moderate confidence* that the first human infection with SARS-CoV-2 most likely was the result of a laboratory-associated incident. (*Id*. (emphasis added)).

12

## SUMMARY OF THE ARGUMENT

Under the WARN Act, a company that terminates its employees without 60 days' notice is barred from defending its violation unless it has explained to them at the time why it could not notify them earlier. If it does so, the company may proceed to try to prove the merit of the defense in the litigation. Debtors stated at the time of the layoff that COVID-19 had impacted the company. But, simultaneously, Debtors made contrary representations, creating a material issue of fact. Debtors have never been put to their proof. The Court below blocked Plaintiffs from discovery and accepted Debtors' explanation without reference to any evidence. To be sure, there were some temporary governmental lockdowns, but a WARN Act "mass layoff" is a permanent layoff. Debtors have never pointed to, no less substantiated, the business circumstances that pressured them to permanently terminate their workforce on one days' notice at the time of those lockdowns.

 On Friday, March 19, 2020, Debtors emailed their 4,000 or so employees to tell them they were terminated effective the next day. The email said the company had been impacted by the Covid-19 virus and the "resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date."

The notice implied that COVID caused the layoff, without expressly saying so. But the week had been a terrifying and unforgettable one. Governors in several eastern states had temporarily closed certain venues and told people to stay home and shelter-in-place. Studies tell us that exposure to shocking events can shape our perceptions of probability. Such a disastrous week readies us to lay the blame for the layoff on covid and makes us resistant to digging out a different, more nuanced and mundane cause, such as the one hinted to by Debtors' ellipsis.

13

Plaintiffs filed suit seeking to represent the 4,000 employees who were forced out of their jobs and health care coverage in a cresting pandemic.  They claimed the lack of 60 days' notice was a prima facie WARN Act violation. Debtors did not move to dismiss the complaint but invoked WARN's unforeseeable business circumstances and natural disaster affirmative defenses.

Plaintiffs served discovery to probe what if any evidence supported Debtors' defenses. Debtors' statement in their notice was oblique, but it contained two bombshells, that they were permanently terminating the workforce and no longer supporting the store-closing.  In updating the Court that afternoon of the layoff, Debtors hid the two bombshells.   Counsel merely touched on the temporary store closures and described Debtors as engaged in the wind-down process despite Covid-19's impediments.  This flatly contradicted their message to their workforce that day.  The gulf between the two pictures widened in court twelve days later.  It was only then that Debtors announced to the Court that they were abandoning the plan and seeking to convert the chapter 11 case to chapter 7.  But the reason for it was not the one they gave the employees.  It was not COVID-19.  It was that Debtors had brought immediate, massive payroll and benefits payments upon themselves by having peremptorily terminated their workforce on March 19. The lender's remarks at both hearings however, had a common thread: it was that Debtors' behavior was inimical to the success of the plan.  This suggests that covid was not the cause of these events.  Rather, it was Debtors, who while warning others not to do anything "precipitous" because it would sink the estate, were guilty of doing just that.

Instead of responding to Plaintiffs' discovery requests, Debtors balked and filed their summary judgment motion.  In their brief, Debtors, for the first time, narrated a set of business circumstances in which the governors' orders and a slowdown of going-out-of-business sales

forced the change course and abandonment of the wind down plan. .  They did not answer the question on which their defense hinges – what was the particular circumstance that pressured them to discharge their workforce on one days' notice.   In response to Plaintiffs' fulsome discovery requests, they produced a few governors' orders, two heavily redacted board materials (but not from the key month of March), and a post-layoff draft of a "Confidential -For Discussion-Purposes-Only" PowerPoint.  Plaintiffs moved the Court under Rule 56 to allow for meaningful discovery before deciding summary judgment.  The Court denied the request and held that Debtors' narrative was unquestionably true, although it cited no evidence.

When the Bankruptcy Court held that Covid-19 is a natural disaster, it adopted the first ruling on the matter.   The District Court of Texas had held the Covid-19 pandemic was a "natural disaster " "but for" a resulting WARN layoff requires no notice.  The Fifth Circuit Court of Appeals reversed, holding that a disease cannot be read into the text of the statute and proximate causation is the proper standard.   The Fifth Circuit's statutory interpretation takes the purpose of the WARN Act into account and, here, the causation issue need not be reached.  All causation questions pit one cause again another, requiring an evidentiary record.  The District Court of Texas, on which the Bankruptcy Court relied, denied summary judgment due to the lack of a definitive record.  Here, again, there is a genuine issue of disputed fact that precludes any finding of causation until the completion of discovery.

## **ARGUMENT**

## I.  **THE BANKRUPTCY COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE UNFORESEEABLE BUSINESS CIRCUMSTANCES DEFENSE IN THE ABSENCE OF A SUFFICIENT EVIDENTIARY RECORD**

The WARN Act requires 60 days' advance written notice of a mass layoff or shutdown. *See* 29 U.S.C. § 2101(a) (2-3).  Both these events are defined as having resulted in employment

loss, meaning "termination."  § 2101(a) (6).   Mass layoffs without advance notice are a violation unless the employer can prove that it could not provide such notice under one of the WARN Act's affirmative defenses. *See* 29 U.S.C. § 2102(a) and (b).  Debtors pursue two such defenses: unforeseeable business circumstances ("UBC") and natural disaster.  *See Id.* § 2102(b)(2)(A) and (B).

The UBC defense is highly fact-intensive.  It requires parsing through the various causes and conditions that give rise to large-scale terminations of employees.  The WARN defendant cannot simply point to a plausible event and claim that it alone caused the layoffs.  Rather, that explanation must be tested against the backdrop of a comprehensive factual record.

The Bankruptcy Court forewent such an analysis.  It took at face value Art Van's explanation—backed only by press releases and public proclamations—that COVID-19 caused the immediate termination of the employees.  But even the meager record shows inconsistencies in Art Van's explanations for the circumstances surrounding the layoffs.  These factual questions preclude summary judgment and demand discovery.

## A. The UBC Defense Demands Scrutiny of an Employer's Claimed Reason for Laying Off Large Numbers of Employees

The WARN regulations and case law set a high bar for the defendant seeking excusal for non-compliance with a remedial statute because of a UBC.

To state a UBC defense, the employer must prove both that 1) an unforeseeable business circumstance actually caused the layoff or plant closure and, if so, 2) the business circumstance was not reasonably foreseeable. *Calloway v. Caraco Pharm. Labs.*, *Ltd.*, 800 F.3d 244 (6th Cir. 2015); *Jones v. Kayser–Roth Hosiery*, 748 F.Supp. 1276, 1285–87 (E.D.Tenn.1990).

The first element requires identification of the relevant "business circumstance" and determination that it "caused" the layoffs. The regulations and the case law put limits on what appropriately fits this description.

First, a "business circumstance" must be something outside the employer's control, like the market in which it does business. *See* 20 C.F.R. § 639.9(b)(1) ("An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control."). A mere change in the employer's *perception* of the market, even when outside parties contributed to that change, does not suffice: that is neither a "business circumstance" nor outside its control. In *Snider v. Com. Fin. Services,* the defendant company hired Goldman Sachs to conduct the sale of its business. 288 B.R. 890, 894 (N.D. Okla. 2002). Goldman originally advised that the company maintain operations at status-quo levels during the sale process, which the company did as it began the sales process. But Goldman later changed its advice, recommending that the company get rid of its "bloated workforce" which was turning off buyers. *Id.* The company conducted a layoff without WARN notice. The bankruptcy court found Goldman Sachs changed advice was an unforeseeable business circumstance. In reversing on appeal, the district court recognized that while foreseeability rests on commercially reasonable perceptions, perceptions are not business circumstances. *See Id.* at 898 (no evidence of changes "in the market of selling the business itself," but rather, "the only evidence bearing on the topic…was evidence that CFS's perception of the business circumstances for the sale of CFS had changed"). WARN requires a hard look at the record for true changes in actual business circumstances—the business, its market, its financial condition, and its need for the services of its employees. Companies must

17

act—and the Courts must rely—on empirical information about those business circumstances if WARN non-compliance is to be excused.

Second, the business circumstance must actually "cause" the layoff, that is, they must "by their very nature necessitate or impel" them. *Carpenters Dist. Council v. Dillard Dept. Stores,* 778 F.Supp. 297, 306–7 (E.D.La.1991), *affirmed in part, reversed in part on other grounds by Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275 (5th Cir. 1994). In *Dillard*, the defendant company was involved in a merger that included layoffs of its employees. *Id*. at 302. The company claimed that it was not required to give full WARN notice because, although the company had negotiated for the merger, both the timing of the SEC's approval of the merger, and the outcome of the company's shareholder vote to approve it, were unforeseeable. *Id*. at 306. The court found no UBC. It noted that both the SEC approval and the shareholder vote "did not 'cause' any layoffs but were merely 'links in a chain' of events leading up to the timing of a merger that was contemplated and sought by both defendants." *Id.* Indeed, the court emphasized that even the merger itself did not "cause" the layoffs, "but merely provided Dillard the opportunity, albeit for economic reasons, to lay off employees." *Id*.

As with other areas of the law, causation in WARN is often a quest to determine which among multiple empirical factors actually caused the harm: here, the layoff without full notice. The courts demand a full picture of the defendant's circumstances before making such a determination. *See, e.g.*, *Bradley v. Sequoyah Fuels Corp.,* 847 F.Supp. 863, 864–866 (E.D.Okla.1994) (detailing and determining causal relationship of each in a series of events leading to layoffs, including release of nitrogen dioxide, governmental agency action, and withdrawal of potential lender). Highly distressed companies, in particular, often face many

18

pressures that cause their demise. Only after a deep dive into the facts can the courts be confident

they have identified the "last straw." *Jones v. Kayser-Roth Hosiery, Inc.*, 748 F. Supp. 1276,

1285 (E.D. Tenn. 1990).  It is the employer's burden to establish, indeed pinpoint, that last straw.

In *Jones*, for example, the defendant was able to show through credible testimony that although

the plant had faced financial troubles, it was mounting a "massive effort" to "cure the problems,"

such that the subsequent loss of a major account was the singular cause of its "economic[]

[in]feasib[ility]." *Id*. at 1285–1286.

On the other hand, even a facially plausible last straw cannot be declared decisive when it

is counterweighed by a backstory of major distress that may make it superfluous.  In *Wallace v.

Detroit Coke Corp.*, the plant was shut down when a $459,000 payment was unexpectedly

cancelled.  818 F. Supp. 192, 198 (E.D. Mich. 1993).  The defendant claimed this unexpected

event caused the shutdown and moved for summary judgment on its UBC defense.  But the court

found this notion "entirely inconsistent" with an earlier statement of one of the defendant's

principals, which indicated that unless it obtained $15 million, the plant would close.  *Id.* Thus,

defendant knew more than 60 days prior to the shutdown that only $15 million would avoid a

closure—indeed, the company had already began preparing for a closing before the payment

cancellation.  The Court denied the motion and held that an issue of fact existed as to whether the

$459,000 nonpayment caused the plant to close.  *Id*.

Clearly, the "last straw" determination cannot be made in a void. Until the backstory

comes into full view, it is easy to conclude that a layoff has been caused by a significant "last

straw" that precedes it.  The courts' insistence on a full factual record is not just legally, but

scientifically justified.  Economic science affirms that we choose to believe explanations for real-

world phenomena based on how easily they come to mind, rather than their empirical

probability.  This mental shortcut is called the "availability heuristic: what comes to mind the easiest – what's most available – is true." Tversky, A. and Kahneman, D., "Availability: A Heuristic for Judging Frequency and Probability." *Cognitive Psychology* 5, 207–232 (1973). The more extreme and disastrous the purported last straw, the more we perceive it to be determinative relative to obscure, harder-to-understand, and mundane backstories.[6] COVID-19 is a paradigmatic "available" explanation for Art Van's layoffs. The week in which COVID-19 threw normal life awry makes it a most appealing explanation for a mass layoff, rather than a complicated tale of a debtor who could not get its optimistic projections for a sale process approved, because it never gave its secured creditor the necessary data to justify its paying for it. But WARN requires a rigorous analysis, based on a developed factual record, to make that determination.

## B. Art Van's Litigation Convenient Explanation is Riddled with Gaps and Inconsistencies that Precluded Summary Judgment

The Bankruptcy Court adopted Debtors' COVID-blaming account for its layoff and closure.  That account cannot be credited without further development of a record, for several reasons.  First, Art Van's sweeping explanation that COVID-19 led to the layoffs does not meet the WARN defense' required specificity, as set by Congress in its demands for the content of WARN notices.  Second, even Art Van's explanation alone contains self-contradictions.  Third, the explanation appears only post-hoc in Art Van's briefs, and without citations to evidence, rather than in the frequent contemporaneous court hearings. Finally, what *was* stated in court at the time of the layoffs bolsters the contrary inference that a more mundane cause doomed the

---

[6] Most people overestimate the likelihood of death by accidents versus strokes, while the latter in fact cause more deaths.  Students in one study thought accidents were 25 times more likely than strokes to cause death.  Lichtenstein, Slovic, Fischhoff, Layman, & Combs, "Judged Frequency of Lethal Events", *Journal of Experimental Psychology: Human Learning and Memory*, 4 (6), 551–578 (1978).  Experiencing the extreme event makes its probability greater than the impact of reading about it.  Seeing a car overturned by the side of the road temporarily raises the subjective probability of traffic accidents.  Tversky, A. and Kahneman, D. "Judgment under Uncertainty: Heuristics and Biases", *Science,* New Series, Vol. 185, 1127-28 (1974).

chapter 11 process – the lack of a viable plan, a business circumstance that pre-existed COVID's impact and was exacerbated by Art Van's own incautious actions.  Parsing through these various causes is inherently fact-intensive and demands discovery, as the COVID-era WARN courts consistently recognize.  *See Easom v. US Well Servs.*, Inc., 527 F. Supp. 3d 898, 914 (S.D. Tex. 2021) (denying summary judgment where record did not "clearly show the relative roles of" economic trends and COVID-19), *rev'd and remanded on other grounds*, No. 21-20202, 2022 WL 2136084 (5th Cir. June 15, 2022); *Benson v. Enter. Leasing Co. of Orlando,* No. 6:20-CV-891-RBD-LRH, 2021 WL 1078410, at *6 (M.D. Fla. Feb. 4, 2021) (denying motion to dismiss because "[e]xactly when Defendants had to give notice will doubtless be a hotly contested factual issue").

1. <u>Debtors Never Have Explained What Caused an Interruption of Art Van's Liquidation Plan to Result in Abrupt, Permanent Terminations</u>

The Bankruptcy Court adopted a "'straw that broke the camel's back" causation standard, citing *Easom*, 527 F. Supp. 3d at 914 n.15 despite that case's opposite outcome.  (PA01294). The Bankruptcy Court noted that Art Van had been on long downward slide, but reasoned that COVID was the final blow, (PA01294-5), or as the Opinion later called it, "an immediate cause" of the layoffs.  (PA01300).

To support its conclusion, the Bankruptcy Court quoted the narrative contained in Paragraph 56 of the Trustee's Memorandum, (PA01292), which states:

 [T]he COVID-19 pandemic was clearly the *immediate* cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and *immediately* shut down their business.  The pandemic made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required citizens to stay at home or shelter in place to limit the spread of COVID-19.  The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would soon follow.

(PA00090) (emphasis added).

The Trustee's account claims it was "impossible" for Debtors to reorganize its $100+ million-dollar estate and reach its goals, as if there was some pressure or a gun at its head.  The source of that pressure is nowhere to be found in the supporting "facts" outlined earlier in the Trustee's Memorandum, which cite exclusively to press releases regarding government orders and the Trustee's own Motion to Convert to Chapter 7.  (PA00077-80, ¶¶ 30-32 and nn. 26-37). While no one would dispute the Bankruptcy Court's finding that stay-at-home orders "unquestionably impacted the Debtors' operations," (PA01294), what is missing from the Trustee's account is how these orders, issued in mid-March, prevented it from "completing" an anticipated plan to wind-down on May 5. The orders may have required temporarily closing some stores, but the Trustee does not explain what, if anything, prevented it from completing the purpose of the bankruptcy, either on time, or with a delay.  It does not explain what compelled immediate, permanent terminations.

Had the Trustee's reasons for its actions been consistent with its WARN defense, it surely would have produced them and annexed them to the summary judgment motion.  In fact, the Trustee would have spelled them out in the employees' WARN notice itself—not just out of pragmatism and a desire for clarity, but because WARN requires it.

    2.   <u>The Notice Had to State Precisely What Caused the Abrupt, Permanent Terminations, but Debtors' Notice Did Not.</u>

Art Van's failure to provide specificity in its WARN notice is especially conspicuous given the legal weight the WARN Act places on notice language.

WARN does not permit the employer to cook up causes for the WARN layoff at the time of the layoff or thereafter.  It does not accept loose explanations with wiggle room that allow for

invention.   It places an affirmative burden on the employer to pinpoint what it contends was the "cause" of the layoffs contemporaneously in the WARN notice distributed to the employees – to which the employer will be forced to stick thereafter.   In that notice, Congress required employers to spell out specifically what prevented them from providing full notice: "An employer relying on this subsection … shall give a brief statement of the basis for reducing the notification period" 29 U.S.C. § 2102(b)(3).   This a gating issue in WARN litigation.   If an employer's WARN notice does not give "reasonably specific facts that make an exception to the statutory notice period applicable, providing an adequate, specific explanation to affected workers[,]" its affirmative defense will be stricken. *Grimmer v. Lord Day & Lord,* 937 F.Supp. 255, 256-57 (S.D.N.Y.1996) (quotations and citations omitted).  *See also in In re Tweeter OPCO,* 453 B.R. 534, 547 (Bankr. D. Del. 2011) (citing *Grimmer* and striking defense where notice merely stated "Unfortunately, due to adverse business conditions outside our control, we are not able to give you advance notice."); *In re Dewey & Leboeuf, LLP*, 507 B.R. 522, 533-34 (Bankr. S.D.N.Y. 2014) (striking affirmative defenses where notice stated the firm was "unexpectedly experiencing extraordinary difficulties [and] [u]nfortunately, the situation is deteriorating at a more rapid pace than was initially anticipated").

The purpose of a specific brief statement is two-fold: first, to "assist" the employees in "understand[ing] the employer's situation and its reasons for shortening the notice period." *In re AE Liquidation, Inc.*, 866 F.3d 515, 525 (3d Cir. 2017).   Equally as important, however, it yolks employers to the truth and forecloses contrived facts and causes. Holding employers to their contemporaneous explanations for not providing 60 days' notice prevents "litigation-convenient but factually post-hoc justifications for their actions" that lead to wasteful, protracted litigation. *Newman as Tr. of World Mktg. Tr. v. Crane, Heyman, Simon, Welch, & Clar*, 435 F. Supp. 3d

834, 843–44 (N.D. Ill. 2020), *quoting Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1285-86 (11th Cir. 2013). Therefore, "an employer omits vital information at its peril." *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 391 (9th Cir. 1994). *See Childress v. Darby Lumber Inc.*, 126 F. Supp. 2d 1310, 1318 (D. Mont. 2001), *aff'd*, 357 F.3d 1000 (9th Cir. 2004) ("If the stated basis for the shortened notice is later determined not to be the cause of the shortened notice, the notice may be found inadequate").

Art Van's March 19 notice stated only that COVID and its economic impact caused Art Van to "no longer support the wind-down of its retail operations through the originally projected termination date." (PA00795). Whether COVID-19 *also* caused the permanent terminations beginning the very next day is this litigation's entire scope. It makes everything else in Debtors' account extraneous. And it is completely undermined by Debtors' in-court representations that day.

3. <u>At the Time of the Terminations, Art Van Painted Drastically Different Pictures of Business Conditions to the Employees and to the Bankruptcy Court and Stakeholders.</u>

The very same day it was telling employees that it had no choice but to immediately and permanently terminate them, Art Van's counsel was in the Bankruptcy Court painting a diametrically opposed picture. The transcript of the court hearing that day shows Debtors professing wholehearted allegiance to accomplishing the wind down and downplaying COVID-19's impact. This is not an innocuous inconsistency.

As the bankruptcy records make clear, Wells Fargo, the DIP lender and senior secured creditor, was central to the success of the bankruptcy process. Coming into the bankruptcy, Debtors owed Wells Fargo approximately $208.5 million, secured by virtually all of Debtors' assets. (PA00133, ¶31). Even their $11.6 million in cash was under Wells Fargo's dominion. (PA00194 line 22 to PA00195 line 5). It was Wells Fargo that was supporting the wind down

plan for the Chapter 11 bankruptcy to defray its loans.  (PA00196 line 16 to PA00197 line 19).

Debtors operated only on an expense-by-expense basis with Wells Fargo's approval.  (PA00196 line 16 to PA00197 line 19).  Wells Fargo had "funded every single payroll request that the debtors have made for current pay."  (PA0839 lines 20-23.  *See also* PA00267, ¶2).

> a.  *March 19 hearing – Debtors did not disclose the permanent terminations and suspension of operations*

At the March 19 hearing, Debtors expressed their intention to do everything they could to get to the planned Going out of Business sale, yet they startled the courtroom by announcing that they had started to close stores temporarily.  Debtors' counsel said that although Debtors had been "attempting to operate as much as possible in the ordinary course" they had "made []the difficult decision, effective as of today, to tell employees not to report to work at those locations." (PA00806, lines 9-12).  But Debtors did *not* explain that the workforce was being terminated permanently.  To the contrary, counsel couched the closures as temporary, stating that it was Debtors' "hope" that the locations they had "at least temporarily, shuttered" would not be closed "forever" (PA00806, lines 12-18).

Having given the Court and stakeholders the false impression that the employees were merely told not to come to work temporarily, instead of being gone, Debtors' counsel elaborated further to dispel any thought of an immediate shutdown.  (PA00808, lines 3 to 14).  Debtors' counsel made "clear" that "we are trying to explore with our lenders and our other stakeholders … other options short of outright liquidation."  (PA00808, lines 9 to 14).  Counsel specifically referenced the ongoing "Craftworks" case, in which a pause in the Chapter 11 closing sale plan process was being entertained to adapt to the COVID directives.  (*Id*.).  Counsel called for problem-solving and dialogue around the temporary obstacle:

So let me just say then, conceptually, we are looking at the possibility of…going idle or going into a state of dormancy for a period of time, and then the possibility then of either…reopening stores, some subset of stores as, either in furtherance of the going concern transaction…or…closing sales and an orderly liquidation, you know, essentially, once the economic and retail environment and the safety environment have improved to a degree that we can do that. … [T]here are a number of scenarios under consideration… we are right now, engaging in a dialogue with Wells Fargo and our term loan lenders to see if there's a way to pursue that alternative.

(PA00808 line 23 to PA00809 line 13).

Permanent terminations are different creatures from a temporary closure. Terminations entail an expensive process of paying all accrued compensation and making any required benefits discontinuation payments, as well as other formalities. It includes 60 days' WARN notice. If such employees are later needed they cannot be simply recalled and reinstated. They need to be rehired with further formalities, if they are available at all. They are more likely to have moved on. To woo them back requires expense such as the cost of higher compensation and relocation. It is likely to require the recruitment and training of a replacement workforce. A temporary layoff can be cost free. It does not require continued pay or benefits. It does not require formalities or WARN notice. It is a path virtually every employer took during the pandemic. That would be the only viable option for a cash strapped company like the Debtors, whose sole purpose is to sell through its specialized inventory to its customer for the best price possible. Only a temporary layoff (sometimes called a "furlough) would have been consistent with Debtors' earnest and constructive tone, which was echoed by counsel for the Creditor's Committee, Mr. Sandler. He stressed the need for creative problem-solving and cooperation: "Restructuring professionals are…supposed to come up with creative solutions to very very tough problems. And it may be easy to … pull the plug and say let's convert the case to a Chapter 7. I'm not really sure what that gets you. (PA00817 line 14 to PA00818 line 3). He said the committee favored "put[ting] everything on ice and let's come back to in[]a month or two

and see." (PA00818 lines 4-9).  Indeed, Debtors had admonished Wells' Fargo to "take no

precipitous action" such as sweeping the cash, because Debtors were "trying to navigate this

situation.  (PA00809 line 17 to PA00810 line 3).  But that was untrue.  In fact, unbeknownst to

the Bankruptcy Court and Wells Fargo, Debtors themselves had already set in motion the

precipitous action that spelled the end of the Chapter 11.

      Debtors clearly shaped their "business circumstances" message to its two audiences that

day.  To the employees, Debtors emphasized its termination of them and non-support of the

wind-down, implying business circumstances that dictated a suspension of operations that was

permanent.  In court, Debtors emphasized the momentary stay-home orders and its support of the

wind-down plan, implying circumstances warranting a suspension that was temporary.  Its

business circumstances could not have warranted both at once.

      That Debtors' communications were already considered suspect by that time was alluded

to by their most important stakeholder, Wells Fargo.

      Wells Fargo was surprised by the Debtors' announcement of the temporary closure:

"Debtors' decisions, unfortunately, are coming at us minutes before these hearings."  (PA00811

lines 1-2).  Counsel expressed dismay that Debtors seemed be hiding the ball rather than allow it

too move forward. She stated that while the bank wanted "to try to find a path forward…for all

stakeholders," Debtors here, "as opposed to other cases," had not "fully come to their creditors,

other than to say this is somebody else's problem and, put -- you know, fix it for us or don't

sweep or do these things." (PA00811 lines 2-9).  She summed up the narrative as Wells Fargo

saw it: "unfortunately, we haven't gotten the information that we need from the company to be

able to even consider a full wind-down plan.  (PA00811 lines 16-18).

> b. *March 31 hearing – Debtors identified its own actions as causing the shutdown.*

On March 31, when the parties came back to court, Debtors announced that they were abandoning the plan.  They did not ascribe the cause to the effects of COVID-19 and the stay-at-home orders, like they did in their WARN notice and at summary judgment below.  (PA00090, ¶56).  Instead, what the Bankruptcy Court heard was that the cataclysmic, unforeseen event that forced all stakeholders to throw in the towel, was *Debtors' precipitous decision* to permanently terminate their workforce on March 20, which triggered an avalanche of unsupportable obligations. It was an unforced error.

Debtors' counsel explained that they were not able to get consensus from their lenders to go forward, due in part to the amount of their employee obligations.  (PA00834 lines 1-21). Wells Fargo's counsel revealed the nature of these obligations: Debtors' decision to immediately suspend operations, including in locations where there were no shutdown orders in place, and "to terminate all" or "significantly all of their employees" "was not something that was done in coordination with the lenders, either the ABL lender or the term lender, or even the [Gordon Brothers store-closing] consultant …who…had remained to support the debtor's efforts to try to continue a GOB sale." (PA00840 lines 1-13).  She explained the disastrous effects of that decision: "[s]o, because of terminating their employees, … the debtors now have significant accrued PTO commissions, other benefits related to the terminated employees as well as healthcare obligations.  Most of these were not included in any budget and certainly in the cash collateral budget because there was **no contemplation of a wholesale mass termination of employees**." (PA00840 lines 14-20) (emphasis added). "[J]ust the employee obligation alone" were over $14 million.  (PA00841 lines 1-4).

Ms. Feldsher questioned aloud: "Could these have been mitigated if employees had been furloughed [or by] less drastic more spaced out termination we will never know… but now these expenses exist."  (PA00840 lines 20-25).

As far as Wells Fargo was concerned, the "but for" cause of the shutdown was Debtors' decision – to conduct permanent terminations and not a temporary layoff.  Debtors' recklessness, not the pandemic caused the layoff.   That is not hindsight.  That was attested to by the most invested observer at the time, and Debtors, in court, did not deny it.

The Debtors made use of the COVID rationale for their layoff when it was expedient and unlikely to be tested. They did so obliquely in its WARN notice to its employees, but when under scrutiny in court that afternoon avoided mentioning the mass layoff altogether.  When their conversion announcement drew no opposition, Debtors then added facts to connect the COVID rationale to the demise of the company.  Their summary judgment motion contained the full explanation, for which they cited no evidence:

> 56. The unforeseeable business circumstances exception is plainly applicable here. First, as discussed in Sections III.D and E above, the COVID-19 pandemic was clearly the immediate cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and immediately shut down their business.  The pandemic made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required citizens to stay at home or shelter in place to limit the spread of COVID-19. The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would follow shortly.

(PA00090) (emphasis added).

This second sentence of the account was adopted by the Bankruptcy Court as the basis for its grant of summary judgment: "The Debtors issued the Second WARN Notice as COVID-

19 and the ensuing government-ordered shutdowns prevented the Debtors from operating and completing its anticipated wind-down plans."  (PA01294).

All along, Debtors have contrived to connect COVID not to the layoff, but to a euphemism that substitutes for "layoff," that is – being "prevented "from operating and completing their anticipated wind-down plans."  That phrase could refer to a cause that was as minor as a slight delay that prevents the plan from being completed on the exact date planned, or refer to something profound that prevented them from going forward at all and immediately shutting down.  Debtors have to demonstrate there was a business circumstance on the order of something profound.

Debtors' WARN defense turns on what specific business circumstance was so profound it caused Debtors not merely to layoff some employees on March 19, but to order a *permanent*, *mass termination* of nearly their entire workforce.  Debtors have not answered that precise question. To uphold their defense, Debtors had to have stated that profound circumstance in their notice and be able to prove that it both truly existed and was unforeseeable.

## II.  THE BANKRUPTCY COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE NATURAL DISASTER EXCEPTION

The WARN Act provides an exception to the 60-day notice requirement in the case of "natural disaster":

> No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.

29 U.S.C. § 2102(b)(2)(B).

In finding that COVID constituted a "natural disaster" which excused Debtors' failure to provide notice as a matter of law, the Bankruptcy Court's error was two-fold.  First, the Bankruptcy Court adopted an interpretation of the statutory term which is inconsistent with the

statute's language, context and purpose, as underscored by the recent reversal of the district court decision the Bankruptcy Court found persuasive. Second, as with the Bankruptcy Court's application of the UBC defense, its finding that COVID-19 actually caused the layoffs under this defense was not supported by an evidentiary record.

### A.     COVID is Not a Natural Disaster under the WARN Act

The Bankruptcy Court's first error was one of statutory interpretation. COVID is neither a "disaster," as that those term was used by Congress in the WARN Act, nor was it shown below to be "natural," as a factual matter, for the purposes of summary judgment.

>   1.   Congress intended to exclude human disease from the external "disasters" that trigger the WARN exception.

The Fifth Circuit Court of Appeals is the sole court to have opined on the question in a precedential decision.  *Easom v. US Well Services, Inc.*, 21-20202, 2022 WL 2136084 (5th Cir. June 15, 2022).  In *Easom*, the employer argued, and the district court accepted, that COVID-19 was a form of natural disaster contemplated by Congress' use of the word "any" in "any form of natural disaster." *Id.* at *4.  *See* 29 U.S.C. § 2102(b)(2)(B). The *Easom* panel disagreed.  Citing Supreme Court precedent, it held that even the breadth of the word "any" is limited by the canon of *noscitur a sociis* (words are defined by their neighbors and should not contradict them).  *Id.* at n.1, citing *Yates v. United States*, 574 U.S. 528, 544, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015). Congress followed "any natural disaster" with a list of examples: "flood, earthquake, or drought." 29 U.S.C. § 2102(b)(2)(B).  In doing so, the Fifth Circuit held, Congress meant to limit the term's scope to "hydrological, geological, and meteorological events." 2022 WL 2136084 at *4.  The appeals court found a second canon of construction supported the view that COVID is not a WARN "natural disaster": *expressio unius est exclusio*  (omitted words in a list indicate an intent to exclude them). The Fifth Circuit reasoned that when it enacted WARN, "Congress was

familiar with pandemics and infectious diseases" and had enacted other legislation addressing those phenomena. Congress' decision not to include disease in WARN's "natural disaster" examples indicates a deliberate exclusion.  *Id.* Finally, the panel looked beyond the clause to statute itself.  It found Congress' purpose in enacting it was "remedial," *Id.*, based on the legislative history recognized by the Third Circuit Court of Appeals: WARN was "adopted in response to the extensive worker dislocation that occurred in the 1970s and 1980s." *Id.*, citing *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999).  The panel therefore "declined to expand the definition of 'natural disaster' beyond what is justified by the Act's statutory language, context, and purpose." 2022 WL 2136084 at *4.

The Fifth's Circuit's reasoning is persuasive for another reason.  Floods, earthquakes and droughts can be deadly, but their gravity for WARN purposes is that they directly affect physical infrastructure in the first instance. They do not, however, make it more likely that employees who are terminated will die as a result.  Thus, terminating employees in the case of these disasters does not compound the disaster's risk to the employees.  Viral diseases, on the other hand, attack health requiring prompt medical attention, which may be unobtainable or affordable without health insurance.  In the case at bar, Debtors' termination instantly stripped the employees of their health insurance coverage, compounding the danger posed to them by the virus itself and their own medical circumstances.  Many of Debtors' terminated employees experienced health emergencies exacerbated by the loss of their insurance.  Congress' exclusion of disease makes sense.   Destruction of infrastructure is more likely to make the dissemination of notice impracticable, but a disease should not prevent the sending and receiving of emailed notice.  The instant termination of employment with its loss of insurance affects a workforce whose need for medical attention is more acute than may the case of other calamities.

!

2.   <u>Debtors have not and cannot prove that the COVID pandemic was natural</u>

Even if COVID were to be considered a "disaster" it must be shown to be "natural." Disasters that originate in human conduct are not "natural disasters" under the WARN Act. *Carver v. Foresight Energy LP,* 3:16-CV-3013, 2016 WL 3812376, at *1 (C.D. Ill. July 12, 2016).   In *Carver*, the court held that careless human activity which allowed coal and oxygen to mix and combust in the defendant employer's coal mine, resulting in its closure, would not constitute a natural disaster, even though the mix of the substances was a "natural" event. *Id*. at *4.   While the district court in *Easom* (followed by the Bankruptcy Court) took note of *Carver*, it indicated no awareness of any theories that attributed COVID's spread to involved humans.   527 F. Supp. 3d at 907.   Apparently, the arguments involving laboratory invention or leakage, as opposed to natural germ evolution and bat spillover, had not reached the court. But in 2021 President Biden ordered a study and report on COVID-19's origins.   (*See* Report, PA00954). While the findings were inconclusive, the opinions tipped slightly in favor of a laboratory leak as opposed to a market emergence.[7] Debtors did not carry their burden below with evidence to the contrary sufficient to warrant summary judgment.

---

[7]The report of the National Intelligence Council elevated the creditability of the "laboratory leak" theory above the [infected animals in the] "market" hypothesis. After examining all available intelligence, the Council and "four [Intelligence Community] elements" assessed with *low confidence* that the initial SARS-CoV-2 infection was most likely caused by natural exposure to an animal infected with it.  (Report, PA00954 (emphasis added)).  But "one Intelligence Community element assesse[d] with *moderate confidence* that the first human infection with SARS-CoV-2 most likely was the result of a laboratory-associated incident.  (*Id.* (emphasis added)).  Debtors have failed to meet their burden on this issue.

**B.  Every Theory of "Natural Disaster" Causation is Fact Intensive and Requires an Evidentiary Record**

Were the Court to deem COVID is natural disaster, the defense must incorporate a level of causation to apply to the question whether a layoff was "due to" COVID.  29 U.S.C. § 2102(b)(2)(B).  Courts have considered several.  They share a common view that the words "due to" denotes a level of causation that can either be "but for" or "proximate cause," at least in the first instance.  *See Jones v. Scribe Opco, Inc.*, 8:20-CV-2945-VMC-SPF, 2022 WL 813824, at *3 (M.D. Fla. Mar. 17, 2022).  The *Easom* district court is the only WARN court to rule on a COVID-based summary judgment motion with a full evidentiary record.  Despite adopting the least onerous "but for" standard for the natural disaster defense, the district court still denied the employer's summary judgment motion.  It found issues of fact existed as to whether COVID or other market forces had caused the depressed oil prices which led to the layoffs there.  527 F. Supp. 3d at, 916.  Indeed, in the WARN case law, no court has granted any WARN affirmative defense, including the natural disaster or unforeseeable business circumstances, except on an evidentiary record after the close of discovery – except for the Bankruptcy Court below.

Just as the factual issues should have precluded a finding of with regard to Debtors' UBC defense, the same issues should have foreclosed judgment on its natural disaster defense.

The U.S. District Court in the Middle District of Florida twice denied motions to dismiss that claimed the natural disaster was dispositive.  *See Benson v. Enterprise Leasing Co. of Fla., LLC*, 620CV891ORL37LRH, 2021 WL 1078185, at *4 (M.D. Fla. Jan. 4, 2021), *vacated sub nom. Benson v. Enterprise Leasing Co. of Orlando, LLC*, 6:20-CV-891-RBD-LRH, 2021 WL 1080914 (M.D. Fla. Feb. 4, 2021); *Benson v. Enterprise Leasing Co. of Orlando, LLC,* No. 6:20-CV-891-RBD-LRH, 2021 WL 1078410, at *6 (M.D. Fla. Feb. 4, 2021).[8]  The court noted the

---

[8] The *Benson* court certified the causation question to the Eleventh Circuit Court of Appeals, 2021 WL 1078410, at

levels of causation generally connoted by "due to" in the common law, but under the *Chevron* doctrine, deferred to the special definitions set by WARN's DOL regulation. 2021 WL 1078410, at *5, citing 20 C.F.R. § 639.9(c). The regulation distinguishes between harms that the company demonstrates are *a direct result of a natural disaster* to which the exemption attaches, and those that *indirect* to which it does not. 20 C.F.R. § 639.9(c).  Both *Benson* decisions interpreted "direct result" to refer to tangible physical contact, and "indirect" as the economic or other harms that flow through an intermediary.  In both of the motions, only economic harm was alleged and so the motions were denied. 2021 WL 1080914, at *5;  2021 WL 1078410, at *6.

On appeal in *Easom*, the Fifth Circuit Court of Appeals also gave controlling weight to the DOL regulation.  2022 WL 2136084, at *6.  It relied on "binding precedent equating direct cause with proximate cause" and held that the natural-disaster exception incorporates proximate causation.  *Id.*

Here, the Bankruptcy Court declined to choose a causation standard for the natural disaster exception.  (PA01300).  It reiterated that COVID was "an immediate cause" the layoffs, which the Bankruptcy Court equated with its "final straw" UBC standard.  (*Id.*)  But even if the Bankruptcy Court had chosen the lesser but-for standard, the test for that standard is to follow events and "change one thing at a time and see if the outcome changes," as the *Easom* district court noted.  527 F. Supp. 3d at 915.  Here, as discussed *supra*, the circumstances that preceded COVID were that the Debtors had no consensual plan for its wind-down.  COVID entered, but Debtors' circumstances remained the same.  Having no plan, they discharged their workforce and shut down.  Debtors have not demonstrated otherwise.

---

*8, but the case settled during the pendency of the appeal.

### III.    THE BANKRTUPCY COURT ABUSED ITS DISCRETION IN DENYING PLAINTIFFS-APPELLANTS' CROSS-MOTION TO DEFER RULING

The Trustee moved for summary judgment having produced a total of three largely redacted documents, (PA01014, ¶7), and less than two weeks after serving an Amended Answer. (PA00036; PA00063; PA00065; PA00097).  Plaintiffs-Appellants sought to defer ruling on the SJ Motion and allow discovery of decisional documents and communications that led to their terminations, but the Bankruptcy Court refused to do.  (PA00982-86; PA01274).  The Bankruptcy Court abused its discretion by denying Plaintiffs-Appellants that relief and blocking them from seeking the true cause of the March 19 layoffs.

"[I]t is well established that a court 'is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery.'" *Doe v. Abington Friends Sch*., 480 F.3d 252, 257 (3d Cir. 2007), citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 139 (3d Cir. 1988).  This is necessary because, by its very nature, the summary judgment process presupposes the existence of an adequate record.  *Abington Friends*, 480 F.3d at 257.  *See also,* FED. R. CIV. P. 56(c) (summary judgment is decided on the basis of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any"); *Anderson v. Liberty Lobby, Inc.*  477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining the non-moving party's burden at summary judgment rests on the assumption that the party "had a full opportunity to conduct discovery").

The non-movant, in response to a motion for summary judgment, may bring a motion to defer a ruling.  FED. R. CIV. P. 56(d).  "District courts usually grant properly filed Rule 56(f) [now Rule 56(d)] motions as a matter of course." *Abington Friends*, 480 F.3d at 256, citing *St. Surin v. V.I. Daily News, Inc.,* 21 F.3d 1309, 1314 (3d Cir.1994) (internal quotation marks omitted).  The propriety of such a motion is particularly evident when there are

discovery requests outstanding or where relevant facts are under the control of the moving party. *See Ward v. United States,* 471 F.2d 667, 670 (3d Cir.1973) (where moving party controls evidence, motions to continue summary judgment "should, we think, ordinarily be granted almost as a matter of course"); *Costlow v. United States,* 552 F.2d 560, 562–64 (3d Cir.1977) (citing *Ward* and finding error in lower court's denial of such a motion). If discovery is incomplete in any way material to a pending summary judgment motion, the court is not justified in denying the non-movant's motion to continue summary judgment. *See Miller v. Beneficial Mgmt. Corp.,* 977 F.2d 834, 845–46 (3d Cir.1992) (where defendant's employees, who participated in the promotion and salary decisions regarding the plaintiff, had not been deposed, lower court abused discretion in deciding summary judgment on plaintiff's discrimination claims without allowing opportunity for discovery).

Plaintiff-Appellants filed a Declaration from their counsel, René S. Roupinian, detailing the facts regarding Plaintiffs-Appellants' attempts to take discovery on the UBC and natural disaster exceptions. (PA01013-15, ¶¶ 5-15).  Ms. Roupinian described multiple attempts at seeking discovery, including serving two set of formal written requests, informal requests, obtaining publicly available information, and sending communications to the Trustee's counsel requesting supplemental document production.  (PA01011-14).  These requests targeted crucial information, including, for example, COVID-related economic impacts, options other than permanent terminations considered, board minutes (Informal Requests, PA01013, ¶6); identification of those who participated in the liquidation and termination decisions and discussion of COVD-19 impacts (Interrogatories Nos. 12, 23-24, PA01025 and PA01028); and communications concerning the terminations and documents related to Debtors' financing (Request for Production No. 3 and 21, PA01043 and PA01045).

Plaintiff-Appellants urged the Bankruptcy Court that a decision on the Trustee's SJ Motion was premature because Plaintiffs-Appellants had not had an opportunity to conduct meaningful discovery on the Trustee's fact-intensive affirmative defenses.  (PA00985-6).  The Bankruptcy Court instead elevated the Trustee's version of the facts as being beyond legitimate dispute.  The Bankruptcy Court did not allow Plaintiffs-Appellants to develop facts for the record, despite their having properly sought that relief and the regularity with which it is granted where a non-moving party is without adequate evidence to contest a summary judgment motion. That decision was abuse of discretion.  Accordingly, this Court should reverse and remand the case to allow for discovery on the merits of Debtors' factually-intensive defenses to WARN Act liability.

## <u>CONCLUSION</u>

Plaintiffs-Appellants request that the judgment below in favor of the Trustee-Appellee and Cross Appellant be reversed and the case be remanded for discovery.

Dated: June 21, 2022                                 Respectfully Submitted,

<u>/s/ Michael J. Joyce</u>
Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

OF COUNSEL:

René S. Roupinian
Jack A. Raisner
Gail C. Lin
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747

Email: rsr@raisnerroupinian.com
Email:jar@raisnerroupinian.com
Email: gcl@raisnerroupinian.com

*Attorneys for Appellants and Cross Appellees*
*Todd Stewart and Jennifer Sawle, on behalf of themselves and all others*