## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, et al.,[1]<br><br>           Debtors. | Chapter 11<br>Bankr. Case No.  20-10553<br>**Joint Administration Pending** |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>           Plaintiff,<br><br>   v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>           Defendants. | **Adv. Pro. No. _____ - \_\_\_\_\_** |

## CLASS ACTION
## ADVERSARY PROCEEDING COMPLAINT FOR
## <u>VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ.</u>

Plaintiffs Todd Stewart and Jennifer Sawle ("Plaintiffs") alleges on behalf of themselves

and a putative class of similarly situated former employees of Debtor Art Van Furniture, LLC

and its affiliates (together "Debtors" or "Defendants") by way of this Class Action Adversary

Proceeding Complaint against Defendants as follows:

### <u>NATURE OF THE ACTION</u>

1.     The Plaintiffs brings this action on behalf of themselves, and other similarly

---

[1]

 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

situated former employees who worked for Defendants and who were terminated without cause as part of, or as the result of, mass layoffs or plant closings ordered by Defendants beginning on March 4, 2020, who were not provided 60 days advance written notice of their terminations by Defendants, as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq, (the "WARN Act").

2.    Plaintiffs were terminated along with approximately 700 other similarly situated employees as part of, or as the foreseeable result of a mass layoffs or plant shutdowns ordered by Defendants. These terminations failed to give Plaintiffs and other similarly situated employees of Defendants at least 60 days' advance notice of termination, as required by the WARN Act. As a consequence of the violation, Plaintiffs and other similarly situated employees of Defendants seek their statutory remedies, pursuant to 29 U.S.C. § 2104.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1334, and 29 U.S.C. § 2104(a)(5).

4.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1409 and 29 U.S.C. § 2104(a)(5).

## THE PARTIES

### *Plaintiffs*

6.    Plaintiff Stewart was employed by Defendants as the Store Manager at Defendants' facility at 14055 Hall Rd. Shelby Township Michigan 48315 one of seven WARN-covered facilities (the "WARN Facilities") until his termination.

7.    Plaintiff Sawle was employed by Defendants as a salesperson at one of Defendants' WARN Facilities located at 8748 West Saginaw Highway, Lansing, Michigan until her

PA00002

termination.

8.  On March 4, 2020, Plaintiffs received a letter notifying them that terminations at the Facilities where they worked would commence on May 5, 2020 or within 14 days thereafter.

9.  Plaintiffs were not terminated on May 5, 2020. Instead, on evening of March 19, 2020, Defendants abruptly notified its employees, including Plaintiffs that terminations would occur immediately for non-leader personnel and March 22, for lead personnel.

10.  Plaintiff Sawle's last day of employment was March 20, 2020.

11.  Plaintiff Stewart was, and other store leaders were, specifically told they would not get paid unless they continued to work through the Saturday and Sunday, March 21 and 22.

12.  With the power off at the facility, Plaintiff Stewart and colleagues worked in the dark through the week carrying purchased furniture out to the cars of waiting customers.

13.  Along with Plaintiffs, hundreds of other employees of Defendants who worked at, reported to, or received assignments from Defendants' Facilities were terminated on or about March 19, 2020 without advanced written notice.

**_Defendants_**

14.  Upon information and belief and at all relevant times, Defendant Art Van Furniture LLC is a Delaware corporation with its principal place of business located at 6500 E. 14 Mile Road, Warren, Michigan (the "Headquarters Facility") and it conducted business in this district.

15.  Upon information and belief at all relevant times, Defendants owned, maintained and operated its corporate headquarters at the Headquarters Facility, and operated additional facilities as that term is defined by the WARN Act in the United States.

16.  Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. Debtors do business under several brand names,

3

including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.

17.     The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.

18.     As of the Petition Date of March 9, 2020, Debtors operated stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19.     Upon information and belief, on March 19, 2020, Defendants terminated approximately 700 employees who worked at or reported to their WARN Facilities, and the rest of the employees who worked at non-WARN-covered stores (because they did not employee 50 full-time employees as required by the WARN Act definition of a mass layoff or plant shutdown).

20.     By late-January, 2020, Debtors had sunk into a liquidity crisis leading to a default of the Defendant's revolver facility with its lender, Wells Fargo, and some leases.  Wells Fargo agreed to forebear until February 28, 2020 conditioned on taking control of Defendant's cash and on Defendant immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by then.

21.     By January 31, 2020, the United States reported its first confirmed case of person-to-person transmission of the Wuhan coronavirus and the WHO determined that the outbreak constitutes a Public Health Emergency of International Concern.

22.     In February, 2020, KKR investigated then quickly dropped consideration of make a new money investment in Art Van.  Debtor's private equity parent THL, along with Van Eslander family, and some important suppliers formed a "Consortium."

PA00004

23. The Consortium proposed to infuse new capital into Art Van, but by month's end failed to secure the capital purportedly due in part to the impact of coronavirus on the equity markets during the week of February 24, 2020.

24. According Debtors, the market drop had a "deleterious effect" on the Consortium investors' "willingness to contribute capital." (Doc. 12, Mar. 9, 2020, First Day Declaration of David Ladd.)

25. As a result of the Consortium investors' unwillingness, Debtors began to execute on its planned liquidation.

26. On March 5, 2020, Art Van announced its store closing sales and that it would complete the closures with six to eight weeks.

27. That day, it informed it WARN Facility employees in a WARN notice that they would be retained and paid through May 5th and terminated then or within 14 days thereafter, whether there was work for them or not. Their benefits including health coverage would be maintained until their termination.

28. The Debtors' March 5, 2020 WARN notice did not condition the 60 days' of pay and benefits on any contingency. It did not mention coronavirus or any factor that could reduce the 60-day period of anticipated employment.

29. By March 8, 2020, at least eight states had declared a State of Emergency due to coronavirus.

30. On March 9, 2020, Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. Joint administration of those cases is pending.

## FEDERAL WARN ACT CLASS ALLEGATIONS

31. Plaintiffs bring this Claim for Relief for violation of 29 U.S.C. § 2101 et seq., on

PA00005

behalf of himself and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from Defendants' Facilities and were terminated without cause beginning on or about March 19, 2020, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020 and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

32.     The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

33.     Upon information and belief, Defendants employed more than 100 full-time employees who worked at or reported to the Facilities.

34.     On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants.

35.     On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of Defendants.

36.     Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)     whether the members of the WARN Class were employees of the Defendants who worked at or reported to Defendants' Facilities;

6

(b)     whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)     whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

37.     Plaintiffs' claims are typical of those of the WARN Class.  Plaintiffs, like other WARN Class members, worked at or reported to Defendants' Facilities and was terminated beginning on or about March 19, 2020, due to the mass layoff and/or plant closing ordered by Defendants.

38.     Plaintiffs will fairly and adequately protect the interests of the WARN Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

39.     On or about March 19, 2020, Plaintiffs were terminated by Defendants.  These terminations were part of mass layoffs or plant closings as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to receive 60 days advance written notice under the WARN Act.

40.     Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate Defendants, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

PA00007

41.     Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

42.     Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

## **CLAIM FOR RELIEF**

### **Violation of the Federal WARN Act**

43.     Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

44.     At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

45.     At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a) and continued to operate as a business until it decided to order mass layoffs or plant closings at the Facilities.

46.     At all relevant times, Plaintiffs and the other similarly situated former employees were employees of Defendants as that term is used in 29 U.S.C. §2101.

47.     On or about March 19, 2020, the Defendants ordered mass layoffs or plant closings at the Facilities, as that term is defined by 29 U.S.C. § 210l(a)(2).

48.     The mass layoffs or plant closings at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well

PA00008

as thirty–three percent of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2l01(a)(8).

49.     Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants at the Facilities.

50.     Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

51.     Defendants were required by the WARN Act to give Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

52.     Defendants failed to give Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

53.     Plaintiffs and each of the Class Members are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

54.     Defendants failed to pay Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, health and life insurance premiums, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to provide employee benefits including health insurance, for 60 days from and after the dates of their respective terminations.

55.     The relief sought in this proceeding is predominately equitable in nature.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated persons, prays for the following relief as against Defendants:

A.     Certification of this action as a class action;

9

B.   Designation of Plaintiffs as Class Representatives;

C.   Appointment of the undersigned attorneys as Class Counsel;

D.   A judgment in favor of the Plaintiffs and each of the affected employees equal to the sum of:  their unpaid wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits, for up to 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period all determined in accordance with the federal WARN Act, 29 U.S.C. §2104(a)(1)(A);

E.   Allowance of all damages as first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) or, alternatively wage priority status pursuant to 11 U.S.C. § 507(a)(4) and (5) up to $13,650, and the remainder as a general unsecured claim;

F.   Reasonable attorneys' fees and the costs and disbursements that Plaintiffs will incur in prosecuting this action, as authorized by the federal WARN Act, 29 U.S.C. § 2104(a)(6);

G.   Interest as allowed by law on the amounts owed under the preceding paragraphs; and

H.   Such other and further relief as this Court may deem just and proper.


[*Signature Page to Follow*]

PA00010

Dated: March 23, 2020

Respectfully submitted,

*/s/ Michael Joyce*
Michael J. Joyce (No. 4563)
THE LAW OFFICES OF JOYCE, LLC
1225 King Street
Suite 800
Wilmington, DE 19801
(302)-388-1944
Email: mjoyce@mjlawoffices.com

-and-

OF COUNSEL:

Jack A. Raisner
René S. Roupinian
RAISNER ROUPINIAN LLP
500 Fifth Avenue, Suite 1600
New York, New York 10110
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for the and the putative class*
*Plaintiffs*

PA00011

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
|  | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, |  |
| Plaintiff, |  |
| v. |  |
| ART VAN FURNITURE, LLC, et al., |  |
| Defendants. |  |

**CHAPTER 7 TRUSTEE'S ANSWER TO COMPLAINT FOR VIOLATION OF
WARN ACT AND AFFIRMATIVE DEFENSES**

For his answer to the *Class Action Adversary Proceeding Complaint for Violation of the WARN Act, 29 U.S.C. §2101, et seq* (the "Complaint") filed by Plaintiffs Todd Stewart and Jennifer Sawle (purportedly on behalf of themselves and all others similarly situated), Alfred T. Giuliano (the "Trustee"), on behalf of the chapter 7 bankruptcy estates of Art Van Furniture, LLC, AVF Holding Company, Inc., AVCE, LLC, AVF Holdings I, LLC, AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., Sam Levin, Inc., and Comfort Mattress LLC (collectively, the "Debtors" or the "Defendants"), states as follows:

**NATURE OF THE ACTION**

1.　　The Trustee admits that Plaintiffs purport to bring a claim under the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* (the "WARN Act"). The Trustee is informed and believes that Plaintiffs were employed by debtor Art Van Furniture, LLC ("AVF"). The Trustee is without sufficient knowledge or information as to whether "mass layoffs or plant closings" began on March 4, 2020, and therefore these allegations are denied. The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied. The Trustee denies that the Defendants violated the WARN Act or any other law and denies that Plaintiffs are entitled to any relief.

2.　　The Trustee admits that the Plaintiffs were terminated, along with at least 700 other employees of AVF and Sam Levin, Inc. ("Levin"). The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied. The Trustee denies that the Defendants violated the WARN Act or any other law and denies that Plaintiffs are entitled to any relief.

**JURISDICTION AND VENUE**

3.　　The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

4.　　The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

2

5. The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

## THE PARTIES

6. The Trustee admits that Plaintiff Todd Stewart ("STEWART") was employed by AVF as the store manager at the AVF facility at 14055 Hall Rd. Shelby Township Michigan (the "Shelby Store"). The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

7. The Trustee admits that Plaintiff Jennifer Sawle ("SAWLE") was employed by AVF as a salesperson at the AVF store located at 8748 West Saginaw Highway, Lansing, Michigan (the "Lansing Store"). The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

8. The Trustee is informed and believes that on or about March 5, 2020 AVF notified Plaintiff STEWART and Plaintiff SAWLE in writing as follows:

Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations. The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily. All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the

3

Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "Warn Act Notice"). The remaining allegations are denied.

    9.    The Trustee admits that Plaintiffs were not terminated on May 5, 2020.

The Trustee is informed and believes that on March 19, 2020, AVF notified Plaintiffs in writing

as follows:

On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations. Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "Revised Warn Act Notice"). The remaining allegations are denied.

4

10. On information and belief, the Trustee admits that Plaintiff SAWLE's last day of employment was March 20, 2020.

11. The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and on that basis, the allegations are denied.

12. The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and on that basis, the allegations are denied.

13. On information and belief, the Trustee admits that in connection with the cessation of the Debtors' operations, AVF terminated approximately 3,006 employees between March 20, 2020 and April 3, 2020, and LEVIN terminated approximately 1,355 employees between March 20, 2020 and May 29, 2020 (collectively, the "Terminated Employees"). The Trustee denies that the Terminated Employees were terminated without advance written notice. The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph as to unnamed class members, and as such they are denied.

14. The Trustee admits the allegations in this paragraph.

15. The Trustee admits that AVF maintained and operated its corporate headquarters at 6340, 6440 and 6500 E. 14 Mile Road, Warren, Michigan (the "Headquarters Facility") and that it operated additional facilities. The Trustee denies that AVF or any other Defendant owned the Headquarters Facility. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required.

16.     On information and belief, the Trustee admits the allegations in this paragraph as of the Petition Date.

17.     The Trustee lacks sufficient knowledge to admit or deny the allegations in this paragraph, which are therefore denied.

18.     The Trustee denies that the Petition Date was March 9, 2020. On information and belief, the Trustee admits that prior to March 8, 2020 (the "Petition Date"), the Debtors operated stores in Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19.     The Trustee admits that between March 20, 2020 and May 29, 2020, AVF and LEVIN terminated the Terminated Employees. On information and belief, the Trustee admits that AVF provided the Warn Act Notice on or about March 5, 2020 and the Revised Warn Act Notice on or about March 19, 2020 to employees who worked at the following locations: (a) 27775 Novi Road, Novi MI 48377 (AVF Store 19); (b) 4375 28th Street SE Grand Rapids, MI 49512 (AVF Store 25); (c) 4095 East Court Street Burton, MI 48509 (AVF Store 34); (d) 14055 Hall Road Shelby Township, MI 48315 (AVF Store 44); (e) 8748 West Saginaw Highway Lansing MI 48917 (AVF Store 71); (f) 4273 Alpine Avenue NW Comstock Park MI 49321 (AVF Store 83); (g) 6340, 6440 and 6500 E Fourteen Mile Road in Warren, MI 48092 (Tech Plaza/AVF Warehouse/Corporate); (h) 1150 115th Street Bolingbrook, IL 60490 (AVF Bolingbrook Warehouse and AVF Store 180); (i) 1021 Butterfield Road Downers Grove IL 60515 (AVF Store 197) (the "AVF WARN Locations").  On information and belief, the Trustee admits that between March 20, 2020 and April 3, 2020, in connection with the cessation of the Debtors' operations, AVF terminated approximately 1551 employees who worked at the AFV

6

WARN Locations and 1455 employees who worked at its other locations (the "AVF Non-Warn Locations"). On information and belief, the Trustee admits that LEVIN provided the Warn Act Notice on or about March 5, 2020 and the Revised Warn Act Notice on or about March 19, 2020 to employees who worked at 301 Fitz Henry Road Smithton PA 15479 (the "LEVIN WARN Location"). On information and belief, the Trustee admits that between March 20, 2020 and May 29, 2020, in connection with the cessation of the Debtors' operations, LEVIN terminated approximately 305 employees who worked at the LEVIN WARN Location and 1050 employees who worked at its other locations (the "LEVIN Non-Warn Locations"). The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied.

20.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

21.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

22.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

23.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

24.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

25.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

7

26.     On information and belief, the Trustee admits the allegations in this paragraph.

27.     The Warn Act Notice is a writing that speaks for itself.  Therefore, the Trustee denies the allegations in this paragraph.

28.     The Warn Act Notice is a writing that speaks for itself.  Therefore, the Trustee denies the allegations in this paragraph.

29.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

30.     The Trustee denies the allegation in this first sentence of this paragraph. The Trustee admits that the cases are being jointly administered.

## FEDERAL WARN ACT CLASS ALLEGATIONS

31.     The Trustee admits only that Plaintiffs have filed a putative class action on behalf of themselves and a class of all similarly situated employees pursuant to Federal Rule of Civil Procedure 23(a)(b)(1) and (3), Federal Rule of Bankruptcy Procedure 7023, the WARN Act, 29 U.S.C. 2101.  The Trustee denies that the class is appropriate and denies that the Debtors violated any law.  The Trustee denies all the other allegations in the paragraph.

32.     The Trustee admits only that this paragraph sets forth the class Plaintiffs allege they intend to certify. The Trustee denies all the other allegations in the paragraph.

33.     The Trustee admits the allegations in this paragraph.

34.     The Trustee denies that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits that the Debtors' books and records contain

8

PA00019

addresses for the Terminated Employees. The Trustee denies all the other allegations in the paragraph.

35.     The Trustee denies that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits that the Debtors' books and records contain the rate of pay and benefits for the Terminated Employees. The Trustee denies all the other allegations in the paragraph.

36.     The allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

        a.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied; and

        b.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

        c.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

37.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits

PA00020

only that the Plaintiffs and the Terminated Employees worked for AVF or Levin and were terminated between March 20, 2020 and May 29, 2020. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

38.     The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and as such they are denied.

39.     The Trustee admits only that the Plaintiffs and the Terminated Employees were terminated between March 20, 2020 and May 29, 2020. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

40.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

41.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

42.     The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and as such they are denied.

10

PA00021

## **CLAIM FOR RELIEF**

## **Violation of the Federal WARN Act**

43.     The Trustee incorporates by reference his responses above to paragraphs 1 through 42 as if set forth in full herein.

44.     On information and belief, the Trustee admits that AVF and LEVIN each employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States. The Trustee denies the allegations with respect to each of the other Defendants.

45.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. To the extent a response is deemed to be required, the Trustee admits that AVF and LEVIN each employed more than 100 employees (excluding part time employees) on or about March 19, 2020. The Trustee denies that AVF Holding Company, Inc., AVCE, LLC,  AVF Holdings I, LLC,  AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc.,  and Comfort Mattress LLC were "employers" as defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a).

46.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. To the extent a response is deemed to be required, the Trustee admits only that the two named Plaintiffs were employed by AVF. The Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations as to unnamed class members, and as such they are denied.

11

PA00022

47.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. The Trustee denies that the Defendants violated the WARN Act.

48.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. The Trustee denies that the Defendants violated the WARN Act.

49.     The allegations in this paragraph are conclusions of law to which no responsive pleading is required. To the extent that a response is deemed required, the Trustee admits that the two named Plaintiffs were terminated by AVF without cause on their part. The Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations as to unnamed class members, and as such they are denied.

50.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required.  To the extent that a response is deemed required, the Trustee admits that the two named Plaintiffs were terminated by AVF without cause on their part. The Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations as to unnamed class members, and as such they are denied.

51.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

52.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

PA00023

53.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

54.     The Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations, and as such they are denied.

55.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegation.

## **AFFIRMATIVE DEFENSES**

The Trustee asserts the following affirmative defenses, without accepting the burden of proof on any claim or defense where such burden would otherwise be on Plaintiffs.

### First Affirmative Defense

The claims of Plaintiffs and all persons alleged to be similarly situated are barred pursuant to 29 U.S.C. § 2102(b)(2)(A) because (a) an employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required; and (b) AVF and LEVIN gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to 29 U.S.C. § 2102(b)(3).

### Second Affirmative Defense

The claims of Plaintiffs and all persons alleged to be similarly situated are barred pursuant to 29 U.S.C. § 2102(b)(2)(B) pursuant to which no notice is required if the plant

closing or mass layoff is due to any form of natural disaster; and (b) AVF and LEVIN gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to 29 U.S.C. § 2102(b)(3).

### Third Affirmative Defense

The claims of Plaintiffs and all persons alleged to be similarly situated may be barred in whole or in part by his or her failure to mitigate damages.

### Fourth Affirmative Defense

The claims of Plaintiffs and all other persons alleged to be similarly situated are barred and or may be reduced pursuant to 29 U.S.C. § 2104(a)(4) because any act or omission by the Defendants was in good faith and without intent to deny Plaintiffs or class members rights and the Defendants had reasonable grounds for believing it was not in violation of the WARN Act.

### Fifth Affirmative Defense

The claims of Plaintiffs and all persons alleged to be similarly situated may be barred in whole or in part by the doctrine of unclean hands, estoppel or waiver.

### Sixth Affirmative Defense

The Complaint fails to state a claim against Defendants AVF Holding Company, Inc., AVCE, LLC, AVF Holdings I, LLC, AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., and Comfort Mattress LLC.

### Seventh Affirmative Defense

Any damages awarded to Plaintiffs and all other persons alleged to be similarly situated are not entitled to first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) or, alternatively wage priority status pursuant to 11 U.S.C. § 507(a)(4) and (5) up to $13,650.

14

Eighth Affirmative Defense

Plaintiffs and all other persons alleged to be similarly situated suffered no damages or losses due to any alleged violation of the WARN Act.

Reservation of Rights

The Trustee reserves the right to amend or add additional defenses which may become later known during the course of discovery or pretrial procedures.

Dated: December 10, 2020        PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Peter J. Keane*
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:    bsandler@pszjlaw.com
        crobinson@pszjlaw.com
        pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

DOCS_LA:330924.2 05233/002

PA00026

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Peter J. Keane, hereby certify that on the 10th day of December, 2020, I caused

a copy of the following document(s) to be served on the individuals on the attached service list(s)

in the manner indicated:

### CHAPTER 7 TRUSTEE'S ANSWER TO COMPLAINT FOR VIOLATION OF WARN ACT AND AFFIRMATIVE DEFENSE

/s/ Peter J. Keane
Peter J. Keane (DE Bar No. 5503)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

Art Van Furniture **–** Todd Stewart/Jennifer Sawle
WARN Act Service List
Main Case No. 20-10553 (CSS)
Adv. Case No. 20-50548 (CSS)
Doc. No. 232107v1
03 – E-Mail

*Via Email*
Michael J. Joyce, Esquire
THE LAW OFFICES OF JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Email: mjoyce@mjlawoffices.com

*Via Email*
Jack A. Raisner, Esquire
René S. Roupinian, Esquire
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, New York 10016
Email: rsr@raisnerroupinian.com;
      jar@raisnerroupinian.com

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## <u>PRETRIAL SCHEDULING ORDER</u>

Todd Stewart and Jennifer Sawle (the "Plaintiffs"), together with Alfred T. Giuliano, the

Chapter 7 Trustee for Debtors (the "Trustee") (collectively "the Parties"), by and through their

counsel, hereby submit this Pretrial Scheduling Order, and, in support thereof, aver the following:

1.      On March 8, 2020, the Debtors each filed a Voluntary Petition for Relief under

Chapter 11 of the Bankruptcy Code.  (Bankr. No. 20-10553, D.I. 2).

2.      On March 10, 2020, the Debtors' cases were consolidated for joint administration.

(Bankr. No. 20-10553, D.I. 71).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463) (collectively, the "Debtors").

PA00029

3.      On March 23, 2020, Plaintiffs commenced an adversary proceeding against the above-captioned debtor-defendants ("Defendants"), which adversary proceeding is docketed as No. 20-50548 (CSS) (the "Adversary Proceeding") (Adv. D.I. 1).

4.      The Complaint alleges that the Defendants violated the Federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq*. (the "WARN Act") and seeks relief on behalf of a putative class of present or former employees of the Defendants (the "Complaint").

5.      On April 7, 2020, the bankruptcy case was converted to Chapter 7 and the Trustee was appointed. (Bankr. No. 20-10553, D.I. 263, 264).

6.      Between March and December, the Parties agreed to extend the deadline for Defendants to respond to the Complaint and utilized the extensions to work cooperatively and diligently in exchanging information relevant to the WARN claim.

7.      On December 10, 2020, the Debtors filed an Answer to the Complaint. (Adv. D.I. 25).

8.      On April 28, 2021, Plaintiffs served *Plaintiffs' First Set of Interrogatories* and *Plaintiffs' First Request for Production of Documents* on Defendants (collectively, the "Plaintiffs' Discovery Requests").

9.      On May 26, 2021, the Court entered an Order Assigning Adversary Proceeding to Mediation setting July 26, 2021, as the deadline for submission of a Mediation Report.  (Adv. D.I. 26).

10.     The Parties have conferred and agreed, subject to Court approval, to stay litigation and proceed to mediation with the exchange of limited informal discovery prior to mediation so long as it is without prejudice to the Trustee's right to move for summary judgment and

2

PA00030

Plaintiffs' right to oppose summary judgment as premature absent full discovery, should the Parties not reach a mediated settlement.

To promote the efficient and expeditious disposition of adversary proceedings, the following schedule shall apply to the above-captioned adversary proceeding.

**IT IS HEREBY ORDERED** that:

11.  The Parties shall exchange informal discovery requests by June 21, 2021.

12.  The Parties have conferred and agree to Ret. Judge Kevin Gross as Mediator (the "Mediator").

13.  Subject to the Mediator's schedule, the Parties shall complete mediation by August 31, 2021.

14.  All formal discovery and litigation shall be stayed during the mediation process, including without limitation, the Trustee's obligation to respond to the Plaintiffs' Discovery Requests.

15.  If the Parties are unable to reach a consensual resolution of the Adversary Proceeding the following deadlines shall apply:

16.  Unless otherwise agreed to by the parties or ordered by the Court, Plaintiffs and the Trustee shall exchange their Initial Disclosures as detailed in Bankruptcy Rule 7026(a)(1) within fourteen (14) days of the filing of the Mediator's Report stating a settlement has not been reached ("Mediator's Report").

17.  Unless otherwise agreed to by the parties or ordered by the Court, all amended pleadings shall be filed within fourteen (14) days of the filing of the Mediator's Report.

18.  The Trustee may file and serve a motion for summary judgment (the "Trustee Summary Judgment Motion"), if any, within thirty (30) days of the filing of the Mediator's

PA00031

Report. To the extent the Trustee Summary Judgment Motion is filed, and unless the Court orders otherwise, supporting memoranda shall be filed with the Trustee Summary Judgment Motion at the time of its initial presentation.  With respect to the Trustee Summary Judgment Motion, a responding memorandum shall be filed within 21 days following the filing of the Trustee Summary Judgment Motion, and a reply memorandum, if any, shall be filed 14 days thereafter.

19.     Unless otherwise ordered by the Court, the length of all memoranda and briefs filed in connection with any substantive motion (whether the Trustee Summary Judgment Motion, Class Certification Motion (as defined below) or otherwise) shall be governed by Rule 7007-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

20.     Plaintiffs reserve the right to oppose the Trustee Summary Judgment Motion on all grounds including, that the Trustee Motion is premature and should be filed, if at all, at the conclusion of fact discovery.

21.     Plaintiffs shall file a Motion for Class Certification (the "Class Certification Motion"), if any, no later than  thirty (30) days from the filing of the Mediator's Report. Unless otherwise ordered by the Court, a responding memorandum shall be filed within 21 days following the filing of the Class Certification Motion, if any, and a reply memorandum, if any, shall be filed 14 days thereafter.

22.     Unless otherwise agreed by the parties and approved by the Court, to the extent applicable, all fact discovery, shall be completed and closed within one-hundred and eighty (180) days from the filing of the Mediator's Report. Unless otherwise agreed by the parties or Order by Court, all discovery of electronic documents shall proceed in accordance with Local Rule 7026-3.

4

PA00032

23.     To the extent applicable, the parties shall exchange expert reports regarding any issue on which he, she, it or they bear the burden of proof within two-hundred and forty (240) days of the filing of the Mediator's Report, and the other party shall have thirty (30) days thereafter to file a rebuttal report.  Depositions of experts shall be completed within thirty (30) days from the date of submission of the last rebuttal report ("Final Expert Report Submission Date"), after which time all expert discovery shall be completed and closed.

24.     To the extent applicable, the parties may file dispositive motions within thirty (30) days after the Final Expert Report Submission Date.  To the extent any dispositive motions are filed, and unless the Court orders otherwise, supporting memoranda shall be filed with any dispositive motion at the time of its initial presentation,  responding memoranda shall be filed within 21 days following the filing of a dispositive motion, and reply memoranda, if any, shall be filed 14 days thereafter.

25.     The parties shall comply with the General Order Governing Pre-Trial Procedures in Adversary Proceedings Set for Trial before Judge Christopher S. Sontchi as may be amended or restated from time to time. The parties shall file, no later than three (3) business days prior to the earlier of the date set for (i) pre -trial conference (if one is scheduled) or (ii) trial, their Joint Pre-Trial Memorandum approved by all counsel and shall contemporaneously deliver two (2) copies thereof to Judge Christopher S. Sontchi's chambers.

26.     The above dates may be modified by consent of the parties without need for further order of this Court or by Order of this Court.

27.      The parties will contact the Bankruptcy Court for a date for a status conference, which status conference shall be for the purpose of (i) setting a date by which pre-trial disclosures under Bankruptcy Rule 7026(a)(3) shall be served, (ii) scheduling a pre-trial

DOCS_DE:234840.1 05233/003

PA00033

conference to schedule a date and time of trial, and (iii) addressing such other issues as the Bankruptcy Court or the parties deem necessary and appropriate.

28.  The Plaintiffs shall serve this Pretrial Scheduling Order on the Trustee's counsel within 5 business days after the entry of this Pretrial Scheduling Order.

**Dated: June 10th, 2021**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

DOCS_DE:234840.1 05233/003

PA00034

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- :

In re:                                    :        Case No. 20-10533 (CSS)

ART VAN FURNITURE, LLC., et al.,          :          Chapter 7

Debtors.                                  :
                                                   Jointly Administered
-------------------------------------------------------- :

TODD STEWART and JENNIFER SAWLE on        :
behalf of themselves and all others similarly
situated,                                 :

Plaintiffs,                               :
v.                                                 Adv. Pro. No. 20-50548 (CSS)
                                          :
ART VAN FURNITURE, LLC, et al.,
                                          :
Defendants.
                                          :

-------------------------------------------------------- :
```

## MEDIATOR'S REPORT

On July 27, 2021, counsel and the parties met with the Mediator using the Zoom function to mediate the issues which the adversary proceeding raise. The parties also met by teleconference with the Mediator and each other thereafter. Unfortunately, the mediation did not result in a settlement of the adversary proceeding. The Mediator remains available should the parties later decide that mediation would be useful.

s/ Kevin Gross

-----------------------------------------------------

Kevin Gross, Mediator
Bar I.D. No. 209

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
|  | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, |  |
| Plaintiff, |  |
| v. |  |
| ART VAN FURNITURE, LLC, et al., |  |
| Defendants. |  |

## CHAPTER 7 TRUSTEE'S FIRST AMENDED ANSWER TO COMPLAINT FOR VIOLATION OFWARN ACT AND AFFIRMATIVE DEFENSES

For his amended answer to the *Class Action Adversary Proceeding Complaint for Violation of the WARN Act, 29 U.S.C. §2101, et seq* (the "Complaint") filed by Plaintiffs Todd Stewart and Jennifer Sawle (purportedly on behalf of themselves and all others similarly situated), Alfred T. Giuliano (the "Trustee"), on behalf of the chapter 7 bankruptcy estates of Art Van Furniture, LLC, AVF Holding Company, Inc., AVCE, LLC, AVF Holdings I, LLC, AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., Sam Levin, Inc.,

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

and Comfort Mattress LLC (collectively, the "<u>Debtors</u>" or the "<u>Defendants</u>"), states as follows[2]:

## <u>Nature Of the Action</u>

1.      The Trustee admits that Plaintiffs purport to bring a claim under the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* (the "<u>WARN Act</u>"). The Trustee is informed and believes that Plaintiffs were employed by debtor Art Van Furniture, LLC ("<u>AVF</u>"). The Trustee is without sufficient knowledge or information as to whether "mass layoffs or plant closings" began on March 4, 2020, and therefore these allegations are denied. The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied. The Trustee denies that the Defendants violated the WARN Act or any other law and denies that Plaintiffs are entitled to any relief.

2.      The Trustee admits that the Plaintiffs were terminated, along with 700 other employees of AVF and Sam Levin, Inc. ("<u>Levin</u>"). The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied. The Trustee denies that the Defendants violated the WARN Act or any other law and denies that Plaintiffs are entitled to any relief.

## <u>Jurisdiction and Venue</u>

3.      The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

---

[2] Pursuant to the Pretrial Scheduling Order [Docket No. 31], "Unless otherwise agreed to by the parties or ordered by the Court, all amended pleadings shall be filed within fourteen (14) days of the filing of the Mediator's Report." The Mediator's Report was filed on October 15, 2021 [Docket No. 39].

DOCS_DE:236738.7 05233/003

PA00037

4.      The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

5.      The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

**<u>The Parties</u>**

6.      The Trustee admits that Plaintiff Todd Stewart ("<u>STEWART</u>") was employed by AVF as the store manager at the AVF facility at 14055 Hall Rd. Shelby Township Michigan (the "<u>Shelby Store</u>").  The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required.  If a response is deemed required, the allegations are denied.

7.      The Trustee admits that Plaintiff Jennifer Sawle ("<u>SAWLE</u>") was employed by AVF as a salesperson at the AVF store located at 8748 West Saginaw Highway, Lansing, Michigan (the "<u>Lansing Store</u>"). The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required.  If a response is deemed required, the allegations are denied.

8.      The Trustee is informed and believes that on or about March 5, 2020, AVF notified Plaintiff STEWART and Plaintiff SAWLE in writing as follows:

> Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations. The Company submits this notice to you to satisfy any obligation that may exist under the federal

3

PA00038

Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily. All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "Warn Act Notice"). The remaining allegations are denied.

9. The Trustee admits that Plaintiffs were not terminated on May 5, 2020.

The Trustee is informed and believes that on March 19, 2020, AVF notified Plaintiffs in writing

as follows:

On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations. Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not

4

PA00039

> scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "Revised Warn Act Notice"). The remaining allegations are denied.

10. On information and belief, the Trustee admits that Plaintiff SAWLE's last day of employment was March 20, 2020.

11. The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and on that basis, the allegations are denied.

12. The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and on that basis, the allegations are denied.

13. On information and belief, the Trustee admits that in connection with the cessation of the Debtors' operations, AVF terminated approximately 3,006 employees between March 20, 2020 and April 3, 2020, and LEVIN terminated approximately 1,355 employees between March 20, 2020 and May 29, 2020 (collectively, the "Terminated Employees"). The Trustee denies that the Terminated Employees were terminated without advance written notice. The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph as to unnamed class members, and as such they are denied.

DOCS_DE:236738.7 05233/003

PA00040

14.     The Trustee admits the allegations in this paragraph.

15.     The Trustee admits that AVF maintained and operated its corporate headquarters at 6340, 6440 and 6500 E. 14 Mile Road, Warren, Michigan (the "<u>Headquarters Facility</u>") and that it operated additional facilities. The Trustee denies that AVF or any other Defendant owned the Headquarters Facility. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required.

16.     On information and belief, the Trustee admits the allegations in this paragraph as of the Petition Date.

17.     The Trustee lacks sufficient knowledge to admit or deny the allegations in this paragraph, which are therefore denied.

18.     The Trustee denies that the Petition Date was March 9, 2020. On information and belief, the Trustee admits that prior to March 8, 2020 (the "<u>Petition Date</u>"), the Debtors operated stores in Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19.     The Trustee admits that between March 20, 2020 and May 29, 2020, AVF and LEVIN terminated the Terminated Employees. On information and belief, the Trustee admits that AVF, although not required, in an abundance of caution provided the Warn Act Notice on or about March 5, 2020 and the Revised Warn Act Notice on or about March 19, 2020 to employees who worked at the following locations: (a) 27775 Novi Road, Novi MI 48377 (AVF Store 19); (b) 4375 28th Street SE Grand Rapids, MI 49512 (AVF Store 25); (c) 4095 East Court Street Burton, MI 48509 (AVF Store 34); (d) 14055 Hall Road Shelby Township, MI 48315 (AVF Store 44); (e) 8748 West Saginaw Highway Lansing MI 48917 (AVF Store 71); (f)

6

PA00041

4273 Alpine Avenue NW Comstock Park MI 49321 (AVF Store 83); (g) 6340, 6440 and 6500 E Fourteen Mile Road in Warren, MI 48092 (Tech Plaza/AVF Warehouse/Corporate); (h) 1150 115th Street Bolingbrook, IL 60490 (AVF Bolingbrook Warehouse and AVF Store 180); (i) 1021 Butterfield Road Downers Grove IL 60515 (AVF Store 197) (the "AVF Target Locations").  On information and belief, the Trustee admits that between March 20, 2020 and April 3, 2020, in connection with the cessation of the Debtors' operations, AVF terminated approximately 1551 employees who worked at the AFV Target Locations and 1455 employees who worked at its other locations (the "AVF Non-Target Locations").  On information and belief, the Trustee admits that LEVIN, although not required, in an abundance of caution, provided the Warn Act Notice on or about March 5, 2020 and the Revised Warn Act Notice on or about March 19, 2020 to employees who worked at 301 Fitz Henry Road Smithton PA 15479 (the "LEVIN Target Location").  On information and belief, the Trustee admits that between March 20, 2020 and May 29, 2020, in connection with the cessation of the Debtors' operations, LEVIN terminated approximately 305 employees who worked at the LEVIN Target Location and 1050 employees who worked at its other locations (the "LEVIN Non-Target Locations"). The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied.

20.    The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

21.    The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

7

PA00042

22.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

23.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

24.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

25.     The Trustee admits that the Debtors conducted a liquidation and is without knowledge or information sufficient to form a belief as the truth or falsity of the remaining allegations in this paragraph.

26.     On information and belief, the Trustee admits the allegations in this paragraph.

27.     The Warn Act Notice is a writing that speaks for itself.  Therefore, the Trustee denies the allegations in this paragraph.

28.     The Warn Act Notice is a writing that speaks for itself.  Therefore, the Trustee denies the allegations in this paragraph.

29.     On information and belief, the Trustee admits the allegations in this paragraph.

30.     The Trustee denies the allegation in this first sentence of this paragraph. The Debtors filed voluntary petitions under Chapter 11 of Title 11 of the United States Bankruptcy Code to liquidate all of their assets. The Trustee admits that the cases are being jointly administered.

PA00043

## Federal WARN Act Class Allegations

31. The Trustee admits only that Plaintiffs have filed a putative class action on behalf of themselves and a class of all similarly situated employees pursuant to Federal Rule of Civil Procedure 23(a)(b)(1) and (3), Federal Rule of Bankruptcy Procedure 7023, the WARN Act, 29 U.S.C. 2101. The Trustee denies that the class is appropriate and denies that the Debtors violated any law. The Trustee denies all the other allegations in the paragraph.

32. The Trustee denies all the other allegations in the paragraph, and denies that there was any violation of any law.

33. The Trustee admits the allegations in this paragraph.

34. The Trustee denies that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits that the Debtors' books and records contain addresses for the Terminated Employees. The Trustee denies all the other allegations in the paragraph.

35. The Trustee denies that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits that the Debtors' books and records contain the rate of pay and benefits for the Terminated Employees. The Trustee denies all the other allegations in the paragraph.

36. The allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

   a. The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining

allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied; and

        b.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

        c.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

        37.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits only that the Plaintiffs and the Terminated Employees worked for AVF or Levin and were terminated between March 20, 2020 and May 29, 2020. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

        38.     The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations that Plaintiffs "have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation," and as such they are denied. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

39.     The Trustee admits only that the Plaintiffs and the Terminated Employees were terminated between March 20, 2020 and May 29, 2020. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

40.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

41.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

42.     The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and as such they are denied.

### Claim For Relief Violation Of the Federal WARN Act

43.     The Trustee incorporates by reference his responses above to paragraphs 1 through 42 as if set forth in full herein.

44.     On information and belief, the Trustee admits that AVF and LEVIN each employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States. The Trustee denies the allegations with respect to each of the other Defendants.

11

PA00046

45.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. To the extent a response is deemed to be required, the Trustee admits that AVF and LEVIN each employed more than 100 employees (excluding part time employees) on or about March 19, 2020. The Trustee denies that any of the Defendants were "employers" as defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a).

46.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. To the extent a response is deemed to be required, the Trustee admits only that the two named Plaintiffs were employed by AVF. The Trustee denies that any of the Defendants were "employers" as defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a).

47.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. The Trustee denies that the Defendants violated the WARN Act.

48.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. The Trustee denies that the Defendants violated the WARN Act.

49.     The allegations in this paragraph are conclusions of law to which no responsive pleading is required. To the extent that a response is deemed required, the Trustee admits that the two named Plaintiffs were terminated by AVF without cause on their part. The Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations as to unnamed class members, and as such they are denied.

50.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required.  To the extent that a response is deemed required, the Trustee admits that the two named Plaintiffs were terminated by AVF without cause on their part. The

DOCS_DE:236738.7 05233/003

PA00047

Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations as to unnamed class members, and as such they are denied. Furthermore, the Trustee denies that any of the Defendants were "employers" as defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a).

51.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

52.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

53.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

54.     The Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations, and as such they are denied.

55.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegation.

## **Affirmative Defenses**

56.     The Trustee asserts the following affirmative defenses, without accepting the burden of proof on any claim or defense where such burden would otherwise be on Plaintiffs.

PA00048

**First Affirmative Defense**
Defendants Are Not "Employers" Under the WARN Act.
(29 U.S.C. § 2101(a)(1))

57. None of the Defendants was an "employer" under the WARN Act at the time of the Revised Warn Act Notice and the March 20, 2020 layoff. Under the WARN Act, an "employer" is "any business enterprise that employs—(A) 100 or more employees (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1)).

58. At the time of the Revised Warn Act Notice and the March 20, 2020 layoff, AVF and LEVIN were chapter 11 debtors that had ceased operating as going concerns and were merely conducting a liquidation. As such, AVF and LEVIN were acting as liquidating fiduciaries for the benefit of creditors and were not operating a "business enterprise" for the purpose of the WARN Act.

59. Accordingly, neither AVF nor LEVIN (or any other Defendant) was an "employer" subject to the WARN Act's notice requirements. 29 U.S.C. § 2101(a)(1).

**Second Affirmative Defense**
Unforeseeable Business Circumstances Exception
(29 U.S.C. § 2102(b)(2)(A))

60. To the extent that any of the Defendants is determined to be an "employer" under the WARN Act, the claims of Plaintiffs and all persons alleged to be similarly situated are barred pursuant to 29 U.S.C. § 2102(b)(2)(A) because (a) an employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time

PA00049

that notice would have been required; and (b) AVF and LEVIN gave as much notice as was

practicable along with a brief statement of the basis for reducing the notification period pursuant

to 29 U.S.C. § 2102(b)(3).

61.     The COVID-19 pandemic (which prevented the Defendants from

conducting going-out-of business sales as originally planned post-petition) and the resulting

government ordered business closures (or threatened closures) and the restriction of citizens to

their homes: (i) caused the March 20, 2020 layoff; (ii) was a business circumstances that was not

reasonably foreseeable on January 18, 2020 when AVF and LEVIN would have had to give

notice of the March 20, 2020 layoff (if they were "employers" under the WARN Act); and (iii)

AVF and Levin gave as much notice as was practicable along with a brief statement of the basis

for reducing the notification period pursuant to the Revised Warn Act Notice.

62.     Accordingly, the Defendants are not liable to Plaintiffs for any violation of

the WARN Act.

### Third Affirmative Defense
Natural Disaster Exception
(29 U.S.C. § 2102(b)(2)(B))

63.     To the extent that any of the Defendants is determined to be an

"employer" under the WARN Act, the claims of Plaintiffs and all persons alleged to be similarly

situated are barred pursuant to 29 U.S.C. § 2102(b)(2)(B) pursuant to which no notice is required

if the plant closing or mass layoff is due to any form of natural disaster.

64.     The March 20, 2020 layoff was (i) due to the COVID-19 pandemic (which

prevented the Defendants from conducting going-out-of business sales as originally planned

post-petition) and the resulting government ordered business closures (or threatened closures)

PA00050

and the restriction of citizens to their homes, and (ii) COVID-19 is a "natural disaster" under the Warn Act.

65.    While under 29 U.S.C. § 2102(b)(2)(B), "no notice" is required, AVF and Levin gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to the Revised Warn Act Notice.  Accordingly, the Defendants are not liable to Plaintiffs for any violation of the WARN Act.

## Fourth Affirmative Defense
Contractual Mandatory Arbitration

66.    Plaintiff STEWART and Plaintiff SAWLE are required to arbitrate the claims alleged in the Complaint pursuant to the terms of those certain Arbitration Agreements (the "Arbitration Agreements") they each entered into in connection with their employment in which they agreed to submit to final and binding arbitration of, *inter alia*, any dispute, matter or controversy arising out of their employment or the termination of their employment (the "Mandatory Arbitration Provision").

67.    All of Plaintiffs' claims set forth In the Complaint are subject to the Mandatory Arbitration Provision. Accordingly, the Court should dismiss the Complaint.

## Fifth Affirmative Defense
Class Action Prohibition

68.    Pursuant to the terms of the Arbitration Agreements, Plaintiff STEWART and Plaintiff SAWLE are required to arbitrate the claims alleged in the Complaint "in an individual capacity and not as plaintiff or class member in any purported class, collective action or representative proceeding (the "Class Action Prohibition Provision")."

DOCS_DE:236738.7 05233/003

PA00051

69.     All of Plaintiffs' claims set forth in the Complaint are subject to the Class Action Prohibition Provision. Accordingly, the Court should (a) dismiss the Complaint and/or (b) deny certification of a class.

**<u>Sixth Affirmative Defense</u>**
Failure to Mitigate

70.     The claims of Plaintiffs and all persons alleged to be similarly situated may be barred in whole or in part by his or her failure to mitigate damages.

**<u>Seventh Affirmative Defense</u>**
Good Faith

71.     The claims of Plaintiffs and all other persons alleged to be similarly situated are barred and or may be reduced pursuant to 29 U.S.C. § 2104(a)(4) because any act or omission by the Defendants was in good faith and without intent to deny Plaintiffs or class members rights and the Defendants had reasonable grounds for believing it was not in violation of the WARN Act.

**<u>Eighth Affirmative Defense</u>**
Unclean Hands, Estoppel & Waiver

72.     The claims of Plaintiffs and all persons alleged to be similarly situated may be barred in whole or in part by the doctrine of unclean hands, estoppel or waiver.

**<u>Ninth Affirmative Defense</u>**
Failure to State A Claim

73.     The Complaint fails to state a claim against all Defendants.

**Tenth Affirmative Defense**
No Priority
(11 U.S.C. §§ 503, 507,726)

74.    Any damages awarded to Plaintiffs and all other persons alleged to be similarly situated are not entitled to priority under any provision of the Bankruptcy Code including but not limited to 11 U.S.C. § 503, 11 U.S.C. § 507 and 11 U.S.C. § 726.

**Eleventh Affirmative Defense**
No Damages

75.    Plaintiffs and all other persons alleged to be similarly situated suffered no damages or losses due to any alleged violation of the WARN Act.

**Reservation of Rights**

76.    The Trustee reserves the right to amend or add additional defenses which may become later known during the course of discovery or pretrial procedures.

PA00053

WHEREFORE, the Trustee requests that the Court deny all of the relief requested by the Plaintiffs, and grant such other relief to the Trustee as may be just and proper, including, without limitations, reimbursement of legal fees and expenses and all other cost and expenses incurred by the estates in defending against the causes of action set forth in the Complaint.

Respectfully Submitted,

Dated:  October 29, 2021              PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Beth E. Levine (NY Bar No. 2572246) (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email:        bsandler@pszjlaw.com
                 blevine@pszjlaw.com
                 crobinson@pszjlaw.com
                 pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

PA00054

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Bradford J. Sandler, hereby certify that on the 29th day of October, 2021, I

caused a copy of the following document(s) to be served on the individuals on the attached

service list(s) in the manner indicated:

**CHAPTER 7 TRUSTEE'S FIRST AMENDED ANSWER TO COMPLAINT FOR VIOLATION OF WARN ACT AND AFFIRMATIVE DEFENSE**

*/s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

Art Van Furniture – Todd Stewart/Jennifer Sawle
WARN Act Service List
Main Case No. 20-10553 (CSS)
Adv. Case No. 20-50548 (CSS)
Doc. No. 232772v1
03 – E-Mail

***Via Email***
Michael J. Joyce, Esquire
THE LAW OFFICES OF JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Email: mjoyce@mjlawoffices.com

***Via Email***
Jack A. Raisner, Esquire
René S. Roupinian, Esquire
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, New York 10016
Email: rsr@raisnerroupinian.com;
　　　jar@raisnerroupinian.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

ART VAN FURNITURE, LLC., *et al.,*[1]

Debtors.

TODD STEWART and JENNIFER
SAWLE on behalf of themselves and all
others similarly situated,

Plaintiff,

v.

ART VAN FURNITURE, LLC, et al.,

Defendants.

Chapter 7

Case No. 20-10553 (CSS)

Jointly Administered

Adv. Proc. No. 20-50548 (CSS)

## NOTICE OF SERVICE OF DISCOVERY

**PLEASE TAKE NOTICE** that on the 29th day of October, 2021, counsel to the

Defendants in the above-captioned adversary proceeding served the documents listed below on

the individual(s) listed on the service list attached hereto as Exhibit A and in the manner

indicated.

### DEFENDANT'S INITIAL DISCLOSURES

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_DE:236772.1 05233/003

PA00057

Dated:  October 29, 2021          PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Beth E. Levine (NY Bar No. 2572246) (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email:     bsandler@pszjlaw.com
             blevine@pszjlaw.com
             crobinson@pszjlaw.com
             pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

2

# **EXHIBIT A**

PA00059

Art Van Furniture **–** Todd Stewart/Jennifer Sawle
WARN Act Service List
Main Case No. 20-10553 (CSS)
Adv. Case No. 20-50548 (CSS)
Doc. No. 232772v1
03 – E-Mail

***Via Email***
Michael J. Joyce, Esquire
THE LAW OFFICES OF JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Email: mjoyce@mjlawoffices.com

***Via Email***
Jack A. Raisner, Esquire
René S. Roupinian, Esquire
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, New York 10016
Email: rsr@raisnerroupinian.com;
     jar@raisnerroupinian.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that on October 29, 2021, a copy of Plaintiffs' Rule 26(a)

Disclosures were caused to be served on the following via Electronic Mail:

Bradford J. Sandler
Colin R. Robinson
Peter J. Keane
Beth Levine
**PACHULSKI STANG ZIEHL & JONES LLP**
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Email: bsandler@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com
blevine@pszjlaw.com

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

Dated: November 1, 2021

*/s/ René S. Roupinian*
René S. Roupinian, Esq. (P52737)
Jack A. Raisner, Esq.
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

**THE LAW OFFICES OF JOYCE, LLC**
Michael J. Joyce (No. 4563)
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

*Attorneys for Plaintiffs and the putative class*

PA00062

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | (Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Adv. Proc. No. 20-50548 (CSS) |
| vs. | |
| ART VAN FURNITURE, LLC, *et al.*, | |
| Defendants. | |

## CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, made applicable herein by Federal Rule of Bankruptcy Procedure 7056, Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee") to Art Van Furniture, LLC, Sam Levin, Inc. and related debtors, hereby moves for summary judgment in his favor and against Plaintiffs. In support of this motion, the Trustee relies on the record in the adversary proceeding, the concurrently-filed declaration of Bradford Sandler (including all exhibits thereto), the concurrently-filed *Memorandum in Support of Chapter 7 Trustee's Motion*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

*for Summary Judgment*, and such additional facts and law as this Court may consider through judicial notice or otherwise.

　　　　WHEREFORE, the Trustee respectfully requests that the Court enter judgment in his favor and against Plaintiffs and grant such other and further relief that may be appropriate or just.

　　　　　　　　　　　　　　Respectfully Submitted,

Dated:　November 12, 2021　　　PACHULSKI STANG ZIEHL & JONES LLP
　　　　Wilmington, Delaware

　　　　　　　　　　　　　　*/s/ Bradford Sandler*
　　　　　　　　　　　　　　Bradford J. Sandler (DE Bar No. 4142)
　　　　　　　　　　　　　　Beth Levine (New York Bar No. 2572246)
　　　　　　　　　　　　　　(admitted *pro hac vice*)
　　　　　　　　　　　　　　Colin R. Robinson (DE Bar No. 5524)
　　　　　　　　　　　　　　Peter J. Keane (DE Bar No. 5503)
　　　　　　　　　　　　　　**PACHULSKI STANG ZIEHL & JONES LLP**
　　　　　　　　　　　　　　919 North Market Street, 17th Floor
　　　　　　　　　　　　　　P.O. Box 8705
　　　　　　　　　　　　　　Wilmington, Delaware 19899
　　　　　　　　　　　　　　Telephone: (302) 652-4100
　　　　　　　　　　　　　　Facsimile: (302) 652-4400
　　　　　　　　　　　　　　Email:　　bsandler@pszjlaw.com
　　　　　　　　　　　　　　　　　　blevine@pszjlaw.com
　　　　　　　　　　　　　　　　　　crobinson@pszjlaw.com
　　　　　　　　　　　　　　　　　　pkeane@pszjlaw.com

　　　　　　　　　　　　　　Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
　　　　　　　　　　　　　　Defendants Art Van Furniture, LLC, *et al.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | (Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Adv. Proc. No. 20-50548 (CSS) |
| vs. | |
| ART VAN FURNITURE, LLC, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (DE Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:   bsandler@pszjlaw.com
         blevine@pszjlaw.com
         crobinson@pszjlaw.com
         pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

---

[1]   The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_LA:340567.8 05233/003

## TABLE OF CONTENTS

Page

I.    STATEMENT OF NATURE AND STATUS OF PROCEEDING ..................................1

II.   SUMMARY OF ARGUMENT ...................................................................................1

III.  STATEMENT OF MATERIAL FACTS TO
      WHICH THERE IS NO GENUINE DISPUTE.............................................................4

      A.   General Background ...........................................................................4

      B.   The Planned Liquidation Process...........................................................5

      C.   The Chapter 11 Cases .........................................................................8

      D.   The Rapid Escalation of the COVID-19 Pandemic ..................................9

      E.   The Plaintiffs' Termination and the Conversion to Chapter 7.............................11

      F.   The Adversary Proceeding....................................................................15

IV.   ARGUMENT .......................................................................................................15

      A.   Summary Judgment Standard ..............................................................16

      B.   The WARN Act ...............................................................................17

      C.   There is No Genuine Dispute That AVF Was a Liquidating Fiduciary At
           the Time of the Layoff and Not Subject to the WARN Act .................................17

      D.   The Governmental Mandated "Shelter in Place" and "Stay at Home"
           Orders Were "Not Reasonably Foreseeable" and Thus, the Debtors Were
           Not Subject to the Notice Provisions of the WARN Act.....................................20

      E.   If the WARN Act Is Applicable, Which It is Not, the Debtors Were Not
           Required to Provide Any Notice Because the Layoff Was Due to the
           COVID-19 Pandemic -- a "Natural Disaster" For Purposes of the WARN
           Act...............................................................................................23

V.    CONCLUSION.....................................................................................................27

PA00066

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re AE Liquidation, Inc.*
    522 B.R. 62 (Bankr. D. Del. 2014) ...................................................................... 21
*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 248 (1986) ................................................................................. 16
*Bailey v. Jamesway*
    1997 Bankr. LEXIS 825 (Bankr. S.D.N.Y. 1997) ....................................................... 19
*Benson v. Enter. Leasing Co. of Orlando*, LLC
    2021 U.S. Dist. LEXIS 55137 (D. M.D. Fla. Feb. 4, 2021) .................................................. 26
*Bostock v. Clayton Cty., Ga.*
    140 S. Ct. 1731 (2020) ................................................................................... 26
*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ..................................................................................... 16
*Czyzewksi v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*
    496 B.R. 151 (Bankr. D. Del. 2013) (Hon. B. Shannon) .................................................. 21
*Easom v. US Well Servs*
    2021 U.S. Dist. LEXIS 52941 (S.D. Tex. March 22, 2021) ................................... 22, 23, 26
*In Friends of Danny DeVito v. Wolf*
    227 A.3d 872 (Pa. 2020), *cert. denied*, 141 S. Ct. 239 (2020) ................................ 25
*Hotel Employees & Restaurant Employees International Union Local 54 v. Elsinore Shore*
    *Associates* 173 F.3d 175 (3d Cir. 1999) .............................................................. 21
*Ieradi v. Mylan Labs., Inc.*
    230 F.3d 594 (3d Cir. 2000) ............................................................................. 10
*JN Contemporary Art, LLC v. Phillips Auctioneers LLC*
    2020 U.S. Dist. LEXIS 237085 (S.D.N.Y. Dec. 16, 2020) ............................................... 25
*Kasten v. Saint-Gobain Performance Plastics Corp.*
    563 U.S. 1 (2011) ....................................................................................... 23
*Matias v. Terrapin House, Inc.*
    2021 U.S. Dist. LEXIS 176094 (E.D. Pa. Sept. 16, 2021) .......................................... 10
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ..................................................................................... 16
*Montemayor v. City of San Antonio*
    276 F.3d 687 (5th Cir. 2001) ............................................................................. 17
*Pennsylvania Democratic Party v. Boockvar*
    238 A.3d 345 (Pa. 2020) ................................................................................. 25
*Reeves v. Sanderson Plumbing Prods., Inc.*
    530 U.S. 133, 120 S. Ct. 2097 (2000) ................................................................... 16
*Scully v. Allegheny Ludlum Corp.*
    2006 U.S. Dist. LEXIS 105589 (W.D. Pa. Feb. 10, 2006) .............................................. 10
*In re United Healthcare System, Inc.*
    200 F.3d 170 (3d Cir. 1999), *cert denied*, 530 U.S. 1204 (2000) .......................... 17, 18, 19

PA00067

**Page(s)**

**CASES** (continued)

*Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*
   481 B.R. 268 (Bankr. S.D. N.Y. 2012) ................................................................... 18
*U.S. ex rel. Anderson v. N. Telecom, Inc.*
   52 F.3d 810 (9th Cir. 1995) (quoting *Celotex*, 477 U.S. at 327) ........................... 16
*United States v. Kindred Healthcare, Inc.*
   469 F.Supp.3d 431 (E.D. Pa. 2020) ....................................................................... 10
*United States v. Petway*
   2020 U.S. Dist. LEXIS 82954 (D.N.J. May 11, 2020) ........................................... 10
*Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*
   866 F.3d 515 (3d Cir. 2017) .................................................................................. 21
*Walsh v. Century City Doctors Hosp., LLC*
   *(In re Century City Doctors Hosp., LLC)*
   417 B.R. 801 (Bankr. C.D. Cal. 2009) ................................................................... 18


**OTHER AUTHORITIES**

20 C.F.R. § 639.9 .......................................................................................................... 17
20 C.F.R. § 639.9(c) ...................................................................................................... 23
29 U.S.C. § 2101 ................................................................................................ 3, 7, 13, 15
29 U.S.C. § 2101(a)(1) .................................................................................................. 17
29 U.S.C. § 2102 ........................................................................................................... 17
29 U.S.C. § 2102(a) ...................................................................................................... 17
29 U.S.C. § 2102(b)(2)(A) ........................................................................................ 15, 20
29 U.S.C. § 2102(b)(2)(B) ..................................................................................... 3, 15, 23
29 U.S.C. § 2102 ........................................................................................................... 17
29 U.S.C.§ 2102(b)(2)(A) ............................................................................................... 3
29 U.S.C. § 2104 ........................................................................................................... 17
Fed. R. Civ. P. 56(a) ..................................................................................................... 16
Fed.R.Evid. 201 ............................................................................................................ 10
Fed.R.Evid. 201(b) ....................................................................................................... 10

Alfred T. Giuliano, Chapter 7 Trustee (the "<u>Trustee</u>") to Art Van Furniture, LLC ("<u>AVF</u>"), Sam Levin, Inc. ("<u>SLI</u>") and related debtors (collectively, the "<u>Debtors</u>" or "<u>Art Van</u>") submits this memorandum of law, together with the declaration of Bradford Sandler (the "<u>Sandler Declaration</u>"), in support of his motion for summary judgment (the "<u>Motion</u>").

## I. STATEMENT OF NATURE AND STATUS OF PROCEEDING

1. The Debtors commenced their chapter 11 bankruptcy cases on March 8, 2020. Upon the Debtors' motion, the chapter 11 cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020.

2. On March 23, 2020, Plaintiffs initiated this adversary proceeding by filing their *Class Action Adversary Proceeding Complaint For Violation of WARN Act 29 U.S.C. § 2101, et seq.* in which they assert that the Debtors violated the WARN Act and seek, *inter alia*, judgment in favor of Plaintiffs and other similarly situated former employees for unpaid wages and other benefits and damages for up to 60 days that would have been otherwise paid.

3. The Trustee filed an Answer on December 10, 2020, and in accordance with the Pretrial Scheduling Order, on October 29, 2021, the Trustee filed his First Amended Answer.

## II. SUMMARY OF ARGUMENT[1]

4. This case arises out of AVF's termination of Todd Stewart and Jennifer Sawle ("<u>Plaintiffs</u>") on March 20, 2020, as part of the cessation of the Debtors' business caused by the COVID-19 global pandemic.

5. Notwithstanding that the Debtors were liquidating their business prior to filing for bankruptcy on March 8, 2020 (the "<u>Petition Date</u>"), the Plaintiffs are seeking WARN Act damages

---

[1] Capitalized terms used but not defined in this Summary of Argument have the meanings ascribed to them in the balance of this brief, and all facts adverted to herein are supported by record citations in the balance of this brief.

because they were terminated as a result of the global COVID-19 pandemic. There are no genuine issues of material fact, and the Plaintiffs ignore a critical piece of information in their complaint that has enormous legal implications for their allegations: prior to the Petition Date (and prior to March 20, 2020), the Debtors had already started an orderly wind-down plan, comprised of going-out-of-business ("GOB") sales (commenced pre-petition) and an anticipated sale of the SLI stores to a third party buyer, Robert Levin, who previously owned those SLI stores. *See* Complaint, attached as **Exhibit Y** to Sandler Declaration, at ¶ 25 (pre-petition, "Debtors began to execute on its planned liquidation."). Indeed, on March 5, 2020, Art Van had publicly announced that it was liquidating and going out of business, and in an abundance of caution, had provided a WARN Act notification to its employees that their employment would terminate on May 5, 2020. That, of course, was before the global economy shut down as a result of the COVID-19 pandemic.

6.     The Debtors then filed their Chapter 11 Cases on March 8, 2020, to further implement and facilitate their Planned Liquidation Process which was designed to liquidate their assets and pay down their secured creditors, which were owed in excess of $200 million.

7.     However, by mid-March 2020, the world economy had changed drastically, as the COVID-19 pandemic surged and governmental authorities started to issue extensive business restrictions by imposing business shutdowns and "stay at home" orders. In this unprecedented, unforeseeable situation, on March 19, 2020 (the day that the Governor of Pennsylvania ordered the closure of all non-essential businesses), the Debtors were forced to shut down their retail operations. With no revenue being generated, the Debtors abandoned their orderly liquidation plan and terminated all retail employees, including the Plaintiffs.

8.     Within a few days of their termination, on March 23, 2020, Plaintiffs brought this action alleging violations of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §

2101 *et seq.* (the "WARN Act") on behalf of themselves and a purported class of former employees.

9. As set forth below, Plaintiffs are not entitled to WARN Act damages[2] because:

(i) AVF was not an "employer" under the WARN Act on March 20, 2020. It was a "liquidating fiduciary" which is not subject to the WARN Act's notice requirements.

(ii) Assuming *arguendo* AVF was subject to the WARN Act, which it was not for reasons discussed below, pursuant to 29 U.S.C.§ 2102(b)(2)(A) (the "unforeseeable business circumstances exception"), AVF is not liable to Plaintiffs because the Debtors' inability to conduct the GOB Sales and other parts of the Planned Liquidation Process due to the unprecedented government-ordered business closures (or threatened closures) and the government-ordered requirement of citizens to shelter in place or stay at home, together, constituted a business circumstance that was not reasonably foreseeable on January 18, 2020, when AVF would have had to give notice of the March 20, 2020 terminations.[3]

(iii) Assuming *arguendo* AVF was subject to the WARN Act, which it is not, pursuant to 29 U.S.C. § 2102(b)(2)(B) (the "natural disaster exception"), it is not liable to Plaintiffs because the Plaintiffs' termination was caused by COVID-19, and COVID-19 is a "natural disaster."

---

[2] The Trustee reserves his rights to assert any and all additional defenses to liability including, but not limited to, opposing priority or administrative treatment of any claim under the WARN Act.

[3] All of the Debtors' employees worked for either AVF or SLI. Plaintiffs both worked for AVF, but all of the arguments set forth herein would apply equally to claims brought by former employees of SLI. While AVF and SLI are not subject to WARN Act liability for the reasons discussed herein, Defendants AVF Holding Company, Inc., AVCE, LLC, AVF Holdings I, LLC, AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., and Comfort Mattress LLC are also not subject to WARN Act liability because they did not have any employees, and were not, therefore, "employers" under the WARN Act.

PA00071

10.     As set forth below, the foregoing legal conclusions that mandate summary judgment are based on facts as to which there is no genuine dispute.

### III.  STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE DISPUTE

**A.      General Background**

11.     On March 8, 2020 (the "Petition Date"), the Debtors commenced their respective voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS).

12.     Upon the Debtors' motion (the "Conversion Motion"), based on the facts and circumstances described further below, less than a month after the Petition Date, on April 6, 2020, the Chapter 11 Cases were converted to chapter 7 proceedings (the "Cases").

13.     Prior to the Petition Date, the Debtors had sold furniture for over 60 years, with 169 stores in Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, and approximately 4,500 employees.[4]

14.     The Debtors filed the Chapter 11 Cases with the intention of winding down their affairs by liquidating their inventory through store closing sales (the "GOB Sales"), paying down their secured debt, and using any remaining proceeds of their GOB Sales to wind-down their operations.[5]  As of the Petition Date, the Debtors were party to a binding letter of intent for a sale of 44 Levin and Wolf stores and related assets and operations (the "Levin Sale") to a third party buyer. The GOB Sales, the Levin Sale, and other actions taken by the Debtors in the Chapter 11

---

[4] *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Bankr. Doc. 12] ("Ladd Declaration") at 2. A copy of the Ladd Declaration is **Exhibit A** to the Sandler Declaration.

[5] Ladd Declaration at ¶¶ 6 & 18.

Cases were all part of the orderly liquidation and wind-down planned by the Debtors prior to and as of the Petition Date (the "<u>Planned Liquidation Process</u>") in order to maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors.[6]

**B.    The Planned Liquidation Process**

15.    In the months leading up to the Petition Date, Art Van was struggling under the weight of poor sales and $208.5 million in secured debt encumbering substantially all of its assets: (i) $33.5 million in an asset-backed loan ("<u>ABL Loan</u>") from Wells Fargo Bank ("<u>Wells Fargo</u>") and (ii) a $175 million term loan (the "<u>Term Loan</u>") from FS KKR Capital Corp. (the "<u>Term Lenders</u>" and together with Wells Fargo, the "<u>Secured Lenders</u>").[7]  Art Van had defaulted on the ABL Loan on February 5, 2020 and had only been able to obtain a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the business.  As a condition to the forbearance, Wells Fargo insisted that the Debtors begin to prepare for going-out-of-business (GOB) sales.[8]

16.    In spite of the Debtors' efforts over the next 23 days in February 2020, by February 28, 2020, the Debtors were unable to secure financing or attract a going concern buyer.[9]  The forbearance period ended on that date, and the Debtors had no alternative but to pursue an orderly wind-down of their operations and liquidation of their assets.[10] To that end, prior to the Petition Date, the Debtors negotiated a wind-down budget with Wells Fargo ("<u>Wind-Down Budget</u>"), hired

---

[6] Ladd Declaration at ¶¶ 6, 16, 17, 18, 19, 20, 40, 41, 42 & 43.

[7] *See* Ladd Declaration at ¶¶ 7, 8, 13, 14, 16, 17, 18, 31-36.

[8] *See* Ladd Declaration at ¶¶ 14 & 36.

[9] *See* Transcript of March 10, 2020 hearing at p. 55, line 25 to 57, line 20; Ladd Declaration at ¶¶ 14-15.  A copy of the March 10, 2020 Transcript is **Exhibit B** to the Sandler Declaration.

[10] *See* Ladd Declaration at ¶¶ 16-18.

a liquidator, and announced publicly that after decades in business they were going out of business.[11]

17.     As part of the Planned Liquidation Process, on March 4, 2020, SLI entered into a letter agreement (the "Levin LOI") pursuant to which it agreed to sell 44 stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") to Robert Levin (the "Levin Sale").[12]   The Levin Sale was expected to be approved in bankruptcy and consummated in or about early April 2020.   The Debtors believed that the buyer would keep the 44 stores operating and thereby preserve approximately 1,000 jobs.[13]

18.     The Levin LOI contemplated that the Levin Sale stores would briefly continue operating pending the closing of the Levin Sale.[14]   Because the Debtors had no money to operate these stores (they only had the money that Wells Fargo had agreed to let them use to conduct the GOB Sales), Robert Levin agreed to extend $10 million of debtor-in-possession (DIP) financing to SLI (the "Levin DIP Loan") to the Debtors to facilitate the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale.[15]

---

[11] See Ladd Declaration at ¶¶ 16-18; *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 93] (the "Interim CC Order") at 13.  A copy of the Interim CC Order is **Exhibit C** to the Sandler Declaration.  On March 5, 2020, the Debtors entered into an agreement (the "Consulting Agreement") with HilcoMerchant Resources, LLC (the "Liquidator"). *See* Interim CC Order at 12.  *See also* "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html ("Art Van GOB Press Release") (attached as **Exhibit D** to Sandler Declaration).

[12] Robert Levin had owned the stores that were the subject of the Levin LOI prior to them being sold to the Debtors.

[13] *See* Ladd Declaration at ¶¶ 19-20 & 40-42.

[14] *See* Ladd Declaration at ¶¶ 40-41.  *See also Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Bankr. Doc. 49] ("Levin DIP Motion") (attached as **Exhibit E** to Sandler Declaration).

[15] *See* Levin DIP Motion; *Interim Order* on Levin DIP Motion [Bankr. Doc. 137] ("Interim Levin DIP Order") (attached as **Exhibit F** to Sandler Declaration).

19.    In sum, as of March 5, 2020, the Debtors had an orderly wind-down plan, comprised of the GOB Sales to liquidate AVF's assets including 125 stores and the Levin Sale to liquidate the SLI Assets.

20.    On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business.[16]  Indeed, plaintiffs have acknowledged and admitted that the Debtors began their liquidation plan at this time.  *See* Complaint (attached as **Exhibit Y** to Sandler Declaration) at ¶ 25 ("… Debtors began to execute on its planned liquidation.").

21.    On March 5, 2020, as part of its Planned Liquidation Process, although not required, AVF issued a WARN Act notice to approximately 1,400 potentially "affected employees" who worked in or reported to seven facilities in Michigan, two facilities in Illinois and one in Pennsylvania.  Each of the Plaintiffs worked at an affected location in Michigan and were notified as follows:

> Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

> The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

---

[16] *See* Art Van GOB Press Release (attached as **Exhibit D** to Sandler Declaration).

PA00075

You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "GOB Sale WARN Notice").[17]

22.      The Debtors' target date to end the GOB Sales was the end of April 2020.[18]  The GOB Sales commenced as expected, and went well at first.  From March 5, 2020 through March 8, 2020, deposits from inventory sales were in excess of $23 million.[19]

**C.      The Chapter 11 Cases**

23.      On March 8, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases and filed "first day motions" to obtain approval of, *inter alia*, the Wind-Down Budget,[20] the Levin DIP,[21] and GOB Sales and the Consulting Agreement with the Liquidator.[22]  First day hearings were held on March 10, 2020.  While there was an extensive discussion of the GOB Sales at the first day hearing, there was no discussion by the Court and other parties of COVID-19 and the effects thereof, including any potential government-mandated shut downs and extensive business restrictions.[23]

---

[17] A copy of the GOB Sale WARN Notice is **Exhibit G** to the Sandler Declaration.

[18] *See* Ladd Declaration at ¶ 18 (Debtors seeking to complete store closure sales in six to eight weeks from March 5, 2020).

[19] *Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* [Bankr. Doc. 252] (the "Conversion Motion") at ¶ 22.  A copy of the Conversion Motion is **Exhibit H** to the Sandler Declaration.

[20] *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 5] (attached as **Exhibit I** to Sandler Declaration).

[21] *See* Levin DIP Motion (**Exhibit E** to Sandler Declaration); Interim Levin DIP Order (**Exhibit F** to Sandler Declaration).

[22] *See Debtors' Motion for Entry of Interim and Final Orders  (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* [Bankr. Doc. 52] (attached as **Exhibit J** to Sandler Declaration).

[23] *See* Transcript from March 10, 2020 Hearing (attached as **Exhibit B** to Sandler Declaration).

24.     On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order, authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales.  The Wind-Down Budget assumed that the GOB Sales would continue unabated through April 30, 2020, and provided that the "the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis" is a default, and thus, the Debtors continued their ongoing GOB sales.[24]

25.     Art Van continued the hearing on its first day motions to March 12, 2020.  The Bankruptcy Court apologized for taking the bench 40 minutes late, saying, "I very much apologize.  As I'm sure you all are aware, things are developing very quickly.  It is taking a lot of my time."[25]  The Bankruptcy Court and the U.S. Trustee expressed concerns about the fee in the Liquidator's Consulting Agreement and continued that portion of the Debtors' GOB sale motion to March 20, 2020.  Other than the Bankruptcy Court's comments at the beginning of the hearing, however, there was no mention by the parties at the March 12, 2020 hearing of COVID-19 or the possibility that the GOB Sales might not be able to continue.

**D.     The Rapid Escalation of the COVID-19 Pandemic**

26.     The unprecedented, extraordinary circumstances caused by the COVID-19 pandemic confronting the Debtors during the period March 8, 2020 (the Petition Date) and March 19, 2020 (the day of the COVID WARN Notice, as discussed below) are a matter of public

---

[24] Interim CC Order at pp. 34-35.

[25] Transcript of March 12, 2020 Hearings at p. 5, lines 5-7. A copy of the transcript from the March 12, 2020 Hearing is at **Exhibit K** of the Sandler Declaration.

record.[26]  On March 13, 2020, then-President Donald Trump declared a national emergency.[27]  By

March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two

of their distribution centers are located, had issued guidance urging all non-essential businesses to

close.[28]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The

Wolf Administration is relying on businesses to act now before the governor or the Secretary of

Health finds it necessary to compel closures under the law for the interest of public health …."[29]

     27.     Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan -- where

the Debtors' headquarters, their main distribution center the size of 14 football fields, and 82 of

their stores are located -- entered an executive order that closed Michigan's bars, theaters, casinos

and other public spaces.[30]  Governor Whitmer urged Michigan residents to "mak[e] smart choices"

---

[26] This Court can take judicial notice of online publications of federal and state governmental authorities and online newspaper articles and other publications pursuant to Fed.R.Evid. 201(b) and to evaluate what information is in the "public realm."  *See, e.g., Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, n.2 (3d Cir. 2000) (court taking judicial notice of *New York Times* article; citations omitted); *Scully v. Allegheny Ludlum Corp.*, 2006 U.S. Dist. LEXIS 105589, at n.3 (W.D. Pa. Feb. 10, 2006) (court taking judicial notice of a newspaper article for company related statistics pursuant to Fed.R.Evid. 201(b); citation omitted); *United States v. Petway*, 2020 U.S. Dist. LEXIS 82954, at *6 (D.N.J. May 11, 2020) ("the Court takes judicial notice of the world-wide pandemic that is continuing to unfold and impact all of us" under Fed.R.Evid. 201; "The federal government and State of New Jersey have declared emergencies. Public health officials have attributed the pandemic to a novel corona virus spreading from person to person.  COVID-19 'poses a serious public health risk.' (footnotes and citations including citations to CDC publications omitted)); *United States v. Kindred Healthcare, Inc.*, 469 F.Supp.3d 431, n.3 (E.D. Pa. 2020) (taking judicial notice of court filings and news reports to evaluate "what was in the public realm" at a given time; citations omitted); *Matias v. Terrapin House, Inc.*, 2021 U.S. Dist. LEXIS 176094, at n.4 (E.D. Pa. Sept. 16, 2021) (taking judicial notice of COVID-19 related facts in CDC publications available on its website).

[27] *Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* dated March 13, 2020 (85 F.R 15337 (March 13, 2020)), available at https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf (attached as **Exhibit L** to Sandler Declaration).

[28] *Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/ (attached as **Exhibit M** to Sandler Declaration).

[29] *All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19,* March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/ (attached as **Exhibit N** to Sandler Declaration).

[30] *Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at

by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary." [31]

28.    On March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations were located to issue a "stay at home" or "shelter in place" type order.  Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.[32]

29.    Further, on March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction, and thus, the stores covered by the Levin Sale would also have to be immediately closed by the Debtors.[33]

**E.    The Plaintiffs' Termination and the Conversion to Chapter 7**

30.    Notwithstanding the careful planning of the Debtors and their advisors, as a result of the COVID-19 pandemic and resultant shutdowns, shortly after the Petition Date, the Debtors' situation changed drastically upending the Debtors' plans for an orderly liquidation.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date.  Specifically, during the initial days of the GOB Sales

---

https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html (attached as **Exhibit O** to Sandler Declaration).

[31] *Id.*

[32]    Pennsylvania: Gov. Tom Wolf, Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (attached as **Exhibit P** to Sandler Declaration); Michigan: Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html (attached as **Exhibit Q** to Sandler Declaration); Ohio: Dir. of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (attached as **Exhibit R** to Sandler Declaration); and Illinois: Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf (attached as **Exhibit S** to Sandler Declaration).

[33] Conversion Motion at ¶ 26.

PA00079

from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million,[34] suggesting, among other things, a precipitous drop in customer traffic in the Debtors' stores.

31.    Ultimately, the restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease (discussed in greater detail below) mandated that the Debtors discontinue all retail operations and other non-essential business operations – a scenario they had not and could not have planned for when they developed their Planned Liquidation Process.[35]

32.    Soon thereafter, the Debtors' management, with their professionals' counsel and assistance, determined that the Planned Liquidation Process, in its then-form, was no longer viable and that a more immediate shutdown of the Debtors' stores and remaining support operations was in the estates' and creditors' best interest.[36]  Thus, on March 19, 2020, the Debtors made the painful decision to suspend all sales operations in all stores and terminate the majority of their employees, excluding workers who would be needed for the rest of the liquidation and wind-down process.[37]

33.    Accordingly, on March 19, 2020, AVF issued a WARN Act notice to employees which stated:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste

---

[34] Conversion Motion at ¶ 22.

[35] Conversion Motion at ¶¶ 1-2.

[36] Conversion Motion at ¶¶ 1-2.

[37] Conversion Motion at ¶ 25.

B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

***Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").***

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "COVID WARN Notice") (emphasis added).[38]

34.     Plaintiffs Todd Stewart and Jennifer Sawle were two of AVF's employees, and each worked at one of AVF's 82 stores in the State of Michigan (where AVF also had it main trucking terminal, its corporate headquarters and a distribution center). Mr. Stewart was a store manager at an AVF Store in Shelby Township, Michigan; and Ms. Sawle was a salesperson at an AVF Store in Lansing, Michigan. In accordance with the COVID WARN Notice, the Trustee believes that Mr. Stewart and Ms. Sawle were both terminated by AVF, as were most of AVF's and SLI's employees, on March 20, 2022 (the "Layoff").[39]

---

[38] A copy of the COVID WARN Notice is at **Exhibit T** to the Sandler Declaration.

[39] Complaint (attached as **Exhibit Y** to Sandler Declaration) at ¶¶ 6, 7, 10.

PA00081

35.     During a March 19, 2020 status conference, Debtors' counsel advised the
Bankruptcy Court of the store closures.[40]  Judge Sontchi stated on the record at a later related
hearing:

> This is an unfortunate situation. It is nobody's fault. It is nobody's fault. I know
> many people in my local business community who are good business people who
> have great businesses who are staring down the barrel of a gun based on what's
> happened. It's just—it's extraordinary. And I'm not casting aspersions on anyone,
> but obviously this case changed dramatically, as did the whole world—well not
> the whole world but as to the United States in the last three weeks, three or four
> weeks.[41]

36.     Wells Fargo declared a default under the Interim CC Order, and terminated use of
cash collateral as of March 24, 2020; later extended through March 31 and finally April 6.[42]
Unable to continue the Chapter 11 Cases without the continued consent of the Debtors' secured
lenders to use their cash collateral, the Debtors filed the Conversion Motion and the Chapter 11
Cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020.[43]  In
ruling on the Conversion Motion, Judge Sontchi stated:

> This case is very unfortunate.  It's really been a parade of unfortunate events that
> has kind of conspired to put a long-standing, solid business into liquidation.  And,
> as I sit here today, I certainly don't have enough information to blame anyone or
> anything other than the coronavirus and the disaster it has left in its wake.[44]

---

[40] *See* Transcript of March 19, 2020 Hearing at 10, line 8 to 11, line 1.  A copy of the Transcript of the March 19, 2020 Hearing is at **Exhibit U** to the Sandler Declaration.

[41] Transcript of March 31, 2020 Hearing at 47, line 24 to 48, line 7.  A copy of the Transcript of the March 31, 2020 Hearing is at **Exhibit V** of the Sandler Declaration.

[42] Conversion Motion at ¶ 27.

[43] *See* Order Granting Debtor's Amended Motion to Convert [Bankr. Doc. 263] ("Conversion Order') (attached as **Exhibit W** to Sandler Declaration).

[44] *See* Transcript of April 6, 2020 Hearing at 28, line 24 to p. 29, line 5.  A copy of the Transcript from the April 6, 2020 Hearing is **Exhibit X** to the Sandler Declaration.

37.     Upon the conversion, Alfred Giuliano was appointed as the chapter 7 trustee
[Bankr. Doc. 264].

**F.      The Adversary Proceeding**

38.     On March 23, 2020, Plaintiffs initiated the adversary proceeding (the "<u>Adversary
Proceeding</u>") by filing their *Class Action Adversary Proceeding Complaint For Violation of Warn
Act 29 U.S.C. § 2101, et seq.* [Adv. Docket No. 1] (the "<u>Complaint</u>") in which they assert that the
Debtors violated the WARN Act and seek, *inter alia*, judgment in favor of Plaintiffs and other
similarly situated former employees for unpaid wages and other benefits and damages for up to 60
days that would have been otherwise paid, all determined in accordance with the WARN Act.

39.     The Trustee filed an Answer on December 10, 2020 [Adv. Docket No. 25], and in
accordance with the Pretrial Scheduling Order [Adv. Docket No. 31], on October 29, 2021, the
Trustee filed his First Amended Answer [Adv. Docket No. 40].

## IV.  ARGUMENT

40.     This Court should grant summary judgment to the Trustee because, as discussed
below the Debtors are not subject to WARN Act liability because: (1) on the date of the Layoff,
AVF and SLI were not "employers," but rather "liquidating fiduciaries" to whom the WARN Act's
notice requirements do not apply under controlling Third Circuit precedent (as discussed below);
(2) even if the Debtors were subject to the WARN Act as of the date of the Layoff, which they
were not, they are subject to the unforeseeable business circumstances exception set forth in in 29
U.S.C. § 2102(b)(2)(A) because of their inability to conduct their Court-approved post-petition
GOB Sales as a result of COVID-19 and the unprecedented governmental issuance of orders
requiring businesses to shut down and people to shelter in place; and (3) assuming *arguendo* the
Debtors were subject to the WARN Act as of the date of the Layoff, which they were not, they are
subject to the natural disaster exception set forth in 29 U.S.C. § 2102(b)(2)(B) because the Layoff

PA00083

was clearly and unequivocally caused by COVID-19, a natural disaster.

**A.     Summary Judgment Standard**

41.     Summary judgment should be granted "if the movant shows that there is no ***genuine***

dispute as to any ***material*** fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a) (emphasis added).  A fact is "material" if, under the governing substantive law, it

could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute about a material fact is "genuine" only if the evidence is such that a reasonable trier of

fact could return a verdict for the nonmoving party.  *Id*.

42.     The movant "bears the initial responsibility of informing the … court of the basis

for its motion" and identifying what "it believes demonstrate[s] the absence of a genuine issue of

material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party carries

this burden, the "party opposing a properly supported motion for summary judgment may not rest

upon the mere allegations or denials of his pleading, but must set forth specific facts showing that

there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 256.  "Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial,'" and summary judgment is properly granted.  *Matsushita Elec. Indus. Co., Ltd. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

43.     Summary judgment is "'not a disfavored procedural shortcut,' but [rather is] the

'principal tool by which factually insufficient claims or defenses can be isolated and prevented

from going to trial with the attendant unwarranted consumption of public and private resources.'"

*U.S. ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995) (quoting *Celotex*, 477

U.S. at 327).   While the Court may not make credibility determinations or weigh the evidence,

pursuant to *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097 (2000), "*Reeves*

does not require [the Court] to reject the plainly obvious." *Montemayor v. City of San Antonio*, 276 F.3d 687, 693 (5th Cir. 2001).

**B.     The WARN Act**

44.     The WARN Act requires "employers" that are subject to its terms to give sixty (60) days' notice to all "affected employees" or their representatives prior to a mass layoff or a plant closing.  29 U.S.C. § 2102(a).  To prove a WARN Act violation, a plaintiff must show that: (i) the defendant was an employer; (ii) the defendant ordered a mass layoff; (iii) the defendant failed to give employees 60-days' notice before the mass layoff; and (iv) the plaintiff is an aggrieved or affected employee. 29 U.S.C. §§ 2102, 2104.  An employer who violates the notice provision "shall be liable to each aggrieved employee who suffers an employment loss for back pay for each day of violation."  If the plaintiff establishes its *prima facia* case, the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the WARN Act's three exceptions: (1) faltering company; (2) unforeseen business circumstances; or (3) natural disaster.  29 U.S.C. § 2102; 20 C.F.R. § 639.9.

**C.     There is No Genuine Dispute That AVF Was a Liquidating Fiduciary At the Time of the Layoff and Not Subject to the WARN Act**

45.     The Third Circuit Court of Appeals has specifically held that where, as here, a chapter 11 debtor-in-possession has ceased operating as a going concern and is merely conducting a liquidation, it is not operating a "business enterprise" and is therefore not, an "employer"[45] subject to the WARN Act.   *In re United Healthcare System, Inc.,* 200 F.3d 170, 178 (3d Cir. 1999), cert denied, 530 U.S. 1204 (2000).

---

[45] The WARN Act defines an "employer" is "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."  29 U.S.C. § 2101(a)(1).

46.     In *United Healthcare*, the creditors' committee argued that the debtor-in-possession

-- a hospital that ceased operating and terminated its 1,300 employees 16 days after the petition

was filed -- was not an "employer" under the WARN Act.  The Third Circuit Court of Appeals

agreed, reasoning:

> [W]e find that United Healthcare, as the fiduciary in bankruptcy proceedings, was
> operating not as a "business operating as a going concern," but rather as a business
> liquidating its affairs. On February 18, 1997, United Healthcare surrendered its
> certificates of need; on February 19, it filed a voluntary bankruptcy plan under
> which it would liquidate its assets and cease to exist; and, no later than February
> 21, United Healthcare had discharged or transferred all of its patients and was no
> longer admitting new patients. Significantly, after February 19, but in any event
> no later than February 21, its employees were no longer engaged in their regular
> duties but instead were performing tasks solely designed to prepare United
> Healthcare for liquidation.
>
> We recognize that United Healthcare filed for Chapter 11 bankruptcy, ordinarily
> used to reorganize, rather than Chapter 7 bankruptcy, generally used to liquidate.
> **But as discussed, United Healthcare's actions from the time it filed its
> Chapter 11 petition throughout the proceedings clearly demonstrate its
> intent to liquidate.**  Simultaneously, United Healthcare filed for bankruptcy,
> agreed to sell its assets and goodwill to St. Barnabas, and surrendered its
> certificates of need. Had United Healthcare's conduct and activities demonstrated
> a *bona fide* effort toward reorganization, the evidence may have shown that
> United Healthcare was an "employer" subject to the WARN Act.
>
> We believe this analysis is consistent with the legislative purpose behind WARN.
> . . .

200 F.3d at 178 (emphasis in bold added).

47.     Other courts have similarly recognized this "liquidating fiduciary" principle.  *See,*

*e.g., Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*, 481 B.R. 268, 272

(Bankr. S.D. N.Y. 2012) ("The U.S. Department of Labor ('DOL') and federal courts addressing

WARN Act claims have recognized a 'liquidating fiduciary' principle, excepting from the

protection of the WARN Act employee layoffs by liquidating fiduciaries."); *Walsh v. Century City*

*Doctors Hosp., LLC (In re Century City Doctors Hosp., LLC)*, 417 B.R. 801, 804-05 (Bankr. C.D.

Cal. 2009), *aff'd* 2010 Bankr. LEXIS 5048 (B.A.P. 9th Cir. Oct. 29, 2010) (holding a chapter 7

trustee who operated a hospital for a few days post-petition (pursuant to an order authorizing him to do so) before terminating its employees was not an "employer" under the WARN Act based on *United Healthcare* where it was clear from the record that the "trustee's intentions have consistently been to close the hospital business at the earliest reasonable time and to liquidate its assets for the benefit of its creditors. The trustee only operated [the debtor] for approximately a week from the date of filing, and the trustee's brief operation of [the debtor] was not for any commercial purpose."); *Bailey v. Jamesway*, 1997 Bankr. LEXIS 825, at *40 (Bankr. S.D.N.Y. 1997) ("liquidating fiduciaries need not provide notice to terminated employees under the WARN Act"). Consistent with the foregoing judicial conclusions, the Department of Labor, the agency responsible for interpreting and implementing WARN Act requirements, has explained in connection with its regulations that "DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a 'business enterprise' in the normal commercial sense." 54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989).

48.     Here, as in *United Healthcare*, the Debtors' actions from the beginning of the Chapter 11 Cases (and before) evidence a clear intent to liquidate the Debtors' stores and other assets, and <u>not</u> to operate their business "in the normal commercial sense." *See* 54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989). As detailed in Section III.B above, all of the Debtors' efforts at reorganizing as a going concern occurred prepetition, when they hired advisors to reach out to potential buyers and investors. Those efforts failed prior to the bankruptcy filing. As a result of this failure, and prior to the Petition Date, the Debtors, at Wells Fargo's insistence, hired the Liquidator, gave the GOB Sale WARN Notice and commenced GOB Sales. Further, when the Debtors filed their Chapter 11 Cases on March 8, 2020, they intended to, and did, continue to

liquidate their assets through the GOB Sales and the Levin Sale. As of the Petition Date, and prior to the Layoff, the only business activities to be conducted by the Debtors were those necessary to liquidate their assets to pay off their creditors.

49. There can be no dispute that the Debtors were at all relevant times liquidating, as opposed to reorganizing, in the Chapter 11 Cases. As described in detail above, the Debtors intended to be and were acting as liquidating fiduciaries prior to the Petition Date and at the time of the March 20, 2020 Layoff. Therefore, as a matter of law, the Debtors were not "employers" under the WARN Act, and, accordingly, by its terms cannot be held liable for failure to give sixty days' notice of the Layoff, and as such, summary judgment is mandated in favor of the Trustee.

**D.    The Governmental Mandated "Shelter in Place" and "Stay at Home" Orders Were "Not Reasonably Foreseeable" and Thus, the Debtors Were Not Subject to the Notice Provisions of the WARN Act.**

50. The COVID-19 pandemic was a business circumstance that was not reasonably foreseeable during the 60-day period prior to Layoff. As a matter of law, the Debtors therefore cannot be held liable for failure to provide 60 days' notice of the Layoff, and summary judgment should be granted in favor of the Trustee.

51. Specifically, 29 U.S.C. § 2102(b)(2)(A) provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances **that were not reasonably foreseeable as of the time that notice would have been required.**" 29 U.S.C. § 2102(b)(2)(A) (emphasis added**).**

52. Here, the Debtors' inability to conduct the GOB Sales and orderly liquidation they had planned to execute in March and April of 2020 were caused by (1) COVID-19, (2) the government-ordered business closures (or threatened closures), and (3) the restriction of residents

to their homes, which, together constitute a business circumstance that was not reasonably foreseeable during the 60-day period prior to the Layoff.

53.     The Third Circuit Court of Appeals has established that, under the WARN Act, a layoff becomes reasonably foreseeable when it becomes "probable" (more likely than not) that it would occur; a clear probability of layoffs is necessary to trigger the WARN Act notice requirement. *Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*, 866 F.3d 515, 528 (3d Cir. 2017) (company had received numerous assurances that funding for a transaction that would have allowed it to continue its operations was imminent, and thus, the company was entitled to invoke the WARN Act's unforeseeable business circumstances exception).[46]  *See also Hotel Employees & Restaurant Employees International Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175 (3d Cir. 1999) (casino's closure was not reasonably foreseeable and thus the unforeseeable business circumstances defense applied to excuse the casino's failure to notify its employees prior to its being shut down by the New Jersey Casino Control Commission).

54.     As explained by Bankruptcy Judge Shannon:

The Department of Labor's ("DOL") regulations state that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some *sudden, dramatic, and unexpected action or condition outside the employer's control*." 20 C.F.R. § 639.9(b)(1). The DOL's test for determining when business circumstances are not reasonably foreseeable

> focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of a particular market.  The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.

*Id*. § 639.9(b)(2).

---

[46] Notably, the bankruptcy court in the proceedings below in *AE Liquidation* had granted the trustee's motion for summary judgment on the basis that the applicable circumstance there was unforeseeable for purposes of WARN Act liability.  *In re AE Liquidation, Inc.*, 522 B.R. 62 (Bankr. D. Del. 2014) (Judge Walrath).  The bankruptcy court's decision was affirmed by the district court, and both decisions were affirmed by the Third Circuit Court of Appeals in the afore-cited *AE Liquidation* case.

*Czyzewksi v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*, 496 B.R. 151, 161 (Bankr. D. Del. 2013) (Hon. B. Shannon) (emphasis added).

55.     In addition, in order to establish the applicability of the exception, courts require that employers show that an unforeseen business circumstance was the immediate cause of a mass layoff. *Easom v. US Well Servs.*, 2021 U.S. Dist. LEXIS 52941, at *32.

56.     The unforeseeable business circumstances exception is plainly applicable here. First, as discussed in Sections III.D and E above, the COVID-19 pandemic was clearly the immediate cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and immediately shut down their business.  The pandemic made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required citizens to stay at home or shelter in place to limit the spread of COVID-19. The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would follow shortly thereafter.

57.     Moreover, on January 18, 2020 and thereafter (the 60-day period prior to the Layoff), the Debtors could not reasonably have foreseen that the threat of infection and death from COVID-19 would be so profound that millions of people in the United States would be afraid to leave their homes and governments would be ordering their citizens to stay at home and closing non-essential businesses across the nation.

58.     Finally, given that the Governor of Pennsylvania ordered store closures on March 19, 2020 (the day of the Debtors' COVID WARN Notice), the one day's notice that the Debtors gave to the Plaintiffs was patently reasonable under the circumstances.

59.     Based on the foregoing circumstances, it cannot be credibly debated that the

COVID-19 pandemic and its unprecedented adverse business and societal effects could have been reasonably foreseeable by the Debtors as of January 18, 2020 or that the Debtors' actions were not commercially reasonable under the circumstances.  Accordingly, the Trustee is also entitled to summary judgment in his favor on the basis of the unforeseen business exception.

**E.     If the WARN Act Is Applicable, Which It is Not, the Debtors Were Not Required to Provide Any Notice Because the Layoff Was Due to the COVID-19 Pandemic -- a "Natural Disaster" For Purposes of the WARN Act.**

### (i)      The COVID-19 Pandemic Is a Natural Disaster

60.     If the WARN Act were held to be applicable (which it is not because of the liquidating fiduciary exception), the Debtors were not required to give any notice because the March 20, 2020 Layoff was due to the COVID-19 pandemic, which falls within the natural disaster exception to the WARN Act.

61.     The WARN Act provides: "No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States."  29 U.S.C. § 2102(b)(2)(B); 20 C.F.R. § 639.9(c).  As the statue makes clear, if the employer establishes that the mass layoff was "due to any form of natural disaster," there is no duty to provide any notice under the WARN Act.

62.     The COVID-19 pandemic is a "natural disaster" and therefore falls under the exception to the WARN Act's notice requirement.  *Easom v. US Well Servs*, 2021 U.S. Dist. LEXIS 52941, *17 (S.D. Tex. March 22, 2021) ("The dictionary definition of natural disaster, other court decisions, and the statutory language support the conclusion that the COVID-19 pandemic is a natural disaster under the WARN Act.").[47]  *See also* Hiltzik, M., "A declassified

---

[47] The statute in fact refers more broadly to "any form of natural disaster" – a phrase which plainly supports a broad interpretation of "natural disaster."  *See, e.g., Kasten v. Saint-Gobain Performance Plastics Corp*., 563 U.S. 1, 9–10 (2011) (the statutory phrase "any complaint" suggests a broad interpretation).

PA00091

government report offers no support for the lab-leak theory of COVID's origin," *Los Angeles Times*, Nov. 1, 2021, available at https://www.latimes.com/business/story/2021-11-01/declassified-government-report-lab-leak-theory (attached as **Exhibit Z** to Sandler Declaration) ("LA Times Article") (recently declassified report by federal governmental agency, Office of the Director of National Intelligence ("ODNI Report"), "provides details of the agencies' findings that make clear they looked into the specific assertions that have been proposed in support of the lab-leak theory and found them wanting"); Office of the Director of National Intelligence, "Updated Assessment on COVID-19 Origins" Report, available at https://www.dni.gov/files/ODNI/documents/assessments/Declassified-Assessment-on-COVID-19-Origins.pdf (ODNI Report referenced in the LA Times Article) (attached as **Exhibit AA** to Sandler Declaration).

63.     As the District Court for the Southern District of Texas reasoned in *Easom*:

> COVID-19 qualifies as a disaster under the WARN Act.  COVID-19 is clearly a "disaster."  *See* Disaster, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] calamity; a catastrophic emergency"); Natural Disaster, OXFORD ENGLISH DICTIONARY ("[a] natural event that causes great damage or loss of life").  In a year, two million people lost their lives, and over one hundred million people were diagnosed with infections. *See AB Stable VIII LLC*, 2020 Del. Ch. LEXIS 353, 2020 WL 7024929, at *58 ("[The COVID-19 pandemic] is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths.") . . . .
>
> COVID-19 also qualifies as a "natural" disaster because human beings were not responsible for starting or consciously spreading the virus. . . .  COVID-19, like other viruses, did not require conscious human effort to appear or spread, as individuals without symptoms infected others.  *See* Angela L. Rasmussen, *On the Origins of SARS-CoV-2*, 27 Nature Medicine 9, 9 (2021) ("[A]ll indications suggest that, like SARS-CoV and MERS-CoV, this virus probably evolved in a bat host until an unknown spillover event into humans occurred."); Murat Seyran, *et al.*, *Questions Concerning the Proximal Origin of SARS CoV-2*, Journal of Medical Virology 1, 1 (2020) ("There is a consensus that severe acute respiratory syndrome coronavirus (SARS-CoV-2) originated naturally from bat coronaviruses (CoVs), in particular RaTG13."); *see also AB Stable VIII LLC*, 2020 Del. Ch. LEXIS 353, 2020 WL 7024929, at *58 n.214 ("The record in this case does not support a finding that the virus was anything other than a natural

product of germ evolution."). While humans can take precautions to slow the spread of COVID-19 or engage in behavior that fosters contagion, the possibility of slowing the virus spread does not suggest that humans caused the pandemic.

*Id*. at *20-*21.

64.     Outside the WARN Act context, courts have also consistently found that COVID-19 is a natural disaster for reasons that are equally applicable here.  The U.S. District Court for the Southern District of New York held that COVID-19 qualified as a "natural disaster" for the purpose of applying a force majeure clause in a contract dispute.  *See JN Contemporary Art, LLC v. Phillips Auctioneers LLC*, 2020 U.S. Dist. LEXIS 237085 (S.D.N.Y. Dec. 16. 2020).  The Pennsylvania Supreme Court has held twice that the Covid-19 pandemic is a "natural disaster."  In *In Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 876 (Pa. 2020), *cert. denied*, 141 S. Ct. 239 (2020), the petitioners challenged the Pennsylvania governor's executive order closing all non-life-sustaining businesses to control the virus' spread.  Among other arguments, they contended that the pandemic was not a "natural disaster" under the state's Emergency Code because it was not specifically listed as such and was different in "type or kind" from those disasters found in the statute.  The Pennsylvania Supreme Court disagreed, holding, "The COVID-19 pandemic is, by all definitions, a natural disaster, and a catastrophe of massive proportions." *Id*. at 889.  The Pennsylvania Supreme Court re-affirmed this conclusion seven months later in the context of election-related litigation.  *See Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster.").

65.     Accordingly, even if the WARN Act applies, which it does not because the Debtors were liquidating fiduciaries, the Debtors were not required to give notice of the Layoff because Covid-19 is a "natural disaster," and summary judgment should be granted in favor of the Trustee.

### (ii) The Layoff Was "Due To" the COVID-19 Pandemic

66.     The Debtors' Layoff was clearly "due to" the COVID-19 pandemic. The "but for" standard of causation applies to the natural disaster exception. *Easom v. US Well Servs*, 2021 U.S. Dist. LEXIS 52941, at *33-*34 ("[T]he WARN Act's language, structure, and legislative history, as well as case law interpreting similar statutory language, support finding that the natural-disaster exception uses but-for causation standards. The COVID-19 pandemic need not be the direct or sole cause of the layoffs for the natural-disaster exception to apply.").[48] But-for causation is established whenever a particular outcome would not have happened "but for" the purported cause. The "but-for" test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a "but-for" cause. *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1739 (2020).

67.     But for COVID-19, Debtors would have completed the Planned Liquidation Process as originally planned, including the provision of adequate notice of the Layoff. As discussed in greater detail in Sections III.B and C above, the Debtors expressly intended to liquidate their assets under chapter 11 through a combination of the GOB Sales and the Levin Sale. The Debtors had hired a Liquidator, negotiated a Wind-Down Budget with Wells Fargo, announced store closures, commenced the GOB Sales and filed the Chapter 11 Cases. The Planned Liquidation Process was proceeding as expected, even as late as the second week in March.

68.     But for the threat of infection and death from COVID-19, the foot traffic in the Debtors' stores would have continued apace, and Plaintiffs would have worked throughout their 60-days' notice period under the GOB Sale WARN Notice. But for the threat of infection and

---

[48] Whether the WARN Act's natural disaster exception uses the "but for" standard was certified for appeal and accepted by the Court of Appeals for the Fifth Circuit in *Easom* (pending as Case No. 21-90010), as well as by the Court of Appeals for the Eleventh Circuit in *Bensen* (pending as Case No. 21-11911) (*Benson v. Enter. Leasing Co. of Orlando*, LLC, 2021 U.S. Dist. LEXIS 55137 (D. M.D. Fla. Feb. 4, 2021) (court assumed *arguendo* that COVID‐19 was a "natural disaster" under the WARN Act but denied employer's motion to dismiss because complaint did not allege that COVID-19 was the "direct cause" (*i.e.*, the "proximate cause") of the layoff)).

PA00094

death from COVID-19, the Debtors' employees would not have been afraid or hesitant to come to work. But for the threat of infection and death from Covid-19, the Debtors would not have been under threat of compulsory closures in every state in which it did business. But for the threat of infection and death from COVID-19, the Governor of Pennsylvania would not have ordered the Debtors to close all of their stores in Pennsylvania by 8 pm on March 19, 2020. But for the threat of infection and death from COVID-19, the Debtors would not have issued the COVID WARN Notice and would not have terminated the Plaintiffs on March 20, 2020.

69.     The natural disaster exception applies, and, accordingly, the Debtors are not liable under the WARN Act. Summary judgment should therefore be granted in favor of the Trustee.

## V. CONCLUSION

For the reasons set forth herein, the Trustee respectfully requests that the Court grant the Motion, enter judgment in his favor, and grant such other and further relief as the Court deems appropriate.

Respectfully Submitted,

Dated:   November 12, 2021          PACHULSKI STANG ZIEHL & JONES LLP
         Wilmington, Delaware

                                    /s/ Bradford Sandler
                                    Bradford J. Sandler (DE Bar No. 4142)
                                    Beth Levine (New York Bar No. 2572246)
                                    (admitted pro hac vice)
                                    Colin R. Robinson (DE Bar No. 5524)
                                    Peter J. Keane (DE Bar No. 5503)
                                    **PACHULSKI STANG ZIEHL & JONES LLP**
                                    919 North Market Street, 17th Floor
                                    P.O. Box 8705
                                    Wilmington, Delaware 19899
                                    Telephone: (302) 652-4100
                                    Facsimile: (302) 652-4400
                                    Email:   bsandler@pszjlaw.com
                                             blevine@pszjlaw.com
                                             crobinson@pszjlaw.com
                                             pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

PA00096

**FIN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | (Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Adv. Proc. No. 20-50548 (CSS) |
| vs. | |
| ART VAN FURNITURE, LLC, *et al.*, | |
| Defendants. | |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  bsandler@pszjlaw.com
          blevine@pszjlaw.com
          crobinson@pszjlaw.com
          pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

---

[1]  The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_LA:340713.3 05233/003

Alfred T. Giuliano, Chapter 7 Trustee (the "<u>Trustee</u>") to Art Van Furniture, LLC ("<u>AVF</u>"), Sam Levin, Inc. ("<u>SLI</u>") and related debtors (collectively, the "<u>Debtors</u>" or "<u>Art Van</u>") submits this Statement of Undisputed Facts in support of his motion for summary judgment (the "<u>Motion</u>"). All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Motion.

1.     The Debtors filed the Chapter 11 Cases with the intention of winding down their affairs by liquidating their inventory through store closing sales (the "<u>GOB Sales</u>"), paying down their secured debt, and using any remaining proceeds of their GOB Sales to wind-down their operations. (*Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Bankr. Doc. 12] ("<u>Ladd Declaration</u>") (attached as **Exhibit A** to Sandler Declaration) at ¶¶ 6 & 18.)

2.     The GOB Sales, the Levin Sale, and other actions taken by the Debtors in the Chapter 11 Cases (discussed below) were all part of the orderly liquidation and wind-down planned by the Debtors prior to and as of the Petition Date (the "<u>Planned Liquidation Process</u>") in order to maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors. (Ladd Declaration at ¶¶ 6, 16, 17, 18, 19, 20, 40, 41, 42 & 43.)

3.     In the months leading up to the Petition Date, Art Van was struggling under the weight of poor sales and $208.5 million in secured debt encumbering substantially all of its assets: (i) $33.5 million in an asset-backed loan ("<u>ABL Loan</u>") from Wells Fargo Bank ("<u>Wells Fargo</u>") and (ii) a $175 million term loan (the "<u>Term Loan</u>") from FS KKR Capital Corp. (the "<u>Term Lenders</u>" and together with Wells Fargo, the "<u>Secured Lenders</u>"). (Ladd Declaration at ¶¶ 7, 8, 13, 14, 16, 17, 18, 31-36.)

4.      Art Van had defaulted on the ABL Loan on February 5, 2020 and had only been able to obtain a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the business.  As a condition to the forbearance, Wells Fargo insisted that the Debtors begin to prepare for going-out-of-business (GOB) sales. (Ladd Declaration at ¶¶ 14, 36.)

5.      In spite of the Debtors' efforts over the next 23 days in February 2020, by February 28, 2020, the Debtors were unable to secure financing or attract a going concern buyer.  (Transcript of March 10, 2020 hearing (attached as **Exhibit B** to Sandler Declaration) at p. 55, line 25 to p. 57, line 20; Ladd Declaration at ¶¶ 14-15.)  The forbearance period ended on that date, and the Debtors had no alternative but to pursue an orderly wind-down of their operations and liquidation of their assets. (Ladd Declaration at ¶¶ 16-18.)  To that end, prior to the Petition Date, the Debtors negotiated a wind-down budget with Wells Fargo ("Wind-Down Budget"), hired a liquidator, and announced publicly that after decades in business they were going out of business. (Ladd Declaration at ¶¶ 16-18; *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 93] ("Interim CC Order") (attached as **Exhibit C** to Sandler Declaration) at 12-13; "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html) (attached as **Exhibit D** to Sandler Declaration).)

6.      As part of the Planned Liquidation Process, on March 4, 2020, SLI entered into a letter agreement (the "Levin LOI") pursuant to which it agreed to sell 44 stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") to

PA00099

Robert Levin (the "Levin Sale"). The Levin Sale was expected to be approved in bankruptcy and consummated in or about early April 2020. The Debtors believed that the buyer would keep the 44 stores operating and thereby preserve approximately 1,000 jobs. (Ladd Declaration at ¶¶ 19-20 & 40-42.)

7.      The Levin LOI contemplated that the Levin Sale stores would continue briefly operating pending the closing of the Levin Sale. (Ladd Declaration at ¶¶ 40-41; *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Bankr. Doc. 49] ("Levin DIP Motion") (attached as **Exhibit E** to Sandler Declaration).) Because the Debtors had no money to operate these stores (they only had the money that Wells Fargo had agreed to let them use to conduct the GOB Sales), Robert Levin agreed to extend $10 million of debtor-in-possession (DIP) financing to SLI (the "Levin DIP Loan") to the Debtors to facilitate the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale. (Levin DIP Motion; *Interim Order* on Levin DIP Motion [Bankr. Doc. 137] ("Interim Levin DIP Order") (attached as **Exhibit F** to Sandler Declaration).)

8.      On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business. (Art Van GOB Press Release (attached as **Exhibit D** to Sandler Declaration).) Plaintiffs have acknowledged that the Debtors began their liquidation plan at this time. (Complaint (attached as **Exhibit Y** to Sandler Declaration) at ¶ 25 ("… Debtors began to execute on its planned liquidation.").)

9.      On March 5, 2020, as part of its Planned Liquidation Process, although not required, AVF issued a WARN Act notice to approximately 1,400 potentially "affected employees" who

PA00100

worked in or reported to seven facilities in Michigan, two facilities in Illinois and one in Pennsylvania, which notice provided:

> Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.
>
> The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.
>
> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.
>
> You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(WARN Act notice issued by AVF on March 5, 2020 (attached as **Exhibit G** to Sandler Declaration).)

     10.     The Debtors' target date to end the GOB Sales was the end of April 2020 (Ladd Declaration at ¶ 18). The GOB Sales commenced as expected, and went well at first: From March 5, 2020 through March 8, 2020, deposits from inventory sales were in excess of $23 million. (*Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* [Bankr. Doc. 252] (the "Conversion Motion") (attached as **Exhibit H** to Sandler Declaration) at ¶ 22.)

PA00101

11.     On March 8, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases and filed "first day motions" to obtain approval of, *inter alia*, the Wind-Down Budget, the Levin DIP, and GOB Sales and the Consulting Agreement with the Liquidator.  (*Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 5] (attached as **Exhibit I** to Sandler Declaration); Levin DIP Motion; Interim Levin DIP Order; *Debtors' Motion for Entry of Interim and Final Orders  (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* [Bankr. Doc. 52] (attached as **Exhibit J** to Sandler Declaration).)

12.     While there was an extensive discussion of the GOB Sales at the first day hearing held on March 10, 2020, there was no discussion by the Court and other parties of COVID-19 and the effects thereof, including any potential government-mandated shut downs and extensive business restrictions.  (Transcript from March 10, 2020 Hearing (attached as **Exhibit B** to Sandler Declaration).)

13.     On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order, authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales.  The Wind-Down Budget assumed that the GOB Sales would continue unabated through April 30, 2020, and provided that the "the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely

basis" is a default, and thus, the Debtors continued their ongoing GOB sales. (Interim CC Order (attached as **Exhibit C** to Sandler Declaration) at pp. 34-35.)

14.     At the continued hearing on first day motions held on March 12, 2020, the Bankruptcy Court and the U.S. Trustee expressed concerns about the fee in the Liquidator's Consulting Agreement and continued that portion of the Debtors' GOB sale motion to March 20, 2020, but other than comments by the Bankruptcy Court at the beginning of the hearing, there was no mention by the parties at the hearing of COVID-19 or the possibility that the GOB Sales might not be able to continue.  (Transcript of March 12, 2020 Hearing (attached as **Exhibit K** to Sandler Declaration) at p. 5, lines 5-7.)

15.     The unprecedented, extraordinary circumstances caused by the COVID-19 pandemic confronting the Debtors during the period March 8, 2020 (the Petition Date) and March 19, 2020 (the day of the COVID WARN Notice) are a matter of public record.  On March 13, 2020, then-President Donald Trump declared a national emergency.  (*Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* dated March 13, 2020 (85 F.R. 15337 (March 13, 2020)), available at https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf (attached as **Exhibit L** to Sandler Declaration).)

16.     By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.  (*Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf  (attached   as **Exhibit M** to Sandler Declaration).)  Two days later, Governor Wolf repeated and amplified that

guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …." (*All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19,* March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/ (attached as **Exhibit N** to Sandler Declaration).).

17. On March 16, 2020, Governor Gretchen Whitmer of Michigan -- where the Debtors' headquarters, their main distribution center, and 82 of their stores are located -- entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces. (*Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html (attached as **Exhibit O** to Sandler Declaration).) Governor Whitmer urged Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary." (*Id.*)

18. On March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations were located to issue a "stay at home" or "shelter in place" type order. Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020. (Gov. Tom Wolf, Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wpcontent/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (attached as **Exhibit P** to Sandler Declaration); Gov. Gretchen

PA00104

Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html (attached as **Exhibit Q** to Sandler Declaration); Dir. of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (attached as **Exhibit R** to Sandler Declaration); and Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf (attached as **Exhibit S** to Sandler Declaration).)

19.     Further, on March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction, and thus, the stores covered by the Levin Sale would also have to be immediately closed by the Debtors.  (Conversion Motion at ¶ 26.)

20.     As a result of the COVID-19 pandemic and resultant shutdowns, shortly after the Petition Date, the Debtors' situation changed drastically upending the Debtors' plans for an orderly liquidation.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date.  Specifically, during the initial days of the GOB Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million, suggesting, among other things, a precipitous drop in customer traffic in the Debtors' stores.  (Conversion Motion at ¶ 22.)

21.     The restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease  mandated that the Debtors discontinue all retail operations and other non-essential business operations – a

scenario they had not and could not have planned for when they developed their Planned Liquidation Process.  (Conversion Motion at ¶¶ 1-2.)

22.     Soon thereafter, the Debtors' management, with their professionals' counsel and assistance, determined that the Planned Liquidation Process, in its then-form, was no longer viable and that a more immediate shutdown of the Debtors' stores and remaining support operations was in the estates' and creditors' best interest.  (Conversion Motion at ¶¶ 1-2.)  Thus, on March 19, 2020, the Debtors determined to suspend all sales operations in all stores and terminate the majority of their employees, excluding workers who would be needed for the rest of the liquidation and wind-down process.  (Conversion Motion at ¶ 25.)

23.     Accordingly, on March 19, 2020, AVF issued a WARN Act notice to employees which stated:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.
>
> ***Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date.  The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").***
>
> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020.  All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on

March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020.  Nothing in this letter alters your at-will employment status with the Company.  You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(WARN Act notice issued by AVF on March 19, 2020, to AVF employees) ("COVID WARN Notice") (emphases added and attached as **Exhibit T** to Sandler Declaration).

24.     Plaintiffs Todd Stewart and Jennifer Sawle were two of AVF's employees, and each worked at one of AVF's 82 stores in the State of Michigan.  In accordance with the COVID WARN Notice, the Trustee believes that Mr. Stewart and Ms. Sawle were both terminated by AVF, as were most of AVF's and SLI's employees, on March 20, 2022 (the "Layoff").  (Complaint (attached as **Exhibit Y** to Sandler Declaration), ¶¶ 6, 7, 10.)

25.     During a March 19, 2020 status conference, Debtors' counsel advised the Bankruptcy Court of the store closures.  (Transcript of March 19, 2020 Hearing (attached as **Exhibit U** to Sandler Declaration) at p. 10, line 8 to p. 11, line 1.)

26.     Judge Sontchi stated on the record at a later related hearing:

This is an unfortunate situation. It is nobody's fault. It is nobody's fault. I know many people in my local business community who are good business people who have great businesses who are staring down the barrel of a gun based on what's happened. It's just—it extraordinary. And I'm not casting aspersions on anyone, but obviously this case changed dramatically, as did the whole world—well not the whole world but as to the United States in the last three weeks, three or four weeks.

(Transcript of March 31, 2020 Hearing (attached as **Exhibit V** to Sandler Declaration) at p. 47, line 24 to 48, line 7.)

27.     Wells Fargo declared a default under the Interim CC Order, and terminated use of cash collateral as of March 24, 2020; later extended through March 31 and finally April 6.  (Conversion Motion at ¶ 27.)

28.     Unable to continue the Chapter 11 Cases without the continued consent of the
Debtors' secured lenders to use their cash collateral, the Debtors filed the Conversion Motion and
the Chapter 11 Cases were converted to chapter 7 proceedings pursuant to an order entered on
April 6, 2020.  (*Order Granting Debtor's Amended Motion to Convert* [Bankr. Doc. 263] (attached
as **Exhibit W** to Sandler Declaration).)

29.     The COVID-19 pandemic was a natural disaster.  (Hiltzik, M., "A declassified
government report offers no support for the lab-leak theory of COVID's origin," *Los Angeles
Times*,  Nov.  1,  2021,  available  at  https://www.latimes.com/business/story/2021-11-
01/declassified-government-report-lab-leak-theory (attached as **Exhibit Z** to Sandler Declaration)
("LA Times Article") (recently declassified report by federal governmental agency, Office of the
Director of National Intelligence ("ODNI Report"), "provides details of the agencies' findings that
make clear they looked into the specific assertions that have been proposed in support of the lab-
leak theory and found them wanting"); Office of the Director of National Intelligence, "Updated
Assessment      on      COVID-19      Origins"      Report,      available      at
https://www.dni.gov/files/ODNI/documents/assessments/Declassified-Assessment-on-COVID-
19-Origins.pdf (ODNI Report referenced in the LA Times Article) (attached as **Exhibit AA** to

Sandler Declaration).)

Respectfully Submitted,

Dated:    November 12, 2021              PACHULSKI STANG ZIEHL & JONES LLP
          Wilmington, Delaware

                                         /s/ Bradford Sandler
                                         Bradford J. Sandler (DE Bar No. 4142)
                                         Beth Levine (New York Bar No. 2572246)
                                         (admitted *pro hac vice*)
                                         Colin R. Robinson (DE Bar No. 5524)
                                         Peter J. Keane (DE Bar No. 5503)
                                         **PACHULSKI STANG ZIEHL & JONES LLP**
                                         919 North Market Street, 17th Floor
                                         P.O. Box 8705
                                         Wilmington, Delaware 19899
                                         Telephone: (302) 652-4100
                                         Facsimile: (302) 652-4400
                                         Email:    bsandler@pszjlaw.com
                                                   blevine@pszjlaw.com
                                                   crobinson@pszjlaw.com
                                                   pkeane@pszjlaw.com

                                         Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
                                         Defendants Art Van Furniture, LLC, *et al.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, *et al.*,[1]<br><br>         Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>(Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>    vs.<br><br>ART VAN FURNITURE, LLC, *et al.*,<br><br>         Defendants. | Adv. Proc. No. 20-50548 (CSS) |

### DECLARATION OF BRADFORD SANDLER IN SUPPORT OF
### CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (DE Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: bsandler@pszjlaw.com
    blevine@pszjlaw.com
    crobinson@pszjlaw.com
    pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

I, BRADFORD SANDLER, hereby declares:

1.      I am an attorney at law duly licensed to practice before this Court.  I am a partner of the law firm of Pachulski Stang Ziehl & Jones LLP, attorneys of record for Alfred T. Giuliano, Chapter 7 Trustee to Defendants Art Van Furniture, LLC, *et al*. in the above-captioned chapter 7 case (the "Case").  The facts stated herein are of my own personal knowledge, or made known to me from a review of the files and pleadings in the Case which are maintained in the ordinary course of business.  If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.  All capitalized terms not defined below shall have the meaning ascribed to said terms in the Chapter 7 Trustee's Motion for Summary Judgment (the "Motion").

2.      Attached hereto as **Exhibit A** is a true and correct copy of the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed in the Chapter 11 Cases [Bankr. Doc. 12].

3.      Attached hereto as **Exhibit B** is a true and correct copy of the transcript of the March 10, 2020 hearing held before the Bankruptcy Court in the Chapter 11 Cases.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered in the Chapter 11 Cases [Bankr. Doc. 93].

5.      Attached hereto as **Exhibit D** is a true and correct copy of the article "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at        https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html.

6.      Attached hereto as **Exhibit E** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 49] ("Levin DIP Motion").

7.      Attached hereto as **Exhibit F** is a true and correct copy of the *Interim Order* on Levin DIP Motion entered in the Chapter 11 Cases [Bankr. Doc. 137].

8.      Attached hereto as **Exhibit G** is a true and correct copy of the WARN Act notice issued by AVF on March 5, 2020, to potentially "affected employees" who worked in or reported to seven of the Debtors' facilities in Michigan, two facilities in Illinois and one in Pennsylvania.

9.      Attached hereto as **Exhibit H** is a true and correct copy of the *Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* filed in the Chapter 11 Cases [Bankr. Doc. 252].

10.      Attached hereto as **Exhibit I** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 5].

11.      Attached hereto as **Exhibit J** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 52].

12.     Attached hereto as **Exhibit K** is a true and correct copy of the transcript of the March 12, 2020 hearing held before the Bankruptcy Court in the Chapter 11 Cases.

13.     Attached hereto as **Exhibit L** is a true and correct copy of the *Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* dated March 13, 2020 (85 F.R. 15337 (March 13, 2020)), available at https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf.

14.     Attached hereto as **Exhibit M** is a true and correct copy of *Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/.

15.     Attached hereto as **Exhibit N** is a true and correct copy of *All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19,* March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/.

16.     Attached hereto as **Exhibit O** is a true and correct copy of *Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html.

17.     Attached hereto as **Exhibit P** is a true and correct copy of Gov. Tom Wolf's Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf.

18.     Attached hereto as **Exhibit Q** is a true and correct copy of Gov. Gretchen Whitmer's Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html.

19.     Attached hereto as **Exhibit R** is a true and correct copy of Dir. of Public Health Amy Acton's Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf.

20.     Attached hereto as **Exhibit S** is a true and correct copy of Gov. JB Pritzker's Executive Order in Response to COVID-19 (COVID-19Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf.

21.     Attached hereto as **Exhibit T** is a true and correct copy of the WARN Act notice issued by AVF on March 19, 2020, to AVF employees.

22.     Attached hereto as **Exhibit U** is a true and correct copy of the transcript of the March 19, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

23.     Attached hereto as **Exhibit V** is a true and correct copy of the transcript of the March 31, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

24.     Attached hereto as **Exhibit W** is a true and correct copy of the *Order Granting Debtor's Amended Motion to Convert* entered in the Chapter 11 Cases [Bankr. Doc. 263].

25.     Attached hereto as **Exhibit X** is a true and correct copy of the transcript of the April 6, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

26.     Attached hereto as **Exhibit Y** is a true and correct copy of the *Class Action Adversary Proceeding Complaint For Violation of Warn Act 29 U.S.C. § 2101, et seq.* filed in the

above-captioned adversary proceeding [Adv. Docket No. 1].

27.    Attached hereto as **Exhibit Z** is a true and correct copy of the article by Hiltzik, M., "A declassified government report offers no support for the lab-leak theory of COVID's origin," *Los Angeles Times*, Nov. 1, 2021, available at https://www.latimes.com/business/story/2021-11-01/declassified-government-report-lab-leak-theory.

28.    Attached hereto as **Exhibit AA** is a true and correct copy of the Office of the Director of National Intelligence, "Updated Assessment on COVID-19 Origins" Report, available at https://www.dni.gov/files/ODNI/documents/assessments/Declassified-Assessment-on-COVID-19-Origins.pdf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge. Executed this 12th day of November, 2021 at Wilmington, Delaware.

_____
Bradford Sandler

PA00116

# EXHIBIT A

PA00117

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) |
|  | ) Case No. 20-10553 (___) |
| Debtors. | ) |
|  | ) (Joint Administration Requested) |
|  | ) |

### DECLARATION OF
### DAVID LADD, EXECUTIVE VICE PRESIDENT AND
### CHIEF FINANCIAL OFFICER OF ART VAN FURNITURE, LLC,
### IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, David Ladd, hereby declare under penalty of perjury:

1.      I am the Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC ("Art Van"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company").

2.      I have served in this role since October 10, 2016.  In my current position, I oversee financial planning, accounting and the management of financial risk for the Company and its brands.  Prior to serving in this capacity, I had over twenty years of financial experience in the retail sector, during which time I served in various roles, including as an auditor for Kmart and as Vice President of Finance for various divisions of Sears.  Most recently, I served as the Vice President of Finance for 1,500 Sears and Kmart stores.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

3.     I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration (this "Declaration") to assist the United States Bankruptcy Court for the District of Delaware (the "Court") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested pursuant to the motions and applications filed on the first day of these cases (collectively, the "First Day Motions").

4.     Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions with the other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

**Preliminary Statement**

5.     Art Van is a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan. The Company operates 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. The Company does business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture. The Company was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017. As part of this transaction, THL acquired the operating assets of the Company and certain real estate investment trusts, who closed the transaction alongside THL, acquired the owned real estate portfolio of the Company, and entered into long-term leases with Art Van. The proceeds from the sale-leaseback transaction were used to fund the purchase price

2

paid to the selling shareholders. Pennsylvania-based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017 through similar transaction structures. As of the Petition Date, the Company operates stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

6.     In the wake of extreme market conditions and faced with limited liquidity, the Company has commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down its remaining store locations and other operations through a going-out-of-business sales process. Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going concern, the Company is simply unable to meet its financial obligations. The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind down process that will maximize value and recoveries for stakeholders in these cases.

7.     Art Van's declines in sales, profits, and cash flow were driven by a combination of several factors. *First*, the Company has faced significant macro-related revenue headwinds, as well as local microeconomic headwinds, that have led to sustained negative "same-store sales," a key measure of retail health, during every quarter since June 2016. These macro-related headwinds include broad-based declining retail foot traffic, market share losses of brick and mortar furniture outlets to online sellers such as Wayfair and Amazon.com, and increased fragmentation and intense competition in mattresses leading to decreased profitability. On a local level, Art Van has faced increased retail competition, as key competitors such as Ashley HomeStore, Bob's Discount

PA00120

Furniture, and Mattress Firm opened at least 30 stores in Michigan and Illinois over the last three years

8.      **Second**, while Art Van revenues have declined approximately 27% cumulatively on a same-store basis since fiscal year 2016 through January 2020, expenses have increased significantly due to, among other things, over $8 million in tariff costs in fiscal year 2019 (which continued and escalated in fiscal year 2020) and an increase in marketing expenses intended to stem same-store sales declines.

9.      **Third**, the business suffered numerous operational challenges in the course of the Company's effort to grow and navigate a challenging retail environment.  In continuing to support the existing management team and growth initiatives that had driven the Company's success over the prior decade, the Company invested significant capital, but many of the initiatives failed to meet expectations and were insufficient in offsetting countervailing headwinds.  These operational challenges included, among other things:

- **Expansion**.  The Company began an expansion into Chicago in fiscal year 2013 that continued through fiscal year 2018, which ultimately led to market oversaturation as new stores cannibalized revenues from preexisting locations.  Despite spending significant capital and gaining material revenue share in this market, the Company was not able to achieve sustained profitability in Chicago.

- **Leadership Turnover**.  The Company lost eight of its top nine executive leaders in fiscal years 2017 and 2018 through unplanned and, in many cases, voluntary departures.

- **Required Changes to Marketing Strategies**.  In June 2017, the Company ceased certain of its historically successful marketing practices after becoming aware they violated the Telephone Consumer Protection Act ("TCPA"), and in early 2018, the Company settled a class-action lawsuit on account of an alleged violation of the TCPA.

- **St. Louis Franchise Acquisition**.  In fiscal year 2018, the Company entered into an operating agreement with its largest franchisee, based in St. Louis, Missouri, due to financial distress being experienced by the franchisee.  The Company acquired the operations of the franchisee in fiscal year 2019 to help stabilize performance and avoid further deterioration, but Art Van was unable to stabilize the revenues of the St. Louis stores or generate a profit in the market after such acquisition.

PA00121

- **Levin/Wolf Integration**. In fiscal year 2019, the Company's management attempted to integrate the operations of Wolf Furniture into Levin Furniture. The integration involved a significant overhaul of many fundamental aspects of the Wolf business, including human capital management, furniture assortments, distribution/delivery, and technology systems. These actions were taken in an effort to improve the business and align its operations with those of Levin, but they created significant strain on the Wolf business, which led to same-store sales declines of approximately 22% in Wolf in the second half of fiscal year 2019, as well as meaningful turnover of tenured sales staff.

- **Changes to Inventory Mix and Showroom Layout**. In the same year, the Company turned over approximately 60% of its furniture assortment and reorganized many of its flagship showroom floors by "lifestyle" instead of by category of product, which negatively impacted sales and led to increased markdowns from product that was not easily saleable.

As a result of these challenges, the Company's Adjusted EBITDA decreased significantly in each fiscal year since 2016 and dropped to negative for the twelve months ended December 31, 2019.

10.     Faced with rapidly declining profitability, the Company made key leadership changes in summer 2019 that it deemed necessary to stem the downward trajectory and recover sales and profits. In August 2019, the Company's board of directors (the "Board") terminated the Company's then-current Chief Executive Officer, its Chief Merchant, its Head of Stores, and several other executives. It promoted a Company veteran to the role of Chief Merchant in August 2019, and, in September 2019, the Board hired a mattress industry turnaround executive as Chief Executive Officer. The Board also named Gary Van Elslander, the former President of Art Van, as Chairman of the Board, in an effort to improve morale and re-establish a connection between the Company's employees and customers with the namesake of the business. During this period, the Company also launched a new marketing campaign intended to differentiate the business against a competitive landscape, and it improved its e-commerce operating systems, including its website.

11.     In the summer and fall of 2019, the Company took further actions to create additional liquidity and extend the runway for management to execute on a sales-led operational turnaround:

PA00122

- In November, 2019, the Company amended its asset-backed loan ("ABL") facility with Wells Fargo Bank, National Association ("Wells Fargo") to increase the size of the facility from $60 million to $82.5 million.

- In summer 2019, the Company engaged Evercore Group L.L.C. ("Evercore") as investment banker and undertook a review of strategic alternatives, including efforts to identify potential buyers for all or portions of the business.

- In December 2019, the Company secured an amendment to its term loan credit facility, which allowed the Company to suspend cash interest payments and mandatory amortization under the term loan.[2]

- In the fall and winter of 2019, the Company also was implementing a cost reduction and profit improvement plan, which was predicated on (a) reducing marketing expenses as a percentage of sales; (b) increasing gross margin through improved coordination of the merchandising, marketing, and in-store sales teams; and
(c) decreasing occupancy costs.

12.     Throughout this time, the Company also was focused on optimizing its lease

portfolio and reducing rent expense:

- With the assistance of its financial advisor, Alvarez & Marsal North America, LLC ("A&M") the Company created a store footprint optimization analysis that supported store closure plan.

- The Company hired real estate restructuring advisers Jones Lang LaSalle ("JLL") and Newmark Knight Frank to lead discussions with key landlords to reduce rent expense given the Company's decline in sales and to close 49 underperforming locations (including 31 mattress locations), consistent with and supported by the above-referenced store closure plan.

- The Company hired an accounting advisory firm in November, 2019, to create standardized and reliable schedules of store-level financials needed for JLL and Newmark Knight Frank to be able to engage in productive negotiations with the Company's lessors.  This effort was completed in January, 2020, and the real estate brokers began discussions with key lessors shortly thereafter.

---

[2]     Despite these liquidity enhancements, the Company also faced offsetting liquidity challenges.  Certain companies, including The CIT Group ("CIT"), which provided accounts receivable factoring services to the Company's suppliers, refused to factor receivables owed by the Company unless the Company issued CIT and other factoring companies letters of credit under its ABL facility.  These letters of credit reduced availability under the Company's ABL facility by $10 million, further exacerbating the Company's liquidity constraints.

PA00123

13.     In late January, 2020, the Company unexpectedly faced further liquidity constraints due to a reduction in the Company's "borrowing base," which is required collateral support for borrowing under the ABL facility.  At the same time, certain financial partners of the Company began to demand additional collateral and tightened access to credit as a result of the Company's weak financial results.   These financial partners included credit card processing companies, including Bank of America Merchant Services and PNC Merchant Services—who are critical to the Company's ability to accept credit cards in stores and on-line for customer purchases—as well as providers of consumer credit.  In total, this group demanded approximately $33 million in collateral through holdbacks to fund reserves and letters of credit.

14.     As a result of the impending liquidity crisis created by the shrinking borrowing base, poor operating cash flow, and the collateral demands, the Company was unable to issue "clean" audited financial statements (*i.e.*, without a potential "going concern" qualification), which led to a default under the Company's ABL facility, as well as various other contractual arrangements, including certain leases.  Wells Fargo agreed to forbear from exercising remedies on account of such default until February 28, 2020, to give the Company time to explore opportunities to raise additional capital and restructure its debt obligations.  As part of this short forbearance, Wells Fargo required the Company to comply with cash dominion, and also required the Company to begin immediate preparations for a "going-out-of-business" liquidation in the event ongoing efforts to raise capital did not materialize before the forbearance period expired.

15.     Against this backdrop, with the assistance of Evercore and A&M, the Company held discussions with at least 31 potential buyers and investors, including its term loan lender, FS KKR Capital Corp. and affiliates ("KKR"), about potential transactions to recapitalize or sell all

PA00124

or parts of the business.[3]  Following a short evaluation period, KKR declined to make a new money investment in Art Van pursuant to any recapitalization transaction.  The most likely and promising alternative that emerged was an out-of-court recapitalization transaction involving a consortium of investors that included a new-money investment from THL, the Van Elslander family, and three important suppliers to the Art Van business (the "Consortium").  The transaction contemplated the Consortium investing significant new capital into the Company and refinancing the existing ABL facility.[4]  The Consortium also sought and received support for the transaction from the Company's five largest lessors (the "Master Lessors"), in which the Master Lessors agreed to reduce rent obligations on the company and allow Art Van to close certain underperforming locations.  The Consortium submitted a letter of intent to the Company outlining the details of its proposal on February 20, 2020, followed by a further letter of intent on February 26, 2020, discussing the Consortium's progress in arranging the transaction.  Unfortunately, the Consortium ultimately failed to secure the necessary capital commitments due to a variety of circumstances, including, but not limited to, the significant equity market impact of the coronavirus during the week of February 24, 2020, and the resulting deleterious effect on Consortium investors' willingness to contribute capital.  Over the weekend of March 1, 2020, the Company, its Board, and the Company's advisors worked with JLL and the Master Lessors to attempt to replace the deficit in the Consortium investment with a new money investment from the Master Lessors in the form of a lease incentive investment, but on Monday, March 2, 2020, certain Master Lessors declined to participate in the proposed transaction as revised.

---

[3]   Immediately prior to the Petition Date, KKR assigned the claims and obligations under the term loan to HGB AVF Lending, LLC, which is an affiliate of Hilco Merchant Resources, LLC.

[4]   KKR also agreed to participate in the Consortium Bid by exchanging its term loan into a percentage of the pro forma equity and new debt *pari passu* with the Consortium investment.

PA00125

16.     After the Company's forbearance with Wells Fargo expired on February 28, 2020, the Company went into default under its credit facilities and focused its attention on launching a going-out-of-business process to preserve value.  Based on the expected timing for commencing the liquidation process, any delay in a launch of the going-out-of-business sales could have caused the process to continue into May and, therefore, necessitate the payment of May rent at locations still active in the liquidation at that time.  The Company also had not received substantial shipments of new product since early February given it was no longer making payments to vendors, and, as such, sales were decreasing and weekly cash burn was increasing.

17.     With no actionable alternatives, and given the urgency with which Wells Fargo was pressing the Company and its advisors to proceed, the Company began executing on plans for an orderly wind-down of the Company's operations and a liquidation of its inventory (the "Wind Down").  The Company and its advisors negotiated extensively with the Company's secured lenders to ensure that customer deposits, credits, and/or refunds, as well as payment of certain administrative costs, were contemplated by the agreed budget for the Wind Down process.  In particular, as a result of these negotiations, the Company has implemented a process for addressing customer deposits whereby customers can elect to: (a) receive the merchandise they purchased if such merchandise is present in the Art Van warehouses; (b) receive a credit in an amount equal to their deposits that can be used to purchase alternative merchandise at discounted prices during the Wind-Down, if the originally purchased merchandise is not available; or (c) cancel their order and submit a request to refund their deposit, which request would be processed as soon as practicable depending on the volume of refund requests, required processing times, and the timing and availability of cash proceeds generated by the Wind Down.[5]

---

[5]     The relief requested with respect to the customer deposits, credits and/or refunds is set forth in the *Debtors'
        Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain*

PA00126

18.     To facilitate the Wind Down, the Company and its advisors solicited bids from potential liquidators to conduct store closing sales, and received bids from various parties, including a proposal from certain parties to acquire certain of the Company's intellectual property and other assets.  After discussions with several firms that specialize in store closings and inventory dispositions, and with input from its secured lenders, the Company entered into a consulting agreement with a contractual joint venture (as amended and restated, the "Consultant Agreement") of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Consultant") to conduct the store closing sales.  The Consultant Agreement is an expense-based arrangement in which the Consultant will provide reimbursement of all supervisor costs, reasonable and documented travel expenses, and general legal fees subject to the caps set forth in the Consultant Agreement.  The Debtors expect to move swiftly through these chapter 11 cases to minimize costs, with an expected timeline for completing the store closing sales of approximately six to eight weeks.  To maximize recoveries and minimize administrative expenses, the Company announced and initiated a soft launch of the store closing sales on March 5, 2020,[6] and seeks to expedite the remaining store closure sales in order to complete them within six to eight weeks.

19.     In parallel with preparations for the Wind-Down, the Company continued to engage with interested parties regarding alternative transactions, which ultimately resulted in a proposal to preserve the Levin business segment and a portion of the Wolf business segment as a going-

---

*Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief*, filed contemporaneously herewith, and remains subject to approval by the Bankruptcy Court.

[6]     Upon commencement of the store closing sales, Bank of America, N.A., Banc of America Merchant Services, LLC ("BAMS"), one of the company's credit card processors, immediately issued notice of its intent to hold 100 percent of all sale proceeds as a reserve.  The filing of petitions on March 8, 2020, initiated an automatic stay against any action to control property of these estates and the Debtors reserve all rights and causes of action against BAMS, including with respect to potential preference claims.  In addition, on March 6, 2020, Broadstone AVF Illinois, LLC, and Broadstone AVF Michigan, LLC (collectively, "Broadstone"), two of the Company's Master Lessors, initiated a lawsuit against the Company in Illinois federal court, alleging, among other things, various defaults under their respective leases related to the commencement the store closing sales.

PA00127

concern.  In the days leading up to the Petition Date, the Company, with the assistance of its

advisors, extensively negotiated and reached an agreement-in-principle with Robert Levin, the

former owner of Levin Furniture, regarding a going-concern sale of certain of the assets of Sam

Levin, Inc. and LF Trucking, Inc. (the "Levin-Wolf Sale").  The key terms of the Levin-Wolf Sale

are set forth in a letter of intent, dated as of March 4, 2020, a copy of which is attached hereto as

**Exhibit B** (the "Levin-Wolf LOI").  As set forth in the Levin-Wolf LOI, the Levin-Wolf Sale will:

- provide for cash and non-cash consideration, including the assumption of liabilities related to customer deposits, employee obligations, specified cure costs, and potential claims under section 503(b)(9) of the Bankruptcy Code;

- preserve nearly 1,000 jobs; and

- provide for the continued operation of approximately 44 retail store locations under the Wolf and Levin store banners and two related distribution centers.

20.     The Company expects to move forward with definitive documentation for, and

approval of, the Levin-Wolf Sale on an expedited basis.  The Company believes effectuating the

Levin-Wolf Sale on an expedited basis is critical to avoiding employee attrition and other potential

value leakage related to the simultaneous Wind Down of the Company's other operations.  The

Levin-Wolf Sale is supported by the Company's secured lenders.

21.     To familiarize the Court with the Debtors, their business, the circumstances leading

to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions (defined

below and filed contemporaneously herewith) this Declaration is organized as follows:

- **Part I** provides a general overview of the Debtors' corporate history and business operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

PA00128

- **Part III** provides a discussion of the circumstances leading to these chapter 11 cases and the Debtors efforts to pursue alternate restructuring options; and

- **Part IV** sets forth the evidentiary basis in support of the relief requested in each of the First Day Motions.

## I.    The Company's Corporate History and Business Operations.

### A.    Corporate History

22.    Mr. Art Van Elslander founded Art Van Furniture in 1959 with the first location on Gratiot Avenue and 10 Mile Road in East Detroit, Michigan.  From 1959 through the 1970s, Mr. Van Elslander focused on building the foundation for his furniture store footprint.  During this time he opened additional stores and acquired the current corporate headquarters and distribution center in Warren, Michigan.  From 1980 to 2000, Art Van Furniture focused on its expansion in the state of Michigan and introduced the first Art Van credit card, the clearance center concept, and ArtVan.com.  By 1997, following growth in the early to mid-1990s, the Company had increased in size to a total of twenty-six stores with over 2,600 employees.  Further, in the following decade the Company would open seven more stores for a total of 33 stores in 2009.  In this most recent decade, the Company experienced its most intense growth phase under former CEO Kim Yost, who led the business from 2009 until his departure in 2018.  In 2010, the Company began to execute on its freestanding PureSleep mattress store thesis.  From 2011–2015, the Company acquired 27 Mattress World stores, began franchising, and entered the Chicago market.  Upon Art Van Elslander's sale of the Company in 2017, the enterprise had 113 stores, more than triple the amount of stores than it did in 2009.  Around this time, the Company was ranked as number nineteen on Furniture Today's "Top 100 list."

23.    In 2016, founder and sole owner Art Van Elslander decided to explore exit opportunities and engaged in a transaction to sell the Company and its owned real estate to THL

PA00129

for $612.5 million, which transaction closed in March 2017 (the "2017 Transaction").  At the closing of the 2017 Transaction, THL acquired the operating assets of the business and certain real estate investment trusts acquired the owned real estate portfolio.  The proceeds from the sale-leaseback transaction were used to fund the purchase price paid to the selling shareholders.  Later in 2017, the Company acquired two Pennsylvania-based furniture companies:  Levin, with operations in greater Pittsburgh and Cleveland, and Wolf, with operations in eastern Pennsylvania, Maryland, and Virginia.  The Company continued its growth strategy through further geographic expansion and new store openings, and it also invested in e-commerce capabilities to bolster the brand and improve consumer experiences.  As of the Petition Date, the Company has 92 total furniture showrooms and 77 freestanding mattress and specialty locations.

**B.**      **The Company's Products.**

24.      Since its founding, Art Van Furniture has focused on retailing high-quality, made-to-last furniture that is available to customers across all price points.  Art Van Furniture delivers an array of merchandise and uses a "Good-Better-Best" approach to pricing, which allows the Company to play up and down the value spectrum.  The Debtors' store locations feature a seasonally refreshed assortment that has both exclusive and national brands, traditional and fashion-forward merchandise, and an optimal mix to maximize sales per square foot performance.  To support the customer experience, Art Van Furniture has a financing program to offer customers flexibility in purchasing larger and more expensive items.  Key comparable companies in the industry include Ashley Furniture, Raymour & Flanigan, Haverty's, Mattress Firm, and Rooms To Go.  Other relevant companies in the industry include Bob's Discount Furniture, IKEA, Ethan Allen, Restoration Hardware, and Gardner White.

PA00130

**C.** **The Company's Brands.**

25. The Company operates stores under five primary retail nameplates: Art Van®, Art Van PureSleep®, Scott Shuptrine Interiors, Levin, and Wolf. The respective stores operate as follows:



***Art Van*** features high-quality, made-to-last furniture featuring deals on furniture for every room in your home.



***Pure Sleep*** features top brand mattress and other sleep and bedding related goods and products at accessible prices.



***Scott Shuptrine*** is primarily a store-within-a-store format offering exclusive and custom designed home furniture and furnishings



***Levin Furniture***, including the ***Levin Mattress*** nameplate, features a wide selection of modern and stylish living room, dining room, and bedroom furniture, including mattresses, with operations in the greater Pittsburgh and Cleveland area.



***Wolf Furniture*** features a wide selection of eclectic furniture from around the country, including Amish made furniture, with operations in Pennsylvania, Maryland and Virginia.

The Art Van and Art Van PureSleep nameplates have their own standalone stores and operate under the website artvan.com. Both Levin Furniture (including Levin Mattress) and Wolf Furniture nameplates operate their own standalone stores and operate under the websites levinfurniture.com and wolffurniture.com, respectively.

**D.** **The Company's Business Operations.**

26. The Company markets and sells its merchandise through a variety of different channels, including stand-alone stores, franchised locations, and their e-commerce platforms.

PA00131

### 1. Brick-and-Mortar Presence.

27. ***Stand-Alone Stores.*** The Company maintains a substantial domestic presence. Currently, the Company operates 169 stores across 9 states. Of these, 92 are showroom and 77 are freestanding sleep and specialty stores. Certain furniture showroom locations have attached Clearance Center & Outlet stores to sell discounted products and merchandise.



28. ***Franchise Stores.*** The Company also has arrangements with franchisees (each, a "Franchise Store"). There currently are 20 Franchise Stores across the United States. The Franchise Stores are subject to franchise agreements with the Company, pursuant to which Company supplies franchisees with product and receives a royalty on sales.

### 2. E-Commerce Platform.

29. In addition to its physical footprint, the Company maintains a user-friendly and well-curated e-commerce platform with the goal of facilitating a complete, omnichannel customer experience to help educate them before they arrive at a showroom. Customers can seek out the latest home furnishing trends, explore different options for an array of different furniture styles, and purchase furniture online. In 2019, e-commerce accounted for approximately 2% of sales.



15

### 3. Distribution Centers

30.     The Company primarily operates from two principal distribution centers, one of which is co-located with Art Van's headquarters in Warren, MI.  The second distribution center is located in Smithon, PA.

## II.     The Company's Prepetition Corporate and Capital Structure.

31.     A summary chart depicting the Debtors' corporate structure is attached to this Declaration as **Exhibit A**.  As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations under the Prepetition ABL Credit Facility and the Prepetition Term Loan (each as defined herein) in the aggregate principal amount of approximately $208.5 million.  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Principal Outstanding as of the Petition Date |
|---|---|---|
| Prepetition ABL Credit Facility | March 1, 2022 | $33.5 million |
| Prepetition Term Loan | March 1, 2024 | $175 million |
| Total Funded Debt | | $208.5 million |

## A.     The Prepetition ABL Credit Facility.

32.     The Debtors are party to that certain amended and restated senior secured revolving credit facility, dated as of March 1, 2017 (as amended from time to time the "Prepetition ABL Credit Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower agent, certain of its subsidiaries, as subsidiary borrowers, certain of its subsidiaries, as guarantors, and Wells Fargo, as administrative agent collateral agent, and issuing bank, and the Lenders party thereto.  The Prepetition ABL Credit Agreement provides for total revolving credit commitments of $82.5 million with a maturity date of March 1, 2022 (the "Prepetition ABL Credit Facility").

16

PA00133

Approximately $33.5 million is currently outstanding in principal under the Prepetition ABL Credit Facility.

33.     The obligations under the Prepetition ABL Credit Facility are secured by a security interest in substantially all of the Debtors' assets. However, solely with respect to liens on certain of the Debtor's fixed assets, the liens securing the Prepetition ABL Credit Facility on such assets are subordinated, to the extent set forth in that certain intercreditor agreement, dated March 1, 2017 (as amended from time to time, the "Intercreditor Agreement"), to the payment in full of the obligations in respect of the Prepetition Term Loan. The Prepetition ABL Credit Agreement contains various affirmative and negative covenants, representations, and warranties, including a covenant that the Debtors maintain a certain amount of excess availability. Due to the Debtors' deteriorating financial performance, Wells Fargo increased certain reserves in the months leading up to the Petition Date.

**B.     The Prepetition Term Loan.**

34.     The Debtors are party to that certain term loan credit agreement (the "Prepetition Term Loan Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower, certain of its subsidiaries, as guarantors, Virtus Group, LP ("Virtus"), as administrative agent and collateral agent, and the lenders party thereto. The Prepetition Term Loan matures on March 1, 2024 (the "Prepetition Term Loan"). Approximately $175 million is currently outstanding in principal on the Prepetition Term Loan.

35.     Obligations under the Prepetition Term Loan are secured by a security interest in substantially all of each Debtor's assets. However, solely with respect to liens on the Debtor's trade receivables, inventory, cash intangibles and other assets collectively referred to as ABL Priority Collateral in the Intercreditor Agreement, the liens securing the Prepetition Term Loan on

PA00134

such assets are subordinated, to the extent set forth in the Intercreditor Agreement, to the payment in full of the obligations in respect of the Prepetition ABL Credit Facility.

36.       The Prepetition Term Loan Agreement was subsequently amended, including on February 5, 2020 (the "Term Loan Amendment").  Among other things, pursuant to the Term Loan Amendment, Virtus and certain of the Prepetition Term Loan lenders agreed to extend the deadline to deliver the 2019 annual financial statements to February 28, 2020.

## III.    Additional Information Regarding the Debtors' Efforts to Pursue Alternate Restructuring Options.

37.       Recognizing the need to explore strategic alternatives, the Debtors worked closely with THL and their advisors to evaluate available solutions to the Debtors' deteriorating circumstances, including efforts to continue the business as a going concern by means of one or more out of court transactions.

### 1.    Prepetition Marketing Process.

38.       The Debtors, with the assistance of their advisors, Evercore and A&M, engaged in discussions with various parties considered to be potential investors in the business.  Evercore and A&M compiled diligence information and responded to a high volume of diligence requests from multiple interested parties.

39.       Prior to the Petition Date, Evercore and members of the Board contacted at least 31 potentially interested strategic, financial, corporate and individual parties, including at least 19 parties interested in the whole company and at least 12 parties interested in Levin and/or Wolf. Many of these parties entered into confidentiality agreements with the Debtors and received various confidential information documents, and thus began the diligence process.  As discussed above, the Debtors made substantial progress towards consummation of the Consortium Proposal, but due to market conditions and the uncertain financial viability of the business, the Debtors were

PA00135

unable to secure investments needed for an actionable going-concern reorganization of the entire business.

### 2. The Expedited Levin-Wolf Sale.

40.     Prior to the Petition Date, Robert Levin, the former owner of the Levin entities, submitted a written proposal, and the Debtors worked to finalize the Wolf-Levin LOI, pursuant to which Robert Levin will purchase substantially all of the assets of Debtors Sam Levin, Inc. and LF Trucking, Inc., excluding inventory located at the eight Maryland and Virginia Wolf locations (the "Assets"), as part of an expedited sale process under section 363 of the Bankruptcy Code.  The purchase price consists of a combination of cash consideration and assumed liabilities, including: a cash payment equal to 82.25% of the agreed value of Wolf and Levin's actual cost of goods and freight, the amount of allowed section 503(b)(9) claims related to the Assets, the amount of any cure costs for executory contracts or unexpired leases assumed as part of the Levin-Wolf Sale, and an incremental payment of $3,650,000.  The Levin-Wolf Sale also contemplates the assumption of customer deposits and employee obligations related to the Wolf and Levin business.

41.     After hard-fought negotiations, the Debtors and Robert Levin reached an agreement on material terms and are currently moving toward definitive documentation.  The Debtors are commencing an expedited sale process to close the Levin-Wolf Sale to prevent continued diminution of value and mitigate the risk of employee and customer attrition as the Debtors contemporaneously pursue the Wind-Down with respect to the Art Van store portfolio.  The Levin-Wolf Sale contemplates the following timeline:

- the Debtors shall file a motion to approve a private sale of the Assets to Robert Levin no later than five (5) days following the Petition Date;

- the buyer and Debtors shall enter into an asset purchase agreement for the sale of the Assets no later than ten (10) days following the Petition Date; and

PA00136

- the Court shall enter an order approving the asset purchase agreement no later than twenty-one (21) days following the Petition Date.

42.     The Debtors expect the Levin-Wolf Sale to maximize recoveries for the Debtors' creditors as well as to preserve jobs and the Levin and Wolf brands.

### 3.     Store Closings.

43.     Due to the challenges discussed above, and at the direction of Wells Fargo, the assets not included in the Levin-Wolf Sale will be subject to going-out-of-business sales conducted in accordance with the Consultant Agreement.  To avoid incurring any unnecessary administrative expenses with respect to certain facilities where the Debtors are no longer operating and retain no assets of value, the Debtors expect to take a number of steps to reduce their expenses moving forward, including filing contract and lease rejection motions, pursuant to which the Debtors will seek to reject store leases and contracts that the Debtors and their advisors have determined are no longer be necessary to the Debtors' business operations.

## IV.     Relief Sought in First Day Motions.

44.     Contemporaneously herewith, the Debtors filed the First Day Motions seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  A list of the First Day Motions is attached hereto as **Exhibit C**.

45.     These First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, honor employee-related wages and benefit obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to

give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

46.    Several of these motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

47.    I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; and (b) best serves the interests of the Debtors' stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

*[Remainder of Page Intentionally Blank]*

PA00138

Dated:  March 8, 2020                    _/s/ David Ladd_
Wilmington, Delaware                     Name: David Ladd
                                         Title:   Executive Vice President and Chief Financial
                                                  Officer

PA00139

**Exhibit A**

**Corporate and Capital Structure**

PA00140



PA00141

**<u>Exhibit B</u>**

**Levin-Wolf LOI**

PA00142

March 4, 2020

David Ladd, Chief Financial Officer
Michael Zambricki, Vice President and General Counsel
Sam Levin, Inc.
LF Trucking, Inc.
6500 E 14 Mile Rd
Warren, MI 48092

Re:     Purchase of Substantially All of the Assets of Sam Levin, Inc. and LF Trucking, Inc.
Assets by a Newly-Formed Entity Owned and Controlled by Robert Levin

This non-binding letter of intent (this "Letter Agreement" is intended to confirm certain understandings between Company representatives, Sam Levin, Inc., LF Trucking, Inc. and Buyer (defined below) with respect to the potential purchase by Buyer of substantially all of the assets free and clear of all liens, claims and encumbrances except for such liabilities explicitly assumed by Buyer pursuant to an order of the Bankruptcy Court (defined below). If this letter of intent accurately summarizes the understanding of Company representatives, Sam Levin, Inc. and LF Trucking, Inc. with respect to the potential transaction, please date and execute this letter of intent and return the same to me.

| | |
|---|---|
| **Buyer:** | Levin Furniture, LLC and Levin Trucking, LLC, newly formed entities controlled by Robert Levin, ("Buyer") (Buyer, Sam Levin and LF Trucking, Inc. are each a "Party", herein collectively referred to as the "Parties"). |
| **Seller:** | Sam Levin and LF Trucking, Inc. |
| **Purchased Assets:** | Substantially all of the assets of Sam Levin, Inc. and LF Trucking, Inc. (the "Assets"), excluding the inventory located at the eight Maryland and Virginia Wolfe locations. |
| **Purchase Price:** | The Inventory Valuation (defined below), *less* any amounts of customer deposits and employee obligations existing as of the date of closing *plus* the amount of section 503(b)(9) claims allowed pursuant to an order of the Bankruptcy Court (defined below) and any cure costs associated with any leases and/or executory contract designated for assumption by the Buyer and approved for such assumption and assignment by an order of the Bankruptcy Court (defined below) (the customer deposits, employee obligations, section 503(b)(9) claims and cure costs will be referred to herein as "Additional Consideration") *plus* $3,650,000 related to FF&E and other related assets. |
| | The term "Inventory Valuation" means 82.25% of the estimated value of the Seller's actual cost of goods plus freight based upon actual record receipts provided by Seller (which valuation excludes the value of the inventory located at the eight Maryland and Virginia Wolfe locations we estimate to be over $4,500,000). |

**Security Deposit:** Buyer will deposit $2,000,000 in cash (the "Deposit") promptly following execution of this Letter Agreement in an interest bearing escrow account held by a mutually agreeable escrow agent pursuant to a commercially reasonable escrow agreement. The Deposit is refundable in the following instances: 1) the Seller terminates the transaction or otherwise materially breaches any of its obligations under the definitive documentation required to implement the transactions contemplated hereby; 2) the Bankruptcy Court does not approve the transaction; 3) the Bankruptcy Court approves an alternative transaction for the sale of the Assets; or 4) the transaction does not close on or before 30 days from the Petition Date (defined below). The Deposit is non-refundable in the event the Buyer terminates the transaction unilaterally or otherwise materially breaches any of its obligations under the definitive documentation required to implement the transactions contemplated hereby..

**Fiduciary Duty:** Notwithstanding anything to the contrary in this Letter Agreement or the Definitive Agreements (defines below), nothing in such agreements shall require a Debtor party or the board of directors, board of managers, or similar governing body of a Debtor party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the restructuring transactions contemplated by this letter of intent to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction shall not be deemed to constitute a breach of those agreements.

**Bankruptcy Filing:** No later than March 8, 2020,or such other date as may be agreed to by the Parties (the "Petition Date") Sam Levin, Inc. and LF Trucking, Inc. (the "Debtors") shall file voluntary petitions for protection under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court").

**Sale Process:** No later than 5 days following the Petition Date, or such other date as may be agreed to by the Parties, the Debtors shall file a motion to approve private sale of the Assets to Buyer ("Sale Motion"). The Sale Motion must explicitly request approval of the sale of the Assets to Buyer without futher marketing, competitive bidding or an alterntive transaction.

No later than 10 days following the Petition Date, or such other date as may be agreed to by the Parties, Buyer and Seller shall enter into an asset purchase agreement for the sale of the Assets in a form reasonably acceptable to Buyer, subject only to Bankuptcy Court approval ("Asset Purchase Agreement").

No later than 21 days following the Petition Date, or such other date as may be agreed to by the Parties, the Bankruptcy Court shall enter an order approving the Asset Purchase Agreement and the closing of the sale of the Assets to Buyer free and clear of all liens, claims and excumbrances, other than such claims explicitly assumed by Buyer in the Asset Purchase Agreement with a finding that the Buyer is a "good faith purchaser" for sufficient value for the Assets and approval of the assumption and assignment of unexpired leases and executory contracts designated by the Buyer for such assumption and assignment ("Sale Order").

Until the entry of the Sale Order, the Buyer has the right to designate which unexpired leases and executory contracts shall by assumed and assigned pursuant to the Sale Order. Seller shall cooperate with Buyer to permit Buyer access to the Seller's landlords for the purpose of negotiating amendments to such leases.

The Sale Order shall include an explicit provision waiving any stay of the Sale Order (i.e. Federal Rule of Bankruptcy Procedure 6004(f)) to permit the Buyer and Seller to close promptly upon entry of the Sale Order.

**Expenses:** Each of the Parties would pay their own legal fees and other incidental expenses incurred in connection with the transactions contemplated hereby.

**Due Diligence:** Buyer waives any due diligence, other than verification of the Inventory Valuation and any items that comprise the Additional Consideration.

**Closing Date:** The Buyer and Seller shall close on the transaction within two (2) business days from the entry of the Sale Order.

**Closing Conditions:** Closing shall occur, and the Definitve Agreements (defined below) shall become effective, only upon timely entry of the Sale Order in a form and manner acceptable to Buyer in accordance with the timeframes set forth herein.

**Documentation:** The Parties intend to prepare and negotiate (i) the Asset Purchase Agreement, and (ii) any other agreements reasonably necessary to consummate the transactions contemplated hereby.

**Miscellaneous:** This letter of intent sets forth the intent of the Parties with respect to the transactions contemplated hereby but does not create any legal or binding obligation, except for the provisions set forth under the title "Miscellaneous" of this letter of intent (the "<u>Binding Provisions</u>"), which provisions shall be binding on each Party. Except for the Binding Provisions, no other obligation will arise unless and until mutually satisfactory definitive documentation, including the Asset Purchase Agreement (the "<u>Definitive Agreements</u>"), has or have been executed and delivered by the Parties hereto. This letter of intent will be governed by the laws of the Commonwealth of Pennsylvania and may not be amended, and no provision hereof may be waived or modified, except by an instrument in writing signed by the party to be bound. This letter of intent may be executed in any number of counterparts, each of which shall be deemed to be an original. This letter of intent shall not become effective until executed by all Parties.

Sincerely,

Levin Furniture, LLC

By: _Robert Levin_
Print Name: _Robert Levin_
Title: _President_
Date: _3/4/20_

Levin Trucking, LLC

By: _Robert Levin_
Print Name: _ROBERT LEVIN_
Title: _President_
Date: _3/4/20_

*Duly Executed and Agreed to by Seller:*

Sam Levin, Inc. / LF Trucking, Inc.

By:
Print Name: Michael Zambricki
Title: Secretary
Date: Sam Levin, Inc.
March 4, 2020

By:
Print Name: Michael Zambricki
Title: Secretary, LF Trucking, Inc
Date: March 4, 2020

PA00147

**Exhibit C**

**First Day Motions**

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief;*

- *Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of an Order (A) Authorizing the Debtors to File a (I) Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (III) Redact Certain Personally Identifiable Information for Individual Creditors and Interest Holders and (B) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (V) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement, and (IV) Granting Related Relief;* and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Specified Lienholder Claims and (II) Granting Related Relief.*

# EXHIBIT B

PA00150

```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3                                    .      Chapter 11
         IN RE:                       .
 4                                    .      Case No. 20-10553 (CSS)
         ART VAN FURNITURE, LLC, et al., .
 5                                    .      Courtroom No. 6
                                      .      824 North Market Street
 6                                    .      Wilmington, Delaware 19801
                                      .
 7                        Debtors.    .      March 10, 2020
         . . . . . . . . . . . . . . . . .  10:00 A.M.
 8

 9                  TRANSCRIPT OF FIRST DAY HEARING
             BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
10                  UNITED STATES BANKRUPTCY JUDGE

11       APPEARANCES:

12       For the Debtors:           Gregory G. Werkheiser, Esquire
                                    Michael J. Barrie, Esquire
13                                  Jennifer Hoover, Esquire
                                    Kevin Capuzzi, Esquire
14                                  John C. Gentile, Esquire
                                    BENESCH, FRIEDLANDER, COPLAN
15                                     & ARONOFF LLP
                                    222 Delaware Avenue, Suite 801
16                                  Wilmington, Delaware 19801

17

18       Audio Operator:           Leslie Murin

19       Transcription Company:    Reliable
                                    1007 N. Orange Street
20                                  Wilmington, Delaware 19801
                                    (302)654-8080
21                                  Email: gmatthews@reliable-co.com

22       Proceedings recorded by electronic sound recording, transcript
         produced by transcription service.
23

24

25
```

PA00151

```
1   APPEARANCES (Continued):

2   For the Debtors:          Marua I. Russell, Esquire
                              MONTGOMERY MCCRACKEN WALKER
3                               & RHOADS LLP
                              437 Madison Avenue, 24th Floor
4                             New York, New York 10022

5
    For U.S. Trustee:         Linda Richenderfer, Esquire
6                             David Buchbinder, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
7                             OFFICE OF UNITED STATES TRUSTEE
                              844 King Street, Suite 2207
8                             Lockbox 35
                              Wilmington, Delaware 19801
9
    For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                            MORGAN LEWIS & BOCKIUS LLP
                              101 Park Avenue
11                            New York, New York 10178

12
                              - and -
13
                              Cory Falgowski, Esquire
14                            BURR & FORMAN LLP
                              1201 N. Market Street, Suite 1407
15                            Wilmington, Delaware 19801

16  For Kingsdown, Inc.:      Gregory Taylor, Esquire
                              ASHBY & GEDDES LLP
17                            500 Delaware Avenue, 8th Floor
                              P.O. Box 1150
18                            Wilmington, Delaware 19899

19
    For Landlords:            Leslie C. Heilman, Esquire
20                            BALLARD SPAHR LLP
                              919 North Market Street, 11th Floor
21                            Wilmington, Delaware 19801

22  For Hilco & Gordon        Steven E. Fox, Esquire
    Brothers:                 RIEMER & BRAUNSTEIN LLP
23                            Times Square Tower, Suite 2506
                              Seven Times Square
24                            New York, New York 10036

25
```

```
 1   APPEARANCES (Continued):

 2   For Levin Furniture:      William C. Price, Esquire
                               CLARK HILL PLC
 3                             One Oxford Centre
                               301 Grant Street, 14th Floor
 4                             Pittsburgh, Pennsylvania 15219

 5
     For US Assets, Inc.:      Zachary I. Shapiro, Esquire
 6                             RICHARDS, LAYTON & FINGER LLP
                               920 North King Street
 7                             Wilmington, Delaware 19801

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    <u>FIRST DAY MOTIONS</u>:

2    **Joint Administration Motion.** Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief [Docket No. 2]

3

4    **Ruling: Order Entered**

5    **Creditor Matrix Motion.** Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to File a (A) Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (B) Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, (III) Authorizing the Debtors to Redact Certain Personal Identification Information, and (IV) Granting Related Relief [Docket No. 6]

6

7

8

9    **Ruling: Order Entered**

10    **Kurtzman Carson Consultants LLC 156(c) Retention Application.** Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date [Docket No. 3]

11

12

13    **Ruling: Order Entered**

14    **Cash Management Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief [Docket No. 4]

15

16

17    **Ruling: Order Entered**

18    **Customer Programs Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief [Docket No. 27]

19

20    **Ruling: Order Entered**

21    **Cash Collateral Motion.** Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief [Docket No. 5]

22

23

24    **Ruling: Order Entered**

25

1 **Taxes Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees
2 and (II) Granting Related Relief [Docket No. 7]

3 **Ruling: Order Entered**

4 **Utilities Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future
5 Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing
6 Procedures for Determining Adequate Assurance of Payment, (IV) Requiring Utility Providers to Return Deposits for Utility Services
7 No Longer in Use, and (V) Granting Related Relief [Docket No. 8]

8 **Ruling: Order Entered**

9 **Wages Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages,
10 Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related
11 Relief [Docket No. 9]

12 **Ruling: Order Entered**

13 **NOL Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain
14 Transfers of and Declarations of Worthlessness With Respect to Common Stock and (II) Granting Related Relief [Docket No. 10]

15 **Ruling: Order Entered**

16 **Lienholder Claims Motion.** Debtors' Motion for Entry of Interim and
17 Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Specified Lienholder Claims and (II) Granting Related Relief [Docket
18 No. 11]

19 **Ruling: Order Entered**

20

21 EXHIBITS:                                    ID      Rec'd

22 Declaration of David Ladd                            52

23

24

25

PA00155

1           (Proceedings commence at 10:27 a.m.)

2                THE CLERK:  All rise.

3                THE COURT:  Please be seated.

4           Good morning, Mr. Werkheiser.

5                MR. WERKHEISER:  Good morning, Your Honor.  For

6     the record Gregory Werkheiser, Benesch Friedlander Coplan &

7     Aronoff LLP, proposed counsel for the debtors.

8                Thank you, Your Honor, for accommodating us so we

9     could have this expedited first day hearing in these cases.

10               If I may, Your Honor, just before we get underway,

11    I'd like to make some quick introductions to the court.

12               THE COURT:  Of course.

13               MR. WERKHEISER:  So, seated behind me, Your Honor,

14    is the debtors' chief financial officer and executive vice

15    president, Mr. David Ladd.

16               THE COURT:  Sir.

17               MR. WERKHEISER:  He's joined us from Detroit,

18    Illinois.  Also with us today, Your Honor, is Mr. Dennis

19    Stogsdill from Alvarez & Marsal North America.

20               THE COURT:  Welcome.

21               MR. WERKHEISER:  He leads the engagement with

22    Alvarez for this case.

23               THE COURT:  Very good.

24               MR. WERKHEISER:  Joining me, Your Honor, at

25    counsel's table, I think, are some familiar faces.  You know

1  Mr. Capuzzi, Mr. John Gentile, Kate Harmon, Jennifer Hoover;

2  all from the Benesch Firm.  Then our special counsel, Marua

3  Russell, who I know is familiar to this court as well.

4          THE COURT:  Welcome.

5          MR. WERKHEISER:  Just before we proceed, in the

6  press of getting everything done, we did not have an

7  opportunity to file a *pro hac* motion for Ms. Russell.  If the

8  court wanted to entertain an oral motion we will file for

9  something in writing.

10         THE COURT:  All right.  I assume she's admitted

11 somewhere.

12         MR. WERKHEISER:  I will represent that Ms.

13 Russell, to my understanding, is admitted and in good

14 standing in New York and other jurisdictions.  And we would

15 have no reservations at all in signing her *pro hac* motion.

16         THE COURT:  Very good.  Happy to admit you *pro hac*

17 *vice* pending entry of an order.

18         MR. WERKHEISER:  Thank you, Your Honor.

19         Your Honor, if its acceptable to the court what we

20 would propose to do is give Your Honor a brief overview, and

21 I'm going to emphasize because I know Your Honor is pressed

22 for time this morning and we've already taken some to try to

23 work out issues.  A brief overview of the case and the

24 company, and then what we would like to do is try to work

25 through what I think are the least controversial of the first

1   days; joint administration, the creditor matrix motion, KCC,

2   cash management, customer programs, taxes, utilities, wages

3   and lienholders.  I think then we would like to take up the

4   cash collateral, and I think the only open issues we're aware

5   of there at this point involves some comments from our U.S.

6   Trustees Office that in the time we had available we resolved

7   a lot of them, but we do have a couple outstanding still.

8        Then there are, of course, a couple of matters

9   that we did not have an opportunity to get on the docket

10  until last evening.  One is a supplement small DIP facility

11  that relates to just one of the debtors.  The second one is

12  the GOB sale motion.  We understand what the court said in

13  terms of scheduling of those matters.  We would like to just

14  discuss them with the court before the end of today's hearing

15  and see if we can't accomplish a little bit with those

16  motions and agree with people on a path forward.

17        THE COURT:  Okay.

18        MR. WERKHEISER:  So, Your Honor, again, to

19  expedite things I'm going to assume Your Honor has had a

20  chance to read our first day declaration.

21        THE COURT:  I did, yes.

22        MR. WERKHEISER:  So, this is on the spectrum of

23  Chapter 11 cases a more difficult case.  This is a company

24  that, you know, finds itself in significant distress and for

25  which the circumstances have dictated for the majority of the

1  business there is no other option but liquidation.  And so in

2  that sense it is regrettable that we have to be here today

3  because it means some jobs will be lost, and creditors, you

4  know, may not achieve recoveries that they were hoping for,

5  but I can assure you that the company and its advisors are

6  here today to do the best that they can to not only maximize

7  value, but to do this in a way that is most respectful of all

8  the stakeholders who are affected by this process and that,

9  you know, minimizes any harm to anyone as part of this

10  process.

11          The good news, Your Honor, is that despite all of

12  the head winds that this company faced leading to getting

13  here today, and being in the bankruptcy court, and the

14  inability to save the core, Art Van Furniture, business from

15  liquidation.  We are in the happy position of having a buyer

16  for the Wolf and Levin furniture lines.  These are two

17  Pennsylvania based furniture retailers that were acquired in

18  2017 from the Levin Family.  And they had performed somewhat

19  better than other parts of the business; although, they have

20  had their own challenges.

21          Fortunately, as part of the process that got us

22  here today, the company and its advisors were able to engage

23  successfully with them and ultimately to come to an

24  understanding on a proposed assert purchase acquisition of

25  the assets of the Sam Levin, Inc. entity, which is one of our

1  debtors, and LF Trucking, Inc., which is a second of our

2  debtors.  Those are the debtors that hold the assets related

3  to those two retail furniture lines.  We are going to be

4  seeking, although not shortening notice, but to proceed with

5  a very expedited sale process for that by, if at all

6  possible, a private sale process because of the, otherwise,

7  dire liquidity situation of the overall company.

8         Part of the relief that we had sought through the

9  filings yesterday was to get, when Your Honor can entertain

10  it, what would be a small inventory DIP for that piece of the

11  business which would encumber only those assets and none

12  others, then would ultimately be credited against the

13  purchase price to be paid for those assets when that sale

14  closes.  The concept there is to simply give the company

15  liquidity for a runway to purchase inventory and preserve

16  going concern value over the expedited sales process as

17  contemplated; just for context, Your Honor.

18         So, stepping back for a moment, Your Honor, I --

19  we are relatively recently involved as a firm in the case,

20  but in the short time that we have been on the case I've come

21  to understand that this company is, in a way, sort of an

22  iconic institution for a lot of people in the mid-west.  A

23  lot of people in Michigan especially, you know, have some

24  piece of Art Van Furniture in their house.  So, I think, you

25  know, even lawyers, and lawyers, obviously, are not the most

1  sentimental bunch in the world, lawyers who have called or

2  emailed me about this case since it filed have expressed, you

3  know, some bit of sadness that the company is going away, but

4  a fondness for the company over the years.  So, you know, we

5  are, sort of, mindful of that and will proceed accordingly.

6          The goal for this case, you know, given the

7  difficult circumstances, given the lack of access to capital

8  in the markets that was available to the company, and just eh

9  operational and financial challenges that it faced is, you

10 know, unfortunately to maximize value through a liquidation

11 of most of the locations, preserve the going concern on the

12 balance and hopefully save those thousand jobs, and provide a

13 benefit to those creditors.  To do that as expeditiously as

14 possible maximizing value and doing as little harm to our

15 creditors and other stakeholders as possible along the way.

16          Again, I think I will cut-off opening comments

17 there, Your Honor, and jump right into the first day agenda

18 unless Your Honor has questions or comments before we proceed

19 with that.

20          THE COURT:  I do not.  Thank you very much.

21          MR. WERKHEISER:  Thank you.

22          Your Honor, I'm going to turn the podium over to

23 Mr. Gentile who's going to present our joint administration

24 motion, then I or Mr. Capuzzi will be back up at the podium

25 in just a moment.

1          THE COURT:  Okay.

2          MR. GENTILE:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. GENTILE:  John Gentile from Benesch

5   Friedlander Coplan & Aronoff LLP, proposed counsel for the

6   debtors.

7          Before we get started, Your Honor, I have a stack

8   of orders here.  May I approach?

9          THE COURT:  Yes, you may.  Thank you.

10          MR. GENTILE:  Your Honor, before I begin just one

11   slight change in scheduling.  I'm going to be handling the

12   joint admin and the KCC retention app.  I think the creditor

13   matrix is sandwiched in between, and Kevin Capuzzi is going

14   to handle that one.

15          THE COURT:  Okay.

16          MR. GENTILE:  So, for our first motion the debtors

17   request that they be allowed to administer these cases

18   jointly.  There are no objections to the joint admin.  So, we

19   ask that the court enter the order.

20          THE COURT:  Any changes?

21          MR. GENTILE:  No changes.

22          THE COURT:  Do you have a copy that doesn't have

23   this legend at the top because if I file this, if I e-file

24   with this legend on the top and then anyone else prints it

25   with their legend on the top its going to be unreadable.  So,

1  all clean orders can't have that.

2           MR. GENTILE:  I do understand, Your Honor.

3           THE COURT:  Yeah.  It just looks like the only

4  ones are the -- the consolidated list of creditors has the

5  same problem. All the others look fine -- well, no, I lied,

6  the others have the same problem.

7           MR. GENTILE:  Your Honor, may we submit the orders

8  immediately after the hearing?

9           THE COURT:  Yes.

10          MR. GENTILE:  Okay.  Thank you.

11          THE COURT:  I will orally grant joint

12  administration.

13          MR. GENTILE:  Thank you, Your Honor.

14          THE COURT:  Can you just upload them for Ms.

15  Szymanski --

16          MR. GENTILE:  Yes.  We will upload them.

17          THE COURT:  -- and she will take care of them.

18          MR. GENTILE:  Moving onto the KCC retention

19  application your folder only contains a redline.  We needed

20  to resolve one minor comment from the U.S. Trustee that is

21  reflected in the redline.  There were no other objections or

22  comments.  So, as a result we ask that we be allowed to

23  upload a clean order by the court.

24          THE COURT:  Does anybody wish to be heard?

25          MS. RICHENDERFER:  Your Honor, Linda Richenderfer

1   for the U.S. Trustees Office.

2           I have just asked counsel if I could have a copy

3   of what Your Honor is looking at so I can just make certain

4   that the remaining comment I had was addressed.

5           THE COURT:  Its looks like it's at the top of Page

6   4.

7           MS. RICHENDERFER:  Thank you, Your Honor.  No

8   objection.

9           THE COURT:  Okay.  The court will grant the

10  motion.  Just upload a clean version and it will be entered.

11          MR. GENTILE:  Thank you, Your Honor.

12          At this time I would like to introduce my

13  colleague, Kevin Capuzzi.

14          THE COURT:  Thank you very much, sir.

15          MR. CAPUZZI:  Good morning, Your Honor.  For the

16  record Kevin Capuzzi of Benesch Friedlander Coplan & Aronoff,

17  proposed counsel for the debtors.

18          THE COURT:  That law firm is a real mouthful.

19      (Laughter)

20          MR. CAPUZZI:  I know, right.  We need to shorten

21  that; the Werkheiser Firm.

22      (Laughter)

23          MR. CAPUZZI:  Your Honor, I'm going to be running

24  through some operational motions.  I also have the cash

25  management or the creditor matrix motion which I know there

1  is an objection by the U.S. Trustee.  So, what I propose is

2  to go through some of the more routine ones and then handle

3  creditor matrix at the end.

4          THE COURT:  Okay.

5          MR. CAPUZZI:  All right. So, the first one I'm

6  going to handle is Number 6 on the agenda, it's the cash

7  management motion.  The debtors seek authority to continue

8  their prepetition cash management system and honor

9  obligations in connection therewith.

10          The debtors have about 45 bank accounts that are

11  spread across six banks.  They are all in the United States.

12  All but two of those 45 accounts are on the U.S. Trustees

13  approved list.  And the two that are not on the approved list

14  do not exceed the FDIC insured maximum levels.  Continuation

15  of these systems will facilitate the smooth transition into

16  Chapter 11.

17          I do have, Your Honor, a redline of that order.

18  If you can't easily find it in your packet I can hand it up.

19          THE COURT:  I think I have it right -- I think

20  what you gave me was the redline.

21          MR. CAPUZZI:  Okay.  These are all agreed changes

22  with the Office of the United States Trustee. We do not have

23  any outstanding issues.  So, we will, unless the court has

24  any questions, upload a copy of that order.

25          THE COURT:  It looks like I have a clean here.

```
 1          MR. CAPUZZI:  I don't think you do.  I think it
 2   looks like there is, but I paged through in the rush of this
 3   morning and I think that is a stapled copy of a redline that
 4   looks clean.
 5          So, I think just to make things easier we will
 6   upload; however, Your Honor --
 7          THE COURT:  You can upload.  That's fine.
 8          MR. CAPUZZI:  -- if you could orally grant that
 9   one just because we need to process payroll today.  That
10   would be very helpful.
11          THE COURT:  By the way, backing up to the Kurtzman
12   motion, I had the same comment.  So, thank you, Ms.
13   Richenderfer, for doing my job for me.
14          All right.  So, it's an interim order.
15          MR. CAPUZZI:  Correct.
16          THE COURT:  I'm sorry, does anyone -- I'm off my
17   game this morning.  I apologize.  I've only had six cups of
18   coffee today.
19      (Laughter)
20          THE COURT:  Does anyone wish to be heard in
21   connection with cash management?
22      (No verbal response)
23          THE COURT:  All right.  I hear none.  It's an
24   interim order so we need a date to fill in the blanks there
25   for a second day hearing.  So, now is a good a time as any to
```

PA00166

```
 1  talk about that.  Let's see, did you file yesterday?  You
 2  filed Monday or you filed Sunday?
 3          MR. CAPUZZI:  We filed Sunday night in the wee
 4  hours.
 5          THE COURT:  Okay.  Was it the wee hours of Monday
 6  morning or was it Sunday night?
 7          MR. CAPUZZI:  No.  It was the late hours of Sunday
 8  night.
 9          THE COURT:  Okay.  All right.  So, sometime the
10  week of March 30th for a second day hearing, Mr. Werkheiser,
11  is that all right?
12          MR. WERKHEISER:  I'm sorry, Your Honor, you said
13  the week of March 30th?
14          THE COURT:  Yeah, sometime that week.  That will
15  be 21 plus days from the -- the 31st is 21 days from today.
16  We can go into the next week.  We might need to actually
17  because I'm unavailable Thursday and Friday.  So, I guess we
18  could do April fool's day or we could do the week of April
19  6th which I have more availability the week of April 6th.
20          MR. WERKHEISER:  Your Honor, can we just consult?
21          THE COURT:  Yes, of course.
22          MS. RICHENDERFER:  Your Honor, Linda Richenderfer
23  again from the Office of the United States Trustees Office.
24          Just for the record, in case it effects anyone's
25  scheduling, we are currently -- the proposed date for the
```

1    committee formation meeting is Wednesday the 11th.

2              THE COURT:  Tomorrow.

3              MS. RICHENDERFER:  I'm sorry, Wednesday the 18th.

4    I'm mixing up my calendar here.

5              THE COURT:  That's okay.

6              MS. RICHENDERFER:  Just so that Your Honor has

7    that in mind.  So, April 1st would be good.  It would give

8    the committee, if formed, two weeks.

9              THE COURT:  Yeah.  I think April 1st is really the

10   earliest because if you file any new motions today that you

11   want to schedule for that hearing date that will be 21 days'

12   notice, but if you go -- actually, that will be 21 days'

13   notice, but if you go -- actually, that would be 22 days'

14   notice.  I'm think the week of March 6th makes the most sense

15   -- April 6th, I apologize.

16             MR. WERKHEISER:  Your Honor, I think that seems to

17   be the leading candidate.  I was just trying to give folks a

18   moment to confirm.  Ideally, if you could hear us that

19   Monday, April 6th that --

20             THE COURT:  Yeah.  I can fit you in.  One o'clock?

21             MR. WERKHEISER:  Fine for me, Your Honor.

22             THE COURT:  That way people coming from --

23             MR. WERKHEISER:  I don't see anybody --

24             THE COURT:  -- out of town can fly in that morning

25   hopefully and not have to spend Sunday night in exciting

1    Wilmington, Delaware. So, April 6th at one p.m., and then

2    the objection deadline will be March 30th at four. You don't

3    have to put a time anymore, but if you want to put a time you

4    can put four o'clock. We will use that for the second day

5    hearing for everything and that will include final cash

6    collateral and final DIP after we have the interim DIP

7    probably Thursday this week, but we will talk about that when

8    we get to it.

9           MR. WERKHEISER: Thank you, Your Honor.

10          THE COURT: All right. So, fill those blanks in

11    and I will be happy to approve cash managment. I orally

12    approve cash management along the lines set forth in the

13    motion for purposes of being able to process payroll.

14          MR. CAPUZZI: Thank you, Your Honor.

15          The next motion will be the taxes motion which is

16    Number 9 in the amended agenda. The debtors seek authority

17    to pay prepetition taxes and fees in an interim amount of

18    $854,000 dollars and a final amount of $1,031,000 dollars.

19    There's a table in Paragraph 10 of the motion that reflects

20    how that is broken down.

21          The order, as filed with the motion, reflects the

22    agreed changes with the U.S. Trustee. There has been no

23    changes since then. So, we would ask the court to enter that

24    order on an interim basis.

25          THE COURT: Does anyone wish to be heard?

1    (No verbal response)

2         THE COURT:  All right.  We will use the same date

3  for the final hearing.  We have the same problem with the

4  form of orders so please upload it with the correct date and

5  the court will approve the motion.

6         MR. CAPUZZI:  Thank you, Your Honor.

7         The next motion is the wages motion which is

8  Number 11 in your binder.  The debtors seek authority to pay

9  prepetition wages, benefits and non-insider commissions in an

10  interim amount of approximately $12 and a half million

11  dollars, and a final amount of approximately $20.4 million

12  dollars.

13         There is a table in Paragraph 12 of the motion

14  which breaks that down in further detail.  These are wages

15  that are, otherwise, entitled to priority.  The debtors are

16  not seeking to exceed the cap imposed by Section 507(a)(4) of

17  the Bankruptcy Code.  The relief is necessary to maintain the

18  goodwill of the employees and the smooth transition into

19  Chapter 11.

20         The order, as filed, which we will have to re-

21  upload, reflects the agreed changes with the United States

22  Trustee.  So, unless there are any issues with that I'd ask

23  that it be entered and orally granted today so that we can

24  process payroll.

25         THE COURT:  Does anyone wish to be heard?

PA00170

1          (No verbal response)

2              THE COURT:  All right.  The court will grant the

3    motion and it's granted subject to entry of an order, but

4    orally granted for purposes of process payroll.

5              MR. CAPUZZI:  Thank you, Your Honor.

6              And that's an interim order.  We will fill-in the

7    same dates.

8              THE COURT:  Yes.

9              MR. CAPUZZI:  The next motion is Number 12 in the

10   court's packet or the court's binder, I'm sorry.  This is the

11   NOL motion.  The debtors seek to establish procedures related

12   to the transfers or declarations of worthlessness as to

13   debtor Art Van Furniture stock.  They estimate roughly 90

14   million in federal NOL's and tax attributes which are

15   property of the estate.  These are requested notification

16   procedures that we would seek to approve on an interim basis.

17             There is a redline order in the court's packet.

18   There is just one very minor change at the request of the

19   Office of the United States Trustee and that is in the

20   procedures which are Exhibit 1 to the order and it is the

21   very last provision of the procedures. There was a procedure

22   that stated that the forms could be filed in a redacted

23   version.  I added, with the agreement of Ms. Richenderfer,

24   that it would be subject to the requirements of the new

25   robust Local Rule 9018.1(d).

1          Other than that, Your Honor, there were no further

2     comments from the Office of the United States Trustee. We'd

3     ask that this be entered on an interim basis subject to the

4     same dates and deadlines which we would upload following the

5     hearing.

6          THE COURT:  Does anyone wish to be heard?

7        (No verbal response)

8          THE COURT:  Court will grant the motion.

9          MR. CAPUZZI:  The next motion, Your Honor, is the

10    lienholder's motion which is Number 14 in the court's agenda.

11    The debtors seek authority to pay prepetition lienholder

12    claims in an interim amount of $1,154,000 dollars and a final

13    amount of $3,462,000 dollars.  These claims generally relate

14    to shippers, importers and others who are integral to the

15    debtors' logistical network and may, otherwise, possess

16    common law or statutory lien rights over the debtors'

17    property.  The relief is necessary to ensure the

18    uninterrupted flow of inventory and shipment of merchandise.

19         Your Honor, the order, as submitted, which we will

20    upload, reflects the agreed changes with the Office of the

21    United States Trustee.  And there has been no further

22    changes.  With that we would ask that it be approved on an

23    interim basis subject to the same dates and deadlines that we

24    have discussed.

25         THE COURT:  Does anyone wish to be heard?

```
 1          (No verbal response)

 2               THE COURT:  Court will grant the motion.

 3               MR. CAPUZZI:  The other operational motion is the

 4   utilities motion which my colleague, Kate Harmon, will

 5   handle, but so that we don't wear out the carpet should we do

 6   creditor matrix now?

 7               THE COURT:  Sure.

 8               MR. CAPUZZI:  The creditor matrix motion, I

 9   believe, is Number 4 in the court's binder.  Some of the

10   relief sought in here is pretty generic and I don't believe

11   there is an objection to it by the Office of the United

12   States Trustee.  That generally relates to filing a

13   consolidated creditor's list and consolidated top 30 list.  I

14   believe that is not at issue here.

15               The aspect of the motion that's garnered some

16   attention, as you can imagine, is the request to redact the

17   home addresses of the employees and customer creditors of the

18   debtors.  There is about 4,000 employees and about 7,000

19   customer creditors; people who have deposits, or potential

20   returns, or gift cards, things of that nature.

21               While I recognize that the relief sought is not

22   routine it is becoming increasingly important and more

23   commonly granted as issues of identity theft and safety of

24   non-debtor individual's rise.  The debtors respectfully

25   assert that those issues that concern those individuals who
```

1  are not part of this bankruptcy by choice, but because they

2  merely work for the debtor or have dealings with the debtor

3  outweigh any transparency or public policy concerns that the

4  Office of the United States Trustee may raise.

5          We recognize that those concerns are important,

6  but redacting the home addresses, not the names of those

7  creditors, will not impinge on the bankruptcy process.  Those

8  addresses will be made available to the court, to the Office

9  of the United States Trustee, to any creditors committee.

10  So, I see not prejudice in redacting them from the publicly

11  filed versions of the creditor matrix.

12          Similar relief has been granted recently, as

13  recent as last year in Loot Crate, THG Holdings, and the

14  Achaogen cases, as well as older cases such a Model Reorg and

15  Dex Media which are set forth in our motion.  The debtors,

16  therefore, assert that cause exists under 107(c)(1) to grant

17  the relief requested.

18          THE COURT:  All right.

19          MR. CAPUZZI:  Thank you.

20          THE COURT:  Any objection?

21          MS. RICHENDERFER:  Your Honor, Linda Richenderfer

22  for the Office of the United States Trustee.

23          Your Honor, I rise to object because I note for

24  the record that there has been no attempt to make an

25  evidentiary showing to meet the burden.  We just have generic

1    comments regarding identity theft.  There is nothing in the

2    first day affidavit regarding this.  So, I would just submit

3    to Your Honor that the debtors have not met their burden of

4    proof.

5              THE COURT:  Okay.  Well I disagree on that in that

6    I really don't view it as a burden of proof as much as a

7    common sense issue.  I'm not sure what proof you would say

8    other than to get a witness up and say just want counsel

9    said.

10             In my experience this has become a serious issue

11   and I have changed my thinking on this as I'm sure people who

12   track these things know, based on experience in a previous

13   case.  In my mind, at this point and given the risks

14   associated with having any kind of private information out on

15   the internet, this has really become routine.  I think

16   obvious relief.

17             I don't ignore the plain meaning of the code or

18   the rules lightly, but sometimes the code and the rules lag

19   behind reality, and don't take into account the issues that

20   face real life people every day.  I can, from personal

21   experience, tell you that identity theft happens, it happens

22   all the time. It happened to my wife and I a few years ago.

23   And I have had experience in other cases with people who have

24   been subject to danger by estranged people in their lives who

25   have been able to find out where they are.  I take that

1  extremely seriously.

2          So, I will overrule the objection and grant the

3  motion.

4          MR. CAPUZZI:  Thank you, Your Honor.  We will

5  upload that order.

6          To round up the operation motions my colleague,

7  Kate Harmon, will handle the utilities motion, then Mr.

8  Werkheiser will be back for customer programs and cash

9  collateral.

10         Thank you.

11         THE COURT:  Now I know it's cold in here, but is

12 that a scarf?

13         MS. HARMON:  It is.

14         THE COURT:  Okay.

15    (Laughter)

16         THE COURT:  It's lovely, it's just its not that

17 cold.

18         MS. HARMON:  Always cold.  Good morning, Your

19 Honor.  Kate Harmon, Benesch Friedlander Coplan & Aronoff,

20 proposed counsel to the debtors.

21         As Mr. Capuzzi mentioned, I will be presenting the

22 utilities motion which is Number 10 on the agenda and should

23 be Number 10 in your binder.

24         As set forth more fully in our motion we are

25 seeking interim relief today with respect to the utility

PA00176

 1   services that the debtors rely on and the utility providers

 2   that provide those services, and submit that the relief is

 3   necessary both to maintain good customer relationships,

 4   employee goodwill and also to aid in the transition into the

 5   Chapter 11 cases.

 6              As set forth in our motion we propose to provide

 7   an adequate assurance deposit in a segregated account in the

 8   amount that is half of the estimated average monthly payments

 9   for the utilities that the debtors pay on a direct basis.

10   Additionally, we propose to continue paying our utilities on

11   a monthly basis going forward in the ordinary course of

12   business from cash on hand, cash received in the ordinary

13   course of business and cash collateral.

14              Additionally, we have proposed additional

15   assurance procedures should utility providers request that.

16   Those are set forth fully in the motion and in our interim

17   order.  We submitted our motion and interim, proposed interim

18   order to the U.S. Trustee in the last couple of days.  The

19   U.S. Trustee provided one proposed change.  It's Paragraph

20   8(b) of the proposed interim order which just changed the

21   language regarding the timing in which the debtors need to

22   make that adequate assurance deposit to a date certain which

23   is five days from the entry of the interim order.

24              Unless the court has any questions we'd request

25   that the court enter that order today.

1          THE COURT:  Does anyone wish to be heard?

2      (No verbal response)

3          THE COURT:  Okay.  Happy to grant the order as

4   modified.  If you could upload that that would be great.

5          MS. HARMON:  With the same dates as discussed?

6          THE COURT:  Yup.

7          MS. HARMON:  Thank you.

8          THE COURT:  You're on a roll, Mr. Werkheiser.

9   Don't mess it up.

10         MR. WERKHEISER:  I was going to say I seem to

11  always get up and create the difficult issues.

12         Your Honor, again, for the record Gregory

13  Werkheiser returning to the podium to present the customer

14  practices motion.  Your Honor, this appears at Docket Item

15  27.  The customer practices motion seeks authority for the

16  debtors to maintain a subset of customer practices as

17  modified which it identifies as the essential customer

18  practices.

19         Prior to the petition date and the commencement of

20  store closing sales the debtors maintained a number of

21  customer practice programs in the ordinary course of business

22  at their various retail locations, as detailed in our motion,

23  including taking customer practices for furniture products

24  which are often large dollar value items and have to be

25  special ordered.  And in connection with the Art Van

1   Furniture stores the debtors had loyalty programs referenced

2   in the motion as the Art Van signature card which had various

3   different participation levels and benefits to customers.

4         Third, the debtors maintained a refund and

5   exchange policy prepetition in the ordinary course under

6   which customers were generally permitted only seven days to

7   return anything purchased to the store or to exchange it

8   after delivery.  Fourth, the debtors had traditional

9   warranties and extended warranties that they offered their

10  customers.  Fifth, the debtors had the ability for customers

11  either online or in store to purchase gift cards.  I believe

12  that all of their stores other than Wolf Furniture stores

13  that existed.

14        So, in light of the debtors current difficult

15  financial and operation circumstances and the need to

16  discontinue the larger portion of the business we are seeking

17  to continue customer programs in a modified form as described

18  in the motion, but I would summarize as follows:

19        For customer deposits at the stores that are the

20  subject of what is defined as the wind-down in the motion,

21  but essentially these are the store closing locations,

22  customers have the option to, who have deposits previously

23  provided to the debtors, receive store merchandise that they

24  purchased if its present in an Art Van store or warehouse.

25  If the originally purchased merchandise is not available to

1  receive a store credit in an amount equal to their deposit

2  that can be used towards the purchase of alternative

3  merchandise during the wind-down.  For those customers for

4  whom neither of those options would work we are seeking the

5  authority for the debtors, but the debtor is not to be

6  required because as set forth in the first day declaration

7  and elsewhere, their financial circumstances do not permit

8  them unlimited liquidity to do this.

9          THE COURT:  What are we talking about quantity of

10  deposits on hand?

11          MR. WERKHEISER:  So, the quantity -- let me just -

12  - so across all of the stores, Your Honor, there are

13  approximately 7,000 people that have submitted deposits in an

14  aggregate amount give or take 35 million.  And so, you know,

15  it's quite widespread in some magnitude in the overall scope

16  of the business.

17          What I was saying, Your Honor, is that we are

18  seeking authority, in certain circumstances, to be able to

19  provide refunds, but, you know, I want to be clear for the

20  record that financial circumstances and the cash limitations

21  that the debtors have are such that those --

22          THE COURT:  Is there an argument?  Is there an

23  argument that it's not your money, that you're holding it in

24  trust?

25          MR. WERKHEISER:  Not that I'm aware of based on

PA00180

1  anything that we've seen to date since our involvement in the

2  case.  I mean, obviously, these -- we're not necessarily

3  disputing that these wouldn't be entitled to priority under

4  507 of the Code.  I'm not trying to prejudice anybody's claim

5  in that regard, but, no, I think especially for items that

6  are special order items, you know, the nature of the

7  transaction is such that if somebody makes a down payment and

8  then the debtor makes, you know, a financial commitment to

9  its suppliers to special order something.  So, I think there

10 is consideration given by the company from the outset even

11 when it's only received a deposit.

12          THE COURT:  Okay.  I'm listening.

13          MR. WERKHEISER:  I do, you know, also want to be

14 clear that the debtors, again taking into account the

15 financial limitations of their liquidity and their other

16 circumstances are trying to make the resources they can make

17 available to make refunds in those cases where there is no

18 other viable alternative for the customer.  So, we are

19 seeking that relief.  And, you know, again, we will need to

20 use is sparingly because of the circumstances of the company

21 in its financial situation, but that is part of the relief

22 requested.

23          I also want to draw distinction for Your Honor

24 between the ultimate treatment of customer deposits in the

25 sides of the business that are subject to liquidation and the

1  11 Wolf Furniture stores.  Those are the subject of a

2  proposed going concern sale.  And while the debtors are not

3  necessarily in a position to honor those outside of the

4  bankruptcy process the buyer may very well be assuming those

5  upon closing of that sale.  And there may be the opportunity

6  for those customers to be made whole if that transaction

7  closes.  It's certainly contemplated that those may be among

8  the obligations that will be assumed by the buyer.

9          With respect to the Art Van signature card

10  program, Your Honor, that has been discontinued.  It was

11  discontinued in connection with the wind-down.  We are not

12  seeking any relief to continue that.

13          With respect to refund and exchange policies, Your

14  Honor, although the motion may give the impression that the

15  policy has changed, in reality, as it relates to any person

16  who purchased merchandise or furniture prior to the

17  commencement of the store closing sales.  The policy remains

18  the same.  They have the same seven days to return or

19  exchange that they had under the stores existing policy.

20          What has changed is that, and all customers that

21  enter the store are made aware of this fact through signage,

22  anything they buy as part of the store closing sales is a

23  final sale.  There are no returns or exchanges for those

24  items.  Again, that is not a change in the policy for the

25  stores operating in the ordinary course.

1        Then finally with respect to warranties, as we

2    explained in the motion, their financial circumstances and

3    because of the bankruptcy the company is not in a position to

4    honor warranty obligations.  Again, setting aside the Wolf

5    and Levin Furniture stores and such warranty obligations as

6    the buyer may pick-up as part of that transaction.

7        And with respect to the gift cards, Your Honor,

8    the debtor had approximately 1.2 million in the aggregate in

9    gift cards outstanding as of the petition date; 500,000 of

10   which are Art Van cards and 700,000 of which were Levin

11   Furniture cards.  I believe none were Wolf because to my

12   understanding they don't have gift cards.

13       The gift cards will be honored and customers are

14   being notified of this fact through information being made

15   available on the company's website and in store that they

16   have until April 15th to remit those gift cards.  And they

17   will be honored through April 15th.  Again, the gift cards as

18   they relate to the stores in the Levin/Wolf sale transactions

19   upon closing, I believe it was contemplated that the buyer

20   would be assuming those obligations as to those particular

21   gift cards, but not Art Van gift cards generally.

22       The last portion of the relief, Your Honor, that

23   we're seeking here relates to credit card processing and

24   other payment processors.  This is simply designed to provide

25   comfort to the parties involved in those transactions that

1  the debtors will continue in the ordinary course of accepting

2  the non-cash payment which I think accounts for something

3  like 80 or 90 percent or more of the transaction volume in

4  the stores.  So, we want to maintain that in the ordinary

5  course.

6          THE COURT:  So, if people have ordered a specific

7  piece of furniture in a liquidating store, and it hasn't been

8  delivered yet are they going to get that or should they

9  immediately be looking at whatever is on the floor while

10 there still is stuff on the floor to get credit for their

11 deposit?

12         MR. WERKHEISER:  So, if the furniture exists in an

13 Art Van warehouse, even if it's not on the floor, the company

14 will be trying to fill that order and is committing to try to

15 fill that order even under these customer practices.

16         THE COURT:  But if it hasn't been delivered it's

17 not coming?

18         MR. WERKHEISER:  If it's not currently in the

19 possession of the company in some fashion we're not in a

20 position to --

21         THE COURT:  How are the customers going to know

22 what to do?  Someone who is given a deposit to your client

23 how are they going to know what to do?  What notice are they

24 going to be given of the fact that they're not getting their

25 deposit back in all likelihood and they might not be getting

1  their furniture back, but if they want to not lose that value

2  they need to get busy and come to the store and buy something

3  else?  How are they going to find that out?

4       MR. WERKHEISER:  Your Honor, can I just take a

5  moment to consult with Mr. Stogsdill?

6       (Participants conferring)

7       MR. WERKHEISER:  Your Honor, I'm sorry.  I just

8  wanted to confirm that my understanding of these things is

9  correct.

10      So, the company -- well, one, there has been

11  widespread publicity about this.  This is the worst kept

12  secret, one of the worst kept secrets in a long time.  So,

13  you know, I think from experience people are well aware of

14  the GOB process and the consequences of that.  But beyond

15  that, as I mentioned, the company has replaced its original

16  website landing page with one that contains a summary of its

17  policies in this regard and to contact a call center for

18  people to get more information.

19      In addition, anyone who is in store can have this

20  information.  And then the company has been, over the last

21  few days, trying to determine whether they have sufficient

22  information to make an email distribution to all of the

23  customers who submitted deposits to notify them of their

24  rights under the new policy with respect to the deposits.

25      I can't, standing at the podium right now,

1   represent to Your Honor in a conclusive fashion that we have

2   the data we need to do that across the board, but that is

3   something that the company is committing to executing upon if

4   they can.

5          THE COURT:  All right.

6          MR. WERKHEISER:  Then, Your Honor, I may have been

7   not entirely clear in my comments previously about the gift

8   card cut-off and merchandise cut-off, but I just want to re-

9   emphasize that April 15th is the hard cut-off date for all of

10  those if I wasn't clear about that before.

11         Your Honor, for purposes of the interim relief

12  we're seeking today I am not aware of any objections that are

13  unresolved.  Apparently Ms. Richenderfer has objections that

14  remain unresolved that I wasn't clear about.  I believe one

15  issue that we have addressed to the satisfaction of the U.S.

16  Trustees Office is in Paragraph 2 of the proposed order.

17         There is language that confirms and cross-

18  references to any orders using cash collateral and makes

19  clear that payments are subject to that which, obviously, is

20  a given.  We have agreed to remove that, obviously, without

21  prejudice to any rights that the lenders have as secured

22  lenders pursuant to the cash collateral order so that this

23  order is clear in that regard.

24         I will cede the podium to Ms. Richenderfer from

25  the U.S. Trustees Office and reserve the opportunity to

PA00186

1    respond to any concerns she expresses.  Thank you.

2             MS. RICHENDERFER:  Good morning, Your Honor.

3    Linda Richenderfer from the Office of the United States

4    Trustee.

5             With respect to that last comment by Mr.

6    Werkheiser it's actually the last sentence of Paragraph 3

7    that I ask be removed.  I believe debtors have agreed to

8    remove.

9             Your Honor, the issue that I had raised while

10   reviewing these particular motions was the issue of notice,

11   the same issue that Your Honor has brought up.  I'm used to

12   seeing in these types of orders detailed procedures regarding

13   where the announcements were going to be made.  For instance,

14   requirements that every store would have a big sign in them

15   that would give everyone notice as to when the gift cards

16   would no longer be accepted.

17            Your Honor raised questions regarding notice to

18   the people with deposits.  I would think that the debtors

19   would have contact information cause, otherwise, you wouldn't

20   be able to tell the individual when their goods had been

21   received.  There has to be some sort of contact information.

22            Your Honor, with respect to the website, this is

23   what Mr. Werkheiser had sent to me and if I may approach I'd

24   like Your Honor to take a look at what the website currently

25   says as of yesterday and I'll ask Mr. Werkheiser to confirm

PA00187

1  this for me.

2       THE COURT:  What is the website address?

3       MS. RICHENDERFER:  They took the paper from me,

4  Your Honor.

5       THE COURT:  What's the --

6       UNIDENTIFIED SPEAKER:  Artvan.com.

7       THE COURT:  Thank you.  I'm looking at it right

8  now.

9       MS. RICHENDERFER:  Okay.  Your Honor, I'm told

10 that there has been information that's been added regarding

11 the gift cards, but the information that I'm looking at with

12 respect to the deposits I don't think clearly defines what

13 was just described to us.

14      THE COURT:  It's different.  It says store credit.

15 It does not say what was represented to the court.

16      MS. RICHENDERFER:  That's right.

17      THE COURT:  And I don't see the gift cards.

18      MR. BUCHBINDER:  Your Honor, Dave Buchbinder for

19 the record.

20      THE COURT:  Oh, I see it.

21      MR. BUCHBINDER:  Its here in the liquidation

22 paragraph.

23      THE COURT:  Yeah.  Boy, that couldn't be buried

24 any further.  Yeah.  We're going to have to talk about this.

25 This is inadequate.

```
 1              MS. RICHENDERFER:  It has to be more --
 2              THE COURT:  Absolutely.
 3              MS. RICHENDERFER:  The other thing, Your Honor, I
 4   was just doing -- well, actually Mr. Buchbinder did some
 5   quick math for me here.  With a total of 7,000 deposits on
 6   hand that total 35 million, if we just presume, for the sake
 7   of argument, that everyone put down the same amount that's
 8   5,000 per person.  And the -- 7,000, I'm sorry.
 9              MR. BUCHBINDER:  70,000.
10              MS. RICHENDERFER:  Oh, 70,000.  Okay.  I guess,
11   Your Honor, the point is this; what portion of the 35 million
12   would apply for -- should be given, I should say,
13   administrative priority under the code because debtors are
14   not going to be able to confirm a plan later on if that is
15   where they're going with this unless the administrative
16   claims are paid.  And at this point I don't know what portion
17   of the 35 million qualifies.
18              THE COURT:  Not to be argumentative, but why is a
19   deposit an administrative claim?
20              MS. RICHENDERFER:  Priority claim.  I'm sorry, I'm
21   using the wrong terminology under 507(a)(2).
22              THE COURT:  Why is it a priority claim?  I was
23   looking at the -- huh, which ones?
24              MS. RICHENDERFER:  507(a)(7), I'm sorry.  Section
25   507(a)(7).
```

1      THE COURT:  I was looking earlier when Mr.

2  Werkheiser was talking and I decided that I should actually

3  be paying attention to him.  So, I stopped looking.  Oh, I

4  see it.

5      MS. RICHENDERFER:  Yeah.  So, the deposit would be

6  up to $3,025 dollars.

7      THE COURT:  Every time I open the code I find

8  something I didn't know was in there before.  I shouldn't

9  admit that, should I.

10     (Laughter)

11     THE COURT:  All right.  Let me say something.

12  First of all, I got a couple comments.  One, the order itself

13  needs to spell all this out.  Right now it just references a

14  defined term that's defined in the motion and I think in this

15  particular instance the order really needs to spell out

16  exactly what the procedures are and what the elements are of

17  the customer program that the court is approving.

18     Second, I think you have to -- I'm particularly

19  concerned about two people.  Now gift card holders who knows

20  where are, right.  You know, I bought the gift card, but I

21  gave it to my uncle and it's been in his sock drawer for two

22  years.  I mean, you know, who knows where these gift cards

23  are.  But I think there has to be some notice both on the

24  website and on the store that's more obvious as to exactly

25  how gift cards are going to be dealt with especially since

1 there's a deadline of just five weeks.  Not even five weeks

2 in order to cash them in.

3          Did you give notice of the filing to State

4 Attorney's General?

5          MR. WERKHEISER:  I believe we did, Your Honor.

6 I'm not sure if anyone from the SAG is on the telephone

7 today, but that was certainly part of the notice.

8          THE COURT:  Well, you might get some trouble from

9 them.  That was a big piece of the RadioShack case as you

10 might remember.

11          The other thing is, the other people I'm really

12 worried about are the deposit fore's.  I think you, first of

13 all, need to have, again, obvious notice on the website and

14 at the store exactly what you are going to do.  And it needs

15 to be consistent with whatever is in the order I'm signing.

16 This is not -- what's on the website now is not consistent

17 with what you told the court.  It just says simply store

18 credit.

19          MR. WERKHEISER:  Your Honor, I want to just

20 clarify I would not knowingly misrepresent that to the court.

21          THE COURT:  Of course you wouldn't, Mr.

22 Werkheiser.  We've known each other 20 years.  No, no.  It's

23 not a problem.

24          MR. WERKHEISER:  I worked off the version Ms.

25 Richenderfer had that existed yesterday.

```
 1           THE COURT:  These things -- to describe these
 2    situations as fluid is an understatement.  We all know, we've
 3    all done this for a long time.  I am not in any way implying
 4    anybody has done anything other than in good faith.  So, I'm
 5    just saying there's an inconsistency.  I want it to be
 6    consistent and I want it to be, obviously, advertised.
 7           I don't know, I'm a little worried -- I'm
 8    remembering, I don't know if anyone else remembers Breuners
 9    Home Furnishings from 2004 or 2005 where the debtor used
10    deposits to pay rent to get the landlords off their back.
11    And I'm worried that these deposits are going to be used for
12    liquidity to run the company as opposed to provide services
13    to the people who put their money up and haven't received
14    anything in return yet.  I'm particularly worried about the
15    priority cap being preserved.
16           So, I'm not going to do anything with that right
17    now other than to say that I have concerns about the use of
18    the deposits.  We might need to deal with that in connection
19    with the cash collateral budget.  I haven't -- I just got the
20    budget this morning and I haven't, frankly, had an
21    opportunity to look at it because I've been involved with a
22    lot of things going on.  But I'm worried we're going to spend
23    the deposits.  And if that's the case that's a problem at
24    least particularly at the priority level because you can say
25    you get store credit and that's it, but the law says
```

```
 1   otherwise, assuming you do a plan.  You may liquidate, I
 2   don't know, in which case you don't have to pay your priority
 3   claims.
 4           MR. WERKHEISER:  Your Honor, obviously, the end of
 5   this case is uncertain at this stage.
 6           THE COURT:  Of course it is.
 7           MR. WERKHEISER:  And as to whatever comments I
 8   made about priority I think -- you know, what I was trying to
 9   convey and may have in-artfully done was that we're not
10   trying to prejudice anybody's arguments as to what is
11   priority and what's not.  I think that the language that was
12   chose in that provision is in-artful, to be charitable, and
13   so for today's purposes that's, obviously, not something that
14   is before the court.
15           THE COURT:  Well, yes and no.  So, yes, this isn't
16   confirmation of a plan where we have to talk about the
17   details of the priority scheme, but, yes, it's before the
18   court because you're seeking to use this money to operate
19   your business whereas if I were to cut you off today, I'm not
20   going to do it, don't get excited, convert your case, hand
21   over everything to a trustee he would be sitting on that
22   cash.  Meanwhile, you're going to use that cash or what's
23   left of it to operate the business.  The banks are shaking
24   their heads.
25           MR. WERKHEISER:  Maybe I was going to say I don't
```

1    know the --

2              THE COURT:  I haven't gone through the cash

3    collateral budget with any detail.

4              MR. WERKHEISER:  Well, I don't know the

5    particulars also, Your Honor, of what actions the banks have

6    taken in the past in terms of sweeping cash from the company,

7    but certainly they are of the view that this is their cash

8    collateral. So, to the extent that deposits had been accepted

9    it is certainly conceivable that that money has already made

10   its way into the hands of the lenders and is no longer in the

11   possession of the debtors.

12             So, I think respectfully the situation you posit

13   where we're using it to pay landlords and operate the

14   business is probably less likely than a scenario where the

15   money is no longer with the debtors at this stage.

16             THE COURT:  So, you don't have it in your hands

17   anymore?

18             MR. WERKHEISER:  I don't know.

19             THE COURT:  What you have about 11 million cash on

20   hand?  I can't remember.  I thought I saw in the papers you

21   have $11 million dollars in cash, is that right?  No?

22             MS. RICHENDERFER:  Your Honor, the budget shows

23   11.6 million as of Monday this week.

24             MR. WERKHEISER:  Yeah.  I mean one of the

25   challenges of this case, Your Honor, is that the debtors have

1   been in cash dominion for some time.

2          THE COURT:  Have been what?

3          MR. WERKHEISER:  In cash dominion.  So, the

4   lenders have, effectively, control of all of the cash are

5   just essentially revolving it back to us for cash collateral

6   purposes.

7          THE COURT:  So, its not been swept?

8          MR. WERKHEISER:  I'm going to -- I think I should

9   probably let the finance lawyers delve into this a little bit

10  more.

11         THE COURT:  Yeah.  They never want to say anything

12  though.  They like it when you do the talking.

13         MR. WERKHEISER:  You know, the upshot is that this

14  is, obviously, not the place the debtors wanted to be I think

15  as we detailed in our papers.  We did everything possible to

16  preserve the status quo with cash deposits, but reality is

17  reality and this is where we are.  We're trying to do the

18  best we can.

19         THE COURT:  Yeah.  But that doesn't mean you can

20  do whatever you want.

21         MR. WERKHEISER:  Understood, Your Honor.

22         THE COURT:  Okay.

23         MR. FALGOWSKI:  Good morning, Your Honor; Cory

24  Falgowski from Burr & Forman on behalf of Wells Fargo Bank.

25  I'm here with my co-counsel from Morgan Lewis, Jennifer

1  Feldsher, Margorie Crider and Chris Carter.  I believe Ms.

2  Feldsher is going to take the lead in addressing the court.

3          THE COURT:  All right.  Ms. Feldsher?

4          MS. FELDSHER:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MS. FELDSHER:  I guess I can't hid from the

7  gallery anymore.

8          THE COURT:  Well, if you keep nodding and shaking

9  your head, you know, I'm going to notice you.

10          MS. FELDSHER:  I just didn't want to compound any

11  representations to the court that weren't 100 percent

12  accurate.

13          THE COURT:  Of course not.

14          MS. FELDSHER:  So, that is why I was shaking my

15  head.

16          Your Honor, as the debtors have reported to you

17  the company has been in cash dominion for some time.  What

18  that means is we have a -- the ABL lenders have a revolver.

19  In the ordinary course money comes in, it goes to pay down

20  the revolver and then the debtors borrow back on the line

21  that they have.  So, that is normal course and that would be

22  the same if deposits came in.  The debtors use that, they pay

23  down, they get more availability on the line.

24          Prior to the filing, because the debtors were in

25  default of their obligations under the ABL facility they went

PA00196

1   into cash dominion which means that they have -- you know,

2   the lenders fund based on what the debtors need.  They give

3   us a schedule, they say we need the following things funded

4   and the banks fund based on the things that they approve to

5   be funded.  So, the deposits are not in the debtors' bank

6   accounts today.  What the debtors have is sufficient cash to

7   pay their payroll.

8           The debtors are selling collateral and that

9   collateral, we believe, should exceed the amount that the

10  debtors need to fund their Chapter 11 cases and to repay

11  those deposits that don't get used by people in the ordinary

12  course towards buying something else at the stores.

13  Obviously, that is the preference for the company so that it

14  can realize value from both the deposits and the furniture

15  that they have in stock.  But we have discussed with the

16  debtors and they insisted upon being able to return deposits

17  as they need to.  There is going to be some process because

18  they need people to tell them that they don't want to use the

19  deposit towards something else in the store.

20          And from the ABL lender's perspective and also

21  from the term loan perspective we have allowed -- we have

22  agreed that the debtors can do that through the budget and we

23  believe there are sufficient funds in the budget that they

24  will be realizing as they sell assets to be able to return

25  deposits that aren't, otherwise, used by customers towards

1   other purchases.

2           THE COURT:  Okay.  I got you.

3           MS. FELDSHER:  Hopefully that's helpful.

4           THE COURT:  It was very helpful.

5           MS. FELDSHER:  Thank you.

6           THE COURT:  I'm not going to resolve this today.

7   All I want is notice.  I want clear notice to go to the

8   deposit holders exactly what is happening to them and the

9   deadlines that they're facing.  So, that they are able to

10  maximize their ability to get some value for the deposit.

11          MR. WERKHEISER:  Understood, Your Honor.

12          THE COURT:  In my experience if you wait, based on

13  cases I've had, thankfully have not been in this position,

14  but if your depositors wait too long by the time they go to

15  the store, unless its one of the going concern stores, unless

16  they go to one of the liquidating stores if they don't go in

17  time there's not going to be anything that they want that

18  they could use the store credit for.

19          MR. WERKHEISER:  Yes, Your Honor.

20          THE COURT:  So, that has happened in cases I have

21  been involved with.  So, the important thing is people --

22  they are where they are from their legal right's perspective.

23  I'm not going to change that.  I'm not trying to change that.

24  I'm not saying you have to do X, Y or Z, or I'm going to

25  convert your case or any nonsense like that.  All I'm saying

PA00198

1   is you got to give people notice.  And part of that is I want

2   the order to really specify what's happening and I want clear

3   and conspicuous notice to go on the website and in the

4   stores.  I would prefer something going to them in the mail

5   or email, but you're telling me you don't know if you have

6   that ability.

7           So, we will put something in there that if you can

8   do it you're required to do it and if you can't you can make

9   some sort of representation to the court that you can't.

10          MR. WERKHEISER:  Thank you, Your Honor.

11          THE COURT:  Okay.

12          MR. WERKHEISER:  I just would like to reiterate so

13  you hear it from the debtors is that, yes, we do believe that

14  the budget does provide for adequate access to cash going

15  forward if we meet our projections to honor refunds and

16  exchanges.

17          THE COURT:  Let me ask you another question.

18          MR. WERKHEISER:  Excuse me, honor deposits rather

19  as described by our lender's counsel.

20          THE COURT:  How old are your projections?

21          MR. WERKHEISER:   I think they have been updated

22  as recently as yesterday.  Within a couple days, Your Honor.

23          THE COURT:  Okay.

24          MR. WERKHEISER:  And --

25          THE COURT:  The only reason I -- I know we all

PA00199

1 watched the news yesterday, the economy may not be doing so

2 well right now.  So, I was just wondering if we were dealing

3 with February 12th projections or we were dealing with March

4 10th projections.

5          MR. WERKHEISER:  No.  I think we're dealing with

6 March 8th and 9th projections in that range, Your Honor.

7          THE COURT:  Okay.

8          MR. WERKHEISER:  What I also wanted to just

9 clarify for the record to is one of the things that the

10 debtors negotiated vigorously for was that the term loan

11 lenders have agreed to subordinate their recoveries to the

12 extent necessary consistent with our budget for us to honor

13 the deposit obligations.  So, once Wells gets out as the ABL

14 lender, you know, we are maintaining availability within the

15 cash collateral structure to honor deposit obligations

16 consistent with the budget by agreement with the term loan

17 lenders.

18          THE COURT:  So, make those changes to the order.

19          MR. WERKHEISER:  We will

20          THE COURT:  Submit it under certification of

21 counsel.  Run it by the U.S. Trustee before you submit it and

22 let me know in the COC whether or not they're okay with it.

23          MR. WERKHEISER:  Very well, Your Honor.  Thank

24 you.

25          THE COURT:  Okay.

```
 1              MR. WERKHEISER:  Yes.

 2              THE COURT:  Can we take just a few minute break

 3    just five minutes.  All we have left is cash collateral,

 4    right?

 5              MR. WERKHEISER:  And then we'd like to have some

 6    preliminary discussions.

 7              THE COURT:  Okay.  We're running out of time, but

 8    we'll get it done.  I just need a short recess.

 9              MR. WERKHEISER:  Thank you.

10         (Recess taken at 11:33 a.m.)

11         (Proceedings resumed at 11:37 a.m.)

12              THE CLERK:  All rise.

13              THE COURT:  Please be seated.

14              All right.  Let me get your website off my

15    computer here.

16              MR. WERKHEISER:  All right.  Your Honor, for the

17    record, Gregory Werkheiser.

18              I think that brings us to cash collateral, Your

19    Honor.  And before we proceed, I just would like to take care

20    of the housekeeping matter of moving in the first day

21    declaration of David Ladd, which is the factual basis for our

22    first day relief --

23              THE COURT:  Any objection?

24         (No verbal response)

25              MR. WERKHEISER:  -- which was filed with the
```

1  petition.

2          THE COURT:  It's admitted.

3      (Ladd Declaration received in evidence)

4          MR. WERKHEISER:  Thank you, Your Honor.

5          Your Honor, as we get into cash collateral here, I

6  would like to offer a proffer of Mr. Dennis Stogsdill who, as

7  Your Honor knows from my prior introductions, is present in

8  the courtroom and available for cross-examination if that

9  becomes necessary.

10         And before we get underway with the overview of

11 the cash collateral order and some issues that we resolved,

12 and a handful that remain outstanding, I'd like to offer that

13 proffer and just a brief introduction to the process that

14 resulted in this order, if I could?

15         THE COURT:  Any objection to the use of a proffer?

16     (No verbal response)

17         THE COURT:  You may proceed.

18         MR. WERKHEISER:  Okay.  Mr. Stogsdill of Alvarez &

19 Marsal North America, LLC is present in the courtroom and

20 available for cross-examination.

21         If called to testify, Mr. Dennis Stogsdill could

22 and would testify truthfully, as follows:  one, that he is a

23 managing director of Alvarez & Marsal North America, LLC,

24 which has been advising Art Van Furniture, LLC and its

25 affiliated debtors on their restructuring and deleveraging

     1   efforts at certain times, since August of 2019.

     2            He has more than 20 years of management consulting

     3   and restructuring experience, serving as a financial advisor,

     4   and providing performance improvements services to

     5   corporations, various creditor groups, equity owners, and

     6   other constituencies.

     7            THE COURT:  Slow down a little bit.

     8            MR. WERKHEISER:  Sure.  Sorry.  I was just trying

     9   to speed through the background, Your Honor.

    10            THE COURT:  Yeah, but I still have understand you.

    11       (Laughter)

    12            MR. WERKHEISER:  Mr. Stogsdill has -- would

    13   testify that he has significant experience assisting

    14   distressed retail companies with day-to-day management

    15   activities, including development of business plans, cash

    16   flow management, and implementation of liquidity and cost-

    17   saving strategies, including store-closing strategies.

    18            His prior retail restructuring experience includes

    19   advisory roles in Chapter 11 cases such as Sears Holdings,

    20   Fairway Market, and Fresh & Easy Markets.

    21            A&M, itself, is a global business-advisory firm

    22   with multidisciplinary solutions, complex and challenges and

    23   opportunities, and he would testify that it is well-equipped

    24   and deeply resourced for engagements of this nature.

    25            He Mr. Stogsdill would testify that since A&M's

PA00203

1   retention, he has overseen a team of individuals assisting

2   the debtors' management with, among other things, managing

3   and forecasting the debtors' liquidity position, evaluating

4   profitability on a four-wall basis, providing alternative

5   sale and financing options, and other financial analyses and

6   planning.

7           Accordingly, he is knowledgeable and familiar with

8   the debtors' day-to-day operations, business, and financial

9   affairs, cash flow needs, and projections, and personnel.

10          He is also familiar with the debtors' supply chain

11  and the status of the debtors' relationship with various

12  vendors, suppliers, service providers.

13          With respect to the debtors' restructuring

14  efforts, Mr. Stogsdill would testify that he is familiar with

15  the testimony of Art Van's executive vice president and chief

16  financial officer David Ladd, as set forth in his first day

17  declaration, filed on March 9th at Docket Item 12 and based

18  on his and his team's extensive work with the debtors since

19  August of 2019, could and would testify, consistent with

20  Mr. Ladd's testimony regarding, among other things, the

21  debtors' restructuring efforts and the events that led the

22  debtors to commence these Chapter 11 proceedings,

23  particularly, as it appears in Paragraphs 6 through 20 and 37

24  through 43 of Mr. Ladd's declaration.

25          Further, through A&M's engagement with the debtors

1    he would testify that he has become deeply familiar with the

2    debtors' prepetition corporate and capital structure and,

3    therefore, could and would testify, consistently with

4    Mr. Ladd's testimony appearing at Paragraphs 31 through 36 of

5    his first day declaration.

6            With respect to the circumstances that brought the

7    debtors to this Court today, Mr. Stogsdill would testify and

8    emphasize that, as detailed in the live first day

9    declaration, the debtors were making headway in late 2019 and

10   addressing their operational and financial challenges but

11   lacked the runway necessary to fully implement these remedial

12   steps.

13           He would further testify that the company's

14   situation became critical when, in January 2020, the

15   company's borrowing base under its prepetition ABL facility

16   was further restricted and certain other financial partners

17   of the company tightened its access to credit.  When it

18   became clear in early January that the company's lenders and

19   certain other financial partners could not or would not

20   support an extended schedule for the company to explore

21   strategic alternatives, Alvarez & Marsal and Evercore, the

22   company's financial -- excuse me -- the investment banker

23   assisted the company pursue an expedited process to

24   recapitalize or sell all or part of its business or assets.

25           Mr. Stogsdill and A&M personnel under his

1  supervision worked closely with Evercore's team on this
2  project.  As a result of these efforts, the company and its
3  advisors held discussions with at least 31 potential buyers
4  and investors, including its prepetition term loan lender,
5  KKR Capital Corp. and affiliates about such potential
6  transactions.  In parallel with these efforts and as a
7  condition to its ABL lender's forbearance, the company, with
8  A&M's assistance, began preparations for potential store-
9  closing sales.

10           The most viable option to emerge from this process
11 was the so-called consortium recapitalization transaction
12 discussed in Paragraph 15 of the Ladd first day declaration.
13 This transaction was developed in concert with the parties'
14 most financially motivated to support the business as a
15 going-concern.  It depended upon, among other things, an
16 additional capital infusion from Thomas H. Lee, the debtors'
17 equity sponsor, and the Van Elslander family, which was the
18 family of the founder and the original owners of the company;
19 second, it contemplated refinancing of the company's existing
20 ABL facility; third; it contemplated and the support from the
21 company's trade vendors; and fourth, rent relief from the
22 company's five largest lessors under master leases with those
23 parties.  Indeed, the debtors negotiated extensively with
24 those master lessors, in connection with the consortium
25 including several of the parties that filed a response to the

1    first day declaration late last evening.

2            Another key constituency of this consortium effort

3    was the Levin family, the former owners of the Levin-Wolf

4    Furniture business.

5            As detailed, Mr. Stogsdill would testify as

6    detailed in the Ladd first day declaration the consortium

7    transaction ultimately failed to come to fruition, given the

8    significant amount of capital needed and unforeseen setbacks

9    in the capital matters that resulted in the withdrawal of

10   certain investors' willingness to infuse new capital.

11           Although efforts were then made to resuscitate the

12   transaction, they were unsuccessful for several reasons,

13   including the unwillingness of the master leaseholders to

14   enter into further lease concessions.

15           It was not until the end of February that it

16   became clear that the consortium transaction was beyond

17   saving; however, as mentioned previously, at the insistence

18   of the ABL lenders, efforts were already underway to prepare

19   the company for the contingency of an orderly liquidation

20   process.

21           Even as the consortium deal was falling apart, the

22   debtors were able to salvage a going-concern sale transaction

23   with the Levin family for the sale of assets of the Levin-

24   Wolf Furniture lines.  Although the cash value of that

25   transaction is only slightly above liquidation value, it has

PA00207

1   important additional benefits that cannot be realized in a

2   liquidation, including nearly 1,000 jobs will be preserved,

3   customer deposits and warranty obligations are expected to be

4   honored by the buyer upon closing, and Section 503(b)(9)

5   vendor obligations will be assumed.

6           However, for the Levin to proceed on a going-

7   concern basis, the inventory stocks of those stores needs to

8   be replenished, which has led to the debtors' decision to

9   agree to that separate DIP facility.

10          With respect to the debtors' need to -- for access

11  to cash collateral, he would testify that the debtors'

12  immediate access to cash collateral, ability to use the cash

13  collateral, consistent with the agreed-upon budget is

14  critical to providing sufficient liquidity to market and

15  conduct the -- not only the going-concern sale transaction,

16  but the orderly wind-down and liquidation of the debtors'

17  assets.

18          He would further emphasize that the process of

19  getting to an agreement on cash collateral was extensively

20  negotiated over a process -- a period of weeks, and in large

21  part, was a challenging negotiation because the debtors we're

22  so dedicated to trying to ensure that they had sufficient

23  liquidity to meet employee obligations and customer

24  obligations, including allowing customers the opportunity to

25  either receive store credit or in certain cases, a return of

1  customer deposits.  This, the debtors believe, was achieved

2  in large part through the extensive efforts of the debtors

3  and their advisors and their equity sponsors who have pushed

4  for this to be part of the overall deal for cash collateral.

5        With respect to milestones, Your Honor,

6  Mr. Stogsdill would testify that these had to be agreed to as

7  part of the attaining the lender's agreement to use cash

8  collateral.  That he believes most of the milestones that are

9  contained in the interim order are traditional bankruptcy-

10  related milestones.  Others that are relating to the approval

11  and conduct of store-closing sales and related documentation

12  and approval in closing of the Levin-Wolf sale.

13        He would further testify that at his direction,

14  counsel has been in contact with the Levin buyer group and

15  with the other lenders and has secured agreements to modify,

16  outward, some of those milestones to ensure that the Levin

17  sale, when it goes forward, can go forward under normal

18  Bankruptcy Rule-required notice.

19        With respect to the milestones in general, he

20  would testify that based on his experience, having been

21  involved in many such orders in the past and many such retail

22  restructurings, that they are achievable under the

23  circumstances that we have available here.

24        As the order relates to fees, Mr. Stogsdill would

25  testify that he is aware that the order provides for the

1    lender to recover a weekly consent fee of $150,000.  While

2    this was certainly something that the debtor would, in its

3    preference, would not have had to pay as consent to obtain

4    access to cash collateral, this was part of the overall

5    package of bargained-for cash collateral access that the

6    lenders required is something that they insist on having has

7    part of their overall adequate protection package to make

8    cash available to the debtor in connection with this case.

9            Let me just confirm if I've left anything out.

10       (Pause)

11           MR. WERKHEISER:  Your Honor, that concludes

12   Mr. Stogsdill's proffer in support of our cash collateral.

13           THE COURT:  Does anyone wish to cross-examine the

14   witness?

15       (No verbal response)

16           THE COURT:  Okay.  I hear none.

17           I have no questions.

18           MR. WERKHEISER:  Thank you, Your Honor.

19           So, Your Honor, again, I know time is short, so

20   I'm going to try to expedite this presentation as much as

21   possible --

22           THE COURT:  Yep.

23           MR. WERKHEISER:  -- this is a fairly, I think, on

24   the whole, traditional cash collateral order for a retail

25   liquidation of this nature.  We have an ABL facility with

 1   approximately $34 million owing and then behind that, a much
 2   larger term loan facility, as originally held and agented by
 3   affiliates of KKR.  It has since been acquired by certain
 4   affiliates of Hilco and Gordon Brothers in an assignment and
 5   the debtors negotiated with all of those parties at various
 6   times to ensure that they had adequate liquidity in their
 7   judgment to conduct this orderly liquidation and wind-down of
 8   the stores, other than the Wolf and Levin stores and to try
 9   to sell those stores as a going-concern in furtherance of
10   fulfilling their fiduciary duties and maximizing value.
11           Cash collateral, as you would expect, is tied to a
12   13-week cash flow budget that is subject to approval by the
13   lender group and, as detailed in the Mr. Stogsdill's proffer,
14   is subject to various milestones related to the conduct of
15   the case.
16           It has, Your Honor, the traditional stipulations
17   by debtors in this situation as to validity of liens and
18   claims and the lack of defenses to them and it also has the
19   traditional reservations for a committee to challenges within
20   75 days after commencement of the case or 60 days of
21   committee formation.
22           Adequate protection packages for the lenders
23   consist of, of course, the replacement liens, the ability to
24   receive a payment of their respective counsel's attorney's
25   fees, subject to a review process, that this Court has seen

1  before, and such matters as carve-out liens on proceeds of

2  avoidance actions, waiver of 552 waiver, 506(c) waiver, and

3  so on, are all reserved for the final hearing, subject to the

4  rights of the committee or parties in interest to dispute

5  whether the final order should contain those.

6          I can represent that to our knowledge there is no

7  non-consensual priming contemplated by this order and it has

8  appropriate language that carves out preexisting liens that

9  are valid and by their terms, would be senior, and broadly

10  speaking, that is the order.

11          I think most of the issues that we have with this

12  order, yet, Your Honor, are (indiscernible) in the nature of

13  drafting issues and certain protections that there's a

14  difference of opinion on as to whether they're appropriate,

15  with the exception of the consent fee.

16          So, briefly, we did try to engage with the U.S.

17  Trustee's Office prior to the hearing and I think we resolved

18  a number of these issues.  To my understanding, we received

19  comments from Ms. Richenderfer from -- in reference to the

20  findings that appear in Paragraphs E and N of the order and I

21  believe we have agreement to modify language there in a way

22  that is acceptable to the U.S. Trustee's Office on what

23  notice was provided and how we express the adequacy of that

24  notice in context of this interim order.

25          With respect to the payment of professional fees

1 and expenses to the term loan and ABL lenders, I believe

2 we've satisfied the U.S. Trustee as to the existence of

3 appropriate language that allows for an opportunity for a

4 review and objection of those fees, as is consistent with

5 practice in the district. With respect to -- and that

6 language, Your Honor, is already present in the order; it did

7 not require changes.

8              With respect to Paragraph 12(e)(ii) of the order,

9 that contemplates certain milestones related to, among other

10 things, the Levin asset sale -- the Levin-Wolf asset sale

11 and, by agreement, with the buyer there and our lenders. We

12 have agreed to adjust those milestones slightly so that

13 instead of what is currently read into the order, we will be

14 filing a sale motion and executed APA within seven days of

15 the petition date. We will be seeking a sale order proving

16 that within what is approximately 22 days thereafter, which I

17 believe is April 7th, if my math is correct, and we will be,

18 then, closing within two business days after that.

19              So, those milestones are not necessarily

20 milestones that our ABL and term loan lenders have demanded,

21 but since they tie to that transaction, that transaction is a

22 source of value to the estate, so they appear to the

23 milestones that are required by the purchaser and the

24 proposed DIP lender.

25              THE COURT: I'm not crazy about a milestone that

1   blows the cash collateral order in 21 days, but -- unless a

2   committee shows up and want some more time.

3           MR. WERKHEISER:  We're certainly committed to

4   engaging with them in good faith and I think, you know,

5   committees being committees and late on the scene, certainly

6   have the ability to accomplish things that debtors do not.

7   So, you know, we understand Your Honor's concern and

8   obviously the committee will have its opportunity to be heard

9   if and when that happens.

10          In Paragraph 20(n), Your Honor, we've agreed to

11  modify language at the request of the U.S. Trustee's Office

12  to make clear that the filing of a motion of the type

13  described in that paragraph by a party other than the debtors

14  is not a default event unless the debtors fail to contest

15  that in good faith, which is more in keeping with the

16  practice in this district and elsewhere.  And I think that's

17  it, in terms of I believe the issues that we've been able to

18  resolve.

19          I believe there are three issues on cash

20  collateral that are open to my knowledge.  One is the U.S.

21  Trustee's Office disagrees that as to the propriety of paying

22  a consent fee to the ABL lenders for access to cash

23  collateral and the second issue relates to the language that

24  appears in subparagraph -- in Clause A of Paragraph 25, this,

25  which recognizes the ability of a committee to -- or any

 1  party in interest -- to contest the existence of the default,

 2  but (indiscernible) with certain other actions that might

 3  interfere with the lender's exercise of remedies.

 4          Finally, there's a dispute that remains in

 5  Paragraph 27(b) as it relates to the lender's entitlement to

 6  recover fees in the event of a challenge to the lender's

 7  liens and the claims by someone with standing to do so.  And

 8  the position of the U.S. Trustee's Office, as I understand

 9  it, there, is that the lenders should have to prevail on that

10  challenge, then under some definition of prevail that I think

11  is not currently present in the documents.

12          THE COURT:  Explain that to me.  I don't have a

13  blackline.  Explain that to me.

14          What -- under the order as it exists, if the

15  committee brings a challenge, they have to disgorge all their

16  fees?

17          MR. WERKHEISER:  Under the order, as it's

18  currently written, Your Honor, the lenders are entitled to

19  their fees --

20          THE COURT:  Oh, the lenders?

21          MR. WERKHEISER:  -- on a real time -- essentially,

22  you know, as they're being incurred, when they're defending

23  against a committee challenge.

24          THE COURT:  Oh, so, the U.S. Trustee wants to stop

25  that, pending the challenge for however long it takes?

```
 1              MR. WERKHEISER:  And --

 2              THE COURT:  All right.  I understand.

 3              MR. WERKHEISER:  -- is of the view that the lender

 4 must actually prevail on the challenge before they can get

 5 their fees.

 6              THE COURT:  I understand.

 7              MR. WERKHEISER:  So, I those are our three issues.

 8 I will cede the podium to the U.S. Trustee's Office --

 9              THE COURT:  Okay.

10              MR. WERKHEISER:  -- and reserve an opportunity for

11 the lenders and the debtors' response.

12              THE COURT:  All right.

13              MS. RICHENDERFER:  Your Honor, Linda Richenderfer

14 from the Office of the United States Trustee.

15              In considering the time --

16              THE COURT:  Yeah, don't rush, because we're not

17 going to finish --

18              MS. RICHENDERFER:  Okay.

19              THE COURT:  -- before I have to get off the bench.

20 I thought I made it pretty clear --

21              MS. RICHENDERFER:  Okay.

22              THE COURT:  -- that I have a meeting that I cannot

23 miss.  So, we're going to be reconvening, so take your time.

24              MS. RICHENDERFER:  Okay.  Your Honor, the first --

25 there's four issues.  Let me back up a minute.
```

1    We had discussions prior to the hearing today in

2    response to the comments that Mr. Buchbinder and I supplied

3    yesterday and believe we've reached some agreements with the

4    debtors and with the ABL lenders regarding changes in

5    language and Mr. Werkheiser did touch upon several of those

6    instances.

7    We will need to see the revised form of order to

8    know whether or not we have totally been able to resolve

9    those because we don't have a blackline and didn't receive

10   any responses.  So, we just want to make sure that Your Honor

11   is aware of that until we see it in black and white, there

12   may be some issues that remain.

13            THE COURT:  Okay.

14            MS. RICHENDERFER:  The consent fee, which is on

15   Page 27 -- it's Paragraph 20 -- I'm sorry, it's

16   Paragraph 12(d) of the order -- requires that the debtors pay

17   $150,000 per week until the prepetition ABL obligations have

18   been repaid in full.  It is part of the covenant -- I'm

19   confused by the limits, Your Honor, because I don't believe

20   it's part of the prepetition documentation for the ABL loan,

21   but there was something that Mr. Werkheiser said that led me

22   to believe maybe it was.  I'm not -- with respect to the

23   proffer that he was giving us, don't understand the basis for

24   that because it's apart from any adequate assurance.

25            THE COURT:  Okay.  Have you ever seen this?

1          MS. RICHENDERFER:  No.  Mr. Buchbinder nor I have

2     ever seen this.

3          THE COURT:  All right.  I haven't seen this,

4     either.

5          MS. RICHENDERFER:  So, that was another reason why

6     it caught our eye.

7          Your Honor, on Page 47 -- and this is part of

8     Paragraph 25(a) at the very beginning, it starts off, "Except

9     to contest the occurrence of an event of default ..."

10         The idea of adding in there "preventing hindering

11    or delaying" are very, I think, undefined terms of art that

12    could be used in many instances where it would not be

13    appropriate in order to use this particular provision against

14    the debtors.

15         Page 50 is the one that Mr. Werkheiser spelled out

16    for Your Honor that's part of Paragraph 27(b) that would

17    allow a during the challenge period, the prepetition secured

18    parties are going to be entitled to receiving their costs and

19    expenses, while the challenge is ongoing.  And that's costs

20    and expenses, with respect to the challenge, not the

21    challenges ongoing.

22         The other concern, Your Honor, is that on Page 53,

23    Paragraph 36, all concerns the Levin DIP facility, which I

24    know Your Honor has already stated will not be heard today.

25    Quite frankly, Your Honor, I haven't even had time to print

1   it out to if you look at it yet and I'm concerned that

2   anything and all that's in here not be considered to be any

3   approval by Your Honor of the Levin DIP facility until such

4   time as the Court has scheduled a hearing on that and we have

5   time to review the documentation in connection with it.

6           THE COURT:  All right.  We're in recess until 1:30

7   and we'll reconvene at that time to talk about cash

8   collateral.  It would be nice to have a redline by then, if

9   possible.  What I have here is just a clean copy, so -- which

10  I think is the original copy.

11          MR. WERKHEISER:  I think what you have is what was

12  filed --

13          THE COURT:  Huh?

14          MR. WERKHEISER:  Yeah, that's what was filed

15  (indiscernible) --

16          THE COURT:  Right.  So, if there's been changes,

17  it would be nice to see them in a redline if you have time;

18  otherwise, it will be what it will be.

19          So, 1:30 or as promptly thereafter, as possible.

20  I have a series of important internal bankruptcy court

21  meetings today, so I apologize, but it is what it is and you

22  can blame Wuhan, China, for what we're talking about.

23          So, we're in recess until 1:30.

24          COUNSEL:  Thank you, Your Honor.

25      (Recess taken at 12:06 p.m.)

PA00219

1         (Proceedings resumed at 1:45 p.m.)

2             THE COURT OFFICER:  All rise.

3             THE COURT:  Please be seated.

4             So, before we proceed, Ms. Richenderfer, if you

5  could -- I want to make sure I have your three points.  So,

6  if you could bullet point your three objections, again, for

7  me, because I was distracted, frankly, because I knew I had

8  to be in this meeting.

9             MS. RICHENDERFER:  Your Honor, there's actually

10  four.

11            THE COURT:  Four bullet points, there you go.

12            MS. RICHENDERFER:  There's three of greater

13  importance, maybe.  The consent fee -- it's on Page 27,

14  Paragraph 12(d) -- there's language at the beginning of

15  Paragraph 25(a) on Page 47 that we think will have a chilling

16  effect on actions taken by the committee or may be taken by

17  the committee.

18            THE COURT:  And what's that -- oh, that's the sort

19  of --

20            MS. RICHENDERFER:  Like hindering and --

21            THE COURT:  Yeah, hindering, right.

22            MS. RICHENDERFER:  -- these undefined terms.

23            The next issue was the payment of legal fees --

24            THE COURT:  Right.

25            MS. RICHENDERFER:  -- to the lender during the --

 1  any challenge period.  That's prevailing party 27 -- we think

 2  it should be prevailing party, Paragraph 27(b), as in boy, on

 3  Page 50.

 4              THE COURT:  Uh-huh.

 5              MS. RICHENDERFER:  And then I just wanted to

 6  underscore and make sure that the Court approving the

 7  language that's in Paragraph 36 on Page 53 regarding the

 8  Levin DIP, is in no way meant to or construed to be an

 9  approval of the DIP, which the Court still needs to consider

10  at a later date.

11              THE COURT:  Thank you very much.

12              Does anyone wish to be heard?

13              MR. WERKHEISER:  Good afternoon, Your Honor.  For

14  the record, again, Gregory Werkheiser, from Benesch, on

15  behalf of the debtors -- proposed counsel on behalf of the

16  debtors.

17              Your Honor, I'll make some comments on these

18  points and to the extent our ABL or term loan lenders want to

19  be heard, I'd ask them to have an opportunity to speak, as

20  well.  So, I think let's take the easiest one first.  I think

21  that was 53, Linda?

22              MS. RICHENDERFER:  Paragraph 36 on Page 53.

23              MR. WERKHEISER:  Page 53.  So, yeah, I think we

24  can make a representation to the Court today that no one's

25  rights relative to consideration of the Levin DIP are being

1  prejudiced by anything contained in today's order.  This

2  language exists in the order solely to anticipate that that

3  small DIP financing facility will be presented to the Court

4  and to make sure that the order is capable of being read

5  consistently with what we understand the terms of that DIP

6  facility and their proposed interim DIP order to be when it's

7  adjudicated by the Court.

8            THE COURT:  Well, I can actually make it even

9  easier.  I don't think it's appropriate, so strike it.

10           This order stands on its own.  The DIP order will

11  stand on its own.

12           MR. WERKHEISER:  Let me cede the podium for a

13  moment, Your Honor.

14           THE COURT:  Uh-huh.

15           MS. RICHENDERFER:  Your Honor, I just rise to say

16  that that change is fine, Your Honor.

17           THE COURT:  Okay.  Thank you.

18           The Paragraph 27(b) legal fees of the lender if

19  there's a challenge ongoing, I think it's appropriate that

20  that language stay in.  I don't think there should be some

21  presumption that the lender doesn't -- isn't entitled to its

22  fees just because somebody brings and action.  And it can be

23  prejudicial to the lender to have to front its own legal fees

24  on a challenge that could last years, so I think it's

25  appropriate to have that language.  So, I'll overrule that

1   objection.

2           MR. WERKHEISER:  All right.  Thank you, Your

3   Honor.

4           And then let's just leave the consent fee to the

5   last, if we may, Your Honor.

6           And then with respect to the language on -- I'm

7   sorry -- Paragraph 25(a), so, it's my understanding this is

8   relatively typical language in this court and in others;

9   essentially, the committee has their investigation budget.

10  This does not invade any traditional investigatory activities

11  by an official committee that Your Honor would appoint.  But,

12  you know, it is, I think, a well-accepted principle of

13  drafting these orders that, as they've developed over the

14  years, that, you know, a secured lender should not be forced

15  to allow its own cash collateral to be used in actually

16  litigating and I think that's what these terms are primarily

17  contemplating.

18          I'm speaking from 21-plus years of experience at

19  this.  I've never seen a committee that was really deterred

20  by this language.

21          THE COURT:  So, if you have a plan, which would be

22  helpful, and it's got the support of the secured creditors

23  and the committee objects to the plan can they use cash

24  collateral to pay their fees to object to the plan?

25          MR. WERKHEISER:  Well, again, I think as this

PA00223

1  language, as in my experience has been interpreted over the

2  years -- and I cannot speak for our specific lenders -- but,

3  you know, I've never seen a lender successfully object just

4  based on that cause to a committee objecting to a plan that

5  they think violated the Bankruptcy Code in some way or was

6  not in the best interests of the estate.

7          If the committee's objection was based on the

8  assertion that the lenders (indiscernible) to the liens or

9  claims, I think, then, they might be well within their rights

10  to rely on this language in that scenario if that's what the

11  committee was trying to litigate in the context of that

12  objection.

13          But, again, I, you know, my understanding and

14  certainly the contextualized understanding that has developed

15  over time and I believe in this court, is that a generic

16  confirmation objection would not be limited on the part of

17  the committee.

18          THE COURT:  Counsel?

19          MS. FELDSHER:  Good afternoon, Your Honor.

20  Jennifer Feldsher, Morgan, Lewis & Bockius, on behalf of

21  Wells Fargo --

22          THE COURT:  Can you move the microphone towards

23  you.  Thank you.

24          MS. FELDSHER:  That's usually never my problem,

25  Your Honor.

```
 1              THE COURT:  Well, this is a noisy air-conditioner,
 2    unfortunately.
 3              MS. FELDSHER:  -- Counsel for the agent for the
 4    ABL lenders.
 5              Your Honor, I actually don't read language, (A),
 6    to cover the Court's concern about a Chapter 11 plan, because
 7    what it says is, you know, this goes to permitted
 8    enforcement -- and that's what it says in (A) -- permitted
 9    enforcement or realization upon the collateral.  So, it's
10    what's permitted under the order and I view that to be an
11    exercise of remedy.
12              So, in other words, if there's a default, there's
13    language, as is typical in similar orders, that says, you
14    know, if the default -- unless the Court orders otherwise,
15    with an x amount of days, the lenders can foreclose, the
16    lenders can take other actions, they can seize cash, they can
17    do things.
18              And so, I think this gets to that point --
19              THE COURT:  Yeah.
20              MS. FELDSHER:  -- that the creditors' committee
21    can't use cash collateral of the lenders, frankly, to
22    challenge anything but the event of default and whether that
23    occurs.  And we do think that this language is fairly typical
24    and while I absolutely hate standing up and citing other
25    cases that the Court's been involved in, that I'm not
```

1   involved in, so I don't know the ramifications of that, I do

2   know this is similar language to what was in True Religion,

3   which I believe the Court approved, as well.

4           THE COURT:  You could write a list a thousand

5   pages long of things that are in orders that I've signed that

6   I don't like --

7           MS. FELDSHER:  I did preface --

8           THE COURT:  -- but this is not one of them.

9           MS. FELDSHER:  I did preface that by saying I hate

10  citing it, but I would do it anyway.

11      (Laughter)

12          THE COURT:  You're going to do it anyway; you're

13  contractually obligated.

14          MS. FELDSHER:  That, I am.

15          THE COURT:  No, I'm okay with this language.  I

16  don't think this is -- I understand the concern, you know,

17  what does hindering meaning, what does preventing mean, but I

18  think it's -- the way the sentence reads, it's really focused

19  on the permitted enforcement or realization on the collateral

20  and I think that's pretty narrow, so I'm okay with that.

21          MS. FELDSHER:  Correct.  Thank you, Your Honor.

22          THE COURT:  So, we're left with the consent fee.

23          MR. WERKHEISER:  Yes, Your Honor.

24          Gregory Werkheiser for the record, again.  So, the

25  consent fee, I think as we got into this previously,

1   obviously, the debtors would prefer not to pay a consent fee.

2   We would like to conserve as much cash as possible and keep

3   the lenders' claims as minimized as possible to ensure the

4   greatest recoveries for everyone in the case.

5           That being said, we did not have the ability to

6   demonstrate adequate protection for both, the ABL and the

7   term loan, in the context of this order and this order

8   represents a negotiated package of terms under which they

9   were prepared to give the debtors access to cash collateral.

10          We got some things that we wanted, such as

11  budgeting, in order to honor customer deposits, budgeting to

12  cover, you know, ordinary course operating expenses for the

13  contemplated projected duration of the liquidation.

14          We didn't get some things that we didn't want such

15  as taking out obligations like this.

16          So, it's hard to -- I don't think it's appropriate

17  in the context of this order to segregate this and say, Well,

18  there's not necessarily a basis explicitly in the prepetition

19  documents for this, therefore, they should not get it.

20          It is part of the overall deal.  It is part of

21  what was required under our agreements to provide adequate

22  protection and it was the bargain that the debtor struck.

23  So, we are prepared to live by it, even if it's not ideal.

24          THE COURT:  Yeah.  Well, I'm okay with it.  I

25  mean, I don't like it either, but it's not my money.

PA00227

1           And this cases is tremendously risky for the

2    lenders.  The prudent lender might simply force a

3    liquidation, so it's a bit of a wing and a prayer here and I

4    certainly -- and I think, importantly, there's just no

5    adequate protection available.  And cash payments, although

6    they generally are to principal as opposed to a fee, but cash

7    payments are specifically contemplated as something that can

8    be used as adequate protection, so I'll allow it.

9           MR. WERKHEISER:  Thank you, Your Honor.

10          THE COURT:  You're welcome.

11          MR. WERKHEISER:  I think that is the remaining

12   open issues we have on the interim order.

13          THE COURT:  I don't -- do you have a blackline

14   yet?

15          MR. WERKHEISER:  I do have a blackline for Your

16   Honor, if I may approach?

17          THE COURT:  Yes.  I just need to go through my

18   notes and see if there's any open issues left.

19          Thank you.

20          Here come the landlords.

21      (Laughter)

22          THE COURT:  Look out.

23          Ms. Heilman, how are you?

24          MS. HEILMAN:  Good afternoon, Your Honor.  Leslie

25   Heilman, Ballard Spahr, on behalf of a number of landlords of

1    the debtors that represent approximately 42 locations of the

2    debtors, so a significant majority of the landlords, Your

3    Honor.

4              I rise, number one, since we are dealing with the

5    DIP, we did raise certain concerns with respect to the DIP.

6    I have seen a blackline that has addressed those concerns,

7    namely, with respect to access in Paragraph 32 and

8    Paragraph 21, just subjecting any default to the access

9    language in Paragraph 32.  I have seen that language.  I

10   believe the order that's been handed up to you will reflect

11   those changes.

12             So, with respect to the DIP, I think we are -- or

13   the cash collateral, we are resolved, with the exception

14   of -- and this is more of like a preview for things to

15   come -- I think, Your Honor, we have been told that stub rent

16   is in the budget for approximately the third week of March,

17   or at least near the tail end of March to be paid.  This is a

18   liquidation case, as they've teed it up to Your Honor and

19   they have commenced GOB sales prior to the petition date and

20   have asked Your Honor authority to continue those sales post-

21   petition, outside the ordinary course of business.  So, it

22   is -- and with the liquidity concerns before Your Honor, we

23   had serious concerns that the rent to be paid during their

24   time of use and occupancy of the premises.  So, that will

25   come to fruition probably before the final and we'll raise

PA00229

1   any concerns with respect to rent at that time.

2           I do want to say, Your Honor, we are not

3   advocating for our rent to be paid out of the priority claims

4   as was indicated earlier this year.  We would not advocate

5   for that, administrative creditors should share equally in

6   that regard.

7           Your Honor, in addition -- and I'm not sure -- I

8   think where we're going is the scheduling piece going

9   forward, and we did file a response to the first day

10  declaration.  I'm not sure if Your Honor had an opportunity

11  to see that.

12          THE COURT:  I saw that.

13          MS. HEILMAN:  Your Honor --

14          THE COURT:  I wouldn't know if I would call it a

15  response; it had a little edge to it.

16      (Laughter)

17          MS. HEILMAN:  It had a little edge to it.  And,

18  Your Honor, it was not raised by all of my representative

19  clients, but there are certain majority interests of

20  landlords here that are very, very concerned going forward,

21  with respect to the expediency of this case and the process

22  to date and the fact that this is on a fast-track for

23  liquidation before any committee is in the door, as well as

24  we are mindful of the liquidity constraints, but as people

25  have indicated, this is an iconic institution.  It is very --

1    you know, the places that -- the geography of where it sits

2    is very important to the people.  It's very important to the

3    landlord community.  It's very important to the vendor

4    community.

5              And we filed the declaration because we think that

6    even though there are liquidity constraints, we are aware

7    that there are buyers out there and that there should be at

8    least be some slowdown, however slight to, allow for that to

9    play out to see if there is possibly a going-concern

10   enterprise here.  And the committee should have a seat at the

11   able on that.

12             I know that the U.S. Trustee's Office has set a

13   formation meeting for next Wednesday and we have continued

14   the liquidation motion to Thursday, so there is some time

15   here to continue to explore that with those purchasers, but

16   there are prospective purchasers out there for a go-forward

17   enterprise and before the train leaves the station, I think

18   that everyone should be mindful of that and see if we can

19   stop fast-tracking to just a closer of the doors for the

20   employees, for the landlords, and for everyone that's

21   involved to maximize value.

22             So, Your Honor, I rise to say that because we just

23   didn't want -- we wanted to comments to be heard and we're

24   hopeful and that will really set the stage for the motion

25   that will be heard on Thursday, as well as when the committee

1    is formed.

2            THE COURT:  Just so -- by liquidation motion, you

3    mean the motion on the GOB sales?

4            MS. HEILMAN:  Yes, Your Honor.

5            THE COURT:  Okay.

6            MS. HEILMAN:  And we will have our usual -- we

7    have our usual concerns with that motion which we are working

8    with the liquidators on, with respect to the conduct of the

9    sale, the signage, and the like, as well as the proposed form

10   of order, but there is this overall concern, too --

11           THE COURT:  Whether that's the --

12           MS. HEILMAN:  -- that we're speeding towards a

13   liquidation where there is a prospect for a going-concern.

14           THE COURT:  Okay.  Thank you.

15           MS. HEILMAN:  Thank you, Your Honor.

16           MS. RUSSELL:  Your Honor, Maura Russell,

17   Montgomery McCracken Walker & Rhoads, proposed special

18   counsel for the debtor.

19           I don't want to get -- jump ahead of the Court

20   with respect to the motion to approve the store-closing

21   sales, but if Your Honor was entertaining comments, our

22   responses to counsel's comments, I wanted to rise and to

23   address those.

24           THE COURT:  Oh, that's not necessary.

25           MS. RUSSELL:  Okay.

1     THE COURT:  Thank you.  Mr. Taylor?

2     You get more distinguished every time I see you,

3 which means you're getting grayer.

4   (Laughter)

5     MR. TAYLOR:  I'm sure it has nothing to do with

6 what's going on up here.

7   (Laughter)

8     MR. TAYLOR:  Good afternoon, Your Honor.  Greg

9 Taylor --

10     THE COURT:  Good afternoon.

11     MR. TAYLOR:  -- of Ashby & Geddes.

12     On the phone with me, Your Honor, is Mr. Michael

13 Small of the Foley & Lardner firm.  Together, we represent

14 Kingsdown, Inc. and our primary issue, Your Honor, is that

15 Kingsdown provides certain diagnostic units and kiosks that

16 are located in the debtors' stores and these diagnostic units

17 contain proprietary technology.

18     We want to make sure that no liens attach or

19 purport to attach to those items that are owned by Kingsdown

20 and we also want to make sure that those items find their way

21 back to Kingsdown at the close of the debtors' stores.

22     We have begun to engage in the dialogue with

23 debtors' counsel on this and we look forward to continuing to

24 work with them on that.  But we did want to at least mention

25 it today, highlight the issue for Your Honor in the event

1 that we were not able to reach an agreement and we're back

2 before you at the final hearing on a disputed matter.

3          THE COURT:  All right.

4          MR. TAYLOR:  Thank you, Your Honor.

5          THE COURT:  Thank you, Mr. Taylor.

6          Of course, if it's not the debtors' property, they

7 can't give somebody a lien on it.  If it is, they can.  And I

8 will decide that at a future date, if necessary.

9          Let me just run through the --

10          MR. WERKHEISER:  And, Your Honor, with respect to

11 the Kingsdown property, there is likely no dispute there.  We

12 just were advised of this position yesterday.  We've had some

13 preliminary discussions with our client and I think, likely,

14 at the end of the day, we'll come to an understanding to

15 return that to them, but we just haven't had a chance to

16 diligence their statement that they owned that property and

17 that it ought to be returned from the locations where it

18 exists with the debtors right now.

19          So, everybody's rights are fully reserved.

20          I don't want to get into the weeds on landlords'

21 counsel's comments before but I do want to just make clear,

22 and I want our record to be clear, that although

23 circumstances have us in a position where we have to pursue a

24 liquidation currently for the majority of the stores, to be

25 clear, the phones are open, the doors are open.  We will

1   entertain legitimate offers that produce more value for our

2   stakeholders than the option that we've currently got before

3   us.  If that option exists, you know, we're prepared to

4   consider it.

5          You know, the difficult part of the situation is

6   that we've tried very hard to find a better option and have

7   not been able to succeed at that to date and so -- but, you

8   know, stranger things have happened and if somebody could

9   come forward with not just, you know, an offer as an going-

10  concern offer, but one that can deliver more value, which is

11  the guiding principle for this Court at the end of the day,

12  everyone, I think, behind me is prepared to consider that.

13         THE COURT:  Okay.  I have some comments to the

14  order.

15         MR. WERKHEISER:  Yes, sir?

16         THE COURT:  Page 14, Paragraph K, which is a

17  finding that there's an entitlement to the equities of the

18  case exception waiver and 506(c), since that's preserved for

19  the final order, I would like to take out that finding.  I'm

20  making no such finding.

21         And then --

22         MR. WERKHEISER:  Your Honor, just to be clear, by

23  removing that now, we are just preserving the *status quo*,

24  pending a final hearing; is that fair?

25         THE COURT:  What does "preserving the *status quo*"

PA00235

1    mean?

2           MR. WERKHEISER:  It means that the issue can still

3    be addressed when we get before Your Honor at a final

4    hearing.

5           THE COURT:  I'm just not making a finding today.

6           MR. WERKHEISER:  Yeah.

7           THE COURT:  I mean, I don't even know why we do

8    this, but it says -- you put a paragraph -- this is why the

9    orders are so long -- you put a paragraph in that says,

10   "subject to the final order" and here's a one-page-long

11   paragraph.  This interim order doesn't even do what this

12   paragraph is designed to do, other than put a pin in it so

13   that the committee has something to aim at or they know what

14   your position is.

15          I'm certainly not going to make a finding for a

16   paragraph that doesn't make any sense to begin with, but I'll

17   live with that.  I'm used to seeing that, but I'm not making

18   any finding.

19          MR. WERKHEISER:  Understood, Your Honor.

20          THE COURT:  There's a blank in Paragraph 11,

21   Page 25, for the exhibit number for the budget.  I don't know

22   what the number is supposed to be, but you want me to fill

23   that in?

24          MR. WERKHEISER:  Yeah, one, please.

25          THE COURT:  There are, one, two, three, four -- at

1   least five instances where you've said that people are

2   authorized and directed to do something.

3           I'd like you to make a global search and replace

4   and get rid of "and directed" and just authorize.  So, for

5   example, I mean, I could list them all for you.  In

6   Paragraphs 7, 8, 9, 17, and 22 is where the language is.

7           So, 12(b) on Page 27, there's a blank for the

8   exhibit number for the borrowing base certificate and 12(c),

9   right below it, there's a blank for the exhibit number for

10  the budget-variance certificate.

11          MR. WERKHEISER:  Yes, I believe those will be two,

12  and three, and so forth.

13          THE COURT:  Well, they are what they are.

14          We've already talked about Paragraph 36 and then

15  for the final hearing let's just use the date, if that's all

16  right, the date that we've already sat of April 6th, I think;

17  is that right?

18          MR. WERKHEISER:  That was April 6th, Your Honor,

19  with a 10:00 a.m.

20          UNIDENTIFIED:  I have 1:00.

21          MR. WERKHEISER:  Oh, 1:00, now?

22          THE COURT:  The 6th at one o'clock, yeah, and

23  objections are due the 30th of March.

24          MR. WERKHEISER:  Okay.

25          THE COURT:  Subject to making those changes and

1  submitting it under certification of counsel, I'm happy to

2  approve your cash collateral order.

3          MR. WERKHEISER:  All right.  Thank you, Your

4  Honor.

5          We will get that over before the end of the day.

6          THE COURT:  Okay.

7          MR. WERKHEISER:  Your Honor, one of the things we

8  left at the hearing prior was our customer practices [sic]

9  motion, and just to bring Your Honor up to speed on that, as

10  I arrived here, we distributed some redline for people to

11  review to try to make some changes responsive to Your Honor's

12  comments about that.  I think rather than put anyone in a

13  position, especially given that we're coming back here within

14  the next day or so, in a position where they don't have an

15  opportunity to review, if I could just summarize those for

16  Your Honor and then give people an opportunity to review the

17  document.

18          But we did agree to reproduce the detailed wind-

19  down customer practices in the text of the order and have

20  revised that to do so.  And then in addition to have attached

21  an exhibit that it provides a fair bit more detail on how

22  customer deposits are processed --

23          THE COURT:  Okay.

24          MR. WERKHEISER:  -- going forward.

25          And then I was able to consult with the company

PA00238

1  and our financial advisor during the break and I understand

2  that the intention is, within the next several days to make a

3  distribution to all customers that tendered deposits for

4  which we have an email address, by email, that will notify

5  them of the company's current policy on customer deposits, so

6  they are alerted to that in time to act upon, you know,

7  whatever they intend to do with their customer deposit.

8          And for those that we do not have email addresses,

9  we have, by and large, physical addresses and will be sending

10  out notices to them by mail.

11          THE COURT:  Good.  Thank you.

12          MR. WERKHEISER:  So --

13          THE COURT:  I expect that this -- word of this has

14  hit these communities where these stores are located -- and I

15  didn't look myself -- but I'm told there are some news

16  stories about the world clearly knows that this is going on,

17  but I think that it does make a lot of sense and it's

18  appropriate and consistent with due process to give these

19  people an opportunity to receive formal notice or informal

20  notice of what is going to be done in connection with their

21  deposits.  Because this is real money for real people and it

22  makes a real difference.

23          MR. WERKHEISER:  Thank you, Your Honor.

24          And I would just ask that if they're present in

25  the courtroom today, if they had further comments on the

1    order, to get them to me before the end of the day and we'll

2    try to sort of things out.  And if everybody is onboard,

3    submit it under certification if that's acceptable to Your

4    Honor?

5              THE COURT:  That's fine.

6              MR. WERKHEISER:  Thank you, Your Honor.

7              THE COURT:  You're welcome.

8              MR. WERKHEISER:  I think that brings us to the

9    remaining items that were filed last evening, for which we

10   want to discuss scheduling.  Why don't we take up store-

11   closing sales first and I'll cede the podium to Ms. Russell

12   and we can try to talk about getting a game plan for that.

13             THE COURT:  Okay.

14             MS. RUSSELL:  Good afternoon, Your Honor.  I'm

15   certainly mindful of the clock, so I will be brief.

16             While we regret the timing of the filing of the

17   motion, that was the quickest we could get it, so we do

18   apologize.  We had hoped that we would be able to at least

19   have preliminary hearings, with respect to the motion and

20   that Your Honor would keep the record open and, perhaps, a

21   telephonic conference tomorrow later in the day to resolve

22   any remaining issues or outstanding objections.

23             We've discussed that with a few of the counsel to

24   the landlords that are in the courtroom.  They've expressed a

25   willingness, so long as there is a, you know, maintaining of

1    the *status quo* until Your Honor has that hearing.

2           The U.S. Trustee's Office is not inclined to --

3    that scheduling did not work for them.

4           THE COURT:  I am not going to conduct a hearing at

5    all.  I'm not going to start a hearing.  I'm not going to

6    conduct a hearing on a motion that was filed at midnight last

7    night for a 10:00 a.m. hearing this morning.  I'm not mad at

8    anybody for filing it.  I understand these things take time.

9    It's just inappropriate and not consistent with the due

10   process to even start the hearing.

11          I'll give you Thursday.

12          MS. RUSSELL:  Okay.

13          THE COURT:  I'm in an all-day mediation

14   tomorrow -- I cannot do it tomorrow -- I can hear you

15   Thursday afternoon on this motion.

16          MS. RUSSELL:  Okay.  Understood, Your Honor.

17          With respect to comments that any parties have to

18   the order that was filed, if they could -- are inclined to

19   communicate those to me at some point tomorrow with the hopes

20   of us being able to incorporate those comments into a revise

21   proposed order for Your Honor to review prior to the hearing,

22   that would be helpful.

23          We would also request that Your Honor -- we have

24   sales going forward and we understand that the debtors are

25   continuing in the mode that they had been in prepetition and

PA00241

1    it is currently their intention to continue in that capacity

2    until that hearing on Thursday.

3            Obviously, signage, Your Honor, would not --

4    banners would not be going up, but there are in-store

5    promotions that are currently ongoing since the petition

6    date, as well as the debtors' intention to comply with the

7    revised customer practices, as set forth in the motion that

8    was discussed earlier.

9            THE COURT:  Well, if it's inside the ordinary

10   course of business you have every right to do it.  If it's

11   outside the ordinary course of business, you are violating

12   the Bankruptcy Code and those are unauthorized post-petition

13   transactions that are avoidable.  It's up to you.

14           MS. RUSSELL:  Well, Your Honor, I guess the

15   question for your is whether or not we can continue until --

16           THE COURT:  I'm not going to tell you.  It's up to

17   you.  I don't know.  I don't know.

18           How am I going to know?  I mean, the Code is what

19   it is.  If it's inside the ordinary course of business,

20   you're free to do it.

21           MS. RUSSELL:  It was in the ordinary course of

22   business upon the filing; however, Your Honor, we do have a

23   motion pending before the Court with regard to other

24   provisions of the motion, but the debtor had been in the

25   process of conducting store-closing sales prior to the

1   filing.

2          As I indicated, the banners are not going up, so

3   it would be a much more soft-sale type structure, but we

4   didn't want to create any inconsistency if anyone was in our

5   stores and saw that there was discounting and promotions that

6   we were somehow not complying with what was going on before

7   the Court.

8          THE COURT:  Look, the problem is, okay, that

9   actions have consequences.  The filing of a petition has

10  consequences.  If you weren't ready, you shouldn't have

11  filed, okay.

12         I'm not the one who filed and then six hours or

13  eight hours before the hearing filed a motion, okay.  I'm not

14  mad at anybody -- it is what it is -- but that was a calculus

15  you made and you did what you had to do, but I'm not going to

16  give you an advisory opinion about whether you're acting

17  consistent with the Code.  I don't know the facts and I don't

18  have time or the inclination, frankly, to get educated about

19  them.

20         MS. RUSSELL:  Understood.  It was the balancing of

21  a whole host of --

22         THE COURT:  I'm sure it was.  I'm sure it was.

23         MS. RUSSELL:  -- challenges in terms of the timing

24  of the filing versus the timing of the motion.

25         THE COURT:  I'm sure it was.

PA00243

1          Look, I did these cases before, too.  I understand
2   how hard they are, but I have an obligation to preserve due
3   process and I've got the U.S. Trustee objecting and I
4   completely back the U.S. Trustee.
5          Did you give them a draft of this motion like
6   you're supposed to?
7          No.
8          MS. RUSSELL:  And, Your Honor --
9          THE COURT:  I can't believe it existed at whole-
10  cloth at 11:45 last night; obviously, you had a draft at some
11  point.  You had an obligation to share it with the
12  U.S.  Trustee.  Read the Local Rules.
13         MS. RUSSELL:  Understood, Your Honor.  That was --
14  it was not intended to put the U.S. Trustee's Office or the
15  Court in a difficult spot or with respect to the timing of
16  the filing of the motion or this morning's hearing.
17         We certainly want to give people the opportunity
18  to review the motion and the order and the relief being
19  requested; unfortunately, we had a timing -- timing didn't
20  sync with respect to all of the objectives we were filing.
21         THE COURT:  All right.  Let me ask the U.S.
22  Trustee, are you okay with the hearing tomorrow if I can fit
23  it in and if so, when?
24         MS. RICHENDERFER:  I'm sorry, Your Honor.  I
25  didn't catch that last part.

PA00244

1          THE COURT:  Sorry.  Are you okay with a hearing
2    tomorrow, and if so, when, on this issue, the store closing?
3          MS. RICHENDERFER:  I've got two 341s I'm
4    conducting tomorrow, so I'm trying to figure out -- I mean if
5    the Court wants to hear it tomorrow, I don't know what is the
6    best time, I guess, because I know it's going to be a long
7    hearing.
8          I haven't read it yet either, Your Honor.  I tried
9    to print it out fast this morning and it jammed our printer.
10   I had requested so many times for a draft copy and just never
11   got anything at all, so I suspect that based on the
12   particular type of transaction here that's been structured,
13   I'm going to have a lot of questions and probably cross-
14   examination of witnesses and I do need time to prepare.
15         Thursday is wide open.  If it has to be tomorrow,
16   I'll live with it somehow and try to make arrangements, but
17   like I said, I've got two 341s.
18         THE COURT:  No.  If it's going to be contested, I
19   can't squeeze it in tomorrow.
20         MR. FOX:  Your Honor, if I may?  I apologize for
21   interrupting.
22         Steven Fox from Riemer & Braunstein, on behalf of
23   the Hilco and Gordon Brothers consulting entities.  I can
24   short circuit the scheduling issues for Your Honor for
25   tomorrow.

1          In light of the U.S. Trustee's suggestion that it

2   may be necessary to inquire of witnesses, we won't be able to

3   have people here for that purpose tomorrow.  When we learned

4   this morning that the hearing was not going to go forward

5   today, we put a Hilco representative who landed in

6   Philadelphia back on a plane and sent them back to Chicago.

7          Ms. Shea (ph) is here today for the hearing and

8   unfortunately will not be available to be here Thursday, but

9   we will have Hilco representatives here on Thursday to

10  respond to any questions that the Court or the U.S. Trustee

11  may have.

12         So, from our perspective, we think at this point

13  it's going to need to be Thursday just for availability

14  purposes.

15         With respect to the continued conduct of the sale

16  comments from Ms. Russell, we are prepared under the terms of

17  our agreement to continue to operate in the normal course

18  under that agreement.  We understand the Court's concerns and

19  with respect to advisory opinions and we're also big boys and

20  we've been down this path before, so a two-day delay is not

21  going to affect us in terms of how we react with the debtor.

22              THE COURT:  Okay.

23              MR. FOX:  Just one last comment, with respect to

24  the customer programs, Your Honor.  We have been working with

25  the company in terms of communications to customers.  As you

PA00246

1   probably understand, it's our practice to make sure stores

2   are properly signed for treatment of gift cards and gift

3   certificates, merchandise, credits, and the like and we will

4   continue to work with the company on communications, in-

5   store, with the customers about how to treat their deposits

6   and merchandise deliveries --

7               THE COURT:  Thank you.

8               MR. FOX:  -- and those are all covered by our

9   consulting agreement.

10              THE COURT:  All right.  Thank you.

11              MR. FOX:  Thank you, Your Honor.

12              THE COURT:  That's very helpful.

13              Thursday.

14              MS. RUSSELL:  Yes, Your Honor.  I didn't get a

15  time from you.

16              THE COURT:  Yeah, I'm just looking.  I'll move

17  something -- what time is that -- let's do two o'clock.  I

18  might be a few minutes late, but let's shoot for two o'clock.

19  I have a meeting outside the office.

20              And we'll do both, the DIP and the going out of

21  business, although it sounds like the GOB is probably needs

22  to be the focus of our attention, but, of course, we'll deal

23  with the DIP, too.  And that's normal -- that's more than

24  normal notice for a DIP financing.

25              MS. RICHENDERFER:  Your Honor, I would hope that

1  upon review of the DIP, that I may be able to work things

2  out.

3        THE COURT:  Have you seen that before, either?

4        MS. RICHENDERFER:  It was -- a draft was emailed

5  to me at eight o'clock last evening and I could not pull it

6  up on my cell phone --

7        THE COURT:  Okay.

8        MS. RICHENDERFER:  -- so I haven't had a chance to

9  review that yet.

10       But under the circumstances of the particular --

11 of the sale and of the DIP, I'm hopeful that we can work

12 things through and be able to present --

13       THE COURT:  Yeah, I think my clerk said it was

14 about a 20-page order, so it hardly even counts as a DIP.  I

15 think he said it was a short order.

16    (Laughter)

17       MS. RICHENDERFER:  Yeah, these days -- so, Your

18 Honor, we may be left only with the GOB motion.

19       THE COURT:  Well, I may have comments to the

20 DIP -- I don't know -- I, obviously, will have to reserve

21 rights on that.

22       What the heck -- hang on, I just messed something

23 up.

24    (Pause)

25       THE COURT:  What did I say?  Two o'clock?

```
 1              MR. WERKHEISER:  Yes, Your Honor.

 2              MS. RUSSELL:  Yes.

 3              THE COURT:  I cannot operate a computer.

 4              All right.  All set.  No problem.

 5              MR. WERKHEISER:  And one small point, Your Honor.

 6              THE COURT:  And I think a lot of your orders were

 7  uploaded, so we're working on getting those signed as quickly

 8  as possible.

 9              MR. WERKHEISER:  Thank you, Your Honor.

10              As I was going to say, just one small point on the

11  Levin DIP.  So, it did contemplate having a hearing a little

12  bit earlier than Thursday, so we were contemplating interim

13  relief, I think for 3.5 million would have been the

14  (indiscernible) purchases under the DIP.  They've raised the

15  possibility that we may need to increase that slightly to get

16  those stores sort of back up to, you know, normal operating

17  levels of inventory.  And so, they're going to look at that,

18  but there might be a slight change in the relief requested

19  between now and Thursday.

20              THE COURT:  Okay.

21              MR. WERKHEISER:  I just wanted to preview that for

22  the Court and the parties.

23              THE COURT:  Just keep everybody in the loop on

24  that, including the budget.

25              MR. WERKHEISER:  I believe Mr. Price is here on
```

```
 1  behalf of the Levin parties and would like to address the

 2  Court.

 3            MR. PRICE:  Good afternoon, Your Honor.  William

 4  Price, Clark Hill, on behalf of Levin Furniture.

 5            We look forward to working with the U.S. Trustee,

 6  the other lenders, and the debtor to hammer out the finer

 7  points on the DIP order.  We appreciate your time and look

 8  forward to being before you Thursday.

 9            THE COURT:  Okay.  Great.

10            MR. PRICE:  Thank you.

11            MR. WERKHEISER:  I think, Your Honor, looking

12  around -- no, we've got one more coming.

13            THE COURT:  You've got to hurry, because I

14  literally have three minutes.

15            MR. SHAPIRO:  I'll be very brief, Your Honor.

16            For the record, Zach Shapiro of Richards, Layton &

17  Finger.  I am appearing on behalf of U.S. Assets, Inc.

18            I think you heard from Ms. Heilman that at least

19  certain of the landlords have concerns about how the sale

20  process was run leading up to the filing.  We represent a

21  potential purchaser of the debtors' assets and we expressed

22  an interest in purchasing them as a going concern and we

23  continue to be interested.

24            We're trying to pursue a transaction that would

25  preserve value for a portion of the debtors' stores as a
```

1  going concern and going forward, we would really very much

2  appreciate being able to participate in a process that makes

3  sense and is fair to all parties.  Thank you, Your Honor.

4           THE COURT:  You're welcome.  Thank you very much.

5           Is there anything pressing, Mr. Werkheiser;

6  otherwise, we're going to adjourn.

7           MR. WERKHEISER:  No.  Again, I just want to be

8  clear that the value is there and the closing risk is

9  acceptable, so we are prepared to engage and we invite them

10 to come talk to us.  So, I think that concludes our business

11 today and we thank Your Honor for your patience and attention

12 and are looking forward to things going a little more

13 smoothly after today.

14          THE COURT:  All right.  Thank you.

15          We're adjourned.

16      (Proceedings concluded at 2:26 p.m.)

17

18

19                        CERTIFICATE

20

21 I certify that the foregoing is a correct transcript from the

22 electronic sound recording of the proceedings in the above-

23 entitled matter.

24
   /s/Mary Zajaczkowski_____          March 10, 2020
25 Mary Zajaczkowski, CET**D-531

# **EXHIBIT C**

PA00252

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of (a) AVF Parent, LLC (the "Borrower"), and (b) AVF Holdings II, LLC, Art Van Furniture, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVCE, LLC, AVF Franchising, LLC, AVF Holding Company, Inc., AVF Holdings I, LLC, Levin Parent, LLC, LF Trucking, Inc., Comfort Mattress, LLC and Sam Levin, Inc., each as a debtor and debtor in possession (collectively, with the Borrower, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this "Interim Order") pursuant to sections 105, 361, 362, 363 and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

(i)      authorizing the Debtors to use the Prepetition Collateral (as defined herein), including all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value, including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and, in the case of the Prepetition Secured Parties, the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("Diminution in Value");

(ii)      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(iii)      scheduling a final hearing (the "Final Hearing") within 30 days of the Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* and the evidence submitted and argument made at the interim hearing held on March 10, 2020 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Interim Hearing having

2

PA00254

been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A. **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B. **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C. **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

3

PA00255

U.S.C. §§ 1408 and 1409.

      D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

      E.    **Notice**.  Notice of the Motion and the Interim Hearing have been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

      F.    **Debtors' Stipulations**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 27 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

      (i)    *Prepetition ABL Facility*.  Pursuant to that certain *ABL Credit Agreement* dated as of March 1, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) the Borrower (the "Prepetition ABL Borrower"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors"), (c) Wells Fargo Bank, National Association, as administrative agent, issuing bank and collateral agent (in such capacity, the "Prepetition ABL Agent"), and (d) the lenders party thereto (collectively, including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and the Prepetition ABL Lenders and the Prepetition ABL Agent, together, the "Prepetition ABL

4

Parties"), the Prepetition ABL Lenders provided revolving credit, term loans and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility") in an aggregate principal amount of up to $82,500,000.

(ii)     *Prepetition ABL Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than approximately $33,573,784.18, inclusive of not less than $14,900,000 of issued and outstanding letters of credit and the Early Termination Premium as defined in the Prepetition ABL Documents (collectively, together with accrued and unpaid interest, bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors' obligations pursuant to, or secured by, the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations").

(iii)     *Prepetition ABL Liens and Prepetition ABL Priority Collateral*.  As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, security interests in and continuing liens on

PA00257

(the "Prepetition ABL Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain Intercreditor Agreement referred to in paragraph F(vii) below) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) and proceeds, products, and rents of any of the foregoing (collectively, the "Prepetition Term Priority Collateral," and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral"), subject only to the liens of the Prepetition Term Loan Agent on the Prepetition Term Priority Collateral and Prepetition ABL Permitted Prior Liens (as defined herein).

(iv)     *Prepetition Term Loan Facility*.  Pursuant to that certain Credit Agreement dated as of March 1, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Agreement," and collectively with the Loan Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Documents," and together with the Prepetition ABL Documents, the "Prepetition Documents"), among (a) the Borrower (the "Prepetition Term Loan Borrower" and together with the Prepetition ABL Borrower, the "Prepetition Borrowers"), (b) Virtus Group, LP, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent," and together with the Prepetition ABL Agent, the "Prepetition Agents"), (c) the guarantors thereunder (the "Prepetition Term Loan Guarantors" and, together with the Prepetition ABL Guarantors, the "Prepetition

6

Guarantors"), and (d) the lenders party thereto (the "<u>Prepetition Term Loan Lenders</u>," and collectively, including the Prepetition Term Loan Agent, the "<u>Prepetition Term Loan Parties</u>," and together with the Prepetition ABL Parties, the "<u>Prepetition Secured Parties</u>"), the Prepetition Term Loan Lenders provided term loans to the Prepetition Term Loan Borrower (the "<u>Prepetition Term Loan Facility</u>," and together with the Prepetition ABL Facility, the "<u>Prepetition Secured Facilities</u>") in an aggregate principal amount of $100,000,000.

(v)     *Prepetition Term Loan Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was not less than approximately $175,000,000 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements reimbursable thereunder), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrower's and the Prepetition Term Loan Guarantors' obligations pursuant to, or secured by, the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "<u>Prepetition Term Loan Obligations</u>," and together with the Prepetition ABL Obligations, the "<u>Prepetition Secured Obligations</u>").

(vi)     *Prepetition Term Loan Liens and Prepetition Term Priority Collateral*.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders,

PA00259

security interests in and continuing liens on (the "Prepetition Term Loan Liens," and together with the Prepetition ABL Liens, the "Prepetition Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to the liens of the Prepetition ABL Agent on the Prepetition ABL Priority Collateral and Prepetition Term Loan Permitted Prior Liens (as defined herein).

(vii)   *Priority of Prepetition Liens; Intercreditor Agreement.*   The Prepetition Agents entered into that certain Intercreditor Agreement dated as of March 1, 2017 (as may be further amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other obligors.  Each of the Prepetition Borrowers and Prepetition Guarantors under the Prepetition Documents acknowledged and agreed to the Intercreditor Agreement.

(viii)   *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.*  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of

8

the Bankruptcy Code) or otherwise permitted by the Prepetition ABL Documents (the "Prepetition ABL Permitted Prior Liens"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition ABL Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix)     *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.*  The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Loan Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Parties for fair consideration and reasonably equivalent value;

9

(b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Term Loan Documents (the "Prepetition Term Loan Permitted Prior Liens" and, together with the Prepetition ABL Permitted Prior Liens, the "Permitted Prior Liens");[4] (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Facility; (f) the Debtors have

---

[4] For the avoidance of doubt, as used in this Interim Order, no reference to the Prepetition ABL Permitted Prior Liens, the Prepetition Term Loan Permitted Prior Liens, or the Permitted Prior Liens shall refer to or include the Prepetition ABL Liens or the Prepetition Term Loan Liens.

10

waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x)     *Release.*  The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Interim Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties.  The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order.

PA00263

(xi)    *Default by the Debtors.*  The Debtors acknowledge and stipulate that (i) they have been, since February 5, 2020, and are in default of their obligations under the Prepetition ABL Documents, and that an Event of Default has occurred under the Prepetition ABL Documents, and that since February 5, 2020, interest has accrued, and will continue to accrue, on the Prepetition ABL Obligations at the default rate set forth in the Prepetition ABL Agreement, and (ii) they have been, since February 29, 2020, and are in default of the obligations under the Prepetition Term Loan Documents, and that a Default has occurred under the Prepetition Term Loan Documents, and that as of the Petition Date, interest will accrue, on the Prepetition Term Loan Obligations at the default rate set forth in the Prepetition Term Loan Documents.

(xii)    *Consulting Agreement with the Liquidators*.  Pursuant to that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020, by and among Hilco Merchant Resources, LLC, Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC, Gordon Brothers Retail Partners, LLC, DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC and Gordon Brothers Brands, LLC and certain of the Debtors, acknowledged by the Prepetition Agents (as amended, restated or otherwise modified from time to time, the "Consulting Agreement"), the Debtors have retained the Consultant to conduct "Going Out of Business" sales of the Assets (each as defined in the Consulting Agreement).  The continued existence and validity of the Consulting Agreement and the uninterrupted continuation of the sales contemplated thereby is a condition to the consent of the Prepetition Agents to this Interim Order and the Debtors' use of Cash Collateral hereunder.

G.    DIP Facility. On March 9, 2020, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to*

12

PA00264

*11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Dkt. No. 49]

(the "<u>Levin DIP Motion</u>").  To the extent the Court enters the Orders approving the DIP Facility

in accordance with the terms and provisions of the DIP Credit Agreement (each term as defined in

the Levin DIP Motion), the Prepetition Agents have consented to the DIP Facility (in accordance

with the Orders and the DIP Credit Agreement, in form and substance reasonably acceptable to

the Prepetition Agents), and the Debtors' compliance with, and the obligations incurred under, the

DIP Facility (in accordance with the Orders and the DIP Credit Agreement, in form and substance

reasonably acceptable to the Prepetition Agents) shall not give rise to an Event of Default under

this Interim Order.

        H.    **<u>Permitted Prior Liens</u>**.  Nothing herein shall constitute a finding or ruling

by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected,

or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including,

but not limited to the Debtors, the Prepetition Secured Parties, or a Committee (if appointed), to

challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any

alleged Permitted Prior Lien.  The right of a seller of goods to reclaim such goods under section

546(c) of the Bankruptcy Code is not a Permitted Prior Lien, rather, any such alleged claim arising

or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy

Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL

Liens as such claims had on the Petition Date.

        I.    **<u>Cash Collateral</u>**.  All of the Debtors' cash, including any cash in deposit

accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured

Parties.

13

J.   **Adequate Protection**.  The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, are each entitled to receive adequate protection as set forth herein to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral.

K.   **Good Faith**.  The Prepetition Secured Parties and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (defined below). The Prepetition Secured Parties have agreed to permit the Debtors to use their Cash Collateral for the Specified Period, subject to the terms and conditions set forth herein, which terms and conditions are fair and reasonable and have been stipulated to by the Debtors in the exercise of their sound business judgment.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

L.   **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

M.   **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); (vi) counsel to Levin Furniture, LLC and Levin Trucking, LLC, and (vii) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtors have made reasonable efforts to

14

afford the best notice possible under the circumstances.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    <u>Motion Granted</u>.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.  The Debtors shall not use Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order, and in accordance with the Budget, subject to such variances as are permitted by this Interim Order, the Debtors are authorized to use Cash Collateral for the period (the "<u>Specified Period</u>") from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date, (b) thirty (30) days after the Petition Date and (c) entry of the Final Order; *provided, however*, that, during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget and as otherwise agreed to by the Prepetition ABL Agent in its sole discretion.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any use of Cash Collateral or proceeds resulting therefrom, except (x) as permitted in the Consulting Agreement or the Levin APA (as defined below), (y) as otherwise consented to by the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term

15

Priority Collateral) in writing, or (z) as otherwise disposed of, or used, in accordance with the Budget, subject to such variances as are permitted by this Interim Order.

      3.     <u>Adequate Protection Liens.</u>

      (a)    *Prepetition ABL Adequate Protection Liens.* Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition ABL Adequate Protection Liens</u>") on any Postpetition Collateral.[5]

---

[5] "Postpetition Collateral" means: all personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) subject to entry of a Final Order, proceeds of the Debtors' rights under section 506(c) (solely to the extent such rights result from the use of Postpetition Collateral, and are, therefore, enforceable against parties other than the Prepetition Agents or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (e) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date. Notwithstanding the foregoing, Postpetition Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases). Postpetition Collateral that is (i) Prepetition ABL Priority Collateral, (ii) of a type that would be Prepetition ABL Priority Collateral; (iii) of a type that would be Prepetition ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (iv) the "Deposit", as defined in that certain letter agreement dated as of March 4, 2020 by and among Levin Furniture, LLC, Levin Trucking, LLC, as Buyer, and Sam Levin, Inc. and LF Trucking, Inc., as Seller (the "<u>Levin LOI</u>") shall, in each case, constitute "<u>Postpetition ABL Priority Collateral</u>." Postpetition Collateral that is (i) Prepetition Term Priority Collateral, (ii) of a type that would be Prepetition Term Priority Collateral; and (iii) of a type that would be Prepetition Term Priority Collateral, but that was not otherwise subject to valid, perfected,

PA00268

(b)     *Prepetition Term Loan Adequate Protection Liens.*  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens") on the Postpetition Collateral.

4.     Priority of Adequate Protection Liens.

(a)     The Prepetition ABL Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to:  (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens and (B) the Prepetition ABL Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, (B) the Prepetition Term Loan Liens, (C) the Prepetition Term Loan Adequate Protection Liens, and (D) the Prepetition ABL Liens.

(b)     The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral;

---

enforceable, and unavoidable liens on the Petition Date shall constitute "Postpetition Term Priority Collateral."  Postpetition Collateral that is (i) the proceeds of the Debtors' real property leases; and (ii) the proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents shall be shared Postpetition Collateral, and the Prepetition ABL Liens and Prepetition Term Loan Liens (and corresponding adequate protection liens and claims) on such proceeds shall rank equally in priority and share such proceeds equally (with 50% of such proceeds applied to the Prepetitition ABL Obligations and 50% applied to the Prepetition Term Loan Obligations).  Nothing herein shall be construed to impair any Permitted Prior Liens.

17

PA00269

*provided that*, the Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens, (B) the Prepetition ABL Liens, (C) the Prepetition ABL Adequate Protection Liens, and (D) the Prepetition Term Loan Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, and (B) the Prepetition Term Loan Liens.

(c)     Except as provided herein (including with respect to the Carve Out), the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"), and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

5.     Adequate Protection Superpriority Claims.

(a)     *Prepetition ABL Superpriority Claim*. As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative

18

expense claim in each of the Cases and any Successor Cases (the "Prepetition ABL Superpriority Claim").

(b)    *Prepetition Term Loan Superpriority Claim*.  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition Term Loan Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").

6.    Priority of the Adequate Protection Superpriority Claims.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.  The Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall be subject to the following priorities:  (a) with respect to Postpetition ABL Priority Collateral, (1) the Prepetition ABL Superpriority Claim and (2) the Prepetition Term Loan Superpriority Claim; and (b) with respect to Postpetition Term Priority Collateral, (1) the Prepetition Term Loan Superpriority Claim and (2) the Prepetition ABL Superpriority Claim.

7.    Adequate Protection Payments and Protections for Prepetition ABL Parties. As further adequate protection, the Debtors are authorized to pay in cash the following: (a) all

19

principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 below, (b) immediately upon entry of this Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) in accordance with paragraph 22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e) the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI. In addition, immediately upon the payment in full in cash of the Prepetition ABL Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement, or similar continuing

20

obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 below, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 hereof. The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of funds on deposit in the Prepetition ABL Indemnity Reserve. The Prepetition ABL Indemnity Reserve shall be released at such time

PA00273

as the Prepetition ABL Indemnity Obligations are Paid in Full.[6]

8.    <u>Adequate Protection Payments and Protections for Prepetition Term Loan
Agent</u>.  As further adequate protection, the Debtors are authorized to pay in cash the following:
(a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements
(including the reasonable and documented fees, out-of-pocket fees and expenses, and
disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors)
incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable
under the Prepetition Term Loan Documents, and (b) in accordance with paragraph 22 herein, the
reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including
the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of
counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the
Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the
Prepetition Term Loan Documents; *provided*, *however*, that any payments made under this
paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral.

9.    <u>Perfection of Adequate Protection Liens</u>.  This Interim Order shall be
sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal,
interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification
obligations for which no claim has been asserted) under the applicable credit facility, the cash
collateralization of all treasury and cash management obligations, hedging obligations, and bank product
obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each
case, in accordance with the terms of the applicable credit facility.  No facility shall be deemed to have
been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend
thereunder have been terminated, (b) with respect to the Prepetition ABL Obligations (i) the Challenge
Deadline (as defined in paragraph 34 of this Interim Order) shall have occurred without the timely and
proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the
Challenge Deadline, upon the final, non-appealable disposition of such Challenge; and (c) the Prepetition
ABL Agent has received (i) a countersigned payoff letter in form and substance satisfactory to the
Prepetition ABL Agent and (ii) releases in form and substance satisfactory to the Prepetition ABL Agent
in its sole discretion.

22

granted herein, including the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each Prepetition Agent is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Adequate Protection Liens. The Debtors are authorized to execute and deliver promptly upon demand to the Prepetition Agents, as applicable, all such financing statements, mortgages, notices, and other documents as the Prepetition Agents may reasonably request. Each Prepetition Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

10. <u>Adequate Protection Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases. The receipt by the Prepetition Secured Parties of the adequate protection

23

provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

11. <u>Budget</u>. The use of Cash Collateral during the Specified Period is permitted solely in accordance with a cash collateral budget (the "<u>Budget</u>") approved by the Prepetition Agents,[7] each in their sole discretion, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents. A copy of the initial approved Budget is attached hereto as <u>Exhibit 1</u>. The Budget shall depict, on a weekly basis and line item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals and advisors), asset sales and any other fees and expenses), and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date, and such initial Budget shall be approved by, and in form and substance satisfactory to the Prepetition Agents, each in their sole discretion (it being acknowledged and agreed that the initial Budget attached hereto is approved by and satisfactory to the Prepetition Agents). The Budget shall be updated, modified, or supplemented by the Debtors with the written consent of the Prepetition Agents, but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Prepetition Agents, each in their sole discretion), and no such updated, modified, or supplemented budget shall be effective until so

---

[7] For the avoidance of doubt, any reference to the consent rights of the Prepetition Term Loan Agent shall mean the Prepetition Term Loan Agent acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Agreement).

24

approved, and once so approved shall be deemed the Budget; *provided, however*, that in the event the Prepetition Agents, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the Debtors shall continue to operate under the most recent prior-approved Budget and such disagreement shall give rise to an Event of Default once the period covered by such prior Budget has terminated. Each Budget delivered to the Prepetition Agents shall be accompanied by such customary supporting documentation as reasonably requested by the Prepetition Agents and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable at the time of delivery. A copy of any Budget (or updated Budget once approved by the Prepetition Agents) shall simultaneously be delivered to the counsel for a Committee (if appointed), and the U.S. Trustee. All Cash Collateral use must be strictly in accordance with the terms of the Budget, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.

              12.    <u>Covenants</u>.

              (a)    *Budget Compliance*. The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts for any rolling two week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements for any rolling two week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Operating Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the

PA00277

Budget for such period (with any unspent amounts in this subparagraph (iv) being carried forward for subsequent periods).

(b)     *Borrowing Base*.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall at all times maintain actual Total Excess ABL Availability After Covenant (calculated in the manner set forth in the Borrowing Base Certificate attached to the Budget) in an amount not less than $0, it being understood and agreed that the Availability Block set forth in the Borrowing Base Certificate attached to the Budget shall be deemed to be $5,000,000 for each of the weeks beginning March 8, 2020 and March 15, 2020.  Until the Prepetition ABL Obligations are Paid in Full, the Borrowing Base Certificate shall be updated and delivered weekly in accordance with the requirements of an "Increased Reporting Event" as defined in the Prepetition ABL Agreement.  For the avoidance of doubt, the calculation of the Borrowing Base shall at all times deduct the amount of the Carve Out Reserves.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall deliver to the Prepetition Agents, by not later than Thursday of each week, an updated Borrowing Base Certificate, substantially in the form attached hereto as Exhibit 2 (the "Borrowing Base Certificate"), and such Borrowing Base Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents (it being agreed the detail required by the Prepetition ABL Agreement shall be deemed so satisfactory).

(c)     *Variance Testing*.  The Debtors shall, commencing with the week beginning March 15, 2020, deliver to the Prepetition Agents, by not later than Thursday of each week, a certificate, substantially in the form attached hereto as Exhibit 3 (the "Budget Variance Certificate") and such Budget Variance Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents, showing a reconciliation for the prior two week cumulative period, and certifying that (i) the Debtors are in compliance with the covenants contained in this

PA00278

Section 12 and (ii) to the knowledge of the Debtors, no Event of Default hereunder has occurred or, if such an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto.

(d)     *Consent Fee for Prepetition ABL Parties*.  The Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, a consent fee ("Consent Fee") in the amount of $150,000 per week until such time as the Prepetition ABL Obligations have been repaid in full in cash (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents.  The Consent Fee shall be fully earned on Saturday of each week and shall be paid to the Prepetition ABL Agent on the immediately following Tuesday and shall not be subject to refund, offset or rebate under any circumstances.

(e)     *Levin Sale Milestones*.   The Debtors shall achieve each of the following milestones, if and when applicable (as the same may be extended from time to time with the consent of the Prepetition ABL Agent (in its sole discretion), the "Levin Sale Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the Prepetition ABL Agent in all respects:

(i)     On or before the date that is seven (7) days following the Petition Date, the Debtors shall file a motion to approve the sale of the "Assets", as such term is defined in the Levin LOI (the "Levin Sale"), to the Buyer under the Levin LOI.

27

(ii)      On or before the date that is seven (7) days following the Petition Date, the Debtors shall enter into an asset purchase agreement with the Buyer under the Levin LOI for the Levin Sale (the "Levin APA").

(iii)     On or before the date that is twenty-nine (29) days following the Petition Date, the Debtors shall receive an order from the Court approving the Levin Sale.

(iv)     On or before the date that is two (2) business days after the order approving the Levin Sale, the Debtor shall have consummated the Levin Sale and the proceeds thereof shall have been applied to the Prepetition ABL Obligations.

13.      **Modification of Automatic Stay.**  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to: (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the Prepetition ABL Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the Prepetition ABL Parties under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

14.      **Protections of Rights of Prepetition Secured Parties.**

(a)      Subject to the Intercreditor Agreement, unless the Prepetition ABL Agent and Prepetition Term Loan Agent have each provided their respective prior written consent, or all Prepetition ABL Obligations and Prepetition Term Loan Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been Paid in Full, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and

28

otherwise shall object to any motion or application seeking entry of, any order (other than this Interim Order or the Final Order, but including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Postpetition Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim Order; (ii) the use of Cash Collateral for any purpose other than as permitted in this Interim Order (including any use in accordance with the Budget, subject to variances permitted by this Interim Order); (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the Prepetition Secured Parties' rights under this Interim Order, the Prepetition ABL Documents, or the Prepetition Term Loan Documents with respect any Prepetition ABL Obligations or Prepetition Term Loan Obligations. It shall be an Event of Default under this Interim Order if, in any of these Cases or any Successor Cases, the Debtors take or take to take any of the actions contemplated with respect to provisions (i) through (iv) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

(b)    The Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the Prepetition

29

Agents, as applicable, all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the Prepetition Agents, as applicable) to provide under the Prepetition Documents, or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the Prepetition Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Prepetition Documents; (iv) permit the Prepetition Agents to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; and (v) upon reasonable advance notice, permit the Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Postpetition Collateral and Prepetition Collateral, in each case, in accordance with the Prepetition Documents.

15.    <u>Credit Bidding</u>.  No Debtor shall object to any Prepetition ABL Parties credit bidding up to the full amount of the applicable outstanding Prepetition ABL Obligations, or with respect to the Prepetition Term Loan Parties, credit bidding up to the full amount of the applicable outstanding Prepetition Term Loan Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, to the extent permitted by section 363(k) of the Bankruptcy Code, and subject in each case to the rights, duties, and limitations, as

PA00282

applicable, of the parties under the Intercreditor Agreement, Prepetition Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid.

          16.    <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the Prepetition Obligations being Paid in Full, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any Prepetition Collateral or Postpetition Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the Prepetition ABL Agent (or, following the Prepetition ABL Obligations being Paid in Full, to the Prepetition Term Loan Agent) to be applied in accordance with this Interim Order and the Intercreditor Agreement.

          17.    <u>Cash Collection</u>.  From and after the date of the entry of this Interim Order, all collections and proceeds of any Postpetition Collateral and Prepetition Collateral and all Cash Collateral (that does not constitute Prepetition or Postpetition Term Priority Collateral) that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition ABL Priority Collateral were deposited under the Prepetition Documents (or in such other accounts as are designated by the Prepetition ABL Agent from time to time) (collectively, the "<u>Cash Collection Accounts</u>"), which accounts shall, until the Prepetition ABL Obligations are Paid in Full, be subject to the sole dominion and control of the Prepetition ABL Agent and any amounts deposited into the Cash

PA00283

Collection Accounts shall be deemed to be Postpetition ABL Priority Collateral. Proceeds and other amounts in the Cash Collection Accounts shall be used, subject to the conditions set forth herein, to fund the Budget during the Specified Period, and the Debtors are authorized to pay to the Prepetition ABL Agent, and the Prepetition ABL Agent is authorized to apply, amounts in excess thereof in accordance with the Budget until the Prepetition ABL Obligations are Paid in Full. In furtherance of the foregoing, each Thursday during the Specified Period the Debtors shall deliver to the Prepetition Agents a schedule of all proposed disbursements for the following seven (7) day period (each a "Disbursement Schedule"), including identification of which line item(s) in the Budget such proposed disbursements relate to. Upon the Prepetition ABL Agent's receipt of a written cash collateral draw request (each a "CC Draw Request," which shall be delivered to the Prepetition Term Loan Agent at the same time such CC Draw Request is delivered to the Prepetition ABL Agent) (which may be made on a daily basis), and following verification of conformity with the associated Disbursement Schedule and Budget, the Prepetition ABL Agent shall disburse funds from the Cash Collection Account as appropriate to fund the amounts specified in the CC Draw Request; *provided* that, during the period prior to the Prepetition ABL Obligations being Paid in Full, the Prepetition ABL Agent shall only be required to disburse funds if the Debtors are in compliance with the provisions of this Interim Order (including, without limitation, that after giving effect to such disbursement, actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0). For the avoidance of doubt, it shall be a condition to the Debtors' ability to access and use the Prepetition Secured Parties' Cash Collateral that they submit to the Prepetition ABL Agent the CC Draw Request and associated Disbursement Schedule in the manner and time provided herein. In addition to the foregoing, the

32

Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid In Full) is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount sufficient to maintain the "Ending Balance" set forth in the Budget for any applicable weekly period (at the end of the relevant week) and, until the Prepetition ABL Obligations are Paid in Full, the Prepetition ABL Agent is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount such that actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0. Until the Prepetition ABL Obligations are Paid in Full, unless otherwise agreed to in writing by the Prepetition ABL Agent or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "Cash Management Order"). The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid in Full), in each case, to the extent such direction is made in accordance with this Interim Order. The Debtors shall cause the proceeds of Prepetition and Postpetition Term Priority Collateral as identified by the Consultant to be deposited into a segregated, non-commingled account which is required to be subject to the control of the Prepetition Term Loan Agent, and the Debtors' use of such proceeds shall be subject to (and limited to the extent set forth in) this Interim Order but, for the avoidance of doubt, may be used in accordance with the Budget, subject to variances permitted by this Interim Order.

33

18.     <u>Maintenance of Collateral</u>.  Until all Prepetition ABL Obligations are Paid in Full, the Debtors shall:  (a) insure the Postpetition Collateral and Prepetition Collateral as required under the Prepetition Documents; and (b) maintain the cash management system in effect as of the Petition Date, as may be modified with the consent of the Prepetition Agents (such consent not to be unreasonably withheld) or as a result of entry of any order by the Court.

19.     <u>Disposition of Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Postpetition Collateral or Prepetition Collateral other than in the ordinary course of business and in accordance with the Consulting Agreement and the Levin APA, without (subject to the Intercreditor Agreement) the prior written consent of the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral), and no such consent shall be implied, from any other action, inaction or acquiescence by the Prepetition Secured Parties or from any order of this Court.

20.     <u>Events of Default</u>.  The occurrence of any of the following events, unless consented to or waived by the Prepetition Agents in advance, in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "<u>Events of Default</u>"):

(a)     the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including, without limitation, the Covenants in paragraph 12 herein and the payment of all amounts to the Prepetition Secured Parties authorized hereunder);

(b)     the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c)     the failure by the Debtors to continue sales of the Assets in

34

accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

(d)    the filing of a motion or any plan of reorganization or disclosure statement attendant thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Interim Order; (ii) to grant any lien other than Permitted Prior Liens upon or affecting any Postpetition Collateral; or (iii) except as provided in this Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code;

(e)    (i) the filing of any Prohibited Plan (as defined herein) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors) or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan;

(f)    the entry of an order in any of the Cases confirming a Prohibited Plan;

(g)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to this Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect;

(h)    the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by this Interim Order;

(i)    the appointment of an interim or permanent trustee in the Cases, the

35

appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a trustee receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;

> (j)     the filing of a motion to approve a Prohibited Sale or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI;

> (k)     the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Cases to Chapter 7 of the Bankruptcy Code;

> (l)     the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor Agreement, the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (C) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $250,000 or more;

> (m)     the existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior

36

to the claims of the Prepetition Secured Parties under this Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except, in each case, as expressly provided in this Interim Order;

(n)     the Debtors shall file, or any Debtor shall fail to contest in good faith the filing of, a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction;

(o)     any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations;

(p)     any Debtors shall challenge, support or encourage a challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations;

(q)     the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in this Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code;

(r)     any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA, with respect to Postpetition Collateral or Prepetition

37

PA00289

Collateral having a value in excess of $250,000 outside the ordinary course of business and not otherwise permitted hereunder;

(s) any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders" as approved by the Prepetition Agents in writing (provided that this Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by this Interim Order;

(t) any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under this paragraph 20;

(u) the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.

21. <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default under this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall be referred to herein as a "<u>Termination Declaration</u>") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out has occurred through the delivery of the Carve Out

38

Trigger Notice (as defined herein); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to herein as the "Termination Date"). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and this Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable). During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the Prepetition ABL Parties shall be permitted to exercise all remedies set forth herein, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and this Interim Order. Upon the occurrence

39

and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement and paragraph 32, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process.

22.    <u>Prepetition Secured Parties' Expenses</u>.  The Debtors are authorized to pay, in accordance with this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (a) the Prepetition ABL Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Morgan, Lewis & Bockius LLP and Burr & Forman LLP, and any successor counsel) and, (b) solely from the proceeds of Postpetition Term Priority Collateral, the Prepetition Term Loan Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Riemer & Braunstein LLP and Greenberg Traurig, LLP, and any successor counsel). Payment of all such fees and expenses shall not be subject to allowance by the Court.  Professionals for the Prepetition Agents shall not be required to comply with the U.S. Trustee fee guidelines, *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors that were incurred after the Petition Date, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S.

40

Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such summary fee and expense statements to the Debtors. Any objections raised by the Debtors, the U.S. Trustee, or a Committee (if appointed) with respect to such invoices within ten (10) days of the receipt thereof will be subject to resolution by the Court to the extent they cannot be resolved by the applicable parties. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized to pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition ABL Parties as provided in the Prepetition ABL Documents, incurred on or prior to such date without the need for any professional engaged by the Prepetition ABL Parties to first deliver a copy of its invoice as provided for herein. No attorney or advisor to any Prepetition ABL Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

23. <u>Proofs of Claim</u>. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the Prepetition ABL Parties and the Prepetition Term Loan Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the Prepetition ABL Documents or the Prepetition Term Loan Documents. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition ABL Parties and the Prepetition Term Loan Parties with regard to all claims arising under the Prepetition ABL Documents or the Prepetition Term Loan Documents, as the case may be. Notwithstanding the foregoing, the Prepetition ABL Agent on behalf of itself and the Prepetition ABL Parties, and the Prepetition Term Loan Agent on behalf of itself and the Prepetition Term Loan Parties, are hereby authorized

PA00293

and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in any of the Cases deemed to be filed in all Cases of each of the Debtors and asserted against all of the applicable Debtors). Any proof of claim filed by the Prepetition ABL Agent or the Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Parties or Prepetition Term Loan Parties. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the Prepetition ABL Parties or the Prepetition Term Loan Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

24. <u>Carve Out</u>.

(a) *Carve Out*. As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve Out</u>"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee</u>

42

PA00294

Professionals" and, together with the Debtor Professionals, the "Professional Persons") (such fees and expenses, the "Allowed Professional Fees") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined herein), *provided* that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "ABL Professional Fee Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week).

(b) *Carve Out Reserves*. On the day on which a Carve Out Trigger Notice is given by the Prepetition ABL Agent (the "Termination Declaration Date"), the Carve

PA00295

Out Trigger Notice shall be deemed a demand to the Debtors, and authorization for the Debtors, to utilize cash on hand and proceeds of the Postpetition Collateral to fund a reserve in an amount equal to the Carve Out. The Debtors shall deposit and hold such amounts in a segregated account at the Prepetition ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees (each, a "Carve Out Reserves"). For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order or the Final Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

(i)      Following payment of all Allowed Professional Fees entitled to benefit from the Carve Out, any remaining funds in the Carve-Out Reserves funded by (x) the proceeds of Postpetition ABL Priority Collateral shall be distributed (A) first, to the Prepetition ABL Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full, and (B) second, to the Prepetition Term Loan Agent on account of the Obligations (as defined in the Prepetition Term Loan Agreement) until such obligations have been Paid in Full; and (y) the proceeds of Postpetition Term Priority Collateral shall be distributed (A) first, to the Prepetition Term Loan Agent which shall apply such funds to the Obligations (as defined in the Prepetition Term Loan Agreement) in accordance with the Prepetition Term Loan Agreement until such obligations have been Paid in Full, and (B) second, to the Prepetition ABL Administrative Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full.

(ii)     Notwithstanding anything to the contrary in this Interim Order, following the end of the third business day after delivery of a Carve Out Trigger Notice, (x) the

44

Prepetition ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the Prepetition ABL Agent, on the one hand, and the Prepetition Term Loan Agent, on the other hand, shall have a security interest in any residual interests in the Carve Out Reserves, with any excess paid as provided above; and (y) the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves required to be funded by the proceeds of Postpetition Collateral have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves held in accounts by the Prepetition Term Loan Agent, with any excess paid as provided above.

(iii)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in any Prepetition Secured Facilities, to the extent of any shortfall in the Carve Out Reserves, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and any and all other forms of adequate protection, liens, or claims securing the obligations under the Prepetition Documents; provided that in all cases, the Carve Out priority with regard to the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral will always be subject to the limitations applicable thereto set forth in the definition of Carve Out.

(c)    *No Direct Obligation To Pay Allowed Professional Fees*.  The Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the

45

Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.*   Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     *Payment of Carve Out On or After the Termination Declaration Date*.   Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(f)     *Release of Prepetition ABL Parties*.   Notwithstanding anything to the contrary contained herein, (i) prior to the delivery of the Carve Out Trigger Notice, the Debtors shall fund the Carve Out Reserves at the reasonable request of the Prepetition ABL Agent in consultation with the Prepetition Term Loan Agent, the Debtors and their advisors, and (ii) upon the repayment in full of the principal amount of all Loans under the Prepetition ABL Agreement, the cash-collateralization of all Letters of Credit under the Prepetition ABL Agreement and the funding of the Prepetition ABL Indemnity Reserve (the date that such events occur, the "ABL Repayment Date"), and after the funding of the Carve Out Reserves in an amount equal to, as of the ABL Repayment Date, the lesser of (x) the amount set forth in the Budget for Professional Persons (plus the amounts set forth in 24(a)(i) and (ii)) and (y) the then accrued Carve Out, the Prepetition ABL Parties and the Prepetition ABL Liens shall be released from all further liability from the Carve Out (such release shall be a condition to the Prepetition ABL Obligations being deemed Paid in Full).

46

25.     <u>Limitations on Use of Cash Collateral, and Carve Out</u>.  The Postpetition Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with:  (a) except to contest the occurrence of an Event of Default, preventing, hindering, or delaying any of the Prepetition Secured Parties' permitted enforcement or realization upon any of the Postpetition Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order; (c) selling or otherwise disposing of Postpetition Collateral without the consent of the Prepetition Agents; (d) using or seeking to use any insurance proceeds constituting Prepetition Collateral or Postpetition Collateral except as provided for in this Interim Order without the consent of the Prepetition ABL Agent or the Prepetition Term Loan Agent (in the case of Postpetition Term Priority Collateral); (e) incurring Indebtedness (as defined in the Prepetition Documents) without the prior consent of the Prepetition Agents; (f) seeking to amend or modify any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis; (g) objecting to or challenging in any way the Prepetition Liens, Prepetition Secured Obligations, Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the Prepetition Secured Parties, respectively; (h) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations, or any other rights or interests of any of

PA00299

the Prepetition Secured Parties; or (j) seeking to subordinate, recharacterize, disallow, or avoid the Prepetition Secured Obligations; *provided, however*, without prejudice to the ability of a Committee (if appointed) to contest the Investigation Budget Amount (as defined herein) in connection with the Final Hearing, that the Carve Out and such collateral proceeds may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final Order, $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging), the Prepetition Lien and Claim Matters (as defined herein).

26.     Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Budget provided by the Debtors to the Prepetition Agents.

27.     Effect of Stipulations on Third Parties.

(a)     *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless and to the extent that a party in interest with proper standing granted by order of the

PA00300

Bankruptcy Court (or other court of competent jurisdiction) has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) and (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 27) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

(b)     *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition

PA00301

Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof. To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties, in accordance with paragraph 22, shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection. Upon a successful Challenge brought pursuant to this paragraph 27, the Court may fashion any appropriate remedy.

28. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

29. <u>Section 506(c) Claims</u>. Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code,

50

or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

30.    <u>No Marshaling/Applications of Proceeds</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order, notwithstanding any other agreement or provision to the contrary.

31.    <u>Section 552(b)</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

32.    <u>Access to Collateral</u>.  Subject to and effective upon entry of a Final Order, upon expiration of the Remedies Notice Period, the Prepetition Secured Parties, subject to the Intercreditor Agreement, shall be permitted to (a) access and recover any and all Prepetition and Postpetition Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Postpetition Collateral, *provided*, *however*, in the case of clause (b), notwithstanding anything to the contrary herein, and subject to the Intercreditor Agreement, the Prepetition Secured Parties can only enter upon a leased premises during the continuation of an Event of Default in accordance with (i) a separate written agreement by and between the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of

51

the Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable Prepetition Secured Party on such notice to the landlord as shall be required by this Court; *provided*, *however*, that solely with respect to rent due to a landlord of any such leased premises, the Prepetition Secured Parties, as applicable, shall be obligated only to reimburse the Debtors for the payment of rent of the Debtors that first accrues after delivery of the Termination Declaration in accordance with paragraph 21 herein that is payable during the period of such occupancy by the Prepetition Secured Parties, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to delivery of the Termination Declaration through and including any assumption and/or rejection of any lease.  Nothing herein shall require the Prepetition Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

33.     <u>Limits on Lender Liability</u>.  Subject to entry of a Final Order, nothing in this Interim Order, the Prepetition Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Cases.  The Prepetition Secured Parties shall not, solely by reason of having made loans under the Prepetition Documents, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or

52

state statute).  Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

34.     Insurance Proceeds and Policies.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the Prepetition ABL Agent (on behalf of the Prepetition ABL Parties) and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Parties), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the Postpetition Collateral.

35.     Additional Rights of the Prepetition Term Loan Agent.  Subject to the Prepetition ABL Obligations being Paid in Full and the rights preserved in paragraph 27 herein, any reference in this Interim Order to the Prepetition ABL Agent agreeing to or having the right to do, or refraining from or having the right to refrain from doing, an act, or providing any consent or waiver hereunder, shall automatically, without further order of the Court, be construed as referring to the Prepetition Term Loan Agent.

36.     Joint and Several Liability.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder.

37.     No Superior Rights of Reclamation.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claim had on the Petition Date.

PA00305

38.     _Rights Preserved_.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, subject to the Prepetition Documents and the Intercreditor Agreement: (a) the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.  Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and, unless otherwise set forth in this Interim Order or the Final Order, any other position which any party in interest deems appropriate to raise in the Debtors' Chapter 11 cases.

39.     _No Waiver by Failure to Seek Relief_.  The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Secured Parties.

PA00306

40.    <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition Secured Parties, all other creditors of any of the Debtors, a Committee (if appointed), or any other court appointed committee, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

41.    <u>No Modification of Interim Order</u>.  Until and unless the Prepetition Secured Obligations have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the Prepetition ABL Documents which survive such discharge by their terms) the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the Prepetition Agents, (i) any modification, stay, vacatur, or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the Prepetition ABL Agent for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from Collateral or Prepetition Collateral; or (c) without the prior written consent of the Prepetition Agents, any lien on any of the Postpetition Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens, other than the Carve Out.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written

PA00307

consent, as provided in the foregoing, of the Prepetition Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the Prepetition ABL Agent or the Prepetition Term Loan Agent.

42.     Continuing Effect of Intercreditor Agreement.  The Debtors and Prepetition Secured Parties each shall be bound by, and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.

43.     Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the Intercreditor Agreement and this Interim Order (solely as between the Prepetition Secured Parties), the provisions of the Intercreditor Agreement shall govern and control.

44.     Discharge.  The obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable, has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that does not require that all Prepetition ABL Obligations be Paid in Full (in the case of the sale of Postpetition ABL Priority Collateral) or that all Prepetition Term Loan Obligations be Paid in Full (in the case of the sale of Postpetition Term Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a

56

"Prohibited Plan or Sale") without the written consent of each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable. For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder.

45. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition Secured Parties granted pursuant to this Interim Order, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (x) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to the Prepetition ABL Documents and this Interim Order, have been Paid in Full; and (y) in respect of the Prepetition Term Loan Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been Paid in Full. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Parties notwithstanding the repayment in full of the Prepetition ABL Obligations.

46. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (EST)** before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge at the United States Bankruptcy Court for the District of

57

Delaware.  On or before March 12, 2020, the Debtors, or an agent appointed for such purpose, shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) counsel for the Consultant; and (g) counsel for Levin Furniture, LLC, and Levin Towing, LLC.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **March 30, 2020, at 4:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (iv) counsel to the Committee (if appointed).

47.    *Nunc Pro Tunc Effect of this Interim Order*.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

PA00310

48.  <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the this Interim Order.

CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

**Dated: 3/11/2020**
**Wilmington, Delaware**

59

# Exhibit 1

DRAFT - SUBJECT TO CHANGE

**AVF Holding, LLC**
**Cash Collateral Budget (Summary)**

| $ in thousands | Week 1 Fcst 8-Mar | Week 2 Fcst 15-Mar | Week 3 Fcst 22-Mar | Week 4 Fcst 29-Mar | Week 5 Fcst 5-Apr | Week 6 Fcst 12-Apr | Week 7 Fcst 19-Apr | Week 8 Fcst 26-Apr | Week 9 Fcst 3-May | Week 10 Fcst 10-May | Week 11 Fcst 17-May | Week 12 Fcst 24-May | Week 13 Fcst 31-May | 13-Week Total | Remaining Cash Flow | Total Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Receipts | 11,585 | 6,186 | 17,831 | 38,607 | 13,858 | 14,135 | 10,190 | 9,353 | 2,329 | 3,566 | 1,769 | 1,769 | 26 | 131,204 | 2,499 | 133,703 |
| COB Disbursements | - | (2,603) | (13,666) | (4,564) | (4,112) | (7,380) | (5,544) | (5,771) | (2,923) | (524) | (289) | 1,000 | - | (45,377) | (100) | (45,477) |
| Operating Disbursements | (12,063) | (2,712) | (2,844) | (721) | (1,963) | (402) | (2,423) | (664) | (1,414) | (2,555) | (767) | (1,143) | (145) | (29,817) | (3,996) | (33,813) |
| Non-Operating Disbursements | (7,539) | (650) | (1,150) | (4,080) | (4,578) | (650) | | | | | | | 2,100 | (16,547) | 1,101 | (15,446) |
| **Net Cash Flow** | (8,017) | 221 | 170 | 29,241 | 3,205 | 5,703 | 3,223 | 2,918 | (2,008) | 486 | 714 | 1,626 | 1,981 | 39,464 | (496) | 38,968 |
| FF&E Sales & Other | - | - | - | (3,650) | (70) | (70) | (70) | (70) | (278) | (1,669) | (1,669) | (1,669) | | (9,212) | (500) | (9,712) |
| **Net Cash Flow to ABL** | (8,017) | 221 | 170 | 25,591 | 3,135 | 5,633 | 3,154 | 2,848 | (2,287) | (1,182) | (955) | (42) | 1,981 | 30,252 | (996) | 29,256 |
| **Memo: ABL Balance** | | | | | | | | | | | | | | | | |
| Beg. ABL Bal. / (Cash on Hand) | 25,918 | 33,934 | 33,713 | 33,543 | 7,952 | 4,816 | (817) | (3,971) | (6,819) | (4,533) | (3,350) | (2,395) | (2,353) | 25,918 | (4,334) | 25,918 |
| End. ABL Bal. / (Cash on Hand) | 33,934 | 33,713 | 33,543 | 7,952 | 4,816 | (817) | (3,971) | (6,819) | (4,533) | (3,350) | (2,395) | (2,353) | (4,334) | (4,334) | (4,334) | (4,334) |
| Net Borrowing Base | 34,277 | 37,140 | 34,413 | 10,656 | 8,223 | 2,545 | 2,545 | - | - | - | - | - | - | | | |
| Ending ABL Balance | 33,934 | 33,713 | 33,543 | 7,952 | 4,816 | - | - | - | - | - | - | - | - | | | |
| Borrowing Base Availability | 343 | 3,427 | 870 | 2,705 | 3,407 | 2,545 | 2,545 | - | - | - | - | - | - | | | |
| **Availability Excess / (Deficiency)** | 343 | 3,427 | 870 | 2,705 | 3,407 | 2,545 | 2,545 | - | - | - | - | - | - | 4,334 | 3,338 | 3,338 |

*The cash collateral budget contemplates the loss of credit card receipts that occurred on March 6th and March 7th and impact of store closure on March 8th. This resulted in deferral of certain disbursements that are essential to the Company's business operations, including, but not limited to, rent, freight, fuel, liquidator fees and other critical operating expenses. The loss of the credit card receipts that were reserved and the deferment of the critical disbursements will likely result in business disruption and ultimately reduce recovery to the estate.*

For Discussion Purposes Only

PA00312

Exhibit 2

## FORM OF BUDGET VARIANCE CERTIFICATE

BUDGET VARIANCE CERTIFICATE

Date of Certificate: _____

To:    Wells Fargo Bank, N.A.
125 High Street
Boston, Massachusetts 02110
Attention: Danielle Baldinelli & Lauren Murphy
Danielle.m.baldinelli@wellsfargo.com
Lauren.murphy@wellsfargo.com

Reference is made to the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Order"). This certificate is being delivered pursuant to Paragraph 12(c) of the Cash Collateral Order. Capitalized terms used but not defined herein shall have the meanings set forth in the Cash Collateral Order.

The undersigned, a duly authorized and acting responsible officer of the Debtors, in such capacity and not individually, hereby certifies to the Prepetition Agents and the Prepetition Secured Parties on behalf of the Debtors, to the best of his/her knowledge and understanding, as follows:

1. The Debtors are in compliance with the covenants contained in Paragraph 12 of the Cash Collateral Order.

2. To the knowledge of the Debtors, no Event of Default has occurred.

3. [If an Event of Default has occurred, more details can be found in Appendix I.]

4. Attached as Appendix II is the Budget Variance Report for the two week period ending [_____].

DB1/ 112918635.1

PA00313

IN WITNESS WHEREOF, the undersigned responsible officer, in his or her capacity and not individually has duly executed this Budget Variance Certificate as of the first date written above.

**ART VAN FURNITURE, LLC**

By: _____

Name: _____

Title: _____

DB1/ 112918635.1

PA00314

## Appendix I to Budget Variance Certificate

[An Event of Default has occurred and is continuing, and the following describes the nature and extent of the Event of Default in reasonable detail and the corrective, if any, being taken or contemplated by the Debtors to be taken on account thereof.]

PA00315

## FORM OF BUDGET VARIANCE REPORT

|  | Week of _____ | | Variance over Rolling Two Week Period | |
|---|---|---|---|---|
|  | Budget | Actual | Difference | Percent Variance |
| Total Cash Receipts |  |  |  |  |
| GOB Disbursements |  |  |  |  |
| Operating Disbursements |  |  |  |  |
| Non-Operating Disbursements |  |  |  |  |

DB1/ 112918635.1

**Exhibit 3**

DRAFT
SUBJECT TO MATERIAL CHANGE

**AVF Holding, LLC**
Borrowing Base Certificate

*$ in thousands, unless otherwise noted*

| | Week 1 Fcst. 8-Mar | Week 2 Fcst. 15-Mar | Week 3 Fcst. 22-Mar | Week 4 Fcst. 29-Mar | Week 5 Fcst. 5-Apr | Week 6 Fcst. 12-Apr |
|---|---|---|---|---|---|---|
| **Credit Card Receivables** | | | | | | |
| Total Credit Card Receivables | $ - | $ - | $ - | $ - | $ - | $ - |
| Less: Outstandings > 5 Business Days | - | - | - | - | - | - |
| Less: Credit Card Fees | - | - | - | - | - | - |
| Eligible Credit Card Receivables | - | - | - | - | - | - |
| Credit Card Advance Rate | | | | | | |
| **Total Credit Card Receivables Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Ending Inventory as of:** | | | | | | |
| Stock Ledger Ending Inventory at Cost | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Ineligible Inventory | - | - | - | - | - | - |
| Eligible Inventory | - | - | - | - | - | - |
| **Total Eligible Inventory Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Gross Borrowing Base Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Less: Availability Reserves** | | | | | | |
| Gift Certificates and Gift Cards (50% of GL Balance, net) | | | | | | |
| Customer Deposits (100%) | | | | | | |
| Professional Fee Reserve | | | | | | |
| Professional fee Payments (cumulative) | | | | | | |
| P-Card | | | | | | |
| Landed Cost Reserves | | | | | | |
| Landlord Lien (PA, VA, WA) | | | | | | |
| Other | | | | | | |
| Carveout | | | | | | |
| **Total Availability Reserves** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Total Uncapped Borrowing Base** | $ - | $ - | $ - | $ - | $ - | $ - |
| ABL Balance | - | - | - | - | - | - |
| L/C Balance | - | - | - | - | - | - |
| Sub-total - ABL Balance | - | - | - | - | - | - |
| **Total Excess ABL Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| Availability Block | - | - | - | - | - | - |
| **Total Excess ABL Availability After Covenant** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Beginning Accrued Professional Fees** | $ - | $ - | $ - | $ - | $ - | $ - |
| Professional Fees Accrued in Period | - | - | - | - | - | - |
| Professional Fees Paid in Period | - | - | - | - | - | - |
| **Ending Accrued Professional Fees Balance** | $ - | $ - | $ - | $ - | $ - | $ - |

PA00317

# EXHIBIT D

PA00318

ADVERTISEMENT

BUSINESS

# Art Van Furniture to close all stores, including 24 in Illinois

By CHICAGO TRIBUNE STAFF
CHICAGO TRIBUNE   |   MAR 05, 2020

  



SECTIONS

**ONLY $1 FOR 6 MONTHS**
Our best offer ends soon

LOG IN



The ArtVan store at 2606 N. Elston on November 2, 2015. (Phil Velasquez / Chicago Tribune)

PA00319

Art Van Furniture, one of the Midwest's largest furniture retailers with almost 180 stores, including two dozen in Illinois, announced Thursday it will shut down.

Liquidation sales are scheduled to begin Friday.

ADVERTISEMENT

**American Greetings** - Sponsored

**Make Every Moment Merrier**

Shop Now

**American Greetings** - Sponsored

**Make Every Moment Merrier**

Shop Now

ADVERTISEMENT

The company, started in the Detroit area in 1959 and now based in Warren, Michigan, operates stores in the Chicago name under the names Art Van

PA00320

Furniture, Art Van PureSleep and Scott Shuptrine Interiors. In addition to stores in Michigan and Illinois, it has locations in Indiana, Missouri and Ohio.



Shoppers inside the Art Van Furniture store in Chicago on Nov. 2, 2015. (Phil Velasquez / Chicago Tribune)

It entered the Chicago market in mid-2013, with plans to invest more than $40 million in land, store build-out, inventory and labor. The state's Department of Commerce and Economic Opportunity provided a $404,000 tax credit spread over 10 years and based on the company creating 35 jobs and making a $4.9 million investment at its Bolingbrook distribution facility. The distribution center will close when final sales are completed, said spokeswoman Diane Charles.

PA00321

The company's website lists 24 stores in Illinois. Altogether, the shutdown will mean the loss of 520 jobs in Illinois, she said.

[Nordstrom closing Trunk Club stores »](#)

Art Van drew attention for its creative marketing promotions. Those included free furniture if the temperature at O'Hare International Airport topped 100 degrees during part of the summer of 2016 and bets on heavy snowfall during Super Bowl games. In 2015, Art Van refunded a total of $2.5 million to about 1,200 furniture buyers when it snowed more than 3 inches during that year's Super Bowl.

ADVERTISEMENT



In 2017, Boston-based private equity firm Thomas H. Lee Partners acquired a majority stake in Art Van and the retailer began an aggressive expansion, including buying other chains and opening in spaces left empty by other retailers.

[The Standard Club, long the social nexus for Chicago's Jewish leaders, is closing May 1 amid financial struggles »](#)

# EXHIBIT E

PA00323

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10533 (CSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364 (d); AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order" and, collectively with the Interim Order, the "Orders") authorizing the Debtors' use of secured post-petition financing (the "DIP Facility") on an interim and final basis pursuant to the terms of the Debtor-in-Possession Credit and Security Agreement (the "DIP Credit Agreement") by and among Debtor Sam Levin, Inc. (the "Borrower" or "Debtor Levin") and Levin Furniture LLC (the "DIP Lender") attached here to as Exhibit B.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

2.     In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

3.     In further support of the Motion, the Debtors respectfully represent as follows:

## Overview

4.     By this Motion, the Debtors seek entry of the Interim Order:

a.     authorizing, under sections 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors to obtain secured, superpriority, post-petition loans, advances and other financial accommodations (the "DIP Facility"), on an interim basis;

b.     authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related documents and agreements as contemplated by the DIP Credit Agreement and requested by the DIP Lender (collectively, the "DIP Loan Documents");

c.     authorizing the Debtors, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $7,000,000.00 at any one time outstanding;

d.     granting allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents, subject to carve-outs;

e.     granting to the DIP Lender automatically perfected security interests and liens on all of the DIP Collateral;

f.     authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents;

g.     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

h.     granted related relief; and

i.     scheduling the final hearing on this Motion (the "Final Hearing").

## Jurisdiction and Venue

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are 105, 361, 363(c) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6004 and 9014, and Bankruptcy Local Rule 4001-2.

## Background

8.      The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture. The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017. Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017. As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

3

The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

9.      On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**Need to the DIP Facility**

10.      The Debtors have an urgent and immediate need to obtain postpetition financing. Here, the DIP Facility sends a fundamentally positive signal to the Debtors' vendors, employees, customers, and other parties critical to maintaining the Debtors' viability that the operations at the stores subject to the Wolf-Levin LOI (attached to the First Day Declaration) will continue as a going concern.

11.      The DIP Facility is narrow and limited to purchasing inventory for sale in those stores.  Without the availability provided under the DIP Facility, the Debtors may be unable to preserve such stores as a going concern.

13169264 v1

12.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Credit Agreement and hereby request authority to obtain such financing through the proposed Orders.

**Statement of the Material Terms of the Interim Order**

13.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Bankruptcy Local Rule 4001-2(a)(i) and (ii), the following is a concise statement and summary of the material terms of the Interim Order and/or the DIP Credit Agreement (collectively, the "Highlighted Provisions"):

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Borrowers** | Sam Levin, Inc. | DIP Credit Agreement at p. 1 |
| **Guarantors** | None | N/A |
| **DIP Lender** | Levin Furniture, LLC | DIP Credit Agreement at p.1 |
| **Purpose** | To fund operations of Borrower, specifically, to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case | Interim Order at ¶ G |
| **Interim Debt Limit** | Not to exceed $3,500,000.00 during the Interim Period. | Interim Order at ¶ K and DIP Credit Agreement at § 3(d) |
| **Type and Amount of DIP Facility** | $7 million secured superpriority facility | DIP Agreement introduction and defined terms |

5

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Maturity Date** | April 7, 2020 | DIP Credit Agreement at § 14(a) |
| **Interest Rate** | Non-default rate: 9% per annum based upon 360 day year<br><br>Default rate: Non-default rate plus 2% per annum | DIP Credit Agreement at §§ 1 and 3(e)(ii) |
| **Other Fees** | N/A | N/A |
| **Conditions Precedent to Lending** | (a) Each of the representations and warranties made by Borrower in or pursuant to DIP Credit Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.<br><br>(b) <u>Financing Orders</u>. Subject to Section 9(c) of the DIP Credit Agreement, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the DIP Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "<u>Additional Credit</u>"), the DIP Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the DIP Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor | DIP Credit Agreement at § 10 |

6

PA00329

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | the performance by the Borrower of any of its obligations under the DIP Credit Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.<br><br>(c)    Sale Motion. For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the DIP Lender, which shall be reasonably satisfactory in form and substance to the DIP Lender (the "Sale Motion").<br><br>(d)    Asset Purchase Agreement. For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "Sellers"), and the DIP Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "Purchasers"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "Sale Agreement"), which shall be reasonably satisfactory in form and substance to the DIP Lender (the "Sale Motion").<br><br>(e)    For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the DIP Lender (the "Sale Order") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal. Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.<br><br>(f)    No Default. No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that, the DIP Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default. | |
| Interim Borrowing Limit | Not to exceed $3,500,000.00 during the Interim Period. | Interim Order at ¶ K |

7

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | | |
| **Limitations on Use of Proceeds:** | The funds available under the DIP Facility may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders. | DIP Credit Agreement at § 4 |
| **Budget and Financial Covenants** | N/A | N/A |
| **Cash Dominion** | N/A | N/A |
| **DIP Lien / Superpriority Claim** | Borrower agrees to grant DIP Lender an allowed Superpriority Claim which shall survive any conversion of the these matters to a case under chapter 7 of the Bankruptcy Code. "Superpriority Claim" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code. | DIP Credit Agreement at §§ 1 and 5(i) |
| **DIP Collateral** | To secure prompt payment and performance of all obligations, the Borrower grants to the DIP Lender a continuing security interest in and Lien upon: (a) all inventory of the Borrower purchased solely with the proceeds of any Advances under the DIP Loan Documents; (b) all receivables; (c) all right, title and interest in and to (i) all inventory returned or rejected by | DIP Credit Agreement at §1 |

8

PA00331

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, dentinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer related to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien of security interest as security for the payment or enforcement of receivables referred to in clause (b)<br><br>(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and<br><br>(e) proceedings and products of (a), (b), (c) or (d) of this definition, in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claims proceeds. | |

9

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | The term Collateral shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code, or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach of termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest or Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied. | |
| **Lien on Avoidance Claims** | N/A | N/A |
| **Administrative Carve-Out** | Subject to the Financing Orders and the DIP Loan Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall: (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected | DIP Credit Agreement at § 15(k) |

13169264 v1

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral. | |
| **Waivers** | N/A | N/A |
| **Perfection Other Than Under State Law** | The Interim DIP Lien shall be automatically perfected upon entry of the Interim Order. | Interim Order at ¶10 and DIP Credit Agreement at § 5(b) |
| **Events of Default** | The occurrence of one or more of the following events shall constitute an "Event of Default":<br><br>(a)   Payment of Obligations.  Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document.<br><br>(b)   Misrepresentations.   Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made.<br><br>(c)   Failure to Furnish Information. Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten | DIP Credit Agreement at § 12 |

PA00334

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | (10) days after such information is requested, or (iii) permit the inspection of its books or records. | |
| |         (d)    Liens Against Assets. Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days. | |
| |         (e)    Breach of Covenants. Except as otherwise provided for in this Section, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations. | |
| |         (f)    Judgment. Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage). | |
| |         (g)    Loss of Priority Lien. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders. | |
| |         (h)    Invalidity of Credit Agreement. Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender. | |
| |         (i)    Destruction of Collateral. Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material | |

PA00335

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | impairment or loss of the security provided by this Agreement or the Other Documents.<br><br>(j)    Pre-Petition Payments.  Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date.<br><br>(k)    Dismissal or Conversion of Bankruptcy Case.  The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is pari passu with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim.<br><br>(l)    Relief from Stay.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower. | |

PA00336

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | (m) <u>The Financing Orders</u>. Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower. Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.<br><br>(n) <u>Lien Challenge</u>. Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender. Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor of the Lender.<br><br>(o) <u>Filing of Reorganization Plan or Sale Motion</u>. A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers. | |

13169264 v1

PA00337

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Remedies / Relief from Automatic Stay** | Upon the occurrence and during the continuance of any Event of Default, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and/or modified to the extent necessary to permit the DIP Lender to (i) perfect the security interests and Liens granted under the DIP Loan Documents and (ii) exercise its rights under section 13 of the DIP Loan Documents. | DIP Credit Agreement at § 7(d) |
| **Indemnification and Exculpation** | Borrower shall indemnify the DIP Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person (as defined in the DIP Loan Agreement) with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related thereto, the DIP Loan Agreement or Other Documents (as defined in the DIP Loan Agreement), whether or not the DIP Lender is party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified. | DIP Credit Agreement at § 15(a) |

## Bankruptcy Local Rule 4001-2 Disclosures

13.    The Debtors do not believe that this Motion or the Interim Order contain any provisions requiring special disclosure under Bankruptcy Local Rule 4001-2(a).

13169264 v1

## Basis for Relief

I.      **The Debtors Should Be Permitted to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

14.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense…" 11 U.S.C. § 364(c).

15.     In evaluating proposed post-petition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether: (i) unencumbered credit or alternative financing without superpriority status is available to the debtor; (ii) the credit transactions are necessary to preserve assets of the estate; (iii) the terms of the credit agreement are fair, reasonable, and adequate; (iv) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and (v) the proposed financing agreement adequately protects prepetition secured creditors.

16.     *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*,

16

308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

17.    For the reasons discussed below, the Debtors satisfy the standards required to obtain post-petition financing under section 364(c) of the Bankruptcy Code. For the avoidance of doubt, the Debtors are not seeking any relief pursuant to section 364(d) of the Bankruptcy Code

**II.    The Debtors Were Unable to Obtain Financing on an Unsecured Basis.**

18.    Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

19.    Here, as detailed in the First-Day Declaration, as supplemented by the record, the Debtors filed these cases to avert a liquidity crisis and prevent further deterioration of their business. The Debtors are unable, in the present circumstances, to purchase inventory at the Wolf-Levin go-forward stores by obtaining financing on an unsecured, administrative expense basis.

20.    The Debtors respectfully submit that their efforts to obtain post-petition financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code. *See, e.g., In*

13169264 v1

PA00340

*re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

## III.     The Proposed Financing is Necessary to Preserve the Assets of the Debtors' Estates.

21.     Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including purchasing inventory for the Wolf-Levin go-forward stores so that they can continue as going concerns. The DIP Facility thus is essential to Debtor Levin's continued operational viability and will provide Debtor Levin with the opportunity to preserve its businesses while the Debtors prepare to enter the sale process.

22.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require post-petition financing under the terms of the DIP Loan Documents to continue their operations during these Chapter 11 Cases.

## IV.     The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.

23.     In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank &*

18

*Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

24.     The terms of the DIP Credit Agreement and the proposed DIP Orders were negotiated between the Debtors and the DIP Lender. The Debtors negotiated with the DIP Lender in good faith to ensure that the terms of the DIP Facility are consistent with "market" terms, and are fair and reasonable to the Debtors. To that end, the Debtors, on the one hand, and the DIP Lender on the other hand, each had separate business teams and used separate counsel in negotiating the DIP Facility.

**V.      Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

25.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

26.     Here, the Debtors' sound business judgment clearly supports entry into the DIP

Credit Agreement to gain access to needed funding and maximize value for all constituents.

## VI. The DIP Lender is Extending Credit in Good Faith.

27.   Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

28.   The Debtors and the DIP Lender negotiated the DIP Credit Agreement in good faith. Accordingly, the DIP Orders should provide that the DIP Lender, as a good faith lender, is entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

### <u>Request for Final Hearing</u>

29.   Pursuant to Bankruptcy Rule 400l(b)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days of the Petition Date and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

30.   The urgent need to preserve the Debtors' businesses, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain post-petition financing as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Cases. Without the ability to obtain access to such funding, the Debtors would be unable to meet their post-petition obligations, including maintaining and maximizing the value of the Debtors' businesses, thus causing irreparable harm to the value of the Debtors' estates.

13169264 v1

PA00343

31.     Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects, and that the terms and provisions of the Interim Order be implemented and be deemed binding, and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

32.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to use the DIP Facility and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

33.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

34.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the

13169264 v1

PA00344

foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

35.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

PA00345

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, and based on the record of the Chapter 11 Case, the Debtors respectfully request that this Court (a) enter the Orders (i) authorizing the Debtors to use the DIP Facility on an interim and final basis subject to the terms and conditions set forth therein; (ii) scheduling the Final Hearing, pursuant to the Interim Order, within approximately thirty-five (35) days of the commencement of the chapter 11 cases, to consider approval of this Motion on a final basis; and (iii) granting related relief; and (b) grant the Debtors such other and further relief as may be just and proper.

Dated: March 9, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

    */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
          mbarrie@beneschlaw.com
          jhoover@beneschlaw.com
          kcapuzzi@beneschlaw.com
          kharmon@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

13169264 v1

PA00346

# **EXHIBIT A**

PA00347

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) Case No. 20-10533 (CSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) **Re: Docket No. _____** |

### INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i)        authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the Collateral (as defined in the DIP Loan Documents, and referred to herein as the "DIP Collateral")  to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

13172137 v2

PA00348

adequate protection to the DIP Lender in accordance with this order; and

(ii)        scheduling a final hearing (the "Final Hearing") within twenty days of the Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and argument made at the interim hearing held on March 10, 2020 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable local rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

2

A.      **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors

filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the District of Delaware (the "Court").

B.      **Debtors in Possession**.  The Debtors have continued in the management

and operation of their businesses and properties as debtors in possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.

C.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the

Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.

Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409.

D.      **Committee Formation**.  As of the date hereof, the United States Trustee

for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of

unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a

"Committee").

E.      **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and

the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy

Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief

requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.      **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing

(the "DIP Facility") from the DIP Lender pursuant to the terms set forth in that certain Debtor-In-

Possession Credit and Security Agreement and that certain Revolving Credit Note (collectively,

---

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as
such.

3

PA00350

the "DIP Loan Documents") attached to the Motion and as **Exhibit B** thereto.

G.  **Debtor Operations**.  DIP Borrower is unable to operate without the Liquidity provided by the DIP Facility.

H.  **Inability to Obtain Alternative Credit**.  DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

I.  **Good Faith**.  The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

J.  **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

K.  **Interim Debt Limit**.  The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $3,500,000.00 during this Interim Period in accordance with the DIP Loan Documents.

L.  **Avoid Immediate and Irreparable Harm**.  The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other

4

PA00351

things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

    M.  **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

    Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

    **IT IS HEREBY ORDERED** that:

    1.  **Motion Granted**. The Motion is granted.

    2.  **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

    3.  **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower attached to the Motion and incorporated herein, as modified by this Interim Order.

5

4.     **DIP Loan Documents**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder.  The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

5.     **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

6.     **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7.     **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately

6

due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8. **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[4] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

---

[4] Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. ___).

9.      **Security for DIP Loan**.  As security for the DIP Indebtedness, the DIP
Lender is granted a valid, perfected, first priority priming lien (the "DIP Lien") against the DIP
Collateral, as that term is defined in the DIP Loan Documents.  Solely with respect to the DIP
Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP
Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over
all other costs and expenses of administration of any kind, including those specified in, or ordered
pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the
Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at
all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative
in the Case or any successor case.

10.      **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be,
and is hereby deemed duly perfected and recorded under all applicable federal or state or other
laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order,
landlord or warehousemen lien waivers or other third party consents or other act, shall be required
to effect such perfection; provided, however, that notwithstanding the provisions of Section 362
of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i)
DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such
landlord or warehousemen lien waivers or other third party consents or execute, file or record, at
the DIP Borrower's expense, any such UCC financing statements, notices of liens and security
interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender
may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities
evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and
comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be

8

obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed
or recorded any such notices, financing statements, mortgages or other documents with respect to
such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents
or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or
warehouse lien waivers or other third party consents, financing statements or similar documents
or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the
commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its
sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing
or recording office in any county or other jurisdiction in which the DIP Borrower has property.

11. **Books and Records**. The DIP Borrower shall permit DIP Lender and any
authorized representatives designated by DIP Lender (including, without limitation, its auditors,
appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower,
including the DIP Borrower's financial and accounting records, and to make copies and take
extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such
DIP Borrower's officers and independent public accountants, at such reasonable times during
normal business hours and as often as may be reasonably requested. Without limiting the generality
of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data
reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of
the DIP Loan Documents and this Order.

12. **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP
Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP
Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and
remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted,

9

superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13. **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14. **No Liability to Third Parties**. DIP Lender shall not (i) have liability to any third party nor shall it be deemed to be in control of the operations of the DIP Borrower or to be acting as a "controlling person", "responsible person" or "owner or operator" with respect to the operation or management of the DIP Borrower (as such terms, or any similar terms, are used in the Internal Revenue Code, the Unites States Comprehensive, Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), or owe any fiduciary duty to the DIP Borrower, its creditors or its estates, and (ii) DIP Lender's relationship with the DIP Borrower shall not constitute nor be deemed to constitute a joint venture or partnership with the DIP Borrower.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

15. **Order Binding Upon Parties in Interest**. All of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its

10

successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16. **Effect of Modification of Interim Order**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be,

11

PA00358

without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

20. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

21. **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

22. **Final Hearing**. The Final Hearing to consider entry of the Final Order is scheduled for **[_____], 2020 at [__]:00 [_].m. (EST)** before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before March 12, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **[_____], 2020, at [__]:00 p.m. (EST)**,

which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

23. ***Nunc Pro Tunc* Effect of this Interim Order**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

24. **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.


Dated: _____
Wilmington, Delaware

_____
CHIEF JUDGE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT B**

PA00361

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT** (this "Agreement"), dated the 10th day of March, 2020, is entered into by and between Sam Levin, Inc., a Pennsylvania corporation ("Borrower"), and Levin Furniture LLC, a Pennsylvania limited liability company ("Lender").

## Recitals

**WHEREAS,** Borrower has encountered financial difficulties and, together with certain of is affiliates, has filed for bankruptcy protection under chapter 11 of 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are the subject of a request for joint administration under Case No. 20-10553 (CSS) (collectively, the "Bankruptcy Cases");

**WHEREAS,** Lender has agreed to provide post-petition debtor-in-possession financing (the "DIP Financing") to Borrower as more fully set forth herein and as set forth in the Financing Orders (as defined in Section 1 hereof), which Financing Orders shall be in form and substance acceptable to Lender in Lender's sole discretion, such DIP Financing to be used to pay certain expenses of Borrower during the Bankruptcy Case on the terms set forth below;

**WHEREAS,** in return for the DIP Financing, Lender requires that Borrower obtain entry by the Bankruptcy Court of the Financing Orders, specifically granting Lender, among other things, a secured superpriority administrative expense claim against Borrower and its assets only pursuant to Section 364(c) of the Bankruptcy Code with respect to the DIP Financing; and

**WHEREAS,** Borrower and Lender each acknowledge and agree that the terms of this Agreement must be approved by the Bankruptcy Court and that the Interim Financing Order (as defined in Section 1 hereof) be entered by the Bankruptcy Court before this Agreement is enforceable.

**NOW THEREFORE,** in consideration of the mutual covenants and undertakings herein contained, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

## Agreement

Borrower and Lender each agree that the foregoing Recitals are true and correct.

1. **Definitions**. For purposes of this Agreement the following terms shall have the following meanings:

"Additional Credit" shall have the meaning set forth in Section 10(b) hereof.

"Advances" shall mean loans made pursuant to the terms of this Agreement under the Revolving Credit Note.

"Agreement" shall have the meaning set forth in the Preamble hereof.

"Approved Amount" shall mean, as of any date, the maximum amount of Advances that are authorized pursuant to the terms of the Interim Financing Order or the Final Financing Order, as the case may be.

PA00362

"Bankruptcy Case" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Code" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Court" shall have the meaning set forth in the Recitals hereof.

"Borrower" shall have the meaning set forth in the Preamble hereof.

"Borrower Group" shall have the meaning set forth in Section 15(l) hereof.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Pittsburgh, Pennsylvania.

"Cash Collateral Order" shall mean that certain *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered by the Bankruptcy Court in connection with the Bankruptcy Case.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar governmental authority, domestic or foreign, upon the Collateral, the Borrower or any affiliates of the Borrower.

"Claims" shall have the meaning set forth in Section 15(l) hereof.

"Closing" shall mean the closing of the DIP Financing and the other transactions to be consummated on the Closing Date, as contemplated by this Agreement.

"Closing Date" shall mean the date on which all conditions to the effectiveness of this Agreement are satisfied, but in no event shall such date be later than seven (7) days after the Petition Date.

"Collateral" shall mean and include all of the following personal property assets of the Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

(a) all inventory of the Borrower purchased solely with the proceeds of any Advances made hereunder;

(b) all receivables of the Borrower arising out of the sale of inventory referred to in clause (a) above;

(c) all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer relating to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any

13172237 v2

of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

      (d)    ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

      (e)    proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Agreement, the term "Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

      "Contract Rate" shall mean a fixed interest rate equal to **[9 percent (9.00%)]** per annum based on a three hundred sixty (360) day year.

      "Default" shall mean an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

      "Default Rate" shall have the meaning set forth in Section 3(e)(ii) hereof.

      "DIP Financing" shall have the meaning set forth in the Recitals hereof.

      "Event of Default" shall mean the occurrence of any of the events set forth in Section 12 hereof.

      "Final Financing Order" shall mean a Financing Order that is a Final Order entered in the Bankruptcy Case after notice and final hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure and applicable local rules.

      "Final Order" shall mean an order or judgment of the Bankruptcy Court duly entered in the docket of the Bankruptcy Case that (a) has not been modified or amended without the consent of the

Lender, or vacated, reversed, revoked, rescinded, stayed or appealed from, except as the Lender may otherwise specifically agree, (b) with respect to which the time to appeal, petition for certiorari, application or motion for reversal, rehearing, reargument, stay, or modification has expired, (c) no petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for a writ of certiorari with respect thereto has been filed or granted or the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order or judgment was appealed and (d) is no longer subject to any or further appeal or petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for any writ of certiorari with respect thereto or further judicial review in any form.

"Financing Orders" shall mean the Interim Financing Order and such other interim, final, permanent and/or supplemental orders, including the Final Financing Order, satisfactory to the Lender entered by the Bankruptcy Court in the Bankruptcy Case after notice pursuant to Section 364 of the Bankruptcy Code relating thereto or authorizing the granting of credit by the Lender to the Borrower pursuant to the terms of this Agreement.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Interim Financing Order" shall mean the order entered by the Bankruptcy Court on or about the date hereof in the form of Exhibit A attached hereto, with such changes thereto as may be approved by the Lender.

"Lender" shall have the meaning set forth in the Preamble hereof.

"Lender Group" shall have the meaning set forth in Section 15(l) hereof.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the financial condition, results of operations, business or prospects of Borrower or (b) the Lender's Liens on the Collateral taken as a whole or, subject to Permitted Encumbrances, the priority of any such Lien; it being understood that the commencement of the Bankruptcy Case and events and conditions which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code (including, without limitation, reduction in payment terms by suppliers and reclamation claims) shall not be deemed a material adverse effect.

"<u>Maximum Advance Amount</u>" shall mean **Seven Million and 00/100 Dollars ($7,000,000.00)**.

"<u>Notice</u>" shall have the meaning set forth in Section 15(b) hereof.

"<u>Obligations</u>" shall mean and include advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) owing by the Borrower to the Lender or to any other direct or indirect subsidiary or affiliate of the Lender of any kind or nature, present or future (including, without limitation, any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, arising under this Agreement or the Other Documents, whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan or guarantee, or arising under any hedging contract or in connection with any cash management or treasury administration services or agreements, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise, whether evidenced by any other agreement or instrument, including, but not limited to, any and all of Borrower's Indebtedness and/or liabilities under this Agreement or the Other Documents and any amendments, extensions, renewals or increases and all costs and expenses of the Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to, reasonable attorneys' fees and expenses and all obligations of Borrower to the Lender to perform acts or refrain from taking any action, in each such case solely with respect to and/or arising in connection with the Collateral.

"<u>Other Documents</u>" shall mean the Revolving Credit Note, each agreement pursuant to which the Lender is granted a Lien to secure the Obligations and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents and all other writings heretofore, now or hereafter executed by Borrower and/or delivered to the Lender in respect of the transactions contemplated by this Agreement whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Permitted Encumbrances</u>" shall mean (a) Liens in favor of the Lender; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrower in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of the Lender or the value of the assets in which the Lender has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or

PA00366

similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of Borrower's business; (e) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting real property, none of which materially impairs the use of such real property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (f) Liens of the Prepetition Secured Parties as set forth in the Cash Collateral Order; (g) other Liens permitted by the Cash Collateral Order; and (h) Liens disclosed on <u>Schedule 1(f)</u> attached hereto provided that the principal amount secured thereby is not hereafter increased to an amount greater than the amount outstanding on the Closing Date, and no additional assets become subject to such Liens except as otherwise specifically identified on <u>Schedule 1(f)</u>.

"<u>Person</u>" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Petition Date</u>" shall mean March 8, 2020.

"<u>Preamble</u>" shall mean the introductory paragraph of this Agreement.

"<u>Prior Event</u>" shall have the meaning set forth in Section 15(l) hereof.

"<u>Purchasers</u>" shall have the meaning set forth in Section 10(d) hereof.

"<u>Revolving Credit Note</u>" shall mean the promissory note referred to in Section 3(a) hereof, together with all amendments, restatements, extensions, renewals, replacements, refinancings or refundings thereof in whole or in part.

"<u>Sale Agreement</u>" shall have the meaning set forth in Section 10(d) hereof.

"<u>Sale Motion</u>" shall have the meaning set forth in Section 10(d) hereof.

"<u>Sale Order</u>" shall have the meaning given set forth Section 10(f) hereof.

"<u>Sellers</u>" shall have the meaning set forth in Section 10(d) hereof.

"<u>Superpriority Claim</u>" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"<u>Term</u>" shall have the meaning set forth in Section 14(a) hereof.

"<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code or other similar law of the Commonwealth of Pennsylvania as in effect on the date of this Agreement and as amended from time to time.

13172237 v2

2.     **Accounting Terms.** As used in this Agreement, the Revolving Credit Note or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined herein shall have the respective meanings given to them under GAAP.

3.     **The DIP Financing**.

(a)     <u>Advances</u>.  Subject to the terms and conditions set forth in this Agreement, Lender will make Advances to the Borrower in aggregate amounts outstanding at any time equal to the lesser of (x) the Maximum Advance Amount and (y) the Approved Amount.  The Advances shall be evidenced by a secured promissory note substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Revolving Credit Note</u>").

(b)     <u>Procedure for Borrowing Advances</u>.  Borrower may notify Lender prior to 12:00 p.m. (eastern time) on a Business Day of Borrower's request to incur, on that day, an Advance hereunder. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any Other Document, or with respect to any other Obligation, become due, same shall be deemed a request for an Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any Other Document, and such request shall be irrevocable.

(c)     <u>Disbursement of Advance Proceeds</u>.  During the Term, Borrower may use the Advances by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof.  The proceeds of (i) each Advance requested by Borrower to the extent Lender makes such Advance, shall be made available to Borrower on the day so requested by way of credit to Borrower's operating account at Bank of America in immediately available funds and (ii) each Advance deemed to have been requested by Borrower under Section 3(b) hereof shall be disbursed to Lender to be applied to the outstanding Obligations giving rise to such deemed request.

(d)     <u>Maximum Advances</u>.  The aggregate balance of outstanding Advances outstanding at any time (i) pursuant to the Interim Financing Order shall not exceed the lesser of (a) **Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00)** and (b) the Approved Amount and (ii) pursuant to the Final Financing Order shall not exceed the lesser of (a) the Maximum Advance Amount and (b) the Approved Amount.

(e)     <u>Interest on Advances</u>.

(i)     Interest charges shall be computed on the actual principal amount of Advances outstanding during the calendar month and shall bear interest for each day at a rate per annum equal to the Contract Rate.

(ii)     Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Obligations shall bear interest at the Contract Rate plus two percent (2.00%) per annum (the "<u>Default Rate</u>").

(iii)     If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the Contract Rate during such extension.

(iv)     In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law.  In the event interest and other

13172237 v2

PA00368

charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by the Borrower, and if then remaining excess amount is greater than the previously unpaid principal balance, the Lender shall promptly refund such excess amount to the Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate.

(f)     Repayment of Advances.

(i)     The Advances shall be due and payable in full on the last day of the Term.  Borrower shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

(ii)     All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Lender not later than 11:00 A.M. (eastern time) on the due date therefor in lawful money of the United States of America in immediately available funds.  Lender shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging the Borrower or by making Advances as provided in Section 3(b) hereof.

(iii)     The aggregate balance of outstanding Advances at any time in excess of the maximum amount of such Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, whether or not a Default or Event of Default has occurred.

4.     **Use of Funds**.  The funds available under the DIP Financing may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders.

5.     **Collateral; General Terms**.

(a)     Security Interest in the Collateral.  Pursuant to the Interim Financing Order and the Final Financing Order and in accordance with the terms thereof, to secure the prompt payment and performance to the Lender of the Obligations, Borrower hereby assigns, pledges and grants to the Lender a continuing security interest in and to all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located.  Borrower shall promptly provide the Lender with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s).  Upon delivery of each such notice, Borrower shall be deemed to hereby grant to the Lender a security interest and lien in and to such commercial tort claims and all proceeds thereof.

(b)     Perfection of Security Interest.  Borrower shall take all action that may be necessary or desirable, or that the Lender may request, so as at all times to maintain the validity, perfection, enforceability and priority of the Lender's security interest in the Collateral or to enable the Lender to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens on the Collateral other than Permitted Encumbrances, (ii) delivering to the Lender, endorsed or accompanied by such instruments of assignment as the Lender may specify, and stamping or marking, in such manner as the Lender may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iii) entering into warehousing, lockbox and other custodial arrangements satisfactory to

-8-

PA00369

the Lender as and to the extent required hereunder, and (iv) executing and delivering control agreements, instruments of pledge, notices and assignments, in each case in form and substance satisfactory to the Lender, relating to the creation, validity, perfection, maintenance or continuation of the Lender's security interest in Collateral under the Uniform Commercial Code or other applicable law. The Lender is hereby authorized to file financing statements in accordance with the Uniform Commercial Code from time to time. By its signature hereto, Borrower hereby authorizes the Lender to file against Borrower, one or more financing, continuation, or amendment statements pursuant to the Uniform Commercial Code to perfect Liens in the Collateral securing Obligations arising hereunder in form and substance satisfactory to the Lender. All charges, expenses and fees the Lender may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Borrower as an Advance and added to the Obligations (notice thereof shall be provided to the Borrower thereafter), or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(c)     Disposition of Collateral. Borrower will safeguard and protect all Collateral for the Lender's general account and make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement.

(d)     Preservation of Collateral. Following the occurrence and during the continuation of an Event of Default in addition to the rights and remedies set forth in Section 13(a) hereof, the Lender: (i) may at any time take such steps as the Lender deems necessary to protect the Lender's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as the Lender may deem appropriate; (ii) may employ and maintain at any of Borrower's premises a custodian who shall have full authority to do all acts necessary to protect the Lender's interests in the Collateral; (iii) may lease warehouse facilities to which the Lender may move all or part of the Collateral; (iv) may use Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (v) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrower's owned or leased property. Borrower shall cooperate fully with all of the Lender's efforts to preserve the Collateral as permitted in the foregoing sentence and will take such actions to preserve the Collateral as the Lender may direct. All of the Lender's expenses of preserving the Collateral in accordance with the foregoing, including any expenses relating to the bonding of a custodian, shall be charged to the Borrower as an Advance and added to the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(e)     Ownership of Collateral. With respect to the Collateral, at the time the Collateral becomes subject to the Lender's security interest: (i) Borrower shall be the owner of and fully authorized and able to sell, transfer, pledge and/or grant a security interest having the priority set forth in the Financing Orders in each and every item of its Collateral to the Lender; and, except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by Borrower or delivered to the Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of Borrower that appear on such documents and agreements shall be genuine and Borrower shall have full capacity to execute same; and (iv) Borrower's inventory shall be located as set forth on Schedule 5(e) attached hereto (as such Schedule may be updated from time to time) and shall not be removed from such location(s) without the prior written consent of the Lender except with respect to the sale of inventory in the ordinary course of business and with respect to inventory in transit from (a) a supplier to one location identified on Schedule 5(e) (as such Schedule may be updated from time to time) or (b) one location identified on Schedule 5(e) to another location identified on Schedule 5(e).

(f)     Defense of Lender's Interests. Until (i) indefeasible payment and performance in full of all of the Obligations and (ii) termination of this Agreement, the Lender's interests in the Collateral

13172237 v2

shall continue in full force and effect. During such period Borrower shall not, without the Lender's prior written consent, pledge, sell (except inventory in the ordinary course of business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, and except for dispositions expressly permitted elsewhere herein, any part of the Collateral. Borrower shall defend the Lender's interests in the Collateral against any and all Persons whatsoever. At any time after an Event of Default has occurred and is continuing and after demand by the Lender for payment of all Obligations, the Lender shall have the right, after the giving of any required notices under Section 13 hereof and upon the effectiveness of the granting of relief from the stay of Section 362(a) of the Bankruptcy Code, to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including, without limitation, labels, stationery, documents, instruments and advertising materials. If the Lender exercises such right to take possession of the Collateral, Borrower shall, upon demand, assemble it in the best manner possible and make it available to the Lender at a place reasonably convenient to the Lender. In addition, with respect to all Collateral, the Lender shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other applicable law. After the occurrence and during the continuance of an Event of Default and after the giving of any required notices under Section 13 hereof, Borrower shall, and the Lender may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, inventory, documents or instruments in which the Lender holds a security interest to deliver same to the Lender and/or subject to the Lender's order and if they shall come into Borrower's possession, they shall be held by Borrower in trust as the Lender's trustee, and Borrower will immediately deliver them to the Lender in their original form together with any necessary endorsement.

(g)  Books and Records. Borrower shall (i) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (ii) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (iii) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful receivables, advances and investments and all other proper accruals (including without limitation by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in all material respects in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrower.

(h)  Financial Disclosure. Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by Borrower at any time during the Term and promptly after the written request of the Lender (with prior written notice to the Borrower so long as no Event of Default has occurred and is continuing) to deliver to the Lender copies of Borrower's financial statements (if any exist at or prior to the date of such request), trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to the Lender any information such accountants may have concerning Borrower's financial status and business operations. Borrower hereby authorizes all federal, state and municipal authorities to furnish to the Lender copies of reports or examinations relating to Borrower, whether made by Borrower or otherwise; however, the Lender will attempt to obtain such information or materials directly from Borrower prior to obtaining such information or materials from such accountants or such authorities.

(i)  Priority. Subject to entry of the Financing Orders by the Bankruptcy Court, Borrower agrees to grant Lender an allowed Superpriority Claim, and said Superpriority Claim shall survive any conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

-10-

13172237 v2

PA00371

(j)    <u>Compliance with Laws</u>.  Borrower shall comply with all laws, acts, rules, regulations and orders of any Governmental Body with jurisdiction over it or the Collateral or any part thereof or to the operation of Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of those Governmental Bodies or officials in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's Lien on or security interest in the Collateral.  The Collateral at all times shall be maintained in accordance with the material requirements of all insurance carriers which provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect.

(k)    <u>Inspection of Premises</u>.  Borrower shall (i) permit the Lender or any of its agents, attorneys, field examiners, auditors, financial consultants, appraisers and/or any other consultants or advisors access to Borrower's assets, properties, and premises at times to be mutually agreed, during normal business hours to, among other things, conduct appraisals and evaluations of the Collateral and any other assets or properties of Borrower, and (ii) fully cooperate and completely and promptly comply with any and all requests of the Lender and/or any of its agents for information or copies of documents.  All fees, costs, and expenses of such agents, now or hereafter incurred by the Lender shall be reimbursed by Borrower in accordance with Section 15(e) hereof.

(l)    <u>Insurance</u>.  Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral.  Subject to the orders of the Bankruptcy Court, at Borrower's own cost and expense in amounts and with carriers acceptable to the Lender, Borrower shall (i) keep all its insurable properties and properties in which Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrower's including, without limitation, business interruption insurance; (ii) maintain insurance in such amounts as is customary in the case of companies engaged in businesses similar to Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business; and (v) furnish the Lender with (1) evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (2) appropriate lender loss payable endorsements in form and substance satisfactory to the Lender, naming the Lender as an additional insured and lender loss payee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to the Lender, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to the Lender.  Borrower shall provide copies of all such insurance policies (including the appropriate lender loss payee and additional insured endorsements) within thirty (30) days after the Lender's request, however, only certificates of such insurance shall be required at Closing.  In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by the Lender and the Borrower to make payment for such loss to the Lender and not Borrower and the Lender jointly.  If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to Borrower and the Lender jointly, the Lender may endorse Borrower's name thereon and do such other things as the Lender may deem advisable to reduce the same to cash.  The Lender is hereby authorized to negotiate and compromise claims under insurance

-11-

coverage with respect to Collateral. All loss recoveries with respect to Collateral received by the Lender upon any such insurance may be applied to the Obligations, in such order as the Lender in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by the Lender to Borrower or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Borrower to the Lender, on demand. Any loss recoveries not relating to items of Collateral shall be payable directly to Borrower and, if received by the Lender, the Lender shall promptly deliver same to Borrower. Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below, the Lender shall remit to the Borrower all proceeds of business interruption insurance, and all proceeds of insurance with respect to larceny, embezzlement or other criminal misappropriation, regardless of amount, shall be payable directly and promptly to the Borrower. The agreement of the Lender to remit insurance proceeds in the manner above provided shall be subject to satisfaction that no Event of Default or Default shall then have occurred and be continuing.

(m) <u>Failure to Pay Insurance</u>. If Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, the Lender, if the Lender so elects, may obtain such insurance and pay the premium therefor on behalf of Borrower, and charge the Borrower therefor as an Advance and such expenses so paid shall be part of the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(n) <u>Payment of Taxes</u>. Subject to the orders of the Bankruptcy Court, Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon Borrower or any of the Collateral including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except (i) those taxes, assessments or charges that are not material; (ii) those taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding; and (iii) those taxes which Borrower is prohibited from paying (or are not required to pay) by operation of the Bankruptcy Code, provided that, with respect to items (i) and (ii) referenced above in this Section 5(n), that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. If any tax by any governmental authority is or may be imposed on or as a result of any transaction between Borrower and the Lender which the Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in the Lender's opinion, may possibly create a valid Lien on the Collateral, the Lender may without notice to Borrower pay the taxes, assessments or other Charges and Borrower hereby indemnifies and holds the Lender harmless in respect thereof. The Lender will not pay any taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. The amount of any payment by the Lender under this Section 5(n) shall be charged to the Borrower as an Advance and added to the Obligations and, until Borrower shall furnish the Lender with an indemnity therefor (or supply the Lender with evidence satisfactory to the Lender that due provision for the payment thereof has been made), the Lender may hold without interest any balance standing to the Borrower's credit and the Lender shall retain its security interest in any and all Collateral held by the Lender.

(o) <u>Payment of Leasehold Obligations</u>. Borrower shall at all times pay, when and as due, its rental obligations arising after the Petition Date under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases (other than to the extent that the enforcement of such terms by the applicable landlord is stayed by virtue of the Bankruptcy Case) and, at the Lender's reasonable request will provide evidence of having done so.

(p)     Power of Lender to Act on Borrower's Behalf.  The Lender shall have the right, at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to receive, endorse, assign and/or deliver in the name of the Lender or Borrower any and all checks, drafts and other instruments for the payment of money relating to receivables, and Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Borrower hereby constitutes the Lender or the Lender's designee as Borrower's attorney with power at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code (i) to endorse Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign Borrower's name on any invoice or bill of lading relating to any of the receivables, drafts against customers, assignments and verifications of receivables; (iii) to send verifications of receivables to any customer; (iv) to demand payment of the receivables; (v) to enforce payment of the receivables by legal proceedings or otherwise; (vi) to exercise all of the Borrower's rights and remedies with respect to the collection of the receivables and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the receivables; (viii) to settle, adjust or compromise any legal proceedings brought to collect receivables; (ix) to prepare, file and sign Borrower's name on a proof of claim in bankruptcy or similar document against any customer; (x) to prepare, file and sign Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the receivables; and (xi) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done with gross (not mere) negligence or willful misconduct; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  The Lender shall have the right at any time following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to change the address for delivery of mail addressed to Borrower to such address as the Lender may designate and to receive, open and dispose of all mail addressed to Borrower.

(q)     No Liability.  The Lender shall not, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the receivables or any instrument received in payment thereof, or for any damage resulting therefrom unless such liability arises from the Lender's willful misconduct or gross negligence as finally determined by a court of competent jurisdiction.  Following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, the Lender may, without any other notice or consent from Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  The Lender is authorized and empowered to accept following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code the return of the goods represented by any of the receivables, without notice to or consent by Borrower, all without discharging or in any way affecting Borrower's liability hereunder.

(r)     Exculpation of Liability.  Nothing herein contained shall be construed to constitute the Lender as Borrower's agent for any purpose whatsoever, nor shall the Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof except to the extent such shortage, discrepancy, damage, loss or destruction resulted directly from the gross (not mere) negligence or willful

-13-

PA00374

misconduct of the Lender. The Lender will not, whether by anything herein or in any assignment or otherwise, assume any of Borrower's obligations under any contract or agreement assigned to the Lender, and the Lender shall not be responsible in any way for the performance by Borrower of any of the terms and conditions thereof.

6. **Representations and Warranties**.

(a)  <u>Authority</u>.  Subject to entry of the Financing Orders, Borrower has the full power, authority and legal right to enter into this Agreement and the Other Documents to which it is a party and to perform all of its Obligations hereunder and thereunder, as the case may be.  Subject to entry of the Financing Orders, this Agreement and the Other Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms.  The execution, delivery and performance of this Agreement and of the Other Documents by Borrower (i) subject to entry of the Financing Orders, are within Borrower's limited liability company powers, have been duly authorized, are not in contravention of law or the terms of Borrower's operating agreement, articles of organization or other applicable documents relating to Borrower's formation or organization, as the case may be, or to the conduct of Borrower's business or of any material agreement or undertaking arising after the Petition Date to which Borrower is a party or by which Borrower is bound, and (ii) will not conflict with nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of Borrower under the provisions of any agreement, charter document or other instrument  arising after the Petition Date to which Borrower is a party or by which it or its property may be bound.

(b)  <u>Formation and Qualification</u>.  Borrower is duly organized and in good standing under the laws of the Commonwealth of Pennsylvania, which constitutes all jurisdictions in which qualification and good standing are necessary for Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Borrower has delivered to the Lender true and complete copies of its articles of organization, operating agreement or other organizational documents and will promptly notify the Lender of any amendment or changes thereto.

(c)  <u>Survival of Representations and Warranties</u>.  All representations and warranties of Borrower contained in this Agreement and the Other Documents, as the case may be, shall be true at the time of Borrower's execution of this Agreement and the Other Documents, as the case may be, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the Closing.

(d)  <u>No Litigation, Violation or Default</u>.  Except as disclosed in <u>Schedule 6(e)</u>, Borrower does not have any pending or threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect.  Borrower is not in violation of any applicable statute, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is Borrower in violation of any order of any court, governmental authority or arbitration board or tribunal which would reasonably be expected to have a Material Adverse Effect.

(e)  <u>The Financing Orders</u>.  On the date of the making of the initial Advances hereunder, the Interim Financing Order will have been entered and be in full force and effect and will not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in its sole discretion, amended, supplemented or modified.  On the date of the making of any Advance, the Interim Financing Order or the Final Financing Order, as the case may be, shall have been entered and be in full force and effect and shall not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in Lender's sole discretion, amended, supplemented or modified.  Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lender shall, subject solely to

-14-

the provisions of Sections 3(f)(iv), 12 and 13 hereof and to such reservations of rights as may be expressly set forth in the Financing Orders, be entitled to immediate payment in full of such Obligations in cash, and the Lender shall be entitled to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

        (f)    <u>Good Faith</u>.  This Agreement has been negotiated in good faith and at arm's length between the Borrower and the Lender.

    7.    **Affirmative Covenants.**  Following the Closing Date, Borrower shall until payment or satisfaction in full of the Obligations and termination of this Agreement:

        (a)    <u>Conduct of Business and Maintenance of Existence and Assets</u>.  (i) Conduct its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including, without limitation, all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral; (ii) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (iii) make all such reports and pay all such franchise and other taxes and license fees  arising after the Petition Date and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so would reasonably be expected to have a Material Adverse Effect.

        (b)    <u>Violations</u>.  Promptly notify the Lender in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to Borrower or the Collateral which could reasonably be expected to have a Material Adverse Effect.

        (c)    <u>Execution of Supplemental Instruments</u>.  Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as the Lender may reasonably request, in order for the full intent of this Agreement to be carried into effect.

        (d)    <u>Modification of the Automatic Stay</u>.  The Interim Financing Order (and Final Financing Order, as applicable) shall contain language, which shall be satisfactory to the Lender in its sole discretion, vacating and modifying the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary to permit the Lender to (i) perfect the security interests and Liens granted hereunder and (ii) exercise its rights under Section 13 hereof of this Agreement.

    8.    **Negative Covenants.**  Borrower shall not until satisfaction in full of the Obligations and termination of this Agreement:

        (a)    <u>Merger, Consolidation, Acquisition and Sale of Assets</u>.

            (i)    Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person or permit any other Person to consolidate with or merge with it; or

13172237 v2

PA00376

(ii)     Except transactions involving the sale, lease, transfer or other disposition of inventory in the ordinary course of business, sell, lease, transfer or otherwise dispose of any of its properties or assets unless such sale is in accordance with the Sale Agreement, the Sale Motion and the Sale Order.

(b)     <u>Creation of Liens</u>.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

(c)     <u>Guarantees</u>.  Become liable upon the obligations of any Person by assumption, endorsement or guaranty thereof or otherwise.

(d)     <u>Loans</u>.  Make advances, loans or extensions of credit to any Person, including, without limitation, any affiliate, except with respect to the extension of commercial trade credit in connection with the sale of inventory in the ordinary course of its business.

(e)     <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness except in respect of (i) trade debt, deposits placed with the Borrower by customers of the Borrower for boat orders, and as disclosed by the Borrower in its schedules filed in the Bankruptcy Case, (ii) Indebtedness existing on the Closing Date and set forth on <u>Schedule 8(e)</u> attached hereto (including any extensions, renewals or refinancings thereof), provided that there is no material change in the material terms thereof and the principal amount of such Indebtedness shall not be increased to an amount greater than the amount outstanding on the Closing Date without the prior written consent of the Lender, (iii) Indebtedness of the Prepetition Secured Parties under the Prepetition Documents as set forth in the Cash Collateral Order, (iv) other Indebtedness permitted pursuant to the Cash Collateral Order, and (v) Indebtedness to the Lender under or pursuant to this Agreement or the Other Documents.

(f)     <u>Nature of Business</u>.  Substantially change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business or other than those which are useful in, necessary for and are to be used in its business, as presently conducted.

(g)     <u>Amendment of Articles of Organization or Operating Agreement</u>.  Amend, modify or waive any material term or material provision of its articles of organization or operating agreement or other organizational documents which amendment, modification or waiver would reasonably be considered material and adverse to the Lender, unless required by law.

(h)     <u>Prepayment of Indebtedness</u>.  At any time, directly or indirectly, prepay or repurchase, redeem or retire any Indebtedness, except for the prepayment, repurchase, redemption, retirement or acquisition of any Indebtedness of Borrower owed to the Lender pursuant to this Agreement or the Other Documents.

9.     **Conditions to Initial Advances**.  The agreement of the Lender to make the initial Advance requested to be made on the Closing Date is subject to the satisfaction, or waiver by the Lender, immediately prior to or concurrently with the making of such Advance, of the following conditions precedent:

(a)     <u>Note</u>.  The Lender shall have received the Revolving Credit Note duly executed and delivered by an authorized officer of Borrower.

(b)     <u>Bankruptcy Matters</u>.  No trustee or examiner with expanded powers relating to the operation of the business of the Borrower shall have been appointed with respect to Borrower or its

business, properties or assets, including without limitation, the Collateral and any other property that is security for the Obligations and Borrower shall have complied in full with all other requirements as provided for under the Interim Financing Order.

      (c)    <u>Interim Financing Order</u>. At the time of the making of the initial Advance, the Lender shall have received satisfactory evidence of the entry of the Interim Financing Order which Interim Financing Order (i) shall be in form and substance satisfactory to the Lender in Lender's sole discretion, (ii) shall have been entered not later than seven (7) days following the Petition Date and (iii) shall not have been vacated, stayed, reversed, modified or amended in any respect without the express written consent of the Lender, and, if the Interim Financing Order is the subject of a pending appeal in any respect, neither the making of such Advance, nor the performance by the Borrower of any of its obligations hereunder or under the Other Documents or under any other instrument or agreement referred to herein, shall be the subject of a presently effective stay pending appeal.

      (d)    <u>First Day Orders</u>. All of the "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Bankruptcy Case shall be reasonably satisfactory in form and substance to the Lender.

      (e)    <u>Corporate Proceedings of Borrower</u>. The Lender shall have received a copy of the resolutions in form and substance reasonably satisfactory to the Lender, of the board of directors, partners, managers or members, as the case may be, of Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Revolving Credit Note and any Other Document to which Borrower is a party, and (ii) the granting by Borrower of the security interests in and Liens upon the Collateral. Such resolutions shall be certified by an authorized individual of Borrower as of the Closing Date and such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate.

      (f)    <u>Incumbency Certificate of Borrower</u>. The Lender shall have received a certificate of an authorized individual of Borrower, dated the Closing Date, as to the incumbency and signature of the officers or manager of Borrower executing any certificate or other documents to be delivered by Borrower pursuant hereto, together with evidence of the incumbency of such authorized individual.

      (g)    <u>Good Standing Certificates</u>. The Lender shall have received copies of good standing certificates, or similar certifications, for Borrower, issued by the Department of State of the Commonwealth of Pennsylvania and each jurisdiction where the conduct of its business activities or the ownership of its properties necessitates qualification.

      (h)    <u>Insurance</u>. The Lender shall have received in form and substance satisfactory to the Lender, certificates of insurance for the Borrower's casualty insurance policies, together with loss payable endorsements on the Borrower's standard form of loss payee endorsement naming the Lender as lender loss payee with respect to the Collateral, and certificates of insurance for the Borrower's liability insurance policies, together with endorsements naming the Lender as an additional insured.

      (i)    <u>Consents</u>. The Lender shall have received any and all consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, such consents of such third parties as might assert claims with respect to the Collateral, as the Lender and its counsel shall deem necessary.

13172237 v2

PA00378

(j)     Other.  All limited liability company and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Lender and its counsel.

10.     **Conditions to Each Advance**.  The agreement of the Lender to make any Advance requested to be made on any date (including, without limitation, the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made.

(a)     Representations and Warranties.  Each of the representations and warranties made by Borrower in or pursuant to this Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b)     Financing Orders.  Subject to Section 9(c) hereof, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "Additional Credit"), the Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor the performance by the Borrower of any of its obligations under this Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.

(c)     Sale Motion.  For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the Lender, which shall be reasonably satisfactory in form and substance to the Lender (the "Sale Motion").

(d)     Asset Purchase Agreement.  For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "Sellers"), and the Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "Purchasers"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "Sale Agreement"), which shall be reasonably satisfactory in form and substance to the Lender (the "Sale Motion").

(e)     For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the Lender (the "Sale Order") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal.   Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.

(f)     No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such

-18-

date; provided, however that, the Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default.

(g)     Maximum Advances.  In the case of any Advances requested to be made, after giving effect thereto, the aggregate Advances shall not exceed the Maximum Advance Amount.

Each request for an Advance by the Borrower hereunder shall constitute a representation and warranty by Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied (to the extent that such conditions are required to be satisfied by such date).

11.     **Information as to Borrower.**  Borrower shall, until payment or satisfaction in full of the Obligations and the termination of this Agreement deliver the following information:

(a)     Disclosure of Material Matters.  Immediately upon learning thereof, report to the Lender all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including, without limitation, Borrower's reclamation or repossession of, or the return to Borrower of, a material amount of goods or material claims or material disputes asserted by any customer or other obligor.

(b)     Litigation.  Promptly notify the Lender in writing of any adversary proceeding, contested matter or administrative proceeding affecting Borrower, whether or not the claim is covered by insurance, and of any adversary proceeding, contested matter or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

(c)     Material Occurrences.  Promptly, but in any event no later than five (5) days after such occurrence, notify the Lender in writing upon the occurrence of (i) any Event of Default or Default; (ii) any event, development or circumstance whereby any financial statements or other reports furnished to the Lender fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Borrower as of the date of such statements; (iii) each and every default by Borrower which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness arising after the Petition Date, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated; and the amount of such Indebtedness; and (iv) any other development in the business or affairs of Borrower which could reasonably be expected to have a Material Adverse Effect; in each case, to the extent permitted by applicable law, describing the nature thereof and the action Borrower proposes to take with respect thereto.

(d)     Additional Information.  Furnish the Lender with such additional information as the Lender shall reasonably request in order to enable the Lender to determine whether the terms, covenants, provisions and conditions of this Agreement and the Revolving Credit Note have been complied with by Borrower and execute and deliver to the Lender, upon request, such documents and agreements as the Lender may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

(e)     Weekly Reporting.  Furnish the Lender with weekly reporting of inventory tracking, accounts payable aging and accounts receivable aging of the Borrower by 5:00 p.m. on Thursday of each week for the preceding week.

12.     **Events of Default.**  The occurrence of any one or more of the following events shall constitute an "Event of Default":

13172237 v2

(a)     Payment of Obligations.  Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document.

(b)     Misrepresentations.  Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made.

(c)     Failure to Furnish Information.  Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten (10) days after such information is requested, or (iii) permit the inspection of its books or records.

(d)     Liens Against Assets.  Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days.

(e)     Breach of Covenants.  Except as otherwise provided for in this Section 12, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations.

(f)     Judgment.  Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage).

(g)     Loss of Priority Lien.  Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders.

(h)     Invalidity of Credit Agreement.  Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender.

(i)     Destruction of Collateral.  Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material impairment or loss of the security provided by this Agreement or the Other Documents.

(j)     Pre-Petition Payments.  Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date.

(k)     Dismissal or Conversion of Bankruptcy Case.  The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy

Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is pari passu with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim.

(l) <u>Relief from Stay</u>. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower.

(m) <u>The Financing Orders</u>. Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower. Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.

(n) <u>Lien Challenge</u>. Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender. Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor or the Lender.

(o) <u>Filing of Reorganization Plan or Sale Motion</u>. A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers.

13. **<u>Lenders' Rights and Remedies After Default.</u>**

(a) <u>Rights and Remedies</u>. Upon the occurrence of an Event of Default and at any time thereafter (such default not having previously been cured), at the option of Lender during the continuance of such event, and without further order of or application to the Bankruptcy Court except as otherwise provided in the Financing Orders, the Lender may, by notice to the Borrower and its counsel (with a copy to (x) counsel for any statutory creditors' committee appointed in the Bankruptcy Case, (y) the United States Trustee for the Bankruptcy Court and (z) counsel to each of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties pursuant to the Cash Collateral Order), take one or more of the following actions, at the same or different times: (i) terminate or suspend forthwith the commitment to make Advances hereunder; (ii) declare the Advances or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Advances together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any Other Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any Other Document to the contrary notwithstanding; and (iii)

exercise any and all remedies under this Agreement and the Other Documents and under applicable law available to the Lender.

(b)     Lender's Discretion.  The Lender shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies the Lender may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of the Lender's rights hereunder.

(c)     Setoff.  In addition to any other rights which the Lender may have under applicable law, upon the occurrence and during the continuance of an Event of Default hereunder, the Lender shall have a right to apply Borrower's property held by the Lender to reduce the Obligations; *provided that* in no event shall the Postpetition Collateral (as defined in the Cash Collateral Order) be available for such right of setoff.

(d)     Rights and Remedies Not Exclusive.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

(e)     Allocation of Payments After Event of Default.  Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received from Borrower (including the monetary proceeds of collections or of realization upon any Collateral) shall be applied in such order as the Lender shall determine in its sole discretion.

14.     **Effective Date and Termination.**

(a)     Term.  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of Borrower and the Lender, shall become effective on the date hereof and shall continue in full force and effect, and Advances borrowed under this Agreement will be paid in full in cash and the DIP Financing will terminate upon the earliest to occur of the following (the "Term"):  (i) **[April 7, 2020],** or such later date as may be agreed pursuant to this Agreement, (ii) unless extended with the consent of the Lender, the failure to meet any of the dates set forth in the Sale Motion or the entry of the Sale Order to occur, (iii) the closing of a sale pursuant to the Sale Agreement, the Sale Motion and the Sale Order, (iv) at the option of the Lender, at any time on or after an Event of Default, or (v) acceleration of the Obligations in accordance with this Agreement.

(b)     Termination.  The termination of this Agreement shall not affect Borrower's or the Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated.  The security interests, Liens and rights granted to the Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement, until all of the Obligations of Borrower have been paid or performed in full after the termination of this Agreement or Borrower has furnished the Lender with an indemnification satisfactory to the Lender with respect thereto.  Accordingly, Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and the Lender shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds.  All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or

13172237 v2

performed in full. Without limitation, all indemnification obligations contained herein shall survive the termination hereof and payment in full of the Obligations.

15. **Miscellaneous.**

(a)  <u>Indemnity</u>.  Borrower shall indemnify the Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not the Lender is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified.

(b)  <u>Notice</u>.  Any notice or request hereunder may be given to the Borrower or to the Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15(b).  Any notice, request, demand, direction or other communication (for purposes of this Section 15(b) only, a "<u>Notice</u>") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission in accordance with this Section 15(b).  Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 15(b) hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 15(b).  Any Notice shall be effective:

(i)  In the case of hand-delivery, when delivered;

(ii)  If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(iii)  In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(iv)  In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(v)  In the case of electronic transmission, when actually received;

(vi)  If given by any other means (including by overnight courier), when actually received.

13172237 v2

PA00384

    (A)    If to Lender:    Levin Furniture, LLC
c/o Goldberg, Kamin & Garvin
1806 Frick Building
437 Grant St.
Pittsburgh, Pennsylvania 15219
Attention:  Jonathan M. Kamin
Telephone:
Email:

    With a copy to:    Clark Hill PLC
One Oxford Centre
301 Grant Street, 14th Floor
Pittsburgh, Pennsylvania 15219-1425
Attention:  Jarrod J. Duffy / William C. Price
Telephone:  (412) 394-2324 / (412) 394-7776
Telecopier:  (412) 394-2555
Email:  jduffy@clarkhill.com / wprice@clarkhill.com

    (B)    If to Borrower:    Sam Levin, Inc.

c/o Art Van Furniture, LLC
6500 14 Mile Road
Warren, MI 48092
Attention: Michael Zambricki
Email: mzambricki@artvan.com

with copies (which shall not constitute notice) to:

Benesch, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Attn: Gregory Werkheiser & Michael J. Barrie
Email: gwerkheiser@beneschlaw.com /
mbarrie@beneschlaw.com

(c)  <u>Representation by Counsel.</u>  Each party hereto acknowledges that it has been represented by counsel in connection with this Agreement.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the parties hereto.

(d)  <u>Governing Law.</u>  This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without reference to the conflicts of law provisions thereof and, to the extent applicable, the Bankruptcy Code.

(e)  <u>Expenses.</u>  All costs and expenses including, without limitation, reasonable attorneys' fees and disbursements incurred by the Lender (i) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (ii) in connection with the modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, or (iii) in instituting, maintaining, preserving, enforcing and

13172237 v2

PA00385

foreclosing on the Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (iv) in defending or prosecuting any actions or proceedings arising out of or relating to the Lender's transactions with Borrower, or (v) in connection with any advice given to the Lender with respect to its rights and obligations under this Agreement and any Other Document, may be charged to the Borrower and shall be part of the Obligations (the Lender shall promptly thereafter provide notice thereof to the Borrower).

(f)     _Injunctive Relief._  Borrower recognizes that, in the event it fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to the Lender; therefore, the Lender, if the Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

(g)     _Consequential Damages._  Neither the Lender nor any of its agents or attorneys shall be liable to Borrower for any special, incidental, consequential or punitive damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

(h)     _Counterparts._  This Agreement may be executed in counterpart, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

(i)     _Modifications in Writing._  No modification or amendment of the terms of this Agreement shall be valid unless such amendment is in writing and signed by Borrower and Lender.

(j)     _Headings._  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

(k)     _Effect of Financing Orders_.  The Liens and security interest referred to in this Agreement and any Other Document with respect to the Borrower shall be deemed valid and perfected by entry of the Interim Financing Order.

Subject to the Financing Orders and this Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall:  (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral.

(l)     _Release._  Borrower, on behalf of itself and any Person claiming by, through, or under Borrower (collectively, the "_Borrower Group_") acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature (including, for the avoidance of doubt, any claim under Chapter 5 of the Bankruptcy Code) whatsoever (collectively, "_Claims_") against the Lender and/or any of its former, present or future directors, officers, members, employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns (the Lender and its former, present or future directors, officers, members,

13172237 v2

employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns are jointly and severally referred to as the "Lender Group"), that directly or indirectly arise out of, are based upon, or are in any manner connected with any Prior Event; and, should any Claims nonetheless exist, Borrower, on behalf of itself and all the other members of the Borrower Group, hereby (i) releases and discharges each member of the Lender Group from any liability whatsoever on such Claims that directly or indirectly arise out of, are based upon, or are in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Claims against any member of the Lender Group. As used herein the term "Prior Event" means any transaction, event, circumstance, action, failure to act or occurrence of any sort or type, including without limitation any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the execution of this Agreement.


[INTENTIONALLY LEFT BLANK]

13172237 v2

PA00387

**IN WITNESS WHEREOF,** Borrower and Lender have caused this Agreement to be executed as of the date first set forth above.

BORROWER:

Sam Levin, Inc.,
a Pennsylvania corporation

_____

By:
Name:
Title:

LENDER:

Levin Furniture, LLC,
a Pennsylvania limited liability company

_____

By:  Robert Levin, President

223525600
13172237 v2

PA00388

**INDEX TO EXHIBITS**

Exhibit A      -      Interim Financing Order
Exhibit B      -      Revolving Credit Note

223525600
13172237 v2

PA00389

**EXHIBIT A**

**Interim Financing Order**

(see attached)

**EXHIBIT B**

**Revolving Credit Note**

(see attached)

## <u>INDEX TO SCHEDULES</u>

<u>Schedule 1(f)</u>     -     Permitted Encumbrances
<u>Schedule 5(e)</u>     -     Inventory Locations
<u>Schedule 6(e)</u>     -     Litigation
<u>Schedule 8(e)</u>     -     Indebtedness

**SCHEDULE 1(f)**

**Permitted Encumbrances**

223525600
13172237 v2

PA00393

**SCHEDULE 5(e)**

**Inventory Locations**

223525600
13172237 v2

**SCHEDULE 6(e)**

**Litigation**

**SCHEDULE 8(e)**

**Indebtedness**

## REVOLVING CREDIT NOTE

$7,000,000.00

Date: March __, 2020
Pittsburgh, Pennsylvania

This Revolving Credit Note (this "Note") is executed and delivered under and pursuant to the terms of that certain Debtor-in-Possession Credit and Security Agreement, dated of even date herewith (as may be amended, modified, supplemented or restated, from time to time, the "DIP Credit Agreement"), by and between Sam Levin, Inc., a Pennsylvania corporation (the "Borrower"), and Levin Furniture, LLC, a Pennsylvania limited liability company (the "Lender"). Capitalized terms not otherwise defined herein shall have the meanings provided in the DIP Credit Agreement.

FOR VALUE RECEIVED, the Borrower hereby promises to pay to the order of the Lender at such place as Lender may from time to time designate to the Borrower in writing:

(i)     the principal sum of Seven Million Five Hundred Thousand and 00/100 Dollars ($7,000,000.00) or, if different from such amount, the unpaid principal balance of the Advances as may be due and owing under the DIP Credit Agreement, payable in accordance with the provisions of the DIP Credit Agreement and subject to acceleration upon the occurrence of an Event of Default under the DIP Credit Agreement or earlier termination of the DIP Credit Agreement pursuant to the terms thereof; and

(ii)     interest on the principal amount of this Note from time to time outstanding until such principal amount is paid in full at the Contract Rate in accordance with the provisions of the DIP Credit Agreement. In no event, however, shall interest exceed the maximum interest rate permitted by law. Upon and after the occurrence of an Event of Default, and during the continuation thereof, interest shall be payable at the Default Rate.

This Note is the Revolving Credit Note referred to in the DIP Credit Agreement and is secured by the Liens granted pursuant to the DIP Credit Agreement and the Other Documents, is entitled to the benefits of the DIP Credit Agreement and the Other Documents and is subject to all of the agreements, terms and conditions therein contained.

This Note may be voluntarily prepaid, in whole or in part, on the terms and conditions set forth in the DIP Credit Agreement.

If an Event of Default shall have occurred under the DIP Credit Agreement, then this Note may, as provided in the DIP Credit Agreement, be declared immediately due and payable, without notice, together with reasonable attorneys' fees if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof.

This Note shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania. The Borrower hereby consents to the jurisdiction and venue of the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") with respect to any suit arising out of or mentioning this Note provided, however, that in the event that the Bankruptcy Court does not have jurisdiction over any matter or if it has jurisdiction but does not exercise such jurisdiction for any reason, the Borrower hereby consents to the jurisdiction and venue of the courts of the Commonwealth of Pennsylvania or the United States District Court for the Western District of Pennsylvania, in each case located in Allegheny County, Pennsylvania.

The Borrower expressly waives any presentment, demand, protest, notice of protest, or notice of any kind except as expressly provided in the DIP Credit Agreement.

13172258 v2

PA00397

**WAIVER OF TRIAL BY JURY**.  THE UNDERSIGNED HEREBY EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVE ALL BENEFIT AND ADVANTAGE OF ANY RIGHT TO A TRIAL BY JURY, AND THEY WILL NOT AT ANY TIME INSIST UPON, OR PLEAD OR IN ANY MANNER WHATSOEVER CLAIM OR TAKE THE BENEFIT OR ADVANTAGE OF A TRIAL BY JURY IN ANY ACTION ARISING IN CONNECTION WITH THIS NOTE, THE DIP CREDIT AGREEMENT OR ANY OF THE OTHER DOCUMENTS.

[INTENTIONALLY LEFT BLANK]

- 2 -

PA00398

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned has hereby executed this Revolving Credit Note on the date first set forth above.

**BORROWER:**

Sam Levin, Inc.,
a Pennsylvania corporation

By:_____
Name:_____
Title:_____

ACKNOWLEDGMENT

_____ OF _____        )
                                                          )       SS:
COUNTY OF _____           )

        On this, the _____ day of March, 2020, before me, a Notary Public, the undersigned officer, personally appeared _____ who acknowledged himself/herself to be the _____ of Sam Levin, Inc., a Pennsylvania corporation (the "Company"), and that he/she as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by himself/herself as such officer on behalf the Company.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                    _____
                                         Notary Public


My Commission Expires:

# EXHIBIT F

PA00401

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 49** |

### INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i)    authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the DIP Collateral (as defined below)[3] to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

[3]    As used in this Interim Order, "DIP Collateral" shall mean and include all of the following personal property assets of the DIP Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

13193241 v4

PA00402

with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and adequate protection to the DIP Lender in accordance with this order; and

      (ii)      scheduling a final hearing (the "<u>Final Hearing</u>") within twenty days of the

---

(a) all inventory of the DIP Borrower purchased solely with the proceeds of any Advances made under the DIP Credit Agreement;

(b) all receivables of the DIP Borrower arising out of the sale of inventory referred to in clause (a) above;

(c) all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the DIP Borrower giving rise to receivables referred to in clause (b) above, (ii) all of DIP Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b), (iii) all additional amounts due to DIP Borrower from any customer relating to the receivables set forth in clause (b) above, (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b), (v) all of DIP Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b), (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b), and (vii) if and when obtained by DIP Borrower, all real and personal property of third parties in which DIP Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

(e) proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Interim Order or the DIP Credit Agreement, the term "DIP Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

2

Petition Date to consider the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and argument made at the first day hearing held on March 10, 2020 and the interim hearing held on March 12, 2020 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable local rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

3

A.    **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.    **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing (the "DIP Facility") from the DIP Lender pursuant to the terms set forth in this Interim Order and in that certain form of Debtor-In-Possession Credit and Security Agreement (the "DIP Credit Agreement") and that certain Revolving Credit Note (collectively with the DIP Credit Agreement, the "DIP Loan Documents"), each in substantially the form as filed on the docket in these chapter 11 proceedings on March 13, 2020.

F.    **Debtor Operations**.  DIP Borrower is unable to operate without the

---

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4

Liquidity provided by the DIP Facility.

        G.      **Inability to Obtain Alternative Credit**.  DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

        H.      **Good Faith**.  The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

        I.      **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

        J.      **Interim Debt Limit**.  The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $10,000,000.00 during this Interim Period in accordance with the DIP Loan Documents.

        K.      **Avoid Immediate and Irreparable Harm**.  The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

L.        **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.        **Motion Granted**. The Motion is granted.

2.        **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3.        **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower, as modified by this Interim Order; *provided, however,* notwithstanding anything to the contrary in the Motion or the forms of the DIP Loan Documents annexed to the Motion: (a) the "Maximum advance Amount" (as defined in the DIP Credit Agreement) shall be **Twenty Million and 00/100 U.S. dollars ($20,000,000.00);** (b) the aggregate balance of outstanding advances outstanding at any time pursuant to this Interim Order shall not exceed **Ten Million and 00/100 U.S. dollars**

6

**($10,000,000.00)**; and Section 14(a)(i) of the DIP Credit Agreement is deemed amended to strike the text "[April 7, 2020]" and replace it with "April 9, 2020". The Debtors are authorized to revise, execute and deliver the DIP Loan Documents to conform with this Paragraph 3.

        4.      **Additional DIP Loan Documents; Non-Material Amendments**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder. The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

        5.      **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

        6.      **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to

13193241 v4

PA00408

limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7. **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8. **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[5] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the

---

[5] Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 93) (the "Interim CC Order").

8

DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

9. **Security for DIP Loan**. As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "DIP Lien") against the DIP Collateral, as that term is defined in the DIP Loan Documents; *provided, however,* that the DIP Lien shall be junior only to the pre-existing liens on and security interests in such DIP Collateral granted in favor of third parties (other than any Prepetition ABL Secured Party or any Prepetition Term Loan Secured Party (each as defined in the Interim CC Order)) that, as of the Petition Date, (a) were senior in priority under applicable law to the DIP Lien, (b) were not subordinated by agreement or applicable law, and (c) were in existence, valid, enforceable, properly perfected and non-avoidable as of the Petition Date, including any such liens and security interests that were perfected after the Petition Date but relate back to the Petition Date pursuant to section 546(b) of the Bankruptcy Code. Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

9

10. **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

10

11.     **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12.     **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13.     **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any

11

successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14. <u>RESERVED</u>

15. **<u>Order Binding Upon Parties in Interest</u>**. To the fullest extent that relief is available at a hearing held pending a final hearing as contemplated by Bankruptcy Rule 4001(2), all of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16. **<u>Effect of Modification of Interim Order</u>**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

13193241 v4

PA00413

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Relationship to Contemplated Sale Transaction.** As contemplated by the Levin-Wolf LOI (attached as Exhibit B to the First Day Declaration), the Sale Agreement (as defined in the DIP Credit Agreement) shall provide for the DIP Lender and Levin Trucking, LLC, the purchasers thereunder, to assume, pay or otherwise satisfy all allowed section 503(b)(9) claims against the DIP Borrower, effective upon and subject to the occurrence of the closing under such Sale Agreement.

20. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

21. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

13

22.     **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

23.     **Final Hearing**.  The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (Prevailing Delaware Time)** before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware.  On or before March 13, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than **March 30, 2020**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal

14

Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

       24. ***Nunc Pro Tunc* Effect of this Interim Order**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

       25. **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

**Dated: March 16th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

15

13193241 v4

PA00416

# EXHIBIT G

PA00417



FURNITURE
MATTRESS

# **MEMORANDUM**

---

**TO:**      Employees Affected By Closing of 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321

**FROM:**   Cathrine Wenger, Senior Counsel

**SUBJECT:**   WARN Act Notice

**DATE:**    March 5, 2020

---

Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

\*         \*         \*

On a personal note, we are extremely grateful for the service you have given to the Company, and greatly appreciate your continued professionalism through this process.

# EXHIBIT H

PA00419

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Objection Deadline: At the Hearing** |
|  | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET)** |
|  | ) |  |
|  | ) |  |

## DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")
hereby submit this motion (this "<u>Motion</u>"), pursuant to section 1112(a) of title 11 of the United
States Code (the "<u>Bankruptcy Code</u>"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure
(the "<u>Bankruptcy Rules</u>"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and
Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"),
for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed
Order</u>"), (i) converting each of the Debtors' chapter 11 cases to cases under chapter 7 of the
Bankruptcy Code, effective as of 12:00 a.m. (prevailing Delaware time on April 7, 2020 (the
"<u>Conversion Date</u>"), (ii) establishing a deadline for filing final chapter 11 fee applications and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291);
AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451);
Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC
(8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort
Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East
14 Mile Road, Warren Michigan 48092.

setting a hearing thereon, and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      These Chapter 11 Cases were pending for just three days when on March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) outbreak to be a pandemic.[3]  These Chapter 11 Cases were pending for just five days when on March 13, 2020, the Trump administration declared a national emergency in response to the COVID-19 outbreak.[4]  These Chapter 11 Cases were pending for just six days when on March 14, 2020, government regulators in Pennsylvania, one of four states in which the Debtors' core retail operations are concentrated, issued guidance urging all non-essential retail businesses to close, with other states and localities soon to follow.[5]  And, these Chapter 11 Cases were pending for just eleven to fourteen days when the four states in which the Debtors' principal operations are located — Michigan, Pennsylvania, Ohio and Illinois — issued "stay at home" or "shelter in place" orders requiring, among other things, all non-essential businesses (including the Debtors' retail stores) to shut their doors and mandating that individuals not leave their homes except in limited circumstances.[6]

---

[2]    Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion.

[3]    World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).

[4]    Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).

[5]    Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/).

[6]    **Michigan:** Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020 (https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html); **Pennsylvania:** Gov.

2.       Even before government action in response to the COVID-19 pandemic made it impossible for the Debtors' retail operations to continue, the consumer public's understandable fear of the spread of the COVID-19 disease already had a devastating impact on the Debtors' ability to implement their original restructuring plan.  These key components included (a) the continuation of Store Closing Sales at substantially all of the Debtors' 125 Art Van Furniture, Art Van Pure Sleep and Scott Shuptrine Interiors branded locations and eight of the Debtors' Wolf Furniture branded locations, and (b) the operation of 44 Levin Furniture, Levin Mattress and Wolf Furniture locations pending consummation of a going concern sale of those business lines and related assets that was contemplated at the outset of these proceedings.  Unfortunately, by the conclusion of the week ending March 14, 2020, customer traffic in the Debtors' stores — both those participating in the Store Closing Sales program and the Levin and Wolf going concern locations — precipitously dropped below what any of the Debtors' pre-bankruptcy and pre-COVID-19 pandemic financial could have predicted.  As a consequence, it was quickly evident that continued retail operations of any sort would cause the Debtors to incur expenses for the foreseeable future that far outstripped the revenues generated.  Ultimately, of course, the aforementioned restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease effectively removed any choice the Debtors had in the matter by mandating that the Debtors discontinue all retail operations and other non-essential business operations.

---

Tom Wolf, Executive Order, dated March 19, 2020 (https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf); **Ohio:** Dir. Of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020 (https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf); and **Illinois:** Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020 (https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf).

3.      By late March, the exponential spread of the COVID-19 disease throughout the United States, along with the resulting state and locally imposed limitations and prohibitions on non-essential retail operations, had left the Debtors with few potentially viable options.  Further, these extraordinary and unprecedented events have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the best path forward in these proceedings for the Debtors and their estates.  At present, no one can predict with any reliability how long the shelter-in-place orders issued in many states where the Debtors operate will remain in effect.  In fact, the Trump administration just recently extended social distancing guidelines from April 15, 2020 through April 30, 2020.[7]  And, even assuming regulatory barriers to resuming retail operations are lifted in the near future, no one can predict with any reliability what consumer appetite will exist for furniture, given the economic and other trauma that the nation is undergoing presently.[8]

4.      In order to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that may eventually be distributable to their creditors, the Debtors had initially hoped — consistent with what has been recently approved in certain other retail chapter 11 bankruptcy proceedings[9] — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these chapter 11 cases until such time as the broader economic and public safety

---

[7]      *See, e.g.,* Michael D. Shear, "Trump Extends Social Distancing Guidelilnes Through End of April," *The New York Times* (Pub. March 29, 2020, updated April 1, 2020) (https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html).

[8]      *See, e.g.,* Ed Yong, "How the Pandemic Will End," *The Atlantic* (March 25, 2020) (exploring different plausible scenarios for resolution of the COVID-19 epidemic with some taking 12-18 months for society to return to a level of normalcy).

[9]      *See* Order Establishing Temporary Procedures and Granting Related Relief, entered March 30, 2020 [D.I. 217], *In re CraftWorks Parent, LLC, et al.,* Case No. 20-10475 (BLS) (Bankr. D. Del.); Order Temporarily Suspending the Debtors' Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, entered March 27, 2020 [D.I. 166], *In re Modell's Sporting Goods, Inc., et al.,* Case No. 20-14179 (VFP) (Bankr. D.N.J.).

13308537 v1

PA00423

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to this Court and parties in interest at the status conference held that day.

5.      Unfortunately, despite the Debtors and their advisors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, no viable path forward in chapter 11 emerged that would garner the support of the Debtors' senior secured lenders and certain other stakeholders.  With the COVID-19 pandemic still raging and by all reputable accounts likely to get worse in the next several weeks before it improves, the execution risk associated with any of these strategies appears to be unacceptably high for the Debtors to garner the support their senior secured lenders and other stakeholders necessary for the Debtors to be able to move forward.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is likely inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consummated by the time the Debtors and their senior secured lenders conceivably might have some visibility into if or when any of these restructuring alternatives could be successfully implemented.

6.      Furthermore, the Debtors have no ability, without the consent of the Prepetition ABL Agent, to implement any case suspension-based restructuring strategy.  Of necessity, on or about March 19, 2020, after communicating with representatives of the Prepetition ABL Agent on several occasions about the Debtors' increasing operating losses and need to take appropriate

5

action to prevent further dissipation of the Debtors' assets, the Debtors ceased operating their retail stores as going concerns and thereafter dismissed the vast majority of their employees. As a result, the Debtors have no top line revenue, such that each dollar expended by the Debtors at this point is not being replaced. For this and other reasons, the Debtors have no ability to demonstrate that their secured lenders are adequately protected to the degree required for the Debtors continue using cash collateral and other collateral without their consent. And, under the terms of the Interim CC Order, absent extraordinary relief from the Court, the consent of the Senior Secured Parties to use cash collateral and other collateral will expire no later than the end of the day Monday, April 6, 2020.

7. The Debtors, thus, find themselves with no choice other than to move for the prompt conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Though this path is a difficult one that the Debtors are following only after exhausting all other alternatives, under these dire circumstances, the Debtors believe that converting these cases is in the best interests of the Debtors' estates. The Debtors understand that the conversion of Chapter 11 Cases is supported by the Debtors' senior lenders and not opposed by the Committee.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13308537 v1

PA00425

10. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The statutory bases for the relief requested herein are section 1112(a) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

### A. General Background.

12. On March 8, 2020 (the "Petition Date"), each of the Debtors commenced with this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13. The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS) pursuant to Bankruptcy Rule 1015.

14. Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 12], incorporated by reference herein.

15. At the commencement of these cases, the Debtors operated 169 stores in eight states, specifically Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, West Virginia, and Virginia.[10] The Debtors also have four regional distribution centers, three of which are leased and one of which is owned. The Debtors are headquartered in Warren, Michigan and had approximately 4,500 employees as of the Petition Date.

---

[10] The vast majority of the Debtors' stores were located in four states: Michigan; Ohio; Pennsylvania; and Illinois. The remaining five states listed above accounted for only 16 of the Debtors' 169 retail locations as of the Petition Date.

13308537 v1

PA00426

16.     As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases with the intention of liquidating their inventory through store closing sales (the "Store Closing Sales") conducted with the assistance of the Consultant and other proposed professionals, paying down their secured debt, and using any remaining proceeds of their Store Closing Sales to windup their operations.   Also as set forth in the First Day Declaration and Exhibit B thereto, as of the Petition Date, the Debtors were party to a binding letter of intent for a going concern sale of 44 Levin and Wolf stores and related assets and operations (the "Levin-Wolf Sale"). The Debtors intended to effectuate this restructuring through the consensual use of cash collateral.

17.     In furtherance thereof, on or around the Petition Date, the Debtors filed, among other things:

> a.     *Debtors' Application for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 3];
>
> b.     *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 5]; and
>
> c.     *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to § 327(a) of the Bankruptcy Code and (V) Granting Related Relief* [D.I. 52] (the "Store Closing Motion").

18.     On March 10, 2020 (as continued, in part, to March 12, 2020), the Court held a hearing (the "First Day Hearing") following which it entered certain orders, including: (a) an order [D.I. 77], pursuant to 28 U.S.C. § 156(c), appointing Kurtzman Carson Consultants LLC ("KCC") as the Claims and Noticing Agent for these Chapter 11 Cases (the "Claims Agent");  (b) the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,

13308537 v1

and (V) Granting Related Relief [D.I. 93] (the "Interim CC Order"); and (c) an order [D.I. 143] granting limited relief in connection with the Store Closing Motion on an interim basis.

19.     Shortly after the Petition Date, the Debtors filed applications to employ and retain: (a) Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"), as their proposed general bankruptcy counsel [D.I. 142]; (b) Montgomery McCracken Walker & Rhoads ("MMWR"), as their proposed special counsel [D.I. 193]; (c) Alvarez & Marsal North America LLC ("A&M"), as their proposed financial advisors [D.I. 145]; and (d) Jones Lang Lasalle Americas, Inc. ("JLL," and together with Benesch, MMWR and A&M, the "Debtors' Professionals"), as their proposed real estate consultants and advisors [D.I. 141].  The applications to employ and retain Benesch, A&M and JLL, each are scheduled to be heard on April 6, 2020, at 1:00 p.m. (ET).  The application to employ and retain MMWR is scheduled to be heard on April 27, 2020, at 2:00 p.m. (ET).

20.     On March 18, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a seven member Official Committee of Unsecured Creditors in these Chapter 11 Cases (as reconstituted from time to time, the "Committee").  The Committee has engaged and filed applications to employ and retain Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as its proposed counsel [D.I. 244] and Alix Partners ("Alix Partners," and together with Pachulski Stang, the "Committee's Professionals"), as its proposed financial advisor [D.I. 241].

**B.  Events in the Chapter 11 Cases.**

21.     Since the First Day Hearing, the exponential spread of COVID-19 has wrought economic and social havoc across the country and the globe.  As discussed in the Preliminary Statement, on the afternoon of March 13, 2020, President Trump declared COVID-19 a national

emergency and most of the states in which the Debtors operate have also declared states of emergency and issued "stay at home" or "shelter-in-place" type orders.

22.     Notwithstanding the careful planning and modeling of the Debtors and their advisors, since shortly after the Petition Date, the Debtors' situation has changed drastically as a result of COVID-19.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the Store Closing Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23.0 million;[11] however, for the <u>full</u> week ending March 15th, deposits from sales were just $8.0 million.  It quickly became apparent to the Debtors' management and advisory teams that continued retail operations of any sort were causing the Debtors to incur expenses (and would do so for the foreseeable future) that far outstripped any revenues being generated through the Debtors' continued retail operations.

23.     By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[12]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …."[13] Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan — where

---

[11]     The Debtors, however, did not realize the cash proceeds from most of these sales because just prior to the Petition Date and immediately thereafter, certain of the Debtors' credit card processor banks purported to exercise rights to intercept the proceeds from such transactions and redirect them into chargeback reserve accounts.

[12]     Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/)

[13]     Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts, March 16, 2020 (https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/).

13308537 v1

the Debtors' headquarters, a distribution center and 82 of their stores are located — entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[14]  While Michigan's initial order did not explicitly mandate closing of all non-essential retail establishments, it was accompanied by appropriately alarming statement from Governor Whitmer urging Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[15]  Government authorities in Ohio and Illinois also issued similar guidance and direction.

24.    As detailed in the Preliminary Statement, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations are located to issue a "stay at home" or "shelter in place" type order.  Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.

25.    Although the situation was evolving rapidly, the Debtors' board, management team and advisors were paying close attention to the threat COVID-19 posed to the health and welfare of the Debtors' employees and customers and to the financial impact on the Debtors' businesses. The Debtors' board, management team and advisors were in near constant communication about these events as they unfolded in mid-March.  Moreover, the Debtors and their advisors worked to the best of their ability under these circumstances to keep their secured lenders and other stakeholders informed about these challenges and exhausted all efforts to work with them to develop viable responses to the rapidly deteriorating situation.  When no other viable alternative emerged, on March 19, 2020, the Debtors made the painful decision to suspend all retail operations

---

[14]    Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders, March 16, 2020 (https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521763--,00.html).

[15]    *Id.*

PA00430

and terminate the majority of their employees — moves the Debtors hoped at the time would be only temporary measures.

26.     Further compounding the Debtors' problems, on March 19, 2020 the proposed purchaser for the Levin-Wolf Sale notified the Debtors that they would not proceed with the transaction at that time, effectively ending any hope the Debtors had to consummate a going concern transaction for the Levin and Wolf furniture operations and dashing hopes to save upwards of a 1,000 jobs.

27.     Late in the day on March 19, 2020, however, the Prepetition ABL Agent issued a purported Termination Declaration under the Interim CC Order.  Pursuant to Paragraph 21 of the Interim CC Order, a valid Termination Declaration issued on March 19th would have triggered a Remedies Notice Period five business days' in length.  Thereafter, the Prepetition ABL Agent agreed to extend any Remedies Notice Period relating to the alleged Termination Declaration through the end of the day on Tuesday, March 31, 2020, and then again through and including the end of the day on Monday, April 6, 2020.

28.     Following these events, the Debtors and their advisors continued to work with the Prepetition ABL Agent, the Committee, and their respective advisors to identify solutions for the Debtors' deteriorating situation that would allow them to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that might eventually be distributable to their creditors.  The Debtors had hoped — consistent with what has been recently approved this Court in the *CraftWorks* chapter 11 cases and by the District of New Jersey bankruptcy court in the *Modell's* chapter 11 cases — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these Chapter 11 Cases until such time as the broader economic and public safety

13308537 v1

PA00431

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to the Court that day.

29.     Both before and after the March 26th status conference, the Debtors, with the assistance of their advisors and in consultation with the Prepetition ABL Agent, the Committee and their respective advisors, were working to develop and evaluate several potentially value maximizing alternatives for the Debtors to pursue after the contemplated suspension of operations and downscaling of activities in these Chapter 11 Cases came to an end.  One such path was to resume Store Closing Sales at all of the Debtors' locations where it would be financially and operationally viable to do so.  A second path considered was to focus on one or more bulk sales most or all of the Debtors' inventory, equipment, and other readily monetizable assets. Additionally, the Debtors and their advisors examined several "middle" paths for the Debtors and their estates, which would involve various combinations of resuming Store Closing Sales at certain locations and bulk-selling inventory, equipment, and certain other assets associated with other locations.

30.     To be clear, each of the post-suspension restructuring alternatives explored by the Debtors had the prospect of producing some return to the Debtors' senior secured lenders and potentially to other stakeholders.  But none of the potential scenarios showed a reasonable chance of generating a recovery for the Debtors' senior secured lenders coming anywhere near what the pre-COVID 19 pandemic modeling had suggested.  Indeed, under most scenarios, the Prepetition ABL Secured Parties, which at the outset of these proceedings were projected to receive a full

recovery on their approximately $34 million of Prepetion ABL Obligations by the mid-point of the Store Closing Sales Process, would not get out whole before their ABL Priority Collateral was fully monetized.

31.     Despite the Debtors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, these concerted efforts were unable to produce a path forward in chapter 11 that would garner the support of their senior secured lenders and potentially other stakeholders.  Unfortunately, with the COVID-19 pandemic still raging and by all reputable accounts likely to get worse before it improves, the perceived execution risk of any of these restructuring strategies has proven to be an insurmountable  barrier to the Debtors ability to obtain the necessary support of their secured lenders and others.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the reasonable best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consumed by operating expenses before the Debtors and their senior secured lenders would have meaningful visibility into whether these restructuring alternatives could be successfully implemented.

32.     By Monday, March 30, 2020, the Debtors were effectively out of time, with their access to Cash Collateral under the Interim CC Order then due to terminate at the end of the following day.  Although it was clear by this point in the proceedings that the Debtors would be unable to continue these Chapter 11 Cases without the support and consent of their senior secured lenders, unresolved issues existed as to what obligations would and would not be funded under the terms of the Interim CC Order prior to any conversion of the Chapter 11 Cases.  Recognizing the contributions that their employees had made to the Debtors' businesses postpetition and the

PA00433

extreme hardship that many of the employees and their families were apt to experience as a result of losing their jobs in the midst of an ongoing pandemic and associated economic crisis, the Debtors attempted everything in their power to ensure that employee payroll and related employee obligations would be fully funded under the Interim CC Order.

33.     These efforts were to a degree successful. At a hearing held on March 31, 2020, the Court confirmed that the Debtors would have access to Cash Collateral to fund and pay current payroll obligations, including wages, salaries and commissions. The cash available, however, was insufficient for it to be possible for the Debtors to provide at this time for payment in full of other employee related obligations, such as coverage obligations for employee healthcare expenses and certain other benefits plans that were, in whole or part, self-funded by the company.[16] Even though this situation is primarily the result of the COVID-19 pandemic and other circumstances entirely beyond the Debtors' control, the Debtors deeply regret that they are not in a position to be able to do more for their employees, customers, vendors, landlords and other stakeholders.

34.     Based upon the foregoing, the Debtors have considered the circumstances in which they find themselves, and have concluded that converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates.

---

[16]     The Debtors estimate the total unfunded trailing liabilities under their partially self-funded employee health plan to be approximately $8.5 million. Under self-funded plans, like the ones the Debtors had established for their employees in the ordinary course of business prior to the Petition Date, when employees and their covered dependents receive covered services the resulting charges are remitted to the plan's claims administrator for processing. Thereafter, the approved claims are batched and remitted to the Debtors for payment. The remittance of the batched claims to the Debtors for payment can trail the rendering of services to employees by up to several months. In general, the Debtors terminated health care covered for their employees effective as of the dates such employees separated from the company. Thus, the estimated $8.5 million of trailing obligations is on account of covered healthcare services to covered persons provided prior to each such employee's termination date. Although the Debtors' original budget for these Chapter 11 Cases contemplated the funding of such trailing employee healthcare plan obligations, the COVID-19 pandemic's disruption of the Debtors' ability to operate postpetition combined with the issuance of a Termination Declaration under the Interim CC Order that followed, left the Debtors with inadequate cash on hand and inadequate access to additional cash with which to fund such obligations.

15

PA00434

**RELIEF REQUESTED**

35.     By this Motion, the Debtors request entry of the Proposed Order, pursuant to section

1112(a) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting the Debtors' chapter

11 cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date, (ii)

establishing a deadline for filing final chapter 11 professional fee applications and setting a date

for a hearing thereon, and (iii) granting related relief.

36.     The Debtors also request that the Court approve the following procedures in

connection with the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code

(the "Conversion Procedures"):

    a.  **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

    b.  **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain

PA00435

copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

## BASIS FOR RELIEF

### A.    The Conversion Relief Should be Granted

37.    Section 1112(a) of the Bankruptcy Code provides that a debtor may convert a case to chapter 7 as a matter of right. *See* H.R. Rep. No. 95-595, 1st Sess. 405 (1977) ("Subdivision (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case"); *see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) ("[A] debtor has the absolute right to convert [its] Chapter 11 case to a Chapter 7 case"). There are only three circumstances where a debtor is precluded from exercising that right: (i) the debtor is not a debtor in possession; (ii) the case was originally commenced as an involuntary case under chapter 11; or (iii) the case was converted to a case under chapter 11 other than at the debtor's request. 11 U.S.C. § 1112(a).

17

PA00436

None of those exceptions is applicable in these Chapter 11 Cases. Therefore, the Debtors are entitled, as an absolute right, to convert the Chapter 11 Cases to cases under chapter 7.

38. In addition, conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates and creditors. The Debtors no longer have funding to administer these Chapter 11 Cases. Thus, although there is substantial inventory and equipment remaining in the Debtors' stores and distribution centers and other estate assets that may be available to satisfy certain creditor claims, without an ability to fund ongoing administrative expenses, the Debtors have no ability to pursue the recovery of those assets or prosecute a chapter 11 plan. Accordingly, the Debtors believe there is no reasonable likelihood that the Debtors could confirm and consummate a chapter 11 plan, and respectfully submit that a chapter 7 trustee will be able to more efficiently and effectively bring these cases to their conclusion.

39. Accordingly, the Debtors respectfully request that the Court enter an order converting the Debtors' cases from chapter 11 to chapter 7, effective as of the Conversion Date.

**B.      The Conversion Procedures and Other Related Relief Should Be Approved**

40. Pursuant to Local Rule 2002-1(f)(xi), "[u]pon conversion of a chapter 11 case to a chapter 7 case, if there are more than 200 creditors, the claims agent appointed in the chapter 11 case shall . . . submit a termination order." Del. Bankr. L.R. 2002-1(f)(xi).

41. Accordingly, the Debtor requests that the conversion order sought hereby also provides for the termination of KCC services as claims and noticing agent in these Chapter 11 Cases.

42. The Debtor also believes that the Conversion Procedures are appropriate under the facts of this case and should be approved. The Conversion Procedures include, among other things, a request to extend the deadline under Bankruptcy Rule 1019(1)(A) for the filing of any statements

13308537 v1

and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) from fourteen (14) days after the Conversion Date to forty-two days (42) after the Conversion Date.

43.     The Court has authority to grant the requested extension under Bankruptcy Rules 1007(c) and 9006(b) and Bankruptcy Local Rule 1007-1(b). Bankruptcy Rule 1007(c), together with Bankruptcy Rule 9006(b), allows the Court to extend the filing deadline for the Schedules and Statements "for cause shown." Similarly, Bankruptcy Local Rule 1007-1(b) provides that such an extension may be granted for cause. Showing "cause" merely requires that a debtor "demonstrate some justification for the issuance of the order," and bankruptcy courts will normally grant such extensions "in the absence of bad faith or prejudice to the adverse party." *See, e.g., Bryant v. Smith,* 165 B.R. 176, 182 (W.D. Va. 1994) (discussing the standard for granting extensions under Bankruptcy Rule 1007) (internal citations and quotation marks omitted).

44.     Because of the COVID-19 pandemic and other extremely difficult circumstances that have defined these Chapter 11 Cases, the Debtors and their advisors have had virtually no free time or resources available since he Petition Date to devote to the preparation of schedules and statements required by Bankruptcy Rules 1019(1)(A) and 1007(b).  Given the extent of work that remains to be done and the extremely limited resources remaining with which to undertake such work, which conditions both exist through no fault of the Debtors and their advisors, the Debtors' respectfully submit that "cause" exists to extend this deadline. Moreover, since these proceedings are still in their very early stages, the granting of such an extension is unlikely to prejudice the trustee, any creditor or any other party in interest.

## NOTICE

45.     Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of Delaware; (ii) proposed counsel for the Committee; (iii) the agents under the Debtors' prepetition

13308537 v1

secured facilities and counsel thereto; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. A copy of this Motion is also available on the website of the Debtors' notice and claims agent at https://www.kccllc.net/artvan. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## <u>RESERVATION OF RIGHTS</u>

46.     The Debtors understand that employee payroll, the Carve Out and all other obligations that are required to be funded and paid under the Interim CC Order, including without limitation Paragraph 2 thereof, have been or will be funded and paid prior to the Conversion Date. Nevertheless, in the event that such obligations are not funded and paid as required under the Interim CC Order, the Debtors reserve all rights for themselves and their estates, including but not limited to any chapter 7 trustee that may hereafter be appointed.

13308537 v1

PA00439

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other relief as is appropriate under the circumstances.

Dated:  April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

 */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
         mbarrie@beneschlaw.com
         jhoover@beneschlaw.com
         kcapuzzi@beneschlaw.com
         kharmon@beneschlaw.com
         jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

13308537 v1

PA00440

# Exhibit A

PA00441

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: D.I. _____** |
|  | ) |  |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

PA00442

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED, as set forth herein.

2.      Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.      The following Conversion Procedures are hereby approved:

   a.  **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

2

PA00443

    b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

    c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

    d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

    e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

    f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4.    Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5.    Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting*

13308536 v1

*Related Relief* [D.I. 93] (the "<u>Interim CC Order</u>"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent <u>Nunc Pro Tunc</u> to the Petition Date* [D.I. 77] (the "<u>Claims Agent Order</u>") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.      Except as expressly provided in Paragraph 5 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order).

7.      For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or

(ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

8.      Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

9.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

13308536 v1

PA00446

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Objection Deadline: At the Hearing** |
|  | ) **Hearing Date: April 6, 2020 at 1:00 p.m. (ET) (requested)** |
|  | ) |

## NOTICE OF VIDEO AND TELEPHONIC HEARING REGARDING DEBTORS' CORRECTED MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on April 3, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors Corrected Motion for Entry of an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the "Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on **April 6, 2020 at 1:00 p.m. (ET)**, before the Honorable Chief Judge Christopher S. Sontchi via video and telephonic conference.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

PLEASE TAKE FURTHER NOTICE THAT THE HEARING IS PROCEEDING VIA ZOOM USING THE FOLLOWING INSTRUCTIONS:

> **Topic: Art Van Furniture 20-10553 - Hearing**
> **Time: Apr 6, 2020 1:00 PM Eastern Time (US and Canada)**
> **Join Zoom Meeting**
> **https://uchicago.zoom.us/j/911880719**
> **Meeting ID: 911 880 719**

DO NOT COME TO THE COURTHOUSE. ANY PARTY WHO WISHES TO PRESENT EVIDENCE OR EXAMINE WITNESSES IS REQUIRED TO ACCESS VIA ZOOM. ANY PARTY WHO WISHES TO ACCESS VIA ZOOM MUST ALSO MAKE AUDIO ARRANGEMENTS THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).

OTHER PARTIES IN INTEREST MAY MAKE ARRANGEMENTS TO PARTICIPATE BY TELEPHONE AT THE HEARING THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).

PLEASE TAKE FURTHER NOTICE THAT, IF NO RESPONSES OR OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

PA00448

Dated:  April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**

  _/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        kharmon@beneschlaw.com
        jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

3