# EXHIBIT I

PA00450

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) ) Chapter 11 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) ) Case No. 20-10553 (___) ) |
| Debtors. | ) (Joint Administration Requested) ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an interim order (the "Interim Order"), substantially in

the form attached hereto, and a final order (the "Final Order"), *inter alia*:  (a) authorizing the

Debtors' use of Cash Collateral (as defined below); (b) granting adequate protection to the

Prepetition Secured Parties (as defined below) for any diminution in value of their interests in the

Prepetition Collateral (as defined below), including Cash Collateral; and (c) vacating and

modifying the automatic stay solely to the extent necessary to implement and effectuate the terms

and provisions of the Interim Order.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

2.     In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

3.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The bases for the relief requested herein are sections 105, 361, 362, 363, 503, 506, 507 and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 4001 and 9014, and Bankruptcy Local Rules 4401-2 and 9013.1(m).

## Background

6.     The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL")

PA00452

in March 2017.  Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.  As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia. The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

7.     On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**Statement of the Material Terms of the Interim Order**

8.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Bankruptcy Local Rule 4001-2(a)(i) and (ii), the following is a concise statement and summary of the material terms of the Interim Order (collectively, the "Highlighted Provisions"):

13144876 v3

PA00453

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Entities with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(i)* | The Prepetition ABL Parties[2] and the Prepetition Term Loan Parties[3] (collectively, the "<u>Prepetition Secured Parties</u>") | ¶¶ F & H |
| **Purposed Use of Cash Collateral**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors seek authority to use Cash Collateral to:<br><br>(i) finance their working capital needs and for any other general corporate purposes; and (ii) pay related transaction costs, fees, liabilities and expenses (including all professional fees and expenses) and other administration costs incurred in connection with and for the benefit of these chapter 11 cases, in each case solely to the extent consistent with the Budget (as defined below) and the Interim Order. | ¶ 2 |
| **Budget and Variance Reporting**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | <u>Budget</u>:  The use of Cash Collateral for the first thirteen-week period from the Petition Date shall be in accordance with the budget (the "<u>Budget</u>"), which Budget shall be updated, modified, or supplemented by the Debtors not less than one time in each four-week period. | ¶ 11 |
|  | <u>Budget Compliance</u>:  The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts (as defined in the Interim Order) for any rolling four-week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements (as defined in the Interim Order) for any rolling four-week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements (as defined in the Interim Order) for any rolling four-week period to exceed 110% of the aggregate Operating | ¶ 12(a) |

---

[2] The "Prepetition ABL Parties" are Wells Fargo Bank, National Association, as administrative agent, issue bank, and collateral agent (in such capacity, the "<u>Prepetition ABL Agent</u>") and the lenders party to the Prepetition ABL Agreement (as defined in the Interim Order).

[3] The "Prepetition Term Loan Parties" are Virtus Group, LP, as administrative agent and collateral agent and the lenders party to the Prepetition Term Loan Agreement (as defined in the Interim Order).

PA00454

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements (as defined in the Interim Order) for any rolling four week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the Budget for such period (with any unspent amounts in the subparagraph (iv) being carried forward for subsequent periods). | |
| **Duration of Use of Cash Collateral/ Events of Default/ Rights and Remedies Upon Event of Default** | Specified Period:  The Debtors are authorized to use Cash Collateral for the period from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date (as defined in the Interim Order), (b) thirty (30) days after the Petition Date, and (c) entry of the Final Order; provided, however, that, during the Remedies Notice Period (as defined in the Interim Order) the Debtors may use Cash Collateral for certain specified purposes. | ¶ 2 |
| | Events of Default:  The occurrence of any of the following events, unless consented to or waived by the Prepetition Agents in advance in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "Events of Default"): | ¶ 20 |
| | (a)     the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order (including, without limitation, the Covenants in paragraph 12 of the Interim Order); | |
| | (b)     the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date; | |
| | (c)     (i) the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis; | |
| | (d)     the filing of a motion or any plan of reorganization or disclosure statement attendant | |

5

PA00455

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to the Interim Order; (ii) to grant any lien other than Permitted Prior Liens (as defined in the Interim Order) upon or affecting any Postpetition Collateral(as defined in the Interim Order); or (iii) except as provided in the Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code; | |
| | (e) (i) the filing of any Prohibited Plan (as defined in the Interim Order) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors), or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan; | |
| | (f) the entry of an order in any of the cases confirming a Prohibited Plan; | |
| | (g) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to the Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect; | |
| | (h) the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by the Interim Order; | |
| | (i) the appointment of an interim or permanent trustee in the cases, the appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a | |

6

13144876 v3

PA00456

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | trustee receiver or an examiner in the cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors; | |
| | (j) the filing of a motion to approve a Prohibited Sale (as defined in the Interim Order) or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI (as those terms are defined in the Interim Order); | |
| | (k) the dismissal of any case, or the conversion of any case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the cases to Chapter 7 of the Bankruptcy Code; | |
| | (l) the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor Agreement (as defined in the Interim Order), the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (iii) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of [$250,000] or more; | |
| | (m) the existence of any claim or charges, or the entry of any order of the Court authorizing any | |

7

PA00457

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | claims or charges entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under the Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted in the Interim Order, except, in each case, as expressly provided in the Interim Order; | |
| | (n)     the filing of a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction; | |
| | (o)     any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations; | |
| | (p)     any Debtor shall challenge, support or encourage the challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations; | |
| | (q)     the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral  or Prepetition Collateral other than as set forth in the Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code; | |
| | (r)     any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to | |

8

PA00458

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA (as defined in the Interim Order), with respect to Postpetition Collateral or Prepetition Collateral having a value in excess of [$250,000] outside the ordinary course of business and not otherwise permitted under the Interim Order; | |
| | (s) any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders as approved by the Prepetition Agents in writing (provided that the Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by the Interim Order; | |
| | (t) any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under paragraph 20 of the Interim Order; | |
| | (u) the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties. | |
| | <u>Rights and Remedies Upon Entry of Default</u>: Immediately upon the occurrence and during the continuation of an Event of Default, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or | ¶ 21 |

9

PA00459

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | the Prepetition Term Loan Agent, as applicable, shall be referred to as a "<u>Termination Declaration</u>") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out (as defined in the Interim Order) has occurred through the delivery of the Carve Out Trigger Notice (as defined in the Interim Order); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restrict on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to as the "<u>Termination Date</u>"). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "<u>Remedies Notice Period</u>"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and the Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable). During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the | |

13144876 v3

PA00460

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Prepetition ABL Parties shall be permitted to exercise all remedies set forth in the Interim Order, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and the Interim Order. Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process. | |
| **Proposed Adequate Protection**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(iv)*<br><br>*Local Rule 4001-2(a)(ii)* | The Prepetition Secured Parties shall be granted, to the extent of any diminution in value of its interests in the Prepetition Collateral from and after the Petition Date, the following:<br><br>Adequate Protection Liens.<br>(a)   Prepetition ABL Adequate Protection Liens. Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition ABL Adequate Protection Liens") on any Postpetition Collateral.<br><br>(b)   Prepetition Term Loan Adequate Protection Liens. Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the | ¶¶ 3, 5, 7-8<br><br><br><br><br>¶ 3(a)-(b) |

11

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Prepetition Term Loan Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition Term Loan Adequate Protection Liens</u>," and together with the Prepetition ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>") on the Postpetition Collateral. | |
| | <u>Adequate Protection Superpriority Claims.</u> <br> (a)    <u>Prepetition ABL Superpriority Claim.</u> As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition ABL Superpriority Claim</u>"). <br><br> (b)    <u>Prepetition Term Loan Superpriority Claim.</u> As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition Term Loan Superpriority Claim</u>," and together with the Prepetition ABL Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>"). | ¶ 5(a)-(b) |

12

PA00462

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | <u>Adequate Protection Payments and Protections for Prepetition ABL Parties.</u>  As further adequate protection, the Debtors are authorized and directed to pay in cash the following:  (a) all principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 of the Interim Order), (b) immediately upon entry of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) om accordance with paragraph 22 of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e)the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI.  In addition, immediately upon the payment in full in cash of the Prepetition ABL Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted),  the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "<u>Prepetition ABL Indemnity Reserve</u>") to secure | ¶ 7 |

13144876 v3

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 of the Interim Order, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 of the Interim Order. The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of the funds on deposit in the Prepetition ABL Indemnity Reserve. The Prepetition ABL Indemnity Reserve shall be released at such time as the Prepetition ABL Indemnity | |

14

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Obligations are Paid in Full. | |
| | <u>Adequate Protection Payments and Protections for Prepetition Term Loan Agent</u>.  As further adequate protection, the Debtors are authorized and directed to pay in cash the following:  (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph 22 of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided, however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral. | ¶ 8 |
| **Liens on Chapter 5 Actions**<br><br>*Local Rule 4001-2(a)(i)(D)* | Subject to the entry of the Final Order, the Adequate Protection Liens include the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents. | ¶ 3(a)-(b) |

13144876 v3

PA00465

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Carve Out**<br><br>*Local Rule 4001-2(a)(i)(F)* | The "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve Out</u>"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") (such fees and expenses, the "<u>Allowed Professional Fees</u>") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined in the Interim Order), provided that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "<u>ABL Professional Fee Cap</u>"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[500,000] incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "<u>Post Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the | ¶ 24 |

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | continuation of an Event of Default (as defined above), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week). | |
| **Cross Collateralization**<br><br>*Local Rule 4001-2(a)(i)(A)* | None, other than replacement liens as adequate protection. | N/A |
| **Findings Regarding Validity/ Perfection/ Amount**<br><br>*Local Rule 4001-2(a)(i)(B)* | As set forth in the Interim Order, the Debtors have acknowledged and agreed as set forth therein, to the validity, perfection, priority, amount and enforceability of the Prepetition Secured Obligations, without prejudice to any other party's rights to assert claims, counterclaims or causes of actions, objections, contests or defenses prior to the expiration of the Challenge Period (as defined below). | ¶¶ F, 27 |
| **Challenge Period**<br><br>*Local Rule 4001-2(a)(i)(B)* | The "Challenge Period" is (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline. | ¶ 27 |

PA00467

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **506(c) Waiver**<br><br>*Local Rule 4001-2(a)(i)(C)* | Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties. | ¶ 29 |
| **552(b) Wavier**<br><br>*Local Rule 4001-2(a)(i)(H)* | Subject to entry of the Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral. | ¶ 31 |
| **Releases**<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated under the Interim Order or thereunder occurring prior to the entry of the Interim Order including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, | ¶ F(x) |

18

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering the Interim Order. | |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** <br><br> *Local Rule 4001-2(a)(i)(E)* | None. | N/A |
| **Non-Consensual Priming** <br><br> *Local Rule 4001-2(a)(i)(G)* | None. | N/A |

## Basis for Relief

## I.     The Debtors' Request to Use Cash Collateral and Proposed Adequate Protection are Appropriate

10.     The Debtors' use of property of their estates, including Cash Collateral, is governed by section 363 of the Bankruptcy Code.[4]  Pursuant to section 363(c)(2) of the Bankruptcy Code, a

---

[4] The Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as

PA00469

debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

11.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. 11 U.S.C. § 363(e). Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Satcon Tech. Corp.*, No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 COLLIER ON BANKRUPTCY ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry left to the vagaries of each case . . . ") (citation and quotation omitted).

12.     The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re*

---

provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

PA00470

*Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

### A. The Proposed Adequate Protection for the Prepetition Secured Parties is Sufficient

13.     As set forth in the Interim Order and described above in the Highlighted Provisions, the Debtors propose to provide the Prepetition Secured Parties with various forms of Adequate Protection.  The Debtors respectfully submit that, in light of the circumstances of these chapter 11 cases, the proposed Adequate Protection is appropriate and sufficient to protect the Prepetition Secured Parties from any diminution in value to the Collateral during the Specified Period.  In particular, the Cash Collateral will be used to sustain the Debtors' business operations, allowing for the maximization of the value of the Debtors' estates, specifically the arms' length negotiated terms to protect the Debtors' customer programs.  If Cash Collateral is not available for this purpose, the Debtors will be unable to fund payroll obligations, procure goods and services from vendors or otherwise maintain their operations and service their customers, thereby dissipating value to the detriment of the Prepetition Secured Parties and other stakeholders.  The use of the Cash Collateral will therefore protect the Prepetition Secured Parties' security interests by preserving the value of their collateral. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (evaluating "whether the value of the debtor's property will increase as a result of the" use of collateral in determining sufficiency of adequate protection); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream,"

21

provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (observing that debtor's use of rents to maintain and operate property "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the secured lender's] mortgage").

14.     In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate. Thus, the Debtors' proposed Adequate Protection not only is necessary to protect the Prepetition Secured Parties against any diminution in value, but also is fair and appropriate on an interim basis under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using Cash Collateral in the near term, for the benefit of their estates and all parties in interest.

## II.     Failure to Obtain Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm

15.     Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Fed. R. Bankr. P. 4001(b)(2). However, the Court is authorized to conduct a preliminary expedited hearing on the Motion and authorize the Debtors' proposed use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  *Id.*

16.     The Debtors has an immediate postpetition need to use Cash Collateral.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash. The Debtors will use cash to, among other things, continue operating their business and satisfy other working capital needs during the chapter 11 cases, including, among other things, to fund their customer programs. The Debtors believe that all or substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral, as that term is

PA00472

used by section 363(c) of the Bankruptcy Code. The Debtors therefore will be unable to proceed with operating their business without the ability to use Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral is vital to the preservation and maintenance of the value of the Debtors' estates.

17.     The Debtors, therefore, seek immediate authority to use the Cash Collateral on an interim basis and as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Ru1e 400l(b)(2). Accordingly, to the extent that the Debtors require the use of Cash Collateral, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001(b)(2) to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

## III.     <u>Modification of the Automatic Stay is Appropriate</u>

18.     The Interim Order and Final Order (together, the "<u>Cash Collateral Orders</u>") contemplate a modification of the automatic stay (to the extent applicable) as necessary to, *inter alia*, permit the Debtors to: (a) grant the security interests, liens and superpriority claims described above, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; and (b) authorize the Debtors to make certain payments in accordance with the terms of the Cash Collateral Orders.  In addition, the Cash Collateral Orders provide for modification of the automatic stay to allow the Prepetition Secured Partiers to exercise remedies upon the occurrence and during the continuance of an Event of Default, and after the giving of five (5) business days' prior written notice to the Debtors.

13144876 v3

PA00473

19.     Stay modification provisions of this kind are ordinary and standard terms of postpetition use by debtors-in-possession of prepetition collateral, and, in the Debtors' business judgment, are reasonable under the present circumstances. *See, e.g., In re Open Road Films, LLC*, Case No. 18-12012 (LSS) [Docket No. 51] (Bankr. D. Del. September 7, 2018) (terminating automatic stay after occurrence of termination event and applicable notice*); In re RM Holdco LLC*, Case No. 18-11795 (MFW) [Docket No. 53] (Bankr. D. Del. August 7, 2018) (same); *In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG) [Docket No. 46] (Bankr. D. Del. July 31, 2018) (same); *In re EBH Topco, LLC*, Case No. 18-11212 (BLS) [Docket No. 55] (Bankr. D. Del. May 24, 2018) (same); *In re Gibson Brands, Inc.*, Case No. 18-11025 (CSS) [Docket No. 71] (Bankr. D. Del. May 2, 2018) (same); *In re Appvion, Inc.*, Case No. 17-12082 (KJC) [Docket No. 75] (Bankr. D. Del. October 5, 2017).  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Cash Collateral Orders.

### Request for Final Hearing

20.     Pursuant to Bankruptcy Rule 400l(b)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days of the Petition Date and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

24.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to use Cash Collateral and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would

severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

25.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

26.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's Interim Order and Final Order is not intended and should not be construed as an admission as to the validity,

PA00475

priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### Notice

27.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

28.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

PA00476

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, and based on the record of the Chapter 11 Case, the Debtors respectfully request that this Court (a) enter the Cash Collateral Orders (i) authorizing the Debtors to use Cash Collateral on an interim and final basis subject to the terms and conditions set forth therein; (ii) granting adequate protection to the Prepetition Secured Parties to the extent set forth in the Cash Collateral Orders; (iii) scheduling the Final Hearing, pursuant to the Interim Order, within approximately thirty-five (35) days of the commencement of the chapter 11 cases, to consider approval of this Motion on a final basis; and (iv) granting related relief; and (b) grant the Debtors such other and further relief as may be just and proper.

Dated:  March 8, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
          mbarrie@beneschlaw.com
          jhoover@beneschlaw.com
          kcapuzzi@beneschlaw.com
          jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

13144876 v3

PA00477

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of (a) AVF Parent, LLC (the "Borrower"), and

(b) AVF Holdings II, LLC, Art Van Furniture, LLC, Art Van Furniture of Canada, LLC, AV Pure

Sleep Franchising, LLC, AVCE, LLC, AVF Franchising, LLC, AVF Holding Company, Inc., AVF

Holdings I, LLC, Levin Parent, LLC, LF Trucking, Inc., Comfort Mattress, LLC and Sam Levin,

Inc., each as a debtor and debtor in possession (collectively, with the Borrower, the "Debtors") in

the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this

"Interim Order") pursuant to sections 105, 361, 362, 363 and 507 of chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

(i)        authorizing the Debtors to use the Prepetition Collateral (as defined herein), including all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>") of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value, including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and, in the case of the Prepetition Secured Parties, the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("<u>Diminution in Value</u>");

(ii)       vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(iii)      scheduling a final hearing (the "<u>Final Hearing</u>") within 30 days of the Petition Date to consider the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* and the evidence submitted and argument made at the interim hearing held on March [__], 2020 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"); and the Interim Hearing having

PA00479

been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

      A.     **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

      B.     **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      C.     **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

13167798 v1

PA00480

U.S.C. §§ 1408 and 1409.

D. **Committee Formation**. As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E. **Notice**. Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F. **Debtors' Stipulations**. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 27 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i) *Prepetition ABL Facility*. Pursuant to that certain *ABL Credit Agreement* dated as of March 1, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) the Borrower (the "Prepetition ABL Borrower"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors"), (c) Wells Fargo Bank, National Association, as administrative agent, issuing bank and collateral agent (in such capacity, the "Prepetition ABL Agent"), and (d) the lenders party

4

thereto (collectively, including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and the Prepetition ABL Lenders and the Prepetition ABL Agent, together, the "Prepetition ABL Parties"), the Prepetition ABL Lenders provided revolving credit, term loans and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility") in an aggregate principal amount of up to $82,500,000.

(ii) *Prepetition ABL Obligations.* As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than approximately $33,573,784.18, inclusive of not less than $14,900,000 of issued and outstanding letters of credit and the Early Termination Premium as defined in the Prepetition ABL Documents (collectively, together with accrued and unpaid interest, bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors' obligations pursuant to, or secured by, the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations").

(iii) *Prepetition ABL Liens and Prepetition ABL Priority Collateral.* As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition

ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, security interests in and continuing liens on (the "Prepetition ABL Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain Intercreditor Agreement referred to in paragraph F(vii) below) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) and proceeds, products, and rents of any of the foregoing (collectively, the "Prepetition Term Priority Collateral," and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral"), subject only to the liens of the Prepetition Term Loan Agent on the Prepetition Term Priority Collateral and Prepetition ABL Permitted Prior Liens (as defined herein).

(iv) *Prepetition Term Loan Facility*. Pursuant to that certain Credit Agreement dated as of March 1, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Agreement," and collectively with the Loan Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Documents," and together with the Prepetition ABL Documents, the "Prepetition Documents"), among (a) the Borrower (the "Prepetition Term Loan Borrower" and together with the Prepetition ABL Borrower, the "Prepetition Borrowers"), (b) Virtus Group, LP, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent," and together with the

6

Prepetition ABL Agent, the "<u>Prepetition Agents</u>"), (c) the guarantors thereunder (the "<u>Prepetition Term Loan Guarantors</u>" and, together with the Prepetition ABL Guarantors, the "<u>Prepetition Guarantors</u>"), and (d) the lenders party thereto (the "<u>Prepetition Term Loan Lenders</u>," and collectively, including the Prepetition Term Loan Agent, the "<u>Prepetition Term Loan Parties</u>," and together with the Prepetition ABL Parties, the "<u>Prepetition Secured Parties</u>"), the Prepetition Term Loan Lenders provided term loans to the Prepetition Term Loan Borrower (the "<u>Prepetition Term Loan Facility</u>," and together with the Prepetition ABL Facility, the "<u>Prepetition Secured Facilities</u>") in an aggregate principal amount of $100,000,000.

(v) *Prepetition Term Loan Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was not less than approximately $175,000,000 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements reimbursable thereunder), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrower's and the Prepetition Term Loan Guarantors' obligations pursuant to, or secured by, the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "<u>Prepetition Term Loan Obligations</u>," and together with the Prepetition ABL Obligations, the "<u>Prepetition Secured Obligations</u>").

(vi) *Prepetition Term Loan Liens and Prepetition Term Priority Collateral*.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition

Date, the Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, security interests in and continuing liens on (the "Prepetition Term Loan Liens," and together with the Prepetition ABL Liens, the "Prepetition Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to the liens of the Prepetition ABL Agent on the Prepetition ABL Priority Collateral and Prepetition Term Loan Permitted Prior Liens (as defined herein).

(vii) *Priority of Prepetition Liens; Intercreditor Agreement.* The Prepetition Agents entered into that certain Intercreditor Agreement dated as of March 1, 2017 (as may be further amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other obligors. Each of the Prepetition Borrowers and Prepetition Guarantors under the Prepetition Documents acknowledged and agreed to the Intercreditor Agreement.

(viii) *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.* The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and

PA00485

senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition ABL Documents (the "Prepetition ABL Permitted Prior Liens"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition ABL Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix)     *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.*  The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Loan Liens on the Prepetition Collateral were valid,

9

binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Term Loan Documents (the "Prepetition Term Loan Permitted Prior Liens" and, together with the Prepetition ABL Permitted Prior Liens, the "Permitted Prior Liens");[4] (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Parties, or any of their

---

[4] For the avoidance of doubt, as used in this Interim Order, no reference to the Prepetition ABL Permitted Prior Liens, the Prepetition Term Loan Permitted Prior Liens, or the Permitted Prior Liens shall refer to or include the Prepetition ABL Liens or the Prepetition Term Loan Liens.

PA00487

respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x)     *Release*.  The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Interim Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties.  The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against

11

PA00488

the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order.

(xi)     *Default by the Debtors.*  The Debtors acknowledge and stipulate that (i) they have been, since February 5, 2020, and are in default of their obligations under the Prepetition ABL Documents, and that an Event of Default has occurred under the Prepetition ABL Documents, and that since February 5, 2020, interest has accrued, and will continue to accrue, on the Prepetition ABL Obligations at the default rate set forth in the Prepetition ABL Agreement, and (ii) they have been, since February 29, 2020, and are in default of the obligations under the Prepetition Term Loan Documents, and that a Default has occurred under the Prepetition Term Loan Documents, and that as of the Petition Date, interest will accrue, on the Prepetition Term Loan Obligations at the default rate set forth in the Prepetition Term Loan Documents.

(xii)     *Consulting Agreement with the Liquidators.*  Pursuant to that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020, by and among Hilco Merchant Resources, LLC, Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC, Gordon Brothers Retail Partners, LLC, DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC and Gordon Brothers Brands, LLC and certain of the Debtors, acknowledged by the Prepetition Agents (as amended, restated or otherwise modified from time to time, the "Consulting Agreement"), the Debtors have retained the Consultant to conduct "Going Out of Business" sales of the Assets (each as defined in the Consulting Agreement).  The continued existence and validity of the Consulting Agreement and the uninterrupted continuation of the sales contemplated thereby is a condition to the consent of the Prepetition Agents to this Interim Order and the Debtors' use of Cash Collateral hereunder.

PA00489

G. Levin DIP Facility. [Insert description of Levin DIP motion/relief, to be referenced as the "Levin DIP Facility."]. The Prepetition Agents have consented to the Levin DIP Facility (in accordance with the Levin DIP Order and Levin DIP Documents, in form and substance reasonably acceptable to the Prepetition Agents), and the Debtors' compliance with, and the obligations incurred under, the Levin DIP Facility (in accordance with the Levin DIP Order and Levin DIP Documents, in form and substance reasonably acceptable to the Prepetition Agents) shall not give rise to an Event of Default under this Interim Order.

H. **Permitted Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien, rather, any such alleged claim arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claims had on the Petition Date.

I. **Cash Collateral**. All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

J. **Adequate Protection**. The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, are each entitled to receive adequate protection as set

13167798 v1

PA00490

forth herein to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral.

K.    **Sections 506(c) and 552(b).**  In light of: (i) the Prepetition ABL Parties' agreement that their liens shall be subject to the Carve Out and, in the case of the Prepetition Term Priority Collateral, subordinate to the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens; (ii) the Prepetition Term Loan Parties' agreement that their liens shall be subject to the Carve Out and, in the case of the Prepetition ABL Priority Collateral, subordinate to the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens; and (iii) the payment of claims and/or expenses as set forth in the Budget (as defined herein) to the extent approved by the Court in connection with the Debtors' "first day motions," subject to entry of a Final Order, the Prepetition Secured Parties are each entitled to (a) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

L.    **Good Faith**.  The Prepetition Secured Parties and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (defined below). The Prepetition Secured Parties have agreed to permit the Debtors to use their Cash Collateral for the Specified Period, subject to the terms and conditions set forth herein, which terms and conditions are fair and reasonable and have been stipulated to by the Debtors in the exercise of their sound business judgment.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

M.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

14

N.    **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); (vi) counsel to Levin Furniture, LLC and Levin Trucking, LLC, and (vii) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    Motion Granted.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.  The Debtors shall not use Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order, and in accordance with the Budget, subject to such variances as are permitted by this Interim Order, the Debtors are authorized to use Cash Collateral for the period (the "Specified Period") from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date, (b) thirty (30) days after the Petition Date and (c) entry of the Final Order;

PA00492

*provided, however*, that, during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget and as otherwise agreed to by the Prepetition ABL Agent in its sole discretion. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any use of Cash Collateral or proceeds resulting therefrom, except (x) as permitted in the Consulting Agreement or the Levin APA (as defined below), (y) as otherwise consented to by the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral) in writing, or (z) as otherwise disposed of, or used, in accordance with the Budget, subject to such variances as are permitted by this Interim Order.

3.      <u>Adequate Protection Liens</u>.

(a)      *Prepetition ABL Adequate Protection Liens*.   Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition ABL Adequate Protection Liens</u>") on any Postpetition Collateral.[5]

---

[5] "Postpetition Collateral" means: all personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the

16

PA00493

(b) *Prepetition Term Loan Adequate Protection Liens*. Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens") on the Postpetition Collateral.

4.   Priority of Adequate Protection Liens.

(a)   The Prepetition ABL Adequate Protection Liens shall be senior to

---

payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) subject to entry of a Final Order, proceeds of the Debtors' rights under section 506(c) (solely to the extent such rights result from the use of Postpetition Collateral, and are, therefore, enforceable against parties other than the Prepetition Agents or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (e) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date. Notwithstanding the foregoing, Postpetition Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases). Postpetition Collateral that is (i) Prepetition ABL Priority Collateral, (ii) of a type that would be Prepetition ABL Priority Collateral; (iii) of a type that would be Prepetition ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (iv) the "Deposit", as defined in that certain letter agreement dated as of March 4, 2020 by and among Levin Furniture, LLC, Levin Trucking, LLC, as Buyer, and Sam Levin, Inc. and LF Trucking, Inc., as Seller (the "Levin LOI") shall, in each case, constitute "Postpetition ABL Priority Collateral." Postpetition Collateral that is (i) Prepetition Term Priority Collateral, (ii) of a type that would be Prepetition Term Priority Collateral; and (iii) of a type that would be Prepetition Term Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date shall constitute "Postpetition Term Priority Collateral." Postpetition Collateral that is (i) the proceeds of the Debtors' real property leases; and (ii) the proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents shall be shared Postpetition Collateral, and the Prepetition ABL Liens and Prepetition Term Loan Liens (and corresponding adequate protection liens and claims) on such proceeds shall rank equally in priority and share such proceeds equally (with 50% of such proceeds applied to the Prepetitition ABL Obligations and 50% applied to the Prepetition Term Loan Obligations).

PA00494

all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens and (B) the Prepetition ABL Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, (B) the Prepetition Term Loan Liens, (C) the Prepetition Term Loan Adequate Protection Liens, and (D) the Prepetition ABL Liens.

(b)     The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens, (B) the Prepetition ABL Liens, (C) the Prepetition ABL Adequate Protection Liens, and (D) the Prepetition Term Loan Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, and (B) the Prepetition Term Loan Liens.

(c)     Except as provided herein (including with respect to the Carve Out), the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"), and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of

18

PA00495

the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

        5.    <u>Adequate Protection Superpriority Claims</u>.

        (a)    *Prepetition ABL Superpriority Claim*.  As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition ABL Superpriority Claim</u>").

        (b)    *Prepetition Term Loan Superpriority Claim*.  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition Term Loan Superpriority Claim</u>," and together with the Prepetition ABL Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>").

        6.    <u>Priority of the Adequate Protection Superpriority Claims</u>.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b),

<div align="center">19</div>

507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code. The Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall be subject to the following priorities: (a) with respect to Postpetition ABL Priority Collateral, (1) the Prepetition ABL Superpriority Claim and (2) the Prepetition Term Loan Superpriority Claim; and (b) with respect to Postpetition Term Priority Collateral, (1) the Prepetition Term Loan Superpriority Claim and (2) the Prepetition ABL Superpriority Claim.

7.      <u>Adequate Protection Payments and Protections for Prepetition ABL Parties</u>. As further adequate protection, the Debtors are authorized and directed to pay in cash the following: (a) all principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 below, (b) immediately upon entry of this Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) in accordance with paragraph 22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e) the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI. In addition, immediately upon the payment in full in cash of the Prepetition ABL

PA00497

Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 below, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such

PA00498

indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 hereof. The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of funds on deposit in the Prepetition ABL Indemnity Reserve. The Prepetition ABL Indemnity Reserve shall be released at such time as the Prepetition ABL Indemnity Obligations are Paid in Full.[6]

8. <u>Adequate Protection Payments and Protections for Prepetition Term Loan Agent</u>. As further adequate protection, the Debtors are authorized and directed to pay in cash the following: (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility. No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Prepetition ABL Obligations (i) the Challenge Deadline (as defined in paragraph 27 of this Interim Order) shall have occurred without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge; and (c) the Prepetition ABL Agent has received (i) a countersigned payoff letter in form and substance satisfactory to the Prepetition ABL Agent and (ii) releases in form and substance satisfactory to the Prepetition ABL Agent in its sole discretion.

PA00499

22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided*, *however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral.

9. <u>Perfection of Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each Prepetition Agent is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Adequate Protection Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the Prepetition Agents, as applicable,

PA00500

all such financing statements, mortgages, notices, and other documents as the Prepetition Agents may reasonably request. Each Prepetition Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

10. _Adequate Protection Reservation_. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases. The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

11. _Budget_. The use of Cash Collateral during the Specified Period is permitted solely in accordance with a cash collateral budget (the "_Budget_") approved by the Prepetition Agents,[7] each in their sole discretion, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents. A copy of the initial approved Budget is attached hereto as _Exhibit [ ]_. The Budget shall depict, on a weekly basis and line item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals

---

[7] For the avoidance of doubt, any reference to the consent rights of the Prepetition Term Loan Agent shall mean the Prepetition Term Loan Agent acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Agreement).

13167798 v1

PA00501

and advisors), asset sales and any other fees and expenses), and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date, and such initial Budget shall be approved by, and in form and substance satisfactory to the Prepetition Agents, each in their sole discretion (it being acknowledged and agreed that the initial Budget attached hereto is approved by and satisfactory to the Prepetition Agents). The Budget shall be updated, modified, or supplemented by the Debtors with the written consent of the Prepetition Agents, but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Prepetition Agents, each in their sole discretion), and no such updated, modified, or supplemented budget shall be effective until so approved, and once so approved shall be deemed the Budget; *provided, however*, that in the event the Prepetition Agents, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the Debtors shall continue to operate under the most recent prior-approved Budget and such disagreement shall give rise to an Event of Default once the period covered by such prior Budget has terminated. Each Budget delivered to the Prepetition Agents shall be accompanied by such customary supporting documentation as reasonably requested by the Prepetition Agents and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable at the time of delivery. A copy of any Budget (or updated Budget once approved by the Prepetition Agents) shall simultaneously be delivered to the counsel for a Committee (if appointed), and the U.S. Trustee. All Cash Collateral use must be strictly in accordance with the terms of the Budget, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.

PA00502

12.    <u>Covenants</u>.

(a)    *Budget Compliance*.  The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts for any rolling two week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements for any rolling two week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Operating Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the Budget for such period (with any unspent amounts in this subparagraph (iv) being carried forward for subsequent periods).

(b)    *Borrowing Base*.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall at all times maintain actual Total Excess ABL Availability After Covenant (calculated in the manner set forth in the Borrowing Base Certificate attached to the Budget) in an amount not less than $0, it being understood and agreed that the Availability Block set forth in the Borrowing Base Certificate attached to the Budget shall be deemed to be $5,000,000 for each of the weeks beginning March 8, 2020 and March 15, 2020.  Until the Prepetition ABL Obligations are Paid in Full, the Borrowing Base Certificate shall be updated and delivered weekly in accordance with the requirements of an "Increased Reporting Event" as defined in the Prepetition ABL Agreement.  For the avoidance of doubt, the calculation of the Borrowing Base shall at all times deduct the amount of the Carve Out Reserves.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall deliver to the Prepetition Agents, by not later than Thursday of each week, an updated Borrowing Base Certificate, substantially in the form attached hereto as Exhibit

PA00503

[_] (the "<u>Borrowing Base Certificate</u>"), and such Borrowing Base Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents (it being agreed the detail required by the Prepetition ABL Agreement shall be deemed so satisfactory).

(c)     *Variance Testing*.  The Debtors shall, commencing with the week beginning March 15, 2020, deliver to the Prepetition Agents, by not later than Thursday of each week, a certificate, substantially in the form attached hereto as Exhibit [_] (the "<u>Budget Variance Certificate</u>") and such Budget Variance Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents, showing a reconciliation for the prior two week cumulative period, and certifying that (i) the Debtors are in compliance with the covenants contained in this Section 12 and (ii) to the knowledge of the Debtors, no Event of Default hereunder has occurred or, if such an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto.

(d)     *Consent Fee for Prepetition ABL Parties*.  The Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, a consent fee ("<u>Consent Fee</u>") in the amount of $150,000 per week until such time as the Prepetition ABL Obligations have been repaid in full in cash (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents.  The Consent Fee shall be fully earned on Saturday of each week and shall be paid to the Prepetition ABL Agent on the immediately following Tuesday and shall not be subject

27

PA00504

to refund, offset or rebate under any circumstances.

(e) *Levin Sale Milestones*. The Debtors shall achieve each of the following milestones, if and when applicable (as the same may be extended from time to time with the consent of the Prepetition ABL Agent (in its sole discretion), the "Levin Sale Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the Prepetition ABL Agent in all respects:

(i) On or before the date that is five (5) days following the Petition Date, the Debtors shall file a motion to approve the sale of the "Assets", as such term is defined in the Levin LOI (the "Levin Sale"), to the Buyer under the Levin LOI.

(ii) On or before the date that is ten (10) days following the Petition Date, the Debtors shall enter into an asset purchase agreement with the Buyer under the Levin LOI for the Levin Sale (the "Levin APA").

(iii) On or before the date that is twenty-one (21) days following the Petition Date, the Debtors shall receive an order from the Court approving the Levin Sale.

(iv) On or before the date that is two (2) business days after the order approving the Levin Sale, the Debtor shall have consummated the Levin Sale and the proceeds thereof shall have been applied to the Prepetition ABL Obligations.

13. Modification of Automatic Stay. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to: (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the Prepetition ABL Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to

PA00505

the Prepetition ABL Parties under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

14. **Protections of Rights of Prepetition Secured Parties.**

(a)  Subject to the Intercreditor Agreement, unless the Prepetition ABL Agent and Prepetition Term Loan Agent have each provided their respective prior written consent, or all Prepetition ABL Obligations and Prepetition Term Loan Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been Paid in Full, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and otherwise shall object to any motion or application seeking entry of, any order (other than this Interim Order or the Final Order, but including any order confirming any plan of reorganization or liquidation) that authorizes any of the following:  (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Postpetition Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim Order; (ii) the use of Cash Collateral for any purpose other than as permitted in this Interim Order (including any use in accordance with the Budget, subject to variances permitted by this Interim Order); (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the Prepetition

PA00506

Secured Parties' rights under this Interim Order, the Prepetition ABL Documents, or the Prepetition Term Loan Documents with respect any Prepetition ABL Obligations or Prepetition Term Loan Obligations. It shall be an Event of Default under this Interim Order if, in any of these Cases or any Successor Cases, the Debtors take or take to take any of the actions contemplated with respect to provisions (i) through (iv) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

(b)     The Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the Prepetition Agents, as applicable, all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the Prepetition Agents, as applicable) to provide under the Prepetition Documents, or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the Prepetition Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Prepetition Documents; (iv) permit the Prepetition Agents to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; and (v) upon reasonable advance notice, permit the Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Postpetition

Collateral and Prepetition Collateral, in each case, in accordance with the Prepetition Documents.

15. <u>Credit Bidding</u>. No Debtor shall object to any Prepetition ABL Parties credit bidding up to the full amount of the applicable outstanding Prepetition ABL Obligations, or with respect to the Prepetition Term Loan Parties, credit bidding up to the full amount of the applicable outstanding Prepetition Term Loan Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, to the extent permitted by section 363(k) of the Bankruptcy Code, and subject in each case to the rights, duties, and limitations, as applicable, of the parties under the Intercreditor Agreement, Prepetition Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid.

16. <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the Prepetition Obligations being Paid in Full, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any Prepetition Collateral or Postpetition Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the Prepetition ABL Agent (or, following the Prepetition ABL Obligations being Paid in Full, to the Prepetition Term Loan Agent) to be applied in accordance with this Interim Order and the Intercreditor Agreement.

17. <u>Cash Collection</u>. From and after the date of the entry of this Interim Order,

all collections and proceeds of any Postpetition Collateral and Prepetition Collateral or services provided by any Debtor and all Cash Collateral (that does not constitute Prepetition or Postpetition Term Priority Collateral) that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition ABL Priority Collateral were deposited under the Prepetition Documents (or in such other accounts as are designated by the Prepetition ABL Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall, until the Prepetition ABL Obligations are Paid in Full, be subject to the sole dominion and control of the Prepetition ABL Agent and any amounts deposited into the Cash Collection Accounts shall be deemed to be Postpetition ABL Priority Collateral. Proceeds and other amounts in the Cash Collection Accounts shall be used, subject to the conditions set forth herein, to fund the Budget during the Specified Period, and the Debtors are authorized and directed to pay to the Prepetition ABL Agent, and the Prepetition ABL Agent is authorized to apply, amounts in excess thereof in accordance with the Budget until the Prepetition ABL Obligations are Paid in Full. In furtherance of the foregoing, each Thursday during the Specified Period the Debtors shall deliver to the Prepetition Agents a schedule of all proposed disbursements for the following seven (7) day period (each a "Disbursement Schedule"), including identification of which line item(s) in the Budget such proposed disbursements relate to. Upon the Prepetition ABL Agent's receipt of a written cash collateral draw request (each a "CC Draw Request," which shall be delivered to the Prepetition Term Loan Agent at the same time such CC Draw Request is delivered to the Prepetition ABL Agent) (which may be made on a daily basis), and following verification of conformity with the associated Disbursement Schedule and Budget, the Prepetition ABL Agent shall disburse funds

PA00509

from the Cash Collection Account as appropriate to fund the amounts specified in the CC Draw Request; *provided* that, during the period prior to the Prepetition ABL Obligations being Paid in Full, the Prepetition ABL Agent shall only be required to disburse funds if the Debtors are in compliance with the provisions of this Interim Order (including, without limitation, that after giving effect to such disbursement, actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0). For the avoidance of doubt, it shall be a condition to the Debtors' ability to access and use the Prepetition Secured Parties' Cash Collateral that they submit to the Prepetition ABL Agent the CC Draw Request and associated Disbursement Schedule in the manner and time provided herein. In addition to the foregoing, the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid In Full) is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount sufficient to maintain the "Ending Balance" set forth in the Budget for any applicable weekly period (at the end of the relevant week) and, until the Prepetition ABL Obligations are Paid in Full, the Prepetition ABL Agent is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount such that actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0. Until the Prepetition ABL Obligations are Paid in Full, unless otherwise agreed to in writing by the Prepetition ABL Agent or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "Cash Management Order"). The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit, without offset or deduction, funds

33

PA00510

in such Cash Collection Accounts upon receipt of any direction to that effect from the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid in Full), in each case, to the extent such direction is made in accordance with this Interim Order. The Debtors shall cause the proceeds of Prepetition and Postpetition Term Priority Collateral as identified by the Consultant to be deposited into a segregated, non-commingled account which is required to be subject to the control of the Prepetition Term Loan Agent, and the Debtors' use of such proceeds shall be subject to (and limited to the extent set forth in) this Interim Order but, for the avoidance of doubt, may be used in accordance with the Budget, subject to variances permitted by this Interim Order.

18. <u>Maintenance of Collateral</u>. Until all Prepetition ABL Obligations are Paid in Full, the Debtors shall: (a) insure the Postpetition Collateral and Prepetition Collateral as required under the Prepetition Documents; and (b) maintain the cash management system in effect as of the Petition Date, as may be modified with the consent of the Prepetition Agents (such consent not to be unreasonably withheld) or as a result of entry of any order by the Court.

19. <u>Disposition of Collateral</u>. The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Postpetition Collateral or Prepetition Collateral other than in the ordinary course of business and in accordance with the Consulting Agreement and the Levin APA, without (subject to the Intercreditor Agreement) the prior written consent of the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral), and no such consent shall be implied, from any other action, inaction or acquiescence by the Prepetition Secured Parties or from any order of this Court.

20. <u>Events of Default</u>. The occurrence of any of the following events, unless

consented to or waived by the Prepetition Agents in advance, in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "Events of Default"):

(a)      the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including, without limitation, the Covenants in paragraph 12 herein);

(b)      the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c)      (i) the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

(d)      the filing of a motion or any plan of reorganization or disclosure statement attendant thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Interim Order; (ii) to grant any lien other than Permitted Prior Liens upon or affecting any Postpetition Collateral; or (iii) except as provided in this Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code;

(e)      (i) the filing of any Prohibited Plan (as defined herein) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors) or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan;

(f)      the entry of an order in any of the Cases confirming a Prohibited

PA00512

Plan;

(g)  the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to this Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect;

(h)  the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by this Interim Order;

(i)  the appointment of an interim or permanent trustee in the Cases, the appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a trustee receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(j)  the filing of a motion to approve a Prohibited Sale or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI;

(k)  the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Cases to Chapter 7 of the Bankruptcy Code;

(l)  the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor

36

PA00513

Agreement, the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (C) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of [$250,000] or more;

(m)     the existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under this Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except, in each case, as expressly provided in this Interim Order;

(n)     the filing of a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction;

(o)     any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations;

(p)     any Debtors shall challenge, support or encourage a challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations;

13167798 v1

PA00514

(q)     the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in this Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code;

(r)     any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA, with respect to Postpetition Collateral or Prepetition Collateral having a value in excess of [$250,000] outside the ordinary course of business and not otherwise permitted hereunder;

(s)     any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders" as approved by the Prepetition Agents in writing (provided that this Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by this Interim Order;

(t)     any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under this paragraph 20;

(u)     the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.

21.     <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default under this Interim Order,

notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall be referred to herein as a "Termination Declaration") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice (as defined herein); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to herein as the "Termination Date"). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and this Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable). During the

Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the Prepetition ABL Parties shall be permitted to exercise all remedies set forth herein, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and this Interim Order. Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process.

22. <u>Prepetition Secured Parties' Expenses</u>. The Debtors are authorized and directed to pay, in accordance with this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (a) the Prepetition ABL Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Morgan, Lewis & Bockius LLP and Burr & Forman LLP, and any successor counsel) and, (b) solely from the proceeds of Postpetition Term Priority Collateral, the Prepetition Term Loan Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Riemer & Braunstein LLP and Greenberg Traurig, LLP, and any successor counsel). Payment of all such fees and expenses shall not be subject to allowance by the Court. Professionals for the Prepetition Agents shall not be required to comply with the

U.S. Trustee fee guidelines, *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors that were incurred after the Petition Date, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such summary fee and expense statements to the Debtors. Any objections raised by the Debtors, the U.S. Trustee, or a Committee (if appointed) with respect to such invoices within ten (10) days of the receipt thereof will be subject to resolution by the Court to the extent they cannot be resolved by the applicable parties. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized and directed to pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition ABL Parties as provided in the Prepetition ABL Documents, incurred on or prior to such date without the need for any professional engaged by the Prepetition ABL Parties to first deliver a copy of its invoice as provided for herein. No attorney or advisor to any Prepetition ABL Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

23. <u>Proofs of Claim</u>. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the Prepetition ABL Parties and the Prepetition Term Loan Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the

Prepetition ABL Documents or the Prepetition Term Loan Documents. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition ABL Parties and the Prepetition Term Loan Parties with regard to all claims arising under the Prepetition ABL Documents or the Prepetition Term Loan Documents, as the case may be. Notwithstanding the foregoing, the Prepetition ABL Agent on behalf of itself and the Prepetition ABL Parties, and the Prepetition Term Loan Agent on behalf of itself and the Prepetition Term Loan Parties, are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in any of the Cases deemed to be filed in all Cases of each of the Debtors and asserted against all of the applicable Debtors). Any proof of claim filed by the Prepetition ABL Agent or the Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Parties or Prepetition Term Loan Parties. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the Prepetition ABL Parties or the Prepetition Term Loan Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

24. <u>Carve Out</u>.

(a) *Carve Out*. As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and

expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (such fees and expenses, the "Allowed Professional Fees") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined herein), *provided* that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "ABL Professional Fee Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[500,000] incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional

PA00520

Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week).

(b)     *Carve Out Reserves*.   On the day on which a Carve Out Trigger Notice is given by the Prepetition ABL Agent (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed a demand to the Debtors, and authorization for the Debtors, to utilize cash on hand and proceeds of the Postpetition Collateral to fund a reserve in an amount equal to the Carve Out.  The Debtors shall deposit and hold such amounts in a segregated account at the Prepetition ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees (each, a "Carve Out Reserves").   For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order or the Final Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

(i)     Following payment of all Allowed Professional Fees entitled to benefit from the Carve Out, any remaining funds in the Carve-Out Reserves funded by (x) the proceeds of Postpetition ABL Priority Collateral shall be distributed (A) first, to the Prepetition ABL Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full, and (B) second, to the Prepetition Term Loan Agent on account of the Obligations (as defined in the Prepetition Term Loan Agreement) until such obligations have been Paid in Full; and (y) the proceeds of Postpetition Term Priority Collateral

44

shall be distributed (A) first, to the Prepetition Term Loan Agent which shall apply such funds to the Obligations (as defined in the Prepetition Term Loan Agreement) in accordance with the Prepetition Term Loan Agreement until such obligations have been Paid in Full, and (B) second, to the Prepetition ABL Administrative Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full.

(ii)     Notwithstanding anything to the contrary in this Interim Order, following the end of the third business day after delivery of a Carve Out Trigger Notice, (x) the Prepetition ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the Prepetition ABL Agent, on the one hand, and the Prepetition Term Loan Agent, on the other hand, shall have a security interest in any residual interests in the Carve Out Reserves, with any excess paid as provided above; and (y) the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves required to be funded by the proceeds of Postpetition Collateral have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves held in accounts by the Prepetition Term Loan Agent, with any excess paid as provided above.

(iii)     For the avoidance of doubt and notwithstanding anything to the contrary herein or in any Prepetition Secured Facilities, to the extent of any shortfall in the Carve Out Reserves, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and any and all other forms of adequate protection, liens, or claims securing the obligations under the Prepetition Documents; provided that in all cases, the Carve Out priority with regard to the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral

45

PA00522

will always be subject to the limitations applicable thereto set forth in the definition of Carve Out.

(c)     *No Direct Obligation To Pay Allowed Professional Fees*.   The Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.   Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     *Payment of Carve Out On or After the Termination Declaration Date*.   Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(f)     *Release of Prepetition ABL Parties*.   Notwithstanding anything to the contrary contained herein, (i) prior to the delivery of the Carve Out Trigger Notice, the Debtors shall fund the Carve Out Reserves at the reasonable request of the Prepetition ABL Agent in consultation with the Prepetition Term Loan Agent, the Debtors and their advisors, and (ii) upon the repayment in full of the principal amount of all Loans under the Prepetition ABL Agreement, the cash-collateralization of all Letters of Credit under the Prepetition ABL Agreement and the funding of the Prepetition ABL Indemnity Reserve (the date that such events occur, the "<u>ABL</u>

PA00523

Repayment Date"), and after the funding of the Carve Out Reserves in an amount equal to, as of the ABL Repayment Date, the lesser of (x) the amount set forth in the Budget for Professional Persons (plus the amounts set forth in 24(a)(i) and (ii)) and (y) the then accrued Carve Out, the Prepetition ABL Parties and the Prepetition ABL Liens shall be released from all further liability from the Carve Out (such release shall be a condition to the Prepetition ABL Obligations being deemed Paid in Full).

25. <u>Limitations on Use of Cash Collateral, and Carve Out</u>. The Postpetition Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with: (a) except to contest the occurrence of an Event of Default, preventing, hindering, or delaying any of the Prepetition Secured Parties' permitted enforcement or realization upon any of the Postpetition Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order; (c) selling or otherwise disposing of Postpetition Collateral without the consent of the Prepetition Agents; (d) using or seeking to use any insurance proceeds constituting Prepetition Collateral or Postpetition Collateral except as provided for in this Interim Order without the consent of the Prepetition ABL Agent or the Prepetition Term Loan Agent (in the case of Postpetition Term Priority Collateral); (e) incurring Indebtedness (as defined in the Prepetition Documents) without the prior consent of the Prepetition Agents; (f) seeking to amend or modify any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis; (g) objecting to or challenging in any way the Prepetition Liens, Prepetition Secured Obligations, Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the Prepetition Secured Parties, respectively; (h) asserting, commencing, or prosecuting any claims or causes of action

PA00524

whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations, or any other rights or interests of any of the Prepetition Secured Parties; or (j) seeking to subordinate, recharacterize, disallow, or avoid the Prepetition Secured Obligations; *provided, however*, without prejudice to the ability of a Committee (if appointed) to contest the Investigation Budget Amount (as defined herein) in connection with the Final Hearing, that the Carve Out and such collateral proceeds may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final Order, $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging), the Prepetition Lien and Claim Matters (as defined herein).

       26.    Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Budget provided by the Debtors to the Prepetition Agents.

       27.    Effect of Stipulations on Third Parties.

PA00525

(a) *Generally.* The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless and to the extent that a party in interest with proper standing granted by order of the Bankruptcy Court (or other court of competent jurisdiction) has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) and (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 27) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any

such judgment has become a final judgment that is not subject to any further review or appeal.

(b) *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof.  To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection.  Upon a successful Challenge brought pursuant to this paragraph 27, the Court may fashion any appropriate remedy.

28.  <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this

Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

29. <u>Section 506(c) Claims</u>. Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

30. <u>No Marshaling/Applications of Proceeds</u>. Subject to entry of a Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order, notwithstanding any other agreement or provision to the contrary.

31. <u>Section 552(b)</u>. Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

32. <u>Access to Collateral</u>. Subject to and effective upon entry of a Final Order, upon expiration of the Remedies Notice Period, the Prepetition Secured Parties, subject to the Intercreditor Agreement, shall be permitted to (a) access and recover any and all Prepetition and Postpetition Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of

PA00528

the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Postpetition Collateral, *provided*, *however*, in the case of clause (b), notwithstanding anything to the contrary herein, and subject to the Intercreditor Agreement, the Prepetition Secured Parties can only enter upon a leased premises during the continuation of an Event of Default in accordance with (i) a separate written agreement by and between the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of the Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable Prepetition Secured Party on such notice to the landlord as shall be required by this Court; *provided*, *however*, that solely with respect to rent due to a landlord of any such leased premises, the Prepetition Secured Parties, as applicable, shall be obligated only for the payment of rent of the Debtors that first accrues after delivery of the Termination Declaration in accordance with paragraph 20 herein that is payable during the period of such occupancy by the Prepetition Secured Parties, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to delivery of the Termination Declaration through and including any assumption and/or rejection of any lease. Nothing herein shall require the Prepetition Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

33.     <u>Limits on Lender Liability</u>.  Subject to entry of a Final Order, nothing in this Interim Order, the Prepetition Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of

PA00529

their businesses or in connection with the administration of these Cases. The Prepetition Secured Parties shall not, solely by reason of having made loans under the Prepetition Documents, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

34.     <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the Prepetition ABL Agent (on behalf of the Prepetition ABL Parties) and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Parties), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the Postpetition Collateral.

35.     <u>Additional Rights of the Prepetition Term Loan Agent</u>.  Subject to the Prepetition ABL Obligations being Paid in Full and the rights preserved in paragraph 27 herein, any reference in this Interim Order to the Prepetition ABL Agent agreeing to or having the right to do, or refraining from or having the right to refrain from doing, an act, or providing any consent or waiver hereunder, shall automatically, without further order of the Court, be construed as referring to the Prepetition Term Loan Agent.

36.     <u>Levin DIP Facility</u>.  Notwithstanding anything to the contrary contained herein or in any order approving the Levin DIP Facility, (a) the DIP Lenders (as defined in the

Levin DIP) shall not have a lien on any Prepetition or Postpetition Collateral (other than Prepetition

or Postpetition Collateral that is DIP Collateral (as defined in the DIP Order), (b) the Prepetition

ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and

corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and

the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit

of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate

protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent

and the Prepetition Term Loan Permitted Prior Liens, (d) the Levin DIP shall not be repaid from

(or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP

Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a

segregated, non-commingled account which is required to be subject to the control of the DIP

Agent and the Debtors' use of such proceeds shall be subject to, and distributed in accordance

with, the Levin DIP Order.

      37.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed

to constitute a substantive consolidation of any of the Debtors' estates, it being understood,

however, that the Debtors shall be jointly and severally liable for the obligations hereunder.

      38.    <u>No Superior Rights of Reclamation</u>.  The right of a seller of goods to reclaim

such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien; rather, any

such alleged claims arising or asserted as a right of reclamation (whether asserted under section

546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect

to the Prepetition ABL Liens as such claim had on the Petition Date.

      39.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the

entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly

PA00531

or implicitly, subject to the Prepetition Documents and the Intercreditor Agreement: (a) the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order. Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and, unless otherwise set forth in this Interim Order or the Final Order, any other position which any party in interest deems appropriate to raise in the Debtors' Chapter 11 cases.

40. <u>No Waiver by Failure to Seek Relief</u>. The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Secured Parties.

41. <u>Binding Effect of Interim Order</u>. Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to

PA00532

the benefit of the Debtors, the Prepetition Secured Parties, all other creditors of any of the Debtors, a Committee (if appointed), or any other court appointed committee, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

42.     <u>No Modification of Interim Order</u>.  Until and unless the Prepetition Secured Obligations have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the Prepetition ABL Documents which survive such discharge by their terms) the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the Prepetition Agents, (i) any modification, stay, vacatur, or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the Prepetition ABL Agent for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from Collateral or Prepetition Collateral; or (c) without the prior written consent of the Prepetition Agents, any lien on any of the Postpetition Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens, other than the Carve Out.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the Prepetition Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the Prepetition ABL Agent or the

PA00533

Prepetition Term Loan Agent.

43. <u>Continuing Effect of Intercreditor Agreement</u>.  The Debtors and Prepetition Secured Parties each shall be bound by, and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.

44. <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Intercreditor Agreement and this Interim Order (solely as between the Prepetition Secured Parties), the provisions of the Intercreditor Agreement shall govern and control.

45. <u>Discharge</u>.  The obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable, has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that does not require that all Prepetition ABL Obligations be Paid in Full (in the case of the sale of Postpetition ABL Priority Collateral) or that all Prepetition Term Loan Obligations be Paid in Full (in the case of the sale of Postpetition Term Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "<u>Prohibited Plan or Sale</u>") without the written consent of each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable.  For the avoidance of doubt, the Debtors' proposal or

PA00534

support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder.

46. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition Secured Parties granted pursuant to this Interim Order, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (x) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to the Prepetition ABL Documents and this Interim Order, have been Paid in Full; and (y) in respect of the Prepetition Term Loan Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been Paid in Full. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Parties notwithstanding the repayment in full of the Prepetition ABL Obligations.

47. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order is scheduled for **[_____], 2020 at [__]:00 [_].m. (EST)** before the Honorable [_____], United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before [_____], 2020, the Debtors, or an agent appointed for such purpose, shall serve, by United States mail, first-class postage prepaid, notice of the entry of this

PA00535

Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) counsel for the Consultant; and (g) counsel for Levin Furniture, LLC, and Levin Towing, LLC. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **[_____], 2020, at [__]:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (iv) counsel to the Committee (if appointed).

48.     *Nunc Pro Tunc Effect of this Interim Order*. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

49.     <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the this Interim Order.

13167798 v1

PA00536

Dated: _____                    _____
Wilmington, Delaware                       UNITED STATES BANKRUPTCY JUDGE

13167798 v1

PA00537

# EXHIBIT J

PA00538

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):[2]

### Relief Requested

1.       The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final

Order"):  (a) authorizing and approving, on an interim and final basis, store closing or similar

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 12) (the "First Day Declaration") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on March 8, 2020 (the "Petition Date").  Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

themed sales ("Store Closings") in accordance with the terms of the store closing sale procedures (the "Store Closing Procedures," attached as **Exhibit 1** to **Exhibit A** hereto), with such sales to be free and clear of all liens, claims, and encumbrances; (b) authorizing the Debtors to pay customary bonuses to employees of the stores listed on **Exhibit 2** to **Exhibit B** attached hereto (collectively, the "Closing Stores"); (c) in accordance with sections 363 and 365 of the Bankruptcy Code, authorizing the Debtors to assume that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020 (the "Consulting Agreement"), by and between Debtor AVF Holding Company, Inc. and the following entities: Hilco Merchant Resources, LLC ("HMR"), Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC (such entities collectively, the "Hilco Consulting Entities"), Gordon Brothers Retail Partners, LLC ("GBRP"), DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC (such entities collectively the "GB Consulting Entities", and together with the Hilco Consulting Entities the "Consultant"), a copy of which is attached as **Exhibit 3** to **Exhibit A** hereto; (d) authorizing the Debtors to retain certain of the entities comprising the Consultant that will be providing receivables collection (at the Debtors' option) and intellectual property disposition services as special asset disposition advisors and consultants to the Debtors, pursuant to Section 327(a) of the Bankruptcy Code[3]; and (e) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider entry of the Final Order with respect to the relief sought in the Motion.

---

[3] The Consultant affiliated entities that will provide these specific asset disposition services are: Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Receivables, LLC, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC

PA00540

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 554(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6003, and 6004, and Bankruptcy Local Rule 9013-1(m).

## The Store Closings

### I.      The Store Closing Decisions and the Consulting Agreement

5.      As described more fully in the First Day Declaration, in the wake of extreme market conditions and faced with limited liquidity, the Debtors have commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down their remaining store locations and other operations through a going-out-of-business sales process. Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going

13172884 v1

concern, the Company is simply unable to meet its financial obligations. The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind-down process that will maximize value and recoveries for stakeholders in these cases.

6.     In connection with the aforementioned wind-down process, prior to the Petition Date the Debtors conducted a competitive process to engage an exclusive consultant(s) to provide a wide range of asset disposition consulting and related services to assist in and facilitate the Debtors' planned wind-down efforts.  During the course of that same proposal solicitation process, Hilco and Gordon Brothers were engaged in parallel discussions with the Debtors' prepetition term loan lenders, FS KKR Capital Corp. and FS KKR Capital Corp. II (collectively, "KKR") concerning the status of the prepetition term loan debt (the "Term Loans"), and the prospects for development of a creative consulting structure such that the Debtors' estates and their various stakeholders could be spared the burden of having to pay the types of consulting fees that are customary for the types of asset disposition services required by the Debtors.

7.     After arm's-length and extensive negotiations, these discussions ultimately yielded a series of agreements under which (a) the Debtors determined to engage the Consultant to provide the full range of asset disposition consulting services required by the Debtors in respect of merchandise inventories, fixed assets, receivables (subject to a Debtors' option), and intellectual property[4], (b) HGB AVF Lending, LLC ("HGB"), an entity controlled by affiliates of Hilco and Gordon Brothers, entered into an agreement with KKR under which HGB acquired KKR's

---

[4]    The Consulting Agreement presently provides that in addition to the consulting services described herein, the Debtors were to engage the Consultant to market and sell Debtors' real estate holdings.  Subsequent to execution of the Consulting Agreement, the Debtors and the Consultant agreed to exclude the real estate services from the scope of Consultant's engagement.

13172884 v1

PA00542

interests in the Term Loans (and as part of such transaction GBH agreed to share a portion of any recovery, if any, it may later receive on account of the Term Loans), and (c) the Consultant simultaneously agreed with the Debtors that the Consultant would **NOT** earn or be paid any consulting or other fee or compensation from the Debtors or their estates, other than reimbursement of certain out-of-pocket expenses incurred in connection with the conduct of the Store Closing Sales, any such reimbursement being strictly in accordance with a budget agreed to by the Debtors and the Debtors' secured lenders.

8.      Through this approach - whereby the Consultant's only opportunity to realize any compensation on account of the consulting services being provided under the Consulting Agreement is through a recovery realized by its affiliates on account of the Term Loans (a portion of which recovery, if any, will be shared with KKR) - the Debtors, in consultation with their professionals and key stakeholders, determined that the above-described arrangement provided the best framework for accomplishing the Debtors' paramount goal of an orderly and efficient liquidation of all assets.  At the same time, this arrangement fully aligned the estates' interests with those of the Term Lender in achieving maximum realizable value for Debtors' assets during the wind-down process.

9.      Based on an evaluation of the circumstances, the economic structure of the Consulting Agreement, and the Consultant's experience in conducting Store Closings on similar timelines, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.

10.      Accordingly, by this Motion, the Debtors seek relief in two essential parts; first, consistent with well-established precedent in this District, the Debtors seek – on an interim basis –to assume the Consulting Agreement under sections 363 and 365 of the Bankruptcy Code, so that

PA00543

the HMR and GBRP, the Consultant-constituent entities that are providing the inventory and fixed asset disposition consulting services under the Consulting Agreement, may continue their role as the Debtors' consultant in connection with the conduct of the Store Closings on a post-petition basis without interruption; second, the Debtors seek to retain the remaining Consultant-constituent entities that are providing the receivables, and intellectual property-related disposition consulting services, pursuant to section 327 of the Bankruptcy Code.  In connection with the foregoing, the Debtors have determined, in the exercise of their business judgment, that (a) the continuation of services by the Consultant is necessary for efficient large-scale execution of the Store Closings, and the marketing and sale of the other Assets to maximize the value of the Assets being sold and (b) any change or elimination of the engagement with the Consultant would significantly disrupt the Debtors' reorganization efforts and impair the value of the Assets.[5]  Further, the Store Closings and the marketing and sale of the Assets are a critical component of the Debtors' ability to maximize value for all stakeholders, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

11.     For the convenience of the Court and interested parties, a summary of the salient terms of the Consulting Agreement is set forth below:[6]

---

[5]     By this Motion, the Debtors' seek approval of the conduct of the Sales at the Stores and the associated disposition of the Merchandise and the owned M&E in a manner consistent with customary practices in this jurisdiction and in jurisdictions throughout the country in connection with Store Closings.  However, nothing in this Motion seeks approval of the Debtors' assumption and assignment of any of their non-residential real property leases or executory contracts. To the extent that the Debtors', through the services of the Consultant, find one or more buyers of the Real Estate Assets and/or the IP Assets, the Debtors' would file one or more separate motions seeking approval of such asset sales on as expedited a basis as the circumstances and/or economics of such sale dictate.

[6]     The following summary chart is for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.  Any capitalized terms used in the summary chart but not defined therein are used as defined in the Consulting Agreement.

13172884 v1

| Term | Consultant Agreement |
|---|---|
| **Services Provided by Consultant** | Services to be provided by Consultant include, among other things:<br><br>• Provision of qualified Supervisors to supervise and assist the Debtors in its conduct of the Sale;<br><br>• Provision of oversight, supervision, and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and the M&E;<br><br>• Recommendation and implementation of appropriate point of purchase, point of sale, and external advertising to effectively sell the Merchandise during the Sale Term;<br><br>• Advice regarding appropriate discounting of Merchandise, staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;<br><br>• Other advice regarding and during the Sale;<br><br>• Development of an advertising and marketing plan for the sale, auction, or other disposition of the M&E;<br><br>• Implementation of advertising and marketing as deemed necessary to maximize the net recovery on the M&E;<br><br>• Preparation for the sale of the M&E;<br><br>• Developing a Strategic Plan with the Debtors for disposition of the Properties;<br><br>• Subject to the Debtors' exercise of the election under the Consulting Agreement, collecting, settling, and otherwise resolving the Receivables on the Debtors' behalf;<br><br>• Collecting and securing available information regarding the Intellectual Property;<br><br>• Preparing marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition; and<br><br>• Assisting the Debtors in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property.<br><br>• To the extent that the Consultant locates a purchaser of the Assets, other that the Merchandise and the M&E, the Debtors (in consultation with the Secured Lenders) shall file one or motion seeking approval of such underlying transaction(s) on such notice (or Court approved shortened notice) as the terms and the economics of such transactions dictate. |
| **Sale Term** | The Store Closing began on March 6, 2020, and are to continue to no later than May 31, 2020; provided, however, absent the prior consent of the Debtors, the Sale shall conclude in the Stores no later than April 30, 2020. |

7

PA00545

| Asset Marketing Period | The period commencing on the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Debtors and the Consultant (in consultation with the Secured Lenders); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Debtors (in consultation with the Secured Lenders) and the Consultant |
|---|---|
| Sale Expenses | The Debtors shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses). The Debtors, Consultant and Secured Lenders have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses (the "<u>Budget</u>") in the form and content annexed hereto and made a part hereof as <u>Exhibit B</u>. The Budget may only be modified by mutual agreement of the Debtors, the Consultant and the Secured Lenders. In connection with the Sale and subject to the limitations set forth in the Budget as to the Consultant Incurred Expenses, the Debtors shall be responsible for the payment of all expenses incurred in connection with the Sale, including, without limitation, all Sale Expenses (and Consultant shall not be responsible for any such expenses or Sale Expenses except as expressly provided for in <u>Section 11</u> below). Consultant Incurred Expenses shall not exceed the aggregate line item amount of Consultant Incurred Expenses set forth in the Budget without the prior written consent of the Debtors and Secured Lenders, which consent shall not be unreasonably withheld, delayed or conditioned. Subject to the limitations of the Sale Budget, the Debtors shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in <u>Section 4</u> hereof upon presentation of invoices and statements for such expenses. In addition, to the extent that the Consultant anticipates that it, or the Debtors will incur any additional out of pocket expenses in connection with the Services being provided by the Consultant in relating to its provision of Services in connection with the marketing and disposition of the other Assets, such expenses shall be subject to Supplemental Expense Budget to be agreed to between the Debtors (in consultation with the Secured Lenders) and the Consultant prior to such expenses being incurred. |
| Consultant's Compensation | In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall <u>not</u> earn any fee or other compensation from the Debtors, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time in the course of performing Services hereunder, in each case limited to the amounts set forth in the Budget and at the times provided herein. Any fees payable to Consultant shall be paid to Consultant by the Term Loan Lenders from their recovery on account of their secured claim. |
| Tracking of Proceeds of the Sales | The Debtors shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item sold the retail price (as reflected on Debtors' books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale. The Debtors shall make all such records and reports available to Consultant and the Secured Lenders during regular business hours upon reasonable notice. |
| Expenses Deposit | The Interim Approval Order and the Final Approval Order shall include approval on the part of the Debtors to fund, and the Debtors shall thereafter promptly fund, to Consultant $3,353,912 (the "<u>Expense Deposit</u>"). The Debtors shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this |

8

PA00546

| | |
|---|---|
| | Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by the Debtors to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Debtors (or their designee) within three (3) business days following the Final Settlement. |
| **Debtors' Employees** | The Debtors and the Consultant shall cooperate to retain the employees of the Debtors (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion. Such employees shall remain employees of the Debtors, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Debtors' other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("WARN Act") payments, or any other costs, expenses, obligations, or liabilities arising from the Debtors' employment or termination of such employees prior to, during, and subsequent to the Sale Term. Other than advising Debtors that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s). |
| **Fulfillment of Pre-Sale Customer Orders** | Consistent with the relief sought in the Debtors' companion Customer Programs Motion, in addition to providing the forgoing Services in connection with the Sale, the Consultant shall use commercially reasonable efforts to assist the Debtors in fulfilling certain pre-Sale Commencement Date orders for which the Debtors has received customer deposits (collectively, the "Pre-SCD Orders").<br><br>• On-Hand Fulfillment Orders. Consultant shall assist the Debtors in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "On-Hand Fulfillment Orders"), on account of which orders (i) the Debtors has received customer deposits in the aggregate amount of $18 Million (collectively, the "On-Hand Customer Deposits") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "On-Hand Fulfillment Merchandise"). As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Debtors in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Debtors) in order to fulfill and complete the On-Hand Fulfillment Orders. Consultant shall advise the Debtors in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Debtors and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Debtors' existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales commissions and delivery (collectively, the "On-Hand Fulfillment Processing Expenses"), shall be borne exclusively by the Debtors, and the Consultant shall not be responsible for any such costs or expenses. Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without |

9

PA00547

| | |
|---|---|
| | limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Debtors. To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Debtors on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder. Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <u>provided</u>, that any proceeds realized by the Debtors upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder.<br><br>• <u>Back-Order Fulfillment Orders</u>. Following the Sale Commencement Date, Consultant shall also assist the Debtors in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Debtors has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>"). To the extent that a Back-Order Fulfillment Order(s) can be filled by the Debtors within a reasonable time after the Sale Commencement Date, the Debtors and the Consultant shall work together to implement a protocol for fulfillment of such order(s). To the extent that the Debtors is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Debtors, and the Debtors and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Debtors' bankruptcy case for the full amount of such customer's Back-Order Customer Deposit.<br><br>• If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit.<br><br>• During the Sale Term, the Debtors shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders. |
| **Additional Consultant Goods** | • In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("<u>Additional Consultant Goods</u>"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing |

13172884 v1

PA00548

fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods). Sales of Additional Consultant Goods shall be run through Debtors' point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and Debtors shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Debtors goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Debtors' written consent and subject to Consultant's agreement to reimburse Debtors for any associated expenses, Consultant shall not use Debtors' distribution centers for any Additional Consultant Goods.

- Consultant shall pay to the Debtors an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Debtors any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation. Except for sales taxes associated with the sale of Additional Consultant Goods and Debtors' Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation. Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

- The Consultant, the Debtors, and the Secured Lenders intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Debtors in all respects and not a consignment for security purposes. Subject solely to Consultant's obligations to pay to Debtors the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Secured Lenders, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant. In furtherance of the foregoing, the Debtors acknowledge that the Additional Consultant Goods shall be consigned to Debtors as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC"). The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Secured Lenders.

- The Debtors shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with the Debtors' insurers. Consultant shall be responsible for payment of any deductible (but only in relation to the

11

PA00549

| | |
|---|---|
| | Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods. |
| **Debtors' Indemnification Obligations** | The Debtors shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "<u>Consultant Indemnified Parties</u>"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: |
| |       (a)    Debtors' material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; |
| |       (b)    any failure of Debtors to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; |
| |       (c)    any consumer warranty or products liability claims relating to any Merchandise; |
| |       (d)    any liability or other claims asserted by customers, any of Debtors' employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant; |
| |       (e)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Debtors or any of Debtors' employees, agents, or representatives (including, without limitation, any Debtors employees); and |
| |       (f)    the negligence or willful misconduct of Debtors or any of its officers, directors, employees, agents or representatives. |
| **Consultant Indemnification Obligations** | The Consultant shall indemnify and hold Debtors and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "<u>Debtors Indemnified Parties</u>"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: |
| |       (a)    Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; |
| |       (b)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Debtors (including, without limitation, any Store Employees) by Consultant or any |

12

PA00550

| | of Consultant's representatives (including, without limitation, any Supervisor);<br><br>(c)    any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Debtors or Debtors Indemnified Parties or from a breach of the terms hereof by Debtors; and<br><br>(d)    the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor. |
| --- | --- |

## II.    Store Closing Procedures.

12.    In connection with and in facilitation of the ongoing conduct of the store closing sales, the Debtors further seek approval of the Store Closing Procedures, the form and substance of which are consistent with the procedures utilized by debtors in this and many other jurisdictions in connection with the similar such store closing processes.

13.    As is customary, the Store Closing Procedures provide, among other things, that: (a) all sales of Store Assets will be deemed free and clear of all liens, claims, interests, and other encumbrances; (b) the Merchandise and the M&E (as each term is defined in the Consulting Agreement) will be sold with the benefit of various marketing techniques and price markdowns to promote efficient liquidation; and (c) certain unsold M&E and other Store assets that cannot be promptly liquidated may be abandoned if and when the Debtors determine, in their business judgment, that retaining, storing, or removing such assets would result in unnecessary expense with little or no benefit to the estates. The Debtors seek approval of the Store Closing Procedures to, among other things, provide local regulatory authorities and media in which the Store Closings may be advertised with knowledge that the Debtors are conducting the Store Closings in compliance with the Court's order.

13172884 v1

PA00551

14.     The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings.  In certain cases, the contemplated Store Closings may be inconsistent with various provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions, unless waived, would hamper the Debtors' ability to maximize value in selling their inventory.

15.     As set forth in the Store Closing Procedures, the Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on the behalf of the foregoing parties shall interfere with or otherwise impede the conduct of the Store Closings, nor institute any action against the Debtors in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings or the advertising and promotion (including through the posting of signs) of the Store Closings.

16.     The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Merchandise and the M&E to maximize the value of the Debtors' estates.  The Debtors intend to facilitate the Store Closings using current personnel at no increased cost (except as set forth herein), and estimate that, with perhaps a few exceptions, the Stores Closings will be completed by no later than April 30, 2020, with May 31, 2020 being the outside Sale Termination Date at locations that the Debtors (in consultation with

14

PA00552

their secured lenders) and the Consultant agree generate a net positive return by continuing in the month of May 2020.

### III. Liquidation Sale Laws and Dispute Resolution Procedures.

17. Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws"). Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings. Such requirements hamper the Debtors' ability to maximize value in selling their inventory. Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Store Closing Procedures, and to the extent such procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures should control.

18. To facilitate the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), on an interim and final basis:

> a. Provided that the Store Closings are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct Store Closings in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

13172884 v1

PA00553

b.  Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Store Closings are being held; (iii) the county consumer protection agency or similar agency for each county in which the Store Closings are being held; (iv) the division of consumer protection for each state in which the Store Closings are being held; (v) the chief legal counsel for each local jurisdiction in which the Store Closings are being held (collectively, the "Dispute Notice Parties").

c.  With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (a) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (b) proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (c) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (d) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (e) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (f) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (g) counsel to any statutory committee appointed in these chapter 11 cases. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

16

d.  In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Store Closings pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Store Closings pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.  If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

## IV.  Fast Pay Laws.

19.  Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Applicable State Laws"). These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

20.  The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated at or near the end of the Store Closings. To be

clear, the Debtors intend to pay their terminated employees as expeditiously as possible, under normal payment procedures, and pursuant to applicable Court order.[7] Moreover, the Debtors' approved Cash Collateral Budget expressly contemplates the payment of employee wages in the ordinary course during the Store Closings. The Debtors therefore believe that their current systems will allow their employees to be paid expeditiously and in accordance with any Applicable State Laws. However, given the number of employees who will likely be terminated during the Store Closings, the Debtors request a waiver of compliance with the Applicable State Laws to the extent that the Debtors' payroll systems limit their ability to so comply.

**V.    Store Closing Bonus Plan.**

21.    Through this Motion, the Debtors are requesting the authority, but not the obligation, to pay bonuses (the "Store Closing Bonuses") to store-level non-insider employees at the Closing Stores who remain in the employ of the Debtors during the Store Closings (the "Store Closing Bonus Plan"). The Debtors believe that the Store Closing Bonus Plan will motivate employees during the Store Closings and will enable the Debtors to retain those employees necessary to successfully complete the Store Closings.

22.    The amount of the bonuses offered under the Store Closing Bonus Plan will vary depending upon a number of factors, including the employee's position with the Debtors and the performance of the Closing Stores in which the relevant employees work.

23.    The Debtors will set the amounts of the Store Closing Bonuses and eligible employees in consultation with the Consultant, who typically utilizes such bonuses to retain

---

[7]    The Debtors are seeking such relief pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, (the "Wages Motion") filed contemporaneously herewith.

employees and incentivize higher recoveries during store closing sales and are well-acquainted

with optimal methods for designing such bonus plans.[8]

24.     The total aggregate cost of the Store Closing Bonus Plan will also vary depending

on how many Closing Stores are ultimately closed.  If the Debtors were to close every Closing

Store, the aggregate amount of Store Closing Bonuses paid will be not more than approximately

$600,000, assuming one hundred percent of the performance targets were met during the Store

Closings at every Closing Store.

25.     Providing such non-insider bonus benefits is critical to ensuring that key employees

that will be affected by the reduction in the Debtors' work force due to the Store Closings will

continue to provide critical services to the Debtors during the ongoing Store Closing process.  For

the avoidance of doubt, the Debtors do not propose to make any payment on account of Store

Closing Bonuses to any insiders.

26.     Accordingly, the Debtors respectfully submit that the Store Closing Bonus Plan is

in the best interests of their estates and request that the Court authorize the payments under the

Store Closing Bonus Plan as a sound exercise of their business judgment.

**Basis for Relief**

**I.      The Debtors Have a Valid Business Justification for the Store Closings.**

27.     Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a

debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may

use, sell, or lease, other than in the ordinary course of business, property of the estate."

11 U.S.C. § 363(b)(1).  When selling assets outside of the ordinary course of business, a debtor

---

[8]     The final terms of the Store Closing Bonus Plan are still being formulated in consultation with the Consultant.

13172884 v1

must articulate a valid business justification to obtain court approval. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)); *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision). When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11 cases, especially where the debtor is a Delaware corporation).

28.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See, e.g.*, *Ames Dept. Stores*, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"). As such, bankruptcy courts in this jurisdiction have approved similar store closing sales. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019); *In re Fred's Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 27, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re Things Remembered, Inc.*, No. 19-10234

PA00558

(KG) (Bankr. D. Del. Feb. 28, 2019); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 13, 2017).[9]

29.     Sufficient business justification exists to approve the proposed Store Closings under section 363(b)(1) of the Bankruptcy Code.  The Debtors, with the assistance of their advisors, have determined that the Store Closings represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Merchandise and the M&E  and provide the Debtors with much-needed liquidity.   There are meaningful amounts of Merchandise, in the aggregate, that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm.  Further, delay in commencing the Store Closings would diminish the recovery tied to monetization of the Merchandise and the M&E for several important reasons.  Many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity.  As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Merchandise and the M&E  and the termination of operations at the Closing Stores.  Further, uninterrupted and orderly Store Closings will allow the Debtors to timely reject leases associated with the Closing Stores and, therefore, avoid the accrual of unnecessary administrative expenses for rent and related costs.  Suspension of the Store Closings until entry of the Final Order may cause the Debtors to incur claims for rent at many of these stores, creating a further drain on the Debtors' liquidity.

30.     Courts in this district and courts in other jurisdictions have approved sale guidelines in chapter 11 cases on an interim basis.  Importantly, a number of courts have granted retail debtors first day authority to implement such procedures.   *See, e.g.*, *In re Destination Maternity*

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

13172884 v1

PA00559

*Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (approving procedures on an interim basis); *In re Fred's, Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 11, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Mar. 15, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 7, 2019) (same) (*In re Payless Holdings LLC*, No. 17-42267 (E.D. Mo. April 7, 2017) (same).

## II.   The Court Should Approve the Sale of the Merchandise and the M&E Free and Clear of all Liens, Encumbrances, and Other Interests Under Bankruptcy Code Section 363(f).

31.     The Debtors request approval to sell the Merchandise and the M&E on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.   A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).  Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

32.     Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes

other obligations that may flow from ownership of the property." *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000). As the Fourth Circuit held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam*), the scope of section 363(f) is not limited to *in rem* interests in a debtor's assets. Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

33.     With respect to any other party asserting a lien, claim, or encumbrance against the Merchandise and the M&E, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f). In connection with the sale of the Merchandise and the M&E , the Debtors propose that any liens, claims, and encumbrances asserted against the Merchandise and the M&E be transferred to and attach to the amounts earned by the Debtors under the Store Closings with the same force, effect, and priority as such liens currently have on the Merchandise and the M&E .

### III.     The Court Should Waive Compliance with Applicable State Laws and Approve the Dispute Resolution Procedures

34.     The Debtors' ability to conduct the Store Closings in accordance with the Store Closing Procedures and without strict compliance with all Applicable State Laws is critical to the Store Closings' success. Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Store Closings, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.

35.     To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still

adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings. As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

36.     The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws.  ***First***, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order).  ***Second***, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding contrary Applicable State Laws as it is essential to maximize the value of the Debtors' business.  ***Third***, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction.  *See* 28 U.S.C. § 1334.  As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Court because the Debtors are only seeking interim relief at the outset of these cases, and parties in interest will be able to raise any further issues at the final hearing.

37.     Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See Belculfine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

38.     Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety.  *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

39.     Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Store Closings without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The Debtors do not seek a general waiver of all state and local

PA00563

law requirements, but only those that apply specifically to retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closings. Moreover, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising. Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

40. Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein. *See, e.g.*, *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales under the terms of the order "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Sales are conducted and advertised in compliance with this Order"); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

26

## IV. The Court Should Waive Compliance with any Restriction in the Leases and Approve the Store Closing Procedures

41.     Certain of the Debtors' leases governing the premises of the stores subject to any Store Closings may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H., Macy and Co. Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

42.     This Court has long held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable.  *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (ordering "the sale of the Store Closure Assets shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease, license, reciprocal easement agreement, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store

13172884 v1

PA00565

Closings or the Sales"); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7,

2014) (ordering that store closing sales be conducted without the further need for compliance with,

among other things, lease provisions); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del.

Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D.

Del. June 13, 2008) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del.

May 30, 2008) (same).

43.     Thus, to the extent that such provisions or restrictions exist in any of the leases of

the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors

conduct the Store Closings without reference to any such restrictive provisions or interference by

any landlords or other persons affected, directly or indirectly, by the Store Closings.

## V.     The Court Should Approve the Abandonment of Certain Property in Connection with Any Liquidation Sales and Lease Rejections

44.     After notice and a hearing, a debtor "may abandon any property of the estate that

is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C.

§ 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating

that a trustee "may abandon his claim to any asset, including a cause of action, he deems less

valuable than the cost of asserting that claim").

45.     The Debtors are seeking to sell all M&E remaining in the Closing Stores.  However,

the Debtors may determine that the costs associated with holding or selling certain property or

M&E exceeds the proceeds that will be realized upon its sale or that such property is not sellable

at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may

be burdensome to retain.

46.     To maximize the value of the Debtors' assets and to minimize the costs to the

estates, the Debtors respectfully request authority to abandon any of their remaining M&E or other

PA00566

property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned M&E or other property be authorized to dispose of such property without liability to any third parties.

47.     Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that, alone or in conjunction with other information, identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

## VI.     The Store Closing Bonus Plan Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved

48.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a debtor to use property of the estate when such use has a "sound business purpose" and when the use of the property is proposed in good faith.  *See In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

49.     Courts generally require a debtor to demonstrate that a valid business purpose exists for the use of estate property in a manner that is outside the ordinary course of business.  *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).  The debtor's articulation of a valid business justification raises a presumption that the debtor's decision was made on an informed basis, in good faith, and with the honest belief that the action is in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Furthermore, once "the

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule shields a debtor's management from judicial second-guessing. *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615–16 (noting that "the Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the actions in question should be approved under section 363(b)(1) of the Bankruptcy Code.

50. In this case, the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors and their estates. The store employees—along with their skills, knowledge, and hard work—are more critical now than ever. Through their commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and at a time when those employees' positions will soon be terminated.

51. Additionally, the total cost of the Store Closing Bonus Plan is reasonable in light of competitive market practice and involves compensation structures often used in other restructuring situations to incentivize employees to continue optimal performances despite the added stress inherent in the chapter 11 process.

52. The Store Closing Bonus Plan is comparable to employee incentive plans regularly paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed sales. As in those other instances, the specific Store Closing Bonus Plan here was devised with the input of the Consultant based on its views of maximizing the sale process and recoveries for creditors.

------

13172884 v1

As such, courts have approved incentive payments similar to those contemplated by the Store Closing Bonus Plan. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing store closing retention bonus program on a final basis); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Toys "R" Us, Inc.*, No. 17- (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re rue21, Inc.*, No. 17-22045 (GLT) (Bankr. W.D. Pa. June 12, 2017) (same); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 9, 2017) (same).

53. The Debtors respectfully submit that the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and should be approved pursuant to section 363 of the Bankruptcy Code as in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

**VII. The Court Should Authorize the Assumption of the Consulting Agreement.**

54. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract . . . of the debtor." The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract is whether the debtor's reasonable business judgment supports such assumption or rejection. *See, e.g.*, *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard, and that such decision may only be overturned if found to be a product of bad faith, whim, or caprice); *see also In re Market Square Inn Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

55. The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

PA00569

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.3d 1301, 1311 (5th Cir. 1985).

56.      Assumption of the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment. In consultation with their advisors, the Debtors have determined that the stores to be closed are unduly burdensome, and the Merchandise and the M&E should be liquidated for the benefit of the Debtors' estates and their creditors. The Store Closings are already in progress. The Debtors determined that entering into the Consulting Agreement, after engaging in extensive negotiations with the Consultant and their prepetition lenders, will provide the greatest return to the Debtors' estates for the Merchandise and the M&E. The Debtors believe, in their business judgment, that the terms set forth in the Consulting Agreement constitute the best available alternative for the conduct of the Store Closings and Sales.

57.      The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closings in an efficient and cost-effective manner. Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closings for the benefit of all stakeholders. Given the number of stores and the particular issues in administering the Store Closings, the Debtors may not be able to retain a liquidator able to conduct the process as efficiently and effectively as the Consultant, who already has significant experience

13172884 v1

PA00570

with the Debtors' business operations and outlay of stores.  If the Consulting Agreement is not approved, operative, and effective on an interim basis, the Store Closings would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to a loss of additional liquidity and increased administrative expenses.  Moreover, it is imperative that the Consulting Agreement be approved on an interim basis so that the Debtors and the Consultant can immediately begin conducting the Store Closings and closing stores in accordance with the Store Closing Procedures, which will generate more proceeds for the Debtors and their estates.

**VIII.   The Court Should Authorize the Retention of the Consultant
Pursuant to Section 327(a) in Connection with Assumption
of the Consulting Agreement.**

58.    The Debtors have selected the Consultant because they believe that the Consultant has developed an expertise in such matters that will significantly enhance the value recovered for the Assets, whether through the disposition of such through the conduct of strategic store closings for the Merchandise and the M&E, or through targeting marketing of the other Assets through their various divisions having an expertise in each such asset categories.  Each entity comprising the Consultant is familiar with retail businesses generally, and the Debtors' business operations specifically, and are well regarded and a leader in the distressed asset acquisition and disposition field.

59.    The Debtors believe the employment of the Consultant as asset disposition consultants and advisors is in the best interest of the Debtors and their creditors since the Consultant will provide invaluable services as the Debtors attempt to maximize the realizable value recovered for its business and assets.  The matters for which the Consultant is to be engaged are matters in which no other professional employed in this case will render services duplicative of the services rendered by the Consultant.

PA00571

60. Based on the information the Consultant has to date provided to the Debtors, the Debtors believe that the Consultant does not hold an interest adverse to either the Debtors or their estates, and with respect to the subject matter on which the Consultant has been engaged is a "disinterested person" pursuant to sections 327(a) and 101(14) of the Bankruptcy Code.

61. As is customary in this district, each entity comprising the Consultant will file declarations of their connections prior to the final hearing on this Motion (the "Consultant's Declarations").

62. To the best of the Debtors' knowledge, and except as may be disclosed in the respective Consultant Declarations when filed, the Consultant has not provided services to the Debtors' creditors, equity security holders, or any other parties-in-interest, or its respective attorneys, in any matter relating to the Debtors or their estates.

63. The Debtors respectfully requests that the Consultant be retained in conjunction with the Court's approval of the assumption of the Consulting Agreement, *nunc pro tunc* to the Petition Date. Since the Petition Date, the Consultant has provided valuable services that were time sensitive and critical to protection of the interests of the Debtors' stakeholders.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

64. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, authorizing the Debtors reject certain unexpired leases, approving store closing or similar themed sales in accordance with the Store Closing Procedures, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief

34

requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations, and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Reservation of Rights

65.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

13172884 v1

PA00573

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

66.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

67.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) the Dispute Notice Parties; (g) all of the Debtors' landlords at the locations of the Closing Stores, and counsel thereto, if known; and (h) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

68.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

13172884 v1

PA00574

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the form**s** attached hereto as **Exhibit A** and **Exhibit B,** respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated: March 9, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_____ _/s/ Gregory W. Werkheiser_ _____
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

13172884 v1

PA00575

# EXHIBIT A

PA00576

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **Re: Docket No. _____** |

## INTERIM ORDER GRANTING DEBTORS'
## EMERGENCY MOTION FOR ENTRY OF INTERIM AND
## FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE
## CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO
## EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION
## OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE
## BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO
## RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET
## DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A)
## OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (a) authorizing and approving the conduct of store closing or similar themed sales in accordance with the terms of the store closing procedures (the "Store Closing Procedures") attached hereto as **Exhibit 1**, with such sales to be free and clear of all liens, claims and encumbrances; (b) authorizing the Debtors to conduct the Store Closings; (c) authorizing the Debtors to pay customary bonuses to employees of Closing Stores; (d) authorizing the Debtors to assume the Consulting Agreement; (e)

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVCE, LLC (2509); AVF Franchising, LLC (6325); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); LF Trucking, Inc. (1484); and Sam Levin, Inc. (5198).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

PA00577

authorizing the Debtors to retain the Consultant as special asset disposition advisor pursuant ot Section 327(a) fo the bankruptcy Code; (f) scheduling a final hearing to consider approval of the Motion on a final basis; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

A.    The Debtors have advanced sound business reasons for seeking to implement the Store Closing Procedures and assume the Consulting Agreement, as set forth in the Motion and at the Hearing, and such relief is in the best interests of the Debtors and their estates.

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

13172880 v2

PA00578

B.     The Store Closing Procedures are reasonable, and the conduct of the Closing Sales in accordance with the Store Closing Procedures will provide an efficient means for the Debtors to dispose of the Merchandise and the M&E and will maximize the returns on the Merchandise and the M&E.

C.     The Consulting Agreement was negotiated, proposed, and entered into by the Debtors and the Consultant without collusion, in good faith, and from arm's-length bargaining positions, and the operation and effectiveness of the Consulting Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

D.     The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.     The Store Closings and Closing Sales are in the best interest of the Debtors' estates.

F.     The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is HEREBY ORDERED THAT:

1.     The Motion is granted on an interim basis as provided herein.

2.     The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2020, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2020, and shall be served on:   (a) the Debtors, 6500 14 Mile Road, Warren, Michigan 48092, Attn:  Michael Zambricki; (b) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (c)

proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (d) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (e) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (f) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (g) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (h) counsel to any statutory committee appointed in these chapter 11 cases.. In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

3.     The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan.

4.     The Debtors and the Consultant are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion. The failure to specifically include any provision of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments, and transactions be, and hereby are, authorized and approved as and to the extent provided in this Interim Order.

PA00580

5. To the extent of any conflict between this Interim Order, the Consulting Agreement, and the Store Closing Procedures, the terms of this Interim Order shall control.

6. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

**I.    Authority to Engage in Closing Sales and Conduct Store Closings.**

7. The Debtors and the Consultant are authorized, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct Closing Sales at the Closing Stores in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

8. The Store Closing Procedures are approved in their entirety on an interim basis.

9. The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

10. All entities that are presently in possession of some or all of the Merchandise or M&E in which the Debtors hold an interest that are hereby are directed to surrender possession of such Merchandise or M&E to the Debtors.

11. Neither the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Closing Sales and to take the related actions authorized herein.

**II.   Conduct of the Sales.**

12. All media in which the Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Closing Sales and the sale of Merchandise, M&E, and Additional Consultant Goods, including, without limitation, to conduct and advertise the sale of the

PA00581

Merchandise, M&E, and Additional Consultant Goods in the manner contemplated by and in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

13.     The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Store Closings without necessity of further order of this Court as provided in this Interim Order, the Store Closing Procedures, and the Consulting Agreement, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, and street signage; *provided*, *however*, that only Debtor-approved terminology will be used at each Closing Store in connection with the Sales.

14.     The Consultant is authorized to supplement the Merchandise in the Closing Stores with Additional Consultant Goods, provided that any such supplementing with Additional Consultant Goods must be of like kind and no lesser quality than goods sold in the Closing Stores prior to the Petition Date.  Sales of Additional Consultant Goods shall be run through the Debtors' cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  The Consultant and Merchant shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods from the Merchandise.

15.     All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Consultant to the Debtors

under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. At all times and for all purposes, the Additional Consultant Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Consultant Goods or the proceeds thereof. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultant. The Debtors shall, at Consultant's sole cost and expense, insure Additional Consultant Goods and, if required, promptly file any proofs of loss with regard thereto.

16.     Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected on a interim basis pursuant to this Interim Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional Consultant Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds). As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Consultant Goods to the Consultant, net of any fee payable to the Debtors pursuant to the Consulting Agreement.

17.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, M&E, and

PA00583

Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing, or (b) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18.     The sale of the Merchandise, M&E, and Additional Consultant Goods shall be conducted by the Debtors notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Closing Sales (including the sale of the Merchandise, M&E, and Additional Consultant Goods) and the rejection of leases, abandonment of assets, or "going dark" provisions, and such provisions shall not be enforceable in conjunction with the Sales or the Store Closings. Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Closing Sales are conducted in accordance with the terms of this Interim Order and the Store Closing Procedures.

19.     Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs 22 and 23 shall apply) no person or entity, including, but not limited to, any landlord, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Closing Sales or the sale of merchandise, M&E, or Additional Consultant Goods, or the advertising and promotion (including the posting of signs and exterior banners or

13172880 v2

PA00584

the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding the conduct of the Closing Sales and/or Store Closings, and/or (b) instituting any action or proceeding in any court (other than this Court) or administrative body seeking an order or judgment against, among others, the Debtors, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Closing Sales or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.    In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Interim Order.

21.    All sales of Merchandise, M&E and Additional Consultant Goods shall be "as is" and final.  Returns related to the purchase of Store Assets shall not be accepted at stores that are not participating in the Store Closings.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.    The Consultant shall not be liable for sales taxes except wither respect to the Additional Consultant Goods, and  as expressly provided in the Consulting Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors, subject to Consultant's

obligation to collect and remit the sales taxes attributable to the sale of Additional Consultant Goods. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit. For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. This Interim Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell Store Assets—and all sales of Store Assets whether by the Consultant or the Debtors, shall be—free and clear of any and all of any liens, claims, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-

PA00586

contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances")s; as provided for herein because in each case, one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied; *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of the Merchandise and the M&E with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Merchandise and the M&E, subject to any claims and defenses that any party may possess with respect thereto and subject to the Consultant's fees and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon M&E that may contain personal and/or confidential information about the Debtors' employees and/or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of M&E before such sale or abandonment.

25.     The Debtors are authorized and empowered to transfer merchandise, M&E and Additional Consultant Goods among, and into, the Stores.

## III.     Dispute Resolution Procedures with Governmental Units.

26.     Nothing in this Interim Order, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including,

PA00587

without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Nothing in this Interim Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations. Nothing in this Interim Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the bankruptcy Code or this Interim Order. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

27.     To the extent that the sale of Merchandise, M&E, and Additional Consultant Goods is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the merchandise, M&E, and Additional Consultant Goods, the Dispute Resolution Procedures in this section shall apply:

      a.     Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing

PA00588

Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.    Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; (iv) the division of consumer protection for each state in which the Closing Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Closing Sales are being held (collectively, the "Dispute Notice Parties").

c.    With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036; (iii) the United States Trustee's Office for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) counsel to the Prepetition Term Loan Lenders, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf. If the Debtors and the Governmental Unit are unable to resolve the Reserved

Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.      In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.      If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

28.     Subject to paragraphs 22 and 23 above, each and every federal, state, or local agency, departmental unit, or Governmental Unit with regulatory authority over the Closing Sales, and all newspapers and other advertising media in which the Closing Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors be required, to post any bond, to conduct the Sales.

13172880 v2

PA00590

29.     Within three business days of this Interim Order, the Debtors shall serve copies of this Interim Order, and the Store Closing Procedures via e-mail, facsimile, or regular mail, on: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) all parties who are known by the Debtors to assert liens against the Merchandise and the M&E ; (g) all state attorneys general in which the Merchandise and the M&E  are located; (h) municipalities in which the Merchandise and the M&E are located; (i) all of the Debtors' landlords at the locations of the Stores; (j) all applicable state and consumer protection agencies; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## IV.     Effectiveness of the Consulting Agreement.

30.     The Consulting Agreement is operative and effective on an interim basis.  The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including, without limitation, reimbursing all expenses to the Consultant as required by the Consulting Agreement without the need for any application of the Consultant or a further order of the Court.  For avoidance of doubt, the Debtors are also authorized to fund the Expense Deposit in accordance with the terms of the Consulting Agreement.

31.     The treatment of Pre-SCD Orders, including the Cancelled Back-Order Merchandise Credit, described in the Consulting Agreement is a sound exercise of the Debtors' business judgment, complies with applicable law, and is hereby approved, subject to entry of the Final Order.

13172880 v2

PA00591

32.     Subject to the restrictions set forth in this Interim Order and the Store Closing Procedures, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement, the Store Closings, and the Closing Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and the Closing Sales prior to the date hereof, are hereby approved and ratified.  The failure to specifically include any particular provision of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Consulting Agreement and all of its provisions, payments, and transactions, be and hereby are authorized and approved as and to the extent provided for in this Interim Order.

33.     Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of any act or omission by the Consultant constituting fraud, gross negligence, or willful misconduct.

**V.     Debtors are Authorized to Retain Consultant as Special Asset Disposition Consultant Pursuant to the Consulting Agreement.**

34.     The This Court is satisfied that the Consultant represents and holds no interest adverse to the Debtors or their estates, and that the Consultant will not represent any other entity in connection with these cases and that its employment is necessary and would be in the best interests of the Debtors and the estates.  Accordingly, pursuant to sections 327(a), 330 and 331 of Bankruptcy Code, the Debtors be, and hereby are, authorized to retain the Consultant as their special asset disposition advisors and consultants, to assist the Debtors in the marketing and sale process for the Assets in accordance with the Consulting Agreement; provided however, it is agreed and understood that no fees shall be payable to the Consultant in connection with Services

rendered by it to the Debtors pursuant to the Consulting Agreement, and other than the right to reimbursement of Consultant Incurred Expenses, Consultant shall have to claim or right to payment from the Company; provided further however, Consultant shall not be required to file a fee application for reimbursement of the Consultant Incurred Expenses. Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, however, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible

## VI. Other Provisions.

35. The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

36. The Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, *however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible.

37. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or

17

PA00593

(g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Interim Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens. Any payment made pursuant to this Interim Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

38. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

39. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

40. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

41. Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

42. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

43. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords for protection from interference with the Store

18

PA00594

Closings or Closing Sales, (c) any other disputes related to the Store Closings or Closing Sales, and (d) protect the Debtors against any assertions of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action against the Debtors, the landlords, the Store Closings, or the Closing Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

13172880 v2

PA00595

# EXHIBIT 1

PA00596

# **Store Closing Procedures**[1]

1.      The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.      The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.      The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]      Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores.  In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease.  No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E.  The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines.  The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

PA00598

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

PA00599

**EXHIBIT B**

**Proposed Final Order**

PA00600

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **Re: Docket No. _____** |

**FINAL ORDER GRANTING DEBTORS'
EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE
CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO
EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION
OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE
BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO
RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET
DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A)
OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession

(collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Final Order</u>"):  (a)  authorizing and

approving the conduct of store closing or similar themed sales in accordance with the terms of the

store closing procedures (the "<u>Store Closing Procedures</u>") attached hereto as **Exhibit 1**, with such

sales to be free and clear of all liens, claims and encumbrances; (b) authorizing the Debtors to

conduct the Store Closings; (c) authorizing the Debtors to pay customary bonuses to employees of

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVCE, LLC (2509); AVF Franchising, LLC (6325); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); LF Trucking, Inc. (1484); and Sam Levin, Inc. (5198).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

2

Closing Stores; (d) authorizing the Debtors to assume the Consulting Agreement; (e) authorizing the Debtors to retain the Consultant as special asset disposition advisor pursuant to Section 327(a) of the Bankruptcy Code; (f) scheduling a final hearing to consider approval of the Motion on a final basis; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

13172872 v1

PA00602

A.      The Debtors have advanced sound business reasons for seeking to implement the Store Closing Procedures and assume the Consulting Agreement, as set forth in the Motion and at the Hearing, and such relief is in the best interests of the Debtors and their estates.

B.      The Store Closing Procedures are reasonable, and the conduct of the Closing Sales in accordance with the Store Closing Procedures will provide an efficient means for the Debtors to dispose of the Merchandise and the M&E and will maximize the returns on the Merchandise and the M&E.

C.      The Consulting Agreement was negotiated, proposed, and entered into by the Debtors and the Consultant without collusion, in good faith, and from arm's-length bargaining positions, and the operation and effectiveness of the Consulting Agreement on a final basis is a sound exercise of the Debtors' business judgment.

D.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.      The Store Closings and Closing Sales are in the best interest of the Debtors' estates.

F.      The entry of this Final Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as provided herein.

2.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

3.      The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan.

13172872 v1

PA00603

4.      The Debtors and the Consultant are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.  The failure to specifically include any provision of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments, and transactions be, and hereby are, authorized and approved as and to the extent provided in this Final Order.

5.      To the extent of any conflict between this Final Order, the Consulting Agreement, and the Store Closing Procedures, the terms of this Final Order shall control.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of the Final Order are immediately effective and enforceable upon its entry.

## I.      Authority to Engage in Closing Sales and Conduct Store Closings.

7.      The Debtors and the Consultant are authorized, on a final pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to continue and conduct Closing Sales at the Closing Stores in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement as may be modified by a Side Letter (as defined below) between the Debtors and the landlords at the closing locations.

8.      The Store Closing Procedures are approved in their entirety on a final basis. The Store Closing Procedures shall be used for all permitted store closings in these chapter 11 cases, unless otherwise ordered.

9.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement.

10.      All entities that are presently in possession of some or all of the Merchandise or M&E in which the Debtors hold an interest that are or may be subject to this Final Order hereby are directed to surrender possession of such Merchandise or M&E to the Debtors.

13172872 v1

PA00604

11.     Neither the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Closing Sales and to take the related actions authorized herein.

**II.     Conduct of the Sales.**

12.     All media in which the Closing Sales may be advertised and all landlords are directed to accept this Final Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Closing Sales and the sale of Merchandise, M&E, and Additional Consultant Goods, including, without limitation, to conduct and advertise the sale of the Merchandise, M&E, and Additional Consultant Goods in the manner contemplated by and in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement.

13.     The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Store Closings without necessity of further order of this Court as provided in this Final Order,  the Store Closing Procedures, and the Consulting Agreement, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, and street signage; *provided*, *however*, that only Debtor-approved terminology will be used at each Closing Store in connection with the Sales.

14.     The Consultant is authorized to supplement the Merchandise in the Closing Stores with Additional Consultant Goods, provided that any such supplementing with Additional Consultant Goods must be of like kind and no lesser quality than goods sold in the Closing Stores prior to the Petition Date.  Sales of Additional Consultant Goods shall be run through the Debtors'

6

PA00605

cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. The Consultant and Merchant shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods from the Merchandise.

15.     All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Consultant to the Debtors under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. At all times and for all purposes, the Additional Consultant Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Consultant Goods or the proceeds thereof. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultant. The Debtors shall, at Consultant's sole cost and expense, insure Additional Consultant Goods and, if required, promptly file any proofs of loss with regard thereto.

16.     Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected on an final pursuant to this Final Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional

13172872 v1

PA00606

Consultant Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds). As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Consultant Goods to the Consultant, net of any fee payable to the Debtors pursuant to the Consulting Agreement.

17.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, M&E, and Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing, or (b) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18.     The sale of the Merchandise, M&E, and Additional Consultant Goods shall be conducted by the Debtors notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Closing Sales (including the sale of the Merchandise, M&E, and Additional Consultant Goods) and the rejection of leases, abandonment of assets, or "going dark" provisions, and such provisions shall not be enforceable in conjunction with the Sales or the Store Closings. Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Closing Sales are conducted in

8

PA00607

accordance with the terms of this Final Order and the Store Closing Procedures. Subject to the approval of the Secured Lenders, the Debtors and landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Store Closing Procedures without further order of the Court and such Side Letters shall be binding as among the Debtors and any such landlords. In the event of any conflict between the Store Closing Procedures and any Side Letter, the terms of such Side Letter shall control.

19.     Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs  and  shall apply) no person or entity, including, but not limited to, any landlord, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Closing Sales or the sale of Merchandise, M&E, or Additional Consultant Goods, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding the conduct of the Closing Sales and/or Store Closings, and/or (b) instituting any action or proceeding in any court (other than this Court) or administrative body seeking an order or judgment against, among others, the Debtors, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Closing Sales or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

PA00608

20.     In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Order.

21.     All sales of Merchandise, M&E and Additional Consultant Goods shall be "as is" and final.  Returns related to the purchase of Store Assets shall not be accepted at stores that are not participating in the Store Closings.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.     The Consultant shall not be liable for sales taxes except with respect to the Additional Consultant Goods, and  as expressly provided in the Consulting Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors, subject to Consultant's obligation to collect and remit the sales taxes attributable to the sale of Additional Consultant Goods.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  This Final Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

13172872 v1

PA00609

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell Store Assets—and all sales of Store Assets whether by the Consultant or the Debtors, shall be—free and clear of any and all of any liens, claims, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances")s; as provided for herein because in each case, one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied; *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of the Merchandise and the M&E with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Merchandise and the M&E, subject to any claims and defenses that any party may possess with respect thereto and subject to the Consultant's and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon M&E that may contain personal and/or confidential information about the Debtors' employees and/or customers

PA00610

(the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of M&E before such sale or abandonment.

25.     The Debtors are authorized and empowered to transfer merchandise, M&E and Additional Consultant Goods among, and into, the Stores.

**III.     Dispute Resolution Procedures with Governmental Units.**

26.     Nothing in this Final Order, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Final Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Final Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Final Order.  Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with

13172872 v1

respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

27.     To the extent that the sale of Merchandise, M&E, and Additional Consultant Goods is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the merchandise, M&E, and Additional Consultant Goods, the Dispute Resolution Procedures in this section shall apply:

    a.     Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

    b.     Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following:  (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; (iv) the division of consumer protection for each state in which the Closing Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Closing Sales are being held (collectively, the "Dispute Notice Parties").

    c.     With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store

List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036; (iii) the United States Trustee's Office for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) counsel to the Prepetition Term Loan Lenders, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.      In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any

13172872 v1

PA00613

jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.    If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

28.    Subject to paragraphs ___ and ___ above, each and every federal, state, or local agency, departmental unit, or Governmental Unit with regulatory authority over the Closing Sales, and all newspapers and other advertising media in which the Closing Sales are advertised shall consider the Final Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors be required, to post any bond, to conduct the Sales.

29.    Within three business days of the Final Order, the Debtors shall serve copies of the Final Order, and the Store Closing Procedures via e-mail, facsimile, or regular mail, on: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) all parties who are known by the Debtors to assert liens against the Merchandise and the M&E ; (g) all state attorneys general in which the Merchandise and the M&E are located; (h) municipalities in which the Merchandise and the M&E are located; (i) all of the Debtors' landlords at the locations of the Stores; (j) all applicable state and consumer protection agencies; and (k) any party that has requested notice pursuant to

Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**IV.     Effectiveness of the Consulting Agreement.**

30.     The Consulting Agreement is operative and effective on a final basis.  The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including, without limitation, reimbursing all expenses to the Consultant as required by the Consulting Agreement without the need for any application of the Consultant or a further order of the Court.  For avoidance of doubt, the Debtors are also authorized to fund the Expense Deposit in accordance with the terms of the Consulting Agreement.

31.     The treatment of Pre-SCD Orders, including the Cancelled Back-Order Merchandise Credit, described in the Consulting Agreement is a sound exercise of the Debtors' business judgment, complies with applicable law, and is hereby approved, subject to entry of the Final Order.

32.     Subject to the restrictions set forth in this Final Order Order and the Store Closing Procedures, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement, the Store Closings, and the Closing Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and the Closing Sales prior to the date hereof, are hereby approved and ratified.  The failure to specifically include any particular provision of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Consulting Agreement and all of its provisions, payments, and transactions, be and hereby are authorized and approved as and to the extent provided for in this Final Order.

13172872 v1

PA00615

33. Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of any act or omission by the Consultant constituting fraud, gross negligence, or willful misconduct.

**V.     Debtors are Authorized to Retain Consultant as Special Asset Disposition Consultant Pursuant to the Consulting Agreement.**

34. The This Court is satisfied that the Consultant represents and holds no interest adverse to the Debtors or their estates, and that the Consultant will not represent any other entity in connection with these cases and that its employment is necessary and would be in the best interests of the Debtors and the estates. Accordingly, pursuant to sections 327(a), 330 and 331 of Bankruptcy Code, the Debtors be, and hereby are, authorized to retain the Consultant as their special asset disposition advisors and consultants, to assist the Debtors in the marketing and sale process for the Assets in accordance with the Consulting Agreement; provided however, it is agreed and understood that no fees shall be payable to the Consultant in connection with Services rendered by it to the Debtors pursuant to the Consulting Agreement, and other than the right to reimbursement of Consultant Incurred Expenses, Consultant shall have to claim or right to payment from the Company; provided further however, Consultant shall not be required to file a fee application for reimbursement of the Consultant Incurred Expenses. Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, however, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible

**VI.     Other Provisions.**

35. The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

13172872 v1

36.     The Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, *however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible.

37.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Final Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens. Any payment made pursuant to this Final Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

38.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

39.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

13172872 v1

PA00617

40. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

41. Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

42. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

43. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords for protection from interference with the Store Closings or Closing Sales, (c) any other disputes related to the Store Closings or Closing Sales, and (d) protect the Debtors against any assertions of any liens, claims, encumbrances, and other interests. No such parties or person shall take any action against the Debtors, the landlords, the Store Closings, or the Closing Sales until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

13172872 v1

PA00618

# **EXHIBIT 1**

PA00619

## Store Closing Procedures[1]

1. The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2. The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3. On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4. At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5. The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6. The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1] Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores.  In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease.  No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E.  The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines.  The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

PA00621

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

PA00622

# EXHIBIT 2

PA00623

Art Van Furniture
Results - Store Count Strategy by Location

| | | |
|---|---|---|
| 169 | # Stores included in liquidation | Yes |
| 2 | # stores closed prior to sale commencement | No |

*Financial Information in ($000's)*

| Location Information | | | | | | | | | | | | | Location Space Details | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store # | Store Name | Original Store Name | Include in Liquidation | Direct Marketing Area | Store Type | Company Affiliation | Gross Sq. Ft. | Selling Sq. Ft. | Lease Beginning Date | Lease Expire. | Months Remaining | SLB Property | Landlord | Master Lease | Address |
| 1 | Bel Air, MD (1) | BEL AIR (#65) | Yes | Baltimore | Standard | WLF | 74,400 | 62,000 | 5/15/2015 | 12/31/2025 | 70 | No | CAMPUS HILLS MARYLAND ASSOCIATES, L.P. | None | 2400 E Churchville Rd, Bel Air, MD, 21015, USA |
| 2 | Pasadena, MD (2) | PASADENA (#61) | Yes | Baltimore | Standard | WLF | 61,646 | 54,000 | 5/15/2015 | 8/31/2025 | 66 | No | ARUNDEL PROPERTY INVESTORS LP | None | 8038 Ritchie Hwy, Pasadena, MD, 21122, USA |
| 3 | Westminster, MD (3) | WESTMINSTER (#64) | Yes | Baltimore | Standard | WLF | 40,550 | 38,000 | 5/15/2015 | 8/31/2021 | 18 | No | WESTMINSTER GATEWAY, LLC | None | 1030 Baltimore Blvd Suite 110, Westminster, MD, 21157, USA |
| 4 | Towson, MD (4) | TOWSON (#63) | Yes | Baltimore | Standard | WLF | 54,000 | 46,000 | 5/15/2015 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1530 E Joppa Rd, Towson, MD, 21286, USA |
| 5 | Catonsville, MD (5) | CATONSVILLE (#62) | Yes | Baltimore | Standard | WLF | 115,300 | 40,000 | 5/15/2015 | 8/31/2025 | 66 | No | JMB JOINT VENTURE | None | 6415 Baltimore National Pike, Catonsville, MD, 21228, USA |
| 6 | Downers Grove, IL (6) | DOWNERS GROVE AVF & SSI (#199) | Yes | Chicago | Flagship | AVF | 100,000 | 92,428 | 8/1/2015 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1021 BUTTERFIELD RD, DOWNERS GROVE, IL, 60515, USA |
| 7 | Merrillville, IN (7) | MERRILLVILLE AVF | Yes | Chicago | Standard | AVF | 50,000 | 43,130 | 8/24/2013 | 2/28/2023 | 36 | No | ACADIA MERRILLVILLE REALTY, L.P. | None | 1600 E 80TH AVE, MERRILLVILLE, IN, 46410, USA |
| 8 | Naperville, IL (8) | NAPERVILLE AVF | Yes | Chicago | Standard | AVF | 62,000 | 52,753 | 6/18/2015 | 8/31/2025 | 66 | No | BRIXMOR HERITAGE SQUARE, LLC | None | 404 SOUTH ROUTE 59, NAPERVILLE, IL, 60540, USA |
| 9 | Bedford Park, IL (9) | BEDFORD PK AVF | Yes | Chicago | Standard | AVF | 84,505 | 71,590 | 10/26/2013 | 4/30/2024 | 50 | No | SPIRIT SPE LOAN PORTFOLIO 2013-3, LLC | None | 7200 S CICERO AVE, BEDFORD PARK, IL, 60638, USA |
| 10 | Elston, IL (10) | ELSTON AVE AVF | Yes | Chicago | Standard | AVF | 48,000 | 40,660 | 10/26/2013 | 4/30/2024 | 50 | No | Farbman Group | None | 2606 ELSTON AVE, CHICAGO, IL, 60647, USA |
| 11 | Batavia, IL (11) | BATAVIA AVF | Yes | Chicago | Standard | AVF | 42,500 | 37,055 | 9/14/2013 | 1/31/2024 | 47 | No | PARAGON BATAVIA, LLC | None | 165 N RANDALL RD, BATAVIA, IL, 60510, USA |
| 12 | Orland Park, IL (12) | ORLAND PARK AVF | Yes | Chicago | Standard | AVF | 65,523 | 53,329 | 7/13/2013 | 5/31/2024 | 51 | No | 55th & S. Kedzie, LLC | None | 15080 S LA GRANGE RD, ORLAND PARK, IL, 60462, USA |
| 13 | Algonquin, IL (13) | ALGONQUIN AVF | Yes | Chicago | Standard | AVF | 48,397 | 41,272 | 3/31/2016 | 7/31/2025 | 65 | No | c/o Mid America Asset Management, Inc. | None | 1500 S RANDALL ROAD, ALGONQUIN, IL, 60102, USA |
| 14 | Kildeer, IL (14) | KILDEER AVF | Yes | Chicago | Standard | AVF | 40,628 | 34,534 | 10/4/2017 | 9/30/2027 | 91 | No | Kildeer Village Square, LLC. | None | 20393 N RAND RD, KILDEER, IL, 60074, USA |
| 15 | Glendale Heights, IL (15) | GLENDALE HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,820 | 37,044 | 2/26/2016 | 3/31/2026 | 73 | No | 125 W. Army Trail Road LLC | None | 125 ARMY TRAIL ROAD, GLENDALE HGTS, IL, 60139, USA |
| 16 | Deerfield, IL (16) | DEERFIELD AVF | Yes | Chicago | Standard | AVF | 41,966 | 35,671 | 12/13/2017 | 2/29/2028 | 96 | No | Gateway Fairview, Inc. | None | 120 S. WAUKEGAN, DEERFIELD, IL, 60015, USA |
| 17 | Schaumburg, IL (17) | SCHAUMBURG AVF& SSI (#303) | Yes | Chicago | Flagship | AVF | 71,400 | 61,990 | 10/29/2016 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1293 E HIGGINS RD, SCHAUMBURG, IL, 60173, USA |
| 18 | Joliet, IL (18) | JOLIET PS | Yes | Chicago | Sleep | APS | 3,116 | 2,884 | 12/26/2017 | 12/31/2027 | 94 | No | GW Fidelity PH, LLC | None | 2901 PLAINFIELD, JOLIET, IL, 60435, USA |
| 19 | Burbank, IL (19) | BURBANK PS | Yes | Chicago | Sleep | APS | 3,994 | 3,476 | 3/21/2015 | 3/31/2025 | 61 | No | WM 73 RE, LLC | None | 7712 CICERO AVENUE, BURBANK, IL, 60459, USA |
| 20 | Woodridge, IL (20) | WOODRIDGE AVF | Yes | Chicago | Standard | AVF | 68,400 | 59,687 | 3/27/2014 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 900 E BOUGHTON RD, WOODRIDGE, IL, 60517, USA |
| 21 | Gurnee, IL (21) | GURNEE AVF | Yes | Chicago | Standard | AVF | 34,000 | 28,900 | 6/26/2018 | 12/31/2032 | 154 | No | 3503 RP Gurnee, L.L.C. | None | 6911 W. GRAND AVE, GURNEE, IL, 60031, USA |
| 22 | Plainfield, IL (22) | PLAINFIELD PS | Yes | Chicago | Sleep | APS | 3,600 | 3,290 | 2/11/2017 | 2/28/2027 | 84 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 13511 S ROUTE 59, PLAINFIELD, IL, 60544, USA |
| 23 | Willowbrook, IL (23) | WILLOWBROOK PS | Yes | Chicago | Sleep | APS | 3,834 | 3,400 | 12/3/2016 | 1/31/2027 | 83 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6938 KINGERY HIGHWAY, WILLOWBROOK, IL, 60527, USA |
| 24 | Chicago, IL (24) | ASHLAND PS | Yes | Chicago | Sleep | APS | 3,000 | 2,600 | 9/10/2016 | 9/30/2026 | 79 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 2911 N. ASHLAND AVENUE, CHICAGO, IL, 60657, USA |
| 25 | Bloomingdale, IL (25) | BLOOMINGDALE PS | Yes | Chicago | Sleep | APS | 4,798 | 4,370 | 5/26/2017 | 4/30/2027 | 86 | No | Bloomingdale Square, LP | None | 398 W ARMY TRAIL RD #102, BLOOMINGDALE, IL, 60108, USA |
| 26 | Harwood Heights, IL (26) | HARWOOD HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,000 | 51,000 | 11/15/2017 | 12/31/2038 | 226 | No | DBD AVF | None | 7304 WEST LAWRENCE AVE, HARWOOD HEIGHTS, IL, 60706, U |
| 27 | Avon, OH (27) | AVON (#45, 46 CC) | Yes | Cleveland | Standard | LVF | 77,000 | 72,380 | 7/1/2011 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1801 NAGEL ROAD, AVON, OH, 44011, USA |
| 28 | North Canton, OH (28) | CANTON (#14, 25, 26 CC) | Yes | Cleveland | Standard | LVF | 65,765 | 60,199 | 3/1/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 6229 PROMLER AVENUE NW, NORTH CANTON, OH, 44720, USA |
| 29 | Akron, OH (29) | AKRON (#23, 24 CC) | Yes | Cleveland | Standard | LVF | 69,422 | 65,257 | 10/1/2005 | 9/30/2020 | 7 | No | TABANI AKRON, LP | None | 3742 BROOKWALL DRIVE, AKRON, OH, 44333, USA |
| 30 | Middleburg Heights, OH (30) | MIDDLEBURG (#11, 31 CC) | Yes | Cleveland | Standard | LVF | 50,000 | 45,172 | 7/1/1993 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 16960 SPRAGUE ROAD, MIDDLEBURG HEIGHTS, OH, 44130, US |
| 31 | Mentor, OH (31) | MENTOR (#9, 27, 28 CC) | Yes | Cleveland | Standard | LVF | 75,600 | 70,712 | 7/1/2009 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 7799 MENTOR AVE, MENTOR, OH, 44060, USA |
| 32 | Oakwood Village, OH (32) | OAKWOOD VILLAGE (#18, 19 CC) | Yes | Cleveland | Standard | LVF | 89,723 | 67,723 | 8/1/2002 | 11/30/2027 | 93 | No | FIRST INERNATIONAL HAWTHORNE LP | None | 23100 BROADWAY AVE, OAKWOOD VILLAGE, OH, 44146, USA |
| 33 | North Olmsted, OH (33) | NORTH OLMSTED (#12, 34 CC) | Yes | Cleveland | Standard | LVF | 46,000 | 41,270 | 8/1/1996 | 1/31/2027 | 83 | No | GLITZ AND ASSOCIATES INC | None | 23250 LORAIN ROAD, NORTH OLMSTED, OH, 44070, USA |
| 34 | Strongsville, OH (34) | STRONGSVILLE (#74) | Yes | Cleveland | Sleep | LM | 5,000 | 4,400 | 11/5/2015 | 10/31/2025 | 68 | No | ECHO STRONGSVILLE LLC | None | 16105 PEARL ROAD, STRONGSVILLE, OH, 44136, USA |
| 35 | Mayfield Heights, OH (35) | MAYFIELD (#65) | Yes | Cleveland | Sleep | LM | 4,620 | 4,120 | 5/1/2012 | n/a | n/a | No | JACK H SCHWARTS, TRUSTEE OF THE JACK H | None | 6061 Mayfield Rd, Mayfield Heights, OH, 44124, USA |
| 36 | Stow, OH (36) | STOW (#68) | Yes | Cleveland | Sleep | LM | 4,160 | 3,660 | 10/25/2013 | 1/31/2024 | 47 | No | DEVILLE DEVELOPMENTS LLC | None | 1061 GRAHAM RD, STOW, OH, 44224, USA |
| 37 | Medina, OH (37) | MEDINA (#76) | Yes | Cleveland | Sleep | LM | 4,500 | 4,000 | 8/25/2016 | 9/30/2021 | 19 | No | GOWE LEASING LIMITED | None | 3823 PEARL RD, MEDINA, OH, 44256, USA |
| 38 | Sandusky, OH (38) | SANDUSKY (#73) | Yes | Cleveland | Sleep | LM | 5,400 | 4,900 | 11/14/2014 | 2/28/2025 | 60 | No | PLI II LTD | None | 4917 MILAN RD PLAZA, SANDUSKY, OH, 44870, USA |
| 39 | Elyria, OH (39) | ELYRIA (#72) | Yes | Cleveland | Sleep | LM | 6,400 | 5,800 | 6/19/2015 | 6/30/2026 | 76 | No | ELYRIA-CHESTNUT, LLC / NICKLEPLATE REALT | None | 510 CHESTNUT COMMONS DR, ELYRIA, OH, 44035, USA |
| 40 | Solon, OH (40) | SOLON (#67) | Yes | Cleveland | Sleep | LM | 3,788 | 3,288 | 2/22/2013 | 5/31/2023 | 39 | No | L & y PROPERTIES - SOLON, LLC | None | 6130 KRUSE DRIVE, SOLON, OH, 44139, USA |
| 41 | Canton, OH (41) | MASSILLON (#71) | Yes | Cleveland | Sleep | LM | 5,650 | 5,150 | 6/27/2014 | 11/30/2024 | 57 | No | PERRY TOWN CENTER LLC | None | 5119 WEST TUSCARAWAS ST, CANTON, OH, 44708, USA |
| 42 | Polaris, OH (42) | POLARIS AVF | Yes | Columbus | Flagship | AVF | 70,000 | 59,500 | 3/16/2019 | 10/31/2037 | 212 | Yes | STORE CAPITAL | Other | 1551 GEMINI PLACE, COLUMBUS, OH, 43240, USA |
| 43 | Novi, MI (43) | NOVI AVF | Yes | Detroit | Flagship | AVF | 102,520 | 88,958 | 1/1/1985 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 27775 NOVI RD, NOVI, MI, 48377, USA |
| 44 | Warren, MI (44) | TECH PLAZA AVF | Yes | Detroit | Flagship | AVF | 109,380 | 87,859 | 11/26/1982 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 6500 E 14 MILE RD, WARREN, MI, 48092, USA |
| 45 | Shelby Township, MI (45) | LAKESIDE AVF | Yes | Detroit | Flagship | AVF | 68,104 | 72,336 | 8/14/1992 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 14055 HALL RD, SHELBY TOWNSHIP, MI, 48315, USA |
| 46 | Canton, MI (46) | CANTON AVF | Yes | Detroit | Flagship | AVF | 69,929 | 58,740 | 1/3/2018 | 12/31/2038 | 226 | Yes | Agree Limited Partnership | None | 41661 FORD ROAD, CANTON, MI, 48187, USA |
| 47 | Taylor, MI (47) | TAYLOR AVF | Yes | Detroit | Flagship | AVF | 91,720 | 79,294 | 3/6/1978 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 22035 EUREKA RD, TAYLOR, MI, 48180, USA |
| 48 | Ann Arbor, MI (48) | ANN ARBOR AVF | Yes | Detroit | Flagship | AVF | 70,000 | 60,912 | 7/2/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 425 E EISENHOWER PKWY, ANN ARBOR, MI, 48108, USA |
| 49 | Southfield, MI (49) | SOUTHFIELD AVF | Yes | Detroit | Standard | AVF | 64,584 | 52,094 | 11/1/2000 | 7/31/2023 | 41 | No | GREENFIELD PLAZA, INC. | None | 22555 GREENFIELD RD, SOUTHFIELD, MI, 48075, USA |
| 50 | Royal Oak, MI (50) | WOODWARD AVF & SSI (#174) | Yes | Detroit | Standard | AVF | 56,520 | 54,943 | 11/14/1997 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 32301 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 51 | Clinton Twp, MI (51) | CLINTON AVF | Yes | Detroit | Flagship | AVF | 69,720 | 60,128 | 1/1/1988 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 33801 S GRATIOT AVE, CLINTON TWP, MI, 48035, USA |
| 52 | Chesterfield, MI (52) | CHESTERFIELD AVF | Yes | Detroit | Standard | AVF | 73,152 | 58,029 | 12/26/2003 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 50400 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 53 | Howell, MI (53) | HOWELL AVF | Yes | Detroit | Standard | AVF | 51,075 | 45,721 | 11/1/1997 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4101 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 54 | Waterford, MI (54) | DRAYTON PLAINS AVF | Yes | Detroit | Standard | AVF | 53,188 | 57,435 | 6/30/1971 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 5053 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 55 | Dearborn, MI (55) | DEARBORN AVF | Yes | Detroit | Standard | AVF | 57,633 | 58,164 | 7/11/1997 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN CAPITAL PARTNERS, LLC | 15701 MARKET DR, DEARBORN, MI, 48126, USA |
| 56 | Auburn Hills, MI (56) | GREAT LAKES AVF | Yes | Detroit | Standard | AVF | 43,319 | 37,296 | 1/1/2011 | 1/31/2021 | 11 | No | Taubman Auburn Hills Associates Limited Partnersh | None | 4612 BALDWIN RD, AUBURN HILLS, MI, 48326, USA |
| 57 | Port Huron, MI (57) | PORT HURON AVF | Yes | Detroit | Standard | AVF | 74,800 | 59,123 | 9/20/2002 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1234 32ND ST, PORT HURON, MI, 48060, USA |
| 58 | Rochester Hills, MI (58) | ROCHESTER AVF | Yes | Detroit | Standard | AVF | 48,621 | 41,328 | 5/16/2019 | 11/30/2033 | 165 | No | Rochester KM Partners, LLC | None | 1032 SOUTH ROCHESTER ROAD, ROCHESTER, MI, 48307, USA |
| 59 | Livonia, MI (59) | 7 MILE AVF | Yes | Detroit | Standard | AVF | 61,752 | 53,795 | 1/1/1985 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 29905 7 MILE RD, LIVONIA, MI, 48152, USA |
| 60 | Warren, MI (60) | SCHOENHERR AVF | Yes | Detroit | Standard | AVF | 38,795 | 41,890 | 1/19/1972 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 13855 E 8 MILE RD, WARREN, MI, 48089, USA |
| 61 | Westland, MI (61) | WESTLAND AVF | Yes | Detroit | Standard | AVF | 79,773 | 70,723 | 4/14/1987 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 8300 N WAYNE RD, WESTLAND, MI, 48185, USA |
| 62 | Ann Arbor, MI (62) | ANN ARBOR W PS | Yes | Detroit | Sleep | APS | 4,600 | 4,079 | 9/1/2011 | 8/31/2021 | 18 | No | BRIXMOR Holdings 1 SPE, LLC | None | 2570 JACKSON AVE, ANN ARBOR, MI, 48103, USA |
| 63 | Rochester, MI (63) | ROCHESTER PS | Yes | Detroit | Sleep | APS | 5,000 | 4,474 | 6/1/2010 | 7/31/2020 | 5 | No | McKnight South East, LP c/o McKnight Property Mar | None | 1856 S ROCHESTER RD, ROCHESTER, MI, 48307, USA |
| 64 | Grosse Pointe Woods, MI (64) | GROSSE POINTE SOUTH PS | Yes | Detroit | Sleep | APS | 3,500 | 2,688 | 3/1/2018 | 2/29/2028 | 96 | No | Ryder Investments | None | 19387 MACK AVE, GROSSE POINTE, MI, 48236, USA |
| 65 | Warren, MI (65) | WARREN E PS | Yes | Detroit | Sleep | APS | 5,072 | 4,507 | 5/16/2011 | 6/30/2022 | 28 | No | WARREN VILLAGE, LLC | None | 6400 14 MILE RD, WARREN, MI, 48092, USA |
| 66 | Sterling Hgts, MI (66) | STERLING HTS PS | Yes | Detroit | Sleep | APS | 4,014 | 3,672 | 2/9/2013 | 2/28/2023 | 36 | No | EASTLAKE COMMONS ASSOCIATES, LLC | None | 44975 HAYES RD, STERLING HTS, MI, 48313, USA |
| 67 | Washington, MI (67) | WASHINGTON PS | Yes | Detroit | Sleep | APS | 4,000 | 3,425 | 5/16/2011 | 10/31/2021 | 20 | No | AF Jonna Development & Management Company, L | None | 7887 26 MILE ROAD, WASHINGTON, MI, 48094, USA |
| 68 | Southgate, MI (68) | SOUTHGATE PS | Yes | Detroit | Sleep | APS | 5,117 | 4,768 | 1/16/2016 | 3/31/2021 | 13 | No | BRANDON ASSOCIATES SOUTHGATE L.L.C. | None | 15060 DIX TOLEDO RD, SOUTHGATE, MI, 48195, USA |
| 69 | Canton, MI (69) | CANTON PS | Yes | Detroit | Sleep | APS | 4,600 | 4,280 | 7/1/2009 | 6/30/2024 | 52 | No | Ford Road Investments, LLC | None | 41913 FORD RD, CANTON, MI, 48187, USA |
| 70 | Monroe, MI (70) | MONROE PS | Yes | Detroit | Sleep | APS | 4,000 | 3,593 | 7/30/2016 | 7/31/2026 | 77 | No | Keystone Commercial | None | 1570 NORTH TELEGRAPH ROAD, MONROE, MI, 48162, USA |
| 71 | Troy, MI (71) | TROY N PS | Yes | Detroit | Sleep | APS | 4,500 | 4,059 | 5/16/2011 | 7/31/2021 | 17 | No | Universal Mall Properties LLC | None | 1735 BIG BEAVER RD, TROY, MI, 48083, USA |
| 72 | West Bloomfield, MI (72) | W BLOOMFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,655 | 10/1/2013 | 2/29/2024 | 48 | No | MAPLE ORCHARD ASSOCIATES, LLC | None | 6470 ORCHARD LAKE ROAD, WEST BLOOMFIELD, MI, 48322, US |
| 73 | Chesterfield, MI (73) | CHESTERFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,572 | 11/18/2017 | 11/30/2027 | 93 | No | CHESTERFIELD COMMONS ASSOCIATES, LLC | None | 50938 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 74 | Woodhaven, MI (74) | WOODHAVEN PS | Yes | Detroit | Sleep | APS | 3,966 | 3,565 | 10/17/2015 | 10/31/2025 | 68 | No | THE ALLENWEST GROUP, LLC | None | 19410 WEST ROAD, WOODHAVEN, MI, 48183, USA |
| 75 | Brighton, MI (75) | BRIGHTON E PS | Yes | Detroit | Sleep | APS | 4,248 | 3,218 | 5/16/2011 | 9/30/2022 | 31 | No | BRIGHTON GATE COMMONS, LLC | None | 9990 E GRAND RIVER AVE, BRIGHTON, MI, 48116, USA |
| 76 | Bloomfield Twp, MI (76) | BLOOMFIELD TWP PS | Yes | Detroit | Sleep | APS | 3,602 | 3,139 | 5/20/2017 | 7/31/2027 | 89 | No | BP OF WHITE LAKE, INC. | None | 6450 TELEGRAPH ROAD, BLOOMFIELD TWP, MI, 48301, USA |
| 77 | New Hudson, MI (77) | NEW HUDSON PS | Yes | Detroit | Sleep | APS | 4,106 | 3,758 | 4/10/2012 | 10/31/2022 | 32 | No | Milford Road Plaza, LLC | None | 30821 MILFORD RD, NEW HUDSON, MI, 48165, USA |
| 78 | Lapeer, MI (78) | LAPEER PS | Yes | Detroit | Sleep | APS | 4,500 | 3,864 | 10/1/2016 | 1/31/2027 | 83 | No | JKL REAL ESTATE CO. | None | 806 S MAIN STREET, LAPEER, MI, 48446, USA |
| 79 | Royal Oak, MI (79) | ROYAL OAK PS | Yes | Detroit | Sleep | APS | 5,950 | 4,956 | 5/16/2011 | 6/30/2024 | 52 | No | 4400 North Woodward, LLC | None | 32500 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 80 | White Lake, MI (80) | WHITE LAKE PS | Yes | Detroit | Sleep | APS | 3,680 | 2,995 | 5/16/2011 | 3/31/2021 | 13 | No | CLOSED | 0 | 5951 HIGHLAND RD, WHITE LAKE, MI, 48383, USA |
| 81 | Troy, MI (81) | TROY S PS | Yes | Detroit | Sleep | APS | 4,675 | 3,464 | 5/16/2011 | 1/31/2022 | 23 | No | URBAN CAL OAKLAND PLAZA, LLC | None | 272 JOHN R, TROY, MI, 48083, USA |
| 82 | Waterford, MI (82) | WATERFORD PS | Yes | Detroit | Sleep | APS | 6,008 | 5,060 | 5/16/2011 | 3/31/2022 | 25 | No | INVESTCO OF MICHIGAN LLC | None | 4977 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 83 | Novi, MI (83) | NOVI PS | No | Detroit | Sleep | APS | 2,600 | 2,073 | 5/16/2011 | 1/31/2020 | n/a | No | RAMCO WEST OAKS II LLC | None | 43420 W OAKS DR, NOVI, MI, 48377, USA |
| 84 | Brighton, MI (84) | BRIGHTON W PS | Yes | Detroit | Sleep | APS | 4,200 | 3,784 | 5/16/2011 | 10/31/2021 | 20 | No | CROSS GRAND PLAZA, LLC | None | 8709 WEST GRAND RIVER, BRIGHTON, MI, 48116, USA |
| 85 | Ann Arbor, MI (85) | ANN ARBOR E PS | Yes | Detroit | Sleep | APS | 4,274 | 3,062 | 5/16/2011 | 5/31/2021 | 15 | No | AF Jonna Development & Management Company, L | None | 3550 WASHTENAW, ANN ARBOR, MI, 48104, USA |
| 86 | Lake Orion, MI (86) | LAKE ORION PS | Yes | Detroit | Sleep | APS | 4,160 | 3,775 | 4/1/2014 | 1/31/2022 | 23 | No | SHOPS AT THE SHORES OF LONG LAKE L.L.C. | None | 610 N. LAPEER RD, LAKE ORION, MI, 48362, USA |
| 87 | Ferndale, MI (87) | FERNDALE PS | Yes | Detroit | Sleep | APS | 6,553 | 5,587 | 4/1/2016 | 6/30/2026 | 76 | No | B.P. of White Lake Inc. | None | 23100 WOODWARD AVE, FERNDALE, MI, 48220, USA |
| 88 | Utica, MI (88) | UTICA E PS | Yes | Detroit | Sleep | APS | 5,900 | 2,858 | 9/1/2011 | 1/31/2023 | 35 | No | SHELBY CORNERS, LLC | None | 45040 NORTHPOINTE BLVD, UTICA, MI, 48315, USA |
| 89 | Howell, MI (89) | HOWELL PS | Yes | Detroit | Sleep | APS | 9,400 | 8,794 | 5/16/2011 | 10/31/2024 | 56 | No | COUNTRY CORNERS SHOPPING CENTER, L.L.C | None | 4050 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 90 | Westland, MI (90) | WESTLAND PS | Yes | Detroit | Sleep | APS | 4,400 | 3,976 | 10/1/2016 | 10/31/2026 | 80 | No | CENTRAL-WAYNE PROPERTIES, LLC | None | 7671 NORTH WAYNE RD, WESTLAND, MI, 48185, USA |
| 91 | Grosse Pointe, MI (91) | GROSSE POINTE SSI | Yes | Detroit | Design | SSI | 7,600 | 5,933 | 6/26/2015 | 10/31/2020 | 8 | No | ST. John Health | None | 17145 KERCHEVAL, GROSSE POINTE, MI, 48230, USA |
| 92 | Plymouth, MI (92) | PLYMOUTH PS | Yes | Detroit | Sleep | APS | 4,000 | 3,580 | 9/24/2016 | 11/30/2026 | 81 | No | PLYMOUTH HAGGERTY UNIT 6 | None | 41512 ANN ARBOR RD, PLYMOUTH, MI, 48170, USA |
| 93 | Shelby Twp, MI (93) | SHELBY TWP PS | Yes | Detroit | Sleep | APS | 4,000 | 3,714 | 1/13/2018 | 1/31/2028 | 95 | No | JERUSALEM PROPERTIES, LLC | None | 46975 VAN DYKE AVE, SHELBY TWP, MI, 48317, USA |
| 94 | Roseville, MI (94) | ROSEVILLE PS | Yes | Detroit | Sleep | APS | 4,800 | 4,512 | 11/21/2013 | 5/31/2024 | 51 | No | ROSEVILLE VILLAGE, L.L.C. | None | 31851 GRATIOT AVE, ROSEVILLE, MI, 48066, USA |
| 95 | Taylor, MI (95) | TAYLOR PS | Yes | Detroit | Sleep | APS | 4,000 | 3,433 | 10/3/2015 | 10/31/2025 | 68 | No | VAN ELSLANDER VENTURES, LLC | None | 23471 EUREKA RD, TAYLOR, MI, 48180, USA |
| 96 | Dearborn, MI (96) | DEARBORN PS | Yes | Detroit | Sleep | APS | 5,828 | 4,141 | 4/8/2017 | 5/31/2027 | 87 | No | AMD, LLC. | None | 22731 MICHIGAN AVE, DEARBORN, MI, 48124, USA |
| 97 | Livonia, MI (97) | LIVONIA PS | Yes | Detroit | Sleep | APS | 3,612 | 3,120 | 5/17/2014 | 5/31/2024 | 51 | No | Middlebelt Plymouth Venture LLC | None | 29611 PLYMOUTH, LIVONIA, MI, 48150, USA |
| 98 | Southfield, MI (98) | SOUTHFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,606 | 1/13/2018 | 1/31/2028 | 95 | No | AF Jonna Development & Management Company, L | None | 29119 TELEGRAPH RD, SOUTHFIELD, MI, 48034, USA |
| 99 | Bloomfield Hills, MI (99) | BLOOMFIELD AVF | Yes | Detroit | Standard | AVF | 46,388 | 26,440 | 3/15/2016 | 2/28/2037 | 204 | No | LCN PARTNERS | None | 2300 TELEGRAPH RD, BLOOMFIELD HILL, MI, 48302, USA |
| 100 | Saginaw, MI (100) | SAGINAW AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 77,827 | 56,540 | 6/30/1984 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 2660 TITTABAWASSEE RD, SAGINAW, MI, 48604, USA |
| 101 | Flint, MI (101) | FLINT AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,177 | 48,827 | 6/30/1977 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 4577 MILLER RD, FLINT, MI, 48507, USA |
| 102 | Burton, MI (102) | BURTON AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,196 | 48,841 | 7/31/1987 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4095 E COURT ST, BURTON, MI, 48509, USA |
| 103 | Bay City, MI (103) | BAY CITY AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 34,578 | 36,957 | 2/2/1996 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 4150 WILDER RD, BAY CITY, MI, 48706, USA |
| 104 | Grand Blanc, MI (104) | GRAND BLANC PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,477 | 8/2/2014 | 8/31/2024 | 54 | No | GRAND SAGINAW PLAZA, L.L.C. | None | 11501 SOUTH SAGINAW, GRAND BLANC, MI, 48439, USA |
| 105 | Flint Township, MI (105) | FLINT PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,600 | 4/27/2018 | 1/31/2028 | 95 | No | Jonna Management Group, LLC | None | 4002 MILLER ROAD, FLINT, MI, 48507, USA |
| 106 | Saginaw, MI (106) | SAGINAW PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,847 | 4,368 | 1/30/2016 | 1/31/2021 | 11 | No | KMS Investments, LLC | None | 4605 BAY RD #200, SAGINAW, MI, 48604, USA |
| 107 | Fort Wayne, IN (107) | FORT WAYNE AVF | Yes | Fort Wayne | Standard | AVF | 45,982 | 39,667 | 1/25/2014 | 9/30/2023 | 43 | No | Sandor Development Company | None | 311 E COLISEUM BLVD, FORT WAYNE, IN, 46805, USA |
| 108 | Grand Rapids, MI (108) | GRAND RAPIDS AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 79,400 | 69,174 | 7/30/1987 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4375 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 109 | Portage, MI (109) | KALAMAZOO AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 73,990 | 60,986 | 5/1/1989 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 550 RING RD, PORTAGE, MI, 49024, USA |
| 110 | Muskegon, MI (110) | MUSKEGON AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,590 | 34,069 | 1/23/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 630 SEMINOLE RD, MUSKEGON, MI, 49441, USA |
| 111 | Grandville, MI (111) | GRANDVILLE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 28,530 | 24,910 | 1/1/2010 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 4625 WILSON AVE, GRANDVILLE, MI, 49418, USA |
| 112 | Battle Creek, MI (112) | BATTLE CREEK AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 50,220 | 43,411 | 9/1/1997 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 6100 B DR N, BATTLE CREEK, MI, 49014, USA |

PA00624
2/20/2020

| Store # | Store Name | Original Store Name | Are-ity In Liquidation | Marketing Area | Type | | | | | | | | | Lessor | Loan | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113 | Comstock Park, MI (113) | ALPINE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 111,077 | 63,525 | 11/26/1999 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4273 ALPINE AVE NW STE B, COMSTOCK PARK, MI, 49321, USA |
| 114 | Holland, MI (114) | HOLLAND AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,950 | 38,443 | 8/18/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 12610 FELCH ST STE 100, HOLLAND, MI, 49424, USA |
| 115 | Muskegon, MI (115) | MUSKEGON PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,519 | 5/28/2016 | 10/30/2021 | 20 | No | SVH PROPERTIES, LLC | None | 1664 E STERNBERG RD, MUSKEGON, MI, 49444, USA |
| 116 | Portage, MI (116) | PORTAGE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,018 | 3,832 | 5/24/2014 | 5/31/2024 | 51 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6947 SOUTH WESTNEDGE AVE, PORTAGE, MI, 49002, USA |
| 117 | Grandville, MI (117) | GRANDVILLE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,229 | 3,773 | 3/1/2015 | 5/31/2024 | 51 | No | CWD Grandville 1, LLC | None | 4560 IVANREST AVE SW, GRANDVILLE, MI, 49418, USA |
| 118 | Kalamazoo, MI (118) | KALAMAZOO PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 3,481 | 3,186 | 3/8/2013 | 3/31/2023 | 37 | No | Kalamazoo Mall LLC | None | 338 N DRAKE RD, KALAMAZOO, MI, 49009, USA |
| 119 | Grand Rapids, MI (119) | GRAND RAPIDS PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 5,562 | 4,903 | 10/15/2014 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 3500 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 120 | Grand Rapids, MI (120) | GRAND RAPIDS N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,687 | 9/12/2016 | 8/31/2026 | 78 | No | EAST BELTLINE DEVELOPMENT, LLC | None | 2036 EAST BELTLINE AVE, GRAND RAPIDS, MI, 49525, USA |
| 121 | Comstock Park, MI (121) | ALPINE N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,300 | 3,797 | 5/16/2011 | 10/31/2022 | 32 | No | ALPINE VALLEY, L.L.C. | None | 4174 ALPINE AVE NW STE A, COMSTOCK PARK, MI, 49321, USA |
| 122 | Lancaster, PA (122) | LANCASTER (#46) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 9/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 2040 Bennett Avenue, Lancaster, PA, 17601, USA |
| 123 | York, PA (123) | YORK (#44) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 5/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AVF PORTFOLIO | 380 North Northern Way, York, PA, 17402, USA |
| 124 | Harrisburg, PA (124) | HARRISBURG (#42) | Yes | Harrisburg | Standard | WLF | 61,900 | 51,900 | 1/19/1991 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4661 Lindle Road, Harrisburg, PA, 17111, USA |
| 125 | Hanover, PA (125) | HANOVER (#50) | Yes | Harrisburg | Standard | WLF | 34,600 | 30,600 | 5/19/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 371 Eisenhower Drive, Hanover, PA, 17331, USA |
| 126 | Mechanicsburg, PA (126) | MECHANICSBURG (#43) | Yes | Harrisburg | Standard | WLF | 45,567 | 42,567 | 8/22/2010 | 7/31/2020 | 5 | No | LESTER ASSOCIATES | None | 75 Gateway Drive, Mechanicsburg, PA, 17055, USA |
| 127 | Chambersburg, PA (127) | CHAMBERSBURG (#51) | Yes | Harrisburg | Standard | WLF | 27,262 | 25,762 | 1/1/2009 | 12/27/2038 | 226 | No | BRITM, LLC | None | 480 Gateway Avenue, Chambersburg, PA, 17201, USA |
| 128 | Altoona, PA (128) | ALTOONA (#28) | Yes | Johnstown | Standard | WLF | 53,136 | 43,176 | 1/1/1978 | 4/30/2038 | 218 | Yes | VEREIT REAL ESTATE LP | Vereit | 4 Sellers Drive/Altoona, Altoona, PA, 16601, USA |
| 129 | Johnstown, PA (129) | JOHNSTOWN (#32) | Yes | Johnstown | Standard | WLF | 40,258 | 37,258 | 9/1/1995 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1130 Scalp Avenue, Johnstown, PA, 15904, USA |
| 130 | State College, PA (130) | STATE COLLEGE (#40) | Yes | Johnstown | Standard | WLF | 50,000 | 51,402 | 5/1/2007 | 11/21/2037 | 213 | Yes | PATTON CENTER ASSOCIATES LP | None | 138 Valley Vista Drive, State College, PA, 16803, USA |
| 131 | Lansing, MI (131) | LANSING AVF | Yes | Lansing | Flagship | AVF | 71,581 | 77,379 | 10/25/2000 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 8748 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 132 | Jackson, MI (132) | JACKSON AVF | Yes | Lansing | Standard | AVF | 33,214 | 30,012 | 6/5/1992 | 7/31/2024 | 53 | No | ARGYLE ACRES MALL, LLC | None | 950 N WEST AVE, JACKSON, MI, 49202, USA |
| 133 | E Lansing, MI (133) | OKEMOS PS | Yes | Lansing | Sleep | APS | 5,855 | 4,457 | 5/16/2011 | 8/31/2023 | 42 | No | RICHARD AND MICHELLE BROWN | None | 2660 E. GRAND RIVER, EAST LANSING, MI, 48823, USA |
| 134 | East Lansing, MI (134) | EAST LANSING PS | Yes | Lansing | Sleep | APS | 3,974 | 3,495 | 7/16/2016 | 7/31/2021 | 17 | No | River Castle Development, LLC | None | 1595 LAKE LANSING ROAD, EAST LANSING, MI, 48823, USA |
| 135 | Lansing, MI (135) | LANSING PS | Yes | Lansing | Sleep | APS | 4,590 | 3,689 | 5/16/2011 | 12/31/2021 | 22 | No | John Doezema Real Estate | None | 6007 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 136 | Wexford, PA (136) | WEXFORD (#4, 29, 30 CC) | Yes | Pittsburgh | Standard | LVF | 53,000 | 48,823 | 10/1/2009 | 2/28/2038 | 216 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 10688 PERRY HIGHWAY, WEXFORD, PA, 15090, USA |
| 137 | Monroeville, PA (137) | MONROEVILLE (#3 CC, 20, 21 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,545 | 7/1/2004 | 11/30/2037 | 213 | Yes | COLE AVF PORTFOLIO / LEVIN FAMILY | | 124 LEVIN WAY, MONROEVILLE, PA, 15146, USA |
| 138 | Mcmurray, PA (138) | SOUTH HILLS (#2, 32 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,964 | 1/1/2001 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 3664 WASHINGTON ROAD, MCMURRAY, PA, 15317, USA |
| 139 | Greensburg, PA (139) | GREENSBURG (#40, 41 CC) | Yes | Pittsburgh | Standard | LVF | 55,314 | 50,637 | 8/1/2011 | 10/31/2021 | 20 | No | CBLWESTMORELAND, LP | None | 5280 ROUTE 30, GREENSBURG, PA, 15601, USA |
| 140 | Pittsburgh, PA (140) | THE POINTE (#15, 35 CC) | Yes | Pittsburgh | Standard | LVF | 68,730 | 61,886 | 7/1/1999 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 400 CHALVEST DRIVE, PITTSBURGH, PA, 15275, USA |
| 141 | Pleasant Hills, PA (141) | CURRY HOLLOW (#47, 48 CC) | Yes | Pittsburgh | Standard | LVF | 96,500 | 87,500 | 7/1/1991 | 9/30/2026 | 79 | No | PAUL PROPERTY MANAGEMENT, LP | None | 292 CURRY HOLLOW RD, PLEASANT HILLS, PA, 15236, USA |
| 142 | Mount Pleasant, PA (142) | MOUNT PLEASANT (#1, 22 CC) | Yes | Pittsburgh | Standard | LVF | 34,500 | 30,766 | 1/1/1924 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 600 MAIN STREET, MT. PLEASANT, PA, 15666, USA |
| 143 | Cranberry Township, PA (143) | CRANBERRY (#60) | Yes | Pittsburgh | Standard | LM | 5,000 | 4,500 | 5/1/2012 | 4/30/2022 | 26 | No | WALNUT CAPITAL PARTNERS - CRANBERRY SC | None | 20012 ROUTE 19, CRANBERRY, PA, 16066, USA |
| 144 | Mount Lebanon, PA (144) | MOUNT LEBANON (#36) | Yes | Pittsburgh | Sleep | LM | 3,990 | 3,490 | 6/28/2013 | 7/31/2023 | 41 | No | RELIANCE PITTSBURGH LLC | None | 1600 WASHINGTON RD, MT LEBANON, PA, 15228, USA |
| 145 | Butler, PA (145) | BUTLER (#75) | Yes | Pittsburgh | Sleep | LM | 5,010 | 5,010 | 11/18/2016 | 2/28/2027 | 84 | No | BUTLER SITEWORK ASSOCIATES LLC | None | 620 Butler Crossing Suite 5, BUTLER, PA, 16001, USA |
| 146 | Pittsburgh, PA (146) | SHADYSIDE (#70) | Yes | Pittsburgh | Sleep | LM | 7,145 | 6,645 | 10/10/2014 | 4/30/2024 | 50 | No | MCKNIGHT SOUTH EAST LP | None | 5438 BAUM BLVD, PITTSBURGH, PA, 15232, USA |
| 147 | Washington, PA (147) | WASHINGTON (#80) | Yes | Pittsburgh | Sleep | LM | 7,800 | 7,300 | 3/29/2013 | 4/30/2023 | 38 | No | WASHINGTON MALL - JCP ASSOCIATES, LTD | None | 56 TRINITY POINT DR, WASHINGTON, PA, 15301, USA |
| 148 | Pittsburgh, PA (148) | FOX CHAPEL (#61) | Yes | Pittsburgh | Sleep | LM | 4,000 | 3,500 | 5/1/2012 | 4/30/2022 | 26 | No | WATERWORKS PHASE II | None | 956 FREEPORT ROAD, PITTSBURGH, PA, 15238, USA |
| 149 | Pittsburgh, PA (149) | ROBINSON (#64) | Yes | Pittsburgh | Sleep | LM | 5,593 | 5,093 | 8/30/2013 | 12/31/2023 | 46 | No | MCROBIN LTC AND MOSITES FAMILY GST TRUST | None | 6528 STEUBENVILLE PIKE, PITTSBURGH, PA, 15205, USA |
| 150 | Indiana, PA (150) | INDIANA (#33) | Yes | Pittsburgh | Sleep | LM | 4,800 | 4,300 | 6/7/2013 | 9/30/2023 | 43 | No | LIBBY REGENCY ASSOCIATES LP | None | 1570 OAKLAND AVE, INDIANA, PA, 15701, USA |
| 151 | Monroeville, PA (151) | MONROEVILLE (#62) | Yes | Pittsburgh | Sleep | LM | 4,319 | 4,000 | 6/1/2012 | 6/30/2022 | 28 | No | CE-MONROEVILLE 3820 WM PENN LP | None | 3820 WILLIAM PENN HIGHWAY, MONROEVILLE, PA, 15146, USA |
| 152 | St. Louis, MO (152) | AFFTON | Yes | St. Louis | Standard | AVF | 41,352 | 32,759 | 1/17/2018 | 12/31/2023 | 46 | No | South Linebergh Property LLC | None | 5711 S LINDBERGH BLVD, SAINT LOUIS, MO, 63123, USA |
| 153 | O'fallon, IL (153) | FAIRVIEW | Yes | St. Louis | Standard | AVF | 39,676 | 32,627 | 1/17/2018 | 12/31/2023 | 46 | No | Rothman-O'Fallon LLC | None | 1776 WEST US 50, O FALLON, IL, 62269, USA |
| 154 | O'fallon, MO (154) | O FALLON | Yes | St. Louis | Standard | AVF | 40,884 | 31,674 | 1/16/2018 | 12/31/2023 | 46 | No | O'Fallon Missouri Properties, LLC | None | 2101 E TERRA LN, O FALLON, MO, 63366, USA |
| 155 | Bridgeton, MO (155) | BRIDGETON | Yes | St. Louis | Standard | AVF | 45,314 | 35,975 | 1/17/2018 | 12/31/2023 | 46 | No | JS Westfio, LLC | None | 925 NORTHWEST PLAZA, SAINT ANN, MO, 63074, USA |
| 156 | Richmond Heights, MO (156) | RICHMOND (DESIGN STUDIO) | Yes | St. Louis | Design | AVF | 3,670 | 3,343 | 11/15/2017 | 7/31/2024 | 53 | No | Hanley LM Properties, LLC | None | 1516 S HANLEY RD, SAINT LOUIS, MO, 63144, USA |
| 157 | Holland, OH (157) | TOLEDO AVF | Yes | Toledo | Standard | AVF | 91,000 | 80,731 | 9/27/2013 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1301 E MALL DR, HOLLAND, OH, 43528, USA |
| 158 | Toledo, OH (158) | TOLEDO PS | Yes | Toledo | Sleep | APS | 4,500 | 4,045 | 5/24/2013 | 11/30/2023 | 45 | No | REED HOLDING-TALMADGE, LLC | None | 4600 TALMADGE RD, TOLEDO, OH, 43623, USA |
| 159 | Holland, OH (159) | HOLLAND PS (TOLEDO) | Yes | Toledo | Sleep | APS | 3,485 | 3,135 | 7/13/2018 | 8/31/2026 | 102 | No | Kiezi Properties BG, LLC | None | 6760 AIRPORT HWY SUITE B, HOLLAND, OH, 43528, USA |
| 160 | Perrysburg Township, OH (160) | PERRYSBURGH (FREEMONT) | Yes | Toledo | Sleep | APS | 3,500 | n/a | 2/8/2019 | 4/30/2029 | 110 | No | 10411 Fremont Pike, LLC | None | 10411 FREEMONT PIKE, PERRYSBURG, OH, 43551, USA |
| 161 | Traverse City, MI (161) | TRAVERSE CITY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 63,120 | 49,903 | 11/21/1998 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 1775 OAK HOLLOW DR, TRAVERSE CITY, MI, 49686, USA |
| 162 | Petoskey, MI (162) | PETOSKEY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 49,115 | 49,765 | 10/5/2002 | 10/31/2027 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 1619 ANDERSON ROAD, PETOSKEY, MI, 49770, USA |
| 163 | Traverse City, MI (163) | TRAVERSE CITY PS | Yes | Traverse City-Cadillac | Sleep | APS | 4,509 | 4,104 | 6/30/2016 | 6/30/2026 | 76 | No | ANCHOR MANISTEE | None | 3675 N US 31 S SUITE B, TRAVERSE CITY, MI, 49684, USA |
| 164 | Frederick, MD (164) | FREDERICK (#7) | Yes | Washington DC | Standard | WLF | 60,000 | 52,500 | 7/1/2003 | 1/31/2024 | 47 | No | Frederick-BILCO, LLP | None | 1215 West Patrick Street, Frederick, MD, 21702, USA |
| 165 | Hagerstown, MD (165) | HAGERSTOWN (#9) | Yes | Washington DC | Standard | WLF | 66,829 | 60,000 | 2/1/2004 | 5/23/2029 | 111 | No | OUTLET VILLAGE OF HAGERSTOWN LLP | None | 900 Premium Outlets Boulevard, Hagerstown, MD, 21740, USA |
| 166 | Leesburg, VA (166) | LEESBURG (#48) | Yes | Washington DC | Standard | WLF | 46,030 | 41,430 | 8/24/2012 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 131 Fort Evans Road NE, Leesburg, VA, 20176, USA |
| 167 | Frederick, MD (167) | FREDERICK OUTLET (#52) | No | Washington DC | Standard | WLF | 40,484 | 30,484 | 9/17/2014 | 1/31/2020 | n/a | No | RAVID FREDERICK LLC | None | 5830 Ballenger Creek Pike, Frederick, MD, 21703, USA |
| 168 | Saint Clairsville, OH (168) | SAINT CLAIRSVILLE (#50) | Yes | Wheeling | Standard | LVF | 24,908 | 21,000 | 9/29/2017 | 10/31/2022 | 32 | No | 67661 MALL RING RD, SAINT CLAIRSVILLE, OH, 43950, USA | | 67661 MALL RING RD, SAINT CLAIRSVILLE, OH, 43950, USA |
| 169 | Boardman, OH (169) | BOARDMAN (#52) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 8/31/2018 | 8/31/2028 | 102 | No | A&R Properties | None | 300 BOARDMAN POLAND ROAD, BOARDMAN, OH, 44512, USA |
| 170 | Hermitage, PA (170) | HERMITAGE (#52) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 9/21/2018 | 9/30/2023 | 43 | No | A&R Properties | None | 1340 N. Hermitage Road Suite 1, Route 18, Hermitage, PA, 16148, USA |
| 171 | Niles, OH (171) | NILES (#56) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 10/31/2018 | 10/31/2028 | 104 | No | A&R Properties | None | 836 YOUNGSTOWN-WARREN RD, NILES, OH, 44446, USA |
| **Totals** | | | | | | | **5,879,611** | **4,932,964** | | | | | | | |

# **EXHIBIT 3**

PA00626

## CONSULTING AND MARKETING SERVICES AGREEMENT

This Consulting and Marketing Services Agreement, dated as of March 4, 2020 (this "Agreement"), is made by and between **AVF HOLDING COMPANY, INC.,** and **AVF HOLDING COMPANY, INC.** d/b/a Art Van Furniture, Art Van Pure Sleep, Levin Furniture, Levin Mattress and Wolf Furniture (collectively, the "Company"), and a contractual joint venture comprised of **HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC**, each a Delaware limited liability company (collectively, "Hilco"), and **GORDON BROTHERS RETAIL PARTNERS, LLC, DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE, GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC AND GORDON BROTHERS BRANDS, LLC**, each, a Delaware limited liability company (collectively, "GBG", and together with Hilco, the "Consultant").

## R E C I T A L S:

WHEREAS, the Company is (i) the owner or lessee of certain real property identified on Exhibit A attached hereto (each a "Property", and collectively, the "Properties"), (ii) machinery, equipment, furniture, fixtures and other personal property located at, in, or in the vicinity of the Properties (the "M&E"), (iii) Merchandise (defined below) inventory located at, in, or the vicinity of the Properties, (iv) to the extent the Company exercise the Receivables Option (defined below), outstanding trade accounts receivable for which the Company has the exclusive right to collect, except for those accounts receivable that are currently the subject of litigation (the "Receivables") and (v) intangible assets, including, without limitation, trademarks, trade names, copyrights, domain names, software and source code, URLs, telephone numbers, customer data including customer names, addresses, email addresses, transaction history and other demographic data captured and maintained by the Company, vendor data, franchise agreements, "IP" addresses, and license agreements, logos and assorted artwork used in marketing materials and other contractual rights relating to the foregoing (collectively, the "Intellectual Property"; and collectively with the M&E, Inventory, Receivables (to the extent the Company exercises the Receivables Option), and Properties, the "Assets");

WHEREAS, the Company desires to retain Consultant to provide certain consulting, marketing and related asset disposition services to the Company with respect to the Assets, including where the context makes appropriate assisting the Company in the conduct of certain "Store Closing Sale", "Total Inventory Blowout", "Everything Must Go", "Everything On Sale" or similar themed liquidation sales (the "Sale") at the Company's retail store locations identified on Exhibit A-1 attached hereto (each individually, a "Store", and collectively, the "Stores"); and (ii) provide assistance to the Company in fulfilling and delivering On-Hand Fulfillment Merchandise and Back-Order Fulfillment Merchandise on account of goods sold by the Company prior to the Sale Commencement Date (defined  below), in each case as more fully described herein; and

WHEREAS, Consultant is in the business of marketing, selling and otherwise realizing maximum value for assets similar to those comprising the Assets on behalf of its clients, and subject to the terms and conditions set forth herein, including, without limitation, authorization and approval of the Bankruptcy Court (defined below), is willing to serve as the Company's

exclusive agent and consultant to perform the services described herein upon the terms and conditions, and in the manner set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

### 1. Definitions

For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

"ABL Agent" means shall mean Wells Fargo Bank, National Association, as administrative agent and collateral agent for itself and the other ABL Lenders.

"ABL Lenders" means those lenders under that certain ABL Credit Agreement, dated as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof), by and among, among others, the Company, such lenders and the ABL Agent.

"Advertising Expenses" means the costs and expenses incurred in connection with advertising the Sale, including, without limitation, direct media costs, agency fees and production costs) and Signage Costs.

"Approval Orders" shall mean collectively the Interim Order and Final Order.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Cash Collateral Budget" means that certain debtor-in-possession and/or cash collateral Cash Collateral Budget to be approved under the Interim Cash Collateral Order.

"Central Services" shall mean those central administrative services provided by Company that are necessary or appropriate for the conduct and support of the Sale, including, but not limited to, use and/or access to Company's: (i) inventory control system, (ii) payroll system, (iii) accounting system, (iv) office facilities (including use of reasonably sized offices located at Company's central office facility to effect the Sale), (v) central administrative services and personnel to process and perform sales audit, banking, accounting, sale and expense reconciliation, and other normal course administrative services customarily provided to or for the benefit of operating the Stores, (vi) no fewer than one weekly email messages targeted to the customers of the Stores and Company's e-commerce site, which email messages will be designed by Consultant (and approved by Company) and sent by Company or Company's existing service provider and (vii) such other central office services reasonably necessary or appropriate for the Sale.

"Consultant Incurred Expenses" shall mean the aggregate amount of (i) Supervisor Costs; (ii) reasonable and documented travel expenses for members of Consultant's executive team in an

PA00628

aggregate amount not to exceed $20,000; (iii) Consultant's reasonable and documented general legal fees incurred in connection with the negotiation of this Agreement in an aggregate amount not to exceed $35,000; provided, however, in addition to, and not as part of, such capped amount, Company shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with negotiating any "side letters" with landlords of the Stores; and (iv) Advertising Expenses, in each case in as defined herein and in accordance with the Sale Budget (as defined below).

"Final Order" shall mean a final order of the Bankruptcy Court granting final approval, inter alia, for the Company's (a) assumption of this Agreement, (b) retention of the Consultant to perform the consulting, marketing and sale-related services described herein, (c) conduct of the Sale, and (d) granting such other and further relief as is appropriate in order to effectuate the terms and provisions of this Agreement.

"Gross Sales" shall mean the sum of all proceeds derived from the sale of Merchandise during the Sale Term (excluding amounts paid for sales, excise, or gross receipts taxes); plus (i) all proceeds of fire, flood or other insurance covering the Merchandise, and (ii) the amount of any gift cards or merchandise credits redeemed at the Stores during the Sale Term; provided, however, that it is expressly understood and agreed, that Gross Sales shall not include sales made by or on behalf of Company prior to the Sale Commencement Date or after the Sale Termination Date, regardless of when the applicable Merchandise is delivered to or picked up by the customer(s).

"Interim Order" shall mean an order of the Bankruptcy Court granting interim approval, inter alia, for the Company's (a) assumption of this Agreement, (b) retention of the Consultant to perform the consulting, marketing and sale-related services described herein, (c) conduct of the Sale, and (d) granting such other and further relief as is appropriate in order to effectuate the terms and provisions of this Agreement.

"Leases" shall mean all leases, occupancy agreements, reciprocal easement, license, or similar agreements pursuant to which Company has the right to occupy or utilize the Stores.

"Lender Agents" mean collectively, the ABL Agent and the Term Loan Agent.

"Merchandise" shall mean all inventory that is owned by Company and actually sold in the Stores during the Sale Term, the aggregate amount of which shall be determined using the gross rings inventory taking method, which may include inventory that (i) is located at, or in transit to, the Store as of the Sale Commencement Date with respect to each such Store; and/or (ii) is located at the Company's distribution center in the United States during the Sale Term; provided, however, the Company and the Consultant agree that "Merchandise" shall expressly exclude: (1) goods which belong to sublessees, licensees or concessionaires of Company; (2) goods held by the Company on memo or consignment, unless otherwise agreed to by Company (in consultation with the Lender Agents) and Consultant; (3) M&E; and (4) Additional Agent Goods.

"Merchandise File" shall mean the "Store and DC Master Inventory Report Final 020320.xlsx" and "Levin Store & DC Master Inventory as of 2.3.20.xlslx" files together with all subsequent files specifically delivered by Merchant to Agent on or prior to the Sale Commencement Date to be used in connection with this Agreement.

3

"Sale Commencement Date" shall mean a date determined by the Company in consultation with the Consultant, but in no event later than March 6, 2020.

"Sale Expenses" shall mean all expenses incurred in connection with and attributable to the Sale.

"Sale Guidelines" shall mean the Sale Guidelines annexed hereto as Exhibit C which shall serve as the guidelines under which the Sale shall be conducted.

"Sale Term" shall mean the period of time beginning with the Sale Commencement Date and ending on the Sale Termination Date.

"Sale Termination Date" shall mean a date determined by the Consultant in consultation with the Company, but in no event later than May 31, 2020; provided, however, absent the prior consent of the Company, the Sale shall conclude in the Stores no later than April 30, 2020.

"Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

"Signage Costs" shall mean all the interior and exterior signage used in connection with the Sale, including, without limitation, banners, A-frames, feather flags, and sign walkers, in each case to the extent approved by Consultant.

"Store Employees" shall mean those employees of the Company retained by Company to conduct the Sale following consultation with Consultant.

"Supervisor(s)" shall mean the individual(s) whom Consultant shall engage to provide Services in the Stores to Company in connection with the Sale in accordance with Section 2.3 below.

"Supervisor Costs" shall mean the following customary costs and expenses incurred by Consultant with respect to Supervisors in accordance with the Sale Budget,: (i) the weekly compensation paid during the Sale Term per Supervisor (which in each case represents Consultant's actual costs); (ii) reasonable and documented travel expenses of the Supervisors between Stores during the term of the Sale, and to and from the Sale locations at the commencement and conclusion of the Sale (and reasonable travel to and from the Supervisors' homes during the Sale Term as is typical and customary in the liquidation industry given the nature of the Merchandise, the length of the Sale, and the actual results of the Sale); and (iii) reasonable Supervisor deferred compensation.

"Term Loan Agent" shall mean Virtus Group, LP, as administrative agent and collateral agent for itself and the other Term Loan Lenders.

"Term Loan Lenders" means those lenders under that certain Credit Agreement, dated as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof), by and among, among others, the Company, such lenders and the Term Loan Agent.

PA00630

## 2.    Consulting Services

2.1    Company hereby retains Consultant, and Consultant hereby agrees to serve as the exclusive independent consultant to the Company in connection with the conduct of the Sale as set forth herein.  With respect to the Sale, Consultant shall serve as the sole and exclusive consultant to the Company relative to the conduct of the Sale at the Stores, and the sale or other disposition of the other Assets, in each case throughout the Sale Term.

2.2    <u>Conduct of the Sale; Merchandise Services</u>.  On the terms and conditions set forth herein, commencing as of the Sale Commencement Date, the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the Merchandise as part of the Sale:

(a)    provision of approximately forty six (46) qualified Supervisors to supervise and assist Company in its conduct of the Sale as further described in <u>Section 2.3</u> below, including such lead, regional, financial, and field Supervisors as needed (after consultation with Company and Lender Agents). All Supervisors shall have industry-specific experience conducting "Store Closing", "Total Inventory Blowout", "Everything on Sale", "Everything Must Go" or similar themed liquidation sales, and shall act in a professional manner; <u>provided</u>, that from time to time during the Sale Term the Company and the Consultant shall meet and confer to evaluate the level and number of Supervisors being utilized in connection with the conduct of the Sale, and the Company and the Consultant (in consultation with the Lender Agents) shall jointly determine any reasonable adjustments thereto; <u>provided</u>, <u>further</u>, that, once identified, Supervisors cannot be removed from the project absent Company consent;

(b)    provide the Company with such oversight, supervision and guidance as may be appropriate or requested by the Company with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and M&E as may be required from time to time to maximize the recovery for such Assets;

(c)    recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with the theme of the Sale and the Sale Guidelines, it being understood that the Sale will be advertised as a "Total Inventory Blowout", "Store Closing", "Everything Must Go", "Everything on Sale" or similar sale themes throughout the term of the Sale; provided, that Consultant shall not utilize "Going Out of Business" sale theme absent (i) prior consultation with and approval by the Company and (ii) as may be set forth in the Approval Orders;

(d)    advise the Company as to appropriate discounting of Merchandise, appropriate staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;

(e)    advise the Company in creating the optimal display of Merchandise in the Stores in an effort to maximize the recovery for such Assets;

PA00631

(f)     assist Company in the formulation and implementation of a loss prevention security program designed to protect the Merchandise from theft or other shortages;

(g)     assist Company with accounting functions for the Stores, including evaluation of sales of Merchandise by category, sales reporting and monitoring of expenses, in each case using the Company's infrastructure;

(h)     recommend and implement the transfer and balancing of Merchandise between and among the Stores to maximize results during the Sale;

(i)     participate in weekly calls with representatives of the Company and Lender Agents; and

(j)     provide such other related services deemed necessary or prudent by the Company (in consultation with the Lender Agents), and as may be mutually agreed by the Consultant and the Company under the circumstances giving rise to the Sale.

2.3     <u>M&E Services</u>.

(a)     On the terms and conditions set forth herein, commencing as of the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Company and the Consultant (in consultation with the Lender Agents)); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Company (in consultation with the Lender Agents) and the Consultant (as applicable the "<u>Asset Marketing Period</u>"), the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the M&E (the "<u>M&E Services</u>"):

(i)     Develop an advertising and marketing plan ("<u>M&E Marketing Plan</u>") for the sale or auction of, or other disposition strategy for, the M&E and in connection therewith; <u>provided</u>, that no later than March 13, 2020, the Company (in consultation with the Lender Agents) and the Consultant shall mutually agree upon a supplemental expense budget for the sale or other disposition of the M&E (the "<u>M&E Expense Budget</u>");

(ii)     Implement the M&E Marketing Plan as deemed necessary by Consultant to maximize the net recovery on the M&E;

(iii)     Prepare for the sale of the M&E, including gathering specifications and photographs for brochures;

(iv)     Make the M&E available for viewing by potential buyers on an appointment-only basis;

(v)     Sell or auction the M&E for cash to the highest bidder "as is," "where is," and in accordance with the terms of this Agreement; and

6

(vi) Charge and collect on behalf of the Company from all purchasers any purchase price (inclusive of any Buyer's premium paid by the respective buyer(s)) together with all applicable taxes in connection therewith.

(b) All proceeds collected by Consultant in connection with the M&E Services shall be either remitted directly to the Company to such account as designated by the Company (the "Company's Designated Deposit Account") by the buyer of the M&E, or, to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation provided for in Section 4.2 hereof, with such amounts to be deposited into the Company's Designated Deposit Account.

2.4    Real Estate Services.

(a) On the terms and conditions set forth herein, during the applicable Asset Marketing Period, the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the Properties (the "Real Estate Services"):

(i) Meet with the Company to ascertain the Company's goals, objectives and financial parameters with respect to the sale or other disposition of the Properties;

(ii) Mutually agree with the Company with respect to a strategic plan for the disposition of each Property (the "Real Estate Strategic Plan");

(iii) In accordance with the Real Estate Strategic Plan, and in lieu of assigning a Property lease to a third party, work with the Company to secure favorable termination agreements whereby a landlord pays the Company to terminate the lease associated with each such Property; and

(iv) Solicit interested parties for the assumption/assignment of leases associated with each Property or, where applicable, the sale of each Property, and marketing each Property for assignment/sale in accordance with the Real Estate Strategic Plan.

(b) In connection with the performance of Real Estate Services, the Consultant agrees that the Company shall not be responsible for the payment of any expenses incurred in connection with the execution of the Real Estate Strategic Plan, except to the extent pursuant to a budget ("Real Estate Services Budget"), which Real Estate Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(c) All proceeds collected by Consultant in connection with the Real Estate Strategic Plan shall be either remitted directly to Company's Designated Deposit Account by the buyer/assignee of the Company's interests in the Properties, or to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such amounts, with such amounts to be deposited into the Company's Designated Deposit Account.

PA00633

2.5    <u>Receivables Services</u>.  (a)  From the date of execution of this Agreement to and including March 31, 2020, the Company shall retain the exclusive option, in its sole discretion (following consultation with the Lender Agents)(the "<u>Receivables Election</u>") to direct the Consultant to perform Receivables Services (defined below).  The Company shall exercise the Receivables Election, if at all, by delivery of a written notice to the Consultant on or before the above date indicating its direction to the Consultant to commence performance of Receivables Services.  Upon the Company's exercise of the Receivables Election, the Consultant shall thereafter perform Receivables Services on the terms and conditions set forth herein, through the later of (i) expiration of the Asset Marketing Period or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant agree (the "<u>Receivables Marketing Period</u>")

(b)    the Services with respect to the collection or other disposition of the Receivables shall include the following (collectively, the "<u>Receivables Services</u>"):

(i)    In consultation with the Company, collect, service, settle, and otherwise resolve the Receivables on the Company's behalf and in otherwise compliance with applicable law;

(ii)    Direct the obligors on the Receivables to make payment to Consultant, as the agent for the Company and the Lender Agents;

(iii)    (a) Receive cash, drafts, checks, wire transfers, credit cards, and money orders on account or in satisfaction of the Receivables; and (b) endorse and negotiate any of the foregoing received by Consultant, as the agent for the Company; and

(iv)    If the Company requests, identify and oversee third party collection attorneys to collect those Receivables Consultant is otherwise unable to collect.

(c)    In connection with the performance of Receivables Services, the Consultant agrees that the Company shall not be responsible for payment of any expenses incurred in connection with the Consultant's performance of the Receivables Services, except to the extent pursuant to a budget ("<u>Receivables Services Budget</u>"), which Receivables Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(d)    Any amounts collected by Consultant in connection with the collection of the Receivables, shall be remitted by the Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in <u>Section 4.2</u> hereof, following Consultant's receipt of such Proceeds, with such amounts to be deposited into the Company's Designated Deposit Account.

2.6    <u>IP Services</u>.

(a)    Through the later of (i) the expiration of the Asset Marketing Period; or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant may

PA00634

agree (the "IP Marketing Period"), the Consultant shall provide the Company with the following Services with respect to the collection or other disposition of the Company's Intellectual Property (the "IP Services"):

(i)     Work with the Company's management and advisors to collect and secure all of the available information and data concerning the Intellectual Property;

(ii)     In consultation with the Company, prepare marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition;

(iii)     In consultation with the Company, develop and execute a sales and marketing program designed to elicit proposals to acquire the Intellectual Property from qualified acquirers, with a view toward completing one or more sales, assignments, licenses, or other dispositions of the Intellectual Property; and

(iv)     Assist the Company in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property.

(b)     In connection with the performance of IP Services, the Consultant agrees that the Company shall not be responsible for payment of any expenses incurred in connection with the Consultant's performance of the IP Services, except to the extent pursuant to a budget ("IP Services Budget"), which IP Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(c)     All proceeds collected by Consultant in connection with the IP Services shall be either remitted directly to Company's Designated Deposit Account by the buyer(s) of the IP Assets, or to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such amounts, with such amounts to be deposited into the Company's Designated Deposit Account

2.7     License. (a) Solely in connection with the performance of the Services as provided herein, the Company hereby grants Consultant a non-exclusive royalty free license ("Services License") to use, including, but not limited to, in all of its advertising and promotional activities related to this Agreement, all Intellectual Property, including, without limitation, the following Company tradenames: "Art Van Furniture", "Wolf Furniture", "Levin Furniture", and/or similar derivations thereof. The Services License shall extend through the later of (i) the expiration of the Asset Marketing Period, or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant may agree (the "License Period").

(b)     The Company hereby grants Consultant a license to allow Consultant to enter and occupy the Properties. Specifically, Consultant shall have the right to enter and  the Properties during the applicable Asset Marketing Period solely for the purposes of performing its obligations under this Agreement, including, without limitation, taking photographs and preparing the marketing material for the Assets, and selling and overseeing the removal of the removable

9

Assets, without interference from any labor unions or any other third parties. The Company shall use reasonable efforts to ensure that the Consultant shall have access to and quiet enjoyment of the Properties for the applicable Asset Marketing Period. Consultant shall not be obligated to pay any rent, taxes, utilities, or other occupancy-related charges arising from or related to its access to and occupancy of the Properties during the applicable Asset Marketing Period. Subject to and limited by the Cash Collateral Budget, the Company agrees to continue to provide and pay for all utilities and other usual and customary occupancy-related costs and expenses during the course of Consultant's occupancy of the Properties. The Company agrees to maintain and bear the cost of any existing security personnel and trash removal for the Properties during the term of this Agreement. The Company acknowledges that Consultant is not an insurer of the Assets. Consultant shall have the right to abandon at the Properties any movable Assets not sold.

        2.8   <u>Supervisory Personnel</u>. (a) In connection with the Sale, Consultant shall directly or indirectly retain and engage the Supervisors. The Supervisors are engaged by Consultant as independent contractors and are not and shall not be deemed to be employees or agents of Company in any manner whatsoever; nor do the Supervisors have any relationship with Company by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of Company for the Supervisors, except with respect to indemnification pursuant to <u>Section 7.7</u> hereof. During the Sale Term, the Supervisors shall perform Services during normal Store operating hours and for the period of time prior to the Stores' opening and subsequent to the Stores' closing, as required in connection with the Sale, in Consultant's discretion.

        (b)   In consideration of Consultant's engagement of the Supervisors, Company agrees to reimburse Consultant, as a Sale Expense, for the actual Supervisor Costs paid by Consultant for services rendered by the Supervisors during the Sale Term. Company shall reimburse Consultant for all Supervisor Costs weekly, based upon invoices or other documentation reasonably satisfactory to Company (in consultation with the Lender Agents). Company shall not be obligated to pay Supervisor Costs and/or Supervisor deferred compensation that have not been included in, or provided for, in the Sale Budget.

        2.4   <u>Title</u>. (a) Title to all Assets shall remain with Company at all times during the Sale Term until such Asset(s) is sold. Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the benefits to Company from the sale or other disposition of the other Assets, the Company expressly acknowledges that Consultant is not guaranteeing the results of the Sale or ensuring the recoveries to be realized by the Company from the sale or other disposition of the Assets. All sales of Assets shall be made on behalf of Company. Consultant shall have no liability to the Company or any third party for its failure to sell any Asset(s), and shall have the right to abandon such unsold Asset(s) at the conclusion of the applicable Asset Marketing Period; <u>provided</u>, that any abandonment of any M&E in any Store(s) shall be done in a neat and orderly fashion.

        (b)   the Company further agrees that responsibility for the handling of any Merchandise or other goods held by Company and located in the Properties under any consignment, sale or return, or other similar agreement shall lie exclusively with Company, and Consultant shall have no responsibility with respect thereto.

        (c)   The Company and Consultant agree, and the Company hereby expressly

<div align="center">10</div>

acknowledges, that Consultant shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found at or in the Assets, or obtaining or maintaining any Environmental Permits or other permits with respect thereto. The Company shall be responsible for ensuring that the Company possesses and is in compliance with all Environmental Permits that are required for the operation of the Company's businesses. As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws. In addition to any other indemnities provided herein, the Company hereby agrees to defend, indemnify and hold Consultant harmless from any and all claims, losses, damages and liabilities (including reasonable attorney's fees and costs) of any kind whatsoever which arise from or are in connection with any hazardous chemicals, solvents or substances found at or in the Assets or any violation of any such Environmental Laws or Environmental Permits.

## 3.      Sale Expenses; Consultant's Compensation

3.1      Sale Expenses.   (a)   The Company shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses), and Consultant shall not be responsible for any such expenses, including Consultant Incurred Expenses, except as expressly provided for in Section 11 below.  The Company, Consultant and Lender Agents have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses to be incurred in connection with the sale of Merchandise through the Stores  (the "Sale Budget"), the form and content of which Sale Budget is annexed hereto and made a part hereof as Exhibit B. The Sale Budget may only be modified by mutual agreement of the Company, the Consultant, and the Lender Agents. Consultant Incurred Expenses shall not exceed the aggregate amount, per expense category, of Consultant Incurred Expenses set forth in the Sale Budget without the prior written consent of the Company and Lender Agents.  Subject to the limitations of the Sale Budget, the Company shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in Section 4 hereof upon presentation of invoices and statements for such expenses.

(b)      To the extent the Company, Consultant and Lender Agents agree on any separate M&E Budget, Real Estate Budget, Receivables Services Budget, and/or IP Services Budget, as the case may be, such supplemental budgets (each a "Supplemental Budget", and collectively the "Supplemental Budgets") shall be in addition to, and not in substitution of, the Sale Budget.

3.2      Consultant's Compensation. In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall NOT earn any fee or other compensation from the Company, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time at the request of the Company, in the course of performing Services  hereunder, in each case limited to the amounts set forth in the Sale Budget and at the times provided herein. The Company shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store.  Register receipts shall show for each item sold the

11

retail price (as reflected on Company's books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale. The Company shall make all such records and reports available to Consultant and the Lender Agents during regular business hours upon reasonable notice.

3.3     Expenses Deposit. The Interim Order and/or the Interim Cash Collateral Order (defined below) shall include approval on the part of the Company to fund, and the Company shall thereafter promptly fund, to Consultant $3,353,912 (the "Expense Deposit"). The Company shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by Company to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Company (or its designee) within three (3) business days following the Final Settlement.

## 4.     **Sale Proceeds; Weekly/Final Settlement**

4.1     During the Sale, the Company shall collect all proceeds realized from the sale of Merchandise and deposit the same in deposit accounts established by Company for the deposit thereof consistent with Company's existing cash management system (which may be Company's existing Store-level deposit accounts) (the "Sale Accounts"). In addition, if in connection with the sale of any M&E hereunder the Consultant assesses or receives any "buyer's premium" or similar sale price enhancement, the Company shall be entitled to receive any such amount, and the Consultant shall remit such amount to the Company in connection with the weekly reconciliation provided for hereunder and/or any Final Settlement (defined herein). The Company shall, upon request, deliver to Consultant and Lender Agents account statements and such other information relating sale of the Assets (including the Gross Sales and the Sale Accounts) reasonably requested by Consultant or Lender Agents.

4.2     On Wednesday of each week, commencing on the first Wednesday following the Sale Commencement Date, the Company (in consultation with the Lender Agents) and the Consultant shall reconcile the results of the sales of Asset for the prior week, including, without limitation, Gross Sales, sales of Assets, Sale Expenses (including Consultant Incurred Expenses), and any other expenses that may be incurred in connection with the performance of Services that may be in conformity with any Supplemental Budget(s). The Company shall promptly pay or reimburse all amounts due to Consultant on account of Sale Expenses, including Consultant Incurred Expenses and other expenses incurred by Consultant for the previous week on account of which it is entitled to be reimbursed pursuant to the Sale Budget and/or any Supplemental Budget(s).

4.3     No later than fourteen (14) business days following the end of the Sale Term, the Company (in consultation with the Lender Agents) and the Consultant shall complete a final accounting and reconciliation of all amounts contemplated by this Agreement ("Final Settlement"), including, without limitation, the determination and payment/reimbursement of any Sale Expenses, including Consultant Incurred Expenses, and such other expenses reimbursable to

PA00638

Consultant in connection with the performance of Services that may be in conformity with any Supplemental Budget(s), if any.

4.4     To the extent the Company fails to pay or reimburse the Consultant for any amount for which it is entitled to be reimbursed as and when due, the Consultant shall be entitled to set off Asset sale proceeds in its possession and/or the Expense Deposit as reimbursement for any such unreimbursed amounts as part of the weekly reconciliations under <u>Section 4.2</u> hereof and/or  the Final Settlement under <u>Section 4.3</u> hereof.

## 5.     <u>Company Employees</u>

5.1     The Company and the Consultant shall cooperate to retain the employees of the Company (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion.  Such employees shall remain employees of the Company, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Company's other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("<u>WARN Act</u>") payments, or any other costs, expenses, obligations, or liabilities arising from the Company's employment  or termination of such employees prior to, during, and subsequent to the Sale Term. Other than advising Company that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s).

## 6.     <u>Fulfillment of Pre-Sale Customer Orders</u>

6.1     In addition to providing the forgoing Services, the Consultant shall use commercially reasonable efforts to assist the Company in fulfilling certain pre-Sale Commencement Date orders for which the Company has received customer deposits (collectively, the "<u>Pre-SCD Orders</u>").

(a)     <u>On-Hand Fulfillment Orders</u>. Consultant shall assist the Company in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "<u>On-Hand Fulfillment Orders</u>"), on account of which orders (i) the Company has received customer deposits in the aggregate amount of $18 Million (collectively, the "<u>On-Hand Customer Deposits</u>") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Company's Distribution Centers or the Stores (collectively, the "<u>On-Hand Fulfillment Merchandise</u>").  As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Company in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Company) in order to fulfill and complete the On-Hand Fulfillment Orders.  Consultant shall advise the Company in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Company and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Company's existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales

13

commissions and delivery (collectively, the "<u>On-Hand Fulfillment Processing Expenses</u>"), shall be borne exclusively by the Company, and the Consultant shall not be responsible for any such costs or expenses. Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Company. To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Company on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder. Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <u>provided</u>, that any proceeds realized by the Company upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder.

(b) <u>Back-Order Fulfillment Orders</u>. Following the Sale Commencement Date, Consultant shall also assist the Company in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Company has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Company's Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>"). To the extent that a Back-Order Fulfillment Order(s) can be filled by the Company within a reasonable time after the Sale Commencement Date, the Company and the Consultant shall work together to implement a protocol for fulfillment of such order(s). To the extent that the Company is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Company, and the Company and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Company's bankruptcy case for the full amount of such customer's Back-Order Customer Deposit.

(c) If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit.

(d) During the Sale Term, the Company shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders.

**7.** **Affirmative Duties Of Company**

7.1 The Company shall be solely liable for, and shall pay when due (except as provided in this <u>Section 7.1</u>) the following: (i) all Store-level operating expenses, all Sale Expenses (including, but not limited to, Consultant Incurred Expenses), Central Service expenses, any expenses provided for in any Supplemental Budget(s), and all other Sale-related expenses that are

14

necessary to conduct, or are incurred in the conduct of, the Sale or Company's businesses, including, without limitation, all taxes, costs, expenses, accounts payable and other liabilities relating to the Sale, the Properties, Store Employees, any other agents and representatives of Company, and/or Company's businesses. For the avoidance of doubt, unless otherwise agreed to by Company and Lender Agents in writing, the Company shall not be responsible for, and shall have no obligation to pay or reimburse, any Consultant Incurred Expenses or other expenses in excess of the amounts set forth in the Sale Budget or any Supplemental Budget(s).

7.2     The Company shall collect all sales, excise, or gross receipts taxes. The Company shall be solely responsible for preparing and processing of all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes (including, but not limited to, sales taxes collected as part of the Sale) to the appropriate taxing authorities; and Company shall pay all collected sales taxes when due in accordance with applicable law.  The Consultant shall provide all assistance reasonably required or requested by the Company in connection with the preparation and processing of any such reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes (including, but not limited to, sales taxes collected as part of the Sale) to the appropriate taxing authorities.

7.3     Without limiting any other term or provision of this Agreement, during the Sale Term, Company shall provide Consultant, with (i) Central Services; (ii) employees at the Stores necessary or appropriate to implement and conduct the Sale, and (iii) subject to lease expirations, peaceful use and occupancy of, and reasonable access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores and Company's corporate offices and Distribution Centers for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby; provided, however, any incremental cost or expense to the Company in connection with the foregoing that is solely attributable to the Additional Consultant Goods shall reimbursed to the Company by the Consultant.  In furtherance of the foregoing, the Company shall use reasonable efforts to (i) cause the Company's employees, including Store Employees, to cooperate with Consultant and the Supervisors; (ii) execute all agreements determined by the Company and Consultant to be necessary or desirable for the operation of the Stores during the Sale; and (iii) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores.

7.4     During the period between the Sale Commencement Date and April 15, 2020, the Company and the Consultant agree that gift cards and merchandise credits, including any Cancelled Back-Order Merchandise Credit shall be honored at the Stores in accordance with store-level operation procedures to be mutually agreed upon between the Company, the Consultant, and the Lender Agents. The Company and Consultant further agree that no gift cards shall be sold from the Stores during the Sale Term.

7.5     During the first seven (7) days following the Sale Commencement Date, the Company agrees that returns of inventory sold prior to the Sale Commencement Date and either delivered to customers prior to or after the Sale Commencement Date ("Returned Merchandise") shall be accepted in a manner consistent with Company's customary practices and policies in effect on the Sale Commencement Date; provided however, no pricing adjustments, or returns of inventory sold prior to the Sale Commencement Date followed by the Customer's attempt to

15

repurchase the item (or item of the same sku) at the discounted price shall be accepted or honored during the Sale Term. All customer requests for cash refunds or merchandise credits in respect of any Returned Merchandise shall be processed exclusively through Company's point-of-sale system. All Returned Merchandise, to the extent it is not defective, shall be included as Merchandise. No returns of inventory sold prior to the Sale Commencement Date shall be accepted or allowed following the seventh (7th) day following the Sale Commencement Date.

7.6     The Company agrees to procure and maintain, during the Sale Term, all insurance (including, without limitation, commercial general liability, property damage, fire and other perils insurance) currently in effect and in the same amounts, levels, deductibles, and coverages in respect of all Assets until sold.

7.7     The Company shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

        (a)     Company's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

        (b)     any failure of Company to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

        (c)     any consumer warranty or products liability claims relating to any Merchandise;

        (d)     any liability or other claims asserted by customers, any of Company's employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant;

        (e)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Company or any of Company's employees, agents, or representatives (including, without limitation, any Company employees); and

        (f)     the negligence or willful misconduct of Company or any of its officers, directors, employees, agents or representatives.

## 8.     Affirmative Duties Of Consultant

8.1     To the extent necessary, and except as provided in the Approval Orders, Consultant shall assist the Company in obtaining all required permits and governmental consents required in

16

PA00642

order to conduct the Sale, and shall ensure that the Sale is conducted in accordance with all applicable laws, regulations and ordinances.

8.2     The Consultant shall indemnify and hold Company and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Company Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)     Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(b)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Company (including, without limitation, any Store Employees) by Consultant or any of Consultant's representatives (including, without limitation, any Supervisor);

(c)     any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Company or Company Indemnified Parties or from a breach of the terms hereof by Company; and

(d)     the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor.

## 9.     Additional Consultant Goods

9.1     In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("Additional Consultant Goods"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods).  Sales of Additional Consultant Goods shall be run through Company's point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  Consultant and Company shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Company goods.  Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Company's written

17

consent and subject to Consultant's agreement to reimburse Company for any associated expenses, Consultant shall not use Company's distribution centers for any Additional Consultant Goods.

9.2     Consultant shall pay to the Company an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Company any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation.  Except for sales taxes associated with the sale of Additional Consultant Goods and Company's Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation.  Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

9.3     The Consultant, the Company, and the Lender Agents intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Company in all respects and not a consignment for security purposes.  Subject solely to Consultant's obligations to pay to Company the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Lender Agents, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.  In furtherance of the foregoing, the Company acknowledges that the Additional Consultant Goods shall be consigned to Company as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC").  The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Lender Agents.

9.4     The Company shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with Company's insurers.  Consultant shall be responsible for payment of any deductible (but only in relation to the Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

PA00644

## 10.    Representation and Warranties

10.1    <u>Representations and Warranties of the Consultant</u>.    Each entity comprising Consultant hereby represents, warrants and covenants in favor of Company as follows:

(a)    Consultant has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b)    Upon execution by the parties hereto, this Agreement is a valid and binding obligation of Consultant enforceable in accordance with its terms, subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof.

(c)    No action or proceeding has been instituted or, to Consultant's knowledge, threatened, affecting the Consultant's ability to consummate this Agreement or the transactions contemplated herein.

(d)    Except as provided in the Approval Orders and the Sale Guidelines, Consultant will comply with and act in accordance with any and all applicable state and local laws, rules and regulations and other legal obligations of all governmental authorities and the terms/restrictions of the underlying Stores' leases.

10.2    <u>Representations and Warranties of the Company</u>: the Company hereby represents, warrants and covenants in favor of Consultant as follows:

(a)    Subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof, the Company has taken all necessary action required to authorize its execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b)    Subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof, upon execution by the Company, this Agreement is a valid and binding obligation of the Company enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally and the availability of equitable remedies.

(c)    Except as may be affected by the Company's commencement of the Bankruptcy Case, no court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for the Company's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.

(d)    The Company has all requisite authority to grant the License to Consultant to utilize the Properties and the Intellectual Property, including, without limitation, the tradenames "Art Van Furniture", "Wolf Furniture", "Levin Furniture",  and similar derivations thereof as provided for under this Agreement.

PA00645

(e)     The Company has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files, records, and information received by Consultant are true and accurate in all material respects.

(f)     Except for the liens of the ABL Lenders and Term Loan Lenders, all Assets are, or will be as of the Sale Commencement Date free and clear of all liens, claims and encumbrances of any kind whatsoever.

**11.     Bankruptcy Matters**.  If the Company commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the Bankruptcy Court, the Company shall promptly file an expedited motion (a) seeking authorization to conduct the Sale and sell or otherwise dispose of the Assets, and (b) to assume this Agreement under section 365 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved by the Interim Order, and thereafter the Final Order (together with the Interim Order, the "Approval Orders").  The Approval Orders shall be reasonably acceptable in form and substance to the Consultant, the Company and the Lender Agents, and provide for, among other things, the following:

(a)     approval of the transactions contemplated by this Agreement, including, without limitation, the company's conduct of the Sale and the sale of the other Assets;

(b)     approving the Company's retention and employment of Consultant to perform the Services contemplated by this Agreement;

(c)     approving the Sale Guidelines;

(d)     authorizing the Company's reimbursement to Consultant of all Sale Expenses advanced by the Consultant, including Consultant Incurred Expenses, together with any additional expenses incurred pursuant to any Supplemental Budget(s), such reimbursements to be made on a weekly basis and otherwise in accordance with this Agreement, from the Expense Deposit, and thereafter from gross receipts from the sale or other disposition of the Assets (or retained by the Consultant from such receipts) without further order of the Bankruptcy Court and otherwise in accordance with this Agreement, in each case without further order of the Bankruptcy Court, and any such payment(s)/reimbursement(s) shall be free and clear of all liens, claims and encumbrances;

(e)     providing that the authority granted herein for the reimbursement of Sale Expenses, including Consultant Incurred Expenses, and any other expenses incurred or advanced by Consultant pursuant to any Supplemental Budget(s), shall be subject to the provisions of (i) that certain proposed  Interim Order authorizing the Company Use of Cash Collateral" (the "Interim Cash Collateral Order") to be filed and entered in the Bankruptcy Case, and shall be made strictly in accordance with the Cash Collateral Budget (as defined in the Interim Cash Collateral Order), subject to such variances as permitted by the Cash Collateral Order; provided, however, that neither the Interim Cash Collateral Order shall not require or impose a cap or reduction on amounts due to the Consultant under this

PA00646

Agreement, other than any such cap or reduction resulting from the Company's required compliance with the Cash Collateral Budget;

(f)     not later than two (2) business days after entry of the Interim Order the Company shall deliver to the Consultant the Expense Deposit as set forth in the Sale Budget as security for payment or reimbursement to Consultant of Sale Expenses incurred by Consultant on account of which it is entitled to be reimbursed;

(e)     any remaining balance of Expense Deposit being held by Consultant upon completion of the Final Settlement shall (i) be applied by Consultant as shall be set forth in the Final Settlement, and (ii) be subject to all provisions relating to Cash Collateral set forth in the Interim Cash Collateral Order;

(f)     authorizing the Company's conduct of the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale;

(g)     authorizing the Company's conduct of the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents;

(h)     approving the sale of Additional Consultant Goods in accordance with the terms and conditions hereof; and

(i)     authorizing the Consultant and the Company to take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.

Upon the commencement of the Bankruptcy Case, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over the Company's Bankruptcy Case, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum *non conveniens*.  From and after entry of the Approval Orders, Consultant shall conduct the Sale in accordance with the terms of the Approval Orders in all material respects.

## 12.     __Insurance; Risk of Loss__

12.1     Company shall maintain throughout the Sale Term, (i) insurance with respect to the Assets in amounts and on such terms and conditions as are consistent with the Company's ordinary course operations and (ii) casualty and liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the operation of the Stores, and shall cause Consultant to be listed as an additional insured with respect to all such policies, and as loss payee for the property insurance.  Company shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence or willful misconduct of Consultant, or its employees, representatives, agents or Supervisors.

PA00647

12.2    Consultant shall maintain, throughout the Sale Term, liability insurance policies (including, but not limited to, comprehensive general liability and auto liability insurance) covering injuries to persons and property in or in connection with Consultant's provision of Services at the Stores, and shall cause Company to be named an additional insured with respect to such policies.

12.3    Notwithstanding any other provision of this Agreement, the Company and the Consultant agree that Company shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores before, during and after the Sale Term, except to the extent any such claim arises from the negligence, willful misconduct, or unlawful acts of the Consultant or any Supervisor engaged by Consultant under the terms of this Agreement.

## 13.    **Miscellaneous**

13.1    Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

If to the Company:                 c/o AVF HOLDING COMPANY, INC.
                                   6500 East Fourteen Mile Road
                                   Warren, MI  48092
                                   Attn: David Ladd
                                   Email: dladd@artvan.com

                                   With copies to:

                                   MONTGOMERY MCCRACKEN WALKER &
                                   RHOADS, LLP
                                   437 Madison Avenue
                                   New York, NY 10022
                                   Attn:  Maura I. Russell
                                   Email:  mrussell@mmwr.com

                                   ALVAREZ & MARSAL, LLP
                                   600 Madison Avenue – 7th Floor
                                   New York, NY 10022
                                   Attn:   Dennis Stogsdill
                                           Matthew Davidson
                                   Email: DStogsdill@alvarezandmarsal.com
                                          matthew.davidson@alvarezandmarsal.com

PA00648

If to the Consultant:   HILCO MERCHANT RESOURCES, LLC, HILCO
                        IP SERVICES, LLC D/B/A HILCO STREAMBANK,
                        HILCO REAL ESTATE, LLC, AND HILCO
                        RECEIVABLES, LLC
                        5 Revere Drive, Suite 206
                        Northbrook, IL 60062
                        Attention: Ian S. Fredericks
                        Tel: (847) 418-2075
                        Email: ifredericks@hilcotrading.com

                        -and-

                        GORDON BROTHERS RETAIL PARTNERS, LLC,
                        DJM REALTY SERVICES, LLC D/B/A GORDON
                        BROTHERS REAL ESTATE, GORDON
                        BROTHERS COMMERCIAL & INDUSTRIAL, LLC
                        AND GORDON BROTHERS BRANDS, LLC
                        Prudential Tower
                        800 Boylston Street
                        Boston, MA 02119
                        Attn: Mackenzie L. Shea
                        Tel: (617) 210-7116
                        Email: mshea@gordonbrothers.com

                        With a copy to (which shall not constitute notice):

                        RIEMER & BRAUNSTEIN LLP
                        Times Square Tower
                        Seven Times Square, Suite 2506
                        New York, NY 10036
                        Attn: Steven E. Fox
                        Email: sfox@riemerlaw.com

If to the ABL Lenders:  WELLS FARGO BANK, NATIONAL
                        ASSOCIATION
                        125 High Street, 11th Floor
                        Boston, MA 02110
                        Attn: Danielle Baldinelli
                        Email: Danielle.M.Baldinelli@wellsfargo.com

                        MORGAN, LEWIS & BOCKIUS LLP
                        One Federal Street
                        Boston, MA 02110-1726
                        Attn: Marjorie B. Crider
                        Email: marjorie.crider@morganlewis.com

23

PA00649

If to the Term Lenders:      King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Attn: W. Todd Holleman
Email: tholleman@kslaw.com

13.2   <u>Governing Law</u>. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions.

13.3   <u>Severability</u>. In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

13.4   <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect of the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by the Company (with the consent of the Lender Agents, which consent shall not be unreasonably withheld, delayed or conditioned) and the Consultant.

13.5   <u>Assignment</u>. Neither Company nor Consultant shall assign this Agreement without the express written consent of the other; <u>provided</u>, <u>however</u>, notwithstanding the foregoing, the Consultant may delegate and assign its rights and obligations under this Agreement to one or more affiliates with subject matter experience with applicable Assets without the consent of the Company. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

13.6   <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument. Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

13.7   <u>Independent Contractor</u>. Nothing contained herein shall be deemed to create any relationship between the Company and the Consultant other than that of an independent contractor. It is stipulated that the parties are not partners or joint venturers.

13.8   <u>Termination</u>. This Agreement shall terminate upon the earlier to occur (a) in the event the Bankruptcy Court does not enter the Interim Order on or before March 10, 2020, (b) in the event the Sale Commencement Date does not occur on or prior to March 7, 2020, (c) in the event the Bankruptcy Court does not enter the Final Order on or before March 31, 2020, (d) the mutual agreement of the Parties, or (e) upon the completion and approval of the Final Settlement; <u>provided</u>, <u>however</u>, that either party may terminate this Agreement in the event that the other commits a material breach or material failure of its obligations hereunder. If either party seeks to terminate this Agreement by reason of a claim of a material breach or material failure, such party shall provide the other party with not less than five (5) days' prior written notice stating with specificity the nature of the claimed material breach or material failure, and the party receiving

PA00650

such notice shall have five (5) business days in which to cure such material breach or material failure, failing which this Agreement shall be deemed terminated. In the event this Agreement is terminated by Consultant on account of a material breach or material failure by the Company, Consultant shall be entitled to be reimbursed any Sale Expenses, including Consultant Incurred Expenses and any other expenses incurred in conformity with the Sale Budget or any Supplemental Budget(s) through the date of such termination.

13.8    <u>Confidentiality</u>.  Except for such disclosure as may be required and/or incident to Asset sale-related activities and Services provided for herein, all information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Company, its customers, parent, subsidiary or other affiliated entities (for purposes of this provision, all such entities are included within each reference to "Company") is Company's confidential, trade secret information ("<u>Company Confidential Information</u>"), which is and shall remain the exclusive intellectual property of Company.  Consultant shall not divulge, furnish, make available or in any other manner disclose such information to any third party other than Consultant's officers, employees, representatives and agents.  Consultant shall take and shall cause its officers, employees, representatives and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Company Confidential Information.  Consultant agrees to maintain strict confidentiality and agrees that it may use Company Confidential Information only as reasonably necessary to the performance of its obligations related to the sale of the Assets as contemplated hereby.  Notwithstanding the foregoing, Company hereby agrees that Consultant may identify Company as a Consultant customer for which Consultant has provided services for purposes of promoting its business.

13.9    <u>Force Majeure</u>. If any casualty or act of God, war, or terrorism prevents or substantially inhibits the conduct of business in the ordinary course at any Store(s), or results in a material loss or impairment of the Assets, then the subject location(s) and the remaining Merchandise located thereat shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Consultant and shall have no further rights or obligations hereunder with respect thereto; <u>provided</u>, <u>however</u>, that the proceeds of any insurance attributable to impacted Assets or proceeds from business interruption insurance shall constitute Gross Proceeds hereunder.

13.10   By executing or otherwise accepting this Agreement, the Company and Consultant acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

PA00651

13.11   This Agreement shall be deemed drafted by both parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

[Remainder of Page Intentionally Left Blank]
[Signatures Appear On Next Page]

26

PA00652

IN WITNESS WHEREOF, the Company and the Consultant have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

> **AVF HOLDING COMPANY, INC.**
> **AVF HOLDING COMPANY, INC.**
>
> By: _David Ladd_
>
> Name: DAVID LADD
> Its: 3/4/2020

[Signatures Continue Next Page]

PA00653

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By:_____

    Name:    Sarah Baker
    Title:    Assistant General Counsel

    - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By:_____

    Name:    _____
    Its:    _____

**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By:_____

    Name:    _____
    Its:    _____

**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By:_____

    Name:    _____
    Its:    _____

PA00654

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By: _____

    Name:    Sarah Baker

    Title:    Assistant General Counsel

    - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By: _____

    Name:    _____

    Its:    _____

**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By: _____

    Name:    _____

    Its:    _____

**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By: _____

    Name:    _____

    Its:    _____

PA00655

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**


By:_____

     Name:    Sarah Baker

     Title:    Assistant General Counsel


     - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**


By:_____

     Name:    _____

     Its:    _____


**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**



By:_____

     Name:    Mark T. Dufton

     Its:    Chief Executive Officer , Real Estate


**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**


By:_____

     Name:    _____

     Its:    _____

28

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**


By:_____

    Name:    Sarah Baker

    Title:    Assistant General Counsel


           – and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**


By:_____

    Name:    _____

    Its:    _____



**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**



By:_____

    Name:    _____

    Its:    _____



**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**


By: *Robert J Maroney*

    Name:    Robert J. Maroney

    Its:    President

PA00657

**GORDON BROTHERS BRANDS, LLC**

By: _____
Name: _____ RAMEZ TOUBASSY ____
Its: _____ PRESIDENT _____


[Signatures Continue Next Page]

29

PA00658

ACKNOWLEDGED AND AGREED
TO THIS ___DAY OF MARCH, 2020:

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
As Administrative Agent and Collateral Agent

By: _____

Name: Lauren Murphy

Its: Director

[Signatures Continue Next Page]

30

PA00659

**VIRTUS GROUP, LP,**
As Administrative Agent and Collateral Agent
For Itself and the Other Term Loan Lenders

VIRTUS GROUP, LP,
as Administrative Agent

By: _____

Name:

Title: SNR DIR

Art Van Furniture
Results - Store Count Strategy by Location

| | | |
|---|---|---|
| 169 | # Stores included in liquidation | Yes |
| 2 | # stores closed prior to sale commencement | No |

*Financial Information in ($000's)*

| | Location Information | | | | | | | | | | | | Location Space Details | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store # | Store Name | Original Store Name | Include in Liquidation | Direct Marketing Area | Store Type | Company Affiliation | Gross Sq. Ft. | Selling Sq. Ft. | Lease Beginning Date | Lease Expire. | Months Remaining | SLB Property | Landlord | Master Lease | Address |
| 1 | Bel Air, MD (1) | BEL AIR (#65) | Yes | Baltimore | Standard | WLF | 74,400 | 62,000 | 5/15/2015 | 12/31/2025 | 70 | No | CAMPUS HILLS MARYLAND ASSOCIATES, L.P. | None | 2400 E Churchville Rd, Bel Air, MD, 21015, USA |
| 2 | Pasadena, MD (2) | PASADENA (#61) | Yes | Baltimore | Standard | WLF | 61,646 | 54,000 | 5/15/2015 | 8/31/2025 | 66 | No | ARUNDEL PROPERTY INVESTORS LP | None | 8038 Ritchie Hwy, Pasadena, MD, 21122, USA |
| 3 | Westminster, MD (3) | WESTMINSTER (#64) | Yes | Baltimore | Standard | WLF | 40,550 | 38,000 | 5/15/2015 | 8/31/2021 | 18 | No | WESTMINSTER GATEWAY, LLC | None | 1030 Baltimore Blvd Suite 110, Westminster, MD, 21157, USA |
| 4 | Towson, MD (4) | TOWSON (#63) | Yes | Baltimore | Standard | WLF | 54,000 | 46,000 | 5/15/2015 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1530 E Joppa Rd, Towson, MD, 21286, USA |
| 5 | Catonsville, MD (5) | CATONSVILLE (#62) | Yes | Baltimore | Standard | WLF | 115,300 | 40,000 | 5/15/2015 | 8/31/2025 | 66 | No | JMB JOINT VENTURE | None | 6415 Baltimore National Pike, Catonsville, MD, 21228, USA |
| 6 | Downers Grove, IL (6) | DOWNERS GROVE AVF & SSI (#199) | Yes | Chicago | Flagship | AVF | 100,000 | 92,428 | 8/1/2015 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1021 BUTTERFIELD RD, DOWNERS GROVE, IL, 60515, USA |
| 7 | Merrillville, IN (7) | MERRILLVILLE AVF | Yes | Chicago | Standard | AVF | 50,000 | 43,130 | 8/24/2013 | 2/28/2023 | 36 | No | ACADIA MERRILLVILLE REALTY, L.P. | None | 1600 E 80TH AVE, MERRILLVILLE, IN, 46410, USA |
| 8 | Naperville, IL (8) | NAPERVILLE AVF | Yes | Chicago | Standard | AVF | 62,000 | 52,753 | 6/18/2015 | 8/31/2025 | 66 | No | BRIXMOR HERITAGE SQUARE, LLC | None | 404 SOUTH ROUTE 59, NAPERVILLE, IL, 60540, USA |
| 9 | Bedford Park, IL (9) | BEDFORD PK AVF | Yes | Chicago | Standard | AVF | 84,505 | 71,590 | 10/26/2013 | 4/30/2024 | 50 | No | SPIRIT SPE LOAN PORTFOLIO 2013-3, LLC | None | 7200 S CICERO AVE, BEDFORD PARK, IL, 60638, USA |
| 10 | Elston, IL (10) | ELSTON AVE AVF | Yes | Chicago | Standard | AVF | 48,000 | 40,660 | 10/26/2013 | 4/30/2024 | 50 | No | Farbman Group | None | 2606 ELSTON AVE, CHICAGO, IL, 60647, USA |
| 11 | Batavia, IL (11) | BATAVIA AVF | Yes | Chicago | Standard | AVF | 42,500 | 37,055 | 9/14/2013 | 1/31/2024 | 47 | No | PARAGON BATAVIA, LLC | None | 165 N RANDALL RD, BATAVIA, IL, 60510, USA |
| 12 | Orland Park, IL (12) | ORLAND PARK AVF | Yes | Chicago | Standard | AVF | 65,523 | 53,329 | 7/13/2013 | 5/31/2024 | 51 | No | 55th & S. Kedzie, LLC | None | 15080 S LA GRANGE RD, ORLAND PARK, IL, 60462, USA |
| 13 | Algonquin, IL (13) | ALGONQUIN AVF | Yes | Chicago | Standard | AVF | 48,397 | 41,272 | 3/31/2016 | 7/31/2025 | 65 | No | c/o Mid America Asset Management, Inc. | None | 1500 S RANDALL ROAD, ALGONQUIN, IL, 60102, USA |
| 14 | Kildeer, IL (14) | KILDEER AVF | Yes | Chicago | Standard | AVF | 40,628 | 34,534 | 10/4/2017 | 9/30/2027 | 91 | No | Kildeer Village Square, LLC. | None | 20393 N RAND RD, KILDEER, IL, 60074, USA |
| 15 | Glendale Heights, IL (15) | GLENDALE HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,820 | 37,044 | 2/26/2016 | 3/31/2026 | 73 | No | 125 W. Army Trail Road LLC | None | 125 ARMY TRAIL ROAD, GLENDALE HGTS, IL, 60139, USA |
| 16 | Deerfield, IL (16) | DEERFIELD AVF | Yes | Chicago | Standard | AVF | 41,966 | 35,671 | 12/13/2017 | 2/29/2028 | 96 | No | Gateway Fairview, Inc. | None | 120 S. WAUKEGAN, DEERFIELD, IL, 60015, USA |
| 17 | Schaumburg, IL (17) | SCHAUMBURG AVF& SSI (#303) | Yes | Chicago | Flagship | AVF | 71,400 | 61,990 | 10/29/2016 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 1293 E HIGGINS RD, SCHAUMBURG, IL, 60173, USA |
| 18 | Joliet, IL (18) | JOLIET PS | Yes | Chicago | Sleep | APS | 3,116 | 2,884 | 12/26/2017 | 12/31/2027 | 94 | No | GW Fidelity PH, LLC | None | 2901 PLAINFIELD, JOLIET, IL, 60435, USA |
| 19 | Burbank, IL (19) | BURBANK PS | Yes | Chicago | Sleep | APS | 3,994 | 3,476 | 3/21/2015 | 3/31/2025 | 61 | No | WM 73 RE, LLC | None | 7712 CICERO AVENUE, BURBANK, IL, 60459, USA |
| 20 | Woodridge, IL (20) | WOODRIDGE AVF | Yes | Chicago | Standard | AVF | 68,400 | 59,687 | 3/27/2014 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 900 E BOUGHTON RD, WOODRIDGE, IL, 60517, USA |
| 21 | Gurnee, IL (21) | GURNEE AVF | Yes | Chicago | Standard | AVF | 34,000 | 28,900 | 6/26/2018 | 12/31/2032 | 154 | No | 3503 RP Gurnee, L.L.C. | None | 6911 W. GRAND AVE, GURNEE, IL, 60031, USA |
| 22 | Plainfield, IL (22) | PLAINFIELD PS | Yes | Chicago | Sleep | APS | 3,600 | 3,290 | 2/11/2017 | 2/28/2027 | 84 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 13511 S ROUTE 59, PLAINFIELD, IL, 60544, USA |
| 23 | Willowbrook, IL (23) | WILLOWBROOK PS | Yes | Chicago | Sleep | APS | 3,834 | 3,400 | 12/3/2016 | 1/31/2027 | 83 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6938 KINGERY HIGHWAY, WILLOWBROOK, IL, 60527, USA |
| 24 | Chicago, IL (24) | ASHLAND PS | Yes | Chicago | Sleep | APS | 3,000 | 2,600 | 9/10/2016 | 9/30/2026 | 79 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 2911 N. ASHLAND AVENUE, CHICAGO, IL, 60657, USA |
| 25 | Bloomingdale, IL (25) | BLOOMINGDALE PS | Yes | Chicago | Sleep | APS | 4,798 | 4,370 | 5/26/2017 | 4/30/2027 | 86 | No | Bloomingdale Square, LP | None | 398 W ARMY TRAIL RD #102, BLOOMINGDALE, IL, 60108, USA |
| 26 | Harwood Heights, IL (26) | HARWOOD HEIGHTS AVF | Yes | Chicago | Standard | AVF | 60,000 | 51,000 | 11/15/2017 | 12/31/2038 | 226 | No | DBD AVF | None | 7304 WEST LAWRENCE AVE, HARWOOD HEIGHTS, IL, 60706, U |
| 27 | Avon, OH (27) | AVON (#45, 46 CC) | Yes | Cleveland | Standard | LVF | 77,000 | 72,380 | 7/1/2011 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1801 NAGEL ROAD, AVON, OH, 44011, USA |
| 28 | North Canton, OH (28) | CANTON (#14, 25, 26 CC) | Yes | Cleveland | Standard | LVF | 65,765 | 60,199 | 3/1/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 6229 PROMLER AVENUE NW, NORTH CANTON, OH, 44720, USA |
| 29 | Akron, OH (29) | AKRON (#23, 24 CC) | Yes | Cleveland | Standard | LVF | 69,422 | 65,257 | 10/1/2005 | 9/30/2020 | 7 | No | TABANI AKRON, LP | None | 3742 BROOKWALL DRIVE, AKRON, OH, 44333, USA |
| 30 | Middleburg Heights, OH (30) | MIDDLEBURG (#11, 31 CC) | Yes | Cleveland | Standard | LVF | 50,000 | 45,172 | 7/1/1993 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 16960 SPRAGUE ROAD, MIDDLEBURG HEIGHTS, OH, 44130, US |
| 31 | Mentor, OH (31) | MENTOR (#9, 27, 28 CC) | Yes | Cleveland | Standard | LVF | 75,600 | 70,712 | 7/1/2009 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 7799 MENTOR AVE, MENTOR, OH, 44060, USA |
| 32 | Oakwood Village, OH (32) | OAKWOOD VILLAGE (#18, 19 CC) | Yes | Cleveland | Standard | LVF | 89,723 | 67,723 | 8/1/2002 | 11/30/2027 | 93 | No | FIRST INERNATIONAL HAWTHORNE LP | None | 23100 BROADWAY AVE, OAKWOOD VILLAGE, OH, 44146, USA |
| 33 | North Olmsted, OH (33) | NORTH OLMSTED (#12, 34 CC) | Yes | Cleveland | Standard | LVF | 46,000 | 41,270 | 8/1/1996 | 1/31/2027 | 83 | No | GLITZ AND ASSOCIATES INC | None | 23250 LORAIN ROAD, NORTH OLMSTED, OH, 44070, USA |
| 34 | Strongsville, OH (34) | STRONGSVILLE (#74) | Yes | Cleveland | Sleep | LM | 5,000 | 4,400 | 11/5/2015 | 10/31/2025 | 68 | No | ECHO STRONGSVILLE LLC | None | 16105 PEARL ROAD, STRONGSVILLE, OH, 44136, USA |
| 35 | Mayfield Heights, OH (35) | MAYFIELD (#65) | Yes | Cleveland | Sleep | LM | 4,620 | 4,120 | 5/1/2012 | n/a | n/a | No | JACK H SCHWARTS, TRUSTEE OF THE JACK H | None | 6061 Mayfield Rd, Mayfield Heights, OH, 44124, USA |
| 36 | Stow, OH (36) | STOW (#68) | Yes | Cleveland | Sleep | LM | 4,160 | 3,660 | 10/25/2013 | 1/31/2024 | 47 | No | DEVILLE DEVELOPMENTS LLC | None | 1061 GRAHAM RD, STOW, OH, 44224, USA |
| 37 | Medina, OH (37) | MEDINA (#76) | Yes | Cleveland | Sleep | LM | 4,500 | 4,000 | 8/25/2016 | 9/30/2021 | 19 | No | GOWE LEASING LIMITED | None | 3823 PEARL RD, MEDINA, OH, 44256, USA |
| 38 | Sandusky, OH (38) | SANDUSKY (#73) | Yes | Cleveland | Sleep | LM | 5,400 | 4,900 | 11/14/2014 | 2/28/2025 | 60 | No | PLI II LTD | None | 4917 MILAN RD PLAZA, SANDUSKY, OH, 44870, USA |
| 39 | Elyria, OH (39) | ELYRIA (#72) | Yes | Cleveland | Sleep | LM | 6,400 | 5,800 | 6/19/2015 | 6/30/2026 | 76 | No | ELYRIA-CHESTNUT, LLC / NICKLEPLATE REALT | None | 510 CHESTNUT COMMONS DR, ELYRIA, OH, 44035, USA |
| 40 | Solon, OH (40) | SOLON (#67) | Yes | Cleveland | Sleep | LM | 3,788 | 3,288 | 2/22/2013 | 5/31/2023 | 39 | No | L & y PROPERTIES - SOLON, LLC | None | 6130 KRUSE DRIVE, SOLON, OH, 44139, USA |
| 41 | Canton, OH (41) | MASSILLON (#71) | Yes | Cleveland | Sleep | LM | 5,650 | 5,150 | 6/27/2014 | 11/30/2024 | 57 | No | PERRY TOWN CENTER LLC | None | 5119 WEST TUSCARAWAS ST, CANTON, OH, 44708, USA |
| 42 | Polaris, OH (42) | POLARIS AVF | Yes | Columbus | Flagship | AVF | 70,000 | 59,500 | 3/16/2019 | 10/31/2037 | 212 | Yes | STORE CAPITAL | Other | 1551 GEMINI PLACE, COLUMBUS, OH, 43240, USA |
| 43 | Novi, MI (43) | NOVI AVF | Yes | Detroit | Flagship | AVF | 102,520 | 88,958 | 1/1/1985 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 27775 NOVI RD, NOVI, MI, 48377, USA |
| 44 | Warren, MI (44) | TECH PLAZA AVF | Yes | Detroit | Flagship | AVF | 109,380 | 87,859 | 11/26/1982 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 6500 E 14 MILE RD, WARREN, MI, 48092, USA |
| 45 | Shelby Township, MI (45) | LAKESIDE AVF | Yes | Detroit | Flagship | AVF | 68,104 | 72,336 | 8/14/1992 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 14055 HALL RD, SHELBY TOWNSHIP, MI, 48315, USA |
| 46 | Canton, MI (46) | CANTON AVF | Yes | Detroit | Flagship | AVF | 69,929 | 58,740 | 1/3/2018 | 12/31/2038 | 226 | Yes | Agree Limited Partnership | None | 41661 FORD ROAD, CANTON, MI, 48187, USA |
| 47 | Taylor, MI (47) | TAYLOR AVF | Yes | Detroit | Flagship | AVF | 91,720 | 79,294 | 3/6/1978 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 22035 EUREKA RD, TAYLOR, MI, 48180, USA |
| 48 | Ann Arbor, MI (48) | ANN ARBOR AVF | Yes | Detroit | Flagship | AVF | 70,000 | 60,912 | 7/2/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 425 E EISENHOWER PKWY, ANN ARBOR, MI, 48108, USA |
| 49 | Southfield, MI (49) | SOUTHFIELD AVF | Yes | Detroit | Standard | AVF | 64,584 | 52,094 | 11/1/2000 | 7/31/2023 | 41 | No | GREENFIELD PLAZA, INC. | None | 22555 GREENFIELD RD, SOUTHFIELD, MI, 48075, USA |
| 50 | Royal Oak, MI (50) | WOODWARD AVF & SSI (#174) | Yes | Detroit | Standard | AVF | 56,520 | 54,943 | 11/14/1997 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 32301 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 51 | Clinton Twp, MI (51) | CLINTON AVF | Yes | Detroit | Flagship | AVF | 69,720 | 60,128 | 1/1/1988 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 33801 S GRATIOT AVE, CLINTON TWP, MI, 48035, USA |
| 52 | Chesterfield, MI (52) | CHESTERFIELD AVF | Yes | Detroit | Standard | AVF | 73,152 | 58,029 | 12/26/2003 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 50400 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 53 | Howell, MI (53) | HOWELL AVF | Yes | Detroit | Standard | AVF | 51,075 | 45,721 | 11/1/1997 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4101 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 54 | Waterford, MI (54) | DRAYTON PLAINS AVF | Yes | Detroit | Standard | AVF | 53,188 | 57,435 | 6/30/1971 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 5053 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 55 | Dearborn, MI (55) | DEARBORN AVF | Yes | Detroit | Standard | AVF | 57,633 | 58,164 | 7/11/1997 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN CAPITAL PARTNERS, LLC | 15701 MARKET DR, DEARBORN, MI, 48126, USA |
| 56 | Auburn Hills, MI (56) | GREAT LAKES AVF | Yes | Detroit | Standard | AVF | 43,319 | 37,296 | 1/1/2011 | 1/31/2021 | 11 | No | Taubman Auburn Hills Associates Limited Partnersh | None | 4612 BALDWIN RD, AUBURN HILLS, MI, 48326, USA |
| 57 | Port Huron, MI (57) | PORT HURON AVF | Yes | Detroit | Standard | AVF | 74,800 | 59,123 | 9/20/2002 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1234 32ND ST, PORT HURON, MI, 48060, USA |
| 58 | Rochester Hills, MI (58) | ROCHESTER AVF | Yes | Detroit | Standard | AVF | 48,621 | 41,328 | 5/16/2019 | 11/30/2033 | 165 | No | Rochester KM Partners, LLC | None | 1032 SOUTH ROCHESTER ROAD, ROCHESTER, MI, 48307, USA |
| 59 | Livonia, MI (59) | 7 MILE AVF | Yes | Detroit | Standard | AVF | 61,752 | 53,795 | 1/1/1985 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 29905 7 MILE RD, LIVONIA, MI, 48152, USA |
| 60 | Warren, MI (60) | SCHOENHERR AVF | Yes | Detroit | Standard | AVF | 38,795 | 41,890 | 1/19/1972 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 13855 E 8 MILE RD, WARREN, MI, 48089, USA |
| 61 | Westland, MI (61) | WESTLAND AVF | Yes | Detroit | Standard | AVF | 79,773 | 70,723 | 4/14/1987 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 8300 N WAYNE RD, WESTLAND, MI, 48185, USA |
| 62 | Ann Arbor, MI (62) | ANN ARBOR W PS | Yes | Detroit | Sleep | APS | 4,600 | 4,079 | 9/1/2011 | 8/31/2021 | 18 | No | BRIXMOR Holdings 1 SPE, LLC | None | 2570 JACKSON AVE, ANN ARBOR, MI, 48103, USA |
| 63 | Rochester, MI (63) | ROCHESTER PS | Yes | Detroit | Sleep | APS | 5,000 | 4,474 | 6/1/2010 | 7/31/2020 | 5 | No | McKnight South East, LP c/o McKnight Property Mar | None | 1856 S ROCHESTER RD, ROCHESTER, MI, 48307, USA |
| 64 | Grosse Pointe Woods, MI (64) | GROSSE POINTE SOUTH PS | Yes | Detroit | Sleep | APS | 3,500 | 2,688 | 3/1/2018 | 2/29/2028 | 96 | No | Ryder Investments | None | 19387 MACK AVE, GROSSE POINTE, MI, 48236, USA |
| 65 | Warren, MI (65) | WARREN E PS | Yes | Detroit | Sleep | APS | 5,072 | 4,507 | 5/16/2011 | 6/30/2022 | 28 | No | WARREN VILLAGE, LLC | None | 6400 14 MILE RD, WARREN, MI, 48092, USA |
| 66 | Sterling Hgts, MI (66) | STERLING HTS PS | Yes | Detroit | Sleep | APS | 4,014 | 3,672 | 2/9/2013 | 2/28/2023 | 36 | No | EASTLAKE COMMONS ASSOCIATES, LLC | None | 44975 HAYES RD, STERLING HGTS, MI, 48313, USA |
| 67 | Washington, MI (67) | WASHINGTON PS | Yes | Detroit | Sleep | APS | 4,000 | 3,425 | 5/16/2011 | 10/31/2021 | 20 | No | AF Jonna Development & Management Company, L | None | 7887 26 MILE ROAD, WASHINGTON, MI, 48094, USA |
| 68 | Southgate, MI (68) | SOUTHGATE PS | Yes | Detroit | Sleep | APS | 5,117 | 4,768 | 1/16/2016 | 3/31/2021 | 13 | No | BRANDON ASSOCIATES SOUTHGATE L.L.C. | None | 15060 DIX TOLEDO RD, SOUTHGATE, MI, 48195, USA |
| 69 | Canton, MI (69) | CANTON PS | Yes | Detroit | Sleep | APS | 4,600 | 4,280 | 7/1/2009 | 6/30/2024 | 52 | No | Ford Road Investments, LLC | None | 41913 FORD RD, CANTON, MI, 48187, USA |
| 70 | Monroe, MI (70) | MONROE PS | Yes | Detroit | Sleep | APS | 4,000 | 3,593 | 7/30/2016 | 7/31/2026 | 77 | No | Keystone Commercial | None | 1570 NORTH TELEGRAPH ROAD, MONROE, MI, 48162, USA |
| 71 | Troy, MI (71) | TROY N PS | Yes | Detroit | Sleep | APS | 4,500 | 4,059 | 5/16/2011 | 7/31/2021 | 17 | No | Universal Mall Properties LLC | None | 1735 BIG BEAVER RD, TROY, MI, 48083, USA |
| 72 | West Bloomfield, MI (72) | W BLOOMFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,655 | 10/1/2013 | 2/29/2024 | 48 | No | MAPLE ORCHARD ASSOCIATES, LLC | None | 6470 ORCHARD LAKE ROAD, WEST BLOOMFIELD, MI, 48322, US |
| 73 | Chesterfield, MI (73) | CHESTERFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,572 | 11/18/2017 | 11/30/2027 | 93 | No | CHESTERFIELD COMMONS ASSOCIATES, LLC | None | 50938 GRATIOT AVE, CHESTERFIELD, MI, 48051, USA |
| 74 | Woodhaven, MI (74) | WOODHAVEN PS | Yes | Detroit | Sleep | APS | 3,966 | 3,565 | 10/17/2015 | 10/31/2025 | 68 | No | THE ALLENWEST GROUP, LLC | None | 19410 WEST ROAD, WOODHAVEN, MI, 48183, USA |
| 75 | Brighton, MI (75) | BRIGHTON E PS | Yes | Detroit | Sleep | APS | 4,248 | 3,218 | 5/16/2011 | 9/30/2022 | 31 | No | BRIGHTON GATE COMMONS, LLC | None | 9990 E GRAND RIVER AVE, BRIGHTON, MI, 48116, USA |
| 76 | Bloomfield Twp, MI (76) | BLOOMFIELD TWP PS | Yes | Detroit | Sleep | APS | 3,602 | 3,139 | 5/20/2017 | 7/31/2027 | 89 | No | BP OF WHITE LAKE, INC. | None | 6450 TELEGRAPH ROAD, BLOOMFIELD TWP, MI, 48301, USA |
| 77 | New Hudson, MI (77) | NEW HUDSON PS | Yes | Detroit | Sleep | APS | 4,106 | 3,758 | 4/10/2012 | 10/31/2022 | 32 | No | Milford Road Plaza, LLC | None | 30821 MILFORD RD, NEW HUDSON, MI, 48165, USA |
| 78 | Lapeer, MI (78) | LAPEER PS | Yes | Detroit | Sleep | APS | 4,500 | 3,864 | 10/1/2016 | 1/31/2027 | 83 | No | JKL REAL ESTATE CO. | None | 806 S MAIN STREET, LAPEER, MI, 48446, USA |
| 79 | Royal Oak, MI (79) | ROYAL OAK PS | Yes | Detroit | Sleep | APS | 5,950 | 4,956 | 5/16/2011 | 6/30/2024 | 52 | No | 4400 North Woodward, LLC | None | 32500 WOODWARD AVE, ROYAL OAK, MI, 48073, USA |
| 80 | White Lake, MI (80) | WHITE LAKE PS | Yes | Detroit | Sleep | APS | 3,680 | 2,995 | 5/16/2011 | 3/31/2021 | 13 | No | CLOSED | 0 | 5951 HIGHLAND RD, WHITE LAKE, MI, 48383, USA |
| 81 | Troy, MI (81) | TROY S PS | Yes | Detroit | Sleep | APS | 4,675 | 3,464 | 5/16/2011 | 1/31/2022 | 23 | No | URBAN CAL OAKLAND PLAZA, LLC | None | 272 JOHN R, TROY, MI, 48083, USA |
| 82 | Waterford, MI (82) | WATERFORD PS | Yes | Detroit | Sleep | APS | 6,008 | 5,060 | 5/16/2011 | 3/31/2022 | 25 | No | INVESTCO OF MICHIGAN LLC | None | 4977 DIXIE HWY, WATERFORD, MI, 48329, USA |
| 83 | Novi, MI (83) | NOVI PS | No | Detroit | Sleep | APS | 2,600 | 2,073 | 5/16/2011 | 1/31/2020 | n/a | No | RAMCO WEST OAKS II LLC | None | 43420 W OAKS DR, NOVI, MI, 48377, USA |
| 84 | Brighton, MI (84) | BRIGHTON W PS | Yes | Detroit | Sleep | APS | 4,200 | 3,784 | 5/16/2011 | 10/31/2021 | 20 | No | CROSS GRAND PLAZA, LLC | None | 8709 WEST GRAND RIVER, BRIGHTON, MI, 48116, USA |
| 85 | Ann Arbor, MI (85) | ANN ARBOR E PS | Yes | Detroit | Sleep | APS | 4,274 | 3,062 | 5/16/2011 | 5/31/2021 | 15 | No | AF Jonna Development & Management Company, L | None | 3550 WASHTENAW, ANN ARBOR, MI, 48104, USA |
| 86 | Lake Orion, MI (86) | LAKE ORION PS | Yes | Detroit | Sleep | APS | 4,160 | 3,775 | 4/1/2014 | 1/31/2022 | 23 | No | SHOPS AT THE SHORES OF LONG LAKE L.L.C. | None | 610 N. LAPEER RD, LAKE ORION, MI, 48362, USA |
| 87 | Ferndale, MI (87) | FERNDALE PS | Yes | Detroit | Sleep | APS | 6,553 | 5,587 | 4/1/2016 | 6/30/2026 | 76 | No | B.P. of White Lake Inc. | None | 23100 WOODWARD AVE, FERNDALE, MI, 48220, USA |
| 88 | Utica, MI (88) | UTICA E PS | Yes | Detroit | Sleep | APS | 5,900 | 2,858 | 9/1/2011 | 1/31/2023 | 35 | No | SHELBY CORNERS, LLC | None | 45040 NORTHPOINTE BLVD, UTICA, MI, 48315, USA |
| 89 | Howell, MI (89) | HOWELL PS | Yes | Detroit | Sleep | APS | 9,400 | 8,794 | 5/16/2011 | 10/31/2024 | 56 | No | COUNTRY CORNERS SHOPPING CENTER, L.L.C | None | 4050 E GRAND RIVER AVE, HOWELL, MI, 48843, USA |
| 90 | Westland, MI (90) | WESTLAND PS | Yes | Detroit | Sleep | APS | 4,400 | 3,976 | 10/1/2016 | 10/31/2026 | 80 | No | CENTRAL-WAYNE PROPERTIES, LLC | None | 7671 NORTH WAYNE RD, WESTLAND, MI, 48185, USA |
| 91 | Grosse Pointe, MI (91) | GROSSE POINTE SSI | Yes | Detroit | Design | SSI | 7,600 | 5,933 | 6/26/2015 | 10/31/2020 | 8 | No | ST. John Health | None | 17145 KERCHEVAL, GROSSE POINTE, MI, 48230, USA |
| 92 | Plymouth, MI (92) | PLYMOUTH PS | Yes | Detroit | Sleep | APS | 4,000 | 3,580 | 9/24/2016 | 11/30/2026 | 81 | No | PLYMOUTH HAGGERTY UNIT 6 | None | 41512 ANN ARBOR RD, PLYMOUTH, MI, 48170, USA |
| 93 | Shelby Twp, MI (93) | SHELBY TWP PS | Yes | Detroit | Sleep | APS | 4,000 | 3,714 | 1/13/2018 | 1/31/2028 | 95 | No | JERUSALEM PROPERTIES, LLC | None | 46975 VAN DYKE AVE, SHELBY TWP, MI, 48317, USA |
| 94 | Roseville, MI (94) | ROSEVILLE PS | Yes | Detroit | Sleep | APS | 4,800 | 4,512 | 11/21/2013 | 5/31/2024 | 51 | No | ROSEVILLE VILLAGE, L.L.C. | None | 31851 GRATIOT AVE, ROSEVILLE, MI, 48066, USA |
| 95 | Taylor, MI (95) | TAYLOR PS | Yes | Detroit | Sleep | APS | 4,000 | 3,433 | 10/3/2015 | 10/31/2025 | 68 | No | VAN ELSLANDER VENTURES, LLC | None | 23471 EUREKA RD, TAYLOR, MI, 48180, USA |
| 96 | Dearborn, MI (96) | DEARBORN PS | Yes | Detroit | Sleep | APS | 5,828 | 4,141 | 4/8/2017 | 5/31/2027 | 87 | No | AMD, LLC. | None | 22731 MICHIGAN AVE, DEARBORN, MI, 48124, USA |
| 97 | Livonia, MI (97) | LIVONIA PS | Yes | Detroit | Sleep | APS | 3,612 | 3,120 | 5/17/2014 | 5/31/2024 | 51 | No | Middlebelt Plymouth Venture LLC | None | 29611 PLYMOUTH, LIVONIA, MI, 48150, USA |
| 98 | Southfield, MI (98) | SOUTHFIELD PS | Yes | Detroit | Sleep | APS | 4,000 | 3,606 | 1/13/2018 | 1/31/2028 | 95 | No | AF Jonna Development & Management Company, L | None | 29119 TELEGRAPH RD, SOUTHFIELD, MI, 48034, USA |
| 99 | Bloomfield Hills, MI (99) | BLOOMFIELD AVF | Yes | Detroit | Standard | AVF | 46,388 | 26,440 | 3/15/2016 | 2/28/2037 | 204 | No | LCN PARTNERS | None | 2300 TELEGRAPH RD, BLOOMFIELD HILL, MI, 48302, USA |
| 100 | Saginaw, MI (100) | SAGINAW AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 77,827 | 56,540 | 6/30/1984 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 2660 TITTABAWASSEE RD, SAGINAW, MI, 48604, USA |
| 101 | Flint, MI (101) | FLINT AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,177 | 48,827 | 6/30/1977 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 4577 MILLER RD, FLINT, MI, 48507, USA |
| 102 | Burton, MI (102) | BURTON AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 46,196 | 48,841 | 7/31/1987 | 3/31/2037 | 205 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4095 E COURT ST, BURTON, MI, 48509, USA |
| 103 | Bay City, MI (103) | BAY CITY AVF | Yes | Flint-Saginaw-Bay City | Standard | AVF | 34,578 | 36,957 | 2/2/1996 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 4150 WILDER RD, BAY CITY, MI, 48706, USA |
| 104 | Grand Blanc, MI (104) | GRAND BLANC PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,477 | 8/2/2014 | 8/31/2024 | 54 | No | GRAND SAGINAW PLAZA, L.L.C. | None | 11501 SOUTH SAGINAW, GRAND BLANC, MI, 48439, USA |
| 105 | Flint Township, MI (105) | FLINT PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,000 | 3,600 | 4/27/2018 | 1/31/2028 | 95 | No | Jonna Management Group, LLC | None | 4002 MILLER ROAD, FLINT, MI, 48507, USA |
| 106 | Saginaw, MI (106) | SAGINAW PS | Yes | Flint-Saginaw-Bay City | Sleep | APS | 4,847 | 4,368 | 1/30/2016 | 1/31/2021 | 11 | No | KMS Investments, LLC | None | 4605 BAY RD #200, SAGINAW, MI, 48604, USA |
| 107 | Fort Wayne, IN (107) | FORT WAYNE AVF | Yes | Fort Wayne | Standard | AVF | 45,982 | 39,667 | 1/25/2014 | 9/30/2023 | 43 | No | Sandor Development Company | None | 311 E COLISEUM BLVD, FORT WAYNE, IN, 46805, USA |
| 108 | Grand Rapids, MI (108) | GRAND RAPIDS AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 79,400 | 69,174 | 7/30/1987 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4375 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 109 | Portage, MI (109) | KALAMAZOO AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 73,990 | 60,986 | 5/1/1989 | 10/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 550 RING RD, PORTAGE, MI, 49024, USA |
| 110 | Muskegon, MI (110) | MUSKEGON AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,590 | 34,069 | 1/23/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 630 SE[illegible] MI, 49441, USA |
| 111 | Grandville, MI (111) | GRANDVILLE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 28,530 | 24,910 | 1/1/2010 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 4625 W[illegible]LE, MI, 49418, USA |
| 112 | Battle Creek, MI (112) | BATTLE CREEK AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 50,220 | 43,411 | [illegible] | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 6100 B DR N, BATTLE CREEK, MI, 49014, USA |

PA00661

Case 1:22-cv-01043-CGSS-DD... Document... Filed 10/2?/2... Page 213 of 317... PageID #: 2545

| Store # | Store Name (Original) | Store Name (Marketing) | In Liquidation | Marketing Area | Type | | | | | | | | Landlord | Loan | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113 | Comstock Park, MI (113) | ALPINE AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 111,077 | 63,525 | 11/26/1999 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4273 ALPINE AVE NW STE B, COMSTOCK PARK, MI, 49321, USA |
| 114 | Holland, MI (114) | HOLLAND AVF | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,950 | 38,443 | 8/18/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 12610 FELCH ST STE 100, HOLLAND, MI, 49424, USA |
| 115 | Muskegon, MI (115) | MUSKEGON PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | APS | 4,000 | 3,519 | 5/28/2016 | 10/31/2021 | 20 | No | SVH PROPERTIES, LLC | None | 1664 E STRINSBERG RD, MUSKEGON, MI, 49444, USA |
| 116 | Portage, MI (116) | PORTAGE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,018 | 3,632 | 5/24/2014 | 5/31/2024 | 51 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6947 SOUTH WESTNEDGE AVE, PORTAGE, MI, 49002, USA |
| 117 | Grandville, MI (117) | GRANDVILLE PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,229 | 3,773 | 3/1/2015 | 5/31/2024 | 51 | No | CWD Grandville 1, LLC | None | 4560 IVANREST AVE SW, GRANDVILLE, MI, 49418, USA |
| 118 | Kalamazoo, MI (118) | KALAMAZOO PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 3,481 | 3,186 | 3/8/2013 | 3/31/2023 | 37 | No | Kalamazoo Mall LLC | None | 338 N DRAKE RD, KALAMAZOO, MI, 49009, USA |
| 119 | Grand Rapids, MI (119) | GRAND RAPIDS PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 5,562 | 4,903 | 10/15/2014 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 3500 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 120 | Grand Rapids, MI (120) | GRAND RAPIDS N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,687 | 9/12/2016 | 8/31/2026 | 78 | No | EAST BELTLINE DEVELOPMENT, LLC | None | 2036 EAST BELTLINE AVE, GRAND RAPIDS, MI, 49525, USA |
| 121 | Comstock Park, MI (121) | ALPINE N PS | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,300 | 3,797 | 5/16/2011 | 10/31/2022 | 32 | No | ALPINE VALLEY, L.L.C. | None | 4174 ALPINE AVE NW STE A, COMSTOCK PARK, MI, 49321, USA |
| 122 | Lancaster, PA (122) | LANCASTER (#46) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 9/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 2040 Bennett Avenue, Lancaster, PA, 17601, USA |
| 123 | York, PA (123) | YORK (#44) | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 5/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO | 380 North Northern Way, York, PA, 17402, USA |
| 124 | Harrisburg, PA (124) | HARRISBURG (#42) | Yes | Harrisburg | Standard | WLF | 61,900 | 51,900 | 1/16/1991 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4661 Lindle Road, Harrisburg, PA, 17111, USA |
| 125 | Hanover, PA (125) | HANOVER (#50) | Yes | Harrisburg | Standard | WLF | 34,600 | 30,600 | 5/19/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 371 Eisenhower Drive, Hanover, PA, 17331, USA |
| 126 | Mechanicsburg, PA (126) | MECHANICSBURG (#43) | Yes | Harrisburg | Standard | WLF | 45,567 | 42,567 | 8/22/2010 | 7/31/2020 | 5 | No | LESTER ASSOCIATES | None | 75 Gateway Drive, Mechanicsburg, PA, 17055, USA |
| 127 | Chambersburg, PA (127) | CHAMBERSBURG (#51) | Yes | Harrisburg | Standard | WLF | 27,262 | 25,762 | 1/1/2009 | 12/27/2038 | 226 | No | BRITM, LLC | None | 480 Gateway Avenue, Chambersburg, PA, 17201, USA |
| 128 | Altoona, PA (128) | ALTOONA (#28) | Yes | Johnstown | Standard | WLF | 53,136 | 43,176 | 1/1/1978 | 4/30/2038 | 218 | Yes | VEREIT REAL ESTATE LP | VEREIT REAL ESTATE LP | 4 Sellers Drive/Altoona, Altoona, PA, 16601, USA |
| 129 | Johnstown, PA (129) | JOHNSTOWN (#32) | Yes | Johnstown | Standard | WLF | 40,258 | 37,258 | 9/1/1995 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1130 Scalp Avenue, Johnstown, PA, 15904, USA |
| 130 | State College, PA (130) | STATE COLLEGE (#40) | Yes | Johnstown | Standard | WLF | 50,000 | 51,402 | 5/1/2007 | 11/21/2037 | 213 | No | PATTON CENTER ASSOCIATES LP | None | 138 Valley Vista Drive, State College, PA, 16803, USA |
| 131 | Lansing, MI (131) | LANSING AVF | Yes | Lansing | Flagship | AVF | 71,581 | 77,379 | 10/25/2000 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 8748 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 132 | Jackson, MI (132) | JACKSON AVF | Yes | Lansing | Standard | AVF | 33,214 | 30,012 | 5/9/1992 | 7/31/2024 | 53 | No | ARGYLE ACRES MALL, LLC | None | 950 N WEST AVE, JACKSON, MI, 49202, USA |
| 133 | E Lansing, MI (133) | OKEMOS PS | Yes | Lansing | Sleep | APS | 5,855 | 4,457 | 5/16/2011 | 8/31/2023 | 42 | No | RICHARD AND MICHELLE BROWN | None | 2660 E. GRAND RIVER, EAST LANSING, MI, 48823, USA |
| 134 | East Lansing, MI (134) | EAST LANSING PS | Yes | Lansing | Sleep | APS | 3,974 | 3,495 | 7/16/2016 | 7/31/2021 | 17 | No | River Caddie Development, LLC | None | 1595 LAKE LANSING ROAD, EAST LANSING, MI, 48823, USA |
| 135 | Lansing, MI (135) | LANSING PS | Yes | Lansing | Sleep | APS | 4,590 | 3,689 | 5/16/2011 | 12/31/2021 | 22 | No | John Doezema Real Estate | None | 6007 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 136 | Wexford, PA (136) | WEXFORD (#4, 29, 30 CC) | Yes | Pittsburgh | Standard | LVF | 53,000 | 48,823 | 10/1/2009 | 2/28/2038 | 216 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 10688 PERRY HIGHWAY, WEXFORD, PA, 15090, USA |
| 137 | Monroeville, PA (137) | MONROEVILLE (#3 CC, 20, 21 CC) | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,545 | 7/1/2004 | 11/30/2037 | 213 | Yes | STORE CAPITAL | COLE AV PORTFOLIO / LEVIN FAMILY | 124 LEVIN WAY, MONROEVILLE, PA, 15146, USA |
| 138 | Mcmurray, PA (138) | SOUTH HILLS (#2, 32 CC) | Yes | Pittsburgh | Standard | LVF | 76,000 | 70,000 | 5/1/2004 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 3664 WASHINGTON ROAD, MCMURRAY, PA, 15317, USA |
| 139 | Greensburg, PA (139) | GREENSBURG (#40, 41 CC) | Yes | Pittsburgh | Standard | LVF | 55,314 | 50,637 | 8/1/2011 | 10/31/2021 | 20 | No | CBLIWESTMORELAND, LP | None | 5280 ROUTE 30, GREENSBURG, PA, 15601, USA |
| 140 | Pittsburgh, PA (140) | THE POINTE (#15, 35 CC) | Yes | Pittsburgh | Standard | LVF | 68,730 | 61,886 | 7/1/1999 | 7/31/2024 | 53 | No | STORE CAPITAL | Store Master Funding XII, LLC | 400 CHALVERT DRIVE, PITTSBURGH, PA, 15275, USA |
| 141 | Pleasant Hills, PA (141) | CURRY HOLLOW (#47, 48 CC) | Yes | Pittsburgh | Standard | LVF | 90,500 | 87,500 | 7/1/1991 | 9/30/2026 | 79 | No | PAUL PROPERTY MANAGEMENT, LP | None | 292 CURRY HOLLOW RD, PLEASANT HILLS, PA, 15236, USA |
| 142 | Mount Pleasant, PA (142) | MOUNT PLEASANT (#1, 22 CC) | Yes | Pittsburgh | Standard | LVF | 34,500 | 30,766 | 1/1/1924 | 4/30/2038 | 218 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 600 MAIN STREET, MT. PLEASANT, PA, 15666, USA |
| 143 | Cranberry Township, PA (143) | CRANBERRY (#60) | Yes | Pittsburgh | Standard | LM | 5,000 | 4,500 | 5/1/2012 | 4/30/2022 | 26 | No | WALNUT CAPITAL PARTNERS - CRANBERRY SC | None | 20012 ROUTE 19, CRANBERRY, PA, 16066, USA |
| 144 | Mount Lebanon, PA (144) | MOUNT LEBANON (#36) | Yes | Pittsburgh | Standard | LM | 3,990 | 3,490 | 6/28/2013 | 7/31/2023 | 41 | No | RELIANCE PITTSBURGH LLC | None | 1600 WASHINGTON RD, MT LEBANON, PA, 15228, USA |
| 145 | Butler, PA (145) | BUTLER (#75) | Yes | Pittsburgh | Standard | LM | 5,010 | 5,010 | 11/18/2016 | 2/28/2027 | 84 | No | BUTLER SITEWORK ASSOCIATES LLC | None | 620 Butler Crossing Suite 5, BUTLER, PA, 16001, USA |
| 146 | Pittsburgh, PA (146) | SHADYSIDE (#70) | Yes | Pittsburgh | Standard | LM | 7,145 | 6,645 | 10/10/2014 | 4/30/2024 | 50 | No | MCKNIGHT SOUTH EAST LP | None | 5438 BAUM BLVD, PITTSBURGH, PA, 15232, USA |
| 147 | Washington, PA (147) | WASHINGTON (#63) | Yes | Pittsburgh | Standard | LM | 7,800 | 7,300 | 3/29/2013 | 4/30/2023 | 38 | No | WASHINGTON MALL - JCP ASSOCIATES, LTD | None | 56 TRINITY POINT DR, WASHINGTON, PA, 15301, USA |
| 148 | Pittsburgh, PA (148) | FOX CHAPEL (#61) | Yes | Pittsburgh | Standard | LM | 4,000 | 3,500 | 5/1/2012 | 4/30/2022 | 26 | No | WATERWORKS PHASE II | None | 956 FREEPORT ROAD, PITTSBURGH, PA, 15238, USA |
| 149 | Pittsburgh, PA (149) | ROBINSON (#64) | Yes | Pittsburgh | Standard | LM | 5,593 | 5,093 | 8/30/2013 | 12/31/2023 | 46 | No | MCROBIN LTC AND MOSITES FAMILY GST TRUST | None | 6528 STEUBENVILLE PIKE, PITTSBURGH, PA, 15205, USA |
| 150 | Indiana, PA (150) | INDIANA (#33) | Yes | Pittsburgh | Standard | LM | 4,800 | 4,300 | 6/7/2013 | 9/30/2023 | 43 | No | LIBBY REGENCY ASSOCIATES LP | None | 1570 OAKLAND AVE, INDIANA, PA, 15701, USA |
| 151 | Monroeville, PA (151) | MONROEVILLE (#62) | Yes | Pittsburgh | Standard | LM | 4,319 | 4,000 | 6/1/2012 | 6/30/2022 | 28 | No | CE-MONROEVILLE 3820 WM PENN LP | None | 3820 WILLIAM PENN HIGHWAY, MONROEVILLE, PA, 15146, USA |
| 152 | St. Louis, MO (152) | AFFTON | Yes | St. Louis | Standard | AVF | 41,352 | 32,759 | 1/17/2018 | 12/31/2023 | 46 | No | South Lindbergh Property LLC | None | 5711 S LINDBERGH BLVD, SAINT LOUIS, MO, 63123, USA |
| 153 | O'fallon, IL (153) | FAIRVIEW | Yes | St. Louis | Standard | AVF | 39,676 | 32,627 | 1/17/2018 | 12/31/2023 | 46 | No | Rothman-O'Fallon LLC | None | 1776 WEST US 50, O FALLON, IL, 62269, USA |
| 154 | O'fallon, MO (154) | O FALLON | Yes | St. Louis | Standard | AVF | 40,884 | 31,674 | 1/16/2018 | 12/31/2023 | 46 | No | O'Fallon Missouri Properties, LLC | None | 2101 E TERRA LN, O FALLON, MO, 63366, USA |
| 155 | Bridgeton, MO (155) | BRIDGETON | Yes | St. Louis | Standard | AVF | 45,314 | 35,975 | 1/17/2018 | 12/31/2023 | 46 | No | JS Westfio, LLC | None | 925 NORTHWEST PLAZA, SAINT ANN, MO, 63074, USA |
| 156 | Richmond Heights, MO (156) | RICHMOND (DESIGN STUDIO) | Yes | St. Louis | Design | AVF | 3,670 | 3,343 | 11/15/2017 | 7/31/2024 | 53 | No | Hanley LM Properties, LLC | None | 1516 S HANLEY RD, SAINT LOUIS, MO, 63144, USA |
| 157 | Holland, OH (157) | TOLEDO AVF | Yes | Toledo | Flagship | AVF | 91,000 | 80,731 | 8/27/2013 | 3/31/2037 | 205 | Yes | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1301 E MALL DR, HOLLAND, OH, 43528, USA |
| 158 | Toledo, OH (158) | TOLEDO PS | Yes | Toledo | Sleep | APS | 4,500 | 4,045 | 5/24/2013 | 11/30/2023 | 45 | No | REED HOLDING-TALMADGE, LLC | None | 4600 TALMADGE RD, TOLEDO, OH, 43623, USA |
| 159 | Holland, OH (159) | HOLLAND PS (TOLEDO) | Yes | Toledo | Sleep | APS | 3,485 | 3,135 | 7/13/2018 | 8/31/2028 | 102 | No | Kasi Properties BG, LLC | None | 6760 AIRPORT HWY SUITE B, HOLLAND, OH, 43528, USA |
| 160 | Perrysburg Township, OH (160) | PERRYSBURGH (FREEMONT) | Yes | Toledo | Sleep | APS | 3,500 | n/a | 2/8/2019 | 4/30/2020 | 110 | No | 10411 Fremont Pike, LLC | None | 10411 FREMONT PIKE, PERRYSBURG, OH, 43551, USA |
| 161 | Traverse City, MI (161) | TRAVERSE CITY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 63,120 | 49,903 | 11/21/1998 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 1775 OAK HOLLOW DR, TRAVERSE CITY, MI, 49686, USA |
| 162 | Petoskey, MI (162) | PETOSKEY AVF | Yes | Traverse City-Cadillac | Standard | AVF | 48,115 | 49,765 | 10/5/2002 | 10/31/2027 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 1619 ANDERSON ROAD, PETOSKEY, MI, 49770, USA |
| 163 | Traverse City, MI (163) | TRAVERSE CITY PS | Yes | Traverse City-Cadillac | Sleep | APS | 4,509 | 4,104 | 8/30/2016 | 6/30/2026 | 76 | No | ANCHOR MANISTEE | None | 3675 N US 31 S SUITE B, TRAVERSE CITY, MI, 49684, USA |
| 164 | Frederick, MD (164) | FREDERICK (#7) | Yes | Washington DC | Standard | WLF | 60,000 | 52,500 | 7/1/2003 | 1/31/2024 | 47 | No | Frederick-BLCO, LLP | None | 1215 West Patrick Street, Frederick, MD, 21702, USA |
| 165 | Hagerstown, MD (165) | HAGERSTOWN (#9) | Yes | Washington DC | Standard | WLF | 66,629 | 60,000 | 2/1/2004 | 5/31/2029 | 111 | No | OUTLET VILLAGE OF HAGERSTOWN LP | None | 900 Premium Outlets Boulevard, Hagerstown, MD, 21740, USA |
| 166 | Leesburg, VA (166) | LEESBURG (#48) | Yes | Washington DC | Standard | WLF | 46,030 | 41,430 | 8/24/2012 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 131 Fort Evans Road NE, Leesburg, VA, 20176, USA |
| 167 | Frederick, MD (167) | FREDERICK OUTLET (#52) | No | Washington DC | Standard | WLF | 40,484 | 30,484 | 9/17/2014 | 1/31/2020 | n/a | No | RAVID FREDERICK LLC | None | 5830 Ballenger Creek Pike, Frederick, MD, 21703, USA |
| 168 | Saint Clairsville, OH (168) | SAINT CLAIRSVILLE (#50) | Yes | Wheeling | Standard | WLF | 24,908 | 21,000 | 9/29/2017 | 10/31/2022 | 32 | No | OHIO VALLEY MALL, LLC | None | 67661 MALL RING RD, SAINT CLAIRSVILLE, OH, 43950, USA |
| 169 | Boardman, OH (169) | BOARDMAN (#52) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 8/31/2018 | 8/31/2028 | 102 | No | A&R Properties | None | 300 BOARDMAN POLAND ROAD, BOARDMAN, OH, 44512, USA |
| 170 | Hermitage, PA (170) | HERMITAGE (#54) | Yes | Youngstown | Standard | LVF | 42,000 | n/a | 9/21/2018 | 9/30/2023 | 43 | No | A&R Properties | None | 1340 N. Hermitage Road Suite 1 Route 18, Hermitage, PA, 16148, USA |
| 171 | Niles, OH (171) | NILES (#56) | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 10/31/2018 | 10/31/2028 | 104 | No | A&R Properties | None | 836 YOUNGSTOWN-WARREN RD, NILES, OH, 44446, USA |
| Totals | | | | | | | 5,879,611 | 4,932,964 | | | | | | | |

PA00662

2/20/2020

**AVF Holding Company, Inc.**
**Exhibit B**

| Expense Budget (1) |
|:---:|

### Advertising
| | |
|---|---:|
| Media (2) | 2,097,000 |
| Signs (3) | 1,236,760 |
| Sign Walkers | 566,588 |
| Subtotal Advertising | 3,900,348 |

### Supervision
| | |
|---|---:|
| Fees / Wages / Expenses (4) | 2,160,913 |
| Subtotal Supervision | 2,160,913 |

| | |
|---|---:|
| Miscellaneous /Legal (5) | 35,000 |

| | |
|---|---:|
| Total Expenses | 6,096,261 |

*Note(s):*
*1. This Expense Budget contemplates a sale term of March, 5, 2020 through April 26, 2020. The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.*
*2. Amounts attributable to media shall only be spent in consultation with the Company.*
*3. Includes Sales Tax.*
*4. Includes Deferred Compensation and Insurance.*
*5. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.*

## Store Closing Procedures[1]

1.    The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.    The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.    On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.    At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.    The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.    The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]    Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores.  In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease.  No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E.  The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines.  The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

PA00665

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

        If to the Debtors:

        Art Van Furniture, LLC
        6500 14 Mile Road
        Warren, MI 48092
        Attention: Michael Zambricki

        with copies (which shall not constitute notice) to:

        Benesch, Friedlander, Coplan & Aronoff LLP
        222 Delaware Avenue, Suite 801
        Wilmington, Delaware 19801
        Attn: Gregory Werkheiser & Michael J. Barrie

        -and-

        Montgomery McCracken Walker & Rhoads LLP
        437 Madison Avenue
        New York, NY 10022
        Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

PA00666

# **EXHIBIT K**

PA00667

```
1                     UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
2

3                                       .    Chapter 11
       IN RE:                           .
4                                       .    Case No. 20-10553 (CSS)
       ART VAN FURNITURE, LLC, et al., .
5                                       .    Courtroom No. 6
                                        .    824 North Market Street
6                                       .    Wilmington, Delaware 19801
                                        .
7                           Debtors.    .    March 12, 2020
       . . . . . . . . . . . . . . . . .     2:00 P.M.
8

9              TRANSCRIPT OF CONTINUED FIRST DAY HEARING
            BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
10                  UNITED STATES BANKRUPTCY JUDGE

11     APPEARANCES:

12     For the Debtors:          Gregory G. Werkheiser, Esquire
                                 Michael J. Barrie, Esquire
13                               Jennifer Hoover, Esquire
                                 Kevin Capuzzi, Esquire
14                               John C. Gentile, Esquire
                                 BENESCH, FRIEDLANDER, COPLAN
15                                  & ARONOFF LLP
                                 222 Delaware Avenue, Suite 801
16                               Wilmington, Delaware 19801

17

18     Audio Operator:          Leslie Murin

19     Transcription Company:   Reliable
                                1007 N. Orange Street
20                              Wilmington, Delaware 19801
                                (302)654-8080
21                              Email:  gmatthews@reliable-co.com

22     Proceedings recorded by electronic sound recording, transcript
       produced by transcription service.
23

24

25
```

PA00668

```
 1   APPEARANCES (Continued):

 2   For the Debtors:          Marua I. Russell, Esquire
                               MONTGOMERY MCCRACKEN WALKER
 3                                & RHOADS LLP
                               437 Madison Avenue, 24th Floor
 4                             New York, New York 10022

 5
     For U.S. Trustee:         Linda Richenderfer, Esquire
 6                             David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
 7                             OFFICE OF UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
 8                             Lockbox 35
                               Wilmington, Delaware 19801
 9
     For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                             MORGAN LEWIS & BOCKIUS LLP
                               101 Park Avenue
11                             New York, New York 10178

12
                               - and -
13
                               Cory Falgowski, Esquire
14                             BURR & FORMAN LLP
                               1201 N. Market Street, Suite 1407
15                             Wilmington, Delaware 19801

16   For Jofran Sales, Inc.:   Jeffrey R. Waxman, Esquire
                               MORRIS JAMES LLP
17                             500 Delaware Avenue, Suite 1500
                               Wilmington, Delaware 19801
18
     For Landlords:            Leslie C. Heilman, Esquire
19                             BALLARD SPAHR LLP
                               919 North Market Street, 11th Floor
20                             Wilmington, Delaware 19801

21
     For Hilco & Gordon        Steven E. Fox, Esquire
22   Brothers:                 RIEMER & BRAUNSTEIN LLP
                               Times Square Tower, Suite 2506
23                             Seven Times Square
                               New York, New York 10036
24

25
```

PA00669

```
 1   APPEARANCES (Continued):

 2   For Levin Furniture:        William C. Price, Esquire
                                 CLARK HILL PLC
 3                               One Oxford Centre
                                 301 Grant Street, 14th Floor
 4                               Pittsburgh, Pennsylvania 15219

 5   TELEPHONIC APPEARANCE:

 6
     For the Debtors:            Beth E. Rogers, Esquire
 7                               ROGERS LAW OFFICES
                                 The Equitable Building
 8                               100 Peachtree Street, Suite 1950
                                 Atlanta, Georgia 30303
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 FIRST DAY MOTIONS:

2 **Customer Programs Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Implement and Administer
3 Essential Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief [Docket
4 No. 27; Filed March 9, 2020]

5 **Ruling:  Order Entered**

6 **Store Closing Sales Motion.** Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing
7 Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement
8 Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset
9 Disposition Advisors to the Debtors Pursuant to §327(a) of the Bankruptcy Code and (V) Granting Related Relief [Docket No.
10 52; Filed March 9, 2020]

11 **Ruling:  Order Entered**

12 **Levin DIP Financing Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing
13 Pursuant to 11 U.S.C. §§ 105, 361, 364(c), and 364(d), and (II) Granting Related Relief [Docket No. 49; Filed March 9, 2020].

14 **Ruling:  Order Entered**

15

16

17

18

19

20

21

22

23

24

25

PA00671

1  (Proceedings commence at 2:40 p.m.)

2  THE CLERK:  All rise.

3  THE COURT:  Please be seated.  Good afternoon

4  everybody.

5  It's been a long time since I started a hearing

6  forty minutes late.  I very much apologize.  As I'm sure

7  you're all aware, things have been developing quickly.  So,

8  it's taking a lot of my time.  I apologize.

9  MR. WERKHEISER:  Your Honor, for the record

10  Gregory Werkheiser of Benesch Friedlander Coplan & Aronoff

11  LLP.

12  Certainly no apology necessary.  We're all working

13  under less than ideal circumstances these days and doing the

14  best we can.

15  If Your Honor is ready I can provide, sort of, a

16  brief overview of where we stand generally and also wanted to

17  take the opportunity to preview some issues surrounding the

18  company's financial situation that are developing and coming

19  to light presently, as if we needed more problems to contend

20  with in this case, Your Honor.

21  So, just to refresh Your Honor's recollection, one

22  of the motions that was on for that hearing, but got carried

23  over to this hearing was the debtor's customer practices

24  motion.  We have worked closely with Ms. Richenderfer and her

25  colleagues at the U.S. Trustees Office and our other

1   stakeholders over the last couple of days.  I think we have

2   gotten to a place where we're going to be able to proceed

3   consensually to submit an interim order with revisions

4   responsive to both the feedback from the U.S. Trustees Office

5   and Your Honor's comments at our first day hearing.  So, I am

6   hopeful that will be fully consensual in a few minutes and

7   just a function of walking through an order.

8          With respect to the Levin DIP financing facility,

9   again, my expectation is that that is going to proceed on a

10  consensual basis. There have been some changes that we will

11  need to highlight for Your Honor, but in terms of impacting

12  anybody who is not fully consenting to that arrangement they

13  should not have any material adverse effect.

14         We, as I understand, remain contested as it

15  relates to the GOB consultant motion on a number of issues

16  with the U.S. Trustee.  And Ms. Russell will be able to

17  provide Your Honor an overview of where things stand in a

18  moment.  I think most of the other responses, formal and

19  informal that we knew about at the conclusion of the hearing

20  and even several that have been made aware to us since then,

21  we have been able to successfully address and resolve to

22  everyone's satisfaction.

23         To my knowledge, with the exception of, I think,

24  some objections that hit the docket this morning or an

25  objection that hit the docket this morning the only other

1  objection that remains is that of the U.S. Trustees Office.

2        Your Honor, what we propose to do, in terms of the

3  agenda, would be to take customer practices first, the Levin-

4  Wolf DIP financing facility second and then do the GOB

5  matters last.  I think the first two items we can take care

6  of relatively quickly.

7        THE COURT:  Okay.

8        MR. WERKHEISER:  Your Honor, in the interest of

9  full disclosure to the court, before we jump in I do want to

10 highlight what is a developing situation in a case that is

11 already fairly strapped for cash, and just because we don't

12 want to surprise either anyone in the courtroom or Your

13 Honor.

14        Shortly before the company filed, as is not

15 uncommon in these situations, several of the credit card

16 processors began escalating their reserves including Bank of

17 America Merchant Services which imposed a 100 percent reserve

18 on any transactions at that point.  This coincided with the

19 commencement of the prepetition commencement of the store

20 closing sales.  So, volume was much higher than would

21 normally be the case.

22        By the company's calculation at this point Bank of

23 America is holding something on the order of $24 million

24 dollars of transaction related value.  And at least our

25 information suggests that this has no reasonable relation to

1  any, sort of, adequate protection they would require based on

2  threatened chargebacks or any other need for it.

3       The other component of this is that the

4  information is just now rolling in from the first sales that

5  have occurred since the petitions were filed and at least the

6  preliminary information we have suggests that they are not

7  remitting more than a small fraction of funds related to

8  those transactions as well.  And certainly whatever debate

9  one could have about their activities up until the petition

10 date there's probably no debate that they're violating the

11 stay now in our view.

12      So, Your Honor, just to preview, and I'm sorry

13 that we may end up imposing on the court again, but we may be

14 in here quickly seeking some sort of relief to address this

15 because this is, sort of, an existential threat to the case

16 as things currently stand.  It threatens our compliance with

17 covenants and cash collateral order, and puts an already cash

18 starved case on, you know, basically life support at best.

19      So, I will just leave it at that.  Obviously,

20 everybody's rights are fully preserved if we do have to come

21 before the court, but it may be a necessity.

22      Your Honor, turning to the agenda, on customer

23 programs, as I said, we were able to work closely with the

24 U.S. Trustees Office, I think, on that to address the open

25 issues and we were able to try to address Your Honor's

PA00675

1   comments.

2           If I may approach the bench I have a redline of

3   the order marked against the version that we had in court and

4   filed with the motion at the first day hearing.

5           So, what we've tried to do here, Your Honor, is to

6   reproduce, per Your Honor's instruction, the details of the

7   wind down customer programs beginning at Page 3 of the order.

8   Both a detailed statement of how the company is treating

9   customer deposits going forward with a new Exhibit 1.  That

10  is, essentially, a matrix that shows the treatment in various

11  scenarios where customers have previously provided deposits.

12  It makes it clear what expectations should be.

13          With respect to refunds and exchanges we've fully

14  reproduced a statement of what that policy is as part of the

15  wind down, virtually verbatim for what was in the motion,

16  Your Honor.  We have a clear statement of gift cards being

17  required to be redeemed by April 15th.

18          Finally, and, again, this is consistent with Your

19  Honor's feedback and the feedback we got from the Office of

20  the United States Trustee, Subpart (d) on Page 4 of your

21  redline outlines our customer communications plan here.  So,

22  we are, as I indicated at the afternoon session on Tuesday's

23  hearing, that we are going to do an email blast to all of the

24  customers who have provided customer deposits advising them

25  of the current policies and the need to act quickly to obtain

1 the benefit of those customer deposits. For those customers

2 that did not provide email addresses the company believes

3 that it has mailing addresses and would simultaneously send

4 out a notice by mail to all of those parties.

5      In addition, the statement of the liquidation

6 terms policy will be prominently displayed on the company's

7 website and changes are going to be made by Monday to make

8 sure that that is more prominent then it is now; enlarging

9 the text, making it bold face.

10      THE COURT: Monday?

11      MR. WERKHEISER: I mean we gave ourselves till

12 Monday to implement all of this, but it may be happing as we

13 speak.

14      THE COURT: Its Thursday. You're open Friday,

15 you're open Saturday, you're open Sunday; so, sooner.

16      MR. WERKHEISER: Understood, Your Honor.

17      THE COURT: IT people are like associates.

18 They're used to working all the time.

19      MR. WERKHEISER: Then similar information will be

20 put on the claims agent website as well.

21      In addition, I consulted with Ms. Richenderfer

22 before the hearing and she just asked me to confirm for the

23 record, and I can confirm for the record, that to the extent

24 that anybody had submitted a customer deposit for furniture

25 that is in the company's possession, but for which the party

PA00677

1  had not yet taken delivery as of the petition date the

2  company is continuing to notify those people in the ordinary

3  course that, basically, they can get their stuff delivered or

4  that they can come pick it up as appropriate.  That has not

5  changed; notwithstanding the fact that we're now involved in

6  this store closing process.

7          Your Honor, the only other changes were to just,

8  again, add a decretal Paragraph 4, which is consistent with

9  the relief in the motion, about continuing to accept non-cash

10  payments and abiding by the terms of the processing

11  agreements with respect to those.

12          Finally, just backing up to Paragraph 2 we plugged

13  in the dates consistent with scheduling of the second day

14  hearing and seven day before that objection deadline.

15          THE COURT:  Does anyone wish to be heard in

16  connection with the customer programs motion?

17          MS. RICHENDERFER:  Your Honor, Linda Richenderfer

18  from the Office of the United States Trustee.

19          Just a comment that I think should be put on the

20  record with respect to this motion.  In reading materials

21  associated with the sale motion there's representations in

22  there that of the $35 million dollars being held in deposits

23  that product exists that is associated with 18 million of the

24  35 million.  That is a discussion I had with Mr. Werkheiser

25  prior to beginning this conference today.  I would hope and I

1  would think that debtors are working very hard to reach out

2  to the holders of those $18 million dollars in deposits to

3  let them know that the product is there so it can be

4  delivered to the extent that they want to move forward with

5  the transaction.

6         I know we had questions at the first day hearing

7  on Tuesday regarding how much of this product is available or

8  not available, but somebody has been able to identify $18

9  million dollars' worth of product and associated with

10  deposits.  So, I hope the debtors continue every effort

11  because, otherwise, product may go out the door that really

12  belongs to a creditor who has a deposit with the debtors.

13         THE COURT:  Okay.  Thank you.

14         The only date -- the only place I see a date here

15  is March 16th for the customer communication.

16         MR. WERKHEISER:  Yes, Your Honor.

17         THE COURT:  But you had mentioned something else?

18         MR. WERKHEISER:  No, Your Honor.  We had given

19  ourselves until the 16th to fully implement the customer

20  communication plan.

21         THE COURT:  Okay.  That's all right.  I mean

22  sooner is better than later, but I understand.  Monday is

23  fine.

24         MR. WERKHEISER:  All right.  Thank you, Your

25  Honor.

```
 1              THE COURT:  All right.  I will sign this order
 2  whenever you give it to me.
 3              MR. WERKHEISER:  Okay.  Would you prefer us to
 4  upload it or do you want a copy?
 5              THE COURT:  I'm sorry.
 6              MR. WERKHEISER:  Do you need us to upload it or
 7  hand up a clean copy?
 8              THE COURT:  If you have a clean that's presentable
 9  I'll sign that.
10              MR. WERKHEISER:  Your Honor, why don't we upload
11  it because I think we set it up --
12              THE COURT:  All right.  That's fine.
13              MR. WERKHEISER:  (Inaudible).
14              THE COURT:  Yes, you may.
15              MR. WERKHEISER:  All right.  Thank you, Your
16  Honor.
17              Your Honor, that brings us to the Levin/Wolf DIP
18  financing facility, Item 2 on today's -- excuse me, Item 3 on
19  today's agenda.  Your Honor, this was one of the items that
20  we got on file a little bit too late to be entertained at
21  Tuesday's hearing.
22              To refresh Your Honor's recollection there is a
23  subset of the debtors' overall enterprise that consists of
24  Levin and Wolf furniture branded stores that operate
25  primarily in Pennsylvania.  Those were acquired in 2017 and -
```

PA00680

1  - well, certainly certain back office functions have been

2  integrated with the debtors' broader business of the outward

3  facing parts of that business and many of the store level

4  operations have remained distinct from the balance of the

5  debtors' business.

6          As things had developed leading up to the

7  bankruptcy, as was discussed at our last hearing and through

8  the evidence we put in through Mr. Ladd's first day

9  declaration and Mr. Stogsdill's proffer as well, as we

10  explained there as a consortium deal that parties were

11  putting together.  And unfortunately that fell apart at the

12  eleventh hour near the end of February.

13          In the wake of that falling apart the debtors,

14  with the assistance of the Levin group, were able to

15  resuscitate a transaction for the sale of the, I believe its,

16  40 stores that are the Pennsylvania based Levin and Wolfe

17  Furniture stores which is the subject of an APA and motion

18  that we hope to get on file as early as tomorrow, but most

19  likely Monday.

20          Those stores are to be sold as a going concern.

21  That is a sale that once consummated would stand to, among

22  other things, preserve a thousand jobs nearly.  It then also

23  produces benefits to various creditors who could expect to

24  have claims assumed as part of that process and to customers

25  who might fare better in that process with respect to gift

1  card obligations, warranties and customer deposits then they

2  would in the general liquidation process.

3       This DIP facility, Your Honor, exists solely to

4  support that transaction.  The only borrower is the Sam Levin

5  Inc., entity which is the entity that holds those assets.

6  The collateral for the DIP facility, Your Honor, is inventory

7  and primarily the inventory that would be purchased using the

8  proceeds of the DIP facility.  And the DIP facility when that

9  sale, hopefully, ultimately closes, will be credited against

10  the purchase price as part of that DIP facility.

11  Essentially, it is of limited recourse, in most other

12  respects, because of the limited collateral pool.

13       The DIP facility, Your Honor, when we came before

14  the court on Tuesday, and this is a function of how fast

15  things have been moving, Your Honor, and trying to get real

16  time information to back up the documents, but as originally

17  constructed the DIP facility contemplated an interim

18  borrowing of 3.5 million and final 7.  It's been

19  significantly upsized now.  The proposed order that we filed

20  shortly before today's hearing contemplates interim borrowing

21  of up to 10 million and all in number subject to final

22  approval of 20 million.

23       Again, the other essential characteristics of the

24  facility are the same.  And, essentially, I think the

25  defining principal behind the DIP facility is --

1           THE COURT:  So, you've gone from seven to 20.

2           MR. WERKHEISER:  Seven to 20, Your Honor.

3           THE COURT:  And three and a half to ten.

4           MR. WERKHEISER:  Yes.  And at the risk of

5   testifying from the podium the underlying factors that have

6   produced that result, you know, some of it is information

7   flow because things have been moving very quickly, but its

8   largely a function of the fact that because the debtors have

9   been in distress for some time that the inventory on the

10  floor in most of these stores is, you know, primarily the

11  floor samples and there's a little warehouse of inventory

12  that was available on orders.

13          As I understand it, the company has historically

14  done 121 to 14 million cost of sales every 30 day period of

15  prime inventory. The level right now is down well under 8

16  million.  And as I understand it that based on the, you know,

17  review of orders of outstanding there is a significant number

18  of special orders for customers that remain to be filled.

19  That debtor and the buyer are hopeful to be able to use

20  proceeds to fill those special orders, maintain that customer

21  relationship and honor those customer deposits consistent

22  with everybody's expectations.

23          The last factor, I think, that people began to

24  appreciate as they got deeper into this that may not have

25  been fully appreciated from the outset is that sales

PA00683

1   personnel at these stores only get paid once.  The customer

2   actually takes delivery of the furniture or other merchandise

3   that they order.

4            So, the buyer who is very keen both to maintaining

5   going concern value and to make sure that this is done in

6   such a way that does the least, you know, violence possible

7   to the customer and employee communities has indicated to us

8   or has made us aware that they would prefer to have

9   sufficient availability under this to make sure that those

10  commission obligations can get honored in the ordinary

11  course.

12           Those are the underlying, sort of, factors that

13  have resulted in the decision to upside the DIP.  To my

14  understanding we have socialized this change with our term

15  loan and ABL lenders, with the U.S. Trustees Office, and

16  given the uniquely compact nature of this DIP where the only

17  collateral is this inventory and proceeds thereof, and the

18  fact that the existing lienholders are the ABL's and the term

19  loan lenders and they're consenting to this arrangement no

20  one's ox, at the end of the day, really gets gored other than

21  theirs, and our purchaser/DIP lender, in the event that the

22  transaction does not close.

23           So, it's against that backdrop that we're before

24  Your Honor today asking for interim approval of the DIP.  We

25  would, for purposes of that, incorporate our record from a

PA00684

1  first day hearing including Mr. Stogsdill's proffer, much of

2  which overlaps with the record we would want in support of

3  approval of this DIP facility on an interim basis.

4            THE COURT:  All right.  Does anyone wish to be

5  heard?

6            Mr. Waxman, good afternoon.

7            MR. WAXMAN:  Good afternoon, Your Honor.  May I

8  please the court, Jeff Waxman of Morris James on behalf of --

9            THE COURT:  Could you do me a favor.  Could you

10  actually point those towards you?  Thank you.

11            MR. WAXMAN:  Is this better, Your Honor?

12            THE COURT:  Yeah.

13            MR. WAXMAN:  Thank you, Your Honor.

14            Your Honor, first I'm kind of pulling double duty

15  here.  I am here on behalf of Serta Simmons Bedding Company.

16  Serta Simmons, just by way of background, as Your Honor is

17  likely aware, it provides mattresses and bedding.  They sold

18  -- prior to the petition date they were owed approximately

19  $2.7 million dollars.  And Serta Simmons believes that close

20  to a $1 million dollars of that claim is entitled to an

21  administrative priority pursuant to Section 503(b)(9).  So,

22  this is not an insignificant claim.

23            Your Honor, I do realize that we are only here on

24  an interim basis, but Serta Simmons has some issues with the

25  proposed financing specifically now that the amount has gone

1  up so much.  First, it seeks the -- the motion seeks to

2  provide the DIP lender superpriority administrative expense

3  thereby subordinating administrative claims.  And Serta

4  Simmons has an administrative expense in the right to reclaim

5  its goods which shouldn't be subordinated and funds should be

6  carved out to pay the administrative expenses whether or not

7  the sale goes through.

8         Second, Your Honor, the buyer and the lender here

9  are, essentially, the same entity and should not get a

10  superpriority lien subordinating the administrative expenses

11  and reclamation rights of suppliers without the buyer having

12  to pay those claims as part of the purchase price.

13         Certainly, this case should not result in

14  administrative claimants receiving worse treatment than they

15  did on the petition date and particularly now that the amount

16  of the DIP loan has done up so significantly in only the last

17  couple of days there is certainly that threat.

18         Finally, the DIP collateral should not include all

19  receivables.  It should just be limited to the receivables

20  from inventory bought with the DIP funds.  Generally, the

21  whole description of collateral needs to be rewritten to

22  restricted to only a security interest in the that inventory

23  purchase with the DIP funds.

24         If Your Honor has any questions I am happy to

25  address them.

 1          THE COURT:  I do not.

 2          MR. WAXMAN:  Thank you, Your Honor.

 3          THE COURT:  Anyone else?

 4      (No verbal response)

 5          THE COURT:  You want to respond, Mr. Werkheiser?

 6          MR. WERKHEISER:  I will and I believe Mr. Price is

 7  here on behalf of the Levin Group which is serving as the DIP

 8  lender here.  I believe if Your Honor will indulge him he'd

 9  like to be heard as well.

10          So, with respect to this I understood a couple

11  points here.  So, first, this is all news to us, Your Honor.

12  So, Mr. Waxman filed --

13          THE COURT:  First day hearing.

14          MR. WERKHEISER:  Well, not precisely, but Mr.

15  Waxman, obviously, was very busy this morning and filed a

16  lengthy complaint with, I think, like thirty something

17  exhibits, a TRO motion, an objection on behalf of another

18  client.

19          THE COURT:  Just don't beat this horse.  Move on.

20          MR. WERKHEISER:  And so he's here telling me

21  verbally that he has a client that has a potential

22  administrative claim and we've had no ability to test any of

23  those contentions.  I mean he may or he may not, but I think

24  if he wants to show up an contest what is appropriate relief

25  in the context of DIP financing, you know, the onus was on

1   him to at least come in and come in with some evidence and

2   some concrete information to support his clients asserted

3   theoretical administrative claim.

4           But be that as it may --

5           THE COURT:  I have to say I take issue with that.

6   This is an emergent hearing on, at this point, 36 hours'

7   notice.  Its, in effect, a first day hearing and he's a

8   creditor.  The onus isn't on him.  It's your burden of proof.

9   If you don't think we can go forward we'll continue this to

10  next week and we'll have an evidentiary hearing.  But you

11  can't jump on a creditor who didn't have advance notice of

12  this DIP motion until eight p.m. the day before the first day

13  hearing and fault them for not being ready for a contested

14  evidentiary hearing.  If that's your position fine, this

15  hearing is over.  We will do it next week.

16          MR. WERKHEISER:  Respectfully, Your Honor, these

17  issues were out there in connection with cash collateral as

18  well.  And so, you know, I'm not impuging anybody's motives

19  or --

20          THE COURT:  Cash collateral is completely

21  different than putting new debt on the company.  It's

22  completely different.  You're putting a $20 million dollar

23  superpriority admin claim in front of his company.  The only

24  thing you would do with cash collateral is a diminution

25  claim, okay, that will possibly be a superpriority claim.

PA00688

1  It's completely different than putting $20 million dollars of

2  new debt in front of him.

3         MR. WERKHEISER:  Understood, Your Honor.

4         THE COURT:  So, we're going forward, but this is a

5  loser argument.  So, I hope you have a better one.

6         MR. WERKHEISER:  Your Honor, what I would like to

7  just also highlight for Your Honor, again, is that I think as

8  is clear in the letter of intent that was part of the first

9  day declaration that we filed previously it is the intent to

10  use the proceeds of the DIP to pay for the inventories being

11  acquired.  As is set forth in that letter of intent the buyer

12  is committing to assume certain 503(b)(9) obligations as well

13  and the post-petition ordinary course obligations for those

14  businesses.

15         So, those items are the subject of commitments by

16  the buyer.  We are in the process of documenting that in a

17  binding APA that as I indicated would be expected to be filed

18  no later than Monday.  We are trying to seek expedited, as

19  much as Your Honor can accommodate us, approval of that sale

20  process precisely because there really is no other path to

21  save this business as a going concern and save those jobs.

22         I don't think -- certainly this is not designed to

23  prejudice anyone else.  I think the lender has asked for

24  those traditional protections that a DIP lender would want

25  and actually has asked for a lot less than your typical DIP

1   lender would demand in this situation where there really was

2   not a substantial existing collateral base to support the

3   loan.

4          So, let me limit my comments there.  And since I

5   cannot speak specifically for what our DIP lender can and

6   cannot do in terms of perhaps getting Mr. Waxman's client

7   comfortable and Your Honor comfortable, but I would just

8   submit that what we put before the court is not prejudicial

9   to anyone as is currently crafted.

10         Thank you.

11         THE COURT:  Thank you.

12         Mr. Price?

13         MR. PRICE:  Good afternoon, Your Honor; William

14  Price, Clark Hill, on behalf of Levin Furniture LLC.

15         Your Honor, will try to isolate my comments to

16  just simply responding to the one pending objection, but I'm

17  happy to answer any questions you have about the DIP.  The

18  intention is, as Mr. Werkheiser presented it, which is

19  provide new inventory to replenish as best we can to

20  reinvigorate a going concern for a contemplated sale.

21         The DIP is a commitment by Mr. Levin, frankly, to

22  just make sure that his employees do have the ability when he

23  takes them over as his employees again to be able to work,

24  and function, and have compensation.  He committed quickly to

25  increase the DIP amount because there was further discussions

PA00690

1  when we got continued that we would need a couple more weeks

2  and he committed to ensure that there would be enough space

3  and availability to do what the company needed to do.  So,

4  that is our view of the expansion of the DIP.

5         With respect to treatment I think I can make it

6  easier because this isn't the intention.  If the drafting

7  wasn't done properly we will tailor it and make everybody

8  comfortable.  But the purpose of the super-priority claim was

9  to the extent inventory is purchased, and to the extent that

10 things don't close, and we don't get our credit, and there's

11 a liquidation, and there's an accounting tracking on the

12 skews that relate to the DIP liquidated inventory, and

13 there's a deficiency that was our request that we have some

14 protection for fronting the money.  His client would have

15 been paid for post-petition deliveries with the money used

16 from the DIP that we be provided some superpriority

17 protection for the efforts and the fronting of money when no

18 other financial party will put any money into this estate.

19        So, that was our request.  It's not for purposes

20 of just saddling the estate with a massive superpriority

21 claim.  It's in the event that the thing craters and it

22 liquidates, and the inventory that was purchased within the

23 last few weeks precipitously drops in value and there is a

24 deficiency there.  So, that is the intention and if there is

25 a modification necessary to the order or the credit agreement

1  we will do it.  If it's just a non-starter for the court I

2  will talk to my client quickly and we'll talk about which

3  tranche they get in the form of a deficiency claim.  We

4  really just want to get the DIP in place and get the thing

5  functioning and flowing.

6          On the other issue on 503(b)(9)'s the LOI is of

7  record, I believe, and there is an assumption of 503(b)(9)'s

8  to the extent they relate to the Sam Levin entity.  So, if

9  it's a party that shipped to the stores that we're taking

10  over we would assume those 503(b)(9)'s to the extent that

11  they're authenticated and we would pay them as part of our

12  purchase.  So, I don't believe that to be an issue to the

13  extent that we're talking about the Levin/Wolf stores that

14  are part of the transaction.

15          The last piece of the puzzle is there's no

16  guarantees in life.  We have no idea if we're going to own

17  this company in a couple of weeks.  So, we want some base

18  protections and we greatly appreciate everything the court

19  has done.  The U.S. Trustee was very user friendly in

20  negotiating out the comments they had.  So, I think that we

21  do have a DIP that's properly designed to have the minimally

22  invasive technique to try to keep this thing afloat, but if

23  there is still an issue I'm happy to talk in the hall, hammer

24  it out, get my client on the phone and try to get something

25  that works for everybody whether he has a claim or not.

PA00692

```
 1                THE COURT:  Thank you.

 2                MR. PRICE:  Thank you.

 3                THE COURT:  Mr. Waxman, reply -- oh, Mr.

 4   Werkheiser.  Sorry, Mr. Waxman.  Hang on.

 5                MR. WERKHEISER:  If I could just take a minute

 6   with Mr. Price.

 7                MR. WAXMAN:  Actually, while --

 8                THE COURT:  Well, no, he needs to be able to

 9   listen to what you're saying.  He's your opponent.

10                MR. WAXMAN:  I just wanted to say I thought it

11   might be helpful if we're able to speak.  My co-counsel is on

12   the phone.  So, it might make sense for us to speak about

13   some issues.

14                THE COURT:  You want a break?

15                MR. WAXMAN:  I think that might be helpful, Your

16   Honor.

17                THE COURT:  Mr. Werkheiser, is that acceptable?

18                MR. WERKHEISER:  Your Honor --

19                THE COURT:  You got me all day.  I'm staying till

20   we're done today.  So, if we're late we're late.  So be it.

21   Who knows if we'll ever be allowed to be in the same room

22   ever again after today.

23        (Laughter)

24                MR. WAXMAN:  Not in basketball.

25                MR. WERKHEISER:  Your Honor, I think a break
```

 1  wouldn't hurt.

 2          THE COURT:  Sure.

 3          MR. WERKHEISER:  I think this is something we can

 4  resolve.

 5          THE COURT:  If you get headquarters back at home

 6  base to upload that we'll get that order because I would like

 7  to get that on since you are actually doing all the things

 8  that the order says you are allowed to do.  So, the sooner we

 9  actually get it authorized the better.  So, we will check it

10  out when we get back.

11          MR. WERKHEISER:  Thank you, Your Honor.

12          THE COURT:  We'll take a short recess.  Just let

13  us know when you're ready to go.

14      (Recess taken at 3:13 p.m.)

15      (Proceedings resumed at 3:56 p.m.)

16          THE CLERK:  All rise.

17          THE COURT:  Please be seated.

18          MR. WERKHEISER:  All right.  Thank you, Your

19  Honor.

20          THE COURT:  No problem.

21          MR. WERKHEISER:  For the record Gregory

22  Werkheiser.

23          I think we are able to use the time constructively

24  as it relates to the Levin DIP financing motion.  And I

25  believe that we have come to an understanding with Mr.

PA00694

1  Waxman's client, and co-counsel, and Mr. Waxman about

2  allowing us to proceed on that in a fully consensual manner.

3          So, the concern Your Honor, as was articulated,

4  was that --

5          THE COURT:  I'm sorry.

6          MR. WERKHEISER:  What's the name of your client?

7          MR. WAXMAN:  Serta Simmons.

8          MR. WERKHEISER:  Serta Simmons might, under some

9  theory, have an administrative claim by virtue of certain

10 sales guidelines that they believe were part of a prepetition

11 contract.

12         Leaving that issue aside, not asking the court to

13 address that one way or the other today, what we have agreed

14 to do in the context of the DIP order, I believe, to give

15 everybody comfort on that point is, one, I'm going to just

16 confirm everyone's understanding for the record that the

17 definition of DIP collateral that appears in the order as

18 revised -- and if I may approach, Your Honor, I have a

19 redline copy of the revised interim order that has that

20 definition now built into it.

21         THE COURT:  Thank you.

22         MR. WERKHEISER:  Your Honor, this definition of

23 DIP collateral appears on the first page in Footnote 3 and

24 that is adapted without substantive change from the DIP

25 credit agreement that was attached to the motion.

PA00695

1            Broadly speaking what it says is that the new

2  inventory that Sam Levin Inc. purchases using the proceeds of

3  the DIP is the collateral.  And the proceeds of that

4  inventory are the collateral.  It's not reaching back in time

5  to grab other inventory or other assets unrelated.  So, I

6  think we have come to an understanding that resolves their

7  concerns there.

8            The second concern was the granting of the

9  superpriority administrative claim.  I think as I understand

10  it the way we've been able to successful address that point

11  is that we are going to incorporate language into the DIP

12  order that acknowledges the terms of the LOI that contemplate

13  that 503(b)(9) obligations related to the Sam Levin Inc.,

14  entity are going to be assumed upon closing of the sale

15  transaction and make clear that the final asset purchase

16  agreement will honor those terms.

17            I just ask Mr. Waxman or his co-counsel to confirm

18  that I accurately recited our understandings in that regard.

19            THE COURT:  Thank you, Mr. Werkheiser.

20            Mr. Waxman?

21            MR. WAXMAN:  Your Honor, that is correct.  I

22  understand we will see a revised form of order that we will

23  get a chance to make sure that everything is correct and it

24  will be submitted under certification of counsel.

25            MR. WERKHEISER:  That's correct, Your Honor.  We

 1  will get that done hopefully after we get done today.

 2            THE COURT:  Okay.  Thank you.

 3            MR. WERKHEISER:  Thank you.

 4            THE COURT:  Is there anything else in connection

 5  with the DIP?

 6       (No verbal response)

 7            THE COURT:  All right.  Subject to the -- I

 8  actually look at the redline before I do that.

 9            MR. WERKHEISER:  Your Honor, I can just walk you

10  through it quickly if that's helpful.

11            THE COURT:  I'll just page through it.  It doesn't

12  look like there's a lot of changes.

13            If you're on the phone I'd appreciate it if you

14  would please mute your line; otherwise, we get static and a

15  sound from your line. So, if you could please mute your line

16  unless you're speaking.  Thank you.

17            Okay.  This is fine.

18            MR. WERKHEISER:  Thank you, Your Honor.

19            THE COURT:  Everyone is standing though.  I was

20  about to rule.

21            Subject, obviously, to the changes that were just

22  discussed in court with Mr. Waxman's client I'm prepared to

23  approve the DIP and sign the order along the lines of the one

24  you just showed me with only those changes that are still in

25  flux.  And as soon as you get it to me under certification of

1  counsel I will get it filed, and signed, and docketed.   Then

2  you will be good to go.

3          MR. PRICE:  Thank you so much, Your Honor.

4  William Price.

5          I have to leave and my colleague, Ms. Grivner, is

6  going to stay for the remainder of the proceedings.  I really

7  appreciate all your time.

8          THE COURT:  You're welcome.  Thank you.

9          MR. WAXMAN:  Your Honor, can I ask the indulgence

10 of the court, and everybody, I have to step out for two

11 minutes.  I just got an emergency call from my mother's

12 caretaker.

13         THE COURT:  Oh, of course.  Should we take a

14 break?

15         MR. WAXMAN:  If we could.  I promise it won't be

16 more than three minutes.

17         THE COURT:  Of course.  Happy to give you that

18 accommodation.

19         MR. WAXMAN:  I apologize to everybody in the

20 court.

21         THE COURT:  We will take a very short recess for

22 in deference to Mr. Waxman's personal life.

23         MR. WERKHEISER:  Thank you, Your Honor.

24         THE COURT:  And the customer motion has been

25 docketed.  The order has been docketed.

 1          MR. WERKHEISER:  Thank you, Your Honor.

 2      (Recess taken at 4:01 p.m.)

 3      (Proceedings resumed at 4:09 p.m.)

 4          THE CLERK:  All rise.

 5          THE COURT:  Okay.  So, the DIP order is taken care

 6  of, the customer procedures motion that order has been

 7  entered.

 8          MR. WERKHEISER:  Yes, Your Honor.

 9          THE COURT:  So, that leaves us with store closing.

10          MR. WERKHEISER:  Store closing. Main even.

11  Fortunately for this I get to sit down and I'm going to hand

12  the podium to Ms. Russell.

13          THE COURT:  Okay.

14          MR. WERKHEISER:  Thank you.

15          MS. RUSSELL:  Good afternoon, Your Honor.

16          THE COURT:  Good afternoon.

17          MS. RUSSELL:  Marua Russell, Montgomery McCracken

18  Walker & Rhoads, proposed special counsel for the debtors.

19          We are here in connection with the debtors'

20  emergency motion for entry of an interim order today

21  approving the bid procedures for a store closing sale and

22  authorizing customary bonuses to store employees, and

23  authorizing the assumption of a consulting agreement between

24  the debtors and various entities affiliated with Gordon

25  Brothers Retail Partners and Hilco Merchant Resources LLC.

1          Your Honor, just so that we have a listing in

2     connection with the motion, which the motion was filed at

3     Docket Number 52, Your Honor, we have the declaration of Mr.

4     David Ladd, which was actually filed at Docket Number 12,

5     which was filed in connection with and in support of all of

6     the first day motions.

7          Your Honor, we also have the declaration of Mr.

8     Dennis Stogsdill which was filed in conjunction with the

9     first day motion.  Mr. Stogsdill is a director of Alvarez &

10    Marsal who is the financial advisor to the debtors.

11         In addition, Your Honor, yesterday afternoon there

12    was a declaration filed at Docket Number 96, the declaration

13    of Mackenzie Shea of Gordon Brothers in support of the

14    debtors' motion.

15         In addition, at Docket Number 97 there was a

16    declaration of Sarah Baker in support of Hilco, also in

17    support of the debtors'' motion.

18         Since we were before Your Honor, although not on

19    this motion, that we were before Your Honor on Tuesday, we

20    have had several discussions with counsel for the landlords

21    who were here in the court.  We revised and circulated a

22    revised draft of the proposed order, interim order,

23    addressing issues that had been raised at that hearing.  And

24    we circulated that last evening to everyone who had filed a

25    notice of appearance in the case.  We subsequently received

PA00700

1  additional comments from various parties and incorporated

2  those comments.  And we filed or uploaded a redline draft of

3  the consolidated revised blackline of the order showing all

4  agreed upon changes between the proposed interim order that

5  was filed with the motion and what we had agreed with the

6  various parties.

7          Your Honor has not yet seen that order.  While we

8  do have some clean-up changes to make based upon comments we

9  received in the courtroom, but we do have copies.  We're

10  happy to show it to the court when Your Honor is ready to

11  review that.

12          THE COURT:  Okay.

13          MS. RUSSELL:  With respect to the outstanding

14  issues in connection with the motion there are the Office of

15  the United States Trustee raised some concerns regarding the

16  consulting agreement, the motion and the proposed order.  We

17  believe we have resolved the majority of those issues subject

18  to the one issue, and I will allow the Office of the United

19  States Trustee to speak as to the substance of that

20  objection, but my understanding is the concern with regard to

21  the relationship between the proposed consultant here in

22  connection with the debtors' assets and the relationship with

23  those entities and the entity that now currently holds the

24  term debt of the debtors.

25          Other than that we have spoken.  There was the

1   motion also contemplated that the consultant, in addition to

2   providing services to the debtor in connection with the

3   merchandise, machinery and equipment, that the consultant

4   would also provide consulting services to the extent the

5   debtor has elected with respect to the collection of

6   receivables, and also that the debtor would retain the

7   services of affiliates of the consultant Hilco Stream Bank

8   and Gordon Brothers Brands in connection with assisting the

9   debtor with the marketing and sale of the debtors'

10  intellectual property.

11          While those transactions would not be to the

12  ultimate purchaser were not subject to that motion and the

13  debtors would be required to come back to the court the U.S.

14  Trustee has raised concerns about a Section 327 retention

15  within the context of the debtors' 363 motion currently

16  before the court.  So, we have agreed that with respect to

17  the intellectual property, which would be the subject of the

18  Section 327 retention, that that would not go forward today

19  and it would be subject to Your Honor's availability heard on

20  April 6th.  And to the extent that the Office of the United

21  States Trustee and/or Your Honor required or would like us to

22  file a separate application seeking to retain those advisors

23  under Section 327 that teh debtors would do so just to

24  separate the issue and any concern about it all being wrapped

25  up into the one motion.

1            Your Honor, one of the unusual facts and economic

2      terms of this consulting agreement that I have never seen

3      before and I don't think anyone in the courtroom has seen

4      before is the concept that the fee to the consultant in

5      consideration for the services that the consultant has

6      provided is not being paid by the debtor.  Instead, the

7      debtors would reimburse the consultant for the out of pocket

8      consultant incurred expenses that are incurred in connection

9      with a budget that is part of the consulting agreement.

10            Other than that, any other fees that we would

11     customarily see, 1 percent of sales, 2 percent of sales that

12     we would see on merchandise and 15 percent of sales on

13     machinery and equipment, Your Honor, that's not here.  Those

14     are not fees that the estate is going to incur directly to

15     the consultant.  Instead, the consultant has an economic

16     relationship in the agreement with the holder of the term

17     debt and that any amounts paid would be paid from the

18     recovery under the term debt.

19            So, from the perspective of the estate it was a

20     win-win.  It enabled the estate to not directly incur those

21     fees on an ongoing basis, but instead those fees were

22     deferred to a later date and to be paid out of a recovery if

23     any that is obtained on account of the term loan debt.  Your

24     Honor, that was a beneficial result for the estate because it

25     did preserve cash-flow.

1    In addition, Your Honor, an extensive amount of

2 time has been spent on the debtors' new customer policies

3 that addresses this $35 million dollars of customer deposits.

4 The debtor has heavily negotiated with all parties, Wells

5 Fargo as well as the term lenders, to allow the debtors and

6 to not have issues with respect to the priorities and who

7 gets paid what when, but to come up with these customer

8 policies that enables the debtor to either provide by

9 merchandise credit or refund later on down the road to the

10 consumers.

11    So, in connection with the overall transaction

12 that was a significant benefit to the estate.  Those customer

13 deposits and refunds the term lenders have agreed that they

14 would be satisfied prior to any amounts being paid to them.

15 So, the consultant here has agreed to provide the services,

16 but in essence their fee is really on the back end and is

17 really contingent upon them doing an excellent job to get

18 past and through the Wells Fargo amounts that are owed to it

19 as well as whatever amounts that are due and owing are being

20 paid through the debtors' cash collateral motion and budget.

21    With that, Your Honor, I'm happy to answer any

22 questions that you may have with respect to how we have gone

23 so far, but, otherwise, I would cede the podium to the Office

24 of the United States Trustee to tee-up whatever issues still

25 remain outstanding with respect to the concerns that she has

1    raised.  I do want to note that we did receive a list of

2    questions from the Office of the United States Trustee late

3    yesterday and the debtors, in consultation with the

4    consultant, provided a detailed response to all of those

5    questions.

6              THE COURT:  I have no questions.  Thank you.

7              MS. RICHENDERFER:  Good afternoon, Your Honor;

8    Linda Richenderfer from the Office of the United States

9    Trustee.

10             I guess I respectfully would not agree with the

11   characterization that we've been able to resolve issues.  I

12   think that there is a major gating issue here and I would

13   respectfully submit that at this point in time that the

14   hearing on this particular motion should be adjourned until a

15   time when due process can be served, and the major

16   stakeholders who are directly impacted by this particular

17   order, the unsecured creditors, have an opportunity to form a

18   committee so that they can fashion a constructive concerted

19   response to the particular transaction that is in front of

20   Your Honor.

21             This is totally out of the norm, as Ms. Russell

22   said.  This is not your usual situation where it is a fee for

23   service.  We have gotten used to those over the past five

24   years.  And under that scenario we have also gotten used to

25   the court providing interim approval, and, again, fee for

1  service.  And we have the liquidator, Hilco/Gordon, in a

2  position for running the GOB sales.  At the backend they may

3  come in with other things, they may want to buy-out the

4  inventory that's left, but going into the deal for the most

5  part they're serving as the consultant who is leading the GOB

6  sales.

7       Here we have an entity that is wearing four

8  different hats in this case.  They are secured lender with a

9  claim for $175 million dollars.  They are controlling the

10 purse strings along with Wells Fargo for this case because

11 the cash collateral order is the means by which the debtor

12 continues to operate and run this Chapter 11 case.

13      So, the expenses that they're going to get paid

14 that have to be approved through budgets done by the debtor

15 in consultation with the lenders they're one of the lenders.

16 They're approving the budget that tells then what they can

17 pay for themselves.  And they're also wearing the hat as

18 being a non-327 professional consultant, whatever we want to

19 call them in the normal course, being in charge of the GOB

20 sales.  And then in addition they want to serve as a 327

21 professional.

22      All of this was nicely put together for us in one

23 entire agreement.  We've always heard how separate entities,

24 this and that.  They brought it together as one complete

25 package here.  And we know that Hilco, the consultant I'll

PA00706

1    call them, isn't doing this for free.  But what we don't know

2    are the economics of the deal.  We have no idea of the

3    economics of this deal here.  I think it's also disingenuous

4    to say that their interests are aligned with those of the

5    estate.   Their interest are aligned with the secured

6    creditor.  Their interest is to get Wells Fargo paid and to

7    get the secured debt paid.

8         Now at the end Ms. Russell said something that I

9    don't know if this is something that I missed or if this is

10   something that is new, but that the term lender agreed that

11   they would satisfy the deposits before they take any of the

12   money owed to them. I don't see that anywhere in the

13   documentation.  I don't believe that that is a consideration

14   for the court today when looking at the particular

15   transaction the court is being asked to give interim approval

16   to.

17        We all know once interim approval is given the

18   horse is out of the barn.  And we're doing that when we are

19   not going to have committee formation until next Wednesday.

20   There are repercussions here.  We need time to analyze this.

21   Yes, I asked preliminary questions and they were answered.  I

22   don't believe the debtor represented it, I don't believe Mr.

23   Ladd is here today for me to cross-examine.  And I don't

24   believe that there are individuals here could answer the

25   questions that need to be answered.  We need time.  We need

PA00707

1  discovery and, again, need the committee to be able to step-

2  in and protect the interests of the unsecured creditors.

3              THE COURT:  Okay.  Thank you.

4              Ms. Russell?

5              MS. RUSSELL:  Your Honor, with respect to the U.S.

6  Trustees Office not being aware of the financial arrangements

7  between the term lender and the consultant I did share with

8  her a letter that we had requested and received from the

9  consultant setting forth the economic terms of that financial

10 relationship.  They did request, for confidentiality reasons,

11 that we not file that, but they have consented that that

12 letter be shared with the U.S. Trustees Office, with the

13 creditors committee once appointed, and that to the extent,

14 you know, Your Honor has any questions with regard to that

15 financial arrangement Mr. Steven Fox is here representing the

16 consultant.

17             With respect to the intellectual property, Your

18 Honor, because we will stipulate to remove that and move that

19 to a separate hearing, the court, the U.S. Trustees Office

20 and any other party in interest can review and object to the

21 retention with respect to the intellectual property on

22 whatever basis that they deem is appropriate.  So, we are

23 talking right now that it's the inventory, machinery and

24 equipment that are pretty customary to the consulting

25 agreement.

PA00708

1          This consulting agreement, the budget that is part
2   of this consulting agreement was a budget that had been
3   agreed upon and discussed during prior discussions when
4   competing liquidation groups were submitting bids and
5   proposals before ultimately we landed on the consulting
6   agreement with the current consultant.  So, the expenses are
7   identified in the budget that was submitted as part of a
8   liquidation proposal.  There is no mystery to them.

9          The debtors certain have the ability to, in
10  certain circumstances where we have identified we want to
11  weigh-in and perhaps adjust downward some of the line item
12  expenses to the extent that we determine that we don't think,
13  for example, marketing media purchases that the debtors don't
14  think that those purchases are necessary we reserve the right
15  in the agreement and in the exhibit in the budget to object
16  to those.

17         So, the one key difference is who's paying the fee
18  to the consultant.  And that fee is being paid out of the
19  backend recovery to the term loan lenders.  So, that is the
20  difference and that difference has created a tremendous
21  benefit to the estate.  Unfortunately, Your Honor, we don't
22  have the time or the financial wherewithal to stop everything
23  now.  We're happy to sit down with the Office of the United
24  States Trustee to discuss any questions, or comments or
25  concerns they have between now and the proposed final hearing

1   on April 6th.  But we would like to be in a position to get

2   our signage up, to get into really fully launch into the

3   store closing program as we need to.

4          Time is not on our side.  With respect to the

5   backend there is so much inventory that needs to be

6   liquidated through these stores.  To the extent we are

7   further delayed in a launch of that liquidation the more

8   likelihood is that we could potentially have too much

9   inventory and have to carry over into the month of May in

10  operating these stores or some of these stores which is an

11  additional expense that the company just does not have the

12  ability to absorb.

13         So, we would request -- we're happy to sit down

14  and I'm sure Mr. Fox would likewise say sit down with the

15  Office of the United States Trustee.  Get them comfortable

16  that while, yes, unusual this particular structure is a

17  benefit to the debtors' estate and that we would hope to be

18  able to resolve those concerns prior to the April 6th

19  hearing.  And if not we will discuss and present as

20  appropriate to Your Honor.

21         MS. RICHENDERFER:  Your Honor, if I may respond

22  briefly.

23         Your Honor, one of the problems here is that

24  because they are controlling so many aspects of the case

25  we're in a situation where you have the lender basically

1    standing in the way of a market test which normally this

2    court would not allow.  The lender here is also the person

3    that only benefits to the extent that they're part of the

4    liquidation of the assets on a store by store basis

5    continuing with the sales, the going out of business sales at

6    the locations.  So, while I understand and appreciate the

7    debtors need to continue forward on a path they had chosen we

8    do have the right to look at that path.  And unfortunately a

9    lot of parts of that are not within our purview.

10           Yes, I was given a letter that outlined how things

11   were going to be divvied up, so to speak, between KKR and the

12   HGB.  That doesn't tell me the economics of the deal.  I

13   don't know what HGB paid for the position it has.  So, I

14   don't know what they're making off of this deal.

15           I will harken back, Your Honor may recall that

16   there was a period of time when my office was looking into

17   the issue of whether or not liquidators in the going out of

18   business sales should be considered to be 327(a)

19   professionals.  And Judge Shannon, when issuing his opinion,

20   stated,

21           "The established practice requires fulsome

22   disclosure of the services to be provided and the

23   compensation to be paid followed by a hearing on the merits

24   where the debtor must carry the burden under Bankruptcy Code

25   Sections 365 and 363 that demonstrates that proceeding in

PA00711

1  good faith and its proposed course of action reflects the

2  exercise of reasonable business judgment.  This structure is

3  compliant with the bankruptcy code and is sufficient to

4  address the U.S.T's legitimate desire for transparency and

5  due process without imposing the additional requirements and

6  restrictions by 327(a)."

7           Here we are in a situation where the structure is

8  not giving us the transparency and the due process that Judge

9  Shannon wrote about and was the basis of his opinion when he

10  determined that at least with respect to the going out of

11  business sales they did not need to qualify as a 327(a)

12  professional.

13          So, Your Honor, I don't know how we proceed

14  forward at this point in time again without allowing for

15  there to be more disclosure which is required and allow the

16  real interest holders here, the unsecured creditors, to get

17  up to speed and to analyze this scenario.

18          THE COURT:  Thank you.

19          MR. FOX:  Good afternoon, Your Honor.  For the

20  record, Steven Fox, Riemer & Braunstein, on behalf of the

21  consultant group of affiliates of Hilco Merchant Resources

22  and Gordon Brothers Retail Partners.

23          I rise, Your Honor, ahead of Mr. Waxman, not

24  intending to be disrespectful, but rather, since the

25  U.S. Trustee has identified what they consider to be gating

PA00712

1   issues, before we deal with Mr. Waxman's inventory-related

2   questions, I thought it might be appropriate to sort of deal

3   with the elephant in the room, so to speak.

4           Your Honor, at the outset, let me be the first to

5   acknowledge and concede that the transaction structure before

6   the Court is a little bit different than what the Court and

7   some interested party may be accustomed to seeing, but I also

8   want to be clear that it is not in any way, shape or form

9   unique or novel in any respect.  It is a structure that has

10  been tried and tested before in other cases; most recently, a

11  similar structure was adopted and approved by the Bankruptcy

12  Court of the Southern District of New York in the Barneys

13  cases where there was a clear connection between, in that

14  case, the DIP lender and the consultant that was being

15  engaged by the estate for purposes of liquidating inventory

16  in certain stores, as well as marketing for sale, certain

17  intellectual property.

18          But putting aside that nonbinding precedent, Your

19  Honor, I think part of the failure here is one of

20  understanding as opposed to one of substance.  The reality

21  here is we've heard some terms thrown around such

22  transparency and due process, referring to Judge Shannon's

23  decision, which I'm intimately familiar with because, of

24  course, the parties, similar to my client, were involved in

25  that case and issues not necessarily substantively similar,

1    but certainly relating to the 327(a) retention issues were

2    relevant there.

3          First, let's deal with the 327(a) issues.  As

4    you've heard from Ms. Russell, we understand the debtor is

5    fully prepared to separate that issue and deal with it at the

6    second day hearing on April 6th as it relates to the

7    intellectual property of the consulting agreement and I can

8    confirm on behalf of consultant that it has no objection to

9    proceeding in that manner and should the debtor decide, in

10   consultation with the U.S. Trustee or with a committee, once

11   formed, that a separate motion on that issue is appropriate,

12   then we will certainly cooperate and work in conjunction with

13   the debtor and others to ensure that motion is timely filed

14   in that connection, Your Honor.

15         As far as due process and transparency is

16   concerned, we should be clear when we're talking about those

17   types of issues.  In our opinion there has been full

18   foreclosure.  One need not read further than the second

19   substantive paragraph of the debtors' motion to find

20   disclosure of the fact that there was this unusual

21   relationship; again, not unique and not without precedent,

22   but certainly different than the traditional fee for

23   services.

24         And the reason for that is because the debtor has

25   a definable, realizable, demonstrable benefit from this

1   relationship in that it pays us nothing.  I am representing a

2   party here, who I dare say, is the only party in this room

3   who is working for free.  I'm not, but my client is.  My

4   client, by virtue of the terms of the consulting agreement

5   earns no compensation whatsoever from the debtors' estate for

6   the full range of services that it will provide if this

7   motion is approved today.

8           And I should point out we're only asking for

9   interim approval today, so if for some reason a party in

10  interest has an issue or raises and objection in connection

11  with the final hearing that we cannot resolve or we cannot

12  overcome, we may permanently work for nothing.  But as it

13  stands now, our consulting agreement provides that the estate

14  pays no fee or other compensation to the consultant on

15  account of the consulting services.

16          Our recovery, if any, derives solely and

17  exclusively from a recovery that our affiliate receive and I

18  stress "may," if at the end of the day, this estate generates

19  a return to the term debt, which is junior there the ABL debt

20  and all of the other things that the ABL lenders and the term

21  lenders have agreed be funded through the cash collateral

22  budget.

23          Among other things Your Honor heard through Mr.

24  Werkheiser's introductory remarks today, that right now

25  somebody else is grabbing all the cash.  So, who knows, given

1  uncertainties as to what the ultimate recoveries for the
2  secured creditors in this estate will be, but we understood
3  that risk in negotiating in an arm's-length fashion between
4  our affiliate and the prior holders of the term debt that at
5  the end of the day, we may realize nothing.
6       That is our risk and is not a risk to be borne by
7  the estate, because they do not pay us, again, anything,
8  other than as Ms. Russell indicated, reimbursement for
9  certain definable out-of-pocket expenses, which have been
10 reduced to a highly negotiated budget that would be expenses
11 incurred by the estate, no matter who the liquidators were
12 here.  They include expenses such as signs, supervisors,
13 certain limited travel -- and believe me today, it's going to
14 be limited -- certain other related expenses, but nothing in
15 the nature of a fee or other compensation.
16      With regard further to transparency, Your Honor,
17 as Ms. Russell indicated, it was the debtors' insistence that
18 they understand the economic parameters of the agreement that
19 was being negotiated between the affiliates of the consultant
20 and the prior debt holder KKR.  In response to the debtors'
21 insistence, we made full disclosure to the debtors of the
22 economic relationship and went so far as to reduce it to a
23 writing and then deliver that writing to the debtors'
24 professionals and the debtors have been fully apprised from
25 the very start of what that economic relationship is.

1              And to put it simply, Your Honor, without going

2    into the actual numbers, there is a sharing arrangement

3    solely related to a recovery on account of the term debt.

4    So, again, no fee or any compensation from the estate, other

5    than a sharing between our affiliate, HDB, the current term

6    debt holder, and the prior term debt holder.  They have no

7    involvement in the estate.  They are entitled to no

8    compensation from the estate.  They only get a piece of our

9    recovery, the economics of which have been fully disclosed to

10   the debtors.  So, totally transparent here, no hidden agendas

11   or otherwise.

12              Ms. Richenderfer said that we lack transparency

13   because she claims she knows nothing about it.  She has that

14   letter.  That letter was clearly intended to be delivered to

15   the U.S. Trustee's Office and it specifically said so.  It

16   was prepared in anticipation that the U.S. Trustee's Office

17   was going to want to know and was going to have these

18   questions because of the unusual nature of their

19   relationships here.

20              I'll only ask, as Ms. Russell indicated, that it

21   not be -- it contains certain confidential information about

22   trade information and negotiations relating to third parties

23   not here and we ask merely if it ever needed to become part

24   of the public record, that it not be filed of record, it only

25   be filed under seal, and then if the U.S. Trustee needed to

PA00717

1  use it in connection with any litigation or objections, we'd

2  be happy to do that, just so long as it be done under seal;

3  again, not intending to hide anything.

4       That same letter also says that the debtors are

5  free to share with the creditors' committee, once appointed;

6  again, not looking to hide anything.  The economics are open

7  and transparent to anybody who wants to see it who are the

8  key constituents in the estate, including the ABL lenders on

9  their own.

10      So, from that perspective, Your Honor, I think we

11 have satisfied the transparency concerns that Judge Shannon

12 might have expressed in a different context, as well as the

13 due process concerns.  We are seeking merely interim relief

14 here and if the U.S. Trustee or the creditors' committee

15 subsequently has any additional questions, after having an

16 opportunity to review the substance of that transaction,

17 we're happy to do that.

18      I would also add that to the extent that they

19 think there's anything nefarious that happened here, the term

20 claims are what they are and the committee, once appointed,

21 and any other third party that may wish to challenge that,

22 has all the challenge rights provided for in interim cash

23 collateral order and that is not affected in any way by

24 approval of the consulting agreement or the conduct of the

25 GOB sales.

1          Next, Your Honor, Ms. Richenderfer indicated a

2    concern about the relationship depriving the estate of a

3    market test.  I can only assume from that remark that she

4    somehow believes that the debtor did not exercise its

5    business judgment by testing the market for the most

6    beneficial transaction to the estate.  I beg do differ.

7          As the U.S. Trustee has been apprised in response

8    to the written questions that they posed to us last night by

9    the debtors, that the debtors solicited five separate

10   liquidation firms; especially, the they national liquidation

11   firms that can do a transaction of this size and nature.  It

12   was at the conclusion of that solicitation process that the

13   debtors selected the Hilco and Gordon Brothers venture to

14   conduct store-closing sales on the terms set forth in the

15   consulting agreement.

16         It is equally important to note, however, Your

17   Honor, that there is no linkage between the debt transaction

18   and the consulting agreement.  So, the debtors were be

19   obligated to select us as the consultant just because we were

20   conducting parallel discussions with KKR over the acquisition

21   of the debt.  They made that decision based upon their

22   assessment, I assume, of the economic benefits to the estate

23   of our transaction, which is free services, as opposed to the

24   other proposals, which I've never seen, but I can only

25   assume, based upon my experience in the area, actually cost

1    the estate some money.

2            And were Your Honor to somehow elect to not

3    approve the conduct of sales in the consulting agreement, our

4    affiliate still owns the debt.  The deal still stays the

5    same, but it's not, in our opinion, in the best interests of

6    any of the stakeholders in the estate to disrupt a process

7    that is currently orderly and ongoing.

8            Ms. Richenderfer also indicated an objection

9    because she's of the opinion that somehow because we hold,

10   through the affiliate, the term debt, that we are controlling

11   the purse strings by approval of the budget.  What I can

12   represent to Your Honor is -- and I am confident that the

13   debtors can confirm this -- that the term lenders played very

14   little, if any, role in the construction of the budget that

15   is part of the cash collateral order.  That was driven almost

16   exclusively, and if not exclusively, then certainly primarily

17   by the ABL lenders.

18           The reasons for that are quite obvious; it's their

19   ox that gets gored first and equally importantly, based upon

20   the intercreditor relationship between the two parties, we

21   have an interest in certain party collateral and they have an

22   interest in everything else.  So, their interests are far

23   broader than us on a first lien basis and as Your Honor can

24   certainly recall from your own experience in such matters,

25   the ABL lender didn't really care much -- not disrespecting

PA00720

1  us -- but really didn't care much for our opinions, to the

2  extent we had any, on the budget as they were liquidating

3  their priority collateral first; namely, the inventory and

4  other receivables.  So, we played little to no role in the

5  construction of the budget.

6        We did participate at some extensive level in

7  terms of how the customer deposit issues were going to be

8  handled for two very simple reasons.  The first is, Your

9  Honor can read in the consulting agreement, there are

10  actually mechanics that we agreed to as the consultant to

11  facilitate the debtors' completion of as many customer orders

12  that were represented by corresponding deposits as possible,

13  both in terms of facilitating the approximately $18 million,

14  if that's the correct number, of deposits where there's

15  actually merchandise on hand today, as well as helping the

16  debtors try and source and facilitate completion of orders

17  which there's no inventory represented in the company's

18  coffers today.  So, we spent a lot of time talking about that

19  and memorialized all that, those requirements and the

20  services in the consulting agreement.

21        But separate and apart from that on a near daily

22  basis we also, on the debt side of the transaction, were

23  participants in discussions, along with the ABL lenders and

24  the debtors' professionals and business principals, on how

25  best to deal with the customer deposits on a daily basis

PA00721

1  both, in terms of the messaging -- we spent a lot of time

2  talking -- over two days before Your Honor about that -- in

3  making sure the communications to the customers are clear and

4  concise, but as well, how we're going to deal with the

5  financial impact of that.

6          And, Your Honor, I'm certain will recall, that

7  when we were talking about cash collateral on Tuesday

8  afternoon, it was -- I recall it being pretty clear -- my

9  notes reflect this -- that the statement was made that as

10  part of the budgetary process, the term lenders were fully

11  supportive of the budgetary components that had the company

12  honoring the refund of customer deposits and the use of store

13  credits and the like, notwithstanding that, at least on a

14  legal basis, the term lenders might have been in a position

15  to assert a senior, prior right to proceeds and not honor

16  those deposits as refund requests were being made.

17          That is not the posture the term lenders took then

18  and it's certainly not the posture that we're taking today.

19  We are fully supportive and understand that there's a

20  subordination component that applies to us in that regard and

21  we're not going to back off of that.

22          So, the U.S. Trustee also mentions that one of

23  their concerns is that they don't know what we're making on

24  the deal; respectfully, Your Honor, neither do we.  What we

25  know we're not doing is charging the estate the fee.  We are,

PA00722

1    as I said at the outset, working for free, hoping that our

2    efforts will generate a maximal recovery for the estate and

3    that at some future point in time, whether it's through a

4    wind-down, a plan, a Chapter 7 conversion, whatever the

5    ultimate outcome of this liquidating estate will be, that

6    proceeds will trickle-down through contractual or statutory

7    priorities, to the term debt.  And if that happens, then we

8    will earn a recovery maybe, subject to the sharing

9    arrangement that we have described in writing to the U.S.

10   Trustee.

11          In those circumstances and given those parameters

12   and given the disclosures, including the declarations that

13   were filed yesterday anticipating what the U.S. Trustee's

14   lack of disclosure objection might be, we believe that there

15   is nothing nefarious or inappropriate concerning the

16   relationship that exists between the consultant and its

17   affiliate that is holding the term debt.  We believe,

18   contrary to the U.S. Trustee's posture, that the estate's

19   interests are fully aligned with both, the consultant and the

20   holders of the term debt.  All of those parties are geared

21   towards and their interests are driven towards maximizing the

22   recoverable value for the estate's available assets.

23          Where those proceeds ultimately wind up and who

24   has the first right to them and the like is not being decided

25   today.  Nobody is asking this Court to offer an opinion on

PA00723

1 that or make any ruling on that; that will happen in a

2 subsequent process, that we believe -- expect that the senior

3 ABL lenders, the term lenders, and the committee, once

4 appointed, will be fully engaged in.

5        Your Honor, with that, I'm happy to respond to any

6 questions that the Court may have and I would just reserve

7 the opportunity to respond to any other comments that other

8 parties may make that relate to this relationship.

9        THE COURT:  Thank you.

10        MR. FOX:  Thank you, Your Honor.

11        MR. WAXMAN:  Good afternoon, Your Honor -- and it

12 still is afternoon -- Jeff Waxman of Morris James, on behalf

13 of two clients.  I'm going to start out of, again, with Serta

14 Simmons Bedding Company but after that, there is a limited

15 objection which was filed this morning by JoFran Sales, Inc.

16 and that is at Docket 101; that is a limited objection.

17        Your Honor, before going into the two remaining

18 issues, my understanding is that the debtors do not intend to

19 proceed with respect to the sale of the intellectual property

20 on an interim basis, so that issue that Serta Simmons was

21 concerned with is no longer a live issue, as we understand

22 it; certainly, if the debtors disagree, they are welcome to

23 say so.

24        Your Honor, this dovetails -- the first issue that

25 remains dovetails with the U.S. Trustee's, although, theirs

1   is certainly more process-oriented, with respect to 327.

2   Serta Simmons is concerned by the fact that the consultant is

3   a prepetition lender, has a significant interest, and is

4   getting $3.3 million for expenses, and in order to liquidate

5   what is, in essence, their own collateral, but there is no

6   money that is apparently being provided from the sales to pay

7   administrative expenses.  So, this case is being run for the

8   benefit of the lenders and the lenders are actually getting

9   the expense from the estate in order to do so.

10          I know that this is only an interim motion, but

11  the Court should be concerned, as I know this Court has been

12  in other cases, about where the entirety of the case is being

13  done for the benefit of the lenders.

14          On a more-narrow issue, Your Honor, the parties,

15  Serta Simmons, did business with the debtors prior to the

16  petition date and they are subject to certain terms which

17  include minimum advertised price policies or other policies

18  or guidelines, which, among other things, restrict the price

19  at which the debtors may sell Serta Simmons products and how

20  those products are displayed and marketed.

21          Serta Simmons has a concern, Your Honor, that in

22  the GOB sale, the debtors are going to mark down the price,

23  thereby, flooding the market and diluting the value of Serta

24  Simmons' policy, contrary to the terms of the policies to

25  which the debtors are a party.  Those claims, were they to do

1   that, would be post-petition claims.  They could potentially

2   be claims against the consultants, since they are the ones

3   who are marketing down the prices.

4          At least on an interim basis, the debtors should

5   be -- the debtors and consultants in all GOB sales -- should

6   be required to adhere to those policies and that's all that I

7   have for Serta Simmons, Your Honor, unless Your Honor has

8   questions with respect to those.

9          THE COURT:  I do not.

10         MR. WAXMAN:  The next issues, Your Honor, are

11  JoFran Sales and as I'm sure Your Honor is aware, we filed a

12  complaint and a request for a temporary restraining order.

13  This dovetails with that.

14         Before going into the limited objection, Your

15  Honor, I would just take a pause to ask if Your Honor intends

16  to hear the motion to enjoin the debtors in connection with

17  that motion today?

18         THE COURT:  I'm not prepared to hear the TRO

19  today.  I'll hear it as soon as I have an opportunity,

20  frankly, to spend the time and effort to be properly

21  educated -- maybe tomorrow, maybe Monday -- I don't know --

22  but it won't be today.

23         MR. WAXMAN:  Okay.  Your Honor, that actually

24  brings us into greater relief, then --

25         THE COURT:  Okay.

1      MR. WAXMAN:  -- because in terms of the relief

2  sought by the GOB motion today.

3         And perhaps I should take a moment or two and

4  explain what -- and this is certainly -- everything is in a

5  verified complaint that was filed this morning.  There's an

6  adversary proceeding.  There's a motion for a restraining

7  order.  There's a lengthy memorandum that sets out everything

8  with the citations for the basis of the relief requested.

9         JoFran Sales designs furniture and the debtors

10  purchased certain furniture from JoFran Sales -- excuse me --

11  well, yes, they did -- and then it was in their stores.

12  Basically, the debtors were using those goods as an

13  opportunity to test drive those particular models to see what

14  sold best.

15         It is alleged in the verified complaint that the

16  debtors then contracted with somebody to manufacture, in

17  essence, duplicate, the same goods that are manufactured in,

18  I believe, Vietnam.  The debtors were aware of -- that we

19  knew.  There are emails that are attached as exhibits to the

20  complaint and the preliminary injunction, the TRO requests

21  that the debtors, the consultants, all of the defendants stop

22  manufacturing, selling, advertising, transporting, taking

23  anything that is going to dilute the rights, the trade dress

24  of JoFran.

25         I understand that there are relatively modest --

1    and I say "I understand" because those are the

2    representations that we've received today -- that there are a

3    relatively modest amount of the offending, the infringing

4    furniture remaining in the debtors' stores.  We understand

5    it's thirty or $40,000 worth of this furniture.

6            We also understand that there is a significant

7    amount of that furniture that is on the water someplace and

8    the debtors apparently have no intention of picking that up.

9    I don't know if that's true or not.  I don't know anything

10   other than what was represented today and, frankly, there

11   were a couple of statements made that seem contradictory.

12           All we're looking for today, with respect to the

13   limited objection to the GOB sale procedures is that the

14   debtors remove the offensive pictures advertising the

15   infringing furniture and that they do not sell that

16   infringing furniture on an interim basis and certainly while

17   this Court hasn't had an opportunity to consider the TRO, it

18   is important that that not happen.  It is dilution and causes

19   actual damage to JoFran to have the pictures of the

20   infringing furniture remaining on the debtors' websites.

21           THE COURT:  Okay.  Thank you, Mr. Waxman.

22           MR. WAXMAN:  Does Your Honor have any questions?

23           THE COURT:  I do not.  I do not.

24           All right.  Let me -- I'm ready to make some

25   comments.  I've heard my colleague Judge Shannon to comment

1    on more than one occasion that when it comes to first day

2    motions, creativity is not encouraged.  This is very creative

3    and I think it raises some very serious issues.

4         At the end of the day, this is a principal agency

5    problem.  The principal here, of course, is the debtors'

6    estate.  The principal is the trustee, the debtor in

7    possession, who owes fiduciary duties to the creditors and

8    who has obligations under the Bankruptcy Code and limitations

9    under the Bankruptcy Code in order to ensure that that

10   principal acts appropriately.

11        But a principal can only act through agents and

12   the agents include the lawyers and they get retained in the

13   327 or 328 and they get paid under 330.

14        There are a lot of regulations in place both, in

15   the Code and in practice, to ensure that the incentives to

16   the agent align to the benefit of the principal who is acting

17   on behalf of its beneficiaries.

18        Here, we have a situation where we have a proposal

19   where the principal here is going to hire an agent to conduct

20   store-closing sales and one of the things that we do when we

21   hire agents in bankruptcy is we control how much they make.

22   We have the ability to know what compensation is being paid

23   and it's not just to make sure that the administrative

24   estate -- administrative expenses stay low; it's also to

25   ensure that the incentives of that agent are aligned with the

1  benefit of the principal.

2          This is not the case here.  Here we have a

3  situation where -- and I've never seen it before and

4  obviously I wasn't involved in the <u>Barneys</u> case -- I've

5  certainly never seen it in Delaware before where the services

6  are for free.

7          I've been around long enough to know that if

8  somebody else you that they're going to do something for you

9  for free, you grab your wallet to make sure it's still there

10 because it ain't for free.  Nobody's in this business and

11 nobody is making the kind of money to pay Mr. Fox to

12 represent them by doing stuff for free.  It's a business

13 transaction and that's fine.  That's fine.

14         But it's a business transaction where the payout

15 is out of the recovery to a creditor.  It's not an

16 administrative expense that's monitored by the estate,

17 monitored by the Courts, subject to a fee application, or

18 even some sort of review at all.  It's a black box.

19         And Ms. Richenderfer makes a really important

20 point.  We really don't get into this in bankruptcy very

21 often because the debt is the debt and it changes hands and

22 people buy it at discount.  It doesn't matter.  You buy the

23 discount.  The debt is the debt.  That is what you get paid.

24         It's always in the back of my head when I have a

25 kind of entity in front of me that I know buys at a discount

PA00730

1    and they claim they're getting a terrible recovery at 80

2    cents on the dollar.  Well, did they pay 30 and they're doing

3    great or did they pay 85 and they're not doing great?

4              I don't want to think about that.  I leave that

5    alone.  It is what it is.

6              But here, I think it's important because we don't

7    know what the recovery is.  We don't know the economic

8    incentives that are in play in connection with an agent.  And

9    a principal which -- and I understand why -- who is getting

10   something, to a certain extent, for nothing; i.e., services

11   they don't have to pay out of administrative expense claims,

12   at least not for the most part in a cash-strapped estate, I

13   certainly understand why you want to do that.

14             But I think the bigger picture here is that I'm

15   very worried that there is a fundamental disconnect based on

16   this economic structure; whereas, we have no idea who the

17   consultant is working for.  We have no ability to control the

18   consultant because we don't understand or have any real

19   insight into the economics that are running the deal.  So, I

20   agree with the U.S. Trustee that this is too creative and too

21   important to be heard on this time frame.

22             Now, I don't want to wait until April 6th, but I

23   do want to wait until after a committee is formed, which will

24   be the 18th?

25             MS. RICHENDERFER:  Yes, Your Honor.

1          THE COURT:  So, what I'll do is continue this

2    hearing to the 20th, and I know going to put whoever pitches

3    this committee and gets the job, behind a tough schedule and

4    I can put it on the record now, a motion for a continuance

5    will not be looked upon favorably.  We can't wait forever to

6    put this company into GOB mode.

7          I am taking a risk -- again, it's not my money --

8    but I mean, I am taking a bit of a risk in gambling that the

9    company won't be hurt by this delay, but I think that risk is

10   appropriate, given the uncertainty around this economic

11   relationship.  So, we'll do this Friday, the 20th, at 10:00

12   a.m., and we'll have a committee who will be fresh off the

13   bricks and they can appear.  And in the meantime, the GOBs

14   can't go forward.

15         That moots Mr. Waxman's objection, with regard at

16   least to the GOBs, although I know you still have the TRO --

17   we're going to talk about that in a minute -- and I think it

18   moots, in connection with the mattresses, as well.

19         Yes?

20         MS. RUSSELL:  Your Honor, if I may request -- with

21   respect to the actual conduct of the GOB sale, other than

22   Mr. Waxman's client, I'm not sure that the underlying issues

23   are with respect to actually conducting the going-out-of-

24   business sales.  We would like to request that the debtors be

25   authorized to not engage the consultant -- I understand Your

PA00732

1   Honor's ruling in adjourning that issue until March 20th --

2   but that we be allowed to otherwise proceed with the going-

3   out-of-business sales in accordance with the store-closing

4   procedures and that the debtor, in the interim, will run

5   those store-closing sales themselves.

6         The damage to the estate and the cost to the

7   estate by not moving through into going-out-of-business

8   status could have a detrimental effect or will have a

9   detrimental effect on the overall recovery on this collateral

10   for all creditors, not alone, the term lenders, but Wells

11   Fargo and the other creditors.  I'm not sure if the U.S.

12   Trustee's Office has raised any concerns with respect to that

13   portion of the motion.

14         THE COURT:  Comment?

15         MS. RICHENDERFER:  Your Honor, Linda Richenderfer

16   from the U.S. Trustee's Office, just briefly.

17         I guess I'm not quite sure how the debtor is going

18   to implement the going-out-of-business procedures, not that I

19   have an issue, and counsel is correct that we've raised no

20   issue with the procedures; we raised the issue with respect

21   to who's implementing the procedures and I don't know how the

22   debtors will implement them.  I leave that up to Your Honor,

23   though, as to whether or not to allow them.

24         There was a portion of the procedures, though,

25   that was the bonuses and as a principle, I don't have an

PA00733

1   issue with it, it was just that there wasn't a lot of detail

2   regarding the bonuses and, perhaps, that's something that can

3   also be delayed until next week just to get more details

4   regarding the bonuses.

5           THE COURT:  Well, I'm open to allowing the debtors

6   to run GOB sales themselves under procedures everyone can

7   agree on as long as it's consistent with general practice

8   that we impose and that the landlords' rights are respected.

9           What I would request, specifically, is that you

10  not GOB Mr. Waxman's furniture, so that needs to be cut out.

11          What's the position on the response to the issue

12  with the mattresses?

13          MS. RUSSELL:  Your Honor, what we've been

14  provided -- and, again, another thing that I've been asked

15  not to make public -- which we were provided today are not --

16  they're pricing policies, pricing suggestions.  There's no

17  contract that I've been provided to show on the pricing of

18  the inventory.

19          At best, to the extent there's a contract, it's an

20  executory contract; again, I don't know.  Even -- I've asked

21  to understand what the discounting restrictions are and I've

22  not been provided with that information.  One of the concerns

23  that they have is they've asked us to not sell those goods

24  until now the March 20th, hearing, but it was previously the

25  April 6th hearing.

1      And the situation the estate would find itself in

2    is that today, while they could discount and sell these

3    mattresses for perhaps 10, 15 percent off, when we get into

4    April, we're going to have to be in potentially significantly

5    higher discounts in order to complete the liquidation.

6           THE COURT:  I'm sorry, in my experience, I mean,

7    these aren't unusual commercial relationships where you put a

8    collar on what somebody can sell somebody's product for.  A

9    retailer can't -- you know, if you sell fine china, you don't

10   want it to end up at Marshalls being sold at a deep discount.

11          So, if you -- I don't know -- a mattress is a

12   mattress, as far as I know, but I'm not a connoisseur of

13   mattresses -- but, you know, if they sell a very high-end

14   mattress, they don't want you to sell it for a low-end

15   mattress price.  And I wouldn't be surprised if there's

16   policies or contracts in place to enforce that, but there may

17   not be -- I don't know.

18          MS. RUSSELL:  What I have been provided are

19   suggested retail pricings and I believe counsel acknowledged

20   that they have not provided copies of any contracts that

21   would impose such a restriction on the debtors' sale of those

22   goods.

23          I'm happy to have a conversation with them and I

24   need to understand as to the people at the company

25   understand, you know, now, with, in terms of now the plan --

PA00735

 1 | the discounted program that the company is now running and

 2 | how that cadence interplays with the discounting or purported

 3 | discounting restrictions that Mr. Waxman's client is

 4 | asserting.

 5 |      MS. ROGERS:  (Via telephone)  Your Honor?

 6 |      THE COURT:  Yes.

 7 |      MS. ROGERS:  -- this is Beth Rogers for Serta

 8 | Simmons Bedding Company.

 9 |      May I be heard?

10 |      THE COURT:  Yes.

11 |      MS. ROGERS:  Your Honor, there is a contract in

12 | place between the debtors and Serta Simmons which provides

13 | that the debtor will comply with the pricing guidelines.  And

14 | so, I mean, I apologize I didn't have an opportunity to get

15 | that to the debtors' counsel.  Everything is, you know,

16 | obviously on an emergency basis.

17 |      So, we would just ask -- I mean, we're talking,

18 | you know, another week that the *status quo* be maintained as

19 | far as the debtor complying with the pricing guidelines

20 | (indiscernible) as far as how a product is displayed, how

21 | it's advertised, how it's marketed.  So, I wouldn't think

22 | that maintaining the *status quo* for a week is going to be

23 | detrimental to the debtor.

24 |      THE COURT:  Well, you know, look, if you're going

25 | to sell a discount bed suite, you probably want to include a

PA00736

 1  discount mattress, along with the bed suite in order to do

 2  the sale, otherwise somebody is going to go down the street

 3  to Mattress Firm, one of my debtors -- please go often --

 4            (Laughter)

 5            THE COURT:  -- and buy their discounted mattress

 6  there.  So, I mean I can see why they would want some --

 7  well, I'm not going to -- I mean, we're going to talk this

 8  through, but what is going to happen is you're going to go

 9  off and negotiate an order and send it to me tomorrow under

10  certification of counsel.

11            So, I think this is something that you should

12  discuss and if there is a -- again, this would not surprise

13  me -- if there is a contract that says you cannot sell my

14  price for less than 80 percent off suggested retail, I don't

15  think it's appropriate in a store-closing sale, even, to

16  violate that contract.  That's a post-petition breach.  I

17  think it's perhaps an executory contract that might give rise

18  to administrative expense claims.

19            And those contracts are generally -- I can't

20  remember the name of the case -- but it was affirmed by the

21  Supreme Court several years ago.  Those contracts are not

22  uncommon.

23            So, let's do this.  So, let's -- I will consider a

24  motion -- excuse me -- consider an order that allows the

25  debtors to conduct the GOB sales according to the procedures

1  that have been put in place, no bonuses, no -- none of

2  that -- just do the GOB sales.  I'd like you to either settle

3  with or carve out Mr. Waxman's furniture client from that.

4  I'd like you to discuss some sort of an arrangement with the

5  mattress client and if you can't resolve that, you can submit

6  some competing language with the certifications.  So, I will

7  choose a winner or a loser.

8           Now, I just said no to the bonuses.  I want to

9  rethink that for a second.  Who are the bonuses going to?

10          MS. RUSSELL:  Your Honor, those -- I was going ask

11  Your Honor to reconsider -- those bonuses are contemplated

12  for store-level employees.

13          THE COURT:  They're the store employees; they're

14  not the consultant?

15          MS. RUSSELL:  They're not the consultant,

16  absolutely not.

17          THE COURT:  All right.  They're fine.  They're

18  fine.

19          Okay.  And then Ms. Heilman is being very patient

20  back there.  She keeps standing up and sitting down.  Just a

21  second.

22          But we'll kick the consultant agreement to the

23  20th.

24          Ms. Richenderfer?

25          The 20th, right?

PA00738

 1          MS. RICHENDERFER:  Your Honor, my issue with the

 2    bonuses was -- and maybe counsel can make this

 3    representation -- it wasn't clear to me that we were talking

 4    about rank-and-file employees in the stores.

 5          MS. RUSSELL:  It would be a combination, rank-and-

 6    file and possibly store manager, incentivizing everybody to

 7    work, and the aggregate amount was proposed that it would not

 8    exceed 10 percent of payroll.  So, that's fairly --

 9          THE COURT:  Any officers?

10          MS. RUSSELL:  No officers or directors.

11          THE COURT:  Nobody that's vice president of fun

12    and games or anything like that?

13          MS. RUSSELL:  No, Your Honor.

14          THE COURT:  District managers?

15          MS. RUSSELL:  No, Your Honor.

16          THE COURT:  Store managers only?

17          MS. RUSSELL:  Store managers and rank-and-file.

18          MS. RICHENDERFER:  Your Honor, if it only goes up

19    through the store level --

20          THE COURT:  Nobody's getting rich.

21          MS. RICHENDERFER:  -- that's fine.  And that was

22    our concern, was that the specifics like that were not there.

23    So, if we have those representations, we're fine.

24          THE COURT:  All right.  Give me two seconds,

25    Ms. Heilman, and I'm going to give you all my attention.

1          (Pause)

2          MS. HEILMAN:  Good afternoon, Your Honor.  Leslie

3    Heilman, Ballard Spahr, on behalf of a number of the debtors'

4    landlords.

5          Your Honor, I do appreciate Your Honor's comment

6    about respecting the interests of the landlords in

7    authorizing the debtors to proceed and conduct going-out-of-

8    business sales as not through the consultant, but through the

9    company; however, Your Honor, I do rise because we would have

10   objected to the conduct of the going-out-of-business sales

11   generally, as proposed under the motion, but for our ability

12   to structure and have some balancing of the interests through

13   our side agreement with the consultant that negotiated, and

14   now we will -- I'm sure Ms. Russell will work with us with

15   respect to a similar side agreement -- I'm sure she's very

16   familiar with them with respect to that -- but, Your Honor,

17   the going-out-of-business sales, themselves, are in violation

18   of the leases.

19         And bankruptcy courts generally do authorize once

20   a debtor has filed for bankruptcy, to allow them to proceed

21   with such sales, but they are subject to limitations --

22         THE COURT:  Of course.

23         MS. HEILMAN:  -- and they're subject to the

24   limitations so that the parties can balance the interests to

25   maximize value for the debtors' estate, but also not run

1  havoc across the lease terms.

2          And, Your Honor, some of those balancing go to

3  signage restrictions and limits on the signage and limits on

4  augmentation, store-closing hours, and the store-closing

5  procedures that are proposed, while customary and we see

6  attached to them, many of those store-closing procedures do

7  not adhere to the provisions of the leases in terms of how

8  they need to -- the hours they need to operate and, Your

9  Honor, whether or not they can use the exterior of the

10  building and so forth.

11          So, Your Honor, while we are not opposed to the

12  debtor commencing and continuing their GOB sales, we do

13  request that they be subject to some limitations and that we

14  can negotiate through a side agreement, but until that side

15  agreement is in place, Your Honor, we do request that, at a

16  minimum, no banners be hung, with respect to those sales --

17          THE COURT:  Okay.

18          MS. HEILMAN:  -- and where there is signage

19  limitations.

20          THE COURT:  Yeah.  So, this is easy stuff, right,

21  this is A, B, C stuff.  So, believe it or not we used to

22  litigate this stuff 20 years ago, but we don't anymore, so --

23          MS. RUSSELL:  Your Honor, we would not envision

24  running a sale in any fashion that is inconsistent with the

25  proposed store-closing procedures that the consultant

1 obligated to comply with.

2          And the side letter, other than the signature

3 block being from the debtor, I would envision that the side

4 letter, assuming that it's consistent with customary

5 practices, will be the same letter as they would have

6 negotiated with the liquidator.

7          THE COURT:  All right.  So, if you submit the

8 order, you need to certify that you've signed the side letter

9 or that if you haven't, that Ms. Heilman and the other

10 landlords agree to the procedures that you've put in place.

11          MS. RUSSELL:  Well, Your Honor, I guess I haven't

12 heard any objections from any other landlords or any issues

13 that were raised.  We did circulate the store-closing

14 procedures with the motion.  I don't believe there were

15 substantive revisions to those store-closing procedures since

16 we circulated the order, but I guess if there are issues,

17 people should contact me and we can deal with it.

18          I'm not sure prior to tomorrow I will have signed

19 side letters with all the landlord groups.

20          THE COURT:  All right.  I haven't seen the side

21 letter.  What side letter?

22          MS. RUSSELL:  How many signs you can hang within

23 so many thousand feet.

24          THE COURT:  I'm just remembering a couple of years

25 ago there was a furniture-store chain that went under

1   bankruptcy -- not in Delaware -- by they had a store in

2   Delaware -- so unusual -- and I was driving down Concord Pike

3   and they had a banner that was the entire side of the

4   building and all I could say was that they definitely did not

5   file in Delaware because none of our judges would have signed

6   that order.

7           So, I --

8           MS. RUSSELL:  The signage banner -- the banner

9   language that tends that be in certain side letters -- not

10  all -- that would be something that would be negotiated and

11  we would resolve that in the side letter.

12          THE COURT:  Well, let's see.  Who's here?  That's

13  what really matters, right?

14          And Mr. Riley is here.

15          MR. RILEY:  Your Honor, Richard Riley from

16  Whiteford Taylor.

17          I represent a receiver for a shopping center, so

18  he is the landlord.

19          THE COURT:  Right.

20          MR. RILEY:  So, I don't know if he has reached out

21  to do a side letter, but we would, of course, want to make

22  sure that the GOB sale is done, according to a side letter

23  and is not -- doesn't have banners on the side of our

24  building.

25          THE COURT:  Yeah.  So, when you submit the COC,

 1  you're going to need to certify that you've talked to

 2  Mr. Riley, Ms. Heilman, and any other landlord that calls you

 3  between now and when you do the certification and that

 4  they're agreeable, and if they're not -- say that -- and then

 5  that person will have an opportunity to say something to me.

 6          You can just call up and let Ms. Gadson know that

 7  you have our own language and we'll take care of it.  Okay?

 8          MS. RUSSELL:  Thank you, Your Honor.

 9          THE COURT:  Mr. Waxman?

10          MR. WAXMAN:  First of all, Your Honor, I was

11  remiss earlier -- and excuse me -- I would like to introduce

12  Maureen Mulligan, my co-counsel on -- in relation to JoFran.

13          THE COURT:  Yep.  Welcome.

14          MR. WAXMAN:  Her admission has been moved *pro hac*

15  *vice*.  I haven't seen a copy of the order yet, but that

16  doesn't mean it hasn't been entered.

17          And one of the reasons that I rise to introduce

18  her is because of the issue of the TRO, just in terms of

19  scheduling.  That going forward, I don't know her

20  availability or the client's availability to come down.

21          THE COURT:  Listen, I have it, but I can tell you

22  I haven't read your complaint.  Okay?  I've been extremely

23  busy all day.

24          MR. WAXMAN:  I understand.

25          THE COURT:  I'm running in place in connection

PA00744

1  with all the things associated with recent developments

2  outside of this courtroom.

3          So, I'm going to do it this evening and I will

4  reach out tomorrow.  Chambers will reach out tomorrow and let

5  you know, (A), if we're going to schedule it, and, (B), when

6  it'll be, and we'll obviously consult you on that.

7          MR. WAXMAN:  Okay.  And the second --

8          THE COURT:  And we can do that by phone.

9          MR. WAXMAN:  What's that?

10         THE COURT:  We can do that by phone, the TRO.

11         MR. WAXMAN:  Okay.  That would be great, Your

12  Honor.  Thank you.

13         Actually, before I get to my final point, I think

14  it was Levitz, Your Honor, on Naamans Road that had the

15  enormous sign that was on the --

16         THE COURT:  The whole building.

17         MR. WAXMAN:  -- the whole side of the building.

18         THE COURT:  It was crazy.

19         MR. WAXMAN:  Yes.  It was the single largest GOB

20  sign I've ever seen.

21         THE COURT:  That's why you should file in

22  Delaware.

23     (Laughter)

24         MR. WAXMAN:  Just for clarification -- I know that

25  you had said, and I appreciate that Mr. Waxman's client is

1    going to be carved out -- that was with respect to JoFran?

2             THE COURT:  Yes.

3             MR. WAXMAN:  And we would also mention the

4    mattress separately.

5             THE COURT:  So, I was going to talk to you about

6    Serta and see if you can work something out and if you can't,

7    you can just do dueling language.

8             MR. WAXMAN:  Thank you, Your Honor.

9             THE COURT:  Okay.

10            MR. WAXMAN:  I appreciate it.

11            THE COURT:  You're welcome.

12            Mr. Werkheiser?

13            MR. WERKHEISER:  Your Honor, I just wanted to rise

14   and see if we could just take care of a couple of process

15   points here of what's kicking the hearing to the 20th.

16            Did Your Honor have a timeline for us to start on

17   the 20th?

18            THE COURT:  10:00.

19            MR. WERKHEISER:  Could we -- I mean, the committee

20   is in a different position because they won't be formed until

21   the 18th, but for other parties that are going to raise

22   issues that we have to address for the hearing on the 20th,

23   can we have an objection deadline set so that we know what

24   we're confronted with?

25            THE COURT:  Yeah, I think that's fair -- the 18th

1   at noon.

2           MR. WERKHEISER:  Thank you.

3           THE COURT:  And, you know, in my mind, the issue

4   isn't going to be the nuts and bolts of the sale anymore --

5   we're dealing with that tomorrow when I sign an order

6   allowing the debtors to do it -- it's the nuts and bolts of

7   the consulting arrangement, so it's narrowed to that point.

8           MR. WERKHEISER:  Uh-huh.

9           THE COURT:  I mean the committee may come in and

10  say, Don't do GOB sales, but I think the genie is out of that

11  bottle, but I'll deal with that if that's what they say.

12          But what I really want to focus on the 20th is the

13  issue of the consulting agreement.

14          MR. WERKHEISER:  Understood, Your Honor.

15          Let me just sweep through and make sure there's no

16  other business we need to take care of today.  But I think

17  that covers our agenda and of course we --

18          THE COURT:  So, I'm waiting tomorrow, I'm waiting

19  for the DIP order under COC and I'm waiting for the store-

20  closing order under COC.

21          MR. WERKHEISER:  Correct.

22          THE COURT:  And I'm in all day tomorrow, so not to

23  give you permission to take until 8:00 p.m. but take the time

24  you need and be in touch with chambers if there are any

25  issues.

1      MR. WERKHEISER:  Thank you, Your Honor.

2      THE COURT:  If there's a dust-up or something, you

3  know, we always have the ability to get everybody on the

4  phone and try to figure that out.

5      MR. WERKHEISER:  Thank you, Your Honor.

6      THE COURT:  All right.  Let me just double-check

7  what my availability is tomorrow.

8      (Pause)

9      THE COURT:  Yeah, I have lots of time to fit you

10  in here and there, so that won't be a problem.  All right.

11      MR. WERKHEISER:  We'll do everything possible to

12  avoid having to disturb you, too.  Hopefully we'll just be

13  sending things over and alerting you to their availability.

14      THE COURT:  Well, that would be great.

15      All right.  Thank you very much.  We're adjourned.

16      (Proceedings concluded at 5:28 p.m.)

17

18

19                    CERTIFICATE

20

21  I certify that the foregoing is a correct transcript from the

22  electronic sound recording of the proceedings in the above-

23  entitled matter.

24
   /s/Mary Zajaczkowski_____          March 13, 2020
25  Mary Zajaczkowski, CET**D-531

PA00748

# EXHIBIT L

PA00749

# Presidential Documents

**Proclamation 9994 of March 13, 2020**

## Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak

**By the President of the United States of America**

**A Proclamation**

In December 2019, a novel (new) coronavirus known as SARS–CoV–2 (''the virus'') was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID–19 that has now spread globally. The Secretary of Health and Human Services (HHS) declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID–19. I have taken sweeping action to control the spread of the virus in the United States, including by suspending entry of foreign nationals seeking entry who had been physically present within the prior 14 days in certain jurisdictions where COVID–19 outbreaks have occurred, including the People's Republic of China, the Islamic Republic of Iran, and the Schengen Area of Europe. The Federal Government, along with State and local governments, has taken preventive and proactive measures to slow the spread of the virus and treat those affected, including by instituting Federal quarantines for individuals evacuated from foreign nations, issuing a declaration pursuant to section 319F–3 of the Public Health Service Act (42 U.S.C. 247d–6d), and releasing policies to accelerate the acquisition of personal protective equipment and streamline bringing new diagnostic capabilities to laboratories. On March 11, 2020, the World Health Organization announced that the COVID–19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States.

The spread of COVID–19 within our Nation's communities threatens to strain our Nation's healthcare systems. As of March 12, 2020, 1,645 people from 47 States have been infected with the virus that causes COVID–19. It is incumbent on hospitals and medical facilities throughout the country to assess their preparedness posture and be prepared to surge capacity and capability. Additional measures, however, are needed to successfully contain and combat the virus in the United States.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b–5), do hereby find and proclaim that the COVID–19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020. Pursuant to this declaration, I direct as follows:

**Section 1**. *Emergency Authority.* The Secretary of HHS may exercise the authority under section 1135 of the SSA to temporarily waive or modify certain requirements of the Medicare, Medicaid, and State Children's Health Insurance programs and of the Health Insurance Portability and Accountability Act Privacy Rule throughout the duration of the public health emergency declared in response to the COVID–19 outbreak.

Case 1:22-cv-01445-CRB-OSS Document 546-4 Filed 01/21/22 Page 85 of 115 PageID #: 2634

**Sec. 2**. *Certification and Notice*. In exercising this authority, the Secretary of HHS shall provide certification and advance written notice to the Congress as required by section 1135(d) of the SSA (42 U.S.C. 1320b–5(d)).

**Sec. 3**. *General Provisions*. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirteenth day of March, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

[FR Doc. 2020–05794
Filed 3–17–20; 8:45 am]
Billing code 3295–F0–P

PA00751

# EXHIBIT M

PA00752

# Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts

March 14, 2020

*Businesses in Bucks, Chester, Delaware, Montgomery counties urged to close for 14 days*

**Harrisburg, PA** – Today, the Department of Community and Economic Development (DCED), in consultation with the Department of Health (DOH), issued guidance for non-essential businesses in Bucks, Chester, Delaware, and Montgomery counties to mitigate the spread of COVID-19.

Governor Tom Wolf has strongly urged non-essential businesses in the four counties to close during their county-specific mitigation periods to protect employees, customers, and suppliers and limit the spread of the virus through personal contact and surfaces. DCED and DOH are reaching out to businesses through a **letter (https://dced.pa.gov/letter-from-secretary-levine)** to provide guidance on the types of businesses that are urged to close. The letter also indicates to businesses that financial assistance opportunities are available to mitigate the financial impact of closures.

"We are committed to keeping all Pennsylvanians safe and healthy, and we are taking every measure to prevent the spread of COVID-19," said DCED Secretary Dennis Davin. "We continue to report new cases of coronavirus every day, and additional steps must be taken to stop the spread. Therefore, we strongly urge non-essential businesses across Pennsylvania to do their part by temporarily closing to help mitigate the spread of this contagious virus."

Non-essential businesses include community and recreation centers; gyms, including yoga, barre and spin facilities; hair salons, nail salons and spas; casinos; concert venues; theaters; bars; sporting event venues and golf courses; retail

PA00753

facilities, including shopping malls and except for pharmacy or other health care facilities within retail operations. Restaurants are urged only to remain open for carry-out and delivery orders.

"We understand that small businesses are an economic driver in Pennsylvania, and a temporary closure will be a financial and community disruptor," Davin said. "However, our top priority is maintaining public health and safety of all Pennsylvanians and taking these proactive steps now can help mitigate a potential community spread. DCED is committed to working with the business community to provide helpful resources for financial assistance."

DCED offers working capital loans that could be of assistance to businesses impacted by COVID-19. Resources and information will be posted to **https://dced.pa.gov/resources (https://dced.pa.gov/resources)** as they become available. The U.S. Small Business Administration, in addition to local funding partners, may also be a source of assistance for affected businesses.

The Wolf Administration strongly encourages businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health, including section 7301 of the Emergency Management Services Code.

**MEDIA CONTACTS:**

Casey Smith, DCED, 717.783.1132

Lyndsay Kensinger, Gov. Wolf, 717-783-1116

# # #

 covid-19 (https://dced.pa.gov/tag/covid-19/)

Facebook        Twitter        LinkedIn        More

PA00754

# EXHIBIT N

PA00755

# ALL NON-LIFE-SUSTAINING BUSINESSES IN PENNSYLVANIA TO CLOSE PHYSICAL LOCATIONS AS OF 8 PM TODAY TO SLOW SPREAD OF COVID-19

March 19, 2020

**Press Release,  Public Health**

Wolf Administration Orders Closure of Non-Life-Sustaining Businesses at 8 p.m. Today, March 19
Enforcement Actions for Restaurant, Bar Dine-In Closure Began at 8 p.m., March 18
Enforcement Actions for Non-Compliance will Begin at 12:01 a.m. Saturday, March 21

Governor Tom Wolf today ordered all non-life-sustaining businesses in Pennsylvania to close their physical locations as of 8 p.m. today, March 19, to slow the spread of COVID-19. Enforcement actions against businesses that do not close physical locations will begin at 12:01 a.m. Saturday, March 21.

Gov. Wolf's order is here.
A video statement from Gov. Wolf is here.
Sec. of Health's order is here.
A list of life-sustaining businesses is here.

In extenuating circumstances, special exemptions will be granted to businesses that are supplying or servicing health care providers.

"To protect the health and safety of all Pennsylvanians, we need to take more aggressive mitigation actions," said Gov. Wolf. "This virus is an invisible danger that could be present everywhere. We need to act with the strength we use against any other severe threat. And, we need to act now before the illness spreads more widely."

The governor had previously encouraged non-life-sustaining businesses to close to mitigate the spread of COVID-19. Restaurants and bars were already required to stop all dine-in services. Enforcement for establishments with a liquor license began at 8 p.m. March 18, and enforcement for all other food establishments will begin at 8 p.m. tonight. Food establishments can offer carry-out, delivery, and drive-through food and beverage service, including alcohol.

Pursuant to the Emergency Management Services Code, the governor is granted extraordinary powers upon his declaration of a disaster emergency, such as COVID-19. Among these powers, the governor may control the ingress and egress into the disaster area, the movement of persons, and the occupancy of premises within the disaster area, which has been established to be the entire commonwealth for the COVID-19 disaster emergency. The secretary of health separately is authorized under the law to employ measures necessary for the prevention and suppression of disease.

Separately, and taken together, the administration is exercising these powers to temporarily close all non-life-sustaining businesses and dine-in facilities at all restaurants and bars across the commonwealth. Persons must be removed from these premises to cope with the COVID-19 disaster emergency.

**Failure to Comply and Enforcement**
Failure to comply with these requirements will result in enforcement action that could include citations, fines, or license suspensions.

The governor has directed the following state agencies and local officials to enforce the closure orders to the full extent of the law:

- Pennsylvania Liquor Control Board
- Department of Health
- Department of Agriculture
- Pennsylvania State Police
- Local officials, using their resources to enforce closure orders within their jurisdictions

PA00756

Private businesses, local organizations and other noncompliant entities that fail or refuse to comply with the governor's orders that protect the lives and health of Pennsylvanians will forfeit their ability to receive any applicable disaster relief and/or may be subject to other appropriate administrative action. Such action may include termination of state loan or grant funding, including Redevelopment Assistance Capital Project (RACP) grant funding and/or suspension or revocation of licensure for violation of the law.

Finally, in addition to any other criminal charges that might be applicable, the Department of Health is authorized to prosecute noncompliant entities for the failure to comply with health laws, including quarantine, isolation or other disease control measures. Violators are subject to fines or imprisonment.

**Business Loans and Support**

The Department of Community and Economic Development (DCED) offers working capital loans that could be of assistance to businesses impacted by COVID-19. Resources and information will be posted to http://dced.pa.gov/resources as they become available. The U.S. Small Business Administration, in addition to local funding partners, may also be a source of assistance for affected businesses.

The Wolf Administration today announced the availability of low-interest loans for small businesses and eligible non-profits in all 67 counties in Pennsylvania through the U.S. Small Business Administration (SBA).

Businesses seeking guidance from DCED can also contact its customer service resource account at ra-dcedcs@pa.gov or by calling 1-877-PA-HEALTH and selecting option 1.

For the most up-to-date information on COVID-19, Pennsylvanians should visit: https://www.pa.gov/guides/responding-to-covid-19/.

PA00757

# EXHIBIT O

PA00758



# THE OFFICE OF GOVERNOR GRETCHEN WHITMER

WHITMER / NEWS / PRESS RELEASES

# Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders

FOR IMMEDIATE RELEASE
March 16, 2020

Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders

LANSING, Mich. -- Today, Governor Gretchen Whitmer signed Executive Order 2020-9, which temporarily closes theaters, bars, and casinos, and limits restaurants to carry-out and delivery orders.

Under Executive Order 2020-9, effective Monday, March 16 at 3:00pm, the following places of public accommodation will be closed; restaurants, cafes, coffee houses, bars, taverns, brewpubs, distilleries, clubs, movie theaters, indoor and outdoor performance venues, gymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor exercise facilities, exercise studios, spas, and casinos.

This order does not restrict a place of business from offering food and beverage using delivery service, window service, walk-up service, drive-through service, or drive-up service. Places of public accommodation are encouraged to do so and use precautions to mitigate potential transmission of COVID-19, including social distancing. Restaurants may allow five people inside at a time to pick up orders, so long as they stay six feet apart from each other.

These restrictions do not apply to the following locations: office buildings, grocery stores, markets, food pantries, pharmacies, drug stores, and providers of medical equipment and supplies, health care facilities, residential care facilities, congregate care facilities, and juvenile justice facilities, warehouse and distribution centers, and industrial and manufacturing facilities.

Order restrictions will remain in place until Monday, March 30 at 11:59 pm.



PA00759

"This disease is a challenge unlike any we've experienced in our lifetimes," said Governor Whitmer. "Fighting it will cause significant but temporary changes to our daily lives. By practicing social distancing and taking aggressive action now, the state is working to mitigate the spread of coronavirus so we reduce the risk that our health care system becomes overwhelmed. This is about saving lives. Michiganders are tough and we are going to get through this, but it will require everyone doing their part. That means making smart choices and not putting yourself or others at risk by going out in public unless it is absolutely necessary."

"We need to move quickly to slow the spread of the virus and protect public health," said Dr. Joneigh Khaldun. "I realize these actions will present temporary changes to the way we live, but they are critical to help ensure our health care system is prepared to treat those who need the most urgent medical care."

"This crisis will require business and labor working together to ensure that we are putting the best interests of Michiganders first in order to protect public health," said Jeff Donofrio, Director of the Department of Labor and Economic Opportunity. "We understand that these decisions will impact the way we do business, but the decisions we make now will allow us to get our economy back on track sooner rather than later. We are putting measures in place to help protect the employers, employees, and individuals that will be impacted."

To mitigate the spread of COVID-19, Governors across the United States have begun implementing similar measures in their states, including Jay Inslee (D-WA), Charlie Baker (R-MA), and Tom Wolf (D-PA).

Patients with confirmed infection have reportedly had mild to severe respiratory illness with symptoms of:
- Fever
- Cough
- Shortness of breath

The best prevention for viruses, such as influenza, the common cold or COVID-19 is to:
- If you think you have been exposed to COVID-19, call your health care provider. If you do not have a health care provider, call the nearest hospital.
- Wash your hands often with soap and warm water for 20 seconds. If not available, use hand sanitizer.
- Avoid touching your eyes, nose, or mouth with unwashed hands.
- Cover your mouth and nose with a tissue or upper sleeve when coughing or sneezing.
- Avoid contact with people who are sick.
- If you are sick, stay home, and avoid contact with others.
- Replace handshakes with elbow bumps.
- Stay at least 6 feet away from others when in a public setting.



PA00760

Information around this outbreak is changing rapidly. The latest information is available at Michigan.gov/Coronavirus and CDC.gov/Coronavirus.



- MICHIGAN.GOV HOME
ADA
MICHIGAN NEWS
POLICIES

COPYRIGHT 2021 STATE OF MICHIGAN

PA00761

# EXHIBIT P

PA00762



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

ORDER OF

*THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA REGARDING THE CLOSURE OF ALL BUSINESSES THAT ARE NOT LIFE SUSTAINING*

*WHEREAS, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

*WHEREAS, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and*

*WHEREAS, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and*

*WHEREAS, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein; and suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, and combustibles. 35 Pa. C.S. § 7301(f); and*

*WHEREAS, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and*

*WHEREAS, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and*

*WHEREAS, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.*

*NOW THEREFORE, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:*

*Section 1:      Prohibition on Operation of Businesses that are not Life Sustaining*

*All prior orders and guidance regarding business closures are hereby superseded.*

*No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations.*

*Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons.  A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.*

*Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.*

   *Section 2:    Prohibition on Dine-In Facilities including Restaurants and Bars*

      *All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19.*

      *Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons. Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.*

*Section 3:    Effective Date and Duration*

      *This order is effective immediately and will remain in effect until further notice.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this nineteenth day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

**TOM WOLF**
*Governor*

# Exhibit Q

PA00765

OFFICIAL WEBSITE OF MICHIGAN.GOV

THE OFFICE OF
# GOVERNOR GRETCHEN WHITMER



WHITMER

# Governor Whitmer Signs "Stay Home, Stay Safe" Executive Order

**FOR IMMEDIATE RELEASE**

March 23, 2020

### Governor Whitmer Signs "Stay Home, Stay Safe" Executive Order

Governor directs all non-critical businesses to temporarily close, all Michiganders to stay home or six feet away from others during COVID-19 crisis

**LANSING, Mich. --** Today, Governor Gretchen Whitmer signed the "Stay Home, Stay Safe" Executive Order (EO 2020-21), directing all Michigan businesses and operations to temporarily suspend in-person operations that are not necessary to sustain or protect life. The order also directs Michiganders to stay in their homes unless they're a part of that critical infrastructure workforce, engaged in an outdoor activity, or performing tasks necessary to the health and safety of themselves or their family, like going to the hospital or grocery store.

Effective at 12:01 am on March 24, 2020, for at least the next three weeks, individuals may only leave their home or place of residence under very limited circumstances, and they must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention when they do so, including remaining at least six feet from people from outside the individual's household to the extent feasible under the circumstances.

"In just 13 days, we've gone from 0 to over 1,000 COVID-19 cases," said **Governor Whitmer.** "This is an unprecedented crisis that requires all of us working together to protect our families and our communities. The most effective way we can slow down the virus is to stay home. I know this will be hard, but it will be temporary. If we all come together, get serious, and do our part by staying home, we can stay safe and save lives."

"Taking aggressive action to protect our communities is the most important thing we can do to mitigate further spread of COVID-19," said Michigan Department of Health and Human Services Chief Deputy for Health and Chief Medical Executive **Dr. Joneigh Khaldun.** "If we do this now, we can make sure our hospitals and healthcare workers are prepared to take care of the sickest people. It is crucial that people do the right thing by staying home and staying safe."

Executive Order 2020-21 prohibits all businesses and operations from requiring workers to leave their homes, unless those workers are necessary to sustain or protect life or to conduct minimum basic operations. Businesses and operations are to designate the workers that meet those criteria, and must adopt social distancing practices and other mitigation measures to protect workers and patrons in the performance of that necessary in-person work.

PA00766

Workers that are necessary to sustain or protect life include those in health care and public health, law enforcement and public safety, grocery store workers, and more. For a full list of these critical infrastructure workers, click the link to Executive Order 2020-21 at the bottom of this page.

Additionally, under Executive Order 2020-21, all public and private gatherings of any number of people occurring among persons outside a single household are temporarily prohibited. People may leave the house to perform for limited, necessary purposes, and may engage in outdoor activities like walking, hiking, running, cycling, or any other recreational activity, consistent with remaining at least six feet from people from outside a person's household and with other restrictions imposed by prior executive orders.

Michigan is currently in the top five states in the nation in number of confirmed COVID-19 cases. Several governors across the country have taken similar steps to protect their communities from the spread of COVID-19, including governors Mike DeWine (R-OH), Andrew Cuomo (D-NY), J.B. Pritzker (D-IL), Tom Wolf (D-PA), Gavin Newsom (D-CA), John Bel Edwards (D-LA), Phil Murphy (D-NJ), and Ned Lamont (D-CT).

Patients with confirmed infection have reportedly had mild to severe respiratory illness with symptoms of:

- Fever
- Cough
- Shortness of breath

The best prevention for viruses, such as influenza, the common cold or COVID-19 is:

- If you think you have symptoms of COVID-19, call your health care provider. If you do not have a health care provider, call the nearest hospital.
- Wash your hands often with soap and warm water for 20 seconds. If not available, use hand sanitizer.
- Avoid touching your eyes, nose, or mouth with unwashed hands.
- Cover your mouth and nose with a tissue or upper sleeve when coughing or sneezing.
- Avoid contact with people who are sick.
- If you are sick, stay home, and avoid contact with others.
- Stay at least 6 feet away from others when in a public setting.

Information around this outbreak is changing rapidly. The latest information is available at **Michigan.gov/Coronavirus and CDC.gov/Coronavirus.**

For those who have questions about the state's actions to mitigate the spread of coronavirus, please call the COVID-19 Hotline at 1-888-535-6136 between 8AM - 5PM daily.

Michiganders can apply for unemployment benefits if they have left work or taken a leave of absence because of self-isolation or self-quarantine in response to elevated risk from COVID-19 due to being immunocompromised, displaying the symptoms of COVID-19, having contact in the last 14 days with someone with a confirmed diagnosis of COVID-19, the need to care for someone with a confirmed diagnosis of COVID-19, or a family care responsibility as a result of a government directive. Those temporarily laid off from work should apply for unemployment benefits online at www.michigan.gov/UIA or 1-866-500-0017.

PA00767

Governor Whitmer is working to ensure that children who rely on the food provided by schools will have the resources they need. The Michigan Department of Education (MDE) has developed an online map for families to find meals. Families can access the map at: **https://www.mcgi.state.mi.us/schoolnutrition/**.

On March 19, the U.S. Small Business Administration (SBA) approved the governor's request for a statewide Economic Injury Disaster Loan (EIDL) declaration, opening the opportunity to small businesses to access low-interest loans from the SBA. The application for disaster loan assistance is available at **https://disasterloan.sba.gov/ela/**. For businesses looking for more information on how to apply for an SBA EIDL loan or whether it is something they should consider, visit michiganbusiness.org/covid19.

To view executive order 2020-21, click the link below:

Executive Order 2020-21

This press release will be translated and made available in Arabic and Spanish at **www.michigan.gov/whitmer.**

<center>###</center>



• 

MICHIGAN.GOV HOME
ADA
MICHIGAN NEWS
POLICIES

COPYRIGHT 2021 STATE OF MICHIGAN

PA00768

# EXHIBIT R

PA00769



**Mike DeWine**, Governor
**Jon Husted**, Lt. Governor

**Amy Acton, M.D., MPH**, Director

## DIRECTOR'S STAY AT HOME ORDER

Re: **Director's Order that All Persons Stay at Home Unless Engaged in Essential Work or Activity**

I, Amy Acton, MD, MPH, Director of the Ohio Department of Health (ODH), pursuant to the authority granted to me in R.C. 3701.13 to "make special orders…for preventing the spread of contagious or infectious diseases" **Order** the following to prevent the spread of COVID-19 into the State of Ohio:

1. **Stay at home or place of residence**. With exceptions as outlined below, all individuals currently living within the State of Ohio are ordered to stay at home or at their place of residence except as allowed in this Order. To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible, maintain social distancing of at least six feet from any other person, with the exception of family or household members, consistent with the Social Distancing Requirements set forth in this Order. All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to participate in Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this Order, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Ohio Department of Health (ODH)). This order does not apply to incarcerated individuals, they are to follow the guidance of the facility in which they are confined. Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location. For purposes of this Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease**. All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses, including home-based businesses, may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

   All Essential Businesses and Operations are encouraged to remain open. Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.** All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Order. Any gathering of more than ten people is prohibited unless exempted by this Order. This is

PA00770

in accordance with President Trump's coronavirus guidelines issued March 16, 2020. Nothing in this Order prohibits the gathering of members of a household or residence.

All places of public amusement, whether indoors or outdoors, including, but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed.

4. **Prohibited and permitted travel.** Only Essential Travel and Essential Activities as defined herein, are permitted. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for Essential Activities is permitted.** For purposes of this Order, individuals may leave their residence only to perform any of the following Essential Activities:

   a. **For health and safety.** To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members or persons who are unable or should not leave their home (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

   b. **For necessary supplies and services.** To obtain necessary services or supplies for themselves and their family or household members or persons who are unable or should not leave their home, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, automobile supplies (including dealers, parts, supplies, repair and maintenance), and products necessary to maintain the safety, sanitation, and essential operation of residences.

   c. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, public access playgrounds may increase spread of COVID-19, and therefore shall be closed.

   d. **For certain types of work** To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

   e. **To take care of others.** To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Order. This includes attending weddings and funerals.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary

PA00771

to seek medical care. Nothing in this Order prevents the Department Health or local health departments from issuing and enforcing isolation and quarantine orders.

7. **Healthcare and Public Health Operations.** For purposes of this Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical marijuana dispensaries and licensed medical marijuana cultivation centers; obstetricians and gynecologists; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. **Human Services Operations.** For purposes of this Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Ohio Department of Aging, Department of Developmental Disabilities, Department of Health, Department of Job and Family Services, Department of Medicaid, Department of Mental Health and Addiction Services, Opportunities for Ohioans with Disabilities, Department of Veterans Services, and Department of Youth Services that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; day care centers, day care homes, group day care homes; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, and social

PA00772

services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure.** For purposes of this, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, fulfillment centers, storage facilities, marinas, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, school construction, essential business construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.** For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, legislators, judges, court personnel, jurors and grand jurors, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Order.

Essential Government Functions means all services provided by the State or any municipality, township, county, political subdivision, board, commission or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions. Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

This Order does not apply to the United States government. Nothing in this Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Order.** For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

PA00773

12. **Essential Businesses and Operations.** For the purposes of this Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:

    a. **CISA List**. On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency (CISA), issued a *Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response.* The definition of Essential Businesses and Operations in this Order includes all the workers identified in that Memorandum.

    b. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, prepared food, alcoholic and non-alcoholic beverages, any other household consumer products (such as cleaning and personal care products), and specifically includes their supply chain and administrative support operations. This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

    c. **Food, beverage, and licensed marijuana production and agriculture**. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical marijuana use, medical marijuana dispensaries and licensed medical marijuana cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

    d. **Organizations that provide charitable and social services.** Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

    e. **Religious entities.** Religious facilities, entities and groups and religious gatherings, including weddings and funerals.

    f. **Media.** Newspapers, television, radio, and other media services;

    g. **First amendment protected speech.**

    h. **Gas stations and businesses needed for transportation.** Gas stations and auto supply, auto-repair, farm equipment, construction equipment, boat repair, and related facilities and bicycle shops and related facilities;

    i. **Financial and insurance institutions.** Bank, currency exchanges, consumer lenders, including but not limited, to pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures

PA00774

exchanges, payday lenders, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products. Also insurance companies, underwriters, agents, brokers, and related insurance claims and agency services;

j. **Hardware and supply stores.** Hardware stores and businesses that sell electrical, plumbing, and heating material;

k. **Critical trades.** Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

l. **Mail, post, shipping, logistics, delivery, and pick-up services.** Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods, vehicles or services to end users or through commercial channels;

m. **Educational institutions.** Educational institutions-including public and private pre-K-12 schools, colleges, and universities-for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible. This Order is consistent with and does not amend or supersede prior Orders regarding the closure of schools;

n. **Laundry services.** Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

o. **Restaurants for consumption off-premises.** Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Order is consistent with and does not amend or supersede prior Orders regarding the closure of restaurants;

p. **Supplies to work from home.** Businesses that sell, manufacture, or supply products needed for people to work from home;

q. **Supplies for Essential Businesses and Operations.** Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

PA00775

r. **Transportation.** Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, marinas, docks, boat storage, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Order;

s. **Home-based care and services.** Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

t. **Residential facilities and shelters.** Residential facilities and shelters for adults, seniors, children, pets, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

u. **Professional services.** Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

v. **Manufacture, distribution, and supply chain for critical products and industries.** Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

w. **Critical labor union functions.** Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations - provided that these checks should be done by telephone or remotely where possible.

x. **Hotels and motels.** Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

y. **Funeral services.** Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations.** For the purposes of this Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

14. **Essential Travel.** For the purposes of this Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

a. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

PA00776

b. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

c. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

d. Travel to return to a place of residence from outside the jurisdiction.

e. Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

f. Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements.** For purposes of this Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

a. **Required measures.** Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

i. **Designate six-foot distances.** Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

ii. **Hand sanitizer and sanitizing products.** Having hand sanitizer and sanitizing products readily available for employees and customers;

iii. **Separate operating hours for vulnerable populations.** Implementing separate operating hours for elderly and vulnerable customers; and

iv. **Online and remote access.** Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Order.** The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements. All provisions of this Order should be interpreted to effectuate this intent.

17. **Enforcement.** This Order may be enforced by State and local law enforcement to the extent set forth in Ohio law. To the extent any public official enforcing this Order has questions regarding what services are prohibited under this Order, the Director of Health hereby delegates to local health departments the authority to answer questions in writing and consistent with this Order.

18. **COVID-19 Information and Checklist for Businesses/Employers.** Business and employers are to take the following actions:

PA00777

a. Allow as many employees as possible to work from home by implementing policies in areas such as teleworking and video conferencing.

b. Actively encourage sick employees to stay home until they are free of fever (without the use of medication) for at least 72 hours (three full days) AND symptoms have improved for at least 72 hours AND at least seven days have passed since symptoms first began. Do not require a healthcare provider's note to validate the illness or return to work of employees sick with acute respiratory illness; healthcare provider offices and medical facilities may be extremely busy and not able to provide such documentation in a timely way.

c. Ensure that your sick leave policies are up to date, flexible, and non-punitive to allow sick employees to stay home to care for themselves, children, or other family members. Consider encouraging employees to do a self-assessment each day to check if they have any COVID-19 symptoms (fever, cough, or shortness of breath).

d. Separate employees who appear to have acute respiratory illness symptoms from other employees and send them home immediately. Restrict their access to the business until they have recovered.

e. Reinforce key messages — stay home when sick, use cough and sneeze etiquette, and practice hand hygiene — to all employees, and place posters in areas where they are most likely to be seen. Provide protection supplies such as soap and water, hand sanitizer, tissues, and no-touch disposal receptacles for use by employees.

f. Frequently perform enhanced environmental cleaning of commonly touched surfaces, such as workstations, countertops, railings, door handles, and doorknobs. Use the cleaning agents that are usually used in these areas and follow the directions on the label. Provide disposable wipes so that commonly used surfaces can be wiped down by employees before each use.

g. Be prepared to change business practices if needed to maintain critical operations (e.g., identify alternative suppliers, prioritize customers, or temporarily suspend some of your operations).

19. **No limitation on authority.** Nothing in this Order shall, in any way, alter or modify any existing legal authority allowing the State or any local health department from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closure of a specific location for a limited period of time, including the duration of this public health emergency.

20. **Savings clause.** If any provision of this Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Order are declared to be severable.

21. **Previous Orders superseded.** This Order supersedes, only to the extent that it conflicts, and amends any previous Order which conflicts with the provisions of this Order.

22. **Duration.** This Order shall be effective at 11:59 p.m. on March 23, 2020 and remain in full force and effect until 11:59 p.m. on April 6, 2020, unless the Director of the Ohio Department of Health rescinds or modifies this Order at a sooner time and date.

PA00778

COVID-19 is a respiratory disease that can result in serious illness or death, is caused by the SARS-CoV-2 virus, which is a new strain of coronavirus that had not been previously identified in humans and can easily spread from person to person. The virus is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person coughs or sneezes. It may be possible that individuals can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose or eyes.

On January 23, 2020, the Ohio Department of Health issued a Director's Journal Entry making COVID-19 a Class A reportable disease in Ohio.

On January 28, 2020, the Ohio Department of Health hosted the first statewide call with local health departments and healthcare providers regarding COVID-19.

On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the outbreak of COVID-19 a public health emergency of international concern.

On January 31, 2020, Health and Human Services Secretary, Alex M. Azar II, declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19.

On February 1, 2020, the Ohio Department of Health issued a statewide Health Alert Network to provide local health departments and healthcare providers with updated guidance for COVID-19 and revised Person Under Investigation (PUI) criteria.

On February 3, 2020, the Ohio Department of Health trained over 140 personnel to staff a call center for COVID-19, in the event it was needed.

On February 5, 2020, the Ohio Department of Health began updating and notifying the media of the number of PUIs in Ohio every Tuesday and Thursday.

On February 6, 2020, the Ohio Department of Health updated all agency assistant directors and chiefs of staff on COVID-19 preparedness and status during the Governor's cabinet meeting.

On February 7, 2020, the Ohio Department of Health and the Ohio Emergency Management Agency met to conduct advance planning for COVID-19.

On February 13, 2020, the Ohio Department of Health conducted a Pandemic Tabletop Exercise with State agencies to review responsive actions should there be a pandemic in Ohio.

On February 14, 2020, the Ohio Department of Health held a conference call with health professionals across the state. The purpose of the call was to inform and engage the healthcare community in Ohio. Presentations were provided by the Department of Health, Hamilton County Public Health, and the Ohio State University.

On February 27, 2020, the Ohio Department of Health and the Ohio Emergency Management Agency briefed the directors of State agencies during the Governor's cabinet meeting regarding preparedness and the potential activation of the Emergency Operations Center.

PA00779

On February 28, 2020, the "Governor DeWine, Health Director Update COVID-19 Prevention and Preparedness Plan" was sent to a broad range of associations representing healthcare, dental, long-term care, K-12 schools, colleges and universities, business, public transit, faith-based organizations, non-profit organizations, and local governments.

On March 2, 2020, the Ohio Department of Health activated a Joint Information Center to coordinate COVID-19 communications.

On March 5, 2020, the Ohio Department of Health hosted the Governor's Summit on COVID-19 Preparedness, a meeting with the Governor, cabinet agency directors, local health department commissioners, and their staff.

On March 6, 2020, the Ohio Department of Health opened a call center to answer questions from the public regarding COVID-19.

On March 9, 2020, testing by the Department of Health confirmed that three (3) patients were positive for COVID-19 in the State of Ohio. This confirms the presence of a potentially dangerous condition which may affect the health, safety and welfare of citizens of Ohio.

On March 9, 2020, the Ohio Emergency Management Agency activated the Emergency Operations Center.

On March 9, 2020, the Governor Declared a State of Emergency in Executive Order 2020-01D.

On March 11, 2020, the head of the World Health Organization declared COVID-19 a pandemic.

On March 11, 2020, testing by the Ohio Department of Health confirmed that one (1) more patient was positive for COVID-19 in the State of Ohio.

On March 11, 2020, the Ohio Departments of Health and Veterans Services issued a Joint Directors' Order to limit access to Ohio nursing homes and similar facilities.

On March 15, 2020, the Ohio Department of Health issued a Director's Order to limit access to Ohio's jails and detention facilities.

On March 15, 2020, the Ohio Department of Health issued a Director's Order to limit the sale of food and beverages, liquor, beer and wine to carry-out and delivery only.

On March 15, 2020, the CDC issued Interim Guidance for mass gatherings or large community events, stating that such events that consist of 50 or more people should be cancelled or postponed.

On March 16, 2020 the Ohio Department of Health issued a Director's Order closing polling locations for the March 17, 2020 primary election.

PA00780

On March 17, 2020 the Ohio Department of Health issued a Director's Order for the management of non-essential surgeries and procedures throughout Ohio.

On March 17, 2020 the Ohio Department of Health issued an Amended Director's Order to limit and/or prohibit mass gatherings and the closure of venues in the State of Ohio.

On March 19, 2020, the Ohio Department of Health issued a Director's Order closing hair salons, nail salons, barber shops, tattoo parlors, body piercing locations, and massage therapy locations.

Multiple areas of the United States are experiencing "community spread" of the virus that causes COVID-19. Community spread, defined as the transmission of an illness for which the source is unknown, means that isolation of known areas of infection is no longer enough to control spread.

The CDC reports that people are most contagious when they are most symptomatic (the sickest) however some spread might be possible before people show symptoms although that is not the main way the virus spreads.

Mass gatherings (10 or more persons) increase the risk of community transmission of the virus COVID-19.

Accordingly, to avoid an imminent threat with a high probability of widespread exposure to COVID-19 with a significant risk of substantial harm to a large number of people in the general population, including the elderly and people with weakened immune systems and chronic medical conditions, I hereby **ORDER** effective at 11:59 p.m. on March 23, 2020, all persons are to stay at home or their place of residence unless they are engaged in Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations as set forth in this Order. This Order shall remain in full force and effect until 11:59 p.m. on April 6, 2020, unless the Director of the Ohio Department of Health rescinds or modifies this Order at a sooner time and date. To the extent any public official enforcing this Order has questions regarding what services are prohibited under this Order, the Director of Health hereby delegates to local health departments the authority to answer questions in writing and consistent with this Order.

_____                    _____March 22, 2020_____
Amy Acton, MD, MPH
Director of Health

PA00781

# EXHIBIT S

PA00782

## EXECUTIVE ORDER IN RESPONSE TO COVID-19
## (COVID-19 EXECUTIVE ORDER NO. 8)

**WHEREAS**, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (Gubernatorial Disaster Proclamation) in response to the outbreak of Coronavirus Disease 2019 (COVID-19); and,

**WHEREAS**, in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS**, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19;

**WHEREAS**, COVID-19 has resulted in significant economic impact, including loss of income and wages, that threaten to undermine housing security and stability;

**WHEREAS**, the enforcement of eviction orders for residential premises is contrary to the interest of preserving public health and ensuring that individuals remain in their homes during this public health emergency;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(2), 7(8), 7(10), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective March 21, 2020 at 5:00 pm and for the remainder of the duration of the Gubernatorial Disaster Proclamation, which currently extends through April 7, 2020:

**Section 1. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations**

1. **Stay at home or place of residence.** With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order. To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible maintain social distancing of at least six feet from any other person, consistent with the Social Distancing Requirements set forth in this Executive Order. All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public

Health (IDPH)).  Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location.  For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease.**  All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below.  For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

   All Essential Businesses and Operations are encouraged to remain open.  To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.**  All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order.  Pursuant to current guidance from the CDC, any gathering of more than **ten** people is prohibited unless exempted by this Executive Order.  Nothing in this Executive Order prohibits the gathering of members of a household or residence.

   All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

   This Executive Order supersedes Section 2 of Executive Order 2020-07 (COVID-19 Executive Order No. 5), which prohibited gatherings of 50 people or more.

4. **Prohibited and permitted travel.**  All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited.  People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible.  This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for essential activities is permitted.**  For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities:

a. **For health and safety.** To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

b. **For necessary supplies and services**. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences.

c. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, playgrounds may increase spread of COVID-19, and therefore shall be closed.

d. **For certain types of work**. To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

e. **To take care of others**. To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care. Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

7. **Healthcare and Public Health Operations.** For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. **Human Services Operations.**  For purposes of this Executive Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Illinois Department of Human Services, Illinois Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, group day care homes, and day care centers licensed as specified in Section 12(s) of this Executive Order; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;  transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies;

businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals**.**

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure.**  For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

   Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

   Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.**  For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Executive Order.

    Essential Government Functions means all services provided by the State or any municipal, township, county, subdivision or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions.  Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

PA00787

This Executive Order does not apply to the United States government. Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Executive Order**. For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. **Essential Businesses and Operations**. For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:[1]

   a. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

   b. **Food, beverage, and cannabis production and agriculture**. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

   c. **Organizations that provide charitable and social services**. Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

---

[1] On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency, issued a *Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response*. The definition of Essential Businesses and Operations in this Order is meant to encompass the workers identified in that Memorandum.

d. **Media**. Newspapers, television, radio, and other media services;

e. **Gas stations and businesses needed for transportation.** Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;

f. **Financial institutions**. Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products;

g. **Hardware and supply stores**. Hardware stores and businesses that sell electrical, plumbing, and heating material;

h. **Critical trades.** Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

i. **Mail, post, shipping, logistics, delivery, and pick-up services**. Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j. **Educational institutions**. Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible. This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools are ordered closed through April 7, 2020;

k. **Laundry services**. Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l. **Restaurants for consumption off-premises.** Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up,

and carry-out.  Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property.  This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) except that Section 1 is ordered to be extended through April 7, 2020;

m. **Supplies to work from home**.  Businesses that sell, manufacture, or supply products needed for people to work from home;

n. **Supplies for Essential Businesses and Operations**.  Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

o. **Transportation.**  Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Executive Order;

p. **Home-based care and services**.  Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

q. **Residential facilities and shelters**.  Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

r. **Professional services**.  Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

s. **Day care centers for employees exempted by this Executive Order**.  Day care centers granted an emergency license pursuant to Title 89, Section 407.400 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation.

t. **Manufacture, distribution, and supply chain for critical products and industries**.  Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

u. **Critical labor union functions**.  Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations – provided that these checks should be done by telephone or remotely where possible.

v. **Hotels and motels**.  Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

w. **Funeral services**.  Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations**.  For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

14. **Essential Travel.** For the purposes of this Executive Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

   a. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

   b. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

   c. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

   d. Travel to return to a place of residence from outside the jurisdiction.

   e. Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

   f. Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements**. For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

   a. **Required measures.** Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

      i. **Designate six-foot distances**. Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

      ii. **Hand sanitizer and sanitizing products.** Having hand sanitizer and sanitizing products readily available for employees and customers;

      iii. **Separate operating hours for vulnerable populations**. Implementing separate operating hours for elderly and vulnerable customers; and

iv. **Online and remote access**.  Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Executive Order**.  The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements.  All provisions of this Executive Order should be interpreted to effectuate this intent.

17. **Enforcement**.  This Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305.

18. **No limitation on authority**.  Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing the State or any county, or local government body from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closer of a specific location for a limited period of time, including the duration of this public health emergency.  Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

**Section 2. Order ceasing evictions.**

Pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(2), (8), and (10), all state, county, and local law enforcement officers in the State of Illinois are instructed to cease enforcement of orders of eviction for residential premises for the duration of the Gubernatorial Disaster Proclamation.  No provision contained in this Executive Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage.

**Section 3. Savings clause**.

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

# EXHIBIT T

PA00794



# **MEMORANDUM**

**TO:**  Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321; and 1021 Butterfield Rd. Downers Grove, Ilinois, 60515.

**FROM:**  Cathrine Wenger, Senior Counsel

**SUBJECT:**  WARN Act Notice (revised)

**DATE:**  March 19, 2020

On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

13234411 v1

PA00795

# EXHIBIT U

PA00796

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|                          |     |                                |
|--------------------------|-----|--------------------------------|
|                          | .   | Chapter 11                     |
| IN RE:                   | .   |                                |
|                          | .   | Case No. 20-10553(CSS)         |
| ART VAN FURNITURE, et al,| .   |                                |
|                          | .   |                                |
|                          | .   | 824 Market Street              |
|                          | .   | Wilmington, Delaware 19801     |
|          Debtors.        | .   |                                |
| . . . . . . . . . . . . . . . . | | Thursday, March 19, 2020     |

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

For the Debtors:                Gregory Werkheiser, Esq.
                                Michael J. Barrie, Esq.
                                Kevin M. Capuzzi, Esq.
                                John Gentile, Esq.
                                Kate Harmon, Esq.
                                Jennifer Hoover, Esq.
                                BENESCH, FRIEDLANDER, COPLAN
                                 & ARONOFF, LLP

                                Maura Russell, Esq.
                                MONTGOMERY, MCCRACKEN, WALKER
                                 & RHOADS, LLP

For the U.S. Trustee:           Linda Richenderfer, Esq.
                                OFFICE OF THE U.S. TRUSTEE

(Appearances Continued)

Audio Operator:                 Electronically Recorded
                                by CourtCall/Court Personnel

Transcription Company:          Reliable
                                1007 N. Orange Street
                                Wilmington, Delaware 19801
                                (302)654-8080
                                Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES VIA TELEPHONE:    (Continued)

For the Official Committee
of Unsecured Creditors:        Robert J. Feinstein, Esq.
                               Bradford J. Sandler, Esq.
                               PACHULSKI, STANG, ZIEHL
                                & JONES, LLP


For Wells Fargo Bank:          J. Cory Falgowski, Esq.
                               BURR & FORMAN, LLP


For Wells Fargo
Capital Finance:               Jennifer Feldsher, Esq.
                               MORGAN, LEWIS & BOCKIUS, LLP


For Hilco Merchant
Resources, LLC, et al:         Douglas Hermann, Esq.
                               PEPPER HAMILTON, LLP


                               Steven Fox, Esq.
                               RIEMER & BRAUNSTEIN, LLP


For HGB AVF Lending:           Dennis A. Meloro, Esq.
                               Jeffrey Wolf, Esq.
                               GREENBERG TRAURIG, LLP



ALSO APPEARING VIA TELEPHONE:

                               Dennis Stogsdill
                               ALVAREZ & MARSAL
```

3

INDEX

|  | Page |
|---|---|
| STATUS BY MR. WERKHEISER | 7 |
| COMMENTS BY MS. FELDSHER | 14 |
| COMMENTS BY MR. WERKHEISER | 16 |
| COMMENTS BY MR. FOX | 18 |
| COMMENTS BY MR. SANDLER | 20 |
| COMMENTS BY MR. BARRIE | 22 |
| SCHEDULING | 25 |

PA00799

4

1          (Proceedings commence at 2:01 p.m.)

2                  THE COURT:  Good afternoon, everyone.  This is

3      Judge Sontchi.  I hope all can hear me.  You can't see me,

4      however.  You might -- for many of you, that's an advantage

5      that you are soon going to lose.

6                  UNIDENTIFIED:  Your Honor, I think we have to shut

7      down either the audio in the Skype because we're hearing some

8      feedback.

9                  THE COURT:  Well, everybody that I have that is on

10     Skype is on mute, except for Mr. Sandler.  There we go.

11                 UNIDENTIFIED:  That's better, Your Honor.

12                 THE COURT:  And --

13                 MR. SANDLER:  (Not identified) My apologies, Your

14     Honor.  I've never used Skype before.

15                 THE COURT:  Me neither.  Somehow -- wait a minute.

16     We're doing our best here, some new technology.

17                 Let me ask because, apparently, I've disappeared.

18     Can you see me on your displays?

19                 UNIDENTIFIED:  No.

20                 UNIDENTIFIED:  No.

21                 UNIDENTIFIED:  We can see your name, but there's no

22     picture.

23          (Participants confer)

24                 UNIDENTIFIED:  There you are.  That works.

25                 THE COURT:  Oh, I can tell by the happy faces that

1    I have arrived.

2              UNIDENTIFIED:  You can look at everybody's houses

3    now.

4              THE COURT:  All right.  Well, thank you very much.

5    The Bankruptcy Court remains open for business, but it is not

6    business as normal, as you can tell.  We are dealing with

7    everything you are dealing -- I'm seeing many of you who are

8    clearly at home.  I'm in the office, but I'm about the only

9    person here, and we are operating remotely at the Bankruptcy

10   Court now.

11             So we're going to be, as you know from my previous

12   order -- maybe you've seen it -- we are going to be operating

13   at -- with regard to only time-sensitive matters only.  All

14   other matters are being cleared until, at this point, April

15   15th.  That, of course, is subject to further extension, if

16   necessary.  Our primary concern is the health and safety of

17   our employees and the public, doing our civic duty to help

18   stop the spread of this virus, and to promote and fulfill our

19   mission of running the bankruptcy system.  And those are hard

20   -- four hard things to try to get to work at the same time,

21   but we're doing the very best we can.

22             As you know, we're doing telephonic appearances for

23   most everything.  We are using -- we have this ability to use

24   video to a limited extent, when we have to deal with

25   witnesses.  Our interpretation of the law -- which could be

1    wrong, but it's our interpretation -- is that, if you have a

2    contested evidentiary matter, it is not sufficient to have

3    the witness available by telephone, but that there has to be

4    a video connection, so that the Court can discern the

5    demeanor of the witness, so that parties cross-examining that

6    witness can see the witness, and so the witness can see the

7    people cross-examining him or her.  And of course, there has

8    to be the ability to look at documents.  So this is a

9    complication.

10         And the reason I have this hearing today -- this

11    conference today, is to prepare for tomorrow's hearing, which

12    may be -- well, I think is going to be contested, and it may

13    involve contested evidence.  I'm not sure about that, and

14    that's one of the reasons I asked you all to be on the phone

15    today, so we could flesh that out.

16         So what I'd like to do, first of all, is welcome

17    Mr. Sandler to the case, who I understand represents the

18    Official Committee of Unsecured Creditors that was appointed

19    yesterday.

20         Mr. Barrie, if I could turn to your first, as

21    counsel for the debtors, to give me a general report on

22    what's going on with the debtor and what you -- how you

23    foresee tomorrow going forward.

24         MR. BARRIE:  Thank you, Your Honor.  I'm actually

25    going to defer to Mr. Werkheiser, who is on CourtCall.  As

1  you can imagine, this global pandemic has kind of thrown a

2  wrench into everybody's business everywhere, and the debtors

3  having retail going-out-of-business sales in the Midwest and

4  the Northeast is certainly not excused from that. So I want

5  to kind of pitch it over to Greg, who can give the Court a

6  general status update as to all the matters that are

7  happening and the status of what the debtors are doing.

8          MR. WERKHEISER: Yes. Thank you, Mr. Barrie.

9          Your Honor, Greg Werkheiser of Benesch for the

10  record, for the debtors. And it seems like a lifetime ago,

11  but I think, with the exception of the hearing we had on

12  Monday on the TRO on the (indiscernible) matter, we were last

13  before Your Honor on March 12th.

14          And this situation has evolved with a rapidity and

15  severity over the last week that I don't think anybody could

16  have predicted, and in a way that sort of uniquely makes life

17  challenging for a furniture retailer especially. And you

18  know, so, obviously, as Your Honor is aware, this coronavirus

19  epidemic has been sweeping through the country since early --

20  I think it was late February or early March. But really, you

21  know, we started getting, you know, significant feedback

22  about this shortly after the case was filed. You know, as I

23  look through the time lines of everything that has gone on

24  relative to the coronavirus epidemic, you know, it's really

25  just been in the last week that things have really ramped up.

1       And you know, from the debtors' experience and

2  their operations, you know, what we've seen transpiring in

3  the states and localities where the debtors operate is -- you

4  know, obviously, we have now federal state of emergency

5  declared on account of this, and you know, all of the sort of

6  reliable sources and information is urging everyone to stay

7  home to the greatest extent to possible and to -- you know,

8  no nonessential activities out of their homes.

9       And then a number of places where the company has

10  operated in its core markets, such as Ohio and Pennsylvania

11  and Michigan, the, you know, state and local governments have

12  either issued strong guidance or outright directives for

13  nonessential retail to not be operating over the last several

14  days.  And this has had, you know, a devastating effect on

15  the debtors' ability to operate, you know, both the store

16  closing sales that had gotten underway just before the filing

17  and for the quotations that were contemplated to be part of

18  the Levin-Wolf going concern sale, which are 44 stores,

19  primarily located in Pennsylvania and Ohio, those locations,

20  as well.

21       Not to put too fine of a point on it, but you know,

22  I think, for at least the last several days, you know, the

23  company has been unable to meet, even at the store closing

24  locations, you know, the operating expenses that are incurred

25  just by keeping the doors open and the lights on and staff in

1    place to run those sales.  It's just not getting -- it wasn't

2    getting volume into the stores, in terms of customer traffic.

3    And obviously, people, out of health concerns and economic

4    concerns, are reluctant to make these types of bigger ticket

5    expenditures that are involved in committing to purchase a

6    piece of furniture.

7            So we are in a place now that I think we never

8    hoped or expected to be when, you know, planning for this

9    Chapter 11 was underway, certainly not any -- what anybody

10   expected in negotiating a cash collateral budget or orders.

11   And you know, everybody is doing the best they can under

12   these extraordinary -- extraordinarily different

13   circumstances to -- you know, obviously, paramount is the

14   health and safety of everyone involved, but -- and then, you

15   know, to treat all of our constituents, especially, you know,

16   our employees and customers, as fairly as possible under the

17   circumstances, but also to preserve and maximize value to the

18   greatest extent possible.

19           And so this -- where this has left us is in a

20   position where we've had to make some very, very hard

21   decisions over the last several days.  And just so the -- to

22   preview it for Your Honor, we've got a few different buckets

23   of stores that the company has operated.  There were, you

24   know, Art Van (indiscernible) branded mattress stores that

25   were the subject of going concern sales that were largely

1    completed as of mid March.  There's another bucket of stores

2    that are the, you know, Art Van stores, and the eight

3    Maryland and Virginia-based Wolf stores that had been the

4    subject of the closing -- the store closing sales that had

5    begun just before the filing.  And then thirdly, we have the

6    -- you know, what were going to be the Levin-Wolf going

7    concern stores.

8            And you know, as to the ones where we still had

9    ongoing GOBs and -- or were attempting to operate as much as

10   possible in the ordinary course, the company has made the --

11   you know, the difficult decision, effective as of today, to

12   tell employees not to report to work at those locations.  We

13   hope that -- and has, at least temporarily, shuttered these

14   locations.  You know, we hope this is not forever, but the

15   situation is extraordinarily difficult and very fluid.  And

16   so, you know, we have to adapt consistent with our

17   obligations and fiduciary duties to the facts as they

18   (indiscernible)

19           THE COURT:  So I'm confused.  I apologize, Mr.

20   Werkheiser.  So what stores are you not going -- or what

21   stores is it that you're telling employees not to show up to,

22   the store closing sale stores or all stores?

23           MR. WERKHEISER:  Effectively, all of the ones that

24   we still have ongoing store closing sales or that we're

25   operating in the ordinary course, which is basically the

1    Levin-Wolf sale, so (indiscernible)

2              THE COURT:  So the Wolf and -- so the Wolf and

3    Levin stores are closed, as well?

4              MR. WERKHEISER:  At least temporarily, Your Honor,

5    yes.  And --

6              THE COURT:  What about the mattress stores?

7              MR. WERKHEISER:  Your Honor, the mattress stores,

8    with the exception, I believe, of the Levin Mattress stores -

9    - so all of the Art Van or -- I think the brand was Pure

10   Sleep branded mattress stores were already, to my knowledge,

11   involved in store closing sales.  And as I understand it, the

12   nature of that inventory is such that they tend to sell down

13   quite quickly in a store closing sale context.  And so most

14   of those, if not all of them, were already through their

15   process as of last week.

16             THE COURT:  All right.

17             MR. WERKHEISER:  (Indiscernible)

18             THE COURT:  So, as of tomorrow, you will be not

19   operating business.

20             MR. WERKHEISER:  With the exception of --

21             THE COURT:  Online?

22             MR. WERKHEISER:  -- some back office functions and

23   distribution center functions and the headquarters.  And then

24   the sort of fulfillment side of the retail stores, I believe,

25   for a few days is contemplated to continue open -- operating

```
 1    to try to, you know, allow customers to pick up have

 2    delivered product that they've recently ordered.

 3            THE COURT:  Okay.  So I guess the -- well, to cut

 4    to the chase, that means we're not having a hearing tomorrow.

 5            MR. WERKHEISER:  I don't want to speak for

 6    everybody, Your Honor, on the phone.  But I think that is the

 7    debtor's view, and Mr. Barrie can speak more to that.

 8            I guess, before we sort of segue into talking about

 9    tomorrow's hearing, Your Honor, I just -- I do want to make

10    clear that, you know, we are trying to explore with our

11    lenders and our other stakeholders, you know, other options,

12    short of outright (indiscernible) liquidation.  And you know,

13    we're aware, for example, that in a -- in the Craftworks

14    case, currently pending before Judge Shannon, they've --

15            THE COURT:  I think that's --

16            MR. WERKHEISER:  -- (indiscernible)

17            THE COURT:  Actually, I think that's confidential

18    information, Mr. Werkheiser.

19            MR. WERKHEISER:  Oh --

20            THE COURT:  That call was not on the record today.

21            MR. WERKHEISER:  I was not aware of that, I'm

22    sorry, Your Honor.

23            So let me just say then, conceptually, we are

24    looking at the possibility of a -- you know, going idle or

25    going into a state of dormancy for a period of time, and the
```

1    possibility then of either, you know, reopening stores, some

2    subset of stores as -- either in furtherance of the going

3    concern transaction, if there's still one to be had at that

4    point, or -- you know, or closing sales and an orderly

5    liquidation, you know, essentially, once the economic and the

6    retail environment and the safety environment have improved

7    to a degree that we can do that.

8         It is, you know, a number -- there are a number of

9    scenarios under consideration.  I think, of every available

10   scenario, that is probably the, you know, most attractive one

11   that we have.  And we are, right now, engaging in a dialogue

12   with Wells Fargo and our term loan lenders to see if there's

13   a way to pursue that alternative.  The -- you know, but the

14   reality of the situation is that we cannot continue to burn

15   cash at the rate that we've been, given that there's

16   virtually no revenue coming into the company right now.

17        And you know, we -- of course -- and of course, for

18   us to be able to do that, we need cooperation from the ABL

19   agent and the term loan lenders and, you know, need

20   everyone's assurances that, while we are having these

21   dialogues, that, you know, they'll take no precipitous action

22   to make that -- an already difficult situation worse by, you

23   know, sweeping all of the cash, for example, that are in the

24   debtors' cash collection accounts and leaving us without even

25   the cash necessary to fund those operating and restructuring

1    expenses already incurred or that might be incurred

2    imminently, as we're, you know, trying to navigate this

3    situation.

4              THE COURT:  All right.  Thank you, Mr. Werkheiser.

5              MR. WERKHEISER:  Thank you, Your Honor.

6              THE COURT:  Obviously distressing news, but I

7    appreciate the update.

8              Would anyone like to be heard in connection with

9    Mr. Werkheiser's report?  The lenders, the committee, the

10    liquidator, anybody?

11              MS. FELDSHER:  Your Honor --

12              MR. FOX:  Your Honor --

13              MS. FELDSHER:  -- this is Jennifer --

14              MR. FOX:  -- Steve Fox -- go ahead, Jennifer.

15              THE COURT:  Ms. Feldsher?

16              MS. FELDSHER:  Your Honor, this is Jennifer

17    Feldsher from Morgan Lewis on behalf of Wells Fargo, the ABL

18    lender.

19              Your Honor, these are unprecedented times, and

20    we're -- I personally was on, you know, calls that aren't of

21    public record earlier today.  This has hit retail, it has hit

22    restaurants and other industries very hard.  And it has hit,

23    you know, a lot of cases and a lot of people, and we are

24    mindful of that.

25              Your Honor, a lot of this information and the

1    debtors' decisions, unfortunately, are coming at us minutes

2    before the -- before these hearings.  These are not

3    discussions that -- you know, I would say that where the

4    debtors are, as opposed to other cases, is they haven't fully

5    come to their creditors, other than to say this is somebody

6    else's problem and, you know, put -- you know, fix it for us

7    or don't sweep or do these things.

8              I think that we are certainly discussing with the

9    debtors -- we want to try to find a path forward.  We would

10   like to find a path that makes sense for all stakeholders

11   here, but it's going to require extraordinary measures

12   because we are living through extraordinary times, to try to

13   figure out what is the path forward, what's the path that

14   preserves, you know, value, that provides as much value as

15   possible to those that are impacted by these decisions.

16             And unfortunately, we haven't gotten the

17   information that we need from the company to be able to even

18   consider a full wind-down plan.  So, you know, you heard Mr.

19   Werkheiser, I think asking for an advisory opinion on

20   remedies that the lenders can take.  We're not -- you know,

21   we're in fact-finding mode and, you know, they're asking for

22   advisory opinions.  I mean, I -- they're in default today

23   under their cash collateral budget, they understand that.  We

24   are trying to work with them productively.  There are a

25   number of outstanding items.

1          That's all I can say to you at this time because

2     that is truthful in where we are with the parties.  And you

3     know, we're trying to cope and we're trying to absorb all of

4     this in the best way that we can.  So I'm happy to take any

5     questions that Your Honor has, but a lot what was said on the

6     call has -- is complete news and -- just to the ABL lenders.

7          THE COURT:  Okay.  Yeah, it's news to me, too, of

8     course.  Have you actually issued a notice of default,

9     though?

10          MS. FELDSHER:  We have not yet, Your Honor.

11          THE COURT:  Okay.  Thank you.

12          Anyone else?

13          MR. WERKHEISER:  Your Honor, it's Mr. Werkheiser.

14     If I could respond briefly?

15          THE COURT:  Yes, Mr. Werkheiser.

16          MR. WERKHEISER:  So, Your Honor, I think we have a

17     -- obviously, somewhat of a difference of opinion about

18     information flow, but -- and I don't think we need to belabor

19     that point.  We are committed to -- and I think we have been

20     giving as much information as possible to the lenders.  It's

21     just, you know, the rapidity and severity of the

22     circumstances, you know, have limited how much useful

23     information we have, and therefore we can share at any given

24     moment in time.  But we're committed to making that

25     information available.

```
 1              But -- and I also want to be clear.  I was not
 2     asking Your Honor to limit their remedies or prevent the
 3     lenders from having whatever rights are available to them
 4     under the Code and the interim cash collateral order today.
 5     But we are concerned that we are in a situation that nobody
 6     could have anticipated.  And because there has been a lack of
 7     communication, we want to make sure that the debtors are not
 8     left in a position where they're not able to meet those
 9     committed expenses that have been incurred or cannot be
10     avoided to be incurred in the near term.
11              And my point was simply that we need to have that
12     communication going forward.  But then we absolutely reserve
13     our rights to come before the Court if we need to, to address
14     those sorts of issues.  And you know, we wanted to preview
15     that we had concerns, but not asking for Your Honor to do
16     anything or to grant any relief today.
17              THE COURT:  Well, you're not going to get anything,
18     so that's good.  Obviously --
19              MR. FOX:  Your Honor --
20              THE COURT:  -- the cash collateral --
21              MR. FOX:  -- if I --
22              THE COURT:  -- order --
23              MR. FOX:  If I may?
24              THE COURT:  Just a second.
25              Actually, you know, the cash collateral says what
```

1    it says, and if there's a default that's called, there are

2    certain things that occur.  I think that all the lenders and

3    creditors probably understand that this is a difficult

4    situation, but I'm sure they're all still focused on

5    maximizing their recoveries, even though what "maximizing"

6    means today may not be what "maximizing" meant on Monday, and

7    it is what it is.

8         But I -- what's important, I'm -- I -- like Ms.

9    Feldsher, I'm in information-gathering mode at this point,

10   and this is just a status conference; it's not a hearing.

11   But all of this is very important and I appreciate the

12   information.

13        And I interrupted someone, and I don't know who it

14   was.

15        MR. FOX:  Your Honor, thank you.  This is Steven

16   Fox from Riemer & Braunstein.  As Your Honor will recall, we

17   represent the proposed consultant Hilco and Gordon Brothers.

18   We, too, share everybody's disappointment in the necessity,

19   from the debtors' standpoint, of making this difficult

20   decision.

21        We, too, were a bit in the dark up until minutes

22   before this hearing, when Mr. Barrie sent me an email that

23   the debtors had made this decision and were not planning on

24   going forward tomorrow.  Your Honor probably is aware we did

25   file a declaration in support of the motion earlier today,

1    with the expectation that we were going forward tomorrow.  So

2    this came quite as a shock to us, shortly before the hearing

3    this afternoon.

4         We do have more than 40 people out in the field,

5    who have been continuing to perform services in anticipation

6    of going forward tomorrow.  We've been incurring expenses to

7    support the debtors' efforts in keeping the store closing

8    sales going for the benefit of the estate and the creditors,

9    with the expectation that the debtors were going to conduct

10   themselves in good faith and move forward in connection with

11   the motion.

12        We continue to provide these services at the

13   request of the debtors, as well as the ABL lenders.  And we

14   will continue to stand by to support the estates' efforts,

15   whatever decisions are ultimately made, in terms of what the

16   path forward will be.

17        And we, too, will commit to work with the ABL

18   lenders, the term lenders, and the debtors, and now the

19   committee, having recently been appointed, to find the

20   optimal path forward to maximize value because, as Your Honor

21   will recall, we also, through an affiliate, hold pre-petition

22   term debt, so our interests are aligned with the rest of the

23   constituents within the estate to maximize recovery here for,

24   not only the benefit of ourselves, but for the benefit of

25   others involved.  And we look forward to having an

1    opportunity to come back and resolve these issues when a path

2    forward is ultimately resolved.  Thank you, Your Honor.

3            THE COURT:  Thank you, Mr. Fox.

4            Mr. Wolf?

5            UNIDENTIFIED:  Your Honor, this --

6            MR. SANDLER:  Your Honor, it's Brad Sandler.  If I

7    may be heard.

8            THE COURT:  Yes, you may, Mr. Sandler.

9            MR. SANDLER:  Thank you, Your Honor.  And as you

10   noted, just for the record, Brad Sandler, Pachulski Stang,

11   for the committee.

12           Your Honor, you know, the committee, having only

13   selected us as counsel yesterday, having been informed

14   yesterday, this is all new to us, but none of it really

15   surprising.  The committee's overarching goal was to, I'll

16   just say maximize value, like everybody else.  But there are

17   other things besides, you know, dollar recoveries.

18           For example, with the Wolf Levin going concern

19   sale, we were hoping that 44 stores would be saved, thousands

20   of jobs would be saved.  Maybe that will happen down the

21   road.  But as -- you know, certainly, with the coronavirus,

22   this unprecedented shutdown throughout the country that

23   certainly we have never seen, and hopefully never will see

24   again, Simon Properties closing their malls, L Brands,

25   JCPenney, you know, the Gap, you know, many, many retailers

1   around the country are starting to shut down.  And to have

2   the debtor do that at this time, frankly, from our

3   perspective, makes a lot of sense, to put everything on ice.

4           First of all, it's important for the employees, to

5   make sure that they're not exposed potentially to the virus.

6   It's also something that -- right?  We're talking about

7   something that is not perishable.  You know, furniture,

8   whether, you know, it's in the store today or in the store,

9   you know, a month from now or two months from now, it's still

10  the same furniture.  So it should be relatively easy to shut

11  the debtor down without any value that would dissipate

12  because of the furniture somehow, you know, getting destroyed

13  or damaged.

14          You know, it seems to me, Your Honor, that, in

15  these times -- right?  Restructuring professionals are, in

16  part, supposed to come up with creative solutions to very,

17  very tough problems.  And it may be easy to look at this

18  situation and pull the plug and say let's convert the case to

19  a Chapter 7.  I'm not really sure what that gets you.  If

20  people aren't shopping right now because everybody is shut in

21  their, you know, respective abodes, Chapter 7 isn't going to

22  generate any more value.

23          And it seems to me that this is a creative approach

24  to put everything on ice.  And hopefully, you know, at some

25  time period, whether it's 30 days, 60 days, 90 days, whatever

1    that time period may be, to, you know, turn the lights back

2    on and resume the liquidation of the stores and hopefully

3    find a going concern for the Wolf Levin properties.

4           And whether, you know, Robert Levin is the

5    purchaser at that time, whether he's still interested, we

6    don't know.  But the best chance in certainly the committee's

7    mind right now, to preserve value, is to put everything on

8    ice and let's come back to in, you know, a month or two and

9    see where we are.

10          MR. BARRIE:  Your Honor (indiscernible)

11          THE COURT:  Thank you, Mr. Sandler.

12          MR. BARRIE:  This is Michael Barrie.  If I could

13   just add a lit bit more color to what Mr. Sandler has just

14   spoken about.

15          THE COURT:  Yes.

16          MR. BARRIE:  So mister (indiscernible) did a

17   (indiscernible) explain (indiscernible) where we are and how

18   we got there, and I appreciate all of the constituents', you

19   know, requests and, to some extent, a little bit of

20   frustration about getting information.  But again, this is a

21   fluid -- this is a fluid time where no one had any

22   expectation that the entire world would come to a screeching

23   halt.

24          We are working with Wells, we have given them

25   information about 48 hours ago.  We're starting to get some

PA00818

1    comments and feedback on that information now.  But as Mr.

2    Sandler said, the thought process would be kind of -- and

3    we've set this forth in a more fulsome motion that the Court

4    can hear.  But main -- find a way to maintain a -- almost a

5    status quo going forward, ensure that the employees who have

6    worked to realize a return for the inventory for the benefit

7    of Wells, make sure they're compensated.

8         Make sure our consumers know that -- who have gift

9    cards or who have creditors, you know, make sure that they're

10   aware of how -- you know, through communications on the

11   website, emails, whatever, how they -- you know, they will be

12   treated.  But the idea is let's not make this a

13   (indiscernible) thing.  But the reality of the situation is,

14   is that we can't have a going out of business sale if there's

15   no one to come and buy the merchandise.

16        On the Levin side -- on the Levin side, one of the

17   bigger issues that we're faced with are half of those stores

18   are in Pennsylvania, I think 27 of them.  The Commonwealth of

19   Pennsylvania closed all those stores by order of the

20   Governor.  So they -- being open is not even an option for

21   any of them.

22        So the thought is let's put this thing in a coma

23   for a little bit, let's skinny down this budget.  Let's work

24   with Wells to make sure that the people who are working hard

25   to maximize recovery so far are being taken care of, and then

1    make sure that consumers know how they can be taken care of.

2    And then let's -- let us work with Wells to figure out how

3    this works in the near term.  Let us -- knowing full well

4    that we can use this time to work out if there are bulk

5    inventory sale opportunities; use this time to further

6    discuss the Levin sale, keep that going because that's mostly

7    an attorney-driven piece; discuss potential lease disposition

8    options under 365(d) and discuss with our credit card

9    processors returning monies for the increased reserves they

10   had taken during the preference period, which all can be done

11   in the context of during this temporary -- during this

12   temporary -- for lack of a better word -- coma, and then have

13   some sort of procedure going forward -- again, we'll do this

14   by motion -- that truly puts those emergent needs that have

15   to be decided because of destruction of proper threats or

16   threats to life and safety, putting those needs on an

17   emergent basis that have to be heard, but holding all other

18   non-emergent, monetary-type relief until such point that the

19   parties can really deal with it as it comes down.

20           And we just felt that this is a better framework

21   for preserving the value of what's there, as opposed to

22   simply just pulling the plug and walking way from everything.

23   So --

24           THE COURT:  All right.

25           MR. BARRIE:  -- you know, in that context, with

1     respect to the Hilco retention, Your Honor, in that context,

2     we just don't feel it's appropriate to go forward on a

3     retention hearing for something that hopefully will happen

4     eventually, but is not going to be happening in the next

5     couple of days.

6              THE COURT:  All right.  Now I'm confused.  So you

7     do want to go forward tomorrow?

8              MR. BARRIE:  No, no, no.  We don't want to go

9     forward.  We don't think it's necessary to go forward on that

10    because there's not going to be a going out of business sale

11    right now, so we don't think that it's necessary to go

12    forward on that until that issue materializes.  We just think

13    it's a -- we do think Hilco's partnership is very important

14    and we do intend to go forward with it at some point, just

15    tomorrow is not the day to do it.

16             THE COURT:  All right.  And you don't want to set a

17    date for that at this time?

18             MR. BARRIE:  We can set a date.  I don't have a

19    problem setting a date just to keep it on the calendar.  But

20    I would suspect that that date would be probably mid to later

21    April.

22             THE COURT:  All right.  Well, we have a hearing on

23    April 6th, so we can continue it to then, at least for now.

24             Any objection to continuing that until April 6th?

25        (No verbal response)

1          THE COURT:  Okay.  I don't hear any.

2          We'll obviously not go forward tomorrow, and that's

3    a shame, mainly because it's a shame for the business; and,

4    second, it's a shame because we were hoping to see if we

5    could figure out how to do this, and this was going to be one

6    of the first opportunities.  But that's nothing compared to

7    the loss of productivity and recovery to the employees and

8    the creditors as a result of these developments, which are

9    clearly outside the control of anybody on this call, that's

10   for sure.

11         So this has been very helpful.  We'll cancel

12   tomorrow's hearing.  Is there anything anybody else would

13   like to offer to the Court?

14         MR. WERKHEISER:  Your Honor, this is Greg

15   Werkheiser.

16         UNIDENTIFIED:  Your Honor --

17         MR. WERKHEISER:  I just wanted to mention that we

18   do have a -- I think a March 31st hearing scheduled with the

19   Court that we are trying to keep on the calendar, if at all

20   possible.  I mentioned that there were some 60 odd locations

21   that the debtors are --

22         THE COURT:  Yeah, I have that --

23         MR. WERKHEISER:  -- (indiscernible)

24         THE COURT:  I have that on my -- yes, I have that

25   on my calendar.  But that's a special hearing, that's not an

1    omnibus, so that's why I didn't mention it.  The April 6th

2    hearing is the second day hearing for the case, so that's why

3    I mentioned that hearing.  But now, you still have the March

4    --

5              MR. WERKHEISER:  Okay (indiscernible)

6              THE COURT:  -- you still have the March 31st

7    hearing.

8              MR. WERKHEISER:  All right.  Thank you, Your Honor.

9              THE COURT:  Anyone else?

10             MR. BARRIE:  The only other -- the only other

11   request, given that things are so fluid, Your Honor, and

12   things are ever development, I don't think it's needed for

13   tomorrow.  But maybe perhaps early next week we could just

14   have one further status conference, so, if there are any

15   issues that the Court can help the parties resolve on a

16   little more of an informal basis, and also to update the

17   parties and the Court as to what's going on with the matters,

18   maybe earlier next week might be a good time to have a status

19   conference?

20             THE COURT:  Sure.  I'm available.  It's a very

21   empty calendar, and this is clearly an important and time-

22   sensitive matter.  So I'm available pretty much every -- I

23   have a hearing Wednesday at 2, and I have -- I'm not free

24   Thursday morning, and I have a lunch conference on Friday.

25   Other than that, I'm wide open.  Monday seems early.  How

1    about Tuesday?

2             MR. BARRIE:  Yeah.  Yeah.  Tuesday would be fine

3    with us, Your Honor.

4             THE COURT:  Do we have -- can we do 10 a.m., or

5    does that inconvenience people?  I don't know if we have

6    people on the west coast or not.

7             MR. BARRIE:  I don't believe we do.

8             THE COURT:  All right.

9             MR. BARRIE:  10 a.m. works for the debtors.

10            THE COURT:  All right.  That will be a --

11            MR. SANDLER:  Works for the committee.

12            THE COURT:  Okay.  That will just be a telephonic,

13   no fancy Skype for Business, that will just be a telephonic

14   status conference.

15            MR. WERKHEISER:  Thank you, Your Honor.  We'll get

16   that notice out.

17            UNIDENTIFIED:  (Indiscernible)

18            THE COURT:  Great.  All right.  And Mr. Barrie or

19   Mr. Werkheiser, if you could just issue a notice of

20   continuation of the hearing for tomorrow until April 6th on

21   the docket, that would be great.

22            MR. BARRIE:  Will do.

23            MR. WERKHEISER:  Yes, Your Honor.

24            THE COURT:  All right.  Anything further?

25        (No verbal response)

1          THE COURT:  All right.  Well, thank you everyone.

2          UNIDENTIFIED:  That's it, Your Honor.

3          THE COURT:  Bad news, but good to --

4     (Proceedings concluded at 2:37 p.m.)

5                    * * * * *

PA00825

30

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

_____     March 26, 2020

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable

PA00826

# EXHIBIT V

PA00827

1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

.    Chapter 11
IN RE:    .
.    Case No. 20-10553 (CSS)
ART VAN FURNITURE, LLC, *et al.*, .
.    Courtroom No. 6
.    824 North Market Street
.    Wilmington, Delaware 19801
.
             Debtors.    .    March 31, 2020
. . . . . . . . . . . . . . . . . .    1:00 P.M.

TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:        Gregory G. Werkheiser, Esquire
                      Michael J. Barrie, Esquire
                      Jennifer Hoover, Esquire
                      Kevin Capuzzi, Esquire
                      John C. Gentile, Esquire
                      BENESCH, FRIEDLANDER, COPLAN
                       & ARONOFF LLP
                      222 Delaware Avenue, Suite 801
                      Wilmington, Delaware 19801


Audio Operator:        Leslie Murin

Transcription Company:    Reliable
                      1007 N. Orange Street
                      Wilmington, Delaware 19801
                      (302)654-8080
                      Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1  APPEARANCES (Continued):

2  For the Debtors:            Marua I. Russell, Esquire
                               MONTGOMERY MCCRACKEN WALKER
3                                  & RHOADS LLP
                               437 Madison Avenue, 24th Floor
4                              New York, New York 10022

5
   For U.S. Trustee:           Linda Richenderfer, Esquire
6                              David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
7                              OFFICE OF UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
8                              Lockbox 35
                               Wilmington, Delaware 19801
9
   For Wells Fargo Bank:       Jennifer Feldsher, Esquire
10                             MORGAN LEWIS & BOCKIUS LLP
                               101 Park Avenue
11                             New York, New York 10178

12
   For Brixmor and Various     Craig Ganz, Esquire
13 Landlords:                  BALLARD SPAHR LLP
                               1 East Washington Street, Suite 2300
14                             Phoenix, Arizona

15 For the Committee:          Bradford Sandler, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
16                             780 Third Avenue
                               New York, New York 10017
17
   For HGB AVF Lending:        Jeffrey Wolf, Esquire
18                             GREENBERG TRAURIG LLP
                               One International Place, Suite 2000
19                             Boston, Massachusetts 02110

20
   For Jennifer Sawle:         Rene Roupinian, Esquire
21                             RAISNER ROUPINIAN LLP
                               500 5th Avenue, Suite 1600
22                             New York, New York 10110

23
   For State of               Saverio Mirarchi, Esquire
24 Pennsylvania, Office        STATE OF PENNSYLVANIA
   Of the Attorney General:   OFFICE OF THE ATTORNEY GENERAL
25                             Strawberry Square
                               Harrisburg, Pennsylvania 17120

1    (Proceedings commence at 1:01 p.m.)

2         THE COURT:  Good afternoon everybody.  This is

3    Judge Sontchi.  This is the Art Van hearing.  I know we're

4    all appearing remotely.  Obviously, if you could please make

5    sure you mute your phones unless you're speaking.  It's

6    particularly important if you're working from home with

7    background noise or if you're using a cell phone.  So, thank

8    you very much for your courtesy.

9         I did sign the only matter that was listed on the

10   agenda as going forward.  I signed that order just a little

11   while ago under certification of counsel, but I'd like to

12   turn it over to the debtors, if I may, for a update on the

13   current situation with the case and any scheduling matters

14   that might be related to that and then, of course, once the

15   debtors have made their report I would welcome any

16   contributions from any other parties in interest who wish to

17   be heard.

18        MR. WERKHEISER:  Good afternoon, Your Honor.  It's

19   Gregory Werkheiser of Benesch, proposed counsel for the

20   debtors.  Thank you for making this time available to us.

21        Before we get into this contemplated status

22   conference, Your Honor, I do have to go back to the rejection

23   motion because we were apprised by Ms. Heilman a short time

24   ago that one of her clients has an unresolved issue with the

25   form of issue that we were not aware until after the

4

1   certification had been submitted this morning.  And so we

2   have been communicating with her to try to resolve that.  I

3   don't know whether that issue is or is not resolved at this

4   point.  And I apologize, we did not have the opportunity in

5   the short amount of time available after hearing from Ms.

6   Heilman before the hearing to communicate with Chambers, to

7   notify Chambers that that response from Ms. Heilman had been

8   received.

9          The issue, as I understand it -- well, if I could

10  just generally, for the benefit of the parties on the phone

11  and the court, a number of parties had sought, and I think we

12  had provided, confirmation that as to all of the rejected

13  locations that are incorporated in the proposed order that

14  was submitted to the court this morning the debtors believe

15  that all of the salable inventory in those locations, which

16  was primarily mattresses, these were Art Van Pure Sleep

17  stores, has been removed from those locations or would be

18  removed by the end of the day today, March 31st.  All of the

19  surrendering notices that were contemplated by the motion did

20  go out to the counterparties to the leases last Friday and

21  should have been received by those parties yesterday or at

22  the very latest today by overnight courier.

23         So, putting that issue aside I just don't know,

24  there might be a language issue that Ms. Heilman has still on

25  the order and so if I could pause momentarily and let her

1  have an opportunity or her co-counsel have an opportunity to

2  respond we can try to see if this is something that is easily

3  resolvable or where we stand.

4           THE COURT:  Okay.

5           MR. GANZ:  Good afternoon, Your Honor.  Craig

6  Ganz, Ballard Spahr on behalf of Brixmor and various other

7  landlords.

8           This kind of informal objection that we were

9  working through specifically related to Brixmor.  And as I

10  understand, and I have been cc'd on the emails that have gone

11  back and forth between Mr. Werkheiser and Ms. Heilman, that I

12  think we largely have worked out everything as far as the

13  language.  Just making sure that there's a representation on

14  the record here that the debtors are, in fact, out of the

15  locations notwithstanding anything in the order and if they

16  are out just preserving all rights to any asserted claims

17  that we may have to the extent that there are other issues

18  relating to that abandonment of property and whether that was

19  accomplished or not.

20           The short answer is I think we're resolved on

21  those issues.

22           THE COURT:  Okay.  So it sounds like your resolved

23  and simply based on the representations of Mr. Werkheiser and

24  his client with regard to the fact that they've exited the

25  location and you're reserving all your rights with regard to

PA00832

1  whether they have executed it correctly or completely.  We

2  will deal with that going forward if we have to.

3         MR. GANZ:  Exactly, Your Honor.  Thank you.

4         THE COURT:  All right.

5         MR. WERKHEISER:  Thank you, Your Honor.

6         I think we should move forward to the status

7  update.  So, Your Honor, when we were last before the court,

8  I believe it was last Thursday, March 26th, at that time the

9  debtors reported that they believed they had, at least, an

10 agreement in principal with Wells Fargo, the prepetition ABL

11 agent and on a path forward for a mothball motion or a

12 suspension motion, you know, very short hands for these

13 things.  The concept was that we would reduce the company's

14 remaining operations to the bare minimum and to suspend, to

15 the greatest extent possible, activity in the bankruptcy case

16 over the next short period of time to better assess the

17 outcome of the Coronavirus situation and most viable

18 alternatives to the company going forward to maximize value.

19        So, despite that conceptual agreement there are,

20 obviously, important details that still needed to be worked

21 out related to the budget and other details of that

22 arrangement.  I think what we found, as the parties were

23 working round the clock on these issues since before we were

24 in court last Thursday and throughout the weekend, was that

25 due to a number of facts that are somewhat unique to these

1  debtors and this case we were not able to get to a point

2  where we had the agent support and consent for the mothball

3  arrangement primarily because of the company's liquidity

4  issues and cash needs, both as they exist today based on

5  obligations that have accrued thus far since the filing and

6  the expected obligations that would be incurred going forward

7  even with reducing and deferring obligations for, you know,

8  rent and reducing other activities to the bare minimum.

9          THE COURT:  Mr. Werkheiser, could you keep your

10  voice up, please, I can't hear you.

11          MR. WERKHEISER:  Yes.  I'm sorry.

12          Just by way of example, Your Honor, as is somewhat

13  unique to this debtor as opposed to some others the debtor

14  had a large number of employees, I think in excess of 4,000,

15  as of the petition date.  A lot of those employees are sales

16  personnel who earn commissions on furniture only when it

17  actually delivers, which means there is a long tail on

18  employee compensation.  And so, there was a large portion of

19  employee compensation that still remains outstanding right

20  now from the couple of weeks that the debtors were operating

21  during teh bankruptcy.

22          In addition, this company as a partially self-

23  funded health insurance plan which, again, means that for

24  those employee benefits there are fairly substantial -- there

25  is a fairly substantial tail.  And so the all-in number for

1   those types of obligations is something approaching $10

2   million dollars based on our best estimates of what is owed

3   right now and the company has, you know, cash in the

4   neighborhood of, I believe, $12 to $13 million dollars now

5   just to put, you know, a high level -- just to paint a high

6   level picture of where things stand financially for the

7   company.

8           And so I can't -- you know, we cannot speak for

9   Wells Fargo's decision making process, but, you know, we do

10  understand that as we attempt to model the various scenarios

11  for mothballing the company over the next six, seven, eight

12  weeks as appropriate the challenge always became how to

13  achieve a liquidity event on the backend of that period.

14  That was generating sufficient value both to satisfy any

15  deferred obligations and to provide a recovery to the senior

16  secured lenders at a level that was acceptable to them.

17  Also, how to manage liquidity during that period under

18  certain of the scenarios that we considered.

19          Those scenarios have included, you know, among

20  other things the resumption of GOB sales, various bulk sale

21  scenarios for inventory, consignment arrangements and other

22  potential transactions with parties that have been under

23  discussion for, you know, the last ten days or more

24  including, as we heard at the last status conference, the

25  possibility of resuming a transaction with the Levin Partners

 1 for, at least, a subset of those assets.

 2          And, you know, all those various alternatives,

 3 given the circumstances, the uncertainty surrounding the

 4 Coronavirus impact on the business and on the world in

 5 general, you know, creates a lot of uncertainty both as to

 6 timing and eventual recoveries.  And then some of those

 7 alternatives such as GOB sales require the company to ramp-up

 8 in advance and incur, you know, fairly substantial expenses

 9 in advance to bring employees back on, to incur advertising

10 expense, to spruce up the stores as necessary to resume, you

11 know, store closing sales at those locations.  The numbers

12 are just not rosy from the debtor's perspective and we gather

13 from our lenders' perspective given their unwillingness to go

14 forward on that basis.

15          Your Honor, I think where that leaves us at this

16 time is with few options none of which are particularly

17 attractive for anyone here.  We are operating subject to an

18 alleged termination declaration that was issued by Wells

19 Fargo as the agent on March 19th.  The so-called notice --

20 remedies notice period under the cash collateral order was

21 extended, but only through the end of the day today.  We do

22 not know at this time whether Wells Fargo is prepared to

23 further extend that beyond today and absent that or absent

24 some extraordinary relief from the court the debtors would no

25 longer have access to cash collateral at the close of

1    business -- excuse me, at the end of the day today.

2              The other issues, I think, Your Honor, that are

3    still being worked through at this time relate to funding

4    obligations that may exist under the cash collateral order

5    during this remedies notice period.  Paragraph 2 of the cash

6    collateral order does require funding for employee payroll,

7    certain other emergency expenses and other obligations that

8    would be approved by the agent.

9              The company does have outstanding funding requests

10   to the agent related to those obligations that have not yet

11   been acted upon.  Finally, the order does contemplate the

12   establishment of carve-out reserves and a carve-out trigger

13   notice has been issued.  We have to confirm that those

14   arrangements are in place.

15             So, given all of that, Your Honor, I think while

16   no final decision has been made by the debtors, you know,

17   absent a significant change in the trajectory of these cases

18   over the next, you know, twelve hours or several days, if we

19   can get beyond the next twelve hours, we are looking at a

20   scenario where the debtors will likely have no choice but to

21   move forward with seeking conversion of these cases to a

22   Chapter 7 liquidation.

23             It is our hope and our intention to accomplish

24   that in coordination with our lenders, the committee and our

25   other stakeholders, and to do as orderly and as soft as

PA00837

1   possible a conversion if, in fact, there is no other choice
2   at this point.  That provides to the fullest extent possible
3   to satisfy the employee obligations and the other accrued
4   obligations that are required to be summoned under the cash
5   collateral order, but we are not there yet.  You know, we do
6   not have a clear indication from the agent where we will end
7   up on those issues.

8         I think, Your Honor, I've been talking quite a
9   while and I will pause here and I'm happy to answer Your
10  Honor's questions or respond to questions or comments from
11  any of the other parties on the phone.

12        THE COURT:  No.  I don't have any questions.

13        Does anyone else wish to be heard?

14        MS. FELDSHER:  Your Honor, this is Jennifer
15  Feldsher from Morgan Lewis on behalf of Wells Fargo.  If it
16  would be helpful for Your Honor I can, kind of, weigh in a
17  little bit where Mr. Werkheiser left pauses, I think, in his
18  presentation on where the ABL lenders thinking is at and to
19  correct a couple of, you know, what I think are, at least,
20  misunderstandings in our view with respect to what is or
21  isn't' required of the ABL lender in this case.

22        Your Honor, I want to start by saying that Wells
23  Fargo, as Your Honor has heard from status conference after
24  status conference in this case, you know, we, like everybody
25  else has had to adopt to the new normal or, you know, current

1    circumstances which were completely unforeseen.  And one of

2    the things that we're seeing across these industries that

3    have been so terribly hit by the pandemic and the, you know,

4    shut down orders and things like that is in order for these

5    Chapter 11 cases to continue or to have any chance of

6    success, and we've told this to Your Honor previously so I

7    won't dwell on it or take up a lot of time, but they require

8    creative solutions,

9           Most importantly, a willing partnership between

10   the debtors and their stakeholders, and a fair amount of

11   cooperation from everybody because we're all dealing with

12   this together and in these unforeseen circumstances they are

13   cataclysmic from a top-line number.  The debtor has

14   absolutely no revenue coming in and so we are left to deal

15   with how to get from point a to point b, and all of the

16   costs, and all of the stakeholders that are implicated

17   including employees, including landlords, including lenders

18   with a finite amount of cash and a totally uncertain path

19   forward, at least, in the near term.

20          Within that Wells Fargo has funded every single

21   payroll request that the debtors have made for current pay,

22   for employees that have worked and for payroll requests that

23   has come in.  What has occurred, and Your Honor might recall

24   from a prior status conference where I was notified right

25   before coming into court, I believe, on the 20th, on a status

1 conference that the debtors had determined to suspend all of

2 their operations even though they were still operating in

3 some locations and there were not necessarily shutdown orders

4 in place at that time.

5         They had determined to suspend all operations

6 immediately, to terminate all employees; not all, but

7 significantly all of their employees, certainly all of the

8 store levels. That was not something that was done in

9 coordination with the lenders, either the ABL lender or the

10 term lender, or even the consultant as far as we know who, as

11 Your Honor remembers, had remained even though their

12 retention was still up in the air had remained to support the

13 debtor's efforts to try to continue a GOB sale.

14         So, as a result of terminating their employees, as

15 Mr. Werkheiser described, the debtors now have significant

16 accrued PTO commissions, other benefits related to the

17 terminated employees as well as healthcare obligations. Most

18 of these were not included in any budget and certainly in the

19 cash collateral budget because there was no contemplation of

20 a wholesale mass termination of employees. Could these have

21 been mitigated if employees had been furloughed, could these

22 have been mitigated by a, you know, less drastic more spaced

23 out termination we will never know. We weren't part of the

24 terminations to begin with. We will never know, but now

25 these expenses, as Mr. Werkheiser explained, exist.

1    Just the employee obligations alone, Your Honor,

2  just because I think it's really important given what Mr.

3  Werkheiser disclosed as the cash position, total over $14

4  million dollars.  So, if the debtors have cash, as Mr.

5  Werkheiser said --

6    THE COURT:  I'm sorry, 14?

7    MS. FELDSHER:  14, Your Honor, correct.  That is

8  an estimate on the healthcare costs and that's using an

9  estimate, Your Honor, that's a little bit lower than what Mr.

10 Werkheiser just told you.  In materials that they have

11 provided to the ABL lender we're looking at a number for

12 anticipated healthcare obligations of $8.5 and change million

13 dollars and Mr. Werkheiser, I believe, just told the court

14 that he's now using a $10 million dollar number.

15    Your Honor, that's part of the problem here to is

16 there are lots of demands, including one last night, that all

17 of these amounts need to be paid despite the fact that there

18 just isn't enough cash to pay them, but the numbers detailed

19 on the numbers, we asked for this detail, we don't have the

20 information on it, but we can tell you in the aggregate these

21 numbers are far in excess of what the debtors have in cash

22 today.  And then if you take into account, as Mr. Werkheiser

23 said, the fee carve-out that is required to be funded, and

24 they had demanded as well, that is in excess of, I believe,

25 another $2 and a half million dollars.

1         So, again, 14, two and a half, and that's not even
2    taking into account any other expenses that might result.
3    So, our concern is that, yes, the parties are moving forward.
4    There hasn't been a proposal that's been presented to the
5    lenders that shows a market improvement in outcomes in a
6    Chapter 11 then in a Chapter 7, and the expenses associated
7    with the Chapter 11 are typically illustratively much higher.
8    There is also no scenario that the debtors have put forth
9    that they believe provides the ABL lenders with payment in
10   full.
11        At the end of the day whether that's a resumption
12   of the GOB process or a bulk sale, as the debtors have
13   suggested, they might be forced into because they won't have
14   enough cash by their own budget to get through to a GOB
15   process.  There is no scenario under which the debtors
16   believe that Wells Fargo will be paid in full let alone other
17   creditors.  And yet what we have are demands to today to take
18   all of the remaining cash that exists in the debtors account,
19   use that cash, this is the debtor's request, to pay employee
20   obligations that have accrued.  Again, not current employee
21   obligations going forward.  We have no issue paying for
22   employee wages that are coming due, but to pay the employee
23   obligations as much as they can to fund the professional fee
24   carve-out and then they have asked for Wells Fargo to provide
25   some type of an assurance that out of any proceeds that Wells

1  Fargo is to receive they will fund the remaining employee

2  obligations no matter what that recovery is going to be to

3  Wells Fargo, but they will fund the remaining obligations to

4  employees.

5         Now, Your Honor, we're talking about employees and

6  I'm mindful of that, obviously.  Nobody in entering this case

7  and even as we sit here today had any intention of incurring

8  obligations to employees that were not going to be met.  The

9  budgets originally for, you know, the Chapter 11 case took

10 into account the anticipated employee obligations and, you

11 know, everybody had always hoped and expected that employee

12 obligations could be paid in full through the process and

13 certainly through the GOB sales.

14        The debtors currently don't anticipate being able

15 to make it to a GOB sale and I don't think they believe that

16 even a Chapter 7 Trustee may make it through a GOB sale

17 without further financing.  Yet when it comes to obligations

18 for which they perceive that there might be D&O liability we

19 are getting demands for those.  On anything else they're

20 willing to talk to us, but as to our recoveries, as to other

21 stakeholder recoveries, as to what's in the best interest of

22 all other stakeholders unfortunately, Your Honor, we haven't

23 been as cooperative.

24        So, on the one hand we very much like to say to

25 the debtors let's do this cooperatively.  That is our

1  preference that is what we asked the debtors to do.  We'd

2  like to have a smooth transition to a Chapter 7 process in

3  which we can account for, you know, make sure the inventory

4  is safeguarded, make sure the information is available for

5  the Chapter 7 Trustee so that the Chapter 7 Trustee can get

6  up to speed as quickly as possible, make sure key employees

7  are available and their information is available so that the

8  Chapter 7 Trustee can reach out to them.  Hopefully, if he or

9  she determines that this is the way that we would go so that

10  all of the inventory and the assets can be safeguarded, can

11  be put together.

12         Unfortunately, that is not what is happening and

13  as I started the presentation what I said was that in these

14  times, especially when we're dealing with such unprecedented

15  disruption, the key is to have a willing partner.  And so,

16  Your Honor, we need those assurances from the debtors that

17  they will get their creditors the information they need and

18  the information that will be critical to have a soft landing,

19  but as a condition to that is that we have to gaurantee that

20  all potential liabilities for the directors and officers are

21  taken care of full stop we are not in a position to do that

22  today.  We simply can't.  The debtors do not have sufficient

23  cash today to pay for those things.  This is not a DIP, they

24  don't have availability or no additional cash other then what

25  they have on hand.

1          So, we're a little bit in a -- and I don't really

2    know because I'd prefer option A, Your Honor.  I'd prefer

3    that we did this consensually and that we were before the

4    court late in the week with respect to a voluntary

5    conversion, but I don't know because of demands that we

6    received very, very late last night.  As Mr. Werkheiser said,

7    everybody has been working round the clock to try to make

8    this work and to try to come up with a scenario that works.

9    Then, you know, late in the evening we're getting demands

10   that say you must pay what we believe are $16 and a half

11   million dollars of obligations and we'd like to take that

12   money today.

13          If the debtors were permitted to do what they're

14   asking to do, of course, there's no options for any creditors

15   in a Chapter 7 because you will turn over the case to a

16   Chapter 7 Trustee with no money and no funding.  So, where we

17   sit today our view is if this is likely to convert to a

18   Chapter 7 Trustee then we should turn over the funds that

19   remain in the estate to the Chapter 7 Trustee as well.  I

20   just would be remiss if I didn't mention that the debtors

21   are, as Your Honor can imagine, out of borrowing base

22   compliance.  So, the lenders have the right, under the

23   interim cash collateral order, to sweep cash, to put them

24   into compliance which would be in excess of $5 million

25   dollars.  We have not taken that action for exactly this

1   reason because our view and the view that we have shared with

2   the debtors is we appreciate that the estate today has more

3   obligations that they didn't have cash to pay.  They're going

4   to be tough decisions that need to be made going forward

5   undoubtedly.

6            There might be a scenario in which we have to fund

7   to an exit.  We just don't know, but if its likely to convert

8   to a Chapter 7 anyway then it makes sense for the Chapter 7

9   Trustee to have all of the available options and the cash to

10  make those tough decisions rather than a situation which is,

11  I believe, what the debtors are suggesting or requesting

12  today which is that they would take all of the cash, leave

13  the estate with zero money and soft convert it.  I don't know

14  what's soft about that, but convert it into a Chapter 7 case

15  and leave all of the creditors and the Chapter 7 Trustee with

16  absolutely no options but, you know, a zero for everybody.

17           We can't imagine that that's maximizing value.

18  Certainly not by our view and so, therefore, Your Honor, we

19  are where we are and, as I said, if the debtors want to work

20  cooperatively, we are here.  We want to do that, but we've

21  got to be working towards that conversion and, you know, we

22  will fund payroll expenses for employees that remain at the

23  company today and certain those that we need going forward.

24  But we cannot give the debtors assurances that we are going

25  to fund something to deal with D&O liabilities today.  It's

1   just not appropriate and we're not in a position to do so.

2               THE COURT:  Thank you.

3               MS. FELDSHER:  Your Honor, unless you have any

4   questions thank you.

5               THE COURT:  Anyone else before I turn it back over

6   to Mr. Werkheiser?

7               MR. SANDLER:  Your Honor, very briefly.  Brad

8   Sandler, Pachulski Stang, for the committee.  May I be heard?

9               THE COURT:  Yes.

10              MR. SANDLER:  Your Honor, as I think I said when

11  we had our first hearing that the committee was involved in

12  the overarching goal of this committee was to see one or more

13  going concerns because, obviously, that would be good for the

14  employees, for the landlords and the vendors.

15              You know, you've heard two very different

16  presentations over the last, I guess, about 30 minutes or so

17  that I think you can sense what is going on within the case.

18  The committee is, kind of, caught in the middle.  The one

19  thing from the committee's perspective I don't think there is

20  really much of an operational difference right now with this

21  Chapter 11 in particular and what will likely occur in a

22  Chapter 7 given the state of the emergency.

23              And considering that the trustees in Delaware are,

24  for the most part, comfortable operating a business one of

25  the things that I do want Your Honor to know is that we have

1   been talking to our committee members, some of our committee

2   members, which consist of major vendors as well as major

3   landlords of the debtor.  And we have also had conversations

4   with Robert Levin's counsel and separately with Gary Van

5   Elslander's counsel.  And the committees goal still remains

6   to try to find a going concern transaction, one or more going

7   concern transactions that will hopefully save some portion of

8   the Wolf/Levin stores and the Art Van stores.

9           This, you know, ultimately may be done in a

10  Chapter 7 and it may be that some of us are not around in the

11  Chapter 7, although some of us may be around, and we intend

12  to continue to find a way to develop a value maximizing

13  transaction, one or more of them here because it really will

14  be critical to try to get a going concern to the extent

15  possible.

16          You know, in terms of where the case ultimately

17  goes its unfortunate.  A conversion is never a great thing

18  for a case.  We understand the disagreements between Wells

19  and the company.  We will, obviously, take a look at whatever

20  conversion motion is filed and we will weigh-in on that.  At

21  this time, though, we certainly understand the substantial

22  challenges confronting this debtor right now.

23          So, with that, Your Honor, I think I will just see

24  if you have any questions from the committee's perspective.

25          THE COURT:  No.  Thank you.

1          MS. RICHENDERFER:  Your Honor, if I may.  This I
2    Linda Richenderfer from the U.S. Trustees Office.
3          The one thing that strikes me is that we have a
4    cash collateral -- use of cash collateral that expires at
5    some point this evening.  And it doesn't sound like a motion
6    to convert would be filed sooner than a day or two and then
7    that still needs time for Your Honor to hear it.
8          I have a great concern about who is going to be
9    protecting the collateral in the meantime because it
10   certainly will not be under the control of the Chapter 7
11   Trustee.  And I don't know if the debtor has spoken to the
12   lender yet about any arrangements being made, but until that
13   order is signed and until the trustee is appointed a Chapter
14   7 Trustee is not responsible for what happens with the
15   collateral.  That is just a point I wanted to emphasize at
16   this point.
17          THE COURT:  Thank you.
18          MR. GANZ:  Your Honor, Craig Ganz.  May I be
19   heard?
20          THE COURT:  Yes.
21          MR. GANZ:  Craig Ganz, Ballard Spahr.  Again, Your
22   Honor, as you know, we represent a group of landlords
23   including Brixmor Store, Essential and Broadstone.
24          One of the issues that the Trustee brought up, its
25   one of the issues that we have as well, you know, once we

1  turn the page in April here we're not onto April rents and

2  essentially being a rent free storage facility for the

3  collateral.  It brings a lot of concerns.  We have had

4  multiple discussions with potential purchasers both on that

5  collateral that's inside our stores and also purchasers on

6  the leases as well.  We have tried to direct them many times

7  over to debtor's counsel.  We have not seen any of those

8  conversations bear any fruit.

9          The position that we are taking right now is we

10  just want to find a way here where we can remove ourselves

11  from this process and if it has to be go direct with these

12  potential purchasers of the leases or acquirers a we do have

13  potential new tenants lined up to take over here, but there

14  is no mechanism here to extract us.  And, you know, there

15  could be a situation where we're hopeful when we get into a

16  Chapter 7 that we'll have a trustee that is responsive to

17  removing the collateral from these locations or liquidating

18  the collateral to a potential acquirer of these leases so we

19  can have a new tenant, but as these days start to drag on

20  there's some significant implications here especially, like I

21  said, we're viewed somehow as a rent free storage facility

22  where, you know, those amounts are going to need to be paid

23  at some point and what the mechanism to do it is and whether

24  that is through the Chapter 11 process or through the Chapter

25  7 process.  We would like to see, you know, a mechanism to

PA00850

1  move this along while at the same time, obviously, being

2  sympathetic to the situation that we're all facing.

3            Thank you.

4            MR. WOLF:  Your Honor, Jeff Wolf from Greenberg

5  Traurig on behalf of HGB AVF.  If I could be heard.

6            THE COURT:  Yes.

7            MR. WOLF:  Thank you.

8            We are the term lender and at this point now the

9  successor agent under the term loan facility.  I just wanted

10  to make sure that you and the other parties understood that,

11  first, we have not been involved in the back and forth on the

12  day to day of the discussions between the debtor and Wells

13  Fargo.  We have not been consulted on the continued use of

14  cash collateral.  We have not been a party to the development

15  of the mothball budgets.

16            That having been said I just wanted to let you and

17  the other parties understand that it would have been our

18  hope, like Wells Fargo, that the ABL agent and the debtors

19  would have worked out a mothball budget and continued with

20  consensual use of cash collateral and continued in Chapter

21  11.  And hopefully to find a way to get the stores back open

22  when the time is allowed and dispose of the collateral in an

23  orderly basis in the hope of getting recoveries for the term

24  loan term lenders.

25            Given what we understand to be the current

PA00851

1   circumstances and demands of the debtor in terms of what

2   needs to get paid, and lack of cash and other resources we're

3   supportive of the ABL agent's position at this point to

4   terminate cash collateral.  We would echo their sentiment as

5   well as the U.S. Trustees and landlord's counsel about trying

6   to give this thing a soft landing in Chapter 7 with

7   safeguarding the collateral and paying attention to all the

8   niceties of trying to put the Chapter 7 Trustee in as good a

9   position as possible to maximize value for the benefit of all

10  stakeholders.

11          Thank you.

12          MS. ROUPINIAN:  Your Honor, this is Rene Roupinian

13  of Raisner Roupinian.  May I be heard?

14          THE COURT:  Yes.

15          MS. ROUPINIAN:  Thank you, Your Honor.

16          As everyone knows, this healthcare crisis

17  continues and we wanted to highlight to the court and to the

18  parties that irreparable harm to these employees continues

19  due to the lack of their health insurance.  And while the

20  estate exists, we implore the parties to make every effort to

21  relieve as much of this healthcare crisis as possible by

22  whatever means is available.  Even if it causes some

23  discomfort in the financial analysis here.

24          We're talking about human lives that are at stake.

25  And there would be goodwill towards the parties if some

```
 1   accommodation could be made with respect to these employee
 2   obligations.  And we think that goodwill is worth quite a
 3   bit.  And unlike money, can't be regained.  So, we felt it
 4   important to make a plea here for the employees who, you
 5   know, have been terminated and have lost their health
 6   insurance, and have serious medical issues as my colleague,
 7   Jeff Raisner, pointed out at the last call.  Those issues
 8   continue.
 9            Our concern is that these medical bills aren't
10   going to be paid.  There not going to be money there for
11   them and, obviously, the concern is that they have no
12   healthcare going forward and it sounds like that maybe their
13   payroll is not going to be paid as well.  So, that puts them
14   in an even worse position in terms of trying to pay any kind
15   of medical coverage.
16            Thank you, Your Honor.
17            THE COURT:  Anyone else before I turn it over to
18   Mr. Werkheiser for a brief rebuttal?
19            MR. MIRARCHI:  Your Honor?
20            THE COURT:  I'm sorry.  Yes, sir.
21            MR. MIRARCHI:  Your Honor, this is Sam Mirarchi
22   from the Commonwealth Pennsylvania Office of the Attorney
23   General.
24            We remain interested in this case.  We believe the
25   consumers -- there are many consumers who have been harmed by
```

1  making deposits who didn't get their furniture.  We're going

2  to stay committed to having any discussions that we believe

3  would be helpful to anybody or any of the parties.  Those

4  discussions we would like to be a part of that, but we will

5  be watching and monitoring the proceedings so that consumers

6  are treated fairly in this case.

7            Thank you.

8            THE COURT:  You're welcome.

9            All right, Mr. Werkheiser?

10           MR. WERKHEISER:  Your Honor, thank you for the

11  opportunity to address some of these statements.

12           Your Honor, first, I just want to direct the court

13  and everyone else to Paragraph 2 of the interim cash

14  collateral order which I think is the operative language

15  given where the case is at right now.  And that language

16  states:

17           "During the remedies notice period the debtors may

18  use cash collateral solely to meet payroll obligations and

19  pay expenses necessary or reasonably advisable to avoid

20  immediate and irreparable harm to the debtors' estates in

21  accordance with the budget, and as otherwise agreed to by the

22  prepetition ABL agent in its sole discretion."

23           So, Your Honor, the fairest reading of that is

24  that --

25           THE COURT:  Wait, wait, where is that?  I don't

1    see that?  That's not Paragraph 2.

2            MR. WERKHEISER:  Of the interim cash collateral

3    order, Your Honor?

4            THE COURT:  Yeah, I'm looking at it.

5            MR. WERKHEISER:  Where --

6            THE COURT:  Oh, I see it.  All right.  Hang on,

7    let me read it.

8            MR. WERKHEISER:  Okay.

9            THE COURT:  Not that I don't like being read to,

10   but I don't.  So, what are you -- nothing -- I didn't hear

11   anything other than the payroll obligations that were

12   necessary to avoid irreparable harm.

13           MR. WERKHEISER:  I think we are -- that is

14   primarily our focus at this point, Your Honor.  There are

15   approximately 4.8 million of payroll obligations, wages,

16   salary, and commissions for sales personnel who worked on a

17   post-petition basis to monetize Wells Fargo's collateral on

18   the collateral of the other secured lenders in these cases

19   that remain unpaid at this time.

20           The sales commissions, in particular, have a long

21   tail, Your Honor, because they do not become earned until the

22   furniture is actually delivered to the customer.  And so that

23   accounts for a large portion of those employee obligations

24   that at this point remain unfunded.

25           The second component of employee obligations that

1  was identified were the healthcare obligations, Your Honor,

2  that are part of the employee benefits and would normally be

3  part of payroll.

4         THE COURT:  Its not payroll.  Do they have a right

5  to -- if you cancel the healthcare, do they have a right to a

6  money payment from you?

7         MR. WERKHEISER:  The healthcare benefits?

8         THE COURT:  Are you required under state law to

9  continue to give them healthcare if you decide to voluntarily

10 get rid of it?

11        MR. WERKHEISER:  Your Honor, just to clarify what

12 we're talking about here are claims that were submitted by

13 employees under the debtors' healthcare plan prior to the

14 termination of their employment.  So, these are services

15 where an employee went to a physician or received medical

16 care prior to, in most cases, March 19th and had billed and

17 had been proceed through the insurance claims process or

18 system since then and its now going to get sent back to the

19 debtors to pay several weeks later.

20        So, the numbers that are believed to be the

21 obligations are those that are going to hit the debtors over

22 the next several weeks based on those claims that were made

23 by employees, we think, predominately during the post-

24 petition period and were part of their, you know, employee

25 compensation and benefits package with their wages.

1          THE COURT:  Let me back up a minute.  What

2    furniture have you delivered since you shut down?  None,

3    right?

4          MR. WERKHEISER:  I can't speak without, you know,

5    having the ability to talk to the client and get detail about

6    what that was, but I believe there's been some furniture

7    delivered since the petition date since March 8th through the

8    19th or so. I can't tell definitely whether there's anything

9    that's been delivered after the 19th.

10          THE COURT:  So, how often do you pay payroll?

11    When was the last payroll?

12          MR. WERKHEISER:  I think, Your Honor -- I know

13    this is a little unorthodox, but I believe Mr. Stogsdill is

14    on the line and I don't know if he has that information handy

15    for us.

16          MR. STOGSDILL:  I am Greg.  Payroll is made every

17    Friday at Art Van and those commissions cover the period of

18    March 1st through deliveries that were made up to late as

19    March 21st, I believe.

20          THE COURT:  So, you haven't paid for any March

21    deliveries?

22          MR. STOGSDILL:  Not for commissions.  Commissions

23    are made on a monthly basis.

24          THE COURT:  So when are they due generally?

25          MR. STOGSDILL:  This week.

PA00857

1            THE COURT:  They're due this week, so the 3rd?

2            MR. STOGSDILL:  Well technically, Your Honor, they

3    would be paid if we were going concern, they would be paid in

4    April after the month concluded.  Because we terminated

5    everybody and shut down the operations, we moved them up to

6    be paid one to two weeks after the closing.

7            THE COURT:  Well the closing was the 19th, okay.

8    So, you have March commission earned due to March deliveries

9    that have not been paid.  How much is it?

10           MR. STOGSDILL:  It's a little over $2.2 million

11   dollars, I believe.

12           THE COURT:  And I'm hearing from Mr. Werkheiser

13   that there's payroll that would normally be due, I guess,

14   this Friday for people who are currently working that haven't

15   been paid, is that correct?

16           MR. STOGSDILL:  There's two components of the

17   amounts being paid this week.  It's for employees who were

18   laid off as part of the shutdown on the 19th and there's also

19   a small group of employees that have continued to support the

20   estates, and they're in there as well.  But the bigger piece

21   of it is for the preclosing payroll, just by virtue of

22   having, you know, several thousand people on that.

23           THE COURT:  Okay. So, it's people who are being

24   paid for work they did before you closed that haven't been

25   paid yet.  How much is that?

```
 1            MR. STOGSDILL:  I don't have that number directly
 2   in front of me but it's around $4 million dollars, high
 3   three's probably.
 4            THE COURT:  So, they normally would have been paid
 5   on like the 20th or the 27th, but they weren't?
 6            MR. STOGSDILL:  That's right.
 7            THE COURT:  Okay.  And for people who have been
 8   supporting the company post-closing which was the 19th, how
 9   much is that payroll?
10            MR. STOGSDILL:  It's roughly about $250,000
11   dollars every two weeks.
12            THE COURT:  Okay.  And Mr. Werkheiser was giving
13   me some numbers about healthcare reimbursements. And it
14   sounded like there was a distinction between what you had
15   already received request for payment for and what you
16   expected in the future, is that right?
17            MR. STOGSDILL:  Yes, what's in the forecast which
18   has been in every forecast we've ever put out is a tail; I
19   think of it as like an actuarial tail for claims made
20   incurred in the prior period that because of paperwork and
21   bureaucracy take several months to be processed and presented
22   to the company for payment.  So, the $8 million dollars or so
23   that's in the forecast, that's always been in the forecast is
24   for claims that have been made over the last -- as far back
25   as six months ago.
```

```
 1              THE COURT:  And you have a wage order, Mr.
 2   Werkheiser, that allows you to pay those even though they're
 3   prepetition claims?
 4              MR. WERKHEISER:  We did. We did get authorization
 5   from the court that are continued processing and honoring
 6   healthcare reimbursement claims for the employees.
 7              THE COURT:
 8              MS. FELDSHER:  Your Honor, this is Ms. Feldsher.
 9              THE COURT:  Yep.
10              MS. FELDSHER:  Can I be heard here?
11              THE COURT:  Of course.  I'm just trying to
12   understand --
13              MS. FELDSHER:  Yeah.
14              MR. WERKHEISER:  Your Honor, I'm sorry.  I'm happy
15   to have Ms. Feldsher be heard.  There were a number of
16   mischaracterizations of the record --
17              THE COURT:  Mr. Werkheiser, you'll --
18              MR. WERKHEISER:  -- in the presentation she made
19   to the court.
20              THE COURT:  Mr. Werkheiser --
21              MR. WERKHEISER:  Okay.  I just didn't want to not
22   address those points.
23              THE COURT:  You will get your opportunity -- stop
24   talking over me.  You will get your opportunity to speak.
25   I'm trying to figure out the facts and, frankly, I'm not
```

 1  getting them very well from you where I have to ask your

 2  client and others to tell me what's actually going on.

 3          So, Ms. Feldsher.

 4          MS. FELDSHER:  Thank you, Your Honor.

 5          Your Honor, with respect to these healthcare

 6  obligations my understanding and, again, at the risk of the

 7  lawyer talking numbers, is that what was included in the

 8  budget that was filed -- actually, Your Honor, if I may just

 9  take a brief step back.

10          So, we view the language in two, to be as Your

11  Honor I think, you know, understands and has seen this

12  provision in virtually all DIP and cash collateral orders,

13  this is the debtors can keep the lights on, you know, the

14  stuff that's absolutely necessary they can pay it until they

15  can get back to court and seek some relief from the court.

16          And, you know, as you've heard these obligations

17  were obligations that the debtors incurred by virtue of

18  terminating of all of the employees.  Again, Your Honor, I

19  just want to be very clear --

20          MR. WERKHEISER:  Debtors do --

21          MS. FELDSHER:  -- all current payroll, all current

22  payroll that we are aware of that's been submitted to Wells

23  Fargo has been funded.  But on the issue of these healthcare

24  obligations my understanding is that, one, this is not -- if

25  you look at the budget it's not, there's no line item for

PA00861

1  these obligations in the budget.

2        But from Clear Thinking Group, which is Wells

3  Fargo's financial advisor in this case, I am told that what

4  was included in the backup to the budget that went in with

5  the cash collateral order was accrued worker's comp and

6  medical of $6.2 million dollars.  There were no provisions

7  for unpaid PTO or vacation because the debtors understandably

8  did not anticipate terminating all of their workforce.

9        Again, we have asked all of these questions as

10  well, Your Honor, many many times.  We tried to get to exact

11  numbers.  Mr. (indiscernible) gives one number, the debtors

12  today submitted a funding request for these obligations that

13  were not the same as the numbers we received in a demand

14  email from the debtors' advisors yesterday evening.

15        So, there's always these discrepancies and, you

16  know, that's part, I think, of the issue here.  But any

17  payroll, actual, you know, payroll, right, people working

18  their salaries my understanding is that those have always

19  been honored and have all been paid.

20        THE COURT:  What about the commissions?

21        MS. FELDSHER:  So, the commissions, Your Honor,

22  have not been paid yet and they have not been paid because as

23  you heard from Mr. Werkheiser, these were delayed and they

24  were accelerated, as Mr. Stogsdill said.  They have been

25  accelerated unilaterally by the company to be payable now.

PA00862

1  They wouldn't ordinarily be payable.

2          Your Honor, we have asked for and continue to ask

3  for details on the exact number of these obligations.  And in

4  and of themselves, again, Your Honor, we can work on one

5  issue and say, okay we absolutely agree that these should be

6  paid, and we can get them paid.  There's sufficient cash to

7  pay them.  The problem is there isn't sufficient cash to pay

8  all of the employee obligations, so how do you draw the line?

9  How do you draw the line on commission payments, but not PTO,

10 but not healthcare costs, but not this, but not that?

11         There has to be -- there's a fiduciary that's

12 supposed to be in place to make those decisions.  And if this

13 is going to convert to a Chapter 7, we think the right place

14 is for the Chapter 7 trustee to look at all of these, get to

15 the right, you know, final number and make, you know, and

16 look at those and decide if these obligations can be paid.

17         But as we currently sit here today, were the

18 debtors to pay everything that they want to pay, it would

19 exceed the amount of cash they have and that's even before

20 any sweep for cash that are permitted in the cash collateral

21 order for Wells Fargo which I'm not suggesting we would take.

22 I'm just saying even before you do any of that, you're in

23 excess of the amount that they have.

24         So where do you draw the line?  Why do employees

25 that submitted claims previously get their healthcare claims

1   paid?  The ones that submit them tomorrow aren't going to get

2   them paid because the debtors aren't going to have sufficient

3   month.  There's no way to easily peel this onion as far as we

4   can tell.  We've tried very very hard with the debtors. We're

5   happy to try some more, but we need definitive numbers, not

6   estimates.  We need actual numbers.  We need to know exactly

7   what is being requested.  And what we're doing in funding

8   that in terms of what will be possible in the Chapter 7 for

9   all other stakeholders.

10          THE COURT:  All right, thank you.

11          Mr. Werkheiser.

12          MR. WERKHEISER:  Yes, Your Honor.  Thank you.

13          Your Honor, and I'm sorry if my presentation has

14  not been as clear as would be idea.  We're, obviously, you

15  know, this is a developing situation.  We are doing this by

16  telephone.

17          If we were all in the same room, I would be able

18  to hand you cash forecasts going back to the beginning of the

19  case that have shown that these obligations were in the

20  forecast, in the budget they contemplated.  The numbers may

21  have changed somewhat over the course of the case, but they

22  were always known and always part of what needed to be paid

23  to pay the freight to be in Chapter 11 bankruptcy, this

24  lender and the other secured lenders.

25          And, Your Honor, I would just, again, we don't --

1 the version of the budget that is attached to the cash

2 collateral has minimal detail, you know, has become common,

3 unfortunately, in these cases. But the backups to that

4 really shows, even at the very beginning of the case, for

5 example, that these healthcare obligations were contemplated

6 and prefunded and reflected as prefunded employee obligations

7 in excess of $6 million dollars, at that point in time.

8          Your Honor, I need to correct the factual record

9 too on a number of things that Mr. Feldsher said. I will,

10 giving her the benefit of the doubt assume unintentional.

11          These lenders received daily reports of the

12 operations of the debtors during the bankruptcy case. They

13 knew exactly what was going on with both the GOP stores and

14 the operating stores on a real-time basis. There was

15 complete information flow all throughout these cases.

16          So, it is really disingenuous for her to say that

17 we somehow surprised them with the board having made a

18 responsible decision on March 19th to discontinue operations

19 when the coronavirus was already rousing throughout the

20 country at that point. Pennsylvania, at that point, had

21 issued an order to stay in place where a large portion of the

22 debtors' stores are located.

23          And, Your Honor, I think we can take judicial

24 notice of the fact that Michigan, Ohio and Illinois, where

25 the bulk of the other operations of the debtors and the

1  debtors' headquarters are located in the case of Michigan,

2  have all since issued stay-in-place orders no later than

3  March 23rd.

4       So, maybe the board anticipated the formal

5  government action, at that point, but it was clear, the

6  writing was on the wall, and it was known to Wells Fargo and

7  to everyone else in this case that the operations at those

8  stores, at that point, were losing money on a daily basis

9  because the traffic in the stores, and this makes sense.  The

10 company that sells furniture, and this is a virus that are

11 reports indicating live on hard surfaces for a period of time

12 after somebody touches them who's infected.

13      The customer traffic in the stores was at very low

14 levels once it became known what this country was dealing

15 with in this virus.  So, the board did what it had to do both

16 for economic reasons and for the health and safety and

17 welfare of employees and customers in making the difficult

18 decision to discontinue operations on March 13th.

19      What did that do, Your Honor, at that point?  It

20 didn't change anything other than potential retriggering

21 obligations with respect to unused vacation time.  Unused

22 vacation time, Your Honor, is not part of any of the funding

23 request that we're talking about today.

24      The obligations we're talking about today are

25 salaries, wages, commissions, and healthcare obligations.

1  Does not include vacation pay.  It does not include PTO of

2  any other sort.  That's a red herring and that's

3  misdirection.

4         I also do want to, again, address the point of

5  whether these debtors have tried to cooperate with their

6  lenders. We have been trying throughout this case and before

7  to do that and especially since it became clear the original

8  contemplated going concern transaction and the GOP sales were

9  not going to be able to be implemented as parties that

10  originally intended.

11         Again, if we were all in the same room, I could

12  show you model after model after model of that.  Alvarez &

13  Marsal has shared with the lenders financial advisor and I

14  could show you email after email after email in which we

15  previewed that these issues existed.  We're trying to explain

16  to the lenders why, what challenges the company faced in this

17  situation and what obligations needed to be funded in

18  connection with these cases to pay the freight.

19         So there has been fulsome communication.  There

20  has been accurate communication.  Numbers changed because new

21  data comes in from time to time and new claims come in from

22  time to time.  But the information has always been provided

23  as soon as it was available.

24         Your Honor, what this comes down to, Your Honor,

25  is everybody -- it's a miserable situation.  The employees

 1  have been hurt.  The customers have been hurt.  Everyone else

 2  has been hurt in some fashion by the way this has developed.

 3  Much of it is beyond anyone's control.  Some of it, in

 4  particular, within the control of our secured lenders and

 5  that is, you know, how do we do the least harm to the most

 6  people, primarily the employees?

 7          And that's why we are pressing for these

 8  obligations that are baked into this cash collateral order --

 9          THE COURT:  Well, listen, Mr. Werkheiser, you just

10  raised the point that's the problem.  You got a fixed amount

11  of money, insufficient to meet all this company's

12  obligations.  You want to do the least harm possible

13  particularly to the employees.  Particularly to the employees

14  is a choice.  You are choosing one creditor over another.

15  Those creditors will get paid, other creditors of equal

16  priority will not.

17          Now, generally speaking, a debtor-in-possession

18  has the ability to run his business or its business.  When

19  you start to make those kind of value judgments when you're

20  picking one administrative creditor over another that's

21  really the purview of the court.  And they're very very

22  difficult questions that have to be answered, consistent with

23  due process, an opportunity to be heard, and based on facts

24  and law, not just the debtors' board prefers to pay his

25  employees rather than his bank, rather than his landlords,

PA00868

1   rather than his taxes, rather than any other administrative

2   obligations that are going to go unpaid.

3          And while I certainly understand and sympathize

4   with that desire of a company to want to take care of its

5   employees -- oh by the way, and the other then also includes

6   customers who are never, at this point, going to get their

7   deposits back.  That's a choice.  And, you know, frankly, I

8   don't think your client is in a position to make that choice

9   because reality has outstretched a previous life.

10          MR. WERKHEISER:  Your Honor, may I respond

11   briefly, just on that --

12          THE COURT:  Of course.

13          MR. WERKHEISER:  I do appreciate the difficult

14   situation and perhaps the impossible situation that the court

15   is in and everybody else is in.  But what I'm talking about

16   is enforcing a choice that not just the debtor but the

17   lenders made in the order that they agreed to and had Your

18   Honor enter.  That order explicitly says that the debtors had

19   the ability to use the cash collateral to meet the payroll

20   obligations.

21          They committed -- and I'm not standing -- asking

22   Your Honor today to order them to make additional funds

23   available.  If they committed to make the money available for

24   that purpose and those are obligations that are due now for

25   the most part.

PA00869

1  THE COURT:  It says payroll obligations and

2  irreparable harm expenses.

3  MR. WERKHEISER:  Yes, Your Honor.

4  THE COURT:  And the only payroll obligations that

5  I've heard are salary, wages, and commissions that have been

6  (indiscernible) but unpaid through today.  That's all I've

7  heard.

8  The healthcare reimbursements are not payroll

9  obligations.  They're just not.  Under no reasonable

10  definition of what payroll obligations are would they include

11  healthcare reimbursements under a terminated healthcare

12  policy, many of which are prepetition.  And it's terrible and

13  it's ridiculous that in this country you have to have a job

14  to have health insurance, but that is the law.

15  MR. WERKHEISER:  Understood, Your Honor.  I

16  understand where the court is coming from.

17  Your Honor, again, despite us airing our

18  respective dirty laundry in front of the court today which is

19  not what we had set out to do this afternoon, you know, I

20  think the one thing that from the debtors' perspective, you

21  know, we would agree with our lenders on is that everyone is

22  better off if we can somehow come to an understanding as to

23  dealing with these obligations that is fair and honors the

24  bargain reflected in the cash collateral order, and you know,

25  the basis principles under which I think this court has

1  operated for some time which is, you know.

2       I know Judge Walsh always used to say I can't --

3  if a secure lender wants to be dumb and take, you know, make

4  a rational decision that's collateral at the end of the day,

5  I can't stop them, but so they're going to have to pay the

6  freight.

7       THE COURT:  Well, I think we can all agree a force

8  majeure has occurred between the decision making at the

9  beginning of this case and where we are today, for everyone.

10      MR. WERKHEISER:  Well, of course.  All I'm saying

11 is I think, you know, we are acknowledging as Judge Walsh did

12 that, you know, the secured lender has rights and has a

13 significant amount of control over its collateral.  And that

14 was my only point in raising that, Your Honor.

15      But, at the same time, there's a duty to pay the

16 freight.  And in this case, you know, the freight is -- the

17 largest chunk of that freight that needs to be addressed, you

18 know, sooner rather than later is the employee obligations.

19 And customer obligations which, you know, again, that the

20 (indiscernible) there's not a real opportunity to pay, at

21 least as to the prepetition.

22      You know, I cannot speak to and I do not know, at

23 this time, what ability there is for customers who bought

24 goods and paid in full for them on a post-petition basis

25 where the company was only selling inventory that was

PA00871

1   actually in its possession at that time, not taking special

2   orders, that may actually sit someplace in a warehouse, at

3   this point, and could be delivered if the resources were

4   there to do it, and there was not government action

5   preventing that from happening.  But, again, you know, it's

6   paying the freight, doing what's right and fair and, you

7   know, not to the extent possible hurting individuals who have

8   no control over what transpired here.

9           Thank you, Your Honor.

10          THE COURT:  You're welcome.

11          All right --

12          MS. FELDSHER:  Your Honor, this is Jennifer

13  Feldsher.  I won't take up the time other than I didn't want

14  my silence to be perceived as acquiescence to Mr.

15  Werkheiser's statement that I somehow misrepresented to the

16  court.

17          What I said to the court is to the best of my

18  knowledge and I hope that Your Honor knows that we tried to

19  be very careful about the things we say to the court and that

20  we're not misrepresenting it.

21          THE COURT:  All right.  It's a very difficult

22  situation for everybody, to say the very least and,

23  hopefully, one that will never be put into again but I think

24  it's our reality probably for the next several months.

25          All right, so here's where we are.  What I would

PA00872

1  like to do is have a hearing Friday at one o'clock.  I'd like

2  that by video in case we need testimony.  And Ms. Gatsun will

3  work with you on that.

4        In the interim, the debtor may not spend any

5  money; however, I believe that under the cash collateral

6  order, they have authority to pay salaries, wages, and

7  commissions that were earned but were unpaid through today,

8  the 31st.  But before I authorize that pay, I'm going to need

9  details of exact numbers and backup that can be shared both

10  with me and with Wells Fargo, and any other creditor.

11        Obviously, I don't need names of employees.  I

12  don't want any personal identifiable information.  Maybe

13  names are okay, but obviously but no social security numbers,

14  no addresses, no phone numbers, just pure names is fine, if

15  we have to get to that level of detail.  But I really want

16  detail.  I want to know what these numbers are.

17        Not healthcare, not severance, not PPO, not

18  expense reimbursement, no other fringe benefits.  Just good

19  old fashion wages, commissions and salary.  I think that's

20  fair under the cash collateral order that the debtors would

21  have normally the ability to simply pay that, even without

22  the agreement of the agent.  But in current circumstances

23  and, in particular, some disagreement as to what truly is

24  owed or not, I'm going to insert myself into that process and

25  make a decision on Friday of exactly what's going to get

1   paid.

2            I'd like to make a request of the debtors that

3   they make a decision very quickly as to whether to convert

4   the case or not.  I'm not going to allow anything other than

5   what I just discussed to be paid before conversion, allowing

6   the bank accounts to be emptied to zero and then converting

7   the case is a recipe for disaster and unfair to the

8   creditors, none of whom are going to get paid in full.  And

9   the Chapter 7 trustee has to have something to deal with,

10  some way to operate the estate.

11           So, I'm requesting that the debtors quickly decide

12  whether they're going to convert and do so -- if they decide

13  to do so, to do so quickly and to file a motion to shorten

14  and the court will hear it on shortened notice.

15           I'd also like to request Wells Fargo to indulge me

16  by agreeing to continue the stay relief date that ends today

17  through Monday, April 6th to give us an opportunity to figure

18  out what to do, hopefully, with some comfort that no money is

19  going out the door unless otherwise ordered by the court.

20  And the only money the court is considering are the wages,

21  salaries and commissions, and only after hearing detailed

22  evidence of same on Friday with an opportunity for the agent

23  to be heard.

24           This is an unfortunate situation.  It is nobody's

25  fault.  It is nobody's fault.  I know many people in my local

PA00874

1   business community who are good business people who have

2   great businesses who are staring down the barrel of a gun

3   based on what's happened.  It's just -- it's extraordinary.

4   And I'm not casting aspersions on anyone, but obviously this

5   case changed dramatically as did the whole world -- well not

6   the whole world but as to the United States in the last three

7   weeks, three or four weeks.

8           So, Mr. Werkheiser, is that okay?  Well it may not

9   be okay, but do you understand?

10          MR. WERKHEISER:  Of course, Your Honor, we do

11  understand and let me be clear.  The reason, in part, we're

12  having this debate today is the debtors, of course, never

13  entertained the idea of trying to pay these things without,

14  you know, some court authorization -- some specific vetting

15  of these issues in front of the court given, you know, the

16  lack of consent of Wells Fargo to agreeing to pay these, even

17  if we thought they were required by the order.

18          So we, of course, will abide by Your Honor's

19  direction on these points.

20          THE COURT:  Thank you.

21          MS. FELDSHER:  Your Honor, Jennifer Feldsher.  I

22  apologize for interrupting, just for one clarification.

23          THE COURT:  Yes, ma'am.

24          MS. FELDSHER:  We have been advised -- I

25  apologize, Your Honor.  We understand Your Honor's ruling and

PA00875

49

1  will abide by it as well.

2         Your Honor, we were advised late last night, you

3  know, as usual it's always an emergency. But the debtors

4  have their property insurance is coming due and they need to

5  enter into a renewal on -- Mr. Werkheiser may have more

6  information but we have been told that they need to enter

7  into a renewal by tomorrow or they will have no insurance

8  related to their properties. And, obviously, there's a

9  significant amount of inventory here.

10        So we have no objections to the debtors entering

11  into the renewal policy and we would be okay with the use of

12  cash collateral for that because we think that in any

13  instance, whether this is a Chapter 11 or a Chapter 7, we

14  will need to have, you know, a proper insurance covering the

15  inventory here.

16        While the debtors haven't been able to secure the

17  same insurance that was required under the prepetition credit

18  agreements, they have told us what's the best insurances they

19  can get and we think that's better than not having any

20  insurance.

21        THE COURT: Well if you consent, it's okay with

22  me. And I can guarantee you the first question the Chapter

23  7, if there is one, will ask is whether there's insurance.

24  So, obviously, that's a good idea.

25        MS. FELDSHER: We agree, Your Honor, we just

PA00876

1  didn't want to be, you know, violating a court order so we

2  wanted to make sure you were mindful of that and we will

3  consent to that being paid.

4        MR. WERKHEISER:  Thank you, Ms. Feldsher, and

5  thank you, Your Honor.

6        Yes, I think we had communicated with Wells Fargo

7  just to let them know the terms of the policy, for example,

8  is available for renewal which was less attractive than the

9  one that was in effect through today.  And we're trying to

10  ensure that that would be acceptable to them under the

11  circumstances.

12        As I understand it, we have to sign the paperwork

13  by tomorrow, but nobody need go out the door immediately that

14  there is probably for two weeks of a grace period to make

15  those payments.  So, I think between now and Friday this

16  won't change the amount of cash on hand.

17        THE COURT:  Okay.  Thank you.  Makes a lot of

18  sense.  So, Ms. Feldsher, putting you on -- can you give me

19  that waiver until Monday or do you need to talk to your

20  client?

21        MS. FELDSHER:  Your Honor, I think that I'm

22  authorized -- my client is on, but might be on a mute line,

23  but we will, of course, give Your Honor, the time necessary,

24  particularly if, you know, as we know that the cash position

25  is going to remain the same.  So, Your Honor, at the risk of

PA00877

 1  getting ahead of my client and somebody else being on the

 2  phone on Friday, I'm going to go ahead and agree to Your

 3  Honor's request.

 4          THE COURT:  Okay.  Thank you.

 5          I am very cognizant for the landlords on the

 6  phone.  I am very cognizant of the fact that you are now as

 7  of tomorrow involuntary storage facilities for many of you

 8  for the debtors' inventory and property.  And I take that

 9  very seriously and I know that you will not get paid your

10  rent tomorrow and I know it's not the only commercial lessee

11  who is not going to pay rent tomorrow in the United States of

12  America, and that puts you all in a very difficult situation.

13  You all have your own lenders and you all have your own

14  stockholders, your own vendors.

15          So, I take that very seriously.  I will take that

16  very seriously and we will address that as quickly as

17  possible; however, until we have some decision about a path

18  forward, which -- I mean my preference is a Chapter 7, but

19  I'm not the fiduciary, thank goodness.  And that will be up

20  to either the debtor-in-possession to make that election or a

21  creditor to move to convert.  I cannot and nor would I

22  convert sua sponte.

23          I kind of lost my cool a little bit but, you know,

24  the healthcare situation is horrible.  Among the most

25  difficult decisions I've had to make since I took the bench

PA00878

1  involved terminating people's healthcare insurance.  I had to

2  do that in Fistion (phonetic) for 50,000 retirees.  It was as

3  very difficult decision for me to make, and I don't take that

4  lightly either.

5          However, at least, at this point, I think, the law

6  compels me and good sense compels me, first of all, I can't

7  create money out of thin air or force Wells Fargo to fund

8  money that they aren't legally required to fund.  There isn't

9  enough money to pay everybody including healthcare in full.

10 Paying some now and others nothing is making a choice that

11 may not be fair.

12         And there is hope, I hope, a chance that some of

13 that money might get paid through the results of a

14 liquidation of the inventory in a Chapter 7 that would be, I

15 think, probably fairly, some of it at least, administrative

16 expenses, but that's going to have to await time.  That is a

17 hardship for real people that I take very seriously, but it

18 is unfortunately, in my mind, unavoidable under the facts and

19 law in this situation.

20         I'm worried too about the deposits.  As many of

21 you will remember from early in this case, at our first day

22 hearing, I was very concerned about the deposits.  That

23 situation has gotten not better.  It's gotten much much

24 worse.  That's money people, at least, partially have a

25 priority for and, again, hopefully, Chapter 11 priority wage

PA00879

1  and claims and Chapter 11 priority deposit claims, at least,

2  will get some recovery.  We'll have to wait and see how that

3  plays out but that's a very difficult situation.

4        And I am cognizant of the Commonwealth of

5  Pennsylvania and other Attorney's General being concerned

6  about consumers.  The reality is nobody is getting out of

7  this happy and we're just going to have to do the best we can

8  to weigh the different interests, preserve due process, and

9  make measured decisions that do the least harm possible, and

10  that's hopefully what we're going to accomplish.

11        So, I'll see you all, unless there's anything

12  else.  Mr. Werkheiser, I'll see you all on Friday the 3rd at

13  one.  I would like that by video just in case we have to put

14  somebody on the stand or answer questions.  We really

15  shouldn't do it over the phone like I did today without

16  swearing the witness.

17        It's probably unclear now whether I'm going to use

18  Skype for Business or Zoom, but I'll get you that

19  information, Mr. Werkheiser, and you can include it in

20  whatever notice that goes out at an appropriate time for that

21  hearing.

22        All the audio is by CourtCall, as always, when we

23  go by video.  Only the video is for the pictures and the

24  audio is CourtCall so we can make sure we have a full

25  transcript available as required by law.

1          And if you have detail you can provide me prior to

2  the hearing, as long as you copy the other side with it or

3  the other parties with it, I'd be happy for you to submit

4  this to me by email.  You can work through Ms. Werkheiser or

5  Ms. Samanski; otherwise, I can certainly -- I will need it no

6  later than the hearing.  I will need something in my hand

7  that gives me the detail and you can provide that by email.

8          Any questions?

9          MR. WERKHEISER:  Your Honor, Mr. Werkheiser.  Just

10  a couple requests for clarification here.

11          So, I understood Wells Fargo to indicate that the

12  stay is not being lifted.  I just want to confirm for the

13  record that means that the remedy notice period continues

14  through Monday.  And that's only -- well material, not only

15  material but material from the perspective of while we are

16  not authorized to make any expenditures right now -- if the

17  debtors have no access to cash collateral, we would have no

18  choice but to dismiss the remaining employees effective the

19  end of the day today.  We cannot incur the types of

20  obligations without the ability to pay them, among others.

21          So if we could just clarify for the record that

22  the remedies notice period is continuing through Monday, I

23  think that will assist in (indiscernible) assets until then.

24          THE COURT:  The remedies notice period through

25  Monday but that is not result in the fact that you can or

1  you're going to be able to pay wages from April 1 through

2  April 6th without further order of the court.  The answer to

3  that is no.  I'm not going to let you do that.  What we're

4  going to talk about Friday is through March 31st.

5          MR. WERKHEISER:  I guess, Your Honor, what we're

6  struggling with then is we would then have to effectively

7  dismiss the remaining employees today.

8          THE COURT:  No, you don't.  No, you don't.  They

9  have a --

10          MR. WERKHEISER:  Can't have people to work when I

11  can't pay them.

12          THE COURT:  They have an admin claim.  You're

13  working, you're not getting paid.  They have an admin claim.

14  I may allow it.  I may not.  I don't know.  You don't have

15  the numbers for me.

16          MR. WERKHEISER:  Okay.  Okay.

17          THE COURT:  You can't not give me the information

18  to make a decision and then complain that I can't make a

19  decision, Mr. Werkheiser.

20          MR. WERKHEISER:  Your Honor, that's not what I'm

21  doing, please, please.  What I am trying to make sure is that

22  the legal status of the debtor is not, as of today, that cash

23  collateral is fully cut off, as opposed to making

24  expenditures.  Because if the legal status as of the end of

25  the day today is that there is no more access to cash

1 collateral at all, then the debtors do have zero ability to
2 pay the delegations that might be incurred through the end of
3 the week.
4          THE COURT:  I am struggling to understand in what
5 world you think that occurred.  I didn't terminate the cash
6 collateral order.  I terminated your ability -- I froze your
7 ability to make payments under that cash collateral order
8 until further order of the court.  And I asked and got an
9 accommodation from your lender to extend the remedies notice
10 period for Monday.  That's all that happened.
11          MR. WERKHEISER:  Right.  And nobody actually used
12 the word remedies notice period, Your Honor.  And so, I just
13 wanted to make sure there was no ambiguity about that being
14 extended through Monday.  That's all I was trying to do.  I'm
15 sorry if I did it in an inarticulate way.
16          THE COURT:  All right, whatever.
17          MR. WERKHEISER:  And, Your Honor, just on the
18 issue of conversion as a whole.  I mean I just want to be
19 clear the debtors are not resisting that.  I mean
20 realistically we understand this cannot continue in Chapter
21 11 without the consent of the secured lenders because we do
22 not have the ability to provide adequate protection, given
23 the circumstances of this case.  It's really how to
24 accomplish that, that we struggle with and continue to
25 struggle with.

1          We will do everything we can between now and

2    Friday to try to move past those issues with our lenders and

3    resolve or, at least, narrow the issues that we have on

4    Friday.  Thank you.

5          THE COURT:  Thank you.  Does anyone else wish to

6    be heard?

7          MR. MIRACHI:  Your Honor, this is Commonwealth.

8          THE COURT:  Yes.

9          MR. MIRACHI:  Commonwealth of Pennsylvania; just

10   real quickly.

11         The amount of the commissions may be indicative of

12   the number of deposits or the amount of deposits that were

13   made.  Is there any way we can get a copy of whatever

14   information is going to be provided as well?

15         THE COURT:  Yes.  You'll have to get your

16   information to Mr. Werkheiser.

17         MR. MIRACHI:  We've been in touch with Mr.

18   Werkheiser.  We can do that.  Thank you, Your Honor.

19         MR. WERKHEISER:  Yes, yes.  Your Honor, this

20   hadn't been requested previously, but I'm certain we can

21   accommodate the Commonwealth and provide information about

22   the amount of customer deposits received post-petition and

23   prepetition to the Pennsylvania customers.

24         THE COURT:  Okay.

25         MR. MIRACHI:  Great.  Thanks.

PA00884

Case 1:22-cv-...Case 2:20-cv... Document 4-25 Filed 11/14/22... Page 158 of 189 PageID #: 2768

1          THE COURT:  Anyone else?  Yeah, you're welcome.

2          Anybody else?

3      (No verbal response)

4          THE COURT:  All right, thank you. We're adjourned.

5      (A Chorus of "Thank you, Your Honor")

6          (Teleconference ended at 12:51 p.m.)

7

8

9                      CERTIFICATE

10

11     I certify that the foregoing is a correct transcript

12 from the electronic sound recording of the proceedings in the

13 above-entitled matter.

14

   /s/Mary Zajaczkowski            April 1, 2020
15 Mary Zajaczkowski, CET**D-531

16

17

18

19

20

21

22

23

24

25

# EXHIBIT W

PA00886

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 252** |
| | ) | |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. The Motion is GRANTED, as set forth herein.

2. Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3. The following Conversion Procedures are hereby approved:

   a. **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with the terms of the Interim CC Order; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the Interim CC Order and the priorities set forth in section 726(b) the Bankruptcy Code.

b. **Books and Records.** As soon as reasonably practicable, but in no event later than April 10, 2020, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA.** Without prejudice to the chapter 7 trustee's ability to request further extensions and any party in interest's ability to oppose such requests, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report.** Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims.** Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4. Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5. Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured*

*Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6. Notwithstanding anything to the contrary in the Interim CC Order, the Carve Out Reserves shall be established and funded as follows: (a) $2,593,000 (the "Carve Out Escrow Funds") of the Debtors' funds shall be wired into an IOLTA account at proposed general bankruptcy counsel for the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch"), pursuant to wire instructions Benesch has provided to the Prepetition ABL Agent, where such funds shall be held in trust for the applicable beneficiaries of the Carve Out and disbursed strictly in accordance with the terms of this Order and the Interim CC Order (as modified hereby); and (b) the Carve Out Reserve for the Chapter 7 Trustee Carve Out shall be deemed funded by allowing $50,000 of the Debtors' funds to remain in a bank account of the Debtors where such funds shall remain available to satisfy the reasonable fees and expenses of any interim or permanent chapter 7 trustee, as applicable, for the Debtors' bankruptcy cases. The Carve Out Escrow Funds shall be disbursed by Benesch only as follows: (i) with respect to the portion of the Carve Out Escrow Funds allocable to KCC for fees and expenses incurred as the Claims Agent, in accordance with the procedures set forth in the Claims Agent Order and KCC's Agreement; (ii) with respect to the

4

portions of the Carve Out Escrow Funds allocable to the Debtor Professionals (other than, for the avoidance of doubt, KCC) and the Committee Professionals, upon entry of, and in accordance with the terms of, such further order or orders of the Court as may be entered following the filing of Final Fee Applications and notice and opportunity to object thereto in accordance with the procedures set forth in Paragraph 3(a) above; and (iii) with respect to the portion allocable to fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, as may hereafter be directed by the interim or final chapter 7 trustee, as applicable.

7. Except as expressly provided in Paragraphs 5 and 6 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, (a) all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order), and (b) any lien priorities or superpriority claims granted pursuant to the Interim CC Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

8. For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or

PA00891

are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or (ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

9.      The Debtors have a need for the services of certain independent contractors, including individuals who are former employees of the Debtors (collectively, "Independent Contractors") following the Conversion Date in order to, among other things, (a) provide on-site security at the Debtors' distribution centers, and (b) continue the collection and the Debtors' books and records for transmission to the chapter 7 trustee, prepare the Schedule of Unpaid Debts and prepare the Final Report.  The Debtors are authorized to pay the Independent Contractors from cash on hand in advance for their work and related expenses in an aggregate amount not to exceed $73,243 and as further set forth in the Estimated Disbursements Forecast April 6th - April 10th provided to the Prepetition ABL Agent on April 5, 2020.  After April 10, 2020, the chapter 7 trustee will determine whether, and to what extent, to continue to use the services of the Independent Contractors.

10.      Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

11.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

**Dated: April 6th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

6

PA00892

# EXHIBIT X

PA00893

<pre>
 1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3                                     .   Chapter 11
      IN RE:                           .
 4                                     .   Case No. 20-10553 (CSS)
      ART VAN FURNITURE, LLC, et al., .
 5                                     .   Courtroom No. 6
                                       .   824 North Market Street
 6                                     .   Wilmington, Delaware 19801
                                       .
 7                    Debtors.         .   April 6, 2020
      . . . . . . . . . . . . . . . .  .   1:00 P.M.
 8

 9               TRANSCRIPT OF TELEPHONIC HEARING
           BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
10                UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtors:          Gregory G. Werkheiser, Esquire
                                Michael J. Barrie, Esquire
13                              Jennifer Hoover, Esquire
                                Kevin Capuzzi, Esquire
14                              John C. Gentile, Esquire
                                BENESCH, FRIEDLANDER, COPLAN
15                                & ARONOFF LLP
                                222 Delaware Avenue, Suite 801
16                              Wilmington, Delaware 19801

17

18    Audio Operator:          Leslie Murin

19    Transcription Company:   Reliable
                                1007 N. Orange Street
20                              Wilmington, Delaware 19801
                                (302)654-8080
21                              Email:  gmatthews@reliable-co.com

22    Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
23

24

25
</pre>

```
 1   TELEPHONIC APPEARANCES (Cont'd):

 2   For the Debtors:          Marua I. Russell, Esquire
                               MONTGOMERY MCCRACKEN WALKER
 3                                & RHOADS LLP
                               437 Madison Avenue, 24th Floor
 4                             New York, New York 10022

 5
     For U.S. Trustee:         Linda Richenderfer, Esquire
 6                             David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
 7                             OFFICE OF UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
 8                             Lockbox 35
                               Wilmington, Delaware 19801
 9
     For Wells Fargo Bank:     Jennifer Feldsher, Esquire
10                             MORGAN LEWIS & BOCKIUS LLP
                               101 Park Avenue
11                             New York, New York 10178

12                             - and -

13
                               Cory Falgowski, Esquire
14                             BURR & FORMAN LLP
                               1201 N. Market Street, Suite 1407
15                             Wilmington, Delaware 19801

16   For the Committee:        Bradford Sandler, Esquire
                               PACHULSKI STANG ZIEHL & JONES LLP
17                             919 North Market Street
                               Wilmington, Delaware 19801
18
     For Jofran Sales:         Jeffrey Waxman, Esquire
19                             MORRIS JAMES LLP
                               500 Delaware Avenue, Suite 1500
20                             Wilmington, Delaware 19801

21

22

23

24

25
```

PA00895

1 | MATTERS GOING FORWARD:

2 | Debtors' Application for Entry of an Order Authorizing the
Retention and Employment of Jones Lang Lasalle Americas, Inc.

3 | as Special Real Estate Consultant to the Debtors Nunc Pro Tunc
to the Petition Date [Filed 03/16/2020; Docket No. 141]

4 |

5 | Debtors' Application for Entry of an Order Authorizing and
Approving the Retention of Benesch, Friedlander, Coplan &
Aronoff LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc

6 | to the Petition Date [Filed 03/16/2020; Docket No. 142]

7 | **Ruling:  Matters Continued to April 27th, 2020**

8 |

9 | Debtors' Motion to Convert the case to Chapter 7

| **Ruling:  28**

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

PA00896

1          (Proceedings commence at 1:01 p.m.)

2          THE COURT:  Good afternoon, everybody.  This is

3    Judge Sontchi.  This is the Art Van Furniture hearing; 20-

4    10553, scheduled for one p.m. on Monday afternoon.

5          Just to say what you already know which is all the

6    audio is being done through CourtCall, so if you don't have

7    CourtCall on or are not connected when you want to speak it

8    won't be registered; you have to do that to preserve a valid

9    transcript.  The audio is optional and is on. You have --

10   excuse me, the video is optional and on.  You have the

11   ability to blackout your screen.  That is not a problem, if

12   you're uncomfortable or just don't wish for us to see you

13   that's not a problem whatsoever.

14         I will turn it over to counsel for the debtors.

15         MR. WERKHEISER:  Good afternoon, Your Honor.  This

16   is Gregory Werkheiser of Benesch Friedlander.  Thank you,

17   again, for making this time available to us.

18         Your Honor, this was originally our second day

19   hearing in the case.  So it is a rather lengthy agenda in

20   terms of pages.  Obviously, only one matter of substance

21   going forward today.

22         I just want to make sure Your Honor has the most

23   current version of the agenda which is the second amended

24   agenda that the debtors filed this morning.

25         THE COURT:  I do.

PA00897

1        MR. WERKHEISER:  Alright, thank you.

2        So, Your Honor, just briefly, items one through

3  eight are all adjourned.

4        Item number nine was the debtors' motion to reject

5  certain executory contracts and Your Honor was kind enough to

6  enter the order for us on that in the last couple of days.

7        Item number ten was the debtors' application to

8  retain Jones Lang Lasalle to provide certain real estate

9  related services, and with the court's permission we are

10  carrying that application to the April 27th which is an

11  omnibus date in this case.  (Indiscernible) remain on the

12  calendar as a hearing date notwithstanding the impending

13  conversion of the cases.

14        There were some comments to that from the United

15  States Trustees Office and (indiscernible) still being

16  evaluated.  Candidly, it is unclear whether Jones Lang

17  Lasalle will decide to go forward with a retention

18  application or not under the circumstances.  We contemplated

19  compensation that was largely a success fee or

20  (indiscernible).  So there may not be a need for that

21  application to be pursued, but that is being evaluated

22  currently.

23        Your Honor, item number eleven is our firm's

24  retention application.  Your Honor, we have a bit of

25  (indiscernible) activity on this, this morning.  Largely it

PA00898

1   seems to be a miscommunication that occurred Friday evening

2   with Ms. Richenderfer of the U.S. Trustees Office.  We had

3   been learning with her over the last several days some

4   informal comments we received from her.  There was,

5   apparently, a miscommunication Friday night as to whether

6   this was going to go forward or not go forward.  We tried to,

7   you know, clear that up this morning to indicate that we were

8   prepared to adjourn the application if she still had

9   concerns, but I see that the U.S. Trustees Office has since

10   filed an objection to the retention application and now

11   appears at the docket at Item 260.

12        Notwithstanding that I think, you know, from our

13   firm's perspective and from the debtors' perspective, you

14   know, we think the issues that have been raised are ones that

15   we need some more time to work with the U.S. Trustees Office.

16   It should be entirely resolvable and we just need time to go

17   through the issues (indiscernible).

18        Let me pause there, Your Honor, in case you have

19   any questions or the U.S. Trustee would like to be heard on

20   this issue.

21        MS. RICHENDERFER:  Your Honor, this is Linda

22   Richenderfer from the Office of the United States Trustee.

23        I had no issue with this hearing being continued.

24   That was my understanding on Friday.  I was quite surprised

25   when the agenda did not reflect that.  And based on

1   communications it was not my understanding that the issue was

2   going to be pushed.  Believe me, I have enough to do without

3   having to file objections to retention applications at this

4   point.  Regardless, the objection has been filed.  We will

5   continue to work with the Benesch Law Firm and have no issue

6   with this being pushed to the 27th hearing date.

7           THE COURT:  Okay.  Thank you.  We will continue it

8   to April 27th.

9           In connection with the April 27th date what will

10  happen with that will depend on interactions with whoever the

11  interim trustee is, but we will certainly use that as a

12  holding date.

13          MR. WERKHEISER:  Understood, Your Honor.  Thank

14  you.

15          Your Honor, that then brings us to the Alvarez &

16  Marsal application.  The court did enter an order on that on

17  Friday.  So thank you for that.

18          Item number thirteen was a matter that really

19  should have been continued from the very beginning, it's the

20  interim compensation procedures motion.  On the first amended

21  agenda we did reflect that that was going to be adjourned at

22  that date given where we are.

23          Item fourteen is the schedule extension motion and

24  the court did enter an order for us on that particular

25  motion.  So nothing further to do on that today.

PA00900

1          Your Honor, I think that brings us to the main

2     event today which is the much talked about debtors' motion to

3     convert these cases to Chapter 7 liquidation cases.  It was

4     filed Friday evening and this would make a record that after

5     filing an original version we did discover a mistake

6     (indiscernible) for the effective date and filed a corrected

7     version thereafter.  That was a version that got served out

8     on all of the parties.  That appears as Docket Item 252.

9     That would be the version that we are pursuing, Your Honor,

10    for purposes of today's hearing.

11          THE COURT:  Okay.

12          MR. WERKHEISER:  Your Honor, the relief -- the

13    basic relief that we sought is, of course, converting to

14    Chapter 7 and, you know, (indiscernible) right to do, you

15    know, for the reasons that we have set forth in the motion,

16    you know, while, obviously, I think on this call which

17    (indiscernible) the circumstances in the Chapter 11 cases are

18    such that the debtors aren't able to continue in Chapter 11

19    because of the broader circumstances with the coronavirus

20    (indiscernible) because, you know, lack of access to cash

21    collateral going forward beyond today.

22          So the debtors did feel it was important to lay

23    out, sort of, the history of these cases and the efforts that

24    have been made over the course of these cases and before they

25    were filed to, you know, (indiscernible) to salvage this

1 company and to, you know, protect the interests of the

2 various stakeholders including employees and customers. I

3 think, you know, all of that is, really, the nature and

4 background for the relief that is being requested which is

5 to, you know, convert these cases effective 12 a.m. tomorrow,

6 Tuesday morning, April 7th to Chapter 7 liquidation cases.

7    Your Honor, the proposed order attached to the

8 motion does have some features that are a little bit unusual

9 for a motion of this nature. And we did circulate a further

10 revised proposed order to the court just before the hearing

11 which has also been circulated to, among others, counsel for

12 the committee, counsel for the ABL term loan agent, counsel

13 for -- excuse me, counsel for the prepetition ABL agent,

14 counsel for the prepetition term loan agent, and the U.S.

15 Trustee.

16    That further revised order, which I think the

17 court has as well, reflects some changes that were made in

18 the response to comments received and ongoing review of the

19 order as filed with the motion. We can pursue that however

20 Your Honor would like. You know, I can walk you through

21 changes at this point or if you'd like me to pause to answer

22 any questions the court has or let other people to make

23 whatever comments they feel they need to make for the record;

24 however Your Honor wants to proceed.

25    THE COURT: Alright, thank you.

PA00902

1           Given the motion to shorten we have the objection

2    deadline is actually the hearing, let's just open this up.

3    First I'd like to hear from the committee and Wells Fargo,

4    and then anyone else who wishes to be heard in connection

5    with the motion.

6           I will start with the committee.  Mr. Sandler?

7           MR. SANDLER:  Good morning, Your Honor.

8           It's very unfortunate that this case is

9    converting.  It's something that, you know, we were hoping to

10   see a going concern sale. I think I mentioned that one of the

11   status conferences I was talking to both professionals for

12   Mr. Van Elslander who expressed an interest in the Michigan

13   stores and also with Mr. Levin's counsel who is interested in

14   some of the Pennsylvania stores.

15          So this is unfortunate, but, you know, we all know

16   the history of these cases.  We are where we are and at this

17   point the committee has no objection to the conversion.

18          THE COURT:  Thank you.

19          Ms. Feldsher?

20          MS. FELDSHER:  Good afternoon, Your Honor.  Thank

21   you.

22          I would echo Mr. Sandler's statements and why two

23   decades of practicing it's my first case to convert from an

24   11 to a 7.  On a personal level, you know, its deeply

25   troubling that we couldn't do more to salvage it, but it's

1  just a circumstance of a case caught in the cross-hairs of

2  what is, you know, certainly in my lifetime and hopefully in

3  the lifetime of all those around us who would be a once in a

4  lifetime pandemic and disaster in the country.  So we have no

5  objection to the conversion.

6         We did have some issues with the revised order.

7  There were several versions of the order that had gone

8  around, the latest of which came just before the hearing

9  began.  There is a couple of things, I wouldn't call them

10 objections, per say, but things that we could have cleared up

11 with a little bit more time, but since we're doing it in real

12 time unfortunately we need to, you know, bring them up with

13 the court.

14        The first is, this is Paragraph -- apologies, Your

15 Honor, Paragraph 9.  The debtors have requested a funding of

16 $88,243 to pay for employees that the debtors have identified

17 as being critical to this next week.  Those, I think, as they

18 have been explained to us, fall into two buckets.  The first

19 is security, the second is employees that are necessary to

20 put together information for the Chapter 7 Trustee and also

21 some information that's been requested by the ABL lenders

22 which we think will be integral to the Chapter 7 Trustee as

23 well.

24        The $15,000 of security costs, Your Honor, have

25 already been funded per our last status conference which I

PA00904

1  believe was on Friday at which time the court had approved up

2  to $40,000 of security costs.  They actually were $15,000 at

3  the time.  I think Your Honor just gave everybody a little

4  bit of leeway so we didn't have to have an emergency which we

5  appreciated, but those costs have already been paid.  So if

6  you net those out the actual amount, which I believe ties to

7  what the company has already requested, but the ABL lender

8  fund is $73,243 and not the $88,243.

9          I just -- you know, I didn't want -- I appreciate

10 that the language has not to exceed which protects us, but

11 the $40,000 number created some confusion with some vendors

12 after the last hearing and we got calls from the debtors

13 about that.  So I just wanted to be more precise on this one

14 so that there wasn't any ambiguity on what could and couldn't

15 be funded.

16         The ABL lender has no objection to the funding of

17 the amounts for these employees who have committed to working

18 throughout this week to assist the debtors in getting the

19 information over to the Chapter 7 Trustee.

20         Your Honor, with that the ABL lender has

21 requested, which are the three critical pieces of information

22 as we see it that we're hopeful the debtors will be putting

23 together during this week.

24         The first is information about the debtors'

25 inventory.  A lot of inventory, Your Honor, has been moved

PA00905

1 recently as a result of the debtors rejecting a variety of

2 leases that this court has approved, but as a result there's

3 a lot of uncertainty as to where inventory resides.  That,

4 obviously, goes to the issue of whether or not there is

5 appropriate security at the locations as well.  We want to

6 make sure we know where the inventory is.

7          So we have asked the debtors to put together

8 inventory by location and also, if possible, by skew number.

9 We have been told that that would be provided to us by end of

10 the day tomorrow, but the debtors were not willing to put

11 something into the order requiring them to do so.  I just

12 would like the court to know that we view that as being

13 absolutely critical to the Chapter 7 Trustee being able to

14 get involved quickly, understand where the inventory is and

15 make sure that the trustee can secure it.

16          Secondly, as has been brought up to the court

17 previously, the debtors' insurance policies, its property

18 insurance lapsed and the debtors did get approval to go ahead

19 and pay for replacement insurance  My understanding that that

20 is in progress, but, obviously, we would like to make sure

21 that that gets bound and finalized before, you know,

22 hopefully as part of the (indiscernible), but the Chapter 7

23 Trustee has very current information on what, if anything,

24 remains to be done to have that insurance bounded and

25 completed.

PA00906

```
 1              And the third, which I believe was resolved as we
 2    were on the phone, is we would ask about the Levin sites who
 3    was going to be providing security at those sites which I
 4    believe has just been -- the information was just provided to
 5    us.  So, Your Honor, we had agreed to fund the $73,243 but it
 6    was under the agreement of the parties that the people would
 7    continue to work notwithstanding the conversion.  They would
 8    work throughout this week for which they are being funded and
 9    that they would put this information together.
10    Unfortunately, we're not able to get there with the debtors
11    to include some language that would assure that that was
12    going to occur.
13              Obviously, we're not looking to hold anybody in
14    contempt of court.  If the debtors need some extra time we
15    are, obviously, going to work with them, but we do view this
16    information as being critical to the conversion itself.
17              THE COURT:  Alright, thank you.
18              Mr. Werkheiser, would you like to respond to that?
19              MR. WERKHEISER:  Sure, Your Honor.
20              I think we're largely on the same page in terms of
21    what we are trying to accomplish both with the Chapter 7
22    Trustee and for Wells Fargo who is our other secured lender,
23    whose collateral is implicated in these cases.  So Ms.
24    Feldsher is correct, the amount that remains to be funded
25    under the proposed budget for the week that the debtors would
```

1   seek to pre-fund today, Your Honor, and this is why we didn't

2   reflect it in Paragraph 9 of the further revised order that

3   w3as circulated just before the hearing.  It would be

4   $73,243.

5          That covers some -- it covers, essentially, the

6   debtors' personnel who will be providing some functions

7   ancillary to the security functions that the court recently

8   approved and working on collecting books and record, and

9   collecting the categories and information that Ms. Felder

10  referred to.

11         So, you know, that is something that we would hope

12  the court would consider authorizing the debtor to

13  (indiscernible) cash collateral with the consent of our

14  secured lenders (indiscernible).

15         In terms of the inclusion of language or non-

16  inclusion of language in the order to that effect I think,

17  you know, we had some concerns about because as everyone has

18  acknowledged we are doing this real time and because the

19  debtors did have to make decisions on Friday to relieve the

20  remaining employees that they have, the 40 or 50 employees

21  that was left after prior elections enforced they had to

22  terminate everyone effective the end of the day Friday.

23         We then were in discussions throughout the weekend

24  about these issues and I think reached agreement on what

25  would be (indiscernible) staffing for the security issues and

PA00908

1   for these information issues to be addressed over the next

2   several days, and an appropriate budget for that which is

3   reflected in Paragraph 9. But given the circumstances and

4   the lack of resources available to the debtors and the fact

5   that some of the employees, you know, we couldn't be certain

6   that the employees would be available to the debtors to

7   (indiscernible).

8          We did have concerns about eliminating every

9   single item of information that the Chapter 7 Trustee or

10  Wells might like in the text of the order and then even

11  create a situation where intentionally or unintentionally

12  parties were put in the position of having violated the

13  order.

14         I can confirm, however, for the record, that the

15  debtors are working on assembling all the information that

16  Wells Fargo and the Chapter 7 Trustee would want relative to

17  the inventory. So this would be inventory detailed by

18  location and skewed. I think we had indicated, through

19  correspondence over the weekend, that that is a somewhat more

20  regular intensive process especially given how much an

21  employee has been moved over the last few weeks; objections

22  to various incidents and so on in the case. That is

23  something that we understand from personnel of the debtors to

24  be completed by (indiscernible) tomorrow.

25         I can also, I think, provide information, and I

PA00909

1  didn't realize this was still an open item as far as Wells

2  Fargo was concerned, as to the status of property insurance.

3  In one of our recent prior hearings we did, I believe,

4  discuss this on the record and the debtors have executed a

5  binder for new property insurance to request a policy that

6  expired on March 31st at various locations.

7        It is our understanding that the debtors have a

8  thirty day grace period to pay the premiums on that.  So I

9  don't know right here today whether those premiums have been

10 funded, but, you know, there is no, to our understanding, any

11 gap in the insurance at this time and wouldn't be so long as

12 the premiums are funded within thirty days of the binder

13 having been signed.

14       And then one last point, Your Honor, again, to

15 correct -- just to make sure the record is clear on this

16 point.  The debtors did have to terminate the remaining

17 employees at the end of the day Friday.  So any former

18 employees that are among the personnel that are being asked

19 to provide these services this week are being brought in,

20 effectively, as any contractors at this point and not any

21 employees of the debtors.  I just want to make sure the

22 record is clear on that point because among other things that

23 have expired these debtors they no longer have Worker's

24 Compensation insurance at this point in time.

25       THE COURT:  Thank you, Mr. Werkheiser.  Question:

1   I thought in the context of authorizing the debtors to renew

2   property insurance that there was a sum of money that was

3   involved with that, which I assumed was an initial premium or

4   something along those lines, and now you're saying you don't

5   know if the premiums have been paid.  So what's the status?

6          MR. WERKHEISER:  Yes, Your Honor.  Sorry if I

7   wasn't clear.  So I think we had a discussion about the

8   premium, which was, you know, quite expensive to renew under

9   the circumstances, in excess of, I think, $2 million in

10  total, and then had a discussion on the record at one of the

11  recent prior hearings about the timing of funding of that

12  premium.  And I think what we said at that time is, to my

13  knowledge, still true that there was not a need to fund the

14  premium immediately, that there was a 30-day grace period,

15  and we're still well within that grace period right now.

16         So, given the broader situation with our, you

17  know, limited access to cash collateral and the other things

18  going on in the case, the debtors haven't felt it appropriate

19  to fund that premium prior to the appointment of the trustee.

20  But, you know, certainly, you know, we'd fully cooperate and

21  support the decision to fund that premium once the trustee is

22  in place.

23         THE COURT:  Okay.  All right.  Ms. Feldsher, any

24  response?

25         MS. FELDSHER:  I'm sorry, Your Honor, I could not

1  get off mute early enough.

2        Your Honor, my only concern with that is, one,

3  these amounts have already been authorized by the Court, so

4  I'm not sure what benefit is gained from the grace period or

5  being with the grace period.  My only concern is, you know,

6  for the Chapter 7 trustee to have sufficient time to get

7  involved, and I don't know what orders of the Court the

8  Chapter 7 trustee will feel they will need, you know, to go

9  ahead and authorize the payment of this premium, if they will

10  need an order to operate the debtors' businesses, and I just

11  didn't want the timing of that to become an issue in the

12  case.  We just want to make sure that the company has

13  appropriate insurance; it's not as fulsome as what we had

14  prepetition, but it is, we understand from the debtors, the

15  best that they could get and it's certainly better than

16  nothing.

17        So, you know, our view would be the debtors are

18  authorized to go ahead and pay it and we don't see the

19  benefit of not paying it.  But if Your Honor thinks the

20  Chapter 7 trustee will have sufficient time to address it as

21  well, that's fine, as long as the debtors make the Chapter 7

22  trustee aware of the timing, so that it isn't something that

23  slips, you know, as the Chapter 7 trustee is trying to get

24  his arms around all that is coming over with respect to this

25  case.

PA00912

1          THE COURT:  Ms. Richenderfer, do you have any

2    thoughts on this?

3          MS. RICHENDERFER:  Your Honor, I have a couple of

4    thoughts that I think are interrelated to this question.  One

5    has to do with the form of order itself.  On paragraph 3(b)

6    as (indiscernible) it talks about turning over the books and

7    records to the trustee as soon as reasonably practicable.

8    Your Honor, I have asked that the language be changed to make

9    it clear that the trustee has immediate access to all of the

10   debtors' books and records.  The trustee will make

11   arrangements as need be to obtain physical possession, but

12   the reading of this would have you believe that the trustee

13   does not have immediate access.  I mean, the trustee

14   immediately becomes responsible for the debtor, has the

15   fiduciary duty and is running the business, so to speak, is

16   that they are the debtor, they are the debtors.

17         So I think paragraph (b) needs to be changed to

18   state that the Chapter 7 trustee will have immediate access

19   and can work with the appropriate individuals with respect to

20   the turnover of the information.

21         I do have a general concern, Your Honor, in that

22   we're talking about certain requests for information that are

23   going to go past the date when the Chapter 7 trustee is going

24   to take over the role.  At 12:01 tomorrow morning, it will be

25   the Chapter 7 trustee, and it will be their responsibility

1 and they work with the lender and whomever as they need to

2 with respect to requests for information, with respect to the

3 direction of anyone working on behalf of the debtors.

4         And I guess I'm confused also, Your Honor, because

5 I thought that there was supposed to be a payment that was

6 being made, that was authorized, so that the property

7 insurance would be in place, because it would take the

8 Chapter 7 trustee some time to get their arms around this and

9 to get the property insurance and have it be in place.  So

10 I'm not clear why there wasn't a payment that was made, as

11 Ms. Feldsher has suggested was supposed to have been.

12         MR. WERKHEISER:  Your Honor, this is Mr.

13 Werkheiser, may I speak to Ms. Richenderfer's comments?

14         THE COURT:  Yes.

15         MR. WERKHEISER:  Okay.  Your Honor, so -- you

16 know, subject to -- I believe Mr. Stogsdill is on the line

17 today for the hearing, who is a (indiscernible) at Alvarez

18 and Marsal -- so subject to him piping up and telling us that

19 there's not the present ability to make the premium payment

20 for the property insurance today before the conversion orders

21 become effective, we're not objecting to doing that.  This is

22 really the first we've been told that there was an

23 expectation that would be done pre-conversion versus post

24 conversion.  So I think we can deal with that issue and, if

25 the wires do go out today, you know, we would try to make

1  that happen, if that's the consensus that that should be

2  happening today.

3         THE COURT:  All right, let's pay the insurance.

4  Let's get it done today.

5         MR. WERKHEISER:  Okay.

6         THE COURT:  Please, yes, because the Court so

7  authorizes.

8         MR. WERKHEISER:  Thank you, Your Honor.  And I'd

9  be happy to speak to Ms. Richenderfer's comments about the

10  access information issue --

11         THE COURT:  Yes, please, go ahead.

12         MR. WERKHEISER:  -- if Your Honor wants to hear --

13  sure.

14         THE COURT:  Yeah, please.

15         MR. WERKHEISER:  So I think, again, this is just

16  situation where we're struggling with some of the realities

17  of the situation of having a debtor that until very recently

18  was still an operating debtor with, you know, a hundred to

19  200 locations throughout different areas of the country and,

20  not only that, Your Honor, had really two distinct business

21  lines, the Art Van Furniture line and the Levin and Wolf

22  furniture lines, and the systems for those hadn't been fully

23  integrated.  So what we've been trying to work through with

24  the U.S. Trustee's Office on this issue is just the fact

25  that, as a practical matter, it's not like flipping a switch

PA00915

 1   and we can deliver access, you know, immediately as of the

 2   effective date of conversion to trustee to all of the

 3   documents and information that the debtors have.

 4           Technically, is the trustee at that point in

 5   charge of all that information and does the trustee have a

 6   right to it?  Absolutely, nobody is contending otherwise.

 7   But practically can, you know, we connect the trustee into

 8   all of the computer systems of the debtors or, you know,

 9   provide access to all the books of the debtor in hard copy

10   or, you know, located remotely someplace as of midnight, you

11   know, this evening?  No.

12           And so really I think the -- this is more of a

13   semantic issue than a difference of view on when things

14   should happen.  We are committed to getting all of this

15   information to the trustee as soon as possible, I just didn't

16   want to again set up the client for somebody to say later

17   that they did not do what they were supposed to do by saying

18   access was going to be delivered immediately to everything as

19   of the effective date of conversion when there isn't a

20   practical ability to do that.

21           THE COURT:  All right.  Okay, thank you.  I hear

22   you on that and I think that's reasonable.  I was playing

23   around with drafting some language on the draft and there's

24   really no way to realistically say something needs to be made

25   immediately available at 12 midnight tonight, but I think 14

PA00916

1  days is way too long.  First of all, you're not going to have

2  anyone around past Friday, so unless the trustee decides to

3  pay them.  So I'm going to say four days, no later than four

4  days.

5            MR. WERKHEISER:  Understood, Your Honor.

6            THE COURT:  That means Friday, so -- unless I did

7  the math wrong, I think that's Friday.  Do you want to put --

8            MR. WERKHEISER:  Thank you.

9            THE COURT:  -- Friday instead of four days, just

10  to be clear -- whatever, either four days or Friday, either

11  is fine.

12            MR. WERKHEISER:  All right, Your Honor, we'll make

13  that change.

14            THE COURT:  We have to fix paragraph 9 to make the

15  number 73,243.  Let me just ask Wells and the U.S. Trustee,

16  did you have any other comments on the order that we haven't

17  already heard?

18            MS. RICHENDERFER:  Your Honor, this is Linda

19  Richenderfer.  No, I do not.

20            THE COURT:  Thank you.

21            MS. FELDSHER:  And, Your Honor, this is Jennifer

22  Feldsher, I didn't as well.

23            THE COURT:  Okay, very good.  Thank you very much.

24            Is there anyone else on the phone who would like

25  to be heard in connection with the debtors' conversion motion

PA00917

1   and/or the form of order?

2          MR. WAXMAN:  Your Honor, this is Jeff Waxman, if I

3   may be heard?

4          THE COURT:  Yes, Mr. Waxman.  Good afternoon.

5          MR. WAXMAN:  Good afternoon.  First, Your Honor, I

6   did get a version of the order on Friday that includes the

7   language that we had requested from the debtors, and I want

8   to thank the debtors for its inclusion.  I just haven't seen

9   a revised order, and so I would just ask that Mr. Werkheiser

10  confirm on the record that the language that's in what was

11  paragraph 8 is still in the order in whatever paragraph it's

12  now in.

13         THE COURT:  I'll do that --

14         MR. WERKHEISER:  Yes --

15         THE COURT:  -- it's paragraph 10 now, but it's the

16  same language, there's been no change.

17         MR. WAXMAN:  Okay.  Thank you very much, Your

18  Honor.  I have nothing further.

19         THE COURT:  Okay.  Thank you, Mr. Waxman.

20         Sorry to cut you off, Mr. Werkheiser.

21         MR. WERKHEISER:  No problem, Your Honor.

22         THE COURT:  Anyone else have anything they'd like

23  to say?

24      (No vocal response)

25         THE COURT:  All right, I hear none.  I had no

1  comments to the order myself.  Let me look at it again.  I

2  assume we didn't have any problem with what I had seen on

3  Friday.

4        MS. FELDSHER:  Your Honor, this is Jennifer

5  Feldsher again.  If I might just highlight for the Court,

6  this isn't something that we would have an issue with, but I

7  didn't think Mr. Werkheiser brought it up, but there is a

8  change in this order from what was in the cash -- the interim

9  cash collateral order in that Wells is going to be funding

10  the carveout reserve for the professionals to an account at

11  the Benesch law firm.  The initial -- the interim cash

12  collateral order had required a segregated account be set up

13  at Wells Fargo, but administratively that takes some time and

14  in excess of the time that we would have had on the schedule

15  that the debtors laid out for conversion.  So in order to

16  effectuate the spirit, if not the letter, of what was in the

17  interim cash collateral order, we've arranged for the Benesch

18  firm to hold the funds for the professionals, and then of

19  course any distributions to professionals would be subject to

20  the Court's interim compensation provisions, as well as some

21  of the additional provisions that the debtors have put into

22  this order with respect to professional fees.

23        THE COURT:  Okay.  I did see that.  And I never

24  let Mr. Werkheiser walk through the order, so that's not his

25  fault that we didn't get to that, but I did see that.  Thank

1  you very much.  And I did walk through the order, which I got

2  before the hearing, which was extremely helpful.  Thank you

3  very much for sending that to Ms. Gadson.

4       MR. WERKHEISER:  Of course, Your Honor.

5       THE COURT:  I do have --

6       MR. WERKHEISER:  Your Honor, I --

7       THE COURT:  -- a question about -- I'm sorry -- I

8  do have a question about 7, paragraph 7, at the end, there's

9  a new (b) about lien priorities, what's that about?

10      MR. WERKHEISER:  Your Honor, that is language that

11 the debtors agreed to add at the request of our secured

12 lenders and it simply means that, once the carveout is fully

13 funded, that we don't have any special super-priority status

14 or lien status outside of the carveout reserves that are

15 being funded for, you know, professional fees and the like.

16      THE COURT:  Yep, I got it.  Okay.  All right, well

17 -- yes?  I'm sorry, Mr. Werkheiser.

18      MR. WERKHEISER:  Oh, yes, Your Honor, one other

19 thing I just had wanted to highlight for the Court is that

20 we've had to do just a little bit of gymnastics here with

21 KCC, just because their status as the claims agent is not

22 technically that of a professional.  So some of the language

23 that appears in paragraph of the motion -- or the order as

24 originally filed, and then as carried over through paragraph

25 6 as well, just deals with that issue.

PA00920

```
 1              So, in addition to the professional fees and the
 2    fees that they've -- the U.S. Trustee quarterly fees, the
 3    fees for KCC's services as the claims agent are included in
 4    the carveout reserves escrow that Benesch would hold and then
 5    would disburse in accordance with the language that is set
 6    forth in paragraph 6.
 7              THE COURT:  Thank you.  I saw that, yes.
 8              Ms. Richenderfer, when will the panel -- when will
 9    the interim trustee be appointed, tomorrow morning?
10              MS. RICHENDERFER:  Your Honor, I have to admit,
11    I'm not clear whether or not we can file something prior to
12    12:01 this morning -- tomorrow morning, I mean, in
13    anticipation --
14              THE COURT:  My --
15              MS. RICHENDERFER:  -- of that --
16              THE COURT:  -- my experience is that your office
17    has not done that in the past, that it requires the actual
18    conversion before they'll do that, is my experience.
19              MS. RICHENDERFER:  And I think that's the same
20    case here, Your Honor, and so that would mean that it would
21    be filed first thing tomorrow morning.
22              THE COURT:  Okay.  Like Ms. Feldsher, this is not
23    my first experiencing converting a Chapter 11 to a Chapter 7
24    and it's never a good experience.  This case is very
25    unfortunate.  It's really been a parade of unfortunate events
```

 1  that has kind of conspired to put a long-standing, solid

 2  business into liquidation.  And, as I sit here today, I

 3  certainly don't have enough information to blame anyone or

 4  anything other than the coronavirus and the disaster it has

 5  left in its wake.

 6          Obviously, this was always a partial liquidation,

 7  although through a GOB sale process and a partial going-

 8  concern sale, which as retail cases in 2020 go is pretty

 9  doggone good, but events have led us elsewhere.  And I feel

10  very strongly that it is -- I feel very strong sympathy for

11  the creditors who are not going to get paid their

12  administrative expense claims, at least right away.  The

13  employees who have health care reimbursements, some of them

14  never got -- according to the letters I've received, some of

15  them never got their retention, promised retention payments.

16  I don't think we had a retention program in this case, if I

17  remember correctly, but at least some of the letters had

18  mentioned that that was the case.  And a variety of other

19  claimants.  Obviously, of great concern to me from the very

20  beginning was the deposits, which I think at one point I was

21  told were 35 million.

22          In any event, it is what it is, we are where we

23  are, and we can only do the best we can under the

24  circumstances.  The debtors have presented a perfectly

25  reasonable and acceptable conversion order.  The debtors

 1   have, in my mind, the absolute right to convert, and I'm
 2   really constrained to, but I would not -- in any way not
 3   approve this motion at this time.  We just need to make
 4   changes to paragraph 3(b) and 9 that are consistent with what
 5   we discussed on the record, but with those changes I will
 6   grant the motion and enter the order.
 7          If you file -- if you upload a clean with those
 8   changes, Mr. Werkheiser, and simply email Ms. Gadson or Ms.
 9   Szymanski a redline to show those two changes, that will be
10   sufficient.  I'm not going to make you go through the hula-
11   hoops of filing another COC with just two changes on it.
12   Anyone who cares about what's going on is on the phone or on
13   the video today.
14          So as soon as that gets -- as soon as I get that
15   redline and as soon as the new clean is uploaded, the order
16   will be executed and on the docket, and the conversion will
17   happen at midnight.
18          MR. WERKHEISER:  Thank you, Your Honor.  And,
19   yeah, we can get that over immediately after the hearing.
20          Your Honor, I just wanted to take this opportunity
21   to -- again, I think we tried to communicate our message and
22   wanted to be clear to all of our stakeholders in the motion
23   to convert, you know, how deeply the debtors regret this
24   situation and wish that, you know, circumstances had not
25   conspired to result in this outcome, but, you know,

1   understand that this is adversely affecting a large number of

2   people for reasons beyond, you know, most everybody's

3   control.

4          And, Your Honor, we also wanted to take this

5   opportunity to thank Your Honor for your availability, for

6   your close attention to this case.  And as bad as this is, it

7   certainly could have been a lot worse without everyone

8   working, you know, very diligently, and without the Court's

9   supervision to help us at least deal with the situation in

10   the most orderly way possible.

11          Your Honor, I also wanted to take the opportunity

12   just to clarify one thing about the record, just because the

13   customer deposits, as you might imagine, is an issue that is

14   being paid close attention to by various state's attorney

15   generals.  And I'm not sure that we ever used the number 35

16   million for purposes of the record and I think the number as

17   it stands now might be quite, quite a bit less than even the

18   debtors thought it was earlier in the case for a number of

19   reasons, something south of ten.  But be that as it may, you

20   know, a lot of individuals and small businesses probably have

21   suffered to some degree because the debtors have been unable

22   at this stage of the proceedings to honor those customer

23   deposit obligations and, whatever the number is, we

24   understand that people do -- you know, forced at minimum to

25   wait, then may not get a recovery at the end of the day,

Case 1:22-cv-... Case 2:20-... Document 54-23 Filed 05/22/21 Page 42 of 129 PageID #: 2808

1   depending how things play out from here.

2            But, again, thank you, Your Honor.  I have nothing

3   further to say, unless the Court has anything else for us,

4   and that concludes our business today.

5            THE COURT:  No, I have nothing further.  Anyone

6   else?  Last chance.

7            All right, thank you all.  We are adjourned.  I'll

8   await the order.  Have a good day.

9            COUNSEL:  Thank you, Your Honor.

10       (Proceedings concluded at 1:45 p.m.)

11

12

13

14                        CERTIFICATE

15

16       We certify that the foregoing is a correct transcript

17   from the electronic sound recording of the proceedings in the

18   above-entitled matter.

19
     /s/Mary Zajaczkowski            May 16, 2021
20   Mary Zajaczkowski, CET**D-531

21
     /s/ Tracey J. Williams          May 16, 2021
22
23   Tracey J. Williams, CET-914

24

25

# EXHIBIT Y

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, et al.,[1]<br><br><div align="center">Debtors.</div> | <div align="center">Chapter 11<br>Bankr. Case No. 20-10553<br>**Joint Administration Pending**</div> |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br><div align="center">Plaintiff,</div><br>v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br><div align="center">Defendants.</div> | <div align="center">**Adv. Pro. No. _____ - _____**</div> |

<div align="center">

**CLASS ACTION**
**ADVERSARY PROCEEDING COMPLAINT FOR**
**VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ.**

</div>

Plaintiffs Todd Stewart and Jennifer Sawle ("Plaintiffs") alleges on behalf of themselves and a putative class of similarly situated former employees of Debtor Art Van Furniture, LLC and its affiliates (together "Debtors" or "Defendants") by way of this Class Action Adversary Proceeding Complaint against Defendants as follows:

<div align="center">

**NATURE OF THE ACTION**

</div>

1.     The Plaintiffs brings this action on behalf of themselves, and other similarly

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

situated former employees who worked for Defendants and who were terminated without cause as part of, or as the result of, mass layoffs or plant closings ordered by Defendants beginning on March 4, 2020, who were not provided 60 days advance written notice of their terminations by Defendants, as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq, (the "WARN Act").

2.      Plaintiffs were terminated along with approximately 700 other similarly situated employees as part of, or as the foreseeable result of a mass layoffs or plant shutdowns ordered by Defendants.  These terminations failed to give Plaintiffs and other similarly situated employees of Defendants at least 60 days' advance notice of termination, as required by the WARN Act.  As a consequence of the violation, Plaintiffs and other similarly situated employees of Defendants seek their statutory remedies, pursuant to 29 U.S.C. § 2104.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1334, and 29 U.S.C. § 2104(a)(5).

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1409 and 29 U.S.C. § 2104(a)(5).

## THE PARTIES

### *Plaintiffs*

6.      Plaintiff Stewart was employed by Defendants as the Store Manager at Defendants' facility at 14055 Hall Rd. Shelby Township Michigan 48315 one of seven WARN-covered facilities (the "WARN Facilities") until his termination.

7.      Plaintiff Sawle was employed by Defendants as a salesperson at one of Defendants' WARN Facilities located at 8748 West Saginaw Highway, Lansing, Michigan until her

2

termination.

8.      On March 4, 2020, Plaintiffs received a letter notifying them that terminations at the Facilities where they worked would commence on May 5, 2020 or within 14 days thereafter.

9.      Plaintiffs were not terminated on May 5, 2020. Instead, on evening of March 19, 2020, Defendants abruptly notified its employees, including Plaintiffs that terminations would occur immediately for non-leader personnel and March 22, for lead personnel.

10.     Plaintiff Sawle's last day of employment was March 20, 2020.

11.     Plaintiff Stewart was, and other store leaders were, specifically told they would not get paid unless they continued to work through the Saturday and Sunday, March 21 and 22.

12.     With the power off at the facility, Plaintiff Stewart and colleagues worked in the dark through the week carrying purchased furniture out to the cars of waiting customers.

13.     Along with Plaintiffs, hundreds of other employees of Defendants who worked at, reported to, or received assignments from Defendants' Facilities were terminated on or about March 19, 2020 without advanced written notice.

### *Defendants*

14.     Upon information and belief and at all relevant times, Defendant Art Van Furniture LLC is a Delaware corporation with its principal place of business located at 6500 E. 14 Mile Road, Warren, Michigan (the "Headquarters Facility") and it conducted business in this district.

15.     Upon information and belief at all relevant times, Defendants owned, maintained and operated its corporate headquarters at the Headquarters Facility, and operated additional facilities as that term is defined by the WARN Act in the United States.

16.     Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. Debtors do business under several brand names,

3

including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.

17.     The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.

18.     As of the Petition Date of March 9, 2020, Debtors operated stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19.     Upon information and belief, on March 19, 2020, Defendants terminated approximately 700 employees who worked at or reported to their WARN Facilities, and the rest of the employees who worked at non-WARN-covered stores (because they did not employee 50 full-time employees as required by the WARN Act definition of a mass layoff or plant shutdown).

20.     By late-January, 2020, Debtors had sunk into a liquidity crisis leading to a default of the Defendant's revolver facility with its lender, Wells Fargo, and some leases.  Wells Fargo agreed to forebear until February 28, 2020 conditioned on taking control of Defendant's cash and on Defendant immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by then.

21.     By January 31, 2020, the United States reported its first confirmed case of person-to-person transmission of the Wuhan coronavirus and the WHO determined that the outbreak constitutes a Public Health Emergency of International Concern.

22.     In February, 2020, KKR investigated then quickly dropped consideration of make a new money investment in Art Van.  Debtor's private equity parent THL, along with Van Eslander family, and some important suppliers formed a "Consortium."

PA00930

23.     The Consortium proposed to infuse new capital into Art Van, but by month's end failed to secure the capital purportedly due in part to the impact of coronavirus on the equity markets during the week of February 24, 2020.

24.     According Debtors, the market drop had a "deleterious effect" on the Consortium investors' "willingness to contribute capital." (Doc. 12, Mar. 9, 2020, First Day Declaration of David Ladd.)

25.     As a result of the Consortium investors' unwillingness, Debtors began to execute on its planned liquidation.

26.     On March 5, 2020, Art Van announced its store closing sales and that it would complete the closures with six to eight weeks.

27.     That day, it informed it WARN Facility employees in a WARN notice that they would be retained and paid through May 5th and terminated then or within 14 days thereafter, whether there was work for them or not.  Their benefits including health coverage would be maintained until their termination.

28.     The Debtors' March 5, 2020 WARN notice did not condition the 60 days' of pay and benefits on any contingency.  It did not mention coronavirus or any factor that could reduce the 60-day period of anticipated employment.

29.     By March 8, 2020, at least eight states had declared a State of Emergency due to coronavirus.

30.     On March 9, 2020, Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. Joint administration of those cases is pending.

## FEDERAL WARN ACT CLASS ALLEGATIONS

31.     Plaintiffs bring this Claim for Relief for violation of 29 U.S.C. § 2101 et seq., on

PA00931

behalf of himself and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from Defendants' Facilities and were terminated without cause beginning on or about March 19, 2020, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020 and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

32.     The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

33.     Upon information and belief, Defendants employed more than 100 full-time employees who worked at or reported to the Facilities.

34.     On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants.

35.     On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of Defendants.

36.     Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)     whether the members of the WARN Class were employees of the Defendants who worked at or reported to Defendants' Facilities;

6

(b)     whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)     whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

37.     Plaintiffs' claims are typical of those of the WARN Class.  Plaintiffs, like other WARN Class members, worked at or reported to Defendants' Facilities and was terminated beginning on or about March 19, 2020, due to the mass layoff and/or plant closing ordered by Defendants.

38.     Plaintiffs will fairly and adequately protect the interests of the WARN Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

39.     On or about March 19, 2020, Plaintiffs were terminated by Defendants.  These terminations were part of mass layoffs or plant closings as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to receive 60 days advance written notice under the WARN Act.

40.     Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate Defendants, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

PA00933

41.     Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

42.     Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

## CLAIM FOR RELIEF

## Violation of the Federal WARN Act

43.     Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

44.     At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

45.     At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a) and continued to operate as a business until it decided to order mass layoffs or plant closings at the Facilities.

46.     At all relevant times, Plaintiffs and the other similarly situated former employees were employees of Defendants as that term is used in 29 U.S.C. §2101.

47.     On or about March 19, 2020, the Defendants ordered mass layoffs or plant closings at the Facilities, as that term is defined by 29 U.S.C. § 210l(a)(2).

48.     The mass layoffs or plant closings at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well

8

PA00934

as thirty–three percent of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2l01(a)(8).

49.     Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants at the Facilities.

50.     Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

51.     Defendants were required by the WARN Act to give Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

52.     Defendants failed to give Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

53.     Plaintiffs and each of the Class Members are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

54.     Defendants failed to pay Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, health and life insurance premiums, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to provide employee benefits including health insurance, for 60 days from and after the dates of their respective terminations.

55.     The relief sought in this proceeding is predominately equitable in nature.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated persons, prays for the following relief as against Defendants:

A.     Certification of this action as a class action;

9

B.    Designation of Plaintiffs as Class Representatives;

C.    Appointment of the undersigned attorneys as Class Counsel;

D.    A judgment in favor of the Plaintiffs and each of the affected employees equal to the sum of: their unpaid wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits, for up to 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period all determined in accordance with the federal WARN Act, 29 U.S.C. §2104(a)(1)(A);

E.    Allowance of all damages as first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) or, alternatively wage priority status pursuant to 11 U.S.C. § 507(a)(4) and (5) up to $13,650, and the remainder as a general unsecured claim;

F.    Reasonable attorneys' fees and the costs and disbursements that Plaintiffs will incur in prosecuting this action, as authorized by the federal WARN Act, 29 U.S.C. § 2104(a)(6);

G.    Interest as allowed by law on the amounts owed under the preceding paragraphs; and

H.    Such other and further relief as this Court may deem just and proper.


*[Signature Page to Follow]*

PA00936

Dated: March 23, 2020

Respectfully submitted,

*/s/ Michael Joyce*
Michael J. Joyce (No. 4563)
THE LAW OFFICES OF JOYCE, LLC
1225 King Street
Suite 800
Wilmington, DE 19801
(302)-388-1944
Email: mjoyce@mjlawoffices.com

-and-

OF COUNSEL:

Jack A. Raisner
René S. Roupinian
RAISNER ROUPINIAN LLP
500 Fifth Avenue, Suite 1600
New York, New York 10110
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for the and the putative class*
*Plaintiffs*

PA00937

# EXHIBIT Z

PA00938




☰        Los Angeles Times        LOG IN   🔍



**Moving Forward Post Pandemic**

SPONSORED BY **MERRILL**        SEE MORE

BUSINESS

# Column: A declassified government report offers no support for the lab-leak theory of COVID's origin



A thoroughfare in Wuhan, China, shows the effect of a government lockdown in January 2020 after the first reports of a COVID-19 outbreak in the teeming city. (Hector Retamal / AFP/Getty Images)

BY MICHAEL HILTZIK | BUSINESS COLUMNIST

NOV. 1, 2021 12:19 PM PT



For months, adherents of the theory that COVID-19 originated in a Chinese government laboratory have hoped that an assessment President Biden ordered from the nation's intelligence agencies would validate their suspicions.

Their hopes are now dashed. The intelligence report was declassified and released on Oct. 29. It effectively demolishes the lab-leak theory.

The release of the full report follows the publication of a brief declassified summary in August, stressing the intelligence community's inability to reach a firm conclusion about

PA00940

whether SARS-CoV-2, the virus responsible for the COVID pandemic, originated from natural sources or a Chinese laboratory.

> *Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China…increase the probability that initial transmission occurred along these lines.*
>
> U.S. INTELLIGENCE SERVICES REPORT ON COVID ORIGINS

ADVERTISEMENT

The latest version, which is likely to be the most complete assessment to be released publicly, is couched in the same conditional and qualified language.

The report avoids offering a firm conclusion about the two prevailing theories. But it provides details of the agencies' findings that make clear they looked into the specific assertions that have been proposed in support of the lab-leak theory and found them wanting.



### Get the latest from Michael Hiltzik

Commentary on economics and more from a Pulitzer Prize winner.

Enter email address

PA00941

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.

The intelligence agencies also noted that although no animal source for the virus has yet been identified, that doesn't necessarily undermine the theory of a natural source.

In many previous outbreaks, the report says, "the identification of animal sources has taken years, and in some cases, animal sources have not been identified."

The report was published by the Office of the Director of National Intelligence, an umbrella agency for 17 government intelligence services, including the CIA, FBI, four Cabinet agencies and the intelligence arms of the military services.

Experts who were contacted by the intelligence services preparing the report have said they were impressed by the agents' commitment to a scientific analysis. "These folks were really knowledgeable, had PhDs in molecular biology, they had read all of the papers in detail," Tulane virologist Robert Garry told science writer Amy Maxmen of Nature in August.

---

**BUSINESS**

**Column: New evidence undermines the COVID lab-leak theory — but the press keeps pushing it**

Sept. 28, 2021

---

The lab-leak theory has been kept on life support for more than a year by partisan propagandists, abetted by amateurs posting on social media and credulous journalists reluctant to relinquish a story that would be, as the saying goes, "interesting, if true."

As we've reported before, the hypothesis that the SARS-CoV-2 virus escaped from a Chinese laboratory to wreak havoc on the world originated with a clutch of anti-China

ideologues in the State Department under Trump.

In its initial incarnation, the hypothesis held that the virus was developed by the Beijing government as a biological weapon. Its proponents soon abandoned that claim as too fantastical to win over many believers, so they retreated to the claim that it was merely genetically engineered in standard virological research and reached the outside world through inattention or accident.

In its most recent form, the theory is that a precursor virus was brought from the wild to a Chinese lab in Wuhan and evolved there, and *that* was what sneaked out into the open.

The intelligence assessment dismisses the first two versions outright. It suggests that while it's "plausible" that a lab worker unwittingly became the carrier, that's "less likely than an infection occurring through numerous hunters, farmers, merchants, and others who have frequent, natural contact with animals."

BUSINESS
### Column: When will the Wall Street Journal stop publishing lab-leak propaganda?
Oct. 8, 2021

The report states that the agencies judged the bioweapon allegation to be "supported by scientifically invalid claims," adding that its "proponents are suspected of spreading disinformation."

It says that the intelligence agencies found no "genetic signatures in SARS-CoV-2" that would indicate genetic engineering, such as deliberate manipulation of a virus in the lab to make it more dangerous to humans.

Nor did they find evidence of any virus strains that "could have plausibly served as a backbone" — that is, a biological foundation — for a genetically engineered version.

The agencies examined one of the more popular claims by lab-leak proponents, involving the so-called furin cleavage site on SARS-CoV-2. This is a feature of the virus' spike, the structure that allows it to penetrate healthy cells and pass along infectious material. To be effective, the spike has to be cut in two, a process achieved by the enzyme furin.

Lab-leak proponents have asserted that the furin site is so rare and so well-adapted to human infection that it's certain to have been added to the virus in a lab. Just as many academic virologists have noted, the report observes that furin sites have been found in naturally occurring viruses and can be the product of natural evolution.

The intelligence services found support for the so-called zoonotic theory that the pandemic resulted from a natural spillover of the virus from animals to humans in virological history. Many virological outbreaks have happened this way, the report observes.

---

BUSINESS

### Column: The lab-leak origin claim for COVID-19 is in the news, but it's still fact-free

June 3, 2021

---

"Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China," along with historically lax government oversight, "increase the probability that initial transmission occurred along these lines."

Support for the lab-leak hypothesis, the services say, comes chiefly from reports questioning whether the Wuhan institute conducted its research under adequate biological safeguards. But the services found "no indications that the institute's research involved SARS-CoV-2 or a close progenitor virus."

PA00944

The report does state that, among its contributing agencies, four "assess with low confidence" that the virus probably sprung from natural sources; one finds with "moderate confidence" that the pandemic "most likely" resulted from a laboratory incident, and three couldn't decide between the two theories. The report doesn't link specific agencies to those findings, however.

The intelligence services also reproach the Chinese government for hindering international investigations of COVID-19's origins, in part by refusing to share information about WIV research or its own findings about the early course of the disease in Wuhan.

"These actions reflect, in part, China's government's own uncertainty about where an investigation could lead," the U.S. report says, "as well as its frustration the international community is using the issue to exert political pressure on China."

The services are generally dismissive of what it calls "open-source" theories of the pandemic's origin, typically passed around on social media. "These theories generally do not provide diagnostic information on COVID-19 origins, and in some cases are not supported by the information available to us."

Whether the government report will stifle the propaganda about a Chinese lab-leak is uncertain, but that may not be the way to bet. Too many people are ideologically committed to the claim, and a scientific debunking of a theory that has had little science to support it from the start probably won't matter.

---

LATEST FROM MICHAEL HILTZIK ›

Column: Inflation has spiked. Don't freak out

Column: Billionaire anti-deficit hawks are already attacking Biden's spending plan. Ignore them

PA00945

Column: The infrastructure bill offers lots for California, and social spending you wouldn't expect

BUSINESS



## Get the latest from Michael Hiltzik

Commentary on economics and more from a Pulitzer Prize winner.

Enter email address

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.



Michael Hiltzik

Twitter    Instagram    Email    Facebook

Los Angeles Times columnist Michael Hiltzik writes a daily blog appearing on latimes.com. His seventh book, "Iron Empires: Robber Barons, Railroads, and the Making of Modern America," has just been published by Houghton Mifflin Harcourt. Follow him on Twitter at twitter.com/hiltzikm and on Facebook at facebook.com/hiltzik.

PA00946

MORE FROM THE LOS ANGELES TIMES

BUSINESS

## After Twitter poll, Elon Musk sells off more than $5 billion in Tesla shares

Nov. 11, 2021

BUSINESS

## SpaceX crew launch marks 600 space travelers in 60 years

Nov. 10, 2021

BUSINESS

## Hot inflation report slams bond market, sends stocks lower

Nov. 10, 2021

TECHNOLOGY

## Justice Department sues Uber over wait-time fees charged to disabled passengers

Nov. 10, 2021

PA00947

**SUBSCRIBERS ARE READING**

CALIFORNIA

Gov. Newsom returns to public eye after sudden absence sparked social media speculation

LIFESTYLE

The L.A. Times 2021 holiday gift guide

CALIFORNIA

FOR SUBSCRIBERS

PA00948

Colonialism, power and race. Inside California ethnic studies classes

LIFESTYLE

The 27 coolest made-in-L.A. gifts to give this year

BUSINESS

Cargo jam at L.A. and Long Beach ports begins to ease as hefty fines loom

LATEST BUSINESS ›

TECHNOLOGY

Rivian skyrockets in 2021's biggest IPO

Nov. 10, 2021

LIFESTYLE

Black Girl Magic meets Jazz Age speakeasy at this new L.A. pot shop

Nov. 10, 2021

REAL ESTATE

Liberace's former townhouse above the Sunset Strip is listed for $3.4 million

Nov. 10, 2021

BUSINESS

U.S. consumer prices soared 6.2% in past year, most since 1990

Nov. 10, 2021

PA00949

**BUSINESS**

Which retirement option is better: Lump sum or monthly payout?

Nov. 10, 2021

PA00950

Subscribe for unlimited access

Follow Us

eNewspaper

Coupons

Find/Post Jobs

Place an Ad

Media Kit: Why the
L. A. Times?

Bestcovery

Copyright © 2021, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell My Personal Information

# EXHIBIT AA

PA00952



OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

NATIONAL INTELLIGENCE COUNCIL



Updated Assessment on

# COVID-19 ORIGINS

PA00953

# Updated Assessment on COVID-19 Origins

## Key Takeaways

*Scope Note: This assessment responds to the President's request that the Intelligence Community (IC) update its previous judgments on the origins of COVID-19. It also identifies areas for possible additional research. Annexes include a lexicon, additional details on methodology, and comments from outside experts. This assessment is based on information through August 2021.*

The IC assesses that SARS-CoV-2, the virus that causes COVID-19, probably emerged and infected humans through an initial small-scale exposure that occurred no later than November 2019 with the first known cluster of COVID-19 cases arising in Wuhan, China in December 2019. In addition, the IC was able to reach broad agreement on several other key issues. We judge the virus was not developed as a biological weapon. Most agencies also assess with low confidence that SARS-CoV-2 probably was not genetically engineered; however, two agencies believe there was not sufficient evidence to make an assessment either way. Finally, the IC assesses China's officials did not have foreknowledge of the virus before the initial outbreak of COVID-19 emerged.

After examining all available intelligence reporting and other information, though, the IC remains divided on the most likely origin of COVID-19. All agencies assess that two hypotheses are plausible: natural exposure to an infected animal and a laboratory-associated incident.

- Four IC elements and the National Intelligence Council assess with low confidence that the initial SARS-CoV-2 infection was most likely caused by natural exposure to an animal infected with it or a close progenitor virus—a virus that probably would be more than 99 percent similar to SARS-CoV-2. These analysts give weight to China's officials' lack of foreknowledge, the numerous vectors for natural exposure, and other factors.

- One IC element assesses with moderate confidence that the first human infection with SARS-CoV-2 most likely was the result of a laboratory-associated incident, probably involving experimentation, animal handling, or sampling by the Wuhan Institute of Virology. These analysts give weight to the inherently risky nature of work on coronaviruses.

- Analysts at three IC elements remain unable to coalesce around either explanation without additional information, with some analysts favoring natural origin, others a laboratory origin, and some seeing the hypotheses as equally likely.

- Variations in analytic views largely stem from differences in how agencies weigh intelligence reporting and scientific publications and intelligence and scientific gaps.

The IC judges they will be unable to provide a more definitive explanation for the origin of COVID-19 unless new information allows them to determine the specific pathway for initial natural contact with an animal or to determine that a laboratory in Wuhan was handling SARS-CoV-2 or a close progenitor virus before COVID-19 emerged.

- The IC—and the global scientific community—lacks clinical samples or a complete understanding of epidemiological data from the earliest COVID-19 cases. If we obtain information on the earliest cases that identified a location of interest or occupational exposure, it may alter our evaluation of hypotheses.

PA00954

**NIC** ▮▮▮▮▮▮▮▮     NATIONAL INTELLIGENCE COUNCIL

China's cooperation most likely would be needed to reach a conclusive assessment of the origins of COVID-19. Beijing, however, continues to hinder the global investigation, resist sharing information, and blame other countries, including the United States. These actions reflect, in part, China's government's own uncertainty about where an investigation could lead as well as its frustration the international community is using the issue to exert political pressure on China.

PA00955



# NATIONAL INTELLIGENCE COUNCIL

## IC Assessments of COVID-19 Origins



**AREAS OF BROAD AGREEMENT**

- First known cluster of COVID-19 cases emerged in Wuhan, China in December 2019
- Virus not developed as a biological weapon
- Virus not genetically engineered
- China's officials unaware of virus before pandemic emerged



**TWO PLAUSIBLE HYPOTHESES ON INITIAL HUMAN EXPOSURE**

- Natural transmission from animal to human
- Laboratory-associated incident
- Evidence not strongly diagnostic of either hypothesis



**CHINA'S COOPERATION KEY TO UNDERSTANDING ORIGINS**

- Beijing's lack of cooperation on origins not diagnostic of either hypothesis
- Numerous information gaps, particularly related to technical data

PA00956

## Introduction

The IC has prepared several assessments examining the origins of COVID-19.  Analysts have focused on whether SARS-CoV-2, the causative virus of COVID-19, was genetically engineered—particularly as a biological weapon—was transmitted to humans naturally or transmitted due to a laboratory-associated incident, perhaps during sampling or experimentation.  China's reaction to and handling of the pandemic have given analysts insights into these issues, but Beijing's actions have also impeded the global scientific community and our ability to confidently determine how the virus first infected humans.

## SARS-CoV-2 Probably Not a Biological Weapon

The IC assesses China did not develop SARS-CoV-2 as a biological weapon.

- We remain skeptical of allegations that SARS-CoV-2 was a biological weapon because they are supported by scientifically invalid claims, their proponents do not have direct access to the Wuhan Institute of Virology (WIV), or their proponents are suspected of spreading disinformation.  [*See appendix B.*]

## Most Analysts Assess SARS-CoV-2 Not Genetically Engineered

Most IC analysts assess with low confidence that SARS-CoV-2 was not genetically engineered.  Their assessment is based on technical analysis of SARS-CoV-2 and the IC's growing understanding of traits and the potential for recombination in other coronaviruses.  Two agencies believe there is not sufficient evidence to make an assessment either way.

- As of August 2021, we still have not observed genetic signatures in SARS-CoV-2 that would be diagnostic of genetic engineering, according to the IC's understanding of the virus.  Similarly, we have not identified any existing coronavirus strains that

could have plausibly served as a backbone if SARS-CoV-2 had been genetically engineered.

- Our growing understanding of the similarities of SARS-CoV-2 to other coronaviruses in nature and the ability of betacoronaviruses—the genus to which SARS-CoV-2 belongs—to naturally recombine suggests SARS-CoV-2 was not genetically engineered.  For instance, academic literature has noted that in some instances betacoronaviruses have recombined with other viruses in nature and that furin cleavage sites (FCS)—a region in the spike protein that enhances infection—have been identified in naturally occurring coronaviruses in the same genetic location as the FCS in SARS-CoV-2.  This suggests that SARS-CoV-2 or a progenitor virus could have acquired its FCS through natural recombination with another virus.

IC analysts do not have higher confidence that SARS-CoV-2 was not genetically engineered because some genetic engineering techniques can make modifications difficult to identify and we have gaps in our knowledge of naturally occurring coronaviruses.

- Some genetic engineering techniques may make genetically modified viruses indistinguishable from natural viruses, according to academic journal articles.  For instance, a 2017 dissertation by a WIV student showed that reverse genetic cloning techniques—which are standard techniques used in advanced molecular laboratories—left no trace of genetic modification of SARS-like coronaviruses.

- It will be difficult to increase our confidence that the distinguishing features in SARS-CoV-2 emerged naturally without a better understanding of the diversity of coronaviruses in nature and how often recombination occurs during co-infection of multiple coronaviruses within a particular host.  For example, academic literature has indicated that a FCS had previously been inserted into SARS-CoV-1, the causative agent of SARS, complicating differentiation of how such a feature may have appeared.

PA00957

**NIC** | NATIONAL INTELLIGENCE COUNCIL

## Closest Known Relatives of SARS-CoV-2, as of August

As of August, the closest known whole genome match to SARS-CoV-2—around **96 percent** identical—is **RaTG13**, a coronavirus collected from a bat in 2013 by the Wuhan Institute of Virology (WIV), according to academic literature. Scientific literature examining the genome of SARS-CoV-2 has identified at least some similarities to those of other naturally occurring coronaviruses in bats and pangolins, but an immediate precursor virus strain and animal reservoir have not been identified.

| VIRUS NAME | PERCENT IDENTITY TO COVID-19 VIRUS | YEAR COLLECTED | LOCATION COLLECTED | ANIMAL COLLECTED |
|---|---|---|---|---|
| **RaTG13** | **96.2** | **2013** | **Yunnan Province, China** | Bat |
| RpYN06 | 94.5 | 2020 | Yunnan Province, China | Bat |
| RmYN02 | 93.3 | 2019 | Yunnan Province, China | Bat |
| RShSTT200 | 92.7 | 2010 | Cambodia | Bat |
| RacCS203 | 91.5 | 2020 | Thailand | Bat |
| PrC31 | 90.7 | 2018 | Yunnan Province, China | Bat |
| Pangolin-CoV Guangdong | 90.1 | 2019 | Guangdong Province, China | Pangolin |
| ZC45 | 88.1 | 2015 | Zhejiang Province, China | Bat |
| ZXC21 | 88.0 | 2015 | Zhejiang Province, China | Bat |
| Guangxi pangolin-CoV | 85.5 | 2017, 2018 | Guangxi Zhuang Autonomous Region, China | Pangolin |
| Rc-o319 | 79.2 | 2013 | Japan | Bat |
| RaTG15 | 77.6 | 2015 | Yunnan Province, China | Bat |

- The WIV previously created chimeras, or combinations, of SARS-like coronaviruses, but this information does not provide insight into whether SARS-CoV-2 was genetically engineered by the WIV.

No IC analysts assess that SARS-CoV-2 was the result of laboratory adaptation, although some analysts do not have enough information to make this determination. Repeated passage of a closely related virus through animals or cell culture—which we consider laboratory adaptation and not genetic engineering—could result in some features of SARS-CoV-2, according to publicly available information. However, it probably would take years of laboratory adaptation using the appropriate cell types and a virus that is more closely related to SARS-CoV-2 than ones currently known to generate the number of mutations separating SARS-CoV-2 from any known coronavirus strains, judging from scientific journal articles. Such processes would require differentiation and maintenance of primary cells and the development of appropriate animal models.

PA00958

## China's Lack of Foreknowledge of SARS-CoV-2

The IC assesses China's officials probably did not have foreknowledge that SARS-CoV-2 existed before WIV researchers isolated it after public recognition of the virus in the general population. Accordingly, if the pandemic originated from a laboratory-associated incident, they probably were unaware in the initial months that such an incident had occurred.

- Early in the pandemic, the WIV identified that a new virus was responsible for the outbreak in Wuhan. It is therefore assessed that WIV researchers pivoted to COVID-19-related work to address the outbreak and characterize the virus. These activities suggest that WIV personnel were unaware of the existence of SARS-CoV-2 until the outbreak was underway.

## Two Plausible Hypotheses of Pandemic Origin

IC analysts assess that a natural origin and a laboratory-associated incident are both plausible hypotheses for how SARS-CoV-2 first infected humans. Analysts, however, disagree on which is more likely, or whether an assessment can be made at all, given the lack of diagnosticity of the available information. Most agencies are unable to make higher than low confidence assessments for these reasons, and confidence levels are tempered by plausible arguments for the opposing hypothesis. For these hypotheses, IC analysts consider an exposure that occurs during animal sampling activity that supports biological research to be a laboratory-associated incident and not natural contact. What follows is a look at the cases that can be made for these competing hypotheses.

## The Case for the Natural Origin Hypothesis

Some IC analysts assess with low confidence that the first human COVID-19 infection most likely was caused by natural exposure to an animal that carried SARS-CoV-2 or a close progenitor virus—a virus that would likely be more than 99 percent similar to SARS-CoV-2.

Four IC elements, the National Intelligence Council, and some analysts at elements that are unable to coalesce around either explanation are among this group. Analysts at these agencies give weight to China's officials' lack of foreknowledge and highlight the precedent of past novel infectious disease outbreaks having zoonotic origins, the wide diversity of animals that are susceptible to SARS-CoV-2 infection, and the range of scenarios—to include animal trafficking, farming, sale, and rescue—in China that enable zoonotic transmission. Although no confirmed animal source of SARS-CoV-2 has been identified, to include a reservoir or intermediate species, analysts that assess the pandemic was due to natural causes note that in many previous zoonotic outbreaks, the identification of animal sources has taken years, and in some cases, animal sources have not been identified.

- These analysts assess that WIV's activities in early 2020 related to SARS-CoV-2 are a strong indicator that the WIV lacked foreknowledge of the virus.

- They also see the potential that a laboratory worker inadvertently was infected while collecting unknown animal specimens to be less likely than an infection occurring through numerous hunters, farmers, merchants, and others who have frequent, natural contact with animals.

- Given China's poor public health infrastructure and the potential for asymptomatic infection, some analysts that lean towards a natural origin argue that China's infectious disease surveillance system would not have been able to detect the SARS-CoV-2 exposure as quickly as a suspected exposure in a laboratory setting.

### History of Zoonotic Pathogen Emergence, Conditions in China Ripe for Zoonotic Spillover

Analysts that find the natural zoonotic spillover hypothesis the most likely explanation for the pandemic also note the wide diversity of animals that are susceptible to SARS-CoV-2 infection, range of scenarios—to include animal trafficking, farming, sale, and rescue—in China that would enable zoonotic

PA00959

# NIC | NATIONAL INTELLIGENCE COUNCIL

## Comparing COVID-19 Pandemic to Past Select Viral Zoonotic Outbreaks

| | Location of Emergence | Asymptomatic Infection Common | Reservoir Species and Year Identified | Probable Intermediate Species and Year Identified |
|---|---|---|---|---|
| **COVID-19** (2019–Present) | China | Yes | Unknown | Unknown |
| **Ebola** (2014–16) | Guinea | No (Probably) | Bats (Probably); N/A | Nonhuman primate (Probably); N/A |
| **MERS** (2012) | Saudi Arabia, Jordan | Yes | Bats (Probably); N/A | Dromedary camels; 2013 |
| **SARS** (2002–04) | China | No (Probably) | Horseshoe bats; 2016 | Masked palm civets and Raccoon dogs (Possibly); 2003 |
| **Nipah** (1998–99) | Malaysia | Yes | Fruit bats; 1999 | Pigs; 1998 |
| **HIV-1**[a] (1970s–Present) | Democratic Republic of Congo (Probably) | No (Probably) | Chimpanzees (Probably); 1999 | N/A |

a. HIV is believed to have crossed from chimpanzees to humans in the 1920s; the first documented death occurred in the late 1960s.

transmission, and precedent of novel human infectious disease outbreaks originating from zoonotic transmission. Previous human coronavirus outbreaks, to include SARS-CoV-1 and Middle East Respiratory Syndrome coronavirus (MERS-CoV), occurred naturally and were linked to animal reservoirs with zoonotic transmission to humans, according to scientific literature.

- Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China and historically lax government regulation—and even promotion—of these activities increase the probability that initial transmission occurred along one of these routes.

- Academic literature has revealed Wuhan markets sold live mammals and dozens of species—including raccoon dogs, masked palm civets, and a variety of other mammals, birds, and reptiles—often in poor conditions where viruses can jump among species, facilitating recombination events and the acquisition of novel mutations. SARS-CoV-2 can infect a range of mammals, including cats, dogs, pangolins, minks, raccoon dogs, and a variety of wild and domestic animals, according to academic literature.

- Wider Hubei Province has extensive farming and breeding of animals that are susceptible to SARS-CoV-2, including minks and raccoon dogs.

PA00960

These analysts note that there is a precedent for viral vectors to travel long distances in China and cause infection elsewhere because of transportation and trade nodes, thereby widening and complicating the search for the specific zoonotic spillover incident. For instance, the bat coronavirus that is currently the closest known relative to the original SARS-CoV-1 was identified in Yunnan Province, even though the first SARS outbreak detected in humans occurred in Guangdong Province, hundreds of kilometers away.

## The Case for the Laboratory-Associated Incident Hypothesis

One IC element assesses with moderate confidence that COVID-19 most likely resulted from a laboratory-associated incident involving WIV or other researchers—either through exposure to the virus during experiments or through sampling. Some analysts at elements that are unable to coalesce around either explanation also assess a laboratory origin with low confidence. These analysts place emphasis on academic articles authored by WIV employees indicating that WIV scientists conducted research on other coronaviruses under what these analysts consider to be inadequate biosafety conditions that could have led to opportunities for a laboratory-associated incident. These analysts also take into account SARS-CoV-2's genetic epidemiology and that the initial recorded COVID-19 clusters occurred only in Wuhan—and that WIV researchers who conducted sampling activity throughout China provided a node for the virus to enter the city.

### WIV Research Includes Work With Animals That Carry Relatives of SARS-CoV-2

The analysts that find the laboratory-associated origin theory most likely assess that WIV researchers' inherently risky work with coronaviruses provided numerous opportunities for them to unwittingly become infected with SARS-CoV-2. Although the IC has no indications

> **WIV Illnesses in Fall 2019 Not Diagnostic**
>
> The IC assesses that information indicating that several WIV researchers reported symptoms consistent with COVID-19 in autumn 2019 is not diagnostic of the pandemic's origins. Even if confirmed, hospital admission alone would not be diagnostic of COVID-19 infection.

that WIV research involved SARS-CoV-2 or a close progenitor virus, these analysts note that it is plausible that researchers may have unwittingly exposed themselves to the virus without sequencing it during experiments or sampling activities, possibly resulting in asymptomatic or mild infection. Academic literature indicates that WIV researchers conducted research with bat coronaviruses or collected samples from species that are known to carry close relatives of SARS-CoV-2.

- Based on currently available information, the closest known relatives to SARS-CoV-2 in bats have been identified in Yunnan Province, and researchers bringing samples to laboratories provide a plausible link between these habitats and the city.

- These analysts also note that China's investigations into the pandemic's origin might not uncover evidence of a laboratory-associated incident if it involved only a small number of researchers who did not acknowledge or have knowledge of a potential infection.

### Biosafety Conditions for Specific Work Could Have Led to an Incident

The analysts that assess COVID-19 most likely originated from a laboratory-associated incident also place emphasis on information suggesting researchers in China used biosafety practices that increased the risk of exposure to viruses. Academic publications suggest that WIV researchers did not use adequate biosafety precautions at least some of the time, increasing the risk of a laboratory-associated incident.

PA00961

NIC | NATIONAL INTELLIGENCE COUNCIL

## The Role of the Huanan Seafood Wholesale Market

Some scientists and China's public health officials have shifted their view on the role of the Huanan Seafood Wholesale Market in the pandemic since early 2020. Some now view the market as a potential site of community spread rather than where the initial human infection may have occurred.

- On January 1, 2020, China's security authorities shut down the market after several workers fell ill in late December 2019. China focused early source tracing on the market and Hubei Province; association with the market was included as part of the early case definition.

- In January 2020, a scientific article that described clinical features of initial COVID-19 infections in China found that some COVID-19 patients did not have any known association with the market. Furthermore, there continues to be conflicting data with some academic articles and preprints noting that phylogenetic analysis of the available data on the earliest cases suggests that the progenitor virus may not have originated from the market.

## China's Transparency Key to Determining COVID-19 Origin

The IC judges that closing persistent information gaps on the origins of COVID-19 is very likely to require greater transparency and collaboration from Beijing. The scientific community lacks technical data on a reservoir species, possible intermediate species, and closer relatives to SARS-CoV-2.

**Data and Samples From Initial Cases:** The global scientific community does not know exactly where, when, or how the first human infection with SARS-CoV-2 occurred. It lacks a complete picture of

the initial cases in Wuhan—or potentially elsewhere in China—that would allow it to better understand potential sources of infection or conduct phylogenetic analysis that would help validate both hypotheses.

**Information That Would Confirm Natural Outbreak:** Searching for a natural reservoir or potential intermediate host requires collecting, isolating, and sequencing viruses from samples taken from potential host species and environments to search for viruses related to SARS-CoV-2, endeavors that require international collaboration, resources, and time.

- Information that the earliest confirmed COVID-19 cases were in individuals or families who spent time in rural regions or who were involved in animal trade or environments that facilitate close human-to-animal interactions could indicate that the virus was circulating within an animal reservoir and a zoonotic spillover event caused the first COVID-19 case in humans.

- However, some transmission pathways are fleeting, meaning an animal acquires a virus and evidence of infection vanishes, particularly if the animals are reared and harvested for agricultural or commercial purposes.

**Information That Would Confirm Laboratory-Associated Incident:** China's coronavirus research or related information from origins investigations by Beijing or international organizations could provide clear indications of a laboratory-associated incident or at least yield some new insights.

PA00962

**WIV's Publicly Available Coronavirus Research**

IC analysts are examining published research from China for any indicators that would inform our understanding of COVID-19's origins. The WIV and other research groups in China published coronavirus articles in 2020 and 2021, including the discovery of the closest known relative of SARS-CoV-2, but at least some relevant data on coronaviruses of interest has either been unavailable or has not been published.

Although the WIV described the sampling trip to the mineshaft in Mojiang in Yunnan Province where it collected RaTG13 in 2016, it did not explicitly state that RaTG13 was collected from that mine until 2020. Similarly, the WIV collected eight other coronaviruses from the same mine in 2015 that it did not fully disclose until 2021. In some of these instances, however, the WIV has described unpublished work in webinars and interviews prior to publishing.

## China Likely To Impede Investigation

The IC judges they will be unable to provide a more definitive explanation for the origin of COVID-19 unless new information allows them to determine the specific pathway for initial natural contact with an animal or to determine that a laboratory in Wuhan was handling SARS-CoV-2 or a close progenitor virus before COVID-19 emerged.

- For instance, Beijing limited the World Health Organization (WHO) investigation team's access to sites.

- In late July, China denounced a WHO plan for future investigations into COVID-19 origins, claiming that the proposal for future investigations was politicized. China's officials publicly rebuked the WHO's plans for a future study of labs in China,

saying Beijing would not allow the WHO to engage in the "conspiracy theory."

China is also pushing its narrative that the virus originated outside China.

- Public statements from China's Government have continued to claim the virus originated from imported frozen food, an extremely unlikely theory.

- China's Government continues to spread allegations that the United States created or intentionally spread SARS-CoV-2 to divert attention away from Beijing.

PA00963

# NIC | NATIONAL INTELLIGENCE COUNCIL

## Annex A: Definitions

**Antibody:** A protein produced during an immune response to a part of an infectious agent called an antigen.

**Backbone:** A genetic sequence used as a chassis upon which to build synthetic constructs, such as those used for cloning, protein expression, and production.

**Biological weapon:** A weapon that uses bacteria, viruses, toxins, fungi, and biochemical/biomolecule agents that can cause death or injury to humans, plants, or animals or destroy materials.

**Biosafety:** The application of knowledge, techniques, and equipment to prevent personal, laboratory, and environmental exposure to potentially infectious agents or biohazards. Four **Biosafety levels (BSL)** define the containment conditions under which biological agents can be safely manipulated. These standards range from moderate safety requirements for low-risk agents (BSL-1), to the most stringent controls for high-risk agents (BSL-4). China's standards range from P1–4.

**Biosecurity:** The protection, control of, and accountability for biological agents, toxins, and biological materials and information to prevent unauthorized possession, loss, theft, misuse, diversion, and accidental or intentional release.

**Coronavirus:** A common type of virus that can infect humans and/or animals. The human illness caused by most coronaviruses usually last a short time and presents symptoms consistent with the "common cold," such as a runny nose, sore throat, cough, and a fever.

**COVID-19:** An infectious disease caused by the **SARS-CoV-2** virus, which is a betacoronavirus.

**Diagnostic information:** Information that allows IC analysts to distinguish between hypotheses—in this case, the laboratory origin and natural origin theories.

**DNA (deoxyribonucleic acid):** A molecule that carries an organism's genetic blueprint for growth, development, function, and reproduction.

**Epidemiology:** The study of the distribution and determinants of health-related events in specified populations, and the application of this study to prevent and control health problems.

**Furin cleavage site (FCS):** A region in the spike protein of SARS-CoV-2 that enhances infection.

**Gain-of-function:** The IC considers this as a research method that involves manipulating an organism's genetic material to impart new biological functions that could enhance virulence or transmissibility (e.g., genetically modifying a virus to expand its host range, transmissibility, or severity of illness). The IC assesses that genetic engineering, genetic modification, and laboratory-adaptation can all be used for gain-of-function experiments, but are not inherently so. We address both genetic engineering and laboratory-adaptation in the body of this assessment; the IC is unaware of an agreed, international definition.

**Genetically engineered or genetically modified viruses** are intentionally altered, created, or edited using biotechnologies, such as Clustered Regularly Interspaced Short Palindromic Repeat (CRISPR), DNA recombination, or reverse genetics. These viruses have intentional, targeted edits to the genome designed to achieve specific results, but unintentional genomic changes may also occur.

**Genome:** The genetic material of an organism. It consists of DNA (and sometimes RNA for viruses).

**Genome sequencing:** The process of determining the DNA or RNA sequence of an organism's genome, or its "genetic code." An organism's genetic code is the order in which the four nucleotide bases—adenine, cytosine, guanine, and thymine—are arranged to direct the sequence of the 20 different amino acids in the proteins that determine inherited traits.

**Intermediate species/host:** An organism that can be infected with a pathogen from a resevoir species and

PA00964

**NIC** ||||||||||                    NATIONAL INTELLIGENCE COUNCIL

passes the pathogen to another host species; infection is not sustained in this population.

**Laboratory-adapted viruses** have undergone natural, random mutations through human-enabled processes in a laboratory—such as repeated passage through animals or cells—that put pressure on the virus to more rapidly evolve. Specific changes to the viral genome are not necessarily anticipated in these processes, though the virus can be expected to gain certain characteristics, like the ability to infect a new species. This is a common technique used in public health research of viruses. We consider directed evolution to be under laboratory adaptation.

**Laboratory-associated incidents** include incidents that happen in biological research facilities or during research-related sampling activities.

**Molecular biology:** Study of the molecular basis of activities in and between cells. This includes techniques to amplify or join genetic sequences.

**Naturally occurring viruses** have not been altered in a laboratory. Viruses commonly undergo random mutations as part of the evolutionary process and can continue to change over time; mutations may enable a virus to adapt to its environment, such as evading host immune responses and promoting viral replication.

**Outbreak:** A sudden increase in occurrences of a disease in a particular time and place. Outbreaks include **epidemics**, which is a term that is reserved for infectious diseases that occur in a confined geographical area. **Pandemics** are near-global disease outbreaks.

**Pangolin:** An African and Asian mammal that has a body covered in overlapping scales. Pangolins are a natural reservoir of coronaviruses and researchers are investigating their potential role as an intermediate host for SARS-CoV-2.

**Pathogen:** A bacterium, virus, or other microorganism that can cause disease.

**Phylogenetics:** The study of the evolutionary relationships among groups of organisms.

**Progenitor virus:** A virus that is closely related enough—probably more than 99 percent—to SARS-CoV-2 to have been its direct ancestor or plausible immediate origin of the outbreak. The closest known relative to SARS-CoV-2 is only around 96 percent similar; to put this into context, humans and chimps are around 99 percent similar, demonstrating the signficant differences even at this similarity.

**RaTG13:** A coronavirus with the closest known whole genome to SARS-CoV-2, although it is widely believed to not be a direct ancestor of SARS-CoV-2.

**Resevoir species/host:** An organism that harbors a pathogen, which is endemic within the population.

**RNA (ribonucleic acid):** A molecule essential for gene coding, decoding, regulation, and expression. Certain viruses use RNA as a genetic blueprint.

**Transmissibility:** The measure of new infections initiated by an existing infection.

**Virus:** A replicating piece of genetic material—DNA or RNA—and associated proteins that use the cellular machinery of a living cell to reproduce.

**Wet market:** A market where fresh food and live and dead animals, including wildlife, are sold.

**Zoonosis:** An infection or a disease that is transmissible from animals to humans under natural conditions. A **zoonotic pathogen** may be viral, bacterial, or parasitic, and can sometimes be transmitted through insects, such as mosquitoes.

**Zoonotic spillover:** An initial infection or disease that is caused by contact between an animal and human under natural conditions.

PA00965

**NIC** ▌▌▌▌▌▌      N A T I O N A L   I N T E L L I G E N C E   C O U N C I L

## Annex B: IC Examination of Open-Source Theories

IC analysts have examined a number of open-source articles from a variety of sources that have raised theories about SARS-CoV-2 and COVID-19's origin. The IC assesses that these theories generally do not provide diagnostic information on COVID-19 origins, and in some cases, are not supported by the information available to us. However, several have drawn on insightful methods or identified potential leads.

### Theory of Abnormal Activity at the WIV in Fall 2019

The IC assesses that an assessment about abnormal activity at the WIV in fall 2019 lacks support and does not offer diagnostic insight. The Multi-Agency Collaboration Environment (MACE) published a report assessing that the pandemic began in October 2019 because of a release at the WIV.

- Although the methodology is insightful, the IC has concerns with the small data set and analytic rigor used to derive the group's findings, and our review of information directly contradicts some of its findings.

### Theory That SARS-CoV-2 Was a Biological Weapon

The IC assesses that public claims from a Hong Kong virologist that Beijing created SARS-CoV-2 as a biological weapon are inconsistent with available technical information on coronaviruses. We assess that the articles contain several technical inaccuracies and omit key data points.

- Since September 2020, a virologist who worked in a WHO-affiliated laboratory in Hong Kong has publicly stated that Beijing created SARS-CoV-2 from bat coronaviruses and that China's researchers intentionally released it. The scientific community did not peer review these articles and some publicly rejected the articles' claims as scientifically unsound.

### Theory That SARS-CoV-2 Was Genetically Engineered

The IC assesses that public claims that some distinguishing features in SARS-CoV-2 are the result of genetic engineering are not diagnostic of genetic engineering. The IC has been evaluating how SARS-CoV-2 could have developed these features and notes that the furin cleavage site (FCS)—a region in the spike protein that enables infection and has been the topic of open-source debate—can also be consistent with a natural origin of the virus.

We do not fully understand the diversity of natural coronaviruses or how often they recombine, suggesting that there are plausible natural means by which these features in SARS-CoV-2 could have emerged beyond what we currently understand.

- For example, the author of an article in April notes the SARS-CoV-2's FCS is unique among known betacoronaviruses. The author argues that such features are rare and so well-adapted for human infection that they are more likely emerged from laboratory work than from natural selection.

- Although an IC review of scientific literature has indicated that no known betacoronaviruses in the same subgenus have this FCS in the same region of the spike protein as SARS-CoV-2, similar FCSs are present in the same region of the spike protein as other naturally occurring coronaviruses, according to scientific articles.

We also do not find credible a now-withdrawn preprint article from two Indian educational institutes posted in January 2020 that asserted SARS-CoV-2 was genetically engineered using sequences from the human immunodeficiency virus. We assess it is unlikely that scientists would have chosen to intentionally engineer the specific sequences that were the focus of the scientific article.

PA00966

 **NATIONAL INTELLIGENCE COUNCIL**

## Theory That SARS-CoV-2 Originated Outside China

We are aware of scientific studies claiming to have found SARS-CoV-2 viral fragments or antibodies in samples taken before November 2019 outside China. However, technical flaws in some of these studies, uncertainties in the methodologies, and in some cases, the lack of a credible review process make us skeptical of their utility in determining the pandemic's origin.

- We assess that the first cluster of confirmed COVID-19 cases arose in Wuhan, China, in late 2019, but we lack insight—and may never have it—on where the first SARS-CoV-2 infection occurred. Although all of the earliest confirmed cases of COVID-19 were documented in China's Hubei Province, where Wuhan is located, according to Western and China's press reports, it is plausible that a traveler came in contact with the virus elsewhere and then went to Wuhan.

- We continue to monitor scientific publications and discuss these issues with experts. Even if the virus is found to have existed outside China before the Wuhan outbreak, credible evidence of human infection would also be necessary to determine if the first COVID-19 outbreak began there.

PA00967

# NIC ▐▌▐▌▐▌▐▌▐▌    NATIONAL INTELLIGENCE COUNCIL

## Annex C: IC Approach to 90-Day Study

The NIC collaborated closely with the National Counterproliferation Center (NCPC), the National Intelligence Management Council (NIMC), IC agencies, and other USG entities and departments on this assessment. The IC kicked off the 90-day study by outlining the core intelligence questions that would be addressed over lines of effort—collection and analysis. These questions included:

- Did the outbreak begin through contact with infected domestic or wild animals or was it the result of a laboratory-associated incident?

- Was the virus genetically engineered?

- Is SARS-CoV-2 a biological weapon?

**Collection:** At the kick-off meeting for the 90-day study, the IC discussed core intelligence gaps to drive collection moving forward.

**Analysis:** The NIC had two separate structured analytic exercises to discuss both the underlying reporting and to strengthen argumentation moving into the drafting phase. Analysts at individual agencies also pursued various structured analytic techniques to build their own assessments.

- During a two-day-long in-person IC-wide **Analysis of Competing Hypothesis (ACH)** analytic exercise in June, analysts determined whether existing reporting was consistent or inconsistent with information in individual reports. This exercise allowed analysts to determine that most reporting was consistent with both hypotheses and the reporting that was inconsistent was deemed to be not credible.

- Before the start of drafting, the NIC hosted an IC-wide **Team A/Team B** analytic exercise to explore how the IC could strengthen either hypothesis through a debate style format. Agencies pulled from these conversations—along with the work conducted during and before the study—to solidify their consensus positions.

PA00968

Case 1:20-cv-00454-DCN Document 54-6 Filed 06/11/22 Page 16 of 189

**NIC** ▮▮▮▮▮▮▮   NATIONAL INTELLIGENCE COUNCIL

## Annex D: Outside Review

The NIC conducted four rounds of outside review of the draft assessment.  These sessions provided valuable feedback that we incorporated into the assessment.  The NIC made some organizational changes in response to comments; comments included:

- Emphasize points of agreement.

- Provide additional definitions in the lexicon and ensure technical or intelligence jargon is explicitly explained.

PA00969

# NIC |||||||||||     NATIONAL INTELLIGENCE COUNCIL

## Annex E: Questions

Answers to the following questions would help us better evaluate hypotheses related to the origins of COVID-19:

What additional information—to include timing, location, relevant animal exposures, occupational information, and clinical samples—is there on the earliest cases of COVID-19?

How were early cases investigated? What questions or tools were utilized for tracing contacts and contacts of those contacts?

What direct or indirect indicators of COVID-19 clusters is China aware of from early in the outbreak? This may include things like hospital occupancy rates or efforts to triage medical care outside of hospital facilities.

What insight can China provide on the search for the reservoir and potential intermediate species of the COVID-19 virus?

What insight can China provide on the search for the identification of a progenitor virus? Have any leading candidates or regions for spillover been identified?

What information, data, and/or samples does China have on wildlife or other animals present in the following markets in Wuhan:

- Huanan Seafood Wholesale Market

- Qiyimen Live Animal Market

- Baishazhou Market

- Dijiao Outdoor Pet Market

What information, data, and/or samples does China have on wildlife present in the other markets, wildlife rescue centers, and/or farms in Wuhan, across Hubei, in neighboring provinces, or in locations where live animals in Hubei Province are sourced from?

PA00970