# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## NOTICE OF SERVICE OF DISCOVERY

**PLEASE TAKE NOTICE** that on the 1st day of December, 2021, counsel to the

Defendants in the above-captioned adversary proceeding served the documents listed below on

the individual(s) listed on the service list attached hereto as Exhibit A and in the manner

indicated.

### CHAPTER 7 TRUSTEE'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS; AND

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_DE:236772.2 05233/003

**CHAPTER 7 TRUSTEE'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS**

Dated:  December 2, 2021                    PACHULSKI STANG ZIEHL & JONES LLP

_/s/ Colin R. Robinson_
Bradford J. Sandler (DE Bar No. 4142)
Beth E. Levine (NY Bar No. 2572246) (admitted _pro hac vice_)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:      bsandler@pszjlaw.com
            blevine@pszjlaw.com
            crobinson@pszjlaw.com
            pkeane@pszjlaw.com

_Counsel to Alfred T. Giuliano, Chapter 7 Trustee_

PA00972

# EXHIBIT A

DOCS_DE:236772.2 05233/003

Art Van Furniture – Todd Stewart/Jennifer Sawle
WARN Act Service List
Main Case No. 20-10553 (CSS)
Adv. Case No. 20-50548 (CSS)
Doc. No. 232772v2
04 – E-Mail

*Via Email*
Michael J. Joyce, Esquire
THE LAW OFFICES OF JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Email: mjoyce@mjlawoffices.com

*Via Email*
Jack A. Raisner, Esquire
René S. Roupinian, Esquire
Gail C. Lin, Esquire
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, New York 10016
Email: rsr@raisnerroupinian.com;
      jar@raisnerroupinian.com
      gcl@raisnerroupinian.com

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

</div>

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Debtors. | |

<div align="center">

**PLAINTIFFS' BRIEF IN OPPOSITION TO TRUSTEE'S MOTION FOR**
**SUMMARY JUDGMENT AND CROSS-MOTION TO DEFER RULING**

</div>

Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

OF COUNSEL:

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and the putative class*

PA00976

## TABLE OF CONTENTS

STATEMENT OF NATURE AND STATUS OF PROCEEDING .................................................... 1

SUMMARY OF ARGUMENT ...................................................................................................... 1

STATEMENT OF FACTS IN SUPPORT OF CROSS-MOTION TO DEFER ............................. 2

ARGUMENT ................................................................................................................................. 4

    I.    Legal Standard for Summary Judgment and the Applicable Burden of Proof ........................ 4

    II.    The Court Should Defer Ruling on the Motion to Allow for Discovery ................................. 5

    III.    Defendants Were Not a Liquidating Fiduciary in March 2020 ................................ 6

    IV.    The Cause of the Employees' Termination Has Not Been Proven ........................................ 11

    V.    Defendants Have Not Proved that COVID-19 is a Natural Disaster or that the Layoff was Due to it ....................................................................................................................... 23

CONCLUSION ............................................................................................................................. 28

i

PA00977

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*,
    CV 2020-0310-JTL, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020) .............................................. 25

*Adickes v. S. H. Kress & Co.*,
    398 U.S. 144 (1970) .......................................................................................................... 5

*Benson v. Enter. Leasing Co. of Fla., LLC*,
    No. 6:20-CV-891-ORL-LRH, 2021 WL 1078185, (M.D. Fla. Jan. 4, 2021) ........................ 15, 26

*Carver v. Foresight Energy LP*,
    No. 3:16-CV-3013, 2016 WL 3812376 (C.D. Ill. July 12, 2016) .............................................. 24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................................................................... 5

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
    467 U.S. 837, (1984) ........................................................................................................ 24

*Ciarlante v. Brown & Williamson Tobacco Corp.*,
    143 F.3d 139 (3d Cir. 1998) ............................................................................................... 24

*Connecticut Gen. Life Ins. Co. v. C.I.R.*,
    177 F.3d 136 (3d Cir. 1999) ............................................................................................... 28

*Doe v. Abington Friends School*,
    480 F.3d 252 (3d Cir. 2007) ................................................................................................. 5

*Easom v. US Well Servs., Inc.*,
    527 F. Supp. 3d 898 (S.D. Tex. 2021) .......................................................................... passim

*Grimmer v. Lord Day & Lord*,
    937 F.Supp. 255 (S.D.N.Y.1996) ........................................................................................ 23

*Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*,
    173 F.3d 175 (3d Cir. 1999) ............................................................................................... 28

*In Official Comm. of Unsecured Creditors of United Healthcare Sys., Inc. v. United Healthcare
    Sys., Inc. (In re United Healthcare Sys., Inc.)*,
    200 F.3d 170 (3d Cir. 1999) ............................................................................................. 7, 8

*In re Deb Stores Holding LLC*,
    14-12676 (KG), 2018 WL 1577606 (Bankr. D. Del. Mar. 28, 2018) ........................................ 6

PA00978

*In re Dewey & Leboeuf, LLP,*
   507 B.R. 522 (Bankr. S.D.N.Y. 2014) ........................................................ 23

*In re Kiwi Int'l Air Lines, Inc.,*
   344 F.3d 311 (3d Cir. 2003) ..................................................................... 5

*In re Tweeter OPCO,*
   453 B.R. 534 (Bankr. D. Del. 2011) ......................................................... 23

*In re World Mktg. Chicago, LLC,*
   564 BR 587 (Bankr. N.D. Ill. 2017) ..................................................... 7, 10

*IT Litig. Trust v. Alpha Analytical Labs (In re IT Grp., Inc.),*
   331 B.R. 597 (Bankr. D. Del. 2005) ......................................................... 5

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) .......................................................................... 27

*Law v Am. Capital Strategies,*
   CIV. 3:05-0836, 2007 WL 221671 (M.D. Tenn. Jan. 26, 2007) ................. 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
   475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ........................... 5

*Newman as Tr. of World Mktg. Tr. v. Crane, Heyman, Simon, Welch, & Clar,*
   435 F. Supp. 3d 834 (N.D. Ill. 2020) ....................................................... 23

*Sides v. Macon Cty. Greyhound Park, Inc.,*
   725 F.3d 1276 (11th Cir. 2013) ............................................................... 23

*Thomas Jefferson Univ. v. Shalala,*
   512 U.S. 504 (1994) .............................................................................. 28

*U.S. v. Diebold, Inc.,*
   369 U.S. 654 (1962) .............................................................................. 5

**Statutes**

11 U.S.C. § 503 .......................................................................................... 4
11 U.S.C. § 503(b)(1)(A) ............................................................................ 2
11 U.S.C. § 507 .......................................................................................... 4
11 U.S.C. § 726 .......................................................................................... 4
29 U.S.C. § 2101 ........................................................................................ 2
29 U.S.C. § 2102(b)(2)(A) ......................................................................... 11
29 U.S.C. § 2102 (b)(2)(B) .................................................................. 24, 27
29 U.S.C. § 2102(b)(3) ......................................................................... 22, 27
29 U.S.C. § 2107 ....................................................................................... 24

iii

**Rules**

Fed. R. Bankr. P. 7056 ........................................................................................ 5
Fed. R. Civ. P. 56 ............................................................................................... 1
Fed. R. Civ. P. 56(a) .......................................................................................... 5
Fed. R. Civ. P. 56(c) .......................................................................................... 5
Fed. R. Civ. P. 56(d) ...................................................................................... 2, 6

**Regulations**

20 C.F.R. § 639.9 ............................................................................................... 5
20 C.F.R. § 639.9(b) ......................................................................................... 12
20 C.F.R. § 639.9(c)(1)-(3) ............................................................................... 24
20 C.F.R. § 639.9(c)(3) ..................................................................................... 27
20 C.F.R. § 639.9(c)(4) ..................................................................................... 24
*Worker Adjustment and Retraining Notification*,
    54 FR 16042-01 (1989 WL 278605) .......................................................... 6, 7

PA00980

## STATEMENT OF NATURE AND STATUS OF PROCEEDING

Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated (the "Plaintiffs"), submit the following under Fed. R. Civ. P. 56 in opposition to the Motion for Summary Judgment (D.I. 43, 44 (the "Motion")) filed by the Chapter 7 Trustee (the "Trustee") for Debtors Art Van Furniture, LLC and its affiliates ("Art Van" or "Defendants" or "Debtors").

## SUMMARY OF ARGUMENT

1.  The Trustee moves for judgment on three factual issues: (1) that Defendants were a "liquidating fiduciary"; (2) that they decided to conduct a mass layoff caused by an unforeseeable business circumstance; and (3) that the layoffs were caused by a natural disaster. Defendants have not proffered a single similar case in which any of these factual findings were made prior to discovery. This Motion must be deferred until discovery is complete.

2.  But even without discovery, Defendants' own submissions show clearly that they are not entitled to judgment on any of these issues. When the Defendants terminated the putative class it was operating at least a quarter of its stores as a going concern. No court has been asked to, no less has agreed to treat such an employer as a liquidating fiduciary. That would be an oxymoron.

3.  Defendants have not proved that a natural disaster caused the mass layoff, nor can it. While the COVID virus may have developed naturally, the human invention that arguably spread it disqualifies it as a "natural disaster." Absent reliable evidence as to COVID's emergence, all inferences must be drawn in favor of Plaintiffs. Nor have Defendants proved that COVID-19 was a business circumstance that *caused* the mass layoff. Even the inchoate record plausibly suggests that Defendants' board was motivated by other factors than COVID-19. Even if COVID-19 were found to be an unforeseeable natural disaster, the evidence already suggests that the board was bowing to pressures greater than the temporary COVID-19 measures when it shut down the stores.

1

4. Because Defendants' Motion is premature and Plaintiffs are entitled to take discovery, Plaintiffs cross-move under Rule 56(d) to defer consideration of Defendants' Motion.

<u>**STATEMENT OF FACTS IN SUPPORT OF CROSS-MOTION TO DEFER**</u>

On March 8, 2020, Defendants each filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. (Bankr. No. 20-10553, D.I. 2). On March 10, 2020, the Debtors' cases were consolidated for joint administration. (Bankr. No. 20-10553, D.I. 71). On April 7, 2020, the bankruptcy case was converted to Chapter 7 and the Chapter 7 Trustee was appointed. (Bankr. No. 20-10553, D.I. 263, 264).

On March 23, 2020, Plaintiffs commenced an adversary proceeding against the above-captioned Debtors in this Court (Adv. Proc. No. 20-01584-VFP (CSS) (the "Adversary Proceeding"), D.I.[2] 1) alleging that Debtors violated the Federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. (the "WARN Act") and seeking relief on behalf of a putative class of present or former employees of the Defendants.

On December 10, 2020, Defendants filed an Answer to the Complaint wherein they generally deny the allegations and assert several affirmative defenses, including that the terminations were caused by unforeseeable business circumstances, that notice was not required because the terminations were caused by a natural disaster, that Debtors acted in good faith, and that the Plaintiffs' claims are not entitled to first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A). (D.I. 25).

On April 28, 2021, Plaintiffs served their First Set of Interrogatories and Request for Production of Documents on Debtors. (Declaration of René S. Roupinian ("Roupinian Decl.") and Exhibits, attached hereto as **Exhibit 1**, ¶3; Ex. A. to Roupinian Dec. ) The parties informally

---

[2] For the balance of this Memorandum, "D.I." alone refers to the docket of the Adversary Proceeding.

PA00982

exchanged information regarding the composition of the putative class, covered sites and damages, discussed the substantive issues of the case, and agreed to stay formal discovery pending mediation. (Roupinian Decl., ¶4).  The parties negotiated a Stipulated Scheduling Order, entered by the Court on June 10, 2021, reflecting the parties' intention to conduct informal discovery. (Roupinian Decl., ¶¶ 4-5; Ex. B to Roupinian Decl., ¶11) and "fact discovery[] shall be completed and closed within [180] days from the filing of the Mediator's report." (Ex. B to Roupinian Decl., ¶ 22).

On June 21, 2021, pursuant to the parties' agreement to informally exchange documents, Plaintiffs' Counsel emailed an informal request to Trustee's counsel seeking information regarding, *inter alia*, Defendants' efforts to raise capital, the circumstances leading to Plaintiffs' terminations, the effects of the COVID pandemic, efforts to avoid mass layoffs, and minutes of Board of Directors' meetings.  (Roupinian Decl., ¶6; Ex. C to Roupinian Decl.).

On July 12, 2021, the Trustee's Counsel responded, naming certain public documents and court filings, and producing a total of three documents: (1) Art Van Holding Co., Inc. Q1 Board Member Meeting dated February 4, 2020 (heavily redacted), (2) Board Member Minutes dated April 2, 2020 (almost entirely redacted), and (3) Wind Down Plans dated March 23, 2020. (Roupinian Decl., ¶7; Ex. D to Roupinian Decl.).

On July 27, 2021, the parties participated in a mediation with the Hon. Kevin Gross but did not settle the Adversary Proceeding, as set forth in the Mediator's Final Report filed on October 15, 2021. (Roupinian Decl. ¶8; Report, D.I. 39).  Thereafter, the parties were to resume written discovery pursuant to the pretrial scheduling order entered on June 10, 2021.  (Ex. B to Roupinian Decl., ¶ 22).  The parties exchanged Rule 26(a) disclosures on October 29, 2021. (D.I. 41-42).

On October 29, 2021, the Trustee filed a First Amended Answer to the Complaint.  (Roupinian

PA00983

Decl., ¶10; Ex. E to Roupinian Decl.). In its First Amended Answer, the Trustee denies that Debtors were a WARN "employer" and asserts additional defenses, namely that Plaintiffs are required to arbitrate their claims, that at the time notice was required Art Van was a liquidating fiduciary, and that Debtors acted in good faith. The Trustee also denies Plaintiffs' WARN claims are entitled to priority under 11 U.S.C. § 503, 11 U.S.C. § 507 and 11 U.S.C. § 726. (Ex. E to Roupinian Decl., ¶¶ 57-59, 66-67, 71).

On November 16, 2021, Plaintiffs' counsel contacted Trustee's counsel to request that the Trustee serve overdue responses to the first set of discovery requests served on April 28, 2021. (Roupinian Decl., ¶11; Ex. F to Roupinian Decl.).

On November 17, 2021, Plaintiffs served Plaintiffs' Second Request for Production of Documents to Defendants and a corresponding Certificate of Service. (Roupinian Decl., ¶12; Ex. G to Roupinian Decl.). The Second Request for Production of Documents seeks documents relevant to the newly raised affirmative defenses in the Trustee's First Amended Answer, including communications with Defendants' owners and Wells Fargo relating to financing for the company and efforts to liquidate the company. (Ex. G to Roupinian Decl., Request Nos. 11-17). On December 1, 2021, two days before Plaintiffs' response to the Trustee's Motion for Summary Judgment was due, Trustee's counsel served written responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents, which Plaintiffs had served more than 6 months prior. The Trustee produced no documents in conjunction with those responses. (Roupinian Decl., ¶13; Ex. H to Roupinian Decl.).

## ARGUMENT

### I. Legal Standard for Summary Judgment and the Applicable Burden of Proof

The Trustee's Motion must be denied if the Court finds a genuine dispute over any material

4

fact. Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. In evaluating the evidence, the Court must view the inferences to be drawn from the facts in the light most favorable to the non-movant. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (same); *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 316 (3d Cir. 2003) (citation omitted) (same). A genuine issue of material fact exists where, given the evidence, a reasonable jury could rule in favor of the non-movant. *IT Litig. Trust v. Alpha Analytical Labs (In re IT Grp., Inc.)*, 331 B.R. 597, 600 (Bankr. D. Del. 2005). Under the WARN Act, the employer bears the burden of proof that conditions for the exceptions, that permit the giving of notice less than 60 days in advance, have been met. 20 C.F.R. § 639.9.

## II. The Court Should Defer Ruling on the Motion to Allow for Discovery

The Trustee's Motion is premature because Plaintiffs have not had an opportunity to conduct meaningful discovery on his fact-intensive affirmative defenses, one of which he only first asserted days before filing his Motion.

A party seeking summary judgment must support its position by citing to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the record in the light most favorable to the non-moving party while drawing all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). This standard assumes that there is a fully developed evidentiary record to examine. *Doe v. Abington Friends School*, 480 F.3d 252, 257 (3d Cir. 2007) ("[I]t is well established that a court "is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery … This is necessary because, by its very nature, the summary judgment process presupposes the existence of an adequate record.").

As attested to in the Roupinian Declaration, Plaintiffs have not received documents, or been able to take depositions, concerning Defendants' purported liquidation process, the operations of the stores during the pendency of the bankruptcy, Defendants' efforts to obtain financing, and the decision-making process that led to the terminations of Defendants' employees. These facts directly relate to the Trustee's liquidating fiduciary defense, unforeseeable business circumstances defense, and natural disaster defense. Because of the lack of meaningful discovery on these issues, Plaintiffs are unable to justify their opposition to most of the facts asserted in the Trustee's Motion. (Roupinian Decl., ¶15; Pls.' Resp. to Trustee's Statement of Undisputed Material Facts, filed contemporaneously herewith). Pursuant to Fed. R. Civ. P. 56(d), the Court should therefore defer ruling on the Motion until Plaintiffs have had the opportunity to take relevant discovery. *See In re Deb Stores Holding LLC*, 14-12676 (KG), 2018 WL 1577606, at *3 (Bankr. D. Del. Mar. 28, 2018) (deferring summary judgment ruling under Rule 56(d) because "[t]he Court agrees with the Plaintiff and finds that further discovery is necessary.")

### III. Defendants Were Not a Liquidating Fiduciary in March 2020

The phrase "liquidating fiduciary" neither appears in the text of the WARN Act or its notice and comment Regulation. It appears only in a preamble that the Department of Labor ("DOL") appended to the Regulation in the Federal Register. *Worker Adjustment and Retraining Notification*, 54 FR 16042-01 (1989 WL 278605). The preamble recounts that a commentator had asked whether a bankruptcy fiduciary should be treated as a WARN "employer" required to provide notice. The DOL opined "that a fiduciary whose *sole function* in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a 'business enterprise' [the statutory definition of "employer"] in the normal commercial sense." *Id.* at *16045. The DOL qualified

PA00986

that further by stating "where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary *would* succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation." *Id.* (emphasis added). Given that the Code authorizes Chapter 11 debtors in possession to operate their businesses, the DOL's explanation of "liquidating fiduciary" excludes, on its face, Chapter 11 debtors. *In re World Mktg. Chicago, LLC*, 564 BR 587, 600 (Bankr. N.D. Ill. 2017) (under the Code, "the sole function of the chapter 11 debtor in possession or trustee is *not* to liquidate").

The Third Circuit's *United Healthcare* decision is the sole authority in this Circuit interpreting the DOL's preamble language of "operating business" and "normal commercial sense." *In Official Comm. of Unsecured Creditors of United Healthcare Sys., Inc. v. United Healthcare Sys., Inc.* (*In re United Healthcare Sys., Inc.*), 200 F.3d 170 (3d Cir. 1999) ("*United Healthcare*"). Under *United Healthcare*, Defendants here were indisputably operating their business not as a liquidating fiduciary but rather as a going concern employer when they terminated the putative class.

In *United Healthcare*, the defendant hospital's board accepted an offer to sell its assets to another hospital and close. Three days later, United Healthcare announced that it would close and surrendered its certificates of need. *Id.* at 173. The same day, it (1) filed a voluntary Chapter 11 bankruptcy petition, (2) provided its approximately 1,300 employees with 60 days' notice of termination, and (3) filed an emergency application for the sale of its goodwill. *Id.*

Within the next 48 hours, United Healthcare had transferred or sent home all its patients. *Id.* Thereafter, United Healthcare's employees were "unable to perform their regular duties but instead cleaned, took inventory, and prepared the company assets for sale." *Id.* They were terminated two weeks later, well short of their 60 days' notice. *Id.* Although the employees were awarded WARN backpay, the Committee appealed, claiming that the debtor had ceased to be a "business enterprise"

7

at the point when they had been reduced from care-givers to caretakers.

Reversing, the Third Circuit panel held:

> [W]hether a bankrupt entity is an 'employer' under the WARN Act depends on the nature and extent of the entity's business and commercial activities while in bankruptcy. … The more ore closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act."

*Id.* at 178. Given the hospital's complete abandonment of its ability to do business and the replacement of all its employees normal activities with cleaning and inventory-taking, the panel held that the activities no longer resembled those of going concern. *Id.*

Defendants have not pointed to a single employee whose activities changed before they were terminated. Not only did the company *resemble* a going concern, it was largely, in fact, a going concern. Defendants declared when filing their Chapter 11 petition on March 8, that they planned to conduct a "going concern" sale of 44 stores and two distribution centers during its proceedings. (Ladd Declaration, D.I. 46-1 at 11-12[3]). Those stores comprised almost half of the 92 furniture showrooms. (*Id.*, D.I. 46-1 at 16, ¶27). The goal was to "preserve the going concern on the balance and hopefully save those thousands of jobs" and provide a benefit to creditors. (Transcript of Hearing on March 10, 2020, D.I. 46-1 at 45 lines 11-13.)

Defendants were operating, in large part, as a retailer seller in the "ordinary course" throughout the period of March 8 to March 19 under its Cash Collateral order, which required that it do so. (Cash Collateral Order, D.I. 46-1 at 151.) According to its own motion and proposed Order, which the Court entered on March 16, as a DIP loan borrower Debtor was prohibited from sales "outside the ordinary course of business[.]" (*Id.*) Not only did Defendants have to sell in the "ordinary

---

[3] Page citations to docket entries refer to the page number assigned by the ECF system, e.g., "Pages 10-11 of 201" here.

PA00988

course," they were given authorization to purchase inventory in the *ordinary course* of business during the bankruptcy. (DIP Motion, D.I. 46-2 at 11). They were precluded from deviating in any respect from "ordinary course" of business. (*Id.*, D.I. 46-2 at 14 ("Limitations on Use of Proceeds"). They were prohibited from "[s]ubstantially chang[ing] the nature of the business in which [they were] currently engaged" or "purchas[ing] or invest[ing], directly or indirectly, in any assets or property *other than in the ordinary course* of business or other than those which are useful in, necessary for and are to be used in [their] business, as presently conducted." (DIP Credit Agreement, D.I. 46-2 at 60.)

Defendants also planned to wind down their other stores and operations through "going-out-of-business" ("GOB") sales. (Ladd Declaration, D.I. 46-1 at 4, ¶6.) It had begun the process prepetition, with a "soft launch" of GOB sales on March 5. (*Id.*, D.I. 46-1 at 11, ¶18.) Between that date and March 8, the date of the petition, Defendants' "deposits from inventory sales were in excess of $23.0 million." (Conversion Motion, D.I. 46-2 at 112, ¶22.) Its deposits from sales for the post-petition week ending March 15th, were $8.0 million. (*Id.*) Defendants' operating reports through October 2020 show receipts of millions of dollars each month, presumably from receipts from its sale of goods to its customers in its stores. (2020 Monthly Operating Reports of Art Van Furniture, LLC for May-Oct., Bankr. D.I. 790, 842, 1025, 1026, 1027, 1079).

Unlike the United Healthcare employees, Defendants' employees were performing their jobs exactly as they had prepetition on the day they were terminated. Defendants needed "GOB" signage so that customers would be aware they were going to go out of business. Indeed, the stores from which Defendants terminated approximately 1,000 class members on March 19 were ones that Defendants told the Court on March 19 they were "attempting to operate as much as possible in the ordinary course." (Transcript of Hearing on March 19, 2020, D.I. 46-5 at 25 lines 8-12.)

9

*In re World Marketing Chicago* is instructive here because, like Art Van, the World Marketing business entered bankruptcy hoping to keep itself afloat for 60 days. 564 B.R. at 602. World Marketing announced that it was shutting down operations, yet had also filed motions to use cash collateral, claiming the cash was necessary "to operate its business." *Id.* It further stated that failure to pay its payroll in a timely fashion would "jeopardize its ability to reorganize." *Id.*

The *World Marketing* court found that even "if the Debtors were conducting their business solely for the purposes of a sale, they were engaged in some form of business," and found several compelling reasons not to apply the "court-made liquidating fiduciary exception." *Id.* at 603. First, exceptions to WARN should be "applied sparingly" given it is "remedial legislation and its exceptions are to be construed narrowly." *Id.* Second, the debtor's public representations regarding reorganization should have some binding effect. Even under the *United Healthcare* exception the court found the debtor "unentitled to the benefit of the liquidating fiduciary exception." *Id.* Here, Defendants' continuing of its business with either "going" appellation, "going concern" or "going out" still denotes business is going on. Customers are enticed to come in and do business equally. United Healthcare's patients were not invited to come in for medical care when its employees were sweeping up. Defendants stretch the loose concept of "liquidation" to cover the monetization of any assets once a shutdown is planned. But Congress enacted WARN precisely to require notice to employees 60 days before a planned shutdown. As one court explained when granting the plaintiff's motion to strike the liquidating fiduciary defense, the exception would "swallow the rule" and "eviscerate [WARN]" if taking the "preliminary steps towards liquidation, while otherwise continuing to carry on its business" exempted an employer from notice. *Law v Am. Capital Strategies,* CIV. 3:05-0836, 2007 WL 221671, at *17 (M.D. Tenn. Jan. 26, 2007).

10

## IV. The Cause of the Employees' Termination Has Not Been Proven

On the surface, Defendants' narrative of their unforeseeable business circumstances ("UBC") defense seems plausible: a company accelerates its WARN mass layoff from 60 days of notice to fifteen, because COVID-19-triggered government orders prevented it from continuing its wind down sales. On closer inspection, however, the record, such as it is, indicates a different story—one that warrants formal discovery. It shows that the Art Van Board of Directors were officers of its private equity owner, T.H. Lee, which had steered it into a disastrous LBO and steep decline. (AVF Holding Company Inc. Board Minutes, Apr. 2, 2020, attached hereto as **Exhibit 2**). They were "out-of-the-money" custodians serving, in effect, the under-secured lenders. Unsurprisingly, while the professionals were in Bankruptcy Court, approaching the temporary COVID issues with the constructive, problem-solving creativity valued there, the Board raced ahead to terminate the workforce permanently - triggering obligations that promptly led the cases to convert.

The WARN Act provides: "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). The Department of Labor's WARN regulation interprets "circumstances" as meaning those *outside* the company's control that are sufficiently extreme:

(1) An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition ***outside the employer's control***. …

(2) The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. …

11

PA00991

20 C.F.R. § 639.9(b) (emphasis added).  Whether the cause of the mass layoff's acceleration was the onrush of COVID-19 or the fated, final liquidity crisis in the long death spiral can be discerned in the statement of the parties before the Bankruptcy Court in March 2020.

In January 2020, as the world fell into the grip of COVID-19, Art Van fell into the control of its secured lenders.  The company's situation became critical as its ABL facility borrowing base was further restricted and its access to credit tightened. (Ladd Declaration, D.I. 46-1 at 8, ¶13.)

On January 31, 2020, the World Health Organization issued a Global Health Emergency[4] and the U.S. declared a Public Health Emergency.[5]  On February 5, the company defaulted on its ABL facility and Wells Fargo agreed to forbear until February 28 to allow it to explore a capital raise. But Wells Fargo took "cash dominion" and required the company to begin immediate GOB liquidation before the 28th if the effort was unsuccessful.  (Ladd Declaration, D.I. 46-1 at 8, ¶14.)

In February, COVID-19 crossed paths with Art Van and it was fateful. T.H. Lee Partners had formed a Consortium with Art Van's founders to attempt the capital raise.  But on February 27, COVID set off the sharpest fall of the stock markets since 2008, with the Dow falling 1,191 points, its largest one-day drop in history.[6]  The Consortium purportedly failed to secure the necessary capital commitments because the coronavirus made the Consortium investors' unwilling to contribute the capital.  (Ladd Declaration, D.I. 46-1 at 8-9, ¶15).  What followed was no surprise.

When Defendants filed their bankruptcy petition on March 8th, Defendants owed its secured lenders approximately $208.5 million: a Term Loan of $175 million under its Term Loan and $33.5 to Wells Fargo its ABL lender, all secured by its assets.  (Ladd Declaration, D.I. 46-1 at 17, ¶31).

---

[4] *Coronavirus Declared Global Health Emergency by WHO*, BBC News, Jan. 31, 2020, available at https://www.bbc.com/news/world-51318246.
[5] *US Declares Public Health Emergency Over Coronavirus,* ABC News, Feb. 1, 2020, available at https://abcnews.go.com/Health/delta-suspends-us-flights-china-amid-coronavirus/story?id=68666037.
[6] *Dow Falls 1,191 Points – The Most in History*, CNN, Feb. 27, 2020, available at https://www.cnn.com/2020/02/27/investing/dow-stock-market-selloff/index.html.

PA00992

Their only cash on hand was $11.6 million in cash dominion. (Transcript of Hearing on March 10, 2020, D.I. 46-1 at 78 line 19 to 79 line 6).

Under the plan budget, Defendants would sell collateral through GOB sales that would pay for expenses of Chapter 11 and pay down the ABL revolver. (Transcript of Hearing on March 10, 2020, D.I. 4-1 at 80 line 16 to 81 line 19). Under Wells Fargo's dominion order, Defendants would give Wells Fargo a schedule, saying they need certain things funded and the bank would fund based on the items that it approved to be funded. (*Id.*). Having received deposits from its Store Closing Sales from March 5-8, 2020, in excess of $23.0 million, Defendants reaped $8.0 million more from sales in the first week of its bankruptcy through March 15th. (Conversion Motion, D.I. 46-2 at 112, ¶22). Starting around March 14 some states in which Art Van operated issued "guidance" or closure orders for certain establishments. (Conversion Motion, D.I. 46-2 at 112-113, ¶¶ 22-23.) All these orders were "temporary." (*See, e.g.*, Wolf Order, D.I. 46-4 at 90; Whitmer Order, D.I. 46-4 at 93).

At the March 19 Court status conference, Defendants' counsel downplayed the impact of the government guidance and directives. Defendants' counsel touched on the "different buckets of stores" some of which were the subject of "going concern sales that were largely completed" and eight whose "store closing sales had begun before the filing" and others that were going to be the Levin-Wolf going concern stores." (Transcript of Conference on March 19, 2020, D.I. 46-5 at 25 line 19 to 26 line 7). Counsel then added that, as to those "where we still had ongoing GOBs and -- or were attempting to operate as much as possible in the ordinary course, the company has made the -- you know, the difficult decision, effective as of today, to tell employees not to report to work at those locations." (*Id.*, D.I. 46-5 at 25 lines 8-12).

13

Defendants' counsel stated the it was the company's "hope" that the locations it had "at least temporarily, shuttered" that day would not be "forever," but asserted the need to "adapt consistent with our obligations and fiduciary duties." (*Id.*, D.I. 46-5 at 25 lines 12-18).

Defendants' counsel echoed the sentiment of America's employers when it expressed the need for its clients to act as fiduciaries by adapting to the hoped-for temporary crisis that faced the country. Indeed, in the week Defendants let go their employees over 3.3 million others were filing for unemployment, nearly five times more than the one-week record set during the Great Recession.[7]

But many of those 3.3 million Americans were *not* laid off *permanently.* Employees may file for unemployment when they are no longer paid, such as when they were told to take temporary unpaid time off as in temporary layoffs or furloughs. Employers adopted such approaches, included pay cuts, or reduced hour arrangements rather that terminating their employees permanently, due to the temporary nature of COVID-19. To help them meet the unprecedented challenge, the federal government began enacting unprecedented solutions and support. On March 6, after Defendants gave 60 days' notice to its workforce, and prior to its bankruptcy filing, the president signed the first, $8 billion coronavirus relief bill.[8] The day prior to the second WARN notice, on March 18, he signed a $192 billion bill.[9] Then, on March 25, the Senate unanimously passed and the president signed two days later, the largest economic stimulus package in U.S. history - a $2.2 trillion dollar package that included, among other things, payroll money,

---

[7] *A Record 3.3 Million Americans Filed for Unemployment Benefits,* Washington Post, March 26, 2020, available at https://www.washingtonpost.com/business/2020/03/26/unemployment-claims-coronavirus-3-million/.
[8] *Trump Signs $8.3 Billion Emergency* Package, CBS News, Mar. 6, 2020, available at https://www.cbsnews.com/news/trump-signs-8-3-billion-emergency-package-to-combat-coronavirus/.
[9] *Trump Signs Coronavirus Relief Measure*, ABC News, Mar. 18, 2020, available at https://abcnews.go.com/Politics/mcconnell-urges-colleagues-support-coronavirus-economic-relief-bill/story?id=69664853.

PA00994

unemployment benefits money, and health care coverage.[10]  Starting in mid-March, temporary paid time in the form of furloughs, layoffs and workforce reductions become prevalent. Millions of employees were put on extended leaves while they waited (and hoped) to be recalled back to work.  While many others lost their jobs, only a dozen WARN Act cases arose in the next six months.[11]  Until today, only two COVID-era WARN Act cases have been reported in the case law - suggesting that COVID did not require kneejerk terminations violating WARN. *See Benson v. Enter. Leasing Co. of Fla., LLC*, No. 6:20-CV-891-ORL-LRH, 2021 WL 1078185, (M.D. Fla. Jan. 4, 2021), vacated sub nom. *Benson v. Enter. Leasing Co. of Orlando*, LLC, No. 6:20-CV-891-RBD-LRH, 2021 WL 1080914 (M.D. Fla. Feb. 4, 2021); *Easom v. US Well Servs., Inc*., 527 F. Supp. 3d 898, 900 (S.D. Tex. 2021).

Upon learning that the Defendants had suspended store operations, the Court "cut to the chase" and inferred that Defendants' counsel was communicating that the final interim cash collateral order hearing would not be going forward the next day, on March 20.  Although not denying it, Counsel segued into a discussion of the company's alternatives to dispel any thought of an immediate shutdown.  (Transcript of Conference on March 19, 2020, D.I. 46-5 at 27 lines 3-14).

Defendants' Counsel sought to immediately make "clear" that "we are trying to explore with our lenders and our other stakeholders … other options short of outright liquidation."  (*Id.*, D.I. 46-5 at 27 lines 9-14).  Counsel specifically mentioned the ongoing "Craftworks" case currently pending before Judge Shannon, in which a pause in the Chapter 11 closing sale plan process was being entertained to adapt to the COVID directives.  (*Id.*).  Counsel continued by intoning the spirit of problem-solving and dialogue:

---

[10] *Trump Signs $2 Trillion Coronavirus Relief Bill*, CNBC, Mar. 27, 2020, available at https://www.cnbc.com/2020/03/27/house-passes-2-trillion-coronavirus-stimulus-bill-sends-it-to-trump.html.
[11] *As Fall Approaches, WARN Act Lawsuits Likely to Heat Up*, National Law Review, Sept. 1, 2020, available at https://www.natlawreview.com/article/fall-approaches-warn-act-lawsuits-likely-to-heat.

PA00995

So let me just say then, conceptually, we are looking at the possibility of…going idle or going into a state of dormancy for a period of time, and then the possibility then of either…reopening stores, some subset of stores as, either in furtherance of the going concern transaction…or…closing sales and an orderly liquidation, you know, essentially, once the economic and retail environment and the safety environment have improved to a degree that we can do that. … [T]here are a number of scenarios under consideration… we are right now, engaging in a dialogue with Wells Fargo and our term loan lenders to see if there's a way to pursue that alternative.

(*Id.*, D.I. 46-5 at 27 line 23 to 28 line 13). Defendants' counsel warned, however, that Wells Fargo needed to cooperate, stating the need for

cooperation from the ABL agent and the term loan lenders and… assurances that, while we are having these dialogues…they'll ***take no precipitous action*** to make that -- an already difficult situation worse by [] sweeping all of the cash, for example, that are in the debtors' cash collection accounts and leaving us without even the cash necessary to fund those operating and restructuring expenses already incurred or that might be incurred imminently, as we're [] trying to navigate this situation.

(*Id.*, D.I. 46-5 at 28 line 17 to 29 line 3) (emphasis added).

There was a marked difference, however, between what Defendants told the Court and what it told its employees on March 19. That day, Defendants sent WARN notices telling their thousands of employees that they were permanently terminated. They would receive no pay and no benefits, including health insurance, after that day. (WARN Notice, D.I. 46-5 at 14). But, in Bankruptcy Court, it was Defendants' counsel who was pressuring Wells Fargo not to act precipitously.

Wells Fargo's counsel, Jennifer Feldsher stated: "Debtors' decisions, unfortunately, are coming at us minutes before these hearings." (Transcript of Conference on March 19, 2020, D.I. 46-5 at 30 lines 1-2). She continued that while the bank wanted "to try to find a path forward…for all stakeholders," the debtors here, "as opposed to other cases," had not "fully come to their creditors, other than to say this is somebody else's problem and, put -- you know, fix it for us or don't sweep or do these things." (*Id.*, D.I. 46-5 at 30 lines 2-9). She said "unfortunately, we haven't gotten the information that we need from the company to be able to even consider a full wind-down plan. (*Id.*, D.I. 46-5 at 30 lines 16-18).

16

Creditors' committee counsel, Mr. Sandler, appointed the day before, carried forward the spirit of cooperation and resistance to simply "pull the plug" as the hallmarks of professionalism. (*Id.*, D.I. 46-5 at 36 lines 14-19). He said "there are other things besides, you know, dollar recoveries." (*Id.*, D.I. 46-5 at 35 lines 15-17). He mentioned the hope that "44 stores would be saved, thousands of jobs would be saved. Maybe that will happen down the road." (*Id.*, D.I. 46-5 at 35 lines 18-21). He emphasized the probability that putting the winddown "on ice" would be advantageous:

> We're talking about something that is not perishable. [F]urniture, whether[] it's in the store today or…a month…or two months from now, it's still the same furniture. So it should be relatively easy to shut the debtor down without any value that would dissipate because of the furniture somehow [] getting destroyed or damaged.

(*Id.*, D.I. 46-5 at 36 lines 6-13). But, he continued, "pulling the plug" would be detrimental:

> Restructuring professionals are…supposed to come up with creative solutions to very very tough problems. And it may be easy to … pull the plug and say let's convert the case to a Chapter 7. I'm not really sure what that gets you. … And it seems to me that this is a creative approach to put everything on ice. And hopefully [] at some time period, whether it's 30 days, 60 days, 90 days…to [] turn the lights back on and resume the liquidation of the stores and hopefully find a going concern for the Wolf Levin properties.

(*Id.*, D.I. 46-5 at 36 line 14 to 37 line 3). He said the committee favored "put[ting] everything on ice and let's come back to in[]a month or two and see." (*Id.*, D.I. 46-5 at 37 lines 4-9).

As he spoke these words, Mr. Sandler, the Court, and perhaps even Defendants' counsel may not have realized that the Defendants *had* effectively "pulled the plug" that day. Defendants had already terminated their workforce *permanently* triggering insurmountable obligations. This came to light at the March 31 conference, when Defendants announced the cases were about to convert to Chapter 7. As counsel made clear, the company had, on March 19, steered the company off the course charted by counsel in open court. Without consultation or communication, Defendants accelerated the terminations and resultant payments with the improbable expectation that the bank would cover them, including the D&O liability Defendants had brought upon themselves.

17

Reporting to the Court what had happened, Defendants' counsel Mr. Werkheiser put it genteelly that "we were not able to get to a point where we had the agent support and consent for the mothball arrangement primarily because of the company's liquidity issues and cash needs, both as they exist today based on obligations that have accrued thus far since the filing and the expected obligations[.]"  (Transcript of Hearing on Mar. 31, 2020, D.I. 46-5 at 53 lines 1-6).

Mr. Werkheiser then explained that many of the more than 4,000 employees were salespeople. They earned commission when furniture was delivered - which meant a "long tail" of outstanding commissions on over $30 million in sales, earned "in the couple of weeks that the debtors were operating in bankruptcy" were suddenly now due.  (*Id.*, D.I. 46-5 at 53 lines 15-21).  Moreover, there was an even more substantial tail created by the partially self-funded health plan which had been cancelled on March 19.  Those obligations were "approaching $10 million" and the cash in the estate was, he believed, $12 to $13 million.  (*Id.*, D.I. 46-5 at 53 line 22 to 54 line 7).  He said that unless the company could get beyond "the next 12 hours," the debtors would "likely have no choice but to move forward with seeking conversion of these cases to a Chapter 7 liquidation" - insinuating that the estate's fate was up to others. (*Id.*, D.I. 46-5 at 56 lines 15-22).

Wells Fargo's counsel then presented the stark reality: the problem was Defendants' *uncontemplated mass terminations*, which accelerated obligations - already at $16.5 million - that Defendants insisted the bank underwrite to insulate their D&O's.

Ms. Feldsher noted the importance of a "willing partnership between the debtors and their stakeholders." (*Id.*, D.I. 46-5 at 58 lines 5-10).  To that end, "Wells Fargo has funded every single payroll request that the debtors have made for current pay."  (*Id.*, D.I. 46-5 at 58 lines 20-23).  But Defendants' decision to immediately suspend operations, including where there were no shutdown orders in place, and "to terminate all" or "significantly all of their employees," she said, "was not

18

something that was done in coordination with the lenders, either the ABL lender or the term lender, or even the [Gordon Brothers store-closing] consultant …who…had remained to support the debtor's efforts to try to continue a GOB sale." (*Id.*, D.I. 46-5 at 59 lines 1-13). Ms. Feldsher continued: "[s]o, as a result of terminating their employees, … the debtors now have significant accrued PTO commissions, other benefits related to the terminated employees as well as healthcare obligations. Most of these were not included in any budget and certainly in the cash collateral budget because there was **no contemplation of a wholesale mass termination of employees**." (*Id.*, D.I. 46-5 at 59 lines 14-20) (emphasis added).

She indicated these obligations could have been avoided had employees been laid off temporarily: "Could these have been mitigated if employees had been furloughed [or by] less drastic more spaced out termination we will never know… but now these expenses exist." (*Id.*, D.I. 46-5 at 59 lines 20-25). "[J]ust the employee obligation alone" were over $14 million. (*Id.*, D.I. 46-5 at 60 lines 1-4). But Defendants were seeking another $2.5 million for a professional fee carve out - thus the demand of the estate was for $16.5 million not taking into account any other expenses that might result. (*Id.*, D.I. 46-5 at 60 line 22 to 61 line 2). She stated that "there is no scenario the debtors have put forth that they believe provides the ABL lenders with payment in full." (*Id.*, D.I. 46-5 at 61 lines 8-10). Wells Fargo had "no issue paying for employee wages that are coming due" for further operations but could not make the blank-check assurances Defendants were demanding (*Id.*, D.I. 46-5 at 61 line 21 to 62 line 4). Ms. Feldsher pointed out Wells was being asked to undertake "obligations for which [Defendants] perceive that there might be D&O liability." (*Id.*, D.I. 46-5 at 62 lines 17-19).

She stated that Defendants would only provide the information creditors needed if Wells Fargo made "guarantee that all potential liabilities for the directors and officers are taken care of full

19

stop." (*Id.*, D.I. 46-5 at 63 lines 16-21). Wells Fargo, she explained, was "not in a position to do that today. We simply can't." (*Id.*, D.I. 46-5 at 63 lines 21-25). As Ms. Feldsher described it, Wells Fargo would "prefer that we did this consensually" but Defendants were making "late in the evening demands that say you must pay what we believe are $16 and a half million dollars of obligations and we'd like to take that money today." (*Id.*, D.I. 46-5 at 64 lines 1-12). Ms. Feldsher ended by returning to Wells' commitment:

> If the debtors want to work cooperatively, we are here. … we will fund payroll expenses for employees and [] we will fund payroll expenses for employees that remain at the company today and certain those that we need going forward. But we cannot give the debtors assurances that we are going to fund something to deal with D&O liabilities today. It's just not appropriate and we're not in position to do so.

(*Id.*, D.I. 46-5 at 65 line 19 to 66 line 1).

When the Court tried to drill down on the unfunded employee obligations, Ms. Feldsher asked to speak, but Mr. Werkheiser interjected, and was told:

> THE COURT: …You will get your opportunity to speak. I'm trying to figure out the facts and, frankly, I'm not getting them very well from you where I have to ask your client and others to tell me what's actually going on.

(*Id.*, D.I. 46-5 at 79 line 23 to 80 line 2).

As Defendants' financial advisor, Mr. Stogsdill, had informed the Court, the commissions for March would have been paid in April but, "because we terminated everybody and shut down the operations, we moved them up to be paid one to two weeks after the closing" - i.e., $2.2 million had to be paid that very week. (*Id.*, D.I. 46-5 at 77 lines 2-11).

Ms. Feldsher restated the problem: "So, the commissions, Your Honor, have not been paid yet and they have not been paid because as you heard from Mr. Werkheiser, *these were delayed and they were accelerated*, as Mr. Stogsdill said. *They have been accelerated unilaterally by the company to be payable now.* (*Id.*, D.I. 46-5 at 81 lines 21-25) (emphasis added). There were no provisions for those obligations or the unpaid PTO or vacation that were triggered by the

unanticipated termination of "all of their workforce." (*Id.*, D.I. 46-5 at 81 lines 6-8). Emphasizing the issue of transparency, she stated:

> "We've tried very very hard with the debtors … but we need definitive numbers, not estimates. We need actual numbers. We need to know exactly what is being requested.

(*Id.*, D.I. 46-5 at 83 lines 4-9).

Defendants' counsel argued that Wells Fargo shared the blame for the "impossible situation," because as the ABL lender, it had committed to the payroll expenses and it needed to "pay the freight," including the healthcare plan benefits. (*Id.*, D.I. 46-5 at 83 lines 21-23). He stated:

> I do appreciate the difficult situation and perhaps the impossible situation that the court is in and everybody else is in. But what I'm talking about is enforcing a choice that not just the debtor but the lenders made in the order that they agreed to and had Your Honor enter. That order explicitly says that the debtors had the ability to use the cash collateral to meet the payroll obligations.

(*Id.*, D.I. 46-5 at 88 lines 13-20). But the Court referred Mr. Werkheiser to the interim cash collateral order:

> THE COURT: It says payroll obligations and irreparable harm expenses.
>
> MR. WERKHEISER: Yes, Your Honor.
>
> THE COURT: And the only payroll obligations that I've heard are salary, wages, and commissions that have been (indiscernible) but unpaid through today. …The healthcare reimbursements are not payroll obligations. They're just not. Under no reasonable definition of what payroll obligations are would they include healthcare reimbursements under a terminated healthcare policy, many of which are prepetition. And it's terrible and it's ridiculous that in this country you have to have a job to have health insurance, but that is the law.

(*Id.*, D.I. 46-5 at 89 lines 1-14).

Of course, twelve days earlier, on March 19, Defendants had eliminated the employees' jobs and health insurance at the height of the pandemic - passing the unpredictable risks on to them. Just as Defendants insinuated to the Court that the closures were temporary, and that they would work constructively with the stakeholders, they had in fact foreclosed any opportunity to defer

obligations and negotiate alternatives by taking unilateral permanent action against the employees.

Responding to the Court, Mr. Werkheiser called the employee obligations the "dirty laundry" which he had not prepared himself to discuss: "I understand where the court is coming from. Your Honor, again, despite us airing our *respective* dirty laundry in front of the court today which is not what we had set out to do this afternoon[.]" (*Id.*, D.I. 46-5 at 89 lines 15-19) (emphasis added). He again put it on the lenders to "pay the freight." (*Id.*, D.I. 46-5 at 90 lines 2-21).

Although Defendants may have been liberal in passing some taint along with their burdens, they were less liberal when it came to sharing their financials and plans. This observation is not a matter of hindsight: it was articulated in court at the time. Defendants froze out the stakeholders and ran roughshod over its "Planned Liquidation Process" deciding to cause the ultimate liquidity crises when terminating its workforce. No one had demanded that they do that on March 19 - not Wells Fargo and certainly not COVID-19. What COVID-19 demanded of employers was a transparent, problem-solving approach - the hallmark of Chapter 11 stewardship, not what Defendants did.

WARN, in particular, requires such transparency. Congress required employers to spell out specifically in their WARN notice what prevented them from providing full notice. 29 U.S.C. § 2102(b)(3). That means Defendants had to identify in the March 19 notice why they could not keep employees employed until May 5 as promised - with or without pay or deferments. The notice provided platitudes, not specifics: "Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact." (WARN Notice, D.I. 46-5 at 14). COVID-19 forced every employer to adapt. But that did not result in universal mass terminations. It was not COVID-19 alone, but COVID-19 *plus something else* that caused Defendants to permanently terminate its workforce on March 19. In the end, it was their

PA01002

own impetuosity. Defendants chose to keep others in the dark, pull the plug and play the blame game. Defendants, not an unforeseeable outsider - caused the mass layoff that day.

Summary judgment is not appropriate in favor of Defendants, but it may well be in favor of Plaintiffs - even before the commencement of discovery. The statement in a shortened WARN notice must provide "reasonably specific facts that make an exception to the statutory notice period applicable, 'providing an adequate, specific explanation to affected workers'"). *Grimmer v. Lord Day & Lord,* 937 F.Supp. 255, 256-57 (S.D.N.Y.1996), *cited in In re Tweeter OPCO,* 453 B.R. 534, 547 (Bankr. D. Del. 2011) (striking UBC defense because notice merely stated: "Unfortunately, due to adverse business conditions outside our control, we are not able to give you advance notice."). To say the company was "impacted by the novel COVID-19 virus … resulting, and sudden, negative economic impact" is amorphous. It would permit Defendants to "assert litigation-convenient but factually post-hoc justifications for their actions" which is why their defenses may warrant dismissal as a gating issue. *Newman as Tr. of World Mktg. Tr. v. Crane, Heyman, Simon, Welch, & Clar,* 435 F. Supp. 3d 834, 843–44 (N.D. Ill. 2020), *quoting Sides v. Macon Cty. Greyhound Park, Inc.,* 725 F.3d 1276, 1285-86 (11th Cir. 2013). *See also In re Dewey & Leboeuf, LLP,* 507 B.R. 522, 533-34 (Bankr. S.D.N.Y. 2014) (striking affirmative defenses where notice stated the firm was "unexpectedly experiencing extraordinary difficulties [and] [u]nfortunately, the situation is deteriorating at a more rapid pace than was initially anticipated").

## V. Defendants Have Not Proved that COVID-19 is a Natural Disaster or that the Layoff was Due to it

To carry their burdens of proof, Defendants must prove that COVID-19's spread was a natural disaster, and that the mass layoffs were a direct result of COVID-19. They have not done so because they cannot. The WARN Act provides an exception to the 60-day notice requirement in

PA01003

the case of "natural disaster." It provides in pertinent part:

> No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.

29 U.S.C. § 2102 (b)(2)(B). Although Congress did not define the phrases "natural disaster" or "due to," it expressly delegated to DOL authority to promulgate interpretive regulations. 29 U.S.C. § 2107. In the Third Circuit, these regulations are given "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145 (3d Cir. 1998), *citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, (1984). The regulation states in pertinent part:

> (1) Floods, earthquakes, droughts, storms, tidal waves or tsunamis and similar effects of nature are natural disasters under this provision.
>
> (2) To qualify for this exception, an employer must be able to demonstrate that its plant closing or mass layoff is a direct result of a natural disaster.
>
> (3) While a disaster may preclude full or any advance notice, such notice as is practicable, containing as much of the information required in §639.7 as is available in the circumstances of the disaster still must be given, whether in advance or after the fact of an employment loss caused by a natural disaster.

20 C.F.R. § 639.9(c)(1)-(3). To ensure the exception is narrowly construed, the DOL added:

> (4) Where a plant closing or mass layoff occurs as an indirect result of a natural disaster, the exception does not apply but the "unforeseeable business circumstance" exception described in paragraph (b) of this section may be applicable.

20 C.F.R. § 639.9(c)(4).

For Defendants to carry their defense, they must prove that the SARS-CoV-2 virus is naturally occurring and that the spread of COVID-19 was free of human intervention. *Easom v. US Well Services, Inc.*, 527 F. Supp. 3d 898, 907 (S.D. Tex. 2021), citing *Carver v. Foresight Energy LP*, No. 3:16-CV-3013, 2016 WL 3812376, at *1, 4 (C.D. Ill. July 12, 2016), ("human involvement in the origins of the combustion events would seem to preclude the events from being considered a

PA01004

natural disaster.)"  Although the Defendants rely on *Easom,* that case was decided in August 2020, well before the scrutiny over COVID-19's origins shifted from the wet market to the laboratory in Wuhan.  Nor were those points raised in the only case cited in *Easom* that COVID-19 "emerged naturally." *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, CV 2020-0310-JTL, 2020 WL 7024929, at *58 (Del. Ch. Nov. 30, 2020).  Hewing to the general rule recognized by the *Eason* and *Carver* courts, the Delaware Chancery court opined that a human intervention such as the human creation of COVID-19 as a "bioweapon", if true "could undermine its status as natural disaster" but that the record did not support that contention.  *Id*. at fn. 214.

In the absence of any certainty regarding origins of COVID-19, no court can "rule" as to whether COVID-19 is, or is not, a natural disaster at this point. Defendants cannot avail themselves of this affirmative defense on which they bear the burden of proof, for there is no proof at this time.   The natural inference that the Court must make in Plaintiffs' favor, however, is bolstered by the intelligence community. It accords greater "confidence" to the laboratory leak theory than any other.  Although Defendants are correct that the "bioweapon" theory has been effectively debunked, the report requested by President Biden elevated the creditability of the "laboratory leak" theory above the "market" hypothesis. After examining all available intelligence, the National Intelligence Council and "four [Intelligence Community] elements" assessed with *low confidence* that the initial SARS-CoV-2 infection was most likely caused by natural exposure to an animal infected with it.  (Report, D.I. 46-5 at 173) (emphasis added). But "one Intelligence Community element assesse[d] with *moderate confidence* that the first human infection with SARS-CoV-2 most likely was the result of a laboratory-associated incident. (*Id.*) (emphasis added).  These analysts assessed that it probably involved experimentation, animal handling, or sampling by the Wuhan Institute of Virology.  They gave "weight to the inherently risky nature of

25

PA01005

work on coronaviruses." (*Id.*)  In the end "[a]nalysts at three IC elements remain unable to coalesce around either explanation without additional information. (*Id.*)  As a matter of summary judgment, however, Plaintiffs are entitled to the benefit of the laboratory origin inference.

Even assuming *arguendo*, COVID-19 is a "natural disaster" Defendants have not proved that the mass layoff directly resulted from it, as opposed to being an indirect result.  The only authority to rule on this issue held mass layoffs caused by COVID-19-related business downturns are only "indirectly" caused by COVID-19.  *Benson v. Enter. Leasing Co. of Fla., LLC*, 620CV891ORL37LRH, 2021 WL 1078185, at *4 (M.D. Fla. Jan. 4, 2021), *vacated sub nom. Benson v. Enter. Leasing Co. of Orlando, LLC*, 6:20-CV-891-RBD-LRH, 2021 WL 1080914 (M.D. Fla. Feb. 4, 2021). Neither in *Benson*, nor here, has anyone alleged that the COVID-19 disease harmed anyone directly, as a flood or earthquake might destroy a factory.  *Id.* at *4   As the *Benson* Court described: "a dramatic downturn in business" is "more akin to a factory that closes after nearby flooding depressed the local economy." *Id.*

Here, Defendants appear to be arguing that their sales volume dropped due to COVID-19 related restrictions, which led them to lay off their employees.  That would be an indirect result of COVID-19, negating the natural disaster defense.  Only a UBC defense could be available.  *Id.*

The *Benson* decision stands, for the case has settled.  For its part, the *Easom* Court interpreted the "due to natural disaster" clause in the WARN Act as offering the widest possible, "but for" scope.  *Easom*, 527 F. Supp. 3d at 915.  But that interpretation does not withstand scrutiny.  First, the Court gave no deference to DOL's express and reasonable interpretation of  the words "due to" as precluding the limitless "indirect" effects of natural disasters.  Second, the grounds on which the *Easom* Court invalidated the regulation was wholly unrelated to DOL's interpretation of those words. The *Easom* Court did so based on its misconstruction of other words of the statute as DOL

26

has now explained in an amicus brief filed on its behalf in *Benson*'s Court of Appeals docket (See Amicus of United States, attached hereto as **Exhibit 3**).

The *Easom* Court ruled the Department of Labor had no authority to prescribe its rule that "[a]n employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 20 C.F.R. § 639.9(c)(3); *Easom*, 527 F. Supp. 3d at 906.

The *Easom* Court found that incompatible with the statute itself which states that "no notice under this chapter" is necessary in the case of a natural disaster. 29 U.S.C. § 2102 (b)(2)(B). *See Easom*, 527 F. Supp. 3d at 906. But the "no notice" provision refers to the advance notice "in this chapter." The "chapter" is the entire WARN Act whose sole purpose is to a mandate advance notice. The sentence in the sub-subsection relieves *advance* notice because, as the DOL explains, it would be absurd to require *advance* notice ahead of earthquakes and the like. Congress unambiguously stated in § 2102 (b)(3) that the employer relying on subsection (b) (faltering company, UBC, and natural disasters) give as much notice as practicable. (Ex. 3 at 17-18).

Inexplicably, the *Easom* court did not cite or refer to Congress's words in 2102(b)(3). It may have, therefore, wrongly assumed that the "such notice as is practicable" language was a creature of the Department of Labor rather than the statute itself. Although the *Easom* court relied on several courts that simply quoted the "no notice" phrase from the natural disaster clause, none of those cases involved a natural disaster defense.

The defendant in *Benson* sought, in its aborted appeal, to have the Eleventh Circuit Court of Appeal adopt the *Easom*'s court's findings, including its invalidation of the Secretary's regulation and broad interpretation of the natural disaster's causation standard. The DOL's amicus brief sets forth the agency's interpretation of its own rule, which is entitled to deference. *Kisor v. Wilkie*,

27

139 S. Ct. 2400, 2424 (2019) (Roberts, J. concurring in part) ("the reasons that a court might be persuaded to adopt an agency's interpretation of its own regulation: The agency thoroughly considered the problem, offered a valid rationale, brought its expertise to bear, and interpreted the regulation in a manner consistent with earlier and later pronouncements."); *Connecticut Gen. Life Ins. Co. v. C.I.R.*, 177 F.3d 136, 144 (3d Cir. 1999) ("Once an agency has adopted regulations interpreting the statute, the agency's consistent interpretation of its own regulation will also be accorded substantial deference" and court "must defer to the [agency's ] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation'"), *quoting Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The DOL's amicus brief relies, in part, on the authority of the Third Circuit, citing *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999). (Ex. 3 at 10, 12). The brief explains that "Congress understood the natural disaster exception as applying in a narrow range of circumstances—i.e., where advance notice is generally not practicable." (*Id.* at 19). And that the Secretary sensibly read "due to" as requiring layoffs be the "direct result" of a natural disaster, while recognizing that a layoff indirectly caused by a natural disaster might be covered by the broader unforeseeable business circumstances exception. (*Id.*)

Given this stage of the litigation, in which inferences in favor of the non-movant are required, Defendants have not proved their claim that COVID-19 is a natural disaster that obviates all notice.

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny the Trustee's motion.

Dated: December 3, 2021            Respectfully Submitted,

PA01008

/s/ Michael J. Joyce
Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

OF COUNSEL :

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and the putative class*

PA01009

# EXHIBIT 1

PA01010

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC., *et al.,*[1]<br><br>               Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>               Plaintiff,<br>v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>               Debtors. | Adv. Pro. No. 20-50548 (CSS) |

## DECLARATION OF RENÉ S. ROUPINIAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION TO DEFER RULING

Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

OF COUNSEL:

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and the putative class*

René S. Roupinian hereby declares the following under penalty of perjury:

1.      I am a partner of Raisner Roupinian LLP, the law firm that represents Plaintiffs Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated ("Plaintiffs") in the above-captioned action.  I am an attorney in good standing admitted to practice in the State of New York and before this Court. I make this declaration in support of Plaintiffs' Opposition to Chapter 7 Trustee's Motion for Summary Judgment and Cross Motion to Defer Ruling.

2.      On December 10, 2020, the Chapter 7 Trustee (the "Trustee"), on behalf of the Debtors, filed an Answer to the Complaint generally denying the allegations and asserting several affirmative defenses, including that the terminations were caused by unforeseeable business circumstances, that notice was not required because the terminations were caused by a natural disaster, that Debtors acted in good faith, and that the Plaintiffs' claims are not entitled to first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A). (D.I. 1, 25).

3.      On April 28, 2021, my office served Plaintiffs' First Set of Interrogatories to Defendants, Plaintiffs' First Request for Production of Documents to Defendants and a Certificate of Service on counsel for the Trustee. (Attached hereto as **Exhibit A**).

4.      In early June 2021, I negotiated a stipulated scheduling order with counsel for the Trustee.  Among the issues we discussed was an agreed informal exchange of information to

2

PA01012

narrow the issues of contention and obtain information relevant to the makeup of the putative class given Defendants had not yet responded to Plaintiffs' First Request for Production of Documents and First Set of Interrogatories. We also agreed to stay formal discovery. This agreement is reflected in paragraph 10 of the Stipulated Scheduling Order entered by the Court on June 10, 2021 (D.I. 31, attached hereto as **Exhibit B**).

5.      The June 10th Stipulated Scheduling Order also provides that "[t]he Parties shall exchange informal discovery requests by June 21, 2021," (Ex. B, ¶ 11) and "fact discovery[] shall be completed and closed within [180] days from the filing of the Mediator's report." (Ex. B, ¶ 22). The Stipulated Scheduling Order also states that "Plaintiffs reserve the right to oppose the Trustee's Summary Judgment Motion on all grounds including, that the Trustee Motion is premature and should be filed, if at all, at the conclusion of fact discovery." (Ex. B, ¶ 20).

6.      On June 21, 2021, pursuant to the parties' agreement to informally exchange documents prior to mediation, I emailed an informal request to Trustee's counsel seeking the following information (Attached hereto as **Exhibit C**):

1.   Documents which shows that on or about Jan 5, 2020, Debtor was engaged in discussions for an amount of capital that if received would have avoided the GOB sale.

2.   Documents which show any unforeseeable business circumstance that occurred between Jan 5 and Mar 5 that made the GOB sale and sending of WARN notice on March 5 unforeseeable.

3.  Documents which show any COVID related event that took place prior to March 19 that affected Debtor's ability to remain viable.

4.  Documents which show decision(s) that precipitated Debtor's pursuit of GOB sales.

5.   Documents which show the Debtor's options up to March 19 to avoid conducting permanent terminations on or around that date.

6.  Documents which show the infeasibility of Debtor's options that would have avoided permanent terminations on or around March 19.

7.   Documents which show the number of employees Debtor engaged after March to carry out GOB sales or other business, at the eight WARN locations.

8.  Board minutes from January 1, 2020 and thereafter.

3

7.    On July 12, 2021,  Trustee's Counsel responded (response attached hereto as **Exhibit D**), naming certain public documents and court filings and producing a total of three documents: (1) Art Van Holding Co., Inc. Q1 Board Member Meeting dated February 4, 2020 (heavily redacted), (2) Board Member Minutes dated April 2, 2020 (almost entirely redacted), and (3) Wind Down Plans dated March 23, 2020.

8.    On July 27, 2021, the parties attended mediation with the Hon. Kevin Gross but no settlement was reached, as set forth in the Mediator's Final Report filed on October 15, 2021. (D.I. 39). The filing of the Mediator's Report triggered a resumption of fact discovery pursuant to the June 10 Scheduling Order. (Ex. B, ¶ 22).

9.    On October 29, 2021, the parties exchanged initial Rule 26(a) disclosures (D.I. 41-42).

10.    On October 29, 2021, the Trustee filed a First Amended Answer to the Complaint (D.I. 40) (attached hereto as **Exhibit E**). In his First Amended Answer, the Trustee denies that Debtors were an "employer" under 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639(a), and asserts additional new defenses, namely that  Plaintiffs are required to arbitrate their WARN claims, that at the time notice was required Art Van was no longer operating as a going concern but was a liquidating fiduciary, and that Debtors acted in good faith in carrying out the terminations. The Trustee also denies that Plaintiffs' WARN claims are entitled to priority under  11 U.S.C. § 503, 11 U.S.C. § 507 and 11 U.S.C. § 726. (Ex. E, ¶¶ 57-59, 66-67, 71).

11.    On November 16, 2021, Plaintiffs' counsel contacted Trustee's counsel to request the Trustee serve overdue responses to the first set of discovery requests served on April 28, 2021. On November 17, 2021, Trustee's counsel responded that Defendants would serve responses on or before December 1, 2021. (Attached hereto as **Exhibit F**).

4

12.     On November 17, 2021, my office served Plaintiffs' Second Request for
Production of Documents to Defendants and a corresponding Certificate of Service. (Attached
hereto as **Exhibit G**). The Second Request for Production of Documents seeks documents
relevant to the newly raised affirmative defenses in the Trustee's First Amended Answer to the
Complaint, including communications with Defendants' owners and Wells Fargo relating to
financing for the company and efforts to liquidate the company.   (*See, e.g.*, Ex. G, Request Nos.
11-17).

13.     On December 1, 2021, two days before Plaintiffs' response to the Trustee's
Motion for Summary Judgment was due, Trustee's Counsel propounded written responses to
Plaintiffs' First Set of Interrogatories and First Request for Production of Documents, served
April 28, 2021.  (Attached hereto as **Exhibit H**). Trustee's Counsel produced no documents in
response to those requests.

14.     Attached are true and correct copies of the documents listed and described above
in support of Plaintiffs' Opposition to Chapter 7 Trustee's Motion for Summary Judgment and
Cross-Motion to Defer Ruling.

15.     Plaintiffs have not received documents, or been able to take depositions,
concerning Defendants' purported liquidation process, the operations of the stores during the
pendency of the bankruptcy, Defendants' efforts to obtain financing, and the decision-making
process that led to the terminations of Defendants' employees.  These facts directly relate to the
Trustee's liquidating fiduciary defense, the unforeseeable business circumstances defense, and
the natural disaster defense.  Because of the lack of meaningful discovery on these issues,
Plaintiffs are unable to justify their opposition to most of the facts asserted in the Trustee's
Motion.

PA01015

DATED: December 3, 2021                     Respectfully submitted,

                                            By:   /s/ René S. Roupinian
                                                  RENÉ S. ROUPINIAN

PA01016

# EXHIBIT A

*to Declaration of René S. Roupinian*

PA01017

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS

PLEASE TAKE NOTICE that, pursuant to Rule 33 of the Federal Rules of Civil Procedure Plaintiffs Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated (the "Plaintiffs"), by and through their attorneys, requests that Debtor Art Van Furniture, LLC, et al. (together "Debtors" or "Defendants"):

## DEFINITIONS

Unless indicated otherwise, the following words and phrases are defined and used herein as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

1.　　"Plaintiffs" shall mean Todd Stewart and Jennifer Sawle, the persons named as Plaintiffs in the caption of this action.

2.　　"Defendants" or "Debtors" shall mean the entities named in the caption of this action, including each of the names under which it conducts business, its respective employees, officers, directors, agents, advisors, consultants, attorneys and representatives and all other persons under its control.

3.　　"Putative Class Members" shall mean the putative class defined as: Plaintiffs and all persons (i) who worked at, reported to, or received assignments from Defendants' Facilities, (ii) who were terminated without cause beginning on or about March 19, 2020, and within 90 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020, and (iii) who are "affected employees" within the meaning of 29 U.S.C. § 2101(a)(5).

4.　　"Facilities" shall mean the sites where Defendants conducted business operations during the period January 1, 2020 through September 30, 2020 and which fall under the WARN Act's definition of "Facility or Operating Unit" or "Single Site of Employment" (29 C.F.R. § 639.3), including, but not limited to, the facilities located at 6500 E. 14 Mile Road, Warren, Michigan, 14055 Hall Rd. Shelby Township, Michigan and 8748 West Saginaw Highway, Lansing, Michigan.

5.　　"Affirmative Defense" shall mean a ground for dismissal that Defendants have or intend to assert including in the Answer to the Complaint, dated December 10, 2020 (ECF 25).

6.　　The "WARN Act" shall mean the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq*.

PA01019

7.     "Communication" shall mean the transmittal of information in the form of facts, ideas, inquiries or otherwise such as in e-mail form.

8.     "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including without limitation, electronic or computerized data compilations such as e-mails. A draft or non-identical copy is a separate document within the meaning of this term.

9.      "Identify" with respect to documents:  When referring to documents, to "identify" means to give, to the extent known, the (i) type of document, (ii) general subject matter, (iii) date of the document, (iv) author(s), addressee(s) and recipient(s), and (v) the last known location of the document and the identity of person who has possession of it.

10.     "Identify" with respect to persons:  When referring to persons, to "identify" means to give the name, the title, the last known residence address, the last known e-mail address, and the last known business address of the person.

11.     The terms "Plaintiff" or "Defendants," as well as a party's full or abbreviated name or a pronoun referring to a party shall mean the party and, where applicable, its officers, directors, employee, partners, corporate parent, subsidiaries, or affiliates.

12.     "Person" is defined as any natural person or any business, legal or governmental entity or association.

13.     "Concerning" means relating to, referring to, describing, evidencing, or constituting.

14.     The terms "all" and "each" shall be construed as all and each.

PA01020

15.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

16.    The use of the singular form of any word includes the plural and vice-versa.

## **INSTRUCTIONS**

1.    In answering the following Interrogatories, you shall furnish all information that is available to you, including information in the possession, custody, or control of your attorneys, accountants, investigators, experts, representatives, or other agents.

2.    If, in answering the following Interrogatories, you are unable to answer fully, after exercising due diligence to obtain the information to do so, you shall answer said Interrogatory to the fullest extent possible, specifying your inability to answer the remainder, and stating whatever information or knowledge you have concerning the portion thereof not fully answered.

3.    If, in answering the following Interrogatories, you state in whole or in part "unknown" or otherwise indicate any similar lack of knowledge, you shall state by whom efforts were and are being made to obtain the information requested.

4.    If you claim that the attorney-client privilege or any other privilege is applicable to the response to any Interrogatory, you shall state the following: (a) the nature of the allegedly privileged communication, i.e., written or oral, (b) the date of that communication, (c) the parties to that communication, and (d) the subject matter and circumstances of each communication in sufficient detail to allow a ruling on such claim as to that communication.

5.    You shall respond completely to each Interrogatory or subdivision thereof, setting forth the question in full followed by each answer.

PA01021

6.      These Interrogatories are continuing in nature.  If following responses hereto additional responsive information comes into Defendants' possession or control, you are required to provide that information in a supplemental response.

## INTERROGATORIES

1.      Identify every person who participated in any discussions on behalf of Defendant regarding the decision to wind-down operations beginning on March 5, 2020 and terminate the Plaintiffs and the Putative Class Members.

**ANSWER:**


2.       Identify every individual who received the "WARN Act Notice" dated March 5, 2020 from Cathrine Wenger, Senior Counsel, that was distributed to employees (attached as Exhibit B to Plaintiffs' First Request for Production of Documents to Defendants), including a) the date received, b) his or her work address or facility to which he or she was assigned, c) the manner of distribution, and d) his or her last day of work.

**ANSWER**:


3.      Identify every individual who received the document titled "Termination of Benefits" dated March 19, 2020 (attached as Exhibit C to Plaintiffs' First Request for Production of Documents to Defendants), including a) the date received, b) his or her work address or facility to which he or she was assigned, c) the manner of distribution, and d) his or her last day of work.

**ANSWER:**

PA01022

4. Identify the total number of employees at each of Debtors' facilities where the March 19, 2020 "Termination of Benefits" (attached as Exhibit C to Plaintiffs' First Request for Production of Documents to Defendants) was distributed.

**ANSWER:**

5. Identify every individual who received the document titled "Memorandum" to "Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321" dated March 19, 2020 (attached as Exhibit D to Plaintiffs' First Request for Production of Documents to Defendants), including a) the date received, b) his or her work address or facility to which he or she was assigned, c) the manner of distribution, and d) his or her last day of work.

**ANSWER:**

6. Identify the date that drafting of the following documents began and all persons who participated in the drafting of each document:

(a) Frequently Asked Questions-Store Associates (Art Van, Levin and Wolf Closing), (attached as Exhibit E to Plaintiffs' First Request for Production of Documents to Defendants);

(b) Meeting Instructions to Art Van and Wolf Leaders (WARN Announcement/Talking Points) dated March 5, 2020 (attached as Exhibit F to Plaintiffs' First Request for Production of Documents to Defendants);

6

(c) "Frequently Asked Questions #1/ Benefits Contacts" (attached as Exhibit G to Plaintiffs' First Request for Production of Documents to Defendants); and

(d) "Important Company Announcement, Memorandum to All Team Members" dated March 5, 2020 (attached as Exhibit A to Plaintiffs' First Request for Production of Documents to Defendants).

**ANSWER:**

7.      For every meeting held (including in person, telephonically or remotely) with the Plaintiffs and Putative Class Members regarding their terminations, state the date of each meeting, identify every attendee at the meeting, and describe all written communications distributed to employees at the meeting.

**ANSWER:**

8.      Identify every employee who signed the WARN Act Notice Receipt Acknowledgment (attached as Exhibit H to Plaintiffs' First Request for Production of Documents to Defendants) and produce all lists of attendees, sign-in sheets, scripts, memos, summaries, and compilations of such lists.

**ANSWER:**

9.      State whether Defendants consulted with legal counsel regarding the drafting of Exhibits A-H to Plaintiffs' First Request for Production of Documents to Defendants and, if the answer is in the affirmative, identify the name of such legal counsel, state the date on which each communication occurred and the participants.

**ANSWER:**

10.     Identify every address and location where Defendants conducted business operations where the employees did not receive a WARN Notice and state the reason employees there did not receive a WARN Notice.

**ANSWER:**

11.     State whether Plaintiffs and the Putative Class Members were paid all earned bonuses including productivity bonuses and variable compensation following their terminations. If the answer is in the negative, please state or produce documents sufficient to determine, the amount of each Putative Class Member's accrued but unpaid bonuses and variable compensation.

**ANSWER:**

12.     Identify every partner, employee, manager, principal, or executive of Defendants who participated in any discussions leading to the decision to terminate the employment of Plaintiffs and the Putative Class Members.

**ANSWER:**

13.     State in detail why 60 days' notice was not provided to Plaintiffs and the Putative Class Members, and identify at least one officer, director, or manager of Defendants with personal knowledge thereof.

**ANSWER**:

PA01025

14. Identify each and every person who participated in drafting Exhibits A through H to Plaintiffs' First RTP to Defendants, including the dates of his or her participation.

**ANSWER:**

15. State in detail the "business circumstances that were not reasonably foreseeable at the time notice would have been required" as set forth in Defendants' First Affirmative Defense and identify at least one individual with personal knowledge of these circumstances.

**ANSWER:**

16. State every date Defendants conducted a meeting of its boards of directors during the period March 1, 2019 through June 30, 2020 and, for each date, identify the participants in the meeting.

**ANSWER:**

17. State the name of each member of Defendants' boards of directors during the period March 1, 2019 through June 30, 2020 and, for each person state the term and professional affiliation.

**ANSWER:**

18. Identify each officer, director, managing director, principal, executive, agent, employee, partner, and managing partner of any party, including, but not limited to, Thomas H. Lee Partners, L.P., who participated in the negotiation and/or decision-making of obtaining

PA01026

financing and/or working capital for Defendants during the period March 1, 2019 through March 19, 2020.

**ANSWER**:


19. Identify each and every partner, employee, manager, principal or executive of any party, including, but not limited to, Thomas H. Lee Partners, L.P. who negotiated on behalf of Defendants to enter into contracts with lenders to provide operating capital to the Facilities during the March 1, 2019 through March 19, 2020.

**ANSWER:**


20. Identify each and every meeting and/or teleconference between all employees, executive, officers, directors, advisors and agents of Defendants and sources of capital including investors or prospective investors, and lenders and prospective lenders that occurred regarding efforts to obtain financing for Defendants during the period March 1, 2019 through June 30, 2020 and, for each such meeting and/or teleconference, identify the participants and date that such meeting(s) and/or teleconference(s) occurred.

**ANSWER:**


21. Identify each and every meeting and/or teleconference between all employees, executive, officers, directors, advisors and agents of Defendants and any party regarding any transaction to sell all or parts of Defendants' business or assets during the period March 1, 2019 through June 30, 2020 and, for each such meeting and/or teleconference, identify the participants and date that such meeting(s) and/or teleconference(s) occurred.

10

**ANSWER:**


22.     Identify each and every meeting and/or teleconference between all employees,

executive, officers, directors, advisors and agents of Defendants and any party that occurred

regarding efforts to obtain new business for Defendants during the period March 1, 2019 through

June 30, 2020 and, for each such meeting and/or teleconference, identify the participants and

date that such meeting(s) and/or teleconference(s) occurred.

**ANSWER:**


23.     Identify each and every meeting and/or teleconference between all employees,

executive, officers, directors, advisors and agents of Defendants and any party that occurred

regarding efforts to liquidate Defendants during the period January 1, 2020 through June 30,

2020 and, for each such meeting and/or teleconference, identify the participants and date that

such meeting(s) and/or teleconference(s) occurred.

**ANSWER:**


24.     Identify each and every meeting and/or teleconference between all employees,

executive, officers, directors, advisors and agents of Defendants at which the impact of COVID-

19 was discussed January 1, 2020 through June 30, 2020 and, for each such meeting and/or

teleconference, identify the participants and date that such meeting(s) and/or teleconference(s)

occurred.

**ANSWER:**

PA01028

25.     Identify (or produce documents sufficient to identify) all capital investments, loans and guarantees made to Defendants from March 1, 2019 through June 30, 2020.

**<u>ANSWER</u>**:


26.     State in detail the facts and legal grounds and identify the witnesses and identify (or produce) the documents on which Defendants intend to rely to support each of their affirmative defenses to Plaintiffs' Complaint, as set forth in the Answer dated December 10, 2020 (ECF 25).

**<u>ANSWER</u>**:


27.     Identify all documents that Defendants intend to utilize at trial in this matter.

**<u>ANSWER</u>**:


28.     Identify all witnesses that Defendants intend to call at trial in this matter.

**<u>ANSWER</u>**:


Dated: April 28, 2021

By:     */s/ René S. Roupinian*
René S. Roupinian, Esq. (P52737)
Jack A. Raisner, Esq.
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

PA01029

**THE LAW OFFICES OF JOYCE, LLC**
Michael J. Joyce (No. 4563)
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

*Attorneys for Plaintiffs and the putative class*

13

PA01030

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## PLAINTIFFS' FIRST REQUEST
## FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

Plaintiffs Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated (the "Plaintiffs"), by and through their undersigned counsel, request that Debtor Art Van Furniture, LLC, et al. (together "Debtors" or "Defendants") respond to the following requests for production within 30 days of the date of service:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

**DEFINITIONS**

Unless indicated otherwise, the following words and phrases are defined and used herein as follows:

1.     "Plaintiffs" shall mean Todd Stewart and Jennifer Sawle, the persons named as Plaintiffs in the caption of this action.

2.     "Defendants" or "Debtors" shall mean the entities named in the caption of this action, including each of the names under which it conducts business, its respective employees, officers, directors, agents, advisors, consultants, attorneys and representatives and all other persons under its control.

3.     "Putative Class Members" shall mean the putative class defined as: Plaintiffs and all persons (i) who worked at, reported to, or received assignments from Defendants' Facilities, (ii) who were terminated without cause beginning on or about March 19, 2020, and within 90 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020, and (iii) who are "affected employees" within the meaning of 29 U.S.C. § 2101(a)(5).

4.     "Facilities" shall mean the sites where Defendants conducted business operations during the period January 1, 2020 through September 30, 2020 and which fall under the WARN Act's definition of "Facility or Operating Unit" or "Single Site of Employment" (29 C.F.R. § 639.3), including, but not limited to, the facilities located at 6500 E. 14 Mile Road, Warren, Michigan, 14055 Hall Rd. Shelby Township, Michigan and 8748 West Saginaw Highway, Lansing, Michigan.

5.     "Affirmative Defense" shall mean a ground for dismissal that Defendants have or intend to assert including in their Answer to the Complaint, dated December 10, 2020 (ECF 25).

2

6.    The "WARN Act" shall mean the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq*.

7.    "Communication" shall mean the transmittal of information in the form of facts, ideas, inquiries or otherwise such as in e-mail form.

8.    "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including without limitation, electronic or computerized data compilations such as e-mails. A draft or non-identical copy is a separate document within the meaning of this term.

9.    "Identify" with respect to documents:  When referring to documents, to "identify" means to give, to the extent known, the (i) type of document, (ii) general subject matter, (iii) date of the document, (iv) author(s), addressee(s) and recipient(s), and (v) the last known location of the document and the identity of person who has possession of it.

10.    "Identify" with respect to persons:  When referring to persons, to "identify" means to give the name, the title, the last known residence address, the last known e-mail address, and the last known business address of the person.

11.    The terms "Plaintiff" or "Defendants," as well as a party's full or abbreviated name or a pronoun referring to a party shall mean the party and, where applicable, its officers, directors, employee, partners, corporate parent, subsidiaries, or affiliates.

12.    "Person" is defined as any natural person or any business, legal or governmental entity or association.

13.    "Concerning" means relating to, referring to, describing, evidencing, or constituting.

14.    The terms "all" and "each" shall be construed as all and each.

3

PA01033

15.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

16.     The use of the singular form of any word includes the plural and vice-versa.

## INSTRUCTIONS

Unless otherwise indicated, the following instructions apply to, and are incorporated into, all Definitions, Requests, and Instructions:

1.     With respect to each document produced, Plaintiffs request that Defendants specify the Request(s) to which the document is responsive.

2.     Pursuant to Fed. R. Civ. P. 34, each document shall be produced as it is kept in the usual course of business and shall be organized and labeled with the categories in these requests.

3.     At or before the filing of the complaint in this case, Defendants were under a duty to preserve documents and ESI related to this matter.  Accordingly, Plaintiffs expect that Defendants and its counsel will prevent the destruction or alteration of any documents requested herein by the operation of any electronic information system (routine or otherwise) and hereby put Defendants on notice that any destruction or alteration of such documents, or any action that makes such documents more difficult or expensive to access and use, without completing a meet and confer process with Plaintiffs' counsel regarding such action, will not be considered to be in "good faith," as contemplated in Fed. R. Civ. P. 37(f).  If Defendants does not believe that it can reasonably comply with this instruction, Plaintiff requests that Defendants contact Plaintiffs' counsel in writing, within 10 days from receipt of these Requests, to meet and confer about whether immediate Court intervention is necessary.

PA01034

4.    Unless otherwise indicated, Plaintiffs request that Defendants produce responsive documents pursuant to the agreements reached by the parties after their meet and confer discussions about the preferred format for such production.  Plaintiffs request that Defendants not unilaterally select an electronic format for production.

5.    Alternatively, if Defendants do not wish to meet and confer about the format for production of documents, Plaintiffs request such documents as follows:

a.    Documents should be provided on DVD, CD or external hard drive. The volume of the ESI will determine whether documents are provided on CD, DVD or hard drives.

b.    Documents should not be zipped, compressed, encrypted, or otherwise restricted or proprietarily protected for specific use.

c.    Defendants may compress and/or encrypt the production archive for delivery purposes but should provide passwords for any compressed archives under separate cover, along with a description of any software needed to decrypt the archive.

d.    A cover letter or fact sheet should be included describing in as much detail as practicable the contents of the collection.

e.    Documents created or stored electronically should not be produced in hard copy.  All ESI should be produced with the metadata requested below.

f.    All documents should be produced as they are ordinarily maintained, for example, organized by custodian or source.

g.    All productions should be free of computer viruses.

h.    All deliverables should include a metadata load file that is a .DAT or .TXT format with standard Concordance delimiters, and contain all fields outlined below.  Image load files should be provided in .OPT format.

5

i.      Documents should be produced with TIFF images and named according to the Bates number of the corresponding TIFF image. Each *.tiff file should be assigned a unique name matching the Bates number of the corresponding image. The Bates number should be consistent across the production, contain no special characters, and be numerically sequential within a given document. Attachments to documents should be assigned Bates numbers that directly follow in sequential order the Bates numbers on the documents to which they were attached. If a Bates number or set of Bates numbers is skipped, the skipped number or set of numbers should be noted, for example, with a placeholder.

j.      All unredacted documents should be provided with complete document-level extracted text files. In the event a document contains text which is to be redacted, OCR text files should be provided for any un-redacted portions of the documents. Document-level OCR text files should be provided for any unredacted portions of redacted documents and for all hard copy scanned documents. The extracted full text and/or OCR text for all deliverables should be in separate document-level TXT files. These TXT files may either be provided in a separate folder or included in the same folder as their corresponding images. The number of TXT files per folder should be limited to 1,000 files.

k.      Paper documents should be scanned and processed to TIFF files. If a document is available to Defendants both in paper and electronic form, Plaintiffs request that Defendants produce the requested document in electronic form, as described herein.

l.      For email collections, the parent-child relationships (the association between emails and attachments) should be preserved. Email attachments should be consecutively produced with the parent email record.

6

m.      Documents originating in spreadsheet or presentation programs such as Excel or Powerpoint should be produced in native form.  For deliverables containing native files such as Excel and PowerPoint files, a native file path/link should be included in the metadata load file. Additionally, a Bates-stamped TIFF placeholder should be included in the production and reflected in the image load file. The number of native files per folder should be limited to 1,000 files.

n.      In the event that responses to these requests contain ESI from proprietary or non-proprietary databases, the parties will meet and confer to discuss the fields contained in the database and the best means of producing responsive information from them, such as running reports or queries.  In the event that ESI will be produced directly from a database, the ESI should be produced in a comma delimited file or in Excel format, with all formulae and records of irregular or manual manipulation of data reflected.  If proprietary software is required to access or use documents in their native format, please supply such software.  A written list of all database fields and a reasonable description for each field, or a "database dictionary" should be included.

o.      All images should be provided in single-page, Group IV TIFF with a resolution of 300 DPI.  Bates numbers and confidentiality designations should be electronically branded on each produced *.tiff image. These .TIFF images should be provided in a separate folder and the number of TIFF files per folder should be limited to 1,000 files.

p.      For deliverables containing multi-media files, the following production format should be used:

i.      Audio Data Files: Audio data files should be produced in audio Windows Media Audio ("WMA") format or "MP3" format.

7

        ii.      Video Files: Video files should be produced in Audio/Video Interleaved ("AVI") format.

        iii.     Image Files: If providing color images, files should be produced in "JPEG/JPG" format with a resolution of 150 to 300 DPI.

        q.     Metadata to be produced: The following metadata fields should be produced for each document to the extent that such information is available at the time of collection and processing, except that if a field contains privileged information, that privileged information may be redacted and noted in a corresponding privilege log. All requests should be read to include a request for all metadata associated with all documents responsive to the request.

| FIELD NAME | DESCRIPTION | CATEGORY |
|---|---|---|
| BEGDOC | Starting bates | Hardcopy, edoc, email and attachment |
| ENDDOC | Ending bates | Hardcopy, edoc, email and attachment |
| PARENTID | First bates number of parent email. (Populate in child(ren) record(s) only) | Emails and attachments (populated through processing) |
| FAMLYRNG OR ATTACHRNG | Family (Range of bates related documents (i.e. email & attachment) - this field will be populated for all records in the family.) | Hard copy, edoc, emails and attachments (populated through processing) |
| BEGATTACHID | First BATES of attachment(s) | Hard copy, edoc, emails and attachments (populated through processing) |
| ENDATTACHID | Last BATES of family (populate on families only) | Hard copy, edoc, emails and attachments (populated through processing) |
| CUSTODIAN | Person from whom file was obtained | Hardcopy (if coded), edoc, email and attachment (populated through processing) |
| PRPERTIES OR RCRDTYPE | Record Type – will be either "email", "attachment", "edoc" or "hardcopy" | |
| FROM | Email Author | Emails (populated through processing) |
| TO | Recipient | Emails (populated through processing) |

PA01038

| FIELD NAME | DESCRIPTION | CATEGORY |
|---|---|---|
| CC | CC field - In the event of emails | Emails (populated through processing) |
| BCC | Bcc field - in the event of emails | Emails (populated through processing) |
| SUBJECT | Subject | Emails (populated through processing) |
| DOCTITLE | Document Title/name of the original native file as it existed at the time of collection. | Hardcopy (if coded), edoc or attachment (populated through processing) |
| DOCDATE | Document Date/Date Sent, format MM/DD/YYYY, this is the SORT_DATE field, so populate across families | Email and Attachments |
| DATESENT | Email Sent Date, format MM/DD/YYYY | Emails (populated through processing) |
| TIMESENT | Date sent 00:00:00 AM/PM | Emails (populated through processing) |
| DATECREATED | Date first created, format MM/DD/YYYY | Edoc or attachment (populated through processing) |
| DATESVD | Date last saved/modified, format MM/DD/YYYY | Edoc or attachment (populated through processing) |
| TIMESVD | Time saved 00:00:00 AM/PM | (populated through processing) |
| DATERCVD | Date received/accessed, format MM/DD/YYYY | Emails (populated through processing) |
| TIMERCVD | Time received 00:00:00 AM/PM | (populated through processing) |
| PAGECOUNT | Document page count | Edoc or attachment (populated through processing) |
| ATTILE | File name/Attachment Name | Electronic files and/or attachments (populated through processing) |
| APPLICAT | Application used to open the file (Word, PowerPoint, Adobe, Excel, Explorer, Quicken, etc.) | Electronic files and/or emails, attachments (populated through processing) |
| FOLDERID OR ORIGFOLDERPATH OR FILEPATH | File path/folder structure of original native file as it existed at the time of collection. i.e. Path of email in mailbox (populate for email attachments also); Filepath of edocs or scanned docs (if requested) | Electronic files and/or emails, attachments (populated through processing) |

9

PA01039

| FIELD NAME | DESCRIPTION | CATEGORY |
|---|---|---|
| **DOCLINK** **or** **NATIVEFILE** | Active link reflecting current filepath back to the native file | Electronic files and/or emails, attachments (populated through processing **and only provided if receiving native files**.) |
| **FILEEXTEN** | In the event of attachments or emails, this will enable us to search by document type. Sample contents: *PST, MSG, PDF, DOC, PPT, HTM,* etc. etc. | Electronic files and/or emails, attachments (populated through processing) |
| **AUTHOR** | In the event of attachments, this field contains the 'author' of the document | For Hard Copy docs (if coded) or electronic files and or attachments (populated through processing) |
| **HASH** | Hash value for de-dupe | Electronic files and/or attachments (populated through processing) |
| **HEADER** | Contains all the routing information from the header section of an email message | Emails (populated through processing) |
| **TEXT** | Text of email in the event of emails; text of attachment in the event of attachments; We recognize that some attachments will not have text that can be properly rendered into text (JPGs, GIFs, Flash Files, etc.), but for those flat files such as PDFs which do not have extractable text, we would like them OCR'd, and the contents placed in the TEXT field. | For Hardcopy, electronic files, emails and attachments. |

6. With respect to each request, Defendants are requested to provide all documents in its possession, custody, or control that are known to Defendants or that Defendants can locate or discover through reasonably diligent efforts.

7. If Defendants cannot respond or produce documents in response to any part of the following Requests in full, please respond to the extent possible, specifying the reason or reasons

PA01040

for Defendants' inability to respond or produce documents in response to the remainder of the Requests.

8.     If, to Defendants' knowledge, documents responsive to one or more requests were never in Defendants' possession, custody, or control but are or have been in the possession, custody, or control of any other person, please identify all such persons.

9.     If any responsive document was formerly in Defendants' possession, custody, or control but has been eliminated from Defendants' possession in any way, including, but not limited to, having been lost, destroyed, transmitted, or discarded, please submit a written statement as follows:

    a.  The basis for withholding such document;

    b.  A generic description of the document being withheld;

    c.  The date the information contained in the document was learned or the document created;

    d.  The identity of the individual(s) who learned the information or authored the document;

    e.  The date the document was transmitted or otherwise made available to anyone; and

    f.  The specific Request(s) to which the withheld document relates.

10.     If requested documents are maintained in a file, folder, or other container, please produce the file, folder, or other container, or a complete copy of same, with the documents. For ESI that originates in a digital folder structure, please produce the folder names and relationships as metadata.

11.     The scope of your search for ESI shall include all forms of ESI collection, preservation, transmission, communication, and storage, including:

PA01041

a. All ESI generated and maintained in the ordinary course of business, including ESI stored on mainframe computers or local and network computers or drives or servers or any other media or location where ESI can be or is stored;

b. Distributed data or removable data, i.e., information which resides on portable media and non-local drives, including home computers, laptop computers, magnetic or floppy discs, CD-ROMs, DVDs, zip drives, Internet repositories including email hosted by Internet service providers, handheld storage devices such as PDAs, BlackBerry devices, cellular telephones, and flash memory drives;

c. Forensic copy or backup ESI, including archive and backup data tapes and discs;

d. Network ESI, including voice mail systems, email servers, ISP servers, network servers, cloud servers and fax servers;

e. Legacy ESI, i.e., retained data that has been created or stored by the use of software or hardware that has been rendered outmoded or obsolete;

f. Metadata, i.e., information regarding a particular data set which describes how, when and by whom it was collected, created, accessed and modified and how it is formatted.

12.     Unless otherwise indicated in writing, the failure to produce any documents in response to any request herein means that such documents do not exist, or are not in Defendants' possession, custody, or control, or the possession, custody, or control of Defendants' agents or anybody acting on Defendants' behalf.

13.     To the extent documents responsive to these requests have already been produced by Defendants, state the unique identifier (e.g., MD 5 Hash value) or Bates number for each responsive document that was previously produced.

## DOCUMENT REQUESTS

1.     Produce all documents that relate to or reflect Defendants' responses to Plaintiffs' First Set of Interrogatories to Defendants.

2.     Produce all documents and/or communications reflecting communications that relate to this action.

PA01042

3.     Produce all documents and/or communication sent and received by every director, board member and officer of Defendants concerning the decision to terminate the employment of Plaintiffs and Putative Class Members.

4.     Produce documents that reflect the number of employees who worked at each of the Facilities during the period between October 1, 2019 through June 30, 2020, including their beginning-and-end dates of employment.

5.     Produce documents that reflect the number of employees (including part-time and full-time) who worked at each of Defendants' Facilities during the period between October 1, 2019 through June 30, 2020, including their beginning-and-end dates of employment.

6.     Produce documents that reflect the address of each of Defendants' Facilities where employees received a termination notice dated March 19, 2020, and the names of employees at each store who received the notice.

7.     Produce documents that reflect the address of each of Defendants' Facilities where employees received the document dated March 5, 2020, titled "Important Company Announcement", addressed to All Team Members from the Executive Team (attached hereto as Exhibit A), and the names of employees at each store who received the notice.

8.     Produce documents that reflect the address of each of Defendants' Facilities where employees received a WARN notice dated March 19, 2020, and the names of employees at each store who received the notice.

9.     Produce documents that reflect the address of each of Defendants' Facilities where employees received a copy of the document dated March 5, 2020, titled "WARN Act Notice," from Cathrine Wenger, Senior Counsel, that was distributed to employees (attached hereto as Exhibit B), and the names of employees at each store who received the notice.

13

10.    Produce all documents and/or communications reflecting the drafting of the documents dated March 5, 2020, titled "WARN Act Notice," from Cathrine Wenger, Senior Counsel, that was distributed to employees in Michigan and Illinois (attached hereto as Exhibit B).

11.    Produce documents that reflect Plaintiffs and the Putative Class Members' employment benefits, including health insurance (medical, dental and vision), supplemental insurance, life insurance, long and short-term disability benefits, time-off benefits, retirement savings, health and welfare benefits, including 401k plans, company vehicle, fuel, and education reimbursement.

12.    Produce all documents and/or communications concerning every in-person meeting held on or before March 5, 2020 at which Defendant's managers, executives, directors, board members or supervisors met with Defendant's employees regarding their terminations, including all lists of attendees, sign-in sheets, scripts, memos, handouts and talking points for such meeting(s).

13.    Produce all documents and/or communications reflecting the drafting of the document "Termination of Benefits" dated March 19, 2020 (attached hereto as Exhibit C).

14.    Produce all documents and/or communications reflecting the drafting of the document titled "Memorandum" to "Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321" dated March 19, 2020 (attached hereto as Exhibit D).

PA01044

15.     Produce all documents and/or communications reflecting the drafting of the document "Frequently Asked Questions-Store Associates (Art Van, Levin and Wolf Closing)" (attached hereto as Exhibit E)

16.     Produce all documents and/or communications reflecting the drafting of the document titled "Meeting Instructions," dated March 5, 2020, addressed to "Art Van and Wolf Leaders" from Michelle Dolski & Irene Fostyk (attached hereto as Exhibit F).

17.     Produce all documents and/or communications reflecting the drafting of the document titled "Frequently Asked Questions #1/ Benefits Contacts" (attached hereto as Exhibit G).

18.     Produce all documents reflecting every employee who signed the WARN Act Notice Receipt Acknowledgment, including lists of attendees, sign-in sheets, scripts, memos, summaries, and compilations of such lists (attached hereto as Exhibit H).

19.     Produce all minutes, records, and resolutions of Defendants' Board of Directors meetings during the period March 1, 2019 through June 30, 2020, including submissions to the Boards of Directors and committees of the Boards of Directors at, or in anticipation of, such meetings.

20.     Produce all documents and/or communications reflecting efforts to seek additional business which would have enabled Defendants to avoid the terminations of Plaintiffs and Putative Class Members.

21.     Produce all documents and/or communications concerning Defendants' financing during the period. March 1, 2019 through June 30, 2020.

22.     Produce all documents and/or communications during the period March 1, 2019 through June 30, 2020 reflecting proposals for financing, loans, capital investments, loan

PA01045

guarantees and capital infusions from any source, including but not limited to Thomas H. Lee Partners, L.P., to the Debtors to fund Debtors' operations.

23.     Produce all documents and/or communications during the period March 1, 2019 through June 30, 2020 reflecting Debtors' default of its revolving credit facility with Wells Fargo, including all communications regarding Wells Fargo's agreement to a forbearance until March 28, 2020.

24.     Produce all documents and communications during the period March 1, 2019 through March 28, 2020 reflecting Wells Fargo assuming control of Defendants' available cash.

25.     Produce all documents and/or communications during the period March 1, 2019 through March 28, 2020 reflecting all agreements between Defendants and Wells Fargo that Defendants would immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by February 28, 2020.

26.     Produce all documents and/or communications during the period March 1, 2019 through March 28, 2020 reflecting the terms of all outstanding loans, credit lines, and other indebtedness between Defendants and its lenders that were in existence as of February 28, 2020.

27.     Produce all documents and/or communications between Defendants and its lenders during the period March 1, 2019 through September 30, 2020 referencing the maturity date of all outstanding loans, credit lines, and other indebtedness by Defendant that were in existence as of March 19, 2020.

28.     Produce all documents and/or communications between Defendants and its lenders during the period March 1, 2019 through March 19, 2020 that refer or relate to all forbearance agreements between Defendants and its lenders that were in effect during that period.

16

29.     Produce all documents and/or communications reflecting efforts to seek capital or financing which would have enabled Defendants to avoid the terminations of Plaintiffs and Putative Class Members.

30.     Produce all documents and/or communications reflecting efforts to renegotiate leases or reduce expenses which would have enabled Defendants to avoid the terminations of Plaintiffs and Putative Class Members.

31.     Produce all documents and/or communications concerning Defendants' seeking of capital during the period. March 1, 2019 through June 30, 2020.

32.     Produce all documents and/or communications during the period March 1, 2019 through June 30, 2020 reflecting proposals for financing, loans, capital investments, loan guarantees and capital infusions from any source, including but not limited to Thomas H. Lee Partners, L.P., to the Debtors to fund Debtors' operations.

33.     Produce all documents and/or communications reflecting efforts to seek capital or financing which would have enabled Defendant to avoid the terminations of Plaintiffs and Putative Class Members.

34.     Produce all documents and/or communications concerning a sale of all or parts of Defendants' company or operational assets during the period March 1, 2019 through June 30, 2020.

35.     Produce all documents and/or communications that reflect any agreement by Robert Levin to purchase Levin Furniture and select Wolf stores pending court approval.

36.     Produce all documents and/or communications from the period March 1, 2019 through June 30, 2020 concerning any proposed sale of Defendants' assets to any third-party entity.

17

PA01047

37.     Produce all documents and/or communications concerning Defendants' efforts to renegotiate leases or reduce expenses during the period March 1, 2019 through March 31, 2020.

38.     Produce all documents and/or communications concerning Defendants' decision to file for bankruptcy during the period March 1, 2019 through March 8, 2020.

39.     Produce all documents and/or communications concerning Defendants' liquidation, including its winddown and cessation of operations during the period December 1, 2019 through September 30, 2020.

40.     Produce all documents and/or communications during the period March 1, 2019 through March 28, 2020 reflecting all agreements between Defendants and Wells Fargo that Defendants would immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by February 28, 2020.

41.     Produce all documents and/or communications concerning any change in the terms or conditions of the employment of Defendants' employees during the period January 1, 2020 through September 30, 2020.

42.     Produce all documents and/or communications concerning the consideration of COVID-19 as it related to Defendants during the period January 1, 2020 through September 30, 2020.

43.     Produce all documents and/or communications that refer to Defendants' First Affirmative Defense in its Answer that the terminations were caused by "business circumstances that were not reasonably foreseeable as of the time that notice would have been required" and that "AVF and LEVIN gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to 29 U.S.C. § 2102(b)(3)." (ECF 25)

18

44.     Produce all documents and/or communications that refer to Defendants' Second

Affirmative Defense in its Answer that the mass layoffs or plant closings were caused by a

natural disaster and that "AVF and LEVIN gave as much notice as was practicable along with a

brief statement of the basis for reducing the notification period pursuant to 29 U.S.C. §

2102(b)(3)." (ECF 25)

45.     Produce all written opinions by Defendants' legal counsel to Defendants'

owner(s), officers and/or directors concerning Defendants' legal obligations to its employees

pursuant to the WARN Act.

46.     Produce all documents and/or communications that Defendants will rely upon to

defend this action.

Dated: April 28, 2021

> */s/ René S. Roupinian*
> René S. Roupinian (*admitted pro hac vice*)
> Jack A. Raisner (*admitted pro hac vice*)
> **RAISNER ROUPINIAN LLP**
> 270 Madison Avenue, Suite 1801
> New York, New York 10016
> Telephone: (212) 221-1747
> Facsimile: (212) 221-1747
> Email: rsr@raisnerroupinian.com
> Email: jar@raisnerroupinian.com
>
> **THE LAW OFFICES OF JOYCE, LLC**
> Michael J. Joyce (No. 4563)
> 1225 King Street, Suite 800
> Wilmington, DE 19801
> Telephone: (302)-388-1944
> Email: mjoyce@mjlawoffices.com
>
> *Attorneys for Plaintiffs and the putative class*

PA01049

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC., *et al.,*[1]<br><br><div align=center>Debtors.</div> | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br><div align=center>Plaintiffs,</div><br>v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br><div align=center>Defendants.</div> | Adv. Pro. No. 20-50548 (CSS) |

## <u>CERTIFICATE OF SERVICE</u>

I, Jenny Hoxha, under penalty of perjury, certify the following as true and correct: I am not a party to this action, employed by Raisner Roupinian LLP, and I am over 18 years of age. I hereby certify that I caused true and correct copies of *Plaintiffs' First Set of Interrogatories to Defendants, Plaintiffs' First Request for Production of Documents to Defendants, Exhibits A-H* and the corresponding *Certificate of Service* to be served upon the parties listed below via email as listed below:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

PA01050

**Service List:**

Bradford J. Sandler
Colin R. Robinson
Peter J. Keane
Beth Levine
**PACHULSKI STANG ZIEHL & JONES LLP**
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Email: bsandler@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com
blevine@pszjlaw.com


*Counsel to Alfred T. Giuliano, Chapter 7 Trustee for Debtors*


Dated: April 28, 2021

/s/        *Jenny Hoxha*
         Jenny Hoxha

PA01051

# EXHIBIT B

*to Declaration of René S. Roupinian*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## <u>PRETRIAL SCHEDULING ORDER</u>

Todd Stewart and Jennifer Sawle (the "Plaintiffs"), together with Alfred T. Giuliano, the

Chapter 7 Trustee for Debtors (the "Trustee") (collectively "the Parties"), by and through their

counsel, hereby submit this Pretrial Scheduling Order, and, in support thereof, aver the following:

1.  On March 8, 2020, the Debtors each filed a Voluntary Petition for Relief under

Chapter 11 of the Bankruptcy Code. (Bankr. No. 20-10553, D.I. 2).

2.  On March 10, 2020, the Debtors' cases were consolidated for joint administration.

(Bankr. No. 20-10553, D.I. 71).

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463) (collectively, the "Debtors").

PA01053

3.　　On March 23, 2020, Plaintiffs commenced an adversary proceeding against the above-captioned debtor-defendants ("Defendants"), which adversary proceeding is docketed as No. 20-50548 (CSS) (the "Adversary Proceeding") (Adv. D.I. 1).

4.　　The Complaint alleges that the Defendants violated the Federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq*. (the "WARN Act") and seeks relief on behalf of a putative class of present or former employees of the Defendants (the "Complaint").

5.　　On April 7, 2020, the bankruptcy case was converted to Chapter 7 and the Trustee was appointed. (Bankr. No. 20-10553, D.I. 263, 264).

6.　　Between March and December, the Parties agreed to extend the deadline for Defendants to respond to the Complaint and utilized the extensions to work cooperatively and diligently in exchanging information relevant to the WARN claim.

7.　　On December 10, 2020, the Debtors filed an Answer to the Complaint. (Adv. D.I. 25).

8.　　On April 28, 2021, Plaintiffs served *Plaintiffs' First Set of Interrogatories* and *Plaintiffs' First Request for Production of Documents* on Defendants (collectively, the "Plaintiffs' Discovery Requests").

9.　　On May 26, 2021, the Court entered an Order Assigning Adversary Proceeding to Mediation setting July 26, 2021, as the deadline for submission of a Mediation Report. (Adv. D.I. 26).

10.　　The Parties have conferred and agreed, subject to Court approval, to stay litigation and proceed to mediation with the exchange of limited informal discovery prior to mediation so long as it is without prejudice to the Trustee's right to move for summary judgment and

Plaintiffs' right to oppose summary judgment as premature absent full discovery, should the Parties not reach a mediated settlement.

To promote the efficient and expeditious disposition of adversary proceedings, the following schedule shall apply to the above-captioned adversary proceeding.

**IT IS HEREBY ORDERED** that:

11.     The Parties shall exchange informal discovery requests by June 21, 2021.

12.     The Parties have conferred and agree to Ret. Judge Kevin Gross as Mediator (the "Mediator").

13.     Subject to the Mediator's schedule, the Parties shall complete mediation by August 31, 2021.

14.     All formal discovery and litigation shall be stayed during the mediation process, including without limitation, the Trustee's obligation to respond to the Plaintiffs' Discovery Requests.

15.     If the Parties are unable to reach a consensual resolution of the Adversary Proceeding the following deadlines shall apply:

16.     Unless otherwise agreed to by the parties or ordered by the Court, Plaintiffs and the Trustee shall exchange their Initial Disclosures as detailed in Bankruptcy Rule 7026(a)(1) within  fourteen (14) days of the filing of the Mediator's Report stating a settlement has not been reached ("Mediator's Report").

17.     Unless otherwise agreed to by the parties or ordered by the Court, all amended pleadings shall be filed within fourteen (14) days of the filing of the Mediator's Report.

18.     The Trustee may file and serve a motion for summary judgment (the "Trustee Summary Judgment Motion"), if any, within thirty (30) days of the filing of the Mediator's

PA01055

Report. To the extent the Trustee Summary Judgment Motion is filed, and unless the Court orders otherwise, supporting memoranda shall be filed with the Trustee Summary Judgment Motion at the time of its initial presentation.  With respect to the Trustee Summary Judgment Motion, a responding memorandum shall be filed within 21 days following the filing of the Trustee Summary Judgment Motion, and a reply memorandum, if any, shall be filed 14 days thereafter.

19.     Unless otherwise ordered by the Court, the length of all memoranda and briefs filed in connection with any substantive motion (whether the Trustee Summary Judgment Motion, Class Certification Motion (as defined below) or otherwise) shall be governed by Rule 7007-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

20.     Plaintiffs reserve the right to oppose the Trustee Summary Judgment Motion on all grounds including, that the Trustee Motion is premature and should be filed, if at all, at the conclusion of fact discovery.

21.     Plaintiffs shall file a Motion for Class Certification (the "Class Certification Motion"), if any, no later than  thirty (30) days from the filing of the Mediator's Report. Unless otherwise ordered by the Court, a responding memorandum shall be filed within 21 days following the filing of the Class Certification Motion, if any, and a reply memorandum, if any, shall be filed 14 days thereafter.

22.     Unless otherwise agreed by the parties and approved by the Court, to the extent applicable, all fact discovery, shall be completed and closed within one-hundred and eighty (180) days from the filing of the Mediator's Report. Unless otherwise agreed by the parties or Order by Court, all discovery of electronic documents shall proceed in accordance with Local Rule 7026-3.

DOCS_DE:234840.1 05233/003

PA01056

23.     To the extent applicable, the parties shall exchange expert reports regarding any issue on which he, she, it or they bear the burden of proof within two-hundred and forty (240) days of the filing of the Mediator's Report, and the other party shall have thirty (30) days thereafter to file a rebuttal report.  Depositions of experts shall be completed within thirty (30) days from the date of submission of the last rebuttal report ("Final Expert Report Submission Date"), after which time all expert discovery shall be completed and closed.

24.     To the extent applicable, the parties may file dispositive motions within thirty (30) days after the Final Expert Report Submission Date.  To the extent any dispositive motions are filed, and unless the Court orders otherwise, supporting memoranda shall be filed with any dispositive motion at the time of its initial presentation,  responding memoranda shall be filed within 21 days following the filing of a dispositive motion, and reply memoranda, if any, shall be filed 14 days thereafter.

25.     The parties shall comply with the General Order Governing Pre-Trial Procedures in Adversary Proceedings Set for Trial before Judge Christopher S. Sontchi as may be amended or restated from time to time. The parties shall file, no later than three (3) business days prior to the earlier of the date set for (i) pre -trial conference (if one is scheduled) or (ii) trial, their Joint Pre-Trial Memorandum approved by all counsel and shall contemporaneously deliver two (2) copies thereof to Judge Christopher S. Sontchi's chambers.

26.     The above dates may be modified by consent of the parties without need for further order of this Court or by Order of this Court.

27.      The parties will contact the Bankruptcy Court for a date for a status conference, which status conference shall be for the purpose of (i) setting a date by which pre-trial disclosures under Bankruptcy Rule 7026(a)(3) shall be served, (ii) scheduling a pre-trial

conference to schedule a date and time of trial, and (iii) addressing such other issues as the Bankruptcy Court or the parties deem necessary and appropriate.

28.     The Plaintiffs shall serve this Pretrial Scheduling Order on the Trustee's counsel within 5 business days after the entry of this Pretrial Scheduling Order.

**Dated: June 10th, 2021**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT C

*to Declaration of René S. Roupinian*

PA01059

| From: | Rene Roupinian |
|---|---|
| To: | Erin Gray; Jack Raisner |
| Cc: | Bradford J. Sandler; Beth Levine; Alfred Giuliano; Gail Lin |
| Subject: | RE: Stewart v. Art Van; Subject to FRE 408 |
| Date: | Monday, June 21, 2021 6:01:16 PM |

Erin,

Thank you for your email.

Similarly, following is our informal request for documents in advance of the scheduled mediation.

1.    Documents which shows that on or about Jan 5, 2020, Debtor was engaged in discussions for an amount of capital that if received would have avoided the GOB sale.
2.    Documents which show any unforeseeable business circumstance that occurred between Jan 5 and Mar 5 that made the GOB sale and sending of WARN notice on March 5 unforeseeable.
3.    Documents which show any COVID related event that took place prior to March 19 that affected Debtor's ability to remain viable.
4.    Documents which show decision(s) that precipitated Debtor's pursuit of GOB sales.
5.    Documents which show the Debtor's options up to March 19 to avoid conducting permanent terminations on or around that date.
6.    Documents which show the infeasibility of Debtor's options that would have avoided permanent terminations on or around March 19.
7.    Documents which show the number of employees Debtor engaged after March to carry out GOB sales or other business, at the eight WARN locations.
8.    Board minutes from January 1, 2020 and thereafter.

Please note we are working to create a putative damages model to share in advance of the mediation so the parties are, ideally, apples to apples.  To the extent we do not have certain information or employee data to determine the putative class composition and damages, we reserve the right to supplement this request.   Thank you.

Best,

René S. Roupinian | Partner
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, NY 10016
T & F 212-221-1747
rsr@raisnerroupinian.com
www.raisnerroupinian.com
www.warnlawyers.com

-----Original Message-----
From: Erin Gray <egray@pszjlaw.com>
Sent: Monday, June 21, 2021 8:18 PM
To: Jack Raisner <jar@raisnerroupinian.com>; Rene Roupinian <rsr@raisnerroupinian.com>
Cc: Bradford J. Sandler <bsandler@pszjlaw.com>; Beth Levine <blevine@pszjlaw.com>; Alfred Giuliano <atgiuliano@giulianomiller.com>
Subject: Stewart v. Art Van

Dear Jack and Rene:

Pursuant to the parties agreed scheduling order, below please find the informal discovery that the Trustee would like to have in advance of the scheduled mediation.

As to each plaintiff, please provide the following:

1. A copy of the Warn Act Notice that each plaintiff received;

2. Copies of all applications (including the initial application, subsequent applications and biweekly or periodic certifications) each plaintiff made, if any, for unemployment insurance benefits ("UIB") on or after March 19, 2020.

3. With respect to UIB applied for and/or received after March 19, 2020, documents evidencing the amount and duration of UIB each plaintiff received from March 19, 2020 to present.

4. Documents evidencing efforts by each plaintiff to obtain employment from March 19, 2020 to present.

5. Documents evidencing any stimulus payments received by each plaintiff.

Sincerely,

Erin Elizabeth Gray

# EXHIBIT D

*to Declaration of René S. Roupinian*

PA01062

| | |
|---|---|
| **From:** | Gail Lin |
| **To:** | Gail Lin |
| **Subject:** | FW: In re Art Van: Warn Act Litigation Informal Discovery Requests |
| **Date:** | Thursday, December 2, 2021 9:07:52 AM |
| **Attachments:** | 1. AVF Holding Company Fiscal 2020 Q1 Board Member Update Final_REDACTED....pdf |
| | AVF Holding Company Inc Board Minutes_04.02.20_REDACTED.PDF |
| | Art Van Wind Down Plan-CFs 3.23.20 FINALv2.pdf |

---

**From:** Erin Gray <egray@pszjlaw.com>
**Sent:** Monday, July 12, 2021 7:50 PM
**To:** Jack Raisner <jar@raisnerroupinian.com>; Rene Roupinian <rsr@raisnerroupinian.com>
**Cc:** Beth Levine <blevine@pszjlaw.com>; Bradford J. Sandler <bsandler@pszjlaw.com>;
'atgiuliano@giulianomiller.com' <atgiuliano@giulianomiller.com>
**Subject:** In re Art Van: Warn Act Litigation Informal Discovery Requests

Dear Jack and Rene:

Below (and attached) please find the Trustee's responses to your informal discovery requests. The
highlighted items are attached to this email. The others are all either pleadings, transcripts or
executive orders/proclamations related to COVID that are publically available.

Beth will get back to you on your email of today.

Sincerely,

Erin Gray

1.  **Documents which shows that on or about Jan 5, 2020, Debtor was engaged in discussions
    for an amount of capital that if received would have avoided the GOB sale.**

The Trustee objects to this request on the grounds that it is not reasonably calculated to lead to
discoverable information.

2.  **Documents which show any unforeseeable business circumstance that occurred between
    Jan 5 and Mar 5 that made the GOB sale and sending of WARN notice on March 5
    unforeseeable.**

It is not the Trustee's position that sending the WARN ACT notice on March 5 (which contemplated a
May 5 shut down) and the GOB Sales that were to take place prior to the May 5 shutdown were
unforeseeable. It is the Trustee's position that the shutdown of the country, the closing of
nonessential businesses and the shelter-in-place orders due to COVID-19 that occurred between
March 5 and March 19 was an unforeseeable business circumstance (and a natural disaster) that
caused the layoffs on March 20, 2020 after the Company issued the March 19, 2020 Revised WARN
Act Notice.

3.  **Documents which show any COVID related event that took place prior to March 19 that**

**affected Debtor's ability to remain viable.**

The Trustee objects to this request on the grounds that the terms "remain viable" are ambiguous. Notwithstanding the objection and without waiving it, please refer to the following:

> Transcript of Hearing on March 12, 2020
> Transcript of Hearing on March 19, 2020
> Transcript of Hearing on April 6, 2020
> Declaration of David Lane [Doc 12]
> Interim Cash Collateral Order [Doc. 93]
> Amended Motion to Convert [Doc. 252]
> Executive Order 2020-4 issued 3/10/2020 (Michigan)
> Executive Order 2020-5 issued 3/12/2020 (Michigan)
> Presidential Proclamation declaring National Emergency issued 3/13/2020
> Executive Order 2020-6, 2020-7 issued 3/13/2020 (Michigan)
> Bankruptcy Court for the District of Delaware First General Order issued 3/13/2020
> Executive Order 2020-9 issued 3/16/2020 (Michigan)
> Gov. Tom Wolf, Executive Order, dated March 19, 2020
> (https://www.governor.pa.gov/wpcontent/ uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf)

4. **Documents which show decision(s) that precipitated Debtor's pursuit of GOB sales.**

Please see responses to request numbers 1, 2, 3 and 8.

5. **Documents which show the Debtor's options up to March 19 to avoid conducting permanent terminations on or around that date.**

Due to COVID-19, the Debtors had no options up to March 19 to avoid conducting permanent terminations on or around that date.

6. **Documents which show the infeasibility of Debtor's options that would have avoided permanent terminations on or around March 19.**

The Trustee objects to the term "infeasibility". Notwithstanding the objection and without waiving it, please see answer to request number 5.

7. **Documents which show the number of employees Debtor engaged after March to carry out GOB sales or other business, at the eight WARN locations.**

The Trustee did not conduct any GOB sales, nor were any GOB sales after March prior to the Trustee's appointment; however, the below documents describe generally the employees who were (or would be) retained after March in connection with the wind-down. If you need additional information, we can ask the Trustee for payment records to the employees that he retained, but you will need to narrow your time frame, please.

<mark>Art Van Wind Down Planning Update dated March 23, 2020.</mark>
Trustee's Motion for Authority to Operate Business [Docket 350] and Order [713].

8. **Board minutes from January 1, 2020 and thereafter.**

Please see attached. We are currently looking for additional board minutes but have been unable to locate any to date.

February 4, 2020 Board Meeting: <mark>First Quarter 2020 Board Fiscal Update</mark>

April 2, 2020 Board Meeting: <mark>Board Minutes</mark>

**Erin Elizabeth Gray**
Pachulski Stang Ziehl & Jones LLP
Tel: 310.277.6910 | Mobile: 843.693.8141
egray@pszjlaw.com



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

# EXHIBIT E

*to Declaration of René S. Roupinian*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
|  | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, |  |
| Plaintiff, |  |
| v. |  |
| ART VAN FURNITURE, LLC, et al., |  |
| Defendants. |  |

## CHAPTER 7 TRUSTEE'S FIRST AMENDED ANSWER TO COMPLAINT FOR VIOLATION OF WARN ACT AND AFFIRMATIVE DEFENSES

For his amended answer to the *Class Action Adversary Proceeding Complaint for Violation of the WARN Act, 29 U.S.C. §2101, et seq* (the "Complaint") filed by Plaintiffs Todd Stewart and Jennifer Sawle (purportedly on behalf of themselves and all others similarly situated), Alfred T. Giuliano (the "Trustee"), on behalf of the chapter 7 bankruptcy estates of Art Van Furniture, LLC, AVF Holding Company, Inc., AVCE, LLC, AVF Holdings I, LLC, AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., Sam Levin, Inc.,

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

and Comfort Mattress LLC (collectively, the "Debtors" or the "Defendants"), states as follows[2]:

## Nature Of the Action

1.      The Trustee admits that Plaintiffs purport to bring a claim under the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* (the "WARN Act"). The Trustee is informed and believes that Plaintiffs were employed by debtor Art Van Furniture, LLC ("AVF"). The Trustee is without sufficient knowledge or information as to whether "mass layoffs or plant closings" began on March 4, 2020, and therefore these allegations are denied. The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied. The Trustee denies that the Defendants violated the WARN Act or any other law and denies that Plaintiffs are entitled to any relief.

2.      The Trustee admits that the Plaintiffs were terminated, along with 700 other employees of AVF and Sam Levin, Inc. ("Levin"). The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied. The Trustee denies that the Defendants violated the WARN Act or any other law and denies that Plaintiffs are entitled to any relief.

## Jurisdiction and Venue

3.      The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

---

[2] Pursuant to the Pretrial Scheduling Order [Docket No. 31], "Unless otherwise agreed to by the parties or ordered by the Court, all amended pleadings shall be filed within fourteen (14) days of the filing of the Mediator's Report." The Mediator's Report was filed on October 15, 2021 [Docket No. 39].

PA01068

4.      The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

5.      The allegations in this paragraph are conclusions of law to which no responsive pleading is required.

**The Parties**

6.      The Trustee admits that Plaintiff Todd Stewart ("STEWART") was employed by AVF as the store manager at the AVF facility at 14055 Hall Rd. Shelby Township Michigan (the "Shelby Store").  The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required.  If a response is deemed required, the allegations are denied.

7.      The Trustee admits that Plaintiff Jennifer Sawle ("SAWLE") was employed by AVF as a salesperson at the AVF store located at 8748 West Saginaw Highway, Lansing, Michigan (the "Lansing Store"). The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required.  If a response is deemed required, the allegations are denied.

8.      The Trustee is informed and believes that on or about March 5, 2020, AVF notified Plaintiff STEWART and Plaintiff SAWLE in writing as follows:

> Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations. The Company submits this notice to you to satisfy any obligation that may exist under the federal

3

Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily. All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "Warn Act Notice"). The remaining allegations are denied.

9.    The Trustee admits that Plaintiffs were not terminated on May 5, 2020.

The Trustee is informed and believes that on March 19, 2020, AVF notified Plaintiffs in writing

as follows:

On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations. Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not

scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "Revised Warn Act Notice"). The remaining allegations are denied.

10.     On information and belief, the Trustee admits that Plaintiff SAWLE's last day of employment was March 20, 2020.

11.     The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and on that basis, the allegations are denied.

12.     The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and on that basis, the allegations are denied.

13.     On information and belief, the Trustee admits that in connection with the cessation of the Debtors' operations, AVF terminated approximately 3,006 employees between March 20, 2020 and April 3, 2020, and LEVIN terminated approximately 1,355 employees between March 20, 2020 and May 29, 2020  (collectively, the "Terminated Employees"). The Trustee denies that the Terminated Employees were terminated without advance written notice. The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph as to unnamed class members, and as such they are denied.

5

PA01071

14.     The Trustee admits the allegations in this paragraph.

15.     The Trustee admits that AVF maintained and operated its corporate headquarters at 6340, 6440 and 6500 E. 14 Mile Road, Warren, Michigan (the "Headquarters Facility") and that it operated additional facilities. The Trustee denies that AVF or any other Defendant owned the Headquarters Facility. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required.

16.     On information and belief, the Trustee admits the allegations in this paragraph as of the Petition Date.

17.     The Trustee lacks sufficient knowledge to admit or deny the allegations in this paragraph, which are therefore denied.

18.     The Trustee denies that the Petition Date was March 9, 2020. On information and belief, the Trustee admits that prior to March 8, 2020 (the "Petition Date"), the Debtors operated stores in Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19.     The Trustee admits that between March 20, 2020 and May 29, 2020, AVF and LEVIN terminated the Terminated Employees. On information and belief, the Trustee admits that AVF, although not required, in an abundance of caution provided the Warn Act Notice on or about March 5, 2020 and the Revised Warn Act Notice on or about March 19, 2020 to employees who worked at the following locations: (a) 27775 Novi Road, Novi MI 48377 (AVF Store 19); (b) 4375 28th Street SE Grand Rapids, MI 49512 (AVF Store 25); (c) 4095 East Court Street Burton, MI 48509 (AVF Store 34); (d) 14055 Hall Road Shelby Township, MI 48315 (AVF Store 44); (e) 8748 West Saginaw Highway Lansing MI 48917 (AVF Store 71); (f)

6

PA01072

4273 Alpine Avenue NW Comstock Park MI 49321 (AVF Store 83); (g) 6340, 6440 and 6500 E Fourteen Mile Road in Warren, MI 48092 (Tech Plaza/AVF Warehouse/Corporate); (h) 1150 115th Street Bolingbrook, IL 60490 (AVF Bolingbrook Warehouse and AVF Store 180); (i) 1021 Butterfield Road Downers Grove IL 60515 (AVF Store 197) (the "AVF Target Locations").  On information and belief, the Trustee admits that between March 20, 2020 and April 3, 2020, in connection with the cessation of the Debtors' operations, AVF terminated approximately 1551 employees who worked at the AFV Target Locations and 1455 employees who worked at its other locations (the "AVF Non-Target Locations").  On information and belief, the Trustee admits that LEVIN, although not required, in an abundance of caution, provided the Warn Act Notice on or about March 5, 2020 and the Revised Warn Act Notice on or about March 19, 2020 to employees who worked at 301 Fitz Henry Road Smithton PA 15479 (the "LEVIN Target Location").  On information and belief, the Trustee admits that between March 20, 2020 and May 29, 2020, in connection with the cessation of the Debtors' operations, LEVIN terminated approximately 305 employees who worked at the LEVIN Target Location and 1050 employees who worked at its other locations (the "LEVIN Non-Target Locations"). The remaining allegations are conclusions of law to which no response is required. To the extent that a response is deemed required, the allegations are denied.

20.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

21.     The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

PA01073

22. The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

23. The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

24. The Trustee is without knowledge or information sufficient to form a belief as the truth or falsity of the allegations in this paragraph.

25. The Trustee admits that the Debtors conducted a liquidation and is without knowledge or information sufficient to form a belief as the truth or falsity of the remaining allegations in this paragraph.

26. On information and belief, the Trustee admits the allegations in this paragraph.

27. The Warn Act Notice is a writing that speaks for itself. Therefore, the Trustee denies the allegations in this paragraph.

28. The Warn Act Notice is a writing that speaks for itself. Therefore, the Trustee denies the allegations in this paragraph.

29. On information and belief, the Trustee admits the allegations in this paragraph.

30. The Trustee denies the allegation in this first sentence of this paragraph. The Debtors filed voluntary petitions under Chapter 11 of Title 11 of the United States Bankruptcy Code to liquidate all of their assets. The Trustee admits that the cases are being jointly administered.

PA01074

## Federal WARN Act Class Allegations

31.     The Trustee admits only that Plaintiffs have filed a putative class action on behalf of themselves and a class of all similarly situated employees pursuant to Federal Rule of Civil Procedure 23(a)(b)(1) and (3), Federal Rule of Bankruptcy Procedure 7023, the WARN Act, 29 U.S.C. 2101.  The Trustee denies that the class is appropriate and denies that the Debtors violated any law.  The Trustee denies all the other allegations in the paragraph.

32.     The Trustee denies all the other allegations in the paragraph, and denies that there was any violation of any law.

33.     The Trustee admits the allegations in this paragraph.

34.     The Trustee denies that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits that the Debtors' books and records contain addresses for the Terminated Employees. The Trustee denies all the other allegations in the paragraph.

35.     The Trustee denies that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits that the Debtors' books and records contain the rate of pay and benefits for the Terminated Employees. The Trustee denies all the other allegations in the paragraph.

36.     The allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

a.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining

9

PA01075

allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied; and

        b.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

        c.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

        37.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The Trustee admits only that the Plaintiffs and the Terminated Employees worked for AVF or Levin and were terminated between March 20, 2020 and May 29, 2020.  The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

        38.     The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations that Plaintiffs "have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation," and as such they are denied.  The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required.  If a response is deemed required, the allegations are denied.

DOCS_DE:236738.7 05233/003

PA01076

39.     The Trustee admits only that the Plaintiffs and the Terminated Employees were terminated between March 20, 2020 and May 29, 2020. The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

40.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

41.     The Trustee denies that the Defendants violated the Warn Act, that class certification is appropriate and that there are any "WARN Class Members". The remaining allegations in this paragraph are conclusions of law to which no responsive pleading is required. If a response is deemed required, the allegations are denied.

42.     The Trustee is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and as such they are denied.

## Claim For Relief Violation Of the Federal WARN Act

43.     The Trustee incorporates by reference his responses above to paragraphs 1 through 42 as if set forth in full herein.

44.     On information and belief, the Trustee admits that AVF and LEVIN each employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States. The Trustee denies the allegations with respect to each of the other Defendants.

11

PA01077

45.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. To the extent a response is deemed to be required, the Trustee admits that AVF and LEVIN each employed more than 100 employees (excluding part time employees) on or about March 19, 2020. The Trustee denies that any of the Defendants were "employers" as defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a).

46.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. To the extent a response is deemed to be required, the Trustee admits only that the two named Plaintiffs were employed by AVF. The Trustee denies that any of the Defendants were "employers" as defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a).

47.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. The Trustee denies that the Defendants violated the WARN Act.

48.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required. The Trustee denies that the Defendants violated the WARN Act.

49.     The allegations in this paragraph are conclusions of law to which no responsive pleading is required. To the extent that a response is deemed required, the Trustee admits that the two named Plaintiffs were terminated by AVF without cause on their part. The Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations as to unnamed class members, and as such they are denied.

50.     The allegations in this paragraph are a conclusion of law to which no responsive pleading is required.  To the extent that a response is deemed required, the Trustee admits that the two named Plaintiffs were terminated by AVF without cause on their part. The

12

PA01078

Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations as to unnamed class members, and as such they are denied. Furthermore, the Trustee denies that any of the Defendants were "employers" as defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a).

51.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

52.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

53.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegations.

54.     The Trustee is without knowledge information sufficient to form a belief as to the truth or falsity of the allegations, and as such they are denied.

55.     The allegations in this paragraph state a conclusion of law to which no responsive pleading is required. To the extent a response is deemed required, the Trustee denies the allegation.

**Affirmative Defenses**

56.     The Trustee asserts the following affirmative defenses, without accepting the burden of proof on any claim or defense where such burden would otherwise be on Plaintiffs.

PA01079

**First Affirmative Defense**

Defendants Are Not "Employers" Under the WARN Act.
(29 U.S.C. § 2101(a)(1))

57.     None of the Defendants was an "employer" under the WARN Act at the

time of the Revised Warn Act Notice and the March 20, 2020 layoff.  Under the WARN Act, an

"employer" is "any business enterprise that employs—(A) 100 or more employees (A) 100 or

more employees, excluding part-time employees; or (B) 100 or more employees who in the

aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."  29 U.S.C. §

2101(a)(1).

58.     At the time of the Revised Warn Act Notice and the March 20, 2020

layoff, AVF and LEVIN were chapter 11 debtors that had ceased operating as going concerns

and were merely conducting a liquidation. As such, AVF and LEVIN were acting as liquidating

fiduciaries for the benefit of creditors and were not operating a "business enterprise" for the

purpose of the WARN Act.

59.     Accordingly, neither AVF nor LEVIN (or any other Defendant) was an

"employer" subject to the WARN Act's notice requirements.  29 U.S.C. § 2101(a)(1).

**Second Affirmative Defense**

Unforeseeable Business Circumstances Exception
(29 U.S.C. § 2102(b)(2)(A))

60.     To the extent that any of the Defendants is determined to be an

"employer" under the WARN Act, the claims of Plaintiffs and all persons alleged to be similarly

situated are barred pursuant to 29 U.S.C. § 2102(b)(2)(A) because (a) an employer may order a

plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass

layoff is caused by business circumstances that were not reasonably foreseeable as of the time

that notice would have been required; and (b) AVF and LEVIN gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to 29 U.S.C. § 2102(b)(3).

61.     The COVID-19 pandemic (which prevented the Defendants from conducting going-out-of business sales as originally planned post-petition) and the resulting government ordered business closures (or threatened closures) and the restriction of citizens to their homes: (i) caused the March 20, 2020 layoff; (ii) was a business circumstances that was not reasonably foreseeable on January 18, 2020 when AVF and LEVIN would have had to give notice of the March 20, 2020 layoff (if they were "employers" under the WARN Act); and (iii) AVF and Levin gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to the Revised Warn Act Notice.

62.     Accordingly, the Defendants are not liable to Plaintiffs for any violation of the WARN Act.

### Third Affirmative Defense
Natural Disaster Exception
(29 U.S.C. § 2102(b)(2)(B))

63.     To the extent that any of the Defendants is determined to be an "employer" under the WARN Act, the claims of Plaintiffs and all persons alleged to be similarly situated are barred pursuant to 29 U.S.C. § 2102(b)(2)(B) pursuant to which no notice is required if the plant closing or mass layoff is due to any form of natural disaster.

64.     The March 20, 2020 layoff was (i) due to the COVID-19 pandemic (which prevented the Defendants from conducting going-out-of business sales as originally planned post-petition) and the resulting government ordered business closures (or threatened closures)

PA01081

and the restriction of citizens to their homes, and (ii) COVID-19 is a "natural disaster" under the Warn Act.

65.     While under 29 U.S.C. § 2102(b)(2)(B), "no notice" is required, AVF and Levin gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to the Revised Warn Act Notice.  Accordingly, the Defendants are not liable to Plaintiffs for any violation of the WARN Act.

## Fourth Affirmative Defense
Contractual Mandatory Arbitration

66.     Plaintiff STEWART and Plaintiff SAWLE are required to arbitrate the claims alleged in the Complaint pursuant to the terms of those certain Arbitration Agreements (the "Arbitration Agreements") they each entered into in connection with their employment in which they agreed to submit to final and binding arbitration of, *inter alia*, any dispute, matter or controversy arising out of their employment or the termination of their employment (the "Mandatory Arbitration Provision").

67.     All of Plaintiffs' claims set forth In the Complaint are subject to the Mandatory Arbitration Provision. Accordingly, the Court should dismiss the Complaint.

## Fifth Affirmative Defense
Class Action Prohibition

68.     Pursuant to the terms of the Arbitration Agreements, Plaintiff STEWART and Plaintiff SAWLE are required to arbitrate the claims alleged in the Complaint "in an individual capacity and not as plaintiff or class member in any purported class, collective action or representative proceeding (the "Class Action Prohibition Provision")."

69.     All of Plaintiffs' claims set forth in the Complaint are subject to the Class

Action Prohibition Provision. Accordingly, the Court should (a) dismiss the Complaint and/or (b)

deny certification of a class.

### Sixth Affirmative Defense
Failure to Mitigate

70.     The claims of Plaintiffs and all persons alleged to be similarly situated

may be barred in whole or in part by his or her failure to mitigate damages.

### Seventh Affirmative Defense
Good Faith

71.     The claims of Plaintiffs and all other persons alleged to be similarly

situated are barred and or may be reduced pursuant to 29 U.S.C. § 2104(a)(4) because any act or

omission by the Defendants was in good faith and without intent to deny Plaintiffs or class

members rights and the Defendants had reasonable grounds for believing it was not in violation

of the WARN Act.

### Eighth Affirmative Defense
Unclean Hands, Estoppel & Waiver

72.     The claims of Plaintiffs and all persons alleged to be similarly situated

may be barred in whole or in part by the doctrine of unclean hands, estoppel or waiver.

### Ninth Affirmative Defense
Failure to State A Claim

73.     The Complaint fails to state a claim against all Defendants.

17

PA01083

### Tenth Affirmative Defense
No Priority
(11 U.S.C. §§ 503, 507,726)

74.     Any damages awarded to Plaintiffs and all other persons alleged to be similarly situated are not entitled to priority under any provision of the Bankruptcy Code including but not limited to 11 U.S.C. § 503, 11 U.S.C. § 507 and 11 U.S.C. § 726.

### Eleventh Affirmative Defense
No Damages

75.     Plaintiffs and all other persons alleged to be similarly situated suffered no damages or losses due to any alleged violation of the WARN Act.

### Reservation of Rights

76.     The Trustee reserves the right to amend or add additional defenses which may become later known during the course of discovery or pretrial procedures.

DOCS_DE:236738.7 05233/003

PA01084

WHEREFORE, the Trustee requests that the Court deny all of the relief requested

by the Plaintiffs, and grant such other relief to the Trustee as may be just and proper, including,

without limitations, reimbursement of legal fees and expenses and all other cost and expenses

incurred by the estates in defending against the causes of action set forth in the Complaint.


Respectfully Submitted,

Dated:  October 29, 2021                    PACHULSKI STANG ZIEHL & JONES LLP


*/s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Beth E. Levine (NY Bar No. 2572246) (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:       bsandler@pszjlaw.com
                 blevine@pszjlaw.com
                 crobinson@pszjlaw.com
                 pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

# EXHIBIT F

*to Declaration of René S. Roupinian*

PA01086

| | |
|---|---|
| **From:** | Rene Roupinian |
| **To:** | Bradford J. Sandler (bsandler@pszjlaw.com); Beth Levine |
| **Cc:** | Jack Raisner; Gail Lin |
| **Subject:** | Art Van WARN |
| **Date:** | Tuesday, November 16, 2021 6:05:43 PM |

Beth and Brad,

The Trustee's responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents are overdue.  Please let us know when we may expect them.

Thank you,

Rene'

René S. Roupinian | Partner
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, NY 10016
T & F 212-221-1747
rsr@raisnerroupinian.com
www.raisnerroupinian.com
www.warnlawyers.com

| From: | Beth Levine |
|-------|-------------|
| To: | Rene Roupinian; Bradford J. Sandler |
| Cc: | Jack Raisner; Gail Lin; Erin Gray; Colin R. Robinson |
| Subject: | RE: Art Van WARN |
| Date: | Wednesday, November 17, 2021 3:31:43 PM |

Dear Rene:

I write in response to your email of yesterday in which you stated that the Trustee's responses to the Interrogatories and RFPs that you served on April 28, 2021 (the "Discovery Requests") were overdue.

Respectfully, we disagree. The agreed pretrial order signed by the Court on June 10, 2021 ("PTO") states, "All formal discovery and litigation shall be stayed during the mediation process, including without limitation, the Trustee's obligation to respond to the Plaintiffs Discovery Requests." PTO at ¶ 14. It then lists a series of dates, all of which key off the date on which Judge Gross issued his Mediation Report (October 15, 2021) that are applicable to pre-trial proceedings, but it does not address the issue of the timing of the Trustee's responses to the Discovery Requests. It certainly does not state, as you do in your declaration in support of the Plaintiffs Motion for Class Certification and Related Relief (the "Certification Motion"), that the parties would resume written discovery upon the conclusion of the mediation on July 27, 2021.

We intend to respond to the Discovery Requests, and are currently attempting to reconcile the significant amounts of informal discovery we have already provided to you both before and after the mediation to your formal requests. We have, to date, provided among other information, the following:

1. 6/29/2020: Excel spreadsheets for both Art Van and Levin with all of the information you have requested with respect to employees at the WARN locations who were terminated within 30 days of March 4, 2020 and thereafter, including
    (a) the date of his/her hire;
    (b) the date of his/her termination;
    (c) the site he or she worked or, if remote, reported to;
    (d) the reason for his/her separation, i.e., laid off, terminated for cause, voluntarily quit, retired;
    (e) whether he/she was hourly or salary;
    (f) his/her final rate of pay;
    (g) the amount of his/her gross weekly, biweekly or monthly compensation; and
    (h) the cost of his/her weekly, biweekly or monthly fringe benefits ("Employee Termination Data");
2. 9/17/2020: Updated excel spread sheets that included Employee Termination Data for employees terminated employees at non-Warn Act locations and average weekly employee pay for the 60 days prior to the March 20, 2020 layoff;
3. 10/5/2020: Store number and location spreadsheet;
4. 11/20/2020: Employee Termination Data for Levin sales force;
5. 7/12/2021: Documents responsive to your pre-mediation informal discovery requests, including board minutes and the AVF wind down plan;

6. 7/20/2021: Responses via email to follow up questions regarding Employee Termination Information;
7. 7/28/2021: Arbitration Agreements signed by each of the plaintiffs; and,
8. 8/10/2021: Employee Handbooks

This list is not exhaustive.

Notwithstanding that we believe you have substantially all information necessary for your 2 clients, we intend to serve formal responses to the Discovery Requests on or before December 1, 2021.

We also acknowledge the discovery you served today, and will respond to that in accordance with the applicable rules.

Regards,

Beth

**Beth Levine**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7720
Tel: 212.561.7700 | Fax: 212.561.7777
blevine@pszjlaw.com
vCard | Bio | LinkedIn



Los Angeles | San Francisco | Wilmington, DE | New York | Costa Mesa

---

**From:** Rene Roupinian [mailto:rsr@raisnerroupinian.com]
**Sent:** Tuesday, November 16, 2021 9:06 PM
**To:** Bradford J. Sandler <bsandler@pszjlaw.com>; Beth Levine <blevine@pszjlaw.com>
**Cc:** Jack Raisner <jar@raisnerroupinian.com>; Gail Lin <gcl@raisnerroupinian.com>
**Subject:** Art Van WARN

Beth and Brad,

The Trustee's responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents are overdue. Please let us know when we may expect them.

PA01089

Thank you,

Rene'

René S. Roupinian | Partner
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, NY 10016
T & F 212-221-1747
rsr@raisnerroupinian.com
www.raisnerroupinian.com
www.warnlawyers.com

# EXHIBIT G

*to Declaration of René S. Roupinian*

PA01091

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC., *et al.,*[1]<br><br>                Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br>v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>                Defendants. | Adv. Pro. No. 20-50548 (CSS) |

## PLAINTIFFS' SECOND REQUEST
## FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

Plaintiffs Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated (the "Plaintiffs"), by and through their undersigned counsel, request that Debtor Art Van Furniture, LLC, et al. (together "Debtors" or "Defendants") respond to the following requests for production within 30 days of the date of service:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

## **DEFINITIONS**

Unless indicated otherwise, the following words and phrases are defined and used herein as follows:

1.      "Plaintiffs" shall mean Todd Stewart and Jennifer Sawle, the persons named as Plaintiffs in the caption of this action.

2.      "Defendants" or "Debtors" shall mean the entities named in the caption of this action, including each of the names under which it conducts business, its respective employees, officers, directors, agents, advisors, consultants, attorneys and representatives and all other persons under its control.

3.      "Putative Class Members" shall mean the putative class defined as: Plaintiffs and all persons (i) who worked at, reported to, or received assignments from Defendants' Facilities, (ii) who were terminated without cause beginning on or about March 19, 2020, and within 90 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020, and (iii) who are "affected employees" within the meaning of 29 U.S.C. § 2101(a)(5).

4.       "Facilities" shall mean the sites where Defendants conducted business operations during the period January 1, 2020 through September 30, 2020 and which fall under the WARN Act's definition of "Facility or Operating Unit" or "Single Site of Employment" (29 C.F.R. § 639.3), including, but not limited to, the facilities located at 6500 E. 14 Mile Road, Warren, Michigan, 14055 Hall Rd. Shelby Township, Michigan and 8748 West Saginaw Highway, Lansing, Michigan.

5.    "Affirmative Defense" shall mean a ground for dismissal that Defendants have or intend to assert including in their First Amended Answer to the Complaint, dated October 29, 2021 (ECF 40).

6.    The "WARN Act" shall mean the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq*.

7.    "Communication" shall mean the transmittal of information in the form of facts, ideas, inquiries or otherwise such as in e-mail form.

8.    "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including without limitation, electronic or computerized data compilations such as e-mails. A draft or non-identical copy is a separate document within the meaning of this term.

9.    "Identify" with respect to documents:  When referring to documents, to "identify" means to give, to the extent known, the (i) type of document, (ii) general subject matter, (iii) date of the document, (iv) author(s), addressee(s) and recipient(s), and (v) the last known location of the document and the identity of person who has possession of it.

10.   "Identify" with respect to persons:  When referring to persons, to "identify" means to give the name, the title, the last known residence address, the last known e-mail address, and the last known business address of the person.

11.   The terms "Plaintiff" or "Defendants," as well as a party's full or abbreviated name or a pronoun referring to a party shall mean the party and, where applicable, its officers, directors, employee, partners, corporate parent, subsidiaries, or affiliates.

12.   "Person" is defined as any natural person or any business, legal or governmental entity or association.

3

13. "Concerning" means relating to, referring to, describing, evidencing, or constituting.

14. The terms "all" and "each" shall be construed as all and each.

15. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

16. The use of the singular form of any word includes the plural and vice-versa.

## INSTRUCTIONS

Unless otherwise indicated, the following instructions apply to, and are incorporated into, all Definitions, Requests, and Instructions:

1. With respect to each document produced, Plaintiffs request that Defendants specify the Request(s) to which the document is responsive.

2. Pursuant to Fed. R. Civ. P. 34, each document shall be produced as it is kept in the usual course of business and shall be organized and labeled with the categories in these requests.

3. At or before the filing of the complaint in this case, Defendants were under a duty to preserve documents and ESI related to this matter. Accordingly, Plaintiffs expect that Defendants and its counsel will prevent the destruction or alteration of any documents requested herein by the operation of any electronic information system (routine or otherwise) and hereby put Defendants on notice that any destruction or alteration of such documents, or any action that makes such documents more difficult or expensive to access and use, without completing a meet and confer process with Plaintiffs' counsel regarding such action, will not be considered to be in "good faith," as contemplated in Fed. R. Civ. P. 37(f). If Defendants does not believe that it can reasonably comply with this instruction, Plaintiff requests that Defendants contact Plaintiffs'

4

counsel in writing, within 10 days from receipt of these Requests, to meet and confer about whether immediate Court intervention is necessary.

4.      Unless otherwise indicated, Plaintiffs request that Defendants produce responsive documents pursuant to the agreements reached by the parties after their meet and confer discussions about the preferred format for such production.  Plaintiffs request that Defendants not unilaterally select an electronic format for production.

5.      Alternatively, if Defendants do not wish to meet and confer about the format for production of documents, Plaintiffs request such documents as follows:

a.      Documents should be provided on DVD, CD or external hard drive. The volume of the ESI will determine whether documents are provided on CD, DVD or hard drives.

b.      Documents should not be zipped, compressed, encrypted, or otherwise restricted or proprietarily protected for specific use.

c.      Defendants may compress and/or encrypt the production archive for delivery purposes but should provide passwords for any compressed archives under separate cover, along with a description of any software needed to decrypt the archive.

d.      A cover letter or fact sheet should be included describing in as much detail as practicable the contents of the collection.

e.      Documents created or stored electronically should not be produced in hard copy.  All ESI should be produced with the metadata requested below.

f.      All documents should be produced as they are ordinarily maintained, for example, organized by custodian or source.

g.      All productions should be free of computer viruses.

5

h.      All deliverables should include a metadata load file that is a .DAT or .TXT format with standard Concordance delimiters, and contain all fields outlined below.  Image load files should be provided in .OPT format.

i.      Documents should be produced with TIFF images and named according to the Bates number of the corresponding TIFF image. Each *.tiff file should be assigned a unique name matching the Bates number of the corresponding image.  The Bates number should be consistent across the production, contain no special characters, and be numerically sequential within a given document.  Attachments to documents should be assigned Bates numbers that directly follow in sequential order the Bates numbers on the documents to which they were attached.  If a Bates number or set of Bates numbers is skipped, the skipped number or set of numbers should be noted, for example, with a placeholder.

j.      All unredacted documents should be provided with complete document-level extracted text files.  In the event a document contains text which is to be redacted, OCR text files should be provided for any un-redacted portions of the documents.  Document-level OCR text files should be provided for any unredacted portions of redacted documents and for all hard copy scanned documents.  The extracted full text and/or OCR text for all deliverables should be in separate document-level TXT files.  These TXT files may either be provided in a separate folder or included in the same folder as their corresponding images. The number of TXT files per folder should be limited to 1,000 files.

k.      Paper documents should be scanned and processed to TIFF files.  If a document is available to Defendants both in paper and electronic form, Plaintiffs request that Defendants produce the requested document in electronic form, as described herein.

6

l.      For email collections, the parent-child relationships (the association between emails and attachments) should be preserved.  Email attachments should be consecutively produced with the parent email record.

m.      Documents originating in spreadsheet or presentation programs such as Excel or Powerpoint should be produced in native form.  For deliverables containing native files such as Excel and PowerPoint files, a native file path/link should be included in the metadata load file. Additionally, a Bates-stamped TIFF placeholder should be included in the production and reflected in the image load file. The number of native files per folder should be limited to 1,000 files.

n.      In the event that responses to these requests contain ESI from proprietary or non-proprietary databases, the parties will meet and confer to discuss the fields contained in the database and the best means of producing responsive information from them, such as running reports or queries.  In the event that ESI will be produced directly from a database, the ESI should be produced in a comma delimited file or in Excel format, with all formulae and records of irregular or manual manipulation of data reflected.  If proprietary software is required to access or use documents in their native format, please supply such software.  A written list of all database fields and a reasonable description for each field, or a "database dictionary" should be included.

o.      All images should be provided in single-page, Group IV TIFF with a resolution of 300 DPI.  Bates numbers and confidentiality designations should be electronically branded on each produced *.tiff image. These .TIFF images should be provided in a separate folder and the number of TIFF files per folder should be limited to 1,000 files.

p.      For deliverables containing multi-media files, the following production format should be used:

PA01098

        i.      Audio Data Files: Audio data files should be produced in audio Windows Media Audio ("WMA") format or "MP3" format.

        ii.     Video Files: Video files should be produced in Audio/Video Interleaved ("AVI") format.

        iii.    Image Files: If providing color images, files should be produced in "JPEG/JPG" format with a resolution of 150 to 300 DPI.

        q.    Metadata to be produced: The following metadata fields should be produced for each document to the extent that such information is available at the time of collection and processing, except that if a field contains privileged information, that privileged information may be redacted and noted in a corresponding privilege log. All requests should be read to include a request for all metadata associated with all documents responsive to the request.

| FIELD NAME | DESCRIPTION | CATEGORY |
|---|---|---|
| BEGDOC | Starting bates | Hardcopy, edoc, email and attachment |
| ENDDOC | Ending bates | Hardcopy, edoc, email and attachment |
| PARENTID | First bates number of parent email. (Populate in child(ren) record(s) only) | Emails and attachments (populated through processing) |
| FAMLYRNG OR ATTACHRNG | Family (Range of bates related documents (i.e. email & attachment) - this field will be populated for all records in the family.) | Hard copy, edoc, emails and attachments (populated through processing) |
| BEGATTACHID | First BATES of attachment(s) | Hard copy, edoc, emails and attachments (populated through processing) |
| ENDATTACHID | Last BATES of family (populate on families only) | Hard copy, edoc, emails and attachments (populated through processing) |
| CUSTODIAN | Person from whom file was obtained | Hardcopy (if coded), edoc, email and attachment (populated through processing) |
| PRPERTIES OR RCRDTYPE | Record Type – will be either "email", "attachment", "edoc" or "hardcopy" | |

8

| FIELD NAME | DESCRIPTION | CATEGORY |
|---|---|---|
| FROM | Email Author | Emails (populated through processing) |
| TO | Recipient | Emails (populated through processing) |
| CC | CC field - In the event of emails | Emails (populated through processing) |
| BCC | Bcc field - in the event of emails | Emails (populated through processing) |
| SUBJECT | Subject | Emails (populated through processing) |
| DOCTITLE | Document Title/name of the original native file as it existed at the time of collection. | Hardcopy (if coded), edoc or attachment (populated through processing) |
| DOCDATE | Document Date/Date Sent, format MM/DD/YYYY, this is the SORT_DATE field, so populate across families | Email and Attachments |
| DATESENT | Email Sent Date, format MM/DD/YYYY | Emails (populated through processing) |
| TIMESENT | Date sent 00:00:00 AM/PM | Emails (populated through processing) |
| DATECREATED | Date first created, format MM/DD/YYYY | Edoc or attachment (populated through processing) |
| DATESVD | Date last saved/modified, format MM/DD/YYYY | Edoc or attachment (populated through processing) |
| TIMESVD | Time saved 00:00:00 AM/PM | (populated through processing) |
| DATERCVD | Date received/accessed, format MM/DD/YYYY | Emails (populated through processing) |
| TIMERCVD | Time received 00:00:00 AM/PM | (populated through processing) |
| PAGECOUNT | Document page count | Edoc or attachment (populated through processing) |
| ATTILE | File name/Attachment Name | Electronic files and/or attachments (populated through processing) |
| APPLICAT | Application used to open the file (Word, PowerPoint, Adobe, Excel, Explorer, Quicken, etc.) | Electronic files and/or emails, attachments (populated through processing) |
| FOLDERID OR ORIGFOLDERPATH OR FILEPATH | File path/folder structure of original native file as it existed at the time of collection. | Electronic files and/or emails, attachments (populated through processing) |

9

| FIELD NAME | DESCRIPTION | CATEGORY |
|---|---|---|
| | i.e. Path of email in mailbox (populate for email attachments also); Filepath of edocs or scanned docs (if requested) | |
| **DOCLINK** or **NATIVEFILE** | Active link reflecting current filepath back to the native file | Electronic files and/or emails, attachments (populated through processing **and only provided if receiving native files**.) |
| **FILEEXTEN** | In the event of attachments or emails, this will enable us to search by document type. Sample contents: *PST, MSG, PDF, DOC, PPT, HTM,* etc. etc. | Electronic files and/or emails, attachments (populated through processing) |
| **AUTHOR** | In the event of attachments, this field contains the 'author' of the document | For Hard Copy docs (if coded) or electronic files and or attachments (populated through processing) |
| **HASH** | Hash value for de-dupe | Electronic files and/or attachments (populated through processing) |
| **HEADER** | Contains all the routing information from the header section of an email message | Emails (populated through processing) |
| **TEXT** | Text of email in the event of emails; text of attachment in the event of attachments; We recognize that some attachments will not have text that can be properly rendered into text (JPGs, GIFs, Flash Files, etc.), but for those flat files such as PDFs which do not have extractable text, we would like them OCR'd, and the contents placed in the TEXT field. | For Hardcopy, electronic files, emails and attachments. |

6.      With respect to each request, Defendants are requested to provide all documents in its possession, custody, or control that are known to Defendants or that Defendants can locate or discover through reasonably diligent efforts.

10

PA01101

7.      If Defendants cannot respond or produce documents in response to any part of the following Requests in full, please respond to the extent possible, specifying the reason or reasons for Defendants' inability to respond or produce documents in response to the remainder of the Requests.

8.      If, to Defendants' knowledge, documents responsive to one or more requests were never in Defendants' possession, custody, or control but are or have been in the possession, custody, or control of any other person, please identify all such persons.

9.      If any responsive document was formerly in Defendants' possession, custody, or control but has been eliminated from Defendants' possession in any way, including, but not limited to, having been lost, destroyed, transmitted, or discarded, please submit a written statement as follows:

a.   The basis for withholding such document;

b.   A generic description of the document being withheld;

c.   The date the information contained in the document was learned or the document created;

d.   The identity of the individual(s) who learned the information or authored the document;

e.   The date the document was transmitted or otherwise made available to anyone; and

f.   The specific Request(s) to which the withheld document relates.

10.      If requested documents are maintained in a file, folder, or other container, please produce the file, folder, or other container, or a complete copy of same, with the documents.  For ESI that originates in a digital folder structure, please produce the folder names and relationships as metadata.

11

11. The scope of your search for ESI shall include all forms of ESI collection, preservation, transmission, communication, and storage, including:

a. All ESI generated and maintained in the ordinary course of business, including ESI stored on mainframe computers or local and network computers or drives or servers or any other media or location where ESI can be or is stored;
b. Distributed data or removable data, i.e., information which resides on portable media and non-local drives, including home computers, laptop computers, magnetic or floppy discs, CD-ROMs, DVDs, zip drives, Internet repositories including email hosted by Internet service providers, handheld storage devices such as PDAs, BlackBerry devices, cellular telephones, and flash memory drives;
c. Forensic copy or backup ESI, including archive and backup data tapes and discs;
d. Network ESI, including voice mail systems, email servers, ISP servers, network servers, cloud servers and fax servers;
e. Legacy ESI, i.e., retained data that has been created or stored by the use of software or hardware that has been rendered outmoded or obsolete;
f. Metadata, i.e., information regarding a particular data set which describes how, when and by whom it was collected, created, accessed and modified and how it is formatted.

12. Unless otherwise indicated in writing, the failure to produce any documents in response to any request herein means that such documents do not exist, or are not in Defendants' possession, custody, or control, or the possession, custody, or control of Defendants' agents or anybody acting on Defendants' behalf.

13. To the extent documents responsive to these requests have already been produced by Defendants, state the unique identifier (e.g., MD 5 Hash value) or Bates number for each responsive document that was previously produced.

## DOCUMENT REQUESTS

1. Produce all documents and/or communications that support Defendants' statement in the Chapter 7 Trustee's First Amended Answer to Complaint dated October 29, 2021 (ECF 40), paragraph 58 that "[a]t the time of the Revised Warn Act Notice and the March 20, 2020 layoff, AVF and LEVIN were chapter 11 debtors that had ceased operating as going concerns

12

and were merely conducting a liquidation. As such, AVF and LEVIN were acting as liquidating

fiduciaries for the benefit of creditors and were not operating a "business enterprise" for the

purpose of the WARN Act."

2.        Produce all documents and/or communications that refer to the Chapter 7

Trustee's First Amended Answer to Complaint dated October 29, 2021 (ECF 40), Fifth

Affirmative Defense, that "[p]ursuant to the terms of the Arbitration Agreements, Plaintiff

STEWART and Plaintiff SAWLE are required to arbitrate the claims alleged in the Complaint

"in an individual capacity and not as plaintiff or class member in any purported class, collective

action or representative proceeding (the "Class Action Prohibition Provision")."

3.        Produce all documents and/or communications that refer to the Chapter 7

Trustee's First Amended Answer to Complaint dated October 29, 2021 (ECF 40), Seventh

Affirmative Defense, that "[t]he claims of Plaintiffs and all other persons alleged to be similarly

situated are barred and or may be reduced pursuant to 29 U.S.C. § 2104(a)(4) because any act or

omission by the Defendants was in good faith and without intent to deny Plaintiffs or class

members rights and the Defendants had reasonable grounds for believing it was not in violation

of the WARN Act."

4.        Produce all documents and/or communications that refer to the Chapter 7

Trustee's First Amended Answer to Complaint dated October 29, 2021 (ECF 40), Tenth

Affirmative Defense, that "[a]ny damages awarded to Plaintiffs and all other persons alleged to

be similarly situated are not entitled to priority under any provision of the Bankruptcy Code

including but not limited to 11 U.S.C. § 503, 11 U.S.C. § 507 and 11 U.S.C. § 726."

5.        Produce all documents and/or communications sent or received by the following

individuals (identified in Defendants' Initial Disclosures dated October 29, 2021, Section A) that

13

refer or relate to efforts to seek financing for Defendants during the period January 1, 2019 through September 30, 2020: Gary Fazio, James Ferguson, Gus Glyptis, David Ladd, Michelle Dolski, Matthew Damiani, Marcelo Podesta, Jeff Swenson, Cliff Longley, Alex Smith, Gary A. Van Elslander, David Alexander, Douglas Haber, Cathrine Wenger, Lauren Murphy,  Danielle Baldinelli, Robert Levin, and Dennis Stogsdill.

6.      Produce all documents and/or communications sent or received by the following individuals (identified in Defendants' Initial Disclosures dated October 29, 2021, Section A) that refer or relate to the allegations in Plaintiff's Complaint: Gary Fazio, James Ferguson, Gus Glyptis, David Ladd, Michelle Dolski, Matthew Damiani, Marcelo Podesta, Jeff Swenson, Cliff Longley, Alex Smith, Gary A. Van Elslander, David Alexander, Douglas Haber, Cathrine Wenger, Lauren Murphy,  Danielle Baldinelli, Robert Levin, and Dennis Stogsdill.

7.      Produce all documents identified in Defendants' Initial Disclosures (dated October 29, 2021), Section B.

8.      Produce all documents that reflect the corporate hierarchy of each of the Defendants, including but not limited to certificates of incorporation, operating agreements, and bylaws.

9.      Produce all documents reflecting or referring to negotiations between Wells Fargo Capital Finance and all employees, executive, officers, directors, advisors and agents of Debtors regarding amendments, forbearances or other modifications to the Debtors' credit facilities with Wells Fargo Capital Finance, during the period January 1, 2019 through September 30, 2020.

10.     Produce all documents and/or communications that refer or relate to all liquidation analyses of Debtors during the period January 1, 2019 through September 30, 2020.

14

11.     Produce all documents and/or communications that refer or relate to efforts to liquidate the inventory of Defendants during the period January 1, 2019 through September 30, 2020.

12.     Produce all documents and/or communications that refer or relate to efforts to sell assets or stock of Defendants during the period January 1, 2019 through September 30, 2020.

13.     Produce documents reflecting communications between Thomas H. Lee Partners, L.P. ("THL") and Wells Fargo Capital Finance regarding offers by Thomas H. Lee Partners to provide financing for the business operations of Defendants during the period January 1, 2020 through September 30, 2020.

14.     Produce all documents and/or communications that refer or relate to efforts to increase business for Defendants during the period January 1, 2019 through September 30, 2020.

15.     Produce all minutes, records and resolutions of each of the Defendant's Board of Directors meetings during the period January 1, 2019 through September 30, 2020, including submissions to the Board of Directors and committees of the Board of Directors at, or in anticipation of, such meetings.

16.     Produce all employee handbooks that were in effect during the period January 1, 2020 through September 30, 2020 for individuals who were employed by each of the Defendants.

17.     Produce documents reflecting communications between Thomas H. Lee Partners, L.P. ("THL") and any members of the Van Eslander family regarding the formation of a "Consortium" to make capital investments into the business operations of Defendants during the period January 1, 2020 through September 30, 2020.

15

18.     Produce documents reflecting communications between Thomas H. Lee Partners, L.P. ("THL") and any members of the Van Eslander family regarding or relating to any efforts to make capital investments into the business operations of Defendants during the period January 1, 2020 through September 30, 2020.

19.     Produce documents reflecting communications between THL and members of the Van Eslander family regarding any effort provide financing for the business operations of Defendants during the period January 1, 2020 through September 30, 2020.

20.     Produce documents reflecting communications between THL and any members of the Van Eslander family regarding the possibility of proving a guarantee for loans to finance the business operations of Defendants during the period January 1, 2020 through September 30, 2020.

21.     Produce documents reflecting communications between THL and Wells Fargo Capital Finance regarding offers by THL to provide financing for the business operations of Defendants during the period January 1, 2020 through September 30, 2020.

22.     Produce documents reflecting communications between THL and Wells Fargo Capital Finance regarding offers all offers by third parties to provide financing for the business operations of Defendants during the period January 1, 2020 through September 30, 2020.

23.     Produce documents reflecting communications between Debtors and legal counsel relating or referring to the "natural disaster" exception to the WARN Act.


Dated: November 17, 2021

                              */s/ René S. Roupinian*
                              René S. Roupinian (*admitted pro hac vice*)
                              Jack A. Raisner (*admitted pro hac vice*)
                                        16

**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

**THE LAW OFFICES OF JOYCE, LLC**
Michael J. Joyce (No. 4563)
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

*Attorneys for Plaintiffs and the putative class*

17

PA01108

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Jenny Hoxha, under penalty of perjury, certify the following as true and correct:  I am not a party to this action, employed by Raisner Roupinian LLP, and I am over 18 years of age. I hereby certify that I caused true and correct copies of *Plaintiffs' Second Request for Production of Documents to Defendants* and the corresponding *Certificate of Service* to be served upon the parties listed below via email as listed below:

**Service List:**

Bradford J. Sandler

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

Colin R. Robinson
Peter J. Keane
Beth Levine
**PACHULSKI STANG ZIEHL & JONES LLP**
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Email: bsandler@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com
blevine@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee for Debtors*


Dated: November 17, 2021

/s/    *Jenny Hoxha*
Jenny Hoxha

PA01110

# EXHIBIT H

*to Declaration of René S. Roupinian*

PA01111

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
|  | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, |  |
| Plaintiffs, |  |
| v. |  |
| ART VAN FURNITURE, LLC, et al., |  |
| Defendants. |  |

### CHAPTER 7 TRUSTEE'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS

Alfred T. Giuliano, the chapter 7 trustee (the "Trustee") of the bankruptcy estates

of Art Van Furniture, LLC, AVF Holding Company, Inc., AVCE, LLC, AVF Holdings I, LLC,

AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada,

LLC, AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., Sam Levin,

Inc., and Comfort Mattress LLC (collectively, the "Debtors" or the "Defendants") in the above-

captioned adversary proceeding (the "Adversary Proceeding"), hereby objects and responds to

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_DE:237156.2 05233/003

Plaintiffs Todd Stewart and Jennifer Sawle (the "Plaintiffs") *First Request for Production of Documents to Defendants* (the "RFP").

## GENERAL OBJECTIONS

Each of the following statements and general objections ("General Objections") apply to the RFP, and the Trustee makes its response to the RFP subject to these General Objections:

1.      The Trustee has made a good faith effort to investigate and identify information and documents responsive to the RFP.  The Trustee's discovery, investigation and trial preparation in the Adversary Proceeding, however, are continuing.  The Trustee is a chapter 7 trustee appointed post-conversion of the above-captioned, jointly administered bankruptcy cases from chapter 11 to chapter 7 that has no direct knowledge or involvement in, the affairs of the Debtors that are at issue in the Adversary Proceeding.  In addition, as chapter 7 estates, the Debtors terminated all of their former officers and employees who did have such involvement and/or knowledge.  These responses are based on information presently available to the Trustee and his attorneys.  Accordingly, the Trustee reserves the right (a) to amend, supplement or modify the response to the RFP based on any responses to any discovery requests or subpoenas, including any documents produced in response to such discovery requests or subpoenas, (b) to amend, supplement or modify its response to the RFP based on any further discovery, investigation and trial preparation in the Adversary Proceeding, (c) to amend, supplement or modify its response to the RFP to incorporate or reflect later discovered documents and information to the extent required by law, and (d) to introduce – at deposition, at hearing, at trial or otherwise – any evidence from any source hereafter obtained.

2.      The response to the RFP is provided without waiver of, and with express reservation of, the following: (a) all objections as to competency, relevance, materiality and/or

admissibility of the response, or the subject matter thereof, as evidence for any purpose in the Adversary Proceeding or any other proceeding; (b) all privileges and other protections, including the attorney-client privilege, work product doctrine and common interest doctrine; (c) all objections as to the confidentiality of any documents; (d) all other objections to the use of the response, or the subject matter thereof, on any ground in the Adversary Proceeding or any other proceeding; and (e) the right to object on any ground at any time to a demand or request for any further response(s) to the RFP, or to any other discovery requests in the Adversary Proceeding.

3.      The Trustee objects to the RFP to the extent it calls for the disclosure of confidential, proprietary and/or private information or documents, or the disclosure of information or documents protected from discovery by the attorney-client privilege, the work product doctrine, the common interest doctrine and/or any other applicable privilege or protection. The production of any confidential, proprietary, private, privileged or otherwise protected information or documents in response to the RFP is inadvertent, and is not intended as and shall not be deemed to be a waiver or impairment of any claim of confidentiality, privilege or other applicable protection.

4.      The Trustee objects to the RFP to the extent it conflicts with, seeks to expand upon, purports to require responses inconsistent with, or purports to impose obligations beyond the requirements of the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure.

5.      The Trustee objects to the RFP to the extent it seeks information or documents not relevant to any party's claim or defense in the Adversary Proceeding, and/or not proportional to the needs of the Adversary Proceeding.

6.      The Trustee objects to the RFP as unduly burdensome and oppressive to the extent it purports to require unreasonably costly and/or time-consuming measures to locate, review and produce or identify responsive documents or information.

7.     The Trustee objects to the RFP to the extent it seeks the production of documents that are not reasonably or readily available to the Debtor, and/or that are not within its possession, custody or control.

8.     The Trustee objects to the RFP to the extent it seeks documents that already have been provided or made available to the Plaintiffs, are otherwise in the possession of the Plaintiffs, are equally or more readily available to the Plaintiffs from other sources, and/or are a matter of public record.

9.     The Trustee objects to the time periods of the Requests as not reasonably calculated to lead to the discovery of admissible evidence or not relevant to the nature of this action. The Trustee performed and will continue to perform searches of the Debtors' electronic and email systems that he has access to for the period from January 18, 2020 through and including March 20, 2020 and objects to and will not re-run any searches prior to this date as to do so is unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence or not relevant to the nature of this action.

10.     The Trustee objects to Instruction No. 1 in that it purports to require the Trustee to identify to which request each document is responsive.  For the documents previously produced by the Trustee and for those it will produce in response to the RFP, it would be unduly burdensome for the Trustee to identify the request to which each document is responsive, especially given that such information is evident on its face for the vast majority of the requests.

11.     The Trustee objects to Instruction No. 5 and reserves all rights with respect to the format(s) for production by the Trustee.  The Trustee, as applicable, will meet and confer with the Plaintiffs regarding the format(s) for production.

## DOCUMENT REQUESTS

1.      Produce all documents that relate to or reflect Defendants' responses to Plaintiffs' First Set of Interrogatories to Defendants.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad, and unduly burdensome.  The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the non-privileged documents of the Debtors that were previously produced to the Plaintiffs.  The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

2.      Produce all documents and/or communications reflecting communications that relate to this action.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad, and unduly burdensome.  The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the non-privileged documents of the Debtors that were previously produced to the

Plaintiffs. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

       3.     Produce all documents and/or communication sent and received by every director, board member and officer of Defendants concerning the decision to terminate the employment of Plaintiffs and Putative Class Members.

**ANSWER:**

       The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad, and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

       4.     Produce documents that reflect the number of employees who worked at each of the Facilities during the period between October 1, 2019 through June 30, 2020, including their beginning-and-end dates of employment.

**ANSWER:**

       The Trustee incorporates the General Objections as though set forth herein. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiff to the non-privileged documents of the Debtors that were previously produced to the Plaintiffs.

5.      Produce documents that reflect the number of employees (including part-time and full-time) who worked at each of Defendants' Facilities during the period between October 1, 2019 through June 30, 2020, including their beginning-and-end dates of employment.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiff to the non-privileged documents of the Debtors that were previously produced to the Plaintiffs.

6.      Produce documents that reflect the address of each of Defendants' Facilities where employees received a termination notice dated March 19, 2020, and the names of employees at each store who received the notice.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiff to the non-privileged documents of the Debtors that were previously produced to the Plaintiffs. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

7.      Produce documents that reflect the address of each of Defendants' Facilities where employees received the document dated March 5, 2020, titled "Important Company Announcement", addressed to All Team Members from the Executive Team (attached hereto as Exhibit A), and the names of employees at each store who received the notice.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiff to the non-privileged documents of the Debtors that were previously produced to the Plaintiffs. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

  8. Produce documents that reflect the address of each of Defendants' Facilities where employees received a WARN notice dated March 19, 2020, and the names of employees at each store who received the notice.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiff to the non-privileged documents of the Debtors that were previously produced to the Plaintiffs. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

**ANSWER:**

  9. Produce documents that reflect the address of each of Defendants' Facilities where employees received a copy of the document dated March 5, 2020, titled "WARN Act Notice," from Cathrine Wenger, Senior Counsel, that was distributed to employees (attached hereto as Exhibit B), and the names of employees at each store who received the notice.

**ANSWER:**

   The Trustee incorporates the General Objections as though set forth herein. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiff to the non-privileged documents of the Debtors that were previously produced to the Plaintiffs. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

   10. Produce all documents and/or communications reflecting the drafting of the documents dated March 5, 2020, titled "WARN Act Notice," from Cathrine Wenger, Senior Counsel that was distributed to employees in Michigan and Illinois (attached hereto as Exhibit B).

**ANSWER:**

   The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

   11. Produce documents that reflect Plaintiffs and the Putative Class Members' employment benefits, including health insurance (medical, dental and vision), supplemental insurance, life insurance, long and short-term disability benefits, time-off benefits, retirement savings, health and welfare benefits, including 401k plans, company vehicle, fuel, and education reimbursement.

PA01120

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome.  By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

12.     Produce all documents and/or communications concerning every in-person meeting held on or before March 5, 2020 at which Defendant's managers, executives, directors, board members or supervisors met with Defendant's employees regarding their terminations, including all lists of attendees, sign-in sheets, scripts, memos, handouts and talking points for such meeting(s).

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad, and unduly burdensome.  By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

13.     Produce all documents and/or communications reflecting the drafting of the document "Termination of Benefits" dated March 19, 2020 (attached hereto as Exhibit C).

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome.  The

DOCS_DE:237156.2 05233/003

Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

14. Produce all documents and/or communications reflecting the drafting of the document titled "Memorandum" to "Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321" dated March 19, 2020 (attached hereto as Exhibit D).

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

15. Produce all documents and/or communications reflecting the drafting of the document "Frequently Asked Questions-Store Associates (Art Van, Levin and Wolf Closing)" (attached hereto as Exhibit E)

DOCS_DE:237156.2 05233/003

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

16. Produce all documents and/or communications reflecting the drafting of the document titled "Meeting Instructions," dated March 5, 2020, addressed to "Art Van and Wolf Leaders" from Michelle Dolski & Irene Fostyk (attached hereto as Exhibit F).

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

17. Produce all documents and/or communications reflecting the drafting of the document titled "Frequently Asked Questions #1/ Benefits Contacts" (attached hereto as Exhibit G).

**ANSWER:**

     The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

     18.    Produce all documents reflecting every employee who signed the WARN Act Notice Receipt Acknowledgment, including lists of attendees, sign-in sheets, scripts, memos, summaries, and compilations of such lists (attached hereto as Exhibit H).

**ANSWER:**

     The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee will produce, on a rolling basis after service of this response, those non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

     19.    Produce all minutes, records, and resolutions of Defendants' Board of Directors meetings during the period March 1, 2019 through June 30, 2020, including submissions to the Boards of Directors and committees of the Boards of Directors at, or in anticipation of, such meetings.

DOCS_DE:237156.2 05233/003

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiff to the non-privileged documents of the Debtors that were previously produced to the Plaintiffs. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

20.     Produce all documents and/or communications reflecting efforts to seek additional business which would have enabled Defendants to avoid the terminations of Plaintiffs and Putative Class Members.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad, and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

PA01125

21.     Produce all documents and/or communications concerning Defendants'
financing during the period March 1, 2019 through June 30, 2020.

**ANSWER:**

        The Trustee incorporates the General Objections as though set forth herein. The
Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad, and
unduly burdensome.  The Trustee further objects to the extent that this Request calls for
information that is protected by the attorney-client privilege or the work product doctrine.  By way
of further response, and without waiving the foregoing objections, the Trustee directs the
Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned
bankruptcy case.  The Trustee will produce, on a rolling basis after service of this response,
additional non-privileged documents of the Debtors, if any, in the possession, custody and control
of the Trustee.

22.     Produce all documents and/or communications during the period March 1,
2019 through June 30, 2020 reflecting proposals for financing, loans, capital investments, loan
guarantees and capital infusions from any source, including but not limited to Thomas H. Lee
Partners, L.P., to the Debtors to fund Debtors' operations.

**ANSWER:**

        The Trustee incorporates the General Objections as though set forth herein. The
Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad, and
unduly burdensome.  The Trustee further objects to the extent that this Request calls for
information that is protected by the attorney-client privilege or the work product doctrine.  By way
of further response, and without waiving the foregoing objections, the Trustee directs the

Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

23.     Produce all documents and/or communications during the period March 1, 2019 through June 30, 2020 reflecting Debtors' default of its revolving credit facility with Wells Fargo, including all communications regarding Wells Fargo's agreement to a forbearance until March 28, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through June 30, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

24.     Produce all documents and communications during the period March 1, 2019 through March 28, 2020 reflecting Wells Fargo assuming control of Defendants' available cash.

**ANSWER:**

   The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through March 28, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

   25. Produce all documents and/or communications during the period March 1, 2019 through March 28, 2020 reflecting all agreements between Defendants and Wells Fargo that Defendants would immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by February 28, 2020.

**ANSWER:**

   The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through March 28, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response,

additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

26.     Produce all documents and/or communications during the period March 1, 2019 through March 28, 2020 reflecting the terms of all outstanding loans, credit lines, and other indebtedness between Defendants and its lenders that were in existence as of February 28, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through March 28, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case.  The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

27.     Produce all documents and/or communications between Defendants and its lenders during the period March 1, 2019 through September 30, 2020 referencing the maturity date of all outstanding loans, credit lines, and other indebtedness by Defendant that were in existence as of March 19, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through September 30, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

28. Produce all documents and/or communications between Defendants and its lenders during the period March 1, 2019 through March 19, 2020 that refer or relate to all forbearance agreements between Defendants and its lenders that were in effect during that period.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

29.     Produce all documents and/or communications reflecting efforts to seek capital or financing which would have enabled Defendants to avoid the terminations of Plaintiffs and Putative Class Members.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case.  The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

30.     Produce all documents and/or communications reflecting efforts to renegotiate leases or reduce expenses which would have enabled Defendants to avoid the terminations of Plaintiffs and Putative Class Members.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the

Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case.  The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

31.     Produce all documents and/or communications concerning Defendants' seeking of capital during the period March 1, 2019 through June 30, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through June 30, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case.  The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

32.     Produce all documents and/or communications during the period March 1, 2019 through June 30, 2020 reflecting proposals for financing, loans, capital investments, loan guarantees and capital infusions from any source, including but not limited to Thomas H. Lee Partners, L.P., to the Debtors to fund Debtors' operations.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through June 30, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

33.     Produce all documents and/or communications reflecting efforts to seek capital or financing which would have enabled Defendant to avoid the terminations of Plaintiffs and Putative Class Members.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response,

additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

34.     Produce all documents and/or communications concerning a sale of all or parts of Defendants' company or operational assets during the period March 1, 2019 through June 30, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through June 30, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors and the Trustee in the above-captioned bankruptcy case.  The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

35.     Produce all documents and/or communications that reflect any agreement by Robert Levin to purchase Levin Furniture and select Wolf stores pending court approval.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by

the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors and the Trustee in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

36.     Produce all documents and/or communications from the period March 1, 2019 through June 30, 2020 concerning any proposed sale of Defendants' assets to any third-party entity.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through June 30, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors and the Trustee in the above-captioned bankruptcy case.  The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

37.     Produce all documents and/or communications concerning Defendants' efforts to renegotiate leases or reduce expenses during the period March 1, 2019 through March 31, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through June 30, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

38. Produce all documents and/or communications concerning Defendants' decision to file for bankruptcy during the period March 1, 2019 through March 8, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through March 8, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response,

additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

39.     Produce all documents and/or communications concerning Defendants' liquidation, including its winddown and cessation of operations during the period December 1, 2019 through September 30, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.  By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors and Trustee in the above-captioned bankruptcy case.  The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

**ANSWER:**

40.     Produce all documents and/or communications during the period March 1, 2019 through March 28, 2020 reflecting all agreements between Defendants and Wells Fargo that Defendants would immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by February 28, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome. The Trustee further objects to the period March 1, 2019 through March 28, 2020 in this Request. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

41.     Produce all documents and/or communications concerning any change in the terms or conditions of the employment of Defendants' employees during the period January 1, 2020 through September 30, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period January 1, 2020 through September 30, 2020. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response,

additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

42.    Produce all documents and/or communications concerning the consideration of COVID-19 as it related to Defendants during the period January 1, 2020 through September 30, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is vague, ambiguous, overly broad and unduly burdensome. The Trustee further objects to the period January 1, 2020 through September 30, 2020. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents of the Debtors, if any, in the possession, custody and control of the Trustee.

43.    Produce all documents and/or communications that refer to Defendants' First Affirmative Defense in its Answer that the terminations were caused by "business circumstances that were not reasonably foreseeable as of the time that notice would have been required" and that "AVF and LEVIN gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to 29 U.S.C. § 2102(b)(3)." (ECF 25)

**ANSWER:**

   The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents, if any, in the possession, custody and control of the Trustee.

   44. Produce all documents and/or communications that refer to Defendants' Second Affirmative Defense in its Answer that the mass layoffs or plant closings were caused by a natural disaster and that "AVF and LEVIN gave as much notice as was practicable along with a brief statement of the basis for reducing the notification period pursuant to 29 U.S.C. § 2102(b)(3)." (ECF 25)

**ANSWER:**

   The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine. By way of further response, and without waiving the foregoing objections, the Trustee directs the Plaintiffs to the documents and pleadings publicly filed by the Debtors in the above-captioned bankruptcy case. The Trustee will produce, on a rolling basis after service of this response, additional non-privileged documents, if any, in the possession, custody and control of the Trustee.

45.     Produce all written opinions by Defendants' legal counsel to Defendants' owner(s), officers and/or directors concerning Defendants' legal obligations to its employees pursuant to the WARN Act.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request to the extent that it is overly broad and unduly burdensome. The Trustee further objects to the extent that this Request calls for information that is protected by the attorney-client privilege or the work product doctrine.

46.     Produce all documents and/or communications that Defendants will rely upon to defend this action.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee objects to this Request as vague, ambiguous, overly broad and unduly burdensome.

Dated:  December 1, 2021          PACHULSKI STANG ZIEHL & JONES LLP


                                  /s/ Colin R. Robinson
                                  Bradford J. Sandler (Bar No. 4142)
                                  Colin R. Robinson (Bar No. 5524)
                                  Peter J. Keane (Bar No. 5503)
                                  919 North Market Street, 17th Floor
                                  Wilmington, DE 19801
                                  Telephone:  (302) 652-4100
                                  Facsimile:   (302) 652-4400
                                  Email:  bsandler@pszjlaw.com
                                          crobinson@pszjlaw.com
                                          pkeane@pszjlaw.com

                                  *Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## CHAPTER 7 TRUSTEE'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS

Alfred T. Giuliano, the chapter 7 trustee (the "<u>Trustee</u>") of the bankruptcy estates

of Art Van Furniture, LLC, AVF Holding Company, Inc., AVCE, LLC, AVF Holdings I, LLC,

AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada,

LLC, AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., Sam Levin,

Inc., and Comfort Mattress LLC (collectively, the "<u>Debtors</u>" or the "<u>Defendants</u>") in the above-

captioned adversary proceeding (the "<u>Adversary Proceeding</u>"), hereby objects and responds to

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

Plaintiffs Todd Stewart and Jennifer Sawle (the "Plaintiffs") *First Set of Interrogatories to Defendants* (the "Interrogatories").

<div align="center">

**GENERAL OBJECTIONS**

</div>

Each of the following statements and general objections ("General Objections") apply to the Interrogatories, and the Trustee makes its response to the Interrogatories subject to these General Objections:

1.     The Trustee has made a good faith effort to investigate and identify information and documents responsive to the Interrogatories.  The Trustee's discovery, investigation and trial preparation in the Adversary Proceeding, however, are continuing.  The Trustee is a chapter 7 trustee appointed post-conversion of the above-captioned, jointly administered bankruptcy cases from chapter 11 to chapter 7 that has no direct knowledge or involvement in, the affairs of the Debtors that are at issue in the Adversary Proceeding.  In addition, as chapter 7 estates, the Debtors terminated all of their former officers and employees who did have such involvement and/or knowledge.  These responses are based on information presently available to the Trustee and his attorneys.  Accordingly, the Trustee reserves the right (a) to amend, supplement or modify the response to the Interrogatories based on any responses to any discovery requests or subpoenas, including any documents produced in response to such discovery requests or subpoenas, (b) to amend, supplement or modify its response to the Interrogatories based on any further discovery, investigation and trial preparation in the Adversary Proceeding, (c) to amend, supplement or modify its response to the Interrogatories to incorporate or reflect later discovered documents and information to the extent required by law, and (d) to introduce – at deposition, at hearing, at trial or otherwise – any evidence from any source hereafter obtained.

2.     The response to the Interrogatories is provided without waiver of, and with express reservation of, the following: (a) all objections as to competency, relevance, materiality

and/or admissibility of the response, or the subject matter thereof, as evidence for any purpose in the Adversary Proceeding or any other proceeding; (b) all privileges and other protections, including the attorney-client privilege, work product doctrine and common interest doctrine; (c) all objections as to the confidentiality of any documents; (d) all other objections to the use of the response, or the subject matter thereof, on any ground in the Adversary Proceeding or any other proceeding; and (e) the right to object on any ground at any time to a demand or request for any further response(s) to the Interrogatories, or to any other discovery requests in the Adversary Proceeding.

3.      The Trustee objects to the Interrogatories to the extent they seek the disclosure of confidential, proprietary and/or private information or documents, or the disclosure of information or documents protected from discovery by the attorney-client privilege, the work product doctrine, the common interest doctrine and/or any other applicable privilege or protection. The production of any confidential, proprietary, private, privileged or otherwise protected information or documents in response to the Interrogatories is inadvertent, and is not intended as and shall not be deemed to be a waiver or impairment of any claim of confidentiality, privilege or other applicable protection.

4.      The Trustee objects to the Interrogatories to the extent they conflict with, seek to expand upon, purport to require responses inconsistent with, or purport to impose obligations beyond the requirements of the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure.

5.      The Trustee objects to the Interrogatories to the extent they seek information or documents not relevant to any party's claim or defense in the Adversary Proceeding, and/or not proportional to the needs of the Adversary Proceeding.

6.      The Trustee objects to the Interrogatories as unduly burdensome and oppressive to the extent they purport to require unreasonably costly and/or time-consuming measures to locate, review and produce or identify responsive documents or information.

7.      The Trustee objects to the Interrogatories to the extent they seek the production of documents that are not reasonably or readily available to the Trustee, and/or that are not within his possession, custody or control.

8.      The Trustee objects to the Interrogatories to the extent they seek documents that already have been provided or made available to the Plaintiffs, are otherwise in the possession of the Plaintiffs, are equally or more readily available to the Plaintiffs from other sources, and/or are a matter of public record

9.      The Trustee objects to the time periods of the Interrogatories as not reasonably calculated to lead to the discovery of admissible evidence or not relevant to the nature of this action. The Trustee performed and will continue to perform searches of the Debtors' electronic and email systems that he has access to for the period from January 18, 2020 through and including March 20, 2020 and objects to and will not re-run any searches prior to this date as to do so is unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence or not relevant to the nature of this action

## INTERROGATORIES

1.      Identify every person who participated in any discussions on behalf of Defendant regarding the decision to wind-down operations beginning on March 5, 2020 and terminate the Plaintiffs and the Putative Class Members.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to this Interrogatory on the basis that (a) the term "participated" is vague and ambiguous and (b) the scope of this Interrogatory is overbroad.  Subject to and without waiving the foregoing objections, Gary Fazio, James Ferguson, Gus Glyptis, David Ladd,

Michelle Dolski, Matthew Damiani, Marcelo Podesta, Jeff Swenson, Cliff Longley, Alex Smith, Gary A. Van Elsander, David Alexander, Douglas Haber, Catherine Wenger, Robert Levin and Dennis Stogsdill.  The Trustee further responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents that the Trustee previously produced to the Plaintiffs and the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

   2. Identify every individual who received the "WARN Act Notice" dated March 5, 2020 from Cathrine Wenger, Senior Counsel, that was distributed to employees (attached as Exhibit B to Plaintiffs' First Request for Production of Documents to Defendants), including a) the date received, b) his or her work address or facility to which he or she was assigned, c) the manner of distribution, and d) his or her last day of work.

**ANSWER**:

   The Trustee incorporates the General Objections as though set forth herein. Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents that the Trustee previously produced to the Plaintiffs and the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

   3. Identify every individual who received the document titled "Termination of Benefits" dated March 19, 2020 (attached as Exhibit C to Plaintiffs' First Request for Production

of Documents to Defendants), including a) the date received, b) his or her work address or facility to which he or she was assigned, c) the manner of distribution, and d) his or her last day of work.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents that the Trustee previously produced to the Plaintiffs and the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

4.      Identify the total number of employees at each of Debtors' facilities where the March 19, 2020 "Termination of Benefits" (attached as Exhibit C to Plaintiffs' First Request for Production of Documents to Defendants) was distributed.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents that the Trustee previously produced to the Plaintiffs and the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

5.      Identify every individual who received the document titled "Memorandum" to "Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd,

Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,

49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748

W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321" dated

March 19, 2020 (attached as Exhibit D to Plaintiffs' First Request for Production of Documents to

Defendants), including a) the date received, b) his or her work address or facility to which he or

she was assigned, c) the manner of distribution, and d) his or her last day of work.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.

Subject to and without waiving the foregoing objections, the Trustee responds to this

Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive,

non-privileged documents that the Trustee previously produced to the Plaintiffs and the

responsive, non-privileged documents, if any, that the Trustee will produce in response to the

Plaintiffs' *First Request for Production of Documents to Defendants*.

6.      Identify the date that drafting of the following documents began and all

persons who participated in the drafting of each document:

(a)      Frequently Asked Questions-Store Associates (Art Van, Levin and

Wolf Closing), (attached as Exhibit E to Plaintiffs' First Request for

Production of Documents to Defendants);

(b)      Meeting Instructions to Art Van and Wolf Leaders (WARN

Announcement/Talking Points) dated March 5, 2020 (attached as Exhibit

F to Plaintiffs' First Request for Production of Documents to

Defendants);

(c)  "Frequently Asked Questions #1/ Benefits Contacts" (attached as Exhibit G to Plaintiffs' First Request for Production of Documents to Defendants); and

(d)  "Important Company Announcement, Memorandum to All Team Members" dated March 5, 2020 (attached as Exhibit A to Plaintiffs' First Request for Production of Documents to Defendants).

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to this Interrogatory on the basis that (a) the term "participated" is vague and ambiguous and (b) the scope of this Interrogatory is overbroad and unduly burdensome. Subject to and without waiving the foregoing objections, Gary Fazio, James Ferguson, Gus Glyptis, David Ladd, Michelle Dolski, Matthew Damiani, Marcelo Podesta, Jeff Swenson, Cliff Longley, Alex Smith, Gary A. Van Elsander, David Alexander, Douglas Haber, Catherine Wenger, Robert Levin and Dennis Stogsdill.  The Trustee further responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

7.  For every meeting held (including in person, telephonically or remotely) with the Plaintiffs and Putative Class Members regarding their terminations, state the date of each meeting, identify every attendee at the meeting, and describe all written communications distributed to employees at the meeting.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to this Interrogatory on the basis that the scope of this Interrogatory is unduly burdensome and overbroad.  Subject to and without waiving the foregoing objections, the Trustee further responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

8.      Identify every employee who signed the WARN Act Notice Receipt Acknowledgment (attached as Exhibit H to Plaintiffs' First Request for Production of Documents to Defendants) and produce all lists of attendees, sign-in sheets, scripts, memos, summaries, and compilations of such lists.

 **ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to this Interrogatory on the basis that the scope of this Interrogatory is unduly burdensome and overbroad.  Subject to and without waiving the foregoing objections, the Trustee further responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

9.      State whether Defendants consulted with legal counsel regarding the drafting of Exhibits A-H to Plaintiffs' First Request for Production of Documents to Defendants

and, if the answer is in the affirmative, identify the name of such legal counsel, state the date on which each communication occurred and the participants.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. Subject to and without waiving the foregoing objections, Kirkland & Ellis LLP. The Trustee further responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

10. Identify every address and location where Defendants conducted business operations where the employees did not receive a WARN Notice and state the reason employees there did not receive a WARN Notice.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

11. State whether Plaintiffs and the Putative Class Members were paid all earned bonuses including productivity bonuses and variable compensation following their terminations. If the answer is in the negative, please state or produce documents sufficient to

determine, the amount of each Putative Class Member's accrued but unpaid bonuses and variable compensation.

**ANSWER:**

  The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to this Interrogatory on the basis that the scope of this Interrogatory is unduly burdensome and overbroad. Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

  12. Identify every partner, employee, manager, principal, or executive of Defendants who participated in any discussions leading to the decision to terminate the employment of Plaintiffs and the Putative Class Members.

**ANSWER:**

  The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to this Interrogatory on the basis that (a) the term "participated" is vague and ambiguous and (b) the scope of this Interrogatory is overbroad and unduly burdensome. Subject to and without waiving the foregoing objections, Gary Fazio, James Ferguson, Gus Glyptis, David Ladd, Michelle Dolski, Matthew Damiani, Marcelo Podesta, Jeff Swenson, Cliff Longley, Alex Smith, Gary A. Van Elsander, David Alexander, Douglas Haber, Catherine Wenger, Robert Levin and Dennis Stogsdill.  The Trustee further responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged

DOCS_DE:237077.2 05233/003

PA01153

documents that the Trustee previously produced to the Plaintiffs and the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

13.     State in detail why 60 days' notice was not provided to Plaintiffs and the Putative Class Members, and identify at least one officer, director, or manager of Defendants with personal knowledge thereof.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. Subject to and without waiving the foregoing objections, David Ladd. The Trustee further responds to this Interrogatory by reference to the Trustee's *Memorandum in Support of Chapter 7 Trustee's Motion for Summary Judgment* [D.I. 44] that sets forth in detail a response to this Interrogatory.

14.     Identify each and every person who participated in drafting Exhibits A through H to Plaintiffs' First RTP to Defendants, including the dates of his or her participation.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to this Interrogatory on the basis that (a) the term "participated" is vague and ambiguous and (b) the scope of this Interrogatory is overbroad. Subject to and without waiving the foregoing objections, Gary Fazio, James Ferguson, Gus Glyptis, David Ladd, Michelle Dolski, Matthew Damiani, Marcelo Podesta, Jeff Swenson, Cliff Longley, Alex Smith, Gary A. Van Elsander, David Alexander, Douglas Haber, Catherine Wenger, Robert Levin and

Dennis Stogsdill.  The Trustee further responds to this Interrogatory, pursuant to Federal Rule of

Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the

Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to*

*Defendants*.

15.     State in detail the "business circumstances that were not reasonably

foreseeable at the time notice would have been required" as set forth in Defendants' First

Affirmative Defense and identify at least one individual with personal knowledge of these

circumstances.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.

Subject to and without waiving the foregoing objections, David Ladd.  The Trustee further

responds to this Interrogatory by reference to the Trustee's *Memorandum in Support of Chapter 7*

*Trustee's Motion for Summary Judgment* [D.I. 44] that sets forth in detail a response to this

Interrogatory.

16.     State every date Defendants conducted a meeting of its boards of directors

during the period March 1, 2019 through June 30, 2020 and, for each date, identify the

participants in the meeting.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The

Trustee further objects to the time period March 1, 2019 through June 30, 2020 set forth in this

Interrogatory and on the basis that this Interrogatory is overbroad and unduly burdensome.

Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents that the Trustee previously produced to the Plaintiffs and by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

       17.     State the name of each member of Defendants' boards of directors during the period March 1, 2019 through June 30, 2020 and, for each person state the term and professional affiliation.

**ANSWER:**

       The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the time period March 1, 2019 through June 30, 2020 set forth in this Interrogatory. Subject to and without waiving the foregoing objections, Jeff Swenson, Cliff Longley, Alex Smith, Gary A. Van Elsander, David Alexander, and Douglas Haber. The Trustee further responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

       18.     Identify each officer, director, managing director, principal, executive, agent, employee, partner, and managing partner of any party, including, but not limited to, Thomas H. Lee Partners, L.P., who participated in the negotiation and/or decision-making of obtaining financing and/or working capital for Defendants during the period March 1, 2019 through March 19, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to this Interrogatory on the basis that the term "participated" is vague and ambiguous. The Trustee further objects to the time period March 1, 2019 through March 19, 2019 set forth in this Interrogatory. The Trustee further responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

19.     Identify each and every partner, employee, manager, principal or executive of any party, including, but not limited to, Thomas H. Lee Partners, L.P. who negotiated on behalf of Defendants to enter into contracts with lenders to provide operating capital to the Facilities during the March 1, 2019 through March 19, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to the time period March 1, 2019 through March 19, 2020 set forth in this Interrogatory. Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

20.     Identify each and every meeting and/or teleconference between all employees, executive, officers, directors, advisors and agents of Defendants and sources of capital

including investors or prospective investors, and lenders and prospective lenders that occurred regarding efforts to obtain financing for Defendants during the period March 1, 2019 through June 30, 2020 and, for each such meeting and/or teleconference, identify the participants and date that such meeting(s) and/or teleconference(s) occurred.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to the time period March 1, 2019 through June 30, 2020 set forth in this Interrogatory and that this Interrogatory is overbroad and unduly burdensome.  Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

21.     Identify each and every meeting and/or teleconference between all employees, executive, officers, directors, advisors and agents of Defendants and any party regarding any transaction to sell all or parts of Defendants' business or assets during the period March 1, 2019 through June 30, 2020 and, for each such meeting and/or teleconference, identify the participants and date that such meeting(s) and/or teleconference(s) occurred.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to the time period March 1, 2019 through June 30, 2020 set forth in this Interrogatory and that this Interrogatory is overbroad and unduly burdensome.  Subject to and

without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to

Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents,

if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of*

*Documents to Defendants*.

22.     Identify each and every meeting and/or teleconference between all

employees, executive, officers, directors, advisors and agents of Defendants and any party that

occurred regarding efforts to obtain new business for Defendants during the period March 1, 2019

through June 30, 2020 and, for each such meeting and/or teleconference, identify the participants

and date that such meeting(s) and/or teleconference(s) occurred.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The

Trustee further objects to the time period March 1, 2019 through June 30, 2020 set forth in this

Interrogatory and that this Interrogatory is overbroad and unduly burdensome.  Subject to and

without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to

Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents,

if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of*

*Documents to Defendants*.

23.     Identify each and every meeting and/or teleconference between all

employees, executive, officers, directors, advisors and agents of Defendants and any party that

occurred regarding efforts to liquidate Defendants during the period January 1, 2020 through June

30, 2020 and, for each such meeting and/or teleconference, identify the participants and date that such meeting(s) and/or teleconference(s) occurred.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to this Interrogatory are overbroad and unduly burdensome. Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

24. Identify each and every meeting and/or teleconference between all employees, executive, officers, directors, advisors and agents of Defendants at which the impact of COVID-19 was discussed January 1, 2020 through June 30, 2020 and, for each such meeting and/or teleconference, identify the participants and date that such meeting(s) and/or teleconference(s) occurred.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein. The Trustee further objects to this Interrogatory as overbroad and unduly burdensome. Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

25.     Identify (or produce documents sufficient to identify) all capital investments, loans and guarantees made to Defendants from March 1, 2019 through June 30, 2020.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The Trustee further objects to the time period March 1, 2019 through June 30, 2020 set forth in this Interrogatory and that this Interrogatory is overbroad and unduly burdensome.  Subject to and without waiving the foregoing objections, the Trustee responds to this Interrogatory, pursuant to Federal Rule of Civil Procedure 33(d), by reference to the documents and pleadings publicly available in the above-captioned chapter 11 bankruptcy case and the responsive, non-privileged documents, if any, that the Trustee will produce in response to the Plaintiffs' *First Request for Production of Documents to Defendants*.

26.     State in detail the facts and legal grounds and identify the witnesses and identify (or produce) the documents on which Defendants intend to rely to support each of their affirmative defenses to Plaintiffs' Complaint, as set forth in the Answer dated December 10, 2020 (ECF 25).

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The Trustee objects to this Interrogatory on the grounds that it is premature because discovery in this action has not been completed and the Trustee has not made any determination as to what facts, legal grounds, witnesses and documents he will rely on at trial.

27.     Identify all documents that Defendants intend to utilize at trial in this

matter.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The

Trustee objects to this Interrogatory on the grounds that it is premature because discovery in this

action has not been completed and the Trustee has not made any determination as to what

documents he will rely on at trial.

28.     Identify all witnesses that Defendants intend to call at trial in this matter.

**ANSWER:**

The Trustee incorporates the General Objections as though set forth herein.  The

Trustee objects to this Interrogatory on the grounds that it is premature because discovery in this

action has not been completed and that the Court has not yet set a date for the submission of

witness lists.  The Trustee will timely provide a witness list.

Dated:  December 1, 2021                    PACHULSKI STANG ZIEHL & JONES LLP

                                            */s/ Colin R. Robinson*
                                            Bradford J. Sandler (Bar No. 4142)
                                            Colin R. Robinson (Bar No. 5524)
                                            Peter J. Keane (Bar No. 5503)
                                            919 North Market Street, 17th Floor
                                            Wilmington, DE 19801
                                            Telephone:  (302) 652-4100
                                            Facsimile:  (302) 652-4400
                                            Email:  bsandler@pszjlaw.com
                                                    pkeane@pszjlaw.com

                                            *Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

DOCS_DE:237077.2 05233/003

## VERIFICATION

I, the undersigned, declare as follows:

I am the chapter 7 trustee (the "Trustee") of the Debtors.  I have read the foregoing responses to the Interrogatories and understand the contents thereof.  Based on my role as the Trustee, I am informed and believe that such responses are true and correct as of the date hereof.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 1, 2021.

                */s/ Alfred T. Giuliano*
                Alfred T. Giuliano, solely in his capacity
                  as chapter 7 trustee of the Debtors

# EXHIBIT 2

AVF Holding Company, Inc.

Board of Directors Update Call

April 2, 2020

A Meeting of the Board of Directors of AVF Holding Company, Inc. convened telephonically at 4:00 P.M. EST on April 2, 2020.

| Person | April 2, 2020 |
|---|---|
| **DIRECTORS** | |
| Jeff Swenson, THL | Present |
| Cliff Longley, THL | Present |
| Doug Haber, THL | Not Present |
| **MANAGEMENT** | |
| David Ladd, AVF CFO | Present |
| Jim Ferguson, AVF COO | Present |
| Mike Zambricki, AVF GC | Present |
| **GUESTS** | |
| Dennis Stogsdill, A&M | Present |
| Nicole Greenblatt, K&E | Present |
| Greg Werkheiser, Benesch | Present |
| Mike Barrie, Benesch | Present |
| Janie McDonough, THL | Present |

**ORDER OF BUSINESS**

I.    **Call to Order**

Two Board members being present constituted a quorum and declaring the meeting to be duly constituted for the transaction of business, Mr. Cliff Longley called the meeting to order at 4:00 P.M. on April 2, 2020.

II.   **Executive Summary**

Given the ongoing, time-sensitive developments regarding the state of the business and the hearings, the Board convened for an update from legal counsel (Benesch) and discussed key updates ███████████████████

██████████████████████████████████████████████████████

████████████████

III.     **Funding of Payroll**

███████████████████████████████████████████████████

████████████████████████████████████████████

IV.     **Healthcare Coverage**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

V.     **Credit Card Processors**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

VI.

█████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

VII.     **Motion to Adjourn**

Mr. Longley called for a motion to adjourn the meeting. Upon motion duly made and seconded, the motion was unanimously approved and the called meeting of the Board of Directors adjourned.

The undersigned being the duly appointed Secretary, certifies the minutes above are a true and correct copy duly recorded and adopted at a duly called meeting of the Board of Directors thereof convened and held in accordance with applicable law and governance documents of the Company and that such resolutions are now in full force and effect.

Respectfully submitted this 2nd day of April, 2020

*Cliff Longley*

Cliff Longley, Acting Secretary

PA01166

# EXHIBIT 3

PA01167

No. 21-11911

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————

ELVA BENSON,

Plaintiff-Appellee,

v.

ENTERPRISE LEASING COMPANY OF ORLANDO, LLC;
& ENTERPRISE HOLDINGS, INC.,

Defendants-Appellants.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

———————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING PLAINTIFF-APPELLEE AND AFFIRMANCE**

———————

BRIAN M. BOYNTON
   *Acting Assistant Attorney General*

MICHAEL S. RAAB
GERARD SINZDAK
   *(202) 514-0718*
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7242*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., NW*
   *Washington, DC  20530*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
# DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, the undersigned counsel of record certifies that the Certificate of Interested Persons contained in Appellee's Response Brief is complete, other than the following additions:

Academy of Florida Management Attorneys

Boynton, Brian M., U.S. Department of Justice, Civil Division

Fiore, Kristen M., Akerman LLP

Kline, Arlene K., Akerman, LLP

Miscimarra, Philip M., Morgan Lewis & Bockius LLP

National Retail Federation

Raab, Michael S., U.S. Department of Justice, Civil Division

Restaurant Law Center

Sinzdak, Gerard J., U.S. Department of Justice, Civil Division

U.S. Chamber of Commerce

As far as the undersigned is aware, no publicly traded corporation has an interest in the outcome of this appeal.

> _/s/ Gerard Sinzdak_
> Gerard Sinzdak
> Attorney for the United States

Dated:  September 17, 2021

PA01169

# TABLE OF CONTENTS

**Page**

CONCISE STATEMENT OF INTEREST OF AMICUS CURIAE............................1

STATEMENT OF THE ISSUE...........................................................................1

STATEMENT OF THE CASE............................................................................2

    A. Statutory and Regulatory Background................................................2

    B. District Court Proceedings.................................................................4

SUMMARY OF ARGUMENT...........................................................................5

ARGUMENT .................................................................................................7

THE DEPARTMENT OF LABOR'S REASONABLE INTERPRETATION OF
THE NATURAL DISASTER EXCEPTION'S CAUSATION REQUIREMENT
IS ENTITLED TO DEFERENCE ........................................................................8

    A.    The statutory phrase "due to" is ambiguous .................................9

    B.    The Department of Labor's interpretation is at least reasonable.............17

CONCLUSION ............................................................................................21

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE
PROCEDURE 32(A)

CERTIFICATE OF SERVICE

PA01170

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Adams v. Director, OWCP,*
  886 F.2d 818 (6th Cir. 1989) ........................................................................ 9, 10

*Alliance of Nonprofit Mailers v. Postal Regulatory Comm'n,*
  790 F.3d 186 (D.C. Cir. 2015) ..................................................................... 9, 17

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020) ............................................................................... 12, 15

*Burrage v. United States,*
  571 U.S. 204 (2014) .........................................................................................15

*Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co.,*
  295 F.3d 59 (1st Cir. 2002).............................................................................12

*Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.,*
  15 F.3d 1275 (5th Cir. 1994) ........................................................................ 6, 11

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ...........................................................................................7

*Crose v. Humana Ins. Co.,*
  823 F.3d 344 (5th Cir. 2016) ...........................................................................10

*General Refractories Co. v. First State Ins. Co,*
  855 F.3d 152 (3d Cir. 2017) ............................................................................12

*Horton v. Reliance Standard Life Ins. Co.,*
  141 F.3d 1038 (11th Cir. 1998).......................................................................13

*Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.,*
  173 F.3d 175 (3d Cir. 1999) ...................................................................10, 11, 12

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,*
  513 U.S. 527 (1995) .........................................................................................14

PA01171

*Kimber v. Thiokol Corp.,*
    196 F.3d 1092 (10th Cir.1999) ................................................................9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ...............................................................................13

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,*
    505 F.2d 989 (2d Cir. 1974) ...................................................................10

*Paroline v. United States,*
    572 U.S. 434 (2014) ........................................................................ 13, 14

*Robers v. United States,*
    572 U.S. 639 (2014) ...............................................................................15

*Samantar v. Yousuf,*
    560 U.S. 305 (2010) ...............................................................................13

*San Antonio Sav. Ass'n v. Comm'r,*
    887 F.2d 577 (5th Cir. 1989) .................................................................11

*Sides v. Macon Cty Greyhound Park, Inc.,*
    725 F.3d 1276 (11th Cir. 2013) .............................................7, 8, 11, 17

*Smith v. BellSouth Telecomms., Inc.,*
    273 F.3d 1303 (11th Cir. 2001) ...............................................................8

*United States v. George,*
    949 F.3d 1181 (9th Cir. 2020) ...............................................................12

*United States v. Monzel,*
    641 F.3d 528 (D.C. Cir. 2011) ...............................................................15

*University of Texas Sw. Med. Ctr. v. Nassar,*
    570 U.S. 338 (2013) ...............................................................................15

*U.S. Postal Serv. v. Postal Regulatory Comm'n,*
    640 F.3d 1263 (D.C. Cir. 2011) ...............................................................9

iv

**Statutes:**

Worker Adjustment and Retraining Notification Act (WARN Act):
29 U.S.C. § 2101 *et seq.* ...........................................................................................1
  29 U.S.C. § 2102(a) .............................................................................2, 7, 11
  29 U.S.C. § 2102(b) .....................................................................................2
  29 U.S.C. § 2102(b)(1) .................................................................................2
  29 U.S.C. § 2102(b)(2)(A) .................................................................2, 18, 19
  29 U.S.C. § 2102(b)(2)(B) ..................................................1, 3, 5, 7, 9, 17
  29 U.S.C. § 2102(b)(3) ...........................................................................3, 18
  29 U.S.C. § 2104(a)(1)-(2) ...........................................................................2
  29 U.S.C. § 2104(a)(3) .................................................................................2
  29 U.S.C. § 2107(a) ..................................................................................1, 3

**Regulations:**

20 C.F.R. § 639.1 ................................................................................................17

20 C.F.R. § 639.1(a) ..........................................................................................11

20 C.F.R. § 639.9 ............................................................................................1, 3

20 C.F.R. § 639.9(b)(1) ......................................................................................18

20 C.F.R. § 639.9(c) ..............................................................................4, 7, 8, 17

20 C.F.R. § 639.9(c)(4) ......................................................................................18

**Rule:**

Fed. R. App. P. 29(a)(2) .......................................................................................1

**Legislative Materials:**

134 Cong. Rec 16,122 (1988)..............................................................................16

134 Cong. Rec. S8689 (daily ed. June 28, 1988) .......................................... 16, 20

H.R. Rep. No. 100-285 (1987).........................................................................17-18

v

**Other Authorities:**

*Due to*:

Merriam Webster Online Dictionary (Aug. 2021) ..........................................................14

Oxford English Dictionary Online (June 2021)...........................................................14

The Oxford English Dictionary 1105 (2d ed. 1989) ....................................................14

PA01174

## CONCISE STATEMENT OF INTEREST OF AMICUS CURIAE

The Secretary of Labor administers the Worker Adjustment and Retraining Notification Act (WARN Act), 29 U.S.C. § 2101 *et seq.* Congress vested the Secretary with broad authority to "prescribe such regulations as may be necessary to carry out" the WARN Act. *Id.* § 2107(a). Pursuant to that authority, the Secretary promulgated 20 C.F.R. § 639.9, which, among other things, identifies the circumstances under which the WARN Act's "natural disaster" exception, 29 U.S.C. § 2102(b)(2)(B), excuses an employer from providing employees with the full 60 days' notice of an impending mass layoff. The district court adopted an interpretation of the exception that is consistent with the Secretary's regulation. Defendants-appellants urge this Court to adopt an interpretation that is at odds with the Secretary's regulation. The Secretary has a strong interest in defending its regulations and in the correct interpretation and application of the WARN Act. The United States therefore files this amicus brief to aid the Court in its deliberations. *See* Fed. R. App. P. 29(a)(2).

## STATEMENT OF THE ISSUE

Whether, in accordance with the Secretary's regulation, the WARN Act's natural disaster exception applies where a mass layoff was the "direct result" of a natural disaster, or, as defendants urge, the exception applies where a natural disaster was merely a "but for" cause of a mass layoff.

# STATEMENT OF THE CASE

## A. Statutory and Regulatory Background

The WARN Act requires businesses that employ 100 or more employees to provide employees and state and local government authorities with 60 days' notice of a forthcoming "plant closing" or "mass layoff." *See* 29 U.S.C. § 2102(a). An employer who fails to give the required notice may be liable to each employee for back pay and benefits for each day that the required notice was not supplied, up to 60 days. *See id.* § 2104(a)(1)-(2). An employer is also subject to civil penalties for failing to provide local government officials with the required notice. *See id.* § 2104(a)(3).

The Act specifies three circumstances under which an employer may provide less than the required 60 days' notice *See* 29 U.S.C. § 2102(b). The first, known as the "faltering business" exception, *id.* § 2102(b)(1), is not relevant here. The second, known as the "unforeseeable business circumstances" exception, provides:

> An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.

*Id.* § 2102(b)(2)(A).

The third, known as the "natural disaster" exception, provides:

> No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.

PA01176

*Id.* § 2102(b)(2)(B). The Act further provides that "[a]n employer relying on this subsection [(setting out the three exceptions that allow reduction of the notice period)] shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." *Id.* § 2102(b)(3).

Congress tasked the Secretary of Labor with administering the WARN Act. Specifically, Congress authorized the Secretary of Labor to "prescribe such regulations as may be necessary to carry out" the Act. 29 U.S.C. § 2107(a). Pursuant to that authority, the Secretary promulgated a regulation interpreting the Act's three exceptions to its notice requirement. *See* 20 C.F.R. § 639.9. With respect to the Act's natural disaster exception, the Department of Labor's regulation provides:

> The "natural disaster" exception in section 3(b)(2)(B) of WARN applies to plant closings and mass layoffs due to any form of a natural disaster.
>
> (1) Floods, earthquakes, droughts, storms, tidal waves or tsunamis and similar effects of nature are natural disasters under this provision.
>
> (2) To qualify for this exception, an employer must be able to demonstrate that its plant closing or mass layoff is a direct result of a natural disaster.
>
> (3) While a disaster may preclude full or any advance notice, such notice as is practicable, containing as much of the information required in § 639.7 as is available in the circumstances of the disaster still must be given, whether in advance or after the fact of an employment loss caused by a natural disaster.
>
> (4) Where a plant closing or mass layoff occurs as an indirect result of a natural disaster, the exception does not apply but the "unforeseeable business circumstance" exception described in paragraph (b) of this section may be applicable.

<center>3</center>

*Id.* § 639.9(c).

## B. District Court Proceedings

Plaintiff is a former employee of the rental-car company Enterprise Leasing Company of Orlando, LLC, a subsidiary of Enterprise Holdings, Inc. (collectively, Enterprise).  Doc. 77, p. 2.  In April 2020, Enterprise initiated a mass layoff at its Orlando and Tampa airport locations.  *Id.*  According to plaintiff, she and other affected employees were given little or no advance notice of the layoff.  *Id.*  Plaintiff filed a class action complaint alleging WARN Act violations.  Enterprise moved to dismiss the complaint.  *Id.*  As relevant here, Enterprise argued that it was not required to provide notice of the layoff under the WARN Act's natural disaster exception, citing the COVID-19 pandemic as the relevant disaster.  *Id.* at 10.

The district court denied Enterprise's motion.  Doc. 77, pp. 10-12.  The court assumed that the pandemic was a natural disaster.  *Id.* at 10.  Citing the Department of Labor's regulation, the court held that the natural disaster exception was nonetheless inapplicable because the complaint did not allege that the layoff was the "*direct result*" of the pandemic, as the exception required.  *Id.*  Instead, the complaint alleged a "more tenuous," indirect connection between the pandemic and the layoff: the pandemic led to a dramatic reduction in travel, which led to a reduction in demand for rental cars, which led to the layoff.  *Id.*  The court emphasized that this "isn't a situation where, for example, a factory was destroyed overnight by a massive flood." *Id.* at 11.

4

PA01178

Although the court found the natural disaster exception inapplicable, it noted that the "unforeseeable business circumstances" exception might apply. Doc. 77, pp. 11, 12. Because a factual dispute over the application of that exception existed, the court denied Enterprise's motion to dismiss on that alternative ground. *Id.* at 12.

Upon Enterprise's request, the district court certified for interlocutory review its order denying Enterprise's motion to dismiss. Doc. 77, pp. 12-17. The court found that a controlling question of law existed as to "causal standard" that "is required to establish that a plant closing or mass layoff is 'due to any form of natural disaster' under the WARN Act's natural disaster exception." *Id.* at 15.

This Court subsequently granted Enterprise's petition for interlocutory review.

## SUMMARY OF ARGUMENT

With the goal of providing workers and state and local government with time to prepare for a mass layoff, the WARN Act requires employers to provide at least 60 days' notice of an impending layoff. The Act provides three circumscribed exceptions to the 60-day notice requirement. One such exception is when a mass layoff is "due to" a natural disaster. 29 U.S.C. § 2102(b)(2)(B). The Secretary of Labor promulgated a regulation interpreting this natural disaster exception as applying where a layoff is the "direct result" of a natural disaster. Because the Secretary's interpretation is, at a minimum, reasonable, it is entitled to deference.

In requiring that a mass layoff be the "direct result" of a natural disaster, the Department of Labor's regulation comports with the text and purpose of the WARN

5

Act.  The Act's exceptions to its foundational 60-days' notice requirements are to be

"narrowly construed."  *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't*

*Stores, Inc.*, 15 F.3d 1275, 1282 (5th Cir. 1994).  The Secretary's "direct result"

requirement appropriately cabins the reach of the natural disaster exception.  It

ensures that an employer cannot evade the Act's advance notice requirements simply

because a layoff has an attenuated connection to a natural disaster, while at the same

time providing relief to employers who are forced to close a plant or layoff a large

number of employees as a direct result of a natural disaster.

The Secretary's interpretation also follows the Act's text and structure.  In

specifying that "no notice" shall be required where a layoff is due to a natural disaster,

Congress understood the exception as applying where advance notice is infeasible as a

general matter.  The Secretary's interpretation accords with that intent.  Where a

natural disaster directly causes a layoff—such as where a flood destroys an employer's

place of business—advance notice of the layoff is not likely to be practicable.  Where

a natural disaster indirectly leads to a layoff—such as where a disaster causes a

reduction in demand for an employer's product—some amount of advance notice is

likely to be practicable.

The Secretary's interpretation also harmonizes the natural disaster exception

and the Act's unforeseeable business circumstances exception.  As the Department of

Labor's regulation expressly recognizes, the unforeseeable business circumstances

exception may apply where a natural disaster leads indirectly to a layoff.  By

6

interpreting the natural disaster exception to apply where a layoff is the direct result of a natural disaster, the Secretary ensured that the natural disaster exception works in concert with the unforeseeable business circumstances exception and does not nullify it in cases where an unforeseeable business circumstance, not a natural disaster, is the direct cause of a mass layoff.

## ARGUMENT

The WARN Act requires most employers to provide 60 days' notice of a forthcoming mass layoff or plant closure. *See* 29 U.S.C. § 2102(a). The Act provides an exception to that requirement where the "plant closing or mass layoff is due to any form of natural disaster." *Id.* § 2102(b)(2)(B). Pursuant to its congressionally delegated authority, the Department of Labor issued a regulation interpreting the ambiguous phrase "due to any form of a natural disaster" to require that the mass layoff or plant closure be the "direct result" of a natural disaster. 20 C.F.R. § 639.9(c). The Department of Labor's interpretation is consistent with the natural disaster exception's text, context, and purpose. The Secretary's interpretation is the most natural reading of the statute and is, at a minimum, a reasonable one. The regulation is therefore entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). *See Sides v. Macon Cty Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013) ("Where there is statutory ambiguity we defer to the interpretation of the WARN Act by the agency charged with its implementation, the Department of Labor (DOL).").

7

## THE DEPARTMENT OF LABOR'S REASONABLE INTERPRETATION OF THE NATURAL DISASTER EXCEPTION'S CAUSATION REQUIREMENT IS ENTITLED TO DEFERENCE

To determine whether an agency's interpretation of a statute it is tasked with administering is entitled to deference, courts follow the familiar two-step framework set forth in *Chevron*.  *See Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1307 (11th Cir. 2001).  At step one, this Court asks "whether Congress has directly spoken to the precise question at issue." *Id.*  If "the will of Congress is clear from the statute itself, [the Court's] inquiry ends." *Id.*  If the statute is silent or ambiguous with respect to the specific issue, this Court "next ask[s] whether the agency's construction of the statute is reasonable." *Id.*  If the agency's construction of an ambiguous statute is reasonable, a court must defer to it.  *Sides*, 725 F.3d at 1284.  A "court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Smith*, 273 F.3d at 1307.

The Secretary's regulation interpreting the natural disaster exception's causation requirement satisfies both criteria.  The statutory phrase requiring that a mass layoff be "due to" a natural disaster is ambiguous, and the Secretary reasonably concluded that the natural disaster exception applies where a mass layoff is the "direct result" of a natural disaster, such as where a flood destroys an employer's plant.  *See* 20 C.F.R. § 639.9(c).  Accordingly, the regulation is entitled to deference.  *See Sides*, 725 F.3d at 1284.

PA01182

## A.    The statutory phrase "due to" is ambiguous.

In requiring that a mass layoff be "due to" a natural disaster in order for the natural disaster exception to apply, 29 U.S.C. § 2102(b)(2)(B), Congress did not unambiguously define the required causal connection between the layoff and the natural disaster.  To the contrary, as numerous courts have recognized,

> [t]he phrase "due to" is ambiguous. The words do not speak clearly and unambiguously for themselves.  The causal nexus of 'due to' has been given a broad variety of meanings in the law ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other.

*U.S. Postal Serv. v. Postal Regulatory Comm'n*, 640 F.3d 1263, 1268 (D.C. Cir. 2011) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir.1999)); *see also Adams v. Director, OWCP*, 886 F.2d 818, 821 (6th Cir.1989).  Because the scope of the natural disaster exception's "due to" causation standard is ambiguous, "Congress left it to the [Secretary] to determin[e] how closely" the connection between the natural disaster and the layoff must be to trigger the exception.  *Alliance of Nonprofit Mailers v. Postal Regulatory Comm'n*, 790 F.3d 186, 193 (D.C. Cir. 2015).  For the reasons explained *infra* Part B, the Secretary reasonably concluded that the layoff must be the "direct result" of the natural disaster.

Enterprise contends that the phrase "due to" unambiguously refers only to "but for" causation and does not incorporate a proximate cause requirement, such as the Secretary's "direct result" standard.  Enterprise Br. 11-26.  Enterprise cites no case in which a court of appeals has concluded that the phrase "due to" is

9

unambiguous and refers solely to "but for" causation. Enterprise, in particular, fails to identify any such cases (let alone a uniform collection of cases) interpreting "due to" in the limited manner it proposes in the years predating the enactment of the WARN Act, such that Congress might be presumed to have adopted that construction. Moreover, as noted above, numerous courts have recognized that the phrase "due to" is ambiguous. *See supra* p. 9. One court did so in a decision roughly contemporaneous with the enactment of the WARN Act, underscoring that phrase lacked a settled meaning during the relevant time period. *See Adams*, 886 F.2d at 821.

In fact, in certain contexts, courts have "concluded that 'due to' should be read as *requiring* a proximate cause analysis." *Crose v. Humana Ins. Co.*, 823 F.3d 344, 350 (5th Cir. 2016) (emphasis added); *see also Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1006 (2d Cir. 1974) (stating that the phrase "due to or resulting from" "clearly refers to . . . proximate cause"). Enterprise's contention that Congress understood the phrase "due to" as unambiguously requiring only "but for" causation cannot be squared with precedent.

Enterprise's interpretation of the natural disaster exception's causation requirement is also at odds with the exception's statutory context. Enacted in "response to the extensive worker dislocation that occurred in the 1970s and 1980s," *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999), the WARN Act requires employers to provide workers, that state dislocated worker office, and the chief elected official of the relevant local

10

PA01184

government with notice of an impending mass layoff or plant closing, 29 U.S.C. § 2102(a). The Act is thus designed to ensure that workers have sufficient time "to adjust to the prospective loss of employment, to seek and obtain alternative jobs and . . . to enter skill training or retraining that will allow these workers to successfully compete in the job market." *Sides*, 725 F.3d at 1281 (quoting 20 C.F.R. § 639.1(a)); *Hotel Employees*, 173 F.3d at 182 ("The thrust of WARN is to give fair warning in advance of prospective plant closings."). The Act is likewise designed to provide state and local government agencies with advance notice of layoff or plant closure so those entities may timely prepare and initiate worker outreach and other support programs. *See* 20 C.F.R. § 639.1(a).[1] Because the WARN Act's exceptions to its notice requirements run counter to the Act's fundamental design, they are "narrowly construed." *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1282 (5th Cir. 1994); *see also San Antonio Sav. Ass'n v. Comm'r*, 887 F.2d 577, 586 (5th Cir. 1989) (noting the "general principle of narrow construction of exceptions").

Enterprise's interpretation, by contrast, would improperly create an exception to the Act's notice requirement that is potentially expansive in scope. The "but-for"

---

[1] Notice to the state dislocated worker unit and the local government allows those bodies to prepare services for the soon-to-be laid off workers. Those services, which are funded in part by the Department of Labor, include rapid response programs, job training, job search support, and career counseling. *See* https://www.dol.gov/agencies/eta/workforce-investment/dislocated-workers

PA01185

causation standard "can be a sweeping standard." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020); *see also United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020) ("But-for causation is a relatively undemanding standard."). "'[B]ut for' events can be very remote," *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co.*, 295 F.3d 59, 65 (1st Cir. 2002), and may contribute only modestly to the end result, *General Refractories Co. v. First State Ins. Co*, 855 F.3d 152, 161 (3d Cir. 2017) ("'But for' causation 'is a *de minimis* standard of causation, under which even the most remote and insignificant force may be considered the cause of an occurrence.'"). Thus, if "but for" causation is all the WARN Act's natural disaster exception requires, an employer may be excused from providing 60 days' advance notice of a layoff even in circumstances where the relevant natural disaster occurred months earlier, its effects on the employer's business are modest and were known to the employer for a significant period of time, and the employer could readily have provided notice of the forthcoming layoff. Such a potentially sweeping loophole is inconsistent with the statute's text and purpose, and could not have been what Congress intended. *See, e.g.*, *Hotel Employees*, 173 F.3d at 182 (concluding that government-ordered plant closings do not exempt employers from the WARN Act's notice requirements because, among other things, Congress intended the WARN Act to apply whenever an employer knows of an impending layoff, regardless of its cause).

Enterprise's interpretation of the exception's causation requirement is also at odds with other principles of statutory interpretation. Congress is "understood to

PA01186

legislate against a background of common-law . . . principles." *Samantar v. Yousuf*, 560 U.S. 305, 320-21 & n.13 (2010). "Thus, where a common-law principle is well established[,] . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1041 (11th Cir. 1998); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) ("Congress, we assume, is familiar with the common-law rule and does not mean to displace it *sub silentio*.").

The "requirement of proximate causation" is a "venerable" and "well established" common-law principle that Congress is presumed to incorporate into causation requirements. *Lexmark*, 572 U.S. at 132; *see also id.* (citing cases in which the Court has presumed that Congress intended to incorporate a proximate-cause requirement); *Paroline v. United States,* 572 U.S. 434, 446 (2014) ("Given proximate cause's traditional role in causation analysis, this Court has more than once found a proximate-cause requirement built into a statute that did not expressly impose one.") (citing cases). Congress's use of the general phrase "due to" in describing the natural disaster exception's causal component does not in any way indicate Congress's intent to negate the traditional common-law proximate-cause requirement. Far from running contrary to Congress's statutory purpose in enacting the WARN Act, a proximate-cause requirement furthers Congress's intent by appropriately cabining the circumstances in which an employer may evade the Act's 60-day notice requirement.

13

Enterprise gets the law backwards when it suggests that Congress could have incorporated a proximate causation requirement by including phrases like "directly" or "primarily" in the statutory text.  Enterprise Br. 18-19.  Under settled principles of statutory construction, Congress is presumed to adopt proximate causation unless it states otherwise.  It is not presumed to exclude proximate causation unless it expressly adopts it.  As the Supreme Court has emphasized, it regularly finds a "proximate-cause requirement built into . . . statute[s] that did not expressly impose one."  *Paroline*, 572 U.S. at 446.

In asserting that the statutory phrase "due to" incorporates only "but for" causation, Enterprise notes that "due to" is synonymous with "because of" and "resulting from" and then cites cases interpreting "because of" and "resulting from" to incorporate "but for" causation.  Enterprise Br. 12-15.  Enterprise's argument is unavailing.  Dictionary definitions of "due to" do not clarify its ambiguity.  For example, "due to" is synonymous not only with "because of" and "results from," but also with phrases such as "caused by" and "as a result of."  *See, e.g.*, *Due to*, The Oxford English Dictionary 1105 (2d ed. 1989) ("due to" means "caused by"); *Due to*, Oxford English Dictionary Online (June 2021) ("caused by"; "as a result of"); *Due to*, Merriam Webster Online Dictionary (Aug. 2021) ("as a result of").  Courts have regularly interpreted such phrases as incorporating proximate causation.  *See, e.g.*, *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995) ("The Act uses the phrase 'caused by,' which more than one Court of Appeals has read as

14

requiring what tort law has traditionally called 'proximate causation.'"); *Robers v. United States*, 572 U.S. 639, 645 (2014) ("as a result of" denotes proximate cause); *United States v. Monzel*, 641 F.3d 528, 536 (D.C. Cir. 2011) ("By defining 'victim' as a person harmed 'as a result of' the defendant's offense, the statute invokes the standard rule that a defendant is liable only for harms that he proximately caused."); *see also* Enterprise Br. 25 (conceding that "caused by" "refers to proximate, not but-for, causation"). Enterprise's emphasis on the fact that "due to" is synonymous with "as a result of" thus, if anything, undermines its argument that "due to" does not incorporate proximate causation. *See* Enterprise Br. 15-16.

Enterprise also over-reads the cases that have concluded that the phrases "because of" and "results from" incorporate "but for" causation. While those cases stand for the proposition that "because of" or "results from" incorporate the traditional "but for" causation requirement, they did not hold that "because of" necessarily excludes proximate causation, "but for" causation's traditional companion. *See Burrage v. United States*, 571 U.S. 204, 211 (2014) ("The law has long considered causation a hybrid concept, consisting of two constituent parts: actual [or 'but-for'] cause and legal [or 'proximate'] cause."). In *Burrage*, for example, the Supreme Court expressly declined to reach the question whether the relevant statute imposed a proximate cause requirement in addition to a "but for" requirement. 571 U.S. at 210. In *Bostock*, 140 S. Ct. at 1739, and *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), the Supreme Court similarly addressed only the question whether

15

the relevant statute incorporated a "but for" causation requirement. Neither decision mentions proximate causation, let alone addresses the question whether Congress intentionally overrode the traditional proximate cause requirement.

Finally, Enterprise argues that it is significant that Congress considered a proposed version of the natural disaster exception that would have described the exception as applying when a layoff is "due, *directly or indirectly*, to any form of natural disaster," but ultimately enacted the exception without the "directly or indirectly" language. Enterprise Br. 36-37 (quoting 134 Cong. Rec 16,122-23 (1988)). The Act's legislative history suggests the language may have been dropped due to confusion over the meaning of the terms "directly" and "indirectly." *See, e.g.*, 134 Cong. Rec. S8689 (daily ed. June 28, 1988) (remarks of Sen. Dole) (explaining that the language was removed because "there was some question what 'directly' means and what 'indirectly' means"); *id.* at S8687 (remarks of Sen. Metzenbaum) (objecting to the inclusion of "indirectly" because " 'indirectly' is such an amorphous kind of term you cannot tie it down"); *id.* at S8689 (remarks of Sen. Dole) (agreeing that the removal of "indirectly" was a "good" suggestion given its amorphous character). The most logical inference to be drawn from the failed amendment is that Congress chose the ambiguous phrase "due to" on the understanding that the Secretary of Labor and courts would establish the contours of the exception's causation requirement.

PA01190

## B.     The Department of Labor's interpretation is at least reasonable.

The Secretary of Labor reasonably interpreted the WARN Act's natural disaster exception as applying where a mass layoff or plant closure is the "direct result" of a natural disaster.  *See* 20 C.F.R. § 639.9(c).  The Secretary's interpretation is consistent with the Act's "central focus," *Alliance of Nonprofit Mailers*, 790 F.3d at 193, on ensuring that workers and state and local governments receive adequate notice of a forthcoming mass layoff, so that they may prepare for that eventuality, *see Sides*, 725 F.3d at 1281; 20 C.F.R. § 639.1.  By requiring a direct connection between the natural disaster and the mass layoff, the Secretary's interpretation ensures that the exception will not permit employers to rely on the lingering or remote effects of a natural disaster to evade the WARN Act's notice requirements where notice would have been practicable.  At the same time, it provides relief to employers where a natural disaster has a direct and immediate adverse impact on an employer's business, such that an employer had to immediately shut its plant or layoff many of its employees.

The Department of Labor's regulation also accords with the statute's text.  The WARN Act states that "[n]o notice . . . shall be required" where a mass layoff is due to a natural disaster.  29 U.S.C. § 2102(b)(2)(B).  That Congress specified that "no notice" is required under the natural disaster exception indicates that Congress understood the exception as applying in circumstances where supplying advance notice of a mass layoff or plant closure is likely to be impracticable.  *See* H.R. Rep. No.

17

100-285, at 34 (1987) (suggesting that a precursor to the natural disaster exception covered situations where notice was "impossible").

The regulation's "direct result" requirement is consistent with that congressional intent. Where a layoff results directly from a natural disaster, such as where a natural disaster destroys the employer's factory or place of business in a short period of time, advance notice of a layoff is likely to be impracticable. Conversely, where a natural disaster only indirectly results in a layoff—such as where a natural disaster reduces the demand for an employer's product, eventually leading to a layoff—some amount of notice is likely to be feasible.[2]

The Secretary's interpretation also harmonizes the natural disaster exception with the WARN Act's unforeseeable business circumstances exception. As the Department's regulation recognizes, the Act's unforeseeable business circumstances exception, 29 U.S.C. § 2102(b)(2)(A), covers situations where a natural disaster indirectly causes a layoff by, for example, causing "an unanticipated and dramatic major economic downturn" or a "sudden, dramatic, and unexpected" loss of business for the employer. 20 C.F.R. § 639.9(b)(1); *see also id.* § 639.9(c)(4) (emphasizing that "[w]here a plant closing or mass layoff occurs as an indirect result of a natural disaster, . . . the 'unforeseeable business circumstance' exception . . . may be applicable"). By

---

[2] In 29 U.S.C. § 2102(b)(3), Congress required employers "relying on" any of the Act's three exceptions, including the natural disaster exception, to "give as much notice as is practicable." Ambiguity therefore exists over whether an employer must provide notice of a layoff when relying on the natural disaster exception.

18

requiring that a mass layoff be the "direct result" of a natural disaster, the Secretary ensured that the natural disaster and unforeseeable business circumstances exceptions complement one another and that the unforeseeable business circumstances exception is the properly invoked exception when an unforeseeable business circumstance (such as an unexpected and sudden drop in demand for an employer's services) causes a mass layoff. In other words, the Secretary's interpretation assures that the natural disaster exception does not extend so far that the unforeseeable business circumstances exception is lost whenever a layoff can be traced in some way to a natural disaster.

Differences in the text of the two exceptions lend further support to the Secretary's reading of the interplay between the two. As Enterprise notes (Enterprise Br. 25), Congress used the phrase "caused by" in describing the unforeseeable business circumstances exception's causation standard. *See* 29 U.S.C. § 2102(b)(2)(A). Enterprise then asserts that the phrase "caused by" imposes a narrower, more strict causation standard than "due to." *See* Enterprise Br. 25. The opposite conclusion, however, is far more plausible in context. As explained above, Congress understood the natural disaster exception as applying in a narrow range of circumstances—*i.e.*, where advance notice is generally not practicable. *See supra* pp. 17-18. The Secretary thus sensibly read "due to" as requiring that a layoff be the "direct result" of a natural disaster, while recognizing that a layoff indirectly caused by a natural disaster might be covered by the broader unforeseeable business circumstances exception.

PA01193

Although this Court need not resort to the natural disaster exception's limited legislative history, that history also lends support to the Secretary's interpretation of the exception's causation requirement. The natural disaster exception was added to the WARN Act during a Senate floor debate. *See* 134 Cong. Rec. at S8686–89. As described above, a proposed version of the exception provided that it applied where a layoff was "due, directly or indirectly, to" a natural disaster. *See id.* The WARN Act's primary sponsor, Senator Metzenbaum, objected to the word "indirectly," deeming it too "amorphous" and likely to sweep too broadly. *See id.* at S8687. Ultimately, the Senate agreed to include the amendment without the "directly or indirectly" modifier. Senator Metzenbaum made clear, however, that the exception as enacted was not intended to apply where "notice can be given." *Id.* at S8687. He further emphasized that the exception did not provide "carte blanche" to employers to evade the Act's notice requirements merely because a drought or other natural disaster had "some impact" on the employer's business. *See id.* For the reasons explained above, the Department's "direct result" standard comports with that understanding of the exception, as it limits the exception's reach to situations where a natural disaster has a direct impact on an employer's business and where advance notice of a layoff is likely infeasible.

* * *

The district court correctly concluded, consistent with the Secretary's regulation, that the WARN Act's natural disaster exception applies where a mass

20

layoff is the "direct result" of a natural disaster.  Doc. 77, pp. 10-11.  The district

court further concluded that plaintiff's complaint alleges that the layoff was the direct

result of a sudden drop in demand for Enterprise's services and was only an indirect

result of the pandemic.  The district court's analysis accords with the Secretary's

regulation.  Its judgment should be affirmed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

/s/ Gerard Sinzdak
MICHAEL S. RAAB
GERARD SINZDAK
*(202) 514-0718*
*Attorneys, Appellate Staff*
*Civil Division, Room 7252*
*U.S. Department of Justice*
*950 Pennsylvania Avenue, NW*
*Washington, DC  20530*

SEPTEMBER 2021

21

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing brief was prepared using Microsoft Word 2016 and complies with the type and volume limitations set forth in Rule 32 of the Federal Rules of Appellate Procedure. I further certify that the font used is 14 point Garamond, for text and footnotes, and that the computerized word count for the foregoing brief (excluding exempt material) is 5,227 words.

I further certify that 1) all required privacy redactions have been made; 2) the electronic submission will be an exact copy of the paper copy; and 3) the document is free from viruses and has been scanned by the current version of Symantec Endpoint Protection.

/s/ Gerard Sinzdak
GERARD SINZDAK

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2021, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I also certify that I will file paper copies with the Court, via Federal Express overnight delivery, when the court requests them.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Gerard Sinzdak
GERARD SINZDAK

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC., *et al.,*[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>Defendants. | Adv. Pro. No. 20-50548 (CSS) |

## CERTIFICATE OF SERVICE

I, René S. Roupinian, under penalty of perjury, certify the following as true and correct: I am not a party to this action, employed by Raisner Roupinian LLP, and I am over 18 years of age. I hereby certify that I caused true and correct copies of *Plaintiffs' Brief in Opposition to Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling, Exhibits 1-3 to Plaintiffs' Brief in Opposition to Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling,* and *Plaintiffs Response to Trustee's Statement of Undisputed Facts* and the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

corresponding *Certificate of Service* to be served upon the parties listed below via email as listed

below:

**Service List:**

Bradford J. Sandler
Colin R. Robinson
Peter J. Keane
Beth Levine
**PACHULSKI STANG ZIEHL & JONES LLP**
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Email: bsandler@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com
blevine@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee for Debtors*

Dated:  December 3, 2021

/s/ _____ *René S. Roupinian* _____
                René S. Roupinian

2

PA01199

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Debtors. | |

### PLAINTIFFS' RESPONSE
### TO TRUSTEE'S STATEMENT OF UNDISPUTED FACTS

Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

PA01200

OF COUNSEL:

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and the putative class*

2

PA01201

Plaintiffs Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated ("Plaintiffs"), submit this response to the Statement of Undisputed Facts in Support of Chapter 7 Trustee's Motion for Summary Judgment ("SOF") (D.I. 45). Plaintiffs respond to the Trustee's SOF with the information they currently have and reserve the right to submit an amended response, as the parties have not completed fact discovery and the evidentiary record is incomplete.

1. **Trustee's SOF 1:** The Debtors filed the Chapter 11 Cases with the intention of winding down their affairs by liquidating their inventory through store closing sales (the "GOB Sales"), paying down their secured debt, and using any remaining proceeds of their GOB Sales to wind-down their operations. (*Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Bankr. Doc. 12] ("Ladd Declaration") (attached as **Exhibit A** to Sandler Declaration) at ¶¶ 6 & 18.)

> **Plaintiffs' response: DISPUTED IN PART. Undisputed that Defendants filed for Chapter 11 bankruptcy. Disputed as to the characterization of the Defendants' intentions when they filed for Chapter 11 bankruptcy. The Ladd Declaration speaks for itself. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

2. **Trustee's SOF 2:** The GOB Sales, the Levin Sale, and other actions taken by the Debtors in the Chapter 11 Cases (discussed below) were all part of the orderly liquidation and wind-down planned by the Debtors prior to and as of the Petition Date (the "Planned Liquidation Process") in order to maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors. (Ladd Declaration at ¶¶ 6, 16, 17, 18, 19, 20, 40, 41, 42 & 43.)

> **Plaintiffs' response: DISPUTED IN PART. Undisputed that the Defendants planned to conduct the GOB Sales and the Levin Sale at the time of the Chapter 11 filing. Disputed as to their purpose and whether "other actions taken by the Debtors" were part of any plan, as those actions are not identified. The Ladd Declaration speaks for itself. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

3

PA01202

3.      **Trustee's SOF 3:** In the months leading up to the Petition Date, Art Van was struggling under the weight of poor sales and $208.5 million in secured debt encumbering substantially all of its assets: (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan (the "Term Loan") from FS KKR Capital Corp. (the "Term Lenders" and together with Wells Fargo, the "Secured Lenders"). (Ladd Declaration at ¶¶ 7, 8, 13, 14, 16, 17, 18, 31-36.)

      **Plaintiffs' response: UNDISPUTED.**

4.      **Trustee's SOF 4:** Art Van had defaulted on the ABL Loan on February 5, 2020 and had only been able to obtain a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the business. As a condition to the forbearance, Wells Fargo insisted that the Debtors begin to prepare for going-out-of-business (GOB) sales. (Ladd Declaration at ¶¶ 14, 36.)

      **Plaintiffs' response: DISPUTED IN PART. Undisputed that the Defendants defaulted on the ABL Loan. Disputed as to the characterization that Wells Fargo "insisted" on the GOB sales. The Ladd Declaration speaks for itself. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

5.      **Trustee's SOF 5:** In spite of the Debtors' efforts over the next 23 days in February 2020, by February 28, 2020, the Debtors were unable to secure financing or attract a going concern buyer. (Transcript of March 10, 2020 hearing (attached as **Exhibit B** to Sandler Declaration) at p. 55, line 25 to p. 57, line 20; Ladd Declaration at ¶¶ 14-15.) The forbearance period ended on that date, and the Debtors had no alternative but to pursue an orderly wind-down of their operations and liquidation of their assets. (Ladd Declaration at ¶¶ 16-18.) To that end, prior to the Petition Date, the Debtors negotiated a wind-down budget with Wells Fargo ("Wind-Down Budget"), hired a liquidator, and announced publicly that after decades in business they were going out of business. (Ladd Declaration at ¶¶ 16-18; *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 93] ("Interim CC Order") (attached as **Exhibit C** to Sandler Declaration) at 12-13; "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html) (attached as **Exhibit D** to Sandler Declaration).)

      **Plaintiffs' response: DISPUTED IN PART. Undisputed that the Defendants did not secure financing before the end of the forbearance period, that they negotiated a wind-down budget with Wells Fargo, and announced they were going out of business. Disputed as to the characterization that these events occurred "in spite of**

Debtors' efforts" and that they had "no alternative" but to take these actions. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.

6.    **Trustee's SOF 6:** As part of the Planned Liquidation Process, on March 4, 2020, SLI entered into a letter agreement (the "Levin LOI") pursuant to which it agreed to sell 44 stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") to Robert Levin (the "Levin Sale"). The Levin Sale was expected to be approved in bankruptcy and consummated in or about early April 2020. The Debtors believed that the buyer would keep the 44 stores operating and thereby preserve approximately 1,000 jobs. (Ladd Declaration at ¶¶ 19-20 & 40-42.)

> **Plaintiffs' response: DISPUTED IN PART. Undisputed that the Defendants entered into the LOI. Disputed as to the characterization of this as part of a "Planned Liquidation Process" and as to Defendants' expectations and beliefs about the Levin Sale. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

7.    **Trustee's SOF 7:** The Levin LOI contemplated that the Levin Sale stores would continue briefly operating pending the closing of the Levin Sale. (Ladd Declaration at ¶¶ 40-41; *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Bankr. Doc. 49] ("Levin DIP Motion") (attached as **Exhibit E** to Sandler Declaration).) Because the Debtors had no money to operate these stores (they only had the money that Wells Fargo had agreed to let them use to conduct the GOB Sales), Robert Levin agreed to extend $10 million of debtor-in-possession (DIP) financing to SLI (the "Levin DIP Loan") to the Debtors to facilitate the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale. (Levin DIP Motion; *Interim Order* on Levin DIP Motion [Bankr. Doc. 137] ("Interim Levin DIP Order") (attached as **Exhibit F** to Sandler Declaration).)

> **Plaintiffs' response: DISPUTED IN PART. Undisputed that the LOI contemplated continued operations and that Defendants received the Levin DIP Loan. Disputed as to the characterization of what money Defendants did or did not have. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

PA01204

8.     **Trustee's SOF 8:** On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business. (Art Van GOB Press Release (attached as **Exhibit D** to Sandler Declaration).) Plaintiffs have acknowledged that the Debtors began their liquidation plan at this time. (Complaint (attached as **Exhibit Y** to Sandler Declaration) at ¶ 25 ("… Debtors began to execute on its planned liquidation.").)

> **Plaintiffs' response: DISPUTED IN PART.  Undisputed that the Defendants issued the referenced press release and that Plaintiffs filed the referenced Complaint and allegation.  These documents speak for themselves.  Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

9.     **Trustee's SOF 9:**  On March 5, 2020, as part of its Planned Liquidation Process, although not required, AVF issued a WARN Act notice to approximately 1,400 potentially "affected employees" who worked in or reported to seven facilities in Michigan, two facilities in Illinois and one in Pennsylvania, which notice provided:

> Art Van Furniture, LLC (the "Company") has made the difficult decision to winddown its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

> The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at will employment status with the Company.

> You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the

Company.

(WARN Act notice issued by AVF on March 5, 2020 (attached as **Exhibit G** to Sandler Declaration).)

> **Plaintiffs' response: DISPUTED IN PART. Undisputed that the Defendants gave this notice to some of its employees on March 5. Disputed as to the characterization of the notice as part of a liquidation plan, and as to the characterization of the notice as "not required." Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

10.   **Trustee's SOF 10:**  The Debtors' target date to end the GOB Sales was the end of April 2020 (Ladd Declaration at ¶ 18). The GOB Sales commenced as expected, and went well at first: From March 5, 2020 through March 8, 2020, deposits from inventory sales were in excess of $23 million. (*Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* [Bankr. Doc. 252] (the "Conversion Motion") (attached as **Exhibit H** to Sandler Declaration) at ¶ 22.)

> **Plaintiffs' response: DISPUTED IN PART. Undisputed that the GOB sales generated deposits in excess of $23 million. Disputed as to the characterization of the "target date" for the GOB sales and the characterization that the sales "went well at first." Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

11.   **Trustee's SOF 11:** On March 8, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases and filed "first day motions" to obtain approval of, *inter alia*, the Wind-Down Budget, the Levin DIP, and GOB Sales and the Consulting Agreement with the Liquidator. (*Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 5] (attached as **Exhibit I** to Sandler Declaration); Levin DIP Motion; Interim Levin DIP Order; *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* [Bankr. Doc. 52] (attached as **Exhibit J** to Sandler Declaration).)

> **Plaintiffs' response: Undisputed.**

PA01206

12.    **Trustee's SOF 12:** While there was an extensive discussion of the GOB Sales at the first day hearing held on March 10, 2020, there was no discussion by the Court and other parties of COVID-19 and the effects thereof, including any potential government-mandated shut downs and extensive business restrictions. (Transcript from March 10, 2020 Hearing (attached as **Exhibit B** to Sandler Declaration).)

    **Plaintiffs' response: Undisputed that the hearing took place, the transcript of which speaks for itself. Disputed as to the characterization of the GOB discussion as "extensive." Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

13.    **Trustee's SOF 13:** On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order, authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales. The Wind-Down Budget assumed that the GOB Sales would continue unabated through April 30, 2020, and provided that the "the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis" is a default, and thus, the Debtors continued their ongoing GOB sales. (Interim CC Order (attached as **Exhibit C** to Sandler Declaration) at pp. 34-35.)

    **Plaintiffs' response: DISPUTED IN PART. Undisputed that on March 11, 2020, the Bankruptcy Court entered the interim cash collateral order. Disputed as to the characterization of what the wind-down budget "assumed" and as to the characterization that the Defendants "thus" continued the GOB sales. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

14.    **Trustee's SOF 14:** At the continued hearing on first day motions held on March 12, 2020, the Bankruptcy Court and the U.S. Trustee expressed concerns about the fee in the Liquidator's Consulting Agreement and continued that portion of the Debtors' GOB sale motion to March 20, 2020, but other than comments by the Bankruptcy Court at the beginning of the hearing, there was no mention by the parties at the hearing of COVID-19 or the possibility that the GOB Sales might not be able to continue. (Transcript of March 12, 2020 Hearing (attached as **Exhibit K** to Sandler Declaration) at p. 5, lines 5-7.)

    **Plaintiffs' response: DISPUTED IN PART. Undisputed that the March 12 hearing took place and that the referenced concerns were expressed. Disputed that the parties did not mention COVID-19. The impending pandemic was alluded to**

PA01207

various times. Counsel stated they were working "under less than ideal circumstances these days." (p.5, lines 12-14.) The Court questioned if "we'll ever be allowed to be in the same room ever again after today." (p.26, lines 21-22). Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.

15.    **Trustee's SOF 15:** The unprecedented, extraordinary circumstances caused by the COVID-19 pandemic confronting the Debtors during the period March 8, 2020 (the Petition Date) and March 19, 2020 (the day of the COVID WARN Notice) are a matter of public record. On March 13, 2020, then-President Donald Trump declared a national emergency. (*Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* dated March 13, 2020 (85 F.R. 15337 (March 13, 2020)), available at https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf (attached as **Exhibit L** to Sandler Declaration).)

        **Plaintiffs' response: Undisputed** that the COVID-19 pandemic is a matter of public record and that on March 13, 2020, then-President Donald Trump declared a national emergency. **Disputed** as to the characterization of the circumstances that confronted Defendants specifically between March 8 and March 19. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.

16.    **Trustee's SOF 16:** By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close. (*Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://www.governor.pa.gov/wpcontent/          uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (attached as **Exhibit M** to Sandler Declaration).) Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …." (*All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19,* March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-toclose-          physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/ (attached as **Exhibit N** to Sandler Declaration).).

        **Plaintiffs' response: Undisputed** that Governor Wolf issued the referenced temporary guidances, which speak for themselves.

PA01208

**17.     Trustee's SOF 17:** On March 16, 2020, Governor Gretchen Whitmer of Michigan -- where the Debtors' headquarters, their main distribution center, and 82 of their stores are located – entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces. (*Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html (attached as **Exhibit O** to Sandler Declaration).) Governor Whitmer urged Michigan residents to"mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary." (*Id.*)

> **Plaintiffs' response: Undisputed that Governor Whitmer issued the referenced temporary order, which speaks for itself.**

**18.     Trustee's SOF 18:** On March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations were located to issue a "stay at home" or "shelter in place" type order. Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020. (Gov. Tom Wolf, Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wpcontent/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (attached as **Exhibit P** to Sandler Declaration); Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html (attached as **Exhibit Q** to Sandler Declaration); Dir. of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (attached as **Exhibit R** to Sandler Declaration); and Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288 Gov._Pritzker_Stay_at_Home_Order.pdf (attached as **Exhibit S** to Sandler Declaration).)

> **Plaintiffs' response: DISPUTED IN PART.  Undisputed that the states issued the referenced orders, which speak for themselves.  Disputed as to the characterization of the operations there as Defendants' "major" operations.  Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

**19.     Trustee's SOF 19:** Further, on March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction, and thus, the stores covered by the Levin Sale would also have to be immediately closed by the Debtors. (Conversion Motion at ¶ 26.)

PA01209

**Plaintiffs' response: DISPUTED. Disputed as to the communications between the Defendants and the proposed purchaser, and the claim that the stores would "have to be immediately closed" by the Defendants. Defendant did not consult with its primary lenders, or its own consultants, before abruptly ceasing operations of \ stores, and at least one primary lender indicated that it could have been avoided. (Transcript of March 31, 2020 Hearing, D.I. 46-5 at 59 lines 1-20.) Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

20. **Trustee's SOF 20:** As a result of the COVID-19 pandemic and resultant shutdowns, shortly after the Petition Date, the Debtors' situation changed drastically upending the Debtors' plans for an orderly liquidation. Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the GOB Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million, suggesting, among other things, a precipitous drop in customer traffic in the Debtors' stores. (Conversion Motion at ¶ 22.)

**Plaintiffs' response: DISPUTED IN PART. Undisputed that Defendants generated the referenced million dollars of deposits. Disputed as to the characterizations of the pandemic as "drastically upending" the Defendants' plans and the speculation regarding the amount of foot traffic in its stores. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

21. **Trustee's SOF 21:** The restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease mandated that the Debtors discontinue all retail operations and other non-essential business operations – a scenario they had not and could not have planned for when they developed their Planned Liquidation Process. (Conversion Motion at ¶¶ 1-2.)

**Plaintiffs' response: DISPUTED IN PART. Undisputed that there were restrictions on economic and other activity. Disputed that these events "mandated" discontinuation of all retail operations and that disruptions could not have been planned for. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken**

PA01210

place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.

22.     **Trustee's SOF 22:** Soon thereafter, the Debtors' management, with their professionals' counsel and assistance, determined that the Planned Liquidation Process, in its then-form, was no longer viable and that a more immediate shutdown of the Debtors' stores and remaining support operations was in the estates' and creditors' best interest. (Conversion Motion at ¶¶ 1-2.) Thus, on March 19, 2020, the Debtors determined to suspend all sales operations in all stores and terminate the majority of their employees, excluding workers who would be needed for the rest of the liquidation and wind-down process. (Conversion Motion at ¶ 25.)

**Plaintiffs' response: DISPUTED IN PART. Undisputed that Defendants terminated the majority of their employees. Disputed as to all characterizations of the decision-making process leading to those terminations, and the characterization of the decision as being in anyone's "best interest." Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

23.     **Trustee's SOF 23:** Accordingly, on March 19, 2020, AVF issued a WARN Act notice to employees which stated:

On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

*Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").*

PA01211

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work oMarch 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(WARN Act notice issued by AVF on March 19, 2020, to AVF employees) ("COVID WARN Notice") (emphases added and attached as **Exhibit T** to Sandler Declaration).

> **Plaintiffs' response: Undisputed that Defendants gave this notice to some employees.**

**24.** **Trustee's SOF 24:** Plaintiffs Todd Stewart and Jennifer Sawle were two of AVF's employees, and each worked at one of AVF's 82 stores in the State of Michigan. In accordance with the COVID WARN Notice, the Trustee believes that Mr. Stewart and Ms. Sawle were both terminated by AVF, as were most of AVF's and SLI's employees,on March 20, 2022 (the "Layoff"). (Complaint (attached as **Exhibit Y** to Sandler Declaration), ¶¶ 6, 7, 10.)

> **Plaintiffs' response: DISPUTED IN PART. Undisputed Plaintiffs were Defendants' employees, that they were terminated, and that they filed the referenced Complaint, which speaks for itself. Disputed as to the characterization of which entity legally employed and terminated them, and as to the Trustee's beliefs about their employment. Pursuant to Fed. R. Civ. P. 56(d)(1) and (2), Plaintiffs submit that because minimal formal discovery and no formal document production has taken place in this litigation, they are unable to present facts essential to justify their opposition to Defendants' Motion to the extent Defendants rely on this fact, and the Motion should therefore be denied or deferred until discovery has been taken.**

**25.** **Trustee's SOF 25:** During a March 19, 2020 status conference, Debtors' counsel advised the Bankruptcy Court of the store closures. (Transcript of March 19, 2020 Hearing (attached as **Exhibit U** to Sandler Declaration) at p. 10, line 8 to p. 11, line 1.)

> **Plaintiffs' response: DISPUTED IN PART. Undisputed that Debtors' counsel advised the Bankruptcy Court of some store closures but which ones are referred to in this statement is uncertain.**

**26.** **Trustee's SOF 26:** Judge Sontchi stated on the record at a later related hearing:

> This is an unfortunate situation. It is nobody's fault. It is nobody's fault. I know
> many people in my local business community who are good business people who
> have great businesses who are staring down the barrel of a gun based on what's
> happened. It's just—it extraordinary. And I'm not casting aspersions on anyone,
> but obviously this case changed dramatically, as did the whole world—well not
> the whole world but as to the United States in the last three weeks, three or four
> weeks.

(Transcript of March 31, 2020 Hearing (attached as **Exhibit V** to Sandler Declaration) at p. 47, line 24 to 48, line 7.)

     **Plaintiffs' response: Undisputed.**

**27.**    **Trustee's SOF 27:** Wells Fargo declared a default under the Interim CC Order, and terminated use of cash collateral as of March 24, 2020; later extended through March 31 and finally April 6. (Conversion Motion at ¶ 27.)

     **Plaintiffs' response: Undisputed.**

**28.**    **Trustee's SOF 28:** Unable to continue the Chapter 11 Cases without the continued consent of the Debtors' secured lenders to use their cash collateral, the Debtors filed the Conversion Motion and the Chapter 11 Cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020. (*Order Granting Debtor's Amended Motion to Convert* [Bankr. Doc. 263] (attached as **Exhibit W** to Sandler Declaration).)

     **Plaintiffs' response: Undisputed that the Defendants filed the Conversation Motion, which speaks for itself.**

**29.**    **Trustee's SOF 29:** The COVID-19 pandemic was a natural disaster. (Hiltzik, M., "A declassified government report offers no support for the lab-leak theory of COVID's origin," *Los Angeles Times*, Nov. 1, 2021, available at https://www.latimes.com/business/story/2021-11-01/declassified-government-report-lab-leak-theory (attached as **Exhibit Z** to Sandler Declaration) ("LA Times Article") (recently declassified report by federal governmental agency, Office of the Director of National Intelligence ("ODNI Report"), "provides details of the agencies' findings that make clear they looked into the specific assertions that have been proposed in support of the lab leak theory and found them wanting"); Office of the Director of National Intelligence, "Updated Assessment on COVID-19 Origins" Report, available at https://www.dni.gov/files/ODNI/documents/assessments/Declassified-Assessment-on-COVID-19-Origins.pdf (ODNI Report referenced in the LA Times Article) (attached as **Exhibit AA** to Sandler Declaration).)

     **Plaintiffs' response: DISPUTED.  The referenced article explains that the government report refused to endorse specific theories that the virus was deliberately leaked.  As to the ultimate question whether it originated from a**

PA01213

laboratory, or through natural transmission, the government did not reach any definitive conclusions.  As the article notes: **"The report does state that, among its contributing agencies, four "assess with low confidence" that the virus probably sprung from natural sources; one finds with "moderate confidence" that the pandemic "most likely" resulted from a laboratory incident, and three couldn't decide between the two theories."**

Dated: December 3, 2021                    Respectfully Submitted,

/s/ Michael J. Joyce
Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

OF COUNSEL:

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and the putative class*

PA01214

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | (Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Adv. Proc. No. 20-50548 (CSS) |
| vs. | |
| ART VAN FURNITURE, LLC, *et al.*, | |
| Defendants. | |

### REPLY IN FURTHER SUPPORT OF CHAPTER 7 TRUSTEE'S MOTION
### FOR SUMMARY JUDGMENT

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  bsandler@pszjlaw.com
blevine@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

---

[1]  The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

PA01215

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................1

I.      ARGUMENT ................................................................................................................2

      A.      Plaintiffs Have Failed to Make Their *Prima Facie* Case and Are Wrong on Both the Law and the Facts with Regard to the Trustee's Affirmative Defenses..............................................................................................................2

           1.      The Debtors Were Liquidating Fiduciaries at All Times Relevant, and Thus, Were Not Subject to the WARN Act Under Controlling Third Circuit Law. ..................................................................................2

           2.      COVID-19 and Its Extraordinary Business and Social Effects Were Unforeseeable At All Relevant Times. .....................................................5

           3.      The Layoff Was Clearly "Due to" the COVID-19 Natural Disaster. ..........6

      B.      Plaintiffs Have Failed to Establish That a Determination of the Motion Should Be Deferred In Order to Permit Further Discovery..................................10

II.     CONCLUSION............................................................................................................12

PA01216

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Benson v. Enterprise Leasing Co.,*
  2021 U.S. Dist. LEXIS 55137 (D. M.D. Fla. Feb. 4, 2021) ..................................................... 8

*Bostock v. Clayton Cty., Ga.,*
  140 S. Ct. 1731 (2020) ......................................................................................................... 7

*Easom v. US Well Servs,*
  527 F. Supp. 3d 898 (S.D. Tex. 2021) ................................................................................. 6

*Shelton v. Lemons,*
  486 Fed.Appx. 395 (5th Cir. 2012) ...................................................................................... 11

*Simpson v. Panhandle S. Plains Fair Ass'n,*
  2001 U.S. Dist. LEXIS 15080 (N.D. Tex. Aug. 9, 2001) ....................................................... 10

*In re United Healthcare System, Inc.,*
  200 F.3d 170 (3d Cir. 1999)………………………………………………………..……… 3

*Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.),*
  866 F.3d 515 (3d Cir. 2017) ................................................................................................. 5

*Walsh v. Century City Doctors Hosp., LLC (In re Century City Doctors Hosp., LLC),*
  417 B.R. 801, 804-05 (Bankr. C.D. Cal. 2009) ..................................................................... 10

**Statutes**

20 C.F.R. § 639.9(c)(2).............................................................................................................. 7

29 U.S.C. § 2102 ....................................................................................................................... 2

29 U.S.C. § 2102(b)(2)(A).......................................................................................................... 1

29 U.S.C. § 2102(b)(2)(B) ....................................................................................................... 1, 6

29 U.S.C. § 2104...................................................................................................................... 2

PA01217

Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee") to Art Van Furniture, LLC, Sam

Levin, Inc. and related debtors (collectively, the "Debtors" or "Art Van") submits this Reply in

support of his motion for summary judgment (the "Motion") [Adv. Docket No. 43] and in reply

to Plaintiffs' Opposition to the Motion (the "Opposition") [Adv. Docket Nos. 48 & 49]. In

further support of his Motion, the Trustee respectfully states as follows.

## PRELIMINARY STATEMENT

1.      It has been said that "When the facts are against you, argue the law. When the law

is against you, argue the facts. When the law and the facts are against you, pound the table and

yell loudly."[1] Plaintiffs are attempting to pound the table because both the controlling law and the

undisputed facts are against them.

2.      In his Memorandum in Support of Chapter 7 Trustee's Motion for Summary

Judgment (the "Memorandum") [2] [Adv. Docket No. 44], the Trustee established that the

Defendants were entitled to summary judgment because (1) Plaintiffs cannot meet their burden of

showing that Art Van and SLI were employers as of the Date of the Layoff; (2) even if the Debtors

were subject to the WARN Act as of the date of the Layoff, which they were not, they are subject

to the unforeseeable business circumstances exception set forth in in 29 U.S.C. § 2102(b)(2)(A);

and (3) assuming *arguendo* the Debtors were subject to the WARN Act as of the date of the Layoff,

which they were not, they are subject to the natural disaster exception set forth in 29 U.S.C. §

2102(b)(2)(B). Confronted with incontrovertible facts and law, and with no other ammunition,

---

[1] This statement has been commonly attributed to the American poet Carl Sandburg.

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in the Motion or Memorandum, as applicable.

PA01218

Plaintiffs have pounded on the table. However, Plaintiffs' assertions in their Opposition are a transparent attempt to obfuscate the salient issues that they do not and cannot address because they cannot change the multiple clear, undisputed, dispositive points of law and facts applicable to this adversary proceeding, which mandate summary judgment in the Trustee's favor. Moreover, the Plaintiffs failed to specify any discovery that would overcome the Motion. Accordingly, their cross-motion to defer a ruling on the Trustee's Motion must be denied.

## I.    ARGUMENT

**A.     Plaintiffs Have Failed to Make Their *Prima Facie* Case and Are Wrong on Both the Law and the Facts with Regard to the Trustee's Affirmative Defenses.**

**1.     The Debtors Were Liquidating Fiduciaries at All Times Relevant, and Thus, Were Not Subject to the WARN Act Under Controlling Third Circuit Law.**

3.     To prove a WARN Act violation, Plaintiffs must show that Art Van was an "employer"; otherwise, Plaintiffs have not established their *prima facie* case for WARN Act liability (29 U.S.C. §§ 2102, 2104). Under controlling Third Circuit law, a "liquidating fiduciary" is not an "employer." There can be no reasonable dispute that the Debtors were at all relevant times liquidating, as opposed to reorganizing, in their Chapter 11 Cases. Indeed, it is undisputed that the Debtors not only publicly announced, but also started their liquidation even before they filed for Chapter 11. The evidence already admitted in these bankruptcy cases clearly states that the Debtors filed for Chapter 11 to effectuate an orderly wind down, which they commenced prior to the filing of Chapter 11. *See* Memorandum, at 4-8 (¶¶ 14-22 (citations to Ladd Declaration and Sandler Declaration and exhibits thereto). They were liquidating fiduciaries in both words and deeds prior to the Petition Date and at the time of the March 20, 2020 Layoff. Indeed,

PA01219

notwithstanding their Opposition, Plaintiffs admitted this exact point in their Complaint: Even before the bankruptcy filing, "Debtors began to execute on its planned liquidation." (Complaint, attached as **Exhibit Y** to Sandler Declaration [Adv. Docket No. 46], at ¶ 2.) As a matter of fact and law, the Debtors were not "employers" under the WARN Act as of the date of the Layoff, and, accordingly, cannot be held liable under the WARN Act.

4.     While Plaintiffs would ask this Court to ignore controlling Third Circuit law, they cannot escape the well-settled, reasoned, and binding principles in *United Healthcare* that the Third Circuit laid out to protect companies that are liquidating. In the instant matter, as in the *United Healthcare* case, the Debtors' actions from the very beginning of the Chapter 11 Cases (and even before then) evidenced a clear intent to liquidate the Debtors' business, and not to operate their business "in the normal commercial sense" (54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989)). *See United Healthcare*, 200 F.3d 170, 178 (3d Cir. 1999) ("We recognize that United Healthcare filed for Chapter 11 bankruptcy, ordinarily used to reorganize, rather than Chapter 7 bankruptcy, generally used to liquidate. But … United Healthcare's actions from the time it filed its Chapter 11 petition throughout the proceedings clearly demonstrate its intent to liquidate.").

5.     As detailed in the Memorandum (and as the prior testimony in these cases admitted in evidence indicates), all of the Debtors' efforts at reorganizing as a going concern occurred prepetition, when they hired advisors to reach out to potential buyers and investors. Those efforts failed prior to the bankruptcy filing. As a result of this failure, and prior to the Petition Date, the Debtors decided to liquidate and began an orderly wind-down process, comprised of going-out-of-business (GOB) sales (that were commenced pre-petition) and the anticipated bulk sale of the

SLI stores to a third party buyer. *See* Memorandum, at 4-8 (¶¶ 14-22 (citations to Ladd Declaration and Sandler Declaration and exhibits thereto [Adv. Docket No. 46]). Indeed, on March 5, 2020, Art Van had publicly announced that it was liquidating and going out of business. *See Sandler Declaration,* ¶ 5 and Exhibit D thereto; "Art Van Furniture to Close All Stores; Going Out of Business Sales to Start Friday, March 6," *PRNewswire* (March 5, 2020), available at https://www.prnewswire.com/news-releases/art-van-furniture-to-close-all-stores-going-out-of-business-sales-to-start-friday-march-6-301017308.html (attached hereto as **Exhibit 1**) (Art Van "announced today it has made the difficult decision to wind down operations and begin liquidation sales"); M. Feighan, *et al.*, "'Heartbroken,' 'angry': Art Van closing shocks customers, city leaders," *The Detroit News* (March 5, 2020), available at https://www.detroitnews.com/story/news/local/michigan/2020/03/05/art-van-close-all-stores-start-going-out-business-sale-friday/4962367002/ (attached hereto as **Exhibit 2**) ("Art Van Furniture, a Metro Detroit institution and one of the largest furniture retailers in the Midwest, will close all of its company-owned stores and liquidate its inventory ...."). The liquidation process continued post-Petition Date as the evidence in this case clearly establishes, and as explained in the Motion, as of the Petition Date, and prior to the March 20, 2020 Layoff, the only business activities to be conducted by the Debtors were those necessary to liquidate their assets to pay off their creditors. [3] As Plaintiffs fail to establish that the Debtors were "employers" under the WARN

---

[3] Plaintiffs' focus in their Opposition on the "going concern sale" of certain stores and other assets pursuant to the failed Levin Sale is completely misplaced. Whether terms such as "ordinary course of business" and "going concern" might have been used at times in connection with the Levin Sale is irrelevant. To the extent such terms were used, they do not take away from the actual substance of what was occurring: The Debtors were simply preserving the value of the Levin Sale stores for purposes of the sale to the third party, as evidenced by, among other things, the Levin DIP Loan. As discussed in the Memorandum, because the Debtors had no money to operate these stores, Levin agreed to extend the Levin DIP Loan to the Debtors to directly facilitate the Levin Sale, which funding would be

Act, an essential element of their *prima facie* case, the Court must grant summary judgment against them.[4]

### 2. COVID-19 and Its Extraordinary Business and Social Effects Were Unforeseeable At All Relevant Times.

6. Even if Plaintiffs were able to prove their *prima facie* case, which they cannot, the Debtors are not liable to Plaintiffs because the Debtors' inability to conduct the GOB Sales and other parts of the Planned Liquidation Process due to the COVID-19 pandemic and the attendant extraordinary government-ordered business closures and government-ordered shelter-in-place requirements constituted an unforeseeable business circumstance under the WARN Act.

7. Tellingly, in the Opposition, Plaintiffs do not mention, let alone dispute that, under Third Circuit law (*see, e.g., Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*, 866 F.3d 515, 528 (3d Cir. 2017), a layoff becomes reasonably foreseeable when it becomes "probable" (more likely than not) that it would occur. That is, a clear probability of layoffs is necessary to trigger the WARN Act notice requirement. It cannot be colorably argued that, as of January 2020 (60 days prior to the Layoff), the subsequent unprecedented, devastating impact of the pandemic on the Debtors' stores and financial condition was "probable." Furthermore, it was not merely a downturn in the economy as a result of COVID-19 that "caused" the March 20, 2020 Layoff. The

---

repaid with and deducted from the sales proceeds of the Levin Sale. Thus, this financing transaction and the Debtors' related alleged "operation" of the subject stores were done to preserve the value of these stores until consummation of the Levin Sale for the benefit of the third party buyer. The foregoing cannot be considered to be the "normal" operation of a business.

[4] Plaintiffs appear to argue that the Trustee must prove that the Planned Liquidation Process **caused** the March 20, 2020 Layoff in order to invoke the "liquidating fiduciary" doctrine. This is not so. Establishing that the Debtors were "employers" under the WARN Act is an element of Plaintiff's *prima facie* case. If they were not "employers" on March 20, 2020, the inquiry ends. The Trustee does not have to establish causation.

DOCS_LA:341146.8 05233/003

PA01222

Governor of the State of Pennsylvania literally shut down the business operations of the entire

state at 8:00 p.m. on March 19, 2020.  Plaintiffs can Monday morning quarterback the Debtors'

decision to terminate their employees (as opposed to furlough them), but the fact remains that the

restrictions on retail operations in Pennsylvania were not lifted until June 5, 2020,[5] while similar

restrictions in Michigan were rescinded around the same time on June 4, 2020.[6]

### 3. The Layoff Was Clearly "Due to" the COVID-19 Natural Disaster.

8. Even if Plaintiffs were able to prove their *prima facie* case, which they cannot, the

Debtors were not required to give any notice because the March 20, 2020 Layoff was due to the

COVID-19 pandemic -- a "natural disaster" under the WARN Act as discussed in the

Memorandum (at 23-25).   Strikingly, instead of simply referring to natural disasters, the WARN

Act in fact refers more broadly to "any form of natural disaster" -- a phrase which plainly and

logically supports a broad interpretation of "natural disaster."

9. The Debtors' Layoff was clearly "due to" the COVID-19 pandemic.[7]  As discussed

in the Memorandum, the District Court for the Southern District of Texas recently held that the

"but-for" standard of causation applies to the natural disaster exception. In *Easom v. US Well

Servs*, 527 F. Supp. 3d 898 (S.D. Tex. 2021), the District Court concluded that "due to" means

---

[5] Retail businesses in certain counties in Pennsylvania, which excluded the more populous counties like Philadelphia County, were allowed to reopen under certain restrictions starting on May 8, 2020, with additional counties permitted to reopen on certain dates thereafter.  It was not until June 5, 2020 when all retailers across the state, in all counties, were allowed to reopen.  *See Amendment to Order of Governor of Commonwealth of Pennsylvania for Limited Opening of Businesses, Lifting Stay at Home Requirements, and Continued Aggressive Mitigation Efforts*, available at https://www.governor.pa.gov/wp-content/uploads/2020/06/20200604-TWW-amendment-to-yellow-phase-order.pdf (attached hereto as **Exhibit 3**).

[6] *See* Executive Order No. 2020-110, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-530620--,00.html (attached hereto as **Exhibit 4**).

[7] The Natural Disaster Exception applies when the mass layoff is "due to" a natural disaster. 29 U.S.C. § 2102(b)(2)(B).

PA01223

"but for" causation. *Id.* at 915 ("In sum, the WARN Act's language, structure, and legislative history, as well as case law interpreting similar statutory language, support finding that the natural-disaster exception uses but-for causation standards. The COVID-19 pandemic need not be the direct or sole cause of the layoffs for the natural-disaster exception to apply."). The *Easom* court rejected the argument (advanced by Plaintiffs in this case) that the Department of Labor's ("DOL") implementing regulation (20 C.F.R. § 639.9(c)(2)) requires employers to prove that the natural disaster was the "proximate cause" of the layoff. *Id.* at 913 ("The fact that Congress rejected the word 'directly' not only cuts against the Department of Labor's regulations, it cuts against proximate causation as the standard."). But-for causation is established whenever a particular outcome would not have happened "but for" the purported cause. The "but-for" test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a "but-for" cause. *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1739 (2020).

10.     But for COVID-19, the Debtors would have completed the Planned Liquidation Process as originally planned, including the provision of adequate notice of the Layoff. But for the threat of infection and death from COVID-19, the Debtors would not have issued the COVID WARN Notice and would not have terminated the Plaintiffs on March 20, 2020.[8] Plaintiffs admit that the pandemic was a but-for cause. *See* Opposition at 22 ("It was not COVID-19 alone, but *COVID-19 plus something else that caused* Defendants to permanently terminate its workforce on March 19." (emphasis added)).

---

[8] Based on the foregoing, Plaintiffs' speculations in the Opposition about the Debtors' board of directors at the time of the Layoff (which speculations are part of Plaintiffs' transparent effort to muddy or taint the waters in response to the clear facts and law discussed herein and in the Motion) are completely irrelevant. Plain and simple, as acknowledged by Plaintiffs in the Opposition, COVID-19 was a but-for cause of the Layoff.

DOCS_LA:341146.8 05233/003

PA01224

11.     Even if a more stringent standard of causation under the WARN Act were required, however, it has been met here.  As the Trustee pointed out in his Memorandum, the applicable causation standard has been the subject of recent litigation.  *See* Memorandum at 26 and n.48. Specifically, in *Benson v. Enterprise Leasing Co.,* 2021 U.S. Dist. LEXIS 55137 (D. M.D. Fla. Feb. 4, 2021), the District Court denied the defendant's motion to dismiss where the defendant did not allege in the complaint that the layoff was a "direct result" of COVID-19 and then certified the causation standard for interlocutory appeal.  On appeal, the Department of Justice (the "DOJ") defended the DOL's implementing regulation, arguing that an employer must show that the layoff was a "direct result" of the natural disaster.  *See Benson v. Enterprise Leasing Co*., No. 21-11911, Brief of the United States as Amicus Curiae (the "DOJ Brief") (attached as Exhibit 3 to the Opposition).  The case was settled before the Court of Appeals could rule on the issue.

12.     Even assuming *arguendo* that the Trustee must show that the March 20, 2020 Layoff was a "direct result" of the pandemic, it clearly was according to the DOL's own interpretation.  In the DOJ Brief, the DOJ stated, "By requiring a direct causal connection between the natural disaster and the mass layoff, the Secretary's interpretation ensures that the exception will not permit employers to rely on ***the lingering or remote effects of*** a natural disaster to evade the WARN Act's notice requirements where notice would have been practicable.  At the same time it provides relief to employers where a natural disaster has a ***direct and immediate adverse impact on an employer's business, such that an employer had to immediately shut its plant or layoff its employees***."  DOJ Brief at 17.  The Trustee's Memorandum and the undisputed facts clearly establish:

DOCS_LA:341146.8 05233/003

PA01225

      (i)      the Debtors intended to conduct an orderly liquidation of their business over a period of 60 days;

      (ii)      the Debtors gave the GOB WARN Notice on March 5, 2020 pursuant to which their employees would have had 60 days-notice of their eventual layoff; and

      (iii) the Debtors diligently executed on their Planned Liquidation Process by conducting GOB Sales, filing the Chapter 11 Cases, and seeking approval of the GOB Sales and the Levin Sale;

      (iv)      however, in two weeks'-time, the pandemic deepened so dramatically that on March 19, 2020, the Governor of Pennsylvania ordered all nonessential businesses (including the Debtors) to close by 8:00 p.m. that night.

The March 20, 2020 Layoff was not the result of a "lingering or remote effect of a natural disaster." It was an immediate, direct, acute heart attack caused by COVID-19.

13.      Accordingly, while the Court can easily find that the Debtors were liquidating fiduciaries and thus not "employers" under controlling Third Circuit precedent, even if it chooses to go further into the analysis, the Court can find that the devastating economic impact of the global pandemic was unforeseeable at the relevant times, and that even if not unforeseeable, the Debtors are not subject to the WARN Act because the Layoff was "due to" the natural disaster of COVID-19.

DOCS_LA:341146.8 05233/003

PA01226

B.      **Plaintiffs Have Failed to Establish That a Determination of the Motion Should Be
        Deferred In Order to Permit Further Discovery.**

14.     Plaintiffs' request for additional discovery is baseless and a transparent attempt at
gamesmanship. As discussed above and in the Memorandum, there can be no reasonable dispute
about the material dispositive facts, including that the Debtors were indeed liquidating their
business as of the Petition Date and as of the Layoff. *See, e.g., Walsh v. Century City Doctors
Hosp., LLC (In re Century City Doctors Hosp., LLC)*, 417 B.R. 801, 804-05 (Bankr. C.D. Cal.
2009), *aff'd* 2010 Bankr. LEXIS 5048 (B.A.P. 9th Cir. Oct. 29, 2010) (previously cited in the
Memorandum; holding a chapter 7 trustee who operated a hospital for a brief period post-petition
before terminating its employees was not an "employer" under the WARN Act based on *United
Healthcare* where it was clear from the record that the "trustee's intentions have consistently been
to close the hospital business at the earliest reasonable time and to liquidate its assets for the benefit
of its creditors. The trustee only operated [the debtor] for approximately a week from the date of
filing, and the trustee's brief operation of [the debtor] was not for any commercial purpose.").

15.     Notwithstanding the foregoing, in order to justify additional discovery in any event,
Plaintiffs must specify the discovery they seek that can overcome the Motion -- vague, generalized
assertions by Plaintiffs that discovery will lead to facts in their favor do not justify denying the
Trustee's Motion.[9] *See, e.g., Simpson v. Panhandle S. Plains Fair Ass'n*, 2001 U.S. Dist. LEXIS

---

[9] It is disingenuous for Plaintiffs to complain in the Opposition about the purportedly little discovery obtained so far
in this action. The Debtors' intentions and Planned Liquidation Process are evidenced by the voluminous publicly
filed documents that are part of the record in these cases and have long been available to Plaintiffs on the Court's
docket in the bankruptcy cases. In addition, counsel to Plaintiffs appeared at numerous hearings during the Chapter
11 Cases. (*See* U.S. Bankruptcy Court - District of Delaware Confirmed Telephonic Appearance Schedule (Honorable
Christopher S. Sontchi) in Art Van's Chapter 11 case for hearing dates March 26, 2021, April 3, 2021, and April 6,
2021 (Docket Nos. 192, 240, 262 in No. 20-10553.) Finally, the Trustee provided informal discovery to counsel both
prior to, in connection with and after the recent mediation.

15080, at *4-*5 (N.D. Tex. Aug. 9, 2001) ("the summary judgment rules do not require that discovery take place before a motion for summary judgment can be granted"; for a proper request for continuance under Fed.R.Civ.P. 56(f), the nonmoving party must "(1) present specific facts why he was unable to respond substantively in opposition to the motion; and, (2) specifically demonstrate how not granting the summary judgment or granting additional time for discovery will rebut the moving party's evidence that there is no genuine issue of material fact. [citations omitted]  In other words, the party opposing summary judgment 'must show how the additional discovery will defeat the summary judgment motion.' [citation omitted]  'Vague assertions by the non-moving party that discovery will uncover unspecified facts are not enough to trigger Rule 56(f) protection.'"); *Shelton v. Lemons*, 486 Fed.Appx. 395, 396-97 (5th Cir. 2012) (similar). Here, all Plaintiffs say in support of their cross motion to defer is that:

> Plaintiffs have not received documents, or been able to take depositions, concerning the Defendants' purported liquidation process, the operations of the stores during the pendency of the bankruptcy, Defendants' efforts to obtain financing, and the decision-making process that led to the termination of Defendants' employees.

Opposition at 6.

16.      This is no more than a "vague assertion" that "discovery will uncover unspecified facts," and as such, is patently insufficient.  All of the relevant undisputed facts are known.  The Court lived through this case from the Debtors' first day in bankruptcy when the Debtors filed for Chapter 11 with a GOB motion in hand to effectuate and continue their prepetition liquidation process, to dealing with the Debtors' response to the global economic shutdown in response to the global pandemic, to the conversion of these cases from Chapter 11 to Chapter 7.  Although substantial discovery has taken place, no amount of additional discovery will change this point:

DOCS_LA:341146.8 05233/003

PA01228

the evidentiary record is full and supports the facts set forth in the Motion, and Plaintiffs admit virtually all the facts supported by the evidence. Applying well-settled and binding law to those undisputed facts clearly supports the granting of summary judgment in favor of the Trustee. Accordingly, the Court should deny Plaintiffs' cross-motion for a continuance to allow even more discovery, and grant the Trustee's Motion in all respects.

## II.    CONCLUSION

For the reasons set forth herein and in the Motion, the Trustee respectfully requests that the Court grant the Motion, enter judgment in his favor, and grant such other and further relief as the Court deems appropriate.

**[THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

12

PA01229

Respectfully Submitted,

Dated:     December 17, 2021          PACHULSKI STANG ZIEHL & JONES LLP
           Wilmington, Delaware

                                     */s/ Bradford Sandler* _____
                                     Bradford J. Sandler (Bar No. 4142)
                                     Beth Levine (New York Bar No. 2572246)
                                     (admitted *pro hac vice*)
                                     Colin R. Robinson (DE Bar No. 5524)
                                     Peter J. Keane (DE Bar No. 5503)
                                     **PACHULSKI STANG ZIEHL & JONES LLP**
                                     919 North Market Street, 17th Floor
                                     P.O. Box 8705
                                     Wilmington, Delaware 19899
                                     Telephone: (302) 652-4100
                                     Facsimile: (302) 652-4400
                                     Email:    bsandler@pszjlaw.com
                                               blevine@pszjlaw.com
                                               crobinson@pszjlaw.com
                                               pkeane@pszjlaw.com

                                     Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
                                     Defendants Art Van Furniture, LLC, *et al.*

PA01230

# EXHIBIT 1

PA01231

# Art Van Furniture to Close All Stores; Going Out of Business Sales to Start Friday, March 6

Levin & Wolf Furniture to be sold to Robert Levin, pending sale approval



NEWS PROVIDED BY
**Art Van Furniture →**
Mar 05, 2020, 09:31 ET

WARREN, Mich., March 5, 2020 /PRNewswire/ -- AVF Holdings, Inc. (the "Company"), announced today it has made the difficult decision to wind down operations and begin liquidation sales at all of its company owned stores in Michigan, Illinois, Indiana, Missouri, and Ohio.  The Company operates under the brands Art Van Furniture, Art Van PureSleep and Scott Shuptrine Interiors.  Levin & Wolf Furniture in Ohio and Pennsylvania will be sold to Robert Levin, pending court approval.  Eight Wolf Furniture stores in Maryland and Virginia will also be liquidated.

"Despite our best efforts to remain open, the Company's brands and operating performance have been hit hard by a challenging retail environment," said Diane Charles, Art Van Furniture spokesperson. "We recognize the extraordinary retail, community and philanthropic legacies that Art Van Furniture has built for decades in the community."

Art Van Elslander, opened his first furniture store in metro Detroit in 1959, growing it to the number one furniture and mattress retailer in the Midwest.

"On behalf of the Company we want to offer our sincere appreciation to our employees for their dedication, commitment and hard work. We also want to extend our gratitude to the many customers, vendors, franchisees, charities and communities who have supported these retailers," continued Charles.

PA01232

The liquidation sales will begin Friday, March 6 at all Art Van Furniture, Art Van PureSleep, and Scott Shuptrine Interiors in Michigan, Illinois, Ohio, Indiana, and Missouri, and select Wolf stores in Maryland and Virginia.

SOURCE Art Van Furniture

Related Links

http://www.artvan.com

# EXHIBIT 2

PA01234

# The Detroit News

MICHIGAN

# 'Heartbroken,' 'angry': Art Van closing shocks customers, city leaders

**Maureen Feighan**, **James David Dickson** and **Neal Rubin** The Detroit News
Published 9:50 a.m. ET March 5, 2020 | Updated 11:01 a.m. ET March 6, 2020

*Warren* — Art Van Furniture, a Metro Detroit institution and one of the largest furniture retailers in the Midwest, will close all of its company-owned stores and liquidate its inventory after struggling with changing furniture-shopping habits and heavy debt following its acquisition by a private equity firm three years ago.

Founded in 1959 with one store by Art Van Elslander, the Warren-based company expanded significantly in the last seven years to 190 stores in nine states, including Michigan, Illinois, Indiana, Missouri and Ohio. All 3,100 of its employees will lose their jobs and questions loomed Thursday about what will fill the space left by the closed stores.

"Despite our best efforts to remain open, the company's brands and operating performance have been hit hard by a challenging retail environment," said Diane Charles, Art Van Furniture spokeswoman, in a statement Thursday.

"We recognize the extraordinary retail, community and philanthropic legacies that Art Van Furniture has built for decades in the community."

**More:** Art Van Furniture explores sale, possible bankruptcy

In addition to its main stores, the company also operates Art Van PureSleep, Art Van Flooring, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, Wolf Furniture and Gardiner Wolf Furniture.

All of those stores will close except for some of the Levin and Wolf stores. Former Levin President and owner Robert Levin has agreed to acquire the bulk of the Levin and Wolf Furniture operations in Pennsylvania and Ohio, pending court approval.

The stores' going out of business sales begin Friday. At 3 p.m. Thursday, Art Van PureSleep — part of an empire renowned in Michigan for its endless cycle of sales — emailed its latest

PA01235

offer, with a long-term purchase plan perhaps no longer valid: "$150 Million Blowout. Save up to $800 plus up to 72 months plus free delivery."

The liquidation announcement shocked Metro Detroit customers, employees and city leaders. It comes just weeks after media outlets reported the retailer was exploring bankruptcy proceedings and a possible sale back to the Van Elslander family.

"I'm heartbroken on a number of levels," said customer Beverly Phillips of Farmington Hills. "My last three mattresses came from there. My daughter's bedroom furniture came from there. To see a Detroit family institution go to private equity and disappear in three years, it's awful. My heart goes out to the employees."

## 'This did not have to happen'

Boston-based private equity firm Thomas H. Lee Partners bought Art Van for $550 million in 2017, a year before the death of the furniture chain's founder in February 2018.

In a statement from the private equity firm released late Thursday, a spokesperson said "investors in the March 2017 acquisition, including THL, will lose 100% of their principal investment in the company and never received any dividends or returns of capital from their investments."

Warren Mayor Jim Fouts, who got a letter Thursday morning from the private equity firm about its plans to close, said 262 employees were based at the company's headquarters and flagship store on 14 Mile in his city. He said he heard from some high-level employees the firm that bought Art Van was selling off assets from the moment it took over.

"I'm absolutely outraged and angry," said Fouts, who said the closure in Warren will cost the city and local school districts about $2 million in tax revenue. "This did not have to happen. This was a successful company. This was a case where investment greed got the best."

As recently as last fall, the company seemed hopeful about its future. It celebrated its 60th anniversary then with a big party and concert by pop star Andy Grammer at its 14 Mile store. It also hired last fall a new CEO, Gary Fazio, who pledged to take the company to "another level."

Still, the retail landscape has changed significantly since Art Van Elslander started with one store on Gratiot Avenue in what is now Eastpointe. Ikea, which opened a 355,000-square-foot megastore in Canton Township in 2006, draws customers from a radius of 100 miles and more with its fast-furniture-on-the-cheap business model. Online furniture retailers

PA01236

such as Wayfair and Amazon have become major players, competing with traditional brick-and-mortar stores. Ashley HomeStores also expanded into Metro Detroit in 2017; discount retailer Bob's Discount Furniture opened several stores in Metro Detroit last year.

Ron Goldstone, executive vice president of NAI Farbman, a Southfield-based real estate firm, said "to lose a player in the industry that's of such a high quality, and to put that much square footage on the market, is a little bit of a scary moment."

"All of a sudden the ground shakes and the profit margin isn't there anymore," Goldstone said. "So maybe the Gardner Whites or Ashley or other operators in that category might absorb some of the units that come available."

Cities home to soon-vacant big-box storefronts should be creative and flexible in their search for new tenants, said Goldstone: "I don't anticipate the units won't get back-filled, Art Van has some of the best retail locations in every market," he said.

Alex Calderone, managing director of the Calderone Advisory Group, a financial advisory and consultancy firm, blamed the "private equity playbook" for Art Van's demise.

"Art Van is no different than any other brick-and-mortar retailer that has been impacted by the retail apocalypse, and plans for an orderly wind-down should not be surprising to anyone," Calderone said in a statement.

"The private equity playbook, which almost always results in aggressive use of leverage, which increases the risk of failure exponentially, has not worked out for other retailers in the past and didn't serve Art Van well either. When an investment thesis doesn't pan out, equity sponsors tend to cut their losses quickly."

Fouts wants elected leaders to pass laws to prevent what happened to Art Van from happening again. He said he plans to call Gov. Gretchen Whitmer, President Donald Trump and presidential candidates Sen. Bernie Sanders and former Vice President Joe Biden.

"This can't be tolerated," said Fouts. "There should be a national or state law that would prohibit" private equity firms from immediately selling assets.

State Sen. Paul Wojno, D-Warren, said he'd support a review or audit of the Thomas H. Lee Partners acquisition because Art Van appeared to be solvent when it was purchased. He said private equity firms are regulated by the Securities Exchange Commission.

"I think it's realistic to initiate a constructive dialogue and work with our federal regulators about what, if anything, we can do to make sure this doesn't happen in another city," said

PA01237

Wojno.

## Thanksgiving parade

Among the casualties of the closing will be the annual Art Van Charity Challenge, which donated more than $10 million to Midwest nonprofits and helped raise another $26 million across the past 11 years.

"We definitely benefited financially," said Cindy Eggleton, founder and CEO of two-time participant Brilliant Detroit. "But we also benefited in getting the word out, and in people coming together for something that matters."

Brilliant Detroit, which focuses on early education, took third place in last year's challenge, earning a $25,000 prize from the company atop the $181,788 it collected in donations as part of the competition.

Her organization remains on solid footing, Eggleton said, but for some smaller organizations, the loss of Art Van "is going to be devastating."

How the company's demise might affect America's Thanksgiving Day Parade — which Art Van Elslander saved in 1990 when he wrote a $200,000 check to keep it going — was unclear Thursday.

Tony Michaels, president and CEO of the Parade Co., which puts on the Detroit parade, said Art Van has two years left as the parade's presenting sponsor.

"We have to monitor what's going to happen," Michaels said. "It's really a wait-and-see right now."

Even after Art Van was sold to the private equity firm, it continued on as a supporter of the parade. "That's what we like to do," Art Van spokeswoman Charles told The News at the time.

Michaels stressed that the Parade Co. is "on solid ground."

"It's a substantial partnership," Michaels said. "We'll be talking with people to replace that, if need be, and go from there. But I just come back to the jobs and the effect that this has on so many lives and so many people."

At its flagship store in Warren, business continued Thursday afternoon with the parking lot nearly half-full and customers wandering through each department.

PA01238

For customer Donna Donovan of Macomb Township, the closure will be the end of a tradition. Art Van's Warren location was her "favorite place" to go on her lunch. She worked at 16 Mile and Mound.

"I think it's sad," she said as she put a large painting into her car at the store Thursday. "What's going to be left? I'm not an online shopper."

**More:** Furniture retail giant Van Elslander dies at 87

jdickson@detroitnews.com

Twitter: @downi75

PA01239

# EXHIBIT 3

PA01240

Case 20-50548-CSS Doc 52-3 Filed 12/13/21 Page 2 of 2



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE GOVERNOR

*AMENDMENT TO THE ORDER OF*
*THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA*
*FOR LIMITED OPENING OF BUSINESSES, LIFTING OF STAY AT HOME*
*REQUIREMENTS, AND CONTINUED AGGRESSIVE MITIGATION EFFORTS*

*I hereby amend my Order for the "Limited Opening of Businesses, Lifting of Stay at Home Requirements, and Continued Aggressive Mitigation Efforts" dated May 7, 2020, as amended.*

*The list of counties in Section 1(A) and 2(A) is amended to strike "and" after "Pike" and to add the following after "Schuylkill":*

*, Berks, Bucks, Chester, Delaware, Lackawanna, Lancaster, Lehigh, Montgomery, Northampton, and Philadelphia.*

*Section 3 is amended to add a new sentence at the end of the section as follows:*
*Further, enforcement of this Order with respect to the following counties will commence on June 5, 2020, at 12:01 a.m.:*

*Berks, Bucks, Chester, Delaware, Lackawanna, Lancaster, Lehigh, Montgomery, Northampton, and Philadelphia.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this fourth day of June two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

**TOM WOLF**
*Governor*

PA01241

# EXHIBIT 4



OFFICIAL WEBSITE OF MICHIGAN.GOV

THE OFFICE OF
# GOVERNOR GRETCHEN WHITMER

# Executive Order 2020-110: Temporary restrictions on certain events, gatherings, and businesses - RESCINDED

**EXECUTIVE ORDER**

**No. 2020-110**

**Temporary restrictions on certain events, gatherings, and businesses**

**Rescission of Executive Orders 2020-69 and 2020-96**

The novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine or antiviral treatment for this disease.

On March 10, 2020, the Department of Health and Human Services identified the first two presumptive-positive cases of COVID-19 in Michigan. On that same day, I issued Executive Order 2020-4. This order declared a state of emergency across the state of Michigan under section 1 of article 5 of the Michigan Constitution of 1963, the Emergency Management Act, 1976 PA 390, as amended (EMA), MCL 30.401 et seq., and the Emergency Powers of the Governor Act of 1945, 1945 PA 302, as amended (EPGA), MCL 10.31 et seq.

Since then, the virus spread across Michigan, bringing deaths in the thousands, confirmed cases in the tens of thousands, and deep disruption to this state's economy, homes, and educational, civic, social, and religious institutions. On April 1, 2020, in response to the widespread and

PA01243

severe health, economic, and social harms posed by the COVID-19 pandemic, I issued Executive Order 2020-33. This order expanded on Executive Order 2020-4 and declared both a state of emergency and a state of disaster across the State of Michigan under section 1 of article 5 of the Michigan Constitution of 1963, the Emergency Management Act, and the Emergency Powers of the Governor Act of 1945. And on April 30, 2020, finding that COVID-19 had created emergency and disaster conditions across the State of Michigan, I issued Executive Order 2020-67 to continue the emergency declaration under the Emergency Powers of the Governor Act, as well as Executive Order 2020-68 to issue new emergency and disaster declarations under the Emergency Management Act.

Those executive orders have been challenged in *Michigan House of Representatives and Michigan Senate v Whitmer.* On May 21, 2020, the Court of Claims ruled that Executive Order 2020-67 is a valid exercise of authority under the Emergency Powers of the Governor Act but that Executive Order 2020-68 is not a valid exercise of authority under the Emergency Management Act. Both of those rulings are being challenged on appeal.

On May 22, 2020, I issued Executive Order 2020-99, again finding that the COVID-19 pandemic constitutes a disaster and emergency throughout the State of Michigan. That order constituted a state of emergency declaration under the Emergency Powers of the Governor Act of 1945. And, to the extent the governor may declare a state of emergency and a state of disaster under the Emergency Management Act when emergency and disaster conditions exist yet the legislature has declined to grant an extension request, that order also constituted a state of emergency and state of disaster declaration under that act.

The Emergency Powers of the Governor Act provides a sufficient legal basis for issuing this executive order. In relevant part, it provides that, after declaring a state of emergency, "the governor may promulgate reasonable orders, rules, and regulations as he or she considers necessary to protect life and property or to bring the emergency situation within the affected area under control." MCL 10.31(1).

Nevertheless, subject to the ongoing litigation and the possibility that current rulings may be overturned or otherwise altered on appeal, I also invoke the Emergency Management Act as a basis for executive action to combat the spread of COVID-19 and mitigate the effects of this emergency on the people of Michigan, with the intent to preserve the rights and protections provided by the EMA. The EMA vests the governor with broad powers and duties to "cop[e] with

PA01244

dangers to this state or the people of this state presented by a disaster or emergency," which the governor may implement through "executive orders, proclamations, and directives having the force and effect of law." MCL 30.403(1)–(2). This executive order falls within the scope of those powers and duties, and to the extent the governor may declare a state of emergency and a state of disaster under the Emergency Management Act when emergency and disaster conditions exist yet the legislature has not granted an extension request, they too provide a sufficient legal basis for this order.

To suppress the spread of COVID-19, to prevent the state's health care system from being overwhelmed, to allow time for the production of critical test kits, ventilators, and personal protective equipment, to establish the public health infrastructure necessary to contain the spread of infection, and to avoid needless deaths, it was reasonable and necessary to direct residents to remain at home or in their place of residence to the maximum extent feasible. To that end, on March 23, 2020, I issued Executive Order 2020-21, ordering all people in Michigan to stay home and stay safe. In Executive Orders 2020-42, 2020-59, 2020-70, 2020-77, 2020-92, and 2020-96, I extended that initial order, modifying its scope as needed and appropriate to match the ever-changing circumstances presented by this pandemic.

The measures put in place by these executive orders have been effective: the number of new confirmed cases each day continues to drop. Although the virus remains aggressive and persistent—on May 31, 2020, Michigan reported 57,397 confirmed cases and 5,491 deaths—the strain on our health care system has begun to relent, even as our testing capacity has increased. We are now in the process of gradually resuming in-person work and activities. In so doing, however, we must move with care, patience, and vigilance, recognizing the grave harm that this virus continues to inflict on our state and how quickly our progress in suppressing it can be undone.

With this order, I find it reasonable and necessary to move the state to Stage 4 of the Michigan Safe Start Plan. As a result, Michiganders are no longer required to stay home. Instead, certain businesses will remain closed and specific activities that present a heightened risk of infection will remain prohibited. Any work that is capable of being performed remotely must be performed remotely.

Under this order, retailers will be allowed to resume operations on June 4. Restaurants and bars may reopen fully on June 8. Swimming pools and day camps for kids will also be permitted to reopen on the same day. Those businesses and activities will be subject to safety guidance to

PA01245

mitigate the risk of infection. Other businesses and activities that necessarily involve close contact and shared surfaces, including gyms, hair salons, indoor theaters, tattoo parlors, casinos, and similar establishments, will remain closed for the time being.

Michiganders must continue to wear face coverings when in enclosed public spaces and should continue to take all reasonable precautions to protect themselves, their co-workers, their loved ones, and their communities. Indoor social gatherings and events of more than 10 people are prohibited. Outdoor social gatherings and events are permitted so long as people maintain six feet of distance from one another and the assemblage consists of no more than 100 people.

Acting under the Michigan Constitution of 1963 and Michigan law, I order the following:

1. For purposes of this order, Michigan comprises eight separate regions.

   a. Region 1 includes the following counties: Monroe, Washtenaw, Livingston, Genesee, Lapeer, Saint Clair, Oakland, Macomb, and Wayne.

   b. Region 2 includes the following counties: Mason, Lake, Osceola, Clare, Oceana, Newaygo, Mecosta, Isabella, Muskegon, Montcalm, Ottawa, Kent, and Ionia.

   c. Region 3 includes the following counties: Allegan, Barry, Van Buren, Kalamazoo, Calhoun, Berrien, Cass, Saint Joseph, and Branch.

   d. Region 4 includes the following counties: Oscoda, Alcona, Ogemaw, Iosco, Gladwin, Arenac, Midland, Bay, Saginaw, Tuscola, Sanilac, and Huron.

   e. Region 5 includes the following counties: Gratiot, Clinton, Shiawassee, Eaton, and Ingham.

f. Region 6 includes the following counties: Manistee, Wexford, Missaukee, Roscommon, Benzie, Grand Traverse, Kalkaska, Crawford, Leelanau, Antrim, Otsego, Montmorency, Alpena, Charlevoix, Cheboygan, Presque Isle, and Emmet.

g. Region 7 includes the following counties: Hillsdale, Lenawee, and Jackson.

h. Region 8 includes the following counties: Gogebic, Ontonagon, Houghton, Keweenaw, Iron, Baraga, Dickinson, Marquette, Menominee, Delta, Alger, Schoolcraft, Luce, Mackinac, and Chippewa.

2. Any work that is capable of being performed remotely (i.e., without the worker leaving his or her home or place of residence) must be performed remotely.

3. Any business or operation that requires its employees to leave their home or place of residence for work is subject to the rules on workplace safeguards in Executive Order 2020-97 or any order that may follow from it.

4. Any individual who leaves his or her home or place of residence must:

a. Follow social distancing measures recommended by the Centers for Disease Control and Prevention ("CDC"), including remaining at least six feet from people from outside the individual's household to the extent feasible under the circumstances.

b. Wear a face covering over his or her nose and mouth—such as a homemade mask, scarf, bandana, or handkerchief—when in any enclosed public space, unless the individual is unable medically to tolerate a face covering.

1. An individual may be required to temporarily remove a face covering upon entering an enclosed public space for identification purposes. An individual may also remove a face

PA01247

covering to eat or drink when seated at a restaurant or bar.

2. Businesses and building owners, and those authorized to act on their behalf, are permitted to deny entry or access to any individual who refuses to comply with the rule in this subsection (b). Businesses and building owners will not be subject to a claim that they have violated the covenant of quiet enjoyment, to a claim of frustration of purpose, or to similar claims for denying entry or access to a person who refuses to comply with this subsection (b).

3. Supplies of N95 masks and surgical masks should generally be reserved, for now, for health care professionals, first responders (e.g., police officers, fire fighters, paramedics), and other critical workers who interact with the public.

4. The protections against discrimination in the Elliott-Larsen Civil Rights Act, 1976 PA 453, as amended, MCL 37.2101 et seq., and any other protections against discrimination in Michigan law, apply in full force to individuals who wear a face covering under this order.

5. Indoor social gatherings and events among persons not part of a single household are permitted, but may not exceed 10 people.

6. Outdoor social gatherings and events among persons not part of a single household are permitted, but only to the extent that:

a. The gathering or event does not exceed 100 people, and

🔍 [search box]                                              ✖

b. People not part of the same household maintain six feet of distance from one another.

7. Unless otherwise prohibited by local regulation, outdoor parks and recreational facilities may be open, provided that they make any reasonable modifications necessary to enable employees and patrons not part of the same household to maintain six feet of distance from one another, and provided that areas in which social distancing cannot be

PA01248

maintained be closed, subject to guidance issued by the Department of Health and Human Services.

8. Unless otherwise prohibited by local regulation, public swimming pools, as defined by MCL 333.12521(d), may open as of June 8, 2020, provided that they are outdoors and limit capacity to 50% of the bather capacity limits described in Rule 325.2193 of the Michigan Administrative Code, and subject to guidance issued by the Department of Health and Human Services. Indoor public swimming pools must remain closed.

9. Day camps for children, as defined by Rule 400.11101(i) of the Michigan Administrative Code, may open as of June 8, 2020, subject to guidance issued by the Department of Licensing and Regulatory Affairs. Residential, travel, and troop camps within the meaning of Rule 400.11101(n), (p), or (q) of the Michigan Administrative Code must remain closed for the time being.

10. Unless otherwise prohibited by local regulation, libraries and museums may open as of June 8, 2020, subject to the rules governing retail stores described in Executive Order 2020-97 or any order that may follow from it.

11. Stores that were closed under Executive Order 2020-96 (or that were open only by appointment under the same order) must remain closed to the public (or open only by appointment) until June 4 at 12:01 am. Such stores may then resume normal operations, subject to local regulation and to the capacity constraints and workplace standards described in Executive Order 2020-97 or any order that may follow from it.

12. Subject to the exceptions in section 14, the following places are closed to ingress, egress, use, and occupancy by members of the public:

a. Indoor theaters, cinemas, and performance venues.

b. Indoor gymnasiums, fitness centers, recreation centers, sports facilities, exercise facilities, exercise studios, and the like.

PA01249

c. Facilities offering non-essential personal care services, including hair, nail, tanning, massage, traditional spa, tattoo, body art, and piercing services, and similar personal care services that involve close contact of persons.

d. Casinos licensed by the Michigan Gaming Control Board, racetracks licensed by the Michigan Gaming Control Board, and Millionaire Parties licensed by the Michigan Gaming Control Board.

e. Indoor services or facilities, or outdoor services or facilities involving close contact of persons, for amusement or other recreational or entertainment purposes, such as amusement parks, arcades, bingo halls, bowling alleys, indoor climbing facilities, indoor dance areas, skating rinks, trampoline parks, and other similar recreational or entertainment facilities.

13. Unless otherwise prohibited by local regulation, restaurants, food courts, cafes, coffeehouses, bars, taverns, brew pubs, breweries, microbreweries, distilleries, wineries, tasting rooms, special licensees, clubs, and like places may be open to the public as follows:

a. For delivery service, window service, walk-up service, drive-through service, or drive-up service, and may permit up to five members of the public at one time for the purpose of picking up their food or beverage orders, so long as those individuals are at least six feet apart from one another while on premises.

| Q |  |
| --- | --- |

b. In Regions 1, 2, 3, 4, 5, and 7, beginning at 12:01 am on June 8, 2020, for outdoor and indoor seating, subject to the capacity constraints and workplace standards described in Executive Order 2020-97 or any order that may follow from it.

c. In Regions 6 and 8, for outdoor and indoor seating, subject to the capacity constraints and workplace standards described in Executive Order 2020-97 or any order that may follow from it.

PA01250

14. The restrictions imposed by sections 12 and 13 of this order do not apply to any of the following:

   a. Outdoor fitness classes, athletic practices, training sessions, or games, provided that coaches, spectators, and participants not from the same household maintain six feet of distance from one another at all times during such activities, and that equipment and supplies are shared to the minimum extent possible and are subject to frequent and thorough disinfection and cleaning.

   b. Services necessary for medical treatment as determined by a licensed medical provider.

   c. Health care facilities, residential care facilities, congregate care facilities, and juvenile justice facilities.

   d. Crisis shelters or similar institutions.

   e. Food courts inside the secured zones of airports.

   f. Employees, contractors, vendors, or suppliers who enter, use, or occupy the places described in section 12 of this order in their professional capacity.

15. Nothing in this order should be taken to interfere with or infringe on the powers of the legislative and judicial branches to perform their constitutional duties or exercise their authority. Similarly, nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances.

16. Consistent with prior guidance, neither a place of religious worship nor its owner is subject to penalty under section 19 of this order for allowing religious worship at such place. No individual is subject to penalty under section 19 of this order for engaging in religious worship at a place of religious worship, or for violating the face covering requirement of section 4(b) of this order.

PA01251

17. Executive Orders 2020-69 and 2020-96 are rescinded. Except as specified, nothing in this order supersedes any other executive order. This order takes effect immediately unless otherwise specified.

18. In determining whether to maintain, intensify, or relax the restrictions in this order, I will consider, among other things, (1) data on COVID-19 infections and the disease's rate of spread; (2) whether sufficient medical personnel, hospital beds, and ventilators exist to meet anticipated medical need; (3) the availability of personal protective equipment for the health care workforce; (4) the state's capacity to test for COVID-19 cases and isolate infected people; and (5) economic conditions in the state.

19. Consistent with MCL 10.33 and MCL 30.405(3), a willful violation of this order is a misdemeanor.

Given under my hand and the Great Seal of the State of Michigan.



**MICHIGAN.GOV HOME**
**ADA**
**MICHIGAN NEWS**
**POLICIES**

**COPYRIGHT 2021 STATE OF MICHIGAN**

PA01252

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | (Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Adv. Proc. No. 20-50548 (CSS) |
| vs. | |
| ART VAN FURNITURE, LLC, *et al.*, | **REF. ADV. DOCKET NO. 43** |
| Defendants. | |

## REQUEST FOR ORAL ARGUMENT ON CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 7007-3 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Court"), Plaintiff Alfred T. Giuliano, chapter 7 trustee (the "Trustee") to the estates of the above-captioned debtors (the "Debtors"), hereby requests that the Court permit oral argument on the *Chapter 7 Trustee's Motion for Summary Judgment* [Adv. Docket No. 43] (the "Motion"). The Trustee respectfully submits that oral argument may aid the decisional process.

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

Dated:  December 27, 2021  PACHULSKI STANG ZIEHL & JONES LLP
       Wilmington, Delaware

*/s/ Colin R. Robinson*
Bradford J. Sandler (Bar No. 4142)
Beth Levine (NY Bar No. 2572246) (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  bsandler@pszjlaw.com
       blevine@pszjlaw.com
       crobinson@pszjlaw.com
       pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

PA01254

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | (Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Adv. Proc. No. 20-50548 (CSS) |
| vs. | |
| ART VAN FURNITURE, LLC, *et al.*, | |
| Defendants. | |

## NOTICE OF COMPLETION OF BRIEFING WITH RESPECT TO CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that on March 23, 2020, defendants Plaintiffs Todd Stewart and Jennifer Sawle, on behalf of themselves and a putative class of similarly situated former employees of Debtor Art Van Furniture, LLC and its affiliates, filed the *Class Action Adversary Proceeding Complaint for Violation of WARN Act 29 U.S.C. § 2101, Et Seq.* [Adv. Docket No. 1] with the United States Bankruptcy Court for the District of Delaware (the "Court") in the above-captioned adversary proceeding (the "Adversary Proceeding").

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

PA01255

PLEASE TAKE FURTHER NOTICE that on November 12, 2021, the Plaintiff, Alfred T. Giuliano, chapter 7 trustee to the estates of the above-captioned debtors (the "Debtors"), filed the *Chapter 7 Trustee's Motion for Summary Judgment* [Adv. Docket No. 43] (the "Motion") in the Adversary Proceeding.

PLEASE TAKE FURTHER NOTICE that all briefing with respect to the Motion has been completed. Below is a list of all relevant pleadings and respective docket numbers related to the Motion:

1. *Class Action Adversary Proceeding Complaint for Violation of WARN Act 29 U.S.C. § 2101, Et Seq.* [Filed 3/23/20] (Adv. Docket No. 1)

2. *Chapter 7 Trustee's Answer to Complaint for Violation of WARN Act and Affirmative Defenses* [Filed 12/10/20] (Adv. Docket No. 25)

3. *Chapter 7 Trustee's First Amended Answer to Complaint for Violation of WARN Act and Affirmative Defenses* [Filed 10/29/21] (Adv. Docket No. 40)

4. *Chapter 7 Trustee's Motion for Summary Judgment* [Filed 11/12/21](Adv. Docket No. 43)

5. *Memorandum of Law in Support of Chapter 7 Trustee's Motion for Summary Judgment* [Filed 11/12/21](Adv. Docket No. 44)

6. *Statement of Undisputed Facts in Support of Chapter 7 Trustee's Motion for Summary Judgment* [Filed 11/12/21](Adv. Docket No. 45)

7. *Declaration of Bradford Sandler in Support of Chapter 7 Trustee's Motion for Summary Judgment* [Filed 11/12/21](Adv. Docket No. 46)

8. *Plaintiffs' Brief in Opposition to Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling* [Filed 12/3/21] (Adv. Docket No. 49)

9. *Plaintiffs' Response to Trustee's Statement of Undisputed Facts* [Filed 12/3/21] (Adv. Docket No. 50)

10. *Reply in Further Support of Chapter 7 Trustee's Motion For Summary Judgment* [Filed 12/17/21] (Adv. Docket No. 52)

11. *Request for Oral Argument* [Filed 12/27/21] (Adv. Docket No. 56)

PA01256

Dated:   December 27, 2021     PACHULSKI STANG ZIEHL & JONES LLP
          Wilmington, Delaware

*/s/ Colin R. Robinson*
Bradford J. Sandler (Bar No. 4142)
Beth Levine (NY Bar No. 2572246) (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:   bsandler@pszjlaw.com
       blevine@pszjlaw.com
       crobinson@pszjlaw.com
       pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

PA01257

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## NOTICE OF DEPOSITION OF JENNIFER SAWLE
## PURSUANT TO FED. R. CIV. PROC. 30

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30, made

applicable herein by Federal Rules of Bankruptcy Procedure 7030 and 9014, Alfred T. Giuliano,

the chapter 7 trustee (the "Trustee") of the bankruptcy estates of Art Van Furniture, LLC, AVF

Holding Company, Inc., AVCE, LLC (2509); AVF Holdings I, LLC, AVF Holdings II, LLC, AVF

Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising,

LLC, AVF Franchising, LLC, LF Trucking, Inc., Sam Levin, Inc., and Comfort Mattress LLC

(collectively, the "Debtors" or the "Defendants") in the above-captioned adversary proceeding (the

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_DE:237647.3 05233/003

PA01258

"Adversary Proceeding") will take the deposition upon oral examination of Jennifer Sawle.

The deposition will take place on March 22, 2022, at 10:00 a.m. (Eastern Time) or at such other date and time as the parties may agree. The deposition will be conducted remotely.

With respect to the conduct of this remote deposition:

1. Counsel for the parties and their clients will be participating from various, separate locations;

2. The court reporter will administer the oath to the witness remotely;

3. Each participating attorney must be visible to all other participants, and their statements will be audible to all participants;

4. All exhibits will be provided simultaneously and electronically to the witness and all participants;

5. The court reporter will record the testimony;

6. The deposition may be videotaped; and

7. The deposition may be recorded electronically through the use of Realtime or a similar application.

Dated:  January 12, 2022               PACHULSKI STANG ZIEHL & JONES LLP


                                       /s/ Colin R. Robinson
                                       Bradford J. Sandler (Bar No. 4142)
                                       Colin R. Robinson (Bar No. 5524)
                                       Peter J. Keane (Bar No. 5503)
                                       919 North Market Street, 17th Floor
                                       Wilmington, DE 19801
                                       Telephone:  (302) 652-4100
                                       Facsimile:   (302) 652-4400
                                       Email:  bsandler@pszjlaw.com
                                               crobinson@pszjlaw.com
                                               pkeane@pszjlaw.com

                                       Counsel to Alfred T. Giuliano, Chapter 7 Trustee

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## NOTICE OF DEPOSITION OF TODD STEWART
## PURSUANT TO FED. R. CIV. PROC. 30

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 30, made

applicable herein by Federal Rules of Bankruptcy Procedure 7030 and 9014, Alfred T. Giuliano,

the chapter 7 trustee (the "Trustee") of the bankruptcy estates of Art Van Furniture, LLC, AVF

Holding Company, Inc.,  AVCE, LLC (2509), AVF Holdings I, LLC,  AVF Holdings II, LLC, AVF

Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising,

LLC, AVF Franchising, LLC, LF Trucking, Inc.,  Sam Levin, Inc., and Comfort Mattress LLC

(collectively, the "Debtors" or the "Defendants") in the above-captioned adversary proceeding (the

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).
DOCS_DE:237702.1 05233/003

"<u>Adversary Proceeding</u>") will take the deposition upon oral examination of Todd Stewart.

The deposition will take place on March 24, 2022, at 10:00 a.m. (Eastern Time) or at such other date and time as the parties may agree.  The deposition will be conducted remotely.

With respect to the conduct of this remote deposition:

1.  Counsel for the parties and their clients will be participating from various, separate locations;

2.  The court reporter will administer the oath to the witness remotely;

3.  Each participating attorney must be visible to all other participants, and their statements will be audible to all participants;

4.  All exhibits will be provided simultaneously and electronically to the witness and all participants;

5.  The court reporter will record the testimony;

6.  The deposition may be videotaped; and

*7.*  The deposition may be recorded electronically through the use of Realtime or a similar application.

Dated:  January 12, 2022        PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Bradford J. Sandler (Bar No. 4142)
Colin R. Robinson (Bar No. 5524)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email:  bsandler@pszjlaw.com
      crobinson@pszjlaw.com
      pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | **Re: Docket No. 58** |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## NOTICE OF SERVICE OF DISCOVERY

**PLEASE TAKE NOTICE** that on the 12th day of January, 2022, counsel to the

Defendants in the above-captioned adversary proceeding served the documents listed below on

the individual(s) listed on the service list attached hereto as <u>Exhibit A</u> and in the manner

indicated.

> **Notice of Deposition of Jennifer Sawle Pursuant to Fed. R. Civ. Proc. 30 [Docket No. 58];**
>
> **Chapter 7 Trustee's Request for Admissions Propounded to Plaintiff, Jennifer Sawle, Set One; and**

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_DE:236772.3 05233/003

**Chapter 7 Trustee's First Request for Production of Documents to Plaintiff Jennifer Sawle.**

Dated:  January 14, 2022       PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Bradford J. Sandler (DE Bar No. 4142)
Beth E. Levine (NY Bar No. 2572246) (admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email:     bsandler@pszjlaw.com
          blevine@pszjlaw.com
          crobinson@pszjlaw.com
          pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

PA01263

# EXHIBIT A

PA01264

Art Van Furniture – Todd Stewart/Jennifer Sawle
WARN Act Service List
Main Case No. 20-10553 (CSS)
Adv. Case No. 20-50548 (CSS)
Doc. No. 236772v3
04 – E-Mail
02 – First Class Mail

***Via Email and First Class Mail***
Michael J. Joyce, Esquire
THE LAW OFFICES OF JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Email: mjoyce@mjlawoffices.com

***Via Email and First Class Mail***
Jack A. Raisner, Esquire
René S. Roupinian, Esquire
Gail C. Lin, Esquire
Jenny Hoxha, Esquire
Isaac Raisner, Esquire
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, New York 10016
Email: rsr@raisnerroupinian.com;
        jar@raisnerroupinian.com;
        gcl@raisnerroupinian.com;
        jar@raisnerroupinian.com;
        isr@raisnerroupinian.com

PA01265

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| | Adv. Proc. No. 20-50548 (CSS) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | **Re: Docket No. 59** |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## NOTICE OF SERVICE OF DISCOVERY

**PLEASE TAKE NOTICE** that on the 12th day of January, 2022, counsel to the

Defendants in the above-captioned adversary proceeding served the documents listed below on

the individual(s) listed on the service list attached hereto as Exhibit A and in the manner

indicated.

> **Notice of Deposition of Todd Stewart Pursuant to Fed. R. Civ. Proc. 30 [Docket No. 58];**
>
> **Chapter 7 Trustee's Request for Admissions Propounded to Plaintiff, Todd Stewart, Set One; and**

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_DE:236772.4 05233/003

PA01266

**Chapter 7 Trustee's First Request for Production of Documents to Plaintiff Todd Stewart.**

Dated:  January 14, 2022        PACHULSKI STANG ZIEHL & JONES LLP

       */s/ Colin R. Robinson*

       Bradford J. Sandler (DE Bar No. 4142)
       Beth E. Levine (NY Bar No. 2572246) (admitted *pro hac vice*)
       Colin R. Robinson (DE Bar No. 5524)
       Peter J. Keane (DE Bar No. 5503)
       919 N. Market Street, 17th Floor
       Wilmington, DE  19801
       Telephone:  (302) 652-4100
       Facsimile:   (302) 652-4400
       Email:     bsandler@pszjlaw.com
                   blevine@pszjlaw.com
                   crobinson@pszjlaw.com
                   pkeane@pszjlaw.com

       *Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

DOCS_DE:236772.4 05233/003

PA01267

# EXHIBIT A

PA01268

Art Van Furniture – Todd Stewart/Jennifer Sawle
WARN Act Service List
Main Case No. 20-10553 (CSS)
Adv. Case No. 20-50548 (CSS)
Doc. No. 236772v4
06 – E-Mail
02 – First Class Mail

**Via Email and First Class Mail**
Michael J. Joyce, Esquire
THE LAW OFFICES OF JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Email: mjoyce@mjlawoffices.com

**Via Email and First Class Mail**
Jack A. Raisner, Esquire
René S. Roupinian, Esquire
Gail C. Lin, Esquire
Jenny Hoxha, Esquire
Isaac Raisner, Esquire
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, New York 10016
Email: rsr@raisnerroupinian.com;
    jar@raisnerroupinian.com
    gcl@raisnerroupinian.com;
    jar@raisnerroupinian.com;
    isr@raisnerroupinian.com
                                    ;

PA01269

Case 20-50548-CSS Doc 62 Filed 02/22/22 Page 1 of 4

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC., *et al.*,[1]<br><br>           Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br>v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>           Defendants. | Adv. Pro. No. 20-50548 (CSS) |

## <u>NOTICE OF SERVICE</u>

PLEASE TAKE NOTICE that on February 11, 2022, a copy of *Plaintiff's Response to Chapter 7 Trustee's First Request for Production of Documents to Jennifer Sawle*, *Plaintiff's Response to Request for Admissions Propounded to Jennifer Sawle (Set One)*, *Plaintiff's Response First Request for Production of Documents to Todd Stewart*, *Plaintiff's Response to Request for Admissions Propounded to Todd Stewart (Set One)*, Verification of Jennifer Sawle, Verification of Todd Stewart, Plaintiffs' Document Production P000001-P000228 and a corresponding

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

*Certificate of Service*  were caused to be served on the following via Electronic Mail:


Bradford J. Sandler (bsandler@pszjlaw.com)
Colin R. Robinson (crobinson@pszjlaw.com)
Peter J. Keane (pkeane@pszjlaw.com)
Beth Levine (blevine@pszjlaw.com)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 N. Market Street, 17th Floor
Wilmington, DE 19801


Dated: February 14, 2022

*/s/ René S. Roupinian*
René S. Roupinian, Esq. (P52737)
Jack A. Raisner, Esq.
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

**THE LAW OFFICES OF JOYCE, LLC**
Michael J. Joyce (No. 4563)
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

*Attorneys for Plaintiffs and the putative class*

PA01271

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Case No. 20-10553 (CSS) |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| TODD STEWART and JENNIFER | ) | |
| SAWLE on behalf of themselves and | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No.: 20-50548 (CSS) |
| | ) | Related Adv. Docket No.: 43 |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION[1]

**JOYCE, LLC**
Michael J. Joyce
1225 King Street
Wilmington, DE 19801

Counsel for Todd Stewart,
Jennifer Sawle and the
Putative Class

**PACHULSKI STANG ZIEHL
& JONES LLP**
Bradford J. Sandler
Beth Levine
Colin R. Robinson
Peter J. Keane
919 North Market Street, 17th Floor
Wilmington, DE 19801

Counsel for Alfred T. Guiliano
Chapter 7 Trustee

Date: March 21, 2022

Sontchi, J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of
Bankruptcy Procedure 7052.

PA01272

## INTRODUCTION

Plaintiffs Todd Stewart and Jennifer Sawle (the "Plaintiffs") filed an adversary complaint alleging that the Debtors[2] violated the Federal Worker Adjustment and Retraining Notification Act (the "WARN Act")[3] by failing to provide them (and similarly situated persons) with at least 60 days' notice of their employment termination. Before the Court is the Chapter 7 Trustee's Motion for Summary Judgment asserting three defenses to the Complaint: (i) notice was not required because the relevant Debtors were "liquidating fiduciaries" and not "employers" under the WARN Act; (ii) notice was not required because an "unforeseeable business circumstance" caused the mass layoffs; and (iii) notice was not required because a natural disaster caused the mass layoffs. For the reasons set forth herein, the Court concludes that both the unforeseeable business circumstance and natural disaster exceptions apply here and, therefore, the Debtors were not required to provide the 60-days WARN Act notice to employees before the March 20, 2020 layoff. The Trustee's Summary Judgment Motion will be granted.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the United States Bankruptcy Court for the District of Delaware

---

[2] The Debtors in these cases are: Art Van Furniture, LLC; AVF Holding Company, Inc.; AVCE, LLC; AVF Holdings I, LLC; AVF Holdings II, LLC; AVF Parent, LLC; Levin Parent, LLC; Art Van Furniture of Canada, LLC; AV Pure Sleep Franchising, LLC; AVF Franchising, LLC; LF Trucking, Inc.; Sam Levin, Inc.; and Comfort Mattress LLC (collectively, the "Debtors").

[3] 29 U.S.C. § 2101 *et seq.* (2022).

PA01273

pursuant to 28 U.S.C. § 1409.  This is a core proceeding pursuant to § 157(b)(2)(A), (B) and (O), and this Court has the Constitutional authority to enter a final order.

<u>FACTS</u>

The Trustee filed a Statement of Undisputed Facts in Support of the Summary Judgment Motion (the "SOF").[4]  The Plaintiffs filed a response to the Trustee's SOF, often objecting to the Trustee's characterization of certain facts, and arguing that the Plaintiffs were not given an adequate opportunity to conduct discovery before the Trustee filed the Summary Judgment Motion.[5]  Below, however, are the facts as agreed to by the Plaintiffs and facts arising from orders or transcripts in this bankruptcy case. Because the Court concludes that this combination of undisputed facts and facts in the record provide a sufficient basis for ruling on the Trustee's Summary Judgment Motion, the Plaintiffs' Cross-Motion to Defer Ruling is denied.[6]

Art Van Furniture, LLC ("Art Van") was a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan.[7]  Art Van was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated

---

[4] Adv. D.I. 45.

[5] Plaintiff's Response to Trustee's Statement of Undisputed Facts (Adv. D.I. 50) ("Pl. Resp. to SOF").

[6] Plaintiffs' Brief in Opposition to Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling (Adv. D.I. 49).

[7] Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC in Support of Chapter 11 Petitions and First Day Motions (Main Case D.I. 12), (the "Ladd Decl.") at ¶ 5.

PA01274

with Thomas H. Lee Partners, L.P. ("THL") in March 2017.[8]  Pennsylvania-based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.[9]

On March 8, 2020, when the Debtors filed chapter 11 bankruptcy petitions, the Debtors operated 169 locations (including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations) throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.[10]

In the months leading up to the Petition Date, Art Van was struggling under the weight of poor sales and $208.5 in secured debt encumbering substantially all of its assets, including (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan (the "Tern Loan") from FS KKR Capital Corp. (the "Term Lenders").[11]

On February 5, 2020, Art Van defaulted on the ABL Loan and obtained a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the business.[12]  The Debtors were unable to secure financing or attract a going concern buyer by the February 28, 2020 deadline.[13]

---

[8] Ladd Decl. at ¶ 5.

[9] Ladd Decl. at ¶ 5.

[10] Id.

[11] Pl. Resp. to SOF, ¶ 3.  The Court notes that the Trustee's SOF contains citations to declarations, orders, transcripts, news articles, and other documents to support the facts stated therein.  Unless the Court deems it helpful to a particular undisputed fact, those internal citations are not repeated here.

[12] *Id.* ¶ 4.

[13] *Id.* ¶ 5.

PA01275

The Debtors negotiated a wind-down budget with Wells Fargo, hired a liquidator, and announced publicly that they were going out of business.[14]

On March 4, 2020, debtor Sam Levin, Inc. ("SLI") entered into a letter agreement (the "Levin LOI") pursuant to which SLI agreed to sell 44 stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") to Robert Levin (the "Levin Sale").[15]  The Levin LOI contemplated that the Levin Sale stores would continue operating, pending the closing of the Levin Sale.[16]  Robert Levin agreed to extend $10 million of debtor-in-possession ("DIP") financing to SLI (the "Levin DIP Loan") to facilitate the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale.[17]

On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business.[18]  Also on March 5, 2020, Art Van issued a WARN Act notice (the "First WARN Notice") to approximately 1,400 potentially affected employees. Providing, in part, that:[19]

> Art Van Furniture, LLC (the "Company") made the difficult decision to winddown its operations, which will include the closure of [certain

---

[14] *Id.*

[15] *Id.* ¶ 6.

[16] *Id.* ¶ 7.

[17] Id.

[18] Pl. Resp. to SOF, ¶ 8.

[19] *Id.* ¶ 9.  *See also* Declaration of Bradford Sandler in Support of Chapter 7 Trustee's Motion for Summary Judgment (the "Sandler Decl.") (Adv. D.I. 46), Ex. G.  The WARN Act notice attached as Exhibit G addresses only seven Michigan facilities, but the SOF claims that similar notices were sent to two Illinois facilities and one Pennsylvania facility.  The Plaintiffs do not dispute that the Debtors sent WARN Act notices "to some of [the Debtors'] employees on March 5," but it is unclear whether WARN Act notices were sent to facilities other than the ones located in Michigan.

PA01276

> facilities], and will be permanently terminating the employment of all employees at these locations.
>
> . . . .
>
> While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date").[20]

The Debtors commenced store closing sales (the "GOB Sales") and deposits from inventory sales occurring between March 5, 2020 through March 8, 2020 were in excess of $23 million.[21]

On March 8, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases and filed first day motions to obtain approval of, *inter alia*, the Wind-Down Budget, the Levin DIP, the GOB Sales, and the Consulting Agreement with the Liquidator.[22]  On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order (the "Interim CC Order"), authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales.[23]

On March 13, 2020, then-President Trump declared a national emergency concerning the novel coronavirus disease (COVID-19) outbreak.[24]  By March 14, 2020 Governor Tom Wolf of Pennsylvania issued guidance urging all non-essential

---

[20] *Id.*

[21] Pl. Resp. to SOF, ¶ 10.

[22] *Id.* ¶ 11.  Capitalized terms not defined herein are defined in the SOF.

[23] *Id.* ¶ 13.

[24] *Id.* ¶ 15.

PA01277

businesses to close.[25]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health . . . ."[26]

On March 16, 2020, Governor Gretchen Whitmer of Michigan entered an executive order that closed Michigan's bars, theaters, casinos, and other public spaces.[27] Governor Whitmer urged Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[28]

On March 19, 2020, Pennsylvania issued a "stay at home" or "shelter in place" order.[29]  Similar orders soon followed in Michigan, Ohio, and Illinois, all of which were in lock-down by March 23, 2020.[30]

During the initial days of the GOB Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million.[31]  On March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction.[32]

---

[25] *Id.* ¶ 16.

[26] Id.

[27] *Id.* ¶ 17.

[28] Id.

[29] Pl. Resp. to SOF, ¶ 18.

[30] Id.

[31] *Id.*, ¶ 20; Conversion Mot., Main Case D.I. 252, ¶22.

[32] Conversion Mot., Main Case D.I. 252, ¶ 26.

PA01278

On March 19, 2020, Art Van issued a WARN Act notice (the "Second WARN

Notice") to some of its employees which stated, in part:

> On March 5, 2020, Art Van Furniture, LLC (the "Company")
> informed employees that it had made the difficult decision to wind-down
> its operations, to include the closure of its retail facilities located at [seven
> Michigan sites], which would in the permanent termination the
> employment [*sic*] of all employees at these locations.
>
> Since initial notice, the Company has been impacted by the novel
> COVID-19 virus and the resulting, and sudden, negative economic
> impact. Due to these unforeseen events, the Company can no longer
> support the wind-down of its retail operations through the originally
> projected termination date. The Company, therefore, submits this revised
> notice to you to satisfy any obligation that may exist under the federal
> Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et
> seq. (the "WARN Act").
>
> All terminations of employment will be permanent and you will
> not have bumping rights for other positions (i.e., you will not have the
> right to displace employees with less seniority). The employment of Art
> Van's sales associates and other commissioned employees, visuals,
> housekeepers, drivers, helpers, and other hub warehouse staff, Selling
> Managers and Outlet Managers as well as any Sales or Store Manager who
> is not scheduled to perform services on March 21, 2020 or March 22, 2020,
> will be terminated on March 20, 2020. All CPU's and office staff, along
> with the Store Manager and/or Sales Manager scheduled to work on
> March 21, 2020 or March 22, 2020 will be terminated at the end of the
> business day on March 22, 2020. Nothing in this letter alters your at-will
> employment status with the Company. You will be required to work
> through your Termination Date, following which date you will not be
> required to report to work or provide any services to the Company.[33]

Wells Fargo declared a default under the Interim CC Order and terminated use

of cash collateral as of March 24, 2020; later extended through March 31, 2020, and

finally through April 6, 2020.[34]  The Debtors filed a motion to convert their Chapter 11

---

[33] Pl. Resp. to SOF, ¶ 23.  *See also*  Sandler Decl., Ex. T.

[34] Pl. Resp. to SOF, ¶ 27.

PA01279

Cases to cases under Chapter 7 (the "Conversion Motion").[35]   On April 6, 2020, the

Court entered an Order granting the Conversion Motion.[36]

<div align="center">PROCEDURAL BACKGROUND</div>

On March 23, 2020, the Plaintiffs (both former employees of the Debtors at

locations in Michigan), filed a Class Action Adversary Proceeding Complaint for

Violation of the WARN Act.[37]   The parties stipulated to extend the time for the  Chapter

7 Trustee to respond to the Complaint.   After the Trustee answered the Complaint, the

parties engaged in mediation, which was unsuccessful.[38]   The Trustee filed an amended

answer to the complaint on October 29, 2021.[39]

On November 12, 2021, the Chapter 7 Trustee filed a Motion for Summary

Judgment.[40]   On December 3, 2021, the Plaintiffs filed a Brief in Opposition to the

Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling.[41]   On

December 17, 2021, the Trustee filed a Reply in Further Support of the Motion for

Summary Judgment.[42]   A Notice of Completion of Briefing regarding the Motion for

Summary Judgment was filed, and the matter is ripe for adjudication.[43]

---

[35] Sandler Decl., Ex. H.

[36] Pl. Resp. to SOF, ¶ 28.

[37] Adv. D.I. 1 (the "Complaint").

[38] Adv. D.I. 39.

[39] Adv. D.I. 40.

[40] Adv. D.I. 43.

[41] Adv. D.I. 49.

[42] Adv. D.I. 52.

[43] Adv. D.I. 57.  The Trustee filed a Request for Oral Argument (Adv. D.I. 56), but the Court declines the offer as unnecessary.

PA01280

## STANDARD OF REVIEW- SUMMARY JUDGMENT

"Summary judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial."[44]  Federal Rule of Civil Procedure 56, made applicable to these proceedings through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[45]

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.[46]  A fact is material if it could "alter the outcome of a case."[47] An issue about a material fact is genuine when it is "triable, that is, when reasonable minds could disagree on the result."[48]  "In other words, the movant's goal is 'to establish an absence of evidence to support the nonmoving party's case.'"[49]

The burden then shifts to the nonmoving party to produce "evidence in the record creating a genuine issue of material fact."[50]  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts;"

---

[44] *In re FBI Wind Down, Inc.*, 614 B.R. 460, 472 (Bankr. D. Del. 2020).

[45] Fed. R. Civ. P. 56(c).

[46] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553,  91 L.Ed.2d 265 (1986).

[47] *FBI Wind Down*, 614 B.R. at 473 (quoting *The Liquidating Tr. v. Huffman (In re U.S. Wireless Corp.),* 386 B.R. 556, 560 (Bankr. D. Del. 2008)).

[48] *U.S. Wireless*, 386 B.R. at 560 (quoting *Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005) (internal punctuation omitted)).

[49] *FBI Wind Down*, 614 B.R. at 473 (quoting *U.S. Wireless*, 386 B.R. at 560).

[50] *FBI Wind Down*, 614 B.R. at 473 (citing *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009)).

PA01281

the nonmoving party must demonstrate "sufficient evidence (not mere allegations) upon which a reasonable trier of fact could return a verdict in favor of the nonmoving party."[51]

"[A]t the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."[52] The court must "view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor."[53] If the nonmoving party's evidence "is merely colorable or not significantly probative, summary judgment may be granted."[54] On the other hand, if the "record could lead reasonable minds to draw conflicting inferences, summary judgment is improper, and the action must proceed to trial."[55] In short, "[s]ummary judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party."[56]

<u>ANALYSIS</u>

The WARN Act provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to each affected employee.[57] "The purpose of the WARN Act is to protect workers and their families by providing them with advance notice of a layoff."[58] This advance notice is intended to provide "workers and their families some transition

---

[51] *FBI Wind Down*, 614 B.R. at 473 (citations omitted).

[52] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[53] *FBI Wind Down*, 614 B.R. at 473 (quoting *Saldana v. Kmart*, 260 F.3d 228, 231-32 (3d Cir. 2001)).

[54] *Id.* (quoting *Whitlock v. Pepsi Ams.*, No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal. Oct. 21, 2009)).

[55] *FBI Wind Down*, 614 B.R. at 473 (quoting *O'Connor v. Boeing N. Am.*, 311 F.3d 1139, 1150 (9th Cir. 2002)).

[56] *Id.*

PA01282

time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market."[59]

If an employer fails to comply with the WARN Act, the employer "is liable to provide 'each aggrieved employee' with back pay and benefits for each day that the WARN Act was violated."[60]

"To prove a WARN Act violation, a plaintiff must show that: (1) the defendant was 'an employer;' (2) the defendant ordered a 'plant closing' or 'mass layoff;' (3) the defendant failed to give employees 60-days' notice before the closing or layoff; and (4) the plaintiff is an 'aggrieved' or 'affected' employee."[61]  If a plaintiff proves these elements, "the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the Act's three exceptions:  the 'faltering company' exception; the 'unforeseen business circumstances' exception; or the 'natural disaster' exception."[62]

The Trustee, here, moves for summary judgment in his favor, arguing that: (i) at the time of the layoffs, the Debtors were "liquidating fiduciaries" which are excluded from the definition of "employer" under Department of Labor ("DOL") commentary to

---

[57] 29 U.S.C. § 2102(a)(1).

[58] *Czyzewski v. Jevic Transportation, Inc. (In re Jevic Holding Corp.)*, 496 B.R. 151, 158 (Bankr. D. Del. 2013) (citing 20 C.F.R. § 639.1(a)).

[59] 20 C.F.R. § 639.1(a).

[60] In re World Marketing Chicago, LLC, 564 B.R. 587, (Bankr. N. D. Ill. 2017) (quoting Ellis v. DHL Exp. Inc. (USA), 633 F.3d 522, 525-26 (7th Cir. 2011)).  See also Off'l Comm. of Unsecured Creditors v. United Healthcare System, Inc. (In re United Healthcare System, Inc.), 200 F.3d 170, 176 (3d Cir. 1999) ("If the employer fails to [provide WARN Act notice], it may be liable for up to sixty days' back pay.") (citing 29 U.S.C. § 2104(a)).

[61] *Easom v. US Well Serv., Inc.*, 527 F.Supp.3d 898, 903-04 (S.D. Tex. 2021) (citing 29 U.S.C.  §§ 2102, 2104)).

[62] *Id.* at 904 (citing, *inter alia,*  29 U.S.C. § 2102).

PA01283

the WARN Act regulations, or (ii) the Trustee can demonstrate that either the "unforeseen business circumstances" or "natural disaster" exception to WARN Act liability applies here under the undisputed facts. The Plaintiffs, however, oppose the Trustee's Summary Judgment Motion, arguing that (i) the Debtors operated as "employers" under the Act by using its employees to hold postpetition going out of business sales (or "GOB Sales") or to keep certain stores operating as going concerns pending a bulk sale under the Levin LOI, and (ii) there are disputed issues of material fact regarding the *cause* of the Debtors' mass layoff, which prevent application of the WARN Act exceptions and require more discovery and a trial on the merits.

(A)  The Liquidating Fiduciary Exception

The WARN Act defines an "employer" as "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."[63]  The DOL's comments to its regulations implementing the WARN Act (the "DOL Commentary") addresses whether a bankrupt entity is an "employer" under the WARN Act, writing:

> [T]he Department does not think it appropriate to [exclude all bankrupt companies from the definition of "employer"]. Further, DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN

---

[63] 29 U.S.C. § 2101(a)(1).

PA01284

obligations of the employer precisely because the fiduciary continues the business in operation.[64]

This language provides the basis for the "liquidating fiduciary" exception to the WARN Act.[65]

The Third Circuit considered the liquidating fiduciary exception in the 1999 *United Healthcare* case and decided that a debtor-hospital that ceased operations shortly after its bankruptcy filing and was selling its assets in a chapter 11 case was not an "employer" under the WARN Act when it laid off its employees.[66] Pre-bankruptcy, United Healthcare had been actively seeking a merger partner or purchaser who would keep operating the business, but its efforts came to a halt after its secured creditor issued a notice of default and terminated financing.[67] Shortly thereafter, United Healthcare filed a Chapter 11 bankruptcy petition and, on the same day, advised the New Jersey Department of Health that it would close and surrender its certificates of need.[68] Also on the same day, United Healthcare provided WARN Act notices to its employees notifying them that their employment would end in 60 days. However, 48 hours after issuing the WARN Act notices, all of United Healthcare's hospital patients had either been transferred or sent home and its employees could not perform their

---

[64] *United Healthcare*, 200 F.3d at 177 (citing 54 Fed. Reg at 16045).

[65] *World Marketing*, 564 B.R. at 598-99 ("[B]ankruptcy courts that have considered the specific question of whether a liquidating fiduciary exception to the WARN Act applies have uniformly concluded that it does.").

[66] *United Healthcare*, 200 F.3d at 179.

[67] *Id.* at 172-73.

[68] Under New Jersey law, health care facilities are required to maintain certificates of need issued by the Department of Health. *United Healthcare*, 200 F.3d at 173 n. 1 (citing N.J.S.A. 26:2H-7 (West 1999)).

PA01285

regular duties. Within 16 days after filing Chapter 11, United Healthcare informed 1,200 of its 1,300 employees that they were no longer to report to work. The 100 employees retained would secure the plant facility and maintain necessary equipment. The bankruptcy court determined that, as a debtor-in-possession and fiduciary, United Healthcare was subject to the WARN Act notification requirements.[69] The Third Circuit disagreed, finding that United Healthcare's intent to liquidate was evident from the start of the Chapter 11 case, and "the employees were no longer engaged in their regular duties but instead were performing tasks solely designed to prepare United Healthcare for liquidation" from the date the hospital patients were all transferred or sent home.[70] The Third Circuit wrote that:

> [W]hether a bankrupt entity is an "employer" under the WARN Act depends on the nature and extent of the entity's business and commercial activities while in bankruptcy, and not merely on whether the entity's employees continue to work "on a daily basis." The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act.[71]

The Trustee argues that this case is analogous to *United Healthcare*. Between March 5, 2020 - - just prior to the Petition Date - - and continuing post-petition through March 20, 2020 (the "Layoff Date"), the Debtors' activities were focused on winding up its business affairs and liquidating its assets. The Debtors negotiated a wind-down budget with Wells Fargo, hired a liquidator, and announced that they were liquidating

---

[69] *United Healthcare*, 200 F.3d at 177-78.

[70] *Id.* at 178.

[71] Id.

PA01286

and going out of business.[72]  The Debtors decided to liquidate through an orderly wind-down process compromised of GOB Sales and the anticipated bulk sale of the SLI Assets to a third-party buyer.[73]  The Debtors argue that between the Petition Date and the Layoff Date, the Debtors did not operate as a "business enterprise in the normal commercial sense,"[74] but only conducted such business activities as were necessary to liquidate their assets through GOB Sales and the Levin Sale.

The Plaintiffs dispute the Trustee's characterization of the Debtors' activities. The Plaintiffs argue that the Debtors continued operations as a retail seller post-petition and, unlike the employees in *United Healthcare*, the Debtors' employees continued their normal activities between the Petition Date and the Layoff Date.  The Plaintiffs point out that the Interim CC Order provided that "[n]othing in this Interim Order shall authorize the disposition of assets of the Debtors or their estates *outside the ordinary course of business*."[75] The Plaintiffs assert that the Debtors' First Day Declaration advised the Court that the purpose of the Levin LOI was to "provide for the continued operations of approximately 44 retail store locations under the Wolf and Levin store banners and two related distributed centers" and to "preserve nearly 1,000 jobs."[76]  The

---

[72] Ladd Decl. ¶¶ 16-18; Interim CC Order, pp. 12-13; Sandler Decl. at ¶ 5, Ex. D.  *See also* Pl. Resp. to SOF, ¶ 5.

[73] *Id.*; Ladd Decl. ¶¶ 40-41; Sandler Decl., Ex. E.  *See also* Pl. Resp. to SOF, ¶¶ 6, 7.

[74] 54 Fed. Reg. 16042, 16045 (Apr. 20, 1989).

[75] Interim CC Order, at 15 (emphasis added).

[76] Ladd Decl., ¶ 19.

PA01287

Plaintiffs also assert that in the DIP Motion with SLI, the Debtors sought approval to "purchase inventory in the ordinary course of business"[77] and agreed not to:

> substantially change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business or other than those which are useful in, necessary for and are to in its business, as presently conducted.[78]

Chapter 11 of the Bankruptcy Code is entitled "Reorganization," but it is also used by debtors to facilitate an orderly liquidation process. Applying the liquidating fiduciary exception in a Chapter 11 case requires careful analysis of the particular facts and circumstances of that case to determine whether the entity's activities resemble a business enterprise operating as a going concern or a business enterprise engaged in the winding-up of its affairs.[79] But what if the debtor's activities are a hybrid of these options? It is not uncommon for a debtor-in-possession[80] to commence a liquidating chapter 11 case intending to preserve value by operating the business as a going concern pending a sale of substantially all of the assets of the debtor. Is the debtor-in-possession an "employer" under the WARN Act while operating in a liquidating Chapter 11 case?

DOL Commentary to the WARN Act regulations provides that:

[T]he term "employer" includes public and quasi-public entities which *engage in business* (i.e., take part in a commercial or industrial enterprise,

---

[77] DIP Motion, ¶ 13.

[78] Debtor-In-Possession Credit and Security Agreement, ¶ 8(f) (Main Case D.I. 46-2 at 60).

[79] *United Healthcare*, 200 F.3d at 178.

[80] A debtor-in-possession or a trustee managing a Chapter 11 case is a fiduciary. *World Marketing*, 564 B.R. 599 (citations omitted).

PA01288

supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments).[81]

Consider also the plain language of the DOL Commentary creating the "liquidating fiduciary" exception:

> DOL agrees that a fiduciary whose *sole function* in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligation of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, *where the fiduciary may continue to operate the business for the benefit of creditors*, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.[82]

In *United Healthcare*, the Third Circuit applied the liquidating fiduciary exception when the debtor surrendered its certificates of need to the New Jersey Department of Health the day it filed its petition and shuttered the hospital within 48 hours of the filing. The court concluded that upon assuming the role of a debtor-in-possession fiduciary, United Healthcare "ceased operating its business as a going concern and was simply preparing itself for liquidation."[83] The Third Circuit also recognized, however, that:

> Although we find WARN Act liability does not attach under these facts and circumstances, we do not foreclose the possibility that WARN Act liability may apply to other situations where an employer files for bankruptcy and then terminates its employees. An employer as fiduciary will succeed to its WARN Act obligations if an examination of the debtor's

---

[81] *United Healthcare*, 200 F.3d at 177 (quoting 20 C.F.R. § 639(a)(1)(ii), 54 Fed. Reg. 16042, 16065 (1989) (emphasis added)). In *United Healthcare*, the Third Circuit decided it was appropriate considered the DOL regulations and commentary when the plain language of the WARN Act does not resolve the issue. *Id.*

[82] 54 Fed. Reg. at 16045 (emphasis added).

[83] *United Healthcare*, 200 F.3d at 179.

PA01289

economic activities leading up to and during the bankruptcy proceedings reveals that the fiduciary has continued in an "employer" capacity, operating the business as an ongoing concern.[84]

In the case before the Court, the Debtors announced their intention to liquidate prior to the Chapter 11 filing, but the Debtors' orderly wind-down process contemplated continued postpetition operations.[85] The Debtors' GOB Sales are a perfect example of a hybrid of engaging in business (i.e., continuing operations with its employees for the retail sales of goods) while liquidating at the same time. Also, as the Plaintiffs point out, the Levin LOI called for the continued operation of approximately 44 retail store locations and two related distributed centers pending the proposed sale. In this case, the Debtors intended to continue their operations in the Chapter 11 bankruptcy case for the benefit of creditors and, based on these facts, the Court concludes that the Debtors were subject to an employer's WARN obligations. The "liquidating fiduciary" exception does not apply to this case.[86]

(B) The Unforeseen Business Circumstances Exception

The Unforeseen Business Circumstances ("UBC") exception to the WARN Act provides that:

---

[84] Id.

[85] The Debtors, rightfully, provided the First WARN Notice to its employees just prior to the bankruptcy filing, demonstrating its intention that to continue operations for 60 days The Debtors' intention, however, was interrupted by the COVID-19 pandemic, as discussed *infra*.

[86] The Court recognizes that not all debtors operating in a liquidating Chapter 11 case will be subject to WARN Act obligations. The facts and circumstances must be evaluated in light of *United Healthcare* to determine whether there is an immediate shutdown and the fiduciary's sole function is liquidation. Some liquidating Chapter 11 debtors assert the statutory exceptions to the WARN Act, *i.e.*, the faltering company, unforeseen business circumstances, or natural disaster exceptions. Each case must be evaluated on its own merits.

PA01290

An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.[87]

The employer bears the burden of proving that this exception applies by establishing that two conditions are met:  (1) the circumstance was unforeseeable, and (2) the layoffs were caused by that circumstance.[88]

The DOL regulations state that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control."[89]  The regulations further state:

The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.[90]

The Trustee claims that COVID-19, and the government-ordered business closures (or threatened closures), and the restriction of residents to their homes prevented the Debtors from conducting the GOB Sales and completing the orderly liquidation of its business. The Trustee argues that the UBC exception applies here

---

[87] 29 U.S.C. §2102(b)(2)(A).

[88] *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009) (citing *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 588 (7th Cir. 2005)).

[89] 20 C.F.R. §639.9(b)(1).

[90] 20 C.F.R. §639.9(b)(2).

PA01291

because in January 2020 (60 days before the Layoff), no one could have foreseen the effect of COVID-19 on the Debtors' business operations.

The Plaintiffs, however, do not contest foreseeability; they argue that the Trustee has not and cannot prove that the pandemic *caused* the Layoff. In response, the Trustee argues that the undisputed facts show that:

> [T]he COVID-19 pandemic was clearly the immediate cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and immediately shut down their business. The pandemic made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required citizens to stay at home or shelter in place to limit the spread of COVID-19. The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would soon follow.[91]

The Plaintiffs argue, however, that COVID-19 did not *mandate* the Debtors' mass layoff of employees on March 20, 2020. Instead, they claim that the Debtors could have engaged in a "transparent, problem-solving approach" and temporarily furloughed employees, rather than order a permanent mass layoff. They claim that the Debtors "froze out stakeholders and ran roughshod over its 'Planned Liquidation Process' … to cause the ultimate liquidity crisis when terminating its workforce."[92] In short, the Plaintiffs seek additional discovery to show that the Debtors' insiders used COVID-19 as an excuse for the accelerated the mass layoff.

To support this argument, the Plaintiffs rely on statements made by counsel for the Debtors, Wells Fargo, and the Creditor Committee at a hearing on March 19, 2020,

---

[91] Trustee's Br., Adv. D.I. 44, at 22, ¶ 56.

[92] Plaintiffs' Br., Adv. D.I. 49 at 22.

PA01292

where counsel all suggested that the parties were working on alternatives to "pulling the plug" and avoid an immediate shutdown.[93]  The Plaintiffs also point out that the permanent mass layoff triggered "insurmountable obligations" of at least $16.5 million arising from commissions suddenly due when salespeople were laid off, and an even more substantial tail created by the partially self-funded health plan which was cancelled on March 19, 2020.[94]

When interpreting the phrase "caused by" in WARN Act cases, courts "have generally required defendants to show that an unforeseen business circumstance was the immediate cause of a layoff."[95]  Further, when applying the UBC exception to layoffs occurring after multiple potential causes, courts "have typically held that the

---

[93] The Plaintiffs rely upon the following statements, among others:  (i) Defendants' counsel said that "we are trying to explore with our lenders and our other stakeholders … other options short of outright liquidation." (Tr. 3/19/2020, D.I. 46-5, at 27, lines 9-14);  and "So, let me just say then, conceptually, we are looking at the possibility of … going idle or going into a state of dormancy for a period of time, and then the possibility then of either … reopening stores, some subset of stores as, either in furtherance of the going concern transaction … or … closing sales and an orderly liquidation, you know, essentially, once the economic and retail environment and the safety environment have improved to a degree that we can do that." (*Id.*, D.I. 46-5 at 27 line 23 to 28 line 13);  (ii) Wells Fargo's counsel said: "Debtors' decisions, unfortunately, are coming at us minutes before these hearings," (*Id.*, D.I. 46-5 at 30 lines 1-2) and the bank wanted "to try to find a path forward for all stakeholders," but the Debtors had not "fully come to their creditors, other than to say this is somebody else's problem and … fix it for us or don't sweep or do these things." (*Id.*, D.I. 46-5 at 30, lines 2-9); and (iii) Creditor Committee's counsel said that the committee favored "put[ting] everything on ice and let's come back in [ ] a month or two and see." (*Id.*, D.I. 46-5 at 37 lines 4-9).

[94] The Plaintiffs rely, in part, on the following statements: Wells Fargo's counsel said "as a result of terminating their employees, … the debtors now have significant accrued PTO, commissions, other benefits related to the terminated employees as well as healthcare obligations.  Most of these were not included in any budget and certainly [not] in the cash collateral budget because there was no contemplation of a wholesale mass termination of employees." (*Id.*, D.I. 46-5 at 59 lines 14-20).

[95] *Easom* 527 F.Supp.3d at 914-15 (citing *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 877-78 (10th Cir. 2009) ("[The defendant's] decision to shut down came in the immediate wake of [its partner's] withdrawal … [even though] it had been suffering from financial troubles for months."); *Jevic Holding*, 496 B.R. at 164-6 ("[T]he 'immediate precipitant of the decision to terminate employees' was [the lender's] refusal to extend forbearance," even though there were "other reasons" for the lender's refusal and employer's financial difficulties.)).

PA01293

unforeseen business circumstances do not need to be the sole cause of a plant closing or mass layoff, but they must be the 'straw that broke the camel's back.'"[96]

Here, it is undisputed that the Debtors were in dire financial straits leading up to the Chapter 11 filing. It is also undisputed that the Debtors filed Chapter 11 to pursue an orderly wind-down of operations and liquidation of their assets. On March 5, 2020, the Debtors provided the First WARN Notice to many of their employees, anticipating the winding-down of operations and permanent layoffs by May 5, 2020. It is also undisputed that in mid-March 2020, COVID-19 caused Pennsylvania, and then Michigan, and then other states where the Debtors operated, to issue "stay at home" or "shelter in place" orders. This unquestionably impacted the Debtors' operations. The Debtors issued the Second WARN Notice as COVID-19 and the ensuing government-ordered shutdowns prevented the Debtors from operating and completing its anticipated wind-down plans.

Given these undisputed facts, the Plaintiffs' proffered evidence that COVID-19 was merely a pretext for the mass layoff is tenuous at best. Statements showing that the Debtors' actions were unanticipated or resulted in greater financial distress do not indicate disputed facts concerning the *cause* of the layoff. Rather, those facts underscore that the impact of COVID-19 was sudden and unexpected to other parties as well as the Debtors. Counsels' statements expressing a hope that the closure would only "pause" the orderly liquidation process as the parties explored alternatives to "outright

---

[96] *Easom*, 527 F. Supp. 3d at 914 n. 15 (quoting *Gross*, 554 F.3d at 877-78; citing *Jones v. Kayser-Roth Hosiery, Inc.*, 748 F. Supp. 1276, 1285 (E.D. Tenn. 1990) (an employer's loss of its largest customer was the "last straw" that made it economically infeasible to continue operating the plant.)).

PA01294

liquidation" also do not refute the *cause* of the layoff. The Plaintiffs' argument that temporary furloughs could have been a better option for the Debtors is not a factual dispute, but merely debating the Debtors' actions in hindsight.

The Court should evaluate the UBC WARN Act exception objectively and at the time the decisions were made.[97]  The undisputed facts support the finding that the COVID-19 was the proverbial "straw that broke the camel's back" and caused the March 20, 2020 layoff. Even viewing all inferences in favor of the Plaintiffs, the Plaintiffs' proffered evidence does not demonstrate disputed issues of material facts that cast doubt on that causation.[98]

Finally, the Plaintiffs also argue that the Second WARN Notice was insufficient to allow application of the UBC exception.  The statute requires that "[a]n employer relying on [the WARN Act exceptions] shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period."[99]

The shortened WARN Act notice must "set forth the underlying factual events which led to the shortened [notice] period."[100]  "Congress' purpose in requiring the

---

[97] *Jevic Holding*, 496 B.R. at 161 (citations omitted).

[98] "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (quoting *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (citations omitted).

[99] 29 U.S.C. § 2102(b)(3).

[100] *Grimmer v. Lord Day & Lord*, 937 F. Supp. 255, 257 (S.D.N.Y. 1996) (quoting *Alarcon v. Keller Indus.*, 27 F.3d 386 (9th Cir. 1994)).

PA01295

brief statement must have been to provide employees with information that would assist them in determining whether the notice period was properly shortened."[101] Merely stating a statutory exception - - such as "we are a faltering company" or "termination arises from unforeseeable business circumstances" - - is not sufficient.[102]

The Second Notice stated, in part:

> Since the initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date.

The Plaintiffs argue that this language is amorphous and permits the Debtors to "assert litigation-convenient but factually post-hoc justifications for their actions."[103] Other courts have determined that a shortened WARN Act notice is insufficient when it "simply parroted a statutory exception,"[104] or was arguably given in "the form of billboard ads, third-party newspaper articles, internet postings and memoranda,"[105] or was "a statement read to affected employees on the date of termination."[106] The statement in the Second WARN Notice is brief, but that is what the statute requires. The statement specifically mentions why the shortened notice was necessary - - that the

---

[101] *Id.* (internal punctuation omitted).

[102] *Id.*

[103] Plaintiff's Br., Adv. D.I. 49, at 23 (quoting *Newman v. Crane, Heyman, Simon, Welch, & Clar*, 435 F.Supp.3d 834, (N.D. Ill. 2020)).

[104] *Grimmer*, 937 F. Supp. At 257.

[105] *Sides v. Macon County Greyhound Park, Inc.*, 725 F.3d 1276, 1285 (11th Cir. 2013).

[106] *Newman*, 435 F.Supp.3d at 842. The *Newman* court found the statement insufficient writing that the defendants "present[ed] no evidence that this statement was ever actually read (even assuming the brief statement did not need to be in writing, which the Court highly doubts.") *Id.*

PA01296

unforeseen effects of COVID-19 prevented the Debtors from completing the planned wind-down of the retail operations. The notice is sufficient to pass muster.

For all the reasons set forth above, the Court concludes that the UBC exception applies here, and the Trustee is entitled to summary judgment.

(C)     The Natural Disaster Exception

Although the Court concludes that the UBC exception applies here, the Debtors also argue that the natural disaster exception also applies to this matter. The natural disaster exception provides that:

> No notice under [the WARN Act] shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.[107]

The Trustee argues that the exception applies here because the COVID-19 pandemic is a natural disaster and the March 20, 2020 layoff was "due to" the pandemic. The Plaintiffs, however, argue that the Trustee cannot prove that COVID-19 is a "natural disaster," or that the March 20, 2020 layoff was caused by COVID-19.

The statute and the DOL regulations state broadly that the "natural disaster" exception applies to "any form of a natural disaster."[108] The regulations list "[f]loods, earthquakes, droughts, storms, tidal waves or tsunamis *and similar effects of nature*" as natural disasters under the WARN Act.[109] The issue here is whether COVID-19 arose from the "effects of nature."

---

[107] 29 U.S.C. § 2102(b)(2)(B).

[108] *Id.*; 20 C.F.R. § 639.9(c). "

[109] 20 C.F.R. § 639.9(c) (emphasis added).

PA01297

The Plaintiffs argue that uncertainty regarding the origins of COVID-19, including theories that the initial human infection resulted from "human involvement"[110] through a laboratory-associated incident, prevents any court from ruling that it is a natural disaster. Numerous courts, however, have considered this issue and concluded that the COVID-19 pandemic is a natural disaster.[111] As part of its thorough analysis of the issue, the *Easom* court wrote:

> COVID-19 qualifies as a disaster under the WARN Act. COVID-19 is clearly a "disaster." *See Disaster*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] calamity; a catastrophic emergency"); *Natural Disaster*, OXFORD ENGLISH DICTIONARY ("[a] natural event that causes great damage or loss of life"). In a year, two million people lost their lives, and over one hundred million people were diagnosed with infections. *See AB Stable VIII LLC*, 2020 WL 7024929, at *58 ("[The COVID-19 pandemic] is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths."); *Coronavirus World Map: Tracking the Global Outbreak*, N.Y. TIMES (Feb. 10, 2021, 7:37 AM) (tracking nationwide and global deaths due to COVID-19).

---

[110] *Carver v. Foresight Energy LP*, No. 3:16-cv-3013, 2016 WL 3812376 (C.D. Ill. July 12, 2016) (deciding that coal fires in a mine were not natural disasters). In denying a motion to dismiss a WARN Act claim, the *Carter* court found that the complaint did not allege facts that unambiguously established the existence of a natural disaster exception. *Id.* at *5. The complaint alleged that the fires, although consisting of the interaction between natural elements such as coal and oxygen, were fueled by "poor underground housekeeping, such as failure to properly clean up spilled oil and grease" or were ignited by exposing oxygen to the coal through the mine's ventilation system. *Id.* at *1. Thus, the Court decided that "human involvement in the origins of the combustion events would seem to preclude the events from being considered a natural disaster." *Id.* at *4.

[111] *Easom v. US Well Services, Inc.*, 527 F.Supp.3d 898, 906-11 (S.D. Tex. 2021) (citing, *inter alia*, *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 507 F.Supp.3d 490, 501 (S.D.N.Y. 2020) (after reviewing dictionary definitions for the common meaning of "natural disaster," (as used in a *force majeure* clause in a consignment agreement), the court decided that "it cannot be seriously disputed that the COVID-19 pandemic is a natural disaster"); *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, C.A. No. 2020-0310-JTL, 2020 WL 7024929, *58 (Del. Ch. Nov. 30, 2020) (deciding that the COVID-19 pandemic fits the definition of "natural disaster," and noting that "[i]t is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths."); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster" under a Pennsylvania statute); and *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) ("The COVID-19 pandemic is, by all definitions, a natural disaster" under a Pennsylvania statute.)).

PA01298

COVID-19 also qualifies as a "natural" disaster because human beings were not responsible for starting or consciously spreading the virus. Unlike coal fires, which did not occur in *Carver* without humans digging mines and introducing coal to oxygen, COVID-19, like other viruses, did not require conscious human effort to appear or spread, as individuals without symptoms infected others. *See* Angela L. Rasmussen, *On the Origins of SARS-CoV-2*, 27 NATURE MEDICINE 9, 9 (2021) ("[A]ll indications suggest that, like SARS-CoV and MERS-CoV, this virus probably evolved in a bat host until an unknown spillover event into humans occurred."); Murat Seyran, *et al.*, *Questions Concerning the Proximal Origin of SARS CoV-2*, JOURNAL OF MEDICAL VIROLOGY 1, 1 (2020) ("There is a consensus that severe acute respiratory syndrome coronavirus (SARS-CoV-2) originated naturally from bat coronaviruses (CoVs), in particular RaTG13."); *see also AB Stable VIII LLC*, 2020 WL 7024929, at *58 n.214 ("The record in this case does not support a finding that the virus was anything other than a natural product of germ evolution.").  While humans can take precautions to slow the spread of COVID-19 or engage in behavior that fosters contagion, the possibility of slowing the virus spread does not suggest that humans caused the pandemic.[112]

Based on the reasoning in *Easom* and the many cases cited therein, the Court is satisfied that the COVID-19 pandemic qualifies is a natural disaster and may be invoked under the natural disaster exception to the WARN Act.

The next issue is whether the natural disaster - - COVID-19 - - *caused* the mass layoff.  The Trustee argues that the *Easom* court recently analyzed the natural disaster exception and determined that it requires a lesser "but for" standard for causation, rather direct or proximate cause.[113] The Trustee claims that "but for" COVID-19, the Debtors would have completed the planned liquidation process as originally planned,

---

[112] *Easom*, 527 F.Supp.3d at 908.

[113] *Easom*, 527 F.Supp.3d at 911-915 ("But-for causation is established whenever a particular outcome would not have happened 'but for' the purported cause  … Proximate causation generally refers to the basic requirement that … there must be some direct relation between the outcome and the purported cause." *Id.* at 911 n. 10 (citations and internal punctuation omitted).

PA01299

including the provision of adequate notice of the layoff. The Court does not need to decide whether it agrees that the "but for" standard applies to the natural disaster exception. Even assuming that the more stringent standard of causation applies here, the Court has already analyzed the causation issue in the discussion of the UBC exception, *supra*. The undisputed facts in this case support the finding that the COVID-19 was an immediate cause of the March 20, 2020 layoff.

For all the reasons set forth above, the Court concludes that the natural disaster exception applies here, and the Trustee is entitled to summary judgment.

<u>CONCLUSION</u>

For the reasons set forth above, the Court determined that it had sufficient undisputed facts and facts of record in the bankruptcy case to decide the Trustee's Summary Judgment Motion, so the Plaintiffs' Cross-Motion to Defer Ruling is denied.

Further, for the reasons set forth above, (i) the Court rejects the Trustee's argument that the Debtors were "liquidating fiduciaries" and not WARN Act "employers" under the particular facts and circumstances of this case, but (ii) the Court concludes that both the unforeseen business exception and the natural disaster exception to the WARN Act's 60-day notice requirement applies to the undisputed facts in this case. Accordingly, the Trustee's motion for summary judgment will be granted. An order will be issued.

PA01300

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Case No. 20-10553 (CSS) |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| TODD STEWART and JENNIFER | ) | |
| SAWLE on behalf of themselves and | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No.: 20-50548 (CSS) |
| | ) | Related Adv. Docket No.: 43, 47, 49 |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

For the reasons set forth in the Court's Opinion dated March 21, 2022 it is hereby ordered that:

1) Chapter 7 Trustee's Motion for Summary Judgment [D.I. 43] filed on November 12, 2021 is Granted.

2) The Plaintiffs' Motion for Class Certification and Related Relief [D.I. 47] filed on November 14, 2021 is Denied as Moot.

3) Plaintiffs' Cross Motion to Defer Ruling [D.I. 49] filed on December 3, 2021 is Denied.

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Dated: March 21, 2022

PA01301

Form 417A

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiffs, v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Debtors. | |

## <u>NOTICE OF APPEAL AND STATEMENT OF ELECTION</u>

**Part 1: Identify the appellants**

1.  Names of appellants: Plaintiffs Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated.

2.  Position of appellants in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding:        For appeals in a bankruptcy case and not

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

[X] Plaintiff                                           in an adversary proceeding:
[ ] Defendant                                           [ ] Debtor
[ ] Other (describe) _____              [ ] Creditor
                                                        [ ] Trustee
                                                        [ ] Other (describe) _____

**Part 2: Identify the subject of this appeal**

1.  Describe the judgment, order or decree appealed from: *Opinion and Order Granting*

*Trustee's Summary Judgment Motion and Denying Class Certification* (D.I. 63, 64).

2.  State the date on which the judgment, order or decree was entered: March 21, 2022.

**Part 3: Identify the other parties to the appeal**

1.  Counsel to the Plaintiffs/Appellants Todd Stewart and Jennifer Sawle, on behalf of

themselves and all others similarly situated:

Michael J. Joyce, Esq. (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944

René S. Roupinian, Esq.
Jack A. Raisner, Esq.
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747

2.  Counsel to Defendant/Appellee Alfred T. Giuliano, Chapter 7 Trustee for Debtors Art

Van Furniture, LLC, et al.:

Bradford J. Sandler, Esq.
Beth Levine, Esq.
Colin R. Robinson, Esq.
Peter J. Keane, Esq.
**PACHULSKI STANG ZIEHL &  JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705

PA01303

Wilmington, Delaware 19899
Telephone: (302) 652-4100

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts).**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate

Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal

heard by the United States District Court. If an appellant filing this notice wishes to have the appeal

heard by the United States District Court, check below. Do not check the box if the appellant wishes

the Bankruptcy Appellate Panel to hear the appeal.

[X] Appellant(s) elect to have the appeal heard by the United States District Court rather than by
the Bankruptcy Appellate Panel.


Dated: April 4, 2022                                  Respectfully Submitted,

                                                      */s/ Michael J. Joyce*
                                                      Michael J. Joyce (No. 4563)
                                                      **JOYCE, LLC**
                                                      1225 King Street, Suite 800
                                                      Wilmington, DE 19801
                                                      Telephone: (302)-388-1944
                                                      Email: mjoyce@mjlawoffices.com

OF COUNSEL:

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and all others similarly situated*

3

PA01304

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

ART VAN FURNITURE, LLC., *et al.,*[1]

Debtors.

Chapter 7

Case No. 20-10553 (CSS)

Jointly Administered

---

TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

ART VAN FURNITURE, LLC, et al.,

Defendants.

Adv. Pro. No. 20-50548 (CSS)

---

## CERTIFICATE OF SERVICE

I, Jenny Hoxha, under penalty of perjury, certify the following as true and correct: I am not a party to this action, employed by Raisner Roupinian LLP, and I am over 18 years of age. I hereby certify that I caused true and correct copies of *Notice of Appeal and Statement of Election* and the corresponding *Certificate of Service* to be served upon the parties listed below via email as listed below:

**Service List:**
Bradford J. Sandler
Colin R. Robinson
Peter J. Keane
Beth Levine
**PACHULSKI STANG ZIEHL & JONES LLP**
919 N. Market Street, 17th Floor
Wilmington, DE 19801

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

PA01305

Email: bsandler@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com
blevine@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee for Debtors*

Dated:  April 4, 2022

/s/        *Jenny Hoxha*
Jenny Hoxha

PA01306

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

## APPEAL TRANSMITTAL SHEET

**Case Number:**                                            **BK**      **AP**

If AP, related BK case number:

**Title of Order Appealed:**

**Docket #:**                        **Date Entered:**

Item Transmitted:

| | | |
|---|---|---|
| **Notice of Appeal** | **Docket #:** | **Date Filed:** |
| **Amended Notice of Appeal** | **Docket #:** | **Date Filed:** |
| **Cross Appeal** | **Docket #:** | **Date Filed:** |
| **Motion for Leave to Appeal** | **Docket #:** | **Date Filed:** |
| **Request for Certification of Direct Appeal** | **Docket #:** | **Date Filed:** |

**Appellant/Cross Appellant:**                           **Appellee/Cross Appellee**

**Counsel for Appellant/Cross Appellant:**            **Counsel for Appellee/Cross Appellee:**

| | | |
|---|---|---|
| **Filing fee paid?** | **Yes** | **No** |
| **IFP application filed by applicant?** | **Yes** | **No** |
| **Have additional appeals of the same order been filed?** | **Yes** | **No** |
| **\*If Yes, has District Court assigned a Civil Action Number?** | **Yes** | **No** |
| **Civil Action Number:** | | |

*(continued on next page)*                                              PA01307

**Notes:**

*I hereby certify that all designated items are available electronically through CM/ECF.*

**Date:** **by:**_____
                                   **Deputy Clerk**

Bankruptcy Court Appeal (BAP) Number:

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>START MAN FURNITURE, LLC, et al.[1] | Chapter 7<br>Case No. 20-10553 (CTG)<br>Jointly Administered |

| | |
|---|---|
| TODD STEWART and JENNIFER SAWLE, on behalf of themselves and all others similarly situated,<br><br>           Appellants,<br><br>v.<br><br>ALFRED T. GIULIANO, chapter 7 trustee for Debtors Start Man Furniture, LLC, et al.,<br><br>           Appellee. | Civil Action No. 22-cv-00450 (CFC)<br><br>Bankruptcy Case No. 20-10553 (CTG)<br>Bankruptcy Adv. Pro. No. 20-50548 (CTG)<br>Bankruptcy BAP No. 22-00030 |

## APPELLANTS' STATEMENT OF ISSUES ON APPEAL AND DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Pursuant to Rule 8009 of the Federal Rules of Bankruptcy Procedure, Appellants Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated, respectfully submit the following: (i) statement of issues to be presented on appeal from the *Opinion and Order Granting Trustee's Summary Judgment Motion and Denying Class Certification* [D.I.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Start Man Furniture, LLC (f/k/a Art Van Furniture, LLC) (9205); SVF Holding Company, Inc. (f/k/a AVF Holding Company, Inc.) (0291); SVCE, LLC (f/k/a AVCE, LLC) (2509); StartVF Holdings I, LLC (f/k/a AVF Holdings I, LLC) (2537); StartVF Holdings II, LLC (f/k/a AVF Holdings II, LLC) (7472); SVF Parent, LLC (f/k/a AVF Parent, LLC) (3451); Levin Parent, LLC (8052); Start Man Furniture of Canada, LLC (f/k/a Art Van Furniture of Canada, LLC) (9491); SV Sleep Franchising, LLC (f/k/a AV Pure Sleep Franchising, LLC) (8968); SVF Franchising, LLC (f/k/a AVF Franchising, LLC) (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

63, 64] (the "Order"), entered on March 21, 2022, and (ii) designation of items to be included in the record on appeal.

## I.  Statement Of Issues To Be Presented On Appeal.

The Appellants submit the following statement of issues on appeal:

1.  Did the Bankruptcy Court err in finding that the WARN Act's unforeseeable business circumstances and natural disaster exceptions permitted the Debtor to terminate Plaintiffs and the putative class with less than 60 days' notice?

## II. Designation of Items To Be Included In The Record On Appeal.

The Appellants submit the following designation of items to be included in the record on appeal (including any exhibit, annex, or addendum thereto):

| | Document | Case No. | D.I. | Filing Date |
|---|---|---|---|---|
| 1 | Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions | 20-10553 | 12 | 3/9/20 |
| 2 | WARN ACT Complaint by Plaintiffs Todd Stewart and Jennifer Sawle on behalf of themselves and a putative class of similarly situated former employees of Debtor Art Van Furniture, LLC and its affiliates | 20-50548 | 1 | 3/23/20 |
| 3 | Answer to Complaint by Alfred T. Giuliano, Ch. 7 Trustee for Debtor | 20-50548 | 25 | 12/10/20 |
| 4 | First Amended Answer to Complaint by Alfred T. Giuliano, Ch. 7 Trustee for Debtor | 20-50548 | 40 | 10/29/21 |
| 5 | Notice of Service of Discovery for service of Defendant's Initial Disclosures | 20-50548 | 41 | 10/29/21 |
| 6 | Notice of Service of Plaintiffs' Rule 26(a) Disclosures | 20-50548 | 42 | 11/1/21 |
| 7 | Motion For Summary Judgment Filed by Alfred T. Giuliano, Ch. 7 Trustee for Debtor | 20-50548 | 43 | 11/12/21 |
| 8 | Memorandum of Law in Support of Chapter 7 Trustee's Motion for Summary Judgment | 20-50548 | 44 | 11/12/21 |
| 9 | Exhibit(s) /Statement of Undisputed Facts in Support of Chapter 7 Trustee's Motion for Summary Judgment | 20-50548 | 45 | 11/12/21 |

PA01310

| 10 | Declaration in Support of Bradford Sandler in Support of Chapter 7 Trustee's Motion for Summary Judgment | 20-50548 | 46 | 11/12/21 |
|---|---|---|---|---|
| 11 | Motion to Allow Plaintiffs' Motion for Class Certification and Related Relief | 20-50548 | 47 | 11/14/21 |
| 12 | Notice of Service Chapter 7 Trustee's Objections and Responses to Plaintiffs' First Set of Interrogatories to Defendants, and Chapter 7 Trustee's Objections and Responses to Plaintiffs First Request for Production of Documents to Defendants Filed by Alfred T. Giuliano | 20-50548 | 48 | 12/2/21 |
| 13 | Plaintiffs' Brief in Opposition to Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling | 20-50548 | 49 | 12/3/21 |
| 14 | Plaintiffs' Response to Trustee's Statement of Undisputed Facts | 20-50548 | 50 | 12/3/21 |
| 15 | Chapter 7 Trustee's Opposition to Plaintiffs' Motion for Class Certification and Cross Motion to Stay Consideration | 20-50548 | 51 | 12/6/21 |
| 16 | Reply in Further Support of Chapter 7 Trustee's Motion For Summary Judgment | 20-50548 | 52 | 12/17/21 |
| 17 | Plaintiffs' Reply in Further Support of Motion for Class Certification | 20-50548 | 53 | 12/20/21 |
| 18 | Request for Oral Argument Filed by Jennifer Sawle, Todd Stewart | 20-50548 | 54 | 12/27/21 |
| 19 | Notice of Completion of Briefing | 20-50548 | 55 | 12/27/21 |
| 20 | Request for Oral Argument Filed by Alfred T. Giuliano | 20-50548 | 56 | 12/27/21 |
| 21 | Notice of Completion of Briefing | 20-50548 | 57 | 12/27/21 |
| 22 | Notice of Deposition of Jennifer Sawle | 20-50548 | 58 | 1/12/22 |
| 23 | Notice of Deposition of Todd Stewart | 20-50548 | 59 | 1/12/22 |
| 24 | Notice of Service of Discovery Regarding Notice of Deposition of Jennifer Sawle Pursuant to Fed. R. Civ. Proc. 30 | 20-50548 | 60 | 1/14/22 |
| 25 | Notice of Service of Discovery Regarding Notice of Deposition of Todd Stewart Pursuant to Fed. R. Civ. Proc. 30 | 20-50548 | 61 | 1/14/22 |
| 26 | Notice of Service of Discovery Responses Filed by Jennifer Sawle, Todd Stewart | 20-50548 | 62 | 2/14/22 |
| 27 | Opinion | 20-50548 | 63 | 3/21/22 |
| 28 | Order | 20-50548 | 64 | 3/21/22 |
| 29 | Order of Reassignment of Judge. Judge Craig T Goldblatt added to case. Involvement of Judge Christopher S. Sontchi Terminated | 20-50548 | 65 | 4/1/22 |
| 30 | Notice of Appeal and Statement of Election | 20-50548 | 66 | 4/2/22 |

PA01311

Dated: April 28, 2022

Respectfully Submitted,

*/s/ Michael J. Joyce*
Michael J. Joyce (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944
Email: mjoyce@mjlawoffices.com

OF COUNSEL:

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Appellants*

PA01312

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF
## DAVID LADD, EXECUTIVE VICE PRESIDENT AND
## CHIEF FINANCIAL OFFICER OF ART VAN FURNITURE, LLC,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, David Ladd, hereby declare under penalty of perjury:

1. I am the Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC ("Art Van"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company").

2. I have served in this role since October 10, 2016. In my current position, I oversee financial planning, accounting and the management of financial risk for the Company and its brands. Prior to serving in this capacity, I had over twenty years of financial experience in the retail sector, during which time I served in various roles, including as an auditor for Kmart and as Vice President of Finance for various divisions of Sears. Most recently, I served as the Vice President of Finance for 1,500 Sears and Kmart stores.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.



3. I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration (this "<u>Declaration</u>") to assist the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested pursuant to the motions and applications filed on the first day of these cases (collectively, the "<u>First Day Motions</u>").

4. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions with the other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

### **<u>Preliminary Statement</u>**

5. Art Van is a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan. The Company operates 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. The Company does business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture. The Company was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("<u>THL</u>") in March 2017. As part of this transaction, THL acquired the operating assets of the Company and certain real estate investment trusts, who closed the transaction alongside THL, acquired the owned real estate portfolio of the Company, and entered into long-term leases with Art Van. The proceeds from the sale-leaseback transaction were used to fund the purchase price

2

paid to the selling shareholders. Pennsylvania-based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017 through similar transaction structures. As of the Petition Date, the Company operates stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

6.      In the wake of extreme market conditions and faced with limited liquidity, the Company has commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down its remaining store locations and other operations through a going-out-of-business sales process. Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going concern, the Company is simply unable to meet its financial obligations. The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind down process that will maximize value and recoveries for stakeholders in these cases.

7.      Art Van's declines in sales, profits, and cash flow were driven by a combination of several factors. *First*, the Company has faced significant macro-related revenue headwinds, as well as local microeconomic headwinds, that have led to sustained negative "same-store sales," a key measure of retail health, during every quarter since June 2016. These macro-related headwinds include broad-based declining retail foot traffic, market share losses of brick and mortar furniture outlets to online sellers such as Wayfair and Amazon.com, and increased fragmentation and intense competition in mattresses leading to decreased profitability. On a local level, Art Van has faced increased retail competition, as key competitors such as Ashley HomeStore, Bob's Discount

PA01315

Furniture, and Mattress Firm opened at least 30 stores in Michigan and Illinois over the last three years

8.     **Second**, while Art Van revenues have declined approximately 27% cumulatively on a same-store basis since fiscal year 2016 through January 2020, expenses have increased significantly due to, among other things, over $8 million in tariff costs in fiscal year 2019 (which continued and escalated in fiscal year 2020) and an increase in marketing expenses intended to stem same-store sales declines.

9.     **Third**, the business suffered numerous operational challenges in the course of the Company's effort to grow and navigate a challenging retail environment.  In continuing to support the existing management team and growth initiatives that had driven the Company's success over the prior decade, the Company invested significant capital, but many of the initiatives failed to meet expectations and were insufficient in offsetting countervailing headwinds.  These operational challenges included, among other things:

- **Expansion**.  The Company began an expansion into Chicago in fiscal year 2013 that continued through fiscal year 2018, which ultimately led to market oversaturation as new stores cannibalized revenues from preexisting locations.  Despite spending significant capital and gaining material revenue share in this market, the Company was not able to achieve sustained profitability in Chicago.

- **Leadership Turnover**.  The Company lost eight of its top nine executive leaders in fiscal years 2017 and 2018 through unplanned and, in many cases, voluntary departures.

- **Required Changes to Marketing Strategies**.  In June 2017, the Company ceased certain of its historically successful marketing practices after becoming aware they violated the Telephone Consumer Protection Act ("TCPA"), and in early 2018, the Company settled a class-action lawsuit on account of an alleged violation of the TCPA.

- **St. Louis Franchise Acquisition**.  In fiscal year 2018, the Company entered into an operating agreement with its largest franchisee, based in St. Louis, Missouri, due to financial distress being experienced by the franchisee.  The Company acquired the operations of the franchisee in fiscal year 2019 to help stabilize performance and avoid further deterioration, but Art Van was unable to stabilize the revenues of the St. Louis stores or generate a profit in the market after such acquisition.

PA01316

- **Levin/Wolf Integration**. In fiscal year 2019, the Company's management attempted to integrate the operations of Wolf Furniture into Levin Furniture. The integration involved a significant overhaul of many fundamental aspects of the Wolf business, including human capital management, furniture assortments, distribution/delivery, and technology systems. These actions were taken in an effort to improve the business and align its operations with those of Levin, but they created significant strain on the Wolf business, which led to same-store sales declines of approximately 22% in Wolf in the second half of fiscal year 2019, as well as meaningful turnover of tenured sales staff.

- **Changes to Inventory Mix and Showroom Layout**. In the same year, the Company turned over approximately 60% of its furniture assortment and reorganized many of its flagship showroom floors by "lifestyle" instead of by category of product, which negatively impacted sales and led to increased markdowns from product that was not easily saleable.

As a result of these challenges, the Company's Adjusted EBITDA decreased significantly in each fiscal year since 2016 and dropped to negative for the twelve months ended December 31, 2019.

10. Faced with rapidly declining profitability, the Company made key leadership changes in summer 2019 that it deemed necessary to stem the downward trajectory and recover sales and profits. In August 2019, the Company's board of directors (the "Board") terminated the Company's then-current Chief Executive Officer, its Chief Merchant, its Head of Stores, and several other executives. It promoted a Company veteran to the role of Chief Merchant in August 2019, and, in September 2019, the Board hired a mattress industry turnaround executive as Chief Executive Officer. The Board also named Gary Van Elslander, the former President of Art Van, as Chairman of the Board, in an effort to improve morale and re-establish a connection between the Company's employees and customers with the namesake of the business. During this period, the Company also launched a new marketing campaign intended to differentiate the business against a competitive landscape, and it improved its e-commerce operating systems, including its website.

11. In the summer and fall of 2019, the Company took further actions to create additional liquidity and extend the runway for management to execute on a sales-led operational turnaround:

PA01317

- In November, 2019, the Company amended its asset-backed loan ("ABL") facility with Wells Fargo Bank, National Association ("Wells Fargo") to increase the size of the facility from $60 million to $82.5 million.

- In summer 2019, the Company engaged Evercore Group L.L.C. ("Evercore") as investment banker and undertook a review of strategic alternatives, including efforts to identify potential buyers for all or portions of the business.

- In December 2019, the Company secured an amendment to its term loan credit facility, which allowed the Company to suspend cash interest payments and mandatory amortization under the term loan.[2]

- In the fall and winter of 2019, the Company also was implementing a cost reduction and profit improvement plan, which was predicated on (a) reducing marketing expenses as a percentage of sales; (b) increasing gross margin through improved coordination of the merchandising, marketing, and in-store sales teams; and
(c) decreasing occupancy costs.

12.    Throughout this time, the Company also was focused on optimizing its lease portfolio and reducing rent expense:

- With the assistance of its financial advisor, Alvarez & Marsal North America, LLC ("A&M") the Company created a store footprint optimization analysis that supported store closure plan.

- The Company hired real estate restructuring advisers Jones Lang LaSalle ("JLL") and Newmark Knight Frank to lead discussions with key landlords to reduce rent expense given the Company's decline in sales and to close 49 underperforming locations (including 31 mattress locations), consistent with and supported by the above-referenced store closure plan.

- The Company hired an accounting advisory firm in November, 2019, to create standardized and reliable schedules of store-level financials needed for JLL and Newmark Knight Frank to be able to engage in productive negotiations with the Company's lessors. This effort was completed in January, 2020, and the real estate brokers began discussions with key lessors shortly thereafter.

---

[2]    Despite these liquidity enhancements, the Company also faced offsetting liquidity challenges. Certain companies, including The CIT Group ("CIT"), which provided accounts receivable factoring services to the Company's suppliers, refused to factor receivables owed by the Company unless the Company issued CIT and other factoring companies letters of credit under its ABL facility. These letters of credit reduced availability under the Company's ABL facility by $10 million, further exacerbating the Company's liquidity constraints.

PA01318

13.      In late January, 2020, the Company unexpectedly faced further liquidity constraints due to a reduction in the Company's "borrowing base," which is required collateral support for borrowing under the ABL facility.  At the same time, certain financial partners of the Company began to demand additional collateral and tightened access to credit as a result of the Company's weak financial results.  These financial partners included credit card processing companies, including Bank of America Merchant Services and PNC Merchant Services—who are critical to the Company's ability to accept credit cards in stores and on-line for customer purchases—as well as providers of consumer credit.  In total, this group demanded approximately $33 million in collateral through holdbacks to fund reserves and letters of credit.

14.      As a result of the impending liquidity crisis created by the shrinking borrowing base, poor operating cash flow, and the collateral demands, the Company was unable to issue "clean" audited financial statements (*i.e.*, without a potential "going concern" qualification), which led to a default under the Company's ABL facility, as well as various other contractual arrangements, including certain leases.  Wells Fargo agreed to forbear from exercising remedies on account of such default until February 28, 2020, to give the Company time to explore opportunities to raise additional capital and restructure its debt obligations.  As part of this short forbearance, Wells Fargo required the Company to comply with cash dominion, and also required the Company to begin immediate preparations for a "going-out-of-business" liquidation in the event ongoing efforts to raise capital did not materialize before the forbearance period expired.

15.      Against this backdrop, with the assistance of Evercore and A&M, the Company held discussions with at least 31 potential buyers and investors, including its term loan lender, FS KKR Capital Corp. and affiliates ("KKR"), about potential transactions to recapitalize or sell all

PA01319

or parts of the business.[3] Following a short evaluation period, KKR declined to make a new money investment in Art Van pursuant to any recapitalization transaction. The most likely and promising alternative that emerged was an out-of-court recapitalization transaction involving a consortium of investors that included a new-money investment from THL, the Van Elslander family, and three important suppliers to the Art Van business (the "Consortium"). The transaction contemplated the Consortium investing significant new capital into the Company and refinancing the existing ABL facility.[4] The Consortium also sought and received support for the transaction from the Company's five largest lessors (the "Master Lessors"), in which the Master Lessors agreed to reduce rent obligations on the company and allow Art Van to close certain underperforming locations. The Consortium submitted a letter of intent to the Company outlining the details of its proposal on February 20, 2020, followed by a further letter of intent on February 26, 2020, discussing the Consortium's progress in arranging the transaction. Unfortunately, the Consortium ultimately failed to secure the necessary capital commitments due to a variety of circumstances, including, but not limited to, the significant equity market impact of the coronavirus during the week of February 24, 2020, and the resulting deleterious effect on Consortium investors' willingness to contribute capital. Over the weekend of March 1, 2020, the Company, its Board, and the Company's advisors worked with JLL and the Master Lessors to attempt to replace the deficit in the Consortium investment with a new money investment from the Master Lessors in the form of a lease incentive investment, but on Monday, March 2, 2020, certain Master Lessors declined to participate in the proposed transaction as revised.

---

[3]    Immediately prior to the Petition Date, KKR assigned the claims and obligations under the term loan to HGB AVF Lending, LLC, which is an affiliate of Hilco Merchant Resources, LLC.

[4]    KKR also agreed to participate in the Consortium Bid by exchanging its term loan into a percentage of the pro forma equity and new debt *pari passu* with the Consortium investment.

PA01320

16.     After the Company's forbearance with Wells Fargo expired on February 28, 2020, the Company went into default under its credit facilities and focused its attention on launching a going-out-of-business process to preserve value.  Based on the expected timing for commencing the liquidation process, any delay in a launch of the going-out-of-business sales could have caused the process to continue into May and, therefore, necessitate the payment of May rent at locations still active in the liquidation at that time.  The Company also had not received substantial shipments of new product since early February given it was no longer making payments to vendors, and, as such, sales were decreasing and weekly cash burn was increasing.

17.     With no actionable alternatives, and given the urgency with which Wells Fargo was pressing the Company and its advisors to proceed, the Company began executing on plans for an orderly wind-down of the Company's operations and a liquidation of its inventory (the "Wind Down").  The Company and its advisors negotiated extensively with the Company's secured lenders to ensure that customer deposits, credits, and/or refunds, as well as payment of certain administrative costs, were contemplated by the agreed budget for the Wind Down process.  In particular, as a result of these negotiations, the Company has implemented a process for addressing customer deposits whereby customers can elect to: (a) receive the merchandise they purchased if such merchandise is present in the Art Van warehouses; (b) receive a credit in an amount equal to their deposits that can be used to purchase alternative merchandise at discounted prices during the Wind-Down, if the originally purchased merchandise is not available; or (c) cancel their order and submit a request to refund their deposit, which request would be processed as soon as practicable depending on the volume of refund requests, required processing times, and the timing and availability of cash proceeds generated by the Wind Down.[5]

---

[5]     The relief requested with respect to the customer deposits, credits and/or refunds is set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain*

18.     To facilitate the Wind Down, the Company and its advisors solicited bids from potential liquidators to conduct store closing sales, and received bids from various parties, including a proposal from certain parties to acquire certain of the Company's intellectual property and other assets.  After discussions with several firms that specialize in store closings and inventory dispositions, and with input from its secured lenders, the Company entered into a consulting agreement with a contractual joint venture (as amended and restated, the "Consultant Agreement") of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Consultant") to conduct the store closing sales.  The Consultant Agreement is an expense-based arrangement in which the Consultant will provide reimbursement of all supervisor costs, reasonable and documented travel expenses, and general legal fees subject to the caps set forth in the Consultant Agreement.  The Debtors expect to move swiftly through these chapter 11 cases to minimize costs, with an expected timeline for completing the store closing sales of approximately six to eight weeks.  To maximize recoveries and minimize administrative expenses, the Company announced and initiated a soft launch of the store closing sales on March 5, 2020,[6] and seeks to expedite the remaining store closure sales in order to complete them within six to eight weeks.

19.     In parallel with preparations for the Wind-Down, the Company continued to engage with interested parties regarding alternative transactions, which ultimately resulted in a proposal to preserve the Levin business segment and a portion of the Wolf business segment as a going-

---

*Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief*, filed contemporaneously herewith, and remains subject to approval by the Bankruptcy Court.

[6]     Upon commencement of the store closing sales, Bank of America, N.A., Banc of America Merchant Services, LLC ("BAMS"), one of the company's credit card processors, immediately issued notice of its intent to hold 100 percent of all sale proceeds as a reserve.  The filing of petitions on March 8, 2020, initiated an automatic stay against any action to control property of these estates and the Debtors reserve all rights and causes of action against BAMS, including with respect to potential preference claims.  In addition, on March 6, 2020, Broadstone AVF Illinois, LLC, and Broadstone AVF Michigan, LLC (collectively, "Broadstone"), two of the Company's Master Lessors, initiated a lawsuit against the Company in Illinois federal court, alleging, among other things, various defaults under their respective leases related to the commencement the store closing sales.

PA01322

concern. In the days leading up to the Petition Date, the Company, with the assistance of its advisors, extensively negotiated and reached an agreement-in-principle with Robert Levin, the former owner of Levin Furniture, regarding a going-concern sale of certain of the assets of Sam Levin, Inc. and LF Trucking, Inc. (the "Levin-Wolf Sale"). The key terms of the Levin-Wolf Sale are set forth in a letter of intent, dated as of March 4, 2020, a copy of which is attached hereto as **Exhibit B** (the "Levin-Wolf LOI"). As set forth in the Levin-Wolf LOI, the Levin-Wolf Sale will:

- provide for cash and non-cash consideration, including the assumption of liabilities related to customer deposits, employee obligations, specified cure costs, and potential claims under section 503(b)(9) of the Bankruptcy Code;

- preserve nearly 1,000 jobs; and

- provide for the continued operation of approximately 44 retail store locations under the Wolf and Levin store banners and two related distribution centers.

20. The Company expects to move forward with definitive documentation for, and approval of, the Levin-Wolf Sale on an expedited basis. The Company believes effectuating the Levin-Wolf Sale on an expedited basis is critical to avoiding employee attrition and other potential value leakage related to the simultaneous Wind Down of the Company's other operations. The Levin-Wolf Sale is supported by the Company's secured lenders.

21. To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions (defined below and filed contemporaneously herewith) this Declaration is organized as follows:

- **Part I** provides a general overview of the Debtors' corporate history and business operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

PA01323

- **Part III** provides a discussion of the circumstances leading to these chapter 11 cases and the Debtors efforts to pursue alternate restructuring options; and

- **Part IV** sets forth the evidentiary basis in support of the relief requested in each of the First Day Motions.

## I.    The Company's Corporate History and Business Operations.

### A.    Corporate History

22.    Mr. Art Van Elslander founded Art Van Furniture in 1959 with the first location on Gratiot Avenue and 10 Mile Road in East Detroit, Michigan.  From 1959 through the 1970s, Mr. Van Elslander focused on building the foundation for his furniture store footprint.  During this time he opened additional stores and acquired the current corporate headquarters and distribution center in Warren, Michigan.  From 1980 to 2000, Art Van Furniture focused on its expansion in the state of Michigan and introduced the first Art Van credit card, the clearance center concept, and ArtVan.com.  By 1997, following growth in the early to mid-1990s, the Company had increased in size to a total of twenty-six stores with over 2,600 employees.  Further, in the following decade the Company would open seven more stores for a total of 33 stores in 2009.  In this most recent decade, the Company experienced its most intense growth phase under former CEO Kim Yost, who led the business from 2009 until his departure in 2018.  In 2010, the Company began to execute on its freestanding PureSleep mattress store thesis.  From 2011–2015, the Company acquired 27 Mattress World stores, began franchising, and entered the Chicago market. Upon Art Van Elslander's sale of the Company in 2017, the enterprise had 113 stores, more than triple the amount of stores than it did in 2009.  Around this time, the Company was ranked as number nineteen on Furniture Today's "Top 100 list."

23.    In 2016, founder and sole owner Art Van Elslander decided to explore exit opportunities and engaged in a transaction to sell the Company and its owned real estate to THL

PA01324

for $612.5 million, which transaction closed in March 2017 (the "2017 Transaction").  At the closing of the 2017 Transaction, THL acquired the operating assets of the business and certain real estate investment trusts acquired the owned real estate portfolio.  The proceeds from the sale-leaseback transaction were used to fund the purchase price paid to the selling shareholders.  Later in 2017, the Company acquired two Pennsylvania-based furniture companies:  Levin, with operations in greater Pittsburgh and Cleveland, and Wolf, with operations in eastern Pennsylvania, Maryland, and Virginia.  The Company continued its growth strategy through further geographic expansion and new store openings, and it also invested in e-commerce capabilities to bolster the brand and improve consumer experiences.  As of the Petition Date, the Company has 92 total furniture showrooms and 77 freestanding mattress and specialty locations.

**B.    The Company's Products.**

24.    Since its founding, Art Van Furniture has focused on retailing high-quality, made-to-last furniture that is available to customers across all price points.  Art Van Furniture delivers an array of merchandise and uses a "Good-Better-Best" approach to pricing, which allows the Company to play up and down the value spectrum.  The Debtors' store locations feature a seasonally refreshed assortment that has both exclusive and national brands, traditional and fashion-forward merchandise, and an optimal mix to maximize sales per square foot performance.  To support the customer experience, Art Van Furniture has a financing program to offer customers flexibility in purchasing larger and more expensive items.  Key comparable companies in the industry include Ashley Furniture, Raymour & Flanigan, Haverty's, Mattress Firm, and Rooms To Go.  Other relevant companies in the industry include Bob's Discount Furniture, IKEA, Ethan Allen, Restoration Hardware, and Gardner White.

PA01325

**C.**    **The Company's Brands.**

25.    The Company operates stores under five primary retail nameplates: Art Van®, Art Van PureSleep®, Scott Shuptrine Interiors, Levin, and Wolf.   The respective stores operate as follows:



*Art Van* features high-quality, made-to-last furniture featuring deals on furniture for every room in your home.



*Pure Sleep* features top brand mattress and other sleep and bedding related goods and products at accessible prices.



*Scott Shuptrine* is primarily a store-within-a-store format offering exclusive and custom designed home furniture and furnishings



*Levin Furniture*, including the *Levin Mattress* nameplate, features a wide selection of modern and stylish living room, dining room, and bedroom furniture, including mattresses, with operations in the greater Pittsburgh and Cleveland area.



*Wolf Furniture* features a wide selection of eclectic furniture from around the country, including Amish made furniture, with operations in Pennsylvania, Maryland and Virginia.

The Art Van and Art Van PureSleep nameplates have their own standalone stores and operate under the website artvan.com.   Both Levin Furniture (including Levin Mattress) and Wolf Furniture nameplates operate their own standalone stores and operate under the websites levinfurniture.com and wolffurniture.com, respectively.

**D.**    **The Company's Business Operations.**

26.    The Company markets and sells its merchandise through a variety of different channels, including stand-alone stores, franchised locations, and their e-commerce platforms.

PA01326

### 1.   Brick-and-Mortar Presence.

27.   ***Stand-Alone Stores.***   The Company maintains a substantial domestic presence.   Currently, the Company operates 169 stores across 9 states.   Of these, 92 are showroom and 77 are freestanding sleep and specialty stores.   Certain furniture showroom locations have attached Clearance Center & Outlet stores to sell discounted products and merchandise.



28.   ***Franchise Stores.***   The Company also has arrangements with franchisees (each, a "Franchise Store").   There currently are 20 Franchise Stores across the United States.   The Franchise Stores are subject to franchise agreements with the Company, pursuant to which the Company supplies franchisees with product and receives a royalty on sales.

### 2.   E-Commerce Platform.

29.   In addition to its physical footprint, the Company maintains a user-friendly and well-curated e-commerce platform with the goal of facilitating a complete, omnichannel customer experience to help educate them before they arrive at a showroom.   Customers can seek out the latest home furnishing trends, explore different options for an array of different furniture styles, and purchase furniture online.   In 2019, e-commerce accounted for approximately 2% of sales.

 

15

### 3. Distribution Centers

30. The Company primarily operates from two principal distribution centers, one of which is co-located with Art Van's headquarters in Warren, MI. The second distribution center is located in Smithon, PA.

## II. The Company's Prepetition Corporate and Capital Structure.

31. A summary chart depicting the Debtors' corporate structure is attached to this Declaration as **Exhibit A**. As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations under the Prepetition ABL Credit Facility and the Prepetition Term Loan (each as defined herein) in the aggregate principal amount of approximately $208.5 million. The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Principal Outstanding as of the Petition Date |
|---|---|---|
| Prepetition ABL Credit Facility | March 1, 2022 | $33.5 million |
| Prepetition Term Loan | March 1, 2024 | $175 million |
| Total Funded Debt | | $208.5 million |

### A. The Prepetition ABL Credit Facility.

32. The Debtors are party to that certain amended and restated senior secured revolving credit facility, dated as of March 1, 2017 (as amended from time to time the "Prepetition ABL Credit Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower agent, certain of its subsidiaries, as subsidiary borrowers, certain of its subsidiaries, as guarantors, and Wells Fargo, as administrative agent collateral agent, and issuing bank, and the Lenders party thereto. The Prepetition ABL Credit Agreement provides for total revolving credit commitments of $82.5 million with a maturity date of March 1, 2022 (the "Prepetition ABL Credit Facility").

16

PA01328

Approximately $33.5 million is currently outstanding in principal under the Prepetition ABL Credit Facility.

33.     The obligations under the Prepetition ABL Credit Facility are secured by a security interest in substantially all of the Debtors' assets. However, solely with respect to liens on certain of the Debtor's fixed assets, the liens securing the Prepetition ABL Credit Facility on such assets are subordinated, to the extent set forth in that certain intercreditor agreement, dated March 1, 2017 (as amended from time to time, the "Intercreditor Agreement"), to the payment in full of the obligations in respect of the Prepetition Term Loan. The Prepetition ABL Credit Agreement contains various affirmative and negative covenants, representations, and warranties, including a covenant that the Debtors maintain a certain amount of excess availability. Due to the Debtors' deteriorating financial performance, Wells Fargo increased certain reserves in the months leading up to the Petition Date.

**B.     The Prepetition Term Loan.**

34.     The Debtors are party to that certain term loan credit agreement (the "Prepetition Term Loan Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower, certain of its subsidiaries, as guarantors, Virtus Group, LP ("Virtus"), as administrative agent and collateral agent, and the lenders party thereto. The Prepetition Term Loan matures on March 1, 2024 (the "Prepetition Term Loan"). Approximately $175 million is currently outstanding in principal on the Prepetition Term Loan.

35.     Obligations under the Prepetition Term Loan are secured by a security interest in substantially all of each Debtor's assets. However, solely with respect to liens on the Debtor's trade receivables, inventory, cash intangibles and other assets collectively referred to as ABL Priority Collateral in the Intercreditor Agreement, the liens securing the Prepetition Term Loan on

17

such assets are subordinated, to the extent set forth in the Intercreditor Agreement, to the payment in full of the obligations in respect of the Prepetition ABL Credit Facility.

36.     The Prepetition Term Loan Agreement was subsequently amended, including on February 5, 2020 (the "Term Loan Amendment"). Among other things, pursuant to the Term Loan Amendment, Virtus and certain of the Prepetition Term Loan lenders agreed to extend the deadline to deliver the 2019 annual financial statements to February 28, 2020.

## III.    Additional Information Regarding the Debtors' Efforts to Pursue Alternate Restructuring Options.

37.     Recognizing the need to explore strategic alternatives, the Debtors worked closely with THL and their advisors to evaluate available solutions to the Debtors' deteriorating circumstances, including efforts to continue the business as a going concern by means of one or more out of court transactions.

### 1.    Prepetition Marketing Process.

38.     The Debtors, with the assistance of their advisors, Evercore and A&M, engaged in discussions with various parties considered to be potential investors in the business. Evercore and A&M compiled diligence information and responded to a high volume of diligence requests from multiple interested parties.

39.     Prior to the Petition Date, Evercore and members of the Board contacted at least 31 potentially interested strategic, financial, corporate and individual parties, including at least 19 parties interested in the whole company and at least 12 parties interested in Levin and/or Wolf. Many of these parties entered into confidentiality agreements with the Debtors and received various confidential information documents, and thus began the diligence process. As discussed above, the Debtors made substantial progress towards consummation of the Consortium Proposal, but due to market conditions and the uncertain financial viability of the business, the Debtors were

PA01330

unable to secure investments needed for an actionable going-concern reorganization of the entire business.

### 2. The Expedited Levin-Wolf Sale.

40. Prior to the Petition Date, Robert Levin, the former owner of the Levin entities, submitted a written proposal, and the Debtors worked to finalize the Wolf-Levin LOI, pursuant to which Robert Levin will purchase substantially all of the assets of Debtors Sam Levin, Inc. and LF Trucking, Inc., excluding inventory located at the eight Maryland and Virginia Wolf locations (the "Assets"), as part of an expedited sale process under section 363 of the Bankruptcy Code. The purchase price consists of a combination of cash consideration and assumed liabilities, including: a cash payment equal to 82.25% of the agreed value of Wolf and Levin's actual cost of goods and freight, the amount of allowed section 503(b)(9) claims related to the Assets, the amount of any cure costs for executory contracts or unexpired leases assumed as part of the Levin-Wolf Sale, and an incremental payment of $3,650,000. The Levin-Wolf Sale also contemplates the assumption of customer deposits and employee obligations related to the Wolf and Levin business.

41. After hard-fought negotiations, the Debtors and Robert Levin reached an agreement on material terms and are currently moving toward definitive documentation. The Debtors are commencing an expedited sale process to close the Levin-Wolf Sale to prevent continued diminution of value and mitigate the risk of employee and customer attrition as the Debtors contemporaneously pursue the Wind-Down with respect to the Art Van store portfolio. The Levin-Wolf Sale contemplates the following timeline:

- the Debtors shall file a motion to approve a private sale of the Assets to Robert Levin no later than five (5) days following the Petition Date;

- the buyer and Debtors shall enter into an asset purchase agreement for the sale of the Assets no later than ten (10) days following the Petition Date; and

PA01331

- the Court shall enter an order approving the asset purchase agreement no later than twenty-one (21) days following the Petition Date.

42.     The Debtors expect the Levin-Wolf Sale to maximize recoveries for the Debtors' creditors as well as to preserve jobs and the Levin and Wolf brands.

### 3.     Store Closings.

43.     Due to the challenges discussed above, and at the direction of Wells Fargo, the assets not included in the Levin-Wolf Sale will be subject to going-out-of-business sales conducted in accordance with the Consultant Agreement.  To avoid incurring any unnecessary administrative expenses with respect to certain facilities where the Debtors are no longer operating and retain no assets of value, the Debtors expect to take a number of steps to reduce their expenses moving forward, including filing contract and lease rejection motions, pursuant to which the Debtors will seek to reject store leases and contracts that the Debtors and their advisors have determined are no longer be necessary to the Debtors' business operations.

## IV.     Relief Sought in First Day Motions.

44.     Contemporaneously herewith, the Debtors filed the First Day Motions seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  A list of the First Day Motions is attached hereto as **Exhibit C**.

45.     These First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, honor employee-related wages and benefit obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to

PA01332

give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

46.     Several of these motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

47.     I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge.  I believe that the relief sought in each First Day Motion:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; and (b) best serves the interests of the Debtors' stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

*[Remainder of Page Intentionally Blank]*

PA01333

Dated:  March 8, 2020
Wilmington, Delaware

/s/ David Ladd
_____
Name: David Ladd
Title:   Executive Vice President and Chief Financial
          Officer

PA01334

**Exhibit A**

**Corporate and Capital Structure**

PA01335

PA01336

**Exhibit B**

**Levin-Wolf LOI**

PA01337

March 4, 2020

David Ladd, Chief Financial Officer
Michael Zambricki, Vice President and General Counsel
Sam Levin, Inc.
LF Trucking, Inc.
6500 E 14 Mile Rd
Warren, MI 48092

> Re:   Purchase of Substantially All of the Assets of Sam Levin, Inc. and LF Trucking, Inc.
>        Assets by a Newly-Formed Entity Owned and Controlled by Robert Levin

This non-binding letter of intent (this "Letter Agreement" is intended to confirm certain understandings between Company representatives, Sam Levin, Inc., LF Trucking, Inc. and Buyer (defined below) with respect to the potential purchase by Buyer of substantially all of the assets free and clear of all liens, claims and encumbrances except for such liabilities explicitly assumed by Buyer pursuant to an order of the Bankruptcy Court (defined below). If this letter of intent accurately summarizes the understanding of Company representatives, Sam Levin, Inc. and LF Trucking, Inc. with respect to the potential transaction, please date and execute this letter of intent and return the same to me.

| | |
|---|---|
| **Buyer:** | Levin Furniture, LLC and Levin Trucking, LLC, newly formed entities controlled by Robert Levin, ("Buyer") (Buyer, Sam Levin and LF Trucking, Inc. are each a "Party", herein collectively referred to as the "Parties"). |
| **Seller:** | Sam Levin and LF Trucking, Inc. |
| **Purchased Assets:** | Substantially all of the assets of Sam Levin, Inc. and LF Trucking, Inc. (the "Assets"), excluding the inventory located at the eight Maryland and Virginia Wolfe locations. |
| **Purchase Price:** | The Inventory Valuation (defined below), *less* any amounts of customer deposits and employee obligations existing as of the date of closing *plus* the amount of section 503(b)(9) claims allowed pursuant to an order of the Bankruptcy Court (defined below) and any cure costs associated with any leases and/or executory contract designated for assumption by the Buyer and approved for such assumption and assignment by an order of the Bankruptcy Court (defined below) (the customer deposits, employee obligations, section 503(b)(9) claims and cure costs will be referred to herein as "Additional Consideration") *plus* $3,650,000 related to FF&E and other related assets. |
| | The term "Inventory Valuation" means 82.25% of the estimated value of the Seller's actual cost of goods plus freight based upon actual record receipts provided by Seller (which valuation excludes the value of the inventory located at the eight Maryland and Virginia Wolfe locations we estimate to be over $4,500,000). |

**Security Deposit:** Buyer will deposit $2,000,000 in cash (the "Deposit") promptly following execution of this Letter Agreement in an interest bearing escrow account held by a mutually agreeable escrow agent pursuant to a commercially reasonable escrow agreement. The Deposit is refundable in the following instances: 1) the Seller terminates the transaction or otherwise materially breaches any of its obligations under the definitive documentation required to implement the transactions contemplated hereby; 2) the Bankruptcy Court does not approve the transaction; 3) the Bankruptcy Court approves an alternative transaction for the sale of the Assets; or 4) the transaction does not close on or before 30 days from the Petition Date (defined below). The Deposit is non-refundable in the event the Buyer terminates the transaction unilaterally or otherwise materially breaches any of its obligations under the definitive documentation required to implement the transactions contemplated hereby..

**Fiduciary Duty:** Notwithstanding anything to the contrary in this Letter Agreement or the Definitive Agreements (defines below), nothing in such agreements shall require a Debtor party or the board of directors, board of managers, or similar governing body of a Debtor party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the restructuring transactions contemplated by this letter of intent to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction shall not be deemed to constitute a breach of those agreements.

**Bankruptcy Filing:** No later than March 8, 2020,or such other date as may be agreed to by the Parties (the "Petition Date") Sam Levin, Inc. and LF Trucking, Inc. (the "Debtors") shall file voluntary petitions for protection under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court").

**Sale Process:** No later than 5 days following the Petition Date, or such other date as may be agreed to by the Parties, the Debtors shall file a motion to approve private sale of the Assets to Buyer ("Sale Motion"). The Sale Motion must explicitly request approval of the sale of the Assets to Buyer without futher marketing, competitive bidding or an alterntive transaction.

No later than 10 days following the Petition Date, or such other date as may be agreed to by the Parties, Buyer and Seller shall enter into an asset purchase agreement for the sale of the Assets in a form reasonably acceptable to Buyer, subject only to Bankputcy Court approval ("Asset Purchase Agreement").

No later than 21 days following the Petition Date, or such other date as may be agreed to by the Parties, the Bankruptcy Court shall enter an order approving the Asset Purchase Agreement and the closing of the sale of the Assets to Buyer free and clear of all liens, claims and excumbrances, other than such claims explicitly assumed by Buyer in the Asset Purchase Agreement with a finding that the Buyer is a "good faith purchaser" for sufficient value for the Assets and approval of the assumption and assignment of unexpired leases and executory contracts designated by the Buyer for such assumption and assignment ("Sale Order").

Until the entry of the Sale Order, the Buyer has the right to designate which unexpired leases and executory contracts shall by assumed and assigned pursuant to the Sale Order. Seller shall cooperate with Buyer to permit Buyer access to the Seller's landlords for the purpose of negotiating amendments to such leases.

The Sale Order shall include an explicit provision waiving any stay of the Sale Order (i.e. Federal Rule of Bankruptcy Procedure 6004(f)) to permit the Buyer and Seller to close promptly upon entry of the Sale Order.

**Expenses:** Each of the Parties would pay their own legal fees and other incidental expenses incurred in connection with the transactions contemplated hereby.

**Due Diligence:** Buyer waives any due diligence, other than verification of the Inventory Valuation and any items that comprise the Additional Consideration.

**Closing Date:** The Buyer and Seller shall close on the transaction within two (2) business days from the entry of the Sale Order.

**Closing Conditions:** Closing shall occur, and the Definitve Agreements (defined below) shall become effective, only upon timely entry of the Sale Order in a form and manner acceptable to Buyer in accordance with the timeframes set forth herein.

**Documentation:** The Parties intend to prepare and negotiate (i) the Asset Purchase Agreement, and (ii) any other agreements reasonably necessary to consummate the transactions contemplated hereby.

**Miscellaneous:** This letter of intent sets forth the intent of the Parties with respect to the transactions contemplated hereby but does not create any legal or binding obligation, except for the provisions set forth under the title "Miscellaneous" of this letter of intent (the "Binding Provisions"), which provisions shall be binding on each Party. Except for the Binding Provisions, no other obligation will arise unless and until mutually satisfactory definitive documentation, including the Asset Purchase Agreement (the "Definitive Agreements"), has or have been executed and delivered by the Parties hereto. This letter of intent will be governed by the laws of the Commonwealth of Pennsylvania and may not be amended, and no provision hereof may be waived or modified, except by an instrument in writing signed by the party to be bound. This letter of intent may be executed in any number of counterparts, each of which shall be deemed to be an original. This letter of intent shall not become effective until executed by all Parties.

Sincerely,

Levin Furniture, LLC

By: _Robert Levin_
Print Name: _Robert Levin_
Title: _President_
Date: _3/4/20_

Levin Trucking, LLC

By:
Print Name:     ROBERT LEVIN
Title:          President
Date:           3/4/20

PA01341

*Duly Executed and Agreed to by Seller:*

Sam Levin, Inc. / LF Trucking, Inc.

By:

Print Name: Michael Zambricki

Title: Secretary

Date: Sam Levin, Inc.
      March 4, 2020

By:

Print Name: Michael Zambricki

Title: Secretary, LF Trucking, Inc

Date: March 4, 2020

PA01342

## Exhibit C

### First Day Motions

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief;*

- *Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of an Order (A) Authorizing the Debtors to File a (I) Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (III) Redact Certain Personally Identifiable Information for Individual Creditors and Interest Holders and (B) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (V) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement, and (IV) Granting Related Relief;* and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Specified Lienholder Claims and (II) Granting Related Relief.*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Objection Deadline: At the Hearing** |
|  | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET)** |
|  | ) |  |

## DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

hereby submit this motion (this "<u>Motion</u>"), pursuant to section 1112(a) of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure

(the "<u>Bankruptcy Rules</u>"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"),

for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed</u>

<u>Order</u>"), (i) converting each of the Debtors' chapter 11 cases to cases under chapter 7 of the

Bankruptcy Code, effective as of 12:00 a.m. (prevailing Delaware time on April 7, 2020 (the

"<u>Conversion Date</u>"), (ii) establishing a deadline for filing final chapter 11 fee applications and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

setting a hearing thereon, and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.     These Chapter 11 Cases were pending for just three days when on March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) outbreak to be a pandemic.[3]  These Chapter 11 Cases were pending for just five days when on March 13, 2020, the Trump administration declared a national emergency in response to the COVID-19 outbreak.[4]  These Chapter 11 Cases were pending for just six days when on March 14, 2020, government regulators in Pennsylvania, one of four states in which the Debtors' core retail operations are concentrated, issued guidance urging all non-essential retail businesses to close, with other states and localities soon to follow.[5]  And, these Chapter 11 Cases were pending for just eleven to fourteen days when the four states in which the Debtors' principal operations are located — Michigan, Pennsylvania, Ohio and Illinois — issued "stay at home" or "shelter in place" orders requiring, among other things, all non-essential businesses (including the Debtors' retail stores) to shut their doors and mandating that individuals not leave their homes except in limited circumstances.[6]

---

[2]     Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion.

[3]     World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).

[4]     Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).

[5]     Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/).

[6]     **Michigan:** Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020 (https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html); **Pennsylvania:** Gov.

PA01346

2.     Even before government action in response to the COVID-19 pandemic made it impossible for the Debtors' retail operations to continue, the consumer public's understandable fear of the spread of the COVID-19 disease already had a devastating impact on the Debtors' ability to implement their original restructuring plan.  These key components included (a) the continuation of Store Closing Sales at substantially all of the Debtors' 125 Art Van Furniture, Art Van Pure Sleep and Scott Shuptrine Interiors branded locations and eight of the Debtors' Wolf Furniture branded locations, and (b) the operation of 44 Levin Furniture, Levin Mattress and Wolf Furniture locations pending consummation of a going concern sale of those business lines and related assets that was contemplated at the outset of these proceedings.  Unfortunately, by the conclusion of the week ending March 14, 2020, customer traffic in the Debtors' stores — both those participating in the Store Closing Sales program and the Levin and Wolf going concern locations — precipitously dropped below what any of the Debtors' pre-bankruptcy and pre-COVID-19 pandemic financial could have predicted.  As a consequence, it was quickly evident that continued retail operations of any sort would cause the Debtors to incur expenses for the foreseeable future that far outstripped the revenues generated.  Ultimately, of course, the aforementioned restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease effectively removed any choice the Debtors had in the matter by mandating that the Debtors discontinue all retail operations and other non-essential business operations.

---

Tom Wolf, Executive Order, dated March 19, 2020 (https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf); **Ohio:** Dir. Of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020 (https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf); and **Illinois:** Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020 (https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf).

PA01347

3. By late March, the exponential spread of the COVID-19 disease throughout the United States, along with the resulting state and locally imposed limitations and prohibitions on non-essential retail operations, had left the Debtors with few potentially viable options. Further, these extraordinary and unprecedented events have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the best path forward in these proceedings for the Debtors and their estates. At present, no one can predict with any reliability how long the shelter-in-place orders issued in many states where the Debtors operate will remain in effect. In fact, the Trump administration just recently extended social distancing guidelines from April 15, 2020 through April 30, 2020.[7] And, even assuming regulatory barriers to resuming retail operations are lifted in the near future, no one can predict with any reliability what consumer appetite will exist for furniture, given the economic and other trauma that the nation is undergoing presently.[8]

4. In order to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that may eventually be distributable to their creditors, the Debtors had initially hoped — consistent with what has been recently approved in certain other retail chapter 11 bankruptcy proceedings[9] — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these chapter 11 cases until such time as the broader economic and public safety

---

[7] *See, e.g.,* Michael D. Shear, "Trump Extends Social Distancing Guidelilnes Through End of April," *The New York Times* (Pub. March 29, 2020, updated April 1, 2020) (https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html).

[8] *See, e.g.,* Ed Yong, "How the Pandemic Will End," *The Atlantic* (March 25, 2020) (exploring different plausible scenarios for resolution of the COVID-19 epidemic with some taking 12-18 months for society to return to a level of normalcy).

[9] *See* Order Establishing Temporary Procedures and Granting Related Relief, entered March 30, 2020 [D.I. 217], *In re CraftWorks Parent, LLC, et al.,* Case No. 20-10475 (BLS) (Bankr. D. Del.); Order Temporarily Suspending the Debtors' Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, entered March 27, 2020 [D.I. 166], *In re Modell's Sporting Goods, Inc., et al.,* Case No. 20-14179 (VFP) (Bankr. D.N.J.).

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to this Court and parties in interest at the status conference held that day.

5. Unfortunately, despite the Debtors and their advisors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, no viable path forward in chapter 11 emerged that would garner the support of the Debtors' senior secured lenders and certain other stakeholders. With the COVID-19 pandemic still raging and by all reputable accounts likely to get worse in the next several weeks before it improves, the execution risk associated with any of these strategies appears to be unacceptably high for the Debtors to garner the support their senior secured lenders and other stakeholders necessary for the Debtors to be able to move forward. The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is likely inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales. Even in the best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consummated by the time the Debtors and their senior secured lenders conceivably might have some visibility into if or when any of these restructuring alternatives could be successfully implemented.

6. Furthermore, the Debtors have no ability, without the consent of the Prepetition ABL Agent, to implement any case suspension-based restructuring strategy. Of necessity, on or about March 19, 2020, after communicating with representatives of the Prepetition ABL Agent on several occasions about the Debtors' increasing operating losses and need to take appropriate

PA01349

action to prevent further dissipation of the Debtors' assets, the Debtors ceased operating their retail stores as going concerns and thereafter dismissed the vast majority of their employees. As a result, the Debtors have no top line revenue, such that each dollar expended by the Debtors at this point is not being replaced. For this and other reasons, the Debtors have no ability to demonstrate that their secured lenders are adequately protected to the degree required for the Debtors continue using cash collateral and other collateral without their consent. And, under the terms of the Interim CC Order, absent extraordinary relief from the Court, the consent of the Senior Secured Parties to use cash collateral and other collateral will expire no later than the end of the day Monday, April 6, 2020.

7.     The Debtors, thus, find themselves with no choice other than to move for the prompt conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Though this path is a difficult one that the Debtors are following only after exhausting all other alternatives, under these dire circumstances, the Debtors believe that converting these cases is in the best interests of the Debtors' estates. The Debtors understand that the conversion of Chapter 11 Cases is supported by the Debtors' senior lenders and not opposed by the Committee.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13308537 v1

PA01350

10. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The statutory bases for the relief requested herein are section 1112(a) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

### A. General Background.

12. On March 8, 2020 (the "Petition Date"), each of the Debtors commenced with this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13. The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS) pursuant to Bankruptcy Rule 1015.

14. Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 12], incorporated by reference herein.

15. At the commencement of these cases, the Debtors operated 169 stores in eight states, specifically Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, West Virginia, and Virginia.[10] The Debtors also have four regional distribution centers, three of which are leased and one of which is owned. The Debtors are headquartered in Warren, Michigan and had approximately 4,500 employees as of the Petition Date.

---

[10] The vast majority of the Debtors' stores were located in four states: Michigan; Ohio; Pennsylvania; and Illinois. The remaining five states listed above accounted for only 16 of the Debtors' 169 retail locations as of the Petition Date.

13308537 v1

PA01351

16.     As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases with the intention of liquidating their inventory through store closing sales (the "Store Closing Sales") conducted with the assistance of the Consultant and other proposed professionals, paying down their secured debt, and using any remaining proceeds of their Store Closing Sales to windup their operations.   Also as set forth in the First Day Declaration and Exhibit B thereto, as of the Petition Date, the Debtors were party to a binding letter of intent for a going concern sale of 44 Levin and Wolf stores and related assets and operations (the "Levin-Wolf Sale"). The Debtors intended to effectuate this restructuring through the consensual use of cash collateral.

17.     In furtherance thereof, on or around the Petition Date, the Debtors filed, among other things:

   a.  *Debtors' Application for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 3];

   b.  *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 5]; and

   c.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to § 327(a) of the Bankruptcy Code and (V) Granting Related Relief* [D.I. 52] (the "Store Closing Motion").

18.     On March 10, 2020 (as continued, in part, to March 12, 2020), the Court held a hearing (the "First Day Hearing") following which it entered certain orders, including: (a) an order [D.I. 77], pursuant to 28 U.S.C. § 156(c), appointing Kurtzman Carson Consultants LLC ("KCC") as the Claims and Noticing Agent for these Chapter 11 Cases (the "Claims Agent");  (b) the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,

and (V) Granting Related Relief [D.I. 93] (the "Interim CC Order"); and (c) an order [D.I. 143] granting limited relief in connection with the Store Closing Motion on an interim basis.

19.     Shortly after the Petition Date, the Debtors filed applications to employ and retain: (a) Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"), as their proposed general bankruptcy counsel [D.I. 142]; (b) Montgomery McCracken Walker & Rhoads ("MMWR"), as their proposed special counsel [D.I. 193]; (c) Alvarez & Marsal North America LLC ("A&M"), as their proposed financial advisors [D.I. 145]; and (d) Jones Lang Lasalle Americas, Inc. ("JLL," and together with Benesch, MMWR and A&M, the "Debtors' Professionals"), as their proposed real estate consultants and advisors [D.I. 141].  The applications to employ and retain Benesch, A&M and JLL, each are scheduled to be heard on April 6, 2020, at 1:00 p.m. (ET).  The application to employ and retain MMWR is scheduled to be heard on April 27, 2020, at 2:00 p.m. (ET).

20.     On March 18, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a seven member Official Committee of Unsecured Creditors in these Chapter 11 Cases (as reconstituted from time to time, the "Committee").  The Committee has engaged and filed applications to employ and retain Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as its proposed counsel [D.I. 244] and Alix Partners ("Alix Partners," and together with Pachulski Stang, the "Committee's Professionals"), as its proposed financial advisor [D.I. 241].

### B.  Events in the Chapter 11 Cases.

21.     Since the First Day Hearing, the exponential spread of COVID-19 has wrought economic and social havoc across the country and the globe.  As discussed in the Preliminary Statement, on the afternoon of March 13, 2020, President Trump declared COVID-19 a national

13308537 v1

PA01353

emergency and most of the states in which the Debtors operate have also declared states of emergency and issued "stay at home" or "shelter-in-place" type orders.

22.     Notwithstanding the careful planning and modeling of the Debtors and their advisors, since shortly after the Petition Date, the Debtors' situation has changed drastically as a result of COVID-19.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the Store Closing Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23.0 million;[11] however, for the <u>full</u> week ending March 15th, deposits from sales were just $8.0 million.  It quickly became apparent to the Debtors' management and advisory teams that continued retail operations of any sort were causing the Debtors to incur expenses (and would do so for the foreseeable future) that far outstripped any revenues being generated through the Debtors' continued retail operations.

23.     By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[12]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …."[13] Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan — where

---

[11]     The Debtors, however, did not realize the cash proceeds from most of these sales because just prior to the Petition Date and immediately thereafter, certain of the Debtors' credit card processor banks purported to exercise rights to intercept the proceeds from such transactions and redirect them into chargeback reserve accounts.

[12]     Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/)

[13]     Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts, March 16, 2020 (https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/).

the Debtors' headquarters, a distribution center and 82 of their stores are located — entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[14] While Michigan's initial order did not explicitly mandate closing of all non-essential retail establishments, it was accompanied by appropriately alarming statement from Governor Whitmer urging Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[15] Government authorities in Ohio and Illinois also issued similar guidance and direction.

24.    As detailed in the Preliminary Statement, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations are located to issue a "stay at home" or "shelter in place" type order. Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.

25.    Although the situation was evolving rapidly, the Debtors' board, management team and advisors were paying close attention to the threat COVID-19 posed to the health and welfare of the Debtors' employees and customers and to the financial impact on the Debtors' businesses. The Debtors' board, management team and advisors were in near constant communication about these events as they unfolded in mid-March. Moreover, the Debtors and their advisors worked to the best of their ability under these circumstances to keep their secured lenders and other stakeholders informed about these challenges and exhausted all efforts to work with them to develop viable responses to the rapidly deteriorating situation. When no other viable alternative emerged, on March 19, 2020, the Debtors made the painful decision to suspend all retail operations

---

[14]    Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders, March 16, 2020 (https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521763--,00.html).

[15]    *Id.*

and terminate the majority of their employees — moves the Debtors hoped at the time would be only temporary measures.

26. Further compounding the Debtors' problems, on March 19, 2020 the proposed purchaser for the Levin-Wolf Sale notified the Debtors that they would not proceed with the transaction at that time, effectively ending any hope the Debtors had to consummate a going concern transaction for the Levin and Wolf furniture operations and dashing hopes to save upwards of a 1,000 jobs.

27. Late in the day on March 19, 2020, however, the Prepetition ABL Agent issued a purported Termination Declaration under the Interim CC Order. Pursuant to Paragraph 21 of the Interim CC Order, a valid Termination Declaration issued on March 19th would have triggered a Remedies Notice Period five business days' in length. Thereafter, the Prepetition ABL Agent agreed to extend any Remedies Notice Period relating to the alleged Termination Declaration through the end of the day on Tuesday, March 31, 2020, and then again through and including the end of the day on Monday, April 6, 2020.

28. Following these events, the Debtors and their advisors continued to work with the Prepetition ABL Agent, the Committee, and their respective advisors to identify solutions for the Debtors' deteriorating situation that would allow them to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that might eventually be distributable to their creditors. The Debtors had hoped — consistent with what has been recently approved this Court in the *CraftWorks* chapter 11 cases and by the District of New Jersey bankruptcy court in the *Modell's* chapter 11 cases — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these Chapter 11 Cases until such time as the broader economic and public safety

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to the Court that day.

29.     Both before and after the March 26th status conference, the Debtors, with the assistance of their advisors and in consultation with the Prepetition ABL Agent, the Committee and their respective advisors, were working to develop and evaluate several potentially value maximizing alternatives for the Debtors to pursue after the contemplated suspension of operations and downscaling of activities in these Chapter 11 Cases came to an end.  One such path was to resume Store Closing Sales at all of the Debtors' locations where it would be financially and operationally viable to do so.  A second path considered was to focus on one or more bulk sales most or all of the Debtors' inventory, equipment, and other readily monetizable assets. Additionally, the Debtors and their advisors examined several "middle" paths for the Debtors and their estates, which would involve various combinations of resuming Store Closing Sales at certain locations and bulk-selling inventory, equipment, and certain other assets associated with other locations.

30.     To be clear, each of the post-suspension restructuring alternatives explored by the Debtors had the prospect of producing some return to the Debtors' senior secured lenders and potentially to other stakeholders.  But none of the potential scenarios showed a reasonable chance of generating a recovery for the Debtors' senior secured lenders coming anywhere near what the pre-COVID 19 pandemic modeling had suggested.  Indeed, under most scenarios, the Prepetition ABL Secured Parties, which at the outset of these proceedings were projected to receive a full

recovery on their approximately $34 million of Prepetion ABL Obligations by the mid-point of the Store Closing Sales Process, would not get out whole before their ABL Priority Collateral was fully monetized.

31.     Despite the Debtors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, these concerted efforts were unable to produce a path forward in chapter 11 that would garner the support of their senior secured lenders and potentially other stakeholders.  Unfortunately, with the COVID-19 pandemic still raging and by all reputable accounts likely to get worse before it improves, the perceived execution risk of any of these restructuring strategies has proven to be an insurmountable  barrier to the Debtors ability to obtain the necessary support of their secured lenders and others.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the reasonable best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consumed by operating expenses before the Debtors and their senior secured lenders would have meaningful visibility into whether these restructuring alternatives could be successfully implemented.

32.     By Monday, March 30, 2020, the Debtors were effectively out of time, with their access to Cash Collateral under the Interim CC Order then due to terminate at the end of the following day.  Although it was clear by this point in the proceedings that the Debtors would be unable to continue these Chapter 11 Cases without the support and consent of their senior secured lenders, unresolved issues existed as to what obligations would and would not be funded under the terms of the Interim CC Order prior to any conversion of the Chapter 11 Cases.  Recognizing the contributions that their employees had made to the Debtors' businesses postpetition and the

extreme hardship that many of the employees and their families were apt to experience as a result of losing their jobs in the midst of an ongoing pandemic and associated economic crisis, the Debtors attempted everything in their power to ensure that employee payroll and related employee obligations would be fully funded under the Interim CC Order.

33.     These efforts were to a degree successful.  At a hearing held on March 31, 2020, the Court confirmed that the Debtors would have access to Cash Collateral to fund and pay current payroll obligations, including wages, salaries and commissions.  The cash available, however, was insufficient for it to be possible for the Debtors to provide at this time for payment in full of other employee related obligations, such as coverage obligations for employee healthcare expenses and certain other benefits plans that were, in whole or part, self-funded by the company.[16]  Even though this situation is primarily the result of the COVID-19 pandemic and other circumstances entirely beyond the Debtors' control, the Debtors deeply regret that they are not in a position to be able to do more for their employees, customers, vendors, landlords and other stakeholders.

34.     Based upon the foregoing, the Debtors have considered the circumstances in which they find themselves, and have concluded that converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates.

---

[16]     The Debtors estimate the total unfunded trailing liabilities under their partially self-funded employee health plan to be approximately $8.5 million. Under self-funded plans, like the ones the Debtors had established for their employees in the ordinary course of business prior to the Petition Date, when employees and their covered dependents receive covered services the resulting charges are remitted to the plan's claims administrator for processing.  Thereafter, the approved claims are batched and remitted to the Debtors for payment.  The remittance of the batched claims to the Debtors for payment can trail the rendering of services to employees by up to several months. In general, the Debtors terminated health care covered for their employees effective as of the dates such employees separated from the company.  Thus, the estimated $8.5 million of trailing obligations is on account of covered healthcare services to covered persons provided prior to each such employee's termination date.  Although the Debtors' original budget for these Chapter 11 Cases contemplated the funding of such trailing employee healthcare plan obligations, the COVID-19 pandemic's disruption of the Debtors' ability to operate postpetition  combined with the issuance of a Termination Declaration under the Interim CC Order that followed, left the Debtors with inadequate cash on hand and inadequate access to additional cash with which to fund such obligations.

13308537 v1

PA01359

## RELIEF REQUESTED

35.     By this Motion, the Debtors request entry of the Proposed Order, pursuant to section 1112(a) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date, (ii) establishing a deadline for filing final chapter 11 professional fee applications and setting a date for a hearing thereon, and (iii) granting related relief.

36.     The Debtors also request that the Court approve the following procedures in connection with the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code (the "Conversion Procedures"):

   a.  **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

   b.  **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain

PA01360

copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

## BASIS FOR RELIEF

**A. The Conversion Relief Should be Granted**

37.     Section 1112(a) of the Bankruptcy Code provides that a debtor may convert a case to chapter 7 as a matter of right. *See* H.R. Rep. No. 95-595, 1st Sess. 405 (1977) ("Subdivision (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case"); *see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) ("[A] debtor has the absolute right to convert [its] Chapter 11 case to a Chapter 7 case"). There are only three circumstances where a debtor is precluded from exercising that right: (i) the debtor is not a debtor in possession; (ii) the case was originally commenced as an involuntary case under chapter 11; or (iii) the case was converted to a case under chapter 11 other than at the debtor's request. 11 U.S.C. § 1112(a).

None of those exceptions is applicable in these Chapter 11 Cases. Therefore, the Debtors are entitled, as an absolute right, to convert the Chapter 11 Cases to cases under chapter 7.

38. In addition, conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates and creditors. The Debtors no longer have funding to administer these Chapter 11 Cases. Thus, although there is substantial inventory and equipment remaining in the Debtors' stores and distribution centers and other estate assets that may be available to satisfy certain creditor claims, without an ability to fund ongoing administrative expenses, the Debtors have no ability to pursue the recovery of those assets or prosecute a chapter 11 plan. Accordingly, the Debtors believe there is no reasonable likelihood that the Debtors could confirm and consummate a chapter 11 plan, and respectfully submit that a chapter 7 trustee will be able to more efficiently and effectively bring these cases to their conclusion.

39. Accordingly, the Debtors respectfully request that the Court enter an order converting the Debtors' cases from chapter 11 to chapter 7, effective as of the Conversion Date.

**B. The Conversion Procedures and Other Related Relief Should Be Approved**

40. Pursuant to Local Rule 2002-1(f)(xi), "[u]pon conversion of a chapter 11 case to a chapter 7 case, if there are more than 200 creditors, the claims agent appointed in the chapter 11 case shall . . . submit a termination order." Del. Bankr. L.R. 2002-1(f)(xi).

41. Accordingly, the Debtor requests that the conversion order sought hereby also provides for the termination of KCC services as claims and noticing agent in these Chapter 11 Cases.

42. The Debtor also believes that the Conversion Procedures are appropriate under the facts of this case and should be approved. The Conversion Procedures include, among other things, a request to extend the deadline under Bankruptcy Rule 1019(1)(A) for the filing of any statements

and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) from fourteen (14) days after the Conversion Date to forty-two days (42) after the Conversion Date.

43.     The Court has authority to grant the requested extension under Bankruptcy Rules 1007(c) and 9006(b) and Bankruptcy Local Rule 1007-1(b). Bankruptcy Rule 1007(c), together with Bankruptcy Rule 9006(b), allows the Court to extend the filing deadline for the Schedules and Statements "for cause shown." Similarly, Bankruptcy Local Rule 1007-1(b) provides that such an extension may be granted for cause. Showing "cause" merely requires that a debtor "demonstrate some justification for the issuance of the order," and bankruptcy courts will normally grant such extensions "in the absence of bad faith or prejudice to the adverse party." *See, e.g., Bryant v. Smith,* 165 B.R. 176, 182 (W.D. Va. 1994) (discussing the standard for granting extensions under Bankruptcy Rule 1007) (internal citations and quotation marks omitted).

44.     Because of the COVID-19 pandemic and other extremely difficult circumstances that have defined these Chapter 11 Cases, the Debtors and their advisors have had virtually no free time or resources available since he Petition Date to devote to the preparation of schedules and statements required by Bankruptcy Rules 1019(1)(A) and 1007(b).  Given the extent of work that remains to be done and the extremely limited resources remaining with which to undertake such work, which conditions both exist through no fault of the Debtors and their advisors, the Debtors' respectfully submit that "cause" exists to extend this deadline. Moreover, since these proceedings are still in their very early stages, the granting of such an extension is unlikely to prejudice the trustee, any creditor or any other party in interest.

## **NOTICE**

45.     Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of Delaware; (ii) proposed counsel for the Committee; (iii) the agents under the Debtors' prepetition

secured facilities and counsel thereto; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. A copy of this Motion is also available on the website of the Debtors' notice and claims agent at https://www.kccllc.net/artvan. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## <u>RESERVATION OF RIGHTS</u>

46. The Debtors understand that employee payroll, the Carve Out and all other obligations that are required to be funded and paid under the Interim CC Order, including without limitation Paragraph 2 thereof, have been or will be funded and paid prior to the Conversion Date. Nevertheless, in the event that such obligations are not funded and paid as required under the Interim CC Order, the Debtors reserve all rights for themselves and their estates, including but not limited to any chapter 7 trustee that may hereafter be appointed.

13308537 v1

PA01364

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other relief as is appropriate under the circumstances.

Dated:  April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

  */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        kharmon@beneschlaw.com
        jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

13308537 v1

PA01365

# Exhibit A

PA01366

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|                                           |     |                           |
|-------------------------------------------|-----|---------------------------|
| In re:                                    | )   | Chapter 11                |
|                                           | )   |                           |
| ART VAN FURNITURE, LLC, *et al.*,[1]      | )   | Case No. 20-10553 (CSS)   |
|                                           | )   |                           |
| Debtors.                                  | )   | (Jointly Administered)    |
|                                           | )   |                           |
|                                           | )   | **Re: D.I. _____**       |
|                                           | )   |                           |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED, as set forth herein.

2.      Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "<u>Conversion Date</u>"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.      The following Conversion Procedures are hereby approved:

   a.   **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "<u>Final Fee Applications</u>"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "<u>Final Fee Application Deadline</u>"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

PA01368

    b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

    c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

    d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

    e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

    f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4.     Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5.     Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting*

*Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.   Except as expressly provided in Paragraph 5 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order).

7.   For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or

(ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

8.     Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

9.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

13308536 v1

PA01371

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Objection Deadline: At the Hearing** |
| | ) **Hearing Date: April 6, 2020 at 1:00 p.m. (ET) (requested)** |
| | ) |

### NOTICE OF VIDEO AND TELEPHONIC HEARING REGARDING DEBTORS' CORRECTED MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on April 3, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors Corrected Motion for Entry of an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the "Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on **April 6, 2020 at 1:00 p.m. (ET)**, before the Honorable Chief Judge Christopher S. Sontchi via video and telephonic conference.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

**PLEASE TAKE FURTHER NOTICE THAT THE HEARING IS PROCEEDING VIA ZOOM USING THE FOLLOWING INSTRUCTIONS:**

> **Topic: Art Van Furniture 20-10553 - Hearing**
> **Time: Apr 6, 2020 1:00 PM Eastern Time (US and Canada)**
> **Join Zoom Meeting**
> **https://uchicago.zoom.us/j/911880719**
> **Meeting ID: 911 880 719**

**DO NOT COME TO THE COURTHOUSE. ANY PARTY WHO WISHES TO PRESENT EVIDENCE OR EXAMINE WITNESSES IS REQUIRED TO ACCESS VIA ZOOM. ANY PARTY WHO WISHES TO ACCESS VIA ZOOM MUST ALSO MAKE AUDIO ARRANGEMENTS THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**OTHER PARTIES IN INTEREST MAY MAKE ARRANGEMENTS TO PARTICIPATE BY TELEPHONE AT THE HEARING THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**PLEASE TAKE FURTHER NOTICE THAT, IF NO RESPONSES OR OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

PA01373

Dated: April 3, 2020  
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

  _/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
         mbarrie@beneschlaw.com
         jhoover@beneschlaw.com
         kcapuzzi@beneschlaw.com
         kharmon@beneschlaw.com
         jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

3

PA01374