## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

START MAN FURNITURE, LLC, et al.

Chapter 7
Case No. 20-10553 (CTG)
Jointly Administered

---

TODD STEWART and JENNIFER SAWLE, on behalf of themselves and all others similarly situated,

*Appellants*,

vs.

ALFRED T. GIULIANO, chapter 7 trustee for Debtors Start Man Furniture, LLC, et al.,

*Appellee.*

Civil Action No. 22-cv-00450 (CFC)

Bankr. Case No. 20-10553 (CTG)
Bankr. Adv. Pro. No. 20-50548 (CTG)
Bankr. BAP No. 22-00030

---

**BRIEF OF *AMICI CURIAE* COMMUNICATIONS WORKERS OF AMERICA, SERVICE EMPLOYEES INTERNATIONAL UNION, AMERICAN FEDERATION OF TEACHERS, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AND NATIONAL EMPLOYMENT LAW PROJECT IN SUPPORT OF APPELLANTS' OPENING BRIEF**

**THE ROSNER LAW GROUP LLC**
Jason A. Gibson (DE No. 6091)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
(302) 777-1111
gibson@teamrosner.com

**DEMOCRACY FORWARD FOUNDATION**
Jeffrey Dubner
P.O. Box 34553
Washington, DC 20043-4553
(202) 448-9090
jdubner@democracyforward.org

Dated: July 8, 2022

*Counsel for Amici*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................. ii

INTEREST OF THE AMICI CURIAE.................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................2

ARGUMENT........................................................................................................4

I.     The Exceptions to the WARN Act Must Be Construed Narrowly..............4

     A.     Displaced Workers Are Uniquely Burdened ......................................4

     B.     The Remedial Purpose of Notice .......................................................7

II.     The Debtors' Response to COVID-Related Regulations Does Not Fall Within the "Natural Disaster" Exception..................................................10

     A.     COVID-19 Is Not a "Natural Disaster" for Purposes of the WARN Act..................................................................................................10

     B.     To Satisfy the "Natural Disaster" Exception, the Layoffs Must Be Directly Caused by the Disaster—Not by an Economic Downturn or Government Regulation ....................................................................13

          1.     The "Natural Disaster" Exception Requires Direct, Not Just But-For, Causation.................................................................14

          2.     The Trustee Alleges That Economic Downturn and Regulatory Change Directly Caused The Debtors to Accelerate the Layoffs— Not the "Disaster" Itself .................................................19

III.     The WARN Act's Exceptions Are Fact-Bound Defenses That Typically Require Discovery ...................................................................................20

CONCLUSION ...............................................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Cases**
   **Page(s)**

*AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*,
   C.A. No. 2020-0310-JTL, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020) ..........13

*In re APA Transp. Corp. Consol. Litig.*,
   541 F.3d 233 (3d Cir. 2008) .......................................................................3, 4

*Benson v. Enter. Leasing Co. of Orlando, LLC*,
   No. 20-cv-891, 2021 WL 1078410 (M.D. Fla. Feb. 4, 2021) .....................14, 19

*Castro v. Chicago Hous. Auth.*,
   360 F.3d 721 (7th Cir. 2004) ................................................................4

*Collins v. Gee West Seattle LLC*,
   631 F.3d 1001 (9th Cir. 2011) ..............................................................8

*Day v. Celadon Trucking Servs., Inc.*,
   827 F.3d 817 (8th Cir. 2016) ................................................................4

*Dixie Pine Prods. Co. v. Md. Cas. Co.*,
   133 F.2d 583 (5th Cir. 1943) ...............................................................18

*Doe v. Abington Friends Sch.*,
   480 F.3d 252 (3d Cir. 2007) ................................................................21

*Easom v. US Well Services, Inc.*,
   527 F. Supp. 3d 898 (S.D. Tex. 2021)...................................................10

*Easom v. US Well Servs., Inc.*,
   37 F.4th 238, 2022 WL 2136084 (5th Cir. 2022)......................................*passim*

*Encino Motorcars, LLC v. Navarro*,
   138 S. Ct. 1134 (2018)........................................................................8

*Friends of Danny DeVito v. Wolf*,
   227 A.3d 872 (Penn. 2020)...................................................................12

*Hemi Grp., LLC v. City of New York*,
   559 U.S. 1 .......................................................................................18

*JN Contemp. Art LLC v. Phillips Auctioneers LLC*,
   507 F. Supp. 3d 490 (S.D.N.Y. 2020) ................................................................. 13

*Jones v. Scribe Opco, Inc.*,
   --- F. Supp. 3d ----, 2022 WL 813824 (M.D. Fla. Mar. 17, 2022) .............. 14, 19

*Local Union 7107 v. Clinchfield Coal Co.*,
   124 F.3d 639 (4th Cir. 1997) ..................................................................... 4

*Markowitz v. Ne. Land Co.*,
   906 F.2d 100 (3d Cir. 1990) ..................................................................... 4

*Oil, Chem. & Atomic Workers Int'l Union v. RMI Titanium Co.*,
   199 F.3d 881 (6th Cir. 2000) ..................................................................... 9

*Pearce v. Faurecia Exhaust Sys., Inc.*,
   529 F. App'x 454 (6th Cir. 2013) ........................................................... 4

*Penn. Democratic Party v. Boockvar*,
   238 A.3d 345 (Penn. 2020) ..................................................................... 12

*Sides v. Macon Cnty. Greyhound Park, Inc.*,
   725 F.3d 1276 (11th Cir. 2013) ......................................................... 14, 19

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................................. 12

**Statutes**

29 U.S.C. § 2102 ...........................................................................*passim*

29 U.S.C. § 2106 ..................................................................................... 9

29 U.S.C. § 2107 ............................................................................. 11, 18

35 Pa. Stat. & Cons. Stat. Ann. § 7102 ............................................... 12

**Federal Rules and Regulations**

20 C.F.R. § 639.1 ............................................................................. 8, 18

20 C.F.R. § 639.9 ......................................................................... 15, 18

Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16,042
(Apr. 20, 1989) ..................................................................................... 18

**Legislative History**

H.R. Rep. No. 100-576, pt. 2 (1988) ............................................... *passim*

**Other Authorities**

Ralph Catalano et al., *Job Loss and Alcohol Abuse: A Test Using Data from the
Epidemiological Catchment Area Project*,
34 J. Health & Soc. Behav. 215 (1993) ............................................... 6

Bruce C. Fallick, *A Review of the Recent Empirical Literature on Displaced
Workers*, 50 ILR Rev. 5 (1996) ........................................................... 5

Leon Grunberg et al., *Differences in Psychological and Physical Health Among
Layoff Survivors: The Effect of Layoff Contact*,
6 J. Occupational Health Psych. 15 (2001) .......................................... 5

Louis S. Jacobson et al., *Earnings Losses of Displaced Workers*,
83 Am. Econ. Rev. 685 (1993) ............................................................. 5

Louis Jacobson et al., *Is Retraining Displaced Workers a Good Investment?*,
29 Econ. Perspectives 47 (2005) ......................................................... 5

Tomas Korpi, *Accumulating Disadvantage: Longitudinal Analyses of
Unemployment and Physical Health in Representative Samples of the Swedish
Population*,
17 Eur. Socio. Rev. 255 (2001) ........................................................... 5

Christopher J. Ruhm, *Are Workers Permanently Scarred by Job Displacements?*,
81 Am. Econ. Rev. 319 (1991) ............................................................. 5

Kate W. Strully, *Job Loss and Health in the U.S. Labor Market*,
46 Demography 221 (2009) .................................................................. 5

U.S. Bureau of Lab. Stat., Economic News Release, *Displaced Workers Summary*
(Aug. 27, 2020), https://bit.ly/34Z4wtZ .............................................. 5

U.S. Dep't of Labor, *Economic Adjustment and Worker Dislocation in a
Competitive Society: Report of the Secretary of Labor's Task Force on
Economic Adjustment and Worker Dislocation* (1986) ........................... 2, 5, 6, 8

U.S. Dep't of Labor, *Worker Adjustment and Retraining Notifications Act Frequently Asked Questions*, https://bit.ly/3LFjN3G ........................................11

U.S. Gov't Acct. Office, *Dislocated Workers: Extent of Business Closures, Layoffs, and the Public and Private Response* (July 1, 1986), https://bit.ly/3aq1qSI........7

## <u>INTEREST OF THE AMICI CURIAE</u>

*Amici* in this case are the Communication Workers of America, the Service Workers International Union ("SEIU"), the American Federation of Teachers ("AFT"), the American Federation of State, County and Municipal Employees ("AFSCME"), and the National Employment Law Project ("NELP") (collectively "*Amici*"). *Amici* collectively represent millions of American workers in a wide variety of fields—many of whom were laid off during the economic downturn that accompanied the COVID-19 pandemic or still remain at risk of future layoffs.

As explained in *Amici*'s Motion for Leave, *Amici* have a keen interest in this case because the Court's decision could have profound impacts on *Amici*'s members and their own efforts to serve them. Advance notice of mass layoffs allows unions and other organizations supporting workers to work with their members and get them engaged in retraining or readjustment programs ahead of layoffs, in order to prevent a loss of income. If this Court were to accept Defendant's interpretation of the WARN Act's "natural disaster" exception, many workers would not receive the notice required by the WARN Act. *Amici* thus have a strong interest in this case and the proper interpretation of the WARN Act's "natural disaster" exception.

No counsel for a party authored this brief in whole or in part, and no person other than amicus curiae, their members, and counsel contributed money that was intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress passed the Worker Adjustment and Retraining Notification ("WARN") Act of 1988 to ensure that employees received adequate notice before their employer ordered a mass layoff or plant closing. 29 U.S.C. § 2102(a). As Congress found, advance notice of mass layoffs is critical to protecting workers, their families, and their communities. It gives workers time to retrain, apply for new jobs, and adjust their financial circumstances before losing their income. It enables state and local governments to help laid off employees find new jobs. And it places workers in the best position possible to protect their families' access to food, healthcare, and education. *See generally* H.R. Rep. No. 100-576, pt. 2, at 1045 (1988), *reprinted in* H. Subcomm. on Lab.-Mgmt. Relations of the Comm. on Educ. & Lab., 101st Cong., 2d Sess., Legislative History of S. 2527, 100th Cong., WARN, Pub. L. No. 100-379, at 571 (1990) (hereinafter "Leg. Hist."); U.S. Dep't of Labor, *Economic Adjustment and Worker Dislocation in a Competitive Society: Report of the Secretary of Labor's Task Force on Economic Adjustment and Worker Dislocation* 10 (1986) (hereinafter "1986 DOL Report").

Under the WARN Act, "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). Congress carefully crafted three limited exceptions to the 60-day notice requirement, known as the "faltering company"

exception, the "unforeseeable business circumstances" exception, and the "natural disaster" exception. 29 U.S.C. § 2102(b). These exceptions must be construed narrowly. *See, e.g.*, *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 249 (3d Cir. 2008); *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 2022 WL 2136084, at \*4 (5th Cir. 2022).

The Bankruptcy Court's decision in this case, however, applied the "unforeseeable business circumstances" and "natural disaster" exceptions in ways that significantly impair the WARN Act's remedial purpose. It expanded the scope of the "natural disaster" exception to cover not only the direct effect of natural disasters, but also economic downturns spurred by a viral pandemic. In doing so, the court relied on a single district court case that has since been overturned and inapposite cases having nothing to do with the WARN Act. And it granted summary judgment on the "unforeseen business circumstances" exception because it found that Plaintiffs failed to rebut Defendants' showing even though Plaintiffs had not had the opportunity to test that showing through discovery. This impairs employees' ability to contest an employer's claims and frustrates Congress's purpose in enacting not only the WARN Act but also the Federal Rules of Civil Procedure.

The Bankruptcy Court's decision upsets the careful balance enacted by Congress in its efforts to ensure that workers have as much notice as is possible of an impending layoff. This Court should reverse the judgment below, confine the

"natural disaster" exception to its proper scope, and confirm that summary judgment is generally inappropriate where employees have had no chance to test in discovery an employer's purported rationale for forgoing WARN Act notice.

## ARGUMENT

### I.   The Exceptions to the WARN Act Must Be Construed Narrowly

As numerous courts have held, "the WARN Act's exceptions permitting a reduction of the notice period run counter to the Act's remedial purpose and thus, are to be 'narrowly construed.'" *Easom*, 2022 WL 2136084, at \*4 (quoting *Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1282 (5th Cir. 1994));[1] *see generally Markowitz v. Ne. Land Co.*, 906 F.2d 100, 105 (3d Cir. 1990) (noting "the general rule of statutory construction that exemptions from remedial statutes such as the Act are to be narrowly construed"). The history and text of the WARN Act support the conclusion that the exceptions to the notice requirement must be read narrowly.

#### A. Displaced Workers Are Uniquely Burdened

As the Department of Labor ("DOL") explained in the congressionally

---

[1] *Accord, e.g.*, *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 836 (8th Cir. 2016); *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997); *Pearce v. Faurecia Exhaust Sys., Inc.*, 529 F. App'x 454 (6th Cir. 2013); *see also In re APA Transport Corp.*, 541 F.3d at 247 (construing faltering company defense); *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 730 (7th Cir. 2004) (construing good faith defense).

commissioned report that led to the passage of the WARN Act, displaced workers[2] face potentially devastating challenges upon being laid off from a job. *See, e.g.*, 1986 DOL Report 3 ("Worker dislocation constitutes a markedly different kind of unemployment in many respects."). Especially during a broad economic downturn, they often face problems finding full-time work that provides equivalent pay and benefits as the lost job, thereby decreasing, sometimes quite significantly, their long-term earning potential.[3] In fact, one study found that displaced workers who have been at their jobs for 20 years would see a 20 to 40 percent dip in their income upon reentering the workforce.[4]

Moreover, displaced workers are at increased risk for a variety of mental and physical health issues.[5] For example, studies have found that they are more

---

[2] "Displaced workers" are people "who lost or left jobs because their plant or company closed or moved, there was insufficient work for them to do, or their position or shift was abolished." U.S. Bureau of Lab. Stat., Economic News Release, *Displaced Workers Summary* (Aug. 27, 2020), https://bit.ly/34Z4wtZ.

[3] *See* Bruce C. Fallick, *A Review of the Recent Empirical Literature on Displaced Workers*, 50 ILR Rev. 5, 8–10 (1996); Christopher J. Ruhm, *Are Workers Permanently Scarred by Job Displacements?*, 81 Am. Econ. Rev. 319, 322 (1991); Louis S. Jacobson et al., *Earnings Losses of Displaced Workers*, 83 Am. Econ. Rev. 685, 706 (1993).

[4] Louis Jacobson et al., *Is Retraining Displaced Workers a Good Investment?*, 29 Econ. Perspectives 47, 48 (2005).

[5] *See, e.g.*, Leon Grunberg et al., *Differences in Psychological and Physical Health Among Layoff Survivors: The Effect of Layoff Contact*, 6 J. Occupational Health Psych. 15, 15–25 (2001) (citing studies); Kate W. Strully, *Job Loss and Health in the U.S. Labor Market*, 46 Demography 221, 221 (2009).

susceptible to depression and anxiety, and suffer from a host of other physical conditions, including obesity, high blood pressure, and diabetes.[6] Studies also show that layoffs are connected with an increased incident rate of spousal and child abuse, as well as divorce.[7] And displaced workers are significantly more susceptible to problems with drug and alcohol consumption.[8]

Congress passed the WARN Act to mitigate these types of challenges. Congress acknowledged that "most workers[,] and particularly older workers displaced by plant closings, suffer large income reductions even when they succeed in finding new work." Leg. Hist. at 593. Indeed, DOL had reported to Congress that between 1979 and 1984, displaced workers saw "average real earnings losses of 10 to 15 percent upon reemployment," with many displaced workers having "losses of 25 percent or more." 1986 DOL Report at 14.

Congress also explained that "the health effects of job loss can be even more dramatic," noting that research had documented "numerous physiological changes caused by stress following plant closures, including increased uric acid, blood pressure, blood sugar, and cholesterol levels." Leg. Hist. at 593. It also explained

---

[6] *Id.*; Tomas Korpi, *Accumulating Disadvantage: Longitudinal Analyses of Unemployment and Physical Health in Representative Samples of the Swedish Population*, 17 Eur. Socio. Rev. 255, 270 (2001).

[7] *Id.*

[8] Ralph Catalano et al., *Job Loss and Alcohol Abuse: A Test Using Data from the Epidemiological Catchment Area Project*, 34 J. Health & Soc. Behav. 215 (1993).

that displaced workers are more likely to experience mental health issues, including depression, and that "[s]uicide rates increase dramatically among those who experience plant closings." *Id.*

Congress was also concerned with the families of displaced workers. It explained that "Social Service agencies report huge increases in child abuse and spouse abuse after mass layoffs as the displaced workers vent their anger and frustration on their families," and that "[d]esertion and divorce increase especially in families where the breadwinner remains unemployed a year or more after the closure and family savings begin to be depleted." *Id.* at 593–94.

Finally, Congress explained that mass layoffs and plant closings have a "domino or ripple effect," citing testimony from "dozens of mayors, city managers, and other local leaders" about the public consequences of private sector disinvestment. *Id.* at 594.

### B. The Remedial Purpose of Notice

Congress did not just recognize these problems; it sought to fix them. Between 1979 and 1984, "the vast majority of workers receive[d] little or no notice of closings or layoffs." Leg. Hist. at 596.[9] That lack of notice exacerbated the problems inherent in job loss: workers did not have time to look for new jobs and/or make financial

---

[9] *See also* U.S. Gov't Acct. Office, *Dislocated Workers: Extent of Business Closures, Layoffs, and the Public and Private Response* 3 (July 1, 1986), https://bit.ly/3aq1qSI.

adjustments before the layoff, and state and local governments were unable to develop effective adjustment programs.

Accordingly, both DOL and the Congressional Office of Technology Assessment ("OTA") recommended that employers be required to provide notice. *See* Leg. Hist. at 596–97. As DOL has explained, "[a]dvance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a).[10] It also "provides for notice to State dislocated worker units so that dislocated worker assistance can be promptly provided." *Id.*; *see also* 1986 DOL Report 4 ("[T]he earliest notification possible leads to more effective delivery of public and private services to dislocated workers."). And OTA stressed the economic benefits that could accompany mandatory advance notice, estimating that the federal government could save between $257 and $384 million dollars in unemployment insurance. Leg. Hist. at 184.

Congress heeded DOL and OTA's recommendations in passing the WARN Act in 1988. A House Report on the bill that became the WARN Act explained that

---

[10] *See also Collins v. Gee West Seattle LLC*, 631 F.3d 1001, 1007 (9th Cir. 2011) (the WARN Act "is a wage workers' equivalent of business interruption insurance. It protects a worker from being told on payday that the plant is closing that afternoon and his stream of income is shut off, though he has to buy groceries for his family that weekend and make a mortgage payment the next week.").

"it is in the interest of both the health of our economy and the well being of American workers to devote significant resources to a sensible and effective worker readjustment program." Leg. Hist. at 587. It further found that "advance notification is an essential component of a successful adjustment program." *Id.* at 586.

The WARN Act similarly contains "textual indication[s]," *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (internal quotation omitted), that exemptions to that essential advance notification requirement should be construed narrowly. The WARN Act prohibits employers from "evad[ing]" the ordinary 60-day notice requirement by engaging in the sleight of hand of laying off smaller groups of people in short succession so as to not meet the threshold numerical requirement of a "mass layoff." 29 U.S.C. § 2102(d). And the Act explicitly encourages maximum notice even when not statutorily mandated: "It is the sense of Congress that an employer who is not required to comply with the notice requirements … should, to the extent possible, provide notice to its employees about a proposal to close a plant or permanently reduce its workforce." 29 U.S.C. § 2106; *see also Oil, Chem. & Atomic Workers Int'l Union v. RMI Titanium Co.*, 199 F.3d 881, 886 (6th Cir. 2000) ("WARN expressly encourages employers to notify employees before permanent layoffs are effected, whether or not the statute's triggering thresholds are met.").

Thus, the exceptions to the standard 60-day notice requirement must be

construed narrowly.

## II.    The Debtors' Response to COVID-Related Regulations Does Not Fall Within the "Natural Disaster" Exception

The Trustee argues that the "natural disaster" exception excused the Debtors from providing notice of the anticipated layoffs because they allegedly changed their going-out-of-business plans due to COVID-19 slowing down their sales and states imposing temporary regulations. Leaving aside the impropriety of accepting this defense without discovery (discussed in Part III below), it fails for two reasons: because viral pandemics are not "natural disasters" for the purposes of the WARN Act, and because neither economic downturns nor government regulation are the kind of direct cause required by the WARN Act.

### A. COVID-19 Is Not a "Natural Disaster" for Purposes of the WARN Act

In holding that COVID-19 qualifies as a "natural disaster" under the WARN Act, 29 U.S.C. § 2102(b)(2)(B), the Bankruptcy Court relied principally on the district court opinion in *Easom v. US Well Services, Inc.*, 527 F. Supp. 3d 898 (S.D. Tex. 2021). *See* Bankr. Ct. Op. at 27–28, ECF No. 10-18. After the Bankruptcy Court issued its opinion, however, the Fifth Circuit reversed *Easom*. 37 F.4th 238, 2022 WL 2136084.

The Fifth Circuit's sensible construction of the WARN Act should be followed here. Congress structured the "natural disaster" exception to apply only to disasters "such as a flood, earthquake, or … drought." 29 U.S.C. § 2102(b)(2)(B).

As the Fifth Circuit explained, these are all "hydrological, geological, and meteorological events," *Easom*, 37 F.4th 238, 2022 WL 2136084, at *4—that is, disasters that could physically affect a plant, store, or farm. Under the canons of *noscitur a sociis* and *expressio unius est exclusion*, Congress's decision to specify only disasters that could render continued operation of a facility physically impossible supports an inference that they did not intend to include other types of calamities, even if they could conceivably be considered a "natural disaster" under other definitions. *Id.* at *4.

This interpretation is particularly warranted in light of the remedial purpose discussed above. *See infra* Part I. As the Fifth Circuit said, reading the "natural disaster" exception as Defendants read it here would "expand the definition of 'natural disaster' beyond what is justified by the Act's statutory language, context, and purpose." *Easom*, 37 F.4th 238, 2022 WL 2136084, at *4.

The DOL, which Congress charged with interpreting the WARN Act, *see* 29 U.S.C. § 2107(a), has come to the same conclusion, issuing guidance explaining that layoffs related to COVID-19 should be considered under the unforeseeable business circumstance exception. *See* U.S. Dep't of Labor, *Worker Adjustment and Retraining Notifications Act Frequently Asked Questions* 2 (hereinafter "DOL COVID-19 Guidance"), https://bit.ly/3LFjN3G (last visited July 8, 2022). While this guidance document is not due controlling weight, the Court should defer to it to the

extent it has the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Moreover, as discussed more fully below, DOL, in regulations that are due deference, has interpreted the "unforeseeable business circumstances" exception— not the "natural disaster" exception—in the WARN Act to cover instances, like the one here presented, where a natural disaster causes downstream effects such as regulatory changes or economic downturns, which in turn prompt a mass layoff. *See infra* pp. 19-21.

In a footnote, the Bankruptcy Court also cited a handful of cases that found COVID-19 to fit within clauses of unrelated statutes or contracts that referred to "natural disasters." Bankr. Ct. Op. at 27 n.111. These cases have nothing to do with the WARN Act and shed no light on how Congress's commands should be interpreted. For example, one case dealt with the Pennsylvania Emergency Code, which applies to all "man-made [or] natural disaster[s]" as long as they threaten, cause, or result in "substantial damage to property, *hardship, suffering or possible loss of life*," as well as "war-caused disasters" that result in "substantial damage to property *or injury to persons in the United States*." 35 Pa. Stat. & Cons. Stat. Ann. § 7102 (West 2020) (emphasis added); *see Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 887 (Penn. 2020). Another dealt with the Pennsylvania Election Code, which grants "authority to provide relief when there is a natural disaster *or emergency*." *Penn. Democratic Party v. Boockvar*, 238 A.3d 345, 363 (Penn. 2020)

(emphasis added) (internal quotation marks omitted). These are state statutes designed to ensure the government has adequate power to respond to emergencies of any nature; they are not provisions delineating a limited exception to a remedial federal statute. They therefore shed no light on how the particular language of the WARN Act should be construed. The fact that COVID-19 may qualify as a "natural disaster" in some statutory contexts does not mean it does so in all statutory contexts.[11]

### B. To Satisfy the "Natural Disaster" Exception, Layoffs Must Be Directly Caused by the Disaster—Not by an Economic Downturn or Government Regulation

The Bankruptcy Court next stated that it need not decide whether the "natural disaster" exception requires "but for" causation or "direct" causation, because even under the "more stringent standard," "COVID-19 was an immediate cause of the March 20, 2020 layoff." Bankr. Ct. Op. at 28–29. This misunderstands the exception's causal requirement. Under the Trustee's theory, the putative *disaster*

---

[11] The other cases included in the court's footnote deal with clauses in contracts between private parties, which are even less probative here. In any event, the wording and context of those clauses similarly show an intent to sweep far broader than the WARN Act's language. *See JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F.Supp.3d 490, 496 (S.D.N.Y. 2020) (contractual provision referring to any "circumstances beyond our or your reasonable control, including, without limitation, as a result of natural disaster …"); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, C.A. No. 2020-0310-JTL, 2020 WL 7024929, at *53–54 (Del. Ch. Nov. 30, 2020) (contractual provision referring generally to "natural disasters or calamities").

was not the cause of Debtors' decision to abandon their wind-down plan; the slowdown in purchasing and subsequent state regulations were. The alleged disaster itself was at most a "but for" cause, which would not suffice under the "natural disaster" exception even if COVID-19 came within its definition. The sort of derivative consequences defendants rely upon may fit into the "unforeseen business circumstances" exception, but they are not the kind of direct causation from a natural disaster envisioned by Congress. This is confirmed by the text, structure, and purpose of the WARN Act, as well as the regulations implementing it.

### 1. The "Natural Disaster" Exception Requires Direct, Not Just But-For, Causation

The "natural disaster" exception relieves an employer of its obligation to provide any notice of a plant closing or layoff only if the closing or layoff was "due to" a natural disaster. 29 U.S.C. § 2102(b)(2)(B). As the Fifth Circuit recently explained, that statutory language requires direct, proximate causation—not merely "but-for" or attenuated causation. *See Easom*, 2022 WL 2136084, at *5–6; *see also Jones v. Scribe Opco, Inc.*, --- F. Supp. 3d ----, 2022 WL 813824, at *4–5 (M.D. Fla. Mar. 17, 2022); *Benson v. Enter. Leasing Co. of Orlando, LLC*, No. 20-cv-891, 2021 WL 1078410, at *5 (M.D. Fla. Feb. 4, 2021).

This conclusion is required by the structure and history of the WARN Act's exceptions. The "natural disaster" exception eliminates the notice requirement entirely, while the "unforeseeable business circumstances" exception still requires

that an employer give as much notice as is practicable. *See Sides v. Macon Cnty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284–85 (11th Cir. 2013) (contrasting the "no-notice" natural disaster exception with the "*some* notice" unforeseeable business circumstances exception). Whereas the "natural disaster" exception applies only if the "plant closing or mass layoff is due to" the disaster, 29 U.S.C. § 2102(b)(2)(B), the "unforeseeable business circumstances" exception applies whenever layoffs or plant closings are "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required," *id.* § 2102(b)(2)(A), such as when a layoff or plant closing stems from "an unanticipated and dramatic major economic downturn," 20 C.F.R. § 639.9(b)(1).

Reading those two statutory exceptions in tandem shows that the "natural disaster" exception requires something more than a mere showing of but-for causation, such as Defendants' claim that the pandemic led to regulations or customer aversion that in turn prompted Defendants to change their wind-down plans. Notice is likely impossible in cases of, say, a tornado destroying a plant; by contrast, notice of some kind is likely possible in cases of, say, severe weather causing a regional economic downturn that lowers demand and causes businesses to lay off employees. Recognizing this, Congress established different types of notice exceptions, excusing the directly affected plant owner of their obligation to provide notice under the "natural disaster" exception, and allowing the downstream business

to provide less than 60 days of notice, but still as much as practicable, under the "unforeseeable business circumstances" exception.

That distinction is not only reasonable, it furthers Congress's express purpose in passing the WARN Act: to ensure workers are given as much notice as is possible in the case of a layoff or plant closing. Given the requirement that WARN Act exceptions be construed narrowly, *see supra* Part I, it is the most natural reading of the statute's text.

It is also supported by the Act's legislative history. The "natural disaster" exception was proposed as an amendment to the original bill to excuse a no-notice layoff that was "due, *directly or indirectly*," to a natural disaster. *See* Leg. Hist. at 358–62 (emphasis added). As the amendment's proponent expressed: "I am offering this amendment which stipulates that plant closing notifications will not be required in cases where businesses are shut down due to natural disasters." *Id.* at 358 (statement of Sen. Dole). He went on to state that the word "indirectly" was included to clarify that the "natural disaster" exception would cover the economic hardships of "somebody who may be downstream." *Id.* at 360.

Opponents of the "indirect" language made clear, however, that such a circumstance was already covered by the exception "in connection with unforeseeable business circumstances," which made sense given that oftentimes notice "can be given" by those affected downstream of a natural disaster—even if

16

not the full 60 days. *Id.* (statement of Sen. Metzenbaum). So, it was explained, the "natural disaster" exception, which excuses *any* notice, could not be used as "a carte blanche so that anybody who claims they had some impact, however small … would not have to give notice." *Id.* at 363. The phrase "directly or indirectly" was thus struck from the amendment. *Id.*

A month later, the House included in its Report several examples of unforeseeable business circumstances that might excuse the 60-day notice requirement, including that "a natural disaster may destroy *part* of a plant." Leg. Hist. at 575 (emphasis added). That example makes clear that, in Congress's view, the existence of a natural disaster, by itself—even if it can be said to be a but-for cause of the layoff—does not mean that the "natural disaster" exception applies to completely absolve an employer of its obligations under the Act to provide notice of a layoff. Indeed, the Report listed an example of "unforeseen business circumstances" indistinguishable from what the Bankruptcy Court relied on here: where "an employer may experience a sudden, unexpected and dramatic change in business conditions such as price, cost, or declines in customer orders." *Id.* These examples demonstrate that an economic downturn—regardless of the instigating event—is covered, if at all, by the "unforeseeable business circumstances" exception. That means the "natural disaster" exception covers something different— namely, that an employer is excused from providing notice of a layoff if a natural

disaster is the proximate cause of that layoff.

Finally, even if the statute itself were ambiguous, Congress expressly authorized the Department of Labor ("DOL") to prescribe regulations carrying out the WARN Act. *See* 29 U.S.C. § 2107. The DOL has, in no uncertain terms, adopted the interpretation above. The DOL's regulations, issued after notice-and-comment rulemaking, state that "[t]o qualify for [the natural disaster] exception, an employer must be able to demonstrate that its plant closing or mass layoff is a *direct result* of a natural disaster." 20 C.F.R. § 639.9(c)(2) (emphasis added); *see* Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16,042, 16,063 (Apr. 20, 1989) (considering WARN Act's text, purpose, and legislative history). That requires proximate cause, rather than but-for causation. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 13–14 (2010) (equating "proximate" and "direct" causation); *Dixie Pine Prods. Co. v. Md. Cas. Co.*, 133 F.2d 583, 585 (5th Cir. 1943) ("It is well settled that the words 'direct cause' ordinarily are synonymous in legal intendment with 'proximate cause.'"). By contrast, as DOL explained, "[w]here a plant closing or mass layoff occurs as an *indirect result* of a natural disaster, the exception does not apply but the 'unforeseeable business circumstance' exception … may be applicable." 20 C.F.R. § 639.9(c)(4) (emphasis added). More generally, DOL required that "in ambiguous situations," employers should give notice, 20 C.F.R. § 639.1(e), codifying the rule of narrow construction.

Courts have consistently found this interpretation reasonable and deferred to it. *See Easom*, 2022 WL 2136084, at *5 (giving "controlling weight to the DOL regulation"); *Jones*, 2022 WL 813824, at *4 ("The Secretary's interpretation of the natural disaster exception is reasonable and warrants deference."); *Benson*, 2021 WL 1078410, at *5; *see also Sides*, 725 F.3d at 1284 (deferring to DOL interpretation of "unforeseeable business circumstances" exception). This Court should do so as well.

2. *Defendants Allege That Economic Downturn and Regulatory Change Directly Caused Them to Accelerate the Layoffs—Not the "Disaster" Itself*

As shown above, it is not enough to show that a natural disaster caused a change in the business environment that in turn prompted layoffs. But (assuming for the sake of argument that COVID-19 was a "natural disaster" for the purposes of the WARN Act) that is all that Defendants allege. They argue that "[t]he threat of infection, illness and death from COVID-19 made customers stay away from the [going-out-of-business sales]." Bankr. Ct. Op. at 21. This is indistinguishable from the "sudden, unexpected and dramatic change in business conditions such as … declines in customer orders" that the House Report excluded from the "natural disaster" exception. *See supra* p. 19. They argue that "various governmental authorities required citizens to stay at home or shelter in place," Bankr. Ct. Op. at 21, but the effect of a regulatory change cannot be considered the direct effect of a natural disaster.

For all these reasons, Defendants' claim to escape the WARN Act requirements must be considered under the "unforeseeable business circumstances" exception, not the "natural disaster" exception.

### III.   The WARN Act's Exceptions Are Fact-Bound Defenses That Typically Require Discovery

Finally, as Plaintiffs explain, the Bankruptcy Court erred by granting summary judgment under Federal Rule of Civil Procedure 56 without allowing Plaintiffs to take discovery under Rule 56(d). *See* Appellants' Br. at 36–38, ECF No. 11. The WARN Act's exceptions are narrow, fact-bound defenses that ask whether the circumstances to which the employer points *actually* caused the layoffs. Without an opportunity for discovery, employees have no ability to test this crucial question.

As the Bankruptcy Court recognized, once an employer comes forward with evidence that, if unrebutted, would establish a defense to a WARN Act violation, the employee must then "produce 'evidence in the record creating a genuine issue of material fact.'" Bankr. Ct. Op. at 10 (quoting *FBI Wind Down, Inc.*, 614 B.R. 460, 472 (Bankr. D. Del. 2020)). Any such evidence necessarily would have been in Debtors' possession—but the court deprived Plaintiffs of the opportunity to obtain document or deposition discovery to test the Debtors' assertions. This was error. A court cannot grant summary judgment on the ground that "Plaintiffs' proffered evidence that COVID-19 was merely a pretext for the mass layoff is tenuous," Bankr. Ct. at 23, when it denied Plaintiffs the discovery into that question to which

the Federal Rules entitle them. *See, e.g.*, *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007) ("If discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting the motion.").

## <u>CONCLUSION</u>

For the reasons discussed above, this Court should hold that the "natural disaster" exception could not justify Defendants' failure to provide statutory notice of the mass layoffs, and that the Bankruptcy Court erred by granting summary judgment without providing Plaintiffs an opportunity to receive discovery.

Dated: July 8, 2022
        Wilmington, DE

Respectfully submitted,

**THE ROSNER LAW GROUP LLC**

*/s/ Jason A. Gibson*
Jason A. Gibson (DE No. 6091)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
(302) 777-1111
gibson@teamrosner.com

and

Jeffrey Dubner (*pro hac vice* motion forthcoming)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043-4553
(202) 448-9090
jdubner@democracyforward.org

*Counsel for Amici*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with this Court's November 6, 2019 Standing Order Regarding Briefing in All Cases, because it was prepared in 14-point Times New Roman type and contains 5000 words, excluding the parts of the document exempted by Local Rule 7.1.3.

Dated: July 8, 2022

*/s/ Jason A. Gibson*
Jason A. Gibson (DE Bar No. 6091)