# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, et al.,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br>Bankr. Case No.  20-10553<br>**Joint Administration Pending** |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>　　　　　　　　　Defendants. | **Adv. Pro. No.  _____ - _____** |

## CLASS ACTION
## ADVERSARY PROCEEDING COMPLAINT FOR
## <u>VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ.</u>

Plaintiffs Todd Stewart and Jennifer Sawle ("Plaintiffs") alleges on behalf of themselves

and a putative class of similarly situated former employees of Debtor Art Van Furniture, LLC

and its affiliates (together "Debtors" or "Defendants") by way of this Class Action Adversary

Proceeding Complaint against Defendants as follows:

## <u>NATURE OF THE ACTION</u>

　　1.　　The Plaintiffs brings this action on behalf of themselves, and other similarly

---

[1]　The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

A000335

AB_0001

situated former employees who worked for Defendants and who were terminated without cause as part of, or as the result of, mass layoffs or plant closings ordered by Defendants beginning on March 4, 2020, who were not provided 60 days advance written notice of their terminations by Defendants, as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq, (the "WARN Act").

2.     Plaintiffs were terminated along with approximately 700 other similarly situated employees as part of, or as the foreseeable result of a mass layoffs or plant shutdowns ordered by Defendants.  These terminations failed to give Plaintiffs and other similarly situated employees of Defendants at least 60 days' advance notice of termination, as required by the WARN Act.  As a consequence of the violation, Plaintiffs and other similarly situated employees of Defendants seek their statutory remedies, pursuant to 29 U.S.C. § 2104.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1334, and 29 U.S.C. § 2104(a)(5).

4.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1409 and 29 U.S.C. § 2104(a)(5).

## THE PARTIES

### *Plaintiffs*

6.     Plaintiff Stewart was employed by Defendants as the Store Manager at Defendants' facility at 14055 Hall Rd. Shelby Township Michigan 48315 one of seven WARN-covered facilities (the "WARN Facilities") until his termination.

7.     Plaintiff Sawle was employed by Defendants as a salesperson at one of Defendants' WARN Facilities located at 8748 West Saginaw Highway, Lansing, Michigan until her

2

termination.

8. On March 4, 2020, Plaintiffs received a letter notifying them that terminations at the Facilities where they worked would commence on May 5, 2020 or within 14 days thereafter.

9. Plaintiffs were not terminated on May 5, 2020. Instead, on evening of March 19, 2020, Defendants abruptly notified its employees, including Plaintiffs that terminations would occur immediately for non-leader personnel and March 22, for lead personnel.

10. Plaintiff Sawle's last day of employment was March 20, 2020.

11. Plaintiff Stewart was, and other store leaders were, specifically told they would not get paid unless they continued to work through the Saturday and Sunday, March 21 and 22.

12. With the power off at the facility, Plaintiff Stewart and colleagues worked in the dark through the week carrying purchased furniture out to the cars of waiting customers.

13. Along with Plaintiffs, hundreds of other employees of Defendants who worked at, reported to, or received assignments from Defendants' Facilities were terminated on or about March 19, 2020 without advanced written notice.

### *Defendants*

14. Upon information and belief and at all relevant times, Defendant Art Van Furniture LLC is a Delaware corporation with its principal place of business located at 6500 E. 14 Mile Road, Warren, Michigan (the "Headquarters Facility") and it conducted business in this district.

15. Upon information and belief at all relevant times, Defendants owned, maintained and operated its corporate headquarters at the Headquarters Facility, and operated additional facilities as that term is defined by the WARN Act in the United States.

16. Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. Debtors do business under several brand names,

3

AB_0003

including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.

17.     The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.

18.     As of the Petition Date of March 9, 2020, Debtors operated stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19.     Upon information and belief, on March 19, 2020, Defendants terminated approximately 700 employees who worked at or reported to their WARN Facilities, and the rest of the employees who worked at non-WARN-covered stores (because they did not employee 50 full-time employees as required by the WARN Act definition of a mass layoff or plant shutdown).

20.     By late-January, 2020, Debtors had sunk into a liquidity crisis leading to a default of the Defendant's revolver facility with its lender, Wells Fargo, and some leases.  Wells Fargo agreed to forebear until February 28, 2020 conditioned on taking control of Defendant's cash and on Defendant immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by then.

21.     By January 31, 2020, the United States reported its first confirmed case of person-to-person transmission of the Wuhan coronavirus and the WHO determined that the outbreak constitutes a Public Health Emergency of International Concern.

22.     In February, 2020, KKR investigated then quickly dropped consideration of make a new money investment in Art Van.  Debtor's private equity parent THL, along with Van Eslander family, and some important suppliers formed a "Consortium."

AB_0004

23.     The Consortium proposed to infuse new capital into Art Van, but by month's end failed to secure the capital purportedly due in part to the impact of coronavirus on the equity markets during the week of February 24, 2020.

24.     According Debtors, the market drop had a "deleterious effect" on the Consortium investors' "willingness to contribute capital." (Doc. 12, Mar. 9, 2020, First Day Declaration of David Ladd.)

25.     As a result of the Consortium investors' unwillingness, Debtors began to execute on its planned liquidation.

26.     On March 5, 2020, Art Van announced its store closing sales and that it would complete the closures with six to eight weeks.

27.     That day, it informed it WARN Facility employees in a WARN notice that they would be retained and paid through May 5th and terminated then or within 14 days thereafter, whether there was work for them or not.  Their benefits including health coverage would be maintained until their termination.

28.     The Debtors' March 5, 2020 WARN notice did not condition the 60 days' of pay and benefits on any contingency.  It did not mention coronavirus or any factor that could reduce the 60-day period of anticipated employment.

29.     By March 8, 2020, at least eight states had declared a State of Emergency due to coronavirus.

30.     On March 9, 2020, Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. Joint administration of those cases is pending.

## FEDERAL WARN ACT CLASS ALLEGATIONS

31.     Plaintiffs bring this Claim for Relief for violation of 29 U.S.C. § 2101 et seq., on

A000339
AB_0005

behalf of himself and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from Defendants' Facilities and were terminated without cause beginning on or about March 19, 2020, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020 and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

32. The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

33. Upon information and belief, Defendants employed more than 100 full-time employees who worked at or reported to the Facilities.

34. On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants.

35. On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of Defendants.

36. Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a) whether the members of the WARN Class were employees of the Defendants who worked at or reported to Defendants' Facilities;

A000340
AB_0006

(b)     whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)     whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

37.     Plaintiffs' claims are typical of those of the WARN Class.  Plaintiffs, like other WARN Class members, worked at or reported to Defendants' Facilities and was terminated beginning on or about March 19, 2020, due to the mass layoff and/or plant closing ordered by Defendants.

38.     Plaintiffs will fairly and adequately protect the interests of the WARN Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

39.     On or about March 19, 2020, Plaintiffs were terminated by Defendants.  These terminations were part of mass layoffs or plant closings as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to receive 60 days advance written notice under the WARN Act.

40.     Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate Defendants, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

7

A000341
AB_0007

41.     Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

42.     Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

## CLAIM FOR RELIEF

### Violation of the Federal WARN Act

43.     Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

44.     At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

45.     At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a) and continued to operate as a business until it decided to order mass layoffs or plant closings at the Facilities.

46.     At all relevant times, Plaintiffs and the other similarly situated former employees were employees of Defendants as that term is used in 29 U.S.C. §2101.

47.     On or about March 19, 2020, the Defendants ordered mass layoffs or plant closings at the Facilities, as that term is defined by 29 U.S.C. § 210l(a)(2).

48.     The mass layoffs or plant closings at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well

8

as thirty–three percent of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2l01(a)(8).

49.     Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants at the Facilities.

50.     Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

51.     Defendants were required by the WARN Act to give Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

52.     Defendants failed to give Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

53.     Plaintiffs and each of the Class Members are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

54.     Defendants failed to pay Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, health and life insurance premiums, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to provide employee benefits including health insurance, for 60 days from and after the dates of their respective terminations.

55.     The relief sought in this proceeding is predominately equitable in nature.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated persons, prays for the following relief as against Defendants:

A.      Certification of this action as a class action;

A000343
AB_0009

B.      Designation of Plaintiffs as Class Representatives;

C.      Appointment of the undersigned attorneys as Class Counsel;

D.      A judgment in favor of the Plaintiffs and each of the affected employees equal to the sum of: their unpaid wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits, for up to 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period all determined in accordance with the federal WARN Act, 29 U.S.C. §2104(a)(1)(A);

E.      Allowance of all damages as first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) or, alternatively wage priority status pursuant to 11 U.S.C. § 507(a)(4) and (5) up to $13,650, and the remainder as a general unsecured claim;

F.      Reasonable attorneys' fees and the costs and disbursements that Plaintiffs will incur in prosecuting this action, as authorized by the federal WARN Act, 29 U.S.C. § 2104(a)(6);

G.      Interest as allowed by law on the amounts owed under the preceding paragraphs; and

H.      Such other and further relief as this Court may deem just and proper.

*[Signature Page to Follow]*

10

A000344
AB_00010

Dated: March 23, 2020

           Respectfully submitted,

           */s/ Michael Joyce*
           Michael J. Joyce (No. 4563)
           THE LAW OFFICES OF JOYCE, LLC
           1225 King Street
           Suite 800
           Wilmington, DE 19801
           (302)-388-1944
           Email: mjoyce@mjlawoffices.com

           -and-

           OF COUNSEL:

           Jack A. Raisner
           René S. Roupinian
           RAISNER ROUPINIAN LLP
           500 Fifth Avenue, Suite 1600
           New York, New York 10110
           Telephone: (212) 221-1747
           Facsimile: (212) 221-1747
           Email: rsr@raisnerroupinian.com
           Email: jar@raisnerroupinian.com

           *Attorneys for the and the putative class*
           *Plaintiffs*

A000345
AB_00011

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC, *et al.*,[1] | Case No. 20-10553 (CSS) |
| Debtors. | (Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Adv. Proc. No. 20-50548 (CSS) |
| vs. | |
| ART VAN FURNITURE, LLC, *et al.*, | |
| Defendants. | |

## CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, made applicable herein by Federal Rule of Bankruptcy Procedure 7056, Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee") to Art Van Furniture, LLC, Sam Levin, Inc. and related debtors, hereby moves for summary judgment in his favor and against Plaintiffs. In support of this motion, the Trustee relies on the record in the adversary proceeding, the concurrently-filed declaration of Bradford Sandler (including all exhibits thereto), the concurrently-filed *Memorandum in Support of Chapter 7 Trustee's Motion*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

*for Summary Judgment*, and such additional facts and law as this Court may consider through judicial notice or otherwise.

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in his favor and against Plaintiffs and grant such other and further relief that may be appropriate or just.

Respectfully Submitted,

Dated: November 12, 2021
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Bradford Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:   bsandler@pszjlaw.com
            blevine@pszjlaw.com
            crobinson@pszjlaw.com
            pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

A000389
AB_00013

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, *et al.*,[1]<br><br>             Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>(Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on<br>behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br><br>        vs.<br><br>ART VAN FURNITURE, LLC, *et al.*,<br><br>             Defendants. | Adv. Proc. No. 20-50548 (CSS) |

## MEMORANDUM IN SUPPORT OF
## CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (DE Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:    bsandler@pszjlaw.com
           blevine@pszjlaw.com
           crobinson@pszjlaw.com
           pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

---

[1]  The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVCE, LLC (2509); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    STATEMENT OF NATURE AND STATUS OF PROCEEDING ....................................1

II.    SUMMARY OF ARGUMENT ................................................................1

III.    STATEMENT OF MATERIAL FACTS TO
WHICH THERE IS NO GENUINE DISPUTE....................................................4

     A.      General Background ..................................................................4

     B.      The Planned Liquidation Process.............................................5

     C.      The Chapter 11 Cases ...............................................................8

     D.      The Rapid Escalation of the COVID-19 Pandemic ...............9

     E.      The Plaintiffs' Termination and the Conversion to Chapter 7..............11

     F.      The Adversary Proceeding......................................................15

IV.    ARGUMENT ..................................................................................15

     A.      Summary Judgment Standard .................................................16

     B.      The WARN Act .......................................................................17

     C.      There is No Genuine Dispute That AVF Was a Liquidating Fiduciary At
the Time of the Layoff and Not Subject to the WARN Act ...................17

     D.      The Governmental Mandated "Shelter in Place" and "Stay at Home"
Orders Were "Not Reasonably Foreseeable" and Thus, the Debtors Were
Not Subject to the Notice Provisions of the WARN Act......................20

     E.      If the WARN Act Is Applicable, Which It is Not, the Debtors Were Not
Required to Provide Any Notice Because the Layoff Was Due to the
COVID-19 Pandemic -- a "Natural Disaster" For Purposes of the WARN
Act...........................................................................................23

V.    CONCLUSION...............................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>CASES</u>

*In re AE Liquidation, Inc.*
   522 B.R. 62 (Bankr. D. Del. 2014) ........................................................................ 21
*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242, 248 (1986) ...................................................................................... 16
*Bailey v. Jamesway*
   1997 Bankr. LEXIS 825 (Bankr. S.D.N.Y. 1997) .................................................. 19
*Benson v. Enter. Leasing Co. of Orlando*, LLC
   2021 U.S. Dist. LEXIS 55137 (D. M.D. Fla. Feb. 4, 2021) .................................. 26
*Bostock v. Clayton Cty., Ga.*
   140 S. Ct. 1731 (2020) .......................................................................................... 26
*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) .............................................................................................. 16
*Czyzewksi v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*
   496 B.R. 151 (Bankr. D. Del. 2013) (Hon. B. Shannon) ...................................... 21
*Easom v. US Well Servs*
   2021 U.S. Dist. LEXIS 52941 (S.D. Tex. March 22, 2021) ....................... 22, 23, 26
*In Friends of Danny DeVito v. Wolf*
   227 A.3d 872 (Pa. 2020), *cert. denied*, 141 S. Ct. 239 (2020) .............................. 25
*Hotel Employees & Restaurant Employees International Union Local 54 v. Elsinore Shore*
   *Associates* 173 F.3d 175 (3d Cir. 1999).................................................................. 21
*Ieradi v. Mylan Labs., Inc.*
   230 F.3d 594 (3d Cir. 2000)................................................................................... 10
*JN Contemporary Art, LLC v. Phillips Auctioneers LLC*
   2020 U.S. Dist. LEXIS 237085 (S.D.N.Y. Dec. 16, 2020) .................................... 25
*Kasten v. Saint-Gobain Performance Plastics Corp.*
   563 U.S. 1 (2011)................................................................................................... 23
*Matias v. Terrapin House, Inc.*
   2021 U.S. Dist. LEXIS 176094 (E.D. Pa. Sept. 16, 2021) .................................... 10
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
   475 U.S. 574 (1986)............................................................................................... 16
*Montemayor v. City of San Antonio*
   276 F.3d 687 (5th Cir. 2001) ................................................................................. 17
*Pennsylvania Democratic Party v. Boockvar*
   238 A.3d 345 (Pa. 2020)........................................................................................ 25
*Reeves v. Sanderson Plumbing Prods., Inc.*
   530 U.S. 133, 120 S. Ct. 2097 (2000).................................................................... 16
*Scully v. Allegheny Ludlum Corp.*
   2006 U.S. Dist. LEXIS 105589 (W.D. Pa. Feb. 10, 2006) .................................... 10
*In re United Healthcare System, Inc.*
   200 F.3d 170 (3d Cir. 1999), *cert denied*, 530 U.S. 1204 (2000)................. 17, 18, 19

AB_00016

**Page(s)**

**CASES** (continued)

*Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*
    481 B.R. 268 (Bankr. S.D. N.Y. 2012) ........................................................................ 18
*U.S. ex rel. Anderson v. N. Telecom, Inc.*
    52 F.3d 810 (9th Cir. 1995) (quoting *Celotex*, 477 U.S. at 327) ............................. 16
*United States v. Kindred Healthcare, Inc.*
    469 F.Supp.3d 431 (E.D. Pa. 2020) .......................................................................... 10
*United States v. Petway*
    2020 U.S. Dist. LEXIS 82954 (D.N.J. May 11, 2020) ............................................. 10
*Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*
    866 F.3d 515 (3d Cir. 2017) ....................................................................................... 21
*Walsh v. Century City Doctors Hosp., LLC*
    *(In re Century City Doctors Hosp., LLC)*
    417 B.R. 801 (Bankr. C.D. Cal. 2009) ...................................................................... 18


**OTHER AUTHORITIES**

20 C.F.R. § 639.9 ................................................................................................................. 17
20 C.F.R. § 639.9(c) ........................................................................................................... 23
29 U.S.C. § 2101 .................................................................................................. 3, 7, 13, 15
29 U.S.C. § 2101(a)(1) ........................................................................................................ 17
29 U.S.C. § 2102 ................................................................................................................. 17
29 U.S.C. § 2102(a) ............................................................................................................ 17
29 U.S.C. § 2102(b)(2)(A) ............................................................................................ 15, 20
29 U.S.C. § 2102(b)(2)(B) ........................................................................................ 3, 15, 23
29 U.S.C. § 2102 ................................................................................................................. 17
29 U.S.C.§ 2102(b)(2)(A) ..................................................................................................... 3
29 U.S.C. § 2104 ................................................................................................................. 17
Fed. R. Civ. P. 56(a) ........................................................................................................... 16
Fed.R.Evid. 201 .................................................................................................................. 10
Fed.R.Evid. 201(b) .............................................................................................................. 10

AB_00017

Alfred T. Giuliano, Chapter 7 Trustee (the "Trustee") to Art Van Furniture, LLC ("AVF"), Sam Levin, Inc. ("SLI") and related debtors (collectively, the "Debtors" or "Art Van") submits this memorandum of law, together with the declaration of Bradford Sandler (the "Sandler Declaration"), in support of his motion for summary judgment (the "Motion").

## I. STATEMENT OF NATURE AND STATUS OF PROCEEDING

1.       The Debtors commenced their chapter 11 bankruptcy cases on March 8, 2020. Upon the Debtors' motion, the chapter 11 cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020.

2.       On March 23, 2020, Plaintiffs initiated this adversary proceeding by filing their *Class Action Adversary Proceeding Complaint For Violation of WARN Act 29 U.S.C. § 2101, et seq.* in which they assert that the Debtors violated the WARN Act and seek, *inter alia*, judgment in favor of Plaintiffs and other similarly situated former employees for unpaid wages and other benefits and damages for up to 60 days that would have been otherwise paid.

3.       The Trustee filed an Answer on December 10, 2020, and in accordance with the Pretrial Scheduling Order, on October 29, 2021, the Trustee filed his First Amended Answer.

## II. SUMMARY OF ARGUMENT[1]

4.       This case arises out of AVF's termination of Todd Stewart and Jennifer Sawle ("Plaintiffs") on March 20, 2020, as part of the cessation of the Debtors' business caused by the COVID-19 global pandemic.

5.       Notwithstanding that the Debtors were liquidating their business prior to filing for bankruptcy on March 8, 2020 (the "Petition Date"), the Plaintiffs are seeking WARN Act damages

---

[1] Capitalized terms used but not defined in this Summary of Argument have the meanings ascribed to them in the balance of this brief, and all facts adverted to herein are supported by record citations in the balance of this brief.

AB_00018

because they were terminated as a result of the global COVID-19 pandemic. There are no genuine issues of material fact, and the Plaintiffs ignore a critical piece of information in their complaint that has enormous legal implications for their allegations: prior to the Petition Date (and prior to March 20, 2020), the Debtors had already started an orderly wind-down plan, comprised of going-out-of-business ("GOB") sales (commenced pre-petition) and an anticipated sale of the SLI stores to a third party buyer, Robert Levin, who previously owned those SLI stores. *See* Complaint, attached as **Exhibit Y** to Sandler Declaration, at ¶ 25 (pre-petition, "Debtors began to execute on its planned liquidation."). Indeed, on March 5, 2020, Art Van had publicly announced that it was liquidating and going out of business, and in an abundance of caution, had provided a WARN Act notification to its employees that their employment would terminate on May 5, 2020. That, of course, was before the global economy shut down as a result of the COVID-19 pandemic.

6.      The Debtors then filed their Chapter 11 Cases on March 8, 2020, to further implement and facilitate their Planned Liquidation Process which was designed to liquidate their assets and pay down their secured creditors, which were owed in excess of $200 million.

7.      However, by mid-March 2020, the world economy had changed drastically, as the COVID-19 pandemic surged and governmental authorities started to issue extensive business restrictions by imposing business shutdowns and "stay at home" orders. In this unprecedented, unforeseeable situation, on March 19, 2020 (the day that the Governor of Pennsylvania ordered the closure of all non-essential businesses), the Debtors were forced to shut down their retail operations. With no revenue being generated, the Debtors abandoned their orderly liquidation plan and terminated all retail employees, including the Plaintiffs.

8.      Within a few days of their termination, on March 23, 2020, Plaintiffs brought this action alleging violations of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §

2101 *et seq.* (the "WARN Act") on behalf of themselves and a purported class of former employees.

9.      As set forth below, Plaintiffs are not entitled to WARN Act damages[2] because:

(i)      AVF was not an "employer" under the WARN Act on March 20, 2020. It was a "liquidating fiduciary" which is not subject to the WARN Act's notice requirements.

(ii)      Assuming *arguendo* AVF was subject to the WARN Act, which it was not for reasons discussed below, pursuant to 29 U.S.C.§ 2102(b)(2)(A) (the "unforeseeable business circumstances exception"), AVF is not liable to Plaintiffs because the Debtors' inability to conduct the GOB Sales and other parts of the Planned Liquidation Process due to the unprecedented government-ordered business closures (or threatened closures) and the government-ordered requirement of citizens to shelter in place or stay at home, together, constituted a business circumstance that was not reasonably foreseeable on January 18, 2020, when AVF would have had to give notice of the March 20, 2020 terminations.[3]

(iii)      Assuming *arguendo* AVF was subject to the WARN Act, which it is not, pursuant to 29 U.S.C. § 2102(b)(2)(B) (the "natural disaster exception"), it is not liable to Plaintiffs because the Plaintiffs' termination was caused by COVID-19, and COVID-19 is a "natural disaster."

---

[2] The Trustee reserves his rights to assert any and all additional defenses to liability including, but not limited to, opposing priority or administrative treatment of any claim under the WARN Act.

[3] All of the Debtors' employees worked for either AVF or SLI. Plaintiffs both worked for AVF, but all of the arguments set forth herein would apply equally to claims brought by former employees of SLI. While AVF and SLI are not subject to WARN Act liability for the reasons discussed herein, Defendants AVF Holding Company, Inc., AVCE, LLC, AVF Holdings I, LLC, AVF Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc., and Comfort Mattress LLC are also not subject to WARN Act liability because they did not have any employees, and were not, therefore, "employers" under the WARN Act.

AB_00020

10.     As set forth below, the foregoing legal conclusions that mandate summary judgment are based on facts as to which there is no genuine dispute.

### III.  STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE DISPUTE

**A.     General Background**

11.     On March 8, 2020 (the "<u>Petition Date</u>"), the Debtors commenced their respective voluntary cases under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>").  The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS).

12.     Upon the Debtors' motion (the "<u>Conversion Motion</u>"), based on the facts and circumstances described further below, less than a month after the Petition Date, on April 6, 2020, the Chapter 11 Cases were converted to chapter 7 proceedings (the "<u>Cases</u>").

13.     Prior to the Petition Date, the Debtors had sold furniture for over 60 years, with 169 stores in Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, and approximately 4,500 employees.[4]

14.     The Debtors filed the Chapter 11 Cases with the intention of winding down their affairs by liquidating their inventory through store closing sales (the "<u>GOB Sales</u>"), paying down their secured debt, and using any remaining proceeds of their GOB Sales to wind-down their operations.[5]  As of the Petition Date, the Debtors were party to a binding letter of intent for a sale of 44 Levin and Wolf stores and related assets and operations (the "<u>Levin Sale</u>") to a third party buyer. The GOB Sales, the Levin Sale, and other actions taken by the Debtors in the Chapter 11

---

[4] *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Bankr. Doc. 12] ("<u>Ladd Declaration</u>") at 2. A copy of the Ladd Declaration is **Exhibit A** to the Sandler Declaration.

[5] Ladd Declaration at ¶¶ 6 & 18.

AB_00021

Cases were all part of the orderly liquidation and wind-down planned by the Debtors prior to and as of the Petition Date (the "Planned Liquidation Process") in order to maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors. [6]

**B.      The Planned Liquidation Process**

15.      In the months leading up to the Petition Date, Art Van was struggling under the weight of poor sales and $208.5 million in secured debt encumbering substantially all of its assets: (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan (the "Term Loan") from FS KKR Capital Corp. (the "Term Lenders" and together with Wells Fargo, the "Secured Lenders").[7] Art Van had defaulted on the ABL Loan on February 5, 2020 and had only been able to obtain a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the business.  As a condition to the forbearance, Wells Fargo insisted that the Debtors begin to prepare for going-out-of-business (GOB) sales. [8]

16.      In spite of the Debtors' efforts over the next 23 days in February 2020, by February 28, 2020, the Debtors were unable to secure financing or attract a going concern buyer.[9]  The forbearance period ended on that date, and the Debtors had no alternative but to pursue an orderly wind-down of their operations and liquidation of their assets.[10] To that end, prior to the Petition Date, the Debtors negotiated a wind-down budget with Wells Fargo ("Wind-Down Budget"), hired

---

[6] Ladd Declaration at ¶¶ 6, 16, 17, 18, 19, 20, 40, 41, 42 & 43.

[7] *See* Ladd Declaration at ¶¶ 7, 8, 13, 14, 16, 17, 18, 31-36.

[8] *See* Ladd Declaration at ¶¶ 14 & 36.

[9] *See* Transcript of March 10, 2020 hearing at p. 55, line 25 to 57, line 20; Ladd Declaration at ¶¶ 14-15.  A copy of the March 10, 2020 Transcript is **Exhibit B** to the Sandler Declaration.

[10] *See* Ladd Declaration at ¶¶ 16-18.

a liquidator, and announced publicly that after decades in business they were going out of business.[11]

17.     As part of the Planned Liquidation Process, on March 4, 2020, SLI entered into a letter agreement (the "Levin LOI") pursuant to which it agreed to sell 44 stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") to Robert Levin (the "Levin Sale").[12]  The Levin Sale was expected to be approved in bankruptcy and consummated in or about early April 2020.  The Debtors believed that the buyer would keep the 44 stores operating and thereby preserve approximately 1,000 jobs.[13]

18.     The Levin LOI contemplated that the Levin Sale stores would briefly continue operating pending the closing of the Levin Sale.[14]  Because the Debtors had no money to operate these stores (they only had the money that Wells Fargo had agreed to let them use to conduct the GOB Sales), Robert Levin agreed to extend $10 million of debtor-in-possession (DIP) financing to SLI (the "Levin DIP Loan") to the Debtors to facilitate the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale.[15]

---

[11] *See* Ladd Declaration at ¶¶ 16-18; *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 93] (the "Interim CC Order") at 13.  A copy of the Interim CC Order is **Exhibit C** to the Sandler Declaration.  On March 5, 2020, the Debtors entered into an agreement (the "Consulting Agreement") with HilcoMerchant Resources, LLC (the "Liquidator").  *See* Interim CC Order at 12.  *See also* "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html ("Art Van GOB Press Release") (attached as **Exhibit D** to Sandler Declaration).

[12] Robert Levin had owned the stores that were the subject of the Levin LOI prior to them being sold to the Debtors.

[13] *See* Ladd Declaration at ¶¶ 19-20 & 40-42.

[14] *See* Ladd Declaration at ¶¶ 40-41.  *See also Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Bankr. Doc. 49] ("Levin DIP Motion") (attached as **Exhibit E** to Sandler Declaration).

[15] *See* Levin DIP Motion; *Interim Order* on Levin DIP Motion [Bankr. Doc. 137] ("Interim Levin DIP Order") (attached as **Exhibit F** to Sandler Declaration).

19.     In sum, as of March 5, 2020, the Debtors had an orderly wind-down plan, comprised of the GOB Sales to liquidate AVF's assets including 125 stores and the Levin Sale to liquidate the SLI Assets.

20.     On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business.[16]  Indeed, plaintiffs have acknowledged and admitted that the Debtors began their liquidation plan at this time.  *See* Complaint (attached as **Exhibit Y** to Sandler Declaration) at ¶ 25 ("… Debtors began to execute on its planned liquidation.").

21.     On March 5, 2020, as part of its Planned Liquidation Process, although not required, AVF issued a WARN Act notice to approximately 1,400 potentially "affected employees" who worked in or reported to seven facilities in Michigan, two facilities in Illinois and one in Pennsylvania.  Each of the Plaintiffs worked at an affected location in Michigan and were notified as follows:

> Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

> The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

> All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

---

[16] *See* Art Van GOB Press Release (attached as **Exhibit D** to Sandler Declaration).

AB_00024

You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "GOB Sale WARN Notice").[17]

22. The Debtors' target date to end the GOB Sales was the end of April 2020.[18] The GOB Sales commenced as expected, and went well at first. From March 5, 2020 through March 8, 2020, deposits from inventory sales were in excess of $23 million.[19]

## C. The Chapter 11 Cases

23. On March 8, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases and filed "first day motions" to obtain approval of, *inter alia*, the Wind-Down Budget,[20] the Levin DIP,[21] and GOB Sales and the Consulting Agreement with the Liquidator.[22] First day hearings were held on March 10, 2020. While there was an extensive discussion of the GOB Sales at the first day hearing, there was no discussion by the Court and other parties of COVID-19 and the effects thereof, including any potential government-mandated shut downs and extensive business restrictions.[23]

---

[17] A copy of the GOB Sale WARN Notice is **Exhibit G** to the Sandler Declaration.

[18] *See* Ladd Declaration at ¶ 18 (Debtors seeking to complete store closure sales in six to eight weeks from March 5, 2020).

[19] *Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* [Bankr. Doc. 252] (the "Conversion Motion") at ¶ 22. A copy of the Conversion Motion is **Exhibit H** to the Sandler Declaration.

[20] *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. Doc. 5] (attached as **Exhibit I** to Sandler Declaration).

[21] *See* Levin DIP Motion (**Exhibit E** to Sandler Declaration); Interim Levin DIP Order (**Exhibit F** to Sandler Declaration).

[22] *See Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* [Bankr. Doc. 52] (attached as **Exhibit J** to Sandler Declaration).

[23] *See* Transcript from March 10, 2020 Hearing (attached as **Exhibit B** to Sandler Declaration).

24.     On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order, authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales.  The Wind-Down Budget assumed that the GOB Sales would continue unabated through April 30, 2020, and provided that the "the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis" is a default, and thus, the Debtors continued their ongoing GOB sales.[24]

25.     Art Van continued the hearing on its first day motions to March 12, 2020.  The Bankruptcy Court apologized for taking the bench 40 minutes late, saying, "I very much apologize. As I'm sure you all are aware, things are developing very quickly.  It is taking a lot of my time."[25] The Bankruptcy Court and the U.S. Trustee expressed concerns about the fee in the Liquidator's Consulting Agreement and continued that portion of the Debtors' GOB sale motion to March 20, 2020.  Other than the Bankruptcy Court's comments at the beginning of the hearing, however, there was no mention by the parties at the March 12, 2020 hearing of COVID-19 or the possibility that the GOB Sales might not be able to continue.

**D.      The Rapid Escalation of the COVID-19 Pandemic**

26.     The unprecedented, extraordinary circumstances caused by the COVID-19 pandemic confronting the Debtors during the period March 8, 2020 (the Petition Date) and March 19, 2020 (the day of the COVID WARN Notice, as discussed below) are a matter of public

---

[24] Interim CC Order at pp. 34-35.

[25] Transcript of March 12, 2020 Hearings at p. 5, lines 5-7. A copy of the transcript from the March 12, 2020 Hearing is at **Exhibit K** of the Sandler Declaration.

AB_00026

record.[26] On March 13, 2020, then-President Donald Trump declared a national emergency.[27] By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[28] Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …." [29]

27.     Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan -- where the Debtors' headquarters, their main distribution center the size of 14 football fields, and 82 of their stores are located -- entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[30] Governor Whitmer urged Michigan residents to "mak[e] smart choices"

---

[26] This Court can take judicial notice of online publications of federal and state governmental authorities and online newspaper articles and other publications pursuant to Fed.R.Evid. 201(b) and to evaluate what information is in the "public realm." *See, e.g., Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, n.2 (3d Cir. 2000) (court taking judicial notice of *New York Times* article; citations omitted); *Scully v. Allegheny Ludlum Corp.*, 2006 U.S. Dist. LEXIS 105589, at n.3 (W.D. Pa. Feb. 10, 2006) (court taking judicial notice of a newspaper article for company related statistics pursuant to Fed.R.Evid. 201(b); citation omitted); *United States v. Petway*, 2020 U.S. Dist. LEXIS 82954, at *6 (D.N.J. May 11, 2020) ("the Court takes judicial notice of the world-wide pandemic that is continuing to unfold and impact all of us" under Fed.R.Evid. 201; "The federal government and State of New Jersey have declared emergencies. Public health officials have attributed the pandemic to a novel corona virus spreading from person to person. COVID-19 'poses a serious public health risk.' (footnotes and citations including citations to CDC publications omitted)); *United States v. Kindred Healthcare, Inc.*, 469 F.Supp.3d 431, n.3 (E.D. Pa. 2020) (taking judicial notice of court filings and news reports to evaluate "what was in the public realm" at a given time; citations omitted); *Matias v. Terrapin House, Inc.*, 2021 U.S. Dist. LEXIS 176094, at n.4 (E.D. Pa. Sept. 16, 2021) (taking judicial notice of COVID-19 related facts in CDC publications available on its website).

[27] *Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, dated March 13, 2020 (85 F.R 15337 (March 13, 2020)), available at https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf (attached as **Exhibit L** to Sandler Declaration).

[28] *Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/ (attached as **Exhibit M** to Sandler Declaration).

[29] *All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19*, March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/ (attached as **Exhibit N** to Sandler Declaration).

[30] *Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at

AB_00027

by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary." [31]

28.     On March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations were located to issue a "stay at home" or "shelter in place" type order.  Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.[32]

29.     Further, on March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction, and thus, the stores covered by the Levin Sale would also have to be immediately closed by the Debtors.[33]

## E.    The Plaintiffs' Termination and the Conversion to Chapter 7

30.     Notwithstanding the careful planning of the Debtors and their advisors, as a result of the COVID-19 pandemic and resultant shutdowns, shortly after the Petition Date, the Debtors' situation changed drastically upending the Debtors' plans for an orderly liquidation.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date.  Specifically, during the initial days of the GOB Sales

---

https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html (attached as **Exhibit O** to Sandler Declaration).

[31] *Id.*

[32] Pennsylvania: Gov. Tom Wolf, Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (attached as **Exhibit P** to Sandler Declaration); Michigan: Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html (attached as **Exhibit Q** to Sandler Declaration); Ohio: Dir. of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf (attached as **Exhibit R** to Sandler Declaration); and Illinois: Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf (attached as **Exhibit S** to Sandler Declaration).

[33] Conversion Motion at ¶ 26.

AB_00028

from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million,[34] suggesting, among other things, a precipitous drop in customer traffic in the Debtors' stores.

31.     Ultimately, the restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease (discussed in greater detail below) mandated that the Debtors discontinue all retail operations and other non-essential business operations – a scenario they had not and could not have planned for when they developed their Planned Liquidation Process.[35]

32.     Soon thereafter, the Debtors' management, with their professionals' counsel and assistance, determined that the Planned Liquidation Process, in its then-form, was no longer viable and that a more immediate shutdown of the Debtors' stores and remaining support operations was in the estates' and creditors' best interest.[36] Thus, on March 19, 2020, the Debtors made the painful decision to suspend all sales operations in all stores and terminate the majority of their employees, excluding workers who would be needed for the rest of the liquidation and wind-down process.[37]

33.     Accordingly, on March 19, 2020, AVF issued a WARN Act notice to employees which stated:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste

---

[34] Conversion Motion at ¶ 22.

[35] Conversion Motion at ¶¶ 1-2.

[36] Conversion Motion at ¶¶ 1-2.

[37] Conversion Motion at ¶ 25.

AB_00029

B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

***Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").***

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "COVID WARN Notice") (emphasis added).[38]

34.     Plaintiffs Todd Stewart and Jennifer Sawle were two of AVF's employees, and each worked at one of AVF's 82 stores in the State of Michigan (where AVF also had it main trucking terminal, its corporate headquarters and a distribution center). Mr. Stewart was a store manager at an AVF Store in Shelby Township, Michigan; and Ms. Sawle was a salesperson at an AVF Store in Lansing, Michigan. In accordance with the COVID WARN Notice, the Trustee believes that Mr. Stewart and Ms. Sawle were both terminated by AVF, as were most of AVF's and SLI's employees, on March 20, 2022 (the "Layoff").[39]

---

[38] A copy of the COVID WARN Notice is at **Exhibit T** to the Sandler Declaration.

[39] Complaint (attached as **Exhibit Y** to Sandler Declaration) at ¶¶ 6, 7, 10.

35.     During a March 19, 2020 status conference, Debtors' counsel advised the Bankruptcy Court of the store closures.[40]  Judge Sontchi stated on the record at a later related hearing:

> This is an unfortunate situation. It is nobody's fault. It is nobody's fault. I know many people in my local business community who are good business people who have great businesses who are staring down the barrel of a gun based on what's happened. It's just—it's extraordinary. And I'm not casting aspersions on anyone, but obviously this case changed dramatically, as did the whole world—well not the whole world but as to the United States in the last three weeks, three or four weeks.[41]

36.     Wells Fargo declared a default under the Interim CC Order, and terminated use of cash collateral as of March 24, 2020; later extended through March 31 and finally April 6.[42] Unable to continue the Chapter 11 Cases without the continued consent of the Debtors' secured lenders to use their cash collateral, the Debtors filed the Conversion Motion and the Chapter 11 Cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020.[43]  In ruling on the Conversion Motion, Judge Sontchi stated:

> This case is very unfortunate.  It's really been a parade of unfortunate events that has kind of conspired to put a long-standing, solid business into liquidation.  And, as I sit here today, I certainly don't have enough information to blame anyone or anything other than the coronavirus and the disaster it has left in its wake.[44]

---

[40] *See* Transcript of March 19, 2020 Hearing at 10, line 8 to 11, line 1.  A copy of the Transcript of the March 19, 2020 Hearing is at **Exhibit U** to the Sandler Declaration.

[41] Transcript of March 31, 2020 Hearing at 47, line 24 to 48, line 7.  A copy of the Transcript of the March 31, 2020 Hearing is at **Exhibit V** of the Sandler Declaration.

[42] Conversion Motion at ¶ 27.

[43] *See* Order Granting Debtor's Amended Motion to Convert [Bankr. Doc. 263] ("Conversion Order') (attached as **Exhibit W** to Sandler Declaration).

[44] *See* Transcript of April 6, 2020 Hearing at 28, line 24 to p. 29, line 5.  A copy of the Transcript from the April 6, 2020 Hearing is **Exhibit X** to the Sandler Declaration.

AB_00031

37.     Upon the conversion, Alfred Giuliano was appointed as the chapter 7 trustee [Bankr. Doc. 264].

## F.     The Adversary Proceeding

38.     On March 23, 2020, Plaintiffs initiated the adversary proceeding (the "Adversary Proceeding") by filing their *Class Action Adversary Proceeding Complaint For Violation of Warn Act 29 U.S.C. § 2101, et seq.* [Adv. Docket No. 1] (the "Complaint") in which they assert that the Debtors violated the WARN Act and seek, *inter alia*, judgment in favor of Plaintiffs and other similarly situated former employees for unpaid wages and other benefits and damages for up to 60 days that would have been otherwise paid, all determined in accordance with the WARN Act.

39.     The Trustee filed an Answer on December 10, 2020 [Adv. Docket No. 25], and in accordance with the Pretrial Scheduling Order [Adv. Docket No. 31], on October 29, 2021, the Trustee filed his First Amended Answer [Adv. Docket No. 40].

## IV.  ARGUMENT

40.     This Court should grant summary judgment to the Trustee because, as discussed below the Debtors are not subject to WARN Act liability because: (1) on the date of the Layoff, AVF and SLI were not "employers," but rather "liquidating fiduciaries" to whom the WARN Act's notice requirements do not apply under controlling Third Circuit precedent (as discussed below); (2) even if the Debtors were subject to the WARN Act as of the date of the Layoff, which they were not, they are subject to the unforeseeable business circumstances exception set forth in in 29 U.S.C. § 2102(b)(2)(A) because of their inability to conduct their Court-approved post-petition GOB Sales as a result of COVID-19 and the unprecedented governmental issuance of orders requiring businesses to shut down and people to shelter in place; and (3) assuming *arguendo* the Debtors were subject to the WARN Act as of the date of the Layoff, which they were not, they are subject to the natural disaster exception set forth in 29 U.S.C. § 2102(b)(2)(B) because the Layoff

AB_00032

was clearly and unequivocally caused by COVID-19, a natural disaster.

**A.      Summary Judgment Standard**

41.      Summary judgment should be granted "if the movant shows that there is no ***genuine*** dispute as to any ***material*** fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added).  A fact is "material" if, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party.  *Id*.

42.      The movant "bears the initial responsibility of informing the … court of the basis for its motion" and identifying what "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party carries this burden, the "party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 256.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is properly granted.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

43.      Summary judgment is "'not a disfavored procedural shortcut,' but [rather is] the 'principal tool by which factually insufficient claims or defenses can be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources.'" *U.S. ex rel. Anderson v. N. Telecom, Inc*., 52 F.3d 810, 815 (9th Cir. 1995) (quoting *Celotex*, 477 U.S. at 327).    While the Court may not make credibility determinations or weigh the evidence, pursuant to *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097 (2000), "*Reeves*

does not require [the Court] to reject the plainly obvious." *Montemayor v. City of San Antonio*, 276 F.3d 687, 693 (5th Cir. 2001).

**B.      The WARN Act**

44.      The WARN Act requires "employers" that are subject to its terms to give sixty (60) days' notice to all "affected employees" or their representatives prior to a mass layoff or a plant closing. 29 U.S.C. § 2102(a). To prove a WARN Act violation, a plaintiff must show that: (i) the defendant was an employer; (ii) the defendant ordered a mass layoff; (iii) the defendant failed to give employees 60-days' notice before the mass layoff; and (iv) the plaintiff is an aggrieved or affected employee. 29 U.S.C. §§ 2102, 2104. An employer who violates the notice provision "shall be liable to each aggrieved employee who suffers an employment loss for back pay for each day of violation." If the plaintiff establishes its *prima facia* case, the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the WARN Act's three exceptions: (1) faltering company; (2) unforeseen business circumstances; or (3) natural disaster. 29 U.S.C. § 2102; 20 C.F.R. § 639.9.

**C.      There is No Genuine Dispute That AVF Was a Liquidating Fiduciary At the Time of the Layoff and Not Subject to the WARN Act**

45.      The Third Circuit Court of Appeals has specifically held that where, as here, a chapter 11 debtor-in-possession has ceased operating as a going concern and is merely conducting a liquidation, it is not operating a "business enterprise" and is therefore not, an "employer"[45] subject to the WARN Act. *In re United Healthcare System, Inc.*, 200 F.3d 170, 178 (3d Cir. 1999), cert denied, 530 U.S. 1204 (2000).

---

[45] The WARN Act defines an "employer" is "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1).

AB_00034

46.     In *United Healthcare*, the creditors' committee argued that the debtor-in-possession -- a hospital that ceased operating and terminated its 1,300 employees 16 days after the petition was filed -- was not an "employer" under the WARN Act.  The Third Circuit Court of Appeals agreed, reasoning:

> [W]e find that United Healthcare, as the fiduciary in bankruptcy proceedings, was operating not as a "business operating as a going concern," but rather as a business liquidating its affairs. On February 18, 1997, United Healthcare surrendered its certificates of need; on February 19, it filed a voluntary bankruptcy plan under which it would liquidate its assets and cease to exist; and, no later than February 21, United Healthcare had discharged or transferred all of its patients and was no longer admitting new patients. Significantly, after February 19, but in any event no later than February 21, its employees were no longer engaged in their regular duties but instead were performing tasks solely designed to prepare United Healthcare for liquidation.
>
> We recognize that United Healthcare filed for Chapter 11 bankruptcy, ordinarily used to reorganize, rather than Chapter 7 bankruptcy, generally used to liquidate. **But as discussed, United Healthcare's actions from the time it filed its Chapter 11 petition throughout the proceedings clearly demonstrate its intent to liquidate.**  Simultaneously, United Healthcare filed for bankruptcy, agreed to sell its assets and goodwill to St. Barnabas, and surrendered its certificates of need.  Had United Healthcare's conduct and activities demonstrated a *bona fide* effort toward reorganization, the evidence may have shown that United Healthcare was an "employer" subject to the WARN Act.
>
> We believe this analysis is consistent with the legislative purpose behind WARN. . . .

200 F.3d at 178 (emphasis in bold added).

47.     Other courts have similarly recognized this "liquidating fiduciary" principle.  *See, e.g., Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*, 481 B.R. 268, 272 (Bankr. S.D. N.Y. 2012) ("The U.S. Department of Labor ('DOL') and federal courts addressing WARN Act claims have recognized a 'liquidating fiduciary' principle, excepting from the protection of the WARN Act employee layoffs by liquidating fiduciaries."); *Walsh v. Century City Doctors Hosp., LLC (In re Century City Doctors Hosp., LLC)*, 417 B.R. 801, 804-05 (Bankr. C.D. Cal. 2009), *aff'd* 2010 Bankr. LEXIS 5048 (B.A.P. 9th Cir. Oct. 29, 2010) (holding a chapter 7

trustee who operated a hospital for a few days post-petition (pursuant to an order authorizing him to do so) before terminating its employees was not an "employer" under the WARN Act based on *United Healthcare* where it was clear from the record that the "trustee's intentions have consistently been to close the hospital business at the earliest reasonable time and to liquidate its assets for the benefit of its creditors. The trustee only operated [the debtor] for approximately a week from the date of filing, and the trustee's brief operation of [the debtor] was not for any commercial purpose."); *Bailey v. Jamesway*, 1997 Bankr. LEXIS 825, at *40 (Bankr. S.D.N.Y. 1997) ("liquidating fiduciaries need not provide notice to terminated employees under the WARN Act"). Consistent with the foregoing judicial conclusions, the Department of Labor, the agency responsible for interpreting and implementing WARN Act requirements, has explained in connection with its regulations that "DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a 'business enterprise' in the normal commercial sense." 54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989).

48.     Here, as in *United Healthcare*, the Debtors' actions from the beginning of the Chapter 11 Cases (and before) evidence a clear intent to liquidate the Debtors' stores and other assets, and not to operate their business "in the normal commercial sense." *See* 54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989). As detailed in Section III.B above, all of the Debtors' efforts at reorganizing as a going concern occurred prepetition, when they hired advisors to reach out to potential buyers and investors. Those efforts failed prior to the bankruptcy filing. As a result of this failure, and prior to the Petition Date, the Debtors, at Wells Fargo's insistence, hired the Liquidator, gave the GOB Sale WARN Notice and commenced GOB Sales. Further, when the Debtors filed their Chapter 11 Cases on March 8, 2020, they intended to, and did, continue to

AB_00036

liquidate their assets through the GOB Sales and the Levin Sale. As of the Petition Date, and prior to the Layoff, the only business activities to be conducted by the Debtors were those necessary to liquidate their assets to pay off their creditors.

49. There can be no dispute that the Debtors were at all relevant times liquidating, as opposed to reorganizing, in the Chapter 11 Cases. As described in detail above, the Debtors intended to be and were acting as liquidating fiduciaries prior to the Petition Date and at the time of the March 20, 2020 Layoff. Therefore, as a matter of law, the Debtors were not "employers" under the WARN Act, and, accordingly, by its terms cannot be held liable for failure to give sixty days' notice of the Layoff, and as such, summary judgment is mandated in favor of the Trustee.

**D. The Governmental Mandated "Shelter in Place" and "Stay at Home" Orders Were "Not Reasonably Foreseeable" and Thus, the Debtors Were Not Subject to the Notice Provisions of the WARN Act.**

50. The COVID-19 pandemic was a business circumstance that was not reasonably foreseeable during the 60-day period prior to Layoff. As a matter of law, the Debtors therefore cannot be held liable for failure to provide 60 days' notice of the Layoff, and summary judgment should be granted in favor of the Trustee.

51. Specifically, 29 U.S.C. § 2102(b)(2)(A) provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances **that were not reasonably foreseeable as of the time that notice would have been required.**" 29 U.S.C. § 2102(b)(2)(A) (emphasis added**).**

52. Here, the Debtors' inability to conduct the GOB Sales and orderly liquidation they had planned to execute in March and April of 2020 were caused by (1) COVID-19, (2) the government-ordered business closures (or threatened closures), and (3) the restriction of residents

AB_00037

to their homes, which, together constitute a business circumstance that was not reasonably foreseeable during the 60-day period prior to the Layoff.

53.     The Third Circuit Court of Appeals has established that, under the WARN Act, a layoff becomes reasonably foreseeable when it becomes "probable" (more likely than not) that it would occur; a clear probability of layoffs is necessary to trigger the WARN Act notice requirement.  *Varela v. AE Liquidation, Inc. (In re AE Liquidation, Inc.)*, 866 F.3d 515, 528 (3d Cir. 2017) (company had received numerous assurances that funding for a transaction that would have allowed it to continue its operations was imminent, and thus, the company was entitled to invoke the WARN Act's unforeseeable business circumstances exception).[46]  *See also Hotel Employees & Restaurant Employees International Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175 (3d Cir. 1999) (casino's closure was not reasonably foreseeable and thus the unforeseeable business circumstances defense applied to excuse the casino's failure to notify its employees prior to its being shut down by the New Jersey Casino Control Commission).

54.     As explained by Bankruptcy Judge Shannon:

> The Department of Labor's ("DOL") regulations state that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some *sudden, dramatic, and unexpected action or condition outside the employer's control*."  20 C.F.R. § 639.9(b)(1).  The DOL's test for determining when business circumstances are not reasonably foreseeable
>
> > focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of a particular market.  The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.
>
> *Id*. § 639.9(b)(2).

---

[46] Notably, the bankruptcy court in the proceedings below in *AE Liquidation* had granted the trustee's motion for summary judgment on the basis that the applicable circumstance there was unforeseeable for purposes of WARN Act liability.  *In re AE Liquidation, Inc*., 522 B.R. 62 (Bankr. D. Del. 2014) (Judge Walrath).  The bankruptcy court's decision was affirmed by the district court, and both decisions were affirmed by the Third Circuit Court of Appeals in the afore-cited *AE Liquidation* case.

*Czyzewksi v. Jevic Transp. Inc. (In re Jevic Holding Corp.)*, 496 B.R. 151, 161 (Bankr. D. Del. 2013) (Hon. B. Shannon) (emphasis added).

55.     In addition, in order to establish the applicability of the exception, courts require that employers show that an unforeseen business circumstance was the immediate cause of a mass layoff.  *Easom v. US Well Servs.*, 2021 U.S. Dist. LEXIS 52941, at \*32.

56.     The unforeseeable business circumstances exception is plainly applicable here. First, as discussed in Sections III.D and E above, the COVID-19 pandemic was clearly the immediate cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and immediately shut down their business.  The pandemic made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required citizens to stay at home or shelter in place to limit the spread of COVID-19. The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would follow shortly thereafter.

57.     Moreover, on January 18, 2020 and thereafter (the 60-day period prior to the Layoff), the Debtors could not reasonably have foreseen that the threat of infection and death from COVID-19 would be so profound that millions of people in the United States would be afraid to leave their homes and governments would be ordering their citizens to stay at home and closing non-essential businesses across the nation.

58.     Finally, given that the Governor of Pennsylvania ordered store closures on March 19, 2020 (the day of the Debtors' COVID WARN Notice), the one day's notice that the Debtors gave to the Plaintiffs was patently reasonable under the circumstances.

59.     Based on the foregoing circumstances, it cannot be credibly debated that the

AB_00039

COVID-19 pandemic and its unprecedented adverse business and societal effects could have been reasonably foreseeable by the Debtors as of January 18, 2020 or that the Debtors' actions were not commercially reasonable under the circumstances. Accordingly, the Trustee is also entitled to summary judgment in his favor on the basis of the unforeseen business exception.

E.   **If the WARN Act Is Applicable, Which It is Not, the Debtors Were Not Required to Provide Any Notice Because the Layoff Was Due to the COVID-19 Pandemic -- a "Natural Disaster" For Purposes of the WARN Act.**

(i)   **The COVID-19 Pandemic Is a Natural Disaster**

60.   If the WARN Act were held to be applicable (which it is not because of the liquidating fiduciary exception), the Debtors were not required to give any notice because the March 20, 2020 Layoff was due to the COVID-19 pandemic, which falls within the natural disaster exception to the WARN Act.

61.   The WARN Act provides: "No notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States." 29 U.S.C. § 2102(b)(2)(B); 20 C.F.R. § 639.9(c). As the statue makes clear, if the employer establishes that the mass layoff was "due to any form of natural disaster," there is no duty to provide any notice under the WARN Act.

62.   The COVID-19 pandemic is a "natural disaster" and therefore falls under the exception to the WARN Act's notice requirement. *Easom v. US Well Servs*, 2021 U.S. Dist. LEXIS 52941, *17 (S.D. Tex. March 22, 2021) ("The dictionary definition of natural disaster, other court decisions, and the statutory language support the conclusion that the COVID-19 pandemic is a natural disaster under the WARN Act.").[47] *See also* Hiltzik, M., "A declassified

---

[47] The statute in fact refers more broadly to "any form of natural disaster" – a phrase which plainly supports a broad interpretation of "natural disaster." *See, e.g., Kasten v. Saint-Gobain Performance Plastics Corp*., 563 U.S. 1, 9–10 (2011) (the statutory phrase "any complaint" suggests a broad interpretation).

AB_00040

government report offers no support for the lab-leak theory of COVID's origin," *Los Angeles Times*, Nov. 1, 2021, available at https://www.latimes.com/business/story/2021-11-01/declassified-government-report-lab-leak-theory (attached as **Exhibit Z** to Sandler Declaration) ("LA Times Article") (recently declassified report by federal governmental agency, Office of the Director of National Intelligence ("ODNI Report"), "provides details of the agencies' findings that make clear they looked into the specific assertions that have been proposed in support of the lab-leak theory and found them wanting"); Office of the Director of National Intelligence, "Updated Assessment on COVID-19 Origins" Report, available at https://www.dni.gov/files/ODNI/documents/assessments/Declassified-Assessment-on-COVID-19-Origins.pdf (ODNI Report referenced in the LA Times Article) (attached as **Exhibit AA** to Sandler Declaration).

63. As the District Court for the Southern District of Texas reasoned in *Easom*:

> COVID-19 qualifies as a disaster under the WARN Act. COVID-19 is clearly a "disaster." *See* Disaster, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] calamity; a catastrophic emergency"); Natural Disaster, OXFORD ENGLISH DICTIONARY ("[a] natural event that causes great damage or loss of life"). In a year, two million people lost their lives, and over one hundred million people were diagnosed with infections. *See AB Stable VIII LLC*, 2020 Del. Ch. LEXIS 353, 2020 WL 7024929, at *58 ("[The COVID-19 pandemic] is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths.") . . . .

> COVID-19 also qualifies as a "natural" disaster because human beings were not responsible for starting or consciously spreading the virus. . . . COVID-19, like other viruses, did not require conscious human effort to appear or spread, as individuals without symptoms infected others. *See* Angela L. Rasmussen, *On the Origins of SARS-CoV-2*, 27 Nature Medicine 9, 9 (2021) ("[A]ll indications suggest that, like SARS-CoV and MERS-CoV, this virus probably evolved in a bat host until an unknown spillover event into humans occurred."); Murat Seyran, *et al.*, *Questions Concerning the Proximal Origin of SARS CoV-2*, Journal of Medical Virology 1, 1 (2020) ("There is a consensus that severe acute respiratory syndrome coronavirus (SARS-CoV-2) originated naturally from bat coronaviruses (CoVs), in particular RaTG13."); *see also AB Stable VIII LLC*, 2020 Del. Ch. LEXIS 353, 2020 WL 7024929, at *58 n.214 ("The record in this case does not support a finding that the virus was anything other than a natural

product of germ evolution."). While humans can take precautions to slow the spread of COVID-19 or engage in behavior that fosters contagion, the possibility of slowing the virus spread does not suggest that humans caused the pandemic.

*Id.* at *20-*21.

64.     Outside the WARN Act context, courts have also consistently found that COVID-19 is a natural disaster for reasons that are equally applicable here.  The U.S. District Court for the Southern District of New York held that COVID-19 qualified as a "natural disaster" for the purpose of applying a force majeure clause in a contract dispute.  *See JN Contemporary Art, LLC v. Phillips Auctioneers LLC*, 2020 U.S. Dist. LEXIS 237085 (S.D.N.Y. Dec. 16. 2020).  The Pennsylvania Supreme Court has held twice that the Covid-19 pandemic is a "natural disaster."  In *In Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 876 (Pa. 2020), *cert. denied*, 141 S. Ct. 239 (2020), the petitioners challenged the Pennsylvania governor's executive order closing all non-life-sustaining businesses to control the virus' spread.  Among other arguments, they contended that the pandemic was not a "natural disaster" under the state's Emergency Code because it was not specifically listed as such and was different in "type or kind" from those disasters found in the statute.  The Pennsylvania Supreme Court disagreed, holding, "The COVID-19 pandemic is, by all definitions, a natural disaster, and a catastrophe of massive proportions." *Id.* at 889.  The Pennsylvania Supreme Court re-affirmed this conclusion seven months later in the context of election-related litigation.  *See Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster.").

65.     Accordingly, even if the WARN Act applies, which it does not because the Debtors were liquidating fiduciaries, the Debtors were not required to give notice of the Layoff because Covid-19 is a "natural disaster," and summary judgment should be granted in favor of the Trustee.

AB_00042

### (ii) The Layoff Was "Due To" the COVID-19 Pandemic

66.     The Debtors' Layoff was clearly "due to" the COVID-19 pandemic.  The "but for" standard of causation applies to the natural disaster exception.  *Easom v. US Well Servs*, 2021 U.S. Dist. LEXIS 52941, at *33-*34 ("[T]he WARN Act's language, structure, and legislative history, as well as case law interpreting similar statutory language, support finding that the natural-disaster exception uses but-for causation standards. The COVID-19 pandemic need not be the direct or sole cause of the layoffs for the natural-disaster exception to apply.").[48]  But-for causation is established whenever a particular outcome would not have happened "but for" the purported cause. The "but-for" test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a "but-for" cause.  *Bostock v. Clayton Cty., Ga*., 140 S. Ct. 1731, 1739 (2020).

67.     But for COVID-19, Debtors would have completed the Planned Liquidation Process as originally planned, including the provision of adequate notice of the Layoff.  As discussed in greater detail in Sections III.B and C above, the Debtors expressly intended to liquidate their assets under chapter 11 through a combination of the GOB Sales and the Levin Sale. The Debtors had hired a Liquidator, negotiated a Wind-Down Budget with Wells Fargo, announced store closures, commenced the GOB Sales and filed the Chapter 11 Cases.  The Planned Liquidation Process was proceeding as expected, even as late as the second week in March.

68.     But for the threat of infection and death from COVID-19, the foot traffic in the Debtors' stores would have continued apace, and Plaintiffs would have worked throughout their 60-days' notice period under the GOB Sale WARN Notice.  But for the threat of infection and

---

[48] Whether the WARN Act's natural disaster exception uses the "but for" standard was certified for appeal and accepted by the Court of Appeals for the Fifth Circuit in *Easom* (pending as Case No. 21-90010), as well as by the Court of Appeals for the Eleventh Circuit in *Bensen* (pending as Case No. 21-11911) (*Benson v. Enter. Leasing Co. of Orlando*, LLC, 2021 U.S. Dist. LEXIS 55137 (D. M.D. Fla. Feb. 4, 2021) (court assumed *arguendo* that COVID - 19 was a "natural disaster" under the WARN Act but denied employer's motion to dismiss because complaint did not allege that COVID-19 was the "direct cause" (*i.e.*, the "proximate cause") of the layoff)).

death from COVID-19, the Debtors' employees would not have been afraid or hesitant to come to work. But for the threat of infection and death from Covid-19, the Debtors would not have been under threat of compulsory closures in every state in which it did business. But for the threat of infection and death from COVID-19, the Governor of Pennsylvania would not have ordered the Debtors to close all of their stores in Pennsylvania by 8 pm on March 19, 2020. But for the threat of infection and death from COVID-19, the Debtors would not have issued the COVID WARN Notice and would not have terminated the Plaintiffs on March 20, 2020.

69. The natural disaster exception applies, and, accordingly, the Debtors are not liable under the WARN Act. Summary judgment should therefore be granted in favor of the Trustee.

## V. CONCLUSION

For the reasons set forth herein, the Trustee respectfully requests that the Court grant the Motion, enter judgment in his favor, and grant such other and further relief as the Court deems appropriate.

Respectfully Submitted,

Dated:  November 12, 2021          PACHULSKI STANG ZIEHL & JONES LLP
        Wilmington, Delaware

*/s/ Bradford Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:    bsandler@pszjlaw.com
          blevine@pszjlaw.com
          crobinson@pszjlaw.com
          pkeane@pszjlaw.com

AB_00044

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to Defendants Art Van Furniture, LLC, *et al.*

AB_00045

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, *et al.*,[1]<br><br>                                 Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>(Jointly Administered) |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>                             Plaintiffs,<br><br>         vs.<br><br>ART VAN FURNITURE, LLC, *et al.*,<br><br>                             Defendants. | Adv. Proc. No. 20-50548 (CSS) |

## DECLARATION OF BRADFORD SANDLER IN SUPPORT OF
## CHAPTER 7 TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

**PACHULSKI STANG ZIEHL & JONES LLP**
Bradford J. Sandler (DE Bar No. 4142)
Beth Levine (New York Bar No. 2572246)
(admitted *pro hac vice*)
Colin R. Robinson (DE Bar No. 5524)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:    bsandler@pszjlaw.com
            blevine@pszjlaw.com
            crobinson@pszjlaw.com
            pkeane@pszjlaw.com

Counsel to Alfred T. Giuliano, Chapter 7 Trustee to
Defendants Art Van Furniture, LLC, *et al.*

---

[1]  The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

AB_00046

I, BRADFORD SANDLER, hereby declares:

1.      I am an attorney at law duly licensed to practice before this Court.  I am a partner of the law firm of Pachulski Stang Ziehl & Jones LLP, attorneys of record for Alfred T. Giuliano, Chapter 7 Trustee to Defendants Art Van Furniture, LLC, *et al*. in the above-captioned chapter 7 case (the "Case").  The facts stated herein are of my own personal knowledge, or made known to me from a review of the files and pleadings in the Case which are maintained in the ordinary course of business.  If called upon as a witness to any facts set forth herein, I could and would competently testify thereto.  All capitalized terms not defined below shall have the meaning ascribed to said terms in the Chapter 7 Trustee's Motion for Summary Judgment (the "Motion").

2.      Attached hereto as **Exhibit A** is a true and correct copy of the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed in the Chapter 11 Cases [Bankr. Doc. 12].

3.      Attached hereto as **Exhibit B** is a true and correct copy of the transcript of the March 10, 2020 hearing held before the Bankruptcy Court in the Chapter 11 Cases.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered in the Chapter 11 Cases [Bankr. Doc. 93].

5.      Attached hereto as **Exhibit D** is a true and correct copy of the article "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html.

AB_00047

6. Attached hereto as **Exhibit E** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 49] ("Levin DIP Motion").

7. Attached hereto as **Exhibit F** is a true and correct copy of the *Interim Order* on Levin DIP Motion entered in the Chapter 11 Cases [Bankr. Doc. 137].

8. Attached hereto as **Exhibit G** is a true and correct copy of the WARN Act notice issued by AVF on March 5, 2020, to potentially "affected employees" who worked in or reported to seven of the Debtors' facilities in Michigan, two facilities in Illinois and one in Pennsylvania.

9. Attached hereto as **Exhibit H** is a true and correct copy of the *Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* filed in the Chapter 11 Cases [Bankr. Doc. 252].

10. Attached hereto as **Exhibit I** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 5].

11. Attached hereto as **Exhibit J** is a true and correct copy of the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* filed in the Chapter 11 Cases [Bankr. Doc. 52].

AB_00048

12.     Attached hereto as **Exhibit K** is a true and correct copy of the transcript of the March 12, 2020 hearing held before the Bankruptcy Court in the Chapter 11 Cases.

13.     Attached hereto as **Exhibit L** is a true and correct copy of the *Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* dated March 13, 2020 (85 F.R. 15337 (March 13, 2020)), available at https://www.govinfo.gov/content/pkg/FR-2020-03-18/pdf/2020-05794.pdf.

14.     Attached hereto as **Exhibit M** is a true and correct copy of *Wolf Administration Issues Guidance to Non-Essential Businesses as Part of COVID-19 Mitigation Efforts*, March 14, 2020, available at https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/.

15.     Attached hereto as **Exhibit N** is a true and correct copy of *All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations As of 8 PM Today to Slow Spread of COVID-19,* March 19, 2020, available at https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/.

16.     Attached hereto as **Exhibit O** is a true and correct copy of *Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders*, March 16, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90640-521763--,00.html.

17.     Attached hereto as **Exhibit P** is a true and correct copy of Gov. Tom Wolf's Executive Order, dated March 19, 2020, available at https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf.

AB_00049

18.     Attached hereto as **Exhibit Q** is a true and correct copy of Gov. Gretchen Whitmer's Executive Order 2020-21 (COVID-19), dated March 23, 2020, available at https://www.michigan.gov/whitmer/0,9309,7-387-90487-522625--,00.html.

19.     Attached hereto as **Exhibit R** is a true and correct copy of Dir. of Public Health Amy Acton's Stay at Home Order, dated March 22, 2020, available at https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf.

20.     Attached hereto as **Exhibit S** is a true and correct copy of Gov. JB Pritzker's Executive Order in Response to COVID-19 (COVID-19Executive Order No. 8), dated March 20, 2020, available at https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf.

21.     Attached hereto as **Exhibit T** is a true and correct copy of the WARN Act notice issued by AVF on March 19, 2020, to AVF employees.

22.     Attached hereto as **Exhibit U** is a true and correct copy of the transcript of the March 19, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

23.     Attached hereto as **Exhibit V** is a true and correct copy of the transcript of the March 31, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

24.     Attached hereto as **Exhibit W** is a true and correct copy of the *Order Granting Debtor's Amended Motion to Convert* entered in the Chapter 11 Cases [Bankr. Doc. 263].

25.     Attached hereto as **Exhibit X** is a true and correct copy of the transcript of the April 6, 2020 hearing before the Bankruptcy Court in the Chapter 11 Cases.

26.     Attached hereto as **Exhibit Y** is a true and correct copy of the *Class Action Adversary Proceeding Complaint For Violation of Warn Act 29 U.S.C. § 2101, et seq.* filed in the

AB_00050

above-captioned adversary proceeding [Adv. Docket No. 1].

27.     Attached hereto as **Exhibit Z** is a true and correct copy of the article by Hiltzik, M., "A declassified government report offers no support for the lab-leak theory of COVID's origin," *Los Angeles Times*, Nov. 1, 2021, available at https://www.latimes.com/business/story/2021-11-01/declassified-government-report-lab-leak-theory.

28.     Attached hereto as **Exhibit AA** is a true and correct copy of the Office of the Director of National Intelligence, "Updated Assessment on COVID-19 Origins" Report, available at https://www.dni.gov/files/ODNI/documents/assessments/Declassified-Assessment-on-COVID-19-Origins.pdf.

AB_00051

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed this 12th day of November, 2021 at Wilmington, Delaware.

_____
Bradford Sandler

AB_00052

# EXHIBIT A

AB_00053

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |

## DECLARATION OF
## DAVID LADD, EXECUTIVE VICE PRESIDENT AND
## CHIEF FINANCIAL OFFICER OF ART VAN FURNITURE, LLC,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, David Ladd, hereby declare under penalty of perjury:

1.      I am the Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC ("Art Van"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company").

2.      I have served in this role since October 10, 2016.  In my current position, I oversee financial planning, accounting and the management of financial risk for the Company and its brands.  Prior to serving in this capacity, I had over twenty years of financial experience in the retail sector, during which time I served in various roles, including as an auditor for Kmart and as Vice President of Finance for various divisions of Sears.  Most recently, I served as the Vice President of Finance for 1,500 Sears and Kmart stores.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

AB_00054

3.      I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (this "Declaration") to assist the United States Bankruptcy Court for the District of Delaware (the "Court") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested pursuant to the motions and applications filed on the first day of these cases (collectively, the "First Day Motions").

4.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions with the other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

5.      Art Van is a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan.  The Company operates 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Company does business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Company was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.  As part of this transaction, THL acquired the operating assets of the Company and certain real estate investment trusts, who closed the transaction alongside THL, acquired the owned real estate portfolio of the Company, and entered into long-term leases with Art Van.  The proceeds from the sale-leaseback transaction were used to fund the purchase price

AB_00055

paid to the selling shareholders.  Pennsylvania-based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017 through similar transaction structures.  As of the Petition Date, the Company operates stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

6.     In the wake of extreme market conditions and faced with limited liquidity, the Company has commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down its remaining store locations and other operations through a going-out-of-business sales process.  Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going concern, the Company is simply unable to meet its financial obligations.  The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind down process that will maximize value and recoveries for stakeholders in these cases.

7.     Art Van's declines in sales, profits, and cash flow were driven by a combination of several factors.  ***First***, the Company has faced significant macro-related revenue headwinds, as well as local microeconomic headwinds, that have led to sustained negative "same-store sales," a key measure of retail health, during every quarter since June 2016.  These macro-related headwinds include broad-based declining retail foot traffic, market share losses of brick and mortar furniture outlets to online sellers such as Wayfair and Amazon.com, and increased fragmentation and intense competition in mattresses leading to decreased profitability.  On a local level, Art Van has faced increased retail competition, as key competitors such as Ashley HomeStore, Bob's Discount

AB_00056

Furniture, and Mattress Firm opened at least 30 stores in Michigan and Illinois over the last three years

8.      **Second**, while Art Van revenues have declined approximately 27% cumulatively on a same-store basis since fiscal year 2016 through January 2020, expenses have increased significantly due to, among other things, over $8 million in tariff costs in fiscal year 2019 (which continued and escalated in fiscal year 2020) and an increase in marketing expenses intended to stem same-store sales declines.

9.      **Third**, the business suffered numerous operational challenges in the course of the Company's effort to grow and navigate a challenging retail environment.  In continuing to support the existing management team and growth initiatives that had driven the Company's success over the prior decade, the Company invested significant capital, but many of the initiatives failed to meet expectations and were insufficient in offsetting countervailing headwinds.  These operational challenges included, among other things:

- **Expansion**.  The Company began an expansion into Chicago in fiscal year 2013 that continued through fiscal year 2018, which ultimately led to market oversaturation as new stores cannibalized revenues from preexisting locations.  Despite spending significant capital and gaining material revenue share in this market, the Company was not able to achieve sustained profitability in Chicago.

- **Leadership Turnover**.  The Company lost eight of its top nine executive leaders in fiscal years 2017 and 2018 through unplanned and, in many cases, voluntary departures.

- **Required Changes to Marketing Strategies**.  In June 2017, the Company ceased certain of its historically successful marketing practices after becoming aware they violated the Telephone Consumer Protection Act ("TCPA"), and in early 2018, the Company settled a class-action lawsuit on account of an alleged violation of the TCPA.

- **St. Louis Franchise Acquisition**.  In fiscal year 2018, the Company entered into an operating agreement with its largest franchisee, based in St. Louis, Missouri, due to financial distress being experienced by the franchisee.  The Company acquired the operations of the franchisee in fiscal year 2019 to help stabilize performance and avoid further deterioration, but Art Van was unable to stabilize the revenues of the St. Louis stores or generate a profit in the market after such acquisition.

AB_00057

- **Levin/Wolf Integration**. In fiscal year 2019, the Company's management attempted to integrate the operations of Wolf Furniture into Levin Furniture. The integration involved a significant overhaul of many fundamental aspects of the Wolf business, including human capital management, furniture assortments, distribution/delivery, and technology systems. These actions were taken in an effort to improve the business and align its operations with those of Levin, but they created significant strain on the Wolf business, which led to same-store sales declines of approximately 22% in Wolf in the second half of fiscal year 2019, as well as meaningful turnover of tenured sales staff.

- **Changes to Inventory Mix and Showroom Layout**. In the same year, the Company turned over approximately 60% of its furniture assortment and reorganized many of its flagship showroom floors by "lifestyle" instead of by category of product, which negatively impacted sales and led to increased markdowns from product that was not easily saleable.

As a result of these challenges, the Company's Adjusted EBITDA decreased significantly in each fiscal year since 2016 and dropped to negative for the twelve months ended December 31, 2019.

10.     Faced with rapidly declining profitability, the Company made key leadership changes in summer 2019 that it deemed necessary to stem the downward trajectory and recover sales and profits. In August 2019, the Company's board of directors (the "Board") terminated the Company's then-current Chief Executive Officer, its Chief Merchant, its Head of Stores, and several other executives. It promoted a Company veteran to the role of Chief Merchant in August 2019, and, in September 2019, the Board hired a mattress industry turnaround executive as Chief Executive Officer. The Board also named Gary Van Elslander, the former President of Art Van, as Chairman of the Board, in an effort to improve morale and re-establish a connection between the Company's employees and customers with the namesake of the business. During this period, the Company also launched a new marketing campaign intended to differentiate the business against a competitive landscape, and it improved its e-commerce operating systems, including its website.

11.     In the summer and fall of 2019, the Company took further actions to create additional liquidity and extend the runway for management to execute on a sales-led operational turnaround:

AB_00058

- In November, 2019, the Company amended its asset-backed loan ("ABL") facility with Wells Fargo Bank, National Association ("Wells Fargo") to increase the size of the facility from $60 million to $82.5 million.

- In summer 2019, the Company engaged Evercore Group L.L.C. ("Evercore") as investment banker and undertook a review of strategic alternatives, including efforts to identify potential buyers for all or portions of the business.

- In December 2019, the Company secured an amendment to its term loan credit facility, which allowed the Company to suspend cash interest payments and mandatory amortization under the term loan.[2]

- In the fall and winter of 2019, the Company also was implementing a cost reduction and profit improvement plan, which was predicated on (a) reducing marketing expenses as a percentage of sales; (b) increasing gross margin through improved coordination of the merchandising, marketing, and in-store sales teams; and
(c) decreasing occupancy costs.

12.     Throughout this time, the Company also was focused on optimizing its lease

portfolio and reducing rent expense:

- With the assistance of its financial advisor, Alvarez & Marsal North America, LLC ("A&M") the Company created a store footprint optimization analysis that supported store closure plan.

- The Company hired real estate restructuring advisers Jones Lang LaSalle ("JLL") and Newmark Knight Frank to lead discussions with key landlords to reduce rent expense given the Company's decline in sales and to close 49 underperforming locations (including 31 mattress locations), consistent with and supported by the above-referenced store closure plan.

- The Company hired an accounting advisory firm in November, 2019, to create standardized and reliable schedules of store-level financials needed for JLL and Newmark Knight Frank to be able to engage in productive negotiations with the Company's lessors.  This effort was completed in January, 2020, and the real estate brokers began discussions with key lessors shortly thereafter.

---

[2]   Despite these liquidity enhancements, the Company also faced offsetting liquidity challenges.  Certain companies, including The CIT Group ("CIT"), which provided accounts receivable factoring services to the Company's suppliers, refused to factor receivables owed by the Company unless the Company issued CIT and other factoring companies letters of credit under its ABL facility.  These letters of credit reduced availability under the Company's ABL facility by $10 million, further exacerbating the Company's liquidity constraints.

AB_00059

13.     In late January, 2020, the Company unexpectedly faced further liquidity constraints due to a reduction in the Company's "borrowing base," which is required collateral support for borrowing under the ABL facility.  At the same time, certain financial partners of the Company began to demand additional collateral and tightened access to credit as a result of the Company's weak financial results.   These financial partners included credit card processing companies, including Bank of America Merchant Services and PNC Merchant Services—who are critical to the Company's ability to accept credit cards in stores and on-line for customer purchases—as well as providers of consumer credit.  In total, this group demanded approximately $33 million in collateral through holdbacks to fund reserves and letters of credit.

14.     As a result of the impending liquidity crisis created by the shrinking borrowing base, poor operating cash flow, and the collateral demands, the Company was unable to issue "clean" audited financial statements (*i.e.*, without a potential "going concern" qualification), which led to a default under the Company's ABL facility, as well as various other contractual arrangements, including certain leases.  Wells Fargo agreed to forbear from exercising remedies on account of such default until February 28, 2020, to give the Company time to explore opportunities to raise additional capital and restructure its debt obligations.  As part of this short forbearance, Wells Fargo required the Company to comply with cash dominion, and also required the Company to begin immediate preparations for a "going-out-of-business" liquidation in the event ongoing efforts to raise capital did not materialize before the forbearance period expired.

15.     Against this backdrop, with the assistance of Evercore and A&M, the Company held discussions with at least 31 potential buyers and investors, including its term loan lender, FS KKR Capital Corp. and affiliates ("KKR"), about potential transactions to recapitalize or sell all

AB_00060

or parts of the business.[3]  Following a short evaluation period, KKR declined to make a new money investment in Art Van pursuant to any recapitalization transaction.  The most likely and promising alternative that emerged was an out-of-court recapitalization transaction involving a consortium of investors that included a new-money investment from THL, the Van Elslander family, and three important suppliers to the Art Van business (the "Consortium").  The transaction contemplated the Consortium investing significant new capital into the Company and refinancing the existing ABL facility.[4]  The Consortium also sought and received support for the transaction from the Company's five largest lessors (the "Master Lessors"), in which the Master Lessors agreed to reduce rent obligations on the company and allow Art Van to close certain underperforming locations.  The Consortium submitted a letter of intent to the Company outlining the details of its proposal on February 20, 2020, followed by a further letter of intent on February 26, 2020, discussing the Consortium's progress in arranging the transaction.  Unfortunately, the Consortium ultimately failed to secure the necessary capital commitments due to a variety of circumstances, including, but not limited to, the significant equity market impact of the coronavirus during the week of February 24, 2020, and the resulting deleterious effect on Consortium investors' willingness to contribute capital.  Over the weekend of March 1, 2020, the Company, its Board, and the Company's advisors worked with JLL and the Master Lessors to attempt to replace the deficit in the Consortium investment with a new money investment from the Master Lessors in the form of a lease incentive investment, but on Monday, March 2, 2020, certain Master Lessors declined to participate in the proposed transaction as revised.

---

[3]  Immediately prior to the Petition Date, KKR assigned the claims and obligations under the term loan to HGB AVF Lending, LLC, which is an affiliate of Hilco Merchant Resources, LLC.

[4]  KKR also agreed to participate in the Consortium Bid by exchanging its term loan into a percentage of the pro forma equity and new debt *pari passu* with the Consortium investment.

AB_00061

16.     After the Company's forbearance with Wells Fargo expired on February 28, 2020, the Company went into default under its credit facilities and focused its attention on launching a going-out-of-business process to preserve value.  Based on the expected timing for commencing the liquidation process, any delay in a launch of the going-out-of-business sales could have caused the process to continue into May and, therefore, necessitate the payment of May rent at locations still active in the liquidation at that time.  The Company also had not received substantial shipments of new product since early February given it was no longer making payments to vendors, and, as such, sales were decreasing and weekly cash burn was increasing.

17.     With no actionable alternatives, and given the urgency with which Wells Fargo was pressing the Company and its advisors to proceed, the Company began executing on plans for an orderly wind-down of the Company's operations and a liquidation of its inventory (the "Wind Down").  The Company and its advisors negotiated extensively with the Company's secured lenders to ensure that customer deposits, credits, and/or refunds, as well as payment of certain administrative costs, were contemplated by the agreed budget for the Wind Down process.  In particular, as a result of these negotiations, the Company has implemented a process for addressing customer deposits whereby customers can elect to: (a) receive the merchandise they purchased if such merchandise is present in the Art Van warehouses; (b) receive a credit in an amount equal to their deposits that can be used to purchase alternative merchandise at discounted prices during the Wind-Down, if the originally purchased merchandise is not available; or (c) cancel their order and submit a request to refund their deposit, which request would be processed as soon as practicable depending on the volume of refund requests, required processing times, and the timing and availability of cash proceeds generated by the Wind Down.[5]

---

[5]     The relief requested with respect to the customer deposits, credits and/or refunds is set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain*

AB_00062

18.     To facilitate the Wind Down, the Company and its advisors solicited bids from potential liquidators to conduct store closing sales, and received bids from various parties, including a proposal from certain parties to acquire certain of the Company's intellectual property and other assets.  After discussions with several firms that specialize in store closings and inventory dispositions, and with input from its secured lenders, the Company entered into a consulting agreement with a contractual joint venture (as amended and restated, the "Consultant Agreement") of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (together, "Consultant") to conduct the store closing sales.  The Consultant Agreement is an expense-based arrangement in which the Consultant will provide reimbursement of all supervisor costs, reasonable and documented travel expenses, and general legal fees subject to the caps set forth in the Consultant Agreement.  The Debtors expect to move swiftly through these chapter 11 cases to minimize costs, with an expected timeline for completing the store closing sales of approximately six to eight weeks.  To maximize recoveries and minimize administrative expenses, the Company announced and initiated a soft launch of the store closing sales on March 5, 2020,[6] and seeks to expedite the remaining store closure sales in order to complete them within six to eight weeks.

19.     In parallel with preparations for the Wind-Down, the Company continued to engage with interested parties regarding alternative transactions, which ultimately resulted in a proposal to preserve the Levin business segment and a portion of the Wolf business segment as a going-

---

*Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief*, filed contemporaneously herewith, and remains subject to approval by the Bankruptcy Court.

[6]     Upon commencement of the store closing sales, Bank of America, N.A., Banc of America Merchant Services, LLC ("BAMS"), one of the company's credit card processors, immediately issued notice of its intent to hold 100 percent of all sale proceeds as a reserve.  The filing of petitions on March 8, 2020, initiated an automatic stay against any action to control property of these estates and the Debtors reserve all rights and causes of action against BAMS, including with respect to potential preference claims.  In addition, on March 6, 2020, Broadstone AVF Illinois, LLC, and Broadstone AVF Michigan, LLC (collectively, "Broadstone"), two of the Company's Master Lessors, initiated a lawsuit against the Company in Illinois federal court, alleging, among other things, various defaults under their respective leases related to the commencement the store closing sales.

AB_00063

concern. In the days leading up to the Petition Date, the Company, with the assistance of its advisors, extensively negotiated and reached an agreement-in-principle with Robert Levin, the former owner of Levin Furniture, regarding a going-concern sale of certain of the assets of Sam Levin, Inc. and LF Trucking, Inc. (the "Levin-Wolf Sale"). The key terms of the Levin-Wolf Sale are set forth in a letter of intent, dated as of March 4, 2020, a copy of which is attached hereto as **Exhibit B** (the "Levin-Wolf LOI"). As set forth in the Levin-Wolf LOI, the Levin-Wolf Sale will:

- provide for cash and non-cash consideration, including the assumption of liabilities related to customer deposits, employee obligations, specified cure costs, and potential claims under section 503(b)(9) of the Bankruptcy Code;

- preserve nearly 1,000 jobs; and

- provide for the continued operation of approximately 44 retail store locations under the Wolf and Levin store banners and two related distribution centers.

20.     The Company expects to move forward with definitive documentation for, and approval of, the Levin-Wolf Sale on an expedited basis. The Company believes effectuating the Levin-Wolf Sale on an expedited basis is critical to avoiding employee attrition and other potential value leakage related to the simultaneous Wind Down of the Company's other operations. The Levin-Wolf Sale is supported by the Company's secured lenders.

21.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions (defined below and filed contemporaneously herewith) this Declaration is organized as follows:

- **Part I** provides a general overview of the Debtors' corporate history and business operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

AB_00064

- **Part III** provides a discussion of the circumstances leading to these chapter 11 cases and the Debtors efforts to pursue alternate restructuring options; and

- **Part IV** sets forth the evidentiary basis in support of the relief requested in each of the First Day Motions.

## I. The Company's Corporate History and Business Operations.

### A. Corporate History

22.     Mr. Art Van Elslander founded Art Van Furniture in 1959 with the first location on Gratiot Avenue and 10 Mile Road in East Detroit, Michigan.  From 1959 through the 1970s, Mr. Van Elslander focused on building the foundation for his furniture store footprint.  During this time he opened additional stores and acquired the current corporate headquarters and distribution center in Warren, Michigan.  From 1980 to 2000, Art Van Furniture focused on its expansion in the state of Michigan and introduced the first Art Van credit card, the clearance center concept, and ArtVan.com.  By 1997, following growth in the early to mid-1990s, the Company had increased in size to a total of twenty-six stores with over 2,600 employees.  Further, in the following decade the Company would open seven more stores for a total of 33 stores in 2009.  In this most recent decade, the Company experienced its most intense growth phase under former CEO Kim Yost, who led the business from 2009 until his departure in 2018.  In 2010, the Company began to execute on its freestanding PureSleep mattress store thesis.  From 2011–2015, the Company acquired 27 Mattress World stores, began franchising, and entered the Chicago market.  Upon Art Van Elslander's sale of the Company in 2017, the enterprise had 113 stores, more than triple the amount of stores than it did in 2009.  Around this time, the Company was ranked as number nineteen on Furniture Today's "Top 100 list."

23.     In 2016, founder and sole owner Art Van Elslander decided to explore exit opportunities and engaged in a transaction to sell the Company and its owned real estate to THL

AB_00065

for $612.5 million, which transaction closed in March 2017 (the "2017 Transaction"). At the closing of the 2017 Transaction, THL acquired the operating assets of the business and certain real estate investment trusts acquired the owned real estate portfolio. The proceeds from the sale-leaseback transaction were used to fund the purchase price paid to the selling shareholders. Later in 2017, the Company acquired two Pennsylvania-based furniture companies: Levin, with operations in greater Pittsburgh and Cleveland, and Wolf, with operations in eastern Pennsylvania, Maryland, and Virginia. The Company continued its growth strategy through further geographic expansion and new store openings, and it also invested in e-commerce capabilities to bolster the brand and improve consumer experiences. As of the Petition Date, the Company has 92 total furniture showrooms and 77 freestanding mattress and specialty locations.

**B.** **The Company's Products.**

24. Since its founding, Art Van Furniture has focused on retailing high-quality, made-to-last furniture that is available to customers across all price points. Art Van Furniture delivers an array of merchandise and uses a "Good-Better-Best" approach to pricing, which allows the Company to play up and down the value spectrum. The Debtors' store locations feature a seasonally refreshed assortment that has both exclusive and national brands, traditional and fashion-forward merchandise, and an optimal mix to maximize sales per square foot performance. To support the customer experience, Art Van Furniture has a financing program to offer customers flexibility in purchasing larger and more expensive items. Key comparable companies in the industry include Ashley Furniture, Raymour & Flanigan, Haverty's, Mattress Firm, and Rooms To Go. Other relevant companies in the industry include Bob's Discount Furniture, IKEA, Ethan Allen, Restoration Hardware, and Gardner White.

AB_00066

**C.      The Company's Brands.**

25.      The Company operates stores under five primary retail nameplates: Art Van®, Art Van PureSleep®, Scott Shuptrine Interiors, Levin, and Wolf.   The respective stores operate as follows:

 *Art Van* features high-quality, made-to-last furniture featuring deals on furniture for every room in your home.

 *Pure Sleep* features top brand mattress and other sleep and bedding related goods and products at accessible prices.

 *Scott Shuptrine* is primarily a store-within-a-store format offering exclusive and custom designed home furniture and furnishings

 *Levin Furniture*, including the *Levin Mattress* nameplate, features a wide selection of modern and stylish living room, dining room, and bedroom furniture, including mattresses, with operations in the greater Pittsburgh and Cleveland area.

 *Wolf Furniture* features a wide selection of eclectic furniture from around the country, including Amish made furniture, with operations in Pennsylvania, Maryland and Virginia.

The Art Van and Art Van PureSleep nameplates have their own standalone stores and operate under the website artvan.com.   Both Levin Furniture (including Levin Mattress) and Wolf Furniture nameplates operate their own standalone stores and operate under the websites levinfurniture.com and wolffurniture.com, respectively.

**D.      The Company's Business Operations.**

26.      The Company markets and sells its merchandise through a variety of different channels, including stand-alone stores, franchised locations, and their e-commerce platforms.

14

AB_00067

### 1. Brick-and-Mortar Presence.

27.  ***Stand-Alone Stores.***   The Company maintains a substantial domestic presence.   Currently, the Company operates 169 stores across 9 states.  Of these, 92 are showroom and 77 are freestanding sleep and specialty stores.  Certain furniture showroom locations have attached Clearance Center & Outlet stores to sell discounted products and merchandise.



28.  ***Franchise Stores.***  The Company also has arrangements with franchisees (each, a "Franchise Store").   There currently are 20 Franchise Stores across the United States.   The Franchise Stores are subject to franchise agreements with the Company, pursuant to which the Company supplies franchisees with product and receives a royalty on sales.

### 2. E-Commerce Platform.

29.  In addition to its physical footprint, the Company maintains a user-friendly and well-curated e-commerce platform with the goal of facilitating a complete, omnichannel customer experience to help educate them before they arrive at a showroom.  Customers can seek out the latest home furnishing trends, explore different options for an array of different furniture styles, and purchase furniture online.  In 2019, e-commerce accounted for approximately 2% of sales.



15

AB_00068

### 3. Distribution Centers

30.     The Company primarily operates from two principal distribution centers, one of which is co-located with Art Van's headquarters in Warren, MI.  The second distribution center is located in Smithon, PA.

## II.     The Company's Prepetition Corporate and Capital Structure.

31.     A summary chart depicting the Debtors' corporate structure is attached to this Declaration as **Exhibit A**.  As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations under the Prepetition ABL Credit Facility and the Prepetition Term Loan (each as defined herein) in the aggregate principal amount of approximately $208.5 million.  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Principal Outstanding as of the Petition Date |
|---|---|---|
| Prepetition ABL Credit Facility | March 1, 2022 | $33.5 million |
| Prepetition Term Loan | March 1, 2024 | $175 million |
| Total Funded Debt | | $208.5 million |

## A.     The Prepetition ABL Credit Facility.

32.     The Debtors are party to that certain amended and restated senior secured revolving credit facility, dated as of March 1, 2017 (as amended from time to time the "Prepetition ABL Credit Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower agent, certain of its subsidiaries, as subsidiary borrowers, certain of its subsidiaries, as guarantors, and Wells Fargo, as administrative agent collateral agent, and issuing bank, and the Lenders party thereto.  The Prepetition ABL Credit Agreement provides for total revolving credit commitments of $82.5 million with a maturity date of March 1, 2022 (the "Prepetition ABL Credit Facility").

AB_00069

Approximately $33.5 million is currently outstanding in principal under the Prepetition ABL Credit Facility.

33.     The obligations under the Prepetition ABL Credit Facility are secured by a security interest in substantially all of the Debtors' assets.  However, solely with respect to liens on certain of the Debtor's fixed assets, the liens securing the Prepetition ABL Credit Facility on such assets are subordinated, to the extent set forth in that certain intercreditor agreement, dated March 1, 2017 (as amended from time to time, the "Intercreditor Agreement"), to the payment in full of the obligations in respect of the Prepetition Term Loan.  The Prepetition ABL Credit Agreement contains various affirmative and negative covenants, representations, and warranties, including a covenant that the Debtors maintain a certain amount of excess availability.  Due to the Debtors' deteriorating financial performance, Wells Fargo increased certain reserves in the months leading up to the Petition Date.

**B.**     **The Prepetition Term Loan.**

34.     The Debtors are party to that certain term loan credit agreement (the "Prepetition Term Loan Agreement"), by and among AVF Holdings II, LLC, AVF Parent, LLC, as borrower, certain of its subsidiaries, as guarantors, Virtus Group, LP ("Virtus"), as administrative agent and collateral agent, and the lenders party thereto.  The Prepetition Term Loan matures on March 1, 2024 (the "Prepetition Term Loan").  Approximately $175 million is currently outstanding in principal on the Prepetition Term Loan.

35.     Obligations under the Prepetition Term Loan are secured by a security interest in substantially all of each Debtor's assets.  However, solely with respect to liens on the Debtor's trade receivables, inventory, cash intangibles and other assets collectively referred to as ABL Priority Collateral in the Intercreditor Agreement, the liens securing the Prepetition Term Loan on

AB_00070

such assets are subordinated, to the extent set forth in the Intercreditor Agreement, to the payment in full of the obligations in respect of the Prepetition ABL Credit Facility.

36.  The Prepetition Term Loan Agreement was subsequently amended, including on February 5, 2020 (the "Term Loan Amendment").  Among other things, pursuant to the Term Loan Amendment, Virtus and certain of the Prepetition Term Loan lenders agreed to extend the deadline to deliver the 2019 annual financial statements to February 28, 2020.

### III.  Additional Information Regarding the Debtors' Efforts to Pursue Alternate Restructuring Options.

37.  Recognizing the need to explore strategic alternatives, the Debtors worked closely with THL and their advisors to evaluate available solutions to the Debtors' deteriorating circumstances, including efforts to continue the business as a going concern by means of one or more out of court transactions.

#### 1.  Prepetition Marketing Process.

38.  The Debtors, with the assistance of their advisors, Evercore and A&M, engaged in discussions with various parties considered to be potential investors in the business.  Evercore and A&M compiled diligence information and responded to a high volume of diligence requests from multiple interested parties.

39.  Prior to the Petition Date, Evercore and members of the Board contacted at least 31 potentially interested strategic, financial, corporate and individual parties, including at least 19 parties interested in the whole company and at least 12 parties interested in Levin and/or Wolf. Many of these parties entered into confidentiality agreements with the Debtors and received various confidential information documents, and thus began the diligence process.  As discussed above, the Debtors made substantial progress towards consummation of the Consortium Proposal, but due to market conditions and the uncertain financial viability of the business, the Debtors were

AB_00071

unable to secure investments needed for an actionable going-concern reorganization of the entire business.

### 2. The Expedited Levin-Wolf Sale.

40.    Prior to the Petition Date, Robert Levin, the former owner of the Levin entities, submitted a written proposal, and the Debtors worked to finalize the Wolf-Levin LOI, pursuant to which Robert Levin will purchase substantially all of the assets of Debtors Sam Levin, Inc. and LF Trucking, Inc., excluding inventory located at the eight Maryland and Virginia Wolf locations (the "Assets"), as part of an expedited sale process under section 363 of the Bankruptcy Code. The purchase price consists of a combination of cash consideration and assumed liabilities, including: a cash payment equal to 82.25% of the agreed value of Wolf and Levin's actual cost of goods and freight, the amount of allowed section 503(b)(9) claims related to the Assets, the amount of any cure costs for executory contracts or unexpired leases assumed as part of the Levin-Wolf Sale, and an incremental payment of $3,650,000. The Levin-Wolf Sale also contemplates the assumption of customer deposits and employee obligations related to the Wolf and Levin business.

41.    After hard-fought negotiations, the Debtors and Robert Levin reached an agreement on material terms and are currently moving toward definitive documentation. The Debtors are commencing an expedited sale process to close the Levin-Wolf Sale to prevent continued diminution of value and mitigate the risk of employee and customer attrition as the Debtors contemporaneously pursue the Wind-Down with respect to the Art Van store portfolio. The Levin-Wolf Sale contemplates the following timeline:

- the Debtors shall file a motion to approve a private sale of the Assets to Robert Levin no later than five (5) days following the Petition Date;

- the buyer and Debtors shall enter into an asset purchase agreement for the sale of the Assets no later than ten (10) days following the Petition Date; and

AB_00072

- the Court shall enter an order approving the asset purchase agreement no later than twenty-one (21) days following the Petition Date.

42.     The Debtors expect the Levin-Wolf Sale to maximize recoveries for the Debtors' creditors as well as to preserve jobs and the Levin and Wolf brands.

### 3.     Store Closings.

43.     Due to the challenges discussed above, and at the direction of Wells Fargo, the assets not included in the Levin-Wolf Sale will be subject to going-out-of-business sales conducted in accordance with the Consultant Agreement.  To avoid incurring any unnecessary administrative expenses with respect to certain facilities where the Debtors are no longer operating and retain no assets of value, the Debtors expect to take a number of steps to reduce their expenses moving forward, including filing contract and lease rejection motions, pursuant to which the Debtors will seek to reject store leases and contracts that the Debtors and their advisors have determined are no longer be necessary to the Debtors' business operations.

## IV.     Relief Sought in First Day Motions.

44.     Contemporaneously herewith, the Debtors filed the First Day Motions seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  A list of the First Day Motions is attached hereto as **Exhibit C**.

45.     These First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, honor employee-related wages and benefit obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to

AB_00073

give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

46.     Several of these motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

47.     I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of value; and (b) best serves the interests of the Debtors' stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

*[Remainder of Page Intentionally Blank]*

AB_00074

Dated: March 8, 2020
Wilmington, Delaware

*/s/ David Ladd*
_____
Name: David Ladd
Title:  Executive Vice President and Chief Financial
        Officer

AB_00075

# Exhibit A

## Corporate and Capital Structure

AB_00076



AB_00077

**Exhibit B**

**Levin-Wolf LOI**

AB_00078

March 4, 2020

David Ladd, Chief Financial Officer
Michael Zambricki, Vice President and General Counsel
Sam Levin, Inc.
LF Trucking, Inc.
6500 E 14 Mile Rd
Warren, MI 48092

      **Re:**    **Purchase of Substantially All of the Assets of Sam Levin, Inc. and LF Trucking, Inc.
                Assets by a Newly-Formed Entity Owned and Controlled by Robert Levin**

This non-binding letter of intent (this "Letter Agreement" is intended to confirm certain understandings between Company representatives, Sam Levin, Inc., LF Trucking, Inc. and Buyer (defined below) with respect to the potential purchase by Buyer of substantially all of the assets free and clear of all liens, claims and encumbrances except for such liabilities explicitly assumed by Buyer pursuant to an order of the Bankruptcy Court (defined below). If this letter of intent accurately summarizes the understanding of Company representatives, Sam Levin, Inc. and LF Trucking, Inc. with respect to the potential transaction, please date and execute this letter of intent and return the same to me.

| | |
|---|---|
| **Buyer:** | Levin Furniture, LLC and Levin Trucking, LLC, newly formed entities controlled by Robert Levin, ("Buyer") (Buyer, Sam Levin and LF Trucking, Inc. are each a "Party", herein collectively referred to as the "Parties"). |
| **Seller:** | Sam Levin and LF Trucking, Inc. |
| **Purchased Assets:** | Substantially all of the assets of Sam Levin, Inc. and LF Trucking, Inc. (the "Assets"), excluding the inventory located at the eight Maryland and Virginia Wolfe locations. |
| **Purchase Price:** | The Inventory Valuation (defined below), _less_ any amounts of customer deposits and employee obligations existing as of the date of closing _plus_ the amount of section 503(b)(9) claims allowed pursuant to an order of the Bankruptcy Court (defined below) and any cure costs associated with any leases and/or executory contract designated for assumption by the Buyer and approved for such assumption and assignment by an order of the Bankruptcy Court (defined below) (the customer deposits, employee obligations, section 503(b)(9) claims and cure costs will be referred to herein as "Additional Consideration") _plus_ $3,650,000 related to FF&E and other related assets. |
| | The term "Inventory Valuation" means 82.25% of the estimated value of the Seller's actual cost of goods plus freight based upon actual record receipts provided by Seller (which valuation excludes the value of the inventory located at the eight Maryland and Virginia Wolfe locations we estimate to be over $4,500,000). |

**Security Deposit:** Buyer will deposit $2,000,000 in cash (the "Deposit") promptly following execution of this Letter Agreement in an interest bearing escrow account held by a mutually agreeable escrow agent pursuant to a commercially reasonable escrow agreement. The Deposit is refundable in the following instances: 1) the Seller terminates the transaction or otherwise materially breaches any of its obligations under the definitive documentation required to implement the transactions contemplated hereby; 2) the Bankruptcy Court does not approve the transaction; 3) the Bankruptcy Court approves an alternative transaction for the sale of the Assets; or 4) the transaction does not close on or before 30 days from the Petition Date (defined below). The Deposit is non-refundable in the event the Buyer terminates the transaction unilaterally or otherwise materially breaches any of its obligations under the definitive documentation required to implement the transactions contemplated hereby..

**Fiduciary Duty:** Notwithstanding anything to the contrary in this Letter Agreement or the Definitive Agreements (defines below), nothing in such agreements shall require a Debtor party or the board of directors, board of managers, or similar governing body of a Debtor party, after consulting with outside counsel, to take any action or to refrain from taking any action with respect to the restructuring transactions contemplated by this letter of intent to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction shall not be deemed to constitute a breach of those agreements.

**Bankruptcy Filing:** No later than March 8, 2020,or such other date as may be agreed to by the Parties (the "Petition Date") Sam Levin, Inc. and LF Trucking, Inc. (the "Debtors") shall file voluntary petitions for protection under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court").

**Sale Process:** No later than 5 days following the Petition Date, or such other date as may be agreed to by the Parties, the Debtors shall file a motion to approve private sale of the Assets to Buyer ("Sale Motion"). The Sale Motion must explicitly request approval of the sale of the Assets to Buyer without futher marketing, competitive bidding or an alterntive transaction.

No later than 10 days following the Petition Date, or such other date as may be agreed to by the Parties, Buyer and Seller shall enter into an asset purchase agreement for the sale of the Assets in a form reasonably acceptable to Buyer, subject only to Bankuptcy Court approval ("Asset Purchase Agreement").

No later than 21 days following the Petition Date, or such other date as may be agreed to by the Parties, the Bankruptcy Court shall enter an order approving the Asset Purchase Agreement and the closing of the sale of the Assets to Buyer free and clear of all liens, claims and excumbrances, other than such claims explicitly assumed by Buyer in the Asset Purchase Agreement with a finding that the Buyer is a "good faith purchaser" for sufficient value for the Assets and approval of the assumption and assignment of unexpired leases and executory contracts designated by the Buyer for such assumption and assignment ("Sale Order").

Until the entry of the Sale Order, the Buyer has the right to designate which unexpired leases and executory contracts shall by assumed and assigned pursuant to the Sale Order. Seller shall cooperate with Buyer to permit Buyer access to the Seller's landlords for the purpose of negotiating amendments to such leases.

The Sale Order shall include an explicit provision waiving any stay of the Sale Order (i.e. Federal Rule of Bankruptcy Procedure 6004(f)) to permit the Buyer and Seller to close promptly upon entry of the Sale Order.

**Expenses:** Each of the Parties would pay their own legal fees and other incidental expenses incurred in connection with the transactions contemplated hereby.

**Due Diligence:** Buyer waives any due diligence, other than verification of the Inventory Valuation and any items that comprise the Additional Consideration.

**Closing Date:** The Buyer and Seller shall close on the transaction within two (2) business days from the entry of the Sale Order.

**Closing Conditions:** Closing shall occur, and the Definitve Agreements (defined below) shall become effective, only upon timely entry of the Sale Order in a form and manner acceptable to Buyer in accordance with the timeframes set forth herein.

**Documentation:** The Parties intend to prepare and negotiate (i) the Asset Purchase Agreement, and (ii) any other agreements reasonably necessary to consummate the transactions contemplated hereby.

**Miscellaneous:** This letter of intent sets forth the intent of the Parties with respect to the transactions contemplated hereby but does not create any legal or binding obligation, except for the provisions set forth under the title "Miscellaneous" of this letter of intent (the "Binding Provisions"), which provisions shall be binding on each Party. Except for the Binding Provisions, no other obligation will arise unless and until mutually satisfactory definitive documentation, including the Asset Purchase Agreement (the "Definitive Agreements"), has or have been executed and delivered by the Parties hereto. This letter of intent will be governed by the laws of the Commonwealth of Pennsylvania and may not be amended, and no provision hereof may be waived or modified, except by an instrument in writing signed by the party to be bound. This letter of intent may be executed in any number of counterparts, each of which shall be deemed to be an original. This letter of intent shall not become effective until executed by all Parties.

Sincerely,

Levin Furniture, LLC

By: _Robert Levin_
Print Name: Robert Levin
Title: President
Date: 3/4/20

Levin Trucking, LLC

By: _Robert Levin_

Print Name: _ROBERT LEVIN_

Title: _President_

Date: _3/4/20_

* AB_00082

*Duly Executed and Agreed to by Seller:*

Sam Levin, Inc. / LF Trucking, Inc.

By:

Print Name: Michael Zambricki

Title: Secretary

Date: Sam Levin, Inc.

March 4, 2020

By:

Print Name: Michael Zambricki

Title: Secretary, LF Trucking, Inc.

Date: March 4, 2020

## Exhibit C

## First Day Motions

- *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief;*

- *Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of an Order (A) Authorizing the Debtors to File a (I) Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (III) Redact Certain Personally Identifiable Information for Individual Creditors and Interest Holders and (B) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (V) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief;*

AB_00084

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement, and (IV) Granting Related Relief;* and

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Specified Lienholder Claims and (II) Granting Related Relief.*

AB_00085

# EXHIBIT B

AB_00086

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
|  | . | Case No. 20-10553 (CSS) |
| ART VAN FURNITURE, LLC, *et al.*, | . |  |
|  | . | Courtroom No. 6 |
|  | . | 824 North Market Street |
|  | . | Wilmington, Delaware 19801 |
|  | . |  |
| Debtors. | . | March 10, 2020 |

. . . . . . . . . . . . . . . . .  10:00 A.M.

TRANSCRIPT OF FIRST DAY HEARING
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Gregory G. Werkheiser, Esquire |
|  | Michael J. Barrie, Esquire |
|  | Jennifer Hoover, Esquire |
|  | Kevin Capuzzi, Esquire |
|  | John C. Gentile, Esquire |
|  | BENESCH, FRIEDLANDER, COPLAN |
|  | & ARONOFF LLP |
|  | 222 Delaware Avenue, Suite 801 |
|  | Wilmington, Delaware 19801 |
|  |  |
| Audio Operator: | Leslie Murin |
|  |  |
| Transcription Company: | Reliable |
|  | 1007 N. Orange Street |
|  | Wilmington, Delaware 19801 |
|  | (302)654-8080 |
|  | Email: gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES (Continued):

For the Debtors:              Marua I. Russell, Esquire
                              MONTGOMERY MCCRACKEN WALKER
                                & RHOADS LLP
                              437 Madison Avenue, 24th Floor
                              New York, New York 10022

For U.S. Trustee:             Linda Richenderfer, Esquire
                              David Buchbinder, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF UNITED STATES TRUSTEE
                              844 King Street, Suite 2207
                              Lockbox 35
                              Wilmington, Delaware 19801

For Wells Fargo Bank:         Jennifer Feldsher, Esquire
                              MORGAN LEWIS & BOCKIUS LLP
                              101 Park Avenue
                              New York, New York 10178

                              - and -

                              Cory Falgowski, Esquire
                              BURR & FORMAN LLP
                              1201 N. Market Street, Suite 1407
                              Wilmington, Delaware 19801

For Kingsdown, Inc.:          Gregory Taylor, Esquire
                              ASHBY & GEDDES LLP
                              500 Delaware Avenue, 8th Floor
                              P.O. Box 1150
                              Wilmington, Delaware 19899

For Landlords:                Leslie C. Heilman, Esquire
                              BALLARD SPAHR LLP
                              919 North Market Street, 11th Floor
                              Wilmington, Delaware 19801

For Hilco & Gordon            Steven E. Fox, Esquire
Brothers:                     RIEMER & BRAUNSTEIN LLP
                              Times Square Tower, Suite 2506
                              Seven Times Square
                              New York, New York 10036

APPEARANCES (Continued):

For Levin Furniture:        William C. Price, Esquire
                            CLARK HILL PLC
                            One Oxford Centre
                            301 Grant Street, 14th Floor
                            Pittsburgh, Pennsylvania 15219

For US Assets, Inc.:        Zachary I. Shapiro, Esquire
                            RICHARDS, LAYTON & FINGER LLP
                            920 North King Street
                            Wilmington, Delaware 19801

AB_00089

<u>FIRST DAY MOTIONS</u>:

**Joint Administration Motion.** Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases, and (II) Granting Related Relief [Docket No. 2]

**Ruling:  Order Entered**

**Creditor Matrix Motion.** Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to File a (A) Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (B) Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, (III) Authorizing the Debtors to Redact Certain Personal Identification Information, and (IV) Granting Related Relief [Docket No. 6]

**Ruling:  Order Entered**

**Kurtzman Carson Consultants LLC 156(c) Retention Application.** Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date [Docket No. 3]

**Ruling:  Order Entered**

**Cash Management Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms and (II) Granting Related Relief [Docket No. 4]

**Ruling:  Order Entered**

**Customer Programs Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Certain Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief [Docket No. 27]

**Ruling:  Order Entered**

**Cash Collateral Motion.** Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief [Docket No. 5]

**Ruling:  Order Entered**

**Taxes Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief [Docket No. 7]

**Ruling:  Order Entered**

**Utilities Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (V) Granting Related Relief [Docket No. 8]

**Ruling:  Order Entered**

**Wages Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief [Docket No. 9]

**Ruling:  Order Entered**

**NOL Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and (II) Granting Related Relief [Docket No. 10]

**Ruling:  Order Entered**

**Lienholder Claims Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Specified Lienholder Claims and (II) Granting Related Relief [Docket No. 11]

**Ruling:  Order Entered**

| EXHIBITS: | ID | Rec'd |
| --- | --- | --- |
| Declaration of David Ladd | | 52 |

(Proceedings commence at 10:27 a.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.

Good morning, Mr. Werkheiser.

MR. WERKHEISER:  Good morning, Your Honor.  For the record Gregory Werkheiser, Benesch Friedlander Coplan & Aronoff LLP, proposed counsel for the debtors.

Thank you, Your Honor, for accommodating us so we could have this expedited first day hearing in these cases.

If I may, Your Honor, just before we get underway, I'd like to make some quick introductions to the court.

THE COURT:  Of course.

MR. WERKHEISER:  So, seated behind me, Your Honor, is the debtors' chief financial officer and executive vice president, Mr. David Ladd.

THE COURT:  Sir.

MR. WERKHEISER:  He's joined us from Detroit, Illinois.  Also with us today, Your Honor, is Mr. Dennis Stogsdill from Alvarez & Marsal North America.

THE COURT:  Welcome.

MR. WERKHEISER:  He leads the engagement with Alvarez for this case.

THE COURT:  Very good.

MR. WERKHEISER:  Joining me, Your Honor, at counsel's table, I think, are some familiar faces.  You know

Mr. Capuzzi, Mr. John Gentile, Kate Harmon, Jennifer Hoover;
all from the Benesch Firm.  Then our special counsel, Marua
Russell, who I know is familiar to this court as well.

        THE COURT:  Welcome.

        MR. WERKHEISER:  Just before we proceed, in the
press of getting everything done, we did not have an
opportunity to file a *pro hac* motion for Ms. Russell.  If the
court wanted to entertain an oral motion we will file for
something in writing.

        THE COURT:  All right.  I assume she's admitted
somewhere.

        MR. WERKHEISER:  I will represent that Ms.
Russell, to my understanding, is admitted and in good
standing in New York and other jurisdictions.  And we would
have no reservations at all in signing her *pro hac* motion.

        THE COURT:  Very good.  Happy to admit you *pro hac
vice* pending entry of an order.

        MR. WERKHEISER:  Thank you, Your Honor.

        Your Honor, if its acceptable to the court what we
would propose to do is give Your Honor a brief overview, and
I'm going to emphasize because I know Your Honor is pressed
for time this morning and we've already taken some to try to
work out issues.  A brief overview of the case and the
company, and then what we would like to do is try to work
through what I think are the least controversial of the first

days; joint administration, the creditor matrix motion, KCC,
cash management, customer programs, taxes, utilities, wages
and lienholders.  I think then we would like to take up the
cash collateral, and I think the only open issues we're aware
of there at this point involves some comments from our U.S.
Trustees Office that in the time we had available we resolved
a lot of them, but we do have a couple outstanding still.

Then there are, of course, a couple of matters
that we did not have an opportunity to get on the docket
until last evening.  One is a supplement small DIP facility
that relates to just one of the debtors.  The second one is
the GOB sale motion.  We understand what the court said in
terms of scheduling of those matters.  We would like to just
discuss them with the court before the end of today's hearing
and see if we can't accomplish a little bit with those
motions and agree with people on a path forward.

THE COURT:  Okay.

MR. WERKHEISER:  So, Your Honor, again, to
expedite things I'm going to assume Your Honor has had a
chance to read our first day declaration.

THE COURT:  I did, yes.

MR. WERKHEISER:  So, this is on the spectrum of
Chapter 11 cases a more difficult case.  This is a company
that, you know, finds itself in significant distress and for
which the circumstances have dictated for the majority of the

AB_00094

business there is no other option but liquidation. And so in that sense it is regrettable that we have to be here today because it means some jobs will be lost, and creditors, you know, may not achieve recoveries that they were hoping for, but I can assure you that the company and its advisors are here today to do the best that they can to not only maximize value, but to do this in a way that is most respectful of all the stakeholders who are affected by this process and that, you know, minimizes any harm to anyone as part of this process.

The good news, Your Honor, is that despite all of the head winds that this company faced leading to getting here today, and being in the bankruptcy court, and the inability to save the core, Art Van Furniture, business from liquidation. We are in the happy position of having a buyer for the Wolf and Levin furniture lines. These are two Pennsylvania based furniture retailers that were acquired in 2017 from the Levin Family. And they had performed somewhat better than other parts of the business; although, they have had their own challenges.

Fortunately, as part of the process that got us here today, the company and its advisors were able to engage successfully with them and ultimately to come to an understanding on a proposed assert purchase acquisition of the assets of the Sam Levin, Inc. entity, which is one of our

AB_00095

debtors, and LF Trucking, Inc., which is a second of our
debtors.  Those are the debtors that hold the assets related
to those two retail furniture lines.  We are going to be
seeking, although not shortening notice, but to proceed with
a very expedited sale process for that by, if at all
possible, a private sale process because of the, otherwise,
dire liquidity situation of the overall company.

Part of the relief that we had sought through the
filings yesterday was to get, when Your Honor can entertain
it, what would be a small inventory DIP for that piece of the
business which would encumber only those assets and none
others, then would ultimately be credited against the
purchase price to be paid for those assets when that sale
closes.  The concept there is to simply give the company
liquidity for a runway to purchase inventory and preserve
going concern value over the expedited sales process as
contemplated; just for context, Your Honor.

So, stepping back for a moment, Your Honor, I --
we are relatively recently involved as a firm in the case,
but in the short time that we have been on the case I've come
to understand that this company is, in a way, sort of an
iconic institution for a lot of people in the mid-west.  A
lot of people in Michigan especially, you know, have some
piece of Art Van Furniture in their house.  So, I think, you
know, even lawyers, and lawyers, obviously, are not the most

AB_00096

sentimental bunch in the world, lawyers who have called or emailed me about this case since it filed have expressed, you know, some bit of sadness that the company is going away, but a fondness for the company over the years. So, you know, we are, sort of, mindful of that and will proceed accordingly.

The goal for this case, you know, given the difficult circumstances, given the lack of access to capital in the markets that was available to the company, and just eh operational and financial challenges that it faced is, you know, unfortunately to maximize value through a liquidation of most of the locations, preserve the going concern on the balance and hopefully save those thousand jobs, and provide a benefit to those creditors. To do that as expeditiously as possible maximizing value and doing as little harm to our creditors and other stakeholders as possible along the way.

Again, I think I will cut-off opening comments there, Your Honor, and jump right into the first day agenda unless Your Honor has questions or comments before we proceed with that.

THE COURT: I do not. Thank you very much.

MR. WERKHEISER: Thank you.

Your Honor, I'm going to turn the podium over to Mr. Gentile who's going to present our joint administration motion, then I or Mr. Capuzzi will be back up at the podium in just a moment.

AB_00097

THE COURT:  Okay.

MR. GENTILE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. GENTILE:  John Gentile from Benesch Friedlander Coplan & Aronoff LLP, proposed counsel for the debtors.

Before we get started, Your Honor, I have a stack of orders here.  May I approach?

THE COURT:  Yes, you may.  Thank you.

MR. GENTILE:  Your Honor, before I begin just one slight change in scheduling.  I'm going to be handling the joint admin and the KCC retention app.  I think the creditor matrix is sandwiched in between, and Kevin Capuzzi is going to handle that one.

THE COURT:  Okay.

MR. GENTILE:  So, for our first motion the debtors request that they be allowed to administer these cases jointly.  There are no objections to the joint admin.  So, we ask that the court enter the order.

THE COURT:  Any changes?

MR. GENTILE:  No changes.

THE COURT:  Do you have a copy that doesn't have this legend at the top because if I file this, if I e-file with this legend on the top and then anyone else prints it with their legend on the top its going to be unreadable.  So,

AB_00098

all clean orders can't have that.

        MR. GENTILE:  I do understand, Your Honor.

        THE COURT:  Yeah.  It just looks like the only ones are the -- the consolidated list of creditors has the same problem. All the others look fine -- well, no, I lied, the others have the same problem.

        MR. GENTILE:  Your Honor, may we submit the orders immediately after the hearing?

        THE COURT:  Yes.

        MR. GENTILE:  Okay.  Thank you.

        THE COURT:  I will orally grant joint administration.

        MR. GENTILE:  Thank you, Your Honor.

        THE COURT:  Can you just upload them for Ms. Szymanski --

        MR. GENTILE:  Yes.  We will upload them.

        THE COURT:  -- and she will take care of them.

        MR. GENTILE:  Moving onto the KCC retention application your folder only contains a redline.  We needed to resolve one minor comment from the U.S. Trustee that is reflected in the redline.  There were no other objections or comments.  So, as a result we ask that we be allowed to upload a clean order by the court.

        THE COURT:  Does anybody wish to be heard?

        MS. RICHENDERFER:  Your Honor, Linda Richenderfer

for the U.S. Trustees Office.

I have just asked counsel if I could have a copy of what Your Honor is looking at so I can just make certain that the remaining comment I had was addressed.

THE COURT:  Its looks like it's at the top of Page 4.

MS. RICHENDERFER:  Thank you, Your Honor.  No objection.

THE COURT:  Okay.  The court will grant the motion.  Just upload a clean version and it will be entered.

MR. GENTILE:  Thank you, Your Honor.

At this time I would like to introduce my colleague, Kevin Capuzzi.

THE COURT:  Thank you very much, sir.

MR. CAPUZZI:  Good morning, Your Honor.  For the record Kevin Capuzzi of Benesch Friedlander Coplan & Aronoff, proposed counsel for the debtors.

THE COURT:  That law firm is a real mouthful.

(Laughter)

MR. CAPUZZI:  I know, right.  We need to shorten that; the Werkheiser Firm.

(Laughter)

MR. CAPUZZI:  Your Honor, I'm going to be running through some operational motions.  I also have the cash management or the creditor matrix motion which I know there

AB_000100

is an objection by the U.S. Trustee.  So, what I propose is to go through some of the more routine ones and then handle creditor matrix at the end.

THE COURT:  Okay.

MR. CAPUZZI:  All right. So, the first one I'm going to handle is Number 6 on the agenda, it's the cash management motion.  The debtors seek authority to continue their prepetition cash management system and honor obligations in connection therewith.

The debtors have about 45 bank accounts that are spread across six banks.  They are all in the United States. All but two of those 45 accounts are on the U.S. Trustees approved list.  And the two that are not on the approved list do not exceed the FDIC insured maximum levels.  Continuation of these systems will facilitate the smooth transition into Chapter 11.

I do have, Your Honor, a redline of that order. If you can't easily find it in your packet I can hand it up.

THE COURT:  I think I have it right -- I think what you gave me was the redline.

MR. CAPUZZI:  Okay.  These are all agreed changes with the Office of the United States Trustee. We do not have any outstanding issues.  So, we will, unless the court has any questions, upload a copy of that order.

THE COURT:  It looks like I have a clean here.

MR. CAPUZZI:  I don't think you do.  I think it looks like there is, but I paged through in the rush of this morning and I think that is a stapled copy of a redline that looks clean.

So, I think just to make things easier we will upload; however, Your Honor --

THE COURT:  You can upload.  That's fine.

MR. CAPUZZI:  -- if you could orally grant that one just because we need to process payroll today.  That would be very helpful.

THE COURT:  By the way, backing up to the Kurtzman motion, I had the same comment.  So, thank you, Ms. Richenderfer, for doing my job for me.

All right.  So, it's an interim order.

MR. CAPUZZI:  Correct.

THE COURT:  I'm sorry, does anyone -- I'm off my game this morning.  I apologize.  I've only had six cups of coffee today.

(Laughter)

THE COURT:  Does anyone wish to be heard in connection with cash management?

(No verbal response)

THE COURT:  All right.  I hear none.  It's an interim order so we need a date to fill in the blanks there for a second day hearing.  So, now is a good a time as any to

talk about that. Let's see, did you file yesterday? You
filed Monday or you filed Sunday?

        MR. CAPUZZI: We filed Sunday night in the wee
hours.

        THE COURT: Okay. Was it the wee hours of Monday
morning or was it Sunday night?

        MR. CAPUZZI: No. It was the late hours of Sunday
night.

        THE COURT: Okay. All right. So, sometime the
week of March 30th for a second day hearing, Mr. Werkheiser,
is that all right?

        MR. WERKHEISER: I'm sorry, Your Honor, you said
the week of March 30th?

        THE COURT: Yeah, sometime that week. That will
be 21 plus days from the -- the 31st is 21 days from today.
We can go into the next week. We might need to actually
because I'm unavailable Thursday and Friday. So, I guess we
could do April fool's day or we could do the week of April
6th which I have more availability the week of April 6th.

        MR. WERKHEISER: Your Honor, can we just consult?

        THE COURT: Yes, of course.

        MS. RICHENDERFER: Your Honor, Linda Richenderfer
again from the Office of the United States Trustees Office.

        Just for the record, in case it effects anyone's
scheduling, we are currently -- the proposed date for the

committee formation meeting is Wednesday the 11th.

        THE COURT:  Tomorrow.

        MS. RICHENDERFER:  I'm sorry, Wednesday the 18th.
I'm mixing up my calendar here.

        THE COURT:  That's okay.

        MS. RICHENDERFER:  Just so that Your Honor has
that in mind.  So, April 1st would be good.  It would give
the committee, if formed, two weeks.

        THE COURT:  Yeah.  I think April 1st is really the
earliest because if you file any new motions today that you
want to schedule for that hearing date that will be 21 days'
notice, but if you go -- actually, that will be 21 days'
notice, but if you go -- actually, that would be 22 days'
notice.  I'm think the week of March 6th makes the most sense
-- April 6th, I apologize.

        MR. WERKHEISER:  Your Honor, I think that seems to
be the leading candidate.  I was just trying to give folks a
moment to confirm.  Ideally, if you could hear us that
Monday, April 6th that --

        THE COURT:  Yeah.  I can fit you in.  One o'clock?

        MR. WERKHEISER:  Fine for me, Your Honor.

        THE COURT:  That way people coming from --

        MR. WERKHEISER:  I don't see anybody --

        THE COURT:  -- out of town can fly in that morning
hopefully and not have to spend Sunday night in exciting

Wilmington, Delaware.  So, April 6th at one p.m., and then the objection deadline will be March 30th at four.  You don't have to put a time anymore, but if you want to put a time you can put four o'clock.  We will use that for the second day hearing for everything and that will include final cash collateral and final DIP after we have the interim DIP probably Thursday this week, but we will talk about that when we get to it.

MR. WERKHEISER:  Thank you, Your Honor.

THE COURT:  All right.  So, fill those blanks in and I will be happy to approve cash managment.  I orally approve cash management along the lines set forth in the motion for purposes of being able to process payroll.

MR. CAPUZZI:  Thank you, Your Honor.

The next motion will be the taxes motion which is Number 9 in the amended agenda.  The debtors seek authority to pay prepetition taxes and fees in an interim amount of $854,000 dollars and a final amount of $1,031,000 dollars.  There's a table in Paragraph 10 of the motion that reflects how that is broken down.

The order, as filed with the motion, reflects the agreed changes with the U.S. Trustee.  There has been no changes since then.  So, we would ask the court to enter that order on an interim basis.

THE COURT:  Does anyone wish to be heard?

(No verbal response)

THE COURT:  All right.  We will use the same date for the final hearing.  We have the same problem with the form of orders so please upload it with the correct date and the court will approve the motion.

MR. CAPUZZI:  Thank you, Your Honor.

The next motion is the wages motion which is Number 11 in your binder.  The debtors seek authority to pay prepetition wages, benefits and non-insider commissions in an interim amount of approximately $12 and a half million dollars, and a final amount of approximately $20.4 million dollars.

There is a table in Paragraph 12 of the motion which breaks that down in further detail.  These are wages that are, otherwise, entitled to priority.  The debtors are not seeking to exceed the cap imposed by Section 507(a)(4) of the Bankruptcy Code.  The relief is necessary to maintain the goodwill of the employees and the smooth transition into Chapter 11.

The order, as filed, which we will have to re-upload, reflects the agreed changes with the United States Trustee.  So, unless there are any issues with that I'd ask that it be entered and orally granted today so that we can process payroll.

THE COURT:  Does anyone wish to be heard?

(No verbal response)

THE COURT:  All right.  The court will grant the motion and it's granted subject to entry of an order, but orally granted for purposes of process payroll.

MR. CAPUZZI:  Thank you, Your Honor.

And that's an interim order.  We will fill-in the same dates.

THE COURT:  Yes.

MR. CAPUZZI:  The next motion is Number 12 in the court's packet or the court's binder, I'm sorry.  This is the NOL motion.  The debtors seek to establish procedures related to the transfers or declarations of worthlessness as to debtor Art Van Furniture stock.  They estimate roughly 90 million in federal NOL's and tax attributes which are property of the estate.  These are requested notification procedures that we would seek to approve on an interim basis.

There is a redline order in the court's packet. There is just one very minor change at the request of the Office of the United States Trustee and that is in the procedures which are Exhibit 1 to the order and it is the very last provision of the procedures. There was a procedure that stated that the forms could be filed in a redacted version.  I added, with the agreement of Ms. Richenderfer, that it would be subject to the requirements of the new robust Local Rule 9018.1(d).

Other than that, Your Honor, there were no further comments from the Office of the United States Trustee. We'd ask that this be entered on an interim basis subject to the same dates and deadlines which we would upload following the hearing.

THE COURT:  Does anyone wish to be heard?

(No verbal response)

THE COURT:  Court will grant the motion.

MR. CAPUZZI:  The next motion, Your Honor, is the lienholder's motion which is Number 14 in the court's agenda. The debtors seek authority to pay prepetition lienholder claims in an interim amount of $1,154,000 dollars and a final amount of $3,462,000 dollars.  These claims generally relate to shippers, importers and others who are integral to the debtors' logistical network and may, otherwise, possess common law or statutory lien rights over the debtors' property.  The relief is necessary to ensure the uninterrupted flow of inventory and shipment of merchandise.

Your Honor, the order, as submitted, which we will upload, reflects the agreed changes with the Office of the United States Trustee.  And there has been no further changes.  With that we would ask that it be approved on an interim basis subject to the same dates and deadlines that we have discussed.

THE COURT:  Does anyone wish to be heard?

(No verbal response)

THE COURT:  Court will grant the motion.

MR. CAPUZZI:  The other operational motion is the utilities motion which my colleague, Kate Harmon, will handle, but so that we don't wear out the carpet should we do creditor matrix now?

THE COURT:  Sure.

MR. CAPUZZI:  The creditor matrix motion, I believe, is Number 4 in the court's binder.  Some of the relief sought in here is pretty generic and I don't believe there is an objection to it by the Office of the United States Trustee.  That generally relates to filing a consolidated creditor's list and consolidated top 30 list.  I believe that is not at issue here.

The aspect of the motion that's garnered some attention, as you can imagine, is the request to redact the home addresses of the employees and customer creditors of the debtors.  There is about 4,000 employees and about 7,000 customer creditors; people who have deposits, or potential returns, or gift cards, things of that nature.

While I recognize that the relief sought is not routine it is becoming increasingly important and more commonly granted as issues of identity theft and safety of non-debtor individual's rise.  The debtors respectfully assert that those issues that concern those individuals who

AB_000109

are not part of this bankruptcy by choice, but because they merely work for the debtor or have dealings with the debtor outweigh any transparency or public policy concerns that the Office of the United States Trustee may raise.

We recognize that those concerns are important, but redacting the home addresses, not the names of those creditors, will not impinge on the bankruptcy process. Those addresses will be made available to the court, to the Office of the United States Trustee, to any creditors committee. So, I see not prejudice in redacting them from the publicly filed versions of the creditor matrix.

Similar relief has been granted recently, as recent as last year in Loot Crate, THG Holdings, and the Achaogen cases, as well as older cases such a Model Reorg and Dex Media which are set forth in our motion. The debtors, therefore, assert that cause exists under 107(c)(1) to grant the relief requested.

THE COURT: All right.

MR. CAPUZZI: Thank you.

THE COURT: Any objection?

MS. RICHENDERFER: Your Honor, Linda Richenderfer for the Office of the United States Trustee.

Your Honor, I rise to object because I note for the record that there has been no attempt to make an evidentiary showing to meet the burden. We just have generic

AB_000110

comments regarding identity theft.  There is nothing in the first day affidavit regarding this.  So, I would just submit to Your Honor that the debtors have not met their burden of proof.

THE COURT:  Okay.  Well I disagree on that in that I really don't view it as a burden of proof as much as a common sense issue.  I'm not sure what proof you would say other than to get a witness up and say just want counsel said.

In my experience this has become a serious issue and I have changed my thinking on this as I'm sure people who track these things know, based on experience in a previous case.  In my mind, at this point and given the risks associated with having any kind of private information out on the internet, this has really become routine.  I think obvious relief.

I don't ignore the plain meaning of the code or the rules lightly, but sometimes the code and the rules lag behind reality, and don't take into account the issues that face real life people every day.  I can, from personal experience, tell you that identity theft happens, it happens all the time. It happened to my wife and I a few years ago. And I have had experience in other cases with people who have been subject to danger by estranged people in their lives who have been able to find out where they are.  I take that

extremely seriously.

So, I will overrule the objection and grant the motion.

MR. CAPUZZI:  Thank you, Your Honor.  We will upload that order.

To round up the operation motions my colleague, Kate Harmon, will handle the utilities motion, then Mr. Werkheiser will be back for customer programs and cash collateral.

Thank you.

THE COURT:  Now I know it's cold in here, but is that a scarf?

MS. HARMON:  It is.

THE COURT:  Okay.

(Laughter)

THE COURT:  It's lovely, it's just its not that cold.

MS. HARMON:  Always cold.  Good morning, Your Honor.  Kate Harmon, Benesch Friedlander Coplan & Aronoff, proposed counsel to the debtors.

As Mr. Capuzzi mentioned, I will be presenting the utilities motion which is Number 10 on the agenda and should be Number 10 in your binder.

As set forth more fully in our motion we are seeking interim relief today with respect to the utility

services that the debtors rely on and the utility providers that provide those services, and submit that the relief is necessary both to maintain good customer relationships, employee goodwill and also to aid in the transition into the Chapter 11 cases.

As set forth in our motion we propose to provide an adequate assurance deposit in a segregated account in the amount that is half of the estimated average monthly payments for the utilities that the debtors pay on a direct basis. Additionally, we propose to continue paying our utilities on a monthly basis going forward in the ordinary course of business from cash on hand, cash received in the ordinary course of business and cash collateral.

Additionally, we have proposed additional assurance procedures should utility providers request that. Those are set forth fully in the motion and in our interim order. We submitted our motion and interim, proposed interim order to the U.S. Trustee in the last couple of days. The U.S. Trustee provided one proposed change. It's Paragraph 8(b) of the proposed interim order which just changed the language regarding the timing in which the debtors need to make that adequate assurance deposit to a date certain which is five days from the entry of the interim order.

Unless the court has any questions we'd request that the court enter that order today.

THE COURT:  Does anyone wish to be heard?

(No verbal response)

THE COURT:  Okay.  Happy to grant the order as modified.  If you could upload that that would be great.

MS. HARMON:  With the same dates as discussed?

THE COURT:  Yup.

MS. HARMON:  Thank you.

THE COURT:  You're on a roll, Mr. Werkheiser.  Don't mess it up.

MR. WERKHEISER:  I was going to say I seem to always get up and create the difficult issues.

Your Honor, again, for the record Gregory Werkheiser returning to the podium to present the customer practices motion.  Your Honor, this appears at Docket Item 27.  The customer practices motion seeks authority for the debtors to maintain a subset of customer practices as modified which it identifies as the essential customer practices.

Prior to the petition date and the commencement of store closing sales the debtors maintained a number of customer practice programs in the ordinary course of business at their various retail locations, as detailed in our motion, including taking customer practices for furniture products which are often large dollar value items and have to be special ordered.  And in connection with the Art Van

Furniture stores the debtors had loyalty programs referenced in the motion as the Art Van signature card which had various different participation levels and benefits to customers.

Third, the debtors maintained a refund and exchange policy prepetition in the ordinary course under which customers were generally permitted only seven days to return anything purchased to the store or to exchange it after delivery. Fourth, the debtors had traditional warranties and extended warranties that they offered their customers. Fifth, the debtors had the ability for customers either online or in store to purchase gift cards. I believe that all of their stores other than Wolf Furniture stores that existed.

So, in light of the debtors current difficult financial and operation circumstances and the need to discontinue the larger portion of the business we are seeking to continue customer programs in a modified form as described in the motion, but I would summarize as follows:

For customer deposits at the stores that are the subject of what is defined as the wind-down in the motion, but essentially these are the store closing locations, customers have the option to, who have deposits previously provided to the debtors, receive store merchandise that they purchased if its present in an Art Van store or warehouse. If the originally purchased merchandise is not available to

receive a store credit in an amount equal to their deposit
that can be used towards the purchase of alternative
merchandise during the wind-down.  For those customers for
whom neither of those options would work we are seeking the
authority for the debtors, but the debtor is not to be
required because as set forth in the first day declaration
and elsewhere, their financial circumstances do not permit
them unlimited liquidity to do this.

       THE COURT:  What are we talking about quantity of
deposits on hand?

       MR. WERKHEISER:  So, the quantity -- let me just -
- so across all of the stores, Your Honor, there are
approximately 7,000 people that have submitted deposits in an
aggregate amount give or take 35 million.  And so, you know,
it's quite widespread in some magnitude in the overall scope
of the business.

       What I was saying, Your Honor, is that we are
seeking authority, in certain circumstances, to be able to
provide refunds, but, you know, I want to be clear for the
record that financial circumstances and the cash limitations
that the debtors have are such that those --

       THE COURT:  Is there an argument?  Is there an
argument that it's not your money, that you're holding it in
trust?

       MR. WERKHEISER:  Not that I'm aware of based on

anything that we've seen to date since our involvement in the case. I mean, obviously, these -- we're not necessarily disputing that these wouldn't be entitled to priority under 507 of the Code. I'm not trying to prejudice anybody's claim in that regard, but, no, I think especially for items that are special order items, you know, the nature of the transaction is such that if somebody makes a down payment and then the debtor makes, you know, a financial commitment to its suppliers to special order something. So, I think there is consideration given by the company from the outset even when it's only received a deposit.

THE COURT: Okay. I'm listening.

MR. WERKHEISER: I do, you know, also want to be clear that the debtors, again taking into account the financial limitations of their liquidity and their other circumstances are trying to make the resources they can make available to make refunds in those cases where there is no other viable alternative for the customer. So, we are seeking that relief. And, you know, again, we will need to use is sparingly because of the circumstances of the company in its financial situation, but that is part of the relief requested.

I also want to draw distinction for Your Honor between the ultimate treatment of customer deposits in the sides of the business that are subject to liquidation and the

11 Wolf Furniture stores. Those are the subject of a proposed going concern sale. And while the debtors are not necessarily in a position to honor those outside of the bankruptcy process the buyer may very well be assuming those upon closing of that sale. And there may be the opportunity for those customers to be made whole if that transaction closes. It's certainly contemplated that those may be among the obligations that will be assumed by the buyer.

With respect to the Art Van signature card program, Your Honor, that has been discontinued. It was discontinued in connection with the wind-down. We are not seeking any relief to continue that.

With respect to refund and exchange policies, Your Honor, although the motion may give the impression that the policy has changed, in reality, as it relates to any person who purchased merchandise or furniture prior to the commencement of the store closing sales. The policy remains the same. They have the same seven days to return or exchange that they had under the stores existing policy.

What has changed is that, and all customers that enter the store are made aware of this fact through signage, anything they buy as part of the store closing sales is a final sale. There are no returns or exchanges for those items. Again, that is not a change in the policy for the stores operating in the ordinary course.

AB_000118

Then finally with respect to warranties, as we explained in the motion, their financial circumstances and because of the bankruptcy the company is not in a position to honor warranty obligations.  Again, setting aside the Wolf and Levin Furniture stores and such warranty obligations as the buyer may pick-up as part of that transaction.

And with respect to the gift cards, Your Honor, the debtor had approximately 1.2 million in the aggregate in gift cards outstanding as of the petition date; 500,000 of which are Art Van cards and 700,000 of which were Levin Furniture cards.  I believe none were Wolf because to my understanding they don't have gift cards.

The gift cards will be honored and customers are being notified of this fact through information being made available on the company's website and in store that they have until April 15th to remit those gift cards.  And they will be honored through April 15th.  Again, the gift cards as they relate to the stores in the Levin/Wolf sale transactions upon closing, I believe it was contemplated that the buyer would be assuming those obligations as to those particular gift cards, but not Art Van gift cards generally.

The last portion of the relief, Your Honor, that we're seeking here relates to credit card processing and other payment processors.  This is simply designed to provide comfort to the parties involved in those transactions that

AB_000119

the debtors will continue in the ordinary course of accepting the non-cash payment which I think accounts for something like 80 or 90 percent or more of the transaction volume in the stores. So, we want to maintain that in the ordinary course.

THE COURT: So, if people have ordered a specific piece of furniture in a liquidating store, and it hasn't been delivered yet are they going to get that or should they immediately be looking at whatever is on the floor while there still is stuff on the floor to get credit for their deposit?

MR. WERKHEISER: So, if the furniture exists in an Art Van warehouse, even if it's not on the floor, the company will be trying to fill that order and is committing to try to fill that order even under these customer practices.

THE COURT: But if it hasn't been delivered it's not coming?

MR. WERKHEISER: If it's not currently in the possession of the company in some fashion we're not in a position to --

THE COURT: How are the customers going to know what to do? Someone who is given a deposit to your client how are they going to know what to do? What notice are they going to be given of the fact that they're not getting their deposit back in all likelihood and they might not be getting

their furniture back, but if they want to not lose that value they need to get busy and come to the store and buy something else?  How are they going to find that out?

       MR. WERKHEISER:  Your Honor, can I just take a moment to consult with Mr. Stogsdill?

     (Participants conferring)

       MR. WERKHEISER:  Your Honor, I'm sorry.  I just wanted to confirm that my understanding of these things is correct.

       So, the company -- well, one, there has been widespread publicity about this.  This is the worst kept secret, one of the worst kept secrets in a long time.  So, you know, I think from experience people are well aware of the GOB process and the consequences of that.  But beyond that, as I mentioned, the company has replaced its original website landing page with one that contains a summary of its policies in this regard and to contact a call center for people to get more information.

       In addition, anyone who is in store can have this information.  And then the company has been, over the last few days, trying to determine whether they have sufficient information to make an email distribution to all of the customers who submitted deposits to notify them of their rights under the new policy with respect to the deposits.

       I can't, standing at the podium right now,

represent to Your Honor in a conclusive fashion that we have
the data we need to do that across the board, but that is
something that the company is committing to executing upon if
they can.

THE COURT:  All right.

MR. WERKHEISER:  Then, Your Honor, I may have been
not entirely clear in my comments previously about the gift
card cut-off and merchandise cut-off, but I just want to re-
emphasize that April 15th is the hard cut-off date for all of
those if I wasn't clear about that before.

Your Honor, for purposes of the interim relief
we're seeking today I am not aware of any objections that are
unresolved.  Apparently Ms. Richenderfer has objections that
remain unresolved that I wasn't clear about.  I believe one
issue that we have addressed to the satisfaction of the U.S.
Trustees Office is in Paragraph 2 of the proposed order.

There is language that confirms and cross-
references to any orders using cash collateral and makes
clear that payments are subject to that which, obviously, is
a given.  We have agreed to remove that, obviously, without
prejudice to any rights that the lenders have as secured
lenders pursuant to the cash collateral order so that this
order is clear in that regard.

I will cede the podium to Ms. Richenderfer from
the U.S. Trustees Office and reserve the opportunity to

respond to any concerns she expresses.  Thank you.

MS. RICHENDERFER:  Good morning, Your Honor.
Linda Richenderfer from the Office of the United States
Trustee.

With respect to that last comment by Mr.
Werkheiser it's actually the last sentence of Paragraph 3
that I ask be removed.  I believe debtors have agreed to
remove.

Your Honor, the issue that I had raised while
reviewing these particular motions was the issue of notice,
the same issue that Your Honor has brought up.  I'm used to
seeing in these types of orders detailed procedures regarding
where the announcements were going to be made.  For instance,
requirements that every store would have a big sign in them
that would give everyone notice as to when the gift cards
would no longer be accepted.

Your Honor raised questions regarding notice to
the people with deposits.  I would think that the debtors
would have contact information cause, otherwise, you wouldn't
be able to tell the individual when their goods had been
received.  There has to be some sort of contact information.

Your Honor, with respect to the website, this is
what Mr. Werkheiser had sent to me and if I may approach I'd
like Your Honor to take a look at what the website currently
says as of yesterday and I'll ask Mr. Werkheiser to confirm

this for me.

    THE COURT:  What is the website address?

    MS. RICHENDERFER:  They took the paper from me,
Your Honor.

    THE COURT:  What's the --

    UNIDENTIFIED SPEAKER:  Artvan.com.

    THE COURT:  Thank you.  I'm looking at it right
now.

    MS. RICHENDERFER:  Okay.  Your Honor, I'm told
that there has been information that's been added regarding
the gift cards, but the information that I'm looking at with
respect to the deposits I don't think clearly defines what
was just described to us.

    THE COURT:  It's different.  It says store credit.
It does not say what was represented to the court.

    MS. RICHENDERFER:  That's right.

    THE COURT:  And I don't see the gift cards.

    MR. BUCHBINDER:  Your Honor, Dave Buchbinder for
the record.

    THE COURT:  Oh, I see it.

    MR. BUCHBINDER:  Its here in the liquidation
paragraph.

    THE COURT:  Yeah.  Boy, that couldn't be buried
any further.  Yeah.  We're going to have to talk about this.
This is inadequate.

MS. RICHENDERFER:  It has to be more --

THE COURT:  Absolutely.

MS. RICHENDERFER:  The other thing, Your Honor, I was just doing -- well, actually Mr. Buchbinder did some quick math for me here.  With a total of 7,000 deposits on hand that total 35 million, if we just presume, for the sake of argument, that everyone put down the same amount that's 5,000 per person.  And the -- 7,000, I'm sorry.

MR. BUCHBINDER:  70,000.

MS. RICHENDERFER:  Oh, 70,000.  Okay.  I guess, Your Honor, the point is this; what portion of the 35 million would apply for -- should be given, I should say, administrative priority under the code because debtors are not going to be able to confirm a plan later on if that is where they're going with this unless the administrative claims are paid.  And at this point I don't know what portion of the 35 million qualifies.

THE COURT:  Not to be argumentative, but why is a deposit an administrative claim?

MS. RICHENDERFER:  Priority claim.  I'm sorry, I'm using the wrong terminology under 507(a)(2).

THE COURT:  Why is it a priority claim?  I was looking at the -- huh, which ones?

MS. RICHENDERFER:  507(a)(7), I'm sorry.  Section 507(a)(7).

          THE COURT:  I was looking earlier when Mr.
Werkheiser was talking and I decided that I should actually
be paying attention to him.  So, I stopped looking.  Oh, I
see it.

          MS. RICHENDERFER:  Yeah.  So, the deposit would be
up to $3,025 dollars.

          THE COURT:  Every time I open the code I find
something I didn't know was in there before.  I shouldn't
admit that, should I.

          (Laughter)

          THE COURT:  All right.  Let me say something.
First of all, I got a couple comments.  One, the order itself
needs to spell all this out.  Right now it just references a
defined term that's defined in the motion and I think in this
particular instance the order really needs to spell out
exactly what the procedures are and what the elements are of
the customer program that the court is approving.

          Second, I think you have to -- I'm particularly
concerned about two people.  Now gift card holders who knows
where are, right.  You know, I bought the gift card, but I
gave it to my uncle and it's been in his sock drawer for two
years.  I mean, you know, who knows where these gift cards
are.  But I think there has to be some notice both on the
website and on the store that's more obvious as to exactly
how gift cards are going to be dealt with especially since

there's a deadline of just five weeks.  Not even five weeks
in order to cash them in.

Did you give notice of the filing to State
Attorney's General?

MR. WERKHEISER:  I believe we did, Your Honor.
I'm not sure if anyone from the SAG is on the telephone
today, but that was certainly part of the notice.

THE COURT:  Well, you might get some trouble from
them.  That was a big piece of the RadioShack case as you
might remember.

The other thing is, the other people I'm really
worried about are the deposit fore's.  I think you, first of
all, need to have, again, obvious notice on the website and
at the store exactly what you are going to do.  And it needs
to be consistent with whatever is in the order I'm signing.
This is not -- what's on the website now is not consistent
with what you told the court.  It just says simply store
credit.

MR. WERKHEISER:  Your Honor, I want to just
clarify I would not knowingly misrepresent that to the court.

THE COURT:  Of course you wouldn't, Mr.
Werkheiser.  We've known each other 20 years.  No, no.  It's
not a problem.

MR. WERKHEISER:  I worked off the version Ms.
Richenderfer had that existed yesterday.

THE COURT:  These things -- to describe these
situations as fluid is an understatement.  We all know, we've
all done this for a long time.  I am not in any way implying
anybody has done anything other than in good faith.  So, I'm
just saying there's an inconsistency.  I want it to be
consistent and I want it to be, obviously, advertised.

I don't know, I'm a little worried -- I'm
remembering, I don't know if anyone else remembers Breuners
Home Furnishings from 2004 or 2005 where the debtor used
deposits to pay rent to get the landlords off their back.
And I'm worried that these deposits are going to be used for
liquidity to run the company as opposed to provide services
to the people who put their money up and haven't received
anything in return yet.  I'm particularly worried about the
priority cap being preserved.

So, I'm not going to do anything with that right
now other than to say that I have concerns about the use of
the deposits.  We might need to deal with that in connection
with the cash collateral budget.  I haven't -- I just got the
budget this morning and I haven't, frankly, had an
opportunity to look at it because I've been involved with a
lot of things going on.  But I'm worried we're going to spend
the deposits.  And if that's the case that's a problem at
least particularly at the priority level because you can say
you get store credit and that's it, but the law says

AB_000128

otherwise, assuming you do a plan.  You may liquidate, I
don't know, in which case you don't have to pay your priority
claims.

      MR. WERKHEISER:  Your Honor, obviously, the end of
this case is uncertain at this stage.

      THE COURT:  Of course it is.

      MR. WERKHEISER:  And as to whatever comments I
made about priority I think -- you know, what I was trying to
convey and may have in-artfully done was that we're not
trying to prejudice anybody's arguments as to what is
priority and what's not.  I think that the language that was
chose in that provision is in-artful, to be charitable, and
so for today's purposes that's, obviously, not something that
is before the court.

      THE COURT:  Well, yes and no.  So, yes, this isn't
confirmation of a plan where we have to talk about the
details of the priority scheme, but, yes, it's before the
court because you're seeking to use this money to operate
your business whereas if I were to cut you off today, I'm not
going to do it, don't get excited, convert your case, hand
over everything to a trustee he would be sitting on that
cash.  Meanwhile, you're going to use that cash or what's
left of it to operate the business.  The banks are shaking
their heads.

      MR. WERKHEISER:  Maybe I was going to say I don't

know the --

THE COURT: I haven't gone through the cash collateral budget with any detail.

MR. WERKHEISER: Well, I don't know the particulars also, Your Honor, of what actions the banks have taken in the past in terms of sweeping cash from the company, but certainly they are of the view that this is their cash collateral. So, to the extent that deposits had been accepted it is certainly conceivable that that money has already made its way into the hands of the lenders and is no longer in the possession of the debtors.

So, I think respectfully the situation you posit where we're using it to pay landlords and operate the business is probably less likely than a scenario where the money is no longer with the debtors at this stage.

THE COURT: So, you don't have it in your hands anymore?

MR. WERKHEISER: I don't know.

THE COURT: What you have about 11 million cash on hand? I can't remember. I thought I saw in the papers you have $11 million dollars in cash, is that right? No?

MS. RICHENDERFER: Your Honor, the budget shows 11.6 million as of Monday this week.

MR. WERKHEISER: Yeah. I mean one of the challenges of this case, Your Honor, is that the debtors have

been in cash dominion for some time.

THE COURT:  Have been what?

MR. WERKHEISER:  In cash dominion.  So, the lenders have, effectively, control of all of the cash are just essentially revolving it back to us for cash collateral purposes.

THE COURT:  So, its not been swept?

MR. WERKHEISER:  I'm going to -- I think I should probably let the finance lawyers delve into this a little bit more.

THE COURT:  Yeah.  They never want to say anything though.  They like it when you do the talking.

MR. WERKHEISER:  You know, the upshot is that this is, obviously, not the place the debtors wanted to be I think as we detailed in our papers.  We did everything possible to preserve the status quo with cash deposits, but reality is reality and this is where we are.  We're trying to do the best we can.

THE COURT:  Yeah.  But that doesn't mean you can do whatever you want.

MR. WERKHEISER:  Understood, Your Honor.

THE COURT:  Okay.

MR. FALGOWSKI:  Good morning, Your Honor; Cory Falgowski from Burr & Forman on behalf of Wells Fargo Bank. I'm here with my co-counsel from Morgan Lewis, Jennifer

Feldsher, Margorie Crider and Chris Carter.  I believe Ms.

Feldsher is going to take the lead in addressing the court.

        THE COURT:  All right.  Ms. Feldsher?

        MS. FELDSHER:  Good morning, Your Honor.

        THE COURT:  Good morning.

        MS. FELDSHER:  I guess I can't hid from the

gallery anymore.

        THE COURT:  Well, if you keep nodding and shaking

your head, you know, I'm going to notice you.

        MS. FELDSHER:  I just didn't want to compound any

representations to the court that weren't 100 percent

accurate.

        THE COURT:  Of course not.

        MS. FELDSHER:  So, that is why I was shaking my

head.

        Your Honor, as the debtors have reported to you

the company has been in cash dominion for some time.  What

that means is we have a -- the ABL lenders have a revolver.

In the ordinary course money comes in, it goes to pay down

the revolver and then the debtors borrow back on the line

that they have.  So, that is normal course and that would be

the same if deposits came in.  The debtors use that, they pay

down, they get more availability on the line.

        Prior to the filing, because the debtors were in

default of their obligations under the ABL facility they went

into cash dominion which means that they have -- you know, the lenders fund based on what the debtors need. They give us a schedule, they say we need the following things funded and the banks fund based on the things that they approve to be funded. So, the deposits are not in the debtors' bank accounts today. What the debtors have is sufficient cash to pay their payroll.

The debtors are selling collateral and that collateral, we believe, should exceed the amount that the debtors need to fund their Chapter 11 cases and to repay those deposits that don't get used by people in the ordinary course towards buying something else at the stores. Obviously, that is the preference for the company so that it can realize value from both the deposits and the furniture that they have in stock. But we have discussed with the debtors and they insisted upon being able to return deposits as they need to. There is going to be some process because they need people to tell them that they don't want to use the deposit towards something else in the store.

And from the ABL lender's perspective and also from the term loan perspective we have allowed -- we have agreed that the debtors can do that through the budget and we believe there are sufficient funds in the budget that they will be realizing as they sell assets to be able to return deposits that aren't, otherwise, used by customers towards

other purchases.

THE COURT:  Okay.  I got you.

MS. FELDSHER:  Hopefully that's helpful.

THE COURT:  It was very helpful.

MS. FELDSHER:  Thank you.

THE COURT:  I'm not going to resolve this today.
All I want is notice.  I want clear notice to go to the
deposit holders exactly what is happening to them and the
deadlines that they're facing.  So, that they are able to
maximize their ability to get some value for the deposit.

MR. WERKHEISER:  Understood, Your Honor.

THE COURT:  In my experience if you wait, based on
cases I've had, thankfully have not been in this position,
but if your depositors wait too long by the time they go to
the store, unless its one of the going concern stores, unless
they go to one of the liquidating stores if they don't go in
time there's not going to be anything that they want that
they could use the store credit for.

MR. WERKHEISER:  Yes, Your Honor.

THE COURT:  So, that has happened in cases I have
been involved with.  So, the important thing is people --
they are where they are from their legal right's perspective.
I'm not going to change that.  I'm not trying to change that.
I'm not saying you have to do X, Y or Z, or I'm going to
convert your case or any nonsense like that.  All I'm saying

AB_000134

is you got to give people notice.  And part of that is I want the order to really specify what's happening and I want clear and conspicuous notice to go on the website and in the stores.  I would prefer something going to them in the mail or email, but you're telling me you don't know if you have that ability.

So, we will put something in there that if you can do it you're required to do it and if you can't you can make some sort of representation to the court that you can't.

MR. WERKHEISER:  Thank you, Your Honor.

THE COURT:  Okay.

MR. WERKHEISER:  I just would like to reiterate so you hear it from the debtors is that, yes, we do believe that the budget does provide for adequate access to cash going forward if we meet our projections to honor refunds and exchanges.

THE COURT:  Let me ask you another question.

MR. WERKHEISER:  Excuse me, honor deposits rather as described by our lender's counsel.

THE COURT:  How old are your projections?

MR. WERKHEISER:   I think they have been updated as recently as yesterday.  Within a couple days, Your Honor.

THE COURT:  Okay.

MR. WERKHEISER:  And --

THE COURT:  The only reason I -- I know we all

watched the news yesterday, the economy may not be doing so well right now. So, I was just wondering if we were dealing with February 12th projections or we were dealing with March 10th projections.

        MR. WERKHEISER: No. I think we're dealing with March 8th and 9th projections in that range, Your Honor.

        THE COURT: Okay.

        MR. WERKHEISER: What I also wanted to just clarify for the record to is one of the things that the debtors negotiated vigorously for was that the term loan lenders have agreed to subordinate their recoveries to the extent necessary consistent with our budget for us to honor the deposit obligations. So, once Wells gets out as the ABL lender, you know, we are maintaining availability within the cash collateral structure to honor deposit obligations consistent with the budget by agreement with the term loan lenders.

        THE COURT: So, make those changes to the order.

        MR. WERKHEISER: We will

        THE COURT: Submit it under certification of counsel. Run it by the U.S. Trustee before you submit it and let me know in the COC whether or not they're okay with it.

        MR. WERKHEISER: Very well, Your Honor. Thank you.

        THE COURT: Okay.

MR. WERKHEISER:  Yes.

THE COURT:  Can we take just a few minute break just five minutes.  All we have left is cash collateral, right?

MR. WERKHEISER:  And then we'd like to have some preliminary discussions.

THE COURT:  Okay.  We're running out of time, but we'll get it done.  I just need a short recess.

MR. WERKHEISER:  Thank you.

(Recess taken at 11:33 a.m.)

(Proceedings resumed at 11:37 a.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.

All right.  Let me get your website off my computer here.

MR. WERKHEISER:  All right.  Your Honor, for the record, Gregory Werkheiser.

I think that brings us to cash collateral, Your Honor.  And before we proceed, I just would like to take care of the housekeeping matter of moving in the first day declaration of David Ladd, which is the factual basis for our first day relief --

THE COURT:  Any objection?

(No verbal response)

MR. WERKHEISER:  -- which was filed with the

petition.

        THE COURT:  It's admitted.

     (Ladd Declaration received in evidence)

        MR. WERKHEISER:  Thank you, Your Honor.

        Your Honor, as we get into cash collateral here, I would like to offer a proffer of Mr. Dennis Stogsdill who, as Your Honor knows from my prior introductions, is present in the courtroom and available for cross-examination if that becomes necessary.

        And before we get underway with the overview of the cash collateral order and some issues that we resolved, and a handful that remain outstanding, I'd like to offer that proffer and just a brief introduction to the process that resulted in this order, if I could?

        THE COURT:  Any objection to the use of a proffer?

     (No verbal response)

        THE COURT:  You may proceed.

        MR. WERKHEISER:  Okay.  Mr. Stogsdill of Alvarez & Marsal North America, LLC is present in the courtroom and available for cross-examination.

        If called to testify, Mr. Dennis Stogsdill could and would testify truthfully, as follows:  one, that he is a managing director of Alvarez & Marsal North America, LLC, which has been advising Art Van Furniture, LLC and its affiliated debtors on their restructuring and deleveraging

efforts at certain times, since August of 2019.

He has more than 20 years of management consulting and restructuring experience, serving as a financial advisor, and providing performance improvements services to corporations, various creditor groups, equity owners, and other constituencies.

THE COURT:  Slow down a little bit.

MR. WERKHEISER:  Sure.  Sorry.  I was just trying to speed through the background, Your Honor.

THE COURT:  Yeah, but I still have understand you.

(Laughter)

MR. WERKHEISER:  Mr. Stogsdill has -- would testify that he has significant experience assisting distressed retail companies with day-to-day management activities, including development of business plans, cash flow management, and implementation of liquidity and cost-saving strategies, including store-closing strategies.

His prior retail restructuring experience includes advisory roles in Chapter 11 cases such as Sears Holdings, Fairway Market, and Fresh & Easy Markets.

A&M, itself, is a global business-advisory firm with multidisciplinary solutions, complex and challenges and opportunities, and he would testify that it is well-equipped and deeply resourced for engagements of this nature.

He Mr. Stogsdill would testify that since A&M's

retention, he has overseen a team of individuals assisting the debtors' management with, among other things, managing and forecasting the debtors' liquidity position, evaluating profitability on a four-wall basis, providing alternative sale and financing options, and other financial analyses and planning.

Accordingly, he is knowledgeable and familiar with the debtors' day-to-day operations, business, and financial affairs, cash flow needs, and projections, and personnel.

He is also familiar with the debtors' supply chain and the status of the debtors' relationship with various vendors, suppliers, service providers.

With respect to the debtors' restructuring efforts, Mr. Stogsdill would testify that he is familiar with the testimony of Art Van's executive vice president and chief financial officer David Ladd, as set forth in his first day declaration, filed on March 9th at Docket Item 12 and based on his and his team's extensive work with the debtors since August of 2019, could and would testify, consistent with Mr. Ladd's testimony regarding, among other things, the debtors' restructuring efforts and the events that led the debtors to commence these Chapter 11 proceedings, particularly, as it appears in Paragraphs 6 through 20 and 37 through 43 of Mr. Ladd's declaration.

Further, through A&M's engagement with the debtors

he would testify that he has become deeply familiar with the debtors' prepetition corporate and capital structure and, therefore, could and would testify, consistently with Mr. Ladd's testimony appearing at Paragraphs 31 through 36 of his first day declaration.

With respect to the circumstances that brought the debtors to this Court today, Mr. Stogsdill would testify and emphasize that, as detailed in the live first day declaration, the debtors were making headway in late 2019 and addressing their operational and financial challenges but lacked the runway necessary to fully implement these remedial steps.

He would further testify that the company's situation became critical when, in January 2020, the company's borrowing base under its prepetition ABL facility was further restricted and certain other financial partners of the company tightened its access to credit. When it became clear in early January that the company's lenders and certain other financial partners could not or would not support an extended schedule for the company to explore strategic alternatives, Alvarez & Marsal and Evercore, the company's financial -- excuse me -- the investment banker assisted the company pursue an expedited process to recapitalize or sell all or part of its business or assets.

Mr. Stogsdill and A&M personnel under his

supervision worked closely with Evercore's team on this project. As a result of these efforts, the company and its advisors held discussions with at least 31 potential buyers and investors, including its prepetition term loan lender, KKR Capital Corp. and affiliates about such potential transactions. In parallel with these efforts and as a condition to its ABL lender's forbearance, the company, with A&M's assistance, began preparations for potential store-closing sales.

The most viable option to emerge from this process was the so-called consortium recapitalization transaction discussed in Paragraph 15 of the Ladd first day declaration. This transaction was developed in concert with the parties' most financially motivated to support the business as a going-concern. It depended upon, among other things, an additional capital infusion from Thomas H. Lee, the debtors' equity sponsor, and the Van Elslander family, which was the family of the founder and the original owners of the company; second, it contemplated refinancing of the company's existing ABL facility; third; it contemplated and the support from the company's trade vendors; and fourth, rent relief from the company's five largest lessors under master leases with those parties. Indeed, the debtors negotiated extensively with those master lessors, in connection with the consortium including several of the parties that filed a response to the

first day declaration late last evening.

Another key constituency of this consortium effort was the Levin family, the former owners of the Levin-Wolf Furniture business.

As detailed, Mr. Stogsdill would testify as detailed in the Ladd first day declaration the consortium transaction ultimately failed to come to fruition, given the significant amount of capital needed and unforeseen setbacks in the capital matters that resulted in the withdrawal of certain investors' willingness to infuse new capital.

Although efforts were then made to resuscitate the transaction, they were unsuccessful for several reasons, including the unwillingness of the master leaseholders to enter into further lease concessions.

It was not until the end of February that it became clear that the consortium transaction was beyond saving; however, as mentioned previously, at the insistence of the ABL lenders, efforts were already underway to prepare the company for the contingency of an orderly liquidation process.

Even as the consortium deal was falling apart, the debtors were able to salvage a going-concern sale transaction with the Levin family for the sale of assets of the Levin-Wolf Furniture lines. Although the cash value of that transaction is only slightly above liquidation value, it has

important additional benefits that cannot be realized in a liquidation, including nearly 1,000 jobs will be preserved, customer deposits and warranty obligations are expected to be honored by the buyer upon closing, and Section 503(b)(9) vendor obligations will be assumed.

However, for the Levin to proceed on a going-concern basis, the inventory stocks of those stores needs to be replenished, which has led to the debtors' decision to agree to that separate DIP facility.

With respect to the debtors' need to -- for access to cash collateral, he would testify that the debtors' immediate access to cash collateral, ability to use the cash collateral, consistent with the agreed-upon budget is critical to providing sufficient liquidity to market and conduct the -- not only the going-concern sale transaction, but the orderly wind-down and liquidation of the debtors' assets.

He would further emphasize that the process of getting to an agreement on cash collateral was extensively negotiated over a process -- a period of weeks, and in large part, was a challenging negotiation because the debtors we're so dedicated to trying to ensure that they had sufficient liquidity to meet employee obligations and customer obligations, including allowing customers the opportunity to either receive store credit or in certain cases, a return of

customer deposits.  This, the debtors believe, was achieved in large part through the extensive efforts of the debtors and their advisors and their equity sponsors who have pushed for this to be part of the overall deal for cash collateral.

With respect to milestones, Your Honor, Mr. Stogsdill would testify that these had to be agreed to as part of the attaining the lender's agreement to use cash collateral.  That he believes most of the milestones that are contained in the interim order are traditional bankruptcy-related milestones.  Others that are relating to the approval and conduct of store-closing sales and related documentation and approval in closing of the Levin-Wolf sale.

He would further testify that at his direction, counsel has been in contact with the Levin buyer group and with the other lenders and has secured agreements to modify, outward, some of those milestones to ensure that the Levin sale, when it goes forward, can go forward under normal Bankruptcy Rule-required notice.

With respect to the milestones in general, he would testify that based on his experience, having been involved in many such orders in the past and many such retail restructurings, that they are achievable under the circumstances that we have available here.

As the order relates to fees, Mr. Stogsdill would testify that he is aware that the order provides for the

AB_000145

lender to recover a weekly consent fee of $150,000. While this was certainly something that the debtor would, in its preference, would not have had to pay as consent to obtain access to cash collateral, this was part of the overall package of bargained-for cash collateral access that the lenders required is something that they insist on having has part of their overall adequate protection package to make cash available to the debtor in connection with this case.

Let me just confirm if I've left anything out.

(Pause)

MR. WERKHEISER: Your Honor, that concludes Mr. Stogsdill's proffer in support of our cash collateral.

THE COURT: Does anyone wish to cross-examine the witness?

(No verbal response)

THE COURT: Okay. I hear none.

I have no questions.

MR. WERKHEISER: Thank you, Your Honor.

So, Your Honor, again, I know time is short, so I'm going to try to expedite this presentation as much as possible --

THE COURT: Yep.

MR. WERKHEISER: -- this is a fairly, I think, on the whole, traditional cash collateral order for a retail liquidation of this nature. We have an ABL facility with

approximately $34 million owing and then behind that, a much larger term loan facility, as originally held and agented by affiliates of KKR.  It has since been acquired by certain affiliates of Hilco and Gordon Brothers in an assignment and the debtors negotiated with all of those parties at various times to ensure that they had adequate liquidity in their judgment to conduct this orderly liquidation and wind-down of the stores, other than the Wolf and Levin stores and to try to sell those stores as a going-concern in furtherance of fulfilling their fiduciary duties and maximizing value.

Cash collateral, as you would expect, is tied to a 13-week cash flow budget that is subject to approval by the lender group and, as detailed in the Mr. Stogsdill's proffer, is subject to various milestones related to the conduct of the case.

It has, Your Honor, the traditional stipulations by debtors in this situation as to validity of liens and claims and the lack of defenses to them and it also has the traditional reservations for a committee to challenges within 75 days after commencement of the case or 60 days of committee formation.

Adequate protection packages for the lenders consist of, of course, the replacement liens, the ability to receive a payment of their respective counsel's attorney's fees, subject to a review process, that this Court has seen

before, and such matters as carve-out liens on proceeds of avoidance actions, waiver of 552 waiver, 506(c) waiver, and so on, are all reserved for the final hearing, subject to the rights of the committee or parties in interest to dispute whether the final order should contain those.

I can represent that to our knowledge there is no non-consensual priming contemplated by this order and it has appropriate language that carves out preexisting liens that are valid and by their terms, would be senior, and broadly speaking, that is the order.

I think most of the issues that we have with this order, yet, Your Honor, are (indiscernible) in the nature of drafting issues and certain protections that there's a difference of opinion on as to whether they're appropriate, with the exception of the consent fee.

So, briefly, we did try to engage with the U.S. Trustee's Office prior to the hearing and I think we resolved a number of these issues. To my understanding, we received comments from Ms. Richenderfer from -- in reference to the findings that appear in Paragraphs E and N of the order and I believe we have agreement to modify language there in a way that is acceptable to the U.S. Trustee's Office on what notice was provided and how we express the adequacy of that notice in context of this interim order.

With respect to the payment of professional fees

and expenses to the term loan and ABL lenders, I believe
we've satisfied the U.S. Trustee as to the existence of
appropriate language that allows for an opportunity for a
review and objection of those fees, as is consistent with
practice in the district.  With respect to -- and that
language, Your Honor, is already present in the order; it did
not require changes.

        With respect to Paragraph 12(e)(ii) of the order,
that contemplates certain milestones related to, among other
things, the Levin asset sale -- the Levin-Wolf asset sale
and, by agreement, with the buyer there and our lenders.  We
have agreed to adjust those milestones slightly so that
instead of what is currently read into the order, we will be
filing a sale motion and executed APA within seven days of
the petition date.  We will be seeking a sale order proving
that within what is approximately 22 days thereafter, which I
believe is April 7th, if my math is correct, and we will be,
then, closing within two business days after that.

        So, those milestones are not necessarily
milestones that our ABL and term loan lenders have demanded,
but since they tie to that transaction, that transaction is a
source of value to the estate, so they appear to the
milestones that are required by the purchaser and the
proposed DIP lender.

        THE COURT:  I'm not crazy about a milestone that

blows the cash collateral order in 21 days, but -- unless a
committee shows up and want some more time.

            MR. WERKHEISER:  We're certainly committed to
engaging with them in good faith and I think, you know,
committees being committees and late on the scene, certainly
have the ability to accomplish things that debtors do not.
So, you know, we understand Your Honor's concern and
obviously the committee will have its opportunity to be heard
if and when that happens.

            In Paragraph 20(n), Your Honor, we've agreed to
modify language at the request of the U.S. Trustee's Office
to make clear that the filing of a motion of the type
described in that paragraph by a party other than the debtors
is not a default event unless the debtors fail to contest
that in good faith, which is more in keeping with the
practice in this district and elsewhere.  And I think that's
it, in terms of I believe the issues that we've been able to
resolve.

            I believe there are three issues on cash
collateral that are open to my knowledge.  One is the U.S.
Trustee's Office disagrees that as to the propriety of paying
a consent fee to the ABL lenders for access to cash
collateral and the second issue relates to the language that
appears in subparagraph -- in Clause A of Paragraph 25, this,
which recognizes the ability of a committee to -- or any

party in interest -- to contest the existence of the default, but (indiscernible) with certain other actions that might interfere with the lender's exercise of remedies.

Finally, there's a dispute that remains in Paragraph 27(b) as it relates to the lender's entitlement to recover fees in the event of a challenge to the lender's liens and the claims by someone with standing to do so.  And the position of the U.S. Trustee's Office, as I understand it, there, is that the lenders should have to prevail on that challenge, then under some definition of prevail that I think is not currently present in the documents.

THE COURT:  Explain that to me.  I don't have a blackline.  Explain that to me.

What -- under the order as it exists, if the committee brings a challenge, they have to disgorge all their fees?

MR. WERKHEISER:  Under the order, as it's currently written, Your Honor, the lenders are entitled to their fees --

THE COURT:  Oh, the lenders?

MR. WERKHEISER:  -- on a real time -- essentially, you know, as they're being incurred, when they're defending against a committee challenge.

THE COURT:  Oh, so, the U.S. Trustee wants to stop that, pending the challenge for however long it takes?

MR. WERKHEISER:  And --

THE COURT:  All right.  I understand.

MR. WERKHEISER:  -- is of the view that the lender must actually prevail on the challenge before they can get their fees.

THE COURT:  I understand.

MR. WERKHEISER:  So, I those are our three issues. I will cede the podium to the U.S. Trustee's Office --

THE COURT:  Okay.

MR. WERKHEISER:  -- and reserve an opportunity for the lenders and the debtors' response.

THE COURT:  All right.

MS. RICHENDERFER:  Your Honor, Linda Richenderfer from the Office of the United States Trustee.

In considering the time --

THE COURT:  Yeah, don't rush, because we're not going to finish --

MS. RICHENDERFER:  Okay.

THE COURT:  -- before I have to get off the bench. I thought I made it pretty clear --

MS. RICHENDERFER:  Okay.

THE COURT:  -- that I have a meeting that I cannot miss.  So, we're going to be reconvening, so take your time.

MS. RICHENDERFER:  Okay.  Your Honor, the first -- there's four issues.  Let me back up a minute.

AB_000152

We had discussions prior to the hearing today in response to the comments that Mr. Buchbinder and I supplied yesterday and believe we've reached some agreements with the debtors and with the ABL lenders regarding changes in language and Mr. Werkheiser did touch upon several of those instances.

We will need to see the revised form of order to know whether or not we have totally been able to resolve those because we don't have a blackline and didn't receive any responses. So, we just want to make sure that Your Honor is aware of that until we see it in black and white, there may be some issues that remain.

THE COURT: Okay.

MS. RICHENDERFER: The consent fee, which is on Page 27 -- it's Paragraph 20 -- I'm sorry, it's Paragraph 12(d) of the order -- requires that the debtors pay $150,000 per week until the prepetition ABL obligations have been repaid in full. It is part of the covenant -- I'm confused by the limits, Your Honor, because I don't believe it's part of the prepetition documentation for the ABL loan, but there was something that Mr. Werkheiser said that led me to believe maybe it was. I'm not -- with respect to the proffer that he was giving us, don't understand the basis for that because it's apart from any adequate assurance.

THE COURT: Okay. Have you ever seen this?

MS. RICHENDERFER:  No.  Mr. Buchbinder nor I have ever seen this.

THE COURT:  All right.  I haven't seen this, either.

MS. RICHENDERFER:  So, that was another reason why it caught our eye.

Your Honor, on Page 47 -- and this is part of Paragraph 25(a) at the very beginning, it starts off, "Except to contest the occurrence of an event of default ..."

The idea of adding in there "preventing hindering or delaying" are very, I think, undefined terms of art that could be used in many instances where it would not be appropriate in order to use this particular provision against the debtors.

Page 50 is the one that Mr. Werkheiser spelled out for Your Honor that's part of Paragraph 27(b) that would allow a during the challenge period, the prepetition secured parties are going to be entitled to receiving their costs and expenses, while the challenge is ongoing.  And that's costs and expenses, with respect to the challenge, not the challenges ongoing.

The other concern, Your Honor, is that on Page 53, Paragraph 36, all concerns the Levin DIP facility, which I know Your Honor has already stated will not be heard today. Quite frankly, Your Honor, I haven't even had time to print

it out to if you look at it yet and I'm concerned that anything and all that's in here not be considered to be any approval by Your Honor of the Levin DIP facility until such time as the Court has scheduled a hearing on that and we have time to review the documentation in connection with it.

THE COURT:  All right.  We're in recess until 1:30 and we'll reconvene at that time to talk about cash collateral.  It would be nice to have a redline by then, if possible.  What I have here is just a clean copy, so -- which I think is the original copy.

MR. WERKHEISER:  I think what you have is what was filed --

THE COURT:  Huh?

MR. WERKHEISER:  Yeah, that's what was filed (indiscernible) --

THE COURT:  Right.  So, if there's been changes, it would be nice to see them in a redline if you have time; otherwise, it will be what it will be.

So, 1:30 or as promptly thereafter, as possible. I have a series of important internal bankruptcy court meetings today, so I apologize, but it is what it is and you can blame Wuhan, China, for what we're talking about.

So, we're in recess until 1:30.

COUNSEL:  Thank you, Your Honor.

(Recess taken at 12:06 p.m.)

(Proceedings resumed at 1:45 p.m.)

THE COURT OFFICER:  All rise.

THE COURT:  Please be seated.

So, before we proceed, Ms. Richenderfer, if you could -- I want to make sure I have your three points.  So, if you could bullet point your three objections, again, for me, because I was distracted, frankly, because I knew I had to be in this meeting.

MS. RICHENDERFER:  Your Honor, there's actually four.

THE COURT:  Four bullet points, there you go.

MS. RICHENDERFER:  There's three of greater importance, maybe.  The consent fee -- it's on Page 27, Paragraph 12(d) -- there's language at the beginning of Paragraph 25(a) on Page 47 that we think will have a chilling effect on actions taken by the committee or may be taken by the committee.

THE COURT:  And what's that -- oh, that's the sort of --

MS. RICHENDERFER:  Like hindering and --

THE COURT:  Yeah, hindering, right.

MS. RICHENDERFER:  -- these undefined terms.  The next issue was the payment of legal fees --

THE COURT:  Right.

MS. RICHENDERFER:  -- to the lender during the --

any challenge period.  That's prevailing party 27 -- we think
it should be prevailing party, Paragraph 27(b), as in boy, on
Page 50.

THE COURT:  Uh-huh.

MS. RICHENDERFER:  And then I just wanted to
underscore and make sure that the Court approving the
language that's in Paragraph 36 on Page 53 regarding the
Levin DIP, is in no way meant to or construed to be an
approval of the DIP, which the Court still needs to consider
at a later date.

THE COURT:  Thank you very much.

Does anyone wish to be heard?

MR. WERKHEISER:  Good afternoon, Your Honor.  For
the record, again, Gregory Werkheiser, from Benesch, on
behalf of the debtors -- proposed counsel on behalf of the
debtors.

Your Honor, I'll make some comments on these
points and to the extent our ABL or term loan lenders want to
be heard, I'd ask them to have an opportunity to speak, as
well.  So, I think let's take the easiest one first.  I think
that was 53, Linda?

MS. RICHENDERFER:  Paragraph 36 on Page 53.

MR. WERKHEISER:  Page 53.  So, yeah, I think we
can make a representation to the Court today that no one's
rights relative to consideration of the Levin DIP are being

prejudiced by anything contained in today's order.  This
language exists in the order solely to anticipate that that
small DIP financing facility will be presented to the Court
and to make sure that the order is capable of being read
consistently with what we understand the terms of that DIP
facility and their proposed interim DIP order to be when it's
adjudicated by the Court.

THE COURT:  Well, I can actually make it even
easier.  I don't think it's appropriate, so strike it.

This order stands on its own.  The DIP order will
stand on its own.

MR. WERKHEISER:  Let me cede the podium for a
moment, Your Honor.

THE COURT:  Uh-huh.

MS. RICHENDERFER:  Your Honor, I just rise to say
that that change is fine, Your Honor.

THE COURT:  Okay.  Thank you.

The Paragraph 27(b) legal fees of the lender if
there's a challenge ongoing, I think it's appropriate that
that language stay in.  I don't think there should be some
presumption that the lender doesn't -- isn't entitled to its
fees just because somebody brings and action.  And it can be
prejudicial to the lender to have to front its own legal fees
on a challenge that could last years, so I think it's
appropriate to have that language.  So, I'll overrule that

objection.

          MR. WERKHEISER:  All right.  Thank you, Your
Honor.

          And then let's just leave the consent fee to the
last, if we may, Your Honor.

          And then with respect to the language on -- I'm
sorry -- Paragraph 25(a), so, it's my understanding this is
relatively typical language in this court and in others;
essentially, the committee has their investigation budget.
This does not invade any traditional investigatory activities
by an official committee that Your Honor would appoint.  But,
you know, it is, I think, a well-accepted principle of
drafting these orders that, as they've developed over the
years, that, you know, a secured lender should not be forced
to allow its own cash collateral to be used in actually
litigating and I think that's what these terms are primarily
contemplating.

          I'm speaking from 21-plus years of experience at
this.  I've never seen a committee that was really deterred
by this language.

          THE COURT:  So, if you have a plan, which would be
helpful, and it's got the support of the secured creditors
and the committee objects to the plan can they use cash
collateral to pay their fees to object to the plan?

          MR. WERKHEISER:  Well, again, I think as this

language, as in my experience has been interpreted over the years -- and I cannot speak for our specific lenders -- but, you know, I've never seen a lender successfully object just based on that cause to a committee objecting to a plan that they think violated the Bankruptcy Code in some way or was not in the best interests of the estate.

If the committee's objection was based on the assertion that the lenders (indiscernible) to the liens or claims, I think, then, they might be well within their rights to rely on this language in that scenario if that's what the committee was trying to litigate in the context of that objection.

But, again, I, you know, my understanding and certainly the contextualized understanding that has developed over time and I believe in this court, is that a generic confirmation objection would not be limited on the part of the committee.

THE COURT: Counsel?

MS. FELDSHER: Good afternoon, Your Honor. Jennifer Feldsher, Morgan, Lewis & Bockius, on behalf of Wells Fargo --

THE COURT: Can you move the microphone towards you. Thank you.

MS. FELDSHER: That's usually never my problem, Your Honor.

THE COURT:  Well, this is a noisy air-conditioner, unfortunately.

MS. FELDSHER:  -- Counsel for the agent for the ABL lenders.

Your Honor, I actually don't read language, (A), to cover the Court's concern about a Chapter 11 plan, because what it says is, you know, this goes to permitted enforcement -- and that's what it says in (A) -- permitted enforcement or realization upon the collateral.  So, it's what's permitted under the order and I view that to be an exercise of remedy.

So, in other words, if there's a default, there's language, as is typical in similar orders, that says, you know, if the default -- unless the Court orders otherwise, with an x amount of days, the lenders can foreclose, the lenders can take other actions, they can seize cash, they can do things.

And so, I think this gets to that point --

THE COURT:  Yeah.

MS. FELDSHER:  -- that the creditors' committee can't use cash collateral of the lenders, frankly, to challenge anything but the event of default and whether that occurs.  And we do think that this language is fairly typical and while I absolutely hate standing up and citing other cases that the Court's been involved in, that I'm not

involved in, so I don't know the ramifications of that, I do know this is similar language to what was in True Religion, which I believe the Court approved, as well.

        THE COURT:  You could write a list a thousand pages long of things that are in orders that I've signed that I don't like --

        MS. FELDSHER:  I did preface --

        THE COURT:  -- but this is not one of them.

        MS. FELDSHER:  I did preface that by saying I hate citing it, but I would do it anyway.

    (Laughter)

        THE COURT:  You're going to do it anyway; you're contractually obligated.

        MS. FELDSHER:  That, I am.

        THE COURT:  No, I'm okay with this language.  I don't think this is -- I understand the concern, you know, what does hindering meaning, what does preventing mean, but I think it's -- the way the sentence reads, it's really focused on the permitted enforcement or realization on the collateral and I think that's pretty narrow, so I'm okay with that.

        MS. FELDSHER:  Correct.  Thank you, Your Honor.

        THE COURT:  So, we're left with the consent fee.

        MR. WERKHEISER:  Yes, Your Honor.

        Gregory Werkheiser for the record, again.  So, the consent fee, I think as we got into this previously,

obviously, the debtors would prefer not to pay a consent fee. We would like to conserve as much cash as possible and keep the lenders' claims as minimized as possible to ensure the greatest recoveries for everyone in the case.

That being said, we did not have the ability to demonstrate adequate protection for both, the ABL and the term loan, in the context of this order and this order represents a negotiated package of terms under which they were prepared to give the debtors access to cash collateral.

We got some things that we wanted, such as budgeting, in order to honor customer deposits, budgeting to cover, you know, ordinary course operating expenses for the contemplated projected duration of the liquidation.

We didn't get some things that we didn't want such as taking out obligations like this.

So, it's hard to -- I don't think it's appropriate in the context of this order to segregate this and say, Well, there's not necessarily a basis explicitly in the prepetition documents for this, therefore, they should not get it.

It is part of the overall deal. It is part of what was required under our agreements to provide adequate protection and it was the bargain that the debtor struck. So, we are prepared to live by it, even if it's not ideal.

THE COURT: Yeah. Well, I'm okay with it. I mean, I don't like it either, but it's not my money.

AB_000163

And this cases is tremendously risky for the lenders.  The prudent lender might simply force a liquidation, so it's a bit of a wing and a prayer here and I certainly -- and I think, importantly, there's just no adequate protection available.  And cash payments, although they generally are to principal as opposed to a fee, but cash payments are specifically contemplated as something that can be used as adequate protection, so I'll allow it.

MR. WERKHEISER:  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. WERKHEISER:  I think that is the remaining open issues we have on the interim order.

THE COURT:  I don't -- do you have a blackline yet?

MR. WERKHEISER:  I do have a blackline for Your Honor, if I may approach?

THE COURT:  Yes.  I just need to go through my notes and see if there's any open issues left.

Thank you.

Here come the landlords.

(Laughter)

THE COURT:  Look out.

Ms. Heilman, how are you?

MS. HEILMAN:  Good afternoon, Your Honor.  Leslie Heilman, Ballard Spahr, on behalf of a number of landlords of

the debtors that represent approximately 42 locations of the debtors, so a significant majority of the landlords, Your Honor.

I rise, number one, since we are dealing with the DIP, we did raise certain concerns with respect to the DIP. I have seen a blackline that has addressed those concerns, namely, with respect to access in Paragraph 32 and Paragraph 21, just subjecting any default to the access language in Paragraph 32. I have seen that language. I believe the order that's been handed up to you will reflect those changes.

So, with respect to the DIP, I think we are -- or the cash collateral, we are resolved, with the exception of -- and this is more of like a preview for things to come -- I think, Your Honor, we have been told that stub rent is in the budget for approximately the third week of March, or at least near the tail end of March to be paid. This is a liquidation case, as they've teed it up to Your Honor and they have commenced GOB sales prior to the petition date and have asked Your Honor authority to continue those sales post-petition, outside the ordinary course of business. So, it is -- and with the liquidity concerns before Your Honor, we had serious concerns that the rent to be paid during their time of use and occupancy of the premises. So, that will come to fruition probably before the final and we'll raise

any concerns with respect to rent at that time.

I do want to say, Your Honor, we are not advocating for our rent to be paid out of the priority claims as was indicated earlier this year. We would not advocate for that, administrative creditors should share equally in that regard.

Your Honor, in addition -- and I'm not sure -- I think where we're going is the scheduling piece going forward, and we did file a response to the first day declaration. I'm not sure if Your Honor had an opportunity to see that.

THE COURT: I saw that.

MS. HEILMAN: Your Honor --

THE COURT: I wouldn't know if I would call it a response; it had a little edge to it.

(Laughter)

MS. HEILMAN: It had a little edge to it. And, Your Honor, it was not raised by all of my representative clients, but there are certain majority interests of landlords here that are very, very concerned going forward, with respect to the expediency of this case and the process to date and the fact that this is on a fast-track for liquidation before any committee is in the door, as well as we are mindful of the liquidity constraints, but as people have indicated, this is an iconic institution. It is very --

AB_000166

you know, the places that -- the geography of where it sits is very important to the people.  It's very important to the landlord community.  It's very important to the vendor community.

And we filed the declaration because we think that even though there are liquidity constraints, we are aware that there are buyers out there and that there should be at least be some slowdown, however slight to, allow for that to play out to see if there is possibly a going-concern enterprise here.  And the committee should have a seat at the able on that.

I know that the U.S. Trustee's Office has set a formation meeting for next Wednesday and we have continued the liquidation motion to Thursday, so there is some time here to continue to explore that with those purchasers, but there are prospective purchasers out there for a go-forward enterprise and before the train leaves the station, I think that everyone should be mindful of that and see if we can stop fast-tracking to just a closer of the doors for the employees, for the landlords, and for everyone that's involved to maximize value.

So, Your Honor, I rise to say that because we just didn't want -- we wanted to comments to be heard and we're hopeful and that will really set the stage for the motion that will be heard on Thursday, as well as when the committee

is formed.

THE COURT:  Just so -- by liquidation motion, you mean the motion on the GOB sales?

MS. HEILMAN:  Yes, Your Honor.

THE COURT:  Okay.

MS. HEILMAN:  And we will have our usual -- we have our usual concerns with that motion which we are working with the liquidators on, with respect to the conduct of the sale, the signage, and the like, as well as the proposed form of order, but there is this overall concern, too --

THE COURT:  Whether that's the --

MS. HEILMAN:  -- that we're speeding towards a liquidation where there is a prospect for a going-concern.

THE COURT:  Okay.  Thank you.

MS. HEILMAN:  Thank you, Your Honor.

MS. RUSSELL:  Your Honor, Maura Russell, Montgomery McCracken Walker & Rhoads, proposed special counsel for the debtor.

I don't want to get -- jump ahead of the Court with respect to the motion to approve the store-closing sales, but if Your Honor was entertaining comments, our responses to counsel's comments, I wanted to rise and to address those.

THE COURT:  Oh, that's not necessary.

MS. RUSSELL:  Okay.

THE COURT:  Thank you.  Mr. Taylor?

You get more distinguished every time I see you,
which means you're getting grayer.

(Laughter)

MR. TAYLOR:  I'm sure it has nothing to do with
what's going on up here.

(Laughter)

MR. TAYLOR:  Good afternoon, Your Honor.  Greg
Taylor --

THE COURT:  Good afternoon.

MR. TAYLOR:  -- of Ashby & Geddes.

On the phone with me, Your Honor, is Mr. Michael
Small of the Foley & Lardner firm.  Together, we represent
Kingsdown, Inc. and our primary issue, Your Honor, is that
Kingsdown provides certain diagnostic units and kiosks that
are located in the debtors' stores and these diagnostic units
contain proprietary technology.

We want to make sure that no liens attach or
purport to attach to those items that are owned by Kingsdown
and we also want to make sure that those items find their way
back to Kingsdown at the close of the debtors' stores.

We have begun to engage in the dialogue with
debtors' counsel on this and we look forward to continuing to
work with them on that.  But we did want to at least mention
it today, highlight the issue for Your Honor in the event

that we were not able to reach an agreement and we're back
before you at the final hearing on a disputed matter.

        THE COURT:  All right.

        MR. TAYLOR:  Thank you, Your Honor.

        THE COURT:  Thank you, Mr. Taylor.

        Of course, if it's not the debtors' property, they
can't give somebody a lien on it.  If it is, they can.  And I
will decide that at a future date, if necessary.

        Let me just run through the --

        MR. WERKHEISER:  And, Your Honor, with respect to
the Kingsdown property, there is likely no dispute there.  We
just were advised of this position yesterday.  We've had some
preliminary discussions with our client and I think, likely,
at the end of the day, we'll come to an understanding to
return that to them, but we just haven't had a chance to
diligence their statement that they owned that property and
that it ought to be returned from the locations where it
exists with the debtors right now.

        So, everybody's rights are fully reserved.

        I don't want to get into the weeds on landlords'
counsel's comments before but I do want to just make clear,
and I want our record to be clear, that although
circumstances have us in a position where we have to pursue a
liquidation currently for the majority of the stores, to be
clear, the phones are open, the doors are open.  We will

entertain legitimate offers that produce more value for our

stakeholders than the option that we've currently got before

us.  If that option exists, you know, we're prepared to

consider it.

You know, the difficult part of the situation is

that we've tried very hard to find a better option and have

not been able to succeed at that to date and so -- but, you

know, stranger things have happened and if somebody could

come forward with not just, you know, an offer as an going-

concern offer, but one that can deliver more value, which is

the guiding principle for this Court at the end of the day,

everyone, I think, behind me is prepared to consider that.

THE COURT:  Okay.  I have some comments to the

order.

MR. WERKHEISER:  Yes, sir?

THE COURT:  Page 14, Paragraph K, which is a

finding that there's an entitlement to the equities of the

case exception waiver and 506(c), since that's preserved for

the final order, I would like to take out that finding.  I'm

making no such finding.

And then --

MR. WERKHEISER:  Your Honor, just to be clear, by

removing that now, we are just preserving the *status quo*,

pending a final hearing; is that fair?

THE COURT:  What does "preserving the *status quo*"

mean?

        MR. WERKHEISER:  It means that the issue can still be addressed when we get before Your Honor at a final hearing.

        THE COURT:  I'm just not making a finding today.

        MR. WERKHEISER:  Yeah.

        THE COURT:  I mean, I don't even know why we do this, but it says -- you put a paragraph -- this is why the orders are so long -- you put a paragraph in that says, "subject to the final order" and here's a one-page-long paragraph.  This interim order doesn't even do what this paragraph is designed to do, other than put a pin in it so that the committee has something to aim at or they know what your position is.

        I'm certainly not going to make a finding for a paragraph that doesn't make any sense to begin with, but I'll live with that.  I'm used to seeing that, but I'm not making any finding.

        MR. WERKHEISER:  Understood, Your Honor.

        THE COURT:  There's a blank in Paragraph 11, Page 25, for the exhibit number for the budget.  I don't know what the number is supposed to be, but you want me to fill that in?

        MR. WERKHEISER:  Yeah, one, please.

        THE COURT:  There are, one, two, three, four -- at

least five instances where you've said that people are authorized and directed to do something.

I'd like you to make a global search and replace and get rid of "and directed" and just authorize. So, for example, I mean, I could list them all for you. In Paragraphs 7, 8, 9, 17, and 22 is where the language is.

So, 12(b) on Page 27, there's a blank for the exhibit number for the borrowing base certificate and 12(c), right below it, there's a blank for the exhibit number for the budget-variance certificate.

MR. WERKHEISER: Yes, I believe those will be two, and three, and so forth.

THE COURT: Well, they are what they are.

We've already talked about Paragraph 36 and then for the final hearing let's just use the date, if that's all right, the date that we've already sat of April 6th, I think; is that right?

MR. WERKHEISER: That was April 6th, Your Honor, with a 10:00 a.m.

UNIDENTIFIED: I have 1:00.

MR. WERKHEISER: Oh, 1:00, now?

THE COURT: The 6th at one o'clock, yeah, and objections are due the 30th of March.

MR. WERKHEISER: Okay.

THE COURT: Subject to making those changes and

submitting it under certification of counsel, I'm happy to
approve your cash collateral order.

        MR. WERKHEISER:  All right.  Thank you, Your
Honor.

        We will get that over before the end of the day.
        THE COURT:  Okay.

        MR. WERKHEISER:  Your Honor, one of the things we
left at the hearing prior was our customer practices [sic]
motion, and just to bring Your Honor up to speed on that, as
I arrived here, we distributed some redline for people to
review to try to make some changes responsive to Your Honor's
comments about that.  I think rather than put anyone in a
position, especially given that we're coming back here within
the next day or so, in a position where they don't have an
opportunity to review, if I could just summarize those for
Your Honor and then give people an opportunity to review the
document.

        But we did agree to reproduce the detailed wind-
down customer practices in the text of the order and have
revised that to do so.  And then in addition to have attached
an exhibit that it provides a fair bit more detail on how
customer deposits are processed --

        THE COURT:  Okay.

        MR. WERKHEISER:  -- going forward.

        And then I was able to consult with the company

and our financial advisor during the break and I understand

that the intention is, within the next several days to make a

distribution to all customers that tendered deposits for

which we have an email address, by email, that will notify

them of the company's current policy on customer deposits, so

they are alerted to that in time to act upon, you know,

whatever they intend to do with their customer deposit.

And for those that we do not have email addresses,

we have, by and large, physical addresses and will be sending

out notices to them by mail.

THE COURT:  Good.  Thank you.

MR. WERKHEISER:  So --

THE COURT:  I expect that this -- word of this has

hit these communities where these stores are located -- and I

didn't look myself -- but I'm told there are some news

stories about the world clearly knows that this is going on,

but I think that it does make a lot of sense and it's

appropriate and consistent with due process to give these

people an opportunity to receive formal notice or informal

notice of what is going to be done in connection with their

deposits.  Because this is real money for real people and it

makes a real difference.

MR. WERKHEISER:  Thank you, Your Honor.

And I would just ask that if they're present in

the courtroom today, if they had further comments on the

AB_000175

order, to get them to me before the end of the day and we'll
try to sort of things out.  And if everybody is onboard,
submit it under certification if that's acceptable to Your
Honor?

        THE COURT:  That's fine.

        MR. WERKHEISER:  Thank you, Your Honor.

        THE COURT:  You're welcome.

        MR. WERKHEISER:  I think that brings us to the
remaining items that were filed last evening, for which we
want to discuss scheduling.  Why don't we take up store-
closing sales first and I'll cede the podium to Ms. Russell
and we can try to talk about getting a game plan for that.

        THE COURT:  Okay.

        MS. RUSSELL:  Good afternoon, Your Honor.  I'm
certainly mindful of the clock, so I will be brief.

        While we regret the timing of the filing of the
motion, that was the quickest we could get it, so we do
apologize.  We had hoped that we would be able to at least
have preliminary hearings, with respect to the motion and
that Your Honor would keep the record open and, perhaps, a
telephonic conference tomorrow later in the day to resolve
any remaining issues or outstanding objections.

        We've discussed that with a few of the counsel to
the landlords that are in the courtroom.  They've expressed a
willingness, so long as there is a, you know, maintaining of

the *status quo* until Your Honor has that hearing.

          The U.S. Trustee's Office is not inclined to --
that scheduling did not work for them.

          THE COURT:  I am not going to conduct a hearing at
all.  I'm not going to start a hearing.  I'm not going to
conduct a hearing on a motion that was filed at midnight last
night for a 10:00 a.m. hearing this morning.  I'm not mad at
anybody for filing it.  I understand these things take time.
It's just inappropriate and not consistent with the due
process to even start the hearing.

          I'll give you Thursday.

          MS. RUSSELL:  Okay.

          THE COURT:  I'm in an all-day mediation
tomorrow -- I cannot do it tomorrow -- I can hear you
Thursday afternoon on this motion.

          MS. RUSSELL:  Okay.  Understood, Your Honor.

          With respect to comments that any parties have to
the order that was filed, if they could -- are inclined to
communicate those to me at some point tomorrow with the hopes
of us being able to incorporate those comments into a revise
proposed order for Your Honor to review prior to the hearing,
that would be helpful.

          We would also request that Your Honor -- we have
sales going forward and we understand that the debtors are
continuing in the mode that they had been in prepetition and

it is currently their intention to continue in that capacity until that hearing on Thursday.

Obviously, signage, Your Honor, would not -- banners would not be going up, but there are in-store promotions that are currently ongoing since the petition date, as well as the debtors' intention to comply with the revised customer practices, as set forth in the motion that was discussed earlier.

THE COURT: Well, if it's inside the ordinary course of business you have every right to do it. If it's outside the ordinary course of business, you are violating the Bankruptcy Code and those are unauthorized post-petition transactions that are avoidable. It's up to you.

MS. RUSSELL: Well, Your Honor, I guess the question for your is whether or not we can continue until --

THE COURT: I'm not going to tell you. It's up to you. I don't know. I don't know.

How am I going to know? I mean, the Code is what it is. If it's inside the ordinary course of business, you're free to do it.

MS. RUSSELL: It was in the ordinary course of business upon the filing; however, Your Honor, we do have a motion pending before the Court with regard to other provisions of the motion, but the debtor had been in the process of conducting store-closing sales prior to the

filing.

As I indicated, the banners are not going up, so it would be a much more soft-sale type structure, but we didn't want to create any inconsistency if anyone was in our stores and saw that there was discounting and promotions that we were somehow not complying with what was going on before the Court.

THE COURT:  Look, the problem is, okay, that actions have consequences.  The filing of a petition has consequences.  If you weren't ready, you shouldn't have filed, okay.

I'm not the one who filed and then six hours or eight hours before the hearing filed a motion, okay.  I'm not mad at anybody -- it is what it is -- but that was a calculus you made and you did what you had to do, but I'm not going to give you an advisory opinion about whether you're acting consistent with the Code.  I don't know the facts and I don't have time or the inclination, frankly, to get educated about them.

MS. RUSSELL:  Understood.  It was the balancing of a whole host of --

THE COURT:  I'm sure it was.  I'm sure it was.

MS. RUSSELL:  -- challenges in terms of the timing of the filing versus the timing of the motion.

THE COURT:  I'm sure it was.

Look, I did these cases before, too.  I understand
how hard they are, but I have an obligation to preserve due
process and I've got the U.S. Trustee objecting and I
completely back the U.S. Trustee.

Did you give them a draft of this motion like
you're supposed to?

No.

MS. RUSSELL:  And, Your Honor --

THE COURT:  I can't believe it existed at whole-
cloth at 11:45 last night; obviously, you had a draft at some
point.  You had an obligation to share it with the
U.S. Trustee.  Read the Local Rules.

MS. RUSSELL:  Understood, Your Honor.  That was --
it was not intended to put the U.S. Trustee's Office or the
Court in a difficult spot or with respect to the timing of
the filing of the motion or this morning's hearing.

We certainly want to give people the opportunity
to review the motion and the order and the relief being
requested; unfortunately, we had a timing -- timing didn't
sync with respect to all of the objectives we were filing.

THE COURT:  All right.  Let me ask the U.S.
Trustee, are you okay with the hearing tomorrow if I can fit
it in and if so, when?

MS. RICHENDERFER:  I'm sorry, Your Honor.  I
didn't catch that last part.

THE COURT:  Sorry.  Are you okay with a hearing tomorrow, and if so, when, on this issue, the store closing?

MS. RICHENDERFER:  I've got two 341s I'm conducting tomorrow, so I'm trying to figure out -- I mean if the Court wants to hear it tomorrow, I don't know what is the best time, I guess, because I know it's going to be a long hearing.

I haven't read it yet either, Your Honor.  I tried to print it out fast this morning and it jammed our printer. I had requested so many times for a draft copy and just never got anything at all, so I suspect that based on the particular type of transaction here that's been structured, I'm going to have a lot of questions and probably cross-examination of witnesses and I do need time to prepare.

Thursday is wide open.  If it has to be tomorrow, I'll live with it somehow and try to make arrangements, but like I said, I've got two 341s.

THE COURT:  No.  If it's going to be contested, I can't squeeze it in tomorrow.

MR. FOX:  Your Honor, if I may?  I apologize for interrupting.

Steven Fox from Riemer & Braunstein, on behalf of the Hilco and Gordon Brothers consulting entities.  I can short circuit the scheduling issues for Your Honor for tomorrow.

        In light of the U.S. Trustee's suggestion that it
may be necessary to inquire of witnesses, we won't be able to
have people here for that purpose tomorrow.  When we learned
this morning that the hearing was not going to go forward
today, we put a Hilco representative who landed in
Philadelphia back on a plane and sent them back to Chicago.

        Ms. Shea (ph) is here today for the hearing and
unfortunately will not be available to be here Thursday, but
we will have Hilco representatives here on Thursday to
respond to any questions that the Court or the U.S. Trustee
may have.

        So, from our perspective, we think at this point
it's going to need to be Thursday just for availability
purposes.

        With respect to the continued conduct of the sale
comments from Ms. Russell, we are prepared under the terms of
our agreement to continue to operate in the normal course
under that agreement.  We understand the Court's concerns and
with respect to advisory opinions and we're also big boys and
we've been down this path before, so a two-day delay is not
going to affect us in terms of how we react with the debtor.

        THE COURT:  Okay.

        MR. FOX:  Just one last comment, with respect to
the customer programs, Your Honor.  We have been working with
the company in terms of communications to customers.  As you

probably understand, it's our practice to make sure stores
are properly signed for treatment of gift cards and gift
certificates, merchandise, credits, and the like and we will
continue to work with the company on communications, in-
store, with the customers about how to treat their deposits
and merchandise deliveries --

            THE COURT:  Thank you.

            MR. FOX:  -- and those are all covered by our
consulting agreement.

            THE COURT:  All right.  Thank you.

            MR. FOX:  Thank you, Your Honor.

            THE COURT:  That's very helpful.

            Thursday.

            MS. RUSSELL:  Yes, Your Honor.  I didn't get a
time from you.

            THE COURT:  Yeah, I'm just looking.  I'll move
something -- what time is that -- let's do two o'clock.  I
might be a few minutes late, but let's shoot for two o'clock.
I have a meeting outside the office.

            And we'll do both, the DIP and the going out of
business, although it sounds like the GOB is probably needs
to be the focus of our attention, but, of course, we'll deal
with the DIP, too.  And that's normal -- that's more than
normal notice for a DIP financing.

            MS. RICHENDERFER:  Your Honor, I would hope that

upon review of the DIP, that I may be able to work things out.

THE COURT:  Have you seen that before, either?

MS. RICHENDERFER:  It was -- a draft was emailed to me at eight o'clock last evening and I could not pull it up on my cell phone --

THE COURT:  Okay.

MS. RICHENDERFER:  -- so I haven't had a chance to review that yet.

But under the circumstances of the particular -- of the sale and of the DIP, I'm hopeful that we can work things through and be able to present --

THE COURT:  Yeah, I think my clerk said it was about a 20-page order, so it hardly even counts as a DIP.  I think he said it was a short order.

(Laughter)

MS. RICHENDERFER:  Yeah, these days -- so, Your Honor, we may be left only with the GOB motion.

THE COURT:  Well, I may have comments to the DIP -- I don't know -- I, obviously, will have to reserve rights on that.

What the heck -- hang on, I just messed something up.

(Pause)

THE COURT:  What did I say?  Two o'clock?

MR. WERKHEISER:  Yes, Your Honor.

MS. RUSSELL:  Yes.

THE COURT:  I cannot operate a computer.

All right.  All set.  No problem.

MR. WERKHEISER:  And one small point, Your Honor.

THE COURT:  And I think a lot of your orders were uploaded, so we're working on getting those signed as quickly as possible.

MR. WERKHEISER:  Thank you, Your Honor.

As I was going to say, just one small point on the Levin DIP.  So, it did contemplate having a hearing a little bit earlier than Thursday, so we were contemplating interim relief, I think for 3.5 million would have been the (indiscernible) purchases under the DIP.  They've raised the possibility that we may need to increase that slightly to get those stores sort of back up to, you know, normal operating levels of inventory.  And so, they're going to look at that, but there might be a slight change in the relief requested between now and Thursday.

THE COURT:  Okay.

MR. WERKHEISER:  I just wanted to preview that for the Court and the parties.

THE COURT:  Just keep everybody in the loop on that, including the budget.

MR. WERKHEISER:  I believe Mr. Price is here on

AB_000185

behalf of the Levin parties and would like to address the
Court.

        MR. PRICE:  Good afternoon, Your Honor.  William
Price, Clark Hill, on behalf of Levin Furniture.

        We look forward to working with the U.S. Trustee,
the other lenders, and the debtor to hammer out the finer
points on the DIP order.  We appreciate your time and look
forward to being before you Thursday.

        THE COURT:  Okay.  Great.

        MR. PRICE:  Thank you.

        MR. WERKHEISER:  I think, Your Honor, looking
around -- no, we've got one more coming.

        THE COURT:  You've got to hurry, because I
literally have three minutes.

        MR. SHAPIRO:  I'll be very brief, Your Honor.

        For the record, Zach Shapiro of Richards, Layton &
Finger.  I am appearing on behalf of U.S. Assets, Inc.

        I think you heard from Ms. Heilman that at least
certain of the landlords have concerns about how the sale
process was run leading up to the filing.  We represent a
potential purchaser of the debtors' assets and we expressed
an interest in purchasing them as a going concern and we
continue to be interested.

        We're trying to pursue a transaction that would
preserve value for a portion of the debtors' stores as a

going concern and going forward, we would really very much appreciate being able to participate in a process that makes sense and is fair to all parties. Thank you, Your Honor.

THE COURT: You're welcome. Thank you very much.

Is there anything pressing, Mr. Werkheiser; otherwise, we're going to adjourn.

MR. WERKHEISER: No. Again, I just want to be clear that the value is there and the closing risk is acceptable, so we are prepared to engage and we invite them to come talk to us. So, I think that concludes our business today and we thank Your Honor for your patience and attention and are looking forward to things going a little more smoothly after today.

THE COURT: All right. Thank you.

We're adjourned.

(Proceedings concluded at 2:26 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Mary Zajaczkowski_____          March 10, 2020
Mary Zajaczkowski, CET**D-531

# EXHIBIT C

AB_000188

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) |  |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE
## CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE
## PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
## (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of (a) AVF Parent, LLC (the "Borrower"), and

(b) AVF Holdings II, LLC, Art Van Furniture, LLC, Art Van Furniture of Canada, LLC, AV Pure

Sleep Franchising, LLC, AVCE, LLC, AVF Franchising, LLC, AVF Holding Company, Inc., AVF

Holdings I, LLC, Levin Parent, LLC, LF Trucking, Inc., Comfort Mattress, LLC and Sam Levin,

Inc., each as a debtor and debtor in possession (collectively, with the Borrower, the "Debtors") in

the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this

"Interim Order") pursuant to sections 105, 361, 362, 363 and 507 of chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

AB_000189

(i)  authorizing the Debtors to use the Prepetition Collateral (as defined herein), including all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>") of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value, including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and, in the case of the Prepetition Secured Parties, the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("<u>Diminution in Value</u>");

(ii)  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(iii)  scheduling a final hearing (the "<u>Final Hearing</u>") within 30 days of the Petition Date to consider the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* and the evidence submitted and argument made at the interim hearing held on March 10, 2020 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"); and the Interim Hearing having

2

been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

      A.    <u>**Petition Date**</u>.  On March 8, 2020 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

      B.    <u>**Debtors in Possession**</u>.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      C.    <u>**Jurisdiction and Venue**</u>.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

AB_000191

U.S.C. §§ 1408 and 1409.

D. **Committee Formation**. As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E. **Notice**. Notice of the Motion and the Interim Hearing have been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

F. **Debtors' Stipulations**. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 27 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i) *Prepetition ABL Facility*. Pursuant to that certain *ABL Credit Agreement* dated as of March 1, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) the Borrower (the "Prepetition ABL Borrower"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors"), (c) Wells Fargo Bank, National Association, as administrative agent, issuing bank and collateral agent (in such capacity, the "Prepetition ABL Agent"), and (d) the lenders party thereto (collectively, including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and the Prepetition ABL Lenders and the Prepetition ABL Agent, together, the "Prepetition ABL

4

Parties"), the Prepetition ABL Lenders provided revolving credit, term loans and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility") in an aggregate principal amount of up to $82,500,000.

        (ii)    *Prepetition ABL Obligations*. As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than approximately $33,573,784.18, inclusive of not less than $14,900,000 of issued and outstanding letters of credit and the Early Termination Premium as defined in the Prepetition ABL Documents (collectively, together with accrued and unpaid interest, bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors' obligations pursuant to, or secured by, the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations").

        (iii)    *Prepetition ABL Liens and Prepetition ABL Priority Collateral*. As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, security interests in and continuing liens on

AB_000193

(the "<u>Prepetition ABL Liens</u>") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain Intercreditor Agreement referred to in paragraph F(vii) below) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "<u>Prepetition ABL Priority Collateral</u>"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) and proceeds, products, and rents of any of the foregoing (collectively, the "<u>Prepetition Term Priority Collateral</u>," and together with the Prepetition ABL Priority Collateral, the "<u>Prepetition Collateral</u>"), subject only to the liens of the Prepetition Term Loan Agent on the Prepetition Term Priority Collateral and Prepetition ABL Permitted Prior Liens (as defined herein).

        (iv)   *Prepetition Term Loan Facility*.  Pursuant to that certain Credit Agreement dated as of March 1, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>Prepetition Term Loan Agreement</u>," and collectively with the Loan Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>Prepetition Term Loan Documents</u>," and together with the Prepetition ABL Documents, the "<u>Prepetition Documents</u>"), among (a) the Borrower (the "<u>Prepetition Term Loan Borrower</u>" and together with the Prepetition ABL Borrower, the "<u>Prepetition Borrowers</u>"), (b) Virtus Group, LP, as administrative agent and collateral agent (in such capacities, the "<u>Prepetition Term Loan Agent</u>," and together with the Prepetition ABL Agent, the "<u>Prepetition Agents</u>"), (c) the guarantors thereunder (the "<u>Prepetition Term Loan Guarantors</u>" and, together with the Prepetition ABL Guarantors, the "<u>Prepetition</u>

6

AB_000194

Guarantors"), and (d) the lenders party thereto (the "Prepetition Term Loan Lenders," and collectively, including the Prepetition Term Loan Agent, the "Prepetition Term Loan Parties," and together with the Prepetition ABL Parties, the "Prepetition Secured Parties"), the Prepetition Term Loan Lenders provided term loans to the Prepetition Term Loan Borrower (the "Prepetition Term Loan Facility," and together with the Prepetition ABL Facility, the "Prepetition Secured Facilities") in an aggregate principal amount of $100,000,000.

(v)     *Prepetition Term Loan Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was not less than approximately $175,000,000 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements reimbursable thereunder), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrower's and the Prepetition Term Loan Guarantors' obligations pursuant to, or secured by, the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Term Loan Obligations," and together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations").

(vi)     *Prepetition Term Loan Liens and Prepetition Term Priority Collateral*.  As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition Date, the Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders,

AB_000195

security interests in and continuing liens on (the "Prepetition Term Loan Liens," and together with the Prepetition ABL Liens, the "Prepetition Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the Prepetition Term Priority Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject only to the liens of the Prepetition ABL Agent on the Prepetition ABL Priority Collateral and Prepetition Term Loan Permitted Prior Liens (as defined herein).

(vii)    *Priority of Prepetition Liens; Intercreditor Agreement.*    The Prepetition Agents entered into that certain Intercreditor Agreement dated as of March 1, 2017 (as may be further amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement") to govern the respective rights, interests, obligations, priority, and positions of the Prepetition Secured Parties with respect to the assets and properties of the Debtors and other obligors.  Each of the Prepetition Borrowers and Prepetition Guarantors under the Prepetition Documents acknowledged and agreed to the Intercreditor Agreement.

(viii)    *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.*  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition Term Loan Liens on the Prepetition Term Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of

8

the Bankruptcy Code) or otherwise permitted by the Prepetition ABL Documents (the "Prepetition ABL Permitted Prior Liens"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition ABL Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix)     *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.*  The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Loan Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Parties for fair consideration and reasonably equivalent value;

AB_000197

(b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Term Loan Documents (the "Prepetition Term Loan Permitted Prior Liens" and, together with the Prepetition ABL Permitted Prior Liens, the "Permitted Prior Liens");[4] (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Facility; (f) the Debtors have

---

[4] For the avoidance of doubt, as used in this Interim Order, no reference to the Prepetition ABL Permitted Prior Liens, the Prepetition Term Loan Permitted Prior Liens, or the Permitted Prior Liens shall refer to or include the Prepetition ABL Liens or the Prepetition Term Loan Liens.

10

waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x)     *Release*.  The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Interim Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties.  The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order.

11

(xi)  *Default by the Debtors.*  The Debtors acknowledge and stipulate that (i) they have been, since February 5, 2020, and are in default of their obligations under the Prepetition ABL Documents, and that an Event of Default has occurred under the Prepetition ABL Documents, and that since February 5, 2020, interest has accrued, and will continue to accrue, on the Prepetition ABL Obligations at the default rate set forth in the Prepetition ABL Agreement, and (ii) they have been, since February 29, 2020, and are in default of the obligations under the Prepetition Term Loan Documents, and that a Default has occurred under the Prepetition Term Loan Documents, and that as of the Petition Date, interest will accrue, on the Prepetition Term Loan Obligations at the default rate set forth in the Prepetition Term Loan Documents.

(xii)  *Consulting Agreement with the Liquidators*.  Pursuant to that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020, by and among Hilco Merchant Resources, LLC, Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC, Gordon Brothers Retail Partners, LLC, DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC and Gordon Brothers Brands, LLC and certain of the Debtors, acknowledged by the Prepetition Agents (as amended, restated or otherwise modified from time to time, the "Consulting Agreement"), the Debtors have retained the Consultant to conduct "Going Out of Business" sales of the Assets (each as defined in the Consulting Agreement).  The continued existence and validity of the Consulting Agreement and the uninterrupted continuation of the sales contemplated thereby is a condition to the consent of the Prepetition Agents to this Interim Order and the Debtors' use of Cash Collateral hereunder.

G.  DIP Facility. On March 9, 2020, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to*

AB_000200

*11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Dkt. No. 49] (the "Levin DIP Motion").  To the extent the Court enters the Orders approving the DIP Facility in accordance with the terms and provisions of the DIP Credit Agreement (each term as defined in the Levin DIP Motion), the Prepetition Agents have consented to the DIP Facility (in accordance with the Orders and the DIP Credit Agreement, in form and substance reasonably acceptable to the Prepetition Agents), and the Debtors' compliance with, and the obligations incurred under, the DIP Facility (in accordance with the Orders and the DIP Credit Agreement, in form and substance reasonably acceptable to the Prepetition Agents) shall not give rise to an Event of Default under this Interim Order.

H.    **Permitted Prior Liens**.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien, rather, any such alleged claim arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claims had on the Petition Date.

I.    **Cash Collateral**.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

AB_000201

J.     **Adequate Protection**. The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, are each entitled to receive adequate protection as set forth herein to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral.

K.     **Good Faith**. The Prepetition Secured Parties and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (defined below). The Prepetition Secured Parties have agreed to permit the Debtors to use their Cash Collateral for the Specified Period, subject to the terms and conditions set forth herein, which terms and conditions are fair and reasonable and have been stipulated to by the Debtors in the exercise of their sound business judgment. Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

L.     **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

M.     **Interim Hearing**. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); (vi) counsel to Levin Furniture, LLC and Levin Trucking, LLC, and (vii) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules. The Debtors have made reasonable efforts to

AB_000202

afford the best notice possible under the circumstances.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1. <u>Motion Granted</u>. The Motion is granted, subject to the terms and conditions set forth in this Interim Order. The Debtors shall not use Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2. <u>Authorization to Use Cash Collateral</u>. Subject to the terms and conditions of this Interim Order, and in accordance with the Budget, subject to such variances as are permitted by this Interim Order, the Debtors are authorized to use Cash Collateral for the period (the "<u>Specified Period</u>") from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date, (b) thirty (30) days after the Petition Date and (c) entry of the Final Order; *provided, however*, that, during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget and as otherwise agreed to by the Prepetition ABL Agent in its sole discretion. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any use of Cash Collateral or proceeds resulting therefrom, except (x) as permitted in the Consulting Agreement or the Levin APA (as defined below), (y) as otherwise consented to by the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term

15

AB_000203

Priority Collateral) in writing, or (z) as otherwise disposed of, or used, in accordance with the Budget, subject to such variances as are permitted by this Interim Order.

       3.    <u>Adequate Protection Liens</u>.

       (a)    *Prepetition ABL Adequate Protection Liens*. Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition ABL Adequate Protection Liens</u>") on any Postpetition Collateral.[5]

---

[5] "Postpetition Collateral" means: all personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) subject to entry of a Final Order, proceeds of the Debtors' rights under section 506(c) (solely to the extent such rights result from the use of Postpetition Collateral, and are, therefore, enforceable against parties other than the Prepetition Agents or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (e) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date. Notwithstanding the foregoing, Postpetition Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases). Postpetition Collateral that is (i) Prepetition ABL Priority Collateral, (ii) of a type that would be Prepetition ABL Priority Collateral; (iii) of a type that would be Prepetition ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (iv) the "Deposit", as defined in that certain letter agreement dated as of March 4, 2020 by and among Levin Furniture, LLC, Levin Trucking, LLC, as Buyer, and Sam Levin, Inc. and LF Trucking, Inc., as Seller (the "<u>Levin LOI</u>") shall, in each case, constitute "<u>Postpetition ABL Priority Collateral</u>." Postpetition Collateral that is (i) Prepetition Term Priority Collateral, (ii) of a type that would be Prepetition Term Priority Collateral; and (iii) of a type that would be Prepetition Term Priority Collateral, but that was not otherwise subject to valid, perfected,

AB_000204

(b)     *Prepetition Term Loan Adequate Protection Liens*.  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens") on the Postpetition Collateral.

4.     Priority of Adequate Protection Liens.

(a)     The Prepetition ABL Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to:  (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens and (B) the Prepetition ABL Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, (B) the Prepetition Term Loan Liens, (C) the Prepetition Term Loan Adequate Protection Liens, and (D) the Prepetition ABL Liens.

(b)     The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral;

---

enforceable, and unavoidable liens on the Petition Date shall constitute "Postpetition Term Priority Collateral."  Postpetition Collateral that is (i) the proceeds of the Debtors' real property leases; and (ii) the proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents shall be shared Postpetition Collateral, and the Prepetition ABL Liens and Prepetition Term Loan Liens (and corresponding adequate protection liens and claims) on such proceeds shall rank equally in priority and share such proceeds equally (with 50% of such proceeds applied to the Prepetitition ABL Obligations and 50% applied to the Prepetition Term Loan Obligations).  Nothing herein shall be construed to impair any Permitted Prior Liens.

AB_000205

*provided that*, the Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens, (B) the Prepetition ABL Liens, (C) the Prepetition ABL Adequate Protection Liens, and (D) the Prepetition Term Loan Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, and (B) the Prepetition Term Loan Liens.

(c)    Except as provided herein (including with respect to the Carve Out), the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"), and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

5.    Adequate Protection Superpriority Claims.

(a)    *Prepetition ABL Superpriority Claim*. As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative

AB_000206

expense claim in each of the Cases and any Successor Cases (the "Prepetition ABL Superpriority Claim").

(b)     *Prepetition Term Loan Superpriority Claim.*  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "Prepetition Term Loan Superpriority Claim," and together with the Prepetition ABL Superpriority Claim, the "Adequate Protection Superpriority Claims").

6.     Priority of the Adequate Protection Superpriority Claims.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code.  The Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall be subject to the following priorities:  (a) with respect to Postpetition ABL Priority Collateral, (1) the Prepetition ABL Superpriority Claim and (2) the Prepetition Term Loan Superpriority Claim; and (b) with respect to Postpetition Term Priority Collateral, (1) the Prepetition Term Loan Superpriority Claim and (2) the Prepetition ABL Superpriority Claim.

7.     Adequate Protection Payments and Protections for Prepetition ABL Parties. As further adequate protection, the Debtors are authorized to pay in cash the following: (a) all

AB_000207

principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 below, (b) immediately upon entry of this Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) in accordance with paragraph 22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e) the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI.  In addition, immediately upon the payment in full in cash of the Prepetition ABL Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement, or similar continuing

20

obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations").  The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue.  The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 below, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 hereof.  The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of funds on deposit in the Prepetition ABL Indemnity Reserve.  The Prepetition ABL Indemnity Reserve shall be released at such time

21

as the Prepetition ABL Indemnity Obligations are Paid in Full.[6]

8. **Adequate Protection Payments and Protections for Prepetition Term Loan Agent**. As further adequate protection, the Debtors are authorized to pay in cash the following: (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph 22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided*, *however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral.

9. **Perfection of Adequate Protection Liens**. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility. No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Prepetition ABL Obligations (i) the Challenge Deadline (as defined in paragraph 34 of this Interim Order) shall have occurred without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge; and (c) the Prepetition ABL Agent has received (i) a countersigned payoff letter in form and substance satisfactory to the Prepetition ABL Agent and (ii) releases in form and substance satisfactory to the Prepetition ABL Agent in its sole discretion.

AB_000210

granted herein, including the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each Prepetition Agent is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Adequate Protection Liens. The Debtors are authorized to execute and deliver promptly upon demand to the Prepetition Agents, as applicable, all such financing statements, mortgages, notices, and other documents as the Prepetition Agents may reasonably request. Each Prepetition Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

10. <u>Adequate Protection Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases. The receipt by the Prepetition Secured Parties of the adequate protection

23

provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

11. Budget. The use of Cash Collateral during the Specified Period is permitted solely in accordance with a cash collateral budget (the "Budget") approved by the Prepetition Agents,[7] each in their sole discretion, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents. A copy of the initial approved Budget is attached hereto as Exhibit 1. The Budget shall depict, on a weekly basis and line item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals and advisors), asset sales and any other fees and expenses), and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date, and such initial Budget shall be approved by, and in form and substance satisfactory to the Prepetition Agents, each in their sole discretion (it being acknowledged and agreed that the initial Budget attached hereto is approved by and satisfactory to the Prepetition Agents). The Budget shall be updated, modified, or supplemented by the Debtors with the written consent of the Prepetition Agents, but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Prepetition Agents, each in their sole discretion), and no such updated, modified, or supplemented budget shall be effective until so

---

[7] For the avoidance of doubt, any reference to the consent rights of the Prepetition Term Loan Agent shall mean the Prepetition Term Loan Agent acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Agreement).

AB_000212

approved, and once so approved shall be deemed the Budget; *provided, however*, that in the event the Prepetition Agents, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the Debtors shall continue to operate under the most recent prior-approved Budget and such disagreement shall give rise to an Event of Default once the period covered by such prior Budget has terminated. Each Budget delivered to the Prepetition Agents shall be accompanied by such customary supporting documentation as reasonably requested by the Prepetition Agents and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable at the time of delivery. A copy of any Budget (or updated Budget once approved by the Prepetition Agents) shall simultaneously be delivered to the counsel for a Committee (if appointed), and the U.S. Trustee. All Cash Collateral use must be strictly in accordance with the terms of the Budget, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.

        12.    <u>Covenants</u>.

        (a)    *Budget Compliance*. The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts for any rolling two week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements for any rolling two week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Operating Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the

25

Budget for such period (with any unspent amounts in this subparagraph (iv) being carried forward for subsequent periods).

(b)     *Borrowing Base*.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall at all times maintain actual Total Excess ABL Availability After Covenant (calculated in the manner set forth in the Borrowing Base Certificate attached to the Budget) in an amount not less than $0, it being understood and agreed that the Availability Block set forth in the Borrowing Base Certificate attached to the Budget shall be deemed to be $5,000,000 for each of the weeks beginning March 8, 2020 and March 15, 2020.  Until the Prepetition ABL Obligations are Paid in Full, the Borrowing Base Certificate shall be updated and delivered weekly in accordance with the requirements of an "Increased Reporting Event" as defined in the Prepetition ABL Agreement.  For the avoidance of doubt, the calculation of the Borrowing Base shall at all times deduct the amount of the Carve Out Reserves.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall deliver to the Prepetition Agents, by not later than Thursday of each week, an updated Borrowing Base Certificate, substantially in the form attached hereto as Exhibit 2 (the "<u>Borrowing Base Certificate</u>"), and such Borrowing Base Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents (it being agreed the detail required by the Prepetition ABL Agreement shall be deemed so satisfactory).

(c)     *Variance Testing*.  The Debtors shall, commencing with the week beginning March 15, 2020, deliver to the Prepetition Agents, by not later than Thursday of each week, a certificate, substantially in the form attached hereto as Exhibit 3 (the "<u>Budget Variance Certificate</u>") and such Budget Variance Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents, showing a reconciliation for the prior two week cumulative period, and certifying that (i) the Debtors are in compliance with the covenants contained in this

26

AB_000214

Section 12 and (ii) to the knowledge of the Debtors, no Event of Default hereunder has occurred or, if such an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto.

(d) *Consent Fee for Prepetition ABL Parties*. The Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, a consent fee ("Consent Fee") in the amount of $150,000 per week until such time as the Prepetition ABL Obligations have been repaid in full in cash (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents. The Consent Fee shall be fully earned on Saturday of each week and shall be paid to the Prepetition ABL Agent on the immediately following Tuesday and shall not be subject to refund, offset or rebate under any circumstances.

(e) *Levin Sale Milestones*. The Debtors shall achieve each of the following milestones, if and when applicable (as the same may be extended from time to time with the consent of the Prepetition ABL Agent (in its sole discretion), the "Levin Sale Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the Prepetition ABL Agent in all respects:

(i) On or before the date that is seven (7) days following the Petition Date, the Debtors shall file a motion to approve the sale of the "Assets", as such term is defined in the Levin LOI (the "Levin Sale"), to the Buyer under the Levin LOI.

27

(ii)     On or before the date that is seven (7) days following the Petition Date, the Debtors shall enter into an asset purchase agreement with the Buyer under the Levin LOI for the Levin Sale (the "Levin APA").

(iii)     On or before the date that is twenty-nine (29) days following the Petition Date, the Debtors shall receive an order from the Court approving the Levin Sale.

(iv)     On or before the date that is two (2) business days after the order approving the Levin Sale, the Debtor shall have consummated the Levin Sale and the proceeds thereof shall have been applied to the Prepetition ABL Obligations.

13.     Modification of Automatic Stay.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to:  (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the Prepetition ABL Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the Prepetition ABL Parties under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

14.     Protections of Rights of Prepetition Secured Parties.

(a)     Subject to the Intercreditor Agreement, unless the Prepetition ABL Agent and Prepetition Term Loan Agent have each provided their respective prior written consent, or all Prepetition ABL Obligations and Prepetition Term Loan Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been Paid in Full, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and

28

AB_000216

otherwise shall object to any motion or application seeking entry of, any order (other than this Interim Order or the Final Order, but including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Postpetition Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim Order; (ii) the use of Cash Collateral for any purpose other than as permitted in this Interim Order (including any use in accordance with the Budget, subject to variances permitted by this Interim Order); (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the Prepetition Secured Parties' rights under this Interim Order, the Prepetition ABL Documents, or the Prepetition Term Loan Documents with respect any Prepetition ABL Obligations or Prepetition Term Loan Obligations. It shall be an Event of Default under this Interim Order if, in any of these Cases or any Successor Cases, the Debtors take or take to take any of the actions contemplated with respect to provisions (i) through (iv) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

(b) The Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the Prepetition

29

Agents, as applicable, all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the Prepetition Agents, as applicable) to provide under the Prepetition Documents, or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the Prepetition Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Prepetition Documents; (iv) permit the Prepetition Agents to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; and (v) upon reasonable advance notice, permit the Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Postpetition Collateral and Prepetition Collateral, in each case, in accordance with the Prepetition Documents.

15. <u>Credit Bidding</u>. No Debtor shall object to any Prepetition ABL Parties credit bidding up to the full amount of the applicable outstanding Prepetition ABL Obligations, or with respect to the Prepetition Term Loan Parties, credit bidding up to the full amount of the applicable outstanding Prepetition Term Loan Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, to the extent permitted by section 363(k) of the Bankruptcy Code, and subject in each case to the rights, duties, and limitations, as

30

applicable, of the parties under the Intercreditor Agreement, Prepetition Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid.

16. <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the Prepetition Obligations being Paid in Full, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any Prepetition Collateral or Postpetition Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the Prepetition ABL Agent (or, following the Prepetition ABL Obligations being Paid in Full, to the Prepetition Term Loan Agent) to be applied in accordance with this Interim Order and the Intercreditor Agreement.

17. <u>Cash Collection</u>. From and after the date of the entry of this Interim Order, all collections and proceeds of any Postpetition Collateral and Prepetition Collateral and all Cash Collateral (that does not constitute Prepetition or Postpetition Term Priority Collateral) that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition ABL Priority Collateral were deposited under the Prepetition Documents (or in such other accounts as are designated by the Prepetition ABL Agent from time to time) (collectively, the "<u>Cash Collection Accounts</u>"), which accounts shall, until the Prepetition ABL Obligations are Paid in Full, be subject to the sole dominion and control of the Prepetition ABL Agent and any amounts deposited into the Cash

AB_000219

Collection Accounts shall be deemed to be Postpetition ABL Priority Collateral. Proceeds and other amounts in the Cash Collection Accounts shall be used, subject to the conditions set forth herein, to fund the Budget during the Specified Period, and the Debtors are authorized to pay to the Prepetition ABL Agent, and the Prepetition ABL Agent is authorized to apply, amounts in excess thereof in accordance with the Budget until the Prepetition ABL Obligations are Paid in Full. In furtherance of the foregoing, each Thursday during the Specified Period the Debtors shall deliver to the Prepetition Agents a schedule of all proposed disbursements for the following seven (7) day period (each a "Disbursement Schedule"), including identification of which line item(s) in the Budget such proposed disbursements relate to. Upon the Prepetition ABL Agent's receipt of a written cash collateral draw request (each a "CC Draw Request," which shall be delivered to the Prepetition Term Loan Agent at the same time such CC Draw Request is delivered to the Prepetition ABL Agent) (which may be made on a daily basis), and following verification of conformity with the associated Disbursement Schedule and Budget, the Prepetition ABL Agent shall disburse funds from the Cash Collection Account as appropriate to fund the amounts specified in the CC Draw Request; *provided* that, during the period prior to the Prepetition ABL Obligations being Paid in Full, the Prepetition ABL Agent shall only be required to disburse funds if the Debtors are in compliance with the provisions of this Interim Order (including, without limitation, that after giving effect to such disbursement, actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0). For the avoidance of doubt, it shall be a condition to the Debtors' ability to access and use the Prepetition Secured Parties' Cash Collateral that they submit to the Prepetition ABL Agent the CC Draw Request and associated Disbursement Schedule in the manner and time provided herein. In addition to the foregoing, the

AB_000220

Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid In Full) is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount sufficient to maintain the "Ending Balance" set forth in the Budget for any applicable weekly period (at the end of the relevant week) and, until the Prepetition ABL Obligations are Paid in Full, the Prepetition ABL Agent is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount such that actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0. Until the Prepetition ABL Obligations are Paid in Full, unless otherwise agreed to in writing by the Prepetition ABL Agent or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "Cash Management Order"). The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any direction to that effect from the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid in Full), in each case, to the extent such direction is made in accordance with this Interim Order. The Debtors shall cause the proceeds of Prepetition and Postpetition Term Priority Collateral as identified by the Consultant to be deposited into a segregated, non-commingled account which is required to be subject to the control of the Prepetition Term Loan Agent, and the Debtors' use of such proceeds shall be subject to (and limited to the extent set forth in) this Interim Order but, for the avoidance of doubt, may be used in accordance with the Budget, subject to variances permitted by this Interim Order.

33

18. <u>Maintenance of Collateral</u>. Until all Prepetition ABL Obligations are Paid in Full, the Debtors shall: (a) insure the Postpetition Collateral and Prepetition Collateral as required under the Prepetition Documents; and (b) maintain the cash management system in effect as of the Petition Date, as may be modified with the consent of the Prepetition Agents (such consent not to be unreasonably withheld) or as a result of entry of any order by the Court.

19. <u>Disposition of Collateral</u>. The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Postpetition Collateral or Prepetition Collateral other than in the ordinary course of business and in accordance with the Consulting Agreement and the Levin APA, without (subject to the Intercreditor Agreement) the prior written consent of the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral), and no such consent shall be implied, from any other action, inaction or acquiescence by the Prepetition Secured Parties or from any order of this Court.

20. <u>Events of Default</u>. The occurrence of any of the following events, unless consented to or waived by the Prepetition Agents in advance, in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "<u>Events of Default</u>"):

(a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including, without limitation, the Covenants in paragraph 12 herein and the payment of all amounts to the Prepetition Secured Parties authorized hereunder);

(b) the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c) the failure by the Debtors to continue sales of the Assets in

34

AB_000222

accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

    (d) the filing of a motion or any plan of reorganization or disclosure statement attendant thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Interim Order; (ii) to grant any lien other than Permitted Prior Liens upon or affecting any Postpetition Collateral; or (iii) except as provided in this Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code;

    (e) (i) the filing of any Prohibited Plan (as defined herein) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors) or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan;

    (f) the entry of an order in any of the Cases confirming a Prohibited Plan;

    (g) the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to this Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect;

    (h) the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by this Interim Order;

    (i) the appointment of an interim or permanent trustee in the Cases, the

35

appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a trustee receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(j)     the filing of a motion to approve a Prohibited Sale or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI;

(k)     the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Cases to Chapter 7 of the Bankruptcy Code;

(l)     the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor Agreement, the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (C) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $250,000 or more;

(m)     the existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior

AB_000224

to the claims of the Prepetition Secured Parties under this Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except, in each case, as expressly provided in this Interim Order;

(n) the Debtors shall file, or any Debtor shall fail to contest in good faith the filing of, a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction;

(o) any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations;

(p) any Debtors shall challenge, support or encourage a challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations;

(q) the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in this Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code;

(r) any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA, with respect to Postpetition Collateral or Prepetition

37

Collateral having a value in excess of $250,000 outside the ordinary course of business and not otherwise permitted hereunder;

(s)     any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders" as approved by the Prepetition Agents in writing (provided that this Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by this Interim Order;

(t)     any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under this paragraph 20;

(u)     the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.

21.     <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default under this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall be referred to herein as a "<u>Termination Declaration</u>") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out has occurred through the delivery of the Carve Out

38

AB_000226

Trigger Notice (as defined herein); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to herein as the "Termination Date"). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and this Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable). During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the Prepetition ABL Parties shall be permitted to exercise all remedies set forth herein, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and this Interim Order. Upon the occurrence

AB_000227

and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement and paragraph 32, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process.

22. <u>Prepetition Secured Parties' Expenses</u>. The Debtors are authorized to pay, in accordance with this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (a) the Prepetition ABL Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Morgan, Lewis & Bockius LLP and Burr & Forman LLP, and any successor counsel) and, (b) solely from the proceeds of Postpetition Term Priority Collateral, the Prepetition Term Loan Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Riemer & Braunstein LLP and Greenberg Traurig, LLP, and any successor counsel). Payment of all such fees and expenses shall not be subject to allowance by the Court. Professionals for the Prepetition Agents shall not be required to comply with the U.S. Trustee fee guidelines, *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors that were incurred after the Petition Date, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S.

AB_000228

Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such summary fee and expense statements to the Debtors. Any objections raised by the Debtors, the U.S. Trustee, or a Committee (if appointed) with respect to such invoices within ten (10) days of the receipt thereof will be subject to resolution by the Court to the extent they cannot be resolved by the applicable parties. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized to pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition ABL Parties as provided in the Prepetition ABL Documents, incurred on or prior to such date without the need for any professional engaged by the Prepetition ABL Parties to first deliver a copy of its invoice as provided for herein. No attorney or advisor to any Prepetition ABL Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

23. <u>Proofs of Claim</u>. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the Prepetition ABL Parties and the Prepetition Term Loan Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the Prepetition ABL Documents or the Prepetition Term Loan Documents. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition ABL Parties and the Prepetition Term Loan Parties with regard to all claims arising under the Prepetition ABL Documents or the Prepetition Term Loan Documents, as the case may be. Notwithstanding the foregoing, the Prepetition ABL Agent on behalf of itself and the Prepetition ABL Parties, and the Prepetition Term Loan Agent on behalf of itself and the Prepetition Term Loan Parties, are hereby authorized

41

and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in any of the Cases deemed to be filed in all Cases of each of the Debtors and asserted against all of the applicable Debtors). Any proof of claim filed by the Prepetition ABL Agent or the Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Parties or Prepetition Term Loan Parties. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the Prepetition ABL Parties or the Prepetition Term Loan Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

24.     Carve Out.

(a)     *Carve Out*. As used in this Interim Order, the "Carve Out" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee

AB_000230

Professionals" and, together with the Debtor Professionals, the "Professional Persons") (such fees and expenses, the "Allowed Professional Fees") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined herein), *provided* that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "ABL Professional Fee Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $500,000 incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week).

(b)    *Carve Out Reserves*.  On the day on which a Carve Out Trigger Notice is given by the Prepetition ABL Agent (the "Termination Declaration Date"), the Carve

AB_000231

Out Trigger Notice shall be deemed a demand to the Debtors, and authorization for the Debtors, to utilize cash on hand and proceeds of the Postpetition Collateral to fund a reserve in an amount equal to the Carve Out. The Debtors shall deposit and hold such amounts in a segregated account at the Prepetition ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees (each, a "Carve Out Reserves"). For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order or the Final Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

(i) Following payment of all Allowed Professional Fees entitled to benefit from the Carve Out, any remaining funds in the Carve-Out Reserves funded by (x) the proceeds of Postpetition ABL Priority Collateral shall be distributed (A) first, to the Prepetition ABL Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full, and (B) second, to the Prepetition Term Loan Agent on account of the Obligations (as defined in the Prepetition Term Loan Agreement) until such obligations have been Paid in Full; and (y) the proceeds of Postpetition Term Priority Collateral shall be distributed (A) first, to the Prepetition Term Loan Agent which shall apply such funds to the Obligations (as defined in the Prepetition Term Loan Agreement) in accordance with the Prepetition Term Loan Agreement until such obligations have been Paid in Full, and (B) second, to the Prepetition ABL Administrative Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full.

(ii) Notwithstanding anything to the contrary in this Interim Order, following the end of the third business day after delivery of a Carve Out Trigger Notice, (x) the

AB_000232

Prepetition ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the Prepetition ABL Agent, on the one hand, and the Prepetition Term Loan Agent, on the other hand, shall have a security interest in any residual interests in the Carve Out Reserves, with any excess paid as provided above; and (y) the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves required to be funded by the proceeds of Postpetition Collateral have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves held in accounts by the Prepetition Term Loan Agent, with any excess paid as provided above.

(iii)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in any Prepetition Secured Facilities, to the extent of any shortfall in the Carve Out Reserves, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and any and all other forms of adequate protection, liens, or claims securing the obligations under the Prepetition Documents; provided that in all cases, the Carve Out priority with regard to the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral will always be subject to the limitations applicable thereto set forth in the definition of Carve Out.

(c)    *No Direct Obligation To Pay Allowed Professional Fees*.    The Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the

AB_000233

Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.*  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     *Payment of Carve Out On or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(f)     *Release of Prepetition ABL Parties*.  Notwithstanding anything to the contrary contained herein, (i) prior to the delivery of the Carve Out Trigger Notice, the Debtors shall fund the Carve Out Reserves at the reasonable request of the Prepetition ABL Agent in consultation with the Prepetition Term Loan Agent, the Debtors and their advisors, and (ii) upon the repayment in full of the principal amount of all Loans under the Prepetition ABL Agreement, the cash-collateralization of all Letters of Credit under the Prepetition ABL Agreement and the funding of the Prepetition ABL Indemnity Reserve (the date that such events occur, the "ABL Repayment Date"), and after the funding of the Carve Out Reserves in an amount equal to, as of the ABL Repayment Date, the lesser of (x) the amount set forth in the Budget for Professional Persons (plus the amounts set forth in 24(a)(i) and (ii)) and (y) the then accrued Carve Out, the Prepetition ABL Parties and the Prepetition ABL Liens shall be released from all further liability from the Carve Out (such release shall be a condition to the Prepetition ABL Obligations being deemed Paid in Full).

AB_000234

25. <u>Limitations on Use of Cash Collateral, and Carve Out</u>. The Postpetition Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with: (a) except to contest the occurrence of an Event of Default, preventing, hindering, or delaying any of the Prepetition Secured Parties' permitted enforcement or realization upon any of the Postpetition Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order; (c) selling or otherwise disposing of Postpetition Collateral without the consent of the Prepetition Agents; (d) using or seeking to use any insurance proceeds constituting Prepetition Collateral or Postpetition Collateral except as provided for in this Interim Order without the consent of the Prepetition ABL Agent or the Prepetition Term Loan Agent (in the case of Postpetition Term Priority Collateral); (e) incurring Indebtedness (as defined in the Prepetition Documents) without the prior consent of the Prepetition Agents; (f) seeking to amend or modify any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis; (g) objecting to or challenging in any way the Prepetition Liens, Prepetition Secured Obligations, Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the Prepetition Secured Parties, respectively; (h) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations, or any other rights or interests of any of

47

AB_000235

the Prepetition Secured Parties; or (j) seeking to subordinate, recharacterize, disallow, or avoid the Prepetition Secured Obligations; *provided, however*, without prejudice to the ability of a Committee (if appointed) to contest the Investigation Budget Amount (as defined herein) in connection with the Final Hearing, that the Carve Out and such collateral proceeds may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final Order, $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging), the Prepetition Lien and Claim Matters (as defined herein).

26.    Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Budget provided by the Debtors to the Prepetition Agents.

27.    Effect of Stipulations on Third Parties.

(a)    *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless and to the extent that a party in interest with proper standing granted by order of the

48

Bankruptcy Court (or other court of competent jurisdiction) has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) and (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 27) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.

(b)     *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition

49

Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof. To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties, in accordance with paragraph 22, shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection. Upon a successful Challenge brought pursuant to this paragraph 27, the Court may fashion any appropriate remedy.

28. <u>No Third Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

29. <u>Section 506(c) Claims</u>. Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code,

50

AB_000238

or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

30. <u>No Marshaling/Applications of Proceeds</u>. Subject to entry of a Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order, notwithstanding any other agreement or provision to the contrary.

31. <u>Section 552(b)</u>. Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

32. <u>Access to Collateral</u>. Subject to and effective upon entry of a Final Order, upon expiration of the Remedies Notice Period, the Prepetition Secured Parties, subject to the Intercreditor Agreement, shall be permitted to (a) access and recover any and all Prepetition and Postpetition Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Postpetition Collateral, *provided*, *however*, in the case of clause (b), notwithstanding anything to the contrary herein, and subject to the Intercreditor Agreement, the Prepetition Secured Parties can only enter upon a leased premises during the continuation of an Event of Default in accordance with (i) a separate written agreement by and between the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of

51

the Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable Prepetition Secured Party on such notice to the landlord as shall be required by this Court; *provided*, *however*, that solely with respect to rent due to a landlord of any such leased premises, the Prepetition Secured Parties, as applicable, shall be obligated only to reimburse the Debtors for the payment of rent of the Debtors that first accrues after delivery of the Termination Declaration in accordance with paragraph 21 herein that is payable during the period of such occupancy by the Prepetition Secured Parties, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to delivery of the Termination Declaration through and including any assumption and/or rejection of any lease.  Nothing herein shall require the Prepetition Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

33.    <u>Limits on Lender Liability</u>.  Subject to entry of a Final Order, nothing in this Interim Order, the Prepetition Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Cases.  The Prepetition Secured Parties shall not, solely by reason of having made loans under the Prepetition Documents, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or

AB_000240

state statute). Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

34. <u>Insurance Proceeds and Policies</u>. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the Prepetition ABL Agent (on behalf of the Prepetition ABL Parties) and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Parties), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the Postpetition Collateral.

35. <u>Additional Rights of the Prepetition Term Loan Agent</u>. Subject to the Prepetition ABL Obligations being Paid in Full and the rights preserved in paragraph 27 herein, any reference in this Interim Order to the Prepetition ABL Agent agreeing to or having the right to do, or refraining from or having the right to refrain from doing, an act, or providing any consent or waiver hereunder, shall automatically, without further order of the Court, be construed as referring to the Prepetition Term Loan Agent.

36. <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder.

37. <u>No Superior Rights of Reclamation</u>. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claim had on the Petition Date.

AB_000241

38.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, subject to the Prepetition Documents and the Intercreditor Agreement: (a) the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.  Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and, unless otherwise set forth in this Interim Order or the Final Order, any other position which any party in interest deems appropriate to raise in the Debtors' Chapter 11 cases.

39.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Secured Parties.

AB_000242

40.     <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition Secured Parties, all other creditors of any of the Debtors, a Committee (if appointed), or any other court appointed committee, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

41.     <u>No Modification of Interim Order</u>.  Until and unless the Prepetition Secured Obligations have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the Prepetition ABL Documents which survive such discharge by their terms) the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the Prepetition Agents, (i) any modification, stay, vacatur, or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the Prepetition ABL Agent for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from Collateral or Prepetition Collateral; or (c) without the prior written consent of the Prepetition Agents, any lien on any of the Postpetition Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens, other than the Carve Out.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written

AB_000243

consent, as provided in the foregoing, of the Prepetition Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the Prepetition ABL Agent or the Prepetition Term Loan Agent.

42. <u>Continuing Effect of Intercreditor Agreement</u>. The Debtors and Prepetition Secured Parties each shall be bound by, and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.

43. <u>Interim Order Controls</u>. In the event of any inconsistency between the terms and conditions of the Intercreditor Agreement and this Interim Order (solely as between the Prepetition Secured Parties), the provisions of the Intercreditor Agreement shall govern and control.

44. <u>Discharge</u>. The obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable, has otherwise agreed in writing. None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that does not require that all Prepetition ABL Obligations be Paid in Full (in the case of the sale of Postpetition ABL Priority Collateral) or that all Prepetition Term Loan Obligations be Paid in Full (in the case of the sale of Postpetition Term Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a

AB_000244

"Prohibited Plan or Sale") without the written consent of each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable. For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder.

45. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition Secured Parties granted pursuant to this Interim Order, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (x) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to the Prepetition ABL Documents and this Interim Order, have been Paid in Full; and (y) in respect of the Prepetition Term Loan Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been Paid in Full. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Parties notwithstanding the repayment in full of the Prepetition ABL Obligations.

46. <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (EST)** before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge at the United States Bankruptcy Court for the District of

AB_000245

Delaware. On or before March 12, 2020, the Debtors, or an agent appointed for such purpose, shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) counsel for the Consultant; and (g) counsel for Levin Furniture, LLC, and Levin Towing, LLC. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **March 30, 2020, at 4:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (iv) counsel to the Committee (if appointed).

47. *Nunc Pro Tunc Effect of this Interim Order*. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

AB_000246

48. <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the this Interim Order.

Dated: 3/11/2020
Wilmington, Delaware

CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

59

AB_000247

Exhibit 1

DRAFT - SUBJECT TO CHANGE

**AVF Holding, LLC**
**Cash Collateral Budget (Summary)**

| $ in thousands | Week 1 Fcst 8-Mar | Week 2 Fcst 15-Mar | Week 3 Fcst 22-Mar | Week 4 Fcst 29-Mar | Week 5 Fcst 5-Apr | Week 6 Fcst 12-Apr | Week 7 Fcst 19-Apr | Week 8 Fcst 26-Apr | Week 9 Fcst 3-May | Week 10 Fcst 10-May | Week 11 Fcst 17-May | Week 12 Fcst 24-May | Week 13 Fcst 31-May | 13-Week Total | Remaining Cash Flow | Total Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Receipts | $11,585 | $6,186 | $17,831 | $38,607 | $13,858 | $14,135 | $10,190 | $9,353 | $2,329 | $3,566 | $1,769 | $1,769 | $26 | $131,204 | $2,499 | $133,703 |
| GOB Disbursements | - | (2,603) | (13,666) | (4,564) | (4,112) | (7,380) | (4,544) | (5,771) | (2,923) | (524) | (289) | 1,000 | - | (45,377) | (100) | (45,477) |
| Operating Disbursements | (12,063) | (2,712) | (2,844) | (721) | (1,963) | (402) | (2,423) | (664) | (1,414) | (2,555) | (767) | (1,143) | (145) | (29,817) | (3,996) | (33,813) |
| Non-Operating Disbursements | (7,539) | (650) | (1,150) | (4,080) | (4,578) | (650) | - | - | - | - | - | - | 2,100 | (16,547) | 1,101 | (15,446) |
| Net Cash Flow | (8,017) | 221 | 170 | 29,241 | 3,205 | 5,703 | 3,223 | 2,918 | (2,008) | 486 | 714 | 1,626 | 1,981 | 39,464 | (496) | 38,968 |
| FF&E Sales & Other | - | - | - | (3,650) | (70) | (70) | (70) | (70) | (278) | (1,669) | (1,669) | (1,669) | - | (9,212) | (500) | (9,712) |
| Net Cash Flow to ABL | (8,017) | 221 | 170 | 25,591 | 3,135 | 5,633 | 3,154 | 2,848 | (2,287) | (1,182) | (955) | (42) | 1,981 | 30,252 | (996) | 29,256 |
| Memo: ABL Balance | | | | | | | | | | | | | | | | |
| Beg. ABL Bal / (Cash on Hand) | 25,918 | 33,934 | 33,713 | 33,543 | 7,952 | 4,816 | (817) | (3,971) | (6,819) | (4,533) | (3,350) | (2,395) | (2,353) | 25,918 | (4,334) | 25,918 |
| End. ABL Bal. / (Cash on Hand) | 33,934 | 33,713 | 33,543 | 7,952 | 4,816 | (817) | (3,971) | (6,819) | (4,533) | (3,350) | (2,395) | (2,353) | (4,334) | (4,334) | (4,334) | (4,334) |
| Net Borrowing Base | 34,277 | 37,140 | 34,413 | 10,656 | 8,223 | 2,545 | - | - | - | - | - | - | - | - | - | - |
| Ending ABL Balance | 33,934 | 33,713 | 33,543 | 7,952 | 4,816 | - | - | - | - | - | - | - | - | - | - | - |
| Borrowing Base Availability | 343 | 3,427 | 870 | 2,705 | 3,407 | 2,545 | - | - | - | - | - | - | - | - | - | - |
| **Availability Excess / (Deficiency)** | $343 | $3,427 | $870 | $2,705 | $3,407 | $3,362 | $3,971 | $6,819 | $4,533 | $3,350 | $2,395 | $2,353 | $4,334 | $4,334 | $4,334 | $3,338 |

*The cash collateral budget contemplates the loss of credit card receipts that occurred on March 6th and March 7th and impact of store closure on March 8th. This resulted in deferral of certain disbursements that are essential to the Company's business operations, including, but not limited to, rent, freight, fuel, liquidator fees and other critical operating expenses. The loss of the credit card receipts that were reserved and the deferment of the critical disbursements will likely result in business disruption and ultimately reduce recovery to the estate.*

AB_000248