## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 49** |

### INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i) authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the DIP Collateral (as defined below)[3] to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

[3] As used in this Interim Order, "DIP Collateral" shall mean and include all of the following personal property assets of the DIP Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

AB_000338

with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and adequate protection to the DIP Lender in accordance with this order; and

      (ii)      scheduling a final hearing (the "Final Hearing") within twenty days of the

      (a) all inventory of the DIP Borrower purchased solely with the proceeds of any Advances made under the DIP Credit Agreement;

      (b) all receivables of the DIP Borrower arising out of the sale of inventory referred to in clause (a) above;

      (c) all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the DIP Borrower giving rise to receivables referred to in clause (b) above, (ii) all of DIP Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b), (iii) all additional amounts due to DIP Borrower from any customer relating to the receivables set forth in clause (b) above, (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b), (v) all of DIP Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b), (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b), and (vii) if and when obtained by DIP Borrower, all real and personal property of third parties in which DIP Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

      (d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

      (e) proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Interim Order or the DIP Credit Agreement, the term "DIP Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

AB_000339

Petition Date to consider the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and argument made at the first day hearing held on March 10, 2020 and the interim hearing held on March 12, 2020 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable local rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

A.      **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B.      **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.      **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing (the "DIP Facility") from the DIP Lender pursuant to the terms set forth in this Interim Order and in that certain form of Debtor-In-Possession Credit and Security Agreement (the "DIP Credit Agreement") and that certain Revolving Credit Note (collectively with the DIP Credit Agreement, the "DIP Loan Documents"), each in substantially the form as filed on the docket in these chapter 11 proceedings on March 13, 2020.

F.      **Debtor Operations**.  DIP Borrower is unable to operate without the

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Liquidity provided by the DIP Facility.

G.    **Inability to Obtain Alternative Credit**.  DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

H.    **Good Faith**.  The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

I.    **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

J.    **Interim Debt Limit**.  The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $10,000,000.00 during this Interim Period in accordance with the DIP Loan Documents.

K.    **Avoid Immediate and Irreparable Harm**.  The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

L.        **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.        **Motion Granted**. The Motion is granted.

2.        **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3.        **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower, as modified by this Interim Order; *provided, however,* notwithstanding anything to the contrary in the Motion or the forms of the DIP Loan Documents annexed to the Motion: (a) the "Maximum advance Amount" (as defined in the DIP Credit Agreement) shall be **Twenty Million and 00/100 U.S. dollars ($20,000,000.00);** (b) the aggregate balance of outstanding advances outstanding at any time pursuant to this Interim Order shall not exceed **Ten Million and 00/100 U.S. dollars**

**($10,000,000.00)**; and Section 14(a)(i) of the DIP Credit Agreement is deemed amended to strike the text "[April 7, 2020]" and replace it with "April 9, 2020". The Debtors are authorized to revise, execute and deliver the DIP Loan Documents to conform with this Paragraph 3.

4.    **Additional DIP Loan Documents; Non-Material Amendments**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder. The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

5.    **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

6.    **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to

limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7. **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8. **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[5] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the

---

[5] Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 93) (the "Interim CC Order").

DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

9. **Security for DIP Loan**.  As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "DIP Lien") against the DIP Collateral, as that term is defined in the DIP Loan Documents; *provided, however,* that the DIP Lien shall be junior only to the pre-existing liens on and security interests in such DIP Collateral granted in favor of third parties (other than any Prepetition ABL Secured Party or any Prepetition Term Loan Secured Party (each as defined in the Interim CC Order)) that, as of the Petition Date, (a) were senior in priority under applicable law to the DIP Lien, (b) were not subordinated by agreement or applicable law, and (c) were in existence, valid, enforceable, properly perfected and non-avoidable as of the Petition Date, including any such liens and security interests that were perfected after the Petition Date but relate back to the Petition Date pursuant to section 546(b) of the Bankruptcy Code.  Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

10.     **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

11.     **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12.     **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13.     **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any

successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14.     RESERVED

15.     **Order Binding Upon Parties in Interest**. To the fullest extent that relief is available at a hearing held pending a final hearing as contemplated by Bankruptcy Rule 4001(2), all of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16.     **Effect of Modification of Interim Order**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

AB_000349

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Relationship to Contemplated Sale Transaction.** As contemplated by the Levin-Wolf LOI (attached as Exhibit B to the First Day Declaration), the Sale Agreement (as defined in the DIP Credit Agreement) shall provide for the DIP Lender and Levin Trucking, LLC, the purchasers thereunder, to assume, pay or otherwise satisfy all allowed section 503(b)(9) claims against the DIP Borrower, effective upon and subject to the occurrence of the closing under such Sale Agreement.

20. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

21. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

22. **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

23. **Final Hearing**. The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (Prevailing Delaware Time)** before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before March 13, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than **March 30, 2020**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal

Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

24. ***Nunc Pro Tunc* Effect of this Interim Order**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

25. **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

**Dated: March 16th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT G

AB_000353



**FURNITURE**
**MATTRESS**

# MEMORANDUM

---

**TO:**     Employees Affected By Closing of 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321

**FROM:**   Cathrine Wenger, Senior Counsel

**SUBJECT:**  WARN Act Notice

**DATE:**    March 5, 2020

---

Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.

The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act"). If no obligations exist, this notice is being provided to you voluntarily.

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.

You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

\*        \*        \*

On a personal note, we are extremely grateful for the service you have given to the Company, and greatly appreciate your continued professionalism through this process.

AB_000354

# **EXHIBIT H**

AB_000355

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Objection Deadline: At the Hearing** |
|  | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET)** |
|  | ) |  |

### DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

hereby submit this motion (this "<u>Motion</u>"), pursuant to section 1112(a) of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure

(the "<u>Bankruptcy Rules</u>"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"),

for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed</u>

<u>Order</u>"), (i) converting each of the Debtors' chapter 11 cases to cases under chapter 7 of the

Bankruptcy Code, effective as of 12:00 a.m. (prevailing Delaware time on April 7, 2020 (the

"<u>Conversion Date</u>"), (ii) establishing a deadline for filing final chapter 11 fee applications and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

AB_000356

setting a hearing thereon, and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.     These Chapter 11 Cases were pending for just three days when on March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) outbreak to be a pandemic.[3]  These Chapter 11 Cases were pending for just five days when on March 13, 2020, the Trump administration declared a national emergency in response to the COVID-19 outbreak.[4] These Chapter 11 Cases were pending for just six days when on March 14, 2020, government regulators in Pennsylvania, one of four states in which the Debtors' core retail operations are concentrated, issued guidance urging all non-essential retail businesses to close, with other states and localities soon to follow.[5]   And, these Chapter 11 Cases were pending for just eleven to fourteen days when the four states in which the Debtors' principal operations are located — Michigan, Pennsylvania, Ohio and Illinois — issued "stay at home"  or "shelter in place" orders requiring, among other things, all non-essential businesses (including the Debtors' retail stores) to shut their doors and mandating that individuals not leave their homes except in limited circumstances.[6]

---

[2]     Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion.

[3]     World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).

[4]     Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).

[5]     Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/).

[6]     **Michigan:** Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020 (https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html); **Pennsylvania:** Gov.

2.     Even before government action in response to the COVID-19 pandemic made it impossible for the Debtors' retail operations to continue, the consumer public's understandable fear of the spread of the COVID-19 disease already had a devastating impact on the Debtors' ability to implement their original restructuring plan. These key components included (a) the continuation of Store Closing Sales at substantially all of the Debtors' 125 Art Van Furniture, Art Van Pure Sleep and Scott Shuptrine Interiors branded locations and eight of the Debtors' Wolf Furniture branded locations, and (b) the operation of 44 Levin Furniture, Levin Mattress and Wolf Furniture locations pending consummation of a going concern sale of those business lines and related assets that was contemplated at the outset of these proceedings. Unfortunately, by the conclusion of the week ending March 14, 2020, customer traffic in the Debtors' stores — both those participating in the Store Closing Sales program and the Levin and Wolf going concern locations — precipitously dropped below what any of the Debtors' pre-bankruptcy and pre-COVID-19 pandemic financial could have predicted. As a consequence, it was quickly evident that continued retail operations of any sort would cause the Debtors to incur expenses for the foreseeable future that far outstripped the revenues generated. Ultimately, of course, the aforementioned restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease effectively removed any choice the Debtors had in the matter by mandating that the Debtors discontinue all retail operations and other non-essential business operations.

Tom Wolf, Executive Order, dated March 19, 2020 (https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf); **Ohio:** Dir. Of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020 (https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf); and **Illinois:** Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020 (https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf).

AB_000358

3.      By late March, the exponential spread of the COVID-19 disease throughout the United States, along with the resulting state and locally imposed limitations and prohibitions on non-essential retail operations, had left the Debtors with few potentially viable options.  Further, these extraordinary and unprecedented events have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the best path forward in these proceedings for the Debtors and their estates.  At present, no one can predict with any reliability how long the shelter-in-place orders issued in many states where the Debtors operate will remain in effect.  In fact, the Trump administration just recently extended social distancing guidelines from April 15, 2020 through April 30, 2020.[7]  And, even assuming regulatory barriers to resuming retail operations are lifted in the near future, no one can predict with any reliability what consumer appetite will exist for furniture, given the economic and other trauma that the nation is undergoing presently.[8]

4.      In order to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that may eventually be distributable to their creditors, the Debtors had initially hoped — consistent with what has been recently approved in certain other retail chapter 11 bankruptcy proceedings[9] — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these chapter 11 cases until such time as the broader economic and public safety

---

[7]      *See, e.g.,* Michael D. Shear, "Trump Extends Social Distancing Guidelilnes Through End of April," *The New York Times* (Pub. March 29, 2020, updated April 1, 2020) (https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html).

[8]      *See, e.g.,* Ed Yong, "How the Pandemic Will End," *The Atlantic* (March 25, 2020) (exploring different plausible scenarios for resolution of the COVID-19 epidemic with some taking 12-18 months for society to return to a level of normalcy).

[9]      *See* Order Establishing Temporary Procedures and Granting Related Relief, entered March 30, 2020 [D.I. 217], *In re CraftWorks Parent, LLC, et al.,* Case No. 20-10475 (BLS) (Bankr. D. Del.); Order Temporarily Suspending the Debtors' Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, entered March 27, 2020 [D.I. 166], *In re Modell's Sporting Goods, Inc., et al.,* Case No. 20-14179 (VFP) (Bankr. D.N.J.).

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to this Court and parties in interest at the status conference held that day.

5.     Unfortunately, despite the Debtors and their advisors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, no viable path forward in chapter 11 emerged that would garner the support of the Debtors' senior secured lenders and certain other stakeholders.  With the COVID-19 pandemic still raging and by all reputable accounts likely to get worse in the next several weeks before it improves, the execution risk associated with any of these strategies appears to be unacceptably high for the Debtors to garner the support their senior secured lenders and other stakeholders necessary for the Debtors to be able to move forward.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is likely inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consummated by the time the Debtors and their senior secured lenders conceivably might have some visibility into if or when any of these restructuring alternatives could be successfully implemented.

6.     Furthermore, the Debtors have no ability, without the consent of the Prepetition ABL Agent, to implement any case suspension-based restructuring strategy.  Of necessity, on or about March 19, 2020, after communicating with representatives of the Prepetition ABL Agent on several occasions about the Debtors' increasing operating losses and need to take appropriate

action to prevent further dissipation of the Debtors' assets, the Debtors ceased operating their retail stores as going concerns and thereafter dismissed the vast majority of their employees. As a result, the Debtors have no top line revenue, such that each dollar expended by the Debtors at this point is not being replaced. For this and other reasons, the Debtors have no ability to demonstrate that their secured lenders are adequately protected to the degree required for the Debtors continue using cash collateral and other collateral without their consent. And, under the terms of the Interim CC Order, absent extraordinary relief from the Court, the consent of the Senior Secured Parties to use cash collateral and other collateral will expire no later than the end of the day Monday, April 6, 2020.

7.     The Debtors, thus, find themselves with no choice other than to move for the prompt conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Though this path is a difficult one that the Debtors are following only after exhausting all other alternatives, under these dire circumstances, the Debtors believe that converting these cases is in the best interests of the Debtors' estates. The Debtors understand that the conversion of Chapter 11 Cases is supported by the Debtors' senior lenders and not opposed by the Committee.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The statutory bases for the relief requested herein are section 1112(a) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

### A. General Background.

12. On March 8, 2020 (the "Petition Date"), each of the Debtors commenced with this Court voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13. The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS) pursuant to Bankruptcy Rule 1015.

14. Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 12], incorporated by reference herein.

15. At the commencement of these cases, the Debtors operated 169 stores in eight states, specifically Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, West Virginia, and Virginia.[10] The Debtors also have four regional distribution centers, three of which are leased and one of which is owned. The Debtors are headquartered in Warren, Michigan and had approximately 4,500 employees as of the Petition Date.

---

[10] The vast majority of the Debtors' stores were located in four states: Michigan; Ohio; Pennsylvania; and Illinois. The remaining five states listed above accounted for only 16 of the Debtors' 169 retail locations as of the Petition Date.

16.     As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases with the intention of liquidating their inventory through store closing sales (the "Store Closing Sales") conducted with the assistance of the Consultant and other proposed professionals, paying down their secured debt, and using any remaining proceeds of their Store Closing Sales to windup their operations.   Also as set forth in the First Day Declaration and Exhibit B thereto, as of the Petition Date, the Debtors were party to a binding letter of intent for a going concern sale of 44 Levin and Wolf stores and related assets and operations (the "Levin-Wolf Sale"). The Debtors intended to effectuate this restructuring through the consensual use of cash collateral.

17.     In furtherance thereof, on or around the Petition Date, the Debtors filed, among other things:

  a.  *Debtors' Application for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 3];

  b.  *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 5]; and

  c.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to § 327(a) of the Bankruptcy Code and (V) Granting Related Relief* [D.I. 52] (the "Store Closing Motion").

18.     On March 10, 2020 (as continued, in part, to March 12, 2020), the Court held a hearing (the "First Day Hearing") following which it entered certain orders, including: (a) an order [D.I. 77], pursuant to 28 U.S.C. § 156(c), appointing Kurtzman Carson Consultants LLC ("KCC") as the Claims and Noticing Agent for these Chapter 11 Cases (the "Claims Agent");  (b) the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,

and (V) Granting Related Relief [D.I. 93] (the "Interim CC Order"); and (c) an order [D.I. 143] granting limited relief in connection with the Store Closing Motion on an interim basis.

19.     Shortly after the Petition Date, the Debtors filed applications to employ and retain: (a) Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"), as their proposed general bankruptcy counsel [D.I. 142]; (b) Montgomery McCracken Walker & Rhoads ("MMWR"), as their proposed special counsel [D.I. 193]; (c) Alvarez & Marsal North America LLC ("A&M"), as their proposed financial advisors [D.I. 145]; and (d) Jones Lang Lasalle Americas, Inc. ("JLL," and together with Benesch, MMWR and A&M, the "Debtors' Professionals"), as their proposed real estate consultants and advisors [D.I. 141].  The applications to employ and retain Benesch, A&M and JLL, each are scheduled to be heard on April 6, 2020, at 1:00 p.m. (ET).  The application to employ and retain MMWR is scheduled to be heard on April 27, 2020, at 2:00 p.m. (ET).

20.     On March 18, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a seven member Official Committee of Unsecured Creditors in these Chapter 11 Cases (as reconstituted from time to time, the "Committee").  The Committee has engaged and filed applications to employ and retain Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as its proposed counsel [D.I. 244] and Alix Partners ("Alix Partners," and together with Pachulski Stang, the "Committee's Professionals"), as its proposed financial advisor [D.I. 241].

### B.  Events in the Chapter 11 Cases.

21.     Since the First Day Hearing, the exponential spread of COVID-19 has wrought economic and social havoc across the country and the globe.  As discussed in the Preliminary Statement, on the afternoon of March 13, 2020, President Trump declared COVID-19 a national

emergency and most of the states in which the Debtors operate have also declared states of emergency and issued "stay at home" or "shelter-in-place" type orders.

22. Notwithstanding the careful planning and modeling of the Debtors and their advisors, since shortly after the Petition Date, the Debtors' situation has changed drastically as a result of COVID-19. Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the Store Closing Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23.0 million;[11] however, for the <u>full</u> week ending March 15th, deposits from sales were just $8.0 million. It quickly became apparent to the Debtors' management and advisory teams that continued retail operations of any sort were causing the Debtors to incur expenses (and would do so for the foreseeable future) that far outstripped any revenues being generated through the Debtors' continued retail operations.

23. By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[12] Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …."[13] Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan — where

---

[11] The Debtors, however, did not realize the cash proceeds from most of these sales because just prior to the Petition Date and immediately thereafter, certain of the Debtors' credit card processor banks purported to exercise rights to intercept the proceeds from such transactions and redirect them into chargeback reserve accounts.

[12] Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/)

[13] Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts, March 16, 2020 (https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/).

the Debtors' headquarters, a distribution center and 82 of their stores are located — entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[14] While Michigan's initial order did not explicitly mandate closing of all non-essential retail establishments, it was accompanied by appropriately alarming statement from Governor Whitmer urging Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[15] Government authorities in Ohio and Illinois also issued similar guidance and direction.

24. As detailed in the Preliminary Statement, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations are located to issue a "stay at home" or "shelter in place" type order. Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.

25. Although the situation was evolving rapidly, the Debtors' board, management team and advisors were paying close attention to the threat COVID-19 posed to the health and welfare of the Debtors' employees and customers and to the financial impact on the Debtors' businesses. The Debtors' board, management team and advisors were in near constant communication about these events as they unfolded in mid-March. Moreover, the Debtors and their advisors worked to the best of their ability under these circumstances to keep their secured lenders and other stakeholders informed about these challenges and exhausted all efforts to work with them to develop viable responses to the rapidly deteriorating situation. When no other viable alternative emerged, on March 19, 2020, the Debtors made the painful decision to suspend all retail operations

---

[14]    Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders, March 16, 2020 (https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521763--,00.html).

[15]    *Id.*

and terminate the majority of their employees — moves the Debtors hoped at the time would be only temporary measures.

26.     Further compounding the Debtors' problems, on March 19, 2020 the proposed purchaser for the Levin-Wolf Sale notified the Debtors that they would not proceed with the transaction at that time, effectively ending any hope the Debtors had to consummate a going concern transaction for the Levin and Wolf furniture operations and dashing hopes to save upwards of a 1,000 jobs.

27.     Late in the day on March 19, 2020, however, the Prepetition ABL Agent issued a purported Termination Declaration under the Interim CC Order.  Pursuant to Paragraph 21 of the Interim CC Order, a valid Termination Declaration issued on March 19th would have triggered a Remedies Notice Period five business days' in length.  Thereafter, the Prepetition ABL Agent agreed to extend any Remedies Notice Period relating to the alleged Termination Declaration through the end of the day on Tuesday, March 31, 2020, and then again through and including the end of the day on Monday, April 6, 2020.

28.     Following these events, the Debtors and their advisors continued to work with the Prepetition ABL Agent, the Committee, and their respective advisors to identify solutions for the Debtors' deteriorating situation that would allow them to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that might eventually be distributable to their creditors.  The Debtors had hoped — consistent with what has been recently approved this Court in the *CraftWorks* chapter 11 cases and by the District of New Jersey bankruptcy court in the *Modell's* chapter 11 cases — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these Chapter 11 Cases until such time as the broader economic and public safety

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to the Court that day.

29.     Both before and after the March 26th status conference, the Debtors, with the assistance of their advisors and in consultation with the Prepetition ABL Agent, the Committee and their respective advisors, were working to develop and evaluate several potentially value maximizing alternatives for the Debtors to pursue after the contemplated suspension of operations and downscaling of activities in these Chapter 11 Cases came to an end.  One such path was to resume Store Closing Sales at all of the Debtors' locations where it would be financially and operationally viable to do so.  A second path considered was to focus on one or more bulk sales most or all of the Debtors' inventory, equipment, and other readily monetizable assets.  Additionally, the Debtors and their advisors examined several "middle" paths for the Debtors and their estates, which would involve various combinations of resuming Store Closing Sales at certain locations and bulk-selling inventory, equipment, and certain other assets associated with other locations.

30.     To be clear, each of the post-suspension restructuring alternatives explored by the Debtors had the prospect of producing some return to the Debtors' senior secured lenders and potentially to other stakeholders.  But none of the potential scenarios showed a reasonable chance of generating a recovery for the Debtors' senior secured lenders coming anywhere near what the pre-COVID 19 pandemic modeling had suggested.  Indeed, under most scenarios, the Prepetition ABL Secured Parties, which at the outset of these proceedings were projected to receive a full

recovery on their approximately $34 million of Prepetion ABL Obligations by the mid-point of the Store Closing Sales Process, would not get out whole before their ABL Priority Collateral was fully monetized.

31.  Despite the Debtors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, these concerted efforts were unable to produce a path forward in chapter 11 that would garner the support of their senior secured lenders and potentially other stakeholders.  Unfortunately, with the COVID-19 pandemic still raging and by all reputable accounts likely to get worse before it improves, the perceived execution risk of any of these restructuring strategies has proven to be an insurmountable  barrier to the Debtors ability to obtain the necessary support of their secured lenders and others.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the reasonable best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consumed by operating expenses before the Debtors and their senior secured lenders would have meaningful visibility into whether these restructuring alternatives could be successfully implemented.

32.  By Monday, March 30, 2020, the Debtors were effectively out of time, with their access to Cash Collateral under the Interim CC Order then due to terminate at the end of the following day.  Although it was clear by this point in the proceedings that the Debtors would be unable to continue these Chapter 11 Cases without the support and consent of their senior secured lenders, unresolved issues existed as to what obligations would and would not be funded under the terms of the Interim CC Order prior to any conversion of the Chapter 11 Cases.  Recognizing the contributions that their employees had made to the Debtors' businesses postpetition and the

extreme hardship that many of the employees and their families were apt to experience as a result of losing their jobs in the midst of an ongoing pandemic and associated economic crisis, the Debtors attempted everything in their power to ensure that employee payroll and related employee obligations would be fully funded under the Interim CC Order.

33.     These efforts were to a degree successful.  At a hearing held on March 31, 2020, the Court confirmed that the Debtors would have access to Cash Collateral to fund and pay current payroll obligations, including wages, salaries and commissions.  The cash available, however, was insufficient for it to be possible for the Debtors to provide at this time for payment in full of other employee related obligations, such as coverage obligations for employee healthcare expenses and certain other benefits plans that were, in whole or part, self-funded by the company.[16]  Even though this situation is primarily the result of the COVID-19 pandemic and other circumstances entirely beyond the Debtors' control, the Debtors deeply regret that they are not in a position to be able to do more for their employees, customers, vendors, landlords and other stakeholders.

34.     Based upon the foregoing, the Debtors have considered the circumstances in which they find themselves, and have concluded that converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates.

---

[16]     The Debtors estimate the total unfunded trailing liabilities under their partially self-funded employee health plan to be approximately $8.5 million. Under self-funded plans, like the ones the Debtors had established for their employees in the ordinary course of business prior to the Petition Date, when employees and their covered dependents receive covered services the resulting charges are remitted to the plan's claims administrator for processing.  Thereafter, the approved claims are batched and remitted to the Debtors for payment.  The remittance of the batched claims to the Debtors for payment can trail the rendering of services to employees by up to several months. In general, the Debtors terminated health care covered for their employees effective as of the dates such employees separated from the company.  Thus, the estimated $8.5 million of trailing obligations is on account of covered healthcare services to covered persons provided prior to each such employee's termination date.  Although the Debtors' original budget for these Chapter 11 Cases contemplated the funding of such trailing employee healthcare plan obligations, the COVID-19 pandemic's disruption of the Debtors' ability to operate postpetition  combined with the issuance of a Termination Declaration under the Interim CC Order that followed, left the Debtors with inadequate cash on hand and inadequate access to additional cash with which to fund such obligations.

AB_000370

**RELIEF REQUESTED**

35.    By this Motion, the Debtors request entry of the Proposed Order, pursuant to section 1112(a) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date, (ii) establishing a deadline for filing final chapter 11 professional fee applications and setting a date for a hearing thereon, and (iii) granting related relief.

36.    The Debtors also request that the Court approve the following procedures in connection with the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code (the "Conversion Procedures"):

a.    **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

b.    **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain

AB_000371

copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

## **BASIS FOR RELIEF**

A. **The Conversion Relief Should be Granted**

37.     Section 1112(a) of the Bankruptcy Code provides that a debtor may convert a case to chapter 7 as a matter of right. *See* H.R. Rep. No. 95-595, 1st Sess. 405 (1977) ("Subdivision (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case"); *see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) ("[A] debtor has the absolute right to convert [its] Chapter 11 case to a Chapter 7 case"). There are only three circumstances where a debtor is precluded from exercising that right: (i) the debtor is not a debtor in possession; (ii) the case was originally commenced as an involuntary case under chapter 11; or (iii) the case was converted to a case under chapter 11 other than at the debtor's request. 11 U.S.C. § 1112(a).

None of those exceptions is applicable in these Chapter 11 Cases. Therefore, the Debtors are entitled, as an absolute right, to convert the Chapter 11 Cases to cases under chapter 7.

38.     In addition, conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates and creditors. The Debtors no longer have funding to administer these Chapter 11 Cases. Thus, although there is substantial inventory and equipment remaining in the Debtors' stores and distribution centers and other estate assets that may be available to satisfy certain creditor claims, without an ability to fund ongoing administrative expenses, the Debtors have no ability to pursue the recovery of those assets or prosecute a chapter 11 plan. Accordingly, the Debtors believe there is no reasonable likelihood that the Debtors could confirm and consummate a chapter 11 plan, and respectfully submit that a chapter 7 trustee will be able to more efficiently and effectively bring these cases to their conclusion.

39.     Accordingly, the Debtors respectfully request that the Court enter an order converting the Debtors' cases from chapter 11 to chapter 7, effective as of the Conversion Date.

**B.      The Conversion Procedures and Other Related Relief Should Be Approved**

40.     Pursuant to Local Rule 2002-1(f)(xi), "[u]pon conversion of a chapter 11 case to a chapter 7 case, if there are more than 200 creditors, the claims agent appointed in the chapter 11 case shall . . . submit a termination order." Del. Bankr. L.R. 2002-1(f)(xi).

41.     Accordingly, the Debtor requests that the conversion order sought hereby also provides for the termination of KCC services as claims and noticing agent in these Chapter 11 Cases.

42.     The Debtor also believes that the Conversion Procedures are appropriate under the facts of this case and should be approved. The Conversion Procedures include, among other things, a request to extend the deadline under Bankruptcy Rule 1019(1)(A) for the filing of any statements

and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) from fourteen (14) days after the Conversion Date to forty-two days (42) after the Conversion Date.

43.     The Court has authority to grant the requested extension under Bankruptcy Rules 1007(c) and 9006(b) and Bankruptcy Local Rule 1007-1(b). Bankruptcy Rule 1007(c), together with Bankruptcy Rule 9006(b), allows the Court to extend the filing deadline for the Schedules and Statements "for cause shown." Similarly, Bankruptcy Local Rule 1007-1(b) provides that such an extension may be granted for cause. Showing "cause" merely requires that a debtor "demonstrate some justification for the issuance of the order," and bankruptcy courts will normally grant such extensions "in the absence of bad faith or prejudice to the adverse party." *See, e.g., Bryant v. Smith,* 165 B.R. 176, 182 (W.D. Va. 1994) (discussing the standard for granting extensions under Bankruptcy Rule 1007) (internal citations and quotation marks omitted).

44.     Because of the COVID-19 pandemic and other extremely difficult circumstances that have defined these Chapter 11 Cases, the Debtors and their advisors have had virtually no free time or resources available since he Petition Date to devote to the preparation of schedules and statements required by Bankruptcy Rules 1019(1)(A) and 1007(b).  Given the extent of work that remains to be done and the extremely limited resources remaining with which to undertake such work, which conditions both exist through no fault of the Debtors and their advisors, the Debtors' respectfully submit that "cause" exists to extend this deadline. Moreover, since these proceedings are still in their very early stages, the granting of such an extension is unlikely to prejudice the trustee, any creditor or any other party in interest.

## NOTICE

45.     Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of Delaware; (ii) proposed counsel for the Committee; (iii) the agents under the Debtors' prepetition

secured facilities and counsel thereto; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. A copy of this Motion is also available on the website of the Debtors' notice and claims agent at https://www.kccllc.net/artvan. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **RESERVATION OF RIGHTS**

46.     The Debtors understand that employee payroll, the Carve Out and all other obligations that are required to be funded and paid under the Interim CC Order, including without limitation Paragraph 2 thereof, have been or will be funded and paid prior to the Conversion Date. Nevertheless, in the event that such obligations are not funded and paid as required under the Interim CC Order, the Debtors reserve all rights for themselves and their estates, including but not limited to any chapter 7 trustee that may hereafter be appointed.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other relief as is appropriate under the circumstances.

Dated: April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

 _/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
          mbarrie@beneschlaw.com
          jhoover@beneschlaw.com
          kcapuzzi@beneschlaw.com
          kharmon@beneschlaw.com
          jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

AB_000376

# Exhibit A

AB_000377

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: D.I. _____** |
|  | ) |  |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED, as set forth herein.

2.      Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.      The following Conversion Procedures are hereby approved:

   a.   **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

    b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

    c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

    d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

    e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

    f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

    4.    Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

    5.    Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting*

*Related Relief* [D.I. 93] (the "<u>Interim CC Order</u>"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent* <u>*Nunc Pro Tunc*</u> *to the Petition Date* [D.I. 77] (the "<u>Claims Agent Order</u>") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.      Except as expressly provided in Paragraph 5 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order).

7.      For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or

AB_000381

(ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

8.     Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

9.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline: At the Hearing** |
| | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET) (requested)** |
| | ) | |

## NOTICE OF VIDEO AND TELEPHONIC HEARING REGARDING DEBTORS' CORRECTED MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on April 3, 2020, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors Corrected Motion for Entry of an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the "Motion") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Bankruptcy Court"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on **April 6, 2020 at 1:00 p.m. (ET)**, before the Honorable Chief Judge Christopher S. Sontchi via video and telephonic conference.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

**PLEASE TAKE FURTHER NOTICE THAT THE HEARING IS PROCEEDING VIA ZOOM USING THE FOLLOWING INSTRUCTIONS:**

> **Topic: Art Van Furniture 20-10553 - Hearing**
> **Time: Apr 6, 2020 1:00 PM Eastern Time (US and Canada)**
> **Join Zoom Meeting**
> **https://uchicago.zoom.us/j/911880719**
> **Meeting ID: 911 880 719**

**DO NOT COME TO THE COURTHOUSE. ANY PARTY WHO WISHES TO PRESENT EVIDENCE OR EXAMINE WITNESSES IS REQUIRED TO ACCESS VIA ZOOM. ANY PARTY WHO WISHES TO ACCESS VIA ZOOM MUST ALSO MAKE AUDIO ARRANGEMENTS THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**OTHER PARTIES IN INTEREST MAY MAKE ARRANGEMENTS TO PARTICIPATE BY TELEPHONE AT THE HEARING THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**PLEASE TAKE FURTHER NOTICE THAT, IF NO RESPONSES OR OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

AB_000384

Dated: April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**

 _/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
mbarrie@beneschlaw.com
jhoover@beneschlaw.com
kcapuzzi@beneschlaw.com
kharmon@beneschlaw.com
jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in
Possession_

3

AB_000385

# EXHIBIT D

AB_000386

ADVERTISEMENT

BUSINESS

# Art Van Furniture to close all stores, including 24 in Illinois

By CHICAGO TRIBUNE STAFF
CHICAGO TRIBUNE  |  MAR 05, 2020

  



SECTIONS

**ONLY $1 FOR 6 MONTHS**
Our best offer ends soon

LOG IN



The ArtVan store at 2606 N. Elston on November 2, 2015. (Phil Velasquez / Chicago Tribune)

Art Van Furniture, one of the Midwest's largest furniture retailers with almost 180 stores, including two dozen in Illinois, announced Thursday it will shut down.

Liquidation sales are scheduled to begin Friday.

ADVERTISEMENT

**American Greetings** - Sponsored

**Make Every Moment Merrier**

Shop Now

**American Greetings** - Sponsored

**Make Every Moment Merrier**

Shop Now

ADVERTISEMENT

The company, started in the Detroit area in 1959 and now based in Warren, Michigan, operates stores in the Chicago name under the names Art Van

Furniture, Art Van PureSleep and Scott Shuptrine Interiors. In addition to stores in Michigan and Illinois, it has locations in Indiana, Missouri and Ohio.



Shoppers inside the Art Van Furniture store in Chicago on Nov. 2, 2015. (Phil Velasquez / Chicago Tribune)

It entered the Chicago market in mid-2013, with plans to invest more than $40 million in land, store build-out, inventory and labor. The state's Department of Commerce and Economic Opportunity provided a $404,000 tax credit spread over 10 years and based on the company creating 35 jobs and making a $4.9 million investment at its Bolingbrook distribution facility. The distribution center will close when final sales are completed, said spokeswoman Diane Charles.

AB_000389

The company's website lists 24 stores in Illinois. Altogether, the shutdown will mean the loss of 520 jobs in Illinois, she said.

[Nordstrom closing Trunk Club stores »](#)

Art Van drew attention for its creative marketing promotions. Those included free furniture if the temperature at O'Hare International Airport topped 100 degrees during part of the summer of 2016 and bets on heavy snowfall during Super Bowl games. In 2015, Art Van refunded a total of $2.5 million to about 1,200 furniture buyers when it snowed more than 3 inches during that year's Super Bowl.

ADVERTISEMENT



In 2017, Boston-based private equity firm Thomas H. Lee Partners acquired a majority stake in Art Van and the retailer began an aggressive expansion, including buying other chains and opening in spaces left empty by other retailers.

[The Standard Club, long the social nexus for Chicago's Jewish leaders, is closing May 1 amid financial struggles »](#)

# **EXHIBIT E**

AB_000391

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10533 (CSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364 (d); AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1.      The Debtors seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order" and, collectively with the Interim Order, the "Orders") authorizing the Debtors' use of secured post-petition financing (the "DIP Facility") on an interim and final basis pursuant to the terms of the Debtor-in-Possession Credit and Security Agreement (the "DIP Credit Agreement") by and among Debtor Sam Levin, Inc. (the "Borrower" or "Debtor Levin") and Levin Furniture LLC (the "DIP Lender") attached here to as Exhibit B.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

AB_000392

2. In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

3. In further support of the Motion, the Debtors respectfully represent as follows:

## Overview

4. By this Motion, the Debtors seek entry of the Interim Order:

    a. authorizing, under sections 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtors to obtain secured, superpriority, post-petition loans, advances and other financial accommodations (the "DIP Facility"), on an interim basis;

    b. authorizing the Debtors to execute and deliver the DIP Credit Agreement and all other related documents and agreements as contemplated by the DIP Credit Agreement and requested by the DIP Lender (collectively, the "DIP Loan Documents");

    c. authorizing the Debtors, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $7,000,000.00 at any one time outstanding;

    d. granting allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents, subject to carve-outs;

    e. granting to the DIP Lender automatically perfected security interests and liens on all of the DIP Collateral;

    f. authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Loan Documents;

    g. vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

    h. granted related relief; and

    i. scheduling the final hearing on this Motion (the "Final Hearing").

AB_000393

**Jurisdiction and Venue**

5.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are 105, 361, 363(c) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6004 and 9014, and Bankruptcy Local Rule 4001-2.

**Background**

8.      The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.  Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.  As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

3

AB_000394

The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

9.      On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

## Need to the DIP Facility

10.     The Debtors have an urgent and immediate need to obtain postpetition financing. Here, the DIP Facility sends a fundamentally positive signal to the Debtors' vendors, employees, customers, and other parties critical to maintaining the Debtors' viability that the operations at the stores subject to the Wolf-Levin LOI (attached to the First Day Declaration) will continue as a going concern.

11.     The DIP Facility is narrow and limited to purchasing inventory for sale in those stores.  Without the availability provided under the DIP Facility, the Debtors may be unable to preserve such stores as a going concern.

AB_000395

12.     Hence, the Debtors have determined, in the exercise of their sound business judgment, that they require financing under the terms of the DIP Credit Agreement and hereby request authority to obtain such financing through the proposed Orders.

**<u>Statement of the Material Terms of the Interim Order</u>**

13.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Bankruptcy Local Rule 4001-2(a)(i) and (ii), the following is a concise statement and summary of the material terms of the Interim Order and/or the DIP Credit Agreement (collectively, the "<u>Highlighted Provisions</u>"):

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Borrowers** | Sam Levin, Inc. | DIP Credit Agreement at p. 1 |
| **Guarantors** | None | N/A |
| **DIP Lender** | Levin Furniture, LLC | DIP Credit Agreement at p.1 |
| **Purpose** | To fund operations of Borrower, specifically, to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case | Interim Order at ¶ G |
| **Interim Debt Limit** | Not to exceed $3,500,000.00 during the Interim Period. | Interim Order at ¶ K and DIP Credit Agreement at § 3(d) |
| **Type and Amount of DIP Facility** | $7 million secured superpriority facility | DIP Agreement introduction and defined terms |

5

AB_000396

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Maturity Date** | April 7, 2020 | DIP Credit Agreement at § 14(a) |
| **Interest Rate** | Non-default rate: 9% per annum based upon 360 day year<br><br>Default rate: Non-default rate plus 2% per annum | DIP Credit Agreement at §§ 1 and 3(e)(ii) |
| **Other Fees** | N/A | N/A |
| **Conditions Precedent to Lending** | (a)  Each of the representations and warranties made by Borrower in or pursuant to DIP Credit Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.<br><br>(b)  Financing Orders.  Subject to Section 9(c) of the DIP Credit Agreement, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the DIP Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "Additional Credit"), the DIP Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the DIP Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor | DIP Credit Agreement at § 10 |

AB_000397

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | the performance by the Borrower of any of its obligations under the DIP Credit Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.<br><br>(c) <u>Sale Motion</u>. For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the DIP Lender, which shall be reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Motion</u>").<br><br>(d) <u>Asset Purchase Agreement</u>. For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "<u>Sellers</u>"), and the DIP Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "<u>Purchasers</u>"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "<u>Sale Agreement</u>"), which shall be reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Motion</u>").<br><br>(e) For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the DIP Lender (the "<u>Sale Order</u>") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal. Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.<br><br>(f) <u>No Default</u>. No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that, the DIP Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default. | |
| **Interim Borrowing Limit** | Not to exceed $3,500,000.00 during the Interim Period. | Interim Order at ¶ K |

7

AB_000398

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | | |
| **Limitations on Use of Proceeds:** | The funds available under the DIP Facility may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders. | DIP Credit Agreement at § 4 |
| **Budget and Financial Covenants** | N/A | N/A |
| **Cash Dominion** | N/A | N/A |
| **DIP Lien / Superpriority Claim** | Borrower agrees to grant DIP Lender an allowed Superpriority Claim which shall survive any conversion of the these matters to a case under chapter 7 of the Bankruptcy Code. "Superpriority Claim" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code. | DIP Credit Agreement at §§ 1 and 5(i) |
| **DIP Collateral** | To secure prompt payment and performance of all obligations, the Borrower grants to the DIP Lender a continuing security interest in and Lien upon: (a) all inventory of the Borrower purchased solely with the proceeds of any Advances under the DIP Loan Documents; (b) all receivables; (c) all right, title and interest in and to (i) all inventory returned or rejected by | DIP Credit Agreement at §1 |

8

AB_000399

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, dentinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer related to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien of security interest as security for the payment or enforcement of receivables referred to in clause (b)<br><br>(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and<br><br>(e) proceedings and products of (a), (b), (c) or (d) of this definition, in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claims proceeds. | |

AB_000400

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | The term Collateral shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code, or any other applicable law, constitute or result in (i) the abandonment, invalidation or uneforceability of any right, title or interest of Borrower therein or (ii) a breach of termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest or Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied. | |
| **Lien on Avoidance Claims** | N/A | N/A |
| **Administrative Carve-Out** | Subject to the Financing Orders and the DIP Loan Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall: (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected | DIP Credit Agreement at § 15(k) |

AB_000401

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral. | |
| **Waivers** | N/A | N/A |
| **Perfection Other Than Under State Law** | The Interim DIP Lien shall be automatically perfected upon entry of the Interim Order. | Interim Order at ¶10 and DIP Credit Agreement at § 5(b) |
| **Events of Default** | The occurrence of one or more of the following events shall constitute an "Event of Default": (a)    Payment of Obligations.  Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document. (b)    Misrepresentations.    Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made. (c)    Failure to Furnish Information. Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten | DIP Credit Agreement at § 12 |

AB_000402

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | (10) days after such information is requested, or (iii) permit the inspection of its books or records. | |
| |       (d)    Liens Against Assets. Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days. | |
| |       (e)    Breach of Covenants. Except as otherwise provided for in this Section, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations. | |
| |       (f)    Judgment. Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage). | |
| |       (g)    Loss of Priority Lien. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders. | |
| |       (h)    Invalidity of Credit Agreement. Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender. | |
| |       (i)    Destruction of Collateral. Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material | |

12

AB_000403

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | impairment or loss of the security provided by this Agreement or the Other Documents.<br><br>(j) Pre-Petition Payments. Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date.<br><br>(k) Dismissal or Conversion of Bankruptcy Case. The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is pari passu with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim.<br><br>(l) Relief from Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower. | |

AB_000404

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| | (m)   The Financing Orders. Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower. Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.<br><br>(n)   Lien Challenge. Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender. Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor or the Lender.<br><br>(o)   Filing of Reorganization Plan or Sale Motion. A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers. | |

13169264 v1

AB_000405

| Material Terms | Summary of Material Terms | Para(s). of Interim Order and/or DIP Credit Agreement |
|---|---|---|
| **Remedies / Relief from Automatic Stay** | Upon the occurrence and during the continuance of any Event of Default, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and/or modified to the extent necessary to permit the DIP Lender to (i) perfect the security interests and Liens granted under the DIP Loan Documents and (ii) exercise its rights under section 13 of the DIP Loan Documents. | DIP Credit Agreement at § 7(d) |
| **Indemnification and Exculpation** | Borrower shall indemnify the DIP Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person (as defined in the DIP Loan Agreement) with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related thereto, the DIP Loan Agreement or Other Documents (as defined in the DIP Loan Agreement), whether or not the DIP Lender is party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified. | DIP Credit Agreement at § 15(a) |

**Bankruptcy Local Rule 4001-2 Disclosures**

13.     The Debtors do not believe that this Motion or the Interim Order contain any provisions requiring special disclosure under Bankruptcy Local Rule 4001-2(a).

## Basis for Relief

### I.     The Debtors Should Be Permitted to Obtain Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.

14.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense…" 11 U.S.C. § 364(c).

15.     In evaluating proposed post-petition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether: (i) unencumbered credit or alternative financing without superpriority status is available to the debtor; (ii) the credit transactions are necessary to preserve assets of the estate; (iii) the terms of the credit agreement are fair, reasonable, and adequate; (iv) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and (v) the proposed financing agreement adequately protects prepetition secured creditors.

16.     *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*,

16

AB_000407

308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

17.     For the reasons discussed below, the Debtors satisfy the standards required to obtain post-petition financing under section 364(c) of the Bankruptcy Code. For the avoidance of doubt, the Debtors are not seeking any relief pursuant to section 364(d) of the Bankruptcy Code

## II.     The Debtors Were Unable to Obtain Financing on an Unsecured Basis.

18.     Whether debtors were unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security interest. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009). The required showing under section 364 of the Bankruptcy Code that unsecured credit was not available is not rigorous. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender, particularly when "time is of the essence in an effort to preserve a vulnerable seasonal enterprise").

19.     Here, as detailed in the First-Day Declaration, as supplemented by the record, the Debtors filed these cases to avert a liquidity crisis and prevent further deterioration of their business. The Debtors are unable, in the present circumstances, to purchase inventory at the Wolf-Levin go-forward stores by obtaining financing on an unsecured, administrative expense basis.

20.     The Debtors respectfully submit that their efforts to obtain post-petition financing therefore satisfy the standards required under section 364(c) of the Bankruptcy Code. *See, e.g., In*

17

AB_000408

*re Simasko Production Co.*, 47 B.R. 444, 448-49 (Bankr. D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

### III. The Proposed Financing is Necessary to Preserve the Assets of the Debtors' Estates.

21. Cash is necessary for working capital, operating costs and expenses incurred during these Cases, including purchasing inventory for the Wolf-Levin go-forward stores so that they can continue as going concerns. The DIP Facility thus is essential to Debtor Levin's continued operational viability and will provide Debtor Levin with the opportunity to preserve its businesses while the Debtors prepare to enter the sale process.

22. As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004). As noted above, the Debtors require post-petition financing under the terms of the DIP Loan Documents to continue their operations during these Chapter 11 Cases.

### IV. The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.

23. In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank &*

18

AB_000409

*Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

24.     The terms of the DIP Credit Agreement and the proposed DIP Orders were negotiated between the Debtors and the DIP Lender. The Debtors negotiated with the DIP Lender in good faith to ensure that the terms of the DIP Facility are consistent with "market" terms, and are fair and reasonable to the Debtors. To that end, the Debtors, on the one hand, and the DIP Lender on the other hand, each had separate business teams and used separate counsel in negotiating the DIP Facility.

**V.     Entry Into the Proposed Financing Reflects the Debtors' Sound Business Judgment.**

25.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). One court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

26.     Here, the Debtors' sound business judgment clearly supports entry into the DIP

AB_000410

Credit Agreement to gain access to needed funding and maximize value for all constituents.

## VI.    The DIP Lender is Extending Credit in Good Faith.

27.    Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

28.    The Debtors and the DIP Lender negotiated the DIP Credit Agreement in good faith. Accordingly, the DIP Orders should provide that the DIP Lender, as a good faith lender, is entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

## <u>Request for Final Hearing</u>

29.    Pursuant to Bankruptcy Rule 400l(b)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days of the Petition Date and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

30.    The urgent need to preserve the Debtors' businesses, and avoid immediate and irreparable harm to the Debtors' estates, makes it imperative that the Debtors be authorized to obtain post-petition financing as of the Petition Date, pending the Final Hearing, in order to continue their operations and administer the Cases. Without the ability to obtain access to such funding, the Debtors would be unable to meet their post-petition obligations, including maintaining and maximizing the value of the Debtors' businesses, thus causing irreparable harm to the value of the Debtors' estates.

AB_000411

31. Accordingly, the Debtors respectfully request that, pending the hearing on the Final Order, the Interim Order be approved in all respects, and that the terms and provisions of the Interim Order be implemented and be deemed binding, and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

32. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, authorizing the Debtors to use the DIP Facility and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

33. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

34. Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. Without limiting the

AB_000412

foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

35.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

13169264 v1

AB_000413

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, and based on the record of the Chapter 11 Case, the Debtors respectfully request that this Court (a) enter the Orders (i) authorizing the Debtors to use the DIP Facility on an interim and final basis subject to the terms and conditions set forth therein; (ii) scheduling the Final Hearing, pursuant to the Interim Order, within approximately thirty-five (35) days of the commencement of the chapter 11 cases, to consider approval of this Motion on a final basis; and (iii) granting related relief; and (b) grant the Debtors such other and further relief as may be just and proper.

Dated: March 9, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

    */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
       mbarrie@beneschlaw.com
       jhoover@beneschlaw.com
       kcapuzzi@beneschlaw.com
       kharmon@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

AB_000414

# EXHIBIT A

AB_000415

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) Case No. 20-10533 (CSS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) **Re: Docket No. _____** |

## INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i)     authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the Collateral (as defined in the DIP Loan Documents, and referred to herein as the "DIP Collateral") to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); LF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

AB_000416

adequate protection to the DIP Lender in accordance with this order; and

(ii)        scheduling a final hearing (the "Final Hearing") within twenty days of the Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and argument made at the interim hearing held on March 10, 2020 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable local rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

2

AB_000417

A.     **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B.     **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.     **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.     **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing (the "DIP Facility") from the DIP Lender pursuant to the terms set forth in that certain Debtor-In-Possession Credit and Security Agreement and that certain Revolving Credit Note (collectively,

---

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

3

AB_000418

the "DIP Loan Documents") attached to the Motion and as **Exhibit B** thereto.

G. **Debtor Operations**. DIP Borrower is unable to operate without the Liquidity provided by the DIP Facility.

H. **Inability to Obtain Alternative Credit**. DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

I. **Good Faith**. The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility. Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

J. **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

K. **Interim Debt Limit**. The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $3,500,000.00 during this Interim Period in accordance with the DIP Loan Documents.

L. **Avoid Immediate and Irreparable Harm**. The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate. This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other

AB_000419

things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

M.  **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.  **Motion Granted**. The Motion is granted.

2.  **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3.  **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower attached to the Motion and incorporated herein, as modified by this Interim Order.

5

AB_000420

4.     **DIP Loan Documents**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder.  The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

5.     **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

6.     **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7.     **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately

6

AB_000421

due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8. **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[4] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

---

[4] Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. ___).

AB_000422

9.      **Security for DIP Loan**.  As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "DIP Lien") against the DIP Collateral, as that term is defined in the DIP Loan Documents.  Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

10.      **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be

8

AB_000423

obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

11. **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12. **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted,

9

AB_000424

superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13.    **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14.    **No Liability to Third Parties**. DIP Lender shall not (i) have liability to any third party nor shall it be deemed to be in control of the operations of the DIP Borrower or to be acting as a "controlling person", "responsible person" or "owner or operator" with respect to the operation or management of the DIP Borrower (as such terms, or any similar terms, are used in the Internal Revenue Code, the Unites States Comprehensive, Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), or owe any fiduciary duty to the DIP Borrower, its creditors or its estates, and (ii) DIP Lender's relationship with the DIP Borrower shall not constitute nor be deemed to constitute a joint venture or partnership with the DIP Borrower.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

15.    **Order Binding Upon Parties in Interest**. All of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its

AB_000425

successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16. **Effect of Modification of Interim Order**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be,

11

AB_000426

without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

20. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

21. **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

22. **Final Hearing**. The Final Hearing to consider entry of the Final Order is scheduled for [_____], 2020 at [__]:00 [_].m. (EST) before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before March 12, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on [_____], 2020, at [__]:00 p.m. (EST),

AB_000427

which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

23. ***Nunc Pro Tunc* Effect of this Interim Order**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

24. **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

Dated: _____
Wilmington, Delaware

_____
CHIEF JUDGE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

13

13172137 v2

AB_000428

# **EXHIBIT B**

AB_000429

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT** (this "Agreement"), dated the 10th day of March, 2020, is entered into by and between Sam Levin, Inc., a Pennsylvania corporation ("Borrower"), and Levin Furniture LLC, a Pennsylvania limited liability company ("Lender").

## Recitals

**WHEREAS,** Borrower has encountered financial difficulties and, together with certain of is affiliates, has filed for bankruptcy protection under chapter 11 of 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are the subject of a request for joint administration under Case No. 20-10553 (CSS) (collectively, the "Bankruptcy Cases");

**WHEREAS,** Lender has agreed to provide post-petition debtor-in-possession financing (the "DIP Financing") to Borrower as more fully set forth herein and as set forth in the Financing Orders (as defined in Section 1 hereof), which Financing Orders shall be in form and substance acceptable to Lender in Lender's sole discretion, such DIP Financing to be used to pay certain expenses of Borrower during the Bankruptcy Case on the terms set forth below;

**WHEREAS,** in return for the DIP Financing, Lender requires that Borrower obtain entry by the Bankruptcy Court of the Financing Orders, specifically granting Lender, among other things, a secured superpriority administrative expense claim against Borrower and its assets only pursuant to Section 364(c) of the Bankruptcy Code with respect to the DIP Financing; and

**WHEREAS,** Borrower and Lender each acknowledge and agree that the terms of this Agreement must be approved by the Bankruptcy Court and that the Interim Financing Order (as defined in Section 1 hereof) be entered by the Bankruptcy Court before this Agreement is enforceable.

**NOW THEREFORE,** in consideration of the mutual covenants and undertakings herein contained, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

## Agreement

Borrower and Lender each agree that the foregoing Recitals are true and correct.

1. **Definitions**. For purposes of this Agreement the following terms shall have the following meanings:

"Additional Credit" shall have the meaning set forth in Section 10(b) hereof.

"Advances" shall mean loans made pursuant to the terms of this Agreement under the Revolving Credit Note.

"Agreement" shall have the meaning set forth in the Preamble hereof.

"Approved Amount" shall mean, as of any date, the maximum amount of Advances that are authorized pursuant to the terms of the Interim Financing Order or the Final Financing Order, as the case may be.

AB_000430

"Bankruptcy Case" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Code" shall have the meaning set forth in the Recitals hereof.

"Bankruptcy Court" shall have the meaning set forth in the Recitals hereof.

"Borrower" shall have the meaning set forth in the Preamble hereof.

"Borrower Group" shall have the meaning set forth in Section 15(l) hereof.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Pittsburgh, Pennsylvania.

"Cash Collateral Order" shall mean that certain *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered by the Bankruptcy Court in connection with the Bankruptcy Case.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other similar governmental authority, domestic or foreign, upon the Collateral, the Borrower or any affiliates of the Borrower.

"Claims" shall have the meaning set forth in Section 15(l) hereof.

"Closing" shall mean the closing of the DIP Financing and the other transactions to be consummated on the Closing Date, as contemplated by this Agreement.

"Closing Date" shall mean the date on which all conditions to the effectiveness of this Agreement are satisfied, but in no event shall such date be later than seven (7) days after the Petition Date.

"Collateral" shall mean and include all of the following personal property assets of the Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

(a)     all inventory of the Borrower purchased solely with the proceeds of any Advances made hereunder;

(b)     all receivables of the Borrower arising out of the sale of inventory referred to in clause (a) above;

(c)     all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the Borrower giving rise to receivables referred to in clause (b) above; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b); (iii) all additional amounts due to Borrower from any customer relating to the receivables set forth in clause (b) above; (iv) other property, including warranty claims, relating to any

AB_000431

of the foregoing (a) and (b); (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b); (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b); and (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

    (d)    ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

    (e)    proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Agreement, the term "Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

    "Contract Rate" shall mean a fixed interest rate equal to **[9 percent (9.00%)]** per annum based on a three hundred sixty (360) day year.

    "Default" shall mean an event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

    "Default Rate" shall have the meaning set forth in Section 3(e)(ii) hereof.

    "DIP Financing" shall have the meaning set forth in the Recitals hereof.

    "Event of Default" shall mean the occurrence of any of the events set forth in Section 12 hereof.

    "Final Financing Order" shall mean a Financing Order that is a Final Order entered in the Bankruptcy Case after notice and final hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure and applicable local rules.

    "Final Order" shall mean an order or judgment of the Bankruptcy Court duly entered in the docket of the Bankruptcy Case that (a) has not been modified or amended without the consent of the

Lender, or vacated, reversed, revoked, rescinded, stayed or appealed from, except as the Lender may otherwise specifically agree, (b) with respect to which the time to appeal, petition for certiorari, application or motion for reversal, rehearing, reargument, stay, or modification has expired, (c) no petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for a writ of certiorari with respect thereto has been filed or granted or the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order or judgment was appealed and (d) is no longer subject to any or further appeal or petition, application or motion for reversal, rehearing, reargument, stay or modification thereof or for any writ of certiorari with respect thereto or further judicial review in any form.

"Financing Orders" shall mean the Interim Financing Order and such other interim, final, permanent and/or supplemental orders, including the Final Financing Order, satisfactory to the Lender entered by the Bankruptcy Court in the Bankruptcy Case after notice pursuant to Section 364 of the Bankruptcy Code relating thereto or authorizing the granting of credit by the Lender to the Borrower pursuant to the terms of this Agreement.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Body" shall mean any nation or government, any state or other political subdivision thereof or any entity exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Interim Financing Order" shall mean the order entered by the Bankruptcy Court on or about the date hereof in the form of Exhibit A attached hereto, with such changes thereto as may be approved by the Lender.

"Lender" shall have the meaning set forth in the Preamble hereof.

"Lender Group" shall have the meaning set forth in Section 15(l) hereof.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including, without limitation, any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, results of operations, business or prospects of Borrower or (b) the Lender's Liens on the Collateral taken as a whole or, subject to Permitted Encumbrances, the priority of any such Lien; it being understood that the commencement of the Bankruptcy Case and events and conditions which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code (including, without limitation, reduction in payment terms by suppliers and reclamation claims) shall not be deemed a material adverse effect.

"Maximum Advance Amount" shall mean **Seven Million and 00/100 Dollars ($7,000,000.00)**.

"Notice" shall have the meaning set forth in Section 15(b) hereof.

"Obligations" shall mean and include advances, debts, liabilities, obligations, covenants and duties (absolute, contingent, matured or unmatured) owing by the Borrower to the Lender or to any other direct or indirect subsidiary or affiliate of the Lender of any kind or nature, present or future (including, without limitation, any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, arising under this Agreement or the Other Documents, whether or not for the payment of money, whether arising by reason of an extension of credit, opening of a letter of credit, loan or guarantee, or arising under any hedging contract or in connection with any cash management or treasury administration services or agreements, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise, whether evidenced by any other agreement or instrument, including, but not limited to, any and all of Borrower's Indebtedness and/or liabilities under this Agreement or the Other Documents and any amendments, extensions, renewals or increases and all costs and expenses of the Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to, reasonable attorneys' fees and expenses and all obligations of Borrower to the Lender to perform acts or refrain from taking any action, in each such case solely with respect to and/or arising in connection with the Collateral.

"Other Documents" shall mean the Revolving Credit Note, each agreement pursuant to which the Lender is granted a Lien to secure the Obligations and any and all other agreements, instruments and documents, including, without limitation, guaranties, pledges, powers of attorney, consents and all other writings heretofore, now or hereafter executed by Borrower and/or delivered to the Lender in respect of the transactions contemplated by this Agreement whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Permitted Encumbrances" shall mean (a) Liens in favor of the Lender; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrower in accordance with GAAP; provided, that, such Liens shall have no effect on the priority of the Liens in favor of the Lender or the value of the assets in which the Lender has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or

similar laws, or under unemployment insurance or general liability or product liability insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, performance bonds, surety and appeal bonds and other obligations of like nature arising in the ordinary course of Borrower's business; (e) zoning restrictions, easements, encroachments, rights of way, restrictions, leases, licenses, restrictive covenants and other similar title exceptions or Liens affecting real property, none of which materially impairs the use of such real property or the value thereof, and none of which is violated in any material respect by existing or supporting structures or land use; (f) Liens of the Prepetition Secured Parties as set forth in the Cash Collateral Order; (g) other Liens permitted by the Cash Collateral Order; and (h) Liens disclosed on <u>Schedule 1(f)</u> attached hereto provided that the principal amount secured thereby is not hereafter increased to an amount greater than the amount outstanding on the Closing Date, and no additional assets become subject to such Liens except as otherwise specifically identified on <u>Schedule 1(f)</u>.

"<u>Person</u>" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Petition Date</u>" shall mean March 8, 2020.

"<u>Preamble</u>" shall mean the introductory paragraph of this Agreement.

"<u>Prior Event</u>" shall have the meaning set forth in Section 15(l) hereof.

"<u>Purchasers</u>" shall have the meaning set forth in Section 10(d) hereof.

"<u>Revolving Credit Note</u>" shall mean the promissory note referred to in Section 3(a) hereof, together with all amendments, restatements, extensions, renewals, replacements, refinancings or refundings thereof in whole or in part.

"<u>Sale Agreement</u>" shall have the meaning set forth in Section 10(d) hereof.

"<u>Sale Motion</u>" shall have the meaning set forth in Section 10(d) hereof.

"<u>Sale Order</u>" shall have the meaning given set forth Section 10(f) hereof.

"<u>Sellers</u>" shall have the meaning set forth in Section 10(d) hereof.

"<u>Superpriority Claim</u>" shall mean indebtedness or other claim arising out of credit obtained or debt incurred by the Borrower in the Bankruptcy Case having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"<u>Term</u>" shall have the meaning set forth in Section 14(a) hereof.

"<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code or other similar law of the Commonwealth of Pennsylvania as in effect on the date of this Agreement and as amended from time to time.

2.     **Accounting Terms.** As used in this Agreement, the Revolving Credit Note or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined herein shall have the respective meanings given to them under GAAP.

3.     **The DIP Financing**.

     (a)     <u>Advances</u>. Subject to the terms and conditions set forth in this Agreement, Lender will make Advances to the Borrower in aggregate amounts outstanding at any time equal to the lesser of (x) the Maximum Advance Amount and (y) the Approved Amount. The Advances shall be evidenced by a secured promissory note substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Revolving Credit Note</u>").

     (b)     <u>Procedure for Borrowing Advances</u>. Borrower may notify Lender prior to 12:00 p.m. (eastern time) on a Business Day of Borrower's request to incur, on that day, an Advance hereunder. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any Other Document, or with respect to any other Obligation, become due, same shall be deemed a request for an Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any Other Document, and such request shall be irrevocable.

     (c)     <u>Disbursement of Advance Proceeds</u>. During the Term, Borrower may use the Advances by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof. The proceeds of (i) each Advance requested by Borrower to the extent Lender makes such Advance, shall be made available to Borrower on the day so requested by way of credit to Borrower's operating account at Bank of America in immediately available funds and (ii) each Advance deemed to have been requested by Borrower under Section 3(b) hereof shall be disbursed to Lender to be applied to the outstanding Obligations giving rise to such deemed request.

     (d)     <u>Maximum Advances</u>. The aggregate balance of outstanding Advances outstanding at any time (i) pursuant to the Interim Financing Order shall not exceed the lesser of (a) **Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00)** and (b) the Approved Amount and (ii) pursuant to the Final Financing Order shall not exceed the lesser of (a) the Maximum Advance Amount and (b) the Approved Amount.

     (e)     <u>Interest on Advances</u>.

     (i)     Interest charges shall be computed on the actual principal amount of Advances outstanding during the calendar month and shall bear interest for each day at a rate per annum equal to the Contract Rate.

     (ii)     Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Obligations shall bear interest at the Contract Rate plus two percent (2.00%) per annum (the "<u>Default Rate</u>").

     (iii)     If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the Contract Rate during such extension.

     (iv)     In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law. In the event interest and other

charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by the Borrower, and if then remaining excess amount is greater than the previously unpaid principal balance, the Lender shall promptly refund such excess amount to the Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate.

    (f)    <u>Repayment of Advances</u>.

    (i)    The Advances shall be due and payable in full on the last day of the Term. Borrower shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

    (ii)    All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Lender not later than 11:00 A.M. (eastern time) on the due date therefor in lawful money of the United States of America in immediately available funds. Lender shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging the Borrower or by making Advances as provided in Section 3(b) hereof.

    (iii)    The aggregate balance of outstanding Advances at any time in excess of the maximum amount of such Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, whether or not a Default or Event of Default has occurred.

    4.    **Use of Funds**. The funds available under the DIP Financing may be used to purchase inventory in the ordinary course of business of Borrower during the administration of the Bankruptcy Case in accordance with the terms of any order regarding Borrower's use of cash collateral or the Financing Orders.

    5.    **Collateral; General Terms**.

    (a)    <u>Security Interest in the Collateral</u>. Pursuant to the Interim Financing Order and the Final Financing Order and in accordance with the terms thereof, to secure the prompt payment and performance to the Lender of the Obligations, Borrower hereby assigns, pledges and grants to the Lender a continuing security interest in and to all of its Collateral, whether now owned or existing or hereafter acquired or arising and wheresoever located. Borrower shall promptly provide the Lender with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s). Upon delivery of each such notice, Borrower shall be deemed to hereby grant to the Lender a security interest and lien in and to such commercial tort claims and all proceeds thereof.

    (b)    <u>Perfection of Security Interest</u>. Borrower shall take all action that may be necessary or desirable, or that the Lender may request, so as at all times to maintain the validity, perfection, enforceability and priority of the Lender's security interest in the Collateral or to enable the Lender to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to, (i) immediately discharging all Liens on the Collateral other than Permitted Encumbrances, (ii) delivering to the Lender, endorsed or accompanied by such instruments of assignment as the Lender may specify, and stamping or marking, in such manner as the Lender may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral, (iii) entering into warehousing, lockbox and other custodial arrangements satisfactory to

the Lender as and to the extent required hereunder, and (iv) executing and delivering control agreements, instruments of pledge, notices and assignments, in each case in form and substance satisfactory to the Lender, relating to the creation, validity, perfection, maintenance or continuation of the Lender's security interest in Collateral under the Uniform Commercial Code or other applicable law. The Lender is hereby authorized to file financing statements in accordance with the Uniform Commercial Code from time to time. By its signature hereto, Borrower hereby authorizes the Lender to file against Borrower, one or more financing, continuation, or amendment statements pursuant to the Uniform Commercial Code to perfect Liens in the Collateral securing Obligations arising hereunder in form and substance satisfactory to the Lender. All charges, expenses and fees the Lender may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Borrower as an Advance and added to the Obligations (notice thereof shall be provided to the Borrower thereafter), or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(c) <u>Disposition of Collateral</u>. Borrower will safeguard and protect all Collateral for the Lender's general account and make no disposition thereof whether by sale, lease or otherwise except as may be otherwise permitted under this Agreement.

(d) <u>Preservation of Collateral</u>. Following the occurrence and during the continuation of an Event of Default in addition to the rights and remedies set forth in Section 13(a) hereof, the Lender: (i) may at any time take such steps as the Lender deems necessary to protect the Lender's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as the Lender may deem appropriate; (ii) may employ and maintain at any of Borrower's premises a custodian who shall have full authority to do all acts necessary to protect the Lender's interests in the Collateral; (iii) may lease warehouse facilities to which the Lender may move all or part of the Collateral; (iv) may use Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (v) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrower's owned or leased property. Borrower shall cooperate fully with all of the Lender's efforts to preserve the Collateral as permitted in the foregoing sentence and will take such actions to preserve the Collateral as the Lender may direct. All of the Lender's expenses of preserving the Collateral in accordance with the foregoing, including any expenses relating to the bonding of a custodian, shall be charged to the Borrower as an Advance and added to the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(e) <u>Ownership of Collateral</u>. With respect to the Collateral, at the time the Collateral becomes subject to the Lender's security interest: (i) Borrower shall be the owner of and fully authorized and able to sell, transfer, pledge and/or grant a security interest having the priority set forth in the Financing Orders in each and every item of its Collateral to the Lender; and, except for Permitted Encumbrances, the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by Borrower or delivered to the Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of Borrower that appear on such documents and agreements shall be genuine and Borrower shall have full capacity to execute same; and (iv) Borrower's inventory shall be located as set forth on <u>Schedule 5(e)</u> attached hereto (as such Schedule may be updated from time to time) and shall not be removed from such location(s) without the prior written consent of the Lender except with respect to the sale of inventory in the ordinary course of business and with respect to inventory in transit from (a) a supplier to one location identified on <u>Schedule 5(e)</u> (as such Schedule may be updated from time to time) or (b) one location identified on <u>Schedule 5(e)</u> to another location identified on <u>Schedule 5(e)</u>.

(f) <u>Defense of Lender's Interests</u>. Until (i) indefeasible payment and performance in full of all of the Obligations and (ii) termination of this Agreement, the Lender's interests in the Collateral

shall continue in full force and effect.  During such period Borrower shall not, without the Lender's prior written consent, pledge, sell (except inventory in the ordinary course of business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, and except for dispositions expressly permitted elsewhere herein, any part of the Collateral.  Borrower shall defend the Lender's interests in the Collateral against any and all Persons whatsoever.  At any time after an Event of Default has occurred and is continuing and after demand by the Lender for payment of all Obligations, the Lender shall have the right, after the giving of any required notices under Section 13 hereof and upon the effectiveness of the granting of relief from the stay of Section 362(a) of the Bankruptcy Code, to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including, without limitation, labels, stationery, documents, instruments and advertising materials.  If the Lender exercises such right to take possession of the Collateral, Borrower shall, upon demand, assemble it in the best manner possible and make it available to the Lender at a place reasonably convenient to the Lender.  In addition, with respect to all Collateral, the Lender shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other applicable law.  After the occurrence and during the continuance of an Event of Default and after the giving of any required notices under Section 13 hereof, Borrower shall, and the Lender may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, inventory, documents or instruments in which the Lender holds a security interest to deliver same to the Lender and/or subject to the Lender's order and if they shall come into Borrower's possession, they shall be held by Borrower in trust as the Lender's trustee, and Borrower will immediately deliver them to the Lender in their original form together with any necessary endorsement.

(g)      Books and Records.  Borrower shall (i) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (ii) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (iii) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful receivables, advances and investments and all other proper accruals (including without limitation by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business.  All determinations pursuant to this subsection shall be made in all material respects in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrower.

(h)      Financial Disclosure.  Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by Borrower at any time during the Term and promptly after the written request of the Lender (with prior written notice to the Borrower so long as no Event of Default has occurred and is continuing) to deliver to the Lender copies of Borrower's financial statements (if any exist at or prior to the date of such request), trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to the Lender any information such accountants may have concerning Borrower's financial status and business operations.  Borrower hereby authorizes all federal, state and municipal authorities to furnish to the Lender copies of reports or examinations relating to Borrower, whether made by Borrower or otherwise; however, the Lender will attempt to obtain such information or materials directly from Borrower prior to obtaining such information or materials from such accountants or such authorities.

(i)      Priority.  Subject to entry of the Financing Orders by the Bankruptcy Court, Borrower agrees to grant Lender an allowed Superpriority Claim, and said Superpriority Claim shall survive any conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

(j)     <u>Compliance with Laws</u>.  Borrower shall comply with all laws, acts, rules, regulations and orders of any Governmental Body with jurisdiction over it or the Collateral or any part thereof or to the operation of Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect.  Borrower may, however, contest or dispute any acts, rules, regulations, orders and directions of those Governmental Bodies or officials in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's Lien on or security interest in the Collateral. The Collateral at all times shall be maintained in accordance with the material requirements of all insurance carriers which provide insurance with respect to the Collateral so that such insurance shall remain in full force and effect.

(k)     <u>Inspection of Premises</u>.  Borrower shall (i) permit the Lender or any of its agents, attorneys, field examiners, auditors, financial consultants, appraisers and/or any other consultants or advisors access to Borrower's assets, properties, and premises at times to be mutually agreed, during normal business hours to, among other things, conduct appraisals and evaluations of the Collateral and any other assets or properties of Borrower, and (ii) fully cooperate and completely and promptly comply with any and all requests of the Lender and/or any of its agents for information or copies of documents. All fees, costs, and expenses of such agents, now or hereafter incurred by the Lender shall be reimbursed by Borrower in accordance with Section 15(e) hereof.

(l)     <u>Insurance</u>.  Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral.  Subject to the orders of the Bankruptcy Court, at Borrower's own cost and expense in amounts and with carriers acceptable to the Lender, Borrower shall (i) keep all its insurable properties and properties in which Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrower's including, without limitation, business interruption insurance; (ii) maintain insurance in such amounts as is customary in the case of companies engaged in businesses similar to Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business; and (v) furnish the Lender with (1) evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (2) appropriate lender loss payable endorsements in form and substance satisfactory to the Lender, naming the Lender as an additional insured and lender loss payee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to the Lender, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to the Lender.  Borrower shall provide copies of all such insurance policies (including the appropriate lender loss payee and additional insured endorsements) within thirty (30) days after the Lender's request, however, only certificates of such insurance shall be required at Closing.  In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by the Lender and the Borrower to make payment for such loss to the Lender and not Borrower and the Lender jointly.  If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to Borrower and the Lender jointly, the Lender may endorse Borrower's name thereon and do such other things as the Lender may deem advisable to reduce the same to cash.  The Lender is hereby authorized to negotiate and compromise claims under insurance

coverage with respect to Collateral. All loss recoveries with respect to Collateral received by the Lender upon any such insurance may be applied to the Obligations, in such order as the Lender in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by the Lender to Borrower or applied as may be otherwise required by law. Any deficiency thereon shall be paid by the Borrower to the Lender, on demand. Any loss recoveries not relating to items of Collateral shall be payable directly to Borrower and, if received by the Lender, the Lender shall promptly deliver same to Borrower. Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below, the Lender shall remit to the Borrower all proceeds of business interruption insurance, and all proceeds of insurance with respect to larceny, embezzlement or other criminal misappropriation, regardless of amount, shall be payable directly and promptly to the Borrower. The agreement of the Lender to remit insurance proceeds in the manner above provided shall be subject to satisfaction that no Event of Default or Default shall then have occurred and be continuing.

(m) <u>Failure to Pay Insurance</u>. If Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, the Lender, if the Lender so elects, may obtain such insurance and pay the premium therefor on behalf of Borrower, and charge the Borrower therefor as an Advance and such expenses so paid shall be part of the Obligations, or, at the Lender's option, shall be paid to the Lender immediately upon demand.

(n) <u>Payment of Taxes</u>. Subject to the orders of the Bankruptcy Court, Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon Borrower or any of the Collateral including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except (i) those taxes, assessments or charges that are not material; (ii) those taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding; and (iii) those taxes which Borrower is prohibited from paying (or are not required to pay) by operation of the Bankruptcy Code, provided that, with respect to items (i) and (ii) referenced above in this Section 5(n), that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. If any tax by any governmental authority is or may be imposed on or as a result of any transaction between Borrower and the Lender which the Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in the Lender's opinion, may possibly create a valid Lien on the Collateral, the Lender may without notice to Borrower pay the taxes, assessments or other Charges and Borrower hereby indemnifies and holds the Lender harmless in respect thereof. The Lender will not pay any taxes, assessments or Charges to the extent that Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of the Lender to protect the Lender's security interest in or Lien on the Collateral. The amount of any payment by the Lender under this Section 5(n) shall be charged to the Borrower as an Advance and added to the Obligations and, until Borrower shall furnish the Lender with an indemnity therefor (or supply the Lender with evidence satisfactory to the Lender that due provision for the payment thereof has been made), the Lender may hold without interest any balance standing to the Borrower's credit and the Lender shall retain its security interest in any and all Collateral held by the Lender.

(o) <u>Payment of Leasehold Obligations</u>. Borrower shall at all times pay, when and as due, its rental obligations arising after the Petition Date under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases (other than to the extent that the enforcement of such terms by the applicable landlord is stayed by virtue of the Bankruptcy Case) and, at the Lender's reasonable request will provide evidence of having done so.

(p)  <u>Power of Lender to Act on Borrower's Behalf</u>.  The Lender shall have the right, at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to receive, endorse, assign and/or deliver in the name of the Lender or Borrower any and all checks, drafts and other instruments for the payment of money relating to receivables, and Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed.  Borrower hereby constitutes the Lender or the Lender's designee as Borrower's attorney with power at any time after the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code (i) to endorse Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (ii) to sign Borrower's name on any invoice or bill of lading relating to any of the receivables, drafts against customers, assignments and verifications of receivables; (iii) to send verifications of receivables to any customer; (iv) to demand payment of the receivables; (v) to enforce payment of the receivables by legal proceedings or otherwise; (vi) to exercise all of the Borrower's rights and remedies with respect to the collection of the receivables and any other Collateral; (vii) to settle, adjust, compromise, extend or renew the receivables; (viii) to settle, adjust or compromise any legal proceedings brought to collect receivables; (ix) to prepare, file and sign Borrower's name on a proof of claim in bankruptcy or similar document against any customer; (x) to prepare, file and sign Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the receivables; and (xi) to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done with gross (not mere) negligence or willful misconduct; this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.  The Lender shall have the right at any time following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and upon the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, to change the address for delivery of mail addressed to Borrower to such address as the Lender may designate and to receive, open and dispose of all mail addressed to Borrower.

(q)  <u>No Liability</u>.  The Lender shall not, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the receivables or any instrument received in payment thereof, or for any damage resulting therefrom unless such liability arises from the Lender's willful misconduct or gross negligence as finally determined by a court of competent jurisdiction.  Following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code, the Lender may, without any other notice or consent from Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof.  The Lender is authorized and empowered to accept following the occurrence and during the continuance of an Event of Default after the giving of any required notices under Section 13 hereof and after the effectiveness of relief from the automatic stay of Section 362(a) of the Bankruptcy Code the return of the goods represented by any of the receivables, without notice to or consent by Borrower, all without discharging or in any way affecting Borrower's liability hereunder.

(r)  <u>Exculpation of Liability</u>.  Nothing herein contained shall be construed to constitute the Lender as Borrower's agent for any purpose whatsoever, nor shall the Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof except to the extent such shortage, discrepancy, damage, loss or destruction resulted directly from the gross (not mere) negligence or willful

misconduct of the Lender. The Lender will not, whether by anything herein or in any assignment or otherwise, assume any of Borrower's obligations under any contract or agreement assigned to the Lender, and the Lender shall not be responsible in any way for the performance by Borrower of any of the terms and conditions thereof.

6. **Representations and Warranties**.

(a) <u>Authority</u>. Subject to entry of the Financing Orders, Borrower has the full power, authority and legal right to enter into this Agreement and the Other Documents to which it is a party and to perform all of its Obligations hereunder and thereunder, as the case may be. Subject to entry of the Financing Orders, this Agreement and the Other Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms. The execution, delivery and performance of this Agreement and of the Other Documents by Borrower (i) subject to entry of the Financing Orders, are within Borrower's limited liability company powers, have been duly authorized, are not in contravention of law or the terms of Borrower's operating agreement, articles of organization or other applicable documents relating to Borrower's formation or organization, as the case may be, or to the conduct of Borrower's business or of any material agreement or undertaking arising after the Petition Date to which Borrower is a party or by which Borrower is bound, and (ii) will not conflict with nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of Borrower under the provisions of any agreement, charter document or other instrument arising after the Petition Date to which Borrower is a party or by which it or its property may be bound.

(b) <u>Formation and Qualification</u>. Borrower is duly organized and in good standing under the laws of the Commonwealth of Pennsylvania, which constitutes all jurisdictions in which qualification and good standing are necessary for Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Borrower has delivered to the Lender true and complete copies of its articles of organization, operating agreement or other organizational documents and will promptly notify the Lender of any amendment or changes thereto.

(c) <u>Survival of Representations and Warranties</u>. All representations and warranties of Borrower contained in this Agreement and the Other Documents, as the case may be, shall be true at the time of Borrower's execution of this Agreement and the Other Documents, as the case may be, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the Closing.

(d) <u>No Litigation, Violation or Default</u>. Except as disclosed in <u>Schedule 6(e)</u>, Borrower does not have any pending or threatened litigation, arbitration, actions or proceedings which could reasonably be expected to have a Material Adverse Effect. Borrower is not in violation of any applicable statute, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is Borrower in violation of any order of any court, governmental authority or arbitration board or tribunal which would reasonably be expected to have a Material Adverse Effect.

(e) <u>The Financing Orders</u>. On the date of the making of the initial Advances hereunder, the Interim Financing Order will have been entered and be in full force and effect and will not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in its sole discretion, amended, supplemented or modified. On the date of the making of any Advance, the Interim Financing Order or the Final Financing Order, as the case may be, shall have been entered and be in full force and effect and shall not have been reversed, stayed, vacated or, without the Lender's consent, which consent shall be in Lender's sole discretion, amended, supplemented or modified. Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations, the Lender shall, subject solely to

the provisions of Sections 3(f)(iv), 12 and 13 hereof and to such reservations of rights as may be expressly set forth in the Financing Orders, be entitled to immediate payment in full of such Obligations in cash, and the Lender shall be entitled to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

(f) <u>Good Faith</u>. This Agreement has been negotiated in good faith and at arm's length between the Borrower and the Lender.

7. **Affirmative Covenants.** Following the Closing Date, Borrower shall until payment or satisfaction in full of the Obligations and termination of this Agreement:

(a) <u>Conduct of Business and Maintenance of Existence and Assets</u>. (i) Conduct its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including, without limitation, all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the Collateral; (ii) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; and (iii) make all such reports and pay all such franchise and other taxes and license fees arising after the Petition Date and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof where the failure to do so would reasonably be expected to have a Material Adverse Effect.

(b) <u>Violations</u>. Promptly notify the Lender in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to Borrower or the Collateral which could reasonably be expected to have a Material Adverse Effect.

(c) <u>Execution of Supplemental Instruments</u>. Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as the Lender may reasonably request, in order for the full intent of this Agreement to be carried into effect.

(d) <u>Modification of the Automatic Stay</u>. The Interim Financing Order (and Final Financing Order, as applicable) shall contain language, which shall be satisfactory to the Lender in its sole discretion, vacating and modifying the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary to permit the Lender to (i) perfect the security interests and Liens granted hereunder and (ii) exercise its rights under Section 13 hereof of this Agreement.

8. **Negative Covenants.** Borrower shall not until satisfaction in full of the Obligations and termination of this Agreement:

(a) <u>Merger, Consolidation, Acquisition and Sale of Assets</u>.

(i) Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person or permit any other Person to consolidate with or merge with it; or

(ii)     Except transactions involving the sale, lease, transfer or other disposition of inventory in the ordinary course of business, sell, lease, transfer or otherwise dispose of any of its properties or assets unless such sale is in accordance with the Sale Agreement, the Sale Motion and the Sale Order.

(b)     <u>Creation of Liens</u>.  Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

(c)     <u>Guarantees</u>.  Become liable upon the obligations of any Person by assumption, endorsement or guaranty thereof or otherwise.

(d)     <u>Loans</u>.  Make advances, loans or extensions of credit to any Person, including, without limitation, any affiliate, except with respect to the extension of commercial trade credit in connection with the sale of inventory in the ordinary course of its business.

(e)     <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness except in respect of (i) trade debt, deposits placed with the Borrower by customers of the Borrower for boat orders, and as disclosed by the Borrower in its schedules filed in the Bankruptcy Case, (ii) Indebtedness existing on the Closing Date and set forth on <u>Schedule 8(e)</u> attached hereto (including any extensions, renewals or refinancings thereof), provided that there is no material change in the material terms thereof and the principal amount of such Indebtedness shall not be increased to an amount greater than the amount outstanding on the Closing Date without the prior written consent of the Lender, (iii) Indebtedness of the Prepetition Secured Parties under the Prepetition Documents as set forth in the Cash Collateral Order, (iv) other Indebtedness permitted pursuant to the Cash Collateral Order, and (v) Indebtedness to the Lender under or pursuant to this Agreement or the Other Documents.

(f)     <u>Nature of Business</u>.  Substantially change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business or other than those which are useful in, necessary for and are to be used in its business, as presently conducted.

(g)     <u>Amendment of Articles of Organization or Operating Agreement</u>.  Amend, modify or waive any material term or material provision of its articles of organization or operating agreement or other organizational documents which amendment, modification or waiver would reasonably be considered material and adverse to the Lender, unless required by law.

(h)     <u>Prepayment of Indebtedness</u>.  At any time, directly or indirectly, prepay or repurchase, redeem or retire any Indebtedness, except for the prepayment, repurchase, redemption, retirement or acquisition of any Indebtedness of Borrower owed to the Lender pursuant to this Agreement or the Other Documents.

9.     **Conditions to Initial Advances**.  The agreement of the Lender to make the initial Advance requested to be made on the Closing Date is subject to the satisfaction, or waiver by the Lender, immediately prior to or concurrently with the making of such Advance, of the following conditions precedent:

(a)     <u>Note</u>.  The Lender shall have received the Revolving Credit Note duly executed and delivered by an authorized officer of Borrower.

(b)     <u>Bankruptcy Matters</u>.  No trustee or examiner with expanded powers relating to the operation of the business of the Borrower shall have been appointed with respect to Borrower or its

business, properties or assets, including without limitation, the Collateral and any other property that is security for the Obligations and Borrower shall have complied in full with all other requirements as provided for under the Interim Financing Order.

(c) <u>Interim Financing Order</u>. At the time of the making of the initial Advance, the Lender shall have received satisfactory evidence of the entry of the Interim Financing Order which Interim Financing Order (i) shall be in form and substance satisfactory to the Lender in Lender's sole discretion, (ii) shall have been entered not later than seven (7) days following the Petition Date and (iii) shall not have been vacated, stayed, reversed, modified or amended in any respect without the express written consent of the Lender, and, if the Interim Financing Order is the subject of a pending appeal in any respect, neither the making of such Advance, nor the performance by the Borrower of any of its obligations hereunder or under the Other Documents or under any other instrument or agreement referred to herein, shall be the subject of a presently effective stay pending appeal.

(d) <u>First Day Orders</u>. All of the "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Bankruptcy Case shall be reasonably satisfactory in form and substance to the Lender.

(e) <u>Corporate Proceedings of Borrower</u>. The Lender shall have received a copy of the resolutions in form and substance reasonably satisfactory to the Lender, of the board of directors, partners, managers or members, as the case may be, of Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Revolving Credit Note and any Other Document to which Borrower is a party, and (ii) the granting by Borrower of the security interests in and Liens upon the Collateral. Such resolutions shall be certified by an authorized individual of Borrower as of the Closing Date and such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate.

(f) <u>Incumbency Certificate of Borrower</u>. The Lender shall have received a certificate of an authorized individual of Borrower, dated the Closing Date, as to the incumbency and signature of the officers or manager of Borrower executing any certificate or other documents to be delivered by Borrower pursuant hereto, together with evidence of the incumbency of such authorized individual.

(g) <u>Good Standing Certificates</u>. The Lender shall have received copies of good standing certificates, or similar certifications, for Borrower, issued by the Department of State of the Commonwealth of Pennsylvania and each jurisdiction where the conduct of its business activities or the ownership of its properties necessitates qualification.

(h) <u>Insurance</u>. The Lender shall have received in form and substance satisfactory to the Lender, certificates of insurance for the Borrower's casualty insurance policies, together with loss payable endorsements on the Borrower's standard form of loss payee endorsement naming the Lender as lender loss payee with respect to the Collateral, and certificates of insurance for the Borrower's liability insurance policies, together with endorsements naming the Lender as an additional insured.

(i) <u>Consents</u>. The Lender shall have received any and all consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, such consents of such third parties as might assert claims with respect to the Collateral, as the Lender and its counsel shall deem necessary.

AB_000446

(j)    Other.  All limited liability company and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Lender and its counsel.

10.    **Conditions to Each Advance**.  The agreement of the Lender to make any Advance requested to be made on any date (including, without limitation, the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made.

(a)    Representations and Warranties.  Each of the representations and warranties made by Borrower in or pursuant to this Agreement and any Other Document, as the case may be, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any Other Document shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b)    Financing Orders.  Subject to Section 9(c) hereof, the Financing Orders shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Lender, provided, that at the time of the making of any Advance the aggregate amount of which, when added to the sum of the principal amount of all Advances then outstanding would exceed the amount authorized by the Interim Financing Order (collectively, the "Additional Credit"), the Lender shall have received satisfactory evidence of the entry of the Final Financing Order, which, in any event, shall have been entered by the Bankruptcy Court no later than twenty (20) days after the Petition Date and at the time of the extension of any Additional Credit the Final Financing Order shall be in full force and effect, and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Lender; and if either the Interim Financing Order or the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Advances nor the performance by the Borrower of any of its obligations under this Agreement or any of the Other Documents shall be the subject of a presently effective stay pending appeal.

(c)    Sale Motion.  For each Advance made on or after the fifth (5th) day following the Petition Date, the Borrower shall have filed a motion for approval of the sale of substantially all of the assets of the Borrower to the Lender, which shall be reasonably satisfactory in form and substance to the Lender (the "Sale Motion").

(d)    Asset Purchase Agreement.  For each Advance made on or after the tenth (10th) day following the Petition Date, Borrower and LF Trucking, Inc., a Pennsylvania corporation and co-Debtor in the Bankruptcy Case, as sellers (collectively, the "Sellers"), and the Lender and Levin Trucking, LLC, a Pennsylvania limited liability company, as purchasers (collectively, the "Purchasers"), shall have entered into a purchase and sale agreement for the purchase and sale of substantially all of the assets of the Sellers to the Purchasers (the "Sale Agreement"), which shall be reasonably satisfactory in form and substance to the Lender (the "Sale Motion").

(e)    For each Advance made on or after the twenty-first (21st) day following the Petition Date, an order reasonably satisfactory in form and substance to the Lender (the "Sale Order") shall have been entered by the Bankruptcy Court approving a sale to the Purchasers pursuant to the Sale Motion and the Sale Agreement, which Sale Order shall not be subject to a stay pending appeal.   Within two (2) Business Days after entry of the Sale Order, the Sellers and the Purchasers shall close on such sale pursuant to the Purchase Agreement.

(f)    No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such

date; provided, however that, the Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default.

(g) <u>Maximum Advances</u>. In the case of any Advances requested to be made, after giving effect thereto, the aggregate Advances shall not exceed the Maximum Advance Amount.

Each request for an Advance by the Borrower hereunder shall constitute a representation and warranty by Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied (to the extent that such conditions are required to be satisfied by such date).

11.  **Information as to Borrower.** Borrower shall, until payment or satisfaction in full of the Obligations and the termination of this Agreement deliver the following information:

(a) <u>Disclosure of Material Matters</u>. Immediately upon learning thereof, report to the Lender all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including, without limitation, Borrower's reclamation or repossession of, or the return to Borrower of, a material amount of goods or material claims or material disputes asserted by any customer or other obligor.

(b) <u>Litigation</u>. Promptly notify the Lender in writing of any adversary proceeding, contested matter or administrative proceeding affecting Borrower, whether or not the claim is covered by insurance, and of any adversary proceeding, contested matter or administrative proceeding, which in any such case could reasonably be expected to have a Material Adverse Effect.

(c) <u>Material Occurrences</u>. Promptly, but in any event no later than five (5) days after such occurrence, notify the Lender in writing upon the occurrence of (i) any Event of Default or Default; (ii) any event, development or circumstance whereby any financial statements or other reports furnished to the Lender fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Borrower as of the date of such statements; (iii) each and every default by Borrower which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness arising after the Petition Date, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated; and the amount of such Indebtedness; and (iv) any other development in the business or affairs of Borrower which could reasonably be expected to have a Material Adverse Effect; in each case, to the extent permitted by applicable law, describing the nature thereof and the action Borrower proposes to take with respect thereto.

(d) <u>Additional Information</u>. Furnish the Lender with such additional information as the Lender shall reasonably request in order to enable the Lender to determine whether the terms, covenants, provisions and conditions of this Agreement and the Revolving Credit Note have been complied with by Borrower and execute and deliver to the Lender, upon request, such documents and agreements as the Lender may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

(e) <u>Weekly Reporting</u>. Furnish the Lender with weekly reporting of inventory tracking, accounts payable aging and accounts receivable aging of the Borrower by 5:00 p.m. on Thursday of each week for the preceding week.

12.  **Events of Default.** The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    <u>Payment of Obligations</u>.  Failure by Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document.

(b)    <u>Misrepresentations</u>.  Any representation or warranty made by Borrower in this Agreement or any Other Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith, as the case may be, shall prove to have been misleading in any material respect on the date when made or deemed to have been made.

(c)    <u>Failure to Furnish Information</u>.  Failure by Borrower to (i) furnish financial information required to be provided hereunder when due, (ii) furnish financial information requested by the Lender within ten (10) days after such information is requested, or (iii) permit the inspection of its books or records.

(d)    <u>Liens Against Assets</u>.  Issuance of a notice of Lien (other than Permitted Encumbrances), levy, assessment, injunction or attachment against the Collateral or a material portion of Borrower's property which is not stayed or lifted within ten (10) days.

(e)    <u>Breach of Covenants</u>.  Except as otherwise provided for in this Section 12, failure or neglect of Borrower to perform, keep or observe any term, provision, condition or covenant herein contained or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and the Lender relating to the Obligations.

(f)    <u>Judgment</u>.  Any judgment is rendered or judgment lien is filed against Borrower for any post-petition obligation (to the extent not covered by insurance to which the insurance provider has not contested coverage).

(g)    <u>Loss of Priority Lien</u>.  Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having the priority contemplated herein and in the Financing Orders.

(h)    <u>Invalidity of Credit Agreement</u>.  Any material provision of this Agreement shall, for any reason, cease to be valid and binding on Borrower, or Borrower shall so claim in writing to the Lender.

(i)    <u>Destruction of Collateral</u>.  Any portion of the Collateral shall be seized or taken by a Governmental Body, or Borrower or the title and rights of Borrower shall have become the subject matter of litigation which might, in the reasonable opinion of the Lender, upon final determination, result in material impairment or loss of the security provided by this Agreement or the Other Documents.

(j)    <u>Pre-Petition Payments</u>.  Except as permitted by the Financing Orders, the Borrower shall make any pre-petition payment other than pre-petition payments authorized by the Bankruptcy Court (w) in accordance with the Cash Collateral Order, (x) in accordance with other "first day" orders reasonably satisfactory to the Lender, (y) in connection with the assumption of executory contracts and unexpired leases and (z) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date.

(k)    <u>Dismissal or Conversion of Bankruptcy Case</u>.  The Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Bankruptcy Case under Section 1112 of the Bankruptcy

Code or otherwise; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or an application shall be filed by Borrower for the approval of any other Superpriority Claim in the Bankruptcy Case which is pari passu with or senior to the claims of the Lender against Borrower hereunder, or there shall arise or be granted any such pari passu or senior Superpriority Claim.

(l)     Relief from Stay.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) or repossession on any assets of the Borrower.

(m)    The Financing Orders.  Borrower shall apply for authority to amend, supplement, stay, vacate or otherwise modify any of the Financing Orders without the consent of the Lender, and the Lender has sent notice of such default to Borrower.  Any of the Financing Orders shall be revoked, remanded, vacated, reversed, stayed, rescinded or shall cease to be in full force and effect, in each case without the consent of the Lender, modified or amended on appeal by any Bankruptcy Judge or District Court Judge or the Final Financing Order shall not have been entered within twenty-one (21) days of the Petition Date.

(n)     Lien Challenge.  Borrower shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's opposition of, any motion made in the Bankruptcy Court by Lender seeking confirmation of the amount of Lender's claim or the validity or enforceability of the Liens in favor of Lender.  Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of Borrower) any other Person's motion to disallow in whole or in part Lender's claim in respect of the Obligations or to challenge the validity, perfection and enforceability of Liens in favor or the Lender.

(o)     Filing of Reorganization Plan or Sale Motion.  A plan of reorganization or a motion for the sale of substantially all of the assets of the Sellers is filed by any party in interest in the Bankruptcy Case which does not contemplate a sale to the Purchasers.

13.    **Lenders' Rights and Remedies After Default.**

(a)     Rights and Remedies.  Upon the occurrence of an Event of Default and at any time thereafter (such default not having previously been cured), at the option of Lender during the continuance of such event, and without further order of or application to the Bankruptcy Court except as otherwise provided in the Financing Orders, the Lender may, by notice to the Borrower and its counsel (with a copy to (x) counsel for any statutory creditors' committee appointed in the Bankruptcy Case, (y) the United States Trustee for the Bankruptcy Court and (z) counsel to each of the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties pursuant to the Cash Collateral Order), take one or more of the following actions, at the same or different times:  (i) terminate or suspend forthwith the commitment to make Advances hereunder; (ii) declare the Advances or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Advances together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any Other Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any Other Document to the contrary notwithstanding; and (iii)

exercise any and all remedies under this Agreement and the Other Documents and under applicable law available to the Lender.

(b) Lender's Discretion. The Lender shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies the Lender may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of the Lender's rights hereunder.

(c) Setoff. In addition to any other rights which the Lender may have under applicable law, upon the occurrence and during the continuance of an Event of Default hereunder, the Lender shall have a right to apply Borrower's property held by the Lender to reduce the Obligations; *provided that* in no event shall the Postpetition Collateral (as defined in the Cash Collateral Order) be available for such right of setoff.

(d) Rights and Remedies Not Exclusive. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

(e) Allocation of Payments After Event of Default. Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received from Borrower (including the monetary proceeds of collections or of realization upon any Collateral) shall be applied in such order as the Lender shall determine in its sole discretion.

14. **Effective Date and Termination.**

(a) Term. This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of Borrower and the Lender, shall become effective on the date hereof and shall continue in full force and effect, and Advances borrowed under this Agreement will be paid in full in cash and the DIP Financing will terminate upon the earliest to occur of the following (the "Term"): (i) **[April 7, 2020]**, or such later date as may be agreed pursuant to this Agreement, (ii) unless extended with the consent of the Lender, the failure to meet any of the dates set forth in the Sale Motion or the entry of the Sale Order to occur, (iii) the closing of a sale pursuant to the Sale Agreement, the Sale Motion and the Sale Order, (iv) at the option of the Lender, at any time on or after an Event of Default, or (v) acceleration of the Obligations in accordance with this Agreement.

(b) Termination. The termination of this Agreement shall not affect Borrower's or the Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated. The security interests, Liens and rights granted to the Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement, until all of the Obligations of Borrower have been paid or performed in full after the termination of this Agreement or Borrower has furnished the Lender with an indemnification satisfactory to the Lender with respect thereto. Accordingly, Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and the Lender shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or

AB_000451

performed in full. Without limitation, all indemnification obligations contained herein shall survive the termination hereof and payment in full of the Obligations.

15. **Miscellaneous.**

(a) <u>Indemnity</u>. Borrower shall indemnify the Lender and each of its officers, directors, affiliates, employees, attorneys and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against the Lender in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not the Lender is a party thereto, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the party being indemnified.

(b) <u>Notice</u>. Any notice or request hereunder may be given to the Borrower or to the Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 15(b). Any notice, request, demand, direction or other communication (for purposes of this Section 15(b) only, a "<u>Notice</u>") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission in accordance with this Section 15(b). Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 15(b) hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 15(b). Any Notice shall be effective:

(i) In the case of hand-delivery, when delivered;

(ii) If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(iii) In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(iv) In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(v) In the case of electronic transmission, when actually received;

(vi) If given by any other means (including by overnight courier), when actually received.

(A)    If to Lender:    Levin Furniture, LLC
c/o Goldberg, Kamin & Garvin
1806 Frick Building
437 Grant St.
Pittsburgh, Pennsylvania 15219
Attention:  Jonathan M. Kamin
Telephone:
Email:

    With a copy to:    Clark Hill PLC
One Oxford Centre
301 Grant Street, 14th Floor
Pittsburgh, Pennsylvania 15219-1425
Attention:  Jarrod J. Duffy / William C. Price
Telephone:  (412) 394-2324 / (412) 394-7776
Telecopier:  (412) 394-2555
Email:  jduffy@clarkhill.com / wprice@clarkhill.com

(B)    If to Borrower:    Sam Levin, Inc.

c/o Art Van Furniture, LLC
6500 14 Mile Road
Warren, MI 48092
Attention: Michael Zambricki
Email: mzambricki@artvan.com

with copies (which shall not constitute notice) to:

Benesch, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Attn: Gregory Werkheiser & Michael J. Barrie
Email: gwerkheiser@beneschlaw.com /
mbarrie@beneschlaw.com

(c)    <u>Representation by Counsel.</u>  Each party hereto acknowledges that it has been represented by counsel in connection with this Agreement.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the parties hereto.

(d)    <u>Governing Law.</u>  This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without reference to the conflicts of law provisions thereof and, to the extent applicable, the Bankruptcy Code.

(e)    <u>Expenses.</u>  All costs and expenses including, without limitation, reasonable attorneys' fees and disbursements incurred by the Lender (i) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (ii) in connection with the modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, or (iii) in instituting, maintaining, preserving, enforcing and

AB_000453

foreclosing on the Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (iv) in defending or prosecuting any actions or proceedings arising out of or relating to the Lender's transactions with Borrower, or (v) in connection with any advice given to the Lender with respect to its rights and obligations under this Agreement and any Other Document, may be charged to the Borrower and shall be part of the Obligations (the Lender shall promptly thereafter provide notice thereof to the Borrower).

(f)     Injunctive Relief.    Borrower recognizes that, in the event it fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to the Lender; therefore, the Lender, if the Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

(g)     Consequential Damages.    Neither the Lender nor any of its agents or attorneys shall be liable to Borrower for any special, incidental, consequential or punitive damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

(h)     Counterparts.    This Agreement may be executed in counterpart, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

(i)     Modifications in Writing.    No modification or amendment of the terms of this Agreement shall be valid unless such amendment is in writing and signed by Borrower and Lender.

(j)     Headings.    The headings of the paragraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

(k)     Effect of Financing Orders.    The Liens and security interest referred to in this Agreement and any Other Document with respect to the Borrower shall be deemed valid and perfected by entry of the Interim Financing Order.

Subject to the Financing Orders and this Agreement, the Borrower hereby covenants, represents and warrants that upon entry of the Interim Financing Order (and the Final Financing Order, as applicable), the Obligations shall:  (i) pursuant to Section 364(c)(l) of the Bankruptcy Code, at all times constitute allowed claims in the Bankruptcy Case having priority over any and all administrative expenses, diminution claims and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times be secured by a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and Liens upon the Collateral that is not subject to valid, perfected and non-avoidable Liens on the Petition Date; and (iii) pursuant to Section 364(d) of the Bankruptcy Code, the Advances shall be secured by valid, binding, continuing and enforceable senior priming security interests, senior priming liens on all the Collateral.

(l)     Release.    Borrower, on behalf of itself and any Person claiming by, through, or under Borrower (collectively, the "Borrower Group") acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature (including, for the avoidance of doubt, any claim under Chapter 5 of the Bankruptcy Code) whatsoever (collectively, "Claims") against the Lender and/or any of its former, present or future directors, officers, members, employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns (the Lender and its former, present or future directors, officers, members,

employees, agents, attorneys, financial advisors, legal representatives, affiliates, shareholders, stockholders, partners, successors and assigns are jointly and severally referred to as the "Lender Group"), that directly or indirectly arise out of, are based upon, or are in any manner connected with any Prior Event; and, should any Claims nonetheless exist, Borrower, on behalf of itself and all the other members of the Borrower Group, hereby (i) releases and discharges each member of the Lender Group from any liability whatsoever on such Claims that directly or indirectly arise out of, are based upon, or are in any manner connected with a Prior Event, and (ii) releases, remises, waives and discharges all such Claims against any member of the Lender Group. As used herein the term "Prior Event" means any transaction, event, circumstance, action, failure to act or occurrence of any sort or type, including without limitation any approval or acceptance given or denied, whether known or unknown, which occurred, existed, was taken, permitted or begun prior to the execution of this Agreement.

[INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** Borrower and Lender have caused this Agreement to be executed as of the date first set forth above.

BORROWER:

Sam Levin, Inc.,
a Pennsylvania corporation

_____

By:
Name:
Title:

LENDER:

Levin Furniture, LLC,
a Pennsylvania limited liability company

_____

By:  Robert Levin, President

AB_000456

## <u>INDEX TO EXHIBITS</u>

<u>Exhibit A</u>      -      Interim Financing Order
<u>Exhibit B</u>      -      Revolving Credit Note

AB_000457

**EXHIBIT A**

**Interim Financing Order**

(see attached)

AB_000458

**EXHIBIT B**

**Revolving Credit Note**

(see attached)

AB_000459

## INDEX TO SCHEDULES

Schedule 1(f) — Permitted Encumbrances
Schedule 5(e) — Inventory Locations
Schedule 6(e) — Litigation
Schedule 8(e) — Indebtedness

AB_000460

**SCHEDULE 1(f)**

**Permitted Encumbrances**

AB_000461

**SCHEDULE 5(e)**

**Inventory Locations**

AB_000462

**SCHEDULE 6(e)**

**Litigation**

AB_000463

**SCHEDULE 8(e)**

**Indebtedness**

AB_000464

# REVOLVING CREDIT NOTE

$7,000,000.00

Date:  March __, 2020
Pittsburgh, Pennsylvania

This Revolving Credit Note (this "Note") is executed and delivered under and pursuant to the terms of that certain Debtor-in-Possession Credit and Security Agreement, dated of even date herewith (as may be amended, modified, supplemented or restated, from time to time, the "DIP Credit Agreement"), by and between Sam Levin, Inc., a Pennsylvania corporation (the "Borrower"), and Levin Furniture, LLC, a Pennsylvania limited liability company (the "Lender").  Capitalized terms not otherwise defined herein shall have the meanings provided in the DIP Credit Agreement.

FOR VALUE RECEIVED, the Borrower hereby promises to pay to the order of the Lender at such place as Lender may from time to time designate to the Borrower in writing:

(i)     the principal sum of Seven Million Five Hundred Thousand and 00/100 Dollars ($7,000,000.00) or, if different from such amount, the unpaid principal balance of the Advances as may be due and owing under the DIP Credit Agreement, payable in accordance with the provisions of the DIP Credit Agreement and subject to acceleration upon the occurrence of an Event of Default under the DIP Credit Agreement or earlier termination of the DIP Credit Agreement pursuant to the terms thereof; and

(ii)     interest on the principal amount of this Note from time to time outstanding until such principal amount is paid in full at the Contract Rate in accordance with the provisions of the DIP Credit Agreement.  In no event, however, shall interest exceed the maximum interest rate permitted by law.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, interest shall be payable at the Default Rate.

This Note is the Revolving Credit Note referred to in the DIP Credit Agreement and is secured by the Liens granted pursuant to the DIP Credit Agreement and the Other Documents, is entitled to the benefits of the DIP Credit Agreement and the Other Documents and is subject to all of the agreements, terms and conditions therein contained.

This Note may be voluntarily prepaid, in whole or in part, on the terms and conditions set forth in the DIP Credit Agreement.

If an Event of Default shall have occurred under the DIP Credit Agreement, then this Note may, as provided in the DIP Credit Agreement, be declared immediately due and payable, without notice, together with reasonable attorneys' fees if the collection hereof is placed in the hands of an attorney to obtain or enforce payment hereof.

This Note shall be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.  The Borrower hereby consents to the jurisdiction and venue of the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") with respect to any suit arising out of or mentioning this Note provided, however, that in the event that the Bankruptcy Court does not have jurisdiction over any matter or if it has jurisdiction but does not exercise such jurisdiction for any reason, the Borrower hereby consents to the jurisdiction and venue of the courts of the Commonwealth of Pennsylvania or the United States District Court for the Western District of Pennsylvania, in each case located in Allegheny County, Pennsylvania.

The Borrower expressly waives any presentment, demand, protest, notice of protest, or notice of any kind except as expressly provided in the DIP Credit Agreement.

**WAIVER OF TRIAL BY JURY**. THE UNDERSIGNED HEREBY EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVE ALL BENEFIT AND ADVANTAGE OF ANY RIGHT TO A TRIAL BY JURY, AND THEY WILL NOT AT ANY TIME INSIST UPON, OR PLEAD OR IN ANY MANNER WHATSOEVER CLAIM OR TAKE THE BENEFIT OR ADVANTAGE OF A TRIAL BY JURY IN ANY ACTION ARISING IN CONNECTION WITH THIS NOTE, THE DIP CREDIT AGREEMENT OR ANY OF THE OTHER DOCUMENTS.

[INTENTIONALLY LEFT BLANK]

AB_000466

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned has hereby executed this Revolving Credit Note on the date first set forth above.

**BORROWER:**

Sam Levin, Inc.,
a Pennsylvania corporation


By:_____
Name:_____
Title:_____

AB_000467

ACKNOWLEDGMENT

_____ OF _____          )
                                             )     SS:
COUNTY OF _____               )


      On this, the _____ day of March, 2020, before me, a Notary Public, the undersigned officer, personally appeared _____ who acknowledged himself/herself to be the _____ of Sam Levin, Inc., a Pennsylvania corporation (the "Company"), and that he/she as such officer, being authorized to do so, executed the foregoing instrument for the purposes therein contained by himself/herself as such officer on behalf the Company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                  _____
                       Notary Public


My Commission Expires:

# **EXHIBIT F**

AB_000469

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 49** |

## INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i)        authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the DIP Collateral (as defined below)[3] to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

[3]   As used in this Interim Order, "DIP Collateral" shall mean and include all of the following personal property assets of the DIP Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

AB_000470

with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and adequate protection to the DIP Lender in accordance with this order; and

       (ii)       scheduling a final hearing (the "<u>Final Hearing</u>") within twenty days of the

(a) all inventory of the DIP Borrower purchased solely with the proceeds of any Advances made under the DIP Credit Agreement;

(b) all receivables of the DIP Borrower arising out of the sale of inventory referred to in clause (a) above;

(c) all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the DIP Borrower giving rise to receivables referred to in clause (b) above, (ii) all of DIP Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b), (iii) all additional amounts due to DIP Borrower from any customer relating to the receivables set forth in clause (b) above, (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b), (v) all of DIP Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b), (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b), and (vii) if and when obtained by DIP Borrower, all real and personal property of third parties in which DIP Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

(e) proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Interim Order or the DIP Credit Agreement, the term "DIP Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

AB_000471

Petition Date to consider the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and argument made at the first day hearing held on March 10, 2020 and the interim hearing held on March 12, 2020 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable local rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

A.     **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B.     **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.     **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing (the "DIP Facility") from the DIP Lender pursuant to the terms set forth in this Interim Order and in that certain form of Debtor-In-Possession Credit and Security Agreement (the "DIP Credit Agreement") and that certain Revolving Credit Note (collectively with the DIP Credit Agreement, the "DIP Loan Documents"), each in substantially the form as filed on the docket in these chapter 11 proceedings on March 13, 2020.

F.     **Debtor Operations**.  DIP Borrower is unable to operate without the

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Liquidity provided by the DIP Facility.

   G.  **Inability to Obtain Alternative Credit**.  DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

   H.  **Good Faith**.  The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility.  Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

   I.  **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

   J.  **Interim Debt Limit**.  The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $10,000,000.00 during this Interim Period in accordance with the DIP Loan Documents.

   K.  **Avoid Immediate and Irreparable Harm**.  The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate.  This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

AB_000474

L. **Interim Hearing**. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1. **Motion Granted**. The Motion is granted.

2. **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3. **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower, as modified by this Interim Order; *provided, however,* notwithstanding anything to the contrary in the Motion or the forms of the DIP Loan Documents annexed to the Motion: (a) the "Maximum advance Amount" (as defined in the DIP Credit Agreement) shall be **Twenty Million and 00/100 U.S. dollars ($20,000,000.00);** (b) the aggregate balance of outstanding advances outstanding at any time pursuant to this Interim Order shall not exceed **Ten Million and 00/100 U.S. dollars**

**($10,000,000.00)**; and Section 14(a)(i) of the DIP Credit Agreement is deemed amended to strike the text "[April 7, 2020]" and replace it with "April 9, 2020". The Debtors are authorized to revise, execute and deliver the DIP Loan Documents to conform with this Paragraph 3.

       4.      **Additional DIP Loan Documents; Non-Material Amendments**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder. The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

       5.      **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

       6.      **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to

limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7. **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8. **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[5] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the

---

[5] Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 93) (the "Interim CC Order").

DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

9.   **Security for DIP Loan**.   As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "<u>DIP Lien</u>") against the DIP Collateral, as that term is defined in the DIP Loan Documents; *provided, however,* that the DIP Lien shall be junior only to the pre-existing liens on and security interests in such DIP Collateral granted in favor of third parties (other than any Prepetition ABL Secured Party or any Prepetition Term Loan Secured Party (each as defined in the Interim CC Order)) that, as of the Petition Date, (a) were senior in priority under applicable law to the DIP Lien, (b) were not subordinated by agreement or applicable law, and (c) were in existence, valid, enforceable, properly perfected and non-avoidable as of the Petition Date, including any such liens and security interests that were perfected after the Petition Date but relate back to the Petition Date pursuant to section 546(b) of the Bankruptcy Code.  Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

10. **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

11. **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12. **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13. **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any

AB_000480

successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14. <u>RESERVED</u>

15. **<u>Order Binding Upon Parties in Interest</u>**. To the fullest extent that relief is available at a hearing held pending a final hearing as contemplated by Bankruptcy Rule 4001(2), all of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16. **<u>Effect of Modification of Interim Order</u>**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Relationship to Contemplated Sale Transaction.** As contemplated by the Levin-Wolf LOI (attached as Exhibit B to the First Day Declaration), the Sale Agreement (as defined in the DIP Credit Agreement) shall provide for the DIP Lender and Levin Trucking, LLC, the purchasers thereunder, to assume, pay or otherwise satisfy all allowed section 503(b)(9) claims against the DIP Borrower, effective upon and subject to the occurrence of the closing under such Sale Agreement.

20. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

21. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

AB_000482

22. **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

23. **Final Hearing**. The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (Prevailing Delaware Time)** before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before March 13, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than **March 30, 2020**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal

Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

24. ***Nunc Pro Tunc* Effect of this Interim Order**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

25. **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

**Dated: March 16th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

AB_000484

# **EXHIBIT G**

AB_000485



**FURNITURE**
**MATTRESS**

# MEMORANDUM

---

**TO:**  Employees Affected By Closing of 6500 E 14 Mile Rd, Warren, MI, 48092;
27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321;
4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI,
48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw
Ste B, Alpine, MI, 49321

**FROM:**  Cathrine Wenger, Senior Counsel

**SUBJECT:** WARN Act Notice

**DATE:**  March 5, 2020

---

  Art Van Furniture, LLC (the "Company") has made the difficult decision to wind-down
its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd,
Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,
49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748
W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and
will be permanently terminating the employment of all employees at these locations.

  The Company submits this notice to you to satisfy any obligation that may exist under the
federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the
"WARN Act").  If no obligations exist, this notice is being provided to you voluntarily.

  All terminations of employment will be permanent and you will not have bumping rights
for other positions (i.e., you will not have the right to displace employees with less seniority).
While an exact date has not yet been established for these closures, it is anticipated that your
employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter
which may be provided to you by the Company (your "Termination Date").  Nothing in this
letter alters your at-will employment status with the Company.

  You will be required to work through your Termination Date, following which date you
will not be required to report to work or provide any services to the Company.

  I will be acting as the Company's representative with regard to these matters.  Should you
have any questions, please contact me for further information at Cathrine Wenger, Senior
Counsel, cwenger@artvan.com, (586) 983-2000.  My address is 6500 E 14 Mile Rd, Warren, MI
48092.

*   *   *

  On a personal note, we are extremely grateful for the service you have given to the
Company, and greatly appreciate your continued professionalism through this process.

AB_000486

# EXHIBIT H

AB_000487

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Objection Deadline: At the Hearing** |
| | ) **Hearing Date: April 6, 2020 at 1:00 p.m. (ET)** |
| | ) |

## DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

hereby submit this motion (this "<u>Motion</u>"), pursuant to section 1112(a) of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure

(the "<u>Bankruptcy Rules</u>"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"),

for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed</u>

<u>Order</u>"), (i) converting each of the Debtors' chapter 11 cases to cases under chapter 7 of the

Bankruptcy Code, effective as of 12:00 a.m. (prevailing Delaware time on April 7, 2020 (the

"<u>Conversion Date</u>"), (ii) establishing a deadline for filing final chapter 11 fee applications and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

setting a hearing thereon, and (iii) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1. These Chapter 11 Cases were pending for just three days when on March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) outbreak to be a pandemic.[3] These Chapter 11 Cases were pending for just five days when on March 13, 2020, the Trump administration declared a national emergency in response to the COVID-19 outbreak.[4] These Chapter 11 Cases were pending for just six days when on March 14, 2020, government regulators in Pennsylvania, one of four states in which the Debtors' core retail operations are concentrated, issued guidance urging all non-essential retail businesses to close, with other states and localities soon to follow.[5] And, these Chapter 11 Cases were pending for just eleven to fourteen days when the four states in which the Debtors' principal operations are located — Michigan, Pennsylvania, Ohio and Illinois — issued "stay at home" or "shelter in place" orders requiring, among other things, all non-essential businesses (including the Debtors' retail stores) to shut their doors and mandating that individuals not leave their homes except in limited circumstances.[6]

---

[2]      Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion.

[3]      World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).

[4]      Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).

[5]      Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/).

[6]      **Michigan:** Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020 (https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html); **Pennsylvania:** Gov.

2.      Even before government action in response to the COVID-19 pandemic made it impossible for the Debtors' retail operations to continue, the consumer public's understandable fear of the spread of the COVID-19 disease already had a devastating impact on the Debtors' ability to implement their original restructuring plan.  These key components included (a) the continuation of Store Closing Sales at substantially all of the Debtors' 125 Art Van Furniture, Art Van Pure Sleep and Scott Shuptrine Interiors branded locations and eight of the Debtors' Wolf Furniture branded locations, and (b) the operation of 44 Levin Furniture, Levin Mattress and Wolf Furniture locations pending consummation of a going concern sale of those business lines and related assets that was contemplated at the outset of these proceedings.  Unfortunately, by the conclusion of the week ending March 14, 2020, customer traffic in the Debtors' stores — both those participating in the Store Closing Sales program and the Levin and Wolf going concern locations — precipitously dropped below what any of the Debtors' pre-bankruptcy and pre-COVID-19 pandemic financial could have predicted.  As a consequence, it was quickly evident that continued retail operations of any sort would cause the Debtors to incur expenses for the foreseeable future that far outstripped the revenues generated.  Ultimately, of course, the aforementioned restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease effectively removed any choice the Debtors had in the matter by mandating that the Debtors discontinue all retail operations and other non-essential business operations.

Tom Wolf, Executive Order, dated March 19, 2020 (https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf); **Ohio:** Dir. Of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020 (https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf); and **Illinois:** Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020 (https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf).

3.      By late March, the exponential spread of the COVID-19 disease throughout the United States, along with the resulting state and locally imposed limitations and prohibitions on non-essential retail operations, had left the Debtors with few potentially viable options.  Further, these extraordinary and unprecedented events have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the best path forward in these proceedings for the Debtors and their estates.  At present, no one can predict with any reliability how long the shelter-in-place orders issued in many states where the Debtors operate will remain in effect.  In fact, the Trump administration just recently extended social distancing guidelines from April 15, 2020 through April 30, 2020.[7]  And, even assuming regulatory barriers to resuming retail operations are lifted in the near future, no one can predict with any reliability what consumer appetite will exist for furniture, given the economic and other trauma that the nation is undergoing presently.[8]

4.      In order to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that may eventually be distributable to their creditors, the Debtors had initially hoped — consistent with what has been recently approved in certain other retail chapter 11 bankruptcy proceedings[9] — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these chapter 11 cases until such time as the broader economic and public safety

---

[7]      *See, e.g.,* Michael D. Shear, "Trump Extends Social Distancing Guidelilnes Through End of April," *The New York Times* (Pub. March 29, 2020, updated April 1, 2020) (https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html).

[8]      *See, e.g.,* Ed Yong, "How the Pandemic Will End," *The Atlantic* (March 25, 2020) (exploring different plausible scenarios for resolution of the COVID-19 epidemic with some taking 12-18 months for society to return to a level of normalcy).

[9]      *See* Order Establishing Temporary Procedures and Granting Related Relief, entered March 30, 2020 [D.I. 217], *In re CraftWorks Parent, LLC, et al.,* Case No. 20-10475 (BLS) (Bankr. D. Del.); Order Temporarily Suspending the Debtors' Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, entered March 27, 2020 [D.I. 166], *In re Modell's Sporting Goods, Inc., et al.,* Case No. 20-14179 (VFP) (Bankr. D.N.J.).

AB_000491

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to this Court and parties in interest at the status conference held that day.

5.     Unfortunately, despite the Debtors and their advisors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, no viable path forward in chapter 11 emerged that would garner the support of the Debtors' senior secured lenders and certain other stakeholders.  With the COVID-19 pandemic still raging and by all reputable accounts likely to get worse in the next several weeks before it improves, the execution risk associated with any of these strategies appears to be unacceptably high for the Debtors to garner the support their senior secured lenders and other stakeholders necessary for the Debtors to be able to move forward.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is likely inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consummated by the time the Debtors and their senior secured lenders conceivably might have some visibility into if or when any of these restructuring alternatives could be successfully implemented.

6.     Furthermore, the Debtors have no ability, without the consent of the Prepetition ABL Agent, to implement any case suspension-based restructuring strategy.  Of necessity, on or about March 19, 2020, after communicating with representatives of the Prepetition ABL Agent on several occasions about the Debtors' increasing operating losses and need to take appropriate

action to prevent further dissipation of the Debtors' assets, the Debtors ceased operating their retail stores as going concerns and thereafter dismissed the vast majority of their employees. As a result, the Debtors have no top line revenue, such that each dollar expended by the Debtors at this point is not being replaced. For this and other reasons, the Debtors have no ability to demonstrate that their secured lenders are adequately protected to the degree required for the Debtors continue using cash collateral and other collateral without their consent. And, under the terms of the Interim CC Order, absent extraordinary relief from the Court, the consent of the Senior Secured Parties to use cash collateral and other collateral will expire no later than the end of the day Monday, April 6, 2020.

7.    The Debtors, thus, find themselves with no choice other than to move for the prompt conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Though this path is a difficult one that the Debtors are following only after exhausting all other alternatives, under these dire circumstances, the Debtors believe that converting these cases is in the best interests of the Debtors' estates. The Debtors understand that the conversion of Chapter 11 Cases is supported by the Debtors' senior lenders and not opposed by the Committee.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested herein are section 1112(a) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

### A.  General Background.

12.     On March 8, 2020 (the "Petition Date"), each of the Debtors commenced with this Court voluntary cases  (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS) pursuant to Bankruptcy Rule 1015.

14.     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 12], incorporated by reference herein.

15.     At the commencement of these cases, the Debtors operated 169 stores in eight states, specifically Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, West Virginia, and Virginia.[10]  The Debtors also have four regional distribution centers, three of which are leased and one of which is owned. The Debtors are headquartered in Warren, Michigan and had approximately 4,500 employees as of the Petition Date.

---

[10]     The vast majority of the Debtors' stores were located in four states: Michigan; Ohio; Pennsylvania; and Illinois.  The remaining five states listed above accounted for only 16 of the Debtors' 169 retail locations as of the Petition Date.

16.     As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases with the intention of liquidating their inventory through store closing sales (the "Store Closing Sales") conducted with the assistance of the Consultant and other proposed professionals, paying down their secured debt, and using any remaining proceeds of their Store Closing Sales to windup their operations.   Also as set forth in the First Day Declaration and Exhibit B thereto, as of the Petition Date, the Debtors were party to a binding letter of intent for a going concern sale of 44 Levin and Wolf stores and related assets and operations (the "Levin-Wolf Sale"). The Debtors intended to effectuate this restructuring through the consensual use of cash collateral.

17.     In furtherance thereof, on or around the Petition Date, the Debtors filed, among other things:

    a.   *Debtors' Application for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 3];

    b.   *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 5]; and

    c.   *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to § 327(a) of the Bankruptcy Code and (V) Granting Related Relief* [D.I. 52] (the "Store Closing Motion").

18.     On March 10, 2020 (as continued, in part, to March 12, 2020), the Court held a hearing (the "First Day Hearing") following which it entered certain orders, including: (a) an order [D.I. 77], pursuant to 28 U.S.C. § 156(c), appointing Kurtzman Carson Consultants LLC ("KCC") as the Claims and Noticing Agent for these Chapter 11 Cases (the "Claims Agent");  (b) the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,

AB_000495

and (V) Granting Related Relief [D.I. 93] (the "Interim CC Order"); and (c) an order [D.I. 143] granting limited relief in connection with the Store Closing Motion on an interim basis.

19.     Shortly after the Petition Date, the Debtors filed applications to employ and retain: (a) Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"), as their proposed general bankruptcy counsel [D.I. 142]; (b) Montgomery McCracken Walker & Rhoads ("MMWR"), as their proposed special counsel [D.I. 193]; (c) Alvarez & Marsal North America LLC ("A&M"), as their proposed financial advisors [D.I. 145]; and (d) Jones Lang Lasalle Americas, Inc. ("JLL," and together with Benesch, MMWR and A&M, the "Debtors' Professionals"), as their proposed real estate consultants and advisors [D.I. 141]. The applications to employ and retain Benesch, A&M and JLL, each are scheduled to be heard on April 6, 2020, at 1:00 p.m. (ET). The application to employ and retain MMWR is scheduled to be heard on April 27, 2020, at 2:00 p.m. (ET).

20.     On March 18, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a seven member Official Committee of Unsecured Creditors in these Chapter 11 Cases (as reconstituted from time to time, the "Committee"). The Committee has engaged and filed applications to employ and retain Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as its proposed counsel [D.I. 244] and Alix Partners ("Alix Partners," and together with Pachulski Stang, the "Committee's Professionals"), as its proposed financial advisor [D.I. 241].

**B. Events in the Chapter 11 Cases.**

21.     Since the First Day Hearing, the exponential spread of COVID-19 has wrought economic and social havoc across the country and the globe. As discussed in the Preliminary Statement, on the afternoon of March 13, 2020, President Trump declared COVID-19 a national

emergency and most of the states in which the Debtors operate have also declared states of emergency and issued "stay at home" or "shelter-in-place" type orders.

22.  Notwithstanding the careful planning and modeling of the Debtors and their advisors, since shortly after the Petition Date, the Debtors' situation has changed drastically as a result of COVID-19. Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the Store Closing Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23.0 million;[11] however, for the _full_ week ending March 15th, deposits from sales were just $8.0 million. It quickly became apparent to the Debtors' management and advisory teams that continued retail operations of any sort were causing the Debtors to incur expenses (and would do so for the foreseeable future) that far outstripped any revenues being generated through the Debtors' continued retail operations.

23.  By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[12] Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health …."[13] Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan — where

---

[11]  The Debtors, however, did not realize the cash proceeds from most of these sales because just prior to the Petition Date and immediately thereafter, certain of the Debtors' credit card processor banks purported to exercise rights to intercept the proceeds from such transactions and redirect them into chargeback reserve accounts.

[12]  Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/)

[13]  Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts, March 16, 2020 (https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/).

the Debtors' headquarters, a distribution center and 82 of their stores are located — entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[14] While Michigan's initial order did not explicitly mandate closing of all non-essential retail establishments, it was accompanied by appropriately alarming statement from Governor Whitmer urging Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[15] Government authorities in Ohio and Illinois also issued similar guidance and direction.

24.     As detailed in the Preliminary Statement, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations are located to issue a "stay at home" or "shelter in place" type order. Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.

25.     Although the situation was evolving rapidly, the Debtors' board, management team and advisors were paying close attention to the threat COVID-19 posed to the health and welfare of the Debtors' employees and customers and to the financial impact on the Debtors' businesses. The Debtors' board, management team and advisors were in near constant communication about these events as they unfolded in mid-March. Moreover, the Debtors and their advisors worked to the best of their ability under these circumstances to keep their secured lenders and other stakeholders informed about these challenges and exhausted all efforts to work with them to develop viable responses to the rapidly deteriorating situation. When no other viable alternative emerged, on March 19, 2020, the Debtors made the painful decision to suspend all retail operations

---

[14]     Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders, March 16, 2020 (https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521763--,00.html).

[15]     *Id.*

and terminate the majority of their employees — moves the Debtors hoped at the time would be only temporary measures.

26.     Further compounding the Debtors' problems, on March 19, 2020 the proposed purchaser for the Levin-Wolf Sale notified the Debtors that they would not proceed with the transaction at that time, effectively ending any hope the Debtors had to consummate a going concern transaction for the Levin and Wolf furniture operations and dashing hopes to save upwards of a 1,000 jobs.

27.     Late in the day on March 19, 2020, however, the Prepetition ABL Agent issued a purported Termination Declaration under the Interim CC Order.  Pursuant to Paragraph 21 of the Interim CC Order, a valid Termination Declaration issued on March 19th would have triggered a Remedies Notice Period five business days' in length.  Thereafter, the Prepetition ABL Agent agreed to extend any Remedies Notice Period relating to the alleged Termination Declaration through the end of the day on Tuesday, March 31, 2020, and then again through and including the end of the day on Monday, April 6, 2020.

28.     Following these events, the Debtors and their advisors continued to work with the Prepetition ABL Agent, the Committee, and their respective advisors to identify solutions for the Debtors' deteriorating situation that would allow them to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that might eventually be distributable to their creditors.  The Debtors had hoped — consistent with what has been recently approved this Court in the *CraftWorks* chapter 11 cases and by the District of New Jersey bankruptcy court in the *Modell's* chapter 11 cases — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these Chapter 11 Cases until such time as the broader economic and public safety

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to the Court that day.

29.     Both before and after the March 26th status conference, the Debtors, with the assistance of their advisors and in consultation with the Prepetition ABL Agent, the Committee and their respective advisors, were working to develop and evaluate several potentially value maximizing alternatives for the Debtors to pursue after the contemplated suspension of operations and downscaling of activities in these Chapter 11 Cases came to an end.  One such path was to resume Store Closing Sales at all of the Debtors' locations where it would be financially and operationally viable to do so.  A second path considered was to focus on one or more bulk sales most or all of the Debtors' inventory, equipment, and other readily monetizable assets.  Additionally, the Debtors and their advisors examined several "middle" paths for the Debtors and their estates, which would involve various combinations of resuming Store Closing Sales at certain locations and bulk-selling inventory, equipment, and certain other assets associated with other locations.

30.     To be clear, each of the post-suspension restructuring alternatives explored by the Debtors had the prospect of producing some return to the Debtors' senior secured lenders and potentially to other stakeholders.  But none of the potential scenarios showed a reasonable chance of generating a recovery for the Debtors' senior secured lenders coming anywhere near what the pre-COVID 19 pandemic modeling had suggested.  Indeed, under most scenarios, the Prepetition ABL Secured Parties, which at the outset of these proceedings were projected to receive a full

recovery on their approximately $34 million of Prepetion ABL Obligations by the mid-point of the Store Closing Sales Process, would not get out whole before their ABL Priority Collateral was fully monetized.

31.     Despite the Debtors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, these concerted efforts were unable to produce a path forward in chapter 11 that would garner the support of their senior secured lenders and potentially other stakeholders.  Unfortunately, with the COVID-19 pandemic still raging and by all reputable accounts likely to get worse before it improves, the perceived execution risk of any of these restructuring strategies has proven to be an insurmountable  barrier to the Debtors ability to obtain the necessary support of their secured lenders and others.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the reasonable best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consumed by operating expenses before the Debtors and their senior secured lenders would have meaningful visibility into whether these restructuring alternatives could be successfully implemented.

32.     By Monday, March 30, 2020, the Debtors were effectively out of time, with their access to Cash Collateral under the Interim CC Order then due to terminate at the end of the following day.  Although it was clear by this point in the proceedings that the Debtors would be unable to continue these Chapter 11 Cases without the support and consent of their senior secured lenders, unresolved issues existed as to what obligations would and would not be funded under the terms of the Interim CC Order prior to any conversion of the Chapter 11 Cases.  Recognizing the contributions that their employees had made to the Debtors' businesses postpetition and the

extreme hardship that many of the employees and their families were apt to experience as a result of losing their jobs in the midst of an ongoing pandemic and associated economic crisis, the Debtors attempted everything in their power to ensure that employee payroll and related employee obligations would be fully funded under the Interim CC Order.

33.     These efforts were to a degree successful.  At a hearing held on March 31, 2020, the Court confirmed that the Debtors would have access to Cash Collateral to fund and pay current payroll obligations, including wages, salaries and commissions.  The cash available, however, was insufficient for it to be possible for the Debtors to provide at this time for payment in full of other employee related obligations, such as coverage obligations for employee healthcare expenses and certain other benefits plans that were, in whole or part, self-funded by the company.[16]  Even though this situation is primarily the result of the COVID-19 pandemic and other circumstances entirely beyond the Debtors' control, the Debtors deeply regret that they are not in a position to be able to do more for their employees, customers, vendors, landlords and other stakeholders.

34.     Based upon the foregoing, the Debtors have considered the circumstances in which they find themselves, and have concluded that converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates.

---

[16]     The Debtors estimate the total unfunded trailing liabilities under their partially self-funded employee health plan to be approximately $8.5 million. Under self-funded plans, like the ones the Debtors had established for their employees in the ordinary course of business prior to the Petition Date, when employees and their covered dependents receive covered services the resulting charges are remitted to the plan's claims administrator for processing.  Thereafter, the approved claims are batched and remitted to the Debtors for payment.  The remittance of the batched claims to the Debtors for payment can trail the rendering of services to employees by up to several months. In general, the Debtors terminated health care covered for their employees effective as of the dates such employees separated from the company.  Thus, the estimated $8.5 million of trailing obligations is on account of covered healthcare services to covered persons provided prior to each such employee's termination date.  Although the Debtors' original budget for these Chapter 11 Cases contemplated the funding of such trailing employee healthcare plan obligations, the COVID-19 pandemic's disruption of the Debtors' ability to operate postpetition  combined with the issuance of a Termination Declaration under the Interim CC Order that followed, left the Debtors with inadequate cash on hand and inadequate access to additional cash with which to fund such obligations.

AB_000502

**RELIEF REQUESTED**

35.    By this Motion, the Debtors request entry of the Proposed Order, pursuant to section

1112(a) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting the Debtors' chapter

11 cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date, (ii)

establishing a deadline for filing final chapter 11 professional fee applications and setting a date

for a hearing thereon, and (iii) granting related relief.

36.    The Debtors also request that the Court approve the following procedures in

connection with the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code

(the "Conversion Procedures"):

  a.  **Professional Fees.** To the extent professionals currently or hereafter retained in the
      Chapter 11 case have not already submitted final fee applications to the Court (the
      "Final Fee Applications"), all professionals shall submit Final Fee Applications in
      accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders
      of this Court by no later than thirty (30) days after the Conversion Date (the "Final
      Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall
      be filed and served by no later than twenty-one (21) days after the Final Fee
      Application Deadline. The Court will schedule a hearing, if necessary, at the
      Court's convenience and subject to the Court's availability, on such Final Fee
      Applications within fourteen (14) days thereafter or such later date as the Court
      determines. To the extent no objections are filed to a given professional's final fee
      application, such professional may file a Certificate of No Objection, and the Court
      may, in its sole discretion, enter an order approving such fees.  To the extent the
      Court approves a Final Fee Application after the Conversion Date, all approved
      amounts owed for professional fees and expenses shall be paid (x) first, from each
      professional's retainer to the extent such retainers exist; (y) next, from the Carve
      Out Reserves (as defined in the Interim CC Order) in accordance with its terms;
      and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the
      priorities set forth in the Bankruptcy Code.

  b.  **Books and Records.** As soon as reasonably practicable, but in no event more than
      fourteen (14) days after the appointment of the interim chapter 7 trustee, the
      Debtors shall turn over or provide access to the chapter 7 trustee the books and
      records of the Debtors in the Debtors' possession and control, as required by
      Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies
      (including electronic copies) of such books and records to the chapter 7 trustee, or
      instructions for locating and accessing such books and records, and may retain

copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

## BASIS FOR RELIEF

### A.    The Conversion Relief Should be Granted

37.    Section 1112(a) of the Bankruptcy Code provides that a debtor may convert a case to chapter 7 as a matter of right. *See* H.R. Rep. No. 95-595, 1st Sess. 405 (1977) ("Subdivision (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case"); *see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) ("[A] debtor has the absolute right to convert [its] Chapter 11 case to a Chapter 7 case"). There are only three circumstances where a debtor is precluded from exercising that right: (i) the debtor is not a debtor in possession; (ii) the case was originally commenced as an involuntary case under chapter 11; or (iii) the case was converted to a case under chapter 11 other than at the debtor's request. 11 U.S.C. § 1112(a).

None of those exceptions is applicable in these Chapter 11 Cases. Therefore, the Debtors are entitled, as an absolute right, to convert the Chapter 11 Cases to cases under chapter 7.

38.     In addition, conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates and creditors. The Debtors no longer have funding to administer these Chapter 11 Cases. Thus, although there is substantial inventory and equipment remaining in the Debtors' stores and distribution centers and other estate assets that may be available to satisfy certain creditor claims, without an ability to fund ongoing administrative expenses, the Debtors have no ability to pursue the recovery of those assets or prosecute a chapter 11 plan. Accordingly, the Debtors believe there is no reasonable likelihood that the Debtors could confirm and consummate a chapter 11 plan, and respectfully submit that a chapter 7 trustee will be able to more efficiently and effectively bring these cases to their conclusion.

39.     Accordingly, the Debtors respectfully request that the Court enter an order converting the Debtors' cases from chapter 11 to chapter 7, effective as of the Conversion Date.

**B.      The Conversion Procedures and Other Related Relief Should Be Approved**

40.     Pursuant to Local Rule 2002-1(f)(xi), "[u]pon conversion of a chapter 11 case to a chapter 7 case, if there are more than 200 creditors, the claims agent appointed in the chapter 11 case shall . . . submit a termination order." Del. Bankr. L.R. 2002-1(f)(xi).

41.     Accordingly, the Debtor requests that the conversion order sought hereby also provides for the termination of KCC services as claims and noticing agent in these Chapter 11 Cases.

42.     The Debtor also believes that the Conversion Procedures are appropriate under the facts of this case and should be approved. The Conversion Procedures include, among other things, a request to extend the deadline under Bankruptcy Rule 1019(1)(A) for the filing of any statements

and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) from fourteen (14) days after the Conversion Date to forty-two days (42) after the Conversion Date.

43. The Court has authority to grant the requested extension under Bankruptcy Rules 1007(c) and 9006(b) and Bankruptcy Local Rule 1007-1(b). Bankruptcy Rule 1007(c), together with Bankruptcy Rule 9006(b), allows the Court to extend the filing deadline for the Schedules and Statements "for cause shown." Similarly, Bankruptcy Local Rule 1007-1(b) provides that such an extension may be granted for cause. Showing "cause" merely requires that a debtor "demonstrate some justification for the issuance of the order," and bankruptcy courts will normally grant such extensions "in the absence of bad faith or prejudice to the adverse party." *See, e.g., Bryant v. Smith,* 165 B.R. 176, 182 (W.D. Va. 1994) (discussing the standard for granting extensions under Bankruptcy Rule 1007) (internal citations and quotation marks omitted).

44. Because of the COVID-19 pandemic and other extremely difficult circumstances that have defined these Chapter 11 Cases, the Debtors and their advisors have had virtually no free time or resources available since he Petition Date to devote to the preparation of schedules and statements required by Bankruptcy Rules 1019(1)(A) and 1007(b). Given the extent of work that remains to be done and the extremely limited resources remaining with which to undertake such work, which conditions both exist through no fault of the Debtors and their advisors, the Debtors' respectfully submit that "cause" exists to extend this deadline. Moreover, since these proceedings are still in their very early stages, the granting of such an extension is unlikely to prejudice the trustee, any creditor or any other party in interest.

## NOTICE

45. Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of Delaware; (ii) proposed counsel for the Committee; (iii) the agents under the Debtors' prepetition

secured facilities and counsel thereto; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002. A copy of this Motion is also available on the website of the Debtors' notice and claims agent at https://www.kccllc.net/artvan. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **RESERVATION OF RIGHTS**

46.     The Debtors understand that employee payroll, the Carve Out and all other obligations that are required to be funded and paid under the Interim CC Order, including without limitation Paragraph 2 thereof, have been or will be funded and paid prior to the Conversion Date. Nevertheless, in the event that such obligations are not funded and paid as required under the Interim CC Order, the Debtors reserve all rights for themselves and their estates, including but not limited to any chapter 7 trustee that may hereafter be appointed.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other relief as is appropriate under the circumstances.

Dated:  April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

 _/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
         mbarrie@beneschlaw.com
         jhoover@beneschlaw.com
         kcapuzzi@beneschlaw.com
         kharmon@beneschlaw.com
         jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

AB_000508

# Exhibit A

AB_000509

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: D.I. _____** |
|  | ) |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. The Motion is GRANTED, as set forth herein.

2. Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3. The following Conversion Procedures are hereby approved:

   a. **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

    b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

    c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

    d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

    e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

    f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

    4.    Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

    5.    Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting*

*Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6. Except as expressly provided in Paragraph 5 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order).

7. For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or

AB_000513

(ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

8.      Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

9.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Objection Deadline: At the Hearing** |
| | ) **Hearing Date: April 6, 2020 at 1:00 p.m. (ET) (requested)** |
| | ) |

## NOTICE OF VIDEO AND TELEPHONIC HEARING REGARDING DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on April 3, 2020, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed the *Debtors <u>Corrected</u> Motion for Entry of an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the "<u>Motion</u>") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "<u>Bankruptcy Court</u>"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on **April 6, 2020 at 1:00 p.m. (ET)**, before the Honorable Chief Judge Christopher S. Sontchi via video and telephonic conference.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

PLEASE TAKE FURTHER NOTICE THAT THE HEARING IS PROCEEDING VIA ZOOM USING THE FOLLOWING INSTRUCTIONS:

> **Topic: Art Van Furniture 20-10553 - Hearing**
> **Time: Apr 6, 2020 1:00 PM Eastern Time (US and Canada)**
> **Join Zoom Meeting**
> **https://uchicago.zoom.us/j/911880719**
> **Meeting ID: 911 880 719**

DO NOT COME TO THE COURTHOUSE. ANY PARTY WHO WISHES TO PRESENT EVIDENCE OR EXAMINE WITNESSES IS REQUIRED TO ACCESS VIA ZOOM. ANY PARTY WHO WISHES TO ACCESS VIA ZOOM MUST ALSO MAKE AUDIO ARRANGEMENTS THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).

OTHER PARTIES IN INTEREST MAY MAKE ARRANGEMENTS TO PARTICIPATE BY TELEPHONE AT THE HEARING THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).

PLEASE TAKE FURTHER NOTICE THAT, IF NO RESPONSES OR OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

AB_000516

Dated: April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

  */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
          mbarrie@beneschlaw.com
          jhoover@beneschlaw.com
          kcapuzzi@beneschlaw.com
          kharmon@beneschlaw.com
          jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

3

AB_000517

# EXHIBIT I

AB_000518

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Relief Requested

1. The Debtors seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto, and a final order (the "Final Order"), *inter alia*: (a) authorizing the Debtors' use of Cash Collateral (as defined below); (b) granting adequate protection to the Prepetition Secured Parties (as defined below) for any diminution in value of their interests in the Prepetition Collateral (as defined below), including Cash Collateral; and (c) vacating and modifying the automatic stay solely to the extent necessary to implement and effectuate the terms and provisions of the Interim Order.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

2.     In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

3.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The bases for the relief requested herein are sections 105, 361, 362, 363, 503, 506, 507 and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 4001 and 9014, and Bankruptcy Local Rules 4401-2 and 9013.1(m).

## Background

6.     The Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Debtors do business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL")

2

AB_000520

in March 2017. Pennsylvania based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017. As of the Petition Date (as defined below), the Debtors operate stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia. The Debtors are headquartered in Warren, Michigan and have approximately 4,500 employees as of the Petition Date (as defined below).

7.     On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**Statement of the Material Terms of the Interim Order**

8.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Bankruptcy Local Rule 4001-2(a)(i) and (ii), the following is a concise statement and summary of the material terms of the Interim Order (collectively, the "Highlighted Provisions"):

13144876 v3

AB_000521

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Entities with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(i)* | The Prepetition ABL Parties[2] and the Prepetition Term Loan Parties[3] (collectively, the "<u>Prepetition Secured Parties</u>") | ¶¶ F & H |
| **Purposed Use of Cash Collateral**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors seek authority to use Cash Collateral to:<br><br>(i) finance their working capital needs and for any other general corporate purposes; and (ii) pay related transaction costs, fees, liabilities and expenses (including all professional fees and expenses) and other administration costs incurred in connection with and for the benefit of these chapter 11 cases, in each case solely to the extent consistent with the Budget (as defined below) and the Interim Order. | ¶ 2 |
| **Budget and Variance Reporting**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | <u>Budget</u>:  The use of Cash Collateral for the first thirteen-week period from the Petition Date shall be in accordance with the budget (the "<u>Budget</u>"), which Budget shall be updated, modified, or supplemented by the Debtors not less than one time in each four-week period. | ¶ 11 |
|  | <u>Budget Compliance</u>:  The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts (as defined in the Interim Order) for any rolling four-week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements (as defined in the Interim Order) for any rolling four-week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements (as defined in the Interim Order) for any rolling four-week period to exceed 110% of the aggregate Operating | ¶ 12(a) |

---

[2] The "Prepetition ABL Parties" are Wells Fargo Bank, National Association, as administrative agent, issue bank, and collateral agent (in such capacity, the "<u>Prepetition ABL Agent</u>") and the lenders party to the Prepetition ABL Agreement (as defined in the Interim Order).

[3] The "Prepetition Term Loan Parties" are Virtus Group, LP, as administrative agent and collateral agent and the lenders party to the Prepetition Term Loan Agreement (as defined in the Interim Order).

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements (as defined in the Interim Order) for any rolling four week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the Budget for such period (with any unspent amounts in the subparagraph (iv) being carried forward for subsequent periods). | |
| **Duration of Use of Cash Collateral/ Events of Default/ Rights and Remedies Upon Event of Default** | Specified Period:  The Debtors are authorized to use Cash Collateral for the period from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date (as defined in the Interim Order), (b) thirty (30) days after the Petition Date, and (c) entry of the Final Order; provided, however, that, during the Remedies Notice Period (as defined in the Interim Order) the Debtors may use Cash Collateral for certain specified purposes. | ¶ 2 |
| | Events of Default:  The occurrence of any of the following events, unless consented to or waived by the Prepetition Agents in advance in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "Events of Default"):

(a)     the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order (including, without limitation, the Covenants in paragraph 12 of the Interim Order);

(b)     the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c)     (i) the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

(d)     the filing of a motion or any plan of reorganization or disclosure statement attendant | ¶ 20 |

5

AB_000523

| Material Terms | Summary of Material Terms | | Para(s). of Interim Order |
|---|---|---|---|
| | | thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to the Interim Order; (ii) to grant any lien other than Permitted Prior Liens (as defined in the Interim Order) upon or affecting any Postpetition Collateral(as defined in the Interim Order); or (iii) except as provided in the Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code; | |
| | (e) | (i) the filing of any Prohibited Plan (as defined in the Interim Order) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors), or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan; | |
| | (f) | the entry of an order in any of the cases confirming a Prohibited Plan; | |
| | (g) | the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to the Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect; | |
| | (h) | the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by the Interim Order; | |
| | (i) | the appointment of an interim or permanent trustee in the cases, the appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a | |

AB_000524

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | trustee receiver or an examiner in the cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors; | |
| | (j) the filing of a motion to approve a Prohibited Sale (as defined in the Interim Order) or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI (as those terms are defined in the Interim Order); | |
| | (k) the dismissal of any case, or the conversion of any case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the cases to Chapter 7 of the Bankruptcy Code; | |
| | (l) the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor Agreement (as defined in the Interim Order), the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (iii) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of [$250,000] or more; | |
| | (m) the existence of any claim or charges, or the entry of any order of the Court authorizing any | |

7

AB_000525

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | claims or charges entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under the Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted in the Interim Order, except, in each case, as expressly provided in the Interim Order; | |
| | (n)     the filing of a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction; | |
| | (o)     any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations; | |
| | (p)     any Debtor shall challenge, support or encourage the challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations; | |
| | (q)     the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral  or Prepetition Collateral other than as set forth in the Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code; | |
| | (r)     any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to | |

8

AB_000526

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA (as defined in the Interim Order), with respect to Postpetition Collateral or Prepetition Collateral having a value in excess of [$250,000] outside the ordinary course of business and not otherwise permitted under the Interim Order;<br><br>(s)   any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders as approved by the Prepetition Agents in writing (provided that the Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by the Interim Order;<br><br>(t)   any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under paragraph 20 of the Interim Order;<br><br>(u)   the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.<br><br>Rights and Remedies Upon Entry of Default: Immediately upon the occurrence and during the continuation of an Event of Default, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or | ¶ 21 |

9

AB_000527

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | the Prepetition Term Loan Agent, as applicable, shall be referred to as a "<u>Termination Declaration</u>") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out (as defined in the Interim Order) has occurred through the delivery of the Carve Out Trigger Notice (as defined in the Interim Order); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restrict on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to as the "<u>Termination Date</u>"). The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "<u>Remedies Notice Period</u>"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and the Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable). During the Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the | |

10

AB_000528

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Prepetition ABL Parties shall be permitted to exercise all remedies set forth in the Interim Order, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and the Interim Order.  Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process. | |
| **Proposed Adequate Protection**<br><br>*Bankruptcy Rule 400l(b)(1)(B)(iv)*<br><br>*Local Rule 4001-2(a)(ii)* | The Prepetition Secured Parties shall be granted, to the extent of any diminution in value of its interests in the Prepetition Collateral from and after the Petition Date, the following:<br><br>Adequate Protection Liens.<br>(a)    <u>Prepetition ABL Adequate Protection Liens.</u> Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition ABL Adequate Protection Liens</u>") on any Postpetition Collateral.<br><br>(b)    <u>Prepetition Term Loan Adequate Protection Liens.</u>  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the | ¶¶ 3, 5, 7-8<br><br><br><br><br><br>¶ 3(a)-(b) |

11

AB_000529

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Prepetition Term Loan Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition Term Loan Adequate Protection Liens</u>," and together with the Prepetition ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>") on the Postpetition Collateral. | |
| | <u>Adequate Protection Superpriority Claims.</u><br>(a)    <u>Prepetition ABL Superpriority Claim.</u>  As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition ABL Superpriority Claim</u>"). | ¶ 5(a)-(b) |
| | (b)    <u>Prepetition Term Loan Superpriority Claim.</u>  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition Term Loan Superpriority Claim</u>," and together with the Prepetition ABL Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>"). | |

12

AB_000530

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | <u>Adequate Protection Payments and Protections for Prepetition ABL Parties.</u>  As further adequate protection, the Debtors are authorized and directed to pay in cash the following:  (a) all principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 of the Interim Order), (b) immediately upon entry of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) om accordance with paragraph 22 of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e)the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI.  In addition, immediately upon the payment in full in cash of the Prepetition ABL Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted),  the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "<u>Prepetition ABL Indemnity Reserve</u>") to secure | ¶ 7 |

13

AB_000531

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations").  The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue.  The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement).  Subject to paragraph 22 of the Interim Order, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 of the Interim Order.  The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of the funds on deposit in the Prepetition ABL Indemnity Reserve.  The Prepetition ABL Indemnity Reserve shall be released at such time as the Prepetition ABL Indemnity | |

AB_000532

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | Obligations are Paid in Full.<br><br>Adequate Protection Payments and Protections for Prepetition Term Loan Agent.  As further adequate protection, the Debtors are authorized and directed to pay in cash the following:  (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph 22 of the Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided, however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral. | ¶ 8 |
| **Liens on Chapter 5 Actions**<br><br>*Local Rule 4001-2(a)(i)(D)* | Subject to the entry of the Final Order, the Adequate Protection Liens include the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents. | ¶ 3(a)-(b) |

15

AB_000533

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **Carve Out**<br><br>*Local Rule 4001-2(a)(i)(F)* | The "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve Out</u>"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") (such fees and expenses, the "<u>Allowed Professional Fees</u>") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined in the Interim Order), provided that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "<u>ABL Professional Fee Cap</u>"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[500,000] incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "<u>Post Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the | ¶ 24 |

16

AB_000534

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | continuation of an Event of Default (as defined above), stating that the Post-Carve Out Trigger Notice Cap has been invoked. Each Professional Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week). | |
| **Cross Collateralization**<br><br>*Local Rule 4001-2(a)(i)(A)* | None, other than replacement liens as adequate protection. | N/A |
| **Findings Regarding Validity/ Perfection/ Amount**<br><br>*Local Rule 4001-2(a)(i)(B)* | As set forth in the Interim Order, the Debtors have acknowledged and agreed as set forth therein, to the validity, perfection, priority, amount and enforceability of the Prepetition Secured Obligations, without prejudice to any other party's rights to assert claims, counterclaims or causes of actions, objections, contests or defenses prior to the expiration of the Challenge Period (as defined below). | ¶¶ F, 27 |
| **Challenge Period**<br><br>*Local Rule 4001-2(a)(i)(B)* | The "Challenge Period" is (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline. | ¶ 27 |

13144876 v3

AB_000535

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| **506(c) Waiver**<br><br>*Local Rule 4001-2(a)(i)(C)* | Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties. | ¶ 29 |
| **552(b) Wavier**<br><br>*Local Rule 4001-2(a)(i)(H)* | Subject to entry of the Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral. | ¶ 31 |
| **Releases**<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated under the Interim Order or thereunder occurring prior to the entry of the Interim Order including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, | ¶ F(x) |

AB_000536

| Material Terms | Summary of Material Terms | Para(s). of Interim Order |
|---|---|---|
| | priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties. The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering the Interim Order. | |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** <br><br> *Local Rule 4001-2(a)(i)(E)* | None. | N/A |
| **Non-Consensual Priming** <br><br> *Local Rule 4001-2(a)(i)(G)* | None. | N/A |

## Basis for Relief

**I.      The Debtors' Request to Use Cash Collateral and Proposed Adequate Protection are Appropriate**

10.     The Debtors' use of property of their estates, including Cash Collateral, is governed by section 363 of the Bankruptcy Code.[4]  Pursuant to section 363(c)(2) of the Bankruptcy Code, a

---

[4] The Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as

AB_000537

debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

11.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. 11 U.S.C. § 363(e). Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Satcon Tech. Corp.*, No. 12-12869, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 COLLIER ON BANKRUPTCY ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry left to the vagaries of each case . . . ") (citation and quotation omitted).

12.     The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re*

---

provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

AB_000538

*Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

### A. The Proposed Adequate Protection for the Prepetition Secured Parties is Sufficient

13. As set forth in the Interim Order and described above in the Highlighted Provisions, the Debtors propose to provide the Prepetition Secured Parties with various forms of Adequate Protection. The Debtors respectfully submit that, in light of the circumstances of these chapter 11 cases, the proposed Adequate Protection is appropriate and sufficient to protect the Prepetition Secured Parties from any diminution in value to the Collateral during the Specified Period. In particular, the Cash Collateral will be used to sustain the Debtors' business operations, allowing for the maximization of the value of the Debtors' estates, specifically the arms' length negotiated terms to protect the Debtors' customer programs. If Cash Collateral is not available for this purpose, the Debtors will be unable to fund payroll obligations, procure goods and services from vendors or otherwise maintain their operations and service their customers, thereby dissipating value to the detriment of the Prepetition Secured Parties and other stakeholders. The use of the Cash Collateral will therefore protect the Prepetition Secured Parties' security interests by preserving the value of their collateral. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (evaluating "whether the value of the debtor's property will increase as a result of the" use of collateral in determining sufficiency of adequate protection); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that generates the income stream,"

AB_000539

provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (observing that debtor's use of rents to maintain and operate property "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the secured lender's] mortgage").

14.     In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate. Thus, the Debtors' proposed Adequate Protection not only is necessary to protect the Prepetition Secured Parties against any diminution in value, but also is fair and appropriate on an interim basis under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using Cash Collateral in the near term, for the benefit of their estates and all parties in interest.

## II.     Failure to Obtain Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm

15.     Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Fed. R. Bankr. P. 4001(b)(2). However, the Court is authorized to conduct a preliminary expedited hearing on the Motion and authorize the Debtors' proposed use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  *Id.*

16.     The Debtors has an immediate postpetition need to use Cash Collateral.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash. The Debtors will use cash to, among other things, continue operating their business and satisfy other working capital needs during the chapter 11 cases, including, among other things, to fund their customer programs. The Debtors believe that all or substantially all of their available cash constitutes the Prepetition Secured Parties' Cash Collateral, as that term is

AB_000540

used by section 363(c) of the Bankruptcy Code. The Debtors therefore will be unable to proceed with operating their business without the ability to use Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral is vital to the preservation and maintenance of the value of the Debtors' estates.

17.     The Debtors, therefore, seek immediate authority to use the Cash Collateral on an interim basis and as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Ru1e 400l(b)(2). Accordingly, to the extent that the Debtors require the use of Cash Collateral, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001(b)(2) to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

**III.      Modification of the Automatic Stay is Appropriate**

18.     The Interim Order and Final Order (together, the "Cash Collateral Orders") contemplate a modification of the automatic stay (to the extent applicable) as necessary to, *inter alia*, permit the Debtors to: (a) grant the security interests, liens and superpriority claims described above, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; and (b) authorize the Debtors to make certain payments in accordance with the terms of the Cash Collateral Orders.  In addition, the Cash Collateral Orders provide for modification of the automatic stay to allow the Prepetition Secured Partiers to exercise remedies upon the occurrence and during the continuance of an Event of Default, and after the giving of five (5) business days' prior written notice to the Debtors.

23

AB_000541

19.     Stay modification provisions of this kind are ordinary and standard terms of postpetition use by debtors-in-possession of prepetition collateral, and, in the Debtors' business judgment, are reasonable under the present circumstances. *See, e.g., In re Open Road Films, LLC*, Case No. 18-12012 (LSS) [Docket No. 51] (Bankr. D. Del. September 7, 2018) (terminating automatic stay after occurrence of termination event and applicable notice*); In re RM Holdco LLC*, Case No. 18-11795 (MFW) [Docket No. 53] (Bankr. D. Del. August 7, 2018) (same); *In re Heritage Home Grp. LLC*, Case No. 18-11736 (KG) [Docket No. 46] (Bankr. D. Del. July 31, 2018) (same); *In re EBH Topco, LLC*, Case No. 18-11212 (BLS) [Docket No. 55] (Bankr. D. Del. May 24, 2018) (same); *In re Gibson Brands, Inc.*, Case No. 18-11025 (CSS) [Docket No. 71] (Bankr. D. Del. May 2, 2018) (same); *In re Appvion, Inc.*, Case No. 17-12082 (KJC) [Docket No. 75] (Bankr. D. Del. October 5, 2017).  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Cash Collateral Orders.

### Request for Final Hearing

20.     Pursuant to Bankruptcy Rule 400l(b)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days of the Petition Date and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

24.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors to use Cash Collateral and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would

AB_000542

severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

25.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

26.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's Interim Order and Final Order is not intended and should not be construed as an admission as to the validity,

AB_000543

priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

### **Notice**

27.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition secured facilities and counsel thereto; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

28.     No prior motion for the relief requested herein has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

AB_000544

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, and based on the record of the Chapter 11 Case, the Debtors respectfully request that this Court (a) enter the Cash Collateral Orders (i) authorizing the Debtors to use Cash Collateral on an interim and final basis subject to the terms and conditions set forth therein; (ii) granting adequate protection to the Prepetition Secured Parties to the extent set forth in the Cash Collateral Orders; (iii) scheduling the Final Hearing, pursuant to the Interim Order, within approximately thirty-five (35) days of the commencement of the chapter 11 cases, to consider approval of this Motion on a final basis; and (iv) granting related relief; and (b) grant the Debtors such other and further relief as may be just and proper.

Dated: March 8, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

_/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in Possession_

AB_000545

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of (a) AVF Parent, LLC (the "Borrower"), and (b) AVF Holdings II, LLC, Art Van Furniture, LLC, Art Van Furniture of Canada, LLC, AV Pure Sleep Franchising, LLC, AVCE, LLC, AVF Franchising, LLC, AVF Holding Company, Inc., AVF Holdings I, LLC, Levin Parent, LLC, LF Trucking, Inc., Comfort Mattress, LLC and Sam Levin, Inc., each as a debtor and debtor in possession (collectively, with the Borrower, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking entry of an order (this "Interim Order") pursuant to sections 105, 361, 362, 363 and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

AB_000546

(i)          authorizing the Debtors to use the Prepetition Collateral (as defined herein), including all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Prepetition ABL Parties under the Prepetition ABL Documents and the Prepetition Term Loan Parties under the Prepetition Term Loan Documents (each as defined herein), and providing adequate protection to the Prepetition ABL Parties and Prepetition Term Loan Parties for any diminution in value, including resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and, in the case of the Prepetition Secured Parties, the priming of their respective interests in the Prepetition Collateral (including by the Carve Out) pursuant to the terms and conditions set forth herein ("Diminution in Value");

(ii)         vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(iii)        scheduling a final hearing (the "Final Hearing") within 30 days of the Petition Date to consider the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* and the evidence submitted and argument made at the interim hearing held on March [__], 2020 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and the Interim Hearing having

2

AB_000547

been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.  **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B.  **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.  **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

13167798 v1

AB_000548

U.S.C. §§ 1408 and 1409.

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.    **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.    **Debtors' Stipulations**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in paragraph 27 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i)    *Prepetition ABL Facility*.  Pursuant to that certain *ABL Credit Agreement* dated as of March 1, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Agreement," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition ABL Documents"), among (a) the Borrower (the "Prepetition ABL Borrower"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors"), (c) Wells Fargo Bank, National Association, as administrative agent, issuing bank and collateral agent (in such capacity, the "Prepetition ABL Agent"), and (d) the lenders party

4

AB_000549

thereto (collectively, including the Prepetition ABL Agent, the "Prepetition ABL Lenders," and the Prepetition ABL Lenders and the Prepetition ABL Agent, together, the "Prepetition ABL Parties"), the Prepetition ABL Lenders provided revolving credit, term loans and other financial accommodations to, and issued letters of credit for the account of, the Prepetition ABL Borrowers pursuant to the Prepetition ABL Documents (the "Prepetition ABL Facility") in an aggregate principal amount of up to $82,500,000.

(ii)     *Prepetition ABL Obligations*.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than approximately $33,573,784.18, inclusive of not less than $14,900,000 of issued and outstanding letters of credit and the Early Termination Premium as defined in the Prepetition ABL Documents (collectively, together with accrued and unpaid interest, bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition ABL Borrowers' or the Prepetition ABL Guarantors' obligations pursuant to, or secured by, the Prepetition ABL Documents, including all "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees, prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition ABL Obligations").

(iii)     *Prepetition ABL Liens and Prepetition ABL Priority Collateral*.  As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition

ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, security interests in and continuing liens on (the "Prepetition ABL Liens") substantially all of their assets and property, including (a) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in that certain Intercreditor Agreement referred to in paragraph F(vii) below) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), and (b) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement) and proceeds, products, and rents of any of the foregoing (collectively, the "Prepetition Term Priority Collateral," and together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral"), subject only to the liens of the Prepetition Term Loan Agent on the Prepetition Term Priority Collateral and Prepetition ABL Permitted Prior Liens (as defined herein).

(iv)     *Prepetition Term Loan Facility*.  Pursuant to that certain Credit Agreement dated as of March 1, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Agreement," and collectively with the Loan Documents (as defined in the Prepetition Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Term Loan Documents," and together with the Prepetition ABL Documents, the "Prepetition Documents"), among (a) the Borrower (the "Prepetition Term Loan Borrower" and together with the Prepetition ABL Borrower, the "Prepetition Borrowers"), (b) Virtus Group, LP, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent," and together with the

Prepetition ABL Agent, the "Prepetition Agents"), (c) the guarantors thereunder (the "Prepetition Term Loan Guarantors" and, together with the Prepetition ABL Guarantors, the "Prepetition Guarantors"), and (d) the lenders party thereto (the "Prepetition Term Loan Lenders," and collectively, including the Prepetition Term Loan Agent, the "Prepetition Term Loan Parties," and together with the Prepetition ABL Parties, the "Prepetition Secured Parties"), the Prepetition Term Loan Lenders provided term loans to the Prepetition Term Loan Borrower (the "Prepetition Term Loan Facility," and together with the Prepetition ABL Facility, the "Prepetition Secured Facilities") in an aggregate principal amount of $100,000,000.

(v) *Prepetition Term Loan Obligations*. As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Term Loan Facility was not less than approximately $175,000,000 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, and financial advisors' fees and related expenses and disbursements reimbursable thereunder), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrower's and the Prepetition Term Loan Guarantors' obligations pursuant to, or secured by, the Prepetition Term Loan Documents, including all "Obligations" as defined in the Prepetition Term Loan Agreement, and all interest, fees, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "Prepetition Term Loan Obligations," and together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations").

(vi) *Prepetition Term Loan Liens and Prepetition Term Priority Collateral*. As more fully set forth in the Prepetition Term Loan Documents, prior to the Petition

Date, the Prepetition Term Loan Borrower and the Prepetition Term Loan Guarantors granted to

the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders,

security interests in and continuing liens on (the "Prepetition Term Loan Liens," and together with

the Prepetition ABL Liens, the "Prepetition Liens") substantially all of their assets and property,

including (a) a first priority security interest in and continuing lien on the Prepetition Term Priority

Collateral, and (b) a second priority security interest in and continuing lien on the Prepetition ABL

Priority Collateral, subject only to the liens of the Prepetition ABL Agent on the Prepetition ABL

Priority Collateral and Prepetition Term Loan Permitted Prior Liens (as defined herein).

(vii)     *Priority of Prepetition Liens; Intercreditor Agreement.*     The

Prepetition Agents entered into that certain Intercreditor Agreement dated as of March 1, 2017 (as

may be further amended, restated, supplemented, or otherwise modified in accordance with its

terms, the "Intercreditor Agreement") to govern the respective rights, interests, obligations,

priority, and positions of the Prepetition Secured Parties with respect to the assets and properties

of the Debtors and other obligors.  Each of the Prepetition Borrowers and Prepetition Guarantors

under the Prepetition Documents acknowledged and agreed to the Intercreditor Agreement.

(viii)     *Validity, Perfection, and Priority of Prepetition ABL Liens and*

*Prepetition ABL Obligations.*  The Debtors acknowledge and agree that as of the Petition Date

(a) the Prepetition ABL Liens on the Prepetition Collateral were valid, binding, enforceable,

non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition

ABL Parties for fair consideration and reasonably equivalent value; (b) the Prepetition ABL Liens

were senior in priority over any and all other liens on the Prepetition Collateral, subject only to

(1) the Prepetition Term Loan Liens on the Prepetition Term Priority Collateral and (2) certain

liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and

AB_000553

senior in priority to the Prepetition ABL Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition ABL Documents (the "Prepetition ABL Permitted Prior Liens"); (c) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition ABL Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge or defense including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition ABL Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition ABL Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition ABL Obligations; and (g) the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(ix) *Validity, Perfection, and Priority of Prepetition Term Loan Liens and Prepetition Term Loan Obligations.* The Debtors further acknowledge and agree that, as of the Petition Date, (a) the Prepetition Term Loan Liens on the Prepetition Collateral were valid,

AB_000554

binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Loan Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Term Loan Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (1) the Prepetition ABL Liens on the Prepetition ABL Priority Collateral and (2) certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable, and senior in priority to the Prepetition Term Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or otherwise permitted by the Prepetition Term Loan Documents (the "Prepetition Term Loan Permitted Prior Liens" and, together with the Prepetition ABL Permitted Prior Liens, the "Permitted Prior Liens");[4] (c) the Prepetition Term Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Term Loan Parties, or any of their

---

[4] For the avoidance of doubt, as used in this Interim Order, no reference to the Prepetition ABL Permitted Prior Liens, the Prepetition Term Loan Permitted Prior Liens, or the Permitted Prior Liens shall refer to or include the Prepetition ABL Liens or the Prepetition Term Loan Liens.

AB_000555

respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Loan Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Loan Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Loan Obligations; and (g) the Prepetition Term Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(x)　　*Release*.　The Debtors hereby stipulate and agree that they forever and irrevocably release, discharge, and acquit the Prepetition Agents, the Prepetition Secured Parties, all former, current and future Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys and agents, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including reasonable attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever relating to, as applicable, the Prepetition Secured Facilities, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder occurring prior to entry of this Interim Order, including (x) any so-called "lender liability" or equitable subordination or recharacterization claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Agents and the Prepetition Secured Parties.　The Debtors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Prepetition Secured Obligations which the Debtors may now have or may claim to have against

11

AB_000556

the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to this Court entering this Interim Order.

(xi)     *Default by the Debtors.*  The Debtors acknowledge and stipulate that (i) they have been, since February 5, 2020, and are in default of their obligations under the Prepetition ABL Documents, and that an Event of Default has occurred under the Prepetition ABL Documents, and that since February 5, 2020, interest has accrued, and will continue to accrue, on the Prepetition ABL Obligations at the default rate set forth in the Prepetition ABL Agreement, and (ii) they have been, since February 29, 2020, and are in default of the obligations under the Prepetition Term Loan Documents, and that a Default has occurred under the Prepetition Term Loan Documents, and that as of the Petition Date, interest will accrue, on the Prepetition Term Loan Obligations at the default rate set forth in the Prepetition Term Loan Documents.

(xii)     *Consulting Agreement with the Liquidators*.  Pursuant to that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020, by and among Hilco Merchant Resources, LLC, Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC, Gordon Brothers Retail Partners, LLC, DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC and Gordon Brothers Brands, LLC and certain of the Debtors, acknowledged by the Prepetition Agents (as amended, restated or otherwise modified from time to time, the "Consulting Agreement"), the Debtors have retained the Consultant to conduct "Going Out of Business" sales of the Assets (each as defined in the Consulting Agreement).  The continued existence and validity of the Consulting Agreement and the uninterrupted continuation of the sales contemplated thereby is a condition to the consent of the Prepetition Agents to this Interim Order and the Debtors' use of Cash Collateral hereunder.

G. Levin DIP Facility. [Insert description of Levin DIP motion/relief, to be referenced as the "Levin DIP Facility."]. The Prepetition Agents have consented to the Levin DIP Facility (in accordance with the Levin DIP Order and Levin DIP Documents, in form and substance reasonably acceptable to the Prepetition Agents), and the Debtors' compliance with, and the obligations incurred under, the Levin DIP Facility (in accordance with the Levin DIP Order and Levin DIP Documents, in form and substance reasonably acceptable to the Prepetition Agents) shall not give rise to an Event of Default under this Interim Order.

H. **Permitted Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien, rather, any such alleged claim arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claims had on the Petition Date.

I. **Cash Collateral**. All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

J. **Adequate Protection**. The Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Parties, and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, are each entitled to receive adequate protection as set

13

AB_000558

forth herein to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral.

K.   **Sections 506(c) and 552(b).**   In light of: (i) the Prepetition ABL Parties' agreement that their liens shall be subject to the Carve Out and, in the case of the Prepetition Term Priority Collateral, subordinate to the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens; (ii) the Prepetition Term Loan Parties' agreement that their liens shall be subject to the Carve Out and, in the case of the Prepetition ABL Priority Collateral, subordinate to the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens; and (iii) the payment of claims and/or expenses as set forth in the Budget (as defined herein) to the extent approved by the Court in connection with the Debtors' "first day motions," subject to entry of a Final Order, the Prepetition Secured Parties are each entitled to (a) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

L.   **Good Faith**.   The Prepetition Secured Parties and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (defined below). The Prepetition Secured Parties have agreed to permit the Debtors to use their Cash Collateral for the Specified Period, subject to the terms and conditions set forth herein, which terms and conditions are fair and reasonable and have been stipulated to by the Debtors in the exercise of their sound business judgment.   Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

M.   **Immediate Entry**.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

14

AB_000559

N.    **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); (vi) counsel to Levin Furniture, LLC and Levin Trucking, LLC, and (vii) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    Motion Granted.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.  The Debtors shall not use Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order, and in accordance with the Budget, subject to such variances as are permitted by this Interim Order, the Debtors are authorized to use Cash Collateral for the period (the "Specified Period") from the Petition Date through the date which is the earliest to occur of: (a) the Termination Date, (b) thirty (30) days after the Petition Date and (c) entry of the Final Order;

13167798 v1

AB_000560

*provided, however*, that, during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the Debtors' estates in accordance with the Budget and as otherwise agreed to by the Prepetition ABL Agent in its sole discretion. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any use of Cash Collateral or proceeds resulting therefrom, except (x) as permitted in the Consulting Agreement or the Levin APA (as defined below), (y) as otherwise consented to by the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral) in writing, or (z) as otherwise disposed of, or used, in accordance with the Budget, subject to such variances as are permitted by this Interim Order.

      3.    <u>Adequate Protection Liens</u>.

      (a)    *Prepetition ABL Adequate Protection Liens*. Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "<u>Prepetition ABL Adequate Protection Liens</u>") on any Postpetition Collateral.[5]

---

[5] "Postpetition Collateral" means: all personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the

AB_000561

    (b)  *Prepetition Term Loan Adequate Protection Liens*.  Subject to the Carve Out, pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Parties, continuing, valid, binding, enforceable, and perfected postpetition security interests in and liens (the "Prepetition Term Loan Adequate Protection Liens," and together with the Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens") on the Postpetition Collateral.

    4.  Priority of Adequate Protection Liens.

    (a)  The Prepetition ABL Adequate Protection Liens shall be senior to

---

payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) subject to entry of a Final Order, proceeds of the Debtors' rights under section 506(c) (solely to the extent such rights result from the use of Postpetition Collateral, and are, therefore, enforceable against parties other than the Prepetition Agents or the Prepetition Secured Parties) and 550 of the Bankruptcy Code; and (e) all Prepetition Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date.  Notwithstanding the foregoing, Postpetition Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases).  Postpetition Collateral that is (i) Prepetition ABL Priority Collateral, (ii) of a type that would be Prepetition ABL Priority Collateral; (iii) of a type that would be Prepetition ABL Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date; and (iv) the "Deposit", as defined in that certain letter agreement dated as of March 4, 2020 by and among Levin Furniture, LLC, Levin Trucking, LLC, as Buyer, and Sam Levin, Inc. and LF Trucking, Inc., as Seller (the "Levin LOI") shall, in each case, constitute "Postpetition ABL Priority Collateral."  Postpetition Collateral that is (i) Prepetition Term Priority Collateral, (ii) of a type that would be Prepetition Term Priority Collateral; and (iii) of a type that would be Prepetition Term Priority Collateral, but that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Petition Date shall constitute "Postpetition Term Priority Collateral."  Postpetition Collateral that is (i) the proceeds of the Debtors' real property leases; and (ii) the proceeds of avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents shall be shared Postpetition Collateral, and the Prepetition ABL Liens and Prepetition Term Loan Liens (and corresponding adequate protection liens and claims) on such proceeds shall rank equally in priority and share such proceeds equally (with 50% of such proceeds applied to the Prepetitition ABL Obligations and 50% applied to the Prepetition Term Loan Obligations).

AB_000562

all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition ABL Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens and (B) the Prepetition ABL Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, (B) the Prepetition Term Loan Liens, (C) the Prepetition Term Loan Adequate Protection Liens, and (D) the Prepetition ABL Liens.

(b) The Prepetition Term Loan Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Postpetition Collateral; *provided that*, the Prepetition Term Loan Adequate Protection Liens shall be subject to the Carve Out and shall be junior only to: (i) with respect to the Postpetition ABL Priority Collateral, (A) Prepetition ABL Permitted Prior Liens, (B) the Prepetition ABL Liens, (C) the Prepetition ABL Adequate Protection Liens, and (D) the Prepetition Term Loan Liens; and (ii) with respect to the Postpetition Term Priority Collateral, (A) Prepetition Term Loan Permitted Prior Liens, and (B) the Prepetition Term Loan Liens.

(c) Except as provided herein (including with respect to the Carve Out), the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"), and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of

18

AB_000563

the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

      5.      <u>Adequate Protection Superpriority Claims</u>.

      (a)      *Prepetition ABL Superpriority Claim*.  As further adequate protection of the interests of the Prepetition ABL Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition ABL Superpriority Claim</u>").

      (b)      *Prepetition Term Loan Superpriority Claim*.  As further adequate protection of the interests of the Prepetition Term Loan Parties in the Prepetition Collateral, to the extent of any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the Prepetition Term Loan Parties, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (the "<u>Prepetition Term Loan Superpriority Claim</u>," and together with the Prepetition ABL Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>").

      6.      <u>Priority of the Adequate Protection Superpriority Claims</u>.  Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b),

AB_000564

507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code. The Adequate Protection Superpriority Claims shall be subject to the Carve Out and shall be subject to the following priorities: (a) with respect to Postpetition ABL Priority Collateral, (1) the Prepetition ABL Superpriority Claim and (2) the Prepetition Term Loan Superpriority Claim; and (b) with respect to Postpetition Term Priority Collateral, (1) the Prepetition Term Loan Superpriority Claim and (2) the Prepetition ABL Superpriority Claim.

7.    Adequate Protection Payments and Protections for Prepetition ABL Parties. As further adequate protection, the Debtors are authorized and directed to pay in cash the following: (a) all principal and interest at the default rate due under the Prepetition ABL Documents (but subject to the Challenge rights to the extent preserved in paragraph 27 below, (b) immediately upon entry of this Interim Order, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent arising prior to the Petition Date and reimbursable under the Prepetition ABL Documents, (c) in accordance with paragraph 22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Agent on and subsequent to the Petition Date reimbursable under the Prepetition ABL Documents, (d) the Prepetition ABL Obligations in accordance with the Budget, and (e) the Prepetition ABL Obligations with the Deposit (as defined in the Levin LOI) upon such Deposit becoming non-refundable in accordance with the terms of the Levin LOI. In addition, immediately upon the payment in full in cash of the Prepetition ABL

AB_000565

Obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents, the Debtors shall fund to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, $500,000 into a non-interest bearing account maintained at Wells Fargo Bank, National Association (the "Prepetition ABL Indemnity Reserve") to secure contingent indemnification, reimbursement, or similar continuing obligations arising under or related to the Prepetition ABL Documents (the "Prepetition ABL Indemnity Obligations"). The Prepetition ABL Indemnity Reserve shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) owed to or incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens, as applicable, whether in these Cases or independently in another forum, court, or venue. The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the Prepetition ABL Indemnity Reserve and the funds therein (which shall not be subject to the Carve-Out) and by a lien on the Postpetition Collateral and the Prepetition Collateral (subject in all respects to the Intercreditor Agreement). Subject to paragraph 22 below, the Debtors shall pay all Prepetition ABL Indemnity Obligations as and when they arise and paid; *provided, that* the Prepetition ABL Agent shall have authority in its sole discretion, but not an obligation, to apply amounts in the Prepetition ABL Indemnity Reserve to any Prepetition ABL Indemnity Obligations, without further notice to or consent from the Debtors, a Committee (if appointed), or any other parties in interest and without further order of this Court; *provided*, that (i) any such

AB_000566

indemnification claims shall be subject to (a) the terms of the Prepetition ABL Documents (including with respect to application of proceeds) and (b) the rights of parties in interest with requisite standing to object to such indemnification claim(s) to the extent set forth in paragraph 27 hereof. The Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Parties) shall retain and maintain the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Agent as security for the amount of any Prepetition ABL Indemnity Obligations in excess of funds on deposit in the Prepetition ABL Indemnity Reserve. The Prepetition ABL Indemnity Reserve shall be released at such time as the Prepetition ABL Indemnity Obligations are Paid in Full.[6]

8. <u>Adequate Protection Payments and Protections for Prepetition Term Loan Agent</u>. As further adequate protection, the Debtors are authorized and directed to pay in cash the following: (a) the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent arising prior to the Petition Date and reimbursable under the Prepetition Term Loan Documents, and (b) in accordance with paragraph

---

[6] "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility. No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Prepetition ABL Obligations (i) the Challenge Deadline (as defined in paragraph 27 of this Interim Order) shall have occurred without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the Challenge Deadline, upon the final, non-appealable disposition of such Challenge; and (c) the Prepetition ABL Agent has received (i) a countersigned payoff letter in form and substance satisfactory to the Prepetition ABL Agent and (ii) releases in form and substance satisfactory to the Prepetition ABL Agent in its sole discretion.

AB_000567

22 herein, the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements (including the reasonable and documented fees, out-of-pocket fees and expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition Term Loan Agent on and subsequent to the Petition Date reimbursable under the Prepetition Term Loan Documents; *provided*, *however*, that any payments made under this paragraph 8 shall be made solely from proceeds of Postpetition Term Priority Collateral.

    9. <u>Perfection of Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, each Prepetition Agent is authorized to file, as it in its sole discretion deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Adequate Protection Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the Prepetition Agents, as applicable,

23

AB_000568

all such financing statements, mortgages, notices, and other documents as the Prepetition Agents may reasonably request. Each Prepetition Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.

10. **Adequate Protection Reservation**. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases. The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

11. **Budget**. The use of Cash Collateral during the Specified Period is permitted solely in accordance with a cash collateral budget (the "Budget") approved by the Prepetition Agents,[7] each in their sole discretion, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents. A copy of the initial approved Budget is attached hereto as Exhibit [_]. The Budget shall depict, on a weekly basis and line item basis (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals

---

[7] For the avoidance of doubt, any reference to the consent rights of the Prepetition Term Loan Agent shall mean the Prepetition Term Loan Agent acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Agreement).

24

AB_000569

and advisors), asset sales and any other fees and expenses), and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date, and such initial Budget shall be approved by, and in form and substance satisfactory to the Prepetition Agents, each in their sole discretion (it being acknowledged and agreed that the initial Budget attached hereto is approved by and satisfactory to the Prepetition Agents). The Budget shall be updated, modified, or supplemented by the Debtors with the written consent of the Prepetition Agents, but in any event the Budget shall be updated by the Debtors not less than one time in each four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Prepetition Agents, each in their sole discretion), and no such updated, modified, or supplemented budget shall be effective until so approved, and once so approved shall be deemed the Budget; *provided, however*, that in the event the Prepetition Agents, on the one hand, and the Debtors, on the other hand, cannot agree as to an updated, modified or supplemented budget, the Debtors shall continue to operate under the most recent prior-approved Budget and such disagreement shall give rise to an Event of Default once the period covered by such prior Budget has terminated. Each Budget delivered to the Prepetition Agents shall be accompanied by such customary supporting documentation as reasonably requested by the Prepetition Agents and shall be prepared in good faith based upon assumptions the Debtors believe to be reasonable at the time of delivery. A copy of any Budget (or updated Budget once approved by the Prepetition Agents) shall simultaneously be delivered to the counsel for a Committee (if appointed), and the U.S. Trustee. All Cash Collateral use must be strictly in accordance with the terms of the Budget, subject to such variances as are permitted by this Interim Order or agreed to in writing by the Prepetition Agents.

AB_000570

12.    <u>Covenants</u>.

(a)    *Budget Compliance*.  The Debtors shall not, without the consent of the Prepetition Agents, permit (i) the actual Total Cash Receipts for any rolling two week period to be less than 90% of the Total Cash Receipts set forth in the Budget for such period, (ii) the actual GOB Disbursements for any rolling two week period to exceed 110% of the aggregate GOB Disbursements set forth in the Budget for such period, (iii) the actual Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Operating Disbursements set forth in the Budget for such period, or (iv) the actual Non-Operating Disbursements for any rolling two week period to exceed 110% of the aggregate Non-Operating Disbursements set forth in the Budget for such period (with any unspent amounts in this subparagraph (iv) being carried forward for subsequent periods).

(b)    *Borrowing Base*.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall at all times maintain actual Total Excess ABL Availability After Covenant (calculated in the manner set forth in the Borrowing Base Certificate attached to the Budget) in an amount not less than $0, it being understood and agreed that the Availability Block set forth in the Borrowing Base Certificate attached to the Budget shall be deemed to be $5,000,000 for each of the weeks beginning March 8, 2020 and March 15, 2020.  Until the Prepetition ABL Obligations are Paid in Full, the Borrowing Base Certificate shall be updated and delivered weekly in accordance with the requirements of an "Increased Reporting Event" as defined in the Prepetition ABL Agreement.  For the avoidance of doubt, the calculation of the Borrowing Base shall at all times deduct the amount of the Carve Out Reserves.  Until the Prepetition ABL Obligations are Paid in Full, the Debtors shall deliver to the Prepetition Agents, by not later than Thursday of each week, an updated Borrowing Base Certificate, substantially in the form attached hereto as Exhibit

26

AB_000571

[_] (the "<u>Borrowing Base Certificate</u>"), and such Borrowing Base Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents (it being agreed the detail required by the Prepetition ABL Agreement shall be deemed so satisfactory).

(c)     *Variance Testing*.  The Debtors shall, commencing with the week beginning March 15, 2020, deliver to the Prepetition Agents, by not later than Thursday of each week, a certificate, substantially in the form attached hereto as Exhibit [_] (the "<u>Budget Variance Certificate</u>") and such Budget Variance Certificate shall include such detail as is reasonably satisfactory to the Prepetition Agents, showing a reconciliation for the prior two week cumulative period, and certifying that (i) the Debtors are in compliance with the covenants contained in this Section 12 and (ii) to the knowledge of the Debtors, no Event of Default hereunder has occurred or, if such an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto.

(d)     *Consent Fee for Prepetition ABL Parties*.  The Debtors shall pay the Prepetition ABL Agent, for the benefit of the Prepetition ABL Parties, a consent fee ("<u>Consent Fee</u>") in the amount of $150,000 per week until such time as the Prepetition ABL Obligations have been repaid in full in cash (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted), the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the Prepetition ABL Documents.  The Consent Fee shall be fully earned on Saturday of each week and shall be paid to the Prepetition ABL Agent on the immediately following Tuesday and shall not be subject

to refund, offset or rebate under any circumstances.

(e)     *Levin Sale Milestones*.  The Debtors shall achieve each of the following milestones, if and when applicable (as the same may be extended from time to time with the consent of the Prepetition ABL Agent (in its sole discretion), the "Levin Sale Milestones"), in each case on terms and conditions, and subject to documentation in form and substance, reasonably acceptable to the Prepetition ABL Agent in all respects:

(i)     On or before the date that is five (5) days following the Petition Date, the Debtors shall file a motion to approve the sale of the "Assets", as such term is defined in the Levin LOI (the "Levin Sale"), to the Buyer under the Levin LOI.

(ii)     On or before the date that is ten (10) days following the Petition Date, the Debtors shall enter into an asset purchase agreement with the Buyer under the Levin LOI for the Levin Sale (the "Levin APA").

(iii)     On or before the date that is twenty-one (21) days following the Petition Date, the Debtors shall receive an order from the Court approving the Levin Sale.

(iv)     On or before the date that is two (2) business days after the order approving the Levin Sale, the Debtor shall have consummated the Levin Sale and the proceeds thereof shall have been applied to the Prepetition ABL Obligations.

13.     Modification of Automatic Stay.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to:  (a) permit the Debtors to grant the Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the Prepetition ABL Agent may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to

the Prepetition ABL Parties under this Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order.

14. <u>Protections of Rights of Prepetition Secured Parties.</u>

(a) Subject to the Intercreditor Agreement, unless the Prepetition ABL Agent and Prepetition Term Loan Agent have each provided their respective prior written consent, or all Prepetition ABL Obligations and Prepetition Term Loan Obligations (excluding contingent indemnification obligations for which no claim has been asserted) have been Paid in Full, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and otherwise shall object to any motion or application seeking entry of, any order (other than this Interim Order or the Final Order, but including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Postpetition Collateral or Prepetition Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the Prepetition Liens, the Prepetition Adequate Protection Liens, and/or the Adequate Protection Superpriority Claims except as expressly set forth in this Interim Order; (ii) the use of Cash Collateral for any purpose other than as permitted in this Interim Order (including any use in accordance with the Budget, subject to variances permitted by this Interim Order); (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of any of the Prepetition

AB_000574

Secured Parties' rights under this Interim Order, the Prepetition ABL Documents, or the Prepetition Term Loan Documents with respect any Prepetition ABL Obligations or Prepetition Term Loan Obligations. It shall be an Event of Default under this Interim Order if, in any of these Cases or any Successor Cases, the Debtors take or take to take any of the actions contemplated with respect to provisions (i) through (iv) of the previous sentence or if any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

     (b)  The Debtors shall (i) maintain books, records, and accounts to the extent and as required by the Prepetition Documents (and subject to the applicable grace periods set forth therein); (ii) reasonably cooperate with, consult with, and provide to the Prepetition Agents, as applicable, all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the Prepetition Agents, as applicable) to provide under the Prepetition Documents, or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the Prepetition Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the Prepetition Documents; (iv) permit the Prepetition Agents to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets; and (v) upon reasonable advance notice, permit the Prepetition Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable times in respect of any or all of the Postpetition

AB_000575

Collateral and Prepetition Collateral, in each case, in accordance with the Prepetition Documents.

15.     Credit Bidding.  No Debtor shall object to any Prepetition ABL Parties credit bidding up to the full amount of the applicable outstanding Prepetition ABL Obligations, or with respect to the Prepetition Term Loan Parties, credit bidding up to the full amount of the applicable outstanding Prepetition Term Loan Obligations, in each case including any accrued interest, fees, and expenses, in any sale of any Prepetition Collateral, as applicable, whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, to the extent permitted by section 363(k) of the Bankruptcy Code, and subject in each case to the rights, duties, and limitations, as applicable, of the parties under the Intercreditor Agreement, Prepetition Documents and to the provision of consideration sufficient to pay in full in cash any senior liens on the collateral that is subject to the credit bid.

16.     Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time prior to the Prepetition Obligations being Paid in Full, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any Prepetition Collateral or Postpetition Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the Prepetition ABL Agent (or, following the Prepetition ABL Obligations being Paid in Full, to the Prepetition Term Loan Agent) to be applied in accordance with this Interim Order and the Intercreditor Agreement.

17.     Cash Collection.  From and after the date of the entry of this Interim Order,

all collections and proceeds of any Postpetition Collateral and Prepetition Collateral or services provided by any Debtor and all Cash Collateral (that does not constitute Prepetition or Postpetition Term Priority Collateral) that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition ABL Priority Collateral were deposited under the Prepetition Documents (or in such other accounts as are designated by the Prepetition ABL Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall, until the Prepetition ABL Obligations are Paid in Full, be subject to the sole dominion and control of the Prepetition ABL Agent and any amounts deposited into the Cash Collection Accounts shall be deemed to be Postpetition ABL Priority Collateral. Proceeds and other amounts in the Cash Collection Accounts shall be used, subject to the conditions set forth herein, to fund the Budget during the Specified Period, and the Debtors are authorized and directed to pay to the Prepetition ABL Agent, and the Prepetition ABL Agent is authorized to apply, amounts in excess thereof in accordance with the Budget until the Prepetition ABL Obligations are Paid in Full. In furtherance of the foregoing, each Thursday during the Specified Period the Debtors shall deliver to the Prepetition Agents a schedule of all proposed disbursements for the following seven (7) day period (each a "Disbursement Schedule"), including identification of which line item(s) in the Budget such proposed disbursements relate to. Upon the Prepetition ABL Agent's receipt of a written cash collateral draw request (each a "CC Draw Request," which shall be delivered to the Prepetition Term Loan Agent at the same time such CC Draw Request is delivered to the Prepetition ABL Agent) (which may be made on a daily basis), and following verification of conformity with the associated Disbursement Schedule and Budget, the Prepetition ABL Agent shall disburse funds

AB_000577

from the Cash Collection Account as appropriate to fund the amounts specified in the CC Draw Request; *provided* that, during the period prior to the Prepetition ABL Obligations being Paid in Full, the Prepetition ABL Agent shall only be required to disburse funds if the Debtors are in compliance with the provisions of this Interim Order (including, without limitation, that after giving effect to such disbursement, actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0). For the avoidance of doubt, it shall be a condition to the Debtors' ability to access and use the Prepetition Secured Parties' Cash Collateral that they submit to the Prepetition ABL Agent the CC Draw Request and associated Disbursement Schedule in the manner and time provided herein. In addition to the foregoing, the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid In Full) is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount sufficient to maintain the "Ending Balance" set forth in the Budget for any applicable weekly period (at the end of the relevant week) and, until the Prepetition ABL Obligations are Paid in Full, the Prepetition ABL Agent is authorized to debit the Debtors' accounts and apply Cash Collateral on deposit therein in an amount such that actual Total Excess ABL Availability After Covenant at such time (calculated in the manner as set forth in the Borrowing Base Certificate attached to the Budget) shall not be less than $0. Until the Prepetition ABL Obligations are Paid in Full, unless otherwise agreed to in writing by the Prepetition ABL Agent or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "<u>Cash Management Order</u>"). The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit, without offset or deduction, funds

in such Cash Collection Accounts upon receipt of any direction to that effect from the Prepetition ABL Agent (or the Prepetition Term Loan Agent, after the Prepetition ABL Obligations are Paid in Full), in each case, to the extent such direction is made in accordance with this Interim Order. The Debtors shall cause the proceeds of Prepetition and Postpetition Term Priority Collateral as identified by the Consultant to be deposited into a segregated, non-commingled account which is required to be subject to the control of the Prepetition Term Loan Agent, and the Debtors' use of such proceeds shall be subject to (and limited to the extent set forth in) this Interim Order but, for the avoidance of doubt, may be used in accordance with the Budget, subject to variances permitted by this Interim Order.

18.     <u>Maintenance of Collateral</u>.  Until all Prepetition ABL Obligations are Paid in Full, the Debtors shall:  (a) insure the Postpetition Collateral and Prepetition Collateral as required under the Prepetition Documents; and (b) maintain the cash management system in effect as of the Petition Date, as may be modified with the consent of the Prepetition Agents (such consent not to be unreasonably withheld) or as a result of entry of any order by the Court.

19.     <u>Disposition of Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Postpetition Collateral or Prepetition Collateral other than in the ordinary course of business and in accordance with the Consulting Agreement and the Levin APA, without (subject to the Intercreditor Agreement) the prior written consent of the Prepetition ABL Agent (with respect to Postpetition ABL Priority Collateral) or the Prepetition Term Loan Agent (with respect to Postpetition Term Priority Collateral), and no such consent shall be implied, from any other action, inaction or acquiescence by the Prepetition Secured Parties or from any order of this Court.

20.     <u>Events of Default</u>.  The occurrence of any of the following events, unless

AB_000579

consented to or waived by the Prepetition Agents in advance, in writing, each in their sole and absolute discretion, shall constitute an event of default (collectively, the "Events of Default"):

(a)      the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order (including, without limitation, the Covenants in paragraph 12 herein);

(b)      the failure of the Debtors to obtain a Final Order on the Motion on terms acceptable to the Prepetition Agents on or before 30 days after the Petition Date;

(c)      (i) the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis;

(d)      the filing of a motion or any plan of reorganization or disclosure statement attendant thereto by and of the Debtors: (i) to obtain additional financing under section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Interim Order; (ii) to grant any lien other than Permitted Prior Liens upon or affecting any Postpetition Collateral; or (iii) except as provided in this Interim Order, to use Cash Collateral under section 363(c) of the Bankruptcy Code;

(e)      (i) the filing of any Prohibited Plan (as defined herein) or disclosure statement attendant thereto, or any direct or indirect amendment to such chapter 11 plan or disclosure statement, by a Debtor, (ii) the entry or request for entry of any order terminating any Debtor's exclusive right to file a chapter 11 plan (unless actively contested by the Debtors) or (iii) the expiration of any Debtor's exclusive right to file a chapter 11 plan;

(f)      the entry of an order in any of the Cases confirming a Prohibited

35

AB_000580

Plan;

(g)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Interim Order or the Cash Management Order, the filing by a Debtor of a motion for reconsideration with respect to this Interim Order or the Cash Management Order, or the Interim Order shall cease to be in full force and effect;

(h)     the payment of, or application by the Debtors for authority to pay, any prepetition claim unless in accordance with the Budget, subject to variances permitted by this Interim Order;

(i)     the appointment of an interim or permanent trustee in the Cases, the appointment of a receiver, receiver and manager, interim receiver or similar official over any substantial portion of the assets of the Debtors, or the appointment of a trustee receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors;

(j)     the filing of a motion to approve a Prohibited Sale or to sell all or substantially all of the Debtors' assets other than in accordance with the Consulting Agreement or the Levin LOI;

(k)     the dismissal of any Case, or the conversion of any Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Debtor filing a motion or other pleading seeking the dismissal of the Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Cases to Chapter 7 of the Bankruptcy Code;

(l)     the filing of a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Prepetition ABL Agent and, subject to the Intercreditor

36

AB_000581

Agreement, the Prepetition Term Loan Agent) to execute upon or enforce a lien on any Postpetition Collateral or Prepetition Collateral, (ii) approving any settlement or other stipulation with any secured creditor of any Debtor providing for payments as adequate protection or otherwise to such secured creditor, or (C) with respect to any lien on or the granting of any lien on any Postpetition Collateral or the Prepetition Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of [$250,000] or more;

(m)     the existence of any claim or charges, or the entry of any order of the Court authorizing any claims or charges, entitled to superpriority administrative expense claim status in any Case pursuant to section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Prepetition Secured Parties under this Interim Order, or there shall arise or be granted by the Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (ii) any lien on the Postpetition Collateral or the Prepetition Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except, in each case, as expressly provided in this Interim Order;

(n)     the filing of a motion or entry of an order materially adversely impacting the rights and interests of the Prepetition Secured Parties shall have been entered by the Court or any other court of competent jurisdiction;

(o)     any Debtor shall challenge, support or encourage a challenge of any payments made to any Prepetition ABL Party with respect to the Prepetition ABL Obligations;

(p)     any Debtors shall challenge, support or encourage a challenge of any payments made to any Prepetition Term Loan Party with respect to the Prepetition Term Loan Obligations;

AB_000582

(q)     the entry of any order by the Court granting, or the filing by any Debtor of any motion or other request with the Court seeking authority to use cash proceeds of any of the Postpetition Collateral or Prepetition Collateral other than as set forth in this Interim Order or to obtain any financing under section 364(d) of the Bankruptcy Code;

(r)     any Debtor or any person on behalf of any Debtor shall file any motion seeking authority to consummate a sale of assets, other than in connection with the Consulting Agreement or the Levin APA, with respect to Postpetition Collateral or Prepetition Collateral having a value in excess of [$250,000] outside the ordinary course of business and not otherwise permitted hereunder;

(s)     any Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise provide any credit on account of any prepetition indebtedness or payables other than payments (i) under customary "first day orders" as approved by the Prepetition Agents in writing (provided that this Interim Order and all orders relating to cash management shall be acceptable to the Prepetition Agents) and (ii) payments approved (A) by the Court or (B) by the Prepetition Agents in writing, in each case in accordance with the Budget, subject to variances permitted by this Interim Order;

(t)     any Debtor shall fail to contest in good faith a request to take any action that if taken by the Debtor would constitute an event of default under this paragraph 20;

(u)     the automatic stay shall be modified, reversed, revoked or vacated in a manner that has a material adverse impact on the rights and interests of the Prepetition Agents or the Prepetition Secured Parties.

21.     <u>Rights and Remedies Upon Event of Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default under this Interim Order,

notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order (and the Remedies Notice Period), (a) (i) the Prepetition ABL Agent may declare (any such declaration delivered by the Prepetition ABL Agent or the Prepetition Term Loan Agent, as applicable, shall be referred to herein as a "Termination Declaration") (A) all Prepetition ABL Obligations owing under the Prepetition ABL Documents to be immediately due and payable, and (B) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice (as defined herein); and (ii) the Prepetition ABL Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (b) the Prepetition Term Loan Agent may (i) declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral that is Postpetition Term Priority Collateral and (ii) after the Prepetition ABL Obligations have been Paid in Full, declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (the date a Termination Declaration is delivered shall be referred to herein as the "Termination Date").  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), the Prepetition ABL Agent (if delivered by the Prepetition Term Loan Agent), the Prepetition Term Loan Agent (if delivered by the Prepetition ABL Agent), and the U.S. Trustee. The automatic stay in the Cases otherwise applicable to the Prepetition ABL Parties is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the Prepetition ABL Parties shall be entitled to exercise their rights and remedies in accordance with the Prepetition ABL Documents and this Interim Order to satisfy the Prepetition ABL Obligations, Prepetition ABL Superpriority Claims, and Prepetition ABL Adequate Protection Liens, subject to the Carve Out (to the extent applicable).   During the

AB_000584

Remedies Notice Period, the Debtors and/or a Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration of the Remedies Notice Period, unless the Court orders otherwise, the automatic stay, as to the Prepetition ABL Parties, shall automatically be terminated without further notice or order and the Prepetition ABL Parties shall be permitted to exercise all remedies set forth herein, in the Prepetition Documents, and as otherwise available at law without further order of or application or motion to the Court consistent with the Intercreditor Agreement and this Interim Order. Upon the occurrence and during the continuation of an Event of Default, in each case, subject to the Intercreditor Agreement, the Prepetition ABL Agent and any liquidator or other professional will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Postpetition ABL Priority Collateral, including pursuant to any Court approved sale process.

22. <u>Prepetition Secured Parties' Expenses</u>. The Debtors are authorized and directed to pay, in accordance with this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of (a) the Prepetition ABL Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Morgan, Lewis & Bockius LLP and Burr & Forman LLP, and any successor counsel) and, (b) solely from the proceeds of Postpetition Term Priority Collateral, the Prepetition Term Loan Agent (limited in the case of counsel, to all reasonable and documented out of pocket fees, costs, disbursements and expenses of Riemer & Braunstein LLP and Greenberg Traurig, LLP, and any successor counsel). Payment of all such fees and expenses shall not be subject to allowance by the Court. Professionals for the Prepetition Agents shall not be required to comply with the

AB_000585

U.S. Trustee fee guidelines, *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors that were incurred after the Petition Date, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee and counsel for a Committee (if appointed) contemporaneously with the delivery of such summary fee and expense statements to the Debtors. Any objections raised by the Debtors, the U.S. Trustee, or a Committee (if appointed) with respect to such invoices within ten (10) days of the receipt thereof will be subject to resolution by the Court to the extent they cannot be resolved by the applicable parties. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors. Notwithstanding the foregoing, the Debtors are authorized and directed to pay upon entry of this Interim Order all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition ABL Parties as provided in the Prepetition ABL Documents, incurred on or prior to such date without the need for any professional engaged by the Prepetition ABL Parties to first deliver a copy of its invoice as provided for herein. No attorney or advisor to any Prepetition ABL Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

23. <u>Proofs of Claim</u>. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the Prepetition ABL Parties and the Prepetition Term Loan Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the

41

AB_000586

Prepetition ABL Documents or the Prepetition Term Loan Documents. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition ABL Parties and the Prepetition Term Loan Parties with regard to all claims arising under the Prepetition ABL Documents or the Prepetition Term Loan Documents, as the case may be. Notwithstanding the foregoing, the Prepetition ABL Agent on behalf of itself and the Prepetition ABL Parties, and the Prepetition Term Loan Agent on behalf of itself and the Prepetition Term Loan Parties, are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in any of the Cases deemed to be filed in all Cases of each of the Debtors and asserted against all of the applicable Debtors). Any proof of claim filed by the Prepetition ABL Agent or the Prepetition Term Loan Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition ABL Parties or Prepetition Term Loan Parties. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the Prepetition ABL Parties or the Prepetition Term Loan Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

24. <u>Carve Out</u>.

(a) *Carve Out*. As used in this Interim Order, the "<u>Carve Out</u>" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and

AB_000587

expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (iii) to the extent allowed at any time (regardless of whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (as defined below)), whether by interim order, procedural order, or otherwise, all accrued and unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Committee (if appointed) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (such fees and expenses, the "Allowed Professional Fees") at any time on or prior to the first business day following delivery by the Prepetition ABL Agent of a Carve Out Trigger Notice (as defined herein), *provided* that the amount of such Allowed Professional Fees shall, as relates to the Prepetition ABL Parties, the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral, not exceed, at any time, the amount set forth for Allowed Professional Fees in the Budget at such time (the "ABL Professional Fee Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[500,000] incurred after the first business day following delivery by the Prepetition ABL Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Prepetition ABL Agent to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead counsel to a Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein), stating that the Post-Carve Out Trigger Notice Cap has been invoked.  Each Professional

AB_000588

Person shall deliver bi-weekly (on Thursday of each such week, beginning on the second Thursday following the Petition Date) to the Debtors (and the Debtors shall cause the same to be delivered to the Prepetition Agents on the same day received by the Debtors) a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Persons (through Saturday of such week).

(b)     *Carve Out Reserves*.   On the day on which a Carve Out Trigger Notice is given by the Prepetition ABL Agent (the "Termination Declaration Date"), the Carve Out Trigger Notice shall be deemed a demand to the Debtors, and authorization for the Debtors, to utilize cash on hand and proceeds of the Postpetition Collateral to fund a reserve in an amount equal to the Carve Out.  The Debtors shall deposit and hold such amounts in a segregated account at the Prepetition ABL Agent in trust exclusively to pay such unpaid Allowed Professional Fees (each, a "Carve Out Reserves").  For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out, and any lien priorities or superpriority claims granted pursuant to this Interim Order or the Final Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

(i)     Following payment of all Allowed Professional Fees entitled to benefit from the Carve Out, any remaining funds in the Carve-Out Reserves funded by (x) the proceeds of Postpetition ABL Priority Collateral shall be distributed (A) first, to the Prepetition ABL Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full, and (B) second, to the Prepetition Term Loan Agent on account of the Obligations (as defined in the Prepetition Term Loan Agreement) until such obligations have been Paid in Full; and (y) the proceeds of Postpetition Term Priority Collateral

shall be distributed (A) first, to the Prepetition Term Loan Agent which shall apply such funds to the Obligations (as defined in the Prepetition Term Loan Agreement) in accordance with the Prepetition Term Loan Agreement until such obligations have been Paid in Full, and (B) second, to the Prepetition ABL Administrative Agent on account of the Obligations (as defined in the Prepetition ABL Agreement) until such obligations have been Paid in Full.

(ii)     Notwithstanding anything to the contrary in this Interim Order, following the end of the third business day after delivery of a Carve Out Trigger Notice, (x) the Prepetition ABL Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but the Prepetition ABL Agent, on the one hand, and the Prepetition Term Loan Agent, on the other hand, shall have a security interest in any residual interests in the Carve Out Reserves, with any excess paid as provided above; and (y) the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves required to be funded by the proceeds of Postpetition Collateral have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves held in accounts by the Prepetition Term Loan Agent, with any excess paid as provided above.

(iii)     For the avoidance of doubt and notwithstanding anything to the contrary herein or in any Prepetition Secured Facilities, to the extent of any shortfall in the Carve Out Reserves, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and any and all other forms of adequate protection, liens, or claims securing the obligations under the Prepetition Documents; provided that in all cases, the Carve Out priority with regard to the Prepetition ABL Priority Collateral and the Postpetition ABL Priority Collateral

AB_000590

will always be subject to the limitations applicable thereto set forth in the definition of Carve Out.

(c)     *No Direct Obligation To Pay Allowed Professional Fees*.  The Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date*.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     *Payment of Carve Out On or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(f)     *Release of Prepetition ABL Parties*.  Notwithstanding anything to the contrary contained herein, (i) prior to the delivery of the Carve Out Trigger Notice, the Debtors shall fund the Carve Out Reserves at the reasonable request of the Prepetition ABL Agent in consultation with the Prepetition Term Loan Agent, the Debtors and their advisors, and (ii) upon the repayment in full of the principal amount of all Loans under the Prepetition ABL Agreement, the cash-collateralization of all Letters of Credit under the Prepetition ABL Agreement and the funding of the Prepetition ABL Indemnity Reserve (the date that such events occur, the "ABL

46

AB_000591

Repayment Date"), and after the funding of the Carve Out Reserves in an amount equal to, as of the ABL Repayment Date, the lesser of (x) the amount set forth in the Budget for Professional Persons (plus the amounts set forth in 24(a)(i) and (ii)) and (y) the then accrued Carve Out, the Prepetition ABL Parties and the Prepetition ABL Liens shall be released from all further liability from the Carve Out (such release shall be a condition to the Prepetition ABL Obligations being deemed Paid in Full).

25.    <u>Limitations on Use of Cash Collateral, and Carve Out</u>.  The Postpetition Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve Out may not be used in connection with:  (a) except to contest the occurrence of an Event of Default, preventing, hindering, or delaying any of the Prepetition Secured Parties' permitted enforcement or realization upon any of the Postpetition Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral except as provided for in this Interim Order; (c) selling or otherwise disposing of Postpetition Collateral without the consent of the Prepetition Agents; (d) using or seeking to use any insurance proceeds constituting Prepetition Collateral or Postpetition Collateral except as provided for in this Interim Order without the consent of the Prepetition ABL Agent or the Prepetition Term Loan Agent (in the case of Postpetition Term Priority Collateral); (e) incurring Indebtedness (as defined in the Prepetition Documents) without the prior consent of the Prepetition Agents; (f) seeking to amend or modify any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Prepetition Documents, including seeking to use Cash Collateral and/or Collateral on a contested basis; (g) objecting to or challenging in any way the Prepetition Liens, Prepetition Secured Obligations, Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the Prepetition Secured Parties, respectively; (h) asserting, commencing, or prosecuting any claims or causes of action

AB_000592

whatsoever, including any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (i) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations, or any other rights or interests of any of the Prepetition Secured Parties; or (j) seeking to subordinate, recharacterize, disallow, or avoid the Prepetition Secured Obligations; *provided, however*, without prejudice to the ability of a Committee (if appointed) to contest the Investigation Budget Amount (as defined herein) in connection with the Final Hearing, that the Carve Out and such collateral proceeds may be used for allowed fees and expenses, in an amount not to exceed, subject to the Final Order, $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging), the Prepetition Lien and Claim Matters (as defined herein).

26.    Payment of Compensation.  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default has not occurred, the Debtors shall be permitted to pay fees and expenses allowed and payable by final order (that has not been vacated or stayed, unless the stay has been vacated) under sections 328, 330, 331, and 363 of the Bankruptcy Code, as the same may be due and payable, as reflected in the most recent Budget provided by the Debtors to the Prepetition Agents.

27.    Effect of Stipulations on Third Parties.

AB_000593

(a)      *Generally*.  The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim Order (collectively, the "Prepetition Lien and Claim Matters") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless and to the extent that a party in interest with proper standing granted by order of the Bankruptcy Court (or other court of competent jurisdiction) has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) and (i) has timely filed the appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules, including as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 27) challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "Challenge") by no later than the earlier of (A) for a Committee (if appointed), sixty (60) days from the date of formation of the Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing (the occurrence of (A) and (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Agent (with respect to the Prepetition ABL Documents) and the Prepetition Term Loan Agent (with respect to the Prepetition Term Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any

such judgment has become a final judgment that is not subject to any further review or appeal.

(b) *Binding Effect*.  To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a timely and properly filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above, and only as to plaintiffs or movants that have complied with the terms hereof.  To the extent any such Challenge proceeding is timely and properly commenced, the Prepetition Secured Parties shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred under the Prepetition Documents in defending themselves in any such proceeding as adequate protection.  Upon a successful Challenge brought pursuant to this paragraph 27, the Court may fashion any appropriate remedy.

28.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this

AB_000595

Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

        29.    <u>Section 506(c) Claims</u>.  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Secured Parties or any of their respective claims, the Postpetition Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such parties.

        30.    <u>No Marshaling/Applications of Proceeds</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Postpetition Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order, notwithstanding any other agreement or provision to the contrary.

        31.    <u>Section 552(b)</u>.  Subject to entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

        32.    <u>Access to Collateral</u>.  Subject to and effective upon entry of a Final Order, upon expiration of the Remedies Notice Period, the Prepetition Secured Parties, subject to the Intercreditor Agreement, shall be permitted to (a) access and recover any and all Prepetition and Postpetition Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of

AB_000596

the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the Postpetition Collateral, *provided*, *however*, in the case of clause (b), notwithstanding anything to the contrary herein, and subject to the Intercreditor Agreement, the Prepetition Secured Parties can only enter upon a leased premises during the continuation of an Event of Default in accordance with (i) a separate written agreement by and between the Prepetition Secured Parties, as applicable, and any applicable landlord, (ii) pre-existing rights of the Prepetition Secured Parties, as applicable, and any applicable landlord under applicable non-bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court obtained by motion of the applicable Prepetition Secured Party on such notice to the landlord as shall be required by this Court; *provided*, *however*, that solely with respect to rent due to a landlord of any such leased premises, the Prepetition Secured Parties, as applicable, shall be obligated only for the payment of rent of the Debtors that first accrues after delivery of the Termination Declaration in accordance with paragraph 20 herein that is payable during the period of such occupancy by the Prepetition Secured Parties, as applicable, calculated on a daily per diem basis; *provided*, *further*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to delivery of the Termination Declaration through and including any assumption and/or rejection of any lease. Nothing herein shall require the Prepetition Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

33.     <u>Limits on Lender Liability</u>.  Subject to entry of a Final Order, nothing in this Interim Order, the Prepetition Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of

their businesses or in connection with the administration of these Cases. The Prepetition Secured Parties shall not, solely by reason of having made loans under the Prepetition Documents, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute). Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

34.  <u>Insurance Proceeds and Policies</u>. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the Prepetition ABL Agent (on behalf of the Prepetition ABL Parties) and the Prepetition Term Loan Agent (on behalf of the Prepetition Term Loan Parties), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the Postpetition Collateral.

35.  <u>Additional Rights of the Prepetition Term Loan Agent</u>. Subject to the Prepetition ABL Obligations being Paid in Full and the rights preserved in paragraph 27 herein, any reference in this Interim Order to the Prepetition ABL Agent agreeing to or having the right to do, or refraining from or having the right to refrain from doing, an act, or providing any consent or waiver hereunder, shall automatically, without further order of the Court, be construed as referring to the Prepetition Term Loan Agent.

36.  Levin DIP Facility. Notwithstanding anything to the contrary contained herein or in any order approving the Levin DIP Facility, (a) the DIP Lenders (as defined in the

Levin DIP) shall not have a lien on any Prepetition or Postpetition Collateral (other than Prepetition or Postpetition Collateral that is DIP Collateral (as defined in the DIP Order), (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the Levin DIP shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Agent and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the Levin DIP Order.

37.    <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder.

38.    <u>No Superior Rights of Reclamation</u>.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the Prepetition ABL Liens as such claim had on the Petition Date.

39.    <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly

AB_000599

or implicitly, subject to the Prepetition Documents and the Intercreditor Agreement: (a) the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of any of the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order. Entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and, unless otherwise set forth in this Interim Order or the Final Order, any other position which any party in interest deems appropriate to raise in the Debtors' Chapter 11 cases.

40. <u>No Waiver by Failure to Seek Relief</u>. The failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the Prepetition Secured Parties.

41. <u>Binding Effect of Interim Order</u>. Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to

AB_000600

the benefit of the Debtors, the Prepetition Secured Parties, all other creditors of any of the Debtors, a Committee (if appointed), or any other court appointed committee, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

42. <u>No Modification of Interim Order</u>. Until and unless the Prepetition Secured Obligations have been Paid in Full (such payment being without prejudice to any terms or provisions contained in the Prepetition ABL Documents which survive such discharge by their terms) the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the Prepetition Agents, (i) any modification, stay, vacatur, or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the Adequate Protection Superpriority Claims, other than the Carve Out; (b) without the prior written consent of the Prepetition ABL Agent for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from Collateral or Prepetition Collateral; or (c) without the prior written consent of the Prepetition Agents, any lien on any of the Postpetition Collateral with priority equal or superior to the Prepetition Liens or Adequate Protection Liens, other than the Carve Out. The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the Prepetition Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the Prepetition ABL Agent or the

AB_000601

Prepetition Term Loan Agent.

43.  <u>Continuing Effect of Intercreditor Agreement</u>.  The Debtors and Prepetition Secured Parties each shall be bound by, and be subject to all the terms, provisions and restrictions of the Intercreditor Agreement.

44.  <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the Intercreditor Agreement and this Interim Order (solely as between the Prepetition Secured Parties), the provisions of the Intercreditor Agreement shall govern and control.

45.  <u>Discharge</u>.  The obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable, has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that does not require that all Prepetition ABL Obligations be Paid in Full (in the case of the sale of Postpetition ABL Priority Collateral) or that all Prepetition Term Loan Obligations be Paid in Full (in the case of the sale of Postpetition Term Priority Collateral), and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "<u>Prohibited Plan or Sale</u>") without the written consent of each of the Prepetition ABL Agent and Prepetition Term Loan Agent, as applicable.  For the avoidance of doubt, the Debtors' proposal or

AB_000602

support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder.

46.     <u>Survival</u>.   The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the Prepetition Secured Parties granted pursuant to this Interim Order, notwithstanding the entry of any such orders described in (a)-(d), above, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until:  (x) in respect of the Prepetition ABL Facility, all of the Prepetition ABL Obligations pursuant to the Prepetition ABL Documents and this Interim Order, have been Paid in Full; and (y) in respect of the Prepetition Term Loan Agreement, all of the Prepetition Term Loan Obligations pursuant to the Prepetition Term Loan Documents and this Interim Order have been Paid in Full.  In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Term Loan Parties notwithstanding the repayment in full of the Prepetition ABL Obligations.

47.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order is scheduled for **[_____], 2020 at [__]:00 [_].m. (EST)** before the Honorable [_____], United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware.  On or before [_____], 2020, the Debtors, or an agent appointed for such purpose, shall serve, by United States mail, first-class postage prepaid, notice of the entry of this

AB_000603

Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; (e) the Internal Revenue Service; (f) counsel for the Consultant; and (g) counsel for Levin Furniture, LLC, and Levin Towing, LLC. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **[_____], 2020, at [__]:00 p.m. (EST)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (iv) counsel to the Committee (if appointed).

48. *Nunc Pro Tunc* Effect of this Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

49. <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to the this Interim Order.

AB_000604

Dated: _____
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

AB_000605

# EXHIBIT J

AB_000606