# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE
CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO
EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION
OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE
BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN
CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION
ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE
BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (this "Motion"):[2]

## Relief Requested

1.     The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final

Order"):  (a) authorizing and approving, on an interim and final basis, store closing or similar

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]    A detailed description of the Debtors and their business, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 12) (the "First Day Declaration") filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on March 8, 2020 (the "Petition Date").  Capitalized terms used but not otherwise defined in this Motion shall have the meanings given to them in the First Day Declaration.

AB_000607

themed sales ("Store Closings") in accordance with the terms of the store closing sale procedures (the "Store Closing Procedures," attached as **Exhibit 1** to **Exhibit A** hereto), with such sales to be free and clear of all liens, claims, and encumbrances; (b) authorizing the Debtors to pay customary bonuses to employees of the stores listed on **Exhibit 2** to **Exhibit B** attached hereto (collectively, the "Closing Stores"); (c) in accordance with sections 363 and 365 of the Bankruptcy Code, authorizing the Debtors to assume that certain Consulting and Marketing Services Agreement, dated as of March 5, 2020 (the "Consulting Agreement"), by and between Debtor AVF Holding Company, Inc. and the following entities: Hilco Merchant Resources, LLC ("HMR"), Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Real Estate, LLC, Hilco Receivables, LLC (such entities collectively, the "Hilco Consulting Entities"), Gordon Brothers Retail Partners, LLC ("GBRP"), DJM Realty Services, LLC, d/b/a Gordon Brothers Real Estate, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC (such entities collectively the "GB Consulting Entities", and together with the Hilco Consulting Entities the "Consultant"), a copy of which is attached as **Exhibit 3** to **Exhibit A** hereto; (d) authorizing the Debtors to retain certain of the entities comprising the Consultant that will be providing receivables collection (at the Debtors' option) and intellectual property disposition services as special asset disposition advisors and consultants to the Debtors, pursuant to Section 327(a) of the Bankruptcy Code[3]; and (e) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 25 days of the commencement of these chapter 11 cases to consider entry of the Final Order with respect to the relief sought in the Motion.

---

[3] The Consultant affiliated entities that will provide these specific asset disposition services are: Hilco IP Services, LLC, d/b/a Hilco Streambank, Hilco Receivables, LLC, Gordon Brothers Commercial & Industrial, LLC, Gordon Brothers Brands, LLC

13172884 v1

AB_000608

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 554(a) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6003, and 6004, and Bankruptcy Local Rule 9013-1(m).

## The Store Closings

### I.     The Store Closing Decisions and the Consulting Agreement

5.     As described more fully in the First Day Declaration, in the wake of extreme market conditions and faced with limited liquidity, the Debtors have commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down their remaining store locations and other operations through a going-out-of-business sales process. Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going

AB_000609

concern, the Company is simply unable to meet its financial obligations. The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind-down process that will maximize value and recoveries for stakeholders in these cases.

6.      In connection with the aforementioned wind-down process, prior to the Petition Date the Debtors conducted a competitive process to engage an exclusive consultant(s) to provide a wide range of asset disposition consulting and related services to assist in and facilitate the Debtors' planned wind-down efforts.  During the course of that same proposal solicitation process, Hilco and Gordon Brothers were engaged in parallel discussions with the Debtors' prepetition term loan lenders, FS KKR Capital Corp. and FS KKR Capital Corp. II (collectively, "KKR") concerning the status of the prepetition term loan debt (the "Term Loans"), and the prospects for development of a creative consulting structure such that the Debtors' estates and their various stakeholders could be spared the burden of having to pay the types of consulting fees that are customary for the types of asset disposition services required by the Debtors.

7.      After arm's-length and extensive negotiations, these discussions ultimately yielded a series of agreements under which (a) the Debtors determined to engage the Consultant to provide the full range of asset disposition consulting services required by the Debtors in respect of merchandise inventories, fixed assets, receivables (subject to a Debtors' option), and intellectual property[4], (b) HGB AVF Lending, LLC ("HGB"), an entity controlled by affiliates of Hilco and Gordon Brothers, entered into an agreement with KKR under which HGB acquired KKR's

---

[4]     The Consulting Agreement presently provides that in addition to the consulting services described herein, the Debtors were to engage the Consultant to market and sell Debtors' real estate holdings.  Subsequent to execution of the Consulting Agreement, the Debtors and the Consultant agreed to exclude the real estate services from the scope of Consultant's engagement.

AB_000610

interests in the Term Loans (and as part of such transaction GBH agreed to share a portion of any recovery, if any, it may later receive on account of the Term Loans), and (c) the Consultant simultaneously agreed with the Debtors that the Consultant would **NOT** earn or be paid any consulting or other fee or compensation from the Debtors or their estates, other than reimbursement of certain out-of-pocket expenses incurred in connection with the conduct of the Store Closing Sales, any such reimbursement being strictly in accordance with a budget agreed to by the Debtors and the Debtors' secured lenders.

8.       Through this approach - whereby the Consultant's only opportunity to realize any compensation on account of the consulting services being provided under the Consulting Agreement is through a recovery realized by its affiliates on account of the Term Loans (a portion of which recovery, if any, will be shared with KKR) - the Debtors, in consultation with their professionals and key stakeholders, determined that the above-described arrangement provided the best framework for accomplishing the Debtors' paramount goal of an orderly and efficient liquidation of all assets.  At the same time, this arrangement fully aligned the estates' interests with those of the Term Lender in achieving maximum realizable value for Debtors' assets during the wind-down process.

9.       Based on an evaluation of the circumstances, the economic structure of the Consulting Agreement, and the Consultant's experience in conducting Store Closings on similar timelines, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.

10.       Accordingly, by this Motion, the Debtors seek relief in two essential parts; <u>first</u>, consistent with well-established precedent in this District, the Debtors seek – on an interim basis – to assume the Consulting Agreement under sections 363 and 365 of the Bankruptcy Code, so that

the HMR and GBRP, the Consultant-constituent entities that are providing the inventory and fixed asset disposition consulting services under the Consulting Agreement, may continue their role as the Debtors' consultant in connection with the conduct of the Store Closings on a post-petition basis without interruption; second, the Debtors seek to retain the remaining Consultant-constituent entities that are providing the receivables, and intellectual property-related disposition consulting services, pursuant to section 327 of the Bankruptcy Code.  In connection with the foregoing, the Debtors have determined, in the exercise of their business judgment, that (a) the continuation of services by the Consultant is necessary for efficient large-scale execution of the Store Closings, and the marketing and sale of the other Assets to maximize the value of the Assets being sold and (b) any change or elimination of the engagement with the Consultant would significantly disrupt the Debtors' reorganization efforts and impair the value of the Assets.[5]  Further, the Store Closings and the marketing and sale of the Assets are a critical component of the Debtors' ability to maximize value for all stakeholders, and assumption of the Consulting Agreement will allow the Debtors to continue to conduct the Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

11.    For the convenience of the Court and interested parties, a summary of the salient terms of the Consulting Agreement is set forth below:[6]

---

[5]    By this Motion, the Debtors' seek approval of the conduct of the Sales at the Stores and the associated disposition of the Merchandise and the owned M&E in a manner consistent with customary practices in this jurisdiction and in jurisdictions throughout the country in connection with Store Closings.  However, nothing in this Motion seeks approval of the Debtors' assumption and assignment of any of their non-residential real property leases or executory contracts. To the extent that the Debtors', through the services of the Consultant, find one or more buyers of the Real Estate Assets and/or the IP Assets, the Debtors' would file one or more separate motions seeking approval of such asset sales on as expedited a basis as the circumstances and/or economics of such sale dictate.

[6]    The following summary chart is for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement shall govern in all respects.  Any capitalized terms used in the summary chart but not defined therein are used as defined in the Consulting Agreement.

AB_000612

| Term | Consultant Agreement |
|---|---|
| **Services Provided by Consultant** | Services to be provided by Consultant include, among other things: <br><br> • Provision of qualified Supervisors to supervise and assist the Debtors in its conduct of the Sale; <br><br> • Provision of oversight, supervision, and guidance with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and the M&E; <br><br> • Recommendation and implementation of appropriate point of purchase, point of sale, and external advertising to effectively sell the Merchandise during the Sale Term; <br><br> • Advice regarding appropriate discounting of Merchandise, staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees; <br><br> • Other advice regarding and during the Sale; <br><br> • Development of an advertising and marketing plan for the sale, auction, or other disposition of the M&E; <br><br> • Implementation of advertising and marketing as deemed necessary to maximize the net recovery on the M&E; <br><br> • Preparation for the sale of the M&E; <br><br> • Developing a Strategic Plan with the Debtors for disposition of the Properties; <br><br> • Subject to the Debtors' exercise of the election under the Consulting Agreement, collecting, settling, and otherwise resolving the Receivables on the Debtors' behalf; <br><br> • Collecting and securing available information regarding the Intellectual Property; <br><br> • Preparing marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition; and <br><br> • Assisting the Debtors in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property. <br><br> • To the extent that the Consultant locates a purchaser of the Assets, other that the Merchandise and the M&E, the Debtors (in consultation with the Secured Lenders) shall file one or motion seeking approval of such underlying transaction(s) on such notice (or Court approved shortened notice) as the terms and the economics of such transactions dictate. |
| **Sale Term** | The Store Closing began on March 6, 2020, and are to continue to no later than May 31, 2020; provided, however, absent the prior consent of the Debtors, the Sale shall conclude in the Stores no later than April 30, 2020. |

13172884 v1

AB_000613

| **Asset Marketing Period** | The period commencing on the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Debtors and the Consultant (in consultation with the Secured Lenders); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Debtors (in consultation with the Secured Lenders) and the Consultant |
|---|---|
| **Sale Expenses** | The Debtors shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses). The Debtors, Consultant and Secured Lenders have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses (the "<u>Budget</u>") in the form and content annexed hereto and made a part hereof as <u>Exhibit B</u>. The Budget may only be modified by mutual agreement of the Debtors, the Consultant and the Secured Lenders. In connection with the Sale and subject to the limitations set forth in the Budget as to the Consultant Incurred Expenses, the Debtors shall be responsible for the payment of all expenses incurred in connection with the Sale, including, without limitation, all Sale Expenses (and Consultant shall not be responsible for any such expenses or Sale Expenses except as expressly provided for in <u>Section 11</u> below). Consultant Incurred Expenses shall not exceed the aggregate line item amount of Consultant Incurred Expenses set forth in the Budget without the prior written consent of the Debtors and Secured Lenders, which consent shall not be unreasonably withheld, delayed or conditioned. Subject to the limitations of the Sale Budget, the Debtors shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in <u>Section 4</u> hereof upon presentation of invoices and statements for such expenses. In addition, to the extent that the Consultant anticipates that it, or the Debtors will incur any additional out of pocket expenses in connection with the Services being provided by the Consultant in relating to its provision of Services in connection with the marketing and disposition of the other Assets, such expenses shall be subject to Supplemental Expense Budget to be agreed to between the Debtors (in consultation with the Secured Lenders) and the Consultant prior to such expenses being incurred. |
| **Consultant's Compensation** | In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall <u>not</u> earn any fee or other compensation from the Debtors, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time in the course of performing Services hereunder, in each case limited to the amounts set forth in the Budget and at the times provided herein. Any fees payable to Consultant shall be paid to Consultant by the Term Loan Lenders from their recovery on account of their secured claim. |
| **Tracking of Proceeds of the Sales** | The Debtors shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store. Register receipts shall show for each item sold the retail price (as reflected on Debtors' books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale. The Debtors shall make all such records and reports available to Consultant and the Secured Lenders during regular business hours upon reasonable notice. |
| **Expenses Deposit** | The Interim Approval Order and the Final Approval Order shall include approval on the part of the Debtors to fund, and the Debtors shall thereafter promptly fund, to Consultant $3,353,912 (the "<u>Expense Deposit</u>"). The Debtors shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this |

13172884 v1

AB_000614

|  | Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by the Debtors to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Debtors (or their designee) within three (3) business days following the Final Settlement. |
|---|---|
| **Debtors' Employees** | The Debtors and the Consultant shall cooperate to retain the employees of the Debtors (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion.  Such employees shall remain employees of the Debtors, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Debtors' other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("WARN Act") payments, or any other costs, expenses, obligations, or liabilities arising from the Debtors' employment  or termination of such employees prior to, during, and subsequent to the Sale Term.  Other than advising Debtors that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s). |
| **Fulfillment of Pre-Sale Customer Orders** | Consistent with the relief sought in the Debtors' companion Customer Programs Motion, in addition to providing the forgoing Services in connection with the Sale, the Consultant shall use commercially reasonable efforts to assist the Debtors in fulfilling certain pre-Sale Commencement Date orders for which the Debtors has received customer deposits (collectively, the "<u>Pre-SCD Orders</u>"). |
|  | <ul><li><u>On-Hand Fulfillment Orders</u>. Consultant shall assist the Debtors in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "<u>On-Hand Fulfillment Orders</u>"), on account of which orders (i) the Debtors has received customer deposits in the aggregate amount of $18 Million (collectively, the "<u>On-Hand Customer Deposits</u>") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "<u>On-Hand Fulfillment Merchandise</u>").  As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Debtors in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Debtors) in order to fulfill and complete the On-Hand Fulfillment Orders. Consultant shall advise the Debtors in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Debtors and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Debtors' existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales commissions and delivery (collectively, the "<u>On-Hand Fulfillment Processing Expenses</u>"), shall be borne exclusively by the Debtors, and the Consultant shall not be responsible for any such costs or expenses.  Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without</li></ul> |

AB_000615

| | |
|---|---|
| | limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Debtors. To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Debtors on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder. Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <u>provided</u>, that any proceeds realized by the Debtors upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder. |
| | • <u>Back-Order Fulfillment Orders</u>. Following the Sale Commencement Date, Consultant shall also assist the Debtors in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Debtors has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Debtors' Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>"). To the extent that a Back-Order Fulfillment Order(s) can be filled by the Debtors within a reasonable time after the Sale Commencement Date, the Debtors and the Consultant shall work together to implement a protocol for fulfillment of such order(s). To the extent that the Debtors is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Debtors, and the Debtors and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Debtors' bankruptcy case for the full amount of such customer's Back-Order Customer Deposit. |
| | • If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit. |
| | • During the Sale Term, the Debtors shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders. |
| **Additional Consultant Goods** | • In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("<u>Additional Consultant Goods</u>"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing |

10

AB_000616

fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods). Sales of Additional Consultant Goods shall be run through Debtors' point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and Debtors shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Debtors goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Debtors' written consent and subject to Consultant's agreement to reimburse Debtors for any associated expenses, Consultant shall not use Debtors' distribution centers for any Additional Consultant Goods.

- Consultant shall pay to the Debtors an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Debtors any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation. Except for sales taxes associated with the sale of Additional Consultant Goods and Debtors' Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation. Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

- The Consultant, the Debtors, and the Secured Lenders intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Debtors in all respects and not a consignment for security purposes. Subject solely to Consultant's obligations to pay to Debtors the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Secured Lenders, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant. In furtherance of the foregoing, the Debtors acknowledge that the Additional Consultant Goods shall be consigned to Debtors as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC"). The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Secured Lenders.

- The Debtors shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with the Debtors' insurers. Consultant shall be responsible for payment of any deductible (but only in relation to the

11

AB_000617

| | Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods. |
|---|---|
| **Debtors' Indemnification Obligations** | The Debtors shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: <br><br> (a) Debtors' material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; <br><br> (b) any failure of Debtors to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; <br><br> (c) any consumer warranty or products liability claims relating to any Merchandise; <br><br> (d) any liability or other claims asserted by customers, any of Debtors' employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant; <br><br> (e) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Debtors or any of Debtors' employees, agents, or representatives (including, without limitation, any Debtors employees); and <br><br> (f) the negligence or willful misconduct of Debtors or any of its officers, directors, employees, agents or representatives. |
| **Consultant Indemnification Obligations** | The Consultant shall indemnify and hold Debtors and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Debtors Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: <br><br> (a) Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith; <br><br> (b) any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Debtors (including, without limitation, any Store Employees) by Consultant or any |

12

AB_000618

| | of Consultant's representatives (including, without limitation, any Supervisor);<br><br>(c)    any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Debtors or Debtors Indemnified Parties or from a breach of the terms hereof by Debtors; and<br><br>(d)    the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor. |
|---|---|

## II.    Store Closing Procedures.

12.    In connection with and in facilitation of the ongoing conduct of the store closing sales, the Debtors further seek approval of the Store Closing Procedures, the form and substance of which are consistent with the procedures utilized by debtors in this and many other jurisdictions in connection with the similar such store closing processes.

13.    As is customary, the Store Closing Procedures provide, among other things, that: (a) all sales of Store Assets will be deemed free and clear of all liens, claims, interests, and other encumbrances; (b) the Merchandise and the M&E (as each term is defined in the Consulting Agreement) will be sold with the benefit of various marketing techniques and price markdowns to promote efficient liquidation; and (c) certain unsold M&E and other Store assets that cannot be promptly liquidated may be abandoned if and when the Debtors determine, in their business judgment, that retaining, storing, or removing such assets would result in unnecessary expense with little or no benefit to the estates. The Debtors seek approval of the Store Closing Procedures to, among other things, provide local regulatory authorities and media in which the Store Closings may be advertised with knowledge that the Debtors are conducting the Store Closings in compliance with the Court's order.

13172884 v1

AB_000619

14. The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Store Closings. In certain cases, the contemplated Store Closings may be inconsistent with various provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions. Such restrictions, unless waived, would hamper the Debtors' ability to maximize value in selling their inventory.

15. As set forth in the Store Closing Procedures, the Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on the behalf of the foregoing parties shall interfere with or otherwise impede the conduct of the Store Closings, nor institute any action against the Debtors in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Store Closings or the advertising and promotion (including through the posting of signs) of the Store Closings.

16. The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Merchandise and the M&E to maximize the value of the Debtors' estates. The Debtors intend to facilitate the Store Closings using current personnel at no increased cost (except as set forth herein), and estimate that, with perhaps a few exceptions, the Stores Closings will be completed by no later than April 30, 2020, with May 31, 2020 being the outside Sale Termination Date at locations that the Debtors (in consultation with

14

AB_000620

their secured lenders) and the Consultant agree generate a net positive return by continuing in the month of May 2020.

### III. Liquidation Sale Laws and Dispute Resolution Procedures.

17.     Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (the "Liquidation Sale Laws").  Liquidation Sale Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, and bulk sale restrictions and augmentation limitations that would otherwise apply to the Store Closings.  Such requirements hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Store Closing Procedures, and to the extent such procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures should control.

18.     To facilitate the orderly resolution of any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the following dispute resolution procedures (the "Dispute Resolution Procedures"), on an interim and final basis:

      a.     Provided that the Store Closings are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct Store Closings in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

AB_000621

b.      Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following:  (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Store Closings are being held; (iii) the county consumer protection agency or similar agency for each county in which the Store Closings are being held; (iv) the division of consumer protection for each state in which the Store Closings are being held; (v) the chief legal counsel for each local jurisdiction in which the Store Closings are being held (collectively, the "Dispute Notice Parties").

c.      With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties.  To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to:  (a) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (b) proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (c) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (d) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn:  J. Cory Falgowski; (e) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (f) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (g) counsel to any statutory committee appointed in these chapter 11 cases.  If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

13172884 v1

AB_000622

d. In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Store Closings pursuant to the Interim Order or the Final Order, absent further order of the Court.  Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors  to conduct the Store Closings pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e. If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

## IV. Fast Pay Laws.

19. Many states in which the Debtors operate have laws and regulations that require the Debtors to pay an employee contemporaneously with his or her termination (the "Fast Pay Laws" and, together with the Liquidation Sale Laws, the "Applicable State Laws").  These laws often require payment to occur immediately or within a period of only a few days from the date such employee is terminated.

20. The nature of the Store Closings contemplated by this Motion will result in a substantial number of employees being terminated at or near the end of the Store Closings.  To be

13172884 v1

AB_000623

clear, the Debtors intend to pay their terminated employees as expeditiously as possible, under normal payment procedures, and pursuant to applicable Court order.[7]  Moreover, the Debtors' approved Cash Collateral Budget expressly contemplates the payment of employee wages in the ordinary course during the Store Closings.  The Debtors therefore believe that their current systems will allow their employees to be paid expeditiously and in accordance with any Applicable State Laws.  However, given the number of employees who will likely be terminated during the Store Closings, the Debtors request a waiver of compliance with the Applicable State Laws to the extent that the Debtors' payroll systems limit their ability to so comply.

### V.  Store Closing Bonus Plan.

21.  Through this Motion, the Debtors are requesting the authority, but not the obligation, to pay bonuses (the "Store Closing Bonuses") to store-level non-insider employees at the Closing Stores who remain in the employ of the Debtors during the Store Closings (the "Store Closing Bonus Plan").  The Debtors believe that the Store Closing Bonus Plan will motivate employees during the Store Closings and will enable the Debtors to retain those employees necessary to successfully complete the Store Closings.

22.  The amount of the bonuses offered under the Store Closing Bonus Plan will vary depending upon a number of factors, including the employee's position with the Debtors and the performance of the Closing Stores in which the relevant employees work.

23.  The Debtors will set the amounts of the Store Closing Bonuses and eligible employees in consultation with the Consultant, who typically utilizes such bonuses to retain

---

[7]  The Debtors are seeking such relief pursuant to the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, (the "Wages Motion") filed contemporaneously herewith.

13172884 v1

AB_000624

employees and incentivize higher recoveries during store closing sales and are well-acquainted with optimal methods for designing such bonus plans.[8]

24. The total aggregate cost of the Store Closing Bonus Plan will also vary depending on how many Closing Stores are ultimately closed. If the Debtors were to close every Closing Store, the aggregate amount of Store Closing Bonuses paid will be not more than approximately $600,000, assuming one hundred percent of the performance targets were met during the Store Closings at every Closing Store.

25. Providing such non-insider bonus benefits is critical to ensuring that key employees that will be affected by the reduction in the Debtors' work force due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing process. For the avoidance of doubt, the Debtors do not propose to make any payment on account of Store Closing Bonuses to any insiders.

26. Accordingly, the Debtors respectfully submit that the Store Closing Bonus Plan is in the best interests of their estates and request that the Court authorize the payments under the Store Closing Bonus Plan as a sound exercise of their business judgment.

## **Basis for Relief**

## I. **The Debtors Have a Valid Business Justification for the Store Closings.**

27. Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of a debtor's ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). When selling assets outside of the ordinary course of business, a debtor

---

[8] The final terms of the Store Closing Bonus Plan are still being formulated in consultation with the Consultant.

13172884 v1

AB_000625

must articulate a valid business justification to obtain court approval. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983)); *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision). When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11 cases, especially where the debtor is a Delaware corporation).

28.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors. *See, e.g.*, *Ames Dept. Stores*, 136 B.R. at 359 (noting that liquidation sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"). As such, bankruptcy courts in this jurisdiction have approved similar store closing sales. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019); *In re Fred's Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 27, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re Things Remembered, Inc.*, No. 19-10234

AB_000626

(KG) (Bankr. D. Del. Feb. 28, 2019); *In re Charming Charlie Holdings, Inc.*, No. 17-12906 (CSS) (Bankr. D. Del. Jan. 13, 2017).[9]

29.     Sufficient business justification exists to approve the proposed Store Closings under section 363(b)(1) of the Bankruptcy Code.   The Debtors, with the assistance of their advisors, have determined that the Store Closings represent the best alternative to maximize recoveries to the Debtors' estates with respect to the Merchandise and the M&E  and provide the Debtors with much-needed liquidity.   There are meaningful amounts of Merchandise, in the aggregate, that will be monetized most efficiently and quickly through an orderly process conducted in consultation with an experienced liquidation firm.   Further, delay in commencing the Store Closings would diminish the recovery tied to monetization of the Merchandise and the M&E for several important reasons.   Many of the Closing Stores fail to generate positive cash flow and therefore are a significant drain on liquidity.   As such, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sale of the Merchandise and the M&E  and the termination of operations at the Closing Stores.   Further, uninterrupted and orderly Store Closings will allow the Debtors to timely reject leases associated with the Closing Stores and, therefore, avoid the accrual of unnecessary administrative expenses for rent and related costs.   Suspension of the Store Closings until entry of the Final Order may cause the Debtors to incur claims for rent at many of these stores, creating a further drain on the Debtors' liquidity.

30.     Courts in this district and courts in other jurisdictions have approved sale guidelines in chapter 11 cases on an interim basis.   Importantly, a number of courts have granted retail debtors first day authority to implement such procedures.   *See, e.g.*, *In re Destination Maternity*

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

AB_000627

*Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (approving procedures on an interim basis); *In re Fred's, Inc.*, No. 19-11984 (CSS) (Bankr. D. Del. Sept. 11, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Mar. 15, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 7, 2019) (same) (*In re Payless Holdings LLC*, No. 17-42267 (E.D. Mo. April 7, 2017) (same).

## II.    The Court Should Approve the Sale of the Merchandise and the M&E Free and Clear of all Liens, Encumbrances, and Other Interests Under Bankruptcy Code Section 363(f).

31.    The Debtors request approval to sell the Merchandise and the M&E on a final "as is" basis, free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:  (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).  Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets free and clear of liens.  *See In re TWA Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

32.    Although the term "any interest" is not defined in the Bankruptcy Code, the Third Circuit has noted that the trend in modern cases is toward "a broader interpretation which includes

AB_000628

other obligations that may flow from ownership of the property." *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258–59 (3d Cir. 2000). As the Fourth Circuit held in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by the Third Circuit in *Folger Adam*), the scope of section 363(f) is not limited to *in rem* interests in a debtor's assets. Thus, a debtor can sell its assets under section 363(f) "free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

33. With respect to any other party asserting a lien, claim, or encumbrance against the Merchandise and the M&E, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f). In connection with the sale of the Merchandise and the M&E , the Debtors propose that any liens, claims, and encumbrances asserted against the Merchandise and the M&E be transferred to and attach to the amounts earned by the Debtors under the Store Closings with the same force, effect, and priority as such liens currently have on the Merchandise and the M&E .

## III. The Court Should Waive Compliance with Applicable State Laws and Approve the Dispute Resolution Procedures

34. The Debtors' ability to conduct the Store Closings in accordance with the Store Closing Procedures and without strict compliance with all Applicable State Laws is critical to the Store Closings' success. Although the Debtors intend to comply with state and local health and safety laws and consumer protection laws in conducting the Store Closings, many Liquidation Sale Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.

35. To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Applicable State Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still

AB_000629

adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings. As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

36.     The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws.  ***First***, it is generally accepted that many state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws.  *See, e.g.*, Ark. Code Ann. § 4-74-103 (exempting from the provisions of the chapter sales pursuant to any court order); Fla. Stat. Ann. 559.25(2) (same); Ga. Code Ann. § 10-1-393(b)(24)(C)(iv) (same); 815 ILCS 350/3 (same); La. Rev. Stat. Ann. § 51:43(1) (same); N.Y. Gen. Bus. Law § 584(a) (same); Or. Rev. Stat. Ann. § 646A.100(2)(b) ("'Going out of business sale' does not include a sale conducted by a bankruptcy trustee."); Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order).  ***Second***, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Store Closings to proceed notwithstanding contrary Applicable State Laws as it is essential to maximize the value of the Debtors' business.  ***Third***, this Court will be able to supervise the Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction.  *See* 28 U.S.C. § 1334.  As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Court because the Debtors are only seeking interim relief at the outset of these cases, and parties in interest will be able to raise any further issues at the final hearing.

AB_000630

37.     Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See Belculfine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

38.     Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety.  *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  However, preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety.  *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

39.     Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Store Closings without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and similar items is necessary and appropriate.  The Debtors do not seek a general waiver of all state and local

13172884 v1

AB_000631

law requirements, but only those that apply specifically to retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closings. Moreover, the Debtors will comply with applicable state and local public health and safety laws, and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising. Finally, the Dispute Resolution Procedures provide an ordered means for resolving any disputes arising between the Debtors and any Governmental Units with respect to the applicability of any Liquidation Sale Laws, and should therefore be approved.

40. Further, this Court has recognized that the Bankruptcy Code preempts certain state laws and have granted relief similar to that requested herein. *See, e.g.*, *In re Coldwater Creek*, No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (stating that debtors were authorized to conduct store closing sales under the terms of the order "without the necessity of further showing compliance" with liquidation laws); *In re Boscov's*, No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (ordering that "[g]overnmental units shall not fine, assess or otherwise penalize Debtors or Agent (or any of the landlords of the Closing Stores) for conducting or advertising the Sales in a manner inconsistent with Liquidation Sales Laws, provided that the Sales are conducted and advertised in compliance with this Order"); *In re Goody's Family Clothing, Inc.*, No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (ordering that the "Store Closing Sales at the Closing Stores shall be conducted by the Debtors and the Store Closing Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, 'going out of business', liquidation or auction sales, or affecting advertising, including signs, banners, and posting of signage, other than Safety Laws and General Laws").

AB_000632

IV.     **The Court Should Waive Compliance with any Restriction**
        **in the Leases and Approve the Store Closing Procedures**

41.     Certain of the Debtors' leases governing the premises of the stores subject to any Store Closings may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code. *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H., Macy and Co. Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to remain open throughout the lease term, because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct a liquidation sale).

42.     This Court has long held that restrictive lease provisions affecting store liquidation sales in chapter 11 cases are unenforceable. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Oct. 22, 2019) (ordering "the sale of the Store Closure Assets shall be conducted by the Debtors and the Consultant notwithstanding any restrictive provision of any lease, sublease, license, reciprocal easement agreement, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store

AB_000633

Closings or the Sales"); *In re Coldwater Creek*, Case No. 14-10867 (BLS) (Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re Boscov's*, Case No. 08-11637 (KG) (Bankr. D. Del. Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same).

43.     Thus, to the extent that such provisions or restrictions exist in any of the leases of the stores subject to the Store Closings, the Debtors request that the Court authorize the Debtors conduct the Store Closings without reference to any such restrictive provisions or interference by any landlords or other persons affected, directly or indirectly, by the Store Closings.

## V.     The Court Should Approve the Abandonment of Certain Property in Connection with Any Liquidation Sales and Lease Rejections

44.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

45.     The Debtors are seeking to sell all M&E remaining in the Closing Stores.  However, the Debtors may determine that the costs associated with holding or selling certain property or M&E exceeds the proceeds that will be realized upon its sale or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estates and/or may be burdensome to retain.

46.     To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining M&E or other

AB_000634

property located at any of the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlord of each Closing Store with any abandoned M&E or other property be authorized to dispose of such property without liability to any third parties.

47.    Notwithstanding the foregoing, the Debtors will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information that, alone or in conjunction with other information, identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers, or cash registers or similar equipment that are to be sold or abandoned.

## VI.    The Store Closing Bonus Plan Is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved

48.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to use property of the estate when such use has a "sound business purpose" and when the use of the property is proposed in good faith. *See In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

49.    Courts generally require a debtor to demonstrate that a valid business purpose exists for the use of estate property in a manner that is outside the ordinary course of business. *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1070–71 (2d Cir. 1983). The debtor's articulation of a valid business justification raises a presumption that the debtor's decision was made on an informed basis, in good faith, and with the honest belief that the action is in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992). Furthermore, once "the

29

AB_000635

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The business judgment rule shields a debtor's management from judicial second-guessing. *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615–16 (noting that "the Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, if a debtor's actions satisfy the business judgment rule, then the actions in question should be approved under section 363(b)(1) of the Bankruptcy Code.

50. In this case, the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors and their estates. The store employees—along with their skills, knowledge, and hard work—are more critical now than ever. Through their commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and at a time when those employees' positions will soon be terminated.

51. Additionally, the total cost of the Store Closing Bonus Plan is reasonable in light of competitive market practice and involves compensation structures often used in other restructuring situations to incentivize employees to continue optimal performances despite the added stress inherent in the chapter 11 process.

52. The Store Closing Bonus Plan is comparable to employee incentive plans regularly paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed sales. As in those other instances, the specific Store Closing Bonus Plan here was devised with the input of the Consultant based on its views of maximizing the sale process and recoveries for creditors.

As such, courts have approved incentive payments similar to those contemplated by the Store Closing Bonus Plan. *See, e.g.*, *In re Destination Maternity Corporation*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing store closing retention bonus program on a final basis); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Toys "R" Us, Inc.*, No. 17- (Bankr. E.D. Va. Feb. 6, 2018) (same); *In re rue21, Inc.*, No. 17-22045 (GLT) (Bankr. W.D. Pa. June 12, 2017) (same); *In re Payless Holdings LLC*, No. 17-42267 (KAS) (Bankr. E.D. Mo. May 9, 2017) (same).

53.     The Debtors respectfully submit that the Store Closing Bonus Plan is a sound exercise of the Debtors' business judgment and should be approved pursuant to section 363 of the Bankruptcy Code as in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases.

**VII.    The Court Should Authorize the Assumption of the Consulting Agreement.**

54.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract . . . of the debtor." The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract is whether the debtor's reasonable business judgment supports such assumption or rejection. *See, e.g.*, *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard, and that such decision may only be overturned if found to be a product of bad faith, whim, or caprice); *see also In re Market Square Inn Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

55.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate."

AB_000637

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.3d 1301, 1311 (5th Cir. 1985).

56. Assumption of the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment. In consultation with their advisors, the Debtors have determined that the stores to be closed are unduly burdensome, and the Merchandise and the M&E should be liquidated for the benefit of the Debtors' estates and their creditors. The Store Closings are already in progress. The Debtors determined that entering into the Consulting Agreement, after engaging in extensive negotiations with the Consultant and their prepetition lenders, will provide the greatest return to the Debtors' estates for the Merchandise and the M&E. The Debtors believe, in their business judgment, that the terms set forth in the Consulting Agreement constitute the best available alternative for the conduct of the Store Closings and Sales.

57. The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Store Closings in an efficient and cost-effective manner. Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Store Closings for the benefit of all stakeholders. Given the number of stores and the particular issues in administering the Store Closings, the Debtors may not be able to retain a liquidator able to conduct the process as efficiently and effectively as the Consultant, who already has significant experience

13172884 v1

AB_000638

with the Debtors' business operations and outlay of stores. If the Consulting Agreement is not approved, operative, and effective on an interim basis, the Store Closings would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to a loss of additional liquidity and increased administrative expenses. Moreover, it is imperative that the Consulting Agreement be approved on an interim basis so that the Debtors and the Consultant can immediately begin conducting the Store Closings and closing stores in accordance with the Store Closing Procedures, which will generate more proceeds for the Debtors and their estates.

**VIII. The Court Should Authorize the Retention of the Consultant Pursuant to Section 327(a) in Connection with Assumption of the Consulting Agreement.**

58. The Debtors have selected the Consultant because they believe that the Consultant has developed an expertise in such matters that will significantly enhance the value recovered for the Assets, whether through the disposition of such through the conduct of strategic store closings for the Merchandise and the M&E, or through targeting marketing of the other Assets through their various divisions having an expertise in each such asset categories. Each entity comprising the Consultant is familiar with retail businesses generally, and the Debtors' business operations specifically, and are well regarded and a leader in the distressed asset acquisition and disposition field.

59. The Debtors believe the employment of the Consultant as asset disposition consultants and advisors is in the best interest of the Debtors and their creditors since the Consultant will provide invaluable services as the Debtors attempt to maximize the realizable value recovered for its business and assets. The matters for which the Consultant is to be engaged are matters in which no other professional employed in this case will render services duplicative of the services rendered by the Consultant.

13172884 v1

AB_000639

60.     Based on the information the Consultant has to date provided to the Debtors, the Debtors believe that the Consultant does not hold an interest adverse to either the Debtors or their estates, and with respect to the subject matter on which the Consultant has been engaged is a "disinterested person" pursuant to sections 327(a) and 101(14) of the Bankruptcy Code.

61.     As is customary in this district, each entity comprising the Consultant will file declarations of their connections prior to the final hearing on this Motion (the "Consultant's Declarations").

62.     To the best of the Debtors' knowledge, and except as may be disclosed in the respective Consultant Declarations when filed, the Consultant has not provided services to the Debtors' creditors, equity security holders, or any other parties-in-interest, or its respective attorneys, in any matter relating to the Debtors or their estates.

63.     The Debtors respectfully requests that the Consultant be retained in conjunction with the Court's approval of the assumption of the Consulting Agreement, *nunc pro tunc* to the Petition Date.  Since the Petition Date, the Consultant has provided valuable services that were time sensitive and critical to protection of the interests of the Debtors' stakeholders.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

64.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  For the reasons discussed above, authorizing the Debtors reject certain unexpired leases, approving store closing or similar themed sales in accordance with the Store Closing Procedures, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases smoothly.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief

requested is necessary in order for the Debtors to operate their business in the ordinary course, preserve the going concern value of the Debtors' operations, and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Reservation of Rights

65.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

13172884 v1

AB_000641

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

66.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

67.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) the Dispute Notice Parties; (g) all of the Debtors' landlords at the locations of the Closing Stores, and counsel thereto, if known; and (h) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

68.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

13172884 v1

AB_000642

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the form**s** attached hereto as **Exhibit A** and **Exhibit B,** respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

Dated:  March 9, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN &**
**ARONOFF LLP**

    */s/ Gregory W. Werkheiser*
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
      mbarrie@beneschlaw.com
      jhoover@beneschlaw.com
      kcapuzzi@beneschlaw.com
      jgentile@beneschlaw.com

*Proposed Counsel to the Debtors and Debtors in*
*Possession*

AB_000643

# EXHIBIT A

AB_000644

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re: Docket No. _____** |

## INTERIM ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"): (a) authorizing and approving the conduct of store closing or similar themed sales in accordance with the terms of the store closing procedures (the "Store Closing Procedures") attached hereto as **Exhibit 1**, with such sales to be free and clear of all liens, claims and encumbrances; (b) authorizing the Debtors to conduct the Store Closings; (c) authorizing the Debtors to pay customary bonuses to employees of Closing Stores; (d) authorizing the Debtors to assume the Consulting Agreement; (e)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVCE, LLC (2509); AVF Franchising, LLC (6325); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); LF Trucking, Inc. (1484); and Sam Levin, Inc. (5198). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

13172880 v2

AB_000645

authorizing the Debtors to retain the Consultant as special asset disposition advisor pursuant ot Section 327(a) fo the bankruptcy Code; (f) scheduling a final hearing to consider approval of the Motion on a final basis; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

     A.     The Debtors have advanced sound business reasons for seeking to implement the Store Closing Procedures and assume the Consulting Agreement, as set forth in the Motion and at the Hearing, and such relief is in the best interests of the Debtors and their estates.

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.

AB_000646

B.      The Store Closing Procedures are reasonable, and the conduct of the Closing Sales in accordance with the Store Closing Procedures will provide an efficient means for the Debtors to dispose of the Merchandise and the M&E and will maximize the returns on the Merchandise and the M&E.

C.      The Consulting Agreement was negotiated, proposed, and entered into by the Debtors and the Consultant without collusion, in good faith, and from arm's-length bargaining positions, and the operation and effectiveness of the Consulting Agreement on an interim basis is a sound exercise of the Debtors' business judgment.

D.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E.      The Store Closings and Closing Sales are in the best interest of the Debtors' estates.

F.      The entry of this Interim Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as provided herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2020, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2020, and shall be served on:   (a) the Debtors, 6500 14 Mile Road, Warren, Michigan 48092, Attn:  Michael Zambricki; (b) proposed counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801, Attn: Gregory Werkheiser, Michael J. Barrie, Jennifer R. Hoover, Kevin M. Capuzzi, and John C. Gentile; (c)

AB_000647

proposed special counsel to the Debtors, Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, New York, NY 10022, Attn. Maura I. Russell; (d) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (e) counsel to the administrative agent under the Debtors' ABL loan facilities (i) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie S. Crider, (ii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178, Attn: Jennifer Feldsher, and (iii) Burr & Forman LLP, 1201 N. Market Street, Wilmington, Delaware 19801, Attn:  J. Cory Falgowski; (f) lead counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036, Attn: Steven E. Fox; (g) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (h) counsel to any statutory committee appointed in these chapter 11 cases..  In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

3.	The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan.

4.	The Debtors and the Consultant are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.  The failure to specifically include any provision of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments, and transactions be, and hereby are, authorized and approved as and to the extent provided in this Interim Order.

4

AB_000648

5.     To the extent of any conflict between this Interim Order, the Consulting Agreement, and the Store Closing Procedures, the terms of this Interim Order shall control.

6.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

**I.     Authority to Engage in Closing Sales and Conduct Store Closings.**

7.     The Debtors and the Consultant are authorized, on an interim basis pending the Final Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately continue and conduct Closing Sales at the Closing Stores in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

8.     The Store Closing Procedures are approved in their entirety on an interim basis.

9.     The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

10.    All entities that are presently in possession of some or all of the Merchandise or M&E in which the Debtors hold an interest that are hereby are directed to surrender possession of such Merchandise or M&E to the Debtors.

11.    Neither the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Closing Sales and to take the related actions authorized herein.

**II.    Conduct of the Sales.**

12.    All media in which the Closing Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Closing Sales and the sale of Merchandise, M&E, and Additional Consultant Goods, including, without limitation, to conduct and advertise the sale of the

5

AB_000649

Merchandise, M&E, and Additional Consultant Goods in the manner contemplated by and in accordance with this Interim Order, the Store Closing Procedures, and the Consulting Agreement.

13.     The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Store Closings without necessity of further order of this Court as provided in this Interim Order, the Store Closing Procedures, and the Consulting Agreement, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, and street signage; *provided*, *however*, that only Debtor-approved terminology will be used at each Closing Store in connection with the Sales.

14.     The Consultant is authorized to supplement the Merchandise in the Closing Stores with Additional Consultant Goods, provided that any such supplementing with Additional Consultant Goods must be of like kind and no lesser quality than goods sold in the Closing Stores prior to the Petition Date.  Sales of Additional Consultant Goods shall be run through the Debtors' cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  The Consultant and Merchant shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods from the Merchandise.

15.     All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Consultant to the Debtors

AB_000650

under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. At all times and for all purposes, the Additional Consultant Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Consultant Goods or the proceeds thereof. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultant. The Debtors shall, at Consultant's sole cost and expense, insure Additional Consultant Goods and, if required, promptly file any proofs of loss with regard thereto.

16.     Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected on a interim basis pursuant to this Interim Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional Consultant Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds). As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Consultant Goods to the Consultant, net of any fee payable to the Debtors pursuant to the Consulting Agreement.

17.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, M&E, and

13172880 v2

AB_000651

Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing, or (b) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18.     The sale of the Merchandise, M&E, and Additional Consultant Goods shall be conducted by the Debtors notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Closing Sales (including the sale of the Merchandise, M&E, and Additional Consultant Goods) and the rejection of leases, abandonment of assets, or "going dark" provisions, and such provisions shall not be enforceable in conjunction with the Sales or the Store Closings. Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Closing Sales are conducted in accordance with the terms of this Interim Order and the Store Closing Procedures.

19.     Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs 22 and 23 shall apply) no person or entity, including, but not limited to, any landlord, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Closing Sales or the sale of merchandise, M&E, or Additional Consultant Goods, or the advertising and promotion (including the posting of signs and exterior banners or

8

AB_000652

the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding the conduct of the Closing Sales and/or Store Closings, and/or (b) instituting any action or proceeding in any court (other than this Court) or administrative body seeking an order or judgment against, among others, the Debtors, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Closing Sales or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

20.      In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Interim Order.

21.      All sales of Merchandise, M&E and Additional Consultant Goods shall be "as is" and final.  Returns related to the purchase of Store Assets shall not be accepted at stores that are not participating in the Store Closings.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.      The Consultant shall not be liable for sales taxes except wither respect to the Additional Consultant Goods, and  as expressly provided in the Consulting Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors, subject to Consultant's

AB_000653

obligation to collect and remit the sales taxes attributable to the sale of Additional Consultant Goods. The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit. For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. This Interim Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

23. Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell Store Assets—and all sales of Store Assets whether by the Consultant or the Debtors, shall be—free and clear of any and all of any liens, claims, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-

AB_000654

contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances")s; as provided for herein because in each case, one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied; *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of the Merchandise and the M&E with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Merchandise and the M&E, subject to any claims and defenses that any party may possess with respect thereto and subject to the Consultant's fees and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon M&E that may contain personal and/or confidential information about the Debtors' employees and/or customers (the "Confidential Information"), the Debtors shall remove the Confidential Information from such items of M&E before such sale or abandonment.

25.     The Debtors are authorized and empowered to transfer merchandise, M&E and Additional Consultant Goods among, and into, the Stores.

**III.     Dispute Resolution Procedures with Governmental Units.**

26.     Nothing in this Interim Order, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order.  Nothing contained in this Interim Order, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including,

AB_000655

without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws"). Nothing in this Interim Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations. Nothing in this Interim Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the bankruptcy Code or this Interim Order. Notwithstanding any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

27. To the extent that the sale of Merchandise, M&E, and Additional Consultant Goods is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the merchandise, M&E, and Additional Consultant Goods, the Dispute Resolution Procedures in this section shall apply:

    a.    Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing

AB_000656

Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.    Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; (iv) the division of consumer protection for each state in which the Closing Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Closing Sales are being held (collectively, the "Dispute Notice Parties").

c.    With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036; (iii) the United States Trustee's Office for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) counsel to the Prepetition Term Loan Lenders, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf. If the Debtors and the Governmental Unit are unable to resolve the Reserved

Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

d.      In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order or the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.      If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

28.      Subject to paragraphs 22 and 23 above, each and every federal, state, or local agency, departmental unit, or Governmental Unit with regulatory authority over the Closing Sales, and all newspapers and other advertising media in which the Closing Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors be required, to post any bond, to conduct the Sales.

13172880 v2

AB_000658

29. Within three business days of this Interim Order, the Debtors shall serve copies of this Interim Order, and the Store Closing Procedures via e-mail, facsimile, or regular mail, on: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) all parties who are known by the Debtors to assert liens against the Merchandise and the M&E ; (g) all state attorneys general in which the Merchandise and the M&E are located; (h) municipalities in which the Merchandise and the M&E are located; (i) all of the Debtors' landlords at the locations of the Stores; (j) all applicable state and consumer protection agencies; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## IV. Effectiveness of the Consulting Agreement.

30. The Consulting Agreement is operative and effective on an interim basis. The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including, without limitation, reimbursing all expenses to the Consultant as required by the Consulting Agreement without the need for any application of the Consultant or a further order of the Court. For avoidance of doubt, the Debtors are also authorized to fund the Expense Deposit in accordance with the terms of the Consulting Agreement.

31. The treatment of Pre-SCD Orders, including the Cancelled Back-Order Merchandise Credit, described in the Consulting Agreement is a sound exercise of the Debtors' business judgment, complies with applicable law, and is hereby approved, subject to entry of the Final Order.

AB_000659

32.     Subject to the restrictions set forth in this Interim Order and the Store Closing Procedures, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement, the Store Closings, and the Closing Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and the Closing Sales prior to the date hereof, are hereby approved and ratified.  The failure to specifically include any particular provision of the Consulting Agreement in this Interim Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Consulting Agreement and all of its provisions, payments, and transactions, be and hereby are authorized and approved as and to the extent provided for in this Interim Order.

33.     Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of any act or omission by the Consultant constituting fraud, gross negligence, or willful misconduct.

## V.     Debtors are Authorized to Retain Consultant as Special Asset Disposition Consultant Pursuant to the Consulting Agreement.

34.     The This Court is satisfied that the Consultant represents and holds no interest adverse to the Debtors or their estates, and that the Consultant will not represent any other entity in connection with these cases and that its employment is necessary and would be in the best interests of the Debtors and the estates.  Accordingly, pursuant to sections 327(a), 330 and 331 of Bankruptcy Code, the Debtors be, and hereby are, authorized to retain the Consultant as their special asset disposition advisors and consultants, to assist the Debtors in the marketing and sale process for the Assets in accordance with the Consulting Agreement; provided however, it is agreed and understood that no fees shall be payable to the Consultant in connection with Services

16

AB_000660

rendered by it to the Debtors pursuant to the Consulting Agreement, and other than the right to reimbursement of Consultant Incurred Expenses, Consultant shall have to claim or right to payment from the Company; provided further however, Consultant shall not be required to file a fee application for reimbursement of the Consultant Incurred Expenses. Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, however, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible

## VI. Other Provisions.

35.    The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

36.    The Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, *however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible.

37.    Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or

17

AB_000661

(g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Interim Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens. Any payment made pursuant to this Interim Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

38.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

39.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

40.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

41.     Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

42.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

43.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords for protection from interference with the Store

AB_000662

Closings or Closing Sales, (c) any other disputes related to the Store Closings or Closing Sales, and (d) protect the Debtors against any assertions of any liens, claims, encumbrances, and other interests. No such parties or person shall take any action against the Debtors, the landlords, the Store Closings, or the Closing Sales until this Court has resolved such dispute. This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2020    _____
Wilmington, Delaware                              UNITED STATES BANKRUPTCY JUDGE

13172880 v2

AB_000663

# EXHIBIT 1

AB_000664

## Store Closing Procedures[1]

1.      The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves.  On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant.  The Debtors will have the option to remove the M&E at their own cost prior to the termination date.  Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.      The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business".  The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures.  All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.      The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]      Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

AB_000665

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures. In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores. In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease. No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales. The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E. The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines. The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag. For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

AB_000666

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

AB_000667

**EXHIBIT B**

**Proposed Final Order**

AB_000668

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **Re: Docket No. _____** |

## FINAL ORDER GRANTING DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING PROCEDURES FOR STORE CLOSING SALES, (II) AUTHORIZING CUSTOMARY BONUSES TO EMPLOYEES OF CLOSING STORES, (III) AUTHORIZING ASSUMPTION OF THE CONSULTING AGREEMENT UNDER §§ 363 AND 365 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO RETAIN CERTAIN CONSULTANT ENTITIES AS SPECIAL ASSET DISPOSITION ADVISORS TO THE DEBTORS PURSUANT TO §327(A) OF THE BANKRUPTCY CODE AND (V) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for entry of an order (this "<u>Final Order</u>"): (a) authorizing and approving the conduct of store closing or similar themed sales in accordance with the terms of the store closing procedures (the "<u>Store Closing Procedures</u>") attached hereto as **Exhibit 1**, with such sales to be free and clear of all liens, claims and encumbrances; (b) authorizing the Debtors to conduct the Store Closings; (c) authorizing the Debtors to pay customary bonuses to employees of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVCE, LLC (2509); AVF Franchising, LLC (6325); AVF Holding Company, Inc. (0291); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); LF Trucking, Inc. (1484); and Sam Levin, Inc. (5198). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

13172872 v1

AB_000669

Closing Stores; (d) authorizing the Debtors to assume the Consulting Agreement; (e) authorizing

the Debtors to retain the Consultant as special asset disposition advisor pursuant to Section 327(a)

of the Bankruptcy Code; (f) scheduling a final hearing to consider approval of the Motion on a

final basis; and (g) granting related relief, all as more fully set forth in the Motion; and upon the

First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012; and this Court having found that this

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order

consistent with Article III of the United States Constitution; and this Court having found that venue

of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and this Court having found that the relief requested in the Motion is in the best interests of the

Debtors' estates, their creditors, and other parties in interest; and this Court having found that the

Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under

the circumstances and no other notice need be provided; and this Court having reviewed the

Motion and having heard the statements in support of the relief requested therein at a hearing

before this Court (the "Hearing"); and this Court having determined that the legal and factual bases

set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and

upon all of the proceedings had before this Court; and after due deliberation and sufficient cause

appearing therefor, it is HEREBY FOUND AND DETERMINED THAT:[3]

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of
        fact where appropriate.

13172872 v1

AB_000670

A. The Debtors have advanced sound business reasons for seeking to implement the Store Closing Procedures and assume the Consulting Agreement, as set forth in the Motion and at the Hearing, and such relief is in the best interests of the Debtors and their estates.

B. The Store Closing Procedures are reasonable, and the conduct of the Closing Sales in accordance with the Store Closing Procedures will provide an efficient means for the Debtors to dispose of the Merchandise and the M&E and will maximize the returns on the Merchandise and the M&E.

C. The Consulting Agreement was negotiated, proposed, and entered into by the Debtors and the Consultant without collusion, in good faith, and from arm's-length bargaining positions, and the operation and effectiveness of the Consulting Agreement on a final basis is a sound exercise of the Debtors' business judgment.

D. The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

E. The Store Closings and Closing Sales are in the best interest of the Debtors' estates.

F. The entry of this Final Order is in the best interest of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and now therefore it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as provided herein.

2. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

3. The Debtors are authorized, but not directed, to make payments under the Store Closing Bonus Plan.

AB_000671

4.      The Debtors and the Consultant are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.  The failure to specifically include any provision of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Consulting Agreement and all of its provisions, payments, and transactions be, and hereby are, authorized and approved as and to the extent provided in this Final Order.

5.      To the extent of any conflict between this Final Order, the Consulting Agreement, and the Store Closing Procedures, the terms of this Final Order shall control.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of the Final Order are immediately effective and enforceable upon its entry.

## I.      Authority to Engage in Closing Sales and Conduct Store Closings.

7.      The Debtors and the Consultant are authorized, on a final pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to continue and conduct Closing Sales at the Closing Stores in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement as may be modified by a Side Letter (as defined below) between the Debtors and the landlords at the closing locations.

8.      The Store Closing Procedures are approved in their entirety on a final basis. The Store Closing Procedures shall be used for all permitted store closings in these chapter 11 cases, unless otherwise ordered.

9.      The Debtors are authorized to discontinue operations at the Closing Stores in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement.

10.      All entities that are presently in possession of some or all of the Merchandise or M&E in which the Debtors hold an interest that are or may be subject to this Final Order hereby are directed to surrender possession of such Merchandise or M&E to the Debtors.

13172872 v1

AB_000672

11.     Neither the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including, without limitation, any Governmental Unit (as defined in Bankruptcy Code section 101(27)) or landlord, to conduct the Closing Sales and to take the related actions authorized herein.

**II.      Conduct of the Sales.**

12.     All media in which the Closing Sales may be advertised and all landlords are directed to accept this Final Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Closing Sales and the sale of Merchandise, M&E, and Additional Consultant Goods, including, without limitation, to conduct and advertise the sale of the Merchandise, M&E, and Additional Consultant Goods in the manner contemplated by and in accordance with this Final Order, the Store Closing Procedures, and the Consulting Agreement.

13.     The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Store Closings without necessity of further order of this Court as provided in this Final Order,  the Store Closing Procedures, and the Consulting Agreement, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of signwalkers, and street signage; *provided*, *however*, that only Debtor-approved terminology will be used at each Closing Store in connection with the Sales.

14.     The Consultant is authorized to supplement the Merchandise in the Closing Stores with  Additional  Consultant  Goods,  provided  that  any  such  supplementing  with  Additional Consultant Goods must be of like kind and no lesser quality than goods sold in the Closing Stores prior to the Petition Date.  Sales of Additional Consultant Goods shall be run through the Debtors'

6

AB_000673

cash register systems; provided, however, that the Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. The Consultant and Merchant shall cooperate to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods from the Merchandise.

15. All transactions relating to the Additional Consultant Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Consultant to the Debtors under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes. At all times and for all purposes, the Additional Consultant Goods and their proceeds shall be the exclusive property of the Consultant, and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Consultant Goods or the proceeds thereof. The Additional Consultant Goods shall at all times remain subject to the exclusive control of the Consultant. The Debtors shall, at Consultant's sole cost and expense, insure Additional Consultant Goods and, if required, promptly file any proofs of loss with regard thereto.

16. Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, which security interest shall be deemed perfected on an final pursuant to this Final Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Consultant is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Consultant's interest in the Additional

7

AB_000674

Consultant Goods (and any proceeds from the sale thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and Consultant's security interest in such Additional Consultant Goods and Additional Consultant Goods proceeds). As part of each weekly reconciliation, the Debtors shall turnover all proceeds from the sale of Additional Consultant Goods to the Consultant, net of any fee payable to the Debtors pursuant to the Consulting Agreement.

17. Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise, M&E, and Additional Consultant Goods, to the extent that, prior to the Final Hearing, disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners, or other advertising and the Debtors are unable to resolve the matter consensually, any party may request an immediate telephonic hearing with this Court pursuant to these provisions. Such hearing will, to the extent practicable, be scheduled initially no later than the earlier of (a) the Final Hearing, or (b) within two (2) business days of such request. This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

18. The sale of the Merchandise, M&E, and Additional Consultant Goods shall be conducted by the Debtors notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closings or the Closing Sales (including the sale of the Merchandise, M&E, and Additional Consultant Goods) and the rejection of leases, abandonment of assets, or "going dark" provisions, and such provisions shall not be enforceable in conjunction with the Sales or the Store Closings. Breach of any such provisions in these chapter 11 cases in conjunction with the Store Closings or the Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closings and Closing Sales are conducted in

8

AB_000675

accordance with the terms of this Final Order and the Store Closing Procedures. Subject to the approval of the Secured Lenders, the Debtors and landlords of the Closing Stores are authorized to enter into agreements ("Side Letters") between themselves modifying the Store Closing Procedures without further order of the Court and such Side Letters shall be binding as among the Debtors and any such landlords. In the event of any conflict between the Store Closing Procedures and any Side Letter, the terms of such Side Letter shall control.

19.     Except as expressly provided for herein or in the Store Closing Procedures, and except with respect to any Governmental Unit (as to which paragraphs  and  shall apply) no person or entity, including, but not limited to, any landlord, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Closing Sales or the sale of Merchandise, M&E, or Additional Consultant Goods, or the advertising and promotion (including the posting of signs and exterior banners or the use of signwalkers) of such sales, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding the conduct of the Closing Sales and/or Store Closings, and/or (b) instituting any action or proceeding in any court (other than this Court) or administrative body seeking an order or judgment against, among others, the Debtors, or the landlords at the Closing Stores that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Closing Sales or other liquidation sales at the Closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

9

AB_000676

20.     In accordance with and subject to the terms and conditions of the Consulting Agreement, the Consultant shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment, and other assets of the Debtors for the purpose of conducting the Store Closings, free of any interference from any entity or person, subject to compliance with the Store Closing Procedures and this Order.

21.     All sales of Merchandise, M&E and Additional Consultant Goods shall be "as is" and final.  Returns related to the purchase of Store Assets shall not be accepted at stores that are not participating in the Store Closings.  However, as to the Closing Stores, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

22.     The Consultant shall not be liable for sales taxes except with respect to the Additional Consultant Goods, and  as expressly provided in the Consulting Agreement, and the payment of any and all sales taxes is the responsibility of the Debtors, subject to Consultant's obligation to collect and remit the sales taxes attributable to the sale of Additional Consultant Goods.  The Debtors are directed to remit all taxes arising from the Sales to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  This Final Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

13172872 v1

AB_000677

23.     Pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell Store Assets—and all sales of Store Assets whether by the Consultant or the Debtors, shall be—free and clear of any and all of any liens, claims, encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, environmental, tax, labor, ERISA, CERCLA, alter ego and other liabilities, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances")s; as provided for herein because in each case, one or more of the standards set forth in section 363(f)(1)–(5) has been satisfied; *provided*, *however*, that any such Encumbrances shall attach to the proceeds of the sale of the Merchandise and the M&E with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Merchandise and the M&E, subject to any claims and defenses that any party may possess with respect thereto and subject to the Consultant's and expenses (as provided in the Consulting Agreement).

24.     To the extent that the Debtors propose to sell or abandon M&E that may contain personal and/or confidential information about the Debtors' employees and/or customers

11

AB_000678

(the "<u>Confidential Information</u>"), the Debtors shall remove the Confidential Information from such items of M&E before such sale or abandonment.

25.     The Debtors are authorized and empowered to transfer merchandise, M&E and Additional Consultant Goods among, and into, the Stores.

### III.     Dispute Resolution Procedures with Governmental Units.

26.     Nothing in this Final Order, or the Store Closing Procedures, releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Final Order.  Nothing contained in this Final Order, or the Store Closing Procedures shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "<u>General Laws</u>").  Nothing in this Final Order, the Consulting Agreement, or the Store Closing Procedures, shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Final Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Final Order.  Notwithstanding any other provision in this Final Order, no party waives any rights to argue any position with

12

AB_000679

respect to whether the conduct was in compliance with this Final Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Final Order shall be deemed to have made any rulings on any such issues.

27.     To the extent that the sale of Merchandise, M&E, and Additional Consultant Goods is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the merchandise, M&E, and Additional Consultant Goods, the Dispute Resolution Procedures in this section shall apply:

a.      Provided that the Closing Sales are conducted in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units (as defined in the Bankruptcy Code) that exempt court-ordered sales from their provisions, the Debtors will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Closing Sales in accordance with the terms of the Interim Order or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

b.      Within three business days after entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Closing Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Closing Sales are being held; (iv) the division of consumer protection for each state in which the Closing Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Closing Sales are being held (collectively, the "Dispute Notice Parties").

c.      With respect to any additional Stores, within three business days after Court authorization to close additional stores (each, an "Additional Closing Store

AB_000680

List"), the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order or Final Order, as applicable, and the Store Closing Procedures on the Dispute Notice Parties. To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within ten days following entry of the Interim Order or service of any Additional Closing Store List, as applicable, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "Dispute Notice") explaining the nature of the dispute to: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter, and Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (iii) counsel to the Consultant, Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, New York 10036; (iii) the United States Trustee's Office for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) counsel to the Prepetition Term Loan Lenders, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

d.    In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Order nor the Final Order nor the conduct of the Debtors pursuant to the Interim Order or the Final Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' ability to conduct or to continue to conduct the Closing Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors to conduct the Closing Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any

AB_000681

jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

e.     If, at any time, a dispute arises between the Debtors and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the other party and proceeding thereunder in accordance with those subparagraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

28.     Subject to paragraphs __ and __ above, each and every federal, state, or local agency, departmental unit, or Governmental Unit with regulatory authority over the Closing Sales, and all newspapers and other advertising media in which the Closing Sales are advertised shall consider the Final Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors be required, to post any bond, to conduct the Sales.

29.     Within three business days of the Final Order, the Debtors shall serve copies of the Final Order, and the Store Closing Procedures via e-mail, facsimile, or regular mail, on: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the state attorneys general for all states in which the Debtors conduct business; (f) all parties who are known by the Debtors to assert liens against the Merchandise and the M&E ; (g) all state attorneys general in which the Merchandise and the M&E are located; (h) municipalities in which the Merchandise and the M&E are located; (i) all of the Debtors' landlords at the locations of the Stores; (j) all applicable state and consumer protection agencies; and (k) any party that has requested notice pursuant to

AB_000682

Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## IV. Effectiveness of the Consulting Agreement.

30. The Consulting Agreement is operative and effective on a final basis. The Debtors are authorized to act and perform in accordance with the terms of the Consulting Agreement, including, without limitation, reimbursing all expenses to the Consultant as required by the Consulting Agreement without the need for any application of the Consultant or a further order of the Court. For avoidance of doubt, the Debtors are also authorized to fund the Expense Deposit in accordance with the terms of the Consulting Agreement.

31. The treatment of Pre-SCD Orders, including the Cancelled Back-Order Merchandise Credit, described in the Consulting Agreement is a sound exercise of the Debtors' business judgment, complies with applicable law, and is hereby approved, subject to entry of the Final Order.

32. Subject to the restrictions set forth in this Final Order Order and the Store Closing Procedures, the Debtors and the Consultant are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreement, the Store Closings, and the Closing Sales, and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant necessary or desirable to implement the Consulting Agreement and the Closing Sales prior to the date hereof, are hereby approved and ratified. The failure to specifically include any particular provision of the Consulting Agreement in this Final Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Consulting Agreement and all of its provisions, payments, and transactions, be and hereby are authorized and approved as and to the extent provided for in this Final Order.

AB_000683

33. Notwithstanding anything to the contrary in the Consulting Agreement, the Debtors and their estates shall not indemnify the Consultant for any damages arising primarily out of any act or omission by the Consultant constituting fraud, gross negligence, or willful misconduct.

**V.    Debtors are Authorized to Retain Consultant as Special Asset Disposition Consultant Pursuant to the Consulting Agreement.**

34. The This Court is satisfied that the Consultant represents and holds no interest adverse to the Debtors or their estates, and that the Consultant will not represent any other entity in connection with these cases and that its employment is necessary and would be in the best interests of the Debtors and the estates. Accordingly, pursuant to sections 327(a), 330 and 331 of Bankruptcy Code, the Debtors be, and hereby are, authorized to retain the Consultant as their special asset disposition advisors and consultants, to assist the Debtors in the marketing and sale process for the Assets in accordance with the Consulting Agreement; provided however, it is agreed and understood that no fees shall be payable to the Consultant in connection with Services rendered by it to the Debtors pursuant to the Consulting Agreement, and other than the right to reimbursement of Consultant Incurred Expenses, Consultant shall have to claim or right to payment from the Company; provided further however, Consultant shall not be required to file a fee application for reimbursement of the Consultant Incurred Expenses. Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, however, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible

**VI.    Other Provisions.**

35. The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Consultant, in each case, other than as expressly provided for in the Consulting Agreement.

13172872 v1

AB_000684

36.     The Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided*, *however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible.

37.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (other than the Consulting Agreement); (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Final Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or to seek avoidance of all such liens. Any payment made pursuant to this Final Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

38.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

39.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

13172872 v1

AB_000685

40.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

41.     Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.

42.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

43.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit banner and sign-walker advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords for protection from interference with the Store Closings or Closing Sales, (c) any other disputes related to the Store Closings or Closing Sales, and (d) protect the Debtors against any assertions of any liens, claims, encumbrances, and other interests.  No such parties or person shall take any action against the Debtors, the landlords, the Store Closings, or the Closing Sales until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

13172872 v1

AB_000686

# EXHIBIT 1

AB_000687

# Store Closing Procedures[1]

1.      The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.      The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.      On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.      At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.      The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.      The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]      Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures.  In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores.  In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order.  Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.      The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease.  No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales.  The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.      The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.      Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E.  The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines.  The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag.  For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.      At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases.  The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.      The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

AB_000689

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

# EXHIBIT 2

AB_000691

**Art Van Furniture**

**Results - Store Count Strategy by Location**

| Financial Information ($000's) | |
|---|---|
| 169 # Stores included in liquidation | Yes |
| 2 # stores closed prior to sale commencement | No |

AB-000692  2/20/2020

| Store # | Store Name (Original) | Store Name | In Liquidation | Anchoring Area | Platform | Type | | | | | | | | Prop | Landlord | Lease | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113 | Comstock Park, MI (113) | ALPINE AVF | | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 111,077 | 63,525 | 11/26/1999 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4273 ALPINE AVE NW STE B, COMSTOCK PARK, MI, 49321, USA |
| 114 | Holland, MI (114) | HOLLAND AVF | | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,950 | 38,443 | 8/18/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 12610 FELCH ST STE 100, HOLLAND, MI, 49424, USA |
| 115 | Muskegon, MI (115) | MUSKEGON PS | | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,519 | 5/28/2016 | 10/31/2021 | 20 | No | SVH PROPERTIES, LLC | None | 1664 E STERNBERG RD, MUSKEGON, MI, 49444, USA |
| 116 | Portage, MI (116) | PORTAGE PS | | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,018 | 3,632 | 5/24/2014 | 5/31/2024 | 51 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6947 SOUTH WESTNEDGE AVE, PORTAGE, MI, 49002, USA |
| 117 | Grandville, MI (117) | GRANDVILLE PS | | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,229 | 3,773 | 3/1/2015 | 5/31/2024 | 51 | No | CWD Grandville 1, LLC | None | 4560 IVANREST AVE SW, GRANDVILLE, MI, 49418, USA |
| 118 | Kalamazoo, MI (118) | KALAMAZOO PS | | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 3,481 | 3,186 | 3/8/2013 | 3/31/2023 | 37 | No | Kalamazoo Mall LLC | None | 338 N DRAKE RD, KALAMAZOO, MI, 49009, USA |
| 119 | Grand Rapids, MI (119) | GRAND RAPIDS PS | | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 5,562 | 4,903 | 10/15/2014 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 3500 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 120 | Grand Rapids, MI (120) | GRAND RAPIDS N PS | | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,687 | 9/12/2016 | 8/31/2026 | 78 | No | EAST BELTLINE DEVELOPMENT, LLC | None | 2036 EAST BELTLINE AVE, GRAND RAPIDS, MI, 49525, USA |
| 121 | Comstock Park, MI (121) | ALPINE N PS | | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,300 | 3,797 | 5/16/2011 | 10/31/2022 | 32 | No | ALPINE VALLEY, L.L.C. | None | 4174 ALPINE AVE NW STE A, COMSTOCK PARK, MI, 49321, USA |
| 122 | Lancaster, PA (122) | LANCASTER (#46) | | Harrisburg | Standard | WLF | 60,000 | 52,500 | 9/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 2040 Bennett Avenue, Lancaster, PA, 17601, USA |
| 123 | York, PA (123) | YORK (#44) | | Harrisburg | Standard | WLF | 60,000 | 52,500 | 1/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO | 380 North Northern Way, York, PA, 17402, USA |
| 124 | Harrisburg, PA (124) | HARRISBURG (#42) | | Harrisburg | Standard | WLF | 61,900 | 51,900 | 1/19/1991 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4661 Lindle Road, Harrisburg, PA, 17111, USA |
| 125 | Hanover, PA (125) | HANOVER (#50) | | Harrisburg | Standard | WLF | 34,600 | 30,600 | 5/19/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 371 Eisenhower Drive, Hanover, PA, 17331, USA |
| 126 | Mechanicsburg, PA (126) | MECHANICSBURG (#43) | | Harrisburg | Standard | WLF | 45,567 | 42,567 | 8/22/2010 | 7/31/2020 | 5 | No | LESTER ASSOCIATES | None | 75 Gateway Drive, Mechanicsburg, PA, 17055, USA |
| 127 | Chambersburg, PA (127) | CHAMBERSBURG (#51) | | Harrisburg | Standard | WLF | 27,262 | 25,762 | 1/1/2009 | 12/27/2038 | 226 | No | BRITM, LLC | None | 480 Gateway Avenue, Chambersburg, PA, 17201, USA |
| 128 | Altoona, PA (128) | ALTOONA (#28) | | Johnstown | Standard | WLF | 53,136 | 43,176 | 1/1/1978 | 4/30/2038 | 218 | Yes | VEREIT REAL ESTATE LP | Vereit | 4 Sellers Drive/Altoona, Altoona, PA, 16601, USA |
| 129 | Johnstown, PA (129) | JOHNSTOWN (#32) | | Johnstown | Standard | WLF | 40,258 | 37,258 | 9/1/1995 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1130 Scalp Avenue, Johnstown, PA, 15904, USA |
| 130 | State College, PA (130) | STATE COLLEGE (#40) | | Johnstown | Standard | WLF | 50,000 | 51,402 | 5/1/2007 | 11/21/2037 | 213 | No | PATTON CENTER ASSOCIATES LP | None | 138 Valley Vista Drive, State College, PA, 16803, USA |
| 131 | Lansing, MI (131) | LANSING AVF | | Lansing | Standard | AVF | 71,581 | 77,379 | 10/25/2000 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 8748 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 132 | Jackson, MI (132) | JACKSON AVF | | Lansing | Standard | AVF | 33,214 | 30,012 | 8/9/1992 | 7/31/2024 | 53 | No | ARGYLE ACRES MALL, LLC | None | 950 N WEST AVE, JACKSON, MI, 49202, USA |
| 133 | E Lansing, MI (133) | OKEMOS PS | | Lansing | Sleep | APS | 5,855 | 4,457 | 5/16/2011 | 8/31/2023 | 42 | No | RICHARD AND MICHELLE BROWN | None | 2660 E. GRAND RIVER, EAST LANSING, MI, 48823, USA |
| 134 | East Lansing, MI (134) | EAST LANSING PS | | Lansing | Sleep | APS | 3,974 | 3,495 | 7/16/2016 | 7/31/2021 | 17 | No | River Caddie Development, LLC | None | 1595 LAKE LANSING ROAD, EAST LANSING, MI, 48823, USA |
| 135 | Lansing, MI (135) | LANSING PS | | Lansing | Sleep | APS | 4,590 | 3,689 | 5/16/2011 | 12/31/2021 | 22 | No | John Dieter Real Estate | None | 6007 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 136 | Wexford, PA (136) | WEXFORD (#4, 29, 30 CC) | | Pittsburgh | Standard | LVF | 53,000 | 48,823 | 10/1/2009 | 2/28/2038 | 216 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 10688 PERRY HIGHWAY, WEXFORD, PA, 15090, USA |
| 137 | Monroeville, PA (137) | MONROEVILLE (#3 CC, 20, 21 CC) | | Pittsburgh | Standard | LVF | 74,600 | 67,545 | 7/1/2004 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO / LEVIN FAMILY F.. | 124 LEVIN WAY, MONROEVILLE, PA, 15146, USA |
| 138 | Mcmurray, PA (138) | SOUTH HILLS (#2, 32 CC) | | Pittsburgh | Standard | LVF | 74,600 | 67,964 | 3/1/2007 | 11/30/2037 | 213 | No | CBL/WESTMORELAND, LP | Store Master Funding XII, LLC | 3664 WASHINGTON ROAD, MCMURRAY, PA, 15317, USA |
| 139 | Greensburg, PA (139) | GREENSBURG (#40, 41 CC) | | Pittsburgh | Standard | LVF | 55,314 | 50,637 | 8/1/2011 | 10/31/2021 | 20 | No | CBL/WESTMORELAND, LP | None | 5280 ROUTE 30, GREENSBURG, PA, 15601, USA |
| 140 | Pittsburgh, PA (140) | THE POINTE (#15, 35 CC) | | Pittsburgh | Standard | LVF | 68,730 | 61,886 | 7/1/1999 | 11/30/2037 | 213 | No | STORE CAPITAL | Store Master Funding XII, LLC | 400 CHALFANT DRIVE, PITTSBURGH, PA, 15275, USA |
| 141 | Pleasant Hills, PA (141) | CURRY HOLLOW (#47, 48 CC) | | Pittsburgh | Standard | LVF | 90,500 | 87,500 | 7/1/1991 | 9/30/2026 | 79 | No | PAUL PROPERTY MANAGEMENT, LP | None | 292 CURRY HOLLOW RD, PLEASANT HILLS, PA, 15236, USA |
| 142 | Mount Pleasant, PA (142) | MOUNT PLEASANT (#1, 22 CC) | | Pittsburgh | Standard | LVF | 34,500 | 30,766 | 1/1/1924 | 4/30/2038 | 218 | No | STORE CAPITAL | Store Master Funding XII, LLC | 600 MAIN STREET, MT. PLEASANT, PA, 15666, USA |
| 143 | Cranberry Township, PA (143) | CRANBERRY (#60) | | Pittsburgh | Standard | LM | 5,000 | 4,500 | 5/1/2012 | 4/30/2022 | 26 | No | WALNUT CAPITAL PARTNERS - CRANBERRY SC | None | 20012 ROUTE 19, CRANBERRY, PA, 16066, USA |
| 144 | Mount Lebanon, PA (144) | MOUNT LEBANON (#36) | | Pittsburgh | Sleep | LM | 3,990 | 3,490 | 6/28/2013 | 7/31/2023 | 41 | No | RELIANCE PITTSBURGH LLC | None | 1600 WASHINGTON RD, MT LEBANON, PA, 15228, USA |
| 145 | Butler, PA (145) | BUTLER (#75) | | Pittsburgh | Sleep | LM | 5,010 | 5,010 | 11/18/2016 | 2/28/2027 | 84 | No | BUTLER SITEWORK ASSOCIATES LLC | None | 620 Butler Crossing Suite 5, BUTLER, PA, 16001, USA |
| 146 | Pittsburgh, PA (146) | SHADYSIDE (#70) | | Pittsburgh | Sleep | LM | 7,145 | 6,645 | 10/10/2014 | 4/30/2024 | 50 | No | MCKNIGHT SOUTH EAST LP | None | 5438 BAUM BLVD, PITTSBURGH, PA, 15232, USA |
| 147 | Washington, PA (147) | WASHINGTON (#63) | | Pittsburgh | Sleep | LM | 7,800 | 7,300 | 3/29/2013 | 4/30/2023 | 38 | No | WASHINGTON MALL - JCP ASSOCIATES, LTD | None | 56 TRINITY POINT DR, WASHINGTON, PA, 15301, USA |
| 148 | Pittsburgh, PA (148) | FOX CHAPEL (#61) | | Pittsburgh | Sleep | LM | 4,000 | 3,500 | 5/1/2012 | 4/30/2022 | 26 | No | WATERWORKS PHASE II | None | 956 FREEPORT ROAD, PITTSBURGH, PA, 15238, USA |
| 149 | Pittsburgh, PA (149) | ROBINSON (#64) | | Pittsburgh | Sleep | LM | 5,593 | 5,093 | 8/30/2013 | 12/31/2023 | 46 | No | MCROBIN LTC AND MOSITES FAMILY GST TRU | None | 6528 STEUBENVILLE PIKE, PITTSBURGH, PA, 15205, USA |
| 150 | Indiana, PA (150) | INDIANA (#33) | | Pittsburgh | Sleep | LM | 4,800 | 4,300 | 6/7/2013 | 9/30/2023 | 43 | No | LIBBY REGENCY ASSOCIATES LP | None | 1570 OAKLAND AVE, INDIANA, PA, 15701, USA |
| 151 | Monroeville, PA (151) | MONROEVILLE (#62) | | Pittsburgh | Sleep | LM | 4,319 | 4,000 | 6/1/2012 | 6/30/2022 | 28 | No | CE-MONROEVILLE 3820 WM PENN LP | None | 3820 WILLIAM PENN HIGHWAY, MONROEVILLE, PA, 15146, USA |
| 152 | St. Louis, MO (152) | AFFTON | | St. Louis | Standard | AVF | 41,352 | 32,759 | 1/17/2018 | 12/31/2023 | 46 | No | South Lindbergh Property LLC | None | 5711 S LINDBERGH BLVD, SAINT LOUIS, MO, 63123, USA |
| 153 | O'fallon, IL (153) | FAIRVIEW | | St. Louis | Standard | AVF | 39,676 | 32,627 | 1/17/2018 | 12/31/2023 | 46 | No | Rothman-O'Fallon LLC | None | 1776 WEST US 50, O FALLON, IL, 62269, USA |
| 154 | O'fallon, MO (154) | O FALLON | | St. Louis | Standard | AVF | 40,884 | 31,674 | 1/16/2018 | 12/31/2023 | 46 | No | O'Fallon Missouri Properties, LLC | None | 2101 E TERRA LN, O FALLON, MO, 63366, USA |
| 155 | Bridgeton, MO (155) | BRIDGETON | | St. Louis | Standard | AVF | 45,314 | 35,975 | 1/16/2018 | 12/31/2023 | 46 | No | JS Wiesfeld, LLC | None | 925 NORTHWEST PLAZA, SAINT ANN, MO, 63074, USA |
| 156 | Richmond Heights, MO (156) | RICHMOND (DESIGN STUDIO) | | St. Louis | Design | AVF | 3,670 | 3,343 | 11/15/2017 | 7/31/2024 | 53 | No | Hanley LM Properties, LLC | None | 1516 S HANLEY RD, SAINT LOUIS, MO, 63144, USA |
| 157 | Holland, OH (157) | TOLEDO AVF | | Toledo | Standard | AVF | 91,000 | 80,731 | 8/27/2013 | 3/31/2037 | 205 | Yes | REED HOLDING-TALMADGE, LLC | STORE SPE AVF I 2017-1, LLC | 1301 E MALL DR, HOLLAND, OH, 43528, USA |
| 158 | Toledo, OH (158) | TOLEDO PS | | Toledo | Sleep | APS | 4,500 | 4,045 | 5/24/2013 | 11/30/2023 | 45 | No | REED HOLDING-TALMADGE, LLC | None | 4600 TALMADGE RD, TOLEDO, OH, 43623, USA |
| 159 | Holland, OH (159) | HOLLAND PS (TOLEDO) | | Toledo | Sleep | APS | 3,485 | 3,135 | 7/13/2018 | 8/31/2028 | 102 | No | Kiezi Properties BG, LLC | None | 6760 AIRPORT HWY SUITE B, HOLLAND, OH, 43528, USA |
| 160 | Perrysburg Township, OH (160) | PERRYSBURGH (FREEMONT) | | Toledo | Sleep | APS | 3,500 | n/a | 2/8/2019 | 4/30/2029 | 110 | No | 10411 Fremont Pike, LLC | None | 10411 FREEMONT PIKE, PERRYSBURG, OH, 43551, USA |
| 161 | Traverse City, MI (161) | TRAVERSE CITY AVF | | Traverse City-Cadillac | Standard | AVF | 63,120 | 49,903 | 11/21/1998 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 1775 OAK HOLLOW DR, TRAVERSE CITY, MI, 49686, USA |
| 162 | Petoskey, MI (162) | PETOSKEY AVF | | Traverse City-Cadillac | Standard | AVF | 48,115 | 49,765 | 10/5/2002 | 3/31/2037 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 1619 ANDERSON ROAD, PETOSKEY, MI, 49770, USA |
| 163 | Traverse City, MI (163) | TRAVERSE CITY PS | | Traverse City-Cadillac | Sleep | APS | 4,509 | 4,104 | 6/30/2016 | 6/30/2026 | 76 | No | ANCHOR MANISTEE | None | 3675 N US 31 S SUITE B, TRAVERSE CITY, MI, 49684, USA |
| 164 | Frederick, MD (164) | FREDERICK (#7) | | Washington DC | Standard | WLF | 60,000 | 52,500 | 7/1/2003 | 1/31/2024 | 47 | No | Frederick-BiLCO, LLP | None | 1215 West Patrick Street, Frederick, MD, 21703, USA |
| 165 | Hagerstown, MD (165) | HAGERSTOWN (#9) | | Washington DC | Standard | WLF | 66,829 | 60,000 | 2/1/2004 | 5/23/2029 | 111 | No | OUTLET VILLAGE OF HAGERSTOWN LLC | None | 900 Premium Outlets Boulevard, Hagerstown, MD, 21740, USA |
| 166 | Leesburg, VA (166) | LEESBURG (#48) | | Washington DC | Standard | WLF | 46,030 | 41,430 | 8/24/2012 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 131 Fort Evans Road NE, Leesburg, VA, 20176, USA |
| 167 | Frederick, MD (167) | FREDERICK OUTLET (#52) | No | Washington DC | Standard | WLF | 40,484 | 30,484 | 9/17/2014 | 1/31/2020 | n/a | No | RAVID FREDERICK, LLC | | 5830 Ballenger Creek Pike, Frederick, MD, 21703, USA |
| 168 | Saint Clairsville, OH (168) | SAINT CLAIRSVILLE (#50) | | Wheeling | Standard | LVF | 24,908 | 21,000 | 9/29/2017 | 10/31/2022 | 32 | No | OHIO VALLEY MALL, CO | None | 67661 MALL RING RD, SAINT CLAIRSVILLE, OH, 43950, USA |
| 169 | Boardman, OH (169) | BOARDMAN (#52) | | Youngstown | Standard | LVF | 52,000 | n/a | 9/21/2018 | 8/31/2028 | 102 | No | A&R Properties | None | 300 BOARDMAN POLAND ROAD, BOARDMAN, OH, 44512, USA |
| 170 | Hermitage, PA (170) | HERMITAGE (#51) | | Youngstown | Standard | LVF | 42,000 | n/a | 10/31/2018 | 10/31/2028 | 104 | No | A&R Properties | None | 1340 N. Hermitage Road Suite 1 Route 18, Hermitage, PA, 16148, U |
| 171 | Niles, OH (171) | NILES (#56) | | Youngstown | Standard | LVF | 52,000 | n/a | 10/31/2018 | 10/31/2028 | 104 | No | A&R Properties | None | 836 YOUNGSTOWN-WARREN RD, NILES, OH, 44446, USA |
| **Totals** | | | | | | | **5,879,611** | **4,932,964** | | | | | | | |

# EXHIBIT 3

AB_000694

## CONSULTING AND MARKETING SERVICES AGREEMENT

This Consulting and Marketing Services Agreement, dated as of March 4, 2020 (this "Agreement"), is made by and between **AVF HOLDING COMPANY, INC.,** and **AVF HOLDING COMPANY, INC.** d/b/a Art Van Furniture, Art Van Pure Sleep, Levin Furniture, Levin Mattress and Wolf Furniture (collectively, the "Company"), and a contractual joint venture comprised of **HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC**, each a Delaware limited liability company (collectively, "Hilco"), and **GORDON BROTHERS RETAIL PARTNERS, LLC, DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE, GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC AND GORDON BROTHERS BRANDS, LLC**, each, a Delaware limited liability company (collectively, "GBG", and together with Hilco, the "Consultant").

## R E C I T A L S:

WHEREAS, the Company is (i) the owner or lessee of certain real property identified on Exhibit A attached hereto (each a "Property", and collectively, the "Properties"), (ii) machinery, equipment, furniture, fixtures and other personal property located at, in, or in the vicinity of the Properties (the "M&E"), (iii) Merchandise (defined below) inventory located at, in, or the vicinity of the Properties, (iv) to the extent the Company exercise the Receivables Option (defined below), outstanding trade accounts receivable for which the Company has the exclusive right to collect, except for those accounts receivable that are currently the subject of litigation (the "Receivables") and (v) intangible assets, including, without limitation, trademarks, trade names, copyrights, domain names, software and source code, URLs, telephone numbers, customer data including customer names, addresses, email addresses, transaction history and other demographic data captured and maintained by the Company, vendor data, franchise agreements, "IP" addresses, and license agreements, logos and assorted artwork used in marketing materials and other contractual rights relating to the foregoing (collectively, the "Intellectual Property"; and collectively with the M&E, Inventory, Receivables (to the extent the Company exercises the Receivables Option), and Properties, the "Assets");

WHEREAS, the Company desires to retain Consultant to provide certain consulting, marketing and related asset disposition services to the Company with respect to the Assets, including where the context makes appropriate assisting the Company in the conduct of certain "Store Closing Sale", "Total Inventory Blowout", "Everything Must Go", "Everything On Sale" or similar themed liquidation sales (the "Sale") at the Company's retail store locations identified on Exhibit A-1 attached hereto (each individually, a "Store", and collectively, the "Stores"); and (ii) provide assistance to the Company in fulfilling and delivering On-Hand Fulfillment Merchandise and Back-Order Fulfillment Merchandise on account of goods sold by the Company prior to the Sale Commencement Date (defined below), in each case as more fully described herein; and

WHEREAS, Consultant is in the business of marketing, selling and otherwise realizing maximum value for assets similar to those comprising the Assets on behalf of its clients, and subject to the terms and conditions set forth herein, including, without limitation, authorization and approval of the Bankruptcy Court (defined below), is willing to serve as the Company's

AB_000695

exclusive agent and consultant to perform the services described herein upon the terms and conditions, and in the manner set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**AGREEMENT**

**1.**     **Definitions**

For the purposes of this Agreement, the terms listed below shall have the respective meanings indicated:

"<u>ABL Agent</u>" means shall mean Wells Fargo Bank, National Association, as administrative agent and collateral agent for itself and the other ABL Lenders.

"<u>ABL Lenders</u>" means those lenders under that certain ABL Credit Agreement, dated as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof), by and among, among others, the Company, such lenders and the ABL Agent.

"<u>Advertising Expenses</u>" means the costs and expenses incurred in connection with advertising the Sale, including, without limitation, direct media costs, agency fees and production costs) and Signage Costs.

"<u>Approval Orders</u>" shall mean collectively the Interim Order and Final Order.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Cash Collateral Budget</u>" means that certain debtor-in-possession and/or cash collateral Cash Collateral Budget to be approved under the Interim Cash Collateral Order.

"<u>Central Services</u>" shall mean those central administrative services provided by Company that are necessary or appropriate for the conduct and support of the Sale, including, but not limited to, use and/or access to Company's: (i) inventory control system, (ii) payroll system, (iii) accounting system, (iv) office facilities (including use of reasonably sized offices located at Company's central office facility to effect the Sale), (v) central administrative services and personnel to process and perform sales audit, banking, accounting, sale and expense reconciliation, and other normal course administrative services customarily provided to or for the benefit of operating the Stores, (vi) no fewer than one weekly email messages targeted to the customers of the Stores and Company's e-commerce site, which email messages will be designed by Consultant (and approved by Company) and sent by Company or Company's existing service provider and (vii) such other central office services reasonably necessary or appropriate for the Sale.

"<u>Consultant Incurred Expenses</u>" shall mean the aggregate amount of (i) Supervisor Costs; (ii) reasonable and documented travel expenses for members of Consultant's executive team in an

AB_000696

aggregate amount not to exceed $20,000; (iii) Consultant's reasonable and documented general legal fees incurred in connection with the negotiation of this Agreement in an aggregate amount not to exceed $35,000; provided, however, in addition to, and not as part of, such capped amount, Company shall also reimburse Consultant for its reasonable and documented legal fees and expenses incurred in connection with negotiating any "side letters" with landlords of the Stores; and (iv) Advertising Expenses, in each case in as defined herein and in accordance with the Sale Budget (as defined below).

"Final Order" shall mean a final order of the Bankruptcy Court granting final approval, inter alia, for the Company's (a) assumption of this Agreement, (b) retention of the Consultant to perform the consulting, marketing and sale-related services described herein, (c) conduct of the Sale, and (d) granting such other and further relief as is appropriate in order to effectuate the terms and provisions of this Agreement.

"Gross Sales" shall mean the sum of all proceeds derived from the sale of Merchandise during the Sale Term (excluding amounts paid for sales, excise, or gross receipts taxes); plus (i) all proceeds of fire, flood or other insurance covering the Merchandise, and (ii) the amount of any gift cards or merchandise credits redeemed at the Stores during the Sale Term; provided, however, that it is expressly understood and agreed, that Gross Sales shall not include sales made by or on behalf of Company prior to the Sale Commencement Date or after the Sale Termination Date, regardless of when the applicable Merchandise is delivered to or picked up by the customer(s).

"Interim Order" shall mean an order of the Bankruptcy Court granting interim approval, inter alia, for the Company's (a) assumption of this Agreement, (b) retention of the Consultant to perform the consulting, marketing and sale-related services described herein, (c) conduct of the Sale, and (d) granting such other and further relief as is appropriate in order to effectuate the terms and provisions of this Agreement.

"Leases" shall mean all leases, occupancy agreements, reciprocal easement, license, or similar agreements pursuant to which Company has the right to occupy or utilize the Stores.

"Lender Agents" mean collectively, the ABL Agent and the Term Loan Agent.

"Merchandise" shall mean all inventory that is owned by Company and actually sold in the Stores during the Sale Term, the aggregate amount of which shall be determined using the gross rings inventory taking method, which may include inventory that (i) is located at, or in transit to, the Store as of the Sale Commencement Date with respect to each such Store; and/or (ii) is located at the Company's distribution center in the United States during the Sale Term; provided, however, the Company and the Consultant agree that "Merchandise" shall expressly exclude: (1) goods which belong to sublessees, licensees or concessionaires of Company; (2) goods held by the Company on memo or consignment, unless otherwise agreed to by Company (in consultation with the Lender Agents) and Consultant; (3) M&E; and (4) Additional Agent Goods.

"Merchandise File" shall mean the "Store and DC Master Inventory Report Final 020320.xlsx" and "Levin Store & DC Master Inventory as of 2.3.20.xlslx" files together with all subsequent files specifically delivered by Merchant to Agent on or prior to the Sale Commencement Date to be used in connection with this Agreement.

AB_000697

"Sale Commencement Date" shall mean a date determined by the Company in consultation with the Consultant, but in no event later than March 6, 2020.

"Sale Expenses" shall mean all expenses incurred in connection with and attributable to the Sale.

"Sale Guidelines" shall mean the Sale Guidelines annexed hereto as Exhibit C which shall serve as the guidelines under which the Sale shall be conducted.

"Sale Term" shall mean the period of time beginning with the Sale Commencement Date and ending on the Sale Termination Date.

"Sale Termination Date" shall mean a date determined by the Consultant in consultation with the Company, but in no event later than May 31, 2020; provided, however, absent the prior consent of the Company, the Sale shall conclude in the Stores no later than April 30, 2020.

"Services" shall mean the services to be performed by Consultant pursuant to Section 2.2 of this Agreement.

"Signage Costs" shall mean all the interior and exterior signage used in connection with the Sale, including, without limitation, banners, A-frames, feather flags, and sign walkers, in each case to the extent approved by Consultant.

"Store Employees" shall mean those employees of the Company retained by Company to conduct the Sale following consultation with Consultant.

"Supervisor(s)" shall mean the individual(s) whom Consultant shall engage to provide Services in the Stores to Company in connection with the Sale in accordance with Section 2.3 below.

"Supervisor Costs" shall mean the following customary costs and expenses incurred by Consultant with respect to Supervisors in accordance with the Sale Budget,: (i) the weekly compensation paid during the Sale Term per Supervisor (which in each case represents Consultant's actual costs); (ii) reasonable and documented travel expenses of the Supervisors between Stores during the term of the Sale, and to and from the Sale locations at the commencement and conclusion of the Sale (and reasonable travel to and from the Supervisors' homes during the Sale Term as is typical and customary in the liquidation industry given the nature of the Merchandise, the length of the Sale, and the actual results of the Sale); and (iii) reasonable Supervisor deferred compensation.

"Term Loan Agent" shall mean Virtus Group, LP, as administrative agent and collateral agent for itself and the other Term Loan Lenders.

"Term Loan Lenders" means those lenders under that certain Credit Agreement, dated as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof), by and among, among others, the Company, such lenders and the Term Loan Agent.

## 2. **Consulting Services**

2.1    Company hereby retains Consultant, and Consultant hereby agrees to serve as the exclusive independent consultant to the Company in connection with the conduct of the Sale as set forth herein.  With respect to the Sale, Consultant shall serve as the sole and exclusive consultant to the Company relative to the conduct of the Sale at the Stores, and the sale or other disposition of the other Assets, in each case throughout the Sale Term.

2.2    Conduct of the Sale; Merchandise Services.  On the terms and conditions set forth herein, commencing as of the Sale Commencement Date, the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the Merchandise as part of the Sale:

(a)    provision of approximately forty six (46) qualified Supervisors to supervise and assist Company in its conduct of the Sale as further described in Section 2.3 below, including such lead, regional, financial, and field Supervisors as needed (after consultation with Company and Lender Agents).  All Supervisors shall have industry-specific experience conducting "Store Closing", "Total Inventory Blowout", "Everything on Sale", "Everything Must Go" or similar themed liquidation sales, and shall act in a professional manner; provided, that from time to time during the Sale Term the Company and the Consultant shall meet and confer to evaluate the level and number of Supervisors being utilized in connection with the conduct of the Sale, and the Company and the Consultant (in consultation with the Lender Agents) shall jointly determine any reasonable adjustments thereto; provided, further, that, once identified, Supervisors cannot be removed from the project absent Company consent;

(b)    provide the Company with such oversight, supervision and guidance as may be appropriate or requested by the Company with respect to the conduct of the Sale and the liquidation and disposal of the Merchandise and M&E as may be required from time to time to maximize the recovery for such Assets;

(c)    recommend and implement appropriate point of purchase, point of sale and external advertising to effectively sell the Merchandise during the Sale Term, consistent with the theme of the Sale and the Sale Guidelines, it being understood that the Sale will be advertised as a "Total Inventory Blowout", "Store Closing", "Everything Must Go", "Everything on Sale" or similar sale themes throughout the term of the Sale; provided, that Consultant shall not utilize "Going Out of Business" sale theme absent (i) prior consultation with and approval by the Company and (ii) as may be set forth in the Approval Orders;

(d)    advise the Company as to appropriate discounting of Merchandise, appropriate staffing levels for the Stores, and appropriate deferred compensation and incentive programs for Store Employees;

(e)    advise the Company in creating the optimal display of Merchandise in the Stores in an effort to maximize the recovery for such Assets;

AB_000699

(f)     assist Company in the formulation and implementation of a loss prevention security program designed to protect the Merchandise from theft or other shortages;

(g)     assist Company with accounting functions for the Stores, including evaluation of sales of Merchandise by category, sales reporting and monitoring of expenses, in each case using the Company's infrastructure;

(h)     recommend and implement the transfer and balancing of Merchandise between and among the Stores to maximize results during the Sale;

(i)     participate in weekly calls with representatives of the Company and Lender Agents; and

(j)     provide such other related services deemed necessary or prudent by the Company (in consultation with the Lender Agents), and as may be mutually agreed by the Consultant and the Company under the circumstances giving rise to the Sale.

2.3     <u>M&E Services</u>.

(a)     On the terms and conditions set forth herein, commencing as of the Sale Commencement Date through the earlier of (i) the applicable Sale Termination Date for each of the Stores (or, with respect to any Distribution Center(s), the last day of available occupancy for each such center, as may be mutually agreed by the Company and the Consultant (in consultation with the Lender Agents)); (ii) April 30, 2020; or (iii) such other earlier or extended date as may be mutually agreed upon by the Company (in consultation with the Lender Agents) and the Consultant (as applicable the "<u>Asset Marketing Period</u>"), the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the M&E (the "<u>M&E Services</u>"):

(i)     Develop an advertising and marketing plan ("<u>M&E Marketing Plan</u>") for the sale or auction of, or other disposition strategy for, the M&E and in connection therewith; <u>provided</u>, that no later than March 13, 2020, the Company (in consultation with the Lender Agents) and the Consultant shall mutually agree upon a supplemental expense budget for the sale or other disposition of the M&E (the "<u>M&E Expense Budget</u>");

(ii)     Implement the M&E Marketing Plan as deemed necessary by Consultant to maximize the net recovery on the M&E;

(iii)     Prepare for the sale of the M&E, including gathering specifications and photographs for brochures;

(iv)     Make the M&E available for viewing by potential buyers on an appointment-only basis;

(v)     Sell or auction the M&E for cash to the highest bidder "as is," "where is," and in accordance with the terms of this Agreement; and

AB_000700

(vi)     Charge and collect on behalf of the Company from all purchasers any purchase price (inclusive of any Buyer's premium paid by the respective buyer(s)) together with all applicable taxes in connection therewith.

(b)     All proceeds collected by Consultant in connection with the M&E Services shall be either remitted directly to the Company to such account as designated by the Company (the "Company's Designated Deposit Account") by the buyer of the M&E, or, to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation provided for in Section 4.2 hereof, with such amounts to be deposited into the Company's Designated Deposit Account.

2.4     Real Estate Services.

(a)     On the terms and conditions set forth herein, during the applicable Asset Marketing Period, the Consultant shall provide the Company with the following Services with respect to the sale or other disposition of the Properties (the "Real Estate Services"):

(i)     Meet with the Company to ascertain the Company's goals, objectives and financial parameters with respect to the sale or other disposition of the Properties;

(ii)     Mutually agree with the Company with respect to a strategic plan for the disposition of each Property (the "Real Estate Strategic Plan");

(iii)     In accordance with the Real Estate Strategic Plan, and in lieu of assigning a Property lease to a third party, work with the Company to secure favorable termination agreements whereby a landlord pays the Company to terminate the lease associated with each such Property; and

(iv)     Solicit interested parties for the assumption/assignment of leases associated with each Property or, where applicable, the sale of each Property, and marketing each Property for assignment/sale in accordance with the Real Estate Strategic Plan.

(b)     In connection with the performance of Real Estate Services, the Consultant agrees that the Company shall not be responsible for the payment of any expenses incurred in connection with the execution of the Real Estate Strategic Plan, except to the extent pursuant to a budget ("Real Estate Services Budget"), which Real Estate Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(c)     All proceeds collected by Consultant in connection with the Real Estate Strategic Plan shall be either remitted directly to Company's Designated Deposit Account by the buyer/assignee of the Company's interests in the Properties, or to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such amounts, with such amounts to be deposited into the Company's Designated Deposit Account.

AB_000701

2.5    <u>Receivables Services</u>.  (a)  From the date of execution of this Agreement to and including March 31, 2020, the Company shall retain the exclusive option, in its sole discretion (following consultation with the Lender Agents)(the "<u>Receivables Election</u>") to direct the Consultant to perform Receivables Services (defined below).  The Company shall exercise the Receivables Election, if at all, by delivery of a written notice to the Consultant on or before the above date indicating its direction to the Consultant to commence performance of Receivables Services.  Upon the Company's exercise of the Receivables Election, the Consultant shall thereafter perform Receivables Services on the terms and conditions set forth herein, through the later of (i) expiration of the Asset Marketing Period or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant agree (the "<u>Receivables Marketing Period</u>")

(b)    the Services with respect to the collection or other disposition of the Receivables shall include the following (collectively, the "<u>Receivables Services</u>"):

(i)    In consultation with the Company, collect, service, settle, and otherwise resolve the Receivables on the Company's behalf and in otherwise compliance with applicable law;

(ii)    Direct the obligors on the Receivables to make payment to Consultant, as the agent for the Company and the Lender Agents;

(iii)    (a) Receive cash, drafts, checks, wire transfers, credit cards, and money orders on account or in satisfaction of the Receivables; and (b) endorse and negotiate any of the foregoing received by Consultant, as the agent for the Company; and

(iv)    If the Company requests, identify and oversee third party collection attorneys to collect those Receivables Consultant is otherwise unable to collect.

(c)    In connection with the performance of Receivables Services, the Consultant agrees that the Company shall not be responsible for payment of any expenses incurred in connection with the Consultant's performance of the Receivables Services, except to the extent pursuant to a budget ("<u>Receivables Services Budget</u>"), which Receivables Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(d)    Any amounts collected by Consultant in connection with the collection of the Receivables, shall be remitted by the Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in <u>Section 4.2</u> hereof, following Consultant's receipt of such Proceeds, with such amounts to be deposited into the Company's Designated Deposit Account.

2.6    <u>IP Services</u>.

(a)    Through the later of (i) the expiration of the Asset Marketing Period; or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant may

agree (the "IP Marketing Period"), the Consultant shall provide the Company with the following Services with respect to the collection or other disposition of the Company's Intellectual Property (the "IP Services"):

        (i)     Work with the Company's management and advisors to collect and secure all of the available information and data concerning the Intellectual Property;

        (ii)    In consultation with the Company, prepare marketing materials designed to advertise the availability of the Intellectual Property for sale, assignment, license, or other disposition;

        (iii)   In consultation with the Company, develop and execute a sales and marketing program designed to elicit proposals to acquire the Intellectual Property from qualified acquirers, with a view toward completing one or more sales, assignments, licenses, or other dispositions of the Intellectual Property; and

        (iv)   Assist the Company in connection with the transfer of the Intellectual Property to the acquirer(s) who offer the highest or otherwise best consideration for the Intellectual Property.

(b)     In connection with the performance of IP Services, the Consultant agrees that the Company shall not be responsible for payment of any expenses incurred in connection with the Consultant's performance of the IP Services, except to the extent pursuant to a budget ("IP Services Budget"), which IP Services Budget, if any, shall be subject in all respects to the consent and approval of the Company (in consultation with the Lender Agents) prior to any associated costs or expenses are incurred by the Company or the Consultant.

(c)     All proceeds collected by Consultant in connection with the IP Services shall be either remitted directly to Company's Designated Deposit Account by the buyer(s) of the IP Assets, or to the extent funds are remitted to the Consultant, they shall be remitted by Consultant to the Company as part of the weekly reconciliation as part of the weekly reconciliation provided for in Section 4.2 hereof, following Consultant's receipt of such amounts, with such amounts to be deposited into the Company's Designated Deposit Account

2.7   License.  (a) Solely in connection with the performance of the Services as provided herein, the Company hereby grants Consultant a non-exclusive royalty free license ("Services License") to use, including, but not limited to, in all of its advertising and promotional activities related to this Agreement, all Intellectual Property, including, without limitation, the following Company tradenames: "Art Van Furniture", "Wolf Furniture", "Levin Furniture", and/or similar derivations thereof. The Services License shall extend through the later of (i) the expiration of the Asset Marketing Period, or (ii) such later date as the Company (in consultation with the Lender Agents) and the Consultant may agree (the "License Period").

(b)     The Company hereby grants Consultant a license to allow Consultant to enter and occupy the Properties. Specifically, Consultant shall have the right to enter and the Properties during the applicable Asset Marketing Period solely for the purposes of performing its obligations under this Agreement, including, without limitation, taking photographs and preparing the marketing material for the Assets, and selling and overseeing the removal of the removable

Assets, without interference from any labor unions or any other third parties. The Company shall use reasonable efforts to ensure that the Consultant shall have access to and quiet enjoyment of the Properties for the applicable Asset Marketing Period. Consultant shall not be obligated to pay any rent, taxes, utilities, or other occupancy-related charges arising from or related to its access to and occupancy of the Properties during the applicable Asset Marketing Period. Subject to and limited by the Cash Collateral Budget, the Company agrees to continue to provide and pay for all utilities and other usual and customary occupancy-related costs and expenses during the course of Consultant's occupancy of the Properties. The Company agrees to maintain and bear the cost of any existing security personnel and trash removal for the Properties during the term of this Agreement. The Company acknowledges that Consultant is not an insurer of the Assets. Consultant shall have the right to abandon at the Properties any movable Assets not sold.

2.8     <u>Supervisory Personnel</u>.  (a)  In connection with the Sale, Consultant shall directly or indirectly retain and engage the Supervisors. The Supervisors are engaged by Consultant as independent contractors and are not and shall not be deemed to be employees or agents of Company in any manner whatsoever; nor do the Supervisors have any relationship with Company by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of Company for the Supervisors, except with respect to indemnification pursuant to <u>Section 7.7</u> hereof.  During the Sale Term, the Supervisors shall perform Services during normal Store operating hours and for the period of time prior to the Stores' opening and subsequent to the Stores' closing, as required in connection with the Sale, in Consultant's discretion.

(b)     In consideration of Consultant's engagement of the Supervisors, Company agrees to reimburse Consultant, as a Sale Expense, for the actual Supervisor Costs paid by Consultant for services rendered by the Supervisors during the Sale Term. Company shall reimburse Consultant for all Supervisor Costs weekly, based upon invoices or other documentation reasonably satisfactory to Company (in consultation with the Lender Agents).  Company shall not be obligated to pay Supervisor Costs and/or Supervisor deferred compensation that have not been included in, or provided for, in the Sale Budget.

2.4     <u>Title</u>.  (a)  Title to all Assets shall remain with Company at all times during the Sale Term until such Asset(s) is sold.  Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the benefits to Company from the sale or other disposition of the other Assets, the Company expressly acknowledges that Consultant is not guaranteeing the results of the Sale or ensuring the recoveries to be realized by the Company from the sale or other disposition of the Assets. All sales of Assets shall be made on behalf of Company.  Consultant shall have no liability to the Company or any third party for its failure to sell any Asset(s), and shall have the right to abandon such unsold Asset(s) at the conclusion of the applicable Asset Marketing Period; <u>provided</u>, that any abandonment of any M&E in any Store(s) shall be done in a neat and orderly fashion.

(b)     the Company further agrees that responsibility for the handling of any Merchandise or other goods held by Company and located in the Properties under any consignment, sale or return, or other similar agreement shall lie exclusively with Company, and Consultant shall have no responsibility with respect thereto.

(c)     The Company and Consultant agree, and the Company hereby expressly

AB_000704

acknowledges, that Consultant shall not be responsible for the removal or disposition of any environmentally hazardous chemicals, solvents or substances found at or in the Assets, or obtaining or maintaining any Environmental Permits or other permits with respect thereto. The Company shall be responsible for ensuring that the Company possesses and is in compliance with all Environmental Permits that are required for the operation of the Company's businesses. As used in this Agreement, "Environmental Laws" means all federal, state and local statutes, regulations, ordinances, rules, regulations and policies, all court orders and decrees and arbitration awards, and the common law, which pertain to environmental matters or contamination of any type whatsoever; and "Environmental Permits" means licenses, permits, registrations, governmental approvals, agreements and consents which are required under or are issued pursuant to Environmental Laws. In addition to any other indemnities provided herein, the Company hereby agrees to defend, indemnify and hold Consultant harmless from any and all claims, losses, damages and liabilities (including reasonable attorney's fees and costs) of any kind whatsoever which arise from or are in connection with any hazardous chemicals, solvents or substances found at or in the Assets or any violation of any such Environmental Laws or Environmental Permits.

## 3.    Sale Expenses; Consultant's Compensation

3.1    Sale Expenses.  (a)   The Company shall be responsible for all Sale Expenses (including without limitation, the Consultant Incurred Expenses), and Consultant shall not be responsible for any such expenses, including Consultant Incurred Expenses, except as expressly provided for in Section 11 below.  The Company, Consultant and Lender Agents have agreed on a *pro forma* budget relating to the Sale describing in reasonable detail the projected Sale Expenses to be incurred in connection with the sale of Merchandise through the Stores  (the "Sale Budget"), the form and content of which Sale Budget is annexed hereto and made a part hereof as Exhibit B. The Sale Budget may only be modified by mutual agreement of the Company, the Consultant, and the Lender Agents. Consultant Incurred Expenses shall not exceed the aggregate amount, per expense category, of Consultant Incurred Expenses set forth in the Sale Budget without the prior written consent of the Company and Lender Agents.  Subject to the limitations of the Sale Budget, the Company shall reimburse Consultant for any reasonable and documented Consultant Incurred Expense on a weekly basis in connection with the weekly Sale reconciliation provided for in Section 4 hereof upon presentation of invoices and statements for such expenses.

(b)    To the extent the Company, Consultant and Lender Agents agree on any separate M&E Budget, Real Estate Budget, Receivables Services Budget, and/or IP Services Budget, as the case may be, such supplemental budgets (each a "Supplemental Budget", and collectively the "Supplemental Budgets") shall be in addition to, and not in substitution of, the Sale Budget.

3.2    Consultant's Compensation. In consideration of the Consultant providing the consulting, marketing and asset disposition-related Services provided for herein, the Consultant shall NOT earn any fee or other compensation from the Company, other than reimbursement of all Consultant Incurred Expenses and such other Sale Expenses as may be advanced by Consultant from time to time at the request of the Company, in the course of performing Services  hereunder, in each case limited to the amounts set forth in the Sale Budget and at the times provided herein. The Company shall keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store.  Register receipts shall show for each item sold the

retail price (as reflected on Company's books and records) for such item, and the markdown or other discount granted by Consultant in connection with such sale. The Company shall make all such records and reports available to Consultant and the Lender Agents during regular business hours upon reasonable notice.

3.3     Expenses Deposit. The Interim Order and/or the Interim Cash Collateral Order (defined below) shall include approval on the part of the Company to fund, and the Company shall thereafter promptly fund, to Consultant $3,353,912 (the "Expense Deposit"). The Company shall be entitled to apply the Expense Deposit to, or otherwise offset any portion of the Expense Deposit against, any weekly reimbursement or other amount owing to Consultant under this Agreement prior to the Final Settlement; provided, however, at no time prior to the Final Settlement shall the Expense Deposit be reduced below $1,000,000. Without limiting any of Consultant's other rights, Consultant may apply the Expense Deposit to any unpaid obligation owing by Company to Consultant under this Agreement. Any portion of the Expense Deposit not used to pay amounts contemplated by this Agreement shall be returned to Company (or its designee) within three (3) business days following the Final Settlement.

## 4.     **Sale Proceeds; Weekly/Final Settlement**

4.1     During the Sale, the Company shall collect all proceeds realized from the sale of Merchandise and deposit the same in deposit accounts established by Company for the deposit thereof consistent with Company's existing cash management system (which may be Company's existing Store-level deposit accounts) (the "Sale Accounts"). In addition, if in connection with the sale of any M&E hereunder the Consultant assesses or receives any "buyer's premium" or similar sale price enhancement, the Company shall be entitled to receive any such amount, and the Consultant shall remit such amount to the Company in connection with the weekly reconciliation provided for hereunder and/or any Final Settlement (defined herein). The Company shall, upon request, deliver to Consultant and Lender Agents account statements and such other information relating sale of the Assets (including the Gross Sales and the Sale Accounts) reasonably requested by Consultant or Lender Agents.

4.2     On Wednesday of each week, commencing on the first Wednesday following the Sale Commencement Date, the Company (in consultation with the Lender Agents) and the Consultant shall reconcile the results of the sales of Asset for the prior week, including, without limitation, Gross Sales, sales of Assets, Sale Expenses (including Consultant Incurred Expenses), and any other expenses that may be incurred in connection with the performance of Services that may be in conformity with any Supplemental Budget(s). The Company shall promptly pay or reimburse all amounts due to Consultant on account of Sale Expenses, including Consultant Incurred Expenses and other expenses incurred by Consultant for the previous week on account of which it is entitled to be reimbursed pursuant to the Sale Budget and/or any Supplemental Budget(s).

4.3     No later than fourteen (14) business days following the end of the Sale Term, the Company (in consultation with the Lender Agents) and the Consultant shall complete a final accounting and reconciliation of all amounts contemplated by this Agreement ("Final Settlement"), including, without limitation, the determination and payment/reimbursement of any Sale Expenses, including Consultant Incurred Expenses, and such other expenses reimbursable to

Consultant in connection with the performance of Services that may be in conformity with any Supplemental Budget(s), if any.

4.4     To the extent the Company fails to pay or reimburse the Consultant for any amount for which it is entitled to be reimbursed as and when due, the Consultant shall be entitled to set off Asset sale proceeds in its possession and/or the Expense Deposit as reimbursement for any such unreimbursed amounts as part of the weekly reconciliations under Section 4.2 hereof and/or the Final Settlement under Section 4.3 hereof.

## 5.     Company Employees

5.1     The Company and the Consultant shall cooperate to retain the employees of the Company (including the Store Employees) to be utilized to conduct the Sale at the Stores during the Sale Term, as such employees may be designated from time to time by Consultant, in its discretion.  Such employees shall remain employees of the Company, and Consultant shall have no liability to such employees (including, without limitation, all the Store Employees and any of Company's other current or former employees) of any kind or nature whatsoever, including, without limitation, with respect to severance pay, termination pay, vacation pay, pay in lieu of reasonable notice of termination, Worker Adjustment and Retraining Notification Act ("WARN Act") payments, or any other costs, expenses, obligations, or liabilities arising from the Company's employment  or termination of such employees prior to, during, and subsequent to the Sale Term. Other than advising Company that Consultant no longer desires to utilize the services of any employee in connection with the sale or other disposition of the Assets, including as part of the Sale, Consultant shall not have the right to change the terms of employment of any employee(s).

## 6.     Fulfillment of Pre-Sale Customer Orders

6.1     In addition to providing the forgoing Services, the Consultant shall use commercially reasonable efforts to assist the Company in fulfilling certain pre-Sale Commencement Date orders for which the Company has received customer deposits (collectively, the "Pre-SCD Orders").

(a)     On-Hand Fulfillment Orders. Consultant shall assist the Company in fulfilling certain Pre-SCD Orders having an aggregate retail value of approximately $22 Million (collectively, the "On-Hand Fulfillment Orders"), on account of which orders (i) the Company has received customer deposits in the aggregate amount of $18 Million (collectively, the "On-Hand Customer Deposits") and (ii) with respect to which all of the goods necessary to fulfill such orders are on-hand either at the Company's Distribution Centers or the Stores (collectively, the "On-Hand Fulfillment Merchandise").  As soon as reasonably practicable after the Sale Commencement Date, the Consultant shall assist the Company in earmarking the On-Hand Fulfillment Merchandise (and, to the extent necessary segregated by the Company) in order to fulfill and complete the On-Hand Fulfillment Orders.  Consultant shall advise the Company in the development of efficient methods aimed at fulfilling the On-Hand Fulfillment Orders, and the Company and the Consultant shall use commercially reasonable efforts to deliver the On-Hand Fulfillment Merchandise as promptly as practicable, giving due consideration to the Company's existing distribution/fulfillment capabilities. Any usual and customary costs and expenses incurred in connection with the fulfillment of any On-Hand Fulfillment Orders, including, but not limited to, labor, sales

AB_000707

commissions and delivery (collectively, the "<u>On-Hand Fulfillment Processing Expenses</u>"), shall be borne exclusively by the Company, and the Consultant shall not be responsible for any such costs or expenses. Any funds received from customers on account of the On-Hand Fulfillment Orders, whether received prior to or after the Sale Commencement Date (including, without limitation, any On-Hand Customer Deposits), shall be retained by and/or remitted to the Company. To the extent any such funds are received from the customer in connection with the delivery of such On-Hand Fulfillment Goods, those funds shall be delivered by the Consultant to the Company on a weekly basis as part of the weekly reconciliation contemplated by <u>Section 4.2</u> hereunder. Subject to <u>Section 7.5</u> hereof, the On-Hand Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder; <u>provided</u>, that any proceeds realized by the Company upon fulfillment and completion of an On-Hand Fulfillment Order(s) in excess of the applicable On-Hand Customer Deposit shall constitute Gross Proceeds hereunder.

(b)     <u>Back-Order Fulfillment Orders</u>.  Following the Sale Commencement Date, Consultant shall also assist the Company in evaluating the status certain Pre-SCD Orders (collectively, the "<u>Back-Order Fulfillment Orders</u>"), on account of which orders (i) the Company has received customer deposits (collectively, the "<u>Back-Order Customer Deposits</u>") and (ii) with respect to which the goods necessary to fulfill such orders are <u>not</u> on-hand either at the Company's Distribution Centers or the Stores (collectively, the "<u>Back-Order Fulfillment Merchandise</u>").  To the extent that a Back-Order Fulfillment Order(s) can be filled by the Company within a reasonable time after the Sale Commencement Date, the Company and the Consultant shall work together to implement a protocol for fulfillment of such order(s).  To the extent that the Company is unable to fulfill a Back-Order Fulfillment, such Back-Order Fulfillment Order shall be cancelled by the Company, and the Company and the Consultant shall offer the affected customer the option of either (i) a merchandise credit in the amount of such customer's respective Back-Order Customer Deposit (the "<u>Cancelled Back-Order Merchandise Credit</u>"), which Cancelled Back-Order Merchandise Credit must be used by the affected customer no later than April 15, 2020; or (ii) filing a claim in the Company's bankruptcy case for the full amount of such customer's Back-Order Customer Deposit.

(c)     If a customer cancels a Pre-SCD Order, or refuses to accept completion/delivery of either On-Hand Fulfillment Merchandise or a Back-Order Fulfillment Order (where the goods become available), the subject the On-Hand Fulfillment Merchandise, Back-Order Fulfillment Merchandise, as the case may be, attributable to such cancelled Pre-SCD Orders, shall thereupon constitute Merchandise and be included in the Sale, and the affected customer can file a claim in the bankruptcy case for the full amount of such customer's deposit.

(d)     During the Sale Term, the Company shall provide, and continue to provide through the Sale Term, Consultant with all reports reasonably requested by Consultant with respect to the status of all Pre-SCD Orders.

## 7.    <u>Affirmative Duties Of Company</u>

7.1     The Company shall be solely liable for, and shall pay when due (except as provided in this <u>Section 7.1</u>) the following: (i) all Store-level operating expenses, all Sale Expenses (including, but not limited to, Consultant Incurred Expenses), Central Service expenses, any expenses provided for in any Supplemental Budget(s), and all other Sale-related expenses that are

necessary to conduct, or are incurred in the conduct of, the Sale or Company's businesses, including, without limitation, all taxes, costs, expenses, accounts payable and other liabilities relating to the Sale, the Properties, Store Employees, any other agents and representatives of Company, and/or Company's businesses. For the avoidance of doubt, unless otherwise agreed to by Company and Lender Agents in writing, the Company shall not be responsible for, and shall have no obligation to pay or reimburse, any Consultant Incurred Expenses or other expenses in excess of the amounts set forth in the Sale Budget or any Supplemental Budget(s).

7.2     The Company shall collect all sales, excise, or gross receipts taxes. The Company shall be solely responsible for preparing and processing of all reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes (including, but not limited to, sales taxes collected as part of the Sale) to the appropriate taxing authorities; and Company shall pay all collected sales taxes when due in accordance with applicable law. The Consultant shall provide all assistance reasonably required or requested by the Company in connection with the preparation and processing of any such reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes (including, but not limited to, sales taxes collected as part of the Sale) to the appropriate taxing authorities.

7.3     Without limiting any other term or provision of this Agreement, during the Sale Term, Company shall provide Consultant, with (i) Central Services; (ii) employees at the Stores necessary or appropriate to implement and conduct the Sale, and (iii) subject to lease expirations, peaceful use and occupancy of, and reasonable access (including reasonable before and after hours access and normal utilities/phone service) to, the Stores and Company's corporate offices and Distribution Centers for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby; provided, however, any incremental cost or expense to the Company in connection with the foregoing that is solely attributable to the Additional Consultant Goods shall reimbursed to the Company by the Consultant. In furtherance of the foregoing, the Company shall use reasonable efforts to (i) cause the Company's employees, including Store Employees, to cooperate with Consultant and the Supervisors; (ii) execute all agreements determined by the Company and Consultant to be necessary or desirable for the operation of the Stores during the Sale; and (iii) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores.

7.4     During the period between the Sale Commencement Date and April 15, 2020, the Company and the Consultant agree that gift cards and merchandise credits, including any Cancelled Back-Order Merchandise Credit shall be honored at the Stores in accordance with store-level operation procedures to be mutually agreed upon between the Company, the Consultant, and the Lender Agents. The Company and Consultant further agree that no gift cards shall be sold from the Stores during the Sale Term.

7.5     During the first seven (7) days following the Sale Commencement Date, the Company agrees that returns of inventory sold prior to the Sale Commencement Date and either delivered to customers prior to or after the Sale Commencement Date ("Returned Merchandise") shall be accepted in a manner consistent with Company's customary practices and policies in effect on the Sale Commencement Date; provided however, no pricing adjustments, or returns of inventory sold prior to the Sale Commencement Date followed by the Customer's attempt to

AB_000709

repurchase the item (or item of the same sku) at the discounted price shall be accepted or honored during the Sale Term. All customer requests for cash refunds or merchandise credits in respect of any Returned Merchandise shall be processed exclusively through Company's point-of-sale system. All Returned Merchandise, to the extent it is not defective, shall be included as Merchandise. No returns of inventory sold prior to the Sale Commencement Date shall be accepted or allowed following the seventh (7th) day following the Sale Commencement Date.

7.6     The Company agrees to procure and maintain, during the Sale Term, all insurance (including, without limitation, commercial general liability, property damage, fire and other perils insurance) currently in effect and in the same amounts, levels, deductibles, and coverages in respect of all Assets until sold.

7.7     The Company shall indemnify and hold the Consultant and its affiliates, and their respective officers, directors, employees, agents and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)     Company's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(b)     any failure of Company to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

(c)     any consumer warranty or products liability claims relating to any Merchandise;

(d)     any liability or other claims asserted by customers, any of Company's employees, or any other person against any Consultant Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the "WARN Act"); except where due to the negligence or willful misconduct of Consultant or from a breach of the terms hereof by Consultant;

(e)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees, agents, or representatives of Consultant (including, without limitation, any Supervisors) by Company or any of Company's employees, agents, or representatives (including, without limitation, any Company employees); and

(f)     the negligence or willful misconduct of Company or any of its officers, directors, employees, agents or representatives.

## 8.     Affirmative Duties Of Consultant

8.1     To the extent necessary, and except as provided in the Approval Orders, Consultant shall assist the Company in obtaining all required permits and governmental consents required in

AB_000710

order to conduct the Sale, and shall ensure that the Sale is conducted in accordance with all applicable laws, regulations and ordinances.

8.2    The Consultant shall indemnify and hold Company and its affiliates, and their respective officers, directors, employees, agents, lenders and independent contractors (collectively, "Company Indemnified Parties"), harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)    Consultant's material breach or material failure of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(b)    any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Company (including, without limitation, any Store Employees) by Consultant or any of Consultant's representatives (including, without limitation, any Supervisor);

(c)    any claims by any party engaged by Consultant as an employee or independent contractor (including, without limitation, any Supervisor) arising out of such employment or engagement; except where due to the negligence or willful misconduct of Company or Company Indemnified Parties or from a breach of the terms hereof by Company; and

(d)    the negligence or willful misconduct of Consultant or any of its officers, directors, employees, agents or representatives, or any Supervisor.

## 9.    Additional Consultant Goods

9.1    In connection with the Sale, and subject to compliance with applicable law (or if and when applicable, the Approval Orders), Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise ("Additional Consultant Goods"). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores (or direct shipped to customers) at Consultant's sole cost and expense (including, without limitation, all acquisition costs, sales commissions, credit card processing fees, labor, freight and insurance relative to shipping and/or delivery of such Additional Consultant Goods). Sales of Additional Consultant Goods shall be run through Company's point-of-sale systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and Company shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Company goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. Absent the Company's written

AB_000711

consent and subject to Consultant's agreement to reimburse Company for any associated expenses, Consultant shall not use Company's distribution centers for any Additional Consultant Goods.

9.2     Consultant shall pay to the Company an amount equal to seven and one-half percent (7.5%) of the aggregate Gross Proceeds, net only of sales taxes collected in respect thereof, realized by Consultant from the sale of Additional Consultant Goods (the "Additional Consultant Goods Fee"). Consultant shall pay the Company any earned and accrued Additional Consultant Goods Fee on a weekly basis as part of each weekly sale reconciliation.  Except for sales taxes associated with the sale of Additional Consultant Goods and Company's Additional Consultant Goods Fee, all proceeds from the sale of Additional Consultant Goods shall be for the sole and exclusive account of Consultant, and shall be remitted to Consultant in connection with each weekly sale reconciliation.  Consultant shall be responsible for collecting and remitting sales taxes to the applicable taxing authorities on account of sales of Additional Consultant Goods.

9.3     The Consultant, the Company, and the Lender Agents intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Company in all respects and not a consignment for security purposes.  Subject solely to Consultant's obligations to pay to Company the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity, including, without limitation, the Lenders and Lender Agents, shall have any claim against any of the Additional Consultant Goods or their proceeds. The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.  In furtherance of the foregoing, the Company acknowledges that the Additional Consultant Goods shall be consigned to Company as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC").  The Consultant is hereby granted a first priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds (less any Additional Consultant Goods Fee), and Consultant is hereby authorized to file UCC financing statements and provide notifications to any prior secured parties, including, but not limited to, the Lender Agents.

9.4     The Company shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with Company's insurers.  Consultant shall be responsible for payment of any deductible (but only in relation to the Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

## 10.    **Representation and Warranties**

10.1    <u>Representations and Warranties of the Consultant</u>.    Each entity comprising Consultant hereby represents, warrants and covenants in favor of Company as follows:

(a)    Consultant has taken all necessary action required to authorize the execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b)    Upon execution by the parties hereto, this Agreement is a valid and binding obligation of Consultant enforceable in accordance with its terms, subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof.

(c)    No action or proceeding has been instituted or, to Consultant's knowledge, threatened, affecting the Consultant's ability to consummate this Agreement or the transactions contemplated herein.

(d)    Except as provided in the Approval Orders and the Sale Guidelines, Consultant will comply with and act in accordance with any and all applicable state and local laws, rules and regulations and other legal obligations of all governmental authorities and the terms/restrictions of the underlying Stores' leases.

10.2    <u>Representations and Warranties of the Company</u>: the Company hereby represents, warrants and covenants in favor of Consultant as follows:

(a)    Subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof, the Company has taken all necessary action required to authorize its execution, performance and delivery of this Agreement, and to consummate the transactions contemplated hereby.

(b)    Subject to the entry of the Approval Orders as and to the extent required to the effectiveness hereof, upon execution by the Company, this Agreement is a valid and binding obligation of the Company enforceable in accordance with its terms, subject only to any applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally and the availability of equitable remedies.

(c)    Except as may be affected by the Company's commencement of the Bankruptcy Case, no court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for the Company's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.

(d)    The Company has all requisite authority to grant the License to Consultant to utilize the Properties and the Intellectual Property, including, without limitation, the tradenames "Art Van Furniture", "Wolf Furniture", "Levin Furniture",  and similar derivations thereof as provided for under this Agreement.

(e)     The Company has maintained its pricing files in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files, records, and information received by Consultant are true and accurate in all material respects.

(f)     Except for the liens of the ABL Lenders and Term Loan Lenders, all Assets are, or will be as of the Sale Commencement Date free and clear of all liens, claims and encumbrances of any kind whatsoever.

**11.     Bankruptcy Matters**.  If the Company commences a case under Chapter 11 of title 11, United States Code (the "Bankruptcy Code"), in the Bankruptcy Court, the Company shall promptly file an expedited motion (a) seeking authorization to conduct the Sale and sell or otherwise dispose of the Assets, and (b) to assume this Agreement under section 365 of the Bankruptcy Code, and utilize its reasonable best efforts to ensure that such motion is approved by the Interim Order, and thereafter the Final Order (together with the Interim Order, the "Approval Orders").  The Approval Orders shall be reasonably acceptable in form and substance to the Consultant, the Company and the Lender Agents, and provide for, among other things, the following:

(a)     approval of the transactions contemplated by this Agreement, including, without limitation, the company's conduct of the Sale and the sale of the other Assets;

(b)     approving the Company's retention and employment of Consultant to perform the Services contemplated by this Agreement;

(c)     approving the Sale Guidelines;

(d)     authorizing the Company's reimbursement to Consultant of all Sale Expenses advanced by the Consultant, including Consultant Incurred Expenses, together with any additional expenses incurred pursuant to any Supplemental Budget(s), such reimbursements to be made on a weekly basis and otherwise in accordance with this Agreement, from the Expense Deposit, and thereafter from gross receipts from the sale or other disposition of the Assets (or retained by the Consultant from such receipts) without further order of the Bankruptcy Court and otherwise in accordance with this Agreement, in each case without further order of the Bankruptcy Court, and any such payment(s)/reimbursement(s) shall be free and clear of all liens, claims and encumbrances;

(e)     providing that the authority granted herein for the reimbursement of Sale Expenses, including Consultant Incurred Expenses, and any other expenses incurred or advanced by Consultant pursuant to any Supplemental Budget(s), shall be subject to the provisions of (i) that certain proposed  Interim Order authorizing the Company Use of Cash Collateral" (the "Interim Cash Collateral Order") to be filed and entered in the Bankruptcy Case, and shall be made strictly in accordance with the Cash Collateral Budget (as defined in the Interim Cash Collateral Order), subject to such variances as permitted by the Cash Collateral Order; provided, however, that neither the Interim Cash Collateral Order shall not require or impose a cap or reduction on amounts due to the Consultant under this

Agreement, other than any such cap or reduction resulting from the Company's required compliance with the Cash Collateral Budget;

(f)     not later than two (2) business days after entry of the Interim Order the Company shall deliver to the Consultant the Expense Deposit as set forth in the Sale Budget as security for payment or reimbursement to Consultant of Sale Expenses incurred by Consultant on account of which it is entitled to be reimbursed;

(e)     any remaining balance of Expense Deposit being held by Consultant upon completion of the Final Settlement shall (i) be applied by Consultant as shall be set forth in the Final Settlement, and (ii) be subject to all provisions relating to Cash Collateral set forth in the Interim Cash Collateral Order;

(f)     authorizing the Company's conduct of the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, permitting and licensing requirements, that could otherwise govern the Sale;

(g)     authorizing the Company's conduct of the Sale notwithstanding restrictions in leases, reciprocal easement agreements or other contracts that purport to restrict the Sale or the necessity of obtaining any third party consents;

(h)     approving the sale of Additional Consultant Goods in accordance with the terms and conditions hereof; and

(i)     authorizing the Consultant and the Company to take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.

Upon the commencement of the Bankruptcy Case, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over the Company's Bankruptcy Case, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum *non conveniens*.  From and after entry of the Approval Orders, Consultant shall conduct the Sale in accordance with the terms of the Approval Orders in all material respects.

## 12.    <u>Insurance; Risk of Loss</u>

12.1    Company shall maintain throughout the Sale Term, (i) insurance with respect to the Assets in amounts and on such terms and conditions as are consistent with the Company's ordinary course operations and (ii) casualty and liability insurance policies (including, but not limited to, product liability, comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the operation of the Stores, and shall cause Consultant to be listed as an additional insured with respect to all such policies, and as loss payee for the property insurance.  Company shall be responsible for the payment of all deductibles, self-insurance and other amounts payable in connection with any claim asserted under such policies, except for any claims arising directly from the negligence or willful misconduct of Consultant, or its employees, representatives, agents or Supervisors.

12.2    Consultant shall maintain, throughout the Sale Term, liability insurance policies (including, but not limited to, comprehensive general liability and auto liability insurance) covering injuries to persons and property in or in connection with Consultant's provision of Services at the Stores, and shall cause Company to be named an additional insured with respect to such policies.

12.3    Notwithstanding any other provision of this Agreement, the Company and the Consultant agree that Company shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores before, during and after the Sale Term, except to the extent any such claim arises from the negligence, willful misconduct, or unlawful acts of the Consultant or any Supervisor engaged by Consultant under the terms of this Agreement.

## 13.    <u>Miscellaneous</u>

13.1    Any notice or other communication under this Agreement shall be in writing and may be delivered personally or sent by facsimile or by prepaid registered or certified mail, addressed as follows:

If to the Company:          c/o AVF HOLDING COMPANY, INC.
                            6500 East Fourteen Mile Road
                            Warren, MI  48092
                            Attn: David Ladd
                            Email: dladd@artvan.com

                            With copies to:

                            MONTGOMERY MCCRACKEN WALKER &
                            RHOADS, LLP
                            437 Madison Avenue
                            New York, NY 10022
                            Attn:  Maura I. Russell
                            Email:  mrussell@mmwr.com

                            ALVAREZ & MARSAL, LLP
                            600 Madison Avenue – 7th Floor
                            New York, NY 10022
                            Attn:   Dennis Stogsdill
                                    Matthew Davidson
                            Email: DStogsdill@alvarezandmarsal.com
                                    matthew.davidson@alvarezandmarsal.com

AB_000716

|  |  |
|---|---|
| If to the Consultant: | HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attention: Ian S. Fredericks<br>Tel: (847) 418-2075<br>Email: ifredericks@hilcotrading.com |

-and-

GORDON BROTHERS RETAIL PARTNERS, LLC, DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE, GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC AND GORDON BROTHERS BRANDS, LLC
Prudential Tower
800 Boylston Street
Boston, MA 02119
Attn: Mackenzie L. Shea
Tel: (617) 210-7116
Email: mshea@gordonbrothers.com

With a copy to (which shall not constitute notice):

RIEMER & BRAUNSTEIN LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn: Steven E. Fox
Email: sfox@riemerlaw.com

|  |  |
|---|---|
| If to the ABL Lenders: | WELLS FARGO BANK, NATIONAL ASSOCIATION<br>125 High Street, 11th Floor<br>Boston, MA 02110<br>Attn: Danielle Baldinelli<br>Email: Danielle.M.Baldinelli@wellsfargo.com |

MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110-1726
Attn: Marjorie B. Crider
Email: marjorie.crider@morganlewis.com

AB_000717

If to the Term Lenders:      King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Attn: W. Todd Holleman
Email: tholleman@kslaw.com

13.2   <u>Governing Law</u>.  This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of New York, without reference to any conflict of laws provisions.

13.3   <u>Severability</u>.  In the event any term or provision contained within this Agreement shall be deemed illegal or unenforceable, then such offending term or provision shall be considered deleted from this Agreement and the remaining terms shall continue to be in full force and effect.

13.4   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties with respect of the subject matter hereof and supersedes all prior negotiations and understandings, and can only be modified by a writing signed by the Company (with the consent of the Lender Agents, which consent shall not be unreasonably withheld, delayed or conditioned) and the Consultant.

13.5   <u>Assignment</u>.  Neither Company nor Consultant shall assign this Agreement without the express written consent of the other; <u>provided</u>, <u>however</u>, notwithstanding the foregoing, the Consultant may delegate and assign its rights and obligations under this Agreement to one or more affiliates with subject matter experience with applicable Assets without the consent of the Company.  This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and permitted assigns.

13.6   <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which when so executed shall be deemed to be an original and such counterparts, together, shall constitute one and the same instrument.  Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof or thereof.

13.7   <u>Independent Contractor</u>.  Nothing contained herein shall be deemed to create any relationship between the Company and the Consultant other than that of an independent contractor. It is stipulated that the parties are not partners or joint venturers.

13.8   <u>Termination</u>.  This Agreement shall terminate upon the earlier to occur (a) in the event the Bankruptcy Court does not enter the Interim Order on or before March 10, 2020, (b) in the event the Sale Commencement Date does not occur on or prior to March 7, 2020, (c) in the event the Bankruptcy Court does not enter the Final Order on or before March 31, 2020, (d) the mutual agreement of the Parties, or (e) upon the completion and approval of the Final Settlement; <u>provided</u>, <u>however</u>, that either party may terminate this Agreement in the event that the other commits a material breach or material failure of its obligations hereunder.  If either party seeks to terminate this Agreement by reason of a claim of a material breach or material failure, such party shall provide the other party with not less than five (5) days' prior written notice stating with specificity the nature of the claimed material breach or material failure, and the party receiving

AB_000718

such notice shall have five (5) business days in which to cure such material breach or material failure, failing which this Agreement shall be deemed terminated. In the event this Agreement is terminated by Consultant on account of a material breach or material failure by the Company, Consultant shall be entitled to be reimbursed any Sale Expenses, including Consultant Incurred Expenses and any other expenses incurred in conformity with the Sale Budget or any Supplemental Budget(s) through the date of such termination.

13.8    Confidentiality.  Except for such disclosure as may be required and/or incident to Asset sale-related activities and Services provided for herein, all information of a business nature relating to the pricing, sales, promotions, marketing, assets, liabilities or other business affairs of Company, its customers, parent, subsidiary or other affiliated entities (for purposes of this provision, all such entities are included within each reference to "Company") is Company's confidential, trade secret information ("Company Confidential Information"), which is and shall remain the exclusive intellectual property of Company.  Consultant shall not divulge, furnish, make available or in any other manner disclose such information to any third party other than Consultant's officers, employees, representatives and agents.  Consultant shall take and shall cause its officers, employees, representatives and agents to take such action as shall be reasonably necessary or advisable to preserve and protect the confidentiality of Company Confidential Information.  Consultant agrees to maintain strict confidentiality and agrees that it may use Company Confidential Information only as reasonably necessary to the performance of its obligations related to the sale of the Assets as contemplated hereby.  Notwithstanding the foregoing, Company hereby agrees that Consultant may identify Company as a Consultant customer for which Consultant has provided services for purposes of promoting its business.

13.9    Force Majeure. If any casualty or act of God, war, or terrorism prevents or substantially inhibits the conduct of business in the ordinary course at any Store(s), or results in a material loss or impairment of the Assets, then the subject location(s) and the remaining Merchandise located thereat shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Consultant and shall have no further rights or obligations hereunder with respect thereto; provided, however, that the proceeds of any insurance attributable to impacted Assets or proceeds from business interruption insurance shall constitute Gross Proceeds hereunder.

13.10   By executing or otherwise accepting this Agreement, the Company and Consultant acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

13.11   This Agreement shall be deemed drafted by both parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

[Remainder of Page Intentionally Left Blank]
[Signatures Appear On Next Page]

AB_000720

IN WITNESS WHEREOF, the Company and the Consultant have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

AVF HOLDING COMPANY, INC.
AVF HOLDING COMPANY, INC.

By: _David Ladd_

Name: DAVID LADD

Its: 3/4/2020

[Signatures Continue Next Page]

27

**HILCO MERCHANT RESOURCES, LLC, HILCO IP SERVICES, LLC D/B/A HILCO STREAMBANK, HILCO REAL ESTATE, LLC, AND HILCO RECEIVABLES, LLC**

By:_____

     Name:    Sarah Baker
     Title:     Assistant General Counsel


     - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**


By:_____

     Name:    _____
     Its:      _____


**DJM REALTY SERVICES, LLC D/B/A GORDON BROTHERS REAL ESTATE**


By:_____

     Name:    _____
     Its:      _____


**GORDON BROTHERS COMMERCIAL & INDUSTRIAL, LLC**


By:_____

     Name:    _____
     Its:      _____

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By: _____

    Name:    Sarah Baker
    Title:     Assistant General Counsel

       **-** and **–**

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By: _____
    Name:   _____
    Its:     _____

**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By: _____
    Name:   _____
    Its:     _____

**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By: _____
    Name:   _____
    Its:     _____

28

AB_000723

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By:_____

    Name:    Sarah Baker

    Title:    Assistant General Counsel


           - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By:_____

    Name:    _____

    Its:    _____


**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By:_____

    Name:    Mark T. Dufton

    Its:    Chief Executive Officer , Real Estate


**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By:_____

    Name:    _____

    Its:    _____

AB_000724

**HILCO MERCHANT RESOURCES, LLC,
HILCO IP SERVICES, LLC D/B/A HILCO
STREAMBANK, HILCO REAL ESTATE, LLC, AND
HILCO RECEIVABLES, LLC**

By:_____

    Name:    Sarah Baker

    Title:    Assistant General Counsel

        - and –

**GORDON BROTHERS RETAIL PARTNERS, LLC,**

By:_____

    Name:    _____

    Its:    _____

**DJM REALTY SERVICES, LLC D/B/A GORDON
BROTHERS REAL ESTATE**

By:_____

    Name:    _____

    Its:    _____

**GORDON BROTHERS COMMERCIAL &
INDUSTRIAL, LLC**

By: *Robert J Maroney*_____

    Name:    Robert J. Maroney

    Its:    President

28

AB_000725

**GORDON BROTHERS BRANDS, LLC**

By: _____
Name:     RAMEZ TOUBASSY
Its:     PRESIDENT

[Signatures Continue Next Page]

29

AB_000726

ACKNOWLEDGED AND AGREED
TO THIS ___ DAY OF MARCH, 2020:

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
As Administrative Agent and Collateral Agent

By: _____
    Name: Lauren Murphy
    Its: Director

[Signatures Continue Next Page]

30

AB_000727

**VIRTUS GROUP, LP,**
As Administrative Agent and Collateral Agent
For Itself and the Other Term Loan Lenders

VIRTUS GROUP, LP,
as Administrative Agent

By: _____

Name:

Title: SNR DIR

AB_000728

Art Van Furniture

**Results – Store Count Strategy by Location**

| | Financial Information ($000's) | | |
|---|---|---|---|
| 169 # Stores included in liquidation | Yes | | |
| 2 # stores closed prior to sale commencement | No | | |

A large multi-column table follows, with the following column headers:

| Store # | Store Name | Original Store Name | Include In Liquidation | Direct Marketing Area | Store Type | Company Affiliation | Gross Sq. Ft. | Selling Sq. Ft. | Lease Beginning Date | Lease Expires | Months Remaining | SLB Property | Landlord | Master Lease | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

AVB-000729

| Store # | Store Name (Original) | Store Name (In Liquidation) | In Liquidation | Operating Area | Type | | Sq Ft 1 | Sq Ft 2 | Start | End | Term | Prop | Landlord | Guarantor | Address |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113 | Comstock Park, MI (113) | ALPINE AVF | | Yes | Grand Rapids-Kalamazoo-Battle Creek | Flagship | AVF | 111,077 | 63,525 | 11/26/1999 | 2/28/2037 | 204 | Yes | LCN PARTNERS | LCN AVF WARREN (MI) LLC | 4273 ALPINE AVE NW STE B, COMSTOCK PARK, MI, 49321, USA |
| 114 | Holland, MI (114) | HOLLAND AVF | | Yes | Grand Rapids-Kalamazoo-Battle Creek | Standard | AVF | 39,950 | 38,443 | 8/18/1993 | 2/28/2037 | 204 | Yes | STONEBRIAR | SCF RC Funding III, LLC | 12610 FELCH ST STE 100, HOLLAND, MI, 49424, USA |
| 115 | Muskegon, MI (115) | MUSKEGON PS | | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,519 | 5/28/2016 | 10/31/2021 | 20 | No | SVH PROPERTIES, LLC | None | 1664 E STERNBERG RD, MUSKEGON, MI, 49444, USA |
| 116 | Portage, MI (116) | PORTAGE PS | | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,018 | 3,632 | 5/24/2014 | 5/31/2024 | 51 | No | NATIONAL SHOPPING PLAZAS, INC. | None | 6947 SOUTH WESTNEDGE AVE, PORTAGE, MI, 49002, USA |
| 117 | Grandville, MI (117) | GRANDVILLE PS | | Yes | Grand Rapids-Kalamazoo-Battle Creek | APS | | 4,229 | 3,773 | 3/1/2015 | 5/31/2024 | 51 | No | CWD Grandville 1, LLC | None | 4560 IVANREST AVE SW, GRANDVILLE, MI, 49418, USA |
| 118 | Kalamazoo, MI (118) | KALAMAZOO PS | | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 3,481 | 3,186 | 3/8/2013 | 3/31/2023 | 37 | No | Kalamazoo Mall LLC | None | 338 N DRAKE RD, KALAMAZOO, MI, 49009, USA |
| 119 | Grand Rapids, MI (119) | GRAND RAPIDS PS | | Yes | Grand Rapids-Kalamazoo-Battle Creek | APS | | 5,562 | 4,903 | 10/15/2014 | 2/28/2037 | 204 | Yes | Broadstone | BROADSTONE AVF MICHIGAN, LLC | 3500 28TH ST SE, GRAND RAPIDS, MI, 49512, USA |
| 120 | Grand Rapids, MI (120) | GRAND RAPIDS N PS | | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,000 | 3,687 | 9/1/2016 | 8/31/2026 | 78 | No | EAST BELTLINE DEVELOPMENT, LLC | None | 2036 EAST BELTLINE AVE, GRAND RAPIDS, MI, 49525, USA |
| 121 | Comstock Park, MI (121) | ALPINE N PS | | Yes | Grand Rapids-Kalamazoo-Battle Creek | Sleep | APS | 4,300 | 3,797 | 5/16/2011 | 10/31/2022 | 32 | No | ALPINE VALLEY, L.L.C. | None | 4174 ALPINE AVE NW STE A, COMSTOCK PARK, MI, 49321, USA |
| 122 | Lancaster, PA (122) | LANCASTER (#46) | | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 9/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 2040 Bennett Avenue, Lancaster, PA, 17601, USA |
| 123 | York, PA (123) | YORK (#44) | | Yes | Harrisburg | Standard | WLF | 60,000 | 52,500 | 1/1/2002 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO | 380 North Northern Way, York, PA, 17402, USA |
| 124 | Harrisburg, PA (124) | HARRISBURG (#42) | | Yes | Harrisburg | Standard | WLF | 61,900 | 51,900 | 1/19/1991 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 4661 Lindle Road, Harrisburg, PA, 17111, USA |
| 125 | Hanover, PA (125) | HANOVER (#50) | | Yes | Harrisburg | Standard | WLF | 34,600 | 30,600 | 5/19/2008 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 371 Eisenhower Drive, Hanover, PA, 17331, USA |
| 126 | Mechanicsburg, PA (126) | MECHANICSBURG (#43) | | Yes | Harrisburg | Standard | WLF | 45,567 | 42,567 | 8/22/2010 | 7/31/2020 | 5 | No | LESTER ASSOCIATES | None | 75 Gateway Drive, Mechanicsburg, PA, 17055, USA |
| 127 | Chambersburg, PA (127) | CHAMBERSBURG (#51) | | Yes | Harrisburg | Standard | WLF | 27,262 | 25,762 | 1/1/2009 | 12/27/2038 | 226 | No | BRITM, LLC | None | 480 Gateway Avenue, Chambersburg, PA, 17201, USA |
| 128 | Altoona, PA (128) | ALTOONA (#28) | | Yes | Johnstown | Standard | WLF | 53,136 | 43,176 | 1/1/1978 | 4/30/2038 | 218 | Yes | VEREIT REAL ESTATE LP | Store Master Funding XII, LLC | 4 Sellers DriveAltoona, Altoona, PA, 16601, USA |
| 129 | Johnstown, PA (129) | JOHNSTOWN (#32) | | Yes | Johnstown | Standard | WLF | 40,258 | 37,258 | 9/1/1995 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | Vereit | 1130 Scalp Avenue, Johnstown, PA, 15904, USA |
| 130 | State College, PA (130) | STATE COLLEGE (#40) | | Yes | Johnstown | Standard | WLF | 50,000 | 51,402 | 5/1/2007 | 11/21/2037 | 213 | No | PATTON CENTER ASSOCIATES LP | None | 138 Valley Vista Drive, State College, PA, 16803, USA |
| 131 | Lansing, MI (131) | LANSING AVF | | Yes | Lansing | Flagship | AVF | 71,581 | 77,379 | 10/25/2000 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 8749 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 132 | Jackson, MI (132) | JACKSON AVF | | Yes | Lansing | Standard | AVF | 33,214 | 30,012 | 8/1/1999 | 7/31/2024 | 53 | No | ARGYLE ACRES MALL, LLC | None | 950 N WEST AVE, JACKSON, MI, 49202, USA |
| 133 | E Lansing, MI (133) | OKEMOS PS | | Yes | Lansing | APS | | 5,855 | 4,457 | 5/16/2011 | 8/31/2023 | 42 | No | RICHARD AND MICHELLE BROWN | None | 2660 E. GRAND RIVER, EAST LANSING, MI, 48823, USA |
| 134 | East Lansing, MI (134) | EAST LANSING PS | | Yes | Lansing | Sleep | APS | 3,974 | 3,495 | 7/16/2016 | 7/31/2021 | 17 | No | River Castle Development, LLC | None | 1595 LAKE LANSING ROAD, EAST LANSING, MI, 48823, USA |
| 135 | Lansing, MI (135) | LANSING PS | | Yes | Lansing | APS | | 4,590 | 3,689 | 5/16/2011 | 12/31/2021 | 22 | No | John Doezema Real Estate | None | 6007 W SAGINAW HWY, LANSING, MI, 48917, USA |
| 136 | Wexford, PA (136) | WEXFORD (#4, 29, 30 CC) | | Yes | Pittsburgh | Standard | LVF | 53,000 | 48,823 | 10/1/2009 | 2/28/2038 | 216 | No | STORE CAPITAL | Store Master Funding XII, LLC | 10688 PERRY HIGHWAY, WEXFORD, PA, 15090, USA |
| 137 | Monroeville, PA (137) | MONROEVILLE (#3 CC, 20, 21 CC) | | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,545 | 7/1/2004 | 11/30/2037 | 213 | Yes | VEREIT REAL ESTATE LP | COLE AV PORTFOLIO / LEVIN FAMILY P... | 124 LEVIN WAY, MONROEVILLE, PA, 15146, USA |
| 138 | Mcmurray, PA (138) | SOUTH HILLS (#2, 32 CC) | | Yes | Pittsburgh | Standard | LVF | 74,600 | 67,964 | 1/1/1999 | 11/30/2037 | 213 | No | STORE CAPITAL | Store Master Funding XII, LLC | 3664 WASHINGTON ROAD, MCMURRAY, PA, 15317, USA |
| 139 | Greensburg, PA (139) | GREENSBURG (#40, 41 CC) | | Yes | Pittsburgh | Standard | LVF | 55,314 | 50,637 | 8/1/2011 | 10/31/2021 | 20 | No | CBL/WESTMORELAND, LP | None | 5280 ROUTE 30, GREENSBURG, PA, 15601, USA |
| 140 | Pittsburgh, PA (140) | THE POINTE (#15, 35 CC) | | Yes | Pittsburgh | Standard | LVF | 68,730 | 61,886 | 7/1/1999 | 9/30/2020 | 7 | No | STORE CAPITAL | Store Master Funding XII, LLC | 400 CHALVET DRIVE, PITTSBURGH, PA, 15275, USA |
| 141 | Pleasant Hills, PA (141) | CURRY HOLLOW (#47, 48 CC) | | Yes | Pittsburgh | Standard | LVF | 90,500 | 87,500 | 7/1/1991 | 9/30/2026 | 79 | No | PAUL PROPERTY MANAGEMENT, LP | None | 292 CURRY HOLLOW RD, PLEASANT HILLS, PA, 15236, USA |
| 142 | Mount Pleasant, PA (142) | MOUNT PLEASANT (#1, 22 CC) | | Yes | Pittsburgh | Standard | LVF | 34,500 | 30,766 | 1/1/1924 | 4/30/2038 | 218 | No | STORE CAPITAL | Store Master Funding XII, LLC | 600 MAIN STREET, MT. PLEASANT, PA, 15666, USA |
| 143 | Cranberry Township, PA (143) | CRANBERRY (#60) | | Yes | Pittsburgh | Sleep | LM | 5,000 | 4,500 | 5/1/2012 | 4/30/2022 | 26 | No | WALNUT CAPITAL PARTNERS - CRANBERRY SC | None | 20012 ROUTE 19, CRANBERRY, PA, 16066, USA |
| 144 | Mount Lebanon, PA (144) | MOUNT LEBANON (#36) | | Yes | Pittsburgh | Sleep | LM | 3,990 | 3,490 | 6/28/2013 | 7/31/2023 | 41 | No | RELIANCE PITTSBURGH LLC | None | 1600 WASHINGTON RD, MT LEBANON, PA, 15228, USA |
| 145 | Butler, PA (145) | BUTLER (#75) | | Yes | Pittsburgh | Sleep | LM | 5,010 | 5,010 | 11/18/2016 | 2/28/2027 | 84 | No | BUTLER SITEWORK ASSOCIATES LLC | None | 620 Butler Crossing Suite 5, BUTLER, PA, 16001, USA |
| 146 | Pittsburgh, PA (146) | SHADYSIDE (#70) | | Yes | Pittsburgh | Sleep | LM | 7,145 | 6,645 | 10/10/2014 | 4/30/2024 | 50 | No | MCKNIGHT SOUTH EAST LP | None | 5438 BAUM BLVD, PITTSBURGH, PA, 15232, USA |
| 147 | Washington, PA (147) | WASHINGTON (#63) | | Yes | Pittsburgh | Sleep | LM | 7,800 | 7,300 | 3/30/2013 | 4/30/2023 | 39 | No | WASHINGTON MALL - JCP ASSOCIATES, LTD | None | 56 TRINITY POINT DR, WASHINGTON, PA, 15301, USA |
| 148 | Pittsburgh, PA (148) | FOX CHAPEL (#61) | | Yes | Pittsburgh | Sleep | LM | 4,000 | 3,500 | 5/1/2012 | 4/30/2022 | 26 | No | WATERWORKS PHASE II | None | 956 FREEPORT ROAD, PITTSBURGH, PA, 15238, USA |
| 149 | Pittsburgh, PA (149) | ROBINSON (#64) | | Yes | Pittsburgh | Sleep | LM | 5,593 | 5,093 | 8/30/2013 | 12/31/2023 | 46 | No | MCROBIN LTC AND MOSITES FAMILY GST TRUST | None | 6528 STEUBENVILLE PIKE, PITTSBURGH, PA, 15205, USA |
| 150 | Indiana, PA (150) | INDIANA (#33) | | Yes | Pittsburgh | Sleep | LM | 4,800 | 4,300 | 6/7/2013 | 9/30/2023 | 43 | No | LIBBY REGENCY ASSOCIATES LP | None | 1570 OAKLAND AVE, INDIANA, PA, 15701, USA |
| 151 | Monroeville, PA (151) | MONROEVILLE (#62) | | Yes | Pittsburgh | Sleep | LM | 4,319 | 4,000 | 6/1/2012 | 6/30/2022 | 28 | No | CE-MONROEVILLE 3820 WM PENN LP | None | 3820 WILLIAM PENN HIGHWAY, MONROEVILLE, PA, 15146, USA |
| 152 | St. Louis, MO (152) | AFFTON | | Yes | St. Louis | Standard | AVF | 41,352 | 32,759 | 1/1/1975 | 12/31/2023 | 46 | No | South Limbergh Property LLC | None | 5711 S LINDBERGH BLVD, SAINT LOUIS, MO, 63123, USA |
| 153 | O'fallon, IL (153) | FAIRVIEW | | Yes | St. Louis | Standard | AVF | 39,676 | 32,627 | 1/17/2018 | 12/31/2023 | 46 | No | Rothman-O'Fallon LLC | None | 1776 WEST US 50, O FALLON, IL, 62269, USA |
| 154 | O'fallon, MO (154) | O FALLON | | Yes | St. Louis | Standard | AVF | 40,884 | 31,674 | 1/16/2018 | 12/31/2023 | 46 | No | O'Fallon Missouri Properties, LLC | None | 2101 E TERRA LN, O FALLON, MO, 63366, USA |
| 155 | Bridgeton, MO (155) | BRIDGETON | | Yes | St. Louis | Standard | AVF | 45,314 | 35,975 | 1/17/2018 | 12/31/2023 | 46 | No | JS Westfol, LLC | None | 925 NORTHWEST PLAZA, SAINT ANN, MO, 63074, USA |
| 156 | Richmond Heights, MO (156) | RICHMOND (DESIGN STUDIO) | | Yes | St. Louis | Design | AVF | 3,670 | 3,343 | 11/15/2017 | 7/31/2024 | 53 | No | Hanley LM Properties, LLC | None | 1516 S HANLEY RD, SAINT LOUIS, MO, 63144, USA |
| 157 | Holland, OH (157) | TOLEDO AVF | | Yes | Toledo | Flagship | AVF | 91,000 | 80,731 | 8/27/2013 | 8/31/2028 | 205 | No | STORE CAPITAL | STORE SPE AVF I 2017-1, LLC | 1301 E MALL DR, HOLLAND, OH, 43528, USA |
| 158 | Toledo, OH (158) | TOLEDO PS | | Yes | Toledo | Sleep | APS | 4,500 | 4,045 | 5/24/2013 | 11/30/2023 | 45 | No | REED HOLDING-TALMADGE, LLC | None | 4600 TALMADGE RD, TOLEDO, OH, 43623, USA |
| 159 | Holland, OH (159) | HOLLAND PS (TOLEDO) | | Yes | Toledo | APS | | 3,485 | 3,135 | 7/13/2018 | 8/31/2028 | 102 | No | Kimi Kurz, LLC | None | 6760 AIRPORT HWY SUITE B, HOLLAND, OH, 43528, USA |
| 160 | Perrysburg Township, OH (160) | PERRYSBURGH (FREEMONT) | | Yes | Toledo | APS | | 3,500 | n/a | 2/8/2019 | 4/30/2029 | 110 | No | 10411 Fremont Pike, LLC | None | 10411 FREMONT PIKE, PERRYSBURG, OH, 43551, USA |
| 161 | Traverse City, MI (161) | TRAVERSE CITY AVF | | Yes | Traverse City-Cadillac | Standard | AVF | 63,120 | 49,903 | 11/21/1998 | 2/28/2037 | 204 | Yes | BROADSTONE | BROADSTONE AVF MICHIGAN, LLC | 1775 OAK HOLLOW DR, TRAVERSE CITY, MI, 49686, USA |
| 162 | Petoskey, MI (162) | PETOSKEY AVF | | Yes | Traverse City-Cadillac | Standard | AVF | 49,115 | 49,765 | 10/5/2002 | 10/31/2027 | 212 | Yes | STORE CAPITAL | STORE SPE AVF II 2017-2, LLC | 1619 ANDERSON ROAD, PETOSKEY, MI, 49770, USA |
| 163 | Traverse City, MI (163) | TRAVERSE CITY PS | | Yes | Traverse City-Cadillac | APS | | 4,509 | 4,104 | 8/30/2016 | 6/30/2026 | 76 | No | ANCHOR MANISTE | None | 3675 N US 31 S SUITE B, TRAVERSE CITY, MI, 49684, USA |
| 164 | Frederick, MD (164) | FREDERICK (#7) | | Yes | Washington DC | Standard | WLF | 60,000 | 52,500 | 7/1/2003 | 1/31/2024 | 47 | No | Frederick-BILCO, LLP | None | 1215 West Patrick Street, Frederick, MD, 21703, USA |
| 165 | Hagerstown, MD (165) | HAGERSTOWN (#9) | | Yes | Washington DC | Standard | WLF | 66,829 | 60,000 | 2/1/2004 | 5/29/2025 | 111 | No | OUTLET VILLAGE OF HAGERSTOWN LP | None | 900 Premium Outlets Boulevard, Hagerstown, MD, 21740, USA |
| 166 | Leesburg, VA (166) | LEESBURG (#48) | | Yes | Washington DC | Standard | WLF | 46,030 | 41,430 | 8/24/2012 | 11/30/2037 | 213 | Yes | STORE CAPITAL | Store Master Funding XII, LLC | 131 Fort Evans Road NE, Leesburg, VA, 20176, USA |
| 167 | Frederick, MD (167) | FREDERICK OUTLET (#52) | No | Washington DC | Standard | WLF | 40,484 | 30,484 | 9/17/2014 | 1/31/2020 | n/a | No | RAVID FREDERICK, LLC | None | 5830 Ballenger Creek Pike, Frederick, MD, 21703, USA |
| 168 | Saint Clairsville, OH (168) | SAINT CLAIRSVILLE (#50) | | Yes | Wheeling | Standard | LVF | 24,908 | 21,000 | 9/29/2017 | 10/31/2022 | 32 | No | OHIO VALLEY MALL, CO | None | 67661 MALL RING RD, SAINT CLAIRSVILLE, OH, 43950, USA |
| 169 | Boardman, OH (169) | BOARDMAN (#52) | | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 8/31/2018 | 8/31/2028 | 102 | No | AB&R Properties | None | 300 BOARDMAN POLAND ROAD, BOARDMAN, OH, 44512, USA |
| 170 | Hermitage, PA (170) | HERMITAGE (#52) | | Yes | Youngstown | Standard | LVF | 42,000 | n/a | 9/21/2018 | 9/30/2023 | 43 | No | AB&R Properties | None | 1340 N. Hermitage Road Suite 1 Route 18, Hermitage, PA, 16148, USA |
| 171 | Niles, OH (171) | NILES (#56) | | Yes | Youngstown | Standard | LVF | 52,000 | n/a | 10/31/2018 | 10/31/2028 | 104 | No | AB&R Properties | None | 836 YOUNGSTOWN-WARREN RD, NILES, OH, 44446, USA |
| Totals | | | | | | | 5,879,611 | 4,932,964 | | | | | | | |

AB_000730    2/20/2020

## AVF Holding Company, Inc.
### Exhibit B

| Expense Budget (1) |
|---|

**Advertising**

| | |
|---|---:|
| Media (2) | 2,097,000 |
| Signs (3) | 1,236,760 |
| Sign Walkers | 566,588 |
| Subtotal Advertising | 3,900,348 |

**Supervision**

| | |
|---|---:|
| Fees / Wages / Expenses (4) | 2,160,913 |
| Subtotal Supervision | 2,160,913 |

| | |
|---|---:|
| Miscellaneous /Legal (5) | 35,000 |

| | |
|---|---:|
| Total Expenses | 6,096,261 |

*Note(s):*
*1. This Expense Budget contemplates a sale term of March, 5, 2020 through April 26, 2020.  The Expense Budget remains subject to modification in the event that this term is extended, or as otherwise agreed to by the parties.*
*2. Amounts attributable to media shall only be spent in consultation with the Company.*
*3. Includes Sales Tax.*
*4. Includes Deferred Compensation and Insurance.*
*5. Any legal expenses associated with issues raised by or disputes with landlords, including (without limitation) negotiations in respect of landlord side letters, shall be in addition to and not part of the budgeted legal expenses.*

## <u>Store Closing Procedures</u>[1]

1.    The Sales shall be conducted so that the Stores in which Sales are to occur will remain open no longer than during the normal hours of operation or such hours as otherwise provided for in the respective leases for the Stores.

2.    The Store Closing Sales shall be conducted in accordance with applicable state and local "Blue Laws," where applicable, so that no Store Closing Sale shall be conducted on Sunday unless the Debtors had been operating such Stores on a Sunday prior to the commencement of the Store Closing Sales.

3.    On "shopping center" property, the Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or if distribution is customary in the "shopping center" in which such Stores is located; *provided* that the Consultant may solicit customers in the Stores themselves. On "shopping center" property, the Consultant shall not use any flashing lights or amplified sound to advertise the Store Closing Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.    At the conclusion of the Store Closing Sales, the Consultant shall, subject to the Consulting Agreement, vacate the Stores and the Distribution Centers in broom clean condition; *provided* that Consultant may abandon any M&E not sold in the Store Closing Sales at the conclusion of the Store Closing Sales, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the M&E at their own cost prior to the termination date. Any abandoned M&E left in a Stores after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Debtors. For the avoidance of doubt, as of the Sale Termination Date, the Consultant may abandon, in place and without further responsibility or liability of any kind, any M&E.

5.    The Consultant and the Debtors may advertise each Store Closing Sale as a "store closing," "sale on everything," "everything must go," or similar themed sale, and to the extent permitted in the Approval Orders, "going out of business". The Consultant and the Debtors may also have "countdown to closing" signs prominently displayed in a manner consistent with these Store Closing Procedures. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Debtors in accordance with these Store Closing Procedures.

6.    The Consultant shall be permitted to utilize sign walkers, display, hanging signs, and interior banners in connection with the Sales; *provided* that such sign walkers, display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Debtors and the Consultant shall not use neon or day-glo on its sign walkers, display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs

---

[1]    Capitalized terms used but not defined in these Store Closing Procedures have the meanings given to them in the Interim Order to which these Store Closing Procedures are attached as **Exhibit 1** or the Motion to which the Interim Order is attached as **Exhibit A**, as applicable.

or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Store Closing Procedures. In addition, the Debtors and the Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Stores does not require entry into the enclosed mall common area; *provided*, however, that such banners shall be located or hung so as to make clear that the Store Closing Sales are being conducted only at the affected Stores, and shall not be wider than the storefront of the Closing Stores. In addition, the Debtors and the Consultant shall be permitted to utilize sign walkers in a safe and professional manner and in accordance with the terms of the Order. Nothing contained in these Store Closing Procedures shall be construed to create or impose upon the Debtors or the Consultant any additional restrictions not contained in the applicable lease agreement.

7.      The purchasers of any Merchandise sold during the Store Closing Sales shall be permitted to remove the Merchandise through the front of the Closing Stores, or through the back or alternative shipping areas at any time.

8.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

9.      Except with respect to the hanging of exterior banners, the Consultant shall not make any alterations to the storefront or exterior walls of any Stores, except as authorized by the applicable lease.

10.     The Consultant shall not make any alterations to interior or exterior Stores lighting, except as authorized by the applicable lease. No property of the landlord of a Stores shall be removed or sold during the Store Closing Sales. The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Stores.

11.     The Consultant shall keep Stores premises and surrounding areas clean and orderly consistent with present practices.

12.     Subject to the provisions of the Consulting Agreement, the Consultant shall have the right to use and sell all M&E. The Consultant may advertise the sale of the M&E in a manner consistent with these guidelines. The purchasers of any M&E sold during the Store Closing Sales shall be permitted to remove the M&E either through the back or alternative shipping areas at any time, or through other areas after applicable business hours, *provided, however* that the foregoing shall not apply to *de minimis* M&E sales made whereby the item can be carried out of the Closing Stores in a shopping bag. For the avoidance of doubt, as of the Sale Termination Date, the Consultant and the Debtors may abandon, in place and without further responsibility, any M&E.

13.     At the conclusion of the Store Closing Sales at each Stores, pending assumption or rejection of applicable leases, the landlords of the Closing Stores shall have reasonable access to the Closing Stores' premises as set forth in the applicable leases. The Debtors, the Consultant, and their representatives and agents shall continue to have access to the Closing Stores as provided for in the Consulting Agreement.

14.     The rights of landlords against the Debtors for any damages to a Stores shall be reserved in accordance with the provisions of the applicable lease.

15.     If and to the extent that the landlord of any Stores affected hereby contends that the Debtors or the Consultant is in breach of or default under these Store Closing Procedures, such landlord shall email or deliver written notice by overnight delivery to the Debtors and the Consultant as follows:

> If to the Debtors:
>
> Art Van Furniture, LLC
> 6500 14 Mile Road
> Warren, MI 48092
> Attention: Michael Zambricki
>
> with copies (which shall not constitute notice) to:
>
> Benesch, Friedlander, Coplan & Aronoff LLP
> 222 Delaware Avenue, Suite 801
> Wilmington, Delaware 19801
> Attn: Gregory Werkheiser & Michael J. Barrie
>
> -and-
>
> Montgomery McCracken Walker & Rhoads LLP
> 437 Madison Avenue
> New York, NY 10022
> Attn. Maura I. Russell

If the parties are unable to resolve the dispute, either the landlord or the Debtors shall have the right to schedule a hearing before the Court on no less than five (5) days' written notice to the other party, served by email or overnight delivery.

# EXHIBIT K

AB_000735

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                    .   Chapter 11
IN RE:                              .
                                    .   Case No. 20-10553 (CSS)
ART VAN FURNITURE, LLC, et al., .
                                    .   Courtroom No. 6
                                    .   824 North Market Street
                                    .   Wilmington, Delaware 19801
                                    .
                   Debtors.         .   March 12, 2020
. . . . . . . . . . . . . . . . .   2:00 P.M.
```

TRANSCRIPT OF CONTINUED FIRST DAY HEARING
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Gregory G. Werkheiser, Esquire
                          Michael J. Barrie, Esquire
                          Jennifer Hoover, Esquire
                          Kevin Capuzzi, Esquire
                          John C. Gentile, Esquire
                          BENESCH, FRIEDLANDER, COPLAN
                            & ARONOFF LLP
                          222 Delaware Avenue, Suite 801
                          Wilmington, Delaware 19801


Audio Operator:           Leslie Murin

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          (302)654-8080
                          Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES (Continued):

```
For the Debtors:          Marua I. Russell, Esquire
                          MONTGOMERY MCCRACKEN WALKER
                            & RHOADS LLP
                          437 Madison Avenue, 24th Floor
                          New York, New York 10022


For U.S. Trustee:         Linda Richenderfer, Esquire
                          David Buchbinder, Esquire
                          UNITED STATES DEPARTMENT OF JUSTICE
                          OFFICE OF UNITED STATES TRUSTEE
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, Delaware 19801


For Wells Fargo Bank:     Jennifer Feldsher, Esquire
                          MORGAN LEWIS & BOCKIUS LLP
                          101 Park Avenue
                          New York, New York 10178

                          - and -

                          Cory Falgowski, Esquire
                          BURR & FORMAN LLP
                          1201 N. Market Street, Suite 1407
                          Wilmington, Delaware 19801


For Jofran Sales, Inc.:   Jeffrey R. Waxman, Esquire
                          MORRIS JAMES LLP
                          500 Delaware Avenue, Suite 1500
                          Wilmington, Delaware 19801


For Landlords:            Leslie C. Heilman, Esquire
                          BALLARD SPAHR LLP
                          919 North Market Street, 11th Floor
                          Wilmington, Delaware 19801


For Hilco & Gordon        Steven E. Fox, Esquire
Brothers:                 RIEMER & BRAUNSTEIN LLP
                          Times Square Tower, Suite 2506
                          Seven Times Square
                          New York, New York 10036
```

APPEARANCES (Continued):

For Levin Furniture:          William C. Price, Esquire
                              CLARK HILL PLC
                              One Oxford Centre
                              301 Grant Street, 14th Floor
                              Pittsburgh, Pennsylvania 15219


TELEPHONIC APPEARANCE:

For the Debtors:              Beth E. Rogers, Esquire
                              ROGERS LAW OFFICES
                              The Equitable Building
                              100 Peachtree Street, Suite 1950
                              Atlanta, Georgia 30303

AB_000738

<u>FIRST DAY MOTIONS</u>:

**Customer Programs Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Implement and Administer Essential Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief [Docket No. 27; Filed March 9, 2020]

**Ruling: Order Entered**

**Store Closing Sales Motion.** Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to §327(a) of the Bankruptcy Code and (V) Granting Related Relief [Docket No. 52; Filed March 9, 2020]

**Ruling: Order Entered**

**Levin DIP Financing Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 364(c), and 364(d), and (II) Granting Related Relief [Docket No. 49; Filed March 9, 2020].

**Ruling: Order Entered**

(Proceedings commence at 2:40 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  Good afternoon everybody.

It's been a long time since I started a hearing forty minutes late.  I very much apologize.  As I'm sure you're all aware, things have been developing quickly.  So, it's taking a lot of my time.  I apologize.

MR. WERKHEISER:  Your Honor, for the record Gregory Werkheiser of Benesch Friedlander Coplan & Aronoff LLP.

Certainly no apology necessary.  We're all working under less than ideal circumstances these days and doing the best we can.

If Your Honor is ready I can provide, sort of, a brief overview of where we stand generally and also wanted to take the opportunity to preview some issues surrounding the company's financial situation that are developing and coming to light presently, as if we needed more problems to contend with in this case, Your Honor.

So, just to refresh Your Honor's recollection, one of the motions that was on for that hearing, but got carried over to this hearing was the debtor's customer practices motion.  We have worked closely with Ms. Richenderfer and her colleagues at the U.S. Trustees Office and our other

stakeholders over the last couple of days.  I think we have gotten to a place where we're going to be able to proceed consensually to submit an interim order with revisions responsive to both the feedback from the U.S. Trustees Office and Your Honor's comments at our first day hearing.  So, I am hopeful that will be fully consensual in a few minutes and just a function of walking through an order.

With respect to the Levin DIP financing facility, again, my expectation is that that is going to proceed on a consensual basis. There have been some changes that we will need to highlight for Your Honor, but in terms of impacting anybody who is not fully consenting to that arrangement they should not have any material adverse effect.

We, as I understand, remain contested as it relates to the GOB consultant motion on a number of issues with the U.S. Trustee.  And Ms. Russell will be able to provide Your Honor an overview of where things stand in a moment.  I think most of the other responses, formal and informal that we knew about at the conclusion of the hearing and even several that have been made aware to us since then, we have been able to successfully address and resolve to everyone's satisfaction.

To my knowledge, with the exception of, I think, some objections that hit the docket this morning or an objection that hit the docket this morning the only other

AB_000741

objection that remains is that of the U.S. Trustees Office.

Your Honor, what we propose to do, in terms of the agenda, would be to take customer practices first, the Levin-Wolf DIP financing facility second and then do the GOB matters last. I think the first two items we can take care of relatively quickly.

THE COURT: Okay.

MR. WERKHEISER: Your Honor, in the interest of full disclosure to the court, before we jump in I do want to highlight what is a developing situation in a case that is already fairly strapped for cash, and just because we don't want to surprise either anyone in the courtroom or Your Honor.

Shortly before the company filed, as is not uncommon in these situations, several of the credit card processors began escalating their reserves including Bank of America Merchant Services which imposed a 100 percent reserve on any transactions at that point. This coincided with the commencement of the prepetition commencement of the store closing sales. So, volume was much higher than would normally be the case.

By the company's calculation at this point Bank of America is holding something on the order of $24 million dollars of transaction related value. And at least our information suggests that this has no reasonable relation to

any, sort of, adequate protection they would require based on threatened chargebacks or any other need for it.

The other component of this is that the information is just now rolling in from the first sales that have occurred since the petitions were filed and at least the preliminary information we have suggests that they are not remitting more than a small fraction of funds related to those transactions as well. And certainly whatever debate one could have about their activities up until the petition date there's probably no debate that they're violating the stay now in our view.

So, Your Honor, just to preview, and I'm sorry that we may end up imposing on the court again, but we may be in here quickly seeking some sort of relief to address this because this is, sort of, an existential threat to the case as things currently stand. It threatens our compliance with covenants and cash collateral order, and puts an already cash starved case on, you know, basically life support at best.

So, I will just leave it at that. Obviously, everybody's rights are fully preserved if we do have to come before the court, but it may be a necessity.

Your Honor, turning to the agenda, on customer programs, as I said, we were able to work closely with the U.S. Trustees Office, I think, on that to address the open issues and we were able to try to address Your Honor's

comments.

If I may approach the bench I have a redline of
the order marked against the version that we had in court and
filed with the motion at the first day hearing.

So, what we've tried to do here, Your Honor, is to
reproduce, per Your Honor's instruction, the details of the
wind down customer programs beginning at Page 3 of the order.
Both a detailed statement of how the company is treating
customer deposits going forward with a new Exhibit 1.  That
is, essentially, a matrix that shows the treatment in various
scenarios where customers have previously provided deposits.
It makes it clear what expectations should be.

With respect to refunds and exchanges we've fully
reproduced a statement of what that policy is as part of the
wind down, virtually verbatim for what was in the motion,
Your Honor.  We have a clear statement of gift cards being
required to be redeemed by April 15th.

Finally, and, again, this is consistent with Your
Honor's feedback and the feedback we got from the Office of
the United States Trustee, Subpart (d) on Page 4 of your
redline outlines our customer communications plan here.  So,
we are, as I indicated at the afternoon session on Tuesday's
hearing, that we are going to do an email blast to all of the
customers who have provided customer deposits advising them
of the current policies and the need to act quickly to obtain

AB_000744

the benefit of those customer deposits.  For those customers
that did not provide email addresses the company believes
that it has mailing addresses and would simultaneously send
out a notice by mail to all of those parties.

In addition, the statement of the liquidation
terms policy will be prominently displayed on the company's
website and changes are going to be made by Monday to make
sure that that is more prominent then it is now; enlarging
the text, making it bold face.

THE COURT:  Monday?

MR. WERKHEISER:  I mean we gave ourselves till
Monday to implement all of this, but it may be happing as we
speak.

THE COURT:  Its Thursday.  You're open Friday,
you're open Saturday, you're open Sunday; so, sooner.

MR. WERKHEISER:  Understood, Your Honor.

THE COURT:  IT people are like associates.
They're used to working all the time.

MR. WERKHEISER:  Then similar information will be
put on the claims agent website as well.

In addition, I consulted with Ms. Richenderfer
before the hearing and she just asked me to confirm for the
record, and I can confirm for the record, that to the extent
that anybody had submitted a customer deposit for furniture
that is in the company's possession, but for which the party

AB_000745

had not yet taken delivery as of the petition date the company is continuing to notify those people in the ordinary course that, basically, they can get their stuff delivered or that they can come pick it up as appropriate. That has not changed; notwithstanding the fact that we're now involved in this store closing process.

Your Honor, the only other changes were to just, again, add a decretal Paragraph 4, which is consistent with the relief in the motion, about continuing to accept non-cash payments and abiding by the terms of the processing agreements with respect to those.

Finally, just backing up to Paragraph 2 we plugged in the dates consistent with scheduling of the second day hearing and seven day before that objection deadline.

THE COURT: Does anyone wish to be heard in connection with the customer programs motion?

MS. RICHENDERFER: Your Honor, Linda Richenderfer from the Office of the United States Trustee.

Just a comment that I think should be put on the record with respect to this motion. In reading materials associated with the sale motion there's representations in there that of the $35 million dollars being held in deposits that product exists that is associated with 18 million of the 35 million. That is a discussion I had with Mr. Werkheiser prior to beginning this conference today. I would hope and I

would think that debtors are working very hard to reach out to the holders of those $18 million dollars in deposits to let them know that the product is there so it can be delivered to the extent that they want to move forward with the transaction.

I know we had questions at the first day hearing on Tuesday regarding how much of this product is available or not available, but somebody has been able to identify $18 million dollars' worth of product and associated with deposits. So, I hope the debtors continue every effort because, otherwise, product may go out the door that really belongs to a creditor who has a deposit with the debtors.

THE COURT: Okay. Thank you.

The only date -- the only place I see a date here is March 16th for the customer communication.

MR. WERKHEISER: Yes, Your Honor.

THE COURT: But you had mentioned something else?

MR. WERKHEISER: No, Your Honor. We had given ourselves until the 16th to fully implement the customer communication plan.

THE COURT: Okay. That's all right. I mean sooner is better than later, but I understand. Monday is fine.

MR. WERKHEISER: All right. Thank you, Your Honor.

THE COURT:  All right.  I will sign this order whenever you give it to me.

MR. WERKHEISER:  Okay.  Would you prefer us to upload it or do you want a copy?

THE COURT:  I'm sorry.

MR. WERKHEISER:  Do you need us to upload it or hand up a clean copy?

THE COURT:  If you have a clean that's presentable I'll sign that.

MR. WERKHEISER:  Your Honor, why don't we upload it because I think we set it up --

THE COURT:  All right.  That's fine.

MR. WERKHEISER:  (Inaudible).

THE COURT:  Yes, you may.

MR. WERKHEISER:  All right.  Thank you, Your Honor.

Your Honor, that brings us to the Levin/Wolf DIP financing facility, Item 2 on today's -- excuse me, Item 3 on today's agenda.  Your Honor, this was one of the items that we got on file a little bit too late to be entertained at Tuesday's hearing.

To refresh Your Honor's recollection there is a subset of the debtors' overall enterprise that consists of Levin and Wolf furniture branded stores that operate primarily in Pennsylvania.  Those were acquired in 2017 and -

- well, certainly certain back office functions have been integrated with the debtors' broader business of the outward facing parts of that business and many of the store level operations have remained distinct from the balance of the debtors' business.

As things had developed leading up to the bankruptcy, as was discussed at our last hearing and through the evidence we put in through Mr. Ladd's first day declaration and Mr. Stogsdill's proffer as well, as we explained there as a consortium deal that parties were putting together. And unfortunately that fell apart at the eleventh hour near the end of February.

In the wake of that falling apart the debtors, with the assistance of the Levin group, were able to resuscitate a transaction for the sale of the, I believe its, 40 stores that are the Pennsylvania based Levin and Wolfe Furniture stores which is the subject of an APA and motion that we hope to get on file as early as tomorrow, but most likely Monday.

Those stores are to be sold as a going concern. That is a sale that once consummated would stand to, among other things, preserve a thousand jobs nearly. It then also produces benefits to various creditors who could expect to have claims assumed as part of that process and to customers who might fare better in that process with respect to gift

card obligations, warranties and customer deposits then they would in the general liquidation process.

This DIP facility, Your Honor, exists solely to support that transaction. The only borrower is the Sam Levin Inc., entity which is the entity that holds those assets. The collateral for the DIP facility, Your Honor, is inventory and primarily the inventory that would be purchased using the proceeds of the DIP facility. And the DIP facility when that sale, hopefully, ultimately closes, will be credited against the purchase price as part of that DIP facility. Essentially, it is of limited recourse, in most other respects, because of the limited collateral pool.

The DIP facility, Your Honor, when we came before the court on Tuesday, and this is a function of how fast things have been moving, Your Honor, and trying to get real time information to back up the documents, but as originally constructed the DIP facility contemplated an interim borrowing of 3.5 million and final 7. It's been significantly upsized now. The proposed order that we filed shortly before today's hearing contemplates interim borrowing of up to 10 million and all in number subject to final approval of 20 million.

Again, the other essential characteristics of the facility are the same. And, essentially, I think the defining principal behind the DIP facility is --

THE COURT:  So, you've gone from seven to 20.

MR. WERKHEISER:  Seven to 20, Your Honor.

THE COURT:  And three and a half to ten.

MR. WERKHEISER:  Yes.  And at the risk of testifying from the podium the underlying factors that have produced that result, you know, some of it is information flow because things have been moving very quickly, but its largely a function of the fact that because the debtors have been in distress for some time that the inventory on the floor in most of these stores is, you know, primarily the floor samples and there's a little warehouse of inventory that was available on orders.

As I understand it, the company has historically done 121 to 14 million cost of sales every 30 day period of prime inventory. The level right now is down well under 8 million.  And as I understand it that based on the, you know, review of orders of outstanding there is a significant number of special orders for customers that remain to be filled. That debtor and the buyer are hopeful to be able to use proceeds to fill those special orders, maintain that customer relationship and honor those customer deposits consistent with everybody's expectations.

The last factor, I think, that people began to appreciate as they got deeper into this that may not have been fully appreciated from the outset is that sales

personnel at these stores only get paid once. The customer
actually takes delivery of the furniture or other merchandise
that they order.

So, the buyer who is very keen both to maintaining
going concern value and to make sure that this is done in
such a way that does the least, you know, violence possible
to the customer and employee communities has indicated to us
or has made us aware that they would prefer to have
sufficient availability under this to make sure that those
commission obligations can get honored in the ordinary
course.

Those are the underlying, sort of, factors that
have resulted in the decision to upside the DIP. To my
understanding we have socialized this change with our term
loan and ABL lenders, with the U.S. Trustees Office, and
given the uniquely compact nature of this DIP where the only
collateral is this inventory and proceeds thereof, and the
fact that the existing lienholders are the ABL's and the term
loan lenders and they're consenting to this arrangement no
one's ox, at the end of the day, really gets gored other than
theirs, and our purchaser/DIP lender, in the event that the
transaction does not close.

So, it's against that backdrop that we're before
Your Honor today asking for interim approval of the DIP. We
would, for purposes of that, incorporate our record from a

first day hearing including Mr. Stogsdill's proffer, much of
which overlaps with the record we would want in support of
approval of this DIP facility on an interim basis.

        THE COURT:  All right.  Does anyone wish to be
heard?

        Mr. Waxman, good afternoon.

        MR. WAXMAN:  Good afternoon, Your Honor.  May I
please the court, Jeff Waxman of Morris James on behalf of --

        THE COURT:  Could you do me a favor.  Could you
actually point those towards you?  Thank you.

        MR. WAXMAN:  Is this better, Your Honor?

        THE COURT:  Yeah.

        MR. WAXMAN:  Thank you, Your Honor.

        Your Honor, first I'm kind of pulling double duty
here.  I am here on behalf of Serta Simmons Bedding Company.
Serta Simmons, just by way of background, as Your Honor is
likely aware, it provides mattresses and bedding.  They sold
-- prior to the petition date they were owed approximately
$2.7 million dollars.  And Serta Simmons believes that close
to a $1 million dollars of that claim is entitled to an
administrative priority pursuant to Section 503(b)(9).  So,
this is not an insignificant claim.

        Your Honor, I do realize that we are only here on
an interim basis, but Serta Simmons has some issues with the
proposed financing specifically now that the amount has gone

up so much.  First, it seeks the -- the motion seeks to provide the DIP lender superpriority administrative expense thereby subordinating administrative claims.  And Serta Simmons has an administrative expense in the right to reclaim its goods which shouldn't be subordinated and funds should be carved out to pay the administrative expenses whether or not the sale goes through.

Second, Your Honor, the buyer and the lender here are, essentially, the same entity and should not get a superpriority lien subordinating the administrative expenses and reclamation rights of suppliers without the buyer having to pay those claims as part of the purchase price.

Certainly, this case should not result in administrative claimants receiving worse treatment than they did on the petition date and particularly now that the amount of the DIP loan has done up so significantly in only the last couple of days there is certainly that threat.

Finally, the DIP collateral should not include all receivables.  It should just be limited to the receivables from inventory bought with the DIP funds.  Generally, the whole description of collateral needs to be rewritten to restricted to only a security interest in the that inventory purchase with the DIP funds.

If Your Honor has any questions I am happy to address them.

THE COURT:  I do not.

MR. WAXMAN:  Thank you, Your Honor.

THE COURT:  Anyone else?

(No verbal response)

THE COURT:  You want to respond, Mr. Werkheiser?

MR. WERKHEISER:  I will and I believe Mr. Price is here on behalf of the Levin Group which is serving as the DIP lender here.  I believe if Your Honor will indulge him he'd like to be heard as well.

So, with respect to this I understood a couple points here.  So, first, this is all news to us, Your Honor.  So, Mr. Waxman filed --

THE COURT:  First day hearing.

MR. WERKHEISER:  Well, not precisely, but Mr. Waxman, obviously, was very busy this morning and filed a lengthy complaint with, I think, like thirty something exhibits, a TRO motion, an objection on behalf of another client.

THE COURT:  Just don't beat this horse.  Move on.

MR. WERKHEISER:  And so he's here telling me verbally that he has a client that has a potential administrative claim and we've had no ability to test any of those contentions.  I mean he may or he may not, but I think if he wants to show up an contest what is appropriate relief in the context of DIP financing, you know, the onus was on

him to at least come in and come in with some evidence and
some concrete information to support his clients asserted
theoretical administrative claim.

        But be that as it may --

        THE COURT:  I have to say I take issue with that.
This is an emergent hearing on, at this point, 36 hours'
notice.  Its, in effect, a first day hearing and he's a
creditor.  The onus isn't on him.  It's your burden of proof.
If you don't think we can go forward we'll continue this to
next week and we'll have an evidentiary hearing.  But you
can't jump on a creditor who didn't have advance notice of
this DIP motion until eight p.m. the day before the first day
hearing and fault them for not being ready for a contested
evidentiary hearing.  If that's your position fine, this
hearing is over.  We will do it next week.

        MR. WERKHEISER:  Respectfully, Your Honor, these
issues were out there in connection with cash collateral as
well.  And so, you know, I'm not impugning anybody's motives
or --

        THE COURT:  Cash collateral is completely
different than putting new debt on the company.  It's
completely different.  You're putting a $20 million dollar
superpriority admin claim in front of his company.  The only
thing you would do with cash collateral is a diminution
claim, okay, that will possibly be a superpriority claim.

It's completely different than putting $20 million dollars of new debt in front of him.

        MR. WERKHEISER:  Understood, Your Honor.

        THE COURT:  So, we're going forward, but this is a loser argument.  So, I hope you have a better one.

        MR. WERKHEISER:  Your Honor, what I would like to just also highlight for Your Honor, again, is that I think as is clear in the letter of intent that was part of the first day declaration that we filed previously it is the intent to use the proceeds of the DIP to pay for the inventories being acquired.  As is set forth in that letter of intent the buyer is committing to assume certain 503(b)(9) obligations as well and the post-petition ordinary course obligations for those businesses.

        So, those items are the subject of commitments by the buyer.  We are in the process of documenting that in a binding APA that as I indicated would be expected to be filed no later than Monday.  We are trying to seek expedited, as much as Your Honor can accommodate us, approval of that sale process precisely because there really is no other path to save this business as a going concern and save those jobs.

        I don't think -- certainly this is not designed to prejudice anyone else.  I think the lender has asked for those traditional protections that a DIP lender would want and actually has asked for a lot less than your typical DIP

lender would demand in this situation where there really was not a substantial existing collateral base to support the loan.

So, let me limit my comments there. And since I cannot speak specifically for what our DIP lender can and cannot do in terms of perhaps getting Mr. Waxman's client comfortable and Your Honor comfortable, but I would just submit that what we put before the court is not prejudicial to anyone as is currently crafted.

Thank you.

THE COURT: Thank you.

Mr. Price?

MR. PRICE: Good afternoon, Your Honor; William Price, Clark Hill, on behalf of Levin Furniture LLC.

Your Honor, will try to isolate my comments to just simply responding to the one pending objection, but I'm happy to answer any questions you have about the DIP. The intention is, as Mr. Werkheiser presented it, which is provide new inventory to replenish as best we can to reinvigorate a going concern for a contemplated sale.

The DIP is a commitment by Mr. Levin, frankly, to just make sure that his employees do have the ability when he takes them over as his employees again to be able to work, and function, and have compensation. He committed quickly to increase the DIP amount because there was further discussions

when we got continued that we would need a couple more weeks
and he committed to ensure that there would be enough space
and availability to do what the company needed to do.  So,
that is our view of the expansion of the DIP.

         With respect to treatment I think I can make it
easier because this isn't the intention.  If the drafting
wasn't done properly we will tailor it and make everybody
comfortable.  But the purpose of the super-priority claim was
to the extent inventory is purchased, and to the extent that
things don't close, and we don't get our credit, and there's
a liquidation, and there's an accounting tracking on the
skews that relate to the DIP liquidated inventory, and
there's a deficiency that was our request that we have some
protection for fronting the money.  His client would have
been paid for post-petition deliveries with the money used
from the DIP that we be provided some superpriority
protection for the efforts and the fronting of money when no
other financial party will put any money into this estate.

         So, that was our request.  It's not for purposes
of just saddling the estate with a massive superpriority
claim.  It's in the event that the thing craters and it
liquidates, and the inventory that was purchased within the
last few weeks precipitously drops in value and there is a
deficiency there.  So, that is the intention and if there is
a modification necessary to the order or the credit agreement

we will do it. If it's just a non-starter for the court I will talk to my client quickly and we'll talk about which tranche they get in the form of a deficiency claim. We really just want to get the DIP in place and get the thing functioning and flowing.

On the other issue on 503(b)(9)'s the LOI is of record, I believe, and there is an assumption of 503(b)(9)'s to the extent they relate to the Sam Levin entity. So, if it's a party that shipped to the stores that we're taking over we would assume those 503(b)(9)'s to the extent that they're authenticated and we would pay them as part of our purchase. So, I don't believe that to be an issue to the extent that we're talking about the Levin/Wolf stores that are part of the transaction.

The last piece of the puzzle is there's no guarantees in life. We have no idea if we're going to own this company in a couple of weeks. So, we want some base protections and we greatly appreciate everything the court has done. The U.S. Trustee was very user friendly in negotiating out the comments they had. So, I think that we do have a DIP that's properly designed to have the minimally invasive technique to try to keep this thing afloat, but if there is still an issue I'm happy to talk in the hall, hammer it out, get my client on the phone and try to get something that works for everybody whether he has a claim or not.

AB_000760

THE COURT:  Thank you.

MR. PRICE:  Thank you.

THE COURT:  Mr. Waxman, reply -- oh, Mr. Werkheiser.  Sorry, Mr. Waxman.  Hang on.

MR. WERKHEISER:  If I could just take a minute with Mr. Price.

MR. WAXMAN:  Actually, while --

THE COURT:  Well, no, he needs to be able to listen to what you're saying.  He's your opponent.

MR. WAXMAN:  I just wanted to say I thought it might be helpful if we're able to speak.  My co-counsel is on the phone.  So, it might make sense for us to speak about some issues.

THE COURT:  You want a break?

MR. WAXMAN:  I think that might be helpful, Your Honor.

THE COURT:  Mr. Werkheiser, is that acceptable?

MR. WERKHEISER:  Your Honor --

THE COURT:  You got me all day.  I'm staying till we're done today.  So, if we're late we're late.  So be it.  Who knows if we'll ever be allowed to be in the same room ever again after today.

(Laughter)

MR. WAXMAN:  Not in basketball.

MR. WERKHEISER:  Your Honor, I think a break

wouldn't hurt.

    THE COURT:  Sure.

    MR. WERKHEISER:  I think this is something we can

resolve.

    THE COURT:  If you get headquarters back at home

base to upload that we'll get that order because I would like

to get that on since you are actually doing all the things

that the order says you are allowed to do.  So, the sooner we

actually get it authorized the better.  So, we will check it

out when we get back.

    MR. WERKHEISER:  Thank you, Your Honor.

    THE COURT:  We'll take a short recess.  Just let

us know when you're ready to go.

  (Recess taken at 3:13 p.m.)

  (Proceedings resumed at 3:56 p.m.)

    THE CLERK:  All rise.

    THE COURT:  Please be seated.

    MR. WERKHEISER:  All right.  Thank you, Your

Honor.

    THE COURT:  No problem.

    MR. WERKHEISER:  For the record Gregory

Werkheiser.

    I think we are able to use the time constructively

as it relates to the Levin DIP financing motion.  And I

believe that we have come to an understanding with Mr.

Waxman's client, and co-counsel, and Mr. Waxman about allowing us to proceed on that in a fully consensual manner.

So, the concern Your Honor, as was articulated, was that --

THE COURT: I'm sorry.

MR. WERKHEISER: What's the name of your client?

MR. WAXMAN: Serta Simmons.

MR. WERKHEISER: Serta Simmons might, under some theory, have an administrative claim by virtue of certain sales guidelines that they believe were part of a prepetition contract.

Leaving that issue aside, not asking the court to address that one way or the other today, what we have agreed to do in the context of the DIP order, I believe, to give everybody comfort on that point is, one, I'm going to just confirm everyone's understanding for the record that the definition of DIP collateral that appears in the order as revised -- and if I may approach, Your Honor, I have a redline copy of the revised interim order that has that definition now built into it.

THE COURT: Thank you.

MR. WERKHEISER: Your Honor, this definition of DIP collateral appears on the first page in Footnote 3 and that is adapted without substantive change from the DIP credit agreement that was attached to the motion.

AB_000763

Broadly speaking what it says is that the new inventory that Sam Levin Inc. purchases using the proceeds of the DIP is the collateral. And the proceeds of that inventory are the collateral. It's not reaching back in time to grab other inventory or other assets unrelated. So, I think we have come to an understanding that resolves their concerns there.

The second concern was the granting of the superpriority administrative claim. I think as I understand it the way we've been able to successful address that point is that we are going to incorporate language into the DIP order that acknowledges the terms of the LOI that contemplate that 503(b)(9) obligations related to the Sam Levin Inc., entity are going to be assumed upon closing of the sale transaction and make clear that the final asset purchase agreement will honor those terms.

I just ask Mr. Waxman or his co-counsel to confirm that I accurately recited our understandings in that regard.

THE COURT: Thank you, Mr. Werkheiser.

Mr. Waxman?

MR. WAXMAN: Your Honor, that is correct. I understand we will see a revised form of order that we will get a chance to make sure that everything is correct and it will be submitted under certification of counsel.

MR. WERKHEISER: That's correct, Your Honor. We

will get that done hopefully after we get done today.

        THE COURT:  Okay.  Thank you.

        MR. WERKHEISER:  Thank you.

        THE COURT:  Is there anything else in connection with the DIP?

   (No verbal response)

        THE COURT:  All right.  Subject to the -- I actually look at the redline before I do that.

        MR. WERKHEISER:  Your Honor, I can just walk you through it quickly if that's helpful.

        THE COURT:  I'll just page through it.  It doesn't look like there's a lot of changes.

        If you're on the phone I'd appreciate it if you would please mute your line; otherwise, we get static and a sound from your line. So, if you could please mute your line unless you're speaking.  Thank you.

        Okay.  This is fine.

        MR. WERKHEISER:  Thank you, Your Honor.

        THE COURT:  Everyone is standing though.  I was about to rule.

        Subject, obviously, to the changes that were just discussed in court with Mr. Waxman's client I'm prepared to approve the DIP and sign the order along the lines of the one you just showed me with only those changes that are still in flux.  And as soon as you get it to me under certification of

counsel I will get it filed, and signed, and docketed.    Then
you will be good to go.

            MR. PRICE:  Thank you so much, Your Honor.
William Price.

            I have to leave and my colleague, Ms. Grivner, is
going to stay for the remainder of the proceedings.  I really
appreciate all your time.

            THE COURT:  You're welcome.  Thank you.

            MR. WAXMAN:  Your Honor, can I ask the indulgence
of the court, and everybody, I have to step out for two
minutes.  I just got an emergency call from my mother's
caretaker.

            THE COURT:  Oh, of course.  Should we take a
break?

            MR. WAXMAN:  If we could.  I promise it won't be
more than three minutes.

            THE COURT:  Of course.  Happy to give you that
accommodation.

            MR. WAXMAN:  I apologize to everybody in the
court.

            THE COURT:  We will take a very short recess for
in deference to Mr. Waxman's personal life.

            MR. WERKHEISER:  Thank you, Your Honor.

            THE COURT:  And the customer motion has been
docketed.  The order has been docketed.

MR. WERKHEISER:  Thank you, Your Honor.

(Recess taken at 4:01 p.m.)

(Proceedings resumed at 4:09 p.m.)

THE CLERK:  All rise.

THE COURT:  Okay.  So, the DIP order is taken care of, the customer procedures motion that order has been entered.

MR. WERKHEISER:  Yes, Your Honor.

THE COURT:  So, that leaves us with store closing.

MR. WERKHEISER:  Store closing. Main even. Fortunately for this I get to sit down and I'm going to hand the podium to Ms. Russell.

THE COURT:  Okay.

MR. WERKHEISER:  Thank you.

MS. RUSSELL:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. RUSSELL:  Marua Russell, Montgomery McCracken Walker & Rhoads, proposed special counsel for the debtors.

We are here in connection with the debtors' emergency motion for entry of an interim order today approving the bid procedures for a store closing sale and authorizing customary bonuses to store employees, and authorizing the assumption of a consulting agreement between the debtors and various entities affiliated with Gordon Brothers Retail Partners and Hilco Merchant Resources LLC.

Your Honor, just so that we have a listing in
connection with the motion, which the motion was filed at
Docket Number 52, Your Honor, we have the declaration of Mr.
David Ladd, which was actually filed at Docket Number 12,
which was filed in connection with and in support of all of
the first day motions.

Your Honor, we also have the declaration of Mr.
Dennis Stogsdill which was filed in conjunction with the
first day motion.  Mr. Stogsdill is a director of Alvarez &
Marsal who is the financial advisor to the debtors.

In addition, Your Honor, yesterday afternoon there
was a declaration filed at Docket Number 96, the declaration
of Mackenzie Shea of Gordon Brothers in support of the
debtors' motion.

In addition, at Docket Number 97 there was a
declaration of Sarah Baker in support of Hilco, also in
support of the debtors'' motion.

Since we were before Your Honor, although not on
this motion, that we were before Your Honor on Tuesday, we
have had several discussions with counsel for the landlords
who were here in the court.  We revised and circulated a
revised draft of the proposed order, interim order,
addressing issues that had been raised at that hearing.  And
we circulated that last evening to everyone who had filed a
notice of appearance in the case.  We subsequently received

additional comments from various parties and incorporated those comments. And we filed or uploaded a redline draft of the consolidated revised blackline of the order showing all agreed upon changes between the proposed interim order that was filed with the motion and what we had agreed with the various parties.

Your Honor has not yet seen that order. While we do have some clean-up changes to make based upon comments we received in the courtroom, but we do have copies. We're happy to show it to the court when Your Honor is ready to review that.

THE COURT: Okay.

MS. RUSSELL: With respect to the outstanding issues in connection with the motion there are the Office of the United States Trustee raised some concerns regarding the consulting agreement, the motion and the proposed order. We believe we have resolved the majority of those issues subject to the one issue, and I will allow the Office of the United States Trustee to speak as to the substance of that objection, but my understanding is the concern with regard to the relationship between the proposed consultant here in connection with the debtors' assets and the relationship with those entities and the entity that now currently holds the term debt of the debtors.

Other than that we have spoken. There was the

motion also contemplated that the consultant, in addition to providing services to the debtor in connection with the merchandise, machinery and equipment, that the consultant would also provide consulting services to the extent the debtor has elected with respect to the collection of receivables, and also that the debtor would retain the services of affiliates of the consultant Hilco Stream Bank and Gordon Brothers Brands in connection with assisting the debtor with the marketing and sale of the debtors' intellectual property.

While those transactions would not be to the ultimate purchaser were not subject to that motion and the debtors would be required to come back to the court the U.S. Trustee has raised concerns about a Section 327 retention within the context of the debtors' 363 motion currently before the court. So, we have agreed that with respect to the intellectual property, which would be the subject of the Section 327 retention, that that would not go forward today and it would be subject to Your Honor's availability heard on April 6th. And to the extent that the Office of the United States Trustee and/or Your Honor required or would like us to file a separate application seeking to retain those advisors under Section 327 that teh debtors would do so just to separate the issue and any concern about it all being wrapped up into the one motion.

AB_000770

Your Honor, one of the unusual facts and economic terms of this consulting agreement that I have never seen before and I don't think anyone in the courtroom has seen before is the concept that the fee to the consultant in consideration for the services that the consultant has provided is not being paid by the debtor.  Instead, the debtors would reimburse the consultant for the out of pocket consultant incurred expenses that are incurred in connection with a budget that is part of the consulting agreement.

Other than that, any other fees that we would customarily see, 1 percent of sales, 2 percent of sales that we would see on merchandise and 15 percent of sales on machinery and equipment, Your Honor, that's not here.  Those are not fees that the estate is going to incur directly to the consultant.  Instead, the consultant has an economic relationship in the agreement with the holder of the term debt and that any amounts paid would be paid from the recovery under the term debt.

So, from the perspective of the estate it was a win-win.  It enabled the estate to not directly incur those fees on an ongoing basis, but instead those fees were deferred to a later date and to be paid out of a recovery if any that is obtained on account of the term loan debt.  Your Honor, that was a beneficial result for the estate because it did preserve cash-flow.

AB_000771

In addition, Your Honor, an extensive amount of time has been spent on the debtors' new customer policies that addresses this $35 million dollars of customer deposits. The debtor has heavily negotiated with all parties, Wells Fargo as well as the term lenders, to allow the debtors and to not have issues with respect to the priorities and who gets paid what when, but to come up with these customer policies that enables the debtor to either provide by merchandise credit or refund later on down the road to the consumers.

So, in connection with the overall transaction that was a significant benefit to the estate. Those customer deposits and refunds the term lenders have agreed that they would be satisfied prior to any amounts being paid to them. So, the consultant here has agreed to provide the services, but in essence their fee is really on the back end and is really contingent upon them doing an excellent job to get past and through the Wells Fargo amounts that are owed to it as well as whatever amounts that are due and owing are being paid through the debtors' cash collateral motion and budget.

With that, Your Honor, I'm happy to answer any questions that you may have with respect to how we have gone so far, but, otherwise, I would cede the podium to the Office of the United States Trustee to tee-up whatever issues still remain outstanding with respect to the concerns that she has

raised.  I do want to note that we did receive a list of questions from the Office of the United States Trustee late yesterday and the debtors, in consultation with the consultant, provided a detailed response to all of those questions.

THE COURT:  I have no questions.  Thank you.

MS. RICHENDERFER:  Good afternoon, Your Honor; Linda Richenderfer from the Office of the United States Trustee.

I guess I respectfully would not agree with the characterization that we've been able to resolve issues.  I think that there is a major gating issue here and I would respectfully submit that at this point in time that the hearing on this particular motion should be adjourned until a time when due process can be served, and the major stakeholders who are directly impacted by this particular order, the unsecured creditors, have an opportunity to form a committee so that they can fashion a constructive concerted response to the particular transaction that is in front of Your Honor.

This is totally out of the norm, as Ms. Russell said.  This is not your usual situation where it is a fee for service.  We have gotten used to those over the past five years.  And under that scenario we have also gotten used to the court providing interim approval, and, again, fee for

service.  And we have the liquidator, Hilco/Gordon, in a position for running the GOB sales.  At the backend they may come in with other things, they may want to buy-out the inventory that's left, but going into the deal for the most part they're serving as the consultant who is leading the GOB sales.

Here we have an entity that is wearing four different hats in this case.  They are secured lender with a claim for $175 million dollars.  They are controlling the purse strings along with Wells Fargo for this case because the cash collateral order is the means by which the debtor continues to operate and run this Chapter 11 case.

So, the expenses that they're going to get paid that have to be approved through budgets done by the debtor in consultation with the lenders they're one of the lenders.  They're approving the budget that tells then what they can pay for themselves.  And they're also wearing the hat as being a non-327 professional consultant, whatever we want to call them in the normal course, being in charge of the GOB sales.  And then in addition they want to serve as a 327 professional.

All of this was nicely put together for us in one entire agreement.  We've always heard how separate entities, this and that.  They brought it together as one complete package here.  And we know that Hilco, the consultant I'll

call them, isn't doing this for free.  But what we don't know are the economics of the deal.  We have no idea of the economics of this deal here.  I think it's also disingenuous to say that their interests are aligned with those of the estate.  Their interest are aligned with the secured creditor.  Their interest is to get Wells Fargo paid and to get the secured debt paid.

Now at the end Ms. Russell said something that I don't know if this is something that I missed or if this is something that is new, but that the term lender agreed that they would satisfy the deposits before they take any of the money owed to them. I don't see that anywhere in the documentation.  I don't believe that that is a consideration for the court today when looking at the particular transaction the court is being asked to give interim approval to.

We all know once interim approval is given the horse is out of the barn.  And we're doing that when we are not going to have committee formation until next Wednesday.  There are repercussions here.  We need time to analyze this.  Yes, I asked preliminary questions and they were answered.  I don't believe the debtor represented it, I don't believe Mr. Ladd is here today for me to cross-examine.  And I don't believe that there are individuals here could answer the questions that need to be answered.  We need time.  We need

discovery and, again, need the committee to be able to step-in and protect the interests of the unsecured creditors.

THE COURT: Okay. Thank you.

Ms. Russell?

MS. RUSSELL: Your Honor, with respect to the U.S. Trustees Office not being aware of the financial arrangements between the term lender and the consultant I did share with her a letter that we had requested and received from the consultant setting forth the economic terms of that financial relationship. They did request, for confidentiality reasons, that we not file that, but they have consented that that letter be shared with the U.S. Trustees Office, with the creditors committee once appointed, and that to the extent, you know, Your Honor has any questions with regard to that financial arrangement Mr. Steven Fox is here representing the consultant.

With respect to the intellectual property, Your Honor, because we will stipulate to remove that and move that to a separate hearing, the court, the U.S. Trustees Office and any other party in interest can review and object to the retention with respect to the intellectual property on whatever basis that they deem is appropriate. So, we are talking right now that it's the inventory, machinery and equipment that are pretty customary to the consulting agreement.

This consulting agreement, the budget that is part of this consulting agreement was a budget that had been agreed upon and discussed during prior discussions when competing liquidation groups were submitting bids and proposals before ultimately we landed on the consulting agreement with the current consultant.  So, the expenses are identified in the budget that was submitted as part of a liquidation proposal.  There is no mystery to them.

The debtors certain have the ability to, in certain circumstances where we have identified we want to weigh-in and perhaps adjust downward some of the line item expenses to the extent that we determine that we don't think, for example, marketing media purchases that the debtors don't think that those purchases are necessary we reserve the right in the agreement and in the exhibit in the budget to object to those.

So, the one key difference is who's paying the fee to the consultant.  And that fee is being paid out of the backend recovery to the term loan lenders.  So, that is the difference and that difference has created a tremendous benefit to the estate.  Unfortunately, Your Honor, we don't have the time or the financial wherewithal to stop everything now.  We're happy to sit down with the Office of the United States Trustee to discuss any questions, or comments or concerns they have between now and the proposed final hearing

AB_000777

on April 6th.  But we would like to be in a position to get
our signage up, to get into really fully launch into the
store closing program as we need to.

Time is not on our side.  With respect to the
backend there is so much inventory that needs to be
liquidated through these stores.  To the extent we are
further delayed in a launch of that liquidation the more
likelihood is that we could potentially have too much
inventory and have to carry over into the month of May in
operating these stores or some of these stores which is an
additional expense that the company just does not have the
ability to absorb.

So, we would request -- we're happy to sit down
and I'm sure Mr. Fox would likewise say sit down with the
Office of the United States Trustee.  Get them comfortable
that while, yes, unusual this particular structure is a
benefit to the debtors' estate and that we would hope to be
able to resolve those concerns prior to the April 6th
hearing.  And if not we will discuss and present as
appropriate to Your Honor.

MS. RICHENDERFER:  Your Honor, if I may respond
briefly.

Your Honor, one of the problems here is that
because they are controlling so many aspects of the case
we're in a situation where you have the lender basically

AB_000778

standing in the way of a market test which normally this
court would not allow.  The lender here is also the person
that only benefits to the extent that they're part of the
liquidation of the assets on a store by store basis
continuing with the sales, the going out of business sales at
the locations.  So, while I understand and appreciate the
debtors need to continue forward on a path they had chosen we
do have the right to look at that path.  And unfortunately a
lot of parts of that are not within our purview.

Yes, I was given a letter that outlined how things
were going to be divvied up, so to speak, between KKR and the
HGB.  That doesn't tell me the economics of the deal.  I
don't know what HGB paid for the position it has.  So, I
don't know what they're making off of this deal.

I will harken back, Your Honor may recall that
there was a period of time when my office was looking into
the issue of whether or not liquidators in the going out of
business sales should be considered to be 327(a)
professionals.  And Judge Shannon, when issuing his opinion,
stated,

"The established practice requires fulsome
disclosure of the services to be provided and the
compensation to be paid followed by a hearing on the merits
where the debtor must carry the burden under Bankruptcy Code
Sections 365 and 363 that demonstrates that proceeding in

good faith and its proposed course of action reflects the exercise of reasonable business judgment. This structure is compliant with the bankruptcy code and is sufficient to address the U.S.T's legitimate desire for transparency and due process without imposing the additional requirements and restrictions by 327(a)."

Here we are in a situation where the structure is not giving us the transparency and the due process that Judge Shannon wrote about and was the basis of his opinion when he determined that at least with respect to the going out of business sales they did not need to qualify as a 327(a) professional.

So, Your Honor, I don't know how we proceed forward at this point in time again without allowing for there to be more disclosure which is required and allow the real interest holders here, the unsecured creditors, to get up to speed and to analyze this scenario.

THE COURT: Thank you.

MR. FOX: Good afternoon, Your Honor. For the record, Steven Fox, Riemer & Braunstein, on behalf of the consultant group of affiliates of Hilco Merchant Resources and Gordon Brothers Retail Partners.

I rise, Your Honor, ahead of Mr. Waxman, not intending to be disrespectful, but rather, since the U.S. Trustee has identified what they consider to be gating

issues, before we deal with Mr. Waxman's inventory-related questions, I thought it might be appropriate to sort of deal with the elephant in the room, so to speak.

Your Honor, at the outset, let me be the first to acknowledge and concede that the transaction structure before the Court is a little bit different than what the Court and some interested party may be accustomed to seeing, but I also want to be clear that it is not in any way, shape or form unique or novel in any respect. It is a structure that has been tried and tested before in other cases; most recently, a similar structure was adopted and approved by the Bankruptcy Court of the Southern District of New York in the Barneys cases where there was a clear connection between, in that case, the DIP lender and the consultant that was being engaged by the estate for purposes of liquidating inventory in certain stores, as well as marketing for sale, certain intellectual property.

But putting aside that nonbinding precedent, Your Honor, I think part of the failure here is one of understanding as opposed to one of substance. The reality here is we've heard some terms thrown around such transparency and due process, referring to Judge Shannon's decision, which I'm intimately familiar with because, of course, the parties, similar to my client, were involved in that case and issues not necessarily substantively similar,

but certainly relating to the 327(a) retention issues were relevant there.

First, let's deal with the 327(a) issues. As you've heard from Ms. Russell, we understand the debtor is fully prepared to separate that issue and deal with it at the second day hearing on April 6th as it relates to the intellectual property of the consulting agreement and I can confirm on behalf of consultant that it has no objection to proceeding in that manner and should the debtor decide, in consultation with the U.S. Trustee or with a committee, once formed, that a separate motion on that issue is appropriate, then we will certainly cooperate and work in conjunction with the debtor and others to ensure that motion is timely filed in that connection, Your Honor.

As far as due process and transparency is concerned, we should be clear when we're talking about those types of issues. In our opinion there has been full foreclosure. One need not read further than the second substantive paragraph of the debtors' motion to find disclosure of the fact that there was this unusual relationship; again, not unique and not without precedent, but certainly different than the traditional fee for services.

And the reason for that is because the debtor has a definable, realizable, demonstrable benefit from this

relationship in that it pays us nothing.  I am representing a
party here, who I dare say, is the only party in this room
who is working for free.  I'm not, but my client is.  My
client, by virtue of the terms of the consulting agreement
earns no compensation whatsoever from the debtors' estate for
the full range of services that it will provide if this
motion is approved today.

          And I should point out we're only asking for
interim approval today, so if for some reason a party in
interest has an issue or raises and objection in connection
with the final hearing that we cannot resolve or we cannot
overcome, we may permanently work for nothing.  But as it
stands now, our consulting agreement provides that the estate
pays no fee or other compensation to the consultant on
account of the consulting services.

          Our recovery, if any, derives solely and
exclusively from a recovery that our affiliate receive and I
stress "may," if at the end of the day, this estate generates
a return to the term debt, which is junior there the ABL debt
and all of the other things that the ABL lenders and the term
lenders have agreed be funded through the cash collateral
budget.

          Among other things Your Honor heard through Mr.
Werkheiser's introductory remarks today, that right now
somebody else is grabbing all the cash.  So, who knows, given

uncertainties as to what the ultimate recoveries for the secured creditors in this estate will be, but we understood that risk in negotiating in an arm's-length fashion between our affiliate and the prior holders of the term debt that at the end of the day, we may realize nothing.

That is our risk and is not a risk to be borne by the estate, because they do not pay us, again, anything, other than as Ms. Russell indicated, reimbursement for certain definable out-of-pocket expenses, which have been reduced to a highly negotiated budget that would be expenses incurred by the estate, no matter who the liquidators were here. They include expenses such as signs, supervisors, certain limited travel -- and believe me today, it's going to be limited -- certain other related expenses, but nothing in the nature of a fee or other compensation.

With regard further to transparency, Your Honor, as Ms. Russell indicated, it was the debtors' insistence that they understand the economic parameters of the agreement that was being negotiated between the affiliates of the consultant and the prior debt holder KKR. In response to the debtors' insistence, we made full disclosure to the debtors of the economic relationship and went so far as to reduce it to a writing and then deliver that writing to the debtors' professionals and the debtors have been fully apprised from the very start of what that economic relationship is.

And to put it simply, Your Honor, without going into the actual numbers, there is a sharing arrangement solely related to a recovery on account of the term debt. So, again, no fee or any compensation from the estate, other than a sharing between our affiliate, HDB, the current term debt holder, and the prior term debt holder. They have no involvement in the estate. They are entitled to no compensation from the estate. They only get a piece of our recovery, the economics of which have been fully disclosed to the debtors. So, totally transparent here, no hidden agendas or otherwise.

Ms. Richenderfer said that we lack transparency because she claims she knows nothing about it. She has that letter. That letter was clearly intended to be delivered to the U.S. Trustee's Office and it specifically said so. It was prepared in anticipation that the U.S. Trustee's Office was going to want to know and was going to have these questions because of the unusual nature of their relationships here.

I'll only ask, as Ms. Russell indicated, that it not be -- it contains certain confidential information about trade information and negotiations relating to third parties not here and we ask merely if it ever needed to become part of the public record, that it not be filed of record, it only be filed under seal, and then if the U.S. Trustee needed to

AB_000785

use it in connection with any litigation or objections, we'd be happy to do that, just so long as it be done under seal; again, not intending to hide anything.

That same letter also says that the debtors are free to share with the creditors' committee, once appointed; again, not looking to hide anything. The economics are open and transparent to anybody who wants to see it who are the key constituents in the estate, including the ABL lenders on their own.

So, from that perspective, Your Honor, I think we have satisfied the transparency concerns that Judge Shannon might have expressed in a different context, as well as the due process concerns. We are seeking merely interim relief here and if the U.S. Trustee or the creditors' committee subsequently has any additional questions, after having an opportunity to review the substance of that transaction, we're happy to do that.

I would also add that to the extent that they think there's anything nefarious that happened here, the term claims are what they are and the committee, once appointed, and any other third party that may wish to challenge that, has all the challenge rights provided for in interim cash collateral order and that is not affected in any way by approval of the consulting agreement or the conduct of the GOB sales.

Next, Your Honor, Ms. Richenderfer indicated a concern about the relationship depriving the estate of a market test. I can only assume from that remark that she somehow believes that the debtor did not exercise its business judgment by testing the market for the most beneficial transaction to the estate. I beg do differ.

As the U.S. Trustee has been apprised in response to the written questions that they posed to us last night by the debtors, that the debtors solicited five separate liquidation firms; especially, the they national liquidation firms that can do a transaction of this size and nature. It was at the conclusion of that solicitation process that the debtors selected the Hilco and Gordon Brothers venture to conduct store-closing sales on the terms set forth in the consulting agreement.

It is equally important to note, however, Your Honor, that there is no linkage between the debt transaction and the consulting agreement. So, the debtors were be obligated to select us as the consultant just because we were conducting parallel discussions with KKR over the acquisition of the debt. They made that decision based upon their assessment, I assume, of the economic benefits to the estate of our transaction, which is free services, as opposed to the other proposals, which I've never seen, but I can only assume, based upon my experience in the area, actually cost

the estate some money.

And were Your Honor to somehow elect to not approve the conduct of sales in the consulting agreement, our affiliate still owns the debt. The deal still stays the same, but it's not, in our opinion, in the best interests of any of the stakeholders in the estate to disrupt a process that is currently orderly and ongoing.

Ms. Richenderfer also indicated an objection because she's of the opinion that somehow because we hold, through the affiliate, the term debt, that we are controlling the purse strings by approval of the budget. What I can represent to Your Honor is -- and I am confident that the debtors can confirm this -- that the term lenders played very little, if any, role in the construction of the budget that is part of the cash collateral order. That was driven almost exclusively, and if not exclusively, then certainly primarily by the ABL lenders.

The reasons for that are quite obvious; it's their ox that gets gored first and equally importantly, based upon the intercreditor relationship between the two parties, we have an interest in certain party collateral and they have an interest in everything else. So, their interests are far broader than us on a first lien basis and as Your Honor can certainly recall from your own experience in such matters, the ABL lender didn't really care much -- not disrespecting

us -- but really didn't care much for our opinions, to the extent we had any, on the budget as they were liquidating their priority collateral first; namely, the inventory and other receivables.  So, we played little to no role in the construction of the budget.

We did participate at some extensive level in terms of how the customer deposit issues were going to be handled for two very simple reasons.  The first is, Your Honor can read in the consulting agreement, there are actually mechanics that we agreed to as the consultant to facilitate the debtors' completion of as many customer orders that were represented by corresponding deposits as possible, both in terms of facilitating the approximately $18 million, if that's the correct number, of deposits where there's actually merchandise on hand today, as well as helping the debtors try and source and facilitate completion of orders which there's no inventory represented in the company's coffers today.  So, we spent a lot of time talking about that and memorialized all that, those requirements and the services in the consulting agreement.

But separate and apart from that on a near daily basis we also, on the debt side of the transaction, were participants in discussions, along with the ABL lenders and the debtors' professionals and business principals, on how best to deal with the customer deposits on a daily basis

both, in terms of the messaging -- we spent a lot of time talking -- over two days before Your Honor about that -- in making sure the communications to the customers are clear and concise, but as well, how we're going to deal with the financial impact of that.

      And, Your Honor, I'm certain will recall, that when we were talking about cash collateral on Tuesday afternoon, it was -- I recall it being pretty clear -- my notes reflect this -- that the statement was made that as part of the budgetary process, the term lenders were fully supportive of the budgetary components that had the company honoring the refund of customer deposits and the use of store credits and the like, notwithstanding that, at least on a legal basis, the term lenders might have been in a position to assert a senior, prior right to proceeds and not honor those deposits as refund requests were being made.

      That is not the posture the term lenders took then and it's certainly not the posture that we're taking today. We are fully supportive and understand that there's a subordination component that applies to us in that regard and we're not going to back off of that.

      So, the U.S. Trustee also mentions that one of their concerns is that they don't know what we're making on the deal; respectfully, Your Honor, neither do we.  What we know we're not doing is charging the estate the fee.  We are,

as I said at the outset, working for free, hoping that our efforts will generate a maximal recovery for the estate and that at some future point in time, whether it's through a wind-down, a plan, a Chapter 7 conversion, whatever the ultimate outcome of this liquidating estate will be, that proceeds will trickle-down through contractual or statutory priorities, to the term debt. And if that happens, then we will earn a recovery maybe, subject to the sharing arrangement that we have described in writing to the U.S. Trustee.

In those circumstances and given those parameters and given the disclosures, including the declarations that were filed yesterday anticipating what the U.S. Trustee's lack of disclosure objection might be, we believe that there is nothing nefarious or inappropriate concerning the relationship that exists between the consultant and its affiliate that is holding the term debt. We believe, contrary to the U.S. Trustee's posture, that the estate's interests are fully aligned with both, the consultant and the holders of the term debt. All of those parties are geared towards and their interests are driven towards maximizing the recoverable value for the estate's available assets.

Where those proceeds ultimately wind up and who has the first right to them and the like is not being decided today. Nobody is asking this Court to offer an opinion on

AB_000791

that or make any ruling on that; that will happen in a
subsequent process, that we believe -- expect that the senior
ABL lenders, the term lenders, and the committee, once
appointed, will be fully engaged in.

          Your Honor, with that, I'm happy to respond to any
questions that the Court may have and I would just reserve
the opportunity to respond to any other comments that other
parties may make that relate to this relationship.

          THE COURT:  Thank you.

          MR. FOX:  Thank you, Your Honor.

          MR. WAXMAN:  Good afternoon, Your Honor -- and it
still is afternoon -- Jeff Waxman of Morris James, on behalf
of two clients.  I'm going to start out of, again, with Serta
Simmons Bedding Company but after that, there is a limited
objection which was filed this morning by JoFran Sales, Inc.
and that is at Docket 101; that is a limited objection.

          Your Honor, before going into the two remaining
issues, my understanding is that the debtors do not intend to
proceed with respect to the sale of the intellectual property
on an interim basis, so that issue that Serta Simmons was
concerned with is no longer a live issue, as we understand
it; certainly, if the debtors disagree, they are welcome to
say so.

          Your Honor, this dovetails -- the first issue that
remains dovetails with the U.S. Trustee's, although, theirs

is certainly more process-oriented, with respect to 327.
Serta Simmons is concerned by the fact that the consultant is
a prepetition lender, has a significant interest, and is
getting $3.3 million for expenses, and in order to liquidate
what is, in essence, their own collateral, but there is no
money that is apparently being provided from the sales to pay
administrative expenses.  So, this case is being run for the
benefit of the lenders and the lenders are actually getting
the expense from the estate in order to do so.

I know that this is only an interim motion, but
the Court should be concerned, as I know this Court has been
in other cases, about where the entirety of the case is being
done for the benefit of the lenders.

On a more-narrow issue, Your Honor, the parties,
Serta Simmons, did business with the debtors prior to the
petition date and they are subject to certain terms which
include minimum advertised price policies or other policies
or guidelines, which, among other things, restrict the price
at which the debtors may sell Serta Simmons products and how
those products are displayed and marketed.

Serta Simmons has a concern, Your Honor, that in
the GOB sale, the debtors are going to mark down the price,
thereby, flooding the market and diluting the value of Serta
Simmons' policy, contrary to the terms of the policies to
which the debtors are a party.  Those claims, were they to do

that, would be post-petition claims.  They could potentially be claims against the consultants, since they are the ones who are marketing down the prices.

At least on an interim basis, the debtors should be -- the debtors and consultants in all GOB sales -- should be required to adhere to those policies and that's all that I have for Serta Simmons, Your Honor, unless Your Honor has questions with respect to those.

THE COURT:  I do not.

MR. WAXMAN:  The next issues, Your Honor, are JoFran Sales and as I'm sure Your Honor is aware, we filed a complaint and a request for a temporary restraining order. This dovetails with that.

Before going into the limited objection, Your Honor, I would just take a pause to ask if Your Honor intends to hear the motion to enjoin the debtors in connection with that motion today?

THE COURT:  I'm not prepared to hear the TRO today.  I'll hear it as soon as I have an opportunity, frankly, to spend the time and effort to be properly educated -- maybe tomorrow, maybe Monday -- I don't know -- but it won't be today.

MR. WAXMAN:  Okay.  Your Honor, that actually brings us into greater relief, then --

THE COURT:  Okay.

MR. WAXMAN:  -- because in terms of the relief sought by the GOB motion today.

And perhaps I should take a moment or two and explain what -- and this is certainly -- everything is in a verified complaint that was filed this morning.  There's an adversary proceeding.  There's a motion for a restraining order.  There's a lengthy memorandum that sets out everything with the citations for the basis of the relief requested.

JoFran Sales designs furniture and the debtors purchased certain furniture from JoFran Sales -- excuse me -- well, yes, they did -- and then it was in their stores. Basically, the debtors were using those goods as an opportunity to test drive those particular models to see what sold best.

It is alleged in the verified complaint that the debtors then contracted with somebody to manufacture, in essence, duplicate, the same goods that are manufactured in, I believe, Vietnam.  The debtors were aware of -- that we knew.  There are emails that are attached as exhibits to the complaint and the preliminary injunction, the TRO requests that the debtors, the consultants, all of the defendants stop manufacturing, selling, advertising, transporting, taking anything that is going to dilute the rights, the trade dress of JoFran.

I understand that there are relatively modest --

and I say "I understand" because those are the
representations that we've received today -- that there are a
relatively modest amount of the offending, the infringing
furniture remaining in the debtors' stores.  We understand
it's thirty or $40,000 worth of this furniture.

        We also understand that there is a significant
amount of that furniture that is on the water someplace and
the debtors apparently have no intention of picking that up.
I don't know if that's true or not.  I don't know anything
other than what was represented today and, frankly, there
were a couple of statements made that seem contradictory.

        All we're looking for today, with respect to the
limited objection to the GOB sale procedures is that the
debtors remove the offensive pictures advertising the
infringing furniture and that they do not sell that
infringing furniture on an interim basis and certainly while
this Court hasn't had an opportunity to consider the TRO, it
is important that that not happen.  It is dilution and causes
actual damage to JoFran to have the pictures of the
infringing furniture remaining on the debtors' websites.

                THE COURT:  Okay.  Thank you, Mr. Waxman.

                MR. WAXMAN:  Does Your Honor have any questions?

                THE COURT:  I do not.  I do not.

        All right.  Let me -- I'm ready to make some
comments.  I've heard my colleague Judge Shannon to comment

on more than one occasion that when it comes to first day motions, creativity is not encouraged. This is very creative and I think it raises some very serious issues.

At the end of the day, this is a principal agency problem. The principal here, of course, is the debtors' estate. The principal is the trustee, the debtor in possession, who owes fiduciary duties to the creditors and who has obligations under the Bankruptcy Code and limitations under the Bankruptcy Code in order to ensure that that principal acts appropriately.

But a principal can only act through agents and the agents include the lawyers and they get retained in the 327 or 328 and they get paid under 330.

There are a lot of regulations in place both, in the Code and in practice, to ensure that the incentives to the agent align to the benefit of the principal who is acting on behalf of its beneficiaries.

Here, we have a situation where we have a proposal where the principal here is going to hire an agent to conduct store-closing sales and one of the things that we do when we hire agents in bankruptcy is we control how much they make. We have the ability to know what compensation is being paid and it's not just to make sure that the administrative estate -- administrative expenses stay low; it's also to ensure that the incentives of that agent are aligned with the

benefit of the principal.

This is not the case here. Here we have a
situation where -- and I've never seen it before and
obviously I wasn't involved in the <u>Barneys</u> case -- I've
certainly never seen it in Delaware before where the services
are for free.

I've been around long enough to know that if
somebody else you that they're going to do something for you
for free, you grab your wallet to make sure it's still there
because it ain't for free. Nobody's in this business and
nobody is making the kind of money to pay Mr. Fox to
represent them by doing stuff for free. It's a business
transaction and that's fine. That's fine.

But it's a business transaction where the payout
is out of the recovery to a creditor. It's not an
administrative expense that's monitored by the estate,
monitored by the Courts, subject to a fee application, or
even some sort of review at all. It's a black box.

And Ms. Richenderfer makes a really important
point. We really don't get into this in bankruptcy very
often because the debt is the debt and it changes hands and
people buy it at discount. It doesn't matter. You buy the
discount. The debt is the debt. That is what you get paid.

It's always in the back of my head when I have a
kind of entity in front of me that I know buys at a discount

and they claim they're getting a terrible recovery at 80 cents on the dollar. Well, did they pay 30 and they're doing great or did they pay 85 and they're not doing great?

I don't want to think about that. I leave that alone. It is what it is.

But here, I think it's important because we don't know what the recovery is. We don't know the economic incentives that are in play in connection with an agent. And a principal which -- and I understand why -- who is getting something, to a certain extent, for nothing; i.e., services they don't have to pay out of administrative expense claims, at least not for the most part in a cash-strapped estate, I certainly understand why you want to do that.

But I think the bigger picture here is that I'm very worried that there is a fundamental disconnect based on this economic structure; whereas, we have no idea who the consultant is working for. We have no ability to control the consultant because we don't understand or have any real insight into the economics that are running the deal. So, I agree with the U.S. Trustee that this is too creative and too important to be heard on this time frame.

Now, I don't want to wait until April 6th, but I do want to wait until after a committee is formed, which will be the 18th?

MS. RICHENDERFER: Yes, Your Honor.

THE COURT:  So, what I'll do is continue this hearing to the 20th, and I know going to put whoever pitches this committee and gets the job, behind a tough schedule and I can put it on the record now, a motion for a continuance will not be looked upon favorably.  We can't wait forever to put this company into GOB mode.

I am taking a risk -- again, it's not my money -- but I mean, I am taking a bit of a risk in gambling that the company won't be hurt by this delay, but I think that risk is appropriate, given the uncertainty around this economic relationship.  So, we'll do this Friday, the 20th, at 10:00 a.m., and we'll have a committee who will be fresh off the bricks and they can appear.  And in the meantime, the GOBs can't go forward.

That moots Mr. Waxman's objection, with regard at least to the GOBs, although I know you still have the TRO -- we're going to talk about that in a minute -- and I think it moots, in connection with the mattresses, as well.

Yes?

MS. RUSSELL:  Your Honor, if I may request -- with respect to the actual conduct of the GOB sale, other than Mr. Waxman's client, I'm not sure that the underlying issues are with respect to actually conducting the going-out-of-business sales.  We would like to request that the debtors be authorized to not engage the consultant -- I understand Your

Honor's ruling in adjourning that issue until March 20th --
but that we be allowed to otherwise proceed with the going-
out-of-business sales in accordance with the store-closing
procedures and that the debtor, in the interim, will run
those store-closing sales themselves.

        The damage to the estate and the cost to the
estate by not moving through into going-out-of-business
status could have a detrimental effect or will have a
detrimental effect on the overall recovery on this collateral
for all creditors, not alone, the term lenders, but Wells
Fargo and the other creditors.  I'm not sure if the U.S.
Trustee's Office has raised any concerns with respect to that
portion of the motion.

        THE COURT:  Comment?

        MS. RICHENDERFER:  Your Honor, Linda Richenderfer
from the U.S. Trustee's Office, just briefly.

        I guess I'm not quite sure how the debtor is going
to implement the going-out-of-business procedures, not that I
have an issue, and counsel is correct that we've raised no
issue with the procedures; we raised the issue with respect
to who's implementing the procedures and I don't know how the
debtors will implement them.  I leave that up to Your Honor,
though, as to whether or not to allow them.

        There was a portion of the procedures, though,
that was the bonuses and as a principle, I don't have an

issue with it, it was just that there wasn't a lot of detail regarding the bonuses and, perhaps, that's something that can also be delayed until next week just to get more details regarding the bonuses.

THE COURT:  Well, I'm open to allowing the debtors to run GOB sales themselves under procedures everyone can agree on as long as it's consistent with general practice that we impose and that the landlords' rights are respected.

What I would request, specifically, is that you not GOB Mr. Waxman's furniture, so that needs to be cut out.

What's the position on the response to the issue with the mattresses?

MS. RUSSELL:  Your Honor, what we've been provided -- and, again, another thing that I've been asked not to make public -- which we were provided today are not -- they're pricing policies, pricing suggestions.  There's no contract that I've been provided to show on the pricing of the inventory.

At best, to the extent there's a contract, it's an executory contract; again, I don't know.  Even -- I've asked to understand what the discounting restrictions are and I've not been provided with that information.  One of the concerns that they have is they've asked us to not sell those goods until now the March 20th, hearing, but it was previously the April 6th hearing.

And the situation the estate would find itself in is that today, while they could discount and sell these mattresses for perhaps 10, 15 percent off, when we get into April, we're going to have to be in potentially significantly higher discounts in order to complete the liquidation.

THE COURT: I'm sorry, in my experience, I mean, these aren't unusual commercial relationships where you put a collar on what somebody can sell somebody's product for. A retailer can't -- you know, if you sell fine china, you don't want it to end up at Marshalls being sold at a deep discount.

So, if you -- I don't know -- a mattress is a mattress, as far as I know, but I'm not a connoisseur of mattresses -- but, you know, if they sell a very high-end mattress, they don't want you to sell it for a low-end mattress price. And I wouldn't be surprised if there's policies or contracts in place to enforce that, but there may not be -- I don't know.

MS. RUSSELL: What I have been provided are suggested retail pricings and I believe counsel acknowledged that they have not provided copies of any contracts that would impose such a restriction on the debtors' sale of those goods.

I'm happy to have a conversation with them and I need to understand as to the people at the company understand, you know, now, with, in terms of now the plan --

AB_000803

the discounted program that the company is now running and how that cadence interplays with the discounting or purported discounting restrictions that Mr. Waxman's client is asserting.

        MS. ROGERS:  (Via telephone)  Your Honor?

        THE COURT:  Yes.

        MS. ROGERS:  -- this is Beth Rogers for Serta Simmons Bedding Company.

        May I be heard?

        THE COURT:  Yes.

        MS. ROGERS:  Your Honor, there is a contract in place between the debtors and Serta Simmons which provides that the debtor will comply with the pricing guidelines.  And so, I mean, I apologize I didn't have an opportunity to get that to the debtors' counsel.  Everything is, you know, obviously on an emergency basis.

        So, we would just ask -- I mean, we're talking, you know, another week that the *status quo* be maintained as far as the debtor complying with the pricing guidelines (indiscernible) as far as how a product is displayed, how it's advertised, how it's marketed.  So, I wouldn't think that maintaining the *status quo* for a week is going to be detrimental to the debtor.

        THE COURT:  Well, you know, look, if you're going to sell a discount bed suite, you probably want to include a

AB_000804

discount mattress, along with the bed suite in order to do the sale, otherwise somebody is going to go down the street to Mattress Firm, one of my debtors -- please go often --

(Laughter)

THE COURT:  -- and buy their discounted mattress there.  So, I mean I can see why they would want some -- well, I'm not going to -- I mean, we're going to talk this through, but what is going to happen is you're going to go off and negotiate an order and send it to me tomorrow under certification of counsel.

So, I think this is something that you should discuss and if there is a -- again, this would not surprise me -- if there is a contract that says you cannot sell my price for less than 80 percent off suggested retail, I don't think it's appropriate in a store-closing sale, even, to violate that contract.  That's a post-petition breach.  I think it's perhaps an executory contract that might give rise to administrative expense claims.

And those contracts are generally -- I can't remember the name of the case -- but it was affirmed by the Supreme Court several years ago.  Those contracts are not uncommon.

So, let's do this.  So, let's -- I will consider a motion -- excuse me -- consider an order that allows the debtors to conduct the GOB sales according to the procedures

that have been put in place, no bonuses, no -- none of
that -- just do the GOB sales.  I'd like you to either settle
with or carve out Mr. Waxman's furniture client from that.
I'd like you to discuss some sort of an arrangement with the
mattress client and if you can't resolve that, you can submit
some competing language with the certifications.  So, I will
choose a winner or a loser.

        Now, I just said no to the bonuses.  I want to
rethink that for a second.  Who are the bonuses going to?

        MS. RUSSELL:  Your Honor, those -- I was going ask
Your Honor to reconsider -- those bonuses are contemplated
for store-level employees.

        THE COURT:  They're the store employees; they're
not the consultant?

        MS. RUSSELL:  They're not the consultant,
absolutely not.

        THE COURT: All right.  They're fine.  They're
fine.

        Okay.  And then Ms. Heilman is being very patient
back there.  She keeps standing up and sitting down.  Just a
second.

        But we'll kick the consultant agreement to the
20th.

        Ms. Richenderfer?

        The 20th, right?

MS. RICHENDERFER:  Your Honor, my issue with the bonuses was -- and maybe counsel can make this representation -- it wasn't clear to me that we were talking about rank-and-file employees in the stores.

MS. RUSSELL:  It would be a combination, rank-and-file and possibly store manager, incentivizing everybody to work, and the aggregate amount was proposed that it would not exceed 10 percent of payroll.  So, that's fairly --

THE COURT:  Any officers?

MS. RUSSELL:  No officers or directors.

THE COURT:  Nobody that's vice president of fun and games or anything like that?

MS. RUSSELL:  No, Your Honor.

THE COURT:  District managers?

MS. RUSSELL:  No, Your Honor.

THE COURT:  Store managers only?

MS. RUSSELL:  Store managers and rank-and-file.

MS. RICHENDERFER:  Your Honor, if it only goes up through the store level --

THE COURT:  Nobody's getting rich.

MS. RICHENDERFER:  -- that's fine.  And that was our concern, was that the specifics like that were not there.  So, if we have those representations, we're fine.

THE COURT:  All right.  Give me two seconds, Ms. Heilman, and I'm going to give you all my attention.

(Pause)

MS. HEILMAN:  Good afternoon, Your Honor.  Leslie Heilman, Ballard Spahr, on behalf of a number of the debtors' landlords.

Your Honor, I do appreciate Your Honor's comment about respecting the interests of the landlords in authorizing the debtors to proceed and conduct going-out-of-business sales as not through the consultant, but through the company; however, Your Honor, I do rise because we would have objected to the conduct of the going-out-of-business sales generally, as proposed under the motion, but for our ability to structure and have some balancing of the interests through our side agreement with the consultant that negotiated, and now we will -- I'm sure Ms. Russell will work with us with respect to a similar side agreement -- I'm sure she's very familiar with them with respect to that -- but, Your Honor, the going-out-of-business sales, themselves, are in violation of the leases.

And bankruptcy courts generally do authorize once a debtor has filed for bankruptcy, to allow them to proceed with such sales, but they are subject to limitations --

THE COURT:  Of course.

MS. HEILMAN:  -- and they're subject to the limitations so that the parties can balance the interests to maximize value for the debtors' estate, but also not run

havoc across the lease terms.

And, Your Honor, some of those balancing go to signage restrictions and limits on the signage and limits on augmentation, store-closing hours, and the store-closing procedures that are proposed, while customary and we see attached to them, many of those store-closing procedures do not adhere to the provisions of the leases in terms of how they need to -- the hours they need to operate and, Your Honor, whether or not they can use the exterior of the building and so forth.

So, Your Honor, while we are not opposed to the debtor commencing and continuing their GOB sales, we do request that they be subject to some limitations and that we can negotiate through a side agreement, but until that side agreement is in place, Your Honor, we do request that, at a minimum, no banners be hung, with respect to those sales --

THE COURT: Okay.

MS. HEILMAN: -- and where there is signage limitations.

THE COURT: Yeah. So, this is easy stuff, right, this is A, B, C stuff. So, believe it or not we used to litigate this stuff 20 years ago, but we don't anymore, so --

MS. RUSSELL: Your Honor, we would not envision running a sale in any fashion that is inconsistent with the proposed store-closing procedures that the consultant

obligated to comply with.

         And the side letter, other than the signature
block being from the debtor, I would envision that the side
letter, assuming that it's consistent with customary
practices, will be the same letter as they would have
negotiated with the liquidator.

         THE COURT:  All right.  So, if you submit the
order, you need to certify that you've signed the side letter
or that if you haven't, that Ms. Heilman and the other
landlords agree to the procedures that you've put in place.

         MS. RUSSELL:  Well, Your Honor, I guess I haven't
heard any objections from any other landlords or any issues
that were raised.  We did circulate the store-closing
procedures with the motion.  I don't believe there were
substantive revisions to those store-closing procedures since
we circulated the order, but I guess if there are issues,
people should contact me and we can deal with it.

         I'm not sure prior to tomorrow I will have signed
side letters with all the landlord groups.

         THE COURT:  All right.  I haven't seen the side
letter.  What side letter?

         MS. RUSSELL:  How many signs you can hang within
so many thousand feet.

         THE COURT:  I'm just remembering a couple of years
ago there was a furniture-store chain that went under

bankruptcy -- not in Delaware -- by they had a store in
Delaware -- so unusual -- and I was driving down Concord Pike
and they had a banner that was the entire side of the
building and all I could say was that they definitely did not
file in Delaware because none of our judges would have signed
that order.

   So, I --

   MS. RUSSELL:  The signage banner -- the banner
language that tends that be in certain side letters -- not
all -- that would be something that would be negotiated and
we would resolve that in the side letter.

   THE COURT:  Well, let's see.  Who's here?  That's
what really matters, right?

   And Mr. Riley is here.

   MR. RILEY:  Your Honor, Richard Riley from
Whiteford Taylor.

   I represent a receiver for a shopping center, so
he is the landlord.

   THE COURT:  Right.

   MR. RILEY:  So, I don't know if he has reached out
to do a side letter, but we would, of course, want to make
sure that the GOB sale is done, according to a side letter
and is not -- doesn't have banners on the side of our
building.

   THE COURT:  Yeah.  So, when you submit the COC,

AB_000811

you're going to need to certify that you've talked to

Mr. Riley, Ms. Heilman, and any other landlord that calls you

between now and when you do the certification and that

they're agreeable, and if they're not -- say that -- and then

that person will have an opportunity to say something to me.

       You can just call up and let Ms. Gadson know that

you have our own language and we'll take care of it.  Okay?

       MS. RUSSELL:  Thank you, Your Honor.

       THE COURT:  Mr. Waxman?

       MR. WAXMAN:  First of all, Your Honor, I was

remiss earlier -- and excuse me -- I would like to introduce

Maureen Mulligan, my co-counsel on -- in relation to JoFran.

       THE COURT:  Yep.  Welcome.

       MR. WAXMAN:  Her admission has been moved *pro hac*

*vice*.  I haven't seen a copy of the order yet, but that

doesn't mean it hasn't been entered.

       And one of the reasons that I rise to introduce

her is because of the issue of the TRO, just in terms of

scheduling.  That going forward, I don't know her

availability or the client's availability to come down.

       THE COURT:  Listen, I have it, but I can tell you

I haven't read your complaint.  Okay?  I've been extremely

busy all day.

       MR. WAXMAN:  I understand.

       THE COURT:  I'm running in place in connection