with all the things associated with recent developments outside of this courtroom.

So, I'm going to do it this evening and I will reach out tomorrow. Chambers will reach out tomorrow and let you know, (A), if we're going to schedule it, and, (B), when it'll be, and we'll obviously consult you on that.

MR. WAXMAN: Okay. And the second --

THE COURT: And we can do that by phone.

MR. WAXMAN: What's that?

THE COURT: We can do that by phone, the TRO.

MR. WAXMAN: Okay. That would be great, Your Honor. Thank you.

Actually, before I get to my final point, I think it was Levitz, Your Honor, on Naamans Road that had the enormous sign that was on the --

THE COURT: The whole building.

MR. WAXMAN: -- the whole side of the building.

THE COURT: It was crazy.

MR. WAXMAN: Yes. It was the single largest GOB sign I've ever seen.

THE COURT: That's why you should file in Delaware.

(Laughter)

MR. WAXMAN: Just for clarification -- I know that you had said, and I appreciate that Mr. Waxman's client is

going to be carved out -- that was with respect to JoFran?

    THE COURT:  Yes.

    MR. WAXMAN:  And we would also mention the mattress separately.

    THE COURT:  So, I was going to talk to you about Serta and see if you can work something out and if you can't, you can just do dueling language.

    MR. WAXMAN:  Thank you, Your Honor.

    THE COURT:  Okay.

    MR. WAXMAN:  I appreciate it.

    THE COURT:  You're welcome.

    Mr. Werkheiser?

    MR. WERKHEISER:  Your Honor, I just wanted to rise and see if we could just take care of a couple of process points here of what's kicking the hearing to the 20th.

    Did Your Honor have a timeline for us to start on the 20th?

    THE COURT:  10:00.

    MR. WERKHEISER:  Could we -- I mean, the committee is in a different position because they won't be formed until the 18th, but for other parties that are going to raise issues that we have to address for the hearing on the 20th, can we have an objection deadline set so that we know what we're confronted with?

    THE COURT:  Yeah, I think that's fair -- the 18th

AB_000814

at noon.

          MR. WERKHEISER:  Thank you.

          THE COURT:  And, you know, in my mind, the issue isn't going to be the nuts and bolts of the sale anymore -- we're dealing with that tomorrow when I sign an order allowing the debtors to do it -- it's the nuts and bolts of the consulting arrangement, so it's narrowed to that point.

          MR. WERKHEISER:  Uh-huh.

          THE COURT:  I mean the committee may come in and say, Don't do GOB sales, but I think the genie is out of that bottle, but I'll deal with that if that's what they say.

          But what I really want to focus on the 20th is the issue of the consulting agreement.

          MR. WERKHEISER:  Understood, Your Honor.

          Let me just sweep through and make sure there's no other business we need to take care of today.  But I think that covers our agenda and of course we --

          THE COURT:  So, I'm waiting tomorrow, I'm waiting for the DIP order under COC and I'm waiting for the store-closing order under COC.

          MR. WERKHEISER:  Correct.

          THE COURT:  And I'm in all day tomorrow, so not to give you permission to take until 8:00 p.m. but take the time you need and be in touch with chambers if there are any issues.

MR. WERKHEISER:  Thank you, Your Honor.

THE COURT:  If there's a dust-up or something, you know, we always have the ability to get everybody on the phone and try to figure that out.

MR. WERKHEISER:  Thank you, Your Honor.

THE COURT:  All right.  Let me just double-check what my availability is tomorrow.

(Pause)

THE COURT:  Yeah, I have lots of time to fit you in here and there, so that won't be a problem.  All right.

MR. WERKHEISER:  We'll do everything possible to avoid having to disturb you, too.  Hopefully we'll just be sending things over and alerting you to their availability.

THE COURT:  Well, that would be great.

All right.  Thank you very much.  We're adjourned.

(Proceedings concluded at 5:28 p.m.)


<u>CERTIFICATE</u>


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Mary Zajaczkowski_____         March 13, 2020
Mary Zajaczkowski, CET**D-531

# EXHIBIT L

AB_000817

# Presidential Documents

**Proclamation 9994 of March 13, 2020**

## Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak

**By the President of the United States of America**

**A Proclamation**

In December 2019, a novel (new) coronavirus known as SARS–CoV–2 ("the virus") was first detected in Wuhan, Hubei Province, People's Republic of China, causing outbreaks of the coronavirus disease COVID–19 that has now spread globally. The Secretary of Health and Human Services (HHS) declared a public health emergency on January 31, 2020, under section 319 of the Public Health Service Act (42 U.S.C. 247d), in response to COVID–19. I have taken sweeping action to control the spread of the virus in the United States, including by suspending entry of foreign nationals seeking entry who had been physically present within the prior 14 days in certain jurisdictions where COVID–19 outbreaks have occurred, including the People's Republic of China, the Islamic Republic of Iran, and the Schengen Area of Europe. The Federal Government, along with State and local governments, has taken preventive and proactive measures to slow the spread of the virus and treat those affected, including by instituting Federal quarantines for individuals evacuated from foreign nations, issuing a declaration pursuant to section 319F–3 of the Public Health Service Act (42 U.S.C. 247d–6d), and releasing policies to accelerate the acquisition of personal protective equipment and streamline bringing new diagnostic capabilities to laboratories. On March 11, 2020, the World Health Organization announced that the COVID–19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States.

The spread of COVID–19 within our Nation's communities threatens to strain our Nation's healthcare systems. As of March 12, 2020, 1,645 people from 47 States have been infected with the virus that causes COVID–19. It is incumbent on hospitals and medical facilities throughout the country to assess their preparedness posture and be prepared to surge capacity and capability. Additional measures, however, are needed to successfully contain and combat the virus in the United States.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*) and consistent with section 1135 of the Social Security Act (SSA), as amended (42 U.S.C. 1320b–5), do hereby find and proclaim that the COVID–19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020. Pursuant to this declaration, I direct as follows:

**Section 1**. *Emergency Authority*. The Secretary of HHS may exercise the authority under section 1135 of the SSA to temporarily waive or modify certain requirements of the Medicare, Medicaid, and State Children's Health Insurance programs and of the Health Insurance Portability and Accountability Act Privacy Rule throughout the duration of the public health emergency declared in response to the COVID–19 outbreak.

AB_000818

**Sec. 2**. *Certification and Notice*. In exercising this authority, the Secretary of HHS shall provide certification and advance written notice to the Congress as required by section 1135(d) of the SSA (42 U.S.C. 1320b–5(d)).

**Sec. 3**. *General Provisions*. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this thirteenth day of March, in the year of our Lord two thousand twenty, and of the Independence of the United States of America the two hundred and forty-fourth.

[FR Doc. 2020–05794
Filed 3–17–20; 8:45 am]
Billing code 3295–F0–P

AB_000819

# EXHIBIT M

AB_000820

# Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts

March 14, 2020

*Businesses in Bucks, Chester, Delaware, Montgomery counties urged to close for 14 days*

**Harrisburg, PA** – Today, the Department of Community and Economic Development (DCED), in consultation with the Department of Health (DOH), issued guidance for non-essential businesses in Bucks, Chester, Delaware, and Montgomery counties to mitigate the spread of COVID-19.

Governor Tom Wolf has strongly urged non-essential businesses in the four counties to close during their county-specific mitigation periods to protect employees, customers, and suppliers and limit the spread of the virus through personal contact and surfaces. DCED and DOH are reaching out to businesses through a **letter (https://dced.pa.gov/letter-from-secretary-levine)** to provide guidance on the types of businesses that are urged to close. The letter also indicates to businesses that financial assistance opportunities are available to mitigate the financial impact of closures.

"We are committed to keeping all Pennsylvanians safe and healthy, and we are taking every measure to prevent the spread of COVID-19," said DCED Secretary Dennis Davin. "We continue to report new cases of coronavirus every day, and additional steps must be taken to stop the spread. Therefore, we strongly urge non-essential businesses across Pennsylvania to do their part by temporarily closing to help mitigate the spread of this contagious virus."

Non-essential businesses include community and recreation centers; gyms, including yoga, barre and spin facilities; hair salons, nail salons and spas; casinos; concert venues; theaters; bars; sporting event venues and golf courses; retail

AB_000821

facilities, including shopping malls and except for pharmacy or other health care facilities within retail operations. Restaurants are urged only to remain open for carry-out and delivery orders.

"We understand that small businesses are an economic driver in Pennsylvania, and a temporary closure will be a financial and community disruptor," Davin said. "However, our top priority is maintaining public health and safety of all Pennsylvanians and taking these proactive steps now can help mitigate a potential community spread. DCED is committed to working with the business community to provide helpful resources for financial assistance."

DCED offers working capital loans that could be of assistance to businesses impacted by COVID-19. Resources and information will be posted to **https://dced.pa.gov/resources (https://dced.pa.gov/resources)** as they become available. The U.S. Small Business Administration, in addition to local funding partners, may also be a source of assistance for affected businesses.

The Wolf Administration strongly encourages businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health, including section 7301 of the Emergency Management Services Code.

**MEDIA CONTACTS:**

Casey Smith, DCED, 717.783.1132

Lyndsay Kensinger, Gov. Wolf, 717-783-1116

# # #

 covid-19 (https://dced.pa.gov/tag/covid-19/)

Facebook        Twitter        LinkedIn        More

AB_000822

# EXHIBIT N

AB_000823

# ALL NON-LIFE-SUSTAINING BUSINESSES IN PENNSYLVANIA TO CLOSE PHYSICAL LOCATIONS AS OF 8 PM TODAY TO SLOW SPREAD OF COVID-19

March 19, 2020

### Press Release,  Public Health

Wolf Administration Orders Closure of Non-Life-Sustaining Businesses at 8 p.m. Today, March 19
Enforcement Actions for Restaurant, Bar Dine-In Closure Began at 8 p.m., March 18
Enforcement Actions for Non-Compliance will Begin at 12:01 a.m. Saturday, March 21

Governor Tom Wolf today ordered all non-life-sustaining businesses in Pennsylvania to close their physical locations as of 8 p.m. today, March 19, to slow the spread of COVID-19. Enforcement actions against businesses that do not close physical locations will begin at 12:01 a.m. Saturday, March 21.

Gov. Wolf's order is here.
A video statement from Gov. Wolf is here.
Sec. of Health's order is here.
A list of life-sustaining businesses is here.

In extenuating circumstances, special exemptions will be granted to businesses that are supplying or servicing health care providers.

"To protect the health and safety of all Pennsylvanians, we need to take more aggressive mitigation actions," said Gov. Wolf. "This virus is an invisible danger that could be present everywhere. We need to act with the strength we use against any other severe threat. And, we need to act now before the illness spreads more widely."

The governor had previously encouraged non-life-sustaining businesses to close to mitigate the spread of COVID-19. Restaurants and bars were already required to stop all dine-in services. Enforcement for establishments with a liquor license began at 8 p.m. March 18, and enforcement for all other food establishments will begin at 8 p.m. tonight. Food establishments can offer carry-out, delivery, and drive-through food and beverage service, including alcohol.

Pursuant to the Emergency Management Services Code, the governor is granted extraordinary powers upon his declaration of a disaster emergency, such as COVID-19. Among these powers, the governor may control the ingress and egress into the disaster area, the movement of persons, and the occupancy of premises within the disaster area, which has been established to be the entire commonwealth for the COVID-19 disaster emergency. The secretary of health separately is authorized under the law to employ measures necessary for the prevention and suppression of disease.

Separately, and taken together, the administration is exercising these powers to temporarily close all non-life-sustaining businesses and dine-in facilities at all restaurants and bars across the commonwealth. Persons must be removed from these premises to cope with the COVID-19 disaster emergency.

### Failure to Comply and Enforcement

Failure to comply with these requirements will result in enforcement action that could include citations, fines, or license suspensions.

The governor has directed the following state agencies and local officials to enforce the closure orders to the full extent of the law:

- Pennsylvania Liquor Control Board
- Department of Health
- Department of Agriculture
- Pennsylvania State Police
- Local officials, using their resources to enforce closure orders within their jurisdictions

AB_000824

Private businesses, local organizations and other noncompliant entities that fail or refuse to comply with the governor's orders that protect the lives and health of Pennsylvanians will forfeit their ability to receive any applicable disaster relief and/or may be subject to other appropriate administrative action. Such action may include termination of state loan or grant funding, including Redevelopment Assistance Capital Project (RACP) grant funding and/or suspension or revocation of licensure for violation of the law.

Finally, in addition to any other criminal charges that might be applicable, the Department of Health is authorized to prosecute noncompliant entities for the failure to comply with health laws, including quarantine, isolation or other disease control measures. Violators are subject to fines or imprisonment.

**Business Loans and Support**

The Department of Community and Economic Development (DCED) offers working capital loans that could be of assistance to businesses impacted by COVID-19. Resources and information will be posted to http://dced.pa.gov/resources as they become available. The U.S. Small Business Administration, in addition to local funding partners, may also be a source of assistance for affected businesses.

The Wolf Administration today announced the availability of low-interest loans for small businesses and eligible non-profits in all 67 counties in Pennsylvania through the U.S. Small Business Administration (SBA).

Businesses seeking guidance from DCED can also contact its customer service resource account at ra-dcedcs@pa.gov or by calling 1-877-PA-HEALTH and selecting option 1.

For the most up-to-date information on COVID-19, Pennsylvanians should visit: https://www.pa.gov/guides/responding-to-covid-19/.

AB_000825

# EXHIBIT O

AB_000826



THE OFFICE OF GOVERNOR GRETCHEN WHITMER

WHITMER / NEWS / PRESS RELEASES

# Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders

FOR IMMEDIATE RELEASE
March 16, 2020

Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders

LANSING, Mich. -- Today, Governor Gretchen Whitmer signed Executive Order 2020-9, which temporarily closes theaters, bars, and casinos, and limits restaurants to carry-out and delivery orders.

Under Executive Order 2020-9, effective Monday, March 16 at 3:00pm, the following places of public accommodation will be closed; restaurants, cafes, coffee houses, bars, taverns, brewpubs, distilleries, clubs, movie theaters, indoor and outdoor performance venues, gymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor exercise facilities, exercise studios, spas, and casinos.

This order does not restrict a place of business from offering food and beverage using delivery service, window service, walk-up service, drive-through service, or drive-up service. Places of public accommodation are encouraged to do so and use precautions to mitigate potential transmission of COVID-19, including social distancing. Restaurants may allow five people inside at a time to pick up orders, so long as they stay six feet apart from each other.

These restrictions do not apply to the following locations: office buildings, grocery stores, markets, food pantries, pharmacies, drug stores, and providers of medical equipment and supplies, health care facilities, residential care facilities, congregate care facilities, and juvenile justice facilities, warehouse and distribution centers, and industrial and manufacturing facilities.

Order restrictions will remain in place until Monday, March 30 at 11:59 pm.



AB_000827

"This disease is a challenge unlike any we've experienced in our lifetimes," said Governor Whitmer. "Fighting it will cause significant but temporary changes to our daily lives. By practicing social distancing and taking aggressive action now, the state is working to mitigate the spread of coronavirus so we reduce the risk that our health care system becomes overwhelmed. This is about saving lives. Michiganders are tough and we are going to get through this, but it will require everyone doing their part. That means making smart choices and not putting yourself or others at risk by going out in public unless it is absolutely necessary."

"We need to move quickly to slow the spread of the virus and protect public health," said Dr. Joneigh Khaldun. "I realize these actions will present temporary changes to the way we live, but they are critical to help ensure our health care system is prepared to treat those who need the most urgent medical care."

"This crisis will require business and labor working together to ensure that we are putting the best interests of Michiganders first in order to protect public health," said Jeff Donofrio, Director of the Department of Labor and Economic Opportunity. "We understand that these decisions will impact the way we do business, but the decisions we make now will allow us to get our economy back on track sooner rather than later. We are putting measures in place to help protect the employers, employees, and individuals that will be impacted."

To mitigate the spread of COVID-19, Governors across the United States have begun implementing similar measures in their states, including Jay Inslee (D-WA), Charlie Baker (R-MA), and Tom Wolf (D-PA).

Patients with confirmed infection have reportedly had mild to severe respiratory illness with symptoms of:
- Fever
- Cough
- Shortness of breath

The best prevention for viruses, such as influenza, the common cold or COVID-19 is to:
- If you think you have been exposed to COVID-19, call your health care provider. If you do not have a health care provider, call the nearest hospital.
- Wash your hands often with soap and warm water for 20 seconds. If not available, use hand sanitizer.
- Avoid touching your eyes, nose, or mouth with unwashed hands.
- Cover your mouth and nose with a tissue or upper sleeve when coughing or sneezing.
- Avoid contact with people who are sick.
- If you are sick, stay home, and avoid contact with others.
- Replace handshakes with elbow bumps.
- Stay at least 6 feet away from others when in a public setting.



Information around this outbreak is changing rapidly. The latest information is available at Michigan.gov/Coronavirus and CDC.gov/Coronavirus.



- MICHIGAN.GOV HOME
  ADA
  MICHIGAN NEWS
  POLICIES

COPYRIGHT 2021 STATE OF MICHIGAN

# EXHIBIT P

AB_000830

ORDER OF

### THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA REGARDING THE CLOSURE OF ALL BUSINESSES THAT ARE NOT LIFE SUSTAINING

*WHEREAS, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

*WHEREAS, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and*

*WHEREAS, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and*

*WHEREAS, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein; and suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, and combustibles. 35 Pa. C.S. § 7301(f); and*

*WHEREAS, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and*

*WHEREAS, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and*

*WHEREAS, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.*

*NOW THEREFORE, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:*

*Section 1:        Prohibition on Operation of Businesses that are not Life Sustaining*

*All prior orders and guidance regarding business closures are hereby superseded.*

*No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations.*

*Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons.  A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.*

AB_000831

Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.

Section 2: Prohibition on Dine-In Facilities including Restaurants and Bars

All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19.

Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons. Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.

Section 3: Effective Date and Duration

This order is effective immediately and will remain in effect until further notice.



GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this nineteenth day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.

TOM WOLF
Governor

# Exhibit Q

AB_000833

OFFICIAL WEBSITE OF MICHIGAN.GOV

THE OFFICE OF
# GOVERNOR GRETCHEN WHITMER



WHITMER

# Governor Whitmer Signs "Stay Home, Stay Safe" Executive Order

**FOR IMMEDIATE RELEASE**

March 23, 2020

**Governor Whitmer Signs "Stay Home, Stay Safe" Executive Order**

Governor directs all non-critical businesses to temporarily close, all Michiganders to stay home or six feet away from others during COVID-19 crisis

**LANSING, Mich. --** Today, Governor Gretchen Whitmer signed the "Stay Home, Stay Safe" Executive Order (EO 2020-21), directing all Michigan businesses and operations to temporarily suspend in-person operations that are not necessary to sustain or protect life. The order also directs Michiganders to stay in their homes unless they're a part of that critical infrastructure workforce, engaged in an outdoor activity, or performing tasks necessary to the health and safety of themselves or their family, like going to the hospital or grocery store.

Effective at 12:01 am on March 24, 2020, for at least the next three weeks, individuals may only leave their home or place of residence under very limited circumstances, and they must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention when they do so, including remaining at least six feet from people from outside the individual's household to the extent feasible under the circumstances.

"In just 13 days, we've gone from 0 to over 1,000 COVID-19 cases," said **Governor Whitmer.** "This is an unprecedented crisis that requires all of us working together to protect our families and our communities. The most effective way we can slow down the virus is to stay home. I know this will be hard, but it will be temporary. If we all come together, get serious, and do our part by staying home, we can stay safe and save lives."

"Taking aggressive action to protect our communities is the most important thing we can do to mitigate further spread of COVID-19," said Michigan Department of Health and Human Services Chief Deputy for Health and Chief Medical Executive **Dr. Joneigh Khaldun.** "If we do this now, we can make sure our hospitals and healthcare workers are prepared to take care of the sickest people. It is crucial that people do the right thing by staying home and staying safe."

Executive Order 2020-21 prohibits all businesses and operations from requiring workers to leave their homes, unless those workers are necessary to sustain or protect life or to conduct minimum basic operations. Businesses and operations are to designate the workers that meet those criteria, and must adopt social distancing practices and other mitigation measures to protect workers and patrons in the performance of that necessary in-person work.

AB_000834

Workers that are necessary to sustain or protect life include those in health care and public health, law enforcement and public safety, grocery store workers, and more. For a full list of these critical infrastructure workers, click the link to Executive Order 2020-21 at the bottom of this page.

Additionally, under Executive Order 2020-21, all public and private gatherings of any number of people occurring among persons outside a single household are temporarily prohibited. People may leave the house to perform for limited, necessary purposes, and may engage in outdoor activities like walking, hiking, running, cycling, or any other recreational activity, consistent with remaining at least six feet from people from outside a person's household and with other restrictions imposed by prior executive orders.

Michigan is currently in the top five states in the nation in number of confirmed COVID-19 cases. Several governors across the country have taken similar steps to protect their communities from the spread of COVID-19, including governors Mike DeWine (R-OH), Andrew Cuomo (D-NY), J.B. Pritzker (D-IL), Tom Wolf (D-PA), Gavin Newsom (D-CA), John Bel Edwards (D-LA), Phil Murphy (D-NJ), and Ned Lamont (D-CT).

Patients with confirmed infection have reportedly had mild to severe respiratory illness with symptoms of:

- Fever
- Cough
- Shortness of breath

The best prevention for viruses, such as influenza, the common cold or COVID-19 is:

- If you think you have symptoms of COVID-19, call your health care provider. If you do not have a health care provider, call the nearest hospital.
- Wash your hands often with soap and warm water for 20 seconds. If not available, use hand sanitizer.
- Avoid touching your eyes, nose, or mouth with unwashed hands.
- Cover your mouth and nose with a tissue or upper sleeve when coughing or sneezing.
- Avoid contact with people who are sick.
- If you are sick, stay home, and avoid contact with others.
- Stay at least 6 feet away from others when in a public setting.

Information around this outbreak is changing rapidly. The latest information is available at **Michigan.gov/Coronavirus and CDC.gov/Coronavirus.**

For those who have questions about the state's actions to mitigate the spread of coronavirus, please call the COVID-19 Hotline at 1-888-535-6136 between 8AM - 5PM daily.

Michiganders can apply for unemployment benefits if they have left work or taken a leave of absence because of self-isolation or self-quarantine in response to elevated risk from COVID-19 due to being immunocompromised, displaying the symptoms of COVID-19, having contact in the last 14 days with someone with a confirmed diagnosis of COVID-19, the need to care for someone with a confirmed diagnosis of COVID-19, or a family care responsibility as a result of a government directive. Those temporarily laid off from work should apply for unemployment benefits online at www.michigan.gov/UIA or 1-866-500-0017.

AB_000835

Governor Whitmer is working to ensure that children who rely on the food provided by schools will have the resources they need. The Michigan Department of Education (MDE) has developed an online map for families to find meals. Families can access the map at: **https://www.mcgi.state.mi.us/schoolnutrition/**.

On March 19, the U.S. Small Business Administration (SBA) approved the governor's request for a statewide Economic Injury Disaster Loan (EIDL) declaration, opening the opportunity to small businesses to access low-interest loans from the SBA. The application for disaster loan assistance is available at **https://disasterloan.sba.gov/ela/**. For businesses looking for more information on how to apply for an SBA EIDL loan or whether it is something they should consider, visit michiganbusiness.org/covid19.

To view executive order 2020-21, click the link below:

## Executive Order 2020-21

This press release will be translated and made available in Arabic and Spanish at **www.michigan.gov/whitmer.**

###



• 

MICHIGAN.GOV HOME
ADA
MICHIGAN NEWS
POLICIES

COPYRIGHT 2021 STATE OF MICHIGAN

AB_000836

# **EXHIBIT R**

AB_000837



**Ohio** | Department
of Health

Mike DeWine, Governor
Jon Husted, Lt. Governor          Amy Acton, M.D., MPH, Director

## DIRECTOR'S STAY AT HOME ORDER

Re:   **Director's Order that All Persons Stay at Home Unless Engaged in Essential Work or Activity**

I, Amy Acton, MD, MPH, Director of the Ohio Department of Health (ODH), pursuant to the authority granted to me in R.C. 3701.13 to "make special orders…for preventing the spread of contagious or infectious diseases" **Order** the following to prevent the spread of COVID-19 into the State of Ohio:

1. **Stay at home or place of residence**. With exceptions as outlined below, all individuals currently living within the State of Ohio are ordered to stay at home or at their place of residence except as allowed in this Order. To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible, maintain social distancing of at least six feet from any other person, with the exception of family or household members, consistent with the Social Distancing Requirements set forth in this Order. All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to participate in Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this Order, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Ohio Department of Health (ODH)). This order does not apply to incarcerated individuals, they are to follow the guidance of the facility in which they are confined. Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location. For purposes of this Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease**. All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses, including home-based businesses, may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

   All Essential Businesses and Operations are encouraged to remain open. Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.** All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Order. Any gathering of more than ten people is prohibited unless exempted by this Order. This is

AB_000838

in accordance with President Trump's coronavirus guidelines issued March 16, 2020. Nothing in this Order prohibits the gathering of members of a household or residence.

All places of public amusement, whether indoors or outdoors, including, but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed.

4. **Prohibited and permitted travel.** Only Essential Travel and Essential Activities as defined herein, are permitted. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for Essential Activities is permitted.** For purposes of this Order, individuals may leave their residence only to perform any of the following Essential Activities:

    a. **For health and safety**. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members or persons who are unable or should not leave their home (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

    b. **For necessary supplies and services.** To obtain necessary services or supplies for themselves and their family or household members or persons who are unable or should not leave their home, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, automobile supplies (including dealers, parts, supplies, repair and maintenance), and products necessary to maintain the safety, sanitation, and essential operation of residences.

    c. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, public access playgrounds may increase spread of COVID-19, and therefore shall be closed.

    d. **For certain types of work** To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

    e. **To take care of others.** To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Order. This includes attending weddings and funerals.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary

AB_000839

to seek medical care. Nothing in this Order prevents the Department Health or local health departments from issuing and enforcing isolation and quarantine orders.

7. **Healthcare and Public Health Operations.** For purposes of this Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical marijuana dispensaries and licensed medical marijuana cultivation centers; obstetricians and gynecologists; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. **Human Services Operations.** For purposes of this Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Ohio Department of Aging, Department of Developmental Disabilities, Department of Health, Department of Job and Family Services, Department of Medicaid, Department of Mental Health and Addiction Services, Opportunities for Ohioans with Disabilities, Department of Veterans Services, and Department of Youth Services that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; day care centers, day care homes, group day care homes; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, and social

AB_000840

services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure.** For purposes of this, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, fulfillment centers, storage facilities, marinas, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, school construction, essential business construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.** For purposes of this Order, all first responders, emergency management personnel, emergency dispatchers, legislators, judges, court personnel, jurors and grand jurors, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Order.

Essential Government Functions means all services provided by the State or any municipality, township, county, political subdivision, board, commission or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions. Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

This Order does not apply to the United States government. Nothing in this Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Order.** For the purposes of this Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

AB_000841

12. **Essential Businesses and Operations.** For the purposes of this Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:

   a. **CISA List**. On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency (CISA), issued a *Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response.* The definition of Essential Businesses and Operations in this Order includes all the workers identified in that Memorandum.

   b. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, prepared food, alcoholic and non-alcoholic beverages, any other household consumer products (such as cleaning and personal care products), and specifically includes their supply chain and administrative support operations. This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

   c. **Food, beverage, and licensed marijuana production and agriculture**. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical marijuana use, medical marijuana dispensaries and licensed medical marijuana cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

   d. **Organizations that provide charitable and social services.** Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

   e. **Religious entities.** Religious facilities, entities and groups and religious gatherings, including weddings and funerals.

   f. **Media.** Newspapers, television, radio, and other media services;

   g. **First amendment protected speech.**

   h. **Gas stations and businesses needed for transportation.** Gas stations and auto supply, auto-repair, farm equipment, construction equipment, boat repair, and related facilities and bicycle shops and related facilities;

   i. **Financial and insurance institutions.** Bank, currency exchanges, consumer lenders, including but not limited, to pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures

AB_000842

exchanges, payday lenders, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products. Also insurance companies, underwriters, agents, brokers, and related insurance claims and agency services;

j. **Hardware and supply stores.** Hardware stores and businesses that sell electrical, plumbing, and heating material;

k. **Critical trades.** Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

l. **Mail, post, shipping, logistics, delivery, and pick-up services.** Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods, vehicles or services to end users or through commercial channels;

m. **Educational institutions.** Educational institutions-including public and private pre-K-12 schools, colleges, and universities-for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible. This Order is consistent with and does not amend or supersede prior Orders regarding the closure of schools;

n. **Laundry services.** Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

o. **Restaurants for consumption off-premises.** Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Order is consistent with and does not amend or supersede prior Orders regarding the closure of restaurants;

p. **Supplies to work from home.** Businesses that sell, manufacture, or supply products needed for people to work from home;

q. **Supplies for Essential Businesses and Operations.** Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

AB_000843

r. **Transportation.** Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, marinas, docks, boat storage, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Order;

s. **Home-based care and services.** Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

t. **Residential facilities and shelters.** Residential facilities and shelters for adults, seniors, children, pets, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

u. **Professional services.** Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

v. **Manufacture, distribution, and supply chain for critical products and industries.** Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

w. **Critical labor union functions.** Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations - provided that these checks should be done by telephone or remotely where possible.

x. **Hotels and motels.** Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

y. **Funeral services.** Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations.** For the purposes of this Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

14. **Essential Travel.** For the purposes of this Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

a. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

AB_000844

b.  Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

c.  Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

d.  Travel to return to a place of residence from outside the jurisdiction.

e.  Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

f.  Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements.** For purposes of this Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

   a.  **Required measures.** Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

      i.    **Designate six-foot distances.** Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

      ii.   **Hand sanitizer and sanitizing products.** Having hand sanitizer and sanitizing products readily available for employees and customers;

      iii.  **Separate operating hours for vulnerable populations.** Implementing separate operating hours for elderly and vulnerable customers; and

      iv.   **Online and remote access.** Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Order.** The intent of this Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements. All provisions of this Order should be interpreted to effectuate this intent.

17. **Enforcement.** This Order may be enforced by State and local law enforcement to the extent set forth in Ohio law. To the extent any public official enforcing this Order has questions regarding what services are prohibited under this Order, the Director of Health hereby delegates to local health departments the authority to answer questions in writing and consistent with this Order.

18. **COVID-19 Information and Checklist for Businesses/Employers.** Business and employers are to take the following actions:

AB_000845

a. Allow as many employees as possible to work from home by implementing policies in areas such as teleworking and video conferencing.

b. Actively encourage sick employees to stay home until they are free of fever (without the use of medication) for at least 72 hours (three full days) AND symptoms have improved for at least 72 hours AND at least seven days have passed since symptoms first began. Do not require a healthcare provider's note to validate the illness or return to work of employees sick with acute respiratory illness; healthcare provider offices and medical facilities may be extremely busy and not able to provide such documentation in a timely way.

c. Ensure that your sick leave policies are up to date, flexible, and non-punitive to allow sick employees to stay home to care for themselves, children, or other family members. Consider encouraging employees to do a self-assessment each day to check if they have any COVID-19 symptoms (fever, cough, or shortness of breath).

d. Separate employees who appear to have acute respiratory illness symptoms from other employees and send them home immediately. Restrict their access to the business until they have recovered.

e. Reinforce key messages — stay home when sick, use cough and sneeze etiquette, and practice hand hygiene — to all employees, and place posters in areas where they are most likely to be seen. Provide protection supplies such as soap and water, hand sanitizer, tissues, and no-touch disposal receptacles for use by employees.

f. Frequently perform enhanced environmental cleaning of commonly touched surfaces, such as workstations, countertops, railings, door handles, and doorknobs. Use the cleaning agents that are usually used in these areas and follow the directions on the label. Provide disposable wipes so that commonly used surfaces can be wiped down by employees before each use.

g. Be prepared to change business practices if needed to maintain critical operations (e.g., identify alternative suppliers, prioritize customers, or temporarily suspend some of your operations).

19. **No limitation on authority.** Nothing in this Order shall, in any way, alter or modify any existing legal authority allowing the State or any local health department from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closure of a specific location for a limited period of time, including the duration of this public health emergency.

20. **Savings clause.** If any provision of this Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Order are declared to be severable.

21. **Previous Orders superseded.** This Order supersedes, only to the extent that it conflicts, and amends any previous Order which conflicts with the provisions of this Order.

22. **Duration.** This Order shall be effective at 11:59 p.m. on March 23, 2020 and remain in full force and effect until 11:59 p.m. on April 6, 2020, unless the Director of the Ohio Department of Health rescinds or modifies this Order at a sooner time and date.

AB_000846

COVID-19 is a respiratory disease that can result in serious illness or death, is caused by the SARS-CoV-2 virus, which is a new strain of coronavirus that had not been previously identified in humans and can easily spread from person to person. The virus is spread between individuals who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person coughs or sneezes. It may be possible that individuals can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose or eyes.

On January 23, 2020, the Ohio Department of Health issued a Director's Journal Entry making COVID-19 a Class A reportable disease in Ohio.

On January 28, 2020, the Ohio Department of Health hosted the first statewide call with local health departments and healthcare providers regarding COVID-19.

On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization declared the outbreak of COVID-19 a public health emergency of international concern.

On January 31, 2020, Health and Human Services Secretary, Alex M. Azar II, declared a public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19.

On February 1, 2020, the Ohio Department of Health issued a statewide Health Alert Network to provide local health departments and healthcare providers with updated guidance for COVID-19 and revised Person Under Investigation (PUI) criteria.

On February 3, 2020, the Ohio Department of Health trained over 140 personnel to staff a call center for COVID-19, in the event it was needed.

On February 5, 2020, the Ohio Department of Health began updating and notifying the media of the number of PUIs in Ohio every Tuesday and Thursday.

On February 6, 2020, the Ohio Department of Health updated all agency assistant directors and chiefs of staff on COVID-19 preparedness and status during the Governor's cabinet meeting.

On February 7, 2020, the Ohio Department of Health and the Ohio Emergency Management Agency met to conduct advance planning for COVID-19.

On February 13, 2020, the Ohio Department of Health conducted a Pandemic Tabletop Exercise with State agencies to review responsive actions should there be a pandemic in Ohio.

On February 14, 2020, the Ohio Department of Health held a conference call with health professionals across the state. The purpose of the call was to inform and engage the healthcare community in Ohio. Presentations were provided by the Department of Health, Hamilton County Public Health, and the Ohio State University.

On February 27, 2020, the Ohio Department of Health and the Ohio Emergency Management Agency briefed the directors of State agencies during the Governor's cabinet meeting regarding preparedness and the potential activation of the Emergency Operations Center.

AB_000847

On February 28, 2020, the "Governor DeWine, Health Director Update COVID-19 Prevention and Preparedness Plan" was sent to a broad range of associations representing healthcare, dental, long-term care, K-12 schools, colleges and universities, business, public transit, faith-based organizations, non-profit organizations, and local governments.

On March 2, 2020, the Ohio Department of Health activated a Joint Information Center to coordinate COVID-19 communications.

On March 5, 2020, the Ohio Department of Health hosted the Governor's Summit on COVID-19 Preparedness, a meeting with the Governor, cabinet agency directors, local health department commissioners, and their staff.

On March 6, 2020, the Ohio Department of Health opened a call center to answer questions from the public regarding COVID-19.

On March 9, 2020, testing by the Department of Health confirmed that three (3) patients were positive for COVID-19 in the State of Ohio. This confirms the presence of a potentially dangerous condition which may affect the health, safety and welfare of citizens of Ohio.

On March 9, 2020, the Ohio Emergency Management Agency activated the Emergency Operations Center.

On March 9, 2020, the Governor Declared a State of Emergency in Executive Order 2020-01D.

On March 11, 2020, the head of the World Health Organization declared COVID-19 a pandemic.

On March 11, 2020, testing by the Ohio Department of Health confirmed that one (1) more patient was positive for COVID-19 in the State of Ohio.

On March 11, 2020, the Ohio Departments of Health and Veterans Services issued a Joint Directors' Order to limit access to Ohio nursing homes and similar facilities.

On March 15, 2020, the Ohio Department of Health issued a Director's Order to limit access to Ohio's jails and detention facilities.

On March 15, 2020, the Ohio Department of Health issued a Director's Order to limit the sale of food and beverages, liquor, beer and wine to carry-out and delivery only.

On March 15, 2020, the CDC issued Interim Guidance for mass gatherings or large community events, stating that such events that consist of 50 or more people should be cancelled or postponed.

On March 16, 2020 the Ohio Department of Health issued a Director's Order closing polling locations for the March 17, 2020 primary election.

AB_000848

On March 17, 2020 the Ohio Department of Health issued a Director's Order for the management of non-essential surgeries and procedures throughout Ohio.

On March 17, 2020 the Ohio Department of Health issued an Amended Director's Order to limit and/or prohibit mass gatherings and the closure of venues in the State of Ohio.

On March 19, 2020, the Ohio Department of Health issued a Director's Order closing hair salons, nail salons, barber shops, tattoo parlors, body piercing locations, and massage therapy locations.

Multiple areas of the United States are experiencing "community spread" of the virus that causes COVID-19. Community spread, defined as the transmission of an illness for which the source is unknown, means that isolation of known areas of infection is no longer enough to control spread.

The CDC reports that people are most contagious when they are most symptomatic (the sickest) however some spread might be possible before people show symptoms although that is not the main way the virus spreads.

Mass gatherings (10 or more persons) increase the risk of community transmission of the virus COVID-19.

Accordingly, to avoid an imminent threat with a high probability of widespread exposure to COVID-19 with a significant risk of substantial harm to a large number of people in the general population, including the elderly and people with weakened immune systems and chronic medical conditions, I hereby **ORDER** effective at 11:59 p.m. on March 23, 2020, all persons are to stay at home or their place of residence unless they are engaged in Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations as set forth in this Order. This Order shall remain in full force and effect until 11:59 p.m. on April 6, 2020, unless the Director of the Ohio Department of Health rescinds or modifies this Order at a sooner time and date. To the extent any public official enforcing this Order has questions regarding what services are prohibited under this Order, the Director of Health hereby delegates to local health departments the authority to answer questions in writing and consistent with this Order.

_____           _____March 22, 2020_____

Amy Acton, MD, MPH
Director of Health

AB_000849

# EXHIBIT S

AB_000850

**<u>EXECUTIVE ORDER IN RESPONSE TO COVID-19</u>**
**<u>(COVID-19 EXECUTIVE ORDER NO. 8)</u>**

**WHEREAS**, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (Gubernatorial Disaster Proclamation) in response to the outbreak of Coronavirus Disease 2019 (COVID-19); and,

**WHEREAS**, in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS**, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19;

**WHEREAS**, COVID-19 has resulted in significant economic impact, including loss of income and wages, that threaten to undermine housing security and stability;

**WHEREAS**, the enforcement of eviction orders for residential premises is contrary to the interest of preserving public health and ensuring that individuals remain in their homes during this public health emergency;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(2), 7(8), 7(10), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective March 21, 2020 at 5:00 pm and for the remainder of the duration of the Gubernatorial Disaster Proclamation, which currently extends through April 7, 2020:

**Section 1. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations**

1. **<u>Stay at home or place of residence.</u>** With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order. To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible maintain social distancing of at least six feet from any other person, consistent with the Social Distancing Requirements set forth in this Executive Order. All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public

AB_000851

Health (IDPH)).  Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location.  For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2.  **Non-essential business and operations must cease.**  All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

All Essential Businesses and Operations are encouraged to remain open.  To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3.  **Prohibited activities.**  All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order.  Pursuant to current guidance from the CDC, any gathering of more than **ten** people is prohibited unless exempted by this Executive Order.  Nothing in this Executive Order prohibits the gathering of members of a household or residence.

All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

This Executive Order supersedes Section 2 of Executive Order 2020-07 (COVID-19 Executive Order No. 5), which prohibited gatherings of 50 people or more.

4.  **Prohibited and permitted travel.**  All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited.  People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5.  **Leaving the home for essential activities is permitted.**  For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities:

AB_000852

a. **For health and safety.** To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

b. **For necessary supplies and services**. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences.

c. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, playgrounds may increase spread of COVID-19, and therefore shall be closed.

d. **For certain types of work**. To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

e. **To take care of others**. To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care. Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

7. **Healthcare and Public Health Operations.** For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. **Human Services Operations.** For purposes of this Executive Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Illinois Department of Human Services, Illinois Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, group day care homes, and day care centers licensed as specified in Section 12(s) of this Executive Order; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies;

businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure.** For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.** For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Executive Order.

Essential Government Functions means all services provided by the State or any municipal, township, county, subdivision or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions. Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

AB_000855

This Executive Order does not apply to the United States government. Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Executive Order**. For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. **Essential Businesses and Operations**. For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:[1]

    a. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

    b. **Food, beverage, and cannabis production and agriculture**. Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

    c. **Organizations that provide charitable and social services**. Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

---

[1] On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency, issued a *Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response*. The definition of Essential Businesses and Operations in this Order is meant to encompass the workers identified in that Memorandum.

d. **Media**.  Newspapers, television, radio, and other media services;

e. **Gas stations and businesses needed for transportation.** Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;

f. **Financial institutions**.  Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products;

g. **Hardware and supply stores**.  Hardware stores and businesses that sell electrical, plumbing, and heating material;

h. **Critical trades.**  Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

i. **Mail, post, shipping, logistics, delivery, and pick-up services**.  Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j. **Educational institutions**.  Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible.  This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools are ordered closed through April 7, 2020;

k. **Laundry services**.  Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l. **Restaurants for consumption off-premises.**  Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up,

and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) except that Section 1 is ordered to be extended through April 7, 2020;

m. **Supplies to work from home**. Businesses that sell, manufacture, or supply products needed for people to work from home;

n. **Supplies for Essential Businesses and Operations**. Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

o. **Transportation.** Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Executive Order;

p. **Home-based care and services**. Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

q. **Residential facilities and shelters**. Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

r. **Professional services**. Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

s. **Day care centers for employees exempted by this Executive Order**. Day care centers granted an emergency license pursuant to Title 89, Section 407.400 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation.

t. **Manufacture, distribution, and supply chain for critical products and industries**. Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

u. **Critical labor union functions**. Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations – provided that these checks should be done by telephone or remotely where possible.

v. **Hotels and motels**. Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

w. **Funeral services**. Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations**. For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.

b. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.

14. **Essential Travel.**  For the purposes of this Executive Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.

    a.  Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

    b.  Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

    c.  Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

    d.  Travel to return to a place of residence from outside the jurisdiction.

    e.  Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

    f.  Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements**.  For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

    a.  **Required measures.**  Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

        i.  **Designate six-foot distances**.  Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

        ii.  **Hand sanitizer and sanitizing products.**  Having hand sanitizer and sanitizing products readily available for employees and customers;

        iii.  **Separate operating hours for vulnerable populations**.  Implementing separate operating hours for elderly and vulnerable customers; and

AB_000860

    iv. **Online and remote access**.  Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Executive Order**.  The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements.  All provisions of this Executive Order should be interpreted to effectuate this intent.

17. **Enforcement**.  This Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305.

18. **No limitation on authority**.  Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing the State or any county, or local government body from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closer of a specific location for a limited period of time, including the duration of this public health emergency.  Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

## Section 2. Order ceasing evictions.

Pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(2), (8), and (10), all state, county, and local law enforcement officers in the State of Illinois are instructed to cease enforcement of orders of eviction for residential premises for the duration of the Gubernatorial Disaster Proclamation.  No provision contained in this Executive Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage.

## Section 3. Savings clause.

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

# EXHIBIT T

AB_000862



**FURNITURE**
**MATTRESS**

# <u>MEMORANDUM</u>

**TO:**  Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321; and 1021 Butterfield Rd. Downers Grove, Ilinois, 60515.

**FROM:**  Cathrine Wenger, Senior Counsel

**SUBJECT:**  WARN Act Notice (revised)

**DATE:**  March 19, 2020

On March 5, 2020, Art Van Furniture, LLC (the "<u>Company</u>") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 <u>et seq</u>. (the "<u>WARN Act</u>").

All terminations of employment will be permanent and you will not have bumping rights for other positions (<u>i.e.</u>, you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

13234411 v1

AB_000863

# **EXHIBIT U**

AB_000864

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                                 .  Chapter 11
                                 .
IN RE:                           .
                                 .  Case No. 20-10553(CSS)
ART VAN FURNITURE, et al,        .
                                 .
                                 .  824 Market Street
                                 .  Wilmington, Delaware 19801
               Debtors.          .
. . . . . . . . . . . . . . . .  Thursday, March 19, 2020
```

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA TELEPHONE:

```
For the Debtors:            Gregory Werkheiser, Esq.
                            Michael J. Barrie, Esq.
                            Kevin M. Capuzzi, Esq.
                            John Gentile, Esq.
                            Kate Harmon, Esq.
                            Jennifer Hoover, Esq.
                            BENESCH, FRIEDLANDER, COPLAN
                             & ARONOFF, LLP

                            Maura Russell, Esq.
                            MONTGOMERY, MCCRACKEN, WALKER
                             & RHOADS, LLP

For the U.S. Trustee:       Linda Richenderfer, Esq.
                            OFFICE OF THE U.S. TRUSTEE
```

(Appearances Continued)

```
Audio Operator:             Electronically Recorded
                            by CourtCall/Court Personnel

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES VIA TELEPHONE:     (Continued)

For the Official Committee
of Unsecured Creditors:        Robert J. Feinstein, Esq.
                               Bradford J. Sandler, Esq.
                               PACHULSKI, STANG, ZIEHL
                                & JONES, LLP


For Wells Fargo Bank:          J. Cory Falgowski, Esq.
                               BURR & FORMAN, LLP


For Wells Fargo
Capital Finance:               Jennifer Feldsher, Esq.
                               MORGAN, LEWIS & BOCKIUS, LLP


For Hilco Merchant
Resources, LLC, et al:         Douglas Hermann, Esq.
                               PEPPER HAMILTON, LLP


                               Steven Fox, Esq.
                               RIEMER & BRAUNSTEIN, LLP


For HGB AVF Lending:           Dennis A. Meloro, Esq.
                               Jeffrey Wolf, Esq.
                               GREENBERG TRAURIG, LLP



ALSO APPEARING VIA TELEPHONE:

                               Dennis Stogsdill
                               ALVAREZ & MARSAL
```

AB_000866

Case 1:22-cv-... Case 1:22-cv-10455-GGS-DGS Document 24-5 Filed 05/23/22 Page 13 of 35 PageID #: 4263

INDEX

|                                    | Page |
|------------------------------------|------|
| STATUS BY MR. WERKHEISER           | 7    |
| COMMENTS BY MS. FELDSHER           | 14   |
| COMMENTS BY MR. WERKHEISER         | 16   |
| COMMENTS BY MR. FOX                | 18   |
| COMMENTS BY MR. SANDLER            | 20   |
| COMMENTS BY MR. BARRIE             | 22   |
| SCHEDULING                         | 25   |

AB_000867

4

1      (Proceedings commence at 2:01 p.m.)

2          THE COURT:  Good afternoon, everyone.  This is

3    Judge Sontchi.  I hope all can hear me.  You can't see me,

4    however.  You might -- for many of you, that's an advantage

5    that you are soon going to lose.

6          UNIDENTIFIED:  Your Honor, I think we have to shut

7    down either the audio in the Skype because we're hearing some

8    feedback.

9          THE COURT:  Well, everybody that I have that is on

10   Skype is on mute, except for Mr. Sandler.  There we go.

11         UNIDENTIFIED:  That's better, Your Honor.

12         THE COURT:  And --

13         MR. SANDLER:  (Not identified) My apologies, Your

14   Honor.  I've never used Skype before.

15         THE COURT:  Me neither.  Somehow -- wait a minute.

16   We're doing our best here, some new technology.

17         Let me ask because, apparently, I've disappeared.

18   Can you see me on your displays?

19         UNIDENTIFIED:  No.

20         UNIDENTIFIED:  No.

21         UNIDENTIFIED:  We can see your name, but there's no

22   picture.

23      (Participants confer)

24         UNIDENTIFIED:  There you are.  That works.

25         THE COURT:  Oh, I can tell by the happy faces that

1    I have arrived.

2              UNIDENTIFIED:  You can look at everybody's houses

3    now.

4              THE COURT:  All right.  Well, thank you very much.

5    The Bankruptcy Court remains open for business, but it is not

6    business as normal, as you can tell.  We are dealing with

7    everything you are dealing -- I'm seeing many of you who are

8    clearly at home.  I'm in the office, but I'm about the only

9    person here, and we are operating remotely at the Bankruptcy

10   Court now.

11             So we're going to be, as you know from my previous

12   order -- maybe you've seen it -- we are going to be operating

13   at -- with regard to only time-sensitive matters only.  All

14   other matters are being cleared until, at this point, April

15   15th.  That, of course, is subject to further extension, if

16   necessary.  Our primary concern is the health and safety of

17   our employees and the public, doing our civic duty to help

18   stop the spread of this virus, and to promote and fulfill our

19   mission of running the bankruptcy system.  And those are hard

20   -- four hard things to try to get to work at the same time,

21   but we're doing the very best we can.

22             As you know, we're doing telephonic appearances for

23   most everything.  We are using -- we have this ability to use

24   video to a limited extent, when we have to deal with

25   witnesses.  Our interpretation of the law -- which could be

1    wrong, but it's our interpretation -- is that, if you have a

2    contested evidentiary matter, it is not sufficient to have

3    the witness available by telephone, but that there has to be

4    a video connection, so that the Court can discern the

5    demeanor of the witness, so that parties cross-examining that

6    witness can see the witness, and so the witness can see the

7    people cross-examining him or her.  And of course, there has

8    to be the ability to look at documents.  So this is a

9    complication.

10   And the reason I have this hearing today -- this

11   conference today, is to prepare for tomorrow's hearing, which

12   may be -- well, I think is going to be contested, and it may

13   involve contested evidence.  I'm not sure about that, and

14   that's one of the reasons I asked you all to be on the phone

15   today, so we could flesh that out.

16   So what I'd like to do, first of all, is welcome

17   Mr. Sandler to the case, who I understand represents the

18   Official Committee of Unsecured Creditors that was appointed

19   yesterday.

20   Mr. Barrie, if I could turn to your first, as

21   counsel for the debtors, to give me a general report on

22   what's going on with the debtor and what you -- how you

23   foresee tomorrow going forward.

24   MR. BARRIE:  Thank you, Your Honor.  I'm actually

25   going to defer to Mr. Werkheiser, who is on CourtCall.  As

1    you can imagine, this global pandemic has kind of thrown a

2    wrench into everybody's business everywhere, and the debtors

3    having retail going-out-of-business sales in the Midwest and

4    the Northeast is certainly not excused from that.  So I want

5    to kind of pitch it over to Greg, who can give the Court a

6    general status update as to all the matters that are

7    happening and the status of what the debtors are doing.

8             MR. WERKHEISER:  Yes.  Thank you, Mr. Barrie.

9             Your Honor, Greg Werkheiser of Benesch for the

10   record, for the debtors.  And it seems like a lifetime ago,

11   but I think, with the exception of the hearing we had on

12   Monday on the TRO on the (indiscernible) matter, we were last

13   before Your Honor on March 12th.

14             And this situation has evolved with a rapidity and

15   severity over the last week that I don't think anybody could

16   have predicted, and in a way that sort of uniquely makes life

17   challenging for a furniture retailer especially.  And you

18   know, so, obviously, as Your Honor is aware, this coronavirus

19   epidemic has been sweeping through the country since early --

20   I think it was late February or early March.  But really, you

21   know, we started getting, you know, significant feedback

22   about this shortly after the case was filed.  You know, as I

23   look through the time lines of everything that has gone on

24   relative to the coronavirus epidemic, you know, it's really

25   just been in the last week that things have really ramped up.

1    And you know, from the debtors' experience and

2    their operations, you know, what we've seen transpiring in

3    the states and localities where the debtors operate is -- you

4    know, obviously, we have now federal state of emergency

5    declared on account of this, and you know, all of the sort of

6    reliable sources and information is urging everyone to stay

7    home to the greatest extent to possible and to -- you know,

8    no nonessential activities out of their homes.

9    And then a number of places where the company has

10   operated in its core markets, such as Ohio and Pennsylvania

11   and Michigan, the, you know, state and local governments have

12   either issued strong guidance or outright directives for

13   nonessential retail to not be operating over the last several

14   days.  And this has had, you know, a devastating effect on

15   the debtors' ability to operate, you know, both the store

16   closing sales that had gotten underway just before the filing

17   and for the quotations that were contemplated to be part of

18   the Levin-Wolf going concern sale, which are 44 stores,

19   primarily located in Pennsylvania and Ohio, those locations,

20   as well.

21   Not to put too fine of a point on it, but you know,

22   I think, for at least the last several days, you know, the

23   company has been unable to meet, even at the store closing

24   locations, you know, the operating expenses that are incurred

25   just by keeping the doors open and the lights on and staff in

1   place to run those sales.  It's just not getting -- it wasn't

2   getting volume into the stores, in terms of customer traffic.

3   And obviously, people, out of health concerns and economic

4   concerns, are reluctant to make these types of bigger ticket

5   expenditures that are involved in committing to purchase a

6   piece of furniture.

7           So we are in a place now that I think we never

8   hoped or expected to be when, you know, planning for this

9   Chapter 11 was underway, certainly not any -- what anybody

10  expected in negotiating a cash collateral budget or orders.

11  And you know, everybody is doing the best they can under

12  these extraordinary -- extraordinarily different

13  circumstances to -- you know, obviously, paramount is the

14  health and safety of everyone involved, but -- and then, you

15  know, to treat all of our constituents, especially, you know,

16  our employees and customers, as fairly as possible under the

17  circumstances, but also to preserve and maximize value to the

18  greatest extent possible.

19          And so this -- where this has left us is in a

20  position where we've had to make some very, very hard

21  decisions over the last several days.  And just so the -- to

22  preview it for Your Honor, we've got a few different buckets

23  of stores that the company has operated.  There were, you

24  know, Art Van (indiscernible) branded mattress stores that

25  were the subject of going concern sales that were largely

1  completed as of mid March.  There's another bucket of stores

2  that are the, you know, Art Van stores, and the eight

3  Maryland and Virginia-based Wolf stores that had been the

4  subject of the closing -- the store closing sales that had

5  begun just before the filing.  And then thirdly, we have the

6  -- you know, what were going to be the Levin-Wolf going

7  concern stores.

8          And you know, as to the ones where we still had

9  ongoing GOBs and -- or were attempting to operate as much as

10  possible in the ordinary course, the company has made the --

11  you know, the difficult decision, effective as of today, to

12  tell employees not to report to work at those locations.  We

13  hope that -- and has, at least temporarily, shuttered these

14  locations.  You know, we hope this is not forever, but the

15  situation is extraordinarily difficult and very fluid.  And

16  so, you know, we have to adapt consistent with our

17  obligations and fiduciary duties to the facts as they

18  (indiscernible)

19          THE COURT:  So I'm confused.  I apologize, Mr.

20  Werkheiser.  So what stores are you not going -- or what

21  stores is it that you're telling employees not to show up to,

22  the store closing sale stores or all stores?

23          MR. WERKHEISER:  Effectively, all of the ones that

24  we still have ongoing store closing sales or that we're

25  operating in the ordinary course, which is basically the

1    Levin-Wolf sale, so (indiscernible)

2            THE COURT:  So the Wolf and -- so the Wolf and

3    Levin stores are closed, as well?

4            MR. WERKHEISER:  At least temporarily, Your Honor,

5    yes.  And --

6            THE COURT:  What about the mattress stores?

7            MR. WERKHEISER:  Your Honor, the mattress stores,

8    with the exception, I believe, of the Levin Mattress stores -

9    - so all of the Art Van or -- I think the brand was Pure

10   Sleep branded mattress stores were already, to my knowledge,

11   involved in store closing sales.  And as I understand it, the

12   nature of that inventory is such that they tend to sell down

13   quite quickly in a store closing sale context.  And so most

14   of those, if not all of them, were already through their

15   process as of last week.

16           THE COURT:  All right.

17           MR. WERKHEISER:  (Indiscernible)

18           THE COURT:  So, as of tomorrow, you will be not

19   operating business.

20           MR. WERKHEISER:  With the exception of --

21           THE COURT:  Online?

22           MR. WERKHEISER:  -- some back office functions and

23   distribution center functions and the headquarters.  And then

24   the sort of fulfillment side of the retail stores, I believe,

25   for a few days is contemplated to continue open -- operating

1    to try to, you know, allow customers to pick up have

2    delivered product that they've recently ordered.

3              THE COURT:  Okay.  So I guess the -- well, to cut

4    to the chase, that means we're not having a hearing tomorrow.

5              MR. WERKHEISER:  I don't want to speak for

6    everybody, Your Honor, on the phone.  But I think that is the

7    debtor's view, and Mr. Barrie can speak more to that.

8              I guess, before we sort of segue into talking about

9    tomorrow's hearing, Your Honor, I just -- I do want to make

10   clear that, you know, we are trying to explore with our

11   lenders and our other stakeholders, you know, other options,

12   short of outright (indiscernible) liquidation.  And you know,

13   we're aware, for example, that in a -- in the Craftworks

14   case, currently pending before Judge Shannon, they've --

15             THE COURT:  I think that's --

16             MR. WERKHEISER:  -- (indiscernible)

17             THE COURT:  Actually, I think that's confidential

18   information, Mr. Werkheiser.

19             MR. WERKHEISER:  Oh --

20             THE COURT:  That call was not on the record today.

21             MR. WERKHEISER:  I was not aware of that, I'm

22   sorry, Your Honor.

23             So let me just say then, conceptually, we are

24   looking at the possibility of a -- you know, going idle or

25   going into a state of dormancy for a period of time, and the

1   possibility then of either, you know, reopening stores, some

2   subset of stores as -- either in furtherance of the going

3   concern transaction, if there's still one to be had at that

4   point, or -- you know, or closing sales and an orderly

5   liquidation, you know, essentially, once the economic and the

6   retail environment and the safety environment have improved

7   to a degree that we can do that.

8           It is, you know, a number -- there are a number of

9   scenarios under consideration. I think, of every available

10  scenario, that is probably the, you know, most attractive one

11  that we have. And we are, right now, engaging in a dialogue

12  with Wells Fargo and our term loan lenders to see if there's

13  a way to pursue that alternative. The -- you know, but the

14  reality of the situation is that we cannot continue to burn

15  cash at the rate that we've been, given that there's

16  virtually no revenue coming into the company right now.

17          And you know, we -- of course -- and of course, for

18  us to be able to do that, we need cooperation from the ABL

19  agent and the term loan lenders and, you know, need

20  everyone's assurances that, while we are having these

21  dialogues, that, you know, they'll take no precipitous action

22  to make that -- an already difficult situation worse by, you

23  know, sweeping all of the cash, for example, that are in the

24  debtors' cash collection accounts and leaving us without even

25  the cash necessary to fund those operating and restructuring

```
 1    expenses already incurred or that might be incurred
 2    imminently, as we're, you know, trying to navigate this
 3    situation.
 4           THE COURT:  All right.  Thank you, Mr. Werkheiser.
 5           MR. WERKHEISER:  Thank you, Your Honor.
 6           THE COURT:  Obviously distressing news, but I
 7    appreciate the update.
 8           Would anyone like to be heard in connection with
 9    Mr. Werkheiser's report?  The lenders, the committee, the
10    liquidator, anybody?
11           MS. FELDSHER:  Your Honor --
12           MR. FOX:  Your Honor --
13           MS. FELDSHER:  -- this is Jennifer --
14           MR. FOX:  -- Steve Fox -- go ahead, Jennifer.
15           THE COURT:  Ms. Feldsher?
16           MS. FELDSHER:  Your Honor, this is Jennifer
17    Feldsher from Morgan Lewis on behalf of Wells Fargo, the ABL
18    lender.
19           Your Honor, these are unprecedented times, and
20    we're -- I personally was on, you know, calls that aren't of
21    public record earlier today.  This has hit retail, it has hit
22    restaurants and other industries very hard.  And it has hit,
23    you know, a lot of cases and a lot of people, and we are
24    mindful of that.
25           Your Honor, a lot of this information and the
```

 1    debtors' decisions, unfortunately, are coming at us minutes

 2    before the -- before these hearings.  These are not

 3    discussions that -- you know, I would say that where the

 4    debtors are, as opposed to other cases, is they haven't fully

 5    come to their creditors, other than to say this is somebody

 6    else's problem and, you know, put -- you know, fix it for us

 7    or don't sweep or do these things.

 8          I think that we are certainly discussing with the

 9    debtors -- we want to try to find a path forward.  We would

10    like to find a path that makes sense for all stakeholders

11    here, but it's going to require extraordinary measures

12    because we are living through extraordinary times, to try to

13    figure out what is the path forward, what's the path that

14    preserves, you know, value, that provides as much value as

15    possible to those that are impacted by these decisions.

16          And unfortunately, we haven't gotten the

17    information that we need from the company to be able to even

18    consider a full wind-down plan.  So, you know, you heard Mr.

19    Werkheiser, I think asking for an advisory opinion on

20    remedies that the lenders can take.  We're not -- you know,

21    we're in fact-finding mode and, you know, they're asking for

22    advisory opinions.  I mean, I -- they're in default today

23    under their cash collateral budget, they understand that.  We

24    are trying to work with them productively.  There are a

25    number of outstanding items.

1    That's all I can say to you at this time because

2    that is truthful in where we are with the parties.  And you

3    know, we're trying to cope and we're trying to absorb all of

4    this in the best way that we can.  So I'm happy to take any

5    questions that Your Honor has, but a lot what was said on the

6    call has -- is complete news and -- just to the ABL lenders.

7              THE COURT:  Okay.  Yeah, it's news to me, too, of

8    course.  Have you actually issued a notice of default,

9    though?

10             MS. FELDSHER:  We have not yet, Your Honor.

11             THE COURT:  Okay.  Thank you.

12             Anyone else?

13             MR. WERKHEISER:  Your Honor, it's Mr. Werkheiser.

14   If I could respond briefly?

15             THE COURT:  Yes, Mr. Werkheiser.

16             MR. WERKHEISER:  So, Your Honor, I think we have a

17   -- obviously, somewhat of a difference of opinion about

18   information flow, but -- and I don't think we need to belabor

19   that point.  We are committed to -- and I think we have been

20   giving as much information as possible to the lenders.  It's

21   just, you know, the rapidity and severity of the

22   circumstances, you know, have limited how much useful

23   information we have, and therefore we can share at any given

24   moment in time.  But we're committed to making that

25   information available.

1　　　　　　But -- and I also want to be clear.  I was not

2　　asking Your Honor to limit their remedies or prevent the

3　　lenders from having whatever rights are available to them

4　　under the Code and the interim cash collateral order today.

5　　But we are concerned that we are in a situation that nobody

6　　could have anticipated.  And because there has been a lack of

7　　communication, we want to make sure that the debtors are not

8　　left in a position where they're not able to meet those

9　　committed expenses that have been incurred or cannot be

10　　avoided to be incurred in the near term.

11　　　　　　And my point was simply that we need to have that

12　　communication going forward.  But then we absolutely reserve

13　　our rights to come before the Court if we need to, to address

14　　those sorts of issues.  And you know, we wanted to preview

15　　that we had concerns, but not asking for Your Honor to do

16　　anything or to grant any relief today.

17　　　　　　THE COURT:  Well, you're not going to get anything,

18　　so that's good.  Obviously --

19　　　　　　MR. FOX:  Your Honor --

20　　　　　　THE COURT:  -- the cash collateral --

21　　　　　　MR. FOX:  -- if I --

22　　　　　　THE COURT:  -- order --

23　　　　　　MR. FOX:  If I may?

24　　　　　　THE COURT:  Just a second.

25　　　　　　Actually, you know, the cash collateral says what

AB_000881

1   it says, and if there's a default that's called, there are

2   certain things that occur.  I think that all the lenders and

3   creditors probably understand that this is a difficult

4   situation, but I'm sure they're all still focused on

5   maximizing their recoveries, even though what "maximizing"

6   means today may not be what "maximizing" meant on Monday, and

7   it is what it is.

8            But I -- what's important, I'm -- I -- like Ms.

9   Feldsher, I'm in information-gathering mode at this point,

10  and this is just a status conference; it's not a hearing.

11  But all of this is very important and I appreciate the

12  information.

13           And I interrupted someone, and I don't know who it

14  was.

15           MR. FOX:  Your Honor, thank you.  This is Steven

16  Fox from Riemer & Braunstein.  As Your Honor will recall, we

17  represent the proposed consultant Hilco and Gordon Brothers.

18  We, too, share everybody's disappointment in the necessity,

19  from the debtors' standpoint, of making this difficult

20  decision.

21           We, too, were a bit in the dark up until minutes

22  before this hearing, when Mr. Barrie sent me an email that

23  the debtors had made this decision and were not planning on

24  going forward tomorrow.  Your Honor probably is aware we did

25  file a declaration in support of the motion earlier today,

1    with the expectation that we were going forward tomorrow.  So

2    this came quite as a shock to us, shortly before the hearing

3    this afternoon.

4         We do have more than 40 people out in the field,

5    who have been continuing to perform services in anticipation

6    of going forward tomorrow.  We've been incurring expenses to

7    support the debtors' efforts in keeping the store closing

8    sales going for the benefit of the estate and the creditors,

9    with the expectation that the debtors were going to conduct

10   themselves in good faith and move forward in connection with

11   the motion.

12        We continue to provide these services at the

13   request of the debtors, as well as the ABL lenders.  And we

14   will continue to stand by to support the estates' efforts,

15   whatever decisions are ultimately made, in terms of what the

16   path forward will be.

17        And we, too, will commit to work with the ABL

18   lenders, the term lenders, and the debtors, and now the

19   committee, having recently been appointed, to find the

20   optimal path forward to maximize value because, as Your Honor

21   will recall, we also, through an affiliate, hold pre-petition

22   term debt, so our interests are aligned with the rest of the

23   constituents within the estate to maximize recovery here for,

24   not only the benefit of ourselves, but for the benefit of

25   others involved.  And we look forward to having an

1    opportunity to come back and resolve these issues when a path

2    forward is ultimately resolved.  Thank you, Your Honor.

3              THE COURT:  Thank you, Mr. Fox.

4              Mr. Wolf?

5              UNIDENTIFIED:  Your Honor, this --

6              MR. SANDLER:  Your Honor, it's Brad Sandler.  If I

7    may be heard.

8              THE COURT:  Yes, you may, Mr. Sandler.

9              MR. SANDLER:  Thank you, Your Honor.  And as you

10   noted, just for the record, Brad Sandler, Pachulski Stang,

11   for the committee.

12             Your Honor, you know, the committee, having only

13   selected us as counsel yesterday, having been informed

14   yesterday, this is all new to us, but none of it really

15   surprising.  The committee's overarching goal was to, I'll

16   just say maximize value, like everybody else.  But there are

17   other things besides, you know, dollar recoveries.

18             For example, with the Wolf Levin going concern

19   sale, we were hoping that 44 stores would be saved, thousands

20   of jobs would be saved.  Maybe that will happen down the

21   road.  But as -- you know, certainly, with the coronavirus,

22   this unprecedented shutdown throughout the country that

23   certainly we have never seen, and hopefully never will see

24   again, Simon Properties closing their malls, L Brands,

25   JCPenney, you know, the Gap, you know, many, many retailers

1   around the country are starting to shut down.  And to have

2   the debtor do that at this time, frankly, from our

3   perspective, makes a lot of sense, to put everything on ice.

4          First of all, it's important for the employees, to

5   make sure that they're not exposed potentially to the virus.

6   It's also something that -- right?  We're talking about

7   something that is not perishable.  You know, furniture,

8   whether, you know, it's in the store today or in the store,

9   you know, a month from now or two months from now, it's still

10  the same furniture.  So it should be relatively easy to shut

11  the debtor down without any value that would dissipate

12  because of the furniture somehow, you know, getting destroyed

13  or damaged.

14         You know, it seems to me, Your Honor, that, in

15  these times -- right?  Restructuring professionals are, in

16  part, supposed to come up with creative solutions to very,

17  very tough problems.  And it may be easy to look at this

18  situation and pull the plug and say let's convert the case to

19  a Chapter 7.  I'm not really sure what that gets you.  If

20  people aren't shopping right now because everybody is shut in

21  their, you know, respective abodes, Chapter 7 isn't going to

22  generate any more value.

23         And it seems to me that this is a creative approach

24  to put everything on ice.  And hopefully, you know, at some

25  time period, whether it's 30 days, 60 days, 90 days, whatever

1    that time period may be, to, you know, turn the lights back

2    on and resume the liquidation of the stores and hopefully

3    find a going concern for the Wolf Levin properties.

4         And whether, you know, Robert Levin is the

5    purchaser at that time, whether he's still interested, we

6    don't know.  But the best chance in certainly the committee's

7    mind right now, to preserve value, is to put everything on

8    ice and let's come back to in, you know, a month or two and

9    see where we are.

10        MR. BARRIE:  Your Honor (indiscernible)

11        THE COURT:  Thank you, Mr. Sandler.

12        MR. BARRIE:  This is Michael Barrie.  If I could

13   just add a lit bit more color to what Mr. Sandler has just

14   spoken about.

15        THE COURT:  Yes.

16        MR. BARRIE:  So mister (indiscernible) did a

17   (indiscernible) explain (indiscernible) where we are and how

18   we got there, and I appreciate all of the constituents', you

19   know, requests and, to some extent, a little bit of

20   frustration about getting information.  But again, this is a

21   fluid -- this is a fluid time where no one had any

22   expectation that the entire world would come to a screeching

23   halt.

24        We are working with Wells, we have given them

25   information about 48 hours ago.  We're starting to get some

AB_000886

1    comments and feedback on that information now.  But as Mr.

2    Sandler said, the thought process would be kind of -- and

3    we've set this forth in a more fulsome motion that the Court

4    can hear.  But main -- find a way to maintain a -- almost a

5    status quo going forward, ensure that the employees who have

6    worked to realize a return for the inventory for the benefit

7    of Wells, make sure they're compensated.

8            Make sure our consumers know that -- who have gift

9    cards or who have creditors, you know, make sure that they're

10   aware of how -- you know, through communications on the

11   website, emails, whatever, how they -- you know, they will be

12   treated.  But the idea is let's not make this a

13   (indiscernible) thing.  But the reality of the situation is,

14   is that we can't have a going out of business sale if there's

15   no one to come and buy the merchandise.

16           On the Levin side -- on the Levin side, one of the

17   bigger issues that we're faced with are half of those stores

18   are in Pennsylvania, I think 27 of them.  The Commonwealth of

19   Pennsylvania closed all those stores by order of the

20   Governor.  So they -- being open is not even an option for

21   any of them.

22           So the thought is let's put this thing in a coma

23   for a little bit, let's skinny down this budget.  Let's work

24   with Wells to make sure that the people who are working hard

25   to maximize recovery so far are being taken care of, and then

 1    make sure that consumers know how they can be taken care of.

 2    And then let's -- let us work with Wells to figure out how

 3    this works in the near term.  Let us -- knowing full well

 4    that we can use this time to work out if there are bulk

 5    inventory sale opportunities; use this time to further

 6    discuss the Levin sale, keep that going because that's mostly

 7    an attorney-driven piece; discuss potential lease disposition

 8    options under 365(d) and discuss with our credit card

 9    processors returning monies for the increased reserves they

10    had taken during the preference period, which all can be done

11    in the context of during this temporary -- during this

12    temporary -- for lack of a better word -- coma, and then have

13    some sort of procedure going forward -- again, we'll do this

14    by motion -- that truly puts those emergent needs that have

15    to be decided because of destruction of proper threats or

16    threats to life and safety, putting those needs on an

17    emergent basis that have to be heard, but holding all other

18    non-emergent, monetary-type relief until such point that the

19    parties can really deal with it as it comes down.

20              And we just felt that this is a better framework

21    for preserving the value of what's there, as opposed to

22    simply just pulling the plug and walking way from everything.

23    So --

24              THE COURT:  All right.

25              MR. BARRIE:  -- you know, in that context, with

25

1    respect to the Hilco retention, Your Honor, in that context,

2    we just don't feel it's appropriate to go forward on a

3    retention hearing for something that hopefully will happen

4    eventually, but is not going to be happening in the next

5    couple of days.

6              THE COURT:  All right.  Now I'm confused.  So you

7    do want to go forward tomorrow?

8              MR. BARRIE:  No, no, no.  We don't want to go

9    forward.  We don't think it's necessary to go forward on that

10   because there's not going to be a going out of business sale

11   right now, so we don't think that it's necessary to go

12   forward on that until that issue materializes.  We just think

13   it's a -- we do think Hilco's partnership is very important

14   and we do intend to go forward with it at some point, just

15   tomorrow is not the day to do it.

16             THE COURT:  All right.  And you don't want to set a

17   date for that at this time?

18             MR. BARRIE:  We can set a date.  I don't have a

19   problem setting a date just to keep it on the calendar.  But

20   I would suspect that that date would be probably mid to later

21   April.

22             THE COURT:  All right.  Well, we have a hearing on

23   April 6th, so we can continue it to then, at least for now.

24             Any objection to continuing that until April 6th?

25          (No verbal response)

1          THE COURT:  Okay.  I don't hear any.

2          We'll obviously not go forward tomorrow, and that's

3     a shame, mainly because it's a shame for the business; and,

4     second, it's a shame because we were hoping to see if we

5     could figure out how to do this, and this was going to be one

6     of the first opportunities.  But that's nothing compared to

7     the loss of productivity and recovery to the employees and

8     the creditors as a result of these developments, which are

9     clearly outside the control of anybody on this call, that's

10    for sure.

11         So this has been very helpful.  We'll cancel

12    tomorrow's hearing.  Is there anything anybody else would

13    like to offer to the Court?

14         MR. WERKHEISER:  Your Honor, this is Greg

15    Werkheiser.

16         UNIDENTIFIED:  Your Honor --

17         MR. WERKHEISER:  I just wanted to mention that we

18    do have a -- I think a March 31st hearing scheduled with the

19    Court that we are trying to keep on the calendar, if at all

20    possible.  I mentioned that there were some 60 odd locations

21    that the debtors are --

22         THE COURT:  Yeah, I have that --

23         MR. WERKHEISER:  -- (indiscernible)

24         THE COURT:  I have that on my -- yes, I have that

25    on my calendar.  But that's a special hearing, that's not an

Case 1:22-cv-00450-DAE Document 24-5 Filed 03/30/22 Page 41 of 139 PageID #: 4287

1    omnibus, so that's why I didn't mention it.  The April 6th

2    hearing is the second day hearing for the case, so that's why

3    I mentioned that hearing.  But now, you still have the March

4    --

5              MR. WERKHEISER:  Okay (indiscernible)

6              THE COURT:  -- you still have the March 31st

7    hearing.

8              MR. WERKHEISER:  All right.  Thank you, Your Honor.

9              THE COURT:  Anyone else?

10              MR. BARRIE:  The only other -- the only other

11    request, given that things are so fluid, Your Honor, and

12    things are ever development, I don't think it's needed for

13    tomorrow.  But maybe perhaps early next week we could just

14    have one further status conference, so, if there are any

15    issues that the Court can help the parties resolve on a

16    little more of an informal basis, and also to update the

17    parties and the Court as to what's going on with the matters,

18    maybe earlier next week might be a good time to have a status

19    conference?

20              THE COURT:  Sure.  I'm available.  It's a very

21    empty calendar, and this is clearly an important and time-

22    sensitive matter.  So I'm available pretty much every -- I

23    have a hearing Wednesday at 2, and I have -- I'm not free

24    Thursday morning, and I have a lunch conference on Friday.

25    Other than that, I'm wide open.  Monday seems early.  How

1     about Tuesday?

2              MR. BARRIE:  Yeah.  Yeah.  Tuesday would be fine

3     with us, Your Honor.

4              THE COURT:  Do we have -- can we do 10 a.m., or

5     does that inconvenience people?  I don't know if we have

6     people on the west coast or not.

7              MR. BARRIE:  I don't believe we do.

8              THE COURT:  All right.

9              MR. BARRIE:  10 a.m. works for the debtors.

10            THE COURT:  All right.  That will be a --

11            MR. SANDLER:  Works for the committee.

12            THE COURT:  Okay.  That will just be a telephonic,

13     no fancy Skype for Business, that will just be a telephonic

14     status conference.

15            MR. WERKHEISER:  Thank you, Your Honor.  We'll get

16     that notice out.

17            UNIDENTIFIED:  (Indiscernible)

18            THE COURT:  Great.  All right.  And Mr. Barrie or

19     Mr. Werkheiser, if you could just issue a notice of

20     continuation of the hearing for tomorrow until April 6th on

21     the docket, that would be great.

22            MR. BARRIE:  Will do.

23            MR. WERKHEISER:  Yes, Your Honor.

24            THE COURT:  All right.  Anything further?

25       (No verbal response)

1        THE COURT:  All right.  Well, thank you everyone.

2        UNIDENTIFIED:  That's it, Your Honor.

3        THE COURT:  Bad news, but good to --

4     (Proceedings concluded at 2:37 p.m.)

5                    *****

AB_000893

30

CERTIFICATION

1

2        I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10    _____        March 26, 2020

11    Coleen Rand, AAERT Cert. No. 341

12    Certified Court Transcriptionist

13    For Reliable

AB_000894

# EXHIBIT V

AB_000895

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                       .    Chapter 11
         IN RE:                        .
                                       .    Case No. 20-10553 (CSS)
         ART VAN FURNITURE, LLC, et al., .
                                       .    Courtroom No. 6
                                       .    824 North Market Street
                                       .    Wilmington, Delaware 19801
                                       .
                      Debtors.         .    March 31, 2020
         . . . . . . . . . . . . . . . . .  1:00 P.M.

                      TRANSCRIPT OF STATUS HEARING
            BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                  UNITED STATES BANKRUPTCY JUDGE

         APPEARANCES:

         For the Debtors:          Gregory G. Werkheiser, Esquire
                                   Michael J. Barrie, Esquire
                                   Jennifer Hoover, Esquire
                                   Kevin Capuzzi, Esquire
                                   John C. Gentile, Esquire
                                   BENESCH, FRIEDLANDER, COPLAN
                                     & ARONOFF LLP
                                   222 Delaware Avenue, Suite 801
                                   Wilmington, Delaware 19801




         Audio Operator:          Leslie Murin

         Transcription Company:   Reliable
                                  1007 N. Orange Street
                                  Wilmington, Delaware 19801
                                  (302)654-8080
                                  Email:  gmatthews@reliable-co.com


         Proceedings recorded by electronic sound recording,
         transcript produced by transcription service.
```

APPEARANCES (Continued):

```
For the Debtors:          Marua I. Russell, Esquire
                          MONTGOMERY MCCRACKEN WALKER
                            & RHOADS LLP
                          437 Madison Avenue, 24th Floor
                          New York, New York 10022

For U.S. Trustee:         Linda Richenderfer, Esquire
                          David Buchbinder, Esquire
                          UNITED STATES DEPARTMENT OF JUSTICE
                          OFFICE OF UNITED STATES TRUSTEE
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, Delaware 19801

For Wells Fargo Bank:     Jennifer Feldsher, Esquire
                          MORGAN LEWIS & BOCKIUS LLP
                          101 Park Avenue
                          New York, New York 10178

For Brixmor and Various   Craig Ganz, Esquire
Landlords:                BALLARD SPAHR LLP
                          1 East Washington Street, Suite 2300
                          Phoenix, Arizona

For the Committee:        Bradford Sandler, Esquire
                          PACHULSKI STANG ZIEHL & JONES LLP
                          780 Third Avenue
                          New York, New York 10017

For HGB AVF Lending:      Jeffrey Wolf, Esquire
                          GREENBERG TRAURIG LLP
                          One International Place, Suite 2000
                          Boston, Massachusetts 02110

For Jennifer Sawle:       Rene Roupinian, Esquire
                          RAISNER ROUPINIAN LLP
                          500 5th Avenue, Suite 1600
                          New York, New York 10110

For State of              Saverio Mirarchi, Esquire
Pennsylvania, Office      STATE OF PENNSYLVANIA
Of the Attorney General:  OFFICE OF THE ATTORNEY GENERAL
                          Strawberry Square
                          Harrisburg, Pennsylvania 17120
```

(Proceedings commence at 1:01 p.m.)

THE COURT:  Good afternoon everybody.  This is
Judge Sontchi.  This is the Art Van hearing.  I know we're
all appearing remotely.  Obviously, if you could please make
sure you mute your phones unless you're speaking.  It's
particularly important if you're working from home with
background noise or if you're using a cell phone.  So, thank
you very much for your courtesy.

I did sign the only matter that was listed on the
agenda as going forward.  I signed that order just a little
while ago under certification of counsel, but I'd like to
turn it over to the debtors, if I may, for a update on the
current situation with the case and any scheduling matters
that might be related to that and then, of course, once the
debtors have made their report I would welcome any
contributions from any other parties in interest who wish to
be heard.

MR. WERKHEISER:  Good afternoon, Your Honor.  It's
Gregory Werkheiser of Benesch, proposed counsel for the
debtors.  Thank you for making this time available to us.

Before we get into this contemplated status
conference, Your Honor, I do have to go back to the rejection
motion because we were apprised by Ms. Heilman a short time
ago that one of her clients has an unresolved issue with the
form of issue that we were not aware until after the

AB_000898

certification had been submitted this morning.  And so we have been communicating with her to try to resolve that.  I don't know whether that issue is or is not resolved at this point.  And I apologize, we did not have the opportunity in the short amount of time available after hearing from Ms. Heilman before the hearing to communicate with Chambers, to notify Chambers that that response from Ms. Heilman had been received.

The issue, as I understand it -- well, if I could just generally, for the benefit of the parties on the phone and the court, a number of parties had sought, and I think we had provided, confirmation that as to all of the rejected locations that are incorporated in the proposed order that was submitted to the court this morning the debtors believe that all of the salable inventory in those locations, which was primarily mattresses, these were Art Van Pure Sleep stores, has been removed from those locations or would be removed by the end of the day today, March 31st.  All of the surrendering notices that were contemplated by the motion did go out to the counterparties to the leases last Friday and should have been received by those parties yesterday or at the very latest today by overnight courier.

So, putting that issue aside I just don't know, there might be a language issue that Ms. Heilman has still on the order and so if I could pause momentarily and let her

have an opportunity or her co-counsel have an opportunity to respond we can try to see if this is something that is easily resolvable or where we stand.

THE COURT: Okay.

MR. GANZ: Good afternoon, Your Honor. Craig Ganz, Ballard Spahr on behalf of Brixmor and various other landlords.

This kind of informal objection that we were working through specifically related to Brixmor. And as I understand, and I have been cc'd on the emails that have gone back and forth between Mr. Werkheiser and Ms. Heilman, that I think we largely have worked out everything as far as the language. Just making sure that there's a representation on the record here that the debtors are, in fact, out of the locations notwithstanding anything in the order and if they are out just preserving all rights to any asserted claims that we may have to the extent that there are other issues relating to that abandonment of property and whether that was accomplished or not.

The short answer is I think we're resolved on those issues.

THE COURT: Okay. So it sounds like your resolved and simply based on the representations of Mr. Werkheiser and his client with regard to the fact that they've exited the location and you're reserving all your rights with regard to

whether they have executed it correctly or completely.  We will deal with that going forward if we have to.

              MR. GANZ:  Exactly, Your Honor.  Thank you.

              THE COURT:  All right.

              MR. WERKHEISER:  Thank you, Your Honor.

              I think we should move forward to the status update.  So, Your Honor, when we were last before the court, I believe it was last Thursday, March 26th, at that time the debtors reported that they believed they had, at least, an agreement in principal with Wells Fargo, the prepetition ABL agent and on a path forward for a mothball motion or a suspension motion, you know, very short hands for these things.  The concept was that we would reduce the company's remaining operations to the bare minimum and to suspend, to the greatest extent possible, activity in the bankruptcy case over the next short period of time to better assess the outcome of the Coronavirus situation and most viable alternatives to the company going forward to maximize value.

              So, despite that conceptual agreement there are, obviously, important details that still needed to be worked out related to the budget and other details of that arrangement.  I think what we found, as the parties were working round the clock on these issues since before we were in court last Thursday and throughout the weekend, was that due to a number of facts that are somewhat unique to these

debtors and this case we were not able to get to a point where we had the agent support and consent for the mothball arrangement primarily because of the company's liquidity issues and cash needs, both as they exist today based on obligations that have accrued thus far since the filing and the expected obligations that would be incurred going forward even with reducing and deferring obligations for, you know, rent and reducing other activities to the bare minimum.

THE COURT:  Mr. Werkheiser, could you keep your voice up, please, I can't hear you.

MR. WERKHEISER:  Yes.  I'm sorry.

Just by way of example, Your Honor, as is somewhat unique to this debtor as opposed to some others the debtor had a large number of employees, I think in excess of 4,000, as of the petition date.  A lot of those employees are sales personnel who earn commissions on furniture only when it actually delivers, which means there is a long tail on employee compensation.  And so, there was a large portion of employee compensation that still remains outstanding right now from the couple of weeks that the debtors were operating during teh bankruptcy.

In addition, this company as a partially self-funded health insurance plan which, again, means that for those employee benefits there are fairly substantial -- there is a fairly substantial tail.  And so the all-in number for

those types of obligations is something approaching $10 million dollars based on our best estimates of what is owed right now and the company has, you know, cash in the neighborhood of, I believe, $12 to $13 million dollars now just to put, you know, a high level -- just to paint a high level picture of where things stand financially for the company.

And so I can't -- you know, we cannot speak for Wells Fargo's decision making process, but, you know, we do understand that as we attempt to model the various scenarios for mothballing the company over the next six, seven, eight weeks as appropriate the challenge always became how to achieve a liquidity event on the backend of that period. That was generating sufficient value both to satisfy any deferred obligations and to provide a recovery to the senior secured lenders at a level that was acceptable to them. Also, how to manage liquidity during that period under certain of the scenarios that we considered.

Those scenarios have included, you know, among other things the resumption of GOB sales, various bulk sale scenarios for inventory, consignment arrangements and other potential transactions with parties that have been under discussion for, you know, the last ten days or more including, as we heard at the last status conference, the possibility of resuming a transaction with the Levin Partners

AB_000903

for, at least, a subset of those assets.

And, you know, all those various alternatives, given the circumstances, the uncertainty surrounding the Coronavirus impact on the business and on the world in general, you know, creates a lot of uncertainty both as to timing and eventual recoveries. And then some of those alternatives such as GOB sales require the company to ramp-up in advance and incur, you know, fairly substantial expenses in advance to bring employees back on, to incur advertising expense, to spruce up the stores as necessary to resume, you know, store closing sales at those locations. The numbers are just not rosy from the debtor's perspective and we gather from our lenders' perspective given their unwillingness to go forward on that basis.

Your Honor, I think where that leaves us at this time is with few options none of which are particularly attractive for anyone here. We are operating subject to an alleged termination declaration that was issued by Wells Fargo as the agent on March 19th. The so-called notice -- remedies notice period under the cash collateral order was extended, but only through the end of the day today. We do not know at this time whether Wells Fargo is prepared to further extend that beyond today and absent that or absent some extraordinary relief from the court the debtors would no longer have access to cash collateral at the close of

AB_000904

business -- excuse me, at the end of the day today.

The other issues, I think, Your Honor, that are still being worked through at this time relate to funding obligations that may exist under the cash collateral order during this remedies notice period.  Paragraph 2 of the cash collateral order does require funding for employee payroll, certain other emergency expenses and other obligations that would be approved by the agent.

The company does have outstanding funding requests to the agent related to those obligations that have not yet been acted upon.  Finally, the order does contemplate the establishment of carve-out reserves and a carve-out trigger notice has been issued.  We have to confirm that those arrangements are in place.

So, given all of that, Your Honor, I think while no final decision has been made by the debtors, you know, absent a significant change in the trajectory of these cases over the next, you know, twelve hours or several days, if we can get beyond the next twelve hours, we are looking at a scenario where the debtors will likely have no choice but to move forward with seeking conversion of these cases to a Chapter 7 liquidation.

It is our hope and our intention to accomplish that in coordination with our lenders, the committee and our other stakeholders, and to do as orderly and as soft as

possible a conversion if, in fact, there is no other choice
at this point.  That provides to the fullest extent possible
to satisfy the employee obligations and the other accrued
obligations that are required to be summoned under the cash
collateral order, but we are not there yet.  You know, we do
not have a clear indication from the agent where we will end
up on those issues.

I think, Your Honor, I've been talking quite a
while and I will pause here and I'm happy to answer Your
Honor's questions or respond to questions or comments from
any of the other parties on the phone.

THE COURT:  No.  I don't have any questions.

Does anyone else wish to be heard?

MS. FELDSHER:  Your Honor, this is Jennifer
Feldsher from Morgan Lewis on behalf of Wells Fargo.  If it
would be helpful for Your Honor I can, kind of, weigh in a
little bit where Mr. Werkheiser left pauses, I think, in his
presentation on where the ABL lenders thinking is at and to
correct a couple of, you know, what I think are, at least,
misunderstandings in our view with respect to what is or
isn't' required of the ABL lender in this case.

Your Honor, I want to start by saying that Wells
Fargo, as Your Honor has heard from status conference after
status conference in this case, you know, we, like everybody
else has had to adopt to the new normal or, you know, current

circumstances which were completely unforeseen.  And one of
the things that we're seeing across these industries that
have been so terribly hit by the pandemic and the, you know,
shut down orders and things like that is in order for these
Chapter 11 cases to continue or to have any chance of
success, and we've told this to Your Honor previously so I
won't dwell on it or take up a lot of time, but they require
creative solutions,

      Most importantly, a willing partnership between
the debtors and their stakeholders, and a fair amount of
cooperation from everybody because we're all dealing with
this together and in these unforeseen circumstances they are
cataclysmic from a top-line number.  The debtor has
absolutely no revenue coming in and so we are left to deal
with how to get from point a to point b, and all of the
costs, and all of the stakeholders that are implicated
including employees, including landlords, including lenders
with a finite amount of cash and a totally uncertain path
forward, at least, in the near term.

      Within that Wells Fargo has funded every single
payroll request that the debtors have made for current pay,
for employees that have worked and for payroll requests that
has come in.  What has occurred, and Your Honor might recall
from a prior status conference where I was notified right
before coming into court, I believe, on the 20th, on a status

conference that the debtors had determined to suspend all of their operations even though they were still operating in some locations and there were not necessarily shutdown orders in place at that time.

They had determined to suspend all operations immediately, to terminate all employees; not all, but significantly all of their employees, certainly all of the store levels. That was not something that was done in coordination with the lenders, either the ABL lender or the term lender, or even the consultant as far as we know who, as Your Honor remembers, had remained even though their retention was still up in the air had remained to support the debtor's efforts to try to continue a GOB sale.

So, as a result of terminating their employees, as Mr. Werkheiser described, the debtors now have significant accrued PTO commissions, other benefits related to the terminated employees as well as healthcare obligations. Most of these were not included in any budget and certainly in the cash collateral budget because there was no contemplation of a wholesale mass termination of employees. Could these have been mitigated if employees had been furloughed, could these have been mitigated by a, you know, less drastic more spaced out termination we will never know. We weren't part of the terminations to begin with. We will never know, but now these expenses, as Mr. Werkheiser explained, exist.

Just the employee obligations alone, Your Honor, just because I think it's really important given what Mr. Werkheiser disclosed as the cash position, total over $14 million dollars. So, if the debtors have cash, as Mr. Werkheiser said --

THE COURT: I'm sorry, 14?

MS. FELDSHER: 14, Your Honor, correct. That is an estimate on the healthcare costs and that's using an estimate, Your Honor, that's a little bit lower than what Mr. Werkheiser just told you. In materials that they have provided to the ABL lender we're looking at a number for anticipated healthcare obligations of $8.5 and change million dollars and Mr. Werkheiser, I believe, just told the court that he's now using a $10 million dollar number.

Your Honor, that's part of the problem here to is there are lots of demands, including one last night, that all of these amounts need to be paid despite the fact that there just isn't enough cash to pay them, but the numbers detailed on the numbers, we asked for this detail, we don't have the information on it, but we can tell you in the aggregate these numbers are far in excess of what the debtors have in cash today. And then if you take into account, as Mr. Werkheiser said, the fee carve-out that is required to be funded, and they had demanded as well, that is in excess of, I believe, another $2 and a half million dollars.

AB_000909

So, again, 14, two and a half, and that's not even
taking into account any other expenses that might result.
So, our concern is that, yes, the parties are moving forward.
There hasn't been a proposal that's been presented to the
lenders that shows a market improvement in outcomes in a
Chapter 11 then in a Chapter 7, and the expenses associated
with the Chapter 11 are typically illustratively much higher.
There is also no scenario that the debtors have put forth
that they believe provides the ABL lenders with payment in
full.

At the end of the day whether that's a resumption
of the GOB process or a bulk sale, as the debtors have
suggested, they might be forced into because they won't have
enough cash by their own budget to get through to a GOB
process. There is no scenario under which the debtors
believe that Wells Fargo will be paid in full let alone other
creditors. And yet what we have are demands to today to take
all of the remaining cash that exists in the debtors account,
use that cash, this is the debtor's request, to pay employee
obligations that have accrued. Again, not current employee
obligations going forward. We have no issue paying for
employee wages that are coming due, but to pay the employee
obligations as much as they can to fund the professional fee
carve-out and then they have asked for Wells Fargo to provide
some type of an assurance that out of any proceeds that Wells

Fargo is to receive they will fund the remaining employee
obligations no matter what that recovery is going to be to
Wells Fargo, but they will fund the remaining obligations to
employees.

Now, Your Honor, we're talking about employees and
I'm mindful of that, obviously. Nobody in entering this case
and even as we sit here today had any intention of incurring
obligations to employees that were not going to be met. The
budgets originally for, you know, the Chapter 11 case took
into account the anticipated employee obligations and, you
know, everybody had always hoped and expected that employee
obligations could be paid in full through the process and
certainly through the GOB sales.

The debtors currently don't anticipate being able
to make it to a GOB sale and I don't think they believe that
even a Chapter 7 Trustee may make it through a GOB sale
without further financing. Yet when it comes to obligations
for which they perceive that there might be D&O liability we
are getting demands for those. On anything else they're
willing to talk to us, but as to our recoveries, as to other
stakeholder recoveries, as to what's in the best interest of
all other stakeholders unfortunately, Your Honor, we haven't
been as cooperative.

So, on the one hand we very much like to say to
the debtors let's do this cooperatively. That is our

preference that is what we asked the debtors to do. We'd like to have a smooth transition to a Chapter 7 process in which we can account for, you know, make sure the inventory is safeguarded, make sure the information is available for the Chapter 7 Trustee so that the Chapter 7 Trustee can get up to speed as quickly as possible, make sure key employees are available and their information is available so that the Chapter 7 Trustee can reach out to them. Hopefully, if he or she determines that this is the way that we would go so that all of the inventory and the assets can be safeguarded, can be put together.

Unfortunately, that is not what is happening and as I started the presentation what I said was that in these times, especially when we're dealing with such unprecedented disruption, the key is to have a willing partner. And so, Your Honor, we need those assurances from the debtors that they will get their creditors the information they need and the information that will be critical to have a soft landing, but as a condition to that is that we have to gaurantee that all potential liabilities for the directors and officers are taken care of full stop we are not in a position to do that today. We simply can't. The debtors do not have sufficient cash today to pay for those things. This is not a DIP, they don't have availability or no additional cash other then what they have on hand.

So, we're a little bit in a -- and I don't really know because I'd prefer option A, Your Honor.  I'd prefer that we did this consensually and that we were before the court late in the week with respect to a voluntary conversion, but I don't know because of demands that we received very, very late last night.  As Mr. Werkheiser said, everybody has been working round the clock to try to make this work and to try to come up with a scenario that works.  Then, you know, late in the evening we're getting demands that say you must pay what we believe are $16 and a half million dollars of obligations and we'd like to take that money today.

If the debtors were permitted to do what they're asking to do, of course, there's no options for any creditors in a Chapter 7 because you will turn over the case to a Chapter 7 Trustee with no money and no funding.  So, where we sit today our view is if this is likely to convert to a Chapter 7 Trustee then we should turn over the funds that remain in the estate to the Chapter 7 Trustee as well.  I just would be remiss if I didn't mention that the debtors are, as Your Honor can imagine, out of borrowing base compliance.  So, the lenders have the right, under the interim cash collateral order, to sweep cash, to put them into compliance which would be in excess of $5 million dollars.  We have not taken that action for exactly this

reason because our view and the view that we have shared with the debtors is we appreciate that the estate today has more obligations that they didn't have cash to pay. They're going to be tough decisions that need to be made going forward undoubtedly.

There might be a scenario in which we have to fund to an exit. We just don't know, but if its likely to convert to a Chapter 7 anyway then it makes sense for the Chapter 7 Trustee to have all of the available options and the cash to make those tough decisions rather than a situation which is, I believe, what the debtors are suggesting or requesting today which is that they would take all of the cash, leave the estate with zero money and soft convert it. I don't know what's soft about that, but convert it into a Chapter 7 case and leave all of the creditors and the Chapter 7 Trustee with absolutely no options but, you know, a zero for everybody.

We can't imagine that that's maximizing value. Certainly not by our view and so, therefore, Your Honor, we are where we are and, as I said, if the debtors want to work cooperatively, we are here. We want to do that, but we've got to be working towards that conversion and, you know, we will fund payroll expenses for employees that remain at the company today and certain those that we need going forward. But we cannot give the debtors assurances that we are going to fund something to deal with D&O liabilities today. It's

AB_000914

just not appropriate and we're not in a position to do so.

THE COURT:  Thank you.

MS. FELDSHER:  Your Honor, unless you have any questions thank you.

THE COURT:  Anyone else before I turn it back over to Mr. Werkheiser?

MR. SANDLER:  Your Honor, very briefly.  Brad Sandler, Pachulski Stang, for the committee.  May I be heard?

THE COURT:  Yes.

MR. SANDLER:  Your Honor, as I think I said when we had our first hearing that the committee was involved in the overarching goal of this committee was to see one or more going concerns because, obviously, that would be good for the employees, for the landlords and the vendors.

You know, you've heard two very different presentations over the last, I guess, about 30 minutes or so that I think you can sense what is going on within the case. The committee is, kind of, caught in the middle.  The one thing from the committee's perspective I don't think there is really much of an operational difference right now with this Chapter 11 in particular and what will likely occur in a Chapter 7 given the state of the emergency.

And considering that the trustees in Delaware are, for the most part, comfortable operating a business one of the things that I do want Your Honor to know is that we have

been talking to our committee members, some of our committee members, which consist of major vendors as well as major landlords of the debtor. And we have also had conversations with Robert Levin's counsel and separately with Gary Van Elslander's counsel. And the committees goal still remains to try to find a going concern transaction, one or more going concern transactions that will hopefully save some portion of the Wolf/Levin stores and the Art Van stores.

This, you know, ultimately may be done in a Chapter 7 and it may be that some of us are not around in the Chapter 7, although some of us may be around, and we intend to continue to find a way to develop a value maximizing transaction, one or more of them here because it really will be critical to try to get a going concern to the extent possible.

You know, in terms of where the case ultimately goes its unfortunate. A conversion is never a great thing for a case. We understand the disagreements between Wells and the company. We will, obviously, take a look at whatever conversion motion is filed and we will weigh-in on that. At this time, though, we certainly understand the substantial challenges confronting this debtor right now.

So, with that, Your Honor, I think I will just see if you have any questions from the committee's perspective.

THE COURT: No. Thank you.

AB_000916

MS. RICHENDERFER:  Your Honor, if I may.  This I Linda Richenderfer from the U.S. Trustees Office.

The one thing that strikes me is that we have a cash collateral -- use of cash collateral that expires at some point this evening.  And it doesn't sound like a motion to convert would be filed sooner than a day or two and then that still needs time for Your Honor to hear it.

I have a great concern about who is going to be protecting the collateral in the meantime because it certainly will not be under the control of the Chapter 7 Trustee.  And I don't know if the debtor has spoken to the lender yet about any arrangements being made, but until that order is signed and until the trustee is appointed a Chapter 7 Trustee is not responsible for what happens with the collateral.  That is just a point I wanted to emphasize at this point.

THE COURT:  Thank you.

MR. GANZ:  Your Honor, Craig Ganz.  May I be heard?

THE COURT:  Yes.

MR. GANZ:  Craig Ganz, Ballard Spahr.  Again, Your Honor, as you know, we represent a group of landlords including Brixmor Store, Essential and Broadstone.

One of the issues that the Trustee brought up, its one of the issues that we have as well, you know, once we

AB_000917

turn the page in April here we're not onto April rents and essentially being a rent free storage facility for the collateral. It brings a lot of concerns. We have had multiple discussions with potential purchasers both on that collateral that's inside our stores and also purchasers on the leases as well. We have tried to direct them many times over to debtor's counsel. We have not seen any of those conversations bear any fruit.

The position that we are taking right now is we just want to find a way here where we can remove ourselves from this process and if it has to be go direct with these potential purchasers of the leases or acquirers a we do have potential new tenants lined up to take over here, but there is no mechanism here to extract us. And, you know, there could be a situation where we're hopeful when we get into a Chapter 7 that we'll have a trustee that is responsive to removing the collateral from these locations or liquidating the collateral to a potential acquirer of these leases so we can have a new tenant, but as these days start to drag on there's some significant implications here especially, like I said, we're viewed somehow as a rent free storage facility where, you know, those amounts are going to need to be paid at some point and what the mechanism to do it is and whether that is through the Chapter 11 process or through the Chapter 7 process. We would like to see, you know, a mechanism to

AB_000918

move this along while at the same time, obviously, being
sympathetic to the situation that we're all facing.

Thank you.

MR. WOLF:  Your Honor, Jeff Wolf from Greenberg
Traurig on behalf of HGB AVF.  If I could be heard.

THE COURT:  Yes.

MR. WOLF:  Thank you.

We are the term lender and at this point now the
successor agent under the term loan facility.  I just wanted
to make sure that you and the other parties understood that,
first, we have not been involved in the back and forth on the
day to day of the discussions between the debtor and Wells
Fargo.  We have not been consulted on the continued use of
cash collateral.  We have not been a party to the development
of the mothball budgets.

That having been said I just wanted to let you and
the other parties understand that it would have been our
hope, like Wells Fargo, that the ABL agent and the debtors
would have worked out a mothball budget and continued with
consensual use of cash collateral and continued in Chapter
11.  And hopefully to find a way to get the stores back open
when the time is allowed and dispose of the collateral in an
orderly basis in the hope of getting recoveries for the term
loan term lenders.

Given what we understand to be the current

circumstances and demands of the debtor in terms of what needs to get paid, and lack of cash and other resources we're supportive of the ABL agent's position at this point to terminate cash collateral. We would echo their sentiment as well as the U.S. Trustees and landlord's counsel about trying to give this thing a soft landing in Chapter 7 with safeguarding the collateral and paying attention to all the niceties of trying to put the Chapter 7 Trustee in as good a position as possible to maximize value for the benefit of all stakeholders.

Thank you.

MS. ROUPINIAN: Your Honor, this is Rene Roupinian of Raisner Roupinian. May I be heard?

THE COURT: Yes.

MS. ROUPINIAN: Thank you, Your Honor.

As everyone knows, this healthcare crisis continues and we wanted to highlight to the court and to the parties that irreparable harm to these employees continues due to the lack of their health insurance. And while the estate exists, we implore the parties to make every effort to relieve as much of this healthcare crisis as possible by whatever means is available. Even if it causes some discomfort in the financial analysis here.

We're talking about human lives that are at stake. And there would be goodwill towards the parties if some

accommodation could be made with respect to these employee obligations. And we think that goodwill is worth quite a bit. And unlike money, can't be regained. So, we felt it important to make a plea here for the employees who, you know, have been terminated and have lost their health insurance, and have serious medical issues as my colleague, Jeff Raisner, pointed out at the last call. Those issues continue.

Our concern is that these medical bills aren't going to be paid. There is not going to be money there for them and, obviously, the concern is that they have no healthcare going forward and it sounds like that maybe their payroll is not going to be paid as well. So, that puts them in an even worse position in terms of trying to pay any kind of medical coverage.

Thank you, Your Honor.

THE COURT: Anyone else before I turn it over to Mr. Werkheiser for a brief rebuttal?

MR. MIRARCHI: Your Honor?

THE COURT: I'm sorry. Yes, sir.

MR. MIRARCHI: Your Honor, this is Sam Mirarchi from the Commonwealth Pennsylvania Office of the Attorney General.

We remain interested in this case. We believe the consumers -- there are many consumers who have been harmed by

making deposits who didn't get their furniture.  We're going to stay committed to having any discussions that we believe would be helpful to anybody or any of the parties.  Those discussions we would like to be a part of that, but we will be watching and monitoring the proceedings so that consumers are treated fairly in this case.

Thank you.

THE COURT:  You're welcome.

All right, Mr. Werkheiser?

MR. WERKHEISER:  Your Honor, thank you for the opportunity to address some of these statements.

Your Honor, first, I just want to direct the court and everyone else to Paragraph 2 of the interim cash collateral order which I think is the operative language given where the case is at right now.  And that language states:

"During the remedies notice period the debtors may use cash collateral solely to meet payroll obligations and pay expenses necessary or reasonably advisable to avoid immediate and irreparable harm to the debtors' estates in accordance with the budget, and as otherwise agreed to by the prepetition ABL agent in its sole discretion."

So, Your Honor, the fairest reading of that is that --

THE COURT:  Wait, wait, where is that?  I don't

see that?  That's not Paragraph 2.

       MR. WERKHEISER:  Of the interim cash collateral order, Your Honor?

       THE COURT:  Yeah, I'm looking at it.

       MR. WERKHEISER:  Where --

       THE COURT:  Oh, I see it.  All right.  Hang on, let me read it.

       MR. WERKHEISER:  Okay.

       THE COURT:  Not that I don't like being read to, but I don't.  So, what are you -- nothing -- I didn't hear anything other than the payroll obligations that were necessary to avoid irreparable harm.

       MR. WERKHEISER:  I think we are -- that is primarily our focus at this point, Your Honor.  There are approximately 4.8 million of payroll obligations, wages, salary, and commissions for sales personnel who worked on a post-petition basis to monetize Wells Fargo's collateral on the collateral of the other secured lenders in these cases that remain unpaid at this time.

       The sales commissions, in particular, have a long tail, Your Honor, because they do not become earned until the furniture is actually delivered to the customer.  And so that accounts for a large portion of those employee obligations that at this point remain unfunded.

       The second component of employee obligations that

was identified were the healthcare obligations, Your Honor, that are part of the employee benefits and would normally be part of payroll.

THE COURT: Its not payroll. Do they have a right to -- if you cancel the healthcare, do they have a right to a money payment from you?

MR. WERKHEISER: The healthcare benefits?

THE COURT: Are you required under state law to continue to give them healthcare if you decide to voluntarily get rid of it?

MR. WERKHEISER: Your Honor, just to clarify what we're talking about here are claims that were submitted by employees under the debtors' healthcare plan prior to the termination of their employment. So, these are services where an employee went to a physician or received medical care prior to, in most cases, March 19th and had billed and had been proceed through the insurance claims process or system since then and its now going to get sent back to the debtors to pay several weeks later.

So, the numbers that are believed to be the obligations are those that are going to hit the debtors over the next several weeks based on those claims that were made by employees, we think, predominately during the post-petition period and were part of their, you know, employee compensation and benefits package with their wages.

AB_000924

THE COURT:  Let me back up a minute.  What furniture have you delivered since you shut down?  None, right?

MR. WERKHEISER:  I can't speak without, you know, having the ability to talk to the client and get detail about what that was, but I believe there's been some furniture delivered since the petition date since March 8th through the 19th or so. I can't tell definitely whether there's anything that's been delivered after the 19th.

THE COURT:  So, how often do you pay payroll?  When was the last payroll?

MR. WERKHEISER:  I think, Your Honor -- I know this is a little unorthodox, but I believe Mr. Stogsdill is on the line and I don't know if he has that information handy for us.

MR. STOGSDILL:  I am Greg.  Payroll is made every Friday at Art Van and those commissions cover the period of March 1st through deliveries that were made up to late as March 21st, I believe.

THE COURT:  So, you haven't paid for any March deliveries?

MR. STOGSDILL:  Not for commissions.  Commissions are made on a monthly basis.

THE COURT:  So when are they due generally?

MR. STOGSDILL:  This week.

THE COURT: They're due this week, so the 3rd?

MR. STOGSDILL: Well technically, Your Honor, they would be paid if we were going concern, they would be paid in April after the month concluded. Because we terminated everybody and shut down the operations, we moved them up to be paid one to two weeks after the closing.

THE COURT: Well the closing was the 19th, okay. So, you have March commission earned due to March deliveries that have not been paid. How much is it?

MR. STOGSDILL: It's a little over $2.2 million dollars, I believe.

THE COURT: And I'm hearing from Mr. Werkheiser that there's payroll that would normally be due, I guess, this Friday for people who are currently working that haven't been paid, is that correct?

MR. STOGSDILL: There's two components of the amounts being paid this week. It's for employees who were laid off as part of the shutdown on the 19th and there's also a small group of employees that have continued to support the estates, and they're in there as well. But the bigger piece of it is for the preclosing payroll, just by virtue of having, you know, several thousand people on that.

THE COURT: Okay. So, it's people who are being paid for work they did before you closed that haven't been paid yet. How much is that?

MR. STOGSDILL:  I don't have that number directly in front of me but it's around $4 million dollars, high three's probably.

THE COURT:  So, they normally would have been paid on like the 20th or the 27th, but they weren't?

MR. STOGSDILL:  That's right.

THE COURT:  Okay.  And for people who have been supporting the company post-closing which was the 19th, how much is that payroll?

MR. STOGSDILL:  It's roughly about $250,000 dollars every two weeks.

THE COURT:  Okay.  And Mr. Werkheiser was giving me some numbers about healthcare reimbursements. And it sounded like there was a distinction between what you had already received request for payment for and what you expected in the future, is that right?

MR. STOGSDILL:  Yes, what's in the forecast which has been in every forecast we've ever put out is a tail; I think of it as like an actuarial tail for claims made incurred in the prior period that because of paperwork and bureaucracy take several months to be processed and presented to the company for payment.  So, the $8 million dollars or so that's in the forecast, that's always been in the forecast is for claims that have been made over the last -- as far back as six months ago.

THE COURT:  And you have a wage order, Mr.
Werkheiser, that allows you to pay those even though they're
prepetition claims?

MR. WERKHEISER:  We did. We did get authorization
from the court that are continued processing and honoring
healthcare reimbursement claims for the employees.

THE COURT:

MS. FELDSHER:  Your Honor, this is Ms. Feldsher.

THE COURT:  Yep.

MS. FELDSHER:  Can I be heard here?

THE COURT:  Of course.  I'm just trying to
understand --

MS. FELDSHER:  Yeah.

MR. WERKHEISER:  Your Honor, I'm sorry.  I'm happy
to have Ms. Feldsher be heard.  There were a number of
mischaracterizations of the record --

THE COURT:  Mr. Werkheiser, you'll --

MR. WERKHEISER:  -- in the presentation she made
to the court.

THE COURT:  Mr. Werkheiser --

MR. WERKHEISER:  Okay.  I just didn't want to not
address those points.

THE COURT:  You will get your opportunity -- stop
talking over me.  You will get your opportunity to speak.
I'm trying to figure out the facts and, frankly, I'm not

getting them very well from you where I have to ask your
client and others to tell me what's actually going on.

So, Ms. Feldsher.

MS. FELDSHER:  Thank you, Your Honor.

Your Honor, with respect to these healthcare
obligations my understanding and, again, at the risk of the
lawyer talking numbers, is that what was included in the
budget that was filed -- actually, Your Honor, if I may just
take a brief step back.

So, we view the language in two, to be as Your
Honor I think, you know, understands and has seen this
provision in virtually all DIP and cash collateral orders,
this is the debtors can keep the lights on, you know, the
stuff that's absolutely necessary they can pay it until they
can get back to court and seek some relief from the court.

And, you know, as you've heard these obligations
were obligations that the debtors incurred by virtue of
terminating of all of the employees.  Again, Your Honor, I
just want to be very clear --

MR. WERKHEISER:  Debtors do --

MS. FELDSHER:  -- all current payroll, all current
payroll that we are aware of that's been submitted to Wells
Fargo has been funded.  But on the issue of these healthcare
obligations my understanding is that, one, this is not -- if
you look at the budget it's not, there's no line item for

these obligations in the budget.

But from Clear Thinking Group, which is Wells Fargo's financial advisor in this case, I am told that what was included in the backup to the budget that went in with the cash collateral order was accrued worker's comp and medical of $6.2 million dollars. There were no provisions for unpaid PTO or vacation because the debtors understandably did not anticipate terminating all of their workforce.

Again, we have asked all of these questions as well, Your Honor, many many times. We tried to get to exact numbers. Mr. (indiscernible) gives one number, the debtors today submitted a funding request for these obligations that were not the same as the numbers we received in a demand email from the debtors' advisors yesterday evening.

So, there's always these discrepancies and, you know, that's part, I think, of the issue here. But any payroll, actual, you know, payroll, right, people working their salaries my understanding is that those have always been honored and have all been paid.

THE COURT: What about the commissions?

MS. FELDSHER: So, the commissions, Your Honor, have not been paid yet and they have not been paid because as you heard from Mr. Werkheiser, these were delayed and they were accelerated, as Mr. Stogsdill said. They have been accelerated unilaterally by the company to be payable now.

They wouldn't ordinarily be payable.

Your Honor, we have asked for and continue to ask for details on the exact number of these obligations. And in and of themselves, again, Your Honor, we can work on one issue and say, okay we absolutely agree that these should be paid, and we can get them paid. There's sufficient cash to pay them. The problem is there isn't sufficient cash to pay all of the employee obligations, so how do you draw the line? How do you draw the line on commission payments, but not PTO, but not healthcare costs, but not this, but not that?

There has to be -- there's a fiduciary that's supposed to be in place to make those decisions. And if this is going to convert to a Chapter 7, we think the right place is for the Chapter 7 trustee to look at all of these, get to the right, you know, final number and make, you know, and look at those and decide if these obligations can be paid.

But as we currently sit here today, were the debtors to pay everything that they want to pay, it would exceed the amount of cash they have and that's even before any sweep for cash that are permitted in the cash collateral order for Wells Fargo which I'm not suggesting we would take. I'm just saying even before you do any of that, you're in excess of the amount that they have.

So where do you draw the line? Why do employees that submitted claims previously get their healthcare claims

AB_000931

paid? The ones that submit them tomorrow aren't going to get them paid because the debtors aren't going to have sufficient month. There's no way to easily peel this onion as far as we can tell. We've tried very very hard with the debtors. We're happy to try some more, but we need definitive numbers, not estimates. We need actual numbers. We need to know exactly what is being requested. And what we're doing in funding that in terms of what will be possible in the Chapter 7 for all other stakeholders.

THE COURT: All right, thank you.

Mr. Werkheiser.

MR. WERKHEISER: Yes, Your Honor. Thank you.

Your Honor, and I'm sorry if my presentation has not been as clear as would be idea. We're, obviously, you know, this is a developing situation. We are doing this by telephone.

If we were all in the same room, I would be able to hand you cash forecasts going back to the beginning of the case that have shown that these obligations were in the forecast, in the budget they contemplated. The numbers may have changed somewhat over the course of the case, but they were always known and always part of what needed to be paid to pay the freight to be in Chapter 11 bankruptcy, this lender and the other secured lenders.

And, Your Honor, I would just, again, we don't --

the version of the budget that is attached to the cash
collateral has minimal detail, you know, has become common,
unfortunately, in these cases. But the backups to that
really shows, even at the very beginning of the case, for
example, that these healthcare obligations were contemplated
and prefunded and reflected as prefunded employee obligations
in excess of $6 million dollars, at that point in time.

        Your Honor, I need to correct the factual record
too on a number of things that Mr. Feldsher said. I will,
giving her the benefit of the doubt assume unintentional.

        These lenders received daily reports of the
operations of the debtors during the bankruptcy case. They
knew exactly what was going on with both the GOP stores and
the operating stores on a real-time basis. There was
complete information flow all throughout these cases.

        So, it is really disingenuous for her to say that
we somehow surprised them with the board having made a
responsible decision on March 19th to discontinue operations
when the coronavirus was already rousing throughout the
country at that point. Pennsylvania, at that point, had
issued an order to stay in place where a large portion of the
debtors' stores are located.

        And, Your Honor, I think we can take judicial
notice of the fact that Michigan, Ohio and Illinois, where
the bulk of the other operations of the debtors and the

debtors' headquarters are located in the case of Michigan, have all since issued stay-in-place orders no later than March 23rd.

So, maybe the board anticipated the formal government action, at that point, but it was clear, the writing was on the wall, and it was known to Wells Fargo and to everyone else in this case that the operations at those stores, at that point, were losing money on a daily basis because the traffic in the stores, and this makes sense. The company that sells furniture, and this is a virus that are reports indicating live on hard surfaces for a period of time after somebody touches them who's infected.

The customer traffic in the stores was at very low levels once it became known what this country was dealing with in this virus. So, the board did what it had to do both for economic reasons and for the health and safety and welfare of employees and customers in making the difficult decision to discontinue operations on March 13th.

What did that do, Your Honor, at that point? It didn't change anything other than potential retriggering obligations with respect to unused vacation time. Unused vacation time, Your Honor, is not part of any of the funding request that we're talking about today.

The obligations we're talking about today are salaries, wages, commissions, and healthcare obligations.

Does not include vacation pay.  It does not include PTO of any other sort.  That's a red herring and that's misdirection.

I also do want to, again, address the point of whether these debtors have tried to cooperate with their lenders. We have been trying throughout this case and before to do that and especially since it became clear the original contemplated going concern transaction and the GOP sales were not going to be able to be implemented as parties that originally intended.

Again, if we were all in the same room, I could show you model after model after model of that.  Alvarez & Marsal has shared with the lenders financial advisor and I could show you email after email after email in which we previewed that these issues existed.  We're trying to explain to the lenders why, what challenges the company faced in this situation and what obligations needed to be funded in connection with these cases to pay the freight.

So there has been fulsome communication.  There has been accurate communication.  Numbers changed because new data comes in from time to time and new claims come in from time to time.  But the information has always been provided as soon as it was available.

Your Honor, what this comes down to, Your Honor, is everybody -- it's a miserable situation.  The employees

have been hurt.  The customers have been hurt.  Everyone else

has been hurt in some fashion by the way this has developed.

Much of it is beyond anyone's control.  Some of it, in

particular, within the control of our secured lenders and

that is, you know, how do we do the least harm to the most

people, primarily the employees?

And that's why we are pressing for these

obligations that are baked into this cash collateral order --

THE COURT:  Well, listen, Mr. Werkheiser, you just

raised the point that's the problem.  You got a fixed amount

of money, insufficient to meet all this company's

obligations.  You want to do the least harm possible

particularly to the employees.  Particularly to the employees

is a choice.  You are choosing one creditor over another.

Those creditors will get paid, other creditors of equal

priority will not.

Now, generally speaking, a debtor-in-possession

has the ability to run his business or its business.  When

you start to make those kind of value judgments when you're

picking one administrative creditor over another that's

really the purview of the court.  And they're very very

difficult questions that have to be answered, consistent with

due process, an opportunity to be heard, and based on facts

and law, not just the debtors' board prefers to pay his

employees rather than his bank, rather than his landlords,

rather than his taxes, rather than any other administrative obligations that are going to go unpaid.

And while I certainly understand and sympathize with that desire of a company to want to take care of its employees -- oh by the way, and the other then also includes customers who are never, at this point, going to get their deposits back. That's a choice. And, you know, frankly, I don't think your client is in a position to make that choice because reality has outstretched a previous life.

MR. WERKHEISER: Your Honor, may I respond briefly, just on that --

THE COURT: Of course.

MR. WERKHEISER: I do appreciate the difficult situation and perhaps the impossible situation that the court is in and everybody else is in. But what I'm talking about is enforcing a choice that not just the debtor but the lenders made in the order that they agreed to and had Your Honor enter. That order explicitly says that the debtors had the ability to use the cash collateral to meet the payroll obligations.

They committed -- and I'm not standing -- asking Your Honor today to order them to make additional funds available. If they committed to make the money available for that purpose and those are obligations that are due now for the most part.

THE COURT: It says payroll obligations and irreparable harm expenses.

MR. WERKHEISER: Yes, Your Honor.

THE COURT: And the only payroll obligations that I've heard are salary, wages, and commissions that have been (indiscernible) but unpaid through today. That's all I've heard.

The healthcare reimbursements are not payroll obligations. They're just not. Under no reasonable definition of what payroll obligations are would they include healthcare reimbursements under a terminated healthcare policy, many of which are prepetition. And it's terrible and it's ridiculous that in this country you have to have a job to have health insurance, but that is the law.

MR. WERKHEISER: Understood, Your Honor. I understand where the court is coming from.

Your Honor, again, despite us airing our respective dirty laundry in front of the court today which is not what we had set out to do this afternoon, you know, I think the one thing that from the debtors' perspective, you know, we would agree with our lenders on is that everyone is better off if we can somehow come to an understanding as to dealing with these obligations that is fair and honors the bargain reflected in the cash collateral order, and you know, the basis principles under which I think this court has

operated for some time which is, you know.

I know Judge Walsh always used to say I can't --
if a secure lender wants to be dumb and take, you know, make
a rational decision that's collateral at the end of the day,
I can't stop them, but so they're going to have to pay the
freight.

THE COURT: Well, I think we can all agree a force
majeure has occurred between the decision making at the
beginning of this case and where we are today, for everyone.

MR. WERKHEISER: Well, of course. All I'm saying
is I think, you know, we are acknowledging as Judge Walsh did
that, you know, the secured lender has rights and has a
significant amount of control over its collateral. And that
was my only point in raising that, Your Honor.

But, at the same time, there's a duty to pay the
freight. And in this case, you know, the freight is -- the
largest chunk of that freight that needs to be addressed, you
know, sooner rather than later is the employee obligations.
And customer obligations which, you know, again, that the
(indiscernible) there's not a real opportunity to pay, at
least as to the prepetition.

You know, I cannot speak to and I do not know, at
this time, what ability there is for customers who bought
goods and paid in full for them on a post-petition basis
where the company was only selling inventory that was

actually in its possession at that time, not taking special orders, that may actually sit someplace in a warehouse, at this point, and could be delivered if the resources were there to do it, and there was not government action preventing that from happening. But, again, you know, it's paying the freight, doing what's right and fair and, you know, not to the extent possible hurting individuals who have no control over what transpired here.

Thank you, Your Honor.

THE COURT: You're welcome.

All right --

MS. FELDSHER: Your Honor, this is Jennifer Feldsher. I won't take up the time other than I didn't want my silence to be perceived as acquiescence to Mr. Werkheiser's statement that I somehow misrepresented to the court.

What I said to the court is to the best of my knowledge and I hope that Your Honor knows that we tried to be very careful about the things we say to the court and that we're not misrepresenting it.

THE COURT: All right. It's a very difficult situation for everybody, to say the very least and, hopefully, one that will never be put into again but I think it's our reality probably for the next several months.

All right, so here's where we are. What I would

like to do is have a hearing Friday at one o'clock.  I'd like

that by video in case we need testimony.  And Ms. Gatsun will

work with you on that.

In the interim, the debtor may not spend any

money; however, I believe that under the cash collateral

order, they have authority to pay salaries, wages, and

commissions that were earned but were unpaid through today,

the 31st.  But before I authorize that pay, I'm going to need

details of exact numbers and backup that can be shared both

with me and with Wells Fargo, and any other creditor.

Obviously, I don't need names of employees.  I

don't want any personal identifiable information.  Maybe

names are okay, but obviously but no social security numbers,

no addresses, no phone numbers, just pure names is fine, if

we have to get to that level of detail.  But I really want

detail.  I want to know what these numbers are.

Not healthcare, not severance, not PPO, not

expense reimbursement, no other fringe benefits.  Just good

old fashion wages, commissions and salary.  I think that's

fair under the cash collateral order that the debtors would

have normally the ability to simply pay that, even without

the agreement of the agent.  But in current circumstances

and, in particular, some disagreement as to what truly is

owed or not, I'm going to insert myself into that process and

make a decision on Friday of exactly what's going to get

paid.

I'd like to make a request of the debtors that they make a decision very quickly as to whether to convert the case or not. I'm not going to allow anything other than what I just discussed to be paid before conversion, allowing the bank accounts to be emptied to zero and then converting the case is a recipe for disaster and unfair to the creditors, none of whom are going to get paid in full. And the Chapter 7 trustee has to have something to deal with, some way to operate the estate.

So, I'm requesting that the debtors quickly decide whether they're going to convert and do so -- if they decide to do so, to do so quickly and to file a motion to shorten and the court will hear it on shortened notice.

I'd also like to request Wells Fargo to indulge me by agreeing to continue the stay relief date that ends today through Monday, April 6th to give us an opportunity to figure out what to do, hopefully, with some comfort that no money is going out the door unless otherwise ordered by the court. And the only money the court is considering are the wages, salaries and commissions, and only after hearing detailed evidence of same on Friday with an opportunity for the agent to be heard.

This is an unfortunate situation. It is nobody's fault. It is nobody's fault. I know many people in my local

business community who are good business people who have
great businesses who are staring down the barrel of a gun
based on what's happened.  It's just -- it's extraordinary.
And I'm not casting aspersions on anyone, but obviously this
case changed dramatically as did the whole world -- well not
the whole world but as to the United States in the last three
weeks, three or four weeks.

So, Mr. Werkheiser, is that okay?  Well it may not
be okay, but do you understand?

MR. WERKHEISER:  Of course, Your Honor, we do
understand and let me be clear.  The reason, in part, we're
having this debate today is the debtors, of course, never
entertained the idea of trying to pay these things without,
you know, some court authorization -- some specific vetting
of these issues in front of the court given, you know, the
lack of consent of Wells Fargo to agreeing to pay these, even
if we thought they were required by the order.

So we, of course, will abide by Your Honor's
direction on these points.

THE COURT:  Thank you.

MS. FELDSHER:  Your Honor, Jennifer Feldsher.  I
apologize for interrupting, just for one clarification.

THE COURT:  Yes, ma'am.

MS. FELDSHER:  We have been advised -- I
apologize, Your Honor.  We understand Your Honor's ruling and

AB_000943

will abide by it as well.

Your Honor, we were advised late last night, you know, as usual it's always an emergency. But the debtors have their property insurance is coming due and they need to enter into a renewal on -- Mr. Werkheiser may have more information but we have been told that they need to enter into a renewal by tomorrow or they will have no insurance related to their properties. And, obviously, there's a significant amount of inventory here.

So we have no objections to the debtors entering into the renewal policy and we would be okay with the use of cash collateral for that because we think that in any instance, whether this is a Chapter 11 or a Chapter 7, we will need to have, you know, a proper insurance covering the inventory here.

While the debtors haven't been able to secure the same insurance that was required under the prepetition credit agreements, they have told us what's the best insurances they can get and we think that's better than not having any insurance.

THE COURT: Well if you consent, it's okay with me. And I can guarantee you the first question the Chapter 7, if there is one, will ask is whether there's insurance. So, obviously, that's a good idea.

MS. FELDSHER: We agree, Your Honor, we just

AB_000944

didn't want to be, you know, violating a court order so we wanted to make sure you were mindful of that and we will consent to that being paid.

MR. WERKHEISER:  Thank you, Ms. Feldsher, and thank you, Your Honor.

Yes, I think we had communicated with Wells Fargo just to let them know the terms of the policy, for example, is available for renewal which was less attractive than the one that was in effect through today.  And we're trying to ensure that that would be acceptable to them under the circumstances.

As I understand it, we have to sign the paperwork by tomorrow, but nobody need go out the door immediately that there is probably for two weeks of a grace period to make those payments.  So, I think between now and Friday this won't change the amount of cash on hand.

THE COURT:  Okay.  Thank you.  Makes a lot of sense.  So, Ms. Feldsher, putting you on -- can you give me that waiver until Monday or do you need to talk to your client?

MS. FELDSHER:  Your Honor, I think that I'm authorized -- my client is on, but might be on a mute line, but we will, of course, give Your Honor, the time necessary, particularly if, you know, as we know that the cash position is going to remain the same.  So, Your Honor, at the risk of

getting ahead of my client and somebody else being on the phone on Friday, I'm going to go ahead and agree to Your Honor's request.

THE COURT: Okay. Thank you.

I am very cognizant for the landlords on the phone. I am very cognizant of the fact that you are now as of tomorrow involuntary storage facilities for many of you for the debtors' inventory and property. And I take that very seriously and I know that you will not get paid your rent tomorrow and I know it's not the only commercial lessee who is not going to pay rent tomorrow in the United States of America, and that puts you all in a very difficult situation. You all have your own lenders and you all have your own stockholders, your own vendors.

So, I take that very seriously. I will take that very seriously and we will address that as quickly as possible; however, until we have some decision about a path forward, which -- I mean my preference is a Chapter 7, but I'm not the fiduciary, thank goodness. And that will be up to either the debtor-in-possession to make that election or a creditor to move to convert. I cannot and nor would I convert sua sponte.

I kind of lost my cool a little bit but, you know, the healthcare situation is horrible. Among the most difficult decisions I've had to make since I took the bench

involved terminating people's healthcare insurance.  I had to do that in Fistion (phonetic) for 50,000 retirees.  It was as very difficult decision for me to make, and I don't take that lightly either.

However, at least, at this point, I think, the law compels me and good sense compels me, first of all, I can't create money out of thin air or force Wells Fargo to fund money that they aren't legally required to fund.  There isn't enough money to pay everybody including healthcare in full.  Paying some now and others nothing is making a choice that may not be fair.

And there is hope, I hope, a chance that some of that money might get paid through the results of a liquidation of the inventory in a Chapter 7 that would be, I think, probably fairly, some of it at least, administrative expenses, but that's going to have to await time.  That is a hardship for real people that I take very seriously, but it is unfortunately, in my mind, unavoidable under the facts and law in this situation.

I'm worried too about the deposits.  As many of you will remember from early in this case, at our first day hearing, I was very concerned about the deposits.  That situation has gotten not better.  It's gotten much much worse.  That's money people, at least, partially have a priority for and, again, hopefully, Chapter 11 priority wage

and claims and Chapter 11 priority deposit claims, at least, will get some recovery. We'll have to wait and see how that plays out but that's a very difficult situation.

And I am cognizant of the Commonwealth of Pennsylvania and other Attorney's General being concerned about consumers. The reality is nobody is getting out of this happy and we're just going to have to do the best we can to weigh the different interests, preserve due process, and make measured decisions that do the least harm possible, and that's hopefully what we're going to accomplish.

So, I'll see you all, unless there's anything else. Mr. Werkheiser, I'll see you all on Friday the 3rd at one. I would like that by video just in case we have to put somebody on the stand or answer questions. We really shouldn't do it over the phone like I did today without swearing the witness.

It's probably unclear now whether I'm going to use Skype for Business or Zoom, but I'll get you that information, Mr. Werkheiser, and you can include it in whatever notice that goes out at an appropriate time for that hearing.

All the audio is by CourtCall, as always, when we go by video. Only the video is for the pictures and the audio is CourtCall so we can make sure we have a full transcript available as required by law.

And if you have detail you can provide me prior to the hearing, as long as you copy the other side with it or the other parties with it, I'd be happy for you to submit this to me by email. You can work through Ms. Werkheiser or Ms. Samanski; otherwise, I can certainly -- I will need it no later than the hearing. I will need something in my hand that gives me the detail and you can provide that by email.

Any questions?

MR. WERKHEISER: Your Honor, Mr. Werkheiser. Just a couple requests for clarification here.

So, I understood Wells Fargo to indicate that the stay is not being lifted. I just want to confirm for the record that means that the remedy notice period continues through Monday. And that's only -- well material, not only material but material from the perspective of while we are not authorized to make any expenditures right now -- if the debtors have no access to cash collateral, we would have no choice but to dismiss the remaining employees effective the end of the day today. We cannot incur the types of obligations without the ability to pay them, among others.

So if we could just clarify for the record that the remedies notice period is continuing through Monday, I think that will assist in (indiscernible) assets until then.

THE COURT: The remedies notice period through Monday but that is not result in the fact that you can or

you're going to be able to pay wages from April 1 through April 6th without further order of the court. The answer to that is no. I'm not going to let you do that. What we're going to talk about Friday is through March 31st.

MR. WERKHEISER: I guess, Your Honor, what we're struggling with then is we would then have to effectively dismiss the remaining employees today.

THE COURT: No, you don't. No, you don't. They have a --

MR. WERKHEISER: Can't have people to work when I can't pay them.

THE COURT: They have an admin claim. You're working, you're not getting paid. They have an admin claim. I may allow it. I may not. I don't know. You don't have the numbers for me.

MR. WERKHEISER: Okay. Okay.

THE COURT: You can't not give me the information to make a decision and then complain that I can't make a decision, Mr. Werkheiser.

MR. WERKHEISER: Your Honor, that's not what I'm doing, please, please. What I am trying to make sure is that the legal status of the debtor is not, as of today, that cash collateral is fully cut off, as opposed to making expenditures. Because if the legal status as of the end of the day today is that there is no more access to cash

AB_000950

collateral at all, then the debtors do have zero ability to
pay the delegations that might be incurred through the end of
the week.

THE COURT: I am struggling to understand in what
world you think that occurred. I didn't terminate the cash
collateral order. I terminated your ability -- I froze your
ability to make payments under that cash collateral order
until further order of the court. And I asked and got an
accommodation from your lender to extend the remedies notice
period for Monday. That's all that happened.

MR. WERKHEISER: Right. And nobody actually used
the word remedies notice period, Your Honor. And so, I just
wanted to make sure there was no ambiguity about that being
extended through Monday. That's all I was trying to do. I'm
sorry if I did it in an inarticulate way.

THE COURT: All right, whatever.

MR. WERKHEISER: And, Your Honor, just on the
issue of conversion as a whole. I mean I just want to be
clear the debtors are not resisting that. I mean
realistically we understand this cannot continue in Chapter
11 without the consent of the secured lenders because we do
not have the ability to provide adequate protection, given
the circumstances of this case. It's really how to
accomplish that, that we struggle with and continue to
struggle with.

We will do everything we can between now and Friday to try to move past those issues with our lenders and resolve or, at least, narrow the issues that we have on Friday.  Thank you.

THE COURT:  Thank you.  Does anyone else wish to be heard?

MR. MIRACHI:  Your Honor, this is Commonwealth.

THE COURT:  Yes.

MR. MIRACHI:  Commonwealth of Pennsylvania; just real quickly.

The amount of the commissions may be indicative of the number of deposits or the amount of deposits that were made.  Is there any way we can get a copy of whatever information is going to be provided as well?

THE COURT:  Yes.  You'll have to get your information to Mr. Werkheiser.

MR. MIRACHI:  We've been in touch with Mr. Werkheiser.  We can do that.  Thank you, Your Honor.

MR. WERKHEISER:  Yes, yes.  Your Honor, this hadn't been requested previously, but I'm certain we can accommodate the Commonwealth and provide information about the amount of customer deposits received post-petition and prepetition to the Pennsylvania customers.

THE COURT:  Okay.

MR. MIRACHI:  Great.  Thanks.

AB_000952

THE COURT:  Anyone else?  Yeah, you're welcome.

Anybody else?

(No verbal response)

THE COURT:  All right, thank you. We're adjourned.

(A Chorus of "Thank you, Your Honor")

(Teleconference ended at 12:51 p.m.)


CERTIFICATE


I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.

/s/Mary Zajaczkowski                    April 1, 2020
Mary Zajaczkowski, CET**D-531

AB_000953

# EXHIBIT W

AB_000954

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 252** |
| | ) | |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2] Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.       The Motion is GRANTED, as set forth herein.

2.       Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.       The following Conversion Procedures are hereby approved:

   a.   **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with the terms of the Interim CC Order; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the Interim CC Order and the priorities set forth in section 726(b) the Bankruptcy Code.

    b.  **Books and Records.** As soon as reasonably practicable, but in no event later than April 10, 2020, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

    c.  **Schedules and SOFA.** Without prejudice to the chapter 7 trustee's ability to request further extensions and any party in interest's ability to oppose such requests, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

    d.  **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

    e.  **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

    f.  **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4.    Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5.    Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured*

*Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.     Notwithstanding anything to the contrary in the Interim CC Order, the Carve Out Reserves shall be established and funded as follows: (a) $2,593,000 (the "Carve Out Escrow Funds") of the Debtors' funds shall be wired into an IOLTA account at proposed general bankruptcy counsel for the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch"), pursuant to wire instructions Benesch has provided to the Prepetition ABL Agent, where such funds shall be held in trust for the applicable beneficiaries of the Carve Out and disbursed strictly in accordance with the terms of this Order and the Interim CC Order (as modified hereby); and (b) the Carve Out Reserve for the Chapter 7 Trustee Carve Out shall be deemed funded by allowing $50,000 of the Debtors' funds to remain in a bank account of the Debtors where such funds shall remain available to satisfy the reasonable fees and expenses of any interim or permanent chapter 7 trustee, as applicable, for the Debtors' bankruptcy cases. The Carve Out Escrow Funds shall be disbursed by Benesch only as follows: (i) with respect to the portion of the Carve Out Escrow Funds allocable to KCC for fees and expenses incurred as the Claims Agent, in accordance with the procedures set forth in the Claims Agent Order and KCC's Agreement; (ii) with respect to the

portions of the Carve Out Escrow Funds allocable to the Debtor Professionals (other than, for the avoidance of doubt, KCC) and the Committee Professionals, upon entry of, and in accordance with the terms of, such further order or orders of the Court as may be entered following the filing of Final Fee Applications and notice and opportunity to object thereto in accordance with the procedures set forth in Paragraph 3(a) above; and (iii) with respect to the portion allocable to fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, as may hereafter be directed by the interim or final chapter 7 trustee, as applicable.

7.       Except as expressly provided in Paragraphs 5 and 6 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder.  All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety.  For the avoidance of doubt and without in any way limiting the foregoing, (a) all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order), and (b) any lien priorities or superpriority claims granted pursuant to the Interim CC Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

8.       For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or

are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or (ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

9.      The Debtors have a need for the services of certain independent contractors, including individuals who are former employees of the Debtors (collectively, "Independent Contractors") following the Conversion Date in order to, among other things, (a) provide on-site security at the Debtors' distribution centers, and (b) continue the collection and the Debtors' books and records for transmission to the chapter 7 trustee, prepare the Schedule of Unpaid Debts and prepare the Final Report.  The Debtors are authorized to pay the Independent Contractors from cash on hand in advance for their work and related expenses in an aggregate amount not to exceed $73,243 and as further set forth in the Estimated Disbursements Forecast April 6th - April 10th provided to the Prepetition ABL Agent on April 5, 2020.  After April 10, 2020, the chapter 7 trustee will determine whether, and to what extent, to continue to use the services of the Independent Contractors.

10.      Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

11.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

**Dated: April 6th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT X

AB_000961

```
                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE

                                    .    Chapter 11
IN RE:                              .
                                    .    Case No. 20-10553 (CSS)
ART VAN FURNITURE, LLC, et al., .
                                    .    Courtroom No. 6
                                    .    824 North Market Street
                                    .    Wilmington, Delaware 19801
                                    .
                        Debtors.    .    April 6, 2020
. . . . . . . . . . . . . . . . .    1:00 P.M.

                  TRANSCRIPT OF TELEPHONIC HEARING
          BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
                UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:           Gregory G. Werkheiser, Esquire
                           Michael J. Barrie, Esquire
                           Jennifer Hoover, Esquire
                           Kevin Capuzzi, Esquire
                           John C. Gentile, Esquire
                           BENESCH, FRIEDLANDER, COPLAN
                             & ARONOFF LLP
                           222 Delaware Avenue, Suite 801
                           Wilmington, Delaware 19801




Audio Operator:            Leslie Murin

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
```

TELEPHONIC APPEARANCES (Cont'd):

For the Debtors:          Marua I. Russell, Esquire
                          MONTGOMERY MCCRACKEN WALKER
                            & RHOADS LLP
                          437 Madison Avenue, 24th Floor
                          New York, New York 10022

For U.S. Trustee:         Linda Richenderfer, Esquire
                          David Buchbinder, Esquire
                          UNITED STATES DEPARTMENT OF JUSTICE
                          OFFICE OF UNITED STATES TRUSTEE
                          844 King Street, Suite 2207
                          Lockbox 35
                          Wilmington, Delaware 19801

For Wells Fargo Bank:     Jennifer Feldsher, Esquire
                          MORGAN LEWIS & BOCKIUS LLP
                          101 Park Avenue
                          New York, New York 10178

                          - and -

                          Cory Falgowski, Esquire
                          BURR & FORMAN LLP
                          1201 N. Market Street, Suite 1407
                          Wilmington, Delaware 19801

For the Committee:        Bradford Sandler, Esquire
                          PACHULSKI STANG ZIEHL & JONES LLP
                          919 North Market Street
                          Wilmington, Delaware 19801

For Jofran Sales:         Jeffrey Waxman, Esquire
                          MORRIS JAMES LLP
                          500 Delaware Avenue, Suite 1500
                          Wilmington, Delaware 19801