MATTERS GOING FORWARD:

Debtors' Application for Entry of an Order Authorizing the
Retention and Employment of Jones Lang Lasalle Americas, Inc.
as Special Real Estate Consultant to the Debtors Nunc Pro Tunc
to the Petition Date [Filed 03/16/2020; Docket No. 141]

Debtors' Application for Entry of an Order Authorizing and
Approving the Retention of Benesch, Friedlander, Coplan &
Aronoff LLP as Bankruptcy Counsel to the Debtors Nunc Pro Tunc
to the Petition Date [Filed 03/16/2020; Docket No. 142]

**Ruling:  Matters Continued to April 27th, 2020**

Debtors' Motion to Convert the case to Chapter 7

**Ruling:  28**

(Proceedings commence at 1:01 p.m.)

THE COURT:  Good afternoon, everybody.  This is Judge Sontchi.  This is the Art Van Furniture hearing; 20-10553, scheduled for one p.m. on Monday afternoon.

Just to say what you already know which is all the audio is being done through CourtCall, so if you don't have CourtCall on or are not connected when you want to speak it won't be registered; you have to do that to preserve a valid transcript.  The audio is optional and is on. You have -- excuse me, the video is optional and on.  You have the ability to blackout your screen.  That is not a problem, if you're uncomfortable or just don't wish for us to see you that's not a problem whatsoever.

I will turn it over to counsel for the debtors.

MR. WERKHEISER:  Good afternoon, Your Honor.  This is Gregory Werkheiser of Benesch Friedlander.  Thank you, again, for making this time available to us.

Your Honor, this was originally our second day hearing in the case.  So it is a rather lengthy agenda in terms of pages.  Obviously, only one matter of substance going forward today.

I just want to make sure Your Honor has the most current version of the agenda which is the second amended agenda that the debtors filed this morning.

THE COURT:  I do.

MR. WERKHEISER:  Alright, thank you.

So, Your Honor, just briefly, items one through eight are all adjourned.

Item number nine was the debtors' motion to reject certain executory contracts and Your Honor was kind enough to enter the order for us on that in the last couple of days.

Item number ten was the debtors' application to retain Jones Lang Lasalle to provide certain real estate related services, and with the court's permission we are carrying that application to the April 27th which is an omnibus date in this case.  (Indiscernible) remain on the calendar as a hearing date notwithstanding the impending conversion of the cases.

There were some comments to that from the United States Trustees Office and (indiscernible) still being evaluated.  Candidly, it is unclear whether Jones Lang Lasalle will decide to go forward with a retention application or not under the circumstances.  We contemplated compensation that was largely a success fee or (indiscernible).  So there may not be a need for that application to be pursued, but that is being evaluated currently.

Your Honor, item number eleven is our firm's retention application.  Your Honor, we have a bit of (indiscernible) activity on this, this morning.  Largely it

AB_000966

seems to be a miscommunication that occurred Friday evening with Ms. Richenderfer of the U.S. Trustees Office. We had been learning with her over the last several days some informal comments we received from her. There was, apparently, a miscommunication Friday night as to whether this was going to go forward or not go forward. We tried to, you know, clear that up this morning to indicate that we were prepared to adjourn the application if she still had concerns, but I see that the U.S. Trustees Office has since filed an objection to the retention application and now appears at the docket at Item 260.

Notwithstanding that I think, you know, from our firm's perspective and from the debtors' perspective, you know, we think the issues that have been raised are ones that we need some more time to work with the U.S. Trustees Office. It should be entirely resolvable and we just need time to go through the issues (indiscernible).

Let me pause there, Your Honor, in case you have any questions or the U.S. Trustee would like to be heard on this issue.

MS. RICHENDERFER: Your Honor, this is Linda Richenderfer from the Office of the United States Trustee.

I had no issue with this hearing being continued. That was my understanding on Friday. I was quite surprised when the agenda did not reflect that. And based on

communications it was not my understanding that the issue was going to be pushed.  Believe me, I have enough to do without having to file objections to retention applications at this point.  Regardless, the objection has been filed.  We will continue to work with the Benesch Law Firm and have no issue with this being pushed to the 27th hearing date.

THE COURT:  Okay.  Thank you.  We will continue it to April 27th.

In connection with the April 27th date what will happen with that will depend on interactions with whoever the interim trustee is, but we will certainly use that as a holding date.

MR. WERKHEISER:  Understood, Your Honor.  Thank you.

Your Honor, that then brings us to the Alvarez & Marsal application.  The court did enter an order on that on Friday.  So thank you for that.

Item number thirteen was a matter that really should have been continued from the very beginning, it's the interim compensation procedures motion.  On the first amended agenda we did reflect that that was going to be adjourned at that date given where we are.

Item fourteen is the schedule extension motion and the court did enter an order for us on that particular motion.  So nothing further to do on that today.

Your Honor, I think that brings us to the main event today which is the much talked about debtors' motion to convert these cases to Chapter 7 liquidation cases. It was filed Friday evening and this would make a record that after filing an original version we did discover a mistake (indiscernible) for the effective date and filed a corrected version thereafter. That was a version that got served out on all of the parties. That appears as Docket Item 252. That would be the version that we are pursuing, Your Honor, for purposes of today's hearing.

THE COURT: Okay.

MR. WERKHEISER: Your Honor, the relief -- the basic relief that we sought is, of course, converting to Chapter 7 and, you know, (indiscernible) right to do, you know, for the reasons that we have set forth in the motion, you know, while, obviously, I think on this call which (indiscernible) the circumstances in the Chapter 11 cases are such that the debtors aren't able to continue in Chapter 11 because of the broader circumstances with the coronavirus (indiscernible) because, you know, lack of access to cash collateral going forward beyond today.

So the debtors did feel it was important to lay out, sort of, the history of these cases and the efforts that have been made over the course of these cases and before they were filed to, you know, (indiscernible) to salvage this

company and to, you know, protect the interests of the various stakeholders including employees and customers.  I think, you know, all of that is, really, the nature and background for the relief that is being requested which is to, you know, convert these cases effective 12 a.m. tomorrow, Tuesday morning, April 7th to Chapter 7 liquidation cases.

Your Honor, the proposed order attached to the motion does have some features that are a little bit unusual for a motion of this nature.  And we did circulate a further revised proposed order to the court just before the hearing which has also been circulated to, among others, counsel for the committee, counsel for the ABL term loan agent, counsel for -- excuse me, counsel for the prepetition ABL agent, counsel for the prepetition term loan agent, and the U.S. Trustee.

That further revised order, which I think the court has as well, reflects some changes that were made in the response to comments received and ongoing review of the order as filed with the motion.  We can pursue that however Your Honor would like.  You know, I can walk you through changes at this point or if you'd like me to pause to answer any questions the court has or let other people to make whatever comments they feel they need to make for the record; however Your Honor wants to proceed.

THE COURT:  Alright, thank you.

Given the motion to shorten we have the objection deadline is actually the hearing, let's just open this up. First I'd like to hear from the committee and Wells Fargo, and then anyone else who wishes to be heard in connection with the motion.

I will start with the committee.  Mr. Sandler?

MR. SANDLER:  Good morning, Your Honor.

It's very unfortunate that this case is converting.  It's something that, you know, we were hoping to see a going concern sale. I think I mentioned that one of the status conferences I was talking to both professionals for Mr. Van Elslander who expressed an interest in the Michigan stores and also with Mr. Levin's counsel who is interested in some of the Pennsylvania stores.

So this is unfortunate, but, you know, we all know the history of these cases.  We are where we are and at this point the committee has no objection to the conversion.

THE COURT:  Thank you.

Ms. Feldsher?

MS. FELDSHER:  Good afternoon, Your Honor.  Thank you.

I would echo Mr. Sandler's statements and why two decades of practicing it's my first case to convert from an 11 to a 7.  On a personal level, you know, its deeply troubling that we couldn't do more to salvage it, but it's

just a circumstance of a case caught in the cross-hairs of
what is, you know, certainly in my lifetime and hopefully in
the lifetime of all those around us who would be a once in a
lifetime pandemic and disaster in the country.  So we have no
objection to the conversion.

   We did have some issues with the revised order.
There were several versions of the order that had gone
around, the latest of which came just before the hearing
began.  There is a couple of things, I wouldn't call them
objections, per say, but things that we could have cleared up
with a little bit more time, but since we're doing it in real
time unfortunately we need to, you know, bring them up with
the court.

   The first is, this is Paragraph -- apologies, Your
Honor, Paragraph 9.  The debtors have requested a funding of
$88,243 to pay for employees that the debtors have identified
as being critical to this next week.  Those, I think, as they
have been explained to us, fall into two buckets.  The first
is security, the second is employees that are necessary to
put together information for the Chapter 7 Trustee and also
some information that's been requested by the ABL lenders
which we think will be integral to the Chapter 7 Trustee as
well.

   The $15,000 of security costs, Your Honor, have
already been funded per our last status conference which I

AB_000972

believe was on Friday at which time the court had approved up
to $40,000 of security costs.  They actually were $15,000 at
the time.  I think Your Honor just gave everybody a little
bit of leeway so we didn't have to have an emergency which we
appreciated, but those costs have already been paid.  So if
you net those out the actual amount, which I believe ties to
what the company has already requested, but the ABL lender
fund is $73,243 and not the $88,243.

I just -- you know, I didn't want -- I appreciate
that the language has not to exceed which protects us, but
the $40,000 number created some confusion with some vendors
after the last hearing and we got calls from the debtors
about that.  So I just wanted to be more precise on this one
so that there wasn't any ambiguity on what could and couldn't
be funded.

The ABL lender has no objection to the funding of
the amounts for these employees who have committed to working
throughout this week to assist the debtors in getting the
information over to the Chapter 7 Trustee.

Your Honor, with that the ABL lender has
requested, which are the three critical pieces of information
as we see it that we're hopeful the debtors will be putting
together during this week.

The first is information about the debtors'
inventory.  A lot of inventory, Your Honor, has been moved

recently as a result of the debtors rejecting a variety of leases that this court has approved, but as a result there's a lot of uncertainty as to where inventory resides. That, obviously, goes to the issue of whether or not there is appropriate security at the locations as well. We want to make sure we know where the inventory is.

So we have asked the debtors to put together inventory by location and also, if possible, by skew number. We have been told that that would be provided to us by end of the day tomorrow, but the debtors were not willing to put something into the order requiring them to do so. I just would like the court to know that we view that as being absolutely critical to the Chapter 7 Trustee being able to get involved quickly, understand where the inventory is and make sure that the trustee can secure it.

Secondly, as has been brought up to the court previously, the debtors' insurance policies, its property insurance lapsed and the debtors did get approval to go ahead and pay for replacement insurance  My understanding that that is in progress, but, obviously, we would like to make sure that that gets bound and finalized before, you know, hopefully as part of the (indiscernible), but the Chapter 7 Trustee has very current information on what, if anything, remains to be done to have that insurance bounded and completed.

AB_000974

And the third, which I believe was resolved as we
were on the phone, is we would ask about the Levin sites who
was going to be providing security at those sites which I
believe has just been -- the information was just provided to
us.  So, Your Honor, we had agreed to fund the $73,243 but it
was under the agreement of the parties that the people would
continue to work notwithstanding the conversion.  They would
work throughout this week for which they are being funded and
that they would put this information together.
Unfortunately, we're not able to get there with the debtors
to include some language that would assure that that was
going to occur.

Obviously, we're not looking to hold anybody in
contempt of court.  If the debtors need some extra time we
are, obviously, going to work with them, but we do view this
information as being critical to the conversion itself.

THE COURT:  Alright, thank you.

Mr. Werkheiser, would you like to respond to that?

MR. WERKHEISER:  Sure, Your Honor.

I think we're largely on the same page in terms of
what we are trying to accomplish both with the Chapter 7
Trustee and for Wells Fargo who is our other secured lender,
whose collateral is implicated in these cases.  So Ms.
Feldsher is correct, the amount that remains to be funded
under the proposed budget for the week that the debtors would

seek to pre-fund today, Your Honor, and this is why we didn't reflect it in Paragraph 9 of the further revised order that w3as circulated just before the hearing.  It would be $73,243.

That covers some -- it covers, essentially, the debtors' personnel who will be providing some functions ancillary to the security functions that the court recently approved and working on collecting books and record, and collecting the categories and information that Ms. Felder referred to.

So, you know, that is something that we would hope the court would consider authorizing the debtor to (indiscernible) cash collateral with the consent of our secured lenders (indiscernible).

In terms of the inclusion of language or non-inclusion of language in the order to that effect I think, you know, we had some concerns about because as everyone has acknowledged we are doing this real time and because the debtors did have to make decisions on Friday to relieve the remaining employees that they have, the 40 or 50 employees that was left after prior elections enforced they had to terminate everyone effective the end of the day Friday.

We then were in discussions throughout the weekend about these issues and I think reached agreement on what would be (indiscernible) staffing for the security issues and

AB_000976

for these information issues to be addressed over the next several days, and an appropriate budget for that which is reflected in Paragraph 9. But given the circumstances and the lack of resources available to the debtors and the fact that some of the employees, you know, we couldn't be certain that the employees would be available to the debtors to (indiscernible).

We did have concerns about eliminating every single item of information that the Chapter 7 Trustee or Wells might like in the text of the order and then even create a situation where intentionally or unintentionally parties were put in the position of having violated the order.

I can confirm, however, for the record, that the debtors are working on assembling all the information that Wells Fargo and the Chapter 7 Trustee would want relative to the inventory. So this would be inventory detailed by location and skewed. I think we had indicated, through correspondence over the weekend, that that is a somewhat more regular intensive process especially given how much an employee has been moved over the last few weeks; objections to various incidents and so on in the case. That is something that we understand from personnel of the debtors to be completed by (indiscernible) tomorrow.

I can also, I think, provide information, and I

didn't realize this was still an open item as far as Wells Fargo was concerned, as to the status of property insurance. In one of our recent prior hearings we did, I believe, discuss this on the record and the debtors have executed a binder for new property insurance to request a policy that expired on March 31st at various locations.

It is our understanding that the debtors have a thirty day grace period to pay the premiums on that. So I don't know right here today whether those premiums have been funded, but, you know, there is no, to our understanding, any gap in the insurance at this time and wouldn't be so long as the premiums are funded within thirty days of the binder having been signed.

And then one last point, Your Honor, again, to correct -- just to make sure the record is clear on this point. The debtors did have to terminate the remaining employees at the end of the day Friday. So any former employees that are among the personnel that are being asked to provide these services this week are being brought in, effectively, as any contractors at this point and not any employees of the debtors. I just want to make sure the record is clear on that point because among other things that have expired these debtors they no longer have Worker's Compensation insurance at this point in time.

THE COURT: Thank you, Mr. Werkheiser. Question:

AB_000978

I thought in the context of authorizing the debtors to renew property insurance that there was a sum of money that was involved with that, which I assumed was an initial premium or something along those lines, and now you're saying you don't know if the premiums have been paid. So what's the status?

MR. WERKHEISER: Yes, Your Honor. Sorry if I wasn't clear. So I think we had a discussion about the premium, which was, you know, quite expensive to renew under the circumstances, in excess of, I think, $2 million in total, and then had a discussion on the record at one of the recent prior hearings about the timing of funding of that premium. And I think what we said at that time is, to my knowledge, still true that there was not a need to fund the premium immediately, that there was a 30-day grace period, and we're still well within that grace period right now.

So, given the broader situation with our, you know, limited access to cash collateral and the other things going on in the case, the debtors haven't felt it appropriate to fund that premium prior to the appointment of the trustee. But, you know, certainly, you know, we'd fully cooperate and support the decision to fund that premium once the trustee is in place.

THE COURT: Okay. All right. Ms. Feldsher, any response?

MS. FELDSHER: I'm sorry, Your Honor, I could not

get off mute early enough.

Your Honor, my only concern with that is, one, these amounts have already been authorized by the Court, so I'm not sure what benefit is gained from the grace period or being with the grace period. My only concern is, you know, for the Chapter 7 trustee to have sufficient time to get involved, and I don't know what orders of the Court the Chapter 7 trustee will feel they will need, you know, to go ahead and authorize the payment of this premium, if they will need an order to operate the debtors' businesses, and I just didn't want the timing of that to become an issue in the case. We just want to make sure that the company has appropriate insurance; it's not as fulsome as what we had prepetition, but it is, we understand from the debtors, the best that they could get and it's certainly better than nothing.

So, you know, our view would be the debtors are authorized to go ahead and pay it and we don't see the benefit of not paying it. But if Your Honor thinks the Chapter 7 trustee will have sufficient time to address it as well, that's fine, as long as the debtors make the Chapter 7 trustee aware of the timing, so that it isn't something that slips, you know, as the Chapter 7 trustee is trying to get his arms around all that is coming over with respect to this case.

AB_000980

THE COURT:  Ms. Richenderfer, do you have any thoughts on this?

MS. RICHENDERFER:  Your Honor, I have a couple of thoughts that I think are interrelated to this question.  One has to do with the form of order itself.  On paragraph 3(b) as (indiscernible) it talks about turning over the books and records to the trustee as soon as reasonably practicable.  Your Honor, I have asked that the language be changed to make it clear that the trustee has immediate access to all of the debtors' books and records.  The trustee will make arrangements as need be to obtain physical possession, but the reading of this would have you believe that the trustee does not have immediate access.  I mean, the trustee immediately becomes responsible for the debtor, has the fiduciary duty and is running the business, so to speak, is that they are the debtor, they are the debtors.

So I think paragraph (b) needs to be changed to state that the Chapter 7 trustee will have immediate access and can work with the appropriate individuals with respect to the turnover of the information.

I do have a general concern, Your Honor, in that we're talking about certain requests for information that are going to go past the date when the Chapter 7 trustee is going to take over the role.  At 12:01 tomorrow morning, it will be the Chapter 7 trustee, and it will be their responsibility

and they work with the lender and whomever as they need to
with respect to requests for information, with respect to the
direction of anyone working on behalf of the debtors.

And I guess I'm confused also, Your Honor, because
I thought that there was supposed to be a payment that was
being made, that was authorized, so that the property
insurance would be in place, because it would take the
Chapter 7 trustee some time to get their arms around this and
to get the property insurance and have it be in place.  So
I'm not clear why there wasn't a payment that was made, as
Ms. Feldsher has suggested was supposed to have been.

MR. WERKHEISER:  Your Honor, this is Mr.
Werkheiser, may I speak to Ms. Richenderfer's comments?

THE COURT:  Yes.

MR. WERKHEISER:  Okay.  Your Honor, so -- you
know, subject to -- I believe Mr. Stogsdill is on the line
today for the hearing, who is a (indiscernible) at Alvarez
and Marsal -- so subject to him piping up and telling us that
there's not the present ability to make the premium payment
for the property insurance today before the conversion orders
become effective, we're not objecting to doing that.  This is
really the first we've been told that there was an
expectation that would be done pre-conversion versus post
conversion.  So I think we can deal with that issue and, if
the wires do go out today, you know, we would try to make

that happen, if that's the consensus that that should be
happening today.

       THE COURT:  All right, let's pay the insurance.
Let's get it done today.

       MR. WERKHEISER:  Okay.

       THE COURT:  Please, yes, because the Court so
authorizes.

       MR. WERKHEISER:  Thank you, Your Honor.  And I'd
be happy to speak to Ms. Richenderfer's comments about the
access information issue --

       THE COURT:  Yes, please, go ahead.

       MR. WERKHEISER:  -- if Your Honor wants to hear --
sure.

       THE COURT:  Yeah, please.

       MR. WERKHEISER:  So I think, again, this is just
situation where we're struggling with some of the realities
of the situation of having a debtor that until very recently
was still an operating debtor with, you know, a hundred to
200 locations throughout different areas of the country and,
not only that, Your Honor, had really two distinct business
lines, the Art Van Furniture line and the Levin and Wolf
furniture lines, and the systems for those hadn't been fully
integrated.  So what we've been trying to work through with
the U.S. Trustee's Office on this issue is just the fact
that, as a practical matter, it's not like flipping a switch

and we can deliver access, you know, immediately as of the
effective date of conversion to trustee to all of the
documents and information that the debtors have.

Technically, is the trustee at that point in
charge of all that information and does the trustee have a
right to it?  Absolutely, nobody is contending otherwise.
But practically can, you know, we connect the trustee into
all of the computer systems of the debtors or, you know,
provide access to all the books of the debtor in hard copy
or, you know, located remotely someplace as of midnight, you
know, this evening?  No.

And so really I think the -- this is more of a
semantic issue than a difference of view on when things
should happen.  We are committed to getting all of this
information to the trustee as soon as possible, I just didn't
want to again set up the client for somebody to say later
that they did not do what they were supposed to do by saying
access was going to be delivered immediately to everything as
of the effective date of conversion when there isn't a
practical ability to do that.

THE COURT:  All right.  Okay, thank you.  I hear
you on that and I think that's reasonable.  I was playing
around with drafting some language on the draft and there's
really no way to realistically say something needs to be made
immediately available at 12 midnight tonight, but I think 14

days is way too long.  First of all, you're not going to have anyone around past Friday, so unless the trustee decides to pay them.  So I'm going to say four days, no later than four days.

MR. WERKHEISER:  Understood, Your Honor.

THE COURT:  That means Friday, so -- unless I did the math wrong, I think that's Friday.  Do you want to put --

MR. WERKHEISER:  Thank you.

THE COURT:  -- Friday instead of four days, just to be clear -- whatever, either four days or Friday, either is fine.

MR. WERKHEISER:  All right, Your Honor, we'll make that change.

THE COURT:  We have to fix paragraph 9 to make the number 73,243.  Let me just ask Wells and the U.S. Trustee, did you have any other comments on the order that we haven't already heard?

MS. RICHENDERFER:  Your Honor, this is Linda Richenderfer.  No, I do not.

THE COURT:  Thank you.

MS. FELDSHER:  And, Your Honor, this is Jennifer Feldsher, I didn't as well.

THE COURT:  Okay, very good.  Thank you very much.

Is there anyone else on the phone who would like to be heard in connection with the debtors' conversion motion

AB_000985

and/or the form of order?

        MR. WAXMAN:  Your Honor, this is Jeff Waxman, if I may be heard?

        THE COURT:  Yes, Mr. Waxman.  Good afternoon.

        MR. WAXMAN:  Good afternoon.  First, Your Honor, I did get a version of the order on Friday that includes the language that we had requested from the debtors, and I want to thank the debtors for its inclusion.  I just haven't seen a revised order, and so I would just ask that Mr. Werkheiser confirm on the record that the language that's in what was paragraph 8 is still in the order in whatever paragraph it's now in.

        THE COURT:  I'll do that --

        MR. WERKHEISER:  Yes --

        THE COURT:  -- it's paragraph 10 now, but it's the same language, there's been no change.

        MR. WAXMAN:  Okay.  Thank you very much, Your Honor.  I have nothing further.

        THE COURT:  Okay.  Thank you, Mr. Waxman.

        Sorry to cut you off, Mr. Werkheiser.

        MR. WERKHEISER:  No problem, Your Honor.

        THE COURT:  Anyone else have anything they'd like to say?

      (No vocal response)

        THE COURT:  All right, I hear none.  I had no

comments to the order myself.  Let me look at it again.  I
assume we didn't have any problem with what I had seen on
Friday.

            MS. FELDSHER:  Your Honor, this is Jennifer
Feldsher again.  If I might just highlight for the Court,
this isn't something that we would have an issue with, but I
didn't think Mr. Werkheiser brought it up, but there is a
change in this order from what was in the cash -- the interim
cash collateral order in that Wells is going to be funding
the carveout reserve for the professionals to an account at
the Benesch law firm.  The initial -- the interim cash
collateral order had required a segregated account be set up
at Wells Fargo, but administratively that takes some time and
in excess of the time that we would have had on the schedule
that the debtors laid out for conversion.  So in order to
effectuate the spirit, if not the letter, of what was in the
interim cash collateral order, we've arranged for the Benesch
firm to hold the funds for the professionals, and then of
course any distributions to professionals would be subject to
the Court's interim compensation provisions, as well as some
of the additional provisions that the debtors have put into
this order with respect to professional fees.

            THE COURT:  Okay.  I did see that.  And I never
let Mr. Werkheiser walk through the order, so that's not his
fault that we didn't get to that, but I did see that.  Thank

you very much.  And I did walk through the order, which I got
before the hearing, which was extremely helpful.  Thank you
very much for sending that to Ms. Gadson.

   MR. WERKHEISER:  Of course, Your Honor.

   THE COURT:  I do have --

   MR. WERKHEISER:  Your Honor, I --

   THE COURT:  -- a question about -- I'm sorry -- I
do have a question about 7, paragraph 7, at the end, there's
a new (b) about lien priorities, what's that about?

   MR. WERKHEISER:  Your Honor, that is language that
the debtors agreed to add at the request of our secured
lenders and it simply means that, once the carveout is fully
funded, that we don't have any special super-priority status
or lien status outside of the carveout reserves that are
being funded for, you know, professional fees and the like.

   THE COURT:  Yep, I got it.  Okay.  All right, well
-- yes?  I'm sorry, Mr. Werkheiser.

   MR. WERKHEISER:  Oh, yes, Your Honor, one other
thing I just had wanted to highlight for the Court is that
we've had to do just a little bit of gymnastics here with
KCC, just because their status as the claims agent is not
technically that of a professional.  So some of the language
that appears in paragraph of the motion -- or the order as
originally filed, and then as carried over through paragraph
6 as well, just deals with that issue.

So, in addition to the professional fees and the
fees that they've -- the U.S. Trustee quarterly fees, the
fees for KCC's services as the claims agent are included in
the carveout reserves escrow that Benesch would hold and then
would disburse in accordance with the language that is set
forth in paragraph 6.

THE COURT:  Thank you.  I saw that, yes.

Ms. Richenderfer, when will the panel -- when will
the interim trustee be appointed, tomorrow morning?

MS. RICHENDERFER:  Your Honor, I have to admit,
I'm not clear whether or not we can file something prior to
12:01 this morning -- tomorrow morning, I mean, in
anticipation --

THE COURT:  My --

MS. RICHENDERFER:  -- of that --

THE COURT:  -- my experience is that your office
has not done that in the past, that it requires the actual
conversion before they'll do that, is my experience.

MS. RICHENDERFER:  And I think that's the same
case here, Your Honor, and so that would mean that it would
be filed first thing tomorrow morning.

THE COURT:  Okay.  Like Ms. Feldsher, this is not
my first experiencing converting a Chapter 11 to a Chapter 7
and it's never a good experience.  This case is very
unfortunate.  It's really been a parade of unfortunate events

AB_000989

that has kind of conspired to put a long-standing, solid
business into liquidation.  And, as I sit here today, I
certainly don't have enough information to blame anyone or
anything other than the coronavirus and the disaster it has
left in its wake.

Obviously, this was always a partial liquidation,
although through a GOB sale process and a partial going-
concern sale, which as retail cases in 2020 go is pretty
doggone good, but events have led us elsewhere.  And I feel
very strongly that it is -- I feel very strong sympathy for
the creditors who are not going to get paid their
administrative expense claims, at least right away.  The
employees who have health care reimbursements, some of them
never got -- according to the letters I've received, some of
them never got their retention, promised retention payments.
I don't think we had a retention program in this case, if I
remember correctly, but at least some of the letters had
mentioned that that was the case.  And a variety of other
claimants.  Obviously, of great concern to me from the very
beginning was the deposits, which I think at one point I was
told were 35 million.

In any event, it is what it is, we are where we
are, and we can only do the best we can under the
circumstances.  The debtors have presented a perfectly
reasonable and acceptable conversion order.  The debtors

have, in my mind, the absolute right to convert, and I'm
really constrained to, but I would not -- in any way not
approve this motion at this time.  We just need to make
changes to paragraph 3(b) and 9 that are consistent with what
we discussed on the record, but with those changes I will
grant the motion and enter the order.

          If you file -- if you upload a clean with those
changes, Mr. Werkheiser, and simply email Ms. Gadson or Ms.
Szymanski a redline to show those two changes, that will be
sufficient.  I'm not going to make you go through the hula-
hoops of filing another COC with just two changes on it.
Anyone who cares about what's going on is on the phone or on
the video today.

          So as soon as that gets -- as soon as I get that
redline and as soon as the new clean is uploaded, the order
will be executed and on the docket, and the conversion will
happen at midnight.

          MR. WERKHEISER:  Thank you, Your Honor.  And,
yeah, we can get that over immediately after the hearing.

          Your Honor, I just wanted to take this opportunity
to -- again, I think we tried to communicate our message and
wanted to be clear to all of our stakeholders in the motion
to convert, you know, how deeply the debtors regret this
situation and wish that, you know, circumstances had not
conspired to result in this outcome, but, you know,

AB_000991

understand that this is adversely affecting a large number of
people for reasons beyond, you know, most everybody's
control.

And, Your Honor, we also wanted to take this
opportunity to thank Your Honor for your availability, for
your close attention to this case.  And as bad as this is, it
certainly could have been a lot worse without everyone
working, you know, very diligently, and without the Court's
supervision to help us at least deal with the situation in
the most orderly way possible.

Your Honor, I also wanted to take the opportunity
just to clarify one thing about the record, just because the
customer deposits, as you might imagine, is an issue that is
being paid close attention to by various state's attorney
generals.  And I'm not sure that we ever used the number 35
million for purposes of the record and I think the number as
it stands now might be quite, quite a bit less than even the
debtors thought it was earlier in the case for a number of
reasons, something south of ten.  But be that as it may, you
know, a lot of individuals and small businesses probably have
suffered to some degree because the debtors have been unable
at this stage of the proceedings to honor those customer
deposit obligations and, whatever the number is, we
understand that people do -- you know, forced at minimum to
wait, then may not get a recovery at the end of the day,

depending how things play out from here.

But, again, thank you, Your Honor.  I have nothing further to say, unless the Court has anything else for us, and that concludes our business today.

THE COURT:  No, I have nothing further.  Anyone else?  Last chance.

All right, thank you all.  We are adjourned.  I'll await the order.  Have a good day.

COUNSEL:  Thank you, Your Honor.

(Proceedings concluded at 1:45 p.m.)


CERTIFICATE


We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Mary Zajaczkowski          May 16, 2021
Mary Zajaczkowski, CET**D-531


/s/ Tracey J. Williams          May 16, 2021

Tracey J. Williams, CET-914

# EXHIBIT Y

AB_000994

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC, et al.,[1]<br><br>                    Debtors. | Chapter 11<br>Bankr. Case No.  20-10553<br>**Joint Administration Pending** |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>                    Plaintiff,<br><br>      v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>                    Defendants. | **Adv. Pro. No.  _____ - \_\_\_\_\_** |

## CLASS ACTION
## ADVERSARY PROCEEDING COMPLAINT FOR
## <u>VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ.</u>

      Plaintiffs Todd Stewart and Jennifer Sawle ("Plaintiffs") alleges on behalf of themselves

and a putative class of similarly situated former employees of Debtor Art Van Furniture, LLC

and its affiliates (together "Debtors" or "Defendants") by way of this Class Action Adversary

Proceeding Complaint against Defendants as follows:

## <u>NATURE OF THE ACTION</u>

      1.      The Plaintiffs brings this action on behalf of themselves, and other similarly

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

situated former employees who worked for Defendants and who were terminated without cause as part of, or as the result of, mass layoffs or plant closings ordered by Defendants beginning on March 4, 2020, who were not provided 60 days advance written notice of their terminations by Defendants, as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq, (the "WARN Act").

2.      Plaintiffs were terminated along with approximately 700 other similarly situated employees as part of, or as the foreseeable result of a mass layoffs or plant shutdowns ordered by Defendants.  These terminations failed to give Plaintiffs and other similarly situated employees of Defendants at least 60 days' advance notice of termination, as required by the WARN Act.  As a consequence of the violation, Plaintiffs and other similarly situated employees of Defendants seek their statutory remedies, pursuant to 29 U.S.C. § 2104.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1334, and 29 U.S.C. § 2104(a)(5).

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1409 and 29 U.S.C. § 2104(a)(5).

## THE PARTIES

### *Plaintiffs*

6.      Plaintiff Stewart was employed by Defendants as the Store Manager at Defendants' facility at 14055 Hall Rd. Shelby Township Michigan 48315 one of seven WARN-covered facilities (the "WARN Facilities") until his termination.

7.      Plaintiff Sawle was employed by Defendants as a salesperson at one of Defendants' WARN Facilities located at 8748 West Saginaw Highway, Lansing, Michigan until her

2

AB_000996

termination.

8.     On March 4, 2020, Plaintiffs received a letter notifying them that terminations at the Facilities where they worked would commence on May 5, 2020 or within 14 days thereafter.

9.     Plaintiffs were not terminated on May 5, 2020. Instead, on evening of March 19, 2020, Defendants abruptly notified its employees, including Plaintiffs that terminations would occur immediately for non-leader personnel and March 22, for lead personnel.

10.     Plaintiff Sawle's last day of employment was March 20, 2020.

11.     Plaintiff Stewart was, and other store leaders were, specifically told they would not get paid unless they continued to work through the Saturday and Sunday, March 21 and 22.

12.     With the power off at the facility, Plaintiff Stewart and colleagues worked in the dark through the week carrying purchased furniture out to the cars of waiting customers.

13.     Along with Plaintiffs, hundreds of other employees of Defendants who worked at, reported to, or received assignments from Defendants' Facilities were terminated on or about March 19, 2020 without advanced written notice.

### *Defendants*

14.     Upon information and belief and at all relevant times, Defendant Art Van Furniture LLC is a Delaware corporation with its principal place of business located at 6500 E. 14 Mile Road, Warren, Michigan (the "Headquarters Facility") and it conducted business in this district.

15.     Upon information and belief at all relevant times, Defendants owned, maintained and operated its corporate headquarters at the Headquarters Facility, and operated additional facilities as that term is defined by the WARN Act in the United States.

16.     Debtors operate 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations. Debtors do business under several brand names,

AB_000997

including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.

17.     The Debtors were founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.

18.     As of the Petition Date of March 9, 2020, Debtors operated stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, with approximately 4,500 employees.

19.     Upon information and belief, on March 19, 2020, Defendants terminated approximately 700 employees who worked at or reported to their WARN Facilities, and the rest of the employees who worked at non-WARN-covered stores (because they did not employee 50 full-time employees as required by the WARN Act definition of a mass layoff or plant shutdown).

20.     By late-January, 2020, Debtors had sunk into a liquidity crisis leading to a default of the Defendant's revolver facility with its lender, Wells Fargo, and some leases.  Wells Fargo agreed to forebear until February 28, 2020 conditioned on taking control of Defendant's cash and on Defendant immediately begin preparing for a "going-out-of-business" liquidation if was unable to raise capital by then.

21.     By January 31, 2020, the United States reported its first confirmed case of person-to-person transmission of the Wuhan coronavirus and the WHO determined that the outbreak constitutes a Public Health Emergency of International Concern.

22.     In February, 2020, KKR investigated then quickly dropped consideration of make a new money investment in Art Van.  Debtor's private equity parent THL, along with Van Eslander family, and some important suppliers formed a "Consortium."

4

AB_000998

23.     The Consortium proposed to infuse new capital into Art Van, but by month's end failed to secure the capital purportedly due in part to the impact of coronavirus on the equity markets during the week of February 24, 2020.

24.     According Debtors, the market drop had a "deleterious effect" on the Consortium investors' "willingness to contribute capital." (Doc. 12, Mar. 9, 2020, First Day Declaration of David Ladd.)

25.     As a result of the Consortium investors' unwillingness, Debtors began to execute on its planned liquidation.

26.     On March 5, 2020, Art Van announced its store closing sales and that it would complete the closures with six to eight weeks.

27.     That day, it informed it WARN Facility employees in a WARN notice that they would be retained and paid through May 5th and terminated then or within 14 days thereafter, whether there was work for them or not.  Their benefits including health coverage would be maintained until their termination.

28.     The Debtors' March 5, 2020 WARN notice did not condition the 60 days' of pay and benefits on any contingency.  It did not mention coronavirus or any factor that could reduce the 60-day period of anticipated employment.

29.     By March 8, 2020, at least eight states had declared a State of Emergency due to coronavirus.

30.     On March 9, 2020, Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code. Joint administration of those cases is pending.

## FEDERAL WARN ACT CLASS ALLEGATIONS

31.     Plaintiffs bring this Claim for Relief for violation of 29 U.S.C. § 2101 et seq., on

AB_000999

behalf of himself and on behalf of all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5) and Fed. R. Civ P. 23(a), who worked at, reported to, or received assignments from Defendants' Facilities and were terminated without cause beginning on or about March 19, 2020, and within 30 days of that date, or were terminated without cause as the reasonably foreseeable consequence of the mass layoffs and/or plant closings ordered by Defendants on or about March 19, 2020 and who are affected employees, within the meaning of 29 U.S.C. § 2101(a)(5) (the "WARN Class").

32.     The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

33.     Upon information and belief, Defendants employed more than 100 full-time employees who worked at or reported to the Facilities.

34.     On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in the books and records of Defendants.

35.     On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of Defendants.

36.     Common questions of law and fact exist as to members of the WARN Class, including, but not limited to, the following:

(a)     whether the members of the WARN Class were employees of the Defendants who worked at or reported to Defendants' Facilities;

6

AB_0001000

(b)      whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act; and

(c)      whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act.

37.      Plaintiffs' claims are typical of those of the WARN Class.  Plaintiffs, like other WARN Class members, worked at or reported to Defendants' Facilities and was terminated beginning on or about March 19, 2020, due to the mass layoff and/or plant closing ordered by Defendants.

38.      Plaintiffs will fairly and adequately protect the interests of the WARN Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

39.      On or about March 19, 2020, Plaintiffs were terminated by Defendants.  These terminations were part of mass layoffs or plant closings as defined by 29 U.S.C. § 2101(a)(2), (3), for which they were entitled to receive 60 days advance written notice under the WARN Act.

40.      Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the WARN Class predominate over any questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate Defendants, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

AB_0001001

41.     Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

42.     Plaintiffs intend to send notice to all members of the WARN Class to the extent required by Rule 23.

### CLAIM FOR RELIEF

### Violation of the Federal WARN Act

43.     Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

44.     At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

45.     At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a) and continued to operate as a business until it decided to order mass layoffs or plant closings at the Facilities.

46.     At all relevant times, Plaintiffs and the other similarly situated former employees were employees of Defendants as that term is used in 29 U.S.C. §2101.

47.     On or about March 19, 2020, the Defendants ordered mass layoffs or plant closings at the Facilities, as that term is defined by 29 U.S.C. § 210l(a)(2).

48.     The mass layoffs or plant closings at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well

8

AB_0001002

as thirty–three percent of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2l01(a)(8).

49.     Plaintiffs and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoffs or plant closings ordered by Defendants at the Facilities.

50.     Plaintiffs and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

51.     Defendants were required by the WARN Act to give Plaintiffs and the Class Members at least 60 days advance written notice of their terminations.

52.     Defendants failed to give Plaintiffs and the Class members written notice that complied with the requirements of the WARN Act.

53.     Plaintiffs and each of the Class Members are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

54.     Defendants failed to pay Plaintiffs and each of the Class Members their respective wages, salary, commissions, bonuses, health and life insurance premiums, accrued holiday pay and accrued vacation for 60 days following their respective terminations, and failed to provide employee benefits including health insurance, for 60 days from and after the dates of their respective terminations.

55.     The relief sought in this proceeding is predominately equitable in nature.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated persons, prays for the following relief as against Defendants:

A.     Certification of this action as a class action;

9

B.      Designation of Plaintiffs as Class Representatives;

C.      Appointment of the undersigned attorneys as Class Counsel;

D.      A judgment in favor of the Plaintiffs and each of the affected employees equal to the sum of:  their unpaid wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits, for up to 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period all determined in accordance with the federal WARN Act, 29 U.S.C. §2104(a)(1)(A);

E.      Allowance of all damages as first priority post-petition administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) or, alternatively wage priority status pursuant to 11 U.S.C. § 507(a)(4) and (5) up to $13,650, and the remainder as a general unsecured claim;

F.      Reasonable attorneys' fees and the costs and disbursements that Plaintiffs will incur in prosecuting this action, as authorized by the federal WARN Act, 29 U.S.C. § 2104(a)(6);

G.      Interest as allowed by law on the amounts owed under the preceding paragraphs; and

H.      Such other and further relief as this Court may deem just and proper.


*[Signature Page to Follow]*

10

AB_0001004

Dated: March 23, 2020

Respectfully submitted,

*/s/ Michael Joyce*
Michael J. Joyce (No. 4563)
THE LAW OFFICES OF JOYCE, LLC
1225 King Street
Suite 800
Wilmington, DE 19801
(302)-388-1944
Email: mjoyce@mjlawoffices.com

-and-

OF COUNSEL:

Jack A. Raisner
René S. Roupinian
RAISNER ROUPINIAN LLP
500 Fifth Avenue, Suite 1600
New York, New York 10110
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for the and the putative class*
*Plaintiffs*

11

# EXHIBIT Z

AB_0001006



**Moving Forward Post Pandemic**

SPONSORED BY **MERRILL**

SEE MORE

BUSINESS

# Column: A declassified government report offers no support for the lab-leak theory of COVID's origin



A thoroughfare in Wuhan, China, shows the effect of a government lockdown in January 2020 after the first reports of a COVID-19 outbreak in the teeming city. (Hector Retamal / AFP/Getty Images)

BY MICHAEL HILTZIK | BUSINESS COLUMNIST

NOV. 1, 2021 12:19 PM PT



For months, adherents of the theory that COVID-19 originated in a Chinese government laboratory have hoped that an assessment President Biden ordered from the nation's intelligence agencies would validate their suspicions.

Their hopes are now dashed. The intelligence report was declassified and released on Oct. 29. It effectively demolishes the lab-leak theory.

The release of the full report follows the publication of a brief declassified summary in August, stressing the intelligence community's inability to reach a firm conclusion about

AB_0001008

whether SARS-CoV-2, the virus responsible for the COVID pandemic, originated from natural sources or a Chinese laboratory.

> *Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China...increase the probability that initial transmission occurred along these lines.*
>
> U.S. INTELLIGENCE SERVICES REPORT ON COVID ORIGINS

ADVERTISEMENT

The latest version, which is likely to be the most complete assessment to be released publicly, is couched in the same conditional and qualified language.

The report avoids offering a firm conclusion about the two prevailing theories. But it provides details of the agencies' findings that make clear they looked into the specific assertions that have been proposed in support of the lab-leak theory and found them wanting.



### Get the latest from Michael Hiltzik

Commentary on economics and more from a Pulitzer Prize winner.

Enter email address

AB_0001009

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.

The intelligence agencies also noted that although no animal source for the virus has yet been identified, that doesn't necessarily undermine the theory of a natural source.

In many previous outbreaks, the report says, "the identification of animal sources has taken years, and in some cases, animal sources have not been identified."

The report was published by the Office of the Director of National Intelligence, an umbrella agency for 17 government intelligence services, including the CIA, FBI, four Cabinet agencies and the intelligence arms of the military services.

Experts who were contacted by the intelligence services preparing the report have said they were impressed by the agents' commitment to a scientific analysis. "These folks were really knowledgeable, had PhDs in molecular biology, they had read all of the papers in detail," Tulane virologist Robert Garry told science writer Amy Maxmen of Nature in August.

---

BUSINESS

**Column: New evidence undermines the COVID lab-leak theory — but the press keeps pushing it**

Sept. 28, 2021

---

The lab-leak theory has been kept on life support for more than a year by partisan propagandists, abetted by amateurs posting on social media and credulous journalists reluctant to relinquish a story that would be, as the saying goes, "interesting, if true."

As we've reported before, the hypothesis that the SARS-CoV-2 virus escaped from a Chinese laboratory to wreak havoc on the world originated with a clutch of anti-China

AB_0001010

ideologues in the State Department under Trump.

In its initial incarnation, the hypothesis held that the virus was developed by the Beijing government as a biological weapon. Its proponents soon abandoned that claim as too fantastical to win over many believers, so they retreated to the claim that it was merely genetically engineered in standard virological research and reached the outside world through inattention or accident.

In its most recent form, the theory is that a precursor virus was brought from the wild to a Chinese lab in Wuhan and evolved there, and *that* was what sneaked out into the open.

The intelligence assessment dismisses the first two versions outright. It suggests that while it's "plausible" that a lab worker unwittingly became the carrier, that's "less likely than an infection occurring through numerous hunters, farmers, merchants, and others who have frequent, natural contact with animals."

---

BUSINESS

### Column: When will the Wall Street Journal stop publishing lab-leak propaganda?

Oct. 8, 2021

---

The report states that the agencies judged the bioweapon allegation to be "supported by scientifically invalid claims," adding that its "proponents are suspected of spreading disinformation."

It says that the intelligence agencies found no "genetic signatures in SARS-CoV-2" that would indicate genetic engineering, such as deliberate manipulation of a virus in the lab to make it more dangerous to humans.

Nor did they find evidence of any virus strains that "could have plausibly served as a backbone" — that is, a biological foundation — for a genetically engineered version.

AB_0000101

The agencies examined one of the more popular claims by lab-leak proponents, involving the so-called furin cleavage site on SARS-CoV-2. This is a feature of the virus' spike, the structure that allows it to penetrate healthy cells and pass along infectious material. To be effective, the spike has to be cut in two, a process achieved by the enzyme furin.

Lab-leak proponents have asserted that the furin site is so rare and so well-adapted to human infection that it's certain to have been added to the virus in a lab. Just as many academic virologists have noted, the report observes that furin sites have been found in naturally occurring viruses and can be the product of natural evolution.

The intelligence services found support for the so-called zoonotic theory that the pandemic resulted from a natural spillover of the virus from animals to humans in virological history. Many virological outbreaks have happened this way, the report observes.

---

BUSINESS

### Column: The lab-leak origin claim for COVID-19 is in the news, but it's still fact-free

June 3, 2021

---

"Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China," along with historically lax government oversight, "increase the probability that initial transmission occurred along these lines."

Support for the lab-leak hypothesis, the services say, comes chiefly from reports questioning whether the Wuhan institute conducted its research under adequate biological safeguards. But the services found "no indications that the institute's research involved SARS-CoV-2 or a close progenitor virus."

AB_0001012

The report does state that, among its contributing agencies, four "assess with low confidence" that the virus probably sprung from natural sources; one finds with "moderate confidence" that the pandemic "most likely" resulted from a laboratory incident, and three couldn't decide between the two theories. The report doesn't link specific agencies to those findings, however.

The intelligence services also reproach the Chinese government for hindering international investigations of COVID-19's origins, in part by refusing to share information about WIV research or its own findings about the early course of the disease in Wuhan.

"These actions reflect, in part, China's government's own uncertainty about where an investigation could lead," the U.S. report says, "as well as its frustration the international community is using the issue to exert political pressure on China."

The services are generally dismissive of what it calls "open-source" theories of the pandemic's origin, typically passed around on social media. "These theories generally do not provide diagnostic information on COVID-19 origins, and in some cases are not supported by the information available to us."

Whether the government report will stifle the propaganda about a Chinese lab-leak is uncertain, but that may not be the way to bet. Too many people are ideologically committed to the claim, and a scientific debunking of a theory that has had little science to support it from the start probably won't matter.

---

LATEST FROM MICHAEL HILTZIK >

Column: Inflation has spiked. Don't freak out

Column: Billionaire anti-deficit hawks are already attacking Biden's spending plan. Ignore them

Column: The infrastructure bill offers lots for California, and social spending you wouldn't expect

BUSINESS



## Get the latest from Michael Hiltzik

Commentary on economics and more from a Pulitzer Prize winner.

Enter email address

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.



Michael Hiltzik

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Los Angeles Times columnist Michael Hiltzik writes a daily blog appearing on latimes.com. His seventh book, "Iron Empires: Robber Barons, Railroads, and the Making of Modern America," has just been published by Houghton Mifflin Harcourt. Follow him on Twitter at twitter.com/hiltzikm and on Facebook at facebook.com/hiltzik.

---

MORE FROM THE LOS ANGELES TIMES

BUSINESS

**After Twitter poll, Elon Musk sells off more than $5 billion in Tesla shares**

Nov. 11, 2021

---

BUSINESS

**SpaceX crew launch marks 600 space travelers in 60 years**

Nov. 10, 2021

---

BUSINESS

**Hot inflation report slams bond market, sends stocks lower**

Nov. 10, 2021

---

TECHNOLOGY

**Justice Department sues Uber over wait-time fees charged to disabled passengers**

Nov. 10, 2021



SUBSCRIBERS ARE READING

CALIFORNIA

Gov. Newsom returns to public eye after sudden absence sparked social media speculation

LIFESTYLE

The L.A. Times 2021 holiday gift guide

CALIFORNIA

FOR SUBSCRIBERS

AB_0001016

Colonialism, power and race. Inside California ethnic studies classes

---

LIFESTYLE

The 27 coolest made-in-L.A. gifts to give this year

---

BUSINESS

Cargo jam at L.A. and Long Beach ports begins to ease as hefty fines loom

---

LATEST BUSINESS ›

---

TECHNOLOGY

Rivian skyrockets in 2021's biggest IPO

Nov. 10, 2021

---

LIFESTYLE

Black Girl Magic meets Jazz Age speakeasy at this new L.A. pot shop

Nov. 10, 2021

---

REAL ESTATE

Liberace's former townhouse above the Sunset Strip is listed for $3.4 million

Nov. 10, 2021

---

BUSINESS

U.S. consumer prices soared 6.2% in past year, most since 1990

Nov. 10, 2021

AB_0001017

BUSINESS

Which retirement option is better: Lump sum or monthly payout?

Nov. 10, 2021

Subscribe for unlimited access

Follow Us

eNewspaper

Coupons

Find/Post Jobs

Place an Ad

Media Kit: Why the
L. A. Times?

Bestcovery

Copyright © 2021, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell My Personal Information

# EXHIBIT AA

AB_0001020



OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

NATIONAL INTELLIGENCE COUNCIL



Updated Assessment on

# COVID-19 ORIGINS

AB_0001021

# Updated Assessment on COVID-19 Origins

## Key Takeaways

*Scope Note: This assessment responds to the President's request that the Intelligence Community (IC) update its previous judgments on the origins of COVID-19. It also identifies areas for possible additional research. Annexes include a lexicon, additional details on methodology, and comments from outside experts. This assessment is based on information through August 2021.*

The IC assesses that SARS-CoV-2, the virus that causes COVID-19, probably emerged and infected humans through an initial small-scale exposure that occurred no later than November 2019 with the first known cluster of COVID-19 cases arising in Wuhan, China in December 2019. In addition, the IC was able to reach broad agreement on several other key issues. We judge the virus was not developed as a biological weapon. Most agencies also assess with low confidence that SARS-CoV-2 probably was not genetically engineered; however, two agencies believe there was not sufficient evidence to make an assessment either way. Finally, the IC assesses China's officials did not have foreknowledge of the virus before the initial outbreak of COVID-19 emerged.

After examining all available intelligence reporting and other information, though, the IC remains divided on the most likely origin of COVID-19. All agencies assess that two hypotheses are plausible: natural exposure to an infected animal and a laboratory-associated incident.

- Four IC elements and the National Intelligence Council assess with low confidence that the initial SARS-CoV-2 infection was most likely caused by natural exposure to an animal infected with it or a close progenitor virus—a virus that probably would be more than 99 percent similar to SARS-CoV-2. These analysts give weight to China's officials' lack of foreknowledge, the numerous vectors for natural exposure, and other factors.

- One IC element assesses with moderate confidence that the first human infection with SARS-CoV-2 most likely was the result of a laboratory-associated incident, probably involving experimentation, animal handling, or sampling by the Wuhan Institute of Virology. These analysts give weight to the inherently risky nature of work on coronaviruses.

- Analysts at three IC elements remain unable to coalesce around either explanation without additional information, with some analysts favoring natural origin, others a laboratory origin, and some seeing the hypotheses as equally likely.

- Variations in analytic views largely stem from differences in how agencies weigh intelligence reporting and scientific publications and intelligence and scientific gaps.

The IC judges they will be unable to provide a more definitive explanation for the origin of COVID-19 unless new information allows them to determine the specific pathway for initial natural contact with an animal or to determine that a laboratory in Wuhan was handling SARS-CoV-2 or a close progenitor virus before COVID-19 emerged.

- The IC—and the global scientific community—lacks clinical samples or a complete understanding of epidemiological data from the earliest COVID-19 cases. If we obtain information on the earliest cases that identified a location of interest or occupational exposure, it may alter our evaluation of hypotheses.

**NIC** | **NATIONAL INTELLIGENCE COUNCIL**

China's cooperation most likely would be needed to reach a conclusive assessment of the origins of COVID-19. Beijing, however, continues to hinder the global investigation, resist sharing information, and blame other countries, including the United States. These actions reflect, in part, China's government's own uncertainty about where an investigation could lead as well as its frustration the international community is using the issue to exert political pressure on China.



# NIC | NATIONAL INTELLIGENCE COUNCIL

## IC Assessments of COVID-19 Origins



**AREAS OF BROAD AGREEMENT**

- First known cluster of COVID-19 cases emerged in Wuhan, China in December 2019
- Virus not developed as a biological weapon
- Virus not genetically engineered
- China's officials unaware of virus before pandemic emerged



**TWO PLAUSIBLE HYPOTHESES ON INITIAL HUMAN EXPOSURE**

- Natural transmission from animal to human
- Laboratory-associated incident
- Evidence not strongly diagnostic of either hypothesis



**CHINA'S COOPERATION KEY TO UNDERSTANDING ORIGINS**

- Beijing's lack of cooperation on origins not diagnostic of either hypothesis
- Numerous information gaps, particularly related to technical data

# NIC ▌▌▌▌▌▌      NATIONAL INTELLIGENCE COUNCIL

## Introduction

The IC has prepared several assessments examining the origins of COVID-19. Analysts have focused on whether SARS-CoV-2, the causative virus of COVID-19, was genetically engineered—particularly as a biological weapon—was transmitted to humans naturally or transmitted due to a laboratory-associated incident, perhaps during sampling or experimentation. China's reaction to and handling of the pandemic have given analysts insights into these issues, but Beijing's actions have also impeded the global scientific community and our ability to confidently determine how the virus first infected humans.

## SARS-CoV-2 Probably Not a Biological Weapon

The IC assesses China did not develop SARS-CoV-2 as a biological weapon.

- We remain skeptical of allegations that SARS-CoV-2 was a biological weapon because they are supported by scientifically invalid claims, their proponents do not have direct access to the Wuhan Institute of Virology (WIV), or their proponents are suspected of spreading disinformation. [*See appendix B.*]

## Most Analysts Assess SARS-CoV-2 Not Genetically Engineered

Most IC analysts assess with low confidence that SARS-CoV-2 was not genetically engineered. Their assessment is based on technical analysis of SARS-CoV-2 and the IC's growing understanding of traits and the potential for recombination in other coronaviruses. Two agencies believe there is not sufficient evidence to make an assessment either way.

- As of August 2021, we still have not observed genetic signatures in SARS-CoV-2 that would be diagnostic of genetic engineering, according to the IC's understanding of the virus. Similarly, we have not identified any existing coronavirus strains that

could have plausibly served as a backbone if SARS-CoV-2 had been genetically engineered.

- Our growing understanding of the similarities of SARS-CoV-2 to other coronaviruses in nature and the ability of betacoronaviruses—the genus to which SARS-CoV-2 belongs—to naturally recombine suggests SARS-CoV-2 was not genetically engineered. For instance, academic literature has noted that in some instances betacoronaviruses have recombined with other viruses in nature and that furin cleavage sites (FCS)—a region in the spike protein that enhances infection—have been identified in naturally occurring coronaviruses in the same genetic location as the FCS in SARS-CoV-2. This suggests that SARS-CoV-2 or a progenitor virus could have acquired its FCS through natural recombination with another virus.

IC analysts do not have higher confidence that SARS-CoV-2 was not genetically engineered because some genetic engineering techniques can make modifications difficult to identify and we have gaps in our knowledge of naturally occurring coronaviruses.

- Some genetic engineering techniques may make genetically modified viruses indistinguishable from natural viruses, according to academic journal articles. For instance, a 2017 dissertation by a WIV student showed that reverse genetic cloning techniques—which are standard techniques used in advanced molecular laboratories—left no trace of genetic modification of SARS-like coronaviruses.

- It will be difficult to increase our confidence that the distinguishing features in SARS-CoV-2 emerged naturally without a better understanding of the diversity of coronaviruses in nature and how often recombination occurs during co-infection of multiple coronaviruses within a particular host. For example, academic literature has indicated that a FCS had previously been inserted into SARS-CoV-1, the causative agent of SARS, complicating differentiation of how such a feature may have appeared.

AB_0001025

**NIC** ▌▌▌▌▌▌▌▌ NATIONAL INTELLIGENCE COUNCIL

## Closest Known Relatives of SARS-CoV-2, as of August

As of August, the closest known whole genome match to SARS-CoV-2—around **96 percent** identical—is **RaTG13**, a coronavirus collected from a bat in 2013 by the Wuhan Institute of Virology (WIV), according to academic literature. Scientific literature examining the genome of SARS-CoV-2 has identified at least some similarities to those of other naturally occurring coronaviruses in bats and pangolins, but an immediate precursor virus strain and animal reservoir have not been identified.

| VIRUS NAME | PERCENT IDENTITY TO COVID-19 VIRUS | YEAR COLLECTED | LOCATION COLLECTED | ANIMAL COLLECTED |
|---|---|---|---|---|
| RaTG13 | 96.2 | 2013 | Yunnan Province, China | Bat |
| RpYN06 | 94.5 | 2020 | Yunnan Province, China | Bat |
| RmYN02 | 93.3 | 2019 | Yunnan Province, China | Bat |
| RShSTT200 | 92.7 | 2010 | Cambodia | Bat |
| RacCS203 | 91.5 | 2020 | Thailand | Bat |
| PrC31 | 90.7 | 2018 | Yunnan Province, China | Bat |
| Pangolin-CoV Guangdong | 90.1 | 2019 | Guangdong Province, China | Pangolin |
| ZC45 | 88.1 | 2015 | Zhejiang Province, China | Bat |
| ZXC21 | 88.0 | 2015 | Zhejiang Province, China | Bat |
| Guangxi pangolin-CoV | 85.5 | 2017, 2018 | Guangxi Zhuang Autonomous Region, China | Pangolin |
| Rc-o319 | 79.2 | 2013 | Japan | Bat |
| RaTG15 | 77.6 | 2015 | Yunnan Province, China | Bat |

- The WIV previously created chimeras, or combinations, of SARS-like coronaviruses, but this information does not provide insight into whether SARS-CoV-2 was genetically engineered by the WIV.

No IC analysts assess that SARS-CoV-2 was the result of laboratory adaptation, although some analysts do not have enough information to make this determination. Repeated passage of a closely related virus through animals or cell culture—which we consider laboratory adaptation and not genetic engineering—could result in some features of SARS-CoV-2, according to publicly available information. However, it probably would take years of laboratory adaptation using the appropriate cell types and a virus that is more closely related to SARS-CoV-2 than ones currently known to generate the number of mutations separating SARS-CoV-2 from any known coronavirus strains, judging from scientific journal articles. Such processes would require differentiation and maintenance of primary cells and the development of appropriate animal models.

AB_0001026

## China's Lack of Foreknowledge of SARS-CoV-2

The IC assesses China's officials probably did not have foreknowledge that SARS-CoV-2 existed before WIV researchers isolated it after public recognition of the virus in the general population.  Accordingly, if the pandemic originated from a laboratory-associated incident, they probably were unaware in the initial months that such an incident had occurred.

- Early in the pandemic, the WIV identified that a new virus was responsible for the outbreak in Wuhan.  It is therefore assessed that WIV researchers pivoted to COVID-19-related work to address the outbreak and characterize the virus.  These activities suggest that WIV personnel were unaware of the existence of SARS-CoV-2 until the outbreak was underway.

## Two Plausible Hypotheses of Pandemic Origin

IC analysts assess that a natural origin and a laboratory-associated incident are both plausible hypotheses for how SARS-CoV-2 first infected humans.  Analysts, however, disagree on which is more likely, or whether an assessment can be made at all, given the lack of diagnosticity of the available information.  Most agencies are unable to make higher than low confidence assessments for these reasons, and confidence levels are tempered by plausible arguments for the opposing hypothesis.  For these hypotheses, IC analysts consider an exposure that occurs during animal sampling activity that supports biological research to be a laboratory-associated incident and not natural contact.  What follows is a look at the cases that can be made for these competing hypotheses.

## The Case for the Natural Origin Hypothesis

Some IC analysts assess with low confidence that the first human COVID-19 infection most likely was caused by natural exposure to an animal that carried SARS-CoV-2 or a close progenitor virus—a virus that would likely be more than 99 percent similar to SARS-CoV-2.

Four IC elements, the National Intelligence Council, and some analysts at elements that are unable to coalesce around either explanation are among this group.  Analysts at these agencies give weight to China's officials' lack of foreknowledge and highlight the precedent of past novel infectious disease outbreaks having zoonotic origins, the wide diversity of animals that are susceptible to SARS-CoV-2 infection, and the range of scenarios—to include animal trafficking, farming, sale, and rescue—in China that enable zoonotic transmission.  Although no confirmed animal source of SARS-CoV-2 has been identified, to include a reservoir or intermediate species, analysts that assess the pandemic was due to natural causes note that in many previous zoonotic outbreaks, the identification of animal sources has taken years, and in some cases, animal sources have not been identified.

- These analysts assess that WIV's activities in early 2020 related to SARS-CoV-2 are a strong indicator that the WIV lacked foreknowledge of the virus.

- They also see the potential that a laboratory worker inadvertently was infected while collecting unknown animal specimens to be less likely than an infection occurring through numerous hunters, farmers, merchants, and others who have frequent, natural contact with animals.

- Given China's poor public health infrastructure and the potential for asymptomatic infection, some analysts that lean towards a natural origin argue that China's infectious disease surveillance system would not have been able to detect the SARS-CoV-2 exposure as quickly as a suspected exposure in a laboratory setting.

### History of Zoonotic Pathogen Emergence, Conditions in China Ripe for Zoonotic Spillover

Analysts that find the natural zoonotic spillover hypothesis the most likely explanation for the pandemic also note the wide diversity of animals that are susceptible to SARS-CoV-2 infection, range of scenarios—to include animal trafficking, farming, sale, and rescue—in China that would enable zoonotic

## Comparing COVID-19 Pandemic to Past Select Viral Zoonotic Outbreaks

| | Location of Emergence | Asymptomatic Infection Common | Reservoir Species and Year Identified | Probable Intermediate Species and Year Identified |
|---|---|---|---|---|
| **COVID-19** (2019–Present) | China | Yes | Unknown | Unknown |
| **Ebola** (2014–16) | Guinea | No (Probably) | Bats (Probably); N/A | Nonhuman primate (Probably); N/A |
| **MERS** (2012) | Saudi Arabia, Jordan | Yes | Bats (Probably); N/A | Dromedary camels; 2013 |
| **SARS** (2002–04) | China | No (Probably) | Horseshoe bats; 2016 | Masked palm civets and Raccoon dogs (Possibly); 2003 |
| **Nipah** (1998–99) | Malaysia | Yes | Fruit bats; 1999 | Pigs; 1998 |
| **HIV-1**[a] (1970s–Present) | Democratic Republic of Congo (Probably) | No (Probably) | Chimpanzees (Probably); 1999 | N/A |

*a. HIV is believed to have crossed from chimpanzees to humans in the 1920s; the first documented death occurred in the late 1960s.*

transmission, and precedent of novel human infectious disease outbreaks originating from zoonotic transmission. Previous human coronavirus outbreaks, to include SARS-CoV-1 and Middle East Respiratory Syndrome coronavirus (MERS-CoV), occurred naturally and were linked to animal reservoirs with zoonotic transmission to humans, according to scientific literature.

- Extensive wildlife and livestock farming, wildlife trafficking, and live animal markets in China and historically lax government regulation—and even promotion—of these activities increase the probability that initial transmission occurred along one of these routes.

- Academic literature has revealed Wuhan markets sold live mammals and dozens of species—including raccoon dogs, masked palm civets, and a variety of other mammals, birds, and reptiles—often in poor conditions where viruses can jump among species, facilitating recombination events and the acquisition of novel mutations. SARS-CoV-2 can infect a range of mammals, including cats, dogs, pangolins, minks, raccoon dogs, and a variety of wild and domestic animals, according to academic literature.

- Wider Hubei Province has extensive farming and breeding of animals that are susceptible to SARS-CoV-2, including minks and raccoon dogs.

AB_0001028

These analysts note that there is a precedent for viral vectors to travel long distances in China and cause infection elsewhere because of transportation and trade nodes, thereby widening and complicating the search for the specific zoonotic spillover incident. For instance, the bat coronavirus that is currently the closest known relative to the original SARS-CoV-1 was identified in Yunnan Province, even though the first SARS outbreak detected in humans occurred in Guangdong Province, hundreds of kilometers away.

## The Case for the Laboratory-Associated Incident Hypothesis

One IC element assesses with moderate confidence that COVID-19 most likely resulted from a laboratory-associated incident involving WIV or other researchers—either through exposure to the virus during experiments or through sampling. Some analysts at elements that are unable to coalesce around either explanation also assess a laboratory origin with low confidence. These analysts place emphasis on academic articles authored by WIV employees indicating that WIV scientists conducted research on other coronaviruses under what these analysts consider to be inadequate biosafety conditions that could have led to opportunities for a laboratory-associated incident. These analysts also take into account SARS-CoV-2's genetic epidemiology and that the initial recorded COVID-19 clusters occurred only in Wuhan—and that WIV researchers who conducted sampling activity throughout China provided a node for the virus to enter the city.

### WIV Research Includes Work With Animals That Carry Relatives of SARS-CoV-2

The analysts that find the laboratory-associated origin theory most likely assess that WIV researchers' inherently risky work with coronaviruses provided numerous opportunities for them to unwittingly become infected with SARS-CoV-2. Although the IC has no indications

> ### WIV Illnesses in Fall 2019 Not Diagnostic
>
> The IC assesses that information indicating that several WIV researchers reported symptoms consistent with COVID-19 in autumn 2019 is not diagnostic of the pandemic's origins. Even if confirmed, hospital admission alone would not be diagnostic of COVID-19 infection.

that WIV research involved SARS-CoV-2 or a close progenitor virus, these analysts note that it is plausible that researchers may have unwittingly exposed themselves to the virus without sequencing it during experiments or sampling activities, possibly resulting in asymptomatic or mild infection. Academic literature indicates that WIV researchers conducted research with bat coronaviruses or collected samples from species that are known to carry close relatives of SARS-CoV-2.

- Based on currently available information, the closest known relatives to SARS-CoV-2 in bats have been identified in Yunnan Province, and researchers bringing samples to laboratories provide a plausible link between these habitats and the city.

- These analysts also note that China's investigations into the pandemic's origin might not uncover evidence of a laboratory-associated incident if it involved only a small number of researchers who did not acknowledge or have knowledge of a potential infection.

### Biosafety Conditions for Specific Work Could Have Led to an Incident

The analysts that assess COVID-19 most likely originated from a laboratory-associated incident also place emphasis on information suggesting researchers in China used biosafety practices that increased the risk of exposure to viruses. Academic publications suggest that WIV researchers did not use adequate biosafety precautions at least some of the time, increasing the risk of a laboratory-associated incident.

## The Role of the Huanan Seafood Wholesale Market

Some scientists and China's public health officials have shifted their view on the role of the Huanan Seafood Wholesale Market in the pandemic since early 2020. Some now view the market as a potential site of community spread rather than where the initial human infection may have occurred.

- On January 1, 2020, China's security authorities shut down the market after several workers fell ill in late December 2019. China focused early source tracing on the market and Hubei Province; association with the market was included as part of the early case definition.

- In January 2020, a scientific article that described clinical features of initial COVID-19 infections in China found that some COVID-19 patients did not have any known association with the market. Furthermore, there continues to be conflicting data with some academic articles and preprints noting that phylogenetic analysis of the available data on the earliest cases suggests that the progenitor virus may not have originated from the market.

## China's Transparency Key to Determining COVID-19 Origin

The IC judges that closing persistent information gaps on the origins of COVID-19 is very likely to require greater transparency and collaboration from Beijing. The scientific community lacks technical data on a reservoir species, possible intermediate species, and closer relatives to SARS-CoV-2.

**Data and Samples From Initial Cases:** The global scientific community does not know exactly where, when, or how the first human infection with SARS-CoV-2 occurred. It lacks a complete picture of

the initial cases in Wuhan—or potentially elsewhere in China—that would allow it to better understand potential sources of infection or conduct phylogenetic analysis that would help validate both hypotheses.

**Information That Would Confirm Natural Outbreak:** Searching for a natural reservoir or potential intermediate host requires collecting, isolating, and sequencing viruses from samples taken from potential host species and environments to search for viruses related to SARS-CoV-2, endeavors that require international collaboration, resources, and time.

- Information that the earliest confirmed COVID-19 cases were in individuals or families who spent time in rural regions or who were involved in animal trade or environments that facilitate close human-to-animal interactions could indicate that the virus was circulating within an animal reservoir and a zoonotic spillover event caused the first COVID-19 case in humans.

- However, some transmission pathways are fleeting, meaning an animal acquires a virus and evidence of infection vanishes, particularly if the animals are reared and harvested for agricultural or commercial purposes.

**Information That Would Confirm Laboratory-Associated Incident:** China's coronavirus research or related information from origins investigations by Beijing or international organizations could provide clear indications of a laboratory-associated incident or at least yield some new insights.

NIC | NATIONAL INTELLIGENCE COUNCIL

## WIV's Publicly Available Coronavirus Research

IC analysts are examining published research from China for any indicators that would inform our understanding of COVID-19's origins. The WIV and other research groups in China published coronavirus articles in 2020 and 2021, including the discovery of the closest known relative of SARS-CoV-2, but at least some relevant data on coronaviruses of interest has either been unavailable or has not been published.

Although the WIV described the sampling trip to the mineshaft in Mojiang in Yunnan Province where it collected RaTG13 in 2016, it did not explicitly state that RaTG13 was collected from that mine until 2020. Similarly, the WIV collected eight other coronaviruses from the same mine in 2015 that it did not fully disclose until 2021. In some of these instances, however, the WIV has described unpublished work in webinars and interviews prior to publishing.

## China Likely To Impede Investigation

The IC judges they will be unable to provide a more definitive explanation for the origin of COVID-19 unless new information allows them to determine the specific pathway for initial natural contact with an animal or to determine that a laboratory in Wuhan was handling SARS-CoV-2 or a close progenitor virus before COVID-19 emerged.

- For instance, Beijing limited the World Health Organization (WHO) investigation team's access to sites.

- In late July, China denounced a WHO plan for future investigations into COVID-19 origins, claiming that the proposal for future investigations was politicized. China's officials publicly rebuked the WHO's plans for a future study of labs in China,

saying Beijing would not allow the WHO to engage in the "conspiracy theory."

China is also pushing its narrative that the virus originated outside China.

- Public statements from China's Government have continued to claim the virus originated from imported frozen food, an extremely unlikely theory.

- China's Government continues to spread allegations that the United States created or intentionally spread SARS-CoV-2 to divert attention away from Beijing.

## NIC | NATIONAL INTELLIGENCE COUNCIL

## Annex A: Definitions

**Antibody:** A protein produced during an immune response to a part of an infectious agent called an antigen.

**Backbone:** A genetic sequence used as a chassis upon which to build synthetic constructs, such as those used for cloning, protein expression, and production.

**Biological weapon:** A weapon that uses bacteria, viruses, toxins, fungi, and biochemical/biomolecule agents that can cause death or injury to humans, plants, or animals or destroy materials.

**Biosafety:** The application of knowledge, techniques, and equipment to prevent personal, laboratory, and environmental exposure to potentially infectious agents or biohazards. Four **Biosafety levels (BSL)** define the containment conditions under which biological agents can be safely manipulated. These standards range from moderate safety requirements for low-risk agents (BSL-1), to the most stringent controls for high-risk agents (BSL-4). China's standards range from P1–4.

**Biosecurity:** The protection, control of, and accountability for biological agents, toxins, and biological materials and information to prevent unauthorized possession, loss, theft, misuse, diversion, and accidental or intentional release.

**Coronavirus:** A common type of virus that can infect humans and/or animals. The human illness caused by most coronaviruses usually last a short time and presents symptoms consistent with the "common cold," such as a runny nose, sore throat, cough, and a fever.

**COVID-19:** An infectious disease caused by the **SARS-CoV-2** virus, which is a betacoronavirus.

**Diagnostic information:** Information that allows IC analysts to distinguish between hypotheses—in this case, the laboratory origin and natural origin theories.

**DNA (deoxyribonucleic acid):** A molecule that carries an organism's genetic blueprint for growth, development, function, and reproduction.

**Epidemiology:** The study of the distribution and determinants of health-related events in specified populations, and the application of this study to prevent and control health problems.

**Furin cleavage site (FCS):** A region in the spike protein of SARS-CoV-2 that enhances infection.

**Gain-of-function:** The IC considers this as a research method that involves manipulating an organism's genetic material to impart new biological functions that could enhance virulence or transmissibility (e.g., genetically modifying a virus to expand its host range, transmissibility, or severity of illness). The IC assesses that genetic engineering, genetic modification, and laboratory-adaptation can all be used for gain-of-function experiments, but are not inherently so. We address both genetic engineering and laboratory-adaptation in the body of this assessment; the IC is unaware of an agreed, international definition.

**Genetically engineered or genetically modified viruses** are intentionally altered, created, or edited using biotechnologies, such as Clustered Regularly Interspaced Short Palindromic Repeat (CRISPR), DNA recombination, or reverse genetics. These viruses have intentional, targeted edits to the genome designed to achieve specific results, but unintentional genomic changes may also occur.

**Genome:** The genetic material of an organism. It consists of DNA (and sometimes RNA for viruses).

**Genome sequencing:** The process of determining the DNA or RNA sequence of an organism's genome, or its "genetic code." An organism's genetic code is the order in which the four nucleotide bases—adenine, cytosine, guanine, and thymine—are arranged to direct the sequence of the 20 different amino acids in the proteins that determine inherited traits.

**Intermediate species/host:** An organism that can be infected with a pathogen from a resevoir species and

AB_0001032

passes the pathogen to another host species; infection is not sustained in this population.

**Laboratory-adapted viruses** have undergone natural, random mutations through human-enabled processes in a laboratory—such as repeated passage through animals or cells—that put pressure on the virus to more rapidly evolve. Specific changes to the viral genome are not necessarily anticipated in these processes, though the virus can be expected to gain certain characteristics, like the ability to infect a new species. This is a common technique used in public health research of viruses. We consider directed evolution to be under laboratory adaptation.

**Laboratory-associated incidents** include incidents that happen in biological research facilities or during research-related sampling activities.

**Molecular biology:** Study of the molecular basis of activities in and between cells. This includes techniques to amplify or join genetic sequences.

**Naturally occurring viruses** have not been altered in a laboratory. Viruses commonly undergo random mutations as part of the evolutionary process and can continue to change over time; mutations may enable a virus to adapt to its environment, such as evading host immune responses and promoting viral replication.

**Outbreak:** A sudden increase in occurrences of a disease in a particular time and place. Outbreaks include **epidemics**, which is a term that is reserved for infectious diseases that occur in a confined geographical area. **Pandemics** are near-global disease outbreaks.

**Pangolin:** An African and Asian mammal that has a body covered in overlapping scales. Pangolins are a natural reservoir of coronaviruses and researchers are investigating their potential role as an intermediate host for SARS-CoV-2.

**Pathogen:** A bacterium, virus, or other microorganism that can cause disease.

**Phylogenetics:** The study of the evolutionary relationships among groups of organisms.

**Progenitor virus:** A virus that is closely related enough—probably more than 99 percent—to SARS-CoV-2 to have been its direct ancestor or plausible immediate origin of the outbreak. The closest known relative to SARS-CoV-2 is only around 96 percent similar; to put this into context, humans and chimps are around 99 percent similar, demonstrating the signficant differences even at this similarity.

**RaTG13:** A coronavirus with the closest known whole genome to SARS-CoV-2, although it is widely believed to not be a direct ancestor of SARS-CoV-2.

**Resevoir species/host:** An organism that harbors a pathogen, which is endemic within the population.

**RNA (ribonucleic acid):** A molecule essential for gene coding, decoding, regulation, and expression. Certain viruses use RNA as a genetic blueprint.

**Transmissibility:** The measure of new infections initiated by an existing infection.

**Virus:** A replicating piece of genetic material—DNA or RNA—and associated proteins that use the cellular machinery of a living cell to reproduce.

**Wet market:** A market where fresh food and live and dead animals, including wildlife, are sold.

**Zoonosis:** An infection or a disease that is transmissible from animals to humans under natural conditions. A **zoonotic pathogen** may be viral, bacterial, or parasitic, and can sometimes be transmitted through insects, such as mosquitoes.

**Zoonotic spillover:** An initial infection or disease that is caused by contact between an animal and human under natural conditions.

NIC | NATIONAL INTELLIGENCE COUNCIL

## Annex B: IC Examination of Open-Source Theories

IC analysts have examined a number of open-source articles from a variety of sources that have raised theories about SARS-CoV-2 and COVID-19's origin. The IC assesses that these theories generally do not provide diagnostic information on COVID-19 origins, and in some cases, are not supported by the information available to us. However, several have drawn on insightful methods or identified potential leads.

### Theory of Abnormal Activity at the WIV in Fall 2019

The IC assesses that an assessment about abnormal activity at the WIV in fall 2019 lacks support and does not offer diagnostic insight. The Multi-Agency Collaboration Environment (MACE) published a report assessing that the pandemic began in October 2019 because of a release at the WIV.

- Although the methodology is insightful, the IC has concerns with the small data set and analytic rigor used to derive the group's findings, and our review of information directly contradicts some of its findings.

### Theory That SARS-CoV-2 Was a Biological Weapon

The IC assesses that public claims from a Hong Kong virologist that Beijing created SARS-CoV-2 as a biological weapon are inconsistent with available technical information on coronaviruses. We assess that the articles contain several technical inaccuracies and omit key data points.

- Since September 2020, a virologist who worked in a WHO-affiliated laboratory in Hong Kong has publicly stated that Beijing created SARS-CoV-2 from bat coronaviruses and that China's researchers intentionally released it. The scientific community did not peer review these articles and some publicly rejected the articles' claims as scientifically unsound.

### Theory That SARS-CoV-2 Was Genetically Engineered

The IC assesses that public claims that some distinguishing features in SARS-CoV-2 are the result of genetic engineering are not diagnostic of genetic engineering. The IC has been evaluating how SARS-CoV-2 could have developed these features and notes that the furin cleavage site (FCS)—a region in the spike protein that enables infection and has been the topic of open-source debate—can also be consistent with a natural origin of the virus.

We do not fully understand the diversity of natural coronaviruses or how often they recombine, suggesting that there are plausible natural means by which these features in SARS-CoV-2 could have emerged beyond what we currently understand.

- For example, the author of an article in April notes the SARS-CoV-2's FCS is unique among known betacoronaviruses. The author argues that such features are rare and so well-adapted for human infection that they are more likely emerged from laboratory work than from natural selection.

- Although an IC review of scientific literature has indicated that no known betacoronaviruses in the same subgenus have this FCS in the same region of the spike protein as SARS-CoV-2, similar FCSs are present in the same region of the spike protein as other naturally occurring coronaviruses, according to scientific articles.

We also do not find credible a now-withdrawn preprint article from two Indian educational institutes posted in January 2020 that asserted SARS-CoV-2 was genetically engineered using sequences from the human immunodeficiency virus. We assess it is unlikely that scientists would have chosen to intentionally engineer the specific sequences that were the focus of the scientific article.


NATIONAL INTELLIGENCE COUNCIL

## Theory That SARS-CoV-2 Originated Outside China

We are aware of scientific studies claiming to have found SARS-CoV-2 viral fragments or antibodies in samples taken before November 2019 outside China. However, technical flaws in some of these studies, uncertainties in the methodologies, and in some cases, the lack of a credible review process make us skeptical of their utility in determining the pandemic's origin.

- We assess that the first cluster of confirmed COVID-19 cases arose in Wuhan, China, in late 2019, but we lack insight—and may never have it—on where the first SARS-CoV-2 infection occurred. Although all of the earliest confirmed cases of COVID-19 were documented in China's Hubei Province, where Wuhan is located, according to Western and China's press reports, it is plausible that a traveler came in contact with the virus elsewhere and then went to Wuhan.

- We continue to monitor scientific publications and discuss these issues with experts. Even if the virus is found to have existed outside China before the Wuhan outbreak, credible evidence of human infection would also be necessary to determine if the first COVID-19 outbreak began there.

AB_0001035

## NIC | NATIONAL INTELLIGENCE COUNCIL

## Annex C: IC Approach to 90-Day Study

The NIC collaborated closely with the National Counterproliferation Center (NCPC), the National Intelligence Management Council (NIMC), IC agencies, and other USG entities and departments on this assessment. The IC kicked off the 90-day study by outlining the core intelligence questions that would be addressed over lines of effort—collection and analysis. These questions included:

- Did the outbreak begin through contact with infected domestic or wild animals or was it the result of a laboratory-associated incident?

- Was the virus genetically engineered?

- Is SARS-CoV-2 a biological weapon?

**Collection:** At the kick-off meeting for the 90-day study, the IC discussed core intelligence gaps to drive collection moving forward.

**Analysis:** The NIC had two separate structured analytic exercises to discuss both the underlying reporting and to strengthen argumentation moving into the drafting phase. Analysts at individual agencies also pursued various structured analytic techniques to build their own assessments.

- During a two-day-long in-person IC-wide **Analysis of Competing Hypothesis (ACH)** analytic exercise in June, analysts determined whether existing reporting was consistent or inconsistent with information in individual reports. This exercise allowed analysts to determine that most reporting was consistent with both hypotheses and the reporting that was inconsistent was deemed to be not credible.

- Before the start of drafting, the NIC hosted an IC-wide **Team A/Team B** analytic exercise to explore how the IC could strengthen either hypothesis through a debate style format. Agencies pulled from these conversations—along with the work conducted during and before the study—to solidify their consensus positions.

 **NATIONAL INTELLIGENCE COUNCIL**

## Annex D: Outside Review

The NIC conducted four rounds of outside review of the draft assessment. These sessions provided valuable feedback that we incorporated into the assessment. The NIC made some organizational changes in response to comments; comments included:

- Emphasize points of agreement.

- Provide additional definitions in the lexicon and ensure technical or intelligence jargon is explicitly explained.

AB_0001037

## Annex E: Questions

Answers to the following questions would help us better evaluate hypotheses related to the origins of COVID-19:

What additional information—to include timing, location, relevant animal exposures, occupational information, and clinical samples—is there on the earliest cases of COVID-19?

How were early cases investigated?  What questions or tools were utilized for tracing contacts and contacts of those contacts?

What direct or indirect indicators of COVID-19 clusters is China aware of from early in the outbreak?  This may include things like hospital occupancy rates or efforts to triage medical care outside of hospital facilities.

What insight can China provide on the search for the reservoir and potential intermediate species of the COVID-19 virus?

What insight can China provide on the search for the identification of a progenitor virus?  Have any leading candidates or regions for spillover been identified?

What information, data, and/or samples does China have on wildlife or other animals present in the following markets in Wuhan:

- Huanan Seafood Wholesale Market

- Qiyimen Live Animal Market

- Baishazhou Market

- Dijiao Outdoor Pet Market

What information, data, and/or samples does China have on wildlife present in the other markets, wildlife rescue centers, and/or farms in Wuhan, across Hubei, in neighboring provinces, or in locations where live animals in Hubei Province are sourced from?

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Case No. 20-10553 (CSS) |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Debtors. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| TODD STEWART and JENNIFER | ) | |
| SAWLE on behalf of themselves and | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No.: 20-50548 (CSS) |
| | ) | Related Adv. Docket No.: 43 |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION[1]

**JOYCE, LLC**
Michael J. Joyce
1225 King Street
Wilmington, DE 19801

Counsel for Todd Stewart,
Jennifer Sawle and the
Putative Class

**PACHULSKI STANG ZIEHL
& JONES LLP**
Bradford J. Sandler
Beth Levine
Colin R. Robinson
Peter J. Keane
919 North Market Street, 17th Floor
Wilmington, DE 19801

Counsel for Alfred T. Guiliano
Chapter 7 Trustee

Date: March 21, 2022

Sontchi, J. ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of
Bankruptcy Procedure 7052.

AB_0001039

## INTRODUCTION

Plaintiffs Todd Stewart and Jennifer Sawle (the "Plaintiffs") filed an adversary complaint alleging that the Debtors[2] violated the Federal Worker Adjustment and Retraining Notification Act (the "WARN Act")[3] by failing to provide them (and similarly situated persons) with at least 60 days' notice of their employment termination. Before the Court is the Chapter 7 Trustee's Motion for Summary Judgment asserting three defenses to the Complaint: (i) notice was not required because the relevant Debtors were "liquidating fiduciaries" and not "employers" under the WARN Act; (ii) notice was not required because an "unforeseeable business circumstance" caused the mass layoffs; and (iii) notice was not required because a natural disaster caused the mass layoffs. For the reasons set forth herein, the Court concludes that both the unforeseeable business circumstance and natural disaster exceptions apply here and, therefore, the Debtors were not required to provide the 60-days WARN Act notice to employees before the March 20, 2020 layoff. The Trustee's Summary Judgment Motion will be granted.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in the United States Bankruptcy Court for the District of Delaware

---

[2] The Debtors in these cases are: Art Van Furniture, LLC; AVF Holding Company, Inc.; AVCE, LLC; AVF Holdings I, LLC; AVF Holdings II, LLC; AVF Parent, LLC; Levin Parent, LLC; Art Van Furniture of Canada, LLC; AV Pure Sleep Franchising, LLC; AVF Franchising, LLC; LF Trucking, Inc.; Sam Levin, Inc.; and Comfort Mattress LLC (collectively, the "Debtors").

[3] 29 U.S.C. § 2101 *et seq.* (2022).

pursuant to 28 U.S.C. § 1409. This is a core proceeding pursuant to § 157(b)(2)(A), (B) and (O), and this Court has the Constitutional authority to enter a final order.

<u>FACTS</u>

The Trustee filed a Statement of Undisputed Facts in Support of the Summary Judgment Motion (the "SOF").[4] The Plaintiffs filed a response to the Trustee's SOF, often objecting to the Trustee's characterization of certain facts, and arguing that the Plaintiffs were not given an adequate opportunity to conduct discovery before the Trustee filed the Summary Judgment Motion.[5] Below, however, are the facts as agreed to by the Plaintiffs and facts arising from orders or transcripts in this bankruptcy case. Because the Court concludes that this combination of undisputed facts and facts in the record provide a sufficient basis for ruling on the Trustee's Summary Judgment Motion, the Plaintiffs' Cross-Motion to Defer Ruling is denied.[6]

Art Van Furniture, LLC ("Art Van") was a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan.[7] Art Van was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated

---

[4] Adv. D.I. 45.

[5] Plaintiff's Response to Trustee's Statement of Undisputed Facts (Adv. D.I. 50) ("Pl. Resp. to SOF").

[6] Plaintiffs' Brief in Opposition to Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling (Adv. D.I. 49).

[7] Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC in Support of Chapter 11 Petitions and First Day Motions (Main Case D.I. 12), (the "Ladd Decl.") at ¶ 5.

with Thomas H. Lee Partners, L.P. ("THL") in March 2017.[8]  Pennsylvania-based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017.[9]

On March 8, 2020, when the Debtors filed chapter 11 bankruptcy petitions, the Debtors operated 169 locations (including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations) throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.[10]

In the months leading up to the Petition Date, Art Van was struggling under the weight of poor sales and $208.5 in secured debt encumbering substantially all of its assets, including (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan (the "Tern Loan") from FS KKR Capital Corp. (the "Term Lenders").[11]

On February 5, 2020, Art Van defaulted on the ABL Loan and obtained a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the business.[12]  The Debtors were unable to secure financing or attract a going concern buyer by the February 28, 2020 deadline.[13]

---

[8] Ladd Decl. at ¶ 5.

[9] Ladd Decl. at ¶ 5.

[10] Id.

[11] Pl. Resp. to SOF, ¶ 3.  The Court notes that the Trustee's SOF contains citations to declarations, orders, transcripts, news articles, and other documents to support the facts stated therein.  Unless the Court deems it helpful to a particular undisputed fact, those internal citations are not repeated here.

[12] Id. ¶ 4.

[13] Id. ¶ 5.

AB_0001042

The Debtors negotiated a wind-down budget with Wells Fargo, hired a liquidator, and announced publicly that they were going out of business.[14]

On March 4, 2020, debtor Sam Levin, Inc. ("SLI") entered into a letter agreement (the "Levin LOI") pursuant to which SLI agreed to sell 44 stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") to Robert Levin (the "Levin Sale").[15] The Levin LOI contemplated that the Levin Sale stores would continue operating, pending the closing of the Levin Sale.[16] Robert Levin agreed to extend $10 million of debtor-in-possession ("DIP") financing to SLI (the "Levin DIP Loan") to facilitate the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale.[17]

On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business.[18] Also on March 5, 2020, Art Van issued a WARN Act notice (the "First WARN Notice") to approximately 1,400 potentially affected employees. Providing, in part, that:[19]

> Art Van Furniture, LLC (the "Company") made the difficult decision to winddown its operations, which will include the closure of [certain

[14] *Id.*

[15] *Id.* ¶ 6.

[16] *Id.* ¶ 7.

[17] Id.

[18] Pl. Resp. to SOF, ¶ 8.

[19] *Id.* ¶ 9. *See also* Declaration of Bradford Sandler in Support of Chapter 7 Trustee's Motion for Summary Judgment (the "Sandler Decl.") (Adv. D.I. 46), Ex. G. The WARN Act notice attached as Exhibit G addresses only seven Michigan facilities, but the SOF claims that similar notices were sent to two Illinois facilities and one Pennsylvania facility. The Plaintiffs do not dispute that the Debtors sent WARN Act notices "to some of [the Debtors'] employees on March 5," but it is unclear whether WARN Act notices were sent to facilities other than the ones located in Michigan.

facilities], and will be permanently terminating the employment of all employees at these locations.

. . . .

While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date within 14 days thereafter which may be provided to you by the Company (your "Termination Date").[20]

The Debtors commenced store closing sales (the "GOB Sales") and deposits from inventory sales occurring between March 5, 2020 through March 8, 2020 were in excess of $23 million.[21]

On March 8, 2020 (the "Petition Date"), the Debtors filed their Chapter 11 Cases and filed first day motions to obtain approval of, *inter alia*, the Wind-Down Budget, the Levin DIP, the GOB Sales, and the Consulting Agreement with the Liquidator.[22]  On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order (the "Interim CC Order"), authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales.[23]

On March 13, 2020, then-President Trump declared a national emergency concerning the novel coronavirus disease (COVID-19) outbreak.[24]  By March 14, 2020 Governor Tom Wolf of Pennsylvania issued guidance urging all non-essential

---

[20] *Id.*

[21] Pl. Resp. to SOF, ¶ 10.

[22] *Id.* ¶ 11.  Capitalized terms not defined herein are defined in the SOF.

[23] *Id.* ¶ 13.

[24] *Id.* ¶ 15.

businesses to close.[25]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health . . . ."[26]

On March 16, 2020, Governor Gretchen Whitmer of Michigan entered an executive order that closed Michigan's bars, theaters, casinos, and other public spaces.[27] Governor Whitmer urged Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[28]

On March 19, 2020, Pennsylvania issued a "stay at home" or "shelter in place" order.[29]  Similar orders soon followed in Michigan, Ohio, and Illinois, all of which were in lock-down by March 23, 2020.[30]

During the initial days of the GOB Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million.[31]  On March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction.[32]

---

[25] *Id.* ¶ 16.

[26] Id.

[27] *Id.* ¶ 17.

[28] Id.

[29] Pl. Resp. to SOF, ¶ 18.

[30] Id.

[31] *Id.*, ¶ 20; Conversion Mot., Main Case D.I. 252, ¶22.

[32] Conversion Mot., Main Case D.I. 252, ¶ 26.

On March 19, 2020, Art Van issued a WARN Act notice (the "Second WARN

Notice") to some of its employees which stated, in part:

> On March 5, 2020, Art Van Furniture, LLC (the "Company")
> informed employees that it had made the difficult decision to wind-down
> its operations, to include the closure of its retail facilities located at [seven
> Michigan sites], which would in the permanent termination the
> employment [*sic*] of all employees at these locations.
>
> Since initial notice, the Company has been impacted by the novel
> COVID-19 virus and the resulting, and sudden, negative economic
> impact. Due to these unforeseen events, the Company can no longer
> support the wind-down of its retail operations through the originally
> projected termination date. The Company, therefore, submits this revised
> notice to you to satisfy any obligation that may exist under the federal
> Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et
> seq. (the "WARN Act").
>
> All terminations of employment will be permanent and you will
> not have bumping rights for other positions (i.e., you will not have the
> right to displace employees with less seniority). The employment of Art
> Van's sales associates and other commissioned employees, visuals,
> housekeepers, drivers, helpers, and other hub warehouse staff, Selling
> Managers and Outlet Managers as well as any Sales or Store Manager who
> is not scheduled to perform services on March 21, 2020 or March 22, 2020,
> will be terminated on March 20, 2020. All CPU's and office staff, along
> with the Store Manager and/or Sales Manager scheduled to work on
> March 21, 2020 or March 22, 2020 will be terminated at the end of the
> business day on March 22, 2020. Nothing in this letter alters your at-will
> employment status with the Company. You will be required to work
> through your Termination Date, following which date you will not be
> required to report to work or provide any services to the Company.[33]

Wells Fargo declared a default under the Interim CC Order and terminated use

of cash collateral as of March 24, 2020; later extended through March 31, 2020, and

finally through April 6, 2020.[34] The Debtors filed a motion to convert their Chapter 11

---

[33] Pl. Resp. to SOF, ¶ 23. *See also* Sandler Decl., Ex. T.

[34] Pl. Resp. to SOF, ¶ 27.

Cases to cases under Chapter 7 (the "Conversion Motion").[35]   On April 6, 2020, the Court entered an Order granting the Conversion Motion.[36]

PROCEDURAL BACKGROUND

On March 23, 2020, the Plaintiffs (both former employees of the Debtors at locations in Michigan), filed a Class Action Adversary Proceeding Complaint for Violation of the WARN Act.[37]   The parties stipulated to extend the time for the  Chapter 7 Trustee to respond to the Complaint.  After the Trustee answered the Complaint, the parties engaged in mediation, which was unsuccessful.[38]  The Trustee filed an amended answer to the complaint on October 29, 2021.[39]

On November 12, 2021, the Chapter 7 Trustee filed a Motion for Summary Judgment.[40]   On December 3, 2021, the Plaintiffs filed a Brief in Opposition to the Trustee's Motion for Summary Judgment and Cross-Motion to Defer Ruling.[41]   On December 17, 2021, the Trustee filed a Reply in Further Support of the Motion for Summary Judgment.[42]   A Notice of Completion of Briefing regarding the Motion for Summary Judgment was filed, and the matter is ripe for adjudication.[43]

---

[35] Sandler Decl., Ex. H.

[36] Pl. Resp. to SOF, ¶ 28.

[37] Adv. D.I. 1 (the "Complaint").

[38] Adv. D.I. 39.

[39] Adv. D.I. 40.

[40] Adv. D.I. 43.

[41] Adv. D.I. 49.

[42] Adv. D.I. 52.

[43] Adv. D.I. 57.  The Trustee filed a Request for Oral Argument (Adv. D.I. 56), but the Court declines the offer as unnecessary.

## STANDARD OF REVIEW- SUMMARY JUDGMENT

"Summary judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial."[44] Federal Rule of Civil Procedure 56, made applicable to these proceedings through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[45]

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.[46] A fact is material if it could "alter the outcome of a case."[47] An issue about a material fact is genuine when it is "triable, that is, when reasonable minds could disagree on the result."[48] "In other words, the movant's goal is 'to establish an absence of evidence to support the nonmoving party's case.'"[49]

The burden then shifts to the nonmoving party to produce "evidence in the record creating a genuine issue of material fact."[50] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts;"

---

[44] *In re FBI Wind Down, Inc.*, 614 B.R. 460, 472 (Bankr. D. Del. 2020).

[45] Fed. R. Civ. P. 56(c).

[46] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

[47] *FBI Wind Down*, 614 B.R. at 473 (quoting *The Liquidating Tr. v. Huffman (In re U.S. Wireless Corp.)*, 386 B.R. 556, 560 (Bankr. D. Del. 2008)).

[48] *U.S. Wireless*, 386 B.R. at 560 (quoting *Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005) (internal punctuation omitted)).

[49] *FBI Wind Down*, 614 B.R. at 473 (quoting *U.S. Wireless*, 386 B.R. at 560).

[50] *FBI Wind Down*, 614 B.R. at 473 (citing *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009)).

the nonmoving party must demonstrate "sufficient evidence (not mere allegations) upon which a reasonable trier of fact could return a verdict in favor of the nonmoving party."[51]

"[A]t the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."[52] The court must "view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor."[53] If the nonmoving party's evidence "is merely colorable or not significantly probative, summary judgment may be granted."[54] On the other hand, if the "record could lead reasonable minds to draw conflicting inferences, summary judgment is improper, and the action must proceed to trial."[55] In short, "[s]ummary judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party."[56]

<u>ANALYSIS</u>

The WARN Act provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to each affected employee.[57] "The purpose of the WARN Act is to protect workers and their families by providing them with advance notice of a layoff."[58] This advance notice is intended to provide "workers and their families some transition

---

[51] *FBI Wind Down*, 614 B.R. at 473 (citations omitted).

[52] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[53] *FBI Wind Down*, 614 B.R. at 473 (quoting *Saldana v. Kmart*, 260 F.3d 228, 231-32 (3d Cir. 2001)).

[54] *Id.* (quoting *Whitlock v. Pepsi Ams.*, No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal. Oct. 21, 2009)).

[55] *FBI Wind Down*, 614 B.R. at 473 (quoting *O'Connor v. Boeing N. Am.*, 311 F.3d 1139, 1150 (9th Cir. 2002)).

[56] *Id.*

time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market."[59]

If an employer fails to comply with the WARN Act, the employer "is liable to provide 'each aggrieved employee' with back pay and benefits for each day that the WARN Act was violated."[60]

"To prove a WARN Act violation, a plaintiff must show that: (1) the defendant was 'an employer;' (2) the defendant ordered a 'plant closing' or 'mass layoff;' (3) the defendant failed to give employees 60-days' notice before the closing or layoff; and (4) the plaintiff is an 'aggrieved' or 'affected' employee."[61] If a plaintiff proves these elements, "the employer may avoid liability by proving as an affirmative defense that it qualifies for one of the Act's three exceptions: the 'faltering company' exception; the 'unforeseen business circumstances' exception; or the 'natural disaster' exception."[62]

The Trustee, here, moves for summary judgment in his favor, arguing that: (i) at the time of the layoffs, the Debtors were "liquidating fiduciaries" which are excluded from the definition of "employer" under Department of Labor ("DOL") commentary to

[57] 29 U.S.C. § 2102(a)(1).

[58] *Czyzewski v. Jevic Transportation, Inc. (In re Jevic Holding Corp.)*, 496 B.R. 151, 158 (Bankr. D. Del. 2013) (citing 20 C.F.R. § 639.1(a)).

[59] 20 C.F.R. § 639.1(a).

[60] In re World Marketing Chicago, LLC, 564 B.R. 587, (Bankr. N. D. Ill. 2017) (quoting Ellis v. DHL Exp. Inc. (USA), 633 F.3d 522, 525-26 (7th Cir. 2011)). See also Off'l Comm. of Unsecured Creditors v. United Healthcare System, Inc. (In re United Healthcare System, Inc.), 200 F.3d 170, 176 (3d Cir. 1999) ("If the employer fails to [provide WARN Act notice], it may be liable for up to sixty days' back pay.") (citing 29 U.S.C. § 2104(a)).

[61] *Easom v. US Well Serv., Inc.*, 527 F.Supp.3d 898, 903-04 (S.D. Tex. 2021) (citing 29 U.S.C. §§ 2102, 2104)).

[62] *Id.* at 904 (citing, *inter alia*, 29 U.S.C. § 2102).

the WARN Act regulations, or (ii) the Trustee can demonstrate that either the "unforeseen business circumstances" or "natural disaster" exception to WARN Act liability applies here under the undisputed facts. The Plaintiffs, however, oppose the Trustee's Summary Judgment Motion, arguing that (i) the Debtors operated as "employers" under the Act by using its employees to hold postpetition going out of business sales (or "GOB Sales") or to keep certain stores operating as going concerns pending a bulk sale under the Levin LOI, and (ii) there are disputed issues of material fact regarding the *cause* of the Debtors' mass layoff, which prevent application of the WARN Act exceptions and require more discovery and a trial on the merits.

(A)     The Liquidating Fiduciary Exception

The WARN Act defines an "employer" as "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."[63]   The DOL's comments to its regulations implementing the WARN Act (the "DOL Commentary") addresses whether a bankrupt entity is an "employer" under the WARN Act, writing:

> [T]he Department does not think it appropriate to [exclude all bankrupt companies from the definition of "employer"]. Further, DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, where the fiduciary may continue to operate the business for the benefit of creditors, the fiduciary would succeed to the WARN

---

[63] 29 U.S.C. § 2101(a)(1).

obligations of the employer precisely because the fiduciary continues the business in operation.[64]

This language provides the basis for the "liquidating fiduciary" exception to the WARN Act.[65]

The Third Circuit considered the liquidating fiduciary exception in the 1999 *United Healthcare* case and decided that a debtor-hospital that ceased operations shortly after its bankruptcy filing and was selling its assets in a chapter 11 case was not an "employer" under the WARN Act when it laid off its employees.[66]  Pre-bankruptcy, United Healthcare had been actively seeking a merger partner or purchaser who would keep operating the business, but its efforts came to a halt after its secured creditor issued a notice of default and terminated financing.[67]  Shortly thereafter, United Healthcare filed a Chapter 11 bankruptcy petition and, on the same day, advised the New Jersey Department of Health that it would close and surrender its certificates of need.[68]  Also on the same day, United Healthcare provided WARN Act notices to its employees notifying them that their employment would end in 60 days.  However, 48 hours after issuing the WARN Act notices, all of United Healthcare's hospital patients had either been transferred or sent home and its employees could not perform their

---

[64] *United Healthcare*, 200 F.3d at 177  (citing 54 Fed. Reg at 16045).

[65] *World Marketing*, 564 B.R. at 598-99 ("[B]ankruptcy courts that have considered the specific question of whether a liquidating fiduciary exception to the WARN Act applies have uniformly concluded that it does.").

[66] *United Healthcare*, 200 F.3d at 179.

[67] *Id.* at 172-73.

[68] Under New Jersey law, health care facilities are required to maintain certificates of need issued by the Department of Health.  *United Healthcare*, 200 F.3d at 173 n. 1 (citing N.J.S.A. 26:2H-7 (West 1999)).

regular duties. Within 16 days after filing Chapter 11, United Healthcare informed 1,200 of its 1,300 employees that they were no longer to report to work. The 100 employees retained would secure the plant facility and maintain necessary equipment. The bankruptcy court determined that, as a debtor-in-possession and fiduciary, United Healthcare was subject to the WARN Act notification requirements.[69] The Third Circuit disagreed, finding that United Healthcare's intent to liquidate was evident from the start of the Chapter 11 case, and "the employees were no longer engaged in their regular duties but instead were performing tasks solely designed to prepare United Healthcare for liquidation" from the date the hospital patients were all transferred or sent home.[70] The Third Circuit wrote that:

> [W]hether a bankrupt entity is an "employer" under the WARN Act depends on the nature and extent of the entity's business and commercial activities while in bankruptcy, and not merely on whether the entity's employees continue to work "on a daily basis." The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act.[71]

The Trustee argues that this case is analogous to *United Healthcare*. Between March 5, 2020 - - just prior to the Petition Date - - and continuing post-petition through March 20, 2020 (the "Layoff Date"), the Debtors' activities were focused on winding up its business affairs and liquidating its assets. The Debtors negotiated a wind-down budget with Wells Fargo, hired a liquidator, and announced that they were liquidating

---

[69] *United Healthcare*, 200 F.3d at 177-78.

[70] *Id.* at 178.

[71] Id.

and going out of business.[72]  The Debtors decided to liquidate through an orderly wind-down process compromised of GOB Sales and the anticipated bulk sale of the SLI Assets to a third-party buyer.[73]  The Debtors argue that between the Petition Date and the Layoff Date, the Debtors did not operate as a "business enterprise in the normal commercial sense,"[74] but only conducted such business activities as were necessary to liquidate their assets through GOB Sales and the Levin Sale.

The Plaintiffs dispute the Trustee's characterization of the Debtors' activities. The Plaintiffs argue that the Debtors continued operations as a retail seller post-petition and, unlike the employees in *United Healthcare*, the Debtors' employees continued their normal activities between the Petition Date and the Layoff Date.  The Plaintiffs point out that the Interim CC Order provided that "[n]othing in this Interim Order shall authorize the disposition of assets of the Debtors or their estates *outside the ordinary course of business*."[75] The Plaintiffs assert that the Debtors' First Day Declaration advised the Court that the purpose of the Levin LOI was to "provide for the continued operations of approximately 44 retail store locations under the Wolf and Levin store banners and two related distributed centers" and to "preserve nearly 1,000 jobs."[76]  The

---

[72] Ladd Decl. ¶¶ 16-18; Interim CC Order, pp. 12-13; Sandler Decl. at ¶ 5, Ex. D.  *See also* Pl. Resp. to SOF, ¶ 5.

[73] *Id.*; Ladd Decl. ¶¶ 40-41; Sandler Decl., Ex. E.  *See also* Pl. Resp. to SOF, ¶¶ 6, 7.

[74] 54 Fed. Reg. 16042, 16045 (Apr. 20, 1989).

[75] Interim CC Order, at 15 (emphasis added).

[76] Ladd Decl., ¶ 19.

Plaintiffs also assert that in the DIP Motion with SLI, the Debtors sought approval to "purchase inventory in the ordinary course of business"[77] and agreed not to:

> substantially change the nature of the business in which it is currently engaged, nor, except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business or other than those which are useful in, necessary for and are to in its business, as presently conducted.[78]

Chapter 11 of the Bankruptcy Code is entitled "Reorganization," but it is also used by debtors to facilitate an orderly liquidation process. Applying the liquidating fiduciary exception in a Chapter 11 case requires careful analysis of the particular facts and circumstances of that case to determine whether the entity's activities resemble a business enterprise operating as a going concern or a business enterprise engaged in the winding-up of its affairs.[79] But what if the debtor's activities are a hybrid of these options? It is not uncommon for a debtor-in-possession[80] to commence a liquidating chapter 11 case intending to preserve value by operating the business as a going concern pending a sale of substantially all of the assets of the debtor. Is the debtor-in-possession an "employer" under the WARN Act while operating in a liquidating Chapter 11 case?

DOL Commentary to the WARN Act regulations provides that:

> [T]he term "employer" includes public and quasi-public entities which *engage in business* (i.e., take part in a commercial or industrial enterprise,

---

[77] DIP Motion, ¶ 13.

[78] Debtor-In-Possession Credit and Security Agreement, ¶ 8(f) (Main Case D.I. 46-2 at 60).

[79] *United Healthcare*, 200 F.3d at 178.

[80] A debtor-in-possession or a trustee managing a Chapter 11 case is a fiduciary. *World Marketing*, 564 B.R. 599 (citations omitted).

supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments).[81]

Consider also the plain language of the DOL Commentary creating the "liquidating fiduciary" exception:

> DOL agrees that a fiduciary whose *sole function* in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligation of the former employer because the fiduciary is not operating a "business enterprise" in the normal commercial sense. In other situations, *where the fiduciary may continue to operate the business for the benefit of creditors*, the fiduciary would succeed to the WARN obligations of the employer precisely because the fiduciary continues the business in operation.[82]

In *United Healthcare*, the Third Circuit applied the liquidating fiduciary exception when the debtor surrendered its certificates of need to the New Jersey Department of Health the day it filed its petition and shuttered the hospital within 48 hours of the filing. The court concluded that upon assuming the role of a debtor-in-possession fiduciary, United Healthcare "ceased operating its business as a going concern and was simply preparing itself for liquidation."[83] The Third Circuit also recognized, however, that:

> Although we find WARN Act liability does not attach under these facts and circumstances, we do not foreclose the possibility that WARN Act liability may apply to other situations where an employer files for bankruptcy and then terminates its employees. An employer as fiduciary will succeed to its WARN Act obligations if an examination of the debtor's

---

[81] *United Healthcare*, 200 F.3d at 177 (quoting 20 C.F.R. § 639(a)(1)(ii), 54 Fed. Reg. 16042, 16065 (1989) (emphasis added)). In *United Healthcare*, the Third Circuit decided it was appropriate considered the DOL regulations and commentary when the plain language of the WARN Act does not resolve the issue. *Id.*

[82] 54 Fed. Reg. at 16045 (emphasis added).

[83] *United Healthcare*, 200 F.3d at 179.

economic activities leading up to and during the bankruptcy proceedings reveals that the fiduciary has continued in an "employer" capacity, operating the business as an ongoing concern.[84]

In the case before the Court, the Debtors announced their intention to liquidate prior to the Chapter 11 filing, but the Debtors' orderly wind-down process contemplated continued postpetition operations.[85]  The Debtors' GOB Sales are a perfect example of a hybrid of engaging in business (i.e., continuing operations with its employees for the retail sales of goods) while liquidating at the same time.  Also, as the Plaintiffs point out, the Levin LOI called for the continued operation of approximately 44 retail store locations and two related distributed centers pending the proposed sale.  In this case, the Debtors intended to continue their operations in the Chapter 11 bankruptcy case for the benefit of creditors and, based on these facts, the Court concludes that the Debtors were subject to an employer's WARN obligations.  The "liquidating fiduciary" exception does not apply to this case.[86]

(B) <u>The Unforeseen Business Circumstances Exception</u>

The Unforeseen Business Circumstances ("UBC") exception to the WARN Act provides that:

---

[84] Id.

[85] The Debtors, rightfully, provided the First WARN Notice to its employees just prior to the bankruptcy filing, demonstrating its intention that to continue operations for 60 days The Debtors' intention, however, was interrupted by the COVID-19 pandemic, as discussed *infra*.

[86] The Court recognizes that not all debtors operating in a liquidating Chapter 11 case will be subject to WARN Act obligations.  The facts and circumstances must be evaluated in light of *United Healthcare* to determine whether there is an immediate shutdown and the fiduciary's sole function is liquidation.  Some liquidating Chapter 11 debtors assert the statutory exceptions to the WARN Act, *i.e.*, the faltering company, unforeseen business circumstances, or natural disaster exceptions.  Each case must be evaluated on its own merits.

An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required.[87]

The employer bears the burden of proving that this exception applies by establishing that two conditions are met: (1) the circumstance was unforeseeable, and (2) the layoffs were caused by that circumstance.[88]

The DOL regulations state that "[a]n important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control."[89] The regulations further state:

The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.[90]

The Trustee claims that COVID-19, and the government-ordered business closures (or threatened closures), and the restriction of residents to their homes prevented the Debtors from conducting the GOB Sales and completing the orderly liquidation of its business. The Trustee argues that the UBC exception applies here

---

[87] 29 U.S.C. §2102(b)(2)(A).

[88] *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009) (citing *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 588 (7th Cir. 2005)).

[89] 20 C.F.R. §639.9(b)(1).

[90] 20 C.F.R. §639.9(b)(2).

AB_0001058

because in January 2020 (60 days before the Layoff), no one could have foreseen the effect of COVID-19 on the Debtors' business operations.

The Plaintiffs, however, do not contest foreseeability; they argue that the Trustee has not and cannot prove that the pandemic *caused* the Layoff. In response, the Trustee argues that the undisputed facts show that:

> [T]he COVID-19 pandemic was clearly the immediate cause of the Debtors' abrupt change-of-course determination to abandon the Planned Liquidation Process and immediately shut down their business. The pandemic made it impossible for the Debtors to continue their GOB Sales post-petition as planned as the various governmental authorities required citizens to stay at home or shelter in place to limit the spread of COVID-19. The threat of infection, illness and death from COVID-19 made customers stay away from the GOB Sales even prior to the mandatory shut down orders, but regardless, as of March 19, 2020, Pennsylvania had locked down, and Michigan would soon follow.[91]

The Plaintiffs argue, however, that COVID-19 did not *mandate* the Debtors' mass layoff of employees on March 20, 2020. Instead, they claim that the Debtors could have engaged in a "transparent, problem-solving approach" and temporarily furloughed employees, rather than order a permanent mass layoff. They claim that the Debtors "froze out stakeholders and ran roughshod over its 'Planned Liquidation Process' … to cause the ultimate liquidity crisis when terminating its workforce."[92] In short, the Plaintiffs seek additional discovery to show that the Debtors' insiders used COVID-19 as an excuse for the accelerated the mass layoff.

To support this argument, the Plaintiffs rely on statements made by counsel for the Debtors, Wells Fargo, and the Creditor Committee at a hearing on March 19, 2020,

---

[91] Trustee's Br., Adv. D.I. 44, at 22, ¶ 56.

[92] Plaintiffs' Br., Adv. D.I. 49 at 22.

where counsel all suggested that the parties were working on alternatives to "pulling the plug" and avoid an immediate shutdown.[93]  The Plaintiffs also point out that the permanent mass layoff triggered "insurmountable obligations" of at least $16.5 million arising from commissions suddenly due when salespeople were laid off, and an even more substantial tail created by the partially self-funded health plan which was cancelled on March 19, 2020.[94]

When interpreting the phrase "caused by" in WARN Act cases, courts "have generally required defendants to show that an unforeseen business circumstance was the immediate cause of a layoff."[95]  Further, when applying the UBC exception to layoffs occurring after multiple potential causes, courts "have typically held that the

---

[93] The Plaintiffs rely upon the following statements, among others:  (i) Defendants' counsel said that "we are trying to explore with our lenders and our other stakeholders … other options short of outright liquidation." (Tr. 3/19/2020, D.I. 46-5, at 27, lines 9-14);  and "So, let me just say then, conceptually, we are looking at the possibility of … going idle or going into a state of dormancy for a period of time, and then the possibility then of either … reopening stores, some subset of stores as, either in furtherance of the going concern transaction … or … closing sales and an orderly liquidation, you know, essentially, once the economic and retail environment and the safety environment have improved to a degree that we can do that." (*Id.*, D.I. 46-5 at 27 line 23 to 28 line 13);  (ii) Wells Fargo's counsel said: "Debtors' decisions, unfortunately, are coming at us minutes before these hearings," (*Id.*, D.I. 46-5 at 30 lines 1-2) and the bank wanted "to try to find a path forward for all stakeholders," but the Debtors had not "fully come to their creditors, other than to say this is somebody else's problem and … fix it for us or don't sweep or do these things." (*Id.*, D.I. 46-5 at 30, lines 2-9); and (iii) Creditor Committee's counsel said that the committee favored "put[ting] everything on ice and let's come back in [ ] a month or two and see." (*Id.*, D.I. 46-5 at 37 lines 4-9).

[94] The Plaintiffs rely, in part, on the following statements: Wells Fargo's counsel said "as a result of terminating their employees, … the debtors now have significant accrued PTO, commissions, other benefits related to the terminated employees as well as healthcare obligations.  Most of these were not included in any budget and certainly [not] in the cash collateral budget because there was no contemplation of a wholesale mass termination of employees." (*Id.*, D.I. 46-5 at 59 lines 14-20).

[95] *Easom* 527 F.Supp.3d at 914-15 (citing *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 877-78 (10th Cir. 2009) ("[The defendant's] decision to shut down came in the immediate wake of [its partner's] withdrawal … [even though] it had been suffering from financial troubles for months."); *Jevic Holding*, 496 B.R. at 164-6 ("[T]he 'immediate precipitant of the decision to terminate employees' was [the lender's] refusal to extend forbearance," even though there were "other reasons" for the lender's refusal and employer's financial difficulties.)).

unforeseen business circumstances do not need to be the sole cause of a plant closing or mass layoff, but they must be the 'straw that broke the camel's back.'"[96]

Here, it is undisputed that the Debtors were in dire financial straits leading up to the Chapter 11 filing.  It is also undisputed that the Debtors filed Chapter 11 to pursue an orderly wind-down of operations and liquidation of their assets.  On March 5, 2020, the Debtors provided the First WARN Notice to many of their employees, anticipating the winding-down of operations and permanent layoffs by May 5, 2020.  It is also undisputed that in mid-March 2020, COVID-19 caused Pennsylvania, and then Michigan, and then other states where the Debtors operated, to issue "stay at home" or "shelter in place" orders.  This unquestionably impacted the Debtors' operations. The Debtors issued the Second WARN Notice as COVID-19 and the ensuing government-ordered shutdowns prevented the Debtors from operating and completing its anticipated wind-down plans.

Given these undisputed facts, the Plaintiffs' proffered evidence that COVID-19 was merely a pretext for the mass layoff is tenuous at best. Statements showing that the Debtors' actions were unanticipated or resulted in greater financial distress do not indicate disputed facts concerning the *cause* of the layoff. Rather, those facts underscore that the impact of COVID-19 was sudden and unexpected to other parties as well as the Debtors.  Counsels' statements expressing a hope that the closure would only "pause" the orderly liquidation process as the parties explored alternatives to "outright

---

[96] *Easom*, 527 F. Supp. 3d at 914 n. 15 (quoting *Gross*, 554 F.3d at 877-78; citing *Jones v. Kayser-Roth Hosiery, Inc.*, 748 F. Supp. 1276, 1285 (E.D. Tenn. 1990) (an employer's loss of its largest customer was the "last straw" that made it economically infeasible to continue operating the plant.)).

liquidation" also do not refute the *cause* of the layoff. The Plaintiffs' argument that temporary furloughs could have been a better option for the Debtors is not a factual dispute, but merely debating the Debtors' actions in hindsight.

The Court should evaluate the UBC WARN Act exception objectively and at the time the decisions were made.[97]  The undisputed facts support the finding that the COVID-19 was the proverbial "straw that broke the camel's back" and caused the March 20, 2020 layoff. Even viewing all inferences in favor of the Plaintiffs, the Plaintiffs' proffered evidence does not demonstrate disputed issues of material facts that cast doubt on that causation.[98]

Finally, the Plaintiffs also argue that the Second WARN Notice was insufficient to allow application of the UBC exception.  The statute requires that "[a]n employer relying on [the WARN Act exceptions] shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period."[99]

The shortened WARN Act notice must "set forth the underlying factual events which led to the shortened [notice] period."[100]  "Congress' purpose in requiring the

---

[97] *Jevic Holding*, 496 B.R. at 161 (citations omitted).

[98] "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (quoting *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  *Id.* (citations omitted).

[99] 29 U.S.C. § 2102(b)(3).

[100] *Grimmer v. Lord Day & Lord*, 937 F. Supp. 255, 257 (S.D.N.Y. 1996) (quoting *Alarcon v. Keller Indus.*, 27 F.3d 386 (9th Cir. 1994)).

brief statement must have been to provide employees with information that would assist them in determining whether the notice period was properly shortened."[101] Merely stating a statutory exception - - such as "we are a faltering company" or "termination arises from unforeseeable business circumstances" - - is not sufficient.[102]

> The Second Notice stated, in part:
>
> Since the initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date.

The Plaintiffs argue that this language is amorphous and permits the Debtors to "assert litigation-convenient but factually post-hoc justifications for their actions."[103] Other courts have determined that a shortened WARN Act notice is insufficient when it "simply parroted a statutory exception,"[104] or was arguably given in "the form of billboard ads, third-party newspaper articles, internet postings and memoranda,"[105] or was "a statement read to affected employees on the date of termination."[106] The statement in the Second WARN Notice is brief, but that is what the statute requires. The statement specifically mentions why the shortened notice was necessary - - that the

---

[101] *Id.* (internal punctuation omitted).

[102] *Id.*

[103] Plaintiff's Br., Adv. D.I. 49, at 23 (quoting *Newman v. Crane, Heyman, Simon, Welch, & Clar*, 435 F.Supp.3d 834, (N.D. Ill. 2020)).

[104] *Grimmer*, 937 F. Supp. At 257.

[105] *Sides v. Macon County Greyhound Park, Inc.*, 725 F.3d 1276, 1285 (11th Cir. 2013).

[106] *Newman*, 435 F.Supp.3d at 842. The *Newman* court found the statement insufficient writing that the defendants "present[ed] no evidence that this statement was ever actually read (even assuming the brief statement did not need to be in writing, which the Court highly doubts.") *Id.*

unforeseen effects of COVID-19 prevented the Debtors from completing the planned wind-down of the retail operations. The notice is sufficient to pass muster.

For all the reasons set forth above, the Court concludes that the UBC exception applies here, and the Trustee is entitled to summary judgment.

(C)      The Natural Disaster Exception

Although the Court concludes that the UBC exception applies here, the Debtors also argue that the natural disaster exception also applies to this matter.   The natural disaster exception provides that:

> No notice under [the WARN Act] shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States.[107]

The Trustee argues that the exception applies here because the COVID-19 pandemic is a natural disaster and the March 20, 2020 layoff was "due to" the pandemic. The Plaintiffs, however, argue that the Trustee cannot prove that COVID-19 is a "natural disaster," or that the March 20, 2020 layoff was caused by COVID-19.

The statute and the DOL regulations state broadly that the "natural disaster" exception applies to "any form of a natural disaster."[108]   The regulations list "[f]loods, earthquakes, droughts, storms, tidal waves or tsunamis *and similar effects of nature*" as natural disasters under the WARN Act.[109]   The issue here is whether COVID-19 arose from the "effects of nature."

---

[107] 29 U.S.C. § 2102(b)(2)(B).

[108] *Id.*; 20 C.F.R. § 639.9(c). "

[109] 20 C.F.R. § 639.9(c) (emphasis added).

The Plaintiffs argue that uncertainty regarding the origins of COVID-19, including theories that the initial human infection resulted from "human involvement"[110] through a laboratory-associated incident, prevents any court from ruling that it is a natural disaster. Numerous courts, however, have considered this issue and concluded that the COVID-19 pandemic is a natural disaster.[111] As part of its thorough analysis of the issue, the *Easom* court wrote:

> COVID-19 qualifies as a disaster under the WARN Act. COVID-19 is clearly a "disaster." *See Disaster*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[a] calamity; a catastrophic emergency"); *Natural Disaster*, OXFORD ENGLISH DICTIONARY ("[a] natural event that causes great damage or loss of life"). In a year, two million people lost their lives, and over one hundred million people were diagnosed with infections. *See AB Stable VIII LLC*, 2020 WL 7024929, at *58 ("[The COVID-19 pandemic] is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths."); *Coronavirus World Map: Tracking the Global Outbreak*, N.Y. TIMES (Feb. 10, 2021, 7:37 AM) (tracking nationwide and global deaths due to COVID-19).

---

[110] *Carver v. Foresight Energy LP*, No. 3:16-cv-3013, 2016 WL 3812376 (C.D. Ill. July 12, 2016) (deciding that coal fires in a mine were not natural disasters). In denying a motion to dismiss a WARN Act claim, the *Carter* court found that the complaint did not allege facts that unambiguously established the existence of a natural disaster exception. *Id.* at *5. The complaint alleged that the fires, although consisting of the interaction between natural elements such as coal and oxygen, were fueled by "poor underground housekeeping, such as failure to properly clean up spilled oil and grease" or were ignited by exposing oxygen to the coal through the mine's ventilation system. *Id.* at *1. Thus, the Court decided that "human involvement in the origins of the combustion events would seem to preclude the events from being considered a natural disaster." *Id.* at *4.

[111] *Easom v. US Well Services, Inc.*, 527 F.Supp.3d 898, 906-11 (S.D. Tex. 2021) (citing, *inter alia*, *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 507 F.Supp.3d 490, 501 (S.D.N.Y. 2020) (after reviewing dictionary definitions for the common meaning of "natural disaster," (as used in a *force majeure* clause in a consignment agreement), the court decided that "it cannot be seriously disputed that the COVID-19 pandemic is a natural disaster"); *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, C.A. No. 2020-0310-JTL, 2020 WL 7024929, *58 (Del. Ch. Nov. 30, 2020) (deciding that the COVID-19 pandemic fits the definition of "natural disaster," and noting that "[i]t is a terrible event that emerged naturally in December 2019, grew exponentially, and resulted in serious economic damage and many deaths."); *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster" under a Pennsylvania statute); and *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) ("The COVID-19 pandemic is, by all definitions, a natural disaster" under a Pennsylvania statute.)).

COVID-19 also qualifies as a "natural" disaster because human beings were not responsible for starting or consciously spreading the virus. Unlike coal fires, which did not occur in *Carver* without humans digging mines and introducing coal to oxygen, COVID-19, like other viruses, did not require conscious human effort to appear or spread, as individuals without symptoms infected others. *See* Angela L. Rasmussen, *On the Origins of SARS-CoV-2*, 27 NATURE MEDICINE 9, 9 (2021) ("[A]ll indications suggest that, like SARS-CoV and MERS-CoV, this virus probably evolved in a bat host until an unknown spillover event into humans occurred."); Murat Seyran, *et al.*, *Questions Concerning the Proximal Origin of SARS CoV-2*, JOURNAL OF MEDICAL VIROLOGY 1, 1 (2020) ("There is a consensus that severe acute respiratory syndrome coronavirus (SARS-CoV-2) originated naturally from bat coronaviruses (CoVs), in particular RaTG13."); *see also AB Stable VIII LLC*, 2020 WL 7024929, at *58 n.214 ("The record in this case does not support a finding that the virus was anything other than a natural product of germ evolution.").  While humans can take precautions to slow the spread of COVID-19 or engage in behavior that fosters contagion, the possibility of slowing the virus spread does not suggest that humans caused the pandemic.[112]

Based on the reasoning in *Easom* and the many cases cited therein, the Court is satisfied that the COVID-19 pandemic qualifies is a natural disaster and may be invoked under the natural disaster exception to the WARN Act.

The next issue is whether the natural disaster - - COVID-19 - - *caused* the mass layoff.  The Trustee argues that the *Easom* court recently analyzed the natural disaster exception and determined that it requires a lesser "but for" standard for causation, rather direct or proximate cause.[113] The Trustee claims that "but for" COVID-19, the Debtors would have completed the planned liquidation process as originally planned,

---

[112] *Easom*, 527 F.Supp.3d at 908.

[113] *Easom*, 527 F.Supp.3d at 911-915 ("But-for causation is established whenever a particular outcome would not have happened 'but for' the purported cause  … Proximate causation generally refers to the basic requirement that … there must be some direct relation between the outcome and the purported cause."  *Id.* at 911 n. 10 (citations and internal punctuation omitted).

including the provision of adequate notice of the layoff. The Court does not need to decide whether it agrees that the "but for" standard applies to the natural disaster exception. Even assuming that the more stringent standard of causation applies here, the Court has already analyzed the causation issue in the discussion of the UBC exception, *supra*. The undisputed facts in this case support the finding that the COVID-19 was an immediate cause of the March 20, 2020 layoff.

For all the reasons set forth above, the Court concludes that the natural disaster exception applies here, and the Trustee is entitled to summary judgment.

<u>CONCLUSION</u>

For the reasons set forth above, the Court determined that it had sufficient undisputed facts and facts of record in the bankruptcy case to decide the Trustee's Summary Judgment Motion, so the Plaintiffs' Cross-Motion to Defer Ruling is denied.

Further, for the reasons set forth above, (i) the Court rejects the Trustee's argument that the Debtors were "liquidating fiduciaries" and not WARN Act "employers" under the particular facts and circumstances of this case, but (ii) the Court concludes that both the unforeseen business exception and the natural disaster exception to the WARN Act's 60-day notice requirement applies to the undisputed facts in this case. Accordingly, the Trustee's motion for summary judgment will be granted. An order will be issued.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | Case No. 20-10553 (CSS) |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Debtors. | ) | |
| —————————————— | ) | |
| TODD STEWART and JENNIFER | ) | |
| SAWLE on behalf of themselves and | ) | |
| all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Pro. No.: 20-50548 (CSS) |
| | ) | Related Adv. Docket No.: 43, 47, 49 |
| ART VAN FURNITURE, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

For the reasons set forth in the Court's Opinion dated March 21, 2022 it is hereby ordered that:

1) Chapter 7 Trustee's Motion for Summary Judgment [D.I. 43] filed on November 12, 2021 is Granted.

2) The Plaintiffs' Motion for Class Certification and Related Relief [D.I. 47] filed on November 14, 2021 is Denied as Moot.

3) Plaintiffs' Cross Motion to Defer Ruling [D.I. 49] filed on December 3, 2021 is Denied.

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Dated: March 21, 2022

Form 417A

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ART VAN FURNITURE, LLC., *et al.,*[1]<br><br>          Debtors. | Chapter 7<br><br>Case No. 20-10553 (CSS)<br><br>Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br>v.<br><br>ART VAN FURNITURE, LLC, et al.,<br><br>          Debtors. | Adv. Pro. No. 20-50548 (CSS) |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1: Identify the appellants**

1.  Names of appellants: Plaintiffs Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated.

2.  Position of appellants in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding:      For appeals in a bankruptcy case and not

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

[X] Plaintiff                                    in an adversary proceeding:
[ ] Defendant                                    [ ] Debtor
[ ] Other (describe) _____        [ ] Creditor
                                                 [ ] Trustee
                                                 [ ] Other (describe) _____

**Part 2: Identify the subject of this appeal**

1.  Describe the judgment, order or decree appealed from: *Opinion and Order Granting*

*Trustee's Summary Judgment Motion and Denying Class Certification* (D.I. 63, 64).

2.  State the date on which the judgment, order or decree was entered: March 21, 2022.

**Part 3: Identify the other parties to the appeal**

1.  Counsel to the Plaintiffs/Appellants Todd Stewart and Jennifer Sawle, on behalf of

themselves and all others similarly situated:

Michael J. Joyce, Esq. (No. 4563)
**JOYCE, LLC**
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302)-388-1944

René S. Roupinian, Esq.
Jack A. Raisner, Esq.
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747

2.  Counsel to Defendant/Appellee Alfred T. Giuliano, Chapter 7 Trustee for Debtors Art

Van Furniture, LLC, et al.:

Bradford J. Sandler, Esq.
Beth Levine, Esq.
Colin R. Robinson, Esq.
Peter J. Keane, Esq.
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705

AB_0001070

Wilmington, Delaware 19899
Telephone: (302) 652-4100

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts).**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate

Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal

heard by the United States District Court. If an appellant filing this notice wishes to have the appeal

heard by the United States District Court, check below. Do not check the box if the appellant wishes

the Bankruptcy Appellate Panel to hear the appeal.

[X] Appellant(s) elect to have the appeal heard by the United States District Court rather than by
the Bankruptcy Appellate Panel.

Dated: April 4, 2022                          Respectfully Submitted,

                                              */s/ Michael J. Joyce*
                                              Michael J. Joyce (No. 4563)
                                              **JOYCE, LLC**
                                              1225 King Street, Suite 800
                                              Wilmington, DE 19801
                                              Telephone: (302)-388-1944
                                              Email: mjoyce@mjlawoffices.com

OF COUNSEL:

René S. Roupinian (*admitted pro hac vice*)
Jack A. Raisner (*admitted pro hac vice*)
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiffs and all others similarly situated*

AB_0001071

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CSS) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CSS) |
| Plaintiffs, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I, Jenny Hoxha, under penalty of perjury, certify the following as true and correct: I am not a party to this action, employed by Raisner Roupinian LLP, and I am over 18 years of age. I hereby certify that I caused true and correct copies of *Notice of Appeal and Statement of Election* and the corresponding *Certificate of Service* to be served upon the parties listed below via email as listed below:

**Service List:**
Bradford J. Sandler
Colin R. Robinson
Peter J. Keane
Beth Levine
**PACHULSKI STANG ZIEHL & JONES LLP**
919 N. Market Street, 17th Floor
Wilmington, DE 19801

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

Email: bsandler@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com
blevine@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee for Debtors*

Dated:  April 4, 2022

/s/        *Jenny Hoxha*
Jenny Hoxha

2

AB_0001073

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.,*[1] | Case No. 20-10553 (CTG) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CTG) |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

**NOTICE OF CROSS-APPEAL**

Alfred T. Giuliano, the chapter 7 trustee (the "Trustee") of the bankruptcy estates of Art

Van Furniture, LLC, AVF Holding Company, Inc.,  AVCE, LLC, AVF Holdings I, LLC,  AVF

Holdings II, LLC, AVF Parent, LLC, Levin Parent, LLC, Art Van Furniture of Canada, LLC,

AV Pure Sleep Franchising, LLC, AVF Franchising, LLC, LF Trucking, Inc.,  Sam Levin, Inc.,

and Comfort Mattress LLC (collectively, the "Debtors" or the "Defendants") in the above-

captioned adversary proceeding, by and through his undersigned counsel, hereby gives notice of

its cross-appeal pursuant to 28 U.S.C. § 158(aa) and Rules 8001 and 8002 of the Federal Rules of

Bankruptcy Procedure from the Opinion (the "Opinion"), dated March 21, 2022 [D.I 63], and the

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

AB_0001074

Order (the "Order") [D.I. No. 64], dated March 21, 2022, granting the Trustee's motion for summary judgment and the motion of the plaintiffs for class-certification. The Trustee cross-appeals only that portion of the Opinion that found that "liquidating fiduciary" exception does not apply to the facts set forth in the above-captioned adversary proceeding and the Order only to the extent it incorporates that portion of the Court's Opinion holding that the "liquidating fiduciary" exception to alleged WARN Act liability was not applicable.

The names of all parties to the Opinion and Order being appealed, as well as the name, addresses, and telephone numbers of their respective attorneys are as follows:

1.      Counsel to the Plaintiffs/Appellants Todd Stewart and Jennifer Sawle, on behalf of themselves and all others similarly situated.

> Michael J. Joyce. Esq.
> Joyce LLC
> 1225 King Street, Suite 800
> Wilmington, DE 19801
> Telephone: (302) 388-1944
>
> Rene S, Roupinian, Esq.
> Jack A. Raiser, Esq.
> Raisner Roupinian LLP
> 270 Madison Avenue, Suite 1801
> New York, New York 10016
> Telephone: (212) 221-1747

2.      Counsel to Alfred Giuliano, Chapter 7 Trustee for Debtors Art Van Furniture, LLC, et al., Defendants/Appellees.

> Bradford J. Sandler, Esq.
> Beth E. Levine, Esq.
> Colin R. Robinson, Esq.
> Peter J. Keane, Esq.
> Pachulski Stang Ziehl Young & Jones LLP
> 919 N. Market Street, 17th Floor
> Wilmington, Delaware 19899-8705
> (302) 778-6403

AB_0001075

Dated:  April 14, 2022                          PACHULSKI STANG ZIEHL & JONES LLP

                                                                /s/ Bradford J. Sandler
                                                                Bradford J. Sandler (Bar No. 4142)
                                                                Beth E. Levine (admitted *pro hac vice*)
                                                                Colin R. Robinson (Bar No. 5524)
                                                                Peter J. Keane (Bar No. 5503)
                                                                919 North Market Street, 17th Floor
                                                                Wilmington, DE 19801
                                                                Telephone:  (302) 652-4100
                                                                Facsimile:  (302) 652-4400
                                                                Email:  bsandler@pszjlaw.com
                                                                            blevine@pszjlaw.com
                                                                            crobinson@pszjlaw.com
                                                                            pkeane@pszjlaw.com

                                                                *Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

AB_0001076

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| ART VAN FURNITURE, LLC., *et al.*,[1] | Case No. 20-10553 (CTG) |
| Debtors. | Jointly Administered |
| TODD STEWART and JENNIFER SAWLE on behalf of themselves and all others similarly situated, | Adv. Pro. No. 20-50548 (CTG) |
| Plaintiff, | |
| v. | |
| ART VAN FURNITURE, LLC, et al., | |
| Defendants. | |

**CERTIFICATE OF SERVICE**

I, Bradford J. Sandler, hereby certify that on the 14th day of April, 2022, I caused

a copy of the following document(s) to be served on the individuals on the attached service list(s)

in the manner indicated:

**NOTICE OF CROSS-APPEAL**

*/s/ Bradford J. Sander*
Bradford J. Sandler (DE Bar No. 4142)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

AB_0001077

Art Van Furniture – Todd Stewart/Jennifer Sawle
WARN Act Service List
Main Case No. 20-10553 (CSS)
Adv. Case No. 20-50548 (CSS)
Doc. No. 232107v1
03 – E-Mail

***Via Email***
Michael J. Joyce, Esquire
THE LAW OFFICES OF JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Email: mjoyce@mjlawoffices.com

***Via Email***
Jack A. Raisner, Esquire
René S. Roupinian, Esquire
RAISNER ROUPINIAN LLP
270 Madison Avenue, Suite 1801
New York, New York 10016
Email: rsr@raisnerroupinian.com;
      jar@raisnerroupinian.com

AB_0001078

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF
## DAVID LADD, EXECUTIVE VICE PRESIDENT AND
## CHIEF FINANCIAL OFFICER OF ART VAN FURNITURE, LLC,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, David Ladd, hereby declare under penalty of perjury:

1.      I am the Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC ("Art Van"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company").

2.      I have served in this role since October 10, 2016.  In my current position, I oversee financial planning, accounting and the management of financial risk for the Company and its brands.  Prior to serving in this capacity, I had over twenty years of financial experience in the retail sector, during which time I served in various roles, including as an auditor for Kmart and as Vice President of Finance for various divisions of Sears.  Most recently, I served as the Vice President of Finance for 1,500 Sears and Kmart stores.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484);  Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

AB_0001079

3.     I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration (this "Declaration") to assist the United States Bankruptcy Court for the District of Delaware (the "Court") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the relief requested pursuant to the motions and applications filed on the first day of these cases (collectively, the "First Day Motions").

4.     Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my discussions with the other members of the Company's management team and the Company's advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## **Preliminary Statement**

5.     Art Van is a brick-and-mortar furniture and mattress retailer headquartered in Warren, Michigan.  The Company operates 169 locations, including 92 furniture and mattress showrooms and 77 freestanding mattress and specialty locations.  The Company does business under brand names, including Art Van Furniture, Pure Sleep, Scott Shuptrine Interiors, Levin Furniture, Levin Mattress, and Wolf Furniture.  The Company was founded in 1959 and was owned by its founder, Art Van Elslander, until it was sold to funds affiliated with Thomas H. Lee Partners, L.P. ("THL") in March 2017.  As part of this transaction, THL acquired the operating assets of the Company and certain real estate investment trusts, who closed the transaction alongside THL, acquired the owned real estate portfolio of the Company, and entered into long-term leases with Art Van.  The proceeds from the sale-leaseback transaction were used to fund the purchase price

2

paid to the selling shareholders.  Pennsylvania-based Levin Furniture and Wolf Furniture were acquired by Art Van in November 2017 through similar transaction structures.  As of the Petition Date, the Company operates stores throughout Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia.

6.     In the wake of extreme market conditions and faced with limited liquidity, the Company has commenced these chapter 11 cases to effectuate a going-concern sale of approximately 44 stores and two distribution centers operating under the Wolf and Levin banners and to wind down its remaining store locations and other operations through a going-out-of-business sales process.  Given continuously declining profitability and operational challenges over the past three years, and despite the best efforts of the Company and its advisors to secure the capital necessary to preserve the entire business as a going concern, the Company is simply unable to meet its financial obligations.  The Company has worked in concert with its secured lenders to develop a budget for the use of cash collateral to facilitate an expedited sale and orderly wind down process that will maximize value and recoveries for stakeholders in these cases.

7.     Art Van's declines in sales, profits, and cash flow were driven by a combination of several factors.  *First*, the Company has faced significant macro-related revenue headwinds, as well as local microeconomic headwinds, that have led to sustained negative "same-store sales," a key measure of retail health, during every quarter since June 2016.  These macro-related headwinds include broad-based declining retail foot traffic, market share losses of brick and mortar furniture outlets to online sellers such as Wayfair and Amazon.com, and increased fragmentation and intense competition in mattresses leading to decreased profitability.  On a local level, Art Van has faced increased retail competition, as key competitors such as Ashley HomeStore, Bob's Discount

AB_0001081

Furniture, and Mattress Firm opened at least 30 stores in Michigan and Illinois over the last three years

8.      **Second**, while Art Van revenues have declined approximately 27% cumulatively on a same-store basis since fiscal year 2016 through January 2020, expenses have increased significantly due to, among other things, over $8 million in tariff costs in fiscal year 2019 (which continued and escalated in fiscal year 2020) and an increase in marketing expenses intended to stem same-store sales declines.

9.      **Third**, the business suffered numerous operational challenges in the course of the Company's effort to grow and navigate a challenging retail environment.  In continuing to support the existing management team and growth initiatives that had driven the Company's success over the prior decade, the Company invested significant capital, but many of the initiatives failed to meet expectations and were insufficient in offsetting countervailing headwinds.  These operational challenges included, among other things:

- **Expansion**.  The Company began an expansion into Chicago in fiscal year 2013 that continued through fiscal year 2018, which ultimately led to market oversaturation as new stores cannibalized revenues from preexisting locations.  Despite spending significant capital and gaining material revenue share in this market, the Company was not able to achieve sustained profitability in Chicago.

- **Leadership Turnover**.  The Company lost eight of its top nine executive leaders in fiscal years 2017 and 2018 through unplanned and, in many cases, voluntary departures.

- **Required Changes to Marketing Strategies**.  In June 2017, the Company ceased certain of its historically successful marketing practices after becoming aware they violated the Telephone Consumer Protection Act ("TCPA"), and in early 2018, the Company settled a class-action lawsuit on account of an alleged violation of the TCPA.

- **St. Louis Franchise Acquisition**.  In fiscal year 2018, the Company entered into an operating agreement with its largest franchisee, based in St. Louis, Missouri, due to financial distress being experienced by the franchisee.  The Company acquired the operations of the franchisee in fiscal year 2019 to help stabilize performance and avoid further deterioration, but Art Van was unable to stabilize the revenues of the St. Louis stores or generate a profit in the market after such acquisition.

AB_0001082

- **Levin/Wolf Integration**.  In fiscal year 2019, the Company's management attempted to integrate the operations of Wolf Furniture into Levin Furniture.  The integration involved a significant overhaul of many fundamental aspects of the Wolf business, including human capital management, furniture assortments, distribution/delivery, and technology systems.  These actions were taken in an effort to improve the business and align its operations with those of Levin, but they created significant strain on the Wolf business, which led to same-store sales declines of approximately 22% in Wolf in the second half of fiscal year 2019, as well as meaningful turnover of tenured sales staff.

- **Changes to Inventory Mix and Showroom Layout**.  In the same year, the Company turned over approximately 60% of its furniture assortment and reorganized many of its flagship showroom floors by "lifestyle" instead of by category of product, which negatively impacted sales and led to increased markdowns from product that was not easily saleable.

As a result of these challenges, the Company's Adjusted EBITDA decreased significantly in each fiscal year since 2016 and dropped to negative for the twelve months ended December 31, 2019.

10.     Faced with rapidly declining profitability, the Company made key leadership changes in summer 2019 that it deemed necessary to stem the downward trajectory and recover sales and profits.  In August 2019, the Company's board of directors (the "Board") terminated the Company's then-current Chief Executive Officer, its Chief Merchant, its Head of Stores, and several other executives.  It promoted a Company veteran to the role of Chief Merchant in August 2019, and, in September 2019, the Board hired a mattress industry turnaround executive as Chief Executive Officer.  The Board also named Gary Van Elslander, the former President of Art Van, as Chairman of the Board, in an effort to improve morale and re-establish a connection between the Company's employees and customers with the namesake of the business.  During this period, the Company also launched a new marketing campaign intended to differentiate the business against a competitive landscape, and it improved its e-commerce operating systems, including its website.

11.     In the summer and fall of 2019, the Company took further actions to create additional liquidity and extend the runway for management to execute on a sales-led operational turnaround:

AB_0001083

- In November, 2019, the Company amended its asset-backed loan ("ABL") facility with Wells Fargo Bank, National Association ("Wells Fargo") to increase the size of the facility from $60 million to $82.5 million.

- In summer 2019, the Company engaged Evercore Group L.L.C. ("Evercore") as investment banker and undertook a review of strategic alternatives, including efforts to identify potential buyers for all or portions of the business.

- In December 2019, the Company secured an amendment to its term loan credit facility, which allowed the Company to suspend cash interest payments and mandatory amortization under the term loan.[2]

- In the fall and winter of 2019, the Company also was implementing a cost reduction and profit improvement plan, which was predicated on (a) reducing marketing expenses as a percentage of sales; (b) increasing gross margin through improved coordination of the merchandising, marketing, and in-store sales teams; and
  (c) decreasing occupancy costs.

12. Throughout this time, the Company also was focused on optimizing its lease portfolio and reducing rent expense:

- With the assistance of its financial advisor, Alvarez & Marsal North America, LLC ("A&M") the Company created a store footprint optimization analysis that supported store closure plan.

- The Company hired real estate restructuring advisers Jones Lang LaSalle ("JLL") and Newmark Knight Frank to lead discussions with key landlords to reduce rent expense given the Company's decline in sales and to close 49 underperforming locations (including 31 mattress locations), consistent with and supported by the above-referenced store closure plan.

- The Company hired an accounting advisory firm in November, 2019, to create standardized and reliable schedules of store-level financials needed for JLL and Newmark Knight Frank to be able to engage in productive negotiations with the Company's lessors. This effort was completed in January, 2020, and the real estate brokers began discussions with key lessors shortly thereafter.

---

[2] Despite these liquidity enhancements, the Company also faced offsetting liquidity challenges. Certain companies, including The CIT Group ("CIT"), which provided accounts receivable factoring services to the Company's suppliers, refused to factor receivables owed by the Company unless the Company issued CIT and other factoring companies letters of credit under its ABL facility. These letters of credit reduced availability under the Company's ABL facility by $10 million, further exacerbating the Company's liquidity constraints.

AB_0001084

13.     In late January, 2020, the Company unexpectedly faced further liquidity constraints due to a reduction in the Company's "borrowing base," which is required collateral support for borrowing under the ABL facility.  At the same time, certain financial partners of the Company began to demand additional collateral and tightened access to credit as a result of the Company's weak financial results.  These financial partners included credit card processing companies, including Bank of America Merchant Services and PNC Merchant Services—who are critical to the Company's ability to accept credit cards in stores and on-line for customer purchases—as well as providers of consumer credit.  In total, this group demanded approximately $33 million in collateral through holdbacks to fund reserves and letters of credit.

14.     As a result of the impending liquidity crisis created by the shrinking borrowing base, poor operating cash flow, and the collateral demands, the Company was unable to issue "clean" audited financial statements (*i.e.*, without a potential "going concern" qualification), which led to a default under the Company's ABL facility, as well as various other contractual arrangements, including certain leases.  Wells Fargo agreed to forbear from exercising remedies on account of such default until February 28, 2020, to give the Company time to explore opportunities to raise additional capital and restructure its debt obligations.  As part of this short forbearance, Wells Fargo required the Company to comply with cash dominion, and also required the Company to begin immediate preparations for a "going-out-of-business" liquidation in the event ongoing efforts to raise capital did not materialize before the forbearance period expired.

15.     Against this backdrop, with the assistance of Evercore and A&M, the Company held discussions with at least 31 potential buyers and investors, including its term loan lender, FS KKR Capital Corp. and affiliates ("KKR"), about potential transactions to recapitalize or sell all

AB_0001085