Exhibit 3

DRAFT
SUBJECT TO MATERIAL CHANGE

**AVF Holding, LLC**
Borrowing Base Certificate

*$ in thousands, unless otherwise noted*

| | Week 1 Fcst. 8-Mar | Week 2 Fcst. 15-Mar | Week 3 Fcst. 22-Mar | Week 4 Fcst. 29-Mar | Week 5 Fcst. 5-Apr | Week 6 Fcst. 12-Apr |
|---|---|---|---|---|---|---|
| **Credit Card Receivables** | | | | | | |
| Total Credit Card Receivables | $ - | $ - | $ - | $ - | $ - | $ - |
| Less: Outstandings > 5 Business Days | - | - | - | - | - | - |
| Less: Credit Card Fees | - | - | - | - | - | - |
| Eligible Credit Card Receivables | - | - | - | - | - | - |
| Credit Card Advance Rate | | | | | | |
| **Total Credit Card Receivables Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Ending Inventory as of:** | | | | | | |
| Stock Ledger Ending Inventory at Cost | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Ineligible Inventory** | - | - | - | - | - | - |
| Eligible Inventory | - | - | - | - | - | - |
| **Total Eligible Inventory Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Gross Borrowing Base Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Less: Availability Reserves** | | | | | | |
| Gift Certificates and Gift Cards (50% of GL Balance, net) | - | - | - | - | - | - |
| Customer Deposits (100%) | - | - | - | - | - | - |
| Professional Fee Reserve | - | - | - | - | - | - |
| Professional fee Payments (cumulative) | - | - | - | - | - | - |
| P-Card | - | - | - | - | - | - |
| Landed Cost Reserves | - | - | - | - | - | - |
| Landlord Lien (PA, VA, WA) | - | - | - | - | - | - |
| Other | - | - | - | - | - | - |
| Carveout | - | - | - | - | - | - |
| **Total Availability Reserves** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Total Uncapped Borrowing Base** | $ - | $ - | $ - | $ - | $ - | $ - |
| ABL Balance | - | - | - | - | - | - |
| L/C Balance | - | - | - | - | - | - |
| Sub-total - ABL Balance | - | - | - | - | - | - |
| **Total Excess ABL Availability** | $ - | $ - | $ - | $ - | $ - | $ - |
| Availability Block | - | - | - | - | - | - |
| **Total Excess ABL Availability After Covenant** | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **Beginning Accrued Professional Fees** | $ - | $ - | $ - | $ - | $ - | $ - |
| Professional Fees Accrued in Period | - | - | - | - | - | - |
| Professional Fees Paid in Period | - | - | - | - | - | - |
| **Ending Accrued Professional Fees Balance** | $ - | $ - | $ - | $ - | $ - | $ - |

For Discussion Purposes Only

A000302
AB_0001303

**<u>intentionally left blank</u>**

AB_0001304

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC ., *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 49** |

## INTERIM ORDER: (I) AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 364(c) AND 364(d); (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases (collectively, the "Cases"), seeking among other relief, *inter alia,* an order (this "Interim Order") pursuant to sections 105, 361, 364(c)(1), 364(c)(2) and 364(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") *inter alia*:

(i)     authorizing Sam Levin, Inc. ("DIP Borrower"), authority to obtain postpetition financing and grant a senior purchase money security interest in the DIP Collateral (as defined below)[3] to Levin Furniture, LLC "DIP Lender"), solely with respect to DIP Collateral purchased

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

[3]   As used in this Interim Order, "DIP Collateral" shall mean and include all of the following personal property assets of the DIP Borrower, whether now in existence or hereafter acquired or arising, and wherever located:

with the Advances made postpetition to DIP Borrower together with superpriority administrative expense status and adequate protection to the DIP Lender in accordance with this order; and

(ii)     scheduling a final hearing (the "<u>Final Hearing</u>") within twenty days of the

(a) all inventory of the DIP Borrower purchased solely with the proceeds of any Advances made under the DIP Credit Agreement;

(b) all receivables of the DIP Borrower arising out of the sale of inventory referred to in clause (a) above;

(c) all right, title and interest in and to (i) all inventory returned or rejected by customers previously sold by the DIP Borrower giving rise to receivables referred to in clause (b) above,  (ii) all of DIP Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase with respect to any of the foregoing (a) or (b), (iii) all additional amounts due to DIP Borrower from any customer relating to the receivables set forth in clause (b) above, (iv) other property, including warranty claims, relating to any of the foregoing (a) and (b), (v) all of DIP Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit and money relating to any of the foregoing (a) and (b), (vi) all commercial tort claims (whether now existing or hereafter arising) relating to any of the foregoing (a) and (b), and (vii) if and when obtained by DIP Borrower, all real and personal property of third parties in which DIP Borrower has been granted a lien or security interest as security for the payment or enforcement of receivables referred to in clause (b);

(d) ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computer software (owned by Borrower or in which it has an interest and in which the granting of a security interest therein is not expressly prohibited), computer programs, tapes, disks and documents relating to (a), (b) or (c) of this definition; and

(e) proceeds and products of (a), (b), (c) or (d) of this definition in whatever form, including, but not limited to cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents and tort claim proceeds.

Notwithstanding anything to the contrary in this Interim Order or the DIP Credit Agreement, the term "DIP Collateral" shall not include any lease, license, contract, property right or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; provided, however, that (y) the Collateral excluded hereby shall not include any and all proceeds of such property rights or agreements or any right, title or interest of Borrower therein, and (z) the security interest shall attach immediately at any such time as the restriction resulting in abandonment, invalidation or unenforceability or breach or termination shall be removed or any condition thereto (including any consent) shall be satisfied.

Petition Date to consider the relief requested in the Motion on a final basis (the "<u>Final Order</u>") and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (D.I. 20) and the evidence submitted and argument made at the first day hearing held on March 10, 2020 and the interim hearing held on March 12, 2020 (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and all applicable local rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as

A. **Petition Date**.  On March 8, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

B. **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C. **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue for the Cases and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E. **DIP Loan**.  DIP Borrower proposes that it obtain post-petition financing (the "DIP Facility") from the DIP Lender pursuant to the terms set forth in this Interim Order and in that certain form of Debtor-In-Possession Credit and Security Agreement (the "DIP Credit Agreement") and that certain Revolving Credit Note (collectively with the DIP Credit Agreement, the "DIP Loan Documents"), each in substantially the form as filed on the docket in these chapter 11 proceedings on March 13, 2020.

F. **Debtor Operations**.  DIP Borrower is unable to operate without the

such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Liquidity provided by the DIP Facility.

G. **Inability to Obtain Alternative Credit**. DIP Borrower asserts that it is unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense in an amount necessary to fund operations and that financing on a post-petition basis is not otherwise available to pay operating expenses or wage obligations to its employees without the DIP Borrower granting, pursuant to Bankruptcy Code Section 364(c)(1), claims having priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code and the granting of a senior priming lien pursuant to Bankruptcy Code Section 364(d).

H. **Good Faith**. The DIP Lender and the DIP Borrower have negotiated at arms' length and in good faith regarding the DIP Facility. Entry of this Interim Order is in the best interests of the Debtors, their estates and their creditors.

I. **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

J. **Interim Debt Limit**. The DIP Borrower has requested immediate entry of this Interim Order so that the DIP Lender will advance funds in an amount not to exceed $10,000,000.00 during this Interim Period in accordance with the DIP Loan Documents.

K. **Avoid Immediate and Irreparable Harm**. The partial relief granted herein to obtain the Interim DIP Loan (as defined herein) is necessary to avoid immediate and irreparable harm to the Debtor's estate. This Court concludes that entry of this Interim Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the Debtor to continue servicing its necessary contracts and providing services to its customers without interruption.

L.  **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition ABL Agent; (iv) counsel to the Prepetition Term Loan Agent; (v) counsel to the Consultant (as defined in the Consulting Agreement); and (v) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.  **Motion Granted**. The Motion is granted.

2.  **Authorization For Interim DIP Loan**. The DIP Borrower is expressly authorized and empowered to obtain credit pursuant to the DIP Loan Documents and this Interim Order on an interim basis (the "Interim DIP Loan") for the purchase of inventory during the Interim Period.

3.  **Terms of the Interim DIP Loan**. The terms of the Interim DIP Loan are governed by the DIP Loan Documents between the DIP Lender and the DIP Borrower, as modified by this Interim Order; *provided, however,* notwithstanding anything to the contrary in the Motion or the forms of the DIP Loan Documents annexed to the Motion: (a) the "Maximum advance Amount" (as defined in the DIP Credit Agreement) shall be **Twenty Million and 00/100 U.S. dollars ($20,000,000.00);** (b) the aggregate balance of outstanding advances outstanding at any time pursuant to this Interim Order shall not exceed **Ten Million and 00/100 U.S. dollars**

**($10,000,000.00)**; and Section 14(a)(i) of the DIP Credit Agreement is deemed amended to strike the text "[April 7, 2020]" and replace it with "April 9, 2020". The Debtors are authorized to revise, execute and deliver the DIP Loan Documents to conform with this Paragraph 3.

        4.        **Additional DIP Loan Documents; Non-Material Amendments**. The DIP Borrower may enter into such other agreements, instruments and documents as may be necessary or required or requested by the DIP Lender in its sole discretion to evidence the Interim DIP Loan and to consummate the terms and provisions contemplated by the DIP Loan Documents and this Interim Order and to evidence perfection of the liens and security interests to be given to Lender hereunder. The DIP Borrower and the DIP Lender may enter into any nonmaterial amendments of or modification to the DIP Loan Documents without the need of further notice and hearing or order of this Court.

        5.        **The DIP Indebtedness**. The Interim DIP Loan and all other indebtedness and obligations incurred by the DIP Borrower on or after the Petition Date with respect to loans, advances and any other indebtedness or obligations, contingent or absolute, pursuant to this Interim Order and the Interim DIP Loan which may now or from time to time hereafter be owing by the DIP Borrower to the DIP Lender (including principal, accrued and unpaid interest, fees, costs and expenses, including without limitation reasonable attorneys' fees and expenses, and any other amounts owed under this Order or the DIP Loan Documents) are referred to herein as the "DIP Indebtedness".

        6.        **Interest, Fees, Costs and Expenses**. The DIP Indebtedness shall bear interest at the applicable non-default rate as set forth in the Motion and in the DIP Loan Documents. Notwithstanding the foregoing, nothing in this Interim Order shall be construed to

limit or otherwise impair the liability of the DIP Borrower for all of the DIP Indebtedness under the DIP Loan Documents.

7.  **Termination of the DIP Loan**. DIP Lender's obligation to provide the Interim DIP Loan shall immediately and automatically terminate (except as DIP Lender may otherwise agree in writing in its sole discretion), and all DIP Indebtedness shall be immediately due upon the earlier of (i) closing of a § 363 sale of substantially all of the DIP Borrower's assets; or (ii) the occurrence of an Event of Default (as defined in the DIP Loan Documents). In the event of a postpetition default of the terms of this Interim Order and/or the DIP Loan Documents, the DIP Lender may declare the DIP Indebtedness immediately due and owing; provided that the DIP Lender may not exercise any remedies against the DIP Borrower upon default without first providing five (5) business days' notice of default to the DIP Borrower, obtaining a hearing date and without further order of the Court.

8.  **DIP Intercreditor Provisions**. Notwithstanding anything to the contrary herein, (a) the DIP Lenders shall not have a lien on any Prepetition or Postpetition Collateral[5] that is not DIP Collateral, (b) the Prepetition ABL Agent (for the benefit of itself and the Prepetition ABL Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders and the Prepetition ABL Permitted Prior Liens, (c) the Prepetition Term Loan Agent (for the benefit of itself and the Prepetition Term Loan Lenders) shall have a lien (and corresponding adequate protection lien) on the DIP Collateral, junior only to the DIP Lenders, the Prepetition ABL Agent and the Prepetition Term Loan Permitted Prior Liens, (d) the

---

[5]  Capitalized terms used in this paragraph 8 but not otherwise defined shall have the meanings ascribed to such terms in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 93) (the "Interim CC Order").

DIP Indebtedness shall not be repaid from (or have any recourse to) any proceeds of Prepetition or Postpetition Collateral that is not DIP Collateral, and (e) the Debtors shall cause the proceeds of DIP Collateral to be deposited into a segregated, non-commingled account which is required to be subject to the control of the DIP Lender and the Debtors' use of such proceeds shall be subject to, and distributed in accordance with, the DIP Loan Documents and the Budget.

9. **Security for DIP Loan**.  As security for the DIP Indebtedness, the DIP Lender is granted a valid, perfected, first priority priming lien (the "<u>DIP Lien</u>") against the DIP Collateral, as that term is defined in the DIP Loan Documents; *provided, however,* that the DIP Lien shall be junior only to the pre-existing liens on and security interests in such DIP Collateral granted in favor of third parties (other than any Prepetition ABL Secured Party or any Prepetition Term Loan Secured Party (each as defined in the Interim CC Order)) that, as of the Petition Date, (a) were senior in priority under applicable law to the DIP Lien, (b) were not subordinated by agreement or applicable law, and (c) were in existence, valid, enforceable, properly perfected and non-avoidable as of the Petition Date, including any such liens and security interests that were perfected after the Petition Date but relate back to the Petition Date pursuant to section 546(b) of the Bankruptcy Code.  Solely with respect to the DIP Collateral, the DIP Lender is granted an administrative expense in the amount of the Interim DIP Loan with the highest priority under §364(c) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in this Case or any successor case), and shall at all times be senior to the rights of the DIP Borrower, any successor trustee or estate representative in the Case or any successor case.

10. **Perfection of DIP Lien and Limited Stay Relief**. The DIP Lien shall be, and is hereby deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that notwithstanding the provisions of Section 362 of the Bankruptcy Code which stay is lifted for the limited purpose of allowing perfection, the (i) DIP Lender may, at its sole option, file or record or cause the DIP Borrower to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the DIP Borrower's expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as DIP Lender may require, and (ii) DIP Lender may require the DIP Borrower to deliver to DIP Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the DIP Borrower is directed to cooperate and comply therewith. If DIP Lender, in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if DIP Lender, in accordance with the DIP Loan Documents or this Interim Order, elects to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in this Case as of the commencement of this Case but with the priorities as set forth herein. The DIP Lender may (in its sole discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the DIP Borrower has property.

11. **Books and Records**. The DIP Borrower shall permit DIP Lender and any authorized representatives designated by DIP Lender (including, without limitation, its auditors, appraisers and financial advisors) to visit and inspect any of the properties of the DIP Borrower, including the DIP Borrower's financial and accounting records, and to make copies and take extracts therefrom, and to discuss any DIP Borrower's affairs, finances and business with such DIP Borrower's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the DIP Borrower shall promptly provide to DIP Lender any information or data reasonably requested to monitor the Debtor's compliance with the covenants and the provisions of the DIP Loan Documents and this Order.

12. **Effect of Dismissal, Conversion or Substantive Consolidation**. If the DIP Borrower's Case is dismissed, converted, otherwise superseded or substantively consolidated, DIP Lender's rights and remedies under this Interim Order and the DIP Loan Documents shall be and remain in full force and effect as if the DIP Borrower's Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

13. **Order Binding on Successors**. The provisions of this Interim Order shall be binding upon and inure to the benefit of DIP Lender and the DIP Borrower and their respective successors and assigns (including any subsequently appointed trustee, examiner or other estate representative appointed as a representative of the DIP Borrower's estate or of any estate in any

AB_0001315

successor cases). No third parties are intended to be or shall be deemed to be third party beneficiaries of this Interim Order or the DIP Loan Documents.

14.    RESERVED

15.    **Order Binding Upon Parties in Interest**. To the fullest extent that relief is available at a hearing held pending a final hearing as contemplated by Bankruptcy Rule 4001(2), all of the provisions of this Interim Order shall be final and binding on the DIP Borrower (including, without limitation, its successors and assigns), the DIP Borrower's equity holders, and all creditors and other parties in interest, including any Chapter 11 or Chapter 7 trustee hereinafter appointed.

16.    **Effect of Modification of Interim Order**. The DIP Borrower shall not, without DIP Lender's prior written consent (which shall be given or refused in its sole discretion), seek to modify, vacate or amend this Interim Order or any DIP Loan Documents. If any of the provisions of this Interim Order are hereafter modified, vacated or stayed by subsequent order of this or any other Court without DIP Lender's prior written consent, such stay, modification or vacatur shall not affect the validity of any obligation outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such obligations. Notwithstanding any such stay, modification or vacatur, any obligation outstanding immediately prior to the effective time of such modification, stay or vacatur shall be governed in all respects by the original provisions of this Interim Order, and DIP Lender shall be entitled to all the rights, privileges and benefits, including, without limitation, the security interests and priorities granted herein, with respect to all such obligations.

17. **Safe Harbor**. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the DIP Borrower to obtain credit on the terms and conditions upon which the DIP Borrower and Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under Section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in Section 364(e) of the Bankruptcy Code.

18. **Insurance Proceeds and Policies**. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Borrower that in any way relates to the DIP Collateral.

19. **Relationship to Contemplated Sale Transaction.** As contemplated by the Levin-Wolf LOI (attached as Exhibit B to the First Day Declaration), the Sale Agreement (as defined in the DIP Credit Agreement) shall provide for the DIP Lender and Levin Trucking, LLC, the purchasers thereunder, to assume, pay or otherwise satisfy all allowed section 503(b)(9) claims against the DIP Borrower, effective upon and subject to the occurrence of the closing under such Sale Agreement.

20. **Notice of Interim Order**. The DIP Borrower shall promptly serve a copy of this Order, by regular mail upon the creditors holding the 30 largest unsecured claims of each of the Debtor, or the Committee, if appointed, and any other party which theretofore has filed in the Cases a request for special notice with this Court and served such request upon DIP Borrower's counsel.

21. **Objections Overruled or Withdrawn**. All objections to the entry of this Interim Order have been withdrawn or are hereby overruled.

22. **Controlling Effect of Order**. To the extent any provisions in this Interim Order conflict with any provisions of the Motion, or any DIP Loan Document, the provisions of this Interim Order shall control.

23. **Final Hearing**. The Final Hearing to consider entry of the Final Order is scheduled for **April 6, 2020 at 1:00 p.m. (Prevailing Delaware Time)** before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before March 13, 2020, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than **March 30, 2020**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP, 222 Delaware Avenue, Suite 201, Wilmington, Delaware 19801-1611, Attn: Michael J. Barrie and Gregory W. Werkheiser; (ii) counsel to the DIP Lender, Clark Hill PLC, (a) 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219, Attn: William C. Price and Jarrod Duffy, and (b) 824 N. Market Street, Suite 710, Wilmington, Delaware 19801, Attn: Karen Grivner; (iii) the Office of The United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Linda Richenderfer; (iv) lead counsel to the Prepetition ABL Agent, Morgan Lewis & Bockius LLP, (a) 101 Park Avenue, New York, New York 10178-0060, Attn: Jennifer Feldsher, and (b) One Federal

Street, Boston, Massachusetts 02110, Attn: Marjorie Crider and Christopher L. Carter; (v) Delaware counsel to the Prepetition ABL Agent, Burr & Forman LLP, 1201 N. Market Street, Suite 1407, Wilmington, Delaware 19801, Attn: J. Cory Falgowski; (vi) counsel to the Prepetition Term Loan Agent, Greenberg Traurig, LLP, One International Place, Suite 2000, Boston, MA 02110, Attn: Jeffrey M. Wolf; and (vii) counsel to the Committee (if appointed)

       24.     ***Nunc Pro Tunc* Effect of this Interim Order**.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

       25.     **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce the terms of, any and all matters arising from or related to this Interim Order.

**Dated: March 16th, 2020**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

# page left blank

AB_0001320

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Objection Deadline: At the Hearing** |
|  | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET)** |
|  | ) |  |

### DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER
### (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER
### CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL
### CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON,
### AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

hereby submit this motion (this "<u>Motion</u>"), pursuant to section 1112(a) of title 11 of the United

States Code (the "<u>Bankruptcy Code</u>"), Rule 1017(f) of the Federal Rules of Bankruptcy Procedure

(the "<u>Bankruptcy Rules</u>"), and Rule 2002-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"),

for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed

Order</u>"), (i) converting each of the Debtors' chapter 11 cases to cases under chapter 7 of the

Bankruptcy Code, effective as of 12:00 a.m. (prevailing Delaware time on April 7, 2020 (the

"<u>Conversion Date</u>"), (ii) establishing a deadline for filing final chapter 11 fee applications and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

setting a hearing thereon, and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.    These Chapter 11 Cases were pending for just three days when on March 11, 2020, the World Health Organization declared the novel coronavirus disease (COVID-19) outbreak to be a pandemic.[3] These Chapter 11 Cases were pending for just five days when on March 13, 2020, the Trump administration declared a national emergency in response to the COVID-19 outbreak.[4] These Chapter 11 Cases were pending for just six days when on March 14, 2020, government regulators in Pennsylvania, one of four states in which the Debtors' core retail operations are concentrated, issued guidance urging all non-essential retail businesses to close, with other states and localities soon to follow.[5]  And, these Chapter 11 Cases were pending for just eleven to fourteen days when the four states in which the Debtors' principal operations are located — Michigan, Pennsylvania, Ohio and Illinois — issued "stay at home" or "shelter in place" orders requiring, among other things, all non-essential businesses (including the Debtors' retail stores) to shut their doors and mandating that individuals not leave their homes except in limited circumstances.[6]

---

[2]    Capitalized terms used but not defined in this Preliminary Statement have the meanings ascribed to such terms elsewhere in this Motion.

[3]    World Health Organization, WHO Director-General's opening remarks at the media briefing on COVID-19, March 11, 2020 (https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020).

[4]    Pres. Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, dated March 13, 2020 (https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/).

[5]    Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/).

[6]    **Michigan:** Gov. Gretchen Whitmer, Executive Order 2020-21 (COVID-19), dated March 23, 2020 (https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html); **Pennsylvania:** Gov.

2.        Even before government action in response to the COVID-19 pandemic made it impossible for the Debtors' retail operations to continue, the consumer public's understandable fear of the spread of the COVID-19 disease already had a devastating impact on the Debtors' ability to implement their original restructuring plan.  These key components included (a) the continuation of Store Closing Sales at substantially all of the Debtors' 125 Art Van Furniture, Art Van Pure Sleep and Scott Shuptrine Interiors branded locations and eight of the Debtors' Wolf Furniture branded locations, and (b) the operation of 44 Levin Furniture, Levin Mattress and Wolf Furniture locations pending consummation of a going concern sale of those business lines and related assets that was contemplated at the outset of these proceedings.  Unfortunately, by the conclusion of the week ending March 14, 2020, customer traffic in the Debtors' stores — both those participating in the Store Closing Sales program and the Levin and Wolf going concern locations — precipitously dropped below what any of the Debtors' pre-bankruptcy and pre-COVID-19 pandemic financial could have predicted.  As a consequence, it was quickly evident that continued retail operations of any sort would cause the Debtors to incur expenses for the foreseeable future that far outstripped the revenues generated.  Ultimately, of course, the aforementioned restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease effectively removed any choice the Debtors had in the matter by mandating that the Debtors discontinue all retail operations and other non-essential business operations.

---

Tom Wolf, Executive Order, dated March 19, 2020 (https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf); **Ohio:** Dir. Of Public Health, Amy Acton, Stay at Home Order, dated March 22, 2020 (https://content.govdelivery.com/attachments/OHOOD/2020/03/22/file_attachments/1407840/Stay%20Home%20Order.pdf); and **Illinois:** Gov. JB Pritzker, Executive Order in Response to COVID-19 (COVID-19 Executive Order No. 8), dated March 20, 2020 (https://www2.illinois.gov/IISNews/21288-Gov._Pritzker_Stay_at_Home_Order.pdf).

3.      By late March, the exponential spread of the COVID-19 disease throughout the United States, along with the resulting state and locally imposed limitations and prohibitions on non-essential retail operations, had left the Debtors with few potentially viable options.  Further, these extraordinary and unprecedented events have made it extremely difficult for the Debtors and their advisors to predict with any reasonable certainty the best path forward in these proceedings for the Debtors and their estates.  At present, no one can predict with any reliability how long the shelter-in-place orders issued in many states where the Debtors operate will remain in effect.  In fact, the Trump administration just recently extended social distancing guidelines from April 15, 2020 through April 30, 2020.[7]  And, even assuming regulatory barriers to resuming retail operations are lifted in the near future, no one can predict with any reliability what consumer appetite will exist for furniture, given the economic and other trauma that the nation is undergoing presently.[8]

4.      In order to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that may eventually be distributable to their creditors, the Debtors had initially hoped — consistent with what has been recently approved in certain other retail chapter 11 bankruptcy proceedings[9] — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these chapter 11 cases until such time as the broader economic and public safety

---

[7]     *See, e.g.,* Michael D. Shear, "Trump Extends Social Distancing Guidelilnes Through End of April," *The New York Times* (Pub. March 29, 2020, updated April 1, 2020) (https://www.nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html)

[8]     *See, e.g.,* Ed Yong, "How the Pandemic Will End," *The Atlantic* (March 25, 2020) (exploring different plausible scenarios for resolution of the COVID-19 epidemic with some taking 12-18 months for society to return to a level of normalcy).

[9]     *See* Order Establishing Temporary Procedures and Granting Related Relief, entered March 30, 2020 [D.I. 217], *In re CraftWorks Parent, LLC, et al.,* Case No. 20-10475 (BLS) (Bankr. D. Del.); Order Temporarily Suspending the Debtors' Chapter 11 Case Pursuant to 11 U.S.C. §§ 105 and 305, entered March 27, 2020 [D.I. 166], *In re Modell's Sporting Goods, Inc., et al.,* Case No. 20-14179 (VFP) (Bankr. D.N.J.).

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to this Court and parties in interest at the status conference held that day.

5.       Unfortunately, despite the Debtors and their advisors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, no viable path forward in chapter 11 emerged that would garner the support of the Debtors' senior secured lenders and certain other stakeholders.  With the COVID-19 pandemic still raging and by all reputable accounts likely to get worse in the next several weeks before it improves, the execution risk associated with any of these strategies appears to be unacceptably high for the Debtors to garner the support their senior secured lenders and other stakeholders necessary for the Debtors to be able to move forward.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is likely inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consummated by the time the Debtors and their senior secured lenders conceivably might have some visibility into if or when any of these restructuring alternatives could be successfully implemented.

6.       Furthermore, the Debtors have no ability, without the consent of the Prepetition ABL Agent, to implement any case suspension-based restructuring strategy.  Of necessity, on or about March 19, 2020, after communicating with representatives of the Prepetition ABL Agent on several occasions about the Debtors' increasing operating losses and need to take appropriate

action to prevent further dissipation of the Debtors' assets, the Debtors ceased operating their retail stores as going concerns and thereafter dismissed the vast majority of their employees. As a result, the Debtors have no top line revenue, such that each dollar expended by the Debtors at this point is not being replaced. For this and other reasons, the Debtors have no ability to demonstrate that their secured lenders are adequately protected to the degree required for the Debtors continue using cash collateral and other collateral without their consent. And, under the terms of the Interim CC Order, absent extraordinary relief from the Court, the consent of the Senior Secured Parties to use cash collateral and other collateral will expire no later than the end of the day Monday, April 6, 2020.

7.     The Debtors, thus, find themselves with no choice other than to move for the prompt conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Though this path is a difficult one that the Debtors are following only after exhausting all other alternatives, under these dire circumstances, the Debtors believe that converting these cases is in the best interests of the Debtors' estates. The Debtors understand that the conversion of Chapter 11 Cases is supported by the Debtors' senior lenders and not opposed by the Committee.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested herein are section 1112(a) of the Bankruptcy Code, Bankruptcy Rule 1017(f), and Local Rule 2002-1.

## BACKGROUND

### A.  General Background.

12.     On March 8, 2020 (the "Petition Date"), each of the Debtors commenced with this Court voluntary cases  (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS) pursuant to Bankruptcy Rule 1015.

14.     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of David Ladd, Executive Vice President and Chief Financial Offer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 12], incorporated by reference herein.

15.     At the commencement of these cases, the Debtors operated 169 stores in eight states, specifically Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, West Virginia, and Virginia.[10]  The Debtors also have four regional distribution centers, three of which are leased and one of which is owned. The Debtors are headquartered in Warren, Michigan and had approximately 4,500 employees as of the Petition Date.

---

[10]     The vast majority of the Debtors' stores were located in four states: Michigan; Ohio; Pennsylvania; and Illinois.  The remaining five states listed above accounted for only 16 of the Debtors' 169 retail locations as of the Petition Date.

16.     As set forth in the First Day Declaration, the Debtors filed these chapter 11 cases with the intention of liquidating their inventory through store closing sales (the "Store Closing Sales") conducted with the assistance of the Consultant and other proposed professionals, paying down their secured debt, and using any remaining proceeds of their Store Closing Sales to windup their operations.   Also as set forth in the First Day Declaration and Exhibit B thereto, as of the Petition Date, the Debtors were party to a binding letter of intent for a going concern sale of 44 Levin and Wolf stores and related assets and operations (the "Levin-Wolf Sale"). The Debtors intended to effectuate this restructuring through the consensual use of cash collateral.

17.     In furtherance thereof, on or around the Petition Date, the Debtors filed, among other things:

a.  *Debtors' Application for Entry of Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 3];

b.  *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 5]; and

c.  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores, (III) Authorizing Assumption of the Consulting Agreement Under §§ 363 and 365 of the Bankruptcy Code, (IV) Authorizing the Debtors to Retain Certain Consultant Entities as Special Asset Disposition Advisors to the Debtors Pursuant to § 327(a) of the Bankruptcy Code and (V) Granting Related Relief* [D.I. 52] (the "Store Closing Motion").

18.     On March 10, 2020 (as continued, in part, to March 12, 2020), the Court held a hearing (the "First Day Hearing") following which it entered certain orders, including: (a) an order [D.I. 77], pursuant to 28 U.S.C. § 156(c), appointing Kurtzman Carson Consultants LLC ("KCC") as the Claims and Noticing Agent for these Chapter 11 Cases (the "Claims Agent");  (b) the Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,

and (V) Granting Related Relief [D.I. 93] (the "Interim CC Order"); and (c) an order [D.I. 143] granting limited relief in connection with the Store Closing Motion on an interim basis.

19.     Shortly after the Petition Date, the Debtors filed applications to employ and retain: (a) Benesch, Friedlander, Coplan & Aronoff, LLP ("Benesch"), as their proposed general bankruptcy counsel [D.I. 142]; (b) Montgomery McCracken Walker & Rhoads ("MMWR"), as their proposed special counsel [D.I. 193]; (c) Alvarez & Marsal North America LLC ("A&M"), as their proposed financial advisors [D.I. 145]; and (d) Jones Lang Lasalle Americas, Inc. ("JLL," and together with Benesch, MMWR and A&M, the "Debtors' Professionals"), as their proposed real estate consultants and advisors [D.I. 141].  The applications to employ and retain Benesch, A&M and JLL, each are scheduled to be heard on April 6, 2020, at 1:00 p.m. (ET).  The application to employ and retain MMWR is scheduled to be heard on April 27, 2020, at 2:00 p.m. (ET).

20.     On March 18, 2020, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed a seven member Official Committee of Unsecured Creditors in these Chapter 11 Cases (as reconstituted from time to time, the "Committee").  The Committee has engaged and filed applications to employ and retain Pachulski Stang Ziehl & Jones LLP ("Pachulski Stang") as its proposed counsel [D.I. 244] and Alix Partners ("Alix Partners," and together with Pachulski Stang, the "Committee's Professionals"), as its proposed financial advisor [D.I. 241].

**B.  Events in the Chapter 11 Cases.**

21.     Since the First Day Hearing, the exponential spread of COVID-19 has wrought economic and social havoc across the country and the globe.  As discussed in the Preliminary Statement, on the afternoon of March 13, 2020, President Trump declared COVID-19 a national

emergency and most of the states in which the Debtors operate have also declared states of emergency and issued "stay at home" or "shelter-in-place" type orders.

22.     Notwithstanding the careful planning and modeling of the Debtors and their advisors, since shortly after the Petition Date, the Debtors' situation has changed drastically as a result of COVID-19.  Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the Store Closing Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23.0 million;[11] however, for the <u>full</u> week ending March 15th, deposits from sales were just $8.0 million.  It quickly became apparent to the Debtors' management and advisory teams that continued retail operations of any sort were causing the Debtors to incur expenses (and would do so for the foreseeable future) that far outstripped any revenues being generated through the Debtors' continued retail operations.

23.     By March 14, 2020, Governor Tom Wolf of Pennsylvania, where 25 of the Debtors' stores and two of their distribution centers are located, had issued guidance urging all non-essential businesses to close.[12]  Two days later, Governor Wolf repeated and amplified that guidance, declaring: "The Wolf Administration is relying on businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health ...."[13] Similarly, on March 16, 2020, Governor Gretchen Whitmer of Michigan — where

---

[11]     The Debtors, however, did not realize the cash proceeds from most of these sales because just prior to the Petition Date and immediately thereafter, certain of the Debtors' credit card processor banks purported to exercise rights to intercept the proceeds from such transactions and redirect them into chargeback reserve accounts.

[12]     Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts, March 14, 2020 (https://dced.pa.gov/newsroom/wolf-administration-issues-guidance-to-non-essential-businesses-as-part-of-covid-19-mitigation-efforts/)

[13]     Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts, March 16, 2020 (https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/).

the Debtors' headquarters, a distribution center and 82 of their stores are located — entered an executive order that closed Michigan's bars, theaters, casinos and other public spaces.[14] While Michigan's initial order did not explicitly mandate closing of all non-essential retail establishments, it was accompanied by appropriately alarming statement from Governor Whitmer urging Michigan residents to "mak[e] smart choices" by "not putting [themselves] or others at risk by going out in public unless it is absolutely necessary."[15] Government authorities in Ohio and Illinois also issued similar guidance and direction.

24.    As detailed in the Preliminary Statement, on March 19, 2020, Pennsylvania became the first of the four states in which the Debtors' major retail and fulfillment operations are located to issue a "stay at home" or "shelter in place" type order. Similar orders soon followed in Michigan, Ohio and Illinois, all of which also were in lock-down by March 23, 2020.

25.    Although the situation was evolving rapidly, the Debtors' board, management team and advisors were paying close attention to the threat COVID-19 posed to the health and welfare of the Debtors' employees and customers and to the financial impact on the Debtors' businesses. The Debtors' board, management team and advisors were in near constant communication about these events as they unfolded in mid-March. Moreover, the Debtors and their advisors worked to the best of their ability under these circumstances to keep their secured lenders and other stakeholders informed about these challenges and exhausted all efforts to work with them to develop viable responses to the rapidly deteriorating situation. When no other viable alternative emerged, on March 19, 2020, the Debtors made the painful decision to suspend all retail operations

---

[14]    Governor Whitmer Signs Executive Order Temporarily Closing Bars, Theaters, Casinos, and Other Public Spaces; Limiting Restaurants to Delivery and Carry-Out Orders, March 16, 2020 (https://www.michigan.gov/coronavirus/0,9753,7-406-98158-521763--,00.html).

[15]    *Id.*

and terminate the majority of their employees — moves the Debtors hoped at the time would be only temporary measures.

26.     Further compounding the Debtors' problems, on March 19, 2020 the proposed purchaser for the Levin-Wolf Sale notified the Debtors that they would not proceed with the transaction at that time, effectively ending any hope the Debtors had to consummate a going concern transaction for the Levin and Wolf furniture operations and dashing hopes to save upwards of a 1,000 jobs.

27.     Late in the day on March 19, 2020, however, the Prepetition ABL Agent issued a purported Termination Declaration under the Interim CC Order.  Pursuant to Paragraph 21 of the Interim CC Order, a valid Termination Declaration issued on March 19th would have triggered a Remedies Notice Period five business days' in length.  Thereafter, the Prepetition ABL Agent agreed to extend any Remedies Notice Period relating to the alleged Termination Declaration through the end of the day on Tuesday, March 31, 2020, and then again through and including the end of the day on Monday, April 6, 2020.

28.     Following these events, the Debtors and their advisors continued to work with the Prepetition ABL Agent, the Committee, and their respective advisors to identify solutions for the Debtors' deteriorating situation that would allow them to preserve to the greatest extent possible the value of the Debtors' assets and maximize the proceeds thereof that might eventually be distributable to their creditors.  The Debtors had hoped — consistent with what has been recently approved this Court in the *CraftWorks* chapter 11 cases and by the District of New Jersey bankruptcy court in the *Modell's* chapter 11 cases — to pursue relief from this Court authorizing the Debtors to "mothball" their remaining assets and operations and to suspend substantially all activity in these Chapter 11 Cases until such time as the broader economic and public safety

situations stabilized and hopefully improved sufficiently to allow the Debtors to resume value-maximizing actions for the benefit of their creditors and other stakeholders. After consultation with advisors for the Prepetition ABL Agent and the Committee, as of last Thursday, March 26, 2020, the Debtors believed that they had at least conceptual support for pursuing this path, as the Debtors reported to the Court that day.

29.     Both before and after the March 26th status conference, the Debtors, with the assistance of their advisors and in consultation with the Prepetition ABL Agent, the Committee and their respective advisors, were working to develop and evaluate several potentially value maximizing alternatives for the Debtors to pursue after the contemplated suspension of operations and downscaling of activities in these Chapter 11 Cases came to an end.  One such path was to resume Store Closing Sales at all of the Debtors' locations where it would be financially and operationally viable to do so.  A second path considered was to focus on one or more bulk sales most or all of the Debtors' inventory, equipment, and other readily monetizable assets. Additionally, the Debtors and their advisors examined several "middle" paths for the Debtors and their estates, which would involve various combinations of resuming Store Closing Sales at certain locations and bulk-selling inventory, equipment, and certain other assets associated with other locations.

30.     To be clear, each of the post-suspension restructuring alternatives explored by the Debtors had the prospect of producing some return to the Debtors' senior secured lenders and potentially to other stakeholders.  But none of the potential scenarios showed a reasonable chance of generating a recovery for the Debtors' senior secured lenders coming anywhere near what the pre-COVID 19 pandemic modeling had suggested.  Indeed, under most scenarios, the Prepetition ABL Secured Parties, which at the outset of these proceedings were projected to receive a full

recovery on their approximately $34 million of Prepetion ABL Obligations by the mid-point of the Store Closing Sales Process, would not get out whole before their ABL Priority Collateral was fully monetized.

31.     Despite the Debtors working around the clock for days, in consultation with the Prepetition ABL Agent, the Committee and others, these concerted efforts were unable to produce a path forward in chapter 11 that would garner the support of their senior secured lenders and potentially other stakeholders.  Unfortunately, with the COVID-19 pandemic still raging and by all reputable accounts likely to get worse before it improves, the perceived execution risk of any of these restructuring strategies has proven to be an insurmountable  barrier to the Debtors ability to obtain the necessary support of their secured lenders and others.  The Debtors' ability to implement any of these strategies is further confounded by the reality that what remains of the Debtors' cash on hand is inadequate to implement certain of these restructuring alternatives, such as the resumption of GOB Sales.  Even in the reasonable best case forecasts available to the Debtors, virtually all of their remaining cash on hand would be consumed by operating expenses before the Debtors and their senior secured lenders would have meaningful visibility into whether these restructuring alternatives could be successfully implemented.

32.     By Monday, March 30, 2020, the Debtors were effectively out of time, with their access to Cash Collateral under the Interim CC Order then due to terminate at the end of the following day.  Although it was clear by this point in the proceedings that the Debtors would be unable to continue these Chapter 11 Cases without the support and consent of their senior secured lenders, unresolved issues existed as to what obligations would and would not be funded under the terms of the Interim CC Order prior to any conversion of the Chapter 11 Cases.  Recognizing the contributions that their employees had made to the Debtors' businesses postpetition and the

extreme hardship that many of the employees and their families were apt to experience as a result of losing their jobs in the midst of an ongoing pandemic and associated economic crisis, the Debtors attempted everything in their power to ensure that employee payroll and related employee obligations would be fully funded under the Interim CC Order.

33.     These efforts were to a degree successful.  At a hearing held on March 31, 2020, the Court confirmed that the Debtors would have access to Cash Collateral to fund and pay current payroll obligations, including wages, salaries and commissions.  The cash available, however, was insufficient for it to be possible for the Debtors to provide at this time for payment in full of other employee related obligations, such as coverage obligations for employee healthcare expenses and certain other benefits plans that were, in whole or part, self-funded by the company.[16]  Even though this situation is primarily the result of the COVID-19 pandemic and other circumstances entirely beyond the Debtors' control, the Debtors deeply regret that they are not in a position to be able to do more for their employees, customers, vendors, landlords and other stakeholders.

34.     Based upon the foregoing, the Debtors have considered the circumstances in which they find themselves, and have concluded that converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is in the best interests of the Debtors' estates.

---

[16]     The Debtors estimate the total unfunded trailing liabilities under their partially self-funded employee health plan to be approximately $8.5 million. Under self-funded plans, like the ones the Debtors had established for their employees in the ordinary course of business prior to the Petition Date, when employees and their covered dependents receive covered services the resulting charges are remitted to the plan's claims administrator for processing.  Thereafter, the approved claims are batched and remitted to the Debtors for payment.  The remittance of the batched claims to the Debtors for payment can trail the rendering of services to employees by up to several months. In general, the Debtors terminated health care covered for their employees effective as of the dates such employees separated from the company.  Thus, the estimated $8.5 million of trailing obligations is on account of covered healthcare services to covered persons provided prior to each such employee's termination date.  Although the Debtors' original budget for these Chapter 11 Cases contemplated the funding of such trailing employee healthcare plan obligations, the COVID-19 pandemic's disruption of the Debtors' ability to operate postpetition  combined with the issuance of a Termination Declaration under the Interim CC Order that followed, left the Debtors with inadequate cash on hand and inadequate access to additional cash with which to fund such obligations.

## RELIEF REQUESTED

35.     By this Motion, the Debtors request entry of the Proposed Order, pursuant to section 1112(a) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date, (ii) establishing a deadline for filing final chapter 11 professional fee applications and setting a date for a hearing thereon, and (iii) granting related relief.

36.     The Debtors also request that the Court approve the following procedures in connection with the conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code (the "Conversion Procedures"):

a.  **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees.  To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

b.  **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain

copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

## **BASIS FOR RELIEF**

### A. **The Conversion Relief Should be Granted**

37. Section 1112(a) of the Bankruptcy Code provides that a debtor may convert a case to chapter 7 as a matter of right. *See* H.R. Rep. No. 95-595, 1st Sess. 405 (1977) ("Subdivision (a) gives the debtor an absolute right to convert a voluntarily commenced chapter 11 case in which the debtor remains in possession to a liquidation case"); *see also Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142 (5th Cir. 1988) ("[A] debtor has the absolute right to convert [its] Chapter 11 case to a Chapter 7 case"). There are only three circumstances where a debtor is precluded from exercising that right: (i) the debtor is not a debtor in possession; (ii) the case was originally commenced as an involuntary case under chapter 11; or (iii) the case was converted to a case under chapter 11 other than at the debtor's request. 11 U.S.C. § 1112(a).

None of those exceptions is applicable in these Chapter 11 Cases. Therefore, the Debtors are entitled, as an absolute right, to convert the Chapter 11 Cases to cases under chapter 7.

38. In addition, conversion of these Chapter 11 Cases to cases under chapter 7 is in the best interests of the Debtors' estates and creditors. The Debtors no longer have funding to administer these Chapter 11 Cases. Thus, although there is substantial inventory and equipment remaining in the Debtors' stores and distribution centers and other estate assets that may be available to satisfy certain creditor claims, without an ability to fund ongoing administrative expenses, the Debtors have no ability to pursue the recovery of those assets or prosecute a chapter 11 plan. Accordingly, the Debtors believe there is no reasonable likelihood that the Debtors could confirm and consummate a chapter 11 plan, and respectfully submit that a chapter 7 trustee will be able to more efficiently and effectively bring these cases to their conclusion.

39. Accordingly, the Debtors respectfully request that the Court enter an order converting the Debtors' cases from chapter 11 to chapter 7, effective as of the Conversion Date.

**B.      The Conversion Procedures and Other Related Relief Should Be Approved**

40. Pursuant to Local Rule 2002-1(f)(xi), "[u]pon conversion of a chapter 11 case to a chapter 7 case, if there are more than 200 creditors, the claims agent appointed in the chapter 11 case shall . . . submit a termination order." Del. Bankr. L.R. 2002-1(f)(xi).

41. Accordingly, the Debtor requests that the conversion order sought hereby also provides for the termination of KCC services as claims and noticing agent in these Chapter 11 Cases.

42. The Debtor also believes that the Conversion Procedures are appropriate under the facts of this case and should be approved. The Conversion Procedures include, among other things, a request to extend the deadline under Bankruptcy Rule 1019(1)(A) for the filing of any statements

and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) from fourteen (14) days after

the Conversion Date to forty-two days (42) after the Conversion Date.

43.     The Court has authority to grant the requested extension under Bankruptcy Rules

1007(c) and 9006(b) and Bankruptcy Local Rule 1007-1(b). Bankruptcy Rule 1007(c), together

with Bankruptcy Rule 9006(b), allows the Court to extend the filing deadline for the Schedules

and Statements "for cause shown." Similarly, Bankruptcy Local Rule 1007-1(b) provides that such

an extension may be granted for cause. Showing "cause" merely requires that a debtor

"demonstrate some justification for the issuance of the order," and bankruptcy courts will normally

grant such extensions "in the absence of bad faith or prejudice to the adverse party." *See, e.g.,*

*Bryant v. Smith,* 165 B.R. 176, 182 (W.D. Va. 1994) (discussing the standard for granting

extensions under Bankruptcy Rule 1007) (internal citations and quotation marks omitted).

44.     Because of the COVID-19 pandemic and other extremely difficult circumstances

that have defined these Chapter 11 Cases, the Debtors and their advisors have had virtually no free

time or resources available since he Petition Date to devote to the preparation of schedules and

statements required by Bankruptcy Rules 1019(1)(A) and 1007(b).  Given the extent of work that

remains to be done and the extremely limited resources remaining with which to undertake such

work, which conditions both exist through no fault of the Debtors and their advisors, the Debtors'

respectfully submit that "cause" exists to extend this deadline. Moreover, since these proceedings

are still in their very early stages, the granting of such an extension is unlikely to prejudice the

trustee, any creditor or any other party in interest.

## <u>NOTICE</u>

45.     Notice of this Motion has been provided to: (i) the U.S. Trustee for the District of

Delaware; (ii) proposed counsel for the Committee; (iii) the agents under the Debtors' prepetition

secured facilities and counsel thereto; and (iv) any party that has requested notice pursuant to Bankruptcy Rule 2002.  A copy of this Motion is also available on the website of the Debtors' notice and claims agent at https://www.kccllc.net/artvan.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## RESERVATION OF RIGHTS

46.     The Debtors understand that employee payroll, the Carve Out and all other obligations that are required to be funded and paid under the Interim CC Order, including without limitation Paragraph 2 thereof, have been or will be funded and paid prior to the Conversion Date. Nevertheless, in the event that such obligations are not funded and paid as required under the Interim CC Order, the Debtors reserve all rights for themselves and their estates, including but not limited to any chapter 7 trustee that may hereafter be appointed.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially

in the form attached hereto, granting the relief requested in this Motion and granting such other

relief as is appropriate under the circumstances.

Dated:  April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP**

  _/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer Hoover (DE No. 5111)
Kevin Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
      mbarrie@beneschlaw.com
      jhoover@beneschlaw.com
      kcapuzzi@beneschlaw.com
      kharmon@beneschlaw.com
      jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in
Possession_

# Exhibit A

AB_0001342

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) Case No. 20-10553 (CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. _____** |
| | ) |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]     Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.     The Motion is GRANTED, as set forth herein.

2.     Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.     The following Conversion Procedures are hereby approved:

   a.   **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with its terms; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the priorities set forth in the Bankruptcy Code.

b. **Books and Records.** As soon as reasonably practicable, but in no event more than fourteen (14) days after the appointment of the interim chapter 7 trustee, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

c. **Schedules and SOFA**. To the extent not already filed with the Court, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

d. **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

e. **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

f. **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

4.     Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

5.     Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting*

*Related Relief* [D.I. 93] (the "<u>Interim CC Order</u>"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent <u>Nunc Pro Tunc</u> to the Petition Date* [D.I. 77] (the "<u>Claims Agent Order</u>") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6.       Except as expressly provided in Paragraph 5 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder. All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety. For the avoidance of doubt and without in any way limiting the foregoing, all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order).

7.       For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or

(ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

8.      Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

9.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

AB_0001347

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline: At the Hearing** |
| | ) | **Hearing Date: April 6, 2020 at 1:00 p.m. (ET) (requested)** |
| | ) | |

## NOTICE OF VIDEO AND TELEPHONIC HEARING REGARDING DEBTORS' <u>CORRECTED</u> MOTION FOR ENTRY OF AN ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on April 3, 2020, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed the *Debtors <u>Corrected</u> Motion for Entry of an Order (I) Converting Their Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing a Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* (the "<u>Motion</u>") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "<u>Bankruptcy Court</u>"). A copy of the Motion is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on **April 6, 2020 at 1:00 p.m. (ET)**, before the Honorable Chief Judge Christopher S. Sontchi via video and telephonic conference.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).  The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

**PLEASE TAKE FURTHER NOTICE THAT THE HEARING IS PROCEEDING VIA ZOOM USING THE FOLLOWING INSTRUCTIONS:**

> **Topic: Art Van Furniture 20-10553 - Hearing**
> **Time: Apr 6, 2020 1:00 PM Eastern Time (US and Canada)**
> **Join Zoom Meeting**
> **https://uchicago.zoom.us/j/911880719**
> **Meeting ID: 911 880 719**

**DO NOT COME TO THE COURTHOUSE. ANY PARTY WHO WISHES TO PRESENT EVIDENCE OR EXAMINE WITNESSES IS REQUIRED TO ACCESS VIA ZOOM. ANY PARTY WHO WISHES TO ACCESS VIA ZOOM MUST ALSO MAKE AUDIO ARRANGEMENTS THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**OTHER PARTIES IN INTEREST MAY MAKE ARRANGEMENTS TO PARTICIPATE BY TELEPHONE AT THE HEARING THROUGH COURTCALL BY TELEPHONE (888-882-6878) OR FACSIMILE (310-743-1850).**

**PLEASE TAKE FURTHER NOTICE THAT, IF NO RESPONSES OR OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.**

AB_0001349

Dated: April 3, 2020
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**

_/s/ Gregory W. Werkheiser_
Gregory W. Werkheiser (DE No. 3553)
Michael J. Barrie (DE No. 4684)
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
Kate Harmon (DE No. 5343)
John C. Gentile (DE No. 6159)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: gwerkheiser@beneschlaw.com
        mbarrie@beneschlaw.com
        jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        kharmon@beneschlaw.com
        jgentile@beneschlaw.com

_Proposed Counsel to the Debtors and Debtors in
Possession_

3

AB_0001350

**page left blank**

AB_0001351

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ART VAN FURNITURE, LLC, *et al.*,[1] | ) | Case No. 20-10553 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 252** |
| | ) | |

## ORDER (I) CONVERTING THEIR CHAPTER 11 CASES TO CASES UNDER CHAPTER 7, (II) ESTABLISHING A DEADLINE FOR FILING FINAL CHAPTER 11 FEE APPLICATIONS AND SETTING A HEARING THEREON, AND (III) GRANTING RELATED RELIEF

Upon consideration of the corrected motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of an order, pursuant to section 1112(a) of the Bankruptcy Code, (i) converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, (ii) establishing a deadline for filing final chapter 11 fee applications, and (iii) granting related relief; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that this is a core matter pursuant to 28 U.S.C. § 157(b)(2) and that this

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Art Van Furniture, LLC (9205); AVF Holding Company, Inc. (0291); AVCE, LLC (2509); AVF Holdings I, LLC (2537); AVF Holdings II, LLC (7472); AVF Parent, LLC (3451); Levin Parent, LLC (8052); Art Van Furniture of Canada, LLC (9491); AV Pure Sleep Franchising, LLC (8968); AVF Franchising, LLC (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463). The location of the Debtors' service address in these chapter 11 cases is: 6500 East 14 Mile Road, Warren Michigan 48092.

[2]    Capitalized terms used but not otherwise defined in this Order have the meanings ascribed to such terms in the Motion.

Court may enter a final order consistent with Article III of the United States Constitution; and it appearing that venue of these chapter 11 cases and of the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate notice of the Motion has been given under the circumstances, and that no other or further notice need be given; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED, as set forth herein.

2.      Effective as of 12:00 a.m. (prevailing Delaware time), on April 7, 2020 (the "Conversion Date"), the Chapter 11 Cases shall be converted to cases under chapter 7 of the Bankruptcy Code.

3.      The following Conversion Procedures are hereby approved:

    a.  **Professional Fees.** To the extent professionals currently or hereafter retained in the Chapter 11 case have not already submitted final fee applications to the Court (the "Final Fee Applications"), all professionals shall submit Final Fee Applications in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and orders of this Court by no later than thirty (30) days after the Conversion Date (the "Final Fee Application Deadline"). Objections, if any, to the Final Fee Applications shall be filed and served by no later than twenty-one (21) days after the Final Fee Application Deadline. The Court will schedule a hearing, if necessary, at the Court's convenience and subject to the Court's availability, on such Final Fee Applications within fourteen (14) days thereafter or such later date as the Court determines. To the extent no objections are filed to a given professional's final fee application, such professional may file a Certificate of No Objection, and the Court may, in its sole discretion, enter an order approving such fees. To the extent the Court approves a Final Fee Application after the Conversion Date, all approved amounts owed for professional fees and expenses shall be paid (x) first, from each professional's retainer to the extent such retainers exist; (y) next, from the Carve Out Reserves (as defined in the Interim CC Order) in accordance with the terms of the Interim CC Order; and (z) thereafter, from the Debtors' chapter 7 estates in accordance with the Interim CC Order and the priorities set forth in section 726(b) the Bankruptcy Code.

      b.   **Books and Records.** As soon as reasonably practicable, but in no event later than April 10, 2020, the Debtors shall turn over or provide access to the chapter 7 trustee the books and records of the Debtors in the Debtors' possession and control, as required by Bankruptcy Rule 1019(4). For purposes hereof, the Debtors may provide copies (including electronic copies) of such books and records to the chapter 7 trustee, or instructions for locating and accessing such books and records, and may retain copies of such books and records to the extent necessary to complete the reports required herein.

      c.   **Schedules and SOFA.** Without prejudice to the chapter 7 trustee's ability to request further extensions and any party in interest's ability to oppose such requests, the statements and schedules required by Bankruptcy Rules 1019(1)(A) and 1007(b) shall be filed within forty-two (42) days after the Conversion Date.

      d.   **Schedule of Unpaid Debts.** Within fourteen (14) days of the Conversion Date, the Debtors shall file a schedule of unpaid debts incurred after commencement of the Debtors' Chapter 11 Cases, including the name and address of each creditor, as required by Bankruptcy Rule 1019(5).

      e.   **Final Report**. Within thirty (30) days after the Conversion Date, the Debtors shall file and transmit to the chapter 7 trustee a final report and account in accordance with Bankruptcy Rule 1019(5)(A).

      f.   **Claims**. Within fourteen (14) days of the Conversion Date, KCC shall (i) forward to the Clerk of this Court an electronic version of all imaged claims; (ii) upload the creditor mailing list into CM/ECF; (iii) docket a final claims register in the Debtors' Chapter 11 Cases; and (iv) box and transport all original claims to the Philadelphia Federal Records Center, 14470 Townsend Road, Philadelphia, PA 19154 and docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

    4.    Subject to its compliance with Del. Bankr. L.R. 2002-1(f)(x)-(xi), on the Conversion Date, KCC shall be relieved of its responsibilities as the Debtors' claims and noticing agent in the Debtors' Chapter 11 Cases and will have no further obligations to the Court, the Debtors, the chapter 7 trustee (once appointed), or any party in interest with respect to the Debtors' Chapter 11 Cases or the chapter 7 cases.

    5.    Notwithstanding anything to the contrary in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured*

*Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 93] (the "Interim CC Order"), KCC shall be treated as a Professional Person (as such term is defined in the Interim CC Order) solely for the purpose of KCC's eligibility to have its fees and expenses paid from the Carve Out Reserves or otherwise as part of the Carve Out (each as defined in the Interim CC Order). To the extent that KCC is entitled, or hereafter becomes entitled, to payment of its fees and expenses in accordance with the *Order Appointing KCC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [D.I. 77] (the "Claims Agent Order") and the Agreement (as defined in the Claims Agent Order), such fees and expenses shall be Allowed Professional Fees (as defined in the Interim CC Order) for purposes of the Carve Out.

6. Notwithstanding anything to the contrary in the Interim CC Order, the Carve Out Reserves shall be established and funded as follows: (a) $2,593,000 (the "Carve Out Escrow Funds") of the Debtors' funds shall be wired into an IOLTA account at proposed general bankruptcy counsel for the Debtors, Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch"), pursuant to wire instructions Benesch has provided to the Prepetition ABL Agent, where such funds shall be held in trust for the applicable beneficiaries of the Carve Out and disbursed strictly in accordance with the terms of this Order and the Interim CC Order (as modified hereby); and (b) the Carve Out Reserve for the Chapter 7 Trustee Carve Out shall be deemed funded by allowing $50,000 of the Debtors' funds to remain in a bank account of the Debtors where such funds shall remain available to satisfy the reasonable fees and expenses of any interim or permanent chapter 7 trustee, as applicable, for the Debtors' bankruptcy cases. The Carve Out Escrow Funds shall be disbursed by Benesch only as follows: (i) with respect to the portion of the Carve Out Escrow Funds allocable to KCC for fees and expenses incurred as the Claims Agent, in accordance with the procedures set forth in the Claims Agent Order and KCC's Agreement; (ii) with respect to the

portions of the Carve Out Escrow Funds allocable to the Debtor Professionals (other than, for the avoidance of doubt, KCC) and the Committee Professionals, upon entry of, and in accordance with the terms of, such further order or orders of the Court as may be entered following the filing of Final Fee Applications and notice and opportunity to object thereto in accordance with the procedures set forth in Paragraph 3(a) above; and (iii) with respect to the portion allocable to fees required to be paid to (A) the Clerk of the Court and (B) the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, as may hereafter be directed by the interim or final chapter 7 trustee, as applicable.

7.      Except as expressly provided in Paragraphs 5 and 6 above, nothing in this Order or the conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code shall affect or modify the terms of the Interim CC Order, prejudice any person or entity's rights thereunder or relieve any person or entity of obligations thereunder.  All rights, claims, remedies, defenses and obligations under and in connection with the Interim CC Order shall be reserved and preserved in their entirety.  For the avoidance of doubt and without in any way limiting the foregoing, (a) all rights and obligations in respect of the Carve Out and the Carve Out Reserves (each as defined in the Interim CC Order) shall survive any termination of the Specified Period (as defined in the Interim CC Order), and (b) any lien priorities or superpriority claims granted pursuant to the Interim CC Order to secure payment of the Carve Out shall be limited to the Carve Out Reserves, once funded.

8.      For the avoidance of doubt, with respect to cash and cash equivalents in the possession, custody or control of any Debtor as of the date of entry of this Order, neither the entry of this Order, nor any relief granted hereunder, nor the occurrence of the Conversion Date for any Debtor's Chapter 11 Case shall have any effect on whether such cash or cash equivalents (i) are or

are not funds collected on account of "trust fund taxes" and held in trust for the benefit taxing authorities or other governmental units (as defined in section 101(27) of the Bankruptcy Code) or (ii) are or are not property of any Debtor's bankruptcy estate pursuant section 541 of the Bankruptcy Code.

9.      The Debtors have a need for the services of certain independent contractors, including individuals who are former employees of the Debtors (collectively, "Independent Contractors") following the Conversion Date in order to, among other things, (a) provide on-site security at the Debtors' distribution centers, and (b) continue the collection and the Debtors' books and records for transmission to the chapter 7 trustee, prepare the Schedule of Unpaid Debts and prepare the Final Report.  The Debtors are authorized to pay the Independent Contractors from cash on hand in advance for their work and related expenses in an aggregate amount not to exceed $73,243 and as further set forth in the Estimated Disbursements Forecast April 6th - April 10th provided to the Prepetition ABL Agent on April 5, 2020.  After April 10, 2020, the chapter 7 trustee will determine whether, and to what extent, to continue to use the services of the Independent Contractors.

10.      Nothing herein shall affect the Order Granting the Motion of Jofran Sales, Inc. for Injunctive Relief entered on March 27, 2020, in Adversary Proceeding 20-50546.

11.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: April 6th, 2020
Wilmington, Delaware

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

# Wolf Administration Issues Guidance to Non-essential Businesses as Part of COVID-19 Mitigation Efforts

March 14, 2020

*Businesses in Bucks, Chester, Delaware, Montgomery counties urged to close for 14 days*

Harrisburg, PA – Today, the Department of Community and Economic Development (DCED), in consultation with the Department of Health (DOH), issued guidance for non-essential businesses in Bucks, Chester, Delaware, and Montgomery counties to mitigate the spread of COVID-19.

Governor Tom Wolf has strongly urged non-essential businesses in the four counties to close during their county-specific mitigation periods to protect employees, customers, and suppliers and limit the spread of the virus through personal contact and surfaces. DCED and DOH are reaching out to businesses through a letter (https://dced.pa.gov/letter-from-secretary-levine) to provide guidance on the types of businesses that are urged to close. The letter also indicates to businesses that financial assistance opportunities are available to mitigate the financial impact of closures.

"We are committed to keeping all Pennsylvanians safe and healthy, and we are taking every measure to prevent the spread of COVID-19," said DCED Secretary Dennis Davin. "We continue to report new cases of coronavirus every day, and additional steps must be taken to stop the spread. Therefore, we strongly urge non-essential businesses across Pennsylvania to do their part by temporarily closing to help mitigate the spread of this contagious virus."

Non-essential businesses include community and recreation centers; gyms, including yoga, barre and spin facilities; hair salons, nail salons and spas; casinos; concert venues; theaters; bars; sporting event venues and golf courses; retail facilities, including

∧
Back
To Top

AB_0001358

7/25/22, 1:... Wolf Administration Issues Guidance to Non-Essential Businesses as Part of Covid-19 Mitigation Efforts | Department of Co…

Case 1:22-cv-00450-CFC   Document 22-9   Filed 07/25/22   Page 57 of 91 PageID #: 4755

shopping malls and except for pharmacy or other health care facilities within retail operations. Restaurants are urged only to remain open for carry-out and delivery orders.

"We understand that small businesses are an economic driver in Pennsylvania, and a temporary closure will be a financial and community disruptor," Davin said. "However, our top priority is maintaining public health and safety of all Pennsylvanians and taking these proactive steps now can help mitigate a potential community spread. DCED is committed to working with the business community to provide helpful resources for financial assistance."

DCED offers working capital loans that could be of assistance to businesses impacted by COVID-19. Resources and information will be posted to https://dced.pa.gov/resources (https://dced.pa.gov/resources) as they become available. The U.S. Small Business Administration, in addition to local funding partners, may also be a source of assistance for affected businesses.

The Wolf Administration strongly encourages businesses to act now before the governor or the Secretary of Health finds it necessary to compel closures under the law for the interest of public health, including section 7301 of the Emergency Management Services Code.

MEDIA CONTACTS:

Casey Smith, DCED, 717.783.1132

Lyndsay Kensinger, Gov. Wolf, 717-783-1116

# # #

 covid-19 (https://dced.pa.gov/tag/covid-19/)



Back To Top

# ALL NON-LIFE-SUSTAINING BUSINESSES IN PENNSYLVANIA TO CLOSE PHYSICAL LOCATIONS AS OF 8 PM TODAY TO SLOW SPREAD OF COVID-19

March 19, 2020

**Press Release,  Public Health**

Wolf Administration Orders Closure of Non-Life-Sustaining Businesses at 8 p.m. Today, March 19
Enforcement Actions for Restaurant, Bar Dine-In Closure Began at 8 p.m., March 18
Enforcement Actions for Non-Compliance will Begin at 12:01 a.m. Saturday, March 21

Governor Tom Wolf today ordered all non-life-sustaining businesses in Pennsylvania to close their physical locations as of 8 p.m. today, March 19, to slow the spread of COVID-19. Enforcement actions against businesses that do not close physical locations will begin at 12:01 a.m. Saturday, March 21.

Gov. Wolf's order is here.
A video statement from Gov. Wolf is here.
Sec. of Health's order is here.
A list of life-sustaining businesses is here.

In extenuating circumstances, special exemptions will be granted to businesses that are supplying or servicing health care providers.

"To protect the health and safety of all Pennsylvanians, we need to take more aggressive mitigation actions," said Gov. Wolf. "This virus is an invisible danger that could be present everywhere. We need to act with the strength we use against any other severe threat. And, we need to act now before the illness spreads more widely."

The governor had previously encouraged non-life-sustaining businesses to close to mitigate the spread of COVID-19. Restaurants and bars were already required to stop all dine-in services. Enforcement for establishments with a liquor license began at 8 p.m. March 18, and enforcement for all other food establishments will begin at 8 p.m. tonight. Food establishments can offer carry-out, delivery, and drive-through food and beverage service, including alcohol.

Pursuant to the Emergency Management Services Code, the governor is granted extraordinary powers upon his declaration of a disaster emergency, such as COVID-19. Among these powers, the governor may control the ingress and egress into the disaster area, the movement of persons, and the occupancy of premises within the disaster area, which has been established to be the entire commonwealth for the COVID-19 disaster emergency. The secretary of health separately is authorized under the law to employ measures necessary for the prevention and suppression of disease.

Separately, and taken together, the administration is exercising these powers to temporarily close all non-life-sustaining businesses and dine-in facilities at all restaurants and bars across the commonwealth. Persons must be removed from these premises to cope with the COVID-19 disaster emergency.

**Failure to Comply and Enforcement**
Failure to comply with these requirements will result in enforcement action that could include citations, fines, or license suspensions.

The governor has directed the following state agencies and local officials to enforce the closure orders to the full extent of the law:

- Pennsylvania Liquor Control Board
- Department of Health
- Department of Agriculture
- Pennsylvania State Police
- Local officials, using their resources to enforce closure orders within their jurisdictions

AB_0001360

Private businesses, local organizations and other noncompliant entities that fail or refuse to comply with the governor's orders that protect the lives and health of Pennsylvanians will forfeit their ability to receive any applicable disaster relief and/or may be subject to other appropriate administrative action. Such action may include termination of state loan or grant funding, including Redevelopment Assistance Capital Project (RACP) grant funding and/or suspension or revocation of licensure for violation of the law.

Finally, in addition to any other criminal charges that might be applicable, the Department of Health is authorized to prosecute noncompliant entities for the failure to comply with health laws, including quarantine, isolation or other disease control measures. Violators are subject to fines or imprisonment.

**Business Loans and Support**

The Department of Community and Economic Development (DCED) offers working capital loans that could be of assistance to businesses impacted by COVID-19. Resources and information will be posted to http://dced.pa.gov/resources as they become available. The U.S. Small Business Administration, in addition to local funding partners, may also be a source of assistance for affected businesses.

The Wolf Administration today announced the availability of low-interest loans for small businesses and eligible non-profits in all 67 counties in Pennsylvania through the U.S. Small Business Administration (SBA).

Businesses seeking guidance from DCED can also contact its customer service resource account at ra-dcedcs@pa.gov or by calling 1-877-PA-HEALTH and selecting option 1.

For the most up-to-date information on COVID-19, Pennsylvanians should visit: https://www.pa.gov/guides/responding-to-covid-19/.

AB_0001361

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

START MAN FURNITURE, LLC, et al.[1]

Chapter 7
Case No. 20-10553 (CTG)
Jointly Administered

| | |
|---|---|
| TODD STEWART and JENNIFER SAWLE, on behalf of themselves and all others similarly situated, <br><br>                Appellants, <br><br> v. <br><br><br> ALFRED T. GIULIANO, chapter 7 trustee for Debtors Start Man Furniture, LLC, et al., <br><br>                Appellee. | Civil Action No. 22-cv-450 (CFC) <br><br> Bankruptcy Case No. 20-10553 (CTG) <br> Bankruptcy Adv. Pro. No. 20-50548 (CTG) <br> Bankruptcy BAP No. 22-00030 |
| ALFRED T. GIULIANO, chapter 7 trustee For Debtors Start Man Furniture, LLC, et al., <br><br>                Appellant, <br><br> v. <br><br> TODD STEWART and JENNIFER SAWLE, on behalf of themselves and all others similarly situated, <br><br>                Appellees. | Civil Action No. 22-cv-489 (CFC) <br><br> Bankruptcy Case No. 20-10553 (CTG) <br> Bankruptcy Adv. Pro. No. 20-50548 (CTG) <br> Bankruptcy BAP No. 22-00032 |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, include: Start Man Furniture, LLC (f/k/a Art Van Furniture, LLC) (9205); SVF Holding Company, Inc. (f/k/a AVF Holding Company, Inc.) (0291); SVCE, LLC (f/k/a AVCE, LLC) (2509); StartVF Holdings I, LLC (f/k/a AVF Holdings I, LLC) (2537); StartVF Holdings II, LLC (f/k/a AVF Holdings II, LLC) (7472); SVF Parent, LLC (f/k/a AVF Parent, LLC) (3451); Levin Parent, LLC (8052); Start Man Furniture of Canada, LLC (f/k/a Art Van Furniture of Canada, LLC) (9491); SV Sleep Franchising, LLC (f/k/a AV Pure Sleep Franchising, LLC) (8968); SVF Franchising, LLC (f/k/a AVF Franchising, LLC) (6325); LF Trucking, Inc. (1484); Sam Levin, Inc. (5198); and Comfort Mattress LLC (4463).

DOCS_LA:344077.4 05233/003

<u>**CROSS-APPELLANT'S OPENING BRIEF**</u>

PACHULSKI STANG ZIEHL & JONES LLP
Bradford J. Sandler (Bar No. 4142)
Beth E. Levine (admitted *pro hac vice*)
Colin R. Robinson (Bar No. 5524)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  bsandler@pszjlaw.com
            crobinson@pszjlaw.com
            pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7 Trustee*

DOCS_LA:344077.4 05233/003

AB_0001363

# CORPORATE DISCLOSURE STATEMENT

Each of the Debtors listed below* is wholly directly or indirectly owned by SVF Holding Company, Inc. (f/k/a AVF Holding Company, Inc.) ("<u>Holding</u>").  Holding has no corporate parent, and there is no publicly held corporation that owns 10% or more of its stock.

*<u>Applicable Debtors</u>:  Start Man Furniture, LLC (f/k/a Art Van Furniture, LLC); SVCE, LLC (f/k/a AVCE, LLC); StartVF Holdings I, LLC (f/k/a AVF Holdings I, LLC); StartVF Holdings II, LLC (f/k/a AVF Holdings II, LLC); SVF Parent, LLC (f/k/a AVF Parent, LLC); Levin Parent, LLC; Start Man Furniture of Canada, LLC (f/k/a Art Van Furniture of Canada, LLC); SV Sleep Franchising, LLC (f/k/a AV Pure Sleep Franchising, LLC); SVF Franchising, LLC (f/k/a AVF Franchising, LLC); LF Trucking, Inc.; Sam Levin, Inc.; and Comfort Mattress LLC.

AB_0001364

# TABLE OF CONTENTS

Page

BASIS OF APPELLATE JURISDICTION ..................................................1

STATEMENT OF ISSUE ON CROSS-APPEAL ...................................2

SUMMARY OF ARGUMENT ....................................................2

STANDARD OF REVIEW ........................................................4

STATEMENT OF FACTS ........................................................4

    A.    General Background    4

    B.    The Planned Liquidation Process    6

    C.    The Chapter 11 Cases    10

    D.    Plaintiffs' Termination by Debtors and the Conversion to Chapter 7  12

    E.    The Adversary Proceeding    15

    F.    Bankruptcy Court Ruling [Adv. D.I. 63 & 64]    16

ARGUMENT ..................................................................17

    AVF Was A Liquidating Fiduciary At The Time Of The Layoff And Was Thus Not Subject To The WARN Act Pursuant To Binding Third Circuit Precedent    17

CONCLUSION ................................................................23

AB_0001365

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Flint Glass Workers Union v. Anchor Resolution Corp.*,
197 F.3d 76 (3d Cir. 1999) ...................................................................... 4

*Bailey v. Jamesway*,
1997 Bankr. LEXIS 825 (Bankr. S.D.N.Y. 1997) .................................. 19

*Farrell v. Planters Lifesavers Co.*,
206 F.3d 271 (3d Cir. 2000) .................................................................... 4

*Fields v. Thompson Printing Co., Inc.*,
363 F.3d 259 (3d Cir. 2004) .................................................................... 4

*Hanover Potato Products, Inc. v. Shalala*,
989 F.2d 123 (3d Cir. 1993) .................................................................... 4

*In re Mushroom Transp. Co., Inc.*,
382 F.3d 325 (3d Cir. 2004) .................................................................... 4

*In re United Healthcare Sys.*,
1997 U.S. Dist. LEXIS 5090 (D.N.J. March 26, 1997) ........................ 20

*In re United Healthcare System, Inc.*,
200 F.3d 170 (3d Cir. 1999) ........................................................... passim

*Marco v. Accent Pub. Co.*,
969 F.2d 1547 (3d Cir. 1992) .................................................................. 4

*Newark Morning Ledger Co. v. United States*,
734 F.Supp. 176 (D.N.J. 1990) ............................................................. 20

*Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*,
481 B.R. 268 (Bankr. S.D. N.Y. 2012) .................................................. 18

*Walsh v. Century City Doctors Hosp., LLC (In re Century City Doctors Hosp., LLC)*,
417 B.R. 801 (Bankr. C.D. Cal. 2009) ................................................... 18

## STATUTES

28 U.S.C. § 157(a) .......................................................................................... 1

28 U.S.C. § 157(b)(1) ..................................................................................... 1

28 U.S.C. § 158(a) ........................................................................................ 16

28 U.S.C. § 1334(a) ......................................................................................... 1

29 U.S.C. § 2101(a)(1) .................................................................................. 17

AB_0001366

**RULES**

Federal Rule of Civil Procedure 56(c) ................................................................................. 4

Bankruptcy Rule 8001 ......................................................................................................... 16

Bankruptcy Rule 8002 ......................................................................................................... 16

**REGULATIONS**

54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989) ........................................................ 17

AB_0001367

Cross-Appellant and Appellee Alfred T. Giuliano, Chapter 7 Trustee ("Trustee" or "Cross-Appellant"), in connection with his cross-appeal to the United States District Court for the District of Delaware from the final order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), set forth in its *Opinion* and *Order* filed on March 21, 2022 [Adv. D.I. 63 & 64] (Appendix A001693-A001721 and A001722, respectively) (the "Opinion" or "Order"),[2] hereby submits his Cross-Appellant's Opening Brief.

## BASIS OF APPELLATE JURISDICTION

The Bankruptcy Court had jurisdiction over the voluntary petition for relief under Title 11 of the United States Code (the "Bankruptcy Code"). The Bankruptcy Court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a). The Bankruptcy Court had jurisdiction over the adversary proceeding as a core proceeding in accordance with 28 U.S.C. § 157(b)(1).

This Court has jurisdiction over this timely appeal from the Opinion and the Order of the Bankruptcy Court, which denied the Trustee's motion for summary judgment (the "SJ Motion") solely with respect to the "liquidating fiduciary" exception under the Federal Worker Adjustment and Retraining Notification Act.

---

[2] All citations herein to "Adv. D.I. __" refer to the adversary proceeding docket in Adversary Number 20-50548 (CSS). All citations to "Bankr. D.I. __" refer to the Debtors' lead Chapter 11 Case, Case No. 20-10553 (CSS).

AB_0001368

Pursuant to the Opinion and the Order, the Bankruptcy Court granted the SJ Motion in favor of the Trustee on all other bases.[3]

## STATEMENT OF ISSUE ON CROSS-APPEAL

Did the Bankruptcy Court err in finding that the "liquidating fiduciary" exception to the Federal Worker Adjustment and Retraining Notification Act (the "WARN Act") does not apply to the instant case?

## SUMMARY OF ARGUMENT

The Third Circuit Court of Appeals has specifically held that where, as here, a chapter 11 debtor-in-possession has ceased operating as a going concern and is merely conducting a liquidation, it is not operating a "business enterprise" and is therefore not, an "employer" subject to the WARN Act.[4] *In re United Healthcare System, Inc.*, 200 F.3d 170, 178 (3d Cir. 1999), *cert denied*, 530 U.S. 1204 (2000). The Bankruptcy Court erred by incorrectly determining that the "liquidating fiduciary" exception to WARN Act liability established in *United Healthcare* does not apply to the instant case.

Importantly, as discussed below, the *United Healthcare* court explained that the application of the "liquidating fiduciary" exception would be subject to a sliding scale: "the more closely the [debtor's] activities resemble those of a business

---

[3] Pursuant to the Opinion and Order, the Bankruptcy Court granted the Trustee's SJ Motion with respect to the following: (i) the "unforeseen business circumstances" exception under the WARN Act applies in this case; and (ii) the COVID-19 pandemic falls within the "natural disaster" exception under the WARN Act.

[4] The WARN Act defines an "employer" as "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a)(1).

AB_0001369

winding up its affairs, the more likely it is the entity is not subject to the WARN Act." 200 F.3d at 178.  The Third Circuit did not view a debtor's liquidation process in a chapter 11 case, including a postpetition sale of the debtor's goodwill (i.e., a going concern sale), as the conduct of business "in the normal commercial sense" that would make the entity an employer for WARN Act purposes.

In determining that the "liquidating fiduciary" exception did not apply, the Bankruptcy Court erroneously focused on the facts that the Debtors conducted postpetition going-out-of-business ("GOB") sales at a number of stores, which would be closed thereafter, and kept certain stores temporarily open pending the going-concern sale of those stores to a third party in the bankruptcy case.  But the United Healthcare court recognized that a debtor's actions in connection with and/or in preparation of a goodwill/going concern sale (including limited postpetition business operations) can be consistent with and part of the liquidating fiduciary function and an exception to WARN liability.  As in United Healthcare, the Debtors' actions here, from the beginning of the Chapter 11 Cases (and even before the Chapter 11 Cases), publicly and openly demonstrated a clear intent to liquidate the Debtors' stores and other assets, and not to operate their business "in the normal commercial sense."  200 F.3d at 177 (quoting 54 Fed. Reg. at 16045).

Accordingly, the Opinion and the Order of the Bankruptcy Court should be reversed solely with respect to the Bankruptcy Court's rulings relating to the "liquidating fiduciary" exception.  The Bankruptcy Court erred in not granting

AB_0001370

summary judgment in favor of the Trustee on the basis of the "liquidating fiduciary" exception articulated by the Court of Appeals for the Third Circuit.

## <u>STANDARD OF REVIEW</u>

This appeal involves review of the Bankruptcy Court's grant of summary judgment, a purely legal determination governed by a *de novo* standard of review. *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). The District Court assesses the record using the same standards for summary judgment employed by the Bankruptcy Court. *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 335 (3d Cir. 2004) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)). A Bankruptcy Court abuses its discretion when its ruling is founded on a clearly erroneous finding of fact, an error of law, or a misapplication of law to the facts. *Marco v. Accent Pub. Co.*, 969 F.2d 1547, 1548 (3d Cir. 1992); *Hanover Potato Products, Inc. v. Shalala*, 989 F.2d 123, 127 (3d Cir. 1993).

Summary judgment is appropriate where the moving party can demonstrate "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Appellant is entitled to the evidence in the light most favorable to the non-movant, "draw[ing] all reasonable inferences in favor of the non-moving party." *Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 265 (3d Cir. 2004).

## <u>STATEMENT OF FACTS</u>

### A.   <u>General Background</u>

AB_0001371

Prior to March 8, 2020 (the "Petition Date"), the Debtors had sold furniture for over 60 years, with 169 stores in Michigan, Indiana, Ohio, Illinois, Pennsylvania, Maryland, Missouri, and Virginia, and approximately 4,500 employees.[5]

On the Petition Date, Art Van Furniture, LLC ("AVF"), Sam Levin, Inc. ("SLI") and the other related above-captioned debtors (collectively, the "Debtors" or "Art Van") commenced their respective voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") to continue liquidating substantially all of their assets, an effort which had started before the Petition Date. The Debtors' cases are being jointly administered under lead Case No. 20-10553 (CSS). Upon the Debtors' motion (the "Conversion Motion"), based on the facts and circumstances described further below, on April 6, 2020, less than a month after the Petition Date, the Chapter 11 Cases were converted to chapter 7 proceedings (the "Cases").

The Debtors filed the Chapter 11 Cases with the express intention of winding down their affairs by liquidating their inventory through store closing sales (the "GOB Sales"), paying down their secured debt, and using any remaining proceeds of their GOB Sales to wind-down their operations.[6] In addition, as of the Petition Date, the Debtors were party to a binding letter of intent for a sale of 44 Levin and Wolf stores and related assets and operations to a third party buyer. The GOB Sales, the Levin Sale (as defined and described below), and other actions taken by the

---

[5] *Declaration of David Ladd, Executive Vice President and Chief Financial Officer of Art Van Furniture, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Bankr. D.I. 12] ("Ladd Declaration") at 2 (Appendix A0000001-000032).

[6] Ladd Declaration at ¶¶ 6 & 18.

AB_0001372

Debtors in the Chapter 11 Cases were all part of the orderly liquidation and wind-down started by the Debtors before and continuing after the Petition Date (the "Planned Liquidation Process") to maximize the liquidation value of the estates' assets and the recoveries for the Debtors' creditors.[7]

## B.    The Planned Liquidation Process

In the months leading up to the Petition Date, Art Van struggled under the weight of poor sales and $208.5 million in secured debt encumbering substantially all of its assets made up of: (i) $33.5 million in an asset-backed loan ("ABL Loan") from Wells Fargo Bank ("Wells Fargo") and (ii) a $175 million term loan (the "Term Loan") from FS KKR Capital Corp. (the "Term Lenders" and together with Wells Fargo, the "Secured Lenders").[8] Art Van defaulted on the ABL Loan on February 5, 2020 and had only been able to obtain a forbearance from Wells Fargo through February 28, 2020, giving it 23 days to find a buyer, an investor or a means of recapitalizing the business.  As a condition to the forbearance, Wells Fargo insisted that the Debtors begin preparing for going-out-of-business (GOB) sales.[9]

In spite of the Debtors' efforts over the next 23 days in February 2020, by February 28, 2020, the Debtors were unable to secure financing or attract a going concern buyer.[10]  The forbearance period ended on that date, and the Debtors had no

---

[7] Ladd Declaration at ¶¶ 6, 16, 17, 18, 19, 20, 40, 41, 42 & 43.

[8] *See* Ladd Declaration at ¶¶ 7, 8, 13, 14, 16, 17, 18, 31-36.

[9] *See* Ladd Declaration at ¶¶ 14 & 36.

[10] *See* Transcript of March 10, 2020 hearing (attached as Exhibit B to Sandler Declaration) at p. 55, line 25 to 57, line 20 (Appendix A000530-A000532); Ladd Declaration at ¶¶ 14-15.

AB_0001373

alternative but to commence an orderly wind-down of their operations and liquidate their assets.[11] To that end, before the Petition Date, the Debtors negotiated a wind-down budget with Wells Fargo ("Wind-Down Budget"), hired a liquidator, and announced publicly that after decades of operations, they were going out of business.[12]

As part of the Planned Liquidation Process, on March 4, 2020, SLI entered into a letter agreement (the "Levin LOI") pursuant to which it agreed to liquidate certain stores (most of which were in Pennsylvania), two distribution centers and certain other assets (the "SLI Assets") by a sale to Robert Levin (the "Levin Sale").[13] The Levin Sale was expected to be approved in bankruptcy and consummated in or about early April 2020.

The Levin LOI contemplated that although the Levin Sale stores would be monetized by liquidating those assets, the Levin Sale stores would briefly continue operating under the Art Van banner to preserve their value for the buyer pending the

---

[11] *See* Ladd Declaration at ¶¶ 16-18.

[12] *See* Ladd Declaration at ¶¶ 16-18; *Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. D.I. 93] (the "Interim CC Order") at 13 (Appendix A000238-A000302). On March 5, 2020, the Debtors entered into an agreement (the "Consulting Agreement") with HilcoMerchant Resources, LLC (the "Liquidator") (Appendix A001084-A001123). *See* Interim CC Order at 12. *See also* "Art Van Furniture to close all stores, including 24 in Illinois," *Chicago Tribune*, March 5, 2020, available at https://www.chicagotribune.com/business/ct-biz-art-van-shutting-down-20200305-2efw2ukfk5g2dfpzgooebjv7ry-story.html (Appendix A000776-A000779) ("Art Van GOB Press Release").

[13] Robert Levin had owned the stores that were the subject of the Levin LOI prior to them being sold to the Debtors.

AB_0001374

approval of the Levin Sale by the Bankruptcy Court.[14]  Because the Debtors had no money to operate these stores (they only had the money that Wells Fargo had agreed to let them use to conduct the GOB Sales), Robert Levin agreed to extend $10 million of debtor-in-possession (DIP) financing to SLI (the "Levin DIP Loan") to facilitate the bankruptcy process to allow for the Bankruptcy Court's approval of the Levin Sale, which $10 million then would be repaid with and deducted from the sales proceeds of the Levin Sale.[15]

In sum, as of March 5, 2020, the Debtors had put into place an orderly full business liquidation process, comprised of the GOB Sales to liquidate AVF's assets including 125 stores and the Levin Sale to liquidate the SLI Assets.

On March 5, 2020, Art Van publicly announced that it was liquidating and going out of business.[16]  Indeed, plaintiffs have acknowledged and admitted that the

---

[14] *See* Ladd Declaration at ¶¶ 40-41.  *See also Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. Sections 105, 361, 364(c) and 364(d); and (II) Granting Related Relief* [Bankr. D.I. 49] ("Levin DIP Motion") (Appendix A000033-A000109).

[15] *See* Levin DIP Motion; *Interim Order* on Levin DIP Motion [Bankr. D.I. 137] ("Interim Levin DIP Order").  Because the Levin DIP Loan would be repaid with and deducted from the sales proceeds of the Levin Sale, this financing transaction and the Debtors' related alleged "operation" of the Levin Stores were done to preserve the value of these stores until consummation of the Levin Sale for the benefit of the third party buyer, not the Debtors.  The foregoing cannot be reasonably considered to be the "normal" operation of a business.

[16] *See* Art Van GOB Press Release; "Art Van Furniture to Close All Stores; Going Out of Business Sales to Start Friday, March 6," *PRNewswire* (March 5, 2020), available at https://www.prnewswire.com/news-releases/art-van-furniture-to-close-all-stores-going-out-of-business-sales-to-start-friday-march-6-301017308.html (Art Van "announced today it has made the difficult decision to wind down operations and begin liquidation sales"); M. Feighan, *et al.*, "'Heartbroken,' 'angry': Art Van closing shocks customers, city leaders," *The Detroit News* (March 5, 2020), available at https://www.detroitnews.com/story/news/local/michigan/2020/03/05/art-van-close-all-stores-start-going-out-business-sale-friday/4962367002/ ("Art Van Furniture, a Metro Detroit institution and one of the largest furniture retailers in the Midwest, will close all of its company-owned stores and liquidate its inventory ….").

Debtors began their liquidation plan at this time. *See Class Action Adversary Proceeding Complaint For Violation of WARN Act 29 U.S.C. § 2101, et seq.* [Adv. Docket No. 1] (the "<u>Complaint</u>") (Appendix A000335-A000345), at ¶ 25 ("… Debtors began to execute on its planned liquidation.").

On March 5, 2020, as part of its Planned Liquidation Process, although not required, AVF issued a WARN Act notice to approximately 1,400 potentially "affected employees" who worked in or reported to seven facilities in Michigan, two facilities in Illinois and one in Pennsylvania. Each of the Plaintiffs who worked at an affected location in Michigan and were notified as follows:

> Art Van Furniture, LLC (the "<u>Company</u>") has made the difficult decision to wind-down its operations, which will include the closure of its facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI,49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, and will be permanently terminating the employment of all employees at these locations.
>
> The Company submits this notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 <u>et seq</u>. (the "<u>WARN Act</u>"). If no obligations exist, this notice is being provided to you voluntarily.
>
> All terminations of employment will be permanent and you will not have bumping rights for other positions (<u>i.e.</u>, you will not have the right to displace employees with less seniority). While an exact date has not yet been established for these closures, it is anticipated that your employment with the Company will terminate on May 5, 2020 or a date

AB_0001376

> within 14 days thereafter which may be provided to you by the Company (your "Termination Date"). Nothing in this letter alters your at-will employment status with the Company.
>
> You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "GOB Sale WARN Notice") (Appendix A000875).[17]

The Debtors' target date to end the GOB Sales was the end of April 2020.[18] The GOB Sales commenced as expected, and went well at first.[19]

## C.    The Chapter 11 Cases

On the Petition Date, the Debtors filed their Chapter 11 Cases and filed "first day motions" to obtain approval of, *inter alia*, the Wind-Down Budget,[20] the Levin DIP,[21] and GOB Sales and the Consulting Agreement with the Liquidator.[22]  On March 11, 2020, the Bankruptcy Court entered an interim cash collateral order,

---

[17] Notably, given how transparent and proactive Art Van was from early on in informing its employees and the public and other parties in interest of Art Van's liquidation and wind-down, it cannot be credibly argued that the Debtors were engaged in gamesmanship to avoid any legitimate WARN Act liabilities.

[18] *See* Ladd Declaration at ¶ 18 (Debtors seeking to complete store closure sales in six to eight weeks from March 5, 2020).

[19] *Corrected Motion for Entry of Order Converting Their Chapter 11 Cases to Cases Under Chapter 7* [Bankr. D.I. 252] (Appendix A000304-A000333) (the "Conversion Motion") at ¶ 22.

[20] *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Bankr. D.I. 5] (Appendix A000908-A000934).

[21] *See* Levin DIP Motion; Interim Levin DIP Order.

[22] *See Debtors' Motion for Entry of Interim and Final Orders  (I) Approving Procedures for Store Closing Sales, (II) Authorizing Customary Bonuses to Employees of Closing Stores; (III) Authorizing Assumption of Consulting Agreement and (IV) Granting Related Relief* [Bankr. D.I. 52] (Appendix A000110-A000237).

authorizing the Debtors to use cash collateral in accordance with the Wind-Down Budget until April 7, 2020 (unless terminated earlier due to default or entry of a final order) to conduct the GOB Sales. The Wind-Down Budget assumed that the GOB Sales would continue unabated through April 30, 2020, and provided that "the failure by the Debtors to continue sales of the Assets in accordance with the Consulting Agreement and to assume the Consulting Agreement on a timely basis" is a default, and thus, the Debtors continued their ongoing GOB sales.[23]

The unprecedented and extraordinary adverse effects during this period (social, economic, and business) caused by the COVID-19 pandemic, confronting the Debtors and many other businesses, are a matter of public record.[24] Among other signs of the escalation of the pandemic, on March 13, 2020, then-President Donald Trump declared a national emergency.[25]

Art Van continued the hearing on its first day motions to March 12, 2020. The Bankruptcy Court apologized for taking the bench 40 minutes late, saying, "I very much apologize. As I'm sure you all are aware, things are developing very quickly. It is taking a lot of my time."[26] At the hearing, the Bankruptcy Court and the U.S.

---

[23] Interim CC Order at pp. 34-35.

[24] *See Declaration of Bradford Sandler* [Adv. D.I. 46] (Appendix A000435-A001427) (the "Sandler Declaration"), Exhibits L to S attached thereto (Appendix A001206-A001250).

[25] *See* Sandler Declaration, Exhibit L attached thereto (Appendix A001206-A001208).

[26] Transcript of March 12, 2020 Hearings (attached as Exhibit K to Sandler Declaration) at p. 5, lines 5-7. (Appendix A001129).

AB_0001378

Trustee expressed concerns about the fee in the Liquidator's Consulting Agreement and continued that portion of the Debtors' GOB sale motion to March 20, 2020.

**D.**      **Plaintiffs' Termination by Debtors and the Conversion to Chapter 7**

Notwithstanding the careful planning of the Debtors and their advisors, as a result of the COVID-19 pandemic and resultant shutdowns, shortly after the Petition Date, the Debtors' situation changed drastically upending the Debtors' plans for an orderly liquidation. Customer traffic in the Debtors' stores, which had been robust just days earlier, dissipated to almost nothing within the first week after the Petition Date. Specifically, during the initial days of the GOB Sales from March 5-8, 2020, deposits from inventory sales were in excess of $23 million; however, for the full week ending March 15, 2020, deposits from sales were just $8 million,[27] suggesting, among other things, a precipitous drop in customer traffic in the Debtors' stores. Further, on March 19, 2020, the proposed purchaser for the Levin Sale notified the Debtors that they would not proceed with the transaction, and thus, the stores covered by the Levin Sale would also have to be immediately closed by the Debtors.[28]

Ultimately, the restrictions on economic and other activity that various state and local governments determined to be necessary to slow the spread of the COVID-19 disease mandated that the Debtors discontinue all retail operations and other non-

---

[27] Conversion Motion at ¶ 22.

[28] Conversion Motion at ¶ 26.

essential business operations – a scenario they had not and could not have planned for when they developed their Planned Liquidation Process.[29]

Soon thereafter, the Debtors' management, with their professionals' counsel and assistance, determined that the Planned Liquidation Process, in its then-existing form, was no longer viable and that a more immediate shutdown of the Debtors' stores and remaining support operations was in the estates' and creditors' best interest.[30]  Thus, on March 19, 2020, the Debtors made the painful decision to suspend all sales operations in all stores and terminate the majority of their employees, excluding workers who would be needed for the rest of the liquidation and wind-down process.[31]

Accordingly, on March 19, 2020, AVF issued a WARN Act notice to employees which stated:

> On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.
>
> ***Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative***

---

[29] Conversion Motion at ¶¶ 1-2.

[30] Conversion Motion at ¶¶ 1-2.

[31] Conversion Motion at ¶ 25.

AB_0001380

*economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").*

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

(the "COVID WARN Notice") (Appendix A001252) (emphasis added).

Plaintiffs Todd Stewart and Jennifer Sawle were two of AVF's employees, and each worked at one of AVF's 82 stores in the State of Michigan (where AVF also had it main trucking terminal, its corporate headquarters and a distribution center). Mr. Stewart was a store manager at an AVF Store in Shelby Township, Michigan; and Ms. Sawle was a salesperson at an AVF Store in Lansing, Michigan. In accordance with the COVID WARN Notice, the Trustee believes that Mr. Stewart

AB_0001381

and Ms. Sawle were both terminated by AVF, as were most of AVF's and SLI's employees, on March 20, 2022 (the "Layoff").[32]

Wells Fargo declared a default under the Interim CC Order, and terminated use of cash collateral as of March 24, 2020; later extended through March 31 and finally April 6.[33] Unable to continue the Chapter 11 Cases without the continued consent of the Debtors' secured lenders to use their cash collateral, the Debtors filed the Conversion Motion and the Chapter 11 Cases were converted to chapter 7 proceedings pursuant to an order entered on April 6, 2020.[34] In ruling on the Conversion Motion, Judge Sontchi stated:

> This case is very unfortunate. It's really been a parade of unfortunate events that has kind of conspired to put a long-standing, solid business into liquidation. And, as I sit here today, I certainly don't have enough information to blame anyone or anything other than the coronavirus and the disaster it has left in its wake.[35]

Upon the conversion, Alfred Giuliano was appointed as the chapter 7 trustee [Bankr. D.I. 264] (Appendix A000334).

## E.     The Adversary Proceeding

On March 23, 2020, Plaintiffs initiated the adversary proceeding (the "Adversary Proceeding") by filing the Complaint (Appendix A000335-A000345) in

---

[32] Complaint, at ¶¶ 6, 7, 10.

[33] Conversion Motion at ¶ 27.

[34] *See* Order Granting Debtor's Amended Motion to Convert [Bankr. D.I. 263] (Appendix A001344-A001349) ("Conversion Order').

[35] *See* Transcript of April 6, 2020 Hearing (attached as Exhibit X to Sandler Declaration) at 28, line 24 to p. 29, line 5 (Appendix A001378-A001379).

AB_0001382

which they assert that the Debtors violated the WARN Act and seek, *inter alia*, judgment in favor of Plaintiffs and other similarly situated former employees for unpaid wages and other benefits and damages for up to 60 days that would have been otherwise paid, all determined in accordance with the WARN Act.

The Trustee filed an Answer on December 10, 2020 [Adv. D.I. 25] (Appendix A000346-A000362), and in accordance with the Pretrial Scheduling Order [Adv. D.I. 31] (Appendix A000363-A000368), on October 29, 2021, the Trustee filed his First Amended Answer [Adv. D.I. 40] (Appendix A000369-A000387).

## F.     **Bankruptcy Court Ruling [Adv. D.I. 63 & 64]**

On November 12, 2021, the Trustee filed his *Motion for Summary Judgment* [Adv. D.I. 43 & 44] (Appendix A000388-A000389, respectively) and supporting *Statement of Undisputed Facts* [Adv. D.I. 45] (Appendix A000422-A000434) and *Declaration of Bradford Sandler* [Adv. D.I. 46] (Appendix A000435-A001427). Plaintiffs filed their *Opposition* [Adv. D.I. 49] (Appendix A001428-A001652). The Trustee filed his *Reply* in support of the SJ Motion [Adv. D.I. 52] (Appendix A001653-A001692).

On March 21, 2022, the Bankruptcy Court issued its Opinion and Order, pursuant to which the Bankruptcy Court granted the Trustee's SJ Motion, specifically ruling that (i) the "liquidating fiduciary" exception under the WARN Act does not apply to the instant case; (ii) the "unforeseen business circumstances" exception under the WARN Act applies in this case; and (iii) the COVID-19 pandemic falls within the "natural disaster" exception under the WARN Act.

AB_0001383

Plaintiffs appealed the Opinion and Order on or about April 4, 2022 [Adv. D.I. 66] (Appendix A001723-A001727).  The Trustee filed his Notice of Cross-Appeal pursuant to 28 U.S.C. § 158(a) and Bankruptcy Rules 8001 and 8002 [Adv. D.I. 72] (Appendix A001728-A001732).   The Trustee cross-appeals only that portion of the Opinion that found that the "liquidating fiduciary" exception does not apply to the facts set forth in the Adversary Proceeding and the Order only to the extent it incorporates that portion of the Bankruptcy Court's Opinion holding that the "liquidating fiduciary" exception to alleged WARN Act liability was inapplicable.  *See* Opinion, at pp. 13-19.

## ARGUMENT

### AVF Was A Liquidating Fiduciary At The Time Of The Layoff And Was Thus Not Subject To The WARN Act Pursuant To Binding Third Circuit Precedent

The Third Circuit Court of Appeals has specifically held that where, as here, a chapter 11 debtor-in-possession has ceased operating as a going concern and is merely conducting a liquidation, it is not operating a "business enterprise" and is therefore not, an "employer"[36] subject to the WARN Act.  *In re United Healthcare System, Inc.,* 200 F.3d 170, 178 (3d Cir. 1999), *cert denied*, 530 U.S. 1204 (2000).[37]

---

[36] The WARN Act defines an "employer" is "any business enterprise that employs (A) 100 or more employees, excluding part-time employees; or (B) 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)."  29 U.S.C. § 2101(a)(1).

[37] The Department of Labor, the agency responsible for interpreting and implementing WARN Act requirements, has explained in connection with its regulations that "DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligations of the former employer because the fiduciary is not operating a 'business enterprise' in the normal commercial sense."  54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989).

AB_0001384

*United Healthcare* is binding on courts in the Third Circuit.  The Bankruptcy Court

erred by incorrectly construing and applying *United Healthcare* to this case.

In *United Healthcare*, the creditors' committee argued that the debtor-in-

possession -- a hospital that ceased operating and terminated nearly all of its 1,300

employees 16 days after the petition was filed -- was not an "employer" under the

WARN Act.  The Third Circuit Court of Appeals agreed, reasoning:

> [W]e find that United Healthcare, as the fiduciary in bankruptcy
> proceedings, was operating not as a "business operating as a
> going concern," but rather as a business liquidating its affairs. On
> February 18, 1997, United Healthcare surrendered its certificates
> of need; on February 19, it filed a voluntary bankruptcy plan
> under which it would liquidate its assets and cease to exist; and,
> no later than February 21, United Healthcare had discharged or
> transferred all of its patients and was no longer admitting new
> patients. Significantly, after February 19, but in any event no
> later than February 21, its employees were no longer engaged in
> their regular duties but instead were performing tasks solely
> designed to prepare United Healthcare for liquidation.

> We recognize that United Healthcare filed for Chapter 11
> bankruptcy, ordinarily used to reorganize, rather than Chapter 7
> bankruptcy, generally used to liquidate. **But as discussed,
> United Healthcare's actions from the time it filed its Chapter
> 11 petition throughout the proceedings clearly demonstrate
> its intent to liquidate.** Simultaneously, United Healthcare filed
> for bankruptcy, agreed to sell its assets and goodwill to St.
> Barnabas, and surrendered its certificates of need.  Had United
> Healthcare's conduct and activities demonstrated a *bona fide*
> effort toward reorganization, the evidence may have shown that
> United Healthcare was an "employer" subject to the WARN Act.

> We believe this analysis is consistent with the legislative purpose
> behind WARN. . . .

AB_0001385

200 F.3d at 178 (emphasis in bold added).[38]  The *United Healthcare* court noted the indisputable point that the debtor in possession in that case (like the Debtors in the prior Chapter 11 Cases) was a fiduciary to the bankruptcy estate and its creditors generally, including in connection with the liquidation of the debtor's business and assets.  *Id.* at 177 n.9.

Importantly, the *United Healthcare* court underscored that the application of the liquidating fiduciary exception would <u>not</u> be black and white in many bankruptcy cases, and that the reviewing court's determination would be subject to a sliding scale:

> In light of the Department of Labor commentary to the regulations and the cases cited, we believe that whether a bankrupt entity is an "employer" under the WARN Act depends on the nature and extent of the entity's business and commercial activities while in bankruptcy, and not merely on whether the entity's employees continue to work "on a daily basis."  The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer" **the more closely the activities resemble those of a business winding**

---

[38] Other courts have similarly recognized the "liquidating fiduciary" principle.  *See, e.g., Thielmann v. MF Global Holdings Ltd. (In re MF Global Holdings Ltd.)*, 481 B.R. 268, 272 (Bankr. S.D. N.Y. 2012) ("The U.S. Department of Labor ('DOL') and federal courts addressing WARN Act claims have recognized a 'liquidating fiduciary' principle, excepting from the protection of the WARN Act employee layoffs by liquidating fiduciaries."); *Walsh v. Century City Doctors Hosp., LLC (In re Century City Doctors Hosp., LLC)*, 417 B.R. 801, 804-05 (Bankr. C.D. Cal. 2009), *aff'd* 2010 Bankr. LEXIS 5048 (B.A.P. 9th Cir. Oct. 29, 2010) (holding a chapter 7 trustee who operated a hospital for a few days post-petition (pursuant to an order authorizing him to do so) before terminating its employees was not an "employer" under the WARN Act based on *United Healthcare* where it was clear from the record that the "trustee's intentions have consistently been to close the hospital business at the earliest reasonable time and to liquidate its assets for the benefit of its creditors.  The trustee only operated [the debtor] for approximately a week from the date of filing, and the trustee's brief operation of [the debtor] was not for any commercial purpose."); *Bailey v. Jamesway*, 1997 Bankr. LEXIS 825, at *40 (Bankr. S.D.N.Y. 1997) ("liquidating fiduciaries need not provide notice to terminated employees under the WARN Act").

AB_0001386

> **up its affairs, the more likely it is the entity is not subject to the WARN Act**.

*Id.* at 178 (bold emphasis added). The Third Circuit expressly viewed the sale of the debtor's assets including the debtor's goodwill to an unrelated party named "St. Barnabas" (the "St. Barnabas Sale") early in the chapter 11 case as part and parcel of, and consistent with, the debtor's liquidation which was subject to the liquidating fiduciary exception:

> (i) "United Healthcare … filed an emergency application [to the bankruptcy court] for the sale of its goodwill to St. Barnabas" (*id.* at 173);
>
> (ii) "United Healthcare's actions from the time it filed its Chapter 11 petition throughout the proceedings clearly demonstrate its intent to liquidate. Simultaneously, United Healthcare filed for bankruptcy, agreed to sell its assets and goodwill to St. Barnabas …." (*id.* at 178); and
>
> (iii) "[Following the bankruptcy filing], [debtor] ceased operating its business as a going concern and was simply preparing itself for liquidation. The bankruptcy plan it filed simultaneously with its Chapter 11 petition confirms this assessment: United Healthcare planned to sell its goodwill to St. Barnabas and would itself cease to exist. Given these prospects and the absence of any evidence United Healthcare structured its bankruptcy petition and the furlough of its employees to avoid WARN Act liability, we hold United Healthcare was no longer subject to the WARN Act when it furloughed its employees" (*id.* at 179).

In short, the Third Circuit did <u>not</u> view a debtor's liquidation process in a chapter 11 case, <u>including</u> a postpetition sale of the debtor's goodwill (*i.e.*, a going concern sale),[39] as the conduct of business "in the normal commercial sense" that would

---

[39] St. Barnabas, as a result of and after the bankruptcy sale, intended to keep the debtor's children hospital open. *See In re United Healthcare Sys.*, 1997 U.S. Dist. LEXIS 5090, at *19 (D.N.J. March 26, 1997) (St.

AB_0001387

make the entity an employer for WARN purposes. *See id.* at 177 (quoting "normal commercial sense" language from 54 Fed. Reg. at 16045). Rather, it viewed the debtor as "simply preparing itself for liquidation." 200 F.3d at 179.

Notwithstanding the *United Healthcare* opinion's focus on the question of whether the debtor was conducting its business in the "normal commercial sense," in reaching its determination in this case, the Bankruptcy Court was primarily – and incorrectly – concerned with purportedly how "the Debtors' orderly wind-down process contemplated continued postpetition operations." Opinion, at 19. According to the Bankruptcy Court:

> The Debtors' GOB Sales are a perfect example of a hybrid of engaging in business (i.e., continuing operations with its employees for the retail sales of goods) while liquidating at the same time. Also, as the Plaintiffs point out, the Levin LOI called for the continued operation of approximately 44 retail store locations and two related distributed centers pending the proposed sale. In this case, the Debtors intended to continue their operations in the Chapter 11 bankruptcy case for the benefit of creditors and, based on these facts, the Court concludes that the Debtors were subject to an employer's WARN obligations. The "liquidating fiduciary" exception does not apply to this case.

*Id.* (footnotes omitted).

Yet, as discussed above, the *United Healthcare* court acknowledged there would be gradations on the liquidating fiduciary scale and that a debtor's actions in

---

Barnabas "was committed to keeping the Children's Hospital in one location and providing $5 million in future investments"). *See also Newark Morning Ledger Co. v. United States*, 734 F.Supp. 176, 182 (D.N.J. 1990), *rev'd on other grounds*, 945 F.2d 555 (3d Cir. 1991) ("Goodwill is acquired by the purchase of a going concern where the transfer enables the purchaser to step into the shoes of the seller.").

AB_0001388

connection with and/or in preparation of a goodwill / going concern sale (including limited postpetition business operations) can be consistent with and part of the liquidating fiduciary function and exception to WARN liability.[40]   In sum, the Bankruptcy Court's reading and application of all of the elements of *United Healthcare* was overly narrow and erroneous.

Here, as in *United Healthcare*, the Debtors' actions from the beginning of the Chapter 11 Cases (and before) evidence a clear, open, and public intent from the outset to liquidate the Debtors' stores and other assets, and <u>not</u> to operate their business "in the normal commercial sense."  *See* 54 Fed. Reg. 16042, 16045 (Thurs., April 20, 1989).  As discussed above, all of the Debtors' efforts at reorganizing as a going concern stopped even before the Petition Date, and in fact, all of the Debtors' efforts prepetition to reorganize were unsuccessful.  As a result of this failure, and before the Petition Date, the Debtors hired the Liquidator, gave the GOB Sale WARN Notice and commenced GOB Sales, and issued a public statement telling the world that they were liquidating their assets.  When the Debtors ultimately filed their Chapter 11 Cases on March 8, 2020, they intended to, and did, continue liquidating their assets through the GOB Sales and the Levin Sale.  As of the Petition

---

[40] The healthcare/hospital industry in which the debtor in *United Healthcare* was involved is certainly different from the retail furniture industry in which the Debtors were involved, with respect to what constitutes liquidating and wind-down activities and regulatory requirements and aspects related thereto. Thus, it is not surprising that some specific details of United Healthcare's liquidation are different from the Debtors' liquidation as occurred in the Debtors' Chapter 11 Cases, but nonetheless, both United Healthcare and Art Van intended to promptly liquidate their assets in their respective chapter 11 cases, thus falling within the liquidating fiduciary exception.

Date, and before the Layoff, the only business activities to be conducted by the Debtors were those necessary to continue liquidating their assets.

Under the clear facts in this case, there can be no reasonable dispute that the Debtors were at all relevant times – both pre-Petition Date and post-Petition Date – liquidating, as opposed to operating their business in the normal commercial sense, which they stopped doing before the Petition Date and certainly did not do in these Chapter 11 Cases. As described above, the Debtors intended to be and were acting as liquidating fiduciaries before the Petition Date and at the time of the March 20, 2020 Layoff. Therefore, as a matter of Third Circuit law, the Debtors were not "employers" under the WARN Act, and as such, summary judgment on the liquidating fiduciary defense should have been entered in favor of the Trustee.

## CONCLUSION

Cross-Appellant respectfully submits that the Opinion and the Order are predicated on a flawed reading of the *United Healthcare* case and application thereof to the instant case. As such, the portion of the Opinion and the Order that held that the "liquidating fiduciary" defense under the WARN Act was inapplicable here should be reversed.

Dated:  June 21, 2022

PACHULSKI STANG ZIEHL & JONES LLP

*/s/Bradford J. Sandler*
Bradford J. Sandler (Bar No. 4142)
Beth E. Levine (admitted *pro hac vice*)
Colin R. Robinson (Bar No. 5524)
Peter J. Keane (Bar No. 5503)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email:  bsandler@pszjlaw.com
            crobinson@pszjlaw.com
            pkeane@pszjlaw.com

*Counsel to Alfred T. Giuliano, Chapter 7
Trustee*

AB_0001391



# MEMORANDUM

**TO:**           Employees Affected By Closing of Art Van Furniture Stores located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321; and 1021 Butterfield Rd. Downers Grove, Ilinois, 60515.

**FROM:**    Cathrine Wenger, Senior Counsel

**SUBJECT:**  WARN Act Notice (revised)

**DATE:**     March 19, 2020

---

On March 5, 2020, Art Van Furniture, LLC (the "Company") informed employees that it had made the difficult decision to wind-down its operations, to include the closure of its retail facilities located at 6500 E 14 Mile Rd, Warren, MI, 48092; 27775 Novi Rd, Novi, MI, 48377; 4375 28th St SE, Grand Rapids, MI, 49321; 4095 E Court St, Burton, MI, 48509; 14055 Hall Rd, Shelby Township, MI, 48315; 8748 W Saginaw Hwy, Lansing, MI, 48917; and 4273 Alpine Ave Nw Ste B, Alpine, MI, 49321, which would in the permanent termination the employment of all employees at these locations.

Since initial notice, the Company has been impacted by the novel COVID-19 virus and the resulting, and sudden, negative economic impact. Due to these unforeseen events, the Company can no longer support the wind-down of its retail operations through the originally projected termination date. The Company, therefore, submits this revised notice to you to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "WARN Act").

All terminations of employment will be permanent and you will not have bumping rights for other positions (i.e., you will not have the right to displace employees with less seniority). The employment of Art Van's sales associates and other commissioned employees, visuals, housekeepers, drivers, helpers, and other hub warehouse staff, Selling Managers and Outlet Managers as well as any Sales or Store Manager who is not scheduled to perform services on March 21, 2020 or March 22, 2020, will be terminated on March 20, 2020. All CPU's and office staff, along with the Store Manager and/or Sales Manager scheduled to work on March 21, 2020 or March 22, 2020 will be terminated at the end of the business day on March 22, 2020. Nothing in this letter alters your at-will employment status with the Company. You will be required to work through your Termination Date, following which date you will not be required to report to work or provide any services to the Company.

I will be acting as the Company's representative with regard to these matters. Should you have any questions, please contact me for further information at Cathrine Wenger, Senior Counsel, cwenger@artvan.com, (586) 983-2000. My address is 6500 E 14 Mile Rd, Warren, MI 48092.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF | : | CHAPTER 7 |
| | : | |
| Art Van Furniture, LLC | : | Case No. 20-10553 (CSS) |
| | : | |
| Debtor. | : | |

NOTICE TO INTERIM TRUSTEE/ TRUSTEE OF SELECTION IN AN ASSET CASE

TO:    Alfred T. Giuliano

     You are hereby notified of your appointment in an asset case as Interim Trustee/Trustee of the estate of the above named debtor. The amount of your bond has been fixed by the United States Trustee.  You are required to notify **T. PATRICK TINKER, ASSISTANT UNITED STATES TRUSTEE,** at J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE. 19801 in writing within (5) days after receipt of this notice only if you reject this case.

                              ANDREW R. VARA
                              UNITED STATES TRUSTEE, REGIONS 3 & 9
                              T. PATRICK TINKER
                              ASSISTANT UNITED STATES TRUSTEE

DATED:    April 7, 2020

A000334